# EXHIBIT B

## Part 5 of 8



# FORM 10-K

## SERVICE CORPORATION INTERNATIONAL - sci

**Filed: March 02, 2009 (period: December 31, 2008)**

Annual report which provides a comprehensive overview of the company for the past year



EXHIBIT

28

Ryan

4-22-09

# Table of Contents

10-K - FORM 10-K

## PART I

| | |
|---|---|
| Item 1. | Business. |
| Item 1A. | Risk Factors. |
| Item 1B. | Unresolved Staff Comments. |
| Item 2. | Properties. |
| Item 3. | Legal Proceedings. |
| Item 4. | Submission of Matters to a Vote of Security Holders. |

## PART II

| | |
|---|---|
| Item 5. | Market for Registrant s Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities. |
| Item 6. | Selected Financial Data. |
| Item 7. | Management s Discussion and Analysis of Financial Condition and Results of Operations. |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk. |
| Item 8. | Financial Statements and Supplementary Data. |
| Item 9. | Changes In and Disagreements with Accountants on Accounting and Financial Disclosure |
| Item 9A. | Controls and Procedures |
| Item 9B. | Other Information |

## PART III

| | |
|---|---|
| Item 10. | Directors, Executive Officers and Corporate Governance |
| Item 11. | Executive Compensation |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence |
| Item 14. | Principal Accountant Fees and Services |

## PART IV

| | |
|---|---|
| Item 15. | Exhibits and Financial Statement Schedule |
| SIGNATURES | |
| EXHIBIT INDEX | |
| EX-10.14 (EX-10.14) | |
| EX-10.30 (EX-10.30) | |

EX-10.43 (EX-10.43)

EX-12.1 (EX-12.1)

EX-21.1 (EX-21.1)

EX-23.1 (EX-23.1)

EX-24.1 (EX-24.1)

EX-31.1 (EX-31.1)

EX-31.2 (EX-31.2)

EX-32.1 (EX-32.1)

EX-32.2 (EX-32.2)

Table of Contents

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549
# Form 10-K

☑     **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)**
**OF THE SECURITIES EXCHANGE ACT OF 1934**
For the fiscal year ended December 31, 2008
OR

☐     **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d)**
**OF THE SECURITIES EXCHANGE ACT OF 1934**
For the transition period from    to
Commission file number 1-6402-1

# Service Corporation International
*(Exact name of registrant as specified in its charter)*

| | |
|---|---|
| **Texas** | **74-1488375** |
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. employer identification no.)* |
| **1929 Allen Parkway** | **77019** |
| **Houston, Texas** | *(Zip code)* |
| *(Address of principal executive offices)* | |

**Registrant's telephone number, including area code:**
**713/522-5141**
**Securities registered pursuant to Section 12(b) of the Act:**

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| Common Stock ($1 par value) | New York Stock Exchange |

**Securities registered pursuant to Section 12(g) of the Act:**
**None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☑ No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☑ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☑

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☑        Accelerated filer ☐

Non-accelerated filer ☐ (Do not check if a smaller reporting company)      Smaller Reporting company ☐

Indicate by check mark whether the registrant is a shell company (as defined in the Securities Exchange Act of 1934 Rule 12b-2). Yes ☐ No ☑

The aggregate market value of the common stock held by non-affiliates of the registrant (assuming that the registrant's only affiliates are its officers and directors) was $2,409,933,852 based upon a closing market price of $9.86 on June 30, 2008 of a share of common stock as reported on the New York Stock Exchange — Composite Transactions Tape.

The number of shares outstanding of the registrant's common stock as of February 20, 2009 was 250,932,474 (net of treasury shares)

## DOCUMENTS INCORPORATED BY REFERENCE

Portions of the registrant's Proxy Statement in connection with its 2009 Annual Meeting of Shareholders (Part III)

# SERVICE CORPORATION INTERNATIONAL

## INDEX

**Page**

### PART I

| | | |
|---|---|---|
| Item 1. | Business | 4 |
| Item 1A. | Risk Factors | 9 |
| Item 1B. | Unresolved Staff Comments | 14 |
| Item 2. | Properties | 14 |
| Item 3. | Legal Proceedings | 14 |
| Item 4. | Submission of Matters to a Vote of Security Holders | 14 |

### PART II

| | | |
|---|---|---|
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters, and Issuer Purchases of Equity Securities | 17 |
| Item 6. | Selected Financial Data | 20 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 21 |
| Item 7A. | Quantitative and Qualitative Disclosures about Market Risk | 44 |
| Item 8. | Financial Statements and Supplementary Data | 46 |
| Item 9. | Changes In and Disagreements with Accountants on Accounting and Financial Disclosure | 121 |
| Item 9A. | Controls and Procedures | 121 |
| Item 9B. | Other Information | 123 |

### PART III

| | | |
|---|---|---|
| Item 10. | Directors, Executive Officers, and Corporate Governance | 123 |
| Item 11. | Executive Compensation | 123 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 123 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 123 |
| Item 14. | Principal Accountant Fees and Services | 123 |

### PART IV

| | | |
|---|---|---|
| Item 15. | Exhibits and Financial Statement Schedule | 125 |
| Signatures | | 126 |
| Exhibit Index | | 128 |
| EX-10.14 | | |
| EX-10.30 | | |
| EX-10.43 | | |
| EX-12.1 | | |
| EX-21.1 | | |
| EX-23.1 | | |
| EX-24.1 | | |
| EX-31.1 | | |
| EX-31.2 | | |
| EX-32.1 | | |
| EX-32.2 | | |

2

Source: SERVICE CORPORATION , 10-K, March 02, 2009

Table of Contents

## GLOSSARY

The following terms are common to the deathcare industry, are used throughout this report, and have the following meanings:

<u>Atneed</u> — Funeral and cemetery arrangements initiated after a death has occurred.

<u>Burial Vaults</u> — A reinforced container intended to house and protect the casket before it is placed in the ground.

<u>Cremation</u> — The reduction of human remains to bone fragments by intense heat.

<u>General Agency (GA) Revenues</u> — Commissions we receive from third party life insurance companies for life insurance policies or annuities sold to preneed customers for the purpose of funding preneed funeral arrangements. The commission rate paid is determined based on the product type sold, the length of payment terms, and the age of the insured/annuitant.

<u>Interment</u> — The burial or final placement of human remains in the ground.

<u>Lawn Crypt</u> — An underground outer burial receptacle constructed of concrete and reinforced steel, which is usually pre-installed in predetermined designated areas.

<u>Marker</u> — A method of identifying a deceased person in a particular burial space, crypt, or niche. Permanent burial markers are usually made of bronze, granite, or stone.

<u>Maturity</u> — When the underlying contracted service is performed or merchandise is delivered, typically at death. This is the point at which preneed contracts are converted to atneed contracts (note — delivery can occur prior to death).

<u>Mausoleum</u> — An above ground structure that is designed to house caskets and cremation urns.

<u>Cemetery Perpetual Care or Endowment Care Fund</u> — A trust fund established for the purpose of maintaining cemetery grounds and property into perpetuity.

<u>Preneed</u> — Purchase of products and services prior to use.

<u>Preneed Backlog</u> — Future revenues from unfulfilled preneed funeral and cemetery contractual arrangements.

<u>Production</u> — Sales of preneed funeral and preneed or atneed cemetery contracts.

As used herein, "SCI", "Company", "we", "our", and "us" refer to Service Corporation International and companies owned directly or indirectly by Service Corporation International, unless the context requires otherwise.

3

Table of Contents

# PART I

**Item 1. *Business*.**

### General

Service Corporation International (SCI) is North America's leading provider of deathcare products and services, with a network of funeral homes and cemeteries unequalled in geographic scale and reach. At December 31, 2008, we operated 1,302 funeral service locations and 369 cemeteries (including 208 combination locations) in North America, which are geographically diversified across 43 states, eight Canadian provinces, the District of Columbia, and Puerto Rico. Our funeral segment also includes the operations of 12 funeral homes in Germany that we intend to exit when economic values and conditions are conducive to a sale. As part of our Alderwoods Group, Inc. (Alderwoods) acquisition in the fourth quarter of 2006, we acquired Mayflower National Life Insurance Company (Mayflower), an insurance business that we sold in July 2007. The operations of this business through the date of sale are presented as discontinued operations in our consolidated statement of operations.

### History

We were incorporated in Texas in July of 1962. Our original business plan was based on efficiencies of scale, specifically reducing overhead costs by sharing resources such as embalming, accounting, transportation, and personnel among funeral homes in a business "cluster." After proving the plan's effectiveness in Houston in the early 1960s, SCI set out to apply this operating strategy through the acquisition of death care businesses in other markets. It was the beginning of a three-decade period of expansion that would create a North American network of nearly 1,400 funeral homes and cemeteries by the end of 1992. Beginning in 1993, we expanded beyond North America, acquiring major death care companies in Australia, the United Kingdom, and France, plus smaller holdings in other European countries and South America. By the end of 1999, our global network numbered more than 4,500 funeral service locations, cemeteries, and crematories in 20 countries.

During the mid to late 1990s, acquisitions of deathcare facilities became extremely competitive, resulting in increased prices for acquisitions and substantially reduced returns on invested capital. In 1999, we significantly reduced our level of acquisition activity and over the next several years implemented various initiatives to pay down debt, increase cash flow, reduce overhead costs, and increase efficiency. We divested most of our international businesses and many North American funeral homes and cemeteries that were either underperforming or did not fit our long-term strategy. At the same time we began to capitalize on the strength of our network by introducing to North America the first transcontinental brand of death care services and products — Dignity Memorial® (See www.dignitymemorial.com)

In late 2006, having arrived at a position of significant financial strength and improved operating efficiency, we acquired our biggest competitor, Alderwoods. By combining the two leading companies in the deathcare industry, we are able to realize more than $90 million in annual pretax cost synergies, savings, and revenue enhancement opportunities.

### Funeral and Cemetery Operations

Worldwide, we have 1,314 funeral service locations and 369 cemeteries (including 208 combination locations) covering 43 states, eight Canadian provinces, the District of Columbia, Puerto Rico, and Germany. See Note 16 in Part II, Item 8. Financial Statements and Supplementary Data, for financial information about our business segments and geographic areas.

Our funeral service and cemetery operations consist of funeral service locations, cemeteries, funeral service/cemetery combination locations, crematoria, and related businesses. We provide all professional services relating to funerals and cremations, including the use of funeral facilities and motor vehicles and preparation and embalming services. Funeral related merchandise, including caskets, burial vaults, cremation receptacles, flowers, and other ancillary products and services, is sold at funeral service locations. Our cemeteries provide cemetery property interment rights, including mausoleum spaces, lots, and lawn crypts, and sell cemetery related merchandise and services, including stone and bronze memorials, burial vaults, casket and cremation memorialization products,

4

Table of Contents

merchandise installations, and burial openings and closings. We also sell preneed funeral and cemetery products and services whereby a customer contractually agrees to the terms of certain products and services to be delivered and performed in the future. As a result of these preneed sales, our backlog of unfulfilled contracts was $6.2 billion and $6.7 billion at December 31, 2008 and 2007, respectively.

Funeral service/cemetery combination locations are those businesses in which a funeral service location is physically located within or adjoining a cemetery that we own. Combination locations allow certain facility, personnel, and equipment costs to be shared between the funeral service location and cemetery. Such combination facilities typically can be cost competitive and have higher gross margins than if the funeral and cemetery operations were operated separately. Combination locations also create synergies between funeral and cemetery sales force personnel and give families added convenience to purchase both funeral and cemetery products and services at a single location. With the acquisition of Alderwoods, we acquired Rose Hills, which is the largest combination operation in the United States, performing over 5,000 funeral services and 8,500 interments per year.

Our operations in the United States and Canada are organized into 37 major markets and 45 middle markets (including eight Hispana markets). Each market is led by a market director with responsibility for funeral and/or cemetery operations and preneed sales. Within each market, the funeral homes and cemeteries share common resources such as personnel, preparation services, and vehicles. There are four market support centers in North America to assist market directors with financial, administrative, pricing, and human resource needs. These support centers are located in Houston, Miami, New York, and Los Angeles. The primary functions of the support centers are to help facilitate the execution of corporate strategies, coordinate communication between the field and corporate offices, and serve as liaisons for the implementation of policies and procedures.

The following table (which includes businesses held-for-sale at December 31, 2008) provides the number of our funeral homes and cemeteries by country, and by state, territory, or province:

| Country, State/Territory/Province | Number of Funeral Homes | Number of Cemeteries | Total |
|---|---|---|---|
| United States | | | |
| Alabama | 31 | 9 | 40 |
| Arizona | 30 | 11 | 41 |
| Arkansas | 10 | — | 10 |
| California | 118 | 32 | 150 |
| Colorado | 23 | 11 | 34 |
| Connecticut | 16 | — | 16 |
| District of Columbia | 1 | — | 1 |
| Florida | 113 | 52 | 165 |
| Georgia | 40 | 20 | 60 |
| Hawaii | 2 | 1 | 3 |
| Idaho | 2 | 1 | 3 |
| Illinois | 40 | 25 | 65 |
| Indiana | 27 | 8 | 35 |
| Iowa | 4 | 2 | 6 |
| Kansas | 8 | 2 | 10 |
| Kentucky | 12 | 3 | 15 |
| Louisiana | 27 | 5 | 32 |
| Maine | 10 | — | 10 |
| Maryland | 12 | 7 | 19 |
| Massachusetts | 28 | — | 28 |
| Michigan | 24 | — | 24 |
| Minnesota | 10 | 2 | 12 |

5

Source: SERVICE CORPORATION , 10-K, March 02, 2009

Table of Contents

| Country, State/Territory/Province | Number of Funeral Homes | Number of Cemeteries | Total |
|---|---|---|---|
| Mississippi | 24 | 2 | 26 |
| Missouri | 17 | 3 | 20 |
| Montana | 4 | — | 4 |
| Nebraska | 2 | — | 2 |
| Nevada | 3 | 1 | 4 |
| New Hampshire | 6 | — | 6 |
| New Jersey | 20 | — | 20 |
| New York | 73 | 1 | 74 |
| North Carolina | 43 | 11 | 54 |
| Ohio | 18 | 11 | 29 |
| Oklahoma | 15 | 7 | 22 |
| Oregon | 10 | 3 | 13 |
| Pennsylvania | 17 | 17 | 34 |
| Puerto Rico | 4 | 5 | 9 |
| Rhode Island | 4 | — | 4 |
| South Carolina | 3 | 5 | 8 |
| Tennessee | 33 | 14 | 47 |
| Texas | 146 | 55 | 201 |
| Utah | 3 | 3 | 6 |
| Virginia | 27 | 12 | 39 |
| Washington | 34 | 12 | 46 |
| West Virginia | 5 | 6 | 11 |
| Wisconsin | 8 | — | 8 |
| Canada | | | |
| Alberta | 15 | — | 15 |
| British Columbia | 34 | 7 | 41 |
| Manitoba | 4 | 3 | 7 |
| New Brunswick | 5 | — | 5 |
| Nova Scotia | 12 | — | 12 |
| Ontario | 46 | — | 46 |
| Quebec | 57 | — | 57 |
| Saskatchewan | 22 | — | 22 |
| Germany | 12 | — | 12 |
| Total | 1,314 | 369 | 1,683 |

We believe we have satisfactory title to the properties owned and used in our business, subject to various liens, encumbrances, and easements, which are incidental to ownership rights and uses and do not materially detract from the value of the property. We also lease a number of facilities that we use in our business under both capital and operating leases.

At December 31, 2008, we owned approximately 91% of the real estate and buildings used at our facilities, and the remainder of the facilities were leased. At December 31, 2008, our 369 cemeteries contained a total of approximately 26,007 acres, of which approximately 63% was developed.

6

Source: SERVICE CORPORATION , 10-K, March 02, 2009

Table of Contents

A map of our locations in North America is presented below:



○ Funeral Homes
□ Cemeteries

## Competition

Although there are several public companies that own funeral homes and cemeteries, the majority of deathcare businesses are locally-owned, independent operations. We estimate that our funeral and cemetery market share in North America is approximately 12% based on estimated total industry revenues. The position of a single funeral home or cemetery in any community is a function of the name, reputation, and location of that funeral home or cemetery, although competitive pricing, professional service and attention, and well-maintained locations are also important.

We believe we have an unparalleled network of funeral service locations and cemeteries that offer high quality products and services at prices that are competitive with local competing funeral homes, cemeteries, and retail locations. Within this network, the funeral service locations and cemeteries operate under various names as most operations were acquired as existing businesses. We have branded our funeral operations in North America under the name Dignity Memorial®. We believe our transcontinental branding strategy gives us a strategic advantage and identity in the industry. While this branding process is intended to emphasize our seamless national network of funeral service locations and cemeteries, the original names associated with acquired operations, and their inherent goodwill and heritage, generally remain the same. For example, Geo. H. Lewis & Sons Funeral Directors is now Geo. H. Lewis & Sons Funeral Directors, a Dignity Memorial® provider.

## Strategies for Growth

Currently, we are relying on our strong competitive position and financial strength to remain a solid leader in our industry, despite the depressed state of the overall economy. We remain optimistic that as economic conditions begin to improve, our principal growth strategies will allow us to resume profitable growth over the long-term. Our strategies are as follows:

### Target Our Customer

During 2008 we continued to build on the extensive consumer research we conducted to develop a cohesive marketing and sales program that targets profitable customer segments we believe are most receptive to planning.

7

Table of Contents

Coupled with very specialized training for our sales staff, the launch of our marketing/sales program during the second half of 2008 in select markets began to validate our research. The combination of targeted direct mail, select media advertising, and a revitalized team approach from our sales organization is generating quality leads that our sales team is able to close at a high rate. We expect to expand the program into other Dignity Memorial® markets throughout 2009.

As a component of this new marketing/sales approach, we are also working to strengthen our ties to the military community. Long a supporter of United States veterans through Community Outreach programs such as the Dignity Memorial Homeless Veterans Burial Program, we have now developed a planning guide for veterans that details their benefits available through the Veterans Administration, as well as special benefits and burial options available to them through Dignity Memorial® providers. Coupled with direct mail and advertising programs in select markets, we are seeing lead generation and sales success in this program as well. Our plan is to expand this program throughout 2009 in other markets.

During 2008 we launched Dignity Planning, an end-of-life planning tool available via the web, phones or in a paper version. This planning tool reaches customers we might not ordinarily contact, allowing families who are in the process of estate planning the opportunity to plan a funeral in which they detail the type of services and products they would like. The total cost is then used as a basis for the amount of insurance coverage they need. Although use of the Dignity Planning tool does not require that consumers designate a Dignity Memorial® provider, our preliminary results indicate that most consumers do choose a Dignity provider. We currently have agreements in place with several insurance companies and insurance marketing organizations to have their sales teams sell through Dignity Planning, and we plan to expand that network throughout 2009. Additionally, we have validated that consumers, via web search, will use Dignity Planning for their end-of-life plans. In 2009, we will continue to expand our online keyword search presence to make Dignity Planning a more prevalent and visible site for people wishing to create end-of-life plans.

### Drive Operating Discipline and Leverage Our Scale

We continue to improve our infrastructure through standardization of processes and the usage of key performance metrics for staffing and other operational and administrative activities. One area of focus in 2008 that continued from the previous year was an ongoing review of our location staffing levels to ensure that we are aligning our funeral, cemetery and central care resources appropriately with our volume of business. In 2009 we expect to expand these efficiency reviews and metrics to other areas of our business. Additionally, in 2008 we began to focus on gaining better companywide leverage of our purchasing spend to reduce the total cost of materials, goods and services. This involved identifying opportunities to consolidate our supplier base, modifying processes and policies for more efficient purchasing and employing metrics to manage and improve supplier performance. We expect this discipline around our supply chain activities to mature in the coming year.

### Manage and Grow the Footprint

We are managing our network of business locations by positioning each business location to support the preferences of its local customer base while monitoring each market for changing demographics and competitive dynamics. We are also looking to optimize our portfolio through strategic market reviews. We expect to pursue selective business expansion through construction or targeted acquisitions of cemeteries and funeral homes with a focus on the highest return customer categories. Over the long term, our size and scale also allow us the opportunity to pursue a franchise business model, which could drive incremental revenue at very little cost.

### Employees

At December 31, 2008, we employed 13,581 (13,550 in North America) individuals on a full-time basis and 7,190 (7,180 in North America) individuals on a part-time basis. Of the full-time employees, 12,820 were employed in the funeral and cemetery operations and 761 were employed in corporate or other overhead activities and services. All eligible employees in the United States who so elect are covered by our group health and life insurance plans. Eligible employees in the United States are participants in retirement plans of SCI or various subsidiaries, while international employees are covered by other SCI (or SCI subsidiary) defined or government mandated

8

Table of Contents

benefit plans. Approximately 3.6% of our employees in North America are represented by unions. Although labor disputes occur from time to time, relations with employees are generally considered favorable.

## Regulation

Our operations are subject to regulations, supervision, and licensing under numerous foreign, federal, state, and local laws, ordinances, and regulations, including extensive regulations concerning trust funds, preneed sales of funeral and cemetery products and services, and various other aspects of our business. We strive to comply in all material respects with the provisions of these laws, ordinances, and regulations. Since 1984, we have operated in the United States under the Federal Trade Commission (FTC) comprehensive trade regulation rule for the funeral industry. The rule contains requirements for funeral industry practices, including extensive price and other affirmative disclosures and imposes mandatory itemization of funeral goods and services.

## Other

Our corporate headquarters are located at 1929 Allen Parkway, Houston, Texas 77019. The property consists of approximately 120,000 square feet of office space and 185,000 square feet of parking space. We own and utilize an additional building located in Houston, Texas for corporate activities containing a total of approximately 38,000 square feet of office space. We also lease approximately 29,000 square feet of office space in Houston, Texas, which we utilize for corporate activities.

We make available free of charge, on or through our website, our annual, quarterly, and current reports and any amendments to those reports, as soon as reasonably practicable after electronically filing such reports with the Securities and Exchange Commission (SEC). Our website is http://www.sci-corp.com and our telephone number is (713) 522-5141. The SEC also maintains an internet site at http://www.sec.gov that contains reports, proxy and information statements, and other information regarding issuers that file electronically. The public may read and copy any materials we file with the SEC at the SEC's Public Reference Room at 100 F Street, N.E., Washington, DC 20549. Information on the operation of the Public Reference Room may be obtained by calling the SEC at 1-800-SEC-0330.

Each of our Board of Directors' standing committee charters, our Corporate Governance Guidelines, our Code of Ethics for Board Members, and our Code of Conduct for Officers and Employees are available, free of charge, through our website or, upon request, in print. We will post on our internet website all waivers to or amendments of our Code of Conduct for Officers and Employees, which are required to be disclosed by applicable law and rules of the New York Stock Exchange listing standards. Information contained on our website is not part of this report.

## Item 1A. *Risk Factors.*

### Cautionary Statement on Forward-Looking Statements

The statements in this Form 10-K that are not historical facts are forward-looking statements made in reliance on the safe harbor protections provided under the Private Securities Litigation Reform Act of 1995. These statements may be accompanied by words such as "believe", "estimate", "project", "expect", "anticipate", or "predict" that convey the uncertainty of future events or outcomes. These statements are based on assumptions that we believe are reasonable; however, many important factors could cause our actual consolidated results in the future to differ materially from the forward-looking statements made herein and in any other documents or oral presentations made by, or on behalf of, the Company. These factors are discussed below. We assume no obligation to publicly update or revise any forward-looking statements made herein or any other forward-looking statements made by the Company, whether as a result of new information, future events, or otherwise.

*Our affiliated funeral and cemetery trust funds own investments in equity securities, fixed income securities, and mutual funds, which are affected by market conditions that are beyond our control.*

Our affiliated funeral and cemetery trust funds own investments in equity securities, fixed income securities and mutual funds. Our earnings and losses and gains on these investments are affected by market conditions that are

9

Source: SERVICE CORPORATION , 10-K, March 02, 2009

Table of Contents

beyond our control. In 2008, the value of our trust funds was significantly and adversely impacted by market volatility, particularly in the fourth quarter of 2008.

The following table summarizes our investment losses and returns (realized and unrealized), excluding fees, on our trust funds for the fourth quarter of 2008 and the last three years ended December 31.

|  | Q4 2008 | 2008 | 2007 | 2006 |
|---|---|---|---|---|
| Preneed funeral trust funds | (13.2)% | (23.5)% | 9.9% | 8.8% |
| Cemetery merchandise and service trust funds | (15.7)% | (26.9)% | 9.8% | 8.4% |
| Perpetual care trust funds | (8.0)% | (15.4)% | 3.2% | 10.8% |

Generally, earnings or gains and losses on our trust investments are recognized, and we withdraw cash, when the underlying service is performed, merchandise is delivered, or upon contract cancellation; however, our cemetery perpetual care trusts recognize earnings, and in certain states, capital gains and losses, and we withdraw cash, when we incur qualifying cemetery maintenance costs. Therefore, unless market conditions improve and the value of our trust investments recover, our results of operations and cash flows will be negatively impacted in 2009 and perhaps in future years as we recognize over time the unrealized losses in our trusts.

If our trust funds experience additional significant investment losses in 2009 or subsequent years, there could be insufficient funds in the trusts to cover the costs of delivering services and merchandise or maintaining cemeteries in the future. We would have to cover any such shortfall with cash flows from operations, which could have a material adverse effect on our financial condition, results of operations, or cash flows. For more information related to our trust investments, see Notes 4, 5, and 6 in Part II, Item 8. Financial Statements and Supplementary Data.

If the fair market value of these trusts, plus any other amount due to us upon delivery of the associated contracts, were to decline below the estimated costs to deliver the underlying products and services, we would record a charge to earnings to record a liability for the expected losses on the delivery of the associated contracts. As of December 31, 2008, no such charge was required. For additional information, see Critical Accounting Policies in Part II, Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations.

*We may be required to replenish our affiliated funeral and cemetery trust funds in order to meet minimal funding requirements, which would have a negative affect on our earnings and cash flow.*

In certain states and provinces, we have withdrawn allowable distributable earnings including unrealized gains prior to the maturity or cancellation of the related contract. Additionally, some states have laws that either require replenishment of investment losses under certain circumstances or impose various restrictions on withdrawals of future earnings when trust fund values have dropped below certain prescribed amounts. In the event of market declines, we may be required to deposit portions or all of these amounts into the respective trusts in some future period. As of December 31, 2008, we had unrealized losses of $19.8 million in the various trusts in these states. See Off-Balance Sheet Arrangements, Contractual Obligations, and Commercial and Contingent Commitments in Part II, Item 7.

*Our ability to execute our strategic plan depends on many factors, some of which are beyond our control.*

Our strategic plan is focused on cost management and the continued implementation of key revenue initiatives. Many of the factors necessary for the execution of our strategic plan, such as the number of deaths and general economic conditions, are beyond our control. Changes in operating conditions, such as supply disruptions and labor disputes, could negatively impact our operations. Our inability to achieve the levels of cost savings, productivity improvements, or earnings growth anticipated by management could affect our financial performance. Our inability to complete acquisitions, divestitures, or strategic alliances as planned or to realize expected synergies and strategic benefits could impact our financial performance. We cannot give assurance that we will be able to execute any or all of our strategic plan. Failure to execute any or all of our strategic plan could have a material adverse effect on our financial condition, results of operations, or cash flows.

10

Source: SERVICE CORPORATION , 10-K, March 02, 2009

Table of Contents

*Our credit agreements and debt securities contain covenants that may prevent us from engaging in certain transactions.*

Our credit agreements and debt securities contain, among other things, various affirmative and negative covenants that may prevent us from engaging in certain transactions that might otherwise be considered beneficial to us. These covenants limit, among other things, our and our subsidiaries' ability to:

- Incur additional secured indebtedness (including guarantee obligations);

- Create liens on assets;

- Engage in certain transactions with affiliates;

- Enter into sale-leaseback transactions;

- Engage in mergers, liquidations, and dissolutions;

- Sell assets;

- Enter into leases;

- Pay dividends, distributions, and other payments in respect of our capital stock;

- Purchase our capital stock in the open market;

- Make investments, loans, or advances;

- Repay subordinated indebtedness or amend the agreements relating thereto;

- Change our fiscal year;

- Create restrictions on our ability to receive distributions from subsidiaries; and

- Change our lines of business.

Our bank credit facility requires us to maintain certain leverage and interest coverage ratios. These covenants and coverage ratios may require us to take actions to reduce our indebtedness or act in a manner contrary to our strategic plan and business objectives. In addition, events beyond our control, including changes in general economic and business conditions, may affect our ability to satisfy these covenants. A breach of any of these covenants could result in a default under our indebtedness. If an event of default under our bank credit facility occurs, the lenders could elect to declare all amounts outstanding thereunder, together with accrued interest, immediately due and payable. Any such declaration would also result in an event of default under our Senior Indenture governing our various senior notes. For additional information, see Liquidity and Capital Resources in Part II, Item 7. Management's Discussion and Analysis of Financial Condition and Result of Operations and Note 10 in Part II, Item 8. Financial Statements and Supplementary Data.

*If we lost the ability to use surety bonding to support our preneed funeral and preneed cemetery activities, we may be required to make material cash payments to fund certain trust funds.*

We have entered into arrangements with certain surety companies whereby such companies agree to issue surety bonds on our behalf as financial assurance or as required by existing state and local regulations. The surety bonds are used for various business purposes; however, the majority of the surety bonds issued and outstanding have been issued to support our preneed funeral and cemetery activities. In the event all of the surety companies cancelled or did not renew our surety bonds, which generally have twelve-month renewal periods, we would be required to either obtain replacement coverage or fund approximately $232.8 million into state-mandated trust accounts as of December 31, 2008.

*The funeral home and cemetery industry continues to be increasingly competitive.*

In North America, the funeral home and cemetery industry is characterized by a large number of locally-owned, independent operations. To compete successfully, our funeral service locations and cemeteries must maintain good reputations and high professional standards, as well as offer attractive products and services at

11

Source: SERVICE CORPORATION , 10-K, March 02, 2009

Table of Contents

competitive prices. In addition, we must market the Company in such a manner as to distinguish us from our competitors. We have historically experienced price competition from independent funeral home and cemetery operators, monument dealers, casket retailers, low-cost funeral providers, and other non-traditional providers of services and merchandise. If we are unable to successfully compete, our financial condition, results of operations, and cash flows could be materially adversely affected.

### *A weakening economy could decrease preneed sales as well as decrease amounts atneed customers are willing to pay.*

A weakening economy that causes customers to reduce discretionary spending could cause, and we believe has caused in the recent past, a decline in preneed sales, and could also decrease the amounts atneed customers are willing to pay. Declines in preneed cemetery property sales and average revenue per atneed event would reduce current revenue. Declines in preneed funeral and cemetery service and merchandise sales would reduce our backlog and could reduce our future revenues and market share. A weakening economy could also impact our customers' ability to pay, causing increased delinquencies, increased bad debt, and decreased finance charge revenue, which would reduce future earnings and cash flow.

### *Increasing death benefits related to preneed funeral contracts funded through life insurance or annuity contracts may not cover future increases in the cost of providing a price-guaranteed funeral service.*

We sell price-guaranteed preneed funeral contracts through various programs providing for future funeral services at prices prevailing when the agreements are signed. For preneed funeral contracts funded through life insurance or annuity contracts, we receive in cash a general agency commission that typically averages approximately 16% of the total sale from the third party insurance company. Additionally, there is an increasing death benefit associated with the contract of approximately 1% per year to be received in cash at the time the funeral is performed. There is no guarantee that the increasing death benefit will cover future increases in the cost of providing a price-guaranteed funeral service, and any such excess cost could materially adversely affect our future cash flows, revenues, and operating margins.

### *The financial condition of third-party insurance companies that fund our preneed funeral contracts may impact our future revenues.*

Where permitted, customers may arrange their preneed funeral contract by purchasing a life insurance or annuity policy from third-party insurance companies. The customer/policy holder assigns the policy benefits to our funeral home to pay for the preneed funeral contract at the time of need. If the financial condition of the third-party insurance companies were to deteriorate materially because of market conditions or otherwise, there could be an adverse effect on our ability to collect all or part of the proceeds of the life insurance policy, including the annual increase in the death benefit, when we fulfill the preneed contract at the time of need. Failure to collect such proceeds could have a material adverse effect on our financial condition, results of operations, or cash flows.

### *Unfavorable results of litigation could have a material adverse impact on our financial statements.*

As discussed in Note 12 of Part II, Item 8. Financial Statements and Supplementary Data, we are subject to a variety of claims and lawsuits in the ordinary course of our business. Adverse outcomes in some or all of the pending cases may result in significant monetary damages or injunctive relief against us. Management currently believes that resolving all of these matters, individually or in the aggregate, will not have a material adverse impact on our financial position, cash flows, or results of operations; however, litigation and other claims are subject to inherent uncertainties and management's view of these matters may change in the future. There exists the possibility of a material adverse impact on our financial position, cash flows, and results of operations for the period in which the effect of an unfavorable final outcome becomes probable and reasonably estimable.

### *If the number of deaths in our markets declines, our cash flows and revenues may decrease.*

If the number of deaths declines, the number of funeral services and interments performed by us could decrease and our financial condition, results of operations, and cash flows could be materially adversely affected.

Source: SERVICE CORPORATION , 10-K, March 02, 2009

Table of Contents

*The continuing upward trend in the number of cremations performed in North America could result in lower revenue and gross profit.*

There is a continuing upward trend in the number of cremations performed in North America as an alternative to traditional funeral service dispositions. We have seen a recent stabilization in the trend for our businesses as our strategic pricing initiative and discounting policies have resulted in a decline in highly-discounted, low-service cremation customers. In our operations in North America during 2008, 41.9% of the comparable funeral services we performed were cremation cases compared to 41.4% and 40.3% performed in 2007 and 2006, respectively. We continue to expand our cremation memorialization products and services, which have resulted in higher average sales for cremation services. If we are unable to successfully expand our cremation memorialization products and services, and cremations continue to be a significant percentage of our funeral services, our financial condition, results of operations, and cash flows could be materially adversely affected.

*The funeral home and cemetery businesses are high fixed-cost businesses.*

The majority of our operations are managed in groups called "markets". Markets are geographical groups of funeral service locations and cemeteries that share common resources such as operating personnel, preparation services, clerical staff, motor vehicles, and preneed sales personnel. Personnel costs, the largest component of our operating expenses, are the cost components most beneficially affected by this grouping. We must incur many of these costs regardless of the number of funeral services or interments performed. Because we cannot necessarily decrease these costs when we experience lower sales volumes, a sales decline may cause our margin percentages to decline at a greater rate than the decline in revenues.

*Regulation and compliance could have a material adverse impact on our financial results.*

Our operations are subject to regulation, supervision, and licensing under numerous foreign, federal, state, and local laws, ordinances, and regulations, including extensive regulations concerning trust funds, preneed sales of funeral and cemetery products and services, and various other aspects of our business. The impact of such regulations varies depending on the location of our funeral and cemetery operations. Violations of applicable laws could result in fines or sanctions against us.

In addition, from time to time, governments and agencies propose to amend or add regulations, which would increase costs and decrease cash flows. For example, foreign, federal, state, local, and other regulatory agencies have considered and may enact additional legislation or regulations that could affect the deathcare industry. These include regulations that require more liberal refund and cancellation policies for preneed sales of products and services, limit or eliminate our ability to use surety bonding, increase trust requirements, require the deposit of funds or collateral to offset unrealized losses of trusts, and/or prohibit the common ownership of funeral homes and cemeteries in the same market. If adopted by the regulatory authorities of the jurisdictions in which we operate, these and other possible proposals could have a material adverse effect on our financial condition, results of operations, and cash flows.

Compliance with laws, regulations, industry standards, and customs concerning burial procedures and the handling and care of human remains is critical to the continued success of our business and any operations we may acquire. Litigation and regulatory proceedings regarding these issues could have a material adverse effect on our financial condition, results of operations, and cash flows. We are continually monitoring and reviewing our operations in an effort to insure that we are in compliance with these laws, regulations, and standards and, where appropriate, taking appropriate corrective action.

*A number of years may elapse before particular tax matters, for which we have established accruals, are audited and finally resolved.*

The number of tax years with open tax audits varies depending on the tax jurisdiction. In the United States, the Internal Revenue Service is currently examining our tax returns for 1999 through 2005 and various state jurisdictions are auditing years through 2006. While it is often difficult to predict the final outcome or the timing of resolution of any particular tax matter, we believe that our accruals reflect the probable outcome of known tax contingencies. Unfavorable settlement of any particular issue would reduce a deferred tax asset or require the use of

13

Table of Contents

cash. Favorable resolution could result in reduced income tax expense reported in the financial statements in the future.

*Continued economic crisis and financial and stock market declines could reduce future potential earnings and cash flows and could result in future goodwill impairments.*

In addition to an annual review, we assess the impairment of goodwill whenever events or changes in circumstances indicate that the carrying value may be greater than fair value. Factors that could trigger an interim impairment review include, but are not limited to, a significant decline in our stock price, significant underperformance relative to historical or projected future operating results, and significant negative industry or economic trends. If these factors occur, we may have a triggering event, which could result in an impairment to our goodwill. Based on the results of our annual goodwill impairment test and the interim goodwill impairment test we performed using December 31, 2008 fair value information, we concluded that there was no impairment of our goodwill. However, if current economic conditions worsen causing further deterioration in our operating revenues, operating margins and cash flows, we may have another triggering event that could result in an impairment of our goodwill. Our cemetery segment, which has a goodwill balance of $54.8 million as of December 31, 2008, is more sensitive to market conditions and goodwill impairments because it is more reliant on preneed sales, which are impacted by customer discretionary spending. For additional information, see Critical Accounting Policies in Part II, Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations.

*Failure to maintain effective internal control over financial reporting could adversely affect our financial results, our operations and our stock price, and cause investors to lose confidence in the reliability of our financial statements.*

Effective internal control over financial reporting is necessary for us to provide reliable financial reports. When we identify material weaknesses in our internal control over financial reporting, such as those disclosed in Part II, Item 9A. Controls and Procedures, we are unable to conclude that our internal control over financial reporting is effective. In such event, our financial results, operations and stock price could be adversely affected, and investors could lose confidence in the reliability of our financial statements.

**Item 1B.** *Unresolved Staff Comments.*

None.

**Item 2.** *Properties.*

Information regarding properties is set forth in Part I, Item 1. Business.

**Item 3.** *Legal Proceedings.*

Information regarding legal proceedings is set forth in Note 12 of Part II, Item 8. Financial Statements and Supplementary Data.

**Item 4.** *Submission of Matters to a Vote of Security Holders.*

None.

14

Table of Contents

## EXECUTIVE OFFICERS OF THE COMPANY

The following table sets forth as of February 27, 2009 the name and age of each executive officer of the Company, the office held, and the year first elected an officer.

| Officer Name | Age | Position | Year First Became Officer |
|---|---|---|---|
| R. L. Waltrip | 78 | Chairman of the Board | 1962 |
| Thomas L. Ryan | 43 | President and Chief Executive Officer | 1999 |
| Michael R. Webb | 50 | Executive Vice President and Chief Operating Officer | 1998 |
| J. Daniel Garrison | 57 | Senior Vice President Operations Support | 1998 |
| Philip C. Jacobs | 54 | Senior Vice President and Chief Marketing Officer | 2007 |
| Stephen M. Mack | 57 | Senior Vice President Middle Market Operations | 1998 |
| Gregory T. Sangalis | 53 | Senior Vice President General Counsel and Secretary | 2007 |
| Eric D. Tanzberger | 40 | Senior Vice President Chief Financial Officer and Treasurer | 2000 |
| Sumner J. Waring, III | 40 | Senior Vice President Major Market Operations | 2002 |
| Jeffrey I. Beason | 60 | Vice President Corporate Controller | 2006 |
| Joseph A. Hayes | 52 | Vice President Ethics and Business Conduct and Assistant General Counsel | 2007 |
| Jane D. Jones | 53 | Vice President Human Resources | 2005 |
| Albert R. Lohse | 48 | Vice President Litigation and Risk Management | 2004 |
| Elisabeth G. Nash | 47 | Vice President Process and Technology | 2004 |

Mr. Waltrip is the founder, Chairman of the Company, and a licensed funeral director. He grew up in his family's funeral business and assumed management of the firm in the 1950s after earning a Bachelor's degree in Business Administration from the University of Houston. He began buying additional funeral homes in the 1960s, achieving cost efficiencies by pooling their resources. At the end of 2008, the network he began had grown to include more than 1,600 funeral service locations and cemeteries. Mr. Waltrip took the Company public in 1969. He has provided leadership to the Company for over 41 years. In 2005, Mr. Waltrip resigned as Chief Executive Officer, but he continues to serve as Chairman of the Board.

Thomas L. Ryan joined the Company in June 1996 and served in a variety of financial management roles until November 2000, when he was asked to serve as Chief Executive Officer of European Operations based in Paris, France. In July 2002, Mr. Ryan returned to the United States where he was appointed President and Chief Operating Officer of SCI. Mr. Ryan was elected Chief Executive Officer of Service Corporation International in February 2005 and has served as President of SCI since July 2002. Before joining SCI, Mr. Ryan was a Certified Public Accountant with Coopers & Lybrand LLP for eight years. He holds a bachelor's degree in Business Administration from the University of Texas at Austin. Mr. Ryan serves on the Board of Directors of the American Diabetes Association. Mr. Ryan also serves on the Board of Trustees of the Texas Gulf Coast United Way, where he chaired the Young Leaders Campaign and served on the Finance and Audit Committee. Mr. Ryan is a member and Chapter Secretary of the Young Presidents Organization. Mr. Ryan also serves on the University of Texas McCombs Business School Advisory Council and on the JPMorgan Chase Houston Regional Advisory Board.

Mr. Webb joined the Company in 1991 when it acquired Arlington Corporation, a regional funeral and cemetery consolidator, where he was then Chief Financial Officer. Prior to joining Arlington Corporation, Mr. Webb held various executive financial and development roles at Days Inns of America and Telemundo Group, Inc. In 1993, Mr. Webb joined our corporate development group, which he later led on a global basis before accepting operational responsibility for our Australian and Hispanic businesses. Mr. Webb was promoted to Vice President International Corporate Development in February 1998 and was named Executive Vice President in July 2002. In February 2005, he was promoted to Chief Operating Officer. He is a graduate of the University of Georgia, where he earned a Bachelor of Business Administration degree.

15

Source: SERVICE CORPORATION , 10-K, March 02, 2009

Table of Contents

Mr. Garrison joined the Company in 1978 and worked in a series of management positions until he was promoted to President of the Southeastern Region in 1992. In 1998, Mr. Garrison was promoted to Vice President International Operations. In 2000, Mr. Garrison became Vice President North American Cemetery Operations and was promoted to Vice President Operations Services in August 2002. He assumed his current position as Senior Vice President Operations Support in February 2005. Mr. Garrison has a Bachelor of Science degree in Administrative Management from Clemson University.

Mr. Jacobs joined SCI in 2007 as Senior Vice President and Chief Marketing Officer. Prior to joining the Company, Mr. Jacobs was employed by CompUSA as Chief Marketing Officer. Prior to that he was employed by Publicis Worldwide as Chief Marketing Officer and prior to that held other management roles over the past 23 years at several of the nation's top advertising agencies, as well as client-side positions. Mr. Jacobs holds a Bachelor of Science degree from the University of Tennessee and a Masters degree from Vanderbilt University.

Mr. Mack joined the Company in 1973 as a resident director after graduating from Farmingdale State University of New York. He became Vice President of the Eastern Region in 1987 and in February 1998 Mr. Mack was appointed Vice President North American Funeral Operations. Mr. Mack was promoted to Senior Vice President Eastern Operations in August 2002 and assumed the office of Senior Vice President Middle Market Operations, his current position, in May 2004.

Mr. Sangalis joined the Company in 2007 as Senior Vice President General Counsel and Secretary. He previously served as Senior Vice President, Law and Administration for Team Inc., a leading provider of specialty industrial maintenance and construction services. Prior to that, Mr. Sangalis served as Managing Director and General Counsel of Main Street Equity Ventures II, a private equity investment firm, and as Senior Vice President General Counsel and Secretary for Waste Management, Inc., the leading provider of waste management services in North America. Mr. Sangalis holds a bachelor's degree in finance from Indiana University and an M.B.A. from the University of Minnesota. He earned his juris doctorate from the University of Minnesota Law School.

Mr. Tanzberger joined the Company in August 1996 as Manager of Budgets & Financial Analysis. He was promoted to Vice President Investor Relations and Assistant Corporate Controller in January 2000 and to Corporate Controller in August 2002. In 2006, Mr. Tanzberger was promoted to the position of Senior Vice President and Chief Financial Officer. In 2007, Mr. Tanzberger was appointed Treasurer. Prior to joining the Company, Mr. Tanzberger was Assistant Corporate Controller at Kirby Marine Transportation Corporation, an inland waterway barge and tanker company, from January through August 1996. Prior thereto, he was a Certified Public Accountant with Coopers & Lybrand L.L.P. for more than five years. Mr. Tanzberger is a graduate of the University of Notre Dame, where he earned a Bachelor of Business Administration degree.

Mr. Waring, a licensed funeral director, joined the Company as an Area Vice President in 1996 when we merged with his family's funeral business. Mr. Waring was appointed Regional President of the Northeast Region in 1999 and was promoted to Regional President of the Pacific Region in September 2001. Mr. Waring was promoted to Vice President Western Operations in August 2002 and assumed the office of Vice President Major Market Operations in November 2003. In February 2006, Mr. Waring was promoted to Senior Vice President Major Market Operations. In July 2008, Mr. Waring's responsibilities were expanded to include business development. Mr. Waring holds a Bachelor of Science degree in Business Administration from Stetson University, a degree in Mortuary Science from Mt. Ida College and a Masters of Business Administration degree from the University of Massachusetts Dartmouth.

Mr. Beason joined SCI in July 2006 as Vice President and Corporate Controller. Prior to joining SCI, he was an employee of El Paso Corporation, a natural gas transmission and production company. Mr. Beason joined El Paso in 1978 and held various accounting and reporting roles until 1993. From 1993 to 1996, he held the position of Sr. Vice President Administration of Mojave Pipeline Operating Company, a wholly owned subsidiary of El Paso Corporation. From 1996 to November 2005, Mr. Beason was Senior Vice President Controller and Chief Accounting Officer of El Paso Corporation. He is a Certified Public Accountant and holds a Bachelor of Business Administration in Accounting degree from Texas Tech University.

Mr. Hayes was appointed Vice President Ethics and Business Conduct and Assistant General Counsel in November 2007. Mr. Hayes joined the Company in 1991 as corporate counsel. He was named Managing Counsel in

16

Table of Contents

1996 and Assistant General Counsel in 2005. Prior to joining SCI, Mr. Hayes practiced law in Chicago and San Diego, specializing in securities, mergers and acquisitions, and commercial transactions. He received a bachelors degree in commerce from DePaul University and earned his juris doctorate from the University of California at Berkeley.

Mrs. Jones joined SCI in 2003 from Dynegy, Inc., where she served as Vice President of Total Rewards. She oversees human resources, training and education, and payroll and commission services — activities that assist approximately 20,000 employees in North America. Mrs. Jones was promoted to Vice President Human Resources in February 2005. She holds a Bachelor of Business Administration degree in Accounting with a minor in Finance from Southern Methodist University. She is a Certified Compensation Professional.

Mr. Lohse joined SCI in 2000 as Managing Director of Litigation and has since been involved in the resolution of major litigation issues for the Company. In 2004, Mr. Lohse was promoted to Vice President Corporate Governance. Before joining the Company, Mr. Lohse was Managing Partner at McDade, Fogler, Maines & Lohse where he conducted a general civil trial practice. Prior to that, he practiced tort and commercial litigation at Fulbright & Jaworski. Mr. Lohse received a Bachelor of Business Administration degree from the University of Texas and a juris doctorate from the University of Houston Law Center.

Ms. Nash joined SCI in 2002 as Managing Director of Strategic Planning and Process Improvement. Prior to joining SCI, Ms. Nash worked for the Pennzoil Corporation and held various senior management accounting and financial positions. In 2004, Ms. Nash was promoted to Vice President Continuous Process Improvement. Her primary responsibilities include improving operating systems, reducing overhead costs, and identifying and assisting in the implementation of initiatives to improve operating profit margins and cash flow. She is a graduate of Texas A&M University where she received a Bachelor of Business Administration degree in Accounting.

Each officer of the Company is elected by the Board of Directors and holds their office until a successor is elected and qualified or until earlier death, resignation, or removal in the manner prescribed in the Bylaws of the Company. Each officer of a subsidiary of the Company is elected by the subsidiary's board of directors and holds their office until a successor is elected and qualified or until earlier death, resignation, or removal in the manner prescribed in the Bylaws of the Subsidiary.

## PART II

**Item 5.** *Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities.*

Our common stock has been traded on the New York Stock Exchange since May 14, 1974. On December 31, 2008, there were 4,787 holders of record of our common stock. In calculating the number of shareholders, we consider clearing agencies and security position listings as one shareholder for each agency or listing. At December 31, 2008, we had 249,472,075 shares outstanding, net of 481,000 treasury shares.

During 2008, we paid cash dividends totaling $41.5 million and accrued $10.0 million for dividends paid on January 30, 2009. While we intend to pay regular quarterly cash dividends for the foreseeable future, all subsequent dividends are subject to final determination by our Board of Directors each quarter after its review of our financial performance.

The table below shows our quarterly high and low closing common stock prices for the two years ended December 31:

|                | 2008 | | 2007 | |
|----------------|------|------|------|------|
|                | High | Low | High | Low |
| First quarter  | $ 13.88 | $ 9.48 | $ 12.20 | $ 10.31 |
| Second quarter | $ 11.29 | $ 9.86 | $ 13.98 | $ 11.66 |
| Third quarter  | $ 10.50 | $ 8.14 | $ 12.90 | $ 11.04 |
| Fourth quarter | $ 8.26 | $ 4.31 | $ 14.47 | $ 12.83 |

17

Table of Contents

Options in our common stock are traded on the Philadelphia Stock Exchange. Our common stock is traded on the New York Stock Exchange under the symbol SCI.

*Stock Performance Graph.* This graph assumes the total return on $100 invested on December 31, 2003, in SCI Common Stock, the S&P 500 Index, and a peer group selected by the Company (the "Peer Group"). The Peer Group is comprised of Alderwoods Group, Inc., Carriage Services, Inc., Hillenbrand Inc., Matthews International Corp., Rock of Ages Corporation, and Stewart Enterprises, Inc. Hillenbrand Inc. is included in the Peer Group starting March 31, 2008 when it was spun off from Hillenbrand Industries, Inc. Prior to the spin-off, the Peer Group included Hillenbrand Industries, Inc. Alderwoods Group is included in the Peer Group until November 28, 2006, when it was acquired by SCI. Total return data assumes reinvestment of dividends.

## TOTAL SHAREHOLDER RETURNS

### INDEXED RETURNS
### Years Ending



For equity compensation plan information, see Part III to these consolidated financial statements.

On October 31, 2008, we issued 1,162 deferred common stock equivalents or units pursuant to provisions regarding the receipt of dividends under the Amended and Restated Director Fee Plan to four non-employee directors. These issuances were unregistered as they did not constitute a "sale" within the meaning of Section 2(3) of the Securities Act of 1933, as amended.

18

Source: SERVICE CORPORATION , 10-K, March 02, 2009

Table of Contents

Since 2004, we have repurchased a total of $1.0 billion of common stock at an average cost per share of $9.42. During the three months ended December 31, 2008, we repurchased 10,678,218 shares of our common stock at an aggregate cost of $62.7 million and an average cost per share of $5.87. In November 2008, our Board of Directors approved an increase in our share repurchase program authorizing the investment of up to an additional $120 million to repurchase our common stock. The remaining dollar value of shares to be purchased under the share repurchase program was $123.4 million at December 31, 2008. As discussed in Item 1A, our credit agreement and debt securities contain covenants that restrict our ability to repurchase our common stock. Pursuant to the program, we repurchased shares of our common stock during the fourth quarter of 2008 as set forth in the table below:

| Period | Total Number of Shares Purchased | Average Price Paid per Share | Total Number of Shares Purchased as Part of Publicly Announced Programs | Dollar Value of Shares That May Yet be Purchased Under the Program |
|---|---|---|---|---|
| October 1, 2008 — October 31, 2008 | 2,832,343 | $ 6.47 | 2,832,343 | $ 47,811,794 |
| November 1, 2008 — November 30, 2008 | 4,373,575 | $ 5.97 | 4,373,575 | $ 141,682,626 |
| December 1, 2008 — December 31, 2008 | 3,472,300 | $ 5.25 | 3,472,300 | $ 123,444,042 |
| | 10,678,218 | | 10,678,218 | |

Source: SERVICE CORPORATION , 10-K, March 02, 2009

Table of Contents

**Item 6.  *Selected Financial Data.***

The table below contains selected consolidated financial data as of and for the years ended December 31, 2004 through December 31, 2008. The statement of operations data includes reclassifications of certain items to conform to current period presentations with no impact on net income or financial position.

The data set forth below should be read in conjunction with our consolidated financial statements and accompanying notes to these consolidated financial statements. This historical information is not necessarily indicative of future results.

### Selected Consolidated Financial Information

| | Years Ended December 31, | | | | |
| | 2008 | 2007(5) | 2006 | 2005 | 2004 |
|---|---|---|---|---|---|
| | (Dollars in millions, except per share amounts) | | | | |
| **Selected Consolidated Statements of Operations Data:** | | | | | |
| Revenue | $ 2,155.6 | $ 2,285.3 | $ 1,752.9 | $ 1,717.0 | $ 1,832.0 |
| Income from continuing operations before cumulative effect of accounting changes | $   97.4 | $  243.3 | $   52.6 | $   55.1 | $  117.4 |
| (Loss) income from discontinued operations, net of tax(1) | $   (0.3) | $    4.4 | $    3.9 | $    4.5 | $   43.8 |
| Cumulative effect of accounting changes, net of tax(2)(3)(4) | — | — | — | $ (187.5) | $  (30.6) |
| Net income (loss) | $   97.1 | $  247.7 | $   56.5 | $ (127.9) | $  110.7 |
| Earnings (loss) per share: | | | | | |
| Income from continuing operations before cumulative effect of accounting changes | | | | | |
| Basic | $    .38 | $    .85 | $    .18 | $    .18 | $    .37 |
| Diluted | $    .37 | $    .83 | $    .18 | $    .18 | $    .36 |
| Net income (loss) | | | | | |
| Basic | $    .38 | $    .87 | $    .19 | $   (.42) | $    .35 |
| Diluted | $    .37 | $    .85 | $    .19 | $   (.42) | $    .34 |
| Cash dividends declared per share | $   0.16 | $   0.13 | $  0.105 | $   0.10 | $     — |
| **Selected Consolidated Balance Sheet Data (at December 31):** | | | | | |
| Total assets | $ 8,110.9 | $ 8,932.2 | $ 9,729.4 | $ 7,544.8 | $ 8,227.2 |
| Long-term debt (less current maturities), including capital leases | $ 1,821.4 | $ 1,820.1 | $ 1,912.7 | $ 1,186.5 | $ 1,200.4 |
| Stockholders' equity | $ 1,293.2 | $ 1,492.1 | $ 1,594.8 | $ 1,581.6 | $ 1,843.0 |
| **Selected Consolidated Statement of Cash Flows Data:** | | | | | |
| Net cash provided by operating activities | $  350.2 | $  356.2 | $  324.2 | $  312.9 | $   94.2 |

(1) Our operations in Singapore, which were sold in 2006, and our operations in Argentina, Uruguay, and Chile, which were sold in 2005, have been classified as discontinued operations for all periods presented. The operations of Mayflower, which were sold in 2007, have been classified as discontinued operations in 2007 and 2006 (since our acquisition of Alderwoods). For more information regarding discontinued operations, see Note 19 in Part II, Item 8. Financial Statements and Supplementary Data.

(2) In 2005, we changed our accounting to expense our direct selling costs related to preneed funeral and cemetery sales in the period in which they were incurred. In connection with this accounting change, we recorded a

20

Source: SERVICE CORPORATION , 10-K, March 02, 2009

Table of Contents

$187.5 million charge, net of tax, for the cumulative effect of this change in 2005 and our results for 2008, 2007, 2006, and 2005 reflect this change.

(3) On March 18, 2004, we implemented revised Financial Accounting Standards Board (FASB) Interpretation No. 46 (FIN 46R). Under the provisions of FIN 46R, we are required to consolidate our preneed funeral and cemetery merchandise and service trust assets, cemetery perpetual care trusts, and certain cemeteries. As a result of this accounting change, we recognized a cumulative effect charge of $14.0 million, net of tax, in 2004.

(4) Results for 2004 include a $36.6 million charge, net of tax, for the cumulative effect of our change in accounting for pension gains and losses.

(5) Results for 2007 include a $158.1 million pretax gain on redemption of securities related to our former equity investment in France.

## Item 7.  *Management's Discussion and Analysis of Financial Condition and Results of Operations.*

### The Company

We are North America's leading provider of deathcare products and services, with a network of funeral homes and cemeteries unequalled in geographic scale and reach. Our funeral service and cemetery operations consist of funeral service locations, cemeteries, funeral service/cemetery combination locations, crematoria, and related businesses. We sell cemetery property and funeral and cemetery products and services at the time of need and on a preneed basis.

We continue to focus on returning capital to our shareholders. Since 2004, we have invested $1 billion in cumulative stock repurchases and quarterly dividends. We currently have over $123.4 million authorized to repurchase our common stock. Our financial stability is further enhanced by our $6.2 billion backlog of future revenues at December 31, 2008, which is the result of preneed funeral and cemetery sales. We believe we have the financial strength and flexibility to reward shareholders through dividends while maintaining a prudent capital structure and pursuing new opportunities for profitable growth.

### Financial Condition, Liquidity and Capital Resources

#### *Recent Volatility in Financial Markets*

Our funeral, cemetery merchandise and service, and cemetery perpetual care trusts have been and continue to be impacted by adverse conditions in the U.S. and global financial markets. The fair market value of our trust investments declined sharply in 2008, particularly in the fourth quarter of 2008 when our trust funds experienced investment losses of 12.6%. In 2008, we realized aggregate net losses of $67.6 million in our preneed funeral and cemetery merchandise and service trusts. In addition, we realized aggregate net losses of $13.2 million in our cemetery perpetual care trusts.

As of December 31, 2008, we have net unrealized losses of $488.9 million in our preneed funeral and cemetery merchandise and service trusts, and net unrealized losses of $159.9 million in our cemetery perpetual care trusts, as discussed in Notes 4, 5, and 6 in Part II, Item 8, Financial Statements and Supplementary Data. At December 31, 2008, these net unrealized losses represented 24% of our original cost basis of $2.7 billion. As explained in "Critical Accounting Policies, Fair Value Measurements", changes in unrealized gains and/or losses related to these securities are reflected in *Other comprehensive income (loss)* and offset by the *Deferred preneed funeral and cemetery receipts held in trust* and *Care trusts' corpus interest* in those unrealized gains and/or losses. Therefore, the majority of these significant net unrealized losses are not reflected in our consolidated statement of operations for the year ended December 31, 2008. We do, however, rely on our trust investments to provide funding for the various contractual obligations that arise upon maturity of the underlying preneed contracts. Because of the long-term relationship between the establishment of trust investments and the required performance of the underlying contractual obligations, the impact of current market conditions that may exist at any given time is not necessarily indicative of our ability to generate profit on our future performance obligations.

This magnitude of the market decline in such a short time frame and the resulting net unrealized losses in our trust investments were not anticipated. Typically, net unrealized losses in our funeral and cemetery merchandise and services trusts have a minimal impact on our reported results of operations; however, in the fourth quarter of 2008,

21

Table of Contents

the net unrealized losses had a significant adverse impact on trust fund income associated with our preneed funeral and cemetery merchandise and service trusts.

We anticipate that the decline in the value of our trust investments will negatively impact our financial performance in the future. Until the market values of our trust investments increase significantly, we expect to report lower earnings from our trusts. In addition, we expect to report lower cash flow from operations due to a reduction in earnings and lower amounts of distributable investment earnings from certain trusts where we are allowed to withdraw funds prior to the delivery of merchandise and services. Generally these distributions are not allowed unless the market value exceeds the cost of our trust investments.

When we performed our evaluation of goodwill during the fourth quarter of 2008, the fair values of our reporting units exceeded their respective book values. However, if current economic conditions worsen causing further deterioration in our operating revenues, operating margins, and cash flows, we may have a triggering event that could result in an impairment to our goodwill in future periods. Our cemetery segment, which has a goodwill balance of $54.8 million as of December 31, 2008, is more sensitive to market conditions and goodwill impairments because it is more reliant on preneed sales, which are impacted by customer discretionary spending.

The weakened economy has also negatively impacted our cemetery property sales. In 2008, preneed and atneed cemetery property production, net of discounts, declined 5.4%, which significantly decreased our cemetery revenue and cash flow. In addition, our preneed cemetery service and merchandise production decreased 9.4% compared to 2007, which does not impact current revenue but reduces our preneed backlog and will reduce our future revenues. See Part I, Item 1A. Risk Factors for additional information.

*Capital Allocation Considerations*

We rely on cash flow from operations as a significant source of liquidity. Our cash flow from operating activities provided $350.2 million in 2008. Our current cash and cash equivalents balance is approximately $148 million as of February 25, 2009. In addition, we have approximately $247 million in excess borrowing capacity under our revolving credit facility, which matures in November 2011 (currently used to support $52.7 million of letters of credit). We have $28.7 million in 7.7% notes due in April 2009; however, we intend to refinance these notes on a long-term basis through the utilization of our revolving credit facility. Exclusive of the notes due April 2009 discussed above, we have no significant maturities of long-term debt until November 2011. We believe these sources of liquidity can be supplemented by our ability to access the capital markets for additional debt or equity securities. However, given the current environment, interest rates on borrowings are significantly higher than levels experienced in recent history.

We believe our cash on hand, future operating cash flows, and the available capacity under our credit facility described above will be adequate to meet our working capital needs and other financial obligations over the next twelve months.

Our bank credit facility requires us to maintain certain leverage and interest coverage ratios. As of December 31, 2008 we were in compliance with all of our debt covenants. Our financial covenant requirements and actual ratios as of December 31, 2008 are as follows:

|  | Per Credit Agreement | Actual |
|---|---|---|
| Leverage ratio | 4.75 (Max) | 3.53 |
| Interest coverage ratio | 2.50 (Min) | 3.79 |

Our financial covenant requirements per our agreement become more restrictive over time. The future leverage and interest coverage ratios are as follows:

|  | Leverage Ratio (Max) |
|---|---|
| 2009 | 4.25 |
| 2010 | 3.75 |
| Thereafter | 3.50 |

22

Source: SERVICE CORPORATION , 10-K, March 02, 2009

Table of Contents

|  | Interest Coverage Ratio (Min) |
| --- | --- |
| 2009 thru June 2010 | 2.75 |
| Thereafter | 3.00 |

We expect to continue to focus on funding growth initiatives that generate increased profitability, revenue, and cash flows. These capital investments include the construction of high-end cemetery property (such as private family estates) and the construction of funeral home facilities. We will also consider the acquisition of additional deathcare operations that fit our long-term customer-focused strategy, if the expected returns exceed our cost of capital. Our outlook for capital improvements at existing facilities and cemetery development expenditures in 2009 is $80 to $90 million.

We paid our shareholders cash dividends from 1974 to 1999. In early 2005, we resumed paying shareholders a quarterly cash dividend of $0.025 per common share. In November 2006, we increased our quarterly dividend to $0.03 per common share. In November 2007, we increased our quarterly dividend to $0.04 per common share. While we intend to pay regular quarterly cash dividends for the foreseeable future, all future dividends are subject to limitations in our debt covenants and final determination by our Board of Directors each quarter upon review of our financial performance.

We currently have approximately $123.4 million authorized under our share repurchase program. We intend to make purchases from time to time in the open market or through privately negotiated transactions, subject to market conditions, debt covenants, and normal trading restrictions. Our credit agreement and privately-placed debt securities contain covenants that limit our ability to repurchase our common stock. There can be no assurance that we will buy our common stock under our share repurchase program in the future.

### Cash Flow

We believe our ability to generate strong operating cash flow is one of our fundamental financial strengths and provides us with substantial flexibility in meeting operating and investing needs. Set forth below is a reconciliation of net cash provided by operating activities excluding special items to our reported net cash provided by operating activities prepared in accordance with GAAP. We believe this non-GAAP financial measure provides a consistent basis for comparison between periods and better reflects the performance of our core operations. We do not intend for this information to be considered in isolation or as a substitute for other measures of performance prepared in accordance with GAAP.

### Operating Activities

|  | 2008 | 2007 | 2006 |
| --- | --- | --- | --- |
|  | (In millions) | | |
| Net cash provided by operating activities, as reported | $ 350.2 | $ 356.2 | $ 324.2 |
| One-time Alderwoods transition and other costs | 3.3 | 38.6 | 3.2 |
| Premiums paid on early extinguishment of debt | — | 11.7 | 15.7 |
| Redemption of French securities | — | (17.0) | — |
| Net tax refund | (1.2) | — | — |
| Pension termination | 3.0 | 40.9 | — |
| Net cash provided by operating activities, excluding special items | $ 355.3 | $ 430.4 | $ 343.1 |

Net cash provided by operating activities, excluding special items, decreased approximately $75 million in 2008 compared to 2007. This decrease reflects the sale of Mayflower Insurance Co., which contributed $17.3 million of operating cash flows from discontinued operations in 2007 and $8.6 million in insurance proceeds related to Hurricane Katrina in 2007 that did not recur in 2008. The remaining decrease was driven by a decline in our operating income related to lower preneed cemetery sales and net investment losses on our trust assets. Also, during the fourth quarter of 2008 we began to see a slowdown in preneed cash receipts.

Net cash provided by operating activities, excluding special items, increased approximately $87 million in 2007 compared to 2006. This increase includes additional cash flow and synergies achieved related to the

23

Source: SERVICE CORPORATION , 10-K, March 02, 2009

Table of Contents

Alderwoods acquisition as well as $26.1 million in trust proceeds received from our reconciliation of the preneed funeral and cemetery backlogs of Alderwoods. These increases were partially offset by $42.4 million in additional interest payments resulting from increased borrowings to finance the Alderwoods acquisition and $29 million in additional cash tax payments.

We paid approximately $20.1 million in income taxes in 2008 compared to approximately $44.5 million paid in 2007, primarily as a result of lower taxable income in 2008 compared to 2007. We did not pay federal income taxes in 2008 because of net operating loss carryforwards. Our tax payment in 2007 increased $20.6 million from $15.6 million in 2006 primarily as a result of the additional taxable income generated from our Alderwoods operations acquired at the end of 2006.

*Investing Activities* — Investing activities used net cash of $151.3 million in 2008 compared to providing net cash flows of $378.1 million in 2007, primarily due to a $527.4 million decrease in proceeds generated from the divestiture of non-strategic assets. The 2007 net cash flows from investing activities of $378.1 million represents a $1.7 billion change from 2006 primarily due to $1.3 billion used in 2006 for acquisitions (primarily Alderwoods), offset by a $327.5 million increase in proceeds from divestitures in 2007 compared to 2006.

In 2007, we completed the sale of Mayflower National Life Insurance Company, Alderwoods' former insurance subsidiary, and we divested all of our properties required to be divested by the FTC as a result of the Alderwoods acquisition. We also received $4.7 million of proceeds held as an income tax receivable related to the 2005 sale of our operations in Chile, $1.9 million in cash proceeds related to the 2006 sale of our operations in Singapore, and $144.0 million related to the redemption of securities involving our former equity investment in France.

In 2006, we acquired Alderwoods for $1.2 billion, including refinancing of $357.7 million of Alderwoods debt. We also received $11.0 million of proceeds held as an income tax receivable related to the 2005 sale of our operations in Chile and $10.6 million in cash proceeds from the fourth quarter 2006 sale of our operations in Singapore.

*Financing Activities* — Cash flows from financing activities used $230.5 million in 2008 compared to using $607.5 million in 2007. This $377.0 million net decrease in financing cash outflows in 2008 compared to 2007 was driven by a $363.0 million decrease in share repurchases and a $472.5 million decrease in early extinguishments of debt, partially offset by $38.1 million lower proceeds from stock option exercises, an $81.9 million increase in scheduled debt payments and $310.4 million lower proceeds from the issuance of long-term debt. Cash flows from financing activities used $607.5 million in 2007 compared to generating $565.2 million in 2006. This $1.2 billion net change in financing cash flows in 2007 compared to 2006 was driven by lower proceeds from the issuance of long-term debt, higher share repurchases, and an increase in debt extinguishments.

Proceeds from long-term debt (net of debt issuance costs) were $82.1 million in 2008 due to a $54.3 million drawdown under our revolving credit facility and $27.8 million of mortgage and other debentures. Proceeds from long-term debt (net of debt issuance costs) were $392.6 million in 2007 due to the issuance of $200 million of senior unsecured 6.75% notes due 2015 and $200 million of senior unsecured 7.50% notes due 2027. Proceeds from long-term debt (net of debt issuance costs) were $825.3 million in 2006 due to the issuance of $250 million of senior unsecured 7.625% notes due 2018, $250 million of senior unsecured 7.375% notes due 2014, $200 million of private placement offerings, and a $150 million term loan.

Payments of debt in 2008 were $138.2 million due to the repayment of our revolving credit facility of $54.3 million, the repayment of $45.2 million of our 6.5% notes due March 2008, $12.8 million in other scheduled debt payments, and $25.9 million in payments on capital leases. Payments of debt in 2007 were $528.8 million due to early extinguishments of $472.5 million, the acceptance of the tender of $13.5 million of our 6.875% notes due October 2007, $3.7 million in scheduled debt payments, $27.1 million in payments on capital leases, and $12.0 million of other note payments. Payments of debt in 2006 were $228.9 million due to early extinguishments of $181.5 million, $26.1 million in scheduled debt payments, and $21.3 million in payments on capital leases.

We repurchased 17.7 million shares of common stock for $142.2 million in 2008, compared to 38.5 million shares for $505.1 million in 2007 and 3.4 million shares for $27.9 million in 2006.

24

Source: SERVICE CORPORATION , 10-K, March 02, 2009

Table of Contents

We paid cash dividends of $41.5 million in 2008, $34.6 million in 2007 and $29.4 million in 2006.

*Off-Balance Sheet Arrangements, Contractual Obligations, and Commercial and Contingent Commitments*

We have assumed various financial obligations and commitments in the ordinary course of conducting our business. We have contractual obligations requiring future cash payments under existing contractual arrangements, such as debt maturities, interest on long-term debt, operating lease agreements, and employment, consulting, and non-competition agreements. We also have commercial and contingent obligations that result in cash payments only if certain events occur requiring our performance pursuant to a funding commitment.

The following table details our known future cash payments (on an undiscounted basis) related to various contractual obligations as of December 31, 2008.

| Contractual Obligations | Payments Due by Period | | | | |
|---|---|---|---|---|---|
|  | 2009 | 2010-2011 | 2012-2013 | Thereafter | Total |
|  | (Dollars in millions) | | | | |
| Debt maturities(1)(2) | $ 27.1 | $ 237.8 | $ 102.1 | $ 1,481.5 | $ 1,848.5 |
| Interest obligation on long-term debt(3) | 121.1 | 241.7 | 221.8 | 464.4 | 1,049.0 |
| Operating lease agreements(4) | 9.3 | 13.5 | 10.9 | 49.2 | 82.9 |
| Employment, consulting, and non-competition agreements(5) | 5.6 | 5.6 | 2.6 | 2.6 | 16.4 |
| Total contractual obligations | $ 163.1 | $ 498.6 | $ 337.4 | $ 1,997.7 | $ 2,996.8 |

---

(1) Our outstanding indebtedness contains standard provisions, such as payment delinquency default clauses and change of control clauses. In addition, our bank credit agreement contains a maximum leverage ratio and a minimum interest coverage ratio. See "Capital Allocation Considerations" and Note 10 in Part II, Item 8. Financial Statements and Supplementary Data, for additional details related to our long-term debt.

(2) Included in 2010-2011 is $28.7 million of 7.7% notes due April 2009 which we intend to refinance on a long-term basis through the utilization of our revolving credit facility that matures in November 2011. See Note 10 in Part II, Item 8. Financial Statements and Supplementary Data, for additional information related to our revolving credit facility.

(3) Approximately 87% of our total debt is fixed rate debt for which the interest obligation was calculated at the stated rate. Future interest obligations on our floating rate debt are based on the current forward rate curve of the underlying index. See Note 10 in Part II, Item 8. Financial Statements and Supplementary Data, for additional information related to our future interest obligations.

(4) The majority of our lease arrangements contain options to (i) purchase the property at fair value on the exercise date, (ii) purchase the property for a value determined at the inception of the leases, or (iii) renew for the fair rental value at the end of the primary lease term. Our leases primarily relate to funeral service locations and cemetery operating and maintenance equipment. See Note 12 in Part II, Item 8. Financial Statements and Supplementary Data, for additional details related to our leases.

(5) We have entered into management employment, consulting, and non-competition agreements that contractually require us to make cash payments over the contractual period. The agreements have been primarily entered into with certain officers and employees and former owners of businesses acquired. Agreements with contractual periods less than one year are excluded. See Note 12 in Part II, Item 8. Financial Statements and Supplementary Data, for additional details related to these agreements.

25

Source: SERVICE CORPORATION , 10-K, March 02, 2009

Table of Contents

The following table details our known potential or possible future cash payments (on an undiscounted basis) related to various commercial and contingent obligations as of December 31, 2008.

| Commercial and Contingent Obligations | 2009 | Expiration by Period | | | Total |
| | | 2010-2011 | 2012-2013 | Thereafter | |
| | | (Dollars in millions) | | | |
|---|---|---|---|---|---|
| Surety obligations(1) | $ 232.8 | $ — | $ — | $ — | $ 232.8 |
| Long-term obligations related to uncertain tax positions(2) | 9.9 | 161.9 | 0.2 | 2.7 | 174.7 |
| Letters of credit(3) | 52.7 | — | — | — | 52.7 |
| Representations and warranties(4) | 5.1 | 26.8 | — | — | 31.9 |
| Total commercial and contingent obligations | $ 300.5 | $ 188.7 | $ 0.2 | $ 2.7 | $ 492.1 |

---

(1) Represents the aggregate funding obligation associated with our surety bond arrangements. See the section titled "Financial Assurances" following this table in this Form 10-K for more information related to our surety bonds.

(2) We adopted the provisions of FIN 48 on January 1, 2007. In accordance with the provisions of FIN 48, we have recorded a liability for unrecognized tax benefits and related interest and penalties of $174.7 million as of December 31, 2008. See Note 9 in Part II, Item 8. Financial Statements and Supplementary Data, for additional information related to our uncertain tax positions.

(3) We are occasionally required to post letters of credit, issued by a financial institution, to secure certain insurance programs or other obligations. Letters of credit generally authorize the financial institution to make a payment to the beneficiary upon the satisfaction of a certain event or the failure to satisfy an obligation. The letters of credit are generally posted for one-year terms and are usually automatically renewed upon maturity until such time as we have satisfied the commitment secured by the letter of credit. We are obligated to reimburse the issuer only if the beneficiary collects on the letter of credit. We believe it is unlikely we will be required to fund a claim under our outstanding letters of credit. As of December 31, 2008, the full amount of our letters of credit was supported by our revolving credit facility which expires in November 2011.

(4) In addition to the letters of credit described above, we currently have contingent obligations of $31.9 million related to our asset sales and joint venture transactions. We have agreed to guarantee certain representations and warranties associated with such disposition transactions with letters of credit or interest-bearing cash investments. We have interest-bearing cash investments of $23.2 million included in *Deferred charges and other assets* pledged as collateral for certain of these contingent obligations. During the year ended December 31, 2004, we recognized $35.8 million of contractual obligations related to representations and warranties associated with the disposition of our funeral operations in France. The remaining obligations of $20.8 million at December 31, 2008 are primarily related to certain foreign taxes and litigation matters. This amount is recorded in *Other liabilities* in our consolidated balance sheet. See Note 12 in Part II, Item 8. Financial Statements and Supplementary Data, for additional information related to this obligation.

Not included in the above table are potential funding obligations related to our funeral and cemetery merchandise and service trusts. In certain states and provinces, we have withdrawn allowable distributable earnings including unrealized gains prior to the maturity or cancellation of the related contract. Additionally, some states have laws that either require replenishment of investment losses under certain circumstances or impose various restrictions when trust fund values have dropped below certain prescribed amounts. In the event that our trust investments do not recover from recent market declines, we may be required to deposit portions or all of these amounts into the respective trusts in some future period. As of December 31, 2008, we had unrealized losses of $19.8 million in the various trusts in these states.

Source: SERVICE CORPORATION , 10-K, March 02, 2009

Table of Contents

*Financial Assurances*

In support of our operations, we have entered into arrangements with certain surety companies whereby such companies agree to issue surety bonds on our behalf as financial assurance and/or as required by existing state and local regulations. The surety bonds are used for various business purposes; however, the majority of the surety bonds issued and outstanding have been used to support our preneed funeral and cemetery sales activities. The obligations underlying these surety bonds are recorded on the consolidated balance sheet as *Deferred preneed funeral revenues* and *Deferred preneed cemetery revenues.* The breakdown of surety bonds between funeral and cemetery preneed arrangements, as well as surety bonds for other activities, is described below.

| | December 31, 2008 | December 31, 2007 |
|---|---|---|
| | (Dollars in millions) | |
| Preneed funeral | $ 130.6 | $ 134.9 |
| Preneed cemetery: | | |
| Merchandise and services | 132.4 | 148.0 |
| Pre-construction | 2.9 | 6.4 |
| Bonds supporting preneed funeral and cemetery obligations | 265.9 | 289.3 |
| Bonds supporting preneed business permits | 5.1 | 5.4 |
| Other bonds | 17.7 | 8.4 |
| Total surety bonds outstanding | $ 288.7 | $ 303.1 |

When selling preneed funeral and cemetery contracts, we may post surety bonds where allowed by state law. We post the surety bonds in lieu of trusting a certain amount of funds received from the customer. The $265.9 million in bonds supporting preneed funeral and cemetery obligations differs from the $232.8 potential funding obligation disclosed in our "Commercial and Contingent Obligations" table above because the amount of the bond posted is generally determined by the total amount of the preneed contract that would otherwise be required to be trusted, in accordance with applicable state law, at the time we enter into the contract. We would only be required to fund the trust for the portion of the preneed contract for which we have received payment from the customer, less any applicable retainage, in accordance with state law. For the years ended December 31, 2008, 2007, and 2006, we had $29.5 million, $38.4 million, and $50.9 million, respectively, of cash receipts attributable to bonded sales. These amounts do not consider reductions associated with taxes, obtaining costs, or other costs.

Surety bond premiums are paid annually and are automatically renewable until maturity of the underlying preneed contracts, unless we are given prior notice of cancellation. Except for cemetery pre-construction bonds (which are irrevocable), the surety companies generally have the right to cancel the surety bonds at any time with appropriate notice. In the event a surety company were to cancel the surety bond, we are required to obtain replacement surety assurance from another surety company or fund a trust for an amount generally less than the posted bond amount. Management does not expect that we will be required to fund material future amounts related to these surety bonds due to a lack of surety capacity or surety company non-performance.

*Preneed Funeral and Cemetery Activities and Backlog of Contracts*

In addition to selling our products and services to client families at the time of need, we sell price-guaranteed preneed funeral and cemetery contracts, which provide for future funeral or cemetery services and merchandise. Since preneed funeral and cemetery services or merchandise will not be provided until sometime in the future, most states and provinces require that all or a portion of the funds collected from customers on preneed funeral and cemetery contracts be paid into merchandise and service trusts until the merchandise is delivered or the service is performed. In certain situations, as described above, where permitted by state or provincial laws, we post a surety bond as financial assurance for a certain amount of the preneed funeral or cemetery contract in lieu of placing funds into trust accounts. Our backlog of funeral and cemetery contracts shown below represents the total amount of future revenues we have under contract at the end of 2008 and 2007.

27

Source: SERVICE CORPORATION , 10-K, March 02, 2009

Table of Contents

*Trust-Funded Preneed Funeral and Cemetery Contracts:*  The funds are deposited into trust and invested by independent trustees in accordance with state and provincial laws. We retain any funds above the amounts required to be deposited into trust accounts and use them for working capital purposes, generally to offset the selling and administrative costs of our preneed programs.

Investment earnings associated with the trust investments are expected to mitigate the inflationary costs of providing the preneed funeral and cemetery services and merchandise in the future for the prices that were guaranteed at the time of sale. Our preneed funeral and cemetery trust assets are consolidated and recorded in our consolidated balance sheet at fair market value. Investment earnings on trust assets are generally accumulated in the trust and distributed as the revenue associated with the preneed funeral or cemetery contract is recognized or cancelled by the customer. In certain states and provinces, the trusts are allowed to distribute a portion of the investment earnings to us prior to that date. See "Recent Volatility in Financial Markets" for more information.

If a preneed funeral or cemetery contract is cancelled prior to delivery, state or provincial law determines the amount of the refund owed to the customer, if any, including the amount of the attributed investment earnings. Upon cancellation, we receive the amount of principal deposited to trust and previously undistributed net investment earnings and, where required, issue a refund to the customer. We retain excess funds, if any, and recognize the attributed investment earnings (net of any investment earnings payable to the customer) as revenues in our consolidated statement of operations. In certain jurisdictions, we may be obligated to fund any shortfall if the amounts deposited by the customer exceed the funds in trust. Funds in trust assets exceeded customer deposits at December 31, 2008. See Off-Balance Sheet Arrangements, Contractual Obligations, and Commercial and Contingent Commitments for additional information about reasonably possible obligations from trust assets. Based on our historical experience, we have included a cancellation reserve for preneed funeral and cemetery contracts in our consolidated balance sheet of $137.8 million and $143.7 million as of December 31, 2008 and 2007, respectively.

The cash flow activity over the life of a trust-funded preneed funeral or cemetery contract from the date of sale to its recognition or cancellation is captured in the operating cash flow line items *(Increase) decrease in preneed receivables and trust investments, Increase (decrease) in deferred preneed revenue, Increase (decrease) in deferred preneed funeral and cemetery receipts held in trust* and *Net income (loss)* in our consolidated statement of cash flows. While the contract is outstanding, cash flow is provided by the amount retained from funds collected from the customer and any distributed investment earnings. At the time of death maturity, we receive the principal and undistributed investment earnings from the funeral trust and any remaining receivable due from the customer. At the time of delivery or storage of cemetery merchandise and service items for which we were required to deposit funds to trust, we receive the principal and undistributed investment earnings from the cemetery trust. There is generally no remaining receivable due from the customer, as our policy is to deliver preneed cemetery merchandise and service items only upon payment of the contract balance in full. This cash flow at the time of service, delivery, or storage is generally less than the associated revenue recognized, thus reducing cash flow from operating activities.

28

Table of Contents

The tables below detail our North America results of preneed funeral and cemetery production and maturities, excluding insurance contracts, for the years ended December 31, 2008 and 2007.

| | North America Years Ended December 31, | |
|---|---|---|
| | 2008 | 2007 |
| | (Dollars in millions) | |
| **Funeral:** | | |
| Preneed trust-funded (including bonded): | | |
| Sales production | $ 152.8 | $ 148.5 |
| Sales production (number of contracts) | 30,320 | 30,363 |
| Maturities | $ 196.1 | $ 210.1 |
| Maturities (number of contracts) | 45,392 | 46,998 |
| **Cemetery:** | | |
| Sales production: | | |
| Preneed | $ 358.9 | $ 399.3 |
| Atneed | 249.5 | 272.8 |
| Total sales production | $ 608.4 | $ 672.1 |
| Sales production deferred to backlog: | | |
| Preneed | $ 148.0 | $ 169.7 |
| Atneed | 190.1 | 204.7 |
| Total sales production deferred to backlog | $ 338.1 | $ 374.4 |
| Revenue recognized from backlog: | | |
| Preneed | $ 144.1 | $ 176.1 |
| Atneed | 196.7 | 203.4 |
| Total revenue recognized from backlog | $ 340.8 | $ 379.5 |

*Insurance-Funded Preneed Funeral Contracts:* Where permitted by state or provincial law, customers may arrange their preneed funeral contract by purchasing a life insurance or annuity policy from third-party insurance companies, for which we earn a commission as general sales agent for the insurance company. These general agency commissions (GA revenues) are based on a percentage per contract sold and are recognized as funeral revenues when the insurance purchase transaction between the customer and third-party insurance provider is completed. Direct selling costs incurred pursuant to the sale of insurance-funded preneed funeral contracts are expensed as incurred. The policy amount of the insurance contract between the customer and the third-party insurance company generally equals the amount of the preneed funeral contract. We do not reflect the unfulfilled insurance-funded preneed funeral contract amounts in our consolidated balance sheet. Approximately 66% of our North America preneed funeral production in 2008 relates to insurance-funded preneed funeral contracts.

The third-party insurance company collects funds related to the insurance contract directly from the customer. The life insurance contracts include a death benefit escalation provision, which is expected to offset the inflationary costs of providing the preneed funeral services and merchandise in the future at the prices that were guaranteed at the time of the preneed sale. The customer/policy holder assigns the policy benefits to our funeral home to pay for the preneed funeral contract at the time of need.

Additionally, we may receive cash overrides based on achieving certain dollar volume targets of life insurance policies sold as a result of marketing agreements entered into in connection with the sale of our insurance subsidiaries in 2000. Included in GA revenues for 2008 and 2007 were cash overrides in the amount of $8.5 million and $7.2 million, respectively.

29

Source: SERVICE CORPORATION , 10-K, March 02, 2009

Table of Contents

The table below details the North America results of insurance-funded preneed funeral production and maturities for the years ended December 31, 2008 and 2007, and the number of contracts associated with those transactions.

| | North America | |
| | Years Ended December 31, | |
| | 2008 | 2007 |
| | (Dollars in millions) | |
| Preneed funeral insurance-funded(1): | | |
| Sales production | $ 296.2 | $ 285.8 |
| Sales production (number of contracts) | 49,381 | 50,566 |
| General agency revenue | $ 51.5 | $ 44.8 |
| Maturities | $ 250.5 | $ 241.6 |
| Maturities (number of contracts) | 47,890 | 51,240 |

(1) Amounts are not included in our consolidated balance sheet.

30

Table of Contents

*North America Backlog of Preneed Funeral and Cemetery Contracts:*  The following table reflects our North America backlog of trust-funded deferred preneed funeral and cemetery contract revenues, including amounts related to *Deferred preneed funeral and cemetery receipts held in trust* at December 31, 2008 and 2007. Additionally, the table reflects our North America backlog of unfulfilled insurance-funded contracts (which are not included in our consolidated balance sheet) at December 31, 2008 and 2007. The backlog amounts presented are reduced by an amount that we believe will cancel before maturity based on historical experience.

The table also reflects our North America preneed funeral and cemetery trust investments (market and cost bases) associated with the backlog of deferred preneed funeral and cemetery contract revenues, net of the estimated cancellation allowance. We believe that the table below is meaningful because it sets forth the aggregate amount of future revenues we expect to recognize as a result of preneed sales, as well as the amount of assets associated with those revenues. Because the future revenues exceed the asset amounts, future revenues will exceed the cash distributions actually received from the associated trusts.

| | December 31, 2008 | | December 31, 2007 | |
|---|---|---|---|---|
| | Market | Cost | Market | Cost |
| | (Dollars in billions) | | | |
| Deferred preneed funeral revenues | $ 0.59 | $ 0.59 | $ 0.53 | $ 0.53 |
| Deferred preneed funeral receipts held in trust | 1.00 | 1.24 | 1.24 | 1.26 |
| | $ 1.59 | $ 1.83 | $ 1.77 | $ 1.79 |
| Allowance for cancellation on trust investments | (0.11) | (0.11) | (0.13) | (0.13) |
| Backlog of trust-funded preneed funeral revenues | $ 1.48 | $ 1.72 | $ 1.64 | $ 1.66 |
| Backlog of insurance-funded preneed funeral revenues | 3.30 | 3.30 | 3.36 | 3.36 |
| Total backlog of preneed funeral revenues | $ 4.78 | $ 5.02 | $ 5.00 | $ 5.02 |
| | | | | |
| Preneed funeral receivables and trust investments | $ 1.19 | $ 1.43 | $ 1.43 | $ 1.45 |
| Allowance for cancellation on trust investments | (0.15) | (0.15) | (0.11) | (0.11) |
| Assets associated with backlog of trust-funded deferred preneed funeral revenues, net of estimated allowance for cancellation | $ 1.04 | $ 1.28 | $ 1.32 | $ 1.34 |
| Insurance policies associated with insurance-funded deferred preneed funeral revenues, net of estimated allowance for cancellation | 3.30 | 3.30 | 3.36 | 3.36 |
| Total assets associated with backlog of preneed funeral revenues | $ 4.34 | $ 4.58 | $ 4.68 | $ 4.70 |
| | | | | |
| Deferred preneed cemetery revenues | $ 0.77 | $ 0.77 | $ 0.75 | $ 0.75 |
| Deferred preneed cemetery receipts held in trust | 0.82 | 1.11 | 1.15 | 1.12 |
| | $ 1.59 | $ 1.88 | $ 1.90 | $ 1.87 |
| Allowance for cancellation on trust investments | (0.13) | (0.13) | (0.12) | (0.12) |
| Backlog of deferred cemetery revenues | $ 1.46 | $ 1.75 | $ 1.78 | $ 1.75 |
| | | | | |
| Preneed cemetery receivables and trust investments | $ 1.06 | $ 1.35 | $ 1.43 | $ 1.40 |
| Allowance for cancellation on trust investments | (0.11) | (0.11) | (0.15) | (0.15) |
| Assets associated with backlog of deferred cemetery revenues, net of estimated allowance for cancellation | $ 0.95 | $ 1.24 | $ 1.28 | $ 1.25 |

The market value of our funeral and cemetery trust investments was based on a combination of quoted market prices, observable inputs such as interest rates or yield curves, and appraisals. For more information on how market values are estimated, see Critical Accounting Policies, Recent Accounting Pronouncements, and Accounting

31

Source: SERVICE CORPORATION , 10-K, March 02, 2009

Table of Contents

Changes below. The difference between the backlog and asset amounts represents the contracts for which we have posted surety bonds as financial assurance in lieu of trusting, the amounts collected from customers that were not required to be deposited into trust, and allowable cash distributions from trust assets. The table also reflects the amounts expected to be received from insurance companies through the assignment of policy proceeds related to insurance-funded funeral contracts.

## Results of Operations — Years Ended December 31, 2008, 2007, and 2006

### *Management Summary*

Key highlights in 2008 were as follows:

- Revenues decreased $129.7 million, or 5.7%, as a result of approximately $100 million in lost revenue from significant divestiture activity throughout 2007 and a $13.0 million decline in preneed cemetery property sales.

- Despite a difficult economic environment, our comparable funeral segment demonstrated significant stability with modest growth in profits and margins and a 3.4% increase in average revenue per funeral service; comparable funeral services decreased 2.7%.

- Due to the recent adverse conditions in the financial markets, our funeral trust fund income declined $8.3 million and cemetery merchandise and services and perpetual care trust fund income declined $25.5 million in 2008 compared to 2007.

### *Consolidated Fourth Quarter Results*

During the fourth quarter of 2008, funeral revenues declined $14.5 million, or 3.9%, to $356.4 million from $370.9 million in the same period in 2007 primarily as a result of the divestiture of several locations that contributed an incremental $8.6 million of revenue in the fourth quarter of 2007. Additionally, we experienced a $4.8 million decline in trust fund income recognized on matured preneed contracts. Despite the decline in revenues, funeral gross profit increased $1.4 million, or 2.0%, due to declines in variable costs, employee-related costs, and general liability insurance expenses. Our gross margin percentage increased to 20.4% compared to 19.2% in 2007.

Cemetery revenues declined $41.5 million, or 20.5%, from $202.0 million in the fourth quarter of 2007 to $160.5 million in the fourth quarter of 2008 due to an $19.9 million decline in property sales, a $5.5 million decline in new cemetery property construction revenue, and an $11.8 million decrease in trust fund income. Additionally, we divested several locations that contributed an incremental $7.8 million in revenue in the fourth quarter of 2007. Cemetery gross profit decreased $29.8 million, or 60.9%, and our gross margin percentage decreased to 11.9% compared to 24.2% due to the revenue declines described above which were only partially offset by lower variable costs.

Operating income decreased $29.0 million, or 32.3%, to $60.9 million in the fourth quarter of 2008 from $89.9 million in the fourth quarter of 2007. This decrease in operating income was primarily due to the decline in revenue discussed in the preceding paragraphs, partially offset by a $13.7 million decrease in general administrative expenses.

### *Results of Operations — Years Ended December 31, 2008, 2007, and 2006*

In 2008, we reported consolidated net income of $97.1 million ($.37 per diluted share) compared to net income in 2007 of $247.7 million ($.85 per diluted share) and net income in 2006 of $56.5 million ($.19 per diluted share). These results were impacted by certain significant items that decreased earnings, including:

- after-tax charges of $1.9 million related to Hurricane Ike losses in 2008;

- net after-tax losses on asset sales of $36.0 million in 2008 and $50.1 million in 2006;

- after-tax losses from the early extinguishment of debt of $8.7 million in 2007 and $10.7 million in 2006;

32

Table of Contents

- after-tax expenses related to our acquisition and integration of Alderwoods of $0.7 million in 2008, $16.5 million in 2007 and $4.3 million in 2006;

- after-tax expenses related to our Alderwoods bridge financing of $3.9 million in 2006; and

- after-tax expenses to settle our Cash Balance pension plan of $6.5 million in 2007.

    Significant items that increased earnings included:

- after-tax earnings from discontinued operations of $4.4 million in 2007 and $3.9 million in 2006;

- net after-tax gain from the sale of assets of $6.0 million in 2007;

- after-tax gain on the redemption of securities related to our former equity investment in France of $99.8 million in 2007; and

- after-tax gain on the sale of our equity investment in France of $17.6 million in 2007.

**Consolidated Versus Comparable Results — Years Ended December 31, 2008, 2007, and 2006**

    The table below reconciles our consolidated GAAP results to our comparable, or "same store," results for the years ended December 31, 2008, 2007, and 2006. We define comparable operations (or same store operations) as those funeral and cemetery locations owned by us for the entire period beginning January 1, 2007 and ending December 31, 2008. The following tables present operating results for funeral and cemetery locations that were owned by us for these years.

| 2008 | Consolidated | Less: Activity Associated with Acquisition/New Construction | Less: Activity Associated with Dispositions | Comparable |
|---|---|---|---|---|
| | | (Dollars in millions) | | |
| **North America Revenue** | | | | |
| Funeral revenue | $ 1,468.7 | $ 16.4 | $ 8.3 | $ 1,444.0 |
| Cemetery revenue | 679.9 | 6.1 | 0.4 | 673.4 |
| | 2,148.6 | 22.5 | 8.7 | 2,117.4 |
| **Germany Revenue** | | | | |
| Funeral revenue | 7.0 | — | — | 7.0 |
| **Total revenue** | $ 2,155.6 | $ 22.5 | $ 8.7 | $ 2,124.4 |
| North America Gross Profits | | | | |
| Funeral gross profits | $ 312.6 | $ (2.0) | $ (1.7) | $ 316.3 |
| Cemetery gross profits | 105.9 | 1.0 | (1.0) | 105.9 |
| | 418.5 | (1.0) | (2.7) | 422.2 |
| Germany Gross Profits | | | | |
| Funeral gross profits | 0.3 | — | — | 0.3 |
| Total gross profits | $ 418.8 | $ (1.0) | $ (2.7) | $ 422.5 |

Source: SERVICE CORPORATION , 10-K, March 02, 2009

Table of Contents

| 2007 | Consolidated | Less: Activity Associated with Acquisition/New Construction | Less: Activity Associated with Dispositions | Comparable |
|---|---|---|---|---|
| | | (Dollars in millions) | | |
| **North America Revenue** | | | | |
| Funeral revenue | $ 1,518.3 | $ (0.5) | $ 92.5 | $ 1,426.3 |
| Cemetery revenue | 760.0 | (0.1) | 38.7 | 721.4 |
| | 2,278.3 | (0.6) | 131.2 | 2,147.7 |
| **Germany Revenue** | | | | |
| Funeral revenue | 7.0 | — | | 7.0 |
| **Total revenue** | $ 2,285.3 | $ (0.6) | $ 131.2 | $ 2,154.7 |
| North America Gross Profits | | | | |
| Funeral gross profits | $ 307.3 | $ — | $ 3.8 | $ 303.5 |
| Cemetery gross profits | 159.3 | | 2.4 | 156.9 |
| | 466.6 | | 6.2 | 460.4 |
| Germany Gross Profits | | | | |
| Funeral gross profits | 0.2 | | — | 0.2 |
| Total gross profits | $ 466.8 | $ — | $ 6.2 | $ 460.6 |

| 2006 | Consolidated | Less: Activity Associated with Acquisition/New Construction | Less: Activity Associated with Dispositions | Comparable |
|---|---|---|---|---|
| | | (Dollars in millions) | | |
| **North America Revenue** | | | | |
| Funeral revenue | $ 1,155.3 | $ (0.1) | $ 94.4 | $ 1,061.0 |
| Cemetery revenue | 591.1 | (0.1) | 41.8 | 549.4 |
| | 1,746.4 | (0.2) | 136.2 | 1,610.4 |
| **Germany Revenue** | | | | |
| Funeral revenue | 6.5 | — | | 6.5 |
| **Total revenue** | $ 1,752.9 | $ (0.2) | $ 136.2 | $ 1,616.9 |
| North America Gross Profits | | | | |
| Funeral gross profits | $ 240.1 | $ — | $ 3.5 | $ 236.6 |
| Cemetery gross profits | 107.5 | 0.1 | 1.1 | 106.3 |
| | 347.6 | 0.1 | 4.6 | 342.9 |
| Germany Gross Profits | | | | |
| Funeral gross profits | 0.4 | | — | 0.4 |
| Total gross profits | $ 348.0 | $ 0.1 | $ 4.6 | $ 343.3 |

34

Source: SERVICE CORPORATION , 10-K, March 02, 2009

Table of Contents

The following table provides the data necessary to calculate our consolidated average revenue per funeral service for the years ended December 31, 2008, 2007, and 2006. We calculate average revenue per funeral service by dividing consolidated funeral revenue, excluding General Agency (GA) revenues and certain other revenues to avoid distorting our averages of normal funeral services revenue, by the number of funeral services performed during the period.

| | 2008 | 2007 | 2006 |
|---|---|---|---|
| | (Dollars in millions, except average revenue per funeral service) | | |
| Consolidated funeral revenue | $ 1,475.7 | $ 1,525.3 | $ 1,161.8 |
| Less: GA revenues | 51.5 | 44.8 | 35.1 |
| Less: Other revenues | 10.0 | 12.5 | 12.3 |
| Adjusted Consolidated funeral revenue | $ 1,414.2 | $ 1,468.0 | $ 1,114.4 |
| Consolidated funeral services performed | 278,165 | 299,801 | 235,384 |
| Consolidated average revenue per funeral service | $ 5,084 | $ 4,897 | $ 4,734 |

The following table provides the data necessary to calculate our comparable average revenue per funeral service for the years ended December 31, 2008, 2007, and 2006. We calculate average revenue per funeral service by dividing comparable funeral revenue, excluding General Agency (GA) revenues and other revenues to avoid distorting our averages of normal funeral services revenue, by the comparable number of funeral services performed during the period.

| | 2008 | 2007 | 2006 |
|---|---|---|---|
| | (Dollars in millions, except average revenue per funeral service) | | |
| Comparable funeral revenue | $ 1,451.0 | $ 1,433.3 | $ 1,067.5 |
| Less: GA revenues | 51.4 | 43.1 | 33.2 |
| Less: Other revenues | 9.6 | 8.8 | 7.8 |
| Adjusted Comparable funeral revenue | $ 1,390.0 | $ 1,381.4 | $ 1,026.5 |
| Comparable funeral services performed | 272,693 | 280,290 | 214,773 |
| Comparable average revenue per funeral service | $ 5,097 | $ 4,928 | $ 4,779 |

### Funeral Results

#### Funeral Revenue

Consolidated revenues from funeral operations were $1,475.7 million for the year ended December 31, 2008 compared to $1,525.3 million in the same period of 2007. This decrease is primarily due to the divestiture of non-strategic assets throughout 2007, which resulted in a decrease of $84.2 million of revenue in 2008, partially offset by acquisitions that contributed an additional $16.9 million of revenue and a 3.8% increase in average revenue per funeral service. Our comparable funeral revenues increased $17.7 million, or 1.2%, compared to the year ended December 31, 2007 primarily driven by a 3.4% increase in comparable average revenue per funeral service, which more than offset a 2.7% decline in the number of funeral services performed and a $6.0 million decline in trust fund income.

Consolidated revenue from funeral operations increased $363.5 million in 2007 compared to 2006. Comparable funeral revenues in 2007 increased $365.8 million, or 34.3% over 2006. The increase was primarily driven by our operations acquired from Alderwoods, which contributed $349.6 million in funeral revenues, and continued benefits of our strategic pricing initiatives at legacy locations. This was partially offset by a $1.9 million decline in revenue from divested locations.

#### Funeral Services Performed

Our consolidated funeral services performed decreased 21,636, or 7.2%, in the year ended December 31, 2008 compared to the same period in 2007. This decrease was primarily due to our planned 2007 divestiture of non-

Source: SERVICE CORPORATION , 10-K, March 02, 2009

Table of Contents

strategic assets, which contributed an incremental 17,990 funeral services in 2007, partially offset by an incremental 3,951 funeral services from acquisitions in 2008. Our comparable funeral services performed decreased 7,597, or 2.7%, primarily due to the implementation of our strategic pricing initiative at former Alderwoods locations discussed below. We have seen a recent stabilization in the cremation trend for our businesses as our strategic pricing initiative and discounting policies have resulted in a decline in highly-discounted, low-service cremation customers. Our comparable cremation rate of 41.9% in 2008 increased only slightly from 41.4% in 2007. Our comparable cremation rate of 41.4% in 2007 increased from 40.3% in 2006. We continue to expand our cremation memorialization products and services, which have resulted in higher average sales for cremation services.

### Average Revenue Per Funeral Service

Our consolidated average revenue per funeral service increased $187, or 3.8%, in the year ended December 31, 2008 compared to the same period of 2007. Our comparable average revenue per funeral service increased 3.4%, or $169 per funeral service, reflecting the continued benefits from our strategic pricing initiative, which was implemented at former Alderwoods locations throughout 2007. Pursuant to this strategy, we have realigned our pricing focus away from our products to our service offerings, reflecting our competitive advantage and concentrating on services that our customers believe add the most value. This strategy has resulted in a decline in highly discounted, low-service cremation funeral services. These initiatives, although reducing our funeral services volume, have generated improvements in average revenue per funeral service and increased profitability. We expect that we have seen the full benefit of these initiatives by the end of 2008. However, we believe we can continue to generate increases in our average revenue per funeral service (although much smaller than in 2008) through inflationary price increases.

### Funeral Gross Profit

Consolidated funeral gross profits increased $5.4 million in 2008 as compared to 2007, despite the divestiture of non-strategic assets that contributed an incremental $5.5 million of gross profit in 2007 compared to 2008. The consolidated gross margin percentage increased to 21.2% from 20.2%. Gross profit from our comparable funeral locations increased $12.9 million, or 4.2%, in 2008 compared to 2007 primarily as a result of the increase in comparable revenue described above.

Consolidated funeral gross profits increased $67.0 million in 2007 as compared to 2006. Gross profit from our comparable funeral locations increased $66.7 million, or 28.1%, and our comparable gross margin percentage decreased to 21.2% from 22.2% in 2007 compared to 2006. Comparable gross profits before allocation of corporate and field overhead costs increased $90.1 million, or 29.0%. The increase was primarily driven by our operations acquired from Alderwoods, which contributed $81.4 million in funeral gross profit. Our corporate and field overhead includes costs related to the addition of the former Alderwoods' funeral homes and cemeteries. We do not separately identify and allocate these additional overhead costs; therefore, the negative impact is reflected in our gross profit and gross margin percentage for 2007 on a comparable basis compared to 2006. This increase was partially offset by a $0.3 million decline in gross profit from divested locations.

### Cemetery Results

### Cemetery Revenue

Consolidated revenues from our cemetery operations decreased $80.1 million in 2008 compared to 2007. Comparable cemetery revenue decreased $48.0 million, or 6.7%, in 2008 compared to 2007. This decrease primarily resulted from a $28.8 million decline in preneed cemetery property revenue in 2008 compared to 2007 as several large non-recurring construction projects were completed in 2007, a $14.3 million decrease in preneed cemetery trust fund income, and an $8.4 million decrease in cemetery perpetual care trust fund income. Revenues from divested locations decreased $38.3 million from the divestiture of non-strategic assets, partially offset by acquisitions, which contributed an additional $6.2 million of revenue.

Consolidated revenues from our cemetery operations increased $168.9 million, or 28.6%, in 2007 compared to 2006. Our comparable cemetery revenues grew $172.0 million, or 31.3%, in 2007 compared to 2006, reflecting an increase from operations acquired from Alderwoods, which contributed $154.8 million in cemetery revenues and

36

Table of Contents

our tiered-product strategy, which focused on the development of high-end cemetery property. This increase was partially offset by a $3.1 million decline in revenue from divested locations.

### Cemetery Gross Profits

Consolidated cemetery gross profit decreased $53.4 million, or 33.5%, in 2008 compared to 2007. Consolidated cemetery gross margin percentage decreased to 15.6% in 2008 compared to 21.0% in 2007. Gross profit from our comparable cemetery locations decreased $51.0 million, or 32.5%, in 2008 compared to 2007 primarily as a result of the decrease in comparable revenue described above. Gross profit from divested locations decreased $3.4 million from the divestiture of non-strategic assets throughout 2007, partially offset by acquisitions that contributed an additional $1.0 million of gross profit. We experienced a $9.0 million reduction in administrative and overhead costs as synergies from the Alderwoods acquisition were realized. These decreases were more than offset by increased maintenance costs, including energy-related costs and increased commissions.

Consolidated cemetery gross profit increased $51.8 million, or 48.2%, in 2007 compared to 2006. Consolidated cemetery gross margin percentage grew to 21.0% in 2007 compared to 18.2% in 2006. Our comparable cemetery gross profit increased $50.6 million, or 47.6%, in 2007 compared to 2006 reflecting an increase from operations acquired from Alderwoods, which contributed $41.0 million in cemetery gross profit, partially offset by the receipt and recognition of $7.9 million of endowment care trust fund income in 2006. The comparable cemetery margin percentage was 21.7% in 2007 compared to 19.3% in 2006. Gross profit from divested locations increased $1.3 million in 2007 compared to 2006.

### Other Financial Statement Items

### General and Administrative Expenses

General and administrative expenses were $87.4 million in 2008 compared to $135.8 million in 2007 and $92.6 million in 2006. For 2008 compared to 2007, general and administrative costs decreased $48.4 million primarily due to $27.2 million of transition and other expenses related to the acquisition of Alderwoods incurred in 2007, $11.2 million of costs to terminate our pension plan incurred in 2007, and a $13.6 million decrease in our employee benefits expense related to reductions in corporate bonuses and long-term incentive plans. For 2007 compared to 2006, general and administrative costs increased $43.2 million primarily due to Alderwoods integration costs of $28.4 million and pension termination costs discussed above.

### Gains (Losses) on Divestitures and Impairment Charges, Net

In 2008, we recognized a $36.1 million net pre-tax loss on asset divestitures and impairments. This loss was primarily due to the impairments and asset divestitures associated with non-strategic funeral and cemetery businesses in the United States and Canada, including a $3.8 million impairment charge of our trademark and tradenames and a $13.9 million impairment of certain assets located in Oregon, West Virginia, Michigan, Alabama, and Georgia, which are classified as assets held for sale at December 31, 2008.

In 2007, we recognized a $16.9 million net pre-tax gain on asset divestitures and impairments. This gain was primarily associated with the disposition of funeral and cemetery businesses in the United States and Canada, including a $21.8 million gain on assets sold to StoneMor Partners LP and a $21.1 million gain from real estate dispositions, partially offset by $26.0 million in losses on FTC and non-strategic divestitures.

In 2006, we recognized a $58.7 million net pre-tax loss on asset divestitures and impairments. This loss was primarily associated with the disposition of underperforming funeral and cemetery businesses in United States and Canada, including a $16.6 million impairment of assets sold to StoneMor Partners LP in 2006 and a $26.4 million impairment of certain assets in Michigan for which we had commenced a plan to sell and which were classified as assets held for sale at December 31, 2006. Additionally, in connection with the Alderwoods acquisition, we entered into a consent agreement with the Federal Trade Commission to divest certain of our non-Alderwoods properties, and we recorded an impairment charge of $12.9 million for these properties owned by us and classified as assets held for sale at December 31, 2006.

Source: SERVICE CORPORATION , 10-K, March 02, 2009

Table of Contents

*Hurricane Expense, Net*

Hurricane expense, net reflects $3.1 million in property damages incurred at various locations caused by Hurricane Ike in September 2008, net of estimated insurance recoveries of $2.5 million.

*Interest Expense*

Interest expense decreased $12.6 million to $134.3 million in 2008 compared to $146.9 million in 2007. The decrease in interest expense resulted primarily from the $100 million repayment of our term loan, prepayment of $50 million Series A Senior Notes, the $45.2 million payment of our 6.5% notes due March 2008, and a decrease in rates associated with our floating rate debt, mainly our Series B Senior Notes due November 2011.

Interest expense increased $23.5 million to $146.9 million in 2007 compared to $123.4 million in 2006. The $23.5 million increase in interest expense between 2007 and 2006 resulted primarily from an incremental $31.5 million of interest costs related to our increased borrowings to finance the Alderwoods transaction.

*Interest Income*

Interest income of $5.4 million in 2008, a $6.3 million decrease from 2007, reflects the decrease in our average cash balances throughout 2008 coupled with a decline in interest rates.

Interest income of $11.7 million in 2007, compared to $31.2 million in 2006, reflects the decrease in our cash balance as a result of the acquisition of Alderwoods.

*Loss on Early Extinguishment of Debt*

During 2007, we repaid $100.0 million of our term loan and $50 million of our Series A Senior Notes, and we purchased $149.8 million aggregate principal amount of our 6.50% Notes due 2008 and $173.8 million aggregate principal amount of our 7.70% Notes due 2009 in a tender offer. As a result of these transactions, we recognized a loss of $15.0 million, which represents the write-off of unamortized deferred loan costs of $3.3 million, a $1.0 million loss on a related interest rate hedge, and $10.7 million in premiums paid to extinguish the debt.

During 2006, we repurchased $139.0 million aggregate principal amount of our 7.7% notes due 2009 in a tender offer and prepaid $50.0 million of our term loan in December 2006. As a result of these transactions, we recognized a loss of $17.5 million, which comprised the redemption premiums paid of $8.2 million and the write-off of unamortized deferred loan costs of $9.3 million.

*Equity in Earnings of Unconsolidated Subsidiaries*

Equity income from our equity investment in France was $36.6 million in 2007 compared to $1.1 million in 2006. This increase was primarily attributable to equity earnings generated by the sale of our former equity investment's business operations in the fourth quarter of 2007.

*Gain on Redemption of Securities*

Gain on redemption of securities was $158.1 million in 2007 compared to $10.9 million in 2006. The 2007 and 2006 income is primarily related to the redemption of our convertible preferred equity certificates in our former equity investment in France. This investment was liquidated in the fourth quarter of 2007. See Note 19 in Part II, Item 8. Financial Statements and Supplementary Data, for further information.

*Other (Expense) Income, Net*

Other expense, net was a $0.6 million expense in 2008 compared to a $3.8 million expense in 2007, primarily due to $0.6 million in unfavorable adjustments to our notes receivable allowance in 2007, a decrease in our surety bond expense of $1.7 million in 2008, and a $0.8 million increase in foreign exchange loss in 2008 compared to 2007 as a result of the recent decline in Canadian and Euro currencies.

38

Other expense, net was a $3.8 million expense in 2007 compared to a $1.5 million expense in 2006, primarily due to a an incremental $2.6 million in unfavorable adjustments to our notes receivable allowance in 2007.

*Provision for Income Taxes*

The 2008 consolidated effective tax rate was 40.3%, compared to 37.1% and 46.0% in 2007 and 2006, respectively. The increase in the effective rate from 2007 to 2008 was primarily due to 2007 utilization of capital losses subject to valuation allowances. During the fourth quarter of 2007, we generated taxable capital gains from the sale of our former equity investment in France, which allowed us to recognize the benefit of capital loss carryforwards that we had previously concluded were more likely than not to expire unutilized. The 2008, 2007, and 2006 tax rates were negatively impacted by permanent differences between the book and tax bases of North American asset divestitures and certain other adjustments related to prior periods. See Note 1 in Part II, Item 8. Financial Statements and Supplementary Data, for further discussion.

*Weighted Average Shares*

The diluted weighted average number of shares outstanding was 260.4 million in 2008, compared to 290.4 million in 2007 and 297.4 million in 2006. The decrease in all years reflects shares repurchased under our share repurchase program.

**Critical Accounting Policies, Recent Accounting Pronouncements, and Accounting Changes**

Our consolidated financial statements are impacted by the accounting policies used and the estimates and assumptions made by management during their preparation. See Note 2 in Part II, Item 8. Financial Statements and Supplementary Data, for more information. Estimates and assumptions affect the carrying values of assets and liabilities and disclosures of contingent assets and liabilities at the balance sheet date. Actual results could differ from such estimates due to uncertainties associated with the methods and assumptions underlying our critical accounting measurements. The following is a discussion of our critical accounting policies pertaining to revenue recognition, business combinations, valuation of goodwill, valuation of intangible assets, valuation of long-lived assets, loss contract analysis, the use of estimates, and fair value measurements.

*Revenue Recognition*

Funeral revenue is recognized when funeral services are performed. Our trade receivables primarily consist of amounts due for funeral services already performed. Revenue associated with cemetery merchandise and services is recognized when the service is performed or merchandise is delivered. Revenue associated with cemetery property interment rights is recognized in accordance with the retail land sales provision of SFAS No. 66, *"Accounting for the Sales of Real Estate"* (SFAS 66). Under SFAS 66, revenue from constructed cemetery property is not recognized until a minimum percentage (10%) of the sales price has been collected. Revenue related to the preneed sale of unconstructed cemetery property is deferred until it is constructed and at least 10% of the sales price is collected.

When a customer enters into a preneed funeral trust contract, the entire purchase price is deferred and the revenue is recognized at the time of maturity. The revenues associated with a preneed cemetery contract, however, may be recognized as different contract events occur. Preneed sales of cemetery interment rights (cemetery burial property) are recognized when a minimum of 10% of the sales price has been collected and the property has been constructed or is available for interment. For services and non-personalized merchandise (such as vaults), we defer the revenues until the services are performed and the merchandise is delivered. For personalized marker merchandise, with the customer's direction generally obtained at the time of sale, we can choose to order, store, and transfer title to the customer. Upon the earlier of vendor storage of these items or delivery in our cemetery, we recognize the associated revenues and record the cost of sale. In situations in which we have no further obligation or involvement related to the merchandise, we recognize revenues and record the cost of sales in accordance with SAB 104 upon the earlier of vendor storage of these items or delivery in our cemetery.

39

Source: SERVICE CORPORATION , 10-K, March 02, 2009

Table of Contents

### Business Combinations

We have applied the principles provided in SFAS No. 141, *"Business Combinations"* (SFAS 141) to our prior business combinations. Tangible and intangible assets and liabilities assumed were recorded at their fair value and goodwill recognized for any difference between the price of the acquisition and our fair value determination. We have customarily estimated our purchase costs and other related transactions known to us at closing of the acquisition. To the extent that information was not available to us at the closing date and subsequently became available during the allocation period, as defined by SFAS 141, we have adjusted our goodwill, assets, or liabilities associated with the acquisition. These changes are disclosed in future reports as they occur. See Note 3 in Part II, Item 8. Financial Statements and Supplementary Data, for discussion of Recent Accounting Pronouncements which will affect how we account for Business Combinations effective January 1, 2009.

### Valuation of Goodwill

We record the excess of purchase price over the fair value of identifiable net assets acquired in business combinations as goodwill. Goodwill is tested annually for impairment by assessing the fair value of each of our reporting units. As of December 31, 2008, our funeral segment reporting unit includes assets in North America and Germany. Our cemetery segment reporting unit includes assets in North America. We test for impairment of goodwill in accordance with Statement of Financial Accounting Standards (SFAS) No. 142 *"Goodwill and Other Intangible Assets"* (SFAS 142) annually during the fourth quarter using information as of September 30.

Our goodwill impairment test involves estimates and management judgment. In the first step of our goodwill impairment test, we compare the fair value of a reporting unit to its carrying amount, including goodwill. We determine fair value of each reporting unit using both a market and income approach. Our methodology considers discounted cash flows and multiples of EBITDA (earnings before interest, taxes, depreciation, and amortization) for both SCI and its competitors. The discounted cash flow valuation uses projections of future cash flows and includes assumptions concerning future operating performance and economic conditions that may differ from actual future cash flows. We do not record an impairment of goodwill in instances where the fair value of a reporting unit exceeds its carrying amount. If the aggregate fair value is less than the related carrying amount for a reporting unit, we compare the implied fair value of goodwill (as defined in SFAS 142) to the carrying amount of goodwill. If the carrying amount of reporting unit goodwill exceeds the implied fair value of that goodwill, an impairment loss is recognized in an amount equal to that excess. Based on our most recent annual impairment test performed during the fourth quarter using September 30 information, we concluded that there was no impairment of goodwill as of December 31, 2008.

In addition to our annual review, we assess the impairment of goodwill whenever events or changes in circumstances indicate that the carrying value may be greater than fair value. Factors that could trigger an interim impairment review include, but are not limited to, significant underperformance relative to historical or projected future operating results and significant negative industry or economic trends. In the fourth quarter of 2008, we determined that the decline in our operating results, combined with significant declines in the economy, resulted in a triggering event that occurred subsequent to our annual impairment test of goodwill. We performed an additional impairment test based on December 31, 2008 information and concluded that there was no impairment of goodwill. However, if current economic conditions worsen causing further deterioration in our operating results, we may have another triggering event that could result in an impairment to our goodwill. Our cemetery segment, which has a goodwill balance of $54.8 million as of December 31, 2008, is more sensitive to market conditions and goodwill impairments because it is more reliant on preneed sales which are impacted by customer discretionary spending.

For our most recent annual impairment test performed in the fourth quarter using September 30 data, we used growth rates ranging from (2.0) to 5.3% over a three-year period, plus a terminal value determined using the constant growth method, in projecting our future cash flows. We considered the impact of recent realized losses in our trusts in developing our projected cash flows. We used a 10.3% discount rate which reflected our weighted average cost of capital based on our industry and our supplier industries and capital structure, as adjusted for equity risk premiums and size risk premiums based on our market capitalization. Fair value was calculated as the sum of the projected discounted cash flows of our reporting units over the next three years plus terminal value at the end of those three years. Our terminal value was calculated using a long-term growth rate of 3.0%.

Source: SERVICE CORPORATION , 10-K, March 02, 2009

Table of Contents

For our December 31 impairment test, we used growth rates ranging from (7.5) to 6.1% over a five-year period, plus a terminal value determined using the constant growth method. We considered the impact of recent realized losses in our trusts in developing our projected cash flows. We used an 11.0% discount rate, which reflects our current weighted average cost of capital determined based on our industry and our supplier industries and capital structure as adjusted for equity risk premiums and size risk premiums based on our market capitalization. Fair value was calculated as the sum of the projected discounted cash flows of the reporting units over the next five years plus terminal value. Our terminal value used a long-term growth rate of 3.0%.

### Valuation of Intangible Assets

Our intangible assets include cemetery customer relationships, trademarks and tradenames, and other assets primarily resulting from our acquisition of Alderwoods. Our trademark and tradenames and water rights assets are considered to have an indefinite life and are not subject to amortization. We test for impairment of intangible assets in accordance with Statement of Financial Accounting Standards (SFAS) No. 142 *"Goodwill and Other Intangible Assets"* (SFAS 142) annually during the fourth quarter using information as of September 30.

Our intangible assets impairment tests involve estimates and management judgment. For trademark and tradenames, our test uses the relief from royalty method whereby we determine the fair value of the assets by discounted the cash flows that represent a savings over having to pay a royalty fee for use of the trademark and tradenames. The discounted cash flow valuation uses projections of future cash flows and includes assumptions concerning future operating performance and economic conditions that may differ from actual future cash flows. For our most recent annual impairment test performed in the fourth quarter using September 30 data, we estimated that the pre-tax savings would be 4% of the revenues associated with the trademark and tradenames, based primarily on our research of intellectual property valuation and licensing databases. We also assumed a terminal growth rate of 3.0% and discounted the cash flows at 10.5% based on the relative risk of these assets to our overall business. Based on our annual impairment test performed during the fourth quarter using September 30 information, we concluded there was no impairment of intangible assets as of December 31, 2008.

In addition to our annual review, we assess the impairment of intangible assets whenever events or changes in circumstances indicate that the carrying value may be greater than the fair value. Factors that could trigger an interim impairment review include, but are not limited to, significant underperformance relative to historical or projected future operating results and significant negative industry or economic trends. In the fourth quarter of 2008, we determined that the decline in our operating results, combined with significant declines in the economy, resulted in a triggering event that occurred subsequent to our annual impairment test of intangible assets. We performed an additional impairment test based on December 31, 2008 information and concluded that there was an impairment of our trademark and tradenames asset of $3.8 million. For this additional impairment test, we estimated that the pre-tax savings would be 4% of the revenues associated with the trademark and tradenames, based primarily on our research of intellectual property valuation and licensing databases. We also assumed a terminal growth rate of 3.0% and discounted the cash flows at 11.2% based on the relative risk of these assets to our overall business. If the current economic conditions worsen, causing further deterioration in our operating results, we may have another triggering event which could result in further impairment to these assets.

### Valuation of Long-Lived Assets

We review the carrying value of our long-lived assets for impairment whenever events or circumstances indicate that the carrying amount of the asset may not be recoverable, in accordance with SFAS No. 144, *"Accounting for the Impairment or Disposal of Long-Lived Assets"* (SFAS 144). SFAS 144 requires that long-lived assets to be held and used are reported at the lower of their carrying amount or fair value. Fair value is based on an income approach that utilizes projections of undiscounted future cash flows expected to be generated by our long-lived assets. In the fourth quarter of 2008, we determined that the economic decline in the United States and globally represented a change in circumstance for our long-lived assets to be held and used. As such, we reviewed our long-lived assets for impairment in accordance with SFAS 144, and we determined that no impairment charges were necessary. While we believe our estimates of undiscounted future cash flows used in performing this test are reasonable, different assumptions regarding such cash flows and comparable sales values could materially affect our evaluations.

41

Source: SERVICE CORPORATION , 10-K, March 02, 2009

Table of Contents

Assets to be disposed of and assets not expected to provide any future service potential are recorded at the lower of their carrying amount or fair value less estimated cost to sell. For additional information regarding impairment or disposal of long-lived assets, see Note 19 in Part II, Item 8. Financial Statements and Supplementary Data.

*Loss Contract Analysis*

We perform an analysis to determine whether our preneed contracts are in a loss position, which would necessitate a charge to earnings. For this analysis, we add the sales prices of the underlying contracts and net realized earnings, then subtract net unrealized losses to derive the net amount of proceeds for contracts as of the balance sheet date. We consider unrealized gains and losses based on current market prices quoted for the investments, and we do not include future expected returns on the investments in our analysis. We compare our estimated proceeds to the estimated direct costs to deliver our contracts, which consist primarily of funeral and cemetery merchandise costs and salaries, supplies, and equipment related to the delivery of a preneed contract. If a deficiency were to exist, we would record a charge to earnings and a corresponding liability for the expected loss on delivery of those contracts from our backlog. As of December 31, 2008, no such charge was required. Due to the positive margins of our preneed contracts and the trust portfolio returns we have experienced in prior years, we believe there is currently capacity for additional market depreciation before a loss contract would result.

*Use of Estimates*

The preparation of financial statements in conformity with Generally Accepted Accounting Principles in the United States (GAAP) requires management to make certain estimates and assumptions. These estimates and assumptions affect the carrying values of assets and liabilities and disclosures of contingent assets and liabilities at the balance sheet date. Actual results could differ from such estimates due to uncertainties associated with the methods and assumptions underlying our critical accounting measurements. Key estimates used by management include:

*Allowances* — We provide various allowances and/or cancellation reserves for our funeral and cemetery preneed and atneed receivables, as well as for our preneed funeral and preneed cemetery deferred revenues. These allowances are based on an analysis of historical trends and include, where applicable, collection and cancellation activity. We also record an estimate of general agency revenues that may be cancelled in their first year and revenue would be charged back by the insurance company. These estimates are impacted by a number of factors, including changes in economy, relocation, and demographic or competitive changes in our areas of operation.

*Valuation of trust investments* — With the implementation of revised FASB Interpretation No. 46, *"Consolidation of Variable Interest Entities, an Interpretation of Accounting Research Bulletin No. 51"* (FIN 46R), as of March 31, 2004, we removed the receivables due from trust assets recorded at cost from our balance sheet and added the actual trust investments recorded at market value. The trust investments include marketable securities that are classified as available-for-sale in accordance with Statement of Financial Accounting Standards No. 115, *"Accounting for Certain Investments in Debt and Equity Securities."* When available, we use quoted market prices for specific securities. When quoted market prices are not available for the specific security, fair values are estimated by using either quoted market prices for securities with similar characteristics or a fair value model with observable inputs that include a combination of interest rates, yield curves, credit risks, prepayment terms, rating, and tax exempt status.

The valuation of private equity and other investments requires significant management judgment due to the absence of quoted market prices, inherent lack of liquidity, and the long-term nature of such assets. The fair value of these investments is estimated based on the market value of the underlying real estate and private equity instruments. The underlying real estate value is determined using the most recent appraisals. The private equity investments are valued using appraisals and a discounted cash flow methodology depending on the underlying assets. The appraisals assess value based on a combination of replacement cost, comparative sales analysis, and discounted cash flow analysis. See Fair Value Measurements below for additional information.

*Legal liability reserves* — Contingent liabilities, principally for legal liability matters, are recorded when it is probable that a liability has been incurred and the amount of the loss can be reasonably estimated in accordance with

42

Statement of Financial Accounting Standards No. 5, *"Accounting for Contingencies."* Liabilities accrued for legal matters require judgments regarding projected outcomes and range of loss based on historical experience and recommendations of legal counsel. However, litigation is inherently unpredictable, and excessive verdicts do occur. As disclosed in Note 12 in Part II, Item 8. Financial Statements and Supplementary Data, our legal exposures and the ultimate outcome of these legal proceedings could be material to operating results or cash flows in any given quarter or year.

*Depreciation of long-lived assets* — We depreciate our long-lived assets ratably over their estimated useful lives. These estimates of useful lives may be affected by such factors as changing market conditions or changes in regulatory requirements.

*Valuation of assets acquired and liabilities assumed* — We have applied the principles of SFAS 141 to our prior business combinations. Tangible and intangible assets and liabilities assumed were recorded at their fair value and goodwill recognized for any difference between the price of acquisition and our fair value determination. We have customarily estimated our purchase costs and other related transactions known to us at closing of the acquisition. To the extent that information not available to us at the closing date subsequently became available during the allocation period, as defined in SFAS 141, we have adjusted our goodwill, assets, or liabilities associated with the acquisition. See Note 3 in Part II, Item 8. Financial Statements and Supplementary Data, for discussion of Recent Accounting Pronouncements which will affect how we account for business combinations effective January 1, 2009.

*Income taxes* — We compute income taxes using the liability method. Our ability to realize the benefit of our federal and state deferred tax assets requires us to achieve certain future earnings levels. We have established a valuation allowance against a portion of our deferred tax assets and could be required to further adjust that valuation allowance if market conditions change materially and future earnings are, or are projected to be, significantly different than our current estimates.

We intend to permanently reinvest the unremitted earnings of certain of our foreign subsidiaries in those businesses outside the United States. Therefore, we have not provided for deferred federal income taxes on such unremitted foreign earnings.

We file income tax returns, including tax returns for our subsidiaries, with U.S. federal, state, local, and foreign jurisdictions. Our tax returns are subject to routine compliance review by the various federal, state, and foreign taxing authorities in the jurisdictions in which we have operated and filed tax returns in the ordinary course of business. We accrue tax expense to reduce our tax benefits in those situations where it is more likely than not that we will not prevail against the tax authorities should they challenge the tax return position that gave rise to the benefit. We believe that our tax returns are materially correct as filed and we will vigorously defend any challenges and proposed adjustments to those filings made by the tax authorities. A number of years may elapse before particular tax matters, for which we have established accruals, are audited and finally resolved. The number of tax years that may be subject to a tax audit varies depending on the tax jurisdiction. In the United States, our open tax years are 1996 to 2008. The Internal Revenue Service is currently examining our tax returns for 1999 through 2005 and various state jurisdictions are auditing years through 2006. While it is often difficult to predict the final outcome or the timing of resolution of any particular tax matter, we believe that our accruals reflect the probable outcome of known tax contingencies. Unfavorable settlement of any particular issue would reduce a deferred tax asset or require the payment of cash. Favorable resolution could result in reduced income tax expense reported in the financial statements in the future. Our tax accruals are presented in the balance sheet within *Deferred income taxes* and *Other liabilities.*

*Pension cost* — Our pension plans are frozen with no benefits accruing to participants except interest. Pension costs and liabilities are actuarially determined based on certain assumptions, including the discount rate used to compute future benefit obligations. Weighted-average discount rates used to determine net periodic pension cost were 5.75% and 5.53%, as of December 31, 2008 and 2007, respectively.

We verify the reasonableness of the discount rate by comparing our rate to the rate earned on high-quality fixed income investments, such as the Moody's Aa index. In 2008, we completed the termination of the Employee

43

Source: SERVICE CORPORATION , 10-K, March 02, 2009

Table of Contents

Retirement Plan of Rose Hills, and there are no remaining assets or liabilities under the plan. In 2007, we completed the termination of our U.S. Pension Plan, and there are no remaining assets or liabilities under the plan.

*Insurance loss reserves* — We purchase comprehensive general liability, morticians and cemetery professional liability, automobile liability, and workers' compensation insurance coverages structured with high deductibles. This high-deductible insurance program means we are primarily self-insured for claims and associated costs and losses covered by these policies. Historical insurance industry experience indicates a high degree of inherent variability in assessing the ultimate amount of losses associated with casualty insurance claims. This is especially true with respect to liability and workers' compensation exposures due to the extended period of time that transpires between when the claim might occur and the full settlement of such claim, often many years. We continually evaluate loss estimates associated with claims and losses related to these insurance coverages falling within the deductible of each coverage. Assumptions based on factors such as claim settlement patterns, claim development trends, claim frequency and severity patterns, inflationary trends, and data reasonableness will generally affect the analysis and determination of the "best estimate" of the projected ultimate claim losses. The results of these evaluations are used to both analyze and adjust our insurance loss reserves.

As of December 31, 2008, reported losses within our retention for workers' compensation, general liability, and auto liability incurred during the period May 1, 1987 through December 31, 2008 were approximately $292.2 million over 21.7 years. The selected fully developed ultimate settlement value estimated was $341.5 million for the same period. Paid losses were $277.9 million indicating a reserve requirement of $63.6 million.

At December 31, 2008 and 2007, the balances in our reserve for workers' compensation, general, and auto liability and the related activity were as follows:

| | (Dollars in millions) |
|---|---|
| Balance at December 31, 2006 | $ 67.7 |
| Additions | 35.9 |
| Payments | (33.7) |
| Balance at December 31, 2007 | $ 69.9 |
| Additions | 25.8 |
| Payments | (32.1) |
| Balance at December 31, 2008 | $ 63.6 |

### *Fair Value Measurements*

As discussed above, we measure the available-for-sale securities held by our funeral and cemetery merchandise and service and cemetery perpetual care trusts at fair value on a recurring basis. Changes in unrealized gains and/or losses related to these securities are reflected in *Other comprehensive income* and are offset by changes in *Deferred preneed funeral and cemetery receipts held in trust* and *Care trusts' corpus* as a result of those unrealized gains and/or losses; therefore, these gains and/or losses have no impact on our consolidated statement of operations. Certain of these securities have been classified in Level 3 of the SFAS 157 hierarchy due to significant management judgment required as a result of the absence of quoted market prices, inherent lack of liquidity, or the long-term nature of the securities. These securities represent 5.9% of our total $2.0 billion trust fund portfolio measured at fair value on a recurring basis as of December 31, 2008. For more information, see Notes 4, 5, and 6 in Part II, Item 8. Financial Statements and Supplementary Data.

### *Recent Accounting Pronouncements and Accounting Changes*

For discussion of recent accounting pronouncements and accounting changes, see Note 3 in Part II, Item 8. Financial Statements and Supplementary Data.

### Item 7A. *Quantitative and Qualitative Disclosures About Market Risk*

The market risk inherent in our financial instruments and positions includes the price risk associated with the marketable equity and debt securities included in our portfolio of trust investments, the interest rate risk associated

44

Table of Contents

with our floating rate debt, and the currency risk associated with our foreign operations (primarily in Canada). Our market-sensitive instruments and positions are considered to be "other-than-trading". Our exposure to market risk as discussed below includes forward-looking statements and represents an estimate of possible changes in fair value or future earnings that might occur, assuming hypothetical changes in equity markets, interest rates, and currencies. Our views on market risk are not necessarily indicative of actual results that may occur, and they do not represent the maximum possible gains or losses that may occur. Actual fair value movements related to changes in equity markets, interest rates and currencies, along with the timing of such movements, may differ from those estimated.

The information presented below should be read in conjunction with Note 11 in Part II, Item 8. Financial Statements and Supplementary Data.

### Marketable Equity and Debt Securities — Price Risk

In connection with our preneed funeral operations and preneed cemetery merchandise and service sales, the related funeral and cemetery trust funds own investments in equity and debt securities and mutual funds, which are sensitive to current market prices. Cost and market values as of December 31, 2008 are presented in Notes 4, 5, and 6 in Part II, Item 8. Financial Statements and Supplementary Data.

### Market-Rate Sensitive Instruments — Interest Rate Risk

At December 31, 2008 and 2007, approximately 87% and 89%, respectively, of our total debt consisted of fixed rate debt at a weighted average rate of 6.70% and 7.09%, respectively. The fair market value of our debt was approximately $393.9 million less than its carrying value at December 31, 2008. A hypothetical 10% increase in interest rates associated with our floating rate debt would increase our interest expense by $0.8 million.

### Market-Rate Sensitive Instruments — Currency Risk

At December 31, 2008 and 2007, our foreign currency exposure was primarily associated with the Canadian dollar and the euro. A 10% adverse change in the strength of the U.S. dollar relative to our foreign currency instruments would have negatively affected our income from our continuing operations, on an annual basis, by $2.4 million for the year ended December 31, 2008 and $0.8 million for the year ended December 31, 2007.

At December 31, 2008, approximately 8% of our stockholders' equity and 16% of our operating income were denominated in foreign currencies, primarily the Canadian dollar. Approximately 14% of our stockholders' equity and 8% of our operating income were denominated in foreign currencies, primarily the Canadian dollar, at December 31, 2007. We do not have a significant investment in foreign operations considered to be in highly inflationary economies.

45

Source: SERVICE CORPORATION , 10-K, March 02, 2009

<u>Table of Contents</u>

Item 8. *Financial Statements and Supplementary Data.*

## INDEX TO FINANCIAL STATEMENTS AND RELATED SCHEDULE

|  | Page |
|---|---|
| Financial Statements: |  |
| Report of Independent Registered Public Accounting Firm | 47 |
| Consolidated Statement of Operations for the years ended December 31, 2008, 2007, and 2006 | 49 |
| Consolidated Balance Sheet as of December 31, 2008 and 2007 | 50 |
| Consolidated Statement of Cash Flows for the years ended December 31, 2008, 2007, and 2006 | 51 |
| Consolidated Statement of Stockholders' Equity for the three years ended December 31, 2008 | 52 |
| Notes to Consolidated Financial Statements | 53 |
| 1. Nature of Operations | 53 |
| 2. Summary of Significant Accounting Policies | 53 |
| 3. Recent Accounting Pronouncements and Accounting Changes | 58 |
| 4. Preneed Funeral Activities | 62 |
| 5. Preneed Cemetery Activities | 69 |
| 6. Cemetery Perpetual Care Trusts | 75 |
| 7. Deferred Preneed Funeral and Cemetery Receipts Held in Trust and Care Trusts' Corpus | 80 |
| 8. Goodwill | 83 |
| 9. Income Taxes | 83 |
| 10. Debt | 88 |
| 11. Credit Risk and Fair Value of Financial Instruments | 91 |
| 12. Commitments and Contingencies | 92 |
| 13. Stockholders' Equity | 97 |
| 14. Share-Based Compensation | 100 |
| 15. Retirement Plans | 102 |
| 16. Segment Reporting | 105 |
| 17. Supplementary Information | 109 |
| 18. Earnings Per Share | 112 |
| 19. Divestiture-Related Activities | 113 |
| 20. Alderwoods Acquisition | 116 |
| 21. Quarterly Financial Data (Unaudited) | 118 |
| Financial Statement Schedule: |  |
| II — Valuation and Qualifying Accounts | 120 |

All other schedules have been omitted because the required information is not applicable or is not present in amounts sufficient to require submission or because the information required is included in the consolidated financial statements or the related notes thereto.

46

Source: SERVICE CORPORATION , 10-K, March 02, 2009

Table of Contents

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Board of Directors and Stockholders of
Service Corporation International:

In our opinion, the consolidated financial statements listed in the accompanying index present fairly, in all material respects, the financial position of Service Corporation International and its subsidiaries at December 31, 2008 and 2007, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2008 in conformity with accounting principles generally accepted in the United States of America. In addition, in our opinion, the financial statement schedule listed in the accompanying index presents fairly, in all material respects, the information set forth therein when read in conjunction with the related consolidated financial statements. Also in our opinion, the Company did not maintain, in all material respects, effective internal control over financial reporting as of December 31, 2008, based on criteria established in *Internal Control - Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) because a material weakness in internal control over financial reporting related to the accounting for income taxes existed as of that date. A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the annual or interim financial statements will not be prevented or detected on a timely basis. The material weakness referred to above is described in Management's Annual Report on Internal Control over Financial Reporting appearing under Item 9A. We considered this material weakness in determining the nature, timing, and extent of audit tests applied in our audit of the December 31, 2008 consolidated financial statements, and our opinion regarding the effectiveness of the Company's internal control over financial reporting does not affect our opinion on those consolidated financial statements. The Company's management is responsible for these financial statements and financial statement schedule, for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting included in management's report referred to above. Our responsibility is to express opinions on these financial statements, on the financial statement schedule, and on the Company's internal control over financial reporting based on our integrated audits. We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement and whether effective internal control over financial reporting was maintained in all material respects. Our audits of the financial statements included examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

As discussed in Note 3 to the consolidated financial statements, the Company changed the manner in which it accounts for collateral assignment split-dollar life insurance agreements and the manner in which it accounts for the fair value of certain assets and liabilities effective January 1, 2008, and the manner in which it accounts for uncertain income tax positions effective January 1, 2007.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

47

Source: SERVICE CORPORATION , 10-K, March 02, 2009

__Table of Contents__

      Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ PricewaterhouseCoopers LLP

Houston, Texas
February 28, 2009

48

Table of Contents

# SERVICE CORPORATION INTERNATIONAL

## CONSOLIDATED STATEMENT OF OPERATIONS

| | Years Ended December 31, | | |
|---|---|---|---|
| | 2008 | 2007 | 2006 |
| | (In thousands, except per share amounts) | | |
| Revenues | $ 2,155,622 | $ 2,285,303 | $ 1,752,888 |
| Costs and expenses | (1,736,851) | (1,818,456) | (1,404,924) |
| Gross profits | 418,771 | 466,847 | 347,964 |
| General and administrative expenses | (87,447) | (135,753) | (92,603) |
| (Losses) gains on divestitures and impairment charges, net | (36,124) | 16,920 | (58,683) |
| Hurricane expense, net | (3,113) | — | — |
| Other operating income (expense) | 585 | (1,848) | — |
| Operating income | 292,672 | 346,166 | 196,678 |
| Interest expense | (134,274) | (146,854) | (123,399) |
| Interest income | 5,393 | 11,725 | 31,171 |
| Loss on early extinguishment of debt | — | (14,980) | (17,532) |
| Equity in earnings of unconsolidated subsidiaries | — | 36,607 | 1,052 |
| Gain on redemption of securities | — | 158,133 | 10,932 |
| Other expense, net | (629) | (3,804) | (1,453) |
| Income from continuing operations before income taxes | 163,162 | 386,987 | 97,449 |
| Provision for income taxes | (65,717) | (143,670) | (44,845) |
| Income from continuing operations | 97,445 | 243,317 | 52,604 |
| (Loss) income from discontinued operations (net of income tax benefit (provision) of $195, $(4,818) and $2,548, respectively) | (362) | 4,412 | 3,907 |
| Net income | $ 97,083 | $ 247,729 | $ 56,511 |
| Basic earnings per share: | | | |
| Income from continuing operations | $ .38 | $ .85 | $ .18 |
| Income from discontinued operations, net of tax | — | .02 | .01 |
| Net income | $ .38 | $ .87 | $ .19 |
| Basic weighted average number of shares | 257,477 | 284,966 | 292,859 |
| Diluted earnings per share: | | | |
| Income from continuing operations | $ .37 | $ .83 | $ .18 |
| Income from discontinued operations, net of tax | — | .02 | .01 |
| Net income | $ .37 | $ .85 | $ .19 |
| Diluted weighted average number of shares | 260,446 | 290,444 | 297,371 |
| Dividends declared per share | $ .16 | $ .13 | $ .105 |

(See notes to consolidated financial statements)

49

Source: SERVICE CORPORATION , 10-K, March 02, 2009