# EXHIBIT B

## Part 7 of 8

Table of Contents

## SERVICE CORPORATION INTERNATIONAL

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

The Plans' weighted-average asset allocations at December 31, 2007 by asset category were as follows (there are no assets at December 31, 2008 as the remaining plans are unfunded obligations):

|  | 2007 |
| --- | --- |
| Cash and cash equivalents | 2% |
| Fixed income investments | 62% |
| Equity securities(1) | 36% |
| Total | 100% |

(1) Equity securities do not include shares of our common stock at December 31, 2007.

Our Employee Retirement Plan of Rose Hills was terminated in 2008. In 2008, we made a contribution of $3.0 million to purchase annuities for participants of this plan. To effect the termination of the plan we settled all remaining liabilities in the fourth quarter of 2008.

Our non-contributory, defined benefit pension plan covering approximately 34% of our United States employees was terminated in December 2007. The revaluation of projected benefit obligation (PBO) on a plan termination basis resulted in an additional PBO of $4.7 million. On the asset side, the fund experienced a negative actual return in the fourth quarter of 2007 and paid expenses from the fund, the total of which was $0.5 million. In 2007 we made a contribution of $38.8 million to fully fund the plan bringing the value of assets to $56.4 million prior to adjusting for benefits paid and settlement of the obligation. To effect the termination of the plan, we settled all remaining obligations in December 2007. Monthly annuities paid were $0.8 million for the fourth quarter of 2007, lump sums paid were $14.4 million, and the total annuity purchase for remaining obligations was $41.2 million for a total of $56.4 million. Of this, the lump sums paid and annuity purchases totaling $55.6 million were considered settlements under FAS 88. After all fourth quarter FAS 88 adjustments were made, the outstanding balances of our PBO and accumulated other comprehensive income related to the U.S. Pension Plan are $0.

The following Plan benefit payments are expected to be paid:

|  |  |
| --- | --- |
| 2009 | $ 3,666 |
| 2010 | 4,136 |
| 2011 | 3,806 |
| 2012 | 3,744 |
| 2013 | 3,667 |
| Years 2014 through 2018 | 14,540 |

On December 31, 2006, we adopted FASB Statement No. 158 — *Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans*. The objective of the Statement is to improve financial reporting by requiring an employer to recognize the funded status of a benefit plan — measured as the difference between plan assets at fair value and the projected benefit obligation — in its statement of financial position. SFAS 158 requires an employer to recognize as a component of other comprehensive income, net of tax, the gains and losses and prior service costs or credits that arise during the period which were not recognized as components of net periodic benefit costs pursuant to FASB Statement No. 87, "*Employers' Accounting for Pensions*, or No. 106, *Employers Accounting for Postretirement Benefits Other Than Pensions*".

The Statement calls for measuring the defined benefit plan assets and obligations as of the date of the employer's fiscal year-end statement of financial position. The requirement to change the measurement date is effective for fiscal years ending after December 15, 2008. All of our Plans have a measurement date of December 31.

104

Source: SERVICE CORPORATION , 10-K, March 02, 2009

Table of Contents

## SERVICE CORPORATION INTERNATIONAL

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

We have an employee savings plan that qualifies under section 401(k) of the Internal Revenue Code for the exclusive benefit of our United States employees. Under the plan, participating employees may contribute a portion of their pretax and/or after tax income in accordance with specified guidelines up to a maximum of 50%.

During 2008, we matched a percentage of the employee contributions through contributions of cash. For the year, our matching contribution was based upon the following:

| Years of Vesting Service | Percentage of Deferred Compensation |
|---|---|
| 0 — 5 years | 75% of the first 6% of deferred compensation |
| 6 — 10 years | 100% of the first 6% of deferred compensation |
| 11 or more years | 125% of the first 6% of deferred compensation |

During 2007 and 2006, we matched a percentage of the employee contributions through contributions of cash. For each of the two years, our matching contribution was based upon the following:

| Years of Vesting Service | Percentage of Deferred Compensation |
|---|---|
| 0 — 5 years | 75% of the first 6% of deferred compensation |
| 6 — 10 years | 110% of the first 6% of deferred compensation |
| 11 or more years | 135% of the first 6% of deferred compensation |

The amount of our matched contributions in 2008, 2007, and 2006 was $18.1 million, $17.0 million, and $16.8 million, respectively.

### 16. Segment Reporting

Our operations are both product based and geographically based, and the reportable operating segments presented below include our funeral and cemetery operations. Our geographic areas include United States, Canada, and Germany.

Alderwoods operating results are included in our full-year 2008 and 2007 results and since November 28, 2006 for the year ended December 31, 2006. See Note 20 for pro-forma presentation related to the Alderwoods acquisition.

Results from our funeral business in Singapore, which was sold in the fourth quarter of 2006, are classified as discontinued operations for all periods presented. We conduct both funeral and cemetery operations in the United States and Canada and funeral operations in Germany.

105

Source: SERVICE CORPORATION , 10-K, March 02, 2009

Table of Contents

# SERVICE CORPORATION INTERNATIONAL

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

Our reportable segment information is as follows:

| | Funeral | Cemetery (In thousands) | Reportable Segments |
|---|---|---|---|
| **2008** | | | |
| Revenues from external customers | $ 1,475,736 | $ 679,886 | $ 2,155,622 |
| Interest expense | 4,467 | 1,053 | 5,520 |
| Depreciation and amortization | 87,116 | 21,970 | 109,086 |
| Amortization of intangible assets | 17,171 | 6,344 | 23,515 |
| Gross profit | 312,848 | 105,923 | 418,771 |
| Amortization of cemetery property | | 32,690 | 32,690 |
| Total assets | 3,871,267 | 3,816,182 | 7,687,449 |
| Capital expenditures | 65,879 | 77,304 | 143,183 |
| **2007** | | | |
| Revenues from external customers | $ 1,525,349 | $ 759,954 | $ 2,285,303 |
| Interest expense | 6,897 | 1,837 | 8,734 |
| Depreciation and amortization | 87,877 | 23,433 | 111,310 |
| Amortization of intangible assets | 18,932 | 8,497 | 27,429 |
| Gross profit | 307,552 | 159,295 | 466,847 |
| Amortization of cemetery property | | 35,824 | 35,824 |
| Total assets | 4,245,164 | 4,262,264 | 8,507,428 |
| Capital expenditures | 77,625 | 78,777 | 156,402 |
| **2006** | | | |
| Revenues from external customers | $ 1,161,762 | $ 591,126 | $ 1,752,888 |
| Interest expense | 6,384 | 2,468 | 8,852 |
| Depreciation and amortization | 61,141 | 18,059 | 79,200 |
| Amortization of intangible assets | 11,201 | 2,152 | 13,353 |
| Gross profit | 240,470 | 107,494 | 347,964 |
| Amortization of cemetery property | | 28,263 | 28,263 |
| Total assets | 4,505,437 | 4,575,424 | 9,080,861 |
| Capital expenditures | 38,031 | 53,506 | 91,537 |

106

Source: SERVICE CORPORATION , 10-K, March 02, 2009

Table of Contents

SERVICE CORPORATION INTERNATIONAL

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

The following table reconciles certain reportable segment amounts to our corresponding consolidated amounts:

| | Reportable Segments | Corporate | Discontinued Operations | Consolidated |
|---|---|---|---|---|
| | | (In thousands) | | |
| **2008** | | | | |
| Revenue from external customers | $ 2,155,622 | $ — | $ — | $ 2,155,622 |
| Interest expense | 5,520 | 128,754 | — | 134,274 |
| Depreciation and amortization | 109,086 | 5,071 | | 114,157 |
| Amortization of intangible assets | 23,515 | 121 | — | 23,636 |
| Total assets | 7,687,449 | 423,434 | — | 8,110,883 |
| Capital expenditures | 143,183 | 10,918 | | 154,101 |
| **2007** | | | | |
| Revenue from external customers | $ 2,285,303 | $ — | $ — | $ 2,285,303 |
| Interest expense | 8,734 | 138,120 | — | 146,854 |
| Depreciation and amortization | 111,310 | 4,372 | | 115,682 |
| Amortization of intangible assets | 27,429 | 121 | — | 27,550 |
| Total assets | 8,507,428 | 424,816 | — | 8,932,244 |
| Capital expenditures | 156,402 | 609 | — | 157,011 |
| **2006** | | | | |
| Revenue from external customers | $ 1,752,888 | $ — | $ — | $ 1,752,888 |
| Interest expense | 8,852 | 114,547 | — | 123,399 |
| Depreciation and amortization | 79,200 | 4,810 | | 84,010 |
| Amortization of intangible assets | 13,353 | 121 | | 13,474 |
| Total assets | 9,080,861 | 275,160 | 373,368 | 9,729,389 |
| Capital expenditures | 91,537 | 5,990 | | 97,527 |

107

Source: SERVICE CORPORATION , 10-K, March 02, 2009

Table of Contents

# SERVICE CORPORATION INTERNATIONAL

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

The following table reconciles gross profits from reportable segments shown above to our consolidated income from continuing operations before income taxes:

|  | 2008 | 2007 | 2006 |
|---|---|---|---|
|  | | (In thousands) | |
| Gross profit from reportable segments | $ 418,771 | $ 466,847 | $ 347,964 |
| General and administrative expenses | (87,447) | (135,753) | (92,603) |
| (Losses) gains on dispositions and impairment charges, net | (36,124) | 16,920 | (58,683) |
| Hurricane expense, net | (3,113) | — | — |
| Other operating income (expense) | 585 | (1,848) | — |
| Operating income | 292,672 | 346,166 | 196,678 |
| Interest expense | (134,274) | (146,854) | (123,399) |
| Interest income | 5,393 | 11,725 | 31,171 |
| Loss on early extinguishment of debt | — | (14,986) | (17,532) |
| Equity in earnings of unconsolidated subsidiaries | — | 36,607 | 1,052 |
| Gain on redemption of securities | — | 158,133 | 10,932 |
| Other expense, net | (629) | (3,804) | (1,453) |
| Income from continuing operations before income taxes | $ 163,162 | $ 386,987 | $ 97,449 |

Our geographic area information was as follows:

|  | United States | Canada | Germany | Total |
|---|---|---|---|---|
|  | | (In thousands) | | |
| **2008** | | | | |
| Revenues from external customers | $ 1,942,682 | $ 205,950 | $ 6,990 | $ 2,155,622 |
| Interest expense | 133,961 | 313 | — | 134,274 |
| Depreciation and amortization | 101,905 | 11,575 | 677 | 114,157 |
| Amortization of intangible assets | 21,371 | 2,265 | — | 23,636 |
| Amortization of cemetery property | 28,317 | 4,373 | — | 32,690 |
| Operating income | 244,954 | 47,395 | 323 | 292,672 |
| (Losses) gains on dispositions and impairment charges, net | (32,750) | (3,395) | 21 | (36,124) |
| Long-lived assets | $ 4,434,810 | $ 318,409 | $ 2,753 | $ 4,755,972 |
| **2007** | | | | |
| Revenues from external customers | $ 2,079,088 | $ 199,137 | $ 7,078 | $ 2,285,303 |
| Interest expense | 146,526 | 328 | — | 146,854 |
| Depreciation and amortization | 102,339 | 12,810 | 533 | 115,682 |
| Amortization of intangible assets | 25,039 | 2,511 | — | 27,550 |
| Amortization of cemetery property | 31,454 | 4,370 | — | 35,824 |
| Operating income | 318,348 | 27,608 | 210 | 346,166 |
| Gains (losses) on dispositions and impairment charges, net | 18,942 | (2,018) | (4) | 16,920 |
| Long-lived assets | $ 4,161,000 | $ 578,925 | $ 2,788 | $ 4,742,713 |

Source: SERVICE CORPORATION , 10-K, March 02, 2009

Table of Contents

## SERVICE CORPORATION INTERNATIONAL

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

| | United States | Canada | Germany | Total |
|---|---|---|---|---|
| | | (In thousands) | | |
| **2006** | | | | |
| Revenues from external customers | $ 1,630,680 | $ 115,708 | $ 6,500 | $ 1,752,888 |
| Interest expense | 123,048 | 351 | — | 123,399 |
| Depreciation and amortization | 77,246 | 6,321 | 443 | 84,010 |
| Amortization of intangible assets | 12,459 | 1,015 | — | 13,474 |
| Amortization of cemetery property | 25,829 | 2,434 | — | 28,263 |
| Operating income | 178,944 | 17,385 | 349 | 196,678 |
| (Losses) gains on dispositions and impairment charges, net | (56,710) | (1,906) | (67) | (58,683) |
| Long-lived assets | $ 5,043,144 | $ 512,314 | $ 2,404 | $ 5,557,862 |

### 17. Supplementary Information

The detail of certain balance sheet accounts is as follows:

| | December 31, | |
|---|---|---|
| | 2008 | 2007 |
| | (In thousands) | |
| **Cash and cash equivalents:** | | |
| Cash | $ 33,764 | $ 42,928 |
| Commercial paper and temporary investments | 94,633 | 125,666 |
| | $ 128,397 | $ 168,594 |
| | | |
| **Receivables, net:** | | |
| Notes receivable | $ 2,355 | $ 4,753 |
| Atneed funeral receivables, net of allowances of $15,082 and $14,834, respectively | 71,184 | 82,734 |
| Atneed cemetery receivables, net of allowances of $4,653 and $4,641, respectively | 13,651 | 16,068 |
| Other | 8,955 | 10,238 |
| | $ 96,145 | $ 113,793 |

109

Table of Contents

## SERVICE CORPORATION INTERNATIONAL

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

| | December 31, | |
|---|---|---|
| | 2008 | 2007 |
| | (In thousands) | |
| **Other current assets:** | | |
| Income tax receivable | 9,878 | 2,255 |
| Prepaid insurance | 2,361 | 4,932 |
| Other | 6,276 | 20,074 |
| | $ 18,515 | $ 27,261 |
| | | |
| **Cemetery property:** | | |
| Undeveloped land | $ 1,066,184 | $ 1,078,322 |
| Developed land, lawn crypts, and mausoleums | 392,797 | 373,344 |
| | $ 1,458,981 | $ 1,451,666 |
| | | |
| **Property and equipment:** | | |
| Land | $ 473,208 | $ 494,713 |
| Buildings and improvements | 1,371,235 | 1,355,324 |
| Operating equipment | 562,241 | 464,153 |
| Leasehold improvements | 23,047 | 24,314 |
| | 2,429,731 | 2,338,506 |
| Less: accumulated depreciation | (861,856) | (768,972) |
| | $ 1,567,875 | $ 1,569,534 |
| | | |
| **Deferred charges and other assets:** | | |
| Prepaid covenants-not-to-compete, net | $ 49,807 | $ 58,640 |
| Preneed backlog intangible assets, net | 35,331 | 40,900 |
| Amortizable intangible assets, net | 27,956 | 30,521 |
| Non-amortizable intangible assets, net | 45,932 | 46,800 |
| Restricted cash | 28,848 | 23,658 |
| Notes receivable, net of allowances of $2,775 and $2,825, respectively | 14,407 | 25,172 |
| Cash surrender value of insurance policies | 78,423 | 75,385 |
| Deferred trust tax asset | 71,360 | — |
| Other | 100,570 | 99,658 |
| | $ 452,634 | $ 400,734 |

110

Source: SERVICE CORPORATION , 10-K, March 02, 2009

Table of Contents

## SERVICE CORPORATION INTERNATIONAL

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

| | December 31, | |
|---|---|---|
| | 2008 | 2007 |
| | (In thousands) | |
| Accounts payable and accrued liabilities: | | |
| Accounts payable | $ 78,609 | $ 74,373 |
| Accrued compensation | 45,981 | 59,389 |
| Accrued dividend | 9,981 | 10,585 |
| Accrued interest | 24,958 | 26,101 |
| Accrued property taxes | 16,466 | 17,121 |
| Self insurance reserves | 63,583 | 69,914 |
| Bank overdraft. | 22,044 | 27,689 |
| Other accrued liabilities | 33,237 | 58,220 |
| | $ 294,859 | $ 343,392 |
| Other liabilities: | | |
| Accrued pension | $ 32,951 | $ 37,103 |
| Deferred compensation | 19,676 | 24,105 |
| Customer refund obligation reserve | 95,435 | 93,626 |
| Tax liability | 142,457 | 146,995 |
| Indemnification liability | 23,455 | 27,532 |
| Other | 42,116 | 54,281 |
| | $ 356,090 | $ 383,642 |

111

Source: SERVICE CORPORATION , 10-K, March 02, 2009

Table of Contents

# SERVICE CORPORATION INTERNATIONAL

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

*Revenues and Costs and Expenses*

The detail of certain income statement accounts in thousands is as follows for the years ended December 31:

|  | 2008 | 2007 | 2006 |
|---|---|---|---|
|  |  | (In thousands) |  |
| **Merchandise revenues:** |  |  |  |
| Funeral | $ 482,988 | $ 515,944 | $ 424,786 |
| Cemetery | 456,560 | 519,066 | 391,231 |
| Total merchandise revenues | 939,548 | 1,035,010 | 816,017 |
| **Services revenues:** |  |  |  |
| Funeral | 938,204 | 962,854 | 700,506 |
| Cemetery | 187,470 | 207,007 | 170,523 |
| Total services revenues | 1,125,674 | 1,169,861 | 871,029 |
| **Other revenues** | 90,400 | 80,432 | 65,842 |
| Total revenues | $ 2,155,622 | $ 2,285,303 | $ 1,752,888 |
| **Merchandise costs and expenses:** |  |  |  |
| Funeral | $ 246,867 | $ 256,753 | $ 198,053 |
| Cemetery | 199,033 | 205,629 | 161,157 |
| Total cost of merchandise | 445,900 | 462,382 | 359,210 |
| **Services costs and expenses:** |  |  |  |
| Funeral | 453,704 | 473,559 | 353,117 |
| Cemetery | 105,903 | 112,175 | 93,881 |
| Total cost of services | 559,607 | 585,734 | 446,998 |
| **Overhead and other expenses** | 731,344 | 770,340 | 598,716 |
| Total cost and expenses | $ 1,736,851 | $ 1,818,456 | $ 1,404,924 |

*Certain Non-Cash Financing and Investing Transactions*

|  | Years Ended December 31, | | |
|---|---|---|---|
|  | 2008 | 2007 | 2006 |
|  |  | (In thousands) |  |
| Value of StoneMor partnership units received in disposition | $ — | $ — | $ 5,875 |
| Dividends accrued but not paid | $ 9,981 | $ 10,585 | $ 8,788 |

## 18.  Earnings Per Share

Basic earnings per common share (EPS) excludes dilution and is computed by dividing *Net income* by the weighted average number of common shares outstanding for the period. Diluted EPS reflects the potential dilution that could occur if securities or other obligations to issue common stock were exercised or converted into common stock or resulted in the issuance of common stock that then shared in our earnings.

112

Source: SERVICE CORPORATION , 10-K, March 02, 2009

Table of Contents

## SERVICE CORPORATION INTERNATIONAL

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

A reconciliation of the numerators and denominators of the basic and diluted EPS for the three years ended December 31 is presented below:

|  | 2008 | 2007 | 2006 |
|---|---|---|---|
|  | (In thousands, except per share amounts) | | |
| Income from continuing operations (numerator): | | | |
| Income from continuing operations — basic | $ 97,445 | $ 243,317 | $ 52,604 |
| After tax interest on convertible debt | — | 179 | — |
| Income from continuing operations — diluted | $ 97,445 | $ 243,496 | $ 52,604 |
| (Loss) income from discontinued operations, net of tax (numerator) | $ (362) | $ 4,412 | $ 3,907 |
| Net income (numerator): | | | |
| Net income — basic | $ 97,083 | $ 247,729 | $ 56,511 |
| After tax interest on convertible debt | — | 179 | — |
| Net income — diluted | $ 97,083 | $ 247,908 | $ 56,511 |
| Weighted average shares (denominator): | | | |
| Weighted average shares — basic | 257,477 | 284,966 | 292,859 |
| Stock options | 2,876 | 5,002 | 4,317 |
| Convertible debt | — | 235 | — |
| Restricted stock | 93 | 241 | 195 |
| Weighted average shares — diluted | 260,446 | 290,444 | 297,371 |
| Income per share from continuing operations: | | | |
| Basic | $ .38 | $ .85 | $ .18 |
| Diluted | $ .37 | $ .83 | $ .18 |
| Income per share from discontinued operations, net of tax: | | | |
| Basic | $ — | $ .02 | $ .01 |
| Diluted | $ — | $ .02 | $ .01 |
| Net income per share: | | | |
| Basic | $ .38 | $ .87 | $ .19 |
| Diluted | $ .37 | $ .85 | $ .19 |

The computation of diluted earnings per share excludes outstanding stock options and convertible debt in certain periods in which the inclusion of such options and debt would be antidilutive in the periods presented. Total options and convertible debentures not currently included in the computation of dilutive earnings per share for the respective periods are as follows (in shares):

|  | 2008 | 2007 | 2006 |
|---|---|---|---|
| Antidilutive options | 3,135 | 205 | 5,420 |
| Antidilutive convertible debentures | 167 | 52 | 602 |
| Total common stock equivalents excluded from computations | 3,302 | 257 | 6,022 |

### 19. Divestiture-Related Activities

As dispositions occur in the normal course of business, gains or losses on the sale of such businesses are recognized in the income statement line item *(Losses) gains on divestitures and impairment charges, net.*

113

Source: SERVICE CORPORATION , 10-K, March 02, 2009

Table of Contents

SERVICE CORPORATION INTERNATIONAL

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

Additionally, as divestitures occur pursuant to our ongoing asset sale programs, adjustments are made through this income statement line item to reflect the difference between actual proceeds received from the sale compared to the original estimates.

*(Losses) gains on divestitures and impairment charges, net* consist of the following for the years ended December 31:

|  | 2008 | 2007 | 2006 |
| --- | --- | --- | --- |
|  |  | (In thousands) |  |
| (Losses) gains on divestitures, net | $ (4,695) | $ 30,083 | $ (18,726) |
| Impairment losses | (31,429) | (13,163) | (39,957) |
|  | $ (36,124) | $ 16,920 | $ (58,683) |

### Sale of Kenyon Operations

In October 2007, we divested 70% of our Kenyon investment for proceeds of $0.7 million. We recognized a pre-tax gain of $0.4 million in *(Losses) gains on divestitures and impairment charges, net* in our consolidated statement of operations for the year ended December 31, 2007.

### Sale of Operations in Michigan

In 2006, our Board of Directors approved a plan to divest certain funeral homes and cemeteries in Michigan. We recognized a pretax impairment charge in 2006 of $26.4 million related to these properties. In 2007 and 2008, we recorded additional impairment charges of $1.6 million and $13.9 million, respectively. As of December 31, 2008, these locations remain classified as assets held for sale.

### Sale of Operations in Singapore

In October 2006, we sold our businesses in Singapore for proceeds of approximately $11.6 million. We recognized an after-tax gain in 2006 of $2.9 million in *Income from discontinued operations* in our consolidated statement of operations as a result of this transaction. In 2007, we received proceeds totaling $1.9 million and recorded a receivable of $0.8 million related to this sale. We recognized an after-tax gain in 2007 of $1.5 million in *Income from discontinued operations* in our consolidated statement of operations as a result of this transaction.

### Sale of Operations in Chile

In September 2005, we completed the sale of our cemetery operations in Chile for proceeds of approximately $106 million. We received net cash proceeds of $90.0 million upon completion of the sale and received additional cash proceeds of CLP 5.8 billion or approximately $11.0 million in 2006. In the first quarter of 2007, we received the remainder of the proceeds totaling CLP 2.5 billion or approximately $4.7 million.

### Sales of Assets to StoneMor Partners LP

In December 2007, we sold 46 cemeteries and 30 funeral homes to StoneMor Partners LP (StoneMor) for proceeds of approximately $71.0 million. As a result of this transaction, we recognized a pre-tax gain of $21.1 million in *(Losses) gains on divestitures and impairment charges, net* in our consolidated statement of operations for the year ended December 31, 2007.

In September 2006, we sold 21 cemeteries and 14 funeral homes to StoneMor for proceeds of approximately $11.8 million. We received net cash proceeds of $5.9 million and 275,046 StoneMor units valued at $5.9 million. As a result of this transaction, we recognized a pre-tax loss of $16.6 million in *(Losses) gains on divestitures and impairment charges, net* in our consolidated statement of operations for the year ended December 31, 2006. In 2008, we received proceeds totaling $5.9 million from the sale of our StoneMor units acquired in the divestiture.

114

Table of Contents

SERVICE CORPORATION INTERNATIONAL

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

### Sale of Mayflower National Life Insurance Company

In July 2007, we completed the sale of Mayflower National Life Insurance Company, Alderwoods former insurance subsidiary, to Assurant Inc. for proceeds of approximately $67.5 million. We recognized a $1.5 million gain related to this sale in the third quarter of 2007. The operations of this subsidiary are presented as discontinued operations in our consolidated statement of operations.

### Equity Investment and Redemption of Securities

In October 2007, we sold our remaining equity investment in our French operations for 12.0 million euros, or $17.0 million and recognized a gain on divestiture of $17.6 million recorded in *Equity in earnings of unconsolidated subsidiaries*. Proceeds received from this sale are classified as an operating cash flow in the accompanying statement of cash flows. In connection with this sale, we also received 101.5 million euros, or $144.0 million, in cash from the redemption of securities, which included the remainder of our convertible preferred equity certificates (CPECs), which were received in connection with the original disposition of our operations in France in March 2004. The CPECs had a carrying value of zero. In addition, 10 million euros, or approximately $14.1 million, related to the redemption were deposited into a euro-denominated escrow account for potential payment for existing indemnification liabilities. We recognized a gain of $158.1 million related to the redemption of these CPECs. Proceeds of $158.7 million are classified as investing activities in the accompanying statement of cash flows.

### Assets Held for Sale

We committed to a plan to sell certain operating properties as of both December 31, 2008 and 2007. In connection with these assets held for sale, we recorded impairment losses of approximately $28 million and $13 million, respectively, in our consolidated statement of operations for the years ended December 31, 2008 and 2007.

Net assets held for sale were as follows:

| | December 31, | |
| --- | --- | --- |
| | 2008 | 2007 |
| **Assets:** | | |
| Current assets | $ 1,279 | $ 2,294 |
| Preneed funeral receivables and trust investments | 3,099 | 9,944 |
| Preneed cemetery receivables and trust investments | 49,985 | 64,751 |
| Cemetery property | 11,047 | 9,343 |
| Property and equipment, at cost, net | 1,386 | 9,968 |
| Deferred charges and other assets | 11,748 | 12,390 |
| Cemetery perpetual care trust investments | 20,247 | 16,232 |
| **Total assets** | 98,791 | 124,920 |
| **Liabilities:** | | |
| Accounts payable and accrued liabilities | 465 | 149 |
| Deferred preneed funeral revenues | 2,640 | 8,388 |
| Deferred preneed cemetery revenues | 51,730 | 67,141 |
| Other liabilities | 920 | 167 |
| Care trusts corpus | 20,247 | 16,232 |
| Total liabilities | 76,002 | 92,077 |
| **Net assets held for sale** | $ 22,789 | $ 32,843 |

115

Source: SERVICE CORPORATION , 10-K, March 02, 2009

Table of Contents

SERVICE CORPORATION INTERNATIONAL

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

*Discontinued Operations*

During the fourth quarter of 2006, we disposed of our funeral operations in Singapore, which are classified as discontinued operations for all periods presented.

As part of the Alderwoods transaction, we acquired an insurance subsidiary that we sold on June 30, 2007. The operations of this subsidiary from November 28, 2006 to June 30, 2007 are presented as discontinued operations in our consolidated statement of operations. In addition, in the second quarter of 2008, we settled an outstanding contingency related to the 2005 divestiture of our operations in Argentina. The loss related to this transaction is included in discontinued operations for the year ended December 31, 2008.

The results of our discontinued operations for the years ended December 31, 2008, 2007, and 2006 were as follows:

|  | Years Ended December 31, | | |
|---|---|---|---|
|  | 2008 | 2007 | 2006 |
|  | (In thousands) | | |
| Revenues | $ — | $ 42,626 | $ 12,324 |
| (Losses) gains on divestitures and impairment charges, net | (557) | 1,548 | 128 |
| Costs and other expenses | — | (36,448) | (11,093) |
| Other income | — | 1,504 | — |
| (Loss) income from discontinued operations before income taxes | (557) | 9,230 | 1,359 |
| Benefit (provision) for income taxes | 195 | (4,818) | 2,548 |
| (Loss) income from discontinued operations | $ (362) | $ 4,412 | $ 3,907 |

### 20.  Alderwoods Acquisition

On November 28, 2006, we acquired all of the outstanding common stock of Alderwoods for $20.00 per share in cash, resulting in a purchase price of approximately $1.2 billion, which includes the refinancing of $357.7 million and the assumption of $2.2 million of Alderwoods' debt. Included in our results of operations for the year ended December 31, 2006 are the results of Alderwoods' operations from the date of acquisition through December 31, 2006.

The primary reasons for the merger and the principal factors that contributed to the recognition of goodwill in this acquisition were:

- the acquisition of Alderwoods creates a stronger company with the benefits of increased size and scale, enabling us to serve a number of new, complementary areas;

- the acquisition of Alderwoods' preneed backlog of deferred revenues enhances our long-term stability; and

- combining the two companies' operations provides significant synergies and related cost savings.

116

Source: SERVICE CORPORATION , 10-K, March 02, 2009

Table of Contents

**SERVICE CORPORATION INTERNATIONAL**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

The following unaudited pro forma summary presents information as if the merger had occurred as of January 1, 2006:

| | Year Ended December 31, 2006 |
| --- | --- |
| | (In thousands, except per share amounts) |
| Revenue | $ 2,358,644 |
| Income from continuing operations | 15,505 |
| Net income | 22,450 |
| Income from continuing operations per share: | |
| Basic | .05 |
| Diluted | .05 |
| Net income per share: | |
| Basic | .08 |
| Diluted | .08 |

117

Table of Contents

# SERVICE CORPORATION INTERNATIONAL

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

**21.  Quarterly Financial Data (Unaudited)**

Quarterly financial data for 2008 and 2007 is as follows:

| | First Quarter | Second Quarter | Third Quarter | Fourth Quarter(4) |
|---|---|---|---|---|
| | | (In thousands, except per share amounts) | | |
| **2008** | | | | |
| Revenues | $ 573,451 | $ 548,782 | $ 516,439 | $ 516,950 |
| Costs and expenses | (435,854) | (441,422) | (434,370) | (425,205) |
| Gross profits | 137,597 | 107,360 | 82,069 | 91,745 |
| Operating income | 99,370 | 83,535 | 48,830 | 60,937 |
| Income from continuing operations before income taxes(1) | 66,473 | 52,169 | 15,799 | 28,721 |
| Provision for income taxes | (24,969) | (20,395) | (1,160) | (19,193) |
| Income from continuing operations | 41,504 | 31,774 | 14,639 | 9,528 |
| Income (loss) from discontinued operations, net of tax (3) | 15 | (377) | | |
| Net income | 41,519 | 31,397 | 14,639 | 9,528 |
| Earnings per share: | | | | |
| Basic — EPS | .16 | .12 | .06 | .04 |
| Diluted — EPS | .16 | .12 | .06 | .04 |
| **2007** | | | | |
| Revenues | $ 607,555 | $ 565,492 | $ 539,334 | $ 572,922 |
| Costs and expenses | (466,572) | (462,253) | (436,819) | (452,812) |
| Gross profits | 140,983 | 103,239 | 102,515 | 120,110 |
| Operating income | 98,075 | 82,823 | 75,332 | 89,936 |
| Income from continuing operations before income taxes(1)(2) | 58,214 | 41,850 | 42,907 | 244,016 |
| Provision for income taxes | (23,497) | (28,941) | (14,062) | (77,170) |
| Income from continuing operations | 34,717 | 12,909 | 28,845 | 166,846 |
| Income (loss) from discontinued operations, net of tax(3) | 2,925 | 2,209 | (675) | (47) |
| Net income | 37,642 | 15,118 | 28,170 | 166,799 |
| Earnings per share: | | | | |
| Basic — EPS | .13 | .05 | .10 | .61 |
| Diluted — EPS | .13 | .05 | .10 | .60 |

(1) Includes *(Losses) gains on divestitures and impairment charges, net*, as described in Note 19.

(2) Included in these amounts is a $158.1 million gain on redemption of securities, recognized in fourth quarter of 2007, representing the redemption of our securities which were received in connection with the original disposition of our former equity investment in France and a $36.6 million equity in earnings of unconsolidated subsidiaries in France.

(3) Includes income (loss) from discontinued operations as described in Note 19.

(4) In connection with our ongoing efforts to remediate our previously reported material weaknesses and other internal control deficiencies, we recorded several immaterial adjustments to correct errors related to prior

118

Source: SERVICE CORPORATION , 10-K, March 02, 2009

Table of Contents

SERVICE CORPORATION INTERNATIONAL

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

accounting periods during the year ended December 31, 2008. The net impact of these adjustments was a decrease to our pre-tax income and net income in the amount of $2.1 million and $5.5 million, respectively, for the quarter ended December 31, 2008.

119

Source: SERVICE CORPORATION , 10-K, March 02, 2009

Table of Contents

# SERVICE CORPORATION INTERNATIONAL

## SCHEDULE II — VALUATION AND QUALIFYING ACCOUNTS

Three Years Ended December 31, 2008

| Description | Balance at Beginning of Period | Charged (Credited) to Costs and Expenses | Charged (Credited) to Other Accounts(1) | Write-Offs(2) | Balance at End of Period |
|---|---|---|---|---|---|
| | | | (In thousands) | | |
| **Current provision:** | | | | | |
| **Allowance for doubtful accounts:** | | | | | |
| Year ended December 31, 2008 | $ 19,475 | $ 9,314 | $ 305 | $ (9,359) | $ 19,735 |
| Year ended December 31, 2007 | 25,793 | 11,489 | 9 | (17,816) | 19,475 |
| Year ended December 31, 2006 | 11,835 | 10,020 | 12,060 | (8,122) | 25,793 |
| **Due After One Year:** | | | | | |
| **Allowance for doubtful accounts:** | | | | | |
| Year ended December 31, 2008 | $ 2,825 | $ — | $ — | $ (50) | $ 2,775 |
| Year ended December 31, 2007 | 3,844 | (705) | (314) | — | 2,825 |
| Year ended December 31, 2006 | 7,312 | (2,100) | 450 | (1,818) | 3,844 |
| **Preneed Funeral and Preneed Cemetery Asset:** | | | | | |
| Year ended December 31, 2008 | $ 64,062 | $ 1,305 | $ (6,749) | $ — | 58,618 |
| Year ended December 31, 2007 | 81,572 | (3,546) | (13,964) | — | 64,062 |
| Year ended December 31, 2006 | 60,358 | (803) | 22,017 | — | 81,572 |
| **Deferred Preneed Funeral and Cemetery Revenue:** | | | | | |
| Year ended December 31, 2008 | $ (143,730) | $ — | $ 5,961 | $ — | $ (137,769) |
| Year ended December 31, 2007 | (151,341) | — | 7,611 | — | (143,730) |
| Year ended December 31, 2006 | (112,002) | — | (39,339) | — | (151,341) |
| **Deferred Tax Valuation Allowance:** | | | | | |
| Year ended December 31, 2008 | $ 68,469 | $ (2,355) | $ 3,708 | $ — | $ 69,822 |
| Year ended December 31, 2007 | 70,547 | 8,034 | (10,112) | — | 68,469 |
| Year ended December 31, 2006 | 34,829 | (3,033) | 38,751 | — | 70,547 |

(1) Primarily relates to acquisitions and dispositions of operations.

(2) Uncollected receivables written off, net of recoveries.

120

Source: SERVICE CORPORATION , 10-K, March 02, 2009

Table of Contents

**Item 9.** *Changes In and Disagreements with Accountants on Accounting and Financial Disclosure*

None.

**Item 9A.** *Controls and Procedures*

**Evaluation of Disclosure Controls and Procedures**

As of December 31, 2008, we carried out an evaluation, under the supervision and with the participation of our Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), of the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")). Our disclosure controls and procedures are designed to ensure that information required to be disclosed in the Securities and Exchange Commission ("SEC") reports we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time period specified by the SEC's rules and forms and that such information is accumulated and communicated to management, including our CEO and CFO, as appropriate, to allow timely decisions regarding required disclosure. In light of the material weakness set forth below, these officers have concluded that our disclosure controls and procedures were not effective as of December 31, 2008. To address the material weakness described below, we performed additional review and analysis and other post-closing procedures to ensure that our income tax provision and related tax disclosures were prepared in accordance with accounting principles generally accepted in the United States of America (US GAAP). Based on the additional procedures performed, management has concluded that the consolidated financial statements included in this Annual Report on Form 10-K fairly present, in all material respects, our financial condition, result of operations and cash flows for the periods presented in conformity with US GAAP.

**Management's Annual Report on Internal Control over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rule 13a-15(f) under the Exchange Act. Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of our financial reporting and the preparation of our financial statements for external reporting purposes in accordance with US GAAP. Internal control over financial reporting includes those policies and procedures that: (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of our assets; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of our financial statements in accordance with US GAAP, and that our receipts and expenditures are being made only in accordance with authorizations of our management and directors; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of our assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with policies and procedures may deteriorate.

Under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we have assessed the effectiveness of our internal control over financial reporting as of December 31, 2008. In making this assessment, our management used the criteria described in *Internal Control — Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Based on this assessment and those criteria, and as described below, our management concluded that the Company did not maintain effective internal control over financial reporting as of December 31, 2008 as a result of a material weakness in accounting for income taxes.

A material weakness is a deficiency, or combination of deficiencies, that results in a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected

121

Table of Contents

on a timely basis. As of December 31, 2008, management identified the following material weakness in its assessment of the effectiveness of our internal control over financial reporting:

- We did not maintain effective controls over our accounting for income taxes. Specifically, we did not maintain effective controls over the completeness and accuracy of our quarterly and year-end tax provision calculations and related deferred income taxes and income taxes payable in accordance with US GAAP.

This control deficiency resulted in various audit adjustments to the consolidated financial statements in the first and fourth quarters of 2008. Additionally, this control deficiency, if not corrected, could result in a material misstatement of the income tax accounts that would result in a material misstatement in our annual or interim consolidated financial statements that would not be prevented or detected on a timely basis. Therefore, we have concluded that this control deficiency constitutes a material weakness.

The effectiveness of the Company's internal control over financial reporting as of December 31, 2008 has been audited by PricewaterhouseCoopers LLP, an independent registered public accounting firm, as stated in their report which is included herein.

**Management's Remediation Initiatives**

In our Annual Report on Form 10-K for the year ended December 31, 2007, management identified two material weaknesses in our internal control over financial reporting. These material weaknesses included a material weakness relating to our accounting for income taxes and a material weakness relating to the timely completion and review of certain of our balance sheet account reconciliations. In response to those two identified material weaknesses, we took a number of substantial actions during the year ended December 31, 2008. As a result of these actions, the material weakness relating to the timely completion and review of certain of our balance sheet account reconciliations has been remediated. While we took considerable action to remediate the material weakness in our accounting for income taxes existing as of December 31, 2007, such remediation has not yet been fully evidenced.

To address the material weakness in our accounting for income taxes, we have implemented or will implement the following remediation steps to enhance our internal controls over the calculation of our income tax provision and related balance sheet accounts:

- The hiring of an experienced Managing Director in the first quarter of 2008 to lead the Company's tax department, with responsibility for direction and oversight of all income tax and other tax functions.

- The reorganization of our tax department's organizational structure to facilitate our staffing of the department with an adequate mix of qualified personnel.

- The hiring of experienced tax professionals in all tax director and manager level positions in 2008.

- The provision of FAS 109 technical training for all of our tax personnel.

- The completion of a tax basis balance sheet project with the assistance of third party advisors in the fourth quarter of 2008.

- The implementation of a tax software solution in 2009 to replace manual processes and spreadsheets currently used to compute our state and federal income tax provision.

- The simplification of our legal and reporting structure in 2009, which we believe will facilitate the efficiency and effectiveness of our state income tax provision.

We believe the foregoing actions have improved, and will continue to improve, our internal control over financial reporting and our disclosure controls and procedures.

**Changes in Internal Control over Financial Reporting**

There have been no changes in our internal control over financial reporting during the most recently completed fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

122

Table of Contents

**Item 9B.** *Other Information*

None.

## PART III

**Item 10.** *Directors, Executive Officers and Corporate Governance*

**Item 11.** *Executive Compensation*

**Item 12.** *Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters*

**Item 13.** *Certain Relationships and Related Transactions, and Director Independence*

**Item 14.** *Principal Accountant Fees and Services*

Information required by PART III (Items 10, 11, 12, 13 and 14) has been omitted as we intend to file with the Commission not later than 120 days after the end of our fiscal year a definitive proxy statement that includes such information. Such information is set forth in such proxy statement (i) with respect to Item 10, under the captions "Proxy Voting: Questions and Answers," "Election of Directors," "Other Matters — Section 16(a) Beneficial Ownership Reporting Compliance" and "Report of the Audit Committee," (ii) with respect to Items 11 and 13, under the captions "Election of Directors," "Compensation Discussion and Analysis," "Compensation Committee Report," "Certain Information with Respect to Officers and Directors," "Compensation Committee Interlocks and Insider Participation" and "Certain Transactions", (iii) with respect to Item 12, under the caption "Voting Securities and Principal Holders", and (iv) with respect to Item 14, under the caption "Proposal to Approve the Selection of Independent Accountants — Audit Fees and All Other Fees". The information as specified in the preceding sentence is incorporated herein by reference; provided however, notwithstanding anything set forth in this Form 10-K, the information under the captions "Compensation Committee Report" and "Report of the Audit Committee" in such proxy statement, is not incorporated by reference into this Form 10-K.

The information regarding our executive officers called for by Item 401 of Regulation S-K and the information regarding our code of ethics called for by Item 406 of Regulation S-K has been included in PART I of this report. The information regarding our equity compensation plan information called for by Item 201(d) of Regulation S-K is set forth below.

Equity Compensation Plan Information at December 31, 2008:

| Plan Category | Number of Securities to be Issued upon Exercise of Outstanding Options, Warrants and Rights (a) | Weighted-Average Exercise Price of Outstanding Options, Warrants and Rights (b) | Number of Securities Remaining Available for Future Issuance Under Equity Compensation Plans (Excluding Securities Reflected in Column (a)) (c) |
|---|---|---|---|
| Equity compensation plans approved by security holders | 9,288,287 | 7.99 | 12,068,455 |
| Equity compensation plans not approved by security holders(1) | 1,517,602 | 6.63 | 2,184,775(2) |
| Total | 10,805,889 | 7.79 | 14,253,230 |

(1) Includes options outstanding under the 1996 Nonqualified Incentive Plan under which nonqualified stock options were granted to employees who are not officers or directors. We have 1,517,602 total options outstanding under the 1996 Non-qualified Incentive Plan. No shares of our common stock are available for any future grants under this plan. See Note 14 in Part II, Item 8. Financial Statements and Supplementary Data,

123

Source: SERVICE CORPORATION , 10-K, March 02, 2009

Table of Contents

for a further description of 1996 Nonqualified Incentive Plan. This plan has not been submitted for shareholder approval.

(2) Includes an estimated 2,184,775 shares available under the Employee Stock Purchase Plan. Under such plan, a dollar value of shares (not an amount of shares) are registered. The above estimate was determined by dividing (i) the remaining unissued dollar value of registered shares at December 31, 2008, which was $10.9 million, by (ii) the closing price of $4.97 per share of common stock at December 31, 2008.

The Employee Stock Purchase Plan enables Company employees in North America to invest via payroll deductions up to $500 (or $600 Canadian) per month in our common stock. Contributions are utilized to purchase the stock in the open market. With respect to Canadian employees who meet certain requirements, we will provide annually a match equal to 25% of the amount of the employee's contribution subject to a maximum contribution per participant of $1,800 Canadian. This plan has not been submitted for shareholder approval.

### Certifications

In 2008, the Company submitted to the New York Stock Exchange the Section 12(a) certification by the Company's Chief Executive Officer regarding compliance with the Exchange's corporate governance listing standards. The Sarbanes-Oxley Act Section 302 certifications regarding the quality of the Company's public disclosure are attached as Exhibits 31.1 and 31.2 to this report on Form 10-K.

124

Table of Contents

**PART IV**

**Item 15.** *Exhibits and Financial Statement Schedule*

(a)(1)-(2) *Financial Statements and Schedule:*

The financial statements and schedule are listed in the accompanying Index to Financial Statements and Related Schedule on page 46 of this report.

(3) *Exhibits:*

The exhibits listed on the accompanying Exhibit Index on pages 128-131 are filed as part of this report.

(b) *Included in (a) above.*

(c) *Included in (a) above.*

125

Table of Contents

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant, Service Corporation International, has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

SERVICE CORPORATION INTERNATIONAL

By:     /s/  GREGORY T. SANGALIS
        (Gregory T. Sangalis,
        *Senior Vice President, General
        Counsel, and Secretary)*

Dated: February 27, 2009

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant and in the capacities and on the date indicated.

| Signature | Title | Date |
|---|---|---|
| /s/  R. L. WALTRIP*<br>(R. L. Waltrip) | Chairman of the Board | February 27, 2009 |
| /s/  THOMAS L. RYAN*<br>(Thomas L. Ryan) | President, Chief Executive Officer, and Director (Principal Executive Officer) | February 27, 2009 |
| /s/  ERIC D. TANZBERGER*<br>(Eric D. Tanzberger) | Senior Vice President, Chief Financial Officer, and Treasurer (Principal Financial Officer) | February 27, 2009 |
| /s/  JEFFREY I. BEASON*<br>(Jeffrey I. Beason) | Vice President and Corporate Controller (Chief Accounting Officer) | February 27, 2009 |
| /s/  ALAN R. BUCKWALTER, III*<br>(Alan R. Buckwalter, III) | Director | February 27, 2009 |
| /s/  ANTHONY L. COELHO*<br>(Anthony L. Coelho) | Director | February 27, 2009 |
| /s/  A. J. FOYT, JR.*<br>(A. J. Foyt, Jr.) | Director | February 27, 2009 |
| /s/  MALCOLM GILLIS*<br>(Malcolm Gillis) | Director | February 27, 2009 |
| /s/  VICTOR L. LUND*<br> | Director | February 27, 2009 |

Source: SERVICE CORPORATION , 10-K, March 02, 2009

_____
　　　　　　(Victor L. Lund)

/s/ JOHN W. MECOM, JR.*　　　　　　Director　　　　　February 27, 2009
_____
　　　　　(John W. Mecom, Jr.)

126

Table of Contents

| Signature | Title | Date |
|---|---|---|
| /s/ CLIFTON H. MORRIS, JR.* | Director | February 27, 2009 |
| (Clifton H. Morris, Jr.) | | |
| /s/ W. BLAIR WALTRIP* | Director | February 27, 2009 |
| (W. Blair Waltrip) | | |
| /s/ EDWARD E. WILLIAMS* | Director | February 27, 2009 |
| (Edward E. Williams) | | |

*By     /s/ GREGORY T. SANGALIS

(Gregory T. Sangalis, as
Attorney-In-Fact For each of the
Persons indicated)

127

Table of Contents

## EXHIBIT INDEX

### PURSUANT TO ITEM 601 OF REG. S-K

| Exhibit Number | | Description |
|---|---|---|
| 3.1 | — | Restated Articles of Incorporation. (Incorporated by reference to Exhibit 3.1 to Registration Statement No. 333-10867 on Form S-3). |
| 3.2 | — | Articles of Amendment to Restated Articles of Incorporation. (Incorporated by reference to Exhibit 3.1 to Form 10-Q for the fiscal quarter ended September 30, 1996). |
| 3.3 | — | Statement of Resolution Establishing Series of Shares of Series D Junior Participating Preferred Stock, dated July 27, 1998. (Incorporated by reference to Exhibit 3.2 to Form 10-Q for the fiscal quarter ended June 30, 1998). |
| 3.4 | — | Bylaws, as amended. (Incorporated by reference to Exhibit 3.1 to Form 8-K dated November 16, 2007). |
| 4.1 | — | Senior Indenture dated as of February 1, 1993 by and between the Company and The Bank of New York, as trustee. (Incorporated by reference as Exhibit 4.1 to Form S-4 filed September 2, 2004 (File No. 333-118763)). |
| 4.2 | — | Agreement of Resignation, Appointment of Acceptance, dated October 21, 2005, among the Company, The Bank of New York and The Bank of New York Trust Company, N.A., appointing a successor trustee for the Senior Indenture dated as of February 1, 1993. (Incorporated by reference to Exhibit 4.1 to Form 10-Q for the fiscal quarter ended June 30, 2005). |
| 10.1 | — | Retirement Plan For Non-Employee Directors. (Incorporated by reference to Exhibit 10.1 to Form 10-K for the fiscal year ended December 31, 1991). |
| 10.2 | — | First Amendment to Retirement Plan For Non-Employee Directors. (Incorporated by reference to Exhibit 10.2 to Form 10-K for the fiscal year ended December 31, 2000). |
| 10.3 | — | Agreement dated May 14, 1992 between the Company, R. L. Waltrip and related parties relating to life insurance. (Incorporated by reference to Exhibit 10.4 to Form 10-K for the fiscal year ended December 31, 1992). |
| 10.4 | — | Employment Agreement, dated December 28, 2006, between SCI Executive Services, Inc. and R.L. Waltrip (including Non-Competition Agreement and Amendment to Employment Agreement, dated November 11, 1991, among the Company, R. L. Waltrip and Claire Waltrip). (Incorporated by reference to Exhibit 10.4 to Form 10-K for the fiscal year ended December 31, 2006). |
| 10.5 | — | Amendment to Employment and Noncompetition Agreement, dated November 30, 2007, between SCI Executive Services, Inc. and R. L. Waltrip. (Incorporated by reference to Exhibit 10.5 to Form 10-K for the fiscal year ended December 31, 2007). |
| 10.6 | — | Employment and Noncompetition Agreement, dated January 1, 2004, between SCI Executive Services, Inc. and Thomas L. Ryan. (Incorporated by reference to Exhibit 10.9 to Form 10-K for the fiscal year ended December 31, 2003). |
| 10.7 | — | Addendum to Employment and Noncompetition Agreement, dated December 1, 2005, between SCI Executive Services, Inc. and Thomas L. Ryan. (Incorporated by reference to Exhibit 10.12 to Form 10-K for the fiscal year ended December 31, 2005). |
| 10.8 | — | Amendment to Employment and Noncompetition Agreement, dated November 30, 2007, between SCI Executive Services, Inc. and Thomas L. Ryan. (Incorporated by reference to Exhibit 10.8 to Form 10-K for fiscal year ended December 31, 2007). |
| 10.9 | — | Employment and Noncompetition Agreement, dated January 1, 2004, between SCI Executive Services, Inc. and Michael R. Webb. (Incorporated by reference to Exhibit 10.10 to Form 10-K for the fiscal year ended December 31, 2003). |
| 10.10 | — | Addendum to Employment and Noncompetition Agreement, dated December 1, 2005, between SCI Executive Services, Inc. and Michael R. Webb. (Incorporated by reference to Exhibit 10.14 to Form 10-K for the fiscal year ended December 31, 2005). |
| 10.11 | — | Amendment to Employment and Noncompetition Agreement, dated November 30, 2007, between SCI Executive Services, Inc. and Michael R. Webb. (Incorporated by reference to Exhibit 10.11 to Form 10-K for the fiscal year ended December 31, 2007). |

128

Source: SERVICE CORPORATION , 10-K, March 02, 2009

Table of Contents

| Exhibit Number | Description |
|---|---|
| 10.12 | — Employment and Noncompetition Agreement, dated December 28, 2006 between SCI Executive Services, Inc. and Eric D. Tanzberger. (Incorporated by reference to Exhibit 10.11 to Form 10-K for the fiscal year ended December 31, 2006). |
| 10.13 | — Amendment to Employment and Noncompetition Agreement, dated November 30, 2007, between SCI Executive Services, Inc. and Eric D. Tanzberger. (Incorporated by reference to Exhibit 10.13 to Form 10-K for the fiscal year ended December 31, 2007). |
| 10.14 | — Employment and Noncompetition Agreement, dated February 9, 2005, between SCI Executive Services, Inc. and J. Daniel Garrison; Addendum to Employment and Noncompetition Agreement, dated December 1, 2005, between SCI Executive Services, Inc. and J. Daniel Garrison; Amendment to Employment and Noncompetition Agreement, dated November 30, 2007, between SCI Executive Services, Inc. and J. Daniel Garrison. |
| 10.15 | — Form of Employment and Noncompetition Agreement pertaining to non-senior officers. (Incorporated by reference to Exhibit 10.12 to Form 10-K for the fiscal year ended December 31, 2003). |
| 10.16 | — Form of Addendum to Employment and Noncompetition Agreement pertaining to the preceding exhibit. (Incorporated by reference to Exhibit 10.20 to Form 10-K for the fiscal year ended December 31, 2005). |
| 10.17 | — Form of Amendment to Employment and Noncompetition Agreement dated November 30, 2007, between SCI Executive Services, Inc. and non-senior officers. (Incorporated by reference to Exhibit 10.18 to Form 10-K for the fiscal year ended December 31, 2007). |
| 10.18 | — 1993 Long-Term Incentive Stock Option Plan. (Incorporated by reference to Exhibit 4.12 to Registration Statement No. 333-00179 on Form S-8). |
| 10.19 | — Amendment to 1993 Long-Term Incentive Stock Option Plan, dated February 12, 1997. (Incorporated by reference to Exhibit 10.15 to Form 10-K for the fiscal year ended December 31, 1996). |
| 10.20 | — Amendment to 1993 Long-Term Incentive Stock Option Plan, dated November 13, 1997. (Incorporated by reference to Exhibit 10.17 to Form 10-K for fiscal year ended December 31, 1997). |
| 10.21 | — Amended 1996 Incentive Plan. (Incorporated by reference to Appendix A to Proxy Statement dated April 6, 2007). |
| 10.22 | — Split Dollar Life Insurance Plan. (Incorporated by reference to Exhibit 10.36 to Form 10-K for the fiscal year ended December 31, 1995). |
| 10.23 | — Supplemental Executive Retirement Plan for Senior Officers (as Amended and Restated Effective as of January 1, 1998). (Incorporated by reference to Exhibit 10.28 to Form 10-K for the fiscal year ended December 31, 1998). |
| 10.24 | — First Amendment to Supplemental Executive Retirement Plan for Senior Officers. (Incorporated by reference to Exhibit 10.28 to Form 10-K for the fiscal year ended December 31, 2000). |
| 10.25 | — SCI 401(k) Retirement Savings Plan as Amended and Restated. (Incorporated by reference to Exhibit 4.7 to Registration Statement No. 333-119681). |
| 10.26 | — First Amendment to the SCI 401(k) Retirement Savings Plan. (Incorporated by reference to Exhibit 10.2 to Form 10-Q for the quarterly period ended September 30, 2004). |
| 10.27 | — Second Amendment to the SCI 401(k) Retirement Savings Plan, and Third Amendment to the SCI 401(k) Retirement Savings Plan. (Incorporated by reference to Exhibit 10.26 to Form 10-K for the fiscal year ended December 31, 2004). |
| 10.28 | — Fourth Amendment to the SCI 401(k) Retirement Savings Plan. (Incorporated by reference to Exhibit 10.27 to Form 10-K for the fiscal year ended December 31, 2006). |
| 10.29 | — Fifth Amendment to the SCI 401(k) Retirement Savings Plan. (Incorporated by reference to Exhibit 10.30 to Form 10-K for the fiscal year ended December 31, 2007). |
| 10.30 | — Sixth Amendment to the SCI 401(k) Retirement Savings Plan. |
| 10.31 | — Amended and Restated Director Fee Plan. (Incorporated by reference to Annex A to Proxy Statement dated April 17, 2006). |
| 10.32 | — Employee Stock Purchase Plan. (Incorporated by reference to Exhibit 1.1 to Registration Statement No. 2-62484 on Form S-8). |

129

Table of Contents

| Exhibit Number | | Description |
|---|---|---|
| 10.33 | — | Amendment No. 1 to the Employee Stock Purchase Plan. (Incorporated by reference to Exhibit 15.1 to Registration Statement No. 2-62484 on Form S-8). |
| 10.34 | — | Amendment No. 2 to the Employee Stock Purchase Plan. (Incorporated by reference to Exhibit 28.3 to Registration Statement No. 33-25061 on Form S-8). |
| 10.35 | — | Amendment No. 3 to the Employee Stock Purchase Plan. (Incorporated by reference to Exhibit 28.4 to Registration Statement No. 33-35708 on Form S-8). |
| 10.36 | — | Amendment No. 5 to the Employee Stock Purchase Plan. (Incorporated by reference to Exhibit 10.31 to Form 10-K for the fiscal year ended December 31, 1999). |
| 10.37 | — | Agreement between Merrill Lynch Canada Inc. and Service Corporation International. (Incorporated by reference to Exhibit 28.5 to Post-Effective Amendment No. 1 to Registration Statement No. 33-8907 on Form S-8). |
| 10.38 | — | First Amendment to Agreement between Merrill Lynch Canada Inc. and Service Corporation International. (Incorporated by reference to Exhibit 4.2 to Current Report on Form 8-K dated December 21, 1993). |
| 10.39 | — | Employee Stock Purchase Plan Administration Agreement dated July 25, 2001 between Service Corporation International (Canada) Limited and Fastrak Systems Inc. (Incorporated by reference to Exhibit 10.48 to Form 10-K for the fiscal year ended December 31, 2002). |
| 10.40 | — | Form of Indemnification Agreement for officers and directors. (Incorporated by reference to Exhibit 10.1 to Form 10-Q for the quarterly period ended September 30, 2004). |
| 10.41 | — | Form of Executive Deferred Compensation Plan. (Incorporated by reference to Exhibit 10.52 to Form 10-K for the fiscal year ended December 31, 2005). |
| 10.42 | — | Form of Amendment to Executive Deferred Compensation Plan. (Incorporated by reference to Exhibit 10.49 to Form 10-K for the fiscal year ended December 31, 2007). |
| 10.43 | — | Form of Performance Unit Grant Award Agreement. |
| 10.44 | — | Note Purchase Agreement, dated November 28, 2006 among Service Corporation International and Purchasers identified therein. (Incorporated by reference to Exhibit 4.1 to Current Report on Form 8-K dated November 28, 2006). |
| 10.45 | — | First Amendment to Note Purchase Agreement, dated as of June 11, 2007, among the Company and the purchasers party thereto. (Incorporated by reference to Exhibit 10.2 to Form 8-K dated June 20, 2007). |
| 10.46 | — | Credit Agreement, dated November 28, 2006 among Service Corporation International, the lenders party thereto, and JPMorgan Chase Bank, N.A., as Administrative Agent. (Incorporated by reference to Exhibit 4.2 to Current Report on Form 8-K dated November 28, 2006). |
| 10.47 | — | Agreement and First Amendment to Credit Agreement, dated as of June 14, 2007, among the Company and the lenders party thereto. (Incorporated by reference to Exhibit 10.1 to Form 8-K dated June 20, 2007). |
| 12.1 | — | Ratio of Earnings to Fixed Charges. |
| 21.1 | — | Subsidiaries of the Company. |
| 23.1 | — | Consent of Independent Registered Public Accounting Firm (PricewaterhouseCoopers LLP). |
| 24.1 | — | Powers of Attorney. |
| 31.1 | — | Certification of Thomas L. Ryan as Principal Executive Officer in satisfaction of Section 302 of the Sarbanes-Oxley Act of 2002. |
| 31.2 | — | Certification of Eric D. Tanzberger as Principal Financial Officer in satisfaction of Section 302 of the Sarbanes-Oxley Act of 2002. |
| 32.1 | — | Certification of Periodic Financial Reports by Thomas L. Ryan as Principal Executive Officer in satisfaction of Section 906 of the Sarbanes-Oxley Act of 2002. |
| 32.2 | — | Certification of Periodic Financial Reports by Eric D. Tanzberger as Principal Financial Officer in satisfaction of Section 906 of the Sarbanes-Oxley Act of 2002. |

In the above list, the management contracts or compensatory plans or arrangements are set forth in Exhibits 10.1 through 10.43.

130

Table of Contents

Pursuant to Item 601(b)(4) of Regulation S-K, there are not filed as exhibits to this report certain instruments with respect to long-term debt under which the total amount of securities authorized thereunder does not exceed 10 percent of the total assets of Registrant and its subsidiaries on a consolidated basis. Registrant agrees to furnish a copy of any such instrument to the Commission upon request.

131

Source: SERVICE CORPORATION , 10-K, March 02, 2009

Exhibit 10.14

EMPLOYMENT AND NONCOMPETITION AGREEMENT

THIS AGREEMENT is made and effective this 9th day of February, 2005 between SCI Executive Services, Inc., a Delaware corporation (the "Company"), and J. Daniel Garrison (the "Employee"):

ARTICLE I
EMPLOYMENT

1.1 Employment Term. The Company agrees to employ the Employee and the Employee agrees to accept such employment, in accordance with the terms and conditions of this Agreement, for the period beginning on the date of this Agreement and ending as of the close of business on December 31, 2005 (such period together with all extensions thereof are referred to hereinafter as the "Employment Term"); provided, however, that commencing on January 1, 2006, and on each January 1 thereafter (each such date shall be hereinafter referred to as a "Renewal Date"), the Employment Term shall be extended so as to terminate one year from such Renewal Date if (i) the Company notifies the Employee in writing of such extension at least thirty days prior to such Renewal Date and (ii) the Employee has not previously given the Company written notice that the Employment Term shall not be so extended. In the event that the Company gives the Employee written notice at any time of its intention not to renew the Employment Term, then the Employment Term shall terminate on December 31 of the year in which such notice of non-renewal is given and shall not thereafter be further extended. If the Company fails to notify the Employee at least thirty days prior to a Renewal Date either of its intention to extend the Employment Term as provided above or its intention not to so extend the Employment Term, then the Employment Term shall not be extended and shall terminate as of the day prior to such Renewal Date.

1.2 Duties. The Employee shall serve the Company in an executive or managerial capacity and shall hold such title as may be authorized from time to time by the Board of Directors of Service Corporation International ("SCI"). The Employee shall have the duties, powers and authority consistent therewith and such other powers as are delegated to him in writing from time to time by the Board of Directors of SCI. If the Employee is elected to any office or other position with the Company during the term of this Agreement, the Employee will serve in such capacity or capacities without further compensation unless the Compensation Committee (the "Compensation Committee") of the Board of Directors of SCI authorizes additional compensation. The Employee's title and duties may be changed from time to time at the discretion of the Company. The Employee also agrees to perform, without additional compensation, such other services for the Company and for any subsidiary or affiliated corporations of the Company or for any partnerships in which the Company has an interest, as the Company shall from time to time specify. The term "Company" as used hereinafter shall be deemed to include and refer to subsidiaries and affiliated corporations and partnerships. Employee agrees and acknowledges that he owes, and will comply with, a fiduciary duty of loyalty, fidelity and allegiance to act at all times in the best interests of the Company and to take no action or fail to take action if such action or failure to act would injure the Company's business, its interests or its reputation.

1.3 Extent of Service. During the Employment Term, the Employee shall devote his full time, attention and energy to the business of the Company, and, except as may be specifically permitted by the Company, shall not be engaged in any other business activity during the term of this Agreement. The foregoing shall not be construed as preventing the Employee from making passive investments in other businesses or enterprises, provided, however, that such investments will not: (1) require services on the part of the Employee which would in any way impair the performance of his duties under this Agreement, or (2) in any manner significantly interfere with Employee's responsibilities as an Employee of the Company in accordance with this Agreement.

1.4 Compensation

(a) Salary. The Company shall pay to the Employee a salary at the rate in effect for Employee at the date of this Agreement. Such salary is to be payable in installments in accordance with the payroll policies of the Company in effect from time to time during the term of this Agreement. The Company may (but is not required to) make such upward adjustments to the Employee's salary as it deems appropriate from time to time.

(b) Incentive Compensation. In addition to the above salary, the Employee shall be eligible annually for incentive compensation at the discretion of the Compensation Committee.

(c) Other Benefits. The Employee shall be reimbursed in accordance with the Company's normal expense reimbursement policy for all of the actual and reasonable costs and expenses accrued by Employee in the performance of his or her services and duties hereunder, including but not limited to, travel and entertainment expenses. The Employee shall be entitled to participate in all insurance, stock options, retirement plans and other benefit plans or programs as may be from time to time specifically adopted and approved by the Company for its employees, in accordance with the eligibility requirements and any other terms and conditions of such plans. It is understood and agreed between the parties hereto that the Company reserves the right, at its sole discretion, to modify, amend or terminate such plans, programs or benefits at any time.

1.5 Termination

(a) Death. If the Employee dies during the term of this Agreement and while in the employ of the Company, this Agreement shall automatically terminate and the Company shall have no further obligation to the Employee or his estate except that (i) the Company shall continue to pay the Employee's estate the Employee's salary in installments through the end of the Employment Term which was in effect immediately prior to Employee's death, and (ii) the Company shall pay the Employee's estate any applicable Pro Rated Bonus (defined hereinbelow).

(b) Disability. If during the term of this Agreement, the Employee shall be prevented from performing his duties hereunder by reason of disability, then the Company, on 30 days' prior notice to the Employee, may terminate Employee's employment under this Agreement. For purposes of this Agreement, the Employee shall be deemed to have become disabled when the Company, upon the advice of a qualified physician, shall have determined that the Employee has become physically or mentally incapable (excluding infrequent and temporary

2

absences due to ordinary illness) of performing his duties under this Agreement. In the event of a termination pursuant to this paragraph 1.5(b), the Company shall be relieved of all of its obligations under this Agreement, except that the Company shall pay to the Employee (or his estate, in the event of his subsequent death), (i) the Employee's salary in installments through the end of the Employment Term which was in effect immediately prior to Employee's disability, and (ii) any applicable Pro Rated Bonus. Before making any termination decision pursuant to this Section 1.5(b), the Company shall determine whether there is any reasonable accommodation (within the meaning of the Americans With Disabilities Act) which would enable the Employee to perform the essential functions of the Employee's position under this Agreement despite the existence of any such disability. If such a reasonable accommodation is possible, the Company shall make that accommodation and shall not terminate the Employee's employment hereunder during the Employment Term based on such disability.

(c) Certain Discharges. Prior to the end of the Employment Term, the Company may discharge the Employee for Cause and terminate Employee's employment hereunder without notice and without any further liability hereunder to Employee or his estate. For purposes of this Agreement, "Cause" shall mean a determination by the Company that Employee: (i) has been convicted of a crime involving moral turpitude; (ii) has regularly failed or refused to follow policies or directives established by the Company or the Board of Directors of SCI; (iii) has willfully and persistently failed to attend to his duties; (iv) has committed acts amounting to gross negligence or willful misconduct to the detriment of the Company or its affiliates; (v) has violated any of his obligations under Articles II or III of this Agreement; or (vi) has otherwise breached any of the terms or provisions of this Agreement.

(d) Without Cause. Prior to the end of the Employment Term, the employment of the Employee with the Company may be terminated by the Company other than for Cause, death or disability. If such event occurs prior to a Change of Control (defined hereinbelow), the Company shall have no further obligation to Employee or his estate except that the Company shall pay or provide to the Employee (or his estate, in the event of his subsequent death), (i) the Employee's salary as in effect immediately prior to Employee's termination in installments for a period ending two years from such date of termination, provided that the Company at its sole option may prepay all or any portion of such payment at any time, (ii) any applicable Pro Rated Bonus and (iii) continuation of Employee's Group Health and Dental coverage and Exec-U-Care program (including pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1986 ("Cobra") to the extent applicable) for a period of twenty four months beginning the month following such date of termination, with Employee paying such amount of premiums as would have been applicable if Employee had remained an employee of the Company.

(e) Voluntary Termination by Employee. If during the term of this Agreement, the Employee voluntarily terminates his employment with the Company prior to any Change of Control, the Company shall be relieved of all of its obligations under this Agreement, except that the Company shall pay the Employee (or his estate, in the event of his subsequent death) (i) the Employee's salary through the date of Employee's termination, and (ii) any incentive compensation under Section 1.4(b) determined by the Compensation Committee for any fiscal period ended prior to the date of Employee's termination which had not been paid at the time of his termination. All such payments to the Employee or his estate shall be made in the same

3

Source: SERVICE CORPORATION , 10-K, March 02, 2009

manner and at the same times as the Employee's salary or incentive compensation would have been paid to the Employee had he not terminated his employment.

(f) Change of Control. If (i) a Change of Control occurs during the Employment Term and (ii) within twenty four months after such Change of Control the Employee's employment is (x) terminated by the Company other than for Cause, death or disability, or (y) terminated by Employee after an occurrence of any Good Reason (except under circumstances which would be grounds for termination of Employee by the Company for Cause), then the Company shall be relieved of all of its obligations under this Agreement, except that the Company shall pay or provide the Employee (or his estate, in the event of his subsequent death) the following amounts:

(1) Three, multiplied by the sum of Employee's most recently set Target Bonus plus his annual salary in effect immediately prior to the Change of Control, which amount will be paid in a lump sum in cash within 30 days after the Employee's date of termination; and

(2) Partial Bonus, to be paid within 30 days after the Employee's date of termination; and

(3) Continuation of Employee's Group Health and Dental coverage and Exec-U-Care program (including pursuant to COBRA to the extent applicable) for a period of thirty six months beginning the month following such date of termination, with Employee paying such amount of premiums as would have been applicable if Employee had remained an employee of the Company.

In addition, Company shall pay to Employee an amount that, on an after-tax basis (including federal income, employment, excise and social security taxes, state and local income and employment taxes, and any other applicable taxes), equals any excise tax that is determined to be payable by Employee pursuant to Section 4999 (or any successor provision) of the Internal Revenue Code of 1986, as amended (and any interest or penalties related to the imposition of such excise tax) at any time, by reason of both entitlements under this Agreement (including any and all payments under this Section 1.5(f)) and entitlements outside of this Agreement that are described in Section 280G(b)(2)(A)(i) of the Code (or any successor provision) with reference to Company. For purposes of this paragraph, Employee shall be deemed to pay federal, state and local income taxes at the highest marginal rate of taxation. Such amount will be made payable by Company or its successor within thirty (30) days after Employee delivers a written request for reimbursement accompanied by a statement from a nationally recognized legal, consulting or accounting firm as may be agreed to by the parties setting forth the amount owed pursuant to this paragraph. Company shall pay all fees and costs incurred by Employee related to the preparation, delivery and resolution of such written request for reimbursement.

The obligations of the Company under this Section 1.5(f) shall remain in effect for twenty-four months after any Change of Control that occurs during the Employment Term notwithstanding the fact that such twenty four month period may extend beyond the expiration of the Employment Term.

4

Source: SERVICE CORPORATION , 10-K, March 02, 2009

(g) Post Employment Term Matters. In the event the Employment Term terminates because it is not extended or renewed pursuant to Section 1.1, then the Company shall be relieved of all of its obligations under this Agreement and Employee will thereafter be an employee "at will" of the Company.

## ARTICLE II
## INFORMATION

2.1 Nondisclosure of Information. The Employee acknowledges that in the course of his employment by the Company he will receive certain trade secrets, which may include, but are not limited to, programs, lists of acquisition or disposition prospects and knowledge of acquisition strategy, financial information and reports, lists of customers or potential customers and other confidential information and knowledge concerning the business of the Company (hereinafter collectively referred to as "Information") which the Company desires to protect. The Employee understands that the Information is confidential and agrees not to reveal the Information to anyone outside the Company so long as the confidential or secret nature of the Information shall continue, unless compelled to do so by any federal or state regulatory agency or by a court order. If Employee becomes aware that disclosure of any Information is being sought by such an agency or through a court order, Employee will immediately notify the Company. The Employee further agrees that he will at no time use the Information in competing with the Company. Upon termination of Employee's employment with the Company, the Employee shall surrender to the Company all papers, documents, writings and other property produced by him or coming into his possession by or through his employment or relating to the Information, and the Employee agrees that all such materials are and will at all times remain the property of the Company and to the extent the Employee has any rights therein, he hereby irrevocably assigns such rights to the Company.

2.2 Disclosure of Information, Ideas, Concepts, Improvements, Discoveries and Inventions. As part of the Employee's fiduciary duties to the Company, Employee agrees that during his employment by the Company, and for a period of six months after the termination of the employment relationship for any reason, Employee shall promptly disclose in writing to the Company all information, ideas, concepts, improvements, discoveries and inventions, whether patentable or not, and whether or not reduced to practice, which are conceived, developed, made or acquired by Employee, either individually or jointly with others, and which relate to the business, products or services of the Company or any of its subsidiaries or affiliates, irrespective of whether Employee utilized the Company's time or facilities and irrespective of whether such information, idea, concept, improvement, discovery or invention was conceived, developed, discovered or acquired by the Employee on the job, at home, or elsewhere. This obligation extends to all types of information, ideas and concepts, including information, ideas and concepts relating to new types of services, corporate opportunities, acquisition prospects, the identity of key representatives within acquisition prospect organizations, prospective names or service marks for the Company's business activities, and the like.

5

2.3 Ownership of Information, Ideas, Concepts, Improvements, Discoveries and Inventions and All Original Works of Authorship.

(a) All information, ideas, concepts, improvements, discoveries and inventions, whether patentable or not, which are conceived, made, developed or acquired by Employee or which are disclosed or made known to Employee, individually or in conjunction with others, during Employee's employment by the Company and which relate to the Company's business, products or services (including but not limited to all such information relating to corporate opportunities, research, financial and sales data, pricing and trading terms, evaluations, opinions, interpretations, acquisition prospects, the identity of customers or their requirements, the identity of key contacts within the customer's organization or within the organization of acquisition prospects, or marketing and merchandising techniques, prospective names and marks), are and shall be the sole and exclusive property of the Company. Moreover, all drawings, memoranda, notes, records, files, correspondence, manuals, models, specifications, computer programs, maps and all other writings or materials of any type embodying any of such information, ideas, concepts, improvements, discoveries and inventions are and shall be the sole and exclusive property of the Company.

(b) In particular, Employee hereby specifically sells, assigns and transfers to the Company all of his worldwide right, title and interest in and to all such information, ideas, concepts, improvements, discoveries or inventions described in Section 2.3 (a) above, and any United States or foreign applications for patents, inventor's certificates or other industrial rights that may be filed thereon, including divisions, continuations, continuations-in-part, reissues and/or extensions thereof, and applications for registration of such names and marks. Both during the period of Employee's employment by the Company and thereafter, Employee shall assist the Company and its nominees at all times in the protection of such information, ideas, concepts, improvements, discoveries or inventions both in the United States and all foreign countries, including but not limited to the execution of all lawful oaths and all assignment documents requested by the Company or its nominee in connection with the preparation, prosecution, issuance or enforcement of any applications for United States or foreign letters patent, including divisions, continuations, continuations-in-part, reissues, and/or extensions thereof, and any application for the registration of such names and marks.

(c) Moreover, if during Employee's employment by the Company, Employee creates any original work of authorship fixed in any tangible medium of expression which is the subject matter of copyright (such as videotapes, written presentations on acquisitions, computer programs, drawing, maps, architectural renditions, models, manuals, brochures or the like) relating to the Company's business, products, or services, whether such work is created solely by Employee or jointly with others, the Company shall be deemed the author of such work if the work is prepared by Employee in the scope of his or her employment; or, if the work is not prepared by Employee within the scope of his or her employment but is specially ordered by Company as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation or as an instructional text, then the work shall be considered to be work made for hire and the Company shall be considered the author of the work. In the event such work is neither prepared by the Employee within the scope of his or her employment or is not a work specially ordered and deemed to be a work made for

6

Source: SERVICE CORPORATION , 10-K, March 02, 2009

hire, then Employee hereby agrees to assign, and by these presents, does assign, to the Company all of Employee's worldwide right, title and interest in and to the work and all rights of copyright therein. Both during the period of Employee's employment by the Company and thereafter, Employee agrees to assist the Company and its nominee, at any time, in protection of the Company's worldwide right, title and interest in and to the work and all rights of copyright therein, including but not limited to, the execution of all formal assignment documents requested by the Company or its nominees and the execution of all lawful oaths and applications for registration of copyright in the United States and foreign countries.

ARTICLE III

NONCOMPETITION

3.1 Noncompetition. During the Employment Term (and for a period of one or two years thereafter if the Company exercises its options under Section 3.2 hereof), Employee shall not, acting alone or in conjunction with others, directly or indirectly, in any market in which the Company or any of its affiliated companies conducts business, work for or engage in any business in competition with the business conducted by the Company or any of its affiliated companies, whether for his own account or by soliciting, canvassing or accepting any business or transaction for or from any other company or business in competition with such business of the Company or any of its affiliated companies. In the event that a court should determine that any restriction herein is unenforceable, the parties hereto agree that the obligations under this paragraph shall be enforceable for the maximum term and maximum geographical area allowable by law.

3.2 Extension. The Company shall have the option to extend Employee's obligations under Section 3.1 for one additional year (the "First Extension Term") beyond the end of the Employment Term. If the Company exercises such option, it shall be required to pay Employee an amount equal to one year's salary, based on Employee's salary rate as of the date his employment with the Company ceased (the "Noncompetition Payment"). Such Noncompetition Payment shall be made in 12 equal monthly installments (each installment being an amount equal to 1/12th of such annual salary) commencing on the date which is thirty (30) days after the last day of the Employment Term. Subsequent payments shall be made on the same day of each succeeding month until 12 payments have been made. If the Employee breaches his noncompetition obligations, the Company shall be entitled to cease making such monthly payments. The purpose of this paragraph is to make the noncompetition obligation of the Employee more reasonable from the Employee's point of view. The amounts to be paid by the Company are not intended to be liquidated damages or an estimate of the actual damages that would be sustained by the Company if the Employee breaches his post-employment noncompetition obligation. If the Employee breaches his post-employment noncompetition obligation, the Company shall be entitled to all of its remedies at law or in equity for damages and injunctive relief. The Company may exercise the option conferred by this paragraph at any time within 30 days after the last day of the Employment Term by mailing written notice of such exercise to Employee.

If the Company exercises its option to extend Employee's obligations as set forth in the preceding paragraph, then the Company shall have the option to extend Employee's obligations

7

Source: SERVICE CORPORATION , 10-K, March 02, 2009

under Section 3.1 for one additional year (the "Second Extension Term") beyond the end of the First Extension Term. If the Company exercises its option to extend Employee's obligations for the Second Extension Term, the rights and obligations of the parties set forth in the preceding paragraph shall be applicable during the Second Extension Term. The Company may exercise the option conferred by this paragraph at any time within 30 days after the last day of the First Extension Term by mailing written notice of such exercise to Employee.

3.3 Termination For Cause or Termination By Employee Notwithstanding anything to the contrary in this Agreement, in the event that Employee's employment hereunder is terminated for Cause pursuant to Section 1.5(c) hereof, or in the event Employee voluntarily terminates the employment relationship for any reason other than a material breach of this Agreement by the Company, the noncompetition obligations of Employee described in Section 3.1 above shall automatically continue for a period of two years from the date the employment relationship ceases, and the Company shall not be required to (i) make any payments to Employee in consideration for such obligations, or (ii) provide any notice to Employee. Notwithstanding the foregoing this Section 3.3 shall not be applicable in the event Employee voluntarily terminates the employment relationship for Good Reason within twenty four months after a Change of Control that occurs during the Employment Term; provided however, the first clause of this sentence shall be null and void if such termination referenced therein occurs under circumstances which would be grounds for termination of Employee by the Company for Cause.

3.4 Obligations to Refrain From Competing Unfairly. In addition to the other obligations agreed to by Employee in this Agreement, Employee agrees that during the Employment Term and for five (5) year(s) thereafter, he shall not at any time, directly or indirectly for the benefit or any other party than the Company or any of its affiliated companies, (a) induce, entice, or solicit any employee of the Company or any of its affiliated companies to leave his employment, or (b) contact, communicate or solicit any customer of the Company or any of its affiliated companies derived from any customer list, customer lead, mail, printed matter or other information secured from the Company or any of its affiliated companies or their present or past employees, or (c) in any other manner use any customer lists or customer leads, mail, telephone numbers, printed material or material of the Company or any of its affiliated companies relating thereto.

3.5 Acknowledgement. Employee acknowledges that Employee's compliance with the provisions of this Article III is necessary to protect the existing goodwill and other proprietary rights of the Company, as well as all goodwill and relationships that may be acquired or enhanced during the course of Employee's employment with the Company, and all confidential information which may come into existence or to which Employee may have access during his employment with the Company. Employee further acknowledges that Employee will become familiar with certain of the Company's affairs, operations, customers and confidential information and data by means of his employment with the Company, and that failure to comply with the provisions of this Article III will result in irreparable and continuing damage to the Company for which there will be no adequate remedy at law. The Company shall be entitled to all of its remedies at law or in equity for damages and injunctive relief in the event of any violation of this Article III by Employee.

8

Source: SERVICE CORPORATION , 10-K, March 02, 2009

## ARTICLE IV
## MISCELLANEOUS

4.1 Notices. All notices, requests, consents, and other communications under this Agreement shall be in writing and shall be deemed to have been delivered on the date personally delivered or on the date mailed, postage prepaid, by certified mail, return receipt requested, or telegraphed and confirmed if addressed to the respective parties as follows:

If to the Employee:

_____

_____

_____

If to the Company:

General Counsel
c/o SCI Executive Services, Inc.
1929 Allen Parkway
Houston, Texas 77019
Attention: Legal Department

Either party hereto may designate a different address by providing written notice of such new address to the other party hereto.

4.2 Entire Agreement. This Agreement replaces and merges all previous agreements and discussions relating to the same or similar subject matters between Employee and the Company (or any of its affiliates) and constitutes the entire agreement between the Employee and the Company (and any of its affiliates) with respect to the subject matter of this Agreement. Any existing employment agreement between the Employee and the Company (or any of its affiliates) is hereby terminated, effective immediately. This Agreement may not be modified in any respect by any verbal statement, representation or agreement made by an employee, officer, or representative of the Company or by any written agreement unless signed by an officer of the Company who is expressly authorized by the Company to execute such document.

4.3 Specific Performance. The Employee acknowledges that a remedy at law for any breach of Article II or III of this Agreement will be inadequate, agrees that the Company shall be entitled to specific performance and injunctive and other equitable relief in case of any such breach or attempted breach, and further agrees to waive any requirement for the securing or posting of any bond in connection with the obtaining of any such injunctive or any other equitable relief.

4.4 Severability. Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid or unenforceable under applicable law, such provision shall be ineffective to the extent of such prohibition, invalidity or unenforceability

9

Source: SERVICE CORPORATION , 10-K, March 02, 2009

without invalidating the remainder of such provision or the remaining provisions of this Agreement.

4.5 Assignment. This Agreement may not be assigned by the Employee. Neither the Employee, his spouse, nor his estate shall have any right to commute, encumber or dispose of any right to receive payments hereunder, it being understood that such payments and the right thereto are nonassignable and nontransferable. This Agreement may be assigned by the Company.

4.6 Binding Effect. Subject to the provisions of Section 4.5 of this Agreement, this Agreement shall be binding upon and inure to the benefit of the parties hereto, the Employee's heirs and personal representatives, and the successors and assigns of the Company.

4.7 Captions. The section and paragraph headings in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

4.8 Governing Law. This Agreement shall be construed and enforced in accordance with, and governed by, the laws of Texas.

4.9 Counterparts. This Agreement may be executed in multiple original counterparts, each of which shall be deemed an original, but all of which together shall constitute the same instrument.

4.10 Survival of Certain Obligations. Employee's obligations under Articles II and III hereof shall survive any termination of Employee's employment hereunder.

4.11 Waiver. The waiver by either party of any right hereunder or of any breach of this Agreement shall not operate as or be construed to be an amendment of this Agreement or a waiver of any future right or breach.

4.12 Gender. All references to the masculine pronoun herein are used for convenience and ease of reading only and are intended and apply to the feminine gender as well.

4.13 Dispute Resolution.

(a) Employee and the Company agree that, except for the matters identified in Section 4.13(b) below, all disputes relating to any aspects of Employee's employment with the Company shall be resolved by binding arbitration. This includes, but is not limited to, any claims against the Company, its affiliates or their officers, directors, employees, or agents for breach of contract, wrongful discharge, discrimination, harassment, defamation, misrepresentation, and emotional distress, as well as any disputes pertaining to the meaning or effect of this Agreement.

(b) It is expressly agreed that this Section 4.13 shall not govern claims for workers' compensation or unemployment benefits, or any claim by the Company against Employee which is based on fraud, theft or other dishonest conduct of Employee.

10

Source: SERVICE CORPORATION , 10-K, March 02, 2009

(c) Any claim which either party has against the other must be presented in writing by the claiming party to the other within one year of the date the claiming party knew or should have known of the facts giving rise to the claim. Otherwise, the claim shall be deemed waived and forever barred even if there is a federal or state statute of limitations which would have given more time to pursue the claim.

(d) Each party may retain legal counsel and shall pay its own costs and attorneys' fees, regardless of the outcome of the arbitration. Each party shall pay one-half of the compensation to be paid to the arbitrators, as well as one-half of any other costs relating to the administration of the arbitration proceeding (for example, room rental, court reporter, etc.).

(e) An arbitrator shall be selected by mutual agreement of the parties. If the parties are unable to agree on a single arbitrator, each party shall select one arbitrator, and the two arbitrators so selected shall select a third arbitrator. The three arbitrators so selected will then hear and decide the matter. All arbitrators must be attorneys, judges or retired judges who are licensed to practice law in the state where the Employee is or most recently was employed by the Company. The arbitration proceedings shall be conducted within the county in which Employee is or most recently was employed by the Company or at another mutually agreeable location.

(f) Except as otherwise provided herein, the arbitration proceedings shall be conducted in accordance with the statutes, rules or regulations governing arbitration in the state in which Employee is or most recently was employed by the Company. In the absence of such statutes, rules or regulations, the arbitration proceedings shall be conducted in accordance with the employment arbitration rules of the American Arbitration Association ("AAA"); provided however, that the foregoing reference to the AAA rules shall not be deemed to require any filing with that organization, nor any direct involvement of that organization. In the event of any inconsistency between this Agreement and the statutes, rules or regulations to be applied pursuant to this paragraph, the terms of this Agreement shall apply.

(g) The arbitrator shall issue a written award, which shall contain, at a minimum, the names of the parties, a summary of the issues in controversy, and a description of the award issued. Upon motion to a court of competent jurisdiction, either party may obtain a judgment or decree in conformity with the arbitration award, and said award shall be enforced as any other judgment or decree.

(h) In resolving claims governed by this Section 4.13, the arbitrator shall apply the laws of the state in which Employee is or most recently was employed by the Company, and/or federal law, if applicable.

(i) Employee and the Company agree and acknowledge that any arbitration proceedings between them, and the outcome of such proceedings, shall be kept strictly confidential; provided however, that the Company may disclose such information to the extent required by law and to its employees, agents and professional advisors who have a legitimate need to know such information, and the Employee may disclose such information (1) to the extent required by law, (2) to the extent that the Employee is required to disclose same to professional persons assisting Employee in preparing tax returns; and (3) to Employee's legal counsel.

11

Source: SERVICE CORPORATION , 10-K, March 02, 2009

4.14 Certain Definitions. The following defined terms used in this Agreement shall have the meanings indicated:

Change of Control. "Change of Control" means the happening of any of the following events:

(a) The acquisition by any individual, entity or group (within the meaning of Section 13(d)(3) or 14(d)(2) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")) (a "Person"), of beneficial ownership (within the meaning of Rule 13d-3 promulgated under the Exchange Act) of 20% or more of either (A) the then outstanding shares of Common Stock of SCI (the "Outstanding SCI Common Stock") or (B) the combined voting power of the then outstanding voting securities of SCI entitled to vote generally in the election of directors (the "Outstanding SCI Voting Securities"); provided, however, that the following acquisitions shall not constitute a Change of Control under this subsection (a): (i) any acquisition directly from SCI (excluding an acquisition by virtue of the exercise of a conversion privilege), (ii) any acquisition by SCI, (iii) any acquisition by any employee benefit plan (or related trust) sponsored or maintained by SCI or any corporation controlled by SCI, or (iv) any acquisition by any corporation pursuant to a reorganization, merger or consolidation, if, following such reorganization, merger or consolidation, the conditions described in clauses (A), (B) and (C) of subsection (c) of this definition of "Change of Control" are satisfied; or

(b) Individuals who, as of the effective date hereof, constitute the Board of Directors of SCI (the "Incumbent Board") cease for any reason to constitute at least a majority of the Board of Directors of SCI; provided, however, that any individual becoming a director subsequent to the date hereof whose election, or nomination for election by SCI's shareholders, was approved by (A) a vote of at least a majority of the directors then comprising the Incumbent Board, or (B) a vote of at least a majority of the directors then comprising the Executive Committee of the Board of Directors of SCI at a time when such committee was comprised of at least five members and all members of such committee were either members of the Incumbent Board or considered as being members of the Incumbent Board pursuant to clause (A) of this subsection (b), shall be considered as though such individual were a member of the Incumbent Board, but excluding, for this purpose, any such individual whose initial assumption of office occurs as a result of either an actual or threatened election contest (as such terms are used in Rule 14a-11 of Regulation 14A promulgated under the Exchange Act) or other actual or threatened solicitation of proxies or consents by or on behalf of a Person other than the Board of Directors of SCI; or

(c) Approval by the shareholders of SCI of a reorganization, merger or consolidation, in each case, unless, following such reorganization, merger or consolidation, (A) more than 60% of, respectively, the then outstanding shares of common stock of the corporation resulting from such reorganization, merger or consolidation and the combined voting power of the then outstanding voting securities of such corporation entitled to vote generally in the election of directors is then beneficially owned, directly or indirectly, by all or substantially all of the individuals and entities who were the beneficial owners, respectively, of the Outstanding SCI Common Stock and Outstanding SCI Voting Securities immediately prior to such reorganization, merger or consolidation in substantially the same proportions as their ownership, immediately prior to such

12

Source: SERVICE CORPORATION , 10-K, March 02, 2009

reorganization, merger or consolidation, of the Outstanding SCI Common Stock and Outstanding SCI Voting Securities, as the case may be, (B) no Person (excluding SCI, any employee benefit plan (or related trust) of SCI or such corporation resulting from such reorganization, merger or consolidation, and any Person beneficially owning, immediately prior to such reorganization, merger or consolidation, directly or indirectly, 20% or more of the Outstanding SCI Common Stock or Outstanding SCI Voting Securities, as the case may be) beneficially owns, directly or indirectly, 20% or more of, respectively, the then outstanding shares of common stock of the corporation resulting from such reorganization, merger or consolidation or the combined voting power of the then outstanding voting securities of such corporation entitled to vote generally in the election of directors and (C) at least a majority of the members of the board of directors of the corporation resulting from such reorganization, merger or consolidation were members of the Incumbent Board at the time of the execution of the initial agreement providing for such reorganization, merger or consolidation; or

(d) Approval by the shareholders of SCI of (A) a complete liquidation or dissolution of SCI or (B) the sale or other disposition of all or substantially all of the assets of SCI other than to a corporation, with respect to which following such sale or other disposition, (i) more than 60% of, respectively, the then outstanding shares of common stock of such corporation and the combined voting power of the then outstanding voting securities of such corporation entitled to vote generally in the election of directors is the beneficially owned, directly or indirectly, by all or substantially all of the individuals and entities who were the beneficial owners, respectively, of the Outstanding SCI Common Stock and Outstanding SCI Voting Securities immediately prior to such sale or other disposition in substantially the same proportion as their ownership, immediately prior to such sale or other disposition, of the Outstanding SCI Common Stock and Outstanding SCI Voting Securities, as the case may be, (ii) no Person (excluding SCI and any employee benefit plan (or related trust) of SCI or such corporation, and any Person beneficially owning, immediately prior to such sale or other disposition, directly or indirectly, 20% or more of the Outstanding SCI Common Stock or Outstanding SCI Voting Securities, as the case may be) beneficially owns, directly or indirectly, 20% or more of, respectively, the then outstanding shares of common stock of such corporation and the combined voting power of the then outstanding voting securities of such corporation entitled to vote generally in the election of directors and (iii) at least a majority of the members of the board of directors of such corporation were members of the Incumbent Board at the time of the execution of the initial agreement or action of the Board of Directors of SCI providing for such sale or other disposition of assets of SCI.

Good Reason. "Good Reason" shall mean the occurrence of any of the following after a Change of Control:

(a) The Company requires the Employee to be relocated to such an extent that the Internal Revenue Service requirements for a deductible relocation (currently 50 miles) are satisfied;

(b) The Company materially reduces the responsibilities, authority or accountability of Employee from the same in effect immediately prior to the Change of Control;

13

Source: SERVICE CORPORATION , 10-K, March 02, 2009

(c) The Company reduces the base salary, Target Bonus or other compensation program participation of Employee; or

(d) The Company materially reduces the aggregate benefits of Employee.

Partial Bonus. "Partial Bonus" shall mean a bonus equal to the product of (i) Employee's most recently set Target Bonus, and (ii) a fraction, the denominator of which is 365 and the numerator of which is the number of days in the fiscal year being considered through the date of the termination of Employee's employment.

Pro Rated Bonus. "Pro Rated Bonus" shall mean, a bonus equal to the product of (i) the bonus Employee did not receive but would have received under Section 1.4(b) if he had remained an employee through the end of the Employment Term, it being understood that the amount of such bonus Employee would have received shall be determined by reference to the average amount of bonus actually awarded to other officers who were at the same or comparable level of responsibility as Employee immediately prior to his termination, and (ii) a fraction, the denominator of which is 365 and the numerator of which is the number of days in the fiscal year being considered through the date of death, determination of disability or notice of termination of employment, whichever is applicable. In the event that a majority of SCI officers do not receive a bonus for the fiscal year being considered, then the Pro Rated Bonus shall not be applicable and Employee shall not be entitled to a Pro Rated Bonus. The Pro Rated Bonus, if any, payable to Employee shall be paid within 90 days after the date that bonuses, if any, are awarded for a majority of SCI officers for the year being considered.

Target Bonus. "Target Bonus" shall mean the percentage of salary or level of bonus for Employee which is set by the Compensation Committee at the beginning of each year as an incentive goal to be achieved (it being understood that the actual bonus eventually earned could be lesser or greater than the Target Bonus).

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date and year first above written.

"COMPANY"

SCI Executive Services, Inc.

By:          /s/ Curtis G. Briggs
             Curtis G. Briggs
             Vice President

"EMPLOYEE"

             /s/ J. Daniel Garrison

14

Source: SERVICE CORPORATION , 10-K, March 02, 2009

ADDENDUM TO EMPLOYMENT
AND NONCOMPETITION AGREEMENT

This Addendum to the Employment and Noncompetition Agreement ("Addendum") between SCI Executive Services, Inc., a Delaware Corporation (the "Company") and the undersigned executive of the Company (the "Employee"), is executed as of December 1, 2005.

The Company and the Employee have previously entered into an Employment and Noncompetition Agreement ("Agreement").

This Addendum is intended to (i) supplement and modify such Agreement in order to comply with applicable provisions of the Internal Revenue Code Section 409A, and (ii) extend the term of the Agreement.

This Agreement is modified effective as of December 31, 2005 as follows:

1.   Notwithstanding the applicable provisions of this Agreement regarding timing of distribution of payments, the following special rules shall apply in order for this Agreement to comply with IRC §409A: (i) to the extent any distribution is to a "specified employee" (as defined under IRC §409A) and to the extent such applicable provisions of IRC §409A require a delay of such distributions by a six month period after the date of such Employee's separation of service with the Company, the provisions of this Agreement shall be construed and interpreted as requiring a six month delay in the commencement of such distributions thereunder, and (ii) in the event there are any installment payments under this Agreement that are required to be delayed by a six month period in order to comply with IRC §409A, the monthly installments that would have been paid during such six month delay shall be accumulated and paid to the Employee in a single lump sum within five business days after the end of such six month delay, and (iii) the Company shall not have the discretion to prepay any installment payments otherwise provided under this Agreement.

2.   To the extent of any compliance issues under Internal Revenue Code Section 409A, the Agreement shall be construed in such a manner so as to comply with the requirements of such provision so as to avoid any adverse tax consequences to the Employee.

3.   The term of the Agreement is hereby extended to December 31, 2006.

EXECUTED as of the date first written above.

SCI Executive Services, Inc.                                    Employee

By:        _____/s/ Curtis G. Briggs_____        _____/s/ J. Daniel Garrison_____
Name:   Curtis G. Briggs                        Name:   _____J. Daniel Garrison_____
Title:    Vice President

15

Source: SERVICE CORPORATION , 10-K, March 02, 2009

### AMENDMENT TO EMPLOYMENT
### AND NONCOMPETITION AGREEMENT

THIS AMENDMENT to the Employment and Noncompetition Agreement (this "Amendment") between SCI Executive Services, Inc., a Delaware Corporation (the "Company"), and the undersigned executive of the Company (the "Employee").

WHEREAS, the Company and Employee have previously entered into an Employment and Noncompetition Agreement (the "Agreement"); and

WHEREAS, this Amendment is intended to (i) supplement and modify such Agreement (including, if applicable, any amendments or addendums thereto) in order to comply with Section 409A of the Internal Revenue Code of 1986, as amended, and (ii) extend the term of the Agreement; and

WHEREAS, the parties would like to make certain changes to the terms of the Agreement;

NOW THEREFORE, Employee agrees with the Company, in consideration for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and accepted, to amend the Agreement as follows, effective as of the date this Amendment is executed as written below:

4. Section 1.5(d). Section 1.5(d) is hereby amended by revising clauses (i), (ii) and (iii) to be and to read as follows:

"(i) bi-weekly salary continuation payments calculated based on Employee's rate of salary as in effect immediately prior to Employee's termination, which shall continue for a period equal to two years from such date of termination, each of which shall be treated as a separate payment obligation of the Company, (ii) any applicable Pro Rated bonus and (iii) continuation of Employee's Group Health and Dental coverage and Exec-U-Care program (including pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1986 ("Cobra") to the extent applicable) for a period of eighteen months beginning the month following such date of termination, with Employee paying such amount of premiums as would have been applicable if Employee had remained an employee of the Company."

5. Section 1.5(f). The paragraph numbered (3) in Section 1.5(f) is hereby amended to be and read as follows:

"(3) Continuation of Employee's Group Health and Dental coverage and Exec-U-Care program (including pursuant to COBRA to the extent applicable) for a period of eighteen months beginning the month following such date of termination, with Employee

16

Source: SERVICE CORPORATION , 10-K, March 02, 2009

paying such amount of premiums as would have been applicable if Employee had remained an employee of the Company."

6.Section 4.14. The definition of "Pro Rated Bonus" in Section 4.14 shall be amended by revising its final sentence to be and to read as follows:

"The Pro Rated Bonus, if any, payable to Employee shall be paid during the period between January 1st and March 14th of the calendar year immediately following the date Employee ceases to be employed by the Company."

4. The Term of the Agreement is hereby extended to December 31, 2008.

Except as is provided in this Amendment, the Agreement shall remain unchanged and continue in full force and effect.

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of this 30th day of November, 2007.

**SCI EXECUTIVE SERVICES, INC.**

By: _____ /s/ Curtis G. Briggs _____

Curtis G. Briggs, Vice President

**EMPLOYEE**

_____ /s/ J. Daniel Garrison _____

J. Daniel Garrison

17

Source: SERVICE CORPORATION , 10-K, March 02, 2009

Exhibit 10.30

## SIXTH AMENDMENT TO THE
## SCI 401(K) RETIREMENT SAVINGS PLAN
## (AS AMENDED AND RESTATED JANUARY 14, 2004)

**WHEREAS,** Service Corporation International (the "Company") previously adopted and maintains the SCI 401(k) Retirement Savings Plan, as amended and restated effective January 14, 2004 (the "Plan"); and

**WHEREAS,** the Company reserved the right to amend the Plan at any time; and

**WHEREAS,** the Plan has been amended by the "First Amendment" dated October 22, 2004, the "Second Amendment" dated December 8, 2004, the "Third Amendment" dated February 25, 2005, the "Fourth Amendment" dated December 20, 2006 and the Fifth Amendment dated December 19, 2007; and

**WHEREAS,** the Company now desires to amend the Plan to credit service for certain former employees of OPI and to comply with Final Code Section 415 Regulations;

**NOW, THEREFORE,** the Plan shall be and hereby is amended as follows:

1. Effective as of April 1, 2008 item D.1. of the Plan's Adoption Agreement shall be amended to provide that service with OPI with respect to certain employees as listed on Exhibit A, as attached hereto, will be recognized for eligibility and vesting purposes.

2. The attached Addendum H shall be added to the Plan for the purpose of complying with the requirements of the Final Code Section 415 Regulations.

3. Except as amended herein, the Plan is hereby specifically ratified and affirmed.

**IN WITNESS WHEREOF,** the Company has executed this Sixth Amendment this 2 day of May, 2008.

**SERVICE CORPORATION INTERNATIONAL**

By:      /s/ Jane D. Jones
Title:    Vice President Human Resources
Printed Name:           Jane D. Jones

**EXHIBIT A**

Corina Slott
Naren Patel
Michael Lambright
Chris Pryor
Henry Higareda
Ken Mathew
Rosemary Amatong
John Messenger
Kim Kellogg
James Lierman
Steve Webb
Steve Bixler
Anu Shah
Chirag Patel
Adrian Robles
Darren Feleman
Joseph Cherian
Chan Chang
Celestine Khuong
Daphne Chan
Colin Ramsey
Jasminka Blews
Rory Green
Cristina Esquivel
Fatima Skalski
Chris Hartman
Hector Lewis
Betty Davis
Charles Reynolds
Mara Stephenson
Lucille Bean
Dawn Jackson-Pinson
Jody Lewis
Valeria Rose

## ADDENDUM H
## FINAL CODE SECTION 415 REGULATIONS

### ARTICLE I. 415 COMPENSATION

**1.1 Effective date.** The provisions of this Addendum H shall apply to limitation years beginning on and after July 1, 2007.

**1.2 415 Compensation paid after severance from employment.** 415 Compensation shall be adjusted for the following types of compensation paid after a Participant's severance from employment with the Employer maintaining the Plan (or any other entity that is treated as the Employer pursuant to Code Section 414(b), (c), (m) or (o)). However, amounts described in subsections (a) and (b) below may only be included in 415 Compensation to the extent such amounts are paid by the later of 2 1/2 months after severance from employment or by the end of the limitation year that includes the date of such severance from employment. Any other payment of compensation paid after severance of employment that is not described in the following types of compensation is not considered 415 Compensation within the meaning of Code Section 415(c)(3), even if payment is made within the time period specified above.

(a) **Regular pay.** 415 Compensation shall include regular pay after severance of employment if:

(1) The payment is regular compensation for services during the Participant's regular working hours, or compensation for services outside the Participant's regular working hours (such as overtime or shift differential), commissions, bonuses, or other similar payments; and

(2) The payment would have been paid to the Participant prior to a severance from employment if the Participant had continued in employment with the Employer.

(b) **Leave cash outs and deferred compensation.** Leave cashouts shall be included in 415 Compensation if those amounts would have been included in the definition of 415 Compensation if they were paid prior to the Participant's severance from employment, and the amounts are payment for unused accrued bona fide sick, vacation, or other leave, but only if the Participant would have been able to use the leave if employment had continued. In addition, deferred compensation shall be included in 415 Compensation if the compensation would have been included in the definition of 415 Compensation if it had been paid prior to the Participant's severance from employment, and the compensation is received pursuant to a nonqualified unfunded deferred compensation plan, but only if the payment would have been paid at the same time if the Participant had continued in employment with the Employer and only to the extent that the payment is includible in the Participant's gross income.

(c)  **Salary continuation payments for military service Participants.** 415 Compensation does not include payments to an individual who does not currently perform services for the Employer by reason of qualified military service (as that term is used in Code Section 414(u)(1)) to the extent those payments do not exceed the amounts the individual would have received if the individual had continued to perform services for the Employer rather than entering qualified military service.

(d)  **Salary continuation payments for disabled Participants.** 415 Compensation does not include compensation paid to a Participant who is permanently and totally disabled (as defined in Code Section 22(e)(3)).

1.3  **Administrative delay ("the first few weeks") rule.** 415 Compensation for a limitation year shall not include amounts earned but not paid during the limitation year solely because of the timing of pay periods and pay dates.

1.4  **Inclusion of certain nonqualified deferred compensation amounts.** 415 Compensation shall include amounts that are includible in the gross income of a Participant under the rules of Code Section 409A or Code Section 457(f)(1)(A) or because the amounts are constructively received by the Participant.

1.5  **Code Section 401(a)(17) limit.** 415 Compensation shall not include compensation in excess of the applicable limit under Code Section 401(a)(17).

1.6  **Definition of annual additions to exclude restorative payments.** The Plan's definition of "Annual Additions" is modified as follows:

(a)  **Restorative payments.** "Annual Additions" for purposes of Code Section 415 shall not include restorative payments. A restorative payment is a payment made to restore losses to a Plan resulting from actions by a fiduciary for which there is reasonable risk of liability for breach of a fiduciary duty under ERISA or under other applicable federal or state law, where Participants who are similarly situated are treated similarly with respect to the payments. Generally, payments are restorative payments only if the payments are made in order to restore some or all of the Plan's losses due to an action (or a failure to act) that creates a reasonable risk of liability for such a breach of fiduciary duty (other than a breach of fiduciary duty arising from failure to remit contributions to the Plan). This includes payments to a Plan made pursuant to a Department of Labor order, the Department of Labor's Voluntary Fiduciary Correction Program, or a court-approved settlement, to restore losses to a qualified defined contribution plan on account of the breach of fiduciary duty (other than a breach of fiduciary duty arising from failure to remit contributions to the Plan). Payments made to the Plan to make up for losses due merely to market fluctuations and other payments that are not made on account of a reasonable risk of liability for breach of a fiduciary duty under ERISA are not restorative payments and generally constitute contributions that are considered "Annual Additions."

(b) **Other Amounts.** "Annual Additions" for purposes of Code Section 415 shall not include: (1) The direct transfer of a benefit or employee contributions from a qualified plan to this Plan; (2) Rollover contributions (as described in Code Sections 401(a)(31), 402(c)(1), 403(a)(4), 403(b)(8), 408(d)(3), and 457(e)(16)); (3) Repayments of loans made to a Participant from the Plan; and (4) Repayments of amounts described in Code Section 411(a)(7)(B) (in accordance with Code Section 411(a)(7)(C)) and Code Section 411(a)(3)(D) or repayment of contributions to a governmental plan (as defined in Code Section 414(d)) as described in Code Section 415(k)(3), as well as Employer restorations of benefits that are required pursuant to such repayments.

(c) **Date of tax-exempt Employer contributions.** Notwithstanding anything in the Plan to the contrary, in the case of an Employer that is exempt from federal income tax (including a governmental employer), Employer contributions are treated as credited to a Participant's account for a particular limitation year only if the contributions are actually made to the Plan no later than the 15th day of the tenth calendar month following the end of the calendar year or fiscal year (as applicable, depending on the basis on which the employer keeps its books) with or within which the particular limitation year ends.

**1.7   Change of limitation year.** The limitation year may only be changed by a Plan amendment. Furthermore, if the Plan is terminated effective as of a date other than the last day of the Plan's limitation year, then the Plan is treated as if the Plan had been amended to change its limitation year.

**1.8   Excess Annual Additions.** Notwithstanding any provision of the Plan to the contrary, if the annual additions (within the meaning of Code Section 415) are exceeded for any Participant, then the Plan may only correct such excess in accordance with the Employee Plans Compliance Resolution System (EPCRS) as set forth in Revenue Procedure 2006-27 or any superseding guidance, including, but not limited to, the preamble of the final Section 415 regulations.

**1.9   Aggregation and Disaggregation of Plans.**

(a) For purposes of applying the limitations of Code Section 415, all defined contribution plans (without regard to whether a plan has been terminated) ever maintained by the Employer (or a "predecessor employer") under which the Participant receives annual additions are treated as one defined contribution plan. The "Employer" means the Employer that adopts this Plan and all members of a controlled group or an affiliated service group that includes the Employer (within the meaning of Code Section 414(b), (c), (m) or (o)), except that for purposes of this Section, the determination shall be made by applying Code Section 415(h), and shall take into account tax-exempt organizations under Regulation Section 1.414(c)-5, as modified by Regulation Section 1.415(a)-1(f)(1). For purposes of this Section:

Source: SERVICE CORPORATION , 10-K, March 02, 2009

(1) A former Employer is a "predecessor employer" with respect to a Participant in a plan maintained by an Employer if the Employer maintains a plan under which the Participant had accrued a benefit while performing services for the former Employer, but only if that benefit is provided under the plan maintained by the Employer. For this purpose, the formerly affiliated plan rules in Regulation Section 1.415(f)-1(b)(2) apply as if the Employer and predecessor employer constituted a single employer under the rules described in Regulation Section 1.415(a)-1(f)(1) and (2) immediately prior to the cessation of affiliation (and as if they constituted two, unrelated employers under the rules described in Regulation Section 1.415(a)-1(f)(1) and (2) immediately after the cessation of affiliation) and cessation of affiliation was the event that gives rise to the predecessor employer relationship, such as a transfer of benefits or plan sponsorship.

(2) With respect to an Employer of a Participant, a former entity that antedates the Employer is a "predecessor employer" with respect to the Participant if, under the facts and circumstances, the employer constitutes a continuation of all or a portion of the trade or business of the former entity.

(b)   **Break-up of an affiliate employer or an affiliated service group.** For purposes of aggregating plans for Code Section 415, a "formerly affiliated plan" of an employer is taken into account for purposes of applying the Code Section 415 limitations to the employer, but the formerly affiliated plan is treated as if it had terminated immediately prior to the "cessation of affiliation." For purposes of this paragraph, a "formerly affiliated plan" of an employer is a plan that, immediately prior to the cessation of affiliation, was actually maintained by one or more of the entities that constitute the employer (as determined under the employer affiliation rules described in Regulation Section 1.415(a)-1(f)(1) and (2)), and immediately after the cessation of affiliation, is not actually maintained by any of the entities that constitute the employer (as determined under the employer affiliation rules described in Regulation Section 1.415(a)-1(f)(1) and (2)). For purposes of this paragraph, a "cessation of affiliation" means the event that causes an entity to no longer be aggregated with one or more other entities as a single employer under the employer affiliation rules described in Regulation Section 1.415(a)-1(f)(1) and (2) (such as the sale of a subsidiary outside a controlled group), or that causes a plan to not actually be maintained by any of the entities that constitute the employer under the employer affiliation rules of Regulation Section 1.415(a)- 1(f)(1) and (2) (such as a transfer of plan sponsorship outside of a controlled group).

(c)   **Midyear Aggregation.** Two or more defined contribution plans that are not required to be aggregated pursuant to Code Section 415(f) and the Regulations thereunder as of the first day of a limitation year do not fail to satisfy the requirements of Code Section 415 with respect to a Participant for the limitation year merely because they are aggregated later in that limitation year, provided that no annual additions are credited to the Participant's account after the date on which the plans are required to be aggregated.

Source: SERVICE CORPORATION , 10-K, March 02, 2009

**ARTICLE II. PLAN COMPENSATION**

2.1 **Compensation limit.** Notwithstanding Amendment Section 2.2, if the Plan is a 401(k) plan, then Participants may not make elective deferrals with respect to amounts that are not 415 Compensation. However, for this purpose, 415 Compensation is not limited to the annual compensation limit of Code Section 401(a)(17).

2.2 **Compensation paid after severance from employment.** Compensation for purposes of allocations (hereinafter referred to as Plan Compensation) shall be adjusted in the same manner as 415 Compensation pursuant to Article I of this Amendment, except in applying Article I, the term "limitation year" shall be replaced with the term "plan year" and the term "415 Compensation" shall be replaced with the term "Plan Compensation."

Source: SERVICE CORPORATION , 10-K, March 02, 2009

Exhibit 10.43

## PERFORMANCE UNIT GRANT
## AWARD AGREEMENT

This AGREEMENT ("Agreement") is made as of February 10, 2009, by and between Service Corporation International, a Texas corporation (the "Company"), and_____(the "Employee")

WHEREAS, the Compensation Committee ("Compensation Committee") of the Board of Directors of the Company has determined that it is to the advantage and interest of the Company to grant to the Employee the performance units grant provided for herein in consideration of services provided by Employee and to provide focus on the longer-term success of the Company.

NOW, THEREFORE, the Company and the Employee hereby agree as follows:

1._Grant of Award_. Pursuant to the Company's Amended 1996 Incentive Plan ("Plan"), Employee is hereby granted as of January 1, 2009, a Performance Unit Grant Award (the "Award"), subject to the terms and conditions set forth below, with respect to _____performance units ("Units"). The Units covered by the Award shall vest in accordance with Section 2 --- Vesting. If the Award becomes payable, Employee will be entitled to receive, net of applicable withholding or applicable social security taxes, a cash payment representing the product of (i) the number of Units vested and (ii) the Performance Settlement Factor as determined using Schedule B, attached hereto and made a part of this Agreement. If the Award becomes payable, the Award will be paid to the Employee as soon as practicable after the end of the Performance Cycle, but no later than March 15, 2012.

2. _Vesting._

(a) _Vesting for Continuous Employment_. If the Employee is employed by the Company (or any Affiliate thereof) continuously during the Performance Cycle, the Award will vest 100%.

(b) _Vesting for Death, Disability and Termination by the Company without Cause_. In the event of the termination of Employee's employment with the Company (or any Affiliate thereof) prior to the end of the Performance Cycle due to the Employee's death, Disability or termination by the Company without cause, the Award will vest, in accordance with the following calculation. The number of Performance Units under the Award to be vested is determined by the number of active months of employment by the Employee during the Performance Cycle divided by 36 (which is the number of months in the "Performance Cycle" as set forth in Schedule A).

Performance Unit Plan Grant Agreement
Performance Year 2009

Source: SERVICE CORPORATION , 10-K, March 02, 2009

(c) <u>Discretionary Vesting for Retirement</u>. In the event of the termination of Employee's employment with the Company (or any Affiliate thereof) prior to the end of the Performance Cycle due to the Employee's retirement on or after attainment of age 60 with 10 years of service or retirement on or after attainment of age 55 with 20 years of service, the Award will vest, if the Compensation Committee, in its sole discretion by meeting or unanimous consent occurring prior to the date of resignation, causes the Award to vest, in which event the Award will vest in accordance with the following calculation. The number of Performance Units under the Award to be vested is determined by the number of active months of employment by the Employee during the Performance Cycle divided by 36 (which is the number of months in the "Performance Cycle" as set forth in Schedule A).

(d) <u>No Vesting regarding Termination for Cause or Termination by Employee</u>. In the event of a termination by the Company for cause of Employee's employment with the Company (or any Affiliate thereof), or if the Employee terminates his/her employment with the Company (or any Affiliate thereof), any unpaid Award shall be forfeited in its entirety.

(e) <u>Vesting for Change of Control</u>. In the event of a Change of Control of the Company, the Award will be vested and paid at target.

3. <u>Transfer Restrictions</u>. This Award is non-transferable otherwise than by will or by the laws of descent and distribution, and may not otherwise be assigned, pledged or hypothecated and shall not be subject to execution, attachment or similar process. Upon any attempt by the Employee (or the Employee's successor in interest after the Employee's death) to effect any such disposition, or upon the levy of any such process, the Award may immediately become null and void, at the discretion of the Compensation Committee.

4. <u>Tax</u>. The Employee will pay ordinary income tax and all associated employment taxes (FICA) when the Award is paid.

5. <u>Miscellaneous</u>. This Agreement (a) shall be binding upon and inure to the benefit of any successor of the Company, (b) shall be governed by the laws of the State of Texas and any applicable laws of the United States, and (c) may not be amended without the written consent of both the Company and the Employee. No contract or right of employment shall be implied by this Agreement.

6. <u>Incorporation of Plan Provisions</u>. This Award and the terms and conditions herein set forth are subject in all respects to the terms and conditions of the Plan, which shall be controlling and are incorporated herein by reference. Capitalized terms not otherwise defined herein (inclusive of Schedule A) shall have the meanings set forth for such terms in the Plan.

7. <u>Code Section 409A Compliance</u>. Notwithstanding the applicable provisions of this Agreement regarding timing of distribution of payments, the following special rules shall apply in order for this Agreement to comply with Internal Revenue Code §409A: (i)

Performance Unit Plan Grant Agreement
Performance Year 2009

Source: SERVICE CORPORATION , 10-K, March 02, 2009

to the extent any distribution is to a "specified employee" (as defined under IRC§409A) and to the extent such applicable provisions of IRC §409A require a delay of such distributions by a six month period after the date of such Employee's separation of service with the Company, the provisions of this Agreement shall be construed and interpreted as requiring a six month delay in the commencement of such distributions thereunder.

To the extent of any compliance issues under Internal Revenue Code Section 409A, the Agreement shall be construed in such a manner so as to comply with the requirements of such provision so as to avoid any adverse tax consequences to the Employee.

8. SCI TSR. Notwithstanding anything herein to the contrary, no Award and no payment shall be made under this Agreement if (i) the Company's TSR is negative, or (ii) the Company's TSR ranking is less than the 25th percentile of the TSR of the peers in the Comparator Group.

9. Clawback. If (i) Employee is a Company officer at or above the level of Vice President at the date of this Agreement and (ii) it is determined that Employee has engaged in fraud that causes, in whole or in part, a material adverse restatement of the Company's financial statements, then any unpaid Award shall be forfeited in its entirety. In addition, if (i) an Award has been paid under this Agreement prior to the time of such determination, and (ii) the payment occurred at any time after the ending date of the period covered by the incorrect financial statements, then the Employee must repay the Company the entire amount of his or her Award payment. Any determination by the Board of Directors with respect to the foregoing shall be final, subject however to the right of the Employee to contest such determination in any court of competent jurisdiction. The Company agrees to pay promptly as incurred all legal fees and expenses which the Employee may reasonably incur as a result of any such contest; provided however, if the Employee does not prevail in such contest, the Employee will reimburse the Company for all such legal fees and expenses. As used herein, the term "fraud" shall mean the act of knowingly making a false representation of a material fact with the intent to deceive.

10. Binding Effect. This Agreement shall be effective only if executed by the Company (by manual, typed, stamped or facsimile signature), recorded as a performance unit grant in the minutes of the committee administering the Plan and manually signed by Employee. This Agreement shall be binding upon and inure to the benefit of any successors to the Company and all persons lawfully claiming under Employee.

IN WITNESS HEREOF, the Employee and the Company have executed this Performance Unit Grant Award as of the day and year first above written.

Performance Unit Plan Grant Agreement
Performance Year 2009

Source: SERVICE CORPORATION , 10-K, March 02, 2009

**EMPLOYEE**                                   Service Corporation International

_____          _____
[Signature]                                    Name:
                                               Title:

Performance Unit Plan Grant Agreement
Performance Year 2009
_____

Source: SERVICE CORPORATION , 10-K, March 02, 2009

<u>Schedule A</u>

Performance Unit Grant Criteria

<u>Definitions</u>

For purposes of this Award, the following definitions will control:

"Award" is a grant of Performance Units as approved by the Compensation Committee of the Board of Directors of Service Corporation International.

"Comparator Group" is defined as the publicly traded U.S. companies with revenues of $1 — $3 billion listed in the Towers Perrin 2009 executive compensation database at the date hereof which are in existence at the end of the performance cycle.

"Measurement Price" is defined as the closing stock price on the last trading day of the performance period.

"National Exchange" is defined as the New York Stock Exchange (NYSE), the National Association of Stock Dealers and Quotes (NASDAQ), or the American Stock Exchange (AMEX).

"Plan Administrator" is SCI's Compensation Committee, which may delegate certain elements of administrative responsibility to the Company's CEO or appropriate members of his staff. Any performance goals, performance standards and award determinations must be approved by SCI's Compensation Committee.

"Performance Cycle" is defined as the three-year period beginning December 31, 2008 and ending December 31, 2011.

"Performance Settlement Factor" is the applicable percentage set forth in Schedule B to be applied to the number of vested units based on SCI's relative TSR ranking within the Comparator Group, as interpolated.

"Performance Unit" is a unit valued at $1 per unit.

"Total Shareholder Return" (TSR) is defined as the rate of return reflecting stock price appreciation plus reinvestment of dividends over the Performance Cycle. Specifically, TSR will be calculated using the following provisions: $100 invested in SCI stock on the first day of the performance cycle, with dividends reinvested, compared to $100 invested in each of the peer companies in the Comparator Group, with dividend reinvestment during the same period.

Performance Unit Plan Grant Agreement
Performance Year 2009

Source: SERVICE CORPORATION , 10-K, March 02, 2009

Schedule B

Performance Unit Awards Settlement Criteria
2009 --- 2011 Performance Cycle

| SCI Weighted Average Total Shareholder Return Ranking Relative to Comparator Group at End of Performance Cycle* | Ranking | % of Target Award Paid as Incentive (Performance Settlement Factor) |
|---|---|---|
| Maximum | 75th% or greater | 200% |
| | 70th%ile | 180% |
| | 65th%ile | 160% |
| | 60th%ile | 140% |
| | 55th%ile | 120% |
| Target | 50th%ile | 100% |
| | 45th%ile | 85% |
| | 40th%ile | 70% |
| | 35th%ile | 55% |
| | 30th%ile | 40% |
| Threshold | 25th%ile | 25% |
| Below Threshold | Less than 25th%ile | 0% |

- Calculation of awards for performance levels between Target and Maximum, or Threshold and Target will be calculated using straight-line interpolation.

- If mergers and acquisitions result in a reduction in the number of peer group companies during the cycle, these percentile rankings will reflect the Comparator Group companies still intact at the end of the performance cycle.

- In the event SCI's TSR is negative at the end of the performance period, no payments will be made to participants.

Performance Unit Plan Grant Agreement
Performance Year 2009

Source: SERVICE CORPORATION , 10-K, March 02, 2009

Exhibit 12.1

### SERVICE CORPORATION INTERNATIONAL
### RATIO OF EARNINGS TO FIXED CHARGES
(In thousands, except ratio amounts)

| | Year ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2008 | 2007 | 2006 | 2005 | 2004 |
| **Earnings:** | | | | | |
| Income from continuing operations before income taxes and cumulative effects of accounting changes | $ 163,162 | $ 386,987 | $ 97,449 | $ 87,127 | $ 109,318 |
| Minority interest in (loss) income of majority-owned subsidiaries with fixed charges | — | — | 295 | (201) | 474 |
| Add: Fixed charges as adjusted (from below) | 141,924 | 155,643 | 129,794 | 121,464 | 138,983 |
| | 305,086 | 542,630 | $ 227,538 | $ 208,390 | $ 248,775 |
| | | | | | |
| **Fixed charges:** | | | | | |
| Interest expense: | | | | | |
| Corporate | $ 130,701 | $ 140,593 | $ 107,071 | $ 92,945 | $ 109,246 |
| Amortization of loan cost | 3,573 | 6,261 | 16,328 | 10,788 | 10,047 |
| 1/3 of rental expense | 7,650 | 8,789 | 6,395 | 17,731 | 19,690 |
| Fixed charges | 141,924 | 155,643 | 129,794 | 121,464 | 138,983 |
| Less: Capitalized interest | — | — | — | — | — |
| Fixed charges as adjusted | $ 141,924 | $ 155,643 | $ 129,794 | $ 121,464 | $ 138,983 |
| | | | | | |
| Ratio (earnings divided by fixed charges) | 2.15 | 3.49 | 1.75 | 1.72 | 1.79 |

Source: SERVICE CORPORATION , 10-K, March 02, 2009

Exhibit 21.1

## SUBSIDIARIES OF THE COMPANY

February 20, 2009
Ownership

| | |
|---|---|
| **ALABAMA** | |
| SCI Funeral Services, LLC (Iowa LLC) Alabama subsidiary | |
| SCI Alabama Funeral Services, LLC | 100% |
| SCI Georgia Funeral Services, Inc. (DE Corp) Alabama subsidiary | |
| SCI Alabama Services, LLC | 100% |
| Alderwoods Group, LLC (DE LLC) Alabama subsidiary | |
| Advanced Planning (Alabama), Inc. | 100% |
| | |
| **ALASKA** | |
| SCI Funeral Services, LLC (Iowa LLC) Alaska subsidiary | |
| SCI Alaska Funeral Services, Inc. | 100% |
| Alderwoods Group, LLC (DE LLC) Alaska subsidiary | |
| Alderwoods (Alaska), Inc. | 100% |
| | |
| **ARIZONA** | |
| SCI Funeral Services, LLC (Iowa LLC) Arizona subsidiary | |
| SCI Arizona Funeral Services, Inc. | 100% |
| Alderwoods Group, LLC (DE LLC) Arizona subsidiary | |
| Alderwoods (Arizona), Inc. | 55.00% |
| Osiris Holding Corporation (DE Corp) Arizona subsidiary | |
| Alderwoods (Arizona), Inc. | 45.00% |
| Phoenix Memorial Park Association | 100% |
| | |
| **ARKANSAS** | |
| SCI Funeral Services, LLC (Iowa LLC) Arkansas subsidiary | |
| SCI Arkansas Funeral Services, Inc. | 100% |
| SCI Special, Inc. (DE Corp) | |
| SCI Capital Corporation (DE Corp) | |
| Investment Capital Corporation (TX Corp) | |
| Wilson Financial Group, Inc. (DE Corp) | |
| Wilson Holdings, Inc. (TX Corp) Arkansas subsidiary | |
| Kelley Funeral Home, Inc. | 100% |
| Alderwoods Group, LLC (DE LLC) Arkansas subsidiary | |
| Alderwoods (Arkansas), Inc. | 100% |
| | |
| **CALIFORNIA** | |
| SCI Funeral Services, LLC (Iowa LLC) California subsidiaries | |
| SCI California Funeral Services, Inc. | 100% |
| Mount Vernon Memorial Park | 100% |
| SCI Special, Inc. (DE Corp) | |
| SCI Administrative Services, LLC (DE LLC) | |
| SCI Management L.P.—(DE LP) California subsidiary | |
| SCI Western Market Support Center, Inc. | 100% |
| SCI Capital Corporation (DE Corp) | |
| Investment Capital Corporation (TX Corp) | |
| Wilson Financial Group, Inc. (DE Corp) | |
| Wilson Holdings, Inc. (TX Corp) California subsidiaries | |
| Cooley & Riolo Mortuary, Inc. | 100% |
| Thompson Funeral Home, Inc. | 100% |
| WFG — Fuller Funerals, Inc. | 100% |

Source: SERVICE CORPORATION , 10-K, March 02, 2009

| | |
|---|---|
| Wilson — Bannon Mortuary, Inc. | 100% |
| Wilson Camellia Memorial Lawn, Inc. | 100% |
| Alderwoods Group, LLC (DE LLC) California subsidiaries | |
| Alderwoods Group (California), Inc. | 100% |
| Advance Funeral Insurance Services | 100% |
| Alderwoods (Texas), Inc. | 100% |
| Directors Succession Planning, Inc. | 100% |
| Directors Succession Planning II, Inc. | 100% |
| Earthman Holdings, Inc. (TX Corp) California subsidiary | |
| Earthman LP, Inc. | 100% |
| Rose Hills Holdings Corp. (DE Corp) | |
| Rose Hills Company (DE Corp) California subsidiary | |
| RH Mortuary Corporation | 100% |
| RH Cemetery Corp. (DE Corp) California subsidiary | |
| Workman Mill Investment Company | 100% |
| DSP General Partner, Inc. (TX Corp) California subsidiary | |
| DSP General Partner II, Inc. | 100% |
| S & H Properties and Enterprises, Inc. (WA Corp) California subsidiaries | |
| Universal Memorial Centers V, Inc. | 100% |
| Universal Memorial Centers VI, Inc. | 100% |
| | |
| COLORADO | |
| SCI Funeral Services, LLC (Iowa LLC) Colorado subsidiary | |
| SCI Colorado Funeral Services, Inc. | 100% |
| Alderwoods Group, LLC (DE LLC) Colorado subsidiary | |
| Alderwoods (Colorado), Inc. | 100% |
| | |
| CONNECTICUT | |
| SCI Funeral Services, LLC (Iowa LLC) Connecticut subsidiary | |
| SCI Connecticut Funeral Services, LLC | 100% |
| Alderwoods Group, LLC (DE LLC) Connecticut subsidiary | |
| Alderwoods (Connecticut), Inc. | 51.80% |
| Alderwoods (New York), Inc. (NY Corp) Connecticut subsidiary | |
| Alderwoods (Connecticut), Inc. | 48.20% |
| | |
| DELAWARE | |
| BestHalf.com, Inc. | 80% |
| Christian Funeral Services, Inc. | 100% |
| SCI Funeral Services, LLC (Iowa LLC) | |
| Affiliated Family Funeral Service, Inc. (MA Corp) Delaware subsidiaries | 49% |
| ECI — Rapino Memorial Home, Inc. | 100% |
| ECI Services of Maine, Inc. | 100% |
| ECI Services of New Hampshire, Inc. | 100% |
| ECI Services of South Dakota, Inc. | 100% |
| ECI Services of Vermont, Inc. | 100% |
| Lake View Management Company, Inc. | 100% |
| Memorial Guardian Plans, Inc. | 100% |
| SCI California Funeral Services, Inc. (CA Corp) Delaware subsidiaries | |
| California Cemetery and Funeral Services, LLC | 5% |
| ECI Capital Corporation | 100% |
| California Cemetery and Funeral Services, LLC | 95% |
| SCI Georgia Funeral Services, Inc. | 100% |
| ECI Alabama Services, LLC (AL LLC) Delaware subsidiary | |
| ECI — Chapel Hill, Inc. | 100% |
| SCI Indiana Funeral Services, Inc. | 100% |
| SCI Iowa Funeral Services, Inc. (IA Corp) Delaware subsidiary | |
| SCI Iowa Finance Company | 100% |

2

| | |
|---|---:|
| SCI Maryland Funeral Services, Inc. (MD Corp) Delaware subsidiary | |
| ECI Cemetery Services of Maryland, LLC | 100% |
| SCI Pennsylvania Funeral Services, Inc.(PA Corp)Delaware subsidiary | |
| Saul — Gabauer Funeral Home, Inc. | 100% |
| SCI Texas Funeral Services, Inc. | 100% |
| CemCare, Inc. | 100% |
| PSI Funding, Inc. | 100% |
| SCI Virginia Funeral Services, Inc. (VA Corp) Delaware subsidiary | |
| SCI Loan Services, LLC | 100% |
| Salvatore Air Transportation Corp. | 100% |
| SCI Executive Services, Inc. | 100% |
| SCI Financial Services, Inc. | 100% |
| Making Everlasting Memories, L.L.C. | 80% |
| SCI Investment Services, Inc. | 100% |
| SCI International Limited | 100% |
| Kenyon International Emergency Services, Inc. | 30% |
| SCI Cerberus, LLC | 100% |
| Service Corporation International (Canada) Limited (CAN Corp) DE subsidiary | |
| SCI Funeral & Cemetery Purchasing Cooperative, Inc. | 25% |
| SCI Special, Inc. | 100% |
| SCI Administrative Services, LLC — *General Partner of* | 100% |
| SCI Management L.P. | 1% |
| Remembrance Memorial Traditions, LLC — *Limited Partner of* | 100% |
| SCI Management L.P. | 99% |
| Dignity Memorial Network, Inc. | 100% |
| SCI Western Market Support Center, Inc. (CA Corp) | |
| SCI Funeral & Cemetery Purchasing Cooperative, Inc. | 25% |
| SCI EOps HQ, Inc. (NY Corp) | |
| SCI Eastern Market Support Center, L.P. (TX LP) | |
| SCI Funeral & Cemetery Purchasing Cooperative,Inc. | 25% |
| SCI Houston Hub, Inc. (TX Corp) | |
| SCI Houston Market Support Center, L.P. (TX LP) | |
| SCI Funeral & Cemetery Purchasing Cooperative,Inc. | 25% |
| SCI Capital Corporation | 100% |
| Piney Grove, LLC | 100% |
| Stormy Sky, LLC | 100% |
| Investment Capital Corporation (TX Corp) Delaware subsidiary | 53.30% |
| Wilson Financial Group, Inc. | 100% |
| Amistad Corporation | 100% |
| Wilson Holdings, Inc. (TX Corp) Delaware subsidiary | |
| M.J. Edwards Hillside Chapel, Inc. | 100% |
| Alderwoods Group, LLC | 100% |
| Administration Services, Inc. | 100% |
| Alderwoods (Alabama), Inc. | 100% |
| Alderwoods (Commissioner), Inc. | 100% |
| Alderwoods (Delaware), Inc. | 100% |
| Alderwoods (Mississippi), Inc. | 100% |
| Alderwoods Life Insurance Group, Inc. | 100% |
| American Burial and Cremation Centers, Inc. | 100% |
| H. P. Brandt Funeral Home, Inc. | 100% |
| Osiris Holding Corporation | 100% |
| Rose Hills Holdings Corp. | 100% |
| Rose Hills Company | 100% |
| RH Cemetery Corp. | 100% |
| Alderwoods (Partner), Inc. (KY Corp) *General Partner of* | |
| Alderwoods (Texas), L.P. | 1.00% |

3

| | |
|---|---|
| Alderwoods (Texas), Inc. (CA Corp) *Limited Partner of* | |
| Alderwoods (Texas), L.P. | 73.42% |
| Earthman Holdings, Inc. (TX Corp) | |
| Earthman LP, Inc. (CA Corp) *Limited Partner of* | |
| Alderwoods (Texas), L.P. | 25.58% |
| DSP General Partner, Inc. (TX Corp) *General Partner of* | |
| Directors (Texas), L.P. | 1.00% |
| DSP General Partner II, Inc. (CA Corp) Limited Partner of | |
| Directors (Texas), L.P. | 38.23% |
| Directors Succession Planning, Inc. (CA Corp) | |
| Directors Succession Planning II, Inc. (CA Corp) *Limited Partner of* | |
| Directors (Texas), L.P. | 60.77% |
| | |
| **DISTRICT OF COLUMBIA** | |
| SCI Funeral Services, LLC (Iowa LLC) DC subsidiaries | |
| Joseph Gawler's Sons, LLC | 100% |
| Witzke Funeral Homes, Inc. | 100% |
| **FLORIDA** | |
| SCI Funeral Services, LLC (Iowa LLC) Florida subsidiaries | |
| SCI Funeral Services of Florida, Inc. | 100% |
| Florida Marker, LLC | 100% |
| Fountainhead Memorial Park, LLC | 100% |
| WPALM, Inc. | 100% |
| MR Advertising Agency, LLC | 100% |
| SCI Special, Inc. (DE Corp) | |
| SCI Capital Corporation (DE Corp) | |
| Investment Capital Corporation (TX Corp) | |
| Wilson Financial Group, Inc. (DE Corp) | |
| Wilson Holdings, Inc. (TX Corp) Florida subsidiary | |
| A.B. Coleman Mortuary, Inc. | 100% |
| Holmes Funeral Directors, Inc. | 100% |
| Alderwoods Group, LLC (DE LLC) Florida subsidiaries | |
| Garden Sanctuary Acquisition, Inc. | 100% |
| RC Memorial Chapels, Inc. | 100% |
| MHI Group, Inc. | 100% |
| Funeral Services Acquisition Group, Inc. | 100% |
| Security Trust Plans, Inc. | 100% |
| Naples Memorial Gardens, Inc. | 100% |
| Osiris Holding Corporation (DE Corp) Florida subsidiary | |
| Osiris Holding of Florida, Inc. | 100% |
| Alderwoods (Minnesota), Inc. (MN Corp) Florida subsidiaries | |
| Coral Ridge Funeral Home and Cemetery, Inc. | 100% |
| Kadek Enterprises of Florida, Inc. | 100% |
| | |
| **GEORGIA** | |
| SCI Funeral Services, LLC (Iowa LLC) Georgia subsidiaries | |
| SCI Georgia Funeral Services, Inc. (DE Corp) Georgia subsidiaries | |
| ECI Cemetery Services of Georgia, LLC | 100% |
| SCI Georgia Land, Inc. | 100% |
| Parkhill Cemetery, Inc. | 100% |
| Alderwoods Group, LLC (DE LLC) Georgia subsidiaries | |
| Advanced Planning of Georgia, Inc. | 100% |
| Alderwoods (Georgia) Holdings, Inc. | 100% |
| Southeastern Funeral Homes, Inc. | 100% |
| Alderwoods (Georgia), Inc. | 37.00% |

4

Carothers Holding Company, Inc. (NC Corp) Georgia subsidiary

| | |
|---|---|
| Alderwoods (Georgia), Inc. | 55.00% |
| Poteet Holdings, Inc. | 100% |
| Alderwoods (Georgia), Inc. | 8.00% |

**HAWAII**

| | |
|---|---|
| SCI Funeral Services, LLC (Iowa LLC) Hawaii subsidiaries | |
| Hawaiian Memorial Life Plan, Ltd. | 100% |

**IDAHO**

| | |
|---|---|
| Alderwoods Group, LLC (DE LLC) Idaho subsidiary | |
| Alderwoods (Idaho), Inc. | 100% |

**ILLINOIS**

| | |
|---|---|
| SCI Funeral Services, LLC (Iowa LLC) Illinois subsidiary | |
| SCI Illinois Services, Inc. | 100% |
| Lake View Memorial Gardens, Inc. | 100% |
| Alderwoods Group, LLC (DE LLC) Illinois subsidiaries | |
| Alderwoods (Illinois), Inc. | 100% |
| Alderwoods (Chicago Central), Inc. | 100% |
| Woodlawn Memorial Park, Inc. | 100% |
| Chapel Hill Memorial Gardens & Funeral Home Ltd. | 100% |
| Chicago Cemetery Corporation | 100% |
| Mount Auburn Memorial Park, Inc. | 100% |
| Alderwoods (Chicago North), Inc. | 43.65% |
| RG Memorial Chapels, Inc. (FL Corp) Illinois subsidiary | |
| Alderwoods (Chicago North), Inc. | 56.25% |
| Pineview Memorial Park, Inc. | 100% |
| Ridgewood Cemetery Company, Inc. | 100% |
| Ruzich Funeral Home, Inc. | 100% |
| Woodlawn Cemetery of Chicago, Inc. | 100% |
| Osiris Holding Corporation (DE Corp) Illinois subsidiary | |
| Elmwood Acquisition Corporation | 100% |
| Oakwoods Cemetery Association | 100% |

**INDIANA**

| | |
|---|---|
| Alderwoods Group, LLC (DE LLC) Indiana subsidiaries | |
| Advance Planning of America, Inc. | 100% |
| Alderwoods (Indiana), Inc. | 88.50% |
| Alderwoods (Tennessee), Inc. (TN Corp) Indiana subsidiary | |
| Alderwoods (Indiana), Inc. | 11.50% |

**IOWA**

| | |
|---|---|
| SCI Funeral Services, LLC | 100% |
| SCI Iowa Funeral Services, Inc. | 100% |

**KANSAS**

| | |
|---|---|
| SCI Funeral Services, LLC (Iowa LLC) Kansas subsidiary | |
| SCI Kansas Funeral Services, Inc. | 100% |
| Alderwoods Group, LLC (DE LLC) Kansas subsidiary | |
| Alderwoods (Kansas), Inc. | 100% |

**KENTUCKY**

| | |
|---|---|
| SCI Funeral Services, LLC (Iowa LLC) Kentucky subsidiary | |
| SCI Kentucky Funeral Services, Inc. | 99% |
| Alderwoods Group, LLC (DE LLC) Kentucky subsidiaries | |
| Alderwoods (Kentucky), Inc. | 99% |
| Alderwoods (Partner), Inc. | 100% |

5

| | |
|---|---|
| **LOUISIANA** | |
| SCI Funeral Services, LLC (Iowa LLC) Louisiana subsidiary | |
| SCI Louisiana Funeral Services, Inc. | 100% |
| Alderwoods Group, LLC (DE LLC) Louisiana subsidiary | |
| Alderwoods (Louisiana), Inc. | 100% |
| New Orleans Limousine Service, Inc. | 100% |
| **MARYLAND** | |
| SCI Funeral Services, LLC (Iowa LLC) Maryland subsidiaries | |
| HFH, Inc. | 100% |
| BAMFH, Inc. | 100% |
| Burgee-Henss-Seitz Funeral Home, Inc. | 100% |
| Charles S. Zeiler & Son, Inc. | 100% |
| Danzansky-Goldberg Memorial Chapels, Inc. | 100% |
| Edward Sagel Funeral Direction, Inc. | 100% |
| Fleck Funeral Home, Inc. | 100% |
| Gary L. Kaufman Funeral Home at Meadowridge Memorial Park, Inc. | 100% |
| Gary L. Kaufman Funeral Home Southwest, Inc. | 100% |
| Lemmon Funeral Home of Dulaney Valley, Inc. | 100% |
| Loring Byers Funeral Directors, Inc. | 100% |
| Miller-Dippel Funeral Home, Inc. | 100% |
| Moran-Ashton Funeral Home, Inc. | 100% |
| National Cremation Service, Inc. | 100% |
| Sterling-Ashton-Schwab Funeral Home, Inc. | 100% |
| Sterling-Ashton-Schwab-Witzke Funeral Home of Catonsville, Inc. | 100% |
| SCI Maryland Funeral Services, Inc. | 100% |
| George Washington Cemetery Company, LLC | 100% |
| Alderwoods Group, LLC (DE LLC) Maryland subsidiary | |
| Alderwoods (Maryland), Inc. | 100% |
| **MASSACHUSETTS** | |
| SCI Funeral Services, LLC (Iowa LLC) Massachusetts subsidiaries | |
| Affiliated Family Funeral Service, Inc. | 100% |
| AFFS Boston, Inc. | 10% |
| AFFS North, Inc. | 30% |
| AFFS Norwood, Inc. | 40% |
| AFFS Quincy, Inc. | 40% |
| AFFS South Coast East, Inc. | 25% |
| AFFS South Coast West, Inc. | 11% |
| AFFS West, Inc. | 42% |
| Perlman Funeral Home, Inc. | 40% |
| Stanetsky Memorial Chapels, Inc. | 40% |
| Sullivan Funeral Homes, Inc. | 40% |
| Alderwoods Group, LLC (DE LLC) Massachusetts subsidiaries | |
| Cuffe-McGinn Funeral Home, Inc. | 44% |
| Doane Beal & Ames, Inc. | 49% |
| Ernest A. Richardson Funeral Home, Inc. | 49% |
| Gaffey Funeral Home, Inc. | 49% |
| JCM Holdings, Inc. | 49% |
| Alderwoods (Massachusetts), Inc. | 100% |
| Doba-Haby Insurance Agency, Inc. | 100% |

6

**MICHIGAN**

| | |
|---|---|
| SCI Funeral Services, LLC (Iowa LLC) Michigan subsidiary | |
| SCI Michigan Funeral Services, Inc. | 100% |
| Alderwoods Group, LLC (DE LLC) Michigan subsidiary | |
| Alderwoods (Michigan), Inc. | 100% |
| Alderwoods (Delaware), Inc. (DE Corp) Michigan subsidiaries | |
| AMG, Inc. | 100% |
| WMF, Inc. | 100% |

**MINNESOTA**

| | |
|---|---|
| SCI Funeral Services, LLC (Iowa LLC) Minnesota subsidiaries | |
| SCI Minnesota Funeral Services, Inc. | 100% |
| Alderwoods Group, LLC (DE LLC) Minnesota subsidiary | |
| Alderwoods (Minnesota), Inc. | 100% |

**MISSISSIPPI**

| | |
|---|---|
| SCI Funeral Services, LLC (Iowa LLC) Mississippi subsidiary | |
| SCI Mississippi Funeral Services, Inc. | 100% |
| Alderwoods Group, LLC (DE LLC) Mississippi subsidiaries | |
| Family Care, Inc. | 100% |
| Alderwoods (Mississippi), Inc. (DE Corp) Mississippi subsidiaries | |
| Stephens Burial Association, Inc. | 100% |
| Stephens Funeral Benefit Association, Inc. | 100% |
| Stephens Funeral Fund, Inc. | 100% |
| Thweatt Funeral Insurance Company, Inc. | 100% |

**MISSOURI**

| | |
|---|---|
| SCI Funeral Services, LLC (Iowa LLC) Missouri subsidiaries | |
| SCI Missouri Funeral Services, Inc. | 100% |
| Memorial Guardian Plans, Inc. | 100% |
| Alderwoods Group, LLC (DE LLC) Missouri subsidiary | |
| Alderwoods (Missouri), Inc. | 100% |

**MONTANA**

| | |
|---|---|
| Alderwoods Group, LLC (DE LLC) Montana subsidiary | |
| Alderwoods (Montana), Inc. | 100% |

**NEBRASKA**

| | |
|---|---|
| SCI Funeral Services, LLC (Iowa LLC) Nebraska subsidiary | |
| SCI Nebraska Funeral Services, Inc. | 100% |

**NEVADA**

| | |
|---|---|
| SCI Funeral Services, LLC (Iowa LLC) | |
| SCI Texas Funeral Services, Inc. (DE Corp) Nevada subsidiary | |
| SCI Texas Finance Company | 100% |
| Alderwoods Group, LLC (DE LLC) Nevada subsidiary | |
| Alderwoods (Nevada), Inc. | 100% |

**NEW HAMPSHIRE**

| | |
|---|---|
| Alderwoods Group, LLC (DE LLC) New Hampshire subsidiaries | |
| Robert Douglas Goundrey Funeral Home, Inc. | 100% |
| St. Laurent Funeral Home, Inc. | 100% |
| Alderwoods (Massachusetts), Inc.   New Hampshire subsidiary | |
| ZS Acquisition, Inc. | 100% |

7

Source: SERVICE CORPORATION , 10-K, March 02, 2009

**NEW JERSEY**

| | |
|---|---|
| SCI Funeral Services, LLC (Iowa LLC) New Jersey subsidiaries | |
| SCI New Jersey Funeral Services, Inc. | 100% |
| Garden State Crematory, Inc. | 100% |
| Wien & Wien, Inc. | 100% |

**NEW MEXICO**

| | |
|---|---|
| SCI Funeral Services, LLC (Iowa LLC) New Mexico subsidiary | |
| SCI New Mexico Funeral Services, Inc. | 100% |
| Alderwoods Group, LLC (DE LLC) New Mexico subsidiary | |
| Alderwoods (New Mexico), Inc. | 100% |

**NEW YORK**

| | |
|---|---|
| SCI Funeral Services, LLC (Iowa LLC) New York subsidiaries | |
| SCI Funeral Services of New York, Inc. | 100% |
| Chas. Peter Nagel, Inc. | 100% |
| I. J. Morris, Inc. | 100% |
| New York Funeral Chapels, Inc. | 100% |
| New York Marker, LLC | 100% |
| Thomas M. Quinn & Sons, Inc. | 100% |
| SCI Special, Inc. (DE Corp) | |
| SCI Administrative Services, LLC (DE LLC) | |
| SCI Management L.P.—(DE LP) New York subsidiary | |
| SCI EOps HQ, Inc. | 100% |
| Alderwoods Group, LLC (DE LLC) New York subsidiaries | |
| Alderwoods (New York), Inc. | 100% |
| Northeast Monument Company, Inc. | 100% |

**NORTH CAROLINA**

| | |
|---|---|
| SCI Funeral Services, LLC (Iowa LLC) North Carolina subsidiary | |
| SCI North Carolina Funeral Services, Inc. | 100% |
| | |
| SCI Special, Inc. (DE Corp) | |
| SCI Capital Corporation (DE Corp) | |
| Investment Capital Corporation (TX Corp) | |
| Wilson Financial Group, Inc. (DE Corp) | |
| Wilson Holdings, Inc. (TX Corp) N. Carolina subsidiary | |
| Hamilton Funeral Chapel, Inc. | 100% |
| Alderwoods Group, LLC (DE LLC) North Carolina subsidiaries | |
| Alderwoods (North Carolina), Inc. | 48.80% |
| Westminster Gardens, Inc. | 100% |
| Carothers Holding Company, Inc. | |
| Alderwoods (North Carolina), Inc. | 50.70% |
| MPH, L.L.C. | 100% |
| Lineberry Group, Inc. | 100% |
| Alderwoods (North Carolina), Inc. | 0.50% |
| Alderwoods (Georgia) Holdings, Inc. (GA Corp) North Carolina subsidiary | |
| Reeves, Inc. | 100% |

**OHIO**

| | |
|---|---|
| SCI Funeral Services, LLC (Iowa LLC) Ohio subsidiaries | |
| SCI Ohio Funeral Services, Inc. | 100% |
| The Knollwood Cemetery Company | 100% |
| SCI Special, Inc. (DE Corp) | |
| SCI Capital Corporation (DE Corp) | |
| Investment Capital Corporation (TX Corp) | |

8

Source: SERVICE CORPORATION , 10-K, March 02, 2009

| | |
|---|---|
| Wilson Financial Group, Inc. (DE Corp) | |
| Wilson Holdings, Inc. (TX Corp) Ohio subsidiary | |
| Dale Funeral Home, Inc. | 90% |
| Alderwoods Group, LLC (DE LLC) Ohio subsidiaries | |
| Alderwoods (Ohio) Cemetery Management, Inc. | 100% |
| Alderwoods (Ohio) Funeral Home, Inc. | 100% |
| Bennett-Emmert-Szakovits Funeral Home, Inc. | 100% |

**OKLAHOMA**

| | |
|---|---|
| SCI Funeral Services, LLC (Iowa LLC) Oklahoma subsidiaries | |
| SCI Oklahoma Funeral Services, Inc. | 100% |
| Memorial Gardens Association | 90% |
| Rose Hill Burial Park, a Trust | 100% |
| Sunset Memorial Park Cemetery Trust | 100% |
| Memorial Park Association, a Trust Estate | 100% |
| Sunny Lane Cemetery, a Property Trust | 100% |
| Alderwoods Group, LLC (DE LLC) Oklahoma subsidiary | |
| Alderwoods (Oklahoma), Inc. | 100% |

**OREGON**

| | |
|---|---|
| SCI Funeral Services, LLC (Iowa LLC) Oregon subsidiaries | |
| SCI Oregon Funeral Services, Inc. | 100% |
| Thiservice Corporation | 100% |
| Alderwoods Group, LLC (DE LLC) Oregon subsidiaries | |
| Alderwoods (Oregon), Inc. | 100% |
| S & H Properties and Enterprises, Inc. (WA Corp) Oregon subsidiaries | |
| Universal Memorial Centers I, Inc. | 100% |
| Universal Memorial Centers II, Inc. | 100% |
| Universal Memorial Centers III, Inc. | 100% |

**PENNSYLVANIA**

| | |
|---|---|
| SCI Funeral Services, LLC (Iowa LLC) Pennsylvania subsidiaries | |
| SCI Pennsylvania Funeral Services, Inc. | 100% |
| Auman Funeral Home, Inc. | 100% |
| Ed Melenyzer Co. | 100% |
| Funeral Corporation Pennsylvania | 100% |
| Laughlin Funeral Home, Ltd. | 100% |
| Robert L. Hendricks Funeral Home, Inc. | 100% |
| Rohland Funeral Home | 100% |
| Harold B. Mulligan Co., Inc. | 100% |
| Theo. C. Auman, Inc. | 100% |
| Auman's, Inc. | 100% |
| Francis F. Seidel, Inc. | 100% |
| Memorial Guardian Plans, Inc. (DE Corp) Pennsylvania subsidiary | |
| Ensure Agency of Pennsylvania, Inc. | 100% |
| Alderwoods Group, LLC (DE LLC) Pennsylvania subsidiaries | |
| Alderwoods (Pennsylvania), Inc. | 100% |
| Bright Undertaking Company | 100% |
| H. Samson, Inc. | 100% |
| Rhee Funeral Home of Wilkinsburg, Inc. | 100% |
| Nineteen Thirty-Five Holdings, Inc. | 100% |
| Osiris Holding Corporation (DE Corp) Pennsylvania subsidiary | |
| Oak Woods Management Company | 100% |

**RHODE ISLAND**

| | |
|---|---|
| SCI Funeral Services, LLC (Iowa LLC) Rhode Island subsidiary | |
| SCI Rhode Island Funeral Services, Inc. | 100% |

9

| | |
|---|---|
| Alderwoods Group, LLC (DE LLC) Rhode Island subsidiary | |
| Alderwoods (Rhode Island), Inc. | 100% |
| | |
| SOUTH CAROLINA | |
| SCI Funeral Services, LLC (Iowa Corp) South Carolina subsidiary | |
| SCI South Carolina Funeral Services, LLC | 100% |
| Alderwoods Group, LLC (DE LLC) South Carolina subsidiaries | |
| Alderwoods (South Carolina), Inc. | 44.00% |
| Carothers Holding Company, Inc. (NC Corp) North Carolina subsidiary | |
| Alderwoods (South Carolina), Inc. | 56.00% |
| Alderwoods (Georgia) Holdings, Inc. (GA Corp) North Carolina subsidiary | |
| Graveland Cemetery Development Co. | 100% |
| | |
| TENNESSEE | |
| SCI Funeral Services, LLC (Iowa LLC) Tennessee subsidiaries | |
| SCI Tennessee Funeral Services, LLC | 100% |
| SCI Special, Inc. (DE Corp) | |
| SCI Capital Corporation (DE Corp) | |
| Investment Capital Corporation (TX Corp) | |
| Wilson Financial Group, Inc. (DE Corp) Tennessee subsidiary | 100% |
| Southern Funeral Home, Inc. | |
| Amistad Corporation (DE Corp) Tennessee subsidiary | 100% |
| Franklin-Strickland Funeral Home, Inc. | |
| Wilson Holdings, Inc. (TX Corp) Tennessee subsidiaries | 100% |
| M. J. Edwards & Sons Funeral Home, Inc. | 100% |
| M. J. Edwards-Whitehaven Funeral Chapel, Inc. | |
| Alderwoods Group, LLC (DE LLC) Tennessee subsidiaries | 100% |
| Alderwoods (Tennessee), Inc. | 100% |
| Eagle Financial Associates, Inc. | |
| | |
| TEXAS | |
| SCI Funeral Services, LLC (Iowa LLC) Texas subsidiaries | |
| JPH Properties, Inc. | 100% |
| SCI Texas Funeral Services, Inc. (DE Corp) Texas subsidiaries | 100% |
| FHC Realty, Inc. | |
| WFG Liquidation Corporation | 100% |
| SCI Special, Inc. (DE Corp) | |
| SCI Capital Corporation (DE Corp) Texas subsidiary | 100% |
| Investment Capital Corporation | |
| Wilson Financial Group, Inc. (DE Corp) Texas subsidiary | 100% |
| Wilson Holdings, Inc. | |
| Carl Barnes Funeral Home, Inc. | 100% |
| Cedar Crest Funeral Home, Inc. | 100% |
| Fuller-Sheffield Funeral Services, Inc. | 100% |
| Lincoln Funeral Home, Inc. | 100% |
| Mainland Funeral Home, Inc. | 100% |
| Morris-Bates Funeral Home, Inc. | |
| Paradise Funeral Home, Inc. | 100% |
| Paradise Investment Corporation | 100% |
| Paradise Cemetery South | 100% |
| Warford-Walker Mortuary, Inc. | |
| WFG-Cristo Rey Funeral Home, Inc. | 100% |
| WFG-Lockwood Funeral Home, Inc. | |
| WFG-Nat Clark, Inc. | 100% |
| Wilson-Lincoln Cemetery, Inc. | 100% |
| Carver Memorial Park, Inc. | 100% |

10

| | |
|---|---|
| SCI Administrative Services, LLC (DE LLC) | |
| SCI Management L.P. (DE LP)- Texas subsidiaries — *Limited Partner of* | |
| SCI Eastern Market Support Center, L.P. | 99% |
| SCI Houston Market Support Center, L.P. | 99% |
| SCI Management L.P. (DE LP) Texas subsidiaries | |
| SCI EOps HQ, Inc. (NY Corp) — *General Partner of* | |
| SCI Eastern Market Support Center, L.P. | 1% |
| SCI Houston Hub, Inc.-*General Partner of* | 100% |
| SCI Houston Market Support Center, L.P. | 1% |
| Alderwoods Group, LLC (DE LLC) Texas subsidiaries | |
| Alderwoods (Texas) Cemetery, Inc. | 100% |
| DSP General Partner, Inc. | 100% |
| Tyler Memorial Funeral Home and Chapel, Inc. | 100% |
| Dunwood Cemetery Service Company | 80% |
| Earthman Holdings, Inc. | 100% |
| HFCC Holdings, Inc. | 100% |
| HFIC Holdings, Inc. | 100% |
| Alderwoods (Texas), Inc. (CA Corp) Texas subsidiary | |
| Funeral Service, Inc. | 100% |
| Directors Succession Planning, Inc. (CA Corp) Texas subsidiary | |
| Directors Cemetery (Texas), Inc. | 100% |
| DRMP Holdings, Inc. | 100% |
| Panola County Restland Memorial Park, Inc. | 100% |
| Directors (Texas), L.P. (DE Limited Partnership) Texas subsidiary | |
| Pioneer Funeral Plans, Inc. | 100% |
| Alderwoods (Georgia) Holdings, Inc. (GA Corp) Texas subsidiary | |
| Waco Memorial Park, Inc. | 100% |
| | |
| UTAH | |
| SCI Funeral Services, LLC (Iowa LLC) Utah subsidiaries | |
| SCI Utah Funeral Services, Inc. | 100% |
| Evans & Early Mortuary, LLC | 100% |
| Wasatch Land and Improvement Company | 100% |
| | |
| VIRGINIA | |
| SCI Funeral Services, LLC (Iowa LLC) Virginia subsidiary | |
| SCI Virginia Funeral Services, Inc. | 100% |
| Memorial Guardian Plans, Inc. (DE Corp) Virginia subsidiary | |
| Sentinel Security Plans, Inc. | 100% |
| Alderwoods Group, LLC (DE LLC) Virginia subsidiary | |
| Alderwoods (Virginia), Inc. | 52.90% |
| Carothers Holding Company, Inc. (NC Corp) Virginia subsidiary | |
| Alderwoods (Virginia), Inc. | 0.50% |
| Lineberry Group, Inc. (NC Corp) Virginia subsidiary | |
| Alderwoods (Virginia), Inc. | 46.60% |
| | |
| WASHINGTON | |
| SCI Funeral Services, LLC (Iowa LLC) Washington subsidiary | |
| SCI Washington Funeral Services, Inc. | 100% |
| Alderwoods Group, LLC (DE LLC) Washington subsidiaries | |
| Alderwoods (Washington), Inc. | 100% |
| S & H Properties and Enterprises, Inc. | 100% |
| Vancouver Funeral Chapel, Inc. | 100% |
| Evergreen Funeral Home and Cemetery, Inc. | 100% |
| Green Service Corporation | 100% |

11

Source: SERVICE CORPORATION , 10-K, March 02, 2009

| | |
|---|---|
| WEST VIRGINIA | |
| SCI Funeral Services, LLC (Iowa LLC) West Virginia subsidiaries | |
| SCI West Virginia Funeral Services, Inc. | 100% |
| Rosedale Cemetery Company | 100% |
| Rosedale Funeral Chapel, Inc. | 100% |
| Alderwoods Group, LLC (DE LLC) West Virginia subsidiary | |
| Alderwoods (West Virginia), Inc. | 100% |
| | |
| WISCONSIN | |
| SCI Funeral Services, LLC (Iowa LLC) Wisconsin subsidiary | |
| SCI Wisconsin Funeral Services, Inc. | 100% |
| Alderwoods Group, LLC (DE LLC) Wisconsin subsidiaries | |
| Alderwoods (Wisconsin), Inc. | 99% |
| Osiris Holding Corporation (DE Corp) Wisconsin subsidiary | |
| Alderwoods (Wisconsin), Inc. | 1% |
| Northern Land Company, Inc. | 100% |

12

Source: SERVICE CORPORATION , 10-K, March 02, 2009

**International**

| | |
|---|---|
| **BELGIUM** | |
| SCI International Limited (DE Corp) Belgium subsidiaries | 100% |
| Camilla Belgium N.V. | 100% |
| Diana Belgium N.V. | 100% |
| | |
| **BRAZIL** | |
| SCI International Limited (DE Corp) | |
| SCI Latin America Ltd. (Cayman Co) Brazil subsidiary | 100% |
| Service Corporation International Brazil Limitada | 100% |
| | |
| **CANADA** | |
| Service Corporation International (Canada) Limited——(Federal) — ownership as follows: | |
| SCI International Limited | 1share |
| ECI Capital Corporation | 1share |
| SCI Cerberus LLC | 8,900shares |
| Service Corporation International Canada Funding Limited Partnership | 1,098shares |
| | |
| Service Corporation International (Canada) Limited — (Canada subsidiaries) | 100% |
| SSPI (Canada), Inc. (Federal) | |
| Service Corporation International (Canada) Limited — (U.S. subsidiary) | 25% |
| SCI Funeral & Cemetery Purchasing Cooperative, Inc. (DE Corp) | |
| SCI International Limited (DE Corp) Canada subsidiaries | 100% |
| 3056269 Nova Scotia Company | 100% |
| Service Corporation International Canada Funding Limited Partnership | 1% |
| 3056271 Nova Scotia Company | 100% |
| Service Corporation International Canada Funding Limited Partnership | 99% |
| Alderwoods Group, LLC (DE LLC) Canada subsidiaries | 100% |
| Alderwoods Group Canada Inc.——(Federal) | 100% |
| 247663 Alberta Ltd.— (Alberta) | 90% |
| Advance Funeral Planning Ltd.— (Saskatchewan) | 100% |
| Community Crematorium Services Limited — (Saskatchewan) | 50% |
| Gregory's Williams Lake Funeral Home Ltd.— (British Columbia) | 100% |
| Guayco Investments Inc./Investissements Guayco— (Quebec) | 100% |
| Les Salons Funeraires Guay Inc.— (Quebec) | 100% |
| Jayne's Funeral Home (1984) Limited—(Nova Scotia) | 100% |
| P. Conti Funeral Chapels Ltd.— (Manitoba) | 100% |
| Nafcanco ULC——(Nova Scotia) | 100% |
| | |
| **BARBADOS** | |
| Alderwoods Group, LLC (DE LLC) | |
| Alderwoods Group Canada Inc (Ontario Corp) Barbados subsidiaries | 100% |
| Loewen International Holdings Ltd. | 100% |
| Loewen Financial Corporation | 100% |
| Loewen Insurance Holdings Inc. | 100% |
| Loewen Trading Corporation | |
| | |
| **CAYMAN ISLANDS** | |
| SCI International Limited (DE Corp) Cayman Islands subsidiaries | 100% |
| SCI Latin America Ltd | 100% |
| SCI Cayman I Ltd. | |

13

Source: SERVICE CORPORATION , 10-K, March 02, 2009

**GERMANY** | | 100%
SCI International Limited (DE Corp) Germany subsidiaries |
   SCI-D GmbH | | 100%
      Norddeutsche Bestattungsgesellschaft mbH | | 100%
      Bestattungsinstitut Barbel Brand GmbH | | 100%
      Breidenstein Bestattungen GmbH | | 100%
      Thomas Zimm GmbH | | 100%

**LUXEMBOURG**
SCI International Limited (DE Corp) Luxembourg subsidiary |
   SCI Luxembourg SARL | | 100%

**MALAYSIA**
SCI International Limited (DE Corp) Malaysia subsidiaries |
Enlightened Transition Sdn Bhd | | 100%
   Bahua Funeral Services Sdn Bhd | | 33.33%

**PUERTO RICO**
Alderwoods Group, LLC (DE LLC) Puerto Rico subsidiary |
SCI Puerto Rico Funeral and Cemetery Services, Inc. | | 100%

**SWITZERLAND**
SCI International Limited (DE Corp) Switzerland subsidiaries |
   Osefi Holdings SA | | 100%

**UNITED KINGDOM**
SCI Special, Inc. | | 100%
SCI Administrative Services, LLC (DE LLC) United Kingdom subsidiary |
   SCI UK Investments Limited | | 100%
Alderwoods Group, LLC (DE LLC) United Kingdom subsidiary |
   Alderwoods UK Holdings Ltd. | | 100%

14

Source: SERVICE CORPORATION , 10-K, March 02, 2009

**Exhibit 23.1**

<u>CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM</u>

We hereby consent to the incorporation by reference in the Registration Statements on Form S-8 (Nos. 333-67800, 333-50084, 333-33101, 333-00179, 333-68683, 333-19863, 333-82475, 333-119681 and 333-142843) of Service Corporation International of our report dated February 28, 2009 relating to the consolidated financial statements, financial statement schedule and the effectiveness of internal control over financial reporting, which appears in this Form 10-K.

/s/ PricewaterhouseCoopers LLP
Houston, Texas
February 28, 2009

Source: SERVICE CORPORATION , 10-K, March 02, 2009

**Exhibit 24.1**

<u>POWER OF ATTORNEY</u>

KNOW ALL MEN BY THESE PRESENTS, that the undersigned, an officer or director, or both, of Service Corporation International, a Texas corporation (the "Company"), does hereby constitute and appoint Eric D. Tanzberger and Gregory T. Sangalis his true and lawful attorneys and agents (each with authority to act alone), with power and authority to sign for and on behalf of the undersigned the name of the undersigned as officer or director, or both, of the Company to the Company's Annual Report to the Securities and Exchange Commission on Form 10-K for the fiscal year of the Company ending December 31, 2008 and to any amendments thereto filed with the Securities and Exchange Commission, and to any instrument or document filed as a part of, as an exhibit to or in connection with said Report or amendments; and the undersigned does hereby ratify and confirm as his own act and deed all that said attorney and agent shall do or cause to be done by virtue hereof.

IN WITNESS WHEREOF, the undersigned has subscribed these presents this 11th day of February, 2009.

|  | /s/ R. L. Waltrip |
|---|---|
|  | R. L. WALTRIP |

## POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS, that the undersigned, an officer or director, or both, of Service Corporation International, a Texas corporation (the "Company"), does hereby constitute and appoint Eric D. Tanzberger and Gregory T. Sangalis his true and lawful attorneys and agents (each with authority to act alone), with power and authority to sign for and on behalf of the undersigned the name of the undersigned as officer or director, or both, of the Company to the Company's Annual Report to the Securities and Exchange Commission on Form 10-K for the fiscal year of the Company ending December 31, 2008 and to any amendments thereto filed with the Securities and Exchange Commission, and to any instrument or document filed as a part of, as an exhibit to or in connection with said Report or amendments; and the undersigned does hereby ratify and confirm as his own act and deed all that said attorney and agent shall do or cause to be done by virtue hereof.

IN WITNESS WHEREOF, the undersigned has subscribed these presents this 11th day of February, 2009.

/s/ Thomas L. Ryan

THOMAS L. RYAN

<u>POWER OF ATTORNEY</u>

KNOW ALL MEN BY THESE PRESENTS, that the undersigned, an officer or director, or both, of Service Corporation International, a Texas corporation (the "Company"), does hereby constitute and appoint Eric D. Tanzberger and Gregory T. Sangalis his true and lawful attorneys and agents (each with authority to act alone), with power and authority to sign for and on behalf of the undersigned the name of the undersigned as officer or director, or both, of the Company to the Company's Annual Report to the Securities and Exchange Commission on Form 10-K for the fiscal year of the Company ending December 31, 2008 and to any amendments thereto filed with the Securities and Exchange Commission, and to any instrument or document filed as a part of, as an exhibit to or in connection with said Report or amendments; and the undersigned does hereby ratify and confirm as his own act and deed all that said attorney and agent shall do or cause to be done by virtue hereof.

IN WITNESS WHEREOF, the undersigned has subscribed these presents this 11th day of February, 2009.

/s/ Eric D. Tanzberger
ERIC D. TANZBERGER

Source: SERVICE CORPORATION , 10-K, March 02, 2009

## POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS, that the undersigned, an officer or director, or both, of Service Corporation International, a Texas corporation (the "Company"), does hereby constitute and appoint Eric D. Tanzberger and Gregory T. Sangalis his true and lawful attorneys and agents (each with authority to act alone), with power and authority to sign for and on behalf of the undersigned the name of the undersigned as officer or director, or both, of the Company to the Company's Annual Report to the Securities and Exchange Commission on Form 10-K for the fiscal year of the Company ending December 31, 2008 and to any amendments thereto filed with the Securities and Exchange Commission, and to any instrument or document filed as a part of, as an exhibit to or in connection with said Report or amendments; and the undersigned does hereby ratify and confirm as his own act and deed all that said attorney and agent shall do or cause to be done by virtue hereof.

IN WITNESS WHEREOF, the undersigned has subscribed these presents this 11th day of February, 2009.

/s/ Jeffrey I. Beason
JEFFREY I. BEASON

Source: SERVICE CORPORATION , 10-K, March 02, 2009

POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS, that the undersigned, an officer or director, or both, of Service Corporation International, a Texas corporation (the "Company"), does hereby constitute and appoint Eric D. Tanzberger and Gregory T. Sangalis his true and lawful attorneys and agents (each with authority to act alone), with power and authority to sign for and on behalf of the undersigned the name of the undersigned as officer or director, or both, of the Company to the Company's Annual Report to the Securities and Exchange Commission on Form 10-K for the fiscal year of the Company ending December 31, 2008 and to any amendments thereto filed with the Securities and Exchange Commission, and to any instrument or document filed as a part of, as an exhibit to or in connection with said Report or amendments; and the undersigned does hereby ratify and confirm as his own act and deed all that said attorney and agent shall do or cause to be done by virtue hereof.

IN WITNESS WHEREOF, the undersigned has subscribed these presents this 11th day of February, 2009.

/s/ Alan R. Buckwalter, III

ALAN R. BUCKWALTER, III

Source: SERVICE CORPORATION , 10-K, March 02, 2009

## POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS, that the undersigned, an officer or director, or both, of Service Corporation International, a Texas corporation (the "Company"), does hereby constitute and appoint Eric D. Tanzberger and Gregory T. Sangalis his true and lawful attorneys and agents (each with authority to act alone), with power and authority to sign for and on behalf of the undersigned the name of the undersigned as officer or director, or both, of the Company to the Company's Annual Report to the Securities and Exchange Commission on Form 10-K for the fiscal year of the Company ending December 31, 2008 and to any amendments thereto filed with the Securities and Exchange Commission, and to any instrument or document filed as a part of, as an exhibit to or in connection with said Report or amendments; and the undersigned does hereby ratify and confirm as his own act and deed all that said attorney and agent shall do or cause to be done by virtue hereof.

IN WITNESS WHEREOF, the undersigned has subscribed these presents this 11th day of February, 2009.

/s/ Anthony L. Coelho
ANTHONY L. COELHO

POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS, that the undersigned, an officer or director, or both, of Service Corporation International, a Texas corporation (the "Company"), does hereby constitute and appoint Eric D. Tanzberger and Gregory T. Sangalis his true and lawful attorneys and agents (each with authority to act alone), with power and authority to sign for and on behalf of the undersigned the name of the undersigned as officer or director, or both, of the Company to the Company's Annual Report to the Securities and Exchange Commission on Form 10-K for the fiscal year of the Company ending December 31, 2008 and to any amendments thereto filed with the Securities and Exchange Commission, and to any instrument or document filed as a part of, as an exhibit to or in connection with said Report or amendments; and the undersigned does hereby ratify and confirm as his own act and deed all that said attorney and agent shall do or cause to be done by virtue hereof.

IN WITNESS WHEREOF, the undersigned has subscribed these presents this 11th day of February, 2009.

/s/ A. J. Foyt, Jr.

A. J. FOYT, JR.

Source: SERVICE CORPORATION , 10-K, March 02, 2009

## POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS, that the undersigned, an officer or director, or both, of Service Corporation International, a Texas corporation (the "Company"), does hereby constitute and appoint Eric D. Tanzberger and Gregory T. Sangalis his true and lawful attorneys and agents (each with authority to act alone), with power and authority to sign for and on behalf of the undersigned the name of the undersigned as officer or director, or both, of the Company to the Company's Annual Report to the Securities and Exchange Commission on Form 10-K for the fiscal year of the Company ending December 31, 2008 and to any amendments thereto filed with the Securities and Exchange Commission, and to any instrument or document filed as a part of, as an exhibit to or in connection with said Report or amendments; and the undersigned does hereby ratify and confirm as his own act and deed all that said attorney and agent shall do or cause to be done by virtue hereof.

IN WITNESS WHEREOF, the undersigned has subscribed these presents this 11th day of February, 2009.

/s/ Malcolm Gillis
MALCOLM GILLIS

Source: SERVICE CORPORATION , 10-K, March 02, 2009

## POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS, that the undersigned, an officer or director, or both, of Service Corporation International, a Texas corporation (the "Company"), does hereby constitute and appoint Eric D. Tanzberger and Gregory T. Sangalis his true and lawful attorneys and agents (each with authority to act alone), with power and authority to sign for and on behalf of the undersigned the name of the undersigned as officer or director, or both, of the Company to the Company's Annual Report to the Securities and Exchange Commission on Form 10-K for the fiscal year of the Company ending December 31, 2008 and to any amendments thereto filed with the Securities and Exchange Commission, and to any instrument or document filed as a part of, as an exhibit to or in connection with said Report or amendments; and the undersigned does hereby ratify and confirm as his own act and deed all that said attorney and agent shall do or cause to be done by virtue hereof.

IN WITNESS WHEREOF, the undersigned has subscribed these presents this 11th day of February, 2009.

/s/ Victor L. Lund

VICTOR L. LUND

## POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS, that the undersigned, an officer or director, or both, of Service Corporation International, a Texas corporation (the "Company"), does hereby constitute and appoint Eric D. Tanzberger and Gregory T. Sangalis his true and lawful attorneys and agents (each with authority to act alone), with power and authority to sign for and on behalf of the undersigned the name of the undersigned as officer or director, or both, of the Company to the Company's Annual Report to the Securities and Exchange Commission on Form 10-K for the fiscal year of the Company ending December 31, 2008 and to any amendments thereto filed with the Securities and Exchange Commission, and to any instrument or document filed as a part of, as an exhibit to or in connection with said Report or amendments; and the undersigned does hereby ratify and confirm as his own act and deed all that said attorney and agent shall do or cause to be done by virtue hereof.

IN WITNESS WHEREOF, the undersigned has subscribed these presents this 11th day of February, 2009.

/s/ John W. Mecom, Jr.

JOHN W. MECOM, JR.

## POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS, that the undersigned, an officer or director, or both, of Service Corporation International, a Texas corporation (the "Company"), does hereby constitute and appoint Eric D. Tanzberger and Gregory T. Sangalis his true and lawful attorneys and agents (each with authority to act alone), with power and authority to sign for and on behalf of the undersigned the name of the undersigned as officer or director, or both, of the Company to the Company's Annual Report to the Securities and Exchange Commission on Form 10-K for the fiscal year of the Company ending December 31, 2008 and to any amendments thereto filed with the Securities and Exchange Commission, and to any instrument or document filed as a part of, as an exhibit to or in connection with said Report or amendments; and the undersigned does hereby ratify and confirm as his own act and deed all that said attorney and agent shall do or cause to be done by virtue hereof.

IN WITNESS WHEREOF, the undersigned has subscribed these presents this 11th day of February, 2009.

/s/ Clifton H. Morris, Jr.

CLIFTON H. MORRIS, JR.

Source: SERVICE CORPORATION , 10-K, March 02, 2009

## POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS, that the undersigned, an officer or director, or both, of Service Corporation International, a Texas corporation (the "Company"), does hereby constitute and appoint Eric D. Tanzberger and Gregory T. Sangalis his true and lawful attorneys and agents (each with authority to act alone), with power and authority to sign for and on behalf of the undersigned the name of the undersigned as officer or director, or both, of the Company to the Company's Annual Report to the Securities and Exchange Commission on Form 10-K for the fiscal year of the Company ending December 31, 2008 and to any amendments thereto filed with the Securities and Exchange Commission, and to any instrument or document filed as a part of, as an exhibit to or in connection with said Report or amendments; and the undersigned does hereby ratify and confirm as his own act and deed all that said attorney and agent shall do or cause to be done by virtue hereof.

IN WITNESS WHEREOF, the undersigned has subscribed these presents this 11th day of February, 2009.

/s/ W. Blair Waltrip

W. BLAIR WALTRIP

Source: SERVICE CORPORATION , 10-K, March 02, 2009

POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS, that the undersigned, an officer or director, or both, of Service Corporation International, a Texas corporation (the "Company"), does hereby constitute and appoint Eric D. Tanzberger and Gregory T. Sangalis his true and lawful attorneys and agents (each with authority to act alone), with power and authority to sign for and on behalf of the undersigned the name of the undersigned as officer or director, or both, of the Company to the Company's Annual Report to the Securities and Exchange Commission on Form 10-K for the fiscal year of the Company ending December 31, 2008 and to any amendments thereto filed with the Securities and Exchange Commission, and to any instrument or document filed as a part of, as an exhibit to or in connection with said Report or amendments; and the undersigned does hereby ratify and confirm as his own act and deed all that said attorney and agent shall do or cause to be done by virtue hereof.

IN WITNESS WHEREOF, the undersigned has subscribed these presents this 11th day of February, 2009.

/s/ Edward E. Williams
EDWARD E. WILLIAMS

**Exhibit 31.1**

Service Corporation International
a Texas corporation
CERTIFICATION OF CHIEF EXECUTIVE OFFICER
Section 302 Certification

I, Thomas L. Ryan, certify that:

1. I have reviewed this annual report on Form 10-K of Service Corporation International, a Texas corporation (the "registrant");

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and we have:

   a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent function):

   a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize, and report financial information; and

   b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 27, 2009

/s/ Thomas L. Ryan
Thomas L. Ryan
President and Chief Executive Officer and Director
(Principal Executive Officer)

**Exhibit 31.2**

Service Corporation International
a Texas corporation
CERTIFICATION OF PRINCIPAL FINANCIAL OFFICER
Section 302 Certification

I, Eric D. Tanzberger, certify that:

1. I have reviewed this annual report on Form 10-K of Service Corporation International, a Texas corporation (the "registrant");

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and we have:

   a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent function):

   a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize, and report financial information; and

   b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 27, 2009

/s/ Eric D. Tanzberger
Eric D. Tanzberger
Senior Vice President
Chief Financial Officer and Treasurer
(Principal Financial Officer)

Source: SERVICE CORPORATION , 10-K, March 02, 2009

()

**Exhibit 32.1**

Certification of Chief Executive Officer

I, Thomas L. Ryan, of Service Corporation International, certify, pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

(1)   the Report on Form 10-K for the period ended December 31, 2008 (the "Periodic Report") which this statement accompanies fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

(2)   the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of Service Corporation International.

Dated: February 27, 2009

/s/ Thomas L. Ryan
Thomas L. Ryan
President and Chief Executive Officer and Director
(Principal Executive Officer)

Exhibit 32.2

## Certification of Principal Financial Officer

I, Eric D. Tanzberger, of Service Corporation International, certify, pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

(1)  the Report on Form 10-K for the period ended December 31, 2008 (the "Periodic Report") which this statement accompanies fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

(2)  the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of Service Corporation International.

Dated: February 27, 2009

/s/ Eric D. Tanzberger
Eric D. Tanzberger
Senior Vice President
Chief Financial Officer and Treasurer
(Principal Financial Officer)

Created by 10KWizard   www.10KWizard.com

Source: SERVICE CORPORATION , 10-K, March 02, 2009