# EXHIBIT 29

# FUNERAL HOME PROCEDURES

■ Piecework pay records

Payroll records must document and record that taxable benefits are being calculated for other compensation such as but not limited to the use of company car or housing benefits.

### G.12.6   RECORDING TIME WORKED

A time clock is the preferred method to record time worked. If a time clock is not available time actually worked may be recorded by use of time sheets. The time card/sheet must show the time the person begins work, the time they break for lunch, the time they return from lunch and the time they end work for the day.

- All employees must record all hours actually worked unless exempt from timekeeping requirements as permitted in compliance with all federal and state / provincial regulations.

- Consult your HR Specialists for assistance in determining if an employee is exempt from time keeping requirements.

- Many states / provinces require a designated meal break after a certain number of hours worked. You may consult the HR Specialist for your area for assistance in determining the required meal periods.

- If an employee is eligible for and receives piecework pay, the employee is still required to record the actual time worked. The actual hours worked must be figured to determine the correct hourly rate of pay and overtime rate for the pay period.

- Completed time cards/sheet are to be signed by the employee to verify that the card accurately documents the actual hours worked. The employee's supervisor or manager must also sign the time card/sheet to verify that the hours are accurate and that any overtime recorded is approved. It is not acceptable for either the employee or manager to sign the time card/sheet in advance. It is to be signed after all hours are recorded.

- The original time card/sheet is to be kept on file at the location for a minimum of seven (7) years.

### G.12.7   HIRING EMPLOYEES

**NPAL0381**

New employees may only be hired as approved by the designated operational management structure. When hiring new employees your Market General Manager and the HR specialist should be contacted for guidance with appropriate and required steps to be taken. Working with your Market General Manager and the HR Specialist the following should be completed:

- Medical information about the employee related to reasonable accommodation under the American Disabilities Act.

- Any other Medical Information

### E.10.4.2 Equal Employment Opportunity Records

Confidential files are to be maintained for records relating to any:

- Discrimination complaints filed with EEOC or DFEH

- Internal investigative files for harassment, or discrimination claims

### E.10.5   PAYROLL RECORDS

All payroll records, including payroll registers and reports are to be kept secured in a locked area (locked at all times). Only the manager (and a specifically designated assistant if necessary) is to have access to the payroll records.  Information required to be maintained for payroll purposes includes:

- Wages paid: (Hourly rate or salary)

- Time Cards/sheet documenting actual hours worked

- Employee Name and address

Payroll records must document and record that taxable benefits are being calculated for other compensation such as but not limited to the use of company car or housing benefits.

### E.10.6   RECORDING TIME WORKED

A time clock is the preferred method to record time worked. If a time clock is not available, time actually worked may be recorded by use of time sheets. The time card/sheet must show the time the person begins work, the time they break for lunch, the time they return from lunch and the time they end work for the day.

- All employees must record all hours actually worked unless he/she is exempt as permitted in compliance with all federal and state / provincial regulations.

- Consult your HR Specialists for assistance in determining if an employee is exempt from

ALD013648

hourly pay and time keeping requirements.

- Many states / provinces require a designated meal break after a certain number of hours worked. You may consult the HR Specialist for your area for assistance in determining the required meal periods.

- If an employee is eligible for and receives piecework pay, the employee is still required to record the actual time worked. The actual hours worked must be figured to determine the correct hourly rate of pay and overtime rate for the pay period.

- Completed time cards/sheet are to be signed by an employee to verify that the card documents accurately the actual hours worked. The employee's supervisor or Manager must also sign the time card/sheet to verify that the hours are accurate and that any overtime recorded is approved. It is not acceptable for either the employee or Manager to sign the time card/sheet in advance. It is to be signed after all hours are recorded.

- The original time card/sheet is to be kept on file at the location for a minimum of seven (7) years.

### E.10.7   HIRING EMPLOYEES

New employees may only be hired as approved by the designated operational management structure. When hiring new employees your Market General Manager and the HR specialist should be contacted for guidance with appropriate and required steps to be taken. Working with your Market General Manager and the HR Specialist the following should be completed:

- A Job Description is to be developed

- The position is listed on the Company Intranet site

- Each applicant for the position is to complete the company approved application. A copy is available in the HR Section of the People Manual (binder # 1)

- A background check is to be conducted prior to hiring the individual. A background check release form must be signed by the individual prior to having the background check conducted

- Necessary Paperwork and forms are completed. Review the lists of items for personnel files for more details

© 2004 Alderwoods Group, Inc. Rev. Feb. 2004: Cemetery Procedures. All rights reserved. Alderwoods Employee Helpline: 1-888-782-7899.

ALD013649

EXHIBIT 30

timing in or out for another employee, or having another employee time in or out for you, is against Company policy and shall result in corrective action, up to and including termination.

### F. Overtime

At times, it may be necessary for an employee to work overtime hours. All overtime, however, must be approved in advance by management. Hourly employees are not permitted or authorized to work any period of time other than their normally scheduled hours unless directed to do so by their manager.

Non-exempt employees will receive overtime pay of one and one-half (1.5) times their regular rate of pay for all hours worked over forty (40) in any work week (excluding holidays and paid leaves such as vacation and sick days), or for any other hours required by state law. In states that have enacted state overtime laws, where an employee is subject to both the state and federal overtime laws, the employee will be paid overtime according to the higher standard. Employees may contact their manager or Human Resources Manager for clarification of how overtime is calculated and paid in their state.

Overtime pay eligibility is based on the hours worked each work week (or day, where applicable). Payment for overtime worked should be made no later than the end of the pay period immediately following the pay period during which the overtime was worked (provided approved time cards/time sheets are submitted before the payroll deadline). Employees must receive payment for overtime hours worked; time off in lieu of overtime payment is not permitted.

### G. On-Call

A non-exempt employee is considered to be "on-call" only when so assigned by his or her manager. On-call time is normally compensable only while the employee is actually working. Employees scheduled for on-call duty are not required to remain on Company premises, or to be confined to their homes or to any particular place, provided they remain within a reasonable travel distance of the location (as determined by management). On-call employees are required to not consume alcohol or other intoxicants. If there are greater restrictions on the employee's on-call duty, on-call time may be compensable; the employee and manager should consult with Human Resources. When the employee is called to work during the on-call time, the employee will be paid at the employee's appropriate pay rate (see Call Back section below). In all instances, it is the employee's responsibility to clock in when called into work and to clock out when the work assignment is complete.

When a non-exempt employee is required to take phone calls after completing the regular work schedule and leaving the premises, but is not required to physically return to work, the employee shall log the start and end times of each phone call. The employee will be paid for the time spent in phone conversations. The recorded time will be included in determining if an employee qualifies for overtime pay in a work week.

### H. Call Back

When a non-exempt employee is called back to work after completing the regular work schedule and leaving the premises, the employee shall be paid for time actually worked upon leaving home or a minimum number of hours, whichever is greater. The minimum number of hours may vary by job task and market. Please contact your manager to determine the correct minimum number of hours for your location. In all instances, it is the employee's responsibility to clock in when called into work and to clock out when the work assignment is complete. Call back time will be included in determining if an employee qualifies for overtime pay in a work week.

P08887

# EXHIBIT 31

## Minutes from October 8, 2003 Meeting – Pittsburgh Market Staff

The meeting was called to order at 7:30 A.M. Those present were: Pat McDermott, Bob Irlbacher, Claudia Young, Bill Sutter, Heather Rady, Les Howard, Tom Mills, Michael Hilgefort, Randy Howard, Ken Hunkele, Larry Beck and Deborah Prise.

Randy Howard presented the staff with its annual formaldehyde training after which all employees present signed acknowledgements of training. Randy Howard also encouraged the staff to offer suggestions for future topics to review for safety training.

Pat McDermott reminded the staff that the Alderwoods' company policy is located at each location in the company's manual. He also announced that Mayflower would replace Forethought as our pre-need vehicle and encouraged all funeral directors to become licensed life insurance agents.

Pat McDermott reviewed the reporting structure for the Pittsburgh Market, N.E. 14: Ron Collins – Vice-President of Operations < John DiPalma – Director of Operations < George Amato – Regional General Manager < Pat McDermott – Market General Manager < Michael Hilgefort – Location Manager ( BLH & HSI ) & Pat McDermott – Location Manager ( HPB & HSI ). He reminded the staff that any and all overtime must be pre-approved by Pat McDermott. Any overtime that is submitted without prior approval will not be paid. Patrick McDermott must approve any and all schedule changes. Pat McDermott stated that payroll would only be opened and disbursed by him and / or Michael Hilgefort and that it was the responsibility of the location manager to keep payroll locked until it could be distributed to the individual employees. Pat McDermott asked that all funeral directors have their community events / activities summarized and given to him by Monday, October 13, 2003. He also emphasized the importance of seamless service and reminded us that the staff as a whole needs to work together to achieve this common goal with each family we serve.

Pat McDermott introduced the select CORE TEAM members: Kim Stebler, Michael Hilgefort, Randy Howard, Ken Hunkele and Pat McDermott. He stated that the CORE TEAM members had to meet every other week and that a minimum of three people had to be present for each meeting. It was suggested that presentations be made at each staff meeting by a CORE TEAM member to inform the staff of current progress and / or changes that may come about. The CORE TEAM members decided to meet on Wednesdays at 1 PM alternating locations for place to host meetings. The first meeting will be October 15th at H. P. Brandt Funeral Home, Inc..

Pat McDermott introduced the " I Believe in Service *Award Program*." Posters will be posted at each location to remind all employees have the point system and to act as encouragement. Points are accumulative for one year beginning when one employee obtains his or her first points. Pat McDermott asked if anyone had any suggestions to refine or enhance the program as a whole or to customize it to better suit our market. Les Howard suggested entertainment booklets.

Before the meeting concluded Pat McDermott asked if anyone had any questions, concerns or comments. Bill Sutter expressed concern about the human remains not being properly tagged when arriving to the preparation facility at H. P. Brandt Funeral Home, Inc.. This is of great concern due to the volume of calls received and that this is the designated facility for centralized embalming for the market. Pat McDermott emphasized the importance that all human remains without exception should be tagged on the right ankle with the name of deceased and the name of the location for which is to provide service.

The meeting was adjourned at 8:45 A.M. The next meeting will be November 12, 2003 at 8:30 A.M..

## MEMO

**DATE:** 09/16/2002

**TO:** ALL EVERGREEN STAFF

**CC:**

**FROM:** SCOTT

**RE:** OVERTIME AND HANDWRITING

**PRIORITY:** [URGENT]

---

This memo is to serve as a written reminder of certain issue that were brought up in last Thursday's morning meeting (9/5).

<u>Overtime:</u> It has always been the policy at Evergreen Memorial Chapel, and now Alderwoods Group, that no overtime be paid without prior approval and without a written explanation. This policy has been stated in the past many times, and will now be reinforced without exception. If there is no written explanation on your time card (excluding death calls) that time will not be submitted to payroll, and the time will be considered a "donation" to the company. These explanations can be as simple as "Smith Visit", "Clean Prep Room". All overtime must be approved: talk to Scott, Rob, Kirstin or Debbie in person or by phone. You should be able to contact at least one person for approval.

Handwriting: It is a new company policy that all paperwork must be completed in **legibly printed block letters**. *This means all paperwork, green sheets, contracts, case reports, etc...* Wherever possible, it should be typed. **All permits, death certificates and fax cover sheets must be typed.** Scott and Rob will randomly be assessing various forms. The first time someone does not follow this policy, it will result in a written reprimand. The second infraction will result in a three-day suspension without pay. The third infraction will result in a recommendation for termination.

KAB/KAB

09/16/2002

P12519

# Memo

**Date:** 05/19/2003

**To:** Evergreen Staff

**Cc:**

**From:** Kirstin for Scott

**RE:** OVERTIME!

**Priority:**

---

RECENTLY, EMPLOYEE ATTITUDES HAVE BEEN LAX TOWARDS THE NEED FOR OVERTIME APPROVAL. IT IS, AND ALWAYS HAS BEEN THE POLICY OF EVERGREEN MEMORIAL CHAPELS THAT ALL OVERTIME REQUIRES APPROVAL, WITHOUT EXCEPTION. AS PREVIOUSLY PUT FORTH, WHEN YOUR EIGHT HOURS IS ALMOST UP, IT IS YOUR RESPONSIBILITY TO NOTIFY YOUR SUPERVISER SO THAT HE/SHE IS AWARE. ALL OVERTIME WILL REQUIRE SCOTT'S APPROVAL, WITHOUT EXCEPTION. IF SCOTT IS NOT IN THE OFFICE, YOU WILL COME TO THE OFFICE STAFF AND REQUEST THAT WE CONTACT SCOTT FOR APPROVAL. THE REASON FOR THIS OVERTIME WILL BE NOTED ON THE TIMECARD WITH THE INITIALS OF THE PERSON OBTAINING SCOTT'S APPROVAL.

**AS PER POLICY, ANY OVERTIME NOT APPROVED WILL NOT BE PAID.**

KAB

05/19/2003

**ALDERW⊙⊙DS**™
GROUP

INTERNAL MEMO

☐ Urgent      ☐ Response Required      ☐ For Review/Approval      ☒ FYI

To:        All Location Managers

CC:        Bill Kuljam, Kyle West, Todd Noecker, Petra Dennis, Delaine Ramirez, Betty
           Wiley

From:      Ken Dimond

Date:      May 10, 2006

**Subject:**

---

From time to time it is important to re-visit issues that seem to re-occur a couple of times a year. Please
have a staff meeting to discuss the company's work schedule and overtime policies. It is important for all
location managers to establish regular work hours for our employees. Those work hours must be adhered
to at all times with any exceptions authorized by the location manager only. Employees are not to clock in
earlier than their established work hours or work late without the approval of the location manager. The
employees are required to work an 8 hour day and are required to clock out for their lunch hour. Only
approved overtime will be paid. Overtime in California is any time worked that exceeds 8 hours in a day.
In Arizona and Nevada overtime is any time worked that exceeds 40 hours in a week. The location
managers are responsible for monitoring the work time of the employees. The location manager is
required to sign off on the time cards each week. This means you are accountable for the time worked by
your employees. I recently audited some locations time cards and found that for 1 funeral home location
they did 1 call in the week, had no special projects going on, yet entered over 30 hours of overtime for the
employees that week. This is a result of staff arriving to the location much earlier than their scheduled
time and clocking in and then working the regular work hours and then clocking out. No lunch hour was
clocked out for. So basically they are working a 9 hour day every day accounting for 5 hours of overtime
not worked and not approved plus the amount of time they received in the morning for clocking in prior to
their scheduled hours. This behavior must stop immediately. It is important to note on a large scale how
this behavior affects the region. On a region wide basis we have nearly 200 fulltime employees. If this
was occurring at every location, and it is not, it would create an overage of 1000 OT hours per week
minimum or an average of $20k per week. You can see how this type of practice can truly hurt the
locations financials. If you see that your location has this issue, please address it immediately.

Please give me or your MGM a call if you have any questions.

Thank you!

ALD003836

Overtime
- ❑ <u>There is no unapproved Overtime</u>
- ❑ Abuse of overtime
  - ➢ This will be monitored and tracked through time cards.
  - ➢ Part Timers cannot work more than 29 hours in a week, and no hours are guaranteed, called on a need to basis.
  - ➢ Work smart, efficiently and hard the first 8. Think about how much time we waste in a day doing non productive, non company related business on company time.
- ❑ Expenses
  - ➢ No money will be sent using funeral home funds unless approved by GM, this includes purchases made on the petty cash cards and accounts we have with local vendors such as McClendons.
  - ➢ We need to monitor waste and mistakes, the more waste and mistakes we make, the less funds there are for important things that will help us move forward.

- ❑ Goal Setting for 2008
  - ➢ Set 4 Goals for us to achieve this year.
  - ➢ Review and acceptance of Goals for 2008 will be done at Friday's morning meeting.
- ❑ Culture for 2008 at Powers Funeral Home "Yes Attitude"
  - ➢ "You become what you think all day long" – Earl Nightingale
  - ➢ "Tell me what you can do, not what you cant. Tell me the solution…." – Jeffrey Gitomer
  - ➢ "Philosophy drives Attitude. Attitude drives Actions. Actions Drive Results. Results Drive Lifestyles. If you don't like your lifestyle, look at your results. If you don't like your results. Look at your actions. If you don't like your actions, look at your attitude. If you don't like your attitude, look at your philosophy" – Jim Rohn

ALD010391

EXHIBIT 32

**South Central 36**

# Memo

**To:** All Employees

**From:** Bob Russell, Rick Halkuff, Michael Blasberg, Neal Hornfeld, Ed Libengood, Melissa Pitalo, Yvette McPhillips, and JM Jones

**CC:** Dalmis Garcia, Felicia Lopez

**Date:** May 10, 2004

**Re:** Time Card Procedures

---

Friendly reminder:

All PAID HOURLY personnel are not to work overtime unless pre-approved.  Pre-approved overtime would be utilized only in instances where there is a "high" at need or pre need volume week.  All Salaried employees should continue to utilize time cards as well.

All Personnel:  Time cards are to be punched as close to scheduled working time as possible. Time cards should not be punched earlier than 5 minutes prior to your scheduled work time, <u>unless designated by your immediate supervisor</u>.  Time cards should be punched within 5 minutes after your scheduled work time ends.

| EXAMPLE: | Schedule to Work | 8:00am – 5:00pm |
| | Punched In | 7:57 am – with normal lunch break |
| | Punched Out | 5:04pm |

This is the allowable variance. We do appreciate the fact that some employees come in early to work of their own volition, but that does not necessitate early clocking, creating payroll issues.

It has been brought to our attention via an anonymous phone call through Management that employees are asking other employees to punch them in. **This is in direct violation of Company Policy and all employees involved will be terminated immediately.**

Time Cards:

1. Should not be removed from the Time Card Rack -- unless you are a floating employee between locations

2. All time cards with Overtime or NO lunch taken <u>must be initialed on the appropriate weekday by your supervising Manager</u>, vacation, float and sick must be indicated as well on the day taken

3. All time cards must be signed by the Employee, Managers must review and approve weekly by signing

Your prompt attention to this procedure is greatly appreciated.

1

ALD000215

 Sue Posipanko
01/04/2006 09:37 AM

To: Jerry Tilton/Alderwoods@Alderwoods
cc: John Blute/Alderwoods@Alderwoods
Subject: meeting Thursday

Hi Jerry,
   Thought I would pass along some thoughts and things that employees have asked about in the past that you may want to present in your meeting.
 Responsibility of :

Employee- all of us--- To be on time , meaning not early or late. Some people show a half hour early with little to do and expect to be paid for that- just because they decided it would be good for them to come in early- Need to stick to hours assigned by supervisor unless directed to come in early
Responsible to fill out time card correctly, total hours and get to supervisor on time
This includes calling in sick, requesting vacation time or floating holiday time. Should be a 30 day notice minimum. Do Not leave time until the last month.

Supervisor- Responsible to keep accurate records of vacation time, sick time and floating holiday time. Responsible to sign each and every card and get to keyer (fax or otherwise) by 10:00 am Monday-- No later
Supervisor is responsible for time- off, overtime, scheduling. Supervisor can designate an admin person to help with attendance and faxing info to keyer, but Supervisor is the sign- off on all time cards/ sheets

Suggest: Back up record at Central Keying

Keyer- Responsible to input time cards/ sheets - that is all-

Other

Discrepancies go to either supervisor first( who should keep a copy of cards/ sheet) or MGM who has final sign- off of payroll

Explain system of time cards when moving from one home to another

Punch in when you go to work- punch out when you leave- punch out for lunches-
On Call- write down time of call- and then punch out after removal is delivered to home and you are leaving

Phone calls- 15 minutes for a phone call? I see this all the time - that FDs or others are receiving a phone call after hours and may not make any removal and probably spend 5 minutes with a family or answering service. Could we use common sense on these calls. Charging us for that seems a little knit- picking.

If you are still working at time you are supposed to leave - it should be somethings that was unavoidable say a late removal or embalming and then just punch out as soon as your done that job - do not hang around waiting for whatever. I have noticed that a removal might becoming back in an hour say 5:30 or 6:00 that one person will wait for the other and then charge us for that extra time waiting- To me that is not what call time is about or over- time is about. Explaining the budget process might be helpful, but most of them do not really care about the budget- so at this meeting it might be very good to try to cover all the loop holes they are using to mount up time.

Perhaps have them ask questions for different situation and together we can come with a proper answer.

One last thing- Have the LMs actually tried to get in touch with all of the part time help?
Last week I found that a full timer did not know about the meeting. The notice was just hung on the door. When I asked Bill he was somewhat negative on the subject saying "you will only get 50% anyways"-I just said " Yes that could be if right especially if they do not know about the meeting"    Maybe someone could make some phone call today

ALD005833

Just a few thought, but then you know how I can ramble
Have a great day
Sue

Sue Posipanko, RA
NE/PA/WV
PH: 1-508-775-7649
FAX: 1-508-775-8057

ALD005834

# EXHIBIT 33

Edo Miller and Sons Funeral Home

Staff Meeting:   May 31, 2005

Meeting was brought to order by Manager, Warren H. Putnam.

Warren talked about the following subjects:
Incentives for the Full Time Staff
Vault Averages
Casket Averages
Per Call Averages

Warren gave the qualifications for Bonuses and explained that they are paid 2 times a year if we meet the qualifications.

Warren announced that the new vehicles would be here today.

Warren told all employees at meeting that they are to watch about overtime.  We are not to go over what we are suppose to work.

Warren handed out our job description that was handed down by Bird Hodges and told us to go over our job description and follow it. On this note, we had 2 people that ask; "Why we are not getting paid more for doing duties beyond our job description?" If we had to take on more responsibility then we should be paid more for that.

Warren talk to us about that Alderwoods is considering the location to do their own laundry and also washing their own cars instead of having outside vendors for these duties.

Warren spoke to us about the Awards for Excellence Program and said that Bird Hodges wants each employee to nominate someone for this.  Nomination forms were handed out so that everybody could nominate who they feel deserves the Award of Excellence.

Warren told us about William Rhinehart resigning and that Lynn Kopp will be on the floor Tuesday's and Thursday's.  Funeral Directors need to check the preneed board before scheduling appointments for the preneed staff.

The Funeral Director that sign a contract will be responsible for the paper work that is in or is not in the folder.  It does not matter who starts with the folder but the one that signs the contract is consider to be the Funeral Director for that contract.  When a Funeral Director marks on the folder that everything is ok and in the folder, then that Funeral Director is responsible for the paper work being in that folder.

Some of the employees brought up that the ties are falling apart and they needed better ties.  Warren will be discussing this with Arlie McNeill.

ALD002070

April 3, 2006

# Staff & Safety Meeting

A meeting was called by Warren Putnam, General Manager, and Patty Daughtry-Godbee, Location Manager, to discuss proposed merger with SCI. Handouts were given to each employee in attendance. Multiple questions were asked and employees were referred to the Q & A sheet supplied by Alderwoods.

Access to medical records was the topic of the health and safety meeting since questions had come up in regards to work excuses, etc. being left on GM's desk.

Teamwork was once again stressed.

We also stressed that employees need to stay within the hours they are budgeted unless we are busy and overtime is approved. Need to better utilize part-timers also to cut down on full-timers OT. Part-timers can NOT work over 32 hours a week, period.

Employee of the month award was not handed out due to the chosen employee being absent — we'll hold another meeting later in the month.

ALD002082

John,                                                          7/1/02

   I just wanted to thank you for keeping your
overtime hours "in-check" last week, since I
realize what a challenge it can be in our
profession.

   With half the year behind us already, I
must keep an eye on certain expenses and I
appreciate your support in this area. Keep
up the good work.

ALD004743

# *Minutes of staff meeting*

June 7, 2005 at 6;30 PM

Meeting conducted by Dennis Christie

People in attendance: Craig Morgan, Donna Vincent, Chris O'Mary, Marcie Doolin, Jan Lidstrom,  Bill Kruse, Mike Konrath, Ron Bohlman, Ed Pinnell, Paul Friden, Stephen Christmas, John Frostad, Gary Desimone, Kim Terrell

1.  Discussed the Alderwoods yellow pages and issue all employees a copy.
2.  Discussed the excellence program and gave all employees the corresponding paperwork. Gave Ron Price-Helton's poster and asked him to post it.
3.  Discussed the importance of using red bio-hazard containers for disposal of all used protective equipment.  No bio hazard storage in public access areas like the flower room or the back hall. Discussed keeping full containers in the prep room.
4.  Attention to detail. Make sure messages are getting to the proper people.  Told of an incident that cost us a lot of money because a family wanted to run an obit on Sunday instead of Monday as had been planned by the family and the FD.  The message never got to the FD so the obit didn't run Sun. the family was angry and didn't want to pay for the obits at all.
5.  If you sign a DC it means you proofed the DC.
6.  Obituaries need to be proofed.  It is preferred that the family proof but, if not someone needs to proof.
7.  Only an FD can put a file away.  After admin. and office staff are done with the file it is placed on the FD's desk.  After making sure everything has been done the file is put away.
8.  Please keep your overtime down as much as possible if you go over 5 per week you should contact Dennis to talk about the hours.
9.  Properly completing time cards.   Time cards must be signed and initialed if there are any hand written times.  Use the proper space for the proper day.  When entering piece work write in the time you were called and the time you completed the call at the funeral home.
10.  Proper inventory- When doing removals you need to write down everything you remove from the place of death.   We recently had a ring found on a deceased that was not on the removal paperwork.  Also do not say "Red Bag". The contents of the bag must be inventoried.  Whenever possible compare the hospitals inventory to our own.
11.  Please clean up after yourself- Lately the cosmetic room has not been looking very good and sometimes the prep room isn't looking as good as it should.   It was discussed that an extra five minutes need to be planned for clean up after you complete a task.
12.  Discussion of a recent incident of a cremation that was done improperly.   It was shared with the group that because of a lack of following procedure a person was  cremated incorrectly.  We discussed that we would be following the two tag system and that if any person is delivered to the Woodlawn Abbey without the second tag placed on top of the box for the crematory operators verification that NO cremations will take place until a funeral director comes and removes the second tag and verifies identity.   We will not be accepting a cremation that the funeral director hasn't signed on the authorization. Initials should be placed on the crematory operator's log that is placed on top of the cremation container.  In short all the I's will be dotted and the t's will be crossed or no cremation will take place.

ALD010392

**Minutes from June 3, 2003 Meeting – Pittsburgh Market Staff**

Those present were: Bruce Bills, Pat McDermott, Kim Stebler, Tom Mills, John Fodor, Claudia Young, Michael E. Hilgefort, Heather P. Rady, Bill Sutter, Bob Irlbacher, Ken Hunkele, Randy Howard, and Leslie Howard.

Bruce Bills welcomed everyone to a *Town Hall Meeting*. The following questions, responses, and comments were recorded:

- Bruce Bills: Opened the floor
- Randy Howard: Concern about layoffs
- Bruce Bills: No layoffs; business is good; volume is not where the company has projected throughout the company; observing expenses; region is 125 calls behind; advertising and repairs on hold at this time.
- Kim Stebler: Repairs to Samson's?
- Bruce Bills: Exploring alternatives; keep running the business; small sector within company, which examines such funeral homes and often decisions are made even without his (Bruce Bills) knowledge.
- John Fodor: Who has final decision with regard to the closure of a location?
- Bruce Bills: Capital Committee and Bruce Bills
- Pat McDermott: Examined Samson's with Bruce Bills
- Bruce Bills: Samson's needs help
- Bill Sutter: Concerned about the image of Samson's transfer to other facilities
- Claudia Young: Concerned about Prep Room
- Pat McDermott: Order what you need
- Bill Sutter: About table and dressing table
- Bruce Bills: Sounds that these concerns can be remedied locally.
- Kim Stebler: Is there a budget for Prep Room?
- Bruce Bills: Capital Budget exists.
- Randy Howard: Perhaps trade table.
- Bruce Bills: Is this a new concern?
- Staff: No
- Randy Howard: Concerned about ventilation in the Prep Room
- Pat McDermott: We need to run another test.
- Bruce Bills: How is morale in the market?
- Claudia Young: Likes to go to work sometimes.
- John Fodor: Good staff
- Claudia Young: Stuff is bothering people. Staff is not happy.
- Heather Rady: Short staffed, overwhelming at times
- Bruce Bills: Working too much?
- Les Howard: There is neglect at Samson's.
- Bruce Bills: Do you get a paycheck?
- Les Howard: Spend money, and you will maintain this market.

NPAL0567

- Bruce Bills: Scenario -  $150,000 - $200,000 estimate to repair Samson's;  for 100 calls to make back the money, you will need to generate $800,000 of business.  Will Samson's generate the calls?
- Kim Stebler: Compares renovations of Brandt's to Samson's
- Randy Howard: Families are responding favorably.
- Kim Stebler: How many more calls is Brandt's to generate?
- Pat McDermott: No projection was formally made;  end of period 5 – 21 calls down for market.
- Kim Stebler: Each location should know the budgeted calls.
- John Fodor: Families are pleased with the service and the renovations.
- Bruce Bills: What does renovation of a building mean?  Good business
- Randy Howard: Client loyalty is still high.
- John Fodor: Renovate landscaping of Brandt's.
- Kim Stebler: What about the house next door?
- Bruce Bills: No, not yet. Who is "they"?
- Claudia Young: The corporation
- Bruce Bills: Take control; you sound like victims.  Ask me a question for which I have control.
- Bill Sutter: Concerned about pay
- Bruce Bills: Did you get a bonus?  Raises were given.  What is the problem?
- Bill Sutter:  Raises are minimal;  cost of healthcare going up;  cost  of living is increasing.
- Bruce Bills: Guaranteed overtime should have been done away with two years ago. Reduce your individual expenses to adjust.
- Randy Howard: The hourly pay is not the concern; the adjusted pay (decrease) is.
- Bruce Bills: This was a vehicle to lower company expenses.
- Claudia Young: Concerned about asking for overtime
- Bruce Bills: Good business is to watch all expenses.  Resource sharing between locations is important.  I trust you are doing well in your work.  I know how to handle people.  We must open our minds.  It is all about perspective, e.g. location versus corporation.
- Bill Sutter: What is the response to the Batesville Selection Room?
- Bruce Bills: Positive – Brandt's casket sale average is up – huge.  We as a staff have to change the way we think.  It is about presentation.  We need to relearn things, because we are habitual.
- Bruce Bills(cont.): Discussions regarding the Alderwoods Selection Room and general business... Bring up payment options up front to ease the customer's mind. Try to see the world half full, not half empty.  Get involved in the community.  Be positive.  Don't be a victim; change your perception.  Take control.
- Claudia Young: Wants software to print prayer cards and wants to bring in own computer.
- Bruce Bills: It is already here and employee computers are strongly discouraged.

NPAL0568

EXHIBIT 34

**To:** Clark, Freda
**Subject:** RE: list of employees in upload file

Freda please see below.  Will the several pages be for one employee or several employees?

**Mary-Ellen Chiffriller**
**Human Resources Director**
**New York Market Support Center**
**Ph  (718) 721-4719**
**Fax  (718) 956-4158**



**From:** Clark, Freda
**Sent:** Thursday, March 20, 2008 2:12 PM
**To:** Chiffriller, Mary-Ellen
**Subject:** RE: list of employees in upload file

Mary-Ellen,

I am going to fax you a couple pages of what we have as backup for the OTA calculations.  You may want to take a look at it and see if it will be sufficient backup for the employees and also if they will be able to understand how the calculations were done.

Can you please send me you fax number?

Freda

**From:** Kneipp, Lynnette
**Sent:** Wednesday, March 19, 2008 10:39 AM
**To:** Clark, Freda
**Cc:** Chiffriller, Mary-Ellen
**Subject:** list of employees in upload file

Freda,

**We need to provide Mary-Ellen the list of the employees in the upload file (those that received the new OTA code).**

Just to give you some history . . . AWGI was not calculating the OT premium correctly. They did NOT take the bonus into consideration when calculating the OT for the employees.

There are 2 files – 1 small file was paid with the 03/22/08 check (which is the list of names that Mary-Ellen needs). I have the other large file that I will forward to you (after we verify AWGI's calculations). If memory serves, one of these files was for a "true-up" of ½ of the year, and I believe the other file was the "true-up" for just a few months.

My concern, which I explained to Mary-Ellen last night, is that the only back-up that we can provide to

ALD012847

the employee is a hard-copy calculation that was done by Clarissa's team. I had requested some sort of electronic back-up at the employee level. Clarissa's team did all of the calculations by hand on paper, so there is no electronic back-up. So . . .when an employee wants to know why they received $224.56 on their check, we don't have anything that we can email them – it would have to be faxed to the location. (that's probably not a big deal with the small file, but it will be a big deal with the large file)

**Also – can you let Mary-Ellen know what will show on the employee's check for the new OTA code? She needs to be able to tell the employees what the payment is for.**

Thanks!!!

**Lynnette Kneipp**
Payroll Manager
ph: 713-525-5218
fax: 713-525-5449

ALD012848

*REDACTED*

Message from "Chiffriller, Mary-Ellen" <Mary-Ellen.Chiffriller@sci-us.com> on Tue, 25 Mar 2008 -----
----- 0600- 13:48:06

*REDACTED*

-----Original Message-----
From: Kneipp, Lynnette
To: Chiffriller, Mary-Ellen; Dyess, Katie; Clark, Freda
CC: Ritter, Gary; Joubert, Benita
Sent: Tue Mar 25 14:00:54 2008
Subject: RE: Action Required - Heat ticket 950849

Katie,

Mary-Ellen is correct. The payment is because AWGI did not calculate the 2007 OT premium correctly when the counselor also received a bonus during the same pay period.

We uploaded a file with this "2007 true-up" on check date 03/21/08. The problem is that the AWGI payroll team did

ALD012849

these calculations by HAND (meaning that they wrote out a formula in pencil). We are having difficulty interpreting their results (although we did spot check some of their calculations).

Mary-Ellen – I understand the concern that we did not provide a statement to go along with this payment. We did not have the time to type this up manually, but we didn't want to hold up the payment. However, it is important that we are able to tie out the amount. Therefore, we are meeting with our IT team this afternoon to see what data can be pulled from the old AWGI payroll system to accommodate this. Once this is complete, we can provide statements that show the actual calculation and payment amount.

Thanks,
Lynnette

-----Original Message-----
From: Chiffriller, Mary-Ellen
Sent: Tuesday, March 25, 2008 1:53 PM
To: Dyess, Katie; Kneipp, Lynnette; Clark, Freda
Cc: Ritter, Gary
Subject: Action Required - Heat ticket 950849

Katie, please refer to Lynnette and Freda as there has been some movement on this front as of the last paycheck.

The premium is OT payment as it relates to the recalculation of the hourly rate when the counselor receives a bonus.

Most importantly, I would like to have the list of employees who will receive their payment during the next paycycle and the amount they are due to receive.

Can this happen sometime this weekb
Mary-Ellen Chiffriller
  HR Director
  718 721 4719

Sent from my BlackBerry Wireless Handheld

-----Original Message-----
From: Dyess, Katie
To: Nowak, Diane
CC: Chiffriller, Mary-Ellen; Ritter, Gary
Sent: Tue Mar 25 12:07:57 2008
Subject: RE: Heat ticket 950849

Thanks so much! Also, just to be clear, when you say premium, you are referring to Overtime, correct?

I appreciate your help!

ALD012850

# EXHIBIT 35

# ORGANIZATIONAL CHARTS

# ORGANIZATIONAL CHARTS

## Table of Contents

Executives . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Western, S. Philips . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

North East / Canada, R. Collins . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

South Eastern, B. Mayes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Executives . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Legal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

E. Neeman, Legal Compliance, C. Kizina . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Legal – Trust & Regulatory Compliance, D. Gauntley . . . . . . . . . . . . . . . . . . . . 17

Legal – Corporate Records, L. Langford . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Corporate Development, C. Duff . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Sales & Marketing, R. Scully . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Finance, K. Sloan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Finance – Consolidation Accounting & Reporting and Tax, D. Hawes . . . . . . . . . . 27

Finance – Tax, V. Perry . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Finance – Financial Planning, W. Tottle . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Finance – Accounting, G. Woodean . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Finance – Accounting, E. McWhirter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Finance – Accounting, A. Drinkwater . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Finance – Accounting Support, J. Farrell . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Finance – Accounts Payable, C. Ansell . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Finance – Treasury & Customer Finance, J. Lowe . . . . . . . . . . . . . . . . . . . . . . . 43

Finance – Customer Finance Collections, R. Weigand . . . . . . . . . . . . . . . . . . . . 45

Finance – Customer Finance, Customer Service & Transactions, D. Fredley . . . . . . . . 47

P08656

# ORGANIZATIONAL CHARTS

Finance – Trust Administration, E. Mignosa . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Finance – Trust Administration, D. Negus . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Finance – Trust Administration, D. Barfurth . . . . . . . . . . . . . . . . : . . . . . . . . . . . . . . . . . 53

Finance – Trust Administration, Trust Relations, S. Pau . . . . . . . . . . . . . . . . . . . . . . . . 55

Finance – Trust Administration, HMIS Project, T. Ingram . . . . . . . . . . . . . . . . . . . . . . . 57

Finance – Trust Administration, Tax, T. Krause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

Human Resources & ITS, R. Caradonna . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

ITS – Systems Infrastructure, A. Coe . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

ITS – Support Services, J. McMillan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

ITS – Applications Development, E. Chin . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . : 67

ITS – Applications Management, E. Kenkel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

Human Resources, M. Wilson . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

Human Resources – Payroll & Commissions, C. Hollinger . . . . . . . . . . . . . . . . . . . . . . . 73

Human Resources – Benefits, D. Byrn . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

Human Resources, D. Routley . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

Human Resources Office Support, M. Tullan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

© 2004 Alderwoods Group, Inc. Rev. Feb. 2004; Organizational Charts. All rights reserved. Alderwoods Employee Helpline: 1-888-782-7809

P08657

# ORGANIZATIONAL CHARTS

## Executives



**Executive Committee**

**Management Committee**

**Operations Managment**

© 2004 Alderwoods Group, Inc. Rev. Feb. 2004. Organizational Charts. All rights reserved. Alderwoods Employee Helpline 1 888-782-7894

3

P08658

# ORGANIZATIONAL CHARTS

**Western**
S. Philips

Organizational chart — Western, S. Philips

- Shawn Phillips — VP, Operations Western USA.
  - Janice Moody — Assistant, Admin - Western
  - John Head — RGM - Oregon/Idaho
    - Greg Hilsendorf — RGM - Minnesota
    - Brett Edgarty — MGM - Rev - Oregon/Idaho
    - Jean-Christoph Aubry — MGM - Exp - Oregon/Idaho
  - Bryan Marx — RGM - Pacific Northwest
    - Ken Dimond — RGM - AZ/NM/NM
      - John Gerhart — MGM - Rev - AZ NM/NM
      - Vincent S — MGM - Exp - AZ/ NM/NM
    - Cyndi Ross — MGM - Exp - Pacific Northwest
    - Monty Roberts — MGM - Rev - Pacific Northwest
  - Brent Matherly — RGM - OK/KS/CO
    - Jim Straub — RGM - Illinois
      - Darin Keener — MGM - Exp - Illinois
      - Dean White — MGM - Rev - Illinois
    - Dow Wilson — MGM - Rev - OK/ KS/CO
    - Gordon Mair — MGM - Exp - OK/ KS/CO
  - Bill Mitchell — RGM - California
    - Greg McCormick — RGM - OK/WI/NM MI
      - John Cagge — MGM - Rev - OK/ WI/NM/NM
      - Ronald Rodnash — MGM - Exp - OK/ WI/NM/NM
    - Derek Pole — MGM - Rev - California
    - Nick Hager — MGM - Exp - California
  - Paul Bruemmer — Controller - Western
    - Beth Wagner — Controller - Western
  - Chris Timothy — DOO - Western
    - Jeff James — HR Specialist - Western
    - Ted Coleman — MMC - Western
  - Stephania Tureck — Regional Admin - Western
  - Mark Mace — DOSM - Western
    - Jon Drozdz — Western - Geographic Sales Support
    - Mike Edelich — Western - Geographic Sales Support

© 2004 Alderwoods Group, Inc. Rev. Feb. 2004; Organizational Charts. All rights reserved. Alderwoods Employee Helpline: 1-888-783-7899.

5

P08659

# ORGANIZATIONAL CHARTS

## North East / Canada
R. Collins



**Ron Collins** — VP, Operations Northeast USA & Canada

**Bonnie Kulba** — Geographic Assistant

### Ralph Del Gallo — RGM - NY State
- Craig Duke — MGM - Hudson Valley / Western NY
- John Fitzpatrick — MGM - Brooklyn / Bronx / Long Island / Queens NY
- Steve LaPointe — MGM - NY (Standalone)
- Vacant S — Regional Admin - NY State

### Katie Leahy — RGM - Carolinas
- Barbara Matthieu — MGM - Southern NC
- Gary Toye — MGM - Central Northern SC
- Ken Pearce — MGM - Charlotte / Gaston County NC
- Sylvia Smith — Regional Admin - Carolinas

### Bruce Cumming — RGM - Mid Atlantic
- Bob Burger — MGM - Central VA
- Dean French — MGM - Northern VA, Maryland
- Jackie Keranovic — Regional Admin - Mid Atlantic
- Kelly Cecil — MGM - Central VA
- Tina Holmes — MGM - Western NC (standalone)
- Wayne Tapp — MGM - Northern NC

### George Anelo — RGM - New England/WVPA
- Bob Pranik — MGM - Harrisburg, PA
- Eric Tunstall — MGM - Providence / Springfield New Hampshire
- John Blute — MGM - Cape Cod Boston MA
- Pat McDermot — MGM - Pittsburgh, PA
- Randy Amos — MGM - Clarksburg, WV
- Suzanne Posjanino — Regional Admin - New Endland / WVPA

### Peter Wiesner — RGM - Canada Western
- Dave Garabo — MGM - Regina / Saskatoon
- Don Campbell — MGM - British Columbia
- James Coveadale — MGM - Alberta / Cdn Standalone
- Margaret McDonald — Regional Admin - Canada West
- Robert Mangell — MSM - BC

### Greg MacDonald — RGM - Canada Eastern
- Andrew Swan — MGM - South West ON
- Brad Carlson — MGM - Northwest ON
- Bruce Cooke — MGM - Sainl Sle. Marie ON
- Darin Hoffman — MGM - Manitoba
- Graham Murphy — MGM - Nova Scotia
- Joanne Johnston — Regional Admin - Canada East
- Oliver Guay — MGM - Quebec
- Richard Choronzay — MSM - Greater TO
- Richard Clayton — MGM - Greater Toronto ON

### Heather Patterson — DGSM - Northeast & Canada
- Trish Scott — Controller - Canada
- Leanne Sersun — HR Specialist
- Larry Newsom — HR Recruiter
- Chris Aslin — Controller - North East
  - Vicki Clark — Analyst - North East
- John DiPietra — ODC - North East & Canada
  - Don Green — MKBC - North East

P08660

# ORGANIZATIONAL CHARTS

## South Eastern
### B. Mayes



© 2004 Alderwoods Group, Inc. Rev. Feb. 2004. Organizational Charts. All rights reserved. Alderwoods Employee Helpline: 1-888-782-7806.

9

# ORGANIZATIONAL CHARTS

## Executives



### Executive Committee

John Lacey, Chairman

Paul Houston, President & CEO

Azalea Angeles, Assistant, Adm

Margaret Prjateli, Assistant, Executive

Ken Sloan, EVP, CFO

Ross Caradonna, EVP, CIO

### Management Committee

Cameron Duff, SVP, Corporate Development

Ellen Neeman, SVP, Legal & Compliance

Rick Scally, SVP, Sales & Marketing

### Operations Managment

Shawn Phillips, VP, Operations Western USA

Ron Collins, VP, Operations Northeast USA & Canada

Buddy Mayes, VP, Operations South Eastern USA

Kevin Musico, VP, Operations Development

Aaron Shlppar, President - Mayflower

© 2004 Alderwoods Group, Inc. Rev Feb. 2004. Organizational Charts, All rights reserved. Alderwoods Employee Helpline: 1-888-782-7899.

P08662

ORGANIZATIONAL CHARTS

## Legal
E. Neeman



© 2004 Alderwoods Group, Inc. Rev Feb. 2004. Organizational Charts. All rights reserved. Alderwoods Employee Helpline, 1-888-782-7899.

13

P08663

# ORGANIZATIONAL CHARTS

## Legal Compliance
C. Kizina



© 2004 Alderwoods Group, Inc. Rev. Feb. 2004. Organizational Charts. All rights reserved. Alderwoods Employee Helpline 1-888-782-7809.

P08664

# ORGANIZATIONAL CHARTS

## Legal – Trust & Regulatory Compliance
### D. Gauntley



P08665

# ORGANIZATIONAL CHARTS

## Legal – Corporate Records
### L. Langford



© 2004 Alderwoods Group, Inc. Rev Feb. 2004. Organizational Charts. All rights reserved. Alderwoods Employee Helpline 1-888-782-7849.

P08666

# ORGANIZATIONAL CHARTS

## Corporate Development
### C. Duff



© 2004 Alderwoods Group, Inc. Rev. Feb. 2004. Organizational Charts. All rights reserved. Alderwoods Employee Helpline: 1-888-782-7899.

P08667

# ORGANIZATIONAL CHARTS

## Sales & Marketing
R. Scully



© 2004 Aldenwoods Group, Inc. Rev Feb. 2004: Organizational Charts. All rights reserved. Aldenwoods Employee Helpline: 1-888-782-7849.

P08668

# ORGANIZATIONAL CHARTS

## Finance
### K. Sloan



© 2004 Alderwoods Group, Inc. Rev. Feb. 2004. Organizational Charts. All rights reserved. Alderwoods Employee Helpline: 1-888-782-7899

P08669

# ORGANIZATIONAL CHARTS

### Finance – Consolidation
### Accounting & Reporting and Tax
D. Hawes



P08670

# ORGANIZATIONAL CHARTS

## Finance – Tax
V. Perry



© 2004 Alderwoods Group, Inc. Rev. Feb. 2004. Organizational Charts. All rights reserved. Alderwoods Employee Helpline. 1-888-782-7899.

P08671

# ORGANIZATIONAL CHARTS

## Finance – Financial Planning
### W. Tottle



P08672

# ORGANIZATIONAL CHARTS

## Finance – Accounting
### G. Woodean



© 2004 Alderwoods Group, Inc. Rev. Feb. 2004. Organizational Charts. All rights reserved. Alderwoods Employee Helpline: 1-888-782-7899

P08673

# ORGANIZATIONAL CHARTS

## Finance – Accounting
### E. McWhirter



© 2004 Alderwoods Group, Inc. Rev Feb. 2004. Organizational Charts. All rights reserved. Alderwoods Employee Helpline: 1-888-782-7890.

P08674

# ORGANIZATIONAL CHARTS

## Finance – Accounting

A. Drinkwater



© 2004 Aldenwoods Group, Inc. Rev Feb. 2004: Organizational Charts. All rights reserved. Aldenwoods Employee Helpline: 1-888-782-7894

37

P08675

# ORGANIZATIONAL CHARTS

## Finance – Accounting Support
### J. Farrell



© 2004 Alderwoods Group, Inc. Rev. Feb. 2004  Organizational Charts. All rights reserved. Alderwoods Employee Helpline: 1-888-782-7899.                39

# ORGANIZATIONAL CHARTS

### Finance -- Accounts Payable
C. Ansell



© 2004 Alderwoods Group, Inc. Rev. Feb. 2004 Organizational Charts. All rights reserved. Alderwoods Employee Helpline: 1-888-782-7809.

P08677

# ORGANIZATIONAL CHARTS

## Finance – Treasury & Customer Finance

J. Lowe



© 2004 Alderwoods Group, Inc. Rev. Feb. 2004. Organizational Charts. All rights reserved. Alderwoods Employee Helpline: 1-888-782-7890.

P08678

# ORGANIZATIONAL CHARTS

## Finance – Customer Finance Collections
### R. Weigand



© 2004 Alderwoods Group, Inc. Rev. Feb. 2004. Organizational Charts. All rights reserved. Alderwoods Employee Helpline 1-888-782-7894

P08679

# ORGANIZATIONAL CHARTS

## Finance – Customer Finance
### Customer Service & Transactions
D. Fredley



© 2004 Aldenwoods Group, Inc. Rev. Feb. 2004. Organizational Charts. All rights reserved. Aldenwoods Employee Helpline 1-888-782-7509

47

P08680

# ORGANIZATIONAL CHARTS

## Finance – Trust Administration
### E. Mignosa



Elena Mignosa
VP, Trust Administration

Theresa Krause
Mgr, Trust Tax

Terrence Ingram
Mgr, Trust Business Process (HMIS)

Susanna Pau
Mgr, Trust Relations

Jane DeWitt
Sr. Mgr, Special Projects (HMIS)

Deborah Barfurth
Mgr, Special Projects (temp)

David Negus
Sr. Mgr, Trust Administration

© 2004 Alderwoods Group, Inc. Rev Feb. 2004. Organizational Charts. All rights reserved. Alderwoods Employee Helpline: 1-888-782-7899.

49

P08681

# ORGANIZATIONAL CHARTS

## Finance – Trust Administration

D. Negus



© 2004 Alderwoods Group, Inc. Rev Feb, 2004. Organizational Charts. All rights reserved. Alderwoods Employee Helpline: 1-888-782-7999

P08682

# ORGANIZATIONAL CHARTS

## Finance – Trust Administration
### D. Barfurth



© 2004 Alderwoods Group, Inc. Rev. Feb. 2004. Organizational Charts. All rights reserved. Alderwoods Employee Helpline: 1-888-782-7899.

P08683

# ORGANIZATIONAL CHARTS

## Finance – Trust Administration
## Trust Relations
### S. Pau



© 2004 Alderwoods Group, Inc. Rev. Feb. 2004. Organizational Charts. All rights reserved. Alderwoods Employee Helpline: 1-888-782-7809.

P08684

# ORGANIZATIONAL CHARTS

### Finance – Trust Administration
### HMIS Project
T. Ingram



© 2004 Aldenwoods Group, Inc. Rev. Feb. 2004. Organizational Charts. All rights reserved. Aldenwoods Employee Helpline 1-888-782-7800.

57

P08685

# ORGANIZATIONAL CHARTS

## Finance – Trust Administration
## Tax
### T. Krause



P08686

# ORGANIZATIONAL CHARTS

## Human Resources & ITS
### R. Caradonna



© 2004 Alderwoods Group, Inc. Rev. Feb. 2004. Organizational Charts. All rights reserved. Alderwoods Employee Helpline: 1-888-782-7899.

P08687

# ORGANIZATIONAL CHARTS

## ITS – Systems Infrastructure
A. Coe



© 2004 Alderwoods Group, Inc. Rev Feb. 2004. Organizational Charts. All rights reserved. Alderwoods Employee Helpline: 1-886-782-7894

P08688

# ORGANIZATIONAL CHARTS

## ITS – Support Services
J. McMillan



P08689

# ORGANIZATIONAL CHARTS

## ITS – Applications Development
### E. Chin



© 2004 Alderwoods Group, Inc. Rev Feb. 2004. Organizational Charts. All rights reserved. Alderwoods Employee Helpline, 1-888-782-7899.

P08690

# ORGANIZATIONAL CHARTS

## ITS – Applications Management
### E. Kenkel



© 2004 Alderwoods Group, Inc. Rev. Feb. 2004; Organizational Charts. All rights reserved. Alderwoods Employee Helpline: 1-888-732-7509.

P08691

# ORGANIZATIONAL CHARTS

## Human Resources
M. Wilson



© 2004 Alderwoods Group, Inc. Rev Feb. 2004, Organizational Charts, All rights reserved. Alderwoods Employee Helpline: 1-888-702-7999.

P08692

# ORGANIZATIONAL CHARTS

## Human Resources – Payroll & Commissions
### C. Hollinger



© 2004 Alderwoods Group, Inc., Rev. Feb. 2004  Organizational Charts  All rights reserved. Alderwoods Employee Helpline, 1-888-782-7894

P08693

# ORGANIZATIONAL CHARTS

## Human Resources – Benefits
D. Byrn



© 2004 Alderwoods Group, Inc. Rev Feb. 2004. Organizational Charts. All rights reserved. Alderwoods Employee Helpline: 1-888-782-7809.

P08694

# ORGANIZATIONAL CHARTS

## Human Resources
### D. Routley



© 2004 Alderwoods Group, Inc. Rev. Feb. 2004; Organizational Charts. All rights reserved. Alderwoods Employee Helpline; 1-886-782-7899.

P08695

# ORGANIZATIONAL CHARTS

## Human Resources Office Support
M. Tullan



© 2004 Alderwoods Group, Inc. Rev Feb. 2004, Organizational Charts. All rights reserved. Alderwoods Employee Helpline: 1-888-782-7849.

P08696

EXHIBIT 36

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

**DEBORAH PRISE and HEATHER RADY**
**on behalf of themselves and all employees**
**similarly situated,**

        **Plaintiffs,**

        v.

**ALDERWOODS GROUP, INC.,**

        **Defendant.**

**Civil Action No. 06-1641**

**Judge Joy Flowers Conti**

**ELECTRONICALLY FILED**

### DECLARATION OF CHUCK GIBSON

I, Chuck Gibson, pursuant to 28 U.S.C. § 1746 do hereby declare and state as follows:

1.    I am over 21 years of age, have personal knowledge of the facts set forth in this declaration, and could testify to them competently if called to do so.

2.    I was employed by Alderwoods Group, Inc. from October 20, 2005 through its merger with a subsidiary of Service Corporation International ("SCI").

3.    I was the Human Resources Manager for Alderwoods' North East USA/Canada Geography. In this position, I gained knowledge of the organization, hierarchy, and communication channels of Alderwoods' corporate human resources ("HR") department and field operations.

4.    I currently work as a human resources manager for SCI. I received and have complied with the document retention memorandum that was issued relative to this case.

5.    Alderwoods' corporate HR department was led by one Vice President of HR. Working for the Vice President of HR was one HR Director.

6.      During my time at Alderwoods, the Vice President of HR was Mark Wilson.  The HR Director was Jaana Harkonen, and she was assisted by Rhonda Suurd, who I believe was titled an HR Administrator.

7.      Below the corporate level, Alderwoods was divided into three physical areas called Geographies:  the North East USA/Canada Geography, the Western Geography, and the Southern Geography.  Each Geography was structured in a similar fashion.

8.      Each Geography had one Vice President of Operations (VPO).  Ron Collins was VPO of the North East USA/Canada Geography; Shawn Phillips was VPO of the Western Geography; and Buddy Mayes was VPO of the Southern Geography.

9.      Each Geography also had one HR Manager.  I was the HR Manager for the North East USA/Canada Geography.  Each Geography's HR Manager reported to his respective VPO and to the corporate HR Director, Jaana Harkonen.  Accordingly, I reported to Ron Collins and Jaana Harkonen.

10.     Reporting to each VPO was one Director of Operations (DO).  The DO for the North East USA/Canada Geography was Katie Leahy.

11.     Each Geography was further divided into Regions.  In the North East USA/Canada Geography, there were approximately six Regions.  Each Region had one Regional General Manager (RGM) who was responsible for overseeing operations of the Region.  The RGMs reported formally to their respective VPOs and informally to their respective DOs.

12.     Each Region was further divided into Markets.  In the North East USA/Canada Geography, there were approximately five to seven Markets per Region.  Each Market had one Market Growth Manager (MGM).  The MGMs reported to their respective RGMs.

- 2 -

13. Finally, within each Market were numerous funeral home locations that were managed by General Managers (GMs) or Location Managers (LMs) who reported to their respective MGMs. The location-level manager was called a GM if he or she managed more than one physical location.

14. RGMs, MGMs and GMs/LMs were responsible for overseeing operations and making sure company policies were being followed.

15. Corporate HR Director Jaana Harkonen drafted personnel/employment policies—including timekeeping and pay policies—with the assistance of Rhonda Suurd. All policies then went to the Vice President of HR, Mark Wilson, for final approval.

16. After policies were approved, Jaana Harkonen distributed the policies to the three VPOs and the three Geographic HR Managers, including myself, before rolling them out to the individual locations.

17. Employees at the location level had two primary ways to reach out to HR. They could either contact their Geographic HR Manager, which was me for the North East USA/Canada Geography, or they could call a 1-800 Alderwoods helpline. Complaints or inquiries related to HR matters received through the helpline were directed to Jaana Harkonen who, depending on the issue, may have redirected the matter to the appropriate Geographic HR Manager.

18. During the time I worked for Alderwoods, John Blute was RGM for the New England/West Virginia/Pennsylvania Region, which encompassed the Pittsburgh locations where Deborah Prise and Heather Rady worked. It is my understanding that George Amato preceded John Blute as RGM for this Region; however, I did not personally know George Amato, and I believe he had left this RGM position before I began working for Alderwoods.

- 3 -

19.     During the time I worked for Alderwoods, Randy Amos was MGM for the Market encompassing the Pittsburgh locations where Deborah Prise and Heather Rady worked, and Pat McDermott was a GM or LM for those locations.

20.     Alderwoods' VPOs had administrative assistants who handled clerical matters. The administrative assistant to Ron Collins in the North East USA/Canada Geography had an email account; however, Ron Collins himself handled communications related to policy matters. To my knowledge, DOs, RGMs, MGMs, and GMs/LMs did not have administrative assistants.

21.     Other than the individuals I have identified in this declaration, I am not aware of any other individuals who were responsible for drafting or disseminating policies applicable to the Pittsburgh market.

I declare under penalty of perjury that the foregoing is true and correct.

September _11_, 2009

_Chuck Gibson_
Chuck Gibson

- 4 -

PII-1202615v3

EXHIBIT 37

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DEBORAH PRISE AND HEATHER RADY, | ) | Civil Action No. 2:06-cv-1470-JFC |
|     Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | Judge Joy Flowers Conti |
| ALDERWOODS GROUP, INC., BURTON | ) | |
| L. HIRSCH FUNERAL HOME, INC., H.P. | ) | |
| BRANDT FUNERAL HOME, INC., AND H. | ) | |
| SAMSON, INC. | ) | |
|     Defendants. | ) | |
| | ) | |

### DECLARATION OF KATIE LEAHY

I, Katie Leahy, pursuant to 28 U.S.C. § 1746, depose and state as follows:

1.    I am over the age of 18, am of sound mind and am fully competent to make this declaration. I am familiar with and have personal knowledge of each and every statement of fact set forth in this Declaration. Each and every statement of fact contained in this Declaration is true and correct.

2.    I am currently employed with Carriage Services, Inc. as Regional Partner of the Eastern Region. I have held that position since December 2006. I was employed with Alderwoods Group, Inc. ("Alderwoods") between 1995 and December 2006 in various positions. I had held the position of Director of Operations for the company's Northeast United States and Canada markets between January 2006 and December 2006. During that time, I was based in Charlotte, N.C. and reported directly to Vice President of Operations Ron Collins.

3.    From 2002 to 2006, Alderwoods was a corporation engaged in the business of providing death-related services, such as funeral arrangements, embalming, and cremation, at both a pre-need (before the death) and at-need basis (time of death). Alderwoods operated

1

funeral homes and cemeteries across North America, including, in the Pittsburgh, Pennsylvania area, the Burton L. Hirsch Funeral Home ("Hirsch"), the H.P. Brandt Funeral Home ("Brandt"), and the H. Samson Funeral Home ("Samson").

4.   Alderwoods directly controlled all operations at its funeral homes, and determined all personnel, disciplinary, and operations policies for the homes. Alderwoods hired the individuals who staffed each funeral home, paid their wages, withheld their taxes, provided benefits programs that were universally available to all employees, and in all other respects exercised sole supervisory authority over the terms of staff members' employment and compensation.

5.   Alderwoods was affiliated with Burton L. Hirsch Funeral Home, Inc., H.P. Brandt Funeral Home, Inc., and H. Samson Inc. These were single purpose entities that held the funeral licenses required by Pennsylvania law. These companies exercised no control over Alderwoods employees.

6.   Every Alderwoods funeral home was available 365 days a year to any family that requested service. Alderwoods funeral directors were available twenty-four hours a day, 365 days a year, and the funeral homes were available whenever a service was requested or work was needed.

7.   As Director of Operations for Alderwoods' Northeast United States and Canada markets, I oversaw operations across several markets.

8.   Regional general managers supervised market general managers, who oversaw operations in a specific market and reported directly to the regional general manager. Location managers were the highest-ranking employees at each individual funeral home, and reported directly to market general managers.

2

9. Until approximately April 2005, Pittsburgh, Pennsylvania constituted its own market and Pat McDermott was the market general manager. The organizational chart attached hereto as Exhibit A is an accurate description of the reporting structure for the Pittsburgh market in approximately January 2005.

10. Alderwoods changed its market structure in spring 2005. At that time, the Pennsylvania and West Virginia markets were combined into one market. Randy Amos, formerly market general manager for West Virginia, was given the new position of market general manager for the larger market. McDermott was given the title general manager for the Pittsburgh area and began reporting to Amos. The organizational chart attached hereto as Exhibit B is an accurate description of the reporting structure for the Pittsburgh market in approximately May 2005.

11. Because the additional layer of management proved unnecessary, in October 2005 McDermott's title was changed to funeral director and he began reporting to the location manager for the H.P. Brandt Funeral Home in Pittsburgh, Pa. The organizational chart attached hereto as Exhibit C is an accurate description of the reporting structure for the Pittsburgh market in approximately November 2005.

12. I first became acquainted with Deborah Prise when she was a funeral director at the Hirsch Funeral Home. Prise frequently sought my advice on numerous occasions on how to develop her career. She told me that she admired me because I was able to rise to a senior management position in the funeral industry.

13. When Prise was promoted to location manager, I approved her salary based on her experience, the market location, and the funeral home's budget. Her salary was in line with the prior manager at Hirsch.

3

14.    In September 2005, I received a call from John Blute to inform me about a dispute over
whether Hirsch would serve a non-Jewish family. Blute told me that a family had
requested a Saturday visitation at Hirsch, which was unusual because Hirsch serves
primarily Jewish families, and rabbis and Jewish cemeteries do not conduct services
during the Jewish Sabbath. Blute and I discussed the matter and agreed that Alderwoods'
policy of open service mandated that we follow the family's wishes.

15.    Following our decision, Blute informed me that Prise insisted that Hirsch was closed on
Saturdays and that she refused to serve the family as requested because a Saturday
visitation would drive away Jewish business.

16.    Collins and I discussed Prise's failure to meet Alderwoods' essential value of open
service, her lack of empathy for a bereaved family, her refusal to follow orders from her
superiors in management, and her potentially discriminatory conduct. I felt that in
addition to contravening Alderwoods policies, Prise's conduct made the company
vulnerable to legal liability for discrimination for refusing to serve a Christian family.
Based on our discussions, on September 23, 2005, Collins and I approved Prise's
termination.

17.    Over the weekend, Collins and I reconsidered Prise's termination and decided to give
Prise another chance. We downgraded Prise's discipline to a warning letter that
explaining that further insubordination would result in termination.

18.    Shortly thereafter, rabbis from the Pittsburgh community began contacting Alderwoods
and threatening to boycott Hirsch. Prise contacted me to discuss damage control and
offer ideas to help resolve the tense situation. Prise warned me that Alderwoods must

4

apologize to the community and that, if Alderwoods refused, the rabbis might boycott Hirsch.

19.    I listened and told Prise that Alderwoods is always open to any family that requested service and explained that Alderwoods must care for all people regardless of religion. I informed Prise that her refusal to abide by management's decision was insubordination and would not be tolerated.

20.    During our conversation, I instructed Prise to take two weeks off to think about her career. I thought the leave would allow Prise to cool down and recommit herself to her job. Prise also told me that her mother was ill and I thought the leave would help her relieve some of her stress. She told me that she appreciated the time off. After our conversation, Prise sent me an e-card thanking me for my help and understanding. Prise was on leave for approximately the first two weeks of October, and continued to receive her full salary and benefits during her time off.

21.    Prise continued to be insubordinate after she returned. I received reports that Prise refused to follow management's decision that Hirsch was open 365 days a year and remained confrontational with colleagues.

22.    On November 2, I learned Prise had disrupted a staff meeting, been confrontational with colleagues, and was planning to attend a meeting of the Rabbinical Council to urge a boycott of the Hirsch Funeral Home. I felt that Prise's behavior was damaging staff morale and made funeral home operations more difficult. I also worried that Prise's disruptive behavior, including the possibility of a renewed public campaign against Alderwoods, would damage business at Hirsch.

23. In response to Prise's continued defiance of Alderwoods policy, Collins and I decided to place Prise on a temporary paid leave pending resolution of the dispute over Saturday operations at the Hirsch Funeral Home. Prise continued to receive her full pay and benefits during her November leave.

24. On November 15, 2005, I received an email from Alderwoods' in-house attorney Tom Harris reporting that Prise had accepted another employment offer and had voluntarily resigned from Alderwoods. Solely on the basis of Harris' representation, Prise's resignation was noted in Alderwoods' internal personnel database and I approved the change in her status.

25. Prise was not terminated. Had Prise been terminated, I would have been involved in the decision and would have had to authorize the termination. I never authorized an involuntary termination for Prise after September 2005.

I hereby declare under penalty of perjury, that the foregoing is true and correct.

Executed on: January 21, 2009

Katie Leahy

# EXHIBIT A

## Alderwoods Organizational Chart
### *Pittsburgh Market – January2005*



# EXHIBIT B

## Alderwoods Organizational Chart
### *Pittsburgh Market – May 2005*



# EXHIBIT C

## Alderwoods Organizational Chart
*Pittsburgh Market – November 2005*

