# EXHIBIT 66

Deposition Transcript of Jason Burgess (08-11-09)

1

1         THE UNITED STATES DISTRICT COURT
      FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2           Civil Action No. 06-1641

3

4  _____

                           )
  DEBORAH PRISE and HEATHER     )
5  RADY on behalf of themselves   )
  and all employees similarly    )
6  situated,                   )
                           )
7         Plaintiffs,        )
                           )
8  vs.                       )
                           )
9  ALDERWOODS GROUP, INC., and   )
  SERVICE CORPORATION INTERNATIONAL)
10                        )
         Defendant.        )
11  _____)

12        DEPOSITION OF JASON ALEX BURGESS

13         (Taken by Defendants)

14        Charlotte, North Carolina

15       Tuesday, August 11, 2009

16

17

18

19

20

21

22

23

24         Reported in Stenotype by
     V. Dario Stanziola, CSR, RPR, CRR
25

2

1               APPEARANCES

Deposition Transcript of Jason Burgess (08-11-09)

7      Q.    And when you went back to work for Lowen,

8   I'm sorry, was that at Carothers or was that at a

9   different location?

10      A.    Carothers.   Yes, ma'am.

11      Q.    Okay.  And what was your title at that

12   point?

13      A.    Licensed funeral director and embalmer.

14      Q.    And how long did you work for Carothers?

15      A.    'Til September of '97.

16      Q.    And what happened at that point?

17      A.    I had what they called a chronic

18   appendicitis.  I went out on medical leave, and I

19   was in the hospital for eight days and was let go

20   while I was on medical leave.  The company was

21   struggling with the whole Chapter 11, that was the

22   first time, and they decided to let me go while I

23   was in the hospital recovering.

24      Q.    Was there a subsequent point in time when

25   you became reemployed with Alderwoods or with a

15

1   predecessor?

2      A.    Yes, August of 1999, I went back to work

3   for Alderwoods.

4      Q.    Where?

5      A.    At Hankins & Whittington here in

6   Charlotte.

7      Q.    And what was your title?

8      A.    Funeral director, embalmer.

9      Q.    And was that Hankins & Whittingham?

Deposition Transcript of Jason Burgess (08-11-09)

10      A.    Whittington.

11      Q.    Whittington?

12      A.    Yes, ma'am.

13      Q.    And how long did you continue working at

14  Hankins & Whittington?

15      A.    'Til April the 1st, 2000.

16      Q.    And what happened in April of 2000?

17      A.    The company was going back into

18  Chapter 11 and the location I worked at, which was

19  the Hankins & Whittington Matthews Chapel, was sold

20  and closed down, and I was transferred to McEwen

21  Funeral Home in Monroe, which is an Alderwoods

22  firm -- well, Lowen firm, and then it became an

23  Alderwoods firm.

24      Q.    And that was McEwen?

25      A.    Yes, ma'am.

                                                          16

1       Q.    Can you spell that for the record?

2       A.    M -- capital M, little C, capital

3   E-W-E-N.

4       Q.    Okay.  And that was also a North Carolina

5   location you said?

6       A.    Yes, ma'am.

7       Q.    In --

8       A.    In Monroe.

9       Q.    In Monroe.

10      A.    Yes, ma'am.

11      Q.    So if I understand your testimony, you

12  began working for McEwen in April -- approximately
                          Page 14

Deposition Transcript of Jason Burgess (08-11-09)

1      Q.    Okay.  Did you sometimes look in the OSHA

2   binder?

3      A.    Yes, ma'am.  It was a standard set forth

4   by Alderwoods for us on federal regulations if they

5   wanted us to comply with.  And it was my job to

6   take those regulations and the regulations from the

7   State of North Carolina and see which one

8   superseded which and enforce that rule.

9      Q.    And did you ever look at the code of

10  conduct binder?

11     A.    I did.

12     Q.    Did you have any understanding as to what

13  locations the code of conduct binder applied to?

14     A.    What do you mean?

15     Q.    It applied to McEwen, correct?

16     A.    It applied to McEwen, it applied to all

17  Alderwoods locations.

18     Q.    And when you say all Alderwoods locations,

19  why do you say that?

20     A.    Because all locations had the same five

21  binders.

22     Q.    And how do -- how do you know that?

23     A.    Because it was introduced at that town

24  hall meeting that we'd be getting the five binders.

25  And Ron Collins had introduced those things and was

⬜

76

1   holding them up and explained what each one would

2   be.  And that you would be seeing that in the

3   somewhat near future.
                    Page 68

Deposition Transcript of Jason Burgess (08-11-09)

4      Q.    But what was he specifically saying in

5  terms of -- of what locations would have the five

6  binders?  I mean, you're saying that you understood

7  you're in a town hall meeting and he was holding up

8  the binders.  But what do you recall him saying about

9  what locations would have these or receive these

10  binders?  What do you recall him saying about what

11  locations would receive the binders?

12      A.    Oh, it was just that those were the

13  policies set forth by Alderwoods that each funeral

14  establishment should follow and practice.  Anything

15  further than that, I don't remember.

16      Q.    Okay.  Let me hand you what we'll have

17  marked as Defendant's Exhibit 1.

18          (Exhibit D-1: A document entitled Funeral

19      Home Procedures, Bates ALD000001 marked for

20      identification, as of this date.)

21      Q.    Okay.  I've handed you what we've had

22  marked as Defendant's Exhibit 1.  Is this a document

23  that -- that you've seen before?

24      A.    I don't remember, but it has to be

25  because it's got the Alderwoods Group thing at the

77

1  bottom like the rest -- a lot of the material in

2  those notebooks did.

3      Q.    So you think that this possibly is a

4  document you've seen before?

5      A.    Yes, ma'am, possibly so.

6      Q.    Okay.  So were you aware that Alderwoods

Page 69

Deposition Transcript of Jason Burgess (08-11-09)

10      A.   Because we were instructed as to -- by
11   Maurice Trull that if we did community service work
12   or if we did continuing education for our license,
13   those hours would not be paid.  So I did not write
14   them on there just for sake of argument with him.
15      Q.   Other than your reference to community
16   service and the continuing education for -- was that
17   for your limited insurance license?
18      A.   That was for my funeral director
19   embalmer's license and my OSHA license.
20      Q.   And for your limited insurance license?
21      A.   Yes, ma'am.  Yes, ma'am.  And for limited
22   insurance.
23      Q.   So you understood Mr. Trull to say -- to
24   say what about that time?
25      A.   That time would not be paid.  It was your

79

1   responsibility to have the license, therefore, it
2   was your responsibility to -- to get your
3   continuing education.
4      Q.   Was there any other time that you did not
5   record, other than what you've just mentioned here,
6   you said community service and continuing education
7   for your funeral director, OSHA and limited insurance
8   license?
9      A.   No, ma'am.
10      Q.   So no other time that you didn't record
11   that you worked?
12      A.   Correct.
                        Page 71

Deposition Transcript of Jason Burgess (08-11-09)

17    Q.   Your -- whether it be the time card or
18  whether it was the notepad?
19    A.   Yes, ma'am.
20    Q.   Okay.  And did you understand -- have an
21  understanding what the purpose was for you to sign
22  that?
23    A.   Just to verify that that was our time
24  worked and that what I had wrote down was the time
25  I had actually worked.

                                                    92

1     Q.   Okay.  So if you were verifying that those
2   are the hours that you actually worked when you put
3   your signature on the notepad, you believed those
4   to -- that to have been a true -- true and accurate
5   representation of hours you worked, correct?
6         MR. McGEE:  Object to the form.
7     A.   Yes, ma'am.  For what I had written down,
8   yes.
9     Q.   And do you believe that you were paid for
10  all the hours that you wrote down on your notepad?
11    A.   No, ma'am.
12    Q.   No?
13    A.   No.
14    Q.   Why do you say that?
15    A.   Because there was no -- there were
16  several times that I would sit down with Maurice
17  and had been explanation on the back, and if he
18  said that his boss, Ken Pierce, and higher ups in
19  Alderwoods were coming down on him about

                    Page 83

Deposition Transcript of Jason Burgess (08-11-09)

20   controlling overtime, he would sit there and look

21   at your time sheet, and if he didn't feel that it

22   was a legitimate thing, he would mark off the

23   overtime, put his initials on it and change your

24   time.

25            And I told him, I said that's not right.

☐

93

1   If it's on there, it has to be paid.  If you punch

2   a clock, it has to be paid.  Why are you marking it

3   off?  And he said because it was not approved.  And

4   I said is there a policy that says the time

5   sheet -- the time -- overtime has to be approved?

6   He produced a written document, and it was -- it

7   was addressed to all -- he posted it on the board

8   to all employees from Maurice Trull.  It explained

9   that all overtime had to be approved, preapproved

10  and it was signed by him and he said that that was

11  an Alderwoods policy.

12            And I told him, I said, you know, you're

13  breaking the law, you know you're breaking the law.

14  And he said if you question it or go any step

15  further above me, he says it could -- it could

16  jeopardize your job, your employment.  So I just --

17  I dropped it.  I was scared to say anything.  I

18  needed my job.

19       Q.   Okay.  And you say that there were several

20  times you sat down with Maurice and he would use the

21  words mark off your overtime; is that correct?

22       A.   Yes, ma'am.

Page 84

Deposition Transcript of Jason Burgess (08-11-09)

23      Q.   Okay.  Is that when you were using the time

24   clock?

25      A.   We were using time sheets and time clock.

94

1      Q.   And both -- under both situations?

2      A.   Yes, ma'am.

3      Q.   Okay.  Can you give me a specific example

4   when you remember sitting down with Maurice and

5   having a conversation like this where --

6      A.   There were -- there were times -- usually

7   on the time sheet, it was usually when you were

8   busy that day and you were embalming and could not

9   take a lunch hour and you put on there no lunch,

10   explained on the reason why, I put see back, and on

11   the back of the time sheet you would write why you

12   were unable to take a lunch.  And still, you were

13   marked out for it and docked for it.

14      Q.   Okay.  So that's a circumstance where you

15   say you were busy embalming and you worked through

16   lunch?

17      A.   That or I maybe on 11 o'clock funeral,

18   the funeral run late, getting back from the

19   cemetery and have a 2 o'clock or 3 o'clock funeral

20   to be on and there might be time, whereas a normal

21   funeral would take about hour-and-a-half, you'd

22   probably have an hour to go out and get you a

23   sandwich, come back and eat and be ready to go on

24   the next funeral.  There could be a situation where

25   at the cemetery the family may have hung around,

Page 85

Deposition Transcript of Jason Burgess (08-11-09)

95

 1   didn't want to leave and the funeral ran late, and
 2   you came back, switched vehicles, went to the next
 3   funeral and never had a chance to eat.
 4          Or you could have gotten a body after
 5   that funeral and it ran normal and they say, okay,
 6   hey, we need this body embalmed right now, you've
 7   got another funeral at 3 o'clock, just go ahead and
 8   embalm it.  And you take your lunch hour embalming
 9   it because you were told to go ahead, it needed to
10   be embalmed then.
11      Q.   Is there some other circumstance, other
12   than these two instances that you're talking about,
13   working through lunch to embalm a body or coming back
14   from a funeral late, having to get ready for another
15   one, anything else where -- any specific example that
16   you can recall where you met with Mr. Trull and he
17   allegedly marked off time?
18      A.   It could be -- there may have been an
19   incident, to the best of my knowledge.  There could
20   have been one about working visitations late or a
21   visitation ran late, past 10 o'clock like it should
22   have, and you put the extra time on there.  And if
23   it went over your 47 or went over your 50, it was
24   marked -- it was marked off and brought back down
25   to that time.

96

Deposition Transcript of Jason Burgess (08-11-09)

11    Q.   It was always 8:30?

12    A.   Yes, ma'am.

13    Q.   It was always 8:30.

14    Okay.  Did any -- did Mr. Trull, or any

15 other member of Alderwoods management, ever tell you

16 that you couldn't clock in until your scheduled start

17 time?

18    A.   Yes, Maurice did.  I mean, when -- when I

19 first went there, I would come in, 8:00 --

20 8 o'clock, 8:15, go ahead, get the place opened up,

21 get the papers in and start a pot of coffee, things

22 like that.  And when they started controlling the

23 overtime, it was you're welcome to do this, but

24 you're not going to be paid for it if you punch in

25 early or you write in early, you will not be paid

132

1 for it.  So I come in 8:25, 8:26.  I mean, I

2 wouldn't -- I wouldn't come in early anymore then.

3    Q.   Right.  Because you wanted --

4    A.   I wouldn't be paid for it.

5    Q.   You wanted to clock in?

6    A.   Correct.

7    Q.   Okay.  And other than posting this alleged

8 memo that you've referred to, did Mr. Trull have

9 any -- or any other member of Alderwoods management

10 have any discussion with the employees about the

11 preapproval for overtime?

12    A.   From what I can remember, there were

13 staff meetings that Katie would attend and had

Page 119

Deposition Transcript of Jason Burgess (08-11-09)

14   attended.  And somebody, I don't remember who

15   brought it up, somebody brought up the fact that

16   the approved overtime and unapproved overtime.  And

17   if it was a legitimate thing or if it was just

18   something he was doing to make his budget look

19   good, Maurice.  And she addressed it as to the fact

20   that yes, it -- all overtime needed to be approved,

21   preapproved, I guess you'd say.

22       Q.   And other than that -- that statement by

23   Katie, do you remember any other member of Alderwoods

24   management discussing preapproval for overtime?

25       A.   No, ma'am, not to my knowledge.

133

1       Q.   Just this one -- just this one statement

2   that Katie made?

3       A.   Yes, ma'am, best I can remember.

4       Q.   And do you remember Mr. Trull having any

5   other -- communicating the preapproval for overtime

6   in any other way, other than putting it up on the

7   bulletin board?

8       A.   There might have been the occasional

9   thing where he would remind us, you know,

10   periodically, hey, watch your overtime.  Remember,

11   if you work over, it's got to be preapproved.

12   Other than that, that would be it.

13       Q.   Was that on a one-on-one basis?

14       A.   No.  I mean, he would say it in passing

15   or say it while we were all sitting around, you

16   know, doing office work, paperwork, reading

Page 120

EXHIBIT 67

```
 1            IN THE UNITED STATES DISTRICT COURT

 2         FOR THE WESTERN DISTRICT OF PENNSYLVANIA

 3

 4     ------------------------------

 5   DEBORAH PRISE and HEATHER RADY )

 6   on behalf of themselves and all)

 7   employees similarly situated,  ) No. 06-1641

 8               Plaintiffs,  ) VOLUME I

 9           vs.              )

10   ALDERWOODS GROUP, INC.,        )

11               Defendant.   )

12     ------------------------------

13

14

15          Deposition of MICHAEL S. BUTLER,

16          taken at 4700 Airport Plaza Drive,

17          Long Beach, California, commencing

18          at 9:28 A.M., Monday, March 9,

19          2009, before Cathryn L. Baker, CSR

20          No. 7695.

21

22

23

24

25     PAGES 1 - 207
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Michael Butler**

6 (Pages 18 to 21)

18

1  A. Oh, gosh, I would say I prepared this
2  shortly after July of 2001.
3  Q. Is this a resume that you gave to Rose Hills
4  in seeking employment with them?
5  A. I don't recall.
6  Q. By the way, we're going to get tripped up a
7  little on the name. It's my understanding that the
8  facility you worked at with the company initially
9  was Melrose Abbey Memorial Park and Mortuary. I'm
10  going to refer to it sometimes as Melrose, but it
11  was also referred to as Rose Hills Mortuary Anaheim?
12  A. Yes.
13  Q. Do you understand when I use those two
14  different terms I'm talking about the same facility?
15  A. Yes.
16  Q. I believe that this document was from your
17  personnel file and that's why I'm asking you some
18  questions. I'm not trying to do anything to trick
19  you up. But your best recollection, though, is you
20  prepared that on or about July 2001?
21  A. That's my best recollection.
22  Q. And then at the time that you prepared this,
23  was everything on it true and correct?
24  A. I would say that the education showing the
25  bachelor of business administration was incorrect.

19

1  Other than that, yes.
2  Q. Do you have a bachelor of business
3  administration?
4  A. I do not.
5  Q. Let's, then -- you mentioned that the first
6  place that you started work was with Hall-VanHook.
7  That's H-a-l-l-V-a-n H-o-o-k Funeral Chapel. It's
8  listed here in Chico. It states that you started
9  there in about the fall of 1979. Do you see that,
10  sir?
11  A. Yes, I see that.
12  Q. When is it that you left Hall-VanHook
13  Funeral Home?
14  A. To my best recollection, 1981.
15  Q. What was the position you were hired for at
16  that funeral establishment?
17  A. Apprentice funeral director embalmer.
18  Q. Did you hold any other positions at that
19  facility?
20  A. I worked as a cemetery groundsman also.
21  Q. Any other positions?
22  A. I operated the crematory; however, I don't
23  know if that includes a separate position. It was a
24  job that I performed as a groundsman at the
25  cemetery.

20

1  MR. FORESTIERE: Why don't we take a break.
2  (A recess was taken.)
3  (Mr. Ehrman joined the deposition by
4  telephone.)
5  BY MR. FORESTIERE:
6  Q. Mr. Butler, before we broke we were talking
7  about your employment with Hall-VanHook Funeral
8  Chapel in Chico. I think you've identified three
9  different positions, or at least job duties that you
10  were assigned. One was an apprentice funeral
11  director/embalmer, the second one, the groundsman,
12  the third was operating the cemetery. Any other job
13  duties or job titles that you held while at that
14  funeral home?
15  A. No.
16  Q. Did your duties as an apprentice funeral
17  director or embalmer involve any on-call duties?
18  A. Are you referring to Hall Van-Hook Funeral
19  Home?
20  Q. Yes, sir.
21  A. Could you repeat that question.
22  Q. Did your job duties or job duties at Hall
23  Brook --
24  A. Hall-VanHook.
25  Q. -- Hall-VanHook Funeral Chapel involve any

21

1  on-call duties?
2  A. Yes.
3  Q. Could you describe what those are, please.
4  A. We had an answering service that would relay
5  calls to the mortician on duty that evening in order
6  to dispatch him to make removals from the hospital,
7  a residence or a nursing home in the middle of the
8  night or whenever the calls came in.
9  Q. And what were your duties with respect to
10  that on-call policy?
11  MS. GIFFORD: Objection.
12  THE WITNESS: To take the information off
13  the telephone, get dressed in my suit and drive in
14  my car down to the mortuary. Pick up the first-call
15  vehicle, make the removal of the body, return to the
16  mortuary, secure the body in the preparation room,
17  and go back to bed.
18  BY MR. FORESTIERE:
19  Q. And were you compensated for that work?
20  MS. GIFFORD: Objection.
21  THE WITNESS: I was.
22  BY MR. FORESTIERE:
23  Q. And was that on a per-hour basis?
24  A. No.
25  Q. How were you compensated?

**Johnstown**
**814-266-2042**

**Toll-Free**
**866-565-1929**

**Pittsburgh**
**412-281-7908**

**NETWORK DEPOSITION SERVICES**
**Transcript of Michael Butler**

20 (Pages 74 to 77)

74

1   A. Where did that discussion take place?
2   Q. Yes, sir.
3   A. In the arrangement room in the mortuary.
4   Q. Anybody else present?
5   A. No.
6   Q. What did you and Ms. Chung discuss at this
7   second meeting?
8   A. The details of the position with regard to
9   after-hours coverage of the mortuary and phones.
10  Q. Anything else?
11  A. Briefing me on the staff, the staff that was
12  currently there, and what their responsibilities
13  were and my specific responsibilities in the funeral
14  home and to her, from a reporting standpoint. And
15  of course my salary.
16  Q. When you say salary, what are you referring
17  to?
18  A. My hourly rate.
19  Q. When you say you made reference to coverage
20  of the phones, are you referring to -- what are you
21  referring to when you said that?
22  A. On-call responsibilities.
23  Q. Do you specifically recall what those
24  responsibilities were?
25  A. Yes. Accepting telephone calls from

75

1   families and hospitals, the answering service, and
2   handling any issues that came up overnight. And
3   either making the removals myself or using a
4   service, depending on the workload.
5   Q. Did you receive a pager to perform those
6   duties?
7   A. I did.
8   Q. Did you talk about how you would be
9   compensated for that work?
10  A. No.
11  Q. What was your understanding as to how you'd
12  be compensated performing your on-call
13  responsibilities?
14  A. Didn't give them a lot of thought. It's
15  just been a situation where -- every mortuary is
16  unique, and so when I come into a situation and I'm
17  faced with coverage during the night, sometimes
18  that's looked at as an expected part of the job.
19  The old adage of engage to be on call or on call to
20  be engaged plays in. And it was an unspoken
21  arrangement where I understood it to be, coverage
22  was necessary, but no mention was made by Ms. Ngo or
23  the company policy with regard to being paid for
24  that. And I didn't discuss it with her, just the
25  responsibility for it. In other words, we never set

76

1   out a fixed fee for that and I didn't ask about it.
2   MR. FORESTIERE: Could you read my question
3   back to me please.
4   (The record was read by the
5   reporter as follows:
6   "Question: What was your
7   understanding as to how you'd be
8   compensated performing your on-call
9   responsibilities?")
10  BY MR. FORESTIERE:
11  Q. Did you have any discussions about
12  performing community service with Ms. Chung at the
13  second meeting?
14  A. Not until about my last year there.
15  Q. But at the second meeting you didn't have a
16  discussion about community service; is that correct?
17  A. No.
18  Q. But you mentioned your last year there you
19  had a discussion with her about that subject?
20  A. Could you repeat that question.
21  Q. You said you recall a conversation you had
22  with Ms. Chung during your last year working at
23  Melrose about community service?
24  A. Yes.
25  Q. Do you recall when that was?

77

1   A. No.
2   Q. You don't recall when it was during the last
3   year?
4   A. No.
5   Q. You don't recall the month?
6   A. No.
7   Q. Where did this meeting take place?
8   A. In my office, which was a -- shared by two
9   other individuals on the staff.
10  Q. Were they present at this meeting?
11  A. Yes.
12  Q. Who were they?
13  A. I don't recall their names. One male, one
14  female.
15  Q. Were they employees at Melrose?
16  A. Yes.
17  Q. What were their positions?
18  A. One was a funeral director like myself, and
19  the other was an apprentice embalmer, I believe.
20  Q. But you don't recall the names?
21  A. No.
22  Q. So it was just the four of you, these two
23  individuals, yourself and Ms. Chung?
24  A. That's correct.
25  Q. And what did you discuss about the community

**Johnstown**
814-266-2042

**Toll-Free**
866-565-1929

**Pittsburgh**
412-281-7908

**NETWORK DEPOSITION SERVICES**
**Transcript of Michael Butler**

21 (Pages 78 to 81)

78

1  service?
2  A.  Well, Chung came to me in my office with the
3  other employees present and, in essence, described
4  that it is the wish of the company that its
5  employees who are funeral directors, in my job
6  classification, be active in the community to a
7  degree so that we can get our name and our face out
8  there in the community.  Help build up business in
9  the community.  That was the crux of her
10 conversation.
11 Q.  What was your response to her statements?
12 A.  I agreed.
13 Q.  Anything else discussed on community
14 service?
15 A.  She did make it clear that it was a
16 condition of continued employment, as far as the
17 company was concerned.
18 Q.  How did she make that clear?
19 A.  Orally.
20 Q.  What did she say?
21 A.  Just what I told you.
22 Q.  She said, "Unless you do it, you're going to
23 get fired"?
24 A.  No, I didn't say that.
25 Q.  Tell me what she said.

79

1  A.  I said it was a condition of continued
2  employment, is how it was put to me by Ms. Ngo.
3  Q.  She used those terms, that performing
4  community service was a condition of continued
5  employment?
6  A.  Yes.
7  Q.  What was your response to that?
8  A.  I agreed.  And she told me that I could
9  choose whatever extra curricular program that I
10 wanted to join, and that she would pay for that.
11 The company would pay for that.
12 Q.  What do you mean the company would pay for
13 that?
14 A.  Well, I chose, for instance, the Sunrise
15 Rotary.  The rotary club has dues, she asked me for
16 an expense report for paying those dues on my own,
17 which was 100, $200, then usual regular donations on
18 a regular basis while I was attending on behalf of
19 the funeral.  And I would pay those things and put
20 them on an expense report wherein I was reimbursed.
21 Q.  Anything else you and Ms. Chung discussed
22 concerning the performance of community service?
23 A.  Oh, to let her know what I chose and what
24 hours I would need to be away.  And I reported those
25 back to her.

80

1  Q.  How did you report those back to her?
2  A.  I don't recall if it was -- I'm pretty sure
3  it was just orally I told her that I would be going
4  to the early morning meetings.
5  Q.  How often were the meetings?
6  A.  Once a week.
7  Q.  How long were the meetings?
8  A.  An hour and a half, approximately.
9  Q.  How much time did you spend attending these
10 meetings?
11 A.  One morning per week.
12 Q.  Did you attend them every week?
13 A.  Yes.
14 Q.  When did you start attending the meetings?
15 A.  As I say, I don't recall the date that she
16 approached me about this, so I couldn't tell you the
17 date I started with Sunrise Rotary.  I don't recall.
18 Q.  Where is Sunrise Rotary located?
19 A.  In a hotel in Anaheim.  A local hotel.
20 Q.  Where is its office located?  That's where
21 they hold the meetings?
22 A.  I have no idea where its office is located.
23 Q.  Are you still a member of Sunrise Rotary
24 now?
25 A.  No.

81

1  Q.  Who is the president or representative at
2  Sunrise Rotary?
3  A.  I don't know who that was.  I don't recall
4  the name.  It was told to me but I don't recall the
5  name.
6  Q.  Where was the city Sunrise Rotary is located
7  in?
8  A.  Anaheim.  That's where the meetings were
9  held.
10 Q.  How long did you attend the meetings?
11 A.  Up until my termination, as best I recall.
12 Q.  That would be November 2003?
13 A.  3.
14 Q.  Do you remember how far in advance of
15 November 2003 you started attending these meetings?
16 A.  No, I don't.
17 Q.  Was it a couple of months?
18 A.  That would be fair to say.  At least a
19 couple of months.
20 Q.  Two to three months?
21 A.  I don't recall.
22 Q.  Would it be more than two to three months?
23 A.  Possibly.
24 Q.  Would it be less than two to three months?
25 A.  No.

**Johnstown**
**814-266-2042**

**Toll-Free**
**866-565-1929**

**Pittsburgh**
**412-281-7908**

EXHIBIT 68

1              IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF PENNSYLVANIA
2
                  Civil Action No. 06-1641
3                   Judge Joy Flowers Conti

4
DEBORAH PRISE and HEATHER RADY
5 on behalf of themselves and all
employees similarly situated,
6
              Plaintiffs,
7
vs.
8
ALDERWOODS GROUP, INC.,
9
              Defendant.
10
--------------------------------
11

12

13

14
                     2525 Glades Road
15                   Boca Raton, Florida
                   December 10, 2008
16                 9:55 a.m. - 7:20 p.m.

17

18
              DEPOSITION OF SHANE M. CARSWELL
19

20

21    Taken before Mark Rabinowitz, Registered Professional

22 Reporter and Notary Public for the State of Florida at

23 Large, pursuant to Notice of Taking Deposition filed in

24 the above cause.

25

**NETWORK DEPOSITION SERVICES**
**Transcript of Shane Carswell**

4 (Pages 10 to 13)

---

**10**

1  This may have been it. Again, that's three years ago.
2  I can't be 100 percent certain, but it was something
3  similar to this.
4    Q   If you can, turn to page 4 of Exhibit A.
5    A   Okay.
6    Q   It identifies the defendant's attorneys as the
7  law firm of Dolin, Thomas & Solomon, LLP?
8    A   Yes.
9    Q   Is that the law firm --
10   A   Yes.
11   Q   -- that sent you correspondence that you
12  previously testified about?
13   A   Yes.
14   Q   After you got that letter, you said that you
15  filled something out?
16   A   If I remember correctly, there was something I
17  filled out or I contacted them and wrote something down
18  or signed something, but I can't remember exactly what
19  it was.
20   Q   Is your recollection that in signing it, you
21  were indicating your interest in participating in the
22  lawsuit?
23   A   Yes, that I was interested in that. Yeah.
24   Q   What happened next?
25       MR. LINGLE: Objection to the form.

---

**11**

1    Q   Did somebody from the law firm contact you
2  after you sent in that document?
3    A   If I remember correctly, somebody did call.
4  Again, this has been, you know, a few years back. So
5  it's hard to recall exactly who I spoke to.
6    Q   Was it an attorney?
7    A   It may have been, but it may have been just
8  an aid or something along those lines.
9    Q   What did you talk with this individual about
10  regarding the lawsuit?
11       MR. LINGLE: I'm going to instruct him not to
12  answer, obviously, because after he sent in the form he
13  was a client. So it's privileged.
14       MS. MORGAN: Okay.
15   Q   Why did you decide to join the lawsuit?
16   A   More or less, because of the practices of the
17  Alderwoods Group, as far as their payments and not taking
18  care of the employees when they were working overtime,
19  not paying us when we were working at home and out of
20  work.
21   Q   So you joined the lawsuit because of the pay
22  practices of Alderwoods Group?
23   A   Yeah, because, again, they didn't pay the
24  employees properly. You know, we complained about it for
25  years.

---

**12**

1    Q   Have you discussed the lawsuit with anyone,
2  other than your attorneys?
3    A   No.
4    Q   So you have not talked about it with any
5  Alderwoods employees?
6    A   I don't work there anymore. So I have limited
7  contact with anybody there.
8    Q   So, no, you didn't?
9    A   No.
10   Q   How did you first become interested in working
11  for the Alderwoods Group?
12   A   I was with the company. It was the Loewen
13  Group. So when the Loewen Group filed bankruptcy and
14  they came out of bankruptcy, they merged as the
15  Alderwoods Group. So I was already there.
16   Q   When did the Loewen Group file for bankruptcy
17  and Alderwoods Group took over?
18   A   It would have been in the late nineties. I
19  would say somewhere around 1999, somewhere around there;
20  1998/1999.
21   Q   What position were you in when you first
22  started working for Alderwoods?
23   A   Alderwoods?
24   Q   Yes.
25   A   When they actually -- I was a funeral director/

---

**13**

1  embalmer.
2    Q   So you transitioned to Alderwoods in that
3  position?
4    A   Yes.
5    Q   Did you go through any application process
6  with Alderwoods?
7    A   No.
8    Q   How did your employment with the Loewen Group
9  change to being employment with Alderwoods?
10       MR. LINGLE: Objection to the form.
11   A   I mean, how did it change? What do you mean?
12   Q   I guess what I'm asking you is: Whether you
13  had to do anything, apply for an interview or anything
14  in order to become employed with Alderwoods?
15       MR. LINGLE: Objection to the form.
16   A   No.
17   Q   Once you began working for Alderwoods, did
18  your job duties change?
19   A   No.
20   Q   Did your hours of work change?
21   A   No.
22   Q   What location did you work at?
23   Q   Which one?
24   Q   At Alderwoods, when you transitioned to
25  Alderwoods, what location did you work at?

---

**NETWORK DEPOSITION SERVICES**
**Transcript of Shane Carswell**

14

1    A    I was at Roswell Funeral Home, which was part
2  of -- they called it the Foster Group.  There were
3  several funeral homes.
4    Q    Was that in Roswell, Georgia?
5    A    Yes.
6    Q    What dates were you a funeral director/
7  embalmer at the Roswell Funeral Home location?
8    A    Let's see.  From probably 1997 to 1999/2000,
9  in that range, 2000, roughly.
10   Q    Who was your immediate supervisor when you
11 held that position at that location?
12   A    James Mullikin.
13   Q    What was Mr. Mullikin's position?
14   A    He was the operations manager.
15   Q    What is your understanding of what his job
16 responsibilities were as an operations manager?
17       MR. LINGLE:  Objection to the form.
18   A    He was managing five or six funeral homes, he
19 managed those.
20   Q    Were these five or six funeral homes the
21 Foster Group that you were referring to before?
22   A    Yes.
23   Q    Did you have a location manager as well?
24   A    James was at first; and if I remember
25 correctly, Anthony Sorrells was afterwards after James.

15

1    Q    So Mr. Mullikin was the location manager, and
2  then Anthony Sorrells was the location manager at the
3  Roswell, Georgia -- I'm sorry, the Roswell Funeral Home?
4    A    Yes, he came on after James took over.  He
5  decided that he wanted one location manager in each place
6  instead him being over all five.
7    Q    Do you recall what time period that was?
8    A    No, not off the top of head; no, I really
9  can't.
10   Q    Was your position as function director/
11 embalmer at the Roswell Funeral Home a full-time
12 position?
13   A    Yes.
14   Q    And in that position, were you paid hourly or
15 salary?
16   A    Hourly.
17   Q    What were your job duties in that position?
18   A    Licensed funeral director/embalmer.  It was
19 embalming bodies, picking them up from places of death,
20 being on-call at night, meeting with families, arranging
21 funerals, working funeral services, coordinating
22 everything in the cemeteries, police; anything and
23 everything.
24   Q    Any other job duties that you can recall when
25 you were in that position?

16

1    A    None off the top of my head, that I can think
2  of right now.
3    Q    Then did you move to a different location with
4  Alderwoods?
5    A    After Roswell Funeral Home, I moved to Tara
6  Garden Chapel.
7    Q    Where was Tara Garden Chapel?
8    A    In Jonesboro, Georgia.
9    Q    Were you the funeral director/embalmer at the
10 Tara Garden Chapel?
11   A    I was one of three.
12   Q    What were the dates that you were in in that
13 position?
14   A    It would have been right around 1999, towards
15 the middle or the end of 1999 until 2001.
16   Q    Who was your immediate supervisor?
17   A    Thomas Scroggs.
18   Q    What was his position at that time?
19   A    He was the location manager.
20   Q    Was there an upper-level supervisor that
21 Mr. Scroggs reported to?
22   A    That was James Mullikin.
23   Q    Were you full time when you held that
24 position?
25   A    Yes.

17

1    Q    Were you paid hourly or salaried?
2    A    Hourly.
3    Q    Were your job duties the same as you described
4  them being when you were at Roswell Funeral Home?
5    A    Yes.
6    Q    Any changes to the job duties when you were in
7  the Tara Garden chapel location?
8    A    None that I can think of.
9    Q    Did you move to another position or location
10 with Alderwoods after that?
11   A    Yes.
12   Q    Did your job position change, or were you
13 still a funeral director/embalmer?
14   A    Still funeral director/embalmer, yes.
15   Q    So was it your location that changed?
16   A    Yes.
17   Q    What location were you moved to?
18   A    That's when I moved to Kraeer Funeral Home.
19   Q    Where is the Kraeer Funeral Home located?
20   A    It's in Pompano Beach, Florida.
21   Q    When did you hold the funeral director/
22 embalmer position at the Kraeer Funeral Home location?
23   A    I started June 1st of 2001.  I was there up
24 until about three years ago.  I don't remember the exact
25 date that I left.

**NETWORK DEPOSITION SERVICES**
**Transcript of Shane Carswell**

6 (Pages 18 to 21)

---

18

1   Q   So roughly 2005 you left?
2   A   Yes.
3   Q   Who was your immediate supervisor when you
4   were in this position?
5   A   I was actually at two.
6   Q   At this location?
7   A   There were two locations; when I moved down,
8   Kraeer was part of one -- at Kraeer, my immediate
9   supervisor was Wayne Jarvis.
10  Q   Did he have a supervisor, Mr. Jarvis?
11  A   Yes.
12  Q   Who did he report to?
13  A   John Michael Jones.
14  Q   Was Wayne Jarvis the location manager?
15  A   He was the CPF manager, which is the central
16  prep facility.
17  Q   What does that mean, if you know, the central
18  prep facility?
19  A   That's where all the embalming is done.
20  Q   Was John Michael Jones the regional manager,
21  or what was --
22  A   No.
23  Q   -- his position?
24  A   He was the operations manager.
25  Q   Did he have responsibilities for other

---

19

1   location, other than the Kraeer Funeral Home?
2   A   Just the Kraeer Funeral Home and ABC Jennings.
3   Q   What about Wayne Jarvis, what locations did he
4   have responsibilities for?
5   A   His was just the central prep facility.
6   Q   Was that also known as Kraeer Central
7   Services?
8   A   No. No.
9   Q   You were at the central prep facility for some
10  part of this time?
11  A   Correct.
12  Q   But what part of this, of the June 1st, 2001
13  to 2005 time frame were you at the central prep
14  facility?
15  A   I was there until probably the middle of 2003.
16  Q   Then did you move to another location?
17  A   Yes.
18  Q   What location did you move to at that point?
19  A   That was ABC Jennings.
20  Q   Were you at the ABC Jennings location until
21  the end of your employment with Alderwoods?
22  A   Up until three months before.
23  Q   When you were at the central prep facility,
24  you held the position of funeral director/embalmer;
25  is that correct?

---

20

1   A   Correct.  Yes.
2   Q   Were you full time?
3   A   Yes.
4   Q   Were you paid hourly?
5   A   Hourly, yes.
6   Q   Were there any changes to your job duties
7   during the time that you were at the central prep
8   facility?
9       MR. LINGLE:  Objection to the form.
10  A   I guess the only thing that changed was that
11  I wasn't meeting with families as much.  My main job was
12  embalming and the preparation of bodies for visitations
13  and viewings.
14  Q   Why was more of your time allocated to the
15  embalming?
16  A   That's what central prep does.
17  Q   What do you mean by that?  Was that an
18  embalming center or something like that?
19  A   Yes, the other locations don't embalm;
20  everything is done centralized.
21  Q   And by "the other locations don't embalm,"
22  what other locations are you referring to?
23  A   It was called the Kraeer Group of Funeral
24  Homes.  There were half a dozen funeral homes that were
25  all named "Kraeer."

---

21

1   Q   Were the Kraeer Group of Funeral Homes in a
2   centralized region or area?
3   A   From Boca Raton down to Fort Lauderdale and to
4   Margate.
5   Q   During the time that you were the funeral
6   director/embalmer at the central prep facility, did you
7   have any other supervisors other than Wayne Jarvis and
8   John Michael Jones?
9       MR. LINGLE:  Objection to form.
10  A   The only person would have been the assistant
11  manager; that was Michael Angotti.
12  Q   Mr. Carswell, what was his name again?
13  A   Michael Angotti.
14  Q   Was he the assistant manager of the central
15  prep facility?
16  A   Yes.
17  Q   Then in mid-2003 your location changed to ABC
18  Jennings Funeral Home; is that right?
19  A   Yes.
20  Q   Where is that located?
21  A   That's in Fort Lauderdale.
22  Q   What job position did you hold at the ABC
23  Jennings Funeral Home location?
24  A   Manager.
25  Q   Did you ever hold a funeral director/embalmer

---

**Johnstown**
814-266-2042

**Toll-Free**
866-565-1929

**Pittsburgh**
412-281-7908

90

1    A    It was a wash; in the system it was a wash.
2  They would say, okay, you are paying it back.  But, okay,
3  you are not paying it back because you are staying with
4  the company.  It was kind of -- I signed a two-year
5  contract with them.  So they washed it out.
6    Q    Did you sign the two-year contract with
7  Alderwoods or with the Loewen Group?
8    A    That's a good question.  I don't remember
9  because of the time frame.  It was close.  I'm not sure
10  if it was -- it may have been with the Loewen Group now
11  that I think about it.  It might have been with them.
12    Q    You just don't recall if it was with the
13  Loewen Group or with Alderwoods because of the timing
14  of the loan?
15    A    Right.  Right.
16    Q    You are saying you didn't have to actually pay
17  it back because you entered into --
18    A    Yes.
19    Q    -- a two-year contract?
20    A    Correct.
21    Q    Was that an employment contract?
22    A    Yes.
23    Q    What were, generally, the terms of that
24  employment contract?
25    A    More or less, just stay with the company and a

91

1  no compete-type clause for two years.
2    Q    And in exchange for that, the loan was for
3  given?
4    A    Yes, in general.
5    Q    You were reporting overtime hours that you
6  worked most weeks; is that correct?
7    MR. LINGLE:  Objection to form.
8    A    At the funeral home, yes.
9    Q    During the time that you were employed with
10  Alderwoods, did you ever fail to report overtime hours
11  on your time records?
12    MR. LINGLE:  Objection to form.
13    A    Such as what -- working there or doing work
14  outside of the funeral home?
15    Q    Any time during the time that you were
16  employed with Alderwoods, starting from December of 2003
17  until you separated in May of 2006, did you ever not
18  report on your time records overtime hours that you
19  performed?
20    MR. LINGLE:  Objection to form.
21    A    I guess you can say -- well, yes.  I mean,
22  there were days I was doing stuff at home and bringing
23  home work with me and things like that.  So that wasn't
24  necessarily reported, but it was known.  You know, you
25  have to get some of this stuff done, and I'm not going

92

1  to stay at work until 10 o'clock at night.  So you bring
2  some of it home with you, working on programs and other
3  things, too.
4    Q    There were occasions that you worked overtime
5  hours, but you didn't report it on your time sheets?
6    A    Yes, I guess so.  Yes.
7    (Defendant's Exhibit 14 was marked for
8  identification.)
9    Q    I have handed you what was been marked as
10  Exhibit 14.  These are copies of your timecards for the
11  pay period ending December 20th, 2003, through May --
12    MR. McGEE:  December 13th of 2003?
13    MS. MORGAN:  December 20th -- I'm sorry.
14  Thank you.
15    MR. McGEE:  No problem.
16    MS. MORGAN:  December 20th, 2003 through May
17  1st of 2004.
18    A    Yes.
19    Q    Let's take a look at ALD000179, which is the
20  third page of this exhibit.  For the pay period ending
21  January 10th, 2004, you reported a total of 54 hours;
22  is that right?
23    A    Correct.
24    Q    Would you have tallied those hours and written
25  that total in?

93

1    A    Yes.
2    Q    Then that's your signature on the timecard,
3  right?
4    A    On the bottom.
5    Q    On the bottom?
6    A    Yes.
7    Q    Did you accurately report your overtime hours
8  on the timecard?
9    MR. LINGLE:  Objection to form.
10    A    As best as I can tell on here, yes.
11    Q    You were paid overtime for all the overtime
12  hours that you reported on this timecard, right?
13    A    To the best of my knowledge, yes.
14    Q    Please turn to page ALD 000182.
15    A    Okay.
16    Q    I'm looking at a copy of your timecard for the
17  pay period ending February 14th, 2004.  Okay?
18    A    Okay.
19    Q    On this timecard, would you have tallied up
20  your hours for each day?
21    A    Yes, it looks that way.  Yes.
22    Q    Then you tallied up your hours for the week?
23    A    Yes.
24    Q    So you reported a total of 49 hours; is that
25  right?

**NETWORK DEPOSITION SERVICES**
**Transcript of Shane Carswell**

94

1    A    I believe so, yes.
2    Q    Of which it looks like nine and-a-half hours
3    were reported as overtime?
4    A    Correct.
5    Q    You signed the timecard, right?
6    A    Yes.
7    Q    Did your manager initial it?
8    A    Yes. That's Wayne's signature there
9    (indicating).
10   Q    Wayne Jarvis' signature?
11   A    Yes.
12   Q    Did you accurately report your overtime hours
13   on this timecard?
14        MR. LINGLE: Objection to form.
15   A    Actually, Wayne made a change to it and made it
16   nine-and-a-half because of the staff meeting. So after
17   that, after that fact, then it would be -- I don't
18   recollect.
19   Q    So a half-hour was added because of a staff
20   meeting?
21   A    Correct.
22   Q    With that addition or correction, does the
23   timecard then accurately reflect the hours that you
24   worked for that pay period?
25        MR. LINGLE: Objection to form.

95

1    A    Actually, they don't, no, because of the lunch
2    breaks.
3    Q    What did you mean by that?
4    A    No, we never took a lunch break. We were
5    required to put down that we took a lunch break.
6    Q    You are saying where it says here "lunch 11:00
7    to 11:30," who wrote those?
8    A    I did.
9    Q    Why did you write that?
10   A    Because we were required to take a lunch break;
11   whether or not we took it or not, we had to take it.
12   Q    So meaning you then took lunch from 11:00 to
13   11:30 on that first entry?
14   A    No, we had to put down that we took a half-hour
15   lunch break.
16   Q    So you recorded that you took a half-hour
17   lunch break, but you didn't necessarily take it?
18   A    That's correct. We were required to do that.
19   Q    Who required you to do that?
20   A    Everything -- actually, it's in Alderwoods'
21   handbook. It's also required by the location manager
22   who is told by the operations manager all the way up the
23   chain that we were required to take a half-hour lunch
24   break. That's all fine and good, but we never took a
25   half-hour lunch break.

96

1    Q    You are saying the requirement was to take a
2    half-hour meal break?
3    A    We were required to clock out for a half-hour
4    lunch break.
5    Q    But who required you to clock out for a meal
6    break?
7    A    Alderwoods.
8    Q    But who specifically? What individual? What
9    manager?
10        MR. LINGLE: Objection to form.
11   A    It's in the handbook, you have to. It's
12   required by Alderwoods to take a half-hour lunch break;
13   if you work a full day, you are supposed to take a half-
14   hour lunch break.
15   Q    Did Mr. Jarvis require you to?
16   A    He did, and he had to do it as well. It was
17   required by John Michael Jones. It was required by Bob
18   Russell. It was required by all of the higher management
19   that every employee punch out for a half-hour lunch
20   break.
21   Q    When you say that it was required by Bob
22   Russell --
23   A    Yes.
24   Q    -- what are you basing that on?
25   A    Him telling us that we had to punch out for a

97

1    half-hour lunch break.
2    Q    Did he ever say that you have to punch out for
3    a half-hour lunch break whether or not you take lunch?
4    A    Yes.
5    Q    He specifically said that?
6    A    You have to punch out for a half-hour lunch
7    break. It's got to be on your card. It has to be there.
8    Q    But did he say it had to be on there,
9    regardless of whether you took the meal break?
10   A    If you didn't, they were going to comp you for
11   it anyway. They were going to take it out of your pay,
12   anyway.
13   Q    Did he say that?
14   A    They did. It didn't matter.
15   Q    But that's not my question. I'm asking you:
16   Did Mr. Russell specifically tell you that you must
17   clock out for a meal break, regardless of whether or not
18   you actually take it?
19   A    Yes. You have to take your lunch break. That
20   was required. Also, you would sit there. If the phone
21   rang, you would have to answer it. You are on your lunch
22   break, but you are answering your phones. So you are not
23   on a lunch break. Yes, he did say that you will have to
24   do it, and it will be taken out of your pay.
25   Q    When did Mr. Russell tell you that?

**Johnstown**
**814-266-2042**

**Toll-Free**
**866-565-1929**

**Pittsburgh**
**412-281-7908**

98

1    A    Several times.
2    Q    When? When was the first time that he told
3 you that?
4    A    Probably when I first started.
5    Q    What was the context?
6    A    They were griping about people not taking lunch
7 breaks.
8    Q    Who was griping about people not taking lunch
9 breaks?
10   A    The managers, Bob Russell John Michael Jones.
11 They were griping about us not taking our lunch breaks.
12   Q    Was this at one of the staff meetings?
13   A    Yes.
14   Q    At one of the staff meetings when you first
15 started working at -- was this when you were working
16 at the Loewen Group, or when you were working at
17 Alderwoods?
18   A    Alderwoods.
19   Q    You say they were griping about people not
20 taking meal breaks?
21   A    Not clocking out for a meal break, yes.
22   Q    It was at that time Mr. Russell told you that
23 you had to clock out for a meal break, regardless of
24 whether or not you were actually taking one?
25   A    It was told to everyone at the meetings that

99

1 you have to clock out for your lunch break. What they
2 are saying that in that context, in the funeral service
3 industry, is that you have to do that. We are telling
4 you to take your lunch break. If you have to answer the
5 phones, answer the phones. It's talking on both sides of
6 your mouth.
7    Q    But did he say that?
8    A    Yes.
9    Q    Did Mr. Russell say that even if you are
10 clocked out for your lunch break, you have to answer the
11 phones anyway?
12   A    Of course, you have to answer the phones,
13 because you can't just let them ring. That's what he
14 said. You have to answer the phones. You have to take
15 your lunch break. You have to do these things. Somebody
16 comes in, you have to see the person that comes in. Stop
17 your lunch. Come back to it. I mean, they are telling
18 us to come back, you know, three or four hours later
19 after you had started your lunch; you can't.
20      So, yes, he did tell us to take the lunch
21 breaks. He did tell us to make sure to answer the
22 phones. He also told us to answer the doors and meet
23 people.
24   Q    Did any other manager besides Bob Russell give
25 you that instruction?

100

1    A    Yes.
2    Q    Who were the other managers that gave you that
3 instruction?
4    A    Let's see. There would have been Bob Russell.
5 There was John Michael Jones, James Mullikin, Anthony
6 Sorrells, Jeff. Let's see. Who else would be there?
7      That's all I can think of off the top of my
8 head right now. But, I mean, it's told to you that, yes,
9 you have to take your lunch break, but you have to answer
10 the phones.
11   Q    So you have to take your lunch break, but you
12 also have to perform work --
13   A    Yes.
14   Q    -- during your meal break, is what you are
15 saying?
16   A    Yes.
17   Q    You are saying that you were instructed to
18 that effect by those managers that you just listed?
19   A    Absolutely.
20   Q    And the context was the group meetings?
21   A    Group meetings, individuals. It was said in
22 the office, everyone. It was in each chapel even. You
23 knew that's what they would say to you. That you have to
24 catch the phone. Somebody answer that and you are taking
25 your break.

101

1    Q    Were you paid overtime for all the overtime
2 hours that were reported on this timecard for the pay
3 period ending February 14th of 2004?
4      MR. LINGLE: Objection to form.
5    A    I was paid for the overtime that is listed on
6 here, yes.
7    Q    Turn to ALD000184. Can you take a look at the
8 timecard, the copy of the timecard, for March 6th of
9 2004.
10   A    Yes.
11   Q    That's your signature at the bottom of the
12 timecard, right?
13   A    Yes.
14   Q    Did your manager also sign off on your
15 timecard?
16   A    Yes, it looks Mike Angotti; yes, the assistant
17 manager.
18   Q    For this pay period ending March 6th, 2004, on
19 your timecard was reported a total of 55.25 hours; is
20 that right?
21   A    Correct.
22   Q    You were paid overtime for all of the overtime
23 hours that were reported on the card?
24      MR. LINGLE: Objection to form.
25   A    For the 15.25 hours that's listed, yes.

**Johnstown**
**814-266-2042**

**Toll-Free**
**866-565-1929**

**Pittsburgh**
**412-281-7908**

---

134

1    A    Never.
2    Q    The other individuals that you mentioned,
3 for example, Roger Slater, do you know what community
4 service activities he was involved in?
5    A    I'm not a hundred percent certain. I think he
6 may have been in some type of an organization for retired
7 firemen, but I'm not a hundred percent certain.
8    Q    Was he a funeral director/embalmer?
9    A    Yes.
10   Q    Do you know how much time he spent with
11 activities with that organization?
12   A    I certainly don't.
13   Q    Do you know whether he reported any of that
14 time on his time sheets?
15   A    No, I don't.
16   Q    Do you know whether he was compensated for any
17 of that time?
18   A    I don't know.
19   Q    With respect to all of the individuals that
20 you listed -- Bob Russell, John Michael Jones, Felicia
21 Lopez, Larry Ott, Larry Sherman, Dave Ogburn -- do you
22 know how much time they spent performing community
23 service?
24   A    Not right off the top of my head, I don't.
25 I know that they did, but I don't know how much time.

---

135

1    Q    Do you know whether they ever reported their
2 time?
3    A    That I'm not certain of.
4    Q    Do you know whether they were compensated for
5 any time they spent performing community service?
6    A    That I don't know.
7    Q    Are you aware of any company-wide Alderwoods
8 policy of requiring hourly employees like funeral
9 directors/embalmers to belong to community
10 organizations?
11   A    There is something in there that I have seen
12 that they required that you belong to some type of
13 community organization, or involved in some type of
14 organization.
15   Q    When you say "there is something in there,"
16 what are you referring to?
17   A    In the manuals, in Alderwoods' books.
18   Q    So you are saying Alderwoods has some type of
19 written policy requiring hourly employees to be involved
20 in a community organization?
21   A    They did when I was there.
22   Q    How was this policy communicated to you?
23   A    In written form.
24   Q    Was it in the Alderwoods policy manuals?
25   A    I believe that's where it was.

---

136

1    Q    Any other way in which this policy was
2 communicated to you?
3    A    And verbally.
4    Q    By whom?
5    A    My boss.
6    Q    Who is that?
7    A    That was Jeff, or John Michael Jones, or Bob
8 Russell.
9    Q    Any other managers, other than those, that
10 communicated the policy to you?
11   A    None that I can think of down here, in Georgia
12 it was different. Different people in Georgia would do
13 it. All my bosses up there wanted us to do it.
14   Q    Anybody else?
15   A    Nobody that I can think of. Well, I don't
16 know. James Mullikin also in one of our town hall
17 meetings.
18   Q    What specifically was verbally communicated to
19 you by these managers about the community service?
20       MR. LINGLE: Objection to form.
21   A    That we need to be in a community meeting with
22 people, spending time outside of the funeral home with
23 people, joining organizations, making sure the people
24 know who we are.
25   Q    When you say "we needed to be spending time on

---

137

1 you in the community," who are you referring to?
2    A    All of the employees.
3    Q    All of the employees at the Kraeer Funeral
4 Home locations in Florida?
5    A    All of Kraeer's employees.
6    Q    Who communicated to you that all of the
7 Alderwoods' employees needed to be out performing
8 community service work?
9    A    James Mullikin.
10   Q    Do you know how any employees outside of the
11 Kraeer Funeral Home locations in Florida were, or the
12 one in Georgia where you worked at learned of this
13 policy?
14   A    James Mullikin. I mean, it was then the town
15 hall meetings he would hold because he is the regional
16 manger for the southeast region. He would hold these
17 meetings. That's what we would be told in some of the
18 meetings.
19   Q    Did you attend meetings other than the general
20 staff meetings that were held in the --
21   A    Yeah.
22   Q    -- downtown location?
23   A    Yes.
24   Q    What other meetings would you attend?
25   A    They would be at locations that were central

---

**Johnstown**
814-266-2042

**Toll-Free**
866-565-1929

**Pittsburgh**
412-281-7908

138

1  to the other surrounding funeral homes that were owned by
2  Alderwoods. They considered them kind of a town hall
3  meeting. Then they would people from Miami come up,
4  because there are funeral homes in Miami. They would
5  have them come from out west to where everybody meets for
6  a meeting. That's when new policies and changes were
7  discussed and, you know, what we are supposed to be doing
8  and things like that.
9      Q   These meetings that you are describing, which
10 ones did you attend?
11     A   All of them that were here in this area in
12 Southeast Florida; when I was there, there were probably
13 maybe three of them.
14     Q   How many employees attended the three meetings
15 that you attended?
16     A   Probably 250 to 300 people depending on who
17 could make it and get there. Sometimes they couldn't all
18 get there.
19     Q   To what location did these employees come to
20 attend the meeting?
21     A   It's the downtown chapel. They would use the
22 Sample Road -- excuse me, the CPF chapel. We also went
23 to a -- there was one down in Miami. I can't think of
24 the name of it. It was a Jewish one, but I can't think
25 of the name of it.

139

1      Q   And at which of the three meetings did
2  Mr. Mullikin communicate information about community
3  service?
4      A   I would say all of them.
5      Q   What specifically did he communicate about
6  community service?
7      A   Again, that we need to be out in the community.
8  We need to make sure people know who we are. We need to
9  be a face out there for people to see and know.
10     Q   Did Mr. Mullikin instruct anyone as to how
11 many organizations they needed to be involved in?
12     A   No, I don't think so.
13     Q   Did he ever give any instructions about what
14 kind of community service activities people should be
15 involved in?
16     A   There were suggestions, but they weren't -- you
17 didn't have to actually do those exact ones, but there
18 were suggested ones.
19     Q   Which ones did he suggest?
20     A   Like the Rotary Club, Kiwanis and things like
21 that.
22     Q   Were those just examples?
23     A   Yes.
24     Q   Did Mr. Mullikin -- at any of those meetings
25 -- instruct employees as to how much time they should

140

1  spend being involved in community service activities?
2      A   I don't recall if he did or not.
3      Q   Did Mr. Mullikin communicate at any of these
4  three meetings that you attended whether people should
5  report the time they spent engaged in community service
6  activities?
7      A   I don't recall if he did or not.
8      Q   At any of these three meetings that you
9  attended, did Mr. Mullikin communicate any instructions
10 about whether or not people would be compensated for the
11 time that they spent involved in community service
12 activities?
13     A   I don't recall if he did or not.
14     Q   I believe you testified that you learned
15 about Alderwoods' policy regarding community service
16 involvement from Jeff; is that right, your operations
17 manager?
18     A   As far as me getting involved in things?
19     Q   Yes.
20     A   He had mentioned that since I'm the manager
21 there, yes, to get more involved out in the communities.
22     Q   Did he instruct you to get involved in any
23 particular community service organizations?
24     A   Not that I can think of.
25     Q   Did he instruct you to spend any certain

141

1  amount of time involved in the community service
2  organizations?
3      A   He didn't give a specific amount of time, no.
4      Q   Did Jeff instruct you as to whether the time
5  you spent involved in community organizations, whether
6  you should report that time?
7      A   Not that I recall, he didn't.
8      Q   Did he give you any instruction as to whether
9  you would be compensated for any time you spent involved
10 in community service organizations?
11     A   Not that I recall.
12     Q   What did John Michael Jones tell you about
13 Alderwoods' community service activities?
14     A   Other than they just wanted us to be in the
15 community and to be involved in all of the community.
16     Q   Is that all that he told you?
17     A   He wanted us to do it, you know, whenever we
18 were able to.
19     Q   Did he give you any information about whether
20 to report the time spent in those activities?
21     A   Not that I recall.
22     Q   Did he give you any information about whether
23 you would be compensated for the time you spent involved
24 in those activities?
25     A   Not that I recall, no.

**Johnstown**
814-266-2042

**Toll-Free**
866-565-1929

**Pittsburgh**
412-281-7908

142

1    Q    John Russell. What was his position?
2    A    Bob Russell.
3    Q    Bob Russell.
4    A    He was, more or less, over all of the Kraeer
5    funeral homes and a couple of other chapels that were
6    involved with the Kraeer Group.
7    Q    Did Mr. Russell communicate any information to
8    you about Alderwoods' policy regarding community service
9    involvement?
10   A    Again, the same things the others did, just
11   telling us that we needed to be involved in our
12   communities.
13   Q    Did he ever give you any instructions about
14   why to report your time spent involved in community
15   service organizations?
16   A    Not that I recall, no.
17   Q    Did he ever give you new information about
18   whether you would be compensated for any time you spent
19   performing community service activities?
20   A    Not that I recall.
21   Q    Other than the three or so meetings that you
22   attended in the Southeast Florida area, did you attend
23   any other meetings where Alderwoods' policy regarding
24   community service was discussed?
25   A    Friday morning staff meetings for the funeral

143

1    directors.
2    Q    Any other meetings?
3    A    Not that I recall like that, no.
4    Q    These Friday morning staff meetings for
5    funeral directors, who would lead those meetings?
6    A    That would be Bob Russell and John Michael
7    Jones, and then Jeff would have been afterwards, after
8    John Michael left.
9    Q    At any of these Friday morning staff meetings
10   that you attended, did any of the managers leading the
11   meetings communicate any other information about
12   community service, other than what you have already
13   testified to?
14   A    It was always brought up at the staff meetings
15   about who has done what community service and things like
16   that. It was always brought up. It was kind of a recap
17   of the week.
18   Q    So the managers would talk about what types
19   of activities that people had been involved in?
20   A    Correct.
21   Q    At any of these Friday morning staff meetings,
22   did the managers leading the meetings communicate any
23   information about whether time spent performing
24   community service should be reported?
25   A    Not that I recall, no.

144

1    Q    At any of the Friday morning staff meetings,
2    did any of the managers leading the meetings communicate
3    any information about whether time spent involved in
4    community organizations would be compensated?
5    A    Not that I recall, no.
6    Q    Other than the three meetings in Southeast
7    Florida, the Friday morning staff meetings and the
8    written policy that you talked about in your verbal
9    conversations with the managers, is there any other
10   source of information about Alderwoods' policies
11   regarding community service?
12   A    Nothing that I can think of right now.
13   Q    Do you have any knowledge, Mr. Carswell, about
14   any information provided to Alderwoods' employees at any
15   location outside of Georgia and Florida regarding
16   community service work?
17   A    Do I have knowledge of what other funeral homes
18   were doing?
19   Q    Yes.
20       MR. LINGLE: Objection to form.
21   A    Yes, because I have friends who worked for
22   Alderwoods in California; I know they were doing their
23   community service work there, too.
24   Q    Any other locations?
25   A    I'm trying to think if there were.

145

1        There was Hubert Baker in Savannah, Georgia.
2    That was a funeral director and a funeral home there.
3    Q    Anywhere else?
4    A    I'm just to think if there was anybody else
5    that I knew that worked for Alderwoods. The person in
6    California was David Greiner, G-R-E-I-N-E-R. Off the top
7    of my head, I can't any of anybody else right now.
8    Q    Is Hubert Baker the name of this person?
9    A    Yes, H-U-B-E-R-T.
10   Q    Is that the name of the employee that you
11   knew?
12   A    That's the name of the employee and the funeral
13   home.
14   Q    What position did David Greiner hold?
15   A    He was a manager of a funeral home there.
16   Q    The location manager?
17   A    Yes, the location manager of -- it was in San
18   Diego, but I can't recall the name of it right now.
19   Q    What do you know from David Greiner about
20   community service work in the San Diego location?
21   A    We talked on the phone a good bit. We were
22   friends. I know that he was involved in a couple of
23   community organizations there, but he has since moved
24   back to Atlanta. So I'm not sure what the involvement
25   was there.

**NETWORK DEPOSITION SERVICES**
**Transcript of Shane Carswell**

42 (Pages 162 to 165)

162

1 You were supposed to take it, but you couldn't. So they
2 take it out and you do it anyway.
3 Q Did you report the time, all of the time, you
4 spent embalming in those instances?
5 A It's all in the forms that they have in each
6 person's file, each deceased person. It's in their file
7 when the embalming started and when it finished. It
8 tells when a person was picked up, the time of death and
9 everything. So all of that is recorded in those files.
10 Q Was it also reflected on your timecards?
11 A If you punched in, whenever you punched in in
12 the morning, it would just run over into it. You just
13 wrote it down. Say you punched in that you were in the
14 prep from 9:30 in the morning. You put it in. I was
15 here from 7 o'clock this morning. Then when that shift
16 ended. I was still there. So, yeah, you put that on
17 there.
18 Q I guess what I'm not understanding is: What
19 part of that time do you believe that you were not
20 compensated for?
21 A The time between, say, from 7:00 to 8 o'clock
22 you were supposed to actually be on a break. You were
23 supposed to take your hour break in the morning. You
24 come in later than everybody else. You are supposed to
25 take that hour break. If you are there embalming a body,

163

1 you just can't stop in the middle of it. You have to
2 continue with it and finish that out and then you go.
3 Then at that time it's 8:30, 9 o'clock in the morning.
4 You have to finish up. So you start your day there
5 because you are busy.
6 Q Were you on the clock throughout that whole
7 time period from 7:00 to 8:30?
8 A Yes, but you are also supposed to take off that
9 hour break. So they will take it out whether or not you
10 do it. Some nights they did and some nights they don't.
11 So you would have -- just like the lunch breaks. You
12 would have that half-hour that you would have to write
13 down that you took off, whether you take it or not.
14 Again, this is one of those instances where I
15 have that hour that I'm supposed to take off and I can't.
16 Q You are saying that there were occasions you
17 worked through a break?
18 A Yes.
19 Q It's those occasions that you worked through
20 a break that you are saying you believe you were not
21 compensated for?
22 A Correct.
23 Q Any other aspects of the on-call work that you
24 believe that you were not compensated for, other than
25 working through a break on those types of occasions?

164

1 A Not that I can think of right at the moment.
2 Q During the time you were on-call at the CPF,
3 you said the type of work that you performed was either
4 a removal or embalming; is that right?
5 A Both, yeah.
6 Q Any other types of work that you performed
7 when you were on-call?
8 A No.
9 Q Of the on-call work that you performed during
10 the time you were at the CPF, is there any on-call work
11 that you performed for which you did not report the
12 time?
13 A I don't recall if I did or not. I don't know
14 if I did or not. I'm not sure.
15 Q You don't know if there was any time that you
16 spent performing work for Alderwoods that you did not
17 report?
18 A I don't think so, but I'm not a hundred percent
19 certain.
20 Q Moving to the time that you were the location
21 manager at Jennings, what did it mean to be on-call,
22 then?
23 A If anybody needs anything, if anybody has any
24 questions, you are the person that they call. You are
25 in charge of that building. So, I mean, the day after

165

1 the hurricanes came through, you know, nobody else came
2 in, but I had to go clean the building up. So I'm
3 on-call. Even though I was off, I had to go back in and
4 clean up because I'm responsible for that building.
5 Q Who gave you that responsibility?
6 A Who actually put me in as the manager?
7 Q Yes.
8 A James Mullikin.
9 Q Did Mr. Mullikin instruct you that you were to
10 be on-call at all times during the time that you were
11 the location manager there?
12 A It was just what we do. That's the way it's
13 done. I mean, it's like your baby. You have to go in
14 and you have to take care of it. That's what is expected
15 of you.
16 Q Did Mr. Mullikin communicate that expectation
17 to you?
18 A He told me that he expected me to make that
19 place great.
20 Q But did he tell you that he expected you to be
21 on-call all during the time that you were the location
22 manager?
23 A When you are a manager of a funeral home, you
24 are on-call.
25 Q That's what he told you?

**Johnstown**
**814-266-2042**

**Toll-Free**
**866-565-1929**

**Pittsburgh**
**412-281-7908**

**NETWORK DEPOSITION SERVICES**
**Transcript of Shane Carswell**

45 (Pages 174 to 177)

---

174

1    report time that you spent actually performing work
2    while you were on-call?
3         MR. LINGLE: Objection to form.
4         A    Not that I recall, not in those words, no.
5         Q    Did any Alderwoods manager ever tell you
6    whether or not you would be compensated for work that
7    you performed while you were on-call during the time
8    that you were location manager?
9         A    Not that I recall, no.
10        Q    The time that you were the location manager,
11   did you have any employees that you supervised that were
12   on-call?
13        A    No.
14        Q    Other than when you were funeral director/
15   embalmer at CPF and when you were the location manager
16   and funeral director at ABC Jennings from the period of
17   December of 2008 to May of 2006, were there any other
18   time periods in which you were on-call?
19        A    Not that I can think of, no.
20        Q    Did you ever use after-hour call logs while
21   you were employed at Alderwoods?
22        A    Such as what?
23        Q    Did you ever use any log or document to log
24   time that you spent on after-hour calls during the time
25   that you were at Alderwoods?

---

175

1         A    No, I don't think so.
2         Q    Are you aware of any company-wide Alderwoods
3    policy of not compensating employees for work that they
4    performed while on-call?
5         MR. LINGLE: Objection to form.
6         A    I don't know if I am or not.  As far as like
7    written or verbal or what?
8         Q    Just any knowledge that you have of any
9    company-wide policy that employees would not be
10   compensated for actually performing work while on-call.
11        A    Not that I'm aware of, no.
12        (Defendant's Exhibit 17 was marked for
13   identification).
14        Q    I'm handing you what I have marked as Exhibit
15   17.  Is Exhibit 17 a copy of a sworn affirmation that
16   you submitted in this case?
17        A    Yes.
18        Q    Is that your signature on the affirmation?
19        A    Yes.
20        Q    What's the date on that affirmation?
21        A    Actually, I can't see it.
22        Q    Do you recall the date that you signed the
23   affirmation?
24        A    It was in April of 2000-something.
25        Q    No, you can't recall?

---

176

1         A    No, I can't.
2         Q    Did anyone help you prepare the affirmation?
3         A    My attorneys.
4         Q    Were there multiple versions of your
5    affirmation?
6         A    I don't recall if there were one or two.
7    Again, it's been a while.
8         Q    So you are not sure?
9         A    Yeah, I'm not a hundred percent certain.  There
10   might have something that was revised or something, but I
11   don't recall.
12        Q    In your affirmation in paragraph 7 you allege
13   that while you were employed by Alderwoods, you were
14   aware that Alderwoods had a pre-approval for an overtime
15   policy under which hourly employees were not compensated
16   for overtime until they were pre-approved for paid
17   overtime.  Do you see that?
18        A    Yes.
19        Q    When did you become aware of such a policy?
20        A    From day one.
21        Q    How did you become aware of it?
22        A    Verbally and written.
23        Q    How did you become aware of it verbally?
24        A    James Mullikin.
25        Q    So was it James Mullikin who communicated this

---

177

1    to you when you first started working for Alderwoods?
2         A    Yes.
3         Q    Did Mr. Mullikin specifically tell you that
4    if you worked overtime hours without pre-approval, you
5    would not be compensated for your time?
6         A    I think so, yes.
7         Q    Did he tell you that in a one-on-one meeting,
8    or in some other context?
9         A    I'm trying to recall if it was one on one, or
10   if it was in a staff meeting.  I think it was probably
11   in a staff meeting.
12        Q    Did Mr. Mullikin communicate this to you on
13   more than one occasion?
14        A    I believe so, yeah.
15        Q    What other occasions did he --
16        A    Again, in staff meetings.
17        Q    Mr. Mullikin.  What location or area was he
18   responsible for?
19        A    At the time I think he was the operations
20   manager.  He may have even been the Georgia regional
21   manager.
22        Q    So for what areas or locations did he have
23   responsibility for at the time that he first
24   communicated this information to you?
25        A    If he was the operations manager, it would have

---

**Johnstown**
**814-266-2042**

**Toll-Free**
**866-565-1929**

**Pittsburgh**
**412-281-7908**

### 178

1   been at the Foster Group Funeral Homes in Georgia; if he
2   was the Georgia regional manager, then it would have been
3   the entire state of Georgia.
4       Q   If he was the operations manager, about how
5   many people would he have had responsibility for?
6       A   Probably 50 or 60.
7       Q   And if he was the Georgia regional manager at
8   the time --
9       A   Probably a few hundred.
10      Q   At paragraph 9 of your affirmation you state
11  that you were also informed of this policy by your local
12  manager, Thomas Scroggs, in Georgia and JM Jones in
13  Florida; is that correct?
14      A   Yes.
15      Q   At the time that you were working in Georgia,
16  that was prior to December of 2003, right?
17      A   Yes.
18      Q   During the time you were under the supervision
19  of JM Jones in Florida, was that sometime after December
20  of 2003?
21      A   It was from 2001 until I left, so yes.
22      Q   Mr. Jones was the operations manager?
23      A   The operations manager.
24      Q   What locations or areas was he responsible
25  for?

### 179

1       A   The Kraeer Group.
2       Q   What specifically did Mr. Jones communicate to
3   you about pre-approval for overtime?
4       A   Basically, you had to have pre-approval for it,
5   but we also worked 52-hour-work weeks. That work week
6   was already based on the overtime. That was in my
7   interview with you.
8       Q   Did he communicate any other information with
9   you, other than pre-approval for overtime?
10      A   Not that I recall.
11      Q   It was just at the interview that he
12  communicated this to you?
13      A   That was the first time.
14      Q   Did he have occasion to communicate
15  information to you about the pre-approval for overtime
16  on other occasions?
17      A   Just in staff meetings.
18      Q   What information did he communicate in the
19  staff meetings about pre-approval for overtime?
20      A   Again, it was per instance for the funeral
21  directors, theirs was based on a 52-hour-work week; the
22  support staff, theirs was based on separate ways. So you
23  had to be pre-approved for the hours that you were going
24  to work overtime.
25      Q   Did Mr. Jones ever communicate to you that you

### 180

1   would not be compensated for overtime -- I'm sorry.
2   That if you worked overtime hours without pre-approval,
3   that you wouldn't be compensated for it?
4       A   I believe so, yes.
5       Q   That information that Mr. Jones would have
6   provided, that is inconsistent with Alderwoods' written
7   policies saying that Alderwoods employees would all be
8   compensated for all overtime hours, correct?
9           MR. LINGLE: Objection to form.
10      A   Say that again.
11      Q   Earlier on in your deposition we were looking
12  at various Alderwoods written policies.
13      A   Right.
14      Q   In those policies it stated that employees
15  would be compensated for all overtime hours worked,
16  correct?
17      A   Yes.
18      Q   To the extent Mr. Jones told you that if you
19  worked overtime hours without pre-approval you would not
20  be compensated for it, is that inconsistent with the
21  written policies?
22          MR. LINGLE: Objection to form.
23      A   I guess that would, but -- yeah, I guess so.
24      Q   Yes, it would be inconsistent?
25      A   Yeah.  But, again, we all had the overtime

### 181

1   pre-approved anyway.  That's why I'm saying everybody
2   already had overtime pre-approved.  The 52 hours -- that
3   the 12 hours a week you were already pre-approved for,
4   for your overtime.  So you are going to get it.
5       Q   Are you saying given those parameters that you
6   were not working overtime, that was not pre-approved?
7           MR. LINGLE: Objection to form.
8       A   No; overtime that I had, my 52 hours a week,
9   that was already approved.  So I was working that.
10      Q   But Mr. Jones told you that if you worked
11  overtime hours without pre-approval, you would not be
12  compensated for it; is that correct?
13          MR. LINGLE: Objection to form.
14      A   I think I may have misunderstood you.
15      Q   I'm trying to understand -- well, let's just
16  back up.  What did Mr. Jones communicate to you about
17  what would happen if you worked overtime that was not
18  pre-approved?
19      A   I don't think he ever said that there were
20  going to be any problems with working overtime that was
21  not pre-approved, because all of our overtime was
22  pre-approved.  So, I mean, we did that with our overtime
23  already.  We knew that we were going to be working it.
24      Q   It was not an issue of getting pre-approval
25  for overtime that you worked?

**Johnstown**
**814-266-2042**

**Toll-Free**
**866-565-1929**

**Pittsburgh**
**412-281-7908**

**NETWORK DEPOSITION SERVICES**
**Transcript of Shane Carswell**

49 (Pages 190 to 193)

---

190

1  overtime was pre-approved?
2      A    Not that I'm aware of, but hers was, again,
3  already pre-approved.
4      Q    Then you identify an apprentice that worked at
5  the Sample Road location in Florida?
6      A    Yes.
7      Q    What was that apprentice's name?
8      A    That was Sara Daigle, D-A-I-G-L-E.
9      Q    Is it your testimony that Ms. Daigle worked
10  overtime for which she was not compensated, because it
11  was not pre-approved?
12      A    Yes.
13      Q    How do you know that?
14      A    She said something about it to me.
15      Q    What did she tell you?
16      A    That she worked, I think, about six or eight
17  hours overtime.  They said that they were not going to
18  pay her for it, because that was in addition to her
19  pre-approved hours.  I don't know what the outcome of
20  it was, though, after everything was said and done.
21      Q    So you don't know whether she was actually
22  compensated for that time?
23      A    No, I don't know, but I know initially that
24  they said no.
25      Q    That was based on her verbally telling you

191

1  that?
2      A    Yes.
3      Q    Did she identify the manager or managers that
4  told her that?
5      A    She didn't say.
6      Q    What was the time period when you had this
7  conversation with Ms. Daigle?
8      A    That's a while back, sometime, I guess, in
9  early 2006, but I'm not certain.  I don't recall.
10      Q    Ultimately, you don't know whether she was
11  compensated for that time?
12      A    No, I don't.
13      Q    Are there any other employees in other job
14  titles that you are referencing in paragraph 6, other
15  than Bill Santmyer, Edy Sands and Sara Daigle?
16      A    Everyone was subjected to the pre-approval
17  policy for overtime pay.  So, I mean, that could be
18  anybody, any of the hourly employees.
19      Q    Are there any individuals -- as you sit here
20  today -- that you can identify by name?
21      MR. LINGLE:  Objection to form.
22      A    Any of the funeral directors?  I mean, Mike
23  Angotti.  I can't think of anybody's name.  This is
24  horrible.  Larry Sherman, Larry Ott.
25      Q    When you say that they were subject "to

192

1  pre-approval for overtime policy," what policy is it
2  that you are talking about?
3      A    The Alderwoods policy.
4      Q    Which was what?
5      A    That you had to have pre-approval for the hours
6  that you were going to work overtime.
7      Q    Is it your testimony that Mike Angotti, Larry
8  Sherman and Larry Ott were subject to some policy
9  whereby if they worked overtime that wasn't
10  pre-approved, that they would not be compensated for it?
11      A    No.  I'm just stating that they were all
12  subject to the same pre-approval policies; as far as you
13  have to have your hours pre-approved, again, they all had
14  the same schedule, a 52-hour-work week.
15      Q    But you are not saying they were subject to
16  a policy whereby if they worked overtime that wasn't
17  pre-approved, they weren't going to get paid for it?
18      A    Not that I'm aware of.
19      Q    You never discussed with Mr. Angotti, or
20  Mr. Sherman, or Mr. Ott, or any other Alderwoods
21  employee, for that matter, what their compensation was?
22      A    No.
23      Q    If you could, turn back to your first
24  affirmation, Exhibit 17.
25      A    Okay.

193

1      Q    In your first affirmation, you allege that
2  you were required to attend certain training sessions?
3      A    Yes.
4      Q    That you would not be compensated for
5  attending them and they occurred after hours, correct?
6      A    Yes.
7      Q    What training did you do after hours that you
8  allege you were not compensated for?
9      A    There were different education courses and
10  things like that that we had to do.
11      Q    What were the continuing education courses
12  related to?
13      A    Funeral service, embalming and those things.
14      Q    Were you required to attend these continuing
15  courses by Alderwoods?
16      A    Alderwoods and the State, yes, both.
17      Q    Were these related to a license that you had?
18      A    Licensing and training for funeral homes, yes.
19      Q    Because you were licensed a funeral director?
20      A    Correct.
21      Q    The training that you are talking about
22  related to maintaining that license?
23      A    Maintaining the license, but also there were
24  other training sessions for Alderwoods like computer
25  training and things like that.  We had to do those

---

**Johnstown**
**814-266-2042**

**Toll-Free**
**866-565-1929**

**Pittsburgh**
**412-281-7908**

194

1  things.
2      Q   Let's talk about the training that was not
3  related to your funeral director license. Okay?
4      A   Okay.
5      Q   What type of training did Alderwoods require
6  you to attend after your regularly-scheduled work hours?
7      MR. LINGLE: Objection to form.
8      A   There were things like -- what were they
9  called? They did things like how to conduct services and
10  things like that, what the company wanted, policies and
11  things like that, when did you attend those. Typically,
12  they would try to do them in the mornings, but most of
13  the time they ended up in the afternoon, some in the
14  evening.
15      Q   How often between December of 2003 and May of
16  2006 would you attend these training sessions?
17      A   Maybe half a dozen times.
18      Q   How long would they last, typically?
19      A   Typically, about an hour.
20      Q   Did you report the time that you spent
21  attending these training sessions?
22      A   I don't recall if I did or not. I don't think
23  I did. Sometimes they were on your day off and you had
24  to come in then.
25      Q   So sometimes they were at night? Sometimes

195

1  they were on your day off?
2      A   Yes, they required all employees to be there.
3  So they would do it; and if you were off, then you had to
4  come in.
5      Q   And by all employees, you mean all of the ones
6  in the Kraeer --
7      A   Yes.
8      Q   -- funeral homes?
9      A   Yes.
10      Q   So you don't think that you reported the time
11  that you spent at these training sessions, but you don't
12  remember?
13      A   I don't recall doing that, no.
14      Q   Were you compensated for the time you spent in
15  those training sessions?
16      A   I don't believe so, no.
17      THE REPORTER: Ms. Morgan, could we take a
18  short break, please?
19      MS. MORGAN: Sure.
20      (Recess taken.)
21  BY MS. MORGAN:
22      Q   Mr. Carswell, I believe we were talking about
23  the time you spent in Alderwoods training?
24      A   Yes.
25      Q   You were saying you don't believe that you

196

1  recorded the time that you spent in these training
2  sessions?
3      A   Correct.
4      Q   Do you know why you didn't report the time
5  spent in these depositions?
6      A   Honestly, it's been a while. So I don't recall
7  why I did that.
8      Q   Were you compensated for the time you spent in
9  these training sessions?
10      A   That I don't recall.
11      Q   In paragraph 18 of your first affirmation you
12  claim you were aware of other hourly employees who were
13  required to attend training outside their regular
14  shifts, but were not compensated for that time. Who
15  were these other employees?
16      A   I'm guessing they are probably some of the
17  people that I knew mostly in Georgia. Because some of
18  the people I worked with there, we all went together.
19  What was the name?
20      Steve White would have been one of them. I'm
21  trying to think of some others.
22      Kevin Scroggs, Paul Yebba, Y-E-B-B-A. That's
23  all I can think of right now.
24      Q   How do you know they were not compensated for
25  the time they spent in training?

197

1      A   They griped about it.
2      Q   Other than their griping about it, do you have
3  any other basis for knowing they were not compensated
4  for the time they spent in training?
5      A   Other than that, no. They never said that they
6  did compensate for it. So I guess as far as I know, they
7  didn't get compensated since they never said they did.
8      Q   So it's just based on what these individuals
9  told you?
10      A   Yes.
11      Q   You never reviewed their timecards --
12      A   No.
13      Q   -- or paychecks?
14      A   No.
15      Q   In your affirmation in paragraph 15 you claim
16  there is a company-wide policy requiring employees to
17  attend training and not compensating them for the time
18  if it occurred outside of their regularly-scheduled
19  shifts. Do you see that?
20      A   Yes.
21      Q   When did you become aware of that policy?
22      A   1998/1999.
23      Q   When you first started working for Alderwoods?
24      A   Yes.
25      Q   Who communicated this policy for not

**Johnstown**
814-266-2042

**Toll-Free**
866-565-1929

**Pittsburgh**
412-281-7908

198

1    compensating employees for training that they spent
2    outside of their regularly-scheduled shifts?
3        A    That I'm not certain of.
4        Q    Take a look at paragraph 17. Did you learn
5    about it from James Mullikin?
6        A    That would be the only person that -- yeah, if
7    it was in Georgia, then definitely it would have been
8    him. And then Thomas Scroggs, because I would have been
9    at Tara Garden Chapel.
10       Q    At paragraph 17 you also stated that you were
11   informed of it by JM Jones in Florida; is that right?
12       A    Yes.
13       Q    What specifically did these managers inform
14   you about regarding Alderwoods' policy for compensating
15   people for training?
16       A    The compensation? I'm trying to remember
17   exactly how they put it. That was the reason they were
18   trying to do it during business hours. That's why they
19   required everybody to be there. If you weren't -- I
20   don't remember exactly the phrasing of how they said it.
21   It was a long time ago. 2001 would have been the last
22   time that I heard anything about it.
23       Q    2001?
24       A    Yeah. I mean, that's probably the last time
25   that I would have heard anything about it from John

199

1    Michael Jones.
2        Q    So after December of 2003, did you ever hear
3    anything about an Alderwoods policy referring employees
4    to attend training and not compensating them for that
5    time if it was outside their regular shift?
6        A    The training was required, but I don't recall
7    about the compensation. But I know the training was
8    always required.
9        Q    When you were the location manager at ABC
10   Jennings, how did you handle reporting of training time
11   by the employees that you supervised?
12       A    We all went to the same training sessions.
13   So it was all done centralized, by the Kraeer Group.
14       Q    Any of the employees that you supervised, were
15   they ever required to attend training outside of their
16   regularly-scheduled shifts?
17       A    No.
18       Q    Were the employees that you supervised
19   compensated for the time they spent for training at
20   Alderwoods?
21       A    As far as I know, they were, yes.
22       Q    Mr. Carswell, you testified a little bit
23   earlier that you had to attend training to maintain your
24   funeral director's license --
25       A    Yes.

200

1        Q    -- is that correct?
2        A    Yes.
3        Q    From December of 2003 until May of 2006, what
4    licenses did you hold?
5        A    A funeral director/embalmer for Florida and a
6    funeral director/embalmer for Georgia.
7        Q    Did you hold any other licenses related to
8    your employment at Alderwoods?
9        A    No. No.
10       Q    But you had a driver's license?
11       A    Yes, I had one of those.
12       Q    So you didn't hold an insurance license?
13       A    No.
14       Q    Did you ever sell pre-needs insurance?
15       A    Before I moved to Florida, I sold some in
16   Georgia, but they always had to go through somebody else
17   to be finalized, I guess.
18       Q    Between December of 2003 and May of 2006, did
19   you sell any pre-needs insurance?
20       A    No.
21       Q    When did you obtain your funeral director/
22   embalmer license for Georgia?
23       A    1996 or 1995, probably 1996.
24       Q    So that was before you began working for
25   Alderwoods?

201

1        A    I was working for Loewen Group at that time.
2        Q    So that was before you started working for
3    Alderwoods?
4        A    Yes.
5        Q    During the time that you were employed with
6    Alderwoods, did you attain your funeral director/
7    embalmer license for Florida?
8        A    Yes.
9        Q    When was that?
10       A    That was in July of 2001, I believe, July or
11   August.
12       Q    Who issued that license?
13       A    The State of Florida.
14       Q    What did that license authorize you to do?
15       A    To be a licensed funeral director/embalmer for
16   the State of Florida.
17       Q    Between December of 2003 and May of 2006, were
18   you required to do anything to maintain your funeral
19   director/embalmer's license for the State of Florida?
20       A    Yes.
21       Q    What were you required to do?
22       A    Continuing education.
23       Q    What are those requirements?
24       A    There is a four-hour HIV/AIDS communicable
25   disease course. Then you had to do various different

**NETWORK DEPOSITION SERVICES**
**Transcript of Shane Carswell**

52 (Pages 202 to 205)

---

202

1  types of courses that you could take for funeral
2  director/embalmer. Those were -- I believe it was 12
3  hours.
4      Q   So 12 hours total --
5      A   Yes.
6      Q   -- including the four-hour HIV/AIDS course?
7      A   On top of the four hours.
8      Q   So a total of what?
9      A   Of 16.
10     Q   Was it annually that you were required to get
11 this?
12     A   Every two years.
13     Q   You were required to meet that 16-hour
14 continuing education requirement in 2003?
15     A   Yes.
16     Q   And again in 2006?
17     A   2005 for 2006, yes.
18     Q   That was a total of 32 hours of continuing
19 education --
20     A   Correct.
21     Q   -- where you participate in the continuing
22 education, the 32 hours?
23     A   Some of it was done at the funeral home. I'm
24 trying to remember where else.
25         I think I did some online courses.

---

203

1      Q   Did you participate in the continuing
2  education during your regular work hours?
3      A   No.
4      Q   None of the time?
5      A   The HIV/AIDS course, that one we did, because
6  they did that for all employees at the funeral home. So
7  we did do that there.
8      Q   On both occasions --
9      A   Yes.
10     Q   -- did you do it at the location --
11     A   Correct.
12     Q   -- during regular work hours?
13     A   Correct.
14     Q   The other 24 hours of continuing education,
15 did you do that continuing education after hours?
16     A   Yes.
17     Q   Did you report any of the time that you spent
18 in those 24 hours of continuing education?
19     A   No.
20     Q   Why not?
21     A   I honestly have no idea why I didn't.
22     Q   Did Alderwoods compensate you for the time you
23 spent for those 24 hours of continuing education?
24     A   No.
25     Q   Did you ever complain to any Alderwoods

---

204

1  manager about not being compensated for the 24 hours
2  that you spent in the continuing education to maintain
3  your funeral director/embalmer's license for Florida?
4          MR. LINGLE: Objection to form.
5      A   Not that I recall.
6      Q   Did you ever call the hotline or the
7  Alderwoods help line to complain?
8      A   Not that I recall.
9          MR. LINGLE: Objection to form.
10     Q   Do you think you should have been compensated
11 for the time you spent in the 24 hours of continuing
12 education for maintaining your funeral director's
13 license for Florida?
14         MR. LINGLE: Objection to form.
15     A   I think so.
16     Q   Why do you think so?
17         MR. LINGLE: Objection to form.
18     A   Because if I'm not licensed, then they can't
19 keep the place running.
20     Q   So in the State of Florida are funeral
21 directors required to have a license?
22     A   Yes.
23     Q   Was anyone in your job position of funeral
24 director/embalmer in Florida that you know of not
25 licensed?

---

205

1      A   Not that I'm aware of.
2      Q   Do you still have your funeral director
3  license for the State of Florida?
4      A   Yes.
5      Q   Did Alderwoods bear the costs associated with
6  this continuing education?
7      A   I believe so, yeah.
8      Q   Are you aware of any company-wide policy of
9  requiring employees to become licensed funeral director/
10 embalmers and not compensating people for the time
11 associated with maintaining the license?
12         MR. LINGLE: Objection to form.
13     A   I'm not certain if there is or not.
14     Q   Do you know whether any other funeral
15 director/embalmers in the State of Florida that were
16 working for Alderwoods were compensated for the time
17 they spent maintaining their license?
18     A   I'm not aware of anybody. I'm not sure.
19     Q   You don't know if they were compensated or
20 not?
21     A   No, I don't.
22     Q   Did any Alderwoods manager ever instruct you
23 not to report the time that you spent maintaining your
24 license, the funeral director/embalmer license, for the
25 State of Florida?

---

**Johnstown**
**814-266-2042**

**Toll-Free**
**866-565-1929**

**Pittsburgh**
**412-281-7908**

210

1    possession that are responsive that you have not turned
2    over to your attorneys?
3         A    Nothing that I'm aware of, no.
4         MS. MORGAN:  Can we go off the record for a
5    moment?  I just want to make sure I'm done.
6         MR. LINGLE:  Sure.
7         (Recess taken).
8         MS. MORGAN:  I have just a couple of more
9    questions, and then we will be done.
10   BY MS. MORGAN:
11        Q    During the time that you were the location
12   manager at ABC Jennings, did you ever instruct any of
13   the employees that reported to you not to report hours
14   that they worked for Alderwoods?
15        MR. LINGLE:  Objection to form.
16        A    No.
17        Q    During the time that you were the location
18   manager at ABC Jennings, did you ever refuse to
19   compensate employees for any overtime hours that they
20   reported?
21        A    No.
22        MR. LINGLE:  Objection to form.
23        MS. MORGAN:  Okay.  I will pass the witness.
24        MR. LINGLE:  Would you mind giving us a couple
25   of seconds first?

211

1         MS. MORGAN:  No problem.
2         (Recess taken).
3         MR. LINGLE:  Back on the record.
4              CROSS-EXAMINATION
5    BY MR. LINGLE:
6         Q    Mr. Carswell, I want to turn your attention
7    back to Exhibit 10 for a second.  I'm going to turn you
8    to page ALD000175.  You were not asked whether you were
9    earned commissions.  I believe in here -- I just want to
10   show you in the week ending or the check paid 4/21/06,
11   does it appear that you earned a commission in that
12   period?
13        A    Are you talking about the FH commission?
14        Q    Right.
15        A    I'm not certain what that is.
16        Q    Would it be appear to be a commission of some
17   sort?
18        A    It would.  I mean, as far as I could tell.  It
19   says "commission."  I don't know what commission that it
20   would be, though.
21        Q    You also describe the process by which payroll
22   would be submitted.  Do you remember that?
23        A    Yes.
24        Q    Where was payroll processed for the locations
25   that you worked?

212

1         A    It went to the downtown location first where
2    Felicia would submit everything, and then everything was
3    sent to Cincinnati.
4         Q    Where did your paycheck come from?
5         A    Cincinnati.
6         Q    Is that Alderwoods' headquarters?
7         A    Yes, the main office.  Yes.
8         Q    Throughout today's deposition you were asked
9    questions about various things that you did that you
10   didn't get paid for.  That was one of many of the topics
11   of today's deposition, but I just want to make sure that
12   we had gotten them all.
13            You mentioned community service work, right?
14        A    Correct.
15        Q    There was work that you performed at home?
16        A    Correct.
17        Q    And various tasks that you performed while
18   on-call?
19        A    Correct.
20        Q    You worked during your meal breaks?
21        A    Correct.
22        Q    And you had written recorded hours of time,
23   right, on the time sheet?
24        A    Yes.
25        Q    And training that you had done, right?

213

1         A    Correct.
2         Q    Were any of those categories of time recorded
3    on your time sheets?
4         A    Other than like the meal breaks, no.
5         Q    The meal breaks were actually times that you
6    did work, correct?
7         A    Correct.
8         Q    Your time sheets would not reflect those hours
9    that you worked, correct?
10        A    That's correct.
11        Q    Let's talk about community service for a
12   second.  Did you report any of the community service
13   time that you worked?
14        A    No.
15        Q    Was there any record of community service that
16   you performed?
17        A    The IBIS book, you know, that was something we
18   were supposed to keep track of and keep record of when we
19   did community service or other services.
20        Q    Did you report all of the community service
21   work that you performed in there?
22        A    No.
23        Q    What was your understanding that would happen
24   if you reported the time that you spent doing community
25   service work?

**Johnstown**
**814-266-2042**

**Toll-Free**
**866-565-1929**

**Pittsburgh**
**412-281-7908**

214

1    A    I didn't think we would get paid for it.
2    Q    Why not?
3    A    It's just what you were expected to do. It was
4  part of what you had to do. It was part of your job.
5  So, I mean -- I'm trying to think of the best way to put
6  it. It's not something you are going to be compensated
7  for, because that's what everyone is doing. That's what
8  being part of the team does.
9    Q    Was it your understanding that that only
10  applied in your location?
11    A    No.
12    Q    What was your understanding of how that
13  applied?
14    A    It applied throughout the entire company.
15    Q    Why did you have that understanding?
16    A    Because all of the funeral homes I worked in,
17  we all did that and other people I know that worked for
18  Alderwoods did the same.
19    Q    Was your manager aware of the community
20  service work that you did?
21    A    Of course.
22    Q    How was he aware?
23    A    We all talked about it.
24    Q    When did you talk about it?
25    A    Usually at the staff meetings on Friday

215

1  mornings. That was one of the things. The Friday
2  meeting was to tell people what's going on, what's
3  upcoming and things like that.
4    Q    As a result of your community service work,
5  did you generate any business?
6    A    Yes.
7    Q    What business did you generate?
8    A    New calls, people coming in for pre-need, those
9  things. Some of it was from Gay Pride. Some of it was
10  from the hospitals, from the chaplains and things like
11  that and different hospitals. It was referrals.
12    Q    You were also asked a series of questions
13  about the pre-approval for overtime, right?
14    A    Yes.
15    Q    You said that you were pre-approved for a
16  certain number of overtime hours each week; is that
17  right?
18    A    Yes.
19    Q    What was your understanding of what would
20  happen if you reported additional hours beyond those
21  that were pre-approved to be paid for those? What would
22  happen?
23    A    You shouldn't report more than what you already
24  had because you were allotted those. The understanding
25  was that you won't be paid for them even though you are

216

1  working the extra hours anyway, because you have already
2  been allotted a set number of hours. Some people, like
3  support staff, would have 60 hours that they could work
4  a week and directors would have 52.
5        You were allotted your hours. You don't need
6  to be over those hours.
7    Q    What was your understanding of what would
8  happen if you had reported more than that?
9    A    I was told that we wouldn't get paid.
10    Q    In what positions were you required to do
11  on-call work again?
12    A    I was on-call with the CPF doing those, during
13  those intervals, and then at ABC Jennings Funeral Home.
14  That was pretty much all of the time because I was the
15  location manager. So I'm responsible for that.
16    Q    So as a funeral director, you were on-call?
17    A    Yes.
18    Q    I think you described during a certain period
19  of time for on-call you will punch in when you got to
20  the funeral home; is that right?
21    A    Yes. Correct.
22    Q    During the time where you recorded on-call
23  time that way, were you paid for any time prior to
24  punching in?
25    A    No.

217

1    Q    How about when you received a call at home,
2  did you get paid for that time?
3    A    No.
4    Q    Taking the call?
5    A    No.
6    Q    Talking with the family?
7    A    No.
8    Q    Getting ready to go in?
9    A    No.
10    Q    You weren't paid anything prior to arriving at
11  the funeral home?
12    A    Correct.
13    Q    Was your manager aware of the on-call that you
14  performed?
15    A    Yes.
16    Q    How was your manager aware?
17    A    I talked to him. We discussed what I was
18  doing. He knew the schedule. He knew what was going on.
19  He was aware of what was happening.
20    Q    Would your manager be aware of the time you
21  actually worked while on-call?
22    A    Actually, he would only -- the only way he
23  could do that is if he would go and look at the files of
24  anyone that died that day, because it has the time of
25  death, the time of arrival, the time we leave and the

**Johnstown**
**814-266-2042**

**Toll-Free**
**866-565-1929**

**Pittsburgh**
**412-281-7908**

218

1  time I leave from there.  It has all of the information
2  on there.  It has every detail of that call that came in.
3  So he knows the exact time from the moment that the phone
4  rang.
5      Q    Training time.  You were also asked about
6  training time?
7      A    Yes.
8      Q    Do you remember that?
9      A    Yes.
10     Q    Was all of your training time recorded?
11     A    No.
12     Q    What was your understanding of what would
13 happen recorded training time?
14     A    Honestly, I didn't think that I would get paid
15 for that because it was training.  Most of it was
16 supposed to be done during hours.
17     Q    You would only get paid for it during your
18 regularly-scheduled shift?
19     A    Yes.
20     Q    Did any manager tell you that you should
21 report your time for maintaining your license for the
22 State of Florida?
23     A    No.
24     Q    Did any license tell you that you would be
25 compensated for the time that you spent maintaining your

219

1  license for the State of Florida?
2      A    No.
3      Q    These various policies that we have been
4  speaking about today of what you would be paid for and
5  what you wouldn't be paid for --
6      A    Right.
7      Q    -- what was your understanding regarding where
8  those policies applied?
9          MS. MORGAN:  Objection to form.
10     A    I'm not certain.
11     Q    Was it your understanding that those policies
12 only applied at your location?
13     A    No.  No.
14     Q    What was your understanding about where those
15 policies applied?
16     A    They were company-wide.
17     Q    How did you come to that understanding?
18     A    Again, I had worked for several locations.  We
19 all had the same paperwork and all of the same books.
20 The people I know that worked at other chapels and other
21 funeral homes -- Georgia, Florida, California -- they all
22 had the same stuff.
23     Q    Was it also common in each of the locations
24 that you worked at that audits would be done?
25     A    Yes.

220

1      Q    Those were done by Alderwoods?
2      A    Yes.
3          MR. LINGLE:  I don't think I have any further
4  questions at this time.
5          MS. MORGAN:  I have some more questions.
6          REDIRECT EXAMINATION
7  BY MS. MORGAN:
8      Q    Mr. Carswell, you were testifying about how
9  you did not report the community -- the hours you spent
10 doing community service during the time that you were at
11 Alderwoods, correct?
12     A    Correct.
13     Q    I believe you testified that you didn't record
14 that time because you didn't think you would get paid
15 for it, correct?
16     A    Correct.
17     Q    Did any Alderwoods manager ever instruct you
18 not to record the time that you spent performing
19 community work?
20     A    I don't believe so.
21     Q    Did any Alderwoods manager ever instruct you
22 that you would not be compensated for any time that you
23 spent performing community service work?
24     A    I don't recall.  I don't believe so.
25     Q    You testified that it was your understanding

221

1  there was a company-wide policy that employees were
2  required to perform community service work; is that
3  correct?
4      A    Yes.
5      Q    You testified that the basis of that
6  understanding was that it happened at all of the other
7  locations that you worked at; is that correct?
8          MR. LINGLE:  Objection to form.
9      A    And the locations that I know other people
10 worked at, too.
11     Q    How do you know it was a policy at the
12 locations that you worked at that employees were
13 required to perform community service work?
14     A    It's in the handbooks that are at all of the
15 offices.  Every chapel has those books.
16     Q    But it was not your understanding, correct,
17 that there was a company-wide policy that employees were
18 not supposed to record the time they spent performing
19 community work, right?
20         MR. LINGLE:  Objection to form.
21     A    I'm sorry.  I didn't understand that.
22     Q    Your understanding about this company-wide
23 policy --
24     A    Right.
25     Q    -- related to community service?

Johnstown
814-266-2042

Toll-Free
866-565-1929

Pittsburgh
412-281-7908

230

1    Q    -- at the locations in Pennsylvania?
2    A    Not in all of them, no.
3    Q    You don't know what those managers of
4  locations outside of the ones where you worked actually
5  instructed employees regarding overtime?
6    A    Of course not.
7    Q    You didn't speak to employees at all of the
8  different Alderwoods locations of what their managers
9  instructed them regarding overtime and compensation,
10  correct?
11    A    No. That's impossible.
12    Q    Other than the employees that you supervised
13  during the time that you were a location manager, you
14  did not review any other employees' time records,
15  correct?
16        MR. LINGLE: Objection to form.
17    A    Only on those rare occasions where I was the
18  funeral director in charge of that place.
19    Q    That's right. But outside of that, outside
20  of those instances and reviewing the time sheets of the
21  people that you supervised at ABC Jennings, you didn't
22  review other employees' time sheets, correct?
23    A    No.
24        MS. MORGAN: All right. I will pass the
25  witness.

231

1            RECROSS-EXAMINATION
2  BY MR. LINGLE:
3    Q    Did anyone instruct you to record time that
4  you spent working on community work?
5    A    Again, it was supposed to be put in the IBIS
6  books.
7    Q    Was it done all the time?
8    A    No.
9    Q    Did anybody tell you that you should report it
10  for purposes of being compensated?
11    A    No.
12    Q    Did anyone instruct you that you would be
13  compensated for time that you would spend performing
14  community work?
15    A    No.
16    Q    On the pre-approval overtime that's for the
17  pre-approved, when you say in excess of 52 hours, were
18  you talking about the time that you spent in the funeral
19  home?
20    A    Well, yeah. I guess that would be the 52
21  hours. Yes.
22    Q    Because as we have been discussing today, you
23  spent plenty of time outside of the funeral home?
24    A    Yes. Exactly. That's the 52 hours that you
25  are spending at work. You know, there are -- I know

232

1  people don't understand this, and they don't get this.
2  But when you are a funeral director, you don't have a
3  life of much fun anyway. You put in a lot more hours
4  than you ever are paid for or are compensated for.
5  That's normal.
6    Q    And on-call time, did you -- first of all,
7  explain to me what you would have to do after you took
8  a call from a family.
9    A    If I took a call for a death?
10    Q    That's correct.
11    A    After I hang up from them, I get all of the
12  information I need, get up, get showered, put a suit
13  on, head to the funeral home and get the hearse, or the
14  removal vehicle, whichever it is, and go.
15        MS. MORGAN: Do you mind if we go off the
16  record for just a minute?
17        MR. LINGLE: No.
18        (Recess taken).
19  BY MR. LINGLE:
20    Q    With respect to the on-call time that you
21  worked, did anyone tell you to record that time that
22  you spent working --
23    A    No.
24    Q    -- for those phone calls and getting ready?
25    A    No.

233

1    Q    Did anyone tell you that you would be
2  compensated for that time?
3    A    No.
4    Q    As far as training, you were asked a few
5  follow-up questions on training. Did anyone tell you
6  to record all of the time that you spent training?
7    A    No.
8    Q    Did anyone tell you that you would be
9  compensated for that time that you spent training?
10    A    No.
11        MR. LINGLE: I don't have anything further.
12        MS. MORGAN: I don't have anything further
13  now, either.
14        THE REPORTER: Mr. Lingle, read or waive?
15        MR. LINGLE: Yes, he will read.
16        THE REPORTER: Okay. Thank you very much.
17  Do you want a copy of the transcript?
18        MR. LINGLE: Yes.
19        THE REPORTER: Okay. Thank you.
20        Ms. Morgan, do you need the transcript regular
21  time?
22        MS. MORGAN: I will let you know tomorrow. Is
23  that all right?
24        THE REPORTER: Sure. No problem.
25        (Deposition concluded).

EXHIBIT 69

1

```
1
             THE UNITED STATES DISTRICT COURT
2               FOR THE WESTERN DISTRICT OF
                        PENNSYLVANIA
3

4
    DEBORAH PRISE AND HEATHER  *CIVIL ACTION
5   RADY ON BEHALF OF           *
    THEMSELVES AND ALL          *
6   EMPLOYEES SIMILARY SITUATED*NO. 06-1641
                                *
7   VERSUS                      *
                                *
8   ALDERWOODS GROUP, INC.      *
    *   *   *   *   *   *   *   *   *  **
9

10

11

12

13

14

15
                Deposition of MILLARD JUDE
16  DAIGLE, 2456 Highway 20, Vacherie,
17  Louisiana 70090, taken in the offices of
18  Gaudet Kaiser, Certified Court Reporters,
19  601 Poydras Street, Suite 2003, New
20  Orleans, Louisiana 70130, on Monday, the
21  20th day of April, 2009.
22

23

24

25
```

222

1    think I gave you that already.
2        Q.   Okay.  So they're the same?
3    They're the requirements for just a funeral
4    directors's license in the state of
5    Louisiana, is the 30 college credit hours?
6        A.   Right.
7        Q.   The 25 funeral arrangements?
8        A.   Uh-huh (Affirmative Response).
9        Q.   Taking and passing a written
10   test?
11       A.   Uh-huh (Affirmative Response).
12       Q.   And a one-year internship?
13       A.   Pay the fee, which is $80, and
14   not be convicted of a crime.
15       Q.   That's to maintain it, right?
16       A.   Right.
17       Q.   The initial license, getting it?
18       A.   That's -- all those are
19   requirements in there.
20       Q.   Okay.  And is there like a
21   one-time fee or something that you have to
22   pay?
23       A.   Yes, uh-huh (Affirmative
24   Response).
25       Q.   Do you know what the amount is?

223

1        A.   I think it's $150.
2        Q.   Any fee associated with the
3    embalming license?
4        A.   Same fee.  Initially, you know,
5    you pay 150 up front and then 80 bucks a
6    year for renewal.
7        Q.   Mr. Daigle, I've handed you
8    what's been marked Exhibit 10.  Are you
9    familiar with this document?
10       A.   Yes.
11       Q.   Is that your signature at the
12   bottom of the document?
13       A.   Yes.
14       Q.   And it's dated March 31st, 2008,
15   is that correct?
16       A.   Yes.
17       Q.   When did you receive this
18   information sheet?
19       A.   I don't specifically recall the
20   date that I received it.
21       Q.   Do you recall whether it was
22   close in time to when you -- when you
23   signed and dated it?
24       A.   Yes.
25       Q.   Did anyone help you fill it out?

224

1        MS. DOUGLASS:
2            Objection.
3        THE WITNESS:
4            No.
5    EXAMINATION BY MS. MORGAN:
6        Q.   Did you discuss it with an
7    attorney?  And I'm not asking you about
8    what you talked about with your attorney,
9    but whether you just discussed the
10   information sheet with an attorney.
11       A.   An outside counsel, counsel, or
12   somebody with the --
13       Q.   Just any attorney.
14       A.   No.
15       Q.   Did you have multiple versions
16   of your information sheet or just one?
17       A.   Just one.
18       Q.   Is the information that you
19   provided regarding the dates of your
20   employment with Alderwoods correct?  You
21   stated June 2000 to December 2005.
22       A.   Yes.  But in 2000, I think it
23   was still Loewen.
24       Q.   Okay.  So with that note, any --
25       A.   Other than that, the rest of the

225

1    information is correct.
2        Q.   Okay.
3        A.   Uh-huh (Affirmative Response).
4        Q.   And with respect to the
5    positions you've held with Alderwoods,
6    funeral director slash assistant manager,
7    is that correct?
8        A.   I was a funeral director.
9    Assistant manager was just a title.
10       Q.   But the funeral director/
11   assistant manager is the title that you
12   held from June 2000 to December 2005?
13       A.   Yes.
14       Q.   And on this information sheet is
15   listed the locations that you worked while
16   you were employed with Alderwoods.
17       A.   Right.
18       Q.   The Hollabaugh-Spindle?
19       A.   Hollabaugh-Spindle?  That was
20   not with Alderwoods.  That was with Loewen.
21       Q.   Okay.
22       A.   And I had a different position
23   at that funeral home.
24       Q.   But that was back when you were
25   employed with Loewen, not Alderwoods?

230

1    A.   Yes.
2    Q.   And what is your claim?
3    A.   Well, my claim is that, you
4  know, I did everything as far as the actual
5  setting up of the sale, but wasn't
6  compensated for any of it.
7    Q.   You weren't compensated for your
8  time?
9    A.   No, any -- any -- I wasn't given
10 anything extra for, you know, doing those
11 things, you know, setting up the sale for
12 the pre-need person.
13   Q.   Were you paid?  You were
14 compensated by Alderwoods for the time that
15 you spent engaged in pre-sales meetings or
16 appointments?
17   A.   Yes.
18   Q.   So you're not claiming that
19 you're owed compensation for the time that
20 you spent --
21   A.   No.
22   Q.   -- in pre-needs?
23   A.   No.
24   Q.   Appointments or meetings,
25 correct?

231

1    A.   No.
2  MS. DOUGLASS:
3      Objection.
4  THE WITNESS:
5      Well, I'm not sure.  Can you run
6  that by me again?
7  EXAMINATION BY MS. MORGAN:
8    Q.   Are you claiming in the lawsuit
9  that you are entitled to compensation for
10 time you spent in pre-needs meetings or
11 appointments?
12   A.   If I was at work, no.
13   Q.   So any time that you spent
14 involved in pre-needs meetings or
15 appointments, you reported that time?
16   A.   I was there at the funeral home
17 during the day.
18   Q.   So yes, you did report that?
19   A.   Yes.
20   Q.   And then you were compensated
21 for that time?
22   A.   Yes.
23   Q.   Okay.  So what is it you're
24 claiming you should be compensated for with
25 respect to pre-need insurance, pre-needs

232

1  meetings?
2    A.   Well, there were times when we
3  counseled with pre-need people, the people
4  that were selling pre-need after hours,
5  before hours, whatever it took to get the
6  sale, you know, accomplished.
7    Q.   So you're saying that you spent
8  time associated with pre-needs sales that
9  you were not compensated for?
10   A.   Right.
11   Q.   Okay.  Did you report that time?
12   A.   No.
13   Q.   Why not?
14   A.   There was no need to, because we
15 were not to report anything over 40 hours
16 in a week's time.
17   Q.   Were you ever compensated for
18 the time that you spent, for the unreported
19 time that you spent doing pre-needs?
20   A.   No.
21   Q.   Did any Alderwoods manager ever
22 instruct you not to -- did any Alderwoods
23 manager ever tell you not to report the
24 time that you spent in pre-needs?
25   A.   And the answer no.

233

1    Q.   Did any Alderwoods manager ever
2  tell you that you would not be compensated
3  for time that you spent in pre-needs
4  meetings or appointments?
5    A.   No.
6    Q.   Are you aware of any Alderwoods,
7  of any Alderwoods manager telling any other
8  Alderwoods employees not to report time
9  spent in pre-needs sales or appointments?
10   A.   No.
11   Q.   Are you aware of any other
12 Alderwoods employees who were not paid for,
13 who were not compensated for time they
14 spent in pre-needs meetings or
15 appointments?
16   A.   No.
17   Q.   How frequently would you have
18 pre-needs meetings or appointments that you
19 didn't report?
20   A.   Probably on the average, a
21 couple or three times a week.  It was an
22 ongoing thing.  We always had to counsel
23 with the pre-need person, because the
24 people that they hired were -- didn't have
25 enough experience.

234

1    Q.   So three times a week on
2  average.  And about how much time was
3  associated with pre-needs appointments on
4  those occasions?
5    A.   Maybe half an hour with each
6  one, just -- that's a ball-park figure.
7    Q.   And this is the unreported
8  pre-needs time?
9    A.   Right.
10    Q.   Are you aware of any company-
11  wide policy that an employee should not
12  report all the time they spend in pre-needs
13  appointments or meetings?
14    A.   No.
15    Q.   And during what period of time
16  of your employment with Alderwoods were you
17  doing pre-needs appointments or meetings?
18    A.   The times that I was talking
19  about was probably in between 2003 and 2005
20  at Lamana-Panno-Fallo.
21    Q.   Did any Alderwoods manager
22  observe you doing these pre-needs
23  appointments or meetings on the times that
24  you didn't report it?
25    A.   Yeah, Ronnie.

235

1    Q.   And how do you know that Ronnie
2  observed you doing this?
3    A.   Well, I saw him and he saw me.
4    Q.   Did he see you on every
5  occasion?
6    A.   Just about every occasion.
7    Q.   Any other Alderwoods manager see
8  you doing pre-needs meetings or
9  appointments that you didn't report?
10    A.   No.
11    Q.   Do you know whether other
12  Alderwoods employees reported the time they
13  spent doing pre-needs meetings or
14  appointments?
15    A.   No, I don't.
16    Q.   Do you know whether any other
17  Alderwoods employee was compensated for the
18  time they spent doing pre-needs meetings or
19  appointments?
20    A.   No, I don't.
21    MS. MORGAN:
22      Can we go off the record for
23  about three minutes?  I just want to make
24  sure I don't have any other questions.
25    MS. DOUGLASS:

236

1      Sure.
2      (Short Break)
3    EXAMINATION BY MS. MORGAN:
4    Q.   Mr. Daigle, how many hours are
5  you claiming that you were not paid for the
6  pre-needs meetings or appointments?
7    A.   I have no specific amount of
8  hours.  I didn't add them up.
9    Q.   Did you ever keep a personal
10  record of the time that you spent in the
11  pre-needs meetings or appointments?
12    A.   No, I don't.
13    Q.   How much money are you seeking
14  in this lawsuit, Mr. Daigle?
15    A.   I've not arrived at any dollar
16  amount.
17    Q.   Are you seeking anything other
18  than money damages?
19    A.   No.
20    MS. MORGAN:
21      I pass the witness.
22    MS. DOUGLASS:
23      Okay.  Can we take a break?
24    MS. MORGAN:
25      Sure.

237

1      (Short Break)
2    EXAMINATION BY MS. DOUGLASS:
3    Q.   Okay, Mr. Daigle.  If you
4  recall, there were some questions posed to
5  you today about seek pre-approval for work,
6  overtime work or hours over 40.
7    A.   Right.
8    Q.   Do you remember those questions,
9  more or less?
10    A.   Yes.
11    Q.   And I believe it was that you
12  testified that you did not ever seek
13  approval to do -- to seek approval to do
14  overtime work or work in excess of 40 hours
15  in a week.  Do you remember giving that
16  testimony?
17    A.   That's correct.
18    Q.   I believe, also, that you stated
19  that you did not seek pre-approval because
20  there was no need.  What did you mean by
21  there was no need to seek pre-approval?
22    A.   The reason I said that there was
23  no need was because we were told that we
24  could not show anything beyond 40 hours on
25  the timecard and no overtime would be

EXHIBIT 70

1

```
 1                              VOLUME: I
                                PAGES:  1 to 251
 2                              EXHIBITS:  1 to 14

 3

                    UNITED STATES DISTRICT COURT
 4             WESTERN DISTRICT OF PENNSYLVANIA

 5

        Civil Action No. 06-1641
 6

 7      DEBORAH PRISE and HEATHER        )
        RADY, on behalf of              )
 8      themselves and all              )
        employees similarly             )
 9      situated,                        )
                    Plaintiffs,         )
10                                       )
        vs.                              )
11                                       )
        ALDERWOODS GROUP, INC.,          )
12                  Defendant.           )

13

14           DEPOSITION OF STEVEN A. DETSCHNER,

15      called as a witness on behalf of the

16      Defendant, pursuant to the applicable

17      provisions of the Federal Rules of Civil

18      Procedure, before Jeanette N. Maracas,

19      Registered Professional Reporter and Notary

20      Public in and for the Commonwealth of

21      Massachusetts, at the Holiday Inn Hotel,

22      929 Hingham Street, Rockland, Massachusetts,

23      on Friday, May 8, 2009, commencing at 9:23

24      a.m.

25
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Steven Detschner**

4 (Pages 10 to 13)

---

10

1  A. I became a funeral director. My job
2  responsibilities increased to dealing with
3  families and conducting and supervising
4  funerals.
5  Q. When you first started working for
6  Alderwoods, at what location did you work?
7  A. Doane, Beal & Ames, D O A N E, B E A L and
8  A M E S. That was located, headquarters in
9  Hyannis, Massachusetts, with funeral homes
10  also in Dennis and Harwich, Massachusetts.
11  Q. So there were three Doane, Beal & Ames
12  locations?
13  A. Yes. Affiliated with those was Nickerson
14  Funeral Home in Chatham, Orleans and
15  Wellfleet, and I assisted when needed at
16  those locations.
17  Q. So Doane, Beal & Ames Funeral Home had three
18  locations, the Nickerson Funeral Home also
19  had three locations, is that right?
20  A. Yes.
21  Q. And you worked at all six of those physical
22  locations?
23  A. Yes.
24  Q. Did employees rotate among these six
25  locations, the employees you worked with?

---

11

1  A. At times.
2  Q. Did you have a particular location that
3  was sort of your home base?
4  A. My home base when I first started through
5  my initial days as a funeral director, I was
6  at Doane, Beal & Ames in Hyannis is where I
7  reported to and primarily worked out of.
8  Q. Were Doane, Beal & Ames and Nickerson part
9  of a particular geographic market, to your
10  knowledge?
11  A. Yes.
12  Q. Do you know what the market was called?
13  A. They were part of the northeastern group
14  of funeral homes.
15  Q. Do you know how many other funeral homes
16  were in the Northeast group?
17  A. I do not.
18  Q. During your employment with Alderwoods did
19  you ever work at any other locations besides
20  the three Doane, Beal & Ames and the three
21  Nickerson locations?
22  A. I did not physically work at any of those
23  locations. However, I did make various
24  trips to some others to drop off bodies or
25  paperwork or retrieve dead human remains.

---

12

1  Q. What other locations did you travel to
2  for those purposes?
3  A. Mulreys, M U L R E Y S, Funeral Home in
4  Dorchester, and Cuff-McGinn Funeral Home
5  and I believe that's located in Lynn, and
6  that's just a vague recollection. I believe
7  that that's the name of the funeral home,
8  whether it be Lynn or Lowell, it's up north
9  of Boston.
10  Q. Okay. Did you ever talk to employees who
11  worked at these other locations?
12  A. Just general pleasantries, but nothing really
13  too business-related.
14  Q. Just incidental conversation as you were
15  passing through?
16  A. Yes.
17  Q. Okay. Who were your supervisors when you
18  first started working for Alderwoods?
19  A. Jerome Tilton was the location manager of
20  Hyannis, Massachusetts. There's a lesser
21  manager there named James Mendes, but
22  ultimately decisions were made through
23  Jerome Tilton.
24  Q. And what was James Mendes' position, do you
25  know?

---

13

1  A. He was an apprentice as well.
2  Q. But he had some kind of management role?
3  A. I believe on paper he did, but he didn't
4  benefit from any sort of managerial status.
5  Q. Did you have any other direct supervisors?
6  MS. GIFFORD: When he first started
7  or ever?
8  Q. Ever.
9  A. David Hunt in mid 2004 after I became a
10  licensed funeral director.
11  Q. And what was David Hunt's position?
12  A. He was the location manager of the Nickerson
13  Funeral Homes.
14  Q. Was he not your manager before 2004?
15  A. He was not. He was a manager, but he was
16  not my manager.
17  Q. Why did he become your manager in 2004?
18  A. I moved my employment primary check-in
19  and operations out of, into the Nickerson
20  Funeral Homes. Essentially, I was
21  transferred to primarily work the Nickerson
22  Funeral Homes.
23  Q. Before that time that you were transferred
24  to Nickerson as your home base, did David
25  Hunt have any authority over you?

---

26

1  Q. And your position then changed to funeral
2     director at Alderwoods, correct?
3  A. Yes.
4  Q. Did you have any discussion about your job
5     duties in connection with that position
6     change with anyone at Alderwoods?
7  A. Yes.
8  Q. And who did you talk to about your duties
9     as a funeral director?
10 A. Jerry Tilton and Jonathan Blute.
11 Q. Did you speak with them together or were
12    there separate instances?
13 A. I don't recall, I do not recall a meeting
14    where I sat with both those together, but
15    I may have. I don't recall specifically.
16 Q. What did Jerry Tilton say about your duties
17    as a funeral director?
18 A. Jerry Tilton explained the additional
19    duties that I have, such as supervising
20    funerals, being on call would now include
21    fielding telephone calls from various
22    sources and embalming dead human remains
23    unsupervised and supervising funerals, if
24    I didn't already say that, and meeting with
25    families to facilitate funeral services.

27

1  Q. Do you recall anything else that Jerry
2     Tilton said about your duties as a funeral
3     director?
4  A. Jerry Tilton expressed just the importance
5     of being involved in the community and I
6     recall telling, saying to him what my goals
7     were as far as community service clubs or
8     organizations that I intended to join or
9     take part of in order to represent the
10    Alderwoods corporation on Cape Cod in a
11    positive manner.
12 Q. And you had that discussion with Jerry
13    Tilton at the time you became funeral
14    director in June 2004?
15 A. Yes. I also spoke with Jonathan Blute in
16    regards to that subject regarding community
17    service and the studying and issuance,
18    should I have passed the pre-need insurance
19    license program so that I could sell the
20    insurance policy sanctioned by Alderwoods
21    for pre-need funeral services.
22 Q. Going back to your discussion with Jerry
23    Tilton before this time in June 2004, had
24    he ever said anything to you about the
25    importance of community involvement?

28

1  A. Yes.
2  Q. When was the first time?
3  A. I do not recall the exact month, but it was
4     instilled very early on in my full-time
5     career, possibly even when I was a part-time
6     employee, although I don't recall anything
7     in particular, that the importance of
8     community service for employees so that
9     funeral directors were viewed in a positive
10    manner in the community and, therefore, we
11    would receive more business as a result of
12    positive community service, positive impact
13    on the community.
14 Q. Image?
15 A. Image.
16 Q. Not to put words in your mouth. You said
17    he mentioned the importance of community
18    involvement. Did Jerry Tilton ever tell
19    you that some type of community involvement
20    was required of you?
21 A. I do not recall if Jerry Tilton ever used
22    the word "required," but I do know that I
23    was asked what community service I was
24    planning on partaking in, and my goals
25    were as far as what groups I would join or

29

1     what service that I would, or services that
2     I would plan on providing.
3  Q. So would you say community involvement was
4     encouraged?
5  A. Strongly encouraged to include conversations
6     regarding feedback on community service.
7  Q. You mentioned that you also discussed
8     with Mr. Tilton your own goals for community
9     involvement. What did your goals regarding
10    community involvement entail?
11 A. My recollection, I remember speaking about
12    the Loyal Order of the Moose Club, the Elks
13    Club, and just in conversation talking about
14    the Veterans of Foreign Wars Club that I
15    had intended on joining.
16 Q. Were those three organizations you mentioned,
17    were those organizations that you picked and
18    identified?
19 A. Yes, those were.
20 Q. And why was it a goal of yours to become
21    involved in one or more of those three
22    organizations?
23 A. Because the company employed, encouraged
24    community service, several members of my
25    employment had various community service

30

1  organizations. One of them was heavily
2  involved in the Cape Cod baseball league
3  so that she would be a positive image in
4  that aspect. So I felt that it was necessary
5  for me to heavily involve myself so I would
6  be a pillar of the community and I would
7  be respected in the workplace and, therefore,
8  I felt that I would be able to rise in the
9  ranks of the funeral industry.
10 Q. Any particular reason that the three
11 organizations you mentioned, the Moose Club,
12 the Elks Club and the Veterans of Foreign
13 Wars, any particular reason that those
14 organizations interest you?
15 A. No particular reason. Logistically the
16 Moose Club was in my neighborhood and the
17 other clubs were not too far away from my
18 home.
19 Q. Did Jerry Tilton ever give you specific
20 instruction to join a specific organization?
21 A. Not that I recall.
22 Q. Or did he put any other kinds of limitations
23 on what kind of community involvement you
24 should choose?
25     MS. GIFFORD: Objection.

31

1 A. Not that I recall.
2 Q. You said you also discussed community
3 involvement with Jon Blute, is that right?
4 A. Yes.
5 Q. When was the first time you recall discussing
6 it with Jon Blute?
7 A. I would say -- let me rephrase that. I
8 recall discussing with him about my community
9 service involvement when I was transitioning
10 from an apprentice to a licensed funeral
11 director.
12 Q. And what was discussed -- you had mentioned
13 before that you had to interview with Mr.
14 Blute at that time?
15 A. Yes.
16 Q. Is this when you discussed with him your
17 community involvement, during that interview?
18 A. Yes. I spoke with Jon Blute regarding my
19 involvement with the community and how I
20 felt that it would impact the business.
21 Q. What did you say, do you recall?
22 A. I don't recall specifics. I just remember
23 informing him that I was in some various
24 clubs and I felt that by getting my name
25 and face out there, the company would

32

1  benefit by citizens of the community seeing
2  me and seeing that I was a positive role
3  model.
4  Q. And did you offer that information to Mr.
5  Blute or did he initiate the conversation
6  about community involvement?
7  A. I don't recall particularly. However, I
8  do recall there was some sort of an
9  Alderwoods formatted paper that questioned
10 your goals and one of the lines was community
11 service. I don't recall the specifics of
12 that paper, but it was several, it had
13 several different subtopics, and one of
14 them I specifically recall writing that I
15 intended on joining the three organizations
16 that I named prior.
17 Q. And you don't recall what that form was
18 called?
19 A. I do not.
20 Q. Do you recall anything else that was included
21 in that form besides goals for community
22 involvement?
23 A. I don't exactly recall, but I believe that
24 I wrote where I went to school on that
25 paperwork, but I do not recall anything

33

1  specifically.
2  Q. Do you recall when you filled out that form?
3  A. I do not.
4  Q. Or whether it was in connection with a
5  position change or anything else?
6  A. I do not.
7  Q. Did you keep a copy of the form that you
8  completed?
9  A. I do not believe so. However, I may have
10 kept a copy, but if I did, I do no longer
11 have that copy.
12 Q. What else did you discuss with Mr. Blute
13 in that interview?
14 A. In the interview for my position as funeral
15 director?
16 Q. Yes.
17 A. My salary. And when I became a licensed
18 funeral director, I was offered a salary
19 that was a very small raise compared to what
20 I was making before I became a licensed
21 funeral director. I interviewed for the
22 position as a licensed funeral director
23 and in that interview I had to ask for a
24 higher salary, and I was asked to take the
25 pre-need license insurance test, which I

**NETWORK DEPOSITION SERVICES**
**Transcript of Steven Detschner**

11 (Pages 38 to 41)

38

```
1      Hunt --
2         MS. GIFFORD:  Why don't you let
3   her ask the question so we make sure we're
4   clear on the record.
5   Q. I want to know what David Hunt said about
6      getting a pre-need insurance license.
7   A. I specifically remember David Hunt stating,
8      Steve, you need to get your pre-need license.
9      Prior to that he said they're going to pay
10     you 17.50 an hour as a funeral director,
11     and immediately after that he said, but,
12     Steve, you need to get your pre-need license,
13     and I interpreted that as I better get my
14     pre-need license to justify my position.
15  Q. Did David Hunt say that you had to get it
16     by a certain time?
17  A. I do not recall if he gave me a date.
18  Q. Did he say anything would happen if you
19     did not get your pre-need license?
20  A. I do not recall.  I know that my salary
21     was in question regarding that so I don't
22     recall if I was ever threatened or told of
23     an adverse reaction to my not getting a
24     pre-need license.
25  Q. Did David Hunt say why, Steve, you need to
```

39

```
1      get a pre-need license?
2   A. I don't recall the exact conversation, but
3      I know that because I was becoming a
4      licensed funeral director and the rate that
5      they were paying me that I asked for,
6      because the rate was different than what
7      they offered me, that was an issue, but I
8      don't know if there's any further response
9      regarding if I didn't take the test.
10  Q. What does having a pre-need license enable
11     you to do in the funeral industry?
12  A. Sell the pre-need insurance policies for
13     services.
14  Q. If you sold pre-need insurance policies,
15     did you have an opportunity to earn
16     commissions on those sales?
17  A. I was under the impression that I would.
18  Q. Did you get your pre-need insurance license?
19  A. No, I didn't.
20  Q. Why not?
21  A. I left the industry prior to taking any sort
22     of examinations.
23  Q. So you had these conversations with Mr. Hunt
24     and Mr. Blute around June 2004, is that
25     right?
```

40

```
1   A. Yes.
2   Q. And you left the industry, you at least
3      quit full-time, you said, in October 2004?
4   A. Yes.
5   Q. During that time period, did you take any --
6      strike that.  During that time period, did
7      you take any action in pursuit of a pre-need
8      license?
9   A. I purchased the materials, the study
10     materials, and I studied quite often for it.
11  Q. Where did the study materials come from?
12  A. I don't recall the specific origin, but I
13     remember that I went to -- I procured them
14     myself.
15  Q. Did anyone from Alderwoods direct you to
16     purchase a certain set of study materials?
17  A. I do not recall specifically.  I may have
18     received guidance as far as where I could
19     obtain those study materials, but I don't
20     recall anything specific.
21  Q. Did anyone from Alderwoods give you a
22     specific study schedule that you were
23     supposed to follow?
24  A. No.
25  Q. So did you decide to study on your own time?
```

41

```
1   A. Yes.
2   Q. When did you start studying for the pre-need
3      license?
4   A. In October of 2004.
5   Q. Where did you study?
6   A. At home.
7   Q. Did you typically study at a particular time
8      of day?
9   A. Generally, it was in the evening on my
10     scheduled work days.  On my days off, it
11     may have been in the morning or evening.
12     I don't recall specifically.
13  Q. Did you ever study at work?
14  A. No.
15  Q. Did anyone from Alderwoods ever observe you
16     studying for the exam?
17  A. No.
18  Q. Did you ever tell anyone from Alderwoods
19     what you were doing in preparation for the
20     exam?
21  A. Just I gave assurance to David Hunt that I
22     was studying for the exam and I plan on
23     taking it.
24  Q. Did you ever tell Mr. Hunt, for example,
25     I studied for two hours last night in
```

---

**46**

1   what the -- I do not recall at this time
2   what was actually in, associated in the same
3   binder as this so that I found it.
4   Q. Do you know if this position description
5   was included in the Alderwoods binder? Is
6   that what you're telling me? This Alderwoods
7   binder, I know you don't remember the exact
8   title, but you pulled it from that binder?
9   A. From the group of binders.
10  Q. The binder this came from, was it a specific
11  binder for Doane, Beal & Ames and Nickerson
12  Funerals Homes?
13  A. No.
14  Q. Do you know who created this document, who
15  prepared this position description?
16  A. I do not.
17  Q. Did anyone give it to you or did you find
18  it yourself in these binders?
19  A. As I recall, I came across it when looking
20  at different binders.
21  Q. Do you recall when?
22  A. I recall that it was right around when I
23  became a licensed funeral director.
24  Q. So no one had given this document to you
25  before that time?

---

**48**

1   documents may have been in binders at other
2   locations?
3   A. That's correct.
4   Q. The binders that you mentioned you brought
5   this from or pulled this from, there was
6   more than one binder?
7   A. As I recall, there were several, up to four.
8   I don't know the exact number, but there
9   were several binders.
10  Q. And you call them Alderwoods binders, is
11  that right?
12  A. Alderwoods binders, yes.
13  Q. But you don't recall the exact title of
14  the binders?
15  A. No. I just remember the logo. What stands
16  out is the loop in the "woods," it's kind
17  of a distinct loop that connects the O's
18  and, as I recall, there were, they have
19  different colors on them, as I recall.
20  Q. Do you recall seeing any other documents in
21  those binders that had a Doane, Beal &
22  Ames/Nickerson header on them?
23  A. I don't, I don't recall at this time.
24  Q. Did you ever refer to those binders at any
25  other time besides the time when you pulled

---

**47**

1   A. Not that I recall.
2   Q. Did you have any discussions with anyone
3   about this document?
4   A. I don't recall at this time, but it may
5   have been presented at my interview. I
6   certainly recall having it present when I
7   became a licensed funeral director because
8   I presented these documents during my
9   interview.
10  Q. So you don't recall anyone giving them to
11  you. You actually brought them to the
12  interview, is that right?
13  A. As I recall, that's correct.
14  Q. Do you know whether this first position
15  description applied to any other locations
16  besides Doane, Beal & Ames and Nickerson?
17  A. I can't speak for whether it did or not.
18  I don't recall. I mean, I don't believe
19  that this particular document at Doane,
20  Beal & Ames was also at Cuff McGinn Funeral
21  Home, but that's purely speculation. There
22  may have been an identical document there
23  with a different letterhead. I can't comment
24  about that.
25  Q. So you have no basis for knowing what

---

**49**

1   these position descriptions?
2   A. I believe that I did review them on occasion.
3   I remember pulling them out and leafing
4   through them.
5   Q. Where were the binders kept?
6   A. Specifically in each funeral home domicile.
7   I don't recall, but I remember they were on
8   a shelf.
9   Q. In each funeral home they were, there was
10  a copy at each funeral home?
11  A. Yes. There were binders at each funeral
12  home. What was in each binder, I don't know.
13  Q. Was it your understanding that these binders
14  contained Alderwoods policies?
15  A. Yes.
16  Q. Was it your understanding that those binders
17  of documents contained policies that applied
18  to all Alderwoods locations?
19  A. It was my understanding that they were
20  corporate policies controlling all Alderwoods
21  employees.
22  Q. And, to your knowledge, possible that in
23  some instances local documents like Exhibit 1
24  that had the header from Doane, Beal & Ames
25  and Nickerson, may have been added to the

---

54

1      want to call it, in place before this memo.
2  Q. And you said that the memo said that you
3      were required to get pre-approval for
4      overtime, a manager had to sign off. Is
5      that what you said?
6  A. It had to be pre-approved by a manager.
7  Q. Did the memo address payment for overtime?
8  A. I don't recall specifically what the memo
9      stated in addition to just, in addition to
10     the general idea that there had to be
11     approval by management for overtime. If
12     there's anything else in the memo, I don't
13     recall at this time.
14  Q. You don't recall the memo saying that
15     overtime pay would be withheld if you did
16     not have the overtime pre-approved?
17  A. I don't recall. I'm sorry.
18  Q. Do you recall David Hunt saying that overtime
19     pay would be withheld if you failed to get
20     the required pre-approval?
21  A. I don't recall the exact conversation, but
22     the issue was raised that if we didn't get
23     it approved, we didn't get paid for it. If
24     it wasn't sanctioned overtime, then it was
25     on us.

55

1  Q. That issue was raised between you and David
2     Hunt?
3  A. Between me and David Hunt, just as more or
4     less as colleagues than really, you know, I
5     grumbled to him, as him being a manager, but
6     I don't know if he went up to the chain of
7     command with my feelings or with any other
8     employees' feelings on that matter.
9  Q. Did David Hunt tell you that your overtime
10     will not be paid if you don't have it
11     pre-approved?
12  A. I don't recall that exact conversation I
13     had with David at this time. It's been
14     several years so I don't recall.
15  Q. You're not sure one way or the other whether
16     he said that pay would be withheld if you
17     did not have pre-approval?
18     MS. GIFFORD: Objection. I think
19     he said that he described the content, but
20     he's saying he doesn't remember the exact
21     words.
22  A. The general consensus from the conversation
23     that I do remember is that if we didn't
24     get pre-approval, we weren't getting paid,
25     don't bother putting in for it. That was

56

1      just, if I were to, you know -- from what
2      I recall from the conversation, that was
3      the end result, was that if it wasn't
4      pre-approved, we weren't going to get paid
5      for it, don't even, it's not even worth
6      your time to put in for it.
7  Q. That was the understanding you took away
8     from the conversation?
9  A. Yes, yes.
10  Q. But you don't recall exactly what David Hunt
11     said?
12  A. That's correct.
13  Q. Did you discuss the memo with anyone other
14     than David Hunt and possibly Jerry Tilton?
15  A. I recall just, I recall mentioning to a
16     couple of the other employees, a couple of
17     the secretaries, and I don't recall if I
18     had spoke to anybody else. I don't recall
19     exactly who I spoke to.
20  Q. Did the memo say to which employees this
21     applied? Did the memo say that certain
22     employees were required to get pre-approval?
23  A. I don't recall, but I don't think it
24     specifically stated which employees. I
25     think it was just a canvas of all the

57

1      employees that were up there.
2  Q. Did David Hunt or Jerry Tilton make any
3     statements about to which employees this
4     requirement would apply?
5  A. No.
6  Q. Did the memo detail how you were supposed
7     to get pre-approval for overtime?
8  A. I don't recall how long the memo was or what
9     the exact content was. I just remember
10     walking away with the general idea and
11     attitude that we didn't get the -- if we
12     didn't get the overtime pre-approved, don't
13     put in for it, you're not getting paid for
14     it, just deal with it.
15  Q. Did David Hunt give you any specific
16     direction about the procedure that was to
17     be followed to get pre-approval for overtime?
18  A. I don't recall. I don't recall any
19     specific -- I don't recall any specific
20     instruction other than just griping to
21     David about corporation rules, but other
22     than any specifics, I don't recall. I
23     don't remember anything.
24  Q. From that time forward, did you get
25     pre-approval when you needed to work

114

1    A.  I believe, to my recollection, there was
2        the yearly bonus.
3    Q.  Do you personally recall that you received
4        a yearly bonus?
5    A.  It's my recollection that I did.
6    Q.  How many bonuses do you recall receiving?
7    A.  I believe it was at least one for one year.
8        It was a yearly bonus.
9    Q.  Besides that yearly bonus, were there any
10       other types of bonuses that you received?
11   A.  No.
12   Q.  Do you know how the amount of the yearly
13       bonus was determined?
14   A.  I'm not entirely certain.  I believe that
15       it was a percentage of my income.  It was a
16       cost-of-living raise is, I think, what it
17       was also known as, a cost-of-living bonus.
18   Q.  You're not sure how that was calculated?
19   A.  I'm not sure the inner workings of that.
20   Q.  Did you receive any commissions during
21       your employment with Alderwoods?
22   A.  No.
23   Q.  Or any other forms of pay besides your
24       hourly wage, a bonus, any other forms of
25       pay you can recall?

115

1    A.  Just hourly rates and overtime.
2    Q.  Were you ever encouraged to arrive to work
3        before your scheduled start time?
4    A.  There were times, yes.
5    Q.  Can you give an example of a time when you
6        were encouraged to come in before your
7        scheduled start time?
8    A.  I don't recall any specific examples, but
9        there were times when I would arrive half an
10       hour to 15 minutes prior to work to get
11       something ready.
12   Q.  And was that at someone's request that you
13       came in early?
14   A.  Generally it would be a request of one of
15       the supervisors or just the nature of the
16       task for that day if I was required to start
17       off a little earlier.
18   Q.  But you don't recall any specific instances?
19   A.  No, I don't recall anything specific.
20   Q.  Are you aware of any Alderwoods employees
21       being encouraged to come in before their
22       scheduled shift?
23   A.  I can't recall any specific instances.  I
24       can't really speak for any other employees.
25       I'm not certain.

116

1    Q.  Were you ever told not to clock in until your
2        scheduled start time?
3        MS. GIFFORD:  Objection.
4    A.  I've never heard that terminology used
5        before, "clocked in."
6    Q.  Assuming that your day was scheduled to
7        start at 8:00 a.m., were you ever told not
8        to report any time you worked earlier than
9        your 8:00 a.m. start time?
10   A.  I don't recall if it was ever verbalized
11       explicitly not to sign up for additional
12       hours.  If it was a small amount of time,
13       then it was general consensus that you
14       didn't put in for it.  If it was for, say,
15       an example is an hour or more and that was
16       substantial, then you put in for that.
17   Q.  So you don't recall any absolute rule being
18       communicated to you that you can't report
19       time worked before your scheduled start time?
20   A.  Not that I recall.
21   Q.  Were you ever told that you would not be
22       paid for any time after your scheduled end
23       time on the other end of the day?  Were you
24       ever told not to report any time that you
25       stayed after your scheduled end time?

117

1    A.  I don't recall of any explicit conversation
2        regarding not being allowed to put in for
3        minutes worked overtime, but it was general
4        knowledge among myself and other employees
5        that we weren't to put in for inconsequential
6        amounts of time, for example, 20 minutes of
7        time or 19 minutes of time.
8    Q.  At the end of the shift?
9    A.  That's correct.
10   Q.  But, again, you don't recall any specific
11       rule being communicated to you that you were
12       not allowed to report any time after your
13       scheduled end time, is that right?
14       MS. GIFFORD:  Objection.
15   A.  I don't remember any specific rule, to my
16       recollection, at this time.
17       (Exhibit 10 marked for
18       identification.)
19   Q.  I'm handing you the document that's been
20       marked as Exhibit 10.  It is a consent to
21       become a party plaintiff in this case.  Do
22       you recognize this document?
23   A.  It looks familiar.
24   Q.  Does your signature appear on the second
25       page of this document?

122

1   A. To Exhibit 11.  And under the basic
2      information, it says Alderwoods records
3      show that you currently work or since
4      December 8, 2003, have previously worked
5      for Alderwoods as an apprentice funeral
6      director slash embalmer or funeral director
7      and/or location manager paid on an hourly
8      basis.
9   Q. So you felt that statement applied to you?
10  A. I recall that the statements that were
11     solicited to me matched up to my scenario,
12     my individual scenario.
13  Q. What other statements are you referring to
14     that match up to your scenario?
15  A. Regarding overtime.  I remember working
16     overtime.  I can't say with exact certainty
17     what -- I don't recall exactly what the
18     form stated, but I remember looking them
19     over and reading a couple of the lines and
20     thinking that, saying to myself that seemed
21     to fit with what I experienced.
22  Q. So you mentioned that you knew you had
23     worked overtime?
24  A. Right.
25  Q. And since you had worked overtime, you

123

1      thought the suit pertained to you?
2   A. I don't recall the exact wording of it,
3      but I remember that the overtime was
4      mentioned.  I don't know the exact thing.
5      I just remember thinking to myself that
6      some of the bullets in the information
7      seemed to correlate with my situation.
8   Q. Are you referring to any of the bullets on
9      Exhibit 11?
10  A. I'm not entirely certain what my first --
11     when you say Exhibit 11, I'm not even
12     certain if this was the first piece of
13     paper that I received so I can't really
14     comment on -- I can't really comment if I
15     read this Exhibit 11 and agreed with it.
16  Q. Do you believe that you worked overtime
17     for Alderwoods for which you weren't paid?
18  A. Yes.
19  Q. And what is your understanding of the
20     claims in this lawsuit -- strike that.  Is
21     it your understanding that this lawsuit is
22     about unpaid overtime?
23  A. Initially, I don't recollect what I felt
24     initially.  I believe that overtime was
25     one of the components.  I can't say with

124

1      absolute certainty if that was the only
2      thing that stuck out in my mind.  There
3      may have been other issues which I don't
4      recall because I'm not exactly certain
5      exactly what I read and what I thought to
6      myself when I signed up for it.
7   Q. Did you ever bring any complaints or claims
8      against Alderwoods other than the claims
9      raised in this lawsuit?
10  A. I recall mentioning that and speaking with
11     some of the employees and even with David
12     Hunt that we were paid -- we were employees
13     and we were on call and it didn't seem to
14     be fair labor standards that we weren't
15     compensated for being on call even though
16     there was instances where we were on duty,
17     such as answering telephones or carrying
18     on conversations with various agencies
19     while we were on call.
20  Q. So did you raise a complaint to anyone at
21     Alderwoods?
22        MS. GIFFORD:  Do you mean a formal
23     complaint?
24  Q. Formal or informal.
25  A. I did not raise any formal complaints, but

125

1      I raised the issue, as did another employee.
2      I do not recall exactly who it was, but I
3      remember that it was a topic of conversation
4      for a certain period of time.
5   Q. Specifically the issue of on-call work?
6   A. On-call work.
7   Q. You raised that issue with David Hunt, is
8      that right?
9   A. I brought it up with David Hunt.
10  Q. Did you raise any other informal complaints
11     to Alderwoods besides that?
12  A. I may have, and I'm not exactly certain.  I
13     may have mentioned it to Jerry Tilton as
14     well.  I know Jerry Tilton was aware of it,
15     though.
16  Q. You may have raised the on-call complaint to
17     Jerry Tilton?
18  A. I may have mentioned it.  I do not believe
19     that I was the original member that pointed
20     it out.
21  Q. And what exactly did you complain about to
22     David Hunt with respect to on-call work?
23  A. I mentioned that when we were on call, we
24     would spend time on the telephone talking
25     to different family members, newspapers

126

1   regarding obituaries, or even people would
2   call up and ask for information on funerals.
3   And it was the general feeling among all
4   the employees, it was common practice that
5   you only put in when you're on call for when
6   you physically left the building. That was
7   brought up, that if we used the phone on our
8   on-call time, it was on our own, we weren't
9   to put in for time on the telephone when
10  we're on call.
11  Q. We had seen some examples of time that you
12      reported for phone calls made earlier,
13      didn't we? Do you recall?
14  A. I recall looking at one in particular thing.
15  Q. So there may have been some instances where
16      you reported overtime for time spent making
17      phone calls?
18  A. If I was in the building, yes. If I was at
19      home --
20      MS. GIFFORD: When you say in the
21      building, you mean in the funeral home?
22  A. At the funeral home.
23  Q. So you reported phone time if you were in
24      the building?
25  A. Right.

127

1   Q. But you would not report phone time if you
2       were out of the building?
3   A. Correct.
4   Q. And why did you do it that way?
5   A. In certain cases, if it was going to be an
6       hour or more of time, I'd have to come into
7       work and take care of it. If it was ten,
8       15, 20 minutes of a spontaneous call at
9       home when I was on call, we just didn't get
10      paid for that. We got paid if we went out.
11      There's no set method to track telephone
12      conversations when we're out of the building,
13      and when we're off duty even though we were
14      on call.
15  Q. Did anyone instruct you one way or the
16      other as to whether you should report time
17      spent handling phone calls away from the
18      funeral home?
19  A. I do not recall specifically myself speaking
20      with anyone and being the subject of a
21      conversation, but I know that another
22      individual raised the issue of, that they
23      were on the telephone with a family for an
24      extended amount of time and they weren't
25      compensated for it.

128

1   Q. Who was on the phone for an extended amount
2       of time?
3   A. The individual I recall is Bridget Murphy.
4       Other than that, I just don't recall.
5   Q. What do you recall Bridget Murphy saying?
6   A. I just recall Bridget Murphy complaining
7       that she had spoken with Jerry about that
8       she was on the telephone for an extended
9       period of time and that she felt she should
10      get paid for being on the telephone.
11  Q. So Bridget told you that Bridget told
12      Jerry that she'd been on the phone for a
13      long time?
14  A. Bridget was -- I was in the same room when
15      Bridget was speaking with employees. Jerry
16      may have been present. She may have been
17      speaking directly to Jerry or she made just
18      referenced in the conversation that she had
19      with Jerry. I'm not very certain on the
20      exact nature of the conversation or who was
21      present in the room.
22  Q. But you got the impression that Bridget
23      Murphy had complained to Jerry Tilton about
24      a long time that she spent on the phone
25      conversation?

129

1   A. Yes.
2   Q. And did Bridget tell you what Jerry, how
3       Jerry responded?
4   A. I don't recall the exact nature, but I
5       remember the end result was that she was
6       not going to be compensated for it.
7   Q. But you don't know what Jerry Tilton actually
8       said?
9   A. I don't know if she was paid. I don't know
10      what specifically Jerry said to her.
11  Q. So you have no personal knowledge of any
12      manager telling any employee that you are
13      not allowed to report time spent in phone
14      calls while away from the funeral home?
15      MS. GIFFORD: Objection. Go ahead.
16  A. I don't recall if I've ever heard that
17      particular statement.
18  Q. Or specific directive?
19  A. Yeah.
20  Q. Do you know whether any employees did report
21      time that they spent handling phone calls
22      away from the funeral home?
23  A. I don't know what was reported by other
24      employees.
25  Q. Did you personally ever report time that

**NETWORK DEPOSITION SERVICES**
**Transcript of Steven Detschner**

178

1   A. No.
2   Q. So anything you attended for the Moose Club
3      or Elks Club at a dinner event would have
4      been outside of your workday?
5   A. That's correct.
6   Q. When did you join the Elks Club?
7   A. To my recollection, it was roughly around
8      the same time that I joined the Moose Club.
9   Q. So you believe it was prior to becoming a
10     funeral director in June 2004, but you're
11     not sure beyond that?
12  A. It was prior to me becoming a funeral
13     director.
14  Q. Were you already employed by Alderwoods at
15     the time that you joined the Elks Club?
16  A. I was employed and then I joined those
17     organizations.
18  Q. Are you still involved in the Elks Club
19     today?
20  A. No.
21  Q. When did you stop participating in the Elks
22     Club?
23  A. I'm not sure of the exact amount of months,
24     but it was a couple of months later, half a
25     year later. I'm not exactly certain.

179

1   Q. Half a year later, meaning you were a member
2      of the Elks for a total of six months,
3      approximately?
4   A. It's possible it could have been less.
5   Q. Six months or less you were a member of the
6      Elks Club?
7   A. I may have been for up to a year. I pay
8      the year membership, but I don't remember
9      how many months successively I was active
10     in participating.
11  Q. Did you quit the Elks Club before you quit
12     the Moose Club?
13  A. I stopped participating in both organizations
14     roughly around the same time.
15  Q. So you may have -- I thought previously
16     you testified that you were a member of the
17     Moose Club for a year.
18  A. I had a year membership.
19  Q. And you stopped participating in both
20     organizations at approximately the same time?
21  A. It's probably an accurate statement.
22  Q. And that may have been less than six months?
23  A. It could have been. It could have been
24     more. I don't recall. Are you talking
25     about participation?

180

1   Q. Yes, time you actually spent engaged in some
2      activity with these clubs.
3   A. Probably less than six months.
4   Q. For both the Elks and Moose Club?
5   A. Yes.
6   Q. Aside from the dinners with the Elks Club,
7      were there any other Elks club activities you
8      participated in?
9   A. I don't recall anything in particular.
10  Q. Why did you choose the Elks Club?
11  A. It was located in Hyannis and there's --
12     Elks is predominately members of the elderly
13     community and I wanted to get involved with
14     the elderly community.
15  Q. Looking back to Exhibit 13, the statement
16     in Part A, the very first part says, "I
17     believe that as part of my job duties for
18     Alderwoods, the company permitted me to
19     perform community service." During your
20     employment with Alderwoods, did you perform
21     any community service that wasn't part of
22     your job duties for Alderwoods?
23        MS. GIFFORD: Objection. Go ahead.
24  A. I did community service that was not part
25     of my job duties.

181

1   Q. What was that? What community service did
2      you do that was not part of your job duties?
3   A. Anything that didn't directly relate to
4      removal or transfer of dead human bodies
5      and funerals was in addition to my, was
6      community service. So all my community
7      service was, I did it under the understanding
8      that I was being a representative of the
9      Doane, Beal & Ames and Nickerson Funeral
10     Homes and I knew that it was after my, off
11     my work hours.
12  Q. I asked you previously if you did any
13     community service during your employment
14     with Alderwoods that was not part of your
15     job duties for Alderwoods.
16        MS. DUGAN: And can you read back
17     the answer to that question?
18        (Record read)
19  Q. What I'm trying to understand is do you
20     contend that any and all community service
21     that you performed was part of your job
22     duties for Alderwoods?
23        MS. GIFFORD: Objection.
24  A. It was part of my -- it was part of what was
25     expected of me as a member of Doane, Beal &

**NETWORK DEPOSITION SERVICES**
**Transcript of Steven Detschner**

182

1    Ames Funeral Homes.
2  Q. So you never did anything in the community
3    or did any volunteer work that you just
4    personally decided to do that was unrelated
5    to Alderwoods?
6        MS. GIFFORD: Are we talking at the
7    time he was employed there?
8  Q. Yes, during your employment. Did you ever
9    personally on your own get involved in the
10   community in a way that was unrelated to
11   Alderwoods?
12 A. I mean, there are certain times that the
13   Elks Club, that I didn't every minute say
14   I was a member of the community, but, I mean,
15   on the outlying pretense of why I joined
16   was to be a representative. What I did was
17   I volunteered there as Steve Detschner who
18   worked at Doane, Beal & Ames Funeral Homes,
19   he's a funeral director.
20 Q. So you're saying Alderwoods was the impetus,
21   the reason you got involved in the first
22   place?
23 A. I joined these groups because I was told
24   that community service was highly expected
25   from their employees and it was strongly

183

1    encouraged.
2  Q. Are you seeking compensation in this lawsuit
3    for all of the time that you spent in any
4    Moose Club or Elks Club activity?
5  A. I'm seeking compensation for -- I don't know
6    how to answer for all time.
7  Q. For example, if you were at an Elks Club
8    fish fry that you attended for two and a
9    half hours, do you claim that you're entitled
10   to compensation for the full two and a half
11   hours that you spent at the Elks Club fish
12   fry?
13 A. I don't know how to break down -- I wouldn't
14   know how to break down the time that I
15   spent there.
16 Q. I don't either.
17 A. I'm sorry, but I don't really know how to
18   answer that question because it's difficult.
19       MS. GIFFORD: She's not asking
20   about how much time you spent. What she's
21   saying was all that time that you're seeking
22   to recover in the lawsuit, whatever the
23   amount is.
24 A. I wouldn't be a member of those organizations
25   if it hadn't been for me wanting to be a

184

1    positive member, a team player in the funeral
2    home. I wouldn't have done any of those
3    things if I hadn't received feedback from
4    my managers regarding my community service
5    and I wouldn't have done any of that if the
6    issue was never raised.
7  Q. I understand. That was your motivation
8    for getting involved in the first place,
9    correct?
10 A. Right.
11 Q. What I'm asking is was any of the time
12   that you spent at Moose Club or Elks Club
13   activities purely personal social time
14   for which you are not seeking to be
15   compensated?
16       MS. GIFFORD: Objection. Go ahead.
17 A. I'm not demanding to be compensated for
18   every second that I was at the different
19   functions, but I did join those clubs and
20   participate in those functions because I was
21   an employee of Doane, Beal & Ames and I
22   wanted to be a representative of them while
23   in those organizations.
24 Q. Okay. Did anyone at Alderwoods specifically
25   instruct you to join the Moose Club and the

185

1    Elks Club in particular?
2  A. I was not solicited by any members of my
3    company to join those particular
4    organizations. However, I was asked what
5    I was, what my plan was for community
6    service, if I was going to join any clubs.
7  Q. Did anyone from Alderwoods tell you what
8    the consequences would be if you did not
9    get involved in the community?
10 A. The consequences were not laid out verbally
11   or written.
12 Q. Did you believe that you could be fired if
13   you failed to join one of these clubs or
14   otherwise get involved in the community?
15       MS. GIFFORD: Objection.
16 A. I felt that I needed to do my part in
17   whatever ways that I could in order to
18   receive positive feedback from my employers
19   as well as my evaluations took place, that
20   was brought up as well, and I wanted to
21   have something positive for a portion of
22   the evaluations.
23 Q. Did you believe you could be fired if you
24   failed to get involved in the community?
25       MS. GIFFORD: Objection.

190

1   A. I don't know if that's how she fulfilled
2      it, but she felt fulfilled.
3   Q. Do you know if she participated in any
4      other community activities?
5   A. I don't know of anything from my
6      recollection.
7   Q. Did Alan Edwards belong to any community
8      organization?
9   A. I don't know. I don't recall if he had
10     ever spoken to me about anything.
11  Q. Did Jeffrey Antoine belong to any community
12     organizations?
13  A. Jeffrey Antoine was a member of the Elks.
14  Q. Did he do anything else in the community,
15     to your knowledge?
16  A. He did a lot of different community
17     organizations, but I don't know exactly what
18     they were, but he talked about community
19     service a lot.
20  Q. Mr. Antoine was a maintenance man, is that
21     right?
22  A. Yes.
23  Q. Were maintenance employees expected to be
24     involved in the community as part of their
25     job with Alderwoods?

191

1   A. I don't know what maintenance personnel
2      were required to do.
3   Q. Were any employees other than funeral
4      directors expected to get involved in the
5      community as part of their job for
6      Alderwoods?
7   A. I don't know what other employees besides
8      myself were expected to do. I can't
9      reasonably say that Bridget Murphy was
10     expected because I wasn't privy to any
11     conversations that she had with her manager.
12  Q. So this may have been an expectation
13     individual to you? You don't know that
14     that expectation was conveyed to the other
15     funeral directors, is that right?
16        MS. GIFFORD: Objection.
17  A. I don't know what was individually conveyed
18     to each member.
19  Q. And you don't --
20  A. But it was a topic that community service
21     is something we should all do.
22  Q. That was conveyed to you personally?
23  A. It was conveyed to me that it was something
24     that would help me and help the company.
25  Q. Do you have any basis for knowing whether

192

1      that expectation was conveyed to any other
2      employee?
3   A. I can't cite any specific conversation
4      where an individual told me that they were
5      required to do community service, but I
6      know everybody from time to time spoke
7      about different community service, so I
8      don't know.
9   Q. You have no basis for knowing whether any
10     other employee was told that he was expected
11     to get involved in the community?
12        MS. GIFFORD: Objection.
13  A. I can't recall if there was ever a
14     conversation or even a meeting regarding
15     community service or follow-up or feedback,
16     so I don't recall.
17  Q. So you don't know if that was conveyed to
18     anyone other than you?
19  A. I can't recall if I had ever -- I can't
20     confirm that because I can't recall if there
21     was ever a conversation.
22  Q. Okay. Charlene Goudreault, perhaps?
23  A. Yes.
24  Q. Was she a member of a community organization,
25     to your knowledge?

193

1   A. I don't know. I don't recall.
2   Q. Do you know if she did anything in the
3      community?
4   A. I don't recall.
5   Q. James Mendes, do you know if he was involved
6      in the community in any way?
7   A. He spoke of being a Lion's Club member,
8      but that's the extent.
9   Q. Did you ever hear of any employee being
10     disciplined in any way for failing to get
11     involved in the community?
12  A. Not that I know of.
13  Q. Did anyone at Alderwoods ever ask you to
14     report on the various things you did in
15     the community?
16  A. Alderwoods instituted a career, a community
17     service rewards program, of the title I'm
18     not aware, but in that program we were
19     encouraged to submit any sort of community
20     service that we did and a point system was
21     calculated and different activities were
22     given different points.
23  Q. Aside from this rewards system, were you
24     asked to report on what you did in the
25     community in any other way?

Case3:08-cv-01184-SI Document188-17 Filed09/28/09 Page60 of 66
NETWORK DEPOSITION SERVICES
Transcript of Steven Detschner

50 (Pages 194 to 197)

194

1  A. The only thing that I remember is, going
2  back several hours ago I made mention that
3  I wrote on some sort of a form that I was
4  a member of two different various clubs and
5  I attended and joined the VFW.
6  Q. Right.
7  A. Documentarily-wise, I would submit like a
8  paper saying that I participated in a
9  certain thing and then Jerry would give me
10  a points card that was redeemable for various
11  things, whether they were gift certificates
12  or -- I don't recall exactly what the
13  nature of the point system calculator was.
14  Q. You say you reported that information to
15  Jerry, did you say?
16  A. Jerry.
17  Q. What exactly did you report to him?
18  A. Just that I did some community service,
19  I would write it down and give him the
20  piece of paper.
21  Q. Can you give me an example of what kind
22  of description you would give or an example
23  of something you would report?
24  A. The VFW fish fry, I did that on Friday night
25  and it was two and a half hours long.

195

1  Q. Would you report to Jerry how much time you
2  spent at the activity?
3  A. I recall that I did, but I don't recall
4  that he was concerned with the particular
5  amount of hours that I spent, just that I
6  did that.
7  Q. Did you report any of the time you spent in
8  these community activities on your time
9  sheets?
10  A. No.
11  Q. Why not?
12  A. It would be ludicrous to do that. It would
13  be absolutely -- I would be the only guy in
14  the house doing that.
15  Q. Why?
16  A. Because that wasn't something we did. It
17  was something that we knew better not to
18  document.
19  Q. Do you personally think it would be ludicrous
20  to report time, for example, spent at a fish
21  fry on your work time sheet?
22    MS. GIFFORD: Objection.
23  A. I don't know what the underlying reason
24  why --
25  Q. I'm asking you about your personal opinion.

196

1  I said why didn't you report it. You said
2  it would be ludicrous. You personally think
3  it would be ludicrous to report that time?
4    MS. GIFFORD: Objection.
5  A. I see no reason why time spent in the
6  interest of bettering a company could not
7  be compensatedable.
8  Q. So why would it be ludicrous to report that
9  time on your time sheet?
10  A. It was not something that we did at the
11  company across the board.
12  Q. If you thought that was something that
13  you should be compensated for, did you say
14  anything to anybody to that effect?
15  A. No. I didn't want to make any trouble.
16  Q. Did anyone instruct you one way or the
17  other whether you should report that time
18  on your time sheet?
19  A. I was never instructed to document any sort
20  of time on a time sheet.
21  Q. Were you ever instructed not to report
22  community service time on your time sheets?
23  A. Not in so many words.
24  Q. Did you ever try to report time that you
25  spent in community activities?

197

1  A. Can you repeat that? Did I ever try to?
2    MS. DUGAN: Can you read that back,
3  please?
4    (Question read)
5  A. I reported it to Jerry so that I could get
6  the points or so he would give me points.
7  Q. Did you ever seek compensation for that time?
8  A. Not on, not via the overtime rate.
9  Q. You never reported that time on your time
10  sheets?
11  A. That's correct.
12  Q. Is that what you're saying?
13  A. That's correct.
14  Q. And you never said to anyone, hey, I'm
15  doing this stuff on behalf of the company,
16  I think I should be paid for it?
17    MS. GIFFORD: Objection.
18  A. I never raised an issue about it.
19  Q. And no manager ever specifically prohibited
20  you from reporting time spent in community
21  activities?
22    MS. GIFFORD: Objection.
23  A. I was never hindered from doing community
24  service.
25    MS. DUGAN: Can you read back my

198

1    question, please?
2         (Question read)
3    A. I don't recall ever being prohibited.
4    Q. Do you know whether any other employees
5       reported on their time sheets time that
6       they spent in community work?
7    A. Not to my knowledge.
8    Q. You don't know one way or the other whether
9       they did?
10   A. I don't believe anybody did, but I have no
11      documentation support other than the fact
12      that we knew we were doing it on our own
13      time.
14   Q. So you have no first-hand knowledge as to
15      whether anyone else was reporting that
16      time on their time sheets?
17        MS. GIFFORD: Objection.
18   A. I have no way of tracking their time sheets.
19   Q. Whenever you reported activities to Jerry
20      Tilton in connection with the rewards
21      program, did you keep any personal record
22      of the activities that you reported to him?
23   A. It may have been on a pocket calendar that
24      I had, but other than that, I didn't keep
25      any sort of documentation.  It was my

199

1    understanding that it wasn't something
2    that would be paid for and I certainly wasn't
3    expecting compensation for it, so I didn't
4    document it for the purpose of getting
5    compensation for it.
6    Q. Do you know if anyone, any other employee
7       raised the issue of compensation for
8       community work during your employment at
9       Alderwoods?
10   A. I don't.
11   Q. If you had, other than an entry on a personal
12      calendar, would you have any other record
13      of time that you spent involved in community
14      activities?
15   A. No.
16   Q. Do you know that such an entry in a calendar
17      existed or was that just a speculation?
18   A. If it did, it was only scribbled down so
19      that I remembered to attend.  It wasn't for
20      tracking purposes.  It could even be on a
21      scrap of three-by-five card that I shoved
22      in my pocket.
23   Q. So you have no records that you would have
24      saved of the activities you were involved in?
25   A. No.

200

1    Q. Did you receive performance evaluations
2       during your employment with Alderwoods?
3    A. Yes.
4    Q. How frequently did you receive a performance
5       evaluation?
6    A. I don't recall the nature and frequency of
7       them, but I know that I received at least
8       one.
9    Q. Do you recall in what year that performance
10      evaluation was?
11   A. I believe it was in 2004, probably a year
12      after I had been employed, but I don't know
13      exactly when it was.
14   Q. Who evaluated you?
15   A. Jerry Tilton.
16   Q. Did he evaluate you at that time on your
17      involvement in the community?
18   A. It was raised, the issue was raised up.
19   Q. How was the issue raised in your performance
20      evaluation?
21   A. I was asked what I did.  I remember filling
22      out that form saying what I was a member
23      of and what my goals were and I remember
24      talking about my goals, and I remember
25      explaining, being asked to explain how

201

1    that would correlate to being a funeral
2    director.  I remember speaking to Jerry
3    that it would help out business by having a
4    representative in Yarmouth.
5    Q. Do you recall that conversation being
6       specifically in the context of your
7       performance evaluation?
8    A. It was during my evaluation.
9    Q. It was.  Okay.  Was it during your evaluation
10      that you filled out that form where you
11      said you noted your memberships?
12   A. I can't say with absolute certainty, but I
13      believe my recollection serves me that I
14      may have filled out something at the time.
15   Q. Going back to the rewards program you
16      mentioned, what was it called?  What did
17      you call it?
18   A. I don't know the name of the -- I don't
19      know the name of it.
20   Q. Who created it?  Who put it into place?
21   A. It was instituted by Alderwoods, but Jerry
22      was the one that was promoting it.
23   Q. How do you know where Jerry got it from?
24   A. Just it had, if I recall, it had Alderwoods
25      on the back of the little cards.  They were

EXHIBIT 71

1

1            UNITED STATES DISTRICT COURT

2         WESTERN DISTRICT OF PENNSYLVANIA

3

4    DEBORAH PRISE and HEATHER RADY
     on behalf of themselves and all
5    employees similiarly situated,

6              Plaintiffs,

7       vs.

8    ALDERWOODS GROUP, INC., and SERVICE
     CORPORATION INTERNATIONAL,
9
               Defendants.
10   ———————————————————————————————————————

11   Civil Action No. 06-1641

12

13

14

15

16                    DEPOSITION OF JEFFREY DIGGS

17              Taken April 22, 2009
                Commencing at 9:30 a.m.

18      Volume I - Pages 1 - 153, inclusive

19

20

21              Taken by the Defendant
                       at
                   LANE POWELL
22         301 W. Northern Lights Blvd.
           Anchorage, AK  99503

23

24

25   Reported by: Susan J. Warnick, RPR

34

1  time?
2  A  Went to Evergreen.
3  Q  You started to work for Evergreen in May of '04?
4  A  Actually June 1st of '04.
5  Q  And what were you hired by Evergreen to do?
6  A  Funeral director/embalmer.
7  Q  And when did you stop working for Evergreen?
8  A  May of '05.
9  Q  Where did you go to work after Evergreen?
10  A  Anchorage Funeral Home.
11  Q  And when did you start working again for Anchorage
12  Funeral Home?
13  A  May of '05.
14  Q  They employed you again as a funeral
15  director/embalmer?
16  A  They did.
17  Q  How long did you work for Anchorage the second time?
18  A  Three months.
19  Q  I'm sorry.  Three months?
20  A  Yeah.
21  Q  So you left around August, September of '06 [sic]?
22  A  Uh-huh.
23  Q  Why did you leave Anchorage?
24  A  Went to work for State of Alaska.
25  Q  So you started working then for State of Alaska in

35

1  October '06?
2  A  Yeah.
3  Q  What did they hire you to do?
4  A  Autopsy deener (ph).
5  Q  Autopsy what?
6  A  Deener.  Autopsy assistant.
7  Q  I'm sorry.  I'm not familiar with that term.  Is that
8  d-i-n-e-r or --
9  A  I don't know how you spell it.  It's an old term.
10  Assistant is better.
11  Q  Are you working there now?
12  A  No.
13  Q  How long did you work at the State of Alaska?
14  A  Two months.
15  Q  Was there a reason why you left?
16  A  Yeah.
17  Q  What was that?
18  A  I was fired.
19  Q  What were you fired for?
20  A  Alcohol related.
21  Q  Did you go to work after working for the State of
22  Alaska?
23  A  I did.
24  Q  Where did you next get employment?
25  A  I went through Personnel Plus, temporary company.

36

1  Q  Did they send you on various jobs?
2  A  Sent me to Witzleben's.
3  Q  I'm sorry?
4  A  Witzleben's.
5  Q  The name of the agency?
6  A  Witzleben Funeral Home is where they sent me to.
7  Q  Oh, I see.  But you were sent there as a temporary
8  employee from Personnel Plus?
9  A  Correct.
10  Q  What did you do for Witzleben?
11  A  Funeral director/embalmer.
12  Q  When did you start doing that?
13  A  That would have been January of '06.
14  Q  That's when you started working at Witzleben?
15  A  Through the temporary service.
16  Q  Was that the first job you got through the temporary
17  service?
18  A  Yeah.
19  Q  How long did you work at Witzleben?
20  A  Until April.
21  Q  '06?
22  A  Uh-huh.
23  Q  And why did you leave Witzleben?
24  A  Tore up my shoulder.
25  Q  To work your shoulder?

37

1  A  Tore up my shoulder.
2  Q  Oh, tore up.  I'm sorry.
3      And that prevented you from performing your
4  duties there?
5  A  It did.
6  Q  Have you received any other employment after
7  Personnel Plus?
8  A  Yes.
9  Q  Where did you go to work next?
10  A  Now I work at Alaska Oncology and Hematology clinic.
11  Q  When did you start working there?
12  A  November of '07.
13  Q  And what are you doing for them?
14  A  I'm a medical assistant.
15  Q  And you're still presently employed with them?
16  A  Yes.
17  Q  Any other funeral-related industry employment that
18  you have not identified?
19  A  No.
20  Q  I want to kind of go back and now focus on pretty
21  much Evergreen at this point, concerning the employment
22  issues.
23      MR. FORESTIERE:  Let's mark this as the next
24  exhibit, No. 2.
25      (Exhibit 2 was marked.)

**NETWORK DEPOSITION SERVICES**
**Transcript of Jeffrey Diggs**

74

1  BY MR. FORESTIERE:
2  Q  Have you ever written any documents and sent them to
3  anyone at Evergreen complaining about not being paid for
4  all the time that you worked at Evergreen?
5  A  No.
6      MR. LINGLE: Object to the form.
7      THE WITNESS: Sorry.
8  BY MR. FORESTIERE:
9  Q  Did you ever prepare and send any documents to anyone
10  at Evergreen for not being paid for the on-call services
11  you performed?
12      MR. LINGLE: Object to the form.
13      THE WITNESS: No.
14  BY MR. FORESTIERE:
15  Q  Did you ever prepare and send any documents to anyone
16  at Evergreen concerning not being paid all of the time
17  that you worked at Evergreen's?
18      MR. LINGLE: Object to form.
19      THE WITNESS: No.
20      MR. FORESTIERE: Why don't we take a break.
21      (Recess taken.)
22  BY MR. FORESTIERE:
23  Q  Did you ever consider calling the confidential help
24  line concerning your not being paid all the hours that you
25  worked at Evergreen?

75

1  A  No.
2      MR. LINGLE: Object to the form.
3      MR. FORESTIERE: Let's mark this next.
4      (Exhibit 6 was marked.)
5  BY MR. FORESTIERE:
6  Q  Exhibit 6 is a three-page document identified ALD 1
7  through 3. It's an excerpt from the 2004 Alderwoods
8  Funeral Home Procedures and Cemetery Procedures Manual.
9      Have you had an opportunity to take a look at
10  that document, Mr. Diggs?
11  A  Yes.
12  Q  Are you familiar with this document?
13  A  No.
14  Q  The second sentence of the first paragraph states,
15  quote, "The time card/sheet must show the time the person
16  begins work, the time they break for lunch, the time they
17  return from lunch, and the time they end work for the
18  day," end quote. Do you see that?
19  A  I do.
20  Q  Was that your understanding as to how you were to
21  fill out your time cards while you performed work at
22  Evergreen?
23  A  It's my understanding you clock in, you clock out,
24  you clock back in, you clock out.
25  Q  So you clock in when you come to work; correct?

76

1  A  Yes.
2  Q  And then you clock out for lunch; correct?
3  A  If you took it.
4  Q  And then, if you took a lunch and you came back, you
5  clocked in?
6  A  Yes.
7  Q  And then you clocked out at the end of the day?
8  A  Yes.
9  Q  The second sentence there, the first bullet point, it
10  says, quote, "All employees must record all hours actually
11  worked unless exempt." Do you see that?
12  A  Yes.
13  Q  Did you understand that you were required to report
14  all the hours that you -- to work at Evergreen?
15      MR. LINGLE: Object to the form.
16      THE WITNESS: Yes.
17  BY MR. FORESTIERE:
18  Q  Lower on the page, fourth bullet point, it says, "If
19  an employee is eligible for and receives piece work pay,
20  the employee is still required to record the actual time
21  worked." Do you see that, sir?
22  A  I do.
23  Q  And was that your understanding as to recording time
24  when you performed piece work?
25  A  No.

77

1  Q  What was your understanding as to recording time when
2  you performed piece work?
3  A  That that was a flat rate, piece work.
4  Q  And what was your understanding as to it being a flat
5  rate piece of work?
6  A  A removal was $35.
7  Q  So every time you did a removal, you were paid $35?
8  A  Correct.
9  Q  And you were paid that amount regardless of the
10  amount of time it took to perform the removal?
11  A  Correct.
12  Q  And that's why it's referred to as a flat rate:
13  Because it doesn't matter how much time it took to do it,
14  you're only going to get paid X amount?
15  A  That's what it says, yes.
16  Q  And that's what your understanding was?
17  A  Flat rate, $35 per removal.
18  Q  Correct?
19  A  Correct.
20  Q  Now, who generally set your work schedule while you
21  were performing your duties at Evergreen?
22  A  Scott.
23  Q  Mr. Janssen?
24  A  Yes.
25  Q  How was that done? Did he perform a schedule for you

Case3:08-cv-01184-SI   Document188-17   Filed09/28/09   Page66 of 66
**NETWORK DEPOSITION SERVICES**
**Transcript of Jeffrey Diggs**

32 (Pages 122 to 125)

122

1 policy.
2 BY MR. FORESTIERE:
3 Q  Have you ever calculated the amount of hours that
4 you're claiming for work that you performed doing this
5 on-call work that you were not paid?
6 A  I believe I guesstimated 10 hours.
7 Q  For what period of time?
8 A  Per month.
9 Q  For every month that you were employed at Evergreen?
10 A  Yes.
11 Q  And that's just based solely on your recollection?
12 A  Yes.
13 Q  There's no documents to corroborate that number;
14 correct?
15 A  Not that I'm aware of.
16    (Exhibit 13 was marked.)
17 BY MR. FORESTIERE:
18 Q  We've marked as Exhibit 13 documents identified as
19 ALD 4 through 8, entitled, "Hours of Work and Overtime,"
20 excerpts from the Alderwoods Group policy manual.
21    Mr. Diggs, if I could direct you on page six,
22 dealing with the on-call provisions there.  Have you had
23 an opportunity to read that section, sir?
24 A  Yes.
25 Q  Let's see here.  The second sentence on that Section

123

1 G states, quote, "On-call time is normally compensable
2 only when the employee is actually working," end quote.
3    Do you see that?
4 A  I do.
5 Q  Was that your understanding as to how you were to be
6 compensated for your on-call work?
7    MR. LINGLE: Object to the form.
8    THE WITNESS: It was my understanding to be paid
9 for my on-call work was a flat fee of $35 per removal.
10 That was my understanding.
11 BY MR. FORESTIERE:
12 Q  The second sentence says, "Employees scheduled for
13 on-call duty are not required to remain on the company
14 premises."  Do you see that?
15 A  I do.
16 Q  And that was your understanding as far as performing
17 on-call duties; correct?
18 A  Sure.
19 Q  And it also says, "Are not required to be confined in
20 their homes or any particular place."
21    That was true, too; isn't it?
22 A  For on-call removal, yeah.
23 Q  And it also states that -- the second sentence
24 here -- "On-call employees are required to not consume
25 alcohol or other intoxicants."  You understood that?

124

1 A  Yes.
2 Q  And then a little lower it says, quote, "When the
3 employee is called back to work during the on-call time,
4 the employee will be paid at the employee's appropriate
5 pay rate."  And then it says, "See call-back section
6 below."  Do you see that?
7 A  I do.
8 Q  Did you have that understanding regarding the
9 compensation for your on-call work?
10    MR. LINGLE: Object to the form.
11    THE WITNESS: My understanding of the on-call
12 work was a flat fee of $35.
13 BY MR. FORESTIERE:
14 Q  And then it next states, "In all instances it's the
15 employee's responsibility to clock in when called in to
16 work and clock out when the work assignment was complete."
17 Did you see that?
18 A  I see it now, yeah.
19 Q  I understand.
20    And is it your testimony that you were not
21 required to do that because you were paid a flat rate of
22 $35?
23    MR. LINGLE: Object to the form.
24    And on top of that, I don't -- you're asking him
25 based on this manual?  And it's 2006, after his employment

125

1 ended.
2    MR. FORESTIERE: I'm not asking him whether he's
3 seen the document; I'm not asking whether it's in effect.
4 My question is whether that's his understanding at the
5 time he was performing his duties.
6    MR. LINGLE: Well, that's why I asked if it was
7 based on the manual.  Because the manual was not in place,
8 based on the date on here, when he was actually employed.
9    MR. FORESTIERE: I understand that.
10 BY MR. FORESTIERE:
11 Q  Do you understand my question?
12 A  Can you repeat that?
13 Q  That last sentence basically said that it's your
14 responsibility to clock in and out when you perform these
15 on-call duties.
16    Is it your understanding that you were not
17 required to do that because you were paid a flat rate of
18 $35 for each removal?
19    MR. LINGLE: Object to the form.
20    THE WITNESS: It was my understanding not to
21 clock in or out for removal.
22 BY MR. FORESTIERE:
23 Q  And why was that?
24 A  It is flat rate.
25 Q  The next paragraph, it says, "When a nonexempt