# EXHIBIT 72

**NETWORK DEPOSITION SERVICES**
**Transcript of Stephen Escobar**

1

```
1              THE UNITED STATES DISTRICT COURT

2          FOR THE WESTERN DISTRICT OF PENNSYLVANIA

3

4       -----------------------------

5   DEBORAH PRISE and HEATHER       )

6   RADY on behalf of themselves    )

7   and all employees similarly     )

8   situated,                       )

9           Plaintiffs,             ) Civil Action No. 06-1641

10      vs.                         )

11  ALDERWOODS GROUP, INC.,         )

12          Defendant.              )

13      -----------------------------

14

15

16

17          Deposition of STEPHEN ESCOBAR, taken at

18          1312 McHenry Avenue, Modesto,

19          California, commencing at 10:06 a.m.,

20          Wednesday, March 11, 2009, before

21          Amanda J. Dunn, California CSR No. 13336.

22

23

24

25  PAGES 1 - 177
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Stephen Escobar**

37

1      Q.   And it says, Termination Reason:  Personal."

2           Do you see that?

3      A.   Yes.

4      Q.   And then "Remarks," it says, "Stephen found

5  another job."

6      A.   Yes.

7      Q.   Is that correct?

8      A.   Yes.

9      Q.   What job did you find?

10     A.   I was working help desk for Quicken -- or STS

11  International with my brother-in-law in Milpitas.

12     Q.   It also said at the time that you left you were

13  making $13 an hour; is that true?

14     A.   Yes.

15     Q.   At the time that you started actually working

16  for -- strike that.

17          At the time that you actually started working

18  at Lakewood Funeral Home, who did you understand was

19  your employer?

20          MR. LINGLE:  Object to the form.

21          THE WITNESS:  Alderwoods and Lakewood.

22  BY MR. FORESTIERE:

23     Q.   Do you recall what the name was on your payroll

24  check?

25     A.   I believe it was Alderwoods.

**NETWORK DEPOSITION SERVICES**
**Transcript of Stephen Escobar**

1    on whether you worked the weekends?

2        A.    Yes.

3        Q.    And I think you indicated that you didn't have

4    any discussion with him concerning overtime prior to

5    your being hired, correct?

6        A.    That is correct.

7        Q.    Did you have any discussions with Mr. Webb

8    concerning performing any community service?

9        A.    Yes.

10       Q.    What was your discussion about that matter?

11       A.    They came out with a program, I guess in

12   January 2004, that they wanted us to network with the

13   community.

14       Q.    So prior to being employed, you didn't have

15   that discussion with Mr. Webb, correct?

16       A.    That is correct.

17       Q.    Because it didn't exist at that time?

18           MR. LINGLE:  Object to the form.

19   BY MR. FORESTIERE:

20       Q.    Let me ask it this way.

21           You stated, I think, that, quote, they came out

22   with that policy in January of 2004, correct?

23           MR. LINGLE:  Object to the form.  That's not

24   what he said.

25           MR. FORESTIERE:  You can make your objection,

**NETWORK DEPOSITION SERVICES**
**Transcript of Stephen Escobar**

1    Counselor.

2         MR. LINGLE:  Then don't misstate what he said.

3         MR. FORESTIERE:  Okay.  I can state my

4    questions the way I want.

5         MR. LINGLE:  Well, you can state your

6    questions, but you can't misstate what his testimony --

7         MR. FORESTIERE:  You can make your objection

8    and --

9         MR. LINGLE:  I'm telling you, do not misstate

10   his testimony.

11        MR. FORESTIERE:  Can you read back what he

12   stated in the question about coming out in January of

13   2004, please.

14        (Record read by the reporter.)

15   BY MR. FORESTIERE:

16   Q.   So the program they came out with was

17   concerning the community service that they wanted you to

18   network with them?

19   A.   Yes.

20   Q.   Okay.  So your understanding at the time that

21   you were hired -- strike that.

22        Did you have any understanding at the time that

23   you were hired that you were required to perform

24   community service?

25   A.   Yes.

**Johnstown**
**814-266-2042**

**Toll-Free**
**866-565-1929**

**Pittsburgh**
**412-281-7908**

**NETWORK DEPOSITION SERVICES**
**Transcript of Stephen Escobar**

1      Q.    What was your understanding at the time you

2   were hired?

3      A.    That we would work in the community in drumming

4   up business.

5      Q.    And how'd you come to that understanding?

6      A.    Brad told me that.

7      Q.    When did he tell you that?

8      A.    After I was hired.

9      Q.    When you say after you were hired, did you have

10  an approximate date that that conversation occurred?

11     A.    No, I don't.

12     Q.    How long after you were hired did he make that

13  statement to you?

14     A.    I don't know the approximate date so --

15     Q.    Was it a couple of days after you were hired?

16     A.    I guess it was a couple of days.

17     Q.    Was it a week after you were hired?

18           MR. LINGLE:  Object to the form.

19           THE WITNESS:  A couple days.

20  BY MR. FORESTIERE:

21     Q.    So your best recollection is it happened a

22  couple of days after you were hired?

23     A.    Yes.

24     Q.    Did you have any conversations with anybody

25  else about community service at the time or prior to

## NETWORK DEPOSITION SERVICES
### Transcript of Stephen Escobar

81

```
 1      A.   No.
 2      Q.   If you worked on Saturdays and Sundays, were
 3  you paid regular time?
 4      A.   Yes.
 5      Q.   And you filled out the hours you worked for
 6  those Saturdays and Sundays, correct, on your time card
 7  or time sheet?
 8      A.   I'm not sure about that.
 9      Q.   Are you saying that when you were working on a
10  Saturday or Sunday at the facility, you did not record
11  all the time that you worked at that facility?
12      A.   Yes.
13           MR. LINGLE:  Object to the form.
14           THE WITNESS:  Oh.
15  BY MR. FORESTIERE:
16      Q.   And why was that?
17      A.   Because it would make the district manager mad.
18      Q.   Who was the district manager?
19      A.   Bill White, I think.
20      Q.   How do you know it would make him mad?
21      A.   That's what they said.  That's what Brad said.
22      Q.   So your testimony is that you did not record
23  all the time you worked on Saturdays and Sundays because
24  it would make Mr. White mad?
25      A.   Yes.
```

**Johnstown**
**814-266-2042**

**Toll-Free**
**866-565-1929**

**Pittsburgh**
**412-281-7908**

**NETWORK DEPOSITION SERVICES**
**Transcript of Stephen Escobar**

82

1        Q.    Even though it was regular hours worked --

2        A.    Yes.

3        Q.    -- as opposed to overtime?

4        A.    Yes.

5        Q.    So Mr. White objected to paying you regular

6    time for the full amount of time that you worked on

7    Saturdays and Sundays?

8        A.    Yes.

9        Q.    And that came from Mr. Webb?

10       A.    Mr. Webb, yes.

11       Q.    And that was done orally with Mr. Webb?

12       A.    Yes.

13       Q.    When did those -- strike that.

14             Did you have more than one conversation with

15    Mr. Webb about that?

16       A.    No.

17       Q.    So you only had one conversation with him?

18       A.    Yes.

19       Q.    When did that occur?

20       A.    That would be two days in.

21       Q.    After you started working?

22       A.    Yes.

23       Q.    Where did that conversation take place?

24       A.    In the office.

25       Q.    When you say in the office, you indicated

**NETWORK DEPOSITION SERVICES**
**Transcript of Stephen Escobar**

```
 1            MR. LINGLE:  Object to the form.
 2            THE WITNESS:  Can you rephrase the question,
 3   please.
 4   BY MR. FORESTIERE:
 5       Q.   Yeah.  During the time that you worked at
 6   Lakewood, did you record all the hours you worked for
 7   each day?
 8       A.   No.
 9       Q.   And why didn't you?
10       A.   Because I did not know the policy.  I've never
11   seen -- this is the first time I've seen this, recording
12   of hours.
13       Q.   Well, didn't you think it was wrong that you
14   were not recording the -- strike that.
15            Did you think it was wrong that you were not
16   recording all the times that you worked for each day
17   that you were employed at Alderwoods?
18       A.   Yeah.
19            MR. LINGLE:  Object to the form.
20   BY MR. FORESTIERE:
21       Q.   Did you ever make any complaint to anybody
22   about that?
23       A.   Yes.
24       Q.   Who did you complain to?
25       A.   Brad Webb.
```

**Johnstown**
**814-266-2042**

**Toll-Free**
**866-565-1929**

**Pittsburgh**
**412-281-7908**

**NETWORK DEPOSITION SERVICES**
**Transcript of Stephen Escobar**

87

1      Q.   When did you complain to him about that?

2      A.   Two days after.  And what was it -- two, four,

3  six.

4      Q.   I'm not sure -- two days after you started

5  working?

6      A.   Yeah.

7      Q.   And then you said two, four, six.  What is that

8  referring to?

9      A.   Same thing I said before.

10     Q.   Okay.  But that was concerning the community

11  service.  Was that what you're --

12     A.   Yes.

13     Q.   So you complained to him that --

14     A.   The recording hours also too.

15     Q.   Okay.  So each of those conversations, in

16  addition to talking about community service, you were

17  also talking about the -- you were not recording all the

18  hours that you were working --

19     A.   Yes.

20     Q.   -- at Lakewood?

21     A.   Yes.

22     Q.   What did he say about that?

23     A.   That's the way it is here.

24     Q.   Did he say anything else?

25     A.   No.

## NETWORK DEPOSITION SERVICES
### Transcript of Stephen Escobar

143

1      A.   Yes.

2      Q.   For the on-call services?  They gave you a

3  telephone?

4      A.   Yes.

5      Q.   Okay.  Did you have to pay for that?

6      A.   No.

7      Q.   That was something the company paid for?

8      A.   Yes.

9      Q.   Was it a cell phone?

10     A.   Yes.

11     Q.   Would you agree that perhaps the cell phone

12  records would be a good indication of calls you received

13  to perform on-call services?

14     A.   Yes.

15     Q.   Now, you also talked about meal -- working

16  through meal periods.

17     A.   Yes.

18     Q.   And you claim that to also be overtime?

19     A.   Yes.

20     Q.   How often did that occur that you worked

21  through a meal period?

22     A.   I would say two times a week.

23     Q.   How's it that you were asked to do work through

24  a meal period -- strike that.

25           Could you explain to me how that occurred that

**Johnstown**
**814-266-2042**

**Toll-Free**
**866-565-1929**

**Pittsburgh**
**412-281-7908**

**NETWORK DEPOSITION SERVICES**
**Transcript of Stephen Escobar**

144

1    you missed a meal period or were forced to work during a

2    meal period?

3        A.   We were the busiest funeral home in this

4    county.

5        Q.   What work were you performing during your meal

6    periods typically?

7        A.   Whatever.  Whatever they needed.  I did

8    whatever they wanted me to.

9        Q.   You've got to tell us -- that's what I'm trying

10   to ask.

11       A.   Cremations, arranging for a service, picking up

12   flowers, getting the flowers ready for the service,

13   helping the embalmer get the people dressed.

14       Q.   Who was it that would generally tell you to do

15   this?

16       A.   It would be the manager.

17       Q.   I'm sorry.  Who?

18       A.   Manager.  Brad Webb.

19       Q.   Did you ever tell him, hey, I'm on my lunch

20   break?

21       A.   I tried to.

22       Q.   What was his response?

23       A.   Ha, ha -- no, I'm sorry.

24       Q.   Do you recall what his response was?

25       A.   That's okay.  There's work to be done.

1      Q.    Did you ever attempt to submit any time for

2   working through your lunch periods?

3      A.    I've done a few, but not many -- with the

4   records that you showed me.

5      Q.    How much time are you claiming for unpaid --

6   strike that.

7            How much time are you claiming for overtime for

8   working through your meal periods?

9      A.    At least two hours a week.

10      Q.    And for how many weeks are you claiming?

11      A.    Until I no longer was there.  October.

12      Q.    So two hours a week for every week that you

13   worked at Lakewood?

14      A.    Yes.

15      Q.    And then I think the last category you've

16   indicated for unpaid overtime was hours not -- not told

17   to take down or hours not recorded?  Is that --

18      A.    Yes.

19      Q.    Okay.  Well, why don't you put it in your words

20   so I can use that appropriately.  What is the overtime

21   for the hours not -- hours not reported, is that a good

22   way to describe it?

23      A.    That's good.

24      Q.    Okay.  As to hours not reported, tell me how

25   that occurred.

**Johnstown**
**814-266-2042**

**Toll-Free**
**866-565-1929**

**Pittsburgh**
**412-281-7908**

NETWORK DEPOSITION SERVICES
Transcript of Stephen Escobar

146

1     A.   Basically, they -- there would be so many hours
2   that you would have for the -- that would need to be on
3   the time card.  And I was told that those hours I
4   wouldn't be able to put those on this time card.
5     Q.   And what type of work did that reflect?
6     A.   That reflected all work.  The flowers and all
7   the different responsibility -- crematory.  Everything.
8     Q.   How was that different -- okay.
9          Well, was this overtime on a daily basis?
10    A.   Yes.
11    Q.   In other words, it was overtime in excess of 8
12  hours a day?
13    A.   Yes.
14    Q.   And do you have any records about the amount of
15  overtime that you worked in excess of 8 hours a day?
16    A.   No.
17    Q.   And you were told not to record more than 8
18  hours a day?  Is that what you're saying?
19    A.   No.  I'm not saying that.
20    Q.   Okay.
21    A.   Because I do have some that have overtime.  But
22  it depends on which day and which week.
23    Q.   How is that determined, which day or which week
24  or what's --
25    A.   It's to be determined by the manager.

Johnstown
814-266-2042

Toll-Free
866-565-1929

Pittsburgh
412-281-7908

NETWORK DEPOSITION SERVICES
**Transcript of Stephen Escobar**

162

1    A.    Outside.  A lot of the people would come

2    through that would bring patrons to our funeral home.  I

3    would talk to them also too.

4    Q.    And what was your understanding from them about

5    whether or not they were paid for on-call time?

6    A.    They were not paid for on-call time.

7    Q.    Anybody else that you spoke with about on-call

8    time?

9    A.    No.

10    Q.    Anybody at any other locations?

11    A.    Oh, yeah.  Other locations, yes.  They were

12    coming through from locations -- Lodi, Turlock, those

13    locations.

14    Q.    Okay.  So they're coming through your funeral

15    home?

16    A.    Yes.

17    Q.    How about community service?

18    A.    Community service, it was understood that we

19    would not get paid for that.

20    Q.    Did you have any conversations with people,

21    other than people in your funeral home, about community

22    service?

23         MR. FORESTIERE:  Objection.  Asked and

24    answered.

25

Johnstown
814-266-2042

Toll-Free
866-565-1929

Pittsburgh
412-281-7908

NETWORK DEPOSITION SERVICES
**Transcript of Stephen Escobar**

163

1    BY MR. LINGLE:

2        Q.    What was your understanding about whether

3    they'd get paid for --

4            MR. FORESTIERE:   Objection.

5    BY MR. LINGLE:

6        Q.    -- their community service?  Can you answer the

7    question?

8        A.    It would be the same thing with community

9    service.  It wouldn't be paid.

10       Q.    And before, you were asked whether or not you

11   had conversations with other employees.

12       A.    Yes.

13       Q.    During that question, was it your understanding

14   that you were asked whether or not it was a specific

15   person with a name?

16       A.    Yes.

17       Q.    You also testified earlier about weekend work,

18   time spent during the weekends; is that right?

19       A.    Yes.

20       Q.    Okay.  And I believe you said that your

21   schedule when you worked on the weekends was typically

22   8:00 to 5:00 as well?

23       A.    Yes.

24       Q.    And when would it be the case that you would

25   not get paid for that time?


**Johnstown**
**814-266-2042**

**Toll-Free**
**866-565-1929**

**Pittsburgh**
**412-281-7908**

**NETWORK DEPOSITION SERVICES**
**Transcript of Stephen Escobar**

1      A.   Any time that was overtime.

2      Q.   So if the additional time were pushing to

3  overtime, you wouldn't get paid; is that right?

4      A.   Yes.

5      Q.   You were also asked about time recording

6  earlier.  Do you recall that?

7      A.   Yes.

8      Q.   Okay.  And tell me your understanding as to

9  whether or not you could report community service, which

10  you performed.

11          MR. FORESTIERE:  Objection.  Asked and

12  answered.

13          THE WITNESS:  I cannot.

14  BY MR. LINGLE:

15      Q.   Okay.  And how did you come to that

16  understanding?

17          MR. FORESTIERE:  Objection.  Asked and

18  answered.

19          THE WITNESS:  From my manager.

20  BY MR. LINGLE:

21      Q.   Anybody else?

22          MR. FORESTIERE:  Objection.  Asked and

23  answered.

24          THE WITNESS:  John Fullerton.

25

# EXHIBIT 73

Garza Joe11-21

00001
```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2
     DEBORAH PRISE and HEATHER RADY  )
 3   on behalf of themselves and all )
     employees similarly situated,   )
 4                                    )
          Plaintiffs,                 ) Civil Action No. 06-1641
 5                                    )
     vs.                              ) Judge Joy Flowers Conti
 6                                    )
     ALDERWOODS GROUP, INC.,          )
 7                                    )
          Defendant.                  )
 8
 9   *********************************************************
10                       ORAL DEPOSITION
11                          JOE GARZA
12                      NOVEMBER 21, 2008
13   *********************************************************
14
15
16        ORAL DEPOSITION OF JOE GARZA, produced as a witness
17   at the instance of the Defendant and duly sworn, was
18   taken in the above-styled and numbered cause on the 21st
19   day of November, 2008, from 10:52 a.m. to 2:27 p.m.,
20   before Anne F. Sitka, Certified Shorthand Reporter in
21   and for the State of Texas, reported by computerized
22   stenotype machine at the offices of Jones Day, 717
23   Texas, Suite 3300, Houston, Texas 77002, pursuant to the
24   Federal Rules of Civil Procedure and the provisions
25   stated on the record or attached hereto.
```
00002
```
 1                        APPEARANCES
 2
     FOR PLAINTIFFS:
 3
          Mr. Charles H. Saul
 4        MARGOLIS EDELSTEIN
          525 William Penn Place
 5        Suite 3300
          Pittsburgh, PA 15219
 6
          Ms. Annette M. Gifford, Esq.
 7        DOLIN, THOMAS & SOLOMON, L.L.P.
          693 East Avenue
 8        Rochester, New York 14607
 9   FOR DEFENDANT:
10        Ms. Michelle Amy Morgan
          JONES DAY
11        2727 North Harwood Street
          Dallas, Texas 75201
12
13
14
15
16
17
18
19
20
21
```

Page 1

Garza Joe11-21

```
15       Q.   How did you first become interested in working
16  for Alderwoods?
17       A.   I was asked by the company to help part time,
18  and that's how I came on board with them.
19       Q.   Who from the company approached you?
20       A.   My wife.
21       Q.   Your wife is also an employee of Alderwoods?
22       A.   She is.
23       Q.   What is her name?
24       A.   Beatrice Sandoval.
25       Q.   And at the time that your wife approached you
00015
 1  regarding an opportunity at Alderwoods, what was her
 2  position with the company?
 3       A.   She's an office manager.
 4       Q.   When did she discuss this part-time opportunity
 5  with you?
 6       A.   Approximately four [sic] years ago.
 7       Q.   And what did you do in response to her making
 8  you aware of that opportunity?
 9       A.   I went and applied.
10       Q.   What job did you apply for?
11       A.   It was a part-time driver/dispatcher.
12       Q.   What was the Alderwoods location for this job?
13       A.   This was Earthman downtown Fannin.
14       Q.   Were you hired by Alderwoods?
15       A.   I was.
16       Q.   Into what position?
17       A.   Driver/dispatcher.
18       Q.   How long did you remain in that part-time
19  position?
20       A.   Week and a half.
21       Q.   A week and a half?
22       A.   Yes.
23       Q.   And then what happened?
24       A.   I was made -- I was asked to come on board
25  permanently, full time, placed on a 90-day probationary
00016
 1  period.
 2       Q.   And when did you take on the permanent,
 3  full-time position?
 4       A.   That would have been approximately May 3rd.
 5       Q.   Of what year?
 6       A.   2006.
 7       Q.   Was the full-time job at the Earthman downtown
 8  Fannin location, too?
 9       A.   Yes, it was.
10       Q.   Is that the location where your wife was also
11  working?
12       A.   No, ma'am.
13       Q.   Where was your wife working?
14       A.   My wife works at southwest location.
15       Q.   Is your wife still in the same position?
16       A.   Yes, ma'am.
17       Q.   Still in the same location?
18       A.   Still in the same location.
19       Q.   When you were hired into the part-time
20  position, who did you -- what was the hiring process --
21  or application process?  I'm sorry.
22       A.   They had a formal application, which I -- which
23  I filled out; and then they called my previous employer
24  and then allowed me to come on board, you know.
25       Q.   And who -- who were you interacting with at
```

Page 7

Garza Joe11-21

```
 9    to time.
10        Q.    Did anybody ever instruct you to keep track of
11    your time?
12        A.    No, ma'am.
13        Q.    Do you know of any other employees who worked
14    more than 40 hours in a week?
15        A.    Yes.
16        Q.    Who?
17        A.    I can't remember all their names at this time;
18    but there was some employees there, others from other of
19    the chapels that would come and in conversations say,
20    "Oh, I didn't get mine either."
21        Q.    In terms of employees that you knew who worked
22    more than 40 hours a week -- you know, you're indicating
23    there's a number of them -- can you identify the ones
24    that you recall?
25        A.    Diane Paris, Kim Stoner, Rene Munoz.
00054
 1              THE REPORTER:  Who was that?  I'm sorry.
 2              THE WITNESS:  Rene.  Rene.
 3              MR. SAUL:  Munoz?
 4              THE WITNESS:  Munoz.
 5        A.    That's about all I can remember right now.
 6        Q.    (By Ms. Morgan) Were they employees of
 7    Alderwoods at the same location as you?
 8        A.    Yes.
 9        Q.    And how do you know that they worked more than
10    40 hours in a week?
11        A.    They stated so.
12        Q.    Is that the only basis --
13        A.    Yes, ma'am.
14        Q.    -- of your knowledge?
15              All the employees at the location where
16    you worked, they did not all work the same hours,
17    correct?
18        A.    No, ma'am.
19        Q.    What was your pay period while you were at
20    Alderwoods?
21        A.    Every two weeks.
22        Q.    By what method were you paid?
23        A.    Check.
24        Q.    And were there pay periods in which you believe
25    you received less than your full pay?
00055
 1        A.    Yes, ma'am.
 2        Q.    When?
 3        A.    Just about every week.
 4        Q.    And what were the circumstances?
 5        A.    Waiting on the other shift to show up and not
 6    being allowed to clock out when they arrived.  I had to
 7    clock out on my shift and then wait for them to come in.
 8        Q.    Any other circumstances?
 9        A.    Pitch in, just show up early and be asked, "Can
10    you get that phone?  Will you" -- you know.
11              And then turn around and ask, "Can I clock
12    in?"
13              And "No, you may not.  Wait for your
14    schedule."
15              So, you learned to kind of like stay away.
16        Q.    When you mean you learned to stay away, do you
17    mean you learned --
18        A.    Well, don't go near the --
19        Q.    -- to only --
```

Page 23

# EXHIBIT 74

Deposition Transcript of Donna Gonzales (03-13-09)

00001
1               UNITED STATES DISTRICT COURT
           WESTERN DISTRICT OF PENNSYLVANIA
2
3   No. 06-1641
4   DEBORAH PRISE and HEATHER RADY
    on behalf of themselves and all employees similarly
5   situated,
6           Plaintiffs,
7   vs.
8   ALDERWOODS GROUP, INC. And SERVICE
    CORPORATION INTERNATIONAL,
9
            Defendants.
10
11
12
13            DEPOSITION OF DONNA GONZALES
                March 13, 2009
14                9:50 a.m.
15        At the Homewood Suites by Hilton
             1520 Sunport Place, SE
16        Albuquerque, New Mexico  87106
17
18        PURSUANT TO THE FEDERAL RULES OF CIVIL PROCEDURE
    this deposition was:
19
20
21  TAKEN BY: MICHELLE AMY MORGAN
            ATTORNEY FOR THE DEFENDANTS
22
23  REPORTED BY: KAREN RODRIGUEZ, NM CCR #55
             KMR Court Reporters, etc., LLC
24           Post Office Box 16346
             Albuquerque, New Mexico  87191-6346
25
00002
1                A P P E A R A N C E S
2   For the Plaintiffs:
3   LIBERTY J. WEYANDT
    CHARLES SAUL (Telephonically)
4   Margolis Edelstein
    525 William Penn Place
5   Suite 3300
    Pittsburgh, PA 15219
6   (412) 281-4256
7   CHRISTINA DOUGLAS (Telephonically)
    Dolin, Thomas & Solomon
8   693 East Avenue
    Rochester, New York  14607
9
    For the Defendants:
10
    MICHELLE AMY MORGAN
11  Jones Day
    2727 North Harwood Street
12  Dallas, Texas 57201
    (214) 220-3939
13
14
15                I N D E X
                                    PAGE
16  EXAMINATION OF DONNA GONZALES

Page 1

Deposition Transcript of Donna Gonzales (03-13-09)

```
22      Q.  Do you recall whether it was before or after you
23  joined this lawsuit?
24      A.  I don't recall.
25      Q.  Did you have any other discussions with Ms. Fink
00012
 1  regarding this lawsuit?
 2      A.  None.
 3      Q.  Did you have any other communications with any
 4  other Alderwoods' employees regarding the claims in this
 5  case?
 6      A.  No.
 7      Q.  Have you ever recorded any discussions you've had
 8  about this lawsuit?
 9      A.  No.
10      Q.  When did you first begin working at Alderwoods?
11      A.  I began in October of 2002.
12      Q.  Was that the very first time that you had ever
13  worked for Alderwoods?
14      A.  No.
15      Q.  When was the first time that you ever worked for
16  Alderwoods?
17      A.  Wow.  I believe that must have been in 1986 or
18  '85.
19      Q.  What Alderwoods location did you --
20      A.  Here in Albuquerque, New Mexico.
21      Q.  What position did you first hold when you first
22  began --
23      A.  Receptionist.
24      Q.  When you first began working for Alderwoods?
25      A.  Yes.
00013
 1      Q.  Was as a receptionist?
 2      A.  Yes, ma'am.
 3      Q.  At that time, were you full time or part time?
 4      A.  Part time.
 5      Q.  Just so I'm sure we're on the same page,
 6  Ms. Gonzales, this part-time receptionist position,
 7  that's the one that you held when you worked around 1985
 8  or 1986 for Alderwoods in Albuquerque, New Mexico?
 9      A.  Correct.
10      Q.  In what location did you work?
11      A.  Strong Thorne Mortuary on Coal, Southeast.
12      Q.  For what period of time did you hold the
13  part-time receptionist position at the Strong Thorne
14  Mortuary?
15      A.  I'm not exactly sure.  I couldn't give you an
16  exact date.
17      Q.  Can you give me an approximate date?
18      A.  No.
19      Q.  During the time that you worked at the Strong
20  Thorne Mortuary, did you hold the part time receptionist
21  position?
22      A.  Yes.
23      Q.  Did you hold any other position during the time
24  you worked at Strong Thorne Mortuary?
25      A.  Not as far as a position, but I did other duties
00014
 1  there.
 2      Q.  What other duties did you perform?
 3      A.  I was removal.
 4      Q.  Anything else?
 5      A.  I would prepare, preparation, help prepare.
 6      Q.  Help prepare what?
```

Page 6

Deposition Transcript of Donna Gonzales (03-13-09)

```
 3   sure?
 4       A.   Correct.
 5                    (Exhibit 6 marked.)
 6       Q.   (By Ms. Morgan)  I've handed you what has been
 7   marked as Exhibit 6.  This is an Alderwoods document, a
 8   new employee form, and this document identifies your
 9   rehire date as October 14th, 2002.  Is that date
10   correct?
11       A.   I suppose so.
12       Q.   It identifies your hourly rate of pay as being
13   $7.50 an hour.  Is that hourly rate correct?
14       A.   Yes.
15       Q.   Exhibit 6 also identifies your job status and
16   position as part-time receptionist.  Is that correct?
17       A.   Yes.
18       Q.   Is the part-time receptionist position the first
19   position you held with Alderwoods after your rehire?
20       A.   Yes.
21       Q.   Was the first Alderwoods location where you
22   worked after your rehire the Humphrey Mortuary?
23       A.   Yes.
24       Q.   That was in San Diego, California?
25       A.   Correct.
00020
 1       Q.   Do you recall the dates that you were in the
 2   position of part-time receptionist at the Humphrey
 3   Mortuary Alderwoods location?
 4       A.   I believe it was maybe two months that I held
 5   that position.  I don't know the exact dates, but I
 6   believe it was two months after my hire that I held
 7   other positions there.
 8       Q.   Who was your immediate supervisor?
 9       A.   Derreck Pate.
10       Q.   What position did Derreck Pate hold?
11       A.   Supervisor, director.
12       Q.   Was he the manager of that location?
13       A.   When I first started working there, he was, like,
14   the assistant manager.  There was another person ahead
15   of him, his manager.  But I don't recall his name.
16       Q.   There was another manager above Derreck Pate, but
17   you don't recall his name?
18       A.   Correct.
19       Q.   Was Derreck Pate the one that directly supervised
20   you?
21       A.   Yes.
22       Q.   Did your immediate supervisor ever change while
23   you were at the Humphrey Mortuary location?
24       A.   Change what?
25       Q.   Did you ever get a different direct supervisor
00021
 1   during the time you were there?
 2       A.   Yes.
 3       Q.   Who was that?
 4       A.   David.
 5       Q.   Do you recall his last name?
 6       A.   David Greiner, Greiner, something like that,
 7   Greiner or Greiner.
 8       Q.   David Greiner?
 9       A.   Yes.
10       Q.   When did David Greiner become your direct
11   supervisor?
12       A.   I believe it had to have been maybe two months
13   before I quit, two or three months maybe, something like
```

Page 9

Deposition Transcript of Donna Gonzales (03-13-09)

```
 1  That was all part of taking care of the cremains.  I
 2  mean there wasn't no other specific job duties as far as
 3  I know.  I mean I would take -- like, if one of the
 4  receptionists went on break, I would cover for the
 5  receptionist.  I was doing more of what you would do as
 6  a receptionist, besides the cremains.
 7     Q.  So aside from the cremains, you also started
 8  performing some duties that a receptionist would do?
 9     A.  Yes.
10     Q.  What did those include?
11     A.  Answer the phones.
12     Q.  What else?
13     A.  Take messages, answer the phone, what a
14  receptionist's duties are.
15     Q.  Did your duties involve removals?
16     A.  No.
17     Q.  I believe your testimony was that when you
18  stopped performing the funeral arranging
19  responsibilities and started performing cremains
20  responsibilities, you were no longer doing any removals;
21  is that correct?
22     A.  No, I wasn't.
23     Q.  Did that impact your compensation?
24     A.  Yes.
25     Q.  How?
00054
 1     A.  Because I would get paid by removal.  I would be
 2  on call all night.  But whatever removals that we did,
 3  we would get paid for per removal.
 4     Q.  What would you get paid per removal?
 5     A.  I believe it was either 25 or $35 per removal.
 6     Q.  About how many removals would you do in a week?
 7     A.  Prior to not doing them?
 8     Q.  Yes.
 9     A.  Oh, geez.  Per week?  It could be up to, like, 20
10  or 30 or 40.  It just depends.  It was quite a bit.  You
11  could do two a night, three a night.  It just kind of
12  depended on how many people died that night.
13     Q.  So the amount of removals that you did during the
14  timeframe when you were doing removals would range from
15  two to three a night and perhaps 20 to 40 per week; is
16  that what you said?
17     A.  Correct.
18     Q.  And it's your testimony that you were paid on a
19  per removal basis for removals?
20     A.  Correct.
21     Q.  Throughout the time that you performed removals
22  for Alderwoods, did the rate for the removals stay at
23  between 25 and $30 per removal, or did it change?
24     A.  It stayed the same.
25     Q.  Did David Greiner communicate to you any reason
00055
 1  for having you no longer do removals?
 2     A.  No.  He just hired some young men to work there
 3  for him.
 4     Q.  So no, he didn't communicate to you anything
 5  about the reason?
 6     A.  No.  And I did complain about it.
 7     Q.  When did your job duties change from funeral
 8  arranger responsibilities to cremains responsibilities?
 9     A.  When David Greiner started working as the
10  supervisor, the director there.  He is the one who took
11  me off my job and put me into doing something else.
```

Page 23

Deposition Transcript of Donna Gonzales (03-13-09)

```
23   exact time you were at home.
24      Q.  If removals took two to three hours on average,
25   understanding sometimes they may have taken more time,
00121
 1   is the time that you just described when you would
 2   answer the phones and do other tasks at the mortuary
 3   included in the time that you spent performing removals,
 4   or is that something different?
 5      A.  No.  That is something different.
 6      Q.  So for the time that you spent answering phones
 7   at the mortuary -- about how much time would you spend
 8   doing that in a typical week?
 9      A.  During my removals, you're asking?
10      Q.  Yes.
11      A.  It varied.
12      Q.  Is there any range that you could give?
13      A.  I can't give that range.
14      Q.  Other than answering the phone and performing
15   cleaning tasks and other things that you did at the
16   mortuary and handling the on-call removal tasks, was
17   there any other type of work that you performed while
18   you were on call?
19      A.  No.
20      Q.  Did you report to Alderwoods the time that you
21   spent on call?
22              MS. WEYANDT:  Object to form.
23              THE WITNESS:  Can you repeat that question?
24   Did I report?
25      Q.  (By Ms. Morgan)  Let me go back for a minute.
00122
 1   what procedure did you use to report your time during
 2   the time you worked at Alderwoods from October 2002 to
 3   August 2003?
 4      A.  When I was on call, the way you would report it
 5   was when you actually dropped off the body and put them
 6   at the mortuary into the freezer, then you would sign a
 7   paper and write down the name of the body, where you
 8   picked up the body and what time you dropped it off.
 9   That's how you got paid on your removal, your name, the
10   name of the body, the time you dropped it off and where
11   you picked up the body.
12      Q.  Where would you report this?
13      A.  It was a log they kept in the garage.
14      Q.  Was it referred to by any name?
15      A.  The removal log.
16              MS. MORGAN:  I am going to take a quick
17   bathroom break.
18           (A recess was taken from 3:10 to 3:15.)
19      Q.  (By Ms. Morgan)  Ms. Gonzales, we were talking
20   about the removal log that you said was maintained in
21   the garage at Humphrey Mortuary; is that right?
22      A.  Yes.
23      Q.  Can you describe the log and how you used it?
24      A.  It was on a desk.  We had to tag the people in
25   when we picked them up.  On the tag, you would write
00123
 1   down what color tag it was, because each mortuary had a
 2   different color tag.  So you would write down the color
 3   of the tag.  You would write down your name.  You would
 4   write down when the person you brought in.  You would write
 5   down the time that you brought the person in and what
 6   mortuary or where you picked up the body from.
 7      Q.  You would write down the time that you brought
```

Page 51

Deposition Transcript of Donna Gonzales (03-13-09)

8   the person to the mortuary?
9       A.  Yes.
10      Q.  Would you write down the time that you picked the
11  deceased up?
12      A.  No.
13      Q.  Was there anyone at Humphrey Mortuary who was
14  responsible for maintaining the log?
15      A.  Not that I know of.  Maybe the embalming person.
16  That way he knew who was there.
17      Q.  What, if anything, was done with respect to the
18  entries you made in the removal log?
19              MS. WEYANDT:  Can you say that back?  I
20  missed it.
21      Q.  (By Ms. Morgan)  Were the entries that you made
22  in the removal log used to determine your compensation
23  for the removals you performed?
24      A.  Yes.
25      Q.  How were the removal logs used?
00124
1       A.  How were they used?
2       Q.  Yeah.  How were they used with respect to your
3   compensation?
4       A.  They would just see what was the name of the
5   person that brought in this person, the deceased.  So
6   they would pay the person's name that brought it in the
7   25 or $35, whatever it was.  That's how they compensated
8   you, by who brought the person in.
9       Q.  Who would review the removal logs and then handle
10  compensating the person who performed the removal?
11      A.  They would go to payroll.
12      Q.  Who would go to the payroll?
13      A.  The logs.
14      Q.  Oh, the logs would be sent to payroll?
15      A.  Yes.
16      Q.  Do you know who was responsible for sending the
17  logs to payroll?
18      A.  No.
19      Q.  Would your compensation for performing the
20  removals be part of your regular payroll check?
21      A.  Yes.
22      Q.  Was the compensation for the removals reflected
23  as a separate entry in any earning statements that you
24  received?
25      A.  No.
00125
1       Q.  Was the way in which you were compensated for
2   removals ever changed during the time you performed the
3   removals?
4       A.  No.
5       Q.  Did you ever report on your timecards any time
6   you spent performing removals?
7       A.  No.
8       Q.  Did you personally keep track of the time that
9   you spent handling removals?
10      A.  Yes.
11      Q.  How did you keep track of it?
12      A.  I wrote it down.
13      Q.  Where?
14      A.  Just on a personal paper in my purse or at home.
15      Q.  What did you do with those records?
16      A.  I have no idea.  I probably trashed them.
17      Q.  So you don't still have those records?
18      A.  No, I don't.
                    Page 52

Deposition Transcript of Donna Gonzales (03-13-09)

00133
1    could or couldn't do while you were on call.  That is my
2    question.  And so with respect to the restriction about
3    what you had to wear, that was for what you had to wear
4    when you actually went and did a removal; correct?
5        A.  Correct.
6        Q.  It wasn't that you had to wear a suit the entire
7    time you were on call; correct?
8        A.  If you went to pick a body, yes.
9        Q.  When you were actually doing the removal, you
10   needed to be in a suit?
11       A.  Correct.
12       Q.  But during the whole time that you were on call,
13   waiting for a removal call, you didn't have to be in
14   your suit?
15       A.  If I'm at home, you're talking about?
16       Q.  Yes.
17       A.  Well, of course not.
18       Q.  That's just what I'm trying to understand.
19       A.  I could take my clothes off sometimes.  That was
20   confusing.
21       Q.  What I'm asking about is restrictions on you and
22   on your activities during the time that you were on
23   call.  Okay?  Are there any other ones, other than the
24   ones you've mentioned already?
25       A.  I don't believe so.
00134
1        Q.  Did you have to be able to be reached?
2        A.  Yes.
3        Q.  Could that be on a cell phone or pager?
4        A.  It was on a pager.  They gave us pagers -- or
5    your cell phone, if you had a cell phone.
6        Q.  What mechanism did you use?
7        A.  Pager and cell phone.  You had to use both.
8    They'd page you.  They'd beep, and then you'd have to
9    call in.  You would see which mortuary called.  You
10   would have to call in and get the information from
11   whoever called you.
12       Q.  So you needed to use a pager and a phone?
13       A.  A phone, yes.
14       Q.  And you used the Alderwoods' pager and your cell
15   phone?
16       A.  Yes.
17       Q.  So it didn't have to be your home phone?
18       A.  Well, if you were home.  They would have both
19   numbers.  If they couldn't reach you on your cell, they
20   would call your home.
21       Q.  But there was no requirement that it be your home
22   phone; correct?  You could use a cell phone?
23       A.  Yes.  You had to have a home phone, though.  You
24   had to give them your home phone number.  That was a
25   requirement, they had to have your home phone number.
00135
1        Q.  Could you turn to Exhibit 12 again.
2        A.  12?
3        Q.  Yes.  If you could, turn to page 7.
4        A.  I'm on 7.
5        Q.  Looking again at paragraph six in your
6    supplementary interrogatory response, it states that you
7    spent approximately 2.75 hours per week for the entire
8    period of your employment performing work-related
9    activities from home while working on call for which you
10   were not compensated.  This work consisted of
                        Page 56

Deposition Transcript of Donna Gonzales (03-13-09)

11 preparations necessary to go out to perform removals.
12 What work-related activities did you perform from home
13 while you were on call?
14     A.  I'd have to get ready to go to removals.  Once
15 you got a call, you had to be ready.  You had to get
16 ready.  So the preparation that I'm talking about is
17 getting dressed to go to do a removal.
18     Q.  So putting on a suit?
19     A.  Putting on suit, combing your hair, putting
20 makeup, whatever you needed to do to go out to do the
21 removal.
22     Q.  Was there any other preparatory activity that you
23 did at home while you were on call?
24     A.  No.
25     Q.  And the amount of time set forth in your
00136
1 interrogatory of 2.75 hours per week, is that accurate?
2     A.  What I was trying to explain was that you have to
3 be ready within 15 minutes.  They gave you 15 minutes to
4 get ready, is what I was saying.  So I was trying to
5 calculate every day, like, 15 minutes, 15 minutes,
6 15 minutes to get ready to prepare myself to go out to
7 the removals.  We had 15 minutes to get on the road.
8     Q.  So is that number of 2.75 hours per week --
9     A.  It was an estimate.
10     Q.   -- accurate?
11     A.  It was an estimate, estimated time.  Guesstimate
12 I should say.
13     Q.  Do you feel like it's not accurate and there is
14 an amount of time that is a better estimate?
15     A.  Well, like I said, the 10 to 12 removals isn't
16 accurate.  So I was figuring it out between the 10 and
17 12 removals a week as to the time I spent trying to
18 prepare myself for this removal.  That's what I
19 guesstimated it as.  If it was 30 bodies a week, then it
20 would be more time.  So it just varied.  It varied on
21 the day, the situation.  Everything changed every day.
22 You never could really say it's exactly this many times
23 on this week or it's exactly this many times on this
24 week.  So it's varied.  So I was just kind of
25 guesstimating the time that I put as between 10 to 12
00137
1 removals on 15 minutes trying to get ready to prepare
2 myself to go pick up the person.
3     Q.  So is about 15 minutes of preparatory work per
4 removal an accurate estimate?
5     A.  Yes.
6     Q.  You didn't actually perform a removal every time
7 you were on call; correct?
8          MS. WEYANDT:  Object to form.
9     A.  Yes.
10     Q.  (By Ms. Morgan) You did?
11     A.  Yes.  Oh, yes.
12     Q.  Let me ask that another way.  Every time you were
13 on call, did you perform a removal?
14     A.  Yes.
15          (Discussion off the record.)
16     Q.  (By Ms. Morgan) So Ms. Gonzales, you testified
17 that you were on call for removals every night except
18 for maybe one night out of the week from December 2002
19 to June or July of 2003 and that every time you were on
20 call you performed a removal; is that correct?
21     A.  Correct.

Page 57

Deposition Transcript of Donna Gonzales (03-13-09)

22 Q.  Other than the removal log, was there any other
23 way that you reported time that you spent doing on-call
24 work for Alderwoods?
25 A.  There was one other form that we signed on every
00138
1 person we picked up.  We had to sign a form where we
2 picked them up, who picked them up, if there was one or
3 two people, if it was a home death.  And there was one
4 other form we did sign, that we did fill out of the time
5 the call came in and the time that we actually dropped
6 off the body at the mortuary.
7 Q.  What was that form you used?
8 A.  It was a form they typed up.  Let's say the
9 receptionist got the call, or let's say the answering
10 service got the call.  Whoever they called to call us
11 would be the one who would start that form, to say what
12 time they got the call.  And then we would pick up that
13 form to let us know where the -- if they didn't tell us
14 over the phone, once we called back in, they would have
15 that form for us to fill out, and we'd have to fill out
16 that form, and that form would stay at whatever mortuary
17 we dropped off the body.
18 Q.  The information that you would put on it was the
19 time that you dropped off the body?  That's what you
20 would add?
21 A.  Yes.  That's what I would add.  The time the call
22 came in was added by whoever got the call, and I would
23 add the time that I actually dropped off the body.  Or I
24 would add the time that I called in -- or the time I got
25 the call, that's the time that I would put in, what time
00139
1 I got the call.  And whoever got the first call would
2 put in the time they got the call.
3 Q.  So the data that you would enter on the form
4 would be the time you received the call to perform a
5 removal as well as the time that you ultimately dropped
6 off the body at the mortuary; correct?
7 A.  Correct.
8 Q.  Was this form referred to by any particular name?
9 A.  No.  First call.  I think it was called a first
10 call or something like that.
11 Q.  And there was a form of this type maintained at
12 all of the mortuary locations where you performed
13 removals?
14 A.  Yes.
15 Q.  The forms stayed at that mortuary?
16 A.  Yes, wherever you dropped off the body.  Where
17 you dropped off the body, that's where the form would
18 stay.  That way they would know not only on the log, but
19 they would know on the form of who the person was.
20 Actually what we would do with that is we would
21 put it on the embalming door, now that I remember,
22 because that way -- we would connect it to the door
23 where they embalmed the people.  So that way they would
24 know that that person is -- where he's at.  He would be
25 in the refrigerator, first shelf, second shelf, third
00140
1 shelf, something like that.
2 Then we would kind of put -- we would tag the
3 people anyway.  But just so the embalmer would know how
4 many people were in the freezer and which shelf they
5 were in and things like that.  So that form went on the
6 door.  There was, like, a clip on the door where the

Page 58

Deposition Transcript of Donna Gonzales (03-13-09)

7   embalmers were at.  That's the form we would put on the
8   embalmer's door, now that I remember.
9       Q.  And that form was for the embalmer's use?
10      A.  Yes.
11      Q.  Was that form used for any other purpose that you
12  know of?
13      A.  I don't know.
14      Q.  Are you familiar with any logs that you would use
15  to record after-hour calls?
16      A.  No.  I think those were the only two forms that
17  were used.  One went to the embalmer, and one was the
18  log on the desk in the garage.
19      Q.  For removals that you performed after hours, were
20  you compensated for the time that you spent performing
21  the removals?
22      A.  No.
23      Q.  Never?
24      A.  There was just one fee that they paid you.  That
25  was $25 or 35.  That's all they paid you.  It didn't
00141
1   matter if it took two hours or five hours to do the
2   removal.  You only got paid $35.  It was just per
3   removal.  It didn't matter the hours you spent doing it.
4       Q.  Were you compensated for the time that you spent
5   engaged in the preparatory work of getting yourself
6   ready to go do a removal?
7       A.  No.
8       Q.  Did you ever report that time to Alderwoods?
9       A.  I questioned it, yes.
10      Q.  You questioned it.  But did you ever report it on
11  a timecard or in any other way to Alderwoods?
12      A.  No.
13      Q.  You say you questioned it.  What do you mean by
14  that?
15      A.  Well, I questioned it as far as getting paid for
16  the hours that you spent going to the removals, picking
17  up the body, by the time you got back to the mortuary
18  and if you had to go to a different mortuary, by the
19  time you got back to Humphrey Mortuary.  But their
20  answer was it was only one flat fee of -- like I said, I
21  don't remember if it was $25 or $35.  That's what they
22  paid, and that's just the way it was.
23      Q.  When you questioned this, who did you present
24  your question to?
25      A.  I believe it was Derreck.
00142
1       Q.  Derreck Pate?
2       A.  Uh-huh.
3       Q.  When did you question how you were paid for
4   performing removals?
5       A.  What date, you're asking?
6       Q.  Yes.
7       A.  I don't know.
8       Q.  Was it soon after you started performing the
9   removals or --
10      A.  Yes.
11      Q.  A few weeks in?  Months in?
12      A.  Probably about a month in.
13      Q.  How did Derreck Pate respond?
14      A.  That's just the flat rate that they pay.
15      Q.  Did Derreck Pate ever instruct you or direct you
16  not to report the time that you spent performing
17  removals?

Page 59

Deposition Transcript of Donna Gonzales (03-13-09)

16    A.  That it was a memo sent to her that she had to do
17  that by the upper management.
18    Q.  Did you ever see a copy of this memo?
19    A.  No, I didn't.
20    Q.  Did you raise a concern or make a complaint to
21  anybody else other than the payroll clerk?
22    A.  I don't recall.
23    Q.  You don't recall if you did?
24    A.  No, I don't recall if I did.
25    Q.  Did anyone else at Alderwoods deduct meal break
00177
1  time from your timecards?
2    A.  No.
3    Q.  Are you aware of any other employees who worked
4  through or were interrupted during a meal break but were
5  not compensated for the time they were working?
6    A.  No.
7    Q.  Are you aware of any company-wide policy that
8  employees could not report all the hours worked if they
9  worked during or through a break?
10    A.  Repeat your question.
11    Q.  Are you aware of any Alderwoods policy that
12  employees could not report all hours they worked if they
13  worked during or through a meal break?
14    A.  No, I'm not aware of it.
15    Q.  Are you aware of any Alderwoods' policy whereby
16  employees would not be compensated for the time they
17  spent working if they worked through or were interrupted
18  from a meal break?
19    A.  No.
20    Q.  How many hours of uncompensated time are you
21  claiming with respect to time that you worked through
22  meal breaks or got interrupted during meal breaks?
23    A.  I can't calculate it at this time.
24    Q.  In your interrogatory responses, in your
25  supplemental interrogatory responses, you stated that
00178
1  there were times when you had to come in early or stay
2  late to make a removal that was not compensated because
3  your manager did not approve the time; is that correct?
4    A.  I believe so.
5    Q.  What manager would not approve your time to
6  stay -- I'm sorry, to --
7    A.  David Greiner.
8    Q.  Any other Alderwoods' manager that wouldn't
9  approve your time to come in early or stay late?
10    A.  No.
11    Q.  Would you report the hours that you worked, that
12  you stayed late or came early on your timecards?
13    A.  Yes, I would.
14    Q.  But then Mr. Greiner would not compensate you for
15  that?
16    A.  Correct.
17    Q.  Would he mark off the time from your timecards?
18    A.  Yes.  I'm not sure if he marked it off or he
19  would go into the payroll clerk and tell her that he
20  didn't approve that or something like that.
21    Q.  So you're not sure the mechanics of how he did
22  it?
23    A.  I'm not sure of the mechanics, no.
24    Q.  Did Mr. Greiner ever instruct you not to report
25  the time on your timecards that you spent staying late
00179

Page 74

Deposition Transcript of Donna Gonzales (03-13-09)

1  or coming early?
2      A.  No.
3      Q.  And you wouldn't seek his preapproval to come in
4  early or stay late; correct?
5      A.  The only way I would stay late is if I'm already
6  working and my job wasn't done and I had to stay late.
7  How could I get preapproval if he's not there?  If I'm
8  already at work and it took longer, the services took
9  longer than what they were supposed to or something,
10  then I would stay longer, you know, to close up, to
11  close the mortuary until the services were over.  So,
12  yes, sometimes I couldn't get preapproval because of the
13  situation, if the family took longer to leave or
14  whatever the scenario was at the time.  It wasn't that
15  you could always reach your supervisor.  I mean I'm
16  doing a job.  If it's not over, it's not over until it's
17  over.
18      Q.  So there were times that you couldn't reach David
19  Greiner to request approval to stay late?
20      A.  Correct.
21      Q.  Were there times that he was reachable and you
22  could request approval from him to stay late?
23      A.  Not if I'm in a funeral service.  I can't leave a
24  funeral service to go get his approval.
25      Q.  Were there ever times you sought preapproval from
00180
1  Mr. Greiner to stay late?
2      A.  Yes, I'm sure there was.  Not to stay late,
3  but -- I'm not sure exactly what the question is.  What
4  is the question again?
5      Q.  What I'm trying to understand is, with respect to
6  any of the time that you came early or stayed late,
7  whether on any of those occasions with respect to which
8  you're saying you were not compensated for that time, if
9  you sought preapproval from Mr. Greiner to perform that
10  work?
11      A.  Yes.
12      Q.  What kinds of occasions would you seek his
13  preapproval for?  Are you saying it was when he was
14  around or available to ask?
15      A.  That's a hard question.  I'm not really
16  understanding that question.
17      Q.  Okay.  There were times when you did seek
18  Mr. Greiner's preapproval to stay late or come early;
19  correct?
20      A.  If it was on my schedule.  I don't know if he put
21  it on the schedule or who scheduled it.  But if I was on
22  the schedule to work late, that means I'm preapproved.
23  That's what I'm understanding.  I'm not sure if it was
24  him that did the preapproval or not.  I don't know.
25      Q.  So the times that you were scheduled to come in
00181
1  early or stay late, you had approval to work that time,
2  and then you were compensated for it; is that correct?
3      A.  Yes.
4      Q.  But there were other times when you were not
5  scheduled to come in early or stay late that you did
6  perform that work; correct?
7      A.  Yes.
8      Q.  And there were times that Mr. Greiner didn't
9  compensate you for that work?
10      A.  Correct.
11      Q.  But you don't know what occasions those were?
                              Page 75

# EXHIBIT 75

Deposition Transcript of Louise Johnson (07-17-09)

```
00001
  1              UNITED STATES DISTRICT COURT
  2        FOR THE WESTERN DISTRICT OF PENNSYLVANIA
  3
  4   DEBORAH PRISE and HEATHER RADY on   )
      behalf of themselves and all        )
  5   employees similarly situated,       )
                                          )
  6              Plaintiffs,              )
                                          ) Civil Action
  7      vs.                              ) No.: 06-1641
                                          )
  8   ALDERWOODS GROUP, INC.,             )
                                          )
  9              Defendant.               )
      _____)
 10
 11
 12
 13
 14
 15
 16
 17
 18          Deposition of LOUISE JOHNSON, taken on behalf
 19   of the Defendant, before Victoria A. Guerrero, CSR No.
 20   8370, RPR, CRR, for the State of California, commencing
 21   on Monday, July 17, 2009, 9:36 a.m., at Veritext
 22   National Deposition & Litigation Services, 3090 Bristol
 23   Street, Suite 190, Costa Mesa, California.
 24
 25   Pages 1 through 328
00002
  1   APPEARANCES OF COUNSEL:
  2
  3        For the Plaintiff:
  4
                Margolis Edelstein
  5             BY:  KYLE T. MCGEE, ESQ.
                525 William Penn Place, Suite 3300
  6             Pittsburgh, Pennsylvania  15219
                Phone (412) 355-4971  Fax (412) 642-2380
  7             E-mail:  Kmcgee@margolisedelstein.com
  8
  9
 10        For the Defendant:
 11
                Gurnee, Wolden & Daniels, LLP
 12             BY:  NICHOLAS P. FORESTIERE, ESQ.
                2240 Douglas Boulevard, Suite 150
 13             Roseville, California  95661-3805
                Phone (916) 797-3100  Fax (916) 797-3131
 14             E-mail:  Nicholas@gurneelaw.com
 15
 16
 17
 18
 19
 20
 21
 22
 23
 24
```

Page 1

```
                    Deposition Transcript of Louise Johnson (07-17-09)
         Exhibit 15      Back Pay Request Form; Bates            271
      16                 Nos. ALD011591 through 011596
      17
      18                            * * *
      19
      20
      21
      22
      23
      24
      25
00005
       1              Monday, July 17, 2009; 9:36 a.m.
       2                    Costa Mesa, California
       3                           ooOoo
       4                    LOUISE JOHNSON was
       5      called as a witness by and on behalf of the Defendant,
       6      and having been first duly sworn by the Certified
       7      Shorthand Reporter, was examined and testified as
       8      follows:
       9
      10                         EXAMINATION
      11
      12      BY MR. FORESTIERE:
      13          Q    Could you state your full legal name for the
      14      record, please?
      15          A    Louise Elizabeth Johnson.
      16          Q    And where do you reside, Miss Johnson?
      17          A    Long Beach.
      18          Q    And your social security number?
      19          A    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.
      20          Q    And your date of birth?
      21          A    8-29-1984.
      22          Q    Miss Johnson, my name a Nick Forestiere.  I'm
      23      the attorney representing the defendants in this action,
      24      Alderwoods.
      25               Do you understand that?
00006
       1          A    Yes.
       2          Q    And today we're taking your deposition
       3      concerning some claims you made in joining a lawsuit
       4      against Alderwoods.
       5               Do you understand that?
       6          A    Yes.
       7          Q    Have you ever had your deposition taken before?
       8          A    No.
       9          Q    I'm going to go over the ground rules in just a
      10      second, then, about how things will proceed today.  I
      11      just want to get a couple things as I was going through
      12      the file correct.
      13               You worked at the -- is it Harbor Lawn Funeral
      14      Home?
      15          A    The full name?
      16          Q    Yes.
      17          A    Harbor Lawn Mount Olive Memorial Park and
      18      Mortuary.
      19          Q    How is it that you generally refer to that so
      20      that you understand it so I don't have to repeat that
      21      long name with every question?
      22          A    Call it Harbor Lawn.
      23          Q    Harbor Lawn.  So if I use Harbor Lawn, you
      24      understand I'm referring to that place of business that
      25      you worked at that was owned by Alderwoods?
```

Page 3

Deposition Transcript of Louise Johnson (07-17-09)

10    Q    Did you sign an acknowledgment of receipt of
11  employee handbook?
12    A    Probably did.
13    Q    And if you go down further to the bottom of the
14  page, second check box, it says show your employee where
15  the location policy manual is located; do you see that?
16    A    Yes.
17    Q    And did they show you where the policy manual
18  was located?
19    A    I believe so.  I'm not sure when they started.
20  They had five policy binders.  And I was always aware of
21  those binders when we had them, but I don't know if this
22  started at this point.
23    Q    Where were the binders located?
24    A    We had a filing cabinet or a shelf that was
25  very close to my desk.  They kind of moved locations a
00090
1   couple times, but they were right in and about my
2   office.  There's another set in my manager's office.
3     Q    You said there was five policy binders?
4     A    Yes.
5     Q    What do they consist of?
6     A    Each was a different subject.  One was
7   regarding employees, another was regarding funeral
8   policies or -- I don't know the exact titles of each
9   binders, but I know I have made copies in the past.
10    Q    The binders that were in the filing cabinet
11  next to your desk, was that available for all employees
12  to use?
13    A    Yes.
14    Q    When you said you made copies in the past, why
15  were you making copies of the policy pages, policy
16  manual pages?
17    A    I made a couple copies of my job description
18  when I became an apprentice embalmer just so that I
19  would know what was expected of my position.
20         I don't know that I had copies of any of the
21  rest of the manuals other than I submitted to the law
22  firm some examples of the policies.
23    Q    What law firm you talking about?
24    A    Dolin, Thomas & Solomon.
25    Q    When did you do that?
00091
1     A    I don't recall the time, but it was when they
2   asked us to submit any documentation that we had.
3     Q    And at that time you copied part of the policy
4   manuals and sent them to Dolin?
5     A    Yes.
6     Q    Do you recall which parts of it that you
7   copied?
8     A    I copied quite a bit.  All of the things that
9   were relevant.  But I don't know exactly what -- what I
10  did.  It was sometime ago.
11    Q    And how long ago was that?
12    A    It was after late 2007, at least.
13         (Johnson Exhibit 6 was marked for
14         identification by the Certified Shorthand
15         Reporter and a copy is attached hereto.)
16  BY MR. FORESTIERE:
17    Q    Marking next as Exhibit 6, Exhibit 6 is a
18  one-page document called code of business conduct and
19  ethics.
20         Have you had a chance to read that document?
Page 38

Deposition Transcript of Louise Johnson (07-17-09)

21  is not to perform work for the company; do you see that?
22      A    I see that.
23      Q    And was that a policy that Alderwoods had in
24  effect during the time that you worked for him?
25      A    That may have been the written policy, but
00155
1   that's definitely not what we did.
2       Q    Are you saying that you -- for every meal
3   period you took, you worked through your lunch?
4       A    Not necessarily through the entire lunch, but
5   as we were sitting there eating, we would answer the
6   phone, answer the door, if somebody came in and needed
7   us, we'd leave our meal at our desk and go and help
8   them.
9       Q    And how long would that usually take to do that
10  type of work?
11      A    They were so different, every day was
12  different.  There was rarely an uninterrupted lunch
13  break, though, in the entire time I've been working
14  there.
15      Q    An uninterrupted for an entire hour or
16  uninterrupted for a half hour?
17      A    We could go five minutes and get a phone call
18  or we could go 45 minutes and get a phone call.  I mean,
19  it was different every single time.
20      Q    But you knew that you were entitled at least to
21  30 minutes, not less than 30 minutes for lunch, correct?
22      A    We were always told that we got an hour.  We
23  didn't know that it was supposed to be a half an hour.
24      Q    Did you keep any records concerning the amount
25  of time you were interrupted during your meal periods?
00156
1       A    No.  We just all knew that that's the way it
2   was.  Somebody had to do it.
3       Q    Did you ever make any complaint about being
4   interrupted during your meal periods to perform work to
5   anybody?
6       A    Curt, Kathy, and myself, we would constantly
7   complain just in personal conversation.
8       Q    You mean complain to each other?
9       A    Exactly.  We would only sort of go beyond that
10  if it was excessive.  But there was days where we were
11  so busy that it wasn't realistic.  There's nothing
12  anybody can do about it.
13      Q    What is your definition of excessive?
14      A    If we had a number of funerals throughout the
15  day, also appointments, and on top of that we have
16  people walking through the door that don't have
17  appointments, we don't turn them away.
18           If we have so much going on for one day or if
19  we're short-handed, then there's nothing you can do.
20  You just can't stop.
21      Q    Have you ever tried to quantify what you mean
22  by excessive?
23      A    Not really.  If it's to a point where you can't
24  sit down or use the rest room or even grab a bite to eat
25  while you're working, then that's -- that's a bit much.
00157
1   That's maybe when we would say something.
2       Q    And who would you say something to?
3       A    Normally we would go through Curt and sometimes
4   to Lynn.
5       Q    When you went to Curt, what was he to do about
                        Page 65

Deposition Transcript of Louise Johnson (07-17-09)

```
 2       A    Yes.
 3       Q    Let's go off the record for a second.
 4                      (Off the record.)
 5   BY MR. FORESTIERE:
 6       Q    Let's take a look at Exhibit 10 on page six,
 7   under the heading at the very top it says F, overtime;
 8   do you see that, Miss Johnson?
 9       A    Yes.
10       Q    And the first sentence says time may be
11   necessary for employee to work overtime; do you see
12   that?
13       A    Yes.
14       Q    And that's pretty typical in the industry,
15   isn't it?  If you have someone that comes in at
16   4:00 o'clock, a family member that comes in and it's
17   going to take an hour or two or three, that you just
18   can't sit there and say come back the next day; you're
19   expected to work overtime in that situation?
20       A    We never say no.
21       Q    But you're expecting to be paid for the
22   overtime, right?
23       A    Yes.
24       Q    And the next sentence says, All overtime,
25   however, must be approved in advance by management; do
00163
 1   you see that?
 2       A    Yes.
 3       Q    And was that the policy that Alderwoods had in
 4   effect during the time that you worked for it?
 5       A    We had heard that phrase before, but it's
 6   entirely unrealistic.  You can't predict overtime
 7   because you can't predict when someone's going to die or
 8   walk in or whatever else --
 9       Q    Let's take the situation we just mentioned
10   where an employee -- a family member comes in at
11   4:00 o'clock and you just know talking to them after the
12   first 10 or 15 minutes you're going to be there two,
13   three hours or more.
14            Can't you stop and at least tell your
15   supervisor, either Curt or Lynn or whoever happens to be
16   around at that time, say, look, I'm going to have to
17   meet with these people for the next couple hours and
18   that's going to be more than eight hours and I need
19   approval.
20            You're telling me that can't be done in that
21   type of situation?
22       A    I suppose if you can find a way to get out of
23   there you might be able to.  If who you need to ask is
24   still there.  But by the time we're finding this out,
25   the person we're needing to get approval from isn't
00164
 1   there.
 2            Or with my particular case, a lot of my
 3   overtime came from embalming after hours, in which case
 4   the managers had already left and the overtime, I would
 5   only really know about when I encountered a
 6   complication, you cannot predict how long an embalming's
 7   going to last.
 8       Q    Some people tend to leak more than others?
 9       A    Yes.
10       Q    Okay.  We're going to talk about that because
11   you have a whole letter that explains the conundrum that
12   you get in with these situations.
```

Page 68

Deposition Transcript of Louise Johnson (07-17-09)

13     A    Yes.

14     Q    Was the overtime being primarily the result of

15  your embalming services as opposed to your funeral

16  director services?

17     A    Yes.

18     Q    The next sentence says hourly employees are not

19  permitted or authorized to work any period of time other

20  than they're normally scheduled hours unless directed to

21  do so by their manager; do you see that?

22     A    Yes.

23     Q    Was that the policy that Alderwoods had in

24  effect during the time that you worked for it?

25     A    That was their written policy.  We had to make

00165

1  a lot of judgment calls.  That's not really covered in

2  this.

3     Q    What do you mean by judgment calls?

4     A    When there's nobody around to ask, you just

5  know that you have to do your job.

6     Q    Wouldn't Curt be on-call, though, sometimes?

7  Couldn't you call him up and say, look, I've got a real

8  bad embalming case and it's going to take more than just

9  the typical time period, I'll be here until whenever,

10  7:00 o'clock or three hours of overtime; couldn't you

11  call him and get preapproval or get approval that way?

12     A    I don't know if he was one that could approve

13  or preapprove overtime.  I didn't know if it was him or

14  the manager.  I wasn't clear.

15     Q    What about calling Mr. Stucker in the same

16  situation, you know, you had a bad embalming case

17  because heaven knows you get those occasionally and this

18  is going to take more time than what was initially

19  estimated and you needed to get ready for a service the

20  next day, there's only so many hours in day to get it

21  done.

22     Did you ever try to call Mr. Stucker and make

23  those kind of comments to him?

24     A    I tried not to bother these people after normal

25  business hours.  They've got their own lives.

00166

1     Q    So the answer is no because you try not to

2  bother these people because they have their own lives?

3     A    It was out of courtesy.  I'm not going to call

4  them at 3:00 in the morning and tell them I'm having a

5  problem with a body.

6     Q    How often did you work at 3:00 in the morning?

7     A    A lot.

8     Q    Was that usually where the overtime was at, was

9  at 3:00 o'clock in the morning?

10     A    What I would do normally is, and everybody knew

11  this, that I would work in the office from 8:00 to 5:00

12  or so.  And then at the end of the day when the doors

13  closed, the phones stopped ringing, I would go in the

14  back to start embalming.  I'd be uninterrupted.  So a

15  lot of that was naturally going to be overtime anyways.

16  And then some of it ran a lot longer than expected.

17     Q    Under the overtime category on page six of

18  Exhibit 10, the last sentence in the first full

19  paragraph states, quote, Employees may contact their

20  manager or human resources manager for clarification of

21  how overtime is calculated and paid in their state; do

22  you see that?

23     A    Yes.

Page 69

Deposition Transcript of Louise Johnson (07-17-09)

```
25    six months.  And that's when it turned over to the care
00213
 1    center.
 2         Q    Four to six months into 2007?
 3         A    I believe so.
 4         Q    Would it be fair to say midyear, 2007, June or
 5    July?
 6         A    That sounds about right.
 7         Q    The service center started taking over most of
 8    the embalmings?
 9         A    Yes.
10         Q    Would it also be fair to say that the overtime
11    reflected in 2005, 2006, and part of 2007 was primarily
12    due to your working as an embalmer performing those
13    services in addition to the days you worked as a funeral
14    director?
15         A    Yes.
16         Q    Next will be Exhibit 13.  And this is a
17    one-page document entitled Information Sheet.
18              (Johnson Exhibit 13 was marked for
19              identification by the Certified Shorthand
20              Reporter and a copy is attached hereto.)
21    BY MR. FORESTIERE
22         Q    Before I get there, were you ever given any
23    monetary awards while you worked at Harbor Lawn?
24         A    By whom?
25         Q    By your employer, by Alderwoods.
00214
 1         A    No.
 2         Q    I think we talked about this a little bit, but
 3    do you have a driver's license now?
 4         A    I do now.
 5         Q    When did you get that?
 6         A    I think December 2006.
 7         Q    Since that time were you driving to the
 8    facility at Harbor Lawn to report to work?
 9         A    Yes.
10         Q    So prior to that time, December 2006, you were
11    carpooling with your husband?
12         A    Yes.  And I still do on the days we work
13    together.
14         Q    Other than Miss Baxter coming to you in the
15    morning when you got there early and telling you you
16    needed to do this, generally when is it that you started
17    your workday?
18         A    8:00 clock.
19         Q    And you would work until what time?
20         A    5:00 o'clock.
21         Q    And when would you take a lunch during that
22    time period, usually?
23         A    It was different every single day.  Depended on
24    the work that was going on.
25         Q    Your time card would reflect, then, the time
00215
 1    periods that you worked or started your lunch period?
 2         A    For a lot of the time we would put down, you
 3    know, whether it was from 3:30 to 4:30, we would put
 4    that down as 3:30 to 4:30.  But we had all this mess
 5    with the lunch breaks and overtime, we had to have it by
 6    a certain day and it's --
 7         Q    You talking about for the Fridays now?
 8         A    No.  The lunch breaks, where we have to have
 9    eaten by a certain time of day, uh, we get hassled if we
```

Page 89

Deposition Transcript of Louise Johnson (07-17-09)

```
10   haven't eaten by that certain time of day, but on the
11   other hand, we have no control over the workload that's
12   coming in.
13           So it's a lot easier for us to put 12:00 to
14   1:00 every single day.  It's not even worth the hassle
15   sometimes of them saying why didn't you take your break
16   earlier?  It's because we had four funerals going on and
17   six people walked in.
18       Q    Did you ever have that conversation with Mr. --
19       A    Stucker?
20       Q    Yeah.  Start with him.  I was going to say the
21   other guy.
22       A    Owen.
23       Q    Did you ever have that conversation with
24   Mr. Owen?
25       A    He's well aware of it because this happens to
00216
1    him all the time also.  And he knows it happens to us.
2    We all generally eat lunch about the same time and we
3    share our work duties.  So if one of us is busy, usually
4    the other ones are, too.
5        Q    And then you worked generally till 5:00 o'clock
6    average?
7        A    Yes.
8        Q    And on days you were doing embalming would you
9    just start right up at 5:00 o'clock at that time or
10   5:30?
11       A    Usually it was 5:00 o'clock.  Or whenever we
12   closed the front door, that's when I was pretty much
13   free to go in the back and work uninterrupted.
14       Q    Did you put that time on your time card as
15   well?
16       A    After 5:00 o'clock?
17       Q    Yeah.  The time you spent working overtime as
18   an embalmer?
19       A    I did for the most part.
20       Q    You were compensated for that time?
21       A    For what I put down, yes.
22       Q    Okay.  Let's get back to this information
23   sheet.  Have you had an opportunity to take a look at
24   that?
25       A    Yes.
00217
1        Q    And is that your signature down at the bottom
2    right-hand corner?
3        A    Yes.
4        Q    And is that your writing where it says Louise
5    Johnson?
6        A    Yes.
7        Q    And to the left, the date of September 23rd,
8    2007; is that your handwriting?
9        A    Yes.
10       Q    And did you sign this document on or about that
11   time?
12       A    Yes.
13       Q    What other handwriting on this document is
14   yours?
15       A    That's the only writing on there that's mine,
16   the rest of it is someone else's.
17       Q    Do you know whose handwriting that is?
18       A    I don't.  I think it's somebody associated with
19   the law firm.
20       Q    Up at the top it talks about date of your
```

Page 90

Deposition Transcript of Louise Johnson (07-17-09)

20    A    That might be what it evens out to.
21    Q    So just so we have a clear record, there, on
22  average, were two meal periods you worked per week that
23  you were not compensated for?
24    A    Probably.
25    Q    And that would be at least during the entire
00235
1  time you worked as a funeral director, correct?
2    A    Yes.
3    Q    Did Alderwoods have a policy that required you
4  to work through your meal periods?
5    A    It was understood that we would do what we
6  needed to do whether we were eating or not.
7    Q    Did you ever see a written policy by Alderwoods
8  saying all employees must work throughout their meal
9  periods?
10        MR. MCGEE:  Object to the form.
11  BY MR. FORESTIERE:
12    Q    You never saw anything in writing that way, did
13  you?
14    A    I don't recall.
15    Q    Did any Alderwoods manager ever tell you that
16  you had to work throughout all of your meal periods
17  while at Harbor Lawn?
18    A    Nobody's ever said that you must work through
19  all of your meal breaks; but in the same token, it was
20  expected that we wouldn't leave.  The three of us
21  funeral directors, there was an unspoken rule we don't
22  go anywhere.  We're still on the premises, so we're
23  still available.  So therefore they were constantly
24  interrupting us.
25    Q    Why couldn't you rotate among the three of you
00236
1  to handle all of these interruptions during your meal
2.  periods?
3    A    We did to some extent.  Like the phone would
4  ring, one person would answer it, someone would come to
5  the door, I would get up and answer it, the next phone
6  call, the other director answers it.
7    Q    No.  I'm talking about today.  You're on meal
8  interruption duty and the other two people can take
9  their meal period uninterrupted; did you ever talk about
10  doing that?
11    A    Did you ever get six phone calls at once?
12    Q    Yeah, I do.  And I put them on hold and go to
13  the next one.
14    A    It's what we've always had to do.  And if
15  someone's died, you can't do that.
16    Q    So the answer is:  Did you ever have those
17  discussions or not?
18    A    It's unrealistic.
19    Q    Miss Johnson, I understand it may be
20  unrealistic.  My question is did you have such
21  discussions with Curt and Kathy about rotating amongst
22  yourselves the duty to take all the interruptions during
23  the meal periods so that the other two could have
24  uninterrupted lunches?
25    A    We never discussed that because it just wasn't
00237
1  an option for us.
2    Q    By the way, you never signed any affidavits or
3  declarations concerning this lawsuit, have you?
4    A    None that I know of.
                    Page 98

Deposition Transcript of Louise Johnson (07-17-09)
```
 6   received?
 7           MR. FORESTIERE:  Objection.
 8           THE WITNESS:  I believe so.
 9   BY MR. MCGEE:
10      Q    Now, let's talk about the preapproval.  You say
11   it didn't make sense.  Could you explain, what do you
12   mean by that?
13      A    Because of the nature of our work, it was too
14   hard to determine if and when there would be overtime
15   and you couldn't say for certain how long.
16           I could theoretically get preapproved for an
17   hour's worth of overtime; but if I told them I wanted
18   ten hours preapproval, they probably wouldn't accept it.
19   But how do I figure out how long I'm going to be working
20   my overtime for?  So it was something where we would
21   look at after the fact.
22      Q    Okay.  You personally remember discussions
23   about the preapprove policy, correct?
24           MR. FORESTIERE:  Objection.
25           THE WITNESS:  Yes, I remember.
00284
 1   BY MR. MCGEE:
 2      Q    And if I understood your testimony, based on
 3   the way the business was, it was hard to always get
 4   preapproval for every instance of overtime; is that
 5   correct?
 6           MR. FORESTIERE:  Objection.
 7           THE WITNESS:  It's hard if not impossible.  So
 8   that's why we just didn't even bother.
 9   BY MR. MCGEE:
10      Q    Didn't even bother to what?
11      A    To try and obtain preapproval.  Something that
12   they knew we were working, but they didn't know exactly
13   how many hours, because we didn't know.
14      Q    Did that factor into -- I mean, you've
15   testified here today that some of your claim is time you
16   did not put down on your time card; is that correct?
17      A    Yes.
18      Q    And did this preapproval policy, as you
19   understood it, have any effect on your recording of your
20   time?
21           MR. FORESTIERE:  Objection.
22           THE WITNESS:  I don't know if it did or did
23   not.  We -- we were aware of the policy, but we, for the
24   most part, ignored it.  It's just not something that we
25   could apply to ourselves.  We couldn't make it work for
00285
 1   ourselves.
 2   BY MR. MCGEE:
 3      Q    Explain for me, then, why it was you didn't put
 4   down all of your time.
 5           MR. FORESTIERE:  Objection.
 6           MR. MCGEE:  All of your time worked.
 7           MR. FORESTIERE:  Same.
 8   BY MR. MCGEE:
 9      Q    On your time card?
10           MR. FORESTIERE:  Objection.
11           THE WITNESS:  The reason I didn't put down all
12   of the time I worked was because I knew I would be given
13   a hard time about it, it would start problems, I'd have
14   people watching me, they wouldn't be letting me do my
15   job effectively.  And what I'm trying to do is get my
16   job done to the best of my ability.
```
Page 118

Deposition Transcript of Louise Johnson (07-17-09)

```
17        And if they cut me off, cut me short, I can't
18 do that job to the best of my ability.  So in the best
19 interest of the families I was serving, I had made a
20 judgment call saying I'd rather serve them better than
21 get chastised by these people.
22    Q    Who do you mean by these people?
23    A    My company.  My supervisor.  Whoever was
24 putting in my time that would have argued with my
25 overtime.
00286
1     Q    I believe you testified that at least on one
2  occasion you went and worked at another funeral home
3  owned and operated by Alderwoods; is that correct?
4         MR. FORESTIERE:  Objection.
5         THE WITNESS:  Yes.
6  BY MR. McGEE:
7     Q    Which home was that again?
8     A    White's Funeral Home in Bellflower.
9     Q    And what did you do there?
10    A    I spent one day doing death certificates.  I
11 may have answered the phone.
12    Q    And when you got there, did anybody instruct
13 you on any policies or procedures for how to perform
14 your job duties at that home?
15        MR. FORESTIERE:  Objection.
16        THE WITNESS:  I don't believe it came up.
17 BY MR. McGEE:
18    Q    Did you believe you were to perform your duties
19 under the same policies and procedures at that home as
20 you did at Harbor Lawn?
21        MR. FORESTIERE:  Objection.
22        THE WITNESS:  There was no reason not to.
23 BY MR. McGEE
24    Q    So is that a yes?
25    A    Yes.
00287
1         MR. FORESTIERE:  Objection.
2  BY MR. McGEE:
3     Q    You gave some various testimony on direct on
4  e-mail.  I'm going to start at the beginning of your
5  employment.  Not with -- I forget who you said owned the
6  home before Alderwoods.
7         From Alderwoods going forward when they came on
8  scene, and I believe it was somewhere in late 2003,
9  early 2004, to the best of your knowledge, correct?
10    A    Yes.
11        MR. FORESTIERE:  Objection.
12 BY MR. McGEE:
13    Q    From that point -- at that point did you have
14 e-mail?
15    A    When we were Alderwoods, from 2003 on, we did
16 not have personal e-mail through the company.  I believe
17 my manager had a company e-mail, I think my assistant
18 manager may have had access to it.  But we were not
19 given our own company e-mail until SCI took over.
20    Q    Do you know for what reasons your manager would
21 use the company e-mail account?
22        MR. FORESTIERE:  Objection.
23        THE WITNESS:  I know that he was communicating
24 with other people in the corporation.
25 ///
00288
1  BY MR. McGEE:
```

Page 119

# EXHIBIT 76

```
 1              UNITED STATES DISTRICT COURT
 2            WESTERN DISTRICT OF PENNSYLVANIA
 3   DEBORAH PRISE and HEATHER RADY,
     on behalf of themselves and all
 4   employees similarly situated,
 5        Plaintiffs,
 6   vs.
 7   ALDERWOODS GROUP, INC. and
     SERVICE CORPORATION INTERNATIONAL,
 8
          Defendants.
 9   _____
10   Civil Action No. 06-1641 Civil
     Judge Joy Flowers Conti
11
12
13
14
15          DEPOSITION OF ROBERT GORDON JONES
16              Taken April 21, 2009
                Commencing at 9:30 a.m.
17
            Volume I - Pages 1 - 216, inclusive
18
19
20              Taken by the Defendants
                         at
21              Lane Powell Law Firm
        301 West Northern Lights Boulevard, Suite 301
22                 Anchorage, Alaska
23
     Reported by:
24   Mary A. Vavrik, RMR
25
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Jones**

3 (Pages 6 to 9)

---

**6**

1  A  I do.
2  Q  Sometimes when he objects, I'm just going to --
3  he will put his objection on the record.  There will
4  be this big pause because I'm waiting for you, then,
5  to answer the question.
6  A  Okay.
7  Q  If you need to take a break for any reason, let
8  me know.  I will ask for sometimes perhaps that we
9  finish a line of questioning or answer to a question
10  that I asked before we take a break, but if any time
11  you need to -- I don't know if you smoke or --
12  A  (Shakes head.)
13  Q  Okay.  Well, if you need a break, just let us
14  know; we will take that.
15  A  Okay.
16  Q  Do you understand all the instructions I've
17  given you here today?
18  A  I do.
19  Q  Do you have any medical conditions or take any
20  medication that would prevent you from understanding
21  or answering the questions completely and truthfully
22  today?
23  A  No.
24  Q  Have you reviewed anything in preparation for
25  your deposition today?

---

**7**

1  A  Mike and I looked over some of the paperwork
2  yesterday.
3  Q  Could you identify what the paperwork is that
4  you reviewed, please?
5  A  Memos and time sheets and pay stubs; time cards
6  and pay stubs.
7  Q  And to your understanding, were those documents
8  produced to the defense in this case?
9  A  Yes.
10  Q  You gave those to your attorney previously from
11  today's -- prior to today's deposition?
12  A  Yes.
13  Q  Okay.  Now, you say you have never been deposed
14  before, correct?
15  A  Correct.
16  Q  Have you ever testified at trial before?
17  A  I have.
18  Q  Have you done it more than once?
19  A  No, sir.
20  Q  Okay.  When did you give testimony at a trial?
21  A  It was about a year ago.
22  Q  Do you remember the name of the case?
23  A  I do not.
24  Q  Were you a party to that action?
25  A  No.

---

**8**

1  Q  You were just a witness?
2  A  Yes.
3  Q  Where was the case filed?
4  A  Here in Anchorage.
5  Q  What was the case about?
6  A  It was a family that I met at the funeral home
7  was fighting over the estate of the gentleman who
8  passed away, I believe.
9  Q  And that was in regards to funeral services
10  provided by Greenwood?
11  A  No, sir.  It's while I was working at Kehl's
12  Forest Lawn.  And the gentleman's wife passed away
13  about two months prior, and then he passed away.
14  And because I had met him when his wife passed away,
15  they called me to give my input on his mental
16  condition when his wife died.
17  Q  Could you spell Kehl's for me, please?
18  A  K-E-H-L apostrophe S.
19  Q  So it was a state-of-mind type of contest?
20  A  I believe so, yeah.  They were fighting over
21  what was left of --
22  Q  Any other trial testimony that you gave?
23  A  No, sir.
24  Q  Have you ever filed a lawsuit against anyone?
25  A  No, sir.

---

**9**

1  Q  I mean other than this lawsuit.
2  A  No, sir.
3  Q  Okay.  Have you ever filed any claims
4  concerning wage and hour conditions of your
5  employment with any government agency?
6  A  No, sir.
7  Q  Ever filed any government claims concerning
8  your work at Evergreen Memorial Chapel and Funeral
9  Home?
10  A  No, sir.
11  Q  And just for shorthand, I'm going to refer to
12  Evergreen Memorial chapel and the funeral home as
13  just Greenwood.  That way I won't have to say it so
14  long.  Would you understand if I just said Greenwood
15  what I'm referring to?
16  A  I believe so.  Why Greenwood?
17  Q  Do I have the wrong funeral home?
18  A  I guess it's a combination of Alderwoods and
19  Evergreen, but --
20  Q  I'm going to get to that next.  Greenwood was
21  the facility where you worked at, correct?
22  A  No, sir.
23  Q  What's the name of the funeral home that you
24  worked at?
25  A  Well, it was Evergreen Memorial Chapel is the

---

NETWORK DEPOSITION SERVICES
Transcript of Robert Jones

**10**

1  main office, the Alaska Cremation Center on Spenard,
2  and the Evergreen Eagle River Chapel.
3  Q  My mistake.  It is Evergreen.
4  A  Yes, sir.
5  Q  So when I say Evergreen Memorial Chapel and
6  Funeral Home, you know that I'm referring to that
7  facility?
8  A  Yes, sir.
9  Q  And what is your understanding as to who owns
10 that facility?
11 A  I believe it's owned now by Mr. Janssen and his
12 partner, Mr. Eastman.
13 Q  Were you aware if Alderwoods Group, Inc. ever
14 owned that facility?
15 A  Yes.
16 Q  Do you remember a period of time that occurred?
17 A  Yes, sir.
18 Q  Could you tell me that, please?
19 A  Let's see.  Alderwoods came out of the
20 bankruptcy, but I'm not exactly sure when that was.
21 So they emerged from bankruptcy as Alderwoods until,
22 I believe, they were bought by SCI.
23 Q  Okay.  You talking about the Loewen bankruptcy?
24 A  Yes, sir.
25 Q  You know when it was bought by SCI?

**11**

1  A  It was summer, early fall of '06, I believe.
2  Q  By the way, from time to time I'll be asking
3  you questions about dates.  If you remember the
4  exact date, that's fine.  It would be unusual, but
5  if you have a, like I said, recollection or an
6  estimate as to the month or year or season or if it
7  happened around a holiday or an event, I'm entitled
8  to your best recollection --
9  A  Okay.
10 Q  -- into that testimony as well if you have a
11 recollection of it.  Okay?
12 A  Yes, sir.
13     MR. FORESTIERE:  Let's go ahead and
14 mark as exhibit -- are we doing letters or numbers?
15     MR. LINGLE:  Numbers, I think.
16     MR. FORESTIERE:  Exhibit No. 1 to
17 your deposition here, your deposition notice.
18     (Exhibit No. 1 marked.)
19 BY MR. FORESTIERE:
20 Q  Okay.  Have you had a chance to take a look at
21 that document, sir?
22 A  Yes, sir.
23 Q  And this is the document by which you were
24 taking -- by which we are taking your deposition
25 today.

**12**

1  A  (Nods head.)
2  Q  And we will probably go through most of this
3  this afternoon, I think.  Your attorney had
4  mentioned that you had some additional documents
5  that you wanted to produce.  And maybe we could
6  identify those now, if we could.
7     MR. LINGLE:  We have brought with us
8  some day -- yearly day planners during the time when
9  Mr. Jones worked for Alderwoods.  So -- and we have
10 offered to let Mr. Forestiere look at those over the
11 meal break so if he has questions he can ask them
12 today, but we will produce them in the future.
13     MR. FORESTIERE:  Thank you.
14 BY MR. FORESTIERE:
15 Q  How did you first learn about this lawsuit,
16 Mr. Jones?
17 A  I received a letter from the Dolin, Thomas
18 folks.
19 Q  Do you recall when that was?
20 A  No, sir.
21 Q  Did you learn about this lawsuit from any other
22 Alderwoods employees?
23 A  Former employees when I went to work at the
24 Kehl's Funeral Home.  There were some former
25 employees of theirs.

**13**

1  Q  Who were they?
2  A  Jeff Diggs, Rob Schaefer, Ed Bouwens.
3  Q  Can you spell Bouwens, please?
4  A  B-O-U-W-E-N-S.
5  Q  Anyone else?
6  A  No, sir.
7  Q  Have you had discussions with those
8  individuals -- Mr. Diggs, Schaefer, Bouwens -- about
9  this lawsuit?
10 A  Yes, yes, sir.
11 Q  What generally did you discuss with them?
12 A  Just generally that we had been contacted.  The
13 three -- the four of us worked together briefly, and
14 I see them occasionally since then, so just kind of
15 how is it going, have you heard anything kind of
16 discussions.
17 Q  Let's talk -- let's first focus on Mr. Diggs.
18 When did you first talk to him about this lawsuit?
19 A  It must have been around the first part of
20 April, end of March of '06.
21 Q  Have you had one -- more than one telephone --
22 strike that.  Have you had more than one
23 conversation with him about this lawsuit?
24 A  Yes.
25 Q  How many have you had?

**Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg**
**866-565-1929**

206

1    reverse.
2              EXAMINATION
3    BY MR. LINGLE:
4    Q   You were asked a few questions earlier today
5    concerning your -- the termination of employees.  Do
6    you recall that?
7    A   Uh-huh.
8    Q   Was it the case that -- how -- tell me about
9    the process for how somebody would be terminated.
10   A   Well, let's see.  We would -- I would need to
11   inform Mr. Janssen of whatever the issue may be,
12   typically not showing up for scheduled shifts, and
13   he would make a decision as to what the next step
14   would be.  And he would give me those instructions
15   and I would take care of it.
16   Q   And would you follow through, then, on his
17   instructions?
18   A   Yes, sir.
19   Q   Tell me about the process that would be
20   involved for hiring somebody.
21   A   Folks usually came to the funeral home to apply
22   through word of mouth.  And that seemed to be the
23   best way to get folks, but every once in a while we
24   would have to post it in, you know, a general public
25   newspaper and on-line, things like that.

207

1         They would come in, fill out the
2    application, have an interview with typically myself
3    and Mrs. Boyd.  And she and I would talk about the
4    interviews, and if we thought the person was a good
5    candidate we would make that recommendation to
6    Mr. Janssen, and he would make the decision and go
7    from there.
8    Q   There was some reference earlier to your day
9    planners.
10   A   Uh-huh.
11   Q   Do you remember that today?
12   A   Yes, sir.
13   Q   Are the day planners an accurate representation
14   of the time that you worked?
15            MR. FORESTIERE: Objection, form.
16            THE WITNESS: Not entirely.
17   BY MR. LINGLE:
18   Q   You did not -- did you record all the time that
19   you worked in your day planners?
20   A   No.
21   Q   And would your time clock punches be a more
22   accurate recording of the time that you worked?
23            MR. FORESTIERE: Objection, vague,
24   form of the question.
25            THE WITNESS: Yes.

208

1    BY MR. LINGLE:
2    Q   You would typically punch your -- punch in on
3    the time card when you arrived at work, right?
4    A   Yes, sir.
5    Q   And you would typically punch out at the end of
6    the day when you left work, right?
7    A   Yes, sir.
8    Q   And those would be the hours that you worked in
9    the funeral home, right?
10   A   Correct.
11   Q   You described, I believe, at least two
12   different ways in which on-call work -- or death
13   calls, how those were paid during your employment,
14   is that right?
15   A   Yes, sir.
16   Q   And one I think you described as a flat rate,
17   right?
18   A   Like piecework?
19   Q   Right.
20   A   Yes, sir.
21   Q   And was there a time I think you also described
22   where individuals actually recorded the time that it
23   took them to do a removal?
24   A   Yes, sir.
25   Q   Okay.  When those policies were in place, did

209

1    they apply to everybody in your funeral home, to
2    your knowledge?
3    A   I believe they did.
4    Q   Are you aware of any employee at the funeral
5    home location where you worked who was permitted to
6    record the time they spent working for community
7    service organizations?
8    A   No, sir.
9    Q   You were also asked earlier about how you might
10   go about figuring out the amount that you are owed.
11   Do you recall that?
12   A   Yes, sir.
13   Q   Okay.  Now, for time spent in the funeral home,
14   could we look at the time punches and add up the
15   hours that were reflected from the time punches to
16   determine how much time you spent working in the
17   funeral home?
18            MR. FORESTIERE: Objection to form.
19            THE WITNESS: Could you say that
20   again?
21   BY MR. LINGLE:
22   Q   Sure.  We have -- you want to take a look at
23   Exhibit 11 again for a second?  Now, Exhibit 11
24   is -- contains some of your time cards, correct?
25   A   Correct.

EXHIBIT 77

**NETWORK DEPOSITION SERVICES**
**Transcript of Angela Keath**

```
 1              IN THE UNITED STATES DISTRICT COURT

 2          FOR THE WESTERN DISTRICT OF PENNSYLVANIA

 3                      *  *  *  *  *

 4   DEBORAH PRISE AND HEATHER RADY
     ON BEHALF OF THEMSELVES AND ALL
 5   EMPLOYEES SIMILARLY SITUATED,

 6        Plaintiffs,

 7   vs.                        Civil Action No. 06-1641

 8   ALDERWOODS GROUP, INC.,

 9        Defendants.

10

11             DEPOSITION OF ANGELA KEATH

12        ON MARCH 5, 2009, BEGINNING AT 11:20 A.M.
                IN COFFEYVILLE, KANSAS

13

14                    APPEARANCES:

15   On behalf of the Plaintiffs:

16   Annette Gifford, Attorney at Law
     DOLIN, THOMAS & SOLOMON, LLP
17   693 East Avenue
     Rochester, New York 14607
18   (585) 272-0540
     agifford@theemploymentattorneys.com

19

20   On behalf of the Defendant:

21   Michelle Amy Morgan, Attorney at Law
     JONES DAY
22   2727 North Harwood Street
     Dallas, Texas 75201-1515
23   (214) 220-3939
     mamorgan@jonesday.com

24

25   REPORTED BY:  DAVID G. HARJO, CSR RPR
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Angela Keath**

2

CONTENTS

1  Direct Examination by Ms. Morgan................. 4
2  Cross-Examination by Ms. Gifford................. 238
3  Redirect Examination by Ms. Morgan.............. 245
4  Recross-Examination by Ms. Gifford.............. 247

DEFENDANT'S EXHIBITS

1.
2. Consent to join lawsuit.................... 12
3. Offer letter................................. 22
4. Deposition Notice........................... 29
5. Memo dated March 27, 2006, from Chuck
   Gibson, Michael Tuttle and Carol Whitehead...... 63
6. Alderwoods' policy regarding recording
   time, from a 2004 policy binder................ 71
7. Alderwoods' policy regarding work hours and
   overtime, 2006 Alderwoods group policy manual... 75
8. Alderwoods' policy regarding hours of work
   and overtime in the United States.............. 77
9. Alderwoods' new employee form................ 91
10. Alderwoods' change in employee form........ 92
11. Detail printout of checks issued from
    August 2005 to July 2006...................... 94
12. Notice of disciplinary action June of 2006. 102
13. Letter of resignation, June 19, 2006....... 108

3

14. Information sheet.......................... 120
15. Sworn affirmation.......................... 147
16. Alderwoods spreadsheet showing a
    calculation of overtime rate.................. 158

STIPULATIONS

It is hereby stipulated and agreed by and between the parties hereto, through their respective attorneys, that the deposition of ANGELA KEATH may be taken pursuant to Notice and in accordance with the Federal Rules of Civil Procedure on March 5, 2005, in Coffeyvile, Kansas, before David G. Harjo, CSR RPR.

4

WHEREUPON,

ANGELA KEATH,

after having been first duly sworn, deposes and says in reply to the questions propounded as follows, to-wit:

DIRECT EXAMINATION

BY MS. MORGAN:

Q   Would you please state and spell your name for the record.

A   Angela Keath, A-N-G-E-L-A K-E-A-T-H.

Q   Mrs. Keath, my name is Michelle Morgan, I'm an attorney with Jones Day and I represent Alderwoods in this lawsuit. Have you ever been known by any name besides Angela Keith?

A   Johnson was my last name when I worked at Potts.

COURT REPORTER: Worked at where?

MS. MORGAN: Potts, P-O-T-T-S. It's the name of the chapel that Alderwoods owns -- owned.

Q   (By Ms. Morgan) For purpose of the deposition may I address you as Mrs. Keath?

A   Uh-huh.

Q   What is your address?

A   608 North Foreman, Caney, Kansas 67333.

Q   And your social security number?

5

A   XXX-XX-6976.

Q   And your date of birth?

A   4/24/73.

Q   Have you ever been deposed before?

A   No.

Q   I'm going to be asking you questions about the facts and you are under oath so you promised to tell the truth. If -- if you can try your best give a verbal response to my questions that will enable to the court reporter to take down your responses; is that okay?

A   Okay.

Q   If you don't hear my question, would you ask me to repeat it?

A   Okay.

Q   And if you don't understand, if you will tell me and I'll rephrase.

A   Okay.

Q   If you answer my question I'm going to assume that you heard and understood it; is that fair?

A   Okay.

Q   If at any point during the deposition you realize that an answer that you previously gave is inaccurate or you want to correct it, please feel

Johnstown
814-266-2042

Toll-Free
866-565-1929

Pittsburgh
412-281-7908

**NETWORK DEPOSITION SERVICES**
**Transcript of Angela Keath**

31 (Pages 118 to 121)

---

118

1  married employees, as you understood it, was that
2  married employees could not work at the same
3  location; right?
4     A   Uh-huh.
5     Q   But you and John both separated --
6  tendered your resignation and separated employment
7  with Alderwoods; correct?
8     A   Yes.
9     Q   And I believe you testified that one of
10  the reasons why you separated from employment with
11  Alderwoods was this policy that married employees
12  couldn't work at the same location; correct?
13     A   Yes.
14     Q   Okay. So was it -- was it -- was it your
15  plan that John Keath would stay on and continue to
16  work at Alderwoods and you would work elsewhere?
17     A   That was originally our plan, is that I
18  was going to leave because, I mean, honestly my job
19  is a whole lot easier to replace, a $10 an hour job
20  versus him as a funeral director in that specific
21  environment. But when Parcells happened to call and
22  said that he was buying the funeral home in Caney,
23  where we lived, and was looking for a funeral
24  director to run it, it was just too good of an
25  opportunity for both of us to be able to stay in the

---

119

1  same position, same field that we were in, in the
2  hometown that we lived in, and so we both took it.
3     MS. MORGAN: Can we go off the record a
4  minute?
5     (Recess.)
6     MS. MORGAN: Ready?
7     Q   (By Ms. Morgan) Ms. Keath, are you
8  claiming in the lawsuit that you were not paid for
9  all the time you spent working for Alderwoods
10  because that time was not preapproved?
11     MS. GIFFORD: Objection.
12     THE WITNESS: No. I'm claiming that I
13  wasn't paid for all the time that I worked doing
14  community service things, representing Alderwoods.
15  And the mealtimes that we were required to take
16  whether we actually took them or not.
17     Q   (By Ms. Morgan) So you are not claiming
18  that you weren't paid for time you spent working for
19  Alderwoods because it wasn't preapproved?
20     MS. GIFFORD: Objection.
21     THE WITNESS: I am not saying that I was
22  not paid for -- I don't know how I would say this.
23  I was paid for my normal hours and if I wrote down I
24  worked 8:00 to 6:00 I was paid for 8:00 to 6:00, but
25  I may not have been able to take a 30-minute lunch

---

120

1  hour that day and we were made to write them out. I
2  may have gone to a Habitat for Humanity's meeting
3  that night, representing the funeral home, and I was
4  not paid to go even though it was strongly -- what
5  am I trying to say? They strongly recommended that
6  we be involved in the community, and continually
7  asked, what groups are you in? What are you
8  participating in? That's what I'm saying. Is there
9  was mealtimes that I wasn't paid for and there was
10  community service activities that I was not paid
11  for.
12     Q   (By Ms. Morgan) Is there any other time
13  that you worked that you're claiming you were not
14  paid for, other than the mealtimes and the community
15  service work?
16     MS. GIFFORD: Objection.
17     THE WITNESS: No, I don't think so.
18     (Defendant's Exhibit 14 marked for
19  identification.)
20     Q   (By Ms. Morgan) I have handed you what's
21  been marked as Defendant's Exhibit 14. Are you
22  familiar with this document?
23     A   Yes.
24     Q   (By Ms. Morgan) Is it your signature at
25  the bottom?

---

121

1     A   Yes.
2     Q   When did you receive this information
3  sheet?
4     MS. GIFFORD: Objection.
5     THE WITNESS: I'm going to guess around
6  April 28th of '08. Because that's the date that I
7  dated it.
8     Q   (By Ms. Morgan) Did anyone help you fill
9  it out?
10     A   No.
11     Q   Did you discuss it with an attorney?
12     MS. GIFFORD: Objection.
13     THE WITNESS: No.
14     Q   (By Ms. Morgan) Did you have multiple
15  versions of this document, or just one?
16     MS. GIFFORD: Objection.
17     THE WITNESS: Just one I think. I think
18  this was the only one that -- I don't think there
19  was multiple versions that I was given.
20     Q   (By Ms. Morgan) What process did you go
21  through to fill this document out?
22     A   I read the sentences and checked the ones
23  that I thought applied to me.
24     Q   And then did you do anything with this
25  document once you filled it out?

---

**Johnstown**
**814-266-2042**

**Toll-Free**
**866-565-1929**

**Pittsburgh**
**412-281-7908**

NETWORK DEPOSITION SERVICES
**Transcript of Angela Keath**

41 (Pages 158 to 161)

158

1    did receive an overtime adjustment that accounted
2    for the payment of your bonus?
3        MS. GIFFORD: Objection.
4        THE WITNESS: I don't know. I have no
5    idea. All I did was add up the payroll and send it
6    in, and what had they did with it after that I have
7    no idea.
8        (Defendant's Exhibit 16 marked for
9    identification.)
10        Q   (By Ms. Morgan) I have handed you what's
11    been marked as Defendant's Exhibit 16. This is an
12    Alderwoods spreadsheet that shows a calculation of
13    your overtime rate. Do you see on the third page of
14    this document ALD 004287, an entry for a year-end
15    bonus for period ending March 18, 2003 in the amount
16    of $72.13?
17        A   Yes.
18        Q   And you received a bonus in the gross
19    amount of $72.13 in your March 16, 2006 paycheck?
20        MS. GIFFORD: Objection.
21        THE WITNESS: March 18, 2006?
22        Q   (By Ms. Morgan) Did you receive a bonus
23    from Alderwoods in the gross amount of $72.13?
24        MS. GIFFORD: Objection.
25        THE WITNESS: Yeah.

159

1        Q   (By Ms. Morgan) Okay. But you don't
2    remember when you received it; is that right?
3        A   No.
4        Q   Okay. If you could take a look at
5    Exhibit 11, and turn to the page marked ALD 008103.
6    And there's an entry for March 16, 2006, for a
7    year-end bonus in the amount of $72.13.
8        A   Yes.
9        Q   Okay. And then the net was $44.98?
10        A   Uh-huh.
11        Q   And you recall that you did receive a
12    bonus from Alderwoods in the net amount of
13    approximately $44.98; is that right?
14        A   Yes.
15        Q   Okay. So do you know whether that bonus
16    that you received from Alderwoods was applied to
17    your overtime hours?
18        MS. GIFFORD: Objection.
19        Q   (By Ms. Morgan) Resulting in an overtime
20    adjustment that you received?
21        THE WITNESS: I have no idea.
22        Q   (By Ms. Morgan) So Mrs. Keath, you don't
23    know whether the bonus that you received from
24    Alderwoods was -- you don't know whether your
25    overtime pay rate at Alderwoods took into account

160

1    the bonus that you received from Alderwoods?
2        MS. GIFFORD: Objection.
3        THE WITNESS: I have no idea.
4        Q   (By Ms. Morgan) Are you currently claiming
5    in the lawsuit that you were not paid for any
6    community service work that you performed?
7        A   Yes.
8        Q   During the time that you work for
9    Alderwoods did you do any community service work?
10        A   Yes.
11        Q   What work did you do? What community
12    service work or community work did you do?
13        A   I had gone to several meetings to try and
14    discover which community organization I wanted to be
15    involved in. Went to a couple of Habitat for
16    Humanity meetings. And one was with the Humane
17    Society about volunteers. And went to, I would say
18    in my best guestimate, four Chamber of Commerce
19    meetings. All in Independence.
20        Q   And your Humane Society meeting, Habitat
21    for Humanity meeting and the Chamber of Commerce
22    meetings, those were all to learn about the
23    community service work, opportunities there?
24        A   Yeah, to kind of check out the groups, to
25    see what I wanted to be involved with. It was

161

1    strongly suggested that you be involved in some form
2    of activity in the community. So I went to several
3    different ones to see which one I would be the most
4    interested in.
5        Q   Who suggested that you be involved in
6    community work?
7        A   It came from Mike and David and Kim and
8    Brandi, they had all asked what are you involved in.
9        Q   Did you say Brandi?
10        A   Uh-huh.
11        Q   So Mike, Kim and Brandi?
12        A   And David.
13        Q   David. Anybody else suggest that you be
14    involved in community work?
15        A   No.
16        Q   Was there any -- did you ever see any
17    written policy strongly suggesting that you be
18    involved in community work?
19        MS. GIFFORD: Objection.
20        THE WITNESS: I'm sure that we did but
21    what I am positive to is that it was in location
22    administrator phone calls, our conference calls,
23    they would ask what groups are you involved in, it
24    came up in our monthly meetings when Mike Skolaut
25    would be there and they would ask what activities

**Johnstown**
814-266-2042

**Toll-Free**
866-565-1929

**Pittsburgh**
412-281-7908

**NETWORK DEPOSITION SERVICES**
**Transcript of Angela Keath**

162

1   are we involved in.  Of course David knew because he
2   had to let us, you know, either off work early or
3   going to a luncheon for some event or whatever, so
4   he knew what events we were in.  But, I mean,
5   several people always asked so I know I can speak to
6   the verbal communication about it but I'm not a
7   hundred percent positive about the written.
8       Q   (By Ms. Morgan) And in these location
9   administrator conference calls, was -- were they
10  just -- were they asking about your involvement or
11  were they strongly suggesting that you be involved,
12  or what took place in the call?
13      A   Well, they strongly suggested that we be
14  involved, and they strongly suggested even with us
15  that -- they wanted us to know that even though we
16  were the location administrators that we were still
17  considered a face in the community of Alderwoods so
18  that they weren't just talking to funeral directors
19  when they wanted them to be community involved.  But
20  it applied to us too.
21      Q   Was it Kim or Brandi who led the location
22  administrator conference calls?
23      A   They both did.  Brandi usually spoke to
24  more of the paperwork procedures, doing all of your
25  paperwork correctly, where Kim would kind of speak

163

1   to the overall company procedures.
2       Q   Was there any other individual that would
3   lead the location administrator conference calls
4   other than Kim or Brandi?
5       A   No.
6       Q   Who else would participate in location
7   administrator conference calls?
8       A   All of the LAs in WE 23, all of them in
9   our district.
10      Q   How many were there; how many location
11  administrators were there in the district?
12      A   Well, they would do -- they would do a
13  couple of or three maybe different phone calls based
14  on the different time zones, so -- there's probably
15  12 or 15 on our conference call.
16      Q   And how often would you have the location
17  administrator conference calls?
18      A   There was really no set time.  It would
19  just depend on that we needed to talk about.  They
20  would usually try to do one every month to six weeks
21  but sometimes we would have them every couple of
22  weeks depending on if there were paperwork changes
23  or, you know, new forms implemented or things like
24  that.  But they would definitely try to do it every
25  month to six weeks.

164

1       Q   Would all of the location administrator
2   conference calls addressed community work?
3       A   Not all, no.
4       Q   About how many would address community
5   work?
6       A   I would say in some form half.
7       Q   And other than explaining that the --
8   other than encouraging location administrators to be
9   involved in community work and asking about what
10  community involvement you'd had, was there any other
11  community work topic that they addressed?
12          MS. GIFFORD:  Objection.
13          THE WITNESS:  I can't think of any.  I
14  don't know what else it would have been.  It was
15  just, when they asked about your community service
16  it was kind of a big rah rah to get you excited to
17  get out in your community and represent the funeral
18  home.
19      Q   (By Ms. Morgan) And would you, on these
20  conference calls would you describe the community
21  service work you were involved in?
22      A   Yeah, they would ask if I had -- have you
23  picked a group or what are you doing?  So I would
24  tell them, Habitat or wherever I had gone, you know,
25  that I was still searching for a group and I would

165

1   tell them wherever I had gone to check it out.
2       Q   Would you just describe generally the
3   work that you had done or the status of your search
4   for community organization, or would you describe in
5   detail what community work you had performed on
6   those phone calls?
7       A   No, I would do it generically because, I
8   mean, not everybody cared that I went to a Habitat
9   meeting, you know, we were on there to discuss
10  whatever the topic of the conversation was, so I
11  would just tell them, I'm still looking.  While we
12  were on those calls.  Now, if they called and asked
13  me, it was just us, and they asked, what are you
14  involved in, I might go into a little more detail,
15  but as far as on a conference call, no, I wasn't
16  going to -- I didn't go into detail.
17      Q   Did Brandi or Kim or any other
18  Alderwoods' manager, for that matter, ever ask you
19  specifically about what community work you had
20  performed?
21      A   Yeah, if they were just on the phone with
22  just me they might ask.
23      Q   And who might just ask?
24      A   Any of the three, Mike, Brandi, Kim.
25      Q   And David too?

**Johnstown**
814-266-2042

**Toll-Free**
866-565-1929

**Pittsburgh**
412-281-7908

**NETWORK DEPOSITION SERVICES**
**Transcript of Angela Keath**

43 (Pages 166 to 169)

166

1    A    Well, David wouldn't have to just be on
2  the phone with me to ask, he knew what meetings I
3  was going to or whatever. It was just a topic of
4  conversation with us, not a specific point, are you
5  going to a community service thing; it would just be
6  a topic of conversation with us.
7    Q    What -- you talked about the different
8  meetings that you went to to learn about various
9  community service organizations. Did you decide to
10 start or join any community service organizations?
11   A    No.
12   Q    So were the meetings that you went to to
13 learn about community service, is that the community
14 service work --
15   A    Yes.
16   Q    -- that you performed?
17   A    Yeah. I mean, I gave -- I gave them a
18 shot. You know, I would go to two or three
19 meetings, if it wasn't holding my attention I didn't
20 want to be there anyway, it wasn't in the town that
21 I lived in, I lived in Coffeyville; if I were going
22 to volunteer my time it would be in my hometown, not
23 in a town 20 miles away. So, you know, I gave them
24 a shot and if it didn't hold my attention I would
25 move on to something else.

167

1    Q    You never ended up joining any
2  particular, any community organization at all during
3  the time that you worked at Alderwoods?
4    A    No.
5    Q    How much time did you spend going to the
6  Humane Society meeting?
7    A    These meetings were usually a couple of
8  hours, so my guess, best guess would be like five
9  because I know that there's one three-hour really
10 long meeting on, you know, volunteer type
11 orientation, if you wanted to be a volunteer this is
12 everything you had to go through, so if I wanted to
13 go back to volunteer I was already oriented to go.
14   Q    So a total of about five hours for the
15 Humane Society meetings?
16   A    Uh-huh.
17   Q    What about Habitat of Humanity (sic)?
18   A    I went to three meetings of theirs so I
19 claimed three hours, just guessing.
20   Q    Sorry, is it Habitat for Humanity?
21   A    Yeah.
22   Q    Okay. Then you went to four Chamber of
23 Commerce meetings?
24   A    Yeah, they were a couple of hours each,
25 those were the only ones that were fun.

168

1    Q    That was a total of about eight hours?
2    A    Yeah.
3    Q    So was the total amount of time that you
4  spent involved in community work during the time you
5  were at Alderwoods about 17 hours?
6    A    I guess. I mean, we didn't keep track of
7  how many hours we were doing stuff for because we
8  weren't going get paid for them, so that would be my
9  best guesstimate.
10   Q    So you didn't track or record the amount
11 of time that you spent going to community --
12 community organization tape of activities?
13   A    No.
14   Q    But your best guesstimate is about 17
15 hours total?
16   A    Yes.
17   Q    How did you select these three
18 organizations as potential organizations that you
19 might join?
20   A    Because they had the youngest membership.
21 Everybody else was -- sounds bad, but everybody else
22 was old people groups, you know, the Lions Club and
23 the Masons, and I just -- I wasn't interested in
24 shopping the medium age of the group, I just was
25 doing whatever I was told to do. I was trying to

169

1  find something that would at least kind of hold my
2  interest.
3    Q    And how did you -- how did you identify
4  these particular organizations? Were they on a list
5  or did you see it in the newspaper or --
6    A    No. I think David's wife worked for a
7  nonprofit organization of some kind, I think she's
8  the one that provided the list of who to contact for
9  community service and all of this stuff to get
10 involved.
11   Q    So David Hill's wife had some kind of a
12 list of possible organizations?
13   A    Yeah, like nonprofit organizations and
14 community involvement tape stuff.
15   Q    Did David Hill or any other Alderwoods
16 manager tell you you needed to pick an organization
17 that was on that list?
18   A    I mean, he did not like in an
19 intimidating way. It was just, here's the list from
20 my wife, now get busy picking one. You know, I
21 mean, it wasn't like an intimidation, you have to do
22 this. It was, here, get busy, because, I mean, they
23 were on him too about your employees need to get
24 involved, so, you know, in turn he had to convince
25 us that we needed to get involved.

**NETWORK DEPOSITION SERVICES**
**Transcript of Angela Keath**

44 (Pages 170 to 173)

---

**170**

1  Q  Okay.  But -- so did you have to choose
2  one of the organizations or did you feel like you
3  had to choose one of the organizations that was on
4  that list?
5  A  I don't know that I felt like I had to
6  choose one off of that list, but I did feel like I
7  had to choose one, it could have come from another
8  list or just something to get us in front of, you
9  know, people in the community so that at the time of
10  death they would consider -- they would remember us
11  from being in whatever group we were in, use our
12  funeral home.
13  Q  But you never actually did choose any --
14  A  No.
15  Q  -- organization?  Did you consider any
16  aspect of your going to or attending the meetings
17  that's you just described, to involve doing work for
18  Alderwoods?
19  A  Oh, yeah, I wouldn't have been going if
20  it wasn't for the fact I was supposed to be the face
21  of Alderwoods at these functions.
22  Q  Was there any aspect of your
23  participation in these meetings that was something
24  you derived some kind of personal satisfaction --
25  MS. GIFFORD:  Objection.

**171**

1  Q  (By Ms. Morgan) -- from?
2  A  No, I wouldn't have done it in
3  Independence.  If I were just going to volunteer my
4  time to be doing something, it would have been in my
5  own community, not in a community 20 miles away that
6  I worked in, it would have been here in Coffeyville.
7  Q  I believe you testified that Mike Skolaut
8  also suggested that you -- I'm sorry -- strongly
9  suggested that you be involved in community work.
10  What did he communicate to you?
11  A  He didn't make it sound like it was a
12  suggestion, that it was an expectation that you be
13  involved in the community, some form of action.
14  Q  What did he specifically communicate that
15  made it sound like it was an expectation?
16  A  I don't know specifically, but I'm sure
17  that he said, we expect you to be involved in the
18  community, you know.  I don't know exactly what he
19  said but --
20  Q  Did he -- did he give you a list of any
21  suggested organizations to join?
22  A  Oh, no.  No, he didn't.  He was in
23  Wichita.  I mean, that's where he officed out of.
24  He would have no idea what I could join in
25  Independence.  He was three hours away in Wichita.

**172**

1  Q  Were you ever evaluated on your
2  participation, or lack of participation in community
3  work?
4  A  I don't think so.
5  Q  Did the fact that you -- did the fact
6  that you never joined a community organization
7  impact anything related to your employment at
8  Alderwoods?
9  MS. GIFFORD:  Objection.
10  THE WITNESS:  I wouldn't know that.  I
11  mean -- I don't know.  I don't know if that was part
12  of the reason that Mike and I didn't get along or
13  not.  I don't know.
14  Q  (By Ms. Morgan) Well, you don't believe
15  you were ever evaluated based on your participation;
16  correct?
17  A  Correct.
18  Q  Okay.  Did you ever get counseled or
19  reprimanded, disciplined in any way for being
20  involved, not being involved in the community?
21  MS. GIFFORD:  Objection.
22  THE WITNESS:  No.
23  Q  (By Ms. Morgan) Did you ever receive
24  any -- any recognition at Alderwoods for the
25  community meetings that you attended?

**173**

1  A  No.
2  Q  I believe you said you never tracked your
3  time that you spent attending those community
4  organization meetings; correct?
5  A  No.  Not formally.  I mean, I had it on
6  my calendars as far as what meetings were when, but,
7  no, I didn't formally track how many hours I spent
8  at each one.
9  Q  Did the other employees at Alderwoods
10  participate in community organizations?
11  A  Yes.
12  Q  Which employees do you know participated
13  in community organizations?
14  A  Chad was a city commissioner, I think.
15  Wasn't Chamber of Commerce.  City commissioner I
16  think is what he was in Cherryville, in his
17  hometown.  And that was okay that he was involved in
18  his own hometown because we had a funeral home
19  there, that's where the Cherryville locations was.
20  Otherwise it would was not okay if I would have
21  gotten involved here and John would have gotten
22  involved in Caney where he lived.  That wasn't okay,
23  it had to be in Independence or Cherryville because
24  that's where the locations were.
25  Q  So Chad was perhaps a city commissioner

238

1    Q   (By Ms. Morgan) So you don't -- you don't
2 feel like Mike Skolaut treated you differently with
3 respect to like your -- how you reported the hours
4 that you worked, for example?
5    A   Right, I don't think he -- no, he didn't
6 treat me any different than anybody else in that
7 regard.
8    Q   Or what about how you were compensated?
9    A   No.
10    Q   Or what about the hours that you worked?
11    A   No, that didn't change.
12    MS. MORGAN:  I pass the witness.
13    MS. GIFFORD:  All right.  I am just going
14 follow up with a few questions.
15       CROSS-EXAMINATION
16 BY MS. GIFFORD:
17    Q   I said previously you said that when
18 David Hill was the manager you would have contact
19 with Mike Skolaut through, he would call the funeral
20 home and you would talk to him on the phone, were
21 there other ways at that time that Mike would
22 communicate with you or other employees of the
23 funeral home?
24    A   Oh, he would -- I mean, he may -- we
25 didn't have e-mail but he may e-mail David stuff.

239

1 David, the manager, had an e-mail address, but we
2 personally didn't.  They couldn't e-mail something
3 directly to me or directly to Chad or directly to
4 John's e-mail, it would go through David.  So if
5 there's a policy that changed or a memo that we all
6 needed to be aware of or whatever, he would e-mail
7 it to David, and then David would be responsible for
8 printing it off and letting all of us read it or
9 give us copies or whatever the case may be, but, I
10 mean, other than, he would just call.
11    Q   Did David have a system for making sure
12 you all read those e-mails?
13    A   He would -- he would post them -- if it
14 wasn't something that had to go in the book that he
15 would give to me a copy too, then he would post them
16 up on the magnetic whiteboard and everybody had to
17 initial off on them, that they had read them.
18    Q   Okay.  In your experience when David Hill
19 was the location manager, did he have the authority
20 to make policies on his own?
21    A   No.  Because -- I mean, as an example, he
22 wanted everybody to wear -- he wanted the dress code
23 for the days that we had funerals, and it was more
24 strict than the policy manual's dress code.  He
25 wanted everybody to be in Navy pants, a gray sports

240

1 suit, coat and a white shirt.  Yeah, I know, yuck.
2 So they all fought it.  They were like, if you want
3 us to be in these God awful uniforms that make us
4 look like bell boys then you buy them.  The company
5 should have to buy them.  And they said, no, we're
6 not buying them because he cannot make the policy
7 different than what is in that book.  That is what
8 you guys have to go by.  So no, he didn't, he
9 couldn't make up his own policy.
10    Q   You said previously that you assumed that
11 other locations applied the same policies that your
12 location did.  What's the basis of that assumption?
13 What made you assume that?
14    A   Well, not necessarily that we discussed
15 any of the -- like the stuff that we are talking
16 about, the meal period, the things like that, but
17 when we were at the location administrator training,
18 just on the ride down there, you know, one of them
19 said, God don't you hate that they make us wear
20 pantyhose even though it's in the summer, and so
21 those type of things that I knew were the same
22 policy because we had to too.  And, you know, I
23 mean, it was just stuff like that that would lead me
24 to believe that they must have all been following
25 the same policies because they had a lot of the same

241

1 probably unimportant complaints about that we had to
2 wear pantyhose.
3    Q   When we spoke about the community work
4 before in the meetings that you went to, was there
5 anything you did to identify yourself as an
6 Alderwoods employee at the meetings that you did
7 attend?
8    A   Yeah, we were supposed to wear our --
9 they had two things that would have been considered
10 kind of a uniform, we had our name tag that said,
11 you know, Angela Johnson, Potts Chapel, and then we
12 that a little brushed gold pin that said Alderwoods,
13 and we were supposed to wear both of those things.
14 I mean, if I would have volunteered for the AWOL and
15 I would be, you know, cleaning out kennels or
16 something, that wouldn't be a necessity to wear it,
17 but if we were going to meetings that there was, you
18 know, a lot of people involved or whatever, we were
19 expected to wear those.
20    Q   Did you wear those at the meetings you
21 did attend?
22    A   Yes.
23    Q   And was community work or community
24 service ever discussed at all during any sort of
25 perform evaluation or review that you had; did the

# EXHIBIT 78

```
 1                    IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF PENNSYLVANIA
 2
                        Civil Action No. 06-1641
 3                       Judge Joy Flowers Conti

 4
      DEBORAH PRISE and HEATHER RADY
 5    on behalf of themselves and all
      employees similarly situated,
 6
              Plaintiffs,
 7
      vs.
 8
      ALDERWOODS GROUP, INC.,
 9
              Defendant.
10
      ---------------------------
11

12

13

14
                        2525 Glades Road
15                     Boca Raton, Florida
                      December 11, 2008
16                   10:05 a.m. - 3:45 p.m.

17

18
                 DEPOSITION OF RICHARD T. KUHTA
19

20

21       Taken before Mark Rabinowitz, Registered Professional

22    Reporter and Notary Public for the State of Florida at

23    Large, pursuant to Notice of Taking Deposition filed in

24    the above cause.

25
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Richard Kuhta**

14

1  A  Funeral director/embalmer.
2  Q  What Alderwoods location did you work in in
3  August of 1996?
4  A  The location is called Eternal Light,
5  L-I-G-H-T, Funeral Chapel.
6  Q  Where is that located?
7  A  At 17250 West Dixie Highway. That's in North
8  Miami Beach, Florida 33160.
9  Q  Did you apply for that position with
10  Alderwoods?
11  A  I was working there when Alderwoods purchased
12  the locations.
13  Q  Were you working in the position as funeral
14  director/embalmer at the Eternal Light Funeral Chapel
15  when Alderwoods acquired it?
16  A  Yes, ma'am.
17  Q  Who was your employer previous to the
18  Alderwoods acquisition?
19  A  It was a private ownership.
20  Q  What was the name of the private owner?
21  A  It was owned by Michael, last name Orit,
22  O-R-I-T, and Kenneth Kay, K-A-Y.
23  Q  Did you actually apply for a position with
24  Alderwoods in August of 1996?
25  MR. LINGLE: Objection to form.

15

1  A  I believe -- to the best of my memory -- they
2  had us complete an employment application.
3  Q  Did you interview with anybody at Alderwoods?
4  A  No, ma'am.
5  Q  How did you learn that you had a funeral
6  director/embalmer position with Alderwoods in August
7  of 1996?
8  A  We were already working there filling the
9  position.
10  Q  Did your management change when you began
11  working for Alderwoods?
12  A  No, the location manager stayed the same.
13  Q  Who was that? What was the name of the
14  location manager?
15  A  In 1996 are you referring to?
16  Q  Yes.
17  A  That would have been Kenneth Kay.
18  Q  Could you describe the hiring process that you
19  went through with Alderwoods when you became funeral
20  director/embalmer in August of 1996?
21  MR. LINGLE: Objection to form.
22  A  We would have just filled out an application
23  and turned it in. We were already working there.
24  Q  So there was nothing else that you had to do?
25  A  No, ma'am, there was nothing else. It was

16

1  basically a standardized form and just policy to have
2  an application on record with the company.
3  Q  Kenneth Kay, who was the location manager,
4  when the location was under the private ownership, was
5  the location manager when you first became employed with
6  Alderwoods; is that right?
7  A  Let me clarify something, if I can.
8  Q  Okay.
9  A  In 1996 the Alderwoods Corporation did not
10  exist. The Alderwoods Corporation came after the Loewen
11  Group. The Loewen Group purchased the funeral homes in
12  1996. They subsequently declared protection from the
13  court or bankruptcy; out of the ashes of the Loewen Group
14  came the Alderwoods Group, and they changed their name to
15  the Alderwoods Group.
16  Q  And throughout that period of time, you were
17  the funeral director/embalmer at the Eternal Light
18  Funeral Chapel?
19  A  Yes, ma'am.
20  Q  So when did Alderwoods take over from the
21  Loewen Group ownership of the Eternal Light Funeral
22  Chapel?
23  A  After they satisfied all of the items the court
24  had imposed on the Loewen Group, then the Loewen Group
25  changed their name to the Alderwoods Group; the date, I

17

1  do not remember.
2  Q  What were the dates that you were in the
3  position of funeral director/embalmer at the Eternal
4  Light Funeral Home?
5  A  That would have been from before the
6  acquisition in August of 1996 until the present day.
7  Q  You are currently a funeral director/embalmer
8  at the Eternal Light Funeral Home?
9  A  Yes, ma'am.
10  Q  But you are still not employed at Alderwoods?
11  A  Yes, ma'am, Alderwoods no longer exists.
12  Q  Who is your current employer in your position
13  as funeral director/embalmer at the Eternal Light
14  Funeral Home?
15  A  When you say "employer," you mean our parent
16  corporation who owns multiple funeral homes or are you
17  speaking to my direct supervisor, which I report to deal?
18  Q  I'm referring not to the supervisor that you
19  report to on a daily basis. But who is your employer in
20  the corporate sense?
21  A  Nationwide. It's called North Star, the North
22  Star Memorial Group.
23  Q  When did North Star Memorial Group become your
24  employer?
25  A  I don't remember exactly.

Johnstown
814-266-2042

Toll-Free
866-565-1929

Pittsburgh
412-281-7908

## NETWORK DEPOSITION SERVICES
## Transcript of Richard Kuhta

26 (Pages 98 to 101)

**98**

1    A    Yes, ma'am.
2        MR. LINGLE: Objection to form.
3    Q    Did your involvement with the U.S. Navy --
4  in terms of giving talks and discussions with fellow
5  servicemen -- continue after your employment with
6  Alderwoods ended?
7    A    My employment with Alderwoods just ended in May
8  of 2007.
9    Q    Right. Have you continued to give talks and
10 discussions with fellow servicemen after?
11   A    My continued association with the United States
12 Navy, yes, it has continued afterwards; and just as of
13 November 2007 I retired from the Navy. So that's over.
14   Q    After your retirement, did you continue to
15 give talks and discussions with your fellow servicemen
16 about funeral services and the like?
17   A    No.
18   Q    Did any Alderwoods employee ever instruct you
19 to join or participate in a community organization?
20       MR. LINGLE: Objection to form.
21   A    Management wanted their funeral directors
22 to have memberships in the community, but they were
23 particularly a Jewish membership because our firm is
24 Jewish firm. And I being gentile couldn't offer anything
25 to join a Jewish organization. So my connection to the

**99**

1  public was through the military.
2    Q    When you say management wanted you to be
3  active in the community and that your management was
4  Jewish, I believe you said --
5    A    Yes, ma'am.
6    Q    -- what management group are you referring --
7        MR. LINGLE: Objection to form.
8    Q    -- to that was Jewish?
9    A    We are a Jewish funeral home.
10   Q    Eternal Light Funeral Home?
11   A    Levitt Weinstein Group is a Jewish family
12 service-oriented funeral home.
13   Q    What manager communicated to you that they
14 wanted you to be involved in community organizations?
15   A    As I remember in particular, Sonny Levitt.
16   Q    Any other manager?
17   A    Maybe, but I can't remember in particular,
18 nothing stands out in my mind.
19   Q    What did Mr. Levitt communicate to you about
20 what he wanted you to do in terms of community
21 involvement?
22   A    Join organizations.
23   Q    Did he specify a number of organizations that
24 you needed to join?
25   A    No, ma'am.

**100**

1    Q    Did he identify any particular organization
2  that you needed to join?
3    A    No, ma'am.
4    Q    There was no other organization -- other than
5  the United States Navy -- that you were involved in in
6  terms of community service?
7    A    No, ma'am.
8    Q    How much time did you spend engaged in
9  activities related to your membership with the U.S. Navy
10 that you regarded as performing work for Alderwoods?
11   A    I was with my unit for one weekend a month.
12 During that time I could speak my members at any time.
13 So there was a continued association there. They could
14 ask me questions. The forum was always open. They knew
15 who to come to. I was readily available all weekend
16 long, eight hours Saturday and eight hours Sunday. And
17 this was for 20 years.
18   Q    Were you required to attend that -- were you
19 required to meet with your unit one weekend a month?
20   A    Yes, ma'am.
21   Q    Where did that requirement come from?
22       MR. LINGLE: Objection to form.
23   Q    Who required you to meet?
24   A    It's promulgated from Washington.
25   Q    Was this like your reserve duty?

**101**

1    A    Yes, ma'am.
2    Q    You were required by the government to do this
3  reserve duty one weekend a month?
4    A    Yes, ma'am.
5    Q    You are saying that you used that time as an
6  opportunity to speak to other service members about
7  opportunities in the funeral business?
8        MR. LINGLE: Objection to form.
9    A    To answer general questions.
10   Q    Did you ever report the time that you spent
11 performing this activity on your time records when you
12 were working for Alderwoods?
13   A    To Alderwoods?
14   Q    Yes.
15   A    No, ma'am, I have not.
16   Q    And why not?
17   A    I guess because in my mind I never -- at the
18 time I didn't view it as being community involvement
19 because they were indicating that you should join clubs
20 like the Knights of the Pythias, the Kiwanis and the
21 Lion's Club; local community things like the Chamber
22 of Commerce.
23       It didn't fit into my mind as being that type
24 of thing, and also it wasn't primarily a Jewish
25 organization again, you know.

EXHIBIT 79

**NETWORK DEPOSITION SERVICES**
**Transcript of Michael Lanza**

1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2          FOR THE SOUTHERN DISTRICT OF PENNSYLVANIA

 3    _____

 4    DEBORAH PRISE and HEATHER      )
      RADY, on behalf of themselves  )
 5    and all employees similarly    )
      situated,                      )
 6                                   ) Civil Action No. 06-1641
              Plaintiffs,            )
 7                                   ) Judge Joy Flowers Conti
         vs.                         )
 8                                   )
      ALDERWOODS GROUP, INC.,        )
 9                                   )
              Defendant.             )
10    _____

11            DEPOSITION UPON ORAL EXAMINATION

12                         of

13                   MICHAEL LANZA

14    _____

15           Taken at 2611 East "E" Street

16                Tacoma, Washington

17

18

19

20

21

22

23    DATE:  April 24, 2009

24    REPORTED BY:  Robyn L. Fisher, CCR, RPR
                    CCR No. 2590
25
```

NETWORK DEPOSITION SERVICES
Transcript of Michael Lanza

3 (Pages 6 to 9)

6

1  so maybe you can just speak up.
2      MR. EHRMAN:  Okay, great.
3  A.  Date of birth is September 14, 1955.
4  Q.  (By Mr. Forestiere:)  Mr. Lanza, my name is
5  Nick Forestiere.  I'm an attorney representing Alderwoods
6  in this lawsuit that you filed.  We're taking your
7  deposition today in that lawsuit.
8      Do you understand that your deposition today
9  concerns the claims that you've made against Alderwoods
10  for compensation during the time that you worked for it
11  at the Powers Funeral Home in Puyallup, Washington?
12  A.  Correct.
13  Q.  It's my understanding that when you worked at
14  the Powers Funeral Home, the time period that Alderwoods
15  owned it was around January 2002 to August 2004?
16  A.  I believe so.
17  Q.  Throughout the deposition, I'm going to be
18  sometimes referring to the Powers Funeral Home as Powers.
19  A.  That's fine.
20  Q.  You'll understand what I mean when I do that?
21  A.  Yeah, that's what we called it.  That's fine.
22  Q.  Have you had your deposition taken before?
23  A.  No.
24  Q.  Let me talk about the ground rules about what's
25  going to happen today and how things will proceed.

7

1      The oath that you've just taken is the same
2  oath you'd take in a courtroom.  The testimony you will
3  be giving today will be the same as if you had given it
4  in a courtroom but just in a little bit more informal
5  proceedings.
6  A.  Right.
7  Q.  Most importantly, of course, the penalties of
8  perjury, the consequences apply equally in today's
9  testimony; do you understand that?
10  A.  That's correct.
11  Q.  So far you're doing pretty well.  You have to
12  give a verbal response because the court reporter cannot
13  take down anything but an oral or verbal statement; do
14  you understand that?
15  A.  Yes, I do.
16  Q.  So if you shake your head yes, you have to say
17  yes.  If you shake your head no, you have to say no.  Do
18  you understand that?
19  A.  Yes.
20  Q.  One more thing:  She can only write down when
21  one of us is talking.  So when we're both talking, she
22  doesn't know who --
23  A.  No.  That's right.  Okay.
24  Q.  So because of that, you've got to wait until I
25  finish talking and finish asking my question before you

8

1  give a response and, likewise, I'll wait until you finish
2  your response before I ask my next question, okay?
3  A.  Yes.
4  Q.  Additionally, if I ask a question that you
5  don't understand or is not clear, please let me know, and
6  I'll attempt to rephrase it or restate it.  If you don't
7  do that, then your answer will be deemed to be given in
8  response to the question asked; do you understand that?
9  A.  Yes, I do.
10  Q.  That's very important because later on you're
11  going to get a booklet of the testimony here today, and
12  you'll have an opportunity to change the testimony that
13  you think was incorrect, especially in light of your
14  answer to a question perhaps you didn't understand.  But
15  if you do that, I'll be able to comment later on at trial
16  as to why you are, in fact, changing your answers; do you
17  understand that?
18  A.  Yes, I do.
19  Q.  From time to time your attorney may be making
20  objections perhaps to some of the questions I ask.
21  Unless they instruct you not to answer, I'm entitled to
22  get a response from you; do you understand that?
23  A.  Yes, I do.
24  Q.  So sometimes there is a big pause after they
25  made the objection.  I'm waiting for you to answer so I

9

1  don't muck up the record; do you understand that?
2  A.  Sure.  I do.
3  Q.  Okay.  Do you have any medical condition, or
4  are you taking any medication that will prevent you from
5  giving truthful and complete and accurate testimony
6  today?
7  A.  No, I'm not.
8  Q.  Have you reviewed any documents in preparation
9  of your deposition before today?
10  A.  Only documents that I have sent to the
11  attorneys.
12  Q.  And could you generally describe those
13  documents for me, please?
14  A.  It was a piece of paper that stated that my
15  employment with them, information about my Social
16  Security Number, date of birth, and that I was filing a
17  claim against the company.
18  Q.  Any other documents that you reviewed?
19  A.  Time cards.
20  Q.  Anything else?
21  A.  There was a sheet of paper with something
22  written on it.  It said "SCI," and I did make statement
23  at the time I was never employed by SCI.
24      MS. GIFFORD:  Nick, to the extent it helps
25  clear things up, I can represent that the documents he

38

1  essence? I should say under new ownership.
2  A.  A new corporate name.  Outside of Ray Loewen
3  and a few other people that were up on the upper
4  management, it pretty well stayed the same.
5  Q.  Did you ever complete a separate application
6  for working for Alderwoods?
7  A.  Not to my knowledge.  I can't remember doing
8  that.
9  Q.  When did you first become interested in working
10  at Powers?
11  A.  Around the date of this application.
12  Q.  That would be February 1st, 1993?
13  A.  Somewhere close to that, yes.
14  Q.  How did you find out about it?  You said there
15  was some connection.
16  A.  Mr. Noel's son and I were friends, but it also
17  brings back to mind Robert Young, the pastor who is named
18  on here as a personal reference.  He let me know that the
19  job was opening up, and that Mr. Noel wanted to talk to
20  me.
21  Q.  Did you believe that Powers was a good place to
22  work?
23  A.  Yes.
24  Q.  What had you heard about it prior to applying
25  for it?

39

1  A.  The company itself, the employees were really
2  important to that company.  They looked out for the
3  employee.  Their benefits were excellent, and it was a
4  pretty good working environment over at Powers.
5  Q.  Prior to you being employed at Powers, did you
6  see a written job description for the duties you'd be
7  performing as a funeral director or embalmer?
8  A.  No, sir.
9  Q.  At the time that you applied for the position,
10  did you have an understanding as to whether you'd be
11  working any overtime?
12  A.  Yes, sir.
13  Q.  What was your understanding in that regard?
14  A.  Anything above 40 hours was overtime.
15  Q.  Did you understand it was very common for a
16  funeral director to work overtime in your industry?
17  A.  Yes, sir.
18  Q.  Why was that?
19  A.  Because of the death calls that come in the
20  middle of the night, so we're on call 24/7.
21  Q.  At the time that you submitted your job
22  application, did you have a formal interview with
23  Mr. Noel?
24  A.  I did.
25  Q.  Did it occur before you submitted your

40

1  application or after?
2  A.  It was before the application.
3  Q.  Where did the interview take place?
4  A.  At Powers Funeral Home in Puyallup.
5  Q.  That was in his office?
6  A.  Yes.
7  Q.  What did you and Mr. Noel talk about?
8  A.  The work schedule, what the duties would
9  entail, and it was pretty similar to what I was doing at
10  Pipers.
11  Q.  Anything else?
12  A.  What days we would have off.  How they rotated
13  holiday on-call schedules.
14  Q.  Anything else?
15  A.  And that the company was big enough where there
16  was room for growth, so there may be a time where they
17  could promote you into management's position.
18  Q.  Anything else that you discussed with them?
19  A.  Also they expected us to have community
20  activity where we were out in the community.
21  Q.  What did Mr. Noel say in that regard?
22  A.  That they wanted us to join some sort of
23  organization.
24  Q.  Anything else he said about that?
25  A.  No, sir.

41

1  Q.  What was your response to that?
2  A.  I told him I had no problem doing that.
3  Q.  Was there any discussion about whether you'd be
4  compensated for doing that work?
5  A.  No, sir.
6  Q.  Anything else that you discussed with Mr. Noel
7  during this interview?
8  A.  He wanted to know what religious preference I
9  was.
10  Q.  Anything else you discussed?
11  A.  No, sir.
12  Q.  Did you discuss anything about overtime?
13  A.  As I mentioned earlier, he mentioned anything
14  above 40 hours was overtime.
15  Q.  Did he mention to you that you would be
16  expected to work a lot of overtime as a funeral director
17  or embalmer?
18  A.  I did know that that funeral home was a lot
19  busier than the one I was at, so there would be more
20  overtime involved at Powers than was at my previous place
21  of employment.
22  Q.  So you knew that at the time you applied for
23  it?
24  A.  Yes, sir.
25  Q.  But you didn't have a discussion with Mr. Noel

170

1  calculations at the time. That's what your concern is
2  about?
3       MS. GIFFORD: Objection.
4  A.  Yes.
5       MR. FORESTIERE: Well, you want me to go
6  through the other direction?
7       MS. GIFFORD: No. I'm only objecting to
8  the characterization of it as being sloppy or in error as
9  opposed to I think he said he couldn't speculate as to
10 the reason for it.
11      MR. FORESTIERE: Okay. Let me rephrase
12 that question then.
13 Q.  (By Mr. Forestiere:) Other than the
14 miscalculations of time that are actually recorded based
15 upon your punching the entries or your putting the entries
16 down, are there any other things that you're concerned
17 about in the time cards you reviewed?
18 A.  The only other thing that I'm going to have to
19 say is earlier you gave me an example of breaks, lunch
20 breaks, and it said that the company will abide by giving
21 you your lunch breaks. There were days I worked
22 12 hours, and I never stopped for lunch or dinner. They
23 never abided by that policy that they had written in
24 their handbook.
25 Q.  You're talking about for paying you for that

171

1  time period?
2  A.  Well, I was paid for the time period, but they
3  said in their policy that we will have those breaks after
4  like five hours of work. We will stop.
5  Q.  But do you remember the other part of the
6  policy is that if business dictates an emergency or if
7  management dictates that you will have to work during
8  your breaks, your meal periods, that you will have to do
9  so, but they will obviously require you to be paid for
10 that time; do you recall that, sir?
11 A.  Yes.
12 Q.  That would be consistent -- the time card would
13 be consistent with that policy that even though they
14 required you to work during those meal periods and
15 breaks, you were compensated for it?
16      MS. GIFFORD: Objection.
17 A.  Yes.
18 Q.  At least the time cards that you reviewed, were
19 all the signatures at the bottom of the page your
20 signatures?
21 A.  Yes, sir.
22 Q.  After today's deposition, I'd like you to go
23 through the rest of the time cards that you haven't had a
24 chance to review, and if you believe any of those
25 signatures are forged or not yours, would you please tell

172

1  us?
2  A.  Yes, sir.
3  Q.  I had some questions about these time cards.
4  I'm going to jump ahead in my outline a bit.
5       If you could turn to Page 231, please.
6  A.  On the time cards?
7  Q.  Yes, sir. This is Exhibit 11.
8  A.  I see that.
9  Q.  Now, by the way, just to clarify, most of the
10 time cards that there are copies of, there is just a
11 front page of it, correct?
12 A.  Yes. That's correct.
13 Q.  The time cards have a back part to it as well,
14 correct?
15 A.  I didn't remember that.
16 Q.  That's why I'm trying to make a clear record of
17 it.
18 A.  Yeah.
19 Q.  So Page 231 is the back of one of those time
20 cards, correct?
21 A.  Okay.
22 Q.  That's the form, it looks like?
23 A.  Okay. That's...
24 Q.  In fact, 231 looks like the back of the time
25 card for the prior Page 230, week ending 1/3/2004.

173

1  A.  Okay.
2  Q.  So if you had the -- the actual original time
3  card would have both those sides to it:  231 and 230,
4  correct?
5  A.  Yes.
6  Q.  Now, there is some handwriting under the term
7  at the top "Overtime Hours;" do you see that?
8  A.  Yes, sir.
9  Q.  Do you know whose handwriting that is?
10 A.  That's my handwriting.
11 Q.  Okay. The first part of it says, "Embalmed
12 Mrs. Stocker."
13 A.  Yes.
14 Q.  And it's a date of 12/31/03?
15 A.  Yes, sir.
16 Q.  It says "50?"
17 A.  Yes, sir.
18 Q.  What does that represent?
19 A.  I was paid $50 to embalm the body.
20 Q.  Okay. Was that the same for Mr. Andy
21 underneath that?
22 A.  Yes, sir.
23 Q.  It says "Embalmed," correct?
24 A.  Yes, sir.
25 Q.  And under Mr. Andy it says, "Hair and

174

1  cosmetics, Mrs. Markum?"
2  A. Yes.
3  Q. It indicates 50 for each of those entries for
4  Mr. Andy and Mrs. Markum?
5  A. Yes, sir.
6  Q. And that's to indicate that you were paid $50
7  for each of that work?
8  A. Yes, sir.
9  Q. So was that a flat rate for doing that work?
10 A. Yes, sir.
11 Q. So it didn't matter how much time you spent;
12 you got paid $50?
13 A. Yes, sir.
14 Q. And then near the middle of the page on 231, it
15 says $150; do you see that?
16 A. Yes, sir.
17 Q. Do you know whose handwriting that is?
18 A. I do not.
19 Q. Would that seem to indicate that you were
20 getting paid $150 for each of those three pieces of work
21 that you performed?
22    MS. GIFFORD: Objection.
23 A. $50 per case adding up to 150, yes.
24 Q. Is that what you're understanding it to mean?
25 A. Yes, sir.

175

1  Q. If you take Exhibit 11 and go nine pages from
2  the last page, I want to direct your attention to the
3  back of another time card. It's one of the pages that
4  have not been Bates stamped, but it kind of looks like
5  this.
6     MR. FORESTIERE: Let the record reflect
7  that I'm showing the witness the time card I'm directing
8  him to. Counsel indicates she has it -- oh, because I
9  tabbed it.
10    MS. GIFFORD: Yes.
11    MR. FORESTIERE: See how nice I was? I
12 did that during the break, and I forgot about it. My
13 mistake.
14 Q. (By Mr. Forestiere:) Let's take a look at this
15 one page, and it says "Overtime hours." Is that your
16 handwriting on this page?
17 A. Yes, sir. Some of it is.
18 Q. Okay. Identify the handwriting that is yours.
19    Let me take it this way: There is $200 at the
20 bottom. Other than that, is all the rest of the
21 handwriting yours?
22 A. With the exception of PFH, PFH, PFH. That's
23 not my handwriting.
24 Q. Do you know what PFH means?
25 A. Powers Funeral Home.

176

1  Q. It seems to indicate that you're also paid for
2  removals, correct?
3  A. Yes, sir.
4  Q. And do these indicate the names of the deceased
5  that you performed removals for?
6  A. Yes, sir.
7  Q. You were paid $50 a removal?
8  A. Yes, sir.
9  Q. If you go to the next one that I have tabbed
10 after that one, again it says "Overtime hours." It says
11 "Picking up sign, Orting?"
12 A. Yes.
13 Q. Is that your handwriting?
14 A. No, sir.
15 Q. It says "Piecework, $50?" Do you know whose
16 handwriting that is?
17 A. That looks to be Rick Noel's handwriting.
18 Q. Do you know if you were paid some money for
19 picking up a sign in Orting?
20 A. I don't know what that means.
21 Q. Let's go to the other page I have tabbed.
22    This one again says "Overtime," and this seems
23 to actually be a duplicate page, so we don't need to do
24 that one.
25    All right. Let's go back and pick up where we

177

1  left off before we were talking about the time cards. We
2  were talking about the actual number of hours that you
3  were working on a weekly basis, and I think you indicated
4  that you worked a lot of overtime that was not put on
5  your time cards, correct?
6  A. That is correct.
7  Q. Did you keep a record of the time that you
8  worked overtime and was not reflected in your time cards?
9  A. Yes, sir.
10 Q. Where is that record, or what does that record
11 consist of?
12 A. The record consisted of notes that I personally
13 made that I worked on this date, the additional hours I
14 worked and what I did.
15 Q. How were those notes created?
16 A. I just handwrote them.
17 Q. When were they created?
18 A. At the date of the time of the overtime.
19 Q. Did you produce those notes in this litigation?
20 A. I don't have any record of anything, sir. Four
21 years ago my wife disposed of a lot of things, and she
22 disposed of everything that I kept. She said I was a
23 junk collector, and that went in the garbage.
24 Q. Well, at least she didn't do anything to you,
25 right? My wife would put me in the garbage.

**NETWORK DEPOSITION SERVICES**
**Transcript of Michael Lanza**

52 (Pages 202 to 205)

---

202

1    Q. During the time that you were working for
2  Alderwoods, how many monthly meetings at the Christopher
3  Columbus Club did you attend?
4    A. Once a month.
5    Q. How many months, though?  Alderwoods, again,
6  January of 2002 through the end of your employment in
7  August of 2004.  How many of those months did you attend
8  the monthly meetings at the Christopher Columbus Club?
9    A. I tried to attend them all, but I can't say
10  that I did because I was busy at times.  So maybe there
11  was three to four months within that time that I couldn't
12  make the meeting.
13    Q. So three to four months during that period of
14  time of January 2002 through August 2004, there was those
15  months that you didn't attend?
16    A. Let me clarify.  If I go from 2002, I may have
17  missed three to four months' meeting there.  2003, I may
18  have missed three to four meetings there and so forth.
19    Q. Okay.  Did you keep any written records of the
20  amount of time that you were spending at the Christopher
21  Columbus Club?
22    A. There was a form that we had to fill out called
23  the community service form, and it was on that form that
24  we had to write the date and what we did on that
25  particular date in the community.

---

203

1    Q. Did you fill that out for the Christopher
2  Columbus Club?
3    A. Yes, sir.
4    Q. Did you fill that form out also for your
5  entertaining priests and ministers?
6    A. Yes, sir.
7    Q. Did you keep a copy of any of those records?
8    A. No, I did not.
9    Q. Were you ever evaluated concerning the amount
10  of community service work you performed?
11      MS. GIFFORD: Objection.
12    A. No, sir.
13    Q. Did you enjoy the time that you spent
14  entertaining the priests and ministers?
15      MS. GIFFORD: Objection.
16    A. I selected that because I did enjoy time with
17  them, but I did that because it was community service for
18  the funeral home.  That's why I selected that particular
19  activity, I guess.
20    Q. Because you enjoyed it, correct?
21    A. Yes.
22    Q. And you also wanted to get credit for something
23  you enjoyed; in other words, it's a dual purpose?
24    A. Well, I would have liked to have gone home
25  after a full day too, but I didn't.

---

204

1    Q. Well, the priests and ministers you'd been
2  doing for a while.
3    A. Yeah.
4    Q. That's what I'm saying.
5      The Christopher Columbus Club; did you enjoy
6  being involved with those activities as well?
7    A. Yes, sir.
8    Q. Did you ever see any written policies prepared
9  by Alderwoods requiring its employees to perform
10  community service work?
11      MS. GIFFORD: Objection.
12    A. I can't recall that I did or have.
13    Q. Do you recall any written policies by
14  Alderwoods addressing whether community time should be
15  reported or paid?
16      MS. GIFFORD: Objection.
17    A. No, sir.
18    Q. I think you said Mr. Morgan also did some type
19  of community service work that consisted of --
20    A. Softball.
21    Q. For what organization?
22    A. He is a member of the LDS church, and they had
23  their own softball team.
24    Q. That would be the Mormons?
25    A. Yes, sir.

---

205

1    Q. Do you know whether he performed those services
2  during the time that he was working for Alderwoods?
3    A. Yes, sir.
4    Q. Do you know how much time he spent performing
5  those services?
6    A. It was hard to say because that was during the
7  summer months.
8    Q. It was kind of seasonal?
9    A. Yes.
10    Q. Other than his participation in the softball
11  with the Mormons, are you aware of any other community
12  service organization he was involved with?
13    A. He was involved in an organization that his
14  church had, so if they were doing anything else during
15  the year, he was involved with it.
16    Q. So it's your understanding he fulfilled his
17  community service requirement by being involved with
18  activities with the Mormon church?
19    A. That's correct.  Yes.
20    Q. Anything other than being involved with the
21  Mormon church are you aware of that he did to fulfill his
22  community service requirement?
23    A. No, sir.
24    Q. Do you know how much time he spent working with
25  the church and fulfilling his community service

---

**NETWORK DEPOSITION SERVICES**
**Transcript of Michael Lanza**

58 (Pages 226 to 229)

---

226

1 stating that the employees were not to record all the
2 time that they spent working?
3    MS. GIFFORD: Objection.
4    A. No, sir.
5    Q. Are you aware of any incorrect calculations of
6 the overtime hourly rate that was used to pay your
7 overtime?
8    MS. GIFFORD: Objection.
9    A. Only in what I've seen on those time sheets
10 just now.
11    Q. What you saw on the time sheets was a
12 discrepancy or a mistake as to the hours being calculated
13 that you actually worked. What I'm focusing on is the
14 amount of the rate of overtime that would then be
15 multiplied by the hours you worked.
16    A. No. I never did.
17    Q. So as to the overtime rate, did you ever have
18 an instance where that was improperly calculated?
19    A. Not to my knowledge, no.
20    Q. Do you know if Alderwoods had a policy of
21 improperly calculating the overtime rate to pay the
22 overtime for employees that worked for it?
23    MS. GIFFORD: Objection.
24    A. Not to my knowledge.
25    Q. Did you ever review the time sheets or time

---

227

1 cards of other employees that worked at any other
2 Alderwoods facilities other than Powers?
3    A. I never reviewed any of them, sir.
4    Q. Did you ever review any of the on-call tracking
5 sheets that employees filled out who worked for locations
6 other than Powers?
7    A. No, sir.
8       If I might clarify, I never reviewed anybody's
9 sheets at all except when I was managing the funeral
10 home. That was the only time.
11    Q. Those would be only for the employees that you
12 were managing?
13    A. Yes. That's correct.
14    Q. And you've already identified them?
15    A. Yes, sir.
16    Q. We're almost there.
17       During the litigation, you were asked to find
18 documents that pertain to this lawsuit, correct?
19    A. I believe so, yes.
20    Q. I mean by your attorneys.
21    A. Yes, sir.
22    Q. But you were directed to find all the documents
23 that pertained to this lawsuit, correct?
24    A. Yes, sir.
25    Q. And you went out and did that, correct?

---

228

1    A. Yes, sir.
2    Q. Could you explain to me what efforts you made
3 to locate those documents?
4    A. I only found a certificate where I attended a
5 class with the company and some pay stubs. That was all
6 I could find because everything else that I had, again,
7 my wife disposed of.
8    Q. Do you specifically recall finding pay stubs?
9    A. I do.
10    Q. What did you do with those pay stubs?
11    A. I sent copies of them to the attorney's office.
12       MR. FORESTIERE: I don't know if we've
13 seen those.
14       MS. GIFFORD: I don't think we have pay
15 stubs, but maybe what you saw were W-2 forms.
16    A. Oh, I'm sorry. They were W-2 forms. I'm
17 sorry.
18       MR. FORESTIERE: I don't believe I've seen
19 the W-2 forms either.
20       MS. GIFFORD: I believe we've objected to
21 and withheld the W-2 forms.
22    A. I'm sorry.
23    Q. (By Mr. Forestiere:) No, that's okay. That's
24 what I'm trying to make clear; that we've looked for
25 everything, and everything has been produced. Something

---

229

1 has been produced, but obviously it's been objected to,
2 and I don't know what's going on with that.
3       Okay. During the time that you worked for
4 Alderwoods, did you ever hear any complaints that any
5 other employees were abusing their overtime?
6    A. Yes.
7    Q. Who made those complaints?
8    A. At our staff meetings it was consistently told
9 that we need to watch our own time because we were going
10 above the budget, and that was reported to us from the
11 manager.
12    Q. Who was the manager?
13    A. All of them: Lewis Noel, Rick Noel. Whoever
14 managed the funeral home, it was always the same
15 complaint.
16    Q. During the time you worked for Alderwoods, did
17 you have staff meetings where these statements were made
18 concerning the overtime was going over budget?
19    A. Yes, sir.
20    Q. Who was the manager at those meetings that made
21 those statements?
22    A. Again, all of the managers. See, all the
23 managers were told from upper management to keep overtime
24 low. And I know that for a fact because when I managed
25 they asked me to do the same thing.

---

NETWORK DEPOSITION SERVICES
Transcript of Michael Lanza

230

1    Q.  Who asked you to do that?
2    A.  Cyndi Ross.
3    Q.  So you know that for a fact?  Well, obviously
4    she told you to do that?
5    A.  Yes, sir.
6    Q.  And you're just presuming she also told the
7    other managers that?
8    A.  If she was in the position at the time.  There
9    may have been someone else in the position that was
10   letting them know that.
11   Q.  During the time that you were the manager, were
12   you involved with the budgeting of expenses for the
13   Powers facility?
14   A.  Once.
15   Q.  Did the budget include a category for overtime?
16   A.  Yes, sir.
17   Q.  What efforts did you make to stay within the
18   budget for overtime during the time you were a manager?
19   A.  Actually, I don't know if I did because it was
20   only for four months I managed the place, so I can't say
21   if I did stay within the budget.
22       The problem that we had at Powers, the reason
23   why if we were above the budget was because the home was
24   understaffed and extremely busy.  So again, to get most
25   of the work done, it had to be done after hours.

231

1    Q.  Do you know of any reason why they wouldn't
2    hire additional people to perform that work if they were
3    understaffed?
4    A.  We wish we knew.  I have no idea.  That was a
5    consistent complaint from everybody; to bring more people
6    on.
7    Q.  Do you know if persons that worked overtime
8    that was not approved received payment of the overtime?
9    A.  Are you speaking of anyone other than myself?
10   Q.  Yes, sir.
11   A.  I'm not sure.  I'm not sure of that.
12   Q.  Okay.  Let me stop.  You have to excuse me.
13   I've had four days of depositions, and we're going to be
14   done here shortly, so we're getting there.
15       Let me ask you this question:  Did you ever
16   work overtime that was not pre-approved that you received
17   payment of?
18   A.  I did not receive payment of, but I did work
19   overtime.
20   Q.  I know that's what you want to tell me.
21       My question was did you work overtime that was
22   not pre-approved that you were then paid for?
23   A.  No, sir.
24   Q.  So even though you worked unapproved overtime,
25   you were still paid for it?

232

1          MS. GIFFORD:  Objection.  I think that's
2    just the opposite of what he just said.
3          MR. FORESTIERE:  Well, that's what I'm
4    trying to make clear.
5    Q.  I know that there is overtime that you worked
6    that was not paid for.  You've already established that.
7    My question is you understand there was a policy that you
8    were supposed to get pre-approval for the overtime that
9    you worked, correct?
10   A.  Yes.
11   Q.  My question is was there ever a time that you
12   worked overtime that was not pre-approved that you still
13   got paid for?
14   A.  No.
15   Q.  Were you ever told not to clock in until your
16   regularly-scheduled start time?
17   A.  Yes, sir.
18   Q.  Who told you that?
19   A.  Management.
20   Q.  Who in management told you that?
21   A.  Lewis Noel.
22   Q.  Anyone else?
23   A.  Mostly every manager that came on made sure we
24   didn't clock in until our start time.
25   Q.  During the period of January 2002 to

233

1    August 2004, did anybody tell you that?
2    A.  Yes.  Mr. Coffey did on several occasions.
3    Q.  Do you recall the number of times he told you
4    that?
5    A.  About the number of times it appeared on my
6    time card.
7    Q.  So every time you clocked in he told you that?
8    A.  If I clocked in before 8:30, yes.  If I clocked
9    in before my scheduled time, he would say, "Don't clock
10   in until you're scheduled to clock."
11   Q.  Let me make sure I understand.  If you on your
12   time card clocked in before 8:30, Mr. Coffey would bring
13   that to your attention?
14   A.  Yes, sir.
15   Q.  And he would tell you not to clock in before
16   your scheduled start time?
17   A.  That's correct.
18   Q.  Do you know if he told that to any other
19   employee; not to clock in until your scheduled start
20   time?
21   A.  I believe he told that to all of us.
22   Q.  Why do you believe that?
23   A.  Because it was in a staff meeting.
24   Q.  He made those statements at a staff meeting?
25   A.  He said, "Directors, when you come in in the

**NETWORK DEPOSITION SERVICES**
**Transcript of Michael Lanza**

234

1  morning, clock in at your scheduled time. Try not to
2  clock in before your scheduled time."
3  Q. He said those statements at which meetings?
4  A. Staff meetings.
5  Q. How often would you have staff meetings?
6  A. Formal staff meetings were supposed to be once
7  a month. Informal ones we were supposed to have every
8  day.
9  Q. So these are statements he made at the formal
10  staff meetings?
11  A. Yes.
12  Q. Anyone other than Mr. Coffey make those
13  statements to you during the time that you worked for
14  Alderwoods?
15  A. Mr. Noel. And not just to me again. It was
16  said at the staff meetings.
17  Q. Did Mr. Noel leave prior to January 2002?
18  A. 2001. You're right.
19  Q. So the only one that you can recall is
20  Mr. Coffey?
21  A. That's who I can think of, yes.
22  Q. We're almost there.
23  Did any funeral directors at Powers sell
24  pre-need?
25  A. No, sir.

235

1  Q. They all sold at-need?
2  A. Yes.
3  Q. By at-need, just so we can make a record and
4  understanding, that is when a family has a need at the
5  present time for funeral services and products?
6  A. That is correct.
7  MR. FORESTIERE: I think that's all the
8  questions I have.
9  MS. GIFFORD: I have a couple questions
10  for you.
11  MR. FORESTIERE: Just so you know, I get
12  to object to her questions.
13  THE DEPONENT: And the same thing; answer
14  or not answer?
15  MS. GIFFORD: And you still answer.
16  That's correct.
17  MR. FORESTIERE: I can't tell you not to
18  answer.
19  THE DEPONENT: Okay.
20
21  EXAMINATION
22  BY MS. GIFFORD:
23  Q. Okay. I want to go back to where we were
24  talking about community service work.
25  A. Okay.

236

1  Q. I believe you said that there was a log where
2  you tracked the community service that you did?
3  A. Yes.
4  Q. Do you know what happened to that log after you
5  completed it?
6  A. We gave it to Mr. Noel who, in turn, shipped it
7  off to, was faxed to Jim Shipman, and I don't know where
8  it went. I think it stopped at Jim Shipman.
9  Q. Who was Jim Shipman?
10  A. He was the regional manager.
11  Q. Do you remember what time period Mr. Shipman
12  was the regional manager?
13  A. I believe he was the regional manager from
14  1995/96 up to 2004. I think he was still in that
15  position.
16  Q. And I believe it was Mr. Noel who initially
17  told you that you were required to do community service
18  work?
19  A. Yes.
20  Q. Did he indicate to you where that requirement
21  came from?
22  A. He did.
23  Q. What did he tell you?
24  A. He told me that Jim Shipman had required that
25  each director be involved in the community, and he wanted

237

1  to see a report of that once a month.
2  Q. And at any time during your employment with
3  Alderwoods, did anyone tell you you were not required to
4  do community work?
5  A. No.
6  Q. This one is a little off topic, but when you
7  were employed at Pipers, what state was that located in?
8  A. Tacoma, Washington.
9  Q. And I know you testified previously in response
10  to Mr. Forestiere's question that you enjoyed the
11  community activities you chose.
12  A. Correct.
13  Q. And I believe Mr. Forestiere described it as a
14  dual purpose activity.
15  A. He did.
16  Q. Did you have a primary purpose with respect to
17  those activities you did?
18  MR. FORESTIERE: Objection. Leading.
19  Object to the form.
20  Q. You can answer. What was your primary purpose?
21  A. My primary purpose to join it was because the
22  company required us to do some sort of community service,
23  and that's why I joined those organizations.
24  Q. All right. You testified that you attended
25  staff meetings.

# EXHIBIT 80

```
 1            IN THE UNITED STATES DISTRICT COURT

 2         FOR THE WESTERN DISTRICT OF PENNSYLVANIA

 3

 4    _____

 5    DEBORAH PRISE and HEATHER RADY
      on behalf of themselves and all other
 6    employees similarly situated,
                                        Plaintiffs,
 7
      v.
 8
      ALDERWOODS GROUP, INC. and SERVICE
 9    CORPORATION INTERNATIONAL,
                                        Defendant.
10    _____

11

12

13            Examination Before Trial, held at the Law

14    Offices of DOLIN THOMAS & SOLOMON, LLP, The

15    Strong-Todd House, 693 East Avenue, Rochester, New

16    York 14607, on December 18th, 2008, commencing at

17    11:30 a.m.

18

19

20            DEPOSITION OF:   Kasi Long

21

22

23

24

25    REPORTED BY:  Karrie M. Utberg
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Kasi Long**

3 (Pages 6 to 9)

6

KASI LONG by MS. DUGAN
1
2  A. No.
3  Q. Have you done anything to prepare for your
4     deposition today?
5  A. Just spoke with my attorney briefly yesterday.
6  Q. Did you review any documents in preparation for
7     today's deposition?
8  A. Briefly, looked over my affidavits. I don't
9     specifically recall all -- I mean, there was a
10    binder, but I didn't look at anything in great
11    detail.
12 Q. Okay. I would like to start by talking about how
13    you came to work for the company that's now called
14    Alderwoods?
15 A. Okay.
16 Q. When did you first become interested in working for
17    the company?
18 A. For the Alderwoods Group, specifically?
19 Q. Yes.
20 A. I actually was initially hired as a funeral
21    director in 1993 to one of the independent firms
22    that was purchased by the Loewen Group. The Loewen
23    Group went Chapter 11, I believe, and came out as
24    the Alderwoods Group.
25       And at that point I was employed. Coming out

7

KASI LONG by MS. DUGAN
1
2  of the bankruptcy, I was already employed by the
3  Loewen Group. So, I become an Alderwoods employee
4  at that point.
5  Q. Do you recall when the Loewen Group became
6     Alderwoods?
7  A. Specifically, exactly, no. I know it was after
8     1999, I believe. Somewhere around 2000, is my best
9     estimate.
10 Q. And how did you first hear of a funeral director
11    position at the dependent firm where you started
12    working?
13 A. I was graduating from my mortuary school, and a
14    friend of my uncle's in a nearby town that I lived
15    in, knew Dwayne Hills, who was the owner of Beilby
16    Funeral Home that kind of hooked me up with an
17    interview, because his -- the previous owner of the
18    firm who he bought it from was retiring that same
19    October that I graduated, we met and that's how I
20    was hired.
21 Q. You mentioned the Beilby Funeral Home, is that the
22    name of the location?
23 A. That was the original location that I worked at,
24    yes.
25 Q. Did you work at that location until the time it was

8

KASI LONG by MS. DUGAN
1
2  purchased by Loewen?
3  A. Yes.
4  Q. Do you recall when that was?
5  A. I know that Loewen purchased the location sometime
6     in 1995. I don't know specifically the month.
7  Q. And at the time that Loewen purchased the location,
8     were you required to apply or do anything to keep
9     your position at the funeral home?
10       MR. LINGLE: Object to form.
11       THE WITNESS: I don't specifically
12    recall filling out an application at that
13    time.
14 BY MS. DUGAN:
15 Q. At the time that you were initially employed at
16    Beilby, did you receive any type of orientation or
17    training?
18       MR. LINGLE: Object to the form.
19       THE WITNESS: No.
20 BY MS. DUGAN:
21 Q. How about when Loewen purchased the location, did
22    you receive any type of orientation from Loewen?
23 A. Not that I specifically recall.
24 Q. And then did you stay employed at Beilby Funeral
25    Home at the time that Alderwoods replace Loewen?

9

KASI LONG by MS. DUGAN
1
2  A. Are you asking me, was I employed by Loewen when
3     Alderwoods took over?
4  Q. Yes.
5  A. At the time that Loewen Group took over, I was
6     employed. There was a brief period of time that I
7     was not employed, from March of 1998 to March of
8     1999. I had taken a pre-leave position with Loewen
9     Group, and they had eliminated that position, and I
10    was called back. I believe when I was called back
11    in 1999, it was still Loewen at that point. It was
12    not yet Alderwoods.
13 Q. Okay. The location at which you worked in 1999,
14    what was it called?
15 A. There were actually four locations that were in our
16    group. It was Beilby Funeral Home, Carpenter's
17    Funeral Home, Hills Funeral Home, and Ballard &
18    Lindgren Funeral Home.
19 Q. Did you work at all four of these locations?
20 A. Yes.
21 Q. Was any one of those four locations your main
22    location or your home base?
23 A. The main office duties, and so forth, were done out
24    of Carpenter's. However, I did have my license, as
25    license manager at different times, I believe, at

**Johnstown**
814-266-2042

**Toll-Free**
866-565-1929

**Pittsburgh**
412-281-7908

**NETWORK DEPOSITION SERVICES**
**Transcript of Kasi Long**

4 (Pages 10 to 13)

---

**10**

KASI LONG by MS. DUGAN

1
2  Beilbys and at Hills, but it wasn't necessarily --
3  I mean, we all worked as we were needed as funerals
4  came in and out.
5  Q. Where is Beilby Funeral Home located?
6  A. It was at 139 Walnut Street.
7  Q. In what city was Beilby?
8  A. Corning, New York.
9  Q. What about Carpenter's Funeral Home, where was it
10  located?
11  A. That was 14 East Pulteney Street, Corning, New York
12  also.
13  Q. And where was the Hills Funeral Home located?
14  A. That was at 69 Main Street, Big Flats, New York.
15  Q. And the forth location you mentioned was Ballard &
16  Lindgren?
17  A. Yes.
18  Q. Where was that?
19  A. 161 Oakwood Avenue, Elmira Heights, New York.
20  Q. Did you ever work at any other locations during
21  your employment with Alderwoods, besides the four
22  that you just mentioned here?
23  A. No.
24  Q. Going back to your first position at Beilby Funeral
25  Home --

---

**11**

KASI LONG by MS. DUGAN

1
2  A. Yes.
3  Q. -- You said you were hired as a funeral director;
4  is that correct?
5  A. Yes.
6  Q. Did you have another position after that?
7  A. With just Beilby Funeral Home, as an independent,
8  or with the Loewen Group, or with the Alderwoods
9  Group?
10  Q. At any point in time did your job title change from
11  funeral director?
12  A. In March, I believe, March or April. No, that's
13  not correct. I did pre-need for the Loewen Group.
14  I was a pre-need counselor from approximately, I
15  want to say, the end of '96 -- somewhere towards
16  the end of 1996 until approximately March of 1998,
17  when the position was eliminated.
18  Q. And at the time that the position was eliminated
19  what did you do?
20  A. I didn't work for that period of time until about
21  six months after, and I had a position as a
22  secretary, briefly, and then I was called back by
23  Dwayne.
24  Q. You were called back by whom?
25  A. Dwayne Hills.

---

**12**

KASI LONG by MS. DUGAN

1
2  Q. Where did Dwayne call you back to?
3  A. He called to ask me if I wanted to come back to
4  work at the firm. I mean, the four firms were
5  basically one. We all worked as needed, where
6  needed . There was no specific location, so the
7  four firms that I mentioned would have been where I
8  was asked to come back in and work at.
9  Q. And when you were asked to come back, were you
10  asked to come to fill a particular position?
11  A. I was asked to be a funeral director, to
12  specifically work on pre-need and help with office
13  duties.
14  Q. What was your position title?
15  A. I believe for company purposes it would have been
16  funeral director.
17  Q. And what do you mean when you say that you were
18  called to also work on "pre-need"?
19  A. He wanted me to specifically focus on pre-need.
20  Q. And for those of us who might not be well versed in
21  the funeral home industry, what does pre-need mean?
22  A. Pre-need is when a family comes in to arrange a
23  funeral ahead of time.
24  Q. Ahead of time, meaning before the individual has
25  actually passed away?

---

**13**

KASI LONG by MS. DUGAN

1
2  A. Before the individual has passed away.
3  Q. Did you have another position after you returned to
4  the funeral director position, with the emphasis on
5  pre-need?
6  A. I basically did everything. I helped the current
7  secretary at the time. When she left, I took on
8  her full-time duties, as well.
9  Q. When did you take on the full secretarial duties?
10  A. I don't specifically recall when she left.
11  Q. What was the earliest date that you can remember
12  when you were performing the secretarial duties?
13  A. I really can't specifically, say a date without
14  looking. I don't really know. I know the previous
15  secretary was Linda, and I don't know when she left
16  exactly.
17  MS. DUGAN: I'm handing the court
18  reporter a document to be marked as Long
19  Exhibit 1.
20  (Long Exhibit 1 - Job Description - was
21  marked for identification.)
22  BY MS. DUGAN:
23  Q. Do you have Exhibit 1 in front of you?
24  A. Yes.
25  Q. This is a document dated August 25th, 2003, to Kasi

---

**Johnstown**
**814-266-2042**

**Toll-Free**
**866-565-1929**

**Pittsburgh**
**412-281-7908**

**NETWORK DEPOSITION SERVICES**
**Transcript of Kasi Long**

16 (Pages 58 to 61)

---

58

KASI LONG by MS. DUGAN

1  BY MS. DUGAN:
2
3  Q. So, you would sometimes not put all of your hours
4     on your timesheet?
5  A. Right.
6  Q. Can you give me an example of when that would
7     occur?
8  A. For example, if I was eating lunch at the funeral
9     home but the phone rang, you have to answer the
10    telephone. If I happened to be sitting at the desk
11    and having my lunch and a customer walks in the
12    door, my lunch is interrupted.
13 Q. So, primarily interrupted meal breaks?
14 A. There were times that it would be meals. There
15    were times at the end of the day I would get caught
16    on my way out of the door. I mean, there's no
17    predictable hours for the funeral. Things happen
18    all of the time.
19        I mentioned that I would get phone calls at
20    home regarding things that the on-call funeral
21    director may or may not be able to handle that they
22    would have question. Those times would not
23    recorded that I would have been have been involved
24    in.
25        There were times I would have made phone

---

59

KASI LONG by MS. DUGAN

1
2  calls to family, if necessary from home, possibly.
3  We had continuing education training . We had those
4  holiday meals that we were required to be at, at
5  certain times.
6  Q. Can you think of any other examples right now?
7  A. At this time those are the ones that come directly
8     to mind.
9  Q. Okay. On gat least some occasions would your
10    weekly timecard accurately reflect the time that
11    you performed work?
12 A. Yes.
13 Q. From looking at the face of your timecard, would we
14    be able to tell on which occasions it accurately
15    reflected the time you actually worked or occasions
16    where maybe it didn't?
17 A. Probably not.
18 Q. If we wanted to try to identify some of those
19    occasions that you recall when your timecards did
20    not reflect all of the time that you worked, how
21    would we go about doing that?
22        MR. LINGLE: Object to the form.
23        THE WITNESS: I have no idea.
24 BY MS. DUGAN:
25 Q. Any examples that you just gave of times whenever

---

60

KASI LONG by MS. DUGAN

1
2  you spent time working that was not reflected on
3  your timecard, was the reason for that unrecorded
4  work different every time?
5        MR. LINGLE: Object to the form.
6        THE WITNESS: I'm not sure I understand
7     the question.
8  BY MS. DUGAN:
9  Q. Was it a case-by-case basis that you would work
10    hours that you did not report on your timecard or
11    can you say that there was any specific pattern as
12    to when you would work time that you would not put
13    on your card?
14        MR. LINGLE: Object to the form.
15        THE WITNESS: Not that comes to mind.
16 BY MS. DUGAN:
17 Q. What did you do with your timesheet or your
18    timecard at the end of the week?
19 A. Meaning, did I keep it? I don't understand the
20    question.
21 Q. Did you turn your timecard in to somebody? What
22    happened with it after the whole week's time?
23 A. Dwayne would look them over, he would sign them,
24    and then I would enter payroll.
25 Q. Did Dwayne review all of the timecards for all of

---

61

KASI LONG by MS. DUGAN

1
2  the employees at the four locations?
3  A. Yes.
4  Q. And after he reviewed them, then you said you
5     entered the time into payroll?
6  A. Yes.
7  Q. Did Dwayne give all of the timesheets to you?
8  A. Following his approval?
9  Q. Yes.
10 A. Yes.
11 Q. And can you explain how you entered the time in
12    payroll from the timesheets?
13 A. There was a computer system, so we found the
14    prompts, there was different ways to enter,
15    depending on the situation; regular hours, overtime
16    hours.
17 Q. Did you have to tally the hours for each employee?
18 A. Dwayne I believe, would do that and then sign them
19    before he gave them to me.
20 Q. So, the individual employees would turn in their
21    timesheets to Dwayne without the time being
22    tallied?
23 A. I believe we would add it. He would review it,
24    check it, and check the adding, and then sign off
25    with his approval.

---

**Johnstown**
**814-266-2042**

**Toll-Free**
**866-565-1929**

**Pittsburgh**
**412-281-7908**

**NETWORK DEPOSITION SERVICES**
**Transcript of Kasi Long**

17 (Pages 62 to 65)

---

**62**

KASI LONG by MS. DUGAN

1        KASI LONG by MS. DUGAN
2    Q. Okay.
3    A. Or question it.
4    Q. How frequently did you submit employee time to
5       payroll?
6    A. I know our checks were issued every two weeks. I
7       believe we entered payroll every week, but I'm not
8       positive on that.
9    Q. When did you take on the responsibility of entering
10      time into payroll?
11       MR. LINGLE: Object to the form.
12       THE WITNESS: I can't specifically
13       recall the date of when that became my
14       responsible.
15   BY MS. DUGAN:
16   Q. When you first started working for Alderwoods, was
17      it your responsibility to enter payroll?
18   A. I can't specifically tell you that for sure. I
19      don't believe so.
20   Q. Were you entering payroll in 2003?
21       MR. LINGLE: Object to the form.
22       THE WITNESS: I believe I was, yes.
23   BY MS. DUGAN:
24   Q. Did you continue to enter payroll throughout the
25      rest of your employment then, through 2007?

---

**63**

1        KASI LONG by MS. DUGAN
2    A. I believe there was a change in policy, but I'm not
3       positive on that. I'm not sure. I can't recall
4       specifically if I did it right up to the last day
5       or not.
6    Q. When Dwayne reviewed your own timecards, did he
7       ever give it back to you for any reason?
8    A. No specific incident that I recall at this time.
9    Q. Do you know whether he would give other employees
10      their timecards back after he reviewed them?
11   A. Yes, sometimes.
12   Q. For what purpose would he give the card back to the
13      employee?
14   A. If he disagreed with their hours, sometimes. There
15      was one employee that I know, Dwayne would change
16      his timecard, because he didn't think he should
17      have that much overtime. He would do it without
18      even mentioning it to the employee.
19   Q. You said that he might go back to the employee if
20      he disagreed with his hours?
21   A. Or he might din some instances just change it on
22      his own accord.
23   Q. Whose timecard would Dwayne Hills change?
24   A. I know that he had changed Dan Buckley's before. I
25      think that's the only one that I specifically

---

**64**

1        KASI LONG by MS. DUGAN
2       recall.
3    Q. When did that occur?
4    A. Sometimes during my employment. I can't give you a
5       specific date. It happened more than once, I'm
6       sure.
7    Q. How did he change his timecard?
8    A. He would take off hours. I don't know specifically
9       whether he would cross them out or what, but he
10      would cross out hours. He would say, don't give
11      him all of those hours, it's too many hours.
12   Q. Dwayne Hills would instruct you on what to do?
13   A. Well, he would have the final tally there, and I
14      would put that into the payroll. So, I just
15      followed whatever was given to me after.
16   Q. And did Dwayne tell you that he was changing --
17   A. Sometimes I would be standing right there when he
18      was changing it.
19   Q. Do you recall any other employee timecards that
20      Dwayne Hills changed?
21   A. Not specifically at this time, no.
22   Q. Did he ever change your timecards?
23   A. Not specifically that I recall, no. I would have
24      argued it.
25   Q. Do you know what process was followed at locations

---

**65**

1        KASI LONG by MS. DUGAN
2       outside of your market for reporting time and
3       entering time into payroll?
4    A. There was a binder that we had policy and procedure
5       manuals, so I assumed that the payroll was similar
6       at most locations. I never was involved in another
7       locations payroll or entry, so I'm not positive on
8       that.
9       I believe everybody had the computer entry
10      thing, because that was part of the internet. How
11      they recorded their specific time on a sheet or
12      whether it was the same sheet, it changed different
13      times. So, I know it wasn't always -- I think our
14      timesheet originally was an old timesheet from the
15      previous owner.
16      Eventually, it had an Alderwoods logo on it,
17      I think, and then eventually we went to timecards.
18      Once we went to time clocks, I'm quite certain each
19      location had the time clock, the same time clock,
20      because they were drop-shipped, and we could -- if
21      we ran out of timecards, I know we could call Craig
22      Duke's office and they would send us more
23      timecards. They kept a stock of them.
24      So, once the time clocks went in, I think it
25      was more uniform for each location, but I can't be

---

**NETWORK DEPOSITION SERVICES**
**Transcript of Kasi Long**

18 (Pages 66 to 69)

66

1         KASI LONG by MS. DUGAN
2   certain of that. I don't know what the timesheets
3   looked like for the other locations prior to that.
4   Q. I believe before you said that you were paid on a
5   biweekly basis; is that right?
6   A. Yes. That's how I recall it, yes.
7   Q. Did you receive an earnings statement for each pay?
8   A. Like a paycheck stub?
9   Q. Yes.
10 A. Yes.
11 Q. Did you review your paycheck stubs?
12 A. I'm sure I looked them over.
13 Q. Did you understand them?
14       MR. LINGLE: Object to the form.
15       THE WITNESS: Understand?
16 BY MS. DUGAN:
17 Q. Did you ever see something on your paycheck stub
18   that you didn't understand?
19       MR. LINGLE: Object to the form.
20       THE WITNESS: At this time, I don't
21   recall anything specific.
22 BY MS. DUGAN:
23 Q. Did you ever review paycheck stubs for any other
24   employees?
25 A. No.

67

1         KASI LONG by MS. DUGAN
2   Q. Did you ever report any errors in your pay after
3   reviewing a paycheck stub?
4   A. From 2003 forward?
5   Q. Did you ever?
6   A. I know when I first got hired back, my hourly rate
7   was less than what Dwayne had offered me verbally,
8   and that was fixed. I don't recall any other
9   specific incidents at this time.
10 Q. Did you keep any personal records of your work time
11   while you worked at Alderwoods?
12 A. No.
13 Q. Did you have any formal training on how to record
14   and report your time?
15       MR. LINGLE: Object to the form.
16       THE WITNESS: Not that I recall formal,
17   no.
18 BY MS. DUGAN:
19 Q. Who instructed you, then, on how to fill out your
20   timesheet?
21 A. I don't recall. It depends. The first time or
22   every week?
23 Q. At any time did anyone instruct you on how to fill
24   out your timesheet?
25 A. The basic filling out of a timesheet and what the

68

1         KASI LONG by MS. DUGAN
2   procedure is or specifically did they tell you? I
3   mean, I'm not sure --
4   Q. How did you became aware of what the process was at
5   the locations where you worked for recording your
6   time?
7   A. I would assume that Dwayne just said, here's a
8   timesheet, it's pretty self-explanatory.
9   Q. When you started using the time clocks at the
10   locations, did you receive any instruction on how
11   to use the time clocks?
12 A. I don't recall a specific sit down instructional
13   meeting. I'm sure there was something, so we knew
14   what to do. I think we figured it out on our own,
15   basically.
16 Q. When you took on the responsibility for entering
17   time into payroll, did you receive any special --
18   any training at all at that time?
19       MR. LINGLE: Object to the form.
20       THE WITNESS: Training specifically how
21   to enter data?
22 BY MS. DUGAN:
23 Q. Whenever you took the responsibility of entering
24   payroll, were you instructed on how to enter
25   payroll for the location?

69

1         KASI LONG by MS. DUGAN
2       MR. LINGLE: Object to the form.
3       THE WITNESS: Specifically how to enter
4   data or specifically the rules to entering
5   payroll?
6 MS. DUGAN:
7 Q. Were you given any guidance at all with respect to
8   entering times for the locations?
9 A. I would assume I had been shown how by somebody. I
10   don't recall who, or when, or what, specifically
11   who taught me about the actual procedure or how to
12   use the program.
13 Q. Okay.
14 A. As far as that goes, anything beyond that I don't
15   recall specific instruction from a particular
16   person, no.
17 Q. Okay. You mentioned before an Alderwoods policy
18   and procedure manual?
19 A. Yes.
20 Q. Was that a written physical document?
21 A. There was several binders that covered different
22   areas of the location procedures.
23 Q. Were they called anything in particular, these
24   binders?
25 A. To the best of my recollection, they were the

**NETWORK DEPOSITION SERVICES**
**Transcript of Kasi Long**

70

KASI LONG by MS. DUGAN
2  Alderwoods' policy and procedure manuals and they
3  were numbered and each one had a specific topic.
4  Q. Where were these manuals kept?
5  A. There was a set at each location.
6  Q. Did the policies in these manuals apply to
7  Alderwoods locations?
8  A. To the best of my knowledge, it made sense. We
9  were all Alderwoods, we had the brand. And as far
10  as I know, every location was to follow that
11  procedure, the policy and procedures manual.
12  Q. Do you know where the manuals came from?
13  A. Home office, I presume.
14  Q. What do you mean by home office?
15  A. Well, I don't know specifically who dropped them
16  off. But, I mean, they were created, I presume,
17  from home office, which was the main headquarters
18  of Alderwoods Groups.
19  Q. Were all Alderwoods company policies contained in
20  the policy manual binders?
21  A. I would say not, because there were sometimes
22  verbal policies that we were told that I assumed
23  were directed at all employees.
24  Q. When you received policies verbally, who did verbal
25  the policies come from?

71

KASI LONG by MS. DUGAN
2  A. Probably either Dwayne or Craig Duke, possibly
3  Ralph DelGatto. Those were usually the people that
4  I would have had any contact with.
5  Q. And did --
6  A. I also would have talked to accounting
7  occasionally, if I didn't understand something.
8  So, there is another place that I may have gotten
9  information from, depending on what I was doing.
10  Q. Did any of the three managers that you mentioned,
11  Ralph DelGatto, Craig Duke and Dwayne Hills, did
12  they ever verbally tell you a policy that
13  conflicted with something that was in the written
14  policy manuals?
15  MR. LINGLE: Object to the form.
16  THE WITNESS: We had a policy regarding
17  overtime that was not ever -- that I never
18  saw in writing that was given as a directive.
19  BY MS. DUGAN:
20  Q. Did that directive conflict with what was in the
21  written policy manual?
22  A. Yes, to the best of my understanding.
23  Q. Who gave you that verbal directive about overtime?
24  A. It would be Craig Duke and also Dwayne Hills.
25  Q. Did each of them tell you something individually on

72

KASI LONG by MS. DUGAN
2  separate occasions?
3  A. I would say probably separate. Yes. I mean, they
4  weren't always together.
5  Q. What did Craig Duke tell you verbally about
6  overtime?
7  A. I recall being on a conference call, and there was
8  a policy that he stated that no overtime can be
9  paid without pre-approval. If it's not
10  pre-approved, it won't be paid. I don't believe
11  that was written in any of the policy manuals that
12  I recall.
13  Q. Did that statement by Craig Duke conflict with what
14  you believed the policy manuals did say?
15  MR. LINGLE: Object to the form.
16  THE WITNESS: I don't specifically
17  recall.
18  BY MS. DUGAN:
19  Q. I asked previously whether you were ever verbally
20  told something by one of these managers that
21  conflicted with what was in the written policies,
22  and I believe that you said that --
23  A. I don't specifically recall exactly what the
24  written policy said on overtime. But I don't
25  believe it to have been written in the policy that

73

KASI LONG by MS. DUGAN
2  overtime had to be approved. We were told that we
3  were not going to be paid unless it was approved.
4  It didn't matter.
5  Q. Craig Duke told you that?
6  A. And I recall a conference call where it was a
7  directive and then Dwayne, of course, would remind
8  us of that.
9  Q. When did Craig Duke first tell you in that
10  conference call?
11  A. I don't recall the exact date.
12  Q. Do you remember in what year it was?
13  A. I can't specifically give a date, no.
14  Q. Do you recall if it was before 2003?
15  A. I can't recall specifically.
16  Q. Other than the one occasion that you mentioned on a
17  conference call, did Craig Duke tell you anything
18  else about pre approval and overtime?
19  A. Not that comes to mind right now, no.
20  Q. Do you know whether anyone other than Craig Duke
21  conveyed to any other employees a verbal policy
22  about overtime and pre-approval?
23  A. I can't specifically say that I recall. Although,
24  you assume that when a directive comes from
25  management that it came from somewhere else above.

**Johnstown**
**814-266-2042**

**Toll-Free**
**866-565-1929**

**Pittsburgh**
**412-281-7908**

**NETWORK DEPOSITION SERVICES**
**Transcript of Kasi Long**

21 (Pages 78 to 81)

78

KASI LONG by MS. DUGAN
1
2   Q. Do you recall any specific discussions you had with
3      employees about pre-approval for overtime?
4   A. The absurdity of it, based on being on-call in the
5      middle of the night and how to get pre-approval if
6      you're over your 40 hours and you had to go on a
7      death removal, there was a concern amongst the
8      on-call directors regarding how to deal with that.
9   Q. Amongst the on-call directors, are you referring to
10     the other funeral directors at your four locations?
11  A. At my four locations. I don't specifically recall
12     for sure talking to anyone else about it. I may
13     have, but, nothing comes to mind at this moment.
14  Q. Have you ever brought any complaints, claims or
15     charges against Alderwoods other than the claims
16     that you brought in this lawsuit?
17         MR. LINGLE: Object to form.
18         THE WITNESS: To an attorney or to
19     Alderwoods themselves?
20  BY MS. DUGAN:
21  Q. Have you ever raised any complaint or made any type
22     of formal claim against the company?
23         MR. LINGLE: Object to the company.
24         THE WITNESS: Formal, meaning to the
25     company themselves or through a third-party.

79

KASI LONG by MS. DUGAN
1
2   BY MS. DUGAN:
3   Q. Have you raised any internal complaints? Let's
4      start there.
5   A. I did.
6   Q. When did you raise an internal complaint?
7   A. Sometime between -- I can't remember the specific
8      date, I remember the circumstances, but I don't
9      remember the specific date, without looking it up.
10     But it would have been before 2003, after
11     obviously, 1999 when I had come back.
12         It was to Alderwoods. So had we not become
13     Alderwoods at that point, it had to be in the
14     timeframe that we were Alderwoods. I did call the
15     employee hotline, help line, whatever.
16  Q. And what did you call the employee help line for?
17  A. I had an issue with another employee that was, I
18     believe, at the time a market administrator.
19  Q. What was the issue with this market administrator?
20  A. There were several issues that I brought to
21     fruition, based that I brought on things that were
22     happening, including harassment, mistreatment. I
23     think the word is nepotism.
24         Because Dwayne has hired his boyfriend to be
25     the market administrator after offering me that as

80

KASI LONG by MS. DUGAN
1
2   a demotion. Then after he was hired, things
3   escalated, and he was abusive. And so I finally
4   had enough and turned that into the employee help
5   line.
6   Q. When you say he was abusive, are you referring to
7      Dwayne Hills or the market administrator?
8   A. The market administrator.
9   Q. Who was the market administrator?
10  A. His name was Andrew VanDusen.
11  Q. What happened after you called in with this
12     complaint to the employee help line?
13  A. Basically, they didn't follow their own procedure.
14     They were to send somebody that was not biased.
15     They sent Ralph DelGatto who knew all of us. It
16     was not handled well. It was not handled properly,
17     and it didn't -- I don't think that they did a good
18     job resolving the issue.
19  Q. How was the issue resolved?
20  A. It ended up, at first they were going to give my
21     job to Andrew. It was a very strange occurrence.
22     Ralph DelGatto -- they were going to give the
23     location administrator job to Andrew. I questioned
24     that, because I had been doing those duties for so
25     long, how all of a sudden they were going to take

81

KASI LONG by MS. DUGAN
1
2   my job away after my complaint.
3         Ralph DelGatto threatened my pay. You can be
4   a location administrator but you're going to get a
5   huge cut in pay. I called human resources once
6   again, at that point I believe they offered Andrew
7   a different job, and then finally he was promoted
8   to regional administrator in another area. So, it
9   was not handled well.
10  Q. Did you ever call the employee help line for any
11     other reason?
12  A. Not that specifically comes to mind at this time.
13  Q. Did you ever raise an external complaint or claims
14     against Alderwoods, other than the claims involved
15     in this lawsuit?
16  A. So, to a third-party, like a lawyer or something to
17     that -- no.
18  Q. Okay.
19  A. Besides --
20         MR. LINGLE: She excluded us.
21         THE WITNESS: Okay.
22  BY MS. DUGAN:
23  Q. Do you currently claim that you're entitled to
24     overtime pay from Alderwoods?
25  A. I do believe there were certainly times that

**Johnstown**
**814-266-2042**

**Toll-Free**
**866-565-1929**

**Pittsburgh**
**412-281-7908**

**NETWORK DEPOSITION SERVICES**
**Transcript of Kasi Long**

22 (Pages 82 to 85)

---

82

KASI LONG by MS. DUGAN

1
2  because I did not -- was not allowed to record all
3  of my time that I did not receive all of the
4  overtime that I was entitled to.
5  Q. Do you understand that the claims in this lawsuit
6     are brought under the federal law, called the Fair
7     Labor Standards Act?
8       MR. LINGLE: Object to the form.
9       THE WITNESS: I don't understand the
10      actual labor law itself, a lot of it. I
11      don't know a lot about it. That's why we
12      have attorneys.
13  BY MS. DUGAN:
14  Q. When did you first have concerns about the way
15     Alderwoods was paying you?
16      MR. LINGLE: Object to the form.
17      THE WITNESS: I don't understand what
18      you're asking me.
19  BY MS. DUGAN:
20  Q. Well, you're here today because you have filed
21     claims against Alderwoods, complaining about its
22     pay practices; is that right?
23  A. Yes.
24  Q. When did you first have concerns about Alderwoods
25     pay practices?

---

83

KASI LONG by MS. DUGAN

1
2  A. Well, I knew that I wasn't being paid properly
3     during my employment. I think that the paperwork
4     that I received mentioning the class action lawsuit
5     brought to my attention that there was actually
6     violations that were made possibly by the
7     Alderwoods Group that pertained to some of the pay
8     that I did not receive.
9  Q. Did you state that during your employment you
10     realized that Alderwoods was not paying you
11     properly?
12  A. Well, obviously I knew I wasn't putting in all of
13     my hours. I didn't specifically know all of the
14     ins and outs of the legality to it.
15  Q. So, did you do anything about the fact that you
16     weren't putting in all of your hours?
17      MR. LINGLE: Object to the form.
18      THE WITNESS: Within the company?
19  BY MS. DUGAN:
20  Q. Let me rephrase the question.
21     You said you were aware during your
22     employment that you were not putting in all of your
23     hours.
24     Was that a concern for you?
25      MR. LINGLE: Object to the form.

---

84

KASI LONG by MS. DUGAN

1
2      THE WITNESS: I'm not sure I understand.
3      Was it a concern?
4  BY MS. DUGAN:
5  Q. While you were employed by Alderwoods, did you
6     believe that Alderwoods owed you additional pay for
7     work that you had performed?
8       MR. LINGLE: Object to the form.
9       THE WITNESS: Yes.
10  BY MS. DUGAN:
11  Q. Did you ever raise that issue with anyone during
12     your employment?
13  A. No.
14  Q. So, that issue was never resolved during your
15     employment; is that correct?
16      MR. LINGLE: Object to the form.
17      THE WITNESS: Do I answer?
18      MR. LINGLE: Answer, if you can.
19      THE WITNESS: I don't believe it was.
20  BY MS. DUGAN:
21  Q. So, at the time that you were terminated in 2007
22     did you believe that Alderwoods owed you overtime
23     pay for work that you had performed?
24      MR. LINGLE: Object to the form.
25      THE WITNESS: I wasn't terminated. I

---

85

KASI LONG by MS. DUGAN

1
2     was laid off, and I knew that there were
3     hours that were not paid to myself and other
4     employees. I had just not ever filed any
5     complaints.
6  BY MS. DUGAN:
7  Q. Okay.
8  A. There was the necessary evil. Either you have a
9     job and you give up a coupe of hours overtime
10    because that's what you're told to do; there is no
11    overtime, there is a business that has to be run.
12     I had dealt with the company before on an
13    issue regarding my employment that was not handled
14    well. We have certain ethical work standards that
15    we all felt that our families came first and that
16    was important for us. They told us that was the
17    directive.
18     Do I argue with my boss and possibly lose my
19    job or not even get treated fairly either. So, it
20    was at that time not reasonable to address it.
21  Q. When did you first learn of this lawsuit?
22  A. I can't give you a specific date. I believe it was
23    just prior or just following when I was laid off,
24    I'm not certain.
25  Q. What did you receive around that time?

---

**NETWORK DEPOSITION SERVICES**
**Transcript of Kasi Long**

122

KASI LONG by MS. DUGAN
1  company and not be paid for it, yes.
2  Q. Why would you not seek approval for working
3  overtime in the examples you just gave?
4      MR. LINGLE: Object to the form.
5      THE WITNESS: Are you saying that I
6  needed approval every single time. Again, I
7  don't know when the dates that approval was
8  required. So some of the time that I worked
9  the overtime maybe there was no approval
10 required. It's getting blurred for me.
11 BY MS. DUGAN:
12 Q. So, can you identify any occurrence when this
13 pre-approval policy was in effect and you were not
14 paid for overtime work you performed because it
15 wasn't pre-approved?
16     MR. LINGLE: Object to the form.
17     THE WITNESS: I'm sure it happened.
18 That's why I'm here today. To give you
19 absolutely every specific time that it
20 happened is unrealistic.
21 BY MS. DUGAN:
22 Q. Can you give me one example?
23     MR. LINGLE: Object to form, besides the
24 ones she has already given you?

123

KASI LONG by MS. DUGAN
1      THE WITNESS: I have given you lunch. I
2  have given you times that I take phone calls
3  at home. I don't know what other --
4  Community service. I have given you holiday
5  dinners, there are things that we were
6  expected to do. We had training sometimes
7  that we had to go to in the evenings in order
8  to keep our licenses up.
9      Obviously, we were required to have a
10 funeral director's license in order to be
11 funeral directors. So, those things were not
12 -- we were never directed to put time in for
13 those things. But at the same time those
14 were things that were expected as an employee
15 of the Alderwoods Group.
16 BY MS. DUGAN:
17 Q. Do you know if any of those incidents happened
18 while the pre-approval for overtime policy stayed
19 in effect?
20 A. I'm sure they did, but I can't give you a specific
21 one. I'm sure the policy existed. There were
22 times when I was working that I was not being paid.
23 Q. How many hours do you claim you worked overtime for
24 which you were not paid because the overtime had

124

KASI LONG by MS. DUGAN
1  not been pre-approved?
2      MR. LINGLE: Object to the form.
3      THE WITNESS: I can give you an estimate
4  of how many hours I worked overtime probably
5  an estimate monthly, but I cannot tell you
6  which specific days fell in the times that it
7  was pre-approved under the pre-approval
8  policy or not, because I don't know those
9  dates.
10     But I can tell you that there were many
11 times, whether the pre-approval policy was in
12 effect or not, that I worked more than
13 40 hours and was not paid for that. I could
14 probably give you an average, based on, if
15 you took my average week of lunches, did I
16 get a lunch.
17     Whether it be lunch or a half an hour I
18 think is probably the allotted time that
19 you're supposed to get for break. I would
20 say, if it's two and a half hours a week, I
21 probably lost most weeks -- and this is an
22 estimate -- anywhere from one and a half to
23 two hours a week, probably a lot of the time
24 that I was employed.

125

KASI LONG by MS. DUGAN
1      If you think of community service, we
2  had to report when we went to community
3  service. That was a monthly report that had
4  to go to the market manager ever month, what
5  you did, what you did in your community. A
6  lot of those things happened after work. I
7  was in girl scouts. There was a period of
8  time I was in Lions Club. I mentioned
9  holiday dinners that we sometimes did.
10 Sometimes I would do pre-need things,
11 seminars or something to that effect.
12     Training, absolutely some of those went
13 unpaid, even though they were directly
14 related to having to do with my job.
15 BY MS. DUGAN:
16 Q. In those instances when those activities went
17 unpaid, was it due to this pre-approval of overtime
18 policy?
19 A. I'm sure that many of them were, yes. You asked
20 the estimate of hours. Community service I
21 probably had a couple of hours a month, at least,
22 depending on what activities we did. Training,
23 that probably could be more estimated on a yearly
24 figure of anywhere from 8 to 15 hours a year. I

**NETWORK DEPOSITION SERVICES**
**Transcript of Kasi Long**

38 (Pages 146 to 149)

---

146

KASI LONG by MS. DUGAN

1 KASI LONG by MS. DUGAN
2 else. I did have a pager and would occasionally
3 fill in, if someone was on vacation or if we were
4 extremely busy. There were times, but I wasn't on
5 the special schedule that I recall.
6 Q. During this time period from 2003 to 2007 were
7 there certain days, nights or weekends when you
8 were scheduled to be on-call?
9 A. Not scheduled without being asked ahead of time.
10 Not on a regular rotation like the other funeral
11 directors.
12 Q. Were there any restrictions on what you could do
13 after you left the funeral home for the day?
14     MR. LINGLE: Object to the form.
15     THE WITNESS: What exactly do you mean,
16 "restrictions"?
17 BY MS. DUGAN:
18 Q. Did Alderwoods replace any restrictions on your
19 after-work activities?
20     MR. LINGLE: Object to the form.
21     THE WITNESS: Me personally?
22 BY MS. DUGAN:
23 Q. Yes.
24 A. Are you asking my behavior or my availability for
25 work?

---

147

KASI LONG by MS. DUGAN

1 KASI LONG by MS. DUGAN
2 Q. Either. With your behavior did Alderwoods say
3 there were certain things that you could not do
4 after you left the funeral home?
5 A. Not that I specifically recall.
6 Q. Regarding availability, did Alderwoods place
7 certain restrictions or requirements on your
8 availability after you left the funeral home?
9     MR. LINGLE: Object to the form.
10     THE WITNESS: I think more verbally the
11 directors would have been required to be
12 within -- there may not have been a written
13 policy that says, you have to be within six
14 minutes of the funeral home, but they were
15 required to answer those pagers within a
16 certain amount of time. It was a known fact.
17 It was one of those unspoken rules which
18 occurs a lot in funeral directing, that you
19 can't, you know, drive to Rochester when
20 you're on-call and hope to be back to the
21 funeral home in five minutes.
22 First of all, you have to make sure your
23 pager works, your phone is on, and that you
24 can be reached, and back to the funeral home
25 in a timely manner to make a removal if it

---

148

KASI LONG by MS. DUGAN

1 KASI LONG by MS. DUGAN
2 comes up. Me, personally, at most times I
3 was not, but I did carry a page. And if it
4 went off, yes, I did call.
5 BY MS. DUGAN:
6 Q. Besides answering pages, was there any other type
7 of work that you were required to do away from the
8 funeral home from 2003 to 2007?
9 A. We were required to do community service. There
10 was a report every month that had to go out that
11 said who did what in the community. I considered
12 part of that when I took time to do community
13 events.
14 That was, to me, helping to promote my
15 funeral home that I worked at, along with the other
16 employees. It was required that we report it. It
17 was clear that they expected something on that
18 report from each employee.
19 In fact, Dwayne Hills would lie to make it
20 look like he did something. So, to me that said
21 obviously there is some value, they want to know
22 we're out there or it could effect our job.
23 Q. Maybe I was unclear. I'm asking about on-call
24 work. with regard to on-call work, were you
25 required to do anything other than addressing pages

---

149

KASI LONG by MS. DUGAN

1 KASI LONG by MS. DUGAN
2 that you received?
3 A. Me personally?
4 Q. Yes.
5 A. Not unless it was prior arranged where if they
6 needed an extra removal person or something, then I
7 would know ahead of time if I had to be expected to
8 come back in.
9 Q. Were there some nights when you did not receive any
10 pages at all?
11 A. Sure.
12 Q. How frequently would you receive pages after
13 leaving the location for the day?
14 A. It would vary, depending on how busy we were,
15 depending on who passed away. I would say on an
16 average if I answered calls back to the funeral
17 home on my time off, which would be evenings or
18 weekends, it could be anywhere from zero to two to
19 three hours a month. It just would depend on what
20 was going on at the funeral home.
21 Q. When you did have to respond to pages away from the
22 funeral home, did you keep any records of the time
23 you spent performing that work?
24 A. There may be. Towards the end, I know they
25 initiated the call log and the directors used it

---

Johnstown
814-266-2042

Toll-Free
866-565-1929

Pittsburgh
412-281-7908