# EXHIBIT 81

**NETWORK DEPOSITION SERVICES**
**Transcript of Beverly McDonald**

1

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2
     DEBORAH PRISE and HEATHER   )
 3   RADY on behalf of themselves)
     and all employees similarly )  .
 4   situated                     )
                                  )
 5                                )
     versus                       ) CIVIL ACTION NO. 06-1641
 6                                )
                                  )
 7   ALDERWOODS GROUP, INC.       )

 8

 9

10        *********************************

11                  ORAL DEPOSITION

12                 BEVERLY MCDONALD

13                 NOVEMBER 24, 2008

14        *********************************

15

16

17        ANSWERS AND ORAL DEPOSITION OF BEVERLY MCDONALD,

18   a witness produced at the instance of the Defendant,

19   was taken in the above-styled and numbered cause on

20   the 24TH day of NOVEMBER 2008, from 10:54 a.m. to

21   5:10 p.m., before VANESSA S. ROBERTSON, CSR in and for

22   the State of Texas, reported by machine shorthand, at

23   the offices of Jones Day, 2727 North Harwood, Dallas,

24   Texas, pursuant to the Pennsylvania Rules of Civil

25   Procedure.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Beverly McDonald**

6  (Pages 18 to 21)

---

**18**

1  the phone when he called, but at some point, you
2  did?
3      A   Yes.
4      Q   How did that come about?
5      A   I called him.
6      Q   You called Mr. Barlow?
7      A   Yes.
8      Q   And told him that you accepted the
9  position?
10     A   Yes.
11     Q   Was there any negotiation with Mr. Barlow
12  about your compensation?
13     A   No.
14     Q   Did you discuss with Mr. Barlow your
15  benefits?
16     A   Yes.
17     Q   And what were your benefits with the
18  position?
19     A   Health insurance, dental insurance, life
20  insurance, and 401(K). And I don't recall any more at
21  this time.
22     Q   After you accepted the position with
23  Alderwoods, when did you start work?
24     A   I don't remember exactly.
25     Q   Was there a long span of time between your

---

**19**

1  acceptance and your start date?
2      A   A long span?
3      Q   A month?  Was it a couple of weeks?
4      A   A couple of weeks, roughly.
5      Q   Did you have any orientation?
6      A   No.
7      Q   Did you receive any training initially when
8  you started work for Alderwoods?
9      A   Not that I can recall.
10     Q   Did you ever bring any complaints or charges
11  against Alderwoods other than those in this lawsuit?
12     A   Complaints?
13     Q   Yes. Is that your answer, yes, complaints,
14  or are you asking?
15     A   No, I'm asking, what do you mean by
16  complaints and charges?
17     Q   Did you ever bring any other legal claims
18  against Alderwoods other than this lawsuit?
19     A   No.
20     Q   What Alderwoods location did you work at?
21     A   Kiker-Seale Funeral Home.
22     Q   Where is that located?
23     A   Colorado City, Texas.
24     Q   And to the best of your recollection, what
25  were your dates in that position?

---

**20**

1      A   From 1998 to 2006.
2      Q   Who was your immediate supervisor?
3      A   Bill Barlow.
4      Q   Who was your upper-level supervisor?
5      A   Randy Piersall.
6      Q   And what was your understanding of Randy
7  Piersall's position?
8      A   Area manager.
9      Q   Did you have any other supervisors during
10  your employment with Alderwoods?
11     A   Yes.
12     Q   Who were they?
13     A   We had different area supervisors.  I don't
14  recall exact names, except for Randy.  He was the last
15  one while I was employed there.
16     Q   Randy Piersall was the last area manager that
17  you recall having?
18     A   Yes, uh-huh.
19     Q   What about your immediate supervisor?
20     A   No.
21     Q   So it was just Bill Barlow through --
22     A   Just Bill Barlow.
23     Q   -- throughout your employment with
24  Alderwoods?
25     A   Yes.

---

**21**

1      Q   Did you work for Alderwoods full-time?
2      A   Yes.
3      Q   And you testified that you were offered a
4  salaried position.  Were you paid on a salary basis?
5      A   No.
6      Q   Were you ever paid a salary at Alderwoods?
7      A   When he hired me, he told me it would be
8  salary.  When I received my first check, I noticed it
9  was an hourly pay.
10     Q   And what, if anything, did you do in
11  response?
12     A   I asked Mr. Barlow about it.
13     Q   How did he respond?
14     A   He said that's the way that -- I was salary,
15  but I would be paid 50 hours a week.
16     Q   And what, if anything, was your response to
17  that information?
18     A   I asked him to explain it some more.  I
19  didn't understand.
20     Q   Did he explain it some more?
21     A   Yes.
22     Q   And what did he explain?
23     A   He explained that at 50 hours a week, it
24  would match the salary, that I would be paid 50 hours
25  a week.

---

**Johnstown**
**814-266-2042**

**Toll-Free**
**866-565-1929**

**Pittsburgh**
**412-281-7908**

**NETWORK DEPOSITION SERVICES**
**Transcript of Beverly McDonald**

34

1 Q. Okay. And you didn't discuss the handbook
2 with your manager?
3 A. He said, sign this. I signed it. You know,
4 it was like the last -- the page that I signed --
5 Q. Exhibit 3?
6 A. -- you know -- you know, the acknowledgement
7 of receiving it, you know, I -- I'm thinking that page
8 was in the very back and had to be ripped out, and I
9 signed it and handed it back to him.
10 Q. So your recollection is that you signed the
11 acknowledgement, but without reading the handbook?
12 A. Yes.
13 Q. Or discussing it with Mr. Barlow?
14 A. Yes, uh-huh.
15 Q. If you believed, during the time that you
16 were employed with Alderwoods, that there was a
17 violation of company policy, what was your
18 understanding about what you should do?
19 A. Talk to my manager.
20 Q. Any other step that you should take?
21 A. I don't recall at this time.
22 Q. If you would turn back to Exhibit 5, which is
23 excerpts from Alderwoods' associate handbook, there is
24 a page number on the -- if you could just turn to the
25 second page of this document.

35

1 A. Okay.
2 Q. And take a look at the last paragraph on that
3 page, Associate responsibilities regarding time
4 records. And this written policy states, Never
5 willfully record inaccurate or misleading information
6 on a time record; is that correct?
7 A. Yes.
8 Q. And if you could turn to the next page of the
9 document. And at the top it says, Nonexempt
10 associates.
11 Does this written policy state that
12 nonexempt associates must regularly record all hours
13 worked on signed timesheets each day?
14 A. That's what it says.
15 Q. And if you can turn to the next page of the
16 document, the bottom paragraph, with the heading
17 Nonexempt Associates.
18 And this policy states that
19 nonexempt associates are paid on an hourly basis for
20 all work controlled or required by the employer,
21 including overtime; is that correct?
22 A. That's what it says.
23 Q. And it also states that all nonexempt
24 associates must account for time worked by reporting
25 based on actual start and stop times each day,

36

1 including lunch breaks, correct?
2 A. That's what it says.
3 (Exhibit No. 6 was marked.)
4 Q. (By Ms. Morgan) I think now I've handed you
5 what's been marked as Exhibit 6. If you could take a
6 moment to review this, Mrs. McDonald.
7 And this document is titled Policy
8 Manual Agreement and Acknowledgement of Management
9 Responsibilities; is that correct?
10 A. Yes.
11 Q. Is it your signature that appears on this
12 document?
13 A. Yes.
14 Q. Did you review Alderwoods' code of conduct?
15 A. Not that I can recall at this time.
16 Q. Did you review Alderwoods' policy manual?
17 A. Policy manual?
18 Q. Yes, the Alderwoods policies and procedures
19 manual.
20 A. The five binders? Was it in there or -- I
21 don't recall at this time which specific you're asking
22 me about.
23 Q. Okay. Did Alderwoods maintain at your
24 location policy and procedure manuals?
25 A. Yes.

37

1 Q. And I think you were describing five
2 binders?
3 A. Yes.
4 Q. What's your understanding of the contents of
5 those binders?
6 A. The policies and regulations of the
7 company.
8 Q. Okay. So there were copies of policies and
9 regulations of the company at your location,
10 correct?
11 A. Yes.
12 Q. Did you ever review those policies and
13 procedures?
14 A. I don't recall specifically.
15 Q. You don't recall specifically whether you
16 reviewed them?
17 A. Right.
18 Q. Might you have reviewed them?
19 A. I might have.
20 (Exhibit No. 7 was marked.)
21 Q. (By Ms. Morgan) I've handed you Exhibit 7,
22 which are excerpts from Alderwoods' funeral home
23 procedures.
24 Do you recall whether you ever
25 reviewed Alderwoods' funeral home procedures?

**NETWORK DEPOSITION SERVICES**
**Transcript of Beverly McDonald**

82

1       Q   (By Ms. Morgan)  Yes.
2       A   I guess.
3       Q   Because you clocked out after the fact,
4   correct?
5       A   Correct.
6       Q   So it's possible that your compensation for
7   April 7, 2004 didn't accurately reflect your hours
8   worked that day, correct?
9       A   It's possible.
10      Q   Is it also possible that you were overpaid on
11  other instances where you went back and clocked out?
12      A   Yes, it's possible.
13          MR. LINGLE:  Object to form.
14      Q   (By Ms. Morgan)  That you went back and
15  clocked out after the fact for days that you had not
16  clocked out?
17      A   It's possible.
18          (Exhibit No. 20 was marked.)
19          MS. MORGAN:  For the record,
20  Exhibit 20 is Bates labeled ALD000367 to ALD000368.
21      Q   (By Ms. Morgan)  Is Exhibit 20 a copy of your
22  time card from July 27th -- I'm sorry, July 25th, 2004
23  through July 29th, 2004?
24      A   Yes, it is.
25      Q   Did you sign this time card?

83

1       A   No, I did not.
2       Q   Why did you not sign the time card?
3       A   I don't recall.
4       Q   On July 25th, 2004, you clocked in for the
5   day; is that correct?
6       A   Yes, it is.
7       Q   Did you clock out for the day?
8       A   Yes, I did.
9       Q   On July 27th, 2004, you clocked in for the
10  day; is that correct?
11      A   Yes, I did.
12      Q   Did you clock out for the day on July 27th,
13  2004?
14      A   No, I did not.
15      Q   And on July 29th, 2004, did you clock in and
16  out for the day?
17      A   Yes, I did.
18      Q   On July 29th, 2004, did you go back and clock
19  out for a day that you had missed that week?
20      A   Yes, I did.
21      Q   And what day did you go back and clock out
22  for?
23      A   For the 27th and the 28th.
24      Q   And why did you do that?
25      A   Because I didn't clock out them days.

84

1       Q   Is it possible that in clocking out on July
2   29th, 2004 for July 27th and July 28th, 2004, that the
3   hours that you worked on those days was not properly
4   reflected?
5       A   It's possible.
6       Q   Is it possible that you were overpaid for
7   this week because those hours weren't properly
8   reflected?
9           MR. LINGLE:  Object to form.
10      Q   (By Ms. Morgan)  Or if those hours were not
11  properly reflected?
12          MR. LINGLE:  Object to form.
13      A   It's possible.
14      Q   (By Ms. Morgan)  Did your manager ever
15  question you about whether you were accurately
16  recording the time?
17      A   Not that I can recall.
18      Q   When you performed work after hours, did you
19  record that time on your time cards?
20      A   Yes, I did.
21      Q   Were you compensated for that time?
22      A   I don't recall if I was or not.
23      Q   Did you ever handle phone calls after
24  hours?
25      A   Yes, I did.

85

1       Q   What are some examples of when you handled
2   some after-hour calls?
3       A   An example?
4       Q   An example of a time that you handled a call
5   after hours.
6       A   1:00 o'clock in the morning.
7       Q   And what kind of calls would you be handling
8   at that time?
9       A   Telephone calls.
10      Q   And what would be the circumstances under
11  which you would handle a call after hours?
12      A   Somebody would either be deceased, somebody
13  would have questions about the cemetery, somebody
14  would have questions about a funeral, somebody would
15  have questions about prices.
16      Q   And how would you -- would you record these
17  out, the time that you spent handling after-hour
18  calls?
19      A   Yes, I would.
20      Q   And how would you record that time?
21      A   For a long time, we didn't record them at
22  all, and then we -- he brought me a sheet to put them
23  on.
24      Q   What time frame did you not record them at
25  all?

**NETWORK DEPOSITION SERVICES**
**Transcript of Beverly McDonald**

23 (Pages 86 to 89)

| 86 |
|---|

1    A   From when I started till -- I don't remember
2  the exact date.
3    Q   And then at some point, it changed?
4    A   Yes.
5    Q   Okay.  And what was the change?
6    A   To record them.
7    Q   And who told you about that change?
8    A   Bill Barlow.
9    Q   When did he tell you?
10    A   I don't recall the exact date.
11    Q   And how did you handle recording after-hours
12  phone calls after Bill Barlow gave you that
13  instruction?
14    A   I wrote them down on a sheet.
15    Q   Did you use an after-hour call log?
16    A   That could be the name of it.  I -- it was a
17  piece of paper.
18    Q   There was a form that you used?
19    A   Yes.
20    Q   Prior to the time that Bill Barlow told you
21  to record after-hour phone calls, had any manager told
22  you not to record your time for those after-hours
23  phone calls?
24    A   I don't recall if they did or not.
25    Q   And prior to the change that we just talked

| 87 |
|---|

1  about, did you record the time spent on after-hour
2  phone calls?
3    A   No.
4    Q   And why not?
5    A   I don't know why not.
6    Q   Do you know how other Alderwoods employees
7  handled the recording of time spent in after-hour
8  phone calls?
9    A   No, I don't.
10        (Exhibit No. 21 was marked.)
11        MS. MORGAN:  For the record,
12  Exhibit 21 is Bates labeled ALD000552 to ALD000553.
13    Q   (By Ms. Morgan)  Is Exhibit 21 an after-hours
14  call log that you used, Mrs. McDonald?
15    A   Yes, it is.
16    Q   Is this the form document that you testified
17  about earlier that you used to record after-hour
18  calls?
19    A   Yes.
20    Q   And is it your -- is that your signature on
21  the first page of Exhibit 21?
22    A   Yes, it is.
23    Q   And what was your practice in using the
24  after-hours call log?
25    A   My practice in using it?

| 88 |
|---|

1    Q   Yes.  How would you -- how would you utilize
2  it?
3    A   To write information down.
4    Q   So you would write down the date of the
5  call?
6    A   Yes.
7    Q   When it started?
8    A   Yes.
9    Q   When it ended?
10    A   Yes.
11    Q   The caller and purpose of the call?
12    A   Yes.
13    Q   And the time spent on the call?
14    A   I'd always write down 15 minutes a call.
15    Q   Would you write down 15 minutes no matter how
16  long the call took?
17    A   Yes.
18    Q   Are there times that the call took less than
19  15 minutes?
20    A   Yes.
21    Q   And times the call took more than 15
22  minutes?
23    A   Yes.
24    Q   And then that total at the bottom of the
25  page, two hours, 120 minutes --

| 89 |
|---|

1    A   Yes.
2    Q   -- what does that reflect?
3    A   The 15-minute total of each call.
4    Q   Were you compensated for the time you spent
5  on the after-hours calls?
6    A   I don't recall.
7        (Exhibit No. 22 was marked.)
8    Q   (By Ms. Morgan)  Is Exhibit 22 a copy of your
9  after-hours call log for week ending July 1st, 2006?
10    A   Yes, it is.
11    Q   Is it your signature that appears on the
12  document?
13    A   Yes, it is.
14    Q   And on this after-hours call log, you would
15  record the date of the call; is that correct?
16    A   Yes.
17    Q   The start time of the call?
18    A   Yes.
19    Q   The end time of the call?
20    A   Yes.
21    Q   The caller and the purpose of the call?
22    A   Yes.
23    Q   And the time spent on the call?
24    A   Yes.
25    Q   Now, the time spent on the call, as

134

1        MR. LINGLE: Object to the form.
2    A  Is it possible I received overtime
3  adjustments? Yes.
4    Q  (By Ms. Morgan) Do you know whether you
5  did?
6    A  I can't recall at this time if I did or
7  not.
8    Q  Is it possible that you received overtime
9  adjustments during your employment at Alderwoods?
10       MR. LINGLE: Object to the form.
11    A  Yes, it's possible.
12    Q  (By Ms. Morgan) And is it possible that if
13  you received overtime adjustments, that they accounted
14  for other forms of compensation that you received,
15  such as commissions?
16       MR. LINGLE: Object to the form.
17    A  It's possible.
18    Q  (By Ms. Morgan) Are you aware of a
19  company-wide policy of not including certain types of
20  compensation in overtime calculations?
21    A  A company-wide policy of not including them?
22    Q  Yes.
23    A  Yes.
24    Q  When did you first become aware of this
25  policy?

135

1    A  I don't remember the exact date.
2    Q  How did you become aware of them?
3    A  Employees talking about it, other Alderwoods
4  employees.
5    Q  Who were these other Alderwoods employees?
6    A  I don't recall their names.
7    Q  Are these other Alderwoods employees at the
8  location where you worked?
9    A  No.
10    Q  What locations were they from?
11    A  I don't remember which locations they were
12  from.
13    Q  What positions at Alderwoods did they hold?
14    A  Funeral director/embalmer.
15    Q  Are these the same employees that you talked
16  about other issues with?
17    A  Could be.
18    Q  Did any manager, any Alderwoods manager, tell
19  you there was a policy of not including certain types
20  of compensation in overtime pay?
21    A  Not that I can recall at this time.
22    Q  And what do you understand this policy of not
23  including certain types of compensation in employees'
24  overtime calculations to be?
25    A  My understanding of the policy --

136

1    Q  Yes.
2    A  -- to not include them?
3       That they weren't included.
4       MR. LINGLE: Object to the form.
5    Q  (By Ms. Morgan) And according to your
6  understanding, what types of pay were excluded?
7    A  My understanding would be commissions.
8    Q  Any other types of pay excluded?
9    A  Not that I can recall at this time.
10    Q  Do you know whether employees in different
11  positions were subject to similar policies?
12    A  We all were.  It was the same policy.
13    Q  And what do you base that understanding on?
14    A  Understanding on Alderwoods has the same
15  policies for everyone; we were uniform.
16    Q  Do you know whether any -- any other
17  Alderwoods employees had forms of compensation,
18  excluded from their overtime pay calculations?
19    A  Was I aware of any specific?
20    Q  Yes.  Of any other employees whose overtime
21  calculations excluded other forms of compensation.
22    A  I don't remember their exact names or when I
23  talked to them, just that it was at different meetings
24  and things.
25    Q  So other employees told you this?

137

1    A  Yes.
2    Q  But did you ever see their -- their pay
3  records?
4    A  No.
5    Q  So you base that on what other employees
6  verbally told you?
7    A  Yes.
8    Q  Could you take another look at Exhibit 27,
9  your information sheet.
10    A  Okay.
11    Q  Could you take a look at Paragraph A.
12       Just let me know when you've had a
13  chance to review that.
14    A  Okay.
15    Q  Are you claiming that you were not paid for
16  any community service work?
17    A  Yes, I am.
18    Q  And during the time that you were working for
19  Alderwoods, did you do any community service work?
20    A  Yes, I did.
21    Q  What community service work did you do?
22    A  Volunteer.  Like community service work of --
23  you want specific -- I mean, I don't understand what
24  you're asking here.
25    Q  Well, you're claiming that the company

**NETWORK DEPOSITION SERVICES**
**Transcript of Beverly McDonald**

36 (Pages 138 to 141)

---

**138**

1   permitted you to perform community service?
2   A   Uh-huh.
3   Q   And at least some of the time was not paid
4   for it by Alderwoods; is that correct?
5   A   That's correct.
6   Q   Okay.
7   A   None of the time was paid for.
8   Q   Okay. What I'm trying to understand is what
9   community service work you did that you believe you
10  were not compensated for.
11  A   The Mitchell County Community Mission,
12  Christmas in Action, and Business and Professional
13  Women.
14  Q   The Mitchell County Community Mission?
15  A   Yes.
16  Q   When did you start work for that
17  organization?
18  A   I don't recall the exact date.
19  Q   Was it before your employment with
20  Alderwoods?
21  A   No.
22  Q   During your employment with Alderwoods?
23  A   Yes.
24  Q   Okay. Why did you decide to join?
25  A   I was told to.

---

**139**

1   Q   By whom?
2   A   Bill Barlow.
3   Q   And what did Mr. Barlow tell you?
4   A   That I had to join three community service
5   organizations.
6   Q   What else did he tell you about community
7   services?
8   A   It was Alderwoods' policy that everybody had
9   to be active in the community and join service
10  organizations.
11  Q   Why did you pick this particular
12  organization?
13  A   They were given to me on a list of these
14  three.
15  Q   Who gave you this list?
16  A   Bill Barlow.
17  Q   Were there other organizations on the list
18  other than these three?
19  A   No. That's the three he would like me to
20  join.
21  Q   And what did you do in response to that
22  information?
23  A   I joined the three organizations.
24  Q   All at the same time?
25  A   No, it was different times.

---

**140**

1   Q   And what purpose does the Mitchell County
2   Community Mission serve?
3         MR. LINGLE: Object to the form.
4   A   What purpose?
5   Q   (By Ms. Morgan) Like what is the work of
6   this group?
7   A   They take donated clothes and funds and help
8   homeless and needy families.
9   Q   And how long were you involved with this
10  organization?
11  A   I don't recall specific dates.
12  Q   Are you still involved?
13  A   No.
14  Q   When did you stop being involved?
15  A   October of 2006.
16  Q   And why did you stop being involved?
17  A   Because I no longer had to be.
18  Q   What did membership in this organization
19  entail?
20  A   Meetings, helping -- if people on the
21  interstate was broke down, I had to take them gas or
22  food or things like that. Just helping people.
23  Q   Did it involve time during the workday?
24  A   It did, but I never did any of it during the
25  workday because there was somebody else who could

---

**141**

1   cover that, you know, for the people who worked.
2   Q   When did you contribute time to the
3   organization?
4   A   After work.
5   Q   And what kinds of things did you do after
6   work for the organization?
7   A   I'd attend meetings, took people food, met
8   with families, took them food, brought them gas,
9   signed them into motels to spend the night before they
10  get on their way again.
11  Q   And how much time did you contribute to this
12  organization?
13  A   I don't know specific amounts.
14  Q   Did you contribute time on a weekly basis?
15  A   Yes.
16  Q   About how much time on a weekly basis?
17  A   Probably an -- on average, I mean ballpark
18  average, probably five hours a week or more. Probably
19  between five to ten.
20  Q   Did you inform Mr. Barlow that you had joined
21  this organization?
22  A   Yes.
23  Q   Did you record -- keep any record of the
24  hours that you spent contributing time to this
25  organization?

---

**NETWORK DEPOSITION SERVICES**
**Transcript of Beverly McDonald**

---

**142**

1  A  No, I didn't keep any records.
2  Q  Did you ever seek compensation from
3  Alderwoods for the time you contributed to this
4  organization?
5        MR. SAUL:  Other than this suit, you
6  mean?
7        MS. MORGAN:  Yes.
8  A  No.
9  Q  (By Ms. Morgan) Did you feel -- or did you
10  experience any personal enjoyment from your membership
11  in this organization?
12        MR. LINGLE:  Object to the form.
13  A  Any personal enjoyment?
14  Q  (By Ms. Morgan)  Yes.
15  A  No, not really.  I didn't enjoy doing it.
16  Q  Were any of your friends or family involved
17  in the organization?
18  A  No.
19  Q  Did you consider any aspect of your
20  participation in the organization to involve doing
21  work for Alderwoods?
22  A  All of it.  I mean, I just -- I wasn't there
23  because I liked it or it was fun or I wanted to do it;
24  I was there because I was told to do it.
25  Q  By Mr. Barlow?

---

**143**

1  A  Yes.
2  Q  Did Mr. Barlow ever evaluate you based on
3  your participation in the organization?
4        MR. LINGLE:  Object to form.
5  A  Not that I'm aware of.
6  Q  (By Ms. Morgan) Did all of the employees at
7  the Kiker-Seale Funeral Home where you worked
8  participate in this organization?
9  A  No.
10  Q  Did anybody else, any other Alderwoods
11  employee?
12  A  Not that I can recall at this time.
13  Q  Do you know whether there was any requirement
14  that anybody -- any other Alderwoods employee at your
15  location participate in this organization other than
16  you?
17  A  There wasn't any requirement on them.  They
18  were part-time.
19  Q  Was Mr. Barlow involved in this
20  organization?
21  A  No.
22  Q  Were there any costs associated with
23  membership in it?
24  A  No.
25  Q  Did Mr. Barlow ever observe you doing work

---

**144**

1  for this organization?
2  A  Yes.
3  Q  When did he observe you doing work?
4  A  I don't remember the exact date.  We were at
5  another function.  A family had come up there and
6  needed help, so he did observe me, yeah.
7  Q  Any other circumstance under which Mr. Barlow
8  observed you performing work for the organization?
9  A  He would ask me about it the next day at the
10  meetings and things.  He would ask me how they went.
11  Q  Any other way that he was informed about your
12  activities on behalf of the organization?
13  A  No.
14  Q  Did you ever receive any compensation for
15  time that you spent performing services for this
16  organization?
17  A  No.
18  Q  Did you ever complain about doing these --
19  doing this community service activity but not getting
20  paid for it?
21  A  Yes.
22  Q  Who did you complain to?
23  A  I complained to my husband, my mom, other
24  Alderwoods employees at other locations.
25  Q  The other Alderwoods employees at other

---

**145**

1  locations that you complained to, who were they?
2  A  I don't recall their names.
3  Q  Were any of them management employees of
4  Alderwoods?
5  A  Bill Barlow was.
6  Q  So you complained --
7  A  But the rest of them --
8  Q  Okay.  So the only Alderwoods management
9  employee to whom you complained about participating in
10  this community service activity, but not getting paid
11  for it, was Mr. Barlow?
12  A  Yes.
13  Q  And how did Mr. Barlow respond to your
14  complaint?
15  A  That it was policy, that I had to join and
16  participate.
17  Q  Did he respond to your complaint about not
18  getting compensated for the time?
19  A  Yes.
20  Q  And how did he respond to that aspect of
21  your --
22  A  He didn't get paid.
23  Q  I'm sorry.
24  A  He didn't get paid for his either, so that
25  was his response.

**Johnstown**
814-266-2042

**Toll-Free**
866-565-1929

**Pittsburgh**
412-281-7908

**NETWORK DEPOSITION SERVICES**
**Transcript of Beverly McDonald**

39 (Pages 150 to 153)

150

1    Q    By Mr. Barlow?
2    A    Yes.
3    Q    What -- what needs does this organization
4    serve --
5            MR. LINGLE: Object to the form.
6    Q    (By Ms. Morgan) -- in the community? What's
7    its mission or purpose?
8            MR. LINGLE: Object to form.
9    A    I really don't know. We raised money for a
10   few cancer societies.
11   Q    (By Ms. Morgan) And how long were you
12   involved in the organization?
13   A    Just during my employment.
14   Q    Did you stop being involved when your
15   employment with Alderwoods ended?
16   A    Yes.
17   Q    And what activities were you involved in for
18   the organization?
19   A    Just meetings.
20   Q    Did it -- did the meetings involve time
21   during the workday?
22   A    No.
23   Q    When were the meetings, typically?
24   A    Once a month in the evening.
25   Q    And how long did the meetings last?

151

1    A    About two hours.
2    Q    And did you consider any aspect of your
3    participation in the organization to involve work for
4    Alderwoods?
5    A    All of it.
6    Q    Were there any other Alderwoods employees
7    that were involved in this organization besides
8    yourself?
9    A    No.
10   Q    Any costs associated with membership in the
11   organization?
12   A    Yes.
13   Q    What were the costs?
14   A    I don't know exactly what they were.
15   Q    Who paid them?
16   A    Alderwoods.
17   Q    About how many hours were you involved in
18   activities for this group?
19   A    Two hours a month.
20   Q    And for what period of time?
21   A    I don't recall exact dates. About four
22   years.
23   Q    And why did you consider your activities
24   regarding this organization to be work?
25   A    Because I was told to join it.

152

1    Q    Did you keep any records of the time you
2    spent involved in activities for the organization?
3    A    No.
4    Q    Any Alderwoods employees observe you doing
5    work for this organization?
6    A    No.
7    Q    Did you report any of the time you spent
8    doing work for the organization to Alderwoods?
9    A    No.
10   Q    Why not?
11   A    I wasn't paid for it. I wouldn't get paid
12   for it.
13   Q    And why did you think that?
14   A    That was policy.
15   Q    And who told you that was the policy, if
16   anybody?
17   A    Bill Barlow.
18   Q    Did he tell you not to keep track of the time
19   you spent performing activities for the
20   organization?
21   A    He didn't tell me not to keep track of it.
22   Just -- it didn't matter if I turned it in or not. I
23   mean, it wouldn't be paid. But, no, he didn't
24   specifically tell me, do not keep track of it.
25   Q    Did he tell you not to turn it in to

153

1    Alderwoods?
2    A    Uh-huh.
3            MR. SAUL: Was that a "yes"?
4    A    Yes.
5    Q    (By Ms. Morgan) Did he give you a reason for
6    that?
7    A    It isn't paid for. It isn't paid.
8    Q    Did you ever receive any compensation for the
9    time you spent doing activities for this
10   organization?
11   A    No.
12   Q    Did you complain about doing these activities
13   but not getting paid?
14           MR. LINGLE: Object to the form.
15   A    Yes.
16   Q    (By Ms. Morgan) To whom did you complain?
17   A    Bill Barlow.
18   Q    And how did he respond?
19   A    He didn't get paid for his community service
20   either.
21   Q    Did you complain to any other Alderwoods
22   management employees about doing community service
23   activities but not getting paid for it?
24   A    About doing community service, in general, or
25   that specific --

**NETWORK DEPOSITION SERVICES**
**Transcript of Beverly McDonald**

41 (Pages 158 to 161)

---

158

1  on call?
2  A    That means if anything happened after hours,
3  you took care of it.
4  Q    Were you expected to be on call?
5  A    Yes.
6  Q    When?
7  A    Every other week.
8  Q    And where would you be while you were on
9  call?
10 A    At home, out and about, you know, just
11 wherever I was, I was on call.  If I went to the
12 grocery store, I was still on call.
13 Q    Did you have to be at any particular location
14 when you were on call?
15 A    No.
16 Q    And who set up the on-call schedule?
17 A    Bill Barlow.
18 Q    How would you learn that you were scheduled
19 to be on call?
20 A    It was every other week.
21 Q    What did you do while you were on call?  What
22 type of work?
23 A    Whatever was needed.
24 Q    Can you give some examples of something that
25 you might do when you were on call?

---

159

1  A    Removals, embalmings, met with families.
2  Q    Anything else?
3  A    Not that I can recall at this time, I'm sure
4  there was a lot more that I did, but that was the main
5  things that we did on call.
6  Q    Were there any restrictions on what you could
7  do during the time you were on call?
8  A    Yes.
9  Q    What were those?
10 A    We couldn't travel outside of Mitchell
11 County.
12 Q    I'm sorry, what?
13 A    Do not travel outside of Mitchell County.
14 Q    Any other restrictions?
15 A    Of course, you know, don't drink.  Be
16 available, have a cell phone with you all the time or
17 be at home, you know, where you can hear the phone.
18 Q    Anything else?
19 A    Not that I can recall at this time.
20 Q    And how would you be contacted during the
21 time you were on call if you needed to perform work?
22 A    Through a cell phone or a house phone.
23 Q    Did you keep track of the time you worked
24 while you were on call?
25 A    Keep track of it by my own personal records

---

160

1  or --
2  Q    Sure.
3  A    No, I didn't have personal records of on-call
4  time.
5  Q    Okay.  What about company records; did you
6  write it down on your timesheets?
7  A    Yes.
8  Q    And then when you used the time clock, would
9  you clock in and out?
10 A    No.  I would write it in on the back of the
11 time cards.  That's if I actually had a call.  Just my
12 regular on-call time, we didn't record any of that.
13 Q    So there were times that you were scheduled
14 to be on call where you didn't actually perform work
15 for Alderwoods?
16 A    Yes.
17 Q    And you -- you did not record that time --
18 A    No.
19 Q    -- is that correct?
20      What type of on-call work did you
21 record?
22 A    Embalmings.
23 Q    Anything else?
24 A    Phone calls.
25 Q    Anything else?

---

161

1  A    No.
2  Q    Was there any Alderwoods work that you were
3  performing when you were on call that you did not
4  record?
5  A    Time to and from -- like from my house to the
6  hospitals, from the hospitals, waiting on transfer
7  companies to show up to take the body from one place
8  to the next, waiting for justice of the peaces,
9  removals at -- really, removals at wreck scenes,
10 things like that.
11 Q    And why did you not record that time?
12 A    They weren't paid.
13 Q    What do you mean by that?
14 A    They weren't -- they weren't paid; just
15 embalming was paid.
16 Q    Your understanding was that the only time on
17 call spent performing embalming was paid for?
18 A    Yes.
19 Q    So that was the only time that you would
20 record?
21 A    Yes.
22 Q    What about phone calls, though?
23 A    The phone calls on the call log, when the
24 call log started, yes.
25 Q    Yes.

---

**NETWORK DEPOSITION SERVICES**
**Transcript of Beverly McDonald**

178

1   they had to go to training.
2       Q   What do you base your belief on?
3       A   On everybody being at the training and
4   Alderwoods' uniformity.
5       Q   But you don't know specifically whether any
6   other employees in other positions were compensated
7   for the time they spent at preneeds training, outside
8   of their regular work hours, do you?
9       A   No.
10      Q   Do you know whether employees at other
11  funeral home locations were subject to similar
12  policies?
13      A   Yes, they were.
14      Q   And what do you base that on?
15      A   Them saying that they were not being paid for
16  it.
17      Q   And who were these individuals?
18      A   I don't remember their specific names.
19      Q   Were they the other funeral
20  director/embalmers that we've talked about previously
21  in the deposition?
22      A   Yes, and some of them with -- the preneed
23  training was in bigger locations, they had people who
24  just went out and sold preneeds who weren't funeral
25  director/embalmers.

179

1       Q   What were their job positions?
2       A   Preneed sales. I am sure they had a title, I
3   just don't know it.
4       Q   Were any of these individuals working at
5   locations outside of Texas?
6       A   I don't know.
7       Q   Did you ever meet with clients about preneeds
8   insurance?
9       A   Yes.
10      Q   Were these called preneeds appointments or
11  meetings, was there any name given to that activity?
12      A   Preneed is all.
13      Q   Okay. But as a funeral director, you did
14  conduct these preneeds meetings, appointments?
15      A   Yes.
16      Q   And who scheduled them?
17      A   I did. Whenever somebody had called and said
18  they needed to speak to someone -- just whoever
19  answered the phone scheduled it.
20      Q   And where would they take place?
21      A   In -- at the funeral home or in the client's
22  home, at a restaurant, wherever they were more
23  comfortable.
24      Q   And were any of these meetings or
25  appointments outside of your regular work hours?

180

1       A   Yes.
2       Q   Were any of them ever within your regular
3   work hours?
4       A   Yes.
5       Q   For the times that you had preneeds
6   appointments outside of your regular work hours, how
7   frequently would that happen?
8       A   Probably at least once a week, one to ten
9   times a week.
10      Q   Did you report on your timesheets or time
11  cards the time that you spent meeting with prospects
12  regarding preneeds insurance?
13      A   No.
14      Q   Why not?
15      A   It wasn't paid.
16      Q   And why wasn't it paid?
17      A   That was policy. We didn't get paid for
18  it.
19      Q   And who informed you of that policy?
20      A   Bill Barlow.
21      Q   What did Mr. Barlow tell you about
22  compensation for preneeds appointments, outside of
23  your regular work hours?
24      A   If you sold a preneed, you got the
25  commission.

181

1       Q   What did he tell you about the time that you
2   spent in those appointments, though?
3       A   You don't get paid for it.
4       Q   Did he tell you not to report the time that
5   you spent in the appointments?
6       A   Yes.
7       Q   And how many hours are you claiming that you
8   were not paid for such appointments?
9       A   I don't know.
10      Q   You don't know?
11      A   I don't know. I don't think I'm claiming a
12  specific number on that. I just -- I don't know how
13  many hours I spent doing that work that I didn't get
14  paid for. I didn't keep a record.
15      Q   You said it would have -- you would have
16  these appointments anywhere from one to ten times a
17  week?
18      A   Yes.
19      Q   And about how long would the appointments
20  last?
21      A   That varied. Some of them were 45 minutes
22  and some of them were two or three hours.
23      Q   So on average, about how much time did you
24  spend in preneeds appointments, outside of your
25  regular work hours?

**NETWORK DEPOSITION SERVICES**
**Transcript of Beverly McDonald**

182

1    A    On average in a day, or a week, a month?
2    Q    A week.
3    A    A week?  Probably four hours, five.  It
4    really varied.
5    Q    And what factors would affect how many hours
6    you would spend in preneeds meetings in one week
7    versus another?
8    A    If we had an advertising campaign go out, you
9    know, mail out, let's say, then we had a lot more
10   preneed appointments that week.  If we didn't, then
11   just however many people called and said they would
12   like to set up a time and talk to us about preneeds,
13   or they might have been in the funeral home when we
14   asked them if they had a preneed and they wanted to
15   talk about it.  It really depended on what the public
16   wanted.
17   Q    And are you aware of any company-wide policy
18   that employees should not report all of the time they
19   spent in their preneeds appointments?
20   A    Uh-huh, yes.
21   Q    And when did you become aware of this?
22   A    It was always there when I started on through
23   until I quit.
24   Q    And how did you become aware of it?
25   A    Through Bill Barlow.

183

1    Q    Did you ever see this policy written
2    anywhere?
3    A    No.
4    Q    Ever undergo any training related to it?
5    A    No.
6    Q    Do you know whether employees in any
7    different -- that held any positions different from
8    yours, were subject to a similar policy?
9    A    I don't know about the preneed sales force.
10   I don't know, you know, if there was.  I unders -- it
11   was my understanding, though, that nobody was
12   compensated for it.
13   Q    And what was that understanding based on?
14   A    The policy.
15   Q    It was based on what Mr. Barlow communicated
16   to you?
17   A    Uh-huh, that, and everyone that I had spoken
18   to, does not receive the compensation for it, and
19   Alderwoods being a uniformed company.
20   Q    And were the individuals that you spoke to,
21   the same individuals that you spoke to about the
22   training, the preneeds training?
23   A    Some of them were, I am sure, and maybe some
24   different ones, you know, it just depends on where I
25   was and who all was there.

184

1    Q    But you don't recall specifically the names
2    of any of these people?
3    A    No, I don't.
4    Q    Were they other funeral directors/embalmers
5    in the state of Texas?
6    A    Yes.
7    Q    And other preneed sales employees in the
8    state of Texas?
9    A    Yes.
10   Q    And you just had verbal conversations with
11   these individuals?
12   A    Yes.
13   Q    Aside from the preneeds training that you
14   received, is there any other training that you're
15   claiming you were not compensated for?
16   A    Any kind of training that didn't happen
17   during the day, then I wasn't compensated for it.  You
18   know, if it wasn't during regular business hours.
19   Q    And what -- what other training did you
20   receive outside of regular business hours at
21   Alderwoods that you're claiming that you were not
22   compensated for?
23   A    For our funeral director/embalmers license,
24   we had continuing education requirements on it.
25   Q    Anything else?

185

1    A    Not that I'm aware of at this time.
2    Q    Was this funeral director/embalmer license
3    training, what we were talking about previously, or
4    was there additional training that you received
5    related to that?
6    A    What were we talking about previously?
7    Q    You were saying that you were required by the
8    state to have some continuing education for your
9    funeral director/embalmer license; is that right?
10   A    I don't remember talking about my
11   embalmer/director license before.
12   Q    Okay.  Did you hold more than one license?
13   A    The insurance license.
14   Q    The insurance license.  Okay.
15   A    Uh-huh.
16   Q    That's what we were talking about before.
17   A    All right.
18   Q    Then you held another license.
19   A    Yes.
20   Q    Okay.  What is this other license?
21   A    It's a Texas funeral directors and embalmers
22   license.
23   Q    Did you have that license before you began
24   working at Alderwoods?
25   A    I was licensed as an apprentice.

**Johnstown**
**814-266-2042**

**Toll-Free**
**866-565-1929**

**Pittsburgh**
**412-281-7908**

**NETWORK DEPOSITION SERVICES**
**Transcript of Beverly McDonald**

49 (Pages 190 to 193)

190

1    A   The same ones as before, just in meetings and
2    things that I talked to.
3    Q   And what did Mr. Barlow inform you about this
4    policy?
5    A   That it was uniform.  You know, that's the
6    way it was done, that he didn't get paid for it
7    either.
8    Q   Did he ever tell you not to record the time
9    that you spent getting the continuing education?
10   A   Yes.
11   Q   Did he give you any reason for that?
12   A   That it wasn't paid.
13   Q   Did you complain to Mr. Barlow about that?
14   A   Yes.
15   Q   What was his response?
16   A   He didn't get paid for it either.
17   Q   Did you complain to any other Alderwoods
18   manager about this policy?
19   A   To Randy Piersall.
20   Q   What was Mr. Piersall's response?
21   A   That was policy.
22   Q   Did you complain to any other Alderwoods
23   manager about this matter?
24   A   Not that I can recall at this time.
25   Q   Do you know whether this funeral

191

1    director/embalmer license was required of any
2    Alderwoods employees in other positions?
3    A   I don't know if it was or not.
4    Q   Do you know whether any other Alderwoods
5    employees were subject to similar policies?
6    A   All of us were.
7    Q   And on what do you base that?
8    A   On the uniformity of Alderwoods, again.  They
9    wanted everything the same nationwide, so...
10   Q   Anything else that you base it on?
11   A   Not that I'm aware of at this time.
12   Q   Did you hold any other licenses during your
13   employment at Alderwoods?
14   A   Driver's license.
15   Q   Is that it?
16   A   A hunting license, fishing license.
17   Q   Were any of those related to your Alderwoods
18   employment?
19   A   No.
20   Q   So we've covered all of the
21   employment-related licenses that you had during your
22   employment with Alderwoods?
23   A   Yes.
24   Q   Okay.  Any other training that you received
25   at Alderwoods for which you claim you were not

192

1    compensated for the time spent in the training?
2    A   We had training sessions at different funeral
3    homes at different times, that if it was my day off, I
4    didn't get paid to go to it, but I was required to
5    go.
6    Q   And what was this training for?
7    A   I think one was for sexual harassment.  I did
8    go to a compliance audit training, it was on a
9    Saturday.  And I can't remember...
10   Q   Anything else at this time?
11   A   I can't remember anything else at this
12   time.
13   Q   And was this -- was the sexual harassment
14   training held after your regular hours of work?
15   A   Yes.
16   Q   When did it take place?
17   A   I don't remember the exact date.
18   Q   Was it at night, on a weekend?
19   A   It was on a weekend.
20   Q   Did you report on your timesheets or record
21   on your time cards the time that you spent in the
22   sexual harassment training?
23   A   No.
24   Q   Why not?
25   A   It wasn't paid.

193

1    Q   And how did you know that?
2    A   Bill Barlow told me.
3    Q   When did he tell you that?
4    A   The day of it, and just that any training
5    outside of your regular hours wasn't paid.
6    Q   That's what Mr. Barlow told you?
7    A   Yes, that was understood.
8    Q   Well, did anybody -- any other Alderwoods
9    manager tell you that?
10   A   Randy Piersall, if I asked him about it.  I
11   don't recall specifically asking him about it, about
12   the sexual harassment training.
13   Q   But you had the understanding that any
14   training that you received outside of regular hours at
15   Alderwoods, you wouldn't be paid for?
16   A   Right.
17   Q   It was Mr. Barlow that communicated that to
18   you?
19   A   Yes.  Yes.
20   Q   And Mr. Piersall?
21   A   I don't specifically remember asking Randy if
22   it was paid or not.
23   Q   Okay.
24   A   Because the sexual harassment training was
25   late in my employment with them, so it was just

**NETWORK DEPOSITION SERVICES**
**Transcript of Beverly McDonald**

194

1  understood that I wouldn't be paid for that.
2      Q   But your understanding was based on what
3  Mr. Barlow had told you?
4      A   Yes, and other employees.
5      Q   And who were these other employees that told
6  you this?
7      A   The ones at the training.
8      Q   And who were they?
9      A   I don't remember their names.
10     Q   Were they from beyond your Alderwoods
11  location?
12     A   Yes, they were from different locations.
13     Q   Were they all from different locations within
14  Texas?
15     A   I think they were all from Texas, yes.
16     Q   Now, this compliance audit that you attended
17  on a Saturday --
18     A   Uh-huh.
19     Q   -- did you record the time that you spent
20  attending that?
21     A   No.
22     Q   Why not?
23     A   It wasn't paid.
24     Q   And was your understanding that it wasn't
25  paid, based on what Mr. Barlow had told you?

195

1      A   And Alderwoods' policy of not paying for
2  anything that -- not paying for training that wasn't
3  outside of your regular scheduled hours.
4      Q   But that policy was what Mr. Barlow had
5  communicated to you --
6      A   Yes.
7      Q   -- is that correct?
8      A   And the other employees that I had spoken
9  with.
10     Q   The other employees that attended the
11  training?
12     A   Yes.
13     Q   And all of these employees were from Texas,
14  from Alderwoods locations of Texas?
15     A   I think so.
16     Q   Mrs. McDonald, is there anything else that we
17  haven't talked about that you claim you were not
18  compensated for by Alderwoods?
19     A   Not that I can recall at this time.
20     Q   Taking a look at --
21         MR. LINGLE:  I hate to interrupt,
22  but can I have that one back, I'm sorry.
23         (Requested portion was read back.)
24         MR. LINGLE:  Just note my objection
25  to that.

196

1      Q   (By Ms. Morgan)  If you could just take a
2  look at Exhibit 27 for me.
3      A   Okay.
4      Q   When did you receive this information
5  sheet?
6      A   In September of '07.
7      Q   Did anyone help you fill it out?
8      A   Yes.
9      Q   Who helped you?
10     A   I don't know.  My name was filled out
11  already.
12     Q   Anybody help fill out any other portion of
13  the document?
14     A   My address -- the whole top part was filled
15  out for me.
16     Q   By whom?
17     A   I don't know.
18     Q   And what, on the form, did you actually fill
19  out?
20     A   I put in my updated address, and the X's, A
21  through E, the date, and my name, and my signature.
22     Q   Did you discuss the checklist, this
23  information sheet with anyone?
24     A   Yes.
25     Q   Who did you discuss it with?

197

1      A   With my husband.
2      Q   Did you discuss it with anybody else?
3      A   The attorneys that -- I can't remember her
4  name on the phone, but we discussed it.
5      Q   Did -- and you don't recall the name of the
6  attorney?
7      A   No.
8      Q   Do you recall her law firm?
9      A   No.
10     Q   Did you fill out the information sheet before
11  you spoke with the attorney or after you spoke with
12  the attorney?
13     A   I don't understand what you're asking.
14     Q   You indicated that you checked the boxes?
15     A   Uh-huh.
16     Q   That you dated the document?
17     A   Yes.
18     Q   That you corrected your address?
19     A   Yes.
20     Q   And that you provided your signature on the
21  document, correct?
22     A   Uh-huh, yes.
23     Q   And you stated that all of the other
24  information on the document was filled in before?
25     A   Yes.

**NETWORK DEPOSITION SERVICES**
**Transcript of Beverly McDonald**

53 (Pages 206 to 209)

206

1  to 40.
2      Q  Okay. And, again, that didn't necessarily
3  reflect the number of hours you were working, it was
4  related to how many hours you were actually just being
5  paid for; is that right?
6      A  Yes.
7      Q  One of the questions that you were asked was
8  concerning additional forms of compensation that you
9  received during your employment.
10         You mentioned, I think, throughout
11  today's deposition, and I just want to make sure it's
12  clear, that you received commissions on -- what did
13  you receive commissions for?
14     A  For preneeds and markers.
15     Q  Okay. Did the time records that you filled
16  out include all of the time that you worked?
17     A  No.
18     Q  Okay. What time was not included on your
19  time records?
20     A  Everything but embalming or time that I
21  actually worked during the day. And time to and from
22  calls, removals, waiting for justice of the peace to
23  show up, just a lot of -- just waiting time.
24     Q  And so now you're referring to work after
25  hours, right?

207

1      A  Yes.
2      Q  Okay.
3      A  Uh-huh.
4      Q  How about time after you took a call to get
5  ready to go out, did you record that time?
6      A  No, I didn't record that time.
7      Q  Okay. And so since we're talking about after
8  work -- after-hours work, how did the policy change
9  during your employment with respect to what you would
10  be paid for after -- for on-call after-hours work?
11     A  It was the same, that I didn't get paid for
12  it -- I didn't get paid for it until we started the
13  time clock, and then I would just get paid for
14  embalming only.
15     Q  Okay. So prior to the time clock, did you
16  receive payment for any on-call activity that you
17  worked?
18     A  No.
19     Q  Okay. And then it changed -- your
20  recollection is that changed when there was a time
21  clock?
22     A  Yes.
23     Q  Okay. And you said at that point you started
24  recording for embalming?
25     A  Yes.

208

1      Q  Okay. How much time were you allowed to
2  record for embalming?
3      A  I wrote down three hours.
4      Q  Okay. When you were doing an embalming, did
5  you ever work more than three hours?
6      A  Yes.
7      Q  Were you allowed to record any of the time
8  for any other on-call work, other than embalming, at
9  that time?
10     A  At that time, no.
11     Q  Was there another change in the policy --
12     A  Yes.
13     Q  -- at some point?
14         And how did the policy change?
15     A  When I could write down on-call times, actual
16  phone calls that I had to take.
17     Q  And so what were you allowed to write down?
18     A  Phone calls.
19     Q  Okay. Was there a certain amount of time
20  that you're allowed to record?
21     A  15 minutes.
22     Q  And did the policy change, again, after
23  that?
24     A  Yes.
25     Q  How did it change?

209

1      A  I could write down the -- an estimated amount
2  of time that it actually took.
3      Q  Were there any other changes that you're
4  aware of for the on-call policy?
5      A  No.
6      Q  You were also shown, during your deposition,
7  a bunch of different pay records, some of which
8  reflected that you hadn't punched out on certain days;
9  do you recall that?
10     A  Yes.
11     Q  What would be the reasons why you wouldn't
12  have punched out?
13     A  If I was at the cemetery, I could go straight
14  home from the cemetery, instead of going back by the
15  office. Really, if I was out of the office for
16  anything at all, I didn't have to go back by the
17  office to clock out.
18     Q  And what were you told to do in that
19  circumstance?
20     A  To write it in, at first. And then, it was
21  just to punch out at the end of the week for all of
22  that.
23     Q  And who told you to do that?
24     A  Bill Barlow.
25     Q  So in days where you did that punch out at a

**Johnstown**
**814-266-2042**

**Toll-Free**
**866-565-1929**

**Pittsburgh**
**412-281-7908**

# EXHIBIT 82

**NETWORK DEPOSITION SERVICES**
**Transcript of Barry Douglas Miles**

1

1          THE UNITED STATES DISTRTICT COURT
      FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2                                          06-1641
3

4

5   DEBORAH PRISE AND HEATHER              )
    RADY ON BEHALF OF THEMSELVES           )
6   AND ALL EMPLOYEES SIMILARLY            )
    SITUATED,                              )
7                                          )
                                           )
8           PLAINTIFFS,                    )
                                           )
    V                                      )
9                                          )
                                           )
    ALDERWOODS GROUP, INC.,                )
10                                         )
                                           )
11          DEFENDANT.                     )
    ---------------------------------------
12
           DEPOSITION OF BARRY DOUGLAS MILES
13
              (TAKEN by DEFENDANT)
14
           CHARLOTTE, NORTH CAROLINA
15
              APRIL 18, 2009
16

17

18

19   REPORTED BY:         Meredith R. Johnson
                          Court Reporter
20                        Notary Public

21

22

23

24

25

**Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg**
**866-565-1929**

**NETWORK DEPOSITION SERVICES**
**Transcript of Barry Douglas Miles**

5 (Pages 14 to 17)

---

14

1    Q   Do you know when -- about the time that
2  that pay sheet was in effect?
3      MS. DOUGLASS: Objection.
4      A   From the time Alderwoods purchased the
5  company I worked for.
6      Q   Okay. We're going to get into all that
7  stuff, but can you just give me a date when you
8  think that that happened?
9      A   No, I can't.
10     Q   Okay. Can you tell me -- can you tell
11 me that -- can you tell me a date range -- and
12 just an estimate, we're not going to hold you to
13 it -- can you tell me a date range of when you
14 would have used that form?
15     A   Reason I hesitate, initially when we
16 started we used time cards --
17     MS. DOUGLASS: Well, let me --
18     A   Then they went to time sheets where you
19 hand wrote your time, that's what I'm talking
20 about.
21     Q   So this was the time sheet?
22     A   Yeah.
23     Q   Was this an overtime sheet or was this
24 just a regular?
25     A   It was a piece of paper where you logged

---

15

1  in and logged out.
2      Q   Okay. When did you first learn of this
3  lawsuit?
4      A   It was soon after SCI purchased
5  Alderwoods.
6      Q   And how did you learn of it?
7      A   Word of mouth.
8      Q   Do you remember who told you?
9      A   No.
10     Q   Is this something that would have been
11 talked about by a lot of people or is this
12 something that maybe a few people?
13     A   Yeah, a lot of people.
14     Q   Do you remember the date that SCI bought
15 Alderwoods?
16     MS. DOUGLASS: Objection.
17     A   No, I don't.
18     Q   Okay. Do you remember anyone -- can you
19 tell me the names of the people that you've talked
20 to about this lawsuit?
21     A   Just one.
22     Q   Who is that?
23     A   John Thomas.
24     Q   So you think you've talked to lots of
25 people but you can only remember Mr. Thomas' name;

---

16

1  is that correct?
2      A   Well --
3      MS. DOUGLASS: If I could say one thing, I
4  think we just want to clarify, are we talking
5  about people we've talked to before joining the
6  lawsuit or about the lawsuit in general?
7      MR. FARMER: I'm just asking about the
8  lawsuit in general right now. I'll try to narrow
9  it down a little bit. He only gave one answer so
10 I'm trying to see if I can start broad and narrow
11 it down from there.
12     A   Initially it was talk among employees.
13     Q   Okay.
14     A   About a lawsuit. Then some of the
15 employees were contacted regarding a lawsuit and
16 that's when it became more specific. And that's
17 where Mr. Thomas and myself are the only two I
18 know that actually joined in the lawsuit.
19     Q   Okay.
20     A   From my firm.
21     Q   How many -- tell me what your firm is,
22 tell me what you mean by that?
23     A   Carruthers Funeral Home.
24     Q   Since the date that you first learned of
25 this lawsuit, is Carruthers Funeral Home the only

---

17

1  firm that you've worked for?
2      A   Yes.
3      Q   And is there more than one Carruthers
4  location?
5      A   Yes, there's five of them in the county.
6      Q   Do you work at all those locations --
7      A   Yes.
8      Q   You work at all of them?
9      A   Yes.
10     Q   Can you tell me any other names of
11 anyone else that you've talked to about this
12 lawsuit at all?
13     A   (Shakes head side to side)
14     Q   But you know there are people at the
15 location, at the Carruthers location, you just
16 don't know who they were?
17     MS. DOUGLASS: Objection.
18     Q   You don't know who you talked to?
19     A   Well, when it became specific to the
20 lawsuit, no. The only conversation I had was
21 between Mr. Thomas and myself and we discussed who
22 called, when did they call the firms. That's
23 about the extent of that.
24     Q   Now, you said with specifics to the
25 lawsuit, does that mean you've talked to other

---

186

1　Q　Okay. So if the phone call was five
2　minutes, you put down 15 minutes?
3　A　That's what they said to do.
4　Q　What if the phone call was 30 minutes?
5　A　I put down 15 minutes.
6　Q　You were told to not record the actual
7　time, just record --
8　A　Fifteen minutes per phone call.
9　Q　Okay. Why --
10　A　So you adjusted these times to equal 15
11　minutes. If you go back and look through them,
12　they're adjusted to read 15 minutes.
13　Q　Okay. So I'm just trying to clarify.
14　Does that mean you were told to put down the
15　actual time from start time to actual end time and
16　then put 15 minutes as time spent?
17　MS. DOUGLASS: Objection.
18　A　No.
19　Q　Tell me. I'm just trying to understand.
20　Tell me what that means?
21　A　It means 15 minutes per call. If the
22　phone rings and I deal with that phone call and I
23　hang up the phone, that's 15 minutes.
24　Q　So why do you think that you would have
25　a start time and an end time listed if every phone

187

1　call was going to be worth 15 minutes?
2　MS. DOUGLASS: Objection.
3　A　Because that's what we were told to do.
4　Q　No, no, no. That's not what I'm asking
5　you. You're telling me that you were told to put
6　down fifteen minutes per phone call, period.
7　A　Right.
8　Q　But why would you have a start time and
9　an end time if the direction was to put down 15
10　minutes no matter what?
11　A　Because that start time -- if you look
12　at it, that equals 15 minutes.
13　Q　I understand that that's what you wrote
14　down.
15　A　Right.
16　Q　But what I'm asking you is, if the
17　computation was supposed to be 15 minutes for
18　every single time, then why would they have a
19　start time and an end time if they say they're all
20　15 minutes? Why would you have --
21　A　You have to ask them. I don't know.
22　That's exactly what I was told to do and that's
23　what I did.
24　Q　Okay. That's fine. Now, this shows
25　employee signature. Is that your signature?

188

1　A　Yeah.
2　Q　And the week ending 11/4/06?
3　A　Right.
4　Q　And who's the approver?
5　A　Danny Gibson.
6　Q　So you have three phone calls on
7　11/3/06?
8　A　Correct..
9　Q　Fifteen minutes each.
10　A　Right.
11　Q　And then you have a fourth entry here
12　that start time, what is that start time? Can you
13　tell what that says.
14　A　Like 7 a.m.
15　Q　And the end time?
16　A　10 a.m.
17　Q　Okay. And can you read what the caller
18　and purpose of call says?
19　A　For that particular time?
20　Q　Yes, sir.
21　A　That's home removal somewhere in Clover,
22　South Carolina. Willard somebody.
23　Q　And the time spent in minutes?
24　A　180.
25　Q　And was that a minimum that you were

189

1　instructed to put down?
2　A　That was a minimum we were supposed to
3　put down.
4　Q　And what -- if the call lasted for five
5　hours?
6　A　We put down three hours down.
7　Q　Now, tell me where you got your
8　instructions to do that. Who instructed you to do
9　that?
10　A　When the call logs were announced, it
11　was announced that you'll get paid 15 minutes per
12　phone call and three hours for removal.
13　Q　And how did you get that information?
14　A　Word of mouth, I guess. I don't know to
15　be honest with you.
16　Q　Do you remember who told you that?
17　A　No, I don't.
18　Q　Did you ever see any documentation that
19　told you to do that?
20　A　Other than that first thing you saw
21　here. It said something about a call log.
22　MS. DOUGLASS: Could we take a break here.
23　MR. FARMER: Absolutely.
24　(Off the Record 2:00 p.m.. to 2:10 p.m.)
25

# EXHIBIT 83

**NETWORK DEPOSITION SERVICES**
**Transcript of William Opie Bernard Ore**

1

```
1          IN THE UNITED STATES DISTRICT COURT
2       FOR THE WESTERN DISTRICT OF PENNSYLVANIA
3                       - - -
4     DEBORAH PRISE and HEATHER RADY,          )
      on behalf of themselves and all          )
5     employees similarly situated,            )
                                               )
6              Plaintiffs,                      )
                                               ) Civil Action
7          vs.                                  ) No. 06-1641
                                               )
8     ALDERWOODS GROUP, INC. and SERVICE )
      CORPORATION INTERNATIONAL,               )
9                                              )
               Defendants.                     )
10
                        - - -
11
          Deposition of WILLIAM OPIE BERNARD ORE
12
              Thursday, March 19, 2009
13
                        - - -
14
           The deposition of WILLIAM OPIE BERNARD ORE,
15    one of the plaintiffs herein, called as a witness
      by the defendants, pursuant to notice and the
16    Federal Rules of Civil Procedure pertaining to the
      taking of depositions, taken before me, the
17    undersigned, Jessica L. Tapia, a Notary Public in
      and for the Commonwealth of Pennsylvania, at the
18    Holiday Inn, 930 East Grafton Road, Fairmont, West
      Virginia 26554, commencing at 9:51 o'clock a.m.,
19    the day and date above set forth.
20                      - - -
21          Network Deposition Services
             Suite 1101, Gulf Tower
22              707 Grant Street
          Pittsburgh, Pennsylvania  15219
23              (412)281-7908
24                      - - -
25
```

**NETWORK DEPOSITION SERVICES**
**Transcript of William Opie Bernard Ore**

4 (Pages 10 to 13)

---

10

1  from providing truthful answers today?
2      A    Not that I know of, no.
3      Q    I'm sorry.  I may have even been
4  having a little trouble hearing you.
5      A    No.
6      Q    And your employment with Alderwoods,
7  can you tell me where you were employed?
8      A    In Brunswick, Georgia.
9      Q    And when did you first take a job with
10  Alderwoods?
11     A    Gosh.  November of 2003, I think.
12         MR. EHRMAN:  Your answers to
13     interrogatories say 2004.  Is that
14     possible?
15         THE WITNESS:  2004, yeah, it's in that
16     area.
17     Q    Let's take a look.  Let me introduce
18  this as Defendant's Exhibit 1, which might clear
19  things up.
20         (Thereupon, Defendant's Exhibit No. 1
21     was marked for identification.)
22  BY MS. BRAUN:
23     Q    This might clear things up.  I do not
24  have additional copies of this, but we can
25  certainly make copies.  Took a look at this.  I

---

11

1  would represent that this is a company document
2  here.
3         Is this a document maybe you have
4  seen, Mr. Ore?
5         MR. EHRMAN:  It says on the top right,
6     "Payroll Status Change New Employee".
7     Q    If you look down, do you see the date?
8  Mr. Ore, do you see the date listed there?
9     A    Yes.
10     Q    And what is it?
11     A    It says 12/1.
12     Q    12/1 of what?
13     A    2004.
14     Q    Does that refresh your recollection
15  that you were first employed --
16     A    Yes, ma'am.
17     Q    -- on December 1, 2004?
18     A    Yes, ma'am.
19     Q    And what was the name or location
20  where you were employed in Brunswick, Georgia?
21     A    Edo Miller Funeral Home.
22     Q    Could you spell that for the record,
23  please.
24     A    E-d-o, M-i-l-l-e-r and it had like the
25  and sign, Sons Funeral Home.

---

12

1         MR. EHRMAN:  Ampersand.  You mean an
2  ampersand, you know, the little --
3         THE WITNESS:  Yeah, and then it said
4  Sons Funeral Home.
5     Q    And do you recall who hired you at the
6  Edo Miller & Sons Funeral Home?
7     A    Warren and Bird were both there.
8     Q    And what was Warren's full name?
9     A    Warren Putnam and Bird Hodges.  That
10  is the only name I know his first name by.
11     Q    Now, Warren Putnam, do you recall what
12  his title was?
13     A    I think it was, you know, the location
14  manager.  I think that's what it was.
15     Q    And Bird Hodges, who was he?  What was
16  his title?
17     A    He was like a regional manager.
18     Q    Now, did you work at any other
19  location, other than the Edo Miller & Sons
20  location in Brunswick, Georgia?
21     A    No, ma'am.
22     Q    And when did your employment terminate
23  from Edo Miller & Sons?
24     A    I think it was April 2007.  To be
25  correct, you might want to look that up.  I can't

---

13

1  remember for sure.  It's right in that --
2     Q    I think we discussed your
3  interrogatory responses early on before we got
4  started here.  If we can look a those for a
5  moment.  Page 5, your response to Interrogatory
6  No. 3.
7     A    Okay.
8     Q    Do you see the date here of April
9  2006, and your initials?
10     A    Yes.
11     Q    Does that refresh your recollection
12  that your employment with the funeral home
13  terminated --
14     A    It would have been 2006 instead of
15  '07.
16     Q    One other thing I just want to clarify
17  in terms of ground rules, and I think it will be
18  easier for the court reporter.  She is recording
19  what we're saying.  There is a tendency,
20  in conversation, for people to talk over each
21  other.  That makes for a messy transcript.  When I
22  ask a question, I will just ask for you, even
23  though you may be anticipating what I'm going to
24  ask, to just wait until I get it out there fully.
25     A    Okay.

---

**Johnstown**
**814-266-2042**

**Toll-Free**
**866-565-1929**

**Pittsburgh**
**412-281-7908**

**NETWORK DEPOSITION SERVICES**
**Transcript of William Opie Bernard Ore**

15 (Pages 54 to 57)

54

1    Q    Okay. So what you're saying is that
2  although -- if we can look back at Defendant's
3  Exhibit 2.
4       MR. EHRMAN: Was that marked?
5       MS. BRAUN: I asked for it to be
6  marked.
7    Q    Although this says that, "All
8  employees must record all hours actually worked,"
9  you're saying that you did not do that?
10    A    Huh-uh.
11    Q    And you did not do that with respect
12  to the pickups and embalming while you were on
13  call?
14       MR. EHRMAN: That is a no.
15    Q    While you were on call --
16    A    No. Now, I mean, we did put these
17  down for our regular time. We clocked in. Not on
18  the night calls.
19    Q    So the time that you did not record is
20  limited to your time during night calls?
21    A    Right.
22    Q    Yes?
23    A    Yes
24    Q    Okay. Did you keep any kind of record
25  yourself as to how much time you spent doing the

55

1  pickups and embalming on the night calls?
2    A    No, ma'am, not at all.
3    Q    And if you had to do -- let me ask you
4  this. Is it an either/or thing? Do you always
5  embalm when you pick up, or do you sometimes just
6  pick up a body?
7    A    Sometimes you just pick up because it
8  might be a cremation, you know. I mean, you know,
9  I would say about 30 percent of our bodies were
10  cremated. That's pretty easy to check. They have
11  to keep records of all of the percentages.
12    Q    If you were doing a pick-up, how much
13  time would it take you, pick-up only?
14    A    Pick-up only, depends on how close the
15  body was. If it was at the hospital, from there,
16  it might take half an hour. If you have to go out
17  to a house, sometimes it might take you an hour
18  and a half because when you get there it's kind of
19  difficult.
20    Q    And if you were to embalm a body, how
21  long does it take?
22    A    About an hour and a half.
23    Q    And which employees at the location --
24  you explained the on call schedule to me. Which
25  employees worked on call at the Edo Miller & Sons

56

1  location?
2    A    Me, Darryl, and I think Bobby filled
3  in. I think that's about it because the other
4  gentleman were older.
5    Q    All right. To be clear, the only
6  hours that you did not record were the hours that
7  you spent picking up and embalming, on call, in
8  the evenings?
9    A    Right.
10       MR. EHRMAN: Just let me make a
11  statement on that.
12       Factually, he's giving an answer that
13  may be correct.
14       Legally, that's not our position. You
15  know, our position is that there were
16  additional times. I will ask on redirect
17  what those are. But I just don't want the
18  answer to be incorrect or short.
19  BY MS. BRAUN:
20    Q    Mr. Ore, do you understand that I am
21  asking you, were there times, other than when you
22  went out at night and had to pick-up or embalm a
23  body, was there any other time that you did not
24  record on your time card?
25    A    Now, there were times that I worked

57

1  through my lunch, but that's a whole different
2  situation. I don't know if that is what you
3  wanted to get at there.
4    Q    I'm asking you about any time that
5  you're saying that -- I'm asking you, was there a
6  time that you did not record on your time card,
7  other than the pick-ups at night that we have
8  discussed, for the deceased and the embalming?
9    A    Just really, other than that that I
10  can think of, would be my lunches and getting
11  interrupted at lunch and stuff like that. But
12  that would be --
13    Q    And when you -- you were talking about
14  the lunch issue for a minute. What are you saying
15  exactly?
16    A    Well, like, you know, if I was back in
17  the back room and, say, we had six bodies laying
18  back there which you knew you weren't going to get
19  them done by 5:00, unless you kept right on going.
20  I would work through my lunch, and I would just
21  not clock out that day for lunch.
22    Q    And so if you didn't clock out -- what
23  are you saying, you didn't clock out, yet you
24  don't think you were paid for that time?
25    A    Right.

## NETWORK DEPOSITION SERVICES
## Transcript of William Opie Bernard Ore

16 (Pages 58 to 61)

58

1   Q    And why do you think that?
2   A    Because of the time card, he would
3   write in 30 minute lunch.
4   Q    Who would write it in?
5   A    Warren.
6   Q    Did you see him do that?  Did you see
7   him write that in?
8   A    Not actually write it in, no.  After
9   we would have -- say, like whoever had
10  discrepancies on your time card, he would call you
11  in before he actually gave them to Flo to sent
12  them up to where he sent them to get them paid.
13  Anyway, you know, he would say, you know, look,
14  you didn't -- I said, "I had to work through lunch
15  that day, we had so much going on."  He is like,
16  "No, you don't do that, you can't work through
17  lunch.  You got to take 30 minutes for lunch."
18  And he would take them off, but, you know.
19  Q    So you're saying that you would be
20  sitting in a room, talking about your time card,
21  because why?  Why would you do that?
22  A    Because I'm not taking a lunch that
23  day or two days or such like that.  Any time he
24  had to do anything to your time card, he would
25  call you in, before he sent it off, to let you

59

1   know.  You had to sign your time card, if I'm not
2   mistaken.  I think we did.  I'm not sure we did.
3       MR. EHRMAN:  Mr. Ore, yesterday, you
4   told me that on Fridays you would meet with
5   him to go over the time card.  Am I correct
6   on that?
7       THE WITNESS:  If there was a
8   discrepancy on your card, he would call you
9   in.
10  BY MS. BRAUN:
11  Q    And the discrepancy would be?
12  A    Usually I didn't clock out for lunch.
13  Q    And your testimony is that you would
14  tell Mr. Putnam that you worked through lunch.
15  And then what would happen?
16  A    He didn't care.  He didn't care.  He
17  just, I mean, that was --
18      MR. EHRMAN:  What did he do?
19  A    He didn't really do anything.  He
20  just, you know, like I said, he just left them
21  marked off and told me that I had to start taking
22  these lunches.  It was hard to explain to him.  If
23  I didn't, I was going to end up working overtime
24  at the end of the day and he was going to be
25  screaming about that.

60

1   Q    Did you ever raise this issue with
2   anyone else, this issue of the missed lunch, you
3   had worked through a lunch and Warren allegedly
4   wrote in a 30 minute lunch on your time card?
5   A    I never said anything, but to Bird.  I
6   told him about it because we were told if we had
7   trouble with a manager to go to him, and we would
8   take things to him.
9   Q    And did you go to Bird?
10  A    Yeah, and he told me to start taking
11  my lunch.  He said, "You got to listen to Warren
12  and get along with him."
13      Like I said, at this point, it was in
14  that area I was telling you about when Bird was
15  coming around a lot.
16  Q    Let's back this out.  When you started
17  working -- let me ask it this way.  When was the
18  first time that you recall that you had a meeting
19  with Warren to discuss the fact that you had a
20  discrepancy with your time card because you had
21  worked through a lunch?  When is the first time
22  you recall that?
23  A    I couldn't recall that.  I mean, I
24  couldn't.  I can't remember.
25  Q    How many times do you recall having a

61

1   conversation with Warren where you raised a
2   discrepancy with your time card because you had
3   worked through a lunch?
4   A    I don't know.  Quite a few.
5   Q    How many times a week?
6   A    Just on payday, you know, the day that
7   our cards went out.
8   Q    Let me rephrase that.
9   A    You mean how many times did I work
10  it?
11  Q    You would have -- what I'm hearing you
12  say is that you had the meetings with him on the
13  day the time cards had to go out?
14  A    Right.
15  Q    And so how many times was there an
16  issue that you raised to him in those meetings
17  that you had a -- you claimed you worked through a
18  lunch?
19  A    A couple, maybe, just a couple.  I
20  mean, it's not like I had to work my lunch every
21  day, you know what I'm saying.  Maybe two.
22  Q    Two times, is that what you are
23  saying?
24  A    In a week, that I had to work my
25  lunch, yeah.

**Johnstown**
814-266-2042

**Toll-Free**
866-565-1929

**Pittsburgh**
412-281-7908

**NETWORK DEPOSITION SERVICES**
**Transcript of William Opie Bernard Ore**

17 (Pages 62 to 65)

62

1    Q    Were you told -- your testimony
2  previously was that you were supposed to clock in
3  and out for lunch; correct?
4    A    Yes.
5    Q    At any point, did you make notations
6  that you had missed lunch on your time card?
7    A    I cannot say for sure that I did, but
8  I think there were times that I wrote "no lunch"
9  on it.
10    Q    And what happened?
11    A    But I can't be sure that -- I mean,
12  I'm just thinking this happened. It didn't
13  matter, really, you know. He was saying that the
14  policy is you had to take a 30 minute lunch, no
15  matter what, you know.
16    Q    So if you wrote "no lunch" on your
17  time card, what would happen? Would you be paid
18  for the time you worked, or not?
19    A    No. He would write "30 minutes." He
20  would take 30 minutes off your time for the lunch.
21    Q    Even if you said "no lunch"?
22    A    Yeah, because he said that you had to
23  do that, it had to be taken off.
24    Q    And your recollection is that you
25  complained to Bird Hodges about this in the same

63

1  time period that he was spending a lot --
2    A    Yeah.
3    Q    -- of time because of Warren's issue
4  with alleged sexual harassment?
5    A    Right.
6    Q    How many times did you -- what
7  happened after you raised it to Bird?
8    A    Nothing. I just kept doing it and
9  kind of, you know, nothing. Nothing really
10  happened.
11    Q    Did you go -- did you ever have
12  another conversation with Bird about it?
13    A    No, ma'am. I just let it go.
14    Q    Did you talk to anyone else, other
15  than Bird, about the alleged discrepancies with
16  the time card, about working through lunch?
17    A    Patty, I remember talking to her about
18  it.
19    Q    When did you do that?
20    A    Gosh, I don't remember. While it was
21  all going on, I remember saying something to her
22  about it.
23    Q    Was there a time period in your --
24  you're using the term "when this was going on."
25  Was there a time period during your employment

64

1  when it wasn't going on?
2    A    When I first started there, I wasn't
3  working that much. In my first, probably, four
4  months, I wasn't doing that much that I had to.
5  After I started doing the work in the prep room,
6  mostly me, it got to be a lot.
7    Q    I am going to hand you what is going
8  to be marked as Defendant's Exhibit 3.
9        (Thereupon, Defendant's Exhibit No. 3
10        was marked for identification.)
11  BY MS. BRAUN:
12    Q    Mr. Ore, this is a document that has
13  been previously produced Bates stamped 1875. Is
14  this a document you recognize?
15    A    Yes, ma'am.
16    Q    And is that your signature at the
17  bottom?
18    A    Yes, ma'am.
19    Q    And the title of this document is
20  "Code of Business Conduct and Ethics"?
21    A    Yes, ma'am.
22    Q    Correct?
23    A    Yes, ma'am.
24    Q    Would you agree with me, looking at
25  the document, that you're provided with a number

65

1  to call?
2        MR. EHRMAN: Can he read it first?
3  Just take a look at it.
4        THE WITNESS: I know what it says.
5        MS. BRAUN: I'm sorry. I thought he
6  said he recognized it.
7    Q    Take your time, if you need it. Would
8  you agree with me that this document provides you
9  with a number to call if you have or suspect an
10  issue regarding compliance or ethical concerns?
11    A    It sure does.
12    Q    And did you ever call that number?
13    A    No, ma'am.
14    Q    Why not?
15    A    Because I knew someone that did and
16  the, you know, fear of retaliation thing doesn't
17  work with it, when you get that high up doing
18  stuff.
19    Q    So you never called it because you --
20    A    Yeah. It's supposed to be anonymous
21  and it just wasn't. Like I said, I know someone
22  that called it about something and it created a
23  big stir.
24    Q    And who was that? Who was that
25  person?

**Johnstown**
**814-266-2042**

**Toll-Free**
**866-565-1929**

**Pittsburgh**
**412-281-7908**

**NETWORK DEPOSITION SERVICES**
**Transcript of William Opie Bernard Ore**

21 (Pages 78 to 81)

78

1   been three and three; correct?
2       A    Well, I think it was six hours
3   altogether, but, yes.
4       Q    So six hours altogether, for the time
5   it would take you to pick up a body?
6       A    Yes.
7       Q    And if it took you less than six hours
8   to pick-up the body, were you still paid for six
9   hours?
10      A    I can't remember. I can't remember
11  how we did that.
12      Q    Is your recollection that you were
13  paid a -- you were given a mandatory number of
14  hours regardless of how long it took you to go and
15  pick up a body?
16      A    You mean were we paid time that we
17  actually went out there?
18      Q    You had said three and three.
19      A    Yes.
20      Q    That you were paid three hours for
21  picking up a body. My question is, if it took
22  you -- if you just had to go to the hospital, like
23  you previously testified, that may only take a
24  half hour. Were you paid for three hours?
25      A    No. No. That's what I mean. It's

79

1   not working right. I can't remember how he told
2   us to do that.
3       Q    Do you recall when -- when you say
4   "he", are you --
5       A    Warren, yes. But it was later on.
6   I'm not sure right now.
7       Q    Would it have been, if you think of it
8   this way, how long do you think you had been
9   working there when Warren came to you and said you
10  need to start keeping track of the time at night
11  differently, you need to do three and three? How
12  long had you been working there?
13      A    That was -- it probably was about six
14  months before I left is when all of that happened
15  because that is after -- that's about six months
16  before I left.
17      Q    So if you left in April of 2006, we're
18  talking about like November of 2005?
19      A    Yeah.
20      Q    And did you follow Warren's directive
21  to begin keeping track of your time in this new
22  way?
23      A    Yes.
24      Q    And this new directive applied to the
25  other two individuals who also worked at night, or

80

1   not?
2       A    Yes, everybody that was doing it had
3   to do it like that.
4       Q    And do you know if there was any type
5   of change at any other location, in terms of how
6   on call time for picking up bodies and embalming
7   bodies was recorded?
8       A    I don't remember. Not that I know of,
9   no.
10      Q    Is it -- you wouldn't -- I mean, you
11  said I don't remember. Would you know?
12      A    How somebody else did their name?
13      Q    Yes.
14      A    No.
15          MR. EHRMAN: Let me just object. If
16  he doesn't understand, then I don't see how
17  he would know. I know that sounds very
18  technical. The witness, Mr. Ore, said that
19  he does not recall whether other people at
20  other locations would have kept their time
21  that way. I'm suggesting that if he didn't
22  remember, then it's not -- he just wouldn't
23  know, one way or the other.
24  BY MS. BRAUN:
25      Q    What I'm saying is, would you have any

81

1   basis of knowing whether there was any other
2   change in how people at other locations kept track
3   of their time for picking up and embalming bodies
4   at night?
5       A    I mean, I really don't understand
6   that.
7       Q    Do you have any basis for knowing
8   whether there was any change in how people at
9   other locations would have kept track of their
10  time for picking up and embalming bodies?
11      A    I know that they were supposed to, but
12  I can't say that they did. I just know that the
13  day they changed this, it was something about
14  piece work. I don't remember. You know, Warren
15  on his conference calls with whoever, I guess, and
16  they were all having a conference call that day.
17  When he got off, he came out there and said, "You
18  all cannot do piece work stuff anymore. We have
19  to get it fixed the other way."
20      Q    And you understand that he was talking
21  to you and to the other two individuals?
22      A    Yeah. We were all sitting there at
23  that time.
24      Q    Do you know whether that applied to
25  anyone, at any other location?

**NETWORK DEPOSITION SERVICES**
**Transcript of William Opie Bernard Ore**

122

1  them on there, yes. That's what we did for a
2  while. That is why we started using this, so
3  everybody would stop scribbling up their time
4  cards. Yes, that is what happened. I mean,
5  that's what we did, yes.
6     Q    And when you were writing on the back
7  of the time card, was there a time when you were
8  also recording, in addition to the deceased's
9  name, the time spent on call, the time that you
10 spent doing the activity of picking up the
11 deceased?
12    A    Yes.
13       MR. EHRMAN: Or did you just write the
14 name?
15       THE WITNESS: That's what I was just
16 getting ready to say.
17    A    We didn't write the exact time. We
18 wrote a piece. That's when we were doing it on a
19 piece by piece. We kind of started at the front
20 of this and are going backwards. You know what
21 I'm saying. We did the piece work. And then that
22 is when we kind of stopped and starting doing the
23 flat rate pay, but it kind of reflected --
24       MR. EHRMAN: I'm going to object, and
25 I am going to ask this line of questioning

123

1  be clarified because I'm very confused.
2  And I apologize. I just don't understand
3  what we're talking about.
4       MS. BRAUN: I think we can clear this
5  up.
6  BY MS. BRAUN:
7     Q    There was a period of time when you
8  worked on call; correct?
9       MR. EHRMAN: No, he worked on call
10 throughout his career, throughout the time
11 he spent there.
12    Q    You worked on call from the beginning
13 of your employment --
14    A    Right.
15    Q    -- through the end of your employment?
16    A    Right.
17    Q    The way that you made notes of what
18 you did on call changed throughout your
19 employment; correct?
20    A    Yes, yes.
21    Q    When it started -- when you started
22 your employment, what did you do?
23    A    I can't remember which one started it
24 out. If I'm not mistaken, that's when we were
25 writing it on the back of our cards.

124

1       MR. EHRMAN: The question is, how did
2  you record your time for on call when you
3  began working? Is that the question?
4     Q    Are you having a hard time
5  understanding what I'm asking?
6     A    Not if my answer was right. If that's
7  what I'm thinking, what you're asking me, you're
8  wanting to know exactly what I said when I first
9  started there to show that I went out on a death
10 call?
11    Q    Yes.
12    A    I wrote it on the back of that card.
13       Then we changed to this, using these
14 pieces of paper so we would quit messing our cards
15 up.
16    Q    And when you say this piece of paper,
17 you are referring to Defendant's Exhibit 8;
18 correct?
19    A    Yes.
20       MR. EHRMAN: Then you said that there
21 was also a flat rate that was paid?
22    A    Yeah, but you're just asking me where
23 I wrote it; right?
24    Q    I was asking you what did you do.
25    A    Then after that and this, we went back

125

1  to that, if I'm not mistaken, and started --
2  Warren and Bird always came up with crazy stuff.
3  They started doing something where they paid us a
4  flat rate again, but they tried to translate it
5  some way. I can't figure it out.
6     Q    And this last comment you made about
7  you believe there was some other change, are you
8  referring to your previous testimony when you said
9  three and three?
10    A    Yeah, but it wasn't three and three.
11 What they did is, they paid us 40 -- I can't. I
12 don't even want to say because I can't remember
13 what the flat rate was. Whatever it was, they
14 tried to figure it out into an hourly rate, which
15 didn't ever work out. That's what our big beef
16 was with them.
17    Q    And why didn't it ever work out?
18    A    Because you were working more than you
19 were getting paid. I mean, say you made -- say
20 somebody made $15 an hour and they spent two
21 hours -- no, say they spent three hours out there
22 working so they should have got $45, but they only
23 got $15 for picking this body up or $20 for
24 picking up this body. See what I'm saying.
25 That's what the deal was with that. Now, I don't

EXHIBIT 84

```
 1          IN THE UNITED STATES DISTRICT COURT
 2       FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 3

 4   DEBORAH PRISE and          )
     HEATHER RADY on behalf     )
 5   of themselves and all      )
     employees similarly        )
 6   situated,                  )
                                )
 7             Plaintiffs,      )
                                )  CIVIL ACTION
 8   vs.                        )  NO. 06-1641
                                )
 9   ALDERWOODS GROUP, INC.,    )
                                )  Judge Joy Flowers Conti
10             Defendant.       )
                                )
11

12

     VIDEOTAPED
13   DEPOSITION OF:   ROBERT J. PRAMIK
14          DATE:   OCTOBER 16, 2008
15          TIME:   9:54 A.M.
16      TAKEN BY:   PLAINTIFFS
17      LOCATION:   HOLIDAY INN EXPRESS
                    5680 ALLENTOWN BOULEVARD
18                  HARRISBURG, PENNSYLVANIA
19

20

21   Reported By:
     SUSAN O'HARA MOORE, CSR, RMR, CLVS
22

     In Association with:
23   NETWORK DEPOSITION SERVICES
     Suite 1100 Gulf Tower
24   707 Grant Street
     Pittsburgh, PA 15219
25   412.281.7908
```

**Johnstown**
**814-266-2042**

**Toll-Free**
**866-565-1929**

**Pittsburgh**
**412-281-7908**

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Pramik**

6 (Pages 18 to 21)

18

1  Q  Okay.
2  A  It's been a long time.
3  Q  Okay. So, at least, 2002 time period --
4  A  Yes.
5  Q  -- to the best of your recollection?
6  A  Yes.
7  Q  Today I'm going to focus largely on your
8  positions as location manager and MGM.
9  A  Okay.
10  Q  Which locations did you work at as a --
11  well, actually, let's go back to the beginning.
12  When you started at Loewen, which location did
13  you start at?
14  A  All of them. I was primarily working out
15  of Harrisburg, but I also worked in Camp Hill.
16  Q  And when you -- when you say, "All of
17  them," which -- which funeral home specifically
18  are you talking about?
19  A  Well, yeah, let's -- let's -- let's
20  clarify that because I guess there was -- Paoli
21  was involved. I never went to Paoli. So I
22  either worked at -- at the Neill in Harrisburg or
23  the Neill in Camp Hill. 2724 and 3043.
24  Q  Okay. And when you became a student,
25  which funeral homes did you work at?

19

1  A  Again, both -- both Neill locations,
2  primarily the Harrisburg.
3  Q  And when you were an intern, which
4  locations did you work at?
5  A  Both.
6  Q  What about when you were a funeral
7  director?
8  A  Both.
9  Q  And when you say, "Both," are you
10  talking --
11  A  Well, actually, I also worked at Reese at
12  that time as well. So there was three funeral
13  homes I actually worked at. It was wherever you
14  were needed.
15  Q  Okay. So when you were a funeral
16  director, you were working at both of the Neill
17  Funeral Homes and the Reese Funeral Home?
18  A  Correct. My desk was in the Harrisburg
19  location.
20  Q  Okay. In the Harrisburg location of
21  Neill?
22  A  Correct.
23  Q  And when you became the location manager,
24  where were you location of?
25  A  Camp Hill.

20

1  Q  And did you at that time work in -- at
2  any of the other Harrisburg funeral homes?
3  A  As needed, yes.
4  Q  And that would be Reese and Neill Funeral
5  Home in Harrisburg?
6  A  Correct.
7  Q  And as MGM, where was -- what was your
8  market? Which homes did you oversee?
9  A  The -- the Neill Funeral Home in Camp
10  Hill, Neill -- Neill Funeral Home in Harrisburg,
11  the Reese Funeral Home in Harrisburg, and Alleva
12  Funeral Home in Paoli.
13  Q  Okay. Other than those four funeral
14  homes, did you have supervisory authority over
15  any other funeral homes?
16  A  No.
17  Q  When you were a location manager, were
18  you paid hourly or salary?
19  A  Both.
20  Q  Can you explain that?
21  A  I started off -- I continued hourly until
22  they renegotiated a -- a -- a -- I'm drawing a
23  blank -- the word -- salary.
24  And then once we -- once we agreed to a
25  salary, then I went to salary.

21

1  Q  Do you recall about when that was?
2  A  No, I do not.
3  Q  Do you recall how long you had been
4  location manager before you had been -- you
5  negotiated your salary?
6  A  It would be a guess. A month or two.
7  Q  Okay. And when you were MGM -- and when
8  I say, "MGM," you understand that to mean "market
9  general manager"?
10  A  Yes.
11  Q  When you were at MGM, were you paid
12  hourly or salary?
13  A  Salary.
14  Q  Were you ever paid hourly while you were
15  MGM?
16  A  No.
17  Q  When you were location manager, who was
18  your immediate supervisor?
19  A  Ted Reese.
20  Q  And where was Ted located?
21  A  Harrisburg.
22  Q  In Camp Hill?
23  A  No, Harrisburg.
24  Q  I'm sorry. Neill Funeral Home in
25  Harrisburg?

**Johnstown**
**814-266-2042**

**Toll-Free**
**866-565-1929**

**Pittsburgh**
**412-281-7908**

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Pramik**

74

1    Q    And -- and so to clarify, you're not
2 seeking or do not claim that you were paid
3 inappropriately as MGM. Is that correct?
4    A    Well, again, that's disputable. I don't
5 think I -- I -- I -- I don't think I was paid
6 what I was worth, but that's a different matter
7 altogether.
8        I'm -- what I'm referring to is when I
9 was a non-MGM and how I was paid, and the many,
10 many hours I gave up with my family and were
11 not -- was not compensated for that.
12   Q    Okay. Let's talk some specifics. Do you
13 currently claim that you were not paid for any
14 community work that you did as an MGM after
15 December 8th, 2003?
16   A    Yes.
17   Q    And how -- which occurrences were you not
18 paid for?
19   A    The only thing that they paid in
20 community involvement was our membership fees.
21 But when I went to meetings, when I went to
22 conventions, when I went to spend time in that
23 particular organization, I was never reimbursed
24 for those hours.
25   Q    Mr. Pramik, you testified earlier that

75

1 you were paid on a salary basis.
2    A    Maybe I didn't understand your question.
3 You -- so you're saying as MGM I --
4    Q    As MGM.
5    A    Yeah.
6    Q    That's -- that's -- that's what I want to
7 focus these questions on.
8    A    I guess I was answering as a non-MGM,
9 that I was never paid for those.
10   Q    And that's why -- that's why I want to
11 clarify.
12       So do you currently claim that you were
13 not paid for any community service work while you
14 were MGM after December 8th, 2003?
15   A    So you're asking me was I not paid for
16 the --
17   Q    Let me start again.
18   A    One more time, and I'll -- and I'll
19 focus. I really will.
20   Q    It's okay. It's okay. There's a lot
21 packed into this question.
22       You testified earlier, and we looked at
23 the documents, that you became MGM approximately
24 September of 2003.
25   A    Yes.

76

1        MS. GIFFORD: Object to form.
2 BY MR. DeJULIUS:
3    Q    And my question is: Do you currently
4 claim that you were not paid for any community
5 service work that you performed as MGM after
6 December 8th, 2003?
7    A    Well, my answer would have to be, no.
8    Q    Okay. Do you currently claim that you
9 were not paid for any on-call work while you were
10 MGM after December 8th, 2003?
11       MS. GIFFORD: Object to form.
12       THE WITNESS: When you throw the "MGM"
13 in, I have to say, no.
14 BY MR. DeJULIUS:
15   Q    Do you currently claim that you were not
16 paid for any work related to obtaining or
17 maintaining your insurance license while you were
18 MGM after December 8th, 2003?
19       MS. GIFFORD: Object to form.
20       THE WITNESS: Again, when you put "MGM"
21 in, I have to say, no. You take the word "MGM"
22 out, and I can argue vehemently against it.
23 BY MR. DeJULIUS:
24   Q    And that -- that's fine. And I don't
25 want to argue with you.

77

1        Do you currently claim that you were not
2 paid for any overtime that was not pre-approved
3 while you were MGM after December 8th, 2003?
4        MS. GIFFORD: Object to form.
5        THE WITNESS: Again, with the word "MGM"
6 in there, the answer is no.
7 BY MR. DeJULIUS:
8    Q    Do you currently claim that you were not
9 paid for any time you spent working through meal
10 breaks while you were MGM after December 8th,
11 2003?
12       MS. GIFFORD: Object to the form.
13       THE WITNESS: And, again, with the word
14 "MGM" in there, the answer is no. But I'm not
15 here for me. I'm here for all the employees that
16 didn't get all those things that you're
17 questioning me about. And I want that on the
18 record.
19 BY MR. DeJULIUS:
20   Q    And I understand, and we will get to
21 that. But I need to clarify some of these other
22 issues first.
23       Do you currently claim that you're not
24 being paid -- or that you were not paid for any
25 time spent during training while you were MGM

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Pramik**

23 (Pages 86 to 89)

86

1 Ken Duffy was in charge -- again, I don't
2 remember the year. I don't even remember what I
3 had for breakfast this morning when it comes to
4 dates.
5 We had -- we had to keep record of it
6 starting in. Not in -- not in the manual type;
7 that came later. But we had like a big sheet on
8 the wall with a pin map that we had to keep
9 record of all of our involvement in the
10 community.
11 Q And when you're referring to Ken Duffy,
12 Ken Duffy was -- what was his position?
13 A I don't -- I don't know what the exact
14 title was, but it was the equivalent of a
15 regional manager.
16 Q Okay.
17 A I don't --
18 MS. GIFFORD: I think -- I'm sorry.
19 Nope. Go ahead.
20 THE WITNESS: I don't remember what his
21 exact title was, but that's basically the same
22 function as what a regional manager would have
23 been.
24 BY MR. DeJULIUS:
25 Q And I -- I won't hold you to any specific

87

1 title.
2 A That's good, because I don't know what
3 his title was.
4 Q I'm just trying to -- to think. So the
5 people who were regional tiles -- or managers, if
6 I go backwards, was John Blute; before John Blute
7 was George Amato?
8 A Do you mean the history of the -- when I
9 was at the company?
10 Q Exactly.
11 A Ken Duffy, and I think John Blute, then
12 Bruce Bills, then George Amato, then that
13 temporary with -- I gave you the name earlier.
14 MS. GIFFORD: Katie Leahy?
15 THE WITNESS: Thank you, yeah. And
16 then -- and then back to John Blute.
17 BY MR. DeJULIUS:
18 Q Okay. So he preceded John Blute the
19 first time -- Ken Duffy did?
20 A Yes.
21 Q And do you recall a rough time period of
22 when that was? 1990s, early 2000s?
23 A I remember him when I started part-time.
24 Q Okay. So this was early '90s --
25 A Yes.

88

1 Q -- when Ken Duffy was the equivalent of a
2 general manager?
3 A Yeah, I don't know when he actually
4 started, but he was there the whole time I was
5 there until the -- until the changeover.
6 Q Okay. And when did you become aware of
7 this policy that you had -- that funeral
8 directors had to belong to at least one community
9 organization?
10 A When Ken Duffy was in charge we didn't
11 have to, but it was highly, highly encouraged. I
12 don't know who implemented and when it was
13 implemented as a mandatory.
14 I don't recall who that was and -- and --
15 and when exactly it was. I remember getting the
16 community binders. But I don't, again, remember
17 when that was instituted.
18 Q And did the community binders inform
19 funeral directors that they had to belong to one
20 community organization?
21 A It's what -- it was rolled out.
22 Otherwise -- do you understand what I mean by
23 "rolled out," or do you want me to go into
24 specifically what "rolled out" means?
25 Q I want you to go into specifically what

89

1 it means.
2 A Otherwise, whenever anything new in the
3 company came down the pike, you had to roll it
4 out to your employees. Otherwise, you had to
5 introduce and explain it to them.
6 Q And this policy that you had to belong --
7 funeral directors had to belong to at least one
8 outside organization was rolled out?
9 A Yes.
10 Q And there were binders that were included
11 in this rollout?
12 A Yes. And it came with a disk as well, CD
13 ROM disk or whatever you want to call it. I
14 can't remember if it was a DVD or -- or a -- an
15 audio. I can't remember.
16 Q And do you recall rough time period of
17 when this occurred -- this rollout occurred?
18 A I don't. Dates -- dates -- dates are
19 terrible for me with this disease.
20 Q After this rollout, did you ever discuss
21 the policy that funeral directors had to belong
22 to at least one community organization with any
23 of your superiors?
24 A It would be a vague answer, but I'm sure
25 I did because I had questions about it.

**Johnstown**
**814-266-2042**

**Toll-Free**
**866-565-1929**

**Pittsburgh**
**412-281-7908**