# EXHIBIT 85

1

```
 1          IN THE UNITED STATES DISTRICT COURT FOR THE
                 WESTERN DISTRICT OF PENNSYLVANIA
 2
                          - - - -
 3
      DEBORAH PRISE and HEATHER RADY )
 4    on behalf of themselves and all)
      employees similarly situated,  )
 5                                    )
                    Plaintiffs,       )
 6                                    )
                    -vs-              )  Civil Action
 7                                    )  No. 06-1641
      ALDERWOODS GROUP, INC.,         )
 8                                    )  Judge Joy Flowers
                    Defendant.        )
 9
                          - - - -
10
                        VOLUME I
11
                          - - - -
12
              DEPOSITION OF:  DEBORAH PRISE
13
14              DATE:     November 6, 2008
                          Thursday, 9:59 a.m.
15
16              LOCATION:  JONES DAY
                           One Mellon Bank Center
17                         500 Grant Street, 45th Floor
                           Pittsburgh, PA  15219
18
19              TAKEN BY:   Defendant
20
                REPORTED BY:   Catherine C. Leverty
21                             Notary Public
22
                          - - - -
23              NETWORK DEPOSITION SERVICES
                       The Gulf Tower
24             707 Grant Street, Suite 1101
              Pittsburgh, Pennsylvania  15219
25                   412-281-7908
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Deborah Prise**

11 (Pages 38 to 41)

### 38

1　another state you have -- there are different
2　requirements for each state, and then you have
3　to pass the state boards to get a license, and
4　so -- like Marvin couldn't get a license here.
5　Q.　But Michael Hilgefort had a license?
6　A.　Yes.
7　Q.　Do you know if Pat McDermott had a license to be
8　　　a funeral director?
9　A.　Yes.
10　Q.　And as far as you know all the funeral directors
11　　you worked with while at Alderwoods had licenses
12　　to be funeral directors; is that right?
13　A.　Except for Marvin.
14　Q.　But Marvin wasn't a funeral director?
15　A.　But he acted as one.
16　Q.　How did he act as one?
17　A.　He did funerals, but meanwhile he was supposed
18　　to have another funeral director officially with
19　　him.
20　Q.　You were a funeral director from and after
21　　November 12th, 2004 until your employment ended
22　　with Alderwoods; is that right?
23　A.　Well, I'm still a funeral director.
24　Q.　A funeral director at Alderwoods?
25　A.　Yes -- well, no, because then I became a

### 39

1　location manager.
2　Q.　Which was sometime in early 2005?
3　A.　No, summer of -- spring, like May, I think.
4　Q.　Of 2005?
5　A.　I think so.
6　Q.　And then you were location manager until you
7　　were terminated?
8　A.　Yes.
9　Q.　And that was approximately November 2005?
10　A.　Approximately.
11　Q.　What were your job duties as a funeral director?
12　A.　Arrangements, on call, community activity.  I
13　　had to get my insurance license and do pre-need.
14　　All of the things that I did as an intern but
15　　then I could actually do arrangements and
16　　funerals without another funeral director being
17　　there.
18　Q.　Were you paid an hourly wage?
19　A.　Yes.
20　Q.　Do you recall what it was?
21　A.　I think it was $18 an hour, but I'm not
22　　positive.
23　Q.　Who did you report to as a funeral director?
24　A.　I reported to Michael Hilgefort, who was the
25　　location manager, Pat McDermott, who was the

### 40

1　market manager -- I might not be clear on the
2　title, it changed a couple of times.  George
3　Amato, I actually reported to him because we
4　were working, you know, even before I was a
5　funeral director, putting community packages
6　together, and Marvin Reznik -- wait, no, not
7　when I was a funeral director, not Marvin
8　Reznik.
9　　　　So that I can think of right now,
10　Michael Hilgefort, Pat McDermott and George
11　Amato.  And I'm not sure when Randy Amos and
12　John Blute came into the picture, I think I was
13　still funeral director -- I was, I was.
14　Q.　And at what Alderwoods location were you a
15　　funeral director?
16　A.　My license hung at the Burton L. Hirsch Funeral
17　　Home in Squirrel Hill.
18　Q.　Did you ever work at any other locations of
19　　Alderwoods?
20　A.　If there was an urgency.
21　Q.　What other locations?
22　A.　Brandt and Samson, which, during that course it
23　　was co-located.
24　Q.　What do you mean by co-located?
25　A.　At some point, when I was with Alderwoods,

### 41

1　Samson and Brandt shared a facility.
2　Q.　And you were a location manager at Brandt; is
3　　that right?
4　A.　No.
5　Q.　I'm sorry, Hirsch, I meant to say?
6　A.　Yes.
7　Q.　Did you have any location manager
8　　responsibilities for Brandt Funeral Home?
9　A.　No.
10　Q.　Did you have any location manager
11　　responsibilities for Samson?
12　A.　No.
13　Q.　So while you were location manager you worked
14　　only at Hirsch; is that right?
15　A.　No, I didn't have location manager
16　　responsibilities at the other two places.
17　Q.　So what did you do at the other two places?
18　A.　Depends.  Sometimes, if there was a funeral and
19　　no funeral director, I did that, if there was a
20　　visitation and no -- they didn't like pulling me
21　　away from there because we were really trying to
22　　build up the numbers, by there, I mean Hirsch's,
23　　but I was, from time to time.
24　Q.　How did you become the location manager at
25　　Hirsch?  Did you have to apply for the position?

Johnstown
814-266-2042

Toll-Free
866-565-1929

Pittsburgh
412-281-7908

## NETWORK DEPOSITION SERVICES
## Transcript of Deborah Prise

13 (Pages 46 to 49)

### 46

1  A. No, but I got my license in preparation for it.
2  Q. Once you became a location manager did you
3    continue to sell pre-need insurance contracts?
4  A. Yes.
5  Q. And you earned commissions from those pre-need
6    insurance contracts at that time?
7  A. Yes.
8  Q. While you were a location manager did you ever
9    receive any bonus?
10 A. I don't remember.
11 Q. Did you ever receive any other form of
12   compensation as a location manager other than
13   commissions and your salary?
14 A. Not that I can think of at this time. I mean,
15   I'd be hard pushed to go through the records,
16   but, offhand, I can't think of anything else.
17 Q. What about before you became a location manager?
18 A. Yeah, the stipend.
19 Q. How much was the stipend?
20 A. It was a $150 a month.
21 Q. When you were a location manager how did -- I'll
22   rephrase, when you were location manager did you
23   keep track of the hours that you worked?
24 A. Well, I -- you know, those big desk calendars
25   that have the -- I didn't keep track of all the

### 47

1    hours because you have to realize that, like
2    with some of these packages and community things
3    that I was doing, I just did it, you know, and a
4    lot of things that I did, for example, putting
5    together packages, or if I was on a committee,
6    or something, you don't just turn it off after
7    5:00, you have homework to do so that you don't
8    show up unprepared for meetings, so I didn't
9    track all the hours.
10 Q. Were you required to track your hours?
11 A. No.
12 Q. So you didn't punch in or punch out on a time
13   clock?
14 A. No.
15 Q. What about prior to becoming a location manager,
16   did you have to punch into a time clock at the
17   beginning of day?
18 A. We had sign-in sheets when I was there.
19 Q. You didn't have a time clock?
20 A. We'd have one that we weren't using in a closet;
21   we did sign in, I don't know if it was broken or
22   what, but then there was a new policy that we
23   had to start using it.
24 Q. You had to start using the time clock?
25 A. Yeah, when I became location manager, but it

### 48

1    didn't apply to me because then I was location
2    manager.
3  Q. So how did these time sheets work, I mean, would
4    you maintain them, yourself?
5  A. To a certain degree. For example, you'd write
6    in your hours but, like, you didn't write in
7    hours that -- for example, you know, sometimes I
8    had overtime, and if it was preapproved I'd
9    write it into the time sheet; if it wasn't
10   preapproved you were told not to even bother
11   putting it on the time sheet, so it wasn't a
12   true representation of the hours worked but it
13   was a representation of the hours you were
14   approved to work.
15 Q. But where did you keep this time sheet?
16 A. At Hirsch's there was, like, there were mail
17   bins in the upstairs hall, and I kept mine in
18   there sometimes -- maybe all the time. I think
19   all of us did.
20 Q. And would you enter your start time when you
21   came in in the morning?
22 A. No, I'd enter 9:00 when I came in in the
23   morning.
24 Q. Why would you enter 9:00?
25 A. That's when I was approved to start.

### 49

1  Q. So if you came in before 9:00 you'd still put in
2    9:00?
3  A. Yes, unless it was preapproved to put in
4    earlier.
5  Q. Were there ever occasions where you came in
6    after 9:00?
7  A. I don't recall. Maybe, because all of our
8    market meetings were at Brandt's, but that
9    counted -- I mean, I'm sure there might have
10   been here or there, maybe.
11 Q. When you came in after 9:00 would you put the
12   actual time on your time sheet?
13 A. If I came in -- I said maybe, if I came in
14   after, I would put in either the actual time or
15   the preapproved time. For example, if I showed
16   up at 8:30 I'd still put in 9:00 but, I mean, I
17   don't know that I did show up at 9:15 or 9:30,
18   but I certainly wouldn't have put down earlier
19   if --
20 Q. Well, you said if you had a preapproved earlier
21   time you might put that down?
22 A. If it were preapproved.
23 Q. Were you always scheduled to start at 9:00?
24 A. Well, I mean, you know, if we had a 9:00 funeral
25   I couldn't show up after the family, so it was a

**Johnstown**
**814-266-2042**

**Toll-Free**
**866-565-1929**

**Pittsburgh**
**412-281-7908**

**NETWORK DEPOSITION SERVICES**
**Transcript of Deborah Prise**

27 (Pages 102 to 105)

102

1  Q.  Were you ever scheduled to work only an hour and
2      a half?
3  A.  Maybe, if this was just, you know, a visitation
4      or a meeting that they needed me for a short
5      period of time, it's possible.
6  Q.  Do you know whether you were scheduled for this
7      hour and a half on that particular day?
8  A.  I don't remember.
9  Q.  Do you recall why you made these notations at
10     the bottom of the page about those arrangements
11     and meeting with Rabbi Wasserman?
12 A.  Yes, whenever there were -- for example, Monday,
13     you see it's more than eight hours, so we have
14     to have an explanation for it.
15         Wednesday, again, it's more than
16     eight hours. Thursday, I'm assuming that this
17     was overtime.
18 Q.  Well, it wasn't overtime, right, because you
19     only worked an hour and a half on that day so it
20     was less than eight hours?
21 A.  I don't remember. To the best of my
22     recollection it's whenever, you know, it wasn't
23     something standard that needed to be noted.
24 Q.  Could it have been because it was unscheduled
25     time?

103

1  A.  I don't know.
2  Q.  You mentioned Monday, eight and a half hours; do
3      you know whether that time was preapproved?
4  A.  I think the Kothos family, if I recall, Bob
5      Pramik sent them to us, I think that's the one
6      call we worked on together, if I recall. That's
7      all I remember when I see that family name.
8  Q.  Would you have had to get that time preapproved?
9  A.  I would assume so, yes, yes, we had to get
10     preapproved overtime before we were allowed to
11     put it down on our sheet.
12 Q.  So that time was approved by some manager, that
13     extra half an hour on Monday?
14 A.  I'm assuming so.
15 Q.  And then on Wednesday it shows you working a
16     total of nine hours, you say below that you had
17     a meeting with, it looks like radio
18     advertisement; is that right?
19 A.  That's right, with Hirsh.
20 Q.  With Hirsh.
21         Does that mean Mr. Hirsh, or Hirsch
22     Funeral Homes?
23 A.  It means Hirsh Dlinn.
24 Q.  What is Hirsh Dlinn?
25 A.  It's a gentleman's name that has a radio show.

104

1  Q.  Okay. So that overtime would have been
2      preapproved by someone; is that correct?
3  A.  Oh, yes, because they wanted me to pursue that
4      radio advertising opportunity, Pat McDermott
5      called it to my attention.
6  Q.  What about Saturday? You have 12 and
7      three-quarters hours down for Saturday but
8      there's no notation below as to what you were
9      doing with that overtime?
10 A.  I'm assuming people died.
11 Q.  Okay. Is there any reason you wouldn't have put
12     that on your time sheet?
13 A.  I don't remember.
14 Q.  Did you get approval for working that extra four
15     and three-quarters hours that day?
16 A.  I don't remember that day at all. Also, you
17     know what else it could be? If it's a Saturday
18     night it could have been, especially a tahara
19     service, it could have been any number of
20     things. If it was a tahara or an airport pickup
21     it would have been preapproved, or a death.
22     There are many reasons.
23 Q.  Are you making any claims that you were not
24     compensated for any of the time you put down on
25     this particular time sheet?

105

1  A.  For the time I put down on my time sheets, I'd
2      have to scrutinize it a lot more closely, but I
3      think they will match what I was paid for. It's
4      things that I didn't put down on the time sheet,
5      because we were told if it wasn't preapproved,
6      or something like -- we couldn't even put it on
7      the time sheet.
8  Q.  Under what circumstances would Mr. McDermott
9      approve community work time, if any?
10 A.  Whatever the policy communicated to him was, I
11     wasn't privy to that.
12 Q.  Well, with respect to your circumstances, what
13     types of community time would be approved other
14     than some of the cocktail receptions, as you
15     mentioned earlier?
16 A.  Basically, we were told if we didn't do our
17     community work inside the clock it wouldn't
18     be preapproved, so it was only the rare
19     circumstance, like when Burton Hirsh more or
20     less said look, we have to go to the B'nai Zion
21     cocktail thing, they said okay, they'd pay for
22     that.
23 Q.  So if someone told you you had to be somewhere
24     after hours you would get paid for it? If
25     someone told you you had to go to a cocktail

**NETWORK DEPOSITION SERVICES**
**Transcript of Deborah Prise**

29 (Pages 110 to 113)

110

1    care of a deceased person?
2    A.  Yes, and the most time-consuming, of course,
3       would be if someone had actually died.
4    Q.  And it was also the same case when you were a
5       funeral director, --
6    A.  Yes.
7    Q.  -- same types of activities?
8    A.  Yes, I mean, I might be leaving things out
9       because there are any number of reasons someone
10      might call the funeral home, but those are some
11      general examples.
12   Q.  Sure.  And you say that you were required to
13      be -- or that employees were required to be on
14      call every other night and every other weekend
15      (indicating)?
16   A.  I said typically the employees were to be on
17      call every other night and every other weekend.
18      There were variations, to some degree, but that
19      was typical.
20   Q.  When you say employees, I'm trying to get a feel
21      for your frame of reference; are you speaking
22      about every hourly employee that worked at
23      Alderwoods?
24   A.  No, I'm speaking of students, interns, funeral
25      directors, in my case, a location manager.

111

1    Q.  So every funeral director that worked at
2       Alderwoods nationwide was typically on call
3       every other night and every other weekend?
4    A.  I'd say that would be typical, there might be
5       some outliers, but I'd say that was typical.
6    Q.  How do you know it was typical in other regions
7       of the country?
8    A.  It's really typical in the industry.
9    Q.  Okay, but I'm asking you what your basis for
10      your knowledge is that Alderwoods' funeral
11      directors in Arizona, for example, would have
12      the same on-call schedule that you would have in
13      Pennsylvania?
14   A.  Again, I couldn't say that, per se, I'd say that
15      is a typical representation.
16   Q.  Typical industry-wide?
17   A.  Industry-wide and, you know, just general
18      knowledge from talking to people in the
19      industry, many of them being Alderwoods
20      employees, I think "typical" is a good word to
21      describe it.
22   Q.  Was there a written policy anywhere that you had
23      to be on call every other night and every other
24      weekend?
25   A.  There were market managers that wrote, you know,

112

1    the specific schedules, call schedules, on-call
2    schedules.  We'd have 'em posted, sometimes, in
3    different parts of the funeral home, it would
4    say, like, on-call schedule and it would show
5    the rotation.
6    Q.  So you'd have a schedule for every week or every
7       month, or so?
8    A.  No, not -- it was, like sometimes it would be a
9       two- or three- or four-week cycle that just kept
10      repeating itself and you'd know, you're like in
11      week one, not necessarily October -- or
12      November, actually, it's November now, but you
13      know, oh, we're in week two of the cycle, week
14      three.
15   Q.  Did they do that at all the Alderwoods locations
16      nationwide?
17   A.  I can't say, per se.
18   Q.  In paragraph 21 of this affirmation you say that
19      although employees were required to, and
20      frequently handled, calls and other work-related
21      issues during this on-call time, defendants did
22      not compensate me or other employees for time
23      spent engaging in such on-call activities, after
24      the workday, offsite from the funeral home
25      (indicating).

113

1         Are you saying that you were never
2    compensated for -- strike that.  When you were
3    on call would there be times where you would
4    have to pick up a body, for example?
5    A.  On occasion.
6    Q.  Would there be times when you would have to go
7       into the funeral home to make arrangements while
8       on call?
9    A.  Yes.
10   Q.  Are you saying in paragraph 21 that you were
11      never compensated for any of that time?
12   A.  I'm saying that the policy was that we weren't
13      paid for doing things on the telephone on call
14      that -- when we weren't physically in the
15      funeral home.
16   Q.  Well, if, for example, you had to pick up a
17      body --
18   A.  You'd have to go to the funeral home first.
19   Q.  So you'd be paid for that time?
20      MR. SAUL:  What time are you
21      referring to?  Objection to the form.
22   BY MR. KNIGHT:
23   Q.  I'm referring to from the time you left your
24      home to pick up the body until the time you were
25      done doing whatever you needed to do.

**Johnstown**
**814-266-2042**

**Toll-Free**
**866-565-1929**

**Pittsburgh**
**412-281-7908**

**NETWORK DEPOSITION SERVICES**
**Transcript of Deborah Prise**

114

1  A.  I don't mean to ridicule, but I can't pick up a
2      body in my car, I have to get equipment, and
3      things like that, so, no, I wouldn't be paid
4      from the time I was called to the time I got to
5      the funeral home, I wouldn't get paid until I
6      got to the funeral home, and then.
7  Q.  Well, were you actually one of the people who
8      were picking up a body from someone's home, is
9      that something that you had to do?
10 A.  On occasion.
11 Q.  And on those occasions when you did that, the
12     time that you spent away from the funeral home
13     at the deceased person's home picking up the
14     body, speaking with the deceased person's, you
15     know, family, would you be compensated for that
16     time?
17 A.  Generally that happened over the phone from
18     home, the just picking up the body part happened
19     on rare occasion, and I'd go to the funeral home
20     and check in, and I think, to the best of my
21     recollection, I was paid for that.
22         It wasn't something that I did very
23     often after hours, most of my on-call time was
24     spent on the phone from my home or wherever I
25     was. I wasn't paid.

115

1  Q.  You were never paid for any phone calls you took
2      when on call?
3  A.  When I was a student trainee I was paid a flat
4      rate of $20 a night for being on call. That was
5      the only time when I was paid for being on call,
6      specifically.
7  Q.  So whether you took a call or not you were paid
8      $20?
9  A.  That's right.
10 Q.  What was your hourly rate at that time?
11 A.  Oh, I couldn't tell you. It was under ten
12     dollars an hour, it was ridiculously low, but it
13     was standard for a student.
14 Q.  How many hours were you required to be on call
15     when you were a student and intern in any one
16     night?
17 A.  Usually from 5:00 that evening till 9:00 the
18     next morning, usually.
19 Q.  Was it typical to have nights when you would be
20     on call and you wouldn't receive any calls?
21 A.  Sometimes.
22 Q.  It would happen -- I'm asking you to estimate
23     based on your experience, it would have happened
24     more or less than half the time?
25 A.  You know, better than estimating we could get

116

1      phone records, and I wouldn't even want to take
2      a stab at it because it's so -- I don't know
3      what the pattern would be, but there are phone
4      records for that.
5  Q.  Okay. So you don't recall as you sit here today
6      whether more or less than half the time you
7      would receive a call?
8  A.  I'd be guessing.
9  Q.  Would there ever be circumstances where you
10     would receive, say, more than five calls in one
11     night?
12 A.  Again, I'd be guessing. Five, it would depend
13     if it was a busy night. Sometimes, if there's a
14     death, you might hear from hospice two or three
15     times, the removal person, the family of the
16     deceased, so there's no average that I could say
17     for -- it depends.
18 Q.  How long would a call typically last?
19 A.  Oh, it depends, if it's with the hospice nurse
20     you need to get information for a death
21     certificate, that could just be, you know, 15 or
22     20 minutes, and if it's with a family, you know,
23     you want to be -- you don't want them to think
24     oh, I'm in a hurry, I want to go back to sleep,
25     it's 3:00 in the morning, you'd have -- however

117

1      long it takes.
2  Q.  Would calls sometimes last more than an hour?
3  A.  Yes, because some -- well, not typically, but
4      sometimes the family would say will you call me
5      when the deceased is back at the funeral home,
6      and by the time the removal person went and got
7      the body, yeah, it could be, like, 3:00, maybe,
8      you got the call, 5:00 o'clock in the morning
9      the body -- it could definitely take well over
10     an hour of your time.
11 Q.  But that wasn't typically the case?
12 A.  It happened, I wouldn't want to guess at it.
13 Q.  When you were a funeral director did Alderwoods
14     pay you any sort of rate for time you spent on
15     call?
16 A.  Never.
17 Q.  In paragraph 22 of your affidavit it indicates
18     that as a manager you were aware that
19     defendants' failure to pay employees for work
20     done while on call is a nationwide policy; do
21     you see that?
22 A.  Yes.
23 Q.  Was that the case the entire time you were a
24     location manager?
25 A.  No, it changed, to the best of my recollection,

**NETWORK DEPOSITION SERVICES**
**Transcript of Deborah Prise**

38 (Pages 146 to 149)

146

1      complying with those policies?
2  A.  No.
3  Q.  Not complying with a written policy or anything
4      else that you understood to be a policy of
5      Alderwoods?
6  A.  Well, there was Michael not complying with the
7      community service, but --
8  Q.  He wasn't a manager, though.
9  A.  Yes, he was, he was the manager before I was.
10 Q.  He didn't comply with the community service
11     policy while he was a manager?
12 A.  Right.
13 Q.  Okay.
14 A.  It's just so broad, the possibilities, that I
15     really don't know where to go on that.  Like are
16     you asking if any managers broke rules, or
17     things like --
18 Q.  Yes.
19 A.  Not that I can think of right now.
20 Q.  I'll try to give a little better example.  If
21     you look at Exhibit 5, the second to last bullet
22     point, say, completed time cards and time sheets
23     are to be signed by the employee to verify that
24     the card accurately documents the actual hours
25     worked, and that the employee's supervisor or

147

1      manager must also sign the time card or time
2      sheet, are there ever any examples, in your
3      experience at Alderwoods, where someone -- where
4      a manager didn't sign an employee's time cards
5      or time sheets?
6  A.  Well, I remember when I was manager and Michael
7      was funeral director he had overtime on there
8      that I questioned the preapproval of but later I
9      found out that regional management gave him
10     guaranteed overtime, so, you know, that would be
11     an example where I, maybe, thought that was an
12     abnormality but then I saw, well, no, it came
13     from higher up.
14 Q.  The first bullet point talked about how
15     employees must record all hours actually worked;
16     were there ever -- so that's a company policy;
17     correct, all employees must record all hours
18     actually worked unless exempt from timekeeping
19     requirements?  Agreed?
20 A.  Yes, but then again it contradicts a different
21     company policy.
22 Q.  Well, would you agree, then, that some location
23     managers didn't comply with this policy that all
24     employees must record all hours actually worked?
25 A.  I don't know.

148

1  Q.  Well, in your experience, did your managers
2      require your employees -- require you, as an
3      employee, to record all your hours actually
4      worked?
5  A.  No, we weren't allowed to put down hours on our
6      time sheets that weren't preapproved.
7  Q.  So this particular bullet point, this particular
8      policy, in your opinion, was not complied with
9      by your management?
10 A.  Well, but, I mean, I wouldn't -- I don't know
11     about the policy of only preapproved overtime
12     and if it wasn't -- it's -- I don't know,
13     because there was that policy of no overtime
14     that wasn't preapproved, so as far as I viewed
15     it, they were conforming to Alderwoods policy
16     because of the preapproval policy, that's how I
17     interpret it.
18 Q.  Can you say where you saw this policy that
19     overtime wouldn't be paid if it's not
20     preapproved?
21 A.  It's in the procedure manual.
22 Q.  And if it's not in the procedure manual where
23     would it be?
24 A.  I feel pretty sure that it was in the procedural
25     manual.

149

1  Q.  Okay.  Let's assume, hypothetically, it's not in
2      the manual.
3  A.  Why?
4  Q.  I'm just asking you to, we're in a deposition,
5      to assume that it's not in the manual; would you
6      agree that that policy doesn't exist?
7  A.  No, because I think that's a faulty assumption.
8  Q.  Okay.  But I'm asking you to make the assumption
9      that it's not in the policy manual; would it be
10     anywhere else?
11 A.  It could be.
12 Q.  But it's your testimony that you believe there's
13     a policy in the -- we're talking about the five
14     binders here, the policy and procedure manual --
15 A.  That's right.
16 Q.  -- that overtime that's not preapproved is not
17     to be paid?
18 A.  That's right.
19 Q.  And it would surprise you if there is no such
20     policy in the manual anywhere?
21 A.  Right now, to the best of my recollection, I
22     feel strongly that that is where I've seen it,
23     given the thought that I've put into it today, I
24     feel firmly.
25 Q.  Okay.  Paragraph 32 says that as a manager you

**NETWORK DEPOSITION SERVICES**
**Transcript of Deborah Prise**

39 (Pages 150 to 153)

150

1 were aware that the defendants' policy of not
2 compensating employees for time spent in pursuit
3 of required insurance licenses was a nationwide
4 policy?
5 A. Yes.
6 Q. How, as a manager, did you come to that
7 understanding?  What was it about being a
8 manager that led you to that knowledge?
9 A. Well, it was probably previous to being a
10 manager, too, but to the best of my recollection
11 I think that we tried to take our CEUs during
12 work hours, and it's just not possible to take
13 24 hours of CEUs and work hours, but it was
14 communicated to us by upper management that
15 we're not paid, we wouldn't get paid for our
16 time.
17 Q. And I'm going to ask you again, can you identify
18 any specific member of upper management that
19 told you that?
20 A. I don't remember, but I do clearly remember that
21 that was the rule.
22 Q. Because it was told to you by upper management
23 that you can't remember?
24 A. That's right, but I'm positive that it was a
25 rule, I'm not maybe, I don't think it was a

151

1 rule, I know it to be the rule.
2 Q. Are you as positive about that rule as you are
3 that there's a policy in the policy and
4 procedures manual that says that overtime not
5 preapproved will not be paid?
6 A. I can't compare the two, they're two separate --
7 Q. Looking at paragraph 35 of your affidavit, you
8 state in your affidavit that defendants
9 maintained a written policy on preapproval for
10 overtime policy in their policy and procedures
11 binder?
12 A. Yes.
13 Q. Would you refer to the policies and procedures
14 binder as the five binders that were at the
15 locations?
16 A. You know, I think it is, bearing in mind that I
17 wrote this in 2006 and it's 2008.  To the best
18 of my recollection, yes.
19 Q. And your recollection was better in 2006 than it
20 is today, I take it?
21 A. It was just -- not necessarily on all areas, but
22 it was just closer to the time where I had
23 access to it.
24 Q. Um-hm.
25 If you could recall in 2006 that this

152

1 preapproval for overtime policy were anywhere
2 other than in the policies and procedures binder
3 would you have said so in your affidavit?
4 A. I don't know, that's -- I don't know.  I mean, I
5 must have -- can't rule out that it's anyplace
6 else, but I do recall and, as I said earlier, it
7 being in the binder.
8 Q. Okay.  If you had thought it was in a different
9 binder, though, you would have identified the
10 different binder if you could; right?
11 MR. SAUL: Objection, asked and
12 answered.
13 A. Or it could be verbal, too, but I specifically
14 did identify the binder.
15 Q. And I just want to be clear, when you say
16 policies and procedures binder you're talking
17 about these five binders, though, at the
18 homes, --
19 A. That's right.
20 Q. -- that's this quote?
21 Okay.  When you say in paragraph 36
22 that defendants would consistently remind
23 employees at staff meetings that no overtime
24 would be paid, even if it was worked, --
25 A. Yes.

153

1 Q. -- unless it had been preapproved, --
2 A. Yes.
3 Q. -- who, specifically, told you that?
4 A. At least Pat McDermott, I know he did several
5 times.  I don't remember who else, but it was a
6 very rigid, rigid rule.
7 Q. So you're saying there could have been other
8 people other than Pat McDermott but you just
9 don't remember?
10 A. Well, you know, looking back I'm pretty sure
11 that my manager at the time, Michael Hilgefort,
12 reinforced that to work overtime I had to
13 preapprove it with Pat.  It was just so strongly
14 built into our meetings that -- and he was the
15 mouthpiece for Alderwoods.
16 Q. Who was?
17 A. Pat McDermott was our market manager that
18 communicated Alderwoods policy in many cases.
19 Q. With responsibility for their Pittsburgh area;
20 correct?
21 A. Yes.
22 Q. Is there a potential that Pat McDermott ever
23 could have miscommunicated a policy to you?
24 A. Well, I mean, there were redundancies from upper
25 management that maybe I don't recall,

Johnstown
814-266-2042

Toll-Free
866-565-1929

Pittsburgh
412-281-7908

Prise Deborah11-25

```
00001
  1              IN THE UNITED STATES DISTRICT COURT
  2          FOR THE WESTERN DISTRICT OF PENNSYLVANIA
  3                      CIVIL DIVISION
  4                Civil Action No. 06-1641
  5                        - - -
  6   DEBORAH PRISE and HEATHER      )
      RADY, on behalf of themselves  )
  7   and all employees similarly    )
      situated,                      )
  8                                  )
                        Plaintiffs, )
  9                                  )
                   vs.              )
 10                                  )
      ALDERWOODS GROUP, INC.,        )
 11                                  )
                        Defendant.  )
 12                        - - -
 13          Continued Deposition of Deborah Prise
 14             Tuesday, November 25, 2008
 15                        - - -
 16          The continued deposition of DEBORAH PRISE, one of
      the Plaintiffs herein, called as a witness by the
 17   Defendant, pursuant to notice and the Federal Rules of
      Civil Procedure pertaining to the taking of
 18   depositions, taken before me, the undersigned, Rebecca
      L. Schnur, Notary Public in and for the Commonwealth of
 19   Pennsylvania, at the offices of  Jones Day, One Mellon
      Center, Suite 4500, 500 Grant Street, Pittsburgh,
 20   Pennsylvania, 15219 commencing at 3:12 o'clock p.m.,
      the day and date above set forth.
 21                        - - -
 22               NETWORK DEPOSITION SERVICES
                        1101 GULF TOWER
 23                     707 GRANT STREET
                PITTSBURGH, PENNSYLVANIA 15219
 24
 25                        - - -
00002
  1   APPEARANCES:
  2        On behalf of the Plaintiffs:
  3             Charles H. Saul, Esq.
                Liberty J. Weyandt, Esq.
  4             Kyle T. McGee, Esq.
                Margolis Edelstein
  5             525 William Penn Place
                Suite 3300
  6             Pittsburgh, PA  15219
  7        On behalf of the Defendant:
  8             Brent D. Knight, Esq.
                Jones Day
  9             77 West Wacker Drive
                Chicago, IL  60601
 10
                April Dugan, Esq.
 11             Jones Day
                One Mellon Center, Suite 4500
 12             500 Grant Street
                Pittsburgh,  PA  15219
 13                        - - -
 14
 15
```

                              Prise Deborah11-25
15   me, I'll let counsel know.
16        Q      In paragraph 9 of this affirmation you say
17   that -- you describe the written policy of pre-approval
18   for overtime that was in the policies binder.
19        Do you see that?
20        A    Yes.
21        Q    You say that it was not -- Am I correct in
22   reading this that you're saying that the written policy
23   that you saw in that binder was not limited to any
24   subset of hourly employees or certain job titles?
25        A    That's what it says.
00015
1         Q      And is that your testimony?
2         A    Yes.
3         Q    When you say the written policy on
4    pre-approval, what written policy are you referring to
5    just so I'm clear?
6         A    I think earlier in the deposition I made
7    mention to you of the policy and procedure manual.
8    There was a reference to pre-approval on overtime.
9              It was emphasized on a regular basis in the
10   workplace.  It would be that specific policy that I'm
11   referring to.
12        Q    Policy -- I'm sorry --
13        A    Without the advantage of having a copy of it
14   now, it's one that was in the manual.
15        Q    The manual said overtime has to be
16   pre-approved.  Is that right?
17        A    I don't remember exactly what it said, but
18   the manual in conjunction with the way it was conveyed
19   to us repeatedly by management was that there was no
20   overtime without pre-approval of it or --
21        Q    I'm asking about the written policy.  We're
22   talking about paragraph 9.  Did the policy say that
23   overtime had to be pre-approved?
24        A    I would have to take a look at the written
25   policy to tell you that.
00016
1              As I recall -- And, clearly, when this was
2    written -- I think we have a copy of the policy.
3         Q    You were looking at a copy of the policy when
4    you wrote this?
5         A    No.  I think I had a copy of the policy at
6    one time.
7         Q    Okay.
8         A    I think we have the policy and procedure
9    manual or parts of it.
10        Q    Do you want to review some of the exhibits
11   from last time to see?
12             I'm trying to figure out what you're talking
13   about when you say "the written policy" here.
14        A    Policy -- There would be these five books
15   that all the locations in North America have.
16        Q    Okay.
17        A    And they had different policies on them.
18   Like one had -- So we're talking about those binders,
19   those books.
20        Q    When you're talking about -- This policy
21   you're talking about in paragraph 9, it said that
22   overtime has to be pre-approved.  It said at least that
23   much.  Is that right?
24        A    Uh-huh.  Yes.
25        Q    Did the written policy -- I'm not asking
                              Page 7

Prise_Deborah11-25

15      Q     Are you claiming entitlement to damages in
16 this case for it?
17      A     I don't know.  I would have to discuss that
18 with counsel.
19      Q     Can you think of anything else that we
20 haven't discussed so far today that would support your
21 claims you're bringing in this lawsuit other than -- I
22 should say other than what was discussed in this
23 deposition, whether it be November 6 or today, that
24 would support the claims you have made in this lawsuit?
25      A     Straightaway, not at this time.
00078
1            MR. KNIGHT:  I have nothing further at this
2       time, Charlie.
3            MR. SAUL:  I just have a few questions.
4                       EXAMINATION
5 BY MR. SAUL:
6       Q     You were asked at the previous deposition
7 session about auditors.  What was your understanding as
8 to the purpose of the auditors?
9       A     Well, to make sure that our locations were in
10 compliance with corporate policy in any number of
11 areas.
12      Q     And, to your knowledge, where did these
13 auditor people come from?
14      A     The auditor people were from senior
15 management, corporate headquarters.
16      Q     Okay.  And you talked about these five
17 binders of policies and procedures.  What's your
18 understanding as to where those emanated from?
19      A     The five policy binders came from corporate
20 headquarters.
21      Q     And was it your -- What was your
22 understanding as to what location or locations these
23 five binders applied to?
24      A     I believe they applied to all U.S. locations.
25      Q     You testified about the policy that employees
00079
1 were not to record overtime that they worked on their
2 time sheets unless that overtime had been pre-approved.
3            From what did you gather that overtime
4 policy?
5       A     We were told that, if it wasn't pre-approved,
6 we couldn't put it on our time sheet and we weren't
7 allowed to claim it.
8       Q     Okay.  And you were asked, concerning Prise
9 Exhibit 8, about certain individuals on page 7, George
10 Amato, Randy Amos, John Blute, Patrick McDermott,
11 Michael Hilgefort, Katie Leahy, and Ron Collins.
12           Which of those, if any, made statements to
13 that effect regarding this overtime policy?
14      A     All of them.
15      Q     And I believe you testified to certain
16 overtime that you worked, yourself, and you didn't put
17 it on your time sheets.  Is that correct?
18      A     Frequently.
19      Q     Okay.  And why didn't you -- If you worked
20 the overtime, why didn't you put it on your time
21 sheets?
22      A     Because we were told we were not permitted to
23 claim it.
24           (Discussion off the record)
25      Q     And were you ever questioned about any
                          Page 33

Prise Deborah11-25

00080
1   overtime that you put in for on your time sheets?
2       A   Yes.  There were times where I had overtime
3   on the time sheets, and I was questioned to ascertain
4   that it was, indeed, pre-approved.
5       Q   And who questioned you about that?
6       A   Kim Stebler, typically.
7       Q   Who's Kim Stebler?
8       A   Kim Stebler was the location manager for this
9   market, and she was in charge of sending payroll in.
10      Q   What was your understanding as to why she was
11  questioning whether or not the overtime you put on your
12  time sheet had been pre-approved?
13      A   Because were it not pre-approved it would
14  have been removed from the time sheet.
15      Q   And were managers or any of your supervisors
16  aware that you were working overtime and you were not
17  putting that time in on your time sheets?
18      A   Absolutely.
19      Q   Okay.  Could you tell us some of the ones
20  that you recall that would have been aware and how they
21  would have been aware of that.
22      A   Well, for example, Patrick McDermott, you
23  know, there were times where he'd even call the funeral
24  home and it would be after I was off the clock, and I
25  would be talking to him, and he would be delegating
00081
1   things.  There were times where Michael Hilgefort or
2   other people in management would say, hey, on your way
3   home or on your way in do this or do that, which was
4   clearly off clock.
5           Emphatically, it wasn't allowed that we even
6   got paid for taking call.  They know that those weren't
7   zero hours.  So they were well aware of that.
8       Q   And was it your understanding that this was a
9   question of some local rogue managers who were
10  implementing their own policy, or was this some
11  policies -- these policies you've been testifying to
12  about overtime broader than just the Pittsburgh area?
13      A   Broader than the Pittsburgh area and
14  uniformity within the firm.
15          MR. SAUL:  No further questions.
16          MR. KNIGHT:  Just a couple points.
17              RE-EXAMINATION
18  BY MR. KNIGHT:
19      Q   Did anyone tell you -- ever say to you that
20  overtime that was not pre-approved would be removed
21  from your time sheets?
22      A   Yes.  There were times where I was told --
23  Kim Stebler, for example, said, is this pre-approved
24  because it can't go on your time sheet if it's not
25  pre-approved, and, therefore, it can't get sent into
00082
1   payroll.
2       Q   So Kim Stebler told you that time that was
3   not pre-approved would actually be removed from the
4   time sheet?
5       A   She was the gatekeeper for it, so -- She was
6   the gatekeeper for the firm in this capacity.
7       Q   Did she actually tell you that, if you put
8   time in that's not pre-approved, it's going to get
9   removed from your time sheet?
10      A   She told us -- as well as management -- that
                    Page 34

Prise Deborah11-25

11  you couldn't put -- you couldn't claim hours that
12  weren't pre-approved, so it couldn't go into payroll.
13  If it wasn't pre-approved, you could not send it into
14  payroll.
15      Q    I'm talking -- The key word here, though, is
16  removed.  Did she ever tell you she would remove any
17  hours that you reported that weren't pre-approved?
18      A    She questioned to make sure that they were
19  pre-approved, but I'm not sure if she said removed.  I
20  know she questioned to make sure that they were
21  pre-approved, and they couldn't be on there if they
22  weren't pre-approved.
23      Q    Did anyone ever actually remove any hours
24  from your time sheets?
25      A    Well, I didn't put unpre-approved time on my
00083
1  time sheets, so I would -- I think nothing was removed
2  because I didn't put it on.  But, you know, I would
3  have to see all the time sheets.
4      Q    You can't recall any overtime being removed
5  or any time at all being removed really?
6      A    I can't recall at this time.
7          MR. KNIGHT:  I don't have anything else.
8          MR. SAUL:  Nothing further.
9                    - - -
10          (Deposition concluded at 6:01 p.m.)
11                    - - -
12
13
14
15
16
17
18
19
20
21
22
23
24
25
00084
1                 C-E-R-T-I-F-I-C-A-T-E
2      I, Rebecca L. Schnur, the undersigned, do hereby
3  certify that the foregoing pages are a true and correct
4  transcript of my stenotypy notes taken of the
5  proceedings held at the above-referenced address on the
6  above-referenced date.
7
8
9          _____
           Rebecca L. Schnur
10          Notary Public in and for the
           Commonwealth of Pennsylvania
11          My Commission Expires:  June 16, 2009
12                    - - -
13
14
15
16
17
18
19                        Page 35

# EXHIBIT 86

1

1      IN THE UNITED STATES DISTRICT COURT FOR THE
           WESTERN DISTRICT OF PENNSYLVANIA
2
                     -  -  -

3

DEBORAH PRISE and HEATHER RADY )
4  on behalf of themselves and all)
   employees similarly situated,  )
5                                  )
                    Plaintiffs,   )
6                                  )
                   -vs-           )   Civil Action
7                                  )   No. 06-1641
   ALDERWOODS GROUP, INC.,         )
8                                  )   Judge Joy Flowers
                    Defendant.    )
9

10                    -  -  -  -

11          DEPOSITION OF:  HEATHER RADY
12                    -  -  -  -
13

                DATE:    November 7, 2008
14                       Friday, 10:15 a.m.
15

             LOCATION:   JONES DAY
16                       One Mellon Bank Center
                         500 Grant Street, 45th Floor
17                       Pittsburgh, PA  15219
18

             TAKEN BY:   Defendant
19

20           REPORTED BY:   Catherine C. Leverty
                           Notary Public
21

22

                     -  -  -  -

23          NETWORK DEPOSITION SERVICES
                 The Gulf Tower
24          707 Grant Street, Suite 1101
           Pittsburgh, Pennsylvania  15219
25               412-281-7908

**NETWORK DEPOSITION SERVICES**
**Transcript of Heather Rady**

3 (Pages 6 to 9)

| | 6 |
|---|---|
| 1 | earlier is inaccurate, or you want to elaborate |
| 2 | or there's something you remember that you |
| 3 | forgot to say earlier, just let me know, we can |
| 4 | go back and you can say anything you want to add |
| 5 | to your previous response. |
| 6 | A. Okay. |
| 7 | Q. Your attorney during this deposition may state |
| 8 | some objections, but you will still answer the |
| 9 | question unless your attorney specifically tells |
| 10 | you not to answer the question. |
| 11 | A. Okay. |
| 12 | Q. Do you have any -- are you taking any |
| 13 | medications that would keep you from answering |
| 14 | truthfully today? |
| 15 | A. I am taking medication, but not medication that |
| 16 | would inhibit me from answering truthfully. |
| 17 | Q. Have you reviewed any documents in preparation |
| 18 | for your deposition today? |
| 19 | A. I have, yes. |
| 20 | Q. Can you tell me what you reviewed? |
| 21 | A. I have reviewed my affirmation, and aside from |
| 22 | that, that was really the only few documents -- |
| 23 | I'm sorry, the only documents that I did review |
| 24 | were my affirmations. |
| 25 | Q. And when you say affirmations, plural, do you |

| | 8 |
|---|---|
| 1 | just apprentice? |
| 2 | A. I think in the very beginning it may just have |
| 3 | been apprentice. After I had gotten my |
| 4 | insurance license it became, I think, apprentice |
| 5 | funeral director, -- |
| 6 | Q. Okay. |
| 7 | A. -- there was a change. |
| 8 | Q. So you obtained an insurance license while you |
| 9 | were an apprentice? |
| 10 | A. Well, titled as an apprentice. |
| 11 | It's very confusing, but my |
| 12 | Alderwoods job title was apprentice and/or |
| 13 | intern, I then obtained my insurance license, |
| 14 | but I was really a licensed funeral director in |
| 15 | the State of Pennsylvania. |
| 16 | Q. What location were you hired into? |
| 17 | A. Initially, when I was hired, I was hired at the |
| 18 | H.P. Brandt location. |
| 19 | Q. And at some point did you move to another |
| 20 | location? |
| 21 | A. I did, I then moved to the H. Samson location. |
| 22 | Q. And approximately when was this? |
| 23 | A. Well, it was very early on. I only spent a |
| 24 | couple of months at Brandt, so I will say in the |
| 25 | fall of 2002. |

| | 7 |
|---|---|
| 1 | remember what affirmations you looked at? |
| 2 | A. Perhaps I should not have said plural, I'm not |
| 3 | certain of the title. |
| 4 | Q. So you looked at one affirmation? |
| 5 | A. Yes. |
| 6 | Q. When were you first hired by Alderwoods? |
| 7 | A. In either July or August of 2002. |
| 8 | Q. And in what position were you hired? |
| 9 | A. I was hired into the position of apprentice, |
| 10 | though I was a licensed funeral director. |
| 11 | Q. And when you say apprentice, was that the job |
| 12 | title that Alderwoods gave you? |
| 13 | A. It was, and it may have even been intern. |
| 14 | Intern and apprentice were used interchangeably. |
| 15 | Q. And were you an apprentice or intern for any |
| 16 | particular position, like funeral director? |
| 17 | A. I'm not sure that I understand what you're |
| 18 | asking. |
| 19 | Q. I know that, just from this case, some |
| 20 | Alderwoods job titles are called things like |
| 21 | apprentice funeral director, or apprentice |
| 22 | embalmer, -- |
| 23 | A. Correct. |
| 24 | Q. -- and I'm trying to get a feel for was your |
| 25 | title apprentice and something else, or was it |

| | 9 |
|---|---|
| 1 | Q. And did you work at H. Samson for the rest of |
| 2 | your employment? |
| 3 | A. I did not. |
| 4 | Q. Where else did you work? |
| 5 | A. I also worked at the Burton L. Hirsch location, |
| 6 | and, when it was still open and operating, the |
| 7 | Bright Undertaking Company. I was assigned |
| 8 | there to meet with a couple of families. |
| 9 | Q. Were you actually assigned to work for the |
| 10 | Bright Undertaking Company, or did you just meet |
| 11 | with them when you were there? |
| 12 | A. Well, when you say assigned, I'm not sure what |
| 13 | you mean. |
| 14 | Q. Well, that's a fair question. I guess would you |
| 15 | keep your time cards, for example, at any |
| 16 | particular location? |
| 17 | A. Yes, we sort of had a home base, if you will, |
| 18 | and then we rotated as needed to the other |
| 19 | locations. |
| 20 | Q. So was Bright Undertaking ever your home base? |
| 21 | A. No. |
| 22 | Q. Was Hirsch your home base? |
| 23 | A. After H. Samson in, I believe it was 2004, |
| 24 | summer of 2004, then Hirsch became my home base. |
| 25 | Q. How long were you an apprentice, or intern? |

**Johnstown**
814-266-2042

**Toll-Free**
866-565-1929

**Pittsburgh**
412-281-7908

**NETWORK DEPOSITION SERVICES**
**Transcript of Heather Rady**

11 (Pages 38 to 41)

---

**38**

1  your time by Alderwoods?
2  A.  Mr. McDermott, at a staff meeting, I believe,
3  laid some ground rules once we got the time
4  clocks.
5  Q.  Do you recall being trained, before the time
6  clocks, about how to keep track of time?
7  A.  I was just given the appropriate form which we
8  handwrote our hours on and told to document the
9  hours.
10  Q.  When you got the time clock and you had to
11  submit them to Mr. McDermott what sort of
12  instructions did you receive about the time
13  clocks?
14  A.  We were told we couldn't clock in, I think it
15  was seven minutes, prior to our shift starting,
16  because, again, that's overtime, or unnecessary
17  overtime, so I think we had a window of seven
18  minutes before or seven minutes after our shift
19  to clock in.
20  Q.  So if you were scheduled from 9:00 to 5:00,
21  don't clock in before 8:53?
22  A.  Correct.
23  Q.  And don't clock out after 5:07?
24  A.  Correct.
25  Q.  What would happen if you started work before

---

**39**

1  9:00 o'clock, if you started at 8:45?
2  A.  And you did punch in, or you just showed up and
3  started working?
4  Q.  Was there any instruction about what to do if
5  you came in before your regularly scheduled
6  shift?
7  A.  You needed to get approved overtime.
8  Q.  Before you clocked in?
9  A.  Correct.
10  Q.  Could you get approval after you clocked in?
11  A.  You mean for the overtime that you may have
12  already worked prior to clocking in?
13  Q.  Right -- well, I am thinking of an example where
14  perhaps you were scheduled from 9:00 to 5:00,
15  you're not supposed to clock in before 8:53 but,
16  for whatever reason, you had something to do in
17  the morning and you would have come in at 8:30;
18  could you clock in at 8:30 and then get a
19  manager's approval at the end of the day for the
20  extra 30 minutes?
21  A.  I don't know, I don't know if that was the case
22  or not.  It was just sort of the overall
23  understanding that what you were doing before
24  your official start time was volunteer time, if
25  you will.

---

**40**

1  Q.  How did you come to that understanding?
2  A.  I think that Mr. McDermott mentioned one time --
3  and it's hard to say because there were often
4  times when you needed to do that, to show up
5  early and begin working, but you just kind of
6  understood that it was part of the job.
7  Q.  What I'm trying to figure out is why would you
8  have this understanding?  Did someone tell that
9  to you?  Where do you think this came from?
10  A.  Well, just, first of all, the instruction that
11  you're not permitted to clock in prior to your
12  shift and you needed to clock out at your
13  scheduled time, or your scheduled finishing time
14  at the end of the day, and we were to ask for --
15  we had to have preapproved overtime, which, to
16  me, indicates that it needs to be approved
17  before you do it.
18  Q.  Now, were there occasions when you were a
19  funeral director or an apprentice that you
20  performed work before you clocked in that you
21  never sought approval for?
22  A.  Oh, sure.
23  Q.  Would that happen frequently?
24  A.  Frequently.
25  Q.  Like how frequently?

---

**41**

1  A.  I would say very frequently during times that we
2  actually had funeral services scheduled, because
3  there's a lot of work involved with setting up,
4  and errands, and so forth, you know, surrounding
5  the funeral service.
6  Q.  So you were doing work that, clearly, needed to
7  be done because it was related to a service;
8  right?
9  A.  Oh, sure.
10  Q.  So if the work needed to be done where -- didn't
11  you think you could go to a manager and tell
12  them that, you know, I have all this work I'm
13  going to have to do, I have all this work I have
14  to do early, I need to get the time approved,
15  did you ever do that?
16  A.  I think one time I was questioned after I had --
17  I had stayed late to wash cars, Mr. McDermott
18  had questioned why I didn't leave until 11:00,
19  and I told him that I was washing the cars in
20  preparation for the next day's service, and he
21  said well, you know, you could have gotten that
22  done in the morning, or a student could have
23  done that in the morning, but my position was
24  you have to anticipate the worst happening over
25  the night, we could have ended up with three

---

**NETWORK DEPOSITION SERVICES**
**Transcript of Heather Rady**

21 (Pages 78 to 81)

### 78

1  Q. You took phone calls when you were on call;
2     correct?
3  A. That's correct, yes.
4  Q. And you're claiming you were not compensated for
5     taking the phone calls?
6  A. That is correct.
7  Q. What other types of work would you do on call
8     that you were not compensated for?
9  A. Sometimes make removals, but just the on-call
10    process, itself, dealing with the families, and,
11    in the case of orthodox Jews who want to bury
12    within 24 hours, I mean, that involves a lot of
13    work, calling rabbis, cemetery caretakers,
14    gravediggers, you can be on the phone for
15    several hours, and it didn't matter if it was
16    3:00 in the morning or 10:00 at night.
17 Q. You said removals, as well?
18 A. Correct.
19 Q. Would you get compensated for removals that you
20    would do?
21 A. I would not.
22 Q. You say I would not; what do you mean, just you,
23    was that unique to you?
24 A. Well, I never, you know, asked Deborah or
25    Michael -- I didn't make very many removals, but

### 79

1     if it were necessary I would. That's,
2     basically, what we had the students around for.
3  Q. When you would make a removal would you have to
4     come into the funeral home?
5  A. Correct.
6  Q. And when you came in you did not punch in?
7  A. No.
8  Q. Why not?
9  A. I made very few.
10 Q. For the few that you did why did you not punch
11    in?
12 A. I live about 45 miles away from my work, so
13    again, that's why students are employed, to sort
14    of offset, or help with the responsibilities
15    during the night.
16 Q. But just talking about the few instances where
17    you had to make removals and you had to come to
18    the funeral home, why didn't you clock in when
19    you got to the funeral home?
20 A. It was just sort of understood that that was
21    part of your job and it was what you needed to
22    do to get the job done.
23 Q. Well, you needed to come to the funeral home;
24    correct?
25 A. Correct, to get a vehicle.

### 80

1  Q. But in order to do that you could have, in
2     theory, have clocked in and still gotten the job
3     done?
4  A. Correct.
5  Q. But you say it was understood that you weren't
6     supposed to?
7  A. Um-hm.
8  Q. Why was it -- how did you come to that
9     understanding?
10 A. That it's just part of my job, and just as with
11    showing up early to make sure that bodies were
12    cosmetized and presentable for viewing, it was
13    just what you did.
14 Q. Did anyone ever tell you not to clock in when
15    you came to the funeral home for a removal?
16 A. Well, Mr. McDermott didn't specifically say for
17    removals, but he said you're only paid for the
18    work that you do while you're in the building.
19 Q. I'm talking about a removal where you're
20    actually coming to the building and you have to
21    do work, perhaps, at night?
22 A. Right.
23 Q. So why wouldn't you have clocked in for that
24    time?
25 A. Again, it's just understood that it's beyond the

### 81

1     normal work hours, the 9:00 to 5:00 work hours,
2     and so I just did not.
3  Q. You testified earlier there was some work that
4     you did outside of normal work hours that you
5     would be compensated for, --
6  A. Correct.
7  Q. -- so what's so different about making the
8     removal?
9  A. Well, again, the policy change, and I can't
10    pinpoint what year or what policy that changed,
11    but that's when -- and I'm calling them the
12    addendums, but that's when we had to start
13    tracking everything, even if somebody had called
14    the funeral home for -- they wanted to know
15    viewing times and you spent 30 seconds on the
16    phone, you had to write that information down.
17 Q. Okay. And at that point did you start punching
18    in when you were coming to the funeral home at
19    night?
20 A. I don't know while we had the time clocks that I
21    ever made a removal, I can't be certain.
22 Q. Were there any occasions prior to you getting
23    time clocks where you made a removal and you
24    recorded that time on your time sheet so it
25    would be paid?

**NETWORK DEPOSITION SERVICES**
**Transcript of Heather Rady**

23 (Pages 86 to 89)

86

1    enough.
2    Q.  So when we're looking at this time sheet from
3        November of 2005, do you believe that this time
4        sheet comes prior to the on-call logs coming
5        into effect?
6    A.  It may have, I'm not sure.
7    Q.  Is there any reason you would have recorded your
8        time on this -- your death call time on this
9        hourly time sheet if you were also recording it
10       on a call log?
11   A.  We would not have made that duplicate entry.
12   Q.  Okay.  Do you know whether you were paid for the
13       two hours you added on Tuesday, November 22nd,
14       from 2:30 to 4:30 a.m.?
15   A.  Well, it appears that Pete approved it, but
16       without seeing the actual pay log for that week
17       I don't know, but I would assume so because Pete
18       approved that.
19   Q.  You also mentioned, I think, earlier, that there
20       was a time when you said you stayed up all night
21       on a call with a family that Pat McDermott paid
22       you for; correct?
23   A.  Yes, that's correct.
24   Q.  So there were occasions when you were doing --
25       taking calls at night even before the time

87

1    sheets came out, that the call logs came out,
2    that you reported that time and you were
3    compensated for that time?
4    A.  One time that I can -- will never forget.
5    Q.  Well, we also have the time on your 11-26-05
6        time sheet?
7    A.  Yes, and I don't deny that, but I needed this
8        paper to refresh my recollection (indicating);
9        the William Balter case, I will never forget.
10   Q.  Because that was an all-night call?
11   A.  Yes.
12   Q.  Could there have been other times when you wrote
13       onto your time sheet time that you spent taking
14       calls or doing removals at night?
15   A.  There may have.
16   Q.  And if you did that, you don't recall any
17       occasion where you were told you would not be
18       compensated for that time that you wrote in?
19   A.  I don't recall.
20   Q.  You say in paragraph 17 of your affidavit that
21       defendants did not compensate me or other
22       employees for time spent engaging in on-call
23       activities; what other employees are you
24       referring to there?
25   A.  I'm referring to all of the other hourly funeral

88

1    directors who performed on-call duties.
2    Q.  Are you referring to hourly funeral directors in
3        the Pittsburgh market or --
4    A.  As well as nationwide.
5    Q.  How do you know that Alderwoods wasn't
6        compensating other funeral directors nationwide
7        for on-call duties?
8    A.  Well, I don't know for sure, but I can't believe
9        that they would allow Pat McDermott the autonomy
10       to make that decision just for the Pittsburgh
11       market.  Again, Alderwoods is a national
12       corporation, and so I can't believe that they
13       would allow Pat McDermott to say Pittsburgh
14       funeral directors aren't paid for call time.
15   Q.  But you were paid for some of your call time?
16   A.  Some.
17   Q.  So Pat McDermott was paying for some of your
18       call time but not other of your on-call time?
19   A.  Correct.
20   Q.  So was there a company-wide policy that said
21       that market general managers are supposed to pay
22       for some on-call time but not other on-call
23       time?
24   A.  I wouldn't think that it would be a
25       discretionary policy.

89

1    I was very upset about the William
2    Balter case, I, literally, was up all night, and
3    though we were not, as a practice, paid for
4    on-call time during the night, I was up all
5    night.  I couldn't call off work the next day
6    because we had funerals and I had to be present,
7    follow through with this Balter call that I had
8    taken through the night, so when I arrived at
9    work, like I had mentioned, I was shaking from
10   being up all night, just very tired and not
11   thinking clearly, so I wanted paid for my time.
12   Q.  And you went to whom?
13   A.  To Pat McDermott.
14   Q.  And he paid you; right?
15   A.  He said, I believe he said that he'll have to
16       talk to John Blute, and then, yes, ultimately I
17       was paid for that time.
18   Q.  Prior to the time when you were keeping call
19       logs did you ever ask Pat McDermott on any other
20       occasions to compensate you for work you did
21       while on call?
22   A.  I don't know if I did or not, I just remember
23       him reinforcing the statement that you're only
24       paid for hours spent working inside the
25       building, whether that would mean another

**Johnstown**
**814-266-2042**

**Toll-Free**
**866-565-1929**

**Pittsburgh**
**412-281-7908**

**NETWORK DEPOSITION SERVICES**
**Transcript of Heather Rady**

24 (Pages 90 to 93)

90

1 funeral director or all of us, collectively,
2 complaining to him, I can't recall, but that
3 will be forever ingrained in my mind, you're
4 only paid for the time spent working inside the
5 building.
6 Q. Did anyone other than Pat McDermott ever make
7 this statement to you, that you'd only get paid
8 for time spent in the building?
9 A. No, not that particular statement, no.
10 Q. What other funeral directors in other Alderwoods
11 homes told you that they were not paid for time
12 spent on call?
13 A. I remember having conversation with a funeral
14 director in Ohio, though his name escapes me
15 now, but we were doing a shipout to him, and I
16 remember being frustrated at not being able to
17 get in touch with him, and when we finally had
18 the opportunity to connect and talk I remember
19 him lamenting that he's the only person going
20 between two locations and he's overworked, he's
21 underpaid.
22    I remember talking with, I think her
23 name is Elaine Lista, in New York, same kind of
24 thing, with the new policies, you know, working
25 more, being underpaid, so I just -- I felt that

91

1 it was the general consensus of not only myself,
2 but other funeral directors, that we were
3 working a lot of hours and probably not being
4 paid for them.
5 Q. But did this funeral director in Ohio tell you
6 that he was not getting paid for work he did
7 while on call, I'm asking a specific question?
8 A. No, he, specifically, did not say that.
9 Q. And what about New York funeral director?
10 A. No, I just inferred from our conversation.
11 Q. You inferred from a conversation in which they
12 said they were overworked and underpaid?
13 A. Um-hm, and just, you know, having to join
14 community organizations, having families, how do
15 they juggle that responsibility, sort of thing.
16 Q. Do you have knowledge of any funeral directors
17 outside the Pittsburgh market who worked while
18 on call and did not get paid for it?
19 A. Not direct knowledge, not that they came to me
20 and said Heather, I'm not getting paid for my
21 on-call time, and aside from reading the
22 affidavits, no, that was not verbally
23 communicated to me.
24 Q. Did you ever see any written policy from
25 Alderwoods that said you would not be paid for

92

1 work performed while on call?
2 A. Written policy, no.
3 Q. You say in paragraph 19 that in July of '05,
4 approximately, defendants announced that they
5 would be changing their company-wide on-call
6 policy --
7 A. Okay.
8 Q. -- to provide employees compensation for phone
9 calls they were required to take after
10 completing their regular work schedules and
11 leaving the premises; is that right?
12 A. That is correct, yes.
13 Q. And that's the call log that we've talked about
14 earlier?
15 A. Correct, and that may encompass the Exhibit
16 No. 2 that we looked at.
17 Q. After July of 2005 did you, in fact, record all
18 of your time you worked while on call?
19 A. I will say most of it. Again, those times that
20 you're showing up early to make sure that a body
21 is properly cosmetized I may not have put in,
22 you know, the total. There were other times
23 when I had to pass our local registrar's
24 office -- she is the one, the woman who
25 processed the death certificates -- I would

93

1 swing by and drop things off on my way in to
2 work and I wouldn't record those hours.
3 Q. I'm asking you specifically about on-call time?
4 A. Oh, on-call time. After 2005, or after July of
5 2005?
6 Q. Were there ever any occasions where you didn't
7 record time you spent working on call?
8 A. Not that I can recall.
9 Q. Okay. And after July 2005 were you -- I should
10 say in approximately July of 2005 were you
11 instructed by anybody that you had to record all
12 time you spent working while on call?
13 A. Yes, I believe that was even a written policy,
14 or it became a written policy, at that point.
15 Q. That's a written policy that was in the policies
16 and procedures binder?
17 A. Yes.
18 Q. Are you making any claims in this case for any
19 unpaid on-call work after July of 2005?
20 A. I'm not certain how a request for damages is
21 structured. It would be something I would need
22 to talk with my counsel regarding.
23 Q. Well, do you believe as you sit here today that
24 you were not compensated for any on-call work
25 that you performed after July of 2005?

**NETWORK DEPOSITION SERVICES**
**Transcript of Heather Rady**

178

1    her additionally privately.
2    Q.  The fifth bullet point on this page mentions
3    statements made by Michael Hilgefort --
4    A.  Yes.
5    Q.  -- regarding an Adopt-a-Highway program?
6    A.  Yes.
7    Q.  What are you referring to there?
8    A.  I don't think that Michael wanted to participate
9    in the Adopt-a-Highway program. Michael was not
10   participating in any community activities or
11   community involvement, and some employees were
12   upset because there was no repercussion or
13   accountability for such, and he didn't want to
14   have to participate in Adopt-a-Highway.
15         I believe -- Michael is an overweight
16   person, and I think the walking and doing that
17   task would create physical or undue hardship.
18   Q.  So all employees were required to participate in
19   Adopt-a-Highway?
20   A.  I don't believe that Deborah participated. I
21   know I did, Pete Johnson, Michael Hilgefort, I
22   believe Ken Hunkele did.
23   Q.  And what, exactly, did you have to do as part of
24   the Adopt-a-Highway program?
25   A.  We wore a fluorescent jacket, walked along the

179

1    highway with a garbage bag picking up trash, and
2    it was a period of or a span of several miles.
3    Q.  And was there any insignia or any indication
4    that you were an employee of Alderwoods while
5    you were doing that?
6    A.  No, I don't think that we had Alderwoods shirts,
7    but that portion of -- goodness, is it -- it's
8    not Semple -- I forget the name of the road
9    right now -- there is a sign that says this
10   portion of Adopt-a-Highway, and it says Brandt
11   Funeral Home employees.
12   Q.  Do you recall what day of the week you would do
13   this?
14   A.  I think it was during work hours that we did it.
15   Q.  Were you compensated for the time you spent
16   doing Adopt-a-Highway?
17   A.  If it was during work hours, yes. We only did
18   it one time, we were required, I think to do it
19   once a month, but my experience was that we -- I
20   had done it once.
21   Q.  And you believe you were compensated for it?
22   A.  I think it occurred during work time.
23   Q.  The top bullet point on page 10, you mention a
24   statement made by Randy Howard regarding after
25   hours pre-needs appointments --

180

1    A.  Yes.
2    Q.  -- when no sales occurred?
3    A.  Yes.
4    Q.  What was his complaint?
5    A.  Randy and I often lamented about that, because
6    you could spend hours, sometimes weeks, with
7    families doing these pre-needs, or coming up
8    with a proposal, and then to have to sit after
9    hours with them for several hours and then not,
10   or you not make the sale, I mean, it's
11   disappointing, so Randy and I were often upset
12   about that.
13   Q.  Would you schedule appointments for after your
14   working hours?
15   A.  I would, because we had to think of the needs of
16   the families. If they worked, if it was a
17   younger person doing it for their elderly
18   parent, usually they had to come to us after
19   5:00 or 6:00 because they worked.
20   Q.  Um-hm.
21         Did you ever go to your manager or --
22   your location manager, and tell them that you
23   had a person or a family coming in after your
24   working hours that you had to meet with?
25   A.  Oh, they knew, sure, that we would be staying in

181

1    the building.
2    Q.  They knew because they were also in the building
3    with you?
4    A.  Not for the duration of the time we spent
5    meeting with the family, but you'd say hey, I'm
6    sticking around, or I'm going to go and sit in
7    the lounge and watch TV, I have a family coming
8    in at 7:00, so --
9    Q.  Did you ever ask to be compensated by your
10   manager for that time?
11   A.  Yes, and it was Pat McDermott who explained that
12   because we were being paid a commission, that
13   would be incentive or reward for our time.
14   Q.  You testified earlier that Mr. McDermott would
15   only compensate for time spent in the building?
16   A.  Correct.
17   Q.  Were these meetings held in the building?
18   A.  They were.
19   Q.  Did you ask him why he would not compensate you
20   for that time?
21   A.  No, in fact, that's a good point that you raise,
22   I didn't think of that at the time.
23   Q.  Did you ever explain to him that if you didn't
24   receive a commission you, effectively, didn't
25   get any pay at all for the time you spent with

Johnstown
814-266-2042

Toll-Free
866-565-1929

Pittsburgh
412-281-7908

**NETWORK DEPOSITION SERVICES**
**Transcript of Heather Rady**

47 (Pages 182 to 185)

182

1  those families?
2  A.  Yes, yes.
3  Q.  What was his response?
4  A.  I think -- well, in fact, one day when I came in
5  on a day off he said something like well, you
6  can go shopping, or something like that, because
7  I have to, as I mentioned earlier, drive about
8  45 miles to my work, so, again, it's a little
9  disheartening, angering, when you spend all of
10 that time with someone and they say, you know,
11 well, we'll think about it and get back to you.
12 Q.  Sure.
13      But Mr. McDermott's response was you
14 can go shopping?
15 A.  Yeah, since I'm in the city I can go shopping,
16 meaning, like, you've already driven, you know,
17 make a day of it, or do something fun.
18 Q.  Are there any other statements other than the
19 ones you've identified in this interrogatory
20 response and you've talked about in your
21 deposition today that you believe constitute
22 statements against interest by Alderwoods
23 employees related to this overtime lawsuit?
24      MS. WEYANDT:  Just for the record,
25 the answers to interrogatories state,

183

1  themselves, that plaintiff reserves the right to
2  supplement her responses at a later date.
3      MR. KNIGHT:  I'm asking if she can
4  think of anything else.
5  A.  And again, when you say -- interest of --
6  Q.  Statements that Alderwoods employees made that
7  go against Alderwoods' interests in this
8  lawsuit.
9  A.  Not just specifically with regard to overtime, I
10 mean, the statement can involve community
11 service or --
12 Q.  Right, statements about the claims you're making
13 in this case.
14 A.  There may be one thing that I want to mention
15 that would support policy, or just policy in
16 general.  We were required, all employees,
17 nationwide, to wear Alderwoods pins, and that
18 was something that I did not do, at one point,
19 and was reprimanded for that, so, again, I think
20 that what we're discussing with regard to
21 policy, if it falls within the policy and
22 procedures manuals, it's company-wide, so
23 specifically with regard to unpaid overtime and
24 community service, I can't think of any other
25 statements right now.

184

1  Q.  When you mentioned these pins, were you supposed
2  to wear the pins during working hours?
3  A.  Yes.
4  Q.  Were you supposed to wear the pins after working
5  hours?
6  A.  No.  I know that we were supposed to wear them
7  during working hours, but after hours, that was
8  probably at our discretion.
9  Q.  Okay.
10      - - - -
11 (Rady Exhibit No. 16 marked for identification.)
12      - - - -
13 BY MR. KNIGHT:
14 Q.  Exhibit 16, and this is entitled Plaintiff
15 Heather Rady's response to defendants' first
16 request for production of documents, and it's --
17 A.  Is this different from Exhibit 14?
18 Q.  This one is dated September 15th, 2008, so this
19 one is a later request.
20 A.  Okay.
21 Q.  Have you ever seen this document before?
22 A.  I have.
23 Q.  And were you asked to locate documents
24 responsive to these requests?
25 A.  Yes.

185

1  Q.  And did you search on your computer for
2  documents responsive to these requests?
3  A.  This time, no, I did not.  I felt that I had
4  done an exhaustive search previously.
5  Q.  Did you search anywhere else in response to the
6  document request?
7  A.  At my home, I couldn't find anything
8  additionally.  My attorneys have everything that
9  I found so far.
10 Q.  Okay.
11      - - - -
12 (Rady Exhibit No. 17 marked for identification.)
13      - - - -
14 BY MR. KNIGHT:
15 Q.  This is Exhibit 17, and these are your responses
16 to our, to defendants', first set of
17 interrogatories, and this is dated, also,
18 September of this year.
19 A.  Okay, yes.
20 Q.  Have you looked -- have you seen this document
21 before today?
22 A.  I have, yes.
23 Q.  And did you provide information to your counsel
24 in response to these requests?
25 A.  I did.

# EXHIBIT 87

1

1        UNITED STATES DISTRICT COURT

2      WESTERN DISTRICT OF PENNSYLVANIA

3

4    DEBORAH PRISE and HEATHER RADY

5    on behalf of themselves and all

6    employees similarly situated,

7              Plaintiffs,

8         vs.                    Case No. 06-1461

9                                Hon. Joy Flowers Conti

10   ALDERWOODS GROUP, INC.,

11             Defendant.

12   _____

13

14

15      The Deposition of JOHN SCHABLOSKI,

16      Taken at 630 East Chicago Street,

17      Coldwater, Michigan,

18      Commencing at 9:28 a.m.,

19      Friday, May 15, 2009,

20      Before Deana M. Van Dyke, CSR-3715.

21

22

23

24

25

**NETWORK DEPOSITION SERVICES**
**Transcript of John Schabloski**

10

1  statement that was allegedly made by Amanda Kirt in
2  the morning meeting?
3  A.  That it was mandatory that we get involved in a social
4  organization within the community if we wanted to
5  continue our employment there.
6  Q.  And you don't know when the statement was allegedly
7  made?
8  A.  I don't remember, I can't recall.
9  Q.  Do you recall it being made on more than one occasion?
10  A.  Yes.
11  Q.  When else do you recall it being made?
12  A.  Several weeks thereafter.
13  Q.  Can you give me a time period?
14  A.  I can't.
15  Q.  Other than your recollection that this statement was
16  repeated a few weeks later, do you recall it being
17  restated after that?
18  A.  No.
19  Q.  Who was in attendance at this morning meeting?
20  A.  All of the hourly employees that worked at the funeral
21  home.
22  Q.  When you say the funeral home --
23  A.  Covell Funeral Home.
24  Q.  What location?
25  A.  Traverse City.

11

1  Q.  And you discussed nothing else with Dennis Johnson
2  last night?
3  A.  Correct.
4  Q.  Did you speak with anyone else other than Dennis
5  Johnson outside of your counsel in preparation --
6  A.  No, I did not.
7  Q.  Did you review any documents in preparation for your
8  deposition today?
9  A.  No, I did not.
10  MS. GIFFORD:  We did review during our
11  session.
12  A.  Yes, yesterday, but last night on my own I did not
13  review any.
14  MS. GIFFORD:  I can represent that the
15  documents we reviewed were documents that had been
16  produced in discovery and primarily the documents that
17  were produced to us relevant to Mr. Schabloski.
18  BY MS. BRAUN:
19  Q.  When you say primarily, are there documents that you
20  have located and not produced in this litigation?
21  A.  No.
22  Q.  Have you located any documents to date responsive to
23  the requests that were made in this litigation?
24  A.  No.
25  Q.  Do you understand that you're obligated to look for

12

1  those documents?
2  A.  Yes.
3  Q.  What have you done to look for documents?
4  A.  Just look through my notes and looked through the
5  things that I accumulated through the years.
6  Q.  Do you have a computer?
7  A.  Yes.
8  Q.  Did you search your computer?
9  A.  Yes.  I have never done anything on my personal
10  computer with the funeral home or anything about the
11  funeral home.
12  Q.  You say you checked notes.  What are you talking
13  about?  Do you have a specific file related to your
14  employment at Alderwoods?
15  A.  No, but just -- I have just a gathering of things that
16  I've kept throughout the years.  I've looked through
17  that stuff and there isn't anything there that I have
18  found.
19  Q.  So your testimony is that you have no documents in
20  your possession --
21  A.  That's correct.
22  Q.  -- regarding your employment?  Remember we talked
23  about just let me go ahead and finish my question.
24  A.  Okay.
25  Q.  Otherwise the transcript will get muddled.

13

1  Your statement is that you have no
2  documents related to your employment at Alderwoods?
3  A.  That's correct.
4  Q.  Do you have any medical condition or are you taking
5  any type of medication that might interfere with your
6  responses to the --
7  A.  No.
8  Q.  -- questions I'll pose today?
9  When did you first become employed by
10  Alderwoods?
11  A.  I believe it was somewhere in the area of 2004.
12  Q.  And what interested you about becoming an employee of
13  Alderwoods, how did that come about?
14  A.  I made a telephone call through my employment search
15  to the Covell Funeral Home in Traverse City and just
16  basically asked if they were looking for a funeral
17  director and the answer was yes.
18  Q.  I'm going to hand you what will be marked as
19  Defendant's Exhibit 1.
20  MARKED FOR IDENTIFICATION:
21  DEPOSITION EXHIBIT 1
22  9:40 a.m.
23  BY MS. BRAUN:
24  Q.  Mr. Schabloski, can you take a look at Defendant's
25  Exhibit 1 and tell me if you recognize this document.

**NETWORK DEPOSITION SERVICES**
**Transcript of John Schabloski**

12 (Pages 42 to 45)

---

42

1   Q.   And you were never encouraged at any point to obtain
2        an insurance license?
3   A.   No.
4   Q.   And to your knowledge, was anyone else encouraged to
5        obtain an insurance license?
6   A.   No.
7   Q.   So there was no requirement as a funeral
8        director/embalmer to have an insurance license?
9   A.   That's correct.
10  Q.   You stated that you were -- I believe you stated this.
11       How were you compensated as an employee?
12  A.   Hourly.
13  Q.   For the entire period of your employment?
14  A.   Yes.
15  Q.   How did you report your hours worked?
16  A.   Through a time card, an electronic time machine.
17  Q.   Let me just try to understand.  When you say a time
18       card, are you talking about a paper sheet that you
19       completed?
20  A.   Cardboard that was inserted into a time clock.
21  Q.   So you had a cardboard sheet that you inserted into a
22       time clock?
23  A.   Yes.
24  Q.   And it punched it?
25  A.   Yes.

---

43

1   Q.   Was that time clock in place throughout your
2        employment with Alderwoods?
3   A.   Yes.
4   Q.   Other than using the time card and sliding it into the
5        time clock did you keep track of your hours worked in
6        any other manner?
7   A.   No.
8   Q.   When you were hired to work at Alderwoods at the
9        Covell Funeral Home did Amanda Kirt or anyone else
10       discuss with you how to use the time clock?
11  A.   Just general instruction in how to insert the card
12       when you came in and where to insert it when you left
13       employment, the workplace.
14  Q.   So the general instructions you say were insert it
15       when you arrived and then when you left; is that what
16       I heard you say?
17  A.   That's correct.
18  Q.   And is that what you did?
19  A.   Yes.
20  Q.   Did anyone instruct you that you were to record all of
21       your hours worked?
22  A.   No.
23  Q.   You recall the instruction being to use the time clock
24       when you arrived and when you left?
25  A.   That's correct.

---

44

1   Q.   Do you recall any other statement or instruction,
2        training being given to you as to recording your hours
3        worked when you became an employee?
4   A.   No.
5   Q.   I'm going to hand you what I will have marked as
6        Defendant's Exhibit 7.  This is Bates stamped 10816.
7             MARKED FOR IDENTIFICATION:
8             DEPOSITION EXHIBIT 7
9             10:38 a.m.
10  BY MS. BRAUN:
11  Q.   It's titled Acknowledgment of Receipt of Employee
12       Handbook at the top.  Mr. Schabloski, is this a
13       document that you recognize?
14  A.   Something similar to it, yes.
15  Q.   Is that your signature on this document?
16  A.   Yes, it is.
17  Q.   And it's dated 8-9-04; is that correct?
18  A.   That's correct.
19  Q.   Does that coincide with the beginning of your
20       employment with Alderwoods?
21  A.   Yes.
22  Q.   Do you recall signing this acknowledgment?
23  A.   I believe something like this, yes.
24  Q.   Were there policies or statements made within the
25       employee handbook?

---

45

1   A.   I don't recall any of them but I'm sure there was.
2   Q.   Okay.  Do you see where it mentions that there may be
3        additional policies in the first paragraph?
4   A.   Yes.
5   Q.   Do you recall at any point reviewing the employee
6        handbook?
7   A.   Yes, I did.
8   Q.   Do you recall reviewing any other policies, written
9        policies, during your employment at Alderwoods?
10  A.   Not that I can recall.
11  Q.   Do you recall that written policies were maintained at
12       your place of employment?
13            MS. GIFFORD: Objection.  Go ahead.
14  A.   Yes.
15  BY MS. BRAUN:
16  Q.   What do you recall?
17  A.   As far as like sick time.  There was a policy, a
18       written policy that everyone needed to take an hour
19       lunch and if you did not take the hour lunch an hour
20       would be deducted from your daily time.
21  Q.   What other policies do you recall?  Written policies
22       we're talking about.
23  A.   None.
24  Q.   Where were the written policies maintained?
25  A.   They were kept in the funeral director's office.

---

**Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg**
**866-565-1929**

**NETWORK DEPOSITION SERVICES**
**Transcript of John Schabloski**

46

1   Q.   Was that your office when you were funeral director?
2   A.   Yes, or work station.
3   Q.   Did you have an office or a work station?
4   A.   A work station that had three desks in there.  I guess
5        to clarify, it would be a work station.
6   Q.   If I'm understanding you, the written policies were
7        maintained at the work station where you worked?
8   A.   Correct.
9   Q.   Do you recall reviewing the written policies at any
10       point?
11  A.   Not really, no.
12  Q.   You wouldn't have had any occasion to do that?
13  A.   No.
14  Q.   As the location manager you didn't have any reason to
15       review the written policies?
16  A.   No.
17  Q.   Do you recall any written policies other than the two
18       that you just named, one regarding sick time and the
19       other regarding lunch breaks?
20  A.   I believe there was one as far as vacation time and
21       supplemented down as to the years of employment as to
22       how many weeks you received.  There was a section in
23       there on if there was a death of a spouse or child how
24       many days you received off for a family death.
25  Q.   Bereavement policy?

47

1   A.   A bereavement policy, correct.
2   Q.   Any others that you can recall?
3   A.   Not that I can remember.
4   Q.   To what location did you understand -- the policies
5        that we just discussed, to what location did you
6        understand those to apply?
7   A.   To Covell Funeral Home and the two additional branches
8        that we had.
9   Q.   So to Traverse City, to Elk Rapids, and what was the
10       other one?
11  A.   Kingsley.
12  Q.   Your understanding that these policies related to
13       those three locations, what do you base that
14       understanding on?
15  A.   That that was company policy.
16  Q.   I'm going to hand you a document that will be marked
17       as Defendant's Exhibit 8.  This is Bates labeled
18       000001.
19            MARKED FOR IDENTIFICATION:
20            DEPOSITION EXHIBIT 8
21            10:44 a.m.
22  BY MS. BRAUN:
23  Q.   It states Funeral Home Procedures at the top.  It's a
24       2004 document you see at the bottom.  Is this a policy
25       that you now recall having reviewed during your

48

1        employment?
2            MS. GIFFORD:  Just for the record, I would
3        note that this document appeared to be part of a
4        larger document and portions are redacted so the
5        appearance may be different.
6   A.   I don't -- I don't recall seeing something like this.
7   BY MS. BRAUN:
8   Q.   Do you see where it's a policy regarding recording
9        time worked; do you see that?
10  A.   Yes, I do.
11  Q.   So your testimony is that you're not aware that
12       Alderwoods had a written policy addressing recording
13       time worked?
14  A.   That's correct.
15  Q.   Regardless of whether you've seen this policy, the
16       first bullet, if you look at that, states, all
17       employees must record all hours actually worked unless
18       exempt from timekeeping requirements.  Do you see that
19       first bullet?
20  A.   Yes.
21  Q.   Was that your understanding of how you were to keep
22       track of your time as an employee of Alderwoods?
23  A.   Yes.
24  Q.   And did you do that?
25  A.   No.

49

1   Q.   Why did you not keep track of all hours actually
2        worked as you were to do under this policy?
3   A.   We were instructed that we could not have any overtime
4        hours unless they were authorized by the location
5        manager, which was Amanda Kirt.
6   Q.   So how did that relate to how you kept track of your
7        time?
8   A.   Well, you punched in during your regular work schedule
9        and you weren't allowed to punch in anything other
10       than that.
11  Q.   And why do you say that?
12  A.   Because that's what was told to us.
13  Q.   Who told you that?
14  A.   Amanda Kirt.
15  Q.   What was the statement that Amanda Kirt made?
16  A.   That she could not incur any overtime hours unless
17       they were authorized by her.
18  Q.   And when did she say this?
19  A.   Shortly after I was an employee of Covell Funeral
20       Home.
21  Q.   When you say shortly after, do you mean within a
22       couple of months, a couple of weeks?
23  A.   A couple of months after August 7, 2004.
24  Q.   A couple months after that?
25  A.   Yes.

**NETWORK DEPOSITION SERVICES**
**Transcript of John Schabloski**

54

1    document?
2    A.  That's correct.
3    Q.  Do you recall completing this document?
4    A.  Not really.
5    Q.  Is this your handwriting completing the document
6        filling in the blanks?
7    A.  Yes, it is.
8    Q.  Does this document provide to you a number that you
9        could call if you had questions?
10   A.  Yes.
11   Q.  It's a hot line number?
12   A.  Yes.
13   Q.  And did you understand that you could make that call
14       anonymously?
15   A.  Yes.
16   Q.  Did you ever call the hot line to ask about any
17       question at all regarding your employment?
18   A.  No.
19   Q.  But you knew that option was available to you?
20   A.  Yes.
21   Q.  Your statement is that you did not always record the
22       hours that you worked; is that correct?
23   A.  That's correct.
24   Q.  And instances in which you did not record the hours
25       worked could have been instances when you worked

56

1    A.  That's correct.
2    Q.  You didn't keep an independent personal record of the
3        hours you worked?
4    A.  No, I did not.
5    Q.  Did you ever look at another employee's time card
6        while you were employed at Alderwoods?
7    A.  Did I ever look at one?
8    Q.  Yes.
9    A.  Probably.  I don't recall but I'm sure I probably did.
10   Q.  Why would you have done that?
11   A.  Because the person showed it to me.
12   Q.  Why would someone show you their time card?
13   A.  Just for the fact of this is how many hours I've
14       worked this week.
15   Q.  Why would someone tell you how many hours they've
16       worked in a week?
17   A.  Just in conversation.
18   Q.  How would that come up in conversation?
19   A.  I can recall a situation with Jennifer that she had
20       approved overtime and she says, oh, boy, look at this,
21       I got a lot of overtime this week.  It was just in
22       general conversation.
23   Q.  She was showing you that she had been approved for
24       overtime and --
25   A.  Correct.

55

1    beyond your scheduled hours; is that correct?
2    A.  That's correct.
3    Q.  Is there some other instance that you would have not
4        recorded your hours worked?
5    A.  Like going to meetings, meetings outside of the
6        workplace.
7    Q.  Can you explain what you're referring to?
8    A.  Like church activities, social clubs like Chamber of
9        Commerce, Rotary, Lions Club.  These were things that
10       were required for us to attend and participate in to
11       fulfill the requirements of employment.
12   Q.  And why would you make a statement like that?
13   A.  Because Amanda Kirt requested that each and every one
14       of us be involved in community activities such as
15       church and social clubs like I named to keep our
16       employment with the funeral home.
17   Q.  Okay.  So you're saying you did not record your time
18       that you spent in church activities, in social clubs
19       such as Rotary and Lions Club?
20   A.  That's correct.
21   Q.  Are there other times that you did not record them
22       other than what we've discussed?
23   A.  No.
24   Q.  You testified previously that you did not keep a
25       record of the hours that you worked?

57

1    Q.  -- she had worked whatever number of hours that was in
2        the week?
3    A.  That's right.
4    Q.  Other than this occasion when you looked at Jennifer's
5        timecard would you have reason to review other
6        employee's timecards?
7    A.  No.
8    Q.  So would you have any knowledge as to what employees
9        recorded on their timecards?
10   A.  No.
11   Q.  You said you didn't have contact with individuals
12       outside the Covell Funeral Home locations; is that
13       correct?
14   A.  That's correct.
15   Q.  So you, therefore, could not have any knowledge as to
16       how employees outside Covell Funeral Homes recorded
17       their time or what they chose to record?
18   A.  That's right.
19   Q.  And you wouldn't know -- you couldn't know what their
20       managers told them about how to record their time?
21   A.  No.
22   Q.  You would not know?
23   A.  No, I would not know.
24   Q.  The timecards that you put into the time clock, did
25       you sign those as well?

**NETWORK DEPOSITION SERVICES**
**Transcript of John Schabloski**

16 (Pages 58 to 61)

**58**

1  A. Yes.
2  Q. Why did you do that?
3  A. It was a requirement of being paid.
4  Q. Did you understand the purpose for why you were asked
5     to sign the timecard?
6        MS. GIFFORD: Objection.
7     A. That that was really your timecard.
8  BY MS. BRAUN:
9  Q. Did you understand that it was -- that you were
10    signing it to verify the accuracy of the timecards?
11 A. No.
12 Q. You didn't have that understanding?
13 A. No.
14 Q. Where were the timecards maintained in the funeral
15    home?
16 A. Out in the garage area.
17 Q. Were they by the time clock?
18 A. Yes.
19 Q. And that's where they were maintained during the week?
20 A. Yes.
21 Q. Were they collected at the end of the week?
22 A. Yes.
23 Q. Who did that?
24 A. The office administrator, Diane.
25 Q. For the time that you did record on the timecards with

**59**

1     the time clock, do you believe you were paid for that
2     time?
3  A. Yes, to the best of my knowledge.
4  Q. There's no reason for you to doubt that you were paid
5     for the time you recorded on your timecard?
6  A. I never kept track of it separately, so I would assume
7     that I was paid for what was on the timecard.
8  Q. Did Amanda ever say to you that you had incorrectly
9     completed your timecard?
10 A. Yes.
11 Q. On what occasion would she have said that?
12 A. Where I worked a -- after my regular shift I put down
13    that I worked a visitation and she says, that's really
14    hard for me to believe that you worked all those
15    hours.
16 Q. What happened from then?
17 A. So she adjusted the time and paid me -- I don't really
18    remember the instance but just, say, for example,
19    there were four additional hours, she paid me for like
20    two of them. She made that adjustment on her own
21    being.
22 Q. Was there any other occasion when you were told by
23    Amanda -- just for clarification, she was the only
24    member of management that you say that you had
25    communications with during your employment, correct?

**60**

1  A. That's correct.
2  Q. Is there any other occasion that Amanda said that
3     you've incorrectly completed your timecard?
4  A. I think there were a couple times.
5  Q. Do you remember the specifics around any of the other
6     occasions?
7  A. I don't really.
8  Q. On this occasion regarding the visitation you stated
9     that you worked the visitation. Would that have been
10    in the evening?
11 A. Yes.
12 Q. So you're saying that you worked that beyond -- did
13    you state that you worked beyond your schedule?
14 A. That's correct.
15 Q. And you recorded that time?
16 A. That's correct.
17 Q. And you were paid for a portion of that time?
18 A. That's correct.
19 Q. Did you have pre-approval from Amanda to work the
20    visitation?
21 A. No.
22 Q. Do you recall when this was?
23 A. I don't.
24 Q. Would it have been early on in your employment, later,
25    or in the middle?

**61**

1  A. Early on.
2  Q. During this occasion was there any statement made to
3     you that you needed to have approval to work the
4     visitation?
5  A. Yes.
6  Q. What did she say about that?
7  A. That she just cannot put additional hours on your
8     timecard, that it has to be pre-approved.
9  Q. But in this case you did not have pre-approval?
10 A. That's correct.
11 Q. You were paid for a portion of that time?
12 A. That's correct.
13 Q. You've mentioned scheduled hours. Did you have an
14    understanding -- I mean, what was your understanding
15    of scheduled hours while you were an Alderwoods
16    employee?
17 A. It was like an 8:00 to 5:00 typical schedule. Then as
18    far as being on call at night it was a rotation
19    amongst the three of us, so it would be every third
20    night and then you worked every third weekend.
21 Q. When you mentioned on call you said it was a rotation
22    amongst three of you and you're referring to the other
23    funeral directors?
24 A. That's correct.
25 Q. Just so we can refresh, that's Ron and Jennifer and

**NETWORK DEPOSITION SERVICES**
**Transcript of John Schabloski**

31 (Pages 118 to 121)

---

118

1  an employee of Alderwoods?
2  A.  I probably wouldn't have.
3  Q.  But you had been a member previously?
4  A.  Correct.  But, again, the only reason that I joined
5     Kiwanis, Rotary, and the Chamber of Commerce was it
6     was a requirement to be involved with a community
7     affair and I didn't have -- I didn't have a whole
8     spectrum of community involvement things that I could
9     pick and choose from so I chose these.
10 Q.  What do you mean that you didn't have a whole spectrum
11    of things to choose from?
12 A.  How many more things would there be to pick from?  I
13    mean, remember I was one of three people and the other
14    two were involved in things in the community too and
15    you couldn't duplicate the same thing.
16 Q.  Why do you say you couldn't duplicate the same thing?
17 A.  Because that was by the standards that Amanda Kirt
18    told us that we couldn't duplicate organizations.  If
19    one was in it, then that's all that needed to be.
20 Q.  List off for a moment specifically about what you
21    allege Amanda Kirt to have said regarding community
22    service.  You originally testified that you heard that
23    you should -- you heard something about community
24    service involvement during a morning meeting; is that
25    correct?

---

119

1  A.  That's correct.
2  Q.  Was that the first time you heard anything about
3     community service with respect to your employment with
4     Alderwoods?
5  A.  Yes.
6  Q.  When do you recall that morning meeting taking place,
7     when was it in your employment?
8  A.  A little after when I joined them, probably late 2004.
9  Q.  So November, December 2004?
10 A.  Yeah, something like that.
11 Q.  Tell me specifically what she said and who was there.
12    Let's start with what she said.
13 A.  That each one of us needed to find at least one thing,
14    if not more, two or three things that we could get
15    involved in in the community.  She named different
16    things like you could get involved in a church, you
17    could get involved in volunteering at the hospital,
18    you could get involved in Rotary, Kiwanis.  One of my
19    fellow workers was involved in the Antique Car Club.
20    You had to be involved in something where you got
21    recognition and exposure to the community.
22 Q.  What do you mean by recognition?
23 A.  Well, that you could do a project and either get an
24    award or a picture in the newspaper or be recognized
25    that --

---

120

1  (Door interruption.)
2  MS. BRAUN:  Let's go off the record.
3  (Off the record at 1:30 p.m.)
4  (Back on the record at 1:35 p.m.)
5  BY MS. BRAUN:
6  Q.  Mr. Schabloski, we are back on the record.
7  A.  Okay.
8  Q.  We were talking about a meeting in late 2004.  I
9     believe you said it was a morning meeting, is that
10    correct, where Amanda Kirt spoke about community
11    service?
12 A.  Yes.
13 Q.  Was that the first time that you heard Amanda Kirt or
14    any member of management speak about community service
15    in relation to your employment at Alderwoods?
16 A.  Yes.
17 Q.  So prior to that you hadn't heard anything about
18    community service?
19 A.  No, I hadn't been there.  That's right, that's the
20    first time I heard it.
21 Q.  I mean, just to be clear, you were hired in August of
22    2004, correct?
23 A.  Correct.
24 Q.  But the first time you heard about a statement with
25    respect to community work or social clubs, was the

---

121

1  word you used, was in late 2004, probably November or
2  December, correct?
3  A.  That's correct.
4  Q.  Did you understand this, therefore, to be something
5     new?
6  A.  I don't know because I was new to the organization.  I
7     kind of assumed that it was new.  I mean, she brought
8     it up.
9  Q.  Because you had been working there for at least three
10    months at that point?
11 A.  Right, right.  Yes, it was something new.
12 Q.  I want to be clear on this because you've used a
13    different -- I've heard you use a couple different
14    terms.  I heard you say that Amanda said in the
15    morning meeting that everyone needed to find an
16    organization and then I've also heard you testify
17    today that you were requested to join an organization,
18    so what were you told?
19 A.  That we were -- we absolutely needed to find one.  We
20    were requested, it was mandatory.
21 Q.  Wasn't it a requirement?
22 A.  Yes, to work there.
23 Q.  Why do you say that it was a requirement to work
24    there?
25 A.  She said it was.  Because we had a fellow employee,

---

**NETWORK DEPOSITION SERVICES**
**Transcript of John Schabloski**

32 (Pages 122 to 125)

122

1    Dennis Johnson, said to her, there's nothing I can
2    find to join and she says you need to absolutely find
3    something, it's required of you to be at least
4    involved in one thing if you want to continue working
5    here, otherwise you will be terminated.
6    Q.  And this is the Dennis Johnson that you spoke to last
7        night prior to your deposition?
8    A.  Yes.
9    Q.  He was a part-time maintenance employee?
10   A.  Yes.
11   Q.  When do you recall Dennis Johnson -- did Dennis
12       Johnson make the statement that he couldn't find any
13       community service activity, did he make that in your
14       presence?
15   A.  Yes.
16   Q.  Was that also in the presence of others?
17   A.  Yes.
18   Q.  When was that?
19   A.  I would say some time late in 2004 after she made the
20       first announcement.
21   Q.  So there was a period of time at least that Dennis was
22       saying that he was -- had not been a member of any
23       organization between the time Amanda announced this
24       and when he brought it up?
25   A.  I would say probably a week between those two events.

123

1    Q.  Is it your testimony that he was threatened with
2        termination if he did not find a community service
3        activity?
4    A.  Yes.
5    Q.  Did Amanda Kirt say anything specifically to you about
6        any adverse consequences if you did not become
7        involved in a community activity?
8    A.  She just said to me, you're going to need to at least
9        find a couple things to do.
10   Q.  Or what?
11   A.  Well, it was previously explained what was going to
12       happen. She didn't repeat herself specifically to me.
13       That's when shortly thereafter I joined Kiwanis and
14       Rotary and the Chamber of Commerce to satisfy that
15       requirement.
16   Q.  Do you know if other employees at Covell Funeral Home
17       had been involved with community service organizations
18       prior to this statement that Amanda allegedly made?
19   A.  I don't know.
20   Q.  You don't know if they were previously involved?
21   A.  I don't know.
22   Q.  Do you know if Dennis Johnson became involved in a
23       community organization after he said he couldn't find
24       anything to become involved in?
25   A.  I believe he did. I don't know what it was. I don't

124

1    remember.
2    Q.  You say you believe he did but you don't know?
3    A.  Yes.
4    Q.  You don't know?
5    A.  I don't know.
6    Q.  Is it your understanding that Amanda's statement was
7        made to all Covell Funeral Home employees or was it
8        directed to a particular subset of employees?
9    A.  No, it was made to everybody.
10   Q.  Including the part-time employees?
11   A.  Yes.
12   Q.  Do you know what community service organizations the
13       employees at Covell Funeral Home were involved in?
14   A.  No, I don't.
15   Q.  So, for example, you do not know what organizations
16       Ron Colgran would have been involved in?
17   A.  No, I do not.
18   Q.  Do you know for certain whether he was involved with a
19       community service organization?
20   A.  I don't know.
21   Q.  Do you know what community service organization
22       Jennifer Holihan was involved in?
23   A.  No.
24   Q.  Do you know for a fact that she was involved with any?
25   A.  No.

125

1    Q.  With respect to Diane, the location administrator, do
2        you know what community service activities she was
3        involved with?
4    A.  No.
5    Q.  Do you know for a fact whether she was involved with
6        any?
7    A.  No.
8    Q.  Was anyone terminated during the course of your
9        employment on the basis of not being involved in
10       community service activities?
11   A.  No.
12   Q.  Was anyone disciplined at Covell Funeral Home during
13       the course of your employment for not being involved
14       in community service activities?
15       MS. GIFFORD: Objection.
16   A.  Not that I know of.
17   BY MS. BRAUN:
18   Q.  What did you understand the specific requirements to
19       be? You stated that Amanda said that you need to
20       become involved in a couple of things. What did you
21       take that to mean?
22   A.  Two or three different organizations.
23   Q.  That was your interpretation of what she said?
24   A.  Yes.
25   Q.  Do you know what employees outside of Covell Funeral

**NETWORK DEPOSITION SERVICES**
**Transcript of John Schabloski**

33 (Pages 126 to 129)

126

1    Home were told about community service activities?
2    A. No, I do not.
3    Q. Do you know if they were told that they were required
4       to belong to community service organizations?
5    A. I don't have any idea.
6    Q. Do you know if they reported time related to their
7       participation in any community service organizations?
8    A. I don't know. I don't know anybody outside of the
9       people that I worked with at Covell.
10   Q. Did Amanda Kirt ever tell you that you would not be
11      paid for your time spent in a community service
12      organization?
13   A. No.
14   Q. Did you ever seek compensation for your time that you
15      spent involved in the community service organizations?
16   A. Not specifically because I didn't know how to go about
17      logging it down. I assumed that I was going to get
18      paid for it or I was led to believe that I was going
19      to get paid for it.
20   Q. How were you led to believe that you would be paid for
21      it?
22   A. By her asking me to pick an organization and belong to
23      it, be involved in it, and by the funeral home paying
24      for the dues.
25   Q. In which organizations did the funeral home pay for

127

1    the dues?
2    A. All of them. Kiwanis, Rotary, and Chamber of
3       Commerce.
4    Q. Did you ask for the funeral home to pay for your dues?
5    A. No.
6    Q. How did you go about getting paid for that?
7    A. Amanda said to me, she says, when you get a dues
8       statement for these organizations be sure to bring
9       them in and I'll approve it and we'll pay it for you.
10      So I was just led to believe that I was going to be
11      paid for the time that I contributed to these
12      organizations since it was business related.
13   Q. Did Amanda ever attend a Kiwanis Club meeting with
14      you?
15   A. No.
16   Q. Did she ever attend a Chamber of Commerce meeting with
17      you?
18   A. Yes.
19   Q. How many times?
20   A. Three or four.
21   Q. Did she ever attend a Rotary Club meeting with you?
22   A. No.
23   Q. Did she ever attend a Kiwanis Club meeting with you?
24   A. No.
25   Q. Did she ever attend church with you?

128

1    A. No.
2    Q. And you kept no record of the number of hours you
3       spent involved with the community organizations?
4    A. No.
5    Q. And you never reported to Amanda the number of hours
6       you worked in these community organizations during
7       your employment?
8    A. No.
9    Q. Then how could she have known the number of hours you
10      worked?
11   A. I don't know.
12   Q. How can you know today if you didn't get a record of
13      how many hours you spent involved in those
14      organizations?
15   A. I can remember how long the meetings were.
16   Q. But you don't know for sure what ones you attended?
17      MS. GIFFORD: Objection.
18   A. I know that I -- out of the year's time I attended,
19      like I stated to you before, maybe eight or ten of
20      them. The majority of them I attended, yes.
21   BY MS. BRAUN:
22   Q. But you have no record of which ones you --
23   A. I don't have a piece of paper documenting the dates
24      down that I did, no, I do not.
25   Q. When Amanda made the statement regarding community

129

1    service or community service involvement, did she tell
2    you that she expected you to use your membership to
3    generate business for the funeral home?
4    A. That was implied, yes.
5    Q. Did she affirmatively state that you needed to use
6       your membership in the organizations to generate
7       business for the funeral home?
8    A. Yes. She stated that we needed to get our name out
9       and to let people know who was at Covell Funeral Home,
10      yes.
11   Q. That was your interpretation of her statement?
12   A. Yes.
13      MS. GIFFORD: Objection.
14   BY MS. BRAUN:
15   Q. And what specifically did you understand that you were
16      required to do to generate business if that was your
17      understanding?
18   A. To join these social memberships and to attend their
19      functions.
20   Q. Anything else?
21   A. And to be involved in the organization. I mean, to
22      get known in the organization.
23   Q. And to get known in the organization what would you
24      do?
25   A. Would be through attending meetings and being in

**NETWORK DEPOSITION SERVICES**
**Transcript of John Schabloski**

134

1  BY MS. BRAUN:
2  Q.  You said you didn't complain when you realized you
3      hadn't been paid for the community service activities.
4      Why not?
5  A.  I was just led to believe that I was getting paid for
6      it and I just -- I didn't. I didn't know who to
7      complain to.
8  Q.  If I can direct your attention to a previous exhibit, i
9      believe it's Defendant's Exhibit 9, the Code of
10     Business Conduct and Ethics, does this document not
11     give you a specific hot line number to call?
12 A.  Yes, it does.
13 Q.  But you did not call this number?
14 A.  No, I did not.
15 Q.  We previously discussed on call work that you
16     performed.
17 A.  Uh-huh.
18 Q.  Did you ever see anything in writing regarding
19     compensation for work that would -- that was performed
20     on call?
21 A.  No.
22 Q.  How did it come about your understanding that you
23     previously testified to that you would go to the
24     Traverse City location and clock in when you began
25     your on call work and clock out at the end of it? How

135

1      did you come to that understanding that that was what
2      you were supposed to do?
3  A.  I was told when I began there that that was the
4      policy, that that's how you had to -- that's how you
5      needed to do it to get paid.
6  Q.  And who told you that, do you recall?
7  A.  I don't recall.
8  Q.  Would it have been Amanda?
9  A.  It could have been. It could have been a fellow
10     employee, I don't remember.
11 Q.  And they told you to get paid for on call work you
12     should?
13 A.  Clock in and clock out at Traverse City.
14 Q.  And that's what you did throughout your course of
15     employment?
16 A.  Yes.
17 Q.  Is there any occasion when you did not clock in or
18     clock out for your on call work while you were an
19     employee of Alderwoods?
20     MS. GIFFORD:  Objection.
21 A.  Yes, if I forgot.
22 Q.  BY MS. BRAUN:
23 Q.  Excuse me. You previously testified that there may
24     have been an occasion when you forget to punch either
25     in or out?

136

1  A.  Right.
2  Q.  Are you saying now that there was occasion when you
3      entirely forgot to clock in and out?
4  A.  No.
5  Q.  Is there some time that you spent on call working that
6      you believe you were not compensated for?
7  A.  Yes.
8  Q.  What would that be?
9  A.  Telephone calls, taking care of answering families'
10     questions in regards to funeral arrangements, picking
11     up floral arrangements left over from a funeral either
12     the day before or prior that day.
13 Q.  Anything else?
14 A.  No, I think that pretty much does it.
15 Q.  Regarding the telephone calls, where would you be
16     taking those telephone calls? Where were you when you
17     were taking the telephone calls?
18 A.  At the funeral home in Elk Rapids where I lived.
19 Q.  What would be the circumstance under which you would
20     have to answer a phone call while on call at your Elk
21     Rapids residence?
22 A.  All the telephones were diverted to the person that
23     was on call so you were answering three funeral home
24     telephone lines.
25 Q.  Was there an answering service?

137

1  A.  Yes.
2  Q.  So how did that work?
3  A.  We were only allowed to use that when we were away
4      from our telephones. Like if you went out in the
5      middle of the night and made a removal you'd put the
6      phones on the answering service because you were not
7      available to answer them yourself. But when you were
8      home by the phone you were required to answer the
9      telephone. The nights you were on call you could not
10     just put the telephone lines on the answering service.
11     The answering service was only used in emergency
12     situations when you were away from the building.
13 Q.  So the telephone calls you would receive while at your
14     residence --
15 A.  They could be from a family, it could be from a
16     nursing home, it could be from a hospital. It could
17     be from a family member inquiring about a service time
18     or arrangement. It could be from a newspaper company
19     trying to -- if they found any mistakes with an
20     obituary or they were trying to verify that person
21     really was deceased. We from time to time would get
22     calls from the Red Cross or the Army, Navy, that one
23     of their loved ones was across seas when mom or dad
24     passes away so they did come home. It was a variety
25     of phone calls that you'd get.

**NETWORK DEPOSITION SERVICES**
**Transcript of John Schabloski**

138

1  Q.  And you did not record the time you spent on the
2     phone?
3  A.  No.
4  Q.  Did someone tell you not to record the time you spent
5     on the phone?
6  A.  No.
7  Q.  But in the same breath they didn't tell you to record
8     it either but your previous testimony is that you
9     understood that you should clock in for the time you
10    spent working on call, correct?
11 A.  That's right.  But how was I going to do that 15 miles
12    away when the phone was ringing or someone banging on
13    my front door?
14 Q.  Did you ever ask for clarification as to what you
15    should do about the time you spent answering a
16    telephone call or while on a call?
17 A.  No.
18 Q.  You never asked for clarification?
19 A.  No.
20 Q.  Did you ever discuss with another employee what they
21    did regarding the time they spent answering telephone
22    calls while on call?
23 A.  No.
24 Q.  So you have no knowledge as to whether another
25    employee working on call would have recorded that

139

1     time?
2  A.  I don't know.
3  Q.  Or whether they would have been asked to be paid for
4     that?
5  A.  I don't know.
6  Q.  Or whether they were, indeed, paid for that time?
7  A.  I don't know.
8  Q.  If you didn't keep track of the time how do you know
9     how much time you spent answering calls like that
10    today?
11    MS. GIFFORD:  Objection.
12 A.  I just took an estimate of what I can recall.
13 BY MS. BRAUN:
14 Q.  And what is it that you can recall about the time you
15    spent answering the phones on call that you did not
16    report?
17 A.  I don't remember what I came up with.
18 Q.  My question is, sitting here independent of whatever
19    other figure you may have come up with, just sitting
20    here right now what would you base that on?
21 A.  I would say maybe two, three, four hours a month.
22 Q.  And why do you say that?  How do you come up with that
23    estimate is what I'm asking.
24 A.  Okay.  It would be -- you figure that you're on call
25    one night out of three.  Every third night you're on

140

1     call and you usually always got at least two or three
2     phone calls a night when you were on call.  If you
3     were on call a weekend you could get a dozen phone
4     calls.  Again, you were answering the telephone for
5     three separate chapels.
6  Q.  How long would the telephone calls last; do you have
7     any recollection of that today?
8  A.  Well, it all depends on who was calling.  I mean, if
9     you had a newspaper on the phone you could easily talk
10    to them ten, 15 minutes.  If you had a family member
11    on the phone you could talk to them a half an hour.
12    It all depends what the situation was.
13 Q.  But sitting here today we don't know what the
14    situation was whether you had X number of calls from a
15    hospital or X number of calls from a newspaper or X
16    number of calls --
17 A.  It all depends.  I mean, a lot of the conversations
18    can be answered with a yes or no or it needs to go
19    into further detail.
20 Q.  So your testimony is that there was range of types of
21    people who could call you and depending on who called
22    you the telephone conversation could last ten minutes
23    to what?
24 A.  A half an hour, 45 minutes.
25 Q.  Did some conversations last less than ten minutes?

141

1  A.  Yes.
2  Q.  So is there any way at this point of knowing how many
3     conversations lasted less than ten minutes, how many
4     lasted between ten and 15, how many --
5  A.  Probably not.
6  Q.  You also mentioned answering questions while you were
7     on call.  Is that part of the telephone calls that we
8     just discussed or is that something separate?
9  A.  That's part of the telephone calls we discussed.
10 Q.  So the other example of time spent on call for which
11    you did not record time other than telephone calls was
12    picking up floral arrangements; is that correct?
13 A.  Yes.
14 Q.  What would be the circumstances under which you would
15    pick up a floral arrangement but not record your time
16    while on call?
17 A.  Like a situation where a family in most of our cases
18    they would take cut flowers to the cemetery, they
19    would leave the pot and plants back at the funeral
20    home.  A lot of families would come back after they
21    had their dinner or their reception at a restaurant
22    and pick them up.  A lot of times it was after 5:00,
23    6:00 at night before they'd come back to the funeral
24    home.  They usually were on their way back to the
25    home.  They would stop and you'd help them load these

# EXHIBIT 88

```
 1              THE UNITED STATES DISTRICT COURT

 2          FOR THE WESTERN DISTRICT OF PENNSYLVANIA

 3

 4    DEBORAH PRISE and HEATHER RADY   )
      on behalf of themselves and all )
 5    employees similarly situated,    )
                                       )
 6              Plaintiffs,            )
                                       )
 7        vs.                          )  Civil Action No. 06-1641
                                       )
 8    ALDERWOODS GROUP, INC.,          )
                                       )
 9              Defendant.             )
                                       )
10    _____ )

11

12

13

14              Deposition of STEPHEN TAKESIAN,

15              taken at 101 North First Avenue,

16              Phoenix, Arizona, commencing at

17              9:42 a.m., Thursday, April 30,

18              2009, before Shannon Stevenson,

19              RPR, Arizona CSR No. 50461

20

21

22

23

24

25
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Stephen Takesian**

5 (Pages 14 to 17)

---

14

1   Q     Do you know who did that?
2   A     No.
3   Q     Did you receive a copy of this document which
4   you could sign and then return it to your attorneys?
5   A     Yes.
6         MS. DOUGLASS:  Objection.  Form.
7   Q     BY MR. DANIELS:  Was this document mailed to
8   you in some form, if you know?
9   A     I don't recall.
10  Q     Okay.  What I'm getting at here is when you
11  received it, was the printing in the upper portion that we
12  just talked about that you said was not yours, was that
13  already completed when you received it and before you signed
14  it?
15        MS. DOUGLASS:  Objection to form.
16        THE WITNESS:  Yes.
17  Q     BY MR. DANIELS:  Those are those objections
18  that your attorney is preserving for the record and it's a
19  little confusing and I appreciate that, but she's just doing
20  her job, I assure you.
21        The section down below the social security
22  number it says dates of your employment with Alderwoods
23  Group September 2005 through December of 2006; correct?
24  A     That is correct.
25  Q     Were those your dates of employment?

---

15

1   A     Yes.
2   Q     So for purposes of today most of my questions
3   will be geared towards that time frame, September 2005
4   through December of 2006.  Fair enough?
5   A     That would be fine.
6   Q     And the next line says, "positions you've
7   held with Alderwoods and dates each position was held."  And
8   it says "family service counselor, assistant funeral
9   director."  Correct?
10  A     That's what the paper says, correct.
11  Q     Is that a correct statement?
12  A     No, it is not.
13  Q     What was your position then?
14  A     I was family service counselor.
15  Q     And never did you do any assistant funeral
16  director work?
17        MS. DOUGLASS:  Objection to form.
18  Q     BY MR. DANIELS:  Is that a correct statement?
19  A     No.
20  Q     Did you do some funeral director work?
21  A     Yes.
22  Q     Let me see if I can clear that up a little
23  bit.
24        Although you were not given the official
25  title of assistant funeral director, you wore many hats and

---

16

1   that would include some of those job responsibilities?
2         MS. DOUGLASS:  Objection to form.
3         THE WITNESS:  Yes.
4   Q     BY MR. DANIELS:  What were the job duties
5   and/or responsibilities of a family service counselor while
6   you were employed?
7   A     To take incoming first calls, death calls and
8   meet with the family regarding cemetery property along with
9   the funeral director.
10  Q     And it says the location you worked at was
11  Phoenix Memorial Park and Mortuary; is that a correct
12  statement?
13  A     It is.
14  Q     I may use the acronym just referring to it as
15  Phoenix Memorial Park.
16  A     That would be fine.
17  Q     Were you ever employed at any other
18  Alderwoods' affiliated location?
19  A     No.
20  Q     Are you a -- do you hold any licenses in the
21  funeral and/or cemetery industry?
22  A     The only license I hold is a real estate
23  license held probably.  I don't think I have it anymore.
24  Q     Was that here in the state of Arizona?
25  A     Correct.

---

17

1   Q     It has just lapsed or in pending status?
2   A     I believe it's probably lapsed.
3   Q     What years did you hold that?
4   A     Just that year.
5   Q     2005, 2006?
6   A     Correct.
7   Q     Was that a required license to be held while
8   working at Phoenix Memorial Park?
9   A     Yes.  It's a state law you have to have a
10  real estate license to sell funeral property.
11  Q     I see.  So in other words, when you are
12  selling cemetery, it was a requirement in the state of
13  Arizona that you be a licensed real estate broker -- or,
14  agent, excuse me?
15  A     Not in the sense of a real estate agent.  It
16  was more of a real estate funeral or cemetery license.  It
17  was a different license, different test.
18  Q     Did you hold an insurance license?
19  A     No.
20  Q     Did you sell any insurance product?
21  A     No.
22  Q     You said you worked incoming first calls and
23  death calls.  That would suggest to me that you sold and/or
24  serviced primarily at-need families; is that correct?
25  A     Correct.

---

| 122 | 124 |
|---|---|
| 1      Was that your understanding of the policy at | 1   thing was basically for people that sat on the cans and |
| 2   Phoenix Memorial Park? | 2   didn't work.  And the hourly people wouldn't last. |
| 3      MS. DOUGLASS: Objection. | 3      Q   Okay.  I think I understand what you are |
| 4      THE WITNESS: Yes. | 4   saying.  There are good salespersons and persons who just |
| 5      Q   BY MR. DANIELS: Was that a company-wide | 5   put their time -- |
| 6   policy, if you know? | 6      A   It's the 80/20. |
| 7      MS. DOUGLASS: Objection. | 7      Q   80 percent of the work is done by the |
| 8      THE WITNESS: I don't know.  I don't recall. | 8   20 percent?  Shaking your head yes? |
| 9      Q   BY MR. DANIELS: Okay.  Let's skip down to | 9      A   Yes. |
| 10   Policy E, recording of hours.  Do you see that? | 10      Q   And I truly appreciate that. |
| 11      A   Yes. | 11      If there were the folks who were not carrying |
| 12      Q   Was it your understanding that the policy at | 12   their weight, so to speak, the 80 percent that did not work, |
| 13   Phoenix Memorial Park was that all non-employees were | 13   they were paid an hourly rate.  Is that what you are saying? |
| 14   required to record all hours worked each day? | 14      A   Correct. |
| 15      MS. DOUGLASS: Objection. | 15      Q   But those that worked hard and earned enough |
| 16      THE WITNESS: I don't have a clue. | 16   commissions, they were paid, what you described earlier, |
| 17      Q   BY MR. DANIELS: Was that a company-wide | 17   hourly rate and/or commission; correct? |
| 18   policy? | 18      A   Yes. |
| 19      MS. DOUGLASS: Objection. | 19      Q   And were you one of those people? |
| 20      THE WITNESS: I don't know. | 20      A   At times. |
| 21      Q   BY MR. DANIELS: Next page, overtime.  Was it | 21      Q   At times you were not? |
| 22   your understanding that all hourly employees were not | 22      A   Sometimes I wasn't. |
| 23   permitted or authorized to work any period of time other | 23      Q   And that's because you didn't hit the |
| 24   than their normally scheduled hours unless directed to do so | 24   commission threshold? |
| 25   by the managers? | 25      A   I didn't hit the commission threshold, I |

| 123 | 125 |
|---|---|
| 1      A   Yes. | 1   didn't have an insurance license. |
| 2      MS. DOUGLASS: Objection. | 2      Q   Anything else? |
| 3      Q   BY MR. DANIELS: The next paragraph talks | 3      A   Right there, that's half my job. |
| 4   about the rate of overtime pay.  "Non-exempt employees will | 4      Q   Did you have aspirations of getting your |
| 5   receive overtime pay of one and one-half times their regular | 5   insurance license? |
| 6   rate of pay for all hours worked over 40 in any work week or | 6      A   Yes. |
| 7   for any hours other than required by state law." | 7      Q   And in the state of Arizona, I'm not |
| 8      When you worked overtime and when you were | 8   familiar, but what's involved with that? |
| 9   paid for the overtime, were you paid one and a half times | 9      A   Week of school and pretty horrible test. |
| 10   the regular rate of pay? | 10      Q   Kind of like the State Bar? |
| 11      MS. DOUGLASS: Objection. | 11      A   Pretty bad. |
| 12      THE WITNESS: I don't know. | 12      Q   Had you attempted to go through the week of |
| 13      Q   BY MR. DANIELS: Were there any discussions | 13   school? |
| 14   about that while you worked at Phoenix Memorial Park? | 14      A   Did the week of school twice. |
| 15      A   No. | 15      Q   And did you take the test? |
| 16      Q   Were you paid overtime at any time? | 16      A   Three times. |
| 17      MS. DOUGLASS: Objection. | 17      Q   And unsuccessful? |
| 18      Go ahead. | 18      A   Unsuccessful. |
| 19      THE WITNESS: I believe I was. | 19      Q   When you took a week off -- did you take a |
| 20      Q   BY MR. DANIELS: When you were paid overtime, | 20   week off? |
| 21   do you know what your rate was? | 21      A   That was at night. |
| 22      A   No. | 22      Q   I see.  Night classes.  Were you compensated |
| 23      Q   Did you ever ask what the rate was? | 23   for that time? |
| 24      A   I saw it on my pay thing, on my slip.  But, | 24      A   No. |
| 25   like I said, on the sales side, Rob made it out, the hourly | 25      Q   Did you ask to be compensated? |

**NETWORK DEPOSITION SERVICES**
**Transcript of Stephen Takesian**

33 (Pages 126 to 129)

### 126

1     A     Yes.
2     Q     What was the answer?
3     A     When I got my license, they would pay me for
4 that and the real estate.
5     Q     I see. Did you -- were you reimbursed for
6 the time that you got your real estate license?
7     A     No. Or for the class.
8     Q     Okay.
9     A     Or for the test.
10     Q     How much was the class and the test?
11     A     I probably spent over $460 on the class and
12 the test and the study guides.
13     MR. DANIELS: Let's go off the record real
14 quick.
15     (Discussion held off the record.)
16     Q     BY MR. DANIELS: Let's go back on the record.
17     Let's finish this exhibit and call for a
18 lunch break. The next section G on-call, maybe cut this
19 short. Did you ever serve any on-call time?
20     A     No.
21     Q     Let's just move on.
22     Other than ask one or two questions. Were
23 you aware that there was an on-call policy at Phoenix
24 Memorial Park for others?
25     MS. DOUGLASS: Objection.

### 127

1     THE WITNESS: Absolutely.
2     Q     BY MR. DANIELS: What is your understanding?
3     A     With the funeral directors that I worked
4 with.
5     Q     And they would be on call for first call body
6 pickups?
7     A     We didn't do too many first call body
8 pickups. We have a service that did that. Every once in a
9 while we would, but they were on call with a phone, with a
10 beeper just in case. But they were always there anyway too.
11 It wasn't like they weren't there.
12     Q     Was the phone and/or beeper provided to them
13 by the company?
14     A     Yes.
15     Q     And, again, this is just your knowledge and
16 if you don't have much, that's fine. Were they paid for
17 their on-call time?
18     A     I don't know. I'm sure they were.
19     Q     Were they required or restricted to stay at
20 home or at the location when they were, quote, on call?
21     A     I don't think so. I don't know.
22     Q     Did you have any discussions with any of the
23 funeral directors about the on-call policy?
24     A     Yes.
25     Q     What was said?

### 128

1     A     That if they were on call, good chance that
2 phone rang in the middle of the night.
3     Q     Did they tell you how many times they would
4 get called in the night?
5     A     I had a real good understanding because I
6 worked very closely with the funeral directors. That's the
7 only way you succeed in this business or try to succeed is
8 to work hand in hand with these people and not separate.
9     Q     Not alienate them?
10     A     Right. And they worked a lot. They
11 worked -- you know, they would be home and the phone -- cell
12 phone would ring.
13     Q     You don't have any actual evidence or
14 paperwork or recordation of the on-call number of calls they
15 got per week?
16     A     No.
17     MS. DOUGLASS: Objection.
18     Q     BY MR. DANIELS: If you know, do you know --
19 and I'm looking to get a scope of how busy Phoenix Memorial
20 Park is. How many cases a year did they handle?
21     A     365.
22     MS. DOUGLASS: Objection.
23     Q     BY MR. DANIELS: So it's a busy park then?
24     A     It can be.
25     Q     Let's go to the next section on H, call back.

### 129

1 This is kind of where we touched on earlier. Were you aware
2 that there was a policy at Phoenix Memorial Park that when a
3 non-exempt employee is called back to work after completing
4 the regular work schedule and leaving the premises, the
5 employee should be paid for time actually worked upon
6 leaving home or a minimum number of hours whichever is
7 greater?
8     MS. DOUGLASS: Objection.
9     THE WITNESS: I'm real familiar with this
10 only because this really pertained to the funeral side.
11 This really didn't pertain to the sales side.
12     Q     BY MR. DANIELS: Okay.
13     A     And the only reason I was aware of this is
14 because I was trying to make that transition over to the
15 funeral side. I knew the funeral directors. In the
16 rotation it worked out that I would work out with one or two
17 all the time, so I got a real tight rapport with one or two.
18     Q     Okay. So you don't believe that you -- when
19 you were called -- strike that.
20     You told me earlier that occasionally a
21 family may call you on your day off?
22     A     Yes.
23     Q     And that might be considered a call back and
24 that's what I'm getting at. Was it your understanding that
25 this policy pertained to that type of situation?

**NETWORK DEPOSITION SERVICES**
**Transcript of Stephen Takesian**

44 (Pages 170 to 173)

170

| | | |
|---|---|---|
| 1 | A | Went down during the day. |
| 2 | Q | During a weekday? |
| 3 | A | Uh-huh. |
| 4 | Q | "Yes"? |
| 5 | A | Yes. |
| 6 | Q | Were you paid for that day? |
| 7 | A | I believe so. |
| 8 | Q | And then you said you spent about 40 to |
| 9 | | $60 -- that was for the other license. Did you spend any |
| 10 | | out-of-pocket expenses for the real estate license? |
| 11 | A | About 115. |
| 12 | Q | What was that? |
| 13 | A | For the license and the test. |
| 14 | Q | Were you ever reimbursed? |
| 15 | A | No. |
| 16 | Q | Did you seek to get reimbursed? |
| 17 | A | Yes. |
| 18 | Q | Who did you ask? |
| 19 | A | Turned it in to Rob Miller and Debbie Lorh. |
| 20 | Q | What happened? |
| 21 | A | Never saw it. |
| 22 | Q | Did you follow up on that, speak to anyone |
| 23 | | else? |
| 24 | A | I was retold after a second time that I had |
| 25 | | to pass the test to get paid. |

171

| | | |
|---|---|---|
| 1 | Q | That meaning pass the insurance license test |
| 2 | | to get paid for both the insurance license and the real |
| 3 | | estate? |
| 4 | A | Yes. |
| 5 | Q | And then let's talk about the insurance |
| 6 | | license. You said that that was a week long course that you |
| 7 | | took in the evenings? |
| 8 | A | In the evening. |
| 9 | Q | Were you paid for your evening work? |
| 10 | A | No. |
| 11 | Q | What time in the evenings did you have to |
| 12 | | attend? |
| 13 | A | Three hours a night for four nights. |
| 14 | Q | How many times did you take that class? |
| 15 | A | Twice. |
| 16 | Q | And then how many times did you take the |
| 17 | | test? |
| 18 | A | Three. |
| 19 | Q | And you did not pass? |
| 20 | A | Correct. |
| 21 | Q | How long was the test? |
| 22 | A | Two hours. |
| 23 | Q | When did you take that, during the week? |
| 24 | A | Yeah. |
| 25 | Q | Did you get paid for that? |

172

| | | |
|---|---|---|
| 1 | A | No. |
| 2 | Q | Did you just take time off for the two or |
| 3 | | three hours and then return to work? |
| 4 | A | Yes. |
| 5 | Q | Did you submit that time to be paid? |
| 6 | A | No. |
| 7 | Q | Why not? |
| 8 | A | I was -- I would probably just punch in right |
| 9 | | then and then work. It goes back to back. If I wasn't |
| 10 | | there, I wasn't punched in. |
| 11 | Q | Any other training that you received that you |
| 12 | | believe you were not compensated for? |
| 13 | A | No. |
| 14 | Q | Again, looking at Exhibit 2, look at E as in |
| 15 | | egg. It states, "I believe that as a part of my job duties |
| 16 | | for Alderwoods, I had meetings with clients to discuss |
| 17 | | pre-need purchases outside my work schedule and was not |
| 18 | | compensated for at least some of such time and the period |
| 19 | | being December 8, 2003 to the present." |
| 20 | | Is that an accurate statement? |
| 21 | A | Yes. |
| 22 | Q | What pre-need -- what meetings do you have |
| 23 | | with clients for the purpose of pre-need purposes outside |
| 24 | | the work schedule? |
| 25 | A | The pre-need that's another -- |

173

| | | |
|---|---|---|
| 1 | Q | That's why I'm asking. |
| 2 | A | That's almost like an insurance funeral side |
| 3 | | and with me not having that, my pre-need was upselling the |
| 4 | | family, that sort of thing, and then if I had a situation |
| 5 | | where it had to be funded -- |
| 6 | Q | You would get a licensed person involved? |
| 7 | A | I had someone there that I thought I could |
| 8 | | trust and they would. |
| 9 | Q | They would service the family and you would |
| 10 | | split the commissions? |
| 11 | A | Sometimes. |
| 12 | Q | I know we've talked about all your community |
| 13 | | service work and then we also talked about meeting with |
| 14 | | at-need families after the service. Is that the -- in the |
| 15 | | era of when you were not on schedule and were selling |
| 16 | | pre-need goods and services that you were not paid? |
| 17 | A | Correct. |
| 18 | | MS. DOUGLASS: Objection. |
| 19 | Q | BY MR. DANIELS: Were there any other times? |
| 20 | A | No, not that I know of, not that I remember. |
| 21 | Q | Is that the part of the 17 to 23 hours per |
| 22 | | week that you were not paid that you are claiming in this |
| 23 | | litigation? |
| 24 | A | Some of it. |
| 25 | Q | What else is it? |

**NETWORK DEPOSITION SERVICES**
**Transcript of Stephen Takesian**

56 (Pages 218 to 221)

218

1  expected it of you?
2      A    He encouraged it because, like I said, he
3  said he had a group that was not participating in community
4  and that when he arrived he was fairly new at that position
5  too and he wanted to shake things up with getting people out
6  in the community. He had two people that were supposedly
7  doing that full-time, but he had no control over them and
8  they had -- they were doing other things, they were out
9  soliciting for insurance, they weren't employed.
10     Q    During your discussion with Mr. Miller either
11 in this first meeting or the second meeting that you had
12 with him when he offered you the job, did you discuss the
13 fact that -- well, let me strike that.
14          During either of those two meetings with him,
15 did you talk about selling pre-needs with customers?
16     A    Yes.
17     Q    Did the issue of whether or not you were
18 licensed to sell that in Arizona, did that arise?
19     A    Yes.
20     Q    How did it arise, what did you discuss with
21 him?
22     A    Rob informed me of the position and said I
23 would need to get a real estate license and that I would
24 have to get an insurance license and that would entail
25 signing up for an insurance school he recommended and going

219

1  to the school for a week and then taking the test and
2  hopefully passing that test.
3      Q    Okay. Did he tell you that you needed to --
4  that he was offering you the job and that he expected that
5  you would -- that you would, in fact, do that?
6      A    Yes. That was one of his stipulations that
7  all of his people were going to be licensed.
8      Q    When did you take the course for the
9  pre-needs license?
10         MR. DANIELS: Just to be clear, insurance
11 license versus the real estate license?
12         MS. DOUGLASS: Correct.
13     Q    BY MS. DOUGLASS: The course.
14     A    After I started employment.
15     Q    How long after?
16     A    Right away, like a week after, the week of.
17     Q    Okay.
18     A    I went to the Ford School of Insurance.
19     Q    And I think you testified that it was a week
20 long course, so is that five days?
21     A    It was four nights.
22     Q    Four nights?
23     A    Three hours a night.
24     Q    Three hours a night?
25     A    Plus the studying.

220

1      Q    What do you mean by "plus the studying"?
2      A    Well, the test was horrendous. I had to
3  learn all kinds of insurance stuff I could care less about,
4  but I hadn't been in school in years, so it was really
5  difficult to get back in that groove.
6      Q    So did you -- you studied for the test in
7  addition to going to the Ford school?
8      A    Right.
9      Q    When would you -- when did you study, was it
10 just during that four-day course?
11     A    At night.
12     Q    At night?
13     A    Yes.
14     Q    During the four days?
15     A    During the evening and that was just, I did
16 the course, studied for the test that week, finally took it
17 for the first time.
18     Q    How much did you study outside of the actual
19 course that was on the four nights?
20     A    About 12 hours.
21     Q    Did you make any record of the time that you
22 spent in the course on those four evenings?
23     A    No.
24     Q    What about the time that you spent studying
25 on those evenings?

221

1      A    No.
2      Q    Why did you not record or keep a record of
3  time you spent studying for the course?
4      A    Didn't think I needed to.
5      Q    Why didn't you think you needed to?
6      A    Basically, I felt it was my obligation to get
7  that done to keep the job.
8      Q    Were you instructed to record any time that
9  you --
10     A    No.
11     Q    -- spent either studying or taking -- or
12 attending a class?
13     A    No.
14     Q    Did you -- you testified today that you spent
15 time --
16         MR. EHRMAN: Cristina, I am so sorry to bug
17 you, but I cannot hear you.
18     Q    BY MS. DOUGLASS: Okay. During the time that
19 you were employed at Alderwoods, you testified today that
20 you spent time standing services. Could you explain what
21 that means.
22     A    Well, you had to work your service. If it
23 was your family, you worked -- I worked the funeral and then
24 I worked the burial.
25     Q    What do you mean by "if it was your family"?

**NETWORK DEPOSITION SERVICES**
**Transcript of Stephen Takesian**

58 (Pages 226 to 229)

---

226

1  the time?
2      A    Yes.
3      MR. DANIELS: Leading.
4      Q    BY MS. DOUGLASS: If you had a service that
5  was going to continue or that was going to begin right at
6  5:00, would you stay clocked in or would you clock out and
7  then attend to the service?
8      A    I would -- it really depended. I normally
9  would clock out. Between 8:00 and 5:00 I would be there.
10 And then there would be some days where I wouldn't clock out
11 until later.
12     Q    Is there any reason why sometimes you clocked
13 out and sometimes you didn't clock out?
14     A    I would be reprimanded from the previous week
15 what I did on my time card with Debbie -- from Debbie.
16     Q    Are you saying if you sometimes clocked out
17 after 5:00 or wrote on your time sheet that you left after
18 5:00, that you would hear from Debbie about it?
19     A    Yeah. Well, I would hear what's that time
20 here about?
21         I was working a funeral.
22         Well, that's your time.
23     Q    That's what she would say?
24     A    Yes.
25     Q    And you are making a gesture?

---

227

1      A    She would cross it off or make a note or
2  write a line through it.
3      Q    Did you see her do that?
4      A    Several different times.
5      Q    Do you understand if that was -- you know,
6  Debbie was doing that on her own or if somebody had
7  instructed her to do that, do you know?
8      A    I know that Debbie was instructed by
9  corporate, corporate was always doing audits on contracts
10 and all those types of things.
11     Q    So, let me follow up on that. So, you said
12 that corporate instructed Debbie to do that?
13     A    Yes.
14     Q    How do you know that?
15     A    Well, either it would come down from a memo
16 or it usually came down from regional to Rob or Nathan.
17 They were constantly on conference calls. If you wanted to
18 talk to either one of them, most of the time they were on
19 conference calls. It was all policy, it was all about those
20 five binders.
21     Q    So is that what you base your belief that
22 Debbie was instructed --
23     A    Yes.
24     Q    -- to change or to --
25     A    Admit -- omit.

---

228

1      Q    -- omit time that was marked on the time
2  card, you believe that was because corporate had instructed
3  her to do that?
4      A    Yes. And the fact that I heard about it
5  all -- we heard about it all the time from the funeral side.
6  Because the funeral directors, they were constantly
7  complaining about doing that.
8      Q    Doing what?
9      A    Overtime, the funeral directors were being
10 reprimanded for having overtime.
11     Q    So I think you just said they were always on
12 conference calls?
13     A    Rob Miller --
14     Q    Something like that?
15     A    -- and Nathan were always on conference
16 calls.
17     Q    Do you know who they were on conference calls
18 with?
19     A    Rob would be on a conference call with his
20 supervisors Governor Joy and/or with Nathan and they would
21 be on conference with Todd and/or people at Alderwoods.
22     Q    How do you know that that's who they were on
23 calls with?
24     A    The door would be shut, I would knock on the
25 door to go in there and get something signed and they would

---

229

1  be in the middle of the conference call.
2      Q    Do you know what -- do you know what the
3  conference calls were about?
4      MR. DANIELS: Calls for speculation.
5  Hearsay.
6      Q    BY MS. DOUGLASS: Go ahead.
7      A    Not always.
8      Q    Did you ever know?
9      A    Yeah. Rob would make comments afterwards
10 about procedures as far as a new sheet to sign out at the
11 funeral or the cemetery. Stuff changed weekly. It was like
12 the policy of the week club.
13     Q    Were you told to record time that you spent
14 at the Masonic Lodge meetings?
15     A    No.
16     Q    Did you record the time?
17     A    No.
18     Q    Why didn't you record the time?
19     A    I don't know.
20     MS. DOUGLASS: Jim, do you have anything
21 else?
22     MR. EHRMAN: I have nothing further.
23     MR. DANIELS: I just have two follow-up
24 questions.
25

---

EXHIBIT 89

1            IN THE UNITED STATES DISTRICT COURT

2        FOR THE WESTERN DISTRICT OF PENNSYLVANIA

3

4    DEBORAH PRISE, and HEATHER RADY )
     on behalf of themselves an all  )
5    employees similarly situated,   )
                                      )
6             Plaintiffs,             )
                                      )
7         vs.                         ) Case No.: 06-1641
                                      )
8    ALDERWOODS GROUP, INC.,          )
                                      )
9             Defendant.              )
     _____)

10

11

12

13

14         DEPOSITION OF MATTHEW O. TWISS

15       Taken on Wednesday, April 29, 2009

16              9:30 o'clock A.M.

17           At 2620 Regatta Drive

18             Las Vegas, Nevada

19

20

21

22

23

24

25   Reported By:  Sandy A. Dahlheimer, CCR 431

**NETWORK DEPOSITION SERVICES**
**Transcript of Matthew Twiss**

6 (Pages 18 to 21)

---

18

1    Q.   So for purposes of today when we're talking
2  about the employment, we'll use those dates, May of 2004
3  through October of 2005.  Is that okay?
4    A.   Yes.
5    Q.   The next section, positions held with
6  Alderwoods and dates, were you a funeral director?
7    A.   In the capacity of the word, yes.  I was not a
8  licensed funeral director.
9    Q.   So in other words, you were working under
10  someone else's license but doing the work, the job
11  description of a funeral director?
12    A.   In Nevada it's a funny state since that the
13  funeral homes do not require that you have a funeral
14  director's license.
15    Q.   Okay.  Do they require at least one person in
16  the home have a license?
17    A.   Yes.
18    Q.   That's what I was getting at.  Although you
19  weren't the licensed person, you were working under
20  someone's license?
21    A.   Yes; that is correct.
22    Q.   Then there's occasionally I note in some of the
23  paperwork that you were also referred to as an arranger.
24    A.   Yes.
25    Q.   Is that one and the same for purposes of our

---

19

1  discussion today?
2    A.   Yes, it is.
3    Q.   Then it says funeral director, slash, embalmer.
4  Did you do you any embalming while working at Alderwoods
5  in Nevada?
6    A.   I did not.
7    Q.   So you were not an embalmer?
8    A.   Not there, no.
9    Q.   Were you a licensed embalmer anywhere?
10    A.   I was in New York.
11    Q.   And New York does require an individual
12  license?
13    A.   Yes.
14    Q.   You did no embalming work here however?
15    A.   No.
16    Q.   Of course then it said that you were working
17  from May of '04 through October of '05, and the location
18  was the Davis Funeral Home in Las Vegas; correct?
19    A.   Yes.
20    Q.   I'm getting a little ahead of myself.
21      Briefly what were your job duties while working
22  at Davis Funeral Home as a funeral director, slash,
23  embalmer?
24    A.   I would make arrangements with families, direct
25  the funerals, dress casket bodies, makeup, the committal

---

20

1  service at the cemetery, fill out the death certificates,
2  sometimes filing the death certificate, having the doctor
3  sign the death certificate, obituaries, death notices,
4  visitations, calling hours, flower arrangements around the
5  casket, dealing with clergy of many faiths, shipping the
6  human remains to various countries and ports around the
7  world.
8    Q.   Okay.  We're going to get to that a little bit
9  more in a bit.
10      You told me you briefly spoke to
11  Mr. Mitch Ames?
12    A.   Amos, A-m-o-s.
13    Q.   Thank you, A-m-o-s, about the current
14  litigation.
15      Have you spoken to anyone else other than your
16  class counsel?
17    A.   Co-worker at Davis, Mark Hopkins.
18    Q.   Mark Hopkins is his name?
19    A.   Yes.
20    Q.   Is he still working at Davis?
21    A.   No.
22    Q.   When did you speak to him about it?
23    A.   Oh, two years ago.
24    Q.   Do you know if he's a member of this -- has he
25  opted in?

---

21

1    A.   I'm thinking not.  He had expressed something
2  that he was not.
3    Q.   Do you know why?
4    A.   Didn't get into something.  I don't know.  He
5  had a death in the family.  He was out of the town for
6  many years.
7    Q.   Anyone else that you have spoken to about this
8  lawsuit?
9    A.   No.
10    Q.   Are you currently married?
11    A.   No.
12    Q.   Have you ever been married?
13    A.   Yes.
14    Q.   When were you married?
15    A.   When I was --
16    Q.   These are the dates you're going to have a hard
17  time remembering.
18    A.   Twenty-six years of age.
19    Q.   How old are you now?
20    A.   Forty-five.
21    Q.   How long were you married?
22    A.   A year and a half.
23    Q.   Was that while you lived in New York?
24    A.   Yes.  Albany, New York.
25    Q.   Any children of that marriage?

---

**NETWORK DEPOSITION SERVICES**
**Transcript of Matthew Twiss**

12 (Pages 42 to 45)

**42**

1  overtime so I adhered to that so I'd clock out. That did
2  happen on many occasions.
3  Q. How many is many?
4  A. I don't know the number of that.
5  Q. Would it happen daily? Weekly? Monthly?
6  Quarterly?
7  A. Probably three or four times a month.
8  Q. Three or four times a month?
9  A. Yes.
10  Q. Just again so I get a better understanding.
11  A. Because they would reprimand against the
12  overtime.
13  Q. I understand. So in other words, if you were
14  again that hypothetical that I created, you're working
15  when a family comes in at 4:30.
16  A. The manager depended too again. Some managers
17  were more flexible in having the families be served than
18  others were.
19  Q. Again, with my hypothetical that I gave you,
20  family comes in at 4:30. You catch that family.
21  A. Yes.
22  Q. Your supposed to be off at 5:00.
23  A. Right.
24  Q. Is it your testimony then that, since you knew
25  you were supposed to be off at 5:00 and didn't want to be

**43**

1  reprimanded that you would break to go clock out and then
2  continue working with the family?
3  A. I have done that, yes.
4  MR. LINGLE: Object to form.
5  THE WITNESS: Many times they would look like
6  they're on their way out, they come back in. It happens a
7  lot. It's a very difficult time for the family.
8  BY MR. DANIELS:
9  Q. By the way, were you selling at need and
10  pre-need?
11  A. I did not sell pre-need. I would prearrange
12  but I would not take monies. I did not have an insurance
13  license.
14  Q. That's where I was going. State of Nevada
15  requires an insurance license for pre-need sales for
16  funeral goods and services?
17  A. Yes.
18  Q. I'm just curious. Why would you clock out?
19  Again, is that because you were afraid you'd be
20  reprimanded?
21  A. I wanted my job.
22  Q. You were afraid that you would be reprimanded?
23  A. Yes.
24  Q. Were you ever told you would be fired or
25  terminated if you did not clock out?

**44**

1  A. There was an air of that certainly.
2  Q. But you were never told that by anyone
3  individually?
4  MR. LINGLE: Object to the form.
5  THE WITNESS: Was never told per se but it was
6  insinuated. I had watched a prior two employees.
7  BY MR. DANIELS:
8  Q. Who were the prior two employees?
9  A. I do not know their names. One was Bob.
10  Q. Both funeral directors?
11  A. One was a removal.
12  Q. First call removal person?
13  A. Yes.
14  Q. And the other one was a funeral director?
15  A. Yeah.
16  Q. We know that you had Steve and Robert as
17  managers and you were leading me to believe that one was
18  more flexible than the other; is that right?
19  A. Yes.
20  Q. Who was the more flexible person?
21  A. Robert.
22  Q. So was Steve the one that you were, quote,
23  insinuated that you would be terminated if you did not
24  clock out?
25  A. Yes, not by him. He was basically telling me,

**45**

1  the corporation.
2  Q. Correct. How long was Steve your manager?
3  A. Maybe three, four months.
4  Q. Then Robert took over?
5  A. I'm wondering if Gerhardt came in as acting
6  manager.
7  Q. For a while?
8  A. Yes.
9  Q. Then Robert?
10  A. Yes.
11  Q. Then was there a Laura Walsh?
12  A. Yes.
13  Q. How long was Laura Walsh your manager?
14  A. July of some point to my demise in October.
15  Q. Just so we have a chronological order here,
16  Steve, possibly Gerhardt temporarily, Robert, and then
17  Laura?
18  A. Yes.
19  Q. They were all, quote, location managers with
20  the exception of Gerhardt who was just acting; right?
21  A. Correct.
22  Q. During the interview process, were you given
23  any documents or shown anything?
24  A. Not during the interview process, no.
25  Q. Only after you were made the offer?

**146**

1  getting paid?
2     A.  Well, six of one, half a dozen of the other.
3  It's a job.
4     Q.  There's no record of the time that you spent
5  there that you're aware of, written record?
6     A.  That's correct.
7     Q.  And you never turned it in to be paid?
8     A.  No.
9       MR. LINGLE: Object to the form.
10 BY MR. DANIELS:
11    Q.  Was there a company wide policy, not just with
12 Gerhardt, but a company wide policy, Alderwoods' policy,
13 some policy that you looked at earlier today that required
14 the community service work?
15    A.  Yes.
16    Q.  Do you have a copy of that written policy?
17      MR. LINGLE: Object to the form?
18      THE WITNESS: No, I don't.
19 BY MR. DANIELS:
20    Q.  Have you ever seen a copy of the written
21 policy?
22      MR. LINGLE: Object to the form.
23      MR. LINGLE: I have.
24 BY MR. DANIELS:
25    Q.  What did it say to your best recollection?

**147**

1     A.  Robert showed it to me.
2     Q.  Robert Falcon?
3     A.  Yeah.
4     Q.  What did it say?  What do you recall?
5     A.  Something to the effect that as an employee of
6  Alderwoods you must be involved in civic community duties.
7     Q.  Did it say you wouldn't be paid?
8     A.  It had nothing to do with compensation.  It's
9  part of your being an employee.  You must do this.
10    Q.  Was it a part of the binders that we talked
11 about earlier?
12      MR. LINGLE: Object to the form.
13      THE WITNESS: It wasn't a mission statement
14 binder.  It was in a folder.  Robert just showed it to me.
15 BY MR. DANIELS:
16    Q.  What was your response when he showed it to
17 you?
18    A.  I'd known this going in.  I knew that this is
19 what they expected.
20    Q.  Did you and Steve have a discussion about that
21 when you were first hired?
22    A.  Yes.
23    Q.  Did you ask him --
24    A.  He says it's encouraged.
25    Q.  It was encouraged to be involved in the

**148**

1  community?
2     A.  Strongly encouraged.
3     Q.  Was there discussion with Steve about pay?  Did
4  you ask him if you'd be paid?
5     A.  Yes.
6     Q.  What did he say?
7     A.  I said I understand this is something we do not
8  receive monetary rewards for, and he said absolutely no.
9     Q.  Did you receive any training about getting
10 involved in the community?
11    A.  No.  Discussion but no formal training.
12    Q.  And you also said you were involved in
13 Healthsouth trade fairs?
14    A.  Yes.
15    Q.  How many Healthsouth trade fairs did you
16 participate in?
17    A.  About four.
18    Q.  Where were they located?
19    A.  Different -- one was up at the Olympic Avenue
20 up off of Sunset.  Something like this but much bigger.
21    Q.  Who put --
22    A.  Nursing homes.  Health care center would set up
23 booths.  People that set up the stuff you put inside your
24 shoes, you know, ped stuff.  Different booths, and funeral
25 home -- John Gerhardt ordered a banner, Davis Funeral

**149**

1  Home.
2     Q.  And would you man that --
3     A.  And the pre-need people would go to one
4  particular one.  She and I would go.
5     Q.  What would you do?
6     A.  Stand there, hand out pens, cards, talk to
7  people about prearranging funeral homes.
8     Q.  How long was this?
9     A.  Four hours, five hours.
10    Q.  Four to five hours on four separate occasions?
11    A.  Yes.
12    Q.  Do you have any record of the time that you
13 spent.
14      MR. LINGLE: Object to the.  Form?
15      THE WITNESS: No record.  No.
16 BY MR. DANIELS
17    Q.  Did you ever -- were you paid for that time?
18    A.  I was paid for one.
19    Q.  Which one.  The first one?  The last one?
20    A.  The second one because I remember I
21 specifically asked John Gerhardt.
22    Q.  What did you ask him?
23    A.  I said can I clock in and clock out on this?
24    Q.  What did he say?
25    A.  He said yes.

## NETWORK DEPOSITION SERVICES
## Transcript of Matthew Twiss

43 (Pages 166 to 169)

---

### 166

1  Q. In other words, you're saying you'd clock out
2  say at 12:00 o'clock and clock back in at 12:30; but in
3  reality you only got a 10 minute lunch?
4  A. Yes.
5  Q. So you'd stop whatever you were doing at 12:30
6  just to go clock back in?
7  A. Oh, yes.
8  Q. You also -- I think you testified earlier that
9  you and Steve had a discussion about the meal periods. I
10  think you said he told you that you were entitled to an
11  unpaid 30 minute meal period during the interview process,
12  during the hiring process; is that right?
13  A. Yes. He may have stated if you are able to.
14  Q. If you look at Exhibit 16 again, that's the one
15  that we talked about, and the page 15 where it talks about
16  subparagraph (c), meal periods.
17  Do you see that?
18  A. Yes, I do.
19  Q. Okay. Then again, it talks about a 30 minute
20  period, no less than 30 minutes, no more than one hour;
21  correct?
22  A. Yes.
23  Q. If you look at the second paragraph, the policy
24  reads, does it not, during the meal period an employee is
25  not to perform work for the company.

---

### 167

1  Is it your understanding that that was the
2  company wide policy at the time you were employed?
3  MR. LINGLE: Object to the form.
4  THE WITNESS: That I must --
5  BY MR. DANIELS:
6  Q. Correct. During your meal period, an employee
7  is not to perform work for the company.
8  I'm not saying that's what happened. I'm
9  telling you that you're aware that was the policy at the
10  time?
11  A. Yes, and if I had followed that policy, then
12  families would be left in the lurch and then I would have
13  a real serious disciplinary action which was valid. You
14  just could not do that. It's physically impossible.
15  Q. Did you ever tell anyone this?
16  A. Oh, of course, yes. It fell on deaf ears.
17  Q. Back to the Complaint, paragraph 19(g) of
18  page 4, it alleges that Alderwoods Group implemented a
19  preapproval for overtime pay policy. Under this policy
20  Alderwoods only permitted payments for overtime if the
21  overtime is preapproved, and then it continues that
22  Alderwoods allowed its employees to work overtime and
23  would not pay them if it was not preapproved.
24  Is that what your understanding of the policy
25  was when you were working there?

---

### 168

1  A. Yes.
2  Q. Have you ever seen a written policy at any time
3  that stated you would not be paid for overtime if it was
4  not preapproved?
5  A. It didn't have to be written because it was
6  touted at meetings very explicitly.
7  Q. You testified earlier I believe that you
8  actually did seek approval for some overtime that you knew
9  was coming up; correct?
10  A. Yes.
11  Q. And that was given to you; right?
12  A. Yes.
13  MR. LINGLE: Object to the form.
14  THE WITNESS: With the one hour, for instance,
15  all the overtime at night I did I was not paid for.
16  BY MR. DANIELS:
17  Q. But the -- now I'm just talking about
18  preapproval. Did you testify then, hey, look, I'm
19  seeking preapproval to work more than one hour at night?
20  A. I tried.
21  Q. And to whom did you ask that?
22  A. Gerhardt.
23  Q. Anyone else?
24  A. Manager. Talk to Gerhardt, he would say the
25  managers.

---

### 169

1  Q. So in other words, you either talked to Laura
2  or Robert or Steve and they would say go talk to the area
3  manager?
4  A. If you pushed it similar to the way you are
5  now, they would come right flat out and say you will not
6  get paid for overtime if it's not preapproved.
7  Q. But there were times however when you asked for
8  it and it was approved?
9  A. Yeah, I let them know that it had occurred and
10  those times they would okay it.
11  Q. Were you ever denied preapproved overtime?
12  A. There have been times where it didn't show up,
13  yes.
14  Q. Before it occurred --
15  A. Denied, yes.
16  Q. You said I think tomorrow --
17  A. Yes.
18  Q. -- I'm going to be in a meeting with the Smith
19  family --
20  A. No.
21  Q. Let me finish my question. I know it's
22  difficult and it's been a long day.
23  You would go to Robert or Laura or Steve or
24  John Gerhardt and say, I've got all these appointments
25  tomorrow. I guarantee you it's going to take me into a

---

# EXHIBIT 90

1

```
 1              IN THE UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2

 3    DEBORAH PRISE and HEATHER RADY )
      on behalf of themselves and   )
 4    all employees similarly       )
      situated,                     )
 5                                   )
                       Plaintiffs,  )Civil Action
 6                                   )No. 06-1641
         vs                         )
 7                                   )
      ALDERWOODS GROUP, INC.,       )
 8                                   )
                       Defendant.   )
 9

10              The discovery deposition of

11    RAY WHITE, called by the Defendant, for examination,

12    pursuant to notice, taken before Julia A. Bauer,

13    CSR, RPR, a notary public within and for the County

14    of Cook and State of Illinois, at 3830 179th Street,

15    Hammond, Indiana, on the 21st day of July, A.D.,

16    2009, commencing at 9:35 a.m.

17

18

19

20

21

22

23

24

25
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Ray White**

30

1  salary.
2      Q.   They switched you to salary.  When
3  they switched you to salary, did they switch you to
4  exempt status?  Do you know?
5          MS. GIFFORD:  Objection.
6  BY THE WITNESS:
7      A.   I don't know.
8  BY MR. KNIGHT:
9      Q.   It says on here that Zalo Wilson
10 became general manager on, approximately,
11 August 25th.  Would that be 2003, to your knowledge?
12     A.   I'm not sure.
13     Q.   Before Mr. Wilson became general
14 manager, who was your general manager?
15     A.   Ron Redpath.
16     Q.   Now, when Mr. Wilson became your
17 general manager, where did he physically work, if
18 you recall?
19     A.   He officed -- his office was at
20 Chapel Lawn.  He ran between all the locations he
21 was general manager of.
22     Q.   And you were at Chapel Lawn?
23     A.   I was at Chapel Lawn.
24     Q.   Is that the only location you worked
25 at while with Alderwoods?

31

1      A.   Yes.
2      Q.   How many locations was Mr. Wilson
3  responsible for?
4      A.   I believe, four.
5      Q.   And his office was at Chapel Lawn?
6      A.   Correct.
7      Q.   Did Mr. Wilson have managerial
8  responsibilities for Chapel Lawn?
9      A.   I would say yes.
10     Q.   When Ron Redpath was your general
11 manager, where was his office?
12     A.   Titus Funeral Home in Warsaw.
13     Q.   Warsaw, Indiana?
14     A.   Correct.  Yes.
15     Q.   Was he physically at Chapel Lawn?
16     A.   Ron Redpath would come, hopefully,
17 weekly; but if not, we'd see him once every two
18 weeks.
19     Q.   Do you know why Zalo Wilson was
20 located at Chapel Lawn, but Mr. Redpath was not?
21     A.   No.
22     Q.   Now, were you paid for overtime that
23 you had accumulated -- strike that.  Let me try to
24 rephrase this.
25         This document, as we've already

32

1  discussed, says that you were to be paid for
2  overtime accumulated since Zalo Wilson became the
3  general manager.  Did that, in fact, happen?
4      A.   I did receive some overtime.
5      Q.   It goes on to say in the second
6  paragraph that, from week 35 to week 42, Ray has
7  worked 95.25 hours of overtime.  Do you see that?
8      A.   Yes.
9      Q.   Do you know where that number came
10 from, 95.25?
11     A.   Probably, the timecards.
12     Q.   What about from the book that you
13 referred to?
14     A.   It's possible.
15     Q.   Did anyone ask you how much overtime
16 you had worked from the time Zalo Wilson became
17 general manager?
18     A.   No.  Zalo kept the book.
19     Q.   But you had access to it; correct?
20     A.   It was on his desk.
21     Q.   But you would access it to put your
22 time in; correct?
23     A.   Correct.
24     Q.   Do you believe -- were you, in fact,
25 compensated for that 95.25 hours of overtime?

33

1      A.   I believe I was.
2      Q.   Do you believe that you worked
3  overtime between August 25th and October 25th, 2003
4  that you were not compensated for?
5          MS. GIFFORD:  Objection.
6          Go ahead.
7  BY THE WITNESS:
8      A.   It's possible.
9  BY MR. KNIGHT:
10     Q.   Do you believe you were?
11         MS. GIFFORD:  Same objection.
12 BY THE WITNESS:
13     A.   Yeah.
14 BY MR. KNIGHT:
15     Q.   Do you have any specific instances in
16 mind?
17     A.   No, I don't.
18     Q.   What's the basis for your belief?
19     A.   Because the overtime fluctuated.  I
20 worked more overtime than what I was getting paid
21 for.  So I know there were times where I wasn't
22 getting the full overtime pay.
23     Q.   I'm talking specifically this
24 two-month window here from August 25th to
25 October 25th?

**NETWORK DEPOSITION SERVICES**
**Transcript of Ray White**

118

1  Q.   Did you join any community groups
2  while you were with Alderwoods?
3  A.   I was a member of it before I started
4  working Alderwoods.
5  Q.   What was that?
6  A.   Rotary, the chamber.
7  Q.   Did anyone ever tell you of any policy
8  that Alderwoods had that you had to be part of a
9  community organization?
10  MS. GIFFORD:  Objection.
11  Go ahead.
12  BY THE WITNESS:
13  A.   It was always brought down at the
14  little powwow meetings that they preferred that
15  every employee should take an active part in their
16  community to better -- not only -- for the sales
17  people, not only generating business for the
18  corporation, but also, they sold on a commission, so
19  they might improve their commission.  So they always
20  had asked that the employees be active in the
21  community, and not everybody in one group.  They
22  wanted everybody to take different groups and become
23  an active member in those.
24  BY MR. KNIGHT:
25  Q.   You said, powwow meetings, what were

119

1  you referring to?
2  A.   Zalo would have a meeting with
3  everybody, maybe, once a month going over the sales
4  numbers, the funeral numbers, the revenue, the
5  expenses, and then try and get everybody to become a
6  little more active role in getting the community
7  aware of Chapel Lawn.
8  Q.   Who else was present at these
9  meetings?
10  A.   It would have been all the sales --
11  the sale counselors, all the sales counselors, the
12  sales manager, sometimes some of the office ladies,
13  but they always had to have one hang back to answer
14  the phones.  But they'd try and have it at the
15  funeral home in the chapel area and get everybody in
16  there and just go over the numbers.  I mean,
17  everybody -- every month, you had a quota of what
18  they'd like you to try and hit, and that's for the
19  sales people.  That's what they had to go by.
20  Q.   There were employees at all of Zalo's
21  locations at these meetings?
22  A.   No.  He'd do one at Chapel Lawn, and
23  then he'd do another one at the other locations.
24  Q.   I thought there was just a couple of
25  you at Chapel Lawn?

120

1  A.   There was two at the funeral home.
2  The cemetery had three office ladies, a sales
3  manager, and then, like, six sales people.  And then
4  the groundsmen had -- there was, I think, eight
5  groundsmen.  So he'd try and get everybody in one
6  location.
7  Q.   Did Zalo ever tell you it was one of
8  your responsibilities to be part of a community
9  organization, that you had to join one?
10  A.   He told everybody that.  It was more
11  to benefit yourself, he told them.
12  Q.   Did they do anything to make sure
13  everyone was part of community organizations?
14  A.   No, he just asked.  The follow-up was
15  terrible.
16  Q.   At this point, were you a member of
17  the rotary club?
18  A.   Not the Griffith Rotary and not
19  Schererville.  I had joined after they -- I brought
20  in, and they fired me.  So they weren't paying --
21  and that was another thing, they wouldn't pay the
22  dues, the memberships.
23  Q.   So were you a member of the rotary in
24  your last four months of employment?
25  A.   No, I petitioned.  I wasn't a member

121

1  yet then.
2  Q.   And before that, were you a member of
3  any community organization while you were employed
4  with Alderwoods?
5  A.   Organizations?
6  Q.   (Nonverbal response.)
7  A.   You know, I'd say, I don't recall
8  because I know we volunteer a lot.  But as far as
9  you had to live in Schererville, and I didn't live
10  in Schererville, so I'd volunteered.  I think we
11  were all members of the chamber, the Schererville
12  chamber.
13  Q.   You said that you were petitioning to
14  be a member of the rotary?
15  A.   The rotary.  I was a member in
16  Griffith prior to me starting going to work for
17  Chapel Lawn.  And then I had to leave because I was
18  working in Crown Point at the time when I worked for
19  Geisen, and so I came back to -- that's when Zalo
20  said get re-involved in our communities.  So I went
21  back to Griffith Rotary to join -- somebody has to
22  take you and subscribe, and then they vote to become
23  a member.
24  Q.   Did you end up becoming a member?
25  A.   Not while I was employed for --