**Exhibit L**

# TABLE OF CONTENTS
## AFFIRMATIONS FROM PLAINTIFFS AND PLAINTIFFS' WITNESSES

| Tab | Name |
| --- | --- |
| 1 | Bath, Herbert |
| 2 | Carswell, Shane |
| 3 | Detschner, Steven |
| 4 | Hensley, Rick |
| 5 | Jones, Robert |
| 6 | Keath, Angela |
| 7 | Kuhta, Richard |
| 8 | Lanza, Michael |
| 9 | Pramik, Robert |
| 10 | Prise, Deborah |
| 11 | Rady, Heather |
| 12 | Reddick, Jack L. |
| 13 | Thomas, Sandy |
| 14 | Weinstein, Stacey |

BRENT KNIGHT EXHIBIT L

**TAB 1**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO/OAKLAND DIVISION

| | |
|---|---|
| WILLIAM HELM, DEBORAH PRISE, HEATHER P. RADY, et al., on behalf of themselves and all other employees and former employees similarly situated,<br><br>               Plaintiffs,<br><br>v.<br><br>ALDERWOODS GROUP, INC.,<br><br>               Defendant. | Case No. CV 08-1184-SI<br><br><br>Affirmation |

I, **HERBERT BATH**, under penalty of perjury do hereby depose and voluntarily state:

1.   I have personal knowledge and I am competent to testify as to the matters set forth herein.

2.   I reside at 200 Oak Avenue, Altamont, Kansas 67330.

3.   I was an employee of Alderwoods Group, Inc. from 2000 to June 2005.

4.   I was an Alderwoods Area Manager of seven locations including Bath Funeral Homes in Altamont, KS and Chetopa, KS.

**Alderwoods' Approach to Policies**

5.     As an Area Manager I was not permitted to make decisions as to how and what employees were paid.

6.     I understood these were corporate-wide policies because I received new policy memoranda by facsimile from my Regional Managers, Brent Matherly and Dennis Philips. Employees were required to initial these policy memoranda and they were faxed to these Regional Managers, who then forwarded them to corporate headquarters.

7.     I understood these were corporate-wide policies because I had absolutely no authority to create such policies and was instead instructed by the Regional Managers, Brent Matherly and Dennis Phillips, that all Alderwoods locations were to be uniform in policies.

8.     I understood these were corporate-wide policies because the Regional Managers, Brent Matherly and Dennis Phillips, conducted annual audits to confirm that Alderwoods national policies were being followed.

9.     I understood these were corporate-wide policies because Human Resources/Corporate sent each location five binders containing their policy information.

10.     I understood these were corporate-wide policies because all employee paychecks came from the same corporate location.

11.     As an Area Manager, I was aware of the defendants' company-wide policies and was responsible for the enforcement of such policies. Part of my responsibilities included communicating the policies to Location Managers as well as other employees. I was also expected to ensure that policies were maintained at each of the locations I supervised.

## Community Work Policy

12.  One of these policies was Alderwoods' Community Work Policy. This policy required employees to volunteer their time to outside community organizations.

13.  Alderwoods was clear in expecting this community work to be completed on a "volunteer" basis, and employees were not paid for any time spent performing community work. However, Alderwoods paid all dues for community organizations and events.

14.  I was aware of the policy from a variety of sources since the Community Work Policy was frequently discussed by company executives. For example, I was told about the policy from the Regional Manager, Brent Matherly, while on a manager conference call towards the beginning of my time as an Area Manager.

15.  Company executives, including the Regional Managers, repeatedly emphasized the importance of community work for Alderwoods. I was told on multiple occasions in meetings with both Brent Matherly and Dennis Phillips that under the Alderwoods corporate policy community work was an expectation but was never compensated. The primary purpose of the policy was to establish a relationship with the community in order to generate business for the company.

16.  Besides the frequent conference calls, company executives, including the Regional Managers, Brent Matherly and Dennis Phillips, continued to emphasize the importance of community work for Alderwoods. As an Area Manager, they required me to communicate the policy to employees at each of my locations and ensure they understood and complied with it.

17.  Further, Alderwoods' Regional Managers, Brent Matherly and Dennis Philips, required that all of my Location Managers held employee regular meetings to discuss the "best practices" of where employees could become involved in the community.

18.  Alderwoods emphasized the importance of the Community Work Policy so much that they provided community relation binders on the subject to all funeral home and cemetery locations.  The binders contained information on how employees could effectively volunteer in the community so as to generate business for Alderwoods.

## On Call Pay Policy

19.  Defendants also had a company-wide On Call Pay Policy.

20.  Funeral Directors were typically on call every evening because of the small size of the funeral homes.  As part of the Funeral Director position, employees handled these calls but were not paid by Alderwoods for any time spent on these calls since they were outside of the regular workday and off-site from the funeral home.

21.  Employees were also responsible for performing embalmings and removals while on call and were not always compensated for their work.  Employees were expected to understand it was part of their job and they would not be compensated.

22.  As an Area Manager, I knew Funeral Directors completed mandatory on-call work without being paid for time spent handling phone calls for the business because I understood that on call work was a required part of the position.  I was also aware of the work involved, since I was verbally updated on the on-call activities by those employees the following day.

23.  Further, I was made aware of the On Call Pay Policy from the Regional Managers, Brent Matherly and Dennis Phillips, who indicated the policy was company-wide

and came "directly from up above" and could not be changed.   I expressed my frustration at the Policy of not compensating employees for their on-call work but was repeatedly told in Manager Meetings that it was a company-wide policy.

**Training Policy**

24.   Alderwoods also had a Training Policy which expected funeral directors to complete work outside of the regular work day for no pay.

25.   Funeral Directors were required to obtain and maintain their license in compliance with state law.

26.   If an employee worked on their training hours away from the funeral home and outside the regular work day, then it was not paid for by Alderwoods.

27.   I have read and had an opportunity to correct this Affidavit consisting of 5 pages and I hereby verify under penalty of perjury that the statements contained in this Affidavit are true and correct to the best of my knowledge and belief.

I affirm under penalty of perjury that the foregoing is true and correct.

Executed on September 21, 2009.

HERBERT BATH

- 5 -

**TAB 2**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA

DEBORAH PRISE and HEATHER RADY,
*on behalf of themselves and all other employees*
*similarly situated,*

Plaintiffs,

v.

ALDERWOODS GROUP, INC.

Defendants.

AFFIRMATION

I, Shane Carswell, under penalty of perjury do hereby depose and voluntarily state:

1.  Previously, I submitted an affirmation in support of plaintiffs' motion for expedited collective action notification (my "First Affirmation"). I submit this affirmation to clarify some of the statements I made in the earlier affirmation. I have personal knowledge and I am competent to testify as to the matters set forth herein.

### Pre-Approval for Overtime Policy

2.  In my First Affirmation, I stated that I was aware Alderwoods had a pre-approval for overtime policy under which hourly employees were not compensated for overtime unless they were pre-approved for paid overtime.

3.  I understand that Alderwoods is now claiming that I have not stated which hourly employees or job titles were subject to this policy. I wish to clarify that I did not identify any specific hourly employees or job titles in my First Affirmation because I was aware that this policy applied to *all* hourly employees of Alderwoods.

4.  No manager or other person at Alderwoods ever told me that the pre-approval for overtime policy did *not* apply to any hourly employees or to any hourly job title. I

understood that *all* hourly employees would not be compensated for overtime hours unless they were pre-approved to be paid for that time.

5.    When I was working as a manger at Alderwoods' ABC Jennings Funeral Home, my Operations Manger informed me that the pre-approval for overtime policy was a company-wide policy applicable to all hourly employees.

6.    I also knew of several other employees in other job titles who were subject to the pre-approval for overtime policy.  For example, support staff and secretaries who worked at the same location as me were not paid overtime unless that overtime was pre-approved.  I was also aware that an apprentice who worked at the Sample Road location in Florida, worked overtime for which she was not compensated because it was not pre-approved.

## Meal Break Policy

7.    In my First Affirmation, I also stated that I was aware Alderwoods had a meal break policy that required employees to record a full lunch or meal break, even when employees were unable to take a break or their break was interrupted.

8.    I understand Alderwoods is now claiming that I have not stated which hourly employees or job titles were subject to this policy.  I wish to clarify that I did not identify any specific hourly employees or job titles in my First Affirmation because I was aware that this policy applied to *all* hourly employees of Alderwoods.

9.    No manager or other person at Alderwoods ever told me that the meal break policy did *not* apply to any hourly employees or to any hourly job title.  I understood that *all* hourly employees were required to record a full meal or lunch break.

- 2 -

10. I also knew of several employees in other job titles who were subject to the meal break policy. For example, secretaries and support staff who worked at the same locations as me worked through part or all of their meal periods but were not paid for such time.

11. I have read and had an opportunity to correct this Affirmation consisting of three pages and I hereby verify under penalty of perjury that the statements contained in this Affirmation are true and correct to the best of my knowledge and belief.

I affirm under penalty of perjury that the foregoing is true and correct.

Executed on June _12_, 2008.

Shane Carswell

**TAB 3**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA

DEBORAH PRISE and HEATHER RADY,
*on behalf of themselves and all other employees
similarly situated,*

|  |  |
|---|---|
| Plaintiffs, | AFFIRMATION |
| v. | |
| ALDERWOODS GROUP, INC., | |
| Defendants. | |

I, Steven Detschner, under penalty of perjury do hereby depose and voluntarily state:

1.    I have personal knowledge and I am competent to testify as to the matters set forth herein.

2.    I reside at 5 Windjammer Lane, South Yarmouth, Massachusetts.

3.    I was an employee of Alderwoods Group, Inc. ("Alderwoods" or the "Company") from approximately 2002 until 2004.

4.    While I worked for Alderwoods, I was an Embalmer for approximately two years and after that I was a Funeral Director at Alderwoods' Doane Beal and Anes Funeral Home and Nickerson Funeral Home locations in Massachusetts.

5.    As an Embalmer and as a Funeral Director I was an hourly employee.

<u>Pre-Approval for Overtime Policy</u>

6.    While I was employed by Alderwoods, I was aware that Alderwoods had a pre-approval for overtime policy.  Under that policy hourly employees were not compensated for overtime unless they were pre-approved for paid overtime.

- 1 -

7.    I received a memorandum from one of Alderwoods' regional managers informing me of the pre-approval for overtime policy. Additionally, my location managers David Hunt and Jerry Tilton stated that employees were required to obtain pre-approval for overtime.

8.    Throughout my employment with Alderwoods I often worked overtime that was not pre-approved and I was not compensated for such time. The Company was aware that I worked such overtime. I am also aware of other employees who were not compensated for overtime that was not pre-approved.

## Meal Break Policy

9.    While I was employed by Alderwoods, I was aware that Alderwoods had a meal break policy. Under that policy, employees were not paid for time that was supposed to be a lunch or meal break each day, even when employees were unable to take a break or were interrupted during a break.

10.    Throughout my employment with Alderwoods, I missed meal breaks or was interrupted during a break regularly. Even when I worked during a lunch break, I was paid as though I had taken a full break and I was not compensated for the time I worked during what was supposed to be my break. The Company was aware that I worked during what were supposed to be meal breaks. I am also aware of other employees who worked through their meal breaks or were interrupted during breaks, but were not compensated for that time.

## Training Policy

11.    Alderwoods also maintained a Company-wide policy requiring employees to attend various types of training. Under the policy, however, Alderwoods would only pay employees to attend training if it occurred during their regularly scheduled shifts. When

training was scheduled outside of employees' regular shifts, those employees were not paid for time spent in training.

12. I was required to attend training that did not occur during my regularly scheduled shift and I was not compensated for that time. The Company was aware that I attended training outside of my regular shift. I am also aware of other employees who were required to attend training outside of their regular shifts but were not compensated for that time.

13. I have read and had an opportunity to correct this Affirmation consisting of three pages and I hereby verify under penalty of perjury that the statements contained in this Affirmation are true and correct to the best of my knowledge and belief.

I affirm under penalty of perjury that the foregoing is true and correct.

Executed on April 29 2008.

_Steven a Detschner_

Steven Detschner

**TAB 4**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO/OAKLAND DIVISION

| | | |
|---|---|---|
| WILLIAM HELM, DEBORAH PRISE, HEATHER P. RADY, et al., on behalf of themselves and all other employees and former employees similarly situated, | ) ) ) ) | Case No. CV 08-1184-SI |
| | ) | |
| Plaintiffs, | ) ) | Affirmation |
| | ) | |
| v. | ) ) | |
| | ) | |
| ALDERWOODS GROUP, INC., | ) ) | |
| Defendant. | ) ) | |
| | ) | |

I, **RICK HENSLEY**, under penalty of perjury do hereby depose and voluntarily state:

1.     I have personal knowledge and I am competent to testify as to the matters set forth herein. ·

2.     I reside at 4305 Felty Drive, Knoxville, Tennessee 37918.

3.     I was an employee of Alderwoods Group, Inc. from 2004/2005 to April 2007.

4.     I was employed as a General Manager over five locations in Tennessee including McCarty Mortuary, Evergreen Funeral Chapel, Weaver Funeral Home, Woodhaven Funeral Home and Rawlings Funeral Home.

- 1 -

**Alderwoods' Approach to Policies**

5.     As a General Manager I was not permitted to make decisions as to how and what employees were paid.

6.     I understood these were corporate-wide policies because I received new policy memoranda by facsimile from my Regional Manager, Mitchell Gerth.   Employees were required to initial these policy memoranda and they were faxed to Mitchell Gerth, who then forwarded them to corporate headquarters.

7.     I understood that all the policies that Mitchell Gerth explained to me were being filtered down from headquarters.

8.     I understood these were corporate-wide policies because I had absolutely no authority to create such policies and was instead instructed by the Regional Manager, Mitchell Gerth, that all Alderwoods locations were to be uniform in policies.

9.     I understood these were corporate-wide policies because Human Resources/Corporate sent each location five binders containing their policy information.

10.     I understood these were corporate-wide policies because all employee pay checks came from the same corporate location.

11.     As a General Manager I knew the defendants company-wide policies and was responsible for the enforcement of such policies.   Part of my responsibilities included training and communicating regularly with employees regarding these company policies.   In order to communicate with employees, I held frequent staff meetings and was expected to make sure employees complied with the Alderwoods company policies.

- 2 -

**Community Work Policy**

12.   One of these policies was Alderwoods' Community Work Policy.  This company-wide policy required employees to volunteer their time to outside community organizations and events.

13.   Since Alderwoods expected this community work to be done on a "volunteer" basis, the employees were not paid for any time spent at these outside community organizations and events.

14.   I knew about this policy from a number of sources.  For example, as a General Manager I was told on a conference call by the Regional Manager Mitchell Gerth, that this Community Work Policy was a new nationwide company policy.  Although I cannot recall the specific date of the conversation, I remember the conversation was toward the beginning of my employment as a General Manager.   As stated above, he explained that employees were supposed to perform this work for the company on a purely volunteer basis, not a paid basis.  This work was to be completed outside of their regular scheduled work day.

15.   Company executives, including the Regional Manager, Mitchell Gerth, emphasized the importance of community work for Alderwoods.  The primary purpose of the policy was to help the company by bringing additional business into the funeral home.

16.   Following that call, Alderwoods continued to emphasize the Community Work Policy for its locations, including mine.  Each week I participated in conference calls with company executives, including the Regional Manager, Mitchell Gerth, and I was told to regularly check in with employees and make sure that they were completing the volunteer work and recording it in the defendant's binder.   Employees were required to record all contact and time spent within the community.

- 3 -

17.   I was on these conference calls every single week and the Community Work Policy was a regular discussion topic.  Upper Management, including the Regional Manager, Mitchell Gerth, made it clear that headquarters always wanted to know how and where the employees were performing community work.

18.   When I learned about the program, I was instructed by my Regional Manager, Mitchell Gerth, to hold a meeting to discuss the new Alderwoods community work policy with all Location Managers.  During this meeting all managers brainstormed how they would get their employees to comply with the new policy.

19.   As a General Manager, I was required to ensure that all Location Managers held weekly staff meetings with employees to discuss the importance of community work.  At these meetings suggestions were provided to employees about where they could become involved in the community and "volunteer" time to help Alderwoods develop business.

20.   Alderwoods required me as a General Manager to ensure that all employees complied with the Community Work Policy at their locations.

21.   Alderwoods emphasized the importance of community work so much that they provided binders on the subject.  The community binders contained spreadsheets discussing community influencers and how employees could effectively volunteer in the community so as to generate business for defendants.

22.   The Location Managers would then forward the work sheets to me, which I forwarded to my supervisor, the Regional Manager, Mitchell Gerth.   My understanding was that the work sheets were forwarded to corporate headquarters.

- 4 -

## On Call Pay Policy

23.    Another Alderwoods policy included their company-wide On Call Pay Policy. Employees were required to be on-call on average two days a week and every other weekend.

24.    While on-call, employees were required to handle and respond to all phone-calls that were received by the funeral home.  As part of the Funeral Director position, employees handled these calls but were not paid by Alderwoods for any time spent on these calls since they were outside of the regular workday and off-site from the funeral home.

25.    As Alderwoods employees, Funeral Directors completed mandatory on-call work without being paid for time spent handling phone calls.   I was aware of the work they performed, since I was verbally updated on the on-call activities by those employees the following day.

## Training Policy

26.    Alderwoods also had a company Training Policy which expected Funeral Directors to maintain their licenses.

27.    Funeral directors were required to obtain and maintain their licenses in compliance with Tennessee state law.  Alderwoods paid the costs involved in completing the licensing requirements but Funeral Directors were not paid for the time spent completing the work. As part of the requirement, they had to complete ten continuing education hours of training every two years.

28.    If an employee worked on their training hours away from the funeral home and outside the regular work day, then it was not paid for by Alderwoods.

- 5 -

29.  I have read and had an opportunity to correct this Affidavit consisting of 6 pages and I hereby verify under penalty of perjury that the statements contained in this Affidavit are true and correct to the best of my knowledge and belief.

I affirm under penalty of perjury that the foregoing is true and correct.

Executed on September ___, 2009

RICK HENSLEY

H:\Alderwood Group\Manager Identification\Interview Memos\affirmations\former manager affirmation (Hensley, Rick)FINAL VERSION.doc

**TAB 5**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLAVANIA

DEBORAH PRISE and HEATHER RADY,
*on behalf of themselves and all other employees
similarly situated,*

                                    *Plaintiffs,*                    AFFIRMATION

            v.                                                      Civil Action No.06-1641

ALDERWOODS GROUP, INC. and SERVICE
CORPORATION INTERNATIONAL,
                                    *Defendants.*

I, ROBERT JONES, under penalty of perjury do hereby depose and voluntarily state:

1.    I have personal knowledge and I am competent to testify as to the matters set forth herein.

2.    I reside at 4001 Crosson Drive, Anchorage, Alaska 99517.

3.    I was an employee of Alderwoods Group, Inc. ("Alderwoods" or "the Company") from approximately October 1995 to May 2004.

4.    From my hiring until 2002 I worked for Alderwoods as a Funeral Director at Alderwoods' Evergreen Memorial Chapel in Anchorage, Alaska.

5.    In 2002 I was promoted to Operations Manager.

6.    As a Funeral Director I was an hourly employee and as an Operations Manager I was a salary employee.

7.    As such I was aware of defendants' company-wide policies and was responsible for the enforcement of such policies at my facility.

- 1 -

## Community Work Policy

8.   When I worked for Alderwoods I was aware that the Company had a company-wide policy requiring hourly employees, such as funeral directors, to belong to at least one outside community organization.

9.   Employees were expected to use their membership in "volunteer" community organizations to generate business for the Company.

10.   While I worked for Alderwoods I was involved in community organizations.

11.   I was told by my manager, Scott Janssen, that I needed to join a civic group to bring in more business to the funeral home.

12.   I was not paid for community work performed outside the regular work day even though the Company required such work and was aware I was performing such work.

13.   As both an hourly employee and as a manager I was aware that this community work policy was a nationwide company policy.

## Pre-Approval for Overtime Policy

14.   Defendants also maintained a pre-approval for overtime policy.   Under that policy hourly employees were not compensated for overtime unless it was pre-approved.

15.   As an hourly employee and later as a manager, I was aware that this pre-approval for overtime policy was a company-wide policy.

16.   I was repeatedly informed by my manager, Scott Janssen, that neither I nor any other employees would be compensated for overtime that was worked but was not preapproved.

17.   This policy was even put into writing in a memo I received from the office manager, Kirstin Boyd (formerly Benson) reiterating the mandatory preapproval for overtime

- 2 -

requirement and explicitly stating that employees would not be paid for any overtime that was not pre-approved.

18.    I typically worked overtime each week that was not pre-approved and was not compensated for such time. The Company was aware that I worked such overtime. I am also aware of other employees who were not compensated for overtime that was not pre-approved.

19.    I have read and had an opportunity to correct this Affirmation consisting of 3 pages and I hereby verify under penalty of perjury that the statements contained in this Affirmation are true and correct to the best of my knowledge and belief.

I affirm under penalty of perjury that the foregoing is true and correct.

Executed on April 9, 2007.

ROBERT JONES

- 3 -

TOTAL P.02

**TAB 6**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA

DEBORAH PRISE and HEATHER RADY,
*on behalf of themselves and all other employees
similarly situated,*

           *Plaintiffs,*

   v.

ALDERWOODS GROUP, INC.

           *Defendants.*

**AFFIRMATION**

I, Angela Keath, under penalty of perjury do hereby depose and voluntarily state:

1.  I have personal knowledge and I am competent to testify as to the matters set forth herein.

2.  I reside at 608 North Foreman, Caney, Kansas 67333.

3.  I was an employee of Alderwoods Group, Inc. ("Alderwoods" or the "Company") from approximately 2005 until 2006.

4.  While I worked for Alderwoods, I was a Location Administrator at Alderwoods' Potts Chapel in Independence, Kansas.

5.  As a Location Administrator I was an hourly employee.

<u>Pre-Approval for Overtime Policy</u>

6.  While I was employed by Alderwoods, I was aware that Alderwoods had a pre-approval for overtime policy. Under that policy hourly employees were not compensated for overtime unless the overtime was pre-approved.

7.  As an hourly employee I was aware that this pre-approval for overtime policy was a Company-wide policy, and thus applied to all hourly employees.

8.    I was also informed by my District Manager Mike Skolaut that under Company policy, I would not be paid for any overtime hours I worked that had not been pre-approved.

**Meal Break Policy**

9.    While I was employed by Alderwoods, I was aware that Alderwoods had a meal break policy.  Under that policy, employees were required to record a full lunch or meal break, even when employees were unable to take a break or were interrupted during their meal break.

10.   As an hourly employee I was aware that this meal break policy was a Company-wide policy.

11.   I was also informed by my District Manager Mike Skolaut that employees would not be paid for a full meal break each day, regardless of the fact that most days employees either did not take a lunch, or it was significantly interrupted.

12.   I missed meal breaks or was interrupted during a break regularly.  Even when I worked during a lunch break, I was required to record my time as though I had taken a full break and I was not compensated for the time I worked during what was supposed to be my break.  The Company was aware that I worked during what were supposed to be meal breaks. I am also aware of other employees who worked through their meal breaks or were interrupted during breaks, but were not compensated for that time.

13.   During my employment with Alderwoods I received performance-based bonuses.

14.   I have read and had an opportunity to correct this Affirmation consisting of three pages and I hereby verify under penalty of perjury that the statements contained in this Affirmation are true and correct to the best of my knowledge and belief.

I affirm under penalty of perjury that the foregoing is true and correct.

Executed on April 21, 2008.

_Angela Keath_
Angela Keath

**TAB 7**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA

DEBORAH PRISE and HEATHER RADY,
*on behalf of themselves and all other employees
similarly situated,*

                                        *Plaintiffs,*                  **AFFIRMATION**

        v.

ALDERWOODS GROUP, INC.,

                                     *Defendants.*

      I, Richard T. Kuhta, under penalty of perjury do hereby depose and voluntarily state:

      1.    I have personal knowledge and I am competent to testify as to the matters set forth herein.

      2.    I reside at 17392 Key Lime Boulevard, Loxahatchee, Florida.

      3.    I have worked at the Eternal Light Funeral Chapel in North Miami Beach, Florida ("Eternal Light") since the 1980s. In 1996, Eternal Light was acquired by Loewen Group, which was subsequently acquired by Alderwoods. I am presently still employed at Eternal Light although, since approximately 2007, Eternal Light is no longer an Alderwoods location.

      4.    While I worked for Alderwoods, I was a Funeral Director/Embalmer and an hourly employee.

## Pre-Approval for Overtime Policy

      5.    While I was employed by Alderwoods, I was aware that Alderwoods had a pre-approval for overtime policy. Under that policy hourly employees were not compensated for overtime unless they were pre-approved for paid overtime.

      6.    I learned about the pre-approval policy through a memorandum I received from someone at Alderwoods' regional level. Additionally, my regional manager, Michael Blasberg, said that he would not pay employees overtime.

7.   On occasion I worked overtime that was not pre-approved and I was not compensated for such time.  The Company was aware that I worked such overtime.

Meal Break Policy

8.   While I was employed by Alderwoods, I was aware that Alderwoods had a meal break policy.  Under that policy, employees were required to record a full lunch or meal break, even when employees were unable to take a break or were interrupted during a break.

9.   Although I don't specifically recall how I learned about the meal break policy, I do recall that I learned about it from someone at a management level.  I believe it is most likely that I learned about the policy through a memorandum.

10.  I missed meal breaks or was interrupted during a break regularly.  Even when I worked during a lunch break, I was required to record my time as though I had taken a full break and I was not compensated for the time I worked during what was supposed to be my break.  The Company was aware that I worked during what were supposed to be meal breaks.

11.  During my employment with Alderwoods I occasionally received commissions and/or performance-based bonuses.

12.  I have read and had an opportunity to correct this Affirmation consisting of two pages and I hereby verify under penalty of perjury that the statements contained in this Affirmation are true and correct to the best of my knowledge and belief.


I affirm under penalty of perjury that the foregoing is true and correct.


Executed on April   , 2008.


Richard T. Kuhta

- 2 -

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA

DEBORAH PRISE and HEATHER RADY,
*on behalf of themselves and all other employees
similarly situated,*

                                        *Plaintiffs,*                    AFFIRMATION

            v.

ALDERWOODS GROUP, INC.
                                        *Defendants.*

I, Richard T. Kuhta, under penalty of perjury do hereby depose and voluntarily state:

1.      Previously, I submitted an affirmation in support of plaintiffs' motion for expedited collective action notification (my "First Affirmation"). I submit this affirmation to clarify some of the statements I made in the earlier affirmation. I have personal knowledge and I am competent to testify as to the matters set forth herein.

Pre-Approval for Overtime Policy

2.      In my First Affirmation, I stated that I was aware Alderwoods had a pre-approval for overtime policy under which hourly employees were not compensated for overtime unless they were pre-approved for paid overtime.

3.      I understand that Alderwoods is now claiming that I have not stated which hourly employees or job titles were subject to this policy. I wish to clarify that I did not identify any specific hourly employees or job titles in my First Affirmation because I was aware that this policy applied to *all* hourly employees of Alderwoods.

4.      No manager or other person at Alderwoods ever told me that the pre-approval for overtime policy did *not* apply to any hourly employees or to any hourly job title. I

- 1 -

understood that *all* hourly employees would not be compensated for overtime hours unless they were pre-approved to be paid for that time.

5.   I also knew of several other employees in other job titles who were subject to the pre-approval for overtime policy, including administrative positions and general duty employees.

**Meal Break Policy**

6.   In my First Affirmation, I also stated that I was aware Alderwoods had a meal break policy that required employees to record a full lunch or meal break, even when employees were unable to take a break or their break was interrupted.

7.   I understand Alderwoods is now claiming that I have not stated which hourly employees or job titles were subject to this policy. I wish to clarify that I did not identify any specific hourly employees or job titles in my First Affirmation because I was aware that this policy applied to *all* hourly employees of Alderwoods.

8.   No manager or other person at Alderwoods ever told me that the meal break policy did *not* apply to any hourly employees or to any hourly job title. I understood that *all* hourly employees were required to record a full meal or lunch break.

9.   I have read and had an opportunity to correct this Affirmation consisting of two pages and I hereby verify under penalty of perjury that the statements contained in this Affirmation are true and correct to the best of my knowledge and belief.

I affirm under penalty of perjury that the foregoing is true and correct.

Executed on June *12*, 2008.

Richard T. Kuhta

- 2 -

**TAB 8**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLAVANIA

DEBORAH PRISE and HEATHER RADY,
*on behalf of themselves and all other employees
similarly situated,*

|                              |                      |
|------------------------------|----------------------|
|                *Plaintiffs,* |    AFFIRMATION       |
|    v.                        |                      |
| ALDERWOODS GROUP, INC. and SERVICE CORPORATION INTERNATIONAL, |  |
|                *Defendants.* |                      |

I, MICHAEL LANZA, under penalty of perjury do hereby depose and voluntarily state:

1.   I have personal knowledge and I am competent to testify as to the matters set forth herein.

2.   I reside at P.O. Box 45246, Tacoma, Washington 98445.

3.   I was an employee of Alderwoods Group, Inc. ("Alderwoods" or "the Company") from approximately 1993 until August 2004.

4.   While I worked for Alderwoods I was a Funeral Director/Embalmer at Alderwoods' Powers Funeral Home, Puyallup, Washington.

5.   As a Funeral Director I was an hourly employee.

Community Work Policy

6.   When I worked for Alderwoods I was aware that the Company had a company-wide policy requiring hourly employees, such as funeral directors, to belong to at least one outside community organization.

7.   Employees were expected to use their membership in "volunteer" community organizations to generate business for the Company.

- 1 -

8.    While I worked for Alderwoods I was involved in a number of community organizations.

9.    I was repeatedly told by my manager, Lewis Noel, to attend such community organizations and events to bring in more business to the funeral home.

10.    Alderwoods even provided employees with forms to fill out detailing the type of work done and the amount and date such work was done. I understood that I had to report my hours spent in community work to management.

11.    I was also evaluated on my participation in community work and the Company maintained binders and spreadsheets on community influencers detailing how to effectively volunteer in the community so as to generate business for the Company.

12.    As an hourly employee I was aware that this community work policy was a company wide policy.

13.    I spoke with other funeral directors in other Alderwoods locations, including the Price-Hilton Funeral Home in Auburn, Washington and Schaeffer Shipman Funeral Home in Marysville, Washington, who indicated that they were also told to do community work and were not paid for the time spent at community events and organizations.

14.    Further, I am aware that the regional manager Jim Shipman informed my manager, Lewis Noel about the Company's mandatory community work policy. Mr. Noel then passed the information on to the rest of the staff.

15.    Employees were not paid for community work performed outside the regular work day even though the Company required such work and were aware employees were performing such work.

- 2 -

**On Call Pay Policy**

16.    While I was employed by Alderwoods, I was also aware that the Company had an on call policy requiring funeral directors to spend time on call.  When I was interviewed for my position with Alderwoods, Mr. Noel informed me specifically that there would be an on call requirement to the position.

17.    While I was employed by Alderwoods, I worked 4 on call shifts per week.

18.    Although I frequently handled calls, and other work related issues during my on call time, Alderwoods did not compensate me or other employees for all the time spent engaging in such on call activities, after the workday, off-site from the funeral home.

19.    I also spoke with a number of other funeral directors in other Alderwoods locations who also indicated that they were not paid for time spent on call.  I am also aware that the other funeral director who worked at my location, Craig Morgan, spent time on work related matters while on call that he was not compensated for.

**Pre-Approval for Overtime Policy**

20.    While I worked for Alderwoods I was also aware that Alderwoods had a pre-approval for overtime policy.  Under that policy hourly employees were not compensated for overtime unless the overtime was pre-approved.

21.    As an hourly employee I was aware that this pre-approval for overtime policy was a company-wide policy.

22.    I was also informed by my manager Mr. Noel that the pre-approval for overtime policy was included in the Company's Manager Handbook.

23.    I typically worked overtime each week that was not pre-approved and was not compensated for such time. The Company was aware that I worked such overtime. I am also aware of other employees who were not compensated for overtime that was not pre-approved.

24.    I have read and had an opportunity to correct this Affirmation consisting of 4 pages and I hereby verify under penalty of perjury that the statements contained in this Affirmation are true and correct to the best of my knowledge and belief.

I affirm under penalty of perjury that the foregoing is true and correct.

Executed on January 29, 2007.

/s/ Michael Lanza
MICHAEL LANZA

**TAB 9**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLAVANIA

DEBORAH PRISE and HEATHER RADY,
*on behalf of themselves and all other employees
similarly situated,*

|  |  |  |
|---|---|---|
|  | *Plaintiffs,* | AFFIRMATION |
| v. |  |  |
| ALDERWOODS GROUP, INC. and SERVICE CORPORATION INTERNATIONAL, | | |
|  | *Defendants.* |  |

I, ROBERT PRAMIK, under penalty of perjury do hereby depose and voluntarily state:

1.    I have personal knowledge and I am competent to testify as to the matters set forth herein.

2.    I reside at 1125 RBD Hill Road, Dauphin, Pennsylvania 17018.

3.    I was an employee of Alderwoods Group, Inc. from 1992 until March 2005.

4.    Beginning in 1992 until 1997 I worked as a part time employee.  In August 1997 until May 1999 I worked as a student intern.  From that time until June 2000 I worked as a student resident.  From approximately June 2000 to August 2000 I was employed as a licensed funeral director and from August 2000 until on or about September 2003 I was employed as a location manager.  Finally, from September 2003 until March 2005 I worked as a market general manager.

5.    Throughout my employment with defendants I was employed at defendants' Neill Funeral Homes with locations in Harrisburg, Pennsylvania and Camp Hill, Pennsylvania.

6.    As a part time employee, student intern, student resident and licensed funeral director I was an hourly employee.

1

7.     As a location manager and market general manager I was a salaried employee. As such I was aware of defendants' company-wide policies and was responsible for the enforcement of such policies at my facilities.  The policies were issued from defendants' New England offices and most were contained in defendants' "Policy and Procedures Binder."

**Community Work Policy**

8.     Defendants maintained a company-wide policy requiring hourly employees, such as funeral directors, to belong to at least one outside community organization.

9.     Employees were expected to use their' membership in "volunteer" community organizations to generate business for defendants.

10.     Such community work was mandated by defendants and was even included in the job descriptions for funeral directors.

11.     Defendants even evaluated employees on their participation in community work.

12.     Defendants also maintained binders and spreadsheets on community influencers detailing how to effectively volunteer in the community so as to generate business for defendants.

13.     Further, defendants required hourly employees to keep track of their community work and provide detail on who the community work was with and how that community influencer rated in terms of importance to the community.

14.     The employees were required to turn in their detailed community involvement work sheets to their manager every four weeks.  As a location manager I was in charge of collecting the community work sheets from my employees.

15.     As a market general manager I would collect the community work sheets from the location manager and retain the work sheets in a binder to be reviewed by the regional manger.

2

As a market general manager I would individually review each employee's community involvement work sheet.

16. As both an hourly employee and as a manager I was aware that this community work policy was a nationwide company policy.

17. Employees were not paid for community work performed outside the regular work day even though defendants required such work and were aware employees were performing such work.

**On Call Pay Policy**

18. Defendants maintained a company-wide on call pay policy.

19. Under this policy, employees were typically required to be on call at least every other night and every other weekend while employed by defendants and the on call shifts were from 5 p.m. to 8 a.m.

20. Although employees were required to, and frequently handled, calls and other work related issues during this on call time, defendants did not compensate me or other employees for time spent engaging in such on call activities, after the work, off-site from the funeral home.

**Training Policy**

21. Defendants maintained a company-wide policy requiring licensed funeral directors to train for and become licensed insurance agents in states where pre-need funeral sales could be funded by insurance.

22. Employees were informed of this requirement by Ted Reese, Alderwoods Market General Manager, during a staff meeting. While I was a market general manager I was also aware of this requirement and relayed it to staff during meetings.

3

24.    Ted Reese indicated to the staff that he was communicating the insurance agent requirement as it had been communicated to him by the Regional Manager.

25.    Defendants maintained an insurance company, Mayflower National Life Insurance Company ("Mayflower"), through which employees, who were located in states where Mayflower was licensed and where pre-need funeral sales could be funded by Insurance, were required to obtain their license.

26.    In pursuit of their license, employees were required to attend classes and take exams. Employees were also required to study on their own time, such as at home, after hours, and on the weekends, for such exams.

27.    Once employees obtained their insurance agent licenses they were required to complete continuing education classes. In Pennsylvania, licensed insurance agents were required to complete 24 continuing education credits every other year.

28.    Under company-wide policy defendants' employees were generally not paid for time spent in classes, time spent studying for and taking exams, and for time spent completing the continuing education classes.

29.    As a manager I was aware that defendants' policy of not compensating employees for time spent in pursuit of the required insurance license was nation wide company policy.

Pre-Approval for Overtime Policy

30.    Defendants also maintained a pre-approval for overtime policy. Under that policy hourly employees were not compensated for overtime unless the overtime was pre-approved.

31.    As an hourly employee and later as a manager, I was aware that this pre-approval for overtime policy was a nation-wide company policy.

4

32.    Further, defendants would consistently remind employees at staff meetings that no overtime would be paid even if it was worked, unless it had been pre-approved.

33.    Market General Manager Ted Reese informed the staff that all overtime must be pre-approved by him and that any overtime submitted without approval would not be paid.

34.    While I was a  market general manager I informed the staff that all overtime must be pre-approved by him and that any overtime submitted without approval would not be paid.

35.    I typically worked overtime each week that was not pre-approved and was not compensated for such time. Defendants were aware that I worked such overtime. I am also aware of other employees who were not compensated for overtime that was not pre-approved.

36.    I have read and had an opportunity to correct this Affirmation consisting of 5 pages and I hereby verify under penalty of perjury that the statements contained in this Affirmation are true and correct to the best of my knowledge and belief.  I affirm under penalty of perjury that the foregoing is true and correct.

Executed on February 7, 2007

                                     /s/ Robert Pramik
                                     ROBERT PRAMIK

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA

DEBORAH PRISE and HEATHER RADY,
*on behalf of themselves and all other employees
similarly situated,*

|  |  |
|---|---|
| *Plaintiffs,* | AFFIRMATION |
| v. | |
| ALDERWOODS GROUP, INC., | |
| *Defendants.* | |

I, **Robert Pramik,** under penalty of perjury do hereby depose and voluntarily state:

1.     I have personal knowledge and I am competent to testify as to the matters set forth herein.

2.     I reside at 1125 Red Hill Road, Dauphin, Pennsylvania 17018.

3.     I was an employee of Alderwoods Group, Inc. ("Alderwoods" or the "Company") from approximately 1992 until 2005.

4.     Beginning in 1992 until 1997 I worked as a part time employee.   From approximately 1997 until 1999 I worked as a student intern.   From that time until approximately 2000 I worked as a student resident.   From approximately 2000 until 2002 I was employed as a licensed funeral director and from approximately 2002 until 2003 I was employed as a location manager.   Finally, from approximately 2003 until 2005 I worked as a market general manager.

5.     Throughout my employment with Alderwoods I was employed at Alderwoods' Neill Funeral Homes with locations in Harrisburg, Pennsylvania and Camp Hill, Pennsylvania.

- 1 -

6. As a part time employee, student intern, student resident and licensed funeral director I was an hourly employee.

7. As a location manager and market general manager I was a salaried employee. As such I was aware of Alderwoods' company-wide policies and was responsible for the enforcement of such policies at my facilities. The policies were issued from Alderwoods' New England offices and most were contained in Alderwoods' "Policy and Procedures Binder."

### Pre-Approval for Overtime Policy

8. While I was employed by Alderwoods, I was aware that Alderwoods had a pre-approval for overtime policy. Under that policy hourly employees were not compensated for overtime unless the overtime was pre-approved.

9. As an hourly employee and later as a manager I was aware that this pre-approval for overtime policy was a Company-wide policy.

10. Alderwoods would consistently remind employees at staff meetings that no overtime would be paid, even if it was worked, unless it had been pre-approved.

11. Market General Manager Ted Reese informed the staff that all overtime must be pre-approved by him and that any overtime submitted without approval would not be paid.

12. While I was a market general manager I informed the staff that all overtime must be pre-approved by him and that any overtime submitted without approval would not be paid.

13. I typically worked overtime each week that was not pre-approved and I was not compensated for such time. The Company was aware that I worked such overtime. I am also aware of other employees who were not compensated for overtime that was not pre-approved.

### Meal Break Policy

14. While I was employed by Alderwoods, I was aware that Alderwoods had a meal break policy. Under that policy, the Company recorded a full lunch or meal break for employees, even when employees were unable to take a break or were interrupted during a break.

15. As an hourly employee and later as a manager I was aware that this meal break policy was a Company-wide policy.

16. I was also informed by my manager Ted Reese that employees would not be paid for a full meal break each day, regardless of the fact that most days employees either did not take a lunch, or it was significantly interrupted.

17. I missed meal breaks or was interrupted during a break regularly. Even when I worked during a lunch break, the company automatically deducted a full meal break from my work time and I was not compensated for the time I worked during what was supposed to be my break. The Company was aware that I worked during what were supposed to be meal breaks. I am also aware of other employees who worked through their meal breaks or were interrupted during breaks, but were not compensated for that time.

**Training Policy**

18. Alderwoods also maintained a Company-wide policy requiring employees to attend various types of training. Under the policy, however, Alderwoods would only pay employees to attend training if it occurred during their regularly scheduled shifts. When training was scheduled outside of employees' regular shifts, those employees were not paid for time spent in training.

19. As an hourly employee I was aware that this training policy was a Company-wide policy.

- 3 -

20.  I was also informed by my manager Ted Reese that any training that took place outside regular working hours would not be paid.

21.  I was required to attend training that did not occur during my regularly scheduled shift and I was not compensated for that time.  The Company was aware that I attended training outside of my regular shift.  I am also aware of other employees who were required to attend training outside of their regular shifts but were not compensated for that time.

22.  During my employment with Alderwoods I occasionally received commissions and/or performance-based bonuses.

23.  I have read and had an opportunity to correct this Affirmation consisting of four pages and I hereby verify under penalty of perjury that the statements contained in this Affirmation are true and correct to the best of my knowledge and belief.

I affirm under penalty of perjury that the foregoing is true and correct.

Executed on April 2?, 2008.

Robert Pramik

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA

DEBORAH PRISE and HEATHER RADY,
*on behalf of themselves and all other employees
similarly situated,*

                     *Plaintiffs,*

      v.

ALDERWOODS GROUP, INC.

                     *Defendants.*

**AFFIRMATION**

I, Robert Pramik, under penalty of perjury do hereby depose and voluntarily state:

1. Previously, I submitted an affirmation in support of plaintiffs' motion for expedited collective action notification (my "First Affirmation"). I submit this affirmation to clarify some of the statements I made in the earlier affirmation. I have personal knowledge and I am competent to testify as to the matters set forth herein.

2. As set forth more fully in my First Affirmation, I learned of all of the policies described below during my time at Alderwoods both as an hourly employee and later as a manager responsible for implementing and enforcing the policies.

**Pre-Approval for Overtime Policy**

3. In my First Affirmation, I described the Pre-Approval for Overtime Policy and stated that this policy was a company-wide policy that applied to hourly employees.

4. I understand that Alderwoods is now claiming that I have not stated which hourly employees or job titles were subject to this policy. I wish to clarify that I did not identify any specific hourly employees or job titles in my First Affirmation because it was my understanding that this policy applied to *all* hourly employees of Alderwoods.

- 1 -

5.    I was aware that the Regional General Manager for Alderwoods' New England region, whose name I do not recall, but who was the Regional General Manager who preceded George Amatto, established the policy region-wide that all hourly employees were not paid for overtime unless it was pre-approved.

6.    Moreover, it is my understanding that the written policy on pre-approval for overtime policy that Alderwoods maintained in its company "Policy and Procedures Binder" did not limit the policy to a subset of hourly employees or to certain job titles.  Instead, that written policy applied to all hourly employees.

7.    Employees were also reminded at staff meetings held once or twice a week that no overtime would be paid unless it had been pre-approved, and those reminders applied to all hourly employees, regardless of job title.  We were never told that certain job titles or groups of hourly employees were exempt from the policy.

8.    When Market General Manager Ted Reese informed the staff that all overtime must be pre-approved and any overtime that was not pre-approved would not be paid, he also stated that the requirement applied to all hourly employees.  Mr. Reese did not indicate that any hourly employees were exempt from the policy or would be paid for unapproved overtime.

9.    No manager or other person at Alderwoods ever told me that this policy did *not* apply to any hourly employees or to any hourly job title.  I understood that *all* hourly employees would not be compensated for overtime hours unless they were pre-approved to be paid for that time.

10.  I also know of employees in other job titles who were subject to the pre-approval for overtime policy, including marketing assistants and secretaries.

- 2 -

**Meal Break Policy**

11. While I was employed by Alderwoods, I was aware that Alderwoods had a meal break policy. Under that policy, employees were required to record a full lunch or meal break, even when employees were unable to take a break or were interrupted during a break.

12. As a manager, I was aware that this meal break policy was a company-wide policy. I also was aware that it applied to all hourly employees, regardless of location or job title. There were no hourly employees or hourly job titles that were exempt from this policy.

13. I was also informed of the meal break policy by my manager, Ted Reese. I knew that the meal break policy was at least a region-wide policy that applied to all hourly employees, and because Mr. Reese always said the policy "came from above," it was my understanding that this policy was a company-wide policy that applied to all hourly employees.

**Training Policy**

14. While I was employed by Alderwoods, I was aware that Alderwoods had a company-wide policy requiring employees to attend various types of training but Alderwoods would only pay employees to attend training that occurred during their regularly scheduled shifts. When training was scheduled outside of employees' regular shifts, those employees were not paid for time spent in training.

15. I was informed by my manager, Ted Reese, that any training that took place outside regular working hours would not be paid and that this policy was a company-wide policy that applied to all hourly employees.

- 3 -

16.  As a manager, I was aware that this training policy was a company-wide policy. I also was aware that it applied to all hourly employees, regardless of location or job title. There were no hourly employees or hourly job titles that were exempt from this policy.

17.  I have read and had an opportunity to correct this Affirmation consisting of four pages and I hereby verify under penalty of perjury that the statements contained in this Affirmation are true and correct to the best of my knowledge and belief.


I affirm under penalty of perjury that the foregoing is true and correct.


Executed on June __, 2008.

_____
**Robert Pramik**

**TAB 10**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA

DEBORAH PRISE and HEATHER RADY,
*on behalf of themselves and all other employees*
*similarly situated,*

                                    *Plaintiffs,*                    **AFFIDAVIT**

        v.

ALDERWOODS GROUP, INC. and SERVICE
CORPORATION INTERNATIONAL,

                                    *Defendants.*

I, **DEBORAH PRISE**, under penalty of perjury do hereby depose and voluntarily state:

1.    I have personal knowledge and I am competent to testify as to the matters set forth herein.

2.    I reside at 5 Bayard Road, Pittsburgh, PA 15213.

3.    I was an employee of Alderwoods Group, Inc. from December 2002 until November 2005.

4.    Beginning in 2002 I first worked as a student trainee, then a resident intern, and then a licensed funeral director through May 2005.

5.    Beginning in May 2005 until November 2005 I was employed as a manager of defendants at defendants' Burton L. Hirsch Funeral Home Inc.

6.    As a student trainee, resident intern and licensed funeral director I was an hourly employee.

7.    As a manager I was a salaried employee. As such I was aware of defendants' company-wide policies and was responsible for the enforcement of such policies at my facility. The policies were issued from defendants' Cincinnati, Ohio

- 1 -

headquarters and most were contained in defendants' "Policy and Procedures Binder."

Community Work Policy

8.  Defendants maintained a company-wide policy requiring hourly employees, such as funeral directors, to belong to at least one outside community organization.

9.  Employees were expected to use their membership in "volunteer" community organizations to generate business for defendants.

10.  Such community work was mandated by defendants and was even included in the job descriptions for funeral directors.

11.  Defendants even evaluated employees on their participation in community work.

12.  Defendants also maintained binders and spreadsheets on community influencers detailing how to effectively volunteer in the community so as to generate business for defendants.

13.  Further, defendants required hourly employees to keep track of their community work and provide detail on who the community work was with and how that community influencer rated in terms of importance to the community.

14.  The employees were required to turn in their detailed community work sheets to their manager every four weeks.

15.  The manager would then forward the work sheets on to the Market Manager and then to the Regional Manager.  My understanding was that the work sheets were then forwarded to defendants' headquarters.

16.  As both an hourly employee and as a manager I was aware that this community work policy was a nationwide company policy.

17. While I was an intern and manager, corporate management visited my funeral home location and commended me on the amount of community work I was performing.

18. Defendants rewarded employees who engaged in community work by giving them incentive points. Such points could be accumulated by employees and later turned in for gift certificates and other rewards. Employees, however, were not paid for community work performed outside the regular work day even though defendants required such work and were aware employees were performing such work.

On Call Pay Policy

19. Defendants maintained a company-wide on call pay policy.

20. Under this policy, employees were typically required to be on call at least every other night and every other weekend while employed by defendants.

21. Although employees were required to, and frequently handled, calls and other work related issues during this on call time, defendants did not compensate me or other employees for time spent engaging in such on call activities, after the workday, off-site from the funeral home.

22. As a manager I was aware that defendants failure to pay employees for work done while on call was a nationwide company-wide policy.

23. I was informed of the company-wide policy by defendants' management throughout my tenure with defendants.

24. In approximately July 2006 defendants announced that they would be changing their company-wide on call policy to provide employees compensation for any phone calls employees were required to take after completing their regular work

- 3 -

schedule and leaving the premises.  Employees, however, were not paid for their past

on call work that they performed prior to that time.

<u>Training Policy</u>

25.  Defendants maintained a company-wide policy requiring licensed funeral

directors to train for and become licensed insurance agents in states where preneed

funeral sales could be funded by insurance.

26.  Employees were informed of this requirement by Pat McDermott,

Alderwoods Market General Manager, during a staff meeting.

27.  Mr. McDermott indicated to the staff that he was communicating the

insurance agent requirement as it had been communicated to him by the Regional

Manager.

28.  Defendants maintained an insurance company, Mayflower National Life

Insurance Company ("Mayflower"), through which employees, who were located in

states where Mayflower was licensed and where preneed funeral sales could be funded

by insurance, were required to obtain their license.

29.  In pursuit of their license employees were required to attend classes and

take exams.  Employees were also required to study on their own time, such as at

home, after hours, and on the weekends, for such exams.

30.  Once employees obtained their insurance agent licenses they were

required to complete continuing education classes.   In Pennsylvania, licensed

insurance agents were required to complete 24 continuing education credits every

other year.

31.  Under company-wide policy defendants' employees were generally not paid

for time spent in classes, time spent studying for and taking exams, and for time

spent completing the continuing education classes.

- 4 -

32. As a manager I was aware that defendants' policy of not compensating employees for time spent in pursuit of the required insurance license was a nationwide company policy.

Pre-Approval for Overtime Policy

33. Defendants also maintained a pre-approval for overtime policy. Under that policy hourly employees were not compensated for overtime unless the overtime was pre-approved.

34. As an hourly employee, and later as a manager, I was aware that this pre-approval for overtime policy was a nationwide company policy.

35. Defendants maintained a written policy on pre-approval for overtime policy in their company "Policy and Procedures Binder."

36. Further, defendants would consistently remind employees at staff meetings that no overtime would be paid, even if it was worked, unless it had been pre-approved.

37. At an October 8, 2003 staff meeting of the Pittsburgh market staff, Mr. McDermott informed the staff that all overtime must be pre-approved by him and that any overtime submitted without approval would not be paid.

38. I typically worked overtime each week that was not pre-approved and was not compensated for such time. Defendants were aware that I worked such overtime. I am also aware of other employees who were not compensated for overtime that was not pre-approved.

Failure to Include All Remuneration in Overtime Calculation

39. Defendants also maintained a policy of not including all remuneration (including bonuses and commissions) in their overtime calculations.

- 6 -

40.  I have read and had an opportunity to correct this Affidavit consisting of 6 pages and I hereby verify under penalty of perjury that the statements contained in this Affidavit are true and correct to the best of my knowledge and belief.

I affirm under penalty of perjury that the foregoing is true and correct.

Executed on December 7, 2006.

_____
DEBORAH PRISE

**TAB 11**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLAVANIA

DEBORAH PRISE and HEATHER RADY,
*on behalf of themselves and all other employees*
*similarly situated,*

Plaintiffs,

v.

ALDERWOODS GROUP, INC. and SERVICE
CORPORATION INTERNATIONAL,

Defendants.

AFFIDAVIT

I, **HEATHER RADY**, under penalty of perjury do hereby depose and voluntarily state:

1.      I have personal knowledge and I am competent to testify as to the matters set forth herein.

2.      I reside at 634 State Street, Greensburg, PA 15601.

3.      I was an employee of Alderwoods Group, Inc. from July 2002 through August 2006.

4.      Throughout my employment with defendants, I was a licensed funeral director and supervisor of H. Samson Inc. in the Commonwealth of Pennsylvania. I am also a licensed insurance agent.

5.      As a licensed funeral director, I was an hourly employee.

**Community Work Policy**

6.      Defendants maintained a company-wide policy requiring hourly employees, such as funeral directors, to belong to at least one outside community organization.

7.      Employees were expected to use their membership in "volunteer" community organizations to generate business for defendants.

8.      Such community work was mandated by defendants and was even included in the job description for funeral directors.

9.      Defendants even evaluated employees on their participation in community work.

- 1 -

10.    Defendants also maintained binders and spreadsheets on Community Influencers detailing how to effectively volunteer in the community so as to generate business for defendants.

11.    Further, defendants required hourly employees to keep track of their community work and provide detail on who the community work was with and how that community influencer rated in terms of importance to the community.

12.    The employees were required to turn in their detailed community work sheets to their manager every four weeks.

13.    The manager would then forward the work sheets on to the Market Manager and then to the Regional Manager.

14.    Defendants rewarded employees who engaged in community work by giving them incentive points.  Such points could be accumulated by employees and later turned in for gift certificates and other rewards.  Employees, however, were not paid for community work performed outside the regular work day even though defendants required such work and were aware employees were performing such work.

**On Call Pay Policy**

15.    Defendants also maintained a company-wide on call pay policy.

16.    Under this policy, funeral directors were required to be on call at least every other night and every other weekend while employed by defendants.

17.    Although, employees were required to, and frequently handled, calls and other work related issues during this on call time, defendants did not compensate me or other employees for time spent engaging in such on call activities, after the workday, off-site from the funeral home.

18.    I spoke with other funeral directors in other Alderwoods locations in other states who also indicated that they were not paid for time spent on call.

19.    In approximately July 2005 defendants announced that they would be changing their company-wide on call policy to provide employees compensation for any phone calls employees were

required to take after completing their regular work schedule and leaving the premises. Employees, however, were not paid for their past on call work that they performed prior to that time.

20.    Defendants' written policy after this change reflected the announced changes.

21.    After the policy change, employees began being provided with "After Hours Call Log[s]" to keep track of any phone calls they took after their regularly scheduled work day. Before this policy change, defendants did not keep records of the employees' time spent on the required on call, after business hours work.

**Training Policy**

22.    Defendants further maintained a company-wide policy requiring licensed funeral directors to train for and become licensed insurance agents in states where preneed funeral sales could be funded by insurance.

23.    Employees were informed of this requirement by Pat McDermott, Alderwoods Market General Manager, during a staff meeting.

24.    Mr. McDermott indicated to the staff that he was communicating the insurance agent requirement as it had been communicated to him by the Regional Manager.

25.    Defendants maintained an insurance company, Mayflower National Life Insurance Company ("Mayflower"), through which employees, who were located in states where Mayflower was licensed and where preneed funeral sales could be funded by insurance, were required to obtain their license.

26.    Although I was already a licensed insurance agent, I am aware that in pursuit of their insurance license other employees were required to attend classes and take exams. Employees were also required to study on their own time, such as at home, after hours, and on the weekends, for such exams.

27.    Once employees obtained their insurance agent licenses they were required to complete continuing education classes. In Pennsylvania, licensed insurance agents were required to complete 24 continuing education credits every other year.

- 3 -

28.    I am aware that under company-wide policy defendants employees were generally not paid for time spent in classes, time spent studying for and taking exams, and for time spent completing the continuing education classes.

**Pre-Approval for Overtime Policy**

29.    Defendants also maintained a pre-approval for overtime policy. Under that policy hourly employees were not compensated for overtime unless the overtime was pre-approved.

30.    Defendants maintained a written policy on pre-approval for overtime in their company "Policy and Procedures Binder."

31.    Further, defendants would consistently remind employees at staff meetings that no overtime would be paid, even if it was worked, unless it had been pre-approved.

32.    At an October 8, 2003 staff meeting of the Pittsburgh market staff, Mr. McDermott informed the staff that all overtime must be pre-approved by him and that any overtime submitted without approval would not be paid.

33.    I typically worked overtime each week that was not pre-approved and was not compensated for such time. Defendants were aware that I worked such overtime. I am also aware of other employees were not compensated for overtime that was not pre-approved.

**Failure to Include All Remuneration in Overtime Calculation**

34.    Defendants also maintained a policy of not including all remuneration (including bonuses and commissions) in their overtime calculations.

35.    I have read and had an opportunity to correct this Affidavit consisting of 5 pages and I hereby verify under penalty of perjury that the statements contained in this Affidavit are true and correct to the best of my knowledge and belief.

I affirm under penalty of perjury that the foregoing is true and correct.

Executed on December 7, 2006.

_Heather P. Rady_

HEATHER RADY

- 4 -

**TAB 12**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLAVANIA

DEBORAH PRISE and HEATHER RADY,
*on behalf of themselves and all other employees
similarly situated,*

|  |  |  |
|---|---|---|
|  | *Plaintiffs,* | **AFFIRMATION** |
| v. |  |  |
| ALDERWOODS GROUP, INC. and SERVICE CORPORATION INTERNATIONAL, | | |
|  | *Defendants.* | |

I, **JACK L. REDDICK,** under penalty of perjury do hereby depose and voluntarily state:

1.    I have personal knowledge and I am competent to testify as to the matters set forth herein.

2.    I reside at  328 Westminster Road, Independence, Kansas.

3.    I was an employee of Alderwoods Group, Inc. ("Alderwoods" or "the Company") from approximately July 2003 until December 2006.

4.    While I worked for Alderwoods I was an Assistant Funeral Director at Potts Chapel in Independence, Kansas.

5.    As an Assistant Funeral Director I was an hourly employee.

<u>Community Work Policy</u>

6.    When I worked for Alderwoods I was aware that the Company had a company-wide policy requiring hourly employees, such as assistant funeral directors, to belong to at least one outside community organization.

7.    Employees were expected to use their membership in "volunteer" community organizations to generate business for the Company.

- 1 -

8.   While I worked for Alderwoods I was involved in a number of community organizations.

9.   I was repeatedly told by my manager, David Hill, and the district manager, Mike Skolout that Alderwoods expected me as their employee to attend such community organizations and events.

10.  Alderwoods even provided employees with forms to fill out detailing the type of work done and the amount and date such work was done.  I understood that I had to frequently report such information to management.

11.  I was also evaluated on my participation in community work and the company maintained binders detailing how to effectively volunteer in the community so as to generate business for the Company.

12.  As an hourly employee I was aware that this community work policy was a company wide policy.

13.  I also spoke with other funeral directors in other Alderwoods locations who indicated that they were also told to do community work and were not paid for the time spent at community events and organizations.

14.  Employees were not paid for community work performed outside the regular work day even though the Company required such work and were aware employees were performing such work.

On Call Pay Policy

15.  While I was employed by Alderwoods, I was also aware that the Company had an on call policy requiring funeral directors and assistant funeral directors to spend time on call.

16.  While I worked for Alderwoods, I spent 24 hours a day for 7 days a week on call.

- 2 -

17.   Although I frequently handled calls, and other work related issues during my on call time, Alderwoods did not compensate me or other employees for time spent engaging in such on call activities, after the workday, off-site from the funeral home.

18.   I also spoke with a number of other funeral directors in other Alderwoods locations who also indicated that they were not paid for time spent on call.

Pre-Approval for Overtime Policy

19.   While I worked for Alderwoods I was also aware that Alderwoods had a pre-approval for overtime policy.  Under that policy hourly employees were not compensated for overtime unless the overtime was pre-approved.

20.   Management even maintained a written policy on pre-approval for overtime policy in their company "Policy and Procedures Binder."

21.   Further, the Company would consistently remind employees at staff meetings that no overtime would be paid, even if it was worked, unless it had been pre-approved.  Myself, and other employees at my location, would also frequently be "chewed out" by our manager if we failed to obtain pre-approval for overtime worked.

22.   I typically worked overtime each week that was not pre-approved and was not compensated for such time.  The Company was aware that I worked such overtime.  I am also aware of other employees who were not compensated for overtime that was not pre-approved.

- 3 -

23.    I have read and had an opportunity to correct this Affirmation consisting of 4 pages and I hereby verify under penalty of perjury that the statements contained in this Affirmation are true and correct to the best of my knowledge and belief.

I affirm under penalty of perjury that the foregoing is true and correct.

Executed on January 26, 2007.

/s/ Jack L. Reddick
JACK L. REDDICK

**TAB 13**

1

2      I, **Sandy Thomas,** under penalty of perjury do hereby depose and voluntarily state:

3      1.    I have personal knowledge and I am competent to testify as to the matters set

4      forth herein.

5      2.    I reside at 5334 Cartaro Drive, Las Vegas, Nevada 89103.

6      3.    I was an employee of Alderwoods, Inc. ("Alderwoods" or the "Company") from

7      approximately 2002 until December 2006.

8      4.    While I worked for Alderwoods, I worked as a Location Manager and Funeral

9      Director.

10     5.    As a Location Manager and Funeral Director, I was an hourly employee.   As a

11     Location Manager and Funeral Director I was responsible for complying with all Alderwoods

12     Company-wide policies at my facilities.   The policies were issued from Alderwoods'

13     headquarters and some of the policies were contained in the "Policy and Procedures Binder."

14     <u>On Call Pay Policy</u>

15     6.    Alderwoods' headquarters maintained an On Call Pay Policy while I was

16     employed by Alderwoods.

17     7.    This corporate On Call Pay Policy meant that Alderwoods employees were

18     paid for only part of the work they did while on call.  Under this policy, I was instructed by

19     my manager Todd Notoker to only record 15 minutes while handling phone calls, regardless

20     of how long the call actually took.   Therefore, I was not compensated for all of my on call

21     work when it was completed outside the workday and away from the funeral home.

22     8.    In all my years at Alderwoods, I had been instructed by management as to the

23     terms and existence of the On Call Policy and this policy was rigidly enforced by company

24     management.

25     9.    As a Location Manager and Funeral Director, I was required to work on call

26     approximately one night a week.

27

- 1 -

10. Alderwoods required that I be available to make arrangements while on call and was not compensated for all my time by Alderwoods because I was not at the funeral home when making those calls.

11. I had conversations with co-workers and employees at other locations who expressed they were similarly experiencing the On Call Pay Policy.

**Training Policy**

12. Alderwoods' headquarters maintained a Training Policy while I was employed by Alderwoods. Alderwoods' Company-wide Training Policy required employees to attend various types of training without compensation in order to maintain their position with the company. Under the policy, however, Alderwoods would only pay employees to attend training if it occurred during their regularly scheduled shifts. When training was scheduled outside of employees' regular shifts, those employees were not paid for time spent in training.

13. In all my years at Alderwoods, I had been instructed by management as to the terms and existence of the Training Policy and this policy was rigidly enforced by company management.

14. I was informed by the General Manager Todd Notoker that any training that took place outside regular working hours would not be paid.

15. I prepared for and completed mandatory online trainings that were completed outside the regular workday and was not compensated for my time. The Company was aware that I completed these trainings because my manager monitored my progress. Other employees were also required to attend training outside of their regular shifts but were not compensated for that time.

16. I had conversations with co-workers and employees at other locations who expressed they were similarly experiencing the Training Policy.

1          **Unrecorded Work Time Policy**

2          17.     Alderwoods' headquarters maintained an Unrecorded Work Time Policy while

3   I was employed by Alderwoods.  Under that policy hourly employees were encouraged or

4   required not to record all overtime hours worked.

5          18.     In all my years at Alderwoods, I had been instructed by management as to the

6   terms and existence of the Unrecorded Work Time Policy and this policy was rigidly enforced

7   by company management.

8          19.     General Manager Todd Notoker informed the staff that they should not record

9   all of their overtime hours and should instead keep hours low.  The managers regularly

10  reminded employees that not recording such overtime would improve Alderwoods' profits,

11  and be better for employees in the long run.

12         20.     While employed by Alderwoods, I typically worked overtime each week that I

13  was required not to record.  The Company was aware that I worked such overtime because

14  my manager typically saw me completing the work.  Other employees similarly did not record

15  all of their overtime hours because management required them not to.

16         21.     Neither I nor other employees were ever compensated for such unrecorded

17  hours.

18         22.     I had conversations with co-workers and employees at other locations who

19  expressed they were similarly experiencing Unrecorded Pay Policy.

20

21

22

23

24

25

26

27

- 3 -

23.    I have read and had an opportunity to correct this Affirmation consisting of four pages and I hereby verify under penalty of perjury that the statements contained in this Affirmation are true and correct to the best of my knowledge and belief.

Executed on September 21, 2009.


_Sandy Thomas_    09-21-2009
Sandy Thomas

-4-

**TAB 14**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO/OAKLAND DIVISION

| | |
|---|---|
| WILLIAM HELM, DEBORAH PRISE, HEATHER P. RADY, et al., on behalf of themselves and all other employees and former employees similarly situated, | ) Case No. CV 08-1184-SI )<br>)<br>)<br>) |
| Plaintiffs, | ) Affirmation )<br>) |
| v. | )<br>) |
| ALDERWOODS GROUP, INC., | )<br>) |
| Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

I, **Stacey Weinstein**, under penalty of perjury do hereby depose and voluntarily state:

1.     I have personal knowledge and I am competent to testify as to the matters set forth herein.

2.     I reside 33 Centennial Court, Deerfield Beach, Florida 33442.

3.     I was an employee of Alderwoods, Inc. ("Alderwoods" or the "Company") from approximately August 2003 until May 9, 2007.

- 1 -

4.      While I worked for Alderwoods, I worked as a Location Manager out of their Levitt-Weinstein location in Coconut Creek, Florida and Star of David Funeral Home in Tamarac, Florida.

**Alderwoods' Approach to Policies**

5.      As a Location Manager I was not permitted to make decisions as to how and what employees were paid.

6.      I understood these were corporate-wide policies because I received new policy memoranda by facsimile from my Regional Manager, Neil Hornfield.  Employees were required to initial these policy memoranda and they were faxed to Neil Hornfield, who then forwarded them to corporate headquarters.  I was also required to hang up any policy memoranda by the time clock in order to ensure employees understood the policies.

7.      I understood these were corporate-wide policies because I had absolutely no authority to create such policies and was instead instructed by the Regional Manager, Neil Hornfield, that all Alderwoods locations were to be uniform in policies.

8.      I understood these were corporate-wide policies because Human Resources/Corporate sent each location five binders containing their policy information.

9.      I understood these were corporate-wide policies because all employee pay checks came from the same corporate location.

10.     As a Location Manager I knew the defendants company-wide policies and was responsible for the enforcement of such policies.  Part of my responsibilities included training and communicating regularly with employees regarding these company policies.  In order to communicate with employees, I held frequent staff meetings and was expected to make sure employees complied with the Alderwoods company policies.

- 2 -

## On Call Pay Policy

1.   Another Alderwoods policy included their company-wide On Call Pay Policy. Employees were required to be on-call on average one to two days a week.

2.   As a Location Manager, I was told about the On Call Policy by the Regional Manager, Neil Hornfield, during the first month or two of my employment.

3.   While on-call, employees were required to handle and respond to all phone-calls that were received by the funeral home.  As part of the Funeral Director position, employees handled these calls but were not paid by Alderwoods for any time spent on these calls since they were outside of the regular workday and off-site from the funeral home.

4.   As a Location Manager, I was aware Funeral Directors completed mandatory on-call work without being paid for time spent handling phone calls.  I was aware of the work they performed, since I received faxes on the on-call activity from the previous night every morning from Neil Hornfield or the North Miami Leavvit-Weinstein Location.

## Pre-Needs

5.   Alderwoods had a company-wide Pre-Needs Policy which expected employees to sell-needs policies outside the regular work day for no compensation.

6.   I was told about this policy from my Regional Manager, Neil Hornfield, who explained that employees should be encouraged to make pre-needs sales presentations after normal working hours or on their days off.

7.   Neil Hornfield made it clear to me that it was important to schedule pre-needs appointments when it was convenient for the family, even when it was after hours and off the clock.

H:\Alderwood Group\Manager Identification\Interview Memos\affirmations\former manager affirmation (Weinstein).doc

## Meal Break Policy

8.   Alderwoods had a Meal Break Policy while I was employed by Alderwoods. Under that policy, the Company recorded a full lunch or meal break for employees, even when employees were unable to take a break or were interrupted during a break.

9.   I was instructed by the Regional Manager, Neil Hornfield ,that employees at our location that employees would not be paid for a full meal break each day, regardless of the fact that most days employees either did not take a lunch, or it was significantly interrupted.

10.   Initially employees were subject to a deduction that the company recorded regardless of whether they took a meal break or were interrupted.  At some point in the middle of my employment, Neil Hornfield, Regional Manager, informed employees that corporate headquarters instead wanted employees to punch out for the entire meal break themselves even if they worked during their breaks.

## Training Policy

11.   Alderwoods also had a company Training Policy which expected Funeral Directors to complete training with no pay.

12.   Employees were required to complete training outside the regular work day with no compensation.  I was told about this Policy by Neil Hornfield, who explained that if an employee worked on training outside the regular work day it would not be paid by Alderwoods.

13.   Employees completed mandatory continuing education requirements and attended required HIV and communicable diseases courses.

## Unrecorded Work Time Policy

14. Alderwoods also maintained an Unrecorded Work Time Policy. Under this policy hourly employees were encouraged or required not to record all overtime hours worked.

15. The Regional Manager Neil Hornfield informed the staff that they were not allowed to record overtime and instead should keep hours low.

16. As a Location Manager, I was required by Neil Hornfield to stand by the time clock to ensure employees were only clock in during their scheduled hours even if they were performing work for the business.

17. The Regional Manager offered employees comp time or time off in lieu of recording the overtime. However, employees were never compensated for this unrecorded work.

18. I have read and had an opportunity to correct this Affidavit consisting of 5 pages and I hereby verify under penalty of perjury that the statements contained in this Affidavit are true and correct to the best of my knowledge and belief.

I affirm under penalty of perjury that the foregoing is true and correct.


Executed on September 18, 2009

STACEY WEINSTEIN

- 5 -