**Exhibit N**

**TABLE OF CONTENTS**
**EXCERPTS OF DEPOSITION TRANSCRIPTS**

| Tab | Name |
|-----|------|
| 1 | Baker, Dennis |
| 2 | Bath, Herbert |
| 3 | Burgess, Jason Alex |
| 4 | Burkle, Clark F. |
| 5 | Butler, Michael |
| 6 | Carswell, Shane |
| 7 | Daigle, Millard Jude |
| 8 | Detschner, Steven A. |
| 9 | Diggs, Jeffrey |
| 10 | Escobar, Stephen |
| 11 | Garza, Joe |
| 12 | Gonzales, Donna |
| 13 | Hensley, Ric |
| 14 | Johnson, Louise |
| 15 | Jones, Robert Gordon |
| 16 | Kamienski, Richard |
| 17 | Keath, Angela |
| 18 | Kuhta, Richard |
| 19 | Lanza, Michael |
| 20 | Leal, Adrian F. |
| 21 | Long, Kasi |
| 22 | McDonald, Beverly |
| 23 | Miles, Barry Douglas |
| 24 | Ore, William |
| 25 | Peters, John |
| 26 | Pramik, Robert |
| 27 | Prise, Deborah |
| 28 | Rady, Heather |

BRENT KNIGHT EXHIBIT N

| Tab | Name |
|:---:|------|
| 29 | Reddick, Jack |
| 30 | Schabloski, John |
| 31 | Takesian, Stephen |
| 32 | Thomas, Sandy |
| 33 | Twiss, Matthew O. |
| 34 | Weinstein, Stacey |
| 35 | White, Ray |
| 36 | Wilkinson, Jack |

BRENT KNIGHT EXHIBIT N

**TAB 1**

NETWORK DEPOSITION SERVICES
Transcript of Dennis Baker

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO/OAKLAND DIVISION

WILLIAM HELM, DEBORAH PRISE,      )
HEATHER P. RADY, [see Complaint   )
and Appendices for a listing of   )
plaintffs] et al., on behalf of   )
themselves and all other employees )
and former employees similarly    )
situated,                         )
                                  )
        Plaintiffs,               )
                                  )
    v.                            ) No. CV 08-1184-SI
                                  )
ALDERWOODS GROUP, INC.,           )
                                  )
        Defendant.                )
_____  )

DEPOSITION OF DENNIS BAKER
October 31, 2009
Tucson, Arizona

Reported by: Doug Kirkpatrick
Certified Reporter No. 50705

c77c7411-3269-486b-8d78-6375d43a630f

NETWORK DEPOSITION SERVICES
Transcript of Dennis Baker

Page 7

1       A.   Approximately July of '06.

2       Q.   And what position did you hold with

3   Alderwoods?

4       A.   Location manager at that time.

5       Q.   Okay.  How long were you employed by

6   Alderwoods?

7       A.   Approximately six years.

8       Q.   And can you list all the positions you held

9   during those six years with Alderwoods?

10      A.   Started out as funeral director/embalmer

11  and gravitated and evolved into general manager.

12      Q.   When did you become a general manager?

13      A.   Approximately early '02.

14      Q.   So you joined Alderwoods in approximately

15  2000 or 2001; is that right?

16      A.   Yes.

17      Q.   And you were a funeral director/embalmer at

18  that point?

19      A.   Yes.

20      Q.   And then after a year or two you became a

21  general manager; is that right?

22      A.   Yes.

23      Q.   And then at some point after that did you

24  become a location manager?

25      A.   Yes.

c77c7411-3269-486b-8d78-6375d43a630f

NETWORK DEPOSITION SERVICES
Transcript of Dennis Baker

Page 15

1    understanding that primarily the question is
2    concerning funeral directors and embalmers.
3         Q.   Are you seeking overtime in this lawsuit?
4         A.   No.
5         Q.   Why not?
6         A.   I was a salaried employee.  As general
7    manager and location manager I was salaried, not
8    hourly wage.
9         Q.   How did you learn about this lawsuit?
10        A.   I was contacted by an attorney.
11        Q.   Do you remember the name of the attorney?
12        A.   Jessica, I think.
13        Q.   Do you know Jessica's last name?
14        A.   No.
15        Q.   Do you know what law firm Jessica works
16   for?
17        A.   No.
18        Q.   Do you know what city Jessica works in?
19        A.   New York.  And I don't know whether that's
20   city or state, quite frankly.  Her phone number says
21   New York when she calls.  I've never met her.
22        Q.   Where were you contacted?
23        A.   I think I was in Idaho.
24        Q.   At home?
25        A.   On my cell phone.  I don't remember where I

c77c7411-3269-486b-8d78-6375d43a630f

NETWORK DEPOSITION SERVICES
Transcript of Dennis Baker

Page 47

1   information, yes.

2          Q.   But as you sit here today, you don't recall

3   ever looking at that information?

4                MS. GIFFORD:   Objection.

5          A.   I recall looking at it.   I mean, I know I

6   was aware that it was there and I had access to that

7   information, yes.

8          Q.   (BY MR. KNIGHT)   Did you ever discuss any

9   portion of the budget that was allocated towards

10  wages and salaries with any of your supervisors?

11               MS. GIFFORD:   Objection.

12         A.   I'm sure it was discussed, yes.

13         Q.   (BY MR. KNIGHT)   Was there any portion of

14  the budget allocated to overtime?

15         A.   I don't know.

16         Q.   Did anyone at Alderwoods ever tell you that

17  your location had an overtime budget?

18         A.   I think so.

19         Q.   Who do you think told you that?

20         A.   I'm sure it would have been Ken Dimond.

21         Q.   Do you recall any specific discussions with

22  Ken Dimond about a overtime budget?

23         A.   No.

24         Q.   Do you recall any specific discussions

25  about -- with Ken Dimond asking you to limit overtime

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

c77c7411-3269-486b-8d78-6375d43a630f

NETWORK DEPOSITION SERVICES
Transcript of Dennis Baker

1    at your locations?

2         A.   I'm sure there were times when I was told

3    to watch salary or overtime expenditures.

4         Q.   Okay.  There was a couple of parts I want

5    to address, that you said you're sure there were

6    times.  Can you think of any specific times --

7         A.   No.

8         Q.   Why are you sure there were times, then?

9         A.   I just know that in meetings we as general

10   managers and managers were, you know, in discussions

11   with superiors.  We were told to, you know, watch,

12   keep an eye on, make certain it's not being --

13   overtime and other costs and expenditures were not

14   being abused or -- you know.

15        Q.   What do you understand it means to watch

16   overtime?

17        A.   I would interpret that to look at the

18   figures and make sure it seemed realistic and not out

19   of bounds.

20        Q.   Okay.  When you were in Phoenix, how did

21   the hourly employees record their hours?

22        A.   We had a time clock.

23        Q.   And what about in Oregon?

24        A.   Time clock, I think.

25        Q.   So is it the case that the entire time that

c77c7411-3269-486b-8d78-6375d43a630f

NETWORK DEPOSITION SERVICES
Transcript of Dennis Baker

Page 52

1   requirement that you review individual time cards?

2       A.   Not that I recall, no.

3       Q.   Do you have any knowledge of how employees

4   kept their time at other locations that you weren't

5   supervising?

6       A.   I think the only other location -- there's

7   only one other Alderwoods location in Phoenix, and I

8   think they had a time clock as well.  But other than

9   that, I don't know.

10      Q.   Did anyone that you ever supervised in

11  Phoenix or Oregon ever complain to you about not

12  getting paid for all their hours?

13      A.   No, no.

14      Q.   Did you receive any training from

15  Alderwoods when you became a general manager?

16           MS. GIFFORD:  Objection.

17      A.   Yes.

18      Q.   (BY MR. KNIGHT)  What kind of training did

19  you receive?

20      A.   Management training.

21      Q.   Did you have to travel anywhere to take

22  that training?

23      A.   Sometimes.

24      Q.   Sometimes.  So you -- did you receive

25  training on multiple occasions?

c77c7411-3269-486b-8d78-6375d43a630f

NETWORK DEPOSITION SERVICES
Transcript of Dennis Baker

Page 65

1      Q.   (BY MR. KNIGHT)   And the same, were you
2  responsible -- or were you familiar with the cemetery
3  procedure while you were with Alderwoods?
4      A.   Yes.
5      Q.   Do you know if these policies were included
6  in the binders at the locations you managed?
7      A.   As far as I know, they were.
8      Q.   On the first page, the first bullet point
9  reads "All employees must record all hours actually
10 worked unless exempt from timekeeping requirements as
11 permitted in compliance with all federal and
12 state/provincial regulations."
13          Did I read that correctly, Mr. Baker?
14     A.   It looks like it.
15     Q.   Did you understand that employees were
16 supposed to record all hours that they actually
17 worked at Alderwoods?
18          MS. GIFFORD:   Objection.
19     A.   Yes.
20     Q.   (BY MR. KNIGHT)   Did you instruct employees
21 to record all the hours they worked?
22          MS. GIFFORD:   Objection.
23     A.   Yes.
24     Q.   (BY MR. KNIGHT)   Okay.  This document
25 says -- in the paragraph at the very top it says a

c77c7411-3269-486b-8d78-6375d43a630f

NETWORK DEPOSITION SERVICES
Transcript of Dennis Baker

Page 66

1    time card or time sheet must show the time that the

2    person begins work.  Do you see that?

3         A.   Yes, I see it.

4         Q.   And while you were general manager and

5    location manager for Alderwoods, did you instruct

6    employees to make sure they recorded on their time

7    card the time that they actually began work?

8         A.   Yes.

9              MS. GIFFORD:  Objection.

10        Q.   (BY MR. KNIGHT)  And did the time cards

11   that the employees who worked under you -- let me

12   rephrase that.

13             For the employees that worked under you,

14   did their time cards show the time that they finished

15   working each day?

16        A.   Yes.

17        Q.   And did you instruct them to accurately

18   record the time that they finished working each day?

19        A.   Yes.

20             MS. GIFFORD:  Objection.

21        A.   Yes, I did.

22        Q.   (BY MR. KNIGHT)  Did you ever instruct

23   employees to work after they had clocked out for the

24   day?

25             MS. GIFFORD:  Objection.

c77c7411-3269-486b-8d78-6375d43a630f

NETWORK DEPOSITION SERVICES
Transcript of Dennis Baker

Page 67

1      A.   No.

2      Q.   (BY MR. KNIGHT)  Did you ever instruct

3  employees to begin work before they clocked in to

4  begin the day?

5           MS. GIFFORD:  Objection.

6      A.   No.

7      Q.   (BY MR. KNIGHT)  Were you aware of

8  employees who were working in the funeral home and

9  the cemetery without being punched in?

10     A.   No.

11     Q.   The third bullet on this first page says

12 that "Many states/provinces require a designated meal

13 break after a certain number of hours worked."

14          Did I read that correctly, Mr. Baker?

15     A.   Yes.

16     Q.   Did employees who you supervised in Arizona

17 receive meal breaks?

18     A.   Yes.

19     Q.   Did they have to clock out during those

20 meal breaks?

21     A.   Yes.

22     Q.   Okay.  Were they instructed to work during

23 their meal breaks?

24          MS. GIFFORD:  Objection.

25     A.   No.

c77c7411-3269-486b-8d78-6375d43a630f

NETWORK DEPOSITION SERVICES
Transcript of Dennis Baker

Page 70

1    not as such.  But I said, you know, when you're

2    supposed to take your meal break, take your meal

3    break, leave the building, clock back in.

4         Q.    (BY MR. KNIGHT)  To your knowledge, did

5    Alderwoods as a company have a policy that employees

6    were supposed to do clock out during meal breaks but

7    continue working?

8                   MS. GIFFORD:  Objection?

9         A.    I'm unaware of any policy like that.

10        Q.    (BY MR. KNIGHT)  Is it your understanding

11   that -- well, let me back up.

12                Alderwoods' policies required employees to

13   record all the time they worked; is that correct?

14                   MS. GIFFORD:  Objection.

15        A.    Yes.

16        Q.    (BY MR. KNIGHT)  Okay.  Is it your

17   understanding based on that policy that if an

18   employee did work during meal break, that pursuant to

19   Alderwoods' policy they should have recorded their

20   time?

21                   MS. GIFFORD:  Objection.

22        A.    I think they had that option, yes.

23        Q.    (BY MR. KNIGHT)  Well, they had that

24   option.  Is it -- were they required to --

25                   MS. GIFFORD:  Objection.

c77c7411-3269-486b-8d78-6375d43a630f

NETWORK DEPOSITION SERVICES
Transcript of Dennis Baker

Page 71

1       Q.   (BY MR. KNIGHT)  -- is my question.

2                MS. GIFFORD:  Objection.

3       A.   If they wanted to get paid for it, yes,

4  they were required to.

5       Q.   (BY MR. KNIGHT)  Was there any policy

6  telling them that they couldn't get paid for that

7  time?

8                MS. GIFFORD:  Objection.

9       A.   I don't believe so.

10      Q.   (BY MR. KNIGHT)  In your opinion as a

11  Alderwoods manager, employees who did not clock back

12  in if they had to work during their meal break, were

13  they violating Alderwoods' policy by not clocking

14  back in?

15               MS. GIFFORD:  Objection.

16      A.   I'm not sure.  You know, I don't quite

17  understand the question exactly.

18               I mean, if they clocked out and then did

19  some work while they were clocked out, I don't think

20  that was a violation of Alderwoods' policy.  I don't

21  think they would get in trouble for working when they

22  were clocked out.

23      Q.   (BY MR. KNIGHT)  But is that inconsistent

24  in your mind with the policy that they record all

25  hours worked?

c77c7411-3269-486b-8d78-6375d43a630f

NETWORK DEPOSITION SERVICES
Transcript of Dennis Baker

1      A.   Well, again, they record all hours worked

2   if they want to get paid for it, you know.

3      Q.   Okay.  Did employees in Arizona that you

4   supervised, in Phoenix, did any of them get paid a

5   piece rate for any of the work they performed?

6      A.   Sometimes.

7      Q.   And who -- which employees?  Which

8   positions would get paid piece rate?

9      A.   Funeral directors and embalmers.

10     Q.   Uh-huh.  Anyone else?

11     A.   And there were some that were not licensed

12  individuals.  You know, they would have fallen into

13  the assistant funeral director maybe or -- I didn't

14  see it on your list, but there was some that helped

15  with removals.  And not everyone that helped on a

16  removal was a licensed funeral director/embalmer.

17  And that was -- that is what some of the piece work

18  was.

19     Q.   Okay.  So they got -- so there was a piece

20  rate for removals; is that right?

21     A.   Yes.

22     Q.   Do you recall what the rate was?

23     A.   I don't.  And it evolved and it changed.

24  It evolved.

25     Q.   Okay.  When you started as general

c77c7411-3269-486b-8d78-6375d43a630f

NETWORK DEPOSITION SERVICES
Transcript of Dennis Baker

Page 73

1    manager --
2         A.   Yeah.
3         Q.   -- was there a piece rate for removals?
4         A.   I don't think so.
5         Q.   When did it come into effect?
6         A.    It may have started -- it's a guess.  '04.
7    For sure came into play by '05.
8         Q.   When you say for sure by '05, how do you
9    know for sure by '05?
10        A.   I remember.
11        Q.   And what was -- was there a written
12   policy?
13        A.   Yes.
14        Q.   Do you recall what the policy was?
15        A.   Not specifically, but it had to do with --
16   as I recall, you know, there was X amount flat rate
17   for a removal.
18        Q.   Uh-huh.
19        A.   And I think there was an X amount flat rate
20   for an embalming if the individual opted to stay off
21   hours, I mean, you know, middle of the night --
22        Q.   Uh-huh.
23        A.   -- and embalm.
24             And then it also evolved.  There was a
25   formula for receiving compensation for telephone

c77c7411-3269-486b-8d78-6375d43a630f

NETWORK DEPOSITION SERVICES
Transcript of Dennis Baker

Page 74

1    work.

2          Q.    Okay.

3          A.    And this was later on during my stay in

4    Phoenix.   This was '05.

5          Q.    So prior to then how were employees paid

6    for removals and embalmings, if at all?

7          A.    Well, we had contract companies that would

8    make removals.

9          Q.    So was it the case that from the time you

10   became general manager until this piece rate policy

11   that you just discussed went into effect that a third

12   party did the removals?

13         A.    Yes.

14         Q.    And who did the embalmings?

15         A.    Licensed embalmers.   Our staff.

16         Q.    Uh-huh.   But they weren't paid a piece rate

17   prior to 2004 or 2005 for those embalmings?

18         A.    Well, they -- I'm not certain when the

19   piece rate for embalming developed.

20         Q.    Sure.

21         A.    Before -- before they -- before that

22   developed, I suspect they just -- third parties made

23   the removal and no licensed -- our staff wasn't there

24   in the middle of the night, so they didn't embalm in

25   the middle of the night.

c77c7411-3269-486b-8d78-6375d43a630f

NETWORK DEPOSITION SERVICES
Transcript of Dennis Baker

Page 75

1    Q.   So they embalmed during business hours?

2    A.   Yeah.

3    Q.   You may have mentioned this already, but I

4  didn't write it down if you did.  Do you recall what

5  the rate was, the flat rate was for removals?

6    A.   I don't.

7    Q.   Do you recall what it was for embalmings?

8    A.   I don't.

9    Q.   Do you recall what the flat rate was for

10 telephone calls?

11            MS. GIFFORD:  Objection.

12   A.   I don't.  I think the minimum time, as I

13 recall, was 15 minutes, you know.  Had something to

14 do with 15 minutes.  I think if you answered the

15 phone and said hello, how are you, and yes, the

16 funeral is next Thursday at 2 o'clock, I think that

17 you recorded 15 minutes and that it counted for 15

18 minutes of their hourly wage or something like that.

19   Q.   (BY MR. KNIGHT)  Okay.

20   A.   It required some rather intricate

21 timekeeping.

22   Q.   When this piece rate policy started, went

23 into effect in whatever year it was 2004, 2005, were

24 employees required to record the hours or the time

25 they spent doing removals, after-hour removals?

c77c7411-3269-486b-8d78-6375d43a630f

NETWORK DEPOSITION SERVICES
Transcript of Dennis Baker

Page 77

1    for employees to claim their hours if their hours
2    were greater than the piece rate?
3         A.   I'm not sure.
4         Q.   And I think you mentioned with the
5    telephone calls, that there was a 15-minute minimum;
6    is that right?
7         A.   Seems like it.
8         Q.   Did they actually get a flat rate for
9    telephone work?
10                   MS. GIFFORD:   Objection.
11        A.   I'm not positive.  But I'm thinking that
12   the minimum was like 15-minutes.  For some reason
13   that sticks in my mind.  And, you know, it's like I
14   said before, if they say hello, yes, the funeral's
15   next Thursday, three-minute phone call, I think they
16   could legitimately claim 15 minutes, which is a
17   fourth of an hour, which went to hourly.
18        Q.   (BY MR. KNIGHT)   If the call is half an
19   hour, could they claim half an hour?
20        A.   I think so.
21        Q.   Okay.  Prior for the piece rate policy that
22   you mentioned going into effect, were employees at
23   your location in Phoenix responsible for answering
24   phones after hours?
25        A.   Yes.

c77c7411-3269-486b-8d78-6375d43a630f

NETWORK DEPOSITION SERVICES
Transcript of Dennis Baker

Page 85

1    on call.

2          Q.    Okay.  And then what would the funeral

3    director/embalmer on call do?

4          A.    Go make a removal.

5          Q.    Okay.  Now, I thought you had said that

6    prior to 2004, 2005, there was a service that did the

7    removals.

8          A.    There was sometimes.

9          Q.    But sometimes there wasn't?

10         A.    Right.

11         Q.    In your experience, having been on call in

12   Phoenix, would you receive a phone call every night

13   that you were on call, at least one call every

14   night?

15         A.    I'm sure there were nights that you would

16   get no phone calls.

17         Q.    Were there nights you would get multiple

18   phone calls?

19         A.    Yes.

20         Q.    Do you have any estimate as to how much --

21   what the average was in a particular night that you

22   would spend on the phone?

23         A.    Not really.  I mean, it varied, you know.

24         Q.    Would it be more than an hour on some

25   occasions?

c77c7411-3269-486b-8d78-6375d43a630f

NETWORK DEPOSITION SERVICES
Transcript of Dennis Baker

1  as to whether or not you signed actual times cards?

2       A.   Yes, it does.  And I think I said I thought

3  I signed them.

4       Q.   I must have misunderstood.  I thought you

5  said you had signed like a summary of time records.

6       A.   Well, I probably did say that as well

7  because I saw that, but -- and I think there was a

8  summary.

9            And I'm also seeing here and recalling

10  after I read this that we had to keep those on site,

11  so -- see, I wasn't -- I couldn't remember.

12       Q.   If an employee worked during a meal break

13  like we had discussed before, you said you're sure

14  that happened on occasions, were you ever concerned

15  that by signing their time card that you would be

16  signing an inaccurate time card?

17       A.   No.

18       Q.   Why not?

19       A.   Well, you know, again, it's my belief if

20  they -- they shouldn't have worked when they were

21  clocked out.

22       Q.   Uh-huh.

23       A.   I don't know that that's an Alderwoods

24  violation, but for the employee's benefit, you know,

25  they're not going to get paid if they're clocked

c77c7411-3269-486b-8d78-6375d43a630f

NETWORK DEPOSITION SERVICES
Transcript of Dennis Baker

Page 88

1    out.  And if they happen to do work, it's their own
2    fault.  So I'm sorry, they shouldn't have done that,
3    you know.
4            And the other side of that coin is, you
5    know, yes, they're supposed to, okay.  It is an
6    Alderwoods policy.  You're supposed to get meal
7    breaks and you're not supposed to work eight hours
8    straight without a meal break, and that was discussed
9    many times, and so -- you know, it's --
10       Q.   Did you ever have any concern that you
11   would be signing an inaccurate time card if you
12   signed cards that didn't reflect people's -- the
13   phone calls that people took in the evenings?
14       A.   I don't recall that.
15       Q.   Okay.  Did you ever take time off of
16   people's time cards as a general manager or a
17   location manager?
18       A.   Yes.
19       Q.   And why what you do that?
20       A.   Well, because I would be aware of an
21   inaccuracy.  Rare, but yes, there were times that I
22   would.
23       Q.   So if someone marked down time they didn't
24   actually work, you would take if off; is that right?
25       A.   Yes.  If I knew it was inaccurate, yeah.

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

c77c7411-3269-486b-8d78-6375d43a630f

NETWORK DEPOSITION SERVICES
Transcript of Dennis Baker

Page 89

1      Q.   Did you ever --

2      A.   I mean, I'd discuss it with them.  It

3  wasn't behind closed doors.

4      Q.   Understood.  Did you ever mark off time

5  that you knew someone in fact did work?

6      A.   No.

7      Q.   Okay.

8           MS. GIFFORD:  Is this a good time for

9  a break?

10          MR. KNIGHT:  Okay yeah.

11          (A recess was taken.)

12          (Marked for identification Deposition

13  Exhibit 5.)

14     Q.   (BY MR. KNIGHT)  Back on the record.

15          Mr. Baker, the court reporter just handed

16  you what's been marked as Exhibit Number 5, which is

17  a -- I think this is double-sided, so it's a

18  five-page document entitled "Hours of Work and

19  Overtime."

20          It says on the bottom of the page that it's

21  part of the Alderwoods Group policy manual, United

22  States, 2006.

23          I'll give you a minute to take a look at

24  this and then I'll ask whether you recall having seen

25  this document before.

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

c77c7411-3269-486b-8d78-6375d43a630f

NETWORK DEPOSITION SERVICES
Transcript of Dennis Baker

Page 90

1    A.   I honestly can't say that I specifically
2  remember seeing this document.
3    Q.   Okay.  I want to -- well, I want to first
4  ask you about -- on the first page, do you see under
5  Policy it reads "All nonexempt employees will be
6  compensated for all hours worked"?  See where it says
7  that?
8    A.   I see that.
9    Q.   Is it your understanding that that was
10  Alderwoods' policy?
11              MS. GIFFORD:  Objection.
12    A.   Yes.
13    Q.   (BY MR. KNIGHT)  Then I want to refer you
14  to the second page, which is -- it's got the numbers
15  at the bottom ALD005.  And if you look under Roman
16  numeral III, Guidelines, there's a subsection 3
17  called Meal Periods.  Do you see that?
18    A.   Yes.
19    Q.   It says, "Hourly employees who work more
20  than five consecutive hours in a day are allowed an
21  unpaid meal period of no less than 30 minutes and no
22  more than one hour."  Do you see that?
23    A.   I see that.
24    Q.   Is it your understanding that that was
25  Alderwoods' policy?

c77c7411-3269-486b-8d78-6375d43a630f