NETWORK DEPOSITION SERVICES
Transcript of Dennis Baker

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO/OAKLAND DIVISION

| | |
|---|---|
| WILLIAM HELM, DEBORAH PRISE, HEATHER P. RADY, [see Complaint and Appendices for a listing of plaintffs] et al., on behalf of themselves and all other employees and former employees similarly situated,<br><br>    Plaintiffs,<br><br>  v.<br><br>ALDERWOODS GROUP, INC.,<br><br>    Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) No. CV 08-1184-SI<br>)<br>)<br>)<br>)<br>) |

DEPOSITION OF DENNIS BAKER
October 31, 2009
Tucson, Arizona

Reported by: Doug Kirkpatrick
Certified Reporter No. 50705

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

c77c7411-3269-486b-8d78-6375d43a630f

NETWORK DEPOSITION SERVICES
Transcript of Dennis Baker

1                    MS. GIFFORD:   Objection.

2          A.   Yes.

3          Q.   (BY MR. KNIGHT)   Two sentences farther down

4     it says, "Meal periods may be waived or delayed at

5     the direction of management in order to meet business

6     needs."  Do you see that?

7          A.   I do.

8          Q.   Was that your understanding of Alderwoods'

9     policy?

10         A.   Yes.

11         Q.   Okay.  The next sentence reads "Employees

12    must clock out at the beginning of their meal period

13    and clock in at its conclusion."

14                 Was it your understanding that that was

15    Alderwoods' policy?

16         A.   Yes.

17         Q.   And then skipping ahead a sentence, it

18    reads "During the meal period an employee is not to

19    perform work for the company."

20                 Was it your understanding that that was

21    Alderwoods' policy?

22                    MS. GIFFORD:   Objection.

23         A.   Which sentence again?  I got lost.

24         Q.   (BY MR. KNIGHT)   It's -- your counsel is

25    pointing it out for you.  Beginning --

c77c7411-3269-486b-8d78-6375d43a630f

NETWORK DEPOSITION SERVICES
Transcript of Dennis Baker

Page 92

1      A.    "During the meal period," that one?

2      Q.    Yeah.

3      A.    "During the meal period an employee is not

4   to perform work for the company."

5            Well -- and what's your question?

6      Q.    Was that Alderwoods' policy?

7            MS. GIFFORD:   Objection.

8      A.    Well, I suppose.

9      Q.    (BY MR. KNIGHT)  Now I want to refer you to

10   the next page, which is Bates numbered ALD and then

11   006.  There is a subsection F, Overtime.  And it

12   reads, "At times it may be necessary for an employee

13   to work overtime hours.  All overtime, however, must

14   be approved in advance by management."

15           Did I read that correctly?

16     A.    Yes.

17     Q.    Was it your understanding that there was a

18   requirement or it was the policy at Alderwoods that

19   managers approve overtime in advance?

20           MS. GIFFORD:   Objection.

21     A.    Yes, ma'am.

22     Q.    (BY MR. KNIGHT)  And as a general manager

23   in Phoenix, was it your responsibility to approve the

24   overtime hours?

25     A.    Yes.

c77c7411-3269-486b-8d78-6375d43a630f

NETWORK DEPOSITION SERVICES
Transcript of Dennis Baker

Page 93

1    Q.   As location manager in Oregon, was it your
2    responsible to approve overtime hours?
3    A.   I think so.
4    Q.   Did employees seek preapproval of the
5    overtime from you in Phoenix?
6    A.   Yes.
7    Q.   And did employees in Oregon seek
8    preapproval for overtime from you?
9    A.   I don't recall that.
10   Q.   You don't recall that they actually sought
11   preapproval?
12   A.   Right.
13   Q.   Did they work overtime in Oregon?
14   A.   Not that I know of.
15   Q.   So there was no overtime to work?
16   A.   I don't recall.
17   Q.   Okay.  Did Alderwoods have any policy that
18   they would not pay employees who did not get
19   preapproval for overtime?
20        MS. GIFFORD:  Objection.
21   A.   I'm unaware of that.
22   Q.   (BY MR. KNIGHT)  Has anyone at any time
23   asked you to sign a statement or write a statement
24   saying that Alderwoods had a policy that employees
25   would not be compensated for overtime that was not

c77c7411-3269-486b-8d78-6375d43a630f

NETWORK DEPOSITION SERVICES
Transcript of Dennis Baker

Page 98

1    we managers would be encouraged to observe, watch and

2    regulate overtime and make sure it didn't get out of

3    hand or, you know, excessive.  You know, manage your

4    people.

5         Q.   Sure.  Did any of your supervisors ever

6    give you a budget of overtime hours?

7         A.   I don't recall that.

8         Q.   Did you ever tell any employee that you

9    supervised that they would not be compensated for any

10   hours they worked before or after their scheduled

11   shift?

12                   MS. GIFFORD:   Objection.

13        A.   Well, you know, back when that was the

14   practice, I suspect I mentioned that to them.

15        Q.   (BY MR. KNIGHT)   Back when what was the

16   practice?

17        A.   To not pay them for working off hours.

18        Q.   You mean like the on-call hours?

19        A.   Right, right.

20        Q.   Okay.

21        A.   I mean, you know, that was -- I'm sure they

22   knew that coming in, and so yeah, I suppose.

23        Q.   Other than on-call work, did you ever tell

24   any employee that they would not be allowed to -- or

25   that they would not be compensated for any time they

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

c77c7411-3269-486b-8d78-6375d43a630f

NETWORK DEPOSITION SERVICES
Transcript of Dennis Baker

Page 99

1    worked before or after their schedule?

2              MS. GIFFORD:  Objection.

3         A.   I don't recall that, no.

4         Q.   (BY MR. KNIGHT)  Are you aware of any

5    employees at Alderwoods who had a certain number of

6    overtime hours per week guaranteed?

7         A.   No.

8         Q.   While you were with Alderwoods, did you

9    ever hear of anything called the Community Leadership

10   Program or Community Influencer Program?

11        A.   I don't recall that specific terminology.

12        Q.   Did you -- were you ever responsible for

13   creating a Leadership Network, something called a

14   Leadership Network at Alderwoods?

15        A.   I don't recall that specifically, no.

16        Q.   Did you ever fill out something called a

17   Leadership Network information sheet?

18        A.   Not that I recall.

19        Q.   Are you familiar with the term "Leadership

20   Network contact report"?

21        A.   Not really.

22        Q.   Were you ever asked to identify community

23   influencers at Alderwoods?

24              MS. GIFFORD:  Objection.

25        A.   I don't recall that term.

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

c77c7411-3269-486b-8d78-6375d43a630f

NETWORK DEPOSITION SERVICES
Transcript of Dennis Baker

Page 100

1      Q.   (BY MR. KNIGHT)  You don't recall the term
2   "influencer"?
3      A.   Community influencer.
4      Q.   Did you have to keep track of important
5   people in the community, important contacts in the
6   community?  Was that one of your job responsibilities
7   at Alderwoods?
8              MS. GIFFORD:  Objection.
9      A.   No.
10     Q.   (BY MR. KNIGHT)  Did any of the people you
11  supervised, were they required to generate lists of
12  community contacts or influencers to your knowledge?
13     A.   No.
14     Q.   When you were supervisor, did you or anyone
15  at your location ever participate in something called
16  a Community Seminar Program?
17     A.   I don't recall that.
18     Q.   When you were at Alderwoods, did you or any
19  of the people you supervised ever host community
20  events at the location that you supervised?
21     A.   Yes.
22     Q.   Okay.  Can you give me some examples?
23     A.   Oh, hospice groups would use our facility
24  for a meeting place.  Grief recovery groups would use
25  our location for a meeting place.  And we were

c77c7411-3269-486b-8d78-6375d43a630f

NETWORK DEPOSITION SERVICES
Transcript of Dennis Baker

Page 117

1    the extra yard, does something extra special nice,
2    and it gets reported to the company, and then they
3    get a little article in the company newsletter about
4    it, is what I'm recalling.
5        Q.   What types of things would be --
6        A.   Oh, I don't know.  Going an extra mile to
7    help a family.  It would all be service related to,
8    you know, assisting -- I mean, doing what we do, help
9    families.
10           If someone can't find a family member's
11   gravesite, have car problems on site or have trouble
12   of some sort and an employee helps them, you know.
13       Q.   Okay.  Now, did you ever hear of anything
14   called an I Believe in Service program or IBS program
15   at Alderwoods?
16       A.   I don't recall that.
17       Q.   Did you ever know anyone at Alderwoods
18   named Wayne Tago, T-a-g-o?
19       A.   Don't recall that.
20       Q.   Did you or anyone at your homes in Arizona
21   or Oregon ever volunteer with a hospice group as a
22   representative of the home?
23       A.   I don't think so, no.  We worked with
24   hospice and so forth.  Like I told you earlier, they
25   came to our location and had meetings there.  But as

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

c77c7411-3269-486b-8d78-6375d43a630f

NETWORK DEPOSITION SERVICES
Transcript of Dennis Baker

Page 119

1    I'm unfamiliar with.

2         Q.   (BY MR. KNIGHT)   Are you aware of any

3    policy at Alderwoods that certain employees obtain

4    insurance licenses to sell preneed insurance?

5              MS. GIFFORD:   Objection.

6         A.   Yes.

7         Q.   (BY MR. KNIGHT)   Which employees were

8    required to obtain insurance licenses?

9         A.   What I called the sale counselors.   The

10   individuals that sold preneed.

11        Q.   Any other people besides sales counselors?

12        A.   No.

13        Q.   Did funeral directors sell preneed in your

14   location?

15        A.   No.

16        Q.   Is it a requirement in Arizona that you

17   have an insurance license to sell preneed?

18        A.   I think so.

19        Q.   Is it a requirement in Oregon that you have

20   an insurance license?

21        A.   I don't know.

22        Q.   Did the sales counselors at your location

23   in Arizona have insurance licenses?

24        A.   Yes.

25        Q.   Do you know whether any employees in Oregon

c77c7411-3269-486b-8d78-6375d43a630f

NETWORK DEPOSITION SERVICES
Transcript of Dennis Baker

Page 120

1    had insurance licenses?

2         A.    I don't know.

3         Q.    To your knowledge did anyone other than

4    sales counselors have insurance licenses in Arizona

5    at your location?

6         A.    No, not that I know of.

7         Q.    These sales counselors, do you know whether

8    they obtained their insurance license before they

9    started at Alderwoods?

10        A.    I know they had to have an insurance

11   license before they could sell anything.

12        Q.    By state law; is that right?

13        A.    Yes.

14        Q.    Are you aware of any employees, any of

15   these sales counselors in Arizona who obtained their

16   insurance licenses while you were supervising them?

17        A.    Yes, I think that happened.

18        Q.    Do you recall any names?

19        A.    No, I don't.  But I remember them studying

20   and fretting and fuming over taking the test, yeah.

21        Q.    Are there any continuing education

22   requirements for insurance licenses?

23        A.    I don't know for certain, but I do not

24   think so.

25        Q.    To your knowledge, does Alderwoods have a

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

c77c7411-3269-486b-8d78-6375d43a630f

NETWORK DEPOSITION SERVICES
Transcript of Dennis Baker

Page 121

1    policy of not compensating employees for obtaining

2    their insurance licenses?

3                    MS. GIFFORD:   Objection.

4        A.   I don't know of a policy like that.

5        Q.   (BY MR. KNIGHT)   Do you have an insurance

6    license?

7        A.   No.

8        Q.   Do you know whether family service

9    counselors receive compensation for any time they

10   spend preparing to take the insurance exam?

11       A.   I don't know.

12       Q.   Do you know the requirements for obtaining

13   an insurance license in states other than Arizona?

14       A.   No, not specifically.   I know that they

15   vary from state to state.

16       Q.   Are you familiar with the term "preneeds

17   appointments"?

18       A.   Yes.

19       Q.   What does that mean to you?

20       A.   That means you have an appointment to meet

21   with people to discuss prearrangement, funeral plans,

22   cemetery property.

23       Q.   Did any of the people who reported to you

24   in Arizona at Alderwoods have responsibility for

25   having these preneeds appointments?

c77c7411-3269-486b-8d78-6375d43a630f

NETWORK DEPOSITION SERVICES
Transcript of Dennis Baker

Page 122

1      A.   Yes.

2      Q.   What positions?

3      A.   Counselors, sales counselors.

4      Q.   Funeral directors?

5      A.   No.

6      Q.   No embalmers?

7      A.   No.

8      Q.   Any administrators participate?

9      A.   No.

10     Q.   Did you participate?

11     A.   No.

12     Q.   Okay.  Did you ever give any instruction to

13   the employees who had preneed appointments as to

14   whether they should record their time, the time that

15   they spent in the appointment?

16     A.   I don't recall.

17     Q.   Was there any policy that they not be

18   compensated for their time in appointments?

19     A.   I don't recall that either.

20     Q.   If the appointment extended beyond -- well,

21   let me strike that.

22          Did family service counselors have

23   scheduled hours?

24     A.   Yes, they did.

25     Q.   And I might be getting terms confused.  I'm

NETWORK DEPOSITION SERVICES
Transcript of Dennis Baker

Page 123

1    saying family service counselors, but I think you are

2    calling them sales counselors?

3          A.    Semantics.  Same, same.

4          Q.    So we're talking about the same thing.

5                And I'm sorry, you said you think they did

6    have scheduled hours?

7          A.    Yes.

8          Q.    Scheduled by you?

9          A.    Basically.

10         Q.    Would their preneed appointments ever

11   extend beyond their scheduled hours?

12         A.    Yes.

13         Q.    If they did extend beyond their scheduled

14   hours, were they required to record their time?

15               MS. GIFFORD:  Objection.

16         A.    I'm not sure.

17         Q.    (BY MR. KNIGHT)  Is there any reason they

18   wouldn't have recorded their time?

19         A.    I'm not sure what the policy was.  I do not

20   recall what the policy was on the family service

21   counselors, salespeople, whatever you want to call

22   them.

23         Q.    Are you aware of any specific policy that

24   they were not allowed to record the time they spent

25   in preneeds appointments that went beyond their

c77c7411-3269-486b-8d78-6375d43a630f

NETWORK DEPOSITION SERVICES
Transcript of Dennis Baker

Page 124

1    scheduled hours?

2        A.   No, I'm not aware of it.

3        Q.   Are you aware of any employees who didn't

4    record the time they spent in preneeds appointments?

5        A.   Who did not?

6        Q.   Correct.

7        A.   I don't know whether they did or not.

8        Q.   So you're not aware of anyone who did not,

9    for example?

10       A.   I don't know whether they did or not.

11       Q.   Okay.  We talked earlier a little bit about

12   how overtime is supposed to be preapproved.  Do you

13   recall that?

14       A.   Yes.

15       Q.   Are you familiar with a company-wide

16   Alderwoods policy that the employees not be

17   compensated for overtime that was not preapproved?

18            MS. GIFFORD:  Objection.

19       A.   I'm aware that the company policy is that

20   it is supposed to be preapproved, yes.

21       Q.   (BY MR. KNIGHT)  Is it the company policy

22   that if it's not preapproved, they don't get paid for

23   it?

24            MS. GIFFORD:  Objection.

25       A.   That's the company policy.

c77c7411-3269-486b-8d78-6375d43a630f

NETWORK DEPOSITION SERVICES
Transcript of Dennis Baker

Page 125

1    Q.   (BY MR. KNIGHT)  Is that what you did?
2    A.   I'm sure there were times that overtime
3    evolved or developed that had not been planned or
4    scheduled that I approved.  You know, I'm sure I did
5    that.
6    Q.   That you approved after the fact?
7    A.   Yeah.
8    Q.   Did you ever refuse to pay someone overtime
9    because they hadn't come to you and had it approved
10   beforehand?
11   A.   Not that I recall.
12   Q.   Okay.  But you said you think that was the
13   company policy that you should have done that?
14   A.   Yes.
15   Q.   Why do you think that's the case?
16   A.   Well, I think it is the case.  I think we
17   just read that, you know.  And I think it was in as
18   well, too, that --
19   Q.   Well, do you recall where you read that?
20   A.   No.  One of these --
21   Q.   It's in one of these exhibits?
22   A.   Yes.
23   Q.   Okay.  I think if we look at Exhibit 5, and
24   I think if you look at subsection F, Overtime --
25   A.   Yes.

c77c7411-3269-486b-8d78-6375d43a630f

NETWORK DEPOSITION SERVICES
Transcript of Dennis Baker

Page 126

1      Q.    We have looked at this.  And the second
2   sentence says "All overtime, however, must be
3   approved in advance by management."
4      A.    There you go.
5      Q.    Is that what you're referring to?
6      A.    Yes.
7      Q.    Is there anything in this section that says
8   if it's not approved in advance that they won't get
9   paid for it?
10     A.    I don't see anything saying that.
11     Q.    Are you aware of any policy elsewhere that
12  said they wouldn't get paid for overtime that wasn't
13  approved?
14     A.    I'm not aware.
15     Q.    Now, we previously marked as Exhibit 2 the
16  affirmation that you provided in this case that you
17  signed on September 23, 2009.  I just want to refer
18  you back to that for a minute.
19     A.    Okay.
20     Q.    Was that the -- September 23, 2009, was
21  that the actual day you signed this affirmation?
22     A.    I believe so.
23     Q.    Did you understand that this affirmation
24  was made under oath?
25     A.    Yes.

c77c7411-3269-486b-8d78-6375d43a630f

NETWORK DEPOSITION SERVICES
Transcript of Dennis Baker

1    Q.    Subject to perjury?

2    A.    Yes.

3    Q.    Did you review any versions of this

4 affirmation prior to signing this one?  In other

5 words, were there drafts that you revised prior to

6 signing this particular version?

7    A.    Yes.

8    Q.    How many versions were there?

9    A.    There was the original draft and I think

10 one revision, we came to the final.

11   Q.    There was one other draft?

12   A.    Yes.

13   Q.    Do you recall what differences there were

14 between that draft and this version?

15   A.    The only thing I recall -- and she asked if

16 there was things I wanted to change, and it was -- it

17 was wording again.  And I doubt it made any

18 difference, but --

19   Q.    Uh-huh.  What page are you on?

20   A.    Well, I'm looking for it.  It seems like

21 the original version said I was ordered or -- and I

22 changed the word to "encouraged."

23        Here, page 3, number 12.  "One of these

24 policies was Alderwoods' Community Work Policy.  This

25 company-wide policy encouraged employees to volunteer

c77c7411-3269-486b-8d78-6375d43a630f

NETWORK DEPOSITION SERVICES
Transcript of Dennis Baker

Page 128

1   their time."

2       Q.   You didn't want to say ordered employees?

3       A.   I think that was what the original was.

4       Q.   And why do you prefer "encouraged" to

5   "ordered"?

6       A.   Well, I just like that word better.

7       Q.   Do you not believe that Alderwoods ordered

8   employees to volunteer time?

9               MS. GIFFORD:  Objection.

10      A.   Yeah, I do believe that Alderwoods

11  employees were not ordered to.  I believe Alderwoods

12  employees were encouraged to.

13      Q.   (BY MR. KNIGHT)  Okay.  Was there any

14  policy to your knowledge that Alderwoods employees

15  join a community organization?

16              MS. GIFFORD:  Objection.

17      A.   There was -- it's my understanding that

18  Alderwoods employees were encouraged to join

19  community organizations.

20      Q.   (BY MR. KNIGHT)  But it wasn't a

21  requirement?

22      A.   It's not a requirement.

23      Q.   Okay.  Was there any other difference

24  between the draft and the final version that you

25  signed besides what you just pointed out?

c77c7411-3269-486b-8d78-6375d43a630f

NETWORK DEPOSITION SERVICES
Transcript of Dennis Baker

Page 137

1    Q.   (BY MR. KNIGHT)  Did you ever discuss
2 community activities or community service work in
3 evaluations with employees?
4    A.   I don't recall doing that.
5    Q.   Do you recall whether it's part of the
6 evaluation form for employees?
7    A.   For application?
8    Q.   Evaluation.
9    A.   Oh, evaluation.  I suspect it is included
10 in the evaluations, yes.
11    Q.   You suspect it is.  Do you recall seeing it
12 in there specifically?
13    A.   I think in evaluations -- I don't know that
14 they're preformed, you know, but I think it's a good
15 thing if employees are involved in community
16 activities.  I think they get kudos or a pat on the
17 back or a gold star.  You know, good for you, you're
18 active in the community, that's good.
19    Q.   In your time with Alderwoods was there one
20 like a uniform evaluation form that all the locations
21 used?
22    A.   I don't -- I don't know.  I suspect there
23 was, but I don't recall.
24    Q.   Did you notice any difference in
25 evaluations forms when you moved to Oregon from what

c77c7411-3269-486b-8d78-6375d43a630f

NETWORK DEPOSITION SERVICES
Transcript of Dennis Baker

Page 138

1   you had seen in Arizona?

2       A.   I did not notice.

3       Q.   Okay.  Did you have any --

4       A.   I'm of the opinion they're all the same.

5       Q.   Did you have any employees when you were in

6   Arizona who didn't do anything in the community at

7   all to your knowledge?

8       A.   I'm sure I did.

9       Q.   Were they disciplined in any way?

10      A.   No.

11      Q.   Did you do anything to monitor their

12  community activity when you were in Arizona, your

13  employees?

14               MS. GIFFORD:  Objection.

15      A.   No.

16      Q.   (BY MR. KNIGHT)  Did Ken Dimond ask you to

17  report to him as to what your employees were doing in

18  the community?

19      A.   I think the question was asked about

20  whether or not there is involvement in community

21  activities, yes.

22      Q.   Did you report to him what specific

23  employees were or were not doing?

24      A.   Probably, uh-huh.

25      Q.   How did you know what they were doing?

c77c7411-3269-486b-8d78-6375d43a630f

NETWORK DEPOSITION SERVICES
Transcript of Dennis Baker

Page 139

1    A.   You know, just by being aware.  I knew, you

2    know, who belonged to the motorcycle club, who was a

3    member -- you know, I just -- you know, I knew from

4    involvement.

5    Q.   You mentioned motorcycle club, for

6    example.  If someone was part of the motorcycle club,

7    did you know whether they had joined the motorcycle

8    club because Alderwoods had encouraged them to do

9    so?

10               MS. GIFFORD:  Objection.

11   A.   No, I would have no way of knowing that.

12   Q.   (BY MR. KNIGHT)  Do you know of any

13   employees who joined a club or joined a church or any

14   other community service or any other community

15   organization specifically because Alderwoods

16   requested them to?

17               MS. GIFFORD:  Objection.

18   A.   Well, two-part answer.  No.  And first

19   part, I don't ever know of Alderwoods, you know,

20   requesting -- we're getting into semantics here, but

21   it wasn't mandated.

22   Q.   (BY MR. KNIGHT)  I should have said

23   encouraged.  Did anyone join to your knowledge

24   specifically because Alderwoods encouraged them to

25   join?

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

c77c7411-3269-486b-8d78-6375d43a630f

NETWORK DEPOSITION SERVICES
Transcript of Dennis Baker

Page 140

1    A.   I would say so, yes.

2    Q.   Who did you think did that?

3    A.   You know, I don't have specifics.

4    Q.   Okay.  In paragraph 14 of your affirmation

5  you say that you were told that the community work

6  was encouraged to be completed on a volunteer basis,

7  so employees would not be paid for this work.

8    A.   Uh-huh.

9    Q.   Did Ken Dimond ever tell you that employees

10  would not be paid for work in the community?

11          MS. GIFFORD:  For the record, this is

12  paragraph 13, not 14; right?

13          MR. KNIGHT:  I'm reading from 14.

14          MS. GIFFORD:  I see, okay.  Uh-huh.

15    A.   Okay.  Well, it depends on where you put

16  the emphasis when you read that sentence.  Okay?

17    Q.   (BY MR. KNIGHT)  Okay.

18    A.   And the way I read this sentence and the

19  way I stated this was, I was told that the community

20  work was encouraged to be completed on a volunteer

21  basis, so employees would not be paid for this work.

22          You know, it's not I was told that

23  community work was encouraged to be completed on a

24  volunteer basis, so employees would not be paid for

25  this work, you know.

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

c77c7411-3269-486b-8d78-6375d43a630f

NETWORK DEPOSITION SERVICES
Transcript of Dennis Baker

Page 154

1      If you look at page 7 of the Second Amended

2   Complaint, do you see paragraph g?

3      A.   Yes.

4      Q.   It says "Defendant implemented an

5   unrecorded work time policy."  Do you see that?

6      A.   Yes.

7      Q.   And then the next sentence reads "Under

8   this policy, defendant suffered or permitted

9   employees to perform work, but directed that such

10  work not be recorded."

11      Are you aware of a policy requiring

12  employees to perform work but not record it?

13          MS. GIFFORD:  Objection.

14      A.   No, I'm not.

15          (Marked for identification Deposition

16  Exhibit 6.).

17      Q.   (BY MR. KNIGHT)  This is a -- what the

18  court reporter has marked as Exhibit 6 is a list of

19  people who have opted in to a related case brought

20  against Alderwoods in Pennsylvania called Prise

21  versus Alderwoods Group, Inc.

22          And I don't want you to spend a lot of time

23  on this, but I just want to ask you to take a couple

24  minutes and scan through this list, which is in

25  alphabetical order, and if you could let me know if

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

c77c7411-3269-486b-8d78-6375d43a630f

C E R T I F I C A T E

BE IT KNOWN that I took the foregoing deposition; that I was then and there a Certified Reporter in the State of Arizona; that by virtue thereof, I was authorized to administer an oath; that the witness, DENNIS BAKER, before testifying was duly sworn to testify to the whole truth and nothing but the truth; and the testimony of the witness was reduced to writing under my direction.

I DO FURTHER CERTIFY that I am not a relative or attorney of either party or otherwise interested in the event of this action.

( XX ) Pursuant to request, notification was provided that the deposition is available for review and signature.

( ) Deposition review and signature was waived.

WITNESS my hand this 2nd day of November, 2009.

_____
DOUG KIRKPATRICK, CR# 50705