**TAB 3**

NETWORK DEPOSITION SERVICES
Transcript of Jason Alex Burgess

Page 1

THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
Civil Action No. 06-1641

```
                              )
DEBORAH PRISE and HEATHER     )
RADY on behalf of themselves  )
and all employees similarly   )
situated,                     )
                              )
          Plaintiffs,         )
                              )
vs.                           )
                              )
ALDERWOODS GROUP, INC., and   )
SERVICE CORPORATION INTERNATIONAL)
                              )
          Defendant.          )
                              )
```

DEPOSITION OF JASON ALEX BURGESS

(Taken by Defendants)

Charlotte, North Carolina

Tuesday, August 11, 2009

Reported in Stenotype by
V. Dario Stanziola, CSR, RPR, CRR

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

ea8d0784-dc62-4143-b5a3-cad356c7c557

NETWORK DEPOSITION SERVICES
Transcript of Jason Alex Burgess

Page 52

1    recall?
2         A.   Just that it was offered -- basically
3    that it was offered through the company and that we
4    needed to have it so that we could sell pre-need.
5              Which didn't do me any good because I
6    never sold pre-need.
7         Q.   Okay.  Well, hold on.
8              Do you know that it was actually a
9    requirement to have some type of insurance license to
10   sell pre-need in the State of North Carolina?
11        A.   Yes, ma'am.
12        Q.   So it was true that you would need to have
13   at least a minimum license to sell pre-need in
14   North Carolina?
15        A.   Yes, ma'am.
16        Q.   Your testimony is that you never sold
17   pre-need?
18        A.   Correct.
19        Q.   Do you have any knowledge as to what
20   Mr. Trull may have told others regarding the limited
21   insurance license to sell pre-need?
22        A.   No, ma'am.
23        Q.   You just know what he told you?
24        A.   Yes, ma'am.
25        Q.   So you don't recall at any point selling

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

NETWORK DEPOSITION SERVICES
Transcript of Jason Alex Burgess

Page 53

1    any type of pre-need policy --
2         A.    No, ma'am.  I did not.
3         Q.    -- after -- I'm sorry, after obtaining your
4    license?
5         A.    No, ma'am.  I never sold pre-need.
6         Q.    And -- and why was that?
7         A.    Because when you sell pre-need, they pay
8    you a commission.  And with -- and it used to be
9    that within the first six months if the person
10   died, they took half -- I'm sorry, they took all of
11   it back.  If they didn't live a year, then they
12   took half of it back.  And if they quit paying
13   their payments in the first year, they took all of
14   your -- 100 percent of your commission back.  And I
15   didn't want that to be deducted out of my payroll
16   or anything.  I liked having a guaranteed salary.
17   I liked to having what I made per hour versus
18   having to paid on commission and then having it --
19   having to wait a year before I can spend any of it
20   to see if it was taken back.
21        Q.    So it was like a personal choice on your
22   part not to use the license?
23        A.    Oh, yes, ma'am, correct.
24        Q.    Was there any fee associated with the
25   license?

ea8d0784-dc62-4143-b5a3-cad356c7c557

NETWORK DEPOSITION SERVICES
Transcript of Jason Alex Burgess

1      A.   He was a location manager for Hankins &
2  Whittington.
3      Q.   Steve Hodge?
4      A.   He was the location manager for Wilson.
5      Q.   And Bill Bird?
6      A.   He was just a funeral director, pre-need
7  counselor.
8      Q.   And what about Eddie Pig?
9      A.   He was just a pre-need counselor, funeral
10  director at Carothers.  Rick Hamilton was the same
11  way.
12      Q.   When you say like a funeral director,
13  you're also saying pre-need counselor, do you mean
14  they had both titles?
15      A.   Yes, ma'am.
16      Q.   And I think Danny?
17      A.   At Bass was the location manager.
18      Q.   The last one you mentioned.  He was the
19  last individual you mentioned, I believe?
20      A.   Yes, ma'am.
21      Q.   Do you have any knowledge whether any of
22  these individuals were required to obtain the
23  insurance licenses that they had?
24      A.   I do not know.
25      Q.   Do you have any knowledge of what's

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

NETWORK DEPOSITION SERVICES
Transcript of Jason Alex Burgess

1      A.    Part of the time we had what they call --
2    it was on like a notebook type thing.  I would call
3    it a time log where you would write your time in.
4    And if you took -- if you worked through your lunch
5    like, say, to work a service or you had a body you
6    had to embalm in between funerals, you'd put on
7    there no lunch, draw a line down through it, put
8    that you went home at 5:00, 5:30, 6:00, whatever.
9          And then up until where they had some --
10   they had a state inspection, and the state
11   inspector came in -- some auditor lady came in,
12   went through the books and looked at everything and
13   said you guys have to have a time card.  If you're
14   going to pay these people by an hourly rate, you
15   must punch a time clock.  Because -- and which was
16   my understanding, you know.  And I had told him
17   this as, you know, the OSHA director.  Because in
18   North Carolina it's part of labor wage and hour law
19   as well.  And I told him, I said, you know, unless
20   we're salary, we're supposed to be punching a time
21   clock and you're going to get in trouble for this.
22   But it was brushed off.  So part of the year we
23   wrote in, part of the year we punched it with a
24   time clock.
25      Q.    So you had a handwritten notebook, as you

ea8d0784-dc62-4143-b5a3-cad356c7c557

NETWORK DEPOSITION SERVICES
Transcript of Jason Alex Burgess

Page 104

1   paycheck and one was a direct deposit pay stub.
2   Direct deposit pay stub would have been your normal
3   salary you got for a week.  The commission would
4   have been written in a check and you would have got
5   two that week instead of having one.
6        Q.   But you don't have any knowledge as to
7   whether the commissions were included in the rate you
8   received for your overtime in the weeks that you sold
9   the markers?
10            MR. McGEE:  Object to form.
11       Q.   Do you know?
12       A.   No, ma'am, I don't know.
13       Q.   Did you ever see any type of policy as to
14   what would be included or what would be excluded in
15   overtime payments?
16       A.   I don't understand what you mean.
17       Q.   Did you ever see any type of -- let me put
18   it to you this way, did you ever see any type of
19   policy that discussed how overtime was calculated?
20       A.   No, ma'am.  The only thing I know that we
21   weren't paid overtime for was community service,
22   that was it.  And to me it should have been paid
23   seeing how we were required to be there, wear our
24   coat and tie and our name tag, telling who we are
25   and who we worked for.

ea8d0784-dc62-4143-b5a3-cad356c7c557

NETWORK DEPOSITION SERVICES
Transcript of Jason Alex Burgess

Page 112

1   and put it on your time sheet.
2        Q.   Okay.  And after this memo was posted, did
3   you always seek preapproval?
4        A.   Sometimes.  And then there would be times
5   that where the funeral home would be busy and we
6   would have the market itself I guess you would say
7   would be busy, and calls would be up and you may
8   work over those hours and nothing be said.  But you
9   always knew -- you always had the possibility that
10  something could be questioned.  But sometimes it
11  would, sometimes it wouldn't.  I guess it just
12  depended on how we were doing as a market as far as
13  call volume being up.
14       Q.   So if I understand you, sometimes you'd
15  work beyond your scheduled hours?
16       A.   Yes, ma'am.
17       Q.   You would record that time?
18       A.   Correct.  And --
19       Q.   And it would never be questioned?
20       A.   It would never be questioned.  And it
21  would be paid.
22       Q.   And it would be paid?
23       A.   Right.
24       Q.   Okay.  Were there -- were there times that
25  you didn't seek -- are you saying that there were

ea8d0784-dc62-4143-b5a3-cad356c7c557

NETWORK DEPOSITION SERVICES
Transcript of Jason Alex Burgess

Page 113

1    times that you didn't seek preapproval, but that time
2    was subsequently questioned?  Was it -- let me ask it
3    this way: We talked about times that you did not seek
4    preapproval.
5         A.   Okay.
6         Q.   Right?
7         A.   Yes, ma'am.
8         Q.   And you said that sometimes you didn't seek
9    preapproval?
10        A.   Right.
11        Q.   Okay.  And you would record the time, it
12   wouldn't be questioned and you would be paid for it?
13        A.   Correct.
14        Q.   Okay.  Were there times when you didn't
15   seek preapproval but that the time was later
16   questioned?
17        A.   Yes, ma'am.
18        Q.   Okay.  And on those occasions, what would
19   happen?
20        A.   He would just ask us why -- either why
21   you didn't take your lunch hour or why you didn't
22   take your dinner hour.  And you would explain the
23   reason why.  And if, like I said, if it was a time
24   where call volume was down and Ken Pierce or Katie
25   was coming down on him about controlling his

ea8d0784-dc62-4143-b5a3-cad356c7c557

NETWORK DEPOSITION SERVICES
Transcript of Jason Alex Burgess

Page 114

1  overtime, then it would be marked off, you know, if
2  you didn't -- if he didn't feel that it was
3  selectively preapproved.
4          And what he would do is -- now, let me
5  back up.  On preapproval, what he would do is if I
6  worked -- if visitation went over the night before,
7  I would let him know usually first thing the next
8  morning, say hey, Morris, I worked until 11:30 last
9  night, visitation ran over.  He'd say okay, don't
10 worry about it, we'll talk about it, just put it on
11 your time sheet.  I put it on there.  And then
12 depending on what the situation was on Monday, it
13 could be paid, it could not be paid.  It just
14 depended on how he was told to control overtime, I
15 would assume.
16     Q.    You would assume?
17     A.    I would assume, yes, ma'am.
18     Q.    Because there were times when it wasn't
19 approved and it was paid?
20     A.    Correct.
21     Q.    Were there times that he -- he questioned
22 it and you gave an explanation and it was paid?
23     A.    Yes, ma'am.  Sometimes it would be.
24 It -- it would just depend.  And it would be times
25 where he knew that week that we were extremely

ea8d0784-dc62-4143-b5a3-cad356c7c557

NETWORK DEPOSITION SERVICES
Transcript of Jason Alex Burgess

Page 115

1   busy.  Now, there may be weeks -- it would be
2   usually during the week we might have 15, 20
3   funerals within five, six days.  And then he would
4   know, you know.  But if it was a week where we may
5   only have three funerals that week or four funerals
6   that week, chances are he probably wouldn't approve
7   it, he would mark it off.  That would -- to the
8   best of my knowledge, be a week that he would do
9   that.  From what I can remember.
10       Q.   Okay.  But just to sum up then, there were
11   times that you didn't seek approval and it was not
12   questioned and it was paid?
13       A.   Yes, ma'am.
14       Q.   There were times you didn't seek
15   preapproval for hours outside your scheduled hours,
16   it was questioned, but you were still paid?
17       A.   Correct.
18       Q.   But then you also claim that there were
19   times when you didn't seek preapproval, it was
20   questioned and then you said that he would mark off
21   the time?
22       A.   Yes, ma'am.
23       Q.   Okay.  And can you recall any specific
24   occasions when that happened, when it was questioned
25   and not paid for hours outside your scheduled hours?

ea8d0784-dc62-4143-b5a3-cad356c7c557

NETWORK DEPOSITION SERVICES
Transcript of Jason Alex Burgess

Page 135

1   relating to hours that you worked?

2       A.   Correct.

3       Q.   Okay.  And if we look at this document at

4   the bottom, it says there are 51 total hours --

5       A.   Correct.

6       Q.   -- that you worked in this week?

7       A.   Yes, ma'am.

8       Q.   Okay.  And that would be 40 hours regular

9   and 11 hours overtime.  Is that what the notation

10  says?

11      A.   Yes, ma'am.

12      Q.   Okay.  Right above that, do you see where

13  it says removal?

14      A.   Yes, ma'am.

15      Q.   And there's three hours --

16      A.   Correct.

17      Q.   -- listed there?

18           Okay.  Below that, what is that -- what

19  does that say?

20      A.   It says telephone, one hour.

21      Q.   Okay.  So this is an occasion when you

22  recorded time that you spent on the telephone?

23      A.   Yes, ma'am.

24      Q.   Would this have been -- what kind of

25  situation would this have been where you were

ea8d0784-dc62-4143-b5a3-cad356c7c557

NETWORK DEPOSITION SERVICES
Transcript of Jason Alex Burgess

Page 136

1    recording time spent on the telephone?

2         A.   Where they had -- where the family just

3    kept -- would have kept calling and kept calling

4    with questions about services and about insurance

5    and about, you know, wanting to pay with the

6    insurance, life insurance policy.  Or it may have

7    been a situation where they wanted to call and

8    decided they wanted to set an appointment and then

9    call back and said we want to change it or may have

10   been a situation where they called back and just

11   had questions about things.

12        Q.   Okay.  Looking at this document, can you --

13   would this hour that you recorded for telephone time,

14   would that have occurred outside of the 8 o'clock to

15   5 o'clock time period that you have -- excuse me, the

16   8 o'clock to 10 o'clock time period that you have

17   recorded here?

18        A.   Yes, ma'am.

19        Q.   Would have been outside of that?

20        A.   Correct.

21        Q.   Okay.

22        A.   Anything that was written on these cards

23   then, happened after those hours.

24        Q.   Anything that was written at the bottom?

25        A.   At the bottom, happened outside of those

ea8d0784-dc62-4143-b5a3-cad356c7c557

NETWORK DEPOSITION SERVICES
Transcript of Jason Alex Burgess

Page 137

1   hours.
2          Q.   Outside of the hours that were recorded?
3          A.   Yes, ma'am.
4          Q.   Okay.  Okay.  So here you recorded an hour
5   for that time?
6          A.   Correct.
7          Q.   And would you agree with me that you were
8   paid for an hour at that time?
9          A.   Yeah, I would agree.
10         Q.   Okay.
11              THE WITNESS:  I'm sorry, yes.
12         Q.   And you were never told at any point that
13  you couldn't record that telephone time?
14         A.   At that point, no, I had not.
15         Q.   Were you ever told that you couldn't record
16  the telephone time?
17         A.   To the best of my knowledge, later on --
18  later on in the years after -- when they started
19  cracking down on overtime, yes, ma'am.
20         Q.   What is it -- what is it that you think you
21  were told?
22         A.   Is that with the -- with the whole time
23  card -- when the time clock came in was when we
24  couldn't record it.  To the best of my knowledge,
25  what I can remember, was the time we couldn't

ea8d0784-dc62-4143-b5a3-cad356c7c557

NETWORK DEPOSITION SERVICES
Transcript of Jason Alex Burgess

Page 139

1    this is a document that you signed; is that correct?
2         A.   Yes, ma'am.
3         Q.   Okay.  So this is a representation of a
4    time card that -- is this a time card you completed
5    or --
6         A.   Yes, ma'am.
7         Q.   -- time notepad you completed?
8         A.   Yes, ma'am.
9         Q.   Okay.  That's your handwriting, writing in
10   the hours?
11        A.   Yes, ma'am.
12        Q.   Okay.  And it says down at the bottom
13   52 hours total?
14        A.   Correct.
15        Q.   Would this have been a week -- can you tell
16   from looking at this, whether this would have been a
17   week where you were scheduled to work 50 hours?
18        A.   Yeah, I would say yes, ma'am, I would
19   think so.
20        Q.   Do you see under Tuesday?
21        A.   Um-hum.
22        Q.   Is there a reference there to telephone
23   time?
24        A.   One hour, yes, ma'am.
25        Q.   Okay.  And that would be one hour in

ea8d0784-dc62-4143-b5a3-cad356c7c557

NETWORK DEPOSITION SERVICES
Transcript of Jason Alex Burgess

Page 140

1  addition to the time that's recorded here?

2       A.   Correct.

3       Q.   So in addition to the -- to the eight

4  through ten --

5       A.   Um-hum.

6       Q.   -- that you have recorded under Tuesday?

7       A.   Yes, ma'am.

8       Q.   Okay.  Do you have any reason to believe

9  that you were not paid for the hour of telephone time

10  that you recorded here?

11       A.   Um-um.  No, ma'am.

12       Q.   So at this point in time, you're recording

13  telephone time if you had telephone time?

14       A.   Yes, ma'am.

15       Q.   Okay.  And again, that would be telephone

16  time outside your scheduled hours?

17       A.   Correct.

18       Q.   While you were on call, is that why this

19  would come up?

20       A.   Yes, ma'am.

21       Q.   Okay.  So this telephone time is hours --

22  time worked on the telephone while you were on call?

23       A.   Correct.

24       Q.   Okay.  I'll hand you what we'll have marked

25  as Defendant's 5.

ea8d0784-dc62-4143-b5a3-cad356c7c557

NETWORK DEPOSITION SERVICES
Transcript of Jason Alex Burgess

1    place, let's break for lunch.  It's about 20
2    'til 1:00 now.
3         MS. BRAUN:  How about if we just get
4    through a couple more.
5         MR. McGEE:  That's fine.  Yeah, whenever
6    is a good place for you to break in the
7    questioning.
8    Q.   Okay.  I'll hand you what we'll have marked
9    as Defendant's Exhibit 6.
10        (Exhibit D-6: A document entitled Payroll
11        Transaction Report Year 2003 Week 52, Bates
12        ALD001024 - 25 marked for identification, as
13        of this date.)
14   Q.   Okay.  And again, this is a document --
15   two-page document, payroll transaction report?
16   A.   Um-hum.
17   Q.   And then the time notepad attached to it,
18   Alderwoods 1024 and 1025?
19   A.   Correct.
20   Q.   And this is your signature on the bottom of
21   it, the second page?
22   A.   Yes, ma'am.
23   Q.   Okay.  And it's for the week ending?
24   A.   December 27th, 2003.
25   Q.   Okay.  And on the far right-hand side under

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

NETWORK DEPOSITION SERVICES
Transcript of Jason Alex Burgess

Page 145

1   Saturday --
2        A.   Yes, ma'am.
3        Q.   -- there's a notation of no lunch?
4        A.   Correct.
5        Q.   Okay.  Is this an example of what you
6   described in your earlier testimony of how you would
7   record if you worked for a lunch -- through a lunch?
8        A.   Yes, ma'am.
9        Q.   Okay.  And here you recorded that you
10  worked through a lunch?
11       A.   Correct.
12       Q.   Okay.  And you were paid --
13       A.   Yes, ma'am.
14       Q.   -- for working through that lunch; is that
15  correct?  Just take a minute and look at the
16  document.
17       A.   Yes, ma'am.
18       Q.   You were paid?
19       A.   Yes, ma'am.
20       Q.   Is that six?
21       A.   Yes, ma'am, that would be six.
22            MR. McGEE:   Yes.
23            MS. BRAUN:   We could break now for lunch,
24        if you'd like.
25            MR. McGEE:   Sounds good.

ea8d0784-dc62-4143-b5a3-cad356c7c557

NETWORK DEPOSITION SERVICES
Transcript of Jason Alex Burgess

1    know, visitation ran a little bit late last night,
2    or we picked this body up at such and such time.
3    So when you see on my time sheet, that's why it's
4    on there.
5         Q.   It was more that you were giving him a
6    heads up?
7         A.   Yes, ma'am.
8         Q.   Okay.
9         A.   Just letting him know.
10        Q.   Okay.  So no formal process of him signing
11   off ahead of time that you had worked -- that you
12   thought you had worked outside your scheduled hours?
13        A.   No, ma'am.
14        Q.   And other than the memo that we've referred
15   to several times today, did you ever see anything
16   else in writing regarding preapproval for overtime?
17        A.   No, ma'am.
18        Q.   Okay.  And in discussing, you know,
19   documents in writing, did you ever see anything in
20   writing in terms of how you would be compensated for
21   your on-call work?
22        A.   No, ma'am.
23        Q.   You only understood what you were told?
24        A.   Correct.
25        Q.   And you were informed of how you'd be paid

ea8d0784-dc62-4143-b5a3-cad356c7c557

NETWORK DEPOSITION SERVICES
Transcript of Jason Alex Burgess

Page 149

1    while on call by?

2         A.   Maurice Trull.

3         Q.   Did anyone ever -- anyone else in

4    Alderwoods management ever instruct you regarding

5    payment for your time worked on call?

6         A.   No, ma'am.

7         Q.   And we saw several examples of a time that

8    you had recorded for time spent on the phone while on

9    call?

10        A.   Correct.

11        Q.   Okay.  So you certainly recorded time spent

12   on the phone while on call --

13        A.   Correct.

14        Q.   -- at certain times during your

15   employment --

16        A.   Yes, ma'am.

17        Q.   -- with Alderwoods.

18             Okay.  Now, is your testimony that there

19   was a time that you stopped recording the time you

20   spent on call -- while you were on the phone while on

21   call?

22        A.   To the best of my knowledge, yes, ma'am.

23        Q.   You think there may have been a time when

24   you stopped doing that?

25        A.   Yes, ma'am.

ea8d0784-dc62-4143-b5a3-cad356c7c557

NETWORK DEPOSITION SERVICES
Transcript of Jason Alex Burgess

Page 164

1    Q.   What are you doing for work now?

2    A.   I was just recently laid off.

3    Q.   Okay.

4    A.   I was doing work for a concrete supply

5  company.  I was driving a concrete mixer.

6    Q.   Okay.

7    A.   And due to the downturn in the economic

8  downturn of the construction industry, everything

9  has just come to a halt.

10    Q.   Did you -- after you left Alderwoods in

11  December of 2004, did you continue to work in the

12  funeral home industry?

13    A.   No, ma'am, actually, I did not.  I drew

14  unemployment for a little bit.  Then I went to work

15  for a company called Adams Outdoor Advertising for

16  about eight, nine months.  And then when the job

17  came open at concrete supply, that's when I

18  switched because it was just a better paying job.

19    Q.   Have you maintained your membership in the

20  North Carolina Funeral Directors Association?

21    A.   No, ma'am.

22    Q.   When did you terminate that?

23    A.   When I was terminated from Alderwoods.

24    Q.   In 2000 -- end of 2004?

25    A.   Yes, ma'am.

ea8d0784-dc62-4143-b5a3-cad356c7c557

NETWORK DEPOSITION SERVICES
Transcript of Jason Alex Burgess

1       Q.    And you mentioned the Monroe Alive
2   Festivals?
3       A.    Um-hum. Yes, ma'am.
4       Q.    They were held in the summer?
5       A.    Yes, ma'am.
6       Q.    Okay.  Those were held during your
7   employment with Alderwoods?
8       A.    Correct.
9       Q.    Okay.  Does Monroe continue to hold those
10  festivals?
11      A.    To the best of my knowledge, yes, ma'am,
12  they still do.
13      Q.    Okay.  Did you continue to attend the
14  festival after your employment?
15      A.    No, ma'am.
16      Q.    And you said that was held in the summer?
17      A.    Yes, ma'am.
18      Q.    And how often was it held, the festival?
19      A.    I believe it was the first and third
20  Friday of every month.
21      Q.    Were you ever told that you had to report
22  to Alderwoods's management regarding your
23  participation in community activities?
24      A.    No, ma'am.
25      Q.    Did you receive performance reviews while

ea8d0784-dc62-4143-b5a3-cad356c7c557

NETWORK DEPOSITION SERVICES
Transcript of Jason Alex Burgess

Page 166

1   you were an employee of Alderwoods, like an annual
2   performance review?
3        A.   I think so.  But I'm not sure.  I'm not a
4   hundred percent sure on that.  I think so.
5        Q.   And whatever recollection you may have of
6   those performance reviews, was your involvement in
7   community service addressed?
8        A.   Oh, yes, ma'am.  Any time -- any time you
9   sit down and talked to anybody about it, if
10  community service could be brought up, he always --
11  Maurice always would bring up community service
12  involvement.
13       Q.   And he would bring it up, what do you mean?
14  What would be said?
15       A.   Like even at staff meetings, you know, he
16  -- Maurice would always say let's remember, you
17  know, to do our community involvement.  Let's
18  remember to be, you know, good moral citizens in
19  the community and make sure the community knows
20  we're here and that we're still the same -- you
21  know, same funeral home, even though we're owned by
22  a corporate conglomerate.  That we're all local
23  directors and that we're not people who's brought
24  in from other places.
25       Q.   Did you ever fill out any type of paperwork

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

ea8d0784-dc62-4143-b5a3-cad356c7c557

NETWORK DEPOSITION SERVICES
Transcript of Jason Alex Burgess

Page 169

1      A.   Yes, ma'am.

2      Q.   Okay.  And when did you first become a

3  member of the North Carolina Funeral Directors

4  Association?

5      A.   It was after April 2000.

6      Q.   And that was in response to?

7           Why did you decide to become a member?

8      A.   Because Maurice told us we needed to

9  become members of it.  That it would look good for

10  us, and that Alderwoods would look good -- it would

11  look good for Alderwoods' employees to be part of a

12  North Carolina organization as such.

13      Q.   Did he tell you it was a requirement of

14  your job?

15      A.   He never came right out and said it was

16  required.  He just said it would -- it would look

17  good.

18      Q.   Did he ever come out and say it was a

19  requirement of your job to join an organization,

20  community organization?

21      A.   No.  But he just said -- again, he

22  just -- Maurice said it would look good if you

23  were.

24      Q.   And did he ever come out and say that it

25  was a requirement for you to join some type of a

ea8d0784-dc62-4143-b5a3-cad356c7c557

NETWORK DEPOSITION SERVICES
Transcript of Jason Alex Burgess

Page 167

1    to indicate what you had done in the community?

2         A.   No, ma'am.

3         Q.   Were you ever aware of anyone being

4    disciplined for their lack of involvement in the

5    community?

6         A.   No, ma'am.  That I do not know.

7         Q.   Your testimony is that Mr. Trull told you

8    to pick from one of several options for a community

9    organization?

10        A.   Yes, ma'am.

11        Q.   Okay.  And with respect to joining a

12   church, could you -- I just want to understand your

13   testimony.  It was your choice as to which church you

14   wanted to belong to?

15        A.   Yes, ma'am.  Because he wanted us to pick

16   a -- as he considered a fairly influential church

17   in the community.

18        Q.   Okay.  So you understood that he was

19   telling you to pick a church?

20        A.   Correct.

21        Q.   Okay.

22        A.   In my county, yes, ma'am.

23        Q.   Did he tell you that there would be any

24   repercussions if you decided not to join a church?

25        A.   No, ma'am.

ea8d0784-dc62-4143-b5a3-cad356c7c557

NETWORK DEPOSITION SERVICES
Transcript of Jason Alex Burgess

Page 187

1    know that there's people that they recognize in the
2    community who work here.
3            Q.    And when you say we would come back and
4    ask, are you meaning, like, you would go back and
5    ask?
6            A.    Myself -- yeah, myself or if sometimes
7    you'd hear Steve gripe about it, about having to
8    go.
9            Q.    About having to go to what?
10           A.    To the Monroe Alive Festival.  Because we
11   really thought it was a waste of time, just to be
12   honest with you.
13           Q.    So your testimony is that you specifically
14   questioned why you should have to be seen at the
15   Monroe festival?
16           A.    Correct.
17           Q.    And their response was?
18           A.    So that the community would be able to
19   put a local face with a local funeral director
20   there, even though we weren't -- we were owned by a
21   conglomerate, they would still know that we had
22   local people working there and they would recognize
23   somebody in the community there.
24           Q.    And how would they recognize you?
25           A.    By seeing us out, knowing our names,

ea8d0784-dc62-4143-b5a3-cad356c7c557

NETWORK DEPOSITION SERVICES
Transcript of Jason Alex Burgess

1   seeing us in our attire.  We had our coat and tie,

2   our name tag on.  That's basically it.  Because

3   it's not like I'd walk up to you strangerly (sic)

4   and say, hey, I'm Jason Burgess, I'm a funeral

5   director for McEwen Funeral Home.  I wouldn't do

6   anything like that.  I'd just wear my name tag.

7           Q.   Okay.  So you didn't approach people --

8           A.   No.

9           Q.   -- while you were at the festival?

10          A.   Oh, no, ma'am.  No, ma'am.

11          Q.   And did you approach people when you were

12   at church to talk business?

13          A.   No.  Only person -- only person I

14   introduced myself to and told who I was and where I

15   worked at was my pastor, and that was it.  And his

16   response was, I'm sorry.

17          Q.   And when you attended the Masonic Lodge

18   meetings --

19          A.   Yes, ma'am.

20          Q.   -- were you introducing yourself to people,

21   telling them where you worked?

22          A.   No, ma'am, because they already knew.

23          Q.   Were you discussing business during your

24   Masonic Lodge meetings?

25          A.   Only if somebody had a question about

ea8d0784-dc62-4143-b5a3-cad356c7c557

NETWORK DEPOSITION SERVICES
Transcript of Jason Alex Burgess

Page 189

1   some insurance or about a cemetery property or

2   about -- you know, pre-need questions that, you

3   know, ask about different options like they might

4   have.  They might say, can we come in today, you

5   know, is it true that you can actually lock a price

6   in and it be good down the road?  And I'd say yes,

7   I've heard that.  I could put you in contact with

8   somebody who could handle that for you.  I don't do

9   that, but I can help you with -- help you find

10  somebody who can.

11       Q.   Were those type of conver- -- or type of

12  questions come up at every Masonic Lodge meeting that

13  you had?

14       A.   No, ma'am, no.  Most of the time it was,

15  are you guys busy, you know, or -- you know, if so

16  and so passed away, do you have -- you know, do you

17  have Mr. Jones at your funeral or do you have

18  Mrs. Jones at your funeral home or whatever.

19       Q.   So in this litigation, are you seeking

20  compensation for the time you spent involved in -- in

21  these activities that we discussed?

22       A.   I think so, yes, ma'am.  I think I should

23  be paid for them.  Now, the Sunday morning, Sunday

24  evening service, that's a little grey for me

25  because I feel like, you know, even though they

ea8d0784-dc62-4143-b5a3-cad356c7c557

NETWORK DEPOSITION SERVICES
Transcript of Jason Alex Burgess

Page 209

1     A.   I do not know.

2     Q.   Okay.  You don't know whether other

3  employees were encouraged to belong to community

4  service organizations?

5     A.   I never heard them say specifically, you

6  know, like, for example, Steve, you need to belong

7  to an organization or, Phillip, you need to partake

8  in this situation.

9     Q.   You never heard that?

10     A.   No, ma'am.  Nothing specific like that.

11     Q.   And for those that you'd had some knowledge

12  of individuals who belonged to community

13  organizations?

14     A.   Correct.

15     Q.   Okay.  But do you know specifically why

16  they belonged to those particular organizations?

17     A.   I do not.

18     Q.   And Mr. Trull never formerly -- when I say

19  formerly, there was no systematic way that Mr. Trull

20  followed up with you regarding your involvement in

21  the community?

22          MR. McGEE:  Object to the form.

23     A.   No, he never come right out and asked

24  hey, you know, did you go here or did you go there.

25     Q.   Was there any kind of incentive program, or

ea8d0784-dc62-4143-b5a3-cad356c7c557

NETWORK DEPOSITION SERVICES
Transcript of Jason Alex Burgess

Page 210

1   were you ever offered an incentive for becoming

2   involved with the community organization?

3        A.   No, ma'am.

4        Q.   Have you ever heard of a program called I

5   Believe in Service?

6        A.   No, ma'am.

7        Q.   Do you have any knowledge as to whether

8   employees at other locations were encouraged to

9   belong to community service organizations?

10       A.   I do not know for 100 percent.

11       Q.   Okay.  Do you have any knowledge as to

12   whether employees at other locations, other than

13   McEwen, were encouraged to belong to community

14   service organizations?

15       A.   I know that Ken Poe belonged to the

16   Rotary Club, I know that much.  And Brandon Cook

17   belonged to a Rotary division in Charlotte.  But

18   beyond that, I don't know.  I know that Ken was an

19   avid golfer, so if he played in the tournament, I

20   don't know.  Our paths didn't cross at the time.

21   But I'm sure he did on some level for some time.

22       Q.   You're sure that he did what?

23       A.   He may have played in the tournament.  I

24   don't know for sure.  I mean, like I said, our

25   paths never crossed.  But with him being the avid

ea8d0784-dc62-4143-b5a3-cad356c7c557

NETWORK DEPOSITION SERVICES
Transcript of Jason Alex Burgess

Page 306

1    Alderwoods employee, correct?

2         A.   Yes.

3         Q.   I want to ask you about that limited

4    license that you gave testimony here today about,

5    okay?

6         A.   Okay.

7         Q.   And you may have said this already, I just

8    don't know.  Were you required to get that or was it

9    recommended or was it encouraged or how did that come

10   to be that you ended up getting that limited license?

11        A.   Just at first it was addressed that it

12   was required, and I questioned why, you know,

13   because I had no intention of selling pre-need,

14   didn't want to sell pre-need and then it became --

15   he says, well, I recommend.  They're offering it,

16   you might as well go ahead and get it.

17        Q.   Who said that, who's he?

18        A.   Morris.

19        Q.   Okay.

20        A.   So we filled out paperwork, did the

21   background check, went to class in Greensboro, next

22   thing I know, I had a limited license from

23   Mayflower.

24        Q.   Was it your understanding that it was

25   required?

NETWORK DEPOSITION SERVICES
Transcript of Jason Alex Burgess

Page 307

1      A.   It was recommended he said.

2      Q.   Okay.  And you followed through with that,

3  correct?

4      A.   Yeah.

5      Q.   And you went to classes.  Where were the

6  classes held at?

7      A.   At the Grandover Resort in Greensboro,

8  North Carolina.

9      Q.   Who went to those classes with you?

10      A.   Me, Philip Tillman and Maurice himself

11  went.

12      Q.   And were you paid for that time you went to

13  those classes?

14      A.   No.

15      Q.   And you may have addressed this, and I

16  didn't see it in my notes, with regards to your

17  funeral director, embalmer's license, is that what

18  it's called in North Carolina?

19      A.   Yes, it was called funeral service

20  license.  But yes, same thing, funeral director,

21  embalmer.

22      Q.   Your funeral service license?

23      A.   Correct.

24      Q.   That's required under North Carolina law

25  for you to be a funeral director embalmer?

ea8d0784-dc62-4143-b5a3-cad356c7c557

NETWORK DEPOSITION SERVICES
Transcript of Jason Alex Burgess

Page 353

1    call?
2               Do you understand the question I'm asking?
3         A.    Do you mean by tell -- do you mean did
4    anybody tell me I couldn't write any time in on my
5    time card?
6         Q.    That's right.
7         A.    Like additional time?
8         Q.    Time that you spent working on call, did
9    anyone tell you that you couldn't write down time
10   that you spent working on call?
11        A.    Not that I can recall.  Not for sure.
12             MS. BRAUN:  That's all I have.
13                       EXAMINATION
14   BY MR. McGEE:
15        Q.    Just one or two real quick follow-ups.
16             Mr. Burgess, you just testified that you
17   did not communicate with Alderwoods' management about
18   each and every instance of community service that you
19   performed; is that correct?
20        A.    Correct.
21        Q.    And, in fact, you've previously testified
22   that you inquired as to whether community service
23   could be paid; is that correct?
24        A.    Correct.
25        Q.    And you were told that that wasn't able to

ea8d0784-dc62-4143-b5a3-cad356c7c557

NETWORK DEPOSITION SERVICES
Transcript of Jason Alex Burgess

Page 235

1    Q.   Okay.  And is it your testimony that
2  Mr. Pierce reported to Ms. Katie Leahey?
3    A.   Yes, ma'am.
4    Q.   And that Ms. Katie Leahey reported to John
5  DePalma?
6    A.   Correct.
7    Q.   Okay.  Could you turn to page five, please.
8    A.   Sure.  Yes, ma'am.
9    Q.   Okay.  I'm in the middle of the page.  It
10 starts with the paragraph that says through company
11 policies and practices?
12   A.   Um-hum.
13   Q.   Which were communicated verbally and in
14 writing.
15   A.   Yes, ma'am.
16   Q.   Alderwoods encouraged employees to perform
17 work in the community?
18   A.   Correct.
19   Q.   Okay.  In our previous discussion of
20 community -- community policies -- or excuse me, of
21 community work, I believe you testified that you had
22 not seen anything in writing regarding community
23 work; is that correct?
24   A.   Yes, that's right.  Yeah, that should
25 have been verbally communicated, yes, ma'am.

NETWORK DEPOSITION SERVICES
Transcript of Jason Alex Burgess

Page 236

1    Q.   Okay.  So this isn't accurate.  You never

2    saw anything in writing regarding the encouragement

3    of --

4        A.   Yes, ma'am.

5        Q.   -- participation of work in the community?

6        A.   Correct.

7            MR. McGEE:  Wait.  I'm going to object.

8        Which sentence are you talking about? Are you

9        talking about the sentence plaintiff does not

10       have access to documents other than those

11       produced --

12           MS. BRAUN:  No, no, no.  We're up at the

13       first --

14       A.   No, no, no, which were communicated

15   verbally and in writing.  It was only communicated

16   verbally.

17           MR. McGEE:  I'm with you.  I'm sorry, I

18       was looking at the wrong sentence.

19           MS. BRAUN:  Okay.  All right.

20       Q.   So just for clarity, you never saw anything

21   in writing --

22       A.   No, ma'am.

23       Q.   -- regarding community work?

24       A.   No, ma'am.

25       Q.   Okay.  So this first statement's

ea8d0784-dc62-4143-b5a3-cad356c7c557

NETWORK DEPOSITION SERVICES
Transcript of Jason Alex Burgess

Page 237

1    inaccurate?

2         A.   Correct.  We only saw it -- we only heard

3    it verbally.

4         Q.   Okay.  And when you say we, you mean --

5         A.   All of us directors at the -- at the

6    location, because Morris would make the statement

7    in staff -- monthly staff meetings or weekly staff

8    meetings, whichever one he decided to have at the

9    time.  Please remember -- continue to remember your

10   community involvement, let's get out there and make

11   sure the community knows who we are.

12        Q.   And you understood that statement to apply

13   to?

14        A.   Everybody that was there in that meeting,

15   especially us licensed people since we were the one

16   meeting with the families.

17        Q.   Okay.  In the middle of this paragraph you

18   say that in addition to general requests that such

19   work be performed, plaintiff recalls that his

20   manager, Ken Poe, required him to attend annual Greek

21   festival?

22        A.   Correct.

23        Q.   Okay.  When Ken Poe was your manager, was

24   that prior to December of 2003?

25        A.   Yes, ma'am.

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

ea8d0784-dc62-4143-b5a3-cad356c7c557

NETWORK DEPOSITION SERVICES
Transcript of Jason Alex Burgess

Page 239

1    estimates of hours here.

2          A.   Um-hum.

3          Q.   Okay.  I'm just trying to understand, were

4    these -- where did these estimates come from?

5          A.   The 16 to 18 hours total was with all

6    golf tournaments involved on average of six to nine

7    hours, depending on how long it took.  Eight hours

8    for attending church on a monthly basis.  That was

9    before I had to -- that was on the basis of will we

10   include -- let's go ahead and include going to

11   church on Sunday morning and Sunday night, too.

12         Q.   But today you testified you think that's a

13   grey area?

14         A.   I just feel like you just shouldn't do

15   it.  I just feel like it ain't right, morally ain't

16   it right.  Because that's between you and God and

17   that's just --

18         Q.   To be paid for that?

19         A.   To be paid for that, yeah.

20             MR. McGEE:  Just for the record, what do

21    you mean by that?

22         A.   To be paid for -- for those hours of --

23   for like your hours of Sunday school and the Sunday

24   morning worship and Sunday night service.  That's

25   what I'm talking about.

NETWORK DEPOSITION SERVICES
Transcript of Jason Alex Burgess

Page 240

1          Q.    So you would revise this estimate?

2          A.    Yes, ma'am, I would revise it probably to

3    possibly three hours every two months, three hours

4    every three, four months, depending on what -- what

5    the situation was.  In August we had a -- in August

6    we had a men's seminar, you know, just, for

7    example, this recent one, yeah, I'm not working

8    there anymore, but if we had one then, like this

9    one it took two hours.  For our fall festival, it

10   normally took about four hours.  So on average, I'd

11   say three hours, maybe every month or every six

12   months, three or four months.  It just depends on

13   what -- what was going on at church.

14         Q.    You know, we previously covered this, you

15   know, I asked you what your estimate would be.  And

16   we talked about ten hours for church over the course

17   of a year.  Do you recall that?

18         A.    Of a year, yes, ma'am. Yes, ma'am.

19         Q.    Okay. So there's some fluctuation here?

20         A.    Yeah.

21         Q.    Okay.  So -- so where -- where is your

22   estimate then?

23         A.    I would say -- I would say approximately

24   ten hours a year.

25         Q.    Ten hours a year?

ea8d0784-dc62-4143-b5a3-cad356c7c557

NETWORK DEPOSITION SERVICES
Transcript of Jason Alex Burgess

1      A.    Yeah.

2      Q.    Okay.  For the church?

3      A.    For a year, yeah.

4      Q.    Okay.

5            Okay. And -- and here you're talking about

6      -- at the end of this you're talking about your

7      estimate for attending the Masonic Lodge?

8      A.    Correct.

9      Q.    Okay.  Now, you previously gave me an

10     estimate for that.

11     A.    Would have been three hours on a normal

12     monthly -- on a monthly meeting.  Had we had a

13     first degree or a second, third degree, you could

14     have added another two, hour-and-a-half to two

15     hours to that each month.  You know, and if you had

16     -- sometimes we had two in the same month.  And if

17     you have two in the same month, then, you know, you

18     add that time to it.

19     Q.    Okay.

20     A.    It's hard to determine it on a month.

21     But it's easier to determine these -- these figures

22     on an annual basis.

23     Q.    Okay.  So what would you say for -- for the

24     year then?

25     A.    I would say probably 38 hours for annual,

ea8d0784-dc62-4143-b5a3-cad356c7c557

```
1                    CERTIFICATE OF REPORTER
2    STATE OF NORTH CAROLINA
3    COUNTY OF MECKLENBURG
4             I, V. Dario Stanziola, the officer before
5    whom the foregoing deposition was taken, do hereby
6    certify that the witness whose testimony appears in
7    the foregoing deposition was duly sworn by me; that
8    the testimony of said witness was taken by me to
9    the best of my ability and thereafter reduced to
10   typewriting under my direction; that I am neither
11   counsel for, related to, nor employed by any of the
12   parties to the action in which this deposition was
13   taken, and further that I am not a relative or
14   employee of any attorney or counsel employed by the
15   parties thereto, nor financially or otherwise
16   interested in the outcome of the action.
17
18
19                      V. DARIO STANZIOLA
20                      Shorthand Reporter
21                      Notary Public in and for
22                      County of Mecklenburg
23                      State of North Carolina
24
25
```