**TAB 5**

NETWORK DEPOSITION SERVICES
Transcript of Michael Butler

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

------------------------------

DEBORAH PRISE and HEATHER RADY )

on behalf of themselves and all)

employees similarly situated,  ) No. 06-1641

                Plaintiffs,  ) VOLUME I

        vs.                 )

ALDERWOODS GROUP, INC.,      )

            Defendant.    )

------------------------------

            Deposition of MICHAEL S. BUTLER,

        taken at 4700 Airport Plaza Drive,

        Long Beach, California, commencing

        at 9:28 A.M., Monday, March 9,

        2009, before Cathryn L. Baker, CSR

        No. 7695.

    PAGES 1 - 207

8a8920f5-8aef-431a-a20e-1f9585d8a7c3

NETWORK DEPOSITION SERVICES
Transcript of Michael Butler

Page 76

1    out a fixed fee for that and I didn't ask about it.

2          MR. FORESTIERE:   Could you read my question

3    back to me please.

4          (The record was read by the

5          reporter as follows:

6               "Question:   What was your

7          understanding as to how you'd be

8          compensated performing your on-call

9          responsibilities?")

10   BY MR. FORESTIERE:

11      Q.   Did you have any discussions about

12   performing community service with Ms. Chung at the

13   second meeting?

14      A.   Not until about my last year there.

15      Q.   But at the second meeting you didn't have a

16   discussion about community service; is that correct?

17      A.   No.

18      Q.   But you mentioned your last year there you

19   had a discussion with her about that subject?

20      A.   Could you repeat that question.

21      Q.   You said you recall a conversation you had

22   with Ms. Chung during your last year working at

23   Melrose about community service?

24      A.   Yes.

25      Q.   Do you recall when that was?

NETWORK DEPOSITION SERVICES
Transcript of Michael Butler

1  service?

2      A.   Well, Chung came to me in my office with the

3  other employees present and, in essence, described

4  that it is the wish of the company that its

5  employees who are funeral directors, in my job

6  classification, be active in the community to a

7  degree so that we can get our name and our face out

8  there in the community.  Help build up business in

9  the community.  That was the crux of her

10  conversation.

11      Q.   What was your response to her statements?

12      A.   I agreed.

13      Q.   Anything else discussed on community

14  service?

15      A.   She did make it clear that it was a

16  condition of continued employment, as far as the

17  company was concerned.

18      Q.   How did she make that clear?

19      A.   Orally.

20      Q.   What did she say?

21      A.   Just what I told you.

22      Q.   She said, "Unless you do it, you're going to

23  get fired"?

24      A.   No, I didn't say that.

25      Q.   Tell me what she said.

8a8920f5-8aef-431a-a20e-1f9585d8a7c3

NETWORK DEPOSITION SERVICES
Transcript of Michael Butler

Page 79

1       A.    I said it was a condition of continued

2   employment, is how it was put to me by Ms. Ngo.

3       Q.    She used those terms, that performing

4   community service was a condition of continued

5   employment?

6       A.    Yes.

7       Q.    What was your response to that?

8       A.    I agreed.  And she told me that I could

9   choose whatever extra curricular program that I

10  wanted to join, and that she would pay for that.

11  The company would pay for that.

12      Q.    What do you mean the company would pay for

13  that?

14      A.    Well, I chose, for instance, the Sunrise

15  Rotary.  The rotary club has dues, she asked me for

16  an expense report for paying those dues on my own,

17  which was 100, $200, then usual regular donations on

18  a regular basis while I was attending on behalf of

19  the funeral.  And I would pay those things and put

20  them on an expense report wherein I was reimbursed.

21      Q.    Anything else you and Ms. Chung discussed

22  concerning the performance of community service?

23      A.    Oh, to let her know what I chose and what

24  hours I would need to be away.  And I reported those

25  back to her.

8a8920f5-8aef-431a-a20e-1f9585d8a7c3

NETWORK DEPOSITION SERVICES
Transcript of Michael Butler

Page 85

1   would be the best reference as to when I started

2   because it was a location check that I paid my dues

3   with.

4       Q.   That's what I'm trying to establish.

5       A.   Yes, it would be.

6       Q.   What about this other community service

7   organization you mentioned.  And I forgot to write

8   it down here.  You said there was two, the Rotary

9   Club and something else.  Or am I misstating your

10  testimony?

11      A.   Another community service?  Well, there are

12  occasions when I was asked by members of my church

13  questions with regard to family members that had

14  just recently died, and this would come up on

15  occasion.  And as a representative of the funeral

16  home, because I'm in that business, I'm representing

17  their prices and -- for the types of services they

18  were inquiring about.

19          So, you know, the fact that I was in church

20  was always there from before I even began with Rose

21  Hills, I had been a member of this church.

22      Q.   What church was that?

23      A.   The Church of Jesus Christ of Latter Day

24  Saints, the Mormons.

25      Q.   And where was that located?

NETWORK DEPOSITION SERVICES
Transcript of Michael Butler

Page 86

1    A.   That was located in Buena Park, the ward I
2  was attending.  What we call in the Cypress,
3  California stake.
4    Q.   You are saying during your attendance at
5  church you would have discussions with other church
6  members about services and prices for funeral
7  services that were available at Melrose?
8    A.   True, yes.  In fact, I went to the stake
9  level and spoke with the stake president on matters
10  concerning offering funeral services at reduced
11  prices to our church members.
12    Q.   When did these -- did these discussions take
13  place on Saturdays or Sundays or what is the day of
14  obligation?
15    A.   Usually a weeknight.
16    Q.   So this was a -- I'm sorry, I'm Catholic so
17  -- you have to explain to me.
18    A.   We had church on Sundays, but the
19  discussions could come up at any time.  And I
20  believe the discussion with the stake presidency was
21  on a given Tuesday or Thursday night.  I don't know
22  why I'm thinking that, but usually we don't speak
23  with the stake representatives on a Sunday.  We're
24  in our own particular ward or church building.
25  Discussions came up because I was either

8a8920f5-8aef-431a-a20e-1f9585d8a7c3

NETWORK DEPOSITION SERVICES
Transcript of Michael Butler

Page 87

1    approached -- mostly because I was approached by

2    members of the church.  That could be at church or

3    it could be at my home, they'll come me.  Or the

4    Bishop, which is kind of the head of our ward, would

5    call the house and say can you call so and so, a

6    member of the church, mom just died and she has some

7    questions and need prices.

8        Q.   What are the tenets of the Mormon church

9    with regards to attending church?  In other words,

10   Catholic church, for example, Sundays are our days

11   of obligations, do the Mormons have something

12   similar to that?

13       A.   I take offense at your asking any questions

14   related to my worship, and I would prefer that you

15   stop that immediately.

16       Q.   I'm not trying -- I'm trying to understand

17   --

18       A.   You can avoid the situation completely.  I

19   will not discuss it.

20           MS. GIFFORD:  Can we just go off the record.

21           (Off the record.)

22           MS. GIFFORD:  Mr. Butler does want to

23   stipulate that he is not seeking reimbursement for

24   anything related to his church activities.  That's

25   not part of what he's seeking in this lawsuit.

8a8920f5-8aef-431a-a20e-1f9585d8a7c3

NETWORK DEPOSITION SERVICES
Transcript of Michael Butler

1   BY MR. FORESTIERE:

2       Q.   Just to make sure I'm clear.  And, I'm

3   sorry, I'm not trying to offend you, Mr. Butler.

4   I'm just trying to get down -- if I have, I

5   apologize.  But one of the issues in the case is

6   you're seeking reimbursement for community service

7   activities.  I'm entitled to explore how often you

8   did that, how long you did it, and things of that

9   nature.  But I understand from your attorney now

10  you're stipulating that you are not seeking

11  compensation for any community service that you

12  performed in regards to your church?

13      A.   Yes, that's true.

14      Q.   We'll go on then.

15           MS. GIFFORD:  Thanks.

16  BY MR. FORESTIERE:

17      Q.   Other than the community service, then,

18  concerning the Rotary Club, are you seeking any type

19  of reimbursement for any other types of community

20  service?

21      A.   No.

22      Q.   Have you calculated the total number of

23  hours that you spent performing community service

24  with the Rotary Club?

25      A.   I have told my attorney --

8a8920f5-8aef-431a-a20e-1f9585d8a7c3

NETWORK DEPOSITION SERVICES
Transcript of Michael Butler

Page 100

1    you would go back to the funeral home for as part of

2    your on-call work when the alarm went off?

3            THE WITNESS:  Yes.  There was additional

4    on-call work that would involve the alarm system

5    that would act up, and that would be one or two

6    times a month that would require about two hours of

7    my time.  I would have to meet the police at the

8    location, unlock the fence, unlock the building.  Go

9    around with the cops, check the prep room with the

10   bodies.  Secure it once again.  Set the alarm.

11   Verify the alarm was set.  And then leave and go

12   home and get back in bed.  So that scenario came up

13   probably twice a month with the alarm system.

14   BY MR. FORESTIERE:

15       Q.  Going back to the on-call basis, the number

16   of hours.  You said 20 to 25 calls per month and

17   that generated how many hours p month?

18       A.  The calls, on average, would go between 15

19   minutes to an hour and a half, depending on the

20   call.

21       Q.  If we take the average of that, would that

22   be fair?

23       A.  I would say the average of that would be

24   fine.

25       Q.  And then you'd multiple that by 20, 25 calls

8a8920f5-8aef-431a-a20e-1f9585d8a7c3

NETWORK DEPOSITION SERVICES
Transcript of Michael Butler

Page 108

1    covered, but I don't want to speculate.
2        Q.    So you can't recall the specifics, but you
3    think the subject matter was discussed?
4        A.    Yes.  And I would say I was given a booklet
5    too.
6            MR. EHRMAN:  Hey Myles --
7            MS. GIFFORD:  Sorry, Jim, are you talking to
8    us?
9            MR. EHRMAN:  No.  I'm going to shut the door
10   here to turn down some noise.
11           MR. FORESTIERE:  You don't want to miss
12   this.  This is good stuff.
13       Q.    I'm sorry.  I'm getting a little Goofy.  My
14   blood sugar must be off a bit.
15           Were you paid any bonuses?
16       A.    In what form?
17       Q.    Well, I'm not talking about annual increases
18   or raises or merit increases.  A bonus would be
19   something that you're not entitled to compensation
20   for but it's an award based upon merit or some other
21   compensation.
22           MS. GIFFORD:  Objection.
23           THE WITNESS:  I received a $25 gift card for
24   something but I don't remember what for.  Something
25   I did right, apparently.

Johnstown              Toll-Free              Pittsburgh
814-266-2042          866-565-1929          412-281-7908

8a8920f5-8aef-431a-a20e-1f9585d8a7c3

NETWORK DEPOSITION SERVICES
Transcript of Michael Butler

Page 109

BY MR. FORESTIERE:

1    Q.    Anything other than the $25 gift card?

2    A.    Not that I recall.

3    Q.    Did you receive any compensation based on

4    commissions?

5    A.    No.

6    Q.    Did you receive any compensation -- I'm

7    talking about the entire time that you worked at

8    Melrose.  Let's keep that period in mind.  During

9    the entire time that you worked at Melrose, did you

10   receive any commission?

11   A.    No.

12   Q.    During the entire time that you worked at

13   Melrose, did you receive any flat rate or piecemeal

14   payments for any work that you performed?

15   A.    Not that I recall.

16   Q.    Other than the hourly rate that you were to

17   be paid, did you receive any other compensation?

18   A.    On occasion, as discussed with Ms. Ngo, I

19   would receive compensation in the form of overtime

20   that could be added to my pay as a result of the

21   alarm, for instance, or staying late with a family

22   in the mortuary after 5:00 o'clock on limited

23   occasions.

24   Q.    But that would be an hourly compensation or

8a8920f5-8aef-431a-a20e-1f9585d8a7c3

NETWORK DEPOSITION SERVICES
Transcript of Michael Butler

1    this document?

2        A.   Probably the first time that I signed the

3    document I did.  I didn't read it every time.

4        Q.   It didn't change, though, from document to

5    document, though, has it?

6        A.   Not that I'm aware of.

7        Q.   Is that a true statement at the time that

8    you signed this document?

9        MS. GIFFORD:  Objection.

10       THE WITNESS:  I don't know that that's what

11   the statement was on the pay slips.  Well, I guess

12   with my signature there.  That's what it says.

13   BY MR. FORESTIERE:

14       Q.   It also says, quote, "I declare under

15   penalty of perjury that all of the information that

16   I have provided on this timecard is true and

17   complete, and I did not work any unauthorized

18   overtime and I have taken all of my rest period and

19   meal period breaks."  Do you see that?

20       A.   Yes.

21       Q.   And that was on this document when you

22   signed it, wasn't it?

23       A.   Yes.

24       Q.   Can you describe for me how it was you

25   recorded the time that you performed work while at

NETWORK DEPOSITION SERVICES
Transcript of Michael Butler

Page 175

1    Do you see that?

2         A.   Yes.

3         Q.   Is that the on-call work that we've been

4    talking here about today in this deposition?

5              MS. GIFFORD:  Objection.

6    BY MR. FORESTIERE:

7         Q.   Because if it's not, we're spending a lot of

8    time for nothing.  I'm sorry.  Let me ask the

9    question again and get rid of my inappropriate

10   comments.

11             On box B, you see the on-call, where it says

12   there "on-call work"?

13        A.   Yes.

14        Q.   Is that the on-call work that we've been

15   discussing in today's deposition?

16             MS. GIFFORD:  Objection.

17             THE WITNESS:  It's not all-inclusive.

18   BY MR. FORESTIERE:

19        Q.   Have we not covered all the -- I see what

20   you're saying.  When you say on-call work it's not

21   exclusive because you talked about the alarm system

22   as part of your on-call work.

23        A.   Exactly.

24        Q.   But as you interpret on-call work, did we

25   cover all those topics in today's deposition?

NETWORK DEPOSITION SERVICES
Transcript of Michael Butler

Page 178

1    not otherwise being compensated for?

2         A.   Yes.

3         Q.   Was that for community service work?

4         A.   No.

5         Q.   Was that for on-call work as you have

6    defined it here today, including the alarm issue?

7         A.   Yes.

8         Q.   Anything other than that?

9         A.   No.

10        Q.   So she would not pre-approve the hours that

11   you spent for the on-call work; is that true?

12        A.   No.

13             MS. GIFFORD:  Objection.

14   BY MR. FORESTIERE:

15        Q.   Why don't you tell me, then, what hours for

16   what type of work did she not give you approval for

17   to put into the AS400 system?

18             MS. GIFFORD:  Objection.

19             THE WITNESS:  Staying an hour or two after

20   5:00 P.M. because a family walks in the door at ten

21   to 5:00 and I'm with them until 7:00 P.M.  That

22   would not be pre-approved even though I approached

23   Chung about this.  That was not an isolated

24   incident.  This would happen quite often.

25             Other days when Chung was in a better mood,

8a8920f5-8aef-431a-a20e-1f9585d8a7c3

NETWORK DEPOSITION SERVICES
Transcript of Michael Butler

1   she would allow me an hour overtime to put in the
2   system which is reflected in the pay records that
3   I've seen today.
4   BY MR. FORESTIERE:
5       Q.   Anything else?
6       A.   It would encompass any reasons that I would
7   be in that mortuary building after the 5:00 o'clock
8   hour or before the 8:00 o'clock hour in the morning,
9   which could have been receiving merchandise into the
10  funeral home, or work that occurred after 5:00 P.M.
11  and I happen to be there and simply just took care
12  of it because I was the only one there to take care
13  of it.
14      Q.   Anything else?
15      A.   I'd say the biggest one would be towards the
16  end of -- towards her disappearance, 60 percent I
17  was doing her job and none of that was paid for.
18      Q.   Anything else?
19      A.   No.
20      Q.   Take the last one, the biggest one, doing
21  her job and you weren't getting paid for it.  When
22  you were performing her job were you being paid for
23  work on those days?
24      A.   Yes.
25      Q.   Number two, any reasons before -- strike

Johnstown              Toll-Free              Pittsburgh
814-266-2042         866-565-1929          412-281-7908

8a8920f5-8aef-431a-a20e-1f9585d8a7c3

NETWORK DEPOSITION SERVICES
Transcript of Michael Butler

Page 185

1          MS. GIFFORD:  Objection.
2   BY MR. FORESTIERE:
3      Q.   Well, she did pay you for some of the time
4   but not all of the time?
5      A.   Right.
6      Q.   Have you done a calculation as to how many
7   hours you were performing this work that you are
8   claiming that you have not been paid for?
9          MS. GIFFORD:  Can you clarify which work
10  you're talking about.
11  BY MR. FORESTIERE:
12     Q.   The only work I'm talking about right now is
13  where you have to stay after work because a
14  bereaving family with at-needs service comes to you
15  five minutes before you close and you have to stay
16  an hour or two afterwards.
17     A.   Are you speaking of the morning also when I
18  had to come in early?
19     Q.   You had family members coming in early?
20     A.   No -- well, that too, but caskets being
21  delivered or --
22     Q.   I want to be clear.  We've already covered
23  that, Receiving merchandise before the morning.  All
24  I'm talking about right now is the time that you had
25  to stay late after work to service a grieving

NETWORK DEPOSITION SERVICES
Transcript of Michael Butler

Page 186

1    family's needs.
2        A.   Okay.
3        Q.   Have you done a calculation as to how much
4    time you spent doing that?
5        A.   No.
6        Q.   What's your best estimate as you sit here
7    today as to the number of hours that you have worked
8    but not been compensated in performing those
9    services?
10       A.   30 hours.
11       Q.   Item E is -- going back to Exhibit 14.   Item
12   E states, "I believe I received compensation in
13   addition to my hourly rate."  And then it goes on to
14   say as well, "that did not include, when
15   calculating, the overtime due me while working."
16           What is your understanding when you checked
17   No. E as to what you were claiming that you should
18   have been paid that you were not paid?
19           MS. GIFFORD:  Objection.
20   BY MR. FORESTIERE:
21       Q.   When you checked box E, what is it you were
22   understanding that you were claiming that you should
23   have been paid that you were not paid?
24       A.   That's not how I read it.
25       Q.   How did you read it?

NETWORK DEPOSITION SERVICES
Transcript of Michael Butler

1    A.   I read it as -- or applied it and checked it
2  because I received additional compensation other
3  than any other forms of payment.  And I remember a
4  gift card that my manager gave me from the company.
5  I don't know if it came out of her purse or if she
6  used company funds to purchase it, but it was small
7  little gifts of that nature that I received as
8  additional compensation for work that I had
9  performed, I guess, in a satisfactory manner.
10    Q.   Did you understand E to mean that you wanted
11  money paid from the defendants for work you
12  performed that you were not paid for?
13         MS. GIFFORD:  Objection.
14         THE WITNESS:  That's not how I read it.
15  BY MR. FORESTIERE:
16    Q.   You read it as something you received, in
17  fact that you were paid, other than hourly
18  compensation?
19    A.   Yes.  That's how I understood it.
20    Q.   Like a gift card?
21    A.   Yes, sir.  That's how I understood it.
22    Q.   Regarding the on-call work that you
23  performed while working at Melrose, did you have any
24  restrictions as to what you could do while you were,
25  quote, "on call," end quote?

NETWORK DEPOSITION SERVICES
Transcript of Michael Butler

Page 189

1      Q.   Were you aware of any written company

2   policies that stated that you would not be

3   compensated for community service work?

4           MS. GIFFORD:  Objection.

5           THE WITNESS:  No.

6   BY MR. FORESTIERE:

7      Q.   Did anybody ever tell you not to submit time

8   for performing on-call services?

9      A.   Mrs. Ngo told me that.

10     Q.   Have we already covered those situations

11  where that occurred?

12     A.   Yes.

13     Q.   Did anybody ever tell you not to record time

14  for community service work you performed?

15     A.   No.

16     Q.   Did you ever attempt to submit time for

17  community service work that was refused or not

18  approved?

19     A.   Yes.

20     Q.   When did that occur?

21     A.   I don't recall.

22     Q.   How many times did it occur?

23     A.   I would say it occurred the majority of the

24  time that I was involved with the Sunrise Rotary

25  Club in the mornings.

NETWORK DEPOSITION SERVICES
Transcript of Michael Butler

1      Q.    By the way, you have access to your computer
2    to input the time, correct?
3      A.    At my office, yes, I did.
4      Q.    And you had access to it during the time
5    that you worked there?
6      A.    Yes.
7      Q.    You indicated that you actually did it.
8    Couldn't you just have put in the time for the
9    on-call and let the stuff fly where it may when it
10   got recorded?
11     A.    No.   Chung and I had an understanding that
12   we would both be on the same page when I input my
13   hours.   And if there were any deviations of that, we
14   were going to discuss it ahead of time.
15     Q.    Was that for all the time you inputted in
16   the system no matter what it was for?
17     A.    Yes.
18     Q.    On Exhibit 14, the box No. C is not checked.
19   Do you see that?
20     A.    Yes.
21     Q.    You weren't required to obtain a license to
22   sell any products while you worked at Melrose, were
23   you?
24     A.    No.
25     Q.    An insurance license?

NETWORK DEPOSITION SERVICES
Transcript of Michael Butler

Page 191

1     A.   No.

2     Q.   And you didn't have any training concerning

3  that while you were employed at Melrose?

4     A.   No.

5     Q.   Are you claiming any unpaid compensation for

6  any training that you performed at Melrose?  That's

7  a bad question.  Let me ask you this way.

8          While you were trained at Melrose, for

9  example, when you went to the formal training.  Do

10 you recall calling it the orientation meeting and

11 training that happened at Whittier?

12    A.   Yes.

13    Q.   You were compensated for that time, correct?

14    A.   Yes.

15    Q.   Was there any training that you were not

16 compensated for while you worked at Melrose?

17    A.   No.

18    Q.   Do you know what a pre-need appointment is?

19    A.   Yes.

20    Q.   Did you ever perform any work concerning

21 pre-need appointments that you were not compensated

22 for?

23    A.   No.

24    Q.   Did you receive all your meal and rest

25 period breaks?

8a8920f5-8aef-431a-a20e-1f9585d8a7c3

NETWORK DEPOSITION SERVICES
Transcript of Michael Butler

Page 193

1   about not receiving any of your meal breaks?

2      A.   No.

3      Q.   Do you believe that the rate that was

4   calculated for your overtime was incorrect?

5           MS. GIFFORD:  Objection.

6           THE WITNESS:  No.

7   BY MR. FORESTIERE:

8      Q.   Are you claiming any compensation for any

9   overtime that was not correctly calculated?

10           MS. GIFFORD:  Objection.

11           THE WITNESS:  Would you repeat that

12   question.

13   BY MR. FORESTIERE:

14      Q.   It's a bad question.  Let's just move on.

15   It's kind of a question that answers itself.

16           Other than the subject matters that we

17   talked about here today of hours that you were not

18   compensated, is there any other work you performed

19   that you were not compensated for that we have not

20   covered today?

21           MS. GIFFORD:  Objection.

22           THE WITNESS:  No.

23   BY MR. FORESTIERE:

24      Q.   Mr. Butler, I think that's all the questions

25   I have for today.  But we're done with your

8a8920f5-8aef-431a-a20e-1f9585d8a7c3

NETWORK DEPOSITION SERVICES
Transcript of Michael Butler

1   your time as well?

2          MR. FORESTIERE:  Objection.  Leading and

3   speculation.

4          THE WITNESS:  I didn't think about that.

5   BY MS. GIFFORD:

6      Q.   Why not?

7      A.   I took it at face value.  In other words, I

8   had an expense over here and how was it going to be

9   handled?  And she told me how, and that was good

10  enough.  I didn't look beyond that.

11     Q.   And why did you not record your hours?

12     A.   Because I thought Chung would enter the

13  system, as she did often, and put in or took out

14  time before she presented that pay sheet to me with

15  the hours on it, and take care of that hour I spent

16  in the mornings.  I kind of thought in the back of

17  my mind she would actually put that in for me.  But

18  the operating procedure was to come in and clock in

19  at 8:00 o'clock and clock out at 5:00 and 12:00 to

20  1:00 for lunch.

21     Q.   Were there times when Chung would change

22  your time sheet?

23         MR. FORESTIERE:  Objection.  Leading.

24         THE WITNESS:  Yes.

25  BY MS. GIFFORD:

8a8920f5-8aef-431a-a20e-1f9585d8a7c3

NETWORK DEPOSITION SERVICES
Transcript of Michael Butler

1    Q.    And when did that happen?

2    A.    As she determined that it was necessary.

3    Q.    Can you describe about how often that

4  happened?

5    A.    Maybe once a month.

6    Q.    And about how much time would she typically

7  change your timecard?

8    A.    Some months she would add four hours in for

9  work I had done.  Other times, she would deny hours

10 I reported on the AS400 system and take those out

11 but let me know ahead of time.

12         I apologize, did you ask me for a number of

13 times per month she did that?

14   Q.    I think you answered the question.

15         Did Ms. Chung ever communicate with you in

16 writing?  Did she ever write anything?

17   A.    E-mails and memos and orally.

18   Q.    Do you have any copies of those e-mails or

19 memos?

20   A.    No.

21   Q.    I'm going to ask you to look at Exhibit 10

22 again, which is the big packet.  Earlier you looked

23 at these documents.  Did you believe that you

24 entered your time on these cards as you were

25 required to?

**NETWORK DEPOSITION SERVICES**
**Transcript of Michael Butler**

202

```
 1    STATE OF CALIFORNIA    ) ss:

 2    COUNTY OF LOS ANGELES )

 3

 4           I, CATHRYN L. BAKER, C.S.R. No. 7695, do

 5    hereby certify:

 6           That the foregoing deposition of MICHAEL

 7    S. BUTLER was taken before me at the time and place

 8    therein set forth, at which time the witness was

 9    placed under oath by me;

10           That the testimony of the witness and all

11    objections made at the time of the examination were

12    recorded stenographically by me, were thereafter

13    transcribed under my direction and supervision and

14    that the foregoing is a true record of same.

15           I further certify that I am neither

16    counsel for nor related to any party in said action,

17    nor in any way interested in the outcome thereof.

18           IN WITNESS WHEREOF, I have subscribed my

19    name this  23  day of  March           ,

20    2009.

21

22

23           _____

24           Cathryn L. Baker, C.S.R. No. 7695

25
```

NETWORK DEPOSITION SERVICES
Transcript of Michael Butler

1                    I N D E X

2    MONDAY, MARCH 9, 2009

3

4    WITNESS                          EXAMINATION

5

6    MICHAEL S. BUTLER

7

8              (By Mr. Forestiere)        4

9              (By Ms. Gifford)         194

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Johnstown              Toll-Free              Pittsburgh
814-266-2042         866-565-1929          412-281-7908

8a8920f5-8aef-431a-a20e-1f9585d8a7c3