NETWORK DEPOSITION SERVICES
Transcript of Shane Carswell

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF PENNSYLVANIA

Civil Action No. 06-1641
Judge Joy Flowers Conti

DEBORAH PRISE and HEATHER RADY
on behalf of themselves and all
employees similarly situated,

       Plaintiffs,

vs.

ALDERWOODS GROUP, INC.,

       Defendant.

-----------------------------

2525 Glades Road
Boca Raton, Florida
December 10, 2008
9:55 a.m. - 7:20 p.m.

DEPOSITION OF SHANE M. CARSWELL

Taken before Mark Rabinowitz, Registered Professional
Reporter and Notary Public for the State of Florida at
Large, pursuant to Notice of Taking Deposition filed in
the above cause.

Johnstown
814-266-2042

Toll-Free
866-565-1929

Pittsburgh
412-281-7908

809ad07d-c731-4311-a7be-9c994e8b8373

NETWORK DEPOSITION SERVICES
Transcript of Shane Carswell

Page 157

1      A      No, it was a different timecard.

2      Q      How did you report the work that you performed

3   while you were on-call?

4      A      You punched in on a timecard, on a separate

5   timecard.  It's actually in here.  There was a copy of

6   one in here (indicating).  It says "all-nighter," and you

7   punch in at 8 o'clock, and you punch out at roughly 7

8   o'clock the next morning.

9      Q      Were you compensated for all of the time that

10  you performed work when you were on-call that you

11  actually reported?

12          MR. LINGLE:  Objection to form.

13     A      That kind of depends.  Yes and no.  Honestly,

14  it really is.  You were paid -- in some occasions you

15  were paid for the hours that you worked.  So if you got

16  the call at 10 o'clock.  Then when you got to the funeral

17  home, you punched in and that was supposedly it.  But,

18  typically, they told you that you are supposed to be paid

19  from the time the phone rings until the time that you get

20  back.  That wasn't always the case.  There were other

21  times when they were paying a flat fee at night, $150,

22  $200, just to do the night work.

23          So it varied.  You were compensated some, but

24  not -- in some ways yes and in some ways no.  In some

25  ways it was not the right amount, in some ways it might

809ad07d-c731-4311-a7be-9c994e8b8373

NETWORK DEPOSITION SERVICES
Transcript of Shane Carswell

Page 158

1    have been.  I'm trying to think of the -- you were

2    compensated some, but not always the right amounts, I

3    guess.

4         Q     On the occasions that you used the timecard to

5    punch in and out for on-call work, were you compensated

6    by Alderwoods for that time?

7              MR. LINGLE:  Objection to form.

8         A     On the all-nighter card, you just punch once in

9    and out.  That was it.  You didn't punch in and out on

10   that.  In the other instances where they had done it

11   before, you would punch in and punch out, but you

12   couldn't punch in before you got into the funeral home.

13             You were not really compensated for the time

14   that you were getting to the funeral home, which --

15        Q     The travel time is what you are talking about?

16        A     Yes, and the travel time back home.  You were

17   not compensated for that.  You were just compensated for

18   the time that you hit the clock.

19        Q     Are you saying on the times you performed

20   work, on-call work for Alderwoods, you were compensated

21   for the time that you reported except for your travel

22   time?

23             MR. LINGLE:  Objection to form.

24        A     The travel time would be one, and then the

25   other one is the all-nighter.  It was a flat fee.  So in

809ad07d-c731-4311-a7be-9c994e8b8373

NETWORK DEPOSITION SERVICES
Transcript of Shane Carswell

Page 159

1  some instances that might not be.  You might not be

2  making the same amount of money where you would if you

3  had done an hourly.  So it just depended on the

4  circumstances, and if so -- sometimes you would and

5  sometimes you wouldn't.  It just depends on the work week

6  and the circumstances.

7      Q    Is there any work that you performed for

8  Alderwoods when you were on-call that you believe you

9  were not compensated for?

10     A    Yes.

11     Q    Okay.  What work was that?

12     A    Night calls, prep work, those things, some

13 nights.  Even with the flat rate, some nights you would

14 get called in, you know, an hour early when you were

15 still just getting paid that flat rate.  You had to go

16 in early.  I mean, there were nights that you didn't get

17 paid for exactly what you were doing.

18     Q    When do you mean by "night calls"?  Is that

19 still the removal --

20     A    Yes.

21     Q    -- and the embalming work?

22     A    Yes.

23     Q    What aspect of that are you saying that you

24 may not have been compensated for?

25          MR. LINGLE:  Objection to form.

809ad07d-c731-4311-a7be-9c994e8b8373

NETWORK DEPOSITION SERVICES
Transcript of Shane Carswell

1    A    I mean, there, again, there were time frames

2    as far as, you know, coming in and those things.  The pay

3    might not have been if you had worked hourly, some of

4    those nights, too.

5    Q    Are you saying the difference between being

6    paid on a flat-fee basis versus being paid strictly for

7    your hours?  Is that what you are saying?

8    A    Sometimes, yes, if that would have been the

9    case and they switched from one to the other.  So it's

10   kind of, again, you get both sides of it.  It's really

11   strange.

12   Q    Then you also mentioned prep work.  What do

13   you mean by that?

14   A    Embalming.

15   Q    With respect to the embalming, is there any

16   on-call or any work that you actually performed for

17   Alderwoods while you were on-call related to embalming

18   that you believe you were not compensated for?

19   A    There were nights with the embalming that if

20   you got a call that came in late and it ran into the

21   morning, you are there.  You are working straight

22   through, and you are no longer on that time clock their

23   suggestion that you are on.  You know, it runs over into

24   the morning when you are still there working.

25          I mean, you can't clock out.  You are supposed

809ad07d-c731-4311-a7be-9c994e8b8373

NETWORK DEPOSITION SERVICES
Transcript of Shane Carswell

Page 161

1    to clock out for an hour and you can't.  So, again, it's

2    the time that you are there.

3        Q     I'm not understanding that.  What do you mean?

4        A      Say, for instance, you get a call at 5 o'clock

5    in the morning.  You go to the residence, and you pick

6    that person up.  You bring that person in, and you have

7    to embalm it.  You get back by 6:00 or 6:30.  Well, you

8    start embalming, because that was one of the rules.  That

9    you have to embalm that body.  So you are embalming that

10   body.  The day crew comes in at 7:30, and you are still

11   there embalming it.  It takes a couple of hours to embalm

12   a body.

13          Once you are on break -- you are supposed to

14   have a break before you start your day.  You get out and

15   now you are working straight through the day, and it

16   overlaps each other, but you are not compensated in any

17   way for that.  So you don't get your hour break that you

18   are supposed to.  You just work through that, and you

19   don't leave to go home early, either.  You have to work

20   until 5:00.

21       Q     When you are saying that you were not

22   compensated for that, are you saying you were not paid

23   overtime for that, but you were compensated for it as if

24   it was on your regular schedule?

25       A      Basically, the same as taking a lunch break.

809ad07d-c731-4311-a7be-9c994e8b8373

NETWORK DEPOSITION SERVICES
Transcript of Shane Carswell

Page 162

1    You were supposed to take it, but you couldn't.  So they

2    take it out and you do it anyway.

3        Q    Did you report the time, all of the time, you

4    spent embalming in those instances?

5        A    It's all in the forms that they have in each

6    person's file, each deceased person.  It's in their file

7    when the embalming started and when it finished.  It

8    tells when a person was picked up, the time of death and

9    everything.  So all of that is recorded in those files.

10       Q    Was it also reflected on your timecards?

11       A    If you punched in, whenever you punched in in

12   the morning, it would just run over into it.  You just

13   wrote it down.  Say you punched in that you were in the

14   prep from 9:30 in the morning.  You put it in.  I was

15   here from 7 o'clock this morning.  Then when that shift

16   ended.  I was still there.  So, yeah, you put that on

17   there.

18       Q    I guess what I'm not understanding is:  What

19   part of that time do you believe that you were not

20   compensated for?

21       A    The time between, say, from 7:00 to 8 o'clock

22   you were supposed to actually be on a break.  You were

23   supposed to take your hour break in the morning.  You

24   come in later than everybody else.  You are supposed to

25   take that hour break.  If you are there embalming a body,

809ad07d-c731-4311-a7be-9c994e8b8373

NETWORK DEPOSITION SERVICES
Transcript of Shane Carswell

Page 163

1   you just can't stop in the middle of it.  You have to

2   continue with it and finish that out and then you go.

3   Then at that time it's 8:30, 9 o'clock in the morning.

4   You have to finish up.  So you start your day there

5   because you are busy.

6        Q    Were you on the clock throughout that whole

7   time period from 7:00 to 8:30?

8        A    Yes, but you are also supposed to take off that

9   hour break.  So they will take it out whether or not you

10  do it.  Some nights they did and some nights they don't.

11  So you would have -- just like the lunch breaks.  You

12  would have that half-hour that you would have to write

13  down that you took off, whether you take it or not.

14           Again, this is one of those instances where I

15  have that hour that I'm supposed to take off and I can't.

16       Q    You are saying that there were occasions you

17  worked through a break?

18       A    Yes.

19       Q    It's those occasions that you worked through

20  a break that you are saying you believe you were not

21  compensated for?

22       A    Correct.

23       Q    Any other aspects of the on-call work that you

24  believe that you were not compensated for, other than

25  working through a break on those types of occasions?

809ad07d-c731-4311-a7be-9c994e8b8373

NETWORK DEPOSITION SERVICES
Transcript of Shane Carswell

Page 164

1      A      Not that I can think of right at the moment.
2      Q      During the time you were on-call at the CPF,
3  you said the type of work that you performed was either
4  a removal or embalming; is that right?
5      A      Both, yeah.
6      Q      Any other types of work that you performed
7  when you were on-call?
8      A      No.
9      Q      Of the on-call work that you performed during
10 the time you were at the CPF, is there any on-call work
11 that you performed for which you did not report the
12 time?
13     A      I don't recall if I did or not.  I don't know
14 if I did or not.  I'm not sure.
15     Q      You don't know if there was any time that you
16 spent performing work for Alderwoods that you did not
17 report?
18     A      I don't think so, but I'm not a hundred percent
19 certain.
20     Q      Moving to the time that you were the location
21 manager at Jennings, what did it mean to be on-call,
22 then?
23     A      If anybody needs anything, if anybody has any
24 questions, you are the person that they call.  You are
25 in charge of that building.  So, I mean, the day after

809ad07d-c731-4311-a7be-9c994e8b8373

NETWORK DEPOSITION SERVICES
Transcript of Shane Carswell

Page 167

1    were on-call as the location manager at ABC Jennings?

2         A     As far as what -- going in or just answering

3    the phones, answering peoples' calls, if anybody needed

4    anything, if anybody needed questions answered.  I'm

5    basically stuck to a phone.

6         Q     So you would answer calls?

7         A     Well, answer calls, go in if somebody needed me

8    to go in.

9         Q     What else?

10        A     Talk with families on the phone if I needed to

11   or if they wanted to speak with me, talk with clergy, the

12   newspapers.

13        Q     Did you do removals?

14        A     No.

15        Q     Did you do embalmings?

16        A     No.

17        Q     Any other work that you performed while you

18   were on-call at ABC Jennings?

19        A     I can't think of anything at the moment, no.

20        Q     Did you report the time you spent performing

21   work when you were on-call at ABC Jennings?

22        A     No.

23        Q     You never reported any of the time --

24        A     No.

25        Q     -- that you spent on-call?

NETWORK DEPOSITION SERVICES
Transcript of Shane Carswell

Page 168

1    A    No.

2    Q    Why not?

3    A    Because they are not going to pay me for 24
4    hours a day.

5    Q    You weren't on-call 24 hours a day?

6    A    Yes.

7    Q    Some of that time was your regularly-scheduled
8    shift; is that right?

9    A    But if I'm there, or if I'm not there, or I'm
10   off, I'm responsible for that chapel.  So, I mean, I'm
11   the person that they are going to call, no one else.

12   Q    But you did not perform work 24 hours a day,
13   seven days a week --

14   A    Yes.

15   Q    -- while you were on-call?

16   A    Yes, while I was on-call.

17   Q    Are you saying that 24 hours a day, seven days
18   a week that you were actually performing work for
19   Alderwoods?

20        MR. LINGLE:  Objection to form.

21   A    I was on-call.  There is a big difference from
22   having to do the work and being on-call.  Yes.

23   Q    What is the difference, in your mind?

24   A    The big difference in my mind and what the
25   truth is, is that when you're on-call you have to be

809ad07d-c731-4311-a7be-9c994e8b8373

NETWORK DEPOSITION SERVICES
Transcript of Shane Carswell

Page 170

1   to be reached.

2        Q      Okay, you had to be reached.

3        A      So I had to have gotten in contact with.

4        Q      You were pointing out, I believe,

5   Mr. Carswell, a distinction between being on-call and

6   then actually performing work --

7        A      Correct.

8        Q      -- for Alderwoods?

9        A      Yeah.

10       Q      What is the distinction that you are making

11  between these two things, between being on-call and

12  actually performing work?

13       A      Actually performing work is when I'm there in

14  the funeral home being on-call, is what they call me.  I

15  have to go to the funeral home.

16       Q      In terms of time you spent actually performing

17  work while you were on-call at ABC Jennings, did you

18  report that time?

19       A      No, I did not.

20       Q      You never reported any of it?

21       A      No.

22       Q      Why not?

23       A      Because they are not going to pay you for that.

24       Q      They are not going to pay you for actually

25  performing work?

NETWORK DEPOSITION SERVICES
Transcript of Shane Carswell

Page 171

1      A     Not if it's your day off.  If you are off,

2  yeah; if you have to come in, you will get somebody.  You

3  will find something.  You will do things, answer calls,

4  get information for people and things of that nature.

5  So it's told to you that it's basically your business.

6      Q     Okay.  But what I'm trying to understand,

7  Mr. Carswell, is that you are saying during the times

8  you were on-call, you would have to actually perform

9  some work for Alderwoods?

10     A     Yes.

11     Q     Then you have identified the work that you

12  would perform, which included answering calls and going

13  in if needed, talking to clergy and talking to people,

14  correct?

15     A     Talking to family, talking to staff.

16     Q     With respect to that work, is it your

17  testimony that you never recorded any of the time that

18  you spent performing that work?

19     A     No.

20     Q     And your reason that you never reported it is

21  what?

22          MR. LINGLE:  Objection to form.

23     A     It's part of the job, and you are not going to

24  get paid for it.

25     Q     How did you know that you were not going to

809ad07d-c731-4311-a7be-9c994e8b8373

NETWORK DEPOSITION SERVICES
Transcript of Shane Carswell

Page 172

1    get paid for it?

2         A     Because nobody gets paid for it.

3         Q     I thought you previously testified that you

4    don't know -- you never discussed with anyone --

5         A     I don't.

6         Q     -- what their compensation was?

7         A     I don't, but I know from what people said and

8    what people have done over the years.  This is just how

9    it is, if you are a manager of a place, you take care of

10   that chapel.

11        Q     But you don't know whether other managers --

12   you don't know why they were compensated or not,

13   correct?

14             MR. LINGLE:  Objection to form.

15        A     No, I don't.

16        Q     What I'm trying to understand is:  You said

17   your reason for not reporting the time that you spent

18   actually performing work while you were on-call is

19   because you were not going to get paid for it, right?

20        A     Correct.

21        Q     But what I'm trying to understand is, what you

22   based that on?

23             MR. LINGLE:  Objection to form.

24        A     Just prior knowledge.

25        Q     What was that prior knowledge?

809ad07d-c731-4311-a7be-9c994e8b8373

NETWORK DEPOSITION SERVICES
Transcript of Shane Carswell

Page 175

1    A    No, I don't think so.

2    Q    Are you aware of any company-wide Alderwoods

3 policy of not compensating employees for work that they

4 performed while on-call?

5         MR. LINGLE:  Objection to form.

6    A    I don't know if I am or not.  As far as like

7 written or verbal or what?

8    Q    Just any knowledge that you have of any

9 company-wide policy that employees would not be

10 compensated for actually performing work while on-call.

11   A    Not that I'm aware of, no.

12        (Defendant's Exhibit 17 was marked for

13 identification).

14   Q    I'm handing you what I have marked as Exhibit

15 17.  Is Exhibit 17 a copy of a sworn affirmation that

16 you submitted in this case?

17   A    Yes.

18   Q    Is that your signature on the affirmation?

19   A    Yes.

20   Q    What's the date on that affirmation?

21   A    Actually, I can't see it.

22   Q    Do you recall the date that you signed the

23 affirmation?

24   A    It was in April of 2000-something.

25   Q    No, you can't recall?

809ad07d-c731-4311-a7be-9c994e8b8373

NETWORK DEPOSITION SERVICES
Transcript of Shane Carswell

Page 181

1    pre-approved anyway.  That's why I'm saying everybody

2    already had overtime pre-approved.  The 52 hours -- that

3    the 12 hours a week you were already pre-approved for,

4    for your overtime.  So you are going to get it.

5         Q     Are you saying given those parameters that you

6    were not working overtime, that was not pre-approved?

7              MR. LINGLE:  Objection to form.

8         A     No; overtime that I had, my 52 hours a week,

9    that was already approved.  So I was working that.

10        Q     But Mr. Jones told you that if you worked

11   overtime hours without pre-approval, you would not be

12   compensated for it; is that correct?

13             MR. LINGLE:  Objection to form.

14        A     I think I may have misunderstood you.

15        Q     I'm trying to understand -- well, let's just

16   back up.  What did Mr. Jones communicate to you about

17   what would happen if you worked overtime that was not

18   pre-approved?

19        A     I don't think he ever said that there were

20   going to be any problems with working overtime that was

21   not pre-approved, because all of our overtime was

22   pre-approved.  So, I mean, we did that with our overtime

23   already.  We knew that we were going to be working it.

24        Q     It was not an issue of getting pre-approval

25   for overtime that you worked?

809ad07d-c731-4311-a7be-9c994e8b8373

NETWORK DEPOSITION SERVICES
Transcript of Shane Carswell

1      A      Not that I'm aware of.  Again, we all knew that
2   we were going to work that 12 extra hours, or however
3   many it was, because that was already on our schedule.
4   So I guess it was already pre-approved.
5      Q      What about Mr. Mullikin, did he ever
6   communicate anything to you that if you worked overtime
7   hours without pre-approval, that you would not be
8   compensated for that time?
9      A      I don't think that he actually said that you
10  wouldn't be compensated for it, but you had to have the
11  pre-approval.  Again, we all had the same hours schedules
12  up there, too.  That it was 52 hours a week.  So we knew
13  that we were having the overtime anyway.  So it was
14  already done.  I don't know if -- I mean, I don't want to
15  work more than 52 hours a week.
16         I don't know many people that did.  But I don't
17  know if it was ever said that, no, you can't.  So I'm not
18  sure on that.  I'm not certain.
19     Q      Mr. Mullikin did not communicate anything to
20  you about what would happen if you worked overtime hours
21  that were not pre-approved?
22     A      I don't recall if he did or not.  I just know
23  the hours were supposed to be pre-approved, and they were
24  already pre-approved for each week or each month that we
25  had our schedules.  I'm not certain if anyone had any

809ad07d-c731-4311-a7be-9c994e8b8373

NETWORK DEPOSITION SERVICES
Transcript of Shane Carswell

Page 189

1    same thing as everyone else said.  That you have to have

2    a pre-approval, but they are doing the pre-approval

3    because you have X amount of hours that you are supposed

4    to work.  So it's pre-approved already.

5         Q     Is there anything else Jeff communicated to

6    you about the pre-approval for overtime policy.

7         A     Not that I recall.

8         Q     In paragraph 6 you stated you knew of several

9    other employees and other job title --

10        A     Uh-hum.

11        Q     -- that you were not compensated, for overtime

12   that was not approved?

13        A     Right.

14        Q     You identify in there support staff and

15   secretaries who worked at the same location as you?

16        A     Correct.

17        Q     Who were those individuals?

18        A     That was Bill Santmyer and Edy Sands.

19        Q     What overtime did Mr. Santmyer work for which

20   he was not compensated because it wasn't pre-approved?

21             MR. LINGLE:  Objection to form.

22        A     I don't know that he was not paid for anything.

23        Q     Edy Sands.  She was your secretary?

24        A     Correct.

25        Q     Was she ever not paid overtime unless that

Johnstown                Toll-Free                Pittsburgh
814-266-2042           866-565-1929            412-281-7908

809ad07d-c731-4311-a7be-9c994e8b8373

NETWORK DEPOSITION SERVICES
Transcript of Shane Carswell

Page 190

1  overtime was pre-approved?

2      A     Not that I'm aware of, but hers was, again,

3  already pre-approved.

4      Q     Then you identify an apprentice that worked at

5  the Sample Road location in Florida?

6      A     Yes.

7      Q     What was that apprentice's name?

8      A     That was Sara Daigle, D-A-I-G-L-E.

9      Q     Is it your testimony that Ms. Daigle worked

10  overtime for which she was not compensated, because it

11  was not pre-approved?

12     A     Yes.

13     Q     How do you know that?

14     A     She said something about it to me.

15     Q     What did she tell you?

16     A     That she worked, I think, about six or eight

17  hours overtime.  They said that they were not going to

18  pay her for it, because that was in addition to her

19  pre-approved hours.  I don't know what the outcome of

20  it was, though, after everything was said and done.

21     Q     So you don't know whether she was actually

22  compensated for that time?

23     A     No, I don't know, but I know initially that

24  they said no.

25     Q     That was based on her verbally telling you

809ad07d-c731-4311-a7be-9c994e8b8373

NETWORK DEPOSITION SERVICES
Transcript of Shane Carswell

Page 191

1    that?

2         A    Yes.

3         Q    Did she identify the manager or managers that

4    told her that?

5         A    She didn't say.

6         Q    What was the time period when you had this

7    conversation with Ms. Daigle?

8         A    That's a while back, sometime, I guess, in

9    early 2006, but I'm not certain.  I don't recall.

10        Q    Ultimately, you don't know whether she was

11   compensated for that time?

12        A    No, I don't.

13        Q    Are there any other employees in other job

14   titles that you are referencing in paragraph 6, other

15   than Bill Santmyer, Edy Sands and Sara Daigle?

16        A    Everyone was subjected to the pre-approval

17   policy for overtime pay.  So, I mean, that could be

18   anybody, any of the hourly employees.

19        Q    Are there any individuals -- as you sit here

20   today -- that you can identify by name?

21             MR. LINGLE:  Objection to form.

22        A    Any of the funeral directors?  I mean, Mike

23   Angotti.  I can't think of anybody's name.  This is

24   horrible.  Larry Sherman, Larry Ott.

25        Q    When you say that they were subject "to

809ad07d-c731-4311-a7be-9c994e8b8373

NETWORK DEPOSITION SERVICES
Transcript of Shane Carswell

Page 192

1    pre-approval for overtime policy," what policy is it
2    that you are talking about?
3         A     The Alderwoods policy.
4         Q     Which was what?
5         A     That you had to have pre-approval for the hours
6    that you were going to work overtime.
7         Q     Is it your testimony that Mike Angotti, Larry
8    Sherman and Larry Ott were subject to some policy
9    whereby if they worked overtime that wasn't
10   pre-approved, that they would not be compensated for it?
11        A     No.  I'm just stating that they were all
12   subject to the same pre-approval policies; as far as you
13   have to have your hours pre-approved, again, they all had
14   the same schedule, a 52-hour-work week.
15        Q     But you are not saying they were subject to
16   a policy whereby if they worked overtime that wasn't
17   pre-approved, they weren't going to get paid for it?
18        A     Not that I'm aware of.
19        Q     You never discussed with Mr. Angotti, or
20   Mr. Sherman, or Mr. Ott, or any other Alderwoods
21   employee, for that matter, what their compensation was?
22        A     No.
23        Q     If you could, turn back to your first
24   affirmation, Exhibit 17.
25        A     Okay.

809ad07d-c731-4311-a7be-9c994e8b8373

NETWORK DEPOSITION SERVICES
Transcript of Shane Carswell

Page 195

1    they were on your day off?

2        A     Yes, they required all employees to be there.

3    So they would do it; and if you were off, then you had to

4    come in.

5        Q     And by all employees, you mean all of the ones

6    in the Kraeer --

7        A     Yes.

8        Q     -- funeral homes?

9        A     Yes.

10       Q     So you don't think that you reported the time

11   that you spent at these training sessions, but you don't

12   remember?

13       A     I don't recall doing that, no.

14       Q     Were you compensated for the time you spent in

15   those training sessions?

16       A     I don't believe so, no.

17             THE REPORTER:  Ms. Morgan, could we take a

18   short break, please?

19             MS. MORGAN:  Sure.

20             (Recess taken).

21   BY MS. MORGAN:

22       Q     Mr. Carswell, I believe we were talking about

23   the time you spent in Alderwoods training?

24       A     Yes.

25       Q     You were saying you don't believe that you

809ad07d-c731-4311-a7be-9c994e8b8373

NETWORK DEPOSITION SERVICES
Transcript of Shane Carswell

Page 196

1    recorded the time that you spent in these training

2    sessions?

3         A    Correct.

4         Q    Do you know why you didn't report the time

5    spent in these depositions?

6         A    Honestly, it's been a while.  So I don't recall

7    why I did that.

8         Q    Were you compensated for the time you spent in

9    these training sessions?

10        A    That I don't recall.

11        Q    In paragraph 18 of your first affirmation you

12   claim you were aware of other hourly employees who were

13   required to attend training outside their regular

14   shifts, but were not compensated for that time.  Who

15   were these other employees?

16        A    I'm guessing they are probably some of the

17   people that I knew mostly in Georgia.  Because some of

18   the people I worked with there, we all went together.

19   What was the name?

20             Steve White would have been one of them.  I'm

21   trying to think of some others.

22             Kevin Scroggs, Paul Yebba, Y-E-B-B-A.  That's

23   all I can think of right now.

24        Q    How do you know they were not compensated for

25   the time they spent in training?

809ad07d-c731-4311-a7be-9c994e8b8373

NETWORK DEPOSITION SERVICES
Transcript of Shane Carswell

Page 200

1    Q    -- is that correct?

2    A    Yes.

3    Q    From December of 2003 until May of 2006, what
4  licenses did you hold?

5    A    A funeral director/embalmer for Florida and a
6  funeral director/embalmer for Georgia.

7    Q    Did you hold any other licenses related to
8  your employment at Alderwoods?

9    A    No.  No.

10    Q    But you had a driver's license?

11    A    Yes, I had one of those.

12    Q    So you didn't hold an insurance license?

13    A    No.

14    Q    Did you ever sell pre-needs insurance?

15    A    Before I moved to Florida, I sold some in
16  Georgia, but they always had to go through somebody else
17  to be finalized, I guess.

18    Q    Between December of 2003 and May of 2006, did
19  you sell any pre-needs insurance?

20    A    No.

21    Q    When did you obtain your funeral director/
22  embalmer license for Georgia?

23    A    1996 or 1995, probably 1996.

24    Q    So that was before you began working for
25  Alderwoods?

NETWORK DEPOSITION SERVICES
Transcript of Shane Carswell

Page 210

1    possession that are responsive that you have not turned

2    over to your attorneys?

3         A     Nothing that I'm aware of, no.

4              MS. MORGAN:  Can we go off the record for a

5    moment?  I just want to make sure I'm done.

6              MR. LINGLE:  Sure.

7              (Recess taken).

8              MS. MORGAN:  I have just a couple of more

9    questions, and then we will be done.

10   BY MS. MORGAN:

11        Q     During the time that you were the location

12   manager at ABC Jennings, did you ever instruct any of

13   the employees that reported to you not to report hours

14   that they worked for Alderwoods?

15             MR. LINGLE:  Objection to form.

16        A     No.

17        Q     During the time that you were the location

18   manager at ABC Jennings, did you ever refuse to

19   compensate employees for any overtime hours that they

20   reported?

21        A     No.

22             MR. LINGLE:  Objection to form.

23             MS. MORGAN:  Okay.  I will pass the witness.

24             MR. LINGLE:  Would you mind giving us a couple

25   of seconds first?

809ad07d-c731-4311-a7be-9c994e8b8373

NETWORK DEPOSITION SERVICES
Transcript of Shane Carswell

Page 220

1     Q    Those were done by Alderwoods?

2     A    Yes.

3     MR. LINGLE:  I don't think I have any further

4  questions at this time.

5     MS. MORGAN:  I have some more questions.

6           REDIRECT EXAMINATION

7  BY MS. MORGAN:

8     Q    Mr. Carswell, you were testifying about how

9  you did not report the community -- the hours you spent

10  doing community service during the time that you were at

11  Alderwoods, correct?

12     A    Correct.

13     Q    I believe you testified that you didn't record

14  that time because you didn't think you would get paid

15  for it, correct?

16     A    Correct.

17     Q    Did any Alderwoods manager ever instruct you

18  not to record the time that you spent performing

19  community work?

20     A    I don't believe so.

21     Q    Did any Alderwoods manager ever instruct you

22  that you would not be compensated for any time that you

23  spent performing community service work?

24     A    I don't recall.  I don't believe so.

25     Q    You testified that it was your understanding

809ad07d-c731-4311-a7be-9c994e8b8373

NETWORK DEPOSITION SERVICES
Transcript of Shane Carswell

Page 222

1      A      Yes.

2      Q      Your understanding of that policy was that all

3  hourly employees were supposed to perform community

4  service work, correct?

5      A      Yes.

6      Q      But was it your understanding that there was a

7  company-wide policy that employees were not supposed to

8  record the time that they spent doing community service

9  work?

10     A      No, there was a book to record that, but it

11 wasn't -- I mean, it wasn't your personal time sheet.

12 It was a different.  The books that they had, the IBIS

13 book, that's where things were recorded in.  Each funeral

14 director had one.  We were supposed to keep our

15 information in there of what we are doing.  But it wasn't

16 something to keep track of for hours or, you know, as far

17 as compensation for pay or anything like that.  It was

18 just to keep track of what you are doing.

19     Q      Was it your understanding that there was a

20 company-wide policy that employees were not supposed

21 to record the time they spent performing community

22 service work?

23     A      I don't believe so.  I don't believe there was

24 a policy saying not to record the time.

25     Q      Was it your understanding that there was a

809ad07d-c731-4311-a7be-9c994e8b8373

NETWORK DEPOSITION SERVICES
Transcript of Shane Carswell

Page 223

1    company-wide policy not to compensate people for time

2    they spent performing community service work?

3        A    To the best of my knowledge -- I mean, again,

4    there were certain areas that you just did those things.

5    You didn't seek compensation for them.

6        Q    I understand that you may have not sought

7    compensation for it, or other employees may have not

8    sought compensation for it.  But was it your

9    understanding that there was a company-wide policy not

10   to compensate people for community service time?

11            MR. LINGLE:  Objection to form.

12            Answer the question.

13       A    In general, I think people were supposed to do

14   their community service during the hours that they were

15   working and if you didn't, then you do them afterwards.

16       Q    What was your understanding of any company-

17   wide policy about compensation for community work?

18            MR. LINGLE:  Objection to form.

19       A    I didn't believe I was going to be paid.  I

20   didn't believe that anybody was going to be paid for it.

21       Q    What do you base that on?

22       A    Past history.

23       Q    What past history?

24       A    I had been in the business for 15 years, and I

25   had never seen anybody get paid for it.

809ad07d-c731-4311-a7be-9c994e8b8373

NETWORK DEPOSITION SERVICES
Transcript of Shane Carswell

Page 225

1      A      Right.

2      Q      -- or hours --

3      A      Correct.

4      Q      -- of work per week, correct?

5      A      Right.

6      Q      It was your understanding that you were not

7   supposed to work hours in excess of 52?

8      A      Correct.

9              MR. LINGLE:  Objection to form.

10     A      I wasn't supposed to work more than the 52

11  allotted hours each week, because it's allotted for the

12  entire month.  So that's 216 hours a month.

13     Q      What would happen on occasions when you did

14  work hours in excess of 52 hours per week?

15     A      I don't know that I ever did, because it was

16  a two-week pay period.  So it would level out.

17     Q      You don't know whether you actually worked

18  hours in excess of the 52 hours that were pre-approved?

19     A      Not that I'm aware of, I didn't.

20     Q      Do you know whether any other Alderwoods

21  employees worked in excess of the hours per week that

22  they were pre-approved for?

23     A      They may have.  But, again, I don't know what

24  their compensation was for that, or if they were

25  compensated.

809ad07d-c731-4311-a7be-9c994e8b8373

NETWORK DEPOSITION SERVICES
Transcript of Shane Carswell

Page 226

1    Q     In terms of your on-call time, I believe you
2    testified that you were not compensated for any time you
3    spent prior to punching in at the funeral home; is that
4    correct?
5          MR. LINGLE:  Objection to form.
6    A     Correct.
7    Q     What type of work would you perform when
8    on-call that would not entail you coming to the funeral
9    home to punch in?
10   A     Phone calls from families, phone calls from
11   employees.
12   Q     Anything other than the phone calls?
13         MR. LINGLE:  Objection to form.
14   A     I mean, that's the only form of communication
15   with the funeral home, but then there is also -- I mean,
16   doing work at home and things like that, but that's not
17   necessarily on-call.  That's doing work.  Nothing I can
18   think of at the very moment, no.
19   Q     Did you ever report the hours that you spent
20   handling phone calls when you were on-call?
21   A     No.
22   Q     Did any Alderwoods manager ever tell you not
23   to record time that you spent handling phone calls while
24   you were on-call?
25   A     Not off the top of my head, I can't recall.

809ad07d-c731-4311-a7be-9c994e8b8373

NETWORK DEPOSITION SERVICES
Transcript of Shane Carswell

Page 227

1     Q     Did any Alderwoods manager ever inform you

2  that you would not be compensated for any time you spent

3  handling phone calls during the time that you were

4  on-call?

5     A     I don't recall anyone saying that.

6     Q     You were also testifying about your training

7  time.  I believe you testified you did not record any

8  of the time that you spent in training; is that right?

9     A     Correct.

10    Q     I think your testimony as to why you didn't is

11 because you didn't think you would get paid for it?

12    A     Correct.

13    Q     Did any Alderwoods manager ever tell you not

14 to record the time you spent in training?

15    A     I don't believe so.

16    Q     Did any Alderwoods manager ever tell you that

17 you will not be compensated for any time you spent in

18 training?

19    A     I don't recall.  I don't believe so.

20    Q     Other than the locations where you worked,

21 Mr. Carswell, do you know what Alderwoods policies were

22 in place?

23    A     As far as --

24    Q     As far as timekeeping.

25    A     I mean, as far as timekeeping what?

809ad07d-c731-4311-a7be-9c994e8b8373

234

CERTIFICATE OF OATH

STATE  OF    FLORIDA)

COUNTY OF MIAMI-DADE)


        I, the undersigned authority, certify that

SHANE M. CARSWELL personally appeared before me and was

duly sworn.

        Witness my hand and official seal this 22nd of

December 2008.

Mark Rabinowitz, RPR


Notary Public - State of Florida


My Commission: DD480924


Expires: November 20, 2009

235

## REPORTER'S DEPOSITION CERTIFICATE

STATE   OF    FLORIDA)

COUNTY OF MIAMI-DADE)


     I, Mark Rabinowitz, Registered Professional Reporter, certify that I was authorized to and did stenographically report the deposition of SHANE M. CARSWELL; that a review of the transcript was requested; and that the transcript is a true and complete record of my stenographic notes.


     I further certify that I'm not a relative, employee, attorney, or counsel of any of the parties, parties' attorney, or counsel connected with the action, nor am I financially interested in the action.


     Dated this 22nd day of December 2008.


Mark Rabinowitz, RPR