NETWORK DEPOSITION SERVICES
Transcript of Millard Jude Daigle

THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF
PENNSYLVANIA


DEBORAH PRISE AND HEATHER  *CIVIL ACTION
RADY ON BEHALF OF          *
THEMSELVES AND ALL         *
EMPLOYEES SIMILARY SITUATED*NO. 06-1641
                           *
VERSUS                     *
                           *
ALDERWOODS GROUP, INC.     *
*  *  *  *  *  *  *  *  * **


          Deposition of MILLARD JUDE
DAIGLE, 2456 Highway 20, Vacherie,

Louisiana 70090, taken in the offices of

Gaudet Kaiser, Certified Court Reporters,

601 Poydras Street, Suite 2003, New

Orleans, Louisiana 70130, on Monday, the

20th day of April, 2009.

da5aa629-e9d2-4503-831f-d3c7f84a1f4e

NETWORK DEPOSITION SERVICES
Transcript of Millard Jude Daigle

1   the people that belong to the Elks clubs
2   are older guys that are going to be using
3   our services before long, get right down to
4   it.
5        Q.    How long were you involved with
6   the Elks Club?
7        A.    Since I've been 18.
8        Q.    And why did you join?
9        A.    Just it was the thing to do in
10  my home town and I just stayed with it all
11  these years, never once thinking that I was
12  going to be in the funeral business, you
13  know?
14       Q.    So were there some personal or
15  social aspects of belonging to it?
16       A.    Yeah, a lot of social aspects
17  and a lot of good friends belonged to it,
18  so, you know.
19       Q.    What about family, did you have
20  family members that belonged?
21       A.    None of my family members
22  belonged to it, no.
23       Q.    But good friends of yours?
24       A.    Correct.
25       Q.    Are you still part of the Elks

da5aa629-e9d2-4503-831f-d3c7f84a1f4e

NETWORK DEPOSITION SERVICES
Transcript of Millard Jude Daigle

1    Club?

2         A.    Not anymore.

3         Q.    When did you stop participating?

4         A.    Probably, I'm just guessing, a

5    year or two ago, when I didn't have time to

6    devote to it anymore.

7         Q.    So you were still part of the

8    Elks Club after you separated from

9    employment with Alderwoods?

10        A.    Just for a short time.

11        Q.    Did anyone at Alderwoods ever

12   tell you to participate in the Elks Club?

13        A.    Not specifically, no.

14        Q.    Were any other Alderwoods

15   employees told to participate in the Elks

16   Club?

17        A.    No.

18        Q.    Anybody else at Alderwoods that

19   you knew of who was in the Elks Club?

20        A.    No.

21        Q.    Was there like a local chapter

22   or something that you participated in?

23        A.    There are chapters all over the

24   United States.  There's probably seven or

25   eight of them here in New Orleans, and

da5aa629-e9d2-4503-831f-d3c7f84a1f4e

NETWORK DEPOSITION SERVICES
Transcript of Millard Jude Daigle

Page 185

1    the Elks Club know that you were with
2    Alderwoods?
3         A.    Simple.  Every time I went in
4    there, I had an Alderwoods pin on.
5         Q.    And why did you wear the
6    Alderwoods pin to your Elks Club meetings?
7         A.    Because I wore one every day
8    with my suit.
9         Q.    But as you testified previously,
10   you joined the Elks Club at 18, long before
11   you ever worked for Alderwoods, right?
12        A.    Right.  Right.
13        Q.    I believe you also testified
14   that nobody at Alderwoods would have known
15   of your participation at the Elks Club, is
16   that right?
17        A.    Not at the Elks Club, no.
18        Q.    Other than All Saints Day, Mardi
19   Gras, the Greek festival and the Elks Club,
20   did you participate in any other community
21   activities or organizations during the time
22   you worked at Alderwoods?
23        A.    Nothing comes to mind, no.
24        Q.    Were you encouraged or requested
25   to get involved in the community by anybody

da5aa629-e9d2-4503-831f-d3c7f84a1f4e

NETWORK DEPOSITION SERVICES
Transcript of Millard Jude Daigle

1      Q.    And what funeral directors do
2  you know of that participated in community
3  work?
4      A.    Well, I would see all of the
5  funeral directors that I worked with at All
6  Saints.
7      Q.    So you personally observed other
8  funeral directors at the All Saints event?
9      A.    Right.
10     Q.    What about the other Alderwoods
11 events?
12     A.    I never saw anybody at the Greek
13 festival.  I saw a lot of them at Carnival;
14 none at the Elks Club.
15     Q.    Do you have any knowledge of any
16 funeral directors participating in any
17 other activities besides the All Saints and
18 the Carnival?
19     A.    Not in particular, no.
20     Q.    And it was your understanding,
21 Mr. Daigle, that community activity was
22 encouraged from funeral directors, but not
23 from other Alderwoods employees?
24     A.    It was -- are you saying that
25 the only people that were expected to do

da5aa629-e9d2-4503-831f-d3c7f84a1f4e

NETWORK DEPOSITION SERVICES
Transcript of Millard Jude Daigle

Page 193

1    that was funeral directors?

2         Q.    Yes.   Is that what you're

3    saying?

4         A.    Yes.   Funeral directors and

5    embalmers, yes.

6         Q.    So embalmers were expected to

7    perform community activities, too?

8         A.    Yes.

9         Q.    Any other categories of

10   employees?

11        A.    No.

12        Q.    How do you know, Mr. Daigle,

13   that embalmers were expected to perform

14   community activities?

15        A.    This was never mentioned during

16   the time that I worked for Alderwoods.  But

17   previous to that, this was something that

18   was always mentioned.  Every licensed

19   person in the company was encouraged to

20   participate in any kind of community

21   service that they could to promote

22   themselves and promote the business.

23        Q.    You said this was prior to

24   Alderwoods?

25        A.    And it went right on through,

da5aa629-e9d2-4503-831f-d3c7f84a1f4e

NETWORK DEPOSITION SERVICES
Transcript of Millard Jude Daigle

1    Q.    Okay.  What is the source from
2  Alderwoods of this expectation?
3    A.    No source from Alderwoods.
4    Q.    Do you know whether there were
5  any consequences for any funeral director
6  or embalmer or any other Alderwoods
7  employee for not participating in community
8  activities?
9    A.    Don't know.
10    Q.    Were there any costs associated
11  with your participation in any of these
12  community activities?
13    A.    In what -- what do you mean, in
14  what way?
15    Q.    Here's an example.  Were there
16  any membership fees for the Elks Club, for
17  example?
18    A.    Yes.  But that was something I
19  paid.  I was a member anyway.  I never
20  expected them to pay for that.  But that's
21  the only one.
22    Q.    So you never asked anybody at
23  Alderwoods to cover the cost for Elks Club?
24    A.    No.  No.
25    Q.    And why not?

da5aa629-e9d2-4503-831f-d3c7f84a1f4e

NETWORK DEPOSITION SERVICES
Transcript of Millard Jude Daigle

1   with the funeral home and they knew that I
2   was there representing them.
3       Q.   But at some point in time during
4   your participation of the Elks Club, you
5   did derive personal and social enjoyment of
6   it since you joined at 18 and continued
7   participating in it until after you worked
8   for Alderwoods, right?
9       MS. DOUGLASS:
10          Objection.
11      THE WITNESS:
12          Some, yes.  I don't know what
13  percentage.  I don't know, you know.  Maybe
14  1 percent out of the 5.  I don't know what
15  you're getting at.
16  EXAMINATION BY MS. MORGAN:
17      Q.   At your location, Mr. Daigle,
18  was there any incentive program for
19  participating in community work?
20      A.   No.
21      Q.   Are you aware of any incentive
22  program for participating in community work
23  used at any other Alderwoods location that
24  you're aware of?
25      A.   Not that I'm aware of.

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

da5aa629-e9d2-4503-831f-d3c7f84a1f4e

NETWORK DEPOSITION SERVICES
Transcript of Millard Jude Daigle

Page 199

1    Q.    Have you ever heard of a program
2    called I Believe In Service, or IBIS?
3         A.    No.
4         Q.    Are you aware of any company-
5    wide policy of requiring community work?
6         A.    Not specifically.
7         Q.    And are you aware of any
8    company-wide policy addressing whether
9    community work should be reported or paid?
10        A.    No.
11        Q.    Mr. Daigle, are you claiming
12   that you were not paid for any on-call
13   work?
14        A.    Yes.
15        Q.    What are the -- what did it mean
16   at your Alderwoods locations where you
17   worked for you to be on-call?
18        A.    I was expected to be available
19   any time I was off of work to answer any
20   questions that might come up, you know,
21   after hours, quote prices, answer
22   questions.
23        Q.    Anything else?
24        A.    Give estimates.
25        Q.    Anything else?

NETWORK DEPOSITION SERVICES
Transcript of Millard Jude Daigle

1    A.    Give general information about
2  visitations and funerals, funeral times.
3    Q.    Any other on-call work?
4    A.    No.
5    Q.    Were you in the job positions
6  that you held at Alderwoods from December
7  2003 through November 2005, were you
8  expected to be on-call?
9    A.    We were expected to be available
10  to answer any questions that might come up.
11    Q.    Does that mean that you were
12  expected to be on-call?
13    A.    Yes.
14    Q.    When?  When were you expected to
15  be on-call?
16    A.    We were expected to answer
17  questions, be available all the time.  If
18  they called us, we had to answer, you know,
19  and had to answer the phone.
20    Q.    Was there any on-call schedule,
21  any certain days that you were on-call?
22    A.    No.  No.
23    Q.    And you've been saying we, we
24  were expected to be on-call.  Who were you
25  referring to?

da5aa629-e9d2-4503-831f-d3c7f84a1f4e

NETWORK DEPOSITION SERVICES
Transcript of Millard Jude Daigle

Page 201

1      A.      Myself and Ronnie.

2      Q.      And Ronnie was your location

3  manager, right?

4      A.      That's correct.

5      Q.      Did he also do funeral-director

6  work?

7      A.      Yes, he did.

8      Q.      Were there ever certain days or

9  weekends, et cetera, where Ronnie was

10  expected to be on-call and you were not or

11  that you were expected to be on-call and he

12  was not?

13      A.      No.  We were both expected to

14  answer the phone if somebody had a problem.

15      Q.      So it was not a situation where

16  one of you was designated for a certain

17  time?

18      A.      No.  No.

19      Q.      Is all of the on-call work for

20  which you're claiming you were not

21  compensated, did that all involve answering

22  questions by phone?

23      A.      Yes.

24  MS. DOUGLASS:

25          Objection.

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

NETWORK DEPOSITION SERVICES
Transcript of Millard Jude Daigle

Page 202

1    EXAMINATION BY MS. MORGAN:

2         Q.    Did you ever report on your

3    timecards the time that you spent answering

4    questions by phone?

5         A.    No.

6         Q.    Did anyone at Alderwoods ever

7    tell you not to report the time you

8    spent --

9         A.    No.

10        Q.    Did anybody at Alderwoods ever

11   tell you not to report the time that you

12   spent answering questions by phone?

13        A.    No.

14        Q.    Did anyone at Alderwoods ever

15   tell you not to report the time that you

16   spent doing on-call work?

17        A.    No.

18        Q.    Are you aware of anyone at

19   Alderwoods being told by any Alderwoods

20   manager not to report the time they spent

21   on-call?

22        A.    No.

23        Q.    And do you believe, Mr. Daigle,

24   that you were ever compensated for the time

25   that you spent doing on-call work?

da5aa629-e9d2-4503-831f-d3c7f84a1f4e

NETWORK DEPOSITION SERVICES
Transcript of Millard Jude Daigle

Page 203

1      A.    No.

2      Q.    So it's your testimony, Mr.

3   Daigle, that you never reported and were

4   never compensated for any on-call work?

5      A.    That's correct.

6      Q.    Are you familiar with after-

7   hours call logs?

8      A.    I'm not familiar with it,

9   because during the time that I worked for

10  Alderwoods, that was never used.

11     Q.    You never used any after-hour

12  call logs during the time that you worked

13  at Alderwoods?

14     A.    When you say call logs, I don't

15  understand what you're talking about.

16     Q.    Okay.  Did you ever log the time

17  that you spent --

18     A.    No.

19     Q.    -- in calls?

20     A.    I understand what you're saying.

21  No, never used them.

22     Q.    But you're familiar with or

23  you've heard of after-hour call logs?

24     A.    I've heard of it, yes.

25     Q.    And what's your understanding of

da5aa629-e9d2-4503-831f-d3c7f84a1f4e

NETWORK DEPOSITION SERVICES
Transcript of Millard Jude Daigle

Page 204

1   after-hour call logs that you have heard of

2   or are familiar with?

3        A.    I just knew that they existed.

4        Q.    Did you learn about them before

5   or after your employment with Alderwoods

6   terminated?

7        A.    After.

8        Q.    And who did you learn of it

9   from?

10       A.    I just heard different funeral

11  directors talking about logging calls down

12  in general, just in conversation, nobody

13  specific, you know?  Just in conversation.

14       Q.    Do you recall which funeral

15  directors talked to you about the

16  after-hour call logs?

17       A.    It was nobody from Alderwoods.

18       Q.    How many hours of uncompensated

19  on-call work time are you claiming in the

20  lawsuit?

21       A.    No specific amount of hours.  I

22  haven't figured it up.

23       Q.    Did you ever keep a personal

24  record of time that you spent doing on-call

25  work?

da5aa629-e9d2-4503-831f-d3c7f84a1f4e

NETWORK DEPOSITION SERVICES
Transcript of Millard Jude Daigle

1      A.    No, I didn't.

2      Q.    Did any Alderwoods manager ever

3  tell you that you would not be compensated

4  for work you performed while you were

5  on-call?

6      A.    No.

7      Q.    So if no one from Alderwoods

8  told you not to report the time you spent

9  working while you were on-call and no one

10  ever told you that you wouldn't be

11  compensated for it, how come you never

12  reported the time you spent doing on-call

13  work?

14      A.    The reason is, I knew that there

15  was -- there was no purpose in reporting it

16  because we would not be compensated for it.

17  That's just the way it was.  It was

18  expected of us to take calls, be available.

19      Q.    Well, if the expectation was

20  that you would be available to take calls

21  but no one ever told you not to report that

22  time, why did you feel like there would be

23  no purpose to reporting it?

24      MS. DOUGLASS:

25          Objection.

da5aa629-e9d2-4503-831f-d3c7f84a1f4e

NETWORK DEPOSITION SERVICES
Transcript of Millard Jude Daigle

Page 209

1   work.

2         A.    Right.

3         Q.    And what I was asking you about

4   was what your -- the basis of your belief

5   that the other funeral directors that you

6   named were not compensated for on-call

7   time.

8         A.    Okay.  The simple answer is, we

9   were told not to put anything beyond 40

10  hours on our timecards, not to show any

11  overtime, no overtime allowed, and if you

12  did community service, on-call, and all of

13  -- and worked during the day, you would --

14  you would come out with a lot more than 40

15  hours.  So we didn't put it down.  I didn't

16  put it down.  And I'm certain that that's

17  the reason why the other funeral directors

18  didn't put it down as well.  I don't know

19  that specifically.

20        Q.    So you don't know specifically

21  whether other funeral directors reported

22  the time they spent on-call?

23        A.    I never saw them report it, no.

24        Q.    You never saw them report the

25  time, so you don't know what they reported?

da5aa629-e9d2-4503-831f-d3c7f84a1f4e

NETWORK DEPOSITION SERVICES
Transcript of Millard Jude Daigle

Page 210

1    A.    No.

2    Q.    Right?

3    A.    Couldn't say.

4    Q.    And you also don't know whether

5  they were compensated for on-call time?

6    A.    How could I?

7    Q.    Well, I'm just asking you, Mr.

8  Daigle, whether you do know.

9    A.    No, I don't.

10    Q.    Okay.  Do you hold any insurance

11  agent -- I'm sorry.  Did you hold any

12  insurance agent license during the time you

13  worked for Alderwoods?

14    A.    No.

15    Q.    To sell pre-needs, would you

16  have needed an insurance license?

17    A.    Yes, I would.

18    Q.    Is it a requirement in

19  Louisiana?

20    A.    Yes, it is.

21    Q.    So did you ever sell any

22  pre-needs while you worked at Alderwoods?

23    A.    Not with Alderwoods, but with

24  the previous companies, I would.

25    Q.    Okay.  So just make sure I've

da5aa629-e9d2-4503-831f-d3c7f84a1f4e

NETWORK DEPOSITION SERVICES
Transcript of Millard Jude Daigle

1  got it straight, during the time that you

2  worked with Alderwoods, you did not hold an

3  insurance agent license?

4          A.     That's correct.

5          Q.     Okay.  And during the time that

6  you worked with Alderwoods, you did not

7  sell pre-needs?

8          A.     That's correct.

9          Q.     Were funeral directors at your

10  location or at other Alderwoods locations

11  required to become licensed insurance

12  agents?

13          A.     They weren't required.

14          Q.     Were any of the funeral

15  directors at your location, so Ronnie

16  Windham or any funeral directors at any

17  other Alderwoods locations that you're

18  aware of, were any of them licensed

19  insurance agents?

20          A.     Not that I'm aware of, because

21  most locations, like Lamana's, had a

22  licensed agent on staff that sold pre-need

23  insurance.  That's how they did it.

24          Q.     Were funeral directors at your

25  location or any other Alderwoods locations

da5aa629-e9d2-4503-831f-d3c7f84a1f4e

NETWORK DEPOSITION SERVICES
Transcript of Millard Jude Daigle

1    that you're aware of given any

2    encouragement or incentive to obtain their

3    insurance agent license?

4        A.    No.

5        Q.    Are you aware of any company

6    policy of requiring funeral directors or

7    other Alderwoods employees to become

8    licensed insurance agents?

9        A.    Not that I'm aware of.

10        Q.    Are you aware of any Alderwoods

11    policy regarding compensating employees for

12    their time or expense associated with

13    obtaining an insurance agent license?

14        A.    I'm not aware of any.

15        Q.    Do you know what the

16    requirements are for obtaining an insurance

17    license in the State of Louisiana?

18        A.    I'm just guessing.  I had one at

19    one time.  You had to take a weekend

20    course.  I think it's like 16 hours.  You

21    have to take a test, pay the fee, and you

22    have to do 24 hours of continuing education

23    every two years.

24        Q.    And that's your recollection of

25    the requirements at the time that you had

da5aa629-e9d2-4503-831f-d3c7f84a1f4e

NETWORK DEPOSITION SERVICES
Transcript of Millard Jude Daigle

Page 231

1    A.    No.

2    MS. DOUGLASS:

3         Objection.

4    THE WITNESS:

5         Well, I'm not sure.  Can you run

6    that by me again?

7    EXAMINATION BY MS. MORGAN:

8    Q.    Are you claiming in the lawsuit

9    that you are entitled to compensation for

10   time you spent in pre-needs meetings or

11   appointments?

12   A.    If I was at work, no.

13   Q.    So any time that you spent

14   involved in pre-needs meetings or

15   appointments, you reported that time?

16   A.    I was there at the funeral home

17   during the day.

18   Q.    So yes, you did report that?

19   A.    Yes.

20   Q.    And then you were compensated

21   for that time?

22   A.    Yes.

23   Q.    Okay.  So what is it you're

24   claiming you should be compensated for with

25   respect to pre-need insurance, pre-needs

da5aa629-e9d2-4503-831f-d3c7f84a1f4e

NETWORK DEPOSITION SERVICES
Transcript of Millard Jude Daigle

Page 232

1    meetings?

2         A.    Well, there were times when we

3    counseled with pre-need people, the people

4    that were selling pre-need after hours,

5    before hours, whatever it took to get the

6    sale, you know, accomplished.

7         Q.    So you're saying that you spent

8    time associated with pre-needs sales that

9    you were not compensated for?

10        A.    Right.

11        Q.    Okay.  Did you report that time?

12        A.    No.

13        Q.    Why not?

14        A.    There was no need to, because we

15   were not to report anything over 40 hours

16   in a week's time.

17        Q.    Were you ever compensated for

18   the time that you spent, for the unreported

19   time that you spent doing pre-needs?

20        A.    No.

21        Q.    Did any Alderwoods manager ever

22   instruct you not to -- did any Alderwoods

23   manager ever tell you not to report the

24   time that you spent in pre-needs?

25        A.    And the answer no.

da5aa629-e9d2-4503-831f-d3c7f84a1f4e

NETWORK DEPOSITION SERVICES
Transcript of Millard Jude Daigle

Page 233

1      Q.    Did any Alderwoods manager ever

2  tell you that you would not be compensated

3  for time that you spent in pre-needs

4  meetings or appointments?

5      A.    No.

6      Q.    Are you aware of any Alderwoods,

7  of any Alderwoods manager telling any other

8  Alderwoods employees not to report time

9  spent in pre-needs sales or appointments?

10     A.    No.

11     Q.    Are you aware of any other

12 Alderwoods employees who were not paid for,

13 who were not compensated for time they

14 spent in pre-needs meetings or

15 appointments?

16     A.    No.

17     Q.    How frequently would you have

18 pre-needs meetings or appointments that you

19 didn't report?

20     A.    Probably on the average, a

21 couple or three times a week.  It was an

22 ongoing thing.  We always had to counsel

23 with the pre-need person, because the

24 people that they hired were -- didn't have

25 enough experience.

da5aa629-e9d2-4503-831f-d3c7f84a1f4e

NETWORK DEPOSITION SERVICES
Transcript of Millard Jude Daigle

Page 234

1      Q.    So three times a week on

2    average.  And about how much time was

3    associated with pre-needs appointments on

4    those occasions?

5      A.    Maybe half an hour with each

6    one, just -- that's a ball-park figure.

7      Q.    And this is the unreported

8    pre-needs time?

9      A.    Right.

10     Q.    Are you aware of any company-

11   wide policy that an employee should not

12   report all the time they spend in pre-needs

13   appointments or meetings?

14     A.    No.

15     Q.    And during what period of time

16   of your employment with Alderwoods were you

17   doing pre-needs appointments or meetings?

18     A.    The times that I was talking

19   about was probably in between 2003 and 2005

20   at Lamana-Panno-Fallo.

21     Q.    Did any Alderwoods manager

22   observe you doing these pre-needs

23   appointments or meetings on the times that

24   you didn't report it?

25     A.    Yeah, Ronnie.

NETWORK DEPOSITION SERVICES
Transcript of Millard Jude Daigle

Page 235

1      Q.    And how do you know that Ronnie

2   observed you doing this?

3      A.    Well, I saw him and he saw me.

4      Q.    Did he see you on every

5   occasion?

6      A.    Just about every occasion.

7      Q.    Any other Alderwoods manager see

8   you doing pre-needs meetings or

9   appointments that you didn't report?

10      A.    No.

11      Q.    Do you know whether other

12   Alderwoods employees reported the time they

13   spent doing pre-needs meetings or

14   appointments?

15      A.    No, I don't.

16      Q.    Do you know whether any other

17   Alderwoods employee was compensated for the

18   time they spent doing pre-needs meetings or

19   appointments?

20      A.    No, I don't.

21   MS. MORGAN:

22          Can we go off the record for

23   about three minutes?  I just want to make

24   sure I don't have any other questions.

25   MS. DOUGLASS:

da5aa629-e9d2-4503-831f-d3c7f84a1f4e

## REPORTER'S CERTIFICATE

I, **ROBERT K. TUCKER**, Certified Court Reporter, State of Louisiana, do hereby certify that the above-mentioned witness, after having been first duly sworn by me to testify to the truth, did testify as hereinabove set forth;

That the testimony was reported by me in shorthand and transcribed under my personal direction and supervision, and is a true and correct transcript, to the best of my ability and understanding;

That I am not of counsel, not related to counsel or the parties hereto, and not in any way interested in the outcome of this matter.

OFFICIAL SEAL
ROBERT K. TUCKER
Certified Court Reporter
in and for the State of Louisiana
Certificate Number 87307
Certificate expires 12-31-09

**ROBERT K. TUCKER**

**CERTIFIED COURT REPORTER**

**STATE OF LOUISIANA**