**TAB 9**

## NETWORK DEPOSITION SERVICES
### Transcript of Jeffrey Diggs

Page 1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF PENNSYLVANIA

DEBORAH PRISE and HEATHER RADY
on behalf of themselves and all
employees similiarly situated,

       Plaintiffs,

   vs.

ALDERWOODS GROUP, INC., and SERVICE
CORPORATION INTERNATIONAL,

       Defendants.

_____

Civil Action No. 06-1641

DEPOSITION OF JEFFREY DIGGS

Taken April 22, 2009
Commencing at 9:30 a.m.

Volume I - Pages 1 - 153, inclusive

Taken by the Defendant
at
LANE POWELL
301 W. Northern Lights Blvd.
Anchorage, AK  99503

Reported by: Susan J. Warnick, RPR

96832057-fd66-463b-9c71-51eca2e9727f

NETWORK DEPOSITION SERVICES
Transcript of Jeffrey Diggs

Page 51

1   any documents with him?

2   A    I don't recall reviewing documents, no.

3   Q    After this meeting with Mr. Janssen, did you have any

4   meetings with any other Evergreen staff before you

5   commenced working there?

6   A    No.

7   Q    When did you report for work after this meeting with

8   Mr. Janssen?

9   A    I believe it was June 1st.

10  Q    Was the only position that you held at Evergreen the

11  funeral/embalmer position?

12  A    Yes.

13  Q    Did you discuss with Mr. Janssen, at your meeting

14  prior to your employment, about what your compensation

15  would be?

16  A    Yes.

17  Q    What did you discuss in that regard?  Did he tell you

18  how much he was going to pay you?

19  A    Yes.

20  Q    What was that?

21  A    I believe it was $21 an hour.

22  Q    Were you to receive any other compensation for your

23  duties?

24  A    No.

25  Q    No commissions?

96832057-fd66-463b-9c71-51eca2e9727f

NETWORK DEPOSITION SERVICES
Transcript of Jeffrey Diggs

Page 52

1    A    No.

2    Q    No bonuses?

3    A    No.

4    Q    What type of benefits were you going to receive?

5    A    I would be offered, as any other employee, the health

6    insurance, you know, how it's all laid out.

7    Q    Did you receive any type of vacation time?

8    A    Up front?

9    Q    Were you entitled, as part of this position, to any

10   vacation?

11   A    You earned it.  You know, as long as you were there,

12   the more you earned.

13   Q    Was it two weeks a year, one week a year?

14   A    I believe two weeks a year after your first year.

15              MR. FORESTIERE:  Let's mark this next as Exhibit

16   3.

17              (Exhibit 3 was marked.)

18   BY MR. FORESTIERE:

19   Q    Exhibit 3 is a two-page document identified as ALD

20   9551 through 9552.  It consists of a document dated May

21   18, 2004, a letter from Mr. Janssen to Mr. Diggs.

22              Have you had an opportunity to review that

23   document, sir?

24   A    Yes.

25   Q    Did you receive this document on or about May 24,

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

96832057-fd66-463b-9c71-51eca2e9727f

NETWORK DEPOSITION SERVICES
Transcript of Jeffrey Diggs

Page 69

1   A    I don't recall her ever telling me that.

2   Q    Did you hold any licenses while you were working at

3   Evergreen?

4   A    Yes.

5   Q    Could you identify those for me, please?

6   A    Funeral director/embalmer.

7   Q    Any others?

8   A    Driver's license.

9   Q    But you needed that for your employment, though;

10  didn't you?

11  A    You did.

12  Q    But you were not a licensed insurance agent?

13  A    No, sir.

14  Q    Did you do any pre-deed sales?

15  A    No.

16  Q    When did you obtain your funeral director's license?

17  A    Originally?

18  Q    From the State of Alaska.

19  A    1990.

20  Q    What did you have to do to obtain that license?

21  A    Take their written law test.

22  Q    When did you take the test?

23  A    Actually, let me rephrase that.  Licensed in '89 in

24  Alaska.  Took the test in '89.  I reciprocated my Texas

25  license to Alaska.

96832057-fd66-463b-9c71-51eca2e9727f

NETWORK DEPOSITION SERVICES
Transcript of Jeffrey Diggs

Page 70

1    Q    Okay.

2    A    Okay?  So all I had to take up here was a little

3    20-question test.

4    Q    And I don't know; that's why I'm asking.

5    A    Yeah, that's it.

6    Q    Because usually they require some type of working

7    under apprenticeship; that's why you had the

8    apprenticeship program.  But you were exempt from that

9    because you already had a license in a different state.

10   A    In another state; right.

11   Q    So you took the test in 1989; correct?

12   A    Yes.

13   Q    And you passed?

14   A    Not the first time.

15   Q    Did you have to take it more than once?

16   A    I did.

17   Q    How many times did you have to take it?

18   A    Twice.

19   Q    You passed the second time?

20   A    Yes.

21   Q    And how long was your license in effect from 1989?

22   A    Until the end of '08.

23   Q    And once your license was issued, what did you have

24   to do to maintain it current?

25   A    Pay them.

96832057-fd66-463b-9c71-51eca2e9727f

NETWORK DEPOSITION SERVICES
Transcript of Jeffrey Diggs

1    Q    Just pay them a fee?

2    A    Yes.

3    Q    Anything else, other than paying them a fee?

4    A    No.  Well, you have to fill out their little

5    paperwork every two years and send them a check along with

6    the renewal form.

7    Q    But you weren't required to do any continuing

8    education; is that correct?

9    A    That's correct.

10   Q    Did you ever have any disciplinary action taken

11   against your license?

12   A    Which license?

13   Q    We're talking about the funeral director's license.

14   A    No.

15   Q    Is there a reason why you let the funeral director's

16   license lapse as of the end of 2008?

17   A    I don't want to pay them $160 apiece.  I'm inactive.

18   Q    That's 160 bucks for the renewal for two years?

19   A    Yeah, per license.

20   Q    Yeah, I haven't got to the embalmer yet.  We're just

21   talking about the funeral director.  I'll get to that in a

22   second.

23   A    Oh, okay.

24   Q    Do you have to pay a fee to go inactive, or how is

25   that done?

96832057-fd66-463b-9c71-51eca2e9727f

NETWORK DEPOSITION SERVICES
Transcript of Jeffrey Diggs

Page 72

1    A    In this state there's not an inactive status.  You're

2    either -- your license is valid or it's not.

3    Q    Let's focus now a little bit on your embalmer's

4    license that you obtained from the State of Alaska.

5         When did you obtain that license?

6    A    Same time.

7    Q    1989?

8    A    Yes.

9    Q    What did you do to obtain that license?

10   A    Pass their little law test.

11   Q    Did you pass the first time?

12   A    No.

13   Q    How many times did you take it before you passed?

14   A    It's the same test.

15   Q    Oh, okay.

16   A    I took it twice.

17   Q    What do you have to do to maintain that license

18   current?

19   A    Same thing.

20   Q    Just pay the fee and fill out the renewal forms?

21   A    Yes.

22   Q    There's no continuing education requirement?

23   A    No, sir.

24   Q    Has there ever been any disciplinary action taken

25   against your embalmer's license?

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

96832057-fd66-463b-9c71-51eca2e9727f

NETWORK DEPOSITION SERVICES
Transcript of Jeffrey Diggs

Page 73

1    A    No.

2    Q    As part of your job position were you required to

3    perform any community service?

4    A    Required?

5    Q    Yes, sir.

6    A    No.

7    Q    Did you ever complain to anyone about not being paid

8    for all the hours that you worked?

9         MR. LINGLE:  Object to the form.

10        THE WITNESS:  I don't recall.

11   BY MR. FORESTIERE:

12   Q    Did you ever complain to anyone about performing your

13   on-call work?

14        MR. LINGLE:  Object to the form.

15        THE WITNESS:  I don't recall.

16   BY MR. FORESTIERE:

17   Q    Did you ever complain about not being compensated for

18   all the hours that you worked at Evergreen?

19        MR. LINGLE:  Object to the form.

20        THE WITNESS:  I don't recall.

21   BY MR. FORESTIERE:

22   Q    Did you ever complain to anyone about not being paid

23   any overtime that you worked that you were not paid for?

24        MR. LINGLE:  Object to the form.

25        THE WITNESS:  I don't recall.

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

96832057-fd66-463b-9c71-51eca2e9727f

NETWORK DEPOSITION SERVICES
Transcript of Jeffrey Diggs

Page 76

1    A    Yes.

2    Q    And then you clock out for lunch; correct?

3    A    If you took it.

4    Q    And then, if you took a lunch and you came back, you

5    clocked in?

6    A    Yes.

7    Q    And then you clocked out at the end of the day?

8    A    Yes.

9    Q    The second sentence there, the first bullet point, it

10   says, quote, "All employees must record all hours actually

11   worked unless exempt."  Do you see that?

12   A    Yes.

13   Q    Did you understand that you were required to report

14   all the hours that you -- to work at Evergreen?

15        MR. LINGLE:  Object to the form.

16        THE WITNESS:  Yes.

17   BY MR. FORESTIERE:

18   Q    Lower on the page, fourth bullet point, it says, "If

19   an employee is eligible for and receives piece work pay,

20   the employee is still required to record the actual time

21   worked."  Do you see that, sir?

22   A    I do.

23   Q    And was that your understanding as to recording time

24   when you performed piece work?

25   A    No.

96832057-fd66-463b-9c71-51eca2e9727f

NETWORK DEPOSITION SERVICES
Transcript of Jeffrey Diggs

Page 89

1    and correct in regards to the information stated on them?
2            MR. LINGLE:  Object to the form.
3            THE WITNESS:  To the best of my knowledge.
4    BY MR. FORESTIERE:
5    Q    Let's go through the first one here on page P4967.
6    And in the upper left-hand corner there's a box that has
7    earnings and rates and hours this period, and year to
8    date.  Do you see that?
9    A    Yes.
10   Q    For the overtime, it indicates that you worked, at
11   least through this pay period of -- ending December 25,
12   2004, 31.5 hours of overtime.
13           MR. LINGLE:  You're talking about hours.
14   BY MR. FORESTIERE:
15   Q    Oh, I'm sorry, 14 hours of overtime -- 14.5 hours of
16   overtime.  Do you see that?
17   A    Yes.
18   Q    And would that be the amount of overtime that was
19   usually reflected on your time card?
20   A    Yes.
21   Q    In other words, it's your understanding that this
22   information reflected the information you put on your time
23   card?
24   A    Yes.
25   Q    And so if you worked overtime, it was reflected on

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

96832057-fd66-463b-9c71-51eca2e9727f

NETWORK DEPOSITION SERVICES
Transcript of Jeffrey Diggs

Page 90

1   your time card and it was then reflected in these earnings

2   statements?

3               MR. LINGLE:  Object to the form.

4   BY MR. FORESTIERE:

5   Q    To the best of your knowledge?

6   A    Yes.

7   Q    Down below that it says, "OT ADJ."  Do you see that?

8   A    Yes.

9   Q    Do you know what that's for?

10  A    No.

11  Q    Under that it says, "Piece work."  Do you see that?

12  A    Yes.

13  Q    Do you know what that's for?

14  A    Yes.

15  Q    Can you explain to me what that makes reference to?

16  A    Removals.

17  Q    That was the piece work that you were paid for doing

18  removals during this period of time?

19  A    Yes.

20  Q    And the amount there is $875; correct?

21              MR. LINGLE:  You're not suggesting that's for

22  this period.

23              THE WITNESS:  That's year to date.

24  BY MR. FORESTIERE:

25  Q    Oh, I'm sorry.  You don't have anything for that

96832057-fd66-463b-9c71-51eca2e9727f

NETWORK DEPOSITION SERVICES
Transcript of Jeffrey Diggs

Page 92

1   to you?

2   A    No, sir.

3   Q    Or the last time he made any such statements to you?

4   A    No, sir.

5   Q    While you worked at Evergreen, did any employees ever

6   complain to you that the earnings statements did not

7   include all the compensation that they were entitled to be

8   paid?

9            MR. LINGLE:  Object to the form.

10           THE WITNESS:  I don't recall.

11  BY MR. FORESTIERE:

12  Q    I think you stated that you were initially paid $21

13  an hour when you commenced works as a funeral director and

14  embalmer at Alderwoods; correct?

15  A    Yes.

16  Q    Did that change during the time you were there?

17  A    I don't believe so.

18  Q    Were there pay periods in which you believed you

19  received less than the full amount of your pay?

20           MR. LINGLE:  Object to the form.

21           THE WITNESS:  As reflected on what?

22           MR. FORESTIERE:  Let me ask that question

23  differently.

24  BY MR. FORESTIERE:

25  Q    Were there ever any pay periods in which you believe

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

NETWORK DEPOSITION SERVICES
Transcript of Jeffrey Diggs

Page 93

1  you received less than your full amount of pay based upon

2  the actual hours that you worked?

3              MR. LINGLE:  Object to the form.

4              THE WITNESS:  I believe that my pay checks were

5  identical to my time card.  Saying, if it was on my time

6  card, I was paid for it.

7  BY MR. FORESTIERE:

8  Q    Did you ever complain to anybody that your time cards

9  did not reflect all the hours that you actually worked?

10             MR. LINGLE:  Object to the form.

11             THE WITNESS:  Did I ever complain?

12  BY MR. FORESTIERE:

13  Q    Yes, sir.

14  A    Not to my knowledge.

15  Q    Did you ever tell Mr. Janssen that you were working

16  more hours than those reflected on your time card?

17  A    No.

18  Q    Did you ever make that statement to Ms. Boyd?

19  A    No.

20             MR. FORESTIERE:  Let's mark this as the next

21  exhibit.

22             (Exhibit 8 was marked.)

23  BY MR. FORESTIERE:

24  Q    I have marked as Exhibit 8 a document identified as

25  ALD 9539, consisting of a number of handwritten statements

96832057-fd66-463b-9c71-51eca2e9727f

NETWORK DEPOSITION SERVICES
Transcript of Jeffrey Diggs

Page 103

1   scheduled from eight to five, but you obviously worked

2   more than that.  So let's talk about the actual hours now.

3   A    I was usually there by seven.

4   Q    What did you do when you arrived?

5   A    Clocked in.

6   Q    Then what did you do after you clocked in?

7   A    I usually went into the prep room to make sure that

8   all the services for that day were ready, what we needed

9   to have done for that day was done.

10  Q    How long would that usually take?

11  A    Depends on how much I had to do.

12  Q    Would it take usually most of the morning?

13  A    Usually we had services at 10:00, so we were rolling

14  out of the funeral home by 8:30.  So that gave me an hour,

15  hour and a half.

16  Q    What did you do after you -- let's see.  You say you

17  went into the prep room.  Well, what did you do after --

18  and I lost track of it.  You say you went into the prep

19  room initially to make sure that everything was ready for

20  the services that day.  It took you about an hour, hour

21  and a half?

22  A    Again, you know, you got to roll out at 8:30.  You're

23  leaving whether you're done or not.

24  Q    So when you say "roll out at 8:30," what did you do

25  at that time?

96832057-fd66-463b-9c71-51eca2e9727f

NETWORK DEPOSITION SERVICES
Transcript of Jeffrey Diggs

Page 107

1   A    Yes.

2   Q    When you finished those duties, did you clock out?

3   A    If we were done.

4   Q    So after you completed the duties, you clocked out?

5   A    If we were done, yes.

6   Q    We both want to get out of here in a couple hours, so

7   let's -- my question is pretty -- after you finished it,

8   did you clock out?

9   A    Yes.

10  Q    Okay.  Thank you.

11            MR. FORESTIERE:  Why don't we just take a --

12  30-minute to 45-minute lunch?  And then I just got to go

13  through -- my stack is getting thinner, so hopefully we'll

14  be done by 2:00.

15            (Lunch recess taken.)

16            (Exhibit 12 was marked.)

17               EXAMINATION (Resumed.)

18  BY MR. FORESTIERE:

19  Q    We marked, for the record, Exhibit 12, entitled,

20  "Information Sheet."  In the upper right-hand corner it

21  says, "Exhibit D."  One-page document.

22            Have you had an opportunity to take a look at

23  that, Mr. Diggs?

24  A    Yes.

25  Q    Are you familiar with this document?

96832057-fd66-463b-9c71-51eca2e9727f

NETWORK DEPOSITION SERVICES
Transcript of Jeffrey Diggs

Page 109

1    Alderwoods for work you performed at Evergreen for the

2    boxes A, C and E?

3    A     Yes.

4    Q     Now, other than the boxes A, B, C, D and E, are there

5    any other bases for compensation that you're claiming for

6    the type of -- strike that.

7              Other than the types of compensation reflected

8    in A through E, are there other types of compensation that

9    you're seeking to be paid for work you performed at

10   Evergreen?

11             MR. LINGLE:  Object to the form.

12   BY MR. FORESTIERE:

13   Q     Do you understand my question?

14   A     Yeah.  You're asking me is there anything that's not

15   on this page that I'm looking for.

16   Q     That's right, to be paid for for the work you

17   performed at Evergreen.

18   A     No.

19   Q     Are you aware of any company-wide policy used by

20   Evergreen requiring any of its employees to perform

21   community service work?

22             MR. LINGLE:  Object to the form.

23             THE WITNESS:  Can you repeat that question?

24             MR. FORESTIERE:  Have it read back, please.

25             (Requested record read.)

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

96832057-fd66-463b-9c71-51eca2e9727f

NETWORK DEPOSITION SERVICES
Transcript of Jeffrey Diggs

Page 110

1           THE WITNESS:  Requiring, no.

2    BY MR. FORESTIERE:

3    Q    Are you aware of any company-wide policy used by

4    Evergreen discussing whether community service work time

5    should be reported?

6           MR. LINGLE:  Object to the form.

7           THE WITNESS:  No.

8    BY MR. FORESTIERE:

9    Q    Have any of the employees employed by Evergreen

10   complained to you that they were required to perform

11   community service work?

12   A    No.

13   Q    Have any of the employees at Evergreen ever

14   complained to you that they were not being paid for their

15   community service work?

16          MR. LINGLE:  Object to the form.

17          THE WITNESS:  No.

18   BY MR. FORESTIERE:

19   Q    Let's talk about your on-call work that you

20   performed.

21          What did you understand your duties were when

22   you were on call?

23          MR. LINGLE:  Object to the form.

24          THE WITNESS:  On call to do what?  Answer the

25   telephones or to make removals?

96832057-fd66-463b-9c71-51eca2e9727f

NETWORK DEPOSITION SERVICES
Transcript of Jeffrey Diggs

Page 112

1  A     Yes.

2  Q     How many times were you performing phone duties?

3              MR. LINGLE:  Object to the form.

4              THE WITNESS:  Usually phone duties two nights a

5  month.

6  BY MR. FORESTIERE:

7  Q     And how much time on those two nights a month would

8  you be performing phone duties?

9              MR. LINGLE:  Object to the form.

10             THE WITNESS:  Let me make sure I understand what

11 you're asking.  How much time I would be answering the

12 phone?

13 BY MR. FORESTIERE:

14 Q     Well, I'm trying to understand what your

15 understanding is of phone duties versus on-call duties.

16 Because other people have testified basically that they're

17 on call also answering the phone; they seem to understand

18 it's all in one function.  But you seem to have a

19 different understanding, and that's what I'm trying to

20 explore.

21 A     My understanding is phone duty is, at 5:00 in the

22 afternoon the phone is diverted to a cell phone, which I

23 will carry and answer that phone throughout the night up

24 until it is undiverted from that cell phone the next

25 morning.  So let's say from five P.M. in the afternoon

96832057-fd66-463b-9c71-51eca2e9727f

NETWORK DEPOSITION SERVICES
Transcript of Jeffrey Diggs

Page 113

1    until eight A.M. the next morning, that's phone duty.

2    Q    And so they would give you a cell phone that you

3    would carry with you to answer the phone?

4    A    Yes.

5    Q    And you were scheduled to do that how often?

6    A    Two nights a month.

7    Q    Two nights a week?

8    A    No, a month.

9    Q    Two nights a month.

10        And when you performed phone duty two nights a

11   month, how often would you actually receive calls?

12   A    Every night.

13   Q    So every time that you were on phone duty you

14   received a call; is that correct?

15   A    Sure.  You bet.

16   Q    How long would the calls last?

17   A    Variations.

18   Q    Can you give me a range?

19   A    You can range from two minutes to 30 minutes.

20   Q    How many calls would you receive on an average on the

21   nights that you were on phone duty?

22   A    Nights you were on phone duty, probably 10 to 15

23   calls.

24   Q    And how was it that you would be scheduled to be on

25   phone duty?  Would Mr. Janssen tell you that?

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

NETWORK DEPOSITION SERVICES
Transcript of Jeffrey Diggs

Page 114

1   A    Yes.

2   Q    Was that also put on that board on the wall?

3   A    Usually.

4   Q    Did you have any restrictions as to what you could do

5   while you were on phone duty?

6   A    Yes.

7   Q    What were the restrictions?

8   A    You could not take the phone into public access

9   areas.  You couldn't take it to church, grocery store,

10  soccer.  Couldn't go anywhere.

11  Q    Where were you when you were on phone duty?

12           MR. LINGLE:  Object to the form.

13  BY MR. FORESTIERE:

14  Q    Do you understand my question?

15  A    Where was I physically?

16  Q    Yes, sir.

17  A    Home.

18  Q    Did you ever record any of the time that you spent on

19  phone duty?

20  A    No.

21  Q    Did you ever try to obtain compensation for the time

22  that you were on phone duty?

23  A    No.

24  Q    Did you ever report the time on your time card that

25  you spent on phone duty?

96832057-fd66-463b-9c71-51eca2e9727f

NETWORK DEPOSITION SERVICES
Transcript of Jeffrey Diggs

Page 115

1   A   I did not.

2   Q   Have you ever attempted to calculate the total amount

3   of time that you spent on phone duty during the time that

4   you were employed at Evergreen?

5          MR. LINGLE:  Object to the form.

6          THE WITNESS:  I just figured in my head right

7   here, two nights a month, roughly 14 hours -- 28 hours.

8   BY MR. FORESTIERE:

9   Q   Twenty-eight hours --

10  A   A month.

11  Q   -- for every month that you were employed at

12  Evergreen?

13  A   Best of my knowledge.

14  Q   Was there a reason why you didn't report this time on

15  the time cards?

16  A   For me it was more of a hassle than it was worth.

17  Q   Did you ever tell anyone that you didn't report the

18  time on your time cards while you were performing this

19  phone duty?

20  A   Yes.

21  Q   Who did you tell?

22  A   Kirstin.

23  Q   Did you tell her more than one time?

24  A   I may have mentioned to her more than once that I

25  wasn't keeping track of that.

96832057-fd66-463b-9c71-51eca2e9727f

NETWORK DEPOSITION SERVICES
Transcript of Jeffrey Diggs

Page 117

1  Evergreen was not going to compensate employees for this
2  phone duty work?
3         MR. LINGLE:  Object to the form.
4         THE WITNESS:  I haven't seen any company-wide
5  policies.
6  BY MR. FORESTIERE:
7  Q    So as far as you know, there is no company policy
8  precluding an employee from requesting compensation for
9  performing phone duty work?
10         MR. LINGLE:  Object to the form.
11         THE WITNESS:  Again, I know of no company-wide
12  policies.
13         MR. FORESTIERE:  Can I have the question read
14  back, please?
15         (Requested record read.)
16  BY MR. FORESTIERE:
17  Q    Did anybody ever tell you that you're not to be
18  compensated for performing phone duty work?
19  A    No.
20  Q    Did any other employees ever complain to you that
21  they were not being compensated for performing phone duty
22  work?
23         MR. LINGLE:  Object to the form.
24         THE WITNESS:  Not that I recall.
25  BY MR. FORESTIERE:

96832057-fd66-463b-9c71-51eca2e9727f

NETWORK DEPOSITION SERVICES
Transcript of Jeffrey Diggs

Page 125

1   ended.

2             MR. FORESTIERE:  I'm not asking him whether he's

3   seen the document; I'm not asking whether it's in effect.

4   My question is whether that's his understanding at the

5   time he was performing his duties.

6             MR. LINGLE:  Well, that's why I asked if it was

7   based on the manual.  Because the manual was not in place,

8   based on the date on here, when he was actually employed.

9             MR. FORESTIERE:  I understand that.

10  BY MR. FORESTIERE:

11  Q    Do you understand my question?

12  A    Can you repeat that?

13  Q    That last sentence basically said that it's your

14  responsibility to clock in and out when you perform these

15  on-call duties.

16            Is it your understanding that you were not

17  required to do that because you were paid a flat rate of

18  $35 for each removal?

19            MR. LINGLE:  Object to the form.

20            THE WITNESS:  It was my understanding not to

21  clock in or out for removal.

22  BY MR. FORESTIERE:

23  Q    And why was that?

24  A    It is flat rate.

25  Q    The next paragraph, it says, "When a nonexempt

96832057-fd66-463b-9c71-51eca2e9727f

NETWORK DEPOSITION SERVICES
Transcript of Jeffrey Diggs

Page 126

1  employee is required to take phone calls after completing

2  the regular work schedule and leaving the premises but is

3  not required to physically return to work, the employee

4  shall log the start and end times of each phone call."

5        Do you see that?

6  A    I do.

7  Q    And that was your understanding at that time that you

8  were on what we defined as phone duty?

9  A    That was my understanding, yes.

10 Q    And you said you didn't do it because it was just a

11 hassle to do; correct?

12 A    Yes.

13 Q    Are you aware of any company-wide policy by Evergreen

14 of requiring employees to become licensed and not

15 compensating them for the time and expense of doing so?

16        MR. LINGLE:  Object to the form.

17        THE WITNESS:  No.

18 BY MR. FORESTIERE:

19 Q    Has any employee, during the time that you worked at

20 Evergreen, ever complained to you that they were required

21 to be licensed and were not compensated for the time of

22 doing so?

23        MR. LINGLE:  Object to the form.

24        THE WITNESS:  No.

25 BY MR. FORESTIERE:

96832057-fd66-463b-9c71-51eca2e9727f

NETWORK DEPOSITION SERVICES
Transcript of Jeffrey Diggs

Page 127

1  Q    Are you aware of any company-wide policy requiring

2  employees to attend training of any sort and not

3  compensating for the time that they spend being trained?

4           MR. LINGLE:  Object to the form.

5           THE WITNESS:  No.

6  BY MR. FORESTIERE:

7  Q    Has any employee ever stated to you that they had to

8  attend any type of training and was not compensated for

9  that time?

10  A    No.

11  Q    Are you aware of what pre-need appointments are?

12  A    Yes.

13  Q    Are you aware of any company-wide policy used by

14  Evergreen that employees who spent their time performing

15  pre-needs appointments were not to be compensated for that

16  time?

17           MR. LINGLE:  Object to the form.

18           THE WITNESS:  Yes, depends on the status of the

19  employee.

20  BY MR. FORESTIERE:

21  Q    What was your understanding in that regard?

22  A    If you are on the clock, being paid hourly wages,

23  you're not to sell pre-needs and draw a commission.  You

24  want to draw a commission on pre-needs, you go off the

25  clock, if you're an insurance person and are able to do

96832057-fd66-463b-9c71-51eca2e9727f

NETWORK DEPOSITION SERVICES
Transcript of Jeffrey Diggs

Page 129

1   Q   Did any employee of Evergreen ever complain to you

2   that they were not being compensated for the amount of

3   time they spent in performing such pre-need appointments?

4          MR. LINGLE:  Object to the form.

5          THE WITNESS:  I didn't have exposure to people

6   writing pre-needs for Evergreen.

7   BY MR. FORESTIERE:

8   Q   So no employee ever told you that?

9          MR. LINGLE:  Object to the form.

10         THE WITNESS:  Not that I recall.

11   BY MR. FORESTIERE:

12   Q   Have you ever reported on your time cards when you

13   did not take a lunch?

14   A   I believe I did.

15   Q   Do you recall how many times you did that?

16   A   No.

17   Q   Did you understand that that was the policy of

18   Evergreen, is to have the employees state on their time

19   cards when they did not take a lunch?

20         MR. LINGLE:  Object to the form.

21         THE WITNESS:  No.

22   BY MR. FORESTIERE:

23   Q   Wasn't it the policy of Evergreen to have its

24   employees indicate on their time cards when they did not

25   take a lunch?

96832057-fd66-463b-9c71-51eca2e9727f

NETWORK DEPOSITION SERVICES
Transcript of Jeffrey Diggs

Page 130

1        MR. LINGLE:  Object to the form.

2        THE WITNESS:  I don't know.

3   BY MR. FORESTIERE:

4   Q    Well, why did you put no lunch on your time cards

5   when you did not take them?

6        MR. LINGLE:  Object to the form.

7        THE WITNESS:  I don't know.

8   BY MR. FORESTIERE:

9   Q    Are you aware of any company-wide policy by Evergreen

10  that employees could not report all hours worked if they

11  worked during a lunch break?

12       MR. LINGLE:  Object to the form.

13       THE WITNESS:  No, I'm not aware.

14  BY MR. FORESTIERE:

15  Q    Did you ever attempt to seek approval to work any

16  overtime?

17  A    Not that I remember.

18  Q    Do you recall any time that you asked to be paid

19  overtime that you were denied working overtime?

20  A    No.

21       MR. LINGLE:  Object to the form.

22  BY MR. FORESTIERE:

23  Q    Did you work overtime without receiving approval of

24  Mr. Janssen?

25  A    Yes.

96832057-fd66-463b-9c71-51eca2e9727f

NETWORK DEPOSITION SERVICES
Transcript of Jeffrey Diggs

Page 131

1  Q    Were you aware that you were required to seek his

2  approval before you worked any overtime?

3  A    No.

4  Q    Are you aware of any company policy requiring you to

5  seek approval before you worked any overtime?

6           MR. LINGLE:  Object to the form.

7           THE WITNESS:  No.

8  BY MR. FORESTIERE:

9  Q    When generally would you work overtime without

10  receiving approval for it?

11          MR. LINGLE:  Object to the form.

12          THE WITNESS:  Whenever it was necessary.

13  BY MR. FORESTIERE:

14  Q    Do you have an idea about how many hours a week you

15  worked overtime that you were not paid for?

16  A    I thought we'd already answered that.

17  Q    Do you recall how much time of overtime you've worked

18  that you were not paid for?

19          MR. LINGLE:  Object to the form.

20          THE WITNESS:  I believe I said earlier, if I put

21  it on my time card, I was paid for it.

22  BY MR. FORESTIERE:

23  Q    So how much overtime did you work on a weekly basis

24  that you did not put on your time card?

25  A    It would be the work on night calls that were limited

96832057-fd66-463b-9c71-51eca2e9727f

NETWORK DEPOSITION SERVICES
Transcript of Jeffrey Diggs

Page 132

1    to the flat rate.

2    Q    Other than the on-call duties and the phone duties,

3    was there any other types of overtime that you worked for

4    that you were not compensated for?

5    A    No.

6    Q    Are you aware of any company-wide policy at Evergreen

7    requiring employees to work overtime without paying for

8    it?

9              MR. LINGLE:  Object to the form.

10             THE WITNESS:  No.

11   BY MR. FORESTIERE:

12   Q    Did any employees ever complain to you that they were

13   required to work overtime without their receiving

14   compensation for it?

15             MR. LINGLE:  Object to the form.

16             THE WITNESS:  No.

17   BY MR. FORESTIERE:

18   Q    Did any employees ever complain to you that they

19   requested to be paid overtime and didn't receive it?

20             MR. LINGLE:  Object to the form.

21             THE WITNESS:  No.

22   BY MR. FORESTIERE:

23   Q    Are you aware of any company-wide policy of not

24   paying for overtime that was not preapproved?

25             MR. LINGLE:  Object to the form.

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

96832057-fd66-463b-9c71-51eca2e9727f

NETWORK DEPOSITION SERVICES
Transcript of Jeffrey Diggs

1   policies.

2   BY MR. FORESTIERE:

3   Q    Are you aware of any company-wide policy of not

4   including all types of remuneration in calculating the

5   overtime rate to be paid employees who were to be paid

6   overtime?

7             MR. LINGLE:  Object to the form.

8             THE WITNESS:  I have no idea what you just

9   asked.

10  BY MR. FORESTIERE:

11  Q    "Remuneration," that word always throws me as well.

12            Are you aware of any policies that the company

13  had concerning how they calculate the overtime rate --

14            MR. LINGLE:  Object --

15  BY MR. FORESTIERE:

16  Q    -- to be paid employees that performed overtime?

17            MR. LINGLE:  Object to the form.

18            THE WITNESS:  I would think that the company

19  would follow federal guidelines and state guidelines on

20  calculating overtime pay.

21  BY MR. FORESTIERE:

22  Q    Do you know of any policy where they did not do that?

23            MR. LINGLE:  Object to the form.

24            THE WITNESS:  I don't.

25  BY MR. FORESTIERE:

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

96832057-fd66-463b-9c71-51eca2e9727f

NETWORK DEPOSITION SERVICES
Transcript of Jeffrey Diggs

Page 136

1   Q    Has any employee ever complained to you that

2   Evergreen did not properly calculate the overtime rate for

3   the overtime they worked?

4            MR. LINGLE:  Object to the form.

5            THE WITNESS:  No.

6   BY MR. FORESTIERE:

7   Q    Other than the three facilities comprising the

8   Evergreen facilities, did you work at any other Alderwoods

9   locations?

10  A    No.

11  Q    Are you aware that Alderwoods owns a number of

12  funeral homes and other funeral establishments other than

13  Evergreen?

14  A    Yes.

15  Q    Do you know how many funeral locations or

16  establishments Evergreen -- strike that.

17           Do you know of how many funeral homes and

18  establishments Alderwood owned other than the Evergreen

19  facility at the time that you worked for Evergreen?

20  A    My understanding was around 1400 facilities.

21  Q    And that was throughout the nation?

22  A    Yes.

23  Q    Do you know how many hourly employees Alderwoods

24  employed during that time that you were employed at

25  Evergreen?

96832057-fd66-463b-9c71-51eca2e9727f

NETWORK DEPOSITION SERVICES
Transcript of Jeffrey Diggs

Page 139

1    Q    -- or pertain to your claims in it?

2    A    No.

3    Q    Were you ever told that you were abusing overtime

4    that was paid to you?

5              MR. LINGLE:  Object to the form.

6              THE WITNESS:  No.

7    BY MR. FORESTIERE:

8    Q    Did anybody ever tell you that your overtime was

9    excessive?

10             MR. LINGLE:  Object to the form.

11             THE WITNESS:  No.

12   BY MR. FORESTIERE:

13   Q    Did any employee at Evergreen ever tell you that they

14   were told they were abusing their overtime?

15             MR. LINGLE:  Object to the form.

16             THE WITNESS:  No.

17   BY MR. FORESTIERE:

18   Q    Or that they were told that their overtime was

19   excessive?

20   A    No.

21   Q    Do you know whether Mr. Janssen monitored the amount

22   of overtime that you were performing?

23             MR. LINGLE:  Object to the form.

24             THE WITNESS:  I do not know.

25   BY MR. FORESTIERE:

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

96832057-fd66-463b-9c71-51eca2e9727f

NETWORK DEPOSITION SERVICES
Transcript of Jeffrey Diggs

Page 140

1    Q    Do you know if the overtime of any of the other
2  Evergreen employees were being monitored?
3              MR. LINGLE:  Object to the form.
4              THE WITNESS:  I don't know.
5  BY MR. FORESTIERE:
6    Q    Did you ever see any reports of overtime that were
7  accumulated for the employees that worked at Evergreen?
8    A    No.
9    Q    Do you know if Mr. Janssen was ever admonished about
10 the amount of overtime he was paying his employees at
11 Evergreen?
12             MR. LINGLE:  Object to the form.
13             THE WITNESS:  I have no idea what was said to
14 Mr. Janssen.
15 BY MR. FORESTIERE:
16   Q    Did you ever hear that there was a budget for the
17 amount of overtime that could be worked at the Evergreen
18 facility?
19   A    Yes.
20   Q    How did you become aware of that?
21   A    Through conversation.
22   Q    Who did you have those conversations with?
23   A    Could have been Kirstin.
24   Q    Mrs. Boyd?
25   A    Yes.

96832057-fd66-463b-9c71-51eca2e9727f

NETWORK DEPOSITION SERVICES
Transcript of Jeffrey Diggs

Page 142

1        THE WITNESS:  Not that I recall.

2   BY MR. FORESTIERE:

3   Q    Are you aware of any other Evergreen employee being

4   told that he or she was incorrectly completing their time

5   cards?

6        MR. LINGLE:  Object to the form.

7        THE WITNESS:  Not that I recall.

8   BY MR. FORESTIERE:

9   Q    Did any Evergreen employee ever tell you that they

10  were told they were incorrectly completing their time

11  cards?

12       MR. LINGLE:  Object to the form.

13       THE WITNESS:  Not that I recall.

14  BY MR. FORESTIERE:

15  Q    Where you ever told that only approved overtime would

16  be paid?

17  A    No.

18  Q    Did any Evergreen employee ever tell you that only

19  their approved overtime would be paid to them?

20  A    Not that I recall.

21  Q    Did you ever work any overtime that was not approved

22  but was paid anyway?

23  A    Yes.

24  Q    Were you encouraged to arrive before your shift

25  commenced?

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

96832057-fd66-463b-9c71-51eca2e9727f

NETWORK DEPOSITION SERVICES
Transcript of Jeffrey Diggs

Page 144

1    work got done?

2    A    No.

3    Q    Were you ever told not to clock in until your

4    scheduled start time commenced?

5    A    No.

6    Q    Did any employee ever complain to you that they were

7    told not to clock in until their scheduled start time

8    commenced?

9              MR. LINGLE:  Object to the form.

10             THE WITNESS:  Not that I recall.

11   BY MR. FORESTIERE:

12   Q    Are there any employees that work at Evergreen who

13   can corroborate that you've worked through your meal

14   periods?

15             MR. LINGLE:  Object to the form.

16             THE WITNESS:  Yes.

17   BY MR. FORESTIERE:

18   Q    Could you identify those for me, please?

19   A    All the previous ones I've mentioned.

20   Q    Do you believe that all those employees are basically

21   truthful and honest people?

22             MR. LINGLE:  Object to the form.

23             THE WITNESS:  For the most part.

24   BY MR. FORESTIERE:

25   Q    Can you recall, during the time you worked at

96832057-fd66-463b-9c71-51eca2e9727f

1                    REPORTER'S CERTIFICATE

2          I, SUSAN J. WARNICK, RPR, and Notary Public in

3    and for the State of Alaska do hereby certify:

4          That the witness in the foregoing proceedings was

5    duly sworn; that the proceedings were then taken before me

6    at the time and place herein set forth; that the testimony

7    and proceedings were reported stenographically by me and

8    later transcribed under my direction by computer

9    transcription; that the foregoing is a true record of the

10   testimony and proceedings taken at that time; and that I

11   am not a party to nor have I any interest in the outcome

12   of the action herein contained.

13         IN WITNESS WHEREOF, I have hereunto subscribed my

14   hand and affixed my seal this 27th day of April,

15   2009.

16

17

18                              SUSAN J. WARNICK,
                                Registered Professional Reporter
19                              Notary Public for Alaska

20

     My Commission Expires:  April 8, 2010
21

22

23

24

25