**TAB 10**

NETWORK DEPOSITION SERVICES
Transcript of Stephen Escobar

Page 1

THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

------------------------------

DEBORAH PRISE and HEATHER )

RADY on behalf of themselves )

and all employees similarly )

situated, )

       Plaintiffs, ) Civil Action No. 06-1641

   vs. )

ALDERWOODS GROUP, INC., )

       Defendant. )

------------------------------

        Deposition of STEPHEN ESCOBAR, taken at

        1312 McHenry Avenue, Modesto,

        California, commencing at 10:06 a.m.,

        Wednesday, March 11, 2009, before

        Amanda J. Dunn, California CSR No. 13336.

   PAGES 1 - 177

Johnstown
814-266-2042

Toll-Free
866-565-1929

Pittsburgh
412-281-7908

4ebe35e9-e05c-4c4b-bcd9-4ed04ae729b2

NETWORK DEPOSITION SERVICES
Transcript of Stephen Escobar

Page 62

1      Q.   For what period of time?

2      A.   From when I was hired until I stopped working

3   there in October.

4      Q.   You said that -- strike that.

5           Were any restrictions placed upon you while you

6   were on-call?

7      A.   Yes.

8      Q.   Could you explain those, please.

9      A.   You had to answer the phone no matter what, no

10  matter where you were or anything.

11     Q.   Anything else?

12     A.   No.

13     Q.   Just give me a second here.

14     A.   Sure.

15     Q.   Prior to being employed at Alderwoods, did you

16  see any job descriptions for the position of funeral

17  arranger?

18     A.   No.

19     Q.   Other than being paid an hourly wage, did you

20  receive any other monetary compensation for performing

21  your duties at Alderwoods?

22     A.   No.

23     Q.   So you didn't receive any bonuses, correct?

24     A.   That is correct.

25     Q.   And you would not be on a commission basis,

4ebe35e9-e05c-4c4b-bcd9-4ed04ae729b2

NETWORK DEPOSITION SERVICES
Transcript of Stephen Escobar

Page 63

 1   true?

 2        A.    True.

 3        Q.    When you did report your time for overtime that

 4   you worked -- strike that.

 5              Did you work any overtime during the time that

 6   you worked at Lakewood?

 7        A.    Yes.

 8        Q.    And when you recorded that time, were you paid

 9   for it?

10              MR. LINGLE:  Object to the form.

11              THE WITNESS:  Yes.

12   BY MR. FORESTIERE:

13        Q.    After you started working at Lakewood, did you

14   attend any orientation classes or training?

15        A.    Yes.

16        Q.    Let me take a step back before I get in that

17   area.

18        A.    Sure.

19              MR. FORESTIERE:  Let me mark as Exhibit 4 a

20   document entitled, "USA New Employee Welcome to

21   Alderwoods."  Bates stamp Nos. ALD8318 through 8320.

22              (Whereupon, Exhibit 4 was marked for

23              identification.)

24              THE WITNESS:  Okay.

25

Johnstown                 Toll-Free              Pittsburgh
814-266-2042            866-565-1929          412-281-7908

4ebe35e9-e05c-4c4b-bcd9-4ed04ae729b2

NETWORK DEPOSITION SERVICES
Transcript of Stephen Escobar

Page 70

1    A.   Yeah.

2    Q.   Okay.  You checked that box, correct?

3    A.   I did, but I'm not a salesman.  I didn't work

4  at the cemetery.  So why would I get that?

5    Q.   I don't know why you signed and checked things.

6  That's why I'm asking.

7    A.   Yeah.

8    Q.   Are you saying that there wasn't sales

9  counselor guidelines for selling funeral products?

10   A.   No.

11   Q.   On page 3, Bates stamp 8320 at the top, you

12  checked a box that says, quote, together with the new

13  employee's supervisor complete a training for

14  performance worksheet.

15        Do you see that?

16   A.   Yes.

17   Q.   Did you do that?

18   A.   No.

19   Q.   Right under it, it says, "Complete a Training

20  Pay Request Form."

21        Do you see that?

22   A.   Yes.

23   Q.   And did you do that?

24   A.   No.

25   Q.   Were you paid for the training you received

4ebe35e9-e05c-4c4b-bcd9-4ed04ae729b2

NETWORK DEPOSITION SERVICES
Transcript of Stephen Escobar

Page 71

1    during the time that you worked at Lakewood?

2         A.    Hourly.

3         Q.    So the answer's yes?

4         A.    Yes.

5         Q.    Okay.  That gets us back to the orientation

6    that you attended.

7               When was it that you attended that program?

8         A.    We had a new person come in.  His name was

9    Shawn Aylesworth, and he decided to train us.

10        Q.    So when did --

11        A.    Approximately September.  A month before I

12   left.

13        Q.    September of 2004?

14        A.    Yes.

15        Q.    So part of that, you never received any type of

16   orientation or training for your work at Lakewood?

17        A.    Yes.

18        Q.    By the way, is the only facility that you

19   worked for Alderwoods was Lakewood, correct?

20        A.    Yes.

21        Q.    Did you ever have any conversations with any

22   other employees that work at any other facilities owned

23   by Alderwoods?

24               MR. LINGLE:  Object to the form.

25               THE WITNESS:  No.

4ebe35e9-e05c-4c4b-bcd9-4ed04ae729b2

NETWORK DEPOSITION SERVICES
Transcript of Stephen Escobar

Page 77

1   employees will be compensated for all hours worked, end
2   quote.
3            Do you see that, sir?
4       A.   Yes.
5       Q.   Was that your understanding at the time that
6   you were performing your work at Alderwoods?
7       A.   No.
8       Q.   And why was that?  Why was that not your
9   understanding?
10      A.   Because of the -- you see, phone time, the
11  community service time.
12      Q.   Anything else?
13      A.   The being paid for overtime for removals.
14      Q.   Anything else?
15      A.   No.
16      Q.   On page ADL14 under the heading, "Guidelines of
17  Workday" -- do you see that?
18      A.   Yes.
19      Q.   It says, quote, arrangements to work -- strike
20  that.
21           Arrangements to regularly work more than 8
22  hours a day must be approved by your manager.
23           Do you see that -- end quote?
24      A.   Yes.
25      Q.   Was that your understanding during the time

Johnstown              Toll-Free              Pittsburgh
814-266-2042          866-565-1929           412-281-7908

4ebe35e9-e05c-4c4b-bcd9-4ed04ae729b2

NETWORK DEPOSITION SERVICES
Transcript of Stephen Escobar

Page 78

1   that you worked at Alderwoods?

2       A.   No.

3       Q.   And why was that not your understanding?

4       A.   I've never heard that before.

5       Q.   You've never heard that in order to work

6   overtime, it had to be approved by your manager?

7       A.   Yes.

8       Q.   Did you work any overtime during the time that

9   you worked at Alderwoods?

10      A.   Yes.

11      Q.   And were you paid overtime?

12      A.   Not all of it, no.

13      Q.   Did you keep any records concerning the

14  overtime that you were not paid for?

15      A.   No.

16      Q.   No calendars?

17      A.   No.

18      Q.   No diaries?

19      A.   No.

20      Q.   By the way, when you previously said phone

21  time, were you talking about the on-call policy?

22      A.   On-call policy, yes.

23      Q.   On page ADL15, under section "D," Work

24  Schedule, it states, "Work schedules are established by

25  the manager of the location/department."

NETWORK DEPOSITION SERVICES
Transcript of Stephen Escobar

Page 91

1    Q.   Did you ever find any errors in the calculation

2    of the amount of wages that you were paid as reflected

3    in your paycheck?

4    A.   No.

5    Q.   Did you ever complain to anybody that the

6    overtime that you had worked was not reflected in your

7    paycheck?

8    A.   No.

9    Q.   Did you ever complain to anybody that the hours

10   that you worked were not reflected in your paycheck?

11   A.   No.

12   Q.   Let's go on page ALD No. 16, section "F,"

13   called "Overtime."

14   A.   Yes.

15   Q.   And it states, quote, all overtime, however,

16   must be approved in advance by management, end quote.

17   A.   Yes.

18   Q.   Were you aware of any requirements during the

19   time that you worked at Alderwoods that any overtime --

20   strike that.

21        During the time that you worked for -- strike

22   that.

23        Did you have an understanding at the time that

24   you worked at Alderwoods that any overtime you worked

25   had to be approved by somebody in management?

4ebe35e9-e05c-4c4b-bcd9-4ed04ae729b2

NETWORK DEPOSITION SERVICES
Transcript of Stephen Escobar

Page 92

1    A.   No.

2    Q.   Did you need Mr. Webb's approval to work any

3  overtime?

4    A.   No.

5    Q.   Did you ever tell Mr. Webb that you were

6  working overtime during the time that you were employed

7  at Alderwoods?

8    A.   Yes.  The on-call.

9    Q.   Other than -- we already covered the on-call

10  conversations, correct?

11    A.   Yeah.

12    Q.   Other than the on-call, did you ever have any

13  discussions with Mr. Webb about any overtime that you

14  were working?

15    A.   No.

16    Q.   The next sentence says, quote, hourly employees

17  are not permitted or authorized to work any period of

18  time other than their normally scheduled hours unless

19  directed to do so by their manager, end quote.

20       Do you see that?

21    A.   Yes.

22    Q.   Do you know of any requirements that you had to

23  get approval by -- excuse me -- strike that.

24       During the time that you worked at Alderwoods,

25  were you aware of any requirement that you had to get

4ebe35e9-e05c-4c4b-bcd9-4ed04ae729b2

NETWORK DEPOSITION SERVICES
Transcript of Stephen Escobar

Page 93

1   authorization for working overtime, other than your
2   normal scheduled hours?
3       A.   No.
4       Q.   I think you might have already indicated when
5   you were scheduled.  I want to just confirm the hours
6   you actually worked.
7            Generally, did you actually work from Monday
8   through Friday, 8:00 to 5:00 p.m.?
9       A.   Yes.
10      Q.   And then every other weekend, you actually
11  worked those weekends?
12      A.   Yes.
13      Q.   And was that also from 8:00 to 5:00?
14      A.   Yes.
15      Q.   Did Mr. Webb ever schedule you to work any
16  overtime?
17      A.   I remember one rosary -- that I remember.
18      Q.   And were you paid for that overtime?
19      A.   Yes.
20      Q.   Did you ever keep any personal records
21  concerning the amount of time that you worked at
22  Alderwoods?
23      A.   No.
24      Q.   Did anybody ever instruct you to keep track of
25  your time that you worked at Alderwoods?

Johnstown                Toll-Free                Pittsburgh
814-266-2042           866-565-1929             412-281-7908

4ebe35e9-e05c-4c4b-bcd9-4ed04ae729b2

NETWORK DEPOSITION SERVICES
Transcript of Stephen Escobar

Page 104

1     the hours that you recorded to be paid?
2            MR. LINGLE:  Object to the form.
3            THE WITNESS:  I think the answer to the
4     question is a yes and a no.
5     BY MR. FORESTIERE:
6        Q.   All right.  Well, explain your answer then.
7        A.   No, because I didn't get community service.  I
8     didn't get some of the overtime.  And then the other one
9     that we talked about --
10       Q.   Okay.
11       A.   -- the telephone.
12       Q.   So my question is, to the time you reported to
13    Vicky, right?
14            In other words, every two weeks, you and Vicky
15    would sit down and have a conversation about how many
16    hours you worked for the prior two weeks?
17       A.   Yes.
18       Q.   And whatever that amount is -- in this case, it
19    would be 128 hours.
20       A.   Yes.
21       Q.   You would tell Vicky that?
22       A.   Yes.
23       Q.   And my question is, when you got your paycheck,
24    did you confirm when you received it that what you told
25    Vicky was correct?

4ebe35e9-e05c-4c4b-bcd9-4ed04ae729b2

NETWORK DEPOSITION SERVICES
Transcript of Stephen Escobar

Page 105

1      A.   Yes.

2      Q.   All right.  I understand you're claiming

3  additional wages that you were not paid?

4      A.   Yes.

5      Q.   That's because you didn't report it?

6           MR. LINGLE:  Object to the form.

7  BY MR. FORESTIERE:

8      Q.   The hours that you didn't report, you were not

9  paid for?

10          MR. LINGLE:  Object to the form.

11          THE WITNESS:  Not if I wasn't told those hours.

12  BY MR. FORESTIERE:

13     Q.   I know.  So you if you didn't report it, you

14  were not paid for it?

15     A.   Yes.

16          MR. LINGLE:  Object to the form.

17  BY MR. FORESTIERE:

18     Q.   Correct?

19     A.   Yes.

20     Q.   All right.  And the same question in regards to

21  overtime.

22          When you received your paycheck, did you verify

23  that the amount of overtime you told Vicky was correctly

24  stated on your earning statement?

25     A.   Yes.

4ebe35e9-e05c-4c4b-bcd9-4ed04ae729b2

NETWORK DEPOSITION SERVICES
Transcript of Stephen Escobar

1    Q.   Is there anything in Exhibit 8 that you believe

2  is inaccurate or incorrect?

3    A.   From what I told Vicky or the overall picture?

4    Q.   No.  From what you told Vicky.

5    A.   No.

6         MR. FORESTIERE:  I guess it's time to take a

7  break for lunch.  Off the record.

8         (Noon recess taken from 12:24 p.m. to 1:33

9         p.m.)

10  BY MR. FORESTIERE:

11    Q.   Mr. Escobar, before we broke for lunch, we were

12  talking about the orientation, meaning the one that you

13  had shortly before you were terminated.

14    A.   Yes.

15    Q.   Do you recall that event in mind?

16    A.   Yes.

17    Q.   Okay.  I had a few other follow-up questions.

18         Did that training occur during your normal

19  workday?

20    A.   Yes.

21    Q.   So you were paid to attend that training?

22    A.   Yes.

23    Q.   How long did it last?

24    A.   I'd say two hours.

25    Q.   Additionally, this morning I don't think I had

4ebe35e9-e05c-4c4b-bcd9-4ed04ae729b2

NETWORK DEPOSITION SERVICES
Transcript of Stephen Escobar

Page 115

1   Q.   And what was your understanding as to what
2   happened to them after you gave it to them?
3   A.   They would enter them into the computer.
4   Q.   Now, on some of the entries -- I'll refer you
5   to pages 3, 4, and 20.  It looks like maybe 6 as well.
6        3, 4, 5, 6 -- just for example there's
7   handwriting that says "No Lunch."
8   A.   Yes.
9   Q.   Do you see that?
10  A.   Yes.
11  Q.   Is that your handwriting?
12  A.   Yes.
13  Q.   And what does that indicate?
14  A.   They didn't let me take lunch.
15  Q.   So the days that you didn't get lunch, you
16  indicated that on your time cards; is that correct?
17  A.   Yes.
18  Q.   And on page 35, on the left side there, it
19  says -- it looks like it says, "No Transaction Report."
20  On page 35, sir.
21       Do you see that on the left-hand side?
22  A.   Yes.
23  Q.   Do you know what that refers to -- strike that.
24       First of all, is that your handwriting?
25  A.   No.

4ebe35e9-e05c-4c4b-bcd9-4ed04ae729b2

NETWORK DEPOSITION SERVICES
Transcript of Stephen Escobar

Page 116

1    Q.   Do you have any idea about what that refers to?

2    A.   No.

3         MR. LINGLE:  Just note my continuing objection

4    to all these questions based on the fact that it was not

5    produced prior to this.  It was sprung on the witness

6    during the deposition.

7         MR. FORESTIERE:  Well, I can't tell you whether

8    that -- but I'm surely entitled to ask him about

9    documents he's completed.

10        MR. LINGLE:  Well, you're supposed to produce

11   them ahead of time.  You haven't been doing it -- you

12   haven't produced them, so I'm continuing to object to

13   all these questions.  You know that you cannot tell me

14   that they were produced, so continuous objections.

15   BY MR. FORESTIERE:

16   Q.   On page 31, about halfway in the middle of the

17   page, it says -- it looks like it says, "Piece work,

18   $100 for Saturday."

19        Do you see that?

20   A.   Yes.

21   Q.   Is that your handwriting?

22   A.   Yes.

23   Q.   What does that mean?

24   A.   That would be that I picked up somebody.

25        MR. LINGLE:  Objection.

4ebe35e9-e05c-4c4b-bcd9-4ed04ae729b2

NETWORK DEPOSITION SERVICES
Transcript of Stephen Escobar

1   BY MR. FORESTIERE:

2      Q.   What do you mean, you picked up somebody?

3          MR. LINGLE:  Objection.

4          THE WITNESS:  Picked up a person from a house.

5   BY MR. FORESTIERE:

6      Q.   You did a removal?

7          MR. LINGLE:  Objection.

8          THE WITNESS:  Mmm-hmm.

9   BY MR. FORESTIERE:

10      Q.   Do you know how many times you did that while

11  employed at Lakewood?

12          MR. LINGLE:  Objection.

13          MR. FORESTIERE:  Counselor, if it's a

14  continuing objection, you've already made it.  If it's a

15  new objection, then you can --

16          MR. LINGLE:  The whole line of questioning is

17  improper, I think, so --

18          MR. FORESTIERE:  You've already --

19          MR. LINGLE:  I'm going to object to each

20  question to make sure that it's clear on the record.

21  Each question is objectionable.

22          MR. FORESTIERE:  Can you read back my question,

23  please.

24          (Record read by the reporter.)

25

4ebe35e9-e05c-4c4b-bcd9-4ed04ae729b2

NETWORK DEPOSITION SERVICES
Transcript of Stephen Escobar

Page 118

1    BY MR. FORESTIERE:
2        Q.   Do you have the question in mind, sir?
3        A.   I do.  I don't know the exact number.
4        Q.   Do you have an estimate?
5             MR. LINGLE:  Object to the form.
6             THE WITNESS:  That number would be really hard
7    to determine.
8    BY MR. FORESTIERE:
9        Q.   Well, was it more than once?
10       A.   Yes.
11       Q.   We know that, right?
12       A.   Yes.
13       Q.   If you had conducted a removal, would you
14   usually note it on your time card?
15            MR. LINGLE:  Objection.
16            THE WITNESS:  Not every time.
17   BY MR. FORESTIERE:
18       Q.   But was it your common practice to do so?
19            MR. LINGLE:  Object to the form.
20            THE WITNESS:  Depending if my manager wanted me
21   to or not.
22   BY MR. FORESTIERE:
23       Q.   And who would that be, Mr. Webb?
24       A.   Yes.
25       Q.   And when would he want you to do it, and when

4ebe35e9-e05c-4c4b-bcd9-4ed04ae729b2

NETWORK DEPOSITION SERVICES
Transcript of Stephen Escobar

1    would he not want you to do it?

2          MR. LINGLE:  Object to the form.

3    BY MR. FORESTIERE:

4      Q.   Did he give you instructions about when to do

5    it and when not to do it?

6      A.   Yes.

7          MR. LINGLE:  Object to the form.

8    BY MR. FORESTIERE:

9      Q.   What instructions would he give you?

10     A.   Whatever the district manager would say.

11     Q.   Who was the district manager?

12     A.   Bill.

13     Q.   Do you know his last name?

14     A.   I don't remember his last name.

15     Q.   So are you saying that every time you did a

16   removal, you had to check with Mr. Webb, and he in turn

17   had to check with Bill to determine whether or not you

18   could write an entry on your time card concerning a

19   removal you performed?

20         MR. LINGLE:  Object to the form.

21         THE WITNESS:  Yes.

22   BY MR. FORESTIERE:

23     Q.   And these instances where you had written on

24   your time card, you've gotten approval from both

25   Mr. Webb and Bill to write the amount of the removal

4ebe35e9-e05c-4c4b-bcd9-4ed04ae729b2

NETWORK DEPOSITION SERVICES
Transcript of Stephen Escobar

Page 120

1    that you performed on your time card?

2          MR. LINGLE:  Object to the form.

3          THE WITNESS:  Yes.

4    BY MR. FORESTIERE:

5      Q.   How much did you get paid for each removal?

6      A.   Like $50.

7      Q.   And that was in addition to your hourly rates?

8      A.   Yes.

9      Q.   So on page 31, it says, "Piece work, $100, for

10   Saturday," that would reflect two removals, correct?

11     A.   Yes.

12         MR. LINGLE:  Objection.

13   BY MR. FORESTIERE:

14     Q.   Page 32, it says, "$50, piece work."  It says

15   the name "Dickerson."  That would reflect payment for

16   one removal?

17         MR. LINGLE:  Objection.

18         THE WITNESS:  Yes.

19   BY MR. FORESTIERE:

20     Q.   On page 37, in the upper left-hand corner of

21   the time card under your name, under -- it looks like it

22   says "Extra Time."

23         Do you see that?

24     A.   No, I don't.

25     Q.   These entries here, sir.

4ebe35e9-e05c-4c4b-bcd9-4ed04ae729b2

NETWORK DEPOSITION SERVICES
Transcript of Stephen Escobar

Page 130

1     A.   No.

2     Q.   Are you claiming that you're entitled to three

3  hours of work for every Sunday during the time that you

4  were employed with Lakewood?

5     A.   Yes.

6     Q.   Do you have a list of the names of the persons

7  that you had discussions with concerning the funeral

8  services offered by Lakewood?

9         MR. LINGLE:  Object to the form.

10        THE WITNESS:  No.

11  BY MR. FORESTIERE:

12     Q.   Do you recall any other names?

13     A.   No.

14     Q.   Did Mr. Webb also perform these community

15  services at the church on Sundays?

16     A.   Yes.

17     Q.   Do you know if he's making any claim for that

18  type of community service?

19     A.   I do not know.

20     Q.   How long have you been a member of the

21  Latter-Day Saints?

22     A.   Since I was born.

23     Q.   Which church did you perform these services at?

24     A.   It would with the Fine Road Chapel in Modesto.

25     Q.   How long have you been attending that church?

4ebe35e9-e05c-4c4b-bcd9-4ed04ae729b2

NETWORK DEPOSITION SERVICES
Transcript of Stephen Escobar

Page 131

1      A.   Let's see -- approximately eight years.

2      Q.   How long prior to employment with Lakewood were

3   you a member of that church?

4      A.   The Fine Road Chapel?

5      Q.   Yes, sir.

6      A.   Probably about 1995.

7      Q.   Why'd you pick that organization to perform

8   your community service?

9      A.   Because it was easier to do.

10     Q.   Because you're already a member of it?

11     A.   Yeah.

12     Q.   Did Lakewood ever pay for any out-of-pocket

13   expenses you incurred in performing these services?

14     A.   No.

15     Q.   Did you incur any out-of-pocket expenses in

16   performing these services?

17     A.   Except hours worked, no.

18     Q.   What would you generally talk about in trying

19   to sell the funeral services that were available at

20   Lakewood?

21     A.   I would talk with them about pre-need.

22     Q.   What would you talk to them about that?

23     A.   I would say that I could get someone to talk to

24   them about pre-need.

25     Q.   Anything else?

4ebe35e9-e05c-4c4b-bcd9-4ed04ae729b2

NETWORK DEPOSITION SERVICES
Transcript of Stephen Escobar

1     A.   That it's better to do pre-need than -- what is

2  that -- at-need?

3     Q.   Yes.  To do advanced planning?

4     A.   Yes.

5     Q.   Did you talk to them about anything else?

6     A.   No.  That's basically it.

7     Q.   Did you talk to them anything about the price

8  lists or costs of doing --

9     A.   Yes.

10     Q.   -- pre-need versus at-need?

11     A.   Yes.  We had price lists.

12     Q.   Did you take that with you to these meetings

13  that you had with these parishioners?

14     A.   Yes.

15     Q.   Did you give them copies of the price lists?

16     A.   Yes.

17     Q.   Did anybody at Lakewood attempt to evaluate

18  your community service work with the Latter-Day Saints?

19     A.   No.

20     Q.   And that was an organization you chose,

21  correct?

22     A.   Yes.

23     Q.   No one instructed you to join that particular

24  group?

25     A.   Yes.

4ebe35e9-e05c-4c4b-bcd9-4ed04ae729b2

NETWORK DEPOSITION SERVICES
Transcript of Stephen Escobar

Page 134

1    community to make us have more business.

2        Q.    Anything else?

3        A.    No.  That would be it.

4        Q.    Was there any other community service

5    organization that you joined in order to perform your

6    community service work while at Lakewood?

7        A.    No.

8        Q.    Were you ever compensated for at least some of

9    the community service work that you performed?

10       A.    No.

11       Q.    Do you recall the hotline or help line to

12   complain about the community service work that you

13   performed?

14            MR. LINGLE:  Object to the form.

15            THE WITNESS:  No.  Because I didn't know about

16   a hotline and a help line.

17   BY MR. FORESTIERE:

18       Q.    Weren't you made aware of that a couple of

19   months before you left as part of the orientation?

20       A.    Yeah.

21       Q.    You were?

22       A.    No, no.  That training.  I had nothing to do

23   with that other -- they never told us about a help line

24   or a hotline.  I had never heard of that.

25

NETWORK DEPOSITION SERVICES
Transcript of Stephen Escobar

Page 135

1    BY MR. FORESTIERE:
2        Q.   Today's the first day you're hearing about it?
3        A.   Yes.
4        Q.   Did you ever attempt to report any time that
5    you spent performing this community service work?
6        A.   No.
7        Q.   Did you ever sign an affidavit or declaration
8    concerning this lawsuit?
9        A.   I don't know.
10       Q.   Did you ever sign a document under penalty of
11   perjury stating any facts concerning this lawsuit?
12       A.   I don't remember.
13       Q.   Are you aware of any written policy by Lakewood
14   concerning the on-call work you performed?
15       A.   No.
16       Q.   Are you aware of any written policy concerning
17   overtime that you worked?
18       A.   No.
19       Q.   Are you aware of any written policy by the
20   company for not compensating you for work that you
21   performed while you were on call?
22       A.   No.
23       Q.   Are you aware of any policy for not
24   compensating you for work you performed concerning your
25   community service?

4ebe35e9-e05c-4c4b-bcd9-4ed04ae729b2

NETWORK DEPOSITION SERVICES
Transcript of Stephen Escobar

Page 136

1          MR. LINGLE:  Object to the form.
2          THE WITNESS:  No.
3    BY MR. FORESTIERE:
4          Q.   Did you ever attend any type of training for
5    which you were not compensated for?
6          A.   No.
7          Q.   When generally did you conduct your pre-need
8    appointments with people that you sold funeral services
9    with?
10         A.   I didn't -- are you talking about community
11   service?
12         Q.   No.  I'm talking about your -- strike that.
13   Let me step --
14         A.   Yeah.  You know what's going on.
15         Q.   When you worked at the Lakewood facility, did
16   you have any appointments with individuals concerning
17   the prepaid services you were going to sell them?
18         A.   No.
19         Q.   Were you aware of any written policy by
20   Lakewood that stated you were to work during your meal
21   periods?
22         A.   Can you repeat the question.
23         Q.   Sure.  In fact, let me clarify a little more.
24              Are you aware of any written policy by
25   Alderwoods that you were required to work during your

Johnstown            Toll-Free              Pittsburgh
814-266-2042         866-565-1929           412-281-7908

4ebe35e9-e05c-4c4b-bcd9-4ed04ae729b2

NETWORK DEPOSITION SERVICES
Transcript of Stephen Escobar

Page 140

1     Q.   That's correct.  I don't know if that's

2  overtime or not.

3     A.   Telephone for the --

4     Q.   That's the on-call stuff?

5     A.   On-call.

6     Q.   Right.

7     A.   That's already been covered.

8     Q.   I think we've already covered that.

9     A.   Okay.  And then --

10     MR. LINGLE:  Can we go off for a second?

11     MR. FORESTIERE:  Yes.

12     (Discussion off the record.)

13  BY MR. FORESTIERE:

14     Q.   Okay.  Mr. Escobar, I want you to list for me,

15  please, the type of work you performed that you're

16  claiming is overtime that you were not paid.

17     A.   Okay.

18     Q.   All right.

19     A.   Piece work.

20     Q.   When you say -- okay.  Go ahead and give me the

21  list, and then we'll go back to it.

22     A.   Piece work, meals, working through meals, the

23  phone on-call, and hours that I was not told to put down

24  on my time card.

25     Q.   Anything else?

4ebe35e9-e05c-4c4b-bcd9-4ed04ae729b2

NETWORK DEPOSITION SERVICES
Transcript of Stephen Escobar

Page 142

1    refer to as on-call.

2        A.    Yes.

3        Q.    All right.  And what was your -- and you might

4    have said this earlier, but please refresh my

5    recollection -- the amount of time you spent doing

6    on-call that you were not compensated for?

7        A.    Well, there was three of us at the funeral

8    home.  So you divide that by how many weeks.  I'd say

9    per week -- so it would at least be twice or three times

10   a week, depending on if you were on a weekend.

11       Q.    So you're performing on-call duties two to

12   three times a week, correct?

13       A.    At least.

14       Q.    And how many hours are you claiming for unpaid

15   on-call services you rendered for each of those times?

16       A.    It would be from 5 o'clock when I quit until

17   8 o'clock the next morning when I would arrive.

18       Q.    So from 5:00 to 8:00 a.m. -- so you're claiming

19   that entire period?

20       A.    Yes.

21       Q.    Did you perform retrievals for that entire

22   period of time?

23       A.    Yes.  Retrievals or phone calls.  Does that

24   make --

25       Q.    Did you have a -- you had a telephone, correct?

4ebe35e9-e05c-4c4b-bcd9-4ed04ae729b2

NETWORK DEPOSITION SERVICES
Transcript of Stephen Escobar

Page 145

1     Q.   Did you ever attempt to submit any time for
2   working through your lunch periods?
3     A.   I've done a few, but not many -- with the
4   records that you showed me.
5     Q.   How much time are you claiming for unpaid --
6   strike that.
7          How much time are you claiming for overtime for
8   working through your meal periods?
9     A.   At least two hours a week.
10    Q.   And for how many weeks are you claiming?
11    A.   Until I no longer was there.  October.
12    Q.   So two hours a week for every week that you
13  worked at Lakewood?
14    A.   Yes.
15    Q.   And then I think the last category you've
16  indicated for unpaid overtime was hours not -- not told
17  to take down or hours not recorded?  Is that --
18    A.   Yes.
19    Q.   Okay.  Well, why don't you put it in your words
20  so I can use that appropriately.  What is the overtime
21  for the hours not -- hours not reported, is that a good
22  way to describe it?
23    A.   That's good.
24    Q.   Okay.  As to hours not reported, tell me how
25  that occurred.

4ebe35e9-e05c-4c4b-bcd9-4ed04ae729b2

NETWORK DEPOSITION SERVICES
Transcript of Stephen Escobar

Page 152

1    strike that.

2         Are you aware of whether the time and a half

3    rate as reflected in the earnings statements is

4    incorrectly calculated?

5         A.   No.  It's not incorrectly calculated.

6         Q.   Are you aware of any records of your employment

7    at Lakewood that was not maintained or kept?

8              MR. LINGLE:  Object to the form.

9              THE WITNESS:  Any form that wasn't maintained

10   or kept?

11   BY MR. FORESTIERE:

12        Q.   Yeah.  Let me do it this way.  Let me go ahead

13   and get a copy of the complaint in this action.  That

14   might help us focus a bit.

15             MR. FORESTIERE:  No. 12.

16             (Whereupon, Exhibit 12 was marked for

17             identification.)

18   BY MR. FORESTIERE:

19        Q.   Let me just ask you just a couple of other

20   questions that have nothing to do with this.

21        A.   Okay.

22        Q.   In regards to Mr. Webb, are you aware of

23   whether he had any responsibilities in supervising the

24   employees at any facilities other than Lakewood?

25        A.   No.

Johnstown              Toll-Free              Pittsburgh
814-266-2042           866-565-1929           412-281-7908

4ebe35e9-e05c-4c4b-bcd9-4ed04ae729b2

NETWORK DEPOSITION SERVICES
Transcript of Stephen Escobar

Page 174

1    STATE OF CALIFORNIA        ) ss:

2    COUNTY OF LOS ANGELES      )

3

4              I, Amanda J. Dunn, CSR No. 13336, do hereby

5    certify:

6              That the foregoing deposition testimony was

7    taken before me at the time and place therein set forth

8    and at which time the witness was administered the oath;

9              That the testimony of the witness and all

10   objections made by counsel at the time of the

11   examination were recorded stenographically by me, and

12   were thereafter transcribed under my direction and

13   supervision, and that the foregoing pages contain a

14   full, true and accurate record of all proceedings and

15   testimony to the best of my skill and ability.

16             I further certify that I am neither counsel

17   for any party to said action, nor am I related to any

18   party to said action, nor am I in any way interested in

19   the outcome thereof.

20             IN WITNESS WHEREOF, I have subscribed my name

21   this 20th day of March, 2009.

22

23

24             _____

25             AMANDA J. DUNN, CSR No. 13336

Johnstown                Toll-Free                Pittsburgh
814-266-2042            866-565-1929            412-281-7908

4ebe35e9-e05c-4c4b-bcd9-4ed04ae729b2