**TAB 12**

NETWORK DEPOSITION SERVICES
Transcript of Donna Gonzales

Page 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA

No. 06-1641

DEBORAH PRISE and HEATHER RADY
on behalf of themselves and all employees similarly
situated,

     Plaintiffs,

vs.

ALDERWOODS GROUP, INC. And SERVICE
CORPORATION INTERNATIONAL,

     Defendants.

DEPOSITION OF DONNA GONZALES
March 13, 2009
9:50 a.m.

At the Homewood Suites by Hilton
1520 Sunport Place, SE
Albuquerque, New Mexico  87106

PURSUANT TO THE FEDERAL RULES OF CIVIL PROCEDURE
this deposition was:

TAKEN BY: MICHELLE AMY MORGAN
ATTORNEY FOR THE DEFENDANTS

REPORTED BY: KAREN RODRIGUEZ, NM CCR #55
KMR Court Reporters, etc., LLC
Post Office Box 16346
Albuquerque, New Mexico  87191-6346

Johnstown
814-266-2042

Toll-Free
866-565-1929

Pittsburgh
412-281-7908

9b5844b4-1613-46bc-b430-fc276bf498ed

NETWORK DEPOSITION SERVICES
Transcript of Donna Gonzales

1    Q.  What type of overtime work were you performing in

2    those four to five hours?

3    A.  Funeral director.

4    Q.  Were you doing any on-call work at that time?

5    A.  No.

6    Q.  Were the funeral director activities just a type

7    of activities you would perform after regular hours?

8    A.  Yes.

9    Q.  Are you claiming that you were not compensated

10   for overtime hours that you worked during the time that

11   you were doing the cremains and --

12   A.  No, I'm not claiming that.

13   Q.  So you were compensated for the overtime work

14   that you performed from the time you took on cremains

15   responsibilities until your termination?

16   A.  Yes.

17        MS. WEYANDT:  Object to form.

18   Q.  (By Ms. Morgan)  So is the timeframe for which

19   you're claiming that you were not compensated for

20   overtime work between December of 2002 and June and July

21   of 2003?

22   A.  Correct.

23   Q.  What overtime work did you perform that you're

24   claiming that you were not compensated for?

25   A.  I was on call from, let's say, whenever my

9b5844b4-1613-46bc-b430-fc276bf498ed

NETWORK DEPOSITION SERVICES
Transcript of Donna Gonzales

Page 109

1   funeral directing was over -- let's say it was over at

2   9:00.  Whatever time I finished doing the funeral

3   directing I was on call for removals from that time

4   until 8:00 in the morning, when I would go back to work

5   at 8:00 in the morning.

6       Q.  Any other type of overtime work you would perform

7   that you're claiming you were not compensated for?

8       A.  Well, I believe I wasn't compensated for my

9   overtime that I was getting because they never gave me

10  my raise.  So I was wasn't getting paid the overtime

11  that I was supposed to be getting, because they never

12  gave me the raise that they were supposed to give me.

13      Q.  Are you claiming that the overtime pay rate was

14  wrong because it didn't incorporate your raise?

15      A.  What I'm claiming is that they didn't give me my

16  raise that they promised they were supposed to give me.

17  They never gave me the raise.  They never gave me the

18  bonus.  I worked for $8 an hour for several months

19  without getting my compensation of what I was supposed

20  to get.

21      Q.  So are you saying that whatever overtime hours of

22  work that you performed should have been paid at the

23  higher rate?

24      A.  Correct.

25      Q.  At some point you were paid $8 an hour instead of

Johnstown            Toll-Free            Pittsburgh
814-266-2042        866-565-1929         412-281-7908

9b5844b4-1613-46bc-b430-fc276bf498ed

NETWORK DEPOSITION SERVICES
Transcript of Donna Gonzales

Page 110

1    $7.50 an hour; right?

2              MS. WEYANDT:  Object to form.

3    A.  The funeral arranger job was not supposed to be

4    at $8 an hour.  They were paying me $8 an hour for

5    receptionist work.

6    Q.  (By Ms. Morgan)  I'm sorry, Ms. Gonzales.  So

7    what amount of raise is it that you believe you should

8    have been getting?

9    A.  I don't know.  I don't know what the other

10   funeral arrangers were making.  They were going to be

11   getting back to me on that and letting me know what my

12   raise was going to be and what my bonus was going to be.

13   And that was never done.

14   Q.  What other type of overtime work are you claiming

15   you performed that you were not compensated for?

16   A.  All the time that I was on call for removals I

17   was not compensated for being on call.

18   Q.  Anything else?

19   A.  No.

20   Q.  You never did receive any bonuses during the time

21   you were at Alderwoods?

22   A.  No, ma'am, I sure didn't.

23   Q.  Did you ever receive any commissions?

24   A.  No.

25   Q.  Any awards?

9b5844b4-1613-46bc-b430-fc276bf498ed

NETWORK DEPOSITION SERVICES
Transcript of Donna Gonzales

Page 111

1      A.  No.

2      Q.  So is the only form of compensation that you

3  received while you were at Alderwoods your hourly rate

4  and overtime pay?

5      A.  That's it.

6      Q.  Would you turn to Exhibit 12.

7      A.  (Witness complies.)

8      Q.  If you could, turn to page 7.  And if you could,

9  look at the sixth paragraph under your name.

10     A.  (Witness complies.)

11     Q.  While you were on call, you performed removals;

12  is that right?

13     A.  Yes, ma'am.

14     Q.  I believe you testified that you were paid at a

15  rate of 25 to $30 an hour for each removal; is that

16  correct?

17     A.  I believe it was 25 or $35, not an hour, per

18  removal.

19     Q.  Oh, it wasn't 25 to $35 per removal?

20     A.  Per removal.

21     Q.  Oh, it was?

22     A.  Yeah, per removal.

23     Q.  In your supplemental interrogatory response, you

24  indicated that your removals generally took at least two

25  to three hours of time on average?

9b5844b4-1613-46bc-b430-fc276bf498ed

NETWORK DEPOSITION SERVICES
Transcript of Donna Gonzales

Page 114

1   be two people on call.  One person was number one, and

2   the other was number two.  What it means is that you

3   have to be available when you get a call on a death

4   removal.

5        If there was a home death, you'd have to have two

6   people go to the home death.  So you'd be first on call,

7   and then they'd call the second person on call on a home

8   death.  One person cannot go to a removal at a home

9   death.  If it was at a nursing home or if it was at the

10  hospital, then it would be just the number one person on

11  call.  You'd only go by yourself on call.

12       Q.  During the timeframe when you were on call for

13  removals, so December 2002 to June or July of 2003, how

14  often were you on call for removals?

15       A.  Every night.  Maybe once out of the week I might

16  not be, if they could find somebody else to do it.

17       Q.  How was it communicated to you that you were

18  going to be on call?

19       A.  They would let me know before the end of the

20  night, before 5:00, before the supervisor would leave.

21       Q.  Who would assign you to on call?

22       A.  There was the person in the embalming room that

23  actually did the assigning for the on call.

24       Q.  Who was that?

25       A.  I don't recall his name.  I'll have to think

NETWORK DEPOSITION SERVICES
Transcript of Donna Gonzales

Page 115

1    about that one.

2        Q.  Did that same individual make the on-call

3    assignments throughout the whole period of time you were

4    doing removals?

5        A.  There would be more than one person.  But I

6    believe there was -- there was, like, a guy.  I remember

7    his name was Max.  But he worked at Merkley-Mitchell,

8    and he -- because we picked up for all the funeral

9    homes.  So he sometimes would make the schedule, that I

10   can recall, or -- I can't remember his name, the guy

11   that worked at Humphrey Mortuary in the embalming room.

12   Brad.

13           MS. WEYANDT:  I am sorry, I didn't hear you.

14           THE WITNESS:  Brad, maybe.  I don't know for

15   sure his name.  If I would see it, I would tell you.  If

16   I could see it on the paper of a list of employees, I

17   would tell you his name.

18       Q.  (By Ms. Morgan)  And would Brad or Max just

19   verbally tell you you're going to be on call?

20       A.  At first, yes.  And then they finally started

21   making a schedule, which would be on paper.

22       Q.  Did they make the schedule on a weekly basis?

23       A.  Yes.

24       Q.  You were assigned every single night to removals?

25       A.  Yes.

9b5844b4-1613-46bc-b430-fc276bf498ed

NETWORK DEPOSITION SERVICES
Transcript of Donna Gonzales

1   would sit at the mortuary and answer the phone until
2   they would call me.  Then I would transfer it over to
3   the answering service.  So if I was at the mortuary, I
4   would answer the phones.  Once I would leave the
5   mortuary, then I could transfer them to the answering
6   service.
7       Q.  So if you were on call and at the mortuary,
8   that's when you would answer the phones?
9       A.  Yes.  And I would vacuum, and I would do the
10  dishes and whatever needed to be done.
11      Q.  But this was all while you were on call?
12      A.  Yes.
13      Q.  When you were on call, did you typically wait at
14  home to be called, or did you typically stay at the
15  mortuary?
16      A.  I typically waited at home.  Occasionally I
17  waited at the mortuary because there was already a call
18  that came in, but it wasn't ready.  So they were going
19  to call you back to let you know when the body was
20  available.  So with, like, a home death and the family
21  wanted one hour with the body, then we'd wait one hour.
22  Instead of going home and then coming back and, you
23  know, getting prepared, I would just wait there until
24  it's time.  When the families were ready for us to go
25  pick up the body, I would leave the mortuary and go pick

9b5844b4-1613-46bc-b430-fc276bf498ed

NETWORK DEPOSITION SERVICES
Transcript of Donna Gonzales

1    is the time that you just described when you would

2    answer the phones and do other tasks at the mortuary

3    included in the time that you spent performing removals,

4    or is that something different?

5        A.  No.  That is something different.

6        Q.  So for the time that you spent answering phones

7    at the mortuary -- about how much time would you spend

8    doing that in a typical week?

9        A.  During my removals, you're asking?

10       Q.  Yes.

11       A.  It varied.

12       Q.  Is there any range that you could give?

13       A.  I can't give that range.

14       Q.  Other than answering the phone and performing

15   cleaning tasks and other things that you did at the

16   mortuary and handling the on-call removal tasks, was

17   there any other type of work that you performed while

18   you were on call?

19       A.  No.

20       Q.  Did you report to Alderwoods the time that you

21   spent on call?

22               MS. WEYANDT:  Object to form.

23               THE WITNESS:  Can you repeat that question?

24   Did I report?

25       Q.  (By Ms. Morgan)  Let me go back for a minute.

9b5844b4-1613-46bc-b430-fc276bf498ed

NETWORK DEPOSITION SERVICES
Transcript of Donna Gonzales

Page 128

1   that.

2       Q.  So the instances when you moved a body from

3   one Alderwoods mortuary to another, that activity took

4   place during your regular work hours?

5       A.  Yes.

6       Q.  So were you compensated according to your regular

7   hourly rate?

8       A.  Yes.

9       Q.  So you're saying you didn't get anything extra,

10  anything additional for performing that work?

11      A.  Correct.

12      Q.  Do you think you should have?

13      A.  Yes.

14      Q.  Why is that?

15      A.  Because only removal persons would be able to do

16  that job.  A receptionist would not be able to do that

17  job, or anybody else that didn't do removals wouldn't be

18  able to do that job.

19      Q.  But this activity of moving one body from one

20  mortuary to another, that was not overtime work;

21  correct?

22      A.  No.

23      Q.  Were there any instances where you were

24  performing a removal in the sense of a body not being

25  moved between Alderwoods locations, but rather picked up

9b5844b4-1613-46bc-b430-fc276bf498ed

NETWORK DEPOSITION SERVICES
Transcript of Donna Gonzales

1   from some outside location and brought to the mortuary

2   where you believe you ultimately were not paid for that?

3       A.   Yes.

4       Q.   What were those instances?

5       A.   For instance, during your regular work hours, if

6   there was a removal to be done during your regular work

7   hours -- if my job was doing cremains or doing funeral

8   directing or doing reception, if there was a removal to

9   be done during the day, they would send me out to do the

10  removal, and I wouldn't get paid to do the removal.  I

11  would just get paid my regular 7.50 an hour or $8 an

12  hour.  They didn't pay you to do a removal as a removal

13  person during your regular work hours.

14      Q.   And the removals you performed during your

15  regular work hours, those were not overtime work?

16      A.   No.

17      Q.   Were there any other instances where you believe

18  you ultimately were not paid the 25 to $35 for a removal

19  that you performed?

20      A.   Any other instances?

21      Q.   Yeah.

22      A.   No.

23      Q.   During the time that you were on call, were there

24  any restrictions that Alderwoods placed on you as to

25  what you could do?

9b5844b4-1613-46bc-b430-fc276bf498ed

NETWORK DEPOSITION SERVICES
Transcript of Donna Gonzales

Page 140

1    shelf, something like that.
2         Then we would kind of put -- we would tag the
3    people anyway.  But just so the embalmer would know how
4    many people were in the freezer and which shelf they
5    were in and things like that.  So that form went on the
6    door.  There was, like, a clip on the door where the
7    embalmers were at.  That's the form we would put on the
8    embalmer's door, now that I remember.
9         Q.  And that form was for the embalmer's use?
10        A.  Yes.
11        Q.  Was that form used for any other purpose that you
12   know of?
13        A.  I don't know.
14        Q.  Are you familiar with any logs that you would use
15   to record after-hour calls?
16        A.  No.  I think those were the only two forms that
17   were used.  One went to the embalmer, and one was the
18   log on the desk in the garage.
19        Q.  For removals that you performed after hours, were
20   you compensated for the time that you spent performing
21   the removals?
22        A.  No.
23        Q.  Never?
24        A.  There was just one fee that they paid you.  That
25   was $25 or 35.  That's all they paid you.  It didn't

9b5844b4-1613-46bc-b430-fc276bf498ed

NETWORK DEPOSITION SERVICES
Transcript of Donna Gonzales

Page 141

1   matter if it took two hours or five hours to do the
2   removal.  You only got paid $35.  It was just per
3   removal.  It didn't matter the hours you spent doing it.
4       Q.  Were you compensated for the time that you spent
5   engaged in the preparatory work of getting yourself
6   ready to go do a removal?
7       A.  No.
8       Q.  Did you ever report that time to Alderwoods?
9       A.  I questioned it, yes.
10      Q.  You questioned it.  But did you ever report it on
11  a timecard or in any other way to Alderwoods?
12      A.  No.
13      Q.  You say you questioned it.  What do you mean by
14  that?
15      A.  Well, I questioned it as far as getting paid for
16  the hours that you spent going to the removals, picking
17  up the body, by the time you got back to the mortuary
18  and if you had to go to a different mortuary, by the
19  time you got back to Humphrey Mortuary.  But their
20  answer was it was only one flat fee of -- like I said, I
21  don't remember if it was $25 or $35.  That's what they
22  paid, and that's just the way it was.
23      Q.  When you questioned this, who did you present
24  your question to?
25      A.  I believe it was Derreck.

9b5844b4-1613-46bc-b430-fc276bf498ed

NETWORK DEPOSITION SERVICES
Transcript of Donna Gonzales

1    information sheet.  I think it might be Exhibit 13.

2        A.  13?  Okay.

3        Q.  No, that is not it.

4        A.  That's not it?

5        Q.  It might be 14.

6        A.  Yeah, it's 14.

7        Q.  Thank you.  On your information sheet, the box is

8    checked at paragraph B stating that you opt into this

9    case because you believe you were not compensated for

10   all the hours you spent working as an arranger,

11   assistant funeral director and/or community relations

12   director from December 8, 2003, to the present because

13   those hours were not preapproved.  Do you see that?

14       A.  Yes, I do.

15       Q.  Is your response regarding the reason why you

16   opted into the case still accurate?

17       A.  Yes.

18       Q.  What process would you go through to request

19   approval for overtime?

20       A.  There was no process in my case because I was

21   told by Bill Mitchell and Derreck Pate that because I

22   had not got my raise yet and they were waiting for it to

23   be on paper, that I was able to work as much overtime as

24   I wanted to, because that way it would help me out

25   before I got my actual raise on paper.  So they approved

9b5844b4-1613-46bc-b430-fc276bf498ed

NETWORK DEPOSITION SERVICES
Transcript of Donna Gonzales

Page 163

1  it without having to be preapproved by the new director

2  or the new manager.

3      So when he came in, he, like, cut my hours, cut

4  my job actually, and so I was not paid for the hours

5  that I was supposed to be working.  He had cut all my

6  hours and cut my pay, actually is what he did.

7      Q.  I believe you testified that there was not a

8  preapproval process in your case?

9      A.  Right.

10     Q.  Was there any point during your employment with

11  Alderwoods when there was a process that you needed to

12  follow to get approval for overtime?

13     A.  No.

14     Q.  So if you were going to work overtime, would you

15  just work it?  Did you have to get approval from anyone

16  to work it?

17     A.  Well, yes and no.

18     Q.  Okay.  How did it work if you were going to be

19  performing overtime?  During the time you worked at

20  Alderwoods, if you were going to be performing overtime,

21  what process, if any, would you need to follow?

22     A.  Volunteer.

23     Q.  You started doing overtime work when you became a

24  full-time receptionist; is that right?

25     A.  Yes.

9b5844b4-1613-46bc-b430-fc276bf498ed

NETWORK DEPOSITION SERVICES
Transcript of Donna Gonzales

1    Q.  How would you volunteer to work overtime?

2    A.  Well, they would ask if anybody wanted to work.

3  They would have, like, ahead of time who wanted to do

4  funeral directing this crew.  So they would ask, and

5  then whoever would volunteer to work, they would work.

6  If nobody volunteered, then they would have to go down

7  the chain of command of who had been funeral directing

8  the longest and go down and see if they would -- who

9  wanted to work.

10   Q.  Who would make the request for volunteers?

11   A.  It would just be on the board.  You would sign

12  up.  It would be by the board, by the time clock.

13   Q.  There was a volunteer form or sheet?

14   A.  Yeah.  There was a sheet of funeral directors

15  that would want to work this week, what days they were

16  available to work.

17   Q.  So if you wanted to work overtime, you would just

18  go put your name down?

19   A.  Correct.

20   Q.  If you choose to volunteer to work overtime, you

21  would put your name down, and then you would work

22  overtime?

23   A.  Yes.  They would just check yes, you can work

24  tonight or tomorrow or whenever, whenever the services

25  were available or whenever there was something going to

9b5844b4-1613-46bc-b430-fc276bf498ed

NETWORK DEPOSITION SERVICES
Transcript of Donna Gonzales

1    be happening that day.  And then they would have one or
2    two people, if there were two services at one time or
3    three services or whatever was going on.  Sometimes they
4    would have three or four people at one time.
5              There were two chapels, and then there was two
6    reception rooms.  And then there was, like, four viewing
7    rooms.  So they would have viewings in all these rooms.
8    So they would have the receptionists, and they would
9    have the funeral directors in the chapels, and they'd
10   have other funeral -- or me or whoever working the
11   viewings.
12       Q.  Who was responsible for administering that
13   process?
14       A.  I believe Derreck.
15       Q.  Were there times when you volunteered to work
16   overtime, but you weren't chosen?
17       A.  Yes.
18       Q.  About how often would that happen?
19       A.  I don't know.  Not very often.
20       Q.  If you volunteered to work overtime but were not
21   chosen to work overtime, would you then not work
22   overtime?
23       A.  Well, no, I wouldn't if I wasn't able to work
24   overtime.  I would still be doing removals, though.  So
25   I would still be getting paid to do the removals, but

NETWORK DEPOSITION SERVICES
Transcript of Donna Gonzales

Page 167

1    everything was covered.

2        Q.  When Mr. Mitchell and Mr. Pate said that you

3    could work as much overtime as possible, did that cause

4    any change in terms of the amount of overtime that you

5    worked?

6        A.  No.

7             (A recess was taken from 4:40 to 4:55.)

8        Q.  (By Ms. Morgan)  Ms. Gonzales, is there any

9    overtime work that you're claiming you were not

10   compensated for because it was not preapproved?

11       A.  Yes.

12       Q.  What was that overtime work that you believe you

13   weren't compensated for because it wasn't preapproved?

14       A.  If you look at my timecards, you'll see where

15   they changed my hours.  If you go back and pull my

16   timecards from the Alderwoods Group, you'll see there

17   were hours they did not pay me on.  I can't give you

18   exact dates or times.

19       Q.  Was that work that you performed that you believe

20   you weren't compensated for because it wasn't

21   preapproved?

22       A.  Yes.

23       Q.  Who do you believe did not preapprove that time?

24       A.  David.

25            MS. WEYANDT:  When you said, "that time," I

NETWORK DEPOSITION SERVICES
Transcript of Donna Gonzales

Page 168

1    missed part of the question.  What time were you talking

2    about?

3                 MS. MORGAN:  I believe Ms. Gonzales was

4    talking about times that she believed she was not

5    compensated for because it was not preapproved.

6                 MS. WEYANDT:  Okay, thanks.

7       Q.  (By Ms. Morgan)  On those occasions, would you

8    request a preapproval from Mr. Greiner?

9       A.  No.

10      Q.  Would you not request preapproval based on the

11   information you had been given by Mr. Mitchell and

12   Mr. Pate that you could work as much overtime as

13   possible?

14      A.  Correct.

15      Q.  What type of work were you performing?

16      A.  Funeral directing.

17      Q.  So you would go ahead and perform the funeral

18   directing work, and then are you saying that Mr. Greiner

19   would mark off your time?

20      A.  Yes.

21      Q.  Would he mark off your time off your timecards?

22      A.  Yes.  He would tell the payroll clerk not to pay

23   me because he didn't sign the -- if he didn't sign the

24   timecard, not to pay me.

25      Q.  He would not sign your timecards?

Johnstown
814-266-2042

Toll-Free
866-565-1929

Pittsburgh
412-281-7908

9b5844b4-1613-46bc-b430-fc276bf498ed

NETWORK DEPOSITION SERVICES
Transcript of Donna Gonzales

Page 169

1     A.  Right.

2     Q.  Would he refuse to pay you for any overtime at

3  all that you worked?

4     A.  On occasions, not always.

5     Q.  On what occasions would he not pay you for

6  overtime work that you worked?

7     A.  I don't know.  You would have to see my timecard

8  to figure that out.

9     Q.  What would the timecards show?

10    A.  It was show that I wasn't paid.

11    Q.  Would it show that he literally marked through

12  it, marked through your hours and reduced them?

13    A.  Yes.

14    Q.  About how many hours are you claiming that you

15  were not compensated for performing overtime work

16  because David Greiner would mark off your hours?

17    A.  I don't know.

18    Q.  Are your claims regarding overtime work that you

19  performed for which you were not compensated for because

20  they were not preapproved only confined to David

21  Greiner's conduct?

22    A.  Yes.

23    Q.  Did you complain about what Mr. Greiner was doing

24  to anyone?

25    A.  Yes.

9b5844b4-1613-46bc-b430-fc276bf498ed

NETWORK DEPOSITION SERVICES
Transcript of Donna Gonzales

Page 170

1      Q.  To whom?

2      A.  To Bill Mitchell.

3      Q.  Is that included in the letter that you

4   previously testified about?

5      A.  No.

6      Q.  Did you complain to him verbally?

7      A.  Verbally, on the phone.

8      Q.  What was his response, if any?

9      A.  He would look into it.

10     Q.  Are you aware that Mr. Mitchell ever looked into

11  it?

12     A.  Not that I know of.

13     Q.  Did you complain to anybody else about

14  Mr. Greiner's conduct?

15     A.  No.

16     Q.  Are you also claiming in this lawsuit that you

17  were not paid for time that you spent working through

18  meal breaks?

19     A.  Yes, ma'am.

20     Q.  Was this confined to the time that David Greiner

21  was manager?

22     A.  No.

23     Q.  During what period of time do you believe you

24  were not paid for time you spent working through meal

25  breaks?

NETWORK DEPOSITION SERVICES
Transcript of Donna Gonzales

Page 171

1     A.   I'd say from January on.

2     Q.   Did you ever seek preapproval to work through a

3   meal break?

4     A.   The supervisor was right in front of me.

5     Q.   So is that yes, you sought preapproval, or no,

6   you didn't?

7     A.   Yes.

8     Q.   From what supervisor would you seek preapproval?

9     A.   Derreck Pate.

10    Q.   Would --

11    A.   Can I revise that answer?

12    Q.   Sure.

13    A.   It's not that you needed preapproval.  It's just

14   that somebody had to help the clients, the customers.

15   So usually they would call me to go help the customers.

16   So it wasn't that there had to be preapproval.  If you

17   were upstairs and they needed anything -- if they needed

18   their cremains, if they needed some kind of assistance,

19   I would be the one that would be called.  So I would go

20   downstairs and help the customers.  There wasn't

21   preapproval.  We don't know when people are going to

22   walk in when we're having lunch.  It was just whatever

23   was going to happen happened while you were eating lunch

24   or something like that.  So there was no preapproval.

25    Q.   So you were not required to get preapproval to

9b5844b4-1613-46bc-b430-fc276bf498ed

NETWORK DEPOSITION SERVICES
Transcript of Donna Gonzales

Page 172

1    work through a meal break?

2        A.   No.

3        Q.   Was working through a meal break something that

4    an Alderwoods' manager would ask you to do?

5        A.   No.  It was normal.  That was an everyday thing.

6        Q.   Would it be at the instruction of an Alderwoods'

7    manager?

8        A.   Well, we weren't going to leave the customer --

9    the bell would ring at the door.  If you were upstairs,

10   somebody would have to run downstairs and help the

11   customer.  So it was -- how do I want to put it?  It

12   wasn't, like, a preapproval.  It wasn't a planned thing.

13   It wasn't, like, something that we would take turns

14   doing or anything like that.  It was just whoever walked

15   in the door, they had a bell.  So if you were upstairs,

16   somebody would have to run downstairs and help the

17   customer.

18       Q.   How would you report time that you worked through

19   a meal break?

20       A.   I didn't.

21       Q.   You never reported --

22       A.   If I didn't take a lunch at all at all, I would

23   put, "no lunch," on my timecard.  Even if I had punched

24   out and then I didn't end up taking a lunch, then I

25   would put, "no lunch."

9b5844b4-1613-46bc-b430-fc276bf498ed

NETWORK DEPOSITION SERVICES
Transcript of Donna Gonzales

1    Q.  So you would handwrite in, "no lunch"?

2    A.  Handwrite it in, yes, correct.

3    Q.  That was on occasions when you took no lunch

4    whatsoever?

5    A.  Correct.

6    Q.  On the other occasions, are you saying your lunch

7    would get interrupted, your meal break would get

8    interrupted?

9    A.  Yes.

10   Q.  Then you would resume your meal break at a later

11   point in time?

12   A.  If you could.

13   Q.  On the occasions that your lunch was interrupted,

14   would you report any time that you spent working during

15   that break on your timecards?

16   A.  No.

17   Q.  Why not?

18   A.  I don't know.

19   Q.  I'm sorry?

20   A.  I don't know.  That was just a normal thing, an

21   everyday thing that just -- you were there to help the

22   customer.  That's what I was there for, to help the

23   customer, and lunch breaks didn't matter.

24   Q.  Did any Alderwoods' manager ever tell you not to

25   report time that you spent working during a meal break?

9b5844b4-1613-46bc-b430-fc276bf498ed

NETWORK DEPOSITION SERVICES
Transcript of Donna Gonzales

1    time from your timecards?

2        A.  No.

3        Q.  Are you aware of any other employees who worked

4    through or were interrupted during a meal break but were

5    not compensated for the time they were working?

6        A.  No.

7        Q.  Are you aware of any company-wide policy that

8    employees could not report all the hours worked if they

9    worked during or through a break?

10       A.  Repeat your question.

11       Q.  Are you aware of any Alderwoods policy that

12   employees could not report all hours they worked if they

13   worked during or through a meal break?

14       A.  No, I'm not aware of it.

15       Q.  Are you aware of any Alderwoods' policy whereby

16   employees would not be compensated for the time they

17   spent working if they worked through or were interrupted

18   from a meal break?

19       A.  No.

20       Q.  How many hours of uncompensated time are you

21   claiming with respect to time that you worked through

22   meal breaks or got interrupted during meal breaks?

23       A.  I can't calculate it at this time.

24       Q.  In your interrogatory responses, in your

25   supplemental interrogatory responses, you stated that

9b5844b4-1613-46bc-b430-fc276bf498ed

NETWORK DEPOSITION SERVICES
Transcript of Donna Gonzales

Page 182

1  timecards to do that.

2      Q.  On the occasions that you would come in early or

3  stay late, would you report that time on your timecards?

4      A.  Yes.  If not on the timecard, on the time sheet.

5      Q.  Ms. Gonzales, are you claiming in this lawsuit

6  that you were not paid for any community work you

7  performed?

8      A.  I didn't do any community work.

9      Q.  So you don't have any claim in this lawsuit that

10  you performed some community work and weren't paid for

11  it?

12      A.  No.

13      Q.  Ms. Gonzales, did you receive a request for

14  production of documents in this case?

15      A.  Yes, I did.

16      Q.  Did you search through the documents that were in

17  your possession, custody or control for documents that

18  were responsive to the request?

19      A.  Yes.

20      Q.  And did that include looking for any electronic

21  documents?

22      A.  No.

23      Q.  By that, I mean e-mails or --

24      A.  No.

25      Q.  Do you have any electronic documents that would

9b5844b4-1613-46bc-b430-fc276bf498ed

NETWORK DEPOSITION SERVICES
Transcript of Donna Gonzales

Page 185

1    their direction.  Alderwoods Group was the corporate

2    office.

3        Q.  Do you believe it was Alderwoods' policy on a

4    national corporate level that they weren't going to pay

5    for on-call time?

6        A.  Yes.

7        Q.  We also had some testimony today about

8    preapproval issues.  You testified that there was not a

9    preapproval process, that there were times that you

10   worked overtime and you weren't paid because it wasn't

11   preapproved?

12       A.  Yes.

13       Q.  What were those times?

14       A.  The times were when David Greiner came in and

15   took over the director's job.  I don't know if he was

16   aware or not aware of the conversation that I had had

17   with Bill Mitchell and Derreck Pate as far as my

18   overtime was concerned for the compensation of not

19   getting paid for or compensated on my promotion and my

20   bonus.

21       Q.  But did that include things like your on-call

22   time?

23       A.  No.

24       Q.  Well, would you agree with the statement that

25   there were some times that your overtime wasn't paid

NETWORK DEPOSITION SERVICES
Transcript of Donna Gonzales

1    because it wasn't preapproved?

2        A.  No.

3        Q.  On the issue of no breaks, you were asked who you

4    spoke to or complained to about not being paid for meal

5    breaks and having it auto deducted.  You went to the

6    payroll supervisor who did that, and she said -- her

7    response to you was that she was sent a memo from upper

8    management that she had to auto deduct that time.  What

9    did you understand that to mean, upper management?

10               MS. MORGAN:  Object to the form of the

11   question.

12       A.  That meant that she got a memo from the corporate

13   office saying to automatically deduct an hour or break

14   time if they were taken or not taken.

15       Q.  (By Ms. Weyandt) You just said break times or

16   lunches.

17       A.  And lunches.

18       Q.  Is it "and" or "or"?

19       A.  And.

20       Q.  So how much time was auto deducted from a given

21   day if you had two 15-minute lunches and -- how long was

22   your --

23       A.  A one-hour lunch and two 15-minute breaks.

24       Q.  So are you saying that an hour and a half of your

25   time in a given day was auto deducted?

**NETWORK DEPOSITION SERVICES**
**Transcript of Donna Gonzales**

196

```
 1              IN THE UNITED STATES DISTRICT COURT
               WESTERN DISTRICT OF PENNSYLVANIA
 2
       NO. 06-1641
 3
       DEBORAH PRISE and HEATHER RADY
 4     on behalf of themselves and all employees similarly
       situated,
 5
              Plaintiffs,
 6
       vs.
 7
       ALDERWOODS GROUP, INC. And SERVICE
 8     CORPORATION INTERNATIONAL,
 9            Defendants.
10            CERTIFICATE OF COMPLETION OF DEPOSITION
11       I, Karen Rodriguez, CCR #55, DO HEREBY CERTIFY that
       on March 13, 2009, the deposition of DONNA GONZALES was
12     commenced before me at the request of MICHELLE AMY
       MORGAN, and sealed original thereof retained by:
13
              MICHELLE AMY MORGAN
14            Attorney for the Defendants
              2727 North Harwood Street
15            Dallas, Texas 75201-1515
              (214) 220-3939
16
17       I FURTHER CERTIFY that copies of this certificate
       have been mailed or delivered to the following counsel
18     and parties not represented by counsel appearing at the
       taking of the deposition.
19
              LIBERTY J. WEYANDT
20            Attorney for the Plaintiffs
              525 William Penn Place
21            Suite 3300
              Pittsburgh, PA 15219
22            (412) 281-4256
23       I FURTHER CERTIFY that examination of this transcript
       and signature of the witness was required.
24
         I FURTHER CERTIFY that the cost of the original and
25     one copy of the deposition to MICHELLE AMY MORGAN is
```

1    I FURTHER CERTIFY that I did administer the oath to
the witness herein prior to the taking of this
2  deposition; that I did thereafter report in stenographic
shorthand the questions and answers set forth herein,
3  and the foregoing is a true and correct transcript of
the proceeding had upon the taking of this deposition to
4  the best of my ability.

5    I FURTHER CERTIFY that I am neither employed by nor
related to any of the parties or attorneys in this case,
6  and that I have no interest in the final disposition of
this case in any court.

7

8

9                KAREN RODRIGUEZ, CCR
                    Certified Reporter #55
10              License Expires 12/31/09

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25