**TAB 13**

NETWORK DEPOSITION SERVICES
Transcript of Ric Hensley

Page 1

DEPOSITION OF RIC HENSLEY

October 28, 2009

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO/OAKLAND DIVISION

```
------------------------------------
WILLIAM HELM, DEBORAH PRISE,        )
HEATHER P. RADY, et al., on behalf  )
of themselves and all other        )
employees and former employees     )
similarly situated,                 )
                                     )
        Plaintiffs,                  )
                                     )Case No.
vs.                                  )CV 08-1184-SI
                                     )
ALDERWOODS GROUP, INC.,             )
                                     )
        Defendant.                   )
------------------------------------
```

APPEARANCES:


        FOR THE PLAINTIFFS:

        MICHAEL J. LINGLE, ESQ.
        Thomas & Solomon LLP
        693 East Avenue
        Rochester, New York 14607


        FOR THE DEFENDANT:

        MATT RAY, ESQ.
        Jones Day
        2727 North Harwood Street
        Dallas, Texas 75201-1515

d5f13f10-43ee-414a-96ed-b78f12fac2f3

NETWORK DEPOSITION SERVICES
Transcript of Ric Hensley

Page 35

1      Q.      If you look there at the first paragraph,
2  Mr. Hensley, it says, "A time clock is the preferred
3  method to record time worked."  Do you see that?
4      A.      Yes.
5      Q.      Was there a time clock at the McCarty
6  Mortuary?
7      A.      Yes, at each location.
8      Q.      There was a time clock at all five
9  locations?
10     A.      All five locations.
11     Q.      The first bullet there says, "All
12  employees must record all hours actually worked unless
13  exempt from timekeeping requirements as permitted in
14  compliance with all federal and state provincial
15  regulations."  Did I read that right?
16     A.      Yes.
17     Q.      Was it your understanding that the
18  written policy at Alderwoods Group was that employees
19  must record all hours actually worked?
20              MR. LINGLE:  Objection.
21     A.      Yes.
22     Q.      The second bullet there, if you take look
23  at that, it refers to an HR specialist or HR
24  specialists plural, do you see that?
25     A.      Yes.

d5f13f10-43ee-414a-96ed-b78f12fac2f3

NETWORK DEPOSITION SERVICES
Transcript of Ric Hensley

1    bit, so I'll circle back and ask you about that.

2        A.      Okay.

3        Q.      The next to last bullet there says,

4    "Completed time card sheet are to be signed by the

5    employee to verify that the card accurately documents

6    the actual hours worked."  Did I read that correctly?

7        A.      Yes.

8        Q.      Was it your understanding that that was

9    the written policy of Alderwoods Group --

10       A.      Yes.

11               MR. LINGLE:  Objection.

12       Q.      -- during the period you were general

13   manager?

14       A.      Yes.

15       Q.      The next sentence says, "The employee's

16   supervisor or manager must also sign the time card

17   sheet to verify that the hours are accurate, and that

18   any overtime recorded is approved."  Did I read that

19   correctly?

20       A.      Yes.

21       Q.      And was it your understanding that that

22   was the written policy of Alderwoods Group while you

23   were the general manager?

24       A.      Yes.

25               MR. LINGLE:  Objection.

d5f13f10-43ee-414a-96ed-b78f12fac2f3

NETWORK DEPOSITION SERVICES
Transcript of Ric Hensley

Page 38

1      Q.      Let me ask you about the time card
2  process.
3      A.      Okay.
4      Q.      How it worked.
5              Did you review, because you were the
6  acting location manager at McCarty, did you review the
7  employees', McCarty employees', time cards for
8  accuracy?
9      A.      Yes.
10     Q.      Did you do that weekly?
11     A.      Weekly.
12     Q.      Was there a specific day that that
13  occurred?
14     A.      I believe it was done every Monday for
15  the previous week.
16     Q.      Once you reviewed them for accuracy, did
17  you sign them?
18     A.      Yes.
19     Q.      And then did you submit them somewhere?
20     A.      Yeah, my administrator would then submit
21  them to whoever they -- you know, payroll, yes.
22     Q.      Was that role of reviewing time cards for
23  accuracy the responsibility of the location manager at
24  each of the locations?
25     A.      At each location, yes.

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

d5f13f10-43ee-414a-96ed-b78f12fac2f3

NETWORK DEPOSITION SERVICES
Transcript of Ric Hensley

Page 40

1     located at each location?

2          A.        No.

3                    MR. LINGLE:  Objection.

4          Q.        If you could look at the policy section

5     on the first page of Exhibit 4, do you see that?

6          A.        Yes.

7          Q.        It says, "All nonexempt employees will be

8     compensated for all hours worked."  Did I read that

9     correctly?

10         A.        Yes.

11         Q.        Was it your understanding that that was

12    Alderwoods Group's written policy during the time you

13    were general manager?

14         A.        Yes.

15                   MR. LINGLE:  Objection.

16         Q.        Your responsibility, I think you said

17    earlier, as the general manager was to enforce

18    Alderwoods Group's policies, correct?

19         A.        Yes.

20         Q.        Did you communicate policies to

21    employees?

22         A.        Yes.

23         Q.        How did you go about doing that?

24         A.        A lot of times it was verbal.  Sometimes

25    we had staff meetings.  If new policy came down or

d5f13f10-43ee-414a-96ed-b78f12fac2f3

NETWORK DEPOSITION SERVICES
Transcript of Ric Hensley

Page 41

1    addition to a policy, we would have actual staff

2    meetings.

3        Q.      When you say "staff meetings," would you

4    have a meeting of the staff of all five locations?

5        A.      Sometimes, sometimes.

6        Q.      How often were those types of staff

7    meetings where you included all five locations?

8        A.      All five locations, maybe twice a year.

9        Q.      Where would those be held?

10       A.      A lot at times at Weaver's.

11       Q.      Why Weaver's?

12       A.      Because it was bigger and it could house

13   everybody.  It was kind of central.

14       Q.      During what time of day were those staff

15   meetings, or did it vary?

16       A.      It varied.

17       Q.      Do you recall as general manager ever

18   communicating at one of these staff meetings this

19   written policy that is referenced on Exhibit 4, that

20   all nonexempt employees will be compensated for all

21   hours worked?

22       A.      No.

23       Q.      Did you ever tell any employee that they

24   would not be compensated for all hours worked?

25               MR. LINGLE:  Objection.

d5f13f10-43ee-414a-96ed-b78f12fac2f3

NETWORK DEPOSITION SERVICES
Transcript of Ric Hensley

Page 42

1      A.      No.

2      Q.      Are you aware of any employees that

3  worked at one of these five locations, meaning McCarty,

4  Evergreen, Weaver, Woodhaven, or Rallings, who did not

5  receive compensation for all hours worked during the

6  time you were general manager?

7              MR. LINGLE:  Objection.

8      A.      Not to my knowledge.

9      Q.      So to your knowledge during the time you

10 were general manager, all employees underneath you were

11 compensated for all hours worked?

12     A.      Yes.

13             MR. LINGLE:  Objection.

14     Q.      If you as general manager, Mr. Hensley,

15 found out that an employee was not being compensated

16 for all hours worked, what would you have done?

17             MR. LINGLE:  Objection.

18     A.      I would have contacted my higher-up and

19 reported that and let them know we have a problem with

20 pay.

21     Q.      Did that ever occur during your tenure?

22     A.      No, not to my knowledge, no.

23     Q.      We talked about the policy binders that

24 were in each location.  Were there policies in your

25 view that were not contained in those policy binders?

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

d5f13f10-43ee-414a-96ed-b78f12fac2f3

NETWORK DEPOSITION SERVICES
Transcript of Ric Hensley

Page 50

1    A.        We may, yeah, yeah.
2    Q.        When you say not all of them did what
3    they were supposed to do with the policy, what does
4    that mean?  What did you mean by that?
5    A.        Well, that means, you know, if you were
6    supposed to try to go out and join a civic
7    organization, not all of them did.  If you tried to get
8    some of them to go to church, not all of them did.
9    That's what I mean by comply.
10   Q.        So not everyone in one of these five
11   locations actually got involved in the community?
12   A.        Exactly.
13   Q.        Do you recall which employees in these
14   five locations over which you were the general manager
15   did go out and get involved in the community?
16   A.        Well, I did.  My managers did.  But I
17   don't remember -- you know, I don't remember specifics
18   as to actually what these other employees done or --
19   you know, again, there was a log, a spreadsheet for
20   these community work policy binders there were supposed
21   to be logged each week as to what they have done and
22   who they have talked to and that sort of stuff.
23   Q.        So you said you did?
24   A.        I did.
25   Q.        What did you do?

NETWORK DEPOSITION SERVICES
Transcript of Ric Hensley

Page 53

1      A.      No, I don't remember specifics.

2      Q.      I think you said that they were required

3  to log on a spreadsheet weekly what they were doing?

4      A.      Yes.

5      Q.      Where was that spreadsheet maintained?

6      A.      In the binder, in the community work

7  policy binder.

8      Q.      And was there one of those binders at

9  each location?

10     A.      At each location.

11     Q.      Was that binder in the McCarty Mortuary

12  on your desk?

13     A.      Yes, yeah, that was on my desk.

14     Q.      So would people actually come into your

15  office weekly and fill it out?

16     A.      Yes.

17     Q.      Did you monitor it weekly to make sure

18  that people were in fact filling it out on a weekly

19  basis?

20             MR. LINGLE:  Objection.

21     A.      It was supposed to be done weekly, but it

22  was not always done weekly, because you always -- you

23  didn't always have information to put on that each

24  week.  And if you didn't have any information to put on

25  it, that's how it was sent back in.  It had to be sent

d5f13f10-43ee-414a-96ed-b78f12fac2f3

NETWORK DEPOSITION SERVICES
Transcript of Ric Hensley

Page 54

1  in each week, once a week.  I don't remember
2  particularly where that went to, the administrator had
3  that communiqué, but if there was no activity for that
4  week, there was no activity.
5        Q.      So the administrator sent it in?
6        A.      Yeah, the administrator sent it in.  And
7  I don't know who they would send it to.  I don't
8  remember.
9        Q.      Did you review these weekly logs before
10 they were sent in?
11       A.      Yes.
12       Q.      Were there times when the weekly logs
13 were blank?
14       A.      Yes.
15       Q.      Was it more often than not that the
16 weekly logs were blank?
17              MR. LINGLE:  Objection.
18       A.      It was more often than not.
19       Q.      Let's start with McCarty Mortuary.
20              Did any of the employees at McCarty
21 Mortuary receive any kind of poor performance
22 evaluation because they weren't doing enough to comply
23 with the community work policy?
24       A.      No.
25       Q.      Was there any consequence for not

NETWORK DEPOSITION SERVICES
Transcript of Ric Hensley

Page 55

1    complying with the community work policy?

2          A.      Not to my knowledge.  Not to my

3    knowledge.

4          Q.      Were you aware of any employees within

5    the five locations you managed as the general manager

6    who received any type of negative consequence as a

7    result of not complying with the community work policy?

8          A.      No.

9                  MR. LINGLE:  Objection.

10         Q.      On this weekly log, do you recall what

11   the columns were, what information had to be logged?

12         A.      I'm trying to picture it.  The employee's

13   name I believe was the first column, the date, I think

14   there was a column for an influencer's name.  If there

15   was a contact made or a meeting scheduled.  I believe

16   there was columns for that.  For instance, depending on

17   if they were interested in prearrangement and wanted to

18   come in the funeral home and talk.  I believe there was

19   address and phone number for those -- a column for

20   those influencers.

21         Q.      Do you know whether any of the community

22   activities that would be considered to comply with this

23   community work policy, attending a civic meeting, for

24   example, were done during normal work hours?

25         A.      Not to my knowledge.

d5f13f10-43ee-414a-96ed-b78f12fac2f3

NETWORK DEPOSITION SERVICES
Transcript of Ric Hensley

Page 64

1          A.       I don't remember specifically.

2          Q.       If you could turn back to Exhibit 1,

3     paragraph 14.  "I knew about this policy from a number

4     of sources; for example, as a general manager, I was

5     told on a conference call by the regional manager,

6     Mitchell Gerth, that this community work policy was a

7     new nationwide company policy."  Did I read that right?

8          A.       Yes.

9          Q.       So do you recall the conversation with

10    Mr. Gerth?

11         A.       Yeah.  I don't remember when, but I do

12    remember there was a conference call before all the

13    binders came down, and it was just a preliminary prep

14    meeting actually just to kind of get with all the

15    managers and let them know that it was coming, and this

16    is what we need to do with it.

17         Q.       Do you know who else was on that call

18    besides Mr. Gerth?

19         A.       No, I don't.

20         Q.       Was there any discussion on that call

21    about the job positions that would be covered by the

22    policy?

23         A.       It was everybody from the top from my

24    position down to the last part-timer.

25         Q.       So grave diggers?

d5f13f10-43ee-414a-96ed-b78f12fac2f3

NETWORK DEPOSITION SERVICES
Transcript of Ric Hensley

Page 65

1      A.      Well, we didn't have grave diggers
2  employed.  Those were outside contractors.
3      Q.      Do you know whether -- so it's your
4  understanding there were never grave digger employees
5  at Alderwoods Group?
6              MR. LINGLE:  Objection.
7      Q.      Grave diggers actually employed by
8  Alderwoods Group?
9      A.      Not in Knoxville.  I don't know about the
10 rest of the country.  I'm sure that there were.
11     Q.      So did Mr. Gerth say on this call that
12 every job position across the country would be covered
13 by this policy?
14             MR. LINGLE:  Objection.
15     Q.      Or was it even addressed?
16     A.      It was addressed in general really
17 through the Knoxville group.  We didn't -- he did talk
18 about it being company policy.  We knew it was going to
19 be companywide.  But it was everybody from my position
20 down to part-timers.  Now, whether he meant that across
21 the board companywide, I don't know.  But we were
22 talking specifics to us.
23     Q.      So is it fair to say that in this
24 conversation you had with Mr. Gerth, he was talking
25 about your specific group, meaning the employees at the

NETWORK DEPOSITION SERVICES
Transcript of Ric Hensley

Page 66

1    five locations you manage; is that correct?

2         A.      Yes, yes.

3         Q.      Paragraph 16, Mr. Hensley, in the second

4    sentence, it says, "Each week I participated in

5    conference calls with company executives including the

6    regional manager, Mitchell Gerth, and I was told to

7    regularly check in with employees and make sure that

8    they were completing the volunteer work and recording

9    it in the defendant's binder."  Did I read that right?

10        A.      Yes.

11        Q.      First of all, is it correct to say there

12   were weekly conference calls where this community work

13   policy was discussed?

14        A.      Yes.

15        Q.      And you reference "company executives."

16   Who was on those calls?

17        A.      There would be other -- maybe other

18   managers from around Knoxville.  And I think a couple

19   of times that his higher-up, Buddy Mayes, was on the

20   conference call.

21        Q.      Were these weekly conference calls solely

22   to discuss the community work policy, or was that just

23   one topic?

24        A.      It was just one topic.  But it was -- it

25   was hit on every time.

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

d5f13f10-43ee-414a-96ed-b78f12fac2f3

NETWORK DEPOSITION SERVICES
Transcript of Ric Hensley

Page 77

1    A.    Yes.
2    Q.    And the time they spent retrieving the
3    body was compensable time?
4          MR. LINGLE:  Objection.
5    A.    Yes.
6    Q.    And during your tenure as general
7    manager, was there ever a time that someone responded
8    to a death call and was not compensated for the time
9    they spent?
10   A.    Not to my knowledge.
11   Q.    It was your policy as general manager, or
12   it was your understanding, rather, of Alderwoods
13   Group's policy that employees who responded to death
14   calls were to be paid for that time?
15   A.    Yes.
16         MR. LINGLE:  Objection.
17         MR. RAY:  What's the objection?
18         MR. LINGLE:  The objection is that's
19         confusing, because you're suggesting that they
20         paid for the actual hours of work for doing a
21         death call, and that's not true.
22         MR. RAY:  Well, thank you.  Let's explore
23         that.
24   BY MR. RAY:
25   Q.    So for a death call, how were employees

d5f13f10-43ee-414a-96ed-b78f12fac2f3

NETWORK DEPOSITION SERVICES
Transcript of Ric Hensley

Page 78

1    compensated?

2         A.      They were able to put two additional

3    hours on their time card for the death call.  99

4    percent of the time, a death call takes less than an

5    hour and a half.  But there were times when maybe a

6    home call or an extenuating trauma call would require

7    that person to be maybe three or four hours.  But they

8    only got paid for the two.

9         Q.      So 99 percent of the time death calls

10   took an hour and a half or less, correct; is that

11   right?

12        A.      Yes.

13        Q.      Are you aware of any times during the

14   time you were general manager where a death call took

15   more than two hours?

16        A.      Yes.

17        Q.      How many times?

18                MR. LINGLE:  Objection.

19        Q.      Was it more than five times?

20        A.      Oh, yes.

21        Q.      Where it took more than two hours?

22        A.      Yes.

23        Q.      Roughly how many times?

24                MR. LINGLE:  Objection.

25                And just to be clear, nobody wants you to

d5f13f10-43ee-414a-96ed-b78f12fac2f3

NETWORK DEPOSITION SERVICES
Transcript of Ric Hensley

Page 81

1   right?

2          A.      Yes.

3          Q.      What positions were responsible for being

4   on call?

5                  MR. LINGLE:  Objection.

6          A.      Funeral directors and funeral directors'

7   assistants.

8          Q.      Any other positions that reported to you

9   directly or indirectly that were scheduled to be on

10  call during the time you were general manager?

11         A.      No.

12         Q.      So it was only funeral directors and

13  funeral director assistants, correct?

14         A.      Yes.

15         Q.      And then you would schedule, I think you

16  said you scheduled them because -- you scheduled them

17  kind of across the board because you would cover

18  different locations?

19         A.      Yes, yes.

20         Q.      So did you coordinate with the location

21  managers?

22         A.      Yes.

23         Q.      What was the typical on-call schedule for

24  an individual; in other words, would an individual be

25  on call a couple nights a week and one weekend day?

NETWORK DEPOSITION SERVICES
Transcript of Ric Hensley

Page 84

1    Q.      It's correct to say that you never
2    suggested to your upper management that they be paid
3    more than two hours if the death call took more than
4    two hours; is that right?
5    A.      That's fair, yes.
6    Q.      Earlier you said when I asked you a
7    question about piece work, I think you referred to it
8    as the on-call payment?
9    A.      Yes, yes.
10    Q.      Is this what you're referring to, this
11    two hour pay for death calls, two hours worth of pay
12    for death calls?
13    A.      Yes, yes.
14    Q.      If you could go back to Exhibit 1, and
15    I'm now looking at the second paragraph of Section G.
16    A.      Oh, Exhibit 1.
17    Q.      I'm sorry, not Exhibit 1, Exhibit 4.
18    Exhibit 4.
19    A.      Okay.  Yeah.
20    Q.      The second paragraph of Section G.  Are
21    you there?
22    A.      Yes.
23    Q.      It says, "When a nonexempt employee is
24    required to take phone calls after completing the
25    regular work schedule and leaving the premises but is

d5f13f10-43ee-414a-96ed-b78f12fac2f3

NETWORK DEPOSITION SERVICES
Transcript of Ric Hensley

Page 89

1    see that?

2         A.    Okay.

3         Q.    "Employees must clock out, sign out at

4    the beginning of their unpaid meal break, and must

5    clock in, sign in when their unpaid meal break ends."

6    Did I read that correctly?

7         A.    Yes.

8         Q.    Did you understand that to be Alderwoods

9    Group's written policy during the time you were general

10   manager?

11        A.    Yes.

12        Q.    Did your employees get lunch breaks?

13        A.    Yes.

14        Q.    And by "your employees," I mean, both

15   direct and indirect reports underneath you?

16        A.    Yes.

17        Q.    How long a lunch break did they get?

18        A.    One hour.

19        Q.    Did they clock in and out?

20        A.    Yes.

21        Q.    Did you require them to take lunch

22   breaks?

23        A.    No.

24        Q.    Do you know whether any of the employees

25   who reported to you ever worked through their lunch

d5f13f10-43ee-414a-96ed-b78f12fac2f3

NETWORK DEPOSITION SERVICES
Transcript of Ric Hensley

Page 90

1   breaks?

2          A.      Yes.

3          Q.      Were they paid if they worked through

4   their lunch breaks?

5          A.      Yes.

6          Q.      Are you aware of any circumstance where

7   an employee who reported to you as general manager,

8   either directly or indirectly, worked through their

9   lunch break and were not paid for that time?

10                 MR. LINGLE:  Objection.

11         A.      I'm not aware of any.

12                 MR. RAY:  What was wrong with that

13         question?

14                 MR. LINGLE:  The people that would

15         actually best know whether or not they actually

16         performed work during meal breaks even though they

17         recorded the time would be employees.  He doesn't

18         have any knowledge about whether or not they did.

19         That's a confusing question.

20  BY MR. RAY:

21         Q.      Let's talk about whether you have

22  knowledge of people working through their lunch breaks.

23                 You're aware that people worked through

24  their lunch breaks?

25         A.      Yes.

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

d5f13f10-43ee-414a-96ed-b78f12fac2f3

NETWORK DEPOSITION SERVICES
Transcript of Ric Hensley

Page 91

1      Q.      How are you aware of that?

2      A.      Depending on the services.  If we had a

3  12 noon service, we worked right through it until it

4  was over.

5      Q.      And you actually worked in the McCarty

6  Mortuary, right?

7      A.      Yes.

8      Q.      And you were actually the acting location

9  manager there while you were general manager?

10      A.      Yes.

11      Q.      So you were familiar with when employees

12  there worked through their lunch breaks, right?

13      A.      Yes.

14      Q.      And by "there," I mean, McCarty Mortuary?

15      A.      Right.

16      Q.      And based on your observations, employees

17  based on services or what have you did work through

18  lunch breaks?

19      A.      Yes.

20      Q.      And it was certainly your understanding

21  and recollection that employees who worked through

22  their lunch breaks were paid for that time?

23      A.      Yes.

24              MR. LINGLE:  Objection.

25      Q.      And when you reviewed time cards for

d5f13f10-43ee-414a-96ed-b78f12fac2f3

NETWORK DEPOSITION SERVICES
Transcript of Ric Hensley

Page 92

1    people at McCarty Mortuary, if they worked through

2    their lunch breaks, you ensured that they actually

3    recorded that time --

4            MR. LINGLE:  Objection.

5        A.      Yes.

6        Q.      -- as time worked?

7        A.      Yes.

8        Q.      And that they were paid for it?

9            MR. LINGLE:  Objection.

10       A.      Yes.

11       Q.      Employees who worked at one of the five

12   locations that you were responsible for as general

13   manager did at times have overtime?

14       A.      Yes.

15       Q.      And Alderwoods Group did pay some

16   overtime to these employees?

17       A.      Yes.

18       Q.      Were you, Mr. Hensley, required to budget

19   overtime in any way as general manager?

20       A.      No.

21       Q.      Would you have any pressure from your

22   superior to keep overtime limited in any way?

23       A.      No.

24            MR. LINGLE:  Just note my objection to

25       the last question.

d5f13f10-43ee-414a-96ed-b78f12fac2f3

NETWORK DEPOSITION SERVICES
Transcript of Ric Hensley

1    Q.     Let's talk for a second about training.

2    A.     Okay.

3    Q.     During the time you were general manager,

4  and I want to limit this for the time up through the

5  end of 2006 before SCI took over.

6    A.     Okay.

7    Q.     Okay.  So I'm focused only on Alderwoods

8  Group.

9           Was there any formal training for any of

10  the employees underneath you?

11    A.     In what?  What kind of training?

12    Q.     Fair question.  Let me see if I can

13  specify it.

14           Did Alderwoods Group have any type of

15  formal training program for any employees --

16           MR. LINGLE:  Objection.

17    Q.     -- that you recall?

18    A.     We had OSHA training, that was done, I

19  believe, once every three months with each employee.

20  Nothing else specifically on training.

21    Q.     So once every three months all employees

22  went through OSHA training?

23    A.     Yeah.  It may not have been every three

24  months, I don't remember exactly what the time period,

25  it was a couple, two or three times a year, and we

d5f13f10-43ee-414a-96ed-b78f12fac2f3

NETWORK DEPOSITION SERVICES
Transcript of Ric Hensley

Page 94

1    logged all that, and they had personnel files that all
2    that was put into.
3         Q.      Who conducted that training, the OSHA
4    training?
5         A.      A lot of times I did.  But each
6    individual location had a safety officer, I guess is
7    what you would call it, and those changed all the time.
8    But they were responsible for conducting a lot of the
9    OSHA training that they would get from corporate and do
10   it at their individual location.
11        Q.      So you conducted some OSHA training?
12        A.      Yes.
13        Q.      When you conducted OSHA training, was it
14   for all the employees who reported to you at the five
15   locations, or only selected employees?
16        A.      Most of the time it was just for McCarty
17   Mortuary, for their employees at my location.  But
18   there were other times when I would actually go to the
19   other locations and do a training session over there
20   with them, because there was nobody else to do it.
21        Q.      And then there were also OSHA training
22   sessions conducted at the other locations by the safety
23   person?
24        A.      Yes.
25        Q.      And you weren't necessarily present at

d5f13f10-43ee-414a-96ed-b78f12fac2f3