# NETWORK DEPOSITION SERVICES
## Transcript of Ric Hensley

Page 1

DEPOSITION OF RIC HENSLEY

October 28, 2009

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO/OAKLAND DIVISION

```
------------------------------------
WILLIAM HELM, DEBORAH PRISE,          )
HEATHER P. RADY, et al., on behalf    )
of themselves and all other          )
employees and former employees       )
similarly situated,                  )
                                     )
        Plaintiffs,                  )
                                     )Case No.
vs.                                  )CV 08-1184-SI
                                     )
ALDERWOODS GROUP, INC.,              )
                                     )
        Defendant.                   )
------------------------------------
```

APPEARANCES:

          FOR THE PLAINTIFFS:

          MICHAEL J. LINGLE, ESQ.
          Thomas & Solomon LLP
          693 East Avenue
          Rochester, New York 14607

          FOR THE DEFENDANT:

          MATT RAY, ESQ.
          Jones Day
          2727 North Harwood Street
          Dallas, Texas 75201-1515

NETWORK DEPOSITION SERVICES
Transcript of Ric Hensley

Page 95

1    all of those?

2        A.      No.

3        Q.      Is that correct?

4        A.      Right.

5        Q.      When you conducted the OSHA training, was

6    it done during regular business hours?

7        A.      Yes.

8        Q.      Were the employees who attended the OSHA

9    trainings you conducted compensated for the time they

10   spent --

11       A.      Yes.

12       Q.      -- at the OSHA training?

13       A.      Yes.

14       Q.      Are you aware of any time where an

15   employee at one of the five locations you were

16   responsible for was not paid for attending any OSHA

17   training?

18       A.      I'm not aware of any, no.

19       Q.      If you were aware that that had happened,

20   you would have taken steps to make sure they were

21   compensated?

22       A.      Yes.

23       Q.      Other than the OSHA training, you don't

24   recall any other formalized training, so to speak, from

25   Alderwoods Group --

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

d5f13f10-43ee-414a-96ed-b78f12fac2f3

NETWORK DEPOSITION SERVICES
Transcript of Ric Hensley

Page 96

1          MR. LINGLE:  Objection.

2     Q.     -- is that correct?

3     A.     No, no.

4     Q.     What about informal training?

5          MR. LINGLE:  Objection.

6     Q.     There was on-the-job training, I assume?

7     A.     Yes.

8     Q.     Were the employees compensated for
9 on-the-job training?

10    A.     Yes, yes.

11    Q.     Was it your understanding that Alderwoods
12 Group's policy was to pay employees for attending
13 training sessions like the OSHA training you described?

14    A.     Yes.

15    Q.     In your affirmation which is Exhibit 1,
16 there's a section on page 5 entitled Training Policy.
17 Do you see that?

18    A.     Yes.

19    Q.     And it says, "Alderwoods also had" -- let
20 me back up.  I'm starting on paragraph 26.  "Alderwoods
21 also had a company training policy which expected
22 funeral directors to maintain their licenses."  Did I
23 read that correctly?

24    A.     Yes.

25    Q.     Was this training policy referenced in

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

d5f13f10-43ee-414a-96ed-b78f12fac2f3

NETWORK DEPOSITION SERVICES
Transcript of Ric Hensley

Page 97

1    paragraph 26 written?
2           A.      I don't recall.
3           Q.      What is required for funeral directors to
4    maintain their licenses?
5           A.      Each funeral director in the State of
6    Tennessee has to perform ten continuing education
7    hours.  And then there is a state board licensing fee
8    for both funeral director and embalmer.  And those ten
9    hours can be seminars, death care meetings, anything
10   that is accredited by the state board.
11          Q.      Do funeral directors, can they get any
12   credit for those ten continuing education hours for the
13   work they're performing on a daily basis?
14          A.      No.
15          Q.      Do these seminars, or I think you said a
16   death care meeting --
17          A.      Yeah, yeah, yeah, yeah.
18          Q.      -- do they ever occur during regular
19   business hours?
20          A.      Funeral directors, a lot of the funeral
21   directors now go online and even then went online to
22   get their continuing education, and a lot of them would
23   do them on the clock.
24          Q.      And if the funeral directors did that on
25   the clock, and by that, I mean, get their continuing

d5f13f10-43ee-414a-96ed-b78f12fac2f3

NETWORK DEPOSITION SERVICES
Transcript of Ric Hensley

Page 98

1    education hours online, would they be paid for it?
2         A.      Yes.
3         Q.      Let's go to paragraph 27.  Second
4    sentence there.  It says, "Alderwoods paid the costs
5    involved in completing the licensing requirements, but
6    funeral directors were not paid for the time spent
7    completing the work."  Did I read that right?
8         A.      Yes.
9         Q.      Are you referring there to when funeral
10   directors would spend time completing their continuing
11   education hours outside of regular business hours?
12        A.      Yes.
13        Q.      But at times they did perform that work,
14   meaning getting their continuing education hours during
15   regular business hours?
16        A.      At work.  Yes, yes.
17        Q.      And this is ten hours per year per
18   funeral director?
19        A.      Ten hours every two years.
20        Q.      Ten hours every two years?
21        A.      Yeah, ten hours every two years.
22        Q.      For each funeral director?
23        A.      For each funeral director.
24        Q.      Is that ten-hour requirement applicable
25   to assistant funeral directors?

d5f13f10-43ee-414a-96ed-b78f12fac2f3

NETWORK DEPOSITION SERVICES
Transcript of Ric Hensley

Page 99

1        A.      No.

2        Q.      Is it applicable to any job position

3   other than funeral directors?

4        A.      No.

5        Q.      Underneath you as general manager, I show

6   the funeral directors to be Randy Suffridge, Tracy

7   Mayes?

8        A.      Randy Suffridge was a funeral director's

9   assistant.

10       Q.      He's an assistant?

11       A.      Yeah.

12       Q.      You were the only funeral director at

13  McCarty Mortuary?

14       A.      A McCarty's, yes.

15       Q.      So the other funeral directors underneath

16  you when you were a general manager were Tracy Mayes?

17       A.      Yes.

18       Q.      Becky Dahl?

19       A.      Yes.

20       Q.      Jamie Beeler?

21       A.      Yes.

22       Q.      Ina Roberts?

23       A.      Ina, yes.

24       Q.      And Steve Miller?

25       A.      Steve Miller and Ron Mayes.

d5f13f10-43ee-414a-96ed-b78f12fac2f3

NETWORK DEPOSITION SERVICES
Transcript of Ric Hensley

Page 100

1    Q.      And Ron Mayes?

2    A.      Yes.

3    Q.      Okay.  So six?

4    A.      Yeah.

5    Q.      Do you know if any of those six people we
6    just listed performed their continuing education hours
7    requirements outside of regular business hours during
8    the time you were general manager?

9    A.      I don't know.  I don't have the
10   knowledge.

11   Q.      Did you ever have a discussion with any
12   of those six that we just talked about about whether
13   they should be compensated if in fact they did perform
14   their continuing education hours outside of regular
15   business hours?

16   A.      No.

17           MR. LINGLE:  Objection.

18   Q.      So sitting here today, you don't know
19   whether there are any funeral directors who reported to
20   you as general manager who were not paid for time spent
21   getting their continuing education?

22   A.      I'm not aware of any, no.

23   Q.      In your affirmation, you say that, "This
24   is the policy of Alderwoods."  How did you come to
25   learn that this is the policy, the training policy?

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

d5f13f10-43ee-414a-96ed-b78f12fac2f3

NETWORK DEPOSITION SERVICES
Transcript of Ric Hensley

Page 102

1    requirements start?

2         A.       Latter part of the '90s, I believe.  I

3    don't remember, to tell you the truth.

4         Q.       And what I'm trying to understand is, in

5    your affirmation, you say that in the second part of

6    paragraph 27, "Funeral directors were not paid for time

7    spent completing the work," meaning the continuing

8    education, right?

9         A.       Right.

10        Q.       And we've talked about that.  You're

11   referring specifically there to the work they perform

12   outside of regular business hours?

13        A.       Right.

14        Q.       And what I'm trying to understand is, how

15   did you come to learn that it was policy according to

16   you that they wouldn't be paid for the time they spent

17   doing that work outside of regular business hours?

18               MR. LINGLE:  Objection.

19        A.       Well, that subject never came up, that it

20   was actually policy, that subject never came up and

21   your wording it that way.  It was just an understanding

22   there as far as the funeral directors were concerned,

23   that we took care of our own license.  The company paid

24   for all the licensing fees, and if you did your

25   continuing education while you were at the office,

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

d5f13f10-43ee-414a-96ed-b78f12fac2f3

NETWORK DEPOSITION SERVICES
Transcript of Ric Hensley

Page 103

1    fine.  If you had to go home and finish it up, you

2    didn't get paid for when you went home.

3              Now, how I came about to specifically

4    know that that was policy, I don't think it is

5    specifically policy.  It's just one of those things

6    that was in the training manual, and, again, I don't

7    remember exactly, but it did read in there something

8    about funeral directors personally are required to

9    maintain their own license.

10        Q.     Is this another topic that you really

11   didn't think about until the plaintiffs' lawyers called

12   you?

13        A.     No.

14             MR. LINGLE:  Objection.

15        A.     I've been having to get a license for 25

16   years, so I know.  As far as the continuing education,

17   I don't remember exactly when all that came about and

18   when they changed all of that and started requiring

19   funeral directors for continuing ed.  But that was

20   something that was -- I don't think there was anything

21   specific came down from the company.  The company paid

22   for it --

23        Q.     Well --

24        A.     -- to keep you licensed.

25        Q.     Right.  And I understand that, the

d5f13f10-43ee-414a-96ed-b78f12fac2f3

NETWORK DEPOSITION SERVICES
Transcript of Ric Hensley

Page 104

1    licensing issue, but I'm still trying to get at this

2    issue of funeral directors not being paid for time they

3    spent on the continuing education if it was time spent

4    outside of regular business hours.

5              You said that was always an

6    understanding?

7         A.      Right.

8         Q.      Okay.  And we talked about the fact that

9    you don't know if any of your funeral directors had

10   time spent outside of regular business hours?

11        A.      Yeah, I don't know.

12        Q.      And I'm just trying to figure out how you

13   got that understanding.

14             Was there ever a discussion that funeral

15   directors wouldn't get paid if they were performing

16   their continuing education responsibilities outside of

17   regular business hours?

18             MR. LINGLE:  Objection.

19        A.      No, there was never any conversation on

20   that subject specifically, no.

21        Q.      And you don't recall anything written on

22   it?

23        A.      No, not on the -- not on the licensing

24   part, no.

25        Q.      And you never talked to your superior

d5f13f10-43ee-414a-96ed-b78f12fac2f3

NETWORK DEPOSITION SERVICES
Transcript of Ric Hensley

Page 105

1    about it?

2         A.        No.

3                   MR. LINGLE:   Objection.

4         Q.        Is that correct?

5         A.        Correct.

6         Q.        Is it possible that in fact Alderwoods

7    Group's policy is to pay funeral directors for the ten

8    continuing education hours even if they perform it

9    outside their regular work hours?

10                  MR. LINGLE:   Objection.

11        A.        As I understood it at that time, no.  It

12   may be possible now, but at that time, no.

13        Q.        But you don't know how you got that

14   understanding?

15        A.        I don't know, you know, how I got that

16   understanding.  Just being in management and the nature

17   of the business and what has gone on for years is the

18   way we do it.  They don't get paid, funeral directors

19   did not get paid, for any time not spent at the funeral

20   home.

21        Q.        Well, they got paid --

22        A.        As far as training.

23        Q.        As far as training?

24        A.        This training, the licensing.

25        Q.        That you're referring to?

d5f13f10-43ee-414a-96ed-b78f12fac2f3

NETWORK DEPOSITION SERVICES
Transcript of Ric Hensley

Page 106

1       A.      Right.

2       Q.      Because we talked about the death calls

3   earlier.

4       A.      Yes, yes, yeah, that's different.

5       Q.      Other than this specific training

6   situation addressed in your affirmation, specifically

7   referring to the maintenance of licenses for funeral

8   directors, are you aware of any other training time

9   that was not compensated by Alderwoods Group while you

10  were a general manager?

11              MR. LINGLE:  Objection.

12      A.      I'm not aware, no.

13      Q.      Or of any policy regarding any type of

14  training that would provide that employees are not paid

15  for training time?

16              MR. LINGLE:  Objection.

17      A.      No, I'm not aware of any.

18      Q.      Have you ever heard of something at

19  Alderwoods called the community leadership program?

20              MR. LINGLE:  Objection.

21      A.      No.

22      Q.      What about the influencer program?  You

23  referred to influencers earlier, but was there an

24  actual program influencer program?

25              MR. LINGLE:  Objection.

NETWORK DEPOSITION SERVICES
Transcript of Ric Hensley

Page 119

1    Q.      And one of the Mayeses may have as well?

2    A.      Yeah, Donna Mayes, that was Buddy Mayes'

3    wife, she actually headed up this region as far as

4    preneeding is concerned.

5    Q.      Did Donna Mayes ever report to you either

6    directly or indirectly?

7    A.      No, no.

8    Q.      So of the people who reported to you when

9    you were general manager either directly or indirectly,

10   Ina Roberts was the only one?

11   A.      Was the only one, yes.

12   Q.      Other than Ina Roberts then, would any of

13   the other employees who reported to you directly or

14   indirectly as a general manager be responsible for

15   selling these prearrangements?

16   A.      No.

17   Q.      Is prearrangement the same thing as

18   preneeds?

19   A.      Yes.

20   Q.      Tell me about the process of selling

21   preneeds.  I assume that contact could start either

22   way, either you reach out to someone --

23   A.      Yes, it's either by phone call, either

24   the customer is calling in or they actually walk into

25   the funeral home, and they just simply inquire as to

d5f13f10-43ee-414a-96ed-b78f12fac2f3

NETWORK DEPOSITION SERVICES
Transcript of Ric Hensley

Page 120

1    how we can go ahead and get our arrangements fixed up
2    and paid for before that time comes.
3            Q.       And Ina Roberts would deal with those?
4            A.       Ina would deal with those.
5            Q.       Would she be paid for the time she spent
6    dealing with those?
7            A.       Yes.
8            Q.       Are you aware of any time that she spent
9    dealing with these preneeds arrangements where she
10   wasn't paid for them?
11           A.       Not that I'm aware of.
12           Q.       Are you aware of any policy at Alderwoods
13   Group that provided that employees who dealt with these
14   preneeds arrangements would not be compensated if they
15   were dealing with them outside of their regular work
16   hours?
17           A.       I'm not aware of any policy.
18           Q.       And that's certainly not what you did
19   within your group?
20           A.       Right.
21           Q.       So if an employee in your group either
22   who reported to you directly or indirectly was working
23   on preneeds either arrangements or discussions outside
24   of the regular work hours, that would be treated as
25   time worked and they would be compensated, correct?

d5f13f10-43ee-414a-96ed-b78f12fac2f3

NETWORK DEPOSITION SERVICES
Transcript of Ric Hensley

Page 121

1    A.      Repeat the question.

2    Q.      If an employee in your group, either

3 someone who reported to you directly or indirectly was

4 working on preneeds appointments, arrangements and they

5 were working on those outside of their regular work

6 hours --

7    A.      Right.

8    Q.      -- that would be treated as time worked

9 and thus paid; is that right?

10   A.      No, no.

11   Q.      Okay.  Tell me why not.  What's wrong

12 about that statement?

13   A.      Ina, even though Ina got a salary, she

14 also, the preneed program is strictly a commission sale

15 only.  So for those preneed counselors who sell

16 preneed, they didn't get a regular hourly wage or a

17 salary.  It was strictly a commission.

18   Q.      Fair enough.

19           Ina was a manager also?

20   A.      Ina was a manager also.

21   Q.      So she was salaried?

22   A.      Yes, yes.

23   Q.      Was Ina then not eligible for overtime

24 work for any work performed outside of her regular

25 duties?

NETWORK DEPOSITION SERVICES
Transcript of Ric Hensley

Page 122

1    A.      Not to my knowledge.  She did get a
2  commission pay off of everything that she told, so I'm
3  sure that was it.
4    Q.      But other than Ina on your team, no one
5  else dealt with these preneeds issues?
6    A.      Right.
7    Q.      We talked earlier about lunch breaks and
8  if employees worked through lunch breaks what happened.
9  Did employees who reported to you either directly or
10 indirectly when you were a general manager get other
11 breaks besides lunch breaks?
12   A.      Yes.
13   Q.      Did they get paid during the time they
14 took those breaks?
15   A.      Yes.
16   Q.      Those were paid breaks?
17   A.      Yes.
18   Q.      To work overtime, were employees who
19 reported to you as general manager either directly or
20 indirectly required to get that overtime preapproved
21 before they worked it?
22   A.      No, no.
23   Q.      No requirement of preapproval during your
24 entire tenure as general manager?
25   A.      Not to my knowledge, yes.

d5f13f10-43ee-414a-96ed-b78f12fac2f3

NETWORK DEPOSITION SERVICES
Transcript of Ric Hensley

Page 122

1      A.      Not to my knowledge.  She did get a
2 commission pay off of everything that she told, so I'm
3 sure that was it.
4      Q.      But other than Ina on your team, no one
5 else dealt with these preneeds issues?
6      A.      Right.
7      Q.      We talked earlier about lunch breaks and
8 if employees worked through lunch breaks what happened.
9 Did employees who reported to you either directly or
10 indirectly when you were a general manager get other
11 breaks besides lunch breaks?
12      A.      Yes.
13      Q.      Did they get paid during the time they
14 took those breaks?
15      A.      Yes.
16      Q.      Those were paid breaks?
17      A.      Yes.
18      Q.      To work overtime, were employees who
19 reported to you as general manager either directly or
20 indirectly required to get that overtime preapproved
21 before they worked it?
22      A.      No, no.
23      Q.      No requirement of preapproval during your
24 entire tenure as general manager?
25      A.      Not to my knowledge, yes.

d5f13f10-43ee-414a-96ed-b78f12fac2f3

NETWORK DEPOSITION SERVICES
Transcript of Ric Hensley

Page 124

1    there for services or work overtime or what have you.

2         A.        Yes.

3         Q.        When there were services that required

4    overtime, would that be accounted for in the employee's

5    schedule; in other words, would an employee be

6    scheduled to work later on a particular day because of

7    known services?

8         A.        No, no.

9         Q.        So just so I understand this, the

10   employees knew what they needed to work based on what

11   was scheduled that day, right?

12        A.        Well, they knew what they were supposed

13   to work for the entire week, okay, on a certain

14   schedule.

15        Q.        Okay.

16        A.        Then if funeral services were thrown into

17   the mix of that during the week, that obviously would

18   have been overtime.

19        Q.        But you didn't have to preapprove, or no

20   manager had to preapprove their overtime?

21                  MR. LINGLE:  Objection.

22        A.        No.

23        Q.        Is that correct?

24        A.        That's correct.

25        Q.        Going back quickly to the preneeds or

d5f13f10-43ee-414a-96ed-b78f12fac2f3

NETWORK DEPOSITION SERVICES
Transcript of Ric Hensley

Page 125

1    prearrangement situation.

2         A.       Yeah.

3         Q.       I think you referenced an insurance

4    license?

5         A.       Yes.

6         Q.       So the person who deals with preneeds has

7    to have a license?

8         A.       Yes, sir.  In the State of Tennessee, you

9    have to be a licensed life insurance agent, have to go

10   through all the licensing requirements, classes, and

11   pass an exam, and then once you're issued a license,

12   then you're eligible to sell prearranged funerals only.

13   You're not allowed to sell accident and health or

14   anything else.

15        Q.       I want to talk a little bit about the

16   type of compensation your employees received.

17                 We've talked about Ina Roberts who was

18   salaried while she reported to you, right?

19        A.       Right.

20        Q.       With respect to the employees who were

21   paid on an hourly basis, were they eligible for any

22   bonus compensation?

23        A.       Not to my knowledge, no.

24        Q.       Were they eligible for any type of

25   incentive awards?

NETWORK DEPOSITION SERVICES
Transcript of Ric Hensley

Page 126

1    A.    No.

2    Q.    So other than their hourly compensation,

3    was there any other pay they were eligible for that you

4    recall when you were general manager?

5    A.    No.

6    Q.    Were you aware of any Alderwoods Group

7    policy that provided that employees could not work

8    overtime unless it was preapproved?

9    A.    I'm not aware of any policy.

10    Q.    Let me go back to Exhibit 1 briefly,

11    which is your affirmation.  And we've gone through this

12    in some detail.  I'd like to give you the opportunity

13    now to review it, take your time, and let me know if

14    sitting here today everything in there is accurate, to

15    your knowledge.

16    A.    Yes, it's accurate.

17    Q.    I want to go back in time now before you

18    were general manager.

19    A.    Okay.

20    Q.    We spent a lot of time with you as

21    general manager, and now I want to go back to your time

22    as an embalmer.

23    A.    Okay.

24    Q.    And I think you said in 1998 you were

25    first hired at McCarty Mortuary?

d5f13f10-43ee-414a-96ed-b78f12fac2f3

NETWORK DEPOSITION SERVICES
Transcript of Ric Hensley

Page 133

1    directly or indirectly when you were a general manager

2    the importance of accurately recording their time?

3           A.      Yeah, there was discussions with the

4    management, with managers to relay to their people, to

5    make sure, yeah, that they record accurately,

6    obviously.

7           Q.      And when you say "management," are you

8    talking about the location managers?

9           A.      The location managers, yes.

10          Q.      Were you aware of any of the employees

11   who reported to you either directly or indirectly as a

12   general manager arriving to work before their scheduled

13   shifts?

14          A.      What do you mean?  Coming to work early?

15          Q.      Yes.

16          A.      Yeah, yeah.

17          Q.      And if they came to work early and

18   performed work, were they compensated for that when you

19   were general manager?

20          A.      Yes, I think if they were required to

21   come in early for whatever reason, either to get a body

22   ready or a casket delivered or whatever, they clocked

23   in, yes.

24                  MR. RAY:  Can we go off the record just

25          for one second.

d5f13f10-43ee-414a-96ed-b78f12fac2f3

NETWORK DEPOSITION SERVICES
Transcript of Ric Hensley

Page 138

1    would still come in early?

2          A.      Sometimes.

3          Q.      Would they get paid for that time then?

4          A.      No.

5          Q.      So there would be times employees would

6    come in early, do some work and not get paid for it?

7          A.      Yes.

8                  MR. LINGLE:  That's all the questions I

9          have right now.

10                 MR. RAY:  Okay.

11   CONTINUED EXAMINATION BY MR. RAY:

12         Q.      Let's go back and talk about meal breaks

13   for a second.

14         A.      Okay.

15         Q.      As general manager, is it accurate to say

16   that it was your approach in dealing with employees

17   that if they worked through meal breaks, they were to

18   be paid for that time?

19                 MR. LINGLE:  Objection.

20         A.      It was my understanding that company

21   policy required them as far as taking a one-hour lunch

22   break, they were to record that on their time card.

23         Q.      And if they worked through that lunch

24   break, is it also your understanding the company policy

25   required that they be paid for that time?

d5f13f10-43ee-414a-96ed-b78f12fac2f3

NETWORK DEPOSITION SERVICES
Transcript of Ric Hensley

Page 139

1          A.        Be paid for that time, yes.
2          Q.        And did you communicate that
3    understanding of policy in your communications to the
4    location managers when you discussed with them
5    policies?
6          A.        Yes.
7          Q.        You said embalmers have continuing
8    education requirements?
9          A.        Yes.
10         Q.        Are they the same, is it the same license
11   required of --
12         A.        Yes, it's the same licensing requirement
13   that it is for a funeral director.
14         Q.        We're talking over each other just a
15   little bit.
16         A.        I'm sorry.
17         Q.        And then there were some questions there
18   about where Mr. Lingle asked you about training,
19   training generally, whether training time was recorded
20   or what have you.
21         A.        Yes.
22         Q.        I just want to make sure the record's
23   clear.
24                   The only training that you believe, the
25   only training time that you believe may not have been

d5f13f10-43ee-414a-96ed-b78f12fac2f3

NETWORK DEPOSITION SERVICES
Transcript of Ric Hensley

Page 143

1    they have to be there at eight o'clock, they may be
2    there by 7:30, they may be just picking up cigarette
3    butts out of the parking lot, shining the wheels on the
4    car, standing outside smoking a cigarette, that sort of
5    stuff.
6                    Now, if they were required to come in
7    early and work, they got compensated.
8           Q.      If an employee came in early, say they
9    got there at 7:30 and they were scheduled at 8:00 and
10   went to work, started performing duties that were
11   expected of them, they couldn't record that time?
12          A.      There was no instances of that.
13          Q.      Then what were the instances of?
14          A.      Well, there might be a time when we had
15   an early service, and maybe I would require a couple of
16   the employees to come in early to get the hearse ready
17   if we had an early burial or whatever, that sort of
18   stuff.
19          Q.      And when that happened, when you required
20   that they were paid --
21          A.      They put it on their time card.
22          Q.      But what I'm trying to understand is if
23   you didn't require it and an employee came in a half
24   hour early and actually started working, performing
25   some job duties, would they not be allowed to record

d5f13f10-43ee-414a-96ed-b78f12fac2f3

NETWORK DEPOSITION SERVICES
Transcript of Ric Hensley

Page 144

1    that?

2         A.     Yes, they would, but I don't remember

3    anything specifically in that area.

4         Q.     You don't remember that ever happening?

5         A.     I don't remember that ever happening, no,

6    no.

7              MR. RAY:  I'll pass the witness.

8              MR. LINGLE:  I think we're all set.

9           FURTHER THIS DEPONENT SAITH NOT.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

d5f13f10-43ee-414a-96ed-b78f12fac2f3

```
 1                C E R T I F I C A T E

 2   STATE OF TENNESSEE

 3

 4   COUNTY OF KNOX

 5           I, Thomas J. Dorsey, Registered Professional

 6   Reporter and Notary Public, do hereby certify that I

 7   reported in machine shorthand the deposition of RIC

 8   HENSLEY, called as a witness at the instance of the

 9   Defendant, that the said witness was duly sworn by me;

10   that the reading and subscribing of the deposition by

11   the witness was not waived; that the foregoing pages

12   were transcribed under my personal supervision and

13   constitute a true and accurate record of the deposition

14   of said witness.

15           I further certify that I am not an attorney or

16   counsel of any of the parties, nor an employee or

17   relative of any attorney or counsel connected with the

18   action, nor financially interested in the action.

19           Witness my hand and seal this the 28th day of

20   October, 2009.

21                       Thomas J. Dorsey, RPR
                         Certified Shorthand Reporter
22                       and Notary Public
                         My Commission Expires:
23                       September 26, 2012

24

25
```