**TAB 14**

NETWORK DEPOSITION SERVICES
Transcript of Louise Johnson

Page 1

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DEBORAH PRISE and HEATHER RADY on  )
behalf of themselves and all       )
employees similarly situated,      )
                                   )
          Plaintiffs,              )
                                   ) Civil Action
     vs.                           ) No.: 06-1641
                                   )
ALDERWOODS GROUP, INC.,            )
                                   )
          Defendant.               )
_____)

Deposition of LOUISE JOHNSON, taken on behalf

of the Defendant, before Victoria A. Guerrero, CSR No.

8370, RPR, CRR, for the State of California, commencing

on Monday, July 17, 2009, 9:36 a.m., at Veritext

National Deposition & Litigation Services, 3090 Bristol

Street, Suite 190, Costa Mesa, California.

Pages 1 through 328

1d21e3be-c57c-4cb1-9f11-213fc513cf37

NETWORK DEPOSITION SERVICES
Transcript of Louise Johnson

Page 45

1    A    No.  Nobody else was there.

2    Q    After he hired you did -- let's take a step

3    back.

4         Did he talk to you about any on-call work?

5    A    No.  At that time that position was not an

6    on-call position.

7    Q    Did he talk with you at that time about any --

8    strike that.

9         You had never performed or been required to

10   perform any community service work, correct?

11   A    Correct.

12   Q    Did he tell you that he'd be the one scheduling

13   your hours or did he tell you how those hours would be

14   scheduled?  Or was it just fixed 8:00 to 5:00?

15   A    These are fixed 8:00 to 5:00 Saturday and

16   Sunday.

17   Q    What was your work week?

18   A    That was it, Saturday and Sunday only.  When

19   there was holidays, since the rest of the staff would be

20   off, it was almost considered like a weekend and I

21   filled that position.

22   Q    So it's not a full-time position?

23   A    It was not a full-time position.

24   Q    Did you get a written job description as to

25   what your duties would include when you were hired?

1d21e3be-c57c-4cb1-9f11-213fc513cf37

NETWORK DEPOSITION SERVICES
Transcript of Louise Johnson

Page 56

1    A    That I can remember.

2    Q    And this bonus was based upon the performance

3    of the entire facility, correct?

4    A    Yes.

5    Q    Did you ever attend any type of formal training

6    or orientation when you were hired at Harbor Lawn?

7    A    No.

8    Q    Did you ever attend any type of formal training

9    or orientation at any time while you worked at Harbor

10   Lawn?

11   A    Just within the last year or two we've started

12   with SCI attending training meetings.  We have an

13   on-line set of courses that we're required to take.

14   Q    Is that the dignity school?

15   A    Dignity University.

16   Q    When did you start getting that type of

17   training?

18   A    When SCI first took over they told us that we

19   had a certain time period to complete that training.

20   And I don't know, I can never remember when SCI sort of

21   took over because it was such a gradual process.  But

22   within the last two years.

23   Q    Did you complete the training?

24   A    I did.  I earned their equivalent of an

25   associates degree.

1d21e3be-c57c-4cb1-9f11-213fc513cf37

NETWORK DEPOSITION SERVICES
Transcript of Louise Johnson

Page 59

1    that correct?

2        A    As far as I can remember.

3        Q    So prior to those classes, you never had any

4    formal orientation or training concerning overtime; is

5    that correct?

6        A    Correct.

7        Q    Or concerning on-call work?

8        A    Everything that I know about my job, I learned

9    on the job.  Not in a formal setting.  As things came

10   up, they would tell me this is how we do this.

11       Q    So you haven't had any formal training or

12   orientation concerning on-call work, correct?

13       A    Correct.

14       Q    Nor any formal orientation or training

15   concerning time recordkeeping, correct?

16       A    Prior to?

17       Q    Yeah.  All this is prior to anything that SCI

18   did with the Dignity University.

19       A    Formally, I don't believe there was anything.

20       Q    By formally, I mean sitting down with a class

21   or sitting down one on one with somebody, other than a,

22   quote, on the job.  That's how I'm defining formal

23   orientation or training; do you understand that?

24       A    I do.  I don't believe there was any formal

25   training.

1d21e3be-c57c-4cb1-9f11-213fc513cf37

NETWORK DEPOSITION SERVICES
Transcript of Louise Johnson

Page 67

1    Q    Do you recall whether you performed any on-call
2    duties in the position of funeral director and
3    apprentice embalmer?
4    A    I may have during that time.
5    Q    Do you recall how much on-call duties you
6    performed during that time?
7    A    If I did any on-call duties, I usually only
8    covered for somebody, maybe one or two nights a month,
9    if that, to the best of my recollection.
10   Q    Did that occur when you were a funeral director
11   and apprentice embalmer?
12   A    Probably.
13   Q    How many times has that occurred when you were
14   a funeral director apprentice embalmer?
15   A    I would estimate maybe one or two nights a
16   month, if that.
17   Q    Did that change when you became a funeral
18   director/embalmer?
19   A    No.  I still only cover when the others can't
20   do it.
21   Q    Who sets forth -- well, let me take a step
22   back.
23        What is your understanding of on-call duties in
24   your position?
25   A    If I was to be on-call, I have to be available

1d21e3be-c57c-4cb1-9f11-213fc513cf37

NETWORK DEPOSITION SERVICES
Transcript of Louise Johnson

1    to answer my phone after normal business hours.  I have

2    to be able to provide pricing information over the phone

3    and answer any family's questions.  Sometimes I need to

4    make calls on their behalf.  And this may be anytime

5    after 5:00 p.m. till 8:00 a.m. the next morning.

6         There's been occasions where -- this hasn't

7    happened to me personally because I've gotten lucky, but

8    others have had to go to the office.  It just hasn't

9    come up with the calls that I received when I was

10   on-call.  But I may have had to go into the office

11   should I have had that come up in a conversation with

12   the family.

13        Q    Okay.  But you haven't done that, correct?

14        A    I have not.

15        Q    You have not gone to the office while you've

16   been on on-call duty, correct?

17        A    Correct.

18        Q    Who schedules the on-call duty rotation?

19        A    I would say Curt Owen.

20        Q    You don't know?

21        A    Everything was somewhat established when I came

22   into my position.  As far as I've been there, it's

23   always been rotated between Curt Owen and Kathy DePeri.

24   They're the two directors on call.  If it's not one,

25   it's the other.  And they already had their system set

1d21e3be-c57c-4cb1-9f11-213fc513cf37

NETWORK DEPOSITION SERVICES
Transcript of Louise Johnson

1    up when I came into it.

2        Q    So it's only when Curt Owen or Kathy DePeri

3    cannot cover on-calls when they call you in?

4        A    Yes.

5        Q    Anybody else in the rotation?

6        A    No.

7        Q    Anybody else substituting for the rotation

8    other than yourself?

9        A    No.

10       Q    By the way, when you were the

11   secretary/receptionist position you described when you

12   first got hired, who was your immediate supervisor?

13       A    Curt Owen.

14       Q    Who was your immediate supervisor in the

15   funeral director/apprentice embalmer position?

16       A    Curt Owen.

17       Q    What about for the position funeral

18   director/embalmer?

19       A    Curt Owen.

20       Q    Who did Curt Owen report to?

21       A    Lynn Stucker.

22       Q    And he's the general manager?

23       A    Yes.

24       Q    And I'm sorry, what was Curt Owen's position

25   again?

1d21e3be-c57c-4cb1-9f11-213fc513cf37

NETWORK DEPOSITION SERVICES
Transcript of Louise Johnson

1    A    My supervising embalmer, who I was licensed to

2   work under, was Curt Owen.  And he did literally

3   supervise, I think, even the first 26 bodies I did.

4    Q    And there's a record, there's a log you've got

5   to fill out and send that in?

6    A    Yes.

7    Q    When did you take your state board exam?

8    A    I may be confusing it with the national board

9   exam which I also took.  But I took some exams in

10  December of 2003.  I tried to do as many exams as I

11  could as close to completing school.

12   Q    On the state board exam, did you take it and

13  pass the first time?

14   A    Yes.

15   Q    And the same with your national board, did you

16  take it and pass the first time?

17   A    Yes.  I just recall that the funeral director's

18  and embalmer's license, they're separate, but I took

19  both of the tests.  It may have been within the next six

20  months after I graduated, but I at least took the

21  national, I think, the day I graduated.

22   Q    What is your understanding as to the

23  requirements for obtaining a funeral director's license

24  in the State of California?

25   A    To get a funeral's director's license you need

1d21e3be-c57c-4cb1-9f11-213fc513cf37

NETWORK DEPOSITION SERVICES
Transcript of Louise Johnson

Page 81

1   to have an associate degree or the equivalent, you need
2   to pass the state board exam, do the necessary
3   paperwork, fingerprints, pay the fees.
4       Q    And did you take the exam and pass it the first
5   time?
6       A    Yes.
7       Q    Is there an ongoing fee that is required to
8   keep your funeral director's license current?
9       A    There's an annual fee.
10      Q    Who pays that?
11      A    Currently, my employer pays it.
12      Q    And the same with the embalmer's license; is
13  there an annual fee to keep that current?
14      A    Yes.
15      Q    And who pays that?
16      A    My employer.
17      Q    And that would be Alderwoods, correct?
18      A    Alderwoods under SCI.
19      Q    Alderwoods -- you don't know who your employer
20  is?
21      A    It's a grey area.
22      Q    Who's on your payroll check?
23      A    It says Alderwoods and then it says -- I think
24  it says an SCI group.
25      Q    Who's on your W-2?

1d21e3be-c57c-4cb1-9f11-213fc513cf37

NETWORK DEPOSITION SERVICES
Transcript of Louise Johnson

Page 109

1    with Mr. Stucker?

2        A    It may have come up.

3        Q    But as you sit here today, you don't recall any

4    specific discussions you had with Mr. Stucker concerning

5    not being paid overtime?

6        A    I can't remember specific conversations, but

7    there's a good chance that at some point we talked.

8        Q    As you sit here today, can you remember an

9    instance where you had a conversation with Mr. Stucker

10   talking about overtime you had worked and were not paid?

11       A    There was at least one occasion where I put

12   something on my time card and then he later took it off.

13       Q    Who did, Mr. Stucker?

14       A    Yes.  And he told me that I wasn't -- probably

15   that I wasn't preapproved to work.  I took an

16   educational seminar and in the past they had either paid

17   for me to get into the seminar or they paid for an eight

18   hour day for me to be there.

19            It wasn't necessarily required, but they

20   compensated me.  And then this time when I put it down,

21   it was one of those occasions where he was in a bad mood

22   or the company was coming down hard on him on overtime

23   at that point, and he decided to take that off.

24       Q    When did that occur?  Take a step back.

25            When did the seminar occur?

1d21e3be-c57c-4cb1-9f11-213fc513cf37

NETWORK DEPOSITION SERVICES
Transcript of Louise Johnson

Page 128

1   they would have had me doing and so that's why I didn't
2   want to do it.
3       Q    What did you think the compensation was worth?
4   What did you mean by that?
5       A    I don't enjoy being woken up at 3:00 in the
6   morning to talk to somebody on the phone.  I've had
7   people call with the most ridiculous questions.  They're
8   not ridiculous to them but, they are to me at 3:00 in
9   the morning.
10          And it's not just that I get the call and I get
11  paid for the call, but then I'm awake, I can't go back
12  to sleep, I've got to get up in a few more hours and go
13  to work.  And I could get called six more times in
14  between then.
15      Q    And you didn't think being paid what you were
16  paid was worth all that upsetness or disruption?
17      A    No.  Well, we get paid for the call, yes, but
18  that doesn't save the rest of my night.  Or if I'm out
19  socially I would have to interrupt my time.  I didn't
20  want to do that.
21      Q    Okay.  Any other complaints about the on-call
22  duties you were performing that you made to Mr. Owens?
23      A    Not really.  It was so rare that I didn't end
24  up doing it.
25      Q    What about making complaints to Mr. Stucker

1d21e3be-c57c-4cb1-9f11-213fc513cf37

NETWORK DEPOSITION SERVICES
Transcript of Louise Johnson

Page 131

1      A     Would this be the overtime that I wrote down?

2      Q     No, I'm just talking about the hourly rate

3   because -- I know I keep saying that.  I'm just talking

4   about the calculation of the hourly premium rate.

5            Remember this morning we talked about base

6   rate?

7      A     Yes.

8      Q     The premium hourly rate is based upon the base

9   rate, correct?  Is that your understanding?

10     A     I think so.

11     Q     And it's got some other calculations that go in

12  it, correct?

13     A     I think so.

14     Q     And I understand, but correct me if I'm wrong,

15  that you believe that your overtime hourly rate was

16  incorrectly calculated?

17     A     On occasion.

18     Q     Did you ever complain to anybody about that?

19     A     Usually the way that these complaints came up

20  was between Curt, Kathy, and myself, just in our normal

21  day-to-day conversation.

22     Q     So it was just complaints shared between the

23  three of you?

24     A     For the most part.

25     Q     Did you ever complain to Mr. Stucker about your

1d21e3be-c57c-4cb1-9f11-213fc513cf37

NETWORK DEPOSITION SERVICES
Transcript of Louise Johnson

Page 132

1    overtime hourly rate being incorrectly calculated?

2        A    I don't think that I ever talked directly to

3    him.  Mostly Kathy and I would kind of talk to Lynn

4    through Curt.

5        Q    Did you ever tell Mr. Owen to convey your

6    complaints about your overtime rate being incorrectly

7    calculated to Mr. Stucker?

8        A    At the very least, we must have implied it.  I

9    don't know that we said it specifically.

10       Q    Did you ever call -- we've been through that.

11   Anybody -- no, we've been through that, too.

12           Let's go to meal periods.  Who have you

13   complained about meal periods to?

14       A    Definitely Curt.

15       Q    Anyone else?

16       A    Same kind of thing where we works, normal

17   personal conversations, we would complain about it.

18       Q    You, Curt, and Kathy DePeri?

19       A    Yes.  And I know there's several times where we

20   mentioned to our administrator who puts in the time

21   cards.  We weren't certain that she was doing it

22   correctly and we'd kind of ask people to look into it.

23   And nobody ever really did until this other employee,

24   Don Webb, he really got into it.  He wouldn't drop it.

25       Q    When you say you'd ask other people to look

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

1d21e3be-c57c-4cb1-9f11-213fc513cf37

NETWORK DEPOSITION SERVICES
Transcript of Louise Johnson

1    every day, but that's what we wrote down.

2        Q    Did you ever write down on your time cards that

3    you worked through lunch?

4        A    Occasionally.

5        Q    And when you put that on your time card, were

6    you paid for the time that you worked during your lunch?

7        A    I think we were paid and then for a while we

8    were paid incorrectly and then they corrected that after

9    that.

10        Q    Okay.  So how were you paid incorrectly?

11        A    There was their certain penalty hour that they

12    weren't giving us where they were paying us our regular

13    rate instead of an overtime rate because of when we took

14    our lunch break or how long it was for if we worked

15    through it.  It was all very confusing, it still is.

16            They figured out there was a problem.  They

17    compensated us for a period of time where they know

18    there was that problem, they went back through the time

19    cards and looked.

20        Q    Okay.  So to your knowledge, then, they

21    corrected that problem concerning the meal periods?

22        A    May still be going on.  We just don't know.

23        Q    Well, have you worked through meal period and

24    put it on your time card within the last month?

25        A    Probably.

1d21e3be-c57c-4cb1-9f11-213fc513cf37

NETWORK DEPOSITION SERVICES
Transcript of Louise Johnson

Page 150

1    Q    Well, were you paid for that working through
2  your lunch?
3    A    I think so.
4    Q    And were you paid the additional time that you
5  were entitled to for working through your lunch?
6    A    I think so.
7    Q    Do you have any reason to believe that you were
8  not paid the incorrect amount of compensation for
9  working through your meal periods?
10   A    Only if they did another calculation error,
11  which I wouldn't know.
12   Q    Why wouldn't you know that?
13   A    Nobody's been able to effectively explain how
14  the extra hours, the extra pay works.  And so whenever
15  we turn in a time card like that, we just give 'em our
16  best guess, we don't know.  We don't understand how it
17  works.
18   Q    Well, you give them the hours you worked and
19  it's their responsibility to make sure you get correctly
20  compensated for it, correct?
21   A    I think it's their responsibility, but they
22  expect us to add it up and then they just put it in.
23   Q    When you say they expect you to add what up?
24   A    The hours worked, the overtime, and all of the
25  penalties associated with the meal breaks, they expect

1d21e3be-c57c-4cb1-9f11-213fc513cf37

NETWORK DEPOSITION SERVICES
Transcript of Louise Johnson

Page 160

1     Q   Okay.  Going back to Exhibit 10 on page five,

2  it states a second or third sentence, quote, The time

3  record should show time in and out for every day worked

4  (including meal breaks, lunch) and time performing work

5  while on-call (e.g., answering phone calls, removal,

6  etc.).

7        Do you see that?

8     A   Yes.

9     Q   And was that Alderwoods' policy during the time

10  that you worked for it?

11     A   That was the written policy.

12     Q   Did you record the phone calls you received

13  while you were on-call?  Did you have a log to do that

14  or documents to fill out?

15     A   For a while on our time card we would -- we

16  weren't putting the in and out time, we would just put

17  eight hours, ten hours.  On that we would put four phone

18  calls.  But then later on as we began to use, like, a

19  time clock or time sheets, there was actually a log for

20  overtime -- or on-call phone calls.

21     Q   So while you're on call there is a log

22  telephone sheet that you're required to fill out,

23  correct?

24     A   Yes.

25     Q   And doesn't that have where you list what the

1d21e3be-c57c-4cb1-9f11-213fc513cf37

NETWORK DEPOSITION SERVICES
Transcript of Louise Johnson

Page 165

1    a lot of judgment calls.  That's not really covered in

2    this.

3        Q    What do you mean by judgment calls?

4        A    When there's nobody around to ask, you just

5    know that you have to do your job.

6        Q    Wouldn't Curt be on-call, though, sometimes?

7    Couldn't you call him up and say, look, I've got a real

8    bad embalming case and it's going to take more than just

9    the typical time period, I'll be here until whenever,

10   7:00 o'clock or three hours of overtime; couldn't you

11   call him and get preapproval or get approval that way?

12       A    I don't know if he was one that could approve

13   or preapprove overtime.  I didn't know if it was him or

14   the manager.  I wasn't clear.

15       Q    What about calling Mr. Stucker in the same

16   situation, you know, you had a bad embalming case

17   because heaven knows you get those occasionally and this

18   is going to take more time than what was initially

19   estimated and you needed to get ready for a service the

20   next day, there's only so many hours in day to get it

21   done.

22            Did you ever try to call Mr. Stucker and make

23   those kind of comments to him?

24       A    I tried not to bother these people after normal

25   business hours.  They've got their own lives.

1d21e3be-c57c-4cb1-9f11-213fc513cf37

NETWORK DEPOSITION SERVICES
Transcript of Louise Johnson

Page 166

1      Q    So the answer is no because you try not to

2  bother these people because they have their own lives?

3      A    It was out of courtesy.  I'm not going to call

4  them at 3:00 in the morning and tell them I'm having a

5  problem with a body.

6      Q    How often did you work at 3:00 in the morning?

7      A    A lot.

8      Q    Was that usually where the overtime was at, was

9  at 3:00 o'clock in the morning?

10     A    What I would do normally is, and everybody knew

11  this, that I would work in the office from 8:00 to 5:00

12  or so.  And then at the end of the day when the doors

13  closed, the phones stopped ringing, I would go in the

14  back to start embalming.  I'd be uninterrupted.  So a

15  lot of that was naturally going to be overtime anyways.

16  And then some of it ran a lot longer than expected.

17     Q    Under the overtime category on page six of

18  Exhibit 10, the last sentence in the first full

19  paragraph states, quote, Employees may contact their

20  manager or human resources manager for clarification of

21  how overtime is calculated and paid in their state; do

22  you see that?

23     A    Yes.

24     Q    Did you ever attempt to do that in regards to

25  the concerns you had about how overtime is calculated

1d21e3be-c57c-4cb1-9f11-213fc513cf37

1   and paid here in California?

2       A    No.

3       Q    And it was your understanding at the time that

4   you worked for Harbor Lawn that if you worked more than

5   eight hours a day you're entitled to overtime?

6       A    Yes.

7            If you work more than 40 hours a week you're

8   entitled to overtime?

9       A    Yes.

10      Q    On the second paragraph under overtime on page

    six of Exhibit 10 it states, Payment for overtime worked

12      will be made no later than the end of the pay period

13  immediately following the pay period during which the

14  overtime is worked (provided approved time cards/time

15  sheets are submitted before the payroll deadline); do

16  you see that there?

17      A    Yes.

18      Q    Is that your understanding of the policy in

19  effect during the time that you worked for Alderwoods?

20      A    I think that's what we were doing.

21      Q    So yes, it was the policy in effect and yes,

22  that's what they were doing or what you were doing?

23      A    I believe so.

24      Q    The next section deals with section G, on-call.

25  And I think we already established what we discussed was

NETWORK DEPOSITION SERVICES
Transcript of Louise Johnson

Page 174

1     Q    So no one from management told you how many
2   miles you had to stay within the facility for on-call
3   duty?
4     A    No.
5     Q    When you performed your on-call duty, where was
6   it that you generally were?
7     A    Generally, I could say I was at home.  I might
8   have been at my parents' home or I may have been out to
9   dinner.
10    Q    You think the substantial amount of time you
11  spent at home when you were on-call?
12    A    A lot of it, because then that includes the
13  time that I would have been asleep.
14    Q    But the company didn't require you to remain on
15  the company premises or in this case at Harbor Lawn,
16  correct?
17    A    Correct.
18    Q    And it didn't require you to stay at your home,
19  correct?
20    A    Correct.
21    Q    And the only thing that was left open is that
22  no one's ever told you what the reasonable distance you
23  were supposed to stay within the facility, correct?
24    A    Correct.
25    Q    The next sentence says, on-call employees

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

1d21e3be-c57c-4cb1-9f11-213fc513cf37

NETWORK DEPOSITION SERVICES
Transcript of Louise Johnson

1  required to not consume alcohol or other intoxicants; do

2  you see that?

3      A    Yes.

4      Q    Was that the policy in effect at Alderwoods

5  during the time that you worked for it?

6      A    Yes.

7      Q    Did you comply with that policy?

8      A    Yeah.  That was one that -- they made it known,

9  my coworkers.  They made it known that we had to be not

10  drinking, not on any drugs, and we had to be able to

11  answer our phones.

12          So you can't really go to a movie because you'd

13  get interrupted, you'd have to leave.  You can't do

14  certain things.  It was common knowledge for us that we

15  knew we couldn't participate in certain activities.

16      Q    Can't tell you the number of times I've been at

17  a movie theater and people answering their cell phones,

18  but that's just me.  For example, you couldn't perhaps

19  go to a rock concert because you couldn't hear the phone

20  ringing?

21      A    Exactly.  And one of the things I do now which

22  precludes me from being on call, really, is I work on

23  cars.  I can't have my phone and my price list and all

24  of that.  I'm up to my elbows in grease.  I can't answer

25  the phone.

1d21e3be-c57c-4cb1-9f11-213fc513cf37

NETWORK DEPOSITION SERVICES
Transcript of Louise Johnson

1    Q    Next sentence says, If there are greater

2    restrictions on the employee's on-call duty, on-call

3    time may be compensable.  The employee and manager

4    consult with the human resources.

5        Did you ever do that?

6    A    We were sort of interested, but we didn't know

7    that that was an option we could do.

8    Q    So you didn't ever consult with the human

9    resources about greater restrictions on on-call that --

10   A    No.

11   Q    It says, When the employee is called to work

12   during the on-call time, the employees will be paid at

13   the employee's appropriate pay rate.  Says see call

14   section below; do you see that?

15       Again, back on Exhibit 10, page six, G, looks

16   like it's the second sentence before the end of the

17   paragraph.

18       Was that the policy in effect at Alderwoods

19   during the time that you worked for it?

20   A    They paid us differently.  When I first started

21   we got -- if you were on-call one night you would get

22   one hour overtime standard.  And then for each phone

23   call you would get 15 minutes of overtime.  So no matter

24   what, if you didn't get any phone calls, you still got

25   one hour overtime just for being on call.

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

1d21e3be-c57c-4cb1-9f11-213fc513cf37

NETWORK DEPOSITION SERVICES
Transcript of Louise Johnson

1        After that it was changed to we got paid 15

2   minutes of overtime for every phone call we got and it

3   was supposed to be within a 15 minute block.  It doesn't

4   matter how many minutes were in that, you got paid for

5   that 15 minutes.

6        So if you waited another 15 minutes to make

7   your next phone call, then you would get your second 15

8   minutes, if that makes sense.

9   Q    No, it doesn't, but I'll have you explain it to

10  me in a second.

11       The first one I understand, I think.  And the

12  second one, it says 15 minutes of overtime for each

13  phone call.

14  A    Yes.

15  Q    And then you lost me after that.

16  A    But then let's say you make your phone call, so

17  you get 15 minutes of overtime.  But within that next 15

18  minutes you make two more phone calls.  You don't get

19  your 15 minutes for each one of those.

20  Q    Okay.  So you get 15 minutes for the number of

21  calls you make during those minutes.

22  A    Right.  And then if you, like, an hour later

23  you make another phone call, you get another 15 minutes.

24  Q    And what you're doing is juxtaposing that

25  against the prior policy that every phone call you made

1d21e3be-c57c-4cb1-9f11-213fc513cf37

NETWORK DEPOSITION SERVICES
Transcript of Louise Johnson

Page 219

1    accurate?

2        A    I think that should also say 2007.

3        Q    What about these X's in the middle of the page

4    where it says A, B, C, D and E; who put those Xs at

5    those boxes, B, D, and E?

6        A    It was probably the same person that wrote

7    everything at the top.

8        Q    Okay.  But wasn't you, correct?

9        A    It was not me.

10       Q    Do you agree with the boxes that are checked

11   on -- do you agree the way that this document is filled

12   out as far as to checking boxes B, D, and E and not C or

13   A?

14       A    Yes.

15       Q    Okay.  And that's why you signed this document

16   was to affirm that B, D, and E were correct?

17       A    Yes.

18       Q    So as far as number A that deals with community

19   service, you're not claiming any community service as

20   part of your claim in this lawsuit, correct?

21       A    Correct.

22       Q    And same thing with C, you're not claiming any

23   compensation for time spent training for and taking a

24   test to become a licensed insurance agent or in time

25   maintaining that license?

1d21e3be-c57c-4cb1-9f11-213fc513cf37

NETWORK DEPOSITION SERVICES
Transcript of Louise Johnson

Page 220

1    A    Correct.

2    Q    Now, number B, it says, I believe Alderwoods

3  permitted me to perform on-call after regular work hours

4  and at least some of the time was not paid for by

5  Alderwoods.

6         Do you see that?

7    A    Yes.

8    Q    And it's my understanding, and correct me if

9  I'm wrong, that the claim you're talking about there is

10  the overtime that you worked and were not paid for,

11  correct?

12    A    Correct.

13    Q    And D states, I believe I was not compensated

14  for all the hours I spent working as an apprentice

15  funeral director/embalmer; do you see that?

16    A    Yes.

17    Q    What hours are you referring to there?

18    A    Those are hours that I spent usually embalming

19  after hours that I did not put on my time card.

20    Q    So that would be overtime for doing after hour

21  work and performing embalming services?

22    A    Yes.

23    Q    Anything else?

24    A    Uh, occasionally there might have been

25  visitations being held at night, but those -- they're

1d21e3be-c57c-4cb1-9f11-213fc513cf37

NETWORK DEPOSITION SERVICES
Transcript of Louise Johnson

Page 228

1    I was submitting so much overtime for the week that I

2    kind of -- I couldn't put any more without attracting a

3    lot of attention and a lot of trouble, particularly from

4    Tracy.

5         Q    Are you aware of any policy that Alderwoods had

6    for not fully compensating employees that were

7    performing on-call duties?

8              MR. McGEE:  Object to the form.

9              THE WITNESS:  I don't know.

10   BY MR. FORESTIERE:

11        Q    Did anyone from Alderwoods ever tell you not to

12   report all the time you worked while you were performing

13   on-call duties?

14        A    Don't believe that they ever said that.

15        Q    Did you ever see a written policy issued by

16   Alderwoods saying that people performing on-call duties

17   would not be fully compensated for the work they

18   performed?

19        A    I've never seen anything.

20        Q    Do you know of anyone that worked at Harbor

21   Lawn that was not fully compensated for their on-call

22   duties other than yourself?

23        A    Most likely Curt and Kathy.

24        Q    How do you know that?

25        A    Through personal conversation in the office.

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

1d21e3be-c57c-4cb1-9f11-213fc513cf37

NETWORK DEPOSITION SERVICES
Transcript of Louise Johnson

1   of her employment performing embalming work after her

2   regular work hours for which she was not compensated

3   because those hours were not approved.

4   BY MR. FORESTIERE:

5       Q    Thank you.  Now, how did you determine it was

6   ten hours per week?

7       A    I estimated based on what I knew myself to have

8   normally worked and what I would normally leave off of

9   the time card.

10      Q    How was it that we can double check your work?

11  How can we double check your calculation?

12      A    Take my word for it.

13      Q    Other than taking your word for it, are there

14  any other documents or any other basis upon which we can

15  corroborate your testimony that you spent ten hours per

16  week?

17      A    That's it.

18      Q    And that's based upon your recollection,

19  correct?

20      A    Yes.

21      Q    And nothing else, true?

22      A    As far as I know.

23      Q    Did you ever attempt to request overtime for

24  working as an embalmer that was denied?

25      A    I think I've had some conversations with Curt

NETWORK DEPOSITION SERVICES
Transcript of Louise Johnson

Page 246

1    community service that other people were doing?

2        Q    No.  I'm just saying anything else.

3        A    Can't remember specifically.

4        Q    So the best of your recollection, there's no

5    other, as you sit here today, compensation that's due

6    for you for not recording all the time you've worked

7    while at Harbor Lawn?

8        A    I believe so.

9        Q    Was there any written policy at Alderwoods

10   instructing its employees not to record all the time

11   that they worked performing services?

12       A    I don't believe so.

13       Q    Have you ever heard Mr. Stucker telling any

14   employees to do that?

15       A    I don't believe so.

16       Q    Have you ever heard Mr. Owens tell anyone not

17   to do that or to do that, that is not to record all

18   their time?

19       A    He might not have said it in so many words, he

20   might not have said do not do this, but it was sort of

21   implied sometimes that it wasn't in our best interest to

22   do that.

23       Q    You're talking about your discussions with him

24   concerning the overtime you worked as an embalmer?

25       A    Yes.

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

1d21e3be-c57c-4cb1-9f11-213fc513cf37

1                        CERTIFICATE

2                             OF

3               CERTIFIED SHORTHAND REPORTER

4

5            The undersigned Certified Shorthand Reporter

6     and Deposition Officer of the State of California does

7     hereby certify:

8            That the foregoing deposition was taken before

9     me at the time and place therein set forth, at which

10    time the witness was duly sworn by me;

11           That the testimony of the witness and all

12    objections made at the time of the deposition were

13    recorded stenographically by me and was thereafter

14    transcribed, said transcript being a true and correct

15    copy of the proceedings thereof.

16           In witness whereof, I have subscribed my name

17    this date: July 17, 2009.

18

19

20

21    _____

            Victoria A. Guerrero, CSR No. 8370

22

23

24

25
                                                        28