**TAB 15**

Case3:08-cv-01184-SI   Document219-35   Filed11/13/09   Page2 of 35

Page 1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF PENNSYLVANIA

DEBORAH PRISE and HEATHER RADY,
on behalf of themselves and all
employees similarly situated,

    Plaintiffs,

vs.

ALDERWOODS GROUP, INC. and
SERVICE CORPORATION INTERNATIONAL,

    Defendants.

_____

Civil Action No. 06-1641 Civil
Judge Joy Flowers Conti

DEPOSITION OF ROBERT GORDON JONES

Taken April 21, 2009
Commencing at 9:30 a.m.

Volume I - Pages 1 - 216, inclusive

Taken by the Defendants
at
Lane Powell Law Firm
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska

Reported by:
Mary A. Vavrik, RMR

72061a54-5157-4519-8455-94be4a32d6e4

NETWORK DEPOSITION SERVICES
Transcript of Robert Jones

1            MR. LINGLE:  Object to the form.

2    You're certainly not asking for his legal opinion,

3    right?

4            MR. FORESTIERE:  I'm asking for his

5    understanding.  I'm not asking for any legal

6    opinions or conclusions.

7            THE WITNESS:  I don't recall.

8    BY MR. FORESTIERE:

9    Q    You don't know one way or the other?

10   A    No, sir.

11   Q    During the time that you were an operational

12   manager, did you work any overtime?

13   A    Yes, sir.

14   Q    Did you ever request overtime to be paid for

15   the time that you worked?

16   A    Yes, sir.

17   Q    Who did you request it from?

18   A    Mr. Janssen.

19   Q    How did you request it from Mr. Janssen?

20   A    Well, if -- if I had accumulated an

21   extraordinary amount of overtime above what he would

22   normally pay me, for instance, if I, you know, had

23   to go out of town for removal, if we went to Seward

24   or wherever outside my normal operations, I would

25   ask that that be included.

72061a54-5157-4519-8455-94be4a32d6e4

NETWORK DEPOSITION SERVICES
Transcript of Robert Jones

Page 55

1    Q    And what was his response?

2    A    Generally accommodating.

3    Q    When you say, "accommodating," did he approve

4    the overtime for you to be paid?

5    A    Yes.

6    Q    And were you paid the overtime for that type of

7    work?

8    A    Yes, sir.

9    Q    And if that occurred, that would be on your

10   payroll or check stubs for the period of time that

11   you were an operational manager, correct?

12   A    Yes, sir.

13   Q    On Exhibit 3 on the page ending 467, which is

14   the third page, do you recognize whose handwriting

15   is on the bottom of the page there, the signatures?

16   A    Yes, sir.

17   Q    Could you identify those for me, please?

18   A    Mr. Janssen and myself.

19   Q    And did you receive this document on or

20   about -- well, strike that.  So the -- is that your

21   handwriting next to your signature where it says

22   August 6, 2003?

23   A    Yes, sir.

24   Q    Did you receive this document on or about that

25   time?

72061a54-5157-4519-8455-94be4a32d6e4

NETWORK DEPOSITION SERVICES
Transcript of Robert Jones

Page 96

1    A    There may be some gray areas in the selling of

2    those products.  I think unlicensed staff members

3    can meet with families and give them the high points

4    and low points of particular services or

5    merchandise, but I don't believe they can conclude

6    the sale of funeral service goods or services

7    without a license.

8    Q    Did Mr. Janssen ever tell you that you had to

9    get a funeral director's license to be employed at

10   Evergreen?

11   A    Yes, sir.

12   Q    When did he tell you that?

13   A    In October '95.

14   Q    So you had your license -- a funeral director's

15   license in October 1996, correct?

16   A    Yes, sir.

17   Q    After that what did you need to do to have it

18   renewed every year?

19   A    Just pay the renewal fee.  They -- I think they

20   are good for two years or longer than a one-year

21   period.

22   Q    Anything else other than paying a renewal fee?

23   A    No, sir.

24   Q    You initially would have to take a test to get

25   the -- well, strike that.  Let's start from the

72061a54-5157-4519-8455-94be4a32d6e4

NETWORK DEPOSITION SERVICES
Transcript of Robert Jones

1   beginning.  On the embalmer's license, what did you

2   have to do to get that license, the apprentice

3   funeral director/embalmer's license?  What did you

4   have to do to get that license?

5   A    You had to have a licensed sponsor, so to

6   speak, someone who could review your apprenticeship

7   program, and fill out the application and pay for

8   it.

9   Q    Did you have to take a test?

10  A    No, sir.

11  Q    And what did you have to do to get your funeral

12  director's license?

13  A    You had to pass a State test and the national

14  board exam for funeral director.

15  Q    When did you take the State test?

16  A    It was the same day I took the national board,

17  which would have been sometime either September --

18  late September or October of '96.

19  Q    And you obviously passed?

20  A    I did.

21  Q    And after that you just had to pay a renewal

22  fee every couple of years to renew it?

23  A    Correct.

24  Q    There is no continuing education required,

25  correct?

72061a54-5157-4519-8455-94be4a32d6e4

NETWORK DEPOSITION SERVICES
Transcript of Robert Jones

1   A      No, there is not.

2               MR. FORESTIERE:  Let's mark this.

3   Mark here as Exhibit 6 -- I unfortunately can't read

4   the Bates stamp numbers, but it's a document called

5   Evergreen Memorial Chapels, Inc. Procedure and

6   Policy Guide effective October 1, 1996.

7               (Exhibit No. 6 marked.)

8   BY MR. FORESTIERE:

9   Q      Have you had an opportunity to review that

10  document, sir?

11  A      Yes, sir.

12  Q      This is a document that was in your files, is

13  that correct?

14  A      I believe it would have been, yes, sir.

15  Q      Have you seen this document before?

16  A      Yes, sir.

17  Q      You are familiar with it, correct?

18  A      Uh-huh, yes, sir.

19  Q      When was the first time you believe you saw

20  this document?

21  A      The first part of October '96.

22  Q      When you received it, did you read through it?

23  A      Yes, sir.

24  Q      And did you believe you understand everything

25  that you read when you went through it?

72061a54-5157-4519-8455-94be4a32d6e4

NETWORK DEPOSITION SERVICES
Transcript of Robert Jones

1  A    There was an arrangement that I had with the

2  management to pay a set number of overtime hours

3  every week regardless of the amount of time worked.

4  So I didn't always necessarily need to record the

5  time worked since my time to be submitted was set.

6  Q    And when was this agreement in place?

7  A    Actually I -- I believe it was started in

8  January of '96 or '97.

9  Q    And who did you have this agreement with?  I

10  mean, who personally did you discuss --

11  A    Mr. Janssen.

12  Q    Are there any documents that you are aware of

13  that exist that confirm that arrangement?

14  A    No, sir.

15            MR. LINGLE:   Objection.

16  BY MR. FORESTIERE:

17  Q    Did that agreement continue throughout the time

18  that you worked at Evergreen?

19  A    Yes.

20  Q    Was that a special arrangement with you, or did

21  other funeral directors have that same arrangement?

22  A    I believe it was just with me.

23  Q    So the other employees were required to record

24  their time on their time cards, at least to your

25  understanding, correct?

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

72061a54-5157-4519-8455-94be4a32d6e4

NETWORK DEPOSITION SERVICES
Transcript of Robert Jones

Page 119

1   A    Yes.

2                MR. LINGLE:  Object to the form.

3   BY MR. FORESTIERE:

4   Q    And when you were manager, was it your

5   responsibility to make sure that they properly

6   completed their time cards?

7                MR. LINGLE:  Object to the form.

8                THE WITNESS:  No, sir.

9   BY MR. FORESTIERE:

10  Q    Did you ever review any of the time cards from

11  any of the other employees?

12               MR. LINGLE:  Object to form.

13               THE WITNESS:  No, sir.

14  BY MR. FORESTIERE:

15  Q    I'm talking about from the period of December

16  of 2002 through May 2004.

17  A    No, sir.

18  Q    Okay.  During that period of time you didn't

19  review any of the other employees who worked at

20  Evergreen -- strike that.  During that period of

21  time you didn't review the other employees' time

22  cards that worked at Evergreen?

23  A    Correct.

24  Q    It wasn't your responsibility?

25  A    Correct.

72061a54-5157-4519-8455-94be4a32d6e4

NETWORK DEPOSITION SERVICES
Transcript of Robert Jones

Page 134

1   Q    And then if you go one, two, three, four pages,
2   and it looks -- says "Rob" at the top.
3   A    Yeah, it's got this sick day?
4   Q    Yeah, exactly.
5   A    Yep.
6   Q    Up at the top, though, it says, "Arrangements,"
7   and then I can't read what it says underneath there.
8   A    "No lunch."
9   Q    Does that indicate that you didn't take a lunch
10  that day?
11  A    Yes, sir.
12  Q    And then under that it says -- on Thursday it
13  says -- does that say, "service," then it says what,
14  "no lunch" again?
15  A    Yes, sir.
16  Q    And so on those two days you didn't take a
17  lunch, is that correct?
18  A    Correct.
19  Q    Then on the next page on Sunday, is that Lawson
20  or Lamson?
21  A    I believe it's Lawson.
22  Q    Is that just the name of a service or --
23  A    That -- yeah, either the last name of the --
24  it's the last name of the decedent.  I don't know
25  what the time frame was, but it was either a funeral

72061a54-5157-4519-8455-94be4a32d6e4

NETWORK DEPOSITION SERVICES
Transcript of Robert Jones

Page 150

1    4/3.  The second page is 5/1.  4/17.

2                    MR. LINGLE:  Okay.

3                    MR. FORESTIERE:  Someone just put an

4    extra page on it.

5    BY MR. FORESTIERE:

6    Q    So getting back to my question, then, it's your

7    understanding that the pay period ending date, this

8    one we're talking about, April 3, 2004, includes the

9    prior two weeks of work?

10   A    Yes, sir.

11   Q    All right, sir.  That makes more sense.  Now,

12   getting back to that page, though, under earnings it

13   says, "piecework," and then it says, "this period,"

14   and then it has "$140," do you see that?

15   A    Yes, I do.

16   Q    What does that pertain to?

17   A    That must be the pay for those death calls that

18   would have been done that two-week period.  So I --

19   Q    Are you contending in this lawsuit that you

20   didn't get paid for all of your death call work?

21                    MR. LINGLE:  Object to the form.

22                    THE WITNESS:  I believe that's the

23   case.

24   BY MR. FORESTIERE:

25   Q    Have you made any determination as to how many

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

72061a54-5157-4519-8455-94be4a32d6e4

NETWORK DEPOSITION SERVICES
Transcript of Robert Jones

1   times you made death calls that you were not paid

2   for?

3   A    No, sir.

4              MR. LINGLE:  Object to the form.

5   BY MR. FORESTIERE:

6   Q    Well, obviously you have been paid in this

7   paycheck at least something for death calls,

8   correct?

9   A    Yes, sir.

10   Q    And was it your understanding that you were

11   doing death calls at $35 for each one?

12   A    That seems to be the case, yes, sir.

13   Q    Because it looks like this would indicate that

14   there was four death calls that you were paid for,

15   correct?

16   A    Yes, sir.

17   Q    Do you know how many death calls -- strike

18   that.  Do you know if you were -- if you -- strike

19   that.  Did you perform any death calls during this

20   two-week period that you were not paid?

21              MR. LINGLE:  Object to the form.

22              THE WITNESS:  Not that I recall.

23   BY MR. FORESTIERE:

24   Q    How can we determine the number of death calls

25   that you were not paid for?

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

72061a54-5157-4519-8455-94be4a32d6e4

NETWORK DEPOSITION SERVICES
Transcript of Robert Jones

1              MR. LINGLE:  Well, he has set the

2   period, so don't -- don't base it off of that.

3   BY MR. FORESTIERE:

4   Q   Did you ever receive any commissions during the

5   time that you worked at Evergreen?  I thought we

6   established this morning that you didn't, but --

7   A   No, we did.  We got --

8   Q   Is that in addition to the piecework?

9   A   It was.

10   Q   What did you get a commission for?

11   A   Sales of vaults, markers, and urns above a

12   certain dollar level.

13   Q   But didn't you testify this morning that you

14   never exceeded that dollar level?

15              MR. LINGLE:  Object to the form.

16   BY MR. FORESTIERE:

17   Q   I'll ask you now.  Did you ever receive a

18   commission in selling those type of products?

19   A   Yes, sir.

20   Q   Okay.  And when did you receive a commission

21   for selling those type of products?

22              MR. LINGLE:  Object to form.

23              THE WITNESS:  From October '95

24   through the bankruptcy filing, I believe.

25   BY MR. FORESTIERE:

72061a54-5157-4519-8455-94be4a32d6e4

NETWORK DEPOSITION SERVICES
Transcript of Robert Jones

Page 175

1    Q    Which was?

2    A    I can't recall.

3    Q    You don't know what year it was?

4    A    No, sir.

5    Q    Was it prior to December 2002?

6    A    Yes, I believe it was.

7    Q    Okay.  Identify for me the bonuses you received

8    from -- or strike that -- during the time --

9    identify for me the bonuses you received during the

10   time period of December 2002 through May 2004.

11              MR. LINGLE:  Object to the form.

12              THE WITNESS:  I believe it was the

13   bonus that we were speaking to earlier as the -- as

14   the only one.

15   BY MR. FORESTIERE:

16   Q    That was a $7,000 figure, I think?

17              MR. LINGLE:  Object to the form.

18   BY MR. FORESTIERE:

19   Q    Strike that.  It's 9,483.17?

20   A    Yes, sir.

21   Q    And that was paid in 2003?

22   A    I believe so, yes, sir.

23   Q    Any other bonuses that you were paid for

24   from -- during the time of December 2002 to May

25   2004?

72061a54-5157-4519-8455-94be4a32d6e4

NETWORK DEPOSITION SERVICES
Transcript of Robert Jones

Page 176

1   A    No, sir.

2   Q    Do you know how much overtime you worked in

3   2003 that you were not paid for?

4                  MR. LINGLE:  Object to the form.

5                  THE WITNESS:  No, sir.

6   BY MR. FORESTIERE:

7   Q    Is there any way that we can determine that?

8   Strike that.  Is there a way for you to determine

9   how many overtime hours you worked in 2003 that you

10  were not paid for?

11                 MR. LINGLE:  Object to the form.

12                 THE WITNESS:  Not at -- not that I

13  know of.

14  BY MR. FORESTIERE:

15  Q    Now, getting back to Exhibit 13, you didn't

16  check box C, correct?

17  A    Correct.

18  Q    So you are not claiming any type of

19  compensation that you spent for training or taking a

20  test, correct?

21  A    Correct.

22  Q    I want to talk a little bit about your

23  community service.  Now, I understand that you are

24  claiming that you want to receive compensation for

25  community service work that you performed while

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

72061a54-5157-4519-8455-94be4a32d6e4

NETWORK DEPOSITION SERVICES
Transcript of Robert Jones

Page 177

1    working at Evergreen, correct?

2    A    Yes, sir.

3    Q    All right.  During the time period of December

4    2002 through May 2004, could you identify for me the

5    community service work that you wish to receive

6    compensation for?

7    A    None.

8    Q    Was there community service work that you

9    performed prior to December 2002 that you are

10   seeking to receive compensation?

11   A    Yes, sir.

12   Q    What community service did you perform prior to

13   2002 that you want to receive compensation for?

14   A    The work I did with the Lions Club.

15   Q    Anything else?

16   A    No, sir.

17   Q    Okay.  Can you identify for me the community

18   service work that you did concerning the Lions Club?

19   A    I did volunteer work with the Food Bank of

20   Alaska distributing food at our clubhouse, and I

21   worked the Tudor Road Bingo during the bingo events.

22   They donated money for our club if the members

23   worked emptying ashtrays and trash cans and helping

24   out the Tudor Road Bingo staff.

25   Q    Anything else?

72061a54-5157-4519-8455-94be4a32d6e4

NETWORK DEPOSITION SERVICES
Transcript of Robert Jones

Page 178

1    A    No, sir.

2    Q    Let's talk about the volunteer work at the

3    Lions Club for the Food Bank.  Do I have that right?

4    Did I mix my apples and oranges?

5    A    Volunteer work with the Lions Club for the Food

6    Bank.  No.  That's accurate.

7    Q    Let me get the word volunteer out of it.  When

8    did you start performing -- strike that.  Did you

9    ever become a member of the Lions Club?

10   A    Yes, sir.

11   Q    When did you become a member of the Lions Club?

12   A    It was -- I believe it was in the spring

13   of '96.

14   Q    Was that before or after you started working at

15   Evergreen?

16   A    After.

17   Q    Does the Lions Club membership have dues?

18   A    Yes, sir.

19   Q    Who paid the dues?

20   A    Evergreen.

21   Q    Are there any other periodic expenses

22   concerning your membership in the Lions Club that

23   Evergreen paid for?

24   A    No, sir.

25   Q    Did you ever have to come out of pocket

72061a54-5157-4519-8455-94be4a32d6e4

NETWORK DEPOSITION SERVICES
Transcript of Robert Jones

Page 179

1    concerning any expenses by being a member of the
2    Lions Club that Evergreen did not pay for?
3    A    No, sir.
4    Q    Why did you join the Lions Club?
5    A    It was a -- well, I joined the Lions Club
6    because I thought it was a good organization.
7    Q    How much time per week did you -- strike that.
8    How much time per week did you perform work at the
9    Lions Club?
10   A    It was probably six hours a month.
11   Q    And what did you do for those six hours?
12   A    Well, you know, one of them would be lunch, and
13   the other would be split between distributing food
14   from our clubhouse on behalf of the Food Bank to the
15   people in the neighborhood.  You know, would sign up
16   for two-, three-hour shifts.  And then the Tudor
17   Road Bingo was usually like a four-hour shift.
18   Q    So there would be weekly lunch meetings that
19   you would attend usually?
20   A    During the week?
21   Q    Yes.  How often were the lunch periods?
22   A    Every Wednesday.
23   Q    And how much time on a Wednesday would you
24   spend at lunch?
25   A    Oh, when I went, probably an hour and 15

72061a54-5157-4519-8455-94be4a32d6e4

NETWORK DEPOSITION SERVICES
Transcript of Robert Jones

Page 180

1    minutes.

2    Q    How often did you attend the lunches?

3    A    About once a month.

4    Q    Do they charge for lunch?

5    A    Gosh, I don't recall.

6    Q    So how much on a monthly basis did you spend

7    performing community service for the Lions Club?

8                    MR. LINGLE:  Object to the form.

9                    THE WITNESS:  Spend in hours?

10   BY MR. FORESTIERE:

11   Q    Yes, sir.

12   A    About five or six hours a month.

13   Q    When did you stop being a member of the Lions

14   Club?

15   A    I was a member for two years.

16   Q    So that ended about spring of 1998?

17   A    I'd say that's accurate.

18   Q    Was there a reason why you stopped attending --

19   strike that.  Was there a reason why you stopped

20   performing community service for the Lions Club?

21   A    I quit participating in the club altogether.

22   Q    And why did you do that?

23   A    I -- the workload wouldn't allow me to make the

24   lunches even once a month, so it just wasn't working

25   out.  Our schedules didn't work together.

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

72061a54-5157-4519-8455-94be4a32d6e4

NETWORK DEPOSITION SERVICES
Transcript of Robert Jones

Page 183

1   Q    What is your understanding as to that
2   requirement?
3   A    The funeral directors had to join a service
4   organization.
5   Q    And how did you become aware of that
6   requirement?
7   A    Mr. Janssen told me that.
8   Q    You recall when it was he first told you that?
9   A    It was October '95.
10  Q    Was there any written policy that you are aware
11  of requiring -- well, strike that.  Was the
12  community service requirement particular to anybody,
13  or did it apply to everybody that worked at
14  Evergreen?
15  A    It was particular to the directors and family
16  service counselors or pre-need sales people.
17  Q    That would be the funeral directors and family
18  service counselors pre-need?
19  A    Uh-huh.
20  Q    You have got to say yes.
21  A    Oh, yes.
22  Q    And do you know what the purpose of requiring
23  these people in those positions to perform community
24  service?
25                   MR. LINGLE:  Object to the form.

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

72061a54-5157-4519-8455-94be4a32d6e4

NETWORK DEPOSITION SERVICES
Transcript of Robert Jones

Page 184

1              THE WITNESS:  The purpose of the

2   requirement, my understanding, was so that the

3   community would get a better overall impression of

4   the staff, the firm.  You know, funeral director --

5   funeral homes are a hard thing to promote, so this

6   is a good nonlethal attempt to do that.

7   BY MR. FORESTIERE:

8   Q    Are you aware of written -- strike that.  Are

9   you aware of any written policies requiring the

10  funeral directors or family service counselors to

11  perform community service?

12  A    I am not.

13  Q    Did you ever complain to anyone about

14  performing community service?

15              MR. LINGLE:  Object to the form.

16              THE WITNESS:  No, sir.

17  BY MR. FORESTIERE:

18  Q    I'm talking about during the time that you

19  worked there.

20  A    No, sir.

21  Q    Did any of the other funeral directors complain

22  about performing community service during the time

23  that you worked there?

24              MR. LINGLE:  Object to the form.

25              THE WITNESS:  Not that I know of.

72061a54-5157-4519-8455-94be4a32d6e4

NETWORK DEPOSITION SERVICES
Transcript of Robert Jones

Page 185

1    BY MR. FORESTIERE:

2    Q    Did any family service counselors complain to

3    you about performing community service during the

4    time that you worked at Evergreen?

5                    MR. LINGLE:  Object to the form.

6                    THE WITNESS:  Not that I know of.

7    BY MR. FORESTIERE:

8    Q    Were you ever evaluated on your participation

9    on performing your community service during the time

10   you worked at Evergreen?

11   A    Not that I recall.

12   Q    Did you have any out-of-pocket expenses

13   concerning your being a volunteer coach for the Boys

14   and Girls Club?

15   A    Nothing that I took to the company.

16   Q    Did you keep any records concerning your

17   performing community service work for the Lions

18   Club?

19   A    No, sir.

20   Q    Did you keep any records concerning the amount

21   of time you spent performing community service with

22   the Boys and Girls Club?

23   A    No, sir.

24   Q    Did you report any time that you spent doing

25   community service work for the Lions Club to anyone

72061a54-5157-4519-8455-94be4a32d6e4

NETWORK DEPOSITION SERVICES
Transcript of Robert Jones

1    performing community service work while employed at
2    Evergreen?
3                        MR. LINGLE:  Object to the form.
4                        THE WITNESS:  No, sir.
5    BY MR. FORESTIERE:
6    Q    Any other community service work you performed
7    other than with the Boys and Girls Club and the
8    Lions Club?
9    A    No, sir.
10   Q    Do you know if there is any community service
11   work that was imposed at any other facilities
12   operated by Alderwoods?
13                        MR. LINGLE:  Object to the form.
14                        THE WITNESS:  Could you restate the
15   question?
16   BY MR. FORESTIERE:
17   Q    Are you aware of any community service
18   requirements that were -- strike that.
19                        MR. FORESTIERE:  Why don't you read
20   my question back.  It's getting to that part of the
21   day.
22                        (The requested record was read.)
23   BY MR. FORESTIERE:
24   Q    Let me ask the question again.  Are you aware
25   of any community service work requirement that was

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

72061a54-5157-4519-8455-94be4a32d6e4

NETWORK DEPOSITION SERVICES
Transcript of Robert Jones

1    imposed by Alderwoods at any of the other facilities

2    that it owned?

3    A    No, sir.

4    Q    Did you receive any type of training related to

5    the community service obligation that was imposed

6    upon you at the Evergreen facility?

7    A    No, sir.

8                   MR. FORESTIERE:  Why don't we go

9    ahead and take a break.  We are just about getting

10   close to the end.

11                   (A break was taken.)

12   BY MR. FORESTIERE:

13   Q    Are you aware of any other -- strike that.  Are

14   you aware of any policies implemented at any other

15   Alderwoods facilities concerning community service?

16   A    No, sir.

17   Q    Or concerning on-call services?

18   A    No, sir.

19   Q    Or concerning overtime, payment of overtime,

20   that is?

21   A    No, sir.

22   Q    Or about not recording hours worked on time

23   cards?

24   A    No, sir.

25   Q    Or policies at Alderwoods facilities requiring

72061a54-5157-4519-8455-94be4a32d6e4

NETWORK DEPOSITION SERVICES
Transcript of Robert Jones

Page 189

1    preapproval of overtime?

2    A    No, sir.

3    Q    Or how overtime rates were calculated at other

4    facilities?

5    A    No, sir.

6    Q    And on your on-call work that we talked about

7    earlier today, did you attempt to report that time

8    to anyone and request payment for it?

9                   MR. LINGLE:  Object to the form.

10                  THE WITNESS:  If -- nothing other

11   than what was recorded on the time sheet, so I guess

12   the answer is no.

13   BY MR. FORESTIERE:

14   Q    So other than the time you put on your time

15   sheets doing on-call work, you didn't report any

16   other time that you performed for on-call services?

17   A    No, sir.

18   Q    And is there a reason why you didn't do that?

19                  MR. LINGLE:  Object to the form.

20                  THE WITNESS:  Yeah.

21   BY MR. FORESTIERE:

22   Q    Could you tell me what that is, please?

23   A    I was so passionate about my job and my

24   position that the compensation really wasn't an

25   issue for me.

72061a54-5157-4519-8455-94be4a32d6e4

NETWORK DEPOSITION SERVICES
Transcript of Robert Jones

Page 190

1  Q    When people called you, they were already in
2  pretty much dire straits and need?
3  A    Most of the time.
4  Q    Did you tell Mr. Janssen that you were doing
5  on-call services and not reporting all your time?
6  A    No, sir.
7  Q    Did you tell anyone at Evergreen that you were
8  performing on-call services and not reporting all
9  your time?
10 A    No, sir.
11 Q    Are you aware of any company policy at
12 Evergreen for not compensating employees for
13 performing on-call services?
14             MR. LINGLE:  Object to form.
15             THE WITNESS:  No, sir.
16             MR. FORESTIERE:  Can I have the
17 question and answer read back, please.
18         (The requested record was read.)
19 BY MR. FORESTIERE:
20 Q    Are you aware of any company policy at
21 Evergreen for employees not reporting all the
22 overtime they worked?
23             MR. LINGLE:  Object to the form.
24             THE WITNESS:  No, sir.
25 BY MR. FORESTIERE:

72061a54-5157-4519-8455-94be4a32d6e4

NETWORK DEPOSITION SERVICES
Transcript of Robert Jones

1    Q    Are you aware of any company-wide policy at

2    Evergreen for not recording -- strike that.  Are you

3    aware of any company-wide policy at Evergreen for

4    employees not recording all the time they worked on

5    their time cards?

6                    MR. LINGLE:  Object to the form.

7                    THE WITNESS:  No, sir.

8    BY MR. FORESTIERE:

9    Q    Are you aware of any company-wide policy

10   employed by Evergreen to intentionally miscalculate

11   the overtime rate to be paid its employees for

12   overtime?

13   A    No, sir.

14                   MR. LINGLE:  Object to form.

15   BY MR. FORESTIERE:

16   Q    Are you aware of any company-wide policy

17   employed at Evergreen for employees not to record or

18   report the time they spent performing community

19   services?

20                   MR. LINGLE:  Object to the form.

21                   THE WITNESS:  No, sir.

22   BY MR. FORESTIERE:

23   Q    Were you involved in any type of pre-needs

24   appointments?

25   A    Yes, sir.

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

72061a54-5157-4519-8455-94be4a32d6e4

NETWORK DEPOSITION SERVICES
Transcript of Robert Jones

Page 192

1   Q    Was it your understanding that you needed an
2   insurance license to sell pre-need?
3   A    Yes, sir.
4   Q    What involvement did you have with the
5   pre-needs appointments?
6   A    My involvement with the pre-need appointments
7   would be to talk to the clients about their options,
8   their needs, their requests for services, explain
9   their options, but I couldn't finalize the deal.
10  Q    Because you didn't have a license?
11  A    Correct.
12  Q    When did you perform those services?
13  A    Oh, whenever necessary.
14  Q    Was it during the -- your typical workday?
15  A    Typically, yes, sir.
16  Q    Are you aware of any company-wide policy that
17  employees should not report their time set in the --
18  strike that.  Are you aware of any company-wide
19  policy for employees not to report their time in
20  performing the pre-needs appointments?
21  A    No, sir.
22            MR. LINGLE:  Object to form.
23  BY MR. FORESTIERE:
24  Q    Are you aware of any company-wide policy that
25  the employee should not take their meal periods when

72061a54-5157-4519-8455-94be4a32d6e4

NETWORK DEPOSITION SERVICES
Transcript of Robert Jones

1  they are supposed to?

2                 MR. LINGLE:  Object to the form.

3                 THE WITNESS:  No, sir.

4  BY MR. FORESTIERE:

5  Q    Are you aware of any company-wide policy that

6  the employees should not take their rest periods

7  when they are supposed to?

8                 MR. LINGLE:  Object to the form.

9                 THE WITNESS:  No, sir.

10  BY MR. FORESTIERE:

11  Q    Have you ever seen a written policy prepared by

12  Alderwoods that employees were not to take their

13  meal periods?

14  A    No, sir.

15  Q    Or that they were not to take their rest

16  periods?

17  A    No, sir.

18  Q    Or that they were not to record all of their

19  time they worked at Evergreen?

20  A    No, sir.

21  Q    Or that they were not to report all the

22  overtime they worked?

23  A    No, sir.

24  Q    Or not to report all the time they spent

25  performing on-call services?

72061a54-5157-4519-8455-94be4a32d6e4

NETWORK DEPOSITION SERVICES
Transcript of Robert Jones

Page 194

1   A    No, sir.

2   Q    Or not to report all the time they spent

3   performing any type of training that Evergreen may

4   have required for their jobs?

5   A    No, sir.

6   Q    Or that they were not to report their time for

7   performing community service work?

8   A    No, sir.

9   Q    Are you aware of any policy adopted by

10  Evergreen regarding the preapproval of overtime pay?

11  A    Nothing other than the policy that we have

12  looked at initially regarding preapproval.

13  Q    What was your understanding as to whether or

14  not preapproval was required before someone worked

15  overtime?

16  A    For me?

17  Q    Yeah.  What was your understanding during the

18  time you worked at Evergreen regarding whether

19  preapproval was required before any employees worked

20  any overtime?

21  A    Well, my understanding was that all the

22  employees other than myself needed to have approval

23  prior to reaching the overtime period.

24  Q    And was that a policy that you enforced during

25  the time that you were the manager?

72061a54-5157-4519-8455-94be4a32d6e4

NETWORK DEPOSITION SERVICES
Transcript of Robert Jones

Page 195

1                    MR. LINGLE:  Object to form.

2                    THE WITNESS:  Somewhat, not strictly.

3       BY MR. FORESTIERE:

4       Q    Did you approve overtime for people that had

5       requested it?

6                    MR. LINGLE:  Object to the form.

7                    THE WITNESS:  Absolutely.

8       BY MR. FORESTIERE:

9       Q    And if you approved it, was it paid to them?

10                   MR. LINGLE:  Object to form.

11                   THE WITNESS:  I believe it was.

12      BY MR. FORESTIERE:

13      Q    Was there ever a time that you told someone

14      they couldn't work overtime and they had nonetheless

15      worked overtime?

16                   MR. LINGLE:  Object to the form.

17                   THE WITNESS:  No, sir.

18      BY MR. FORESTIERE:

19      Q    During the time that you worked at Evergreen,

20      did you hear any complaints that employees were

21      abusing their overtime?

22                   MR. LINGLE:  Object to the form.

23                   THE WITNESS:  No, sir.

24      BY MR. FORESTIERE:

25      Q    Did you ever abuse the overtime that you had

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

72061a54-5157-4519-8455-94be4a32d6e4

NETWORK DEPOSITION SERVICES
Transcript of Robert Jones

Page 202

1    A     No, sir.

2    Q     Did you ever tell any employees to incorrectly

3    complete their time cards?

4    A     No, sir.

5    Q     Did you ever give any instructions to the

6    employees about how to complete their time cards

7    while at Evergreen?

8    A     Just in the initial training period, the first

9    couple of times they punched in and out.

10   Q     What did you tell them?

11   A     How to punch in and out.

12   Q     Did you tell them that the time reflected in

13   the time cards has to be accurate?

14   A     Yes, sir.

15   Q     Did you tell them that they would be

16   disciplined if they didn't accurately reflect the

17   time on their time cards?

18   A     Yes, sir.

19   Q     Did you tell them to report all the overtime

20   that they worked?

21   A     Yes, sir.

22   Q     Did you tell them that they would be

23   disciplined if they did not report all the overtime

24   that they worked?

25   A     No, sir.

72061a54-5157-4519-8455-94be4a32d6e4

NETWORK DEPOSITION SERVICES
Transcript of Robert Jones

Page 203

1    Q    Are you aware of any overtime that you did not

2    approve that was, in fact, paid to an employee?

3                    MR. LINGLE:  Object to the form.

4                    THE WITNESS:  I'm not aware, no, sir.

5    BY MR. FORESTIERE:

6    Q    Now, the employees have to come to you for

7    preapproval for overtime, correct?

8                    MR. LINGLE:  Object to the form.

9                    THE WITNESS:  Best case scenario,

10   yes, sir.

11   BY MR. FORESTIERE:

12   Q    I mean, that's how it's supposed to work?

13   A    Yes, sir.

14   Q    But sometimes were there instances that they

15   worked the overtime without your preapproval?

16                   MR. LINGLE:  Object to the form.

17                   THE WITNESS:  And got paid for it?

18   BY MR. FORESTIERE:

19   Q    Yes, sir.

20   A    No, sir.

21   Q    Okay.  So let me break it down into two

22   questions.

23   A    Okay.

24   Q    Were you aware of overtime that they had worked

25   without getting preapproval?

NETWORK DEPOSITION SERVICES
Transcript of Robert Jones

Page 204

1   A    No, sir.

2   Q    Did you ever encourage any employees to arrive

3   before the time that they were supposed to commence

4   work and not report it on their time card?

5   A    Yes, sir.

6   Q    Could you explain that?  Can you tell me what

7   it is you told those employees?

8   A    Something along the lines of if you want to

9   show up a little bit early and have a cup of coffee

10  before you punch in, that's certainly acceptable,

11  but don't do any work.

12  Q    If they did work, it was your position they are

13  not entitled to -- strike that.  When you talk about

14  drinking coffee, you are talking about just a social

15  gathering type of thing?

16  A    Yes, sir.

17  Q    Okay.  They weren't performing any work,

18  correct?

19  A    No, sir.

20  Q    And therefore they shouldn't be punching in for

21  work at that time?

22  A    Correct.

23              MR. FORESTIERE:  Let's mark as

24  Exhibit 14 an affirmation, Mr. Jones, that you had

25  signed filed in this case dated -- it was executed

```
 1                    REPORTER'S CERTIFICATE

 2              I, MARY A. VAVRIK, RMR, Notary Public in

 3      and for the State of Alaska do hereby certify:

 4              That the witness in the foregoing

 5      proceedings was duly sworn; that the proceedings

 6      were then taken before me at the time and place

 7      herein set forth; that the testimony and proceedings

 8      were reported stenographically by me and later

 9      transcribed under my direction by computer

10      transcription; that the foregoing is a true record

11      of the testimony and proceedings taken at that time;

12      that the witness requested signature; and that I am

13      not a party to nor have I any interest in the

14      outcome of the action herein contained.

15              IN WITNESS WHEREOF, I have hereunto

16      subscribed my hand and affixed my seal this 28th

17      day of _____ 2009.

18

19                              _____

20                              MARY A. VAVRIK,
                                Registered Merit Reporter
21                              Notary Public for Alaska

22      My Commission Expires:  November 5, 2012

23

24

25
```

OFFICIAL SEAL
STATE OF ALASKA
NOTARY PUBLIC
MARY A. VAVRIK