**TAB 16**

```
1              UNITED STATES DISTRICT COURT
2            NORTHERN DISTRICT OF CALIFORNIA
3             SAN FRANCISCO/OAKLAND DIVISION
4

  WILLIAM HELM, DEBORAH PRISE,  ) No. CV 08-1184-SI
5 HEATHER P. RADY, et al, on    )
  behalf of themselves and all  )
6 other employees and former    )
  employees similarly situated, )
7                               )
                                )
                 Plaintiffs,    )
8          v.                   )
                                )
9 ALDERWOODS GROUP, INC.,       )
                                )
10               Defendant.     )
                                )
11
12

           DEPOSITION OF RICHARD KAMIENSKI
13
           Wednesday, October 21, 2009, 9:50 a.m.
14
15         Deposition Officer:
           Patricia Coward, CSR No. 5142
16
           Taken in the offices of:
17
           California Deposition Reporters
18         2509 West March Lane, Suite 160
           Stockton, California 95207
19
20
21
22
           CALIFORNIA DEPOSITION REPORTERS
23          CERTIFIED SHORTHAND REPORTERS
           2509 West March Lane, Suite 160
24          Stockton, California 95207
                  (209) 478-3377
25          Statewide (800) 442-3377
```

COPY

Page 1

1   Q.      Did you attend any college?

2   A.      Yes, I did.

3   Q.      What college did you attend?

4   A.      Temple University in Philadelphia.

5   Q.      Did you obtain a degree?

6   A.      Yes, I did.

7   Q.      What degree was that?

8   A.      Associate in science.

9   Q.      When did you obtain that?

10  A.      June of 1965.

11  Q.      Any other post secondary education?

12  A.      Mortuary school.

13  Q.      Which mortuary school did you attend?

14  A.      Pittsburgh Institute of Mortuary Science.

15  Q.      Where was that located?

16  A.      Pittsburgh, Pennsylvania.

17  Q.      Did you obtain a degree or certification of

18  completion of that curriculum?

19  A.      Certification, graduate, mortician.

20  Q.      When did that occur?

21  A.      September 1966.

22  Q.      Any other education that you had other than what

23  you've listed?

24  A.      No.

25  Q.      Now, were you ever employed by Alderwoods?

Page 28

```
1   director's license?

2   A.      Would have been early summer, maybe May, June of

3   2004.

4   Q.      How long did you have your funeral director's

5   license?  And I'm just talking about the State of

6   California now.

7   A.      Until December 2008.

8   Q.      Why did you become -- strike that.  Why did you

9   obtain a funeral director's license?

10  A.      I needed a funeral director's license to manage

11  funeral homes for Alderwoods.

12  Q.      What did you have to do to obtain a funeral

13  director's license?

14  A.      Pass a state examination.

15  Q.      Anything else?

16  A.      No.

17  Q.      What is necessary to keep that license current?

18  A.      Pay the annual renewal fee.

19  Q.      There's no continuing education requirement?

20  A.      Not in California, no.

21  Q.      Has your license been subject to any discipline?

22  A.      No.

23  Q.      Any suspension?

24  A.      No.

25  Q.      Any revocation?
```

Page 38

080fefd8-945c-4daa-943f-0ea003beeafc

1   A.      No.

2   Q.      In regards to your embalmer's license, when did

3   you acquire it from the State of California?

4   A.      1973.

5   Q.      And how long did you keep it?

6   A.      It was through the employment with Culjis.  I

7   don't remember off the top of my head the dates that we

8   were --

9   Q.      You indicated you stopped working for Culjis in

10   about 1980.  Would that be approximate date?

11   A.      Approximately, yeah.

12   Q.      What did you have to do to obtain an embalmer's

13   license from the State of California?

14   A.      I had to serve one additional year's internship

15   and then sit for an examination.

16   Q.      Did you have to complete a certain number of

17   embalmings?

18   A.      I don't recall.

19   Q.      Do you recall whether or not you had to obtain

20   an embalmer's apprentice license before you could

21   obtain the actual license itself?

22   A.      That's correct.

23   Q.      Do you know what the requirements for obtaining

24   an apprentice license was?

25   A.      Completing high school, nine months of mortuary

California Deposition Reporters
800 442-3377 (Toll Free)  (209) 478-7051 (fax)

080fefd8-945c-4daa-943f-0ea003beeafc

```
 1    school, and two years of internship.
 2    Q.      When you say two years of internship --
 3    A.      No --
 4    Q.      I'm sorry, go ahead.  When you say two years of
 5    internship, what are you referring to?
 6    A.      Serving under the direction of a licensed
 7    embalmer.
 8    Q.      Has your embalmer's license ever been subject to
 9    any discipline?
10    A.      No.
11    Q.      Any suspension?
12    A.      No.
13    Q.      Any revocation?
14    A.      No.
15    Q.      What if anything was required to keep your
16    embalmer's license current or to maintain it?
17    A.      Paying the annual renewal fees.
18    Q.      There was no continuing education requirement?
19    A.      No.
20    Q.      Did you obtain an insurance license from the
21    State of California?
22    A.      Yes.
23    Q.      What type of an insurance license did you
24    obtain?
25    A.      I had a life insurance license, and I had a
```

California Deposition Reporters
800 442-3377 (Toll Free)  (209) 478-7051 (fax)

080fefd8-945c-4daa-943f-0ea003beeafc

```
 1    property and casualty license.
 2    Q.      When did you have your life insurance license?
 3    A.      The first time was when I was in San Luis Obispo
 4    working for Monumental Life in the late '70's.
 5    Q.      How long did you have it after you acquired it
 6    in 1970 or thereabouts?
 7    A.      I don't remember.
 8    Q.      You had indicated I think from your response
 9    that you had a license off and on for different periods
10    of time?
11    A.      Yes.
12    Q.      So the first period of time started in 1970,
13    correct?
14    A.      That's correct.
15    Q.      When did the second period of time start?
16    A.      1980.
17    Q.      Why is it that you needed to have your license
18    in 1980?
19    A.      I became an agent for Farmers Insurance Group.
20    Q.      Farmers doesn't sell pre-need, though, does it?
21    A.      No.
22    Q.      And that's why you needed the license, for
23    Monumental to sell pre-need, correct?
24    A.      That's correct.
25    Q.      What did you have to do to get your life
```

Page 41

1    insurance license?

2    A.      Pass an examination issued by the State of

3    California.

4    Q.      Anything else?

5    A.      No.

6    Q.      What if anything was required to keep it current

7    or to maintain it?

8    A.      Just to pay the annual renewal fees.

9    Q.      No continuing education requirement?

10   A.      No.

11   Q.      Have you ever had any discipline against your

12   life insurance license?

13   A.      No.

14   Q.      Any suspension?

15   A.      No.

16   Q.      Any revocation?

17   A.      No.

18   Q.      Do you still have your license current?

19   A.      No.

20   Q.      When was it that the -- the second time you let

21   your license expire?

22   A.      1992.

23   Q.      Was there a reason why you let it expire in

24   1992?

25   A.      I moved from California to Pennsylvania.

Page 42

080fefd8-945c-4daa-943f-0ea003beeafc

1                    (Exhibit 5 marked for

2                        identification.)

3          MR. FORESTIERE:   Exhibit 5 is a one-page

4    document Bate stamped number ALD 13755 entitled "Weekly

5    Time Sheet."   Does this help refresh your recollection

6    as to whether a weekly time sheet was used for the

7    employees recording their time that you supervised?

8    A.      I don't remember this document.

9    Q.      Do you know if this time sheet was ever used in

10   recording time by any of the employees at the

11   facilities that you managed?

12   A.      I don't remember its use at all.

13   Q.      Let's go back to Exhibit 4.   Do you know if

14   these policies were contained in the binders that were

15   in your office?

16   A.      I can't say.

17   Q.      Do you have any reason to believe that they were

18   not taken from the binders that were included in your

19   office?

20          MS. GIFFORD:   Objection.

21          THE WITNESS:   I don't know where they came from.

22   They could have very well been in the binders.

23          MR. FORESTIERE:   It also states on this exhibit,

24   "All employees must record all hours actually worked."

25   Do you see that, that first bullet point there?

California Deposition Reporters
800 442-3377 (Toll Free)  (209) 478-7051 (fax)

080fefd8-945c-4daa-943f-0ea003beeafc

1   A.      First line?

2   Q.      Yes, sir.

3   A.      Yes, I see that.

4   Q.      Is that your understanding as to how the

5   employees' timecards are to be completed?

6           MS. GIFFORD:  Objection.

7           THE WITNESS:  Yes.

8           MR. FORESTIERE:  Was it your understanding that

9   the employees were required to record all the hours

10  they actually worked on their timecards?

11          MS. GIFFORD:  Objection.

12          THE WITNESS:  It's my understanding.

13          MR. FORESTIERE:  Did you ever instruct your

14  employees to make sure that they recorded all the time

15  that they worked on their timecards?

16          MS. GIFFORD:  Objection.

17          THE WITNESS:  Yes.

18          MR. FORESTIERE:  Did they understand the

19  instructions that you gave them to make sure that they

20  recorded all the time on their timecards?

21  A.      I assume they did.

22  Q.      Well, they didn't say to you, "I don't

23  understand what you're talking about," did they?  Did

24  you ever have that statement made by an employee in

25  response to your instruction to them to make sure all

Page 119

080fefd8-945c-4daa-943f-0ea003beeafc

1   employee was exempt from timekeeping requirements?

2   A.      I can't think of a situation where I did.

3   Q.      Under that, it says, quote, "Many

4   states/slash/provinces require a designated meal break

5   after a certain number of hours worked," end quotes.

6   Do you see that?

7   A.      Yes, I do.

8   Q.      What was your understanding as to the designated

9   meal break that your nonexempt employees were required

10   to take?

11   A.      They were I believe to take a half an hour

12   minimum after working four hours, I believe.

13   Q.      And to your knowledge, is that what the

14   employees did at the facilities that you managed?

15          MS. GIFFORD:   Objection.

16          THE WITNESS:   To my knowledge, that's what they

17   did.

18          MR. FORESTIERE:   It next states, quote, "You may

19   consult the HR specialist for your area for assistance

20   in determining the required meal period," end quote.

21   Do you see that?

22   A.      Yes, I do.

23   Q.      Did you ever do that, consult an HR specialist

24   concerning the required meal periods?

25   A.      I can't recall if I did or not.

Page 123

1  Q.    Do you ever recall any instance where you had

2  any questions about the designated meal breaks your

3  employees were to take?

4  A.    I can't recall.

5  Q.    Next it says, quote -- going back to Exhibit 1

6  on the first page, "If an employee is eligible for and

7  receives piecework pay, an employee is still required

8  to record the actual time worked," end quote.  Do you

9  see that?

10 A.    Yes, I do.

11 Q.    Do you know if any of your employees performed

12 any type of piecework?

13 A.    I don't believe I had anybody doing piecework.

14 Q.    Being paid on a flat-rate basis?

15 A.    I don't believe I had.

16 Q.    Everybody was paid on an hourly basis, to your

17 knowledge?

18       MS. GIFFORD:  Objection.

19       THE WITNESS:  With the exception of myself and

20 the other two nonexempt --

21       MR. FORESTIERE:  That's correct.

22 A.    Or the other two exempt, excuse me.

23 Q.    Yeah.  As to all the hourly, nonexempt

24 employees, it was your understanding basically that

25 they were just paid a wage for the performance of their

Page 124

```
 1   duties?

 2          MS. GIFFORD:  Objection.

 3          THE WITNESS:  Yes, sir.

 4          MR. FORESTIERE:  They were paid a flat rate in

 5   addition to their wages, correct?

 6   A.     I don't remember paying anybody a flat rate.

 7   Q.     The next bullet point states, quote,

 8   "Complete -- or completed timecard --" I'm sorry, let

 9   me start over.  Quote, "Complete timecards/slash/sheet

10   are to be signed by the employee to verify that the

11   card accurately documents the hour -- the actual hours

12   worked," end quote.  Do you see that?

13   A.     I see that.

14   Q.     Is that your understanding as to what the

15   employees were doing when they signed their timecards?

16          MS. GIFFORD:  Objection.

17          THE WITNESS:  Yes.

18          MR. FORESTIERE:  They were verifying that the

19   timecard accurately reflects the actual hours they

20   worked?

21          MS. GIFFORD:  Objection.

22          THE WITNESS:  Yes.

23          MR. FORESTIERE:  Did any employee ever tell you

24   that he was signing his timecard with inaccurate hours

25   stated in it?
```

California Deposition Reporters
800 442-3377 (Toll Free)  (209) 478-7051 (fax)

080fefd8-945c-4daa-943f-0ea003beeafc

1          MS. GIFFORD:  Objection.

2          THE WITNESS:  Not that I recall.

3          MR. FORESTIERE:  To your knowledge, the

4    employees that you managed complied with this policy

5    that they sign a timecard to verify that it included

6    the actual hours that they worked?

7          MS. GIFFORD:  Objection.

8          THE WITNESS:  I assumed so.

9          MR. FORESTIERE:  Did any employee tell you that

10   they didn't understand that they were required to do

11   that?

12         MS. GIFFORD:  Objection.

13         THE WITNESS:  Not to my knowledge.

14         MR. FORESTIERE:  Did any employee ever tell you

15   that they didn't do that?

16         MS. GIFFORD:  Objection.

17         THE WITNESS:  Excuse me, do -- clarify, please.

18         MR. FORESTIERE:  Yeah.  I'm going off the

19   same -- did any employee ever tell you that they signed

20   their timecard that did not include the actual hours

21   that they worked?

22   A.     Not to my recollection, no.

23   Q.     The next sentence, it says, quote, "The

24   employee's supervisor or manager must also sign the

25   timecard/slash/sheet to verify that the hours are

California Deposition Reporters
800 442-3377 (Toll Free)  (209) 478-7051 (fax)

080fefd8-945c-4daa-943f-0ea003beeafc

1    accurate and that any overtime recorded is approved,"

2    end quote.  Do you see that?

3    A.      I see that.

4    Q.      Did you ever sign any of the timecards for the

5    employees?

6    A.      For the ones that worked at the cemetery.

7    Q.      Any other employees' timecards that you signed?

8    A.      No.  I don't recall signing the timecards that

9    were produced at a particular location.

10   Q.      For the funeral homes, you mean?

11   A.      For the funeral homes.

12   Q.      So you signed the timecard for the cemetery, and

13   it was a combo --

14   A.      It was a combo, yes.

15   Q.      So did you sign all the timecards for that

16   combo?

17   A.      Yes.

18   Q.      For the employees that worked at that combo?

19   A.      Yes.

20   Q.      And who signed the timecards for the other five

21   facilities?

22   A.      I believe it was the location administrator.

23   Q.      And who was that?

24   A.      That would have been the person that we've

25   talked about earlier, the recordskeeper that did all

080fefd8-945c-4daa-943f-0ea003beeafc

1    the secretarial work.

2    Q.      We couldn't remember what her name was?

3    A.      That was --

4            MS. GIFFORD:   Shauna?

5            THE WITNESS:   Shauna.   Shauna oversaw the entire

6    operation.   But Phyllis was at one location, there was

7    another gal at another location, and I can't remember

8    their names.

9            MR. FORESTIERE:   Okay.

10   A.      But there were these individuals at the other

11   locations.

12   Q.      And you understood that when you signed the

13   timecards, you were also verifying that the hours the

14   employees stated in it were accurate; is that correct?

15           MS. GIFFORD:   Objection.

16           THE WITNESS:   Yes.

17           MR. FORESTIERE:   Were you also verifying that

18   the overtime recorded in it was approved?

19   A.      Yes.

20   Q.      Give me a second here.   Got to change gears in a

21   little bit, Mr. Kamienski.   I want to talk a little bit

22   about the timekeeping procedures where the employees

23   worked at the facilities that you managed.   First,

24   though, what were the business hours of the facilities?

25   A.      The offices were to be open from 8:00 a.m. to

080fefd8-945c-4daa-943f-0ea003beeafc

1    you leave your personal files there at the facility

2    where you worked?

3    A.      My personal files left with me.

4    Q.      Where are those files today?

5    A.      Could be in a box in my garage; they could be in

6    the dump somewhere.

7    Q.      Have you destroyed any of your personal files

8    after learning that this lawsuit was filed?

9    A.      No.

10   Q.      Do you plan to destroy them now?

11   A.      No.

12   Q.      Were there any employees at the facilities you

13   managed that did not perform community service?

14   A.      Yes.

15   Q.      Do you recall who they were?

16   A.      I recall -- again, we're in the situation with

17   names, and I can tell you that out of that number that

18   we talked about, I had ten percent probably of the

19   employees.  I had three or four employees that were

20   participating in community events, and the rest either

21   refused directly or refused quietly and didn't do

22   anything.

23   Q.      So just so I understand, you only had

24   ten-percent compliance with the requirement by the

25   employees to perform community service?

Page 143

1    A.      Correct.

2    Q.      And 90 percent either told you they weren't

3    going to do it or they just didn't do it?

4    A.      Correct.

5    Q.      Was any discipline taken against the 90 percent

6    that refused to perform or did not perform community

7    service?

8            MS. GIFFORD:  Objection.  Go ahead.

9            THE WITNESS:  Not to my knowledge.

10           MR. FORESTIERE:  Could I have that question read

11   back, please?

12                    (Record read.)

13           MR. FORESTIERE:  I'm talking about the

14   90 percent of the employees, right.  I mean that's what

15   we're --

16   A.      Yes.  I did not personally reprimand them or

17   have any problem with it.  Now, whether or not Bill

18   Mitchell or Derrick Pate spoke with them, I have no

19   idea.

20   Q.      So you personally did not take any discipline

21   against any of the 90 percent of the employees that

22   either refused to perform community service or failed

23   to perform community service, correct?

24   A.      That's correct.

25   Q.      And you said something that you were filling out

California Deposition Reporters
800 442-3377 (Toll Free)  (209) 478-7051 (fax)

080fefd8-945c-4daa-943f-0ea003beeafc

1   A.      No.

2   Q.      Were the employees required to fill out any time

3   records about the community service they were

4   performing?

5   A.      No.

6   Q.      How would they report to you the community

7   service they were performing?

8   A.      Orally.

9   Q.      Did you ever tell any of the employees that they

10  would be evaluated on their performance review based

11  upon whether they were performing community service?

12          MS. GIFFORD:  Objection.

13          THE WITNESS:  I don't recall.

14          MR. FORESTIERE:  Do you recall if, in the

15  performance evaluation forms that Alderwoods gave you,

16  that there was any reference in them concerning the

17  performance of community service by the employees you

18  supervised?

19  A.      I don't recall the form.

20  Q.      To your knowledge, was any employee's

21  performance evaluated based upon whether they performed

22  any community service?

23          MS. GIFFORD:  Objection.

24          THE WITNESS:  No, I don't recall that being a

25  bearing on their evaluation.

Page 147

080fefd8-945c-4daa-943f-0ea003beeafc

1          MS. GIFFORD:  Objection.

2          THE WITNESS:  Not to my recollection.

3          MR. FORESTIERE:  Did any employee ever come to

4    you and complain about having to perform community

5    service?

6    A.     Yes.

7    Q.     Which employees complained to you about having

8    to perform community service?

9    A.     I remember specifically the funeral arranger

10   from Mission Mortuary in Monterey saying with several

11   expletives that he would not perform community service.

12   Q.     And he didn't?

13   A.     And he didn't.

14   Q.     And no disciplinary action was taken against

15   him?

16         MS. GIFFORD:  Objection.

17         THE WITNESS:  None whatsoever.

18         MR. FORESTIERE:  And no evaluation of his

19   performance otherwise -- strike that.  No evaluation of

20   his performance was based upon the fact that he did not

21   perform community service?

22         MS. GIFFORD:  Objection.

23         THE WITNESS:  Not that I can recall.

24         MR. FORESTIERE:  You said Mission Mortuary.  Is

25   that the name of the mortuary now in Monterey?

Page 149

1   Q.      And were there times that appointments were
2   scheduled after 5:00 o'clock Monday through Friday?
3   A.      There were those times.
4   Q.      How frequently would that occur?
5   A.      I don't think it was that often because she
6   managed her own appointments.
7   Q.      That was going to be my next question.  So she
8   scheduled her appointments?
9   A.      Yes.
10  Q.      Okay.  So she had control over when she was
11  going to meet the families?
12  A.      Yes.
13  Q.      Do you recall how often on a monthly basis she
14  would meet with families after 5:00 o'clock Monday
15  through Friday?
16  A.      Possibly a couple of times a week.
17  Q.      So two times a week, eight times a month as an
18  estimate?
19  A.      I think that would be a fair representation,
20  yes.
21  Q.      Now, did she also have the ability to schedule
22  her own work hours?
23  A.      Yes.
24  Q.      So if she was going to meet somebody after
25  hours, does she have the ability to start later in the

Page 160

080fefd8-945c-4daa-943f-0ea003beeafc

1    day on that day so she could try to stay within an

2    eight-hour-time day?

3    A.    Yes.

4    Q.    And did you ever have any discussions with her

5    about trying to achieve that, of having the

6    appointments after hours be within an eight-hour-time

7    day?

8    A.    No, I don't believe we ever had that discussion.

9    Q.    Okay.  Do you know if she had that discussion

10    with anybody else?

11    A.    I don't know.

12    Q.    Would you see her schedule on the employee

13    schedules that you would kind of look at every couple

14    of times a month?

15    A.    She officed in the same location where my office

16    was, and she had a white board with her schedule on it

17    that I could go in and look at any time.

18    Q.    Did she ever schedule appointments on the

19    weekends to meet with families?

20    A.    Yes, she did.

21    Q.    How often would that occur?

22    A.    Possibly two times a month.

23    Q.    And did she schedule her workweek so that she

24    would try to make those scheduled appointments on a

25    Saturday within a 40-hour workweek?

Page 161

080fefd8-945c-4daa-943f-0ea003beeafc

1    A.      No.

2    Q.      Okay.  So she always had to work eight hours a

3    day Monday through Friday and then meet with a family

4    on a Saturday?

5    A.      No.  She wasn't required -- we didn't have a

6    time structure for her.  She was paid straight

7    commission, and the hours she worked, whether she

8    worked 12 hours in a day or she worked an

9    hour-and-a-half to achieve her sales goal for that

10   day --

11   Q.      Okay.  That's -- very good.  I just want to

12   expand on that.  So she wasn't paid an hourly rate,

13   correct?

14   A.      To the best of my knowledge, I don't recall

15   paying her an hourly rate.

16   Q.      And you said she was purely on commission?

17   A.      I believe she was strictly on commission.

18   Q.      Are you aware of any Alderwoods policy that

19   required her to work in selling pre-need policies after

20   normal business hours without paying her for such work?

21         MS. GIFFORD:  Objection.

22         THE WITNESS:  No, I don't.

23         MR. FORESTIERE:  Was any time kept of -- strike

24   that.  Were any records kept of the amount of time that

25   she spent performing her duties as a pre-needs sales

080fefd8-945c-4daa-943f-0ea003beeafc

1    A.      I would do group training on customer service or

2    conducting a funeral service.

3    Q.      And where did that training take place?

4    A.      That would take place at the combination in

5    Seaside or in Salinas, the funeral home in Salinas, and

6    it would be done in a -- as part of general meeting,

7    staff meeting.

8    Q.      And did those training or staff meetings take

9    place during normal business hours?

10   A.      During normal business hours, yes.

11   Q.      And if an employee that had to attend that

12   meeting resulted in his or her working overtime, would

13   they be paid overtime to attend that meeting?

14           MS. GIFFORD:  Objection.

15           THE WITNESS:  They would have, but to the best

16   of my recollection, I don't -- I didn't have meetings

17   that late in the day.

18           MR. FORESTIERE:  Okay.  So to the best of your

19   recollection, no employee who attended these trainings,

20   sessions that you put on or the general meetings --

21   well, let me take them one at a time.  To the best of

22   your knowledge, no employee who attended these training

23   sessions incurred any overtime?

24   A.      To the best of my knowledge.

25   Q.      Okay.  And if they did incur overtime, then

080fefd8-945c-4daa-943f-0ea003beeafc

```
 1    would they be paid overtime for attending that training
 2    session?
 3             MS. GIFFORD:   Objection.
 4             THE WITNESS:   It would have been approved, yes.
 5             MR. FORESTIERE:   It would be required to put it
 6    on their timecard, correct?
 7             MS. GIFFORD:   Objection.
 8             THE WITNESS:   That is correct.
 9             MR. FORESTIERE:   And, okay.   You also talked
10    about general meetings.   When were those general
11    meetings held?
12    A.       Meetings were held at least once a month.
13    Q.       And that would be at the combo in Seaside or at
14    the Salinas facilities?
15    A.       That's correct.
16    Q.       And they would also be held during normal
17    business hours?
18    A.       That's correct.
19    Q.       And to your knowledge, all the employees should
20    have been able to attend those meetings without
21    incurring any overtime?
22    A.       That's correct.
23    Q.       And if they did, for whatever reason, incurred
24    overtime, they were required to put that on their
25    timecard?
```

Page 166

080fefd8-945c-4daa-943f-0ea003beeafc

1   business hours without compensating them for such work?

2          MS. GIFFORD:   Objection.

3          THE WITNESS:   I don't know of any policy.

4          MR. FORESTIERE:   Are you aware of any policy by

5   Alderwoods that required the employees you supervised

6   to attain -- to attend training sessions after normal

7   business hours without paying them for attending that

8   training?

9          MS. GIFFORD:   Objection.

10         THE WITNESS:   I don't recall any situation.

11         MR. FORESTIERE:   Let's talk a little about meal

12  periods, then.   How were meal periods scheduled during

13  the time that you were the manager of these facilities?

14  A.      That was left up to the individual funeral homes

15  with the staffing that was available.   They would set

16  their own meal times.

17  Q.      Who was responsible at each location for making

18  sure each of the employees received their meal periods?

19  A.      Two location managers, two funeral arrangers,

20  and myself at the combo.

21  Q.      You mentioned two location managers.   For which

22  locations?   Or which facilities?

23  A.      Was King City, Monterey, Seaside, Salinas had an

24  arranger, and then myself at the combo.

25  Q.      Well, the combo, was that Seaside?

California Deposition Reporters
800 442-3377 (Toll Free)   (209) 478-7051 (fax)

080fefd8-945c-4daa-943f-0ea003beeafc

```
 1    A.        That's correct.

 2    Q.        So you reviewed Shauna's timecard?

 3    A.        That's correct.

 4    Q.        Did you ever notice on the timecard that she was

 5    filling out that her meal period didn't commence after

 6    four hours of work?

 7    A.        Not that I recall.

 8    Q.        Did you ever tell any of the employees at the

 9    facilities that you managed to incorrectly fill out

10    their timecards in any respect?

11             MS. GIFFORD:  Objection.

12             THE WITNESS:  Restate that.

13             MR. FORESTIERE:  Yeah.  Why don't you read it

14    back, and then I can try to clean it up.

15                        (Record read.)

16             MR. FORESTIERE:  Yeah.

17             THE WITNESS:  No.

18             MR. FORESTIERE:  Did you ever tell any of the

19    other location managers to tell their employees to fill

20    out their timecards incorrectly in any respect?

21             MS. GIFFORD:  Objection.

22             THE WITNESS:  No.

23             MR. FORESTIERE:  Did you ever have any

24    complaints from any employees -- strike that.  Did you

25    receive any complaints from any employees that they
```

California Deposition Reporters
800 442-3377 (Toll Free)  (209) 478-7051 (fax)

080fefd8-945c-4daa-943f-0ea003beeafc

1   were told to incorrectly complete their timecards?

2          MS. GIFFORD:  Objection.

3          THE WITNESS:  I don't remember any such

4   conversations.

5          MR. FORESTIERE:  Do you recall if you received

6   anything in writing from any of the employees stating

7   that they were instructed to inaccurately complete

8   their timecards?

9          MS. GIFFORD:  Objection.

10         THE WITNESS:  I don't recall any communication.

11         MR. FORESTIERE:  I think you said that the

12  employees received half hour for their meal break; is

13  that correct?

14  A.    That's correct.

15  Q.    And that was for all of the facilities that you

16  managed?

17  A.    Yes.

18  Q.    Are you aware of any company policy requiring

19  the employees at the facilities that you managed to

20  work through their meal periods?

21         MS. GIFFORD:  Objection.

22         THE WITNESS:  No, I'm not aware of any.

23         MR. FORESTIERE:  Are you aware of any company

24  policy requiring the employees that you supervised to

25  interrupt their employees during their meal periods to

California Deposition Reporters
800 442-3377 (Toll Free)  (209) 478-7051 (fax)

080fefd8-945c-4daa-943f-0ea003beeafc

```
 1    perform work?
 2            MS. GIFFORD:  Objection.
 3            THE WITNESS:  I'm not aware of any.
 4            MR. FORESTIERE:  Are you aware of any company
 5    policies that the employees were not to report any
 6    missed meal periods on their timecards?
 7            MS. GIFFORD:  Objection.
 8            THE WITNESS:  I'm not aware of any of those.
 9            MR. FORESTIERE:  Are you aware of any company
10    policy that the employees were not to report any
11    interrupted meal periods on their timecards?
12            MS. GIFFORD:  Objection.
13            THE WITNESS:  No, I'm not aware.
14            MR. FORESTIERE:  Okay.  Let's change a little
15    subject matter here.  I want to talk about the overtime
16    that was paid to the employees at the facilities that
17    you supervised.  Could you tell me how -- I'm sorry,
18    I'll get it out.  Did any employees work overtime at
19    the facilities that you managed?
20    A.      I'm sure there were overtime hours.
21    Q.      How was that handled in regards to the hours
22    that they worked?  They're usually scheduled to only
23    work 40 hours, correct?
24    A.      Correct.
25    Q.      Okay.  So when somebody had to work overtime,
```

080fefd8-945c-4daa-943f-0ea003beeafc

1  how was that handled?  How did they bring that to

2  somebody's attention?

3          MS. GIFFORD:  Objection.

4          THE WITNESS:  I think it was just put on their

5  timecards.

6          MR. FORESTIERE:  So if an employee needed to

7  work overtime, they just reported it on their

8  timecards; is that correct?

9          MS. GIFFORD:  Objection.

10         THE WITNESS:  I can't remember if they needed

11 prior approval or whether they just clocked in and

12 clocked out as they normally did.  I just don't

13 remember that particular.

14         MR. FORESTIERE:  So you don't recall if an

15 employee needed to obtain prior approval prior to

16 working overtime; is that correct?

17 A.     I don't recall if that was -- if that was the

18 case.

19 Q.     Do you recall if the company had a policy of

20 requiring employees to obtain prior approval prior to

21 working overtime?

22         MS. GIFFORD:  Objection.

23         THE WITNESS:  I don't recall.

24         MR. FORESTIERE:  To your knowledge, was all the

25 overtime that was worked by an employee and stated on

Page 176

080fefd8-945c-4daa-943f-0ea003beeafc

1   his -- strike that.  To your knowledge, was all the

2   overtime worked by the employees you supervised at the

3   facilities, was paid to them?

4       MS. GIFFORD:  Objection.

5       THE WITNESS:  I'm assuming it was.

6       MR. FORESTIERE:  Are you aware of any instances

7   where an employee worked overtime at the facilities you

8   managed and was not paid for it?

9       MS. GIFFORD:  Objection.

10      THE WITNESS:  I don't remember any such

11  instance.

12      MR. FORESTIERE:  Did any employee ever complain

13  to you that they worked overtime and were -- was not

14  paid for it?

15      MS. GIFFORD:  Objection.

16      THE WITNESS:  I don't remember any such

17  complaint.

18      MR. FORESTIERE:  Are you aware of any company

19  policy that instructed the employees not to include all

20  the overtime that they worked on their timecards?

21      MS. GIFFORD:  Objection.

22      THE WITNESS:  I don't know of any company

23  regulation on that or rule.

24      MR. FORESTIERE:  Are you aware of any company

25  that -- strike that.  Are you aware of any company

Page 177

080fefd8-945c-4daa-943f-0ea003beeafc

```
 1   policy that would not pay employees for the overtime
 2   they worked?
 3          MS. GIFFORD:  Objection.
 4          THE WITNESS:  I don't know of any.
 5          MR. FORESTIERE:  Are you aware of any company
 6   policy that would not pay overtime to employees that
 7   they worked if it was not preapproved?
 8          MS. GIFFORD:  Objection.
 9          THE WITNESS:  Again, I have no recollection.
10          MR. FORESTIERE:  So to your knowledge, that
11   didn't occur?
12          MS. GIFFORD:  Objection.
13          THE WITNESS:  To the best of my knowledge, it
14   did not.
15          MR. FORESTIERE:  And to your knowledge, each
16   employee was required to report all of the overtime on
17   their timecards?
18          MS. GIFFORD:  Objection.
19          THE WITNESS:  To my knowledge, yes, that was the
20   procedure.
21          MR. FORESTIERE:  That was the company policy?
22          MS. GIFFORD:  Objection.
23          THE WITNESS:  To my knowledge, yes.
24          MR. FORESTIERE:  Do you know which employees at
25   the facilities you managed worked any overtime?
```

Page 178

080fefd8-945c-4daa-943f-0ea003beeafc

1    calculated when an employee receives a bonus?  I'm
2    talking about the overtime hourly rate.
3    A.      No, I don't.
4    Q.      Are you aware of any policy by Alderwoods to
5    miscalculate the amount of the overtime hourly rate to
6    be paid to employees that worked overtime?
7            MS. GIFFORD:  Objection.
8            THE WITNESS:  Not to my knowledge.
9            MR. FORESTIERE:  Are you aware of any mistake by
10   Alderwoods in miscalculating the amount of the overtime
11   hourly rate to be paid to any employees that worked
12   overtime?
13           MS. GIFFORD:  Objection.
14           THE WITNESS:  Not that I can recall.
15           MR. FORESTIERE:  Do you know how commissions
16   would affect anyone that would -- well, strike that.
17   As far as you know, the people on commissions were not
18   paid an hourly rate, correct?
19   A.      As far as I can remember, yes, she was not.
20   Q.      Okay.  And that was the only person that worked
21   on a commission basis at all the facilities that you
22   managed?
23   A.      That's correct.
24   Q.      So everybody else was paid an hourly rate?
25   A.      That's correct.

                                                    Page 181

1    who would be taking call that night with myself as the

2    back-up for any location.

3    Q.    Were all employees at all the facilities you

4    managed required to perform on-call-duty work?

5    A.    Not all.

6    Q.    Which employees were required to perform

7    on-call-duty work?

8    A.    Funeral directors, funeral arrangers.

9    Q.    And other than those -- wait, other than the

10   funeral arrangers and funeral directors, no other

11   employees at any of the facilities you managed were

12   required to perform on-call-duty work?

13         MS. GIFFORD:   Objection.

14         THE WITNESS:   As best as I can recall.

15         MR. FORESTIERE:   Do you recall the names of the

16   funeral directors and arrangers who performed

17   on-call-duty services?

18   A.    Don, Bart, Mikey.  I can't remember her name in

19   Salinas.

20   Q.    I'm going to put "lady in Salinas."

21   A.    Thank you.  And myself.

22   Q.    And yourself.  Who was responsible for

23   scheduling the on-call-duty work?  In other words, was

24   there a rotation that was -- everyone participated in

25   so nobody was doing on-call every weekend?  I mean how

Page 189

080fefd8-945c-4daa-943f-0ea003beeafc

1          THE WITNESS:  Yeah, that was the way it was

2    supposed to be done, yes.  They were not to report the

3    time.

4          MS. GIFFORD:  And where did your understanding

5    come from that that was how it was supposed to be done?

6          MR. FORESTIERE:  Asked and answered.

7          THE WITNESS:  It would have come from Bill

8    Mitchell or Derrick Pate.

9          MS. GIFFORD:  Okay.  Did you have the authority

10   to tell employees to put community work on their

11   timecards?

12         MR. FORESTIERE:  Objection, calls for

13   speculation.

14         THE WITNESS:  No, I didn't have that authority.

15         MS. GIFFORD:  Did you have the authority to tell

16   them to record the phone calls they took while on call

17   on their timecards?

18         MR. FORESTIERE:  Same objection.

19         THE WITNESS:  No, I didn't have any authority.

20         MS. GIFFORD:  And just to make sure we're clear,

21   I believe you testified before that funeral directors

22   and arrangers were employees who would be scheduled for

23   on-call shifts; is that correct?

24   A.    That's correct.

25   Q.    Would location managers also perform on-call

California Deposition Reporters
800 442-3377 (Toll Free)  (209) 478-7051 (fax)

080fefd8-945c-4daa-943f-0ea003beeafc

1    work?

2    A.      That's correct.

3    Q.      Okay.  And I'm going to ask you to go back again

4    to Exhibit 4.  Sorry to keep switching.  And again,

5    that first bullet point there that says, "All employees

6    must record all hours actually worked."  Was your

7    understanding that all hours actually worked included

8    time spent answering phone calls while on call?

9            MR. FORESTIERE:  Objections, asked and answered,

10   leading.

11           THE WITNESS:  It's my understanding that it

12   meant that they were to record their time that it took

13   them to do their job during normal working hours.

14           MS. GIFFORD:  And was it your understanding that

15   that's what the employees at your location did record?

16           MR. FORESTIERE:  Objection, vague and leading.

17           THE WITNESS:  It's my understanding.

18           MS. GIFFORD:  Okay.  While we're still on that

19   same document, I'm going to ask you to look again at

20   the third bullet point which says, quote, "Many

21   states/provinces require a designated meal break after

22   a certain number of hours worked."  Do you see that?

23   A.      Yes, I do.

24   Q.      Did employees at the locations you supervised

25   ever work through their lunches?

Page 230

080fefd8-945c-4daa-943f-0ea003beeafc

1          MR. FORESTIERE:   Objection, asked and answered,

2     leading.

3          THE WITNESS:   Given the nature of the business,

4     I'm sure it happened.

5          MS. GIFFORD:   Okay.   And when you say that, what

6     do you mean?

7     A.     Well, it's hard when you have a two-person

8     operation, and one of those two people are out on a

9     funeral service starting at 11:00 o'clock, that the

10    other person that's in the funeral home and is required

11    to keep the doors open can't get out to lunch until the

12    other person comes back.

13    Q.     When you say, "required to keep the doors open,"

14    what do you mean?

15    A.     We were to make every effort, as I remember it,

16    to make sure that our facilities were open to the

17    public from 8:00 to 5:00 Monday through Friday.

18    Q.     And where did your understanding of that

19    requirement come from?

20    A.     It would have come from Bill Mitchell.

21    Q.     Were you aware of any specific instances when

22    employees worked through their lunch breaks?

23         MR. FORESTIERE:   Objection, asked and answered,

24    leading, vague and ambiguous.

25         THE WITNESS:   Not specifically, no, I don't

California Deposition Reporters
800 442-3377 (Toll Free)  (209) 478-7051 (fax)

080fefd8-945c-4daa-943f-0ea003beeafc

1    recall.

2          MS. GIFFORD:   Okay.   Do you know when employees

3    worked through their lunch breaks, what their timecards

4    would reflect?

5          MR. FORESTIERE:   Objection, asked and answered,

6    leading, lacks foundation, vague and ambiguous.

7          THE WITNESS:   Their timecard would reflect a

8    lunch period far beyond the first four hours if they

9    took a lunch period.

10          MS. GIFFORD:   And when you say that, can you

11    clarify what you mean?

12          MR. FORESTIERE:   Same objections.   Go ahead.

13          THE WITNESS:   Well, if the -- I'm sorry.

14          MR. FORESTIERE:   No, no problem.

15          THE WITNESS:   If the funeral director didn't get

16    back until 3:00 o'clock, then that would have been the

17    time that the administrative assistant finally got to

18    have a lunch break if one was taken at all.

19          MS. GIFFORD:   Okay.

20    A.     But without specific time records in front of

21    me, I can't be sure.

22    Q.     Okay.   This is very much jumping topics, but

23    going back to Norma who sold the pre-needs policies --

24    A.     Yes.

25    Q.     -- putting aside the list we've looked at today,

California Deposition Reporters
800 442-3377 (Toll Free)  (209) 478-7051 (fax)

080fefd8-945c-4daa-943f-0ea003beeafc

1   concern as to the amount of overtime that was being

2   generated at various facilities, correct?

3   A.       That's correct.

4   Q.       And I'm unclear, did he single your facility out

5   in particular for the amount of overtime that was

6   occurring or facilities that you were in charge of?

7   A.       He not -- he did not single out my facility.  He

8   brought to the attention of the group, whoever was

9   abusing or had an excessive amount of overtime.  So it

10  could have been a general manager from Ukiah that was

11  on the hot seat.

12  Q.       But it wasn't you, though, correct?

13  A.       It was several times me, yes.

14  Q.       Okay.  Did he tell you that in order to reduce

15  your overtime, you should instruct your employees not

16  to accurately reflect the overtime they worked on their

17  timecards?

18          MS. GIFFORD:  Objection.

19          THE WITNESS:  I don't recall him ever asking me

20  to have an employee alter a timecard.

21          MR. FORESTIERE:  Okay.  Did he ever tell you to

22  tell an employee not to put down all the overtime they

23  worked on their timecards?

24          MS. GIFFORD:  Objection.

25          THE WITNESS:  I don't remember any discussion

Page 238

080fefd8-945c-4daa-943f-0ea003beeafc

1   along those lines.

2          MR. FORESTIERE:  Did Mr. Mitchell ever tell you

3   not to pay all the overtime that your employees worked

4   at the facilities you managed in an effort to reduce

5   the amount of overtime those facilities were

6   generating?

7          MS. GIFFORD:  Objection.

8          THE WITNESS:  No, I don't believe we ever had a

9   discussion like that.

10         MR. FORESTIERE:  That's it.  That's all the

11  questions I have.

12                       --o0o--

13

14         FURTHER EXAMINATION BY MS. GIFFORD

15

16         MS. GIFFORD:  Okay.  I have just a couple

17  follow-up.  On the occasions during those phone calls

18  when your locations were singled out, was that

19  uncomfortable for you?

20  A.     Very much so.

21  Q.     Did you feel that your performance was being

22  called into question?

23  A.     Yes.

24  Q.     And did Bill Mitchell tell you to instruct

25  employees not to record community work on their

California Deposition Reporters
800 442-3377 (Toll Free)  (209) 478-7051 (fax)

080fefd8-945c-4daa-943f-0ea003beeafc

1    timecards?

2         MR. FORESTIERE:  Objection, asked and answered,

3    leading.

4         THE WITNESS:  That is correct.

5         MS. GIFFORD:  And did you understand from Bill

6    Mitchell that employees were not to record all of their

7    on-call work on their timecards?

8         MR. FORESTIERE:  Objection, asked and answered,

9    leading.

10        THE WITNESS:  That's correct.

11        MS. GIFFORD:  Okay.  That's all I have.

12                         --o0o--

13

14        FURTHER EXAMINATION BY MR. FORESTIERE

15

16        MR. FORESTIERE:  All right.  She opened the

17   door.  Even though you felt pressure -- well, strike

18   that.

19        What were the terms that you used, pressure

20   or --

21        MS. GIFFORD:  Uncomfortable, I believe.

22        MR. FORESTIERE:  Uncomfortable.  Even though

23   Mr. Mitchell may have made you feel uncomfortable, that

24   didn't motivate you to falsify any of your employees'

25   timecards, did it?

Page 240

```
1              MS. GIFFORD:  Objection.
2              THE WITNESS:  No.
3              MR. FORESTIERE:  Or motivate you to tell your
4   employees not to record all of the actual hours they
5   worked on their timecards, did it?
6   A.     No.
7   Q.     Or motivate you to tell your employees not to
8   record all the overtime on their timecards, did it?
9   A.     No.
10  Q.     Okay.  And in fact the whole purpose of that was
11  to identify his -- strike that.  The purpose of
12  Mr. Mitchell's statements was to basically try to
13  identify those facilities that should do a better job
14  on managing overtime; isn't that correct?
15             MS. GIFFORD:  Objection, calls for speculation.
16             MR. FORESTIERE:  Let me ask it this way:  Did
17  Mr. Mitchell indicate why it was he was singling out
18  people that had, in his opinion, Mr. Mitchell's
19  opinion, excessive overtime?
20  A.     Because it was putting us over budget and taking
21  away from the bottom line.
22  Q.     But you didn't feel that way as far as the
23  overtime being excessive, correct?
24             MS. GIFFORD:  Objection.
25             THE WITNESS:  I felt we were serving families.
```

Page 241

080fefd8-945c-4daa-943f-0ea003beeafc

1   STATE OF CALIFORNIA          )
                                 ) SS.
2   COUNTY OF SAN JOAQUIN        )

3

4        I, Patricia Coward, Certified Shorthand Reporter

5   of the State of California, do hereby certify:

6        That on the date and time herein indicated, the

7   witness herein named appeared before me for the purpose

8   of giving their deposition; that after the witness was

9   sworn by me in all respects as required by law, I took

10  down in shorthand the said witness' testimony and the

11  proceedings had at the time of the giving of such

12  testimony; that I thereafter transcribed my shorthand

13  notes of such testimony by computer-aided

14  transcription, the above and foregoing being a full,

15  true, and correct transcript of all proceedings had and

16  testimony given.

17

18                    _Patricia Coward_

19                    Patricia Coward, CSR No. 5142

20

21

22

23

24

25