**TAB 18**

NETWORK DEPOSITION SERVICES
Transcript of Richard Kuhta

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF PENNSYLVANIA

Civil Action No. 06-1641
Judge Joy Flowers Conti

DEBORAH PRISE and HEATHER RADY
on behalf of themselves and all
employees similarly situated,

     Plaintiffs,

vs.

ALDERWOODS GROUP, INC.,

     Defendant.

------------------------------

2525 Glades Road
Boca Raton, Florida
December 11, 2008
10:05 a.m. - 3:45 p.m.

DEPOSITION OF RICHARD T. KUHTA

Taken before Mark Rabinowitz, Registered Professional

Reporter and Notary Public for the State of Florida at

Large, pursuant to Notice of Taking Deposition filed in

the above cause.

Johnstown
814-266-2042

Toll-Free
866-565-1929

Pittsburgh
412-281-7908

6f381973-b55f-43c8-8a6e-e27a4eee4da4

NETWORK DEPOSITION SERVICES
Transcript of Richard Kuhta

Page 35

1    A    Generally, I worked Monday through Friday.

2    Q    Generally, what were your hours of work?

3    A    It was generally from 6:30 until -- it was nine
4  hours a day.

5    Q    Did you come in at a certain time each day?

6    A    Yes, ma'am.

7    Q    What time was that?

8    A    I believe it was 6:30.

9    Q    Did you have a typical ending time each day?

10   A    Yes, ma'am.

11   Q    What was that?

12   A    It would have been 3:30.

13   Q    Were you typically scheduled to work more than
14  40 hours in a week?

15   A    Yes, ma'am.

16   Q    How many hours per week were you typically
17  scheduled to work?

18   A    In addition to the 40?

19   Q    Total.

20   A    Usually, my standard schedule was 45 hours a
21  week.

22   Q    Did that vary over time, that standard
23  schedule?

24   A    Sometimes we were required to work more hours.

25   Q    On the occasion that you are referring to, do

6f381973-b55f-43c8-8a6e-e27a4eee4da4

NETWORK DEPOSITION SERVICES
Transcript of Richard Kuhta

Page 39

1    A     We are speaking from when?

2    Q     I'm sorry.  From December 2003 to May 2007.

3    A     That would have been a timecard.

4    Q     Can you describe for me the process you would

5    used for reporting your time on the timecard.

6    A     When you reported into work, you would punch

7    in.  Then we were told that we needed to punch out for

8    lunch, and then punch back when you report back in after

9    lunch, and then to punch out at the end of the day.

10   Q     Did you tally your hours each day on the

11   timecard?

12         MR. LINGLE:  Objection to form.

13   A     I did not.

14   Q     Were your hours tallied each day, or at the

15   end of the week?

16         MR. LINGLE:  Objection to form.

17   A     They would have to be tallied; I never did, our

18   administrator would do that.

19   Q     So you never did tallying of the hours on your

20   timecard during this time frame that we are talking

21   about?

22   A     No, ma'am.

23   Q     Who was the administrator who did that, that

24   would do the tallying?

25   A     That would have been Velda, "V," as in Victor,

6f381973-b55f-43c8-8a6e-e27a4eee4da4

NETWORK DEPOSITION SERVICES
Transcript of Richard Kuhta

Page 48

1   everything.  So I chose to concentrate on operating the

2   funeral home.

3           Q     You do recall when you stopped selling --

4           A     No.

5           Q     -- pre-needs?

6           A     No, I don't.

7           Q     When you did sell pre-needs, how frequently

8   would you make those sales?

9           A     More towards the rare side.

10          Q     And by "rare," what do you mean -- like once a

11  year, a couple of times a month?

12          A     Maybe once every other month, once every two

13  months, every three months.  There was no regularity to

14  any of it.  It just happened.  You could have two within

15  a two-week period and then nothing for five months.

16          Q     On the average, how much commissions did you

17  earn during the time that you were selling pre-needs?

18                MR. LINGLE:  Objection to form.

19          A     I don't remember.

20          Q     Between December of 2003 and May of 2007, did

21  you receive overtime pay in most of your paychecks?

22                MR. LINGLE:  Objection to form.

23          A     For the hours that I worked during the week, I

24  had five hours of overtime built into my regular payroll.

25          Q     Does that mean for each of the paychecks that

6f381973-b55f-43c8-8a6e-e27a4eee4da4

NETWORK DEPOSITION SERVICES
Transcript of Richard Kuhta

Page 49

1   you got between December of 2003 and May of 2007,

2   typically, there was overtime pay reflected in those

3   paychecks?

4        A     Yes, ma'am.

5        Q     And, typically, your paychecks would reflect

6   overtime pay for at least five hours of overtime?

7        A     Per week, yes, ma'am.

8        Q     Between December of 2003 and May of 2007, did

9   your paychecks ever reflect overtime pay in excess of

10  five hours of overtime per week?

11       A     Occasionally, yes.

12       Q     Just bear with me for a minute.

13       A     Yes, ma'am.

14       Q     If you would, turn to page 4 of Defendant's

15  Exhibit 2; which is ALD002681.

16       A     Yes, ma'am.

17       Q     If you could, take a look at the check dated

18  April 8th, 2004.

19       A     Yes, ma'am.

20       Q     In that check underneath the "earnings" column

21  it says "overtime."  Then under "hours" it has 18.50

22  hours --

23       A     Yes, ma'am.

24       Q     -- and then an amount of $553.89?

25       A     Yes, ma'am.

6f381973-b55f-43c8-8a6e-e27a4eee4da4

NETWORK DEPOSITION SERVICES
Transcript of Richard Kuhta

Page 54

1      A      I'm not sure if I understand the question.

2            (Defendant's Exhibit 3 was marked for

3      identification).

4      Q      I have handed you what was marked as

5      Defendant's Exhibit 3.  Are you familiar with this

6      document?

7      A      Yes, ma'am.

8      Q      This document is the information sheet that

9      you filled out for this lawsuit; is that correct?

10     A      Yes, ma'am.

11     Q      Is that your signature at the bottom of the

12     page?

13     A      Yes, ma'am.

14     Q      The document is dated August 21st of 2007; is

15     that right?

16     A      Yes, ma'am.

17     Q      When did you receive this information sheet?

18     A      I don't remember, ma'am.

19     Q      Did anyone help you fill it out?

20     A      There was conversation.

21     Q      Who did you speak with?

22     A      I don't remember now.

23     Q      Did you discuss the information sheet with

24     your attorneys?

25     A      Yes, ma'am.

6f381973-b55f-43c8-8a6e-e27a4eee4da4

NETWORK DEPOSITION SERVICES
Transcript of Richard Kuhta

Page 56

1    A    Yeah.  There may be a -- my address is 17392
2  Key Lime Boulevard.
3    Q    Is your Social Security number correct?
4    A    Yes, ma'am.
5    Q    In the section on the information sheet in the
6  middle it says:  "I opt into this case.  Check all that
7  apply."  Do you see that?
8    A    I opted into this case.  Yes, ma'am, I see
9  that.
10    Q    Underneath are paragraphs A, B, C, D and E?
11    A    Yes, ma'am.
12    Q    Do you see that there are boxes marked with an
13  X in each paragraph?
14    A    Yes, ma'am.
15    Q    Did you mark those boxes with an X?
16    A    Yes, ma'am.
17    Q    Could you review paragraph E, and let me know
18  when you have had a chance to review it.
19    A    Okay.  Yes, ma'am, I have read it.
20    Q    The question I'm asking you is about this
21  claim that you checked in box E.  What I'm asking you
22  is:  Whether you are claiming that you received forms of
23  compensation such as bonuses that were not included when
24  calculating the overtime due to you.
25    A    I'm not sure I understand what was being said.

6f381973-b55f-43c8-8a6e-e27a4eee4da4

NETWORK DEPOSITION SERVICES
Transcript of Richard Kuhta

Page 57

1   We agree that I received bonuses.  I believe that during

2   that time I received some commissions.  This was a true

3   statement.  I don't know how it relates to the words:

4   "Did not include when calculating overtime."  To me the

5   two dollar values are separate items.

6       Q     You don't know how the bonuses and commission

7   that you received during the time that you were employed

8   with Alderwoods, you don't -- I'm sorry.  Go ahead.

9       A     How it relates or if it has anything to do with

10  calculating overtime, because overtime is overtime for

11  overtime hours worked.  Therein lies the conflict in my

12  mind.

13      Q     So you are just not sure?  You just don't

14  know?

15          MR. LINGLE:  Objection to form.

16      A     I'm not sure I understand of how the two -- of

17  how the bonuses and commissions relate to calculating

18  overtime, if they have anything to do with each other.

19      Q     I believe you said that you reviewed your pay

20  stubs --

21      A     Yes, ma'am.

22      Q     -- in preparation for your deposition?

23      A     Yes, ma'am.  This is true.

24      Q     In reviewing your pay stubs, was there

25  anything on your pay stubs that led you to believe that

6f381973-b55f-43c8-8a6e-e27a4eee4da4

NETWORK DEPOSITION SERVICES
Transcript of Richard Kuhta

Page 58

1    any bonuses or commissions that you received during your

2    employment with Alderwoods was not factored in to

3    calculating your overtime pay?

4              MR. LINGLE:  Objection to form.

5        A     Once again, I didn't feel receiving bonuses and

6    commissions would have anything to do overtime.

7        Q     If you could, take a look at Defendant's

8    Exhibit 2 again.

9        A     Yes, ma'am.

10       Q     At the bottom of the page 1 there it is Bates

11   labeled ALD002678.

12       A     Yes, ma'am.

13       Q     Do you see an entry for a check dated January

14   2nd, 2004?

15       A     Yes, ma'am.

16       Q     Underneath "earnings," do you see a line item

17   for "overtime adjustment" or "overtime adjust"?

18       A     Yes, ma'am.

19       Q     Do you see an amount there for that item of

20   $1.38?

21       A     Yes, ma'am.

22       Q     And do you know what that overtime adjust

23   entry is for?

24       A     No, ma'am.

25       Q     Do you know whether this overtime adjustment

6f381973-b55f-43c8-8a6e-e27a4eee4da4

NETWORK DEPOSITION SERVICES
Transcript of Richard Kuhta

Page 67

1    Q    I believe you testified that you don't know
2  how any bonuses or commissions that you received relate
3  to calculating your overtime pay --
4    A    Yes, ma'am.
5    Q    -- is that right?
6    A    That's correct.  I didn't know there was a
7  correlation between -- I don't believe there was a
8  correlation between the two.
9    Q    You don't know if there is any correlation
10 between any of the commissions that are reflected on
11 this document and any overtime adjustments that you
12 received --
13   A    Correct.
14   Q    -- at Alderwoods?
15   A    I believe them to be two separate and distinct
16 things.
17       (Defendant's Exhibit 4 was marked for
18 identification).
19   Q    I have handed you what has been marked as
20 Defendant's Exhibit 4.  If you could, turn to the page
21 marked ALD004399.  This document is titled "worksheet
22 for overtime calculation on year-end bonus."  Do you see
23 that up at the top?
24   A    Yes, ma'am.
25   Q    It indicates a bonus of $269.23.  Do you see

6f381973-b55f-43c8-8a6e-e27a4eeee4da4

NETWORK DEPOSITION SERVICES
Transcript of Richard Kuhta

Page 69

1          MR. LINGLE:  Objection.

2      Q     For example, excluding bonuses or commissions

3   from that calculation.

4      A     I find the question confusing in my mind.

5      Q     Is it confusing for the reasons that other

6   questions about any relationship between bonuses and

7   commissions and the overtime pay rate was confusing?

8      A     I'm not sure.

9      Q     You just don't understand my question at all?

10     A     I don't understand the question.

11     Q     It's your testimony that you don't understand

12  whether there is a connection between calculating your

13  overtime pay rate and any bonuses and commissions that

14  you received, correct?

15     A     Yes, ma'am.

16     Q     Are you aware of any Alderwoods policy

17  regarding how to calculate employees' overtime pay

18  rates?

19          MR. LINGLE:  Objection to form.

20     A     The answer is:  I'm not aware of any policy

21  with regard to calculating any bonuses or commissions or

22  overtime.  I don't know how that was done.  I don't know

23  what their policy was.

24          MS. MORGAN:  Do you guys want to take a break?

25          MR. LINGLE:  Sure.

6f381973-b55f-43c8-8a6e-e27a4eee4da4

NETWORK DEPOSITION SERVICES
Transcript of Richard Kuhta

Page 72

1    you needed to work additional hours.

2        Q      Previously you had testified about the hours

3    of work that you would be scheduled for each week, and

4    that typically it was 45 hours a week; is that right?

5        A      Yes, ma'am, that was the standard.

6        Q      Were the five hours of overtime in the weeks

7    that you were scheduled to work 45 hours per week, were

8    those pre-approved?

9        A      Yes, ma'am.

10       Q      When you were pre-approved for a certain

11   amount of overtime hours in a given week, for example,

12   five hours of overtime --

13       A      Yes.

14       Q      -- were you paid for those overtime hours?

15       A      Yes, ma'am.

16       Q      I believe you testified that there were weeks

17   when you worked in excess of the scheduled overtime

18   hours for that particular week; is that right?

19       A      That is correct.

20       Q      And on those occasions, would you seek

21   pre-approval for those overtime hours?

22       A      Yes.

23       Q      What process would you use to seek

24   pre-approval on those occasions?

25       A      Based on the need, I would speak with my

6f381973-b55f-43c8-8a6e-e27a4eee4da4

NETWORK DEPOSITION SERVICES
Transcript of Richard Kuhta

1    location manager.

2       Q    Dale Granger?

3       A    Dale Granger, yes, ma'am.

4       Q    So you would verbally ask him for approval?

5       A    Most likely, it would come the opposite way;

6    he would ask for me to work additional hours.

7       Q    Typically, would you agree to work those

8    additional overtime hours?

9       A    Yes, ma'am.

10       Q    On the occasions that it worked that way, that

11    Dale Granger spoke with you and requested that you work

12    additional overtime hours and you agreed, were you

13    compensated for those overtime hours?

14       A    Yes, ma'am.

15       Q    Were there occasions when you were the one who

16    initiated a request to work overtime hours in excess of

17    what you had been scheduled for that week?

18       A    Yes, ma'am.

19       Q    On those occasions, how would that process

20    work?

21       A    The occasions would have been when Mr. Granger

22    was on vacation and work needed to be accomplished, we

23    would accomplish the work.  Then I would accomplish the

24    work with overtime hours.  And the area general

25    manager -- after this was all done -- would say something

6f381973-b55f-43c8-8a6e-e27a4eee4da4

NETWORK DEPOSITION SERVICES
Transcript of Richard Kuhta

1    to the effect I'm not paying overtime.  You will need to

2    take time off.

3         Q    Take time off in lieu of overtime pay?

4         A    Yes, ma'am, take the time instead of money.

5         Q    On those occasions that you just described,

6    when Mr. Granger was on vacation and work needed to be

7    accomplished, you would do the work and then you will

8    seek approval from the area general manager after

9    performing the work?

10        A    I can't remember.  I can't remember.

11        Q    You can't remember whether you sought approval

12   for the additional overtime hours before performing it

13   or after.  Is that what you can't remember?

14        A    Correct.

15        Q    If there was an occasion when you sought

16   approval from the area general manager before performing

17   the overtime work, did the area general manager ever

18   deny approval for you to work that overtime?

19        A    I can't remember that.

20        Q    Who was the area general manager that you are

21   referring to?

22        A    Michael Blasberg.

23        Q    Was there any other area general manager who

24   handled overtime in this manner, in your experience?

25        A    No, ma'am.

6f381973-b55f-43c8-8a6e-e27a4eee4da4

NETWORK DEPOSITION SERVICES
Transcript of Richard Kuhta

Page 77

1       A       Yes, ma'am.  That is correct.

2       Q       That scenario, did that happen prior to 2006?

3       A       No.

4       Q       Did it happen sometime during 2006?

5       A       I believe it did.

6       Q       Did any other Alderwoods manager -- other than

7    Mr. Blasberg -- communicate to you that if you performed

8    overtime work, you wouldn't get paid for it?

9       A       Did any other manager say to me if I performed

10   overtime, that I wouldn't get paid for it?

11      Q       Yes.

12      A       I cannot say that.  I cannot say that, no.

13      Q       No other manager --

14      A       Correct.

15      Q       -- communicated that to you?

16      A       No other manager, correct.

17      Q       Just Mr. Blasberg?

18      A       Yes, ma'am.

19      Q       From this point in 2006 until May of 2007,

20   did anyone -- other than Mr. Blasberg -- hold the area

21   general manager position?

22      A       No, ma'am.

23      Q       What actually happened with respect to your

24   compensation for hours of overtime that you worked that

25   Mr. Blasberg said that you were not going to get paid

6f381973-b55f-43c8-8a6e-e27a4eee4da4

NETWORK DEPOSITION SERVICES
Transcript of Richard Kuhta

Page 78

1    for them?  You needed to take time off?

2         MR. LINGLE:  Objection to form.

3    Q    Would you, in fact, get compensated for them?

4    A    I was given hours off.

5    Q    So you weren't paid compensation for it.  You

6    took time off in lieu of it?

7    A    Yes, ma'am.

8    Q    About how many overtime hours were you not

9    paid monetary compensation for, but rather took time off

10   in lieu of it?

11   A    I'm going to estimate that.  I would say

12   maybe -- it's difficult to say -- maybe two days, maybe

13   three days eight-hour days.  But that's not a -- I can't

14   tell you for sure that it happened in 2006.

15   Q    So maybe two to three eight-hour days in 2006?

16   A    Yeah.

17   Q    That's total?

18   A    For that, yes, ma'am; for that instance, yes.

19   Q    Were there any other instances when you would

20   work overtime hours, other than the ones that you just

21   described --

22        MR. LINGLE:  Objection to form.

23   A    -- and not be compensated for it?

24   Q    Yes.

25   A    Do you mean did I work overtime hours and not

6f381973-b55f-43c8-8a6e-e27a4eee4da4

NETWORK DEPOSITION SERVICES
Transcript of Richard Kuhta

1  be paid or compensated for it?

2       Q     Yes.

3       A     I would say no.

4       Q     Other than the two to three eight-hour days in

5  2006, if you worked overtime hours, you were compensated

6  for them?

7       A     Yes, ma'am.

8       Q     Did you complain to anyone at Alderwoods about

9  Mr. Blasberg's handling of those overtime hours that you

10 worked where he would tell you that you were not going

11 to be compensated for them, and you needed to take time

12 off instead?

13          MR. LINGLE:  Objection to form.

14      Q     Did you complain to anyone about that?

15      A     No.

16      Q     I'm sorry.  No?

17      A     No, ma'am.

18      Q     Did you ever call an Alderwoods hotline or a

19 help line to complain about it?

20          MR. LINGLE:  Objection to form.

21      A     No, ma'am.

22          MR. LINGLE:  We will preserve our objection

23 from yesterday, or the previous objections from the

24 deposition yesterday.  Obviously, the different

25 complaints have no bearing on there.  But you can ask

6f381973-b55f-43c8-8a6e-e27a4eee4da4

NETWORK DEPOSITION SERVICES
Transcript of Richard Kuhta

1    questions in order to formulate this into words.  So

2    I would say, yes, that someone has helped me.

3         Q    So someone asked you questions --

4         A    Yes.

5         Q    -- and took down your responses?

6         A    Yes, ma'am, to formulate this and to put this

7    together.

8         Q    Was that your attorney that helped you with

9    that?

10        A    Or an attorney's assistant.

11        Q    Were there multiple versions of your

12   affirmation?

13             MR. LINGLE:  Objection to form.

14        A    Not that I'm aware of.

15        Q    Taking some time to review it now, Mr. Kuhta,

16   does it still reflect your current understanding?

17        A    It appears to be the same document, and I still

18   concur.  Yes, ma'am.

19        Q    If you could, take a look at paragraphs 5 and

20   6 of your affirmation.  Let me know when you have had a

21   chance to read that.  Actually, it's 5, 6 and 7.  Let

22   me know when you have had a chance to read those

23   paragraphs.

24        A    Okay.

25        Q    In your affirmation you allege that while you

6f381973-b55f-43c8-8a6e-e27a4eee4da4

NETWORK DEPOSITION SERVICES
Transcript of Richard Kuhta

Page 85

1   were employed by Alderwoods, you were aware that it had

2   a pre-approval for overtime policy under which hourly

3   employees were not compensated for overtime unless they

4   were pre-approved --

5          MR. LINGLE:  Objection to form.

6      Q     -- for paid overtime?

7      A     I'm not aware of what happened to other

8   employees with regard to overtime.

9      Q     So you are not aware of whether there was a

10  policy to this effect --

11         MR. LINGLE:  Objection to form.

12     Q     -- right?

13         You are not aware of what happened with other

14  employees?

15     A     I'm not aware of what happened with other

16  employees with regard to their pay or their overtime.

17     Q     You are only aware of what happened with

18  you --

19     A     Yes, ma'am.

20     Q     -- and your pay and overtime?

21     A     Yes, ma'am.

22     Q     In paragraph 6 you reference a memorandum that

23  you received from someone at Alderwoods at the regional

24  level.  What memorandum are you talking about -- or, I'm

25  sorry, in that paragraph of your affidavit?

6f381973-b55f-43c8-8a6e-e27a4eee4da4

NETWORK DEPOSITION SERVICES
Transcript of Richard Kuhta

Page 86

1       A       Only that a memorandum was probably used to
2    explain Alderwoods' policy on overtime.  I don't
3    specifically remember the memorandum.

4       Q       Do you remember what the memorandum said?

5       A       No, ma'am.  I'm sorry, I do not.

6       Q       Do you remember who the memorandum came from?

7       A       Most likely, the home office.  But, again, I
8    don't have a clear picture in my mind.  It would be just
9    one of many endless memorandums and papers coming out of
10   the home office and distributed and redistributed and
11   redistributed.

12      Q       So you don't have a particular recollection as
13   to particular memo --

14      A       I do not.

15      Q       -- or its author?

16      A       I do not, other than that it just came from the
17   home office.  Everything came from the home office.

18      Q       And you have no recollection as to the
19   contents of the memo?

20      A       No, ma'am.  I'm sorry.

21      Q       Do you know when you would have received it?

22              MR. LINGLE:  Objection to form.

23      A       No, ma'am.

24      Q       In paragraph 7 on page 2 of your affidavit --

25      A       If we could just digress for one minute, where

6f381973-b55f-43c8-8a6e-e27a4eee4da4

NETWORK DEPOSITION SERVICES
Transcript of Richard Kuhta

Page 87

1    it says that Michael Blasberg said that he would not pay

2    employees overtime, I can't say that he ever said

3    publicly that he wasn't going to pay employees overtime.

4    I'm only saying that he refused to pay me.

5        Q       It's that he refused to pay you overtime on

6    the occasions that you --

7        A       Yes, ma'am.

8        Q       -- testified about earlier?

9        A       Yes, ma'am.  That's correct.

10       Q       So in paragraph 7 is the occasion that you are

11   referencing -- paragraph 7 says:  "On occasion, I worked

12   overtime that was not pre-approved, and I was not

13   compensated for such time."

14       A       That was the time when I did what I needed

15   to do in order to accomplish the day's tasks when

16   Mr. Granger was on vacation, and the work still had to

17   get done.  So I did the work.

18       Q       That was the occasion that you testified that

19   when Mr. Blasberg said he wasn't going to compensate you

20   for that time --

21       A       Yes, ma'am.  That is correct.

22       Q       -- and you need to take it in time off?

23       A       Yes, ma'am, which I did.

24       Q       That's the occasion you are referring to --

25       A       Yes, ma'am.

6f381973-b55f-43c8-8a6e-e27a4eeee4da4

NETWORK DEPOSITION SERVICES
Transcript of Richard Kuhta

Page 90

1      A      Correct.

2      Q      And in this one you are stating that you were

3  aware that Alderwoods had a pre-approval for overtime

4  policy under which hourly employees were not compensated

5  for overtime unless they were pre-approved for paid

6  overtime?

7      A      Yes.  They were supposed to get pre-approval to

8  work overtime before they did from their manager.

9      Q      Are you aware of any Alderwoods policy whereby

10  if an employee worked overtime without pre-approval,

11  that they would not be paid for it?

12          MR. LINGLE:  Objection to form.  You mean in

13  addition to what he just mentioned?

14      A      I'm sorry.  One more time.  My mind is

15  beginning to go on me.

16      Q      You testified that there was a policy whereby

17  employees were supposed to get their overtime hours

18  pre-approved, right?

19      A      Yes, ma'am.

20      Q      But was there a policy -- were you aware of

21  any policy under which employees who did not get

22  overtime hours pre-approved were not compensated for

23  their overtime hours?

24      A      I understand now, and the answer is:  I don't

25  know about that.

6f381973-b55f-43c8-8a6e-e27a4eee4da4

NETWORK DEPOSITION SERVICES
Transcript of Richard Kuhta

Page 91

1    Q     When you say you don't know about that, you
2    mean that you don't know of any such policy?
3    A     I don't know if there was a policy on
4    nonpayments of overtime dollars to overtime hours.  I
5    don't even know if that existed.  I don't remember what
6    the policy -- I don't remember how it read.  So I can't
7    answer that question.  I don't know.
8    Q     If you would, take a look at paragraph 5
9    wherein you state:  "I also knew of several other
10   employees and other job titles who were subject to the
11   pre-approval for overtime policy including
12   administration positions and general-duty employees."
13   A     Yes, ma'am.
14   Q     What employees are you referring to there?
15   A     All employees.
16   Q     Alderwoods employees?
17   A     Yes, ma'am.
18   Q     What policy are you talking about?
19   A     The pre-approval for overtime policy.
20   Q     What was that policy?
21   A     You are required to seek pre-approval for
22   overtime.
23   Q     What you mean when you say "pre-approval for
24   overtime policy," is that you were supposed to seek
25   pre-approval for overtime?

NETWORK DEPOSITION SERVICES
Transcript of Richard Kuhta

Page 92

1      A      Yes, ma'am.

2      Q      At paragraph 5 you talk about employees that

3  were in administrative positions and general-duty

4  employees.  Are there any specific employees that you

5  are referring to there?

6      A      Just the employees at Eternal Light.

7      Q      Who were those employees?

8      A      It would include the funeral directors there.

9  It would include the administrative people who were there

10 at the time, which were two, and one general-duty person.

11     Q      Are there any other employees that you are

12 referring to in paragraph 5, other than the employees

13 that worked at Eternal Light Funeral Home?

14     A      It could have also included the personnel who

15 worked at the Levitt Weinstein Group, too.

16     Q      What employees are you referring to?

17     A      The same thing:  Funeral directors,

18 administrative, general duty.

19     Q      Is it Levitt Weinstein?

20     A      Yes, ma'am.

21     Q      Are these the handful of funeral homes that

22 are in the Dade, Broward and Palm Beach County area?

23     A      Yes, ma'am.

24     Q      Any other employees that you are referring to

25 in paragraph 5?

6f381973-b55f-43c8-8a6e-e27a4eee4da4

NETWORK DEPOSITION SERVICES
Transcript of Richard Kuhta

Page 93

1      A      No, ma'am.

2      Q      On what did you base your knowledge that these

3   employees that you just identified were subject to a

4   policy whereby they had to get pre-approval for their

5   overtime?

6      A      Based on the standardization policy for

7   Alderwoods employees.

8      Q      What is the standardization policy?

9      A      That you have to have pre-approval.

10     Q      Do you know whether any of these employees

11  got pre-approval for the overtime that they worked?

12     A      That I don't know, ma'am.

13     Q      Do you know what their managers instructed

14  them as to getting pre-approval for overtime hours that

15  they worked?

16     A      I'm not aware of that, no.

17     Q      Did you ever review the time records of any

18  other Alderwoods employee?

19     A      No, ma'am.

20     Q      Did you ever review any paychecks for any

21  Alderwoods employee?

22     A      No, ma'am.

23     Q      This policy that you are referring to in

24  paragraph 5 is that employees were supposed to get

25  pre-approval for overtime hours?

6f381973-b55f-43c8-8a6e-e27a4eee4da4

NETWORK DEPOSITION SERVICES
Transcript of Richard Kuhta

Page 94

1        A       Yes, ma'am.

2        Q       And it's not your testimony that there was a

3    policy whereby if employees did not get pre-approval for

4    overtime, that they would not get compensated for that

5    overtime?

6                MR. LINGLE:  Objection to form.

7        A       I'm not aware of that.  I'm not aware of that

8    wording or that intent.  I can't answer that question.

9    I don't know.

10       Q       So the policy that you are referring to in

11   paragraph 5, this pre-approval for overtime policy,

12   that had nothing to do with compensation, correct?

13               MR. LINGLE:  Objection to form.

14       A       Compensation in what form?

15       Q       In terms of being compensated for overtime

16   hours.

17               MR. LINGLE:  Objection to form.

18       A       Paid for overtime?

19       Q       Yes.

20       A       I'm not sure I understanding.

21       Q       I'm just trying to make sure that I understand

22   what you mean by "the pre-approval for overtime policy."

23       A       Pre-approval is when you ask a manager -- if

24   he said that I need you to work overtime, that would be

25   pre-approval.

Johnstown              Toll-Free              Pittsburgh
814-266-2042           866-565-1929           412-281-7908

6f381973-b55f-43c8-8a6e-e27a4eee4da4

NETWORK DEPOSITION SERVICES
Transcript of Richard Kuhta

Page 95

1    Q    When you are saying that "there were employees
2  who were subject to the pre-approval for overtime
3  policy," what are the terms of the policy that you are
4  referring to?
5         MR. LINGLE:  Objection to form.
6    A    I don't know what the terms are.
7    Q    Are you simply meaning that there was a policy
8  at Alderwoods whereby employees were supposed to get
9  pre-approval for overtime hours?
10        MR. LINGLE:  Objection to form.
11   A    Yes, ma'am.
12   Q    You don't know whether or not there was any
13 policy at Alderwoods that if an employee worked overtime
14 hours without getting pre-approval, whether or not they
15 would be compensated for that time, correct?
16        MR. LINGLE:  Objection to form.
17   A    Yes, ma'am.
18   Q    If you could, turn back to your information
19 sheet, which I think is Defendant's Exhibit 3.  If you
20 could, take a look at paragraph A and let me know when
21 you have had a chance to read that.
22   A    Okay, ma'am.  I'm ready.
23   Q    Are you claiming in this lawsuit that you
24 performed community service work as part of your job
25 duties for Alderwoods, and that at least some of that

6f381973-b55f-43c8-8a6e-e27a4eee4da4

NETWORK DEPOSITION SERVICES
Transcript of Richard Kuhta

Page 96

1    time was not compensated?

2        A    Yes.

3        Q    During the time that you were working for

4    Alderwoods between December of 2003 and May of 2007, did

5    you do any community service work?

6        A    Yes, ma'am.

7        Q    What work did you do?

8        A    I was a member of the United States Navy.  I

9    gave talks and discussions with my fellow servicemen.  I

10   also performed cremation services for two of my member's

11   parents who had passed away.

12       Q    Any other community service work that you

13   performed?

14       A    No.

15       Q    Were you a member of United States Navy before

16   you began working at Alderwoods?

17       A    Yes, ma'am.

18       Q    When did you join?

19       A    August of 1983.

20       Q    Did you ever give talks or discussions with

21   fellow servicemen before December of 2003?

22       A    I don't recall specifically that my entire unit

23   was aware that I was a licensed funeral director/embalmer

24   and could come to me for any particular questions they

25   had with regard to funeral services or the particulars

6f381973-b55f-43c8-8a6e-e27a4eeed4a4

NETWORK DEPOSITION SERVICES
Transcript of Richard Kuhta

Page 97

1  of that. There was a continued ongoing conversation with
2  regard to that before.
3         I just want to adjust that. 1983 was actually
4  1984, if that matters at all.
5     Q    So you are saying that prior to December of
6  2003 you might have had talks or discussions with fellow
7  servicemen in the Navy, but it wasn't particular to
8  being a licensed funeral director/embalmer?
9         MR. LINGLE: Objection to form.
10    A    It would have to do with funeral service in
11 general and things to know about funerals, because we
12 are all going to be going through this with our parents,
13 eventually.
14    Q    Is there any part of the activities that you
15 were doing with regard to the U.S. Navy that you viewed
16 as being work for Alderwoods?
17        MR. LINGLE: Objection to form.
18    A    Just my association with the Navy, and my
19 association with Alderwoods, and their connection between
20 the two, and always the possibility of someone using our
21 firm or an Alderwoods firm because of my connection and
22 my association with those people.
23    Q    You would have been associated with the U.S.
24 Navy, regardless of whether you worked for Alderwoods or
25 not, right?

6f381973-b55f-43c8-8a6e-e27a4eee4da4

NETWORK DEPOSITION SERVICES
Transcript of Richard Kuhta

Page 98

1      A      Yes, ma'am.

2             MR. LINGLE:  Objection to form.

3      Q      Did your involvement with the U.S. Navy --

4  in terms of giving talks and discussions with fellow

5  servicemen -- continue after your employment with

6  Alderwoods ended?

7      A      My employment with Alderwoods just ended in May

8  of 2007.

9      Q      Right.  Have you continued to give talks and

10 discussions with fellow servicemen after?

11     A      My continued association with the United States

12 Navy, yes, it has continued afterwards; and just as of

13 November 2007 I retired from the Navy.  So that's over.

14     Q      After your retirement, did you continue to

15 give talks and discussions with your fellow servicemen

16 about funeral services and the like?

17     A      No.

18     Q      Did any Alderwoods employee ever instruct you

19 to join or participate in a community organization?

20            MR. LINGLE:  Objection to form.

21     A      Management wanted their funeral directors

22 to have memberships in the community, but they were

23 particularly a Jewish membership because our firm is

24 Jewish firm.  And I being gentile couldn't offer anything

25 to join a Jewish organization.  So my connection to the

6f381973-b55f-43c8-8a6e-e27a4eee4da4

NETWORK DEPOSITION SERVICES
Transcript of Richard Kuhta

Page 100

1     Q    Did he identify any particular organization

2  that you needed to join?

3     A    No, ma'am.

4     Q    There was no other organization -- other than

5  the United States Navy -- that you were involved in in

6  terms of community service?

7     A    No, ma'am.

8     Q    How much time did you spend engaged in

9  activities related to your membership with the U.S. Navy

10  that you regarded as performing work for Alderwoods?

11     A    I was with my unit for one weekend a month.

12  During that time I could speak my members at any time.

13  So there was a continued association there.  They could

14  ask me questions.  The forum was always open.  They knew

15  who to come to.  I was readily available all weekend

16  long, eight hours Saturday and eight hours Sunday.  And

17  this was for 20 years.

18     Q    Were you required to attend that -- were you

19  required to meet with your unit one weekend a month?

20     A    Yes, ma'am.

21     Q    Where did that requirement come from?

22     MR. LINGLE:  Objection to form.

23     Q    Who required you to meet?

24     A    It's promulgated from Washington.

25     Q    Was this like your reserve duty?

6f381973-b55f-43c8-8a6e-e27a4eee4da4

NETWORK DEPOSITION SERVICES
Transcript of Richard Kuhta

Page 101

1    A     Yes, ma'am.

2    Q     You were required by the government to do this

3    reserve duty one weekend a month?

4    A     Yes, ma'am.

5    Q     You are saying that you used that time as an

6    opportunity to speak to other service members about

7    opportunities in the funeral business?

8          MR. LINGLE:   Objection to form.

9    A     To answer general questions.

10   Q     Did you ever report the time that you spent

11   performing this activity on your time records when you

12   were working for Alderwoods?

13   A     To Alderwoods?

14   Q     Yes.

15   A     No, ma'am, I have not.

16   Q     And why not?

17   A     I guess because in my mind I never -- at the

18   time I didn't view it as being community involvement

19   because they were indicating that you should join clubs

20   like the Knights of the Pythias, the Kiwanis and the

21   Lion's Club; local community things like the Chamber

22   of Commerce.

23         It didn't fit into my mind as being that type

24   of thing, and also it wasn't primarily a Jewish

25   organization again, you know.

NETWORK DEPOSITION SERVICES
Transcript of Richard Kuhta

Page 105

1    A    Navy training.

2    Q    Are you aware of any Alderwoods policy
3 requiring employees to perform community service work?

4    A    A policy?

5    Q    Yes.

6    A    No, ma'am.

7    Q    Do you know whether any of the other employees
8 at Eternal Light Funeral Home performed community
9 service work for Alderwoods?  I mean, between December
10 of 2003 and May of 2007, whether any of the other
11 employees at the Eternal Light Funeral Home were
12 performing community service work?

13    A    Dale Granger was a member of the North Miami
14 Beach Chamber of Commerce.

15    Q    I believe you had testified that Mr. Granger
16 was paid on a salary basis?

17    A    Yes, ma'am, he was.

18    Q    Any other Alderwoods employees that were at
19 your location who were performing community service
20 work?

21    A    No, ma'am.

22        MR. LINGLE:  Could you read the last three or
23 four questions and answers back, please.

24        THE REPORTER:  Sure.

25        (The questions and answers referred you were

6f381973-b55f-43c8-8a6e-e27a4eee4da4

NETWORK DEPOSITION SERVICES
Transcript of Richard Kuhta

Page 106

1    read back).

2        Q    Mr. Kuhta, if you could, take a look at

3    Defendant's Exhibit 3, paragraph B.  Let me know when

4    you have had a chance to review that.

5        A    Yes, ma'am.

6        Q    Mr. Kuhta, are you claiming in this lawsuit

7    that you performed on-call work after your regular work

8    hours, and at least some of the time was not paid for

9    by Alderwoods?

10       A    Yes, ma'am.

11       Q    During the time that you were employed with

12   Alderwoods between December of 2003 and May of 2007,

13   were you ever on-call?

14       A    Yes, ma'am.

15       Q    When were you on-call?

16       A    In the evenings, ma'am.

17       Q    Did you have an on-call schedule?

18       A    We did.

19       Q    What was your on-call schedule, typically?

20       A    It was typically two to three nights a week.

21       Q    Did Mr. Granger set that schedule?

22       A    Yes, ma'am.

23       Q    And what did it mean at your location to be

24   on-call?

25       A    It meant if the detail office at Levitt

6f381973-b55f-43c8-8a6e-e27a4eee4da4

NETWORK DEPOSITION SERVICES
Transcript of Richard Kuhta

1    Weinstein called you after hours, it was with regard
2    to a death.  That a family wanted to speak to a funeral
3    director.
4         Q     Was there any other type of work involved with
5    being on-call, other than taking phone calls?
6         A     That was generally it.
7         Q     Generally, when you were scheduled to be
8    on-call, did the on-call work involve removals?
9         A     For myself, no.
10        Q     What about embalmings?
11        A     No, ma'am.
12        Q     Generally, did the on-call work that you did
13   involve returning to the funeral home?
14        A     Generally, no.
15        Q     Were there occasions when you did need to
16   return to the funeral home?
17        A     On occasion, yes.
18        Q     What would that be in relation to?  Why would
19   you need to rush to the funeral home?
20             MR. LINGLE:  Objection to form.
21        A     As an example:  If you had to pull a pre-need
22   file and access that and find out some important
23   information that you would not have at home, you would
24   have to open the funeral home if it was in the middle of
25   the night, and a special procedure had to be performed

6f381973-b55f-43c8-8a6e-e27a4eee4da4

NETWORK DEPOSITION SERVICES
Transcript of Richard Kuhta

Page 108

1  on the body in the middle of the night.  It's a special

2  Hebrew/Jewish procedure that would have to be performed.

3  It would have to be done relatively immediately, but

4  those incidences were somewhat rare, somewhat.

5       Q     On the occasions where you needed to return to

6  the funeral home when you were on-call, did you punch in

7  and out using the time clock?

8       A     No, ma'am.

9       Q     Why not?

10      A     Because it was after hours.  We were on-call,

11 and there was no record of it.  You just did what you had

12 to do.

13      Q     Other than taking phone calls and returning to

14 the funeral home on these rather rare occasions that you

15 needed to pull a file or perform a certain procedure,

16 was there any other type of work that you performed

17 while you were on-call?

18      A     Most of it was phone work.

19      Q     How often -- when you were on-call -- would

20 you have to take a phone call?

21      A     It's very difficult to say.

22      Q     It wasn't every single time that you were

23 on-call?

24      A     Correct.

25      Q     So there could be occasions where you were

6f381973-b55f-43c8-8a6e-e27a4eee4da4

NETWORK DEPOSITION SERVICES
Transcript of Richard Kuhta

Page 113

1    even know what their titles are above that.

2        Q    Was this expectation that you be on-call a

3    certain amount of time during each week?  You were

4    expected to be on-call and scheduled to be on-call two

5    or three nights a week, right?

6        A    We would share coverage seven nights a week,

7    correct.

8        Q    Did any Alderwoods manager ever instruct or

9    direct you not to report the time that you spent working

10   when you were on-call?

11       A    No, ma'am.  It was just never done.

12       Q    You never reported the time that you spent

13   performing work while you were on-call, correct?

14           MR. LINGLE:  Objection to form.

15       A    Yes, ma'am.  That's correct.

16       Q    When you say "it was never done," do you know

17   whether any other Alderwoods employee recorded it or

18   reported their time?

19       A    I have never heard of them recording their

20   time.

21           MR. LINGLE:  Could we take a quick break?

22           MS. MORGAN:  Sure.

23           (Recess taken 2:35 p.m. to 2:55 p.m.)

24           MS. MORGAN:  Back on the record.

25   BY MS. MORGAN:

6f381973-b55f-43c8-8a6e-e27a4eee4da4

NETWORK DEPOSITION SERVICES
Transcript of Richard Kuhta

Page 114

1    Q    I believe you testified, Mr. Kuhta, that no
2    Alderwoods manager ever instructed you not to record the
3    time that you spent performing work while you were
4    on-call, right?
5    A    Yes, ma'am.  That's correct.
6    Q    When you testified that you had never heard of
7    anyone recording their time, did you have discussions
8    with any Alderwoods employees as to whether or not they
9    recorded the time they spent performing work while they
10   were on-call?
11   A    No, ma'am, there was no discussion.
12   Q    You don't have any personal knowledge as to
13   whether any other Alderwoods employee recorded the time
14   they spent working while they were on-call?
15   A    It was never discussed.  No one ever said I
16   recorded my time.  There was no purpose in recording it.
17   Q    But do you have any personal knowledge as to
18   whether any Alderwoods employee actually did record the
19   time that they spent while they were on-call?
20   A    No, ma'am, I do not.
21   Q    You had testified that your location managers,
22   regional directors and Southeast district manager
23   communicated to you that there was an expectation that
24   there was on-call; is that right?
25   MR. LINGLE:  Objection to form.

6f381973-b55f-43c8-8a6e-e27a4eee4da4

NETWORK DEPOSITION SERVICES
Transcript of Richard Kuhta

Page 115

1      A      Yes, we had to take call and still do.

2      Q      Did any Alderwoods manager ever communicate to

3   you that you will not be compensated for work while you

4   were on-call?

5      A      No, ma'am, it was never discussed.

6      Q      Did you ever, personally, keep track of any of

7   the time that you worked while you were on-call?

8      A      No, ma'am, I have not.

9      Q      What is the number of hours that you spent

10  actually working while you were on-call from December

11  of 2003 and May of 2007?

12          MR. LINGLE:  Objection to form.

13     A      I don't know, ma'am.

14     Q      Did you ever complain to any Alderwoods

15  manager about not being compensated for time you spent

16  performing work while you were on-call?

17          MR. LINGLE:  Objection to form.

18     A      No, ma'am.

19     Q      Why not?

20     A      Because it was an accepted -- it was an

21  understood industry standard that you take call, and

22  you are not paid for it.

23     Q      When you say "it was an understood industry

24  standard," what do you mean by that?

25     A      To the best of my knowledge, I never heard of

6f381973-b55f-43c8-8a6e-e27a4eee4da4

NETWORK DEPOSITION SERVICES
Transcript of Richard Kuhta

Page 118

1    question.

2        Q    Mr. Kuhta, if you can, take a look at

3    Defendant's Exhibit 3 again.  Review paragraph C and let

4    me know when you have had a chance to look it over.

5        A    Yes, ma'am.

6        Q    Do you currently have any claim in this

7    lawsuit that you spent time training for, and taking a

8    test to become a licensed insurance agent and the time

9    retaining that license and that you were not compensated

10   for it while your employment with Alderwoods?

11       MR. LINGLE:  Yes.  We will stipulate to

12   that claim in paragraph C on the information sheet for

13   Mr. Kuhta.

14       MS. MORGAN:  Thank you.

15       Q    Are you currently pursuing any claim related

16   to time that you spent training or taking a test to

17   become a licensed funeral director in this lawsuit?

18       THE WITNESS:  I think we dispensed with that,

19   too.

20       MR. LINGLE:  You can answer her question to

21   the extent there was time that you spent in doing it,

22   and you are claiming it.  You can answer the question.

23       A    I'm sorry.  Please restate the question.

24       Q    I believe your counsel stipulated to the

25   withdrawal of the claim identified in paragraph C of the

6f381973-b55f-43c8-8a6e-e27a4eee4da4

NETWORK DEPOSITION SERVICES
Transcript of Richard Kuhta

Page 119

1    information sheet, which related to time spent training

2    and testing to become a licensed insurance agent and

3    time maintaining that license.

4          What I'm trying to find out is:  Whether you

5    are pursuing any claim related to any other license that

6    you had when you were employed with Alderwoods, other

7    than an insurance license; for example, a funeral

8    director's license?

9          A     No, I'm not.

10         Q     Are you pursuing any claim in this lawsuit for

11   any other type of training that you received while you

12   were employed with Alderwoods that you are claiming that

13   you were not compensated for?

14         A     No, ma'am.

15         Q     Are you currently pursuing any claim in this

16   lawsuit that you were not paid for any time spent

17   meeting with clients about pre-needs insurance?

18         A     No, ma'am.

19         MS. MORGAN:  Can we go off the record for a

20   minute?

21         MR. LINGLE:  Sure.

22         (Recess taken).

23   BY MS. MORGAN:

24         Q     Mr. Kuhta, I believe you testified that you

25   only worked in one Alderwoods location; is that correct?

6f381973-b55f-43c8-8a6e-e27a4eee4da4

136

1              CERTIFICATE OF OATH

2

3

4

5   STATE   OF    FLORIDA)

6   COUNTY OF MIAMI-DADE)

7

8

9          I, the undersigned authority, certify that

10  RICHARD T. KUHTA personally appeared before me and was

11  duly sworn.

12          Witness my hand and official seal this 22nd of

13  December 2008.

14

15

16

17

18

19  _____

20  Mark Rabinowitz, RPR

21  Notary punch - State of Florida

22  My Commission: DD480924

23  Expires: November 20, 2009

24

25

137

REPORTER'S DEPOSITION CERTIFICATE

STATE   OF     FLORIDA)

COUNTY OF MIAMI-DADE)

I, Mark Rabinowitz, Registered Professional Reporter, certify that I was authorized to and did stenographically report the deposition of RICHARD T. KUHTA; that a review of the transcript was requested; and that the transcript is a true and complete record of my stenographic notes.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, parties' attorney, or counsel connected with the action, nor am I financially interested in the action.

Dated this 22nd day of December 2008.

Mark Rabinowitz, RPR