**TAB 19**

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DEBORAH PRISE and HEATHER RADY, on behalf of themselves and all employees similarly situated, | ) ) ) ) ) |
| Plaintiffs, | ) Civil Action No. 06-1641 ) |
| vs. | ) Judge Joy Flowers Conti ) ) |
| ALDERWOODS GROUP, INC., | ) ) |
| Defendant. | ) |

DEPOSITION UPON ORAL EXAMINATION

of

MICHAEL LANZA

Taken at 2611 East "E" Street

Tacoma, Washington

DATE:  April 24, 2009

REPORTED BY:  Robyn L. Fisher, CCR, RPR
              CCR No. 2590

3a69689e-c597-4bee-a3bf-dae486d1a304

NETWORK DEPOSITION SERVICES
Transcript of Michael Lanza

Page 51

1    dated the paper.  I'll give you an example:  If it was

2    January, you went January 1st, and you wrote January 1st,

3    if you worked that day, what you did, how many hours you

4    put in, and I believe that went up to -- it was

5    January 1st to the 31st, the 15th being the cutoff.  You

6    would take that sheet, report the hours.

7         Then we'd hang the sheet up again, and we'd

8    continue to fill it out until the end of the month.

9       Q.   Did it indicate when you started working for

10   the day?

11      A.   Yes.

12      Q.   Did it indicate when you stopped working to

13   take a lunch?

14      A.   Yes.

15      Q.   When you came back from lunch?

16      A.   Yes.

17      Q.   And when you left for the day?

18      A.   Yes.

19      Q.   If you didn't take a lunch period, did you

20   indicate on the time card that you did not take a lunch

21   period?

22      A.   Yes, sir.

23      Q.   Did Mr. Noel explain to you why you needed to

24   put on your time card if you didn't take a lunch?

25      A.   He just said that we needed to report

NETWORK DEPOSITION SERVICES
Transcript of Michael Lanza

Page 52

1    everything we did.  So if we didn't take a lunch, you had

2    to have it on there to show that lunch wasn't taken as to

3    why we put on an extra half hour of work.

4        Q.    So you understood you were entitled to a half

5    hour lunch break, correct?

6        A.    Yes.

7        Q.    If you didn't take it, you understood you were

8    entitled to be paid for it; the fact that you didn't have

9    a lunch break?

10       A.    Correct.

11       Q.    So that would be included in your total work

12   hours for that day?

13       A.    Correct.

14       Q.    Were you instructed every time you didn't take

15   a lunch to make sure that you put it on your time card?

16       A.    Yes, sir.

17       Q.    Did you do that during the entire time that you

18   worked at Powers?

19             MS. GIFFORD:  Objection.

20       A.    Yes, I did.

21       Q.    Did Mr. Noel give you instructions on how to

22   fill out the paperwork for performing on-call services?

23       A.    The only paperwork we had to fill out was a

24   book that was kept in the back office, and we recorded

25   the name of the deceased, the hour we brought the body in

3a69689e-c597-4bee-a3bf-dae486d1a304

NETWORK DEPOSITION SERVICES
Transcript of Michael Lanza

Page 55

1    Q.   Was that a practice that was continued during

2    the entire time that you worked at Powers?

3    A.   Yes, sir.

4    Q.   By the way, were you ever paid any commissions

5    by Alderwoods for any of the cemetery products or

6    cremation products that you sold?

7    A.   No, sir.

8    Q.   Were you ever paid any commissions by

9    Alderwoods?

10   A.   Never by Alderwoods, no.

11   Q.   Did Alderwoods ever pay you any bonuses?

12   A.   No, sir.  Well, hold on a second.  I want to

13   recall maybe once, and I think that was that $200 check

14   we talked about earlier.

15        You said Loewen Group; is that correct?

16   Q.   No.  I said Alderwoods.

17   A.   No.  When it was Alderwoods Group, I never

18   received anything from the company as far as a bonus.

19   I'm sorry.

20   Q.   That's okay.

21   A.   It's a long night.  No.  I'm sorry.  They did

22   not.

23   Q.   I'm with you.  I've been on the road for days

24   doing depositions.

25        Okay.  Did you hold any other positions while

3a69689e-c597-4bee-a3bf-dae486d1a304

NETWORK DEPOSITION SERVICES
Transcript of Michael Lanza

1    you were performing work at Powers?

2        A.   Yes, sir.

3        Q.   And I'm saying positions other than funeral

4    director and embalmer.

5        A.   Yes, sir.

6        Q.   Could you identify those for me, please?

7        A.   I'm trying to think the exact year, and I think

8    it was 2001.

9            Mr. Noel and his son had resigned their

10   positions.  At the time, Mr. Noel's son was the manager

11   of the funeral home, and they had resigned, and they were

12   moving out of state.

13       Q.   I don't mean to interrupt, but you mentioned

14   his son.  Could you give us his name?

15       A.   Rick Noel.

16       Q.   You said somebody was retired and moving out of

17   state?

18       A.   They were both moving out of state; Mr. Noel

19   and his son.

20       Q.   What happened as a result of their moving out

21   of state?

22       A.   We were without a manager to the funeral home.

23       Q.   How did that affect whether you obtained any

24   other positions?

25       A.   The company asked if I would step into that

3a69689e-c597-4bee-a3bf-dae486d1a304

NETWORK DEPOSITION SERVICES
Transcript of Michael Lanza

1    position and take over the management of the funeral

2    home.

3        Q.    Did you do that?

4        A.    Yes, sir.

5        Q.    Did that occur sometime in 2000?

6        A.    I think it was 2001.

7        Q.    And what did you understand your duties to be

8    as a manager of Powers at that time?

9        A.    I was to see the day-to-day operation of the

10   funeral home, have staff meetings with the staff, sign

11   any checks that needed to be signed for purchasing and

12   whatnot.

13           I was also required to do all of the work after

14   5 o'clock so no overtime was going to be encountered by

15   any other employee.

16       Q.    Were you responsible for scheduling the

17   employees' work hours?

18       A.    Well, their work hours were pretty well clear

19   the days they had to come to work.  It was up to me if

20   they were going to schedule a vacation to make sure their

21   vacations were scheduled, make sure they had their days

22   off that they were going to take off.  It was pretty well

23   standard what days they had on and off.  If they were

24   sick, they had to call me in enough time to let me know

25   that they weren't coming in.

3a69689e-c597-4bee-a3bf-dae486d1a304

NETWORK DEPOSITION SERVICES
Transcript of Michael Lanza

Page 60

1          Did Powers have a program where their phones

2     were being answered after hours?

3          A.    Yes, sir.

4          Q.    Could you explain how that worked, please?

5          A.    At that particular time we had an answering

6     service.

7          Q.    So how would that work?  You call in, the

8     answering service would take the call, and then what

9     would happen?

10         A.    Then if a call came in, they would contact our

11    removal staff.

12         Q.    The answering service would?

13         A.    Yes, sir.

14         Q.    And what would happen then?

15         A.    The removal staff would go out and bring the

16    body back to the funeral home.

17         Q.    In light of performing those duties, as manager

18    did you schedule who would be available to take those

19    calls and perform those removals?

20         A.    We had a service that was hired, so it was the

21    same company that we used.

22         Q.    An outside service to do the first removals?

23         A.    Yes.

24         Q.    At some point did this after-hour work change

25    at Powers?

3a69689e-c597-4bee-a3bf-dae486d1a304

NETWORK DEPOSITION SERVICES
Transcript of Michael Lanza

Page 61

1    A.    As far as the removals go?

2    Q.    Yeah.  In other words -- I'm sorry.  Sometimes,

3    like I say, I ask questions that are not clear.

4          It seems like at the time that you were

5    manager, a lot of that work was being outsourced, or

6    companies were retained to do that work, correct?

7    A.    Yes.

8    Q.    Did that change sometime during the time that

9    you were working at Powers?

10   A.    Yes.

11   Q.    When did that change?

12   A.    I can't recall if it was in 2003 or the end of

13   2002.  I can't recall the exact time.

14   Q.    So somewhere around 2002, 2003, it changed?

15   A.    Yes.

16   Q.    How did it change?

17   A.    The company that was making the removals for us

18   went out of business.

19   Q.    What did Powers do in response to that?

20   A.    They hired people to come in and do that.

21   Q.    Hired additional employees to do that?

22   A.    Yes.

23   Q.    And we're talking about actually physically

24   making the removals?

25   A.    Yes, sir.

3a69689e-c597-4bee-a3bf-dae486d1a304

NETWORK DEPOSITION SERVICES
Transcript of Michael Lanza

Page 62

1    Q.    What about handling the calls -- you referred
2    to them as death calls -- that came in?
3    A.    The calls themselves?  You mean when the phone
4    rang?
5    Q.    Yes, sir.
6    A.    There was a point where the answering service
7    was dismissed.
8    Q.    Do you recall when that was?
9    A.    That was the beginning of 2003, maybe.  It was
10   the early part of the year.
11   Q.    Who took those calls after the answering
12   service was dismissed?
13   A.    Can I just go back a second?
14         I don't want to say the beginning of 2003.  It
15   was somewhere in 2003 that it happened.
16   Q.    Okay.  It's a long time ago.
17   A.    It's been so long.  I can't remember the dates,
18   but I can tell you the circumstances.
19   Q.    So sometime in 2003 the answering service was
20   dismissed, and somebody else obviously had to take those
21   calls?
22   A.    Yes.  That's correct.
23   Q.    Who were the persons to take those calls?
24   A.    The staff of the funeral home.
25   Q.    And by staff, who are you referring to?

NETWORK DEPOSITION SERVICES
Transcript of Michael Lanza

Page 63

1    A.    The employees, the funeral directors as well as
2   a secretary.
3    Q.    Would the secretary be scheduled to perform
4   those services after hours?
5    A.    She offered.  The job was opened if anybody
6   wanted to answer the phone, so she took her calls from
7   Monday to Friday.
8    Q.    The secretary did?
9    A.    Yes.
10   Q.    And that was after hours?
11   A.    Yes, sir.  Actually, Monday to Thursday because
12  Friday night the directors took it.
13   Q.    And then from Friday to the following Sunday,
14  the funeral directors covered those calls?
15   A.    Yes.
16   Q.    And the work they performed was, I think you
17  indicated earlier, as far as recording the information in
18  the book and making the arrangements for the pickup and
19  removals and embalming as necessary?
20   A.    At that particular time our directors took the
21  calls, all they did was contact the removal staff, and
22  then they went out and picked up the bodies.
23   Q.    Was there a point in time that the funeral
24  directors were both taking the calls and performing the
25  removals?

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

3a69689e-c597-4bee-a3bf-dae486d1a304

NETWORK DEPOSITION SERVICES
Transcript of Michael Lanza

Page 64

1    A.    Not to my knowledge, no.  At least not at our
2    funeral home they weren't.
3    Q.    Not at Powers?
4    A.    No, sir.
5    Q.    So were the duties of the funeral directors on
6    the on call after hours limited to just handling the
7    calls then?
8    A.    Just the phone calls, yes.
9    Q.    And that continued up to the time that you left
10   Powers?
11   A.    That continued up until the time -- it ceased
12   prior to me leaving Powers.
13   Q.    When you say "it ceased," what are you
14   referring to?
15   A.    It stopped.  They had gone back to an answering
16   service, if I'm not mistaken.
17   Q.    Do you recall when that was?
18   A.    I remember Blane Coffey was the manager when
19   this was going on, and I can't recall if it ceased, you
20   know, if they hired the answering service back during his
21   time or when the next manager came on.  I don't remember.
22   Q.    Do you recall the year that that occurred?
23   A.    Mr. Coffey managed the funeral home from 2003.
24   Q.    From 2003?
25   A.    Yeah.  Sometime in 2003 up until early 2004.

3a69689e-c597-4bee-a3bf-dae486d1a304

NETWORK DEPOSITION SERVICES
Transcript of Michael Lanza

Page 65

1    Q.   So during that time period when the answering

2    service was answering the phones, who was doing the

3    removals?

4    A.   The staff that they had hired, the people that

5    they had hired to go out originally.  I can't recall who

6    they were.  They had people they were calling in after

7    hours to make removals.

8    Q.   Were these like independent contractors that

9    they hired?

10   A.   I know it wasn't directors.  I'm trying to

11   remember if it was just part-time people they had called

12   in.  It was just part-timers that they had called in to

13   do that.

14       If I'm not mistaken, I think the other funeral

15   home in Auburn, which is Price-Helton, I want to say they

16   were assisting with those removals too.

17   Q.   I think we got into this because you were, I

18   think you were indicating that you were the manager after

19   the Noels had left the state, and we were talking about

20   your management duties, and I think I asked you the

21   question about scheduling after-hours work for on call.

22       As part of your duties as manager, did you also

23   give instructions to employees on how to complete their

24   time cards?

25   A.   They knew how to complete them, sir.

3a69689e-c597-4bee-a3bf-dae486d1a304

NETWORK DEPOSITION SERVICES
Transcript of Michael Lanza

Page 77

1    A.    Yes, sir.

2    Q.    And the hourly rate at the time your employment

3    ended was $20.36 an hour?

4    A.    I believe so, yes.

5    Q.    Any reason to believe that was not correct?

6    A.    You know, I think it's right.  I thought it was

7    higher, but that might be correct.

8    Q.    In the remarks it says you moved to Colorado?

9    A.    Yes.  That's correct.

10   Q.    Now, before you were manager, who supervised

11   your work?

12   A.    Mr. Noel.

13   Q.    Did your job title ever change from apprentice

14   embalmer and funeral director to an actual funeral

15   director and embalmer?

16   A.    Not with them.  No, sir.

17   Q.    So after you reassumed your duties as an

18   apprentice funeral director and embalmer, who did you

19   report to?

20   A.    Brian Curnow.

21   Q.    Could you spell his last name, please?

22   A.    C-U-R-N-O-W.

23   Q.    Did you have any other supervisors other than

24   Mr. Curnow?

25   A.    At the time that he was at the funeral home?

3a69689e-c597-4bee-a3bf-dae486d1a304

NETWORK DEPOSITION SERVICES
Transcript of Michael Lanza

Page 78

1    Q.   Yeah.  From the time that you were there until
2  the time you left, did you have any other --
3    A.   Yes.  Yes.
4    Q.   Oh, okay.  Who else supervised you?
5    A.   Steve Clevenger.
6    Q.   Anybody else?
7    A.   Yes.  Blane Coffey.
8    Q.   C-O-F-F-E-E?
9    A.   C-O-F-F-E-Y.
10   Q.   Anyone else?
11   A.   I can't remember his name.  He was the last
12  one.  Dennis something or other.  Can't remember his last
13  name.
14            MS. GIFFORD:  Christie.
15   A.   Dennis Christie.  That's it.
16   Q.   For what period of time did Mr. Curnow
17  supervise your work?
18   A.   For a short period of time.  I think he was
19  only there for, gosh, I'm going to have to take a guess;
20  maybe six to seven months.
21   Q.   Do you recall what year that was?
22   A.   It was after me, so I resigned.
23   Q.   You said February, March of 2002.
24   A.   So he came on shortly after I did, and I think
25  he stayed up until I think January of the following year.

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

3a69689e-c597-4bee-a3bf-dae486d1a304

NETWORK DEPOSITION SERVICES
Transcript of Michael Lanza

1    Q.   2003?

2    A.   Yes.

3    Q.   What was his position?

4    A.   He was the general manager.

5    Q.   And Steve Clevenger; for what period of time

6    did he supervise your work?

7    A.   I think he was only there maybe three months.

8    Q.   Was that in 2003 as well?

9    A.   Yes.

10   Q.   Was he also a general manager?

11   A.   Yes, sir.

12   Q.   And Blane Coffey; what period of time did he

13   supervise your work?

14   A.   Mr. Coffey supervised my work up until Dennis

15   Christie came on, and I can't give you the date.  I don't

16   know.

17   Q.   Was it sometime commencing in 2003?

18   A.   It was commencing in 2003 and ending in 2004 at

19   some time.

20   Q.   Was he also a general manager?

21   A.   Yes, sir.

22   Q.   Then Mr. Christie commenced supervising your

23   work after Mr. Coffey, correct?

24   A.   Yes.  That's right.

25   Q.   Would that commencement start in about 2004?

3a69689e-c597-4bee-a3bf-dae486d1a304

NETWORK DEPOSITION SERVICES
Transcript of Michael Lanza

Page 80

1     A.   Yes, sir.

2     Q.   And, of course, then you left, correct?

3     A.   Yes.

4     Q.   Did you ever have any discussions with

5     Mr. Curnow concerning overtime that you were working?

6     A.   I'm trying to think if that was the time we

7     dismissed the answering service.  I can't recall if it

8     was during his time or Mr. Coffey's time.  With

9     Mr. Curnow, no, there was no discussions about -- he

10    tried to limit the overtime, but Powers Funeral Home is a

11    very busy home, so it's kind of hard to keep it an

12    eight-hour day.

13    Q.   So you don't recall if you had any discussions

14    with him about overtime?

15    A.   I really can't.

16    Q.   What about discussions with Mr. Curnow about

17    performing community service work?

18    A.   He never brought that up.

19    Q.   By the way, after you stopped being general

20    manager, you still performed community service work; is

21    that correct?

22    A.   I went to a club.  I went out more or less at

23    that point for myself.  I got to know people, so I did.

24    I did go out.  They knew who I was.  They knew what I

25    did.

3a69689e-c597-4bee-a3bf-dae486d1a304

NETWORK DEPOSITION SERVICES
Transcript of Michael Lanza

1    Q.    Did you enjoy performing the community service
2  work?
3              MS. GIFFORD:  Objection.
4    A.    Yes.
5    Q.    Did the other funeral directors after you
6  stopped being manager commence doing any community
7  service work?
8              MS. GIFFORD:  Objection.
9    A.    I'd have to answer that knowing when Mr. Morgan
10  came on staff, because he did.  I don't know when he
11  started work with us.
12    Q.    Mr. Morgan was another funeral director?
13    A.    Yes.
14    Q.    Did you have any discussions with Mr. Curnow
15  about performing after-hour on-call duties?
16    A.    As I said, it would depend on when that
17  answering service was dismissed.  I don't recall if it
18  was dismissed during his time or not.  I can't recall
19  having a conversation with him on that.
20    Q.    What about with Mr. Clevenger; do you recall
21  any conversations that you had with him concerning
22  overtime?
23    A.    I remember him claiming that I had too much
24  overtime one particular week.
25    Q.    What did you discuss in that regard?

3a69689e-c597-4bee-a3bf-dae486d1a304

NETWORK DEPOSITION SERVICES
Transcript of Michael Lanza

Page 84

1   and nobody else was astronomically low or something?

2   A.   No.

3   Q.   Did you have any conversations with

4   Mr. Clevenger concerning community service work?

5   A.   No, sir.

6   Q.   Did you have any conversations with

7   Mr. Clevenger concerning after-hour on-call duties?

8   A.   No, sir.

9   Q.   Did you have any conversations with Mr. Coffey

10  concerning overtime?

11  A.   Yes, sir.

12  Q.   What were your discussions with him in that

13  regard?

14  A.   That was the time that the answering service, I

15  know for a fact, we no longer engaged in the answering

16  service.

17  Q.   So it was dismissed?

18  A.   Yes.

19  Q.   What did you discuss with him about the results

20  or the consequences of dismissing the answering service?

21  A.   When they dismissed the answering service, they

22  were forwarding the funeral home phones to our cell

23  phone.

24       At the time I was living out in Graham,

25  Washington.  There was only one cell phone tower that

3a69689e-c597-4bee-a3bf-dae486d1a304

NETWORK DEPOSITION SERVICES
Transcript of Michael Lanza

Page 91

1    the lines of the conversation you had with Mr. Clevenger

2    concerning the overtime concerning embalming?

3        A.   They'd always had a problem with us working

4    late at night.  They wanted that overtime cut down.

5        Q.   But I was trying to get at that this was a

6    continuing problem, and you had a discussion initially

7    with Mr. Clevenger about that matter concerning the

8    astronomical one, but you also had a conversation about

9    that with Mr. Coffey because that was an ongoing issue?

10       A.   That was an ongoing issue for a long time, yes.

11       Q.   Other than the overtime concerning the death

12   calls and the embalming issues, did you have any

13   discussions with Mr. Coffey concerning overtime?

14       A.   No.

15       Q.   Did you have any discussions with Mr. Coffey

16   concerning community service work?

17       A.   No.

18       Q.   Any discussions with Mr. Coffey concerning the

19   after-hour on-call work other than what you testified to?

20       A.   No, sir.

21       Q.   Did you have any discussions with Mr. Christie

22   concerning overtime?

23       A.   Let me just clear that up.

24            I believe at that point when Mr. Christie came

25   on we didn't have the phone problem anymore.  It was the

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

3a69689e-c597-4bee-a3bf-dae486d1a304

NETWORK DEPOSITION SERVICES
Transcript of Michael Lanza

Page 92

1    same story.  If we were too busy, he wanted most of the
2    work done within the eight hours.
3        Q.    You didn't have the overtime problem anymore
4    with the after-hours calls, correct?
5        A.    That is correct.
6        Q.    But you still had, as you indicated before, a
7    continuing problem keeping the overtime down after hours
8    for embalming?
9        A.    Yes.
10       Q.    Any other discussions you had with Mr. Christie
11   other than that concerning the overtime?
12       A.    No, sir.
13       Q.    Did you have any discussions with Mr. Christie
14   concerning the community service work?
15       A.    No, sir.
16       Q.    Or performing on-call duties -- no.  Not an
17   issue because you said you guys weren't doing that
18   anymore; is that correct?
19       A.    That's correct.
20       Q.    Other than the Powers facility, did you work at
21   any other facilities owned by Alderwoods?
22       A.    There was a period of time where I'd go up to
23   Price-Helton Funeral Home in Auburn.
24       Q.    When did you start going up there?
25       A.    I really don't recall.  To be honest with you,

3a69689e-c597-4bee-a3bf-dae486d1a304

NETWORK DEPOSITION SERVICES
Transcript of Michael Lanza

Page 98

1       There were pre-need people, but I can't tell

2   you a name because we went through so many so often.

3       I think I covered everybody.  I'm not sure I

4   did.

5       Q.   Okay.  What was Mr. Ferguson's position?

6       A.   He was a funeral director and embalmer.

7       Q.   And I forgot -- it's Morgan?

8       A.   Craig, C-R-A-I-G Morgan.

9       Q.   What was his position?

10      A.   Funeral director and embalmer.

11      Q.   Karen Graff?

12      A.   Also funeral director and embalmer.

13      Q.   Then Karlene?

14      A.   She was the administration secretary.

15      Q.   And Marcy?

16      A.   She was just the secretary answering phones and

17  doing that sort of stuff.

18      Q.   And Jan Lindstrom?

19      A.   Jan Lindstrom worked the front door just

20  greeting people as they came in.

21      Q.   And Mariam?

22      A.   Mariam did the same.  She greeted people at the

23  Sumner location, and sometimes she came to Puyallup on

24  the weekends to help out.

25      Gosh, I think that's everybody.

3a69689e-c597-4bee-a3bf-dae486d1a304

NETWORK DEPOSITION SERVICES
Transcript of Michael Lanza

Page 129

1    you don't remember that it actually occurred.  You'll get
2    us both into trouble.
3        A.    Right.  I know.  Okay.
4        Q.    All right.  So just so I'm clear, you don't
5    recall who told you not to record all your time on the
6    time card; is that correct?
7        A.    I do not.
8        Q.    You don't recall when that person told you,
9    true?
10       A.    I do not.  That is true.
11       Q.    Do you recall reviewing any written statements
12   or policies by Alderwoods instructing employees not to
13   record all their time on their time cards?
14       A.    No, sir.
15       Q.    Do you know when it was a statement was made to
16   you not to record all your time on the time card?
17       A.    I can't recall, no.
18       Q.    The fourth bullet point on Page ALD1 states,
19   "If an employee is eligible for and receives piecework
20   pay, the employee is still required to record the actual
21   time worked;" do you see that, sir?
22       A.    Yes, I do.
23       Q.    Were you aware if that was a policy that
24   Alderwoods had in effect during the time that you worked
25   for it?

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

3a69689e-c597-4bee-a3bf-dae486d1a304

NETWORK DEPOSITION SERVICES
Transcript of Michael Lanza

Page 134

1   of management in order to meet business needs;" do you

2   see that?

3       A.   Yes, I do.

4       Q.   Is that your understanding; that sometimes you

5   didn't get your lunch as set forth in the first sentence

6   because there were business needs that needed to be taken

7   care of?

8       A.   Correct.

9       Q.   Was it your understanding that when that

10  occurred that you couldn't take a lunch that you were

11  entitled to get paid for it?

12      A.   Correct.

13      Q.   And that the purpose of putting "no lunch" on

14  your time card was to make sure that the fact that when

15  you didn't take a lunch, it was reflected in your payroll

16  check?

17      A.   Yes.

18      Q.   Other than the times when you didn't take a

19  lunch, the second sentence here says, "Employees must

20  clock out at the beginning of their meal period and clock

21  in at its conclusion."

22          So when you didn't take a lunch, there was

23  nothing to clock in or out from, correct?

24      A.   That is right.

25      Q.   So on your time card you'd have where you

3a69689e-c597-4bee-a3bf-dae486d1a304

NETWORK DEPOSITION SERVICES
Transcript of Michael Lanza

Page 135

1    clocked in at the beginning of the day, and sometimes

2    you'd have when you clocked out at the end of the day

3    because there would be no intervening meal period?

4        A.    Correct.

5        Q.    Near the bottom of the page under E, Recording

6    of Hours; do you see that?

7        A.    Yes, I do.

8        Q.    The first sentence says, "All non-exempt

9    employees are required to record all hours worked each

10   day;" do you see that?

11       A.    Yes, I do.

12       Q.    Was the policy in effect at Alderwoods during

13   the time you were working for it?

14           MS. GIFFORD:   Objection.

15       A.    May have been, yes.

16       Q.    The third sentence says, "The time record

17   should show time in and time out for every day worked

18   including meal periods, lunch and time performing work

19   while on call, for example, answering phones, removals,

20   et cetera;" do you see that?

21       A.    Yes, I do.

22       Q.    Was that the policy in effect during the time

23   that you were working for Alderwoods?

24           MS. GIFFORD:   Objection.

25       A.    May have been, yes.

3a69689e-c597-4bee-a3bf-dae486d1a304

NETWORK DEPOSITION SERVICES
Transcript of Michael Lanza

Page 171

1    time period?

2      A.    Well, I was paid for the time period, but they

3    said in their policy that we will have those breaks after

4    like five hours of work.  We will stop.

5      Q.    But do you remember the other part of the

6    policy is that if business dictates an emergency or if

7    management dictates that you will have to work during

8    your breaks, your meal periods, that you will have to do

9    so, but they will obviously require you to be paid for

10   that time; do you recall that, sir?

11     A.    Yes.

12     Q.    That would be consistent -- the time card would

13   be consistent with that policy that even though they

14   required you to work during those meal periods and

15   breaks, you were compensated for it?

16            MS. GIFFORD:  Objection.

17     A.    Yes.

18     Q.    At least the time cards that you reviewed, were

19   all the signatures at the bottom of the page your

20   signatures?

21     A.    Yes, sir.

22     Q.    After today's deposition, I'd like you to go

23   through the rest of the time cards that you haven't had a

24   chance to review, and if you believe any of those

25   signatures are forged or not yours, would you please tell

3a69689e-c597-4bee-a3bf-dae486d1a304

NETWORK DEPOSITION SERVICES
Transcript of Michael Lanza

1    us?

2       A.   Yes, sir.

3       Q.   I had some questions about these time cards.

4    I'm going to jump ahead in my outline a bit.

5            If you could turn to Page 231, please.

6       A.   On the time cards?

7       Q.   Yes, sir.  This is Exhibit 11.

8       A.   I see that.

9       Q.   Now, by the way, just to clarify, most of the

10   time cards that there are copies of, there is just a

11   front page of it, correct?

12      A.   Yes.  That's correct.

13      Q.   The time cards have a back part to it as well,

14   correct?

15      A.   I didn't remember that.

16      Q.   That's why I'm trying to make a clear record of

17   it.

18      A.   Yeah.

19      Q.   So Page 231 is the back of one of those time

20   cards, correct?

21      A.   Okay.

22      Q.   That's the form, it looks like?

23      A.   Okay.  That's...

24      Q.   In fact, 231 looks like the back of the time

25   card for the prior Page 230, week ending 1/3/2004.

3a69689e-c597-4bee-a3bf-dae486d1a304

NETWORK DEPOSITION SERVICES
Transcript of Michael Lanza

Page 191

1   described in A through E, are there other types of

2   compensation that you're seeking from Alderwoods for work

3   you performed for it?

4                   MS. GIFFORD:   Objection.

5       A.   No, sir.

6       Q.   Let's talk a little bit now about your

7   community service.   I know we talked about it already a

8   bit.   Let's start with some basics.

9            During the time that you worked for Alderwoods,

10  did you perform any community service work?

11      A.   Yes, sir.

12      Q.   Could you identify that for me, please?

13      A.   I had a membership in the Christopher Columbus

14  Club, and I was also entertaining priests and ministers

15  after hours.

16      Q.   When you say "entertaining priests and

17  ministers after hours," was that just something that --

18      A.   Taking them out to dinner.

19      Q.   Anything else?

20      A.   No, sir.   They came to my house occasionally

21  also.

22      Q.   When did you start that activity?

23      A.   That commenced in 1993.

24      Q.   When did you stop doing that activity?

25      A.   Close to about the time I ceased employment

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

3a69689e-c597-4bee-a3bf-dae486d1a304

NETWORK DEPOSITION SERVICES
Transcript of Michael Lanza

1   with them; 2004.

2      Q.   So it continued during the time that you were

3   performing work for Alderwoods?

4      A.   Yes, sir.

5      Q.   How often would you either take these persons

6   out to dinner or have dinner at your home?

7      A.   Ones or twice a month.

8      Q.   And did you do that for every month that you

9   were working for Alderwoods?

10     A.   I can't say it was done every month

11   consistently, but when it was done, it was done once or

12   twice a month.  If you're asking me from 1993 to 2004 if

13   it was done every month, I can't honestly say that it

14   was.

15     Q.   I'm not concerned about anything prior to the

16   date that you worked for Alderwoods, so let's just focus

17   on the period from January 2002 to August 2004, so we're

18   talking about a year and some months, almost two years.

19          During that period of time, do you recall

20   whether you had dinner once or twice a month every month?

21     A.   No.  I cannot recall that.

22     Q.   Would it be three or four months a year?

23     A.   It's safe to say about six months a year maybe,

24   seven months a year.

25     Q.   How long would these dinners last on average?

3a69689e-c597-4bee-a3bf-dae486d1a304

NETWORK DEPOSITION SERVICES
Transcript of Michael Lanza

1    A.    Three hours, four hours.  If it was a priest I

2    liked, it was four hours.

3    Q.    Did you try to sell them any type of funeral

4    services or products during these dinners?

5    A.    No, sir.

6    Q.    Did you ever ask anyone at Alderwoods or from

7    the management of Alderwoods for compensation for the

8    time that you spent entertaining these priests or

9    ministers?

10    A.    The only compensation I received back was any

11    monies I laid out for the dinner.

12    Q.    So you asked for reimbursement of your

13    out-of-pocket expenses?

14    A.    Yes, sir.

15    Q.    Did they provide that?

16    A.    Yes.

17    Q.    Did you ask to be compensated for the time that

18    you spent entertaining them?

19    A.    No, sir.

20    Q.    Prior to your working at Powers, did you do any

21    type of entertaining for priests or ministers?

22    A.    Prior to being employed by Powers?

23    Q.    Yes, sir.

24    A.    I did with Pipers.

25    Q.    When you were taking the priests and ministers

3a69689e-c597-4bee-a3bf-dae486d1a304

NETWORK DEPOSITION SERVICES
Transcript of Michael Lanza

Page 194

1   out for dinners or dinners at your home, was it still the

2   same frequency; about once or twice a month, six to seven

3   months a year?

4       A.   At my home it was less; maybe three times, four

5   times a year.  I used to have them pop up sometimes.  I

6   didn't invite them.  They'd come over.

7       Q.   If you're active in the church that can happen.

8   I'm Catholic, so I know what you're talking about.

9            I was trying to basically establish at least

10  prior to your working for Powers you were doing this work

11  for Piper, and was it generally the same frequency or

12  less?  Sounds like it was a little less.

13      A.   With Piper it was less because Mr. Morley had

14  us do that during business hours.

15      Q.   Taking them out to dinner?

16      A.   So we'd take them out to lunch.

17      Q.   Oh, okay.  They like to be taken out for golf

18  too, you know.

19      A.   I know.

20      Q.   But did you also entertain them after hours

21  during the time that you worked for Piper?

22      A.   No, sir.

23      Q.   Why did you pick this type of community service

24  work while you were working for Alderwoods?

25      A.   The type of community service by entertaining

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

3a69689e-c597-4bee-a3bf-dae486d1a304

NETWORK DEPOSITION SERVICES
Transcript of Michael Lanza

1    ministers?

2        Q.    Yes, sir.

3        A.    I found that comfortable, and it was some sort

4    of community service that we had to do, so I picked that.

5        Q.    It was also something you'd already

6    established, so you just used what you had established to

7    fulfill that requirement?

8              MS. GIFFORD:   Objection.

9        Q.    Do you understand my question?  I mean you

10   already were doing this; taking priests out for

11   entertainment and dinners.  In fact, I think you

12   indicated it was done while you were working for Pipers,

13   and that was prior to 1993, correct?

14       A.    Yes.

15       Q.    So it was something you were doing pretty much

16   every year since that time?

17       A.    Yes, sir.

18       Q.    Did you keep any time records about how much

19   time you spent doing entertaining for the priests and

20   ministers?

21       A.    No, sir.

22       Q.    Did you submit any written request for

23   compensation for the time that you spent entertaining the

24   priests and ministers?

25       A.    Just the out-of-pocket expenses.

3a69689e-c597-4bee-a3bf-dae486d1a304

NETWORK DEPOSITION SERVICES
Transcript of Michael Lanza

Page 198

1          All right.  Let's talk about the membership in
2     the Christopher Club.  When did you first become a member
3     in that organization?
4     A.    1997, I believe.
5     Q.    How was it that you joined the club at that
6     time?
7     A.    That was an organization that I joined.  It
8     still is in effect.  It's an all-men Italian
9     organization.
10    Q.    Do you have to be invited to join or sponsored?
11    A.    I inquired about the membership with the fellow
12    who sponsored me.
13    Q.    Who did you inquire --
14    A.    I knew you were going to ask me that; the
15    fellow who sponsored me?
16    Q.    Yes, sir.
17    A.    Louis Costanti.
18    Q.    What was required to join the membership for
19    the Christopher Club?
20    A.    I just had to sign the application, pay the
21    dues, go down to the club, and they initiated me after I
22    gave a speech as to why I wanted to be a member.
23    Q.    Okay.  So you belonged to this club during the
24    time you worked for Alderwoods?
25    A.    Yes, sir.

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

3a69689e-c597-4bee-a3bf-dae486d1a304

NETWORK DEPOSITION SERVICES
Transcript of Michael Lanza

1    Q.    How much time did you spend at this club during
2    the time that you worked at Alderwoods?
3    A.    There was a meeting once a month.
4    Q.    How long would the meeting last?
5    A.    Started at 7 o'clock, and by the time we
6    finished it was about 10:00.
7    Q.    This was in the evening, obviously?
8    A.    Yes, sir.
9    Q.    What happened at the meetings?
10   A.    Oh, we discussed what we were going to do for
11   the community and Christmas dinners and Italian talk.
12   Q.    Did you have any out-of-pocket expenses
13   concerning the Christopher Club that you were reimbursed
14   by Alderwoods?
15   A.    There was no out-of-pocket expenses.  We just
16   paid our dues.
17   Q.    Did Alderwoods pay your dues?
18   A.    I paid the dues.
19   Q.    Did you ask Alderwoods for reimbursement for
20   the dues you paid?
21   A.    Yes, sir.
22   Q.    Did they pay them?
23   A.    No, sir.
24   Q.    Who did you ask that the dues be paid?
25   A.    Mr. Noel.

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

3a69689e-c597-4bee-a3bf-dae486d1a304

NETWORK DEPOSITION SERVICES
Transcript of Michael Lanza

Page 203

1    Q.   Did you fill that out for the Christopher
2  Columbus Club?
3    A.   Yes, sir.
4    Q.   Did you fill that form out also for your
5  entertaining priests and ministers?
6    A.   Yes, sir.
7    Q.   Did you keep a copy of any of those records?
8    A.   No, I did not.
9    Q.   Were you ever evaluated concerning the amount
10  of community service work you performed?
11          MS. GIFFORD:  Objection.
12    A.   No, sir.
13    Q.   Did you enjoy the time that you spent
14  entertaining the priests and ministers?
15          MS. GIFFORD:  Objection.
16    A.   I selected that because I did enjoy time with
17  them, but I did that because it was community service for
18  the funeral home.  That's why I selected that particular
19  activity, I guess.
20    Q.   Because you enjoyed it, correct?
21    A.   Yes.
22    Q.   And you also wanted to get credit for something
23  you enjoyed; in other words, it's a dual purpose?
24    A.   Well, I would have liked to have gone home
25  after a full day too, but I didn't.

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

3a69689e-c597-4bee-a3bf-dae486d1a304

NETWORK DEPOSITION SERVICES
Transcript of Michael Lanza

1    Q.   Well, the priests and ministers you'd been

2    doing for a while.

3    A.   Yeah.

4    Q.   That's what I'm saying.

5         The Christopher Columbus Club; did you enjoy

6    being involved with those activities as well?

7    A.   Yes, sir.

8    Q.   Did you ever see any written policies prepared

9    by Alderwoods requiring its employees to perform

10   community service work?

11             MS. GIFFORD:  Objection.

12   A.   I can't recall that I did or have.

13   Q.   Do you recall any written policies by

14   Alderwoods addressing whether community time should be

15   reported or paid?

16             MS. GIFFORD:  Objection.

17   A.   No, sir.

18   Q.   I think you said Mr. Morgan also did some type

19   of community service work that consisted of --

20   A.   Softball.

21   Q.   For what organization?

22   A.   He is a member of the LDS church, and they had

23   their own softball team.

24   Q.   That would be the Mormons?

25   A.   Yes, sir.

3a69689e-c597-4bee-a3bf-dae486d1a304

NETWORK DEPOSITION SERVICES
Transcript of Michael Lanza

Page 217

1    Q.   Do you recall a month or year that that
2  occurred?

3    A.   No, I do not.

4    Q.   Do you recall when that occurred prior to your
5  leaving on August 2004?

6    A.   I beg your pardon; prior to me leaving in 2004?
7  What was that?

8    Q.   Do you recall when it was that they stopped
9  doing the phones on call?

10   A.   I can't remember when they rehired -- I'm sure
11 they had rehired an answering service again, but I don't
12 remember when that was.

13   Q.   When they hired the answering service, then
14 nobody was doing on call?

15   A.   That's correct.  Nobody was called.

16   Q.   Did that occur sometime in 2002?

17   A.   I'd have to say it occurred sometime in the
18 latter part of 03 or 04.

19   Q.   I think we already covered the restrictions.
20       Let's see.  Did you ever attempt to seek
21 compensation for the amount of time that you were
22 spending performing on-call work?

23   A.   With the phones?

24   Q.   Yes, sir.

25   A.   When I approached Mr. Coffey with it, and I

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

3a69689e-c597-4bee-a3bf-dae486d1a304

NETWORK DEPOSITION SERVICES
Transcript of Michael Lanza

Page 219

1    Q.   So about August 2003 would be a good estimate?

2    A.   Yeah.

3    Q.   On or about August 23, 2003, was the time that

4    they stopped sending calls to your home?

5    A.   I believe so.

6    Q.   Are you aware of a company-wide policy by

7    Alderwoods of not compensating employees for work

8    performed on call?

9         MS. GIFFORD:   Objection.   Go ahead.

10   A.   No, sir.

11   Q.   Okay.   Let's go to this Exhibit 14.

12        The first page of Exhibit 14 has at the upper

13   top where it says "Employee Name, Michael Lanza;" is that

14   your handwriting, sir?

15   A.   Yes, it is.

16   Q.   In fact, is all the handwriting except for the

17   bottom right where it says 30 minutes point 5 hours yours

18   on this document?

19   A.   Yes, sir.

20   Q.   So the entries where it says "Dates" are yours?

21   A.   Yes.

22   Q.   Where it says "Time in" are yours?

23   A.   Yes, sir.

24   Q.   And where it says "Description," those are

25   yours as well?

3a69689e-c597-4bee-a3bf-dae486d1a304

NETWORK DEPOSITION SERVICES
Transcript of Michael Lanza

Page 224

1    Q.    Do you understand my question?

2    A.    Yes, I do.  Seven.  Five to seven calls.

3    Q.    For the 15-hour period?

4    A.    Could be, yeah.

5    Q.    What would be the amount of calls you'd receive

6    during a 30-hour period, the range?  It could be zero

7    again?

8    A.    It could be zero to the same amount.

9    Q.    It's your understanding that the other

10   employees that were performing on-call duties filled out

11   these similar tracking reports?

12   A.    Yes, sir.

13   Q.    Did you ever see the on-call phone tracking

14   report that they filled out?

15   A.    No, sir.

16   Q.    Does the only type of overtime pay that you

17   didn't receive consist of the hours you spent on call?

18   A.    Yes, sir.

19   Q.    Are you aware of any policy that Alderwoods had

20   during the time you were employed by it for not

21   compensating its employees for any training?

22              MS. GIFFORD:  Objection.

23   A.    For not compensating for training?

24   Q.    Yeah.  Did you ever see a written policy by

25   Alderwoods saying, "We do not compensate employees for

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

3a69689e-c597-4bee-a3bf-dae486d1a304

NETWORK DEPOSITION SERVICES
Transcript of Michael Lanza

Page 225

1    training for their jobs?"

2       A.   No, sir.

3       Q.   Did you ever see a written policy by Alderwoods

4    stating they were not going to compensate their employees

5    for time in obtaining licenses or certifications?

6            MS. GIFFORD:  Objection.

7       A.   No, sir.

8       Q.   Did you ever see a written policy by Alderwoods

9    stating that they were not going to compensate its

10   employees for time spent in pre-need appointments with

11   clients?

12      A.   No, sir.

13      Q.   And you know what pre-need is, correct?

14      A.   Yes, sir.

15      Q.   Did you ever see a policy by Alderwoods stating

16   that they would not compensate employees if they missed a

17   meal period?

18           MS. GIFFORD:  Objection.

19      A.   No, sir.

20      Q.   Did you ever see a policy by Alderwoods stating

21   that their employees were not to report all hours that

22   they worked?

23           MS. GIFFORD:  Objection.

24      A.   No, sir.

25      Q.   Did you ever see a written policy by Alderwoods

3a69689e-c597-4bee-a3bf-dae486d1a304

NETWORK DEPOSITION SERVICES
Transcript of Michael Lanza

Page 226

1   stating that the employees were not to record all the

2   time that they spent working?

3          MS. GIFFORD:  Objection.

4   A.   No, sir.

5   Q.   Are you aware of any incorrect calculations of

6   the overtime hourly rate that was used to pay your

7   overtime?

8          MS. GIFFORD:  Objection.

9   A.   Only in what I've seen on those time sheets

10  just now.

11  Q.   What you saw on the time sheets was a

12  discrepancy or a mistake as to the hours being calculated

13  that you actually worked.  What I'm focusing on is the

14  amount of the rate of overtime that would then be

15  multiplied by the hours you worked.

16  A.   No.  I never did.

17  Q.   So as to the overtime rate, did you ever have

18  an instance where that was improperly calculated?

19  A.   Not to my knowledge, no.

20  Q.   Do you know if Alderwoods had a policy of

21  improperly calculating the overtime rate to pay the

22  overtime for employees that worked for it?

23          MS. GIFFORD:  Objection.

24  A.   Not to my knowledge.

25  Q.   Did you ever review the time sheets or time

3a69689e-c597-4bee-a3bf-dae486d1a304

NETWORK DEPOSITION SERVICES
Transcript of Michael Lanza

1    morning, clock in at your scheduled time.  Try not to

2    clock in before your scheduled time."

3        Q.    He said those statements at which meetings?

4        A.    Staff meetings.

5        Q.    How often would you have staff meetings?

6        A.    Formal staff meetings were supposed to be once

7    a month.  Informal ones we were supposed to have every

8    day.

9        Q.    So these are statements he made at the formal

10   staff meetings?

11       A.    Yes.

12       Q.    Anyone other than Mr. Coffey make those

13   statements to you during the time that you worked for

14   Alderwoods?

15       A.    Mr. Noel.  And not just to me again.  It was

16   said at the staff meetings.

17       Q.    Did Mr. Noel leave prior to January 2002?

18       A.    2001.  You're right.

19       Q.    So the only one that you can recall is

20   Mr. Coffey?

21       A.    That's who I can think of, yes.

22       Q.    We're almost there.

23             Did any funeral directors at Powers sell

24   pre-need?

25       A.    No, sir.

3a69689e-c597-4bee-a3bf-dae486d1a304

NETWORK DEPOSITION SERVICES
Transcript of Michael Lanza

Page 247

1

2

3

4

5                                   May 5, 2009

6

7      ANNETTE M. GIFFORD
       DOLIN, THOMAS & SOLOMON LLP
8      693 EAST AVENUE
       ROCHESTER, NEW YORK 14607

9

10              NOTICE OF READINESS FOR SIGNATURE

11     CASE NAME:  PRISE & RADY vs. ALDERWOODS GROUP, INC.
       VENUE:  U.S. District Court, Southern District of
12     Pennsylvania
       CIVIL ACTION NO:  06-1641
13     DEPOSITION OF:  Michael Lanza
       DATE TAKEN:  April 24, 2009

14

15     An e-tran of the deposition transcript of the above-named
       witness has been transmitted to your office.

16

       Please arrange for the witness to review the deposition
17     transcript, record any changes on the Change Sheet and
       sign (1) the Change Sheet and (2) the Affidavit.

18

       Please return the Change Sheet and the Affidavit to this
19     office within 30 days so they may be filed with the
       original transcript.

20

21

                              By:  _____
22                                 Robyn L. Fisher, CCR, RPR

23     cc:  File

24          Nicholas P. Forestiere

25

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

3a69689e-c597-4bee-a3bf-dae486d1a304