**TAB 20**

NETWORK DEPOSITION SERVICES
Transcript of Adrian Leal

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DEBORAH PRISE and HEATHER RADY, on behalf of themselves and all employees similarly situated, | ) ) ) ) ) Civil Action No. 06-1641 |
| Plaintiffs, | ) ) Judge Joy Flowers Conti |
| vs. | ) ) |
| ALDERWOODS GROUP, INC., | ) ) |
| Defendant. | ) |

DEPOSITION UPON ORAL EXAMINATION

of

ADRIAN F. LEAL

Taken at 600 University Street, Suite 320

Seattle, Washington

DATE:  April 23, 2009

REPORTED BY:  Robyn L. Fisher, CCR, RPR
              CCR No. 2590

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

379eae4c-658d-4960-8ab2-ce059b182950

NETWORK DEPOSITION SERVICES
Transcript of Adrian Leal

1      A.   It was random.  And also I was also asked to

2   participate on calls with one of the other directors

3   either from Evergreen or Bauer.

4      Q.   When you assisted with the funeral services,

5   what is your best estimate of the frequency that you

6   would do that on a weekly basis?

7      A.   Oh, it could be once to twice a week.

8      Q.   Did that occur during the time that you worked

9   for Alderwoods?

10     A.   Yes, it did.

11     Q.   And you also said you were participating in on

12  calls?

13     A.   Yes, I was.

14     Q.   Can you state what you understand an on-call

15  duty is or on-call duties you performed?

16     A.   Yes.  You would take the phones home with you,

17  and you were responsible for answering and fielding all

18  phone calls that were directed to either of the three

19  funeral homes that shift you were designated to be on

20  call for.

21     Q.   You said all three funeral homes, so you did

22  the on-call service as part of your duties for

23  Schaefer-Shipman?

24     A.   Yes.  You would be required to take three cell

25  phones home with you and answer calls for all three of

379eae4c-658d-4960-8ab2-ce059b182950

NETWORK DEPOSITION SERVICES
Transcript of Adrian Leal

Page 59

1      Q.   Did he tell you how often you would be on call?

2      A.   They had a rotation, so it was every third

3  weekend or every other weekend.  It just depends on who

4  was there.  And once during the week.

5      Q.   When you say once during the week, one night

6  during the week?

7      A.   One night during the week, Monday through

8  Friday.

9      Q.   And every third or every other weekend?

10      A.   Yes.

11      Q.   Did you have any other discussions with

12  Mr. Gordon at this time concerning the on-call duties?

13      A.   Yes.  How was I compensated for it?

14      Q.   What was the discussion in that regard?

15      A.   He said you were compensated by every phone

16  call you get.

17      Q.   What did you understand him to mean by that?

18      A.   That every time that phone rang and I answered

19  it, I was to log in 15 minutes.

20      Q.   So you were required to keep track of the phone

21  calls you received; is that correct?

22      A.   Yes.  I was required to keep a log for all

23  three phones that I was in charge of.

24      Q.   Were you also required to state in that log how

25  much time you spent on each call?

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

379eae4c-658d-4960-8ab2-ce059b182950

NETWORK DEPOSITION SERVICES
Transcript of Adrian Leal

Page 60

1        A.    I was.

2        Q.    Was this on a form that the facility provided?

3        A.    Yes.

4        Q.    Did the form have a name?

5        A.    On-call log, if you will.

6        Q.    What did it look like?

7        A.    It had a grid on it.  It had the date, the

8    number that was calling, family name, if you can get

9    that, what the subject matter was.

10        Q.    When these calls came in, would you write down

11    that information?

12        A.    Yes.  You'd have to keep an ongoing log of

13    every single call that you intercepted.

14        Q.    Did you have to also track the amount of time

15    that you spent on that log?

16        A.    Yes.

17        Q.    Were you true and accurate with the time that

18    you put down --

19        A.    Absolutely.  Well, the phone had a timer on it.

20        Q.    I'm not trying to infer anything, but you've

21    got to let me finish asking the question.

22        A.    Oh, I'm sorry.

23        Q.    I don't know how much of that you got.

24                          (Question read back.)

25        A.    I'm sorry.

NETWORK DEPOSITION SERVICES
Transcript of Adrian Leal

Page 64

1       A.   Just, you know, it was kind of a new concept to

2   me.  I had never done that for any of my other employers.

3       Q.   Anything else that you discussed with

4   Mr. Gordon about community service?

5       A.   Would I be compensated for it?

6       Q.   What was your discussions in that regard?

7       A.   He said that would be negative.

8       Q.   Any other discussions about compensation?

9       A.   It kind of got to a nil point at that point in

10  time.

11      Q.   What do you mean a nil point?

12      A.   He didn't want to discuss it anymore.

13      Q.   So you did not have any discussions?

14      A.   Yeah.

15      Q.   Did you have any discussions with Mr. Gordon

16  concerning the phone service duties?

17           MS. GIFFORD:  Objection.  Go ahead.

18      Q.   Or did we already discuss those?

19      A.   I believe we did.

20      Q.   Did you handle any death calls that came in

21  after hours?

22      A.   Yes, I did.

23      Q.   Did you have any discussions with Mr. Gordon

24  concerning that?

25      A.   Well, since I lived far enough away from the

379eae4c-658d-4960-8ab2-ce059b182950

NETWORK DEPOSITION SERVICES
Transcript of Adrian Leal

Page 65

1    funeral home, it wasn't cost effective for me to go on a

2    call.  They had other people in the area we could

3    dispatch to make those calls that would be a lot more

4    economical than calling me in, so we had exercised the

5    other option.

6         Q.    What was the other option?

7         A.    The funeral directors that were in the area

8    that would be willing to take the call.

9         Q.    So you didn't have to perform that type of

10   work?

11        A.    Just the phone and the logistics as far as

12   getting someone to take care of the first call and

13   escorting the decedent back to the funeral home.

14        Q.    Did you perform any services at all concerning

15   death calls?

16        A.    Oh, yeah.  If I was there on premises, like if

17   it was right around 5 o'clock or so.

18        Q.    So certainly you handled them when they came in

19   during your scheduled hours or when you first started

20   work and near the end of the day, correct?

21        A.    Or just about getting ready to leave and, oh,

22   we just got a call.

23        Q.    But after your scheduled hours did you perform

24   any services concerning death calls?

25        A.    I believe I just answered that as far as -- if

379eae4c-658d-4960-8ab2-ce059b182950

NETWORK DEPOSITION SERVICES
Transcript of Adrian Leal

Page 75

1      A.    Yes, I did.

2      Q.    Who did you request compensation from?

3      A.    The administrator.

4      Q.    What was your response?

5      A.    You would have had to get that from Jon, and

6   it's too late, so you won't get paid for that.

7      Q.    Did you talk with Mr. Gordon about that?

8      A.    Yes, I did.

9      Q.    And what was his response?

10     A.    He said he would have her make an adjustment.

11     Q.    Was an adjustment made?

12     A.    No.

13     Q.    Did you take it up with Mr. Gordon as to why he

14   told her to make the adjustment, and that wasn't done?

15     A.    Yes.

16     Q.    And what was his response?

17     A.    He talked to her, and then she made a slight

18   adjustment.

19     Q.    So Mr. Gordon told you that he made a slight

20   adjustment?

21     A.    Well, he told her to go ahead and make the

22   adjustment, but she made a 15-minute adjustment on it

23   instead of like 30 minutes I should have been paid

24   because I didn't take the lunch break that day.

25     Q.    Was that 15 minutes for all the lunch breaks

379eae4c-658d-4960-8ab2-ce059b182950

NETWORK DEPOSITION SERVICES
Transcript of Adrian Leal

Page 76

1       that you missed?

2             A.   No, that was just for one of them.

3             Q.   So at least on one occasion you attempted to

4       get compensation for the missed meal break, correct?

5             A.   Correct.

6             Q.   And the result was that you were paid for

7       15 minutes of it?

8             A.   Correct.

9             Q.   Did you attempt to get compensation for the

10      other missed meal periods?

11            A.   Yes, I did.

12            Q.   Who did you request compensation for those

13      missed meal periods?

14            A.   The administrator.  You have to go through her

15      for all the payroll things.  Then at that point if it's

16      not in agreement, you have to talk to Jon about it.

17            Q.   So you talked to her, correct?

18            A.   I talked to Lori.

19            Q.   What was her response?

20            A.   That I would have to talk to Jon about it.

21            Q.   Did you talk to Jon about it?

22            A.   Um-hmm.  Yes.

23            Q.   What did Mr. Gordon say about that?

24            A.   "I thought we had that fixed last time."

25            Q.   Did he say anything else?

379eae4c-658d-4960-8ab2-ce059b182950

NETWORK DEPOSITION SERVICES
Transcript of Adrian Leal

Page 77

1      A.   No.

2      Q.   Was any adjustment made for the other missed

3   meal periods that you missed?

4      A.   No.

5      Q.   Was any adjustment made for the other meal

6   periods you missed?  I restated the question because it

7   didn't come out right.

8           Other than the 15 minutes that was adjusted at

9   least for one instance, were any other adjustments made

10   to the missed meal periods that occurred other than that

11   one?

12      A.   Down the road because I was persistent about

13   it, they did make another adjustment.  So I had two

14   adjustments done but only after I had several

15   conversations with Jon about it.

16      Q.   What was the amount of the second adjustment?

17      A.   The 30 minutes.

18      Q.   Now, when you say the second adjustment, did

19   that rectify all of the other missed meal periods that

20   you missed?

21      A.   No, because they weren't going to go back on

22   those others.

23      Q.   We're getting a little ahead of ourselves, but

24   that's okay.

25           So at least on two occasions on missed meal

379eae4c-658d-4960-8ab2-ce059b182950

NETWORK DEPOSITION SERVICES
Transcript of Adrian Leal

1      A.   That you were only going to be taking one phone
2    home and be on call for one particular location, and you
3    would be paid for the on call.  It didn't actually spell
4    out how you got paid or you only got paid per phone call.
5    It didn't list all those issues.
6      Q.   What was Mr. Gordon's response to your stating
7    what you believed to be stated in the handbook regarding
8    the on-call policy?
9      A.   He said it was their policy.
10     Q.   When you say "their policy" --
11     A.   I'm talking about Schaefer-Shipman.
12     Q.   Are you saying that Schaefer-Shipman was using
13   a different policy than what was stated in the handbook?
14             MS. GIFFORD:  Objection.
15     A.   I have no idea.  I was a new employee, so I was
16   having go to by what my manager told me.
17     Q.   Well, he was telling you something different
18   than what was in the handbook, correct?
19     A.   Correct.
20     Q.   And he was telling you that that was the way
21   they did it there, correct?
22     A.   Correct.
23     Q.   And what they did there was different than what
24   was in the handbook, at least the way you understood it
25   to say?

379eae4c-658d-4960-8ab2-ce059b182950

NETWORK DEPOSITION SERVICES
Transcript of Adrian Leal

Page 103

1     A.   Yes.

2     Q.   Are you aware of any other policies in the

3  handbook that were different than the policies that

4  Mr. Gordon told you were in effect at that facility?

5           MS. GIFFORD:  Objection.

6     A.   Not that I can recall.

7     Q.   Ever heard of something called the confidential

8  help line?

9     A.   No.

10    Q.   Is this the first time you're hearing about it

11  today?

12    A.   I had heard that reference made during the

13  Alderwoods training that we received at Acacia that if

14  there is any type of thing that you need to talk to

15  somebody at a higher level other than your location, you

16  can call this hotline, if you will.

17    Q.   That's the first you heard of the hotline was

18  at this training at Acacia?

19    A.   Yes.

20           MR. FORESTIERE:  Could you read the answer

21  back, please?

22                (Answer read back.)

23    Q.   Did you ever attempt to use the hotline

24  concerning the discrepancy in the policy that Mr. Gordon

25  told you concerning the on-call duties that were

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

379eae4c-658d-4960-8ab2-ce059b182950

NETWORK DEPOSITION SERVICES
Transcript of Adrian Leal

Page 107

1          MS. GIFFORD:  Just for the record, I would
2     note that this document appears to be incomplete in that
3     it appears to be an excerpt from a larger document, and
4     it also appears to have sections redacted.  Go ahead.
5          A.   I vaguely remember this document here.
6          Q.   On the section that says "Recording Time
7     Worked," it states at the second sentence, "The time
8     card/sheet must show the time that the person begins
9     work, the time they break for lunch, the time they return
10    from lunch and the time they end work for the day."  Do
11    you see that statement, sir?
12         A.   Yes, sir.
13         Q.   Did you understand that that was the Alderwoods
14    policy during the time that you worked for it?
15         MS. GIFFORD:  Objection.
16         A.   Yes.
17         Q.   Did you fill out your time card that way?
18         A.   There was a punch clock there.  It was
19    mandatory to use that.
20         Q.   So it would be yes with that explanation?
21         A.   Yes.
22         Q.   I'm not trying to put words in your mouth.
23              Let's go on to the first bullet point there.
24    It says, "All employees must record all hours actually
25    worked."  Do you see that part, sir?

379eae4c-658d-4960-8ab2-ce059b182950

NETWORK DEPOSITION SERVICES
Transcript of Adrian Leal

1      A.    Um-hmm.

2      Q.    Did you understand that that was Alderwoods'

3   policy at the time that you were working for it?

4            MS. GIFFORD:  Objection.

5      A.    Yes.

6      Q.    The fourth bullet point on that page states,

7   "If an employee is eligible for and receives piecework

8   pay, the employee is still required to record the actual

9   time worked."  Did you see that, sir?

10     A.    Yes, sir.

11     Q.    And did you understand that that was

12  Alderwoods' policy during the time that you worked for

13  it?

14           MS. GIFFORD:  Objection.

15     A.    Yes, sir.

16     Q.    Did you perform any piecework?

17     A.    Just hourly.  Piecework; are you meaning like

18  the on call?

19     Q.    Yes, sir.

20     A.    That would be considered piecework per call?

21     Q.    That's why I'm trying to see if you understand

22  that.  You said you got paid only for 15 minutes flat

23  regardless of the amount of time you spent on the call,

24  so depending upon how you define it, that could be

25  piecework, or it could just be something else?

379eae4c-658d-4960-8ab2-ce059b182950

NETWORK DEPOSITION SERVICES
Transcript of Adrian Leal

1      A.   Yeah.  Right.

2      Q.   Did you understand you had to record your time

3   when you did work like that?

4      A.   Absolutely.

5      Q.   The other bullet point underneath this says,

6   "Completed time cards/sheet are to be signed by an

7   employee to verify that the time card accurately

8   documents the actual hours worked."  Do you see that,

9   sir?

10      A.   Yes, sir.

11      Q.   Did you understand that that was Alderwoods'

12   policy at the time that you worked for it?

13             MS. GIFFORD:   Objection.

14      A.   Yes.

15      Q.   The next sentence also says, "The employee's

16   supervisor or manager must also sign the time card/sheet

17   to verify that the hours are accurate and that any

18   overtime recorded is approved."  Do you see that?

19      A.   Yes.

20      Q.   Did you understand that that was Alderwoods'

21   policy during the time that you worked for it?

22             MS. GIFFORD:   Objection.

23      A.   Yes.

24                       (Exhibit 7 marked for

25                        identification.)

379eae4c-658d-4960-8ab2-ce059b182950

NETWORK DEPOSITION SERVICES
Transcript of Adrian Leal

Page 110

1       Q.   Just for the record, Exhibit No. 7 is a
2   document identified as ALD13 through 20.  At the top it
3   says "Hours of Work and Overtime -- U.S."
4            Have you had an opportunity to take a look at
5   that document sir?
6       A.   Um-hmm.  Yes.
7       Q.   Are you familiar with this document?
8       A.   No, I'm not.
9       Q.   I'm not going to cover all of it, but let me
10  cover some parts of with you.  Under Page ALD13 under the
11  heading "Policy," the first sentence states, "All
12  non-exempt employees will be compensated for all hours
13  worked."  Do you see that?
14      A.   Yes, I do.
15      Q.   Did you understand that to be the policy of
16  Alderwoods during the time you worked for it?
17               MS. GIFFORD:  Objection.
18      A.   Yes.
19      Q.   If you take a look on Page 15, there is a
20  section called "Meal Periods."
21      A.   Um-hmm.
22      Q.   It states, "Hourly employees who work more than
23  five consecutive hours in a day are allowed an unpaid
24  meal period of no less than 30 minutes or no more than
25  one hour."  Do you see that, sir?

379eae4c-658d-4960-8ab2-ce059b182950

NETWORK DEPOSITION SERVICES
Transcript of Adrian Leal

Page 111

1      A.   Yes, sir.

2      Q.   Did you understand that that was the policy of

3   Alderwoods during the time that you were working for it?

4           MS. GIFFORD:   Objection.

5      A.   Yes.

6      Q.   Under the Section E on that page, Page 15, the

7   first sentence says, "All nonexempt employees are

8   required to record all hours worked each day."  Do you

9   see that, sir?

10      A.   Um-hmm.

11      Q.   Did you understand that that was the policy of

12   Alderwoods during the time that you worked for it?

13           MS. GIFFORD:   Objection.

14      A.   Yes.

15      Q.   The second sentence after that starts, "The

16   time record should show time in and time out for every

17   day worked including meal breaks, lunch and time

18   performing work on call (e.g., answering phone calls,

19   removals, et cetera)."  Do you see that, sir?

20      A.   I do.

21      Q.   Did you understand that that was the policy of

22   Alderwoods during the time that you worked for it?

23           MS. GIFFORD:   Objection.

24      A.   Um-hmm.

25           Also if you're referring also to the very last

379eae4c-658d-4960-8ab2-ce059b182950

NETWORK DEPOSITION SERVICES
Transcript of Adrian Leal

1    "Overtime," it's the third paragraph, last sentence

2    states, "Employees must receive payment for overtime

3    hours worked."  Do you see that statement?

4         A.   Yes, I do.

5         Q.   Did you understand that that was the policy of

6    Alderwoods during the time that you worked for it?

7                   MS. GIFFORD:  Objection.

8         A.   Yes, I do.

9         Q.   Going a little further down on Section G, "On

10   call," the second sentence says, "On-call time is

11   normally compensable only while the employee is actually

12   working.  Employees scheduled for on-call duty are not

13   required to remain on the company premises or to be

14   confined to their homes or to any particular place,

15   provided they remain within a reasonable travel distance

16   of the location (as determined by management.)" Do you

17   see that, sir?

18        A.   Yes.

19        Q.   Did you understand that that was the policy of

20   Alderwoods during the time that you worked for it?

21                  MS. GIFFORD:  Objection.

22        A.   Yes.

23        Q.   And the next sentence says, "On-call employees

24   are required to not consume alcohol or other

25   intoxicants."  Did you understand that that was the

379eae4c-658d-4960-8ab2-ce059b182950

NETWORK DEPOSITION SERVICES
Transcript of Adrian Leal

Page 116

1    policy of Alderwoods during the time that you worked for

2    it?

3                    MS. GIFFORD:  Objection.

4         A.   Yes.

5         Q.   In Page 17, the first paragraph at the top, the

6    last sentence.  It states, "In all instances, it is the

7    employee's responsibility to clock in when called in to

8    work and to clock out when the work assigned is

9    complete."  Did you understand that to be the policy of

10   Alderwoods during the time that you worked for it?

11                   MS. GIFFORD:  Objection.

12        A.   I do.

13        Q.   The next paragraph down, the first sentence

14   states, "When a non-exempt employee is required to take

15   phone calls after completing their regular work schedule

16   and leaving the premises but is not required to

17   physically return to work, the employee shall log the

18   start and end times of each phone call.  The employee

19   will be paid for the time spent in phone conversations.

20   The recorded time will be included in determining if an

21   employee qualifies for overtime pay in a work week."  Do

22   you see that, sir?

23        A.   Yes, I do.

24        Q.   Did you understand that to be the policy of

25   Alderwoods during the time that you worked for it?

379eae4c-658d-4960-8ab2-ce059b182950

NETWORK DEPOSITION SERVICES
Transcript of Adrian Leal

Page 124

1   time card slot.  You signed it when you were given it to

2   you.

3         Q.   And that's what you did; you signed it when you

4   first received it?

5         A.   That was our policy there.

6         Q.   So you signed a blank time card?

7         A.   Pretty much.

8         Q.   Was there a reason why they had you do that?

9         A.   They said it was just easier because if we were

10  gone or whatever the case may be, if we were off on

11  services or something, then she could just go ahead and

12  generate the payroll.  If there was any discrepancies or

13  anything to amend, then they could do that at a later

14  time.

15        Q.   Did you have any objection to signing the blank

16  time cards?

17        A.   Yes.

18        Q.   Who did you object to?

19        A.   The administrator.

20        Q.   What did she tell you?

21        A.   "Talk to Jon."

22        Q.   What did Jon tell you?

23        A.   "It's okay.  Don't worry about it."

24        Q.   Was there ever a time that signing a blank time

25  card created any issues for you in regards to reporting

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

379eae4c-658d-4960-8ab2-ce059b182950

NETWORK DEPOSITION SERVICES
Transcript of Adrian Leal

Page 125

1    time you worked?

2                    MS. GIFFORD:  Objection.

3         A.   In which respects?  Do you mean having cards

4    adjusted because I didn't feel they were right?

5         Q.   Yes, sir.

6         A.   Yes, there were instances where we had to go

7    back and have those things adjusted.

8         Q.   And were they adjusted?

9         A.   Partially.

10        Q.   And the reason why they were only partially

11   adjusted?

12        A.   Because I did not get approval.

13        Q.   And we've already covered that?

14        A.   Yes, sir.

15        Q.   Were the time cards reviewed by anyone before

16   they were entered into the payroll system?

17        A.   To my knowledge, the administrator had reviewed

18   them and, I guess, would make that determination if they

19   were true and correct and then submit them to payroll so

20   we could then get paid.

21        Q.   Do you recall if, other than yourself, anybody

22   signed your time cards?

23        A.   No.

24        Q.   Do you know of any other employees at

25   Schaefer-Shipman who worked more than 40 hours a week?

379eae4c-658d-4960-8ab2-ce059b182950

NETWORK DEPOSITION SERVICES
Transcript of Adrian Leal

Page 135

1   phones, and they were given to each of you in regards to

2   your location?

3        A.   Yes, sir.

4        Q.   Okay.  Getting back to my question then -- and

5   maybe you said this, and I wasn't focusing -- on Page

6   9787 under Schaefer-Shipman you have, "20 calls equal 5.0

7   hours of overtime?"

8        A.   Um-hmm.

9        Q.   How did you determine 20 calls equals five

10  hours of overtime?

11       A.   It's 15 minutes per call.

12       Q.   It's your understanding that when you reported

13  that time on the back of these time cards that that was

14  then inputted into the payroll system?

15       A.   Yes, sir.

16       Q.   And that then resulted in compensation for you

17  for the hours reported on your payroll check?

18       A.   Yes, sir.

19       Q.   Take a look at Page 9788 and the upper part

20  where it says "Monday," and across from Monday it says

21  "no lunch."  Again, that was a day that you did not take

22  lunch?

23       A.   Right.

24       Q.   By the way, do you have an understanding as to

25  why you were required to put "no lunch" on your time

379eae4c-658d-4960-8ab2-ce059b182950

NETWORK DEPOSITION SERVICES
Transcript of Adrian Leal

Page 136

1    card?

2         A.   If you were not able to take lunch, you weren't

3    able to take lunch, so he was all right with giving you

4    that time.  As you see, I got paid for it.

5              You know, sometimes you just don't have that

6    luxury in our industry to just say, "Hey, you know what?

7    It's 12:00.  I need to eat.  You guys go do something,

8    and we'll come back."

9         Q.   So the purpose of putting "no lunch" on your

10   time card was to make sure that you got an additional

11   hour of pay for --

12        A.   One-half hour.

13        Q.   I'm sorry -- additional one-half hour of pay

14   for the time that you couldn't take lunch?

15        A.   Right.

16        Q.   And it's your understanding that that was then

17   entered into the payroll time system?

18        A.   Um-hmm.  Yes.

19        Q.   And that you were then paid for that no lunch

20   time in your payroll check?

21        A.   Yes.

22        Q.   And on this one across from Saturday on

23   Page 9788 it says "phone on back."

24        A.   Um-hmm.

25        Q.   If you go to the next page, 9789, we have some

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

379eae4c-658d-4960-8ab2-ce059b182950

NETWORK DEPOSITION SERVICES
Transcript of Adrian Leal

Page 165

1 applicable to you, correct?

2   A. That is correct.

3   Q. Now, other than the issues of compensation that

4 you have reflected that applied to you in B and D, is

5 there any other compensation that you're seeking from

6 Alderwoods in this lawsuit?

7      MS. GIFFORD:   Objection.

8   A. Just the overtime hours to be paid that were

9 not.

10   Q. Anything else?

11   A. No.

12   Q. Just so I'm clear, you never performed any

13 community service work while you were employed at

14 Alderwoods, correct?

15   A. No.

16   Q. And also you did not perform any work

17 concerning what people are identifying as death calls?

18   A. I did.

19   Q. What is your understanding as to what a death

20 call is?

21   A. It's a first call.  A death call is when a

22 family calls and lets us know that a family member has

23 passed away and either they're at their home, an

24 institution such as a nursing home or hospital, and they

25 are requesting us to come immediately and recover that

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

379eae4c-658d-4960-8ab2-ce059b182950

NETWORK DEPOSITION SERVICES
Transcript of Adrian Leal

Page 173

1    that the company has a policy of not compensating you for

2    removals that you performed after hours; is that your

3    testimony?

4         A.    No, no, no.  He didn't tell me that.  He said

5    they would make an adjustment.  It just never happened,

6    sir.

7         Q.    That's what I'm trying to make clear.

8              There is no policy that Alderwoods had saying

9    that if you did the removal after hours, you're never

10   going to get paid for it?

11                  MS. GIFFORD:  Objection.

12        A.    Right.

13        Q.    In fact, the policy is just the opposite; you

14   should have been paid for it?

15        A.    Exactly.

16        Q.    And the reason you didn't is because Mr. Gordon

17   didn't make sure that you got paid for it?

18                  MS. GIFFORD:  Objection.

19                  MR. EHRMAN:  So you agree with us then?

20                  MR. FORESTIERE:  Well, I don't know.  I'm

21   trying to get the story straight from you guys.

22        Q.    (By Mr. Forestiere:)  You're shaking your head

23   yes or no.

24        A.    Well, I don't know how better I can lay this

25   out to you.  That's the best way I can explain it.

379eae4c-658d-4960-8ab2-ce059b182950

NETWORK DEPOSITION SERVICES
Transcript of Adrian Leal

Page 174

1          Q.   That's what I'm trying to say.

2               From what you're telling me, Alderwoods had a

3     policy that required you to be compensated for doing

4     removals, correct?

5          A.   Right.

6          Q.   But Mr. Gordon didn't follow through with it?

7     I need a yes or no answer to that.

8          A.   Yes, they do have a policy.  They're going to

9     compensate you.  It is a for-profit corporation.  They do

10    pay their employees.  I wasn't a volunteer.  I was

11    expecting to get paid for it.  I did make mention to

12    Mr. Gordon about it several times.  I was only hopeful it

13    was going to take place.  It never did.

14         Q.   And it was because Mr. Gordon didn't make sure

15    that it happened?

16              MS. GIFFORD:  Objection.

17         A.   I don't know what the mechanics were; if he was

18    talking to his managers and what they told him.  All I

19    know is that I never got compensated for it, sir.

20         Q.   But he did tell you that he was going to take

21    care of it, if I remember your exact words, and he never

22    did?

23         A.   After he talked to his managers or whatever the

24    up-line might be.  I don't know what he was doing.  He

25    just said it would be taken care of, and there would be

379eae4c-658d-4960-8ab2-ce059b182950

NETWORK DEPOSITION SERVICES
Transcript of Adrian Leal

Page 175

1    an adjustment.  It never happened.

2         Q.   I understand.  You can only say what he told

3    you.

4         A.   Yes, sir.

5         Q.   He told you he'd take care of it?

6         A.   Um-hmm.

7         Q.   And after that, it never happened, and you

8    don't know why it never happened?

9         A.   Correct.

10        Q.   I don't think we're disagreeing.  I just want

11   to get clear on the record what your understanding is and

12   what exactly transpired, okay?

13        A.   Um-hmm.

14        Q.   Are you aware of any Alderwoods policy

15   requiring employees to perform on-call work and not

16   paying them for it?

17             MS. GIFFORD:  Objection.

18        A.   Can you rephrase that, please?

19        Q.   Yes.  Are you aware of any Alderwoods policy

20   that requires their employees to perform on-call work and

21   not pay them for it?

22             MS. GIFFORD:  Objection.

23             MR. EHRMAN:  Objection.

24        A.   I'm not aware of any volunteerism that they're

25   asking you to do and not get paid for it.

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

379eae4c-658d-4960-8ab2-ce059b182950

NETWORK DEPOSITION SERVICES
Transcript of Adrian Leal

Page 176

1      Q.   Well, you'd never seen any written policy

2   saying that employees had to perform on-call duties and

3   not receive compensation for it?

4      A.   I never received anything like that.

5      Q.   Are you aware of any Alderwoods policy of

6   requiring employees to become licensed and not

7   compensating them for the time spent becoming licensed?

8              MS. GIFFORD:   Objection.

9      A.   Not aware of that.

10     Q.   Did you ever see a written policy to that

11   effect authored by Alderwoods?

12     A.   No.

13     Q.   Are you aware of any Alderwoods policy for not

14   paying their funeral directors for their family services

15   appointments?

16             MS. GIFFORD:   Objection.

17     A.   That wouldn't pertain to me.   I'm not involved

18   in family services.

19     Q.   So you're not aware of such a policy?

20     A.   I'm not aware of such a policy.   I did not

21   participate in family service activities.

22     Q.   Did anyone complain to you during the time you

23   were employed at Alderwoods that it was requiring them to

24   work these family service appointments and not be paid

25   for them?

379eae4c-658d-4960-8ab2-ce059b182950

NETWORK DEPOSITION SERVICES
Transcript of Adrian Leal

1      A.   Yes.

2      Q.   Is that the policy that we reviewed earlier

3  today that said that unless you got pre-approval, you

4  would not be paid for overtime?

5      A.   Yes.

6      Q.   Did any Alderwoods employee tell you that they

7  had worked overtime and were not paid for it?

8      A.   Yes.

9      Q.   Who was that?

10     A.   That was Pete at the Bauer Chapel.

11     Q.   What did he tell you in that regard?

12     A.   It was in regard to on call.

13     Q.   We've already covered that?

14     A.   Yes.

15          MR. EHRMAN:  Has it been an hour or so

16  since the last break was taken?

17          MR. FORESTIERE:  I don't think it's been

18  an hour or so, but we could take ten minutes if you like.

19          Want to take a break?

20          MS. GIFFORD:  Sure.

21          MR. EHRMAN:  Thank you.

22               (Brief recess taken.)

23     Q.   (By Mr. Forestiere:)  Mr. Leal, are you aware

24  of an Alderwoods policy that its employees should not

25  report all of the time they worked on their time cards?

379eae4c-658d-4960-8ab2-ce059b182950

NETWORK DEPOSITION SERVICES
Transcript of Adrian Leal

Page 180

1          MS. GIFFORD:  Objection.

2      A.   Not aware.

3      Q.   Any employees ever tell you that they were

4  required to do that?

5      A.   Not list their time?

6      Q.   Yes, sir.

7      A.   No.

8      Q.   Do you know what the word remuneration means?

9      A.   No, I don't.

10      Q.   Good.  I won't use it.

11          Are you aware of any policy by Alderwoods of

12  not properly calculating the overtime rates to be paid

13  its employees?

14          MS. GIFFORD:  Objection.

15      A.   I'm not aware of their formally --

16      Q.   Okay.  Did any Alderwoods employee ever tell

17  you that their overtime rate was being improperly

18  calculated by Alderwoods in determining the amount of

19  overtime they would be paid?

20      A.   No.  I'm not aware of any such practice.

21      Q.   Did you ever sign an affidavit or declaration

22  concerning the allegations of this lawsuit?

23      A.   Do you mean with my representative attorneys?

24      Q.   Yeah.  I'm sorry.

25          Do you know what an affidavit is or

379eae4c-658d-4960-8ab2-ce059b182950

NETWORK DEPOSITION SERVICES
Transcript of Adrian Leal

Page 184

1      Q.   Did you ever attend a meeting where concern was
2   expressed by Mr. Gordon that employees were working too
3   much overtime?
4      A.   No.
5      Q.   Or that overtime was excessive?
6      A.   No.
7      Q.   Or that overtime was being abused?
8      A.   No.
9      Q.   Did you ever hear that there was a budget for
10   the Schaefer-Shipman facility for overtime work by its
11   employees?
12      A.   Well, I knew all four locations had different
13   budgets, but that's about the extent of it.  I didn't
14   know what the particulars were.
15      Q.   Were you ever told that you were incorrectly
16   completing your time cards?
17      A.   Never.
18      Q.   Did you hear that any employee that you worked
19   with at Alderwoods was incorrectly completing their time
20   cards?
21      A.   Never.
22      Q.   Were you ever told not to clock in until your
23   scheduled start time?
24      A.   No.
25      Q.   Are you aware of any other Alderwoods employee

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

379eae4c-658d-4960-8ab2-ce059b182950

NETWORK DEPOSITION SERVICES
Transcript of Adrian Leal

Page 185

1   being told not to clock in until their scheduled start

2   time?

3        A.   Not to my knowledge, no.

4        Q.   Were you aware that any other funeral directors

5   at the Schaefer-Shipman location were required to become

6   licensed insurance agents?

7        A.   The family services and pre-need people had to

8   have that particular licensing.

9        Q.   Because that was required for them to sell

10  pre-need, correct?

11       A.   Yes.

12       Q.   Were you ever given a certain budget of hours

13  to work and instructed not to exceed that budget?

14       A.   Never.

15       Q.   You testified earlier concerning phone duty;

16  that you had received a phone duty package.

17       A.   It's a portfolio with the three cell phones in

18  it for the three different locations and also the

19  greeting that's used for each one of them, the price list

20  and what each different location would offer.

21       Q.   Did the package also include the logs, or was

22  that something separate?

23       A.   The logs were in there for each of the three

24  locations.

25            MR. FORESTIERE:  I think that's all the

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

379eae4c-658d-4960-8ab2-ce059b182950

Adrian F. Leal                                          April 23, 2009

Page 195

1                        C E R T I F I C A T E

2

3

      STATE OF WASHINGTON )
4                          ) ss.
      COUNTY OF KING       )

5

6          I, the undersigned officer of the Court, under my
      commission as a Notary Public in and for the State of
7      Washington, hereby certify that the foregoing deposition
      upon oral examination of the witness named herein was
8      taken stenographically before me and thereafter
      transcribed under my direction;

9

10         That the witness before examination was first duly
      sworn by me to testify truthfully; that the transcript of
11     the deposition is a full, true and correct transcript of
      the testimony, including questions and answers and all
12     objections, motions, and exceptions of counsel made and
      taken at the time of the foregoing examination;

13

14         That I am neither attorney for, nor a relative or
      employee of any of the parties to the action; further,
15     that I am not a relative or employee of any attorney or
      counsel employed by the parties hereto, nor financially
16     interested in its outcome.

17

18         IN WITNESS WHEREOF, I have hereunto set my hand and
      seal this 4th day of May, 2009

19

20

21                        \S\ROBYN L. FISHER
                          Robyn L. Fisher, Notary Public in
22                        and for the State of Washington,
                          residing at Kent.

23

24                        My commission expires:  9-19-2012

25