**TAB 23**

NETWORK DEPOSITION SERVICES
Transcript of Barry Douglas Miles

Page 1

THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
06-1641

DEBORAH PRISE AND HEATHER    )
RADY ON BEHALF OF THEMSELVES )
AND ALL EMPLOYEES SIMILARLY  )
SITUATED,                    )
                             )
        PLAINTIFFS,          )
                             )
v                            )
                             )
ALDERWOODS GROUP, INC.,      )
                             )
        DEFENDANT.           )
-----------------------------------

DEPOSITION OF BARRY DOUGLAS MILES

(TAKEN by DEFENDANT)

CHARLOTTE, NORTH CAROLINA

APRIL 18, 2009

REPORTED BY:      Meredith R. Johnson
                  Court Reporter
                  Notary Public

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

5785e779-eb59-4917-9c99-bd763dd59ec4

NETWORK DEPOSITION SERVICES
Transcript of Barry Douglas Miles

1      Q     So there was trusts and there's
2  insurance, correct?
3      A     Right.
4      Q     Those are the two vehicles for funding
5  preneed?
6      A     Correct.
7      Q     And you said that it changed, were both
8  those vehicles available in 1990 when you began
9  working at Carpenter's?
10     A     Yeah, but to 1990, you didn't have to
11 send anything to the state.  That changed in '92,
12 I think.
13     Q     There's periodic reporting requirements
14 to the state on your trust funds, correct?
15     A     Correct.
16     Q     Now, did you have to have -- let me ask
17 this question, can anyone in North Carolina sell a
18 preneed policy?
19     A     No.
20     Q     What are the requirements to sell a
21 preneed policy in the state of North Carolina?
22     A     A licensed funeral director and have an
23 insurance license.
24     Q     Do you have to have an insurance license
25 to sell preneed policies that are funded by a

5785e779-eb59-4917-9c99-bd763dd59ec4

NETWORK DEPOSITION SERVICES
Transcript of Barry Douglas Miles

1   trust?

2        A    Yes.

3        Q    Okay.  Do you have a preneed -- do you

4   have an insurance license?

5        A    I do.

6        Q    Okay.  When did you first obtain an

7   insurance license, a license to sell insurance in

8   North Carolina?

9        A    I don't think it says.  I think 1994 I

10  believe, I mean, I may be wrong on that date.

11  1993, excuse me.

12       Q    Okay.  So from 1990 when you began

13  working at a Carpenter's Funeral Home through 1993

14  when you obtained your license, did you sell

15  preneed policies?

16       A    No.

17       Q    What was the occasion -- why did you get

18  your insurance license in '93?

19       A    Well, most funeral directors were

20  required to write preneeds and in order to do that

21  you had to have an insurance license.  So the

22  company -- I mean everybody knew that.  If you

23  want to sell preneed for your location, you had to

24  have -- there was two kinds of license.  One, you

25  could get a license from the state of North

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

5785e779-eb59-4917-9c99-bd763dd59ec4

NETWORK DEPOSITION SERVICES
Transcript of Barry Douglas Miles

Page 82

1   Carolina which is kind of a temporary license
2   where you did not have to be a licensed agent.
3   That law, I don't know when that law went into
4   effect.  Initially, it started you had to be a
5   licensed insurance agent and at some point the law
6   changed to where you could get a temporary license
7   for the state of North Carolina for $30 to write
8   preneed.
9        Q    Okay.  So you said -- I'm trying to
10  figure out why -- this is what I'm trying to
11  figure out, tell me why in '93 did you get your
12  license, why?
13       A    So I could sell preneed.
14       Q    Did anyone -- was that a requirement of
15  you obtaining employment with Carpenter's in 1990?
16       A    No.
17       MS. DOUGLASS:  Objection.
18       Q    Was obtaining a license, an insurance --
19  we'll just call it an insurance license -- was
20  obtaining an insurance license in 1993 a
21  requirement for your continued employment with
22  Carpenter's?
23       A    No.
24       Q    So they didn't say to you either you get
25  a license or you're fired?

5785e779-eb59-4917-9c99-bd763dd59ec4

NETWORK DEPOSITION SERVICES
Transcript of Barry Douglas Miles

Page 83

1      A    No.

2      Q    Did someone ask you to get your license?

3      A    Yeah.  I mean it was like in a general

4  meeting, if you guys want to write preneed, you

5  need to do this.

6      Q    But it was never a condition of

7  employment?

8      A    No.

9      Q    Were you, did anyone say, if you don't

10  get it, you're going to be disciplined?

11      A    No.

12      Q    Did anyone say if you don't get it,

13  you're going to get your pay cut?

14      A    No.

15      Q    Did anyone say if you don't get it then

16  you're never going to advance beyond the position

17  you're in?

18      A    No.

19      Q    Why -- so why did you decide at that

20  point in time that you wanted to get your

21  insurance license?

22      A    So I would be able to sell preneed.

23      Q    Why did you want to sell preneed?

24      A    Because it was commission based and you

25  could make some extra money.

5785e779-eb59-4917-9c99-bd763dd59ec4

NETWORK DEPOSITION SERVICES
Transcript of Barry Douglas Miles

1    Q    Did you have any problems with the way
2  they treated their employees?
3    A    No.
4    Q    With regard to the prices, did you ever
5  raise that issue with Mr. Rhinehart?
6    A    Yes.
7    Q    And what was his response to your
8  concerns?
9    A    He worked for the same company I do.
10 There's not much he could do about it.
11   Q    Fair enough.  Okay, so when you left
12 Carpenter's in 1997, did you a resign at that
13 point in time?
14   A    Yes, I did.
15   Q    And what did you do after that?
16   A    I went to work for a small firm in
17 Shelby, North Carolina, Lutz-Austell Funeral Home,
18 L-U-T-Z A-U-S-T-E-L-L hyphen.
19   Q    She probably got that down, I didn't.
20 Can you give me that one more time.
21   A    L-U-T-Z - A-U-S-T-E-L-L Funeral Home.
22   Q    And that would have been shortly after
23 Carpenter's?
24   A    April '98 -- April '97.
25   Q    And that's an independent owned funeral

5785e779-eb59-4917-9c99-bd763dd59ec4

NETWORK DEPOSITION SERVICES
Transcript of Barry Douglas Miles

Page 102

1   home?

2        A    Yes.

3        Q    How long did you work there?

4        A    It wasn't quite a year.

5        Q    Okay.  Do you know when you left?  Early

6   '98?

7        A    Yeah.  I guess, I mean that date's

8   fuzzy.

9        Q    Okay.  Why did you leave there?

10       A    It became a family situation where the

11  lady that owned the business incorporated which

12  her son didn't agree with that because he couldn't

13  get his hands on her money.  So he opened a

14  competing funeral home.  She was losing business.

15  She couldn't afford the people we had there,

16  myself included, and so I made inquiries to go

17  back to Carruthers.

18       Q    And did you go back to Carruthers at

19  that time?

20       A    Yes.

21       Q    Okay.  During the time you worked at

22  Lutz-Austell, how were you paid there?  Was it

23  salary?

24       A    Salary.

25       Q    What was your salary if you remember?

5785e779-eb59-4917-9c99-bd763dd59ec4

NETWORK DEPOSITION SERVICES
Transcript of Barry Douglas Miles

1      A      38,000.

2      Q      Per year?

3      A      Per year.

4      Q      And were you required to keep your time

5  while you were there?

6      A      No.

7      Q      Let me ask you a better question, were

8  you required to keep the actual time --

9      A      No.

10     Q      -- you worked while you were there?  And

11 that was an independent the whole time you worked

12 there?

13     A      Yes.

14     Q      And you resigned from that position in

15 early '98 or did the firm -- had the firm folded?

16     A      I had a talk with her and I left because

17 I could see the handwriting on the wall and that

18 might have been '98, '99 instead of '97, '98.  I'm

19 thinking March '98 is when I left Carpenter's and

20 I was there from March -- I was at Lutz-Austell

21 from March '98 'til about March or April of '99.

22 I went to Carruthers in '99 so I knew that.

23     Q      So you think you were at Carpenter's

24 originally from '90 to 98?

25     A      The early part of '98, yeah.

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

5785e779-eb59-4917-9c99-bd763dd59ec4

NETWORK DEPOSITION SERVICES
Transcript of Barry Douglas Miles

Page 115

1    A    Well, it was because the computers we
2  worked on, it was not installed.
3    Q    So tell me about the timekeeping system
4  that existed at Carruthers when you arrived there
5  in '99.
6    MS. DOUGLASS:  Objection.
7    A    We were all on salary.  Part-time people
8  worked by the hour and I think they punched a
9  clock at that point.
10   Q    Was there physically a clock with punch
11  cards and they'd drop it in and it would print the
12  time on there?
13   A    Yeah.
14   Q    Okay.  And salaried funeral directors
15  did not keep track of time that way?
16   A    No.
17   Q    In your discussions with Mr. Wagner, did
18  you -- prior to your reemployment, did you discuss
19  any community service obligations, did he bring up
20  community service?
21   A    No..
22   Q    Did he bring up -- let me jump back, I
23  apologize, I kind of skipped over one thing.  When
24  you were employed at Carpenter's -- when you were
25  employed from '90 to '98 we now believe, did you

5785e779-eb59-4917-9c99-bd763dd59ec4

NETWORK DEPOSITION SERVICES
Transcript of Barry Douglas Miles

Page 116

1    receive any bonuses?

2          A    Yes.

3          Q    Okay.   What type of bonuses did you

4    receive there?

5          A    It had to do with operational bonuses.

6    If you met certain criteria on your operating --

7    on your P and L statements, that kind of thing,

8    account receivable collection, there was a formula

9    they devised.

10         Q    Who devised that?

11         A    Loewen did.

12         Q    And do you know if -- do you know how --

13   never mind, scratch that.   When you were at

14   Carpenter's, do you know if all the funeral

15   directors that were under the Carruthers umbrella

16   so to speak were paid the same way that you were?

17         MS. DOUGLASS:   Objection.

18         A    Yeah.

19         Q    You how do you know that they were all

20   paid the same way?

21         A    That's just the way it was done.

22         Q    Did you see other people's paychecks?

23         A    No, but you were paid every two weeks

24   and everybody was on salary.   Again, that's the

25   nature of the funeral business until the wage and

5785e779-eb59-4917-9c99-bd763dd59ec4

NETWORK DEPOSITION SERVICES
Transcript of Barry Douglas Miles

1    got hired on there as a funeral director tell me
2    what your duties were --
3         A    Wait on families, assist them with
4    services, sell preneed, make removals, on-call.
5         Q    Okay.  Did all funeral directors -- how
6    many funeral directors were there there?
7         A    When I came back, there were three,
8    myself and two other fellows in Gastonia.
9         Q    Did they all three have their preneed
10   insurance licenses?
11        A    No.
12        Q    Okay.  Do you know if they were required
13   to have them to work there?
14        A    No.
15        Q    Okay.  You don't know or they weren't
16   required to?
17        A    They weren't required to.  It was one of
18   those things, if you want to do it, get your
19   license.  If you don't want to do it, that's fine.
20        Q    Was there any requirement to perform
21   community service?
22        A    It was mentioned, but I don't think it
23   was a requirement, no.
24        Q    Okay.  I think we may have -- let's see,
25   did -- were you a member -- you were a member of

5785e779-eb59-4917-9c99-bd763dd59ec4

NETWORK DEPOSITION SERVICES
Transcript of Barry Douglas Miles

Page 132

1   A   They just answered the phone.  They had
2   no other role.
3   Q   Did any of the Carruthers locations --
4   did they have an answering service, a third party
5   answering service or was it --
6   A   After hours.
7   Q   After hours?
8   A   After hours, the phone was diverted to
9   Gastonia which in turn was diverted to an
10  answering service.
11  Q   A third party?
12  A   A third party.
13  Q   When the funeral director was on-call,
14  was there anyone else that was on-call other than
15  the funeral directors at the locations?
16  A   No.
17  Q   Just funeral directors?
18  A   Just funeral directors.
19  Q   Did the location have a cell phone or a
20  pager that was passed around for whoever was
21  on-call?
22  A   We had a pager, that was before we used
23  cell phones at that point.
24  Q   They weren't the size of a gigantic
25  suitcase, the cell phones at that point.

5785e779-eb59-4917-9c99-bd763dd59ec4

NETWORK DEPOSITION SERVICES
Transcript of Barry Douglas Miles

Page 157

1  transfer from being a salaried employee, what that
2  process -- how it was going to change.  You know,
3  we were going to lose a week's pay to start with.
4       Q    What do you mean --
5       A    In the transfer.  That's what he said
6  because when we do this on this date, you're only
7  going to be paid for one week even though you
8  worked two, you were only going to be paid for one
9  week at that rate that they established.  They
10 established that rate by the number of hours you
11 were working.
12      Q    So they took the salary, they took your
13 annual salary, divided it by the average, the
14 40-hour work week roughly and then came up with
15 what your hourly rate would have been at that
16 salary; is that correct?
17      A    No, that's not what they did.
18      Q    Tell me what they did.
19      A    They took the 2080 hours plus the
20 overtime hours and came up with a figure that way.
21      Q    Okay.  And that was your hourly rate?
22      A    Yeah.
23      Q    How did they know what overtime hours to
24 put in that formula?
25      A    Well, we were working at that time

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

5785e779-eb59-4917-9c99-bd763dd59ec4

NETWORK DEPOSITION SERVICES
Transcript of Barry Douglas Miles

Page 158

1   basically, 56-hour a week schedule, working seven

2   days on, three days off, seven days on, four

3   days -- in that seven day period, you worked.  You

4   could have eight hours a day, 56 hours.  You

5   probably worked more, but it was based on 56

6   hours.  But that's what they were basing it on.

7   They went back somehow, payroll or somebody gave

8   them a figure, an average, an average work week

9   plus your overtime.

10          Q    Okay.

11          A    And that's how they came up with it.

12          Q    What was your hourly rate that they

13  computed?

14          A    Initially, it was $17 and something.

15          Q    Why do you say initially?

16          A    Because it didn't stay that way.

17          Q    What happened?

18          A    I raised Cain about it.

19          Q    Okay.

20          A    I jumped up and down.

21          Q    What were you complaining about, the

22  rate was too low?

23          A    I objected to them using overtime hours

24  to establish a 40 hour work week rate which is

25  what I understood was supposed to be done.  Just

5785e779-eb59-4917-9c99-bd763dd59ec4

NETWORK DEPOSITION SERVICES
Transcript of Barry Douglas Miles

Page 159

1    like you said, the 2080 hours, which is 40 hours a

2    week, 52 hours a week (sic).  That's your base

3    rate.

4           Overtime is something out here that you

5    may or may not get so how can you base a rate on

6    something I may or may not get.  So add the two

7    together.

8        Q    So you thought that the base rate that

9    they calculated was incorrect?

10       A    Incorrect.

11       Q    Do you think it was illegal?

12       A    I thought it was illegal.

13       Q    And why did you think it was illegal?

14       A    I'll get back to the overtime issue.

15   How can you -- just like I told Mr. Pearce, if you

16   do like you're doing right here and I come to work

17   and you tell me to go home tomorrow, that does

18   away with eight hours overtime.  So that's why I

19   felt that way and voiced my opinion about it.

20       Q    Who did you tell?

21       A    I told Ken Pearce, I told Bill

22   Rhinehart, I told Danny Gibson, I told Gary Toye,

23   I told Katie Leahy, on up the line, went straight

24   to the director of operations.

25       Q    And who was that?

5785e779-eb59-4917-9c99-bd763dd59ec4

NETWORK DEPOSITION SERVICES
Transcript of Barry Douglas Miles

Page 160

1      A     Katie Leahy.

2      Q     And what was the response that you were
3  given?

4      A     It wasn't very satisfactory.  And they
5  ended up doing it.

6      Q     Doing what?

7      A     What they said they were going to do,
8  the rate was figured that way.

9      Q     So you had a $17 --

10     A     No, no, no.  It was back and forth on
11  that.  We determined, you know, instead of working
12  ten hours overtime a week, we initially cut it
13  down to seven overtime hours a week.

14     Q     For the formula?

15     A     For the formula.  And then it finally
16  ended up being five hours after I had a meeting
17  with all of them in a room and hammered it out.

18     Q     Okay.  And what was the final hourly
19  rate if you recall that you had?

20     A     It was 21-something or 20.  It might
21  have been 20-something.

22     Q     At that point in time, did they tell you
23  that -- was the discussion -- was there any
24  discussion about overtime hours going forward at
25  that point in time?  Not in the formula, but in

5785e779-eb59-4917-9c99-bd763dd59ec4

NETWORK DEPOSITION SERVICES
Transcript of Barry Douglas Miles

Page 161

1   overtime hours that you would record your time

2   for?

3         MS. DOUGLASS:  Objection.

4         A     Not that I'm aware of.

5         Q     Okay.  So they didn't say anything like

6   we'll give you 21 hours but you can't work

7   overtime anymore?  They didn't say that?

8         A     No.

9         Q     They didn't say, we'll give you 21 hours

10  but we're not going to pay you for overtime?  They

11  didn't say that?

12        A     No.

13        Q     At that point in time, what did you

14  understand the Alderwoods policy to be about what

15  you get paid for the number of hours you worked?

16        A     I don't understand the question.

17        Q     Okay.  Bad question.  You had mentioned

18  earlier, I believe, and I want to make sure this

19  still applies, you had mentioned that the policy

20  in the handbooks was that if you work the time you

21  get paid for it; is that correct?

22        A     That's correct.

23        Q     And at that time after this change, do

24  you still understand that that was the policy?  If

25  you worked the time then you got paid for it?

5785e779-eb59-4917-9c99-bd763dd59ec4

NETWORK DEPOSITION SERVICES
Transcript of Barry Douglas Miles

1    A     If you showed time on a time sheet, they
2    paid you for it.
3    Q     Okay.  Did you ever receive any
4    instruction not to record time that you actually
5    worked?
6    A     I can't say.  I don't know.  I don't
7    remember.
8    Q     Okay.  Do you believe that for every
9    hour that you submitted on a time card saying I
10   worked for it, do you believe that you got paid
11   for every hour that you submitted?
12   A     I was paid, yes, sir.
13   Q     When they changed the pay structure for
14   funeral directors at this time we're guessing in
15   '05, did you receive any new information or any
16   new direction on how to record time?
17   A     Yeah, we did because we hadn't been
18   doing it.  So it was, I think, initially it came
19   out we had a handwritten sheet then we went to a
20   time clock and went back to a handwritten sheet.
21   Q     Okay.
22   A     I don't know exactly when that happened.
23   Q     Okay.
24   A     But ended up with a handwritten sheet of
25   hours worked.

5785e779-eb59-4917-9c99-bd763dd59ec4

NETWORK DEPOSITION SERVICES
Transcript of Barry Douglas Miles

Page 165

1    Q    And does this seem like -- I'm sure you
2  haven't seen in a few years.
3    A    It appears that way.
4    Q    It appears to be the time sheet you
5  filled out at the time, correct?
6    A    Right.
7    Q    And you would fill this out on a weekly
8  basis; is that correct?
9    A    Right.
10   Q    And can you tell who your supervisor's
11 signature is down there?
12   A    Yeah, Danny Gibson.
13   Q    Okay.  And why would the supervisor sign
14 off on these time sheets?
15   MS. DOUGLASS:  Objection.
16   A    It was a requirement on his part.
17   Q    And would that --
18   A    From Alderwoods.
19   Q    And would that signify that he's
20 authorizing the time that you've put down
21 essentially?
22   A    I don't think he's doing that.  I think
23 he's signing there that the time is figured
24 correctly.  I don't think that's he's authorizing
25 to do anything.

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

NETWORK DEPOSITION SERVICES
Transcript of Barry Douglas Miles

Page 169

1     Q   Do you specifically recall any
2  inaccuracies?
3     A   I might have incorrectly added up the
4  amount of hours in this box.  And it would be
5  brought to my attention.
6     Q   So they would doublecheck your addition
7  on that?
8     A   Yeah.
9     Q   And they came to you and said?
10    A   I was either short or over.
11    Q   Did you ever have a time sheet returned
12  to you and said you've got too many hours on here?
13    A   No.
14    Q   Did you ever have a time sheet returned
15  to you and said I didn't authorize this overtime?
16    A   Nope.
17    Q   Okay.  Do you know -- were you familiar
18  with the process that Michelle Martin had when
19  she -- once she got the payroll sheets?
20    A   No.
21    Q   Okay.  Now, she was responsible for
22  obtaining and for the payroll clerk, for all five
23  of the Carruthers locations; is that correct?
24    A   Correct.
25    Q   I think I've already asked you this and

5785e779-eb59-4917-9c99-bd763dd59ec4

NETWORK DEPOSITION SERVICES
Transcript of Barry Douglas Miles

Page 173

1   kind of gave you a guideline.  I don't remember
2   who it came from, but I remember something to
3   determine week ending, had something to do with
4   that and then the location.  I don't know when it
5   was.
6       MS. DOUGLASS:  Let him finish the question.
7   It gives me an opportunity to pose an objection if
8   I'd like to.  Thank you.
9       (Exhibit 2 Marked for Identification)
10      Q    I'm handing you what's been marked as
11  Exhibit 2 and ask if you would take a look at
12  that.  Kind of flip through that and familiarize
13  yourself with that.  Let me know whenever you have
14  had a chance to do that.
15      A    Look familiar.
16      Q    Okay.  Does this look like a document
17  and this is Bates stamped ALD0009 through
18  ALD00012.  Does this look like some of the
19  instruction that you -- is this a document that
20  you would have -- that you received instructing
21  you on how to record times?
22      A    I might have looked at a document in the
23  policies and procedures manual, but I don't
24  remember receiving one.
25      Q    So you don't remember this document

5785e779-eb59-4917-9c99-bd763dd59ec4

NETWORK DEPOSITION SERVICES
Transcript of Barry Douglas Miles

Page 174

1    specifically?

2        A    No.

3        Q    Can you read me the first sentence under

4    Purpose?

5        A    "It is the policy of the company that

6    non-exempt employees shall be paid on an hourly

7    basis and are required to count time worked on an

8    hourly and fractional hour basis."

9        Q    Is that your understanding of the policy

10   for recording time?

11       A    Mm-hmm.

12       Q    That Alderwoods had?

13       A    Mm-hmm.

14       Q    Can you read me the second sentence,

15   please.

16       A    "Non-exempt employees cannot be

17   guaranteed hours of work and pay to set weekly

18   amount regardless of the actual hours of work;

19   they must be paid according to actual time

20   recorded on time cards/time sheets.

21       Q    And is that your understanding of the

22   policy?

23       MS. DOUGLASS:  Objection.

24       A    (Nods head up and down)

25       Q    Yes?

5785e779-eb59-4917-9c99-bd763dd59ec4

NETWORK DEPOSITION SERVICES
Transcript of Barry Douglas Miles

Page 175

1      A     Yes.

2      Q     And the next sentence I'm going to read
3   here and just tell me if this is correct.  It
4   says, "Non-exempt employees are to be compensated
5   for all overtime hours worked."  Is that what it
6   says?

7      A     That's what it says.

8      Q     I read that correctly?

9      A     It's what it says.

10     Q     And do you believe that to be the policy
11  of Alderwoods in that time period of 2005 through
12  '06?

13     A     Yeah.

14     Q     Okay.  And, in fact, you've testified
15  already here today that nonexempt or hourly
16  employees, you believe it to be the policy that
17  they were paid for all hours worked the entire
18  time you worked for the Alderwoods/Loewen umbrella
19  for the entire time you worked?  Let me clean up
20  that question for you.

21            You testified previously that the whole
22  time you worked at Carruthers that it's been the
23  policy and it's been enforced that if you worked
24  the hours, whether it was overtime or regular
25  time, you got paid for it period, correct?

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

5785e779-eb59-4917-9c99-bd763dd59ec4

NETWORK DEPOSITION SERVICES
Transcript of Barry Douglas Miles

Page 183

1    Q    And why would you be initialing there?

2    A    I honestly don't know.

3    Q    Would it be fair to say that you would

4    initial next to a time where you hand wrote the

5    time in, verifying that that was the proper time

6    that you were working?

7    MS. DOUGLASS:  Objection.  I think he

8    answered the question.

9    A    I don't.

10   Q    That's fine.  If you don't know, you

11   don't know.  And there's a column, in the lefthand

12   column, is extra time.  And then the second day,

13   can you tell me what that says there?

14   A    It sounds like a house removal.

15   Stanley, something else.

16   Q    I'm sorry, the first notation for the

17   second day.

18   A    Insurance class, I think.

19   Q    Insurance class?

20   A    8 to 12:30.

21   Q    And what would that have been?

22   A    You know, I'm not sure.

23   Q    Would that possibly have been a

24   continuing education insurance class?

25   A    It could be.  Could be.

5785e779-eb59-4917-9c99-bd763dd59ec4

NETWORK DEPOSITION SERVICES
Transcript of Barry Douglas Miles

1    Q    And you put that time down as time that
2  you worked on that second day; is that correct?
3    A    Mm-hmm.
4    Q    And then if you look on the fourth day,
5  you have a notation there, shows you clocked in
6  November 2nd at 8.4.  Would that be eight hours
7  and four tenths of an hour into the day?
8    MS. DOUGLASS:  Objection.  A little after
9  eight.
10    Q    8:24.
11    A    A little after eight.
12    Q    And then you made a notation "no lunch."
13    A    Right.
14    Q    So that shows that you didn't take off
15  time for lunch and that you would -- your hours to
16  the left there are calculated from 8.4 to --
17    A    19.2.
18    Q    -- to 19.2.  And the total hours would
19  be 10.8 hours for that day.
20    A    That's written beside of it.
21    Q    And that's what you believe to be the
22  time that you -- this reflects the time you worked
23  for that day, correct?
24    A    Mm-hmm.
25    Q    And then down at the bottom, we see 60.3

NETWORK DEPOSITION SERVICES
Transcript of Barry Douglas Miles

Page 185

1    added to 3.75, correct?

2         A    That's right.

3         Q    And would you flip to the very next page

4    and tell me what that document is.

5         A    It's the after-hours call log.

6         Q    And tell me what that is.

7         A    If you're on-call -- the policy was, you

8    got paid fifteen minutes per phone call if you

9    were on-call.  And a flat three-hour rate if you

10   went on a house removal.  Flat rate.  So that's

11   what that is.

12        Q    Okay.  Now, were you told to put your

13   actual time down here?

14        A    Yes.

15        Q    Okay.  So if you actually spent an hour

16   on a phone call, would you put an hour down?

17        A    No.  We put 15 minutes down.

18        Q    You just said you were told to put the

19   actual time you spent on the call down.

20        A    No.  The actual -- what they told us to

21   do, 15 minutes per phone call is what they told

22   us.  So that's what we did.

23        Q    They told --

24        A    Some phone calls are five minutes, some

25   are longer.

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

5785e779-eb59-4917-9c99-bd763dd59ec4

NETWORK DEPOSITION SERVICES
Transcript of Barry Douglas Miles

Page 186

1    Q    Okay.  So if the phone call was five
2  minutes, you put down 15 minutes?
3    A    That's what they said to do.
4    Q    What if the phone call was 30 minutes?
5    A    I put down 15 minutes.
6    Q    You were told to not record the actual
7  time, just record --
8    A    Fifteen minutes per phone call.
9    Q    Okay.  Why --
10    A    So you adjusted these times to equal 15
11  minutes.  If you go back and look through them,
12  they're adjusted to read 15 minutes.
13    Q    Okay.  So I'm just trying to clarify.
14  Does that mean you were told to put down the
15  actual time from start time to actual end time and
16  then put 15 minutes as time spent?
17    MS. DOUGLASS:  Objection.
18    A    No.
19    Q    Tell me.  I'm just trying to understand.
20  Tell me what that means?
21    A    It means 15 minutes per call.  If the
22  phone rings and I deal with that phone call and I
23  hang up the phone, that's 15 minutes.
24    Q    So why do you think that you would have
25  a start time and an end time listed if every phone

5785e779-eb59-4917-9c99-bd763dd59ec4

NETWORK DEPOSITION SERVICES
Transcript of Barry Douglas Miles

1       Q      -- 60.3.

2       A      Correct.

3       Q      So can you help me understand why some

4    time is put on the time card and yet others are

5    put on the after-hours call log?

6       A      I think prior to this week right here,

7    if you go back and look at the other time sheets,

8    there was no on-call log at all.  We were

9    recording time on the time sheet right here.

10       Q      Correct, Exhibit 1.

11       A      Example, 11:24 to 2:30.  We didn't have

12    this sheet at that point.  So we kind of continued

13    that process until somebody brought it to our

14    attention -- we had a meeting or something brought

15    it to our attention, we're going to start using

16    this form instead of putting it on your time card.

17       Q      Yes, sir.  And if you look at Exhibit 1

18    where you noted there was the week of October 15,

19    '05, you put down 3.06 hours for what you thought

20    was a removal, correct?

21       A      Yes.

22       Q      So that was more than the three hour

23    minimum that you were testifying about.

24       A      Excluding -- this is before we

25    instituted the 15-minute time call.

5785e779-eb59-4917-9c99-bd763dd59ec4

NETWORK DEPOSITION SERVICES
Transcript of Barry Douglas Miles

Page 199

1      Q    Do you remember seeing this March 27,
2   '06 memo?
3      A    No.
4      Q    Okay.  And at the time, were you a
5   location manager or general manager?
6      A    I was a location manager.
7      Q    Okay.  So according to this distribution
8   list, you would have received it?
9      A    Yeah, but I don't remember it if we did.
10      MS. DOUGLASS:  Objection.
11      Q    But you might have, you just don't
12   remember.
13      A    I don't remember.
14      Q    Would you flip to the last page on here
15   for me, please.
16      A    Mm-hmm.  That's why I laughed.
17      Q    The third question -- the second
18   question, I'm sorry.  Can you read the second
19   question so that our court reporter can put it
20   down.
21      A    "Is a flat rate paid for work performed
22   on off hours."
23      Q    And what is the answer?  It's in a
24   question and answer format.
25      A    It says no.

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

5785e779-eb59-4917-9c99-bd763dd59ec4

NETWORK DEPOSITION SERVICES
Transcript of Barry Douglas Miles

Page 200

1    Q    Read the answer for me.

2    A    "No, a flat rate is not paid for work

3    performed on off hours.  Employees are paid their

4    hourly rate of pay for a guaranteed minimum number

5    of hours or actual hours worked, whichever is

6    greater."

7    Q    So would the minimum policy as you

8    understood it, would that be compliant with this

9    direction?

10    MS. DOUGLASS:  Objection.

11    A    No, because I'm getting paid a flat

12    rate.

13    Q    Okay.  So this memo would reflect a

14    company-wide policy, correct?

15    MS. DOUGLASS:  Objection.

16    Q    Appears to?

17    A    Well, I can't answer that.  I don't

18    know.  I don't know.

19    Q    Okay.  But you can definitely say that

20    this policy is not the way you understood the

21    policy to be?

22    A    It's not the way it was explained to me

23    to fill out this time sheet, no.

24    (Exhibit 5 Marked for Identification)

25    Q    This is Bates stamped ALD0004 through

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

5785e779-eb59-4917-9c99-bd763dd59ec4

NETWORK DEPOSITION SERVICES
Transcript of Barry Douglas Miles

Page 202

1      A      Not this particular one, but --

2      Q      Just generally?

3      A      Yeah.

4      Q      Under Policy, can you please read me the

5  first sentence.

6      A      "All non-exempt employees will be

7  compensated for all hours worked."

8      Q      Okay.  And can you flip to the second

9  page and read me the first -- the heading in the

10  first sentence of E, please?

11      A      "All non-exempt employees are required

12  to record all hours worked each day."

13      Q      And that's entitled Recording of Hours

14  and it says, "All non-exempt employees are

15  required to record all hours worked each day,"

16  correct?

17      A      Correct.

18      Q      And can you read me the last sentence.

19  You only have about five words on this page before

20  it rolls over to the next page the last -- start

21  of that sentence, please.

22      A      "Falsification of a time record, timing

23  in or out of another employee, or having another

24  employee time in or out for you is against company

25  policy and shall result in corrective action, up

5785e779-eb59-4917-9c99-bd763dd59ec4

NETWORK DEPOSITION SERVICES
Transcript of Barry Douglas Miles

1    and to including termination."

2         Q    So it seems from that that the

3    Alderwoods company policy that they wanted the

4    actual time recorded by the employees, isn't it

5    correct, that they worked?

6         MS. DOUGLASS:  Objection.

7         A    Yeah.

8         Q    And they took it so seriously that they

9    said you could be terminated if you falsified your

10   time records, correct?

11        A    Correct.

12        Q    And can you -- I'm sorry go back to the

13   document and the last -- it's the first sentence

14   of the last of the second paragraph under G,

15   please, on page 91.  It's ALD0006.

16        A    The first sentence?

17        Q    Yes, sir.

18        A    "A non-exempt employee is considered to

19   be on-call" --

20        Q    No, I'm sorry, next paragraph.

21        A    "When a non-exempt employee is required

22   to take phone calls, after completing their

23   regular work schedule and leaving the premises,

24   but is not required to physically return to work,

25   the employee shall log the start and end of each

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

5785e779-eb59-4917-9c99-bd763dd59ec4

NETWORK DEPOSITION SERVICES
Transcript of Barry Douglas Miles

Page 204

1   phone call" -- the employee will be made -- "The

2   employee will be paid for the time spent in phone

3   conversation."

4       Q    So it appears from this, that the

5   Alderwoods company policy clearly was not the same

6   as the policy that you understood it, correct?

7       MS. DOUGLASS:   Objection.

8       A    It appears that way, but again, we get

9   back to what we were told.

10      Q    I understand.  And I want to talk to you

11  more about that in a second.  I'm just trying to

12  establish what this policy, what the company

13  policy was, so we can figure out where the

14  deviation was.

15          And going to the last page on that,

16  please.  The last page, page ALD0008, can you read

17  the subheading B.

18      A    "Hourly non-exempt employees must

19  accurately record using time clock/time sheet all

20  hours of work including."

21      Q    And then five.

22      A    "Time performing work while on-call,

23  e.g. answering phone calls, removals."

24      Q    And then could you read C, please.

25      A    "Employees are responsible for ensuring

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

5785e779-eb59-4917-9c99-bd763dd59ec4

NETWORK DEPOSITION SERVICES
Transcript of Barry Douglas Miles

Page 206

1    be handled.  This is what we're doing, fifteen
2    minutes for each phone call and three hours for
3    each removal.  And I think you go back to all
4    these time sheets and that's exactly what they'll
5    reflect.
6        Q    Let's do that.  Let's go back to those
7    '06 time sheets if you don't mind.  And I
8    apologize, mine are not Bates stamped.  Can you
9    look at, if you can find 4/8/06 your after-hours
10   call log from 4/8/06.  That's the one.
11       A    Okay.
12       Q    Can you tell me what the Bates stamp
13   number on that is -- ALD9604 and the first
14   entry -- this is the after-hours call log,
15   correct?
16       A    Mm-hmm.
17       Q    And the date is 4/8/06 week ending,
18   correct?
19       A    Mm-hmm.
20       Q    And is that signature your signature
21   where it says employee signature?
22       A    Mm-hmm.
23       Q    And it's approved by whom?
24       A    Danny Gibson.
25       Q    And the first entry on here shows a

5785e779-eb59-4917-9c99-bd763dd59ec4