**TAB 25**

NETWORK DEPOSITION SERVICES
Transcript of John Peters

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DEBORAH PRISE and      )
HEATHER RADY on behalf )
of themselves and all  )
employees similarly    )
situated,              )
                       )
        Plaintiffs,    )
                       ) CIVIL ACTION
vs.                    ) NO. 06-1641
                       )
ALDERWOODS GROUP, INC., )
                       ) Judge Joy Flowers Conti
        Defendant.     )
                       )


        VOLUME I, PAGES 1 THROUGH 210, INCLUSIVE


DEPOSITION OF:  JOHN J. PETERS

        DATE:  JANUARY 15, 2009

        TIME:  10:09 A.M.

     TAKEN BY:  DEFENDANTS

     LOCATION:  NETWORK DEPOSITION SERVICES
                SUITE 2, 2000 LINGLESTOWN ROAD
                HARRISBURG, PENNSYLVANIA


Reported By:
SUSAN O'HARA MOORE, CSR, RMR, CLVS

In Association with:
NETWORK DEPOSITION SERVICES
Suite 1100 Gulf Tower
707 Grant Street
Pittsburgh, PA 15219
412.281.7908

NETWORK DEPOSITION SERVICES
Transcript of John Peters

Page 100

1        Q      Other than this lawsuit and the workmen's
2   compensation claim that you filed, have you filed
3   any other claims or complaints against
4   Alderwoods?
5        A      No.
6        Q      Okay.  During your employment with
7   Alderwoods, were you supposed to get approval in
8   order to work overtime?
9        A      Yes.
10       Q      Were you supposed to get approval before
11  you performed the overtime work?
12       A      Yes.
13       Q      And were you required to get approval for
14  every single hour of overtime that you worked?
15       A      Yes.
16       Q      And were you required to get approval to
17  work overtime for your entire period of
18  employment with Alderwoods?
19       A      Yes.
20       Q      When were you first told that you needed
21  to get approval in order to work overtime?
22       A      When I first started my employment at
23  Alderwoods.
24       Q      And who told you about the requirement
25  for approval?

91b3fc88-1028-4ea8-9920-87cd8c73d901

NETWORK DEPOSITION SERVICES
Transcript of John Peters

1        A       Mr. Reese.

2        Q       Can you describe what you were supposed

3    to do in order to get this approval?

4        A       Well, I just merely would ask my

5    supervisors, either Mr. Reese or Mr. Wilsbach or

6    Mr. Pramik.

7        Q       What were you supposed to ask them,

8    specifically?

9        A       May I work past my quitting time, which

10   would have been 5:00.  And they would want to

11   know why, and I'd tell them, and they granted it

12   to me.

13       Q       Did they grant you approval to work

14   overtime each time that you asked?

15       A       Yes.

16       Q       So you don't recall any time that you

17   asked for approval to work overtime and they

18   denied approval?

19       A       They -- towards the end of Mr. Reese's

20   employment, he was starting to -- not to abuse

21   the overtime thing.  Tried to cut back on the

22   hours, and I just merely said, you know, "I have

23   this to do; I have that to do."  I mean, it has

24   to be done.  It can't wait until tomorrow.  I

25   always had a good reason, you know.  And he

91b3fc88-1028-4ea8-9920-87cd8c73d901

NETWORK DEPOSITION SERVICES
Transcript of John Peters

1   did -- you know, then he gave me permission.  But

2   towards the end of his employment there, they

3   were cutting back on the overtime issue.

4        Q    He was trying -- let me know if I'm

5   understanding you correctly.  Mr. Reese, towards

6   the end of his employment, was trying to cut down

7   on the number of overtime hours that were being

8   worked?

9        A    Correct, yeah.

10       Q    But you don't recall a time when any of

11  your supervisors actually denied you approval to

12  work overtime?

13       A    No, they didn't deny me.  No.

14       Q    Were you required to get approval to work

15  overtime so far in advance of performing the

16  work?

17       A    No, it was like the day of.

18       Q    And what if it wasn't practical or

19  possible to speak to a supervisor the day that

20  you needed to work overtime?

21       A    Then they would have to step up to the

22  plate and do something about it.

23       Q    What do you mean?

24       A    Well --

25            MR. EHRMAN:  I'm going to object.  It's

91b3fc88-1028-4ea8-9920-87cd8c73d901

NETWORK DEPOSITION SERVICES
Transcript of John Peters

Page 104

1        A        Yes.

2        Q        And did this pre-approval procedure

3    change at all during this period of employment

4    with Alderwoods, or was it always the same

5    procedure?

6        A        It was always the same procedure, yes.

7        Q        Between your supervisors, Ted Reese, Bob

8    Pramik, and Stephen Wilsbach -- did they

9    implement the pre-approval procedure any

10   differently, or did they all handle it the same

11   way?

12       A        They handled it the same way.

13       Q        And it was your understanding that each

14   of those three individuals was authorized to give

15   you the approval that you needed.  Is that right?

16       A        Yes.

17       Q        You previously testified that there were

18   occasions when you worked overtime that you

19   believed you weren't paid for.  Is that correct?

20       A        That is correct.

21       Q        And is it true that on each of those

22   occasions, the overtime had been approved?

23       A        It was approved.

24       Q        So you don't currently claim that any of

25   the overtime that you were not paid was due to

91b3fc88-1028-4ea8-9920-87cd8c73d901

NETWORK DEPOSITION SERVICES
Transcript of John Peters

Page 105

1   the fact that the overtime hadn't been
2   pre-approved.  Is that correct?
3         A       Could you rephrase that?
4         Q       I will.  It was a confusing question.
5   So, do you currently claim that any of the
6   overtime pay that was withheld from you was
7   withheld because you failed to get the overtime
8   work pre-approved?
9         A       I always had it pre-approved.
10         Q       So you were never denied pay for overtime
11   because you had failed to get it pre-approved.
12   Is that right?
13         A       Exactly, right.
14         Q       So any other time that you worked for
15   which you were not paid, you were not paid for it
16   for some other reason.  Would that be right?
17         A       I just simply wasn't paid for the
18   overtime.
19         Q       Okay.  And no one told you why.  Is that
20   right?
21         A       No, they never told me why.  I just
22   wasn't paid.
23         Q       Did the Alderwoods' policy binders
24   address pre-approval for overtime?
25         A       Yes.

91b3fc88-1028-4ea8-9920-87cd8c73d901

NETWORK DEPOSITION SERVICES
Transcript of John Peters

Page 106

1       Q       And what did they say?  What did the
2   Alderwoods' policy say about pre-approval for
3   overtime?
4       A       It said you simply had to get
5   pre-approval to perform overtime.
6       Q       Did the policy in the binder that you're
7   thinking of go into any greater detail about how
8   to get approval?
9       A       I don't remember.  I don't remember.
10      Q       How did you personally know what the
11  procedure was?
12      A       Well, I was told.
13      Q       You know --
14      A       It was verbally -- verbally, I was told.
15      Q       So the specifics of the procedure you got
16  from your supervisors?
17      A       Mr. Reese told me from day one.  He said,
18  "If you want overtime, you've got to get
19  pre-approval."
20      Q       The approval policy in the Alderwoods'
21  policy binders -- did it address whether or not
22  employees would be paid for overtime if they
23  failed to have the overtime pre-approved?
24      A       That I don't recall.  I don't recall.
25      Q       It just said that you had to get approval

91b3fc88-1028-4ea8-9920-87cd8c73d901

NETWORK DEPOSITION SERVICES
Transcript of John Peters

Page 107

1   to work the overtime?

2        A      Yes, um-hum.

3        Q      Did anyone ever tell you that if you

4   failed to follow the policy of getting your

5   overtime approved, then you won't be paid for the

6   overtime that you actually work?

7        A      I was never really told that.

8        Q      Do you have any knowledge or information

9   about the procedure that was followed at

10  locations outside of your market for getting

11  overtime approved?

12       A      I really don't know what transpired

13  outside the market.

14       Q      Okay.  Before, when we were talking about

15  your schedule, you explained that you were

16  typically scheduled to be on call two nights a

17  week.  Is that right?

18       A      That's correct.

19       Q      And that meant that you were on call from

20  5:00 p.m. to 8:00 a.m.  Correct?

21       A      Correct.

22       Q      What exactly did it mean to be on call?

23       A      To take death calls.  5:00 they turn the

24  phones over to the answering service.  A death

25  call would come in to the answering service.  The

| Johnstown | Toll-Free | Pittsburgh |
|---|---|---|
| 814-266-2042 | 866-565-1929 | 412-281-7908 |

91b3fc88-1028-4ea8-9920-87cd8c73d901

NETWORK DEPOSITION SERVICES
Transcript of John Peters

Page 108

1   answering service would call me immediately.

2          When speaking with the answering service,

3   they would basically give me the name of the

4   deceased, next of kin, phone number, place of

5   death.  And then I would call the family just to

6   let them know that, you know, that we received --

7   it was a courtesy call, really, to reassure the

8   family that we've been notified and we'll take

9   care of everything for them and to get verbal

10  permission about embalming.

11      Q    Was there anything other than receiving

12  calls from the answering service and making the

13  courtesy call to the family that you were

14  required to do while you were on call?

15      A    There were -- you know, you just didn't

16  get phone calls because somebody died.  It was --

17  maybe we had three other calls on and maybe a

18  member of one of those three families called to

19  question and couldn't wait until the morning and

20  they would call the funeral home, which I had no

21  problem with.

22          I called them back immediately and tried

23  to answer their question and reassure them and

24  make sure everything was okay.  I just wanted to

25  keep them at ease.

91b3fc88-1028-4ea8-9920-87cd8c73d901

NETWORK DEPOSITION SERVICES
Transcript of John Peters

Page 109

1      Q    And did all of the calls that came to you

2  while you were on call come through the answering

3  service?

4      A    Correct, after 5:00.

5      Q    Were you required to perform any other

6  work while on call besides calling families and

7  answering questions?

8      A    Well, if the family did give us verbal

9  permission to do embalming, of course I would

10  make arrangements to have the body removed to our

11  funeral home, either Harrisburg or Camp Hill.

12  And once I received the human remains, then I

13  would start the embalming process.

14      Q    So to make the arrangements to have the

15  body removed, what did you actually have to do?

16      A    I called the gentleman that made removals

17  for the funeral home, and he would bring the

18  deceased to funeral home.

19      Q    And when the deceased arrived at the

20  funeral home, did you do the embalming

21  immediately then?

22      A    Yes, I did.

23      Q    Did you always do it right away, or was

24  that sometimes --

25      A    I always did it right away.

91b3fc88-1028-4ea8-9920-87cd8c73d901

NETWORK DEPOSITION SERVICES
Transcript of John Peters

1    Q    So were there some nights that you were
2  scheduled to be on call when no calls came in?
3    A    Oh, yes.  But there'd be other calls.
4  Not necessarily death calls, but there were other
5  calls that would come into the funeral home.
6    Q    Were there some nights when you were
7  scheduled to be on call when no calls at all
8  would come into the funeral home?
9    A    Oh, yes.  Very seldom, but it did happen
10 when no calls would come in.
11   Q    So occasionally when you were scheduled
12 to work on call for the night, you might not
13 actually have to perform any work?
14   A    Well, if nobody died, of course.
15   Q    And -- but then other times you would get
16 calls and would have to do work while you were
17 scheduled --
18   A    Most times.
19   Q    -- to be on call?
20   A    Um-hum.
21   Q    When you did have to perform work while
22 on call, did you keep track of the time that you
23 spent actually working?
24   A    Oh, yes, because I had to put that on my
25 time sheet.

91b3fc88-1028-4ea8-9920-87cd8c73d901

NETWORK DEPOSITION SERVICES
Transcript of John Peters

Page 114

1   you were scheduled to be on call from 5:00 p.m.
2   until 8:00 a.m.  Is that right?
3       A      Correct.
4       Q      And during the time that you were
5   scheduled to be on call, were there any
6   restrictions placed on where you could go or what
7   you could do during the hours that you were to be
8   on call?
9       A      When you were on call, you were to be --
10  how can I phrase it?  You can go out because we
11  had pagers.
12      Q      So you had to be available?
13      A      You had to be available.  You had to have
14  your pager.  And they would page you immediately
15  if they couldn't get you by phone, yeah.
16      Q      And when you were scheduled to be on
17  call, you didn't report on your time sheet 5:00
18  p.m. to 8:00 a.m.  Is that right?
19      A      I put down -- when it finally came to my
20  knowledge --
21          MR. EHRMAN:  Listen to her question.
22          THE WITNESS:  Repeat the question.
23  BY MS. DUGAN:
24      Q      When you were scheduled to work on
25  call -- let's say it's Tuesday night and you're

Johnstown                Toll-Free               Pittsburgh
814-266-2042            866-565-1929            412-281-7908

NETWORK DEPOSITION SERVICES
Transcript of John Peters

Page 115

1   scheduled to be on call on Tuesday.  Would your

2   time sheet show on Tuesday an entry for 5:00 p.m.

3   to 8:00 a.m.?

4        A     No.  I put down the hours I actually

5   worked.

6        Q     Okay.  So you would keep track of time

7   that you actually spent answering a call or doing

8   an embalming, actually responding to a call that

9   came in?

10        A     Um-hum, yes.

11        Q     But you would not report the full period

12   of hours --

13        A     No.

14        Q     -- that you were required to be

15   available.  Is that right?

16        A     No, no, I did not.

17        Q     Okay.  And did you always, throughout

18   your entire employment with Alderwoods, keep

19   track of the time that you actually spent engaged

20   in work while on call?

21        A     Yes, I always kept -- when I was on call

22   and I had to work, I put it down.

23        Q     You put it down on your time sheet?

24        A     On the time sheet.

25        Q     Okay.  Now, the hours that you put down

91b3fc88-1028-4ea8-9920-87cd8c73d901

NETWORK DEPOSITION SERVICES
Transcript of John Peters

Page 116

1    on your time sheet which reflected the actual

2    time you were engaged in work on call, were you

3    paid for those hours that you reported?

4        A     There were times that I put down -- well,

5    let me back up a little bit.  When you were on

6    call, they knew -- like Mr. Reese, Mr. Wilsbach,

7    Mr. Pramik, they knew I was on call.  And I

8    didn't have to call them at 3:00 in the morning

9    and say, "Can I embalm a body," because it was

10   understood you're on call; if there's any work,

11   that you do the work and you're supposed to be

12   paid for that.

13       Q     Okay.

14       A     Which I did.  But I wasn't always paid

15   for those hours that I worked.

16       Q     Okay.  So to break that down --

17       A     So, from receiving the death call,

18   talking to the family, making arrangements for

19   the removal and doing the embalming, you're

20   talking about roughly four to four and a half

21   hours.

22       Q     And you would report that four to four

23   and a half hours on your time sheet.  Is that

24   right?

25       A     Yes.

91b3fc88-1028-4ea8-9920-87cd8c73d901

NETWORK DEPOSITION SERVICES
Transcript of John Peters

Page 130

1  and yourself, you don't know of any other

2  employees who were told they had to get their

3  insurance license, do you?

4      A      Correct.

5      Q      You mentioned before that you spent time

6  meeting with families to discuss pre-needs.  Is

7  that right?

8      A      Correct.

9      Q      Is that something that you did throughout

10  your entire period of employment with Alderwoods?

11      A      I've done that for my entire career.

12      Q      And who scheduled these appointments with

13  families to discuss pre-needs?

14      A      Well, there was never really a schedule.

15  I mean, a pre-need occurs like that.  Family will

16  call, "Can we come in and make some

17  prearrangements?"

18      Q      When a family would call to request a

19  pre-needs appointment, who would they speak with?

20      A      A funeral director.

21      Q      And would the funeral director answering

22  the call be the funeral director who would handle

23  the appointment?

24      A      It all depended who was -- first of all,

25  who was going to be on call that night.  If the

91b3fc88-1028-4ea8-9920-87cd8c73d901

NETWORK DEPOSITION SERVICES
Transcript of John Peters

Page 131

1   family would be coming in say, 3:00, 4:00, that's
2   going to take you past 5:00.  So whoever was on
3   call that night would meet with the family.
4           Most families, you know, they would call
5   and they would like to come in right away.  Most
6   of them were during the day, though, during
7   business hours.
8       Q    Did you ever have a pre-need appointment
9   with a family that was outside of your regular
10  hours?
11      A    Yes.
12      Q    And why would that occur?
13      A    Because the family would call and they
14  would say when they wanted to come into the
15  funeral home.  And most families -- "Well, we
16  would like to come in now, if we can," and we
17  would see the family then.
18      Q    And did you keep track of the time that
19  you spent meeting with families to discuss
20  pre-approval -- excuse me.
21          Did you keep track of the time that you
22  spent meeting with families to discuss pre-needs
23  outside of your regular hours?
24      A    Yes, I kept track of that.
25      Q    Did you report that time that you kept

NETWORK DEPOSITION SERVICES
Transcript of John Peters

Page 140

1  continue your involvement in those particular

2  activities after you moved and started working

3  for Alderwoods?

4      A    No.

5      Q    Once you moved and started working for

6  Alderwoods -- which was around 2001.  Is that

7  right?

8      A    October 1, 2001, yeah.

9      Q    At that time, you -- did you join any

10  other groups besides the Good Shepherd Catholic

11  Church and the Elks Club?

12      A    Within the funeral home -- the funeral

13  home sponsored a bus trip to Indiantown Gap

14  National Cemetery, and they made the arrangements

15  but I would go on the bus trip.

16          We would take, like, widows and widowers

17  on this trip and visit their loved ones,

18  husbands/wives that are buried there.  We would

19  have different locations where we stopped, and

20  the people could get off and just pay respect to

21  their loved one's grave, place a flower,

22  whatever.  They would do this around Memorial

23  Day, Veterans Day.

24          And then also within the funeral home I

25  gave -- I think it was one or two speeches I gave

91b3fc88-1028-4ea8-9920-87cd8c73d901

NETWORK DEPOSITION SERVICES
Transcript of John Peters

Page 141

1   at a high school in the area that had career day.
2   And I would address the senior classes and talk
3   to them about if they would be interested in
4   funeral service.  And I would tell them how to
5   get started and what's required of you if you
6   want to get licensed in Pennsylvania.
7           I believe I did that twice.  And Bob
8   Pramik asked me to do that, and I did that.  That
9   was a very interesting day.
10       Q     Can you think of anything else that you
11  did in the community when you started working at
12  Alderwoods?
13       A     I don't recall.  I think that was -- that
14  was about it, yeah.
15       Q     And I think you distinguished the last
16  two things you mentioned, the high school career
17  day and the bus trip, from the others as things
18  that you did through the funeral home?
19       A     They made arrangements.  When I say
20  "arrangements," they would get a bus, charter a
21  bus for the day.  They put the ads in the Good
22  Shepherd Church bulletin about the Neill Funeral
23  Home of Camp Hill was sponsoring the bus trip to
24  Indiantown Gap.
25           As far as the high school, I really don't

91b3fc88-1028-4ea8-9920-87cd8c73d901

NETWORK DEPOSITION SERVICES
Transcript of John Peters

Page 144

1    A    Can I guess?

2    Q    If you don't know --

3    A    It was -- I believe it was 2004.  No.

4  I'm sorry.  2003, 2004.

5    Q    Okay.

6    A    Yeah.

7    Q    But you don't know for sure?

8    A    I don't know for sure.  I'm just taking

9  an educated guess there.

10    Q    Did the bus trips happen during the day?

11    A    Yes.

12    Q    And were they during your scheduled work

13  time?

14    A    Yes.

15    Q    Did you report the time that you went on

16  these bus trips on your time sheets?

17    A    Yes.

18    Q    And, to your knowledge, did Alderwoods

19  compensate you for the time that you spent on

20  these bus trips?

21    A    The first year I went on it, they did.

22  The second year they didn't, for some reason.

23  Because I remember asking my wife, "I mean,

24  that's strange.  They paid me last year.  Why

25  didn't they pay me this year?"

Johnstown                Toll-Free              Pittsburgh
814-266-2042           866-565-1929           412-281-7908

91b3fc88-1028-4ea8-9920-87cd8c73d901

NETWORK DEPOSITION SERVICES
Transcript of John Peters

Page 145

1      Q     So you recall at least one time being

2 paid for going on the trip?

3      A     Yes.  I was paid the first time.

4      Q     And then a time after that you were not

5 paid?

6      A     Correct.

7      Q     Do you know why you were not paid the

8 second time?

9      A     I have no idea.

10         MR. EHRMAN:  Just so the record is clear

11 and I'm clear, he said three or four times.

12         Did you say three or four times, John,

13 that you went on those trips?

14         THE WITNESS:  Three or four, yeah.

15         MR. EHRMAN:  We covered two.  What about

16 the third and fourth?

17         THE WITNESS:  It was twice a year.  So

18 2003, two trips; 2004, two trips.

19         MR. EHRMAN:  You said you did get paid

20 for the first.  You didn't get paid for the

21 second.  Did you get paid for the third?

22 BY MS. DUGAN:

23      Q     Or was the testimony you were paid for

24 the first year and you were not paid for the

25 second year?

NETWORK DEPOSITION SERVICES
Transcript of John Peters

Page 146

1      A      Yeah, I should have rephrased that.
2    There were two years.  There was 2003, 2004.  Two
3    trips in 2003; two trips in 2004.  2003, I was
4    paid.  Okay.  2004, the two trips, I was not
5    paid.
6      Q      And also, just to be clear, before you
7    said you weren't positive if it was in 2003 and
8    in 2004 that you went on the trips.
9      A      I'm not sure of the years, but I do know
10   I was paid the one year and I was not paid the
11   second.
12     Q      Okay.  With respect to the high school
13   career day that you attended, you believe you
14   attended the career day two different times.  Is
15   that right?
16     A      It was two years in a row.
17     Q      And was it just one visit each of those
18   two years?
19     A      Correct.
20     Q      And you don't remember specifically which
21   two years?
22     A      No, I do not.
23     Q      And I'm assuming you went during the
24   school day to talk to the students.  Is that
25   correct?

91b3fc88-1028-4ea8-9920-87cd8c73d901

NETWORK DEPOSITION SERVICES
Transcript of John Peters

1       A       Correct.

2       Q       Do you recall whether those days were --
3   strike that.

4               Did you recall whether you visited the
5   school during your regularly scheduled workday?

6       A       It was during the workday.

7       Q       Do you recall how much time you spent at
8   the school?

9       A       I don't recall.

10      Q       Do you recall whether you reported the
11  time that you spent at the school on your time
12  sheet?

13      A       To be very honest, I did put it on my
14  time sheet, but I don't recall if I was paid or
15  not.  I don't recall that.

16      Q       You put it on your time sheet both times
17  you went?

18      A       Yes, yes.

19      Q       And you don't recall either time if you
20  were paid?

21      A       I don't recall.

22      Q       Okay.  Going back to the Elks Club, which
23  you mentioned you joined, when did you decide to
24  join that organization?

25      A       Bob Pramik and I were talking because he

91b3fc88-1028-4ea8-9920-87cd8c73d901

NETWORK DEPOSITION SERVICES
Transcript of John Peters

Page 153

1   Hill Elks Club?

2         A       No.

3         Q       When did you end your membership with the

4   Elks Club?

5         A       Right after my injury.

6         Q       And why did you leave the Elks Club at

7   that time?

8         A       I was -- just came out of surgery, back

9   operation, and I just didn't feel good.  You

10  know, getting out was difficult, walking was

11  difficult.  So I just dropped the membership.

12        Q       Would you say you ended the membership

13  because you personally found it difficult --

14        A       Yeah.

15        Q       -- to continue participating?

16        A       Yes.

17        Q       And that would have been in May of 2005?

18        A       A little after.  Maybe June of 2005, in

19  through there.

20        Q       Okay.  Did anyone from Alderwoods

21  instruct you to join the Good Shepherd Catholic

22  Church?

23        A       Not really.

24        Q       I know you mentioned that Bob Pramik

25  suggested that you join the Camp Hill Elks Club.

91b3fc88-1028-4ea8-9920-87cd8c73d901

NETWORK DEPOSITION SERVICES
Transcript of John Peters

1   Did anyone else from Alderwoods suggest that you

2   join the Elks Club?

3       A      No.  But Ted Reese -- he more or less

4   suggested to me -- he didn't care what

5   organization I join, but he thought it would be

6   good for the funeral home to get active in the

7   community.  I'm a firm believer -- as you can see

8   in my resumé, I'm a firm believer in that.

9       Q      In what?

10      A      In joining local organizations in your

11  community.

12      Q      Because, generally, it's good for the

13  community to get involved in community

14  activities?

15      A      Yeah, because they give back to the

16  community what the community has given to them

17  over the years.

18      Q      And that's important to you personally?

19      A      Personally, yes.

20      Q      Did anyone from Alderwoods ever tell you

21  that you were specifically required to belong to

22  at least one outside community organization?

23      A      No, not really.

24      Q      Did you ever hear anyone else being told

25  that they had to belong to at least one outside

NETWORK DEPOSITION SERVICES
Transcript of John Peters

Page 155

1    community organization?

2            A       I really don't know.

3            Q       Did anyone from Alderwoods ever tell you

4    that you were expected to use your membership in

5    a community organization to generate business for

6    the funeral home?

7            A       They didn't really come out and say it

8    that way, but that's basically what it's all

9    about, to get out and active in the community and

10   let the people know you're a funeral director and

11   where you're a funeral director at.

12           Q       Did anyone ever specifically tell you

13   that you were specifically to generate business

14   for the funeral home?

15           A       Ted Reese talked about that.

16           Q       What did Ted Reese say?

17           A       He said it's good to get active in Camp

18   Hill to let the people know, you know, that

19   you're with the Neill Funeral Home.

20               I totally disagree with that.  If you

21   want to join an organization, it's not because of

22   business; it's because you have an interest in

23   that organization and believe and do what they

24   stand for.  It's not because -- I don't believe

25   joining something because of business.  I mean,

91b3fc88-1028-4ea8-9920-87cd8c73d901

NETWORK DEPOSITION SERVICES
Transcript of John Peters

Page 156

1   okay, it's good if you get maybe some work out of

2   it, but that's not the reason why I would join

3   something.

4        Q     And was that personally your reason for

5   joining the groups you did?

6        A     Yeah, because, like I had mentioned

7   before, I was an Elk at one time.  And I didn't

8   join all these organizations for business.

9        Q     Did Ted Reese say anything more specific

10  about what you were expected to do to promote the

11  business --

12       A     No.

13       Q     -- in your community organizations?

14       A     No, he did not.  No.

15       Q     Did the other employees you worked with

16  belong to community organizations?

17       A     Well, my wife was asked, but she didn't

18  join any organizations.

19       Q     What was -- you're talking about Sue

20  Davis.  Is that right?

21       A     Um-hum.

22       Q     What was Sue asked?

23       A     She was asked by Ted to get active in the

24  community.  She's not a joiner.  She doesn't

25  belong in all that.  Some people are; some people

91b3fc88-1028-4ea8-9920-87cd8c73d901

NETWORK DEPOSITION SERVICES
Transcript of John Peters

1  why we're talking about Sue, because she's not

2  involved in any of this.  I don't know why we're

3  bringing her name up.

4          MR. EHRMAN:  Which actually is a good

5  point.  I'll let you answer the question.

6          Why don't you rephrase or re-ask the

7  question.  Go ahead.

8  BY MS. DUGAN:

9      Q     Sue Peters was one of your co-workers at

10  Alderwoods.  Is that right?

11     A     Correct.

12     Q     Was she ever disciplined, to your

13  knowledge, for failing to join a community

14  organization?

15     A     No.

16     Q     Did the other employees that you worked

17  with besides Sue Davis belong to at least one

18  community organization?

19     A     I really don't know.

20     Q     Did anyone from Alderwoods ever say what

21  would happen if you didn't belong to at least one

22  community organization?

23     A     No, they never...

24     Q     Did anyone at Alderwoods ask you to

25  report on the various things that you did in your

91b3fc88-1028-4ea8-9920-87cd8c73d901

NETWORK DEPOSITION SERVICES
Transcript of John Peters

Page 159

1    community?

2        A    No.

3        Q    Do you know whether any other employees

4    were asked to report on their community

5    activities to Alderwoods?

6        A    No.

7        Q    Did you ever report any of the time that

8    you spent involved on community activities on

9    your time sheets at work?

10       A    No.

11       Q    Did anyone give you any instruction one

12   way or the other as to whether you should report

13   time spent in community activities on your time

14   sheets?

15       A    It was on your own time.

16       Q    When you were doing these various things

17   in the community, was anyone from Alderwoods

18   present?

19       A    At the Elks Club, Bob Pramik would be

20   there.

21       Q    Some of the time?

22       A    Some of the time.

23       Q    Was Bob Pramik always with you every time

24   you were doing something with the Elks Club?

25       A    No.

91b3fc88-1028-4ea8-9920-87cd8c73d901

NETWORK DEPOSITION SERVICES
Transcript of John Peters

1     Q    And what about the other activities? Was

2    someone from Alderwoods present when you were

3    engaged in other community activities?

4     A    No, I don't recall.

5     Q    Did Alderwoods ever offer you any sort of

6    incentive for getting involved in the community?

7     A    No.

8     Q    Have you ever heard of a program called

9    "I Believe in Service," or IBIS, I-B-I-S?

10     A    I heard it just the other day somewhere.

11    I never heard of such an organization.

12     Q    You never heard of that during your

13    employment with Alderwoods. Is that right?

14     A    No.

15     Q    Did you personally keep any records of

16    the amount of time that you spent involved in the

17    Good Shepherd Catholic Church?

18     A    No, I never kept records.

19     Q    Did you ever keep records of the time

20    that you spent involved in the Elks Club?

21     A    No.

22     Q    So do you know, for example, how many

23    hours you spent working on fundraisers for the

24    Good Shepherd Catholic Church?

25     A    How many? I have no idea how many hours.

91b3fc88-1028-4ea8-9920-87cd8c73d901

NETWORK DEPOSITION SERVICES
Transcript of John Peters

Page 162

1  look back at Exhibit Number 5.  It was this

2  earnings statement that we had looked at.  And we

3  talked about how you had a regular rate of pay of

4  $15 at the time of this statement.  Is that

5  right?

6      A      Correct.

7      Q      And then you had a different overtime

8  rate.  Do you see that?

9      A      Correct.

10     Q      Your overtime rate at this time was

11  $22.50.  Is that right?

12     A      That's what it says.

13     Q      So this overtime rate was higher than

14  your regular rate.  Is that right?

15     A      That's what it says.

16     Q      Now, do you currently claim that

17  Alderwoods did not correctly calculate your

18  overtime rate of pay?

19     A      They just -- it's very simple math here.

20  I put in for overtime many times, and I was not

21  paid for overtime many times.  Yes, I was given

22  overtime, as you can see on this statement here;

23  but there were many times I was not paid for

24  overtime.

25     Q      On the occasions when you were paid for

NETWORK DEPOSITION SERVICES
Transcript of John Peters

Page 163

1    some overtime, do you have any complaint about

2    the rate of pay you received for those overtime

3    hours?

4         A      When they paid me for overtime, no, I

5    didn't complain then.  No.  Something they should

6    have been doing right along.

7              (Peters Deposition Exhibit No. 9 was

8    marked.)

9    BY MS. DUGAN:

10        Q      Exhibit 9 is an information sheet.  Have

11   you seen this document before?

12            MR. EHRMAN:  Mr. Peters?

13            THE WITNESS:  Yes, I've seen this.

14   BY MS. DUGAN:

15        Q      Is this your signature on the bottom of

16   this document?

17        A      Correct.

18        Q      Ant did you fill out the rest of the

19   information on this?

20        A      No.

21        Q      Did you fill out any of the other

22   information besides your signature?

23        A      No.

24            MR. EHRMAN:  Well, the print and the

25   date.

91b3fc88-1028-4ea8-9920-87cd8c73d901

NETWORK DEPOSITION SERVICES
Transcript of John Peters

1        THE WITNESS:  The bottom part is what I
2   wrote.  This from here up, I did not write.
3   These are not my Xs.
4   BY MS. DUGAN:
5        Q     Do you know whose Xs appear on this
6   document?
7        A     I have no idea.
8        Q     Were those Xs on this document at the
9   time that you signed it?
10       A     I don't recall.
11       Q     Did you fill out the name and address
12  information at the top of this document?
13       A     No.  This is not my handwriting.  And
14  they had Neill spelled wrong.  It's N-e-i-l-l,
15  not N-e-i-l.
16       Q     Do you recall if any of the name and
17  address information was filled out at the time
18  that you signed this information sheet?
19       A     No.
20       MR. EHRMAN:  Asked and answered.
21       MS. DUGAN:  I'm sorry.  I thought
22  previously I had asked just about the checkmarks
23  in the blocks.
24       Q     Just to make sure we're clear, at the
25  time you signed this document, were these boxes

NETWORK DEPOSITION SERVICES
Transcript of John Peters

Page 165

1    checked off as they are now?

2        A     I don't recall.

3        Q     And at the time that you signed this

4    document, was the name and address information at

5    the top of the sheet filled out?

6        A     I don't recall.

7        Q     If you would look at paragraph E -- it's

8    the last paragraph on the document.  It states --

9        A     I need to get my eyes on here.  All

10   right.

11       Q     It states, "I believe I received

12   compensation in addition to my hourly rate, such

13   as bonuses, commissions, and other forms of

14   additional pay that Alderwoods did not include

15   when calculating overtime due to me."

16            Now, I'd like to break that statement

17   down.  We already talked a little bit about

18   bonuses and commissions that you may have

19   received during your employment with Alderwoods.

20            MR. EHRMAN:  He said he didn't receive

21   any commissions.  I don't know what you meant

22   when you asked the question.

23            MS. DUGAN:  We'll clarify that.

24       Q     You recall receiving a bonus in 2002 from

25   Alderwoods.  Is that right?

91b3fc88-1028-4ea8-9920-87cd8c73d901

NETWORK DEPOSITION SERVICES
Transcript of John Peters

Page 166

1      A      Correct.

2      Q      And you don't recall receiving any other

3   bonuses.  Is that right?

4      A      I did not receive any other.

5      Q      And you testified that you didn't receive

6   any commissions during your employment with

7   Alderwoods.

8      A      Correct.

9      Q      So, do you -- as you sit here today, do

10  you currently claim that you received

11  compensation in addition to your hourly rate such

12  as bonuses, commissions, and other forms of

13  additional pay?

14     A      No, I did not.

15     Q      So, do you have any claim with respect to

16  whether Alderwoods included those amounts when

17  calculating your overtime due?

18     A      Could you rephrase that question?  This

19  is very misleading.

20          MR. EHRMAN:  What's misleading?

21          THE WITNESS:  This E -- letter E here.

22  BY MS. DUGAN:

23     Q      As you take your time and look at it,

24  sitting here today, do you believe that paragraph

25  E applies to you, Mr. Peters?

Johnstown              Toll-Free              Pittsburgh
814-266-2042          866-565-1929          412-281-7908

91b3fc88-1028-4ea8-9920-87cd8c73d901

NETWORK DEPOSITION SERVICES
Transcript of John Peters

Page 167

1    A    I didn't receive any commissions.  I
2  didn't receive any additional pay.  Occasionally,
3  I did get the overtime.  I received one bonus.
4    Q    So, to your knowledge, does paragraph E
5  apply to you?
6        MR. EHRMAN:  I'm going to object to the
7  extent that I don't understand E myself.  I just
8  want that noted on the record.  It's unclear to
9  me what they're actually saying here.  I'll let
10  the witness answer the question with that
11  objection.
12        THE WITNESS:  I don't understand this
13  question.  I've given you the answer to this.
14  And I did not check this off.
15  BY MS. DUGAN:
16    Q    Okay.  If you look up to paragraph C, it
17  states, "I believe that, as part of my job duties
18  for Alderwoods, I spent time training for and
19  taking a test to become a licensed insurance
20  agent..."
21        Previously you testified that you never
22  took a test to become a licensed insurance agent.
23  Is that correct?
24    A    I didn't take the test.  That's correct.
25    Q    It goes on to say, "...and time

91b3fc88-1028-4ea8-9920-87cd8c73d901

NETWORK DEPOSITION SERVICES
Transcript of John Peters

1    maintaining that license."

2           You never spent time maintaining the

3    license.  Is that correct?

4        A     I never received the license.

5        Q     So is it correct to say that you did not

6    spend time maintaining an insurance license?

7        A     Correct.

8        Q     So, do you agree that paragraph C does

9    not apply to you?

10       A     Correct.

11       Q     If you could please look back to

12   Exhibit 5, your earnings statement.

13       A     5?

14       Q     Yes, it's the earnings statement.  The

15   pay stub.

16          MR. EHRMAN:  Here.  You can look at mine,

17   if you'd like.

18          THE WITNESS:  Too many papers here.

19          All right.

20   BY MS. DUGAN:

21       Q     You have it in front of you there.  Under

22   "Earnings," do you see the entry several lines

23   down that says, "OT Adj"?

24       A     Yes.

25       Q     Do you know what that stands for?

91b3fc88-1028-4ea8-9920-87cd8c73d901

NETWORK DEPOSITION SERVICES
Transcript of John Peters

Page 169

1      A      I have no idea.

2      Q      Do you see under the year-to-date column

3  it shows that under that entry you received

4  $163.22?

5      A      That's what it says.

6      Q      Do you have any idea what that payment is

7  for?

8      A      No.

9      Q      Did you ever talk to any other employees

10 about an OT Adj, or adjustment perhaps?

11     A      I might have.  I don't recall.

12     Q      Do you know whether any other employees

13 received a payment under that heading OT Adj?

14     A      I don't recall.

15     Q      During the workday, Mr. Peters, did you

16 sometimes get a meal break?

17     A      You were -- you would get lunch without

18 pay.

19     Q      Did that lunch last for a certain period

20 of time?

21     A      An hour.

22     Q      Was it always one hour?

23     A      Yes.

24     Q      And were there some days when you were

25 busy and weren't able to take a one-hour lunch

91b3fc88-1028-4ea8-9920-87cd8c73d901

1
2                         CERTIFICATE
3        I, SUSAN O'HARA MOORE, RMR, CSR, a notary public
4   in and for the State of Pennsylvania, do hereby
5   certify that the foregoing transcript is a true and
6   correct of the proceedings therein.
7
8
9
10                          Susan O'Hara Moore
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

                                                            4