Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DEBORAH PRISE and        )
HEATHER RADY on behalf   )
of themselves and all    )
employees similarly      )
situated,                )
                         )
          Plaintiffs,    )
                         ) CIVIL ACTION
vs.                      ) NO. 06-1641
                         )
ALDERWOODS GROUP, INC.,  )
                         ) Judge Joy Flowers Conti
          Defendant.     )
                         )


VIDEOTAPED
DEPOSITION OF:  ROBERT J. PRAMIK

          DATE:  OCTOBER 16, 2008

          TIME:  9:54 A.M.

      TAKEN BY:  PLAINTIFFS

      LOCATION:  HOLIDAY INN EXPRESS
                 5680 ALLENTOWN BOULEVARD
                 HARRISBURG, PENNSYLVANIA




Reported By:
SUSAN O'HARA MOORE, CSR, RMR, CLVS

In Association with:
NETWORK DEPOSITION SERVICES
Suite 1100 Gulf Tower
707 Grant Street
Pittsburgh, PA 15219
412.281.7908

2cd53174-4031-4f60-920e-06c6923416c4

NETWORK DEPOSITION SERVICES
Transcript of Robert Pramik

Page 162

1      A      Not by me.

2             MS. GIFFORD:   Object to form.

3    BY MR. DeJULIUS:

4      Q      Was anything ever done to them, to your

5    knowledge, by anyone else within Alderwoods?

6      A      Not that I'm aware of, no.

7      Q      Okay.

8      A      I think, however, it was put in their

9    employee record for their evaluation.

10     Q      And do you know whether -- do you have

11   personal knowledge as to whether -- the fact that

12   they did not have an insurance license was ever

13   considered in their evaluation?

14     A      When you say, "considered," you mean for

15   a promotion or a raise?

16     Q      At any time.

17     A      I -- I don't know if it weighed out to

18   that point or not, but it was definitely made

19   part of the record.

20     Q      When Ted Reese informed the staff that

21   funeral directors had to become insurance

22   agents --

23     A      Um-hum.

24     Q      -- did he tell you where he got that

25   policy?

2cd53174-4031-4f60-920e-06c6923416c4

NETWORK DEPOSITION SERVICES
Transcript of Robert Pramik

Page 171

1    paid -- passed or not passed?

2         A     One time.

3         Q     One time.

4         A     Correct.

5         Q     It states that employees study -- were

6    required to study on their own time.  Did

7    employees ever study during business hours?

8         A     I'd have to answer that, if there was

9    time allowed, yeah.  They were allowed to.

10   Whether they did or not, I don't know.  I never

11   stopped them from studying during their own

12   business hours.

13        Q     Okay.  So that --

14        A     That's a fair way to answer that.  I

15   never prohibited them from studying for their

16   exam during business hours.

17        Q     Do you know whether there was a policy

18   that prohibited employees from studying during

19   business hours?

20        A     No, no.

21        Q     Did employees actually study during

22   business hours for the insurance exam?

23        A     I think a couple of them did if time

24   permitted.  And, as busy as we were, time wasn't

25   very permissible there.

2cd53174-4031-4f60-920e-06c6923416c...

NETWORK DEPOSITION SERVICES
Transcript of Robert Pramik

Page 182

1    Q    Did anyone besides Mr. Amato, while you
2  were MGM, tell you that hours spent pursuing an
3  insurance license were not compensable?
4    A    Did anybody other than George Amato tell
5  me that?
6    Q    Correct.
7    A    No.
8    Q    Okay.  And you have no idea how markets
9  outside of the Harrisburg market paid -- actually
10  paid employees who were pursuing an insurance
11  license.  Correct?
12    A    I'm pretty sure George also said we don't
13  do that in any of our markets -- in his markets.
14    Q    Okay.
15    A    In his region.
16    Q    But you have no actual knowledge as to
17  what the actual practice was?
18    A    No, other than what he said.
19    Q    Okay.  Did you ever see a written policy
20  that provided when funeral directors would be
21  paid for pursuing an insurance license?
22    A    Again, without the policy manual and my
23  bulletin binder, I can't answer that.  Not to my
24  recollection, without seeing that binder.
25    Q    Okay.  Did you ever undergo any training

2cd53174-4031-4f60-920e-06c6923416c4

NETWORK DEPOSITION SERVICES
Transcript of Robert Pramik

1    an MGM because I wasn't privy to those memos.
2    Those memos were privy to MGM.
3         Q     And who -- who was the memo from?
4         A     Ted.
5         Q     Is there a -- anywhere besides a written
6    memo from Ted that states written policy?
7         A     Without my binders and thing in front of
8    me, I can't answer that honestly.  I -- I -- I
9    really can't.  Without seeing it and being able
10   to go to a page or a contents, I can't tell you.
11        Q     And all I'm asking for is your
12   recollection if you recall seeing --
13        A     I don't recall.
14        Q     -- a written policy --
15        A     I don't recall.
16        Q     -- other than the one from Ted?
17        A     Yes.  I'm sorry.  I don't recall.
18        Q     After you became MGM, did you ever
19   discuss with your supervisors -- scratch that.
20        A     Give me a paper.  I'll scratch it for
21   you.
22              Sorry.
23        Q     This policy of not paying individuals for
24   overtime that was not pre-approved, did it apply
25   to funeral directors or did it apply more

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

NETWORK DEPOSITION SERVICES
Transcript of Robert Pramik

Page 189

1    to get my butt reamed out."
2         And I think the one individual, again,
3    was John Peters.  He just worked it and then
4    expected me to pay him on it, and I -- and I
5    called him on it and said "I'm not paying you.
6    You gotta learn."
7         Q    And was that -- that the only occasion
8    that you can recall?
9         A    That I can.
10        Q    And you have no knowledge outside of your
11   market as to whether other MGMs were as lenient
12   as you were.  Correct?
13        A    That's correct.
14        Q    And you have no way of knowing how those
15   other MGMs actually enforced the policy.
16   Correct?
17        A    I can tell you that Ted wasn't lenient.
18   If he didn't give you the okay, you didn't get
19   paid, period.
20        Q    I'm talking outside your market.
21        A    No.
22        Q    You have no idea?
23        A    I have no idea.
24        Q    Now, employees were -- just to try again
25   to figure out the context.  You said you didn't

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

2cd53174-4031-4f60-920e-06c6923416c4

NETWORK DEPOSITION SERVICES
Transcript of Robert Pramik

Page 199

1        THE WITNESS:  Okay.

2    BY MR. DeJULIUS:

3        Q      Actually, it's paragraph 6, I guess.  And

4    you mentioned earlier that -- well, let me

5    read -- let me read paragraph 6, and then I'll

6    ask you some questions.

7            "Moreover, it is my understanding that

8    the written policy on pre-approval for overtime

9    policy the Alderwoods maintained in its" -- it

10   now says -- "written notice did not limit the

11   policy to a subset of hourly employees or to

12   certain job titles.  Instead, that written policy

13   applied to all hourly employees."  Do you see

14   that?

15       A      Yes.

16       Q      Why did you cross out "Policy and

17   Procedures Binder" and write "written notice"?

18       A      Because I don't have privy to the policy

19   and procedure binder.  And since I left in March

20   of '05, it's been a long time.  And I can't -- I

21   couldn't honestly state that it was in there

22   without physically seeing that policy and

23   procedure binder.

24           So, in effect, I didn't want to -- I

25   didn't want to put a false statement down.  So,

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

2cd53174-4031-4f60-920e-06c6923416c4

NETWORK DEPOSITION SERVICES
Transcript of Robert Pramik

Page 200

1    is it in there?  It could be.

2         Q     Okay.

3         A     Without having privy to that, I don't

4    know if it's in there or not.

5         Q     Okay.  Let's go to the next exhibit.

6         A     Are we done with this one?

7         Q     For now.  We're going to ask you a couple

8    more questions on some of these other exhibits.

9         A     You're going to make me -- make me do

10   some research here, huh.

11             (Defendant's Deposition Exhibit No. 7 was

12   marked.)

13   BY MR. DeJULIUS:

14        Q     I'm handing you what's been marked as

15   Defendant's Exhibit 7.  This, again, if you -- is

16   your affirmation that you filed in April of 2008.

17             If you could again turn to the last page

18   of this document in paragraph -- page 4.  And is

19   that your signature on the bottom of this

20   affirmation?

21        A     Yes, it is.

22        Q     And this affirmation, to the best of your

23   knowledge, was accurate when you signed it?

24        A     Yes.

25        Q     To the best of your knowledge, is it

2cd53174-4031-4f60-920e-06c6923416c4

NETWORK DEPOSITION SERVICES
Transcript of Robert Pramik

Page 205

1           THE WITNESS:  Other than his telling us
2      at our round-table discussion or -- or -- or --
3      or our employee meeting that he just got off the
4      phone with HR and we have to give these lunch
5      breaks.
6      BY MR. DeJULIUS:
7           Q      Right.  And my question's a little bit
8      different.
9           A      Okay.
10          Q      My question is -- and you just said it's
11     policy because it came from my -- my boss.
12          A      Correct.
13          Q      And the policy, as I understand it, is
14     "I'm going to mark a lunch period down.
15     Regardless of whether you work it or not, I'm
16     going to dock your pay."
17          A      Yes.
18          Q      That was Mr. Reese's policy?
19          MS. GIFFORD:  Object to form.
20          THE WITNESS:  Yes.
21     BY MR. DeJULIUS:
22          Q      And the question that I have is:  Did
23     Mr. Reese get that policy -- ever tell you that
24     he got that policy from somebody else?
25          MS. GIFFORD:  Object to form.

2cd53174-4031-4f60-920e-06c6923416c...

NETWORK DEPOSITION SERVICES
Transcript of Robert Pramik

Page 206

1           THE WITNESS:  Again, just that he
2    verbalized to us he just got notification from
3    HR.
4    BY MR. DeJULIUS:
5        Q    But the -- the notification from HR was
6    that employees must get lunch breaks?
7        A    Yes.
8        Q    The verbalization from HR, as you
9    understood it, was not "Dock your employees a
10   half hour and not pay them."
11          MS. GIFFORD:  Object to form.
12          THE WITNESS:  I -- I -- I don't know.  I
13   don't know what the conversation was between --
14   only what he reiterated to us.  I don't know if
15   HR said, "Dock them whether they take it or not."
16   I don't know that for a fact.
17   BY MR. DeJULIUS:
18       Q    Okay.
19       A    And I don't know that it didn't happen
20   either, in all fairness.
21       Q    That's fair.  You weren't -- you weren't
22   there.
23       A    Right.
24       Q    Is there any other indication that
25   Mr. Reese gave you that this policy extended

2cd53174-4031-4f60-920e-06c6923416c4

NETWORK DEPOSITION SERVICES
Transcript of Robert Pramik

Page 207

1    beyond his own policy?
2         MS. GIFFORD:  Object to form.
3         THE WITNESS:  I can't answer that,
4    honestly, but I can give you an objective opinion
5    because when he was -- it was from a conference
6    call with his boss that this HR thing came about.
7    So one can assume that.  But when you assume, you
8    know how that goes.
9    BY MR. DeJULIUS:
10        Q      Right.  And I'm not asking -- I don't
11   want you to assume or speculate.  I'm asking you
12   about your own personal knowledge.
13        Did -- other than Mr. Reese, did anybody
14   from Alderwoods, any management, senior
15   management, someone above you, tell you not to
16   pay employees for their lunch break?
17        A      No.
18        Q      When you were MGM, did you pay employees
19   for their lunch break?
20        MS. GIFFORD:  Object to form.
21   BY MR. DeJULIUS:
22        Q      Let me rephrase it because it's -- it's
23   not clear when I say -- say, "lunch break."
24        A      That's -- that's too general.
25        Q      When you were MGM, did you dock somebody

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

2cd53174-4031-4f60-920e-06c6923416c

NETWORK DEPOSITION SERVICES
Transcript of Robert Pramik

Page 208

1  a lunch break, not pay them for a certain time,

2  even though they worked that time, in order to

3  make it appear as if they had lunch?

4      A    I did not dock their pay, no.

5      Q    Did anybody within your market have their

6  pay docked --

7          MS. GIFFORD:  Object to form.

8  BY MR. DeJULIUS:

9      Q    -- for a lunch period that they didn't

10  take?

11     A    I'm not -- I don't know what their

12  procedures were.  I can tell you about my market.

13     Q    And I asked about your market, within

14  your market.

15     A    Oh, I'm sorry.  I thought you said in the

16  other -- the other markets.  I'm sorry.  Can you

17  ask me again?

18     Q    Well, I asked you the first time whether

19  you had docked anybody's pay.

20     A    I did not.

21     Q    And the second question is:  Did anybody

22  in your pay have -- anybody in your market have

23  their pay docked for not taking a lunch break?

24     A    No.

25         MS. GIFFORD:  Object to form.

2cd53174-4031-4f60-920e-06c6923416c4

NETWORK DEPOSITION SERVICES
Transcript of Robert Pramik

Page 209

1           THE WITNESS:  No.

2   BY MR. DeJULIUS:

3       Q      Okay.  And then the third question --

4       A      Under my realm.

5       Q      Under your realm.

6           The third question is do you -- are you

7   aware of whether employees outside of your market

8   actually were not paid for a lunch break when

9   they worked through it?

10          MS. GIFFORD:  Object to form.

11          THE WITNESS:  I can tell you that that

12  same -- same conversation from HR was addressed

13  to them.  How they responded to that, I can't

14  answer that.

15  BY MR. DeJULIUS:

16      Q      Well, you actually don't -- you weren't

17  actually on that phone call with HR.  Correct?

18      A      No.  But I know it came from a conference

19  call with him and the other MGMs.

20      Q      Because Ted told you?

21      A      Correct.

22      Q      Okay.  Let me ask you this:  The --

23  the -- the procedure, again, as far as employees

24  under your watch, when you were MGM, an employee

25  didn't have a lunch break, and so they -- they --

2cd53174-4031-4f60-920e-06c6923416c4

NETWORK DEPOSITION SERVICES
Transcript of Robert Pramik

Page 210

1    at the end of the week, you'd get a time sheet

2    that says 8:00 a.m. to 5:00 p.m., no lunch break

3    was in there.  What did you do, a general sense?

4         A    I paid them.

5         Q    You just paid them the -- the whole

6    nine hours?

7         A    Yeah.

8         Q    Did anybody --

9         A    I -- I -- I need to interject something

10   there, though.  I tried, because as my job

11   title -- I did not have to work funerals or

12   viewings or embalm bodies.

13        But, as a man and as a conscientious

14   person, I used to try to fill in for them when a

15   viewing or a funeral was going on and say, "Go

16   get something to eat quick.  I'll cover for you."

17        Ted never did that.  Ted just docked your

18   pay.  So they sort of got some sort of a lunch

19   break out of the deal, but I did not dock them if

20   they didn't take it.

21        Q    Okay.  And did any supervisor ever tell

22   you, you need to dock their pay?

23        MS. GIFFORD:  Object to form.

24        THE WITNESS:  No, not directly.

25   ///

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

2cd53174-4031-4f60-920e-06c6923416c4

NETWORK DEPOSITION SERVICES
Transcript of Robert Pramik

Page 211

1   BY MR. DeJULIUS:

2       Q       How -- how did they tell you indirectly?

3       A       Constantly was on my case about wages.

4   "Man, you guys are paying too much out.  You're

5   killing us.  You're killing us.  I'm being

6   hammered from up above.  Your guys have too many

7   hours in."

8       Q       And that's too many hours of overtime?

9       A       Overtime.  And, you know, I guess with --

10  without getting a lunch break, it increased the

11  hours.

12      Q       Okay.  And in those conversations, did

13  they ever tell you, "Cut back on the overtime by

14  cutting their lunch break," you know, making

15  them --

16      A       No, they'd cut back in overtime.  They

17  didn't say use the lunch break, no.

18      Q       Okay.  Was this policy that Mr. Reese

19  had -- did it apply to funeral directors, or did

20  it apply more broadly?

21          MS. GIFFORD:  Object to form.

22          THE WITNESS:  More broadly.

23  BY MR. DeJULIUS:

24      Q       Who did it apply to?

25      A       Any -- any full-time employee.

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

2cd53174-4031-4f60-920e-06c6923416c4

NETWORK DEPOSITION SERVICES
Transcript of Robert Pramik

Page 212

1      Q      Were the -- were the other hourly
2  employees -- when I say "other" -- were the
3  non-funeral director hourly employees able to get
4  lunch on a regular basis?
5      A      Yes.
6      Q      And it varied from week-to-week to
7  day-to-day whether individuals could get a lunch
8  break.  Is that correct?
9      A      Do you mean the -- the funeral directors?
10      Q      Funeral directors and non-funeral
11  directors.
12      A      The non-funeral directors always got
13  their lunch.  The -- the funeral directors --
14  and, again, I'm sorry.  What was it?
15      Q      Two questions.  Let me -- let me start
16  over again.
17          You said this policy applied to all
18  hourly employees.
19      A      Yes.
20      Q      But then you just stated -- correct me if
21  I'm wrong -- that non-funeral directors always
22  got their lunch break.
23      A      Yes.
24      Q      So the policy applied to them, but, in
25  effect, it was never applied to them because they

NETWORK DEPOSITION SERVICES
Transcript of Robert Pramik

Page 215

1    Q    And were certain locations busier than
2    other locations?
3    A    Yes, because, again, the Harrisburg side
4    of my market, we shared the responsibility of
5    three different funeral homes.  Where the Paoli,
6    they were just responsible for their location.
7    So they had an opportunity to be different than
8    what we did.
9    Q    Okay.  Did you ever see a written policy
10   regarding payment of employees during lunch
11   breaks?
12        MS. GIFFORD:  Object to form.
13        THE WITNESS:  From?
14   BY MR. DeJULIUS:
15   Q    From anyone.
16   A    Again, I can't -- I can't swear on a
17   bible.  But anything that Ted verbalized,
18   99.9 percent of the time, we were followed up by
19   a written memo from him.
20        And, again, I do not have privy to those
21   records.  So I can't respond to them without
22   being in front of me.
23   Q    That's okay.  I'm asking for your own
24   recollection, whether you can recall.  Other than
25   the memo that perhaps Ted had sent out, do you

2cd53174-4031-4f60-920e-06c6923416c4

NETWORK DEPOSITION SERVICES
Transcript of Robert Pramik

Page 216

1   recall any other instances where this written

2   policy --

3        A    I don't recall.  That doesn't mean that

4   there wasn't one.  I don't recall.

5        Q    That's all I'm asking --

6        A    Okay.

7        Q    -- for.  Again, I -- I -- you can't --

8   I'm just asking for your own recollection and

9   your own knowledge.

10       Did you ever undergo training with

11  respect to the policy regarding Alderwoods

12  payment of individuals during lunch breaks?

13       A    No.

14       MS. GIFFORD:  Object to form.

15  BY MR. DeJULIUS:

16       Q    To your -- did the policy ever change

17  while you were at Alderwoods?

18       MS. GIFFORD:  Object to form.

19       THE WITNESS:  Meaning the lunch breaks?

20  BY MR. DeJULIUS:

21       Q    Yes.

22       A    Yes, because prior to Ted bringing that

23  to our attention, we didn't get docked pay.

24       Q    Okay.

25       A    After Ted brought it to our attention, we

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

2cd53174-4031-4f60-920e-06c6923416c4

NETWORK DEPOSITION SERVICES
Transcript of Robert Pramik

Page 222

1  business hours?

2          MS. GIFFORD:  Object to form.

3          THE WITNESS:  I answered that earlier

4  when we -- when I tried to approach for my own

5  self, "Why am I not getting paid for the time I'm

6  taking to study these things?"  And I was told

7  that "It's our company policy.  We don't pay you

8  for anything off -- off the clock."

9  BY MR. DeJULIUS:

10      Q      And that was with reference to the

11  insurance license?

12      A      That is -- that is correct.

13      Q      And was that in reference to continuing

14  education for the insurance license?

15      A      That is also correct.

16      Q      Did you ever talk to any management about

17  paying somebody for funeral director continuing

18  education?

19      A      No, because that happened after I left.

20      Q      Okay.  So you don't know what the company

21  policy at any point was regarding funeral

22  director continuing education?

23      A      That is correct.

24          MS. GIFFORD:  Object to form.

25  ///

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

2cd53174-4031-4f60-920e-06c6923416c4

NETWORK DEPOSITION SERVICES
Transcript of Robert Pramik

Page 227

1   them overtime for those meetings, or to have
2   those meetings..."
3   BY MR. DeJULIUS:
4       Q       Earlier during the day.
5       A       Well, yeah.  And that -- that was my
6   argument to him.  "How can I?  I got three
7   funerals going on.  You know, there's no way we
8   can have that meeting.  You wanted it done, it's
9   done."
10          And, again, "I'll let it go this time.
11  Never again."
12      Q       If you can listen to the question.  The
13  question is:  Did George -- and I'll rephrase it
14  a little bit because --
15      A       Okay.
16      Q       -- that one wasn't a good question.
17          Did George ever tell you, "Do not pay
18  employees overtime if you keep them there for a
19  meeting that took them -- took longer than you
20  thought"?
21      A       Yes.
22          MS. GIFFORD:  Object to form.
23  BY MR. DeJULIUS:
24      Q       And that's from that conversation that
25  you just told me?

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

2cd53174-4031-4f60-920e-06c6923416c4

NETWORK DEPOSITION SERVICES
Transcript of Robert Pramik

Page 228

1      A      Absolutely.

2      Q      He's used words, "Do not pay your

3   employees for this time"?

4      A      Sometimes stronger words than that, but,

5   yes.

6      Q      Okay.  I mean, the way you were telling

7   me, you were telling me, you know, he said, "Have

8   have the meetings earlier in the day."

9      A      Um-hum.  Yes, I did say that.  But I also

10  added that, "I'll let it go this time, but never

11  have them again where there's overtime involved."

12     Q      Okay.  Did he say anything beyond those

13  words?

14     A      Again, I don't know word-for-word.  I'm

15  paraphrasing.

16     Q      Which is fine.  But that general --

17     A      He said --

18     Q      That general sentiment --

19     A      Yes.

20     Q      -- is correct?

21     A      Yes.

22     Q      And he didn't say anything beyond those?

23     A      Not that I recall.

24     Q      Okay.  That's fine.

25         I'm trying to see how much I can cut out

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

2cd53174-4031-4f60-920e-06c6923416c4

NETWORK DEPOSITION SERVICES
Transcript of Robert Pramik

Page 262

1      MS. GIFFORD:  Object to form.
2      THE WITNESS:  I mean, yeah.  That's how
3  we paid overtime, based on our hourly wage.
4  That's how we submitted it.
5  BY MR. DeJULIUS:
6      Q    Okay.  And when did you become aware of
7  that policy?
8      MS. GIFFORD:  Object to form.
9      THE WITNESS:  Well, I'm still not sure I
10  am aware.  So what you're saying is they should
11  have included that in my overtime wage?
12  BY MR. DeJULIUS:
13      Q    No one is making any conclusions as to
14  any of that.  I'm just asking you about the
15  policy that's referenced here, if there was a
16  policy.
17      A    I am not -- again, if -- if I don't have
18  that procedure manual in front of me and all my
19  memos, I can't answer your question.
20      To the best of my knowledge and belief, I
21  never understood it.  I always thought it was
22  time and a half of your hourly wage.
23      Q    Okay.  And you don't know how overtime
24  was calculated outside your market?
25      A    I do not.

2cd53174-4031-4f60-920e-06c6923416c4

NETWORK DEPOSITION SERVICES
Transcript of Robert Pramik

Page 273

1    had overtime hours.  So this to me -- this memo

2    is interpreted as one of his many threats as

3    like, "Get those overtime hours down.  We need to

4    work on it."

5        Q    Okay.  So at no time -- and let me ask

6    you a question.  At any time did you have a

7    general pre-approved amount of overtime that you

8    could have --

9        A    No.

10       Q    -- in a week?

11       A    No, every hour of overtime had to be

12   pre-approved.  There was no, "I'll give you

13   three."  Anything over and above, huh-uh.  Every

14   hour.

15       Q    Was there anything -- was there any

16   guaranteed overtime?

17       A    No.  It's almost funny.

18            I can tell you this as an MGM.  The

19   overtime was budgeted.

20       Q    How so?

21       A    When you made your budget, you had

22   overtime hours in there.

23       Q    And -- but those overtime hours, in order

24   to take advantage of them, had to be

25   pre-approved.  Is that correct?

2cd53174-4031-4f60-920e-06c6923416c4

NETWORK DEPOSITION SERVICES
Transcript of Robert Pramik

1    I'd say, "Just do it.  Mark it down.  As

2  long as I know what you're doing, I'll approve

3  it."

4  BY MR. DeJULIUS:

5    Q    But the question is:  Did you follow the

6  policy of not paying individuals overtime unless

7  you pre-approved it?

8    MS. GIFFORD:  Objection.

9    THE WITNESS:  I got what -- I got what

10  you're saying now.  Otherwise, if they didn't

11  call me and they did it, would I approve it.  No.

12    And if they had legitimate reason like,

13  for instance, Ted's rule was:  I don't care if

14  you're in the middle of meeting a family and

15  you're approaching your overtime, you excuse

16  yourself from that family and come in and tell

17  me.

18    My approach was:  If you're in the middle

19  of family and you excuse yourself to call me to

20  get permission for overtime, I'm going to kick

21  your butt.  Serve that family.  Call me

22  afterwards and let me know what's going on.  If

23  its 11:00 at night, wait until next day.  Let me

24  know about it.  I'll approve it.

25  ///

2cd53174-4031-4f60-920e-06c6923416c4

NETWORK DEPOSITION SERVICES
Transcript of Robert Pramik

1 BY MR. DeJULIUS:

2      Q     The question is: Did you follow the

3 policy of paying only overtime that had been

4 pre-approved?

5      A     Yes.

6        MS. GIFFORD: Objection.

7 BY MR. DeJULIUS:

8      Q     So if it had not been pre-approved --

9      A     I wouldn't have paid it.

10      Q     You didn't pay it?

11      A     That's correct. Sometimes I

12 post-approved things versus pre-approved, as my

13 scenario so suggested.

14      Q     And that -- that's what I'm trying to get

15 at. Again, Mr. -- Mr. Pramik, you said the

16 testimony was pre-approval not post-approval.

17        So, just to be clear, did you follow the

18 policy requiring pre-approval --

19        MS. GIFFORD: Objection.

20 BY MR. DeJULIUS:

21      Q     -- in all instances?

22      A     I think the way I did it, yes, because --

23 again, I didn't want to interrupt the family.

24 But, however, if they weren't with a family and

25 they were approaching a certain time and all of a

2cd53174-4031-4f60-920e-06c6923416c4

NETWORK DEPOSITION SERVICES
Transcript of Robert Pramik

Page 363

1    sudden a death call came in and that guy was
2    going to do the embalming, I would expect him to
3    call me prior to doing it.  And I would grant him
4    permission to work overtime.
5         The exception to my pre-approval versus
6    post-approval, I did not want them to interrupt
7    the family to call me to get permission to work
8    overtime to finish meeting that family.
9         So that's what I call post-approval.  So
10   if you want to get technical about what I call it
11   and how I did it, that's fine.  But I'm
12   justifying why I did a post versus pre.  But as
13   long as it was a justifiable overtime, I would
14   approve it.
15        Q    Okay.  And is it fair to say that
16   different managers could apply the policy in a
17   different way, then?
18        MS. GIFFORD:  Objection.
19        THE WITNESS:  I don't know what the other
20   managers did.  I know what I did.
21   BY MR. DeJULIUS:
22        Q    You just mentioned Ted Reese earlier
23   today.  You said that he paid it a different way.
24        A    Oh.  I thought you meant in other areas.
25   I -- I read into your question.  I apologize.  In

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

2cd53174-4031-4f60-920e-06c6923416c4

NETWORK DEPOSITION SERVICES
Transcript of Robert Pramik

Page 364

1    our market, yeah, I did do it differently than

2    Ted.

3         Q    Okay.  You mentioned a couple times that

4    the titles that were given to certain employees,

5    funeral director/embalmer -- are those titles

6    driven by state law?

7         A    Yes.

8         MS. GIFFORD:  Objection.

9    BY MR. DeJULIUS:

10        Q    And the state laws are different in

11   different states?

12        A    Yes.

13        MS. GIFFORD:  Objection.

14        THE WITNESS:  Um-hum.

15   BY MR. DeJULIUS:

16        Q    And that means that the titles for the

17   same employee-type work could be a different

18   title in different states?

19        MS. GIFFORD:  Objection.

20        THE WITNESS:  Yes and no.  Otherwise, for

21   instance, in a procedure manual they have a job

22   description for a funeral director/embalmer.

23        Well, in Pennsylvania you're both.

24   You're a licensed funeral director.  So that

25   would -- that would apply to them.  So I don't

2cd53174-4031-4f60-920e-06c6923416c4

NETWORK DEPOSITION SERVICES
Transcript of Robert Pramik

Page 384

1          REPORTER'S CERTIFICATE

2          I, SUSAN O'HARA MOORE, RMR, CSR, notary

3      public in and for the State of Pennsylvania, do

4      hereby certify:  That the witness named in the

5      foregoing Deposition, to wit, ROBERT J. PRAMIK,

6      was present and duly sworn to testify the truth

7      in the within-entitled action on the day and date

8      and at the time and place therein specified;

9          That the testimony of said witness was

10     reported by me in shorthand and was thereafter

11     transcribed under my direction into computerized

12     transcription;

13         That the foregoing constitutes a full,

14     true, and correct transcript of said deposition

15     and of the proceedings which took place;

16         That the witness was given an opportunity

17     to read and, if necessary, correct said

18     deposition and to subscribe the same;

19         That I am a disinterested person to the

20     said action;

21         IN WITNESS WHEREOF, I have hereunto

22     subscribed my signature on this 27th day of

23     October, 2008.  My commission expires 04/11/2011.

24

25              Susan O'Hara Moore, RMR, CSR, CLVS

2cd53174-4031-4f60-920e-06c6923416c4