**TAB 27**

NETWORK DEPOSITION SERVICES
Transcript of Deborah Prise

Page 1

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA

- - - -

DEBORAH PRISE and HEATHER RADY )
on behalf of themselves and all)
employees similarly situated,  )
                               )
            Plaintiffs,        )
                               )
            -vs-               )  Civil Action
                               )  No. 06-1641
ALDERWOODS GROUP, INC.,        )
                               )  Judge Joy Flowers
            Defendant.         )

- - - -

VOLUME I

- - - -

DEPOSITION OF:  DEBORAH PRISE


            DATE:     November 6, 2008
                      Thursday, 9:59 a.m.


        LOCATION:     JONES DAY
                      One Mellon Bank Center
                      500 Grant Street, 45th Floor
                      Pittsburgh, PA  15219


        TAKEN BY:     Defendant


     REPORTED BY:     Catherine C. Leverty
                      Notary Public


                - - - -
        NETWORK DEPOSITION SERVICES
             The Gulf Tower
      707 Grant Street, Suite 1101
      Pittsburgh, Pennsylvania  15219
             412-281-7908

645bc265-24c5-4d78-9fdb-c377eb16c0bd

NETWORK DEPOSITION SERVICES
Transcript of Deborah Prise

Page 24

1  Q.  You held both titles?

2  A.  Yes.

3  Q.  And how were you compensated, was it salary,

4      wage?

5            MR. SAUL:  When are we talking about,

6      September of '05?

7  BY MR. KNIGHT:

8  Q.  When you were location manager and supervisor?

9  A.  When I was location manager, which began in

10      2005, I was salaried, but I'd get commissions

11      for pre-need, but for the funeral supervisory

12      role I was paid a monthly stipend up until the

13      point where I became the location manager.

14  Q.  So you were a funeral supervisor before you were

15      location manager?

16  A.  Yes.

17  Q.  And when you were a location manager were you

18      also still a funeral supervisor?

19  A.  Yes.

20  Q.  So you were paid a salary as a location manager;

21      correct?

22  A.  Yes.

23  Q.  And were you also getting a monthly stipend for

24      being a funeral supervisor at the same time?

25  A.  No, they quit it when I became location manager.

NETWORK DEPOSITION SERVICES
Transcript of Deborah Prise

Page 25

1    Q.    So when did you become location manager?

2    A.    I think in May 2005.

3    Q.    At that point you were paid a salary; correct?

4    A.    Yes.

5    Q.    Did you receive any other form of compensation?

6    A.    Commissions if I did pre-need.

7    Q.    When you say if I did pre-need, what does that

8          mean?

9    A.    Well, we were told that we had to have an

10         insurance license and, you know, the firm had a

11         subsidiary, Mayflower Insurance, that provided

12         us as insurance agents, so when a family wanted

13         to prearrange for a funeral, you can do it

14         either through a trust or through insurance, but

15         we were told we had to do it through insurance

16         and through Mayflower, so that's what -- it's

17         writing an insurance policy equal to the sum of

18         what the funeral would be is the best way I can

19         explain it.

20   Q.    When you contacted Ms. Mizel in 2005 were you

21         still employed by Alderwoods?

22   A.    Yes.

23   Q.    How long after you first contacted Ms. Mizel did

24         your employment with Alderwoods end?

25   A.    I don't know, exactly.  I would estimate less

645bc265-24c5-4d78-9fdb-c377eb16c0bd

NETWORK DEPOSITION SERVICES
Transcript of Deborah Prise

Page 88

1              - - - -

2         (Whereupon, at 12:20 a luncheon recess was

3     taken, the proceedings to resume at 1:12 p.m.)

4              - - - -

5         A-F-T-E-R-N-O-O-N  S-E-S-S-I-O-N

6              - - - -

7   BY MR. KNIGHT:

8   Q.   Before the break we were talking about your

9        allegations in your first affidavit in this case

10       related to what you call the community work

11       policy?

12   A.   Yes.

13   Q.   If you worked, if you did what you call

14       community work during normal business hours, or

15       during your normal, regularly scheduled hours,

16       would you have been compensated for it?

17   A.   During normal business hours, yes.

18   Q.   If you did community work after business hours

19       but had the time preapproved would you have been

20       compensated for that time?

21   A.   If you had the time preapproved, yes.

22   Q.   Did you ever seek preapproval for community work

23       that you did outside your regularly scheduled

24       hours?

25   A.   Yes.

645bc265-24c5-4d78-9fdb-c377eb16c0bd

NETWORK DEPOSITION SERVICES
Transcript of Deborah Prise

Page 89

1    Q.   And were you granted approval for that time?

2    A.   Partially.

3    Q.   What do you mean, partially?

4    A.   Well, there was, like, a cocktail affair that

5         B'nai Zion had, and I got partially paid for

6         that.

7    Q.   When you sought preapproval did you seek

8         preapproval for a certain amount of time?

9    A.   I don't recall.

10   Q.   When you say you were partially paid for it,

11        were you only paid for certain hours, or what do

12        you mean by that?

13   A.   I wasn't paid for all of my time that I took

14        there, I was paid for part of it.

15   Q.   Do you remember how much of it you were paid

16        for?

17   A.   No.

18   Q.   From whom would you seek preapproval?

19   A.   The time I remember, Pat McDermott, and then I

20        quit because it was general, general knowledge

21        that if we had engagements and community

22        activity outside of the clock time that they

23        wouldn't be preapproved, or it wouldn't be

24        approved, that was general knowledge.

25   Q.   Okay.  When we're talking about this cocktail

645bc265-24c5-4d78-9fdb-c377eb16c0bd

NETWORK DEPOSITION SERVICES
Transcript of Deborah Prise

Page 99

1        participating in was in the community newspaper.

2   Q.   Was it your belief that you were acting as an
3        Alderwoods representative when you were working
4        with Dorothy's Friends?

5   A.   With Dorothy's Friends I'd say that I was
6        partially acting as an Alderwoods representative
7        because I had to do community service for them,
8        but I was, and still am with them, personally.
9        They're committed to their cause.

10  Q.   So even though you've left Alderwoods you've
11       remained involved with Dorothy's Friends?

12  A.   Hardly at the same level.

13  Q.   But you've remained involved?

14  A.   At a minimal level.

15  Q.   What about Haddasah, are you still involved with
16       them?

17  A.   No.

18  Q.   What about the cemetery and social action
19       committee?

20  A.   No.

21  Q.   What about doing educational seminars?

22  A.   No.

23                      - - - -

24     (Prise Exhibit No. 4 marked for identification.)

25                      - - - -

645bc265-24c5-4d78-9fdb-c377eb16c0bd

NETWORK DEPOSITION SERVICES
Transcript of Deborah Prise

Page 104

1   Q.   Okay.  So that overtime would have been
2        preapproved by someone; is that correct?
3   A.   Oh, yes, because they wanted me to pursue that
4        radio advertising opportunity, Pat McDermott
5        called it to my attention.
6   Q.   What about Saturday?  You have 12 and
7        three-quarters hours down for Saturday but
8        there's no notation below as to what you were
9        doing with that overtime?
10  A.   I'm assuming people died.
11  Q.   Okay.  Is there any reason you wouldn't have put
12       that on your time sheet?
13  A.   I don't remember.
14  Q.   Did you get approval for working that extra four
15       and three-quarters hours that day?
16  A.   I don't remember that day at all.  Also, you
17       know what else it could be?  If it's a Saturday
18       night it could have been, especially a tahara
19       service, it could have been any number of
20       things.  If it was a tahara or an airport pickup
21       it would have been preapproved, or a death.
22       There are many reasons.
23  Q.   Are you making any claims that you were not
24       compensated for any of the time you put down on
25       this particular time sheet?

Johnstown              Toll-Free              Pittsburgh
814-266-2042          866-565-1929          412-281-7908

645bc265-24c5-4d78-9fdb-c377eb16c0bd

NETWORK DEPOSITION SERVICES
Transcript of Deborah Prise

Page 105

1   A.   For the time I put down on my time sheets, I'd
2        have to scrutinize it a lot more closely, but I
3        think they will match what I was paid for.  It's
4        things that I didn't put down on the time sheet,
5        because we were told if it wasn't preapproved,
6        or something like -- we couldn't even put it on
7        the time sheet.
8   Q.   Under what circumstances would Mr. McDermott
9        approve community work time, if any?
10  A.   Whatever the policy communicated to him was, I
11       wasn't privy to that.
12  Q.   Well, with respect to your circumstances, what
13       types of community time would be approved other
14       than some of the cocktail receptions, as you
15       mentioned earlier?
16  A.   Basically, we were told if we didn't do our
17       community work inside the clock that it wouldn't
18       be preapproved, so it was only the rare
19       circumstance, like when Burton Hirsh more or
20       less said look, we have to go to the B'nai Zion
21       cocktail thing, they said okay, they'd pay for
22       that.
23  Q.   So if someone told you you had to be somewhere
24       after hours you would get paid for it?  If
25       someone told you you had to go to a cocktail

645bc265-24c5-4d78-9fdb-c377eb16c0bd

NETWORK DEPOSITION SERVICES
Transcript of Deborah Prise

1    A.    I don't mean to ridicule, but I can't pick up a
2          body in my car, I have to get equipment, and
3          things like that, so, no, I wouldn't be paid
4          from the time I was called to the time I got to
5          the funeral home, I wouldn't get paid until I
6          got to the funeral home, and then.
7    Q.    Well, were you actually one of the people who
8          were picking up a body from someone's home, is
9          that something that you had to do?
10   A.    On occasion.
11   Q.    And on those occasions when you did that, the
12         time that you spent away from the funeral home
13         at the deceased person's home picking up the
14         body, speaking with the deceased person's, you
15         know, family, would you be compensated for that
16         time?
17   A.    Generally that happened over the phone from
18         home, the just picking up the body part happened
19         on rare occasion, and I'd go to the funeral home
20         and check in, and I think, to the best of my
21         recollection, I was paid for that.
22              It wasn't something that I did very
23         often after hours, most of my on-call time was
24         spent on the phone from my home or wherever I
25         was.  I wasn't paid.

645bc265-24c5-4d78-9fdb-c377eb16c0bd

NETWORK DEPOSITION SERVICES
Transcript of Deborah Prise

1      long it takes.

2  Q.  Would calls sometimes last more than an hour?

3  A.  Yes, because some -- well, not typically, but

4      sometimes the family would say will you call me

5      when the deceased is back at the funeral home,

6      and by the time the removal person went and got

7      the body, yeah, it could be, like, 3:00, maybe,

8      you got the call, 5:00 o'clock in the morning

9      the body -- it could definitely take well over

10     an hour of your time.

11 Q.  But that wasn't typically the case?

12 A.  It happened, I wouldn't want to guess at it.

13 Q.  When you were a funeral director did Alderwoods

14     pay you any sort of rate for time you spent on

15     call?

16 A.  Never.

17 Q.  In paragraph 22 of your affidavit it indicates

18     that as a manager you were aware that

19     defendants' failure to pay employees for work

20     done while on call is a nationwide policy; do

21     you see that?

22 A.  Yes.

23 Q.  Was that the case the entire time you were a

24     location manager?

25 A.  No, it changed, to the best of my recollection,

645bc265-24c5-4d78-9fdb-c377eb16c0bd

NETWORK DEPOSITION SERVICES
Transcript of Deborah Prise

Page 118

1          around July 2005.  They changed the policy

2          around then, to the best of my knowledge.

3     Q.   And what was the policy change in July 2005?

4     A.   That you would get paid for your on-call time.

5     Q.   Prior to July of 2005 how were you aware that

6          failure to pay for work done while on call was a

7          company-wide policy?

8     A.   Because in meetings -- usually when we learned

9          about things they were in these monthly meetings

10         that we had, and it was frequently announced

11         that this was as per policy.  You know, it was

12         often the tone of the firm and something that

13         was highly encouraged -- or not encouraged,

14         that's too light of a word, was uniformity.

15    Q.   When you say policy, what do you mean?

16    A.   Policy, you know, I'd almost say that a

17         better -- well, it's semantics, rule.

18    Q.   Well, what do you mean by rule, then?

19    A.   Regulation, policy.  You know, I -- I can't

20         describe it any better.

21    Q.   Well, was there anything written that said that

22         employees weren't to be paid for work they

23         performed while on call?

24    A.   Well, in the policy manual it was written that

25         you didn't get paid unless it was preapproved.

NETWORK DEPOSITION SERVICES
Transcript of Deborah Prise

Page 130

1       Claudia failed the exam, I know that; I can't
2       remember the rest.  I know Heather Rady passed
3       the exam, but -- Randy Howard passed the exam.
4   Q.  Do you know what happened to the employees who
5       didn't pass the exam?
6   A.  They were told to keep studying for it.
7   Q.  Do you know whether they took it at another
8       time?
9   A.  No, I don't.
10  Q.  Are you aware of any Alderwoods written policy
11      requiring Alderwoods licensed funeral directors
12      to become insurance agents, at least I should
13      say in the states where insurance licenses are
14      required to sell pre-need?
15  A.  You mean like a memo, or anything?
16  Q.  Or anything in the policies and procedures
17      binder?
18  A.  Not that I can think of at this time.
19  Q.  Do you know which states allow the sale of
20      pre-need policies funded by insurance?
21  A.  No, but I know not New York.
22  Q.  You know New York doesn't require it?
23  A.  No, New York doesn't allow it, it has to be a
24      trust.
25  Q.  Do you know whether that policy that you refer

645bc265-24c5-4d78-9fdb-c377eb16c0bd

NETWORK DEPOSITION SERVICES
Transcript of Deborah Prise

Page 148

1   Q.   Well, in your experience, did your managers
2        require your employees -- require you, as an
3        employee, to record all your hours actually
4        worked?
5   A.   No, we weren't allowed to put down hours on our
6        time sheets that weren't preapproved.
7   Q.   So this particular bullet point, this particular
8        policy, in your opinion, was not complied with
9        by your management?
10  A.   Well, but, I mean, I wouldn't -- I don't know
11       about the policy of only preapproved overtime
12       and if it wasn't -- it's -- I don't know,
13       because there was that policy of no overtime
14       that wasn't preapproved, so as far as I viewed
15       it, they were conforming to Alderwoods policy
16       because of the preapproval policy, that's how I
17       interpret it.
18  Q.   Can you say where you saw this policy that
19       overtime wouldn't be paid if it's not
20       preapproved?
21  A.   It's in the procedure manual.
22  Q.   And if it's not in the procedure manual where
23       would it be?
24  A.   I feel pretty sure that it was in the procedural
25       manual.

Johnstown              Toll-Free              Pittsburgh
814-266-2042          866-565-1929          412-281-7908

645bc265-24c5-4d78-9fdb-c377eb16c0bd

NETWORK DEPOSITION SERVICES
Transcript of Deborah Prise

Page 149

1    Q.   Okay.  Let's assume, hypothetically, it's not in
2         the manual?
3    A.   Why?
4    Q.   I'm just asking you to, we're in a deposition,
5         to assume that it's not in the manual; would you
6         agree that that policy doesn't exist?
7    A.   No, because I think that's a faulty assumption.
8    Q.   Okay.  But I'm asking you to make the assumption
9         that it's not in the policy manual; would it be
10        anywhere else?
11   A.   It could be.
12   Q.   But it's your testimony that you believe there's
13        a policy in the -- we're talking about the five
14        binders here, the policy and procedure manual --
15   A.   That's right.
16   Q.   -- that overtime that's not preapproved is not
17        to be paid?
18   A.   That's right.
19   Q.   And it would surprise you if there is no such
20        policy in the manual anywhere?
21   A.   Right now, to the best of my recollection, I
22        feel strongly that that is where I've seen it,
23        given the thought that I've put into it today, I
24        feel firmly.
25   Q.   Okay.  Paragraph 32 says that as a manager you

NETWORK DEPOSITION SERVICES
Transcript of Deborah Prise

Page 150

1    were aware that the defendants' policy of not

2    compensating employees for time spent in pursuit

3    of required insurance licenses was a nationwide

4    policy?

5  A.  Yes.

6  Q.  How, as a manager, did you come to that

7    understanding?  What was it about being a

8    manager that led you to that knowledge?

9  A.  Well, it was probably previous to being a

10   manager, too, but to the best of my recollection

11   I think that we tried to take our CEUs during

12   work hours, and it's just not possible to take

13   24 hours of CEUs and work hours, but it was

14   communicated to us by upper management that

15   we're not paid, we wouldn't get paid for our

16   time.

17  Q.  And I'm going to ask you again, can you identify

18   any specific member of upper management that

19   told you that?

20  A.  I don't remember, but I do clearly remember that

21   that was the rule.

22  Q.  Because it was told to you by upper management

23   that you can't remember?

24  A.  That's right, but I'm positive that it was a

25   rule, I'm not maybe, I don't think it was a

645bc265-24c5-4d78-9fdb-c377eb16c0bd

NETWORK DEPOSITION SERVICES
Transcript of Deborah Prise

Page 166

1    budgeted you from 5:00 to 7:00 p.m. to do a

2    removal, for example, or any other thing, you

3    actually worked another hour beyond that, and

4    you went back to him and said Pat, by the way,

5    it actually took three hours, I thought you

6    should you know, I'm going to put it on my time

7    sheet?

8  A.  No, I didn't want to whine and complain,

9    because, plus, it was so typical that it would

10   take more than we were allotted for and, you

11   know, he kept going on and on about the budget,

12   the budget, the variance reports, that you

13   didn't want to ruffle your manager's feathers if

14   you know the policy is the policy is the policy

15   and you know what answer you're going to get,

16   you're going to get no, so you don't keep

17   pushing the envelope.

18  Q.  Now, do you know whether managers in other parts

19   of the country outside the Pittsburgh market

20   limited their preapproval for overtime only to

21   specific hours, like, you know, two or three

22   hours to do a removal?

23  A.  I don't recall, I know that it was a subject

24   matter on a couple conference calls, for

25   example, when we switched from doing piece work,

NETWORK DEPOSITION SERVICES
Transcript of Deborah Prise

Page 168

1           showed negative.

2   Q.    But someone could work three hours instead of

3           the two they were allocated and still be within

4           their budget variance if people hadn't been

5           working overtime very extensively within the

6           course of a month and they can still be within

7           their overtime hours; couldn't they?

8   A.    But if that happens consistently you're going to

9           bump up against your budget.  Theoretically,

10          maybe.

11  Q.    Okay.  Were there ever occasions, Ms. Prise,

12          where you asked Pat McDermott to preapprove

13          overtime and he, essentially, refused to

14          preapprove it, any time at all?

15  A.    It was policy so that if there were instances

16          where there was overtime, like on-call or

17          community work, that we knew we couldn't get

18          preapproved on, anyway.

19  Q.    I'm asking whether you asked him to preapprove

20          overtime and he said no?

21  A.    I don't recall.

22  Q.    So you don't recall any circumstance where you

23          said Pat, I'd like work two hours tonight, I

24          didn't get done with my job today, I have to do

25          this, whatever, I have to fill out these forms,

NETWORK DEPOSITION SERVICES
Transcript of Deborah Prise

1    A.    Well, they didn't -- they weren't conveyed as
2          Pat McDermott rules by any stretch of the
3          imagination, they were -- and not for one minute
4          did I think that Pat McDermott had the authority
5          to come up with these rules, it was that there
6          was uniformity with policies, you know,
7          everything.
8                    I mean, why would you have a policy
9          and procedural manual that says U.S. policy if
10         Pat McDermott were writing it?  That's just not
11         how it worked there.  Uniformity was highly
12         stressed, and the authority was clearly from
13         higher than Pat McDermott.
14   Q.    As reflected by the policies and procedures
15         manual?
16   A.    Or by, you know, other members of management
17         that would visit.
18   Q.    Did anyone ever mark down on any of your time
19         sheets saying that you had worked too much
20         overtime and they weren't going to pay you for
21         time that you recorded?
22   A.    No, because I didn't put overtime on it -- not
23         that I can recall because I didn't put overtime
24         on it that wasn't clearly preapproved.  If I
25         worked overtime that wasn't preapproved I didn't

645bc265-24c5-4d78-9fdb-c377eb16c0bd

NETWORK DEPOSITION SERVICES
Transcript of Deborah Prise

1    put it on my time sheet.

2  Q.  Were there any steps that you could take or that

3      you did take to notify Alderwoods of time that

4      wasn't preapproved that you actually worked?

5  A.  I mean, it was so clear with my community

6      involvement that that, you know, wasn't done

7      within the realm of my work schedule.

8  Q.  But people do community involvement for reasons

9      other than their employers; right?

10 A.  Mine was clearly, with rare exception, for

11     reasons of my employer, with rare exception.

12 Q.  How was it clear that it was for your employer,

13     how was it clear to Alderwoods that it was for

14     your employer?

15 A.  I joined because they told me I had to join.

16     They paid for my membership in the

17     organizations.  I mean, things that I did on my

18     own, like they didn't pay for my personal

19     synagogue dues, I didn't give the bill to them,

20     only things that, you know, were -- that LNIS

21     thing, those monthly things that I turned in,

22     that's not feasible to do it in the confines of

23     my time sheet.

24 Q.  Would you look at Exhibit 3 again, Ms. Prise,

25     the Leader Network information sheet?  Is this

645bc265-24c5-4d78-9fdb-c377eb16c0bd

NETWORK DEPOSITION SERVICES
Transcript of Deborah Prise

Page 180

1          lot.
2     Q.   How do you know that Alderwoods maintained a
3          company-wide policy of not paying employees for
4          all bonuses and commissions in their overtime
5          calculations?
6     A.   My payroll thing came from, I think, where all
7          of them came from, and I don't think that they
8          did mine differently than they did all the other
9          ones, and since, you know, it's -- it came from
10         Canada, I believe, so just since mine was the
11         standard Alderwoods payroll printout.
12    Q.   You said earlier you didn't receive any bonuses
13         while you were employed at Alderwoods?
14    A.   No, I said I don't recall.
15    Q.   Well, how do you know that Alderwoods had a
16         policy of not including bonuses in overtime
17         calculations?
18    A.   I don't recall right now, but at some point in
19         putting the information together I did go over
20         some pay records.
21    Q.   At some point.  And what time was that?
22    A.   I don't know, maybe 2005, '06.
23    Q.   So you said you're basing your conclusion that
24         Alderwoods didn't include bonuses or commissions
25         in their overtime calculations on your review of

645bc265-24c5-4d78-9fdb-c377eb16c0bd

NETWORK DEPOSITION SERVICES
Transcript of Deborah Prise

Page 192

1   A.   Yes.

2   Q.   What is it in Exhibit 6, then, that tells you

3        that Alderwoods had a policy not to pay

4        employees overtime based on their commissions?

5   A.   I don't know, it would take me hours.  This

6        is -- how many pages is this?  20 pages, with

7        mathematical calculations that I don't know how

8        they derived these (indicating), so just based

9        on my quick look at these 20 pages of data,

10       having no idea of formulas they used to compute

11       this data, I couldn't venture to come to any

12       conclusions other than the conclusion I came to

13       on December 7th, 2006.

14  Q.   Well, so you would agree from looking at this

15       exhibit that Alderwoods adjusted your overtime

16       pay?

17  A.   From looking at this exhibit I do see some

18       overtime pay adjustments, clearly.

19            MR. KNIGHT:  Okay.  I've got a couple

20       more hours, Charlie, easily, so if she needs to

21       leave at 4:00 we are going to have to

22       reschedule.

23            THE WITNESS:  Yeah, I do.

24            MR. SAUL:  Okay, we'll reschedule.

25            THE WITNESS:  Okay.

645bc265-24c5-4d78-9fdb-c377eb16c0bd

NETWORK DEPOSITION SERVICES
Transcript of Deborah Prise

Page 194

1   COMMONWEALTH OF PENNSYLVANIA )        CERTIFICATE

2   COUNTY OF ALLEGHENY           )        SS:

3        I, Catherine C. Leverty, a Court Reporter and

4   Notary Public in and for the Commonwealth of

5   Pennsylvania, do hereby certify that the witness,

6   DEBORAH PRISE, was by me first duly sworn to testify

7   to the truth, the whole truth, and nothing but the

8   truth; that the foregoing deposition was taken at the

9   time and place stated herein; and that the said

10  deposition was recorded stenographically by me and

11  then reduced to printing under my direction, and

12  constitutes a true record of the testimony given by

13  said witness.

14       I further certify that the inspection, reading

15  and signing of said deposition were waived by counsel

16  for the respective parties and by the witness.

17       I further certify that I am not a relative or

18  employee of any of the parties, or a relative or

19  employee of either counsel, and that I am in no way

20  interested directly or indirectly in this action.

21       IN WITNESS WHEREOF, I have hereunto set my hand

22  and affixed my seal of office this 18th day of

23  November, 2008.

24

25                              Notary Public

Johnstown              Toll-Free              Pittsburgh
814-266-2042         866-565-1929           412-281-7908

645bc265-24c5-4d78-9fdb-c377eb16c0bd

NETWORK DEPOSITION SERVICES
Transcript of Deborah Prise

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CIVIL DIVISION

Civil Action No. 06-1641

- - -

| | |
|---|---|
| DEBORAH PRISE and HEATHER RADY, on behalf of themselves and all employees similarly situated, | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) ) |
| ALDERWOODS GROUP, INC., | ) ) |
| Defendant. | ) |

- - -

Continued Deposition of Deborah Prise

Tuesday, November 25, 2008

- - -

    The continued deposition of DEBORAH PRISE, one of
the Plaintiffs herein, called as a witness by the
Defendant, pursuant to notice and the Federal Rules of
Civil Procedure pertaining to the taking of
depositions, taken before me, the undersigned, Rebecca
L. Schnur, Notary Public in and for the Commonwealth of
Pennsylvania, at the offices of  Jones Day, One Mellon
Center, Suite 4500, 500 Grant Street, Pittsburgh,
Pennsylvania, 15219 commencing at 3:12 o'clock p.m.,
the day and date above set forth.
                - - -

NETWORK DEPOSITION SERVICES
1101 GULF TOWER
707 GRANT STREET
PITTSBURGH, PENNSYLVANIA 15219

- - -

519d0abf-72c3-472d-9e3c-cc9ae09a723b

NETWORK DEPOSITION SERVICES
Transcript of Deborah Prise

Page 16

1          As I recall -- And, clearly, when this was
2     written -- I think we have a copy of the policy.
3          Q    You were looking at a copy of the policy when
4     you wrote this?
5          A    No.  I think I had a copy of the policy at
6     one time.
7          Q    Okay.
8          A    I think we have the policy and procedure
9     manual or parts of it.
10         Q    Do you want to review some of the exhibits
11    from last time to see?
12              I'm trying to figure out what you're talking
13    about when you say "the written policy" here.
14         A    Policy -- There would be these five books
15    that all the locations in North America have.
16         Q    Okay.
17         A    And they had different policies on them.
18    Like one had -- So we're talking about those binders,
19    those books.
20         Q    When you're talking about -- This policy
21    you're talking about in paragraph 9, it said that
22    overtime has to be pre-approved.  It said at least that
23    much.  Is that right?
24         A    Uh-huh.  Yes.
25         Q    Did the written policy -- I'm not asking

519d0abf-72c3-472d-9e3c-cc9ae09a723b

NETWORK DEPOSITION SERVICES
Transcript of Deborah Prise

Page 17

1     about what anyone told you.  Did a written policy say

2     that overtime that was not pre-approved would not be

3     paid?

4          A     As I recall, yes.

5          Q     That's your testimony as you sit here today?

6          A     Yes.

7          Q     That's what you believed to be the case when

8     you signed this affirmation on June 12, 2008.  Is that

9     right?

10         A     I believe so.

11         Q     When was the last time you saw that written

12    policy, if you can recall?

13         A     I have no idea.

14         Q     Sometime before you wrote this affirmation or

15    sometime before you signed this affirmation?

16         A     It might have shown up in the other case's

17    discovery.  I have no idea.

18         Q     Did you ever -- Before you signed your first

19    affirmation in this case did you review any written

20    policies of Alderwoods to help you draft that

21    declaration or affirmation?

22         A     It's so long ago.  Everything you see in

23    these two affirmations are to the best of my knowledge

24    and with utmost accuracy given the information I had at

25    my disposal at the time.  I don't remember what all

NETWORK DEPOSITION SERVICES
Transcript of Deborah Prise

Page 59

1    Q    Do you know how many hours per year
2  continuing education was required for your license?
3    A    It was 24 hours every two years.
4    Q    Okay.
5    A    But you can also work two years ahead, so you
6  can really do 48 hours the first two years and then
7  you'll, you know, have some in the bag for two years
8  going forward.
9    Q    So in your first two years after getting your
10  license -- I think you said you got your license in
11  about February of '04.  Is that right?
12    A    I don't remember.
13    Q    You don't remember when you got your license?
14    A    I think it was in winter '03-'04.  It's in my
15  personnel file.
16    Q    So in the two-year period after you received
17  your license, you were required to take 24 hours of
18  continuing education to maintain that license.  Is that
19  right?
20    A    But you could do up to 48.
21    Q    Do you know approximately how many hours of
22  continuing education you took in the calendar year
23  2004?
24    A    I would have to look at the records, but -- I
25  would have to look at the records.

519d0abf-72c3-472d-9e3c-cc9ae09a723b

NETWORK DEPOSITION SERVICES
Transcript of Deborah Prise

Page 60

1        Q    So you don't know as you sit here today?

2        A    I would have to look at the records.

3        Q    Have you ever looked at the records to try to

4    figure that out?

5        A    I have to do continuing ed for a few active

6    licenses, so -- I'm sure I've looked at the records,

7    but I wouldn't want to state anything without seeing

8    them.

9        Q    What records would you need to look at?

10       A    Like I said, I have to keep continuing ed for

11   a few active licenses, so -- For example, Alderwoods, I

12   could pay -- they would pay for the course material but

13   not the time spent; so, if you showed me the receipts

14   that I gave them on the tuition and the material, I

15   could give you a better estimate.

16       Q    Is there anything that you possess, not,

17   obviously, here but at home, that you could look at

18   that would tell you how many hours you spent doing

19   continuing education in 2004?

20       A    Not accurately.  I mean, I put all my claims

21   into the -- And it works out nicely because, if you

22   look at my expense claims, it tells you how many

23   credits I'm putting the claims in for.

24       Q    What about 2005; do you know how many hours

25   you spent doing continuing education?

Johnstown              Toll-Free              Pittsburgh
814-266-2042          866-565-1929          412-281-7908

519d0abf-72c3-472d-9e3c-cc9ae09a723b

NETWORK DEPOSITION SERVICES
Transcript of Deborah Prise

Page 61

1      A     I don't recall at this time.

2      Q     Again, is there anything you could look at,

3  at home, that would have told you that?

4      A     No.

5      Q     Prior to getting your license in late

6  2003/early 2004 you never had to take any continuing

7  education requirement to maintain that license?

8      A     Are we talking about my insurance license --

9      Q     Yes.

10     A     -- or one of my funeral director licenses?

11     Q     Insurance license.

12           There's no continuing education

13  requirement --

14     A     There's no continuing education until you're

15  licensed.

16           I think it's called the preliminary.  You do

17  have to -- As a matter of fact, I don't know how many

18  hours.  You do have to have a certificate

19  of preliminary education.  It might have an hourly

20  quota.  I can't recall.

21     Q     Are you making any claims related to

22  compensation for that preliminary work?

23     A     That would have been part of, you know, the

24  time that I spent studying for it.

25     Q     So that would be part of the ten hours per

519d0abf-72c3-472d-9e3c-cc9ae09a723b

NETWORK DEPOSITION SERVICES
Transcript of Deborah Prise

Page 84

1              C-E-R-T-I-F-I-C-A-T-E

2       I, Rebecca L. Schnur, the undersigned, do hereby

3    certify that the foregoing pages are a true and correct

4    transcript of my stenotypy notes taken of the

5    proceedings held at the above-referenced address on the

6    above-referenced date.

7

8

9         _____

10        Rebecca L. Schnur
          Notary Public in and for the
          Commonwealth of Pennsylvania
11        My Commission Expires:  June 16, 2009

12                   - - -

13

14

15

16

17

18

19

20

21

22

23

24

25

Johnstown                Toll-Free              Pittsburgh
814-266-2042           866-565-1929           412-281-7908

519d0abf-72c3-472d-9e3c-cc9ae09a723b