**TAB 28**

NETWORK DEPOSITION SERVICES
Transcript of Heather Rady

Page 1

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA

- - - -

DEBORAH PRISE and HEATHER RADY )
on behalf of themselves and all)
employees similarly situated,  )
                                )
            Plaintiffs,         )
                                )
        -vs-                    )  Civil Action
                                )  No. 06-1641
ALDERWOODS GROUP, INC.,         )
                                )  Judge Joy Flowers
            Defendant.          )

- - - -

DEPOSITION OF:  HEATHER RADY

- - - -

DATE:       November 7, 2008
            Friday, 10:15 a.m.


LOCATION:   JONES DAY
            One Mellon Bank Center
            500 Grant Street, 45th Floor
            Pittsburgh, PA  15219


TAKEN BY:   Defendant

REPORTED BY:  Catherine C. Leverty
              Notary Public


- - - -

NETWORK DEPOSITION SERVICES
The Gulf Tower
707 Grant Street, Suite 1101
Pittsburgh, Pennsylvania  15219
412-281-7908

Johnstown                Toll-Free              Pittsburgh
814-266-2042           866-565-1929           412-281-7908

6d22c9fb-77db-4a30-9090-a7dc74ce86c9

NETWORK DEPOSITION SERVICES
Transcript of Heather Rady

1       example, when you'd be scheduled for 50 hours in

2       a week and he'd say it's too many and he'd mark

3       you down, cut two hours every night, or

4       something like that?

5  A.   I'm confused about what you're asking.

6  Q.   I might not be understanding the process --

7  A.   Are you talking about hours that we're

8       physically in the building, because we had a

9       schedule if -- say, at one point, my hours were

10      8:00 to 4:00, those are the hours that I needed

11      to be in the building --

12  Q.   And this would be every day?

13  A.   Yes.

14  Q.   And some weeks that might be all seven days in a

15      week?

16  A.   Correct.

17  Q.   And would that include a lunch period?

18  A.   At first we had paid lunch breaks and then the

19      schedule changed again, because we were not

20      given a paid lunch, so our workday increased, I

21      think by a half-hour.

22  Q.   So when you scheduled yourself from 8:00 to

23      4:00, for example, and you were getting a paid

24      lunch, that would be an eight-hour workday;

25      right?

NETWORK DEPOSITION SERVICES
Transcript of Heather Rady

Page 37

1          MS. WEYANDT: I'm going to object to
2     the form of that question, she never testified
3     that she actually scheduled herself, she --
4  A.  Following the proposed schedule, you're correct
5     in saying when we did not have -- when we had a
6     paid lunch I would be in the building between
7     8:00 and 4:00 and be paid for eight hours.
8  Q.  And that's what you would propose to McDermott,
9     you would say 8:00 to 4:00, Monday through
10    Friday, Saturday, Sunday, and you'd give him a
11    proposed schedule?
12 A.  Again, we would propose it, but then he worked
13    it out according to coverage.
14 Q.  And would he take that proposed schedule -- for
15    example, if you put down 8:00 to 4:00 every day,
16    would he say that's too many hours, I'm going to
17    change it to 9:00 to 3:00 for you, Heather,
18    would that ever happen, as an example? I'm not
19    talking about --
20 A.  He wouldn't say it was too many hours, he would
21    say that we don't have coverage until 5:00
22    o'clock so, you know, you're going to work 9:00
23    to 5:00, whereas Claudia is going to work 8:00
24    to 4:00.
25 Q.  Okay. Were you ever trained on how to record

6d22c9fb-77db-4a30-9090-a7dc74ce86c9

NETWORK DEPOSITION SERVICES
Transcript of Heather Rady

Page 61

1    employees were encouraged to share so that if it

2    was an idea or an organization that others could

3    draw from, you know, they were, of course,

4    encouraged to share.

5  Q.  Now, did Pat McDermott ever tell you in any

6    meeting that employees who belonged to community

7    organizations would not be compensated for the

8    time they spent with those community

9    organizations?

10 A.  He did not use the word community organization,

11   he had made the comment that you're only paid

12   for the hours you work while you're in the

13   building.

14 Q.  Did you ever seek approval from Pat McDermott

15   for time spent doing community service work for

16   Alderwoods?

17 A.  No, I believe after the policies changed, and

18   again, I'm uncertain when the policy did change,

19   I'm thinking of a time when we did a petting zoo

20   for the 4th of July weekend, I believe one year

21   I was not paid for it, and then the policy

22   changed and the next year I was paid for that

23   time.

24 Q.  So that's an example of you being paid for time

25   you worked outside the Alderwoods facility?

NETWORK DEPOSITION SERVICES
Transcript of Heather Rady

Page 62

1    A.    One example.

2    Q.    Are there other examples of that?

3    A.    There may be, but nothing is -- at this moment
4          nothing is coming to mind.

5    Q.    So there may be other examples of you doing
6          community service work outside of Alderwoods
7          locations that you would have been paid for?

8    A.    There may be, but again, I would need to see pay
9          records.

10   Q.    You referenced that there was a written
11         community policy in the policies and procedures
12         binders; is that correct?

13   A.    Correct.

14   Q.    Did that written policy say that employees would
15         not be compensated for that time?

16   A.    Without seeing it in front of me, I don't think
17         so, I don't think it stated that.

18   Q.    A minute ago, Ms. Rady, you said that the policy
19         changed, at some point; what policy are you
20         referring to?

21   A.    We had to -- I guess I'll call it a pay policy,
22         and earlier I had mentioned that we recorded our
23         time, both handwritten as well as on the time
24         clock.  Well, when it changed to having to punch
25         in with the time clock, any time outside of the

6d22c9fb-77db-4a30-9090-a7dc74ce86c9

NETWORK DEPOSITION SERVICES
Transcript of Heather Rady

Page 67

1    appointments.
2  Q.  You go on to say that you were expected to
3       provide detail on who the community work was
4       with and how that community influencer rated in
5       terms of importance to the community; did you do
6       that?
7  A.  Only to the point where I would provide detail
8       on who the community work was with, but the
9       community influencer ratings were something more
10      that the managers were responsible for.
11  Q.  When you say managers, are you referring to
12      location managers?
13  A.  Yes, location managers, regional managers.
14  Q.  Was there ever a written policy, to your
15      knowledge, that required location managers to
16      maintain the community influencer sheets?
17  A.  That information, I would not have been privy
18      to.
19  Q.  In paragraph 14 you say that defendants rewarded
20      employees who engaged in community work by
21      giving them incentive points?
22  A.  Correct, yes.
23  Q.  But you were also compensated for at least some
24      of your community work; is that right?
25  A.  I believe at the very end of my employment.

6d22c9fb-77db-4a30-9090-a7dc74ce86c9

NETWORK DEPOSITION SERVICES
Transcript of Heather Rady

1   Q.   Was the petting zoo that you discussed earlier,
2        was that at the end of your employment?
3   A.   We did that, I believe in 2005 and 2006, so,
4        yes.
5   Q.   So when you say -- you said you believe you were
6        compensated at the very end of your employment?
7   A.   Correct.
8   Q.   At the very end of your employment were you
9        being compensated for all community work time?
10  A.   My community work changed.  I can't recall if I
11       was compensated for the B'nai Zion dessert
12       reception that we had gone to.
13            I know for sure that I wasn't
14       compensated for using a vehicle or for parking,
15       you know, fees associated with attending these
16       events, and I know for certain at the beginning
17       of my employment, when I was active with WQED,
18       that I was not compensated for the work.
19            Rotary, yes, because that occurred
20       during my work hours.
21  Q.   But you know for a fact that there was some work
22       outside your normal work hours in 2006 that
23       you -- community work, that you were compensated
24       for; is that right?
25  A.   Correct.

6d22c9fb-77db-4a30-9090-a7dc74ce86c9

NETWORK DEPOSITION SERVICES
Transcript of Heather Rady

Page 69

1  Q.  Do you know how Alderwoods determined what work

2      you would be compensated for and what work you

3      would not be compensated for?

4  A.  No, I don't.

5  Q.  Did you ever ask anyone?

6  A.  I'm thinking of a particular experience, but I

7      don't know if -- I had dealt with a call in

8      which a family had, literally, kept me up all

9      night, and they -- now, at that time we were not

10     paid for our on-call work, but, truly, when I

11     showed up for work the following morning I was

12     tired, I wasn't thinking clearly, and I told

13     Mr. McDermott that I want to be paid for those

14     hours during the night that I was up with this

15     family.

16              On that occasion I was paid, and then

17     after that I was not for any other calls that I

18     attended to during the night or morning.

19  Q.  But would you consider that to be community

20     work?

21  A.  No, no.

22  Q.  Is it your claim in this case that Alderwoods

23     had a company-wide policy not to compensate

24     employees for community work?

25  A.  Company-wide they were not compensating us for

NETWORK DEPOSITION SERVICES
Transcript of Heather Rady

Page 93

1      swing by and drop things off on my way in to
2      work and I wouldn't record those hours.
3   Q. I'm asking you specifically about on-call time?
4   A. Oh, on-call time.  After 2005, or after July of
5      2005?
6   Q. Were there ever any occasions where you didn't
7      record time you spent working on call?
8   A. Not that I can recall.
9   Q. Okay.  And after July 2005 were you -- I should
10     say in approximately July of 2005 were you
11     instructed by anybody that you had to record all
12     time you spent working while on call?
13  A. Yes, I believe that was even a written policy,
14     or it became a written policy, at that point.
15  Q. That's a written policy that was in the policies
16     and procedures binder?
17  A. Yes.
18  Q. Are you making any claims in this case for any
19     unpaid on-call work after July of 2005?
20  A. I'm not certain how a request for damages is
21     structured.  It would be something I would need
22     to talk with my counsel regarding.
23  Q. Well, do you believe as you sit here today that
24     you were not compensated for any on-call work
25     that you performed after July of 2005?

6d22c9fb-77db-4a30-9090-a7dc74ce86c9

NETWORK DEPOSITION SERVICES
Transcript of Heather Rady

Page 94

1   A.   After 2005, I can't recall, specifically, an
2        instance where I may not have recorded on-call
3        time.
4   Q.   Can you recall any instances where you reported
5        on-call time after July 2005 that you were not
6        paid for?
7   A.   I can't recall a specific instance, no.
8   Q.   Can you recall any instances prior to July 2005
9        when you reported any work you did while on call
10       and were not paid for?
11  A.   I'm sorry, say that again, that was a little too
12       fast.
13  Q.   Before July of 2005 can you recall any instances
14       where you recorded on-call time and were not
15       paid for it?
16  A.   I cannot recall.
17                 MR. KNIGHT:  Off the record for a
18       minute.
19                      - - - -
20       (There was a discussion off the record.)
21                      - - - -
22       (Whereupon, at 12:28 p.m. a luncheon recess was
23       taken, the proceedings to resume at 1:33 p.m.)
24                      - - - -
25

6d22c9fb-77db-4a30-9090-a7dc74ce86c9

NETWORK DEPOSITION SERVICES
Transcript of Heather Rady

Page 97

1   Q.   Was it typically your practice to explain
2        deviations in that schedule on this document?
3   A.   Yes.
4   Q.   So it indicates January 3rd you worked ten
5        hours, embalmed Mr. S-z-y-m-e?
6   A.   I think his entire name is cut off, but, yes,
7        embalming somebody.
8   Q.   Might that be an explanation for why you worked
9        ten hours on that date as opposed to eight?
10  A.   That's correct, yes.
11  Q.   When you wrote these notations in the
12       right-hand column would you already have had
13       your time -- in the right-hand column, would you
14       have already had your time preapproved by a
15       manager?
16  A.   It's hard to say.  At times my managers left
17       prior to my quitting time, so it's hard to say,
18       just looking at this document.
19  Q.   So, for example, on Monday, January 3rd, when
20       you finished at 6:30 p.m., your manager may have
21       left by then?
22  A.   It's possible.
23  Q.   And it's possible the time wouldn't have been
24       preapproved; correct?
25  A.   Correct.

6d22c9fb-77db-4a30-9090-a7dc74ce86c9

NETWORK DEPOSITION SERVICES
Transcript of Heather Rady

Page 98

1          The same with Wednesday, I didn't
2      make an indication as to why I worked a
3      half-hour beyond my quitting time, so, yeah,
4      it's hard to say.
5   Q.   But looking at this time sheet do you think it's
6      the case, then, that even when you didn't have
7      your time preapproved that there were occasions
8      where you would still record the entire time on
9      your time sheet?
10  A.   That's fair enough.
11                - - - -
12      (Rady Exhibit No. 4 marked for identification.)
13                - - - -
14  BY MR. KNIGHT:
15  Q.   Ms. Rady, I hand you what's been marked as
16      Exhibit 4.  Have you ever seen this document
17      before?
18  A.   I have.
19  Q.   And this is another one of your time cards?
20  A.   It is.
21  Q.   And this is an actual time card as opposed to a
22      time sheet; correct?
23  A.   Correct.
24  Q.   So this was done sometime after the time clocks
25      went into effect?

6d22c9fb-77db-4a30-9090-a7dc74ce86c9

NETWORK DEPOSITION SERVICES
Transcript of Heather Rady

Page 100

1  Q.  Because the November of 2005 exhibit is a time
2      sheet?
3  A.  Correct, as is the January 8th.
4  Q.  That makes sense.
5          The first thing I want to ask you,
6      there seem to be some handwritten numbers, there
7      is a No. 1, No. 2, 3 and No. 4, and each of
8      those numbers is circled; do you see that?
9  A.  Actually -- yes, on the right here.
10 Q.  And before I even ask you about those, is this
11     your handwriting on this time sheet
12     (indicating)?
13 A.  My handwriting is my signature, my printed name,
14     no lunch, and on the right-hand columns where
15     I've indicated, by hand, my lunch times.
16 Q.  Are these numbers your writing?
17 A.  They are not.
18 Q.  They're someone else's writing?
19 A.  That looks like Kim Stebler's handwriting.
20 Q.  If you look at the next page there's more
21     writing; do you recognize the handwriting on the
22     next page?
23 A.  Yes, that's my handwriting.
24 Q.  And the first entry says, No. 1, 8:10 a.m.,
25     driving around looking for a place to park on

NETWORK DEPOSITION SERVICES
Transcript of Heather Rady

Page 104

1    Q.    And by punching out at 4:10, that would have
2          been more than seven minutes after 4:00?
3    A.    That is correct.
4    Q.    Do you recall whether you were compensated for
5          those additional ten minutes?
6    A.    Well, to the left, where Kim makes indication of
7          these numbers, I'm not sure how she and Pete
8          calculate the time.
9                    And Pete has looked at this and said
10         oh, she's three minutes over without preapproved
11         overtime, then we need to make the adjustment,
12         so I'm not sure if he did or how they're
13         calculating time.
14   Q.    It looks like there's some initials in that same
15         box, P.J.?
16   A.    That's Pete's initials.
17   Q.    Okay.  And why would Pete initial your time, if
18         you know?
19   A.    He initialed it because -- well, he's actually
20         initialing the fact that I wrote no lunch,
21         because we were supposed to take a lunch break
22         unless there was some extenuating circumstance
23         that the day just did not permit for lunch, so
24         usually we weren't allowed to not take a lunch
25         break, so he's initialing that it was okay that

6d22c9fb-77db-4a30-9090-a7dc74ce86c9

NETWORK DEPOSITION SERVICES
Transcript of Heather Rady

Page 105

1      I did not take lunch this day.

2   Q.  So these notations in the left-hand column,
3       those don't belong to you; right?

4   A.  They do not.

5   Q.  Who do you think they belong to?

6   A.  They belong to Kim Stebler.

7   Q.  How do you know they belong to Kim Stebler?

8   A.  I just recognize her handwriting.

9   Q.  And do you know what she's -- what the purpose
10      of her making these notations in this column
11      was?

12  A.  I know that it has to do with the way you
13      calculate the time.  The clock, itself, didn't,
14      you know, calculate a final tally of hours
15      worked, so this is how they did it, but I don't
16      know what it means or how to interpret that.

17  Q.  Did you ever ask her how to interpret these
18      notations?

19  A.  No, I did not, because we usually -- we would
20      not see -- I would see her working on them at
21      her desk, but after she made these notations she
22      locked up the time cards, so we would not get
23      them back like that (indicating).

24  Q.  In 2006 do you know how your hours were
25      recorded, in other words, were you recorded --

6d22c9fb-77db-4a30-9090-a7dc74ce86c9

NETWORK DEPOSITION SERVICES
Transcript of Heather Rady

Page 122

1   Q.   Did Mr. Hilgefort ever obtain his insurance
2        license while you were employed at Alderwoods?
3   A.   Not while I was employed, no.
4   Q.   And he was not terminated for that; correct?
5   A.   Correct.
6   Q.   And you're not aware of any discipline from
7        management for him not obtaining his insurance
8        license; correct?
9   A.   Not that I'm aware of, no.
10  Q.   What about Ms. Young, did she ever obtain her
11       insurance license while you were at Alderwoods?
12  A.   She never did, no.
13  Q.   Was she ever disciplined, to your knowledge?
14  A.   Not that I'm aware of.
15  Q.   Do you know whether she took the test to become
16       an insurance agent?
17  A.   Many times.
18  Q.   And she just couldn't pass it?
19  A.   Correct.
20  Q.   And was Mr. McDermott a funeral director while
21       you were still employed at Alderwoods?
22  A.   He was, yes.
23  Q.   Did Mr. McDermott ever obtain his insurance
24       license?
25  A.   He did.

6d22c9fb-77db-4a30-9090-a7dc74ce86c9

NETWORK DEPOSITION SERVICES
Transcript of Heather Rady

Page 124

1      the other agencies and use strictly Mayflower.
2   Q.  How do you know they had insurance licenses?
3   A.  I assumed that they did because they were there
4      being trained about the product, the Mayflower
5      product.
6   Q.  Do you know whether they obtained their
7      insurance licenses while they were employees of
8      Alderwoods?
9   A.  That, I don't know.
10  Q.  So you don't know if they were required to
11     obtain insurance licenses by Alderwoods?
12  A.  That's correct.
13  Q.  Do you know any employees outside the Pittsburgh
14     market who were required to obtain their
15     insurance licenses by Alderwoods?
16  A.  Not specifically, no.
17  Q.  I'm not even asking specifics, are you aware of
18     any.  I don't need to know their names, but are
19     you -- do you have knowledge of anyone outside
20     of the Pittsburgh market who was required to
21     obtain insurance licenses?
22  A.  No.
23  Q.  In paragraph 24 of this affidavit, Mr. McDermott
24     indicated to the staff that he was communicating
25     the insurance agent requirement as it had been

Johnstown              Toll-Free              Pittsburgh
814-266-2042          866-565-1929          412-281-7908

6d22c9fb-77db-4a30-9090-a7dc74ce86c9

NETWORK DEPOSITION SERVICES
Transcript of Heather Rady

Page 126

1    because you already had one when you came to --
2    became a funeral director for Alderwoods?
3  A.  I'm sorry, restate the question, please?
4  Q.  Is it your testimony that this policy did not
5    apply to you because you already had an
6    insurance license before the policy went into
7    effect?
8  A.  Well, correct, yeah, I wouldn't need to
9    recertify myself, I already had the license.
10  Q.  So it only would have impacted employees,
11    funeral director employees, who did not have
12    insurance licenses at the time the policy went
13    into effect?
14  A.  I'm sorry, what would have impacted them?
15  Q.  This policy requiring them to get insurance
16    licenses.
17  A.  Correct.
18  Q.  And it would have only been in states that
19    require insurance licenses to sell pre-need
20    insurance; is that right?
21  A.  Correct.  I wouldn't think that in New York,
22    like I said, you would need a license.  They
23    couldn't fund pre-need through insurance in
24    New York.
25  Q.  Are you, personally, making any claims for

6d22c9fb-77db-4a30-9090-a7dc74ce86c9

NETWORK DEPOSITION SERVICES
Transcript of Heather Rady

Page 135

1          you see that?

2     A.   Yes.

3     Q.   Do you see anywhere in this document where it

4          indicates that overtime that isn't approved is

5          not paid?

6     A.   No.

7     Q.   Do you see the first bullet point under

8          recording time worked that requires employees to

9          record all hours actually worked?

10    A.   Yes.

11    Q.   Is it your understanding that it was Alderwoods'

12         country-wide policy that employees record the

13         hours actually worked?

14    A.   Yes.

15                         - - - -

16         (Rady Exhibit No. 7 marked for identification.)

17                         - - - -

18    BY MR. KNIGHT:

19    Q.   I hand you what's been marked as Exhibit 7,

20         Ms. Rady (indicating).  This document, the top

21         of it is labeled hours of work and overtime,

22         U.S.; do you see that?

23    A.   I do.

24    Q.   Is this a document you've ever seen?

25    A.   It appears it may have come from policies and

6d22c9fb-77db-4a30-9090-a7dc74ce86c9

NETWORK DEPOSITION SERVICES
Transcript of Heather Rady

Page 153

1        your overtime calculation?

2    A.   Yes, that is my testimony.

3    Q.   How do you know that to be the case?

4    A.   Well, I understand in order to correctly

5         calculate overtime those things need to be

6         included on top of my weekly pay, and they were

7         not.  It was simply my weekly pay plus overtime

8         hours that were calculated when paying the

9         overtime.

10   Q.   And how do you know that's the case, how do you

11        know that they didn't make any sort of

12        adjustment for bonuses and commissions?

13   A.   I know that because my attorneys have counseled

14        me as such.

15   Q.   Did you review any of your pay records?

16   A.   Yes.

17   Q.   And do those pay records reflect any adjustment

18        for bonuses and commissions in overtime pay?

19   A.   Not that I'm aware of.

20   Q.   Do you know whether you have produced, in this

21        litigation, the pay stub that you reviewed with

22        your attorney?

23   A.   I think that there is one pay stub that was

24        reviewed by the attorneys that indicated that

25        such practice was not being --

NETWORK DEPOSITION SERVICES
Transcript of Heather Rady

Page 154

1                        - - - -

2       (Rady Exhibit No. 11 marked for identification.)

3                        - - - -

4    BY MR. KNIGHT:

5    Q.   I hand you what's been marked as Exhibit 11,

6         Ms. Rady, and I'm going to ask, is this the pay

7         statement that you're referring to (indicating)?

8    A.   Actually, it is, because what sticks out is the

9         chargeback commission.

10   Q.   Why does that stick out?

11   A.   Again, it's a negative number.

12   Q.   That's a minus 187.71, you see?  Is that the

13        chargeback?

14   A.   Correct, I believe this is my chargebacks.

15   Q.   Now, there's a line directly above that; do you

16        see the line directly above that?

17   A.   Yes, overtime adjustment.

18   Q.   Right.

19              Do you know what that overtime

20        adjustment is?

21   A.   I have never understood what that means.

22   Q.   You testify in your affidavit that Alderwoods

23        did not include either bonuses or commissions in

24        your overtime calculations; correct?

25   A.   Correct.

NETWORK DEPOSITION SERVICES
Transcript of Heather Rady

Page 155

1   Q.   How do you know that that overtime adjustment
2        column, line, does not include your commissions
3        or bonuses as part of that overtime adjustment?
4   A.   I don't know that.  I don't know exactly what
5        overtime adjustment is, and that's year to date,
6        that's a very small number, so I don't know.
7   Q.   You don't know one way or another what that
8        overtime adjustment means; correct?
9   A.   I do not.
10  Q.   I'm going to ask you to take a look at Exhibit 5
11       again, Ms. Rady.  This is the check detail
12       listing I showed you before.  Do you see --
13       well, there's a column for check --
14                  MS. WEYANDT:  What page are we
15       looking at?
16                  MR. KNIGHT:  The first page.
17  BY MR. KNIGHT:
18  Q.   It begins with 12-5, 2003, 12-19, 2003, below
19       that 1-02, 2004?
20  A.   Yes.
21  Q.   Were you paid every other week as an employee of
22       Alderwoods?
23  A.   Yes.
24  Q.   Do you see, under the 12-19, 2003 column, or
25       listing, that there is another overtime

NETWORK DEPOSITION SERVICES
Transcript of Heather Rady

Page 163

1       preapproved and other times when you were not
2       paid for that overtime.
3    A. Goodness, for some reason I'm having -- can you
4       rephrase the question, I'm having difficulty
5       with that one?
6    Q. Earlier we looked at some of your time sheets
7       that had some overtime on them, --
8    A. Okay.
9    Q. -- and I'm asking if we looked at all your time
10      sheets over the course of your employment with
11      Alderwoods would we see, on your time sheets,
12      examples of overtime that was not preapproved
13      but was paid?
14   A. Yes, and I think that perhaps one of these
15      exhibits would indicate that, perhaps Exhibit 3,
16      on Wednesday, it's only a half-hour of overtime,
17      but I don't justify what that was for, so --
18   Q. So you think that was an example of overtime
19      that hadn't been preapproved but that you still
20      recorded?
21   A. It could have been, yes.
22   Q. Okay.  You left Alderwoods in August 2006; is
23      that right?
24   A. I think August 1st of 2006.
25   Q. Why did you leave Alderwoods?

6d22c9fb-77db-4a30-9090-a7dc74ce86c9

NETWORK DEPOSITION SERVICES
Transcript of Heather Rady

Page 169

1   A.   Yes, I think that they knew better.
2   Q.   In paragraph 19, subclass E, --
3   A.   Exhibit 13?
4   Q.   Yes.
5   A.   Okay.
6   Q.   -- your complaint refers to a pre-needs
7        appointment policy; what do you understand that
8        to mean?
9   A.   That we were to accommodate the needs of the
10       family wanting to schedule the appointment.
11  Q.   And were you to be compensated for all that
12       time?
13  A.   No, unless we were in the building.  They saw it
14       as such, if we came in on our day off or stayed
15       late, after hours, that the commission was
16       compensation enough for our time.
17  Q.   If you started a pre-need appointment before
18       your regularly scheduled workday was to end and
19       it continued beyond the end of your scheduled
20       workday would you be compensated for all of the
21       time you spent in that appointment?
22  A.   According to the new policy I would think so.
23  Q.   What new policy?
24  A.   That we were required to write down all of our
25       time spent working.

NETWORK DEPOSITION SERVICES
Transcript of Heather Rady

Page 170

1   Q.   What about before that policy?
2   A.   Before the policy, probably not, probably not.
3        We would have -- or I would have signed out at
4        the time that I was supposed to have left for
5        the day.
6   Q.   When you were working on -- when you were
7        recording your times on time clocks were there
8        ever occasions where you would have been in a
9        meeting with someone that began before the end
10       of your workday and continued past?
11  A.   Yes.
12  Q.   Would you get up from that meeting and punch out
13       and then come back and finish the meeting?
14  A.   No, no.
15  Q.   When would you punch out?
16  A.   When I was finished with the meeting, or at the
17       conclusion of the meeting.
18  Q.   And would you be compensated for that entire
19       time?
20  A.   I believe so, I believe so.  We would probably
21       have had to justify that time, like on Exhibit
22       4, we would have to justify why we were working
23       the overtime.
24  Q.   Subclass F, are you making any claims in this
25       case that you were not paid for time you spent

NETWORK DEPOSITION SERVICES
Transcript of Heather Rady

Page 178

1         her additionally privately.

2    Q.   The fifth bullet point on this page mentions

3         statements made by Michael Hilgefort --

4    A.   Yes.

5    Q.   -- regarding an Adopt-a-Highway program?

6    A.   Yes.

7    Q.   What are you referring to there?

8    A.   I don't think that Michael wanted to participate

9         in the Adopt-a-Highway program.  Michael was not

10        participating in any community activities or

11        community involvement, and some employees were

12        upset because there was no repercussion or

13        accountability for such, and he didn't want to

14        have to participate in Adopt-a-Highway.

15             I believe -- Michael is an overweight

16        person, and I think the walking and doing that

17        task would create physical or undue hardship.

18   Q.   So all employees were required to participate in

19        Adopt-a-Highway?

20   A.   I don't believe that Deborah participated.  I

21        know I did, Pete Johnson, Michael Hilgefort, I

22        believe Ken Hunkele did.

23   Q.   And what, exactly, did you have to do as part of

24        the Adopt-a-Highway program?

25   A.   We wore a fluorescent jacket, walked along the

6d22c9fb-77db-4a30-9090-a7dc74ce86c9

NETWORK DEPOSITION SERVICES
Transcript of Heather Rady

Page 179

1        highway with a garbage bag picking up trash, and

2        it was a period of or a span of several miles.

3    Q.   And was there any insignia or any indication

4        that you were an employee of Alderwoods while

5        you were doing that?

6    A.   No, I don't think that we had Alderwoods shirts,

7        but that portion of -- goodness, is it -- it's

8        not Semple -- I forget the name of the road

9        right now -- there is a sign that says this

10       portion of Adopt-a-Highway, and it says Brandt

11       Funeral Home employees.

12   Q.   Do you recall what day of the week you would do

13       this?

14   A.   I think it was during work hours that we did it.

15   Q.   Were you compensated for the time you spent

16       doing Adopt-a-Highway?

17   A.   If it was during work hours, yes.  We only did

18       it one time, we were required, I think to do it

19       once a month, but my experience was that we -- I

20       had done it once.

21   Q.   And you believe you were compensated for it?

22   A.   I think it occurred during work time.

23   Q.   The top bullet point on page 10, you mention a

24       statement made by Randy Howard regarding after

25       hours pre-needs appointments --

Johnstown                 Toll-Free              Pittsburgh
814-266-2042           866-565-1929          412-281-7908

6d22c9fb-77db-4a30-9090-a7dc74ce86c9

```
 1    COMMONWEALTH OF PENNSYLVANIA )       CERTIFICATE
 2    COUNTY OF ALLEGHENY          )       SS:
 3         I, Catherine C. Leverty, a Court Reporter and
 4    Notary Public in and for the Commonwealth of
 5    Pennsylvania, do hereby certify that the witness,
 6    HEATHER RADY, was by me first duly sworn to testify
 7    to the truth, the whole truth, and nothing but the
 8    truth; that the foregoing deposition was taken at the
 9    time and place stated herein; and that the said
10    deposition was recorded stenographically by me and
11    then reduced to printing under my direction, and
12    constitutes a true record of the testimony given by
13    said witness.
14         I further certify that the inspection, reading
15    and signing of said deposition were waived by counsel
16    for the respective parties and by the witness.
17         I further certify that I am not a relative or
18    employee of any of the parties, or a relative or
19    employee of either counsel, and that I am in no way
20    interested directly or indirectly in this action.
21         IN WITNESS WHEREOF, I have hereunto set my hand
22    and affixed my seal of office this 17th day of
23    November, 2008.
24                        _____
25                                    Notary Public
```

Johnstown
814-266-2042

Toll-Free
866-565-1929

Pittsburgh
412-281-7908