# NETWORK DEPOSITION SERVICES
## Transcript of Jack Reddick

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DEBORAH PRISE AND HEATHER RADY ON BEHALF OF THEMSELVES
AND ALL EMPLOYEES SIMILARLY SITUATED,

        Plaintiffs,

vs.             Civil Action No.  06-1641

ALDERWOODS GROUP, INC.,

        Defendants.

DEPOSITION OF JACK REDDICK
TAKEN ON BEHALF OF THE DEFENDANT
ON AUGUST 29, 2009, BEGINNING AT 8:00 A.M.
IN COFFEEVILLE, KANSAS

APPEARANCES

On behalf of the PLAINTIFFS: ANNETTE M. GIFFORD Thomas &
Solomon, LLP 693 East Avenue Rochester, New York 14607

(585)272-0540 agifford@theemploymentattorneys.com

On behalf of the DEFENDANT: TONYA B. BRAUN Jones Day

325 John H. McConnell Blvd., Suite 600 Columbus, Ohio

43215-2673 (614)469-3939 tbraun@jonesday.com

REPORTED BY:  Cheryl J. O'Meilia, C.S.R.

cb4f1969-01b0-440e-b1af-4dbfd8bd7096

NETWORK DEPOSITION SERVICES
Transcript of Jack Reddick

1    it said other than something about servicing the

2    community?

3        A.   Yes.

4        Q.   You don't recall it saying anything about

5    whether or not individuals would be paid for the time

6    they spent in community service?

7            MS. GIFFORD:   Objection.

8        A.   No.

9        Q.   (BY MS. BRAUN)   You don't recall that?

10       A.   I don't recall.

11       Q.   Okay.   Or whether they would be required to

12    join a community service organization?

13       A.   I don't recall -- or recall seeing that.

14       Q.   You don't recall seeing that in there?

15       A.   No.

16       Q.   Do you recall seeing anything that

17    individuals would be required to record their time

18    spent in community service activities?

19       A.   No.

20       Q.   No?

21       A.   No.

22       Q.   You described the community service sheet and

23    the fact that you completed it, but do you -- do you

24    know whether others completed it at Potts Chapel?

25       A.   No, I don't know if they did or not.

cb4f1969-01b0-440e-b1af-4dbfd8bd7096

NETWORK DEPOSITION SERVICES
Transcript of Jack Reddick

Page 177

1      Q.   Did you ever see anyone else's completed --
2  completed community service sheet?
3      A.   I saw the sheets, each one of them had it.   I
4  don't know if they completed it or not.
5      Q.   Did you always complete yours?
6      A.   Yes.
7      Q.   Every month you did?
8      A.   Yeah.
9      Q.   Okay.  And at the time --
10      A.   Don.
11      Q.   -- Mr. Runyon -- at the time Mr. Runyon came
12  onboard, you stopped seeing the sheets, you said.  You
13  didn't -- you didn't use the sheets, you didn't see
14  them lying --
15      A.   No.
16      Q.   -- you know, being available?        Where
17  would you pick them up, by the way?
18      A.   From the LA's office.
19      Q.   Okay.  So you never saw them again after Don
20  came onboard?
21      A.   No.
22      Q.   Did you have performance evaluations while
23  you were an Alderwoods employee?
24      A.   Yes.
25      Q.   Okay.  And in those evaluations, were you

NETWORK DEPOSITION SERVICES
Transcript of Jack Reddick

Page 179

1       A.    Yeah.

2       Q.    And he would say, "You need to get out there

3   in the community"?

4       A.    Yeah, yes.

5       Q.    Okay.  Did he make -- do you have any idea

6   whether he made statements like that to the other

7   employees that worked at Potts Chapel?

8       A.    No.

9       Q.    You don't know what other employees may have

10  been told or what was said to them regarding

11  participation in the community?

12      A.    No.

13      Q.    Your knowledge is limited to what he may have

14  said to you, to Chad and to John?

15      A.    Right.

16      Q.    Because you sat together?

17      A.    Yes.

18      Q.    Okay.  And do you know if Chad or John were

19  ever reprimanded for -- for their lack of participation

20  --

21      A.    No.

22      Q.    -- in the community?

23      A.    No.  When -- when I -- when I have said Chad

24  or John, I'm saying that we're all -- he doesn't --

25  when Dave was talking about overtime or community

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

cb4f1969-01b0-440e-b1af-4dbfd8bd7096

NETWORK DEPOSITION SERVICES
Transcript of Jack Reddick

Page 180

1    service or whatever, he didn't say John, Chad or Jack,

2    he'd just be sitting there talking and saying "guys" or

3    "you guys." He didn't point a finger at -- you know,

4    and he'd say, "You need -- can you get out and do some

5    community service?" Well, I knew he wasn't talking

6    about me because I turned my mine in, so was he talking

7    to them? I don't know.

8        Q.   But you were the only people in the room?

9        A.   Right.

10       Q.   Okay. And in term of the Elks Club, you'd

11   said that you had been an Elks Club member beginning

12   when you were 21 years old?

13       A.   Uh-huh, yes.

14       Q.   And so -- I mean, I don't want to put you on

15   the spot, but about approximately how many years was --

16   were you an Elks Club member then?

17       A.   Probably --

18       Q.   Before you went on hiatus?

19       A.   Let's see, probably 40 years.

20       Q.   And how many -- how -- how long have you

21   lived in -- in Independence?

22       A.   Since April of '72.

23       Q.   And since '72, how many times do you think

24   you've attended the fundraiser, the -- you know, with

25   Kiwanis or -- or otherwise, like the bean feed type

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

cb4f1969-01b0-440e-b1af-4dbfd8bd7096

NETWORK DEPOSITION SERVICES
Transcript of Jack Reddick

1    fundraiser that you described?

2        A.   Oh, as I told you, I was on the ambulance

3    service, so I've been -- I've been to them ever since

4    I've been to town to all this kind of stuff to be out

5    in the public.

6        Q.   Okay.

7        A.   I've always worked with the public.

8        Q.   So going back to '72, probably?

9        A.   Yeah.

10       Q.   Okay.  And are you still a member of the Elks

11   Club?

12       A.   Yes.

13       Q.   Are you still a member of the Masons Lodge?

14       A.   Yes.

15       Q.   And you're still attending bean feed

16   fundraisers, going to pancake breakfasts, attending

17   fundraisers for the Lutheran school?

18       A.   Uh-huh.

19       Q.   Still a member of the Methodist church?

20       A.   Yes.

21       Q.   Okay.  And you still go to the Cherry Bloom

22   Festival -- or Blossom, was it, maybe?

23       A.   Yes.

24       Q.   Excuse me.  So that was a yes to all of those?

25       A.   Yes.

cb4f1969-01b0-440e-b1af-4dbfd8bd7096

NETWORK DEPOSITION SERVICES
Transcript of Jack Reddick

Page 196

1  different clubs, I don't know what all, but he was

2  quite active.

3         Q.   Do you know -- strike that.         And I

4  believe we covered this, I just want to make sure that

5  you said that when you did attend the meetings with the

6  Masons Lodge or the Elks Club, those -- were those --

7  you said those were in the evening?

8         A.   Yes.

9         Q.   So those were not during work time?

10        A.   No.

11        Q.   Okay.  Were any of the other fundraisers or

12  events ever during work time, in the -- in the day?

13        A.   No.

14        Q.   And the form that you filled out, we talked

15  about it would say the -- the organization and the

16  event and the date, but it -- it didn't include the

17  time you spent there?

18        A.   No.  For instance, the lodge, we'd have

19  Halloween coming up, we have a week-long process which

20  is called Neewollah, which is Halloween spelled

21  backwards, and it brings 40 to 50,000 people to

22  Independence.  And from Wednesday until Saturday they

23  have a -- the lodge has a concession stand.  And I help

24  in it and stuff, you know, like that, which you go in

25  and you work generally from 5:00 until 7:00 or 8:00,

cb4f1969-01b0-440e-b1af-4dbfd8bd7096

NETWORK DEPOSITION SERVICES
Transcript of Jack Reddick

1    Q.   And when you put on that name tag, did you

2  write Potts Chapel on it?

3    A.   No, they all knew I worked there.

4    Q.   And when I asked you, like, if you were

5  incentivized to belong there, you -- you said, well,

6  you didn't have to -- you didn't pay or the -- your

7  employer, Alderwoods, did not pay?

8    A.   No.

9    Q.   But was there any other type of, you know,

10 program like if you -- you know, if you do the

11 community service work, you know, we'll get you a cake

12 on Friday or something?  I mean, that's what I'm asking

13 about.  Was there some other type of program, like if

14 you participate in this community service, then we'll

15 make sure that, you know, we bring donuts in on Friday

16 for you?

17   A.   Oh, no.  No.

18   Q.   And that's what I'm asking you about.  Okay.

19   A.   No.

20   Q.   All right.  And do you have any idea as to

21 whether employees at other locations, there may have

22 been programs, incentive type programs for -- for them

23 to belong in community service organizations or

24 participate in activities?

25   A.   Not that I know of.  I mean, no knowledge of

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

cb4f1969-01b0-440e-b1af-4dbfd8bd7096

NETWORK DEPOSITION SERVICES
Transcript of Jack Reddick

Page 202

1    it.

2         Q.    Have you ever heard of a program called I

3    Believe in Service?

4         A.    I Believe in Service?

5         Q.    Service?

6         A.    I don't -- not off the top of my head, no.

7         Q.    No?  Were you ever told that you would lose

8    your job if you did not continue to belong to the

9    Masons Lodge?

10        A.    Not that I would lose my job.  I was given the

11   impression that I wouldn't be working there if I didn't

12   attend some functions, not per se joining a club, but

13   if I didn't do the community service, I was given the

14   impression or left a feeling that I wouldn't work there.

15        Q.    You said you -- how long have you been a

16   member of the Methodist church?

17        A.    I was baptized there.

18        Q.    So since birth, basically?

19        A.    (Nods head).

20        Q.    Okay.  And are you also -- I just want to be

21   very clear because we talked about, you know, are you

22   seeking compensation for time you spent involved in

23   community service activities and with organizations and

24   being a member of the Methodist church was -- was one

25   that you named.

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

cb4f1969-01b0-440e-b1af-4dbfd8bd7096

NETWORK DEPOSITION SERVICES
Transcript of Jack Reddick

Page 229

1      Q.   You wrote it out on paper?

2      A.   Uh-huh.  I think I did, yeah.

3      Q.   Do you have a recollection of writing out the

4  words on this document on paper?

5      A.   I either wrote it out or it was a

6  questionnaire that I wrote -- wrote on.

7      Q.   Could have been a questionnaire?

8      A.   Could have been.

9      Q.   Okay.  Here, again, in Number 3, Paragraph

10  Number 3 --

11      A.   Uh-huh.

12      Q.   -- it says July 2003.  We've established

13  today that's not accurate?

14      A.   Yeah, it's '04.

15      Q.   And Number 6?

16      A.   Yes.

17      Q.   You say that you're aware that the company

18  had a company-wide policy requiring hourly employees

19  such as assistant funeral directors to belong to at

20  least one outside community organization?

21      A.   Yes.

22      Q.   Is that accurate?

23      A.   That's why I joined the Elks Club upon Dave's

24  suggestion.  He said we was supposed to.

25      Q.   And a suggestion is not a requirement; is it?

cb4f1969-01b0-440e-b1af-4dbfd8bd7096

NETWORK DEPOSITION SERVICES
Transcript of Jack Reddick

Page 230

1          MS. GIFFORD:  Objection.

2      A.   Depends on how it's put to you.  I took it as

3  saying I had to belong to some organization, so that's

4  why I renewed my membership in the Elks Club in

5  Cherryville, because we didn't have any members over

6  there.

7      Q.   (BY MS. BRAUN)  The same organization that

8  you'd previously been a part of since you were 21?

9      A.   Yes.

10          MS. GIFFORD:  Objection.

11      Q.   (BY MS. BRAUN)  In here, it says that the

12  policy, it was -- it was company-wide?

13      A.   It was in their manual.

14      Q.   What was in the manual?

15      A.   What's that?

16      Q.   You said something was in the manual.  What

17  was in the manual?

18      A.   That we belong to -- it was in that -- what I

19  was telling you about an organization, a community

20  service -- belong to an organization and performing

21  community service.  It's in the Alderwoods manual.

22      Q.   Is this the same one we were just talking

23  about?

24      A.   Yes.

25      Q.   Oh, okay.  So now you remember that there was

cb4f1969-01b0-440e-b1af-4dbfd8bbd7096

NETWORK DEPOSITION SERVICES
Transcript of Jack Reddick

Page 232

1          MS. GIFFORD:  Objection.

2      Q.   (BY MS. BRAUN)  I mean, that's my question.

3      A.   Yeah.

4      Q.   Because that's what it says, that's what your

5  sworn testimony is here on this piece of paper.

6          MS. GIFFORD:  Objection.

7      A.   Yes.

8      Q.   (BY MS. BRAUN)  Yes, that's what you think it

9  said?

10     A.   Yes.

11     Q.   And here you state that it was a company-wide

12 policy?

13     A.   Potts Chapel Company, yes.

14     Q.   The -- the policy was in -- was at Potts

15 Chapel?

16     A.   Uh-huh.

17     Q.   But you state here that it was a company-wide

18 policy?

19     A.   Alderwoods.  It comes out of Alderwoods'

20 book.  All this stuff was in Alderwoods' policy manual.

21 I don't have that manual now because apparently they

22 took it all, what I didn't shred at their request.

23 It's gone.

24     Q.   You state in Paragraph Number 7 that

25 employees were expected to use their membership in

cb4f1969-01b0-440e-b1af-4dbfd8bd7096

NETWORK DEPOSITION SERVICES
Transcript of Jack Reddick

Page 233

1    volunteer community organizations to generate business

2    for the company?

3         A.   Uh-huh.

4         Q.   Why do you say that?

5         A.   Because we weren't getting paid, expect us to

6    go out and do it for nothing.

7         Q.   And did you, in fact, generate business for

8    the company?

9         A.   I hope I did.

10        Q.   Well, is there any evidence that you did?

11        A.   I go to a little restaurant called Half Pints

12   and we sit at this one big table and drink coffee and

13   we've had nine funerals from that table.  Now, did I do

14   it?  I don't know, but they came to Potts Chapel.

15        Q.   And this is from -- you said this is from a

16   restaurant you go to?

17        A.   Uh-huh.

18        Q.   And did you record the time that you spent

19   going to the restaurant on your community service?

20        A.   This is after I get off work and I go out and

21   get coffee and drink tea and visit with them and stuff.

22        Q.   I know.  But my question was whether you

23   recorded the time you spent in the restaurant on your

24   community service form that you discussed?

25        A.   I didn't record any of my time.

cb4f1969-01b0-440e-b1af-4dbfd8bd7096

NETWORK DEPOSITION SERVICES
Transcript of Jack Reddick

Page 234

1    Q.   Did you report the fact that you went to the
2    restaurant at all on your community service sheet?
3    A.   Yes.
4    Q.   You would put the time that you went to drink
5    coffee?
6    A.   Not time.
7    Q.   I'm sorry, did you record the fact that you
8    went to the restaurant --
9    A.   Yes.
10   Q.   -- on the sheet?
11   A.   Yes.  At that time, it was called Kenzies,
12   not Half Pints.
13   Q.   And is that time that you believe that you
14   should be compensated for, that you're seeking
15   compensation for in this litigation?
16   A.   Well, it's a group --
17        MS. GIFFORD:  Objection.
18   A.   It's a group that meets out there -- well,
19   they're out there about every day.
20   Q.   (BY MS. BRAUN)  Uh-huh.
21   A.   And I go out after work about 6:00 o'clock
22   and I stay until about 8:00 o'clock or so and then I
23   leave.  That's when everybody starts leaving.  They're
24   talking about hunting, they're talking about fishing,
25   they're talking about traveling, they're talking about

cb4f1969-01b0-440e-b1af-4dbfd8bd7096

NETWORK DEPOSITION SERVICES
Transcript of Jack Reddick

1    camping.  It's a group that gathers out there.

2         Q.   But my question was, in this litigation, are

3    you seeking compensation for the time that you spent at

4    this restaurant after work?

5         A.   Yes.

6         Q.   Paragraph 8 says, "While I worked for

7    Alderwoods I was involved in a number of community

8    organizations."  Have we discussed today the

9    organizations in which you belonged?

10        A.   Yes.

11        Q.   In Paragraph 10, it talks about forms that

12   detail the type of work that you did, the amount and

13   the date that the work was done?

14        A.   Yes.

15        Q.   Is that referring to the charts that we --

16   that you described to me today?

17        A.   Yes, ma'am.

18        Q.   And Paragraph 11, you talk about being

19   evaluated on your participation?

20        A.   Yes.

21        Q.   What do you mean by that?

22        A.   Like when we'd have our meetings, Mike would

23   get those things and he would come in and tell me that

24   I was doing a good job, community service, "Keep up the

25   good work," and I says, "Okay, I will," and --

cb4f1969-01b0-440e-b1af-4dbfd8bd7096

NETWORK DEPOSITION SERVICES
Transcript of Jack Reddick

Page 238

1    about his community service work?

2        A.    No.

3        Q.    Have we talked about all the statements that

4    other individuals outside Potts Chapel made to you

5    about their community service work?

6        A.    Yes.

7        Q.    And 14, it says, "Employees are not paid for

8    community work performed outside regular workday -- the

9    regular workday, even though the company required such

10   work and were aware employees were performing such work"?

11       A.    Uh-huh.

12       Q.    But you didn't indicate how many hours you

13   spent in your community service activities on the

14   sheet; did you?

15       A.    I thought I put down two or three hours.

16   That's generally about what it is at one of those

17   functions.

18       Q.    Okay.  So are you testifying now that you did

19   record time you spent on your sheets?

20       A.    I said I think.

21       Q.    I just want to know which it is.

22       A.    I think.

23       Q.    But you don't know whether other -- others at

24   Potts Chapel even completed the forms or what they

25   would have put on them?

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

cb4f1969-01b0-440e-b1af-4dbfd8bd7096

NETWORK DEPOSITION SERVICES
Transcript of Jack Reddick

Page 239

1      A.   No.

2      Q.   And if other -- well, strike that.     Number

3   15 addresses the fact that you say, "I was aware the

4   company had an on-call policy requiring funeral

5   directors and assistant funeral directors to spend time

6   on call."  What are you talking about here, written

7   policy?

8      A.   Written policy.  That's a written policy at

9   any funeral home.  If it's Alderwoods, Paxus,

10  Penwell-Gable, that's part of the duties of a funeral

11  director, is being on call. Requirement.

12     Q.   And -- and you thought that it also applied to

13  assistant funeral directors?

14     A.   It does.

15     Q.   And where was this policy maintained?

16     A.   In the manual, and in the -- in the

17  Alderwoods' -- and in our hand -- guide -- guide book,

18  personnel book.

19     Q.   And what do you recall that this policy said?

20     A.   That's part of your duties, being able to

21  lift 150 pounds, being able -- being on call.  It also

22  says in there that you'll wash cars.  It also says in

23  there that you'll run the sweeper, whatever duties

24  you're -- you're asked to do by the manager.

25     Q.   And you think that's -- and this is a policy

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

cb4f1969-01b0-440e-b1af-4dbfd8bd7096

NETWORK DEPOSITION SERVICES
Transcript of Jack Reddick

Page 240

1    that -- that addresses on-call work?

2         A.   On call?

3         Q.   That's what we're talking about.  It says,

4    "While I was employ- -- while I was employed by

5    Alderwoods, I was also aware that the company had an

6    on-call policy."  So that's what I'm asking you about,

7    so did you see -- what policy are you talking about

8    there was a written policy?

9         A.   The written policy is in the handbook that

10   they hand you when they hire you at Alderwoods or any

11   funeral home, that that's one of the requirements of

12   the funeral director, is to be on call.

13        Q.   Of the funeral director?

14        A.   Right.

15        Q.   And what -- what else do you recall that the

16   policy said?

17        A.   That's what I was saying, car washing,

18   sweeping the floors.  You're talking about on-call

19   policy.  That's all it says, that it requires you to

20   take and be able to take a call. Okay.

21        Q.   Is that --

22        A.   If you want to know what else is in that --

23        Q.   No, I just want to know what the on-call

24   policy addresses.

25        A.   That you will be able to take calls, make

cb4f1969-01b0-440e-b1af-4dbfd8bd7096

NETWORK DEPOSITION SERVICES
Transcript of Jack Reddick

1    removals.

2        Q.    And then my follow-up question to that was,

3    does -- what do you recall, if anything, that the

4    written on-call policy that you're talking about, do

5    you recall anything else that it says?

6            MS. GIFFORD:  Objection.

7        Q.    (BY MS. BRAUN)  And it's just -- it isn't --

8    it --

9        A.    Wasn't that what I just was trying to answer?

10       Q.    But I don't understand what you're saying,

11   because you're -- I just want to clarify what you're

12   saying because then you started talking about being

13   able to wash cars.

14       A.    Well, you're saying --

15           MS. GIFFORD:  If that's --

16       A.    -- what else is in this -- in this policy.

17   In this, it also states -- that's part of the policy,

18   on-call, detailing cars.  That's not -- it's just not a

19   separate policy for on call.

20       Q.    That's what I'm trying to get at.

21       A.    Yes.

22       Q.    It wasn't a separate policy for on call?

23       A.    No.  It's part of the hirement (sic) being

24   hired, part of the qualifications to be hired.

25       Q.    Now we're on the same page.

cb4f1969-01b0-440e-b1af-4dbfd8bd7096

NETWORK DEPOSITION SERVICES
Transcript of Jack Reddick

Page 242

1      A.   Okay.

2      Q.   That's what I'm trying to understand.

3      A.   Okay.

4      Q.   In 18, you say, "I spoke with a number of

5  other funeral directors in other Alderwoods locations

6  who also indicated that they were not paid for time

7  spent on call."

8      A.   Yeah.  You ask any of them, none of them's

9  paid for being on call.

10     Q.   Did you have a specific conversation with

11 someone who told you they were not paid for being on

12 call?

13     A.   I asked them.

14     Q.   Who did you ask?

15     A.   People in Miami, people in Oswego and

16 Columbus, people in Wichita.

17     Q.   And what did you ask them?

18     A.   If they got paid for being on call, if they

19 got paid for making calls.

20     Q.   And what were you told?

21     A.   They got paid for making calls.  Didn't get

22 paid for being on call.  Funeral directors got $75 for

23 being on call.  If they were, oh, part time, people had

24 called them in to get -- to make a call, they got $35

25 for being on call.  If they were a person that was just

cb4f1969-01b0-440e-b1af-4dbfd8bd7096

NETWORK DEPOSITION SERVICES
Transcript of Jack Reddick

Page 243

1    used strictly for being on call and made a call, they
2    got $50.
3        Q.   So -- so when you say that there's like a --
4    I'm hearing a distinction in what you're saying and I
5    want to make sure that I understand this.  You're
6    saying that there's -- there's time when you're just on
7    call; right?  You're on call and you may not get a call
8    at all; right?
9        A.   Uh-huh.  Yeah.
10       Q.   And there's times when you're on call and you
11   might have to go do something, do a removal?
12       A.   Right.
13       Q.   So when you're saying that people indicate --
14   others at other locations indicated they were not paid
15   for time spent on call, are you saying they were
16   complaining about not being paid for just time
17   generally that they were on call?
18       A.   Yes, that's what they were complaining about.
19       Q.   Because they were paid -- you're -- you're
20   saying, and I'm trying to understand what you said, you
21   said they were paid if they went and did something;
22   correct?
23            MS. GIFFORD:  Objection.
24       A.   Yes.
25       Q.   (BY MS. BRAUN)  Their complaint was that they

cb4f1969-01b0-440e-b1af-4dbfd8bd7096

NETWORK DEPOSITION SERVICES
Transcript of Jack Reddick

Page 244

1  weren't paid for the time they might have been on call

2  but not doing something?

3      A.   Right.  Yes.

4      Q.   All right.  And Number 19, you say that

5  you're aware that Alderwoods had a pre-approval for

6  overtime policy; is that what --

7      A.   Right.

8      Q.   -- we've discussed, the memo?

9      A.   Yes.

10     Q.   The memo of having to call --

11     A.   Uh-huh.

12     Q.   -- either Mr. Hill or Don -- I can't remember

13 Don's name.

14          MS. GIFFORD:  Runyon.

15     A.   Runyon.

16     Q.   (BY MS. BRAUN)  Runyon.

17     A.   Yes.

18     Q.   That's what you're referring to?

19     A.   Yes.

20     Q.   And then you say that under the policy,

21 employees are not compensated for overtime unless the

22 overtime was preapproved?

23     A.   Right.

24     Q.   But you, in fact, were compensated for

25 overtime that was not preapproved?

cb4f1969-01b0-440e-b1af-4dbfd8bd7096

NETWORK DEPOSITION SERVICES
Transcript of Jack Reddick

Page 245

1          MS. GIFFORD:  Objection.
2      A.   Most of that's when I was there by myself or
3  when Don first came there, that short period of time.
4      Q.   (BY MS. BRAUN)  20 says, "Management even
5  maintained a written policy on pre-approval for
6  overtime policy in their company policies and
7  procedures binder."  What are you referring to?
8      A.   What it says, there's a policy in this policy
9  and procedure binder that Alderwoods had, and that's
10  what it said.
11      Q.   And that's a policy that you've reviewed,
12  that you've --
13      A.   It was in that --
14      Q.   -- seen?
15      A.   -- binder book.  Yeah.
16      Q.   But is it something that you've read?
17      A.   Yes, or I wouldn't put it down policy and
18  binder proced- -- procedure binder.  That's where a lot
19  of this that I've tried to explain to you came out of,
20  was these policies and procedure -- this binder that
21  I've been talking about.
22      Q.   Well, we -- we talked about pre-approval at
23  length earlier and we talked about the memo?
24      A.   Yes.
25      Q.   So we didn't discuss a policy that was

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

cb4f1969-01b0-440e-b1af-4dbfd8bd7096

NETWORK DEPOSITION SERVICES
Transcript of Jack Reddick

Page 246

1    maintained in a binder?

2            MS. GIFFORD:  I think he was referring to the

3    other policies he was telling you about that were in

4    the binders, the community policy and the on call.

5        A.    Community service, things like that, it's all

6    in this policy bind- -- procedure binder.

7        Q.    (BY MS. BRAUN)  Right.  But when we -- we --

8    we spoke at length about the pre-approval and the memo?

9        A.    Uh-huh.

10       Q.    But there was no mention of a policy in the

11   -- in the policy --

12       A.    (Inaudible).

13       Q.    -- and procedures binder?

14           MS. GIFFORD:  Objection.

15           THE REPORTER:  What was your answer?  Oh, did

16   you answer?

17           MS. GIFFORD:  I don't know that he answered.

18   I thought there was a question.

19           THE REPORTER:  Oh, I thought he did, I'm

20   sorry.

21       Q.    (BY MS. BRAUN)  And 21, you say that, "Myself

22   and other employees at my location would also be

23   frequently chewed out by our manager if we failed to

24   obtain pre-approval for overtime."  Is that accurate?

25       A.    Yes.

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

cb4f1969-01b0-440e-b1af-4dbfd8bd7096

NETWORK DEPOSITION SERVICES
Transcript of Jack Reddick

Page 249

1     A.    Yes.

2     Q.    When you say in 22 -- I'm still with this

3   exhibit, Paragraph 22, and you say that the company was

4   -- excuse me -- "I'm also aware of other employees who

5   are not compensated for overtime that was not

6   preapproved."  Who are you referring to?

7     A.    Well, it's -- it was hearsay, but all I can

8   say is John and Chad, that's what they continually was

9   fighting with Mike and Dave about.  It's like I

10  explained about getting a call, a death call at 5:30 or

11  a quarter to 6:00 and they didn't want to pay them the

12  $75 or their time because they said it was -- well,

13  that's close to being when you was on duty.  Well, when

14  you go off at 5:00 o'clock, that's when that's supposed

15  to kick in, and that's what a lot of the fight was

16  over, was because the call came in at that time and

17  they'd put it down on the time sheet and they didn't

18  want to pay it.

19    Q.    And these are, again, conversations that you

20  would have -- you were in that area, your desk was in

21  the same area as Mr. Hill and --

22    A.    Yes, and when they opened their --

23    Q.    -- Chad?

24    A.    -- checks up -- when they opened their checks

25  up and they saw the thing there and they didn't see the

cb4f1969-01b0-440e-b1af-4dbfd8bd7096

## CERTIFICATE

I, CHERYL O'MEILIA, Certified Shorthand Reporter, do hereby certify that the above-named

Jack Reddick was by me first duly sworn to testify the truth, the whole truth, and nothing but the truth,

in the case aforesaid; that the above and foregoing deposition was by me taken and transcribed

pursuant to agreement, and under the stipulations hereinbefore set out; and that I am not an attorney

for nor relative of any of said parties or otherwise interested in the event of said action.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal this 8th day of

September, 2009.


CHERYL J. O'MEILIA, C.S.R.
State of Oklahoma, No. 1574

CHERYL O'MEILIA
Oklahoma Certified Shorthand Reporter
Certificate No. 1574
Exp. Date: December 31, 2010