**TAB 30**

NETWORK DEPOSITION SERVICES
Transcript of John Schabloski

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF PENNSYLVANIA

DEBORAH PRISE and HEATHER RADY

on behalf of themselves and all

employees similarly situated,

        Plaintiffs,

    vs.               Case No. 06-1461

                       Hon. Joy Flowers Conti

ALDERWOODS GROUP, INC.,

        Defendant.

_____

The Deposition of JOHN SCHABLOSKI,

Taken at 630 East Chicago Street,

Coldwater, Michigan,

Commencing at 9:28 a.m.,

Friday, May 15, 2009,

Before Deana M. Van Dyke, CSR-3715.

1852c36f-c164-4a7f-883d-7d6600be703c

NETWORK DEPOSITION SERVICES
Transcript of John Schabloski

1   Q.  Do you recall anyone that had the title of funeral
2       services support?
3   A.  No.
4   Q.  Do you recall anyone in the title of location
5       administrator?
6   A.  That would have -- yes, I do.
7   Q.  Who was that?
8   A.  That was Diane and I don't recall her last name.
9   Q.  That was at Traverse City?
10   A.  Yes.
11   Q.  You mentioned that you thought there may be ten
12       employees at Traverse City and we've named, I believe,
13       four so who else is it that you recall working at
14       Traverse City?
15   A.  Maintenance personnel.
16   Q.  Would they have had the title of maintenance man or
17       what title would the maintenance --
18   A.  Just part-time employees.
19   Q.  How many part-time maintenance folks were there?
20   A.  I would say probably three or four.
21   Q.  What other employees do you recall working at the
22       Traverse City location?
23   A.  A pre-need person.
24   Q.  Do you remember the person's name?
25   A.  No, not -- Maureen, and I believe her last name is

1852c36f-c164-4a7f-883d-7d6600be703c

NETWORK DEPOSITION SERVICES
Transcript of John Schabloski

1        Rhiel.

2    Q.  Is that Rhiel with an R?

3    A.  R-H-I-E-L.  I'm not sure if that's the correct
4        spelling of it but it's close.

5    Q.  Did anyone else other than Maureen Rhiel do pre-need
6        as you described it?

7    A.  No.

8    Q.  Do you recall any other employee of the Traverse City
9        location?

10   A.  No, that was it.

11   Q.  When you say that Maureen did pre-need, what do you
12       mean?

13   A.  Sold funeral plans ahead of time.  By of time, I mean
14       time of death.

15   Q.  Do you recall Maureen's title?

16   A.  I don't.

17   Q.  But you don't recall it being any one of the titles I
18       asked you about?

19   A.  No.

20   Q.  So you don't think it was any of the titles that I
21       asked you about?

22   A.  No, it was not.

23   Q.  And when you say Maureen did pre-need are you saying
24       that -- I believe you said she was the only one who
25       did pre-need?

1852c36f-c164-4a7f-883d-7d6600be703c

NETWORK DEPOSITION SERVICES
Transcript of John Schabloski

1   A.   That's correct.

2   Q.   So you did not do pre-need?

3   A.   That's correct.

4   Q.   So none of the other funeral directors --

5   A.   That's correct.

6   Q.   -- embalmers did pre-need?  How were you paid as an

7        employee at Alderwoods?

8   A.   Hourly.

9   Q.   Do you know whether Amanda Kirt was paid hourly or had

10       a salary?

11  A.   I believe it was salary.

12  Q.   Do you know?

13  A.   I don't know, no.

14  Q.   Do you know on what basis Ron Colgran was paid?

15  A.   Hourly.

16  Q.   What about Jennifer Holihan?

17  A.   Hourly.

18  Q.   Do you know that or are you --

19  A.   Yes, I do know that.

20  Q.   How do you know?

21  A.   They discussed that with me during my time of

22       employment there.

23  Q.   What did they say about it?

24  A.   That they were paid hourly.

25  Q.   You mentioned a location administrator you believe

1852c36f-c164-4a7f-883d-7d6600be703c

NETWORK DEPOSITION SERVICES
Transcript of John Schabloski

Page 40

1   Q.   So no degree from the community college but two years?

2   A.   Correct.

3   Q.   And then one year at mortuary school by which you

4        obtained an associate's degree in mortuary science?

5   A.   That's correct.

6   Q.   Did you complete a one-year apprenticeship?

7   A.   Yes, I did.

8   Q.   And the state and national exams you had to take, are

9        those -- did you have to sit for -- how long is the

10       test, do you recall?

11  A.   The national exam was an all day test, an 800 question

12       test, and the state exam was like a morning.

13  Q.   Now, did you hold an insurance license while you were

14       an employee at --

15  A.   No, I did not.

16  Q.   -- Alderwoods?  Mr. Schabloski, we keep having that

17       problem.

18              So you did not hold an insurance license?

19  A.   That's correct.

20  Q.   Did anyone suggest to you during your Alderwoods

21       employment that you should obtain an insurance

22       license?

23  A.   No.

24  Q.   Do you know if anyone else you worked with at the

25       Covell Funeral Home location had an insurance license?

1852c36f-c164-4a7f-883d-7d6600be703c

NETWORK DEPOSITION SERVICES
Transcript of John Schabloski

Page 41

1   A.   I believe Maureen did that sold pre-need.

2   Q.   And other than Maureen are you aware of anyone else

3        that held an insurance license?

4   A.   No.

5   Q.   So you don't believe that anyone else did?

6   A.   Not to my knowledge.

7   Q.   Do you know in the State of Michigan if you're

8        required to hold an insurance license to sell

9        pre-need?

10  A.   Yes, you are.

11                MS. GIFFORD:  Can we take a short break?

12                MS. BRAUN:  We can do it now.

13                (Recess taken at 10:29 a.m.)

14                (Back on the record at 10:33 a.m.)

15  BY MS. BRAUN:

16  Q.   Mr. Schabloski, we're back on the record.

17  A.   Okay.

18  Q.   We were discussing the fact that you did not have an

19       insurance license while you were an employee of

20       Alderwoods, correct?

21  A.   That's correct.

22  Q.   And you did not know of any other employee at the

23       Covell Funeral Home to have an insurance license other

24       than Maureen, correct?

25  A.   That's correct.

1852c36f-c164-4a7f-883d-7d6600be703c

NETWORK DEPOSITION SERVICES
Transcript of John Schabloski

Page 42

1   Q.   And you were never encouraged at any point to obtain
2        an insurance license?
3   A.   No.
4   Q.   And to your knowledge, was anyone else encouraged to
5        obtain an insurance license?
6   A.   No.
7   Q.   So there was no requirement as a funeral
8        director/embalmer to have an insurance license?
9   A.   That's correct.
10  Q.   You stated that you were -- I believe you stated this.
11       How were you compensated as an employee?
12  A.   Hourly.
13  Q.   For the entire period of your employment?
14  A.   Yes.
15  Q.   How did you report your hours worked?
16  A.   Through a time card, an electronic time machine.
17  Q.   Let me just try to understand.  When you say a time
18       card, are you talking about a paper sheet that you
19       completed?
20  A.   Cardboard that was inserted into a time clock.
21  Q.   So you had a cardboard sheet that you inserted into a
22       time clock?
23  A.   Yes.
24  Q.   And it punched it?
25  A.   Yes.

1852c36f-c164-4a7f-883d-7d6600be703c

NETWORK DEPOSITION SERVICES
Transcript of John Schabloski

1   A.   Uh-huh.

2   Q.   Now, did you record the time you spent working while

3       you were on call?

4   A.   If it was done through the Traverse City location.

5   Q.   Can you describe what you would do in terms of keeping

6       track of your time on call?

7   A.   You'd punch in using the time clock and for the

8       reasons, making removals, doing embalmings,

9       occasionally maybe waiting on a family, making family

10      arrangements if the family requested you do that at

11      that time.

12   Q.   I'm trying to understand.  If you received a call

13      while you were on call, something needed to be done,

14      you needed to do a removal, needed to do an embalming

15      or meet with the family and making arrangements, you

16      could go to Traverse City, correct, and clock in?

17   A.   Yes.

18   Q.   Did you do that?

19   A.   I did.

20   Q.   And did you stay clocked in until you finished

21      whatever you were doing?

22   A.   Yes.

23   Q.   And then you would punch out?

24   A.   Yes.

25   Q.   And return home?

1852c36f-c164-4a7f-883d-7d6600be703c

NETWORK DEPOSITION SERVICES
Transcript of John Schabloski

Page 77

1   A.   Yes.

2   Q.   Was there any instance in which you did not record

3        time that you worked while you were on call?

4   A.   I can think of maybe a couple times that I forgot to

5        punch in.  I just went to the funeral home, made the

6        removal, did the embalming, and then punched out but I

7        forgot to punch in.

8   Q.   So there would only have been one punch on your

9        timecard; is that what you're saying?

10  A.   Correct.

11  Q.   Do you think you were paid for that time?

12  A.   I don't know.

13  Q.   Other than the couple of times that you may have

14       forgot one of the punches on the time clock for a

15       particular occasion when you worked on call, is there

16       any other time you wouldn't record the time you worked

17       on call?

18            MS. GIFFORD:  At the Traverse City location

19       or anywhere are you talking about?

20            MS. BRAUN:  I want to talk about anywhere.

21  A.   No.

22  BY MS. BRAUN:

23  Q.   So your procedure would be if you got a call to go to

24       Traverse City to clock in and then do what you needed

25       to do, whether it be removal, whether it be embalming?

1852c36f-c164-4a7f-883d-7d6600be703c

NETWORK DEPOSITION SERVICES
Transcript of John Schabloski

Page 80

1   A.   Other than you could not have any overtime hours.

2   BY MS. BRAUN:

3   Q.   But my question was did anyone ever state to you you

4        will not be paid for the time you worked on call?

5   A.   No.

6   Q.   In fact, you'd clock in for the time you spent on

7        call?

8   A.   Right.

9   Q.   And you believe you were paid for that time?

10  A.   I don't know that for a fact but I assumed -- we just

11       assumed we were paid.  There would be no reason why

12       you would not think you wouldn't be paid.

13  Q.   Right, because you recorded the time on the time

14       clock?

15  A.   Yes.

16  Q.   We talked about your schedule and we talked about

17       there were times when Amanda Kirt directed you to do

18       work outside of your schedule, correct?

19  A.   Correct.

20  Q.   So there were, indeed, times that you worked beyond 40

21       hours in a work week, correct?

22  A.   Correct.

23  Q.   I'm going to hand you what is going to be marked as

24       Defendant's Exhibit 11.  This is Bates stamped 10709

25       through 19.

1852c36f-c164-4a7f-883d-7d6600be703c

NETWORK DEPOSITION SERVICES
Transcript of John Schabloski

Page 87

1  A.  I don't know that.

2  Q.  Do you know whether others worked overtime without

3      pre-approval?

4  A.  Other fellow employees attended social functions like

5      I did, yes.

6  Q.  Do you know if they ever sought to be paid for

7      attending any of those functions?

8  A.  I'm not aware of that, I don't know.

9  Q.  So you don't know whether, in fact, they were paid or

10     not --

11 A.  I don't know.

12 Q.  -- or whether they recorded the time?

13 A.  No.

14 Q.  Did you ever hear that there was a budget for overtime

15     at the Covell Funeral Home?

16 A.  Yes.

17 Q.  What did you hear about that?

18 A.  That there were so many dollar amounts -- and there

19     was never a specific number named -- and she had to

20     stay within that budget for her overtime, otherwise

21     she'd be penalized by the corporation.

22 Q.  Do you know, in fact, whether she was ever, in your

23     words, penalized by the corporation?

24 A.  I don't have any idea.

25 Q.  Were you ever told to come in early but not to clock

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

1852c36f-c164-4a7f-883d-7d6600be703c

NETWORK DEPOSITION SERVICES
Transcript of John Schabloski

Page 88

1      in until your scheduled shift time?

2   A.  No.

3   Q.  Were you ever told to stay later but clock out

4      before -- to first clock out and then stay later to

5      work?

6   A.  No.

7   Q.  Do you know if any other employee was told that?

8   A.  Not to my knowledge.

9   Q.  Do you have any idea of what employees at other

10     locations were told about pre-approval for overtime,

11     locations other than Covell Funeral Homes and the

12     three locations we've talked discussed?

13  A.  I wouldn't be aware of anybody.  I don't know.

14  Q.  When is it that you decided to sue your former

15     employer, to join this lawsuit, do you recall?

16  A.  When I received notification in the mail that there

17     was a lawsuit.  No, I do not recall the time.

18  Q.  So the first time you knew about the lawsuit was when

19     you received notification in the mail?

20  A.  Correct.

21  Q.  What did you do at that point?

22  A.  Well, I read the letter that was in the envelope and

23     signed a form saying that I wanted to be an active

24     part of this lawsuit.

25  Q.  Did you talk to someone before you signed that form?

1852c36f-c164-4a7f-883d-7d6600be703c

NETWORK DEPOSITION SERVICES
Transcript of John Schabloski

Page 93

1    pre-approval and were paid?

2  A.  Correct.

3  Q.  Did you ever seek pre-approval for overtime and have
4      it denied by Amanda?

5  A.  No.

6  Q.  So each time you would seek pre-approval she would
7      agree to it?

8  A.  Yes.

9  Q.  Do you have knowledge of any other employee that was
10     not compensated for overtime because they did not seek
11     pre-approval?

12 A.  I wasn't aware of anybody.  I don't know of anybody.

13 Q.  You wouldn't know?

14 A.  I wouldn't know.

15 Q.  And, Mr. Schabloski, we talked a bit about your on
16     call scheduling and recording time while you worked on
17     call, correct?

18 A.  Yes.

19 Q.  Did you ever see a written policy regarding how
20     employees would be compensated for work performed
21     while on call?

22 A.  No, not to my knowledge.  I can't remember seeing one.

23 Q.  And you don't know how the other employees within
24     Covell Funeral Home recorded their time while on call?

25 A.  No, I wouldn't have any idea how they do it.

1852c36f-c164-4a7f-883d-7d6600be703c

NETWORK DEPOSITION SERVICES
Transcript of John Schabloski

1          (Door interruption.)

2          MS. BRAUN:  Let's go off the record.

3          (Off the record at 1:30 p.m.)

4          (Back on the record at 1:35 p.m.)

5    BY MS. BRAUN:

6    Q.   Mr. Schabloski, we are back on the record.

7    A.   Okay.

8    Q.   We were talking about a meeting in late 2004.  I

9         believe you said it was a morning meeting, is that

10        correct, where Amanda Kirt spoke about community

11        service?

12   A.   Yes.

13   Q.   Was that the first time that you heard Amanda Kirt or

14        any member of management speak about community service

15        in relation to your employment at Alderwoods?

16   A.   Yes.

17   Q.   So prior to that you hadn't heard anything about

18        community service?

19   A.   No, I hadn't been there.  That's right, that's the

20        first time I heard it.

21   Q.   I mean, just to be clear, you were hired in August of

22        2004, correct?

23   A.   Correct.

24   Q.   But the first time you heard about a statement with

25        respect to community work or social clubs, was the

1852c36f-c164-4a7f-883d-7d6600be703c

NETWORK DEPOSITION SERVICES
Transcript of John Schabloski

Page 121

1      word you used, was in late 2004, probably November or
2      December, correct?

3   A.   That's correct.

4   Q.   Did you understand this, therefore, to be something
5        new?

6   A.   I don't know because I was new to the organization.  I
7        kind of assumed that it was new.  I mean, she brought
8        it up.

9   Q.   Because you had been working there for at least three
10       months at that point?

11  A.   Right, right.  Yes, it was something new.

12  Q.   I want to be clear on this because you've used a
13       different -- I've heard you use a couple different
14       terms.  I heard you say that Amanda said in the
15       morning meeting that everyone needed to find an
16       organization and then I've also heard you testify
17       today that you were requested to join an organization,
18       so what were you told?

19  A.   That we were -- we absolutely needed to find one.  We
20       were requested, it was mandatory.

21  Q.   Wasn't it a requirement?

22  A.   Yes, to work there.

23  Q.   Why do you say that it was a requirement to work
24       there?

25  A.   She said it was.  Because we had a fellow employee,

1852c36f-c164-4a7f-883d-7d6600be703c

NETWORK DEPOSITION SERVICES
Transcript of John Schabloski

1          projects and doing community affairs through these
2          organizations.
3     Q.   Can you attribute any piece of business that the
4          funeral home received to your participation in any of
5          the community organizations that we've discussed?
6     A.   I can't give you certain names of people that came to
7          our funeral home because I was in those, no.
8     Q.   You testified that you did not report the number of
9          hours you spent in these community service
10         organizations to management at Alderwoods, correct?
11    A.   That's right.
12    Q.   It was never requested of you to report those hours?
13    A.   I didn't know how to go about doing that.
14    Q.   Was it ever requested that you needed to generally
15         report to Amanda or any member of --
16    A.   No, it was never asked.
17    Q.   You were never asked to report regarding your
18         involvement in the community activities?
19    A.   That's right.
20    Q.   Time or otherwise?
21    A.   Right.
22    Q.   Do you know if any other employee at Covell Funeral
23         Home reported their time or generally their activities
24         spent in community service to Amanda or any other
25         member of management at Alderwoods?

1852c36f-c164-4a7f-883d-7d6600be703c

NETWORK DEPOSITION SERVICES
Transcript of John Schabloski

Page 131

1              MS. GIFFORD:  Objection.

2    A.    I don't know.

3    BY MS. BRAUN:

4    Q.    During your employment at Alderwoods were you

5          evaluated on your performance?  Did you receive an

6          annual performance evaluation?

7    A.    No, I never did.

8    Q.    At Covell Funeral Home was there any sort of incentive

9          program to joining a community service organization?

10         Where you incentivized in way any to join?

11   A.    No, other than a requirement but there was no

12         incentive.

13   Q.    There was no incentive intensive program?

14   A.    No.

15   Q.    Have you ever heard of anything called I Believe In

16         Service?

17   A.    No.

18   Q.    Is it the first part of your employment between August

19         and November and December when you heard Amanda Kirt

20         make this statement you were not involved in a

21         community service organization?

22   A.    That's right.

23   Q.    And you were not disciplined during that time for not

24         being involved in a community service organization?

25   A.    That's correct.

1852c36f-c164-4a7f-883d-7d6600be703c

NETWORK DEPOSITION SERVICES
Transcript of John Schabloski

Page 132

1  Q.  At some point did you realize from reviewing your
2      paycheck that you were not being paid for time spent
3      doing community service?
4  A.  Yes.
5  Q.  When did you realize that?
6  A.  Probably a year after I started there.  Probably six
7      months after I attended these meetings and was
8      contributing this time.
9  Q.  And what did you do when you realized that you were
10     not being paid for the time you spent volunteering and
11     attending meetings for the church, Rotary, Kiwanis,
12     and the Chamber of Commerce?
13 A.  There was -- I didn't do really anything.  I assume
14     that -- I was led to believe that I was getting paid
15     for those hours.
16 Q.  But you testified at some point you realized that you
17     were not, correct?
18 A.  Right.
19 Q.  When you realized that did you take any action?
20 A.  No.
21 Q.  You didn't complain?
22 A.  No.
23 Q.  You stated that Amanda Kirt made a statement about
24     community service.  Did you ever see any sort of
25     statement about community service in writing?

1852c36f-c164-4a7f-883d-7d6600be703c

NETWORK DEPOSITION SERVICES
Transcript of John Schabloski

Page 133

1   A.   No.

2   Q.   So you never saw a policy regarding community service

3        during the time you were an employee at Alderwoods?

4   A.   No.

5   Q.   And you never saw a statement addressing payment for

6        the community work?  I just want to make sure you

7        understand the scope of what I'm saying.  You never

8        saw a statement in writing regarding any alleged

9        requirement to participate --

10  A.   Yes.

11  Q.   -- in community work?  And you never saw any sort of

12       statement in writing regarding whether there would be

13       payment for community work?

14  A.   No.

15  Q.   Other than I believe you said there may have been a

16       couple times that Amanda attended a Chamber of

17       Commerce meeting with you?

18  A.   Yes.

19  Q.   How many times was that?

20  A.   Two.

21  Q.   Other than that would there have been any time when

22       she would have observed you performing any fundraising

23       activities for the other organizations?

24            MS. GIFFORD:  Objection.

25  A.   No.

1852c36f-c164-4a7f-883d-7d6600be703c

NETWORK DEPOSITION SERVICES
Transcript of John Schabloski

1   Q.   And you did not record the time you spent on the

2        phone?

3   A.   No.

4   Q.   Did someone tell you not to record the time you spent

5        on the phone?

6   A.   No.

7   Q.   But in the same breath they didn't tell you to record

8        it either but your previous testimony is that you

9        understood that you should clock in for the time you

10       spent working on call, correct?

11   A.   That's right.  But how was I going to do that 15 miles

12       away when the phone was ringing or someone banging on

13       my front door?

14   Q.   Did you ever ask for clarification as to what you

15       should do about the time you spent answering a

16       telephone call or while on a call?

17   A.   No.

18   Q.   You never asked for clarification?

19   A.   No.

20   Q.   Did you ever discuss with another employee what they

21       did regarding the time they spent answering telephone

22       calls while on call?

23   A.   No.

24   Q.   So you have no knowledge as to whether another

25       employee working on call would have recorded that

1852c36f-c164-4a7f-883d-7d6600be703c

NETWORK DEPOSITION SERVICES
Transcript of John Schabloski

Page 142

1            flowers up.  It was more than just unlocking the door
2            and opening the door.  I mean, you helped them with
3            these.  It could be all the way from two, three plants
4            up to 25, 30 plants.  It'd all depend on what was left
5            and how big the service was.
6      Q.   So if the family was coming to you and asking for
7            assistance with the potted plants, I just want to
8            understand what funeral home is that it occurred in?
9            Could that occur like at Traverse City?  I mean, would
10           there be potted plants you'd be help --
11     A.   It could be.
12     Q.   And if there were potted plants at Traverse City,
13           would you record your time because you were at
14           Traverse City and the time clock was there?
15     A.   If you remembered to go through the garage door and do
16           it.
17     Q.   Are you saying there may be times that you would help
18           with the potted plants in another location other than
19           Traverse City?
20     A.   Right.
21     Q.   So is it your testimony that you wouldn't record the
22           time if you were at another location having to help
23           with the potted plants?
24     A.   There was no place to record the time other than at
25           Traverse City.  To answer your question, yes, you

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

1852c36f-c164-4a7f-883d-7d6600be703c

NETWORK DEPOSITION SERVICES
Transcript of John Schabloski

Page 143

1          would not record your time.
2     Q.   How many times do you recall assisting with potted
3          plants at Elk Rapids?
4     A.   In my two years that I was there or year and a half?
5     Q.   During the course of your employment.
6     A.   Probably 12, 15 times.
7     Q.   How many times do you recall assisting with potted
8          plants at the Kingsley location over the course of
9          your employment?
10    A.   Three, four.
11    Q.   Do you have any independent recollection today of how
12         long it took you on each of the 12 occasions at Elk
13         Rapids to assist with potted plants?
14              MS. GIFFORD:  Objection.
15    A.   It all depended.  I don't know how long it would have
16         taken me.
17    BY MS. BRAUN:
18    Q.   Do you have any recollection today as to how long it
19         would have taken you to assist the three times at
20         Kingsley regarding the potted plants?
21              MS. GIFFORD:  Objection.
22    A.   No.
23    BY MS. BRAUN:
24    Q.   What's the greatest amount of time you believe it
25         could have taken you to assist with a potted plant?

1852c36f-c164-4a7f-883d-7d6600be703c

NETWORK DEPOSITION SERVICES
Transcript of John Schabloski

Page 151

1     getting like a $25 service charge on my checking
2     account and she did reimburse me for that and then
3     eventually the check was good.
4  Q.  So eventually you were paid and eventually you were
5     reimbursed for whatever the inconvenience was for the
6     insufficient funds?
7  A.  Right.
8  Q.  Do you know whether any other employee at Covell
9     Funeral Homes received compensation in addition to
10    hourly wages for those folks who were hourly
11    employees?
12 A.  Yes, the funeral directors all received this bonus.
13 Q.  This particular bonus?
14 A.  Right.
15 Q.  Anything else, any other additional compensation that
16    you were aware of?
17 A.  Not that I'm aware of.
18 Q.  You wouldn't be privy to that?
19 A.  I wouldn't know.
20 Q.  Did you ever see any type of documents stating how
21    overtime was to be calculated?
22 A.  No.
23 Q.  Or what was to be included in that calculation?
24 A.  No.
25 Q.  We talked about the fact that this community service

1852c36f-c164-4a7f-883d-7d6600be703c

NETWORK DEPOSITION SERVICES
Transcript of John Schabloski

1      statement was made by Amanda Kirt, your location

2      manager, in late 2004 and that was the first time you

3      had heard of a statement about community service in

4      relation to your employment at Alderwoods, correct?

5  A.  That's correct.

6  Q.  And you understood -- you previously testified that

7      you understood that to be something new; is that

8      correct?

9            MS. GIFFORD:  Objection.

10 A.  Yes.

11 BY MS. BRAUN:

12 Q.  I want to be clear on the overtime, the pre-approval

13     issue.  You first found out about that after you had

14     been working on the job for a period of time, correct?

15 A.  Yes.

16 Q.  So when you first heard of that did you understand

17     that to be something new?

18 A.  I assumed it was something new because I never heard

19     it before, yes.

20 Q.  And you first heard of that -- that was also in kind

21     of the late 2004 period; is that correct?

22 A.  Yes.

23 Q.  Prior to that you didn't have an understanding that

24     you were to have overtime approved?

25 A.  Right, correct.

1852c36f-c164-4a7f-883d-7d6600be703c

NETWORK DEPOSITION SERVICES
Transcript of John Schabloski

Page 158

1            MARKED FOR IDENTIFICATION:
2            DEPOSITION EXHIBIT 16
3            2:40 p.m.
4    BY MS. BRAUN:
5    Q.    Mr. Schabloski, this is a letter dated November 21,
6          2008.  It's been redacted such that the information
7          here relates only to you.  Do you see that?
8    A.    Yes.
9    Q.    The signature page for some reason on this version is
10         missing, but it's signed by J. Nelson Thomas, for the
11         record.  As I stated, this has been redacted so the
12         information relates just to you.  Do you see where
13         that begins?
14   A.    Yes.
15   Q.    I'm on page eight.  I want to direct your attention to
16         page eight of this document.  At the top left --
17   A.    Okay.
18   Q.    -- the third paragraph starts, through company polices
19         and practices, which were communicated verbally and in
20         writing, Alderwoods encouraged employees to perform
21         work in the community.  Do you see that statement?
22   A.    Yes.
23   Q.    You previously testified that you've never seen a
24         policy in writing regarding performing work in the
25         community; is that correct?

1852c36f-c164-4a7f-883d-7d6600be703c

NETWORK DEPOSITION SERVICES
Transcript of John Schabloski

Page 161

1          of the committees of these meetings and which I said,

2          yes, I was.

3     Q.   Did she ask you any other details of your involvement

4          with community activities?

5     A.   No.

6     Q.   In this paragraph.

7               MR. EHRMAN:  Tell me which document 16 is

8          again.

9               MS. GIFFORD:  It is the Supplemental

10         Interrogatory Responses to Interrogatory Number 3.

11              MR. EHRMAN:  Thank you.

12    BY MS. BRAUN:

13    Q.   Mr. Schabloski, I'm still in the middle paragraph

14         here.

15    A.   Okay.

16    Q.   The last sentence relates to your current recollection

17         of the time you spent in community organizations

18         during your employment.

19    A.   Uh-huh.

20    Q.   Do you see where I am?

21    A.   Yes.

22    Q.   And here it states estimates of time in the

23         aforementioned community organizations for the entire

24         period of your employment.  Do you see where it says

25         that?

1852c36f-c164-4a7f-883d-7d6600be703c

NETWORK DEPOSITION SERVICES
Transcript of John Schabloski

Page 162

1   A.   Yes.

2   Q.   But haven't we established today that there was a

3        period of time where you were not involved with

4        community service activities while an employee of

5        Alderwoods?

6   A.   Yes, right at the beginning of my employment.

7   Q.   Between August and late 2004?

8   A.   Right.

9   Q.   So this statement would be inaccurate, correct?

10  A.   Yes, I guess so.

11  Q.   In looking at these estimates here -- I'm still in

12       this middle paragraph regarding your community work.

13  A.   Yes.

14  Q.   Are these accurate, I mean, to your recollection as we

15       sit here today?

16  A.   They would probably be on the low side.

17  Q.   And why would you say that?

18  A.   Well, because I think I contributed actually more time

19       to Rotary and the Chamber of Commerce than .6 hours a

20       week.

21  Q.   What would you have to substantiate that statement?

22  A.   Just my recollection of the time that I was there.

23       Just my recollection.

24  Q.   You just spoke about the Rotary and the Chamber of

25       Commerce.  What about the approximation for the

1852c36f-c164-4a7f-883d-7d6600be703c

NETWORK DEPOSITION SERVICES
Transcript of John Schabloski

Page 163

1       Presbyterian Church, is that accurate?

2   A.  1.3 hours a week, that's probably correct or close to

3       being correct.

4   Q.  Again, that's based on your recollection, not on any

5       type of document?

6   A.  Right, that's correct.

7   Q.  Moving to the next paragraph, it begins with, through

8       company policies and practices, which were

9       communicated verbally and in writing, Alderwoods

10      required employees, including plaintiff, to work on

11      call shifts.  You previously testified that you'd

12      never seen a policy in writing regarding working on

13      call shifts, is that correct?

14              MS. GIFFORD:  Objection.

15  A.  That's correct.

16  BY MS. BRAUN:

17  Q.  You've never seen such a policy?

18  A.  Not.

19  Q.  You testified that your verbal understanding of

20      clocking in for on call time at the Traverse City

21      location was based upon another employee explaining

22      that to you?

23  A.  That's correct.

24  Q.  But you can't recall which employee told you that?

25  A.  No, I don't.

1852c36f-c164-4a7f-883d-7d6600be703c

CERTIFICATE OF NOTARY

STATE OF MICHIGAN   )

                    ) SS

COUNTY OF INGHAM    )


I, DEANA VAN DYKE, a Notary Public in
and for the above county and state, do hereby
certify that the above deposition was taken before
me at the time and place hereinbefore set forth;
that the witness was by me first duly sworn to
testify to the truth, and nothing but the truth;
that the foregoing questions asked and answers made
by the witness were duly recorded by me
stenographically and reduced to computer
transcription; that this is a true, full and correct
transcript of my stenographic notes so taken; and
that I am not related to, nor of counsel to either
party nor interested in the event of this cause.




DEANA VAN DYKE, CSR-3715

Notary Public,

Ingham County, Michigan


My Commission expires: February 27, 2011