**TAB 31**

NETWORK DEPOSITION SERVICES
Transcript of Stephen Takesian

THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DEBORAH PRISE and HEATHER RADY )
on behalf of themselves and all )
employees similarly situated, )
                       )
      Plaintiffs, )
                       )
  vs. ) Civil Action No. 06-1641
                       )
ALDERWOODS GROUP, INC., )
                       )
      Defendant. )
                       )
_____)

Deposition of STEPHEN TAKESIAN,

taken at 101 North First Avenue,

Phoenix, Arizona, commencing at

9:42 a.m., Thursday, April 30,

2009, before Shannon Stevenson,

RPR, Arizona CSR No. 50461

fb1972bd-caad-4b8d-8189-4a22f58148a9

NETWORK DEPOSITION SERVICES
Transcript of Stephen Takesian

1          MS. DOUGLASS:  Objection to form.

2      Q      BY MR. DANIELS:  Did you sell any pre-need

3  goods and services?

4      A      No.

5      Q      Just so I have a better understanding, and

6  I'm somewhat familiar but not very familiar with the funeral

7  and cemetery laws in the state of Arizona, so just bear with

8  me, okay.

9              If you were to sell insurance product in the

10  state of Arizona, if you know, are you required to hold an

11  insurance license?

12     A      Yes.

13     Q      And as a family service counselor, you were

14  selling -- were you only selling pre-need cemetery or were

15  you also selling funeral goods and services?

16     A      I didn't sell any pre-need.

17     Q      Okay.  You were servicing families in the

18  sense that you would assist them in selecting cemetery

19  product and work with the funeral director; is that correct?

20     A      Yes.

21          MS. DOUGLASS:  Objection to form.

22     Q      BY MR. DANIELS:  Just so we're on speaking

23  terms here, I'm going to separate funeral from cemetery in

24  the industry.  Are you good with that?

25     A      I'm very good with that.

fb1972bd-caad-4b8d-8189-4a22f58148a9

NETWORK DEPOSITION SERVICES
Transcript of Stephen Takesian

1   Mr. Takesian?

2        A       It is.

3        Q       Is this your employment application?

4        A       It is.

5        Q       And was this application filled out in

6   response to the ad that you read in the newspaper?

7        A       Yes.

8        Q       In the first page where we -- where it says

9   list the hours you are available to work, do you see that

10  there's several boxes with the week across the top of it?

11       A       Yes.

12       Q       Were you looking for a full-time position?

13       A       Yes.

14       Q       And then you indicated that on Wednesday you

15  have written in Masonic Lodge 6:00 p.m.  Is that correct?

16       A       That's correct.

17       Q       What does that mean?

18       A       That's the only night I could not work.

19       Q       You are a Mason?

20       A       I am.

21       Q       I see you are wearing your ring.  How long

22  have you been a Mason?

23       A       Four years, five years, I think.

24       Q       You were a Mason prior to your employment at

25  Alderwoods Group?

fb1972bd-caad-4b8d-8189-4a22f58148a9

NETWORK DEPOSITION SERVICES
Transcript of Stephen Takesian

1      A       I was.

2      Q       Then you list your high school and some of
3  your other post-high school education; correct?

4      A       Correct.

5      Q       Then below it says, "why do you want to work
6  for our company," and you wrote what?

7      A       "Have background in funeral business."

8      Q       What was that background that you are
9  referring to?

10      A       My apprenticeship, some of my time in the
11  military.  I was a military escort the last eight months of
12  my Naval career.

13      Q       Okay.  If we go to the second page it lists
14  your most recent employer Lawson Products; is that a correct
15  statement?

16      A       Yes.  That was Premiere.

17      Q       So Lawson Premiere are the nuts and bolts
18  that you --

19      A       Right.

20      Q       You have to let me finish my question.

21              That was the nuts and bolts sales position
22  that you held; correct?

23      A       Correct, that was the one that was sold.

24      Q       Curious about the next one.  You were also
25  selling Ultralite scooters.

fb1972bd-caad-4b8d-8189-4a22f58148a9

NETWORK DEPOSITION SERVICES
Transcript of Stephen Takesian

1    funeral and death-care industry?

2        A        Insurance, mostly.  He was concerned about

3    insurance background.

4        Q        And did he indicate to you that -- you told

5    me earlier you did not have an insurance license.  Did he

6    indicate that you would not be qualified for the position

7    because of that or what did he say?

8        A        He told me I would need to get my insurance

9    license and my real estate license.

10       Q        Did he say that if you were hired, the

11   company would assist you in getting those licenses?

12               MS. DOUGLASS:  Objection to form.

13               THE WITNESS:  No, he did not.

14       Q        BY MR. DANIELS:  We know that the application

15   was filled out July 4.  Do you recall approximately when

16   that first meeting occurred?  You were hired in September,

17   so that gives you a range there.

18       A        I pestered him pretty good.

19       Q        Okay.  Do you recall, was it shortly after

20   July 4 when you first filled out the application that you

21   met with him the first time?

22       A        Yes.

23       Q        Did he offer you a position during that first

24   meeting?

25       A        No.

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

fb1972bd-caad-4b8d-8189-4a22f58148a9

NETWORK DEPOSITION SERVICES
Transcript of Stephen Takesian

1   notified of any changes or additions to this document;

2   correct?

3          A       That's what it says, yes.

4          Q       Did you have that understanding when you

5   signed this acknowledgment of receipt?

6          A       Yes.

7          Q       And it also says that you would agree to

8   abide by the conditions described within the sales

9   guidelines.  Did you agree with that?

10         A       Yes.  Again, we're still in this early on

11  process, the hiring process or now hired process.

12         Q       Did you receive any type of orientation other

13  than what we just went through?

14         A       A week.

15         Q       Describe that for me.

16         A       Practice paperwork, observing.

17         Q       Observing other family service counselors?

18         A       Just the business.  What departments did

19  what, how things were handled as far as when you had a

20  contract or when you had paperwork, what it entailed.

21  Paperwork was intense.

22         Q       Was this a week where you worked Monday

23  through Friday 9:00 to 5:00 type situation?

24         A       Yes.

25         Q       Were you compensated for that time?

fb1972bd-caad-4b8d-8189-4a22f58148a9

NETWORK DEPOSITION SERVICES
Transcript of Stephen Takesian

1    A      Yes.

2    Q      Who did you work with, if anyone, or more

3  than one person during that orientation, were you assigned

4  to one person?

5    A      No.  Rob was in and out all day, all week,

6  and then there was one or two other people that he had

7  hired.

8    Q      Okay.  And that was my next question.  That

9  orientation included yourself and one or two other family

10 service counselors?

11   A      Correct.

12   Q      And you were, quote, the rookie, so to speak,

13 and you worked together during your orientation?

14   A      Correct.

15   Q      Was there any formal, like, teaching; in

16 other words, would someone come in and discuss with you and

17 the other two family counselors, the new hires?

18   A      No.

19          MS. DOUGLASS:  Objection.

20          MR. DANIELS:  That it?

21          MS. DOUGLASS:  Yep.  Yep.  Yep.  Sorry.

22          MR. DANIELS:  That's okay.

23   Q      BY MR. DANIELS:  How about after this

24 orientation, was there any other training that you went

25 through?

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

fb1972bd-caad-4b8d-8189-4a22f58148a9

NETWORK DEPOSITION SERVICES
Transcript of Stephen Takesian

1      A      Correct.

2      Q      When you worked weekend duty, would you be

3  given off another day?

4      A      If I worked -- like if we worked the weekend,

5  you would work the following Monday obviously because if you

6  had first calls and Saturday and Sunday, and Monday being

7  the mail works that day, post office, the banks, you would

8  work that Monday, and then you would have like a day off

9  during that following week.

10     Q      Either a Tuesday through Friday; correct?

11     A      Correct.

12     Q      So were you working five days a week even

13  when you had weekend duty or was it more than five days a

14  week?

15     A      It was always more than five days a week.

16     Q      On average how many days a week did you work?

17     A      Probably six days.

18     Q      Were you ever scheduled to work more than

19  40 hours -- this is scheduled, to work more than 40 hours a

20  week?

21     A      No.

22     Q      Did you work more than 40 hours a week?

23     A      Yes.

24     Q      On average how many hours did you work more

25  than 40 hours a week?

fb1972bd-caad-4b8d-8189-4a22f58148a9

NETWORK DEPOSITION SERVICES
Transcript of Stephen Takesian

Page 91

1      A       I probably worked between, an extra, between

2  17 to 23 hours a week.

3      Q       17 to 23?

4      A       Yes.

5      Q       Did you keep a record of those 17 to 23 extra

6  hours?

7      A       I kept track of all of my appointments and

8  everything on my palm pilot.

9      Q       Do you still have your palm pilot?

10     A       No.  That was returned when I resigned.

11     Q       Is there any recordation that you are aware

12  of of the extra hours?

13     A       Not that I know of.

14     Q       Are you aware of any other family service

15  counselor slash professional that had a palm pilot?

16     A       Not offhand.  Like I said, I just loaded

17  them.  I used the technology because I understood it.

18     Q       Okay.  Are you aware of any other family

19  service counselors at other Alderwoods Group locations other

20  than -- that's three others in that same sentence -- Phoenix

21  Memorial Park that used a palm pilot?

22     A       The question is anybody other --

23     Q       Let me re-ask it.  It was really poorly

24  phrased and I apologize.  Must be getting hungry.

25             Let me ask more of a foundational question

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

fb1972bd-caad-4b8d-8189-4a22f58148a9

NETWORK DEPOSITION SERVICES
Transcript of Stephen Takesian

Page 96

1        A        Yes.

2        Q        Did he fill that out?

3        A        Yes, he filled out -- really, the only

4   schedule was if you were on duty or not.

5        Q        Okay.

6        A        And if you were on duty on the weekend.

7   Which got to be pretty frequent towards the end because we

8   were shorthanded several people.

9        Q        The 17 to 23 hours extra, what caused you to

10  work the extra time?

11       A        I did a lot of community service.

12       Q        Okay.

13       A        I am a member of the Masonic Lodge and so I

14  would -- and I was also the -- I had past experience, I was

15  chairman of the Mayors Aging Services Commission in the city

16  of Phoenix.

17       Q        The Mayor's --

18       A        Aging Services Commission.

19       Q        That's a civic commission?

20       A        Uh-huh.

21       Q        Working with the mayor and council.

22       A        I was a volunteer.  I was the youngest

23  chairman ever.

24       Q        I have to write that down.  The Mayor's

25  Aging --

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

fb1972bd-caad-4b8d-8189-4a22f58148a9

NETWORK DEPOSITION SERVICES
Transcript of Stephen Takesian

Page 97

1      A      Service Commissioner.

2      Q      Did you -- you told me you were a member of

3  the Masonic Lodge prior to your work at Alderwoods Group?

4      A      Yes.

5      Q      Were you a chairman of the Mayor's Aging

6  Service Commission prior to your work at Alderwoods?

7      A      Yes.

8      Q      Any other community services that you worked

9  at?

10     A      Perish council member.

11     Q      Catholic church?

12     A      Armenian church.

13     Q      Okay.

14     A      Cub scout leader.  That's about it.

15     Q      We're going to talk more about that in

16  further detail.

17             In any event, just so I have a clear

18  understanding, the 17 to 23 extra hours involved, among

19  other things, your work while you were doing things that

20  would benefit the company at the Masonic Lodge, while

21  working with the Mayor's Aging Service, your Armenian

22  church; is that correct?

23     A      Yes.  It would benefit myself, too.  It not

24  only benefits the company, myself too.

25     Q      In the sense you were making more sales?

fb1972bd-caad-4b8d-8189-4a22f58148a9

NETWORK DEPOSITION SERVICES
Transcript of Stephen Takesian

Page 98

1      A      Absolutely.

2      Q      And I appreciate that.

3             Let's talk about recording your time while

4   you worked.  Were you required by the company to keep a

5   record of your time?

6      A      Yes.

7      Q      How was that?

8      A      Well, it depended on the day.  They started

9   out with writing hand time cards and then writing time

10  sheets and then the powers that be got yelled at and they

11  had to bring a time clock in and the time clock started for

12  a while.

13     Q      Okay.  Was that in chronological order from

14  your --

15     A      Exactly.

16     Q      Let me get a complete question, but that's

17  fine, I appreciate your answer.

18            When you first started you were writing time

19  cards and then sometime during your 15 months went to

20  writing sheets and then switched to the time clocks; is that

21  a fair statement?

22     A      Yes.

23     Q      Did you write all the time that you worked on

24  the time cards?

25     A      Yes.

fb1972bd-caad-4b8d-8189-4a22f58148a9

NETWORK DEPOSITION SERVICES
Transcript of Stephen Takesian

Page 99

1        Q        Did you write all the time that you worked on

2    the time sheets?

3        A        Yes.

4                 MS. DOUGLASS:  Object to the form of the

5    question.

6                 MR. DANIELS:  Sure.

7        Q        BY MR. DANIELS:  When it came to the time

8    clock, were you punching in and punching out for yourself?

9        A        Yes.

10       Q        Did you ever punch out for someone else?

11       A        No.

12       Q        Did you ever have anyone punch in and out for

13   you?

14       A        Never.

15       Q        Were your time cards reviewed by anybody?

16       A        Yes.

17       Q        Who?

18       A        Rob Miller and Debbie Lorh.

19       Q        Were your time sheets reviewed by anyone?

20       A        Yes.

21       Q        Who?

22       A        Same two.

23       Q        And then your time cards on the time clock,

24   excuse me, were your time clock entries reviewed by anyone?

25       A        Yes.

fb1972bd-caad-4b8d-8189-4a22f58148a9

NETWORK DEPOSITION SERVICES
Transcript of Stephen Takesian

Page 100

1      Q      Same folks?

2      A      Yes.

3      Q      Were any of the times that you recorded on

4   your time cards changed or altered by anyone other than

5   yourself?

6      A      Yes.

7      Q      Who?

8      A      Debbie Lorh.

9      Q      How were they altered?

10     A      By not adding or taking away lunchtime, being

11  told that we had to take a lunch and that we were going to

12  be charged for it regardless.

13     Q      See if I can better understand you.

14  Hypothetical day.

15     A      Okay.

16     Q      You fill out your time card, we're talking

17  about now time cards, Monday, 8:00 to 5:00, and you didn't

18  take a lunch for whatever reason that day, would your time

19  card then be changed so it reflected that there was a half

20  hour of time not paid to you because you did not take a

21  lunch break?

22         MS. DOUGLASS:  Object to the form.

23         THE WITNESS:  No, not on that day.

24     Q      BY MR. DANIELS:  Okay.

25     A      It was done once a week.

fb1972bd-caad-4b8d-8189-4a22f58148a9

NETWORK DEPOSITION SERVICES
Transcript of Stephen Takesian

Page 101

1      Q      Explain to me how that happened.

2      A      It was done once a week.  She would grab the
3  time cards at the end of the time period and she would go
4  through them all and rant and rave about the times, if you
5  took a lunch or not.

6      Q      So what would happen?

7      A      It would be a big deal.  They'd make a big
8  federal case out of it.  Even more so on the funeral side.

9      Q      What would she say?

10     A      Got to take the lunch, I am charging you for
11 the lunch because you have to take it.  I get in trouble
12 when I don't do this, and that whole thing.

13     Q      So then would they deduct hours?

14     A      I would imagine.

15     Q      Do you know for sure?

16     A      No.

17     Q      Were you ever paid an extra hour of work --
18 excuse me, ever paid an extra hour of pay on the days you
19 did not take a lunch?

20     A      No.

21     Q      Did you ever record on your time cards that
22 you did not take a lunch?

23     A      All the time.

24     Q      Was Debbie the, for lack of a better term,
25 the payroll person?

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

fb1972bd-caad-4b8d-8189-4a22f58148a9

NETWORK DEPOSITION SERVICES
Transcript of Stephen Takesian

Page 105

1    A    No.

2    Q    Did you also record your community time on

3  that?

4    A    No.  We were told not to.

5    Q    I didn't ask that question about the time

6  cards.  Did you record your community time on the time

7  cards?

8    A    No.

9    Q    Again, why not?

10   A    We were told not to.  That was out-of-work

11 time.

12   Q    Out-of-work time?

13   A    Right.  They wanted time on the property,

14 that's what they considered.

15   Q    Who told that you?

16   A    Rob Miller.

17   Q    The time that you recorded on your time

18 sheets for what you said was time on the property, were you

19 compensated for all the time you spent on the property and

20 recorded?

21   A    No.

22   Q    What were you not paid for?

23   A    When I did viewings at night for the funeral

24 director, if I had a family that had a viewing, I attended.

25   Q    Why?

NETWORK DEPOSITION SERVICES
Transcript of Stephen Takesian

1      A       To be familiar with the family, to have the

2   ability to, for lack of a better unkind term, upsell them.

3      Q       That benefit the company?

4      A       Absolutely.

5      Q       And it benefited you as well?

6      A       If they bought something.

7      Q       Were you told that you had to go to these

8   viewings?

9      A       No.

10      Q       Again, same question with the community

11   service.  Were you told that you had to do that?

12      A       No, I wasn't told that.  But the only way to

13   do it in this business was to do that and that was the

14   experience of other people in the business and in the

15   industry.

16      Q       Okay.  I'm sorry to skip around.  Did anyone

17   tell you how to fill out the time cards or was it pretty

18   much you could do it just by looking at it?

19      A       I think Rob showed examples or something.

20      Q       Same thing with the time sheets?

21      A       Yeah.  We had a whole thing about that at the

22   8:00 meetings.

23      Q       When you say you "had a whole thing about

24   that," what would happen?

25      A       When it would change, whatever would come

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

fb1972bd-caad-4b8d-8189-4a22f58148a9

NETWORK DEPOSITION SERVICES
Transcript of Stephen Takesian

Page 109

1   and corporate, it was constant.  Paperwork driven.  The
2   whole business is paperwork driven.
3           Q       And we'll get into greater detail, and you
4   touched on an issue that is pre-authorization for overtime.
5   Was that the policy at Phoenix Memorial Park at the time?
6           A       I understood that to be the policy on the
7   funeral side.
8           Q       Was it the policy on the cemetery side?
9           A       No.
10                  (Deposition Exhibit No. 10 was marked for
11  identification and attached hereto.)
12          Q       BY MR. DANIELS:  While you take a look at
13  Exhibit No. 10, I'll identify it on the record.  It is
14  funeral home procedures.  It is a three-page document, on
15  the bottom date 2004 Alderwoods Group revised February 2004.
16                  First of all, do you recognize this document,
17  Mr. Takesian?
18          A       Yeah.  It's three pages out of the binders
19  that they keep in the business office.
20          Q       Okay.  And I appreciate you saying that.
21  Yesterday's deposition there was a little bit of confusion.
22  The plaintiff thought this was a standalone document.  But
23  you have the understanding that this is three pages out of a
24  binder?
25          A       Out of five binders.

NETWORK DEPOSITION SERVICES
Transcript of Stephen Takesian

Page 111

1  correct?

2      A      Yes.

3      Q      Was that the policy at Phoenix Memorial Park

4  while you worked there?

5      A      Yes, it was one of them.

6      Q      And then the next sentence says that the time

7  card or sheet must show the time the person begins work, the

8  time they break for lunch, the time they return from lunch,

9  and the time they end the workday for the day.  Was that the

10 policy in effect at Phoenix Memorial Park while you worked

11 there?

12         MS. DOUGLASS:  Object to the form.

13         THE WITNESS:  You know, I don't know.  I

14 don't know if this was in the binder that -- I don't recall

15 this.  But I don't remember this ever being spoken for verse

16 saying this is the preferred method.

17     Q      BY MR. DANIELS:  Okay.  When you were filling

18 out the time cards and the time sheets and/or punching, were

19 you told that you were to punch in and out for lunch when a

20 lunch was taken?

21     A      Yes.

22     Q      And were you told that you were to record all

23 the time that you actually worked?

24     A      Yes.

25     Q      The first bullet point says, "All employees

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

fb1972bd-caad-4b8d-8189-4a22f58148a9

NETWORK DEPOSITION SERVICES
Transcript of Stephen Takesian

Page 112

1   must report all hours actually worked unless exempt from
2   timekeeping requirements as permitted in compliance with all
3   federal and state/provincial regulation."
4       A       Yes.
5       Q       Did you record all the time actually worked?
6       A       I recorded the time on my time card of the
7   work I did within the property, yeah.
8       Q       Any time that you spent off the property you
9   did not record; is that correct?
10      A       Correct.  Or the times I would come in when I
11  would have a family show up on my day off, and I would be
12  called by work to come in.
13      Q       Why did you not record that time?
14      A       Usually it would be like afternoon hour or
15  two.  It was to follow up with paperwork or sales and
16  sometimes I did and sometimes I didn't.  Depending on the
17  weekend, sometimes my card wouldn't be there anymore because
18  she had -- Debbie had taken it the following -- the previous
19  Friday and had worked on the card or something.
20      Q       Did you ever seek to be paid for that time?
21      A       I would mention it.
22      Q       Were you paid?
23      A       I don't know.
24      Q       Was there ever an occasion where you entered
25  your start and stop time, for instance, on the time clock

fb1972bd-caad-4b8d-8189-4a22f58148a9

NETWORK DEPOSITION SERVICES
Transcript of Stephen Takesian

1    Q    BY MR. DANIELS:  So you don't know one way or

2  the other?

3    A    No.

4    Q    Next page, C, meal periods.  Were you aware

5  that the policy at -- was it the policy at Phoenix Memorial

6  Park that hourly employees who worked more than five

7  consecutive hours in a day are allowed an unpaid meal period

8  of no less than 30 minutes and no more than one hour?

9    A    Yes.

10    Q    And do you know if that was a company-wide

11  policy?

12    A    No, I don't know.

13    MS. DOUGLASS:  Objection.

14    Q    BY MR. DANIELS:  That last sentence in that

15  first paragraph says, "On an emergency basis, meal periods

16  may be waived or delayed at the direction of management in

17  order to meet business needs."

18    Did you ever invoke that policy; i.e., get

19  pre-approval to delay a meal period?

20    MS. DOUGLASS:  Objection.

21    THE WITNESS:  No.

22    Q    BY MR. DANIELS:  When you did take a lunch,

23  and here we're talking about the next paragraph, it states

24  that employees must clock out at the beginning of their meal

25  period and clock in at its conclusion."

fb1972bd-caad-4b8d-8189-4a22f58148a9