NETWORK DEPOSITION SERVICES
Transcript of Stephen Takesian

THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DEBORAH PRISE and HEATHER RADY )
on behalf of themselves and all )
employees similarly situated, )
                           )
       Plaintiffs, )
                           )
  vs. ) Civil Action No. 06-1641
                           )
ALDERWOODS GROUP, INC., )
                           )
       Defendant. )
                           )
_____ )

Deposition of STEPHEN TAKESIAN,

taken at 101 North First Avenue,

Phoenix, Arizona, commencing at

9:42 a.m., Thursday, April 30,

2009, before Shannon Stevenson,

RPR, Arizona CSR No. 50461

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

fb1972bd-caad-4b8d-8189-4a22f58148a9

NETWORK DEPOSITION SERVICES
Transcript of Stephen Takesian

Page 122

1           Was that your understanding of the policy at

2    Phoenix Memorial Park?

3           MS. DOUGLASS:  Objection.

4           THE WITNESS:  Yes.

5      Q    BY MR. DANIELS:  Was that a company-wide

6    policy, if you know?

7           MS. DOUGLASS:  Objection.

8           THE WITNESS:  I don't know.  I don't recall.

9      Q    BY MR. DANIELS:  Okay.  Let's skip down to

10   Policy E, recording of hours.  Do you see that?

11     A    Yes.

12     Q    Was it your understanding that the policy at

13   Phoenix Memorial Park was that all non-employees were

14   required to record all hours worked each day?

15          MS. DOUGLASS:  Objection.

16          THE WITNESS:  I don't have a clue.

17     Q    BY MR. DANIELS:  Was that a company-wide

18   policy?

19          MS. DOUGLASS:  Objection.

20          THE WITNESS:  I don't know.

21     Q    BY MR. DANIELS:  Next page, overtime.  Was it

22   your understanding that all hourly employees were not

23   permitted or authorized to work any period of time other

24   than their normally scheduled hours unless directed to do so

25   by the managers?

fb1972bd-caad-4b8d-8189-4a22f58148a9

NETWORK DEPOSITION SERVICES
Transcript of Stephen Takesian

Page 123

1          A       Yes.

2                  MS. DOUGLASS:  Objection.

3          Q       BY MR. DANIELS:  The next paragraph talks

4    about the rate of overtime pay.  "Non-exempt employees will

5    receive overtime pay of one and one-half times their regular

6    rate of pay for all hours worked over 40 in any work week or

7    for any hours other than required by state law."

8                  When you worked overtime and when you were

9    paid for the overtime, were you paid one and a half times

10   the regular rate of pay?

11                 MS. DOUGLASS:  Objection.

12                 THE WITNESS:  I don't know.

13         Q       BY MR. DANIELS:  Were there any discussions

14   about that while you worked at Phoenix Memorial Park?

15         A       No.

16         Q       Were you paid overtime at any time?

17                 MS. DOUGLASS:  Objection.

18                 Go ahead.

19                 THE WITNESS:  I believe I was.

20         Q       BY MR. DANIELS:  When you were paid overtime,

21   do you know what your rate was?

22         A       No.

23         Q       Did you ever ask what the rate was?

24         A       I saw it on my pay thing, on my slip.  But,

25   like I said, on the sales side, Rob made it out, the hourly

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

fb1972bd-caad-4b8d-8189-4a22f58148a9

NETWORK DEPOSITION SERVICES
Transcript of Stephen Takesian

Page 126

1       A       Yes.

2       Q       What was the answer?

3       A       When I got my license, they would pay me for

4    that and the real estate.

5       Q       I see.  Did you -- were you reimbursed for

6    the time that you got your real estate license?

7       A       No.  Or for the class.

8       Q       Okay.

9       A       Or for the test.

10      Q       How much was the class and the test?

11      A       I probably spent over $460 on the class and

12   the test and the study guides.

13              MR. DANIELS:  Let's go off the record real

14   quick.

15              (Discussion held off the record.)

16      Q       BY MR. DANIELS:  Let's go back on the record.

17              Let's finish this exhibit and call for a

18   lunch break.  The next section G on-call, maybe cut this

19   short.  Did you ever serve any on-call time?

20      A       No.

21      Q       Let's just move on.

22              Other than ask one or two questions.  Were

23   you aware that there was an on-call policy at Phoenix

24   Memorial Park for others?

25              MS. DOUGLASS:  Objection.

fb1972bd-caad-4b8d-8189-4a22f58148a9

NETWORK DEPOSITION SERVICES
Transcript of Stephen Takesian

Page 127

1            THE WITNESS:  Absolutely.

2      Q      BY MR. DANIELS:  What is your understanding?

3      A      With the funeral directors that I worked

4  with.

5      Q      And they would be on call for first call body

6  pickups?

7      A      We didn't do too many first call body

8  pickups.  We have a service that did that.  Every once in a

9  while we would, but they were on call with a phone, with a

10  beeper just in case.  But they were always there anyway too.

11  It wasn't like they weren't there.

12      Q      Was the phone and/or beeper provided to them

13  by the company?

14      A      Yes.

15      Q      And, again, this is just your knowledge and

16  if you don't have much, that's fine.  Were they paid for

17  their on-call time?

18      A      I don't know.  I'm sure they were.

19      Q      Were they required or restricted to stay at

20  home or at the location when they were, quote, on call?

21      A      I don't think so.  I don't know.

22      Q      Did you have any discussions with any of the

23  funeral directors about the on-call policy?

24      A      Yes.

25      Q      What was said?

fb1972bd-caad-4b8d-8189-4a22f58148a9

NETWORK DEPOSITION SERVICES
Transcript of Stephen Takesian

Page 130

1     A      I wasn't aware of it.  They made very little
2  aware of -- you aware of anything that would benefit you.
3           MS. DOUGLASS:  Objection.
4     Q      BY MR. DANIELS:  Okay.
5           MS. DOUGLASS:  Give me one second after he
6  asks the question so I can object if I need to.
7           THE WITNESS:  I'm sorry.
8           MR. DANIELS:  You are preserved, no one is
9  going to fight you on that.
10          MS. DOUGLASS:  Just so it's easier for all of
11  us.
12          MR. DANIELS:  Also, it's hard to read the
13  transcript too, which makes it difficult.
14    Q      BY MR. DANIELS:  The funeral directors, did
15  you have discussions about this call-back policy with them?
16    A      Yes.
17    Q      What was discussed?
18    A      You know, they had to come in from home.
19    Q      Did they tell you they would be paid when
20  they were called back?
21    A      Oh, yeah, yes.  That was a constant
22  discussion about it was just always money.  You know, it was
23  always how much I'm working.
24    Q      So they were paid?
25    A      Yes.

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

fb1972bd-caad-4b8d-8189-4a22f58148a9

NETWORK DEPOSITION SERVICES
Transcript of Stephen Takesian

1   employees must accurately record (using time clock/time

2   sheet) all hours of work including:  Time beginning work,

3   time out for lunch/meal breaks, time returning from

4   lunch/meal breaks, time ending work for the day, and time

5   performing work while on call."

6                   Were you aware of that policy?

7                   MS. DOUGLASS:  Objection.

8                   THE WITNESS:  No, I'm not.  I wasn't.

9        Q       BY MR. DANIELS:  Did you follow that policy

10  in any event?

11                  MS. DOUGLASS:  Objection.

12                  THE WITNESS:  Yeah, we tried.

13       Q       BY MR. DANIELS:  Was this a company-wide

14  policy, if you know?

15                  MS. DOUGLASS:  Objection.

16                  THE WITNESS:  No, I don't know.

17       Q       BY MR. DANIELS:  Do you know if other

18  employees at Phoenix Memorial Park followed both A and B,

19  those two responsibilities?

20       A       No, I don't.

21       Q       And then C says, "Employees are responsible

22  for ensuring that their time cards/time sheets are always

23  accurate, and to bring any errors to their manager's

24  attention."

25                  Did you follow that policy?

fb1972bd-caad-4b8d-8189-4a22f58148a9

NETWORK DEPOSITION SERVICES
Transcript of Stephen Takesian

1       A       Yes.

2       Q       And did you --

3               MS. DOUGLASS:  Objection.

4       Q       BY MR. DANIELS:  Did you bring any errors to

5   the management's attention?

6       A       Yes.

7       Q       What would happen when that occurred?

8       A       It would be the Debbie and Rob show.  They'd

9   be fighting and arguing about the hours or what we're

10  allowed to do and not allowed to do.  Debbie would tell us

11  don't go to Rob with these questions, he doesn't know what

12  he's talking about.  We would go to her and she'd give us

13  one answer and a different one from Robert.

14      Q       Were you aware that disciplinary action could

15  be taken against an employee who did not follow the

16  company's time recording and record keeping?

17      A       Yes.  They constantly threatened us with

18  disciplinary.

19      Q       What would they tell you?

20      A       All this has to be done right or they'll send

21  you home, or whatever.

22      Q       Do you know of anyone that was sent home for

23  not following the time recording policies and practices?

24      A       No.

25      Q       Let's talk about a couple of these.

fb1972bd-caad-4b8d-8189-4a22f58148a9

NETWORK DEPOSITION SERVICES
Transcript of Stephen Takesian

Page 145

1      Q      And there were two others.  Boy Scouts was

2   another one.  What were the other ones?

3      A      Pardon me?

4      Q      I thought you said the community --

5             MR. EHRMAN:  Actually, it was Cub Scouts.

6      Q      BY MR. DANIELS:  I think it's asked and

7   answered, but I'll speed up the process.  What community

8   services did you participate in that you believe you were

9   not compensated?

10     A      I was -- once a week I went to a senior

11  center.  I visited the senior center either running the

12  bingo or having lunch with them or explaining services to

13  them or just being there.

14     Q      Just give me the list of the community

15  services you did and then talk about each one individually.

16  There was the senior center, your Masonic Lodge; is that

17  correct?

18     A      Correct.

19     Q      And you told me your Armenian church?

20     A      Yes, I was, perish council member.

21     Q      And was it the Cub Scouts?

22     A      Yes.

23     Q      Any others?

24     A      Not that I can think of right now.

25     Q      Okay.  If you think of another one, let me

NETWORK DEPOSITION SERVICES
Transcript of Stephen Takesian

1    know, okay?

2          A       I will.

3          Q       The senior center, what was the name of that

4    senior center?

5          A       There's 22 senior centers in the city of

6    Phoenix, I went to all of them.

7          Q       I just thought of something.  Was the work

8    that you did at 22 senior service centers in conjunction

9    with the time you spent on the Mayor's Aging --

10         A       I wasn't a member of that commission when I

11   was employed at Alderwoods, but I used all that experience

12   and all those people that I had met over the years to gain

13   access to these people.

14         Q       Okay.  So your experience working on the

15   Mayor's Commission for Senior Aging assisted you in your

16   service that you did to the senior centers; correct?

17         A       Yes.

18         Q       And how many hours per week did you spend at

19   the senior centers?

20         A       Usually one day a week doing my community

21   service.

22         Q       A full day?

23         A       Most of the day.

24         Q       What would be the hours?

25         A       In between 8:00 and 5:00 I would normally

fb1972bd-caad-4b8d-8189-4a22f58148a9

NETWORK DEPOSITION SERVICES
Transcript of Stephen Takesian

1    do community service and it was still listed 8:00 to 5:00,

2    were you actually paid for some of the time that you were

3    not on site?

4              MS. DOUGLASS:  Objection to form.

5              THE WITNESS:  If it was 8:00 to 5:00 during

6    the week, I was paid 40 hours.

7         Q    BY MR. DANIELS:  Regardless if you were at

8    Phoenix Memorial Park or at a senior service center?

9         A    During the week, yeah, during the day.

10        Q    However, is it your testimony that times

11   before or after that 8:00 to 5:00 schedule you were not paid

12   for it or on weekends?

13        A    If I was helping with a viewing, usually no.

14        Q    Okay.

15        A    Why would you help with a viewing, because --

16        Q    Like you said, upsell?

17        A    Upsell.

18        Q    Again, so I can get closure on this one

19   issue.  There were times then that you were paid for at

20   least part of the time that you were doing community service

21   work; is that a correct statement?

22        A    Sure.

23        Q    All right.  Thank you.

24             And you said at least one day a week you were

25   doing your community service at the senior centers?

fb1972bd-caad-4b8d-8189-4a22f58148a9

NETWORK DEPOSITION SERVICES
Transcript of Stephen Takesian

Page 154

1    Q        Did you do that?

2    A        Yes.

3    Q        How often?

4    A        In that year maybe seven times.  Business

5    card in the monthly newsletter, business cards up on the

6    walls.

7    Q        Okay.  Each time you attended a meeting, did

8    you go to, for the most part, all weekly meetings?

9    A        Yes.  I was an officer during that time.

10    Q        Okay.  During the 15 months then that you

11    were working, that's approximately 60 meetings then;

12    correct?  You are shaking your head yes.  I need an answer.

13    A        Yes.

14    Q        And each one was three to four hours.  Was a

15    portion of that three to four hours used for your own

16    personal experience as a Mason?

17              MS. DOUGLASS:  Objection to form.

18    Q        BY MR. DANIELS:  You can go ahead and answer.

19    A        Absolutely.

20    Q        Okay.  In fact, another way of looking at it

21    is would you have attended the Mason meetings even if you

22    were not selling and/or making presentations on behalf of

23    Phoenix Memorial Park?

24    A        Yeah.  That's not why I was a Mason.

25    Q        That's the question I was getting at.

fb1972bd-caad-4b8d-8189-4a22f58148a9

NETWORK DEPOSITION SERVICES
Transcript of Stephen Takesian

1        A        That's not why I was a Mason.

2        Q        I think you said you were a Mason before?

3        A        Correct.

4        Q        However, once you began working there, you

5     spent at least some of the time, is what your testimony is,

6     I believe, selling funeral --

7        A        I was on the funeral committee there too.

8        Q        How much, if you can quantify for me, of the

9     three to four hours each meeting would you attribute to work

10    that you did that benefited Phoenix Memorial Park?

11       A        I wouldn't be able to tell you, I don't know.

12       Q        Would it be less than an hour, more than an

13    hour?

14                 MS. DOUGLASS:  Objection.

15                 THE WITNESS:  I don't know.  I don't

16    remember.  It depended.  Sometimes it would be all

17    afternoon.  I would be at a funeral, Masonic funeral all

18    afternoon, or I would be -- that night I would be at my

19    Masonic meeting and someone would bring their paperwork from

20    another situation and say I want you to look at this.

21       Q        BY MR. DANIELS.  Thank you for that.  I'm

22    talking about the 6:00 meetings on Wednesday.  I know you

23    told me that you may have spent a lot of time in a Mason

24    related funeral.  I'm trying to get a quantity of just the

25    meetings, the three- or four-hour-long meetings.  How much

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

fb1972bd-caad-4b8d-8189-4a22f58148a9

NETWORK DEPOSITION SERVICES
Transcript of Stephen Takesian

1    Q       Okay.  Cub Scouts.  What's your role with the

2  Cub Scouts?

3    A       I was a cub master.

4    Q       Was this during the period of time that --

5    A       No.

6    Q       -- you were at Phoenix Memorial Park?

7    A       No.

8    Q       Did any of the work that -- did you do

9  anything within the Cub Scouts that benefited Phoenix

10 Memorial Park?

11   A       No.

12   Q       We put an end to that one then quickly.

13           Any other community service programs that you

14 participated in while working at Phoenix Memorial Park that

15 you believe was uncompensated?

16   A       Not that I can recall right now.

17   Q       There was a policy in effect that you were

18 aware of at Phoenix Memorial Park that required you to

19 participate in the community service events that you and I

20 just talked about?

21   A       It was expected.

22   Q       It was a written policy?

23   A       I'm not sure.  That was just driven home to

24 us by Rob and not a lot of people did that.  Unfortunately a

25 lot of people didn't understand that concept.  I think they

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

fb1972bd-caad-4b8d-8189-4a22f58148a9

NETWORK DEPOSITION SERVICES
Transcript of Stephen Takesian

Page 162

1   went on their insurance background.

2          Q        When you say not a lot of people, you talking

3   funeral directors?

4          A        No.  The family service professionals.

5   Funeral directors did nothing prospecting.  It wasn't that

6   type of ability with them.

7          Q        If you know, who was selling -- the title of

8   the person who was selling pre-need insurance product?

9          A        Whom?

10         Q        Yours is family service counselor?

11         A        Correct.

12         Q        Was there a different title for someone that

13  was selling pre-need with an insurance license?

14         A        Not that I know of.

15         Q        They were all family service professional or

16  counselor?

17         A        Correct.

18         Q        The difference was they had their license?

19         A        Correct.

20         Q        Did any of the product you sell, was it under

21  trust?

22         A        No.

23         Q        Were you -- in Arizona are you allowed to

24  sell trust without having an insurance license?

25         A        No, we are not.

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

fb1972bd-caad-4b8d-8189-4a22f58148a9

NETWORK DEPOSITION SERVICES
Transcript of Stephen Takesian

Page 163

1       Q        Did anyone evaluate your role in these

2   various community services?

3                MS. DOUGLASS:  Objection.

4                THE WITNESS:  No, but they were questioned

5   all the time.

6       Q        BY MR. DANIELS:  By whom?

7       A        Rob and Nathan.

8       Q        What did they question you on?

9       A        Where did I go, what did I do, what did I

10  accomplish.

11      Q        Did they appear to be pleased with your work

12  or what response did you get?

13      A        You know, it was always -- and I can only

14  speak for myself with regards to Rob and/or Nathan.  They

15  wanted to see results.  This talking was just talking.

16      Q        You said some folks didn't participate in

17  community service activities such as you.  What would happen

18  to them?

19      A        Nothing.

20      Q        Were they ever disciplined or reprimanded?

21      A        No.

22      Q        Were there any costs associated with your

23  involvement with the senior centers?

24      A        Sure.

25      Q        What were those costs?

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

fb1972bd-caad-4b8d-8189-4a22f58148a9

NETWORK DEPOSITION SERVICES
Transcript of Stephen Takesian

Page 168

1      A        If it was a business expense, it went off
2   that way.  If it was a personal donation, it went off that
3   way.
4      Q        And other than talking to Rob, I think you
5   said, did you ever call the hotline to get further
6   information about how to get reimbursed for these
7   appearances?
8      A        No.
9      Q        Are you aware of any companywide Alderwoods
10  Group-wide policy requiring family service counselors or
11  other employees to participate in community service?
12     A        Yes.
13     Q        What is that policy?
14     A        We were encouraged.
15     Q        This was a company-wide policy or was this
16  Rob Miller and Phoenix Memorial Park policy?
17     A        It was Rob Miller and the Phoenix Memorial
18  Park.  I didn't spend a lot of time worrying about what the
19  corporation was doing, I was too busy trying to make money.
20     Q        Again, referring to Exhibit 2.  The next box
21  you checked was B as in boy.  "I believe Alderwoods
22  permitted me," meaning you, "to perform on-call work after
23  regular work hours, and I was not compensated for at least
24  some such time during the period of December 8, 2003 to the
25  present."

NETWORK DEPOSITION SERVICES
Transcript of Stephen Takesian

Page 169

1                    Is that an accurate statement?

2        A        No.

3        Q        I'm going to close the door.  Earlier you

4   have told me you as a family service counselor did not do

5   on-call work?

6        A        Yes.

7        Q        Let's go on to C as in cat.  "I," meaning

8   you, "believe that as a part of my job duties for Alderwoods

9   I spent time training for and taking the test to become a

10  licensed insurance agent and time maintaining that license

11  and I was not compensated for at least some of such time

12  during the period December 8, 2003 to the present."

13                 Correct?

14       A        Yes.

15       Q        I think we already talked about most of this,

16  so this will be brief in this area.  First there was a real

17  estate license; correct?

18       A        Yes.

19       Q        And you said that was half a day or a day

20  studying and a test?

21       A        Uh-huh.

22       Q        "Yes"?

23       A        Yes.

24       Q        Did you have to take a day off or how did

25  that work?

fb1972bd-caad-4b8d-8189-4a22f58148a9

NETWORK DEPOSITION SERVICES
Transcript of Stephen Takesian

Page 174

1      A        Time-wise?

2      Q        Yes.

3      A        What we've been discussing, the Masonic work.

4      Q        I'm sorry.  I grouped that all together.

5      A        Okay.

6      Q        Everything we've talked about so far, the

7   community service work, the pre-need, non-scheduled client

8   needs, those combined add up to the 17 to 23?

9      A        And the church stuff.

10     Q        That adds up to the 17 to 23 hours?

11     A        Correct.

12     Q        Is there anything else that we haven't talked

13  about that is included in that 17 to 23 hours?

14     A        Not that I recall.

15     Q        Look at the next one -- let me back up to

16  kind of get closure on that last one.

17              How many pre-need appointments did you have

18  on average per week that were not scheduled or were not a

19  part of your scheduled day?

20     A        None.

21     Q        I misspoke then and maybe we're not

22  communicating.  Which you were not paid for?

23              MS. DOUGLASS:  Objection.

24     Q        BY MR. DANIELS:  You want me to rephrase?

25     A        Yeah.

fb1972bd-caad-4b8d-8189-4a22f58148a9

NETWORK DEPOSITION SERVICES
Transcript of Stephen Takesian

Page 178

1      Q        Could you have scheduled your day such that
2  there --
3      A        If I'm sitting down having dinner or lunch
4  with them, I'm taking a work lunch.  I didn't say right in
5  the middle of the interview, I need to take my 10-minute
6  scheduled break or Deborah Lorh is going to get me.  No, it
7  didn't play out that way.
8      Q        Was it possible, in any event, to schedule
9  your day such that you could take a 30-minute uninterrupted
10 non-working lunch?
11     A        Yes.
12     Q        Did you choose not to do that?
13              MS. DOUGLASS:  Objection.
14              THE WITNESS:  Not considering I wasn't making
15 any money at it, no.
16     Q        BY MR. DANIELS:  G, 'I," meaning you, "was
17 not compensated for all the time I spent working for
18 Alderwoods from December 2003 to the present because the
19 time was not pre-approved."
20              Again, we talked on that a little bit before.
21 I want to touch base on it.  Was it your understanding that
22 there was a pre-approval requirement for overtime?
23     A        Not on -- not in my situation under the
24 family service professionals.  But it was very vocally known
25 all the time that on the funeral side about overtime.  They

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

fb1972bd-caad-4b8d-8189-4a22f58148a9

NETWORK DEPOSITION SERVICES
Transcript of Stephen Takesian

1    and you just were never paid it?

2         A      Yes.

3         Q      On those occasions where you didn't request

4    the overtime, why did you not request it?

5                MS. DOUGLASS:  Objection to form.

6                Go ahead.

7                THE WITNESS:  I wasn't aware.  Like I said,

8    that wasn't our -- everything up and above our hours was for

9    the benefit of making more money in sales.  On the funeral

10   side, it was constant.  Those guys, they lived and died by

11   the overtime.  They would have a funeral and they would not

12   have a funeral director -- two funeral directors there.

13   They would have one of their part-timers so they wouldn't

14   have to pay the funeral director overtime.  The funeral

15   director is already -- he's already at his 40 hours, he

16   can't work the service, we'll have him work it.  That

17   happened all the time.

18        Q      BY MR. DANIELS:  You told me about Mr. Deer

19   and the conversations you've had with him.  Are you aware of

20   a company-wide policy of not paying overtime that was not

21   pre-approved?

22        A      No.

23        Q      How about employees in other positions other

24   than funeral directors, are you aware of any situation where

25   they were denied overtime because it was not pre-approved?

fb1972bd-caad-4b8d-8189-4a22f58148a9

NETWORK DEPOSITION SERVICES
Transcript of Stephen Takesian

Page 182

1      A      No.

2      Q      How about funeral directors such as Mr. Deer

3    at other Alderwoods' locations?

4      A      No.

5      Q      Or any other employees at other locations?

6      A      No.

7      Q      Are you aware of -- this is now in

8    actuality -- how the actual process would occur if someone

9    sought pre-approval of overtime?

10     A      No.

11            MS. DOUGLASS:  Objection.

12     Q      BY MR. DANIELS:  Okay.  I believe on

13   Exhibit 2 now we're on letter H.  "I believe," meaning you,

14   "I was not compensated for all the time I spent working for

15   Alderwoods from December 8, 2003 to the present because I

16   was directed not to record such time."

17            Is that an accurate statement?

18     A      Yes.

19     Q      Who directed you not to record the time?

20     A      Rob Miller.

21     Q      And what type of activities were you not to

22   report?

23     A      When I wasn't doing my family service

24   professional duties.

25     Q      We talked about that.  What such duties are

fb1972bd-caad-4b8d-8189-4a22f58148a9

NETWORK DEPOSITION SERVICES
Transcript of Stephen Takesian

Page 232

1    STATE OF ARIZONA        )
                             ) ss
2    COUNTY OF MARICOPA      )

3

4         BE IT KNOWN that the foregoing deposition was taken

5    before me, SHANNON STEVENSON, a Certified Reporter in and

6    for the County of Maricopa, State of Arizona; that the

7    witness before testifying was duly sworn to testify to the

8    whole truth; that the questions propounded to the witness

9    and the answers of the witness thereto were taken down by me

10   in shorthand and thereafter reduced to computer-aided

11   transcription under my direction; that the foregoing

12   231 pages are a true and correct transcript of all

13   proceedings had upon the taking of said deposition, all done

14   to the best of my skill and ability.

15        I FURTHER CERTIFY that I am in no way related to any of

16   the parties hereto, nor am I in any way interested in the

17   outcome hereof.

18   (   )  Signature was requested.

19   (XXX)  Signature was not requested.

20        DATED at Phoenix, Arizona, this 11th day of May, 2009.

21

22

23                        _____

24                        SHANNON STEVENSON, CR, RPR
                          Certified Reporter
                          Certificate No. 50461

25

fb1972bd-caad-4b8d-8189-4a22f58148a9