**TAB 32**

NETWORK DEPOSITION SERVICES
Transcript of Sandy Thomas

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO/OAKLAND DIVISION

\* \* \* \* \*

WILLIAM HELM, DEBORAH PRISE,       )
HEATHER P. RADY, et al., on behalf )
of themselves and all other        )
employees and former employees     )
similarly situated,                )
                                   )
        Plaintiffs,                )
                                   )
    vs.                            )   CASE NO.
                                   )   CV-08-1184-SI
ALDERWOODS GROUP, INC.,            )
                                   )
        Defendant.                 )
_____     )

DEPOSITION OF SANDY THOMAS

Taken on Monday, October 19, 2009

At 9:30 a.m.

At 5845 Dean Martin Drive

Las Vegas, Nevada

REPORTED BY:  CHRISTY LYN DeJONKER, CCR NO. 691

fcc82a7c-be5a-4a53-805a-809e071852ac

NETWORK DEPOSITION SERVICES
Transcript of Sandy Thomas

Page 8

1     A.   No, I didn't type it.

2     Q.   Who typed the document?

3     A.   I don't know who typed it.

4     Q.   Did you write the contents of this document?

5     A.   I wrote the contents.

6     Q.   So you wrote it and sent it to somebody?

7     A.   Yes.

8     Q.   And they typed it on your behalf?

9     A.   Yes, ma'am.

10    Q.   Okay.  But the words that are in here are

11    your words?

12    A.   Are my words.

13    Q.   And at the time you signed it, was everything

14    that was contained in here truthful and accurate?

15    A.   Yes, ma'am.

16    Q.   And as you sit here today, is everything that

17    is contained in here truthful and accurate?

18    A.   I'm satisfied with everything.  There's one

19    part here, when I went back over it, the online work,

20    that wasn't with the Alderwoods.  That was with SCI.

21    Okay.  It's a part in here that states that I did it

22    online.  I thought it was online, on my computer or

23    something.

24    Q.   Correct.

25    A.   That wasn't pertaining to the Alderwoods

fcc82a7c-be5a-4a53-805a-809e071852ac

NETWORK DEPOSITION SERVICES
Transcript of Sandy Thomas

Page 9

1    Group.  That is SCI.  Because we didn't have to go
2    online to train with the Alderwoods Group.  They didn't
3    have that.
4         Q.   Are you referring to paragraph 15 on page 2,
5    sir?
6         A.   This one.
7         Q.   Aside from paragraph 15 on page 2, which we
8    will get to and talk about, is there anything else in
9    this affirmation that you do not believe is accurate as
10   you sit here today?
11        A.   No, this is --
12        Q.   No.
13             If you turn back to page 1, sir, paragraph 3,
14   it indicates that you were an employee of Alderwoods
15   Group or Alderwoods, Inc., from approximately 2002
16   until December 2006, correct?
17        A.   Yes.
18        Q.   When in 2002 did you join Alderwoods?
19        A.   When Alderwoods took over from the -- when
20   they changed it from the Lone Group to Alderwoods, that
21   is when.
22        Q.   Do you remember or have a recollection --
23        A.   The months --
24        Q.   Wait, wait.  Let me finish asking.
25             Do you have a recollection what month that

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

fcc82a7c-be5a-4a53-805a-809e071852ac

NETWORK DEPOSITION SERVICES
Transcript of Sandy Thomas

Page 30

1  did you continue to use time sheets, or did you just

2  use the time clock?

3      A.   We continued to use the time sheets.

4      Q.   So did you continue to use time sheets

5  throughout the period of time that you were an

6  Alderwoods employee?

7      A.   Sure did.

8      Q.   It's just for that period, approximately June

9  of 2006 until December of 2006 you used both a time

10 clock and time sheets, correct?

11     A.   Correct.

12     Q.   Did you have an understanding that on the

13 time sheets they were, as this policy says, to record

14 the time actually worked by each employee?

15     A.   It was.

16     Q.   Did you instruct the employees who reported

17 to you to record all the time they actually worked?

18         MR. LINGLE:  Objection.

19         THE WITNESS:  Yes, I did.

20 BY MS. DIAS:

21     Q.   And did you record all of your time that you

22 actually worked?

23     A.   I did.

24         MR. LINGLE:  Objection.

25

fcc82a7c-be5a-4a53-805a-809e071852ac

NETWORK DEPOSITION SERVICES
Transcript of Sandy Thomas

Page 41

1  piecework pay.

2          Did you ever receive piecework pay at

3  Alderwoods?

4      A.  No.

5      Q.  Did any of the employees who reported to you

6  ever receive piecework pay at Alderwoods?

7      A.  No.

8      Q.  If you look at the next bullet, it says,

9  "Completed timecard sheets are to be signed by the

10  employee to verify the card accurately documents the

11  actual hours worked."

12          Do you see that?

13      A.  I see that.

14      Q.  Now, with respect to meal breaks, when

15  individuals worked through meal breaks, this policy was

16  not followed, was it?

17      A.  It wasn't.

18      Q.  And it wasn't followed by you on occasion,

19  correct?

20      A.  Well, I signed it.

21      Q.  But it did not accurately reflect all time

22  worked, correct?

23      A.  No.

24      Q.  And it goes on to say, "The employee's

25  supervisor and manager must also sign the timecard

fcc82a7c-be5a-4a53-805a-809e071852ac

NETWORK DEPOSITION SERVICES
Transcript of Sandy Thomas

Page 57

1      Q.   Under disciplinary action, the third item
2  down, third independent paragraph down indicates that
3  "Working overtime that has not been preapproved by the
4  employee's manager may lead to disciplinary action."
5           Do you see that?
6      A.   I see that.
7      Q.   Did you ever work unapproved overtime?
8      A.   Did I ever work unapproved overtime?
9      Q.   Let me ask you that differently.  Did you
10  ever work overtime that was not first preapproved?
11     A.   No.
12     Q.   Did anyone who reported to you ever work
13  overtime that was not preapproved?
14     A.   No.
15     Q.   No?
16     A.   No.
17     Q.   Did any of the individuals who reported to
18  you ever request to work overtime that you refused to
19  approve?
20     A.   Requested to work overtime?
21     Q.   Yes.
22     A.   I don't remember ever having anyone work
23  overtime, I mean, requested overtime that I didn't
24  approve of.
25     Q.   Did you ever request to work overtime that

fcc82a7c-be5a-4a53-805a-809e071852ac

NETWORK DEPOSITION SERVICES
Transcript of Sandy Thomas

Page 58

1    any of your supervisors refused to approve?

2        A.   No.

3                (Exhibit 4 marked.)

4    BY MS. DIAS:

5        Q.   I'm showing you, Mr. Thomas, what has been

6    marked as deposition Exhibit 4.  This is an Alderwoods

7    document entitled Procedures for Timekeeping Recording

8    Hours Worked.

9            Have you ever seen this document before,

10   Mr. Thomas?

11       A.   I don't remember seeing this before.

12       Q.   If you look under the purpose, this document

13   states -- and I'll draw your attention to it,

14   "Nonexempt employees are to be compensated for all

15   overtime hours worked," correct?

16           MR. LINGLE:  Objection.

17           THE WITNESS:  As stated in this, yes.

18   BY MS. DIAS:

19       Q.   Under procedures, the second procedure --

20       A.   Okay.

21       Q.   -- indicates that "Employees must clock in or

22   out utilizing their own timecard or time sheet so that

23   actual hours worked are properly recorded," correct?

24           MR. LINGLE:  Objection.

25

NETWORK DEPOSITION SERVICES
Transcript of Sandy Thomas

Page 59

1   BY MS. DIAS:

2        Q.   That is what is stated here, correct?

3        A.   It's stated here.

4        Q.   If you turn to the next page, at the top it

5   states:  "Employees who do not take a meal break must

6   have their manager's preapproval and must handwrite no

7   meal break taken, and have the location manager/general

8   manager approve and initial the notation," correct?

9             MR. LINGLE:   Objection.

10            THE WITNESS:   It's stated here, but I never

11   remember doing this.

12   BY MS. DIAS:

13        Q.   That was going to be my question.  Did you

14   ever obtain approval from your manager to not take a

15   meal break?

16        A.   No.

17        Q.   Did any of the employees who reported to you

18   ever seek your preapproval for missing a meal break?

19        A.   Yes, they did.

20        Q.   And did you so approve that?

21        A.   Yes.

22        Q.   And in those circumstances where you approved

23   it, was this procedure followed in terms of writing no

24   meal break taken?

25        A.   It was.

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

NETWORK DEPOSITION SERVICES
Transcript of Sandy Thomas

Page 61

1        A.    Correct.

2        Q.    And if you look at the very bottom of 12,

3   after the hyphen, it indicates that they are only to be

4   signed after all hours worked have been recorded,

5   correct?

6              MR. LINGLE:  Objection.

7              THE WITNESS:  That is what it states here.

8   BY MS. DIAS:

9        Q.    If you look at Procedure under Call Logs, No.

10  1, it says, "Nonexempt employees who are on call are

11  required to carry and maintain a call log."

12             Do you see that?

13       A.    The first?

14       Q.    Yes.

15       A.    I see that.

16       Q.    Did the employees who reported to you carry

17  and maintain call logs?

18       A.    Yes.

19       Q.    And did you carry and maintain a call log?

20       A.    Yes.

21       Q.    And did you understand the call log, the

22  purpose of a call log to record all calls that you had

23  during regular work hours?

24       A.    Yes, I did.

25       Q.    And is that how you so instructed your

fcc82a7c-be5a-4a53-805a-809e071852ac

NETWORK DEPOSITION SERVICES
Transcript of Sandy Thomas

Page 62

1   employees or the employees who reported to you?

2        A.   Yes.

3        Q.   And to your knowledge, did they record all

4   phone calls?

5        A.   Yes.

6        Q.   And to your knowledge, did you record all

7   phone calls?

8        A.   I did.

9        Q.   Item No. 5 indicates that "Location managers

10  or general managers must verify and sign their

11  respective employees' call logs each week."

12            Did you verify the call logs of the employees

13  who reported to you?

14            MR. LINGLE:  Objection.

15            THE WITNESS:  Yes.

16  BY MS. DIAS:

17       Q.   If you skip two pages, Mr. Thomas -- well,

18  let me ask you first, the first page there indicates at

19  the top, weekly time sheet.  You see that, weekly time

20  sheet?  Is this the format that the time sheets

21  followed for the Thomas and Jones Funeral Home?

22       A.   I'm trying to remember.  I don't remember the

23  time sheet being exactly this way.

24       Q.   That's fine.  You don't recall if this is the

25  format that was used?

fcc82a7c-be5a-4a53-805a-809e071852ac

NETWORK DEPOSITION SERVICES
Transcript of Sandy Thomas

Page 64

1      A.   James worked on on call, I worked on-call
2  overtime.
3      Q.   Anyone else other than yourself and James?
4      A.   No.
5      Q.   So throughout the period of time when you
6  began working for Alderwoods until December of 2006,
7  the only people for Thomas and Jones Funeral Home who
8  worked on-call time was yourself and James Jones; is
9  that right?
10      A.   And Regina.  I'm sorry, Regina Bell.  She
11  worked on call.
12      Q.   Was there some type of schedule that you had
13  in place for who would work on call on what days?
14      A.   Yes.
15      Q.   What was that?
16      A.   Usually I would work on Monday nights on
17  call; I would take calls on Monday.  James would take
18  on Wednesday, and Regina would be Thursday, Thursday on
19  call.
20      Q.   What about Tuesdays?
21      A.   Someone else from another location.
22      Q.   Someone else from another --
23      A.   These are just the three days that the three
24  of us worked.  The office manager didn't work on call.
25      Q.   So the office manager never worked on call,

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

fcc82a7c-be5a-4a53-805a-809e071852ac

NETWORK DEPOSITION SERVICES
Transcript of Sandy Thomas

Page 65

1   correct?

2       A.   Correct.

3       Q.   And that is true for -- and that would be

4   true for Patty, Maria and Petra, none of the three of

5   them worked on-call time, correct?

6       A.   That's correct.

7       Q.   And the other three of you -- yourself, James

8   and Regina -- only worked on-call time one night a

9   week?

10      A.   A week.

11      Q.   And was that true from the time that you

12  started working for Alderwoods through December of

13  2006?

14      A.   No, no.  Because sometimes -- yeah, we didn't

15  leave it that way.  Because sometimes we would not do

16  the same day, but yeah.

17      Q.   So the answer to my question is yes, it was

18  for that entire period of time each of you only worked

19  one night per week of on-call time?

20      A.   Yes.

21      Q.   And what types of duties did you perform

22  while on call?

23      A.   Well, from 5 o'clock in the evening until 8

24  o'clock the next morning, we were on call for all calls

25  received from the answering service.  And at that time,

fcc82a7c-be5a-4a53-805a-809e071852ac

NETWORK DEPOSITION SERVICES
Transcript of Sandy Thomas

Page 77

1            MS. DIAS:  Sure.

2                (Whereupon, a recess was taken.)

3    BY MS. DIAS:

4        Q.   Mr. Thomas, paragraph 7 of your affirmation

5    says, "This corporate on-call pay policy is meant for

6    Alderwoods employees."

7            What employees are you referring to when you

8    say "Alderwoods employees"?

9        A.   That meant me, James and Regina.

10       Q.   All right.  So that is you as a location

11   manager/funeral director, and Regina and James as

12   arrangers, correct?

13       A.   Right.

14               (Exhibit 5 marked.)

15   BY MS. DIAS:

16       Q.   Let me show you what has been marked as

17   deposition Exhibit 5, which is a list of Alderwoods

18   positions and jobs.  And I would like to just draw your

19   attention to the jobs that are listed as nonexempt jobs

20   from the middle to the top of the page.  And the second

21   column here is a job description.

22            Now, individuals who are employed by

23   Alderwoods in the accounts payable administrator

24   position, did any such people ever report to you?

25       A.   In administration?

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

NETWORK DEPOSITION SERVICES
Transcript of Sandy Thomas

Page 78

1      Q.    Yes.

2      A.    No.

3      Q.    Do you have any knowledge whether they were

4   ever required to work on-call time?

5      A.    No, I don't.

6      Q.    What about support office administrator?

7   Does a support office administrator ever report to you?

8           MR. LINGLE:   Objection.

9           THE WITNESS:   No.

10  BY MS. DIAS:

11     Q.    Do you know if they were ever required to

12  work on-call time?

13     A.    No, I don't.

14     Q.    Advance planning professional, did any of

15  them ever report to you?

16     A.    Never.

17     Q.    They never reported to you?

18     A.    Never.

19     Q.    So you wouldn't know, would you, whether they

20  were required to work on-call time, correct?

21     A.    Correct.

22     Q.    What about an apprentice embalmer?

23     A.    Never.

24     Q.    So you wouldn't have any knowledge if they

25  were required to work on-call time, correct?

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

NETWORK DEPOSITION SERVICES
Transcript of Sandy Thomas

Page 79

1     A.   Correct.

2     Q.   What about an apprentice funeral director?

3     A.   No knowledge.

4     Q.   And apprentice funeral director embalmer?

5     A.   Never.

6     Q.   So no knowledge about whether they would have

7  to work on-call time, correct?

8     A.   Correct.

9     Q.   Arranger would be the position that Regina

10 and James had, correct?

11    A.   Correct.

12    Q.   And administrative assistant would be the

13 office manager-type position, correct?

14    A.   Correct.

15    Q.   And you have already told me about both of

16 those.  What about a funeral -- if you look at all

17 titles from funeral attendant down through the rest of

18 the nonexempt positions, did anybody who held any of

19 those positions ever report to you?

20    A.   No.

21    Q.   And so therefore, for all of the rest of

22 those positions that never reported to you, you have no

23 idea whether they were required to work on-call time,

24 correct?

25    A.   Correct.

fcc82a7c-be5a-4a53-805a-809e071852ac

NETWORK DEPOSITION SERVICES
Transcript of Sandy Thomas

Page 80

1    Q.   Or if they were required to work on-call time
2  whether they were paid for it, correct?
3    A.   Correct.
4    Q.   Going back to paragraph 7 of your
5  affirmation, Mr. Thomas, we got on the first line to
6  Alderwoods employees and you have now defined what you
7  meant by they were paid for only part of the work that
8  they did while on call.  Here are you referring to the
9  fact that you -- when you say "only part of the work
10  that they did on call," are you referring to the fact
11  that you had put down all the time you were on phone
12  calls?
13    A.   Exactly.
14    Q.   Does that refer to anything else other than
15  that?
16    A.   No, no.
17    Q.   So under this policy I was instructed by my
18  manager Todd Noecker.  Is this spelled correctly?
19    A.   No, it's not spelled right.
20    Q.   What is the correct spelling?
21    A.   N-O-C-E-K-E-R.
22    Q.   You were instructed by Todd to only record 15
23  minutes while handling phone calls, regardless of how
24  long the phone call actually took.  You already told me
25  that.  Now, you note here in your affirmation that Todd

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

fcc82a7c-be5a-4a53-805a-809e071852ac

NETWORK DEPOSITION SERVICES
Transcript of Sandy Thomas

Page 85

1      A.   No.

2      Q.   And you say, "I had conversations with

3  co-workers and employees at other locations."  Any

4  other employees you spoke with?

5      A.   No.

6      Q.   So paragraph 11 refers to Shane Melody and

7  Nascio, solely, and that involved discussions that they

8  had with the same general manager as you, correct?

9      A.   Correct.

10     Q.   Did you ever have any discussions with any

11 employees of Alderwoods who reported to general

12 managers, other than your line of general managers,

13 about what they may have been told about working

14 on-call time?

15     A.   I can't recall.

16     Q.   So you wouldn't be able to speak to what any

17 other line general managers might have told people who

18 reported to them, correct?

19     A.   Correct.

20     Q.   And that would be true for your position as a

21 location manager and arranger, as well as all of these

22 other positions at Alderwoods, correct?

23     A.   Correct.

24     Q.   Have you or did you ever hear of something at

25 Alderwoods called the Community Leadership Program?

fcc82a7c-be5a-4a53-805a-809e071852ac

NETWORK DEPOSITION SERVICES
Transcript of Sandy Thomas

Page 86

1      A.   I can't recall.

2      Q.   Did you ever hear of anything called an

3  Influencer Program?

4      A.   No, I don't remember.

5      Q.   Did you ever create anything known as a

6  Leadership Network when you were employed by

7  Alderwoods?

8      A.   No, I didn't get into that program.

9      Q.   Did any of the individuals who reported to

10  you ever create anything known as a Leadership Network?

11      A.   No.

12      Q.   You never instructed them to do that,

13  correct?

14      A.   No.

15      Q.   Did you as the location manager at Thomas and

16  Jones ever fill out what was known as a Leadership

17  Network information sheet?

18      A.   I don't remember.

19      Q.   Did you ever direct any of the individuals

20  who reported to you to fill out a network information

21  sheet?

22      A.   Not that I can recall.

23      Q.   Did you ever set up anything known as a

24  Leadership Network Contact report?

25      A.   No.

fcc82a7c-be5a-4a53-805a-809e071852ac

NETWORK DEPOSITION SERVICES
Transcript of Sandy Thomas

Page 87

1    Q.   Did you ever instruct any of the individuals

2    who reported to you to fill out that type of a report?

3    A.   No.

4    Q.   Did you ever identify a group of influencers

5    within your community while you were at Alderwoods?

6    A.   No.

7    Q.   Did you ever instruct anyone who reported to

8    you to identify any influencers?

9    A.   No.

10   Q.   Did you ever participate in community seminar

11   programs while you were employed at Alderwoods?

12   A.   No.

13   Q.   Did you ever instruct any of the people who

14   reported to you to participate in any community seminar

15   programs?

16   A.   No.

17   Q.   Did the Thomas and Jones Funeral Home ever

18   host any type of community events while you were at

19   Alderwoods?

20   A.   Yes, we did.

21   Q.   What type of events did you host?

22   A.   We had -- we did some networking with the

23   church.

24   Q.   I'm sorry?

25   A.   We did some networking with the church.  We

NETWORK DEPOSITION SERVICES
Transcript of Sandy Thomas

Page 88

1    had where they come in and had different doctors and

2    things that came in and examined people for different

3    things.  We put that on.

4         Q.   When did those events occur?

5         A.   It occurred in 2006.

6         Q.   And did they occur during the course of the

7    regular work week?

8         A.   Yes.

9         Q.   So during your normal business hours?

10        A.   Normal business hours, yes.

11        Q.   So you were paid during the time you spent on

12   those programs, right?

13        A.   Right.

14        Q.   And any time that the individuals who

15   reported to you spent on those programs, they would

16   have been paid for it as well, correct?

17        A.   Correct.

18        Q.   Did your Alderwoods location -- and I'm going

19   to read a list of these things.  And my question is:

20   Did your location ever participate in these types of

21   events?  So, for example, did your location ever

22   participate in a food drive?

23        A.   No.

24        Q.   In any type of Father's Day or Mother's Day

25   event?

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

fcc82a7c-be5a-4a53-805a-809e071852ac

NETWORK DEPOSITION SERVICES
Transcript of Sandy Thomas

1      Q.   Okay.  Let me see if I understand.  The first

2    time you recall having one of these training sessions

3    on policies was in the beginning of 2006, correct?

4      A.   Correct.

5      Q.   So can we then just eliminate from when you

6    started in 2002 until the beginning of 2006?  There was

7    no training that you needed to attend; is that

8    accurate?

9      A.   I'd say.

10     Q.   So the first training is in the beginning of

11   2006, and that is at the Eastern location?

12     A.   Right.

13     Q.   And who conducted the training?

14     A.   I can't recall who conducted the training.  I

15   can't recall who conducted the training.  Somebody from

16   HR, one of the general managers.  No, it wasn't the

17   general manager.

18     Q.   You don't recall?

19     A.   I don't recall.

20     Q.   Do you recall what the topic was?

21     A.   No.

22     Q.   Do you recall how long it lasted?

23     A.   It lasted approximately six hours.

24     Q.   And did it occur during the course of your

25   regular workday?

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

fcc82a7c-be5a-4a53-805a-809e071852ac

NETWORK DEPOSITION SERVICES
Transcript of Sandy Thomas

Page 100

1      A.   Yes.

2      Q.   So you were paid for your time to attend that

3   training, correct?

4      A.   Yes.

5      Q.   So that's the first one in 2006.  And then I

6   think you were beginning to make reference to the fact

7   there were two more later in 2006 that you were

8   recalling; is that right?

9      A.   No.  I said there was another one in

10  September 2006.

11     Q.   Okay.  And where was that one, also at

12  Eastern?

13     A.   I'm trying to remember.  Because we went --

14  that wasn't it.  I'm going back even before, but no,

15  that was also on Eastern too.  Yes.

16     Q.   And do you remember who conducted the

17  training?

18     A.   The same person, but I don't remember.

19     Q.   Do you recall what the topic of the

20  September 2006 training was?

21     A.   I wish I could.

22     Q.   And do you recall how long that training

23  session lasted?

24     A.   It lasted about six hours, the same.

25     Q.   And was it the same, that it occurred during

fcc82a7c-be5a-4a53-805a-809e071852ac

NETWORK DEPOSITION SERVICES
Transcript of Sandy Thomas

Page 101

1    the course of the regular workday?

2        A.    Yes, it did.

3        Q.    And so you were also paid for that training

4    session, correct?

5        A.    Right.

6        Q.    Any other training as a location manager or

7    funeral director during the period of time that you

8    were employed at Alderwoods?

9        A.    No, not that I can recall.

10       Q.    Now, let's take your arrangers.  Well, let me

11   first ask you, your general managers, do you have any

12   idea, any training that they were required to take?

13       A.    No, I don't.

14       Q.    The arrangers who reported to you, James and

15   Regina, what training were they required to take at

16   Alderwoods?

17       A.    They took the, more or less, staff meetings.

18   They would have a staff meeting on the proper way of

19   making removals.

20       Q.    Anything else?

21       A.    No.

22       Q.    And were these training sessions or staff

23   meetings conducted by you?

24       A.    No, they weren't conducted by me.

25       Q.    Who conducted those meetings?

fcc82a7c-be5a-4a53-805a-809e071852ac

NETWORK DEPOSITION SERVICES
Transcript of Sandy Thomas

Page 104

1    reported to you at Alderwoods?

2         A.   No.

3         Q.   What about training for your office manager,

4    administrator, did they undertake any training?

5         A.   No.

6         Q.   Looking back at Exhibit 5, for any nonexempt

7    position other than arranger and administrative

8    assistant, do you know any training that any of the

9    people who worked in those job positions attended?

10        A.   Of my people?

11        Q.   Yes.

12        A.   No.

13        Q.   So if they attended any training sessions,

14   number one, you wouldn't know about it, correct?

15        A.   Right.

16        Q.   And number two, you wouldn't know if it was

17   mandatory training or not, correct?

18        A.   Correct.

19        Q.   And number three, if they participated in any

20   event, you would have no idea whether they were paid

21   for it or not, correct?

22        A.   Correct.

23        Q.   If you look at paragraph 14, it says, "I was

24   informed by the general manager Todd Noceker that any

25   training that took place outside of regular working

NETWORK DEPOSITION SERVICES
Transcript of Sandy Thomas

1    hours would not be paid."

2            Is this referring to the once per year staff

3    meetings?

4        A.   Yes.

5        Q.   Is it referring to any other training?

6            MR. LINGLE:   Objection.

7    BY MS. DIAS:

8        Q.   Were you in your affirmation intending to

9    refer to anything other than the attendance of the

10   once-per-year staff meeting?

11       A.   No.

12       Q.   Paragraph 15, and you alluded to this at the

13   beginning of the deposition, it says you prepared for

14   and completed mandatory online training.  And I think

15   you already told me that the mandatory online trainings

16   were by SCI, correct?

17       A.   Correct.

18       Q.   Not by Alderwoods, correct?

19       A.   Correct.

20       Q.   Is it fair to say that you never prepared or

21   completed any mandatory online trainings while you were

22   employed by Alderwoods?

23       A.   Not by Alderwoods.

24       Q.   And to your knowledge, did the arrangers or

25   the office administrator who reported to you ever

fcc82a7c-be5a-4a53-805a-809e071852ac

NETWORK DEPOSITION SERVICES
Transcript of Sandy Thomas

Page 106

1    complete any mandatory online trainings while employed

2    by Alderwoods?

3        A.   Not to my knowledge.

4        Q.   You never instructed them to, correct?

5        A.   No.

6        Q.   And let's go to Exhibit 5.  Other than --

7    well, let me ask you this:  For any of the nonexempt

8    job positions on Exhibit 5, are you aware of anyone

9    employed in any of those job positions completing

10   mandatory online trainings while they were employed by

11   Alderwoods?

12       A.   No.

13       Q.   And if they did attend any online trainings,

14   number one, you wouldn't know about it, correct?

15       A.   Correct.

16       Q.   And number two, if they did, you would have

17   no way of knowing whether they were paid for that time

18   or not, correct?

19       A.   I would have no way of knowing.

20       Q.   Okay.  Paragraph 16 says that you had

21   conversations with co-workers and employees at other

22   locations who expressed that they were similarly

23   experiencing the training policy.  Let's take

24   co-workers first.  Who are the co-workers?

25       A.   The co-workers, like I said, I was talking

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

fcc82a7c-be5a-4a53-805a-809e071852ac

NETWORK DEPOSITION SERVICES
Transcript of Sandy Thomas

Page 110

1      A.    Correct.

2      Q.    And to be fair, we have already talked about

3  the on-call time and not recording more than 15 hours

4  worked, right?

5      A.    Fifteen minutes.

6      Q.    I mean 15 minutes worked.  Any other time

7  that your general manager either encouraged you or

8  required you not to record?

9      A.    Like I said, on Saturdays if I worked, I

10  worked a funeral on Saturday or something, I was told

11  not to record it.

12     Q.    Did you ever tell the people who reported to

13  you not to record Saturday time?

14     A.    No.

15     Q.    Did they record a Saturday time?

16     A.    Yes, they got paid.

17     Q.    So they recorded it and they got paid?

18     A.    Yes.

19     Q.    So as far as Thomas Jones is concerned, the

20  encouragement or the directive not to write down hours

21  for Saturday time worked was just to you?

22     A.    To me.

23     Q.    Anything else that your general managers told

24  you about not recording all hours worked?

25     A.    No, I think that pretty much covers it.

fcc82a7c-be5a-4a53-805a-809e071852ac

NETWORK DEPOSITION SERVICES
Transcript of Sandy Thomas

Page 118

1    evenings, I just want to make sure I understood what
2    you were telling me.  It's not only that Regina and
3    James didn't get paid for those visitations, they
4    weren't permitted to put down the visitations on their
5    time sheets, correct?
6        A.    Correct.
7        Q.    I thought that is what you said.  I just
8    wanted to make sure.
9            Other than the couple of seminars that you
10   referred to that were at the home and the one day of
11   volunteering at hospice, is there any other community
12   work that you did at Alderwoods as a representative of
13   the funeral home?
14       A.    No, not that I remember.
15       Q.    And I know you mentioned Regina attended the
16   hospice day with you.  Other than that, was there any
17   type of community work that any other employees at
18   Thomas Jones performed while you were employed by
19   Alderwoods?
20       A.    Okay.  James did go to a school once and did
21   a presentation for the school at the funeral home, yes.
22       Q.    He did that one time?
23       A.    One time, yes.
24       Q.    Do you remember what the presentation was?
25       A.    No, I don't remember.

NETWORK DEPOSITION SERVICES
Transcript of Sandy Thomas

Page 119

1      Q.    Did he do it during the course of the regular
2  workday?
3      A.    Yes.
4      Q.    Was he therefore paid for the time he spent
5  doing that?
6      A.    Yes.
7      Q.    Anything else that you can remember for
8  either Regina or James?
9      A.    Yes.  Sometimes like on the early Sunday
10  morning or Sunday we had to do some viewings, and then
11  we weren't compensated.  Like, when I say early Sunday,
12  if we had to transport a body to the airport for a
13  ship-out, you know, a couple of hours, we did it.  It's
14  like volunteer.
15      Q.    Okay.  So that sort of falls into the
16  category of beyond kind of six or seven hours of
17  overtime a week, whatever you did was not recorded
18  time, right?
19      A.    Right.
20      Q.    Now, on those written performance evaluations
21  that you did for the folks who reported to you, did you
22  evaluate them in any way recording any work that they
23  did in the community?
24      A.    No, because usually we didn't do any work.
25      Q.    Okay.  By the same token, when you were

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

fcc82a7c-be5a-4a53-805a-809e071852ac

NETWORK DEPOSITION SERVICES
Transcript of Sandy Thomas

Page 120

1    evaluated by your general manager, were you evaluated
2    at all based upon work you did in the community?
3        A.   No.
4        Q.   Okay.  Did your administrative assistant do
5    any work in the community?
6        A.   No.
7        Q.   And that would be true for all three of the
8    women?
9        A.   Yes, ma'am.
10       Q.   With the exception of the work that your
11   arrangers did and the times that they recorded or
12   didn't record and so forth, do you have knowledge of
13   what any arrangers did at any other Alderwoods
14   locations other than Thomas and Jones?
15       A.   No, I don't.
16       Q.   Or what they may have been told about
17   recording their time; you wouldn't have any knowledge
18   of that for arrangers, right?
19       A.   No, I wouldn't.
20       Q.   And similarly, other than what you know your
21   administrative assistants were told, you don't have any
22   knowledge about what managers may have told other
23   administrative assistants in other homes about
24   recording their time or working, correct?
25       A.   Correct.

NETWORK DEPOSITION SERVICES
Transcript of Sandy Thomas

Page 121

1      Q.   Do you, Mr. Thomas, maintain any -- or let me
2  rephrase that.
3           Did you maintain any type of licenses while
4  you were employed by Alderwoods relative to the work
5  you did at the funeral home?
6      A.   No.
7      Q.   Did any of the arrangers or administrative
8  assistants who reported to you maintain any licenses
9  while they were employed by Alderwoods to allow them to
10  do their work in their home?
11      A.   No.
12      Q.   The pay you received from Alderwoods, the
13  hourly pay that you received and any overtime pay you
14  received, do you have any reason to claim that it
15  wasn't calculated properly?
16           MR. LINGLE:  Objection.
17           THE WITNESS:  Yes.
18  BY MS. DIAS:
19      Q.   And what's your claim?
20      A.   My claim is that I wasn't paid.  I didn't
21  report all the time.  I never reported all my time, so
22  I didn't get paid.
23      Q.   Okay.  I understand that, but with respect to
24  what you did get paid and what you were paid, do you
25  have any claim that it was calculated improperly?

fcc82a7c-be5a-4a53-805a-809e071852ac

NETWORK DEPOSITION SERVICES
Transcript of Sandy Thomas

Page 122

1      MR. LINGLE:  Objection.

2      THE WITNESS:  No, I guess not.

3 BY MS. DIAS:

4      Q.   The funeral home that you worked at you've

5 told me that you, Regina, and James handled on-call

6 work Monday, Wednesday and Thursday.  My question is

7 with respect to the other four nights of the week.  Who

8 handled the on-call work to cover Thomas Jones Funeral

9 Home?

10      A.   Whoever was assigned from Eastern -- when we

11 do our calls other nights, we would cover all three

12 locations.  But the other on-call people, they covered

13 all three locations.

14      Q.   Okay.  Do you remember who it was that

15 covered the other four nights?  Was it the same

16 standard people, or did it rotate?

17      A.   No, they rotated.

18      Q.   Okay.  So it was a whole group of people?

19      A.   Yes.

20      Q.   As to that whole group of people that worked

21 on call on those additional four nights, do you know

22 what all of them were told, as far as recording their

23 time for their work on call?

24      A.   No, I don't.

25      Q.   Did you ever attend any pre-needs

fcc82a7c-be5a-4a53-805a-809e071852ac

NETWORK DEPOSITION SERVICES
Transcript of Sandy Thomas

Page 124

1    Jones, but she was on the -- down at the Eastern

2    location.  I can't think of his title.  I can't think

3    of his title, but he was over the counselors, you know.

4            Sales manager.

5        Q.   Sales manager, that is who she reported to?

6        A.   She reported to the sales manager.

7        Q.   Do you have any idea what -- was the sales

8    manager a man or a woman?

9        A.   When Vicky was there, it was a woman.

10       Q.   Do you have any idea of what her sales

11   manager told her about how to record her time for time

12   spent in pre-needs meetings with families?

13       A.   No, I have no idea.

14       Q.   Did Vicky ever tell you what she had

15   recorded?

16       A.   No.

17       Q.   For all of the nonexempt positions on

18   Exhibit 5 in front of you --

19       A.   Okay.

20       Q.   -- do you know which one of those positions

21   employed individuals who conducted pre-needs meetings

22   with families?

23            MR. LINGLE:  Objection.

24            THE WITNESS:  No.

25

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

NETWORK DEPOSITION SERVICES
Transcript of Sandy Thomas

Page 125

1   BY MS. DIAS:

2       Q.   For any job position that included as part of

3   its duties meetings with families to make pre-needs

4   arrangements, do you have any idea what they were told

5   about how to record their time?

6       A.   No.

7       Q.   And so you wouldn't have any idea as to

8   whether they ever spent time which, number one, wasn't

9   recorded, correct?

10      A.   Correct.

11      Q.   Or that they weren't paid for, correct?

12      A.   Correct.

13      Q.   Okay.

14               (Exhibit 6 marked.)

15  BY MS. DIAS:

16      Q.   Mr. Thomas, I'm showing you what has been

17  marked as Exhibit 6 and ask you if you have ever seen

18  this document before.

19      A.   I can't remember seeing this.

20      Q.   You don't recall ever seeing Exhibit 6?

21      A.   No.

22      Q.   Okay.  Now, you told me earlier when I asked

23  you when you were first aware of the lawsuit against

24  Alderwoods that you first found out about it yesterday

25  when you were meeting with counsel.

fcc82a7c-be5a-4a53-805a-809e071852ac

144

CERTIFICATE OF REPORTER

1

2  STATE OF NEVADA    )
                      )        ss:
3  COUNTY OF CLARK    )

4          I, Christy L. DeJonker, a duly commissioned
   Notary Public, Clark County, State of Nevada, do hereby
5  certify:  That I reported the deposition of Sandy
   Thomas, commencing on Monday, October 19, 2009, at
6  9:30 a.m.

7          That prior to being deposed, the witness was
   duly sworn by me to testify to the truth.  That I
8  thereafter transcribed my said shorthand notes into
   typewriting and that the typewritten transcript is a
9  complete, true and accurate transcription of my said
   shorthand notes.  That review of the transcript was
10 requested.

11         I further certify that I am not a relative,
   employee or independent contractor of counsel of any of
12 the parties; nor a relative, employee or independent
   contractor of the parties involved in said action; nor
13 a person financially interested in the action; nor do I
   have any other relationship with any of the parties, or
14 with counsel of any of the parties involved in the
   action that may reasonably cause my impartiality to be
15 questioned.

16         IN WITNESS WHEREOF, I have set my hand in my
   office in the County of Clark, State of Nevada, this
17 21st day of October, 2009.

18

19

20         _____
           CHRISTY LYN DeJONKER, CCR NO. 691
21

22

23

24

25