**TAB 34**

NETWORK DEPOSITION SERVICES
Transcript of Stacey Weinstein

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO/OAKLAND DIVISION

CASE NO: CV-08-1184-SI

WILLIAM HELM, DEBORAH PRISE,
HEATHER P. RADY, [see Complaint and
Appendices for a listing of plaintiffs]
et al., on behalf of themselves and
all other employees and former employees
similarly situated,

        Plaintiffs,

vs.

ALDERWOODS GROUP, INC.,

        Defendant

_____/

                Sheraton
                1825 Griffin Road
                Dania, Florida
                Wednesday, October 21, 2009
                11:34 a.m. - 2:13 p.m.

DEPOSITION OF STACEY WEINSTEIN

Taken before Leslie Hanawalt, Court Reporter and

Notary Public for the State of Florida at Large,

pursuant to Notice of Taking Deposition filed in the

above cause.

70e70b81-7724-4310-b163-c7064b1a8932

NETWORK DEPOSITION SERVICES
Transcript of Stacey Weinstein

Page 41

1   Rick; is that right?

2        A.     Right.  If they got pre-approval.

3        Q.     And then if they got pre-approval, they

4   could work overtime and get paid, is that --

5        A.     That's what I understood.

6        Q.     And you understood that how?

7        A.     From when I was there.

8        Q.     From when you were actually working at

9   Star of David?

10       A.     Correct.

11       Q.     And did you ever request pre-approval of

12  overtime hours there?

13       A.     No.

14       Q.     So if you never requested pre-approval of

15  overtime, can I assume there was no occasion where

16  you ever requested pre-approval and that was denied?

17            MR. LINGLE:  Objection.

18  BY MS. DIAS:

19       Q.     Is that right?

20       A.     Right.  I didn't work there that much.

21       Q.     Do you know any individuals who requested

22  pre-approval from Rick Hilkoff?

23       A.     No.

24       Q.     Did you ever hear of anyone that requested

25  pre-approval overtime hours and it was denied?

70e70b81-7724-4310-b163-c7064b1a8932

NETWORK DEPOSITION SERVICES
Transcript of Stacey Weinstein

Page 57

1    recall them all.  Because they had a whole building

2    just for pre-need counselors.  That's where all the

3    pre-needs were kept, all of the files, and everything

4    were there.  And they had the cemetery funeral combo.

5           So they had cemetery people plus funeral

6    home people, you know, they had everything there.

7           Q.    How many pre-needs counselors were there

8    that were housed at Star of David?

9           A.    I would have to take a guess.  I don't

10   know.

11          Q.    Approximately how many?

12          A.    Ten.

13          Q.    Did they service all of the locations that

14   you worked out of?

15          A.    Yes.

16          Q.    Was their job pretty much strictly to sell

17   pre-needs?

18          A.    Yes.

19          Q.    Did any individuals in other job positions

20   sell pre-needs?

21          A.    Yes.

22          Q.    What other job positions?

23          A.    All the funeral directors, some of the

24   embalmers, and all the managers.

25          Q.    So we wouldn't expect anyone working in

70e70b81-7724-4310-b163-c7064b1a8932

NETWORK DEPOSITION SERVICES
Transcript of Stacey Weinstein

Page 58

1   any position other than pre-needs counselors, funeral
2   directors, and embalmers, and managers selling
3   pre-needs, correct?
4        A.    Correct.  They are the only ones licensed
5   to in the State of Florida.
6        Q.    Does that mean that they held positions
7   where they were licensed to sell pre-needs; in other
8   words, I am trying to understand, you said they are
9   the only ones who are licensed to sell pre-needs in
10  Florida?
11       A.    Right.
12       Q.    Is it the job positions that cause them to
13  be licensed or did it just so happen those employees
14  were the ones who had licenses?
15       A.    Both.  A funeral director in Florida is
16  automatically allowed to sell pre-need.  So if you
17  have a funeral director's license you are
18  automatically allowed to sell a pre-need.  If you
19  don't have a license, you have to take a course and
20  get a pre-need license to sell pre-need.
21       Q.    For these locations that you worked out
22  of, those other job positions are the only ones that
23  got the license in order to sell it; is that right?
24       A.    I don't understand what you mean by
25  location.  It's the people that get the license.

70e70b81-7724-4310-b163-c7064b1a8932

NETWORK DEPOSITION SERVICES
Transcript of Stacey Weinstein

1          So we were on-call from 5:00 p.m. until
2   8:00 a.m.
3      Q.    How many days a week were you on-call?
4      A.    Two?
5      Q.    Was it the same days?
6      A.    They would -- no, not always.
7      Q.    What job position worked on-call time?
8      A.    Funeral directors.
9      Q.    So during the period of time that you were
10  employed at the Coconut Creek location for
11  Alderwoods, the only individuals at any of those
12  homes who performed on-call time were funeral
13  directors; is that fair?
14     A.    Yes.  Or a funeral director manager
15  because you had to be licensed to be on-call.  It's a
16  state requirement.
17     Q.    Licensed as a funeral director?
18     A.    Yes.
19     Q.    So if you worked, if you personally worked
20  two days a week on-call, was anyone else working
21  on-call the same night as you?
22     A.    No.
23     Q.    Who worked on-call the other five nights
24  of --
25     A.    It rotated.  It rotated.  It might be Mark

70e70b81-7724-4310-b163-c7064b1a8932

NETWORK DEPOSITION SERVICES
Transcript of Stacey Weinstein

Page 68

1   on-call, and we did not get paid for it.  So both
2   managers were there.
3       Q.    Other than Rick and Neal, did you ever
4   speak with any Alderwoods manager about whether or
5   not to record on-call time?
6       A.    No.
7       Q.    Did you ever instruct anyone as their
8   supervisor about recording or not recording on-call
9   time?
10      A.    No.
11      Q.    So you never instructed Mark?
12      A.    No.  He was there before me so he already
13  knew.
14      Q.    Were you ever paid for any piecework?
15      A.    What do you mean?
16      Q.    Anything known as piecework at your
17  location?
18            MR. LINGLE:  Objection.
19            THE WITNESS:  I don't know what you mean
20      by piecework.
21  BY MS. DIAS:
22      Q.    Did you ever hear the term piecework used
23  when you worked at Alderwoods?
24      A.    No.
25      Q.    Are you aware of anyone getting paid

NETWORK DEPOSITION SERVICES
Transcript of Stacey Weinstein

Page 95

1    Columbus.  And Denise was in the Chamber of Commerce
2    Arta was in the Chamber of Commerce.  That's all I
3    know offhand.
4         Q.    When you say you were encouraged to do
5    these community service activities, who's the you
6    that's being referred to, what group of employees
7    were encouraged to do this, funeral directors?
8         A.    The funeral directors.
9         Q.    Anyone else?
10        A.    I am sure pre-need must have went out, but
11   I don't know how they handled it.
12        Q.    You don't know what they were asked to do?
13        A.    No.
14        Q.    And, therefore, you don't know what they
15   did, correct?
16        A.    Correct.
17        Q.    And you don't know when they did it,
18   correct?
19        A.    Correct.
20        Q.    You don't whether they recorded their time
21   for doing it, correct?
22        A.    Correct.
23        Q.    And, therefore, you don't whether they got
24   paid for doing anything that they might have done,
25   correct?

NETWORK DEPOSITION SERVICES
Transcript of Stacey Weinstein

Page 96

1      A.    Correct.

2            MR. LINGLE:  Objection.

3  BY MS. DIAS:

4      Q.    The activities that you noted some of the

5  other funeral directors engaged in, did they record

6  their time for those activities?

7      A.    No, you're not allowed to.

8      Q.    Who told you that you were not allowed to

9  record your time?

10     A.    Rick Hilkoff and Neal.

11     Q.    Do you remember specifically what they

12  told you?

13     A.    Yes.  Rick Hilkoff told me that when I

14  started there, since I was a girl, he wanted my face

15  to get out there and because I owned my own funeral

16  home and was well known in the area.  So he said he

17  wanted me to get my face out there and get everybody

18  to know where I am and do it as much as possible all

19  the time.

20            And Neal would always encourage me and say

21  I didn't see a receipt for cookies, where's the

22  cookies, come on, get out there.

23     Q.    What did they tell you about recording

24  your time for those activities?

25     A.    Not allowed to.

70e70b81-7724-4310-b163-c7064b1a8932

NETWORK DEPOSITION SERVICES
Transcript of Stacey Weinstein

Page 97

1    Q.    And that was both Rick and Neal?

2    A.    Yes, because we're not allowed any

3    overtime at all.

4    Q.    So were they -- I'm sorry -- did you ever

5    speak to any other manager at Alderwoods other than

6    Rick and Neal about community service activities?

7    A.    I asked Mark if he paid his people and he

8    said no.

9    Q.    Anyone else?

10   A.    No.

11   Q.    Other than funeral directors and your

12   guess that pre-need counselors did something, any

13   other job positions at the five homes that you're

14   aware of that were encouraged to do community

15   service?

16   A.    Well, every funeral director was.  And I

17   would assume every pre-need because they have to get

18   out there.  That's all I would know of.  I don't know

19   if anybody else did or not.

20   Q.    Did you ever encourage anyone else in

21   other job positions to perform community service?

22   A.    Other than funeral director and pre-need?

23   Q.    Yes.

24   A.    No.

25   Q.    What about any employees of Alderwoods

NETWORK DEPOSITION SERVICES
Transcript of Stacey Weinstein

Page 99

1      Q.    Of the funeral directors?

2      A.    Uh-huh.

3      Q.    Is that a yes?

4      A.    Yes.  And the secretaries had to join the

5  Chamber of Commerce.

6      Q.    Anything else?

7      A.    And I heard them always telling the

8  pre-need to get out and do stuff.  I don't know what

9  they did.

10     Q.    Did you ever see anything in writing at

11  Alderwoods regarding community service?

12     A.    No.

13     Q.    Did you ever see anything in writing at

14  Alderwoods regarding whether you should or not record

15  your time spent on community service?

16     A.    No.

17     Q.    During the period of time August 2004

18  through March 2005 did you ever receive a written

19  performance evaluation?

20     A.    I think I did.  I don't remember.

21     Q.    Did any written performance evaluation

22  include evaluating you on your community service

23  work?

24     A.    I don't remember.

25     Q.    Did you from August 2004 through

70e70b81-7724-4310-b163-c7064b1a8932

NETWORK DEPOSITION SERVICES
Transcript of Stacey Weinstein

1    March 2005 ever perform a written performance
2    evaluation for any other employee?
3           A.    Yes.
4           Q.    And did that written performance
5    evaluation include an evaluation of community service
6    work?
7           A.    No.
8           Q.    Who did you do a written performance
9    evaluation for?
10          A.    Avi.
11          Q.    Anyone else?
12          A.    No.
13          Q.    Why just Avi?
14          A.    Because he was brand new in the business,
15   and he had no idea what he was doing.  He just got
16   his license.  And he was fighting Neal because he
17   wanted -- he thought he should get paid for his
18   lunches and Neal was mad.  And he wanted him written
19   up for everything and anything and everything you can
20   think of that he did.
21          Q.    So you wrote him up concerning specific
22   events that occurred, correct?
23          A.    Right.
24          Q.    You didn't do an evaluation like a yearly
25   performance evaluation?

70e70b81-7724-4310-b163-c7064b1a8932

NETWORK DEPOSITION SERVICES
Transcript of Stacey Weinstein

Page 102

1       to know.

2               THE WITNESS:  Okay.

3    BY MS. DIAS:

4       Q.    During the period of time August 2004

5    through March 2005, did you ever hear of anything at

6    Alderwoods called the community leadership program?

7       A.    No.

8       Q.    Did you ever -- all of my questions from

9    now until I tell you when they are not, and I will

10   specifically tell you when they are not, all of my

11   questions I'm going to go through now are directed to

12   the time period August 2004 when you were hired by

13   Alderwoods through March 2005.

14      A.    Okay.

15      Q.    So during that period, did you ever hear

16   anything at Alderwoods called an Influencer Program?

17      A.    No.

18      Q.    During that period, did you ever create

19   any type of leadership network at Alderwoods?

20      A.    No.

21      Q.    Did you ever direct anyone to create a

22   leadership network?

23      A.    No.

24      Q.    During that period did you ever fill out

25   anything known as a leadership network information

70e70b81-7724-4310-b163-c7064b1a8932

NETWORK DEPOSITION SERVICES
Transcript of Stacey Weinstein

Page 103

1   sheet?

2       A.   No.

3       Q.   Did you ever direct anyone to fill out a

4   leadership network information sheet?

5       A.   No.  I don't know what that is.

6       Q.   During that period, did you ever set up

7   anything known as a leadership network contact

8   report?

9       A.   No.

10      Q.   Did you ever direct anyone to prepare such

11  a report?

12      A.   No.

13      Q.   Were you ever directed to identify a group

14  of influencers during that period?

15      A.   What do you mean?

16      Q.   Just that word.

17      A.   Not that I know of.  I am not sure what it

18  means.

19      Q.   Did you ever direct anyone to identify a

20  group of influencers?

21      A.   I don't know what it means, so.

22      Q.   Did you, again during that time period,

23  ever participate in any community seminar programs?

24      A.   Community seminar programs, no.

25      Q.   Did you ever host any community events?

70e70b81-7724-4310-b163-c7064b1a8932

NETWORK DEPOSITION SERVICES
Transcript of Stacey Weinstein

Page 113

1       Q.      Did the five Alderwoods homes that you're
2   familiar with have a Web site?
3       A.      At that time, no, they did not.
4       Q.      So it would be fair to say that you never
5   did anything to develop any content for any Web site
6   for any of those locations?
7       A.      No, everything was hand done.
8       Q.      Were you ever directed to keep anything
9   called a notebook of best practice ideas?
10      A.      No.
11      Q.      Did you ever direct anyone to create such
12  a notebook?
13      A.      No.
14      Q.      Were you ever directed to develop anything
15  known as a market share report?
16      A.      No.
17      Q.      Did you ever direct anyone to prepare such
18  a report?
19      A.      No.
20      Q.      Did any of the locations that you're aware
21  of ever receive an award of excellence?
22      A.      Not that I know of.
23      Q.      Were you ever directed to complete
24  anything known as a community service promotion form?
25      A.      No.

NETWORK DEPOSITION SERVICES
Transcript of Stacey Weinstein

Page 114

1    Q.    Did you ever direct anyone to prepare such

2    a form?

3    A.    No.

4    Q.    Did you ever hear the term success

5    spotlight when you were employed at Alderwoods?

6    A.    No.

7    Q.    Did you ever hear of a program called I

8    believe in service?

9    A.    No.

10    Q.    Did you ever know a manager at Alderwoods

11    by the name of Wayne Tago?

12    A.    No.

13    Q.    Did you ever attend any political debates

14    as a representative of Alderwoods?

15    A.    No.

16    Q.    Did you ever direct anyone to attend a

17    political debate as a representative of Alderwoods?

18    A.    No.

19    Q.    Can we go off the record.

20         (Thereupon, a discussion was held off the

21         record.)

22         MR. LINGLE:  At this time the witness has

23         indicated it would be difficult to continue due

24         to the pain she's experiencing.  So for now we

25         agreed to adjourn the deposition and defense

70e70b81-7724-4310-b163-c7064b1a8932

NETWORK DEPOSITION SERVICES
Transcript of Stacey Weinstein

1                    CERTIFICATE OF OATH

2

3   STATE OF FLORIDA     )
                         ) SS:
4   COUNTY OF PALM BEACH)

5

6        I, LESLIE HANAWALT, Court Reporter, Notary

7   Public in and for the State of Florida at Large,

8   certify that STACEY WEINSTEIN personally appeared

9   before me and was duly sworn by me.

10       WITNESS my hand and official seal this 22nd day

11  of October, 2009.

12

13

14                      _____
                        LESLIE HANAWALT
                        Notary Public, State of Florida
15                      at Large

16

17  Notary #DD852365

18  My commission expires: 1/22/13

19

20

21

22

23

24

25

## NETWORK DEPOSITION SERVICES
### Transcript of Stacey Weinstein

Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO/OAKLAND DIVISION
CASE NO:  CV-08-1184-SI


WILLIAM HELM, DEBORAH PRISE,
HEATHER P. RADY, [see Complaint and
Appendices for a listing of plaintiffs]
et al., on behalf of themselves and
all other employees and former employees
similarly situated,

        Plaintiffs,

vs.

ALDERWOODS GROUP, INC.,

        Defendants.

_____/


33 Centennial Court
Deerfield Beach, Florida 33442
Saturday, November 7th, 2009
11:16 a.m. - 1:08 p.m.


DEPOSITION OF STACEY WEINSTEIN

VOLUME 2

Taken before Beverly Bourlier James,

Registered Professional Reporter, Certified Realtime

Reporter and Notary Public in and for the State of

Florida at Large, pursuant to Notice of Taking

Deposition filed in the above-mentioned cause.

8ea1fd4f-7470-4729-830b-05b128bcee57

NETWORK DEPOSITION SERVICES
Transcript of Stacey Weinstein

Page 33

1    BY MS. DUGAN:

2        Q.    As you sit here today, do you independently

3    recall that at the time you signed this document your

4    medical condition was not affecting your ability to

5    tell the truth?

6        A.    Yes.

7        Q.    And at the time you signed this document,

8    were you taking any medication that affected your

9    ability to tell the truth?

10            MR. LINGLE:  Objection.

11            THE WITNESS:  If I was taking anything, I

12        wouldn't -- like maybe not be able to read it and

13        acknowledge it and represent it, I wouldn't have

14        signed it.

15    BY MS. DUGAN:

16        Q.    So is it your testimony that, at the time

17    you signed this document, you were not taking any

18    medication that at the time affected your ability to

19    tell the truth?

20            MR. LINGLE:  Objection.

21            THE WITNESS:  Yes.

22    BY MS. DUGAN:

23        Q.    I want to draw your attention to paragraph

24    three on the first page of your affirmation.

25        A.    Uh-huh.

8ea1fd4f-7470-4729-830b-05b128bcee57

NETWORK DEPOSITION SERVICES
Transcript of Stacey Weinstein

1    Q.    It states that, "I was an employee of
2  Alderwoods from approximately August 2003 until May
3  of 2007." Now, you didn't actually start working for
4  Alderwoods until August 2004, correct?
5    A.    Oh, yeah, I had the wrong year.
6    Q.    But it actually should be August 2004.
7    A.    Okay.
8    Q.    From August 2004 to May 9, 2007, you didn't
9  work for Alderwoods continuously through that time
10  period, correct?
11   A.    Correct.
12         MR. LINGLE:  Objection.
13         THE WITNESS:  But I wasn't taken off the
14   payroll records until May of 2007, so I gave them
15   the legal date.
16  BY MS. DUGAN:
17   Q.    I understand.  So you actually started in
18  August 2004, correct?
19   A.    Correct.
20   Q.    And you went out on disability leave in
21  March 2005, correct?
22   A.    Correct.
23   Q.    You returned to work for one day in May of
24  2005, correct?
25   A.    Yes.

8ea1fd4f-7470-4729-830b-05b128bcee57

NETWORK DEPOSITION SERVICES
Transcript of Stacey Weinstein

Page 35

1          MR. LINGLE:  Objection.

2          THE WITNESS:  Yes, we went over this.

3     BY MS. DUGAN:

4          Q.    And then you went back out on disability

5     leave, correct?

6          A.    Correct.

7          Q.    And you didn't perform any work for

8     Alderwoods after you went back out on disability

9     leave in May 2005 until May 9, 2007, correct?

10         MR. LINGLE:  Objection.

11         THE WITNESS:  Correct.

12    BY MS. DUGAN:

13         Q.    If you would turn to the next page, please,

14    paragraph four.

15         A.    Yes.

16         Q.    You say, "I worked as a location manager

17    out of the Levitt-Weinstein location in Coconut

18    Creek, Florida and Star of David Funeral Home in

19    Tamarac, Florida."  Are the Star of David and Tamarac

20    locations actually two separate locations?

21         A.    Yes, Star of David is separate from

22    Tamarac.  I worked at all of them, I worked at

23    Coconut Creek, Star of David, Tamarac, and

24    Okeechobee.

25         Q.    Okay.  I'm just trying to understand.

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

8ea1fd4f-7470-4729-830b-05b128bcee57

NETWORK DEPOSITION SERVICES
Transcript of Stacey Weinstein

Page 58

1    A.    Yes.

2    Q.    What did the pre-needs policy in the policy

3  binder say?

4    A.    What now?

5    Q.    What did the pre-needs policy that was in

6  the policy binders say?

7    A.    I don't know, I can't remember.  If you

8  have a copy of it, I don't know offhand.

9    Q.    Do you know that there was a pre-needs

10  policy in the policy binders?

11    A.    Yes, there was a section for pre-needs.

12    Q.    But you don't right now remember what it

13  said?

14    A.    No.

15    Q.    Okay.  It states that, "Alderwoods had a

16  company-wide pre-needs policy which expected

17  employees to sell need policies outside the regular

18  workday for no compensation."  You testified earlier

19  that you were compensated when you sold pre-needs,

20  didn't you?

21    A.    I was compensated for commission, not

22  hourly.

23    Q.    So you can't say that you sold them for no

24  compensation, correct?

25         MR. LINGLE:  Objection.

8ea1fd4f-7470-4729-830b-05b128bcee57

NETWORK DEPOSITION SERVICES
Transcript of Stacey Weinstein

Page 59

1              THE WITNESS:  Correct.
2       BY MS. DUGAN:
3              Q.     And, again, when you say that they expected
4       employees to sell pre-needs, it wasn't all employees,
5       was it?
6              A.     No.
7              Q.     It only applied to pre-need counselors,
8       correct?
9              A.     Pre-need counselors and funeral directors.
10             Q.     Did all funeral directors sell pre-need?
11             A.     No, but most of them.  It was a way to
12      make extra money.
13             Q.     So this applied to pre-need counselors and
14      some funeral directors, is that fair to say?
15             A.     Yes.
16             Q.     In paragraph six, you state that,
17      "Employees should be encouraged to make pre-need
18      sales presentations after normal working hours or on
19      their days off."  Can you tell me what you mean by
20      encouraged?
21             A.     Well --
22             MR. LINGLE:  Objection.
23             THE WITNESS:  We were not supposed to do
24          it during our workday because we needed to be
25          there to do funerals and stuff, so they told us to

8ea1fd4f-7470-4729-830b-05b128bcee57

NETWORK DEPOSITION SERVICES
Transcript of Stacey Weinstein

Page 60

1       do it at night or on our days off.

2   BY MS. DUGAN:

3       Q.      Were you required to do it at night or on

4   your days off?

5       A.      Yes, yes.  The only time that you could

6   ever write one during the day is if it was an at-need

7   and the person died and we were writing the at-need

8   and then the spouse wanted to buy the plot right next

9   to the loved one, then we could write that one

10  because there was a person that had passed away, but,

11  otherwise, if both people were living, you could not

12  do it during the workday.

13      Q.      So is it fair to say that some pre-need

14  sales could be done during the workday, but other

15  pre-need sales had to be done after the workday?

16              MR. LINGLE:  Objection.

17              THE WITNESS:  Maybe ten percent could be

18      done during the workday.  I mean, that's only when

19      a death occurred.

20  BY MS. DUGAN:

21      Q.      During to page four, paragraph eight, you

22  say, "Alderwoods had a meal break policy."  Was there

23  a meal break policy in the policy binders?

24      A.      Yes.

25      Q.      And do you know what the meal break policy

8ea1fd4f-7470-4729-830b-05b128bcee57

NETWORK DEPOSITION SERVICES
Transcript of Stacey Weinstein

Page 62

1  stapled it on there myself as the manager.  They sent

2  it to me and I had to staple it on there.

3      Q.     Who did that come from?

4      A.     Corporate.

5      Q.     Who in corporate?

6      A.     I don't remember.  It came from the

7  corporate offices and they said that we must punch

8  out and punch back in for all meals; whether taken or

9  not, you had to do that hour.

10     Q.     And that policy, you don't know who that

11 came from, what individual sent that policy to you?

12     A.     I have no idea.

13     Q.     It wasn't Neil Hornfeld?

14     A.     No.  Neil had told us numerous times and

15 reminded us of it numerous time, but the new one that

16 was supposed to be stapled in the book came from

17 corporate.

18     Q.     And I'm assuming you don't have any copy of

19 the written policy that came from corporate that was

20 to be stapled on top regarding meal breaks?

21     A.     No, the books never left the funeral home.

22     Q.     Okay.  Paragraph 11, you state Alderwoods

23 also had a company training policy, but the training

24 policy you mention here is in the binders?

25     A.     It was, I don't recall it exactly, but

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

NETWORK DEPOSITION SERVICES
Transcript of Stacey Weinstein

Page 63

1    yes, it was in the binders.

2         Q.     But you don't recall what it said?

3         A.     No, I don't recall what it said.

4         Q.     You said, "The policy expected funeral

5    directors to complete training with no pay."  Did

6    this apply to any employees other than funeral

7    directors?

8         A.     Not that I know of.  I mean, it could

9    have, but while I was working there, it only applied

10   to the funeral directors we hired and that was it.

11        Q.     You also had some secretaries reporting to

12   you, is that right?

13        A.     Yes, I did.

14        Q.     Did the training policy apply to those

15   secretaries?

16        A.     We never hired a new one while I was

17   there, so I don't know.

18        Q.     The secretaries you supervised, did they

19   perform any training at the time you supervised them?

20        A.     Can you repeat that?

21        Q.     Yes.  That was a bad question, anyway.

22               Did the secretaries that you supervised

23   complete any training during the time you were their

24   supervisor?

25        A.     No.

8ea1fd4f-7470-4729-830b-05b128bcee57

117

1                    CERTIFICATE OF OATH

2

3 STATE OF FLORIDA       )

                         ) SS:

4 COUNTY OF PALM BEACH)

5

6       I, LESLIE HANAWALT, Court Reporter, Notary

7 Public in and for the State of Florida at Large,

8 certify that STACEY WEINSTEIN personally appeared

9 before me and was duly sworn by me.

10      WITNESS my hand and official seal this 22nd day

11 of October, 2009.

12

13                          _Leslie Hanawalt_

                            _____

14                          LESLIE HANAWALT

                            Notary Public, State of Florida

15                          at Large

16

17 Notary #DD852365

18 My commission expires: 1/22/13

19

20

21

22

23

24

25

118

1                REPORTER'S DEPOSITION CERTIFICATE

2

3        I, LESLIE HANAWALT, Court Reporter, certify

4 that I was authorized to and did stenographically

5 report the deposition of STACEY WEINSTEIN, that a

6 review of the transcript was requested; that

7 transcript is a true and complete record of my

8 stenographic notes of the deposition by said witness.

9        I further certify that I am not a relative,

10 employee, attorney or counsel of any of the parties,

11 nor am I a relative or employee of any of the

12 parties' attorney or counsel connected with the

13 action.

14        Sworn to and subscribed before me this

15 22nd day of October, 2009.

16                              Leslie Hanawalt

17                              _____

                                Leslie Hanawalt

18                              Court Reporter

19

20

21

22

23

24

25