# NETWORK DEPOSITION SERVICES
## Transcript of Ray White

```
            IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF PENNSYLVANIA


DEBORAH PRISE and HEATHER RADY )
on behalf of themselves and    )
all employees similarly        )
situated,                      )
                               )
               Plaintiffs,  )Civil Action
                            )No. 06-1641
      vs                       )
                               )
ALDERWOODS GROUP, INC.,        )
                               )
               Defendant.   )
```

The discovery deposition of

RAY WHITE, called by the Defendant, for examination,

pursuant to notice, taken before Julia A. Bauer,

CSR, RPR, a notary public within and for the County

of Cook and State of Illinois, at 3830 179th Street,

Hammond, Indiana, on the 21st day of July, A.D.,

2009, commencing at 9:35 a.m.

1a5aa13f-2a14-4190-8b79-8cac4bcb9abb

NETWORK DEPOSITION SERVICES
Transcript of Ray White

Page 147

1    the time Ron Redpath was there.

2         Q.    So for as long as you can recall?

3         A.    Yeah.

4         Q.    Is there any time that you spent doing

5    removals and embalming while on-call that you claim

6    you should be compensated for in this lawsuit?

7              MS. GIFFORD:  Objection.

8    BY THE WITNESS:

9         A.    I think it's all part of the -- again,

10   it's on the timecards.  If we put the hours in, we

11   should be compensated for them.  And there were

12   definitely hours in that book that wasn't

13   compensated for.

14   BY MR. KNIGHT:

15        Q.    What about when you took phone calls,

16   were you keeping track of the time you spent on the

17   phone?

18        A.    No.

19        Q.    Did anyone tell you not to do that?

20        A.    I don't believe so.

21        Q.    Did anyone ever tell you you should

22   keep track of the time you spent answering phone

23   calls?

24        A.    No.

25        Q.    Did you ever ask about that?

NETWORK DEPOSITION SERVICES
Transcript of Ray White

1          A.     No.

2          Q.     Do you believe you should be

3    compensated for that time?

4                 MS. GIFFORD:  Objection.

5    BY THE WITNESS:

6          A.     Do I believe?  If it was for the

7    company, why not.

8    BY MR. KNIGHT:

9          Q.     Did your manager know that you were --

10   did your manager know when you took a phone call at

11   night?

12         A.     Yes.

13         Q.     How would they know?

14         A.     Because we'd report it the next

15   morning.  If we had a house call or a death call, he

16   knew we got a call in the middle of the night.  So

17   he knew we were on the phone with them.  If it was

18   an out-of-town death, figure an extra hour on the

19   phone with another funeral director making

20   arrangements to get a body back to your place.

21         Q.     You said sometimes people call to

22   check on pricing or arrangements.

23         A.     Yeah.

24         Q.     Would you tell your managers about

25   those calls?

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

1a5aa13f-2a14-4190-8b79-8cac4bcb9abb

NETWORK DEPOSITION SERVICES
Transcript of Ray White

Page 151

1    that would refresh your memory?

2         A.    No, no.

3         Q.    Do you think it's more than five hours

4    per week?

5         A.    Possibly around there.

6         Q.    It's around five hours per week?

7         A.    Possibly.

8         Q.    Did anyone at Alderwoods tell you that

9    there was a company-wide policy not to compensate

10   employees for time they spent taking phone calls

11   while on-call?

12              MS. GIFFORD:  Objection.

13   BY THE WITNESS:

14        A.    I'm not aware of that, no.

15   BY MR. KNIGHT:

16        Q.    Did you ever ask what the company

17   policy was with respect to phone calls?

18        A.    No.

19              MS. GIFFORD:  Same objection.

20   BY MR. KNIGHT:

21        Q.    Were there ever occasions where you

22   were on-call, but weren't able to be reached by the

23   answering service?

24        A.    No.

25        Q.    Were you ever disciplined for not

1a5aa13f-2a14-4190-8b79-8cac4bcb9abb

NETWORK DEPOSITION SERVICES
Transcript of Ray White

Page 152

1    being available while on-call?

2          A.     No.

3          Q.     Did an Alderwoods manager ever tell

4    you not to report time you worked while on-call?

5                 MS. GIFFORD:  Objection.

6    BY THE WITNESS:

7          A.     No.

8    BY MR. KNIGHT:

9          Q.     Did an Alderwoods manager ever tell

10   you you would not be compensated for work while

11   on-call?

12                MS. GIFFORD:  Objection.

13   BY THE WITNESS:

14         A.     No.

15   BY MR. KNIGHT:

16         Q.     Are you aware of any policy for

17   compensating employees at other funeral homes for

18   their on-call work?

19                MS. GIFFORD:  Objection.

20   BY THE WITNESS:

21         A.     No.

22   BY MR. KNIGHT:

23         Q.     Did you have your funeral director

24   license when you began to work at Alderwoods?

25         A.     Yes.

1a5aa13f-2a14-4190-8b79-8cac4bcb9abb

NETWORK DEPOSITION SERVICES
Transcript of Ray White

1       Q.    Did you have a license to sell preneed

2  insurance when you began to work at Alderwoods?

3       A.    No.

4       Q.    Did you ever obtain a license to sell

5  preneed insurance?

6       A.    Yes.

7       Q.    When?

8       A.    Early '90s.

9       Q.    And had that license expired when you

10  started with Alderwoods?

11       A.    Yes.

12       Q.    Did you ever get it back while you

13  were with Alderwoods?

14       A.    No.

15       Q.    Did anyone ever ask you to get your

16  insurance license from Alderwoods?

17       A.    No, no.

18       Q.    Did anyone ever tell you that it was

19  an Alderwoods' policy that certain employees obtain

20  insurance licenses?

21       MS. GIFFORD:  Objection.

22  BY THE WITNESS:

23       A.    It was made clear to everybody at

24  Chapel Lawn that the cemetery sales counselors or

25  family service counselors, they were to sell the

1a5aa13f-2a14-4190-8b79-8cac4bcb9abb

NETWORK DEPOSITION SERVICES
Transcript of Ray White

Page 154

1   preneed, and no licensed funeral director would ever

2   sell the preneed.

3   BY MR. KNIGHT:

4         Q.     So it was clear in your mind that

5   there was no point in getting an insurance license?

6         A.     Correct.

7         Q.     Did other funeral homes in the

8   vicinity of Chapel Lawn have funeral directors?  I

9   know you were a funeral director, but you were also

10  a location manager; right?

11        A.     Yes.

12        Q.     And you were coded location manager, I

13  believe?

14               MS. GIFFORD:  Objection.

15  BY THE WITNESS:

16        A.     Right.

17  BY MR. KNIGHT:

18        Q.     Do you know of other employees of

19  other funeral homes in the area that were coded as

20  funeral directors?

21               MS. GIFFORD:  Objection.

22  BY THE WITNESS,

23        A.     Well there are other funeral

24  directors, yes.

25

1a5aa13f-2a14-4190-8b79-8cac4bcb9abb

NETWORK DEPOSITION SERVICES
Transcript of Ray White

Page 155

1  BY MR. KNIGHT:
2       Q.     Do you know if they had insurance
3  licenses?
4       A.     It was the same policy.  They did not.
5       Q.     And this policy that only the sales
6  team would sell preneed that you discussed, how far
7  did that policy extend, to your knowledge?
8       A.     Well, it was -- well, Ron Redpath was
9  our general manager, and he officed out of Titus.
10 And the funeral directors there did not sell
11 preneed.  It was the family service counselors that
12 sold the preneed.
13      Q.     So Ron Redpath's area was extended how
14 far?
15      A.     He had all of Indiana and part of, I
16 believe, Chicago, and then they gave that area to
17 Zalo Wilson.
18      Q.     So Ron's area was the entire State of
19 Indiana?
20      A.     And part of south Chicago.
21      Q.     So is it your understanding that the
22 sales work for the entire State of Indiana was being
23 done by sales counselors?
24      MS. GIFFORD:  Objection.
25

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

1a5aa13f-2a14-4190-8b79-8cac4bcb9abb

NETWORK DEPOSITION SERVICES
Transcript of Ray White

Page 156

1   BY THE WITNESS:

2         A.    Best of my knowledge, yes.

3   BY MR. KNIGHT:

4         Q.    What about Chicago?  Is your

5   understanding that the sales in Chicago was done by

6   sales counselors?

7               MS. GIFFORD:  Objection.

8   BY THE WITNESS:

9         A.    I have no idea what Chicago did.

10  BY MR. KNIGHT:

11        Q.    Are you aware of any company-wide

12  policy that required funeral directors -- Alderwoods

13  funeral directors to obtain insurance licenses to

14  sell preneed insurance?

15              MS. GIFFORD:  Objection.

16  BY THE WITNESS:

17        A.    No.

18  BY MR. KNIGHT:

19        Q.    If I understand your testimony

20  correctly, but correct me if I'm wrong, it was not

21  part of your job to meet with potential customers

22  about preneed sales; is that right?

23        A.    No.  I pitched it.

24        Q.    Okay.  You pitched it?

25        A.    I pitched it and got them to say, yes,

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

1a5aa13f-2a14-4190-8b79-8cac4bcb9abb

NETWORK DEPOSITION SERVICES
Transcript of Ray White

Page 160

1   BY MR. KNIGHT:

2       Q.    Is that correct?

3       A.    State that again.

4       Q.    You are not claiming that Alderwoods

5   had a policy requiring your overtime hours to be

6   approved before you worked them?

7       A.    Correct.

8       Q.    In other words, did you work overtime

9   and were you paid for overtime that was not approved

10  beforehand?

11              MS. GIFFORD:   Objection.

12  BY THE WITNESS:

13      A.    Yes.

14  BY MR. KNIGHT:

15      Q.    When you checked Box B regarding

16  on-call work, what time did you have in mind as not

17  having been paid by Alderwoods?

18              MS. GIFFORD:   Objection.

19  BY THE WITNESS:

20      A.    On-call started after -- if we left

21  at 4:00, I was on-call at 4:01.

22  BY MR. KNIGHT:

23      Q.    Okay.

24      A.    My life was limited.

25      Q.    Are you seeking compensation for all

NETWORK DEPOSITION SERVICES
Transcript of Ray White

1    BY THE WITNESS:

2         A.    Well, unfortunately, a lot of those

3    volunteer events, I was still on-call.  We would

4    work those events, and then if we got a death call,

5    I would have to leave, and then do the work, and

6    then come back if it was still going on.

7    BY MR. KNIGHT:

8         Q.    Volunteer events, are you talking

9    about the meetings?

10        A.    Meetings and the -- say, the

11   Schererville Corn Roast, the St. Mary's Western Day

12   Carnival, the Lake County Fair.  Even though I was

13   on-call, if I got busy, we'd have to go back in,

14   leave the fair, do the work, and then come back.

15        Q.    But you would be compensated for that

16   work if you --

17        A.    Only if we clocked-in for making that

18   removal and doing the prep work.  But the

19   volunteering time, we didn't go clock-in and then

20   work the carnival.

21        Q.    Well, that kind of gets into Part A,

22   the community.  I mean, I guess, it could be a hazy

23   line.  But was there ever any occasion where you

24   were on-call, okay, you're on-call, you get a phone

25   call, you have to go into the funeral home, that you

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

NETWORK DEPOSITION SERVICES
Transcript of Ray White

1    didn't clock-in when you got to the funeral home?

2         A.      There's possibly been one or two

3    times.

4         Q.      Do you know what they would have been?

5         A.      They're on the timecards because Zalo

6    told me to write them in, and he signed off on them.

7         Q.      Were you compensated for the time?

8         A.      Hopefully.

9         Q.      We've talked about the removals.

10   We've talked about taking phone calls while you were

11   on-call where you didn't have to do a removal.  Are

12   there any other -- is there any other phone calls or

13   any other -- strike that.

14              MS. GIFFORD:  Do you want to take a

15        ten-minute break?

16              MR. KNIGHT:  Yeah.

17                   (A break was taken.)

18                        (Document marked as White

19                        Exhibit No. 10 for

20                        identification.)

21   BY MR. KNIGHT:

22        Q.      Mr. White, the court reporter has

23   marked as Exhibit 10 a document that's entitled,

24   Raymond E. White's response to defendant's first

25   request for production of documents.  Did you see

1a5aa13f-2a14-4190-8b79-8cac4bcb9abb

NETWORK DEPOSITION SERVICES
Transcript of Ray White

1    to keep things to a tight...

2         Q.      So as you understood it, the policy

3    regarding overtime was to keep overtime hours down?

4         A.      There was nothing in the budget for

5    overtime hours.

6         Q.      Was this policy about keeping overtime

7    hours down a company-wide policy, to your knowledge?

8         A.      It was just his -- Ron at his monthly

9    meeting.

10        Q.      You mention, in the next sentence,

11   making complaints regarding the pay practices in

12   general.  We've talked about the complaints or the

13   discussions you've had with Zalo Wilson.  Were there

14   any other discussions you had with Mr. Wilson that

15   we haven't discussed?

16              MS. GIFFORD:  Objection.

17   BY THE WITNESS:

18        A.      No.  The other discussions is just

19   day-to-day practices of the funeral home.

20   BY MR. KNIGHT:

21        Q.      What about complaints to Ron Redpath?

22   What complaints did you make to him about pay

23   practices?

24        A.      Some of the pay practices were, you

25   know, the overtime hours.  He kept saying, you know,

1a5aa13f-2a14-4190-8b79-8cac4bcb9abb

NETWORK DEPOSITION SERVICES
Transcript of Ray White

Page 175

1   BY THE WITNESS:
2           A.      I believe it's correct.
3   BY MR. KNIGHT:
4           Q.      In response to Interrogatory No. 1,
5   which asks for every job position or title you had,
6   you list funeral director/embalmer.  Was that a job
7   title you had while at Alderwoods?
8           A.      Yes.
9           Q.      When did you have that title?
10          A.      When I was hired on.
11          Q.      So you weren't hired as a location
12  manager?  You were hired as a funeral director
13          A.      Well, I was hired as a location -- I
14  was their only employee.
15          Q.      So you were everything?
16          A.      I was everything.
17          Q.      Is it your understanding that your job
18  title was funeral director, slash, embalmer?
19          A.      Yes.
20          Q.      It wasn't location manager at that
21  time?
22          A.      Well, it was location manager, but you
23  manage yourself.
24          Q.      Was there a point where your actual
25  job title would change from being a funeral

1a5aa13f-2a14-4190-8b79-8cac4bcb9abb

NETWORK DEPOSITION SERVICES
Transcript of Ray White

1    director/embalmer to location manager?

2         A.    No.

3         Q.    So as far as you know, your job title

4    remained the same throughout your employment?

5         A.    Yes.

6         Q.    On Page 6, you make a reference to

7    monthly meetings with Ron Redpath where paid

8    policies and practices were discussed?

9         A.    Yes.

10        Q.    And you say that you recall him

11   making -- or you recall a discussion of the policy

12   regarding overtime.  What do you mean by the policy

13   regarding overtime?

14        A.    Well, he kept saying the overtime had

15   to be kept to a minimum because there was no

16   overtime in the budget, but there was no one else to

17   work.

18        Q.    And you said you saw all these

19   budgets?

20        A.    Yeah, we'd see a monthly budget.  When

21   he'd show up for the month, he would verify our

22   timecards and sign off on them.  He would show us

23   where our operating expenses were, and then what our

24   revenue was, and he would show us that our revenue

25   was far less to what our expenses were.  So we had

1a5aa13f-2a14-4190-8b79-8cac4bcb9abb

NETWORK DEPOSITION SERVICES
Transcript of Ray White

Page 178

1  eventually, you'll get a day -- we'll get you some
2  time off, but we need to be busier.  If we're
3  busier, we can hire more people to work and less
4  time you would have to be there.
5      Q.      And that was prior to August of 2003?
6      A.      Yeah, whenever Zalo was hired.  In
7  fact, Ron and Zalo were there the same day Shawn
8  Phillips came in.  Ron introduced both Shawn
9  Phillips and Zalo that morning.
10     Q.      You go on to say that there were a
11 number of statements about pay policies made by
12 various managers during plaintiff's employment in
13 addition to the specific recollection of statements
14 by the individuals above.
15             What other managers did you have
16 that would have made statements about pay practices
17 and policies?
18     A.      The other managers were probably the
19 manager, Marie, over at the sales staff, Marie and
20 Lynn Pierce, the sales counselor.
21     Q.      What's Marie's last name?
22     A.      Marie is now Arseni, and Lynn was
23 Pierce, but she's remarried, and I don't know what
24 her new married name is.
25     Q.      Do you recall anything specific Mary

1a5aa13f-2a14-4190-8b79-8cac4bc9abb

NETWORK DEPOSITION SERVICES
Transcript of Ray White

Page 179

1    or Lynn said about pay practices?

2           A.      No.

3           Q.      Did you ever talk to them about

4    overtime compensation, to your knowledge?

5           A.      I don't believe so.

6           Q.      You mentioned in the next paragraph

7    someone named Robert Kalumba, who is he?

8           A.      He was a preneed sales counselor that

9    relocated from the cemetery office down to the

10   funeral home to help answer the phones while I was

11   out mowing the lawn or washing the cars around the

12   funeral.

13          Q.      Was he an employee of the funeral home

14   or the cemetery?

15          A.      Cemetery.  He was a sales counselor.

16          Q.      He physically changed locations while

17   you were out of the home?

18          A.      He'd report everyday to the funeral

19   home, but he was under the direction of Lynn Pierce.

20   They started putting preneed sales counselors at the

21   funeral home.

22          Q.      The next paragraph, defendant's

23   administrative staff was involved in gathering

24   payroll data and issuing paychecks.  What do you

25   mean by the administrative staff?

1a5aa13f-2a14-4190-8b79-8cac4bcb9abb

NETWORK DEPOSITION SERVICES
Transcript of Ray White

Page 185

1          Q.      And who did that?

2          A.      Zalo.

3          Q.      So is it your testimony that at this

4     point you're not sure one way or another whether you

5     were fully compensated for your overtime in your

6     last four months of employment?

7                  MS. GIFFORD:  Objection.

8     BY THE WITNESS:

9          A.      Correct.

10    BY MR. KNIGHT:

11         Q.      It's correct that you don't know one

12    way or another?

13         A.      I don't know.

14         Q.      Your answer on Page 10 specifically

15    references the Hebron Fire Department and the Crown

16    Point Fire Department.  It says, for the community

17    organizations in which you worked, plaintiffs -- or

18    individuals, I should say, from the following groups

19    would have an awareness of the number of hours

20    plaintiff worked:  Hebron Fire Department and Crown

21    Point Fire Department.

22                  What knowledge does the Hebron

23    Fire Department have of hours that you worked?

24         A.      I didn't make the calls.  I didn't

25    make 80 percent of the calls when I was there.  I

1a5aa13f-2a14-4190-8b79-8cac4bcb9abb

NETWORK DEPOSITION SERVICES
Transcript of Ray White

1      A.      Yeah, it's possible it could have been

2  more.

3      Q.      You say that you worked at booths

4  Alderwoods set up at fairs to promote the funeral

5  home?

6      A.      Correct.

7      Q.      Did you do any of that in your last

8  four months of employment?

9      A.      The senior citizen fair, I believe,

10  was in the winter months.  The big one at the Omni

11  Sports Complex.

12      Q.      In the winter of 2003, 2004?

13      A.      Possibly, yeah.  The senior fair is in

14  the winter months.

15      Q.      Did you work it every single year?

16      A.      Yes.

17      Q.      Do you recall working it that year?

18      A.      Yes.

19      Q.      How many hours did you work?

20      A.      It was an eight-hour day.

21      Q.      What day was it?

22      A.      It wasn't on the weekend.  It had to

23  be during the weekday.  It had to be a weekday.

24      Q.      So it was a weekday, but is it your

25  claim you weren't compensated for it?

1a5aa13f-2a14-4190-8b79-8cac4bcb9abb

NETWORK DEPOSITION SERVICES
Transcript of Ray White

Page 190

1     A.    If it was during the weekday, I was
2  probably paid for that.  The Lake County Fair, the
3  weekends and stuff, we weren't compensated for, and
4  those are ten-hour days, twelve- or ten-hour days.
5     Q.    The Lake County Fair?
6     A.    Yeah.
7     Q.    And when did the Lake County Fair
8  happen?
9     A.    At the end of August.
10     Q.    So you wouldn't have done that between
11  December of '03 and March of '04?
12     A.    No.
13     Q.    You say toward -- the letter says,
14  toward the bottom, that you worked, approximately,
15  four hours per week during the entire period of your
16  employment performing removals while on-call for
17  which you are not compensated.
18     A.    Possibly two removals a week.
19     Q.    I thought you had said throughout
20  today that you were compensated for the removals you
21  performed, but not the phone calls?
22         MS. GIFFORD:  Objection.
23  BY THE WITNESS:
24     A.    Yeah.
25

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

1a5aa13f-2a14-4190-8b79-8cac4bcb9abb

NETWORK DEPOSITION SERVICES
Transcript of Ray White

Page 191

1   BY MR. KNIGHT:

2        Q.    So to the extent you were doing

3   removals, you were compensated; is that right?

4             MS. GIFFORD:  Objection.

5   BY THE WITNESS:

6        A.    I believe if it's on the timecard.  We

7   had to clock-in.

8   BY MR. KNIGHT:

9        Q.    You know, and I'm not casting

10  aspersion, but I'm trying to get to the bottom of

11  this.  Is this sentence that begins, plaintiff's

12  best current recollection is he worked,

13  approximately, four hours per week for the entire

14  period of his employment performing removals while

15  on-call for which he was not compensated; is that

16  sentence inaccurate?

17            MS. GIFFORD:  Objection.

18  BY THE WITNESS:

19       A.    It's possible it's inaccurate.

20  BY MR. KNIGHT:

21       Q.    Can you think of any removals that you

22  performed in your last four months of employment

23  that you didn't record in your timecards?

24       A.    Possibly the Illinois removals that we

25  made for the Illinois funeral.

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

1a5aa13f-2a14-4190-8b79-8cac4bcb9abb

NETWORK DEPOSITION SERVICES
Transcript of Ray White

1    possible there were Illinois removals in that period
2    of time.
3              Q.      But is it possible there were not?
4              A.      It's possible.
5              Q.      Now, on the next page, there's a
6    paragraph that -- there's a sentence that says in
7    part that plaintiff does currently recall his
8    managers Ron Redpath and Zalo Wilson telling him
9    that overtime was not paid unless it was
10   pre-approved.  And I think I asked you earlier about
11   that, and I think you said that you don't recall
12   that being the case?
13             A.      No.  There was no -- they'd tell you
14   there was no overtime in the budget, thus, that
15   means there's no overtime.  What they would try and
16   do was, they said, if you worked it, and we could
17   have -- we had enough people here on Monday, and you
18   need a day off, take the day off Monday.  But those
19   days never came.
20             Q.      Okay.  Did Ron Redpath ever have a
21   conversation with you where he said that overtime
22   would not be paid if it's not pre-approved by him
23   beforehand?
24             A.      No.
25             Q.      Did Zalo Wilson have that conversation

1a5aa13f-2a14-4190-8b79-8cac4bcb9abb

NETWORK DEPOSITION SERVICES
Transcript of Ray White

Page 194

1   with you?

2         A.      I believe Zalo Wilson said the company

3   says we're not supposed to approve overtime, but

4   when you're the only employee, and we're asking you

5   to be on-call 24/7, we're going to have to do

6   something.

7         Q.      So he didn't tell you that he needed

8   to pre-approve your overtime?

9               MS. GIFFORD:  Objection.

10  BY THE WITNESS:

11        A.      No.

12  BY MR. KNIGHT:

13        Q.      And then the last sentence in that

14  paragraph says that it's your current recollection

15  you performed, approximately, 300 hours of total

16  overtime work over your entire employment for which

17  you were not compensated?

18        A.      That was based on the book that Zalo

19  had.  I remember seeing that one of them -- it was,

20  like, 320 or 324 hours was in that book.  That was

21  the last time I seen that pay period.

22        Q.      This says, over your entire

23  employment.  300 hours over your entire employment;

24  is that your testimony?

25        A.      I don't believe over my entire --

1a5aa13f-2a14-4190-8b79-8cac4bcb9abb

NETWORK DEPOSITION SERVICES
Transcript of Ray White

Page 196

1    refers to supplemental responses to interrogatories.
2    Have you reviewed this answer we've been going over
3    in Exhibit 12 --
4          A.     Yes.
5          Q.     -- before you signed the
6    certification?
7          A.     Yes.
8          Q.     And did you believe at that time that
9    this claim of 300 hours of total overtime work for
10   his entire employment was inaccurate?
11         A.     I probably just missed it in reading
12   it.
13         Q.     You didn't see the 300 hours on there?
14         A.     I seen the 300 hours, but I probably
15   overlooked "the entire employment" because that
16   would put it all the way back to 1999, and I
17   probably worked 300 hours in 1999 from September to
18   December in overtime.
19         Q.     So it's your testimony today that this
20   is inaccurate?  That this statement of 300 hours of
21   total overtime work for his entire employment is
22   inaccurate?
23         A.     Just "the entire employment" is
24   inaccurate.
25         Q.     This response also refers to eight

1a5aa13f-2a14-4190-8b79-8cac4bcb9abb

NETWORK DEPOSITION SERVICES
Transcript of Ray White

Page 220

1          Is it your testimony that all of

2   that time was recorded on your timecard?

3          A.     Yes.

4          Q.     Were you paid for all of that time?

5          A.     I don't know.

6          Q.     Were you scheduled to have a lunch

7   break while you were employed at Alderwoods?

8          A.     We could take a lunch break, and I

9   believe what the company stated was an uninterrupted

10  lunch break.  And being in the funeral home, that

11  wasn't -- didn't really pertain to us.  Most our

12  funerals were at 11:00.  So at 12:00, we would be on

13  a funeral.  So our lunch breaks were skipped a lot

14  of times.

15         Q.     Do you know if you were supposed to

16  have a half-hour lunch break or an hour lunch break?

17         A.     I believe it was -- we had the option,

18  either two 15-minute breaks, one in the morning, and

19  one in the afternoon.  And the half-hour lunch

20  break, they made that for the smokers.  But we very

21  rarely took even a half-hour lunch break.  It was

22  quick.

23         Q.     So I'm sorry.  Just so I'm clear,

24  sometimes people are scheduled to work, essentially,

25  an eight-and-a-half hour shift, assuming a half-hour

1a5aa13f-2a14-4190-8b79-8cac4bcb9abb

NETWORK DEPOSITION SERVICES
Transcript of Ray White

Page 228

1          A.     Partial.

2          Q.     Partial.  But you said you don't know

3     if it was partial or not?

4          A.     Right.

5          Q.     But you will agree that at least this

6     document reflects that for every pay period you

7     worked after December 2003 you were getting at least

8     some overtime?

9          A.     Partial overtime.

10         Q.     I believe in response to a question

11    from Ms. Gifford you said that you were told by

12    management that everybody should be involved in a

13    community organization?

14         A.     Correct.

15         Q.     But you weren't personally involved in

16    any community organizations; isn't that correct?

17         A.     Not a member.

18         Q.     Right.

19                You also said that you didn't

20    report the time it took you to arrive to the funeral

21    home after you received a call?

22         A.     No.

23         Q.     Why didn't you report that time?

24         A.     I could -- they, actually, said if we

25    wanted to, we could write it in.

NETWORK DEPOSITION SERVICES
Transcript of Ray White

Page 229

1       Q.    Who said that?

2       A.    Zalo.

3       Q.    Why didn't you write it in?

4       A.    It was just, pay me what I was

5 working.

6       Q.    So it was your choice not to write the

7 time in?

8       MS. GIFFORD:  Objection.

9 BY THE WITNESS:

10      A.    Yes.

11 BY MR. KNIGHT:

12      Q.    What about the time you spent working

13 with the people in the community or soliciting

14 business in the community, were you told not to

15 report that time?

16      A.    No.

17      Q.    And then Mr. Gifford asked you a

18 series of questions related to lunch breaks.  Did

19 you punch-out during lunch breaks?

20      A.    If we took it and left, yes.

21      Q.    If you had to do work during lunch

22 break, did you punch back in?

23      A.    A lot of times our lunch was pop.  We

24 drank a pop.

25      Q.    Were you punching-out during lunch

1a5aa13f-2a14-4190-8b79-8cac4bcb9abb

NETWORK DEPOSITION SERVICES
Transcript of Ray White

Page 231

1   A.      I used to help mow grass and weeding
2   for them.
3           Q.      So why didn't you punch back in before
4   you --
5           A.      If I got called, I wasn't going to
6   walk back into the funeral home to clock-in.  I'd
7   just continue doing the work.
8           Q.      So you were having lunch by the
9   cemetery?
10          A.      I was having lunch at the funeral home
11  and got called to the cemetery, and I just went out
12  took care of the business, and then came back.  And
13  the lunch hour was over anyhow.
14          Q.      My question is, why didn't you
15  punch-in before leaving the funeral to go to the
16  cemetery?
17          A.      I just didn't think about it.
18          Q.      Did anyone tell you not to punch-in?
19          A.      No.
20          Q.      It was your decision just not to do
21  it?
22                  MS. GIFFORD:  Objection.
23  BY THE WITNESS:
24          A.      Probably.  Get the work done.
25                  MR. KNIGHT:  I have nothing else.

1a5aa13f-2a14-4190-8b79-8cac4bcb9abb

NETWORK DEPOSITION SERVICES
Transcript of Ray White

Page 232

1                    FURTHER EXAMINATION

2      BY MS. GIFFORD:

3              Q.      I have just a couple.  I promise it'll

4      be quick.

5                           In the time when Zalo Wilson was

6      your supervisor, was there any hours of overtime

7      that was submitted to Alderwoods' payroll that Zalo

8      Wilson had not approved to be submitted to payroll?

9              A.      I have no idea.

10             Q.      Did you ever submit overtime hours to

11     payroll yourself without going through Zalo?

12             A.      No.  Zalo approved it all.

13             Q.      And if you hadn't submitted it, is

14     there any reason to think anybody else would have

15     submitted overtime on your behalf?

16             A.      No.

17             Q.      You testified that you did not write

18     in the time you spent traveling to the funeral

19     home --

20             A.      No.

21             Q.      -- when you received a call while you

22     were on-call?

23             A.      Correct.

24             Q.      If you had written that in, would you

25     have been paid for that time?

1a5aa13f-2a14-4190-8b79-8cac4bcb9abb

NETWORK DEPOSITION SERVICES
Transcript of Ray White

Page 233

1          A.     Yes.
2          Q.     And if it had caused you to exceed the
3   overtime that had been submitted, would you have
4   been paid for that additional time?
5                 MR. KNIGHT:  Object to the form of the
6          question.
7   BY MS. GIFFORD:
8          Q.     Do you know?
9          A.     Well, if Zalo paid me part of the
10  overtime, I'd a got it.
11         Q.     You think you would have gotten all of
12  it?
13         A.     Eventually.
14         Q.     Did you eventually -- were you
15  eventually paid for all of the overtime hours that
16  you worked?
17         A.     I believe they still owe me hours.
18                MS. GIFFORD:  Those are all the
19         questions I have.
20                MR. KNIGHT:  Okay.  Thank you for your
21         time.
22                THE REPORTER:  Signature?
23                MS. GIFFORD:  Reserve.
24                (Whereupon, the deposition
25                 concluded at 4:05 p.m.)

1a5aa13f-2a14-4190-8b79-8cac4bcb9abb

NETWORK DEPOSITION SERVICES
Transcript of Ray White

Page 235

1                    CERTIFICATE

2                        OF

3         CERTIFIED SHORTHAND REPORTER

4

5         I, JULIA A. BAUER, a Certified Shorthand

6    Reporter of the State of Illinois, CSR License No.

7    084-004543, do hereby certify:

8         That previous to the commencement of the

9    examination of the aforesaid witness, the witness

10   was duly sworn by me to testify the whole truth

11   concerning the matters herein;

12        That the foregoing deposition transcript

13   was stenographically reported by me and was

14   thereafter reduced to typewriting under my personal

15   direction and constitutes a true and accurate record

16   of the testimony given and the proceedings had at

17   the aforesaid deposition;

18        That the said deposition was taken before

19   me at the time and place specified;

20        That I am not a relative or employee or

21   attorney or counsel for any of the parties herein,

22   nor a relative or employee of such attorney or

23   counsel for any of the parties hereto, nor am I

24   interested directly or indirectly in the outcome of

25   this action.

1a5aa13f-2a14-4190-8b79-8cac4bcb9abb

NETWORK DEPOSITION SERVICES
Transcript of Ray White

Page 236

1        IN WITNESS WHEREOF, I do hereunto set my

2   hand at Chicago, Illinois, this 5th day of August,

3   2009.

4

5

6

7                    _____

8                    JULIA A. BAUER, CSR, RPR

9                    CSR License No. 084-004543

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

1a5aa13f-2a14-4190-8b79-8cac4bcb9abb