**TAB 36**

NETWORK DEPOSITION SERVICES
Transcript of Jack Wilkinson

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA


DEBORAH PRICE and HEATHER RADY
on behalf of themselves and

all employees similarly
situated,
    Plaintiff,


vs.                  No. 06-1641
ALDERWOODS GROUP, INC.,
    Defendants.


DEPOSITION OF JACK WILKINSON
TAKEN ON BEHALF OF THE DEFENDANTS
ON APRIL 15, 2009, BEGINNING AT 8:00 A.M.
IN COFFEYVILLE, KANSAS


APPEARANCES:

Appearing on behalf of the PLAINTIFF:

Kyle T. McGee, Attorney at Law
MARGOLIS EDELSTEIN
525 William Penn Place
Suite 3300
Pittsburgh, Pennsylvania 15219
(412) 355-4971
kmcgee@margolisedelstein.com


Appearing on behalf of the DEFENDANT:

Tonya B. Braun, Attorney at Law
JONES DAY
325 John H. McConnell Blvd., Suite 600
Columbus, Ohio 43215
tbraun@jonesday.com


REPORTED BY:  Lacy Antle, CSR, RPR

869e63a0-0274-4333-9be4-5b29226c572e

NETWORK DEPOSITION SERVICES
Transcript of Jack Wilkinson

1  arrangements with families for funeral services, I

2  prepared the bodies, I did not do embalming, but I

3  did everything else, which would have been dressing

4  and casketing and cosmetizing.  I, of course,

5  assisted with funerals, I did aftercare, which would

6  have included, you know, taking flowers to the house

7  afterwards and just general follow up, contacting

8  family members or being contacted by family members,

9  you know, taking care of paperwork, for instance,

10  veterans' paperwork, and things like this,

11  afterwards.

12       Q    Okay.  All right.  Now, I take it that

13  because you had the title of assistant funeral home

14  -- or excuse me -- assistant funeral director, you

15  at no point during your employment with Alderwoods

16  had a funeral director's license?

17       A    I did not.

18       Q    Did not, okay.  And at any point did you

19  have any type of insurance license --

20       A    No.

21       Q    -- while you were employed with

22  Alderwoods?

23       A    No.

24       Q    Okay.  Did you do any type of sales in

25  your position -- I mean was sales, pre-need or

869e63a0-0274-4333-9be4-5b29226c572e

NETWORK DEPOSITION SERVICES
Transcript of Jack Wilkinson

1   otherwise, part of your position as an assistant

2   funeral director?

3        A     There was probably less than a half dozen

4   times that -- well, maybe two or three times,

5   actually, that I would sell a headstone.  As far as

6   prearranging, I sit down with the family and get the

7   information and everything, but the actual paperwork

8   on it, the insurance aspect of it, Herb Bath

9   generally took care of.

10       Q     Okay.  And did Herb have to have an

11  insurance license to do that paperwork you're

12  referring to?

13       A     To my understanding, he did.

14       Q     Okay.  Were you ever encouraged to obtain

15  an insurance license?

16       A     No, not that I remember.

17       Q     Okay.  And to your knowledge, did any of

18  the other employees at the Chetopa location hold an

19  insurance license?

20       A     No, not at the Chetopa location.

21       Q     Okay.  And did anyone Altamont location --

22       A     I believe --

23       Q     -- have an insurance license?

24       A     I believe that Dorthy Bath did.

25       Q     Okay.  Anyone else at the Altamont

869e63a0-0274-4333-9be4-5b29226c572e

NETWORK DEPOSITION SERVICES
Transcript of Jack Wilkinson

Page 49

1  Work on weekends if we had a body in state or a
2  funeral, particularly if it was my weekend off --
3  on, but on call.  But at times if we had a funeral
4  also on the weekend that I was off, then, like I
5  said, by nature of it being a small funeral home, I
6  also helped with those funerals too.
7        Q    And you did say that you were scheduled to
8  work on call every other weekend --
9        A    Yes.
10       Q    -- is that correct?
11            Who else worked on call?
12       A    Herb Bath.
13       Q    Anyone else?
14       A    Not that I'm aware of.
15       Q    Okay.  You said that some evenings you
16  worked, was that on an on call basis?
17       A    Yes, there were evenings that I worked on
18  call.
19       Q    Okay.
20       A    It wasn't any set particular time, it was
21  just if Herb needed to be gone or wanted to be gone.
22       Q    So I'm just trying to understand, would he
23  tell you, "You need to be on call," on a particular
24  evening?
25       A    Yes.

869e63a0-0274-4333-9be4-5b29226c572e

NETWORK DEPOSITION SERVICES
Transcript of Jack Wilkinson

1      Q    Okay.  So it was a designated evening that
2  you would be on call?
3      A    Yes.
4      Q    Okay.  But you're saying that would vary
5  depending on Herb's needs?
6      A    Yes.
7      Q    Okay.  Whereas the every other weekend on
8  call was more of a set schedule?
9      A    Yes, yes.
10     Q    You said visitations were typically
11  7:00 to 9:00 p.m.?
12     A    Typically the visitation lasted from
13  7:00 to 8:00 --
14     Q    7:00 to 8:00?
15     A    -- but we stayed opened until 9:00,
16  roughly.
17     Q    Okay.  And you said that you sometimes
18  came in as early as 6:00 --
19     A    Yes.
20     Q    -- prior to a visitation?
21          Okay.  And were the visitations, were they
22  scheduled, I mean would you know in advance --
23     A    Yes.
24     Q    -- that you needed to work a visitation?
25     A    Yes.

869e63a0-0274-4333-9be4-5b29226c572e

NETWORK DEPOSITION SERVICES
Transcript of Jack Wilkinson

1      A     I seem to remember her talking about, yes
2    that there was time that she didn't receive pay for
3    it, yes.
4      Q     Now, other than Larry Wilson and Bill
5    Althaus and Joliene and do we have a last name for
6    Joliene?
7      A     I don't, no.
8      Q     You don't, okay.
9            Do you have knowledge of any other
10   employee, now we're talking about, you know, outside
11   Altamont, outside Chetopa, regarding how they kept
12   track of their time --
13     A     No.
14     Q     -- or pay related issues?
15     A     No.
16     Q     Okay.  When you spoke to Larry Wilson, and
17   he raised concerns regarding the fact that he had to
18   receive preapproval for overtime and could not work
19   over a certain number of hours in the week, what, if
20   anything, did you say in response?
21     A     I don't remember specifically, I'm sure
22   that I wasn't excited about it.  I remember telling
23   him that I didn't have to have preapproval for my
24   overtime.  And that's all I, you know, specifically
25   remember, but I do remember telling him that.

869e63a0-0274-4333-9be4-5b29226c572e

NETWORK DEPOSITION SERVICES
Transcript of Jack Wilkinson

Page 64

1        A    No.
2        Q    Okay.  And you said yourself you did not
3    have to seek preapproval for overtime.
4        A    That's right.
5        Q    Okay.  I'm going to hand you what I'm
6    going to have marked as Defendant's Exhibit 1.  This
7    is a document that's been produced in litigation,
8    it's Bates Stamped 00001 and it's entitled "Funeral
9    Home Procedures" at the top.  Mr. Wilkinson, is this
10   a document that you've seen before?
11            (Defendant's Exhibit 1 marked for
12   identification.)
13       A    I don't remember ever seeing it.
14       Q    Okay.  Are you aware that -- that
15   Alderwoods did have some written policies?
16       A    Yes.
17       Q    Okay.  Do you recall seeing any of those
18   policies during your employment with Alderwoods?
19       A    I remember receiving an employees'
20   handbook, and I know that there was a policy manual
21   that we were to refer to.  I don't remember a time
22   that I specifically -- that I read it, but I
23   remember seeing it, but I can't tell you a time that
24   I -- there's very possible times that I read things
25   out of it, but I don't remember any specific time

869e63a0-0274-4333-9be4-5b29226c572e

NETWORK DEPOSITION SERVICES
Transcript of Jack Wilkinson

Page 87

1      Q    Okay.  Now, you would get the call and you
2   said you would make the death call.
3      A    Yes.
4      Q    But I want to fully understand what that
5   would entail?
6      A    Okay.  They would call me, and I'd get up
7   and dress and put on the proper attire to be going
8   out and meeting anybody in the public, it's hard
9   telling what else I might do, you know, just to get
10  ready --
11     Q    Sure.
12     A    -- you know, but then I'd go downstairs
13  and before I left I'd clock in and then go and make
14  the removal wherever it might be, nursing home,
15  hospital, a home, and then generally the body would
16  go to the funeral home in Altamont where we did our
17  embalming, and then when I returned back to Chetopa,
18  I would clock back out.
19     Q    Okay.  Is there any circumstances under
20  which you would not follow that procedure, that you
21  would not go downstairs and go into the funeral and
22  clock in before you went out on the death call?
23     A    Not that I recall.
24     Q    I'm going to hand you what will be marked
25  as Defendant's Exhibit 5, and, again, if I can draw

869e63a0-0274-4333-9be4-5b29226c572e

NETWORK DEPOSITION SERVICES
Transcript of Jack Wilkinson

1   timecards?

2        A    Not to my knowledge.

3        Q    Okay.  Were you ever encouraged by

4   Mr. Bath or any other management -- person in

5   management at Alderwoods to show up early before

6   your start time?

7        A    Yes, if we were going to have a funeral,

8   for instance, at 10:00 in the morning funeral or

9   earlier, which I think there was an occasion that we

10  had one earlier than that --

11       Q    Uh-huh.

12       A    -- yes, it'd be -- yes, it'd be expected

13  that I'd have to be there earlier than 8:00.  In

14  particular if we had work to do in Altamont, of

15  course, I'd have to be there earlier than 8:00 in

16  order to get to Altamont in time, so, yes.

17       Q    Would you clock in at that point?

18       A    Yes.

19       Q    Okay.  So no one ever told you that you

20  had to wait to clock in until 8:00 --

21       A    No --

22       Q    -- which was your normal --

23       A    -- they didn't.

24       Q    -- start time?

25       A    No.

869e63a0-0274-4333-9be4-5b29226c572e

NETWORK DEPOSITION SERVICES
Transcript of Jack Wilkinson

Page 97

1      Q    No.  Okay.

2           To your knowledge was the time that you

3    reported on your time sheets and, then when it

4    changed to a timecard, your timecard, was that ever

5    changed to your knowledge, altered?

6      A    Not that I recall.

7      Q    When was it that you decided to join this

8    litigation against your former employer, Alderwoods;

9    do you recall when?

10     A    Date, no.  The occasion, I remember

11   receiving something in the mail alerting me to the

12   fact that there was a class action lawsuit --

13     Q    Uh-huh.

14     A    -- and -- but I couldn't tell you exactly

15   when that was.

16     Q    Okay.  Did you -- have you talked to other

17   Alderwoods employees about this litigation?

18     A    No.

19     Q    Okay.  Not before the litigation?

20     A    No.

21     Q    Okay.  And not after?

22     A    Never.

23     Q    Never?

24     A    Never.

25     Q    Okay.  Well, what was it exactly that

869e63a0-0274-4333-9be4-5b29226c572e

NETWORK DEPOSITION SERVICES
Transcript of Jack Wilkinson

1   that you received that you believe should have been

2   included in the overtime calculation that we haven't

3   addressed?

4       A    No.

5       Q    Were you aware of any type of policy that

6   certain forms of calculation would not be included

7   in the overtime calculation?

8            MR. MCGEE:  Objection to form.

9            THE WITNESS:  No.

10      Q    (BY  MS. BRAUN) And do you have any knowledge how

11  the overtime or the regular rate for OT purposes was

12  calculated for any other employee at Alderwoods?

13           MR. MCGEE:  Object to the form.

14           THE WITNESS:  No.

15      Q    (BY  MS. BRAUN) You testified earlier that you did

16  not need to seek preapproval for overtime; correct?

17      A    Correct.

18      Q    Okay.  Are you aware of any policy that

19  would have required any other Alderwoods employee to

20  seek preapproval for overtime?

21      A    A policy?

22           MR. MCGEE:  Object to the form.  You can

23  answer.

24           THE WITNESS:  I -- no, not as far as a

25  policy, no.  All I know is word of mouth.  I was

869e63a0-0274-4333-9be4-5b29226c572e

NETWORK DEPOSITION SERVICES
Transcript of Jack Wilkinson

Page 111

1   told that they were required.

2           MS. BRAUN:  Let's take a break if that's

3   okay.

4           THE WITNESS:  Thank you.

5           (Break taken from 10:41 a.m. to

6   10:52 a.m.)

7       Q    (BY  MS. BRAUN) Do you know what the practice was

8   at Altamont as to whether employees sought preapproval for

9   overtime?

10      A    No, I don't know.

11      Q    And we spoke earlier about Larry Wilson

12  and his statement that he was required to have

13  preapproval; is that correct --

14      A    Yes.

15      Q    -- for overtime?

16      A    Yes.

17      Q    Okay.  Do you know the specific

18  circumstances under which he was required to obtain

19  preapproval?

20      A    No, I don't.

21      Q    Okay.  And so, therefore, would you know

22  if there were any exceptions to what he claimed was

23  a requirement to get preapproval?  Do you know if

24  there would be any exceptions to what he claimed was

25  a requirement to get preapproval for overtime?

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

869e63a0-0274-4333-9be4-5b29226c572e

NETWORK DEPOSITION SERVICES
Transcript of Jack Wilkinson

Page 118

1    or flowers?

2         A    No --

3         Q    You never asked?

4         A    -- I did not.

5         Q    Okay.  Focusing on the time you spent on

6    call, which you testified was at some point during

7    your Alderwoods' employment became every other

8    weekend; is that correct?

9         A    Yes.

10        Q    Okay.  You were the only employee at the

11   Chetopa location to work on call, other than Herbert

12   Bath?

13        A    Yes.

14        Q    Did you know which employees at Altamont

15   worked on call?

16        A    Just Herb Bath, as far as I know.

17        Q    Okay.  And you were never told not to

18   record the time that you spent actually working

19   while on call?

20        A    No, no.

21             MR. MCGEE:  Object to the form.

22        Q    (BY  MS. BRAUN) Are you aware of any policy

23   stating that an Alderwoods employee was not to record time

24   spent on call or worked on call?  Excuse me.

25             MR. MCGEE:  Object to the form.

869e63a0-0274-4333-9be4-5b29226c572e

NETWORK DEPOSITION SERVICES
Transcript of Jack Wilkinson

1           THE WITNESS:  No, not that I'm aware of.

2       Q    (BY  MS. BRAUN) Are you currently claiming that

3   there's any portion of time spent on call -- that you've

4   spent working on call that you believe you're due additional

5   compensation?

6       A    By that you mean...

7       Q    Let me ask you this, you recorded time

8   that you worked while you were on call?

9       A    Yes.

10      Q    You lived above the funeral home, and you

11  went downstairs and you clocked in?

12      A    Yes.

13      Q    Okay.  And you went about your business of

14  doing what you needed to on call, either doing a

15  removal, meeting with a family --

16      A    Yes.

17      Q    -- and you came back to the funeral home

18  and you clocked out.

19      A    Right.

20      Q    Is there some portion of time that you

21  were on call that you believe that you were owed

22  compensation?

23      A    Only for that time that I'm doing

24  something for, you know, that's involved in funeral

25  home business.

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

869e63a0-0274-4333-9be4-5b29226c572e

NETWORK DEPOSITION SERVICES
Transcript of Jack Wilkinson

Page 139

1   reviewed.  Do you recall seeing this document?

2       A    I don't specifically remember seeing this
3   one, no.

4       Q    Okay.  Do you recall signing a
5   verification for these supplemental responses?

6       A    For this?  No, I don't, I don't recall
7   signing them no.

8       Q    Okay.  Well, let's take a look at this for
9   a moment.  The third paragraph states, "Through
10  company policies and practices, which were
11  communicated verbally and in writing, Alderwoods
12  required employees, including plaintiff, to work on
13  call shifts."  We've touched on on call policies,
14  specifically, whether there was an on call policy
15  addressing whether employees would be paid for on
16  call work.  You recall no such policy; correct?

17      A    Right.

18           MR. MCGEE:  Object to the form.

19      Q    (BY  MS. BRAUN) Is there any type of -- do you
20  recall any other type of written policy regarding on call
21  work?

22      A    I do not.

23      Q    Are you aware of any?

24      A    No.

25      Q    What, if any, verbal communication was

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

869e63a0-0274-4333-9be4-5b29226c572e

NETWORK DEPOSITION SERVICES
Transcript of Jack Wilkinson

Page 152

1       Q    Okay.  And what was -- what's the
2   congregation?
3       A    Community Bible Church.
4       Q    Community Bible Church?
5       A    Uh-huh.
6       Q    And when did you first become a member of
7   Community Bible Church, if you recall?
8       A    Let's see, well, it'd have been 1994 we
9   actually began that church.
10      Q    Were you a founder or --
11      A    I was.
12      Q    Yeah?  Okay.
13           Now, you say that was the only community
14  organization of which you were a member --
15      A    Yes.
16      Q    -- during your Alderwoods employment.  Did
17  you have involvement in other community activities,
18  that you recall, during your Alderwoods employment?
19      A    No, not that I can recall.
20      Q    Were you encouraged to become involved in
21  the community by any Alderwoods member of
22  management?
23      A    I don't recall being, no.
24      Q    Okay.  Do you know if other employees at
25  Chetopa were encouraged to be involved in the

NETWORK DEPOSITION SERVICES
Transcript of Jack Wilkinson

Page 153

1    community?

2         A    Not that I'm aware of.

3         Q    Okay.  Do you know if employees at the

4    Altamont location were encouraged by any member of

5    Alderwoods management to become involved in the

6    community?

7         A    Not that I know of.

8         Q    Focusing on Chetopa, Charlotte was the

9    other individual --

10        A    Yes.

11        Q    -- that worked with you there?

12             Do you know if she had any community

13   involvement?

14        A    As I said, she was a member of the same

15   congregation that I was.

16        Q    Oh, sorry.  Uh-huh.

17        A    I can't think of anything else that she

18   was -- her husband was actually the pastor at the

19   time, and he's since passed away, now her son is, so

20   that's the crux of her life.

21        Q    And now focusing on Altamont, do you have

22   any knowledge of whether employees there were

23   involved in community organizations or activities?

24        A    I believe that Herb Bath was, and I'm

25   trying to think of anything specific.  He's the

869e63a0-0274-4333-9be4-5b29226c572e

NETWORK DEPOSITION SERVICES
Transcript of Jack Wilkinson

1    mayor of Altamont now, but he wasn't at that time,

2    it's quite a claim to fame.  I know that he was real

3    active in the community, I know that he was, but I

4    don't know specifically.

5         Q    And what about the other employees there,

6    you mentioned Jon Day and Herb's wife and...

7         A    I think he was a member of some local

8    church congregations, various ones.

9         Q    Jon was?

10        A    Jon was and his -- yeah, and then Herb's

11   wife.  Herb and his wife were a member of various

12   local church congregations over the years.

13        Q    Uh-huh.

14        A    And Jon Day, he worked with a -- they have

15   a senior housing project there in Altamont that he

16   worked there, kind of a -- I think he was actually

17   the manager of the housing project, plus the fix-it

18   man for everything that they had.  So he had a lot

19   of, you know, community involvement with the elderly

20   and -- in Altamont.

21        Q    Uh-huh.  And do you know if Jon Day was

22   specifically encouraged to get involved in those

23   various church congregations or with the senior

24   housing development?

25        A    I don't believe so, I don't know that he

869e63a0-0274-4333-9be4-5b29226c572e

NETWORK DEPOSITION SERVICES
Transcript of Jack Wilkinson

Page 155

1    was.

2         Q    Okay.  Did you at any -- let me rephrase

3    that.  Was there any type of incentive for you to be

4    involved in the Community Bible Church or any other

5    type of organization?

6         A    Not that I know of, no.

7              MR. MCGEE:  You mean regarding

8    Alderwoods?

9         Q    (BY  MS. BRAUN) Is there any incentives, did

10   Alderwoods management, you know, incentivize you to belong

11   to the Community Bible Church?

12        A    No.

13        Q    No?  Okay.  Did you receive evaluations

14   while you were an employee at Alderwoods of

15   Alderwoods?

16        A    I'm sure, I probably did, but I don't

17   specifically remember them.

18        Q    Do you remember, if you did receive such

19   an evaluation, formal or informal, a member of

20   management bringing up community service during

21   that --

22        A    I don't.

23        Q    -- evaluation?

24        A    No, I don't.

25        Q    Are you aware of -- well, let me ask you

869e63a0-0274-4333-9be4-5b29226c572e

NETWORK DEPOSITION SERVICES
Transcript of Jack Wilkinson

Page 156

1    this, did you ever provide any kind of report to
2    Alderwoods management regarding your involvement
3    with the Community Bible Church?
4         A    Not that I recall.
5         Q    Okay.  You were -- were you ever -- do you
6    recall ever being asked to provide a report, for
7    example, the number of, you know -- time you spent
8    there or what you did?
9         A    No.
10        Q    Okay.  Never asked?
11        A    Not that I recall.
12        Q    Okay.  Do you know if any employee at the
13   Altamont location was ever asked to report on their
14   involvement in the community?
15        A    Not that I'm aware of.
16        Q    Okay.  Do you have any knowledge of any
17   Alderwoods employee, beyond the Chetopa and Altamont
18   locations, being required to participate in
19   community activities?
20        A    I'm not aware of anybody being required
21   to, no.
22        Q    Were you aware of any incentive program
23   being used at any location, other than Chetopa or
24   Altamont, to encourage community participation?
25        A    Not that I recall.

869e63a0-0274-4333-9be4-5b29226c572e

NETWORK DEPOSITION SERVICES
Transcript of Jack Wilkinson

Page 157

1      Q      Have you ever heard of a program called "I

2   Believe in Service"?

3      A      I don't remember hearing of it, no.

4      Q      Were you ever told, as an Alderwoods

5   employee, that it was an expectation of you to get

6   out in the community and become involved with

7   projects or activities or organizations?

8      A      I don't remember being encouraged to, no.

9      Q      Okay.  Would you consider any of the time

10   that you've spent as a founder of the Community

11   Bible Church, consider that to be work for

12   Alderwoods?

13      A      No, no.

14      Q      That was a personal issue for you?

15      A      Yes, yes.

16           MR. MCGEE:  I think that explains why the

17   witness didn't check that box.

18      Q      (BY  MS. BRAUN) Okay.  And let's just continue

19   talking about community work for a minute.  Did you ever see

20   anything in writing regarding community work as an

21   Alderwoods employee?

22      A      I don't -- I don't remember seeing

23   anything, no.

24      Q      And in any of the conversations you had

25   with employees at other locations, there was no

869e63a0-0274-4333-9be4-5b29226c572e

NETWORK DEPOSITION SERVICES
Transcript of Jack Wilkinson

Page 159

1   call; correct?
2        A     Yes, yes, ma'am.
3        Q     He was a salaried member of management;
4   correct?
5        A     I assume he was salary.
6        Q     Do you know if employees at locations
7   beyond Chetopa and Altamont used call logs while on
8   call?
9        A     I do not.
10       Q     Okay.  While you worked on call during
11  your Alderwoods employment, you testified that you
12  would go downstairs to the funeral home and clock
13  in; correct?
14       A     Yes.
15       Q     Okay.  Do you know whether employees at
16  locations outside Cheto --
17       A     Chetopa.
18       Q     -- Chetopa -- God, I got to get it
19  right -- and Altamont recorded their time on call in
20  that same manner, using a time clock; do you know?
21       A     I know Chetopa and Altamont, I don't know
22  about the other locations.
23       Q     Okay.  And for your time spent on call,
24  for the time you had clocked in and recorded, you
25  were paid your hourly rate; correct?

869e63a0-0274-4333-9be4-5b29226c572e

NETWORK DEPOSITION SERVICES
Transcript of Jack Wilkinson

Page 160

1        A     I was, yes.

2        Q     Okay.  And do you know if employees

3   outside Cheto -- goodness --

4              MR. MCGEE:  Chetopa.

5        Q     (BY MS. BRAUN) -- I need more caffeine --

6   Chetopa -- maybe I've had too much -- Chetopa and Altamont

7   were compensated in the same manner?

8              MR. MCGEE:  Objection to form.

9              THE WITNESS:  I don't know personally.

10       Q     (BY  MS. BRAUN) You don't know how employees at

11  other locations were compensated for their time on call?

12       A     No, I don't.

13       Q     Okay.  And outside of Chetopa and

14  Altamont, do you know which positions at other

15  Alderwoods locations were required to work on call?

16       A     I know because of conversations with Larry

17  Wilson that he was.

18       Q     And his position again, was?

19       A     Location manager at Oswego.

20       Q     Uh-huh.  Do you know of any other

21  employees, in particular job positions, were

22  required to work on call at Oswego?

23       A     No, I don't.

24       Q     And do you know which positions at any

25  location other than Oswego and Chetopa and Altamont?

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

869e63a0-0274-4333-9be4-5b29226c572e

NETWORK DEPOSITION SERVICES
Transcript of Jack Wilkinson

Page 164

1    A    Oh, my, they vary -- extreme -- because

2  they can go anywhere from 175 to $200 and up.

3    Q    Okay.

4    A    And it's been too long ago for me to

5  remember how much those particular ones sold for,

6  but there's a wide variety.

7    Q    Okay.  Do you know if Kansas law requires

8  an individual to have both an insurance license and

9  a funeral director's license to do the pre-need?

10   A    I don't know.

11        MR. MCGEE:  Object to form.

12   Q    (BY  MS. BRAUN) And do you have any knowledge as

13  to whether funeral directors at other Alderwoods locations,

14  whether it was mandated that they obtain insurance licenses?

15   A    No, I don't.

16   Q    And you made no effort to obtain an

17  insurance license during your time at Alderwoods?

18   A    I did not.

19   Q    Okay.  Were you ever told that you would

20  not be paid for a certain period of time prior to

21  your scheduled work time?

22        MR. MCGEE:  Object to the form.

23        THE WITNESS:  Prior to my scheduled work

24  time?

25   Q    (BY  MS. BRAUN) Uh-huh, you had a scheduled work

869e63a0-0274-4333-9be4-5b29226c572e

# CERTIFICATE

I, Lacy Antle, Certified Shorthand Reporter, do hereby certify that the above-named JACK

WILKINSON was by me first duly sworn to testify the truth, the whole truth, and nothing but the truth,

in the case aforesaid; that the above and foregoing deposition was by me taken in shorthand and

thereafter transcribed; and that I am not an attorney for nor relative of any of said parties or otherwise

interested in the event of said action.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal this 22nd day of April,

2009.

Lacy Antle, CSR RPR

Oklahoma Certified Shorthand Reporter
LACY ANTLE
Certificate No. 1685
Exp. Date: December 31, 2010