**Exhibit O**

**TABLE OF CONTENTS**
**DECLARATIONS OF FIELD LEVEL NON-EXEMPT**
**AND EXEMPT EMPLOYEES**

| Tab | Name |
| --- | --- |
| 1 | Allen, Lois |
| 2 | Amiker, Ellaway |
| 3 | Anton, George |
| 4 | Arms, Beverly |
| 5 | Ayling, Mary |
| 6 | Baird, William |
| 7 | Ballard, Constance |
| 8 | Bollinger, Karen |
| 9 | Cain, Waldo |
| 10 | Clark, William |
| 11 | Clisby, Chad |
| 12 | Crisp, Donald |
| 13 | Crowe, Patrick |
| 14 | Curnow, Brian |
| 15 | D'Andrea, Daniel |
| 16 | Dias, Joe |
| 17 | Eagan, Charles |
| 18 | Elliott, James |
| 19 | Fogg, Margaret |
| 20 | Forrest, Wendy |
| 21 | Friden, Paul |
| 22 | Gibson, Jill |
| 23 | Goni, Helen |
| 24 | Greeno, Donald |
| 25 | Harper, William Ray |
| 26 | Hunt, Theodore |
| 27 | Jones, Jay |

BRENT KNIGHT EXHIBIT O

| Tab | Name |
|-----|------|
| 28 | Jones, Regina |
| 29 | Karneol, Rozlyn |
| 30 | Korell, Karee |
| 31 | Krueger, Richard |
| 32 | Laplaunt, Daniel |
| 33 | Laska, Robert |
| 34 | Lawrence, Gloria |
| 35 | Lay, John |
| 36 | Luciano, Christopher |
| 37 | Mann, Kelley |
| 38 | McCarthy, Eleanor |
| 39 | Messier, Claudia |
| 40 | Nowatka, Steven |
| 41 | Olsen, Judith |
| 42 | Patterson, William |
| 43 | Porte, Kelly |
| 44 | Powell, William |
| 45 | Pruitt, Jeanne |
| 46 | Rizzotto, Michael |
| 47 | Rogers, Kenneth |
| 48 | Rosen, C. Josef |
| 49 | Sands, Edith |
| 50 | Santmyer, William |
| 51 | Schwab, Roxan |
| 52 | Schwinghamer, Steven |
| 53 | Sims, Mertie |
| 54 | Slight, Marshall |
| 55 | St. Laurent, Andy |
| 56 | Strang, Robert Clayton |
| 57 | Strintz, Jack |

BRENT KNIGHT EXHIBIT O

| Tab | Name |
|-----|------|
| 58 | Turnage, Brenda |
| 59 | Walsh, Cathy |
| 60 | Warn, Robin |
| 61 | Welch, Sharon |
| 62 | Wentworth, Shirley |
| 63 | Windsor, Nancy |
| 64 | Young, Annette |

BRENT KNIGHT EXHIBIT O

**TAB 1**

1

UNITED STATES DISTRICT COURT

2

NORTHERN DISTRICT OF CALIFORNIA

3

4   WILLIAM HELM, et al.

    )   **CASE NO.**    **3:08-CV-01184 SI**

5   On behalf of themselves and all employees
    similarly situated,

    )   **DECLARATION OF LOIS ALLEN**

6

7           Plaintiffs,

       vs.

8   ALDERWOODS GROUP, INC., et al.

9

        Defendants.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

DECLARATION OF LOIS ALLEN

I, Lois Allen, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.      My name is Lois Allen. I am a resident of Cherryvale, Kansas. I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.      All the statements in this Declaration are true and accurate. I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.      I worked for Potts Chapel in Cherryvale, Kansas from 1993 through 2005 as a part-time, hourly employee. I was the only hourly employee at this location. I was the hostess at the Cherryvale location and my job consisted of opening the funeral home when there was a viewing or funeral, greeting people who came to visitations and funerals, setting up for funerals and visitations, and cleaning up after visitations. Unless there was a viewing or funeral, the building where I worked would be closed.

4       During the time I worked at the Cherryvale location from 2002 through 2005, it was my understanding that Alderwoods Group, Inc. owned and operated Potts Chapel, including the Cherryvale location where I worked.

5.      As the hostess at this location for Alderwoods, I would work approximately 20 hours each week. I never worked more than 8 hours in any one day, or 40 hours in any one week.

6.      I was never required to, nor did I ever, perform removals of bodies.

2

7.      I was not involved in the selling of pre-needs policies, nor was I ever required to make pre-needs presentations or sell pre-needs policies.

8.      I was not required to participate in community organizations or perform community work as an employee of Alderwoods.  I never reported on my activities in the community to any Alderwoods managers, or completed a community service report form, nor was I ever required to do so.

9.      To the best of my knowledge, I never had an annual evaluation by my manager.

10.     I don't recall a specific policy regarding meal breaks, however, when I was working I would always take about two hours for lunch.

11.     While working for Alderwoods at the Potts Chapel location in Cherryvale, I never received any training or was required to attend training sessions or meetings.

12.     I never heard of any programs entitled "Success Spotlight" or "I Believe In Service," nor was I required to participate in any such programs.

13.     I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked.  Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me.  I also was told that the employees who filed the lawsuit seek to have the class certified, and that the matter of class certification has not been ruled upon by the Court;

3

and that if the class is certified and assuming I am a member of the class, then the attorneys for Alderwoods Group, Inc. will be directly opposing my interest as a class member.

15.    Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions.  I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

16.    The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections.  The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  October 31, 2009

LOIS ALLEN

4

**TAB 2**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| WILLIAM HELM, et al.<br>On behalf of themselves and all employees<br>similarly situated,<br><br>　　　　　Plaintiffs,<br>　　vs.<br><br>ALDERWOODS GROUP, INC., et al.<br><br>　　　　　Defendants. | ) CASE NO.　3:08-CV-01184 SI<br>)<br>)<br>) **DECLARATION OF ELLAWAY D.**<br>) **AMIKER III**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

DECLARATION OF ELLAWAY AMIKER

I, Ellaway D. Amiker III, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.      My name is Ellaway D. Amiker III. I am a resident of Ellenwood, Georgia. I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.      All the statements in this Declaration are true and accurate. I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.      I am currently the general manager of Kennedy Memorial Gardens, a cemetery in Ellenwood, Georgia, owned and operated by Alderwoods Group, Inc. from approximately 2001 through 2006. Under Alderwoods' ownership, I was the general manager for Kennedy Memorial. Accordingly, I was familiar with Alderwoods' time keeping procedures and pay practices, and how they were implemented at this location.

4.      The staff of Kennedy Memorial consisted of five or six full-time hourly employees in the maintenance department, and one or two full-time hourly office workers in the cemetery office.

Overtime

5.      The maintenance department employees and office staff worked 40 hours each week. In addition, the maintenance staff would work anywhere from two to ten hours of overtime a week, depending upon how busy the cemetery was. I would generally ask the hourly employees to obtain pre-approval for overtime, but because of the nature of the work at the cemetery that would not always be possible. I never

2

instructed any hourly employee not to record their overtime.  The hourly employees were always paid for any overtime that they worked, even if they were not able to talk to me about it first.

6.      The office staff rarely worked overtime.

7.      No hourly maintenance or office employees at Kennedy Memorial received bonuses or commissions.  No employees were ever "on-call."

### After-Hours Removals

8.      None of the staff at Kennedy Memorial conducted after-hours removals.

### "Community Work Policy"

9.      The hourly employees were not required to be involved in community activities or organizations.  I conducted annual evaluations of the hourly employees.  I never discussed with them as part of their evaluation their participation in community activities or organizations.

### Pre-Need Sales

10.     The hourly maintenance staff and office employees were not required to participate in pre-need presentations or make pre-need sales.  Alderwoods had a separate staff of family service counselors who were responsible for pre-need sales and presentations.

### Training

11.     I would hold monthly staff meetings to discuss various administrative and training issues with the hourly employees.  These sessions were held during the day and all of the hourly employees were on-the-clock and paid for attending.

3

Meal Breaks

12.     Employees received a half-hour for lunch.  There were times, depending on how many burials were being conducted at the cemetery, when an hourly employee worked through their lunch break.  If they did so, they were paid for their time. Usually, however, the employee would simply take a later lunch.  I never told the employees to record a lunch break if they had not taken the break.

13.     I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked.  Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods.

14.     Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions.  I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

15.     The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections.  The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 13th, 2009

ELLAWAY D. AMIKER III

4

**TAB 3**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WILLIAM HELM, et al.
On behalf of themselves and all employees
similarly situated,

        Plaintiffs,

    vs.

ALDERWOODS GROUP, INC., et al.

        Defendants.

CASE NO.    3:08-CV-01184 SI

**DECLARATION OF GEORGE ANTON**

1

DECLARATION OF GEORGE ANTON:

I, George Anton, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.    My name is George Anton. I am a resident of Deerfield Beach, Florida. I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.    All the statements in this Declaration are true and accurate. I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.    I am currently an Assistant Support Staff employee for Kraeer Funeral Homes and Cremation Services. For approximately 21 years, from 1988 through December 2006, I worked at the Kraeer Cal-Crematory, intially as a support staff, and by 1990 as the Crematory Manager. I was Crematory Manager for the Kraeer Cal-Crematory during the time Alderwoods Group Inc. owned and operated the facility from 2002 through 2006.

4.    In my position as Crematory Manager for Alderwoods at the Kraeer Cal-Crematory, I was a salaried employee. I reported to Robert Russell, a Regional Manager. At the crematory, I had two and sometimes three hourly employees who reported directly to me. These individuals were crematory operators and assisted me with the operations at the crematory. Two of these employees were generally full-time and one part-time.

5.    In the course of my 18 years working as Crematory Manager at the Kraeer Cal-Crematory, I gained knowledge of Alderwoods' timekeeping policies and pay practices and how they were implemented at this location.

2

<u>After-Hours Removals</u>

6.      At Kraeer Cal-Crematory, we would sometimes perform removals. On occasion, these removals were after-hours. The hourly employees who assisted with removals were paid for their work by the hour. The hourly employees would be paid for overtime if they exceeded 40 hours of work in a given week.

7.      Hourly employees were not paid a "piece" rate for removals. From time to time, when needed, we would employ a third-party removal service to perform removals. Only the removal service was paid a "piece" rate for removals.

8.      I have no knowledge of a company-wide Alderwoods policy requiring hourly employees to perform after-hours work without pay. Employees were paid for all the time they worked, including any overtime work.

<u>Overtime</u>

9.      I am unaware of any Alderwoods policy that encouraged or required managers not to pay overtime that was not pre-approved. The hourly employees who reported to me at the Crematory were not required to obtain pre-approval for overtime worked during my tenure as Crematory Manager.

10.      In my experience, Alderwoods employees were always paid for the time they worked, including overtime. The hourly employees at the Crematory would record their time on time cards by punching in and punching out. All hourly employees were paid time-and-a-half for any overtime worked.

11.      I never encouraged, required, or requested any hourly employee at the Crematory to not record their time for hours worked, including overtime. Nor do I recall of any instance in which an hourly employee failed to record his or her overtime.

3

12.     My Regional Manager never encouraged, required, or requested me to have hourly employees not record their hours worked for overtime.

"Community Work Policy"

13.     I never saw or heard of an Alderwoods policy requiring employees to participate in any community organization. Nor was I aware of an Alderwoods policy that required employees to perform community work outside the regular work day without pay. No such policy was ever communicated to me during my employment with Alderwoods.

14.     Alderwoods employees were encouraged to be active in the community, but it was not mandatory. Employees at the Kraeer Cal-Crematory would participate in community work, including the annual Seafood Fest, Fishing Rodeo and other activities that raised money for charitable causes. No hourly employees were required to participate. If an hourly employee volunteered to participate in these community activities, they were paid their hourly rate, or overtime if over 40 hours in a week, for all hours while working at these events.

15.     I would perform evaluations of the hourly employees who reported to me approximately every two years. I did not discuss their involvement in community service as part of the evaluation. Community service was not on the written evaluation that I submitted to Alderwoods for each of my employees.

Pre-Needs Sales

16.     The Alderwoods funeral homes in my region of Florida had a separate sales staff that sold pre-needs insurance to families. Neither I nor any of my staff at the Crematory ever participated in pre-needs presentations or sales.

4

17.    I do recall that employees would get a referral fee from Alderwoods for any pre-needs referrals that they made to the pre-needs staff. Alderwoods, however, did not require any employees make referrals.

Meal Breaks

18.    Full-time staff were permitted a one hour meal break during their shift. On occasion, some of the Crematory staff would have to work during their scheduled meal break. Employees recorded their time if they did so and were paid for the time worked.

19.    Alderwoods did not require that employees deduct a full meal break from their work hours each day if that is not what they took. Generally, any employee at the Crematory whose lunch was interrupted for work would take their meal break later.

20.    I never encouraged, required, or requested any employee who worked for me at the Crematory not to record their time worked during a meal break.

Training

21.    As crematory operators, training was required for the hourly employees both initially when they were hired and periodically during their tenure with the Crematory. An Alderwoods employee, usually Paul Woods, would come to the Crematory and train the hourly employees on safety and data recording procedures.

22.    All training was done on the job, and the hourly employees would be paid for any hours spent in training. On occasion, an hourly employee may have to travel to a location where a training course was being provided. The employee was paid for all travel and time spent attending those training sessions.

23.    I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they

5

have not been properly paid for all time worked.  Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me.

   24. Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions.  I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

   25. The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections.  The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

  I declare under penalty of perjury that the foregoing is true and correct.

Dated: November _13_, 2009

GEORGE ANTON

6

**TAB 4**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WILLIAM HELM, et al.
On behalf of themselves and all employees
similarly situated,

       Plaintiffs,

  vs.

ALDERWOODS GROUP, INC., et al.

       Defendants.

CASE NO.   3:08-CV-01184 SI

**DECLARATION OF BEVERLY ARMS**

## DECLARATION OF BEVERLY ARMS

I, Beverly Arms, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.     My name is Beverly Arms.  I am a resident of Puyallup, Washington.  I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.     All the statements in this Declaration are true and accurate.  I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.     I worked part time at Powers Funeral Home ("Powers") in Puyallup, Washington for about eighteen months.  I started work at Powers in and around the year 2002.  Powers was owned by Alderwoods at the time.

4.     At Powers, I generally worked one to two evenings a week, for about two hours each evening.  My job was to oversee evening viewings, to respond to the needs of any guests during that time, and to lock up after the viewing.  I did not work directly with the deceased, nor was I ever asked to retrieve a deceased individual from an off-site location.

5.     I was never asked to participate in community organizations or perform community service by my manager at Powers.  Participation in community organizations was not a requirement for my position at Powers.  I never saw a "community work" policy when I worked at Powers.

6.     I was never asked to sell pre-need policies as part of my job at Powers.  My interaction with customers was generally restricted to assisting guests during viewings.  On a few occasions, I answered the telephone, but would refer business questions to a manager.

7.     As an hourly employee, I clocked in and out with a time card.  I was paid on an hourly basis.  I was never asked to not record time that I had worked.  I was always paid for the time that I worked, and I always recorded the time that I worked.

8.     I did not take meal breaks when I worked at Powers, because I usually did not work more than two to three hours at a time.  If I ate a snack while working at Powers, I did so while I was on the clock and being paid.

9.     I received no training for the work I performed at Powers.

10.     Before speaking with any attorney for Alderwoods, I was told that the employees who filed the lawsuit seek to have the class certified, and that the matter of class certification has not been ruled upon by the Court.  I was also told that if the class is certified and assuming I am a member of the class, then the attorneys for Alderwoods will be directly opposing my interest as a class member.

11.     I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked.  Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me.

12.     Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions.  I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

13.     The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections.  The attorney told me that I could refuse to sign the

Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  November 9, 2009

_BEVERLY E. ARMS_
BEVERLY ARMS

**TAB 5**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CASE NO.   3:08-CV-01184 SI

WILLIAM HELM, et al.
On behalf of themselves and all employees
similarly situated,

DECLARATION OF MARY AYLING

        Plaintiffs,

    vs.

ALDERWOODS GROUP, INC., et al.

      Defendants.

1

DECLARATION OF MARY AYLING

I, Mary Ayling, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1. My name is Mary Ayling. I am a resident of Brooklyn, New York. I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2. All the statements in this Declaration are true and accurate. I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3. I have worked for Cusimano and Russo Funeral Home in Brooklyn, New York for the past 5 years.

4. When I began working at Cusimano and Russo, the funeral home was owned and operated by Alderwoods Group, Inc. I began working as a part time receptionist, and have continued in that position to this day. I have always been an hourly employee at Cusimano and Russo. My job as assistant receptionist involves answering phones, greeting and meeting with families, and providing general support to the funeral director.

5. As a part-time employee, I would not work more than 8 hours in any one day, or more than 40 hours in any one week. If I ever did work more than those hours, it would be a very rare occasion.

2

6.     My time at Alderwoods was initially recorded on time sheets. At some point in 2004 or 2005, a time clock was installed and I recorded my time on time cards, which I used to punch in and punch out. Whether I recorded my time on a time sheet or a time card, I always recorded all of the hours I worked, including any overtime. To the best of my knowledge, I was always paid for all of the time that I worked.

7.     I never had to get prior approval for any overtime, nor did Alderwoods fail to pay me for any overtime I worked which was not pre-approved.

8.     None of my managers, or any other employee at Alderwoods, ever encouraged, required, or requested me not to record my time, including overtime.

9.     During the time I worked for Alderwoods at Cusimano and Russo Funeral Home, I was never required to be on-call. On occasion, if another employee could not make it into work, the funeral home would call me to see if I was available to work that day. If I had time to help out, I would come in to work, and was paid for the time that I worked.

10.     I was never required to, nor did I ever, perform removals of bodies. To the best of my knowledge, the funeral home used a third party removal service to perform removals.

11.     I was not involved in the selling of pre-needs policies, nor was I ever required to make pre-needs presentations or sell pre-needs policies. To the best of my knowledge, this function was done by the manager and funeral director.

3

12.     I was not required to participate in community organizations or perform community work as an employee of Alderwoods.

13.     To the best of my knowledge, I never had a formal, annual evaluation.

14.     Alderwoods permitted a 30 minute lunch break every day. If I worked more than six hours in a day, I would take a lunch break. On occasion, my meal break would be interrupted because of work. I was always paid for any time that I worked through my lunch break. None of my managers or other Alderwoods employees ever encouraged, required, or requested me not to record my time that I worked through a meal break.

15.     No one at Alderwoods ever encouraged, required, or requested me to perform work but not record the hours that I worked.

16.     While at Cusimano and Russo during the time Alderwoods operated the funeral home, we would have meetings or training sessions periodically. I would do any training on the job, and was paid for the time I spent in training. Whenever we had meetings, we would always be on the clock and record our time spent at both meetings and training.

17.     I never heard of any programs entitled "Success Spotlight" or "I Believe In Service," nor was I required to participate in any such programs.

18.     I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they

4

have not been properly paid for all time worked. Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me. I also was told that the employees who filed the lawsuit seek to have the class certified, and that the matter of class certification has not been ruled upon by the Court; and that if the class is certified and assuming I am a member of the class, then the attorneys for Alderwoods Group, Inc. will be directly opposing my interest as a class member.

19.    Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions. I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

20.    The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections. The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 12, 2009

MARY AYLING

5

**TAB 6**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WILLIAM HELM, et al.
On behalf of themselves and all employees
similarly situated,

        Plaintiffs,

  vs.

ALDERWOODS GROUP, INC., et al.

        Defendants.

CASE NO.   3:08-CV-01184 SI

**DECLARATION OF WILLIAM BAIRD**

# DECLARATION OF WILLIAM BAIRD

I, William Baird, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.  My name is William Baird.  I am a resident of Slidell, Louisiana.  I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.  All the statements in this Declaration are true and accurate.  I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.  I am currently a funeral director at Tharp-Sontheimer-Tharp Funeral Home in Metairie, Louisiana.  I have worked at several locations in the organization since 1982, both as a manager and an hourly employee.  I was an hourly funeral director at Tharp-Sontheimer-Tharp in 2006, when the funeral home was owned by Alderwoods.

4.  As a funeral director, I worked about 45 hours a week.  This consisted of meeting families and arranging funerals.

Overtime

5.  Pre-approval was not required for overtime.  If a family came in late or a funeral service or visitation was scheduled late, I worked that time.  I was never told to not record overtime that I had worked, and I was always paid for the overtime that I worked.

6.  We were paid time and a half for overtime.  I did not receive a commission or bonus from Alderwoods as an hourly funeral director.

### After-Hours Work

7.     No one at the funeral home performed removals.  Removals were performed by a central location in the New Orleans area for all Alderwoods locations in the region.

### Pre-Need Sales

8.     Before Alderwoods, funeral directors sold pre-need policies under an industrial insurance license held by the funeral home.  However, Alderwoods sold pre-need policies though a pre-need sales staff.  Under Alderwoods, hourly employees were not required to sell pre-need policies.

### Meal Breaks

9.     I was paid for any time that I worked during my lunch break.  I was not required to deduct a lunch break from my time if I was unable to take my lunch break.  Nor am I aware of anyone else who was required to deduct a lunch break they did not take from their time.  I was never told that I should punch out for a lunch break even if I was not going to take a lunch break.

### Training

10.     Alderwoods offered courses to satisfy the continuing education requirement for funeral directors in Louisiana.  These courses were free of charge, and we were paid for our time when we attended these courses.  If we attended a non-Alderwoods course, we were not paid for the time we attended the training.

11.     Before speaking with any attorney for Alderwoods, I was told that the employees who filed the lawsuit seek to have the class certified, and that the matter of class certification has not been ruled upon by the Court.  I was also told that if the class is certified and assuming I am a

member of the class, then the attorneys for Alderwoods will be directly opposing my interest as a class member.

12.    I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked.  Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me.

13.    Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions.  I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

14.    The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections.  The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.


Dated: November _10_, 2009                     _William Barr_
                                                WILLIAM BAIRD

**TAB 7**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WILLIAM HELM, et al.
On behalf of themselves and all employees
similarly situated,

        Plaintiffs,

  vs.

ALDERWOODS GROUP, INC., et al.

        Defendants.

CASE NO. 3:08-CV-01184 SI

DECLARATION OF CONSTANCE
BALLARD

## DECLARATION OF CONSTANCE BALLARD

I, Constance Ballard, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.    My name is Constance Ballard. I am a resident of Cameron Park, California. I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.    All the statements in this Declaration are true and accurate. I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.    I currently work at Chapel of the Pines Funeral Home. Under Alderwoods, I worked at Memory Chapel. I began working there in June 2004.

4.    At Memory Chapel, I was an office manager. I was a full-time, hourly employee. I took care of accounts payable, contracts, answering the telephone, and assisting the funeral directors.

Overtime

5.    I rarely worked overtime. I would do so only if something came up in the office that had to be completed before the next work day.

6.    At Memory Chapel, there was a time clock in which we punched our time cards. However, because the location was so small, we stopped using the time clock and just submitted time sheets with our time.

7.    Time sheets were submitted to a funeral director, Scott Layton, who handled

payroll. We were paid time and a half for overtime.

8.    I did not receive any bonuses or commissions.

9.    I was always paid for the overtime I worked. I was always able to get approval from my manager before I worked overtime. I was never asked to not record time as overtime.

After-Hours Removals

10.    After-hours removals were paid $50 per removal. The employees who worked on after-hours removals generally made $10 or $11 an hour. Generally, a removal took between an hour and two hours. Only part-time employees worked on after-hours removals.

"Community Work Policy"

11.    I was not encouraged or required to participate in any community organizations.

12.    There was no incentive program to encourage employees to participate in community activities or organizations.

13.    I only received an evaluation from my supervisor in my first year at Memory Chapel. I do not recall being asked about community service.

Training

14.    I did not receive any training at Alderwoods. Any training on office procedures or systems was on-the-job training.

Meal Breaks

15.    Lunch break was either an hour or a half-hour, depending on when you came into

work that day.  I was never required to work through a lunch break.  If I did so, it was because I chose to do so.  I was not required to punch out or record a lunch that I did not take.

16.    Before speaking with any attorney for Alderwoods, I was told that the employees who filed the lawsuit seek to have the class certified, and that the matter of class certification has not been ruled upon by the Court.  I was also told that if the class is certified and assuming I am a member of the class, then the attorneys for Alderwoods will be directly opposing my interest as a class member.

17.    I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked.  Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me.

18.    Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions.  I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

19.    The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections.  The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: November _9_, 2009

*Constance Ballard*

CONSTANCE BALLARD

**TAB 8**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| WILLIAM HELM, et al. On behalf of themselves and all employees similarly situated,<br><br>        Plaintiffs,<br><br>    vs.<br><br>ALDERWOODS GROUP, INC., et al.<br><br>        Defendants. | CASE NO.    3:08-CV-01184 SI<br><br>**DECLARATION OF KAREN BOLLINGER** |

## <u>DECLARATION OF KAREN BOLLINGER</u>

I, Karen Bollinger, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

     1.     My name is Karen Bollinger. I am a resident of San Diego, California. I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

     2.     All the statements in this Declaration are true and accurate. I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

     3.     I currently work at Humphrey Mortuary, which used to be an Alderwoods location. I began working there in March 2005 as a family service counselor. As a family service counselor, I took care of families' pre-need arrangements. In addition to scheduled calls at the funeral home, I had appointments in the field and conducted some cold-calling of care centers and facilities to set up appointments for pre-need presentations.

     4.     As a family service counselor for Alderwoods, I was paid both hourly and by commission. In addition to my hourly pay, I would make a commission on pre-need sales. The net commission I received was calculated by subtracting my hourly pay from my gross commission. My goal is always to make money from commissions, not wages alone. There have been only a few weeks in which I was paid hourly, without commission. I generally worked about 40 hours a week for Alderwoods.

Overtime

     5.     I was paid overtime when I worked more than 8 hours a day or 40 hours in a week. When I was paid overtime, my base pay and the overtime was substituted for commissions, if the

hourly pay was greater than the commission. I do not recall ever having to obtain approval from a supervisor before working overtime.

6.  I was never told not to record my time. Rather, I always recorded my time.

After-Hours Work

7.  I occasionally did work after-hours with pre-need sales, but did not make cold-calls after-hours. I never performed after-hours removals.

"Community Work Policy"

8.  I was encouraged to participate in community activities, like breakfasts and lunches, but I always had too many appointments and was generally too busy to get involved in community organizations. I was paid for the breakfasts and lunches I attended, and I recorded the time I spent at these activities on my time sheet. Community service was not a requirement of my position.

Training

9.  I received training in pre-need sales when I started at the funeral home. My first week consisted of training by my manager and learning about contracts, policies and procedures. The next two to three weeks I shadowed another family service counselor. I was paid hourly for this time.

10.  I also attended office safety training and training on Alderwoods policies. These sessions were held during regular business hours. I recorded my time for these training sessions, but was probably earning commissions at that time. I had no after-hours training.

<u>Meal Breaks</u>

11.    My lunch break was 30 minutes, but I did not take it on a set schedule.  If I did not take a lunch break, it was of my own choosing.  I was never told to record a lunch break that I had not taken.

12.    Before speaking with any attorney for Alderwoods, I was told that the employees who filed the lawsuit seek to have the class certified, and that the matter of class certification has not been ruled upon by the Court.  I was also told that if the class is certified and assuming I am a member of the class, then the attorneys for Alderwoods will be directly opposing my interest as a class member.

13.    I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked.  Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me.

14.    Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions.  I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

15.    The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections.  The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.


Dated:  November __5__, 2009

_Karen Bollinger_
KAREN BOLLINGER

**TAB 9**

1                UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3

4  WILLIAM HELM, et al.

5  On behalf of themselves and all employees
     similarly situated,

6

7            Plaintiffs,

         vs.

8  ALDERWOODS GROUP, INC., et al.

9

10          Defendants.

CASE NO.    3:08-CV-01184 SI

**DECLARATION OF WALDO CAIN**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

DECLARATION OF WALDO CAIN

I, Waldo Cain, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.    My name is Waldo Cain. I am a resident of Independence, Kansas. I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.    All the statements in this Declaration are true and accurate. I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.    I have worked for Potts Chapel in Independence, Kansas for 24 years, from 1985 through present.

4.    From 2002 through 2006, during the time Alderwoods owned and operated Potts Chapel, I was a part-time hourly employee. I worked as a funeral attendant. My job involved assisting with funerals, providing support to the funeral director, working at visitations, and helping to clean up after services at the funeral home. I also performed removals when necessary.

5.    During the 2002 through 2006 time period, I never worked overtime, nor was I aware of any overtime policies.

6.    To the best of my recollection, I did not work more than 8 hours in any one day, or 40 hours in any one week during the time Alderwoods operated Potts Chapel. Generally, I would be asked to work whenever there was a funeral or body to be picked up and brought back to the funeral home. On average, there were only about 150 funerals a year at the two Potts Chapel

2

locations in Independence and Cherryvale. There were four other part-time employees who assisted the funeral director, and I don't recall any of those individuals working overtime.

7. Before Alderwoods assumed ownership, hourly employees like me recorded our time on time sheets. When Alderwoods assumed ownership, a time clock was installed and hourly employees had to record their time by punching in and punching out.

8. I always recorded all the time that I worked for Alderwoods by punching my time card. Generally, I would work approximately 20 hours each month. On rare occasions, I would work 30 or 40 hours in a month.

9. I was paid for every hour that I worked for Alderwoods. On one occasion, a secretary made an error on the hours that I worked, but when I brought the error to the attention of management, it was corrected and I was paid for the actual hours that I worked.

10. None of my managers, or any other employee at Alderwoods, ever encouraged, required, or requested me not to record the time that I worked. I never heard of anyone at Potts Chapel request hourly employees not to record the time they worked, including overtime.

11. On occasion, I also performed removals of bodies from homes, hospitals and other locations back to the funeral home. I was paid hourly for each removal, and would record my time spent on a removal by punching in and punching out.

12. I was not involved in the selling of pre-needs policies, nor was I ever required to make pre-needs presentations or sell pre-needs policies.

3

13.     I was not required to participate in community organizations or perform community work as an employee of Alderwoods. I was a member of both the Lions and Masons, but I did not represent Potts Chapel or Alderwoods when I attended functions held by these organizations. I joined these groups voluntarily and would have done so regardless of my work at Potts Chapel. I never reported on my activities in the community to any Alderwoods managers, or completed a community service report form, nor was I ever required to do so.

14.     On occasion I would work through the lunch hour. When I did so, I would stay "on the clock" and not punch out so I would be paid for the time I worked through lunch. If I missed lunch, I would take my lunch break later that day.

15.     No one at Alderwoods ever encouraged, required, or requested me to perform work but not record the hours that I worked.

16.     While at Potts Chapel during the time Alderwoods operated the funeral homes, I had limited training. I recall an orientation meeting held by Alderwoods management at our location shortly after Alderwoods assumed ownership. The orientation was held during normal working hours, and the hourly employees recorded the time spent at that meeting by punching the time clock.

17.     I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked. Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me. I also was told that the employees who filed the lawsuit seek to have the class certified, and that the matter of class certification has not been ruled upon by the Court; and that if the class is certified and assuming I

4

am a member of the class, then the attorneys for Alderwoods Group, Inc. will be directly opposing my interest as a class member.

18.     Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions.  I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

19.     The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections.  The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  October 29, 2009

WALDO CAIN

**TAB 10**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CASE NO.   3:08-CV-01184 SI

WILLIAM HELM, et al.
On behalf of themselves and all employees
similarly situated,

       Plaintiffs,

  vs.

ALDERWOODS GROUP, INC., et al.

       Defendants.

**DECLARATION OF WILLIAM CLARK**

# DECLARATION OF WILLIAM CLARK

I, William Clark, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.      My name is William Clark. I am a resident of Madison, Mississippi. I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.      All the statements in this Declaration are true and accurate. I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.      I am currently the manager of the Baldwin-Lee Funeral Home, with locations in Jackson and Pearl, Mississippi. I took over day to day management of Baldwin-Lee in 2005, when it was an Alderwoods location.

Overtime

4.      No pre-approval was required for overtime. Usually, there were only two funeral directors at each location, and therefore I generally knew what each employee was doing. Also, the directors had an on-call schedule. We were generally under-budget on overtime, so pre-approval was not a concern.

5.      I never told any employee not to record overtime, or to record overtime as regular time. I instructed my employees to always put down any time they worked. Time was recorded on a time clock, so if an employee was working late, they simply did not punch out.

After-Hours Work

6.      After-hours removals were handled through our sister location, the Wright &

Ferguson Funeral Home, also in Jackson, Mississippi. Funeral directors remained on-call, however, for residence removals, which always required two employees. The funeral director on-call was on the clock, at the funeral home, until 9 p.m. Often, there would be visitations during that time. After 9 p.m., the funeral director could leave the funeral home, but remained on-call. If called out for a removal, the funeral director was paid hourly from the time he or she left for the removal until the time they returned.

"Community Work Policy"

7.     I encouraged the funeral directors to join a community organization, like Lions Club or Rotary, but I never made this mandatory. Other employees were not encouraged or discouraged from participating in community activities. We never used any incentive programs at the funeral home to encourage employees to participate in community service. I have never heard of a program called "I Believe in Service."

8.     The funeral home paid for dues and fees for community activities. If an activity carried over into the evening, the employee would continue to be paid for his time. Most of the community groups, like Lions Club and Rotary, met during business hours.

9.     I did not consider community service in my evaluations of employees.

Pre-Need Sales

10.     We had pre-need counselors who sold pre-need insurance policies. Only the pre-need counselors sold these policies. Our office manager had a pre-need insurance license, but she was not active in sales. Alderwoods paid all the licensing fees for the sales personnel. Only pre-need counselors were required to obtain an insurance license. The sales staff was paid a

combination of an hourly wage and commissions.   They were paid overtime if they accrued sufficient hours during the week.

Training

11.   There was a training period for new employees.   This training occurred during normal work hours and was paid.

Meal Breaks

12.   Lunch breaks lasted 30 minutes.   There were times when a funeral director or other employee might have to work through a scheduled break.   If they did so, they were compensated for the time that they worked.

13.   I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked.   Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me.

14.   Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions.   I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

15.   The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections.   The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 6, 2009

WILLIAM CLARK

**TAB 11**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WILLIAM HELM, et al.
On behalf of themselves and all employees
similarly situated,

        Plaintiffs,

   vs.

ALDERWOODS GROUP, INC., et al.

       Defendants.

CASE NO.   3:08-CV-01184 SI

**DECLARATION OF CHAD CLISBY**

## DECLARATION OF CHAD CLISBY

I, Chad Clisby, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.      My name is Chad Clisby. I am a resident of Houston, Texas. I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.      All the statements in this Declaration are true and accurate. I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.      I am currently the manager of Memorial Oaks Funeral Home in Houston, Texas. I previously was the location manager of Earthman Funeral Directors-Hunters Creek in Houston, Texas. This was an Alderwoods location when I was hired as location manager. I worked at Hunters Creek from August 2005 until 2008. I was a salaried employee throughout this period.

4.      Hunters Creek consisted of 3 to 4 full-time employees, including funeral directors and the office manager. There were also several part-time employees. As a location manager, I reviewed the employees' time cards at the end of the pay cycle (I do not remember if this was at the end of every week or every other week). I never altered the time entered by the employee. Occasionally, with the employee, we would correct errors in the time recorded (for example, if the employee had failed to punch in one day).

Overtime

5.      My employees at Hunters Creek worked overtime on a number of occasions, such as if there was a large visitation that was running late, or if work needed to be performed on a weekend. I do not specifically recall a "pre-approval" policy for overtime. I set schedules for

employees' overtime, so that I could manage the overtime that they worked. Generally, therefore, I knew ahead of time who would be working overtime. However, when I was out of the office, the employees would work overtime without first consulting with me. They were paid for the overtime that they worked, even though they had not gotten pre-approval of the overtime.

6. I never told employees not to record overtime that they had worked, or to record it as regular time. Employees were always fully paid for the overtime that they worked. Overtime was paid at time and a half.

7. Other than pre-need sales staff, the hourly employees at the funeral home were not paid bonuses or commissions. I am not sure how the pre-need sales staff was paid, as they did not directly report to me.

After-Hours Work

8. After-hours removals were handled by a 24-hour Care Center, which was a central location for the Houston funeral homes. That location took care of all transportation, delivery, and embalming of the deceased. Accordingly, the funeral directors at Hunters Creek did not perform after-hours removals.

9. Nor were the funeral directors or any other employee at Hunters Creek on-call for after-hours business calls. There was an answering service at the central Care Center that took care of after-hours calls. In the rare circumstance that a call came in that the Care Center could not handle, they called me directly.

"Community Work Policy"

10. I did encourage the hourly employees to be involved in the community. However,

I do not recall any of my employees at Hunters Creek becoming involved in community activities or organizations. They were not required to participate in community activities and there were no incentive programs to encourage their participation in such activities or organizations. For example, I do not recall ever hearing about a Community Leadership Program, or an Influencer Program, or a program called "I Believe in Service." I do not recall any forms on which employees reported their community service to me or Alderwoods.

11.    I did not consider community involvement when evaluating employees. I focused on client satisfaction and other operating metrics.

Pre-Need Sales

12.    Other than the dedicated pre-need sales staff, no other employees were encouraged or required to sell pre-need policies. Funeral directors were responsible only for funeral services and at-need business. They did not sell pre-need policies. I do not recall that any of the funeral directors or other employees sought to obtain a license to sell pre-need insurance when I was manager.

Training

13.    Funeral directors in Texas are required to take 16 hours of continuing education credits every two years. This requirement only applied to funeral directors. Alderwoods paid for all courses and credits required for the funeral directors to maintain their licenses. The funeral directors were paid for their time to attend these courses, even if they were after-hours.

Meal Breaks

14.    Employees were given an hour for lunch break. On occasion, they might work

through some or all of their lunch break. Typically, they would just take a later break. If the employee did not take a full lunch break, or if they did not take a lunch break at all, the employee was paid for the time that he or she worked. Employees were not required or instructed to record a lunch break that they had not taken.

15.     I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked. Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me.

16.     Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions. I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

17.     The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections. The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.


Dated: November 13, 2009                         _____
                                                 CHAD CLISBY

**TAB 12**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WILLIAM HELM, et al.
On behalf of themselves and all employees
similarly situated,

      Plaintiffs,

    vs.

ALDERWOODS GROUP, INC., et al.

      Defendants.

)
)
)
)
)
)
)
)
)
)
)

CASE NO.   3:08-CV-01184 SI

DECLARATION OF DONALD CRIPS

*CRisP*

DECLARATION OF DONALD CRISP

I, Donald Crisp, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.   My name is Donald Crisp. I am a resident of Wichita, Kansas. I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.   All the statements in this Declaration are true and accurate. I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.   I am currently a Funeral Director at Hillside Funeral Home in Wichita, Kansas. I began working at Hillside in September 2004 as a full time funeral director. At the time I was hired to work at Hillside, it is my understanding that Acacia was owned and operated by Alderwoods Group, Inc.

4.   As a funeral director, I performed a variety tasks including meeting with families, preparing for funerals, and performing removals

5.   As a funeral director at Hillside for Alderwoods from September 2004 through December of 2006, I was always an hourly, full time employee working 40 or more hours each week.

6.   I was always paid time-and-a-half for any overtime I ever worked. My time was recorded on time cards, which I used to punch in and punch out.

7.   Alderwoods paid me for all the overtime I worked. I don't recall any policy which required my overtime to be pre-approved, nor do I recall ever having my overtime not approved.

2

8. None of my managers, or any other employee at Alderwoods, ever encouraged, required, or requested me not to record my overtime.

9. No one at Alderwoods ever encouraged, required, or requested me to perform work but not record the time that I worked. I always recorded the time that I worked, including overtime.

10. As a funeral director, I would be "on call" approximately three nights a week. My "on call" duties consisted of performing removals of bodies from various locations to the funeral home or answering after-hours calls to the funeral home.

11. For removals, I would be paid hourly and record my time from the time I received the call at home until I returned home. I was not paid a "piece rate" for removals.

12. Answering phones while "on call" consisted of speaking with families or others who called the funeral home after hours. Each on call employee would use a phone log to record their time. For any call that lasted 15 minutes or less, I was paid for 15 minutes. If a call lasted more than 15 minutes, then I was paid for each minute the call lasted.

13. I was not involved in the selling of pre-need policies, nor was I ever required to obtain a pre-need insurance license, make pre-need presentations or sell pre-need policies. Alderwoods used family service counselors exclusively to sell pre-need policies and make presentations.

14. I never heard of something at Alderwoods called the "Community Leadership Program," or "Influencer Program." I never heard of "I Believe In Service" or "Success Spotlight." I was not required to participate in community organizations or perform community work as an employee of Alderwoods. I never reported on my

3

1   activities with any organizations to any Alderwoods managers, or completed a community

2   service report form, nor was I ever required to do so.

3

4          15.    I had an annual evaluation while working for Hillside when it was

5   operated by Alderwoods. No one ever evaluated me on my participation in community

6   service, or the amount of overtime I recorded.

7          16.    Alderwoods permitted a 30 minute to an hour meal break every day.

8   I would always take the full 30 minutes, unless I had to work through lunch or my meal

9   break was interrupted by work. On any occasion that my meal break would be interrupted

10   because of work, I would be paid for working through my break. I would also take my

11   meal break later that day. None of my managers or other Alderwoods employees ever

12   encouraged, required, or requested me not to record my time that I worked through a

13   meal break.

14          17.    As a funeral director I was required by the state to complete 12 hours

15   of continuing education every two years. I would complete these courses while on the

16   clock and be paid for my time spent attending courses. I don't recall any other mandatory

17   training.

18

19          18.    I understand that this Declaration is being provided voluntarily in a

20   lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they

21   have not been properly paid for all time worked. Before speaking with any attorney for

22   Alderwoods, I was told that the attorney represents Alderwoods and does not represent

23   me. I also was told that the employees who filed the lawsuit seek to have the class

24   certified, and that the matter of class certification has not been ruled upon by the Court;

25   and that if the class is certified and assuming I am a member of the class, then the

26   attorneys for Alderwoods Group, Inc. will be directly opposing my interest as a class

27   member.

28

4

19.     Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions. I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

20.     The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections. The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: November _12_, 2009

DONALD CRISP

5

**TAB 13**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WILLIAM HELM, et al.
On behalf of themselves and all employees
similarly situated,

        Plaintiffs,

   vs.

ALDERWOODS GROUP, INC., et al.

        Defendants.

CASE NO.   3:08-CV-01184 SI

DECLARATION OF PATRICK CROWE

1

DECLARATION OF PATRICK CROWE:

I, Patrick Crowe, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.    My name is Patrick Crowe. I am a resident of Levittown, New York. I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.    All the statements in this Declaration are true and accurate. I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.    I am the General Manager of the Vernon C. Wagner Funeral Homes located in Hickstown *Hicksville* and Plainview, New York. I have worked for the Wagner Funeral Homes since the 1980s, including the time period 2002 through 2006 when Alderwoods Group, Inc. owned and operated Wagner Funeral Homes.

4.    In my position as General Manager for Alderwoods at the Wagner Funeral Homes, I was a salaried employee. From 2002 through 2006, I had approximately six full-time and ten part-time hourly employees working at the two Wagner Funeral Homes locations who reported directly to me. These individuals included approximately four full-time funeral directors, one full-time administrative assistant, one full-time support staff, and ten part-time funeral support staff.

5.    In the course of my more than 20 years working at Wagner Funeral Homes, including as General Manager while Alderwoods operated it, I gained knowledge of Alderwoods' timekeeping policies and pay practices and how they were implemented at this location.

2

After-Hours Removals

6.      From 2002 through 2006 at Wagner Funeral Homes, removals were performed by both funeral directors and a third-party removal service. Funeral directors or other hourly employees who performed removals would be paid by the hour, including any overtime, and be required to record their time for a removal by punching their time card on the time clock.

7.      From November 2001 through October 2004, the hourly employees operated under a collective bargaining agreement which governed "on-call" procedures, including the manner in which hourly employees would be compensated for after-hours removals. The collective bargaining agreement included provisions regarding wages, hours, and meal breaks, as well as a grievance and arbitration provision. All grievances, including those related to the wage and hour provisions included in the collective bargaining agreement, were required to be submitted to binding arbitration. If not submitted in accordance with the terms of the collective bargaining agreement, the agreement precluded a covered hourly employee to pursue the grievance in any other forum.

8.      Hourly employees were not paid a "piece" rate for removals.

9.      I have no knowledge of a company-wide Alderwoods policy requiring hourly employees to perform after-hours work without pay. Employees were paid for all the time they worked, including any overtime work. No hourly employees were required to work prior to clocking in, or after clocking out, nor am I aware of any Alderwoods policy requiring hourly employees to do so.

Overtime

10.     I am unaware of any Alderwoods policy that encouraged or required managers not to pay overtime that was not pre-approved. The hourly

3

employees who reported to me at the Wagner Funeral Homes were not required to obtain pre-approval for overtime worked. I am not aware of any hourly employee who worked overtime and was not paid for that overtime.

11.   In my experience, Alderwoods employees were always paid for the time they worked, including overtime. The hourly employees at the Wagner Funeral Homes would record their time on time cards by punching in and punching out. All hourly employees were paid time-and-a-half for any overtime worked.

12.   I never encouraged, required, or requested any hourly employee at the Wagner Funeral Homes to not record their time for hours worked, including overtime. Nor do I recall of any instance in which an hourly employee failed to record his or her overtime.

13.   My Regional Manager never encouraged, required, or requested me to have hourly employees not record their hours worked for overtime.

14.   During the time Wagner Funeral Homes operated under a collective bargaining agreement, from November 2001 through October 2004, I was the only person who took after-hours phone calls. After the collective bargaining agreement expired, both the funeral directors and I would take the after-hours phone calls. Answering phones while "on call" consisted of speaking with families or others who called the funeral home after hours. For any call that lasted 15 minutes or less, the funeral directors were paid for 15 minutes of overtime. If a call lasted more than 15 minutes, then the funeral director was paid for each minute the call lasted.

15.   None of the hourly employees were paid bonuses or commissions.

"Community Work Policy"

4

16.     I never saw or heard of an Alderwoods policy requiring employees to participate in any community organization.  Nor was I aware of an Alderwoods policy that required employees to perform community work outside the regular work day without pay.  No such policy was ever communicated to me during my employment with Alderwoods.

17.     I would perform evaluations of the hourly employees who reported to me approximately every year.  I used an Alderwoods form to record the evaluation.  I did not discuss their involvement in community service as part of the evaluation, nor do I recall seeing any place on the Alderwoods form that included the topic of community service.  Accordingly, I did not include community service on the written evaluation that I submitted to Alderwoods for each of my employees.

Pre-Need Sales

18.     Funeral directors provided the pre-need sales and presentations at Wagner Funeral Homes.  No other hourly employees participated in pre-need sales.  Funeral directors would be on the clock for any time they worked on pre-need sales or presentations.  I am not aware of any funeral director not recording their time while involved in selling pre-need funeral arrangements or making presentations to customers.  Nor am I aware of any Alderwoods policy requiring funeral directors to work "off the clock" on pre-need sales or meetings.

Meal Breaks

19.     The hourly employees at Wagner Funeral Homes were permitted a half hour meal break for lunch and two fifteen minute breaks during the day.  On occasion, some of the staff would have to work during their scheduled meal break.  Employees recorded their time if they did so and were paid for the time worked.

5

20. Alderwoods did not require that employees deduct a full meal break from their work hours each day if that is not what they took. Generally, any employee at the Wagner Funeral Homes whose lunch was interrupted for work would take their meal break later.

21. I never encouraged, required, or requested any employee who worked for me at the Wagner Funeral Homes not to record their time worked during a meal break.

Training

22. The hourly employees would have to attend training sessions or meetings periodically. These meetings were always held during the business day, and the hourly employees would be paid for any hours spent in training.

23. I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked. Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me.

24. Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions. I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

25. The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections. The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

.

6

1   I declare under penalty of perjury that the foregoing is true and correct.

2   Dated: November ___, 2009

4                                              PATRICK CROWE

**TAB 14**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WILLIAM HELM, et al.
On behalf of themselves and all employees
similarly situated,

        Plaintiffs,

    vs.

ALDERWOODS GROUP, INC., et al.

        Defendants.

CASE NO.   3:08-CV-01184 SI

**DECLARATION OF BRIAN CURNOW**

# **DECLARATION OF BRIAN CURNOW**

I, Brian Curnow, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.      My name is Brian Curnow.  I am a resident of Sammamish, Washington.  I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.      All the statements in this Declaration are true and accurate.  I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.      I am currently the owner and manager of Curnow Funeral Home and Cremation Service, with locations in Bellevue and Sumner, Washington.  Prior to this, I worked at Mills & Mills Funeral Home and Park in Olympia, Washington and Powers Funeral Home in Puyallup, Washington in various roles between 1989 and 2002.  Both locations became Alderwoods locations in 2002.

4.      From August 2001 to June 2002, I was the market manager for the Seattle Region. In June 2002, I became General Manager of Powers.  These were salaried positions.  In December 2002, I left Alderwoods and started my own funeral home.

5.      In the course of time with Alderwoods as a market manager and at Powers, I gained knowledge of Alderwoods' timekeeping policies and pay practices and how they were implemented at these locations.

After-Hours Removals

6.      When I worked at Mills & Mills, funeral directors were rarely required to perform after-hours removals.  Part-time staff performed most removals after-hours.  Funeral directors were

"on-call" one night a week should part-time staff require assistance.

7.     When I left Mills & Mills, employees were paid the greater of the piece rate of $50 per removal and their hourly rate for three hours per removal.  The piece rate was generally more than the employee would make hourly, even on overtime.  Removals generally took about two hours, depending on the location of the removal.

8.     Powers handled after-hours removals differently from Mills & Mills.  Powers contracted out to a third-party removal service to conduct after-hours removals.  Therefore, Powers' staff did not perform after-hours removals.

9.     I have no knowledge of a company-wide Alderwoods policy requiring hourly employees to perform after-hours work without pay.  Employees were paid for all the time they worked, including any overtime work.

Overtime

10.     I am unaware of a company-wide Alderwoods policy that stated that employees would not be paid if overtime was not pre-approved.  Towards the end of my time with Alderwoods, it issued a policy requiring pre-approval for overtime, but it did not specify that employees were not to be paid for time worked.  Instead, it meant that employees should notify their managers ahead of time if they were to work over-time.  However, employees at Powers generally were not required to obtain pre-approval for overtime worked during my tenure at these locations.

11.     In my experience, Alderwoods employees were always paid for the time they worked, including overtime.  As a manager, I monitored time cards submitted by the employees,

and if an employee was working too much overtime, I would adjust his schedule.   I never instructed an employee to not record overtime.

12.   Only sales staff and funeral directors earned commissions.

"Community Work Policy"

13.   I never saw or heard of a company-wide policy requiring employees to participate in any community organization.   Nor was I aware of a company-wide policy that required employees to perform community work outside the regular work day without pay.   No such policy was ever communicated to me during my employment with Alderwoods.

14.   Alderwoods employees were encouraged to be active in the community, but it was not mandatory.   There were funeral directors who did not participate in any community organizations.

15.   During evaluations of funeral directors, I would occasionally discuss community service.   However, my priority was the employee's job performance.   Community service was not on the written evaluation that was submitted to Alderwoods for each employee.   I did not discuss community service when evaluating other employees.

Pre-Need Sales

16.   Both Alderwoods funeral homes and cemeteries in my region of Washington had a separate sales staff that sold pre-need insurance to families.   Funeral directors and other funeral home and cemetery staff did not sell pre-need policies.

17.   Alderwoods did not require that sales staff become licensed to sell pre-need insurance.   No license was required to sell cemetery pre-need policies or to sell funeral trust

policies.   A state license was required to sell pre-need funeral insurance policies.   It is my understanding that sales employees who took the insurance classes to become licensed were reimbursed for their classes.

18.     Sales staff were paid overtime for pre-need calls if they exceeded 40 hours in a work week.   In Washington, sales staff were paid either their hourly wage or their commission, depending on which was greater.

Meal Breaks

20.     Full-time staff were permitted a meal break during their shift.   On occasion, some staff would choose to work during their scheduled meal break.   Employees recorded their time if they did so and were paid for the time worked.   Generally, only funeral directors would work through a lunch.   Other funeral home staff took lunch breaks on a rotational basis and rarely had to work during lunch.   Alderwoods did not require that employees deduct a full meal break from their work hours each day if that is not what they took.

21.     I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked.   Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me.

22.     Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions.   I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

23.     The attorney for Alderwoods provided me with an opportunity to review the

Declaration and to make any corrections.  The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: November _3_, 2009

_____
BRIAN CURNOW

**TAB 15**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WILLIAM HELM, et al.
On behalf of themselves and all employees
similarly situated,

   Plaintiffs,

  vs.

ALDERWOODS GROUP, INC., et al.

   Defendants.

CASE NO. 3:08-CV-01184 SI

**DECLARATION OF DANIEL D'ANDREA**

1

DECLARATION OF DANIEL D'ANDREA:

I, Daniel D'Andrea, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.      My name is Daniel D'Andrea.  I am a resident of Deerfield Beach, Florida.  I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.      All of the statements in this Declaration are true and accurate.  I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.      I am currently a Funeral Director/Embalmer Supervisor for Kraeer Funeral Homes and Cremation Services.  I've worked for the Kraeer Funeral Home business since 1977.  From 2003 through 2006, I worked as a manager at the Kraeer Funeral Home Central Care Facility on Sample Road, Pompano Beach, Florida.  I was the night manager at this embalming facility from 2003 through 2005, and the day manager from 2005 through 2006.  From 2002 through 2006, Alderwoods owned and operated this facility.

4.      In my position as Manager for Alderwoods at the Kraeer Funeral Home embalming facility, I was a salaried employee.  At the center, I had two and sometimes three hourly employees who reported directly to me.  These employees assisted with embalmings and removals of the deceased from various locations to the embalming center.  These individuals were generally full-time hourly employees.

5.      In the course of my four years working as Manager for Aldwerwoods at the Kraeer Funeral Home embalming facility, I gained knowledge of Alderwoods' timekeeping policies and pay practices and how they were implemented at this location.

After-Hours Removals

6.      At the Kraeer Funeral Home embalming facility, we would sometimes perform removals.  On occasion, these removals were after-hours.  The hourly employees who assisted with removals were paid for their work by the hour.  The hourly employees would be paid for overtime if they exceeded 40 hours of work in a given week.

7.      Hourly employees were not paid a "piece" rate for removals.  From time to time, when needed, we would employ a third-party removal service to perform removals.  Only the removal service was paid a "piece" rate for removals.

8.      I have no knowledge of a company-wide Alderwoods policy requiring hourly employees to perform after-hours work without pay.  Employees were paid for all the time they worked, including any overtime work.

Overtime

9.      I am unaware of any Alderwoods policy that encouraged or required managers not to pay overtime that was not pre-approved.  The hourly employees who reported to me at the embalming facility were not required to obtain pre-approval for overtime worked during my tenure as Manager.

10.      In my experience, Alderwoods employees were always paid for the time they worked, including overtime.  The hourly employees at the embalming facility

3

would record their time on time cards by punching in and punching out.  All hourly employees were paid time-and-a-half for any overtime worked.

11.    I never encouraged, required, or requested any hourly employee at the embalming facility to not record their time for hours worked, including overtime.  Nor do I recall of any instance in which an hourly employee failed to record his or her overtime.

12.    My Regional Manager never encouraged, required, or requested me to have hourly employees not record their hours worked for overtime.

"Community Work Policy"

13.    I never saw or heard of an Alderwoods policy requiring employees to participate in any community organization.  Nor was I aware of an Alderwoods policy that required employees to perform community work outside the regular work day without pay. No such policy was ever communicated to me during my employment with Alderwoods.

14.    Alderwoods employees were encouraged to be active in the community, but it was not mandatory.  If an hourly employee volunteered to participate in community activities, they were paid their hourly rate, or overtime if over 40 hours in a week, for all hours while working at these events.

15.    I would perform evaluations of the hourly employees who reported to me approximately every two years.  I did not discuss their involvement in community service as part of the evaluation.  Community service was not on the written evaluation that I submitted to Alderwoods for each of my employees.

4

Pre-Needs Sales

16.     The Alderwoods funeral homes in my region of Florida had a separate sales staff that sold pre-needs insurance to families.  Neither I nor any of my staff at the embalming facility ever participated, or were required to participate, in pre-needs presentations or sales.

17.     To the best of my recollection, none of the Funeral Directors or staff at the Kraeer Funeral Homes ever did, or were required to do, pre-needs presentations or sales.

Meal Breaks

18.     Full-time staff were permitted a half-hour meal break during their shift for lunch, and one hour for dinner.  On rare occasions, some of the staff would have to work during their scheduled meal break.  Employees recorded their time if they did so and were paid for the time worked.

19.     Alderwoods did not require that employees deduct a full meal break from their work hours each day if that is not what they took.  Generally, any employee at the embalming facility whose lunch was interrupted for work would take their meal break later.

20.     I never encouraged, required, or requested any employee who worked for me not to record their time worked during a meal break.

Training

5

21.     At the embalming facility, training was required for the hourly employees both initially when they were hired and periodically during their tenure.

22.     All training was done on the job, and the hourly employees would be paid for any hours spent in training.  On occasion, an hourly employee may have to travel to a location where a training course was being provided.  The employee was paid for all travel and time spent attending those training sessions.

23.     I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked.  Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me.

22.     Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions.  I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

23.     The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections.  The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  October **29**, 2009                          _____

DANIEL D'ANDREA

6

**TAB 16**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM HELM, et al.<br>On behalf of themselves and all employees<br>similarly situated,<br><br>          Plaintiffs,<br>   vs.<br><br>ALDERWOODS GROUP, INC., et al.,<br><br>          Defendants. | CASE NO.   3:08-CV-01184 SI<br><br>**DECLARATION OF JOE DIAS** |

1 DECLARATION OF JOE DIAS:

2

3 I, Joe Dias, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

4       1.    My name is Joe Dias. I am a resident of _Turlock_____,

5 California. I am over 21 years of age, suffer no legal disability, and am otherwise

6 competent to make this Declaration.

7

8       2.    All the statements in this Declaration are true and accurate. I have

9 personal knowledge of the facts set forth in this Declaration, and could testify to them

10 competently if called to do so.

11       3.    I am the Manager of the Whitehurst, Norton, Dias Funeral Home in

12 Turlock, California. I have been the Manager of this funeral home for the past 26 years,

13 including the time period 2002 through 2006 when Alderwoods Group, Inc. owned and

14 operated Whitehurst, Norton, Dias Funeral Home.

15

16       4.    In my position as Manager for Alderwoods at the Whitehurst, Norton,

17 Dias Funeral Home, I was a salaried employee. From 2002 through 2006, I had one or

18 two full-time hourly employees and two or three part-time hourly employees who reported

19 directly to me. These individuals included my secretary, a family services employee, and

20 part-time funeral support staff.

21       5.    In the course of my 26 years working as Manager at the Whitehurst,

22 Norton, Dias Funeral Home, I gained knowledge of Alderwoods' timekeeping policies and

23 pay practices and how they were implemented at this location.

24

25 After-Hours Removals

26       6.    From 2002 through 2006 at Whitehurst, Norton, Dias Funeral Home,

27 removals were performed by me and one or two of the part-time hourly employees. I

28 never had full-time hourly employees assist me with removals. The part-time employees

PII-1205411v1                       2

1   would be paid by the hour, and be required to record their time for a removal by punching

2   their time card on the time clock. For any removal that took less than two hours, I would

3   still pay the employee for two hours, plus $20. For removals that took longer than two

4   hours, the employee would be paid their hourly rate plus $20. This was a policy that I

5   implemented at my location. It was not a formal Alderwoods policy. The hourly

6   employees would be paid for overtime if they exceeded 40 hours of work in a given week,

7   which was very rare.

8

9          7.      Hourly employees were not paid a "piece" rate for removals.

10         8.      I have no knowledge of a company-wide Alderwoods policy requiring

11  hourly employees to perform after-hours work without pay. Employees were paid for all

12  the time they worked, including any overtime work.

13

    Overtime

14

15         9.      I am unaware of any Alderwoods policy that encouraged or required

16  managers not to pay overtime that was not pre-approved. The hourly employees who

17  reported to me at the Whitehurst, Norton, Dias Funeral Home were required to obtain pre-

18  approval for overtime worked. This was my policy, not an Alderwoods policy. I am not

19  aware of any hourly employee who worked overtime and was not paid for that overtime.

20

21         10.     In my experience, Alderwoods employees were always paid for the

22  time they worked, including overtime. The hourly employees at the Whitehurst, Norton,

23  Dias Funeral Home would record their time on time cards by punching in and punching

24  out. All hourly employees were paid time-and-a-half for any overtime worked more than 8

25  hours, and double time if they worked more than 12 hours.

26         11.     I never encouraged, required, or requested any hourly employee at

27  the Whitehurst, Norton, Dias Funeral Home to not record their time for hours worked,

28

1  including overtime. Nor do I recall of any instance in which an hourly employee failed to
2  record his or her overtime.

3

4          12.    My Regional Manager never encouraged, required, or requested me
5  to have hourly employees not record their hours worked for overtime.

6          13.    I was the only employee "on call" at the Whitehurst, Norton, Dias
7  Funeral Home. No hourly employees took calls, or were required to be "on call" after
8  hours. If I needed assistance after hours, I would call a part-time hourly employee to help
9  me if they were available. Any part-time hourly employee who assisted me after hours
10 would always be paid for at least 2 hours if they worked 2 hours or less. Accordingly, if I
11 needed only a half-hour of assistance after hours, I would still pay the part-time employee
12 for 2 hours. If the work took longer than two hours, then they were paid their hourly
13 wage. This was a policy that I implemented at my location. It was not an Alderwoods
14 policy.

15

16     "Community Work Policy"

17          14.    I never saw or heard of an Alderwoods policy requiring employees to
18 participate in any community organization. Nor was I aware of an Alderwoods policy that
19 required employees to perform community work outside the regular work day without pay.
20 No such policy was ever communicated to me during my employment with Alderwoods.

21

22          15.    I would perform evaluations of the hourly employees who reported to
23 me approximately every year. I used an Alderwoods form to record the evaluation. I did
24 not discuss their involvement in community service as part of the evaluation, nor do I
25 recall seeing any place on the Alderwoods form that included the topic of community
26 service. Accordingly, I did not include community service on the written evaluation that I
27 submitted to Alderwoods for each of my employees.

28

16.    I never heard of any Alderwoods programs entitled "Success Spotlight" or "I Believe In Service," nor did I require any of the hourly employees to participate in any such programs.

## Pre-Need Sales

17.    Pre-need sales were undertaken by me at the Whitehurst, Norton, Dias Funeral Home. No other employees participated in pre-need sales.

## Meal Breaks

18.    Full-time staff were permitted a one hour meal break and two fifteen minute breaks during their shift. Part-time employees were permitted a one hour lunch break after working six hours. On occasion, some of the staff would have to work during their scheduled meal break. Employees recorded their time if they did so and were paid for the time worked.

19.    Alderwoods did not require that employees deduct a full meal break from their work hours each day if that is not what they took. Generally, any employee at the Whitehurst, Norton, Dias Funeral Home whose lunch was interrupted for work would take their meal break later.

20.    I never encouraged, required, or requested any employee who worked for me at the Whitehurst, Norton, Dias Funeral Home not to record their time worked during a meal break.

## Training

21.    As a Manager, I would attend training sessions and relay what I learned to my staff during business meetings at the funeral home. All training was done on the job, and the hourly employees would be paid for any hours spent in training.

22.    I understand that this Declaration is being provided voluntarily in a

lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked. Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me.

23.     Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions. I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

24.     The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections. The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: November _10__, 2009



JOE DIAS

**TAB 17**

1

2

3                    UNITED STATES DISTRICT COURT

4                    NORTHERN DISTRICT OF CALIFORNIA

5

6   WILLIAM HELM, et al.                    )  **CASE NO.    3:08-CV-01184 SI**
    On behalf of themselves and all employees )
7   similarly situated,                      )  **DECLARATION OF CHARLES EAGAN**
                                             )
8                    Plaintiffs,             )
                                             )
9              vs.                           )
                                             )
10  ALDERWOODS GROUP, INC., et al.           )
                                             )
11                   Defendants.             )
                                             )
12                                           )
                                             )
13                                           )
                                             )
14                                           )
                                             )
15

16

17

18

19

20

21

22

23

24

25

26

27

28

# <u>DECLARATION OF CHARLES EAGAN</u>

I, Charles Eagan, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.      My name is Charles Eagan.  I am a resident of New Orleans, Louisiana.  I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.      All the statements in this Declaration are true and accurate.  I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.      I am currently the manager of the Leitz-Eagan Funeral Home in Metairie, Louisiana.  When Alderwoods owned the funeral home, I was the local manager and, at one point, the market growth manager for all the funeral homes in the New Orleans area.

4.      The Leitz-Eagan Funeral Home consisted of four funeral directors and another 10 or so part-time staff.  There was a punch clock that the employees used to record their time.

<u>Overtime</u>

5.      Alderwoods' policy was to obtain pre-approval before working overtime.  This was never a problem at my location.  Overtime is part of the job and sometimes a funeral director had to stay late or work on a Saturday, depending on when visitations and funeral services were scheduled.  They were paid for any overtime that they worked, even if they could not see me beforehand.

6.      Hourly employees did not receive bonuses or commissions.

<u>After-Hours Work</u>

7.     The staff at Leitz-Eagan did not perform removals.  There was a central location for the New Orleans area at which embalming and removals were handled.

8.     Funeral directors could be on-call to take business calls in the evening, though I usually tried to take these myself.  If a funeral director handled a business call, they were paid at their hourly rate for the length of the call.  If they had accrued sufficient time for overtime, they were paid overtime for the duration of the call.

<u>"Community Work Policy"</u>

9.     I encouraged my employees to participate in community activities, but I did not require that they do so.  I would occasionally have meetings to discuss community involvement with employees, particularly the funeral directors.  I did so because a number of my employees, including funeral directors, did not participate in any community activities.

10.    I did not use any incentive programs to try to entice the employees to participate in community activities or organizations.  I do not recall a program called "I Believe in Service." The employees' community service was not a part of my evaluation of their job performance.

<u>Pre-Need Sales</u>

11.    The funeral directors did not sell pre-need insurance because Alderwoods did not permit them to do so.  There was a separate sales staff, consisting of pre-need counselors, who were licensed to sell pre-need policies.  It is my understanding that the insurance company paid for their licensing.

Training

12.     Funeral directors had to take continuing education credits to maintain their license. They were paid for the time they attended these courses.  The funeral home also paid their course fees.  About half the classes were during the day, the other half in the evening.  Regardless of the time, the funeral directors were paid for the time that the attended.

13.     Alderwoods would have training seminars or meetings to discuss company policies, practices, and procedures, or new systems.  These were held during the day and the employees who attended were on the clock and were paid for their time.

Meal Breaks

14.     If an employee worked through a meal break, they were paid for their time.  I never instructed the employees to punch out for a lunch break that they were not going to take.

15.     I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked.  Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me.

16.     Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions.  I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

17.     The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections.  The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  November 9, 2009

CHARLES EAGAN

**TAB 18**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WILLIAM HELM, et al.
On behalf of themselves and all employees
similarly situated,

        Plaintiffs,

    vs.

ALDERWOODS GROUP, INC., et al.

        Defendants.

CASE NO.   3:08-CV-01184 SI

**DECLARATION OF JAMES ELLIOTT**

# DECLARATION OF JAMES ELLIOTT

I, James Elliott, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.      My name is James Elliott.  I am a resident of San Angelo, Texas.  I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.      All the statements in this Declaration are true and accurate.  I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.      I am currently a funeral director and assistant manager at Johnson's Funeral Home in San Angelo, Texas.  I was only a funeral manager when the funeral home was owned by Alderwoods.  I began working at the funeral home in 1971.  Under Alderwoods, I was a full-time, hourly employee, working 40 to 50 hours per week.

Overtime

4.      I generally worked overtime for rosaries, visitations, and death calls.  I was paid time and a half for overtime.  I was always paid for the overtime that I recorded.  I was never told not to record overtime that I had worked.  I was never required to get "pre-approval" from my supervisor before working overtime.  Most of my overtime, such as on-call work, was scheduled in advance.

After-Hours Work

5.      I was on-call for after-hours removals approximately four times a month.  When on-call, I would remain at the funeral home until 9 p.m., then respond to calls at home from the rest of the night.  There was also a non-funeral director employee who was on call for removals.  This

way, there were always at least 2 employees present for each removal.

6.      For removals that occurred in town, we were paid for at least two hours for each removal. If I had accrued enough hours to qualify for overtime, I was paid overtime for the removal. I would estimate that 99% of the removals were completed within two hours, and most took significantly less time. If the removal was out of town, the time allotted for the removal was increased.

7.      When I was on-call, I also responded to business calls. If I did so, I was paid for the time of the call. However, most calls were taken by our evening answering service, and I was notified of a call only if an emergency or if the call was for a removal.

Pre-Need Sales

8.      I did sell pre-need policies for awhile, but stopped when Alderwoods switched to another pre-need insurance company. I was never required to sell pre-need policies. When I did sell pre-need policies, I was paid on commission. The pre-need presentations that I made to families were during business hours, and I was on-the-clock and paid hourly for this time, in addition to any commission I might make. After I ceased selling pre-need policies, I no longer made any commissions as a funeral director.

Community Activities

9.      I was encouraged to participate in community activities. The only community organization I participated in was Kiwanis. Kiwanis meetings were held during lunch hour on weekdays. The funeral home would pay for my dues and fees. I did not join any other community organizations, nor was I required to do so.

10.    I do not recall any incentive programs to encourage employee participation in community service activities. Community service was never part of any evaluation my supervisor gave me.

Meal Breaks

11.    We were given an hour for lunch break. There were times when I took a shorter lunch break so as to finish work. I was always paid for the time that I worked. I was never required to record a lunch break, or record a full one-hour break, when I had not taken one.

Training

12.    The funeral home paid for my continuing education credits to maintain my funeral director's license. Most of the courses then were on-line, and we took these courses during the work day, while on-the-clock and being paid. I do not recall taking any off-site courses, or courses during the evening.

13.    Before speaking with any attorney for Alderwoods, I was told that the employees who filed the lawsuit seek to have the class certified, and that the matter of class certification has not been ruled upon by the Court. I was also told that if the class is certified and assuming I am a member of the class, then the attorneys for Alderwoods will be directly opposing my interest as a class member.

14.    I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked. Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me.

15.     Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions.  I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

16.     The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections.  The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.


Dated: November 9 , 2009                          JAMES ELLIOTT

**TAB 19**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WILLIAM HELM, et al.
On behalf of themselves and all employees
similarly situated,

            Plaintiffs,

        vs.

ALDERWOODS GROUP, INC., et al.

            Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**CASE NO.    3:08-CV-01184 SI**

**DECLARATION OF MARGARET FOGG**

# DECLARATION OF MARGARET FOGG

I, Margaret Fogg, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.      My name is Margaret Fogg.  I am a resident of Eastham, Massachusetts.  I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.      All the statements in this Declaration are true and accurate.  I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.      I am currently an office manager at Nickerson Funeral Home in Orleans, Massachusetts, which is part of the Doane, Beal and Ames Funeral Home on Cape Cod.  I have been an office manager for Doane, Beal and Ames for about 15 years, including the years when Doane, Beal and Ames was owned by Alderwoods (when my title was called "location administrator").  I have also been an office manager at Doane, Beal and Ames' South Dennis and West Harwich locations.

4.      As an office manager/location administrator for Alderwoods, I was a full-time employee.  For part of this time, I was hourly, and for part I was salaried.  Alderwoods always paid me for the time that I worked.

5.      For part of my time with Alderwoods, in addition to my normal duties as office manager, I also handled payroll.  I entered employees' time cards into the payroll system.  No changes were ever made to the time cards without employee input.  I believe that only the employee could change the time recorded on their time card.

Overtime

6.     When I worked for Alderwoods, I recorded all time that I worked.  I was paid time and a half for overtime.

7.     I worked approximately 5 hours of overtime per week.  Occasionally, I worked on a weekend.  I always was paid for the overtime I worked.  I was never told to not record overtime that I had worked, or to record it as regular time.

8.     The policy at the time I worked for Alderwoods was to get approval from your supervisor before working overtime.  I do not believe approval was required for on-call work.  Even if approval was not obtained, the employee was paid for time worked.  As one of my managers said, "no one works for free."  I do not remember an instance when Alderwoods did not pay overtime that was recorded.

After-Hours Removals

9.     I did not work on after-hour removals.  However, I recall from working payroll that employees were paid for after-hours telephone calls in 15 minute increments per phone call.  Thus, if a call lasted only 2 minutes, they would be paid for 15 minutes.  If a call lasted 17 minutes, the employee was paid for another 15 minute increment (in other words, they were paid for 30 minutes).

"Community Work Policy"

10.     Employees were encouraged, but not required to participate in community service.  Alderwoods paid for dues and fees.  There were many employees, including funeral directors, who did not participate in community activities.

11.     If I participated in a community activity during regular business hours, such as attending career day at a local high school with a funeral director, I was paid for my time.

12.     I do not believe that I was ever asked about community service or activities as part of an evaluation by my supervisor.

Pre-Need Sales

13.     I did not sell pre-need policies.  I am aware that, in Massachusetts, a funeral director must be licensed to sell pre-need insurance policies.  Alderwoods paid for insurance licenses and courses.

Training

14.     Anytime there was a meeting or training that staff and employees attended, they were paid for their time.  For example, if there was a staff meeting at 7:00 a.m., I would record the time I spent at the meeting on my time card.

15.     Whenever a new office procedure or system was introduced, I was trained on the new system.  I was paid for the time I was trained on the new procedure or system.

Meal Breaks

16.     As a full-time employee, I received a half-hour meal break.  Occasionally, I worked through my meal break when there was a lot of work to be done.  I did so voluntarily and I was paid for the time I worked.

17.     Before speaking with any attorney for Alderwoods, I was told that the employees who filed the lawsuit seek to have the class certified, and that the matter of class certification has

not been ruled upon by the Court.  I was also told that if the class is certified and assuming I am a member of the class, then the attorneys for Alderwoods will be directly opposing my interest as a class member.

18.     I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked.  Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me.

19.     Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions.  I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

20.     The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections.  The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: ___10  October___, 2009          _____
                                        MARGARET FOGG

**TAB 20**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WILLIAM HELM, et al.
On behalf of themselves and all employees
similarly situated,

      Plaintiffs,

  vs.

ALDERWOODS GROUP, INC., et al.

      Defendants.

CASE NO.   3:08-CV-01184 SI

**DECLARATION OF WENDY FORREST**

## DECLARATION OF WENDY FORREST

I, Wendy Forrest, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.      My name is Wendy Forrest.  I am a resident of San Diego, California.  I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.      All the statements in this Declaration are true and accurate.  I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.      I currently work at Humphrey Mortuary, which used to be an Alderwoods location. I began working there in March 2006 as the office manager.

4.      As the office manager at Humphrey Mortuary, I was a full-time, hourly employee. I handled payroll, contracts, accounts receivable, billing and depositing checks, and answer the telephone.  I worked 40-plus hours a week.

Overtime

5.      I worked about two hours a week overtime every week.  This time consisted of me staying late when we were busy, such as when I was preparing for an end-of-the-month audit. There was a time clock that we used to punch in and out.

6.      I was always paid for the overtime I worked.  I was paid time and a half.  I was paid for overtime even when I did not get the overtime pre-approved by my manager.  I do not recall a policy requiring employees to get pre-approval for overtime.

7.      I was never told not to record time that I had worked or to record overtime as

regular time.

8.    I did not receive bonuses or commissions.

9.    When I worked payroll, I received the time cards from the employees.  I entered their time into a self-calculating spreadsheet, which the manager reviewed.  Neither I nor my manager ever changed an employee's recorded time.

After-Hours Removals

10.    At one time, employees were paid a flat three hours for every after-hours removal at their individual rate of pay, including overtime if they had reached the requisite level of hours. Removals were usually performed by drivers who were scheduled to be on duty.  Now, a service center handles all removals.

11.    Funeral directors were paid for 15 minutes for each after-hours telephone call they received.  They may have been paid by the minute if the call lasted longer than 15 minutes.

"Community Work Policy"

12.    Employees were encouraged to participate in community organizations.  There was a bulletin board that listed various community activities.  We were paid for the time we spent participating in community activities or organizations.  We wrote up the time on our time cards.

13.    I do not recall if there was a specific community service policy.  There was no incentive program to encourage participation in community activities or organizations.  I did not participate in any community organizations or activities.  I was not required to do so.

14.    I was evaluated annually by my supervisor.  Community activities were not part of

my evaluation.

Training

15.     I received on-the-job training when I started from one of the other office staff.  I was paid for this time.

Meal Breaks

16.     Lunch breaks lasted 30 minutes.  Occasionally, I worked through a lunch break and was paid for this time.  This was rare, because the funeral home would make us take a lunch.  I was never told to record a lunch that I did not take.

17.     Before speaking with any attorney for Alderwoods, I was told that the employees who filed the lawsuit seek to have the class certified, and that the matter of class certification has not been ruled upon by the Court.  I was also told that if the class is certified and assuming I am a member of the class, then the attorneys for Alderwoods will be directly opposing my interest as a class member.

18.     I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked.  Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me.

19.     Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions.  I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

20.     The attorney for Alderwoods provided me with an opportunity to review the

1   Declaration and to make any corrections.   The attorney told me that I could refuse to sign the

2   Declaration without any adverse impact on me.

3

4   I declare under penalty of perjury that the foregoing is true and correct.

5

6   Dated: November 4 , 2009

7                                                          WENDY FORREST

8

**TAB 21**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CASE NO.   3:08-CV-01184 SI

WILLIAM HELM, et al.
On behalf of themselves and all employees
similarly situated,

      Plaintiffs,

    vs.

ALDERWOODS GROUP, INC., et al.

      Defendants.

DECLARATION OF PAUL FRIDEN

1

DECLARATION OF PAUL FRIDEN

I, Paul Friden, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1. My name is Paul Friden. I am a resident of Kent, Washington. I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2. All the statements in this Declaration are true and accurate. I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3. I am currently a Location Manager at Price-Helton Funeral Home in Auburn, Washington. I began working at Price-Helton Funeral Home in January 2005 as a full time funeral director-apprentice. I received my funeral director's license in May 2005 and remained a funeral director through July 2005, at which time I accepted a salaried position as Location Manager. Prior to that time, I worked at Powers Funeral Home in Puyallup, Washington as a full-time funeral director-apprentice. At the time I worked at Powers Funeral Home as a funeral director-apprentice and Price-Helton Funeral as funeral director-apprentice, funeral director, and Location Manager it is my understanding that those funeral homes were owned and operated by Alderwoods Group, Inc.

4. As a funeral director-apprentice and funeral director, I performed a variety tasks including meeting with families, preparing for funerals, embalming, and performing removals.

5. As a funeral director-apprentice at Price-Helton and Powers Funeral Homes, and later as a funeral director at Price-Helton Funeral Home for Alderwoods from

2

1   September 2004 through the end of July 2005, I was always an hourly, full-time employee
2   working 40 hours each week, or more depending upon how busy we were.

3         6.      From September 2004 through July 2005, I would work ten or fewer
4   hours of overtime each week. I was always paid time-and-a-half for any overtime I ever
5   worked. My time was recorded on time cards, which I used to punch in and punch out.
6
7         7.      Alderwoods paid me for all the overtime I worked. Generally, we had
8   to obtain approval from our manager before working overtime; however, I don't recall my
9   manager ever not approving my overtime. If I didn't obtain approval for overtime, but still
10  worked, I was always paid for that time. As a manager, I asked the employees I
11  supervised to obtain approval from me before working overtime. I don't recall ever not
12  approving a request for overtime work, nor do I recall not paying someone for overtime
13  they worked without first seeking my approval.

14        8.      None of my managers, or any other employee at Alderwoods, ever
15  encouraged, required, or requested me not to record my overtime. I was never required
16  to perform any work before clocking-in in the morning, or after clocking-out in the evening.
17  In addition, as a Location Manager at Price-Helton, I never requested any hourly
18  employee not to record their overtime, or require an hourly employee to perform any work
19  before clocking-in in the morning, or after clocking-out in the evening.
20
21        9.      No one at Alderwoods ever encouraged, required, or requested me
22  to perform work but not record the time that I worked. As an hourly employee, I always
23  recorded the time that I worked, including overtime. As a Location Manager, I never
24  encouraged, required, or requested any hourly employee to perform work but not record
25  the time that they worked.

26        10.     As a funeral director-apprentice and funeral director, I would be "on
27  call" approximately one night a week. My "on call" duties consisted of performing
28  removals of bodies from various locations to the funeral home or answering after-hours

3

calls to the funeral home. I received the calls on a cell phone provided by the funeral home.

11.  For removals, I would be paid a minimum of $40 for each removal. Removal calls generally took about 1 ½ hours to complete. If a removal took longer than three hours, then I would be paid for each hour after that, however, I don't recall any removals that ever took that long.

12.  Answering phones while "on call" consisted of speaking with families or others who called the funeral home after hours. For any call that lasted 15 minutes or less, I was paid for 15 minutes. If a call lasted more than 15 minutes, then I was paid for each minute the call lasted. I kept track of my time on a call log.

13.  As a funeral director-apprentice and later funeral director, I was not involved in the selling of pre-need policies, nor was I ever required to make pre-need presentations or sell pre-need policies. Alderwoods used family service counselors exclusively to sell pre-need policies and make presentations. If I ever attended a pre-need presentation, I would clock-in and be paid for attending the meeting.

14.  I don't recall ever hearing about an Alderwoods "Community Work Policy," or heard of "I Believe In Service." I recall hearing about "Success Spotlight," but I don't recall what that was. Although I was encouraged to be active in the community, I was not required to participate in community organizations or perform community work as an employee of Alderwoods. I never reported on my activities with any organizations to any Alderwoods managers, or completed a community service report form, nor was I ever required to do so. If I attended a community activity as a representative of the funeral home (i.e. wearing my funeral home name tag and promoting the funeral home), I was paid my hourly wage for attending.

15.  To the best of my knowledge, I did not have an annual evaluation while working at Powers Funeral Home as an apprentice or as a funeral director or

4

embalmer, or at Price-Helton Funeral Homes while working as Funeral Director/Embalmer. No one ever evaluated me on my participation in community service, or the amount of overtime I recorded. As a manager, I never evaluated anyone on their participation in community activities.

16.     Alderwoods permitted a 30 minute meal break every day. I would take the full 30 minutes, unless I had to work through lunch or my meal break was interrupted by work. On any occasion that my meal break would be interrupted because of work, I would be paid for working through my break. I would also take my meal break later that day. None of my managers or other Alderwoods employees ever encouraged, required, or requested me not to record my time that I worked through a meal break.

17.     The funeral homes would hold training sessions, mostly about safety issues, from time to time. I would clock-in and clock-out for every meeting, and was paid my hourly wage for all the training sessions I attended.

18.     As an Alderwoods hourly employee, and later as a manager, I was not aware of any Alderwoods policies which required hourly employees not to record overtime, or time spent at training sessions or other meetings. Nor was I aware of any Alderwoods policy which required hourly employees to participate in uncompensated community work for the funeral home.

19.     I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked. Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me. I also was told that the employees who filed the lawsuit seek to have the class certified, and that the matter of class certification has not been ruled upon by the Court; and that if the class is certified and assuming I am a member of the class, then the

5

1   attorneys for Alderwoods Group, Inc. will be directly opposing my interest as a class

2   member.

3        20.   Prior to speaking with the attorney for Alderwoods, I was also told

4   that I did not have to answer any questions. I was told that the interview was purely

5   voluntary and that if I did not wish to speak, there would be no adverse impact on me.

6

7        21.   The attorney for Alderwoods provided me with an opportunity to

8   review the Declaration and to make any corrections. The attorney told me that I could

9   refuse to sign the Declaration without any adverse impact on me.

10       I declare under penalty of perjury that the foregoing is true and correct.

11

12   Dated: November 11, 2009

13                                 PAUL FRIDEN

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

6