**TAB 22**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WILLIAM HELM, et al.
On behalf of themselves and all employees
similarly situated,

         Plaintiffs,

  vs.

ALDERWOODS GROUP, INC., et al.

        Defendants.

CASE NO.   3:08-CV-01184 SI

DECLARATION OF JILL GIBSON

## DECLARATION OF JILL GIBSON

I, Jill Gibson, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.    My name is Jill Gibson. I am a resident of Imperial Beach, California. I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.    All the statements in this Declaration are true and accurate. I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.    I am currently a funeral arranger for Humphrey Mortuary in Chula Vista, California. Humphrey Mortuary was an Alderwoods location when I was first hired there. I was hired in February 2004 as a driver. Later that year, my position changed to handling death certificates. In 2005, I became a funeral arranger.

4.    I have always been an hourly, full-time employee at Humphrey Mortuary. When I was a driver, I worked during the day and helped transport the deceased, handle removals, and participate in funeral services. I worked about 50 to 55 hours a week.

5.    When I handled death certificates, I drafted death certificates and arranged for signatures by medical doctors. I worked about 40 hours a week in this position.

6.    As a funeral arranger, I met with families and made arrangements for funeral services. I worked about 40 hours a week in this position. For a time, I managed a small location in Imperial Beach for Humphrey Mortuary, though I spent most of my time at the main funeral home in Chula Vista. I remained an hourly employee throughout this time.

Overtime

7.     When I was a driver, I worked overtime for both removals and for late services that required a driver.  When I worked overtime, I recorded my time and was fully paid for it.  On occasion, I received double-time, rather than time-and-a-half, depending on how long I had worked.

8.     I generally did not get pre-approval from my manager before working overtime because, when I was on-call, my manager was already aware that I would be working.  I always recorded the time that I worked and was always paid for the overtime that I had worked.  I never had any issues in getting paid.

9.     I did not receive any bonuses or commissions from Alderwoods.

After-Hours Removals

10.     When I was a driver, I performed after-hours removals.  I logged my time on "first call sheets."  I was paid hourly for removals, beginning from the time I received the call until the time I returned from the call.

11.     When I began working for Humphrey Mortuary, removals were performed by Humphrey employees.  I was usually on-call three nights a week.  There were usually three employees on call.  Funeral directors were not on-call to perform removals.  Any phone calls I received while on-call were usually handled en route to the removal location.

12.     Funeral Directors and Arrangers handle after-hours business calls.  When I take a call, I am paid an automatic fifteen minutes per call.  I do not recall any phone calls lasting longer than fifteen minutes.  I probably received two phone calls a week.

**"Community Work Policy"**

13.     Employees were encouraged to participate in community organizations.  I was very active and belonged to, among others, the Imperial Beach Chamber of Commerce, Kiwanis, and the Chula Vista Chamber of Commerce.  I represented the funeral home at these organizations and was paid for the time I spent at activities and meetings.  I thought this was a great feature of my job -- I was paid to help the community.

14.     Although I was very active in the community, I was not required to participate in these organizations, or any organization.   There was no incentive program to encourage participation.  Activities were posted on a bulletin board.

15.     Community service was not a topic during my annual evaluations by my supervisor.

**Pre-Need Sales**

16.     I did not sell pre-need policies.  Pre-need counselors sold pre-need policies.

**Training**

17.     As a driver and later in death certificates, I learned on-the-job and was paid for the time I spent learning the trade.

18.     There is an annual, state-required test that funeral arrangers must take.  I usually went to Los Angeles to take this test.  I was paid for the time I spent in Los Angeles taking this test.  Alderwoods would occasionally pay to have me stay overnight in Los Angeles if the schedule dictated it.

<u>Meal Breaks</u>

19.　　There were occasions when I worked through a meal break. This was rare, but occasionally I would take a call during a meal break. If my break was cut short, I was paid for the time that I worked.

20.　　Before speaking with any attorney for Alderwoods, I was told that the employees who filed the lawsuit seek to have the class certified, and that the matter of class certification has not been ruled upon by the Court. I was also told that if the class is certified and assuming I am a member of the class, then the attorneys for Alderwoods will be directly opposing my interest as a class member.

21.　　I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked. Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me.

22.　　Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions. I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

23.　　The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections. The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

1    I declare under penalty of perjury that the foregoing is true and correct.

2

3

4    Dated: November 12, 2009

                         JILL GIBSON

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TAB 23**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WILLIAM HELM, et al.
On behalf of themselves and all employees
similarly situated,

        Plaintiffs,

   vs.

ALDERWOODS GROUP, INC., et al.

        Defendants.

) CASE NO.    3:08-CV-01184 SI
)
)
) **DECLARATION OF HELEN GONI**
)
)
)
)
)
)
)
)

1

1 DECLARATION OF HELEN GONI:

2

3     I, Helen Goni, pursuant to 28 U.S.C. § 1746, do hereby declare and state as

4 follows:

5     1.    My name is Helen Goni. I am a resident of Turlock, California. I am

6 over 21 years of age, suffer no legal disability, and am otherwise competent to make this

7 Declaration.

8

9     2.    All the statements in this Declaration are true and accurate. I have

10 personal knowledge of the facts set forth in this Declaration, and could testify to them

11 competently if called to do so.

12     3.    I am the Office Manager for the Whitehurst, Norton, Dias Funeral

13 Home in Turlock, California. I was hired at the Whitehurst, Norton, Dias Funeral Home in

14 November 2000 as a file clerk. In 2002, I became a part-time secretary, a position I held

15 through the end of 2006. In 2007, I became a full-time Office Manager.

16

17     4.    Shortly after I began working at Whitehurst, Norton, Dias Funeral

18 Home, the funeral home was owned and operated by Alderwoods Group, Inc. In my

19 position as secretary and office manager for Alderwoods at the Whitehurst, Norton, Dias

20 Funeral Home, I was always an hourly employee. My job involved answering phones

21 during normal business hours, filing, making copies, handling death certificates and other

22 general administrative support.

23     5.    As a part-time hourly employee, I worked about 35 hours a week. As

24 a full-time employee, I worked 40 hours a week. I never worked any overtime.

25

26     6.    While working for Alderwoods, I recorded my time on time cards,

27 which I used to clock-in and clock-out. I always recorded all of the hours I worked, and

28 was always paid for all of the time that I worked.

7.    None of my managers, or any other employee at Alderwoods, ever encouraged, required, or requested me not to record my time. I was never required to work prior to clocking-in when I arrived for work in the morning, or after clocking-out when I left in the evening.

8.    During the time I worked for Alderwoods at Whitehurst, Norton, Dias Funeral Home, I never worked on call, nor was I required to be on-call.

9.    I was never required to, nor did I ever, perform removals of bodies, or answer phone calls after hours. To the best of my recollection, after hour phone calls went to the manager, a salaried employee.

10.    I was not involved in the selling of pre-need policies, nor was I ever required to make pre-need presentations or sell pre-need policies.

11.    I was not required to participate in community organizations or perform community work as an employee of Alderwoods. I was never evaluated on my participation in community activities.

12.    I never heard of of any employee incentive programs, including "I Believe in Service," or "Success Spotlight," nor am I familiar with something at Alderwoods called the Community Leadership Program or Influencer Program. I was never required to report on my participation in community activities or organizations to anyone at Alderwoods, nor did I.

13.    When I worked for Alderwoods at Whitehurst, Norton, Dias Funeral Home I never received a bonus, or was paid commissions.

14.    While at Whitehurst, Norton, Dias Funeral Home, Alderwoods had a mandatory one hour lunch break every day. If I had to work during my normal lunch break, I would take it later in the day. On any occasion that my meal break would be

interrupted because of work, I would be paid for working through my break. None of my managers or other Alderwoods employees ever encouraged, required, or requested me not to record my time that I worked through a meal break, or to deduct an hour from my time for lunch if that is not what I took.

15.   No one at Alderwoods ever encouraged, required, or requested me to perform work but not record the hours that I worked.

16.   I don't recall any mandatory training while working for Alderwoods. We would have staff meetings monthly which occurred during normal business hours. I was always on the clock and paid for my time attending these meetings.

17.   I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked. Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me. I also was told that the employees who filed the lawsuit seek to have the class certified, and that the matter of class certification has not been ruled upon by the Court; and that if the class is certified and assuming I am a member of the class, then the attorneys for Alderwoods Group, Inc. will be directly opposing my interest as a class member.

18.   Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions. I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

19.   The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections. The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.

4

1      Dated: November 12, 2009

2

3                          HELEN GONI

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TAB 24**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM HELM, et al.<br>On behalf of themselves and all employees<br>similarly situated,<br><br>          Plaintiffs,<br>     vs.<br><br>ALDERWOODS GROUP, INC., et al.<br><br>          Defendants. | **CASE NO.     3:08-CV-01184 SI**<br><br>**DECLARATION OF DONALD GREENO** |

## DECLARATION OF DONALD GREENO

I, Donald Greeno, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.      My name is Donald Greeno.  I am a resident of Great Falls, Montana.  I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.      All the statements in this Declaration are true and accurate to the best of my knowledge and belief.  I have personal knowledge of the facts set forth in this Declaration, and understand I could testify to them competently if called to do so.

3.      I am currently retired and working part-time at the Schnider Funeral Home

in Great Falls, Montana. Beginning in late 2002 or early 2003, for a period of 16 months until approximately mid-2004, I was a general manager for Alderwoods Group Inc. in Monterey, California. In that position I oversaw, for a period of approximately 10 months, the operations at several funeral homes in the Monterey area, including Whitehurst Muller, Whitehurst Terry, Seaside Chapel, Mission Memorial Park and Mission Mortuary.

Overtime

4.     During the time I was employed by Alderwoods, employees were required to obtain pre-approval before working overtime. However, even if an employee did not get approval from their manager before working overtime, they were allowed to record the time that they worked, and they were paid for those hours. The employee would be subject to a reprimand for not getting approval, but they would be paid.

5.     I never instructed or informed employees, either at a staff meeting or elsewhere, that any overtime submitted without approval would not be paid.

6.     I do not recall any Unrecorded Work Time Policy under Alderwoods. I never encouraged or required employees to not record all the overtime hours that they had been worked. I never informed employees at any staff meeting that they should not record all of their overtime hours and should instead keep hours low.

7.     To my knowledge, all the employees under me received time and a half for overtime and were fully paid for the time they recorded.

8.     I do not recall any employees receiving commissions, with the possible

exception of pre-needs sales/family service counselors.

<u>After-Hours Work</u>

9.      Generally, after-hours removals were performed by part-time employees who did not earn overtime.  They were paid a piece rate per removal.  This rate was either equal to or more than the employee's hourly pay rates.

10.      Funeral directors could be on-call in the evenings to receive business calls. They could claim the time they were on the phone and were paid for it on an hourly basis. If that time caused them to qualify for overtime, they were paid overtime.

<u>"Community Work Policy"</u>

11.      I do not recall a Community Work Policy from Alderwoods.  We did encourage the employees to be active in the community.  The employees were not required to participate in community activities or organizations.  Many employees were not involved in the community, which is why we encouraged it at staff meetings.

12.      We never used any incentive programs to encourage employee participation in community activities.

<u>Training</u>

13.      I do not recall any training that was required of the employees.  There was an employee policies and procedures manual that they were required to read when they started their employment.

Meal Breaks

14.     Employees were to take a lunch break every day.  Some employees fell into the habit of working through their lunch break.  As a manager, I instructed employees to take their lunch breaks.  If an employee worked through a lunch break, however, they were paid for their time.  I never instructed the employees to punch out for a lunch break that they were not going to take.

15.     I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked.  Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me.

16.     Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions.  I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

17.     The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections.  The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.


Dated: November 9, 2009                          _____

                                                 DONALD GREENO

**TAB 25**

1

2

3          UNITED STATES DISTRICT COURT

4          NORTHERN DISTRICT OF CALIFORNIA

5

6   WILLIAM HELM, et al.                          ) CASE NO.    3:08-CV-01184 SI
    On behalf of themselves and all employees     )
7   similarly situated,                           ) DECLARATION OF WILLIAM RAY
                                                   ) HARPER
8              Plaintiffs,                         )
                                                   )
9        vs.                                       )
                                                   )
10  ALDERWOODS GROUP, INC., et al.                 )
                                                   )
11             Defendants.                         )
                                                   )
12                                                 )
                                                   )
13                                                 )
                                                   )
14                                                 )
                                                   )

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DECLARATION OF WILLIAM RAY HARPER

I, William Ray Harper, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.      My name is William Ray Harper, though I am commonly known by my middle name, Ray.  I am a resident of San Angelo, Texas.  I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.      All the statements in this Declaration are true and accurate.  I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.      I am currently the general manager of Johnson's Funeral Home and Lawnhaven Memorial Gardens in San Angelo, Texas.  I was the general manager of these locations when they were owned by Alderwoods.  I have worked at Johnson's Funeral Home for over 36 years.

Overtime

4.      As general manager, I oversaw and approved the payroll for these locations.  I did not require that overtime be pre-approved.  Most overtime work was based on a schedule. Alderwoods always paid overtime that was recorded by the employees, even if not pre-approved.  I never altered time that an employee had submitted to reduce overtime hours.  Every employee was paid for the hours they worked.  Most of my employees worked about 50 hours a week, so Johnson's Funeral Home generally had a significant amount of overtime recorded.

5.      Employees at my location were not required to punch in at a certain hour.  So, if an employee arrived at the funeral home at 7 a.m. or 7:30 a.m., he or she clocked in and was paid for the time that they worked.

6.      The Lawnhaven cemetery had a sizeable maintenance staff, from 9 to 12 employees, to maintain the cemetery grounds and to open and close graves. Most of this staff was full-time and worked overtime on occasion. They were fully paid for any overtime they worked.

After-Hours Work

7.      There was a funeral director who worked exclusively from 5 to 9 and was on-call most evenings. When the night man was not on-call, other funeral directors might be scheduled to be on-call. If a funeral director took a phone call after-hours, he wrote down his time and was paid for the time of the call. Cemetery staff were never on-call.

Pre-Need Sales

8.      Employees who sold pre-need policies were paid on commission. The commission was paid by the pre-need insurance company. We had pre-need counselors at the funeral home, but there were some funeral directors who sold pre-need policies. Most funeral directors sold pre-need policies after hours. If a funeral director made a pre-need presentation to a family after-hours, they were paid for their time. Pre-need counselors were paid hourly for a few weeks when they first started, but thereafter were paid exclusively on commission.

Community Activities

9.      I did not encourage my employees to be active in the community. In my view, I and my brother, who has been with the funeral home for 34 years, performed sufficient community service to advertise the funeral home. Community service was not a requirement for hourly employees at my locations.

10.      There were a few employees who participated in community activities. One was in

the Rotary Club, another in the Lions Club.  The funeral home paid their fees and expenses.  Most did not log their time for this, but I did not tell them that they could not do so.

Meal Breaks

11.    Employees were given an hour for lunch, but some did not take a full hour.  They clocked back in when they returned to work.  I never required employees to record a full lunch break if they had not taken one.   They were paid for any time that they worked.

Training

12.    Funeral directors were required to take continuing education courses to maintain their licenses.  They were paid for the time they spent taking these courses.  Most were held during the day, or were on-line courses completed during the work day.

13.    There was one occasion when I sent the entire cemetery maintenance staff to Missouri for a three-day OSHA safety training course.  They were paid for this time and for the expenses of the trip.

14.    I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked.  Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me.

15.    Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions.  I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

16.    The attorney for Alderwoods provided me with an opportunity to review the

Declaration and to make any corrections.  The attorney told me that I could refuse to sign the

Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  November 9 , 2009

WILLIAM RAY HARPER

**TAB 26**

1

2

3

4

5

6

7

8

9

10

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WILLIAM HELM, et al.
On behalf of themselves and all employees
similarly situated,

        Plaintiffs,

      vs.

ALDERWOODS GROUP, INC., et al.

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)

**CASE NO.    3:08-CV-01184 SI**

**DECLARATION OF THEODORE HUNT**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

DECLARATION OF THEODORE HUNT

I, Theodore Hunt, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.      My name is Theodore Hunt.  I am a resident of Fort Lauderdale, Florida.  I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.      All the statements in this Declaration are true and accurate.  I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.      I worked for Kraeer Funeral Home and its successors since 1988, both full time and part time.  From 2002 through 2006, when Kraeer was owned and operated by Alderwoods Group, Inc., I worked for Kraeer Funeral Homes at the Fort Lauderdale, Florida location.

4.      In 2002, I was a full-time hourly employee at the Fort Lauderdale location.  I worked as a funeral attendant.  My job entailed providing support to the funeral director, working at visitations, cleaning cars, and helping to clean up after services at the funeral home.  I continued in this position at the Fort Lauderdale location for Kraeer Funeral Home through 2006.

5.      On occasion I would work overtime.

6.      Although I worked very little overtime for Alderwoods, I was always paid time-and-a-half for any overtime I ever worked.  My time was recorded on time

cards, which I used to punch in and punch out. I always recorded all of the hours I worked, including my overtime.

7.      I had to to get prior approval for my overtime. The decision to approve overtime was made by Robert Russell, the Regional Manager for Alderwoods. I don't recall ever having an overtime request not approved, nor did Alderwoods fail to pay me for any overtime I worked which was not pre-approved.

8.      None of my managers, or any other employee at Alderwoods, ever encouraged, required, or requested me not to record my overtime.

9.      I was never required to, nor did I ever, perform removals of bodies. To the best of my knowledge, the Kraeer Funeral Homes had a dedicated crew working out of the Sample Road facility who handled the removal of bodies.

10.      I was not involved in the selling of pre-needs policies, nor was I ever required to make pre-needs presentations or sell pre-needs policies.

11.      I was not required to participate in community organizations or perform community work as an employee of Alderwoods. I did not perform community service during the time Alderwoods operated the Fort Lauderdale location where I worked. I never reported on my activities in the community to any Alderwoods managers, or completed a community service report form, nor was I ever required to do so.

12.      I was evaluated by my manager every year. My evaluation never took into account my participation in community work.

3

13. Alderwoods permitted a 30 minute meal break every day. I would always take the full 30 minutes. I never missed a meal break, and only rarely had my meal break interrupted to perform work. On the rare occasion that my meal break would be interrupted because of work, I would take the full 30 minutes for my meal break later that day. None of my managers or other Alderwoods employees ever encouraged, required, or requested me not to record my time that I worked through a meal break.

14. No one at Alderwoods ever encouraged, required, or requested me to perform work but not record the hours that I worked.

15. While at Kraeer during the time Alderwoods operated the funeral homes, I had limited training. Training or meetings would normally be held early in the morning. Whenever I attended meetings or training, I would always be on the clock and record my time spent at both meetings and training.

16. I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked. Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me. I also was told that the employees who filed the lawsuit seek to have the class certified, and that the matter of class certification has not been ruled upon by the Court; and that if the class is certified and assuming I am a member of the class, then the attorneys for Alderwoods Group, Inc. will be directly opposing my interest as a class member.

4

17.     Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions.  I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

18.     The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections.  The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  October 2 9 2009                    *Theodore Hunt*

                                            THEODORE HUNT

5

**TAB 27**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WILLIAM HELM, et al.
On behalf of themselves and all employees
similarly situated,

        Plaintiffs,

   vs.

ALDERWOODS GROUP, INC., et al.

       Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**CASE NO.   3:08-CV-01184 SI**

**DECLARATION OF JAY JONES**

# DECLARATION OF JAY JONES

I, Jay Jones, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.      My name is Jay Jones.  I am a resident of Corinth, Mississippi.  I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.      All the statements in this Declaration are true and accurate.  I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.      I am currently the manager of Memorial Funeral Home in Corinth, Mississippi. Memorial was an Alderwoods location.  I became a manager in 2004 or 2005.  Prior to that, I was a funeral director and embalmer at the funeral home.

4.      As a funeral director, I was an hourly employee.  I worked full-time, and generally worked 45 to 50 hours in a week.

Overtime

5.      I generally worked 5 to 10 hours of overtime a week, which included evening and weekend work.  I was never told not to record my overtime, or to record the overtime I had worked as regular time.  I was not required to get pre-approval from my supervisor before I worked overtime.  Memorial Funeral Home had only two funeral directors for three locations, so our supervisor was aware that we often had to work overtime.  I am not aware of a specific Alderwoods policy that required pre-approval for overtime.  I was always paid for the overtime that I worked.

6.      I did not receive commissions as an hourly employee.

<u>After-Hours Work</u>

7.    After-hours removals were paid on a combination flat-fee/hourly basis.  We were paid for at least two hours for each removal at our hourly rate.  We would be paid our overtime rate if we had reached that level of hours.  Generally, a removal might take at most an hour and a half.  If a removal took longer than two hours, we recorded our actual time and were paid for it. All staff were paid in this manner for after-hours removals.

<u>"Community Work Policy"</u>

8.    We were encouraged to get out into the community.  I joined Kiwanis and a couple of activities within my church.  I would have participated in my church activities regardless of the funeral home policy.  Kiwanis usually met at lunch, during the work day.  The funeral home paid dues and fees for community organizations.

9.    I do not recall any incentive programs to encourage community participation by employees.  I do not recall a program called "I Believe in Service."  My community activities were never part of any evaluation by my supervisor.

<u>Pre-Need Sales</u>

10.    I did not sell pre-need policies.  There was a salesperson who handled these policies.  At one point, there was a funeral director who had a pre-need license and she handled walk-in business.  The funeral home paid for the insurance licensing.  Funeral directors were not required to obtain a pre-need license or sell pre-need policies, nor was it encouraged.  I believe that pre-need sales were paid by commission.

Training

11.     There was mandatory training for all employees, such as safety training or sexual harassment training.   This training was always held during the work day and we were paid for attending it.   There was no other training that was required.

Meal Breaks

12.     There were occasions when the funeral home was busy and I was unable to take my lunch break.   If I chose to work through a lunch break, I was paid for my time.   Often, if I had worked through a lunch break, I would simply leave earlier or come in later the next day. Alternatively, I might be paid overtime for the time worked.   I was encouraged by my supervisor to take my lunch breaks, but I was never told to record a lunch break that I did not take.

13.     Before speaking with any attorney for Alderwoods, I was told that the employees who filed the lawsuit seek to have the class certified, and that the matter of class certification has not been ruled upon by the Court.   I was also told that if the class is certified and assuming I am a member of the class, then the attorneys for Alderwoods will be directly opposing my interest as a class member.

14.     I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked.   Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me.

15.     Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions.   I was told that the interview was purely voluntary and that if I did

1    not wish to speak, there would be no adverse impact on me.

2       16.     The attorney for Alderwoods provided me with an opportunity to review the

3

4    Declaration and to make any corrections. The attorney told me that I could refuse to sign the

5    Declaration without any adverse impact on me.

6

   I declare under penalty of perjury that the foregoing is true and correct.

7

8

9    Dated: November 11 , 2009                        _____

10                                          JAY JONES

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TAB 28**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WILLIAM HELM, et al.
On behalf of themselves and all employees
similarly situated,

        Plaintiffs,

   vs.

ALDERWOODS GROUP, INC., et al.

      Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**CASE NO.    3:08-CV-01184 SI**

**DECLARATION OF REGINA JONES**

## DECLARATION OF REGINA JONES

I, Regina Jones, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.     My name is Regina Jones.  I am a resident of Brandon, Mississippi.  I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.     All the statements in this Declaration are true and accurate.  I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.     I am currently an employed as a funeral director at the Baldwin-Lee Funeral Home in Pearl, Mississippi.  I have worked at Baldwin-Lee since August 2001.  Baldwin-Lee is a former Alderwoods location.

4.     As a funeral director at Baldwin-Lee, I was an hourly employee.  I generally worked between 47 and 52 hours a week, depending on the rotation schedule.  Baldwin-Lee used a time clock to record time worked.

Overtime

5.     During Alderwoods' ownership, my overtime consisted of embalmings, removals, and visitations.   Overtime was generally scheduled in advance – an on-call rotation was established.   There were occasions when I worked overtime that was not scheduled.   If my manager was present at the funeral home, he would know why we had to work the overtime.  If my manager was not present, we would tell him why we had to work overtime the following day.  I was always paid for the overtime that I worked.

After-Hours Work

6.      The funeral directors were on-call for after-hours removals.  We were required to be physically present at the funeral home until 9 p.m. in the evening, and were paid for that time.  We went off the clock at 9 p.m. and left the funeral home, but remained on-call for after-hours removals.  If I received a call for a residence removal, I would be paid hourly from the time I left home until I returned.  I took a removal vehicle home with me when I was on-call, so that I could drive directly to the residence and not have to come into the funeral home first.

7.      There was a separate group of employees who handled non-residence removal calls.  These were full-time employees at another Alderwoods location who worked a night-shift.  I was called out for residence removals because Alderwoods required at least two employees at every residence removal.

8.      Occasionally I would receive business call in the evening when I was on-call.  Up to 9 p.m., I was on the clock.  Afterwards, I was paid hourly for the time of the call.  I often did not record the time for short calls, but this was my choice.  I was not told that I should not record this time.  If I received a longer call (e.g., longer than 5 minutes), I would write in my time for that call on my time card.

"Community Work Policy"

9.      We were strongly encouraged to be active in the community, but never required to do so.  I was a member of several organizations, which I had joined prior to Alderwoods' ownership of the funeral home.  I do not recall doing anything specific to promote the funeral home at these organizations' functions.

10.    I do not recall any incentive program to encourage employees to participate in community activities.   I have never heard of a program called "I Believe in Service."   My participation in community groups was not part of any evaluation I received from my supervisor.

Pre-Need Sales

11.    I did not sell pre-need policies.   No funeral directors sold pre-need policies under Alderwoods, and we were not encouraged to do so.   Alderwoods had a separate pre-need staff of licensed insurance agents.   I do not know how they were paid.

Training

12.    Occasionally, I would attend meetings related to Alderwoods' business, practices, or procedures.   These were always held during the work day, and I was paid for my attendance.

Meal Breaks

13.    There were times when I chose to work through a lunch break.   I would simply not punch out for lunch.   My manager strongly recommended that we take a lunch and needed to know if we had not taken a break, so that he could properly manage our schedule.   If I worked through a lunch break, I was paid for the time that I had worked.   I was never told to punch out for a lunch that I had not or was not going to take.

14.    Before speaking with any attorney for Alderwoods, I was told that the employees who filed the lawsuit seek to have the class certified, and that the matter of class certification has not been ruled upon by the Court.   I was also told that if the class is certified and assuming I am a member of the class, then the attorneys for Alderwoods will be directly opposing my interest as a class member.

15.    I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked.  Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me.

16.    Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions.  I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

17.    The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections.  The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 10 , 2009                    _Regina Jones_____

                                                            REGINA JONES

**TAB 29**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM HELM, et al.<br>On behalf of themselves and all employees<br>similarly situated,<br><br>        Plaintiffs,<br>   vs.<br><br>ALDERWOODS GROUP, INC., et al.<br><br>        Defendants. | **CASE NO.**   **3:08-CV-01184 SI**<br><br>**DECLARATION OF ROZLYN<br>KARNEOL** |

# DECLARATION OF ROZLYN KARNEOL

I, Rozlyn Karneol, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.    My name is Rozlyn Karneol.  I am a resident of Pompano Beach, Florida.  I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.    All the statements in this Declaration are true and accurate.  I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.    I am currently retired.  I worked as an hourly employee at ABC Jennings Funeral Home ("Jennings") in Fort Lauderdale, Florida for about two years.  I started work at Jennings in and around the year 2005, when the funeral home was owned by Alderwoods.

4.    At Jennings, I generally worked eight hours a day on Saturday and Sunday.  I was assigned secretarial duties and worked the front desk of the funeral home and answered the telephone.  If asked, I would provide customers with information on burial and cremation prices from a brochure.  I did not work directly with the deceased individuals, nor was I ever asked to retrieve a deceased individual from an off-site location.

5.    I was never asked to participate in community organizations or perform community service by my manager at Jennings.  Participation in community organizations was not a requirement for my position at Jennings.  I never saw a "community work" policy when I worked at Jennings.

6.      I was never asked to sell pre-need policies as part of my job at Jennings.  When a customer inquired about a pre-need policy, I referred the customer to my manager.

7.      As an hourly employee, I clocked in and out with a time card.  I was paid on an hourly basis.  I was always paid for the time that I worked, and I always recorded the time that I actually worked.  I was never asked to not record time that I had worked, nor was I told that there was a policy to not record time worked.

8.      On rare occasions, I was asked to work beyond my scheduled hours.  Whenever I was asked to do so, I recorded my time and was paid for all of my time.

9.      I did take lunch breaks when I worked at Jennings.  I was never asked to work through a meal break.  There never was a time when I worked through a meal break and was not paid for the time I worked.

10.     I received two to three days of training prior to beginning work for Jennings.  The training consisted of following another employee working the same position to learn what I would have to do.  I recorded my time for this training and was paid for it.  I received no other training during my employment by Jennings.  I was never told that there was a company-wide "training" policy at Alderwoods.

11.     Before speaking with any attorney for Alderwoods, I was told that the employees who filed the lawsuit seek to have the class certified, and that the matter of class certification has not been ruled upon by the Court.  I was also told that if the class is certified and assuming I am a member of the class, then the attorneys for Alderwoods will be directly opposing my interest as a class member.

12.     I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked.  Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me.

13.     Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions.  I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

14.     The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections.  The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 4, 2009

ROZLYN KARNEOL

**TAB 30**

1              UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3

4   WILLIAM HELM, et al.                          )   CASE NO.    3:08-CV-01184 SI
    On behalf of themselves and all employees     )
5   similarly situated,                           )   DECLARATION OF KAREE KORELL
                                                  )
6              Plaintiffs,                         )
                                                  )
7        vs.                                       )
                                                  )
8   ALDERWOODS GROUP, INC., et al.                )
                                                  )
9              Defendants.                         )
                                                  )
10 _____           )

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

DECLARATION OF KAREE KORELL

I, Karee Korell, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1. My name is Karee Korell. I am a resident of Kirkland, Washington. I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2. All the statements in this Declaration are true and accurate. I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3. I am currently a Location Manager at Acacia Memorial Park and Funeral Home in Seattle, Washington. I began working at Acacia in August 2005 as a full time funeral director. At the time I was hired to work at Acacia, it is my understanding that Acacia was owned and operated by Alderwoods Group, Inc.

4. As a funeral director, I performed a variety tasks including meeting with families, preparing for funerals, embalming, and performing removals

5. As a funeral director at Acacia for Alderwoods from 2005 through December of 2006, I was always an hourly, full time employee working 40 or more hours each week.

6. Initially, I worked only some overtime, but in early 2006 through the end of that year I began working approximately 50 to 60 hours each week. I was always paid time-and-a-half for any overtime I ever worked. My time was recorded on time cards, which I used to punch in and punch out.

7. Alderwoods paid me for all the overtime I worked. I don't recall any policy which required my overtime to be pre-approved, nor do I recall ever having my overtime not approved.

8. None of my managers, or any other employee at Alderwoods, ever encouraged, required, or requested me not to record my overtime. I was never required to perform any work before clocking in the morning.

9. No one at Alderwoods ever encouraged, required, or requested me to perform work but not record the time that I worked. I always recorded the time that I worked, including overtime.

10. As a funeral director, I would be "on call" approximately two to three nights a week. My "on call" duties consisted of performing removals of bodies from various locations to the funeral home or answering after-hours calls to the funeral home. I received the calls on my cell phone and was not required to be at home during my on-call hours.

11. For removals, I would be paid a minimum of three hours for each removal I performed. If a removal took less than three hours, I was paid the full three hours. Each removal call generally took about 1 ½ hours to complete. It was rare that a removal took any longer than 2 hours. If a removal took longer than three hours, then I was paid for each hour after that, however, I don't recall any removals that ever took that long.

12. Answering phones while "on call" consisted of speaking with families or others who called the funeral home after hours. For any call that lasted 15 minutes or less, I was paid for 15 minutes. If a call lasted more than 15 minutes, then I was paid for each minute the call lasted.

3

13.     I was not involved in the selling of pre-need policies, nor was I ever required to make pre-need presentations or sell pre-need policies. Alderwoods used family service counselors exclusively to sell pre-need policies and make presentations.

14.     I was never told about or saw an Alderwoods "Community Work Policy," or heard of "I Believe In Service" or "Success Spotlight." I was not encouraged or required to participate in community organizations or perform community work as an employee of Alderwoods. I never reported on my activities with any organizations to any Alderwoods managers, or completed a community service report form, nor was I ever required to do so.

15.     To the best of my knowledge, I did not have an annual evaluation while working for Acacia when it was operated by Alderwoods. No one ever evaluated me on my participation in community service, or the amount of overtime I recorded.

16.     Alderwoods permitted a 30 minute meal break every day. I would take the full 30 minutes, unless I had to work through lunch or my meal break was interrupted by work. On any occasion that my meal break would be interrupted because of work, I would be paid for working through my break. I would also take my meal break later that day. None of my managers or other Alderwoods employees ever encouraged, required, or requested me not to record my time that I worked through a meal break.

17.     I don't recall having to take any required training or attend meetings. As part of obtaining my funeral director's license I was required to "shadow" my manager during the day. I was always paid for the time that I did this.

18.     I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked. Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me. I also was told that the employees who filed the lawsuit seek to have the class

4

certified, and that the matter of class certification has not been ruled upon by the Court; and that if the class is certified and assuming I am a member of the class, then the attorneys for Alderwoods Group, Inc. will be directly opposing my interest as a class member.

19.     Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions.  I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

20.     The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections.  The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  November 3, 2009

KAREE KORELL

5

**TAB 31**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WILLIAM HELM, et al.
On behalf of themselves and all employees
similarly situated,

        Plaintiffs,

    vs.

ALDERWOODS GROUP, INC., et al.

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CASE NO.   3:08-CV-01184 SI

**DECLARATION OF RICHARD KRUEGER**

## DECLARATION OF RICHARD KRUEGER

I, Richard Krueger, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.      My name is Richard Krueger. I am a resident of Conroe, Texas. I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.      All the statements in this Declaration are true and accurate. I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.      I am currently the manager of the Cashner Funeral Home in Conroe, Texas. I was a funeral director and manager at the funeral home during the years that Alderwoods owned Cashner Funeral Home. At that time, the funeral home employed 2 to 3 funeral directors, myself, 3 to 4 part-time employees, and 2 administrative staff.

Overtime

4.      Overtime was time and a half. No pre-approval for overtime was required. When work needed to be completed, it was understood that the employee would work overtime. We never had an issue with employees recording too much overtime at my location. Employees were always paid for the overtime that they worked.

After-Hours Work

5.      Employees who performed after-hours removals were paid their hourly rate, including overtime if they accrued sufficient hours in the week, plus an additional flat rate. The amount of the additional rate would depend on whether the removal involved prep work. A simple removal had a flat rate of $20, while the flat rate for a removal and prep was $50. This rate did

change.

6.     When an employee was on-call, they did not need to be at the funeral home. They were paid from the time they got the call until it was completed. If a funeral director took a business call after hours, they were paid 15 minutes per call. If the call lasted longer than 15 minutes, they were paid another 15-minute increment.

"Community Work Policy"

7.     We made community activities available to the employees, but participation in community organizations was never a requirement of employment. If an employee attended a lunch (like a Kiwanis lunch), Alderwoods paid fees, dues, and the employee's time while at the activity. Most community activities took place during regular business hours and were on-the-clock.

8.     There was no incentive programs to encourage employees to participate in community organizations. I do not recall a program called "I Believe in Service." Employees were not evaluated on their community participation.

Pre-Need Sales

9.     At times, funeral directors were allowed to sell pre-need policies if they were licensed. The funeral home paid for the licensing. They were paid commissions on their sales. There was also a pre-need sales staff. They received 60 days of hourly wages when they began, then were paid on commission. Funeral directors were not required to sell pre-need policies.

Training

10.     The funeral home paid for re-licensing and continuing education courses for the

funeral directors. Likewise, employees were paid for any training required by Alderwoods.

Meal Breaks

11.    Employees were to take a lunch break, but the realities of the business meant that there were times when an employee might choose to work through a lunch. If they did so, they were paid for their time. They were never told to record a lunch break they did not take.

12.    I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked. Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me.

13.    Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions. I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

14.    The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections. The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.


Dated: November _11_ , 2009                          _Richard Krueger_
                                                     RICHARD KRUEGER

**TAB 32**

1

UNITED STATES DISTRICT COURT

2

NORTHERN DISTRICT OF CALIFORNIA

3

4  WILLIAM HELM, et al.                         )  CASE NO.    3:08-CV-01184 SI
                                                )
5  On behalf of themselves and all employees    )
   similarly situated,                          )  **DECLARATION OF DANIEL**
6                                               )  **LAPLAUNT**
                                                )
   Plaintiffs,                                  )
7                                               )
         vs.                                    )
8                                               )
   ALDERWOODS GROUP, INC., et al.               )
9                                               )
   Defendants.                                  )
10                                              )

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

1  DECLARATION OF DANIEL LaPLAUNT

2
3  I, Daniel LaPlaunt, pursuant to 28 U.S.C. § 1746, do hereby declare and state
4  as follows:

5      1.    My name is Daniel LaPlaunt. I am a resident of Centralia,
6  Washington. I am over 21 years of age, suffer no legal disability, and am otherwise
7  competent to make this Declaration.

8
9      2.    All the statements in this Declaration are true and accurate. I
10  have personal knowledge of the facts set forth in this Declaration, and could testify
11  to them competently if called to do so.

12      3.    I am currently a Location Manager at Sticklin Funeral Chapel in
13  Centralia, Washington. I began working at Sticklin in March 1999 as a funeral
14  director/embalmer apprentice. I obtained my funeral director's license in March
15  2000. Shortly after I was I hired, through December 2006, it is my understanding
16  that Sticklin was owned and operated by Alderwoods Group, Inc.

17
18      4.    As a funeral director for Sticklin, I performed a variety tasks
19  including meeting with families, preparing for funerals, embalming, and performing
20  removals. From 2002 through December of 2006, I was always an hourly, full-time
21  employee working 40 or more hours each week.

22      5.    During the time period 2002 through 2006, I would also work
23  overtime on occasion. I would average approximately 2 to 3 hours each week of
24  overtime during this period. I was always paid time-and-a-half for any overtime I
25  ever worked. My time was initially recorded on time sheets. At some point in 2004,
26  Alderwoods installed a time clock, and I recorded my time on time cards, which I
27  used to clock-in and clock-out.

28

6.     Alderwoods paid me for all the overtime I worked.  My manager preferred that I checked with him before working overtime, but I don't recall any Alderwoods policy which required my overtime to be pre-approved.  Nor do I recall ever having my overtime not approved.  If I ever worked any overtime that my manager did not initially approve, I would be paid for working that overtime.

7.     None of my managers, or any other employee at Alderwoods, ever encouraged, required, or requested me not to record my overtime.  I was never required to perform any work before clocking-in the morning or clocking-out at night.

8.     No one at Alderwoods ever encouraged, required, or requested me to perform work but not record the time that I worked.  I always recorded the time that I worked, including overtime.

9.     When I was first hired at Sticklin, the manager had a bonus program which rewarded employees for certain sales of merchandise.  By 2002, however, Alderwoods required our manager to discontinue the program as it was not authorized by the company.  I don't recall receiving any bonuses or commissions after that program was discontinued.

10.    As a funeral director, I would be "on call" approximately seven nights a month.  My "on call" duties consisted of performing removals of bodies from various locations to the funeral home or answering after-hours calls to the funeral home.  I received the calls on a cell phone issued by the funeral home.

11.    Removals performed after hours were generally performed by a funeral director and part time employee.  During the 2002 through 2006 time period, we were paid by the hour for each removal plus an additional $40 per removal.  I would record my time for each removal from the time I took the call until the time the removal was completed.  Removal calls generally took from about 20 minutes to 2 hours to complete.

3

12.    Answering phones while "on call" consisted of speaking with families or others who called the funeral home after hours.  For any call that lasted 15 minutes or less, I was permitted to record 15 minutes for my time.  If a call lasted more than 15 minutes, then I recorded each additional minute the call lasted.

13.    I was not involved in the selling of pre-need policies, nor was I ever required to make pre-need presentations or sell pre-need policies.  Alderwoods used advanced planning personnel exclusively to sell pre-need policies and make presentations.  It is my understanding that in order to sell pre-need policies you are required to have a license.  No one at Alderwoods ever required me to obtain such a license.

14.    I was never told about or saw an Alderwoods "Community Work Policy," or heard of "I Believe In Service" or "Success Spotlight."  Although I was encouraged by my manager at Sticklin to participate in community organizations, I was never required to do so.

15.    To the best of my knowledge, I did not have an annual evaluation while working for Sticklin when it was operated by Alderwoods.  No one ever evaluated me on my participation in community service, or the amount of overtime I recorded.

16.    None of my managers or other Alderwoods employees ever encouraged, required, or requested me not to record my time that I worked through a meal break.

17.    During 2002 through 2006, I was the training coordinator for Sticklin.  We would have annual certification training and other periodic training meetings mostly related to safety issues.  These meetings were held during normal business hours, and the hourly employees, including myself, would be on the clock and paid to attend these meetings.  I don't recall any Alderwoods policy that

4

required after hours training sessions for which employees were required to attend off the clock and not paid.

18. I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked. Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me. I also was told that the employees who filed the lawsuit seek to have the class certified, and that the matter of class certification has not been ruled upon by the Court; and that if the class is certified and assuming I am a member of the class, then the attorneys for Alderwoods Group, Inc. will be directly opposing my interest as a class member.

19. Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions. I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

20. The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections. The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct to the best of my recollection.

Dated: November 1Z, 2009

DANIEL LaPLAUNT

5

**TAB 33**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| WILLIAM HELM, et al.<br>On behalf of themselves and all employees<br>similarly situated,<br><br>　　　　　Plaintiffs,<br>　　vs.<br><br>ALDERWOODS GROUP, INC., et al.<br><br>　　　　　Defendants. | CASE NO.   3:08-CV-01184 SI<br><br>DECLARATION OF ROBERT LASKA |

1

DECLARATION OF ROBERT LASKA

I, Robert Laska, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.      My name is Robert Laska. I am a resident of Hicksville, New York. I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.      All the statements in this Declaration are true and accurate. I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.      I am currently a Funeral Director at the Vernon C. Wagner Funeral Homes in Hicksville, New York. I began working at Wagner Funeral Homes in 2000 as a part-time receptionist, greeter and funeral support staff. In August 2003, I began a residency at Wagner Funeral Homes as a full-time funeral director, and received my funeral director's license in August 2004. At that time, I continued to work full-time as a funeral director at Wagner Funeral Homes. Shortly after I was I hired in 2000, through December 2006, it is my understanding that Wagner Funeral Homes was owned and operated by Alderwoods Group, Inc.

4.      As a part-time employee between 2000 and August 2003, I worked approximately 12 hours a week. I did not work any overtime during this period. When I began my residency as a funeral director in August 2003 through December 2006, I was always an hourly, full-time employee working 40 or more hours each week.

5.      As a funeral director at Wagner Funeral Homes, I would work overtime on occasion. I would work on average approximately 5 to 10 hours each week of overtime. I was always paid time-and-a-half for any overtime I ever worked. My time was initially recorded on time sheets. At some point after August 2004, Alderwoods

2

installed a time clock, and I recorded my time on time cards, which I used to clock-in and clock-out.

6.    Alderwoods paid me for all the overtime I worked. I would check with my manager before working overtime, who would always approve it. If I ever worked any overtime that my manager did not initially approve, I would be paid for working that overtime.

7.    None of my managers, or any other employee at Alderwoods, ever encouraged, required, or requested me not to record my overtime. I was never required to perform any work before clocking-in the morning or clocking-out at night.

8.    No one at Alderwoods ever encouraged, required, or requested me to perform work but not record the time that I worked. I always recorded the time that I worked, including overtime.

9.    I did not receive any bonuses or commissions when I worked for Alderwoods at the Wagner Funeral Homes.

10.    As a part-time employee, and during my residency as a funeral director, I was never on call for after hours work. About two months after I received my funeral director's license, I would be on call periodically. Only the funeral directors at Wagner Funeral Homes would be on call after hours. My "on call" duties consisted of performing removals of bodies from various locations to the funeral home or answering after-hours calls to the funeral home. I received the calls on a cell phone issued by the funeral home, or had the calls forwarded to my home phone.

11.    Removals performed after hours were generally performed by a funeral director. Depending upon where the removal was, a part time employee would assist. Whenever I did a removal, I would record my time from when I first received the call until the removal was completed. Removals were done "on the clock" and we were

3

paid our hourly wage, including any overtime. We did not receive a "piece rate" for removals. At times, we would use tradesmen – a third party service – to perform removals.

12.     Answering phones while "on call" consisted of speaking with families or others who called the funeral home after hours. I recorded my time for phone calls in 15 minute intervals. For any call that lasted less than a full 15 minute interval, I was permitted to record the full 15 minutes for my time. It would be rare that a call would last more than 15 minutes.

13.     I was not involved in the selling of pre-need policies, nor was I ever required to make pre-need presentations or sell pre-need policies.

14.     I was never told about or saw an Alderwoods "Community Work Policy." I was never required to participate in community work as either a part-time employee, during my funeral director's residency, or as a funeral director. As a funeral director, I was encouraged to participate in community activities but was not required to do so. I participate in community organizations, including the Knights of Columbus, but I would be active in these organizations regardless of my work at Alderwoods as I enjoy being active in my community.

15.     I would have an evaluation annually. No one ever evaluated me on my participation in community service, or the amount of overtime I recorded.

16.     Alderwoods permitted a 30 minute meal break every day. I would always take the full 30 minutes. I never had to work through my meal break, and never had my meal break interrupted by work. None of my managers or other Alderwoods employees ever encouraged, required, or requested me to work through my meal break and not record my time.

4

17. While working for Alderwoods at Wagner Funeral Homes, we would have periodic training and other meetings mostly related to safety issues. These meetings usually were held on Friday afternoons, but always during normal business hours. The hourly employees, including myself, would be on the clock and paid to attend these meetings. I don't recall any Alderwoods policy that required after hours training sessions for which employees were required to attend off the clock and not be paid.

18. I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked. Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me. I also was told that the employees who filed the lawsuit seek to have the class certified, and that the matter of class certification has not been ruled upon by the Court; and that if the class is certified and assuming I am a member of the class, then the attorneys for Alderwoods Group, Inc. will be directly opposing my interest as a class member.

19. Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions. I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

20. The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections. The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: November ____, 2009

ROBERT LASKA

5

**TAB 34**

1
2
3
UNITED STATES DISTRICT COURT
4
NORTHERN DISTRICT OF CALIFORNIA
5
                           )   CASE NO.    3:08-CV-01184 SI
6
WILLIAM HELM, et al.          )
On behalf of themselves and all employees  )
7
similarly situated,             )   **DECLARATION OF GLORIA**
                           )   **LAWRENCE**
8
           Plaintiffs,        )
9
      vs.                    )
                           )
10
ALDERWOODS GROUP, INC., et al.   )
                           )
11
         Defendants.      )
12
                           )
13
                           )
14
                           )
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# DECLARATION OF GLORIA LAWRENCE

I, Gloria Lawrence, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.    My name is Gloria Lawrence. I am a resident of Los Angeles, California. I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.    All the statements in this Declaration are true and accurate. I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.    I am currently a location manager at Custer Christiansen Mortuary in Covina, California. I began working at Custer Christiansen in 2001 as an apprentice funeral director. I became a funeral director in 2003. Shortly thereafter, I became an assistant manager. I worked hourly for Alderwoods at Custer Christiansen from 2002 until about 2004 or 2005, when I became a location manager.

4.    Prior to becoming a location manager, I was an hourly, full-time employee. I worked 40 hours a week.

Overtime

5.    I recorded any overtime I worked. As an apprentice, I did not have very much overtime. My overtime generally consisted of working an after-hours service or on a Saturday.

6.    As a funeral director, and then as an assistant manager, I recorded more overtime as my duties expanded. My overtime included after-hours services as well as paperwork.

7.    Pre-approval for overtime was required by my manager.  I never had any difficulty getting approval for overtime.  There were a few occasions when I was not able to approval beforehand, because my manager was not at the funeral home.  I was never questioned about this time and I was paid for it.

8.    I do not know if there was a written overtime policy from Alderwoods.  I do not know if Alderwoods had a policy regarding pre-approval of overtime.

9.    I was fully paid for the overtime I worked.  I did not receive any bonuses or commissions under Alderwoods.

After-Hours Work

10.    As an apprentice embalmer, I did conduct removals.  I was on-call for removals after-hours as well.  If I was on-call, I would take the van home with me because I did not live close to the funeral home.  When I received a call for a removal, I was paid from the moment I stepped into the van until I returned home.

11.    Part-time employees were the first employees on-call for removals.  As an apprentice embalmer, I was served as a back-up.  I was never told to not record time that I had worked.

12.    As an apprentice embalmer, I did not handle business calls in the evening.  Funeral directors handled after-hours business calls.  If a call was received after-hours, the time for the call was recorded and was paid on an hourly basis.

13.    The current practice at the funeral home is for me, as the manager, to take after-hours calls, and we use a removal service for after-hours removals.

"Community Work Policy"

14.    I was not told that I was expected to be involved in community organizations until I became a salaried manager. As an hourly employee, I was not required to participate in community organizations.

15.    Hourly employees generally were encouraged to participate in community activities by the funeral home. When I was an apprentice embalmer working in the prep room, however, I was not even encouraged to be involved in community activities. The only activities in which I participated were mixers put on by the funeral home. Many funeral directors did not participate in any community organizations.

16.    I do not recall any incentive program for community service.

17.    I recall that there was a set of binders with Alderwoods procedures. I recall a "participation guide" and a "community leadership program" relating to community service, but these documents applied only to managers.

18.    As a manager, if I wanted employees to participate in a community activity, like a mixer put on by the funeral home, then that time would go on their time card and they would be paid for their time.

Pre-Need Sales

19.    I did not sell pre-need policies. There was a separate pre-need counselor who handled this under Alderwoods. To my knowledge, no funeral director sold pre-need policies. I was never encouraged to sell pre-need policies.

20.    The pre-need counselor was paid the greater of his or her hourly rate or

commission.

Meal Breaks

21.   Full-time employees received a lunch break.  If it was a busy day, I might tell my supervisor that I wanted to skip lunch and he would sign off on this.  A notation "no lunch" would be made on the time card, and I would be paid for the time I worked.  I was never told to record a lunch break I did not take.

22.   Before speaking with any attorney for Alderwoods, I was told that the employees who filed the lawsuit seek to have the class certified, and that the matter of class certification has not been ruled upon by the Court.  I was also told that if the class is certified and assuming I am a member of the class, then the attorneys for Alderwoods will be directly opposing my interest as a class member.

23.   I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked.  Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me.

24.   Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions.  I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

25.   The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections.  The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

1   I declare under penalty of perjury that the foregoing is true and correct.

2

3

4   Dated: November 12, 2009                    _Gloria Lawrence_____
                                                 GLORIA LAWRENCE

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TAB 35**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WILLIAM HELM, et al.
On behalf of themselves and all employees
similarly situated,

        Plaintiffs,

    vs.

ALDERWOODS GROUP, INC., et al.

        Defendants.

CASE NO.   3:08-CV-01184 SI

DECLARATION OF JOHN LAY

## <u>DECLARATION OF JOHN LAY</u>

I, John Lay, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.      My name is John Lay.  I am a resident of Oakland Park, Florida.  I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.      All the statements in this Declaration are true and accurate.  I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.      I am currently a funeral attendant at Kraeer Funeral Home in Pompano Beach, FL. I have worked for Kraeer Funeral Home for ten years, including the years when it was owned by Alderwoods.  I have always been an hourly employee.  I worked full-time for Alderwoods, 40-hours a week.

4.      As a funeral attendant, my job is to drive the hearse, flower van or limousine for funeral services, to assist at funeral services and visitations in greeting and seating family members, to write and collect prayer cards, and other miscellaneous duties.

5.      As an hourly employee, I recorded my time using a time card and punch clock.

<u>Overtime</u>

6.      During the time Alderwoods owned Kraeer, I worked overtime, usually when there was a late visitation.  I might stay an extra 2 to 4 hours on a given night.  When I worked overtime, I was paid time and a half.

7.      When I worked for Alderwoods, I did not receive commissions or bonuses.

Occasionally, employees might receive a monetary gift at Christmas.

8. The practice under Alderwoods was for overtime to be approved by the manager so that he could manage scheduling. There may have been a few occasions when I was unable to get approval before working overtime. I was paid for the overtime that I worked on these occasions. I was always paid for the time I worked.

9. I was never told to not record overtime that I had worked, or to record it as regular time.

After-Hours Removals

10. I only performed one removal for Alderwoods, which was during work hours. Kraeer had a removal team, which was a group of employees whose job it was to handle removals. Removals were usually performed by an Alderwoods employee, but in the past they have outsourced removals.

"Community Work Policy"

11. Alderwoods encouraged employees to participate in community activities. I would sometimes go to luncheons, but this was always in the context of driving clergy in the funeral home limousine. I was paid for this time.

12. Kraeer had a booth at a seafood festival, but I did not attend. Employees were never required to participate in community activities or organizations. I do not recall seeing any written policy regarding community service.

13. Kraeer currently has an employee whose job is community relations work. This employee performed the same function under Alderwoods, but had a different title.

Pre-Need Sales

14. I did not sell pre-need policies. At most, I occasionally talked to customers or family members about pre-need policies when asked a question while driving the limousine. I was never required to sell pre-need policies.

Meal Breaks

15. As a full-time employee, I received meal breaks. On rare occasions, I have had to work through a lunch break. When this occurred, I made a note of this on a sheet that is submitted with the time card. I was always paid for the time I worked during a lunch break. If working through lunch meant that I had more than 40 hours at the end of the week, I was paid overtime.

16. Before speaking with any attorney for Alderwoods, I was told that the employees who filed the lawsuit seek to have the class certified, and that the matter of class certification has not been ruled upon by the Court. I was also told that if the class is certified and assuming I am a member of the class, then the attorneys for Alderwoods will be directly opposing my interest as a class member.

17. I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked. Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me.

18. Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions. I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

19.    The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections. The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: _Nov. 11_____, 2009

JOHN LAY

**TAB 36**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WILLIAM HELM, et al.
On behalf of themselves and all employees
similarly situated,

        Plaintiffs,

   vs.

ALDERWOODS GROUP, INC., et al.

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CASE NO.    3:08-CV-01184 SI

**DECLARATION OF CHRISTOPHER
LUCIANO**

## DECLARATION OF CHRISTOPHER LUCIANO

I, Christopher Luciano, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.      My name is Christopher Luciano.  I am a resident of Chatham, Massachusetts.  I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.      All the statements in this Declaration are true and accurate.  I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.      I am currently a location manager at Nickerson Funeral Home in Orleans, Massachusetts, which is part of the Doane, Beal and Ames Funeral Home on Cape Cod.  From 2002 to 2004, I worked at the Romano Funeral Home in Providence, RI as a funeral director. Romano Funeral Home was owned by Alderwoods at the time.  In 2004, I became a funeral director for Doan, Beal and Ames in Massachusetts.  Doane, Beal and Ames also was an Alderwoods funeral home.  I became a location manager about a year and a half ago.

4.      As a funeral director for Alderwoods, I was a full-time, hourly employee.  I worked about 40 to 50 hours per week at both Romano and Doane, Beal and Ames.  I recorded my time on a time card that was submitted to payroll or to my supervisor.

Overtime

5.      When I worked for Alderwoods, I recorded all time that I worked.  I was paid time and a half for overtime.  I did not receive any commissions or bonuses.  Only managers received commissions or bonuses.

6.      I was never told to not record overtime that I had worked, or to record it as regular time.  I was always paid for overtime that I worked.

7.      At Romano, I did not obtain pre-approval for overtime because there were only two people working after-hours.  Later, I was required to obtain pre-approval for overtime with the exception of after-hours removals.  I never had any trouble getting approval for overtime.

After-Hours Removals

8.      At Romano, I was on-call for after-hours removals every other day, because there were only two funeral directors at that location.  I averaged about 2 calls a week at Romano.

9.      At Doane, Beal and Ames, I was on-call for after-hours removals 8 nights of the month.  I averaged one removal a night that I was on-call.

10.     At both locations, I was on the clock and paid from the time I was called until the time I returned home.  Any phone calls I had to make as part of the removal were included in this time.  I was paid hourly for this time.

"Community Work Policy"

11.     Employees were encouraged, but not required, to participate in community organizations.  Alderwoods paid for dues and fees (like a dinner fee).  This was an option for any employee that wanted to participate.  However, not many employees were active in community organizations.

12.     I am a member of the Knights of Columbus and the Lions Club.  My participation in these organizations was not required by Alderwoods.

13.    I do not recall a community service "policy."   When I was evaluated by my supervisor, community service was not part of the evaluation.

Pre-Need Sales

14.    I was not required to and did not sell pre-need policies when I worked for Alderwoods.  At Romano, I did sell "trust" policies, which did not require a license, but there was no commission for such policies.  In Massachusetts, a license is required to sell pre-need insurance policies.  Alderwoods paid for any time selling pre-needs, as well as for courses and tests to obtain the insurance license.  The insurance examination took place during the day and was on-the-clock.

Training

15.    Alderwoods paid for the training of funeral directors.  Alderwoods paid for all licensing courses and would host courses at Alderwoods locations.  Most courses were conducted during regular business hours and employees were paid for their time spent at these courses.  Continuing education (CEU) courses were usually scheduled for the morning and early afternoon.

16.    I was paid for the time I spent at these courses and even provided a company car when the course was held off-site.  This applied to funeral directors as well as apprentice funeral directors.

Meal Breaks

17.    As a full-time employee, I received meal breaks.  At Romano, I stayed on the clock for my meal breaks and was paid for this time.  At Doane, Beal and Ames, I was given a half-hour meal break.  If I did not take my meal break, I simply did not punch out at the time clock.  I was never asked to record a meal break or punch out when I did not take a meal break.

18.     Before speaking with any attorney for Alderwoods, I was told that the employees who filed the lawsuit seek to have the class certified, and that the matter of class certification has not been ruled upon by the Court.  I was also told that if the class is certified and assuming I am a member of the class, then the attorneys for Alderwoods will be directly opposing my interest as a class member.

19.     I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked.  Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me.

20.     Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions.  I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

21.     The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections.  The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: _Nov 2, 2009_, 2009

_____
CHRISTOPHER LUCIANO

**TAB 37**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM HELM, et al.<br>On behalf of themselves and all employees<br>similarly situated,<br><br>        Plaintiffs,<br>  vs.<br><br>ALDERWOODS GROUP, INC., et al.<br><br>        Defendants. | **CASE NO.**   **3:08-CV-01184 SI**<br><br>**DECLARATION OF KELLEY MANN** |

1

## DECLARATION OF KELLEY MANN

I, Kelley Mann, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.     My name is Kelley Mann. I am a resident of Hiram, Georgia. I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.     All the statements in this Declaration are true and accurate. I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.     I am currently the general manager of Forest Lawn Memorial Gardens, a cemetery in College Park, Georgia. Prior to that time, I was an office manager at Kennesaw Memorial Park, a cemetery in Marietta, Georgia, and Georgia Memorial Park Funeral Home and Cemetery in Marietta, Georgia. I worked at Georgia Memorial Park on the cemetery side of the business from 1985 through early 2004, and Kennesaw from 2004 through April 2007. It is my understanding that from early 2000 through December 2006, when I worked at both Georgia Memorial and Kennesaw, the cemeteries were owned and operated by Alderwoods Group, Inc. from approximately 2001 through 2006.

4.     As office manager, I was responsible for payroll, entering contracts, paying bills, and other administrative duties. Accordingly, I was familiar with Alderwoods' time keeping procedures and pay practices, and how they were implemented at this location from 2002 through 2006. I was a full-time, hourly employee the entire time I worked for Alderwoods at these locations. I worked 40 to 45 hours a week. On rare

2

back up for the answering service if a family needed to speak with someone. I recorded all of the time I spent on those phone calls, and was paid for my time doing so. None of the other cemetery hourly employees took phone calls after hours.

### After-Hours Removals

10.    None of the cemetery staff at either Georgia Memorial or Kennesaw conducted after-hours removals.

### "Community Work Policy"

11    The hourly employees were not required to be involved in community activities or organizations. I conducted annual evaluations of some of the hourly employees who reported to me. I never discussed with them as part of their evaluation their participation in community activities or organizations. I also was evaluated annually by my manager. My manager never evaluated me on the basis of my involvement in community organizations or activities.

12.    Before Alderwoods assumed ownership of the two locations where I worked from 2002 to 2006, I was involved with the Shriners organization. This was an activity that I participated in voluntarily, on my own time. No one at Alderwoods required me to be a member of that, or any, organization as part of my employment.

13.    Although I recall hearing about a Community Leadership Program, I am not aware of the details of the program as it was not something the employees at the cemetery would have been involved in. I am not aware of any hourly employee who was required to participate in any such program.

### Pre-Need Sales

14.    The hourly maintenance staff and office employees were not required to participate in pre-need presentations or make pre-need sales. Alderwoods had a

4

separate staff of family service counselors who were responsible for pre-need sales and presentations. On rare occasions, if a family came to the cemetary office and needed assistance, I would help them fill complete paperwork for pre-need applications. I did this during normal business hours and was paid for my time.

15.    Family service counselors worked at different locations, including Georgia Memorial and Kennesaw. These individuals would be required to record their time by clocking in and clocking out when they were working. They were compensated for the hours they worked, or based on their commissions, whichever was greater. None of the family service counselors who worked at Kennesaw or Georgia Memorial were paid less than their hourly rate for the hours they worked.

Training

16.    We would have staff meetings from time to time for all of the cemetery workers, including the maintenance employees and the office staff. These sessions were held during the day and all of the hourly employees were on-the-clock and paid for attending.

17.    When family service counselors were hired, they also had training and were paid their hourly rate while attending training sessions. In addition, these newly hired family service counselors were paid an additional sum to compensate for the lack of commissions earned from sales of policies because they were attending training and not selling policies.

Meal Breaks

18.    Employees received a half-hour for lunch. There were times, depending on how many burials were being conducted at the cemetery, when an hourly employee worked through their lunch break. If they did so, they were paid for their time. Usually, however, the employee would simply take a later lunch. I never told the

5

employees to record a lunch break if they had not taken the break. I was always paid for any time I ever worked through lunch.

19.    Alderwoods management would remind me to make sure that I, and the other hourly employees, took a lunch break each day.

20.    I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked. Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods. I also was told that the employees who filed the lawsuit seek to have the class certified, and that the matter of class certification has not been ruled upon by the Court; and that if the class is certified and assuming I am a member of the class, then the attorneys for Alderwoods Group, Inc. will be directly opposing my interest as a class member.

21.    Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions. I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

22.    The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections. The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.


Dated: November 12, 2009                    _Kelley J. Mann_

                                             KELLEY MANN

**TAB 38**

1                UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3

| | |
|---|---|
| 4    WILLIAM HELM, et al. | )    **CASE NO.    3:08-CV-01184 SI** |
| 5    On behalf of themselves and all employees similarly situated, | ) |
| 6 | )    **DECLARATION OF ELEANOR MCCARTHY** |
| 7          Plaintiffs, | ) |
| 8          vs. | ) |
| 9    ALDERWOODS GROUP, INC., et al. | ) |
| 10          Defendants. | ) |

DECLARATION OF ELEANOR MCCARTHY:

I, Eleanor McCarthy, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.     My name is Eleanor McCarthy.  I am a resident of Deerfield Beach, Florida.  I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.     All the statements in this Declaration are true and accurate.  I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.     I am currently a Senior Arranging Director for Kraeer Funeral Homes at the Sample Road Chapel in Pompano Beach, Florida.  I've worked for the Kraeer Funeral Home business since 1971.  From 2002 through 2006, I worked as a manager at the Kraeer Funeral Home Sample Road Chapel in Pompano Beach, Florida, during which time Alderwoods owned and operated the facility.

4.     In my position as Manager for Alderwoods at the Kraeer Funeral Home Sample Road Chapel, I was a salaried employee.  At the Sample Road Chapel, I had two and sometimes three hourly employees who reported directly to me.  These employees assisted me with funeral arrangements, meeting with families, and other day to day operations of the Chapel.  Generally, I had one part-time and two full-time hourly employees working with me.

5.      In the course of my years working as Manager at the Sample Road Chapel, I gained knowledge of Alderwoods' timekeeping policies and pay practices and how they were implemented at this location.

After-Hours Removals

6.      At the Kraeer Funeral Home, we would sometimes perform removals. On occasion, these removals were after-hours.  The hourly employees who assisted with removals were paid for their work by the hour.  The hourly employees would be paid for overtime if they exceeded 40 hours of work in a given week.  The removals were performed exclusively by the employees at the embalming center, and not by the employees at the Sample Road Chapel where I was manager.

7.      Hourly employees were not paid a "piece" rate for removals.  From time to time, when needed, we would employ a third-party removal service to perform removals.  Only the removal service was paid a "piece" rate for removals.

8.      I have no knowledge of a company-wide Alderwoods policy requiring hourly employees to perform after-hours work without pay.  Employees were paid for all the time they worked, including any overtime work.

Overtime

9.      I am unaware of any Alderwoods policy that encouraged or required managers not to pay overtime that was not pre-approved.  The hourly employees who reported to me at the Sample Road Chapel were not required to obtain pre-approval for overtime worked during my tenure as Manager.

3

10. In my experience, Alderwoods employees were always paid for the time they worked, including overtime. The hourly employees at the Sample Road Chapel would record their time on time cards by punching in and punching out. All hourly employees were paid time-and-a-half for any overtime worked.

11. I never encouraged, required, or requested any hourly employee at the embalming facility to not record their time for hours worked, including overtime. Nor do I recall of any instance in which an hourly employee failed to record his or her overtime.

12. My Regional Manager never encouraged, required, or requested me to have hourly employees not record their hours worked for overtime.

"Community Work Policy"

13. I never saw or heard of an Alderwoods policy requiring employees to participate in any community organization. Nor was I aware of an Alderwoods policy that required employees to perform community work outside the regular work day without pay. No such policy was ever communicated to me during my employment with Alderwoods.

14. Alderwoods employees were encouraged to be active in the community, but it was not mandatory. If an hourly employee volunteered to participate in community activities, they were paid their hourly rate, or overtime if over 40 hours in a week, for all hours while working at these events.

15. I don't recall doing annual evaluations for any of the hourly employees who reported to me, nor do I recall ever discussing with an hourly employee

4

their involvement in community service as part of their performance at the Sample Road Chapel.

Pre-Needs Sales

16.     The Alderwoods funeral homes in my region of Florida had a separate sales staff that sold pre-needs insurance to families.  Neither I nor any of my staff at the Sample Road Chapel ever participated, or were required to participate, in pre-needs presentations or sales.

17.     None of the Funeral Directors or staff at the Kraeer Funeral Home Sample Road Chapel ever did, or were required to do, pre-needs presentations or sales. Instead, pre-needs counselors were assigned to each funeral home location, including the Sample Road Chapel.

Meal Breaks

18.     Full-time staff were permitted a half-hour meal break during their shift for lunch, and one hour for dinner.  On some occasions, some of the staff would have to work during their scheduled meal break.  Employees recorded their time if they did so and were paid for the time worked.

19.     Alderwoods did not require that employees deduct a full meal break from their work hours each day if that is not what they took.  Generally, any employee at the Sample Road Chapel whose lunch was interrupted for work would take their meal break later.

5

20.     I never encouraged, required, or requested any employee who worked for me not to record their time worked during a meal break.

Training

21.     Training was required for the hourly employees both initially when they were hired and periodically during their tenure.

22.     All training was done on the job, and the hourly employees would be paid for any hours spent in training.  On occasion, an hourly employee may have to travel to a location where a training course was being provided.  The employee was paid for all travel and time spent attending those training sessions.

23.     I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked.  Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me.

22.     Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions.  I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

23.   The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections. The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 12, 2009                    *Eleanor McCarthy*

                                        ELEANOR MCCARTHY

**TAB 39**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WILLIAM HELM, et al.
On behalf of themselves and all employees
similarly situated,

        Plaintiffs,

   vs.

ALDERWOODS GROUP, INC., et al.

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CASE NO.    3:08-CV-01184 SI

DECLARATION OF CLAUDIA
MESSIER

# DECLARATION OF CLAUDIA MESSIER

I, Claudia Messier, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.     My name is Claudia Messier.  I am a resident of Riverside, California.  I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.     All the statements in this Declaration are true and accurate.  I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.     I currently work at Green Acres Funeral Home.  From April 22, 2002 until October 10, 2008, I worked at Custer Christiansen Mortuary in Covina, California.  Custer Christiansen was an Alderwoods location.

4.     At Custer Christiansen, I was an embalmer/funeral arranger.  I was an hourly employee and worked forty plus hours a week.

## Overtime

5.     Custer Christiansen used a computer system known as AS 400, in which employees directly entered their time.  There was no time clock.  A column was provided for entry of overtime and double-time.

6.     I was always paid for the overtime that I worked.  I was never told to record overtime I had worked as regular time.

## After-Hours Removals

7.     I was never on-call for removals at Custer Christiansen because I lived in Riverside,

which is not near Covina. There were always a couple of employees on-call. Being on-call at Custer Christiansen was an option, not a requirement. Managers asked for volunteers, and employees volunteered because they would receive overtime and be paid more.

8.      Custer Christiansen also used a third party removal company for some removals.

"Community Work Policy"

9.      Employees at Custer Christiansen were encouraged to participate in community activities. This consisted of my being asked on a couple of occasions whether I wanted to participate in an activity. I did not join any community organizations or get involved in any activities when I was at Custer Christiansen.

10.     I do not recall any incentive programs to encourage community service. I do not recall a program called "I Believe in Service." Community service and activity was not part of my evaluation by my supervisor. I was not required to participate in any community organizations.

Pre-Need Sales

11.     I did not sell pre-need policies. There was a pre-need staff who handled pre-need sales. I was never asked to sell pre-need policies and it was not encouraged to do so.

Training

12.     Every year I had to take a refresher course for funeral arrangers. This was a state requirement for funeral arrangers. Alderwoods held refresher courses during business hours at several locations. I was paid for the time I spent at each course.

<u>Meal Breaks</u>

13.     I received an hour for lunch break. I never worked through a lunch break and always took my break. Sometimes, I might come back from lunch break early. I would be paid for the time that I worked.

14.     Before speaking with any attorney for Alderwoods, I was told that the employees who filed the lawsuit seek to have the class certified, and that the matter of class certification has not been ruled upon by the Court. I was also told that if the class is certified and assuming I am a member of the class, then the attorneys for Alderwoods will be directly opposing my interest as a class member.

15.     I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked. Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me.

16.     Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions. I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

17.     The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections. The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 10th, 2009

CLAUDIA MESSIER

**TAB 40**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

1

2

3

4  WILLIAM HELM, et al.
   On behalf of themselves and all employees
5  similarly situated,

6
             Plaintiffs,
7        vs.

8  ALDERWOODS GROUP, INC., et al.

9
             Defendants.
10

) CASE NO.    3:08-CV-01184 SI
)
)
) **DECLARATION OF STEVEN**
) **NOWATKA**
)
)
)
)
)
)
)
)

DECLARATION OF STEVEN NOWATKA:

I, Steven Nowatka, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.      My name is Steven Nowatka.  I am a resident of Deerfield Beach, Florida.  I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.      All the statements in this Declaration are true and accurate.  I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.      I am currently a Funeral Director for Kraeer Funeral Homes at the Deerfield Beach Chapel in Deerfield Beach, Florida.  I've worked for the Kraeer Funeral Home business since 1966.  From 2002 through 2006, I worked as a Funeral Director at the Kraeer Funeral Home Deerfiled Beach, during which time Alderwoods owned and operated the facility.

4.      In my position as Funeral Director for Alderwoods at the Kraeer Funeral Home Deerfield Beach Chapel, I was a salaried employee.  I reported to Robert Russell, a Regional Manager.  At the Deerfield Beach Chapel, I had five hourly employees who reported directly to me.  These employees assisted me with funeral arrangements, meeting with families, and other day to day operations of the Chapel. Generally, I had two full time and three part time hourly employees working with me.

5.      In the course of my years working as a Funeral Director at the Deerfield Beach Chapel, I gained knowledge of Alderwoods' timekeeping policies and pay practices and how they were implemented at this location.

<u>After-Hours Removals</u>

6.      At the Deerfield Beach Chapel while it was operated by Alderwoods, we would not perform removal services.  Removals were handled by the Kraeer Funeral Homes embalming group working out of the Sample Road location in Pompano Beach, Florida.  To the best of my knowledge, the removals were performed mostly by hourly employees who were paid for their work by the hour.  The hourly employees would be paid for overtime if they exceeded 40 hours of work in a given week.

7.      Hourly employees were not paid a "piece" rate for removals.  From time to time, when needed, the embalming center would employ a third-party removal service to perform removals.  Only the removal service was paid a "piece" rate for removals.

8.      I have no knowledge of a company-wide Alderwoods policy requiring hourly employees to perform after-hours work without pay.  Employees were paid for all the time they worked, including any overtime work.

<u>Overtime</u>

9.      I am unaware of any Alderwoods policy that encouraged or required managers not to pay overtime that was not pre-approved.  Hourly employees at the Deerfield Beach Chapel were supposed to obtain pre-approval for any substantial

overtime that they worked from Robert Russell, the Regional Manager. Nominal overtime hours did not require pre-approval.

10.     Alderwoods employees were always paid for the time they worked, including overtime. In my experience, any overtime that required pre-approval was always approved. If for some reason an overtime request was not approved, but an hourly employee worked that overtime anyway, the employee was paid for that overtime. The hourly employees at the Deerfield Beach Chapel would record their time on time cards by punching in and punching out. All hourly employees were paid time-and-a-half for any overtime worked.

11.     I never encouraged, required, or requested any hourly employee at the Deerfield Beach Chapel to not record their time for hours worked, including overtime. Nor do I recall of any instance in which an hourly employee failed to record his or her overtime.

12.     My Regional Manager never encouraged, required, or requested me to have hourly employees not record their hours worked for overtime.

"Community Work Policy"

13.     I never saw or heard of an Alderwoods policy requiring employees to participate in any community organization. Nor was I aware of an Alderwoods policy that required employees to perform community work outside the regular work day without pay. No such policy was ever communicated to me during my employment with Alderwoods.

4

14.     Alderwoods employees were encouraged to be active in the community, but it was not mandatory.

15.     I would perform evaluations of the hourly employees who reported to me at the Deerfield Beach Chapel approximately twice every year.  I did not discuss their involvement in community service as part of the evaluation.  Community service was not on the written evaluation that I submitted to Alderwoods for each of my employees.

Pre-Needs Sales

16.     I am not aware of who was responsible for pre-needs sales at the Alderwoods Funeral Homes in Florida.  Neither I nor any of my staff at the Deerfield Beach Chapel ever participated, or were required to participate, in pre-needs presentations or sales.

Meal Breaks

17.     Full-time staff were permitted a half-hour meal break during their shift for lunch.  On some occasions, some of the staff would have to work during their scheduled meal break.  Employees recorded their time if they did so and were paid for the time worked.

18.     Alderwoods did not require that employees deduct a full meal break from their work hours each day if that is not what they took.  Generally, any employee at the Deerfield Beach Chapel whose lunch was interrupted for work would take their meal break later that day.

19.     I never encouraged, required, or requested any employee who worked for me not to record their time worked during a meal break.

Training

20.     Our employee training at the Deerfield Beach Chapel consisted mostly of monthly meetings at the funeral home.

22.     All training was done on the job, and the hourly employees would be paid for any hours spent in training or meetings.

23.     I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked.  Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me.

22.     Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions.  I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

23.    The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections.  The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  October 30, 2009

STEVEN NOWATKA

**TAB 41**

1          UNITED STATES DISTRICT COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3

4   WILLIAM HELM, et al.

     On behalf of themselves and all employees

5   similarly situated,

6

            Plaintiffs,

7       vs.

8   ALDERWOODS GROUP, INC., et al.

9

            Defendants.

10

| | |
|---|---|
| ) | **CASE NO.   3:08-CV-01184 SI** |
| ) | |
| ) | **DECLARATION OF JUDITH OLSEN** |
| ) | |
| ) | |
| ) | |
| ) | |
| ) | |
| ) | |
| ) | |
| ) | |

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF JUDITH OLSEN

      I, Judith Olsen, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

      1.     My name is Judith Olsen.  I am a resident of Marysville, Washington. I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

      2.     All the statements in this Declaration are true and accurate.  I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

      3.     I have worked for the Schaefer-Shipman Funeral Home in Marysville, Washington for the past 5 years.

      4.     When I began working at Schaefer-Shipman, the funeral home was owned and operated by Alderwoods Group, Inc.  In November 2004, I began working as a part time clerk at the Marysville Cemetery which Schaefer-Shipman operated.  In early 2006, I was hired as a full-time office manager at the funeral home.  I have always been an hourly employee at Schaefer-Shipman.  My job as a part-time clerk at the cemetery involved handling inventory and providing general assistance to the staff.  As the office manager, I am responsible for handling contracts, performing various administrative duties, and providing general support to the funeral director.

      5.     As a part-time employee, I work 30 hours each week.  I never worked more than 8 hours in any one day, or more than 40 hours in any one week.  As a full-time employee, I worked 40 hours a week, and occasionally worked overtime.

      6.     While working for Alderwoods, I recorded my time on time cards, which I used to punch in and punch out.  I always recorded all of the hours I worked,

including any overtime.  To the best of my knowledge, I was always paid for all of the time that I worked, including overtime.

7.    Before working overtime, I would have to obtain the approval of my manager.  I never recall my manager ever not approving my working overtime.  Although I don't recall an instance where I worked overtime that was not approved, to the extent I worked overtime that was not pre-approved, I would have been paid for it.

8.    None of my managers, or any other employee at Alderwoods, ever encouraged, required, or requested me not to record my time, including overtime.  I was never required to work prior to clocking in when I arrived for work in the morning, or after clocking out when I left in the evening.

9.    During the time I worked for Alderwoods at Schaefer-Shipman, I was never required to be on-call.

10.    I was never required to, nor did I ever, perform removals of bodies.

11.    I was not involved in the selling of pre-need policies, nor was I ever required to make pre-need presentations or sell pre-need policies.

12.    I was not required to participate in community organizations or perform community work as an employee of Alderwoods.  On occasion, I would assist at the Memorial Day service at the cemetery, helping to guide people to grave sites and serving food.  I was always paid my hourly wage for working at these services, including any overtime.

13.    I never heard of, was told about, or saw an Alderwoods "Community Work Policy."  I never heard of any employee incentive programs, including "I Believe in Service," or "Success Spotlight."  I never reported on any community service work I

3

performed on my own time to my managers or anyone else at Alderwoods, nor was I ever required to do so.

14.    I had an annual performance evaluation.  My evaluation never took into consideration community service work.

15.    Alderwoods permitted a 30 minute lunch break every day.  I always took my full 30 minutes for lunch.  I never had my lunch break interrupted for work, or had to work through my lunch break.

16.    No one at Alderwoods ever encouraged, required, or requested me to perform work but not record the hours that I worked.

17.    While at Schaefer-Shipman during the time Alderwoods operated the funeral home, I had to attend administration training.  These training sessions took place at various locations in the area, none more than 10 or 15 miles away from my home.  The training sessions were always held during normal business hours, and I would always be paid my hourly wage while attending training sessions.

18.    I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked.  Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me.  I also was told that the employees who filed the lawsuit seek to have the class certified, and that the matter of class certification has not been ruled upon by the Court; and that if the class is certified and assuming I am a member of the class, then the attorneys for Alderwoods Group, Inc. will be directly opposing my interest as a class member.

4

19. Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions. I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

20. The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections. The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 2, 2009

*Judith Olsen*

JUDITH OLSEN

5

**TAB 42**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WILLIAM HELM, et al.
On behalf of themselves and all employees
similarly situated,

   Plaintiffs,

 vs.

ALDERWOODS GROUP, INC., et al.

   Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**CASE NO. 3:08-CV-01184 SI**

**DECLARATION OF WILLIAM PATTERSON**

# DECLARATION OF WILLIAM PATTERSON

I, William Patterson, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1. My name is William Patterson. I am a resident of San Diego, California. I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2. All the statements in this Declaration are true and accurate. I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3. I am currently a funeral director at the Beardsley-Mitchell Funeral Home in San Diego, California. I have been at Beardsley since February 2009. Prior to working at Beardsley, I worked at Humphrey Mortuary in Chula Vista, California. I started at Humphrey Mortuary in September 2006, when it was an Alderwoods location. I was paid for all the time that I worked.

Overtime

4. As a funeral director for Alderwoods, I averaged about 45 to 50 hours per week. The overtime that I worked consisted mostly of meeting with families and church services. Pre-approval was not required to work overtime. I was never told not to record overtime that I worked, or to record it as regular time. I was always fully paid for the overtime that I worked, even if I had not received pre-approval.

5. I did not receive any bonuses or commissions.

After-Hours Work

6. I performed after-hour removals for about two weeks when I started with

Alderwoods, then decided not to continue performing removals. Removals at Humphrey's were usually performed by drivers who were scheduled for after-hours work. They worked a full night-shift. Some funeral directors assisted with removals for additional income, but funeral directors were not required to perform removals.

7.      If I received a call for a removal, I received 3 hours at my hourly rate, or my overtime rate if I had reached the hours threshold. All the removals I performed were completed within 3 hours. Usually, the removals took one and a half to two hours.

8.      For after-hours business calls, I was paid 15 minutes for any call. If the call lasted longer than 15 minutes, I would be paid another 15 minutes. Thus, if I had a 20 minute call, I would be paid for 30 minutes.

"Community Work Policy"

9.      I was not really encouraged to participate in community activities. Rather, my supervisor told me that I could do so. For a while, I joined a networking group. I spent an hour a week and additional hour once a month participating in this group. I was told that I could report the time I spent there on my time card, but I did not feel the need to report my time because this was something I wanted to do and Alderwoods was paying for the fees and dinners. I was not required to join this or any other organization.

Pre-Need Sales

10.     I did not sell pre-need policies at Humphrey. There was a pre-need counselor who sold these policies. Alderwoods did not require that I obtain a license to sell pre-need policies.

Training

11.     During my orientation, I was paid for the time I spent training for my position.  I did not have any other training under Alderwoods.

Meal Breaks

12.     I generally took my lunch breaks.  If I did not take a lunch break, I was paid for the time I worked.  Usually, I would always end up taking a lunch break at some point during the day.  I was never told to record a lunch break that I had not taken.

13.     Before speaking with any attorney for Alderwoods, I was told that the employees who filed the lawsuit seek to have the class certified, and that the matter of class certification has not been ruled upon by the Court.  I was also told that if the class is certified and assuming I am a member of the class, then the attorneys for Alderwoods will be directly opposing my interest as a class member.

14.     I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked.  Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me.

15.     Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions.  I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

16.     The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections.  The attorney told me that I could refuse to sign the

Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 1(  , 2009

WILLIAM PATTERSON