**TAB 43**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM HELM, et al. On behalf of themselves and all employees similarly situated, | ) ) ) ) CASE NO.   3:08-CV-01184 SI ) ) **DECLARATION OF KELLY PORTE** ) |
| Plaintiffs, | ) |
| vs. | ) ) |
| ALDERWOODS GROUP, INC., et al. | ) ) |
| Defendants. | ) ) ) ) ) ) |

KELLY PORTE

## DECLARATION OF KELLY PORTE

I, Kelly Porte, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.     My name is Kelly Porte.  I am a resident of Metairie, Louisiana.  I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.     All the statements in this Declaration are true and accurate.  I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.     I am currently a manager at Tharp-Sontheimer-Tharp Funeral Home in Metairie, Louisiana, which was an Alderwoods location.  I began working at the funeral home in 1991.  I was a funeral director until January 2005, when I became a salaried manager.

4.     As a funeral director under Alderwoods, I was an hourly employee.  I generally worked 40 to 50 hours a week.  Alderwoods used a time clock to record time.  When I became a manager, I reviewed the time at the end of the week.  I never denied overtime that was recorded. Nor did I ever change an employee's time that had been entered.

Overtime

5.     My overtime consisted of meeting family members about arrangements, late funerals, and paperwork.  I do not recall having to ask my manager for approval to work overtime. I do not recall a pre-approval policy that we were required to follow.  I was paid for the overtime that I recorded.  I was never asked to not record overtime that I had worked.

6.     As a manager, I never told employees that they should not record time that they had worked, including overtime, or that they should record their overtime as regular time.

7.    I did not receive bonuses as an hourly employee.  I did when I became a manager. The only commissions I ever received were from the flower shop for flower sales.

After-Hours Work

8.    Funeral directors did not perform after-hours removals, and it was rare to go to a family's house in the evening.  Removals were handled from a central location in New Orleans.

"Community Work Policy"

9.    Participation in community activities was strongly recommended, but it was not a requirement of employment.  There was no incentive program to encourage employees to participate in community organizations.  I never heard of a program called "I Believe in Service." To the best of my knowledge, community activities was never part of any evaluation that I received

Pre-Need Sales

10.    The Tharp-Sontheimer-Tharp Funeral Home used to have an industrial insurance license that allowed funeral directors to sell pre-need insurance.  However, this was phased out under Alderwoods, and I have not sold pre-need policies since then.  We made commissions on pre-need sales.  I never conducted after-hours cold-calls.  I did meet with families after-hours, but usually at the funeral home and I would be on the clock.

Meal Breaks

11.    There were times when I had to work through a lunch break.  I was always paid if on the clock.  I was never told to punch off the clock even though I was not going to take a lunch break.

12.    Before speaking with any attorney for Alderwoods, I was told that the employees who filed the lawsuit seek to have the class certified, and that the matter of class certification has not been ruled upon by the Court. I was also told that if the class is certified and assuming I am a member of the class, then the attorneys for Alderwoods will be directly opposing my interest as a class member.

13.    I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked. Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me.

14.    Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions. I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

15.    The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections. The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.


Dated: November 06, 2009                          _Kelly Porte_____

                                                  KELLY PORTE

**TAB 44**

1

2

3 UNITED STATES DISTRICT COURT

4 NORTHERN DISTRICT OF CALIFORNIA

5

6 WILLIAM HELM, et al.
   On behalf of themselves and all employees

7 similarly situated,

8       Plaintiffs,

9    vs.

10 ALDERWOODS GROUP, INC., et al.

11       Defendants.

12

13

14

15

| | |
|---|---|
| ) | CASE NO.   3:08-CV-01184 SI |
| ) | |
| ) | **DECLARATION OF WILLIAM** |
| ) | **POWELL** |
| ) | |
| ) | |
| ) | |
| ) | |
| ) | |
| ) | |
| ) | |
| ) | |
| ) | |
| ) | |
| ) | |

16

17

18

19

20

21

22

23

24

25

26

27

28

# DECLARATION OF WILLIAM POWELL

I, William Powell, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.      My name is William Powell.  I often go by the name Toby.  I am a resident of Pulaski, Tennessee.  I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.      All the statements in this Declaration are true and accurate.  I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.      I am currently the location manager at the Carr & Erwin Funeral Home in Pulaski, Tennessee.  During the years when Alderwoods owned Carr & Erwin, I was a funeral director.  I was an hourly employee at that time.

4.      There were usually four funeral directors at Carr & Erwin under Alderwoods.  Additional staff included an office manager, a pre-need sales counselor, and a part-time employee.  I was a full-time funeral director.  My hours varied from 30 to 60 per week, depending on how busy we were.

Overtime

5.      We were paid time and a half for overtime.  Alderwoods used a time clock to report time.  When I stayed late, for example, if there was a visitation that was scheduled after-hours, I would clock out later and be paid overtime if I had accrued enough hours for overtime.  I was always paid for overtime that I worked.

6.      Time was submitted to the office manager at the end of the week.  She checked the

time cards and any discrepancies were addressed with the employee. Time was always approved; it was never changed by the manager or office manager.

7.     I did not have to get pre-approval from my manager to work overtime. We worked on a schedule, and the funeral director scheduled to work late would accrue overtime. I do not recall a specific policy that stated I had to get pre-approval before each instance of overtime. I was always paid for the time I worked.

8.     Funeral directors did not receive commissions under Alderwoods. The only bonus I ever received was an end of the year bonus given to the funeral home based on meeting business targets. I was fully paid for any overtime I recorded.

After-Hours Work

9.     Funeral directors rotated on-call time in the evenings. I was paid hourly for after-hours removals. When I had accrued enough hours for overtime, I was paid overtime for any after-hours removal. The time it would take to complete the removal varied depending on the location of the removal.

"Community Work Policy"

10.    We were encouraged to participate in community activities, but we were never required to perform community service. The only community activities I participated in were with my church, such as helping with the Christmas Nativity Pageant. I did not represent the funeral home at these activities, and these were activities in which I would have participated regardless of the funeral home policy.

11.    I was not involved in any other community activities. The funeral home did not

have any incentive programs to encourage community service. For example, I do not recall a program called "I Believe in Service."

Pre-Need Sales

12.    If asked by a family, I would provide information regarding pre-need policies, but I did not sell pre-need policies. There was a pre-need counselor at the funeral home who sold these policies and had an insurance license. I was never required to obtain an insurance license. Selling pre-need policies was not a requirement of the funeral director position.

Training

13.    I do not recall any after-hours training programs. Any training programs I attended were at work and while I was on the clock. There was one year where we went to Nashville for a continuing education course. We were paid for this time.

Meal Breaks

14.    I generally received a lunch break every day. If I ever chose to work through a lunch break, I stayed on the clock and was paid for time. I was not required to record a lunch break I did not take.

15.    Before speaking with any attorney for Alderwoods, I was told that the employees who filed the lawsuit seek to have the class certified, and that the matter of class certification has not been ruled upon by the Court. I was also told that if the class is certified and assuming I am a member of the class, then the attorneys for Alderwoods will be directly opposing my interest as a class member.

16.    I understand that this Declaration is being provided voluntarily in a lawsuit brought

against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked. Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me.

17.   Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions. I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

18.   The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections. The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: November __5__, 2009

_William Powell_
WILLIAM POWELL

**TAB 45**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM HELM, et al.<br>On behalf of themselves and all employees<br>similarly situated,<br><br>       Plaintiffs,<br>  vs.<br><br>ALDERWOODS GROUP, INC., et al.<br><br>       Defendants. | **CASE NO.   3:08-CV-01184 SI**<br><br>**DECLARATION OF JEANNE PRUITT** |

1

DECLARATION OF JEANNE PRUITT

I, Jeanne Pruitt, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.      My name is Jeanne Pruitt. I am a resident of Chehalis, Washington. I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.      All the statements in this Declaration are true and accurate. I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.      I have worked for Sticklin Funeral Chapel in Centralia, Washington since August 2001. From 2001 until December 2006, I was the office administrator at Sticklin. Currently, I am the office manager.

4.      When I began working at Sticklin, the funeral home was owned and operated by Alderwoods Group, Inc. My job as the office administrator involves handling contracts, paying bills, doing payroll, running reports, performing various administrative duties, and providing occasional general support to the funeral director.

5.      As a full-time hourly employee, I worked 40 hours a week, and on occasion worked overtime. I would average about five hours of overtime a month.

6.      While working for Alderwoods, I initially recorded my time on time sheets. In 2004, Alderwoods installed a time clock and I recorded my time on time cards, which I used to clock-in and clock-out. I always recorded all of the hours I worked, including any overtime. I was always paid for all of the time that I worked, including overtime.

2

7.     I did not have to obtain the approval of my manager before working overtime.  If I worked overtime that was not approved, I would always be paid for it.

8.     None of my managers, or any other employee at Alderwoods, ever encouraged, required, or requested me not to record my time, including overtime.  I was never required to work prior to clocking-in when I arrived for work in the morning, or after clocking-out when I left in the evening.

9.     During the time I worked for Alderwoods at Sticklin, I was never required to be on-call.

10.    I was never required to, nor did I ever, perform removals of bodies.  Because I was responsible for payroll I knew how hourly employees were paid for removals.  From 2001 until sometime in 2002 or 2003, hourly employees were credited a minimum of 2 hours for each removal they performed.  If a removal took less than 2 hours, then they would be credited with and paid for 2 hours.  For any removal that took more than two hours, the hourly employees were credited with the actual time it took to do the removal.  Sometime in 2003 or 2004, the removal pay policy changed.  Hourly employees were credited with the actual hours it took to do the removal, plus $40 for each removal.  Hourly employees were to record their time from the time they took the removal call until the removal was complete.  Removals generally took anywhere from less than one hour to two hours.  Removals taking longer than three hours were rare.

11.    I was not involved in the selling of pre-need policies, nor was I ever required to make pre-need presentations or sell pre-need policies.  Alderwoods had one or two people who worked out of the Sticklin Funeral Chapel who handled pre-need policies and presentations.  No other hourly employees were involved in pre-need work at Sticklin.

12.    I was not required to participate in community organizations or perform community work as an employee of Alderwoods.  I don't recall having an annual

3

performance evaluation while working for Alderwoods at Sticklin. I was never evaluated on my participation in community activities.

13.     I never heard of, was told about, or saw an Alderwoods "Community Work Policy." I never heard of any employee incentive programs, including "I Believe in Service," or "Success Spotlight."

14.     When I worked for Alderwoods at Sticklin I never received a bonus, or was paid commissions.

15.     While at Sticklin, Alderwoods permitted a one hour lunch break every day. I would take the full 30 minutes, unless I had to work through lunch or my meal break was interrupted by work. On any occasion that my meal break would be interrupted because of work, I would be paid for working through my break. I would also take my meal break later that day. None of my managers or other Alderwoods employees ever encouraged, required, or requested me not to record my time that I worked through a meal break.

16.     No one at Alderwoods ever encouraged, required, or requested me to perform work but not record the hours that I worked.

17.     While at Sticklin during the time Alderwoods operated the funeral home, I would attend administration training sessions periodically. I recall at least one of these sessions being held in Seattle. I also would travel to various locations in the area to train other administrative employees. The training sessions were always held during normal business hours, and I would always be paid my hourly wage while attending training sessions.

18.     I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked. Before speaking with any attorney for

4

Alderwoods, I was told that the attorney represents Alderwoods and does not represent me. I also was told that the employees who filed the lawsuit seek to have the class certified, and that the matter of class certification has not been ruled upon by the Court; and that if the class is certified and assuming I am a member of the class, then the attorneys for Alderwoods Group, Inc. will be directly opposing my interest as a class member.

19.     Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions. I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

20.     The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections. The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct. to the best of my memory.

Dated: November 11, 2009

JEANNE PRUITT

**TAB 46**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WILLIAM HELM, et al.
On behalf of themselves and all employees
similarly situated,

        Plaintiffs,

    vs.

ALDERWOODS GROUP, INC., et al.

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

CASE NO.   3:08-CV-01184 SI

**DECLARATION OF MICHAEL
RIZZOTTO**

1

DECLARATION OF MICHAEL RIZZOTTO

I, Michael Rizzotto, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.      My name is Michael Rizzotto. I am a resident of Fresh Meadows, New York. I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.      All the statements in this Declaration are true and accurate. I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.      I am the Location Manager of the Cusimano and Russo Funeral Home located in Brooklyn, New York. I have worked for Cusimano and Russo Funeral Home since 1998, including the time period 2002 through 2006 when Alderwoods Group, Inc. owned and operated Wagner Funeral Homes.

4.      In my position as Location Manager for Alderwoods at the Cusimano and Russo Funeral Home, I was a salaried employee. From 2002 through 2006, I supervised approximately seven or eight employees, two full-time and five or six part-time hourly employees. These individuals usually included two full-time funeral directors, a part-time administrative assistant, and four or five part-time funeral support staff.

5.      In the course of my more than 10 years working at Cusimano and Russo Funeral Home, I gained knowledge of Alderwoods' timekeeping policies and pay practices and how they were implemented at this location.

2

After-Hours Removals

6.     From 2002 through 2006 at Cusimano and Russo Funeral Homes, after hours removals were performed by a third-party removal service. No funeral home staff performed after hours removals.

Overtime

7.     I have no knowledge of a company-wide Alderwoods policy requiring hourly employees to perform after-hours work without pay. Employees were paid for all the time they worked, including any overtime work. No hourly employees were required to work prior to clocking in, or after clocking out, nor am I aware of any Alderwoods policy requiring hourly employees to do so.

8.     I am unaware of any Alderwoods policy that encouraged or required managers not to pay overtime that was not pre-approved. The hourly employees who reported to me at Cusimano and Russo Funeral Home were not required to obtain pre-approval for overtime worked. I am not aware of any hourly employee who worked overtime and was not paid for that overtime.

9.     In my experience, Alderwoods employees were always paid for the time they worked, including overtime. The hourly employees at the Cusimano and Russo Funeral Home initially reported their time by filling out time sheets. In 2004, Alderwoods installed a time clock, and hourly employees would record their time on time cards by punching in and punching out. All hourly employees were paid time-and-a-half for any overtime worked.

10.     I never encouraged, required, or requested any hourly employee at the Cusimano and Russo Funeral Home not to record their time for hours worked, including overtime. Nor do I recall of any instance in which an hourly employee failed to record his or her overtime.

3

11.    My Regional Manager never encouraged, required, or requested me to have hourly employees not record their hours worked for overtime.

12.    I was the only person who was "on call" and took after-hours phone calls.

13.    None of the hourly employees were paid bonuses or commissions.

"Community Work Policy"

14.    I never saw or heard of an Alderwoods policy requiring employees to participate in any community organization. Nor was I aware of an Alderwoods policy that required employees to perform community work outside the regular work day without pay. No such policy was ever communicated to me during my employment with Alderwoods.

15.    I am not aware of any hourly employee at Cusimano and Russo who performed community work, or engaged in community activities on behalf of Alderwoods.

16.    I would perform evaluations of the hourly employees who reported to me approximately every year. I used an Alderwoods form to record the evaluation. I did not discuss their involvement in community service as part of the evaluation, nor do I recall seeing any place on the Alderwoods form that included the topic of community service. Accordingly, I did not include community service on the written evaluation that I submitted to Alderwoods for each of my employees.

Pre-Need Sales

17.    Funeral directors and I provided the pre-need sales and presentations at Cusimano and Russo Funeral Home. No other hourly employees participated in pre-need sales. Funeral directors would be on the clock for any time they worked on pre-need sales or presentations. I am not aware of any funeral director not recording their time while involved in selling pre-need funeral arrangements or making

4

1 presentations to customers.  Nor am I aware of any Alderwoods policy requiring funeral

2 directors to work "off the clock" on pre-need sales or meetings.

### Meal Breaks

5     18.    The hourly employees at Cusimano and Russo Funeral Home were

6 permitted a half hour meal break for lunch.  On occasion, some of the staff would have to

7 work during their scheduled meal break.  Employees recorded their time if they did so and

8 were paid for the time worked.

9     19.    Alderwoods did not require that employees deduct a full meal break

10 from their work hours each day if that is not what they took.  Generally, any employee at

11 the Cusimano and Russo Funeral Home whose lunch was interrupted for work would take

12 their meal break later.

13

14     20.    I never encouraged, required, or requested any employee who

15 worked for me at the Cusimano and Russo Funeral Home not to record their time worked

16 during a meal break.

### Training

19     21.    The hourly employees would have to attend training sessions or

20 meetings periodically.  These meetings were always held during the business day, and

21 the hourly employees would be paid for any hours spent in training.

22     22.    Funeral directors were required to obtain continuing education

23 credits.  Alderwoods would pay for the courses, and the funeral directors would be paid

24 on the clock when studying for the credits.

25

26     23.    I understand that this Declaration is being provided voluntarily in a

27 lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they

28 have not been properly paid for all time worked.  Before speaking with any attorney for

1 Alderwoods, I was told that the attorney represents Alderwoods and does not represent
2 me.

3          24.     Prior to speaking with the attorney for Alderwoods, I was also told
4 that I did not have to answer any questions. I was told that the interview was purely
5 voluntary and that if I did not wish to speak, there would be no adverse impact on me.
6

7          25.     The attorney for Alderwoods provided me with an opportunity to
8 review the Declaration and to make any corrections. The attorney told me that I could
9 refuse to sign the Declaration without any adverse impact on me.

10        I declare under penalty of perjury that the foregoing is true and correct.
11
12        Dated: November 12, 2009

13                                                      MICHAEL RIZZOTTO
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

6

**TAB 47**

1

2

3                    UNITED STATES DISTRICT COURT

4                   NORTHERN DISTRICT OF CALIFORNIA

5

6    WILLIAM HELM, et al.                  )  CASE NO.    3:08-CV-01184 SI
     On behalf of themselves and all employees )
7    similarly situated,                    )  DECLARATION OF KENNETH
                                            )  ROGERS
8              Plaintiffs,                   )
                                            )
9          vs.                              )
                                            )
10   ALDERWOODS GROUP, INC., et al.         )
                                            )
11             Defendants.                  )
                                            )
12                                          )
                                            )
13                                          )
                                            )
14                                          )
                                            )

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DECLARATION OF KENNETH ROGERS

I, Kenneth Rogers, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.  My name is Kenneth Rogers.  I am a resident of Colorado City, Texas.  I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.  All the statements in this Declaration are true and accurate.  I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.  I am currently retired.  I worked at the Kiker-Seale Funeral Home in Colorado City, Texas for 14 years, including the years when Alderwoods owned the funeral home.  I left Kiker-Seal Funeral Home about three years ago.

4.  I was an hourly employee at Kiker-Seale.  I helped the funeral directors with conducting funerals and answering phones.

Overtime

5.  I never worked any overtime at Kiker-Seale.  There was a time clock at the funeral home that was used to punch in and out of work.

6.  I was always paid for the time I worked.  I was never told to not record time, or record it inaccurately.

Removals

7.  There were a few occasions when I assisted with removals at the request of the funeral director.  This might occur when the deceased was particularly heavy and the funeral

director required assistance. I was not required to do any work I was not willing to do. On at least one occasion I assisted with a removal at night. I was paid hourly for the time I assisted with removals.

"Community Work Policy"

8. I was never required to participate in community activities by my supervisor at the funeral home. I was a member of the Masonic Lodge and Kiwanis prior to my employment at Kiker-Seale.

Pre-Need Sales

9. I did not sell pre-need policies. I did not talk business with families, but only consoled them. Only the funeral directors who sold pre-need policies would discuss pre-need insurance with the families.

Training

10. Any training I was provided was "on-the-job" training for which I was paid.

Meal Breaks

11. I did receive lunch breaks when I worked a full day. I do not recall an occasion when I had to work through a lunch break. I would punch out for break and punch back in to work.

12. Before speaking with any attorney for Alderwoods, I was told that the employees who filed the lawsuit seek to have the class certified, and that the matter of class certification has not been ruled upon by the Court. I was also told that if the class is certified and assuming I am a

member of the class, then the attorneys for Alderwoods will be directly opposing my interest as a class member.

13.     I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked.  Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me.

14.     Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions.  I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

15.     The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections.  The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.


Dated: November 4, 2009

KENNETH ROGERS

**TAB 48**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WILLIAM HELM, et al.
On behalf of themselves and all employees
similarly situated,

        Plaintiffs,

    vs.

ALDERWOODS GROUP, INC., et al.

        Defendants.

CASE NO.     3:08-CV-01184 SI

**DECLARATION OF C. JOSEF ROSEN**

## DECLARATION OF C. JOSEF ROSEN

I, C. Josef Rosen, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

     1.     My name is Curtis Josef Rosen.  I am a resident of Fort Lauderdale, Florida.  I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

     2.     All the statements in this Declaration are true and accurate.  I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

     3.     I am currently a full-time funeral director at ABC Jennings in Fort Lauderdale, FL.  During the time of Alderwoods ownership, I worked at the Kraeer Funeral Home.

     4.     I was an hourly employee for Alderwoods.  During my time at Kraeer Funeral Home, I worked about 60 to 80 hours a week because the funeral home was very busy.

     5.     As a funeral director, I arranged and conducted funeral and memorial ceremonies.

     6.     As an hourly employee, I kept my time on a time card.  I would punch in and out of a time clock.

Over-Time

     7.     My after-hours work consisted primarily of viewings and funerals.  I did not work any removals.  When I worked overtime, I would circle "40" on the time card and put the over-time hours next to it.

     8.     I recorded all time that I worked on overtime.  Overtime did not require pre-

approval from a manager.  I was unaware of a policy that required me to get approval from my manager before I worked overtime.  I was never told to not record time that I had worked.

9.      I was paid time and a half for overtime.  The only commission I ever received as a funeral director was on flowers sold.  I never received any other commission or bonus during the period I worked for Alderwoods.

After-Hours Removals

10.     As a funeral director, I did not work any removals.  Kraeer had a removal team that performed removals.  These were full-time employees who just worked removals.  If they were not available, Kraeer hired a third party removal service.

11.     As a funeral director, I rarely if ever spoke to the family for purposes of removals. The removal service instructed the family that the funeral director would be contacting them the following day.  I was never "on call" for removals.

"Community Work Policy"

12.     I was told when I was hired that participation in community organizations was encouraged, but never heard anything more about community activities after that.  I never had time to participate in community organizations.

13.     I do not recall being asked about participation in community organizations in any evaluation by my supervisor.  I was never required to participate in community organizations.

14.     I do not recall any incentive programs to promote participation in community activities or organizations.

Pre-Need Sales

15.     I was never required to sell pre-need policies, and I never sold pre-need policies. There was a pre-need counselor who sold these policies. I was not aware of any funeral directors who sold pre-need policies.

Training

16.     As a funeral director, I was required to take continuing education, or CEU, courses. These courses were usually held on one day during the year and all the funeral directors would attend. The courses were held at Kraeer and, usually, during business hours. If there was an after-hours course, I was paid overtime for my attendance.

Meal Breaks

17.     As a full-time employee, I received meal breaks. I punched off the clock for meal breaks and punched back in when the meal break was over. I was usually able to take a lunch.

18.     During meal breaks, I would sometimes take a call from a family. I did so on my own volition, and I did not record the time for this because I thought to do so was frivolous. I was never told not to record time that I spent working during a meal break. Nor was I ever told to record a meal break that I did not take.

19.     I was never asked to not record time that I had worked.

20.     Before speaking with any attorney for Alderwoods, I was told that the employees who filed the lawsuit seek to have the class certified, and that the matter of class certification has not been ruled upon by the Court. I was also told that if the class is certified and assuming I am a member of the class, then the attorneys for Alderwoods will be directly opposing my interest as a

class member.

21.     I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked.   Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me.

22.     Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions.   I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

23.     The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections.   The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.


Dated: _October 29___, 2009                    _C. Josef Rosen_____

                                               C. Josef Rosen

**TAB 49**

1

2

3                          UNITED STATES DISTRICT COURT

4                         NORTHERN DISTRICT OF CALIFORNIA

5
                                            )  CASE NO.      3:08-CV-01184 SI
6    WILLIAM HELM, et al.                   )
     On behalf of themselves and all employees )
7    similarly situated,                    )  DECLARATION OF EDITH SANDS
                                            )
8              Plaintiffs,                   )
                                            )
9          vs.                              )
                                            )
10   ALDERWOODS GROUP, INC., et al.         )
                                            )
11             Defendants.                   )
                                            )
12                                          )
                                            )
13                                          )
                                            )
14                                          )
                                            )
15

## DECLARATION OF EDITH SANDS

I, Edith Sands, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.     My name is Edith Sands.  I am a resident of Pompano Beach, Florida.  I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.     All the statements in this Declaration are true and accurate.  I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.     I am currently an office manager at ABC Jennings in Fort Lauderdale, FL, which was an Alderwoods location.  I have worked there since 2002.  I am an hourly employee.  I work full-time, 40-hours a week.

4.     As an office manager, I keep up on contracts and bills, fill out permits for death certificates, and answer the telephone and speak to customers.  I do not handle payroll.

5.     As an hourly employee for Alderwoods, I kept my time on a time card.  I would punch in and out with a time clock.  I recall working overtime on rare occasions.  On those occasions, I was paid for the time I worked.

After-Hours Removals

6.     I have never worked on removals, either during or after the regular business day.

"Community Work Policy"

7.     I was never encouraged to participate in community activities or organizations by Alderwoods.

Pre-Needs Sales

8.     I have never sold pre-needs policies.  I referred customers who inquired about pre-needs policies to a funeral director or a sale representative.  I did not give out price quotes for pre-needs.

Training

9.     Alderwoods did not require me to participate in any training programs.

Meal Breaks

10.    As a full-time employee, I received meal breaks.  I took a half-hour for lunch every day.  I do not recall a time when I was asked to work through my lunch break.

11.    I was never asked to not record time that I had worked.

12.    Before speaking with any attorney for Alderwoods, I was told that the employees who filed the lawsuit seek to have the class certified, and that the matter of class certification has not been ruled upon by the Court.  I was also told that if the class is certified and assuming I am a member of the class, then the attorneys for Alderwoods will be directly opposing my interest as a class member.

13.    I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked.  Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me.

14.    Prior to speaking with the attorney for Alderwoods, I was also told that I did not

have to answer any questions.  I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

15.    The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections.  The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.


Dated:  Oct. 29      , 2009                     _Edith Sands_____
                                                EDITH SANDS

**TAB 50**

1

2

3          UNITED STATES DISTRICT COURT

4          NORTHERN DISTRICT OF CALIFORNIA

5

6   WILLIAM HELM, et al.                    )   CASE NO.    3:08-CV-01184 SI
    On behalf of themselves and all employees )
7   similarly situated,                      )   DECLARATION OF WILLIAM
                                             )   SANTMYER
8              Plaintiffs,                    )
                                             )
9        vs.                                  )
                                             )
10  ALDERWOODS GROUP, INC., et al.           )
                                             )
11             Defendants.                    )
                                             )
12                                           )
                                             )
13                                           )
                                             )
14                                           )
                                             )

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DECLARATION OF WILLIAM SANTMYER

I, William Santmyer, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.      My name is William Santmyer.  I am a resident of Fort Lauderdale, Florida.  I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.      All the statements in this Declaration are true and accurate.  I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.      I am currently a funeral attendant at ABC Jennings in Fort Lauderdale, FL.  I worked at all the locations for ABC Jennings and Kraer Funeral Home during the time that Alderwoods owned these funeral homes.  I have always been an hourly employee.  I worked full-time for Alderwoods, 40-hours a week.

4.      As a funeral attendant, I am a "jack of all trades" and do everything except embalming.  I perform removals, work at visitations, assist in moving bodies, assist in cremation, and have worked in printing and details.  I have worked on evening removals and visitations.

Overtime

5.      During the time Alderwoods owned the funeral homes, I usually worked 60 to 70 hours a week, although the amount of overtime I worked varied.  In addition to my weekly 40-hour shift, I often worked on Saturday evenings, from 8:30 p.m. on Saturday until 8:30 a.m.  When I worked these weekends, I would work at the funeral home location on Sample Road.

6.      I received time and a half for overtime that I worked.  I did not receive any

commissions or bonuses.  Only managers received commissions or bonuses.

7.    I was never told not to record time that I had worked.  I worked overtime in the chapel on visitations, in details (obtaining death certificates and other paperwork), and on removals.

8.    There was a period of about 2 to 3 months when the person submitting my time was not correctly submitting my overtime, because she was typing the numbers incorrectly.  After speaking with the payroll person, this situation was straightened out.  I was paid correctly afterwards.

After-Hours Removals

9.    I did perform after-hours removals.  I was paid hourly for removals.  Occasionally, I would work a removal with a funeral director, if I needed assistance with a body or if the removal was from a family home, but I would handle removals from hospitals and nursing homes by myself.

10.   I was never "on-call" for removals.  I performed removals during scheduled overtime, such as on Saturday evenings.  There was also a removal service that was generally called in for removals as a backup when we were busy.

"Community Work Policy"

11.   Alderwoods encouraged employees to participate in community organizations if possible.  Because I was working 60 to 70 hour weeks, I never had time to participate in any community organizations.  I was never told that such participation was a requirement of my position with the funeral home.

12.     I once went to a lunch with a funeral director as part of an "outreach" for the Funeral Home. I was paid for that time. The Funeral Home had a booth at the Seafood Festival on a Saturday and asked for volunteers to man the booth. I volunteered for a chance to go to the beach and socialize with my co-workers. My supervisor did not require me to participate in this activity.

Pre-Need Sales

13.     I did not sell pre-need policies. I occasionally brought people to the funeral home to talk about it with those who sold pre-need policies. I did not receive a commission on pre-need sales, though I did receive a monetary award for any referrals I made.

Training

14.     The majority of the training for my position at the Funeral Home was on-the-job training. Occasionally, the funeral directors would hold a meeting to teach how to participate in different denominations' funeral services. They would teach things like when to kneel and when to stand. This training was usually held in the afternoon, and I was paid for my time attending this training. I never had to attend any after-hours training or courses.

Meal Breaks

15.     As a full-time employee, I do receive meal breaks. However, there were times when it was not possible to take a meal break – for example, if I was waiting in a doctor's office to get a signature on a death certificate or if I was at a funeral service. I would usually try to take 5 to 10 minutes for myself when I was on the road. If I worked through lunch, I was paid for it.

16.     Before speaking with any attorney for Alderwoods, I was told that the employees

who filed the lawsuit seek to have the class certified, and that the matter of class certification has not been ruled upon by the Court.  I was also told that if the class is certified and assuming I am a member of the class, then the attorneys for Alderwoods will be directly opposing my interest as a class member.

17.     I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked.  Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me.

18.     Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions.  I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

19.     The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections.  The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: _OctoBEr/28_____, 2009          _William Santmyer_____
                                        WILLIAM SANTMYER

**TAB 51**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WILLIAM HELM, et al.
On behalf of themselves and all employees
similarly situated,

       Plaintiffs,

  vs.

ALDERWOODS GROUP, INC., et al.

       Defendants.

CASE NO.   3:08-CV-01184 SI

**DECLARATION OF ROXAN SCHWAB**

## DECLARATION OF ROXAN SCHWAB

I, Roxan Schwab, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.      My name is Roxan Schwab. I am a resident of Lockeford, California. I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.      All the statements in this Declaration are true and accurate. I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.      I am currently the general manager of Mission Memorial Park and Seaside Funeral Home in Seaside, California and Mission Mortuary in Monterey, California. Under Alderwoods, I was a market growth manager. I had responsibility for numerous funeral homes in the Monterey, Sacramento, and Northern California regions. As of 2006, I had responsibility for, among other funeral homes, Whitehurst Muller, Whitehurst Terry, Seaside Chapel, Mission Memorial Park and Mission Mortuary.

4.      As a market growth manager, I essentially managed the location managers and promoted the growth of the funeral home market. I was also responsible for new hire procedures and instructed new employees at Alderwoods locations on wage and hour procedures.

Overtime

5.      I do not recall ever seeing an "Unrecorded Work Time Policy" at Alderwoods. Nor were hourly employees ever encouraged or required not to record all overtime hours worked. I instructed new hires at all Alderwoods locations to keep accurate time.

6.      Overtime was any time over 8 hours in a day or 40 hours in a week. Employees

were told to record time worked to the minute. There was no company policy to not record overtime.

7.      There was no Alderwoods policy that stated that if an employee did not get pre-approval for overtime hours, the employee would not be allowed to record that time, or be paid for those hours. Pre-approval was not the normal policy, but was required only at problem locations that had been recording an unusually heavy amount of overtime. Employees were always paid for time worked, even if not approved.

8.      I never attended a staff meeting with my local managers in which any of them stated that overtime submitted without approval would not be paid.

9.      I never attended a staff meeting with any of my location managers in which any of them informed staff that they should not record all of their overtime hours and should instead keep hours low.

After-Hours Removals

10.     Employees who took phone calls after-hours were paid 15 minutes for a phone call. If a call lasted longer than 15 minutes, they were paid an additional 15-minute increment.

11.     At the funeral homes in my region, employees who performed after-hours removals were paid an hourly rate for 3 hours minimum per call. The removals were handled by part-time employees.

"Community Work Policy"

12.     All employees were encouraged to participate in community activities. Usually, it was the family service counselors, not the funeral directors, who were active in the community.

There was no Alderwoods policy that required hourly employees to volunteer their time to outside community organizations or events.

13. I instructed employees at all locations in my region that community outreach was to be paid. For example, if an employee went to the Lion's Club representing the location, they were paid an hourly rate, plus any fees or dues. There was no Alderwoods policy that required hourly employees not be paid for any time spent at outside community organizations or events. No such policy was ever communicated to hourly employees by me or any manager in my presence.

14. Alderwoods did not require that employees record in a log book their community involvement, although managers were required to record community involvement per location. Time spent at community activities was recorded on the employees' time sheet.

15. I am not aware of an Alderwoods corporate policy on community service. The vice president for the region pushed community service. However, hourly employees were never required to participate in community service. Community service was not a part of any evaluation that I made of hourly employees.

Pre-Need Sales

16. Family service counselors sold pre-need policies, both cemetery and funeral. Some funeral directors sold pre-need policies, particularly at smaller locations that could not be adequately served by a family service counsel.

17. Employees who sold pre-need policies were paid by the hour or on commission, whichever was greater. Most individuals who sold pre-need policies wanted to make commissions instead of hours.

18.     I instructed employees to punch out for meal breaks. They were not told to punch out even if they did not take a meal break. If an employee was unable to take a meal break, they were supposed to write "no lunch" on their time card.

19.     I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked. Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods.

20.     Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions. I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

21.     The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections. The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.


Dated: November 10, 2009                    ROXAN SCHWAB

**TAB 52**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WILLIAM HELM, et al.
On behalf of themselves and all employees
similarly situated,

        Plaintiffs,

    vs.

ALDERWOODS GROUP, INC., et al.

        Defendants.

CASE NO.    3:08-CV-01184 SI

DECLARATION OF STEVEN
SCHWINGHAMER

# DECLARATION OF STEVEN SCHWINGHAMER

I, Steven Schwinghamer, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.     My name is Steven Schwinghamer.  I am a resident of Fort Myers, Florida.  I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.     All the statements in this Declaration are true and accurate.  I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.     I am currently the manager of Kiser Funeral Home in Fort Myers, Florida.  I was the location manager for this funeral home when it was owned by Alderwoods Group, Inc.

Overtime

4.     Under Alderwoods, the part-time employees at Kiser Funeral Home generally did not receive any overtime because they worked only 20 or 30 hours a week.  Full-time employees were paid overtime if they worked more than 40 hours in a week.  They were paid at time and a half.

5.     I did not require that employees obtain pre-approval before working overtime.  Employees who worked overtime generally worked an hour or two later in the day to finish a visitation, a service or a report that was due, and I usually was present and aware of why they were staying late.  Employees were always paid the overtime they worked, regardless of whether I had approved it beforehand.  I never told the employees that they would only be paid for overtime that I had approved.  If they had too much overtime, I would manage the employee's schedule; I did

not withhold payment for time worked.

6.     I never instructed my employees to not record their time worked or to not record overtime.  To the contrary, I told my employees to always record the time that they had worked.  I was not aware of an Alderwoods policy requiring employees to not record time.

7.     As the location manager, I reviewed the employees' time sheets and signed off on them.  I never made any changes to an employee's time sheet without the employee's consent.  The employee would initial on any change I made to a time sheet.  I seldom had to make any changes to time recorded by employees, and changes were made only if there was an inconsistency, such as incorrect addition of hours.  I never changed an employee's time to reduce their overtime.

After-Hours Work

8.     During the time Kiser Funeral Home was owned by Alderwoods, after-hours removals were handled by a third-party removal company.  No employees of the funeral home performed removals.

9.     The funeral directors and myself rotated on-call responsibility to answer business calls after-hours.  For a period of time, we shared the rotation with funeral directors from two other funeral homes in the Fort Myers area.  No other hourly employees were on-call.

10.    After-hours calls were first taken by an answering service.  If the on-call funeral director was required to respond, the funeral director was paid at his or her hourly rate for 15 minutes per call, for every call (whether received or outgoing).  The vast majority of calls received took less than 15 minutes to resolve, and most took less than 5 minutes.  The funeral director

would fill out a call sheet the next day to record the number of calls received or made and turn it in weekly with his or her time sheet for approval.

"Community Work Policy"

11. Employees were never required to participate in community organizations. I did suggest to employees that they be active in the community. However, I did not consider their community service when I evaluated employees. Nor did I use any incentive programs to encourage employees to become active in community organizations.

Pre-Need Sales

12. Under Alderwoods, Kiser Funeral Home sold only pre-need trust policies, not insurance policies. Funeral directors did not sell pre-need policies. The only employees at Kiser Funeral Home who sold any pre-need policies was myself and Ann Progler, a funeral clerk who was licensed to sell and write pre-need contracts. She sold at least 90% of these policies during the work day, during which she was on the clock, and earned a bonus for each contract sold. She also would meet families after-hours to sign contracts. I understand that she did so only when she knew the family was going to sign the contract, as opposed to prospecting or cold-calling, and that she made more on the bonus than she would have from her hourly wage.

Training

13. Funeral directors were required to take continuing education courses to maintain their license. The funeral directors generally took on-line courses during business hours, and were paid for the time that they completed these courses. I do not recall any funeral directors taking after-hours courses. Only funeral directors had to complete this training, and no other employees

were required to attend any training.

Meal Breaks

14.  I required my employees to take a lunch break, but there were times when the funeral home was so busy that they were unable to do so.  When an employee worked through his or her lunch break, the employee would note "no lunch" on their time sheet.  The employees were always paid for the time they worked, including the time they worked when they skipped a lunch break when it was necessary due to being busy.  I never required or encouraged the employees to record a lunch break that they had not taken.  I did require employees who split their lunch break (taking multiple short breaks in place of the long lunch hour) to record their break in one block of time, but I did not tell them to record the full lunch break if that was not equal to the amount of time that they were on break.

15.  I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked.  Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me.

16.  Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions.  I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

17.  The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections.  The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: November _12_, 2009

_Steven Schwinghamer_
STEVEN SCHWINGHAMER

**TAB 53**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WILLIAM HELM, et al.
On behalf of themselves and all employees
similarly situated,

        Plaintiffs,

    vs.

ALDERWOODS GROUP, INC., et al.

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

CASE NO.   3:08-CV-01184 SI

**DECLARATION OF MERTIE SIMS**

DECLARATION OF MERTIE SIMS

I, Mertie Sims, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.     My name is Mertie Sims. I am a resident of Alpharetta, Georgia. I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.     All the statements in this Declaration are true and accurate. I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.     I have worked for Roswell Funeral Home in Roswell, Georgia since 1999. From 1999 until about 2002 or 2003, I was a receptionist at Roswell Funeral Home. In 2002 or 2003, I became an assistant office manager, and in 2004 or 2005, I became the office manager, which is my position today.

4.     Shortly after I was hired, the Roswell funeral home was owned and operated by Alderwoods Group, Inc. My job as assistant office manager and office manager involves handling contracts, paying bills, doing payroll, running reports, performing various administrative duties, and providing occasional general support to the funeral director. Because my duties included payroll responsibilities, I am familiar with how hourly employees recorded time, and were paid for the time recorded at Roswell Funeral Home.

5.     As a full-time hourly employee, I worked 40 hours a week, and on occasion worked overtime.

6.     While working for Alderwoods, I initially recorded my time on time sheets. In 2003, Alderwoods installed a time clock and I recorded my time on

2

time cards, which I used to clock-in and clock-out. I always recorded all of the hours I worked, including any overtime. I was always paid for all of the time that I worked, including overtime.

7. Generally, hourly employees, including me, had to obtain approval prior to working overtime. If I worked overtime that was not approved, I would always be paid for it.

8. None of my managers, or any other employee at Alderwoods, ever encouraged, required, or requested me not to record my time, including overtime. I was never required to work prior to clocking-in when I arrived for work in the morning, or after clocking-out when I left in the evening.

9. During the time I worked for Alderwoods at Roswell Funeral Home, I was never required to be on-call. Roswell Funeral Home employed a father and son to work on-call for after hours removals. Both were paid hourly for the time they were on-call.

10. Funeral directors would sometimes be forwarded calls from the answering service after hours. Funeral directors who took calls recorded their time, and were paid for their time spent on these calls. No other hourly employees were required to do any after hours, on-call work.

11. I was never required to, nor did I ever, perform removals of bodies.

12. Alderwoods never required me to obtain a pre-need insurance license or sell pre-need policies. I obtained my license on my own, and sold a handful of policies, for which I was paid a commission. I was always working on the clock when I made pre-need presentations and handled pre-need sales, and was paid hourly for the time as well. Alderwoods also had separate family service counselors

3

who were responsible for selling pre-needs policies.  Alderwoods did not require funeral directors or any other hourly employees to sell pre-need policies.

13.   I was not required to participate in community organizations or perform community work as an employee of Alderwoods.  If anyone chose to volunteer to work an event in the community sponsored by Alderwoods, such as an ice cream social, or Memorial Day service, the hourly employees would be paid for the time they attended these events.

14.   I would have an annual evaluation by my manager.  My evaluation was not based on, nor did my manager ever discuss with me as part of my evaluation, my involvement in community activities or organizations.

15.   While at Roswell Funeral Home, Alderwoods permitted a half-hour lunch break every day.  I would take the full 30 minutes, unless I had to work through lunch or my meal break was interrupted by work.  On any occasion that my meal break would be interrupted because of work, I would be paid for working through my break.  None of my managers or other Alderwoods employees ever encouraged, required, or requested me not to record my time that I worked through a meal break.

16.   No one at Alderwoods ever encouraged, required, or requested me to perform work but not record the hours that I worked.

17.   I don't recall having to attend any training sessions while at Roswell during the time Alderwoods operated the funeral home.

18.   I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked.  Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and

4

does not represent me. I also was told that the employees who filed the lawsuit seek to have the class certified, and that the matter of class certification has not been ruled upon by the Court; and that if the class is certified and assuming I am a member of the class, then the attorneys for Alderwoods Group, Inc. will be directly opposing my interest as a class member.

19.    Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions. I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

20.    The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections. The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 13, 2009

MERTIE SIMS

5

**TAB 54**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM HELM, et al.<br>On behalf of themselves and all employees<br>similarly situated,<br><br>              Plaintiffs,<br><br>        vs.<br><br>ALDERWOODS GROUP, INC., et al.<br><br>              Defendants. | ) **CASE NO.    3:08-CV-01184 SI**<br>)<br>)<br>) **DECLARATION OF MARSHALL**<br>) **SLIGHT**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

1

DECLARATION OF MARSHALL SLIGHT

I, Marshall Slight, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.     My name is Marshall Slight.  I am a resident of Yakima, Washington. I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.     All the statements in this Declaration are true and accurate.  I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.     From 2003 through July of 2004, I worked for Shaw and Sons Funeral Directors in Yakima, Washington.  During this time, it is my understanding that Shaw and Sons was owned and operated by Alderwoods Group, Inc.

4.     I was a part-time employee at Shaw and Sons during the time I worked there. My job entailed removal of bodies from various locations to the funeral home.

5.     My only job consisted of removals, and I was paid $50 for each removal I performed.  I worked every other week, and never worked more than a few hours a day during the week I worked.

6.     During the weeks I wasn't working, another employee would be working that week doing removals.  No other employees other than the two of us performed removals while I was working for Shaw and Sons.  Removal calls generally

took about one to two hours each to complete. I never had a call that took more than three hours.

7.     I was not involved in the selling of pre-needs policies, nor was I ever required to make pre-needs presentations or sell pre-needs policies.

8.     I was not required to participate in community organizations or perform community work as an employee of Alderwoods.

9.     While at Shaw and Sons, I received training on safety and how to perform removals. For any training I was required to do, I would always be on the clock and record my time spent while attending training meetings. I was always paid for my time attending these training sessions.

10.    I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked. Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me. I also was told that the employees who filed the lawsuit seek to have the class certified, and that the matter of class certification has not been ruled upon by the Court; and that if the class is certified and assuming I am a member of the class, then the attorneys for Alderwoods Group, Inc. will be directly opposing my interest as a class member.

11.    Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions. I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

2

12.     The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections.  The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  October 30, 2009

*Marshall Slight*

MARSHALL SLIGHT

**TAB 55**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM HELM, et al.<br>On behalf of themselves and all employees<br>similarly situated,<br><br>        Plaintiffs,<br><br>     vs.<br><br>ALDERWOODS GROUP, INC., et al.<br><br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

CASE NO.    3:08-CV-01184 SI

**DECLARATION OF ANDY ST.
LAURENT**

1

DECLARATION OF ANDY ST. LAURENT

I, Andy St. Laurent, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.    My name is Andy St. Laurent. I am a resident of Peoria, Arizona. I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.    All the statements in this Declaration are true and accurate. I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.    I am currently a cemetery grounds keeper at Phoenix Memorial Park and Mortuary in Phoenix, Arizona. I began working at Phoenix Memorial Park and Mortuary in 1999 as a part-time associate/funeral support staff. In 2000, when Alderwoods Group, Inc. assumed ownership of Phoenix Memorial Park, I became a full-time courier. As a courier, I would pick up certificates of death, perform removals of remains from various locations to the funeral home, and assist with funerals when needed.

4.    I worked as courier until 2005, when I became a funeral arranger for approximately 9 months. Later that year, I took the position of cemetery groundskeeper which I hold today. It is my understanding that from 2000 through 2006, Alderwoods owned and operated Phoenix Memorial Park and Mortuary.

5.    As a courier, funeral arranger, and cemetery grounds keeper for Alderwoods, I was always an hourly, full time employee working 40 or more hours each week.

PII-1205422v1

2

6.    As a courier and funeral arranger, I would sometimes work 45 to 55 hours a week. As a cemetery groundskeeper, I would sometimes work as much as 55 to 60 each week. I was always paid time-and-a-half for any overtime I ever worked. My time was recorded on time cards, which I used to punch in and punch out.

7.    Although I had to get prior approval from my manager before I worked overtime, Alderwoods paid me for all the overtime I worked. I don't recall ever having my overtime not approved, but if I ever worked overtime which was not previously approved, I would still be paid time-and-a-half for the overtime worked.

8.    None of my managers, or any other employee at Alderwoods, ever encouraged, required, or requested me not to record my overtime.

9.    No one at Alderwoods ever encouraged, required, or requested me to perform work but not record the time that I worked. I always recorded the time that I worked, including overtime.

10.    I never received commissions or bonuses.

11.    Prior to working as a cemetery groundskeeper, I would be "on call" approximately three to four nights a week. My "on call" duties consisted of performing removals of bodies from various locations to the funeral home or answering after-hours calls to the funeral home.

12.    For removals, I would be paid $55 for each removal I performed. Some nights I would not make any removals, other nights I could make two or three. Each removal call generally took 1 ½ to 2 hours to complete. On very rare occasions a removal may take longer, but I don't recall any removal taking longer than 3 hours.

13.    Answering phones while "on call" consisted of speaking with families or others who called the funeral home after hours. For any call that lasted 15 minutes or

less, I would record 15 minutes of work. If a call lasted more than 15 minutes, then I would record each additional minute. The minutes recorded for each call were credited to my weekly hours.

14. I was not involved in the selling of pre-need policies, nor was I ever required to make pre-need presentations or sell pre-need policies. Alderwoods used cemetery sales counselors to sell pre-need policies and make presentations.

15. I was not required to participate in community organizations or perform community work as an employee of Alderwoods. Although I was involved with the local Elks Club, I participated with that organization voluntarily, on my own time. I never reported on my activities with any organizations to any Alderwoods managers, or completed a community service report form, nor was I ever required to do so.

16. I was evaluated by my manager on an annual basis. My evaluation never took into account my participation in community work.

17. Alderwoods permitted a 30 minute meal break every day. I would take the full 30 minutes, unless I had to work through lunch or my meal break was interrupted by work. On any occasion that my meal break would be interrupted because of work, I would be paid for working through my break. None of my managers or other Alderwoods employees ever encouraged, required, or requested me not to record my time that I worked through a meal break, and I was always paid for any work I performed during a meal break.

18. The only training that I was ever required to attend was cremation training in 2004. The training took place in Chicago, and I was paid for the time that I attended the training session.

19. I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they

have not been properly paid for all time worked. Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me. I also was told that the employees who filed the lawsuit seek to have the class certified, and that the matter of class certification has not been ruled upon by the Court; and that if the class is certified and assuming I am a member of the class, then the attorneys for Alderwoods Group, Inc. will be directly opposing my interest as a class member.

20.     Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions. I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

21.     The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections. The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: November _12_, 2009

Andy St. Laurent

**TAB 56**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WILLIAM HELM, et al.
On behalf of themselves and all employees
similarly situated,

        Plaintiffs,

    vs.

ALDERWOODS GROUP, INC., et al.,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)

CASE NO.   3:08-CV-01184 SI

**DECLARATION OF ROBERT
CLAYTON STRANG**

1

DECLARATION OF ROBERT CLAYTON STRANG

I, Robert Clayton Strang, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.     My name is Robert Clayton Strang. I am a resident of Lynnwood, Washington. I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.     All the statements in this Declaration are true and accurate. I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.     I am currently a funeral director/embalmer intern at Schaefer-Shipman Funeral Home in Marysville, Washington. In March 2006, I began working as a funeral director/embalmer intern at Acacia Memorial Park and Funeral Home in Seattle, Washington. At the time I was hired to work at Acacia, it is my understanding that Acacia was owned and operated by Alderwoods Group, Inc. I worked at Acacia until November 2007.

4.     As a funeral director/embalmer intern, I performed a variety tasks including meeting with families, preparing for funerals, embalming, and performing removals. At Acacia, I was always an hourly, full time employee working 40 or more hours each week.

6.     I would average approximately 25 hours of overtime each week. I was always paid time-and-a-half for any overtime I ever worked. My time was recorded on time cards, which I used to punch in and punch out.

2

7.    Alderwoods paid me for all the overtime I worked. I don't recall any policy which required my overtime to be pre-approved, nor do I recall ever having my overtime not approved.

8.    None of my managers, or any other employee at Alderwoods, ever encouraged, required, or requested me not to record my overtime. I was never required to perform any work before clocking in-the morning or after clocking-out in the evening.

9.    No one at Alderwoods ever encouraged, required, or requested me to perform work but not record the time that I worked. I always recorded the time that I worked, including overtime.

10.    My overtime work consisted mostly of after hours removals. For each removal I performed, I would record my time from the time I left my house until I returned home. I would be paid a minimum of three-and-a-quarter hours for each removal I performed. If a removal took less than three hours, I was paid the full three-and-a-quarter hours. Each removal call generally took about 2 hours to complete. If a removal took longer than three-and-a-quarter hours, then I was paid for each hour after that.

11.    As a funeral director/embalmer intern at Acacia, I was not required to be "on call." On occasion, a funeral director who was on call would ask me to be his back up. When I agreed to be a back up, a funeral director would call me on my cell phone and ask me to assist on certain calls. I would always record my time for this work, and be paid time-and-a-half for the time I worked.

12.    I was not involved in the selling of pre-need policies, nor was I ever required to make pre-need presentations or sell pre-need policies. Alderwoods used family service counselors exclusively to sell pre-need policies and make presentations.

3

13. I never received a bonus or commission when working at Acacia.

14. I was never told about or saw an Alderwoods "Community Work Policy," or heard of "I Believe In Service" or "Success Spotlight." I was not encouraged or required to participate in community organizations or perform community work as an employee of Alderwoods. I never reported on my activities with any organizations to any Alderwoods managers, or completed a community service report form, nor was I ever required to do so. I don't recall any incentive programs for community activities at Acacia.

15. I had an annual evaluation while working for Acacia when it was operated by Alderwoods. No one ever evaluated me on my participation in community activities, or the amount of overtime I recorded.

16. Alderwoods permitted a 30 minute meal break every day. I would take the full 30 minutes, unless I had to work through lunch or my meal break was interrupted by work. On any occasion that my meal break would be interrupted because of work, I would be paid for working through my break. I would also take my meal break later that day. None of my managers or other Alderwoods employees ever encouraged, required, or requested me not to record my time that I worked through a meal break.

17. I recall attending periodic training sessions or meetings involving safety issues or continuing education at Acacia. These sessions were held at the funeral home during normal business hours. I was always on the clock when attending these sessions and would be paid for attending. I don't recall any Alderwoods policy requiring hourly employees to attend training sessions after hours and off the clock.

18. I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that

4

they have not been properly paid for all time worked.  Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me.  I also was told that the employees who filed the lawsuit seek to have the class certified, and that the matter of class certification has not been ruled upon by the Court; and that if the class is certified and assuming I am a member of the class, then the attorneys for Alderwoods Group, Inc. will be directly opposing my interest as a class member.

19.    Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions.  I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

20.    The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections.  The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: November _11_, 2009

ROBERT CLAYTON STRANG

5

**TAB 57**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WILLIAM HELM, et al.
On behalf of themselves and all employees
similarly situated,

        Plaintiffs,

    vs.

ALDERWOODS GROUP, INC., et al.

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

**CASE NO.**    **3:08-CV-01184 SI**

**DECLARATION OF JACK STRINTZ**

DECLARATION OF JACK STRINTZ

I, Jack Strintz, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.      My name is Jack Strintz.  I am a resident of Pompano Beach, Florida. I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.      All the statements in this Declaration are true and accurate.  I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.      I am currently a courier for Kraeer Funeral Home and Cremation Center in Pompano Beach, Florida.  Prior to this, I worked for Alderwoods at the Sample Road office for Kraeer Funeral Home in Pompano Beach, Florida from 1994 through January 2007.

4.      From 1994 through December 2006, I worked as a courier for Alderwoods handling certificates of death.  I was an hourly employee.  My job entailed travelling to nursing homes, doctor's offices and other locations to have the certificates of death signed by the appropriate official and returning those certificates to the funeral home.  I have continued in this position for Kraeer Funeral Home and Cremation Center from January 2007 to present.

5.      As a courier for Alderwoods, I was a full time employee working 40 hours each week.

6.      Although I worked very little overtime for Alderwoods, I was always paid time-and-a-half for any overtime I ever worked.  My time was recorded on time cards, which I used to punch in and punch out.

2

7.     I never had to to get prior approval for my overtime, nor did Alderwoods fail to pay me for any overtime I worked which was not pre-approved.

8.     None of my managers, or any other employee at Alderwoods, ever encouraged, required, or requested me not to record my overtime.

9.     I was never required to, nor did I ever, perform removals of bodies. I was not involved in the selling of pre-needs policies, nor was I ever required to make pre-needs presentations or sell pre-needs policies.

10.     I was not required to participate in community organizations or perform community work as an employee of Alderwoods.  Although I enjoy community service, and am involved with the local Shriners and Elks clubs, I participate with those organizations voluntarily, on my own time.  I never reported on my activities with these organizations to any Alderwoods managers, or completed a community service report form, nor was I ever required to do so.

11.     I was evaluated by my manager every few months.  My evaluation never took into account my participation in community work.

12.     Alderwoods permitted a 30 minute meal break every day.  I would always take the full 30 minutes.  I never missed a meal break, and only rarely had my meal break interrupted to perform work.  On the rare occasion that my meal break would be interrupted because of work, I would take the full 30 minutes for my meal break later that day.  None of my managers or other Alderwoods employees ever encouraged, required, or requested me not to record my time that I worked through a meal break.

13.     No one at Alderwoods ever encouraged, required, or requested me to perform work but not record the hours that I worked.

3

14.     I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked.  Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me.  I also was told that the employees who filed the lawsuit seek to have the class certified, and that the matter of class certification has not been ruled upon by the Court; and that if the class is certified and assuming I am a member of the class, then the attorneys for Alderwoods Group, Inc. will be directly opposing my interest as a class member.

15.     Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions.  I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

16.     The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections.  The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: October 30, 2009

JACK STRINTZ

4

**TAB 58**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WILLIAM HELM, et al.
On behalf of themselves and all employees
similarly situated,

       Plaintiffs,

  vs.

ALDERWOODS GROUP, INC., et al.

       Defendants.

CASE NO.   3:08-CV-01184 SI

**DECLARATION OF BRENDA
TURNAGE**

## DECLARATION OF BRENDA TURNAGE

I, Brenda Turnage, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.      My name is Brenda Turnage.  I am a resident of Colorado City, Texas.  I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.      All the statements in this Declaration are true and accurate.  I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.      I worked at the Kiker-Seale Funeral Home in Colorado City, Texas for about a year in 2004 and 2005.  The funeral home was owned by Alderwoods at the time.

4.      I was an hourly employee at Kiker-Seale.  I answered phones, typed, handled bills and deposits, and greeted families.  My employment with Kiker-Seale was temporary while I recovered from an injury that prevented me from teaching.

Overtime

5.      I never worked any overtime at Kiker-Seale.  There was a time clock at the funeral home that was used to punch in and out of work.

6.      I was always paid for the time I worked.  I was never told to not record time, or record it inaccurately.

Removals

7.      I was not involved in after-hours calls or with removals.

"Community Work Policy"

8.      I was never encouraged or required to participate in community activities by my supervisor at the funeral home.  Before working at Kiker-Seale, I belonged to several community organizations, including the board of directors for the Community Mission, Future Farmers of America, and the board of my church.  I was not requested by the funeral home to participate in these organizations, and I would have done so regardless of my employment by Kiker-Seale.

9.      My participation in community organizations was never part of any evaluation I received from my supervisor.

Pre-Need Sales

9.      I did not sell pre-need policies.

Training

10.     I did not receive any training to work in the office at Kiker-Seale.  I had to refresh my typing skills and learn how to fill out forms.  I did so on the job, and was paid for my time.

Meal Breaks

11.     I do not recall ever working during my lunch break.  I was not told to record a meal break that I did not take.

12.     Before speaking with any attorney for Alderwoods, I was told that the employees who filed the lawsuit seek to have the class certified, and that the matter of class certification has not been ruled upon by the Court.  I was also told that if the class is certified and assuming I am a member of the class, then the attorneys for Alderwoods will be directly opposing my interest as a

class member.

13. I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked. Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me.

14. Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions. I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

15. The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections. The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 11, 2009

_Brenda Turnage_
BRENDA TURNAGE

**TAB 59**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WILLIAM HELM, et al.
On behalf of themselves and all employees
similarly situated,

Plaintiffs,

vs.

ALDERWOODS GROUP, INC., et al.

Defendants.

CASE NO.   3:08-CV-01184 SI

**DECLARATION OF CATHY WALSH**

1

DECLARATION OF CATHY WALSH

I, Cathy Walsh, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.      My name is Cathy Walsh. I am a resident of Levittown, New York. I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.      All the statements in this Declaration are true and accurate. I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.      I have worked for the Vernon C. Wagner Funeral Homes Home in Hicksville, New York for the past 19 years.

4.      From 2002 through 2006, I was an administrative assistant working both full-time and part-time. It was my understanding that during this time period, the funeral home was owned and operated by Alderwoods Group, Inc. I was an hourly employee at Wagner Funeral Homes during this time period. My job as administrative assistant included paying bills, filing documents, answering phones, and providing general support to the funeral directors.

5.      As a part-time employee, I would not work more than 30 hours in any one week. As a full-time employee, I would work 40 hours a week, and on occasion, some overtime.

6.      My time at Wagner Funeral Homes while it was operated by Alderwoods was recorded on a time clock using time cards to punch in and punch out. I always recorded all of the hours I worked, including any overtime. To the best of my knowledge, I was always paid for all of the time that I worked.

2

7.    I never had to get prior approval for any overtime, nor did Alderwoods fail to pay me for any overtime I worked which was not pre-approved.  I don't recall ever being paid a commission or bonus as an Alderwoods employee.

8.    None of my managers, or any other employee at Alderwoods, ever encouraged, required, or requested me not to record my time, including overtime.  I was never required to work before clocking in in the morning, or after clocking out in the evening.

9.    During the time I worked for Alderwoods at Wagner Funeral Homes, I was never required to be on-call.

10.    I was never required to, nor did I ever, perform removals of bodies.  To the best of my recollection, removals were performed by either the funeral directors, or a third party removal service.

11.    I was not involved in the selling of pre-needs policies, nor was I ever required to make pre-needs presentations or sell pre-needs policies.

12.    I did not participate in community organizations or perform community work as an employee of Alderwoods.

13.    My annual evaluation never took into account whether I performed community service work.

14.    Alderwoods permitted a 30 minute lunch break every day.  On occasion, my meal break would be interrupted because of work.  None of my managers or other Alderwoods employees ever encouraged, required, or requested me not to record my time that I worked during a meal break.

15.    No one at Alderwoods ever encouraged, required, or requested me to perform work but not record the hours that I worked.

3

16.     I would do any training on the job, and was paid for the time I spent in training.  Whenever we had meetings, we would always be on the clock and record our time spent at both meetings and training.  I recall attending an all day training session when Alderwoods assumed ownership of Wagner Funeral Homes, for which I was paid.

17.     I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked.  Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me.  I also was told that the employees who filed the lawsuit seek to have the class certified, and that the matter of class certification has not been ruled upon by the Court; and that if the class is certified and assuming I am a member of the class, then the attorneys for Alderwoods Group, Inc. will be directly opposing my interest as a class member.

18.     Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions.  I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

19.     The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections.  The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 13, 2009

CATHY WALSH

4

**TAB 60**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WILLIAM HELM, et al.
On behalf of themselves and all employees
similarly situated,

         Plaintiffs,

   vs.

ALDERWOODS GROUP, INC., et al.

        Defendants.

CASE NO.    3:08-CV-01184 SI

DECLARATION OF ROBIN WARN

# DECLARATION OF ROBIN WARN

I, Robin Warn, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.      My name is Robin Warn.  I am a resident of Ceres, California.  I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.      All the statements in this Declaration are true and accurate.   I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.      I am currently the general manager Lakewood Memorial Park in Hughson, California.   Under Alderwoods' ownership, I was the licensed cemetery manager for Lakewood Memorial Park Cemetery (the "Lakewood Cemetery").

4.      The staff of Lakewood Cemetery consisted of 12-14 employees in the maintenance department, several employees in the cemetery office, and sales staff.   The maintenance and clerical staff were hourly employees.  The sales staff consisted of family service counselors, who were paid on either an hourly or commission basis, depending on which was greater.

Overtime

5.      The maintenance department at Lakewood Cemetery worked overtime on weekends or evenings when services ran late.   Whenever there was a burial, maintenance staff had to be available for opening and closing the grave.  Because the maintenance staff worked on a schedule, pre-approval for overtime was rarely needed.  If a funeral was running late and it appeared that the staff would have to stay late, they would tell me if I was available.  The employees were always paid for any overtime that they worked, even if they were not able to talk to me about it first.

6.     The clerical office staff did not work overtime.

7.     No hourly employees at Lakewood Cemetery received bonuses or commissions, with the exception of sales staff as discussed below.  No employees were ever "on-call."

After-Hours Removals

8.     The staff at Lakewood Cemetery did not conduct after-hours removals.

"Community Work Policy"

9.     The staff at Lakewood Cemetery were not required to be involved in community activities or organizations.   There was no incentive program to encourage participation in community activities.

Pre-Need Sales

10.     The family service counselors sold cemetery and funeral pre-need policies.  They were paid on a commission basis, or for the time spent on an hourly basis, depending on which was greater.  The family service counselors were paid for after hours family visits.

Training

11.     Employees received training from Alderwoods on safety issues.  This training was held during the day and was on-the-clock.

Meal Breaks

12.     Employees received a lunch hour.  There were times, depending on many burials were being conducted at the cemetery, when an employee worked through their lunch hour.  If

they did so, they were paid for their time.  Usually, however, the employee would simply take a later lunch.  I never told the employees to record a lunch break if they had not taken the break.

13.     I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked.  Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods.

14.     Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions.  I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

15.     The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections.  The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.


Dated: November 5 , 2009

ROBIN WARN

**TAB 61**

1

2

3    UNITED STATES DISTRICT COURT

4    NORTHERN DISTRICT OF CALIFORNIA

5

6    WILLIAM HELM, et al.                        )    CASE NO.    3:08-CV-01184 SI
     On behalf of themselves and all employees   )
7    similarly situated,                         )    DECLARATION OF SHARON WELCH
                                                 )
8              Plaintiffs,                        )
                                                 )
9         vs.                                     )
                                                 )
10   ALDERWOODS GROUP, INC., et al.               )
                                                 )
11             Defendants.                        )
                                                 )
12                                                )
                                                 )
13                                                )
                                                 )
14                                                )

## DECLARATION OF SHARON WELCH

I, Sharon Welch, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.      My name is Sharon Welch.  I am a resident of Pulaski, Tennessee.  I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.      All the statements in this Declaration are true and accurate.  I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.      I am currently a funeral director at the Carr & Erwin Funeral Home in Pulaski, Tennessee.  I started at Carr & Erwin in October 2004, when the funeral home was owned by Alderwoods.  I began as an apprentice funeral director and embalmer.  I became a funeral director in 2007.

4.      As an apprentice funeral director/embalmer, I worked full-time.  I was an hourly employee.  I worked about 40 to 50 hours a week.  This included overtime.

Overtime

5.      My overtime included taking calls and after-hours removals.  There were also nights where I would stay late.  Depending on the situation, I might have to get approval from my manager.  If I was staying late to complete work I was already doing, I would ask for approval.  I was always paid for any overtime that I worked.  I was paid time and a half.

6.      I did not receive any bonuses or commissions under Alderwoods.

After-Hours Work

7.      We had a rotating on-call schedule at the funeral home for after-hours work.  If I received a removal call after-hours, I was paid from the time that I received the call until the time the removal was completed.  I was paid hourly for my time and, if I had accrued sufficient hours, I was paid overtime.

"Community Work Policy"

8.      We were encouraged to be involved in community activities, but community service was not a requirement.  As an apprentice, I was working full-time and also in college, so I did not have time to participate in community organizations.  My participation in community activities was never a part of any evaluation I was given by my supervisor at the funeral home.

9.      I do not recall any incentive programs designed to encourage employees to participate in community activities.  I do not recall a program called "I Believe in Service."

Pre-Need Sales

10.     As an apprentice, I was not allowed to sell pre-need policies.  I only handled funeral arrangements with the funeral directors.  There was a pre-need counselor who handled these sales.  Also, our office manager was licensed to sell pre-need insurance.  I was not required to sell pre-need policies as either an apprentice or a funeral director.

Training

11.     The funeral home occasionally had training on office practices, procedures and systems.  Any such training was held during the work day while I was on the clock and being paid.

<u>Meal Breaks</u>

12.    I received lunch breaks as a full-time employee.  There were occasions when we were busy and I was unable to take a lunch break.  When this happened, I was paid for the time that I worked.  I was never told to punch out for a lunch break that I had not taken.

13.    Before speaking with any attorney for Alderwoods, I was told that the employees who filed the lawsuit seek to have the class certified, and that the matter of class certification has not been ruled upon by the Court.  I was also told that if the class is certified and assuming I am a member of the class, then the attorneys for Alderwoods will be directly opposing my interest as a class member.

14.    I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked.  Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me.

15.    Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions.  I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

16.    The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections.  The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

1    I declare under penalty of perjury that the foregoing is true and correct.

2

3

4    Dated: November 5 , 2009                          _Sharon Welch_
                                                         SHARON WELCH
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TAB 62**

1    UNITED STATES DISTRICT COURT

2    NORTHERN DISTRICT OF CALIFORNIA

3

4    WILLIAM HELM, et al.                          )   CASE NO.    3:08-CV-01184 SI
     On behalf of themselves and all employees     )
5    similarly situated,                           )   **DECLARATION OF SHIRLEY**
                                                    )   **WENTWORTH**
6                                                   )
                  Plaintiffs,                       )
7           vs.                                     )
                                                    )
8    ALDERWOODS GROUP, INC., et al.                 )
                                                    )
9                 Defendants.                       )
10   _____       )

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

DECLARATION OF SHIRLEY WENTWORTH

I, Shirley Wentworth, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.      My name is Shirley Wentworth.  I am a resident of Pompano Beach, Florida.  I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.      All the statements in this Declaration are true and accurate.  I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.      I worked for Kraeer Funeral Home and its successors for 14 years, both full time and part time.  From 2002 through 2006, I worked for Kraeer Funeral Homes at two locations, one in Coral Springs, and another in Fort Lauderdale, Florida.

4.      I began working for Kraeer Funeral Homes as an accountant in the accounting department.  In 2002, I began working full time as a secretary and support staff.  I was an hourly employee.  My job entailed providing support to the funeral director, working at visitations, filling in for the secretary, and helping to clean up after services at the funeral home.  I continued in this position for Kraeer Funeral Home through March 2005 at Coral Springs, and resumed in May 2005 in Fort Lauderdale.  During this time, it was my understanding that Alderwoods Group, Inc. owned and operated the Kraeer Funeral Homes where I worked.

2

5.     As support staff, I would work 8 hours a day, and 40 hours a week. On occasion, I would also work some overtime.

6.     Although I worked very little overtime for Alderwoods, I was always paid time-and-a-half for any overtime I ever worked.  My time was recorded on time cards, which I used to punch in and punch out.  I always recorded all of the hours I worked, including my overtime.

7.     I never had to get prior approval for my overtime, nor did Alderwoods fail to pay me for any overtime I worked which was not pre-approved.

8.     None of my managers, or any other employee at Alderwoods, ever encouraged, required, or requested me not to record my overtime.

9.     During the time I was a full-time employee, I was never required to be on-call.

10.     I was never required to, nor did I ever, perform removals of bodies. To the best of my knowledge, the Kraeer Funeral Homes had a dedicated crew working out of the Sample Road facility who handled the removal of bodies.

11.     I was not involved in the selling of pre-needs policies, nor was I ever required to make pre-needs presentations or sell pre-needs policies.  To the best of my knowledge, there was a dedicated staff who handled pre-needs policies and presentations.  It was my understanding that each Chapel had its own pre-needs sales person.

3

12.     I was not required to participate in community organizations or perform community work as an employee of Alderwoods. Although I was a member of my church choir for nearly 35 years, I participated in this activity voluntarily, on my own time, because I enjoyed it. No one at Kraeer Funeral Homes required me to participate in the choir.

13.     I recall that Alderwoods would participate in the annual Seafood Fest in our community, but Alderwoods never required me to participate in that activity, nor did I. I am not aware of any employee at Kraeer Funeral Homes who was required by Alderwoods management to participate in the Seafood Fest or any other activity.

14.     I was evaluated by my manager every year. My evaluation never took into account my participation in community work.

15.     Alderwoods permitted a 30 minute lunch break every day. I would always take the full 30 minutes. I never missed a meal break, and only rarely had my meal break interrupted to perform work. On the rare occasion that my meal break would be interrupted because of work, I would take the full 30 minutes for my meal break later that day. None of my managers or other Alderwoods employees ever encouraged, required, or requested me not to record my time that I worked through a meal break.

16.     No one at Alderwoods ever encouraged, required, or requested me to perform work but not record the hours that I worked.

17.     While at Kraeer during the time Alderwoods operated the funeral homes, my training consisted mostly of computer training. I would do any training on the

4

job, and was paid for the time I spent in training.  Whenever we had meetings, we would always be on the clock and record our time spent at both meetings and training.

18. I never heard of any programs entitled "Success Spotlight" or "I Believe In Service," nor was I required to participate in any such programs.

19. I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked.  Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me.  I also was told that the employees who filed the lawsuit seek to have the class certified, and that the matter of class certification has not been ruled upon by the Court; and that if the class is certified and assuming I am a member of the class, then the attorneys for Alderwoods Group, Inc. will be directly opposing my interest as a class member.

20. Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions.  I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

21.    The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections.  The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  October 31, 2009

*Shirley Wentworth*

SHIRLEY WENTWORTH

6

**TAB 63**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WILLIAM HELM, et al.
On behalf of themselves and all employees
similarly situated,

        Plaintiffs,

   vs.

ALDERWOODS GROUP, INC., et al.

        Defendants.

CASE NO.   3:08-CV-01184 SI

**DECLARATION OF NANCY WINDSOR**

## DECLARATION OF NANCY WINDSOR

I, Nancy Windsor, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.      My name is Nancy Windsor.  I am a resident of Fort Myers, Florida.  I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.      All the statements in this Declaration are true and accurate.  I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.      I am currently the Office Manager for the Kiser Funeral Home in Fort Myers, Florida.  I have worked at Kiser Funeral Home for 15 years, including the period when it was owned by Alderwoods.  At that time, my position was called Location Administrator.  I was a full-time, hourly employee.

Overtime

4.      I worked, on average, several hours of overtime every week.  I worked overtime to complete work that could not be completed during normal business hours, such as month-end closings and a task that required me to enter invoices for 14 other locations on a centralized computer system.

5.      I understood that overtime was to be pre-approved by the manager.  I always was able to get approval for overtime that I worked.  I was always paid for the overtime that I worked.

6.      I was never told that I should not record all the time that I worked or to record overtime that I had worked as regular time.  As the office manager, I handled payroll for the office.  I never changed an employees' time entry on their time sheet or when I inputted time into the

payroll system.

<u>After-Hours Work</u>

7.     I was not on-call for removals or business calls after-hours.  I never performed removals.  Occasionally, I would assist with evening visitations or services if the funeral home was short-handed.  I was paid at my hourly rate for the time I worked.

<u>"Community Work Policy"</u>

8.     I was not encouraged by my manager to be active in community organizations.  I recall only that community service was sometimes mentioned at staff meetings.  There were no incentive programs to encourage community participation by employees.  I did not participate in any community activities or organizations when I worked for Alderwoods.  Community service was not discussed by my supervisor when he evaluated my job performance with me.

<u>Pre-Need Sales</u>

9.     I did not sell pre-need policies.  There was a pre-need salesperson at the funeral home who handled these sales.

<u>Training</u>

10.     The only training that Alderwoods required me to attend were meetings of the office managers, to introduce new office systems or procedures.  These meetings were rare and occurred during business hours.  I was paid for the time I attended these meetings.  Alderwoods did not require that I attend any other training.

<u>Meal Breaks</u>

11.     Although Alderwoods did not encourage its employees to work through lunch, occasionally I chose to work through a lunch break when we were busy.  Usually, I would take a later lunch.  If I could not take a lunch break, I was paid for the time that I worked.  I made a notation on my time sheet that I had not taken a lunch and the reason for doing so.  I was not required to record a lunch break if I had not taken one.

12.     Before speaking with any attorney for Alderwoods, I was told that the employees who filed the lawsuit seek to have the class certified, and that the matter of class certification has not been ruled upon by the Court.  I was also told that if the class is certified and assuming I am a member of the class, then the attorneys for Alderwoods will be directly opposing my interest as a class member.

13.     I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked.  Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me.

14.     Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions.  I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

15.     The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections.  The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  November 12, 2009

*Nancy Windsor*
NANCY WINDSOR

**TAB 64**

1
2
3                      UNITED STATES DISTRICT COURT
4                  NORTHERN DISTRICT OF CALIFORNIA

5
                                )  **CASE NO.   3:08-CV-01184 SI**
6  WILLIAM HELM, et al.               )
    On behalf of themselves and all employees  )
7  similarly situated,               )  **DECLARATION OF ANNETTE YOUNG**
                                )
8             Plaintiffs,      )
9       vs.                )
                                )
10  ALDERWOODS GROUP, INC., et al.    )
11           Defendants.    )
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## DECLARATION OF ANNETTE YOUNG

I, Annette Young, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.    My name is Annette Young.  I am a resident of Arcata, California.  I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.    All the statements in this Declaration are true and accurate.  I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.    I currently work at Paul's Chapel in Arcata, California.  I have worked at Paul's Chapel for more than 61 years.  I started working there in 1948, playing the organ at funerals.  I worked at Paul's Chapel when it was an Alderwoods location.  I found Alderwoods to be fair and honest in its treatment of employees at Paul's Chapel.

4.    I have always been an hourly employee at Paul's Chapel.  I oversee the music for the funeral home, assist with visitations, help the funeral directors at funeral services, and cover the office and handle secretarial duties when the funeral home is short of staff.  My hours varied depending on the number of funerals.  When the office was short of employees, I would work a full-time week or two in a row.

Overtime

5.    I do not recall having to get approval to work overtime.  However, I generally was at the funeral home because I had been called in.  I was always paid for any overtime I worked.

6.    I do not recall seeing a written policy on overtime from Alderwoods.  I was never told not to record time that I had worked.

7.      I did not receive bonuses or commissions from Alderwoods.

**After-Hours Removals**

8.      I never performed after-hours removals.

**"Community Work Policy"**

9.      Employees at Paul's Chapel were encouraged to participate in community organizations.  For me, this usually meant that I might work at a reception after a funeral or service, meeting people and handing out memorial books, and setting up flowers.  I was paid for this time.

10.     I was a music teacher and organist and belong to several community groups, including the American Guild of Organists and the California Music Teachers' Association of Humboldt County.  I joined these organizations before I worked for Alderwoods.  These activities were not related to the funeral home, and I would have participated in them regardless of any funeral home policy.

**Pre-Need Sales**

11.     I did not sell pre-need policies.  There was a pre-need salesperson who handled pre-need sales.

**Training**

12.     Occasionally, Alderwoods would provide training on new office procedures or equipment.  I was paid for the time I attended these meetings.

<u>Meal Breaks</u>

13.    I received a 30 minute lunch break when I worked full-time.  I would punch out for lunch.  I was paid for any time I was not on lunch break.  I was never told to punch out for a lunch break I did not take.  I was always told to record my time worked.

14.    Before speaking with any attorney for Alderwoods, I was told that the employees who filed the lawsuit seek to have the class certified, and that the matter of class certification has not been ruled upon by the Court.  I was also told that if the class is certified and assuming I am a member of the class, then the attorneys for Alderwoods will be directly opposing my interest as a class member.

15.    I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked.  Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me.

16.    Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions.  I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

17.    The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections.  The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: November _11_, 2009

ANNETTE YOUNG