**Exhibit P**

**Part 1 of 2**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM HELM, et al.<br>On behalf of themselves and all employees<br>similarly situated,<br><br>          Plaintiffs,<br><br>     vs.<br><br>ALDERWOODS GROUP, INC., et al.<br><br>          Defendants. | **CASE NO.     3:08-CV-01184 SI**<br><br>**DECLARATION OF RONALD G.**<br>**COLLINS** |

## DECLARATION OF RONALD G. COLLINS

I, RONALD G. COLLINS, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.      I am over 21 years of age, have personal knowledge of the facts set forth in this declaration, and could testify to them competently if called to do so.

2.      I was employed by Alderwoods Group, Inc. ("Alderwoods") as Vice President of Operations for the Northeast United States and Canada from 1999 until November 2006. I began working for The Loewen Group, Alderwoods' predecessor, in 1987 and held a variety of positions, including Regional Manager for Ontario, Director of Operations Due Diligence, and Vice President of Funeral Homes. After Alderwoods' merger with a subsidiary of Service Corporation International, I stayed on as an employee with the job title of Vice President of Operations/Federal Trade Commission Hold Separate Locations' Independent Manager. My employment ended in December 2007.

3.      In the course of my responsibilities with Alderwoods, I became familiar with Alderwoods' corporate structure, management, and its policies and practices, including policies and practices relating to wage and hour issues. Therefore, I am aware that Alderwoods was managed by an Executive Committee, which consisted of the Chairman of the Board of Directors, the President and Chief Executive Officer, the Chief Financial Officer, and the Chief Information Officer.

4.      As Vice President of Operations for the Northeast United States and Canada, it was my responsibility to manage approximately 220 local operations in more than a dozen states and Canada. I was responsible for managing a field team that included a Director of Operations, two Controllers, a Human Resources Specialist, six Regional General Managers, and more than 20 Market Growth Managers (who reported to the Regional Managers). I was one of three Vice Presidents of Operations for Alderwoods at the time of the merger. I reported to Paul Houston, Alderwoods' President and CEO.

5.      Individual funeral homes, crematoriums, and burial sites were managed either by a Market Growth Manager ("MGM") or a Location Manager. MGMs typically managed

locations in rural areas where individual locations were too small to justify a Location Manager. MGMs in such locations would have direct supervisory authority over employees at the location, and typically managed two or more locations at once. Location Managers typically managed larger locations. Depending on their duties and number of employees, a Location Manager might be exempt from overtime requirements and be a salaried employee.

6.     At some locations, particularly small sites with only one or two full-time employees, Location Managers and Funeral Directors were responsible for nearly every aspect of the operation, including administrative duties, selling pre-need insurance, embalming, arranging funeral services, taking phone calls and performing removals of remains after hours. Slightly larger locations might have a Location Administrator or Assistant Administrator to handle payroll, inventory and other administrative matters, leaving Location Managers and Funeral Directors to meet with families and provide funeral services.

7.     As Vice President of Operations for the Northeast United States and Canada it was my job to ensure compliance with company policies. Accordingly, I am familiar with Alderwoods' policies related to wage and hour issues.

8.     Specifically, Alderwoods had an express policy that non-exempt employees record and be paid for all hours worked. This policy appeared in its policy and procedures binders. This policy was enforced by requiring employees to record their time on a daily basis on time cards or timesheets and requiring both the employee and his/her manager to sign the time record to verify its accuracy. To the best of my knowledge, during the time I worked for Alderwoods, this policy was followed and all employees recorded and were compensated for all the time they worked on behalf of Alderwoods. There were no company-mandated limitations placed on the amount of overtime someone could work. Any limitation placed on the amount of overtime that could be worked would have been decided at the location or regional level, not pursuant to my direction, and I have no personal knowledge of any such limitations being set. Even if limitations were set at a few locations, employees were still required to record and be

compensated for all time actually worked.  If anyone did not record all time actually worked, it was contrary to company policy and to my directions.

9.    Alderwoods never had a company-wide policy requiring non-exempt employees to participate in community events.  No such policy appears in any policies or procedures manual and no such policy was ever communicated to me or by me as Vice President of Operations for the Northeast United States and Canada.  I did encourage employees to be involved in the community and to the extent non-exempt employees performed community service for the benefit of Alderwoods, such as participating in community parades or attending community service functions, employees were required to report such time and were paid for it.

10.   I am aware that Alderwoods created the Community Leadership Program and had various other methods of tracking community events and identifying key influencers in the community.  These programs were administered at the location level and the extent to which locations participated or identified community opportunities often varied depending on the location and the manager.  Indeed, the importance of community involvement could vary depending on the size and demographics of a community; communities with less competition would require less in the way of community involvement to attract business.

11.   Nothing in these programs required employees to work beyond their scheduled business hours, much less to do so without compensation.  The creation of lists of community events or influencers could be done during the business day.  Contacting or meeting community influencers could easily be done during the business day.  Attending community events also could be done during the business day.  If employees did any of these things outside their scheduled hours, such as participating in a holiday parade on behalf of the funeral home, it was purely voluntary, and they were required to record their time and they were paid for it.

12.   Alderwoods also never had a company-wide policy requiring non-exempt employees to undergo job-related training without compensation.  To the contrary, training was almost always during employees' normal working hours when they were on the clock.  To the extent any training was not during normal working hours, non-exempt employees were still

required to record their time and be compensated for it.  In this same vein, Alderwoods never required non-exempt employees such as Funeral Directors to obtain their insurance license.  No such policy appears in any policies or procedures manual and no such policy was ever communicated to me or by me as Vice President of Operations for the Northeast United States and Canada.  In fact, in some areas, pre-need insurance policies were sold by sales teams, not Funeral Directors, and there would be no point to a Funeral Director obtaining an insurance license.

13.     Alderwoods had a policy requiring non-exempt employees to receive pre-approval for overtime work.  They generally were required to seek such approval from their Location Manager and failure to do so could result in discipline.  The purpose of this policy was to manage expenses by allowing the manager to determine whether or not overtime was necessary or whether the work in question could be performed by someone in the course of the regularly scheduled work day.  As noted above, however, Alderwoods always had a policy – recorded in company policies and procedures manuals – that employees record all the time they worked, whether pre-approved or not, and they were compensated for all time they recorded.  Accordingly, Alderwoods' policy always was to fully compensate non-exempt employees for all time worked, regardless of whether overtime was pre-approved.  There never was any policy that employees were not paid for unapproved overtime.  I am not aware of any managers who failed to pay overtime.  Any managers in my territory who may have failed to pay overtime actually worked did so in violation of company policy and my express direction.

14.     Also consistent with Alderwoods' written policy that all hours worked must be compensated, Alderwoods never required or permitted employees to omit or deduct hours actually worked.  Employees were required to record their start and finish time each day.  This means that they were to punch in as soon as they began work and punch out only when they had completed work.  They were not to perform any work prior to clocking in or after clocking out.  This was a strict policy enforced at all locations – no off-the-clock work was permitted.  Any

manager who did permit off the clock work violated company policy and ignored my instructions and would have been reprimanded if I knew about it.

15.     For as long as I was Vice President of Operations, Alderwoods' policy always required employees to report any work performed while on call.  This policy was specifically formalized in 2005 with respect to telephone calls taken while on call, but it was always the expectation that if non-exempt employees conducted business while on call, whether it be taking calls, conducting removals, etc., they would be paid for it.

16.     Alderwoods never had a company policy that certain work be paid piece rate.  It was, however, discovered that some locations paid piece rate for certain types of work, such as removals or phone calls.  These were practices carried over from the former owners who owned the locations before Alderwoods purchased them.  When Alderwoods learned of any instances of piece work pay carried over from former owners, it put a stop to the practice immediately.  It was generally Alderwoods' practice to pay employees the greater of a minimum number of hours for a task or their actual hours worked.   For example, in certain locations, employees were paid a minimum of three hours for a removal, but the minimum time would vary from region to region depending on the distances employees would have to drive and the amount of traffic congestion typically experienced.

17.     Whether particular employees would have to be on call varied from location to location.  In some locations, third-party services would take phone calls and handle removals.  In certain other locations, employees did have to be on call, but it was limited to certain positions like Funeral Directors.  In still other locations, removals were handled only by part-time employees.

18.     In response to the fact that some locations were not following company policies regarding reporting on-call work, in 2006 Alderwoods rolled out a standardized method of tracking on call time that provided employees with logs to track their time instead of writing it on their time cards as had been past practice.  This was not a new policy, but a confirmation of existing policy and the creation of a uniform way to track on-call time.

19.    Similarly, to the extent non-exempt employees sold pre-needs policies or did any work after their scheduled hours, they were required to report their time.  While employees occasionally may have met with families after scheduled hours, Alderwoods' policy was clear that they had to record all time just as during the regular work day.  They were not permitted to punch out and continue working, nor could their manager refuse to record their work time.

20.    Also, Alderwoods never had a policy requiring employees to work during their meal break or to miss lunch breaks that were deducted from their hours worked.  On any occasion where employees had to perform a work-related task while on a meal break, they were required to record their time and then resume their full break after completion of the work.

21.    Finally, Alderwoods never had any policy that commissions or bonuses would not be included in employees' regular rate of pay for purposes of determining overtime compensation.  No such policy appears in any policies or procedures manual and no such policy was ever communicated to me or by me.  To the contrary, it is my understanding that such commissions and bonuses should be included in overtime calculations to the extent required by U.S. law.

22.    At several locations in the Northeast U.S., non-exempt employees were represented by unions.  The union contract for these locations included wage and benefit provisions as well as a grievance and arbitration procedure by which all employees were required to contest any wage issues.  An example of one of the union agreements in effect during my tenure is attached hereto as Exhibit 1.


I declare under penalty of perjury under the laws of the United States of America the foregoing is true and correct.

November 11, 2009

_____
Ronald G. Collins

**Exhibit 1**

AGREEMENT

BETWEEN

VERNON C. WAGNER FUNERAL HOMES, INC.

AND

LOCAL 813

AFFILIATED WITH
INTERNATIONAL BROTHERHOOD OF TEAMSTERS, AFL-CIO
52-35 BARNETT AVENUE
LONG ISLAND CITY, NEW YORK 10004

EFFECTIVE
November 1, 2001 THROUGH October 31, 2004

COVERING LICENSED FUNERAL DIRECTORS/RESIDENTS

AGREEMENT made by and between Local 813 affiliated with International Brotherhood of Teamsters, AFL-CIO, hereinafter called "Union" and Vernon C. Wagner Funeral Homes, Inc., hereinafter called "Employer."

WITNESSETH

WHEREAS, the Union was certified as the collective bargaining representative for the employees covered hereunder by the National Labor Relations Board on March 27, 2000 in Case No. 29-RC-9429; and;

WHEREAS, the parties have met and negotiated the terms and conditions of a new agreement; and

WHEREAS, the parties desire to ensure to the fullest extent possible the elimination of waste, protection of property, efficient and flexible operation of the business, superior service to customers and the success of the enterprise for the mutual benefit of the parties and the employees, and

WHEREAS, the parties desire to establish and maintain a peaceful and harmonious relationship for their mutual benefit and for the benefit of the employees covered hereby;

NOW, THEREFORE, in consideration of the mutual covenants herein contained and other good and valuable consideration, the parties hereby agree as follows:

## 1.   RECOGNITION

(a)   The Employer recognizes the Union as the sole and exclusive bargaining representative for all regular full-time licensed funeral directors, and registered residents who perform duties encompassed by their licenses employed by the Employer at its funeral establishments located at 125 Old Country Road, Hicksville, New York and 655 Old Country Road, Plainview, New York with respect to wages, hours and other working conditions. Excluded from the coverage of this Agreement are all other employees, clerical employees, managers, confidential employees, professional employees, guards and supervisors as defined in the Labor Management Relations Act of 1947, as amended, hereinafter referred to as the "Act."

(b)   When used hereafter in this Agreement, the term "employee" in its singular, plural and possessive forms refers only to bargaining unit employees identified in Section 1(a) as covered by this Agreement. The terms "licensed," "licenses," "funeral directors," "managers," "registered residents," and "funeral establishments" incorporate the definitions supplied by and used under the New York Public Health Law and the New York Department of Health Codes, Rules and Regulations. All references to any persons in this Agreement designate both

2

sexes, and wherever either the female or male gender is used, it shall be construed to include both males and females.

(c)     If any employee's license is revoked or suspended, the individual shall immediately be deemed excluded from the bargaining unit and shall have no rights under this Agreement. The Employer may immediately reassign, reclassify, suspend or discharge that individual. Any action under this paragraph shall not be grievable under the grievance and arbitration provisions.

## 2.   ACCESS FOR NON-EMPLOYEE UNION REPRESENTATIVES

(a)     A non-employee representative of the Union, on advance notice to the Employer, shall have access to and shall be admitted to the Employer's place or places of business only according to the provisions of this Article, and only for the purpose of meetings with the Employer, to ascertain whether a particular provision of this Agreement is being complied with, to adjust disputes, investigate and present grievances, collect dues, assessments and the like, and to post messages on the bulletin board or otherwise communicate with employees. Such representatives shall not conduct any kind of vote or engage in organizing on the Employer's premises. While on the Employer's premises, Union Representatives shall conduct themselves in a business-like manner, shall not interrupt or interfere with individuals employed by the Employer while they are working, and shall not disrupt the Employer's operations. They shall make reasonable efforts to minimize the amount of Union activity on the Employer's premises during working hours and to minimize the amount of time lost due to Union activity.

(b)     Unless invited by the Employer to visit, non-employee Union representatives will call the Employer prior to the visit, state the purpose of the visit, and arrange for a time and place for the visit. Upon arrival, the representative shall contact the Employer's representative and notify him of his or her arrival, and the Union representative shall notify the Employer's representative of his or her leaving. Such Union representative may not enter or remain on the Employer's premises in the absence of the Employer's representative, and must leave the Employer's premises if directed to do so by the Employer's representative, or when they have completed their Union business. No more than two (2) non-employee Union representatives may be on the Employer's premises at any given time.

(c)     While on the Employer's premises, non-employee Union representatives shall avoid contact with any individual not in the bargaining unit, other than designated supervisors, and shall not conduct any Union activity with employees without having first complied with the provisions in this Article. The General Manager will make reasonable efforts to schedule appointments with non-employee Union representatives at mutually agreeable times during the Employer's regular business hours, to be present on the Employer's premises and available at the appointed times, and to give non-employee Union representatives reasonable access to employees.

PI-1059189v1

3

(d)     The Union shall provide the Employer with an up-to-date list of all non-employee Union officers and representatives who will normally service the bargaining unit, and shall promptly update the list as changes occur.  The list shall contain each such officer and representative's name, Union title, business address, and business telephone and facsimile numbers, shall be signed by a Union officer, and shall be delivered to the General Manager.

## 3.     UNION SECURITY

(a)     It shall be a condition of employment that all employees covered by this Agreement who are members of the Union in good standing on the execution or effective date of this Agreement, whichever is later, shall, to the extent consistent with the applicable provisions of the Labor Management Relations Act of 1947, as amended, remain members in good standing, and those who are not members on such date shall, on the 30th day following such date, become and remain members in good standing of the Union.  It shall also be a condition of employment that all employees covered by this Agreement hired on or after its execution or effective date, whichever is the later, shall on the 30th day following the beginning of such employment become and remain members in good standing in the Union.

(b)     Upon written notice by the Union that any employee has failed to become or remain a member in good standing as required above, the Employer shall suspend such employee for a 24-hour period exclusive of Saturdays, Sundays and holidays to afford the employee the opportunity to obtain or regain good standing, failing which, said employee will be discharged forthwith.

(c)     In the event of any change in the law during the term of this Agreement, the Employer agrees that the Union will be entitled to the maximum Union security which may be lawfully permissible.

(d)     The Union shall provide the Employer with an up-to-date list of all non-employee Union officers and representatives who will normally service the bargaining unit, and shall promptly update the list as changes occur.  The list shall contain each such officer and representative's name, Union title, business address, and business telephone and facsimile numbers, shall be signed by a Union officer, and shall be delivered to the General Manager.

## 4.     WORK WEEK - HOURS OF WORK

(a)     For scheduling and administrative purposes, the normal workday is generally eight and one-half (8-1/2) hours, eight (8) hours of which is paid working time and one-half (1/2) hour of which is an unpaid meal break.  For payroll purposes, the workweek is a consecutive seven-day period established by the Employer ("Workweek").  The unpaid meal break shall be as near as practicable to the middle of the shift, unless otherwise mutually agreed between the Employer and an employee.

 (b) The right to schedule working hours and working days of all employees remains at the sole discretion of the Employer.  The Employer will assign each employee to a schedule, and will inform employees one week in advance, except in the case of an emergency, of any changes to their schedules.  However, employees may on occasion be required to perform unscheduled and/or overtime work when the Employer deems it necessary.  Nothing contained in this Agreement shall be construed as a guarantee of work or of particular hours or a number of hours of work.

 (c) Hours worked by an employee in excess of forty (40) hours in a Workweek shall be paid for at the rate of one and one-half (1-1/2) times the employee's straight-time hourly rate.

 (d) Neither unpaid time of any kind, nor time away from work, such as for holidays, vacation leave, sick leave and other forms of leave, whether paid or unpaid, shall count towards computing an employee's hours worked for purposes of overtime calculation.

 (e) An employee shall not be paid more than one form of overtime or premium pay for the same hours worked and there shall be no pyramiding of overtime.

## 5. WAGES

 (a) See Appendix "A."

 (b) The basic rates set forth in Appendix "A" shall supersede all wage rates in effect before this Agreement's effective date.

## 6. GENERAL PROVISIONS

 (a) Non-employee funeral directors and registered residents other than those covered by this Agreement may be allowed to work within the Employer's establishments without interference by any employee covered hereby and without changing the scope of the bargaining unit.

 (b) Any employee who is required to appear and attend a hearing in a Workers' Compensation case shall provide the Employer with at least one week's advance notice if possible, including, if requested by Employer, appropriate written documentation.  If such notice and documentation is provided, the employee shall be released from work without pay for one day to attend the hearing.

 (c) In the event any employee is injured or becomes ill or suffers an accident while at work, medical attention will be supplied, as appropriate, by any employee or other individual in the position to provide such help.  An employee who is injured on the job shall be paid for the entire day providing the injuries require medical examination and treatment and provided the employee cannot return to work because of the injury.  If an employee leaves the job for medical attention for any on-the-job injury on the day of the injury and returns the same day, the employee

PI-1059189v1