**Exhibit R**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| WILLIAM HELM, et al.<br>On behalf of themselves and all employees<br>similarly situated,<br><br>   Plaintiffs,<br><br>  vs.<br><br>ALDERWOODS GROUP, INC., et al.<br><br>   Defendants. | CASE NO. 3:08-CV-01184 SI<br><br>**DECLARATION OF SHAWN PHILLIPS** |

## DECLARATION OF SHAWN PHILLIPS

I, SHAWN PHILLIPS, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1. I am over 21 years of age, have personal knowledge of the facts set forth in this declaration, and could testify to them competently if called to do so.

2. I was employed by Alderwoods Group, Inc. ("Alderwoods") as Vice President of Operations for the Western Region from approximately 1998 until November 2006. I was employed by The Loewen Group, Alderwoods' predecessor, beginning in about 1993 and held a variety of positions, including General Manager of five locations in California, Area Manager, Regional Manager, and Director of Operations. After Alderwoods merged with a subsidiary of Service Corporation International in November 2006, I became Managing Director for the Midwest Middle Market until I left the company in September 2007.

3. In the course of my responsibilities with Alderwoods, I became familiar with Alderwoods' corporate structure, management, and its policies and practices, including policies and practices relating to wage and hour issues. In particular, I am aware that Alderwoods was managed by an Executive Committee consisting of the Chairman of the Board of Directors, the President and Chief Executive Officer, the Chief Financial Officer, and the Chief Information Officer. As Vice President of Operations, I reported directly to Alderwoods President and CEO, Paul Houston. I had responsibility for over 300 locations in states ranging from Ohio to Alaska. I managed a field team that included a Director of Operations, two Controllers, a Director of Sales, a Recruiter, a Human Resources Specialist, a Trainer, and nine Regional General Managers. About 12-15 Market General Managers reported to the Regional Managers in my geography.

4. Individual funeral homes and cemeteries in my geography were managed either by an General Manager or a Location Manager. General Managers often would have direct supervisory authority over two or more locations at once. Depending on their duties and number of employees, a Location Manager might be exempt from overtime requirements, and may or may not be salaried.

5.    At small sites with only one or two full-time employees, Location Managers and/or Funeral Directors were responsible for nearly every aspect of the operation, including administrative duties, selling pre-need insurance, embalming, arranging funeral services, taking phone calls and performing removals of remains after hours.  Larger locations often employed administrative employees, leaving Location Managers and Funeral Directors to meet with families and provide funeral services.  Some locations employed students who were supervised by Location Managers and Funeral Directors.

6.    Among my job responsibilities as Vice President of Operations for the Western Region was to ensure compliance with company policies.  I am very familiar with Alderwoods' policies related to wage and hour issues.

7.    Through my job responsibilities, I know that Alderwoods had an express policy requiring non-exempt employees to record and be paid for all hours worked.  This policy appeared in its policy and procedures binders.  During the time I worked for Alderwoods, I was never aware that any hourly employees worked time without being compensated for it.  Indeed, while I was VPO, all my communications regarding recording time emphasized the need to record all time and to the extent time was not recorded it was contrary to both my directives and company policy.

8.    In order to ensure that time was accurately reported, Alderwoods required both non-exempt employees and their managers to verify time cards or timesheets by signing them.  Alderwoods relied on employees to accurately record their time and managers to review their time and verify that it was correct.  If any non-exempt employees or managers were not submitting accurate time, they would be acting directly in contravention of company policy and payroll would have no way of knowing about it.

9.    Employees in my area of responsibility had no limitation on the number of overtime hours they could work.  I did not track overtime hours of employees in my region.  I have no knowledge of any manager telling any employee that they were limited in the number of

overtime hours they could work or record and, to the extent any manager did, it was against my directives and company policy.

10.    Alderwoods never had a company-wide policy requiring non-exempt employees to perform work in the community without compensation. No such policy appears in any policies or procedures manual and no such policy was ever communicated to me or by me as Vice President of Operations for the Western Region. Nor am I aware of any manager communicating such a policy to any Alderwoods employee. Alderwoods did encourage community involvement, but it was never a requirement. When non-exempt employees participated in community service for the benefit of Alderwoods, the company policy was to pay for their expenses. In addition, employees were expected to report all time performing community service for Alderwoods' benefit, and they were compensated for all such time. If any non-exempt employees or managers did not report or were not compensated for such time, it was without my knowledge and contrary to my directives and company policy.

11.    I am not familiar with a program called "I Believe in Service." But I am aware of certain initiatives such as the Community Leadership Program and Leadership Network Information sheets. These programs required Location Managers to identify and keep track of community service opportunities and key community contacts. How these programs were run and the extent of voluntary participation from non-exempt employees would vary from location to location. Some locations were good about identifying opportunities in the community. Other locations were not good at identifying opportunities or simply were not willing to do so and were not active in the community. The success of these initiatives depended on the area of the country as well as the Location Managers themselves and their interest in keeping contact with community influencers. Again, to the extent hourly employees participated in any of these programs – and in some locations they did not participate – they were required to be compensated for it.

12.    Alderwoods never had a company-wide policy requiring hourly employees to perform mandatory job-related training while off the clock. Regardless of the type of training,

and even if it was off-site training or after working hours, the training was to be compensated.  I have no knowledge of any manager telling any hourly employee not to record time spent performing mandatory job-related training or refusing to compensate hourly employees for such time, and, to the extent any manager did so, it was against both my directives and company policy.

13.    I am aware that some states require insurance licenses to sell pre-need insurance. In many locations in my geography, pre-need sales were handled by a separate sales team whose only job responsibility was pre-need sales; these were the only employees who sold pre-need at those locations.  These sales employees reported to geographic Sales Support managers, who were responsible for the pre-need initiatives in my geography.  In other locations, employees who wanted to sell pre-need insurance policies in states that required an insurance license could ask their manager for permission to sell policies.  If the manager approved, the employee would be compensated for time they spent studying for and taking the required test.  Whether an employee would be permitted to sell pre-need insurance would vary by area and location.

14.    Alderwoods had a policy requiring non-exempt employees to receive pre-approval for overtime work.  Employees were required to seek such approval from their location manager and failure to do so could result in discipline, but employees always were paid for all time worked, whether or not it was pre-approved.  In fact, this policy is stated in Alderwoods' policy and procedures manuals.  The purpose of this policy was to manage expenses by allowing the manager to determine whether or not overtime was necessary or whether the work in question could be performed by someone in the course of the regularly scheduled work day; it had nothing to do with compensation for overtime hours.  There never was any policy that employees were not paid for unapproved overtime.  I am not aware of any managers who refused to pay overtime.  Any managers who did refuse to pay overtime, whether pre-approved or not, were in violation of company policies and my directives to management.

15.    Consistent with Alderwoods' written policy that all hours worked must be compensated, Alderwoods never had a policy requiring or permitting employees to omit or

1    deduct hours actually worked.  Employees were required to record their start time and their finish

2    time each day.  They were not permitted to work before punching in nor were they permitted to

3    work after clocking out.  Any locations that permitted off-the-clock work violated the written

4    company policy that all time worked must be recorded and also violated my directions to

5    management and non-exempt employees.

6         16.     In particular, for as long as I was Vice President of Operations, Alderwoods'

7    policy always required employees to report any work performed while on call.  They were

8    expected to record all work performed while on call, including phone calls, and be compensated

9    for it.  This was pursuant to my express instruction.  If any manager told hourly employees not

10   report on-call work, refused to pay all on-call time, or limited compensation to a certain number

11   of minutes per call or per removal, it was against my instruction and against company policy.

12        17.     There was never a time when all locations in my territory paid piece rate to

13   employees for on call work.  Certain locations did pay it, but those locations were ordered to stop

14   by Alderwoods' Human Resources group.  The use of piece rate largely resulted from the many

15   locations that were family run businesses prior to acquisition by Alderwoods that continued to

16   engage in their prior practices after the acquisition.  It was never Alderwoods' policy that on-call

17   work be paid at piece rate.  In lieu of piece rate, locations generally were allowed to guarantee a

18   minimum number of hours for a particular task – such as three hours for a removal – and the

19   employee would get paid the greater of the minimum hours or actual hours worked.

20        18.     In addition, whether non-exempt employees took phone calls or conducted

21   removals varied to a great extent.  Most locations had third-party answering services and third-

22   party removal services to handle both after hours phone calls and removals.  Depending on the

23   type of call, the answering service would take an after hours call and transfer the call to the

24   removal service to handle the removals of the deceased.  Even when Alderwoods employees

25   were required to handle calls and removals, they often were handled by part-time employees.  To

26   the extent full-time employees handled calls and removals, it was almost employees directly

27   involved with funeral services, not other employees.

28

5

19.   In 2006, Alderwoods rolled out a standardized method of tracking on call time that provided employees with logs to track their time instead of writing it on their time cards as had been past practice. This was not a new policy, but a confirmation of existing policy and the creation of a uniform way to track on-call time.

20.   To the extent employees sold pre-needs policies or did any work after their scheduled hours, they were required to report their time. If employees met with families after scheduled hours, Alderwoods' policy was clear that they had to record all time just as during the regular work day. They were not permitted to punch out and continue working, nor could their manager refuse to record their work time. Alderwoods absolutely never had a policy requiring employees to schedule pre-needs meetings after business hours. Any manager who expressed such a requirement to employees was in violation of company policy.

21.   Also, Alderwoods never had a policy requiring employees to work during their meal break or to miss lunch breaks that were deducted from their hours worked. On any occasion where employees may have had to perform a work-related task while on a meal break, they were required to record their time and then resume their full break. I have no knowledge of any manager telling any employee not to record time spent performing work-related tasks while on a meal break, and to the extent any manager did so, it was contrary to both my directives and company policies.

22.   Alderwoods never had any policy that commissions or bonuses would not be included in employees' regular rate of pay for purposes of determining overtime pay. No such policy appears in any policies or procedures manual and no such policy was ever communicated to me or by me. To the contrary, it is my understanding that such commissions and bonuses should be included in overtime calculations to the extent required by U.S. law.

23.   At approximately 20 funeral home and cemetery locations in the Western region, certain non-exempt employees were represented by unions. The union contracts for these locations included wage and benefit provisions, minimum call back pay provisions, as well as a grievance and arbitration procedure by which covered employees were required to contest any

wage or other contractual issues.  True and correct copies of relevant portions of the union contracts that applied to funeral home and cemetery locations in the Western region are attached hereto as Exhibits 1-3.

I declare under penalty of perjury under the laws of the United States of America the foregoing is true and correct.

November 13, 2009

_____
Shawn Phillips

**Exhibit 1**

# A G R E E M E N T

### BETWEEN

### AUTO LIVERY CHAUFFEURS, EMBALMERS, FUNERAL DIRECTORS, APPRENTICES, AMBULANCE DRIVERS, AND HELPERS, TAXICAB DRIVERS, MISCELLANEOUS GARAGE EMPLOYEES, CAR WASHERS, GREASERS, POLISHERS AND WASH RACK ATTENDANTS UNION LOCAL NO. 727

### AND

### ALDERWOODS (CHICAGO NORTH), INC. ALDERWOODS (CHICAGO CENTRAL), INC. ALDERWOODS (CHICAGO SOUTH), INC.

CHI- 1327507v1

1

# ARTICLES OF AGREEMENT

This agreement, effective 1st day of July, 2002, has been made and entered into by and between Alderwoods (Chicago North), Inc., Alderwoods (Chicago Central), Inc., and Alderwoods (Chicago South), Inc. (hereinafter referred to as the "Employer"), and Auto Livery Chauffeurs, Embalmers, Funeral Directors, Apprentices, Ambulance Drivers and Helpers, Taxicab Drivers, Miscellaneous Garage Employees, Car Washers, Greasers, Polishers and Wash Rack Attendants Union Local No.727, an affiliate of the I.B. of T. (hereinafter referred to as the "Union").

This Agreement is entered into by the Employer and the Union in a mutual effort to promote and maintain equitable labor relations, to stabilize the industry, and to protect the best interests of those who are engaged in this industry.

# ARTICLE 3

# 3   WAGES

### 3.1   WAGE RATES.

The wage rates set forth in Appendix A to this Agreement shall be the minimum rates applicable to Bargaining Unit employees.  The Employer reserves the right to pay higher rates or to increase the wage rates of individual employees for legitimate business purposes.  The basic hourly rates set forth in Appendix A shall supersede all wage rates in effect before this Agreement's effective date.

### 3.2   PAY PERIODS.

The pay period will consist of two consecutive work weeks.  Payday shall be the Friday following the end of a pay period.

### 3.3   ON-CALL.

An employee "on stand-by call" who is not called out for work shall be paid a minimum "on stand-by call" rate of $15.00.

### 3.4   MINIMUM PAY WHEN CALLED TO WORK.

Funeral Directors and/or Embalmers are guaranteed a minimum of two (2) hours of pay when called to work.  Full time Chauffeurs who are called back after their regular work day shall be guaranteed a minimum of two and one half (2 ½) hours of pay at overtime rates.

### 3.5   SUNDAY WORK.

Any full time Chauffeur who is required to work on Sunday shall be paid time and one half for same.

### 3.6   OVERTIME PREMIUM.

Time and one half shall be paid for all work done after eight (8) work hours in any one (1) day and after forty (40) work hours in any one (1) week. Overtime shall not be paid twice for the same hours worked. Seniority shall prevail for overtime requirements on call backs within the employee's work classification with the Employer.

# **ARTICLE 4**

# **4   HOURS OF WORK**

**4.1   WORK WEEK, WORK DAY – DEFINED FOR FUNERAL DIRECTORS AND EMBALMERS.**

(a)   The regular work week for a full time Funeral Director and/or Embalmer shall consist of forty (40) work hours, exclusive of one (1) hour in each day for meals. Meal periods, where provided for, shall be taken between the third (3rd) and sixth (6th) hour on the job.

(b)   The regular work day shall start at 8:00 a.m., unless an employee voluntarily agrees to another starting time.  The work hours in each day shall be continuous. An employee shall receive days off as follows:

(1)   For an employee hired prior to July 1, 1991, the employee shall receive two (2) consecutive days off in each week.  In any two (2) week period, the employee's days off shall include a consecutive Saturday and Sunday or a consecutive Sunday and Monday.

(2)   For an employee hired on or after July 1, 1991, the employee shall receive two (2) days off in each week.  In any two (2) week period, the employee's days off shall include a consecutive Saturday and Sunday or a consecutive Sunday and Monday.

**4.2   WORK WEEK, WORK DAY – DEFINED FOR AUTO LIVERY CHAUFFEURS.**

(a)   The work week for a full time Chauffeur shall extend Monday through Saturday and shall consist of forty (40) hours in five (5) days of eight (8) hours each.   The time in any work week when the employee is to be off is left to the discretion of the Employer, provided the work week schedule of the employee is scheduled not later than Saturday of the preceding work week.  Except as otherwise provided in this Section 4.2, a day's work shall be scheduled as follows:

7:00 a.m. to 3:30 p.m. with one-half hour for lunch,
7:30 a.m. to 4:00 p.m. with one-half hour for lunch,
8:00 a.m. to 4:30 p.m. with one-half hour for lunch,
8:30 a.m. to 5:00 p.m. with one-half hour for lunch,
9:00 a.m. to 5:30 p.m. with one-half hour for lunch.

The scheduled work day starting time of an employee hired for regular assignment as a night shift employee shall be 3:30 p.m. or later.

(b)   It shall be permissible in establishments where it is necessary to maintain service that the Employer shall be allowed to start the junior employee at a time consistent with the operation of the Employer's business, provided such starting

time shall be for the minimum duration of one (1) week, and the Union and the employee concerned consent.

(c)    If the employee reports late for work the Employer need not allow the employee to work, but if the Employer does permit the employee to work, the employee shall be paid for his or her time pro-rata.

## 4.3   PART-TIME EMPLOYEES.

The Employer shall have the right to hire part time employees. For purposes of this Agreement, "part time employee" shall mean any employee who regularly works less than thirty (30) hours per week.

## 4.4   WORK SCHEDULES.

The work schedule, and all assignments and changes to it, are to be determined by the Employer in accordance with the terms of Article 4, Sections 4.1 and 4.2. Each employee shall be assigned to a schedule that may change each week, based upon the needs of the business. The Employer will inform employees of their schedules and shifts and any changes to them.

## 4.5   MAXIMUM HOURS OF WORK.

Except in emergency circumstances, not more than twelve (12) hours of work shall be required of any employee in one work day.

# ARTICLE 12

# 12 WORK CONDITIONS

### 12.1 WORK CONDITIONS-FUNERAL DIRECTORS AND/OR EMBALMERS.

The following provisions apply to Funeral Directors and/or Embalmers:

(a)    Permitted And Prohibited Work.  Employees shall be required to assist in maintaining operations normal to the progress of the business of the Employer establishment and to perform such services as are necessary to keep the establishment in an orderly condition and preparation room in a clean and sanitary condition.  Employees shall not, however, be permitted to:

(1)    Do regular janitor or porter work;

(2)    Wash, grease or clean automobiles;  or

(3)    Do repair work or maintenance work without the consent of the Union.

(4)    Furnish any equipment necessary in the performance of embalming.

In the event a question arises as to whether or not a specific job or duty falls under the scope of this Agreement, the employee is to perform such job or duty at the request of the Employer following which the employee is to report same to the Union.

(b)    Proper Attire.  An employee shall be required to furnish formal clothing that shall include a suitable dark business suit and appropriate accessories. The Employer shall provide and maintain any other special suits it may require; however, the employee shall furnish and maintain the accessories for such special suits. Funeral Director and Embalmer Trainees shall be exempt from furnishing formal clothing. Employees when engaged in duties that require them to meet the public within the Employer establishment or in the immediate and direct performance of duties outside the establishment shall be properly attired. Minimum standards in this connection include wearing a suitable dark business suit and appropriate accessories.

(c)    Residency.  No employee shall be required to "live on the work premises" or reside on property owned, leased or under the control of the Employer. Employees who elect to "reside on the premises" may do so provided an arrangement mutually agreeable to the employee and the Employer shall be entered into.

(d)    Work Obligations.  The Employer agrees that only licensed Funeral Directors and Embalmers, Funeral Directors, and Funeral Director and Embalmer Trainees shall do all work that properly comes under the jurisdiction of their Illinois license and otherwise complies with the terms of this Agreement.

CHI- 1327507v1

21

(e)     Licenses.  All employees shall be responsible for the annual cost of their initial state and local area funeral director and embalmer licenses.  If an Employer requires additional licenses for any such employee, the Employer shall pay for such licenses.

(f)     Continuing Education.  The Employer shall provide paid time off for an employee to attend any CE programs, if the programs fall during the regular work day of the employee. The Employer shall not be responsible for CE program registration fees. If requested, the employee shall produce evidence of program attendance. The first employee to request time off is guaranteed that time off.  Additional employees requesting the same time off require management approval.  This Section is only applicable up to the required twenty four (24) CE hours during any renewal period.

## 12.2  WORK CONDITIONS – AUTO LIVERY CHAUFFUERS.

The following provisions apply to chauffeurs:

(a)     Minimum Full Time Employees.  Not less than one (1) full time Chauffeur shall be employed for every three (3) cortege vehicles owned by the Employer and in active service, not less than two (2) full time Chauffeurs shall be employed for every seven (7) cortege vehicles owned by the Employer and in an active service, and not less than three (3) full time Chauffeurs shall be employed for every eleven (11) cortege vehicles owned by the Employer and in active service.  One (1) additional full time Chauffeur shall be employed for every three (3) additional cortege vehicles thereafter.

(b)     Carriage Of Flowers.  Flowers, in the course of a funeral shall be transported and handled as provided in this Section.

(1)     The number of floral pieces to be carried in a hearse is limited to the casket spray, two (2) end baskets and small floral pieces such as the small heart, pillow or rosary, etc.

(2)     Floral pieces may be carried in the respective private cars of family members in the funeral procession to the cemetery, hospital or other place, but employees shall not be permitted to handle these floral pieces under these circumstances.

(3)     A flower car may be ordered and used for the transportation of funeral flowers, if the family chooses to use such a vehicle.  However, the use of a flower car is a matter of the family's choice and is not compulsory.

(4)     Floral pieces may be carried in a hearse if it is part of a transfer to another funeral home located more than thirty (30) miles from the Chicago Metropolitan Area.

(c)     Cortege Vehicles.  The cortege portion of a funeral procession will consist of hearses, and/or limousines, and/or flower cars.  All cortege vehicles will be supplied by the Employer and operated by employees in accordance with Article 1, Section 1.1.  In order to preserve the dignity and safety of the funeral cortege and enforce the provisions of this Section, no for-hire vehicle shall be permitted to operate immediately adjacent to any cortege vehicle.

CHI- 1327507v1

The Employer agrees that each employee may display the Union insignia on the inside right corner of each Employer vehicle.

(d) <u>Reporting</u>. All Chauffeurs, full time or extra, shall be required to report to their Employer, by telephone, immediately upon completion of a trip.

(e) <u>Washing And Cleaning</u>. Where the number of vehicles owned by the Employer does not exceed five (5) cars, the employee shall be required to wash, clean and polish cars and keep said cars in proper condition. The employee shall receive five dollars ($5.00) per week for each car washed over and above the regular rate of wages. Provided, that where the number of vehicles owned by the Employer exceeds five (5) cars and the employee chooses to wash, the employee may be permitted to do so. Extra Chauffeurs shall be required to brush clean the interior, clean the ash trays and clean the windows of their car upon returning from a trip. However, they shall not be required to wash or otherwise clean or polish said car. Although, if agreeable to both the extra Chauffeur and the Employer, an extra Chauffeur may wash cars provided the employee receives pay for the same at the rate of two dollars ($2.00) for each car washed. Work performed washing and cleaning cars after eight (8) hours in any one (1) day shall be paid for at the rate of time and one half.

(f) <u>Uniforms</u>. All special liveries, uniforms, etc., required to be worn by the employee shall bear the Union label and be furnished and paid for by the Employer.

(g) <u>Vehicle Repairs</u>. Each employee shall be required to make necessary minor repairs and adjustments on cars owned by the Employer and used in the livery industry, when requested by the Employer.

(h) <u>Payday</u>. Full time employees and extra Chauffeurs shall be paid on the Employer's currently established payday.

(i) <u>Spotting Private Cars</u>. No Chauffeur shall be required to spot or drive a private car other than in connection with a line up of a funeral cortege at a funeral home, or be required to remove funeral stickers from windshields of private cars at or in a cemetery. Chauffeurs shall not be responsible for any damage to cars in spotting or driving cars in connection with a line up.

(j) <u>Proper Attire</u>. When employees are engaged in duties that require them to meet the public they shall be properly attired. Minimum standards in this connection shall include wearing a suitable dark suit, a white shirt with a starched collar and black tie, a black uniform type cap and other black accessories.

## 12.3 SUNDAY AND HOLIDAY FUNERALS.

Except in the case of an epidemic or contagious disease funeral, no funeral shall be permitted on a Sunday or a legal holiday described in Article 5, Section 5.1. However, a funeral may be conducted for a decedent whose religious tenets or beliefs require burial on a Sunday or legal holiday.

## 12.4  EMERGENCY WORK.

Except as otherwise provided for herein, Union Chauffeurs shall make service trips and pick-ups; provided, however, that an Employer has the right to use any one (1) bargaining unit member to transport human remains to and from an airport. In cases of emergency, full time employees of a firm may be used for service trips or pick-ups. An emergency under this Section is defined as an occasion wherein a full time Union chauffeur is not available to make such service trip or pick-up and the Employer has made a genuine effort to secure the services of an extra Chauffeur covered by the terms of this Agreement. In cases of emergency, an Employer shall contact Union officials; provided that if an Employer is unable to contact Union officials, the Union shall be notified the following work day.

## 12.5  REMOVALS.

Two (2) bargaining unit employees, one (1) of who is a fully licensed Funeral Director and/or Embalmer, are required on all removals except as follows. A removal may be made by one (1) bargaining unit person from the Cook County Medical Examiner's Facility, from a Coroner's Office, and whenever the deceased is a child under six (6) years of age. It is understood that if a one (1) person removal is made, it will be made by a fully licensed Funeral Director and/or Embalmer. The Employer has the right to use any one (1) bargaining unit member to transport human remains to and from an airport. The Employer has the right to use any one (1) bargaining unit member to transport human remains between the funeral homes owned by the Employer for a funeral for that Employer. The above referred to transfer includes crematories and cemeteries only if it is a "direct burial" or "run out" with no services to be held or no family or other type of procession and the crematories or cemeteries are owned by the Employer. The above referred to transfer specifically excludes among others, transfers to or from a house of worship, including chapels, churches and synagogues, rental funeral homes, and associate cases.

# ARTICLE 14

## 14 TRADE EMBALMERS AND TRADE FUNERAL DIRECTORS

### 14.1 WAGES – TRADE EMBALMERS.

All Trade Embalmers shall be paid as follows:

(a)     For embalming, cosmetizing, dressing and encasketing the body of a deceased person (six (6) years of age or older) in one (1) operation:

For the period of July 1, 2002 through June 30, 2003, a minimum wage of $252.62;

For the period of July 1, 2003 through June 30, 2004, a minimum wage of $265.24;

For the period of July 1, 2004 through June 30, 2005, a minimum wage of $277.86;

For the period of July 1, 2005 through June 30, 2006, a minimum wage of $290.48;

For the period of July 1, 2006 through June 30, 2007, a minimum wage of $303.10;

For the period of July 1, 2007 through June 30, 2008, a minimum wage of $315.75;

(b)     A minimum wage of $55.00 for embalming, cosmetizing, dressing and encasketing the body of a deceased person up to the age of six (6) years in one (1) operation;

(c)     A minimum additional wage of $50.00 for each embalming of the body of a deceased person (six (6) years of age or older) which has been the subject of a trunk autopsy;

(d)     A minimum additional wage of $40.00 for each embalming of the body of a deceased person (six (6) years of age or older) which has been the subject of a head autopsy;

(e)     For each embalming of the body of a deceased person (six (6) years of age or older) which has been the subject of an eye, skin, organ or bone donation procedure, a minimum additional wage of $45.00 for each procedure;

(f)     A minimum wage of $40.00 for any work performed on the body of a deceased person received as a ship-in or any pre-embalmed body.

### 14.2 WAGES –TRADE EMBALMERS – SPECIAL DUTIES.

(a)     Trade Embalmers may negotiate a special wage for dermasurgery and restorative art work.

(b)     Minimum wage for being recalled to an Employer establishment, home or any other place for dressing and encasketing or laying out the body of a deceased person, or assisting in dressing and encasketing or laying out the body of a deceased person shall be $55.00.

### 14.3  CHEMICALS AND SUPPLIES.

The Employer shall furnish all necessary chemicals and expendable supplies pertaining to the procedure of embalming.

### 14.4  WAGES – TRADE FUNERAL DIRECTORS.

All Trade Funeral Directors shall be paid a minimum wage of $144.00 for a funeral directing engagement of up to four (4) hours in duration.

### 14.5  CONDITIONS.

This Article contains all economic terms and conditions for Trade Embalmers and Trade Funeral Directors. All other economic terms and conditions in this Agreement do not apply to Trade Embalmers and Trade Funeral Directors.

# ARTICLE 19

## 19 GRIEVANCE AND ARBITRATION PROCEDURE

### 19.1 PURPOSE.

The purpose of this Article is to provide the exclusive method for resolving grievances.

### 19.2 GRIEVANCE DEFINED.

For purposes of this Agreement, the term "grievance" shall mean any difference or dispute growing out of the Agreement or interpretation of this Agreement between the Employer, and the Union.

### 19.3 GRIEVANCE PROCEDURE.

The procedure for the expeditious processing of all grievances shall be as follows:

Step 1 - The Union shall present a grievance to a member of management designated by the Employer in accordance with the time limits set forth in this Article.

Step 2 - In failing to have the dispute resolved in Step 1, a representative of the Union will meet with the designated representative of the Employer at a mutually convenient time and place to revolve the grievance.

Step 3 - If the parties fail to resolve the grievance at the preceding Step 2, the Union may request arbitration of the grievance within thirty (30) business days.

### 19.4 MONETARY GRIEVANCE.

The Employer must be notified of a monetary grievance within thirty (30) days after knowledge of the alleged violation or it shall be waived. It shall be understood that the resolution of monetary matters through the grievance process shall be restricted to earnings or entitlements in the thirty (30) calendar days of employment preceding the notification to the Employer of the grievance, and thereafter.

### 19.5 NON-MONETARY GRIEVANCE.

A non-monetary (policy) grievance must be filed in writing within ten (10) days after knowledge of the alleged violation or it shall be waived.

### 19.6 DISCIPLINARY ACTION.

An employee must be notified as soon as possible of any disciplinary action.

CHI- 1327507v1

**19.7  ARBITRATION.**

a.      Within sixty (60) days after submitting a grievance to final and binding arbitration pursuant to the provisions of Section 19.3 of this Article, the party referring the grievance to arbitration shall send the other party a list of one (1) or more potential arbitrators to hear the case.  The parties shall have ten (10) days to agree to an arbitrator on that list.

b.      In the event the parties are unable to agree to an arbitrator by the end of that period, the party referring the grievance to arbitration shall, within ten (10) days, request the Federal Mediation and Conciliation Service to furnish the parties with a list of seven (7) potential arbitrators from which the parties shall select an impartial arbitrator.  After receiving the list, and within twenty-one (21) days of its receipt, an arbitrator shall be selected by each party striking in turn, one strike at a time, from the list of seven (7) names.  The name remaining on the list after each party has exercised its strikes shall become the arbitrator.

c.      If the selected arbitrator is unable or unwilling to serve, the party referring the grievance to arbitration shall, within ten (10) days of receiving notice of that arbitrators inability or unwillingness to serve, request the Federal Mediation and Conciliation Service to furnish the parties with another list of seven (7) potential arbitrators, and the parties will repeat the process described above.

d.      The fees and expenses of the arbitrator, the expense of the location used for arbitration, any transcripts of the arbitration hearing, and any other joint fees and expenses of holding the arbitration shall be borne equally by the Union and the Employer; however, each party shall bear the expense of its own representative, of its own witnesses, copying costs for documents used in the proceeding, and the other expenses associated with preparing, presenting and briefing its own case.

**Exhibit 2**

# REGULAR CLASSIFIED EMPLOYEES

# A G R E E M E N T

## BETWEEN

## SERVICE EMPLOYEES LOCAL NO. 1, AFFILIATED WITH SERVICE EMPLOYEES INTERNATIONAL UNION, AFL-CIO, CLC

## AND

**BEVERLY CEMETERY
ELMWOOD CEMETERY
IRVING PARK CEMETERY
LINCOLN CEMETERY
MOUNT OLIVE CEMETERY
MT. AUBURN CEMETERY
OAK HILL CEMETERY
OAK WOODS CEMETERY
RIDGEWOOD CEMETERY
WOODLAWN CEMETERY
WOODLAWN MEMORIAL PARK**

## DECEMBER 1, 2002 - DECEMBER 31, 2007

CHI-1340941v1

## COLLECTIVE BARGAINING AGREEMENT

This Agreement is effective the 1st day of December 2002, by and between Service Employees Local No. 1, affiliated with Service Employees International Union, AFL-CIO, CLC, (the "Union") and Beverly Cemetery, 12000 South Kedzie Avenue, Blue Island, IL 60406, Elmwood Cemetery, 2905 North Thatcher Road, River Grove IL 60171, Irving Park Cemetery, 7777 Irving Park Road, Chicago, IL 60634, Lincoln Cemetery, 12300 South Kedzie Avenue, Chicago, IL 60655, Mount Olive Cemetery, 3800 North Narragansett Avenue, Chicago, IL 60634, Mt. Auburn Cemetery, 4101 South Oak Park Avenue, Stickney, IL 60402, Oak Hill Cemetery, 11900 South Kedzie Avenue, Chicago, IL 60803, Oak Woods Cemetery, 1035 East 67th Street, Chicago, IL 60637, Ridgewood Cemetery, 9900 North Milwaukee Avenue, Des Plaines, IL 60016, Woodlawn Cemetery, 7600 West Cermak Road, Forest Park, IL 60130 and Woodlawn Memorial Park, 23060 West Jefferson Street, Joliet, IL 60431 (collectively, the "Cemeteries").

### WITNESSETH

Purpose:

It is the intent and purpose of the parties to promote and improve harmonious relations among employees, the Union and its members and the Cemeteries and to set forth herein the agreement of the parties.

## ARTICLE IV - CLASSIFICATIONS AND WAGES

4.1    Classifications:

(A)    "Regular Employees" as referred to in this Agreement are those who perform the regular work of the Cemeteries and who are designated as such by the Cemeteries.  Regular Employees are hereby classified as follows:

(1)    Working Foremen -- those employees whose principal responsibility is to exercise supervision of the working forces in their labors but who may do any work assigned to them.  Further, it is the intent of all parties to this Agreement that they shall, as conditions permit, promptly work toward the establishment of a working foreman in all cemeteries covered by this Agreement.

(2)    Crematory Engineers -- those employees whose principal responsibility is crematory work and when not so engaged shall be available for any work usually performed by other Regular Employees.

(3)    Specialists -- those employees, few in number, who by reason of unusual skill, experience, physical and mental ability, perform during all, or a substantial part of their working hours, specialized services of extraordinary value to the Cemeteries, including regularly operating and performing normal mechanical maintenance work on grave digging machines, if required, or regularly doing substantial mechanical work, but who shall be available for any work usually performed by other Regular Employees.

(4)    Class "A" -- those employees who have sufficient experience, skill, mental and physical ability to perform all regular cemetery work and maintain regular work standards.

(5)    Class "B" -- those employees who aid and assist Class "A" employees and who have sufficient experience, skill, mental and physical ability to perform a substantial number of the regular cemetery duties at regular work standards.

(B)     Regular Employees - Wages:

(1)     The rates of pay for Regular Employees shall be adjusted in accordance with the cemetery workers Wage Rate Schedule as follows:

| CLASSIFICATION | MINIMUM RATE (AS OF 12/1/02) | MINIMUM RATE (AS OF 12/1/03) | MINIMUM RATE (AS OF 12/1/04) | MINIMUM RATE (AS OF 12/1/05) |
|---|---|---|---|---|
| Working Foreman | $17.00 | $17.50 | $18.00 | $18.50 |
| Specialist | $15.00 | $15.50 | $16.00 | $16.50 |
| Class "A" | $12.25 | $12.75 | $13.25 | $13.75 |
| Class "B" | $11.00 | $11.50 | $12.00 | $12.50 |

(2)     Regular Employees in all the foregoing classifications paid at or above the foregoing minimum rates will receive the following increases:

| | |
|---|---|
| December 1, 2002 | $0.56 Per Hour |
| December 1, 2003 | $0.70 Per Hour |
| December 1, 2004 | $0.60 Per Hour |
| December 1, 2005 | $0.60 Per Hour |
| December 1, 2006 | $0.60 Per Hour |

(3)     Regular Employees when first hired shall be hired at a minimum of Ten Dollars ($10.00) Per Hour.  Regular Employees will be in probationary status for the first six (6) months of their employment, during which probation they may be discharged without recourse to the grievance procedure.  Newly hired employees shall receive an increase of $0.50 every six (6) months until they reach the Class "B" minimum wage rate, except that the last increase may be in excess of $0.50 if necessary to meet the "B" minimum rate.  Employees in this progression as of the date of execution of this Agreement shall receive the same annual increase on December 1st of each year as other Regular Employees.

(C)     Mausoleum And Chapel Attendants:  Mausoleum and Chapel Attendants shall be employed on a forty-eight (48) hour, six (6) day work week basis if required by the Cemetery.  If entombments are performed on Saturday or Sunday, the Attendant is to receive overtime pay applicable for that day.

(1)     No outside grounds work except in the immediate vicinity of the mausoleum or chapel is to be performed by Attendants on Saturday, Sunday, or Holidays.

(2)     Mausoleum and Chapel Attendants paid at or above the foregoing minimum rates will receive the following increases:

| | |
|---|---|
| December 1, 2002 | $0.56 Per Hour |
| December 1, 2003 | $0.70 Per Hour |
| December 1, 2004 | $0.60 Per Hour |
| December 1, 2005 | $0.60 Per Hour |
| December 1, 2006 | $0.60 Per Hour |

(3)     Mausoleum and Chapel Attendants when first hired shall be hired at a minimum of Ten Dollars ($10.00) Per Hour. Attendants will be in probationary status for the first six (6) months of their employment, during which probation they may be discharged without recourse to the grievance procedure. Newly hired employees shall receive an increase of $0.50 every six (6) months until they reach the Class "B" minimum wage rate, except that the last increase may be in excess of $0.50 if necessary to meet the "B" minimum rate. Employees in this progression as of the date of execution of this Agreement shall receive the same annual increase on December 1st of each year as other Attendants.

(D)     Janitors:  Janitors shall be employed on a forty-eight (48) hour, six (6) day work week basis, except as otherwise agreed.

4.2     Temporary Working Foremen:  Any Regular Employee (other than an employee in the Working Foreman classification) that is assigned to fill in for a Working Foreman for an entire work shift shall be paid a differential of $2.00 per hour for all hours worked during the shift that he/she was temporarily assigned to act as a working foreman.

4.3     Wage Reductions:  The Cemeteries agree that any wage rates now in effect but not covered in this Agreement shall remain and continue in effect. Employees already receiving more than the minimum rates provided for herein, shall not suffer a reduction by virtue of this Agreement, excepting through reclassification by the Union and the Cemetery.

4.4     Merit Increases:  Employee benefits such as merit increases, promotions or other privileges shall first have the approval of the Union and clearance through the Union office.

4.5     Payroll Deductions:  All deductions from an employee's pay shall be noted on his paycheck or accompanying memorandum.

## ARTICLE V - WORK WEEK - WORK HOURS

5.1     Work Week: The regular guaranteed work week for all Regular Employees covered by this Agreement, except those whose work week has been previously specified, shall be forty (40) hours per week, Monday Through Friday with no alternate shifts. The usual starting time shall prevail in every cemetery on Monday through Friday; however, in the event of an emergency, this starting time provision is waived.

(A)     The regular guaranteed work week for all employees stated above and covered by this Agreement shall be subject to the Cemetery's right of layoff, if there is no work. All Regular Employees except Mausoleum and Chapel Attendants and Janitors shall be paid at the rate of time and one-half for all work on: (a) Saturday; (b) in excess of eight (8) hours in any one day; or (c) in excess of forty (40) hours in any one week. Mausoleum Attendants, Chapel Attendants and Janitors shall be paid at the rate of time and one-half for all work performed: (a) in excess of eight (8) hours in any one day; or (b) in excess of forty (40) hours in any one week. It is agreed that there shall be no pyramiding or duplication of overtime paid for the same hours of work.

(B)     The work week shall commence on Monday morning. Any employee who fails to report to work without just cause during any work week without the consent of his/her employer when work is available for him/her shall not be entitled to any daily overtime during such work week but shall be entitled to weekly overtime if he/she shall work more than the scheduled hours in such work week.

5.2     Overtime. Employees shall be required to work on Saturday, Sunday, or Holidays if management so requests. Insofar as practicable, the Cemeteries shall notify employees as far in advance as possible of requirements for their overtime work. In assigning overtime, the Cemeteries agree to use Regular Employees to perform work normally performed by Regular Employees and shall give preference within regular classifications rotating the selection on the basis of seniority; however, for grounds maintenance work, the Cemeteries shall use such Seasonal or Temporary employees as the particular Cemetery deems appropriate. In layoffs, no Seasonal employee shall be employed while a Regular Employee qualified and able to do his work is laid off.

5.3     Weekend Work: Employees scheduled to report for work on Saturday or Sunday after 8:00 A.M. may be scheduled between 8:00 A.M. and 12:00 Noon. Any employee scheduled on Saturday or Sunday to start work after 8:00 A.M. will be allowed to go home after the last funeral has been completed and all graves are fully back filled in accordance with usual Cemetery practice, and will still receive a minimum of 4 hours pay at time and one-half for Saturday or a minimum of 4 hours pay at double time for Sunday. Any employee required to continue working on Saturday or Sunday after the last funeral has been completed will be paid from 8:00 A.M. regardless of the time he actually started work. Employees scheduled to work on Saturday or Sunday will perform all work assigned.

5.4     Lists: Each Cemetery agrees to furnish to the Union on a quarterly basis, a list of its Regular Employees with their classifications, and wage rates. Each Cemetery will notify the Union of a new hire within 30 days of the new hire.

## ARTICLE XIV - GRIEVANCE AND ARBITRATION

14.1   <u>Grievance</u>:  For the purpose of this Agreement, a grievance shall be defined as a claim or dispute concerning rates of pay, hours or working conditions, or the interpretation of application of the terms of this Agreement.

14.2   <u>Grievance Procedure</u>:  The procedure for handling grievances pertaining to any difference or dispute which arise under this Agreement, shall be as follows:

(A)   <u>Step 1</u>.  The aggrieved employee, accompanied by the steward if the employee desires, shall consult with the employee's immediate supervisor.  If a group of employees are involved in the grievance, the steward shall represent the employees.  In any event, since it is in the best interest of all concerned that a grievance be promptly and expeditiously resolved, an aggrieved employee(s) and/or the steward shall present such grievance as soon as reasonably possible following the event that gives rise to its occurrence.

(B)   <u>Step 2</u>.  If the matter is not settled in the Step 1 and the Union wishes to further pursue it, the grievance shall be reduced to writing and present to a member of management designated by the Cemetery within thirty (30) calendar days after the event that gives rise to its occurrence.  The designated Cemetery management official shall discuss the grievance with the aggrieved employee(s), the steward and a designated representative of the Union.  The designated Cemetery management official shall provide a written answer to the grievance within fifteen (15) calendar days.

14.3   <u>Arbitration</u>:  If the grievance is not resolved at Step 2 and the Union wishes to further pursue it, the Union shall within thirty (30) calendar days after the grievance was advanced to Step 2, serve a written demand for arbitration on the Cemetery.

(A)   In the case of a grievance alleging improper discharge or violation of the Agreement with respect to job assignments or layoffs, the Union may, within ten (10) working days after the discharge, assignment or layoff, demand arbitration as provided in this Article.  If arbitration is not demanded within ten (10) working days after such claims are made, the grievance shall be deemed dropped.

(B)   The grievance shall thereafter be submitted to final and binding arbitration before an arbitrator selected by mutual agreement of the parties from the following panel:

(1)   Edwin Benn
(2)   Katherine Gerstenberger
(3)   Linda Salkovitz Kohn
(4)   Sinclair Kossof
(5)   Arthur Malinowski
(6)   Robert McAllister
(7)   Robert Perkovich

(B)   If the parties are unable to agree upon any of the foregoing arbitrators, the parties shall alternatively strike one name from the panel and the last remaining name shall be the

arbitrator selected to hear and decide the grievance. The compensation of the said arbitrator shall be paid one-half (1/2) by the Cemetery and one-half (1/2) by the Union.

14.4   Arbitrator's Authority: The award or decision of the Arbitrator shall be final and binding upon the Cemeteries, the employee(s) and the Union. The arbitrator shall not have the authority to add to, subtract from or alter the provisions of this Agreement.

14.5   Time Limits: Grievances that are not presented or appealed within the time limits set forth in this Article shall be considered withdrawn and abandoned. If there is not a timely answer to a grievance by the Cemetery in Step 1 of the Grievance Procedure, the grievance shall automatically be advanced to Step 2.

14.6   No Strikes or Other Work Stoppages: During the term of this Agreement, the Union shall not directly or indirectly call, sanction, encourage, finance, and/or assist in any way, nor shall any employee directly or indirectly instigate or participate in any way, in any strike.

(A)   For purposes of this Agreement, a strike shall be defined as any concerted withdrawal of services, slowdown, walkout, work stoppage, sympathy strike, picketing, boycott, honoring of picket lines or other interference with any Cemetery covered by this Agreement, or the placement of any of the Cemeteries or any of their affiliates, vendors or customers on any "do not patronize" list or "unfair" list.

(B)   The steward shall have no authority to, and may not, call for or instigate any strike.

(C)   Any violation of this section, 14.6, shall be cause for discipline up to and including discharge. Such disciplinary action shall be subject to the provisions of the Grievance and Arbitration procedure set forth in this Agreement.

(D)   During the term of the Agreement, the Union shall cooperate with the Cemeteries and shall take all reasonable actions within its power to prevent activity prohibited under this section, and to terminate such activity if it occurs. In the event of a strike in violation of this section, the Union shall immediately notify all employees that the activity is prohibited by this Article and is not in any way sanctioned or approved by the Union. The Union shall also direct all employees to return to work at once.

14.7   No Lockouts: During the term of this Agreement, the Cemeteries shall not lock out any or all of the employees in the bargaining unit. For purposes of this Agreement, a lockout shall be defined as any refusal by any Cemetery to allow employees to report to work or perform their regularly scheduled assigned duties solely as a means of bringing economic pressure to bear in support of the Cemetery's collective bargaining position or positions on any dispute which has arisen between the parties.

## ARTICLE XVI - SUBCONTRACTING

16.1    The Cemeteries agree not to subcontract openings and closings of graves and the installation and maintenance of foundations thereon provided that the equipment and employees are available to perform the work.

## ARTICLE XVII - TERM OF AGREEMENT

This Agreement shall become effective as of December 1, 2002, and shall continue in full force and effect to and including December 31, 2007.

Dated At Chicago, Illinois this _6th_ day of _June_, 2003.

BEVERLY CEMETERY                          SERVICE EMPLOYEES LOCAL NO. 1
ELMWOOD CEMETERY
IRVING PARK CEMETERY
LINCOLN CEMETERY
MOUNT OLIVE CEMETERY
MT. AUBURN CEMETERY
OAK HILL CEMETERY
OAK WOODS CEMETERY
RIDGEWOOD CEMETERY
WOODLAWN CEMETERY
WOODLAWN MEMORIAL PARK

                                          President

By: _____
        TODD MALONE
        For Employer

**Exhibit 3**

# AGREEMENT

## between

# ROSE HILLS MEMORIAL PARK
# & MORTUARY

## AND

# TEAMSTERS LOCAL UNION NO. 848

**October 23, 2003 - April 30, 2005**

CHI-1384658v1

## AGREEMENT

This Agreement entered into on this 23rd day of October, 2003, by and between RH CEMETERY CORPORATION, D/B/A ROSE HILLS MEMORIAL PARK AND MORTUARY (the "Company") and TEAMSTERS UNION LOCAL 848 (the "Union.")

## PURPOSE OF AGREEMENT

The purpose of this Agreement is to set forth the terms and conditions of employment agreed upon by the Company and the Union; to establish a prompt and equitable means of settling disputes arising hereunder; to assure cooperation of the employees in performance of the work; and to promote satisfactory relations between the Company, the Union, and the employees covered by this Agreement.

## ARTICLE 1 RECOGNITION

**Section 1.** The Company recognizes the Union as the sole and exclusive representative of all the employees constituting the bargaining unit, as hereinafter defined, for the purposes of collective bargaining with respect to rates of pay, wages, hours of employment, and other conditions of employment as herein set forth.

**Section 2.** The bargaining unit consists of all full-time and regular part-time cemetery employees, including interment operators, senior interment operators, interment specialists, maintenance employees, gardeners, escort attendants and crematory operators, employed by the Company at its facility located at 3888 South Workman Mill Road, Whittier, California; excluding all other employees, office clerical employees, professional employees, confidential employees, sales employees, subcontracted workers, foremen, guards and supervisors as defined in the Act.

## ARTICLE 2 EMPLOYEE DEFINITION

**Section 1.** A full-time employee shall be one who has completed a probation period and who is regularly scheduled for forty (40) hours or more per workweek.

**Section 2.** A regular part-time employee shall be one who has completed a probation period and who is regularly scheduled for thirty (30) hours or less.

**Section 3.** The first ninety (90) calendar days of any employee's employment shall be his/her probationary period. No probationary employee shall be discharged during such probationary period to avoid his/her classification as a regular employee.

**Section 4.** During the probationary period, the Company shall have the right to discharge an employee for any reason and such discharge shall not be subject to the grievance and arbitration procedures set forth in this Agreement.

CHI-1384658v1

(j)     violation of any federal, state or local law or regulation,

(k)     gambling,

(l)     carelessness,

(m)     incompetence,

(n)     loss of driver's license,

(o)     flagrant insubordination, or

(p)     falsification of Company records (including time cards).

The foregoing list is not exclusive and any other severe misconduct not specifically referenced herein shall also be grounds for immediate discharge.

**Section 5.**  The Company will provide the Local Union and the employee with a copy of any disciplinary action taken.

## ARTICLE 7 GRIEVANCES AND ARBITRATION

**Section 1.**  A grievance is defined to be a dispute between the Company and the Union with respect to a matter involving an alleged violation of this Agreement.  In the event such a dispute should exist, there shall be no suspension of work or slowdown but such controversy shall be treated as a grievance and settled only in accordance with the procedure hereinafter set forth.

**Step 1**:  Prior to filing a grievance under this Article, an employee shall first attempt to resolve any dispute with his/her immediate Supervisor or other representative designated by the Company.  The employee shall be entitled to Union representation upon request during any discussion with supervision.

**Step 2.**  A grievance must be presented in writing to the Interment Department Manager within five (5) working days after the reason for such grievance has occurred.  In order to be considered a proper grievance, the written grievance must be submitted on a form mutually agreeable to the Company and the Union and must identify, at a minimum, the name of the grievant, the nature of the dispute, the provision or provisions of the Agreement alleged to be violated and the remedy requested.  If the parties are not able to reach a satisfactory settlement in Step 2, the Interment Department Manager shall present the employee with a written answer to the grievance within five (5) working days.  If the employee is not satisfied with the written answer, the Union may refer the grievance to Step 3.

**Step 3**:  Within ten (10) working days after the receipt of the written Step 2 answer, the grievance may be submitted by the Union to the Company's Vice President - Chief of Operations for resolution.  If satisfactory settlement is still not reached within ten (10) working days after the grievance is submitted to the Vice President - Chief of Operations, the Union may appeal the grievance to arbitration.

5

**Section 2.** In the event the grievance cannot be resolved at Step 3, within ten (10) working days, the Union may give notice in writing to the Company of its intention to submit the matter to arbitration. The grieving party shall request a panel of seven arbitrators who shall be members of the National Academy of Arbitrators from the Federal Mediation and Conciliation Service (FMCS). The selection of the arbitrator shall be either by mutual agreement or by alternative striking of names on the panel with the last arbitrator being selected to serve.

**Section 3.** The arbitrator shall be used for a single issue or grievance, and more than one (1) issue or grievance cannot be submitted to the same arbitrator except by mutual consent of the parties.

**Section 4.** The decision of the arbitrator shall be final and binding on the parties, unless for some reason his/her award is not legally enforceable under applicable law.

**Section 5.** The arbitrator shall not have the authority to add to or to modify any of the terms and conditions of this Agreement. The arbitrator's decision shall not go beyond what is necessary for the interpretation and application of this Agreement or the obligations of the parties hereunder. The arbitrator shall justify his/her award by written decision and explanation of his/her rationale within thirty (30) days after the close of the hearing (which may include the filing of briefs).

**Section 6.** All costs of arbitration, including the arbitrator's fee and expenses, shall be split between the parties. Each party may call witnesses whose testimony is pertinent to the issues of the case but each party shall bear the expense of its own witnesses.

**Section 7.** The time limits provided for in this Article are included to assure that grievances are dealt with promptly. Any grievance not initiated or taken to the next Step within the prescribed time limits will be deemed settled on the basis of the other party's last answer. In the event a party does not answer a grievance within the time indicated, the grievant may proceed immediately to the next step. The parties may extend any time limit in this Article by mutual agreement on a case-by-case basis only.

**Section 8.** By mutual agreement of the Company, the Union and the grievant, any grievance may be submitted to mediation before a representative of the FMCS in lieu of arbitration.

## ARTICLE 8 NO STRIKE OR LOCKOUTS

**Section 1.** During the term of this Agreement, there shall be no strike, sympathy strike, secondary boycott, picketing, hand-billing, slowdown, sit down, stoppage of work, refusal to perform overtime, mass resignations, mass absenteeism, or any other intentional interruption or disruption of the operations of the Company, regardless of the reason for so doing. Neither the Union nor any of its officers, agents or employees will instigate, promote, sponsor, engage in, or condone any strike, sympathy strike, secondary boycott, picketing, hand-billing, slowdown, sit down, stoppage of work, refusal to perform overtime, mass resignations, mass absenteeism, or any other intentional interruption or disruption of the operations of the Company.

**Section 2.** The Company shall have the right to discipline employees responsible for or engaging in such unauthorized activities, up to and including discharge.

6

     (b)    The presentation of grievances to the Company in accordance with the provisions of this Agreement.

     (c)    The transmission of such messages and information, which shall originate with, and are authorized by the Local Union or its officers, provided such messages and information:

         (1)    have been reduced to writing; or,

         (2)    if not reduced to writing, are of a routine nature and do not involve work stoppages, slowdowns, refusal to handle goods, or any other interference with the Company's business;

provided, however, that the activities referred to in (a), (b) and (c) shall not conflict with the Steward's work duties.

**Section 2.** The Union agrees that the Stewards shall not perform any of their functions as Stewards during working time or in working areas.

## ARTICLE 13 HOURS OF WORK

**Section 1.** For scheduling and administrative purposes, the normal work day shall be nine (9) hours, eight (8) hours of which is paid working time and one hour of which is an unpaid meal break.

**Section 2.** The Company will be solely responsible to establish reasonable workweek schedules that will offer a minimum of forty (40) hours straight time work for all regular full-time employees.

**Section 3.** The Company will inform employees of their bid schedules and shifts and any changes to them. The work schedule, and changes to it, are to be determined by the Company. If the Company changes the shift of any employee, the Company shall provide at least seven (7) days' notice of such change.

**Section 4.** Employees shall be paid overtime pay of one-and-a-half (1½) times their regular rate of pay for all hours worked in excess of eight (8) hours in a single day or forty (40) in a workweek. Time away from work, such as for holidays, vacation and other forms of leave, whether paid or unpaid, shall not count towards computing an employee's hours worked, nor shall any pay received during such time be credited towards the overtime pay due an employee.

**Section 5.** Any hours worked in excess of twelve (12) hours in a single work day shall be compensated at the rate of two (2) times the employee's regular rate of pay.

**Section 6.** Ordinarily, employees will not be required to work seven (7) days in a single workweek. If business circumstances require a seven (7) day workweek, the employee shall be paid at the rate of one-and-a-half (1½) times their regular rate of pay for the first eight (8) hours of work on the seventh work day in the workweek. If the employee works more than eight (8) hours

10

on the seventh work day in a single workweek, all hours in excess of eight (8) shall be paid at the rate of two (2) times the employee's regular rate of pay.

**Section 7.** Employees may be required at any time to accept and perform unscheduled and/or overtime work when the Company deems it necessary. Scheduled overtime work (when the Company has at least 24 hours notice that overtime work is required) shall be assigned on a voluntary basis by seniority when practical; provided, however, that the Company shall have the right to assign the least senior qualified employee by inverse seniority if there are insufficient volunteers. The Company shall have the right to hold over employees after the end of a shift to complete work in progress. If there is any grievance filed over the assignment of overtime work, the only remedy that shall be available is the offering of overtime work at the next available opportunity, regardless of seniority.

**Section 8.** Employees are not permitted to work off-the-clock. Employees shall not work any period of time before their scheduled starting time or after their scheduled quitting times without authorization from their Supervisor. Employees may be disciplined for working time that is unscheduled and unauthorized.

**Section 9.** Employees shall be required to accurately report their work hours by whatever means is used by the Company from time to time.

**Section 10.** The Company shall have the right to call employees to report to work when required by business circumstances. If an employee is called in to work, he/she shall be at the applicable rate under this Article. The Company shall not exercise its right under this Section if there is less than four (4) hours' work available to be performed.

**Section 11.** Employees shall be paid on a bi-weekly basis in accordance with the Company's regular payroll practices.

## ARTICLE 14 REST, MEAL PERIODS

**Section 1.** Any employee working a normal work day shall be provided with a one hour unpaid meal break. Meal breaks shall be taken as closely as possible to the middle of the shift as business circumstances permit. An employee working ten (10) or more hours in a single work day shall be provided with an additional one-half (1/2) hour unpaid meal break.

**Section 2.** In addition to unpaid meal period(s), employees shall receive a ten (10) minute paid break for each four (4) hours worked in a single work day.

## ARTICLE 15 BENEFITS

**Section 1.** The Company will make available to bargaining unit employees group health and hospitalization, including dental and prescription drug benefits; long term disability; and life insurance. The Company reserves the right to change insurance carriers, health maintenance organizations, or benefit levels or to self-insure, as it deems appropriate. The Company agrees to

11

make such benefits available to bargaining unit employees under the same terms and conditions as other similarly situated Company employees.

**Section 2.** Part time employees shall be eligible to participate in group health and hospitalization, including dental and prescription drug benefits; long term disability; and life insurance benefit programs under this Article, provided that such employees work at least thirty (30) hours per week.

**Section 3.** The Company reserves the right to institute cost containment measures relative to its benefit plans. Such changes may include, but are not limited to, employee premium obligations, co-payments, covered services, health care providers or networks, plan administrators or insurers, preferred provider options and other plan design modifications.

**Section 4.** The extent of coverage under all Company benefit programs (including HMO and self-insured plans) and other benefit plans referred to in this Agreement will be governed by the terms and conditions set forth in applicable insurance policies and/or plan documents, and such benefit programs may be modified or amended by the plan sponsor from time to time in accordance with the terms of the applicable insurance policies and/or plan documents. Any questions or disputes concerning any benefit programs will be resolved in accordance with the terms and conditions set forth in the applicable insurance policies or plan documents.

**Section 5.** The failure of any insurance carrier(s) or plan administrator(s) to provide any benefit for which it has contracted or is obligated will not be considered a breach by the Company of any obligation undertaken under this or any other Agreement. However, nothing in this Agreement will be construed to relieve any insurance carrier(s) or plan administrator(s) from any liability it may have to the Company, bargaining unit employees or beneficiaries of bargaining unit employees.

**Section 6.** Bargaining unit employees shall be eligible to participate in a 401(k) Retirement Plan under the same terms and conditions offered to other similarly situated Company employees. The 401(k) Retirement Plan shall be governed by the terms of the applicable Plan documents, and may be modified or amended by the Plan sponsor from time to time in accordance with the terms of the Plan documents. Any questions or disputes concerning the 401(k) Retirement Plan will be resolved in accordance with the terms and conditions of the applicable Plan documents.

## ARTICLE 16 WAGES

**Section 1.** The wage rates set forth in Appendix 1 to this Agreement shall be the minimum rates applicable to bargaining unit employees. The Company reserves the right to pay higher rates or to increase the wage rates of individual employees for legitimate business purposes.

**Section 2.** The basic hourly rates set forth in Section 1 shall above supersede all wage rates in effect before this Agreement's effective date.

**Section 3.** Effective January 1, 2004, all employees covered by this Agreement shall receive a general wage increase of 2%.

12

**Section 4.**  Effective January 1, 2005, all employees covered by this Agreement shall receive a general wage increase of 1.75%.

## ARTICLE 17 HOLIDAYS

**Section 1.**  The Company shall observe the following holidays for holiday pay purposes and for any other purpose expressly stated in this Agreement:

New Year's Day

Fourth of July

Labor Day

Thanksgiving Day

Christmas Day

Two (2) Floating Holidays

**Section 2.**  In order to receive Holiday Pay, (a) employees must be in active pay status on the day of the holiday; and (b) employees must work the last scheduled shift before, and the first scheduled shift after, the holiday.

**Section 3.**  Holiday pay shall be eight (8) hours of pay at the employee's regular hourly wage rate.

**Section 4.**  The Employer retains the right to schedule work on any holiday.  An employee who works on a holiday shall receive, in addition to holiday pay, one and one half (1½) times his/her basic hourly rate for all hours that he/she works on the holiday.  An employee who is scheduled to work on a holiday and does not work that day shall not receive holiday pay, even if otherwise eligible for it.

**Section 5.**  Employees shall provide at least (1) weeks' notice when scheduling floating holidays.  All requests to schedule floating holidays are subject to Company approval depending upon the needs of the business.

## ARTICLE 18 VACATIONS

**Section 1.**  Vacation is defined as hours of paid leave of absence permitted to be used by an employee for any reason.

**Section 2.**  The established vacation year is the calendar year from January 1 through December 31.

**Section 3.**  Annual vacation accrual for eligible employees is:

One (1) Week                    From an eligible employee's first day of employment

13

CHI-1384658v1

## ARTICLE 30 TERM OF AGREEMENT

**Section 1.** The Agreement shall be effective upon ratification by the bargaining unit and shall continue in full force and effect until April 30, 2005.

RH CEMETERY CORP. d/b/a                          TEAMSTERS LOCAL UNION NO. 848
ROSE HILLS MEMORIAL PARK
& MORTUARY

By: _Kenton Wood_                                By: _Tom Sullivan_

Title: _PRESIDENT & CEO_                          Title: _Business Representative_

Date: _NOVEMBER 24, 2003_                         Date: _November 19, 2003_

19

**Appendix 1**

**Wage Rates**

The following wage rates shall be applicable as the entry level rates for bargaining unit positions:

| JOB CLASSIFICATION | WAGE RATE |
| --- | --- |
| Interment Specialist | $10.00 |
| Interment Operator | $12.00 |
| Senior Interment Operator | $15.50 |
| Auto Mechanic | $18.00 |
| Vehicle Maintenance Specialist | $12.50 |
| Inventory Specialist | $9.50 |
| Senior Inventory Specialist | $12.50 |
| Building Maintenance | $15.00 |
| Senior Building Maintenance | $18.00 |
| Water Systems Operator | $18.00 |
| Gardener | $12.00 |
| Crematory Operator | $15.00 |
| Escort/Attendant | $12.00 |

CHI-1384658v1