**Exhibit Z**

**Part 1 of 3**

10-Q 1 a2174493z10-q.htm FORM 10-Q
QuickLinks -- Click here to rapidly navigate through this document

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
#### Washington, D.C. 20549

# FORM 10-Q

**(Mark One)**

☒  **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934**
For the 16 weeks (fiscal quarter) ended October 7, 2006

**OR**

☐  **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934**
For the transition period from        to

**Commission file number 000-33277**

# ALDERWOODS GROUP, INC.
#### (Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **52-1522627** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **311 Elm Street, Suite 1000, Cincinnati, Ohio** | **45202** |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: **513-768-7400**

Former name, former address and former fiscal year, if changed since last report: **N/A**

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act (check one).

Large Accelerated filer ☐ Accelerated filer ☒ Non-accelerated filer ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

**APPLICABLE ONLY TO ISSUERS INVOLVED IN BANKRUPTCY PROCEEDINGS
DURING THE PRECEDING FIVE YEARS**

    Indicate by check mark whether the registrant has filed all documents and reports required to be filed by Section 12, 13 or 15(d) of the Securities Exchange Act of 1934 subsequent to the distribution of securities under a plan confirmed by a court. Yes ☒    No ☐

---

**APPLICABLE ONLY TO CORPORATE ISSUERS**

    At November 14, 2006, there were 40,678,098 shares of Common Stock outstanding.

## ALDERWOODS GROUP, INC.

|  |  |  | Page |
|---|---|---|---|
| **Part I.** | **FINANCIAL INFORMATION** | | |
| | Item 1. | **FINANCIAL STATEMENTS:** | |
| | | CONSOLIDATED BALANCE SHEETS | |
| | | as of October 7, 2006 and December 31, 2005 | 1 |
| | | CONSOLIDATED STATEMENTS OF OPERATIONS | |
| | | for the 16 and 40 weeks ended October 7, 2006 and October 8, 2005 | 2 |
| | | CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY | |
| | | for the 40 Weeks Ended October 7, 2006 | 3 |
| | | CONSOLIDATED STATEMENTS OF CASH FLOWS | |
| | | for the 16 and 40 weeks ended October 7, 2006 and October 8, 2005 | 4 |
| | | NOTES TO THE INTERIM CONSOLIDATED FINANCIAL STATEMENTS | 5 |
| | Item 2. | **MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS** | 33 |
| | Item 3. | **QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK** | 49 |
| | Item 4. | **CONTROLS AND PROCEDURES** | 49 |
| | | **FORWARD-LOOKING STATEMENTS** | 49 |
| **Part II.** | **OTHER INFORMATION** | | |
| | Item 1. | **LEGAL PROCEEDINGS** | 50 |
| | Item 1A. | **RISK FACTORS** | 50 |
| | Item 6. | **EXHIBITS** | 51 |
| **SIGNATURES** | | | 55 |

i

**PART I**

**FINANCIAL INFORMATION**

ITEM 1.   FINANCIAL STATEMENTS

**ALDERWOODS GROUP, INC.**

**CONSOLIDATED BALANCE SHEETS**

**Expressed in thousands of dollars
except number of shares**

| | October 7, 2006 | December 31, 2005 |
|---|---|---|
| | (unaudited) | |
| **ASSETS** | | |
| Current assets | | |
| Cash and cash equivalents | $ 8,616 | $ 7,455 |
| Receivables, net of allowances | 56,796 | 52,862 |
| Inventories | 14,583 | 15,784 |
| Other | 7,631 | 6,885 |
| | 87,626 | 82,986 |
| Pre-need funeral receivables and trust investments | 329,462 | 334,427 |
| Pre-need cemetery receivables and trust investments | 322,200 | 307,322 |
| Cemetery property | 117,193 | 116,467 |
| Property and equipment | 544,343 | 542,901 |
| Insurance invested assets | 322,154 | 294,598 |
| Deferred income tax assets | 16,563 | 13,057 |
| Goodwill | 296,211 | 295,890 |
| Cemetery perpetual care trust investments | 248,919 | 243,805 |
| Other assets | 42,509 | 42,850 |
| | $ 2,327,180 | $ 2,274,303 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities | | |
| Accounts payable and accrued liabilities | $ 118,012 | $ 119,734 |
| Current maturities of long-term debt | 2,185 | 2,435 |
| | 120,197 | 122,169 |
| Long-term debt | 362,282 | 371,040 |
| Deferred pre-need funeral and cemetery contract revenue | 70,730 | 91,618 |
| Non-controlling interest in funeral and cemetery trusts | 575,634 | 548,497 |
| Insurance policy liabilities | 302,298 | 266,729 |
| Deferred income tax liabilities | 12,436 | 10,552 |
| Other liabilities | 29,232 | 21,983 |
| | 1,472,809 | 1,432,588 |
| Non-controlling interest in perpetual care trusts | 248,980 | 243,962 |
| Stockholders' equity | | |
| Common stock, $0.01 par value, 100,000,000 shares authorized, 40,678,098 issued and outstanding (December 31, 2005—40,458,864) | 407 | 405 |
| Capital in excess of par value | 746,799 | 743,126 |
| Accumulated deficit | (166,945) | (172,405) |
| Accumulated other comprehensive income | 25,130 | 26,627 |
| | 605,391 | 597,753 |
| | $ 2,327,180 | $ 2,274,303 |

*See accompanying notes to the interim consolidated financial statements*

1

## ALDERWOODS GROUP, INC.

### CONSOLIDATED STATEMENTS OF OPERATIONS (unaudited)

**Expressed in thousands of dollars
except per share amounts and number of shares**

| | 16 Weeks Ended | | 40 Weeks Ended | |
|---|---|---|---|---|
| | October 7, 2006 | October 8, 2005 | October 7, 2006 | October 8, 2005 |
| **Revenue** | | | | |
| Funeral | $ 139,367 | $ 133,158 | $ 368,020 | $ 367,672 |
| Cemetery | 55,769 | 52,519 | 135,105 | 134,737 |
| Insurance | 32,287 | 29,105 | 78,559 | 73,036 |
| | 227,423 | 214,782 | 581,684 | 575,445 |
| **Costs and expenses** | | | | |
| Funeral | 113,854 | 116,927 | 296,637 | 301,457 |
| Cemetery | 48,226 | 47,202 | 116,665 | 117,026 |
| Insurance | 30,428 | 27,752 | 74,618 | 69,570 |
| | 192,508 | 191,881 | 487,920 | 488,053 |
| General and administrative expenses | 34,915 | 22,901 | 93,764 | 87,392 |
| Provision for asset impairment | 24,831 | 19,192 | 57,388 | 31,539 |
| | 588 | 254 | 588 | (1,373) |
| | 25,419 | 19,446 | 57,976 | 30,166 |
| Income from operations | 9,496 | 3,455 | 35,788 | 57,226 |
| Interest on long-term debt (Note 3) | 8,554 | 8,967 | 21,503 | 23,495 |
| Other expense (income), net | (347) | (68) | (221) | (5,910) |
| Income (loss) before income taxes | 1,289 | (5,444) | 14,506 | 39,641 |
| Income tax expense (recovery) | 486 | (12,349) | 7,804 | 5,844 |
| Income from continuing operations | 803 | 6,905 | 6,702 | 33,797 |
| Loss from discontinued operations (Note 10) | — | — | — | (1,678) |
| Income before cumulative effect of change in accounting principle | 803 | 6,905 | 6,702 | 32,119 |
| Cumulative effect of change in accounting principle | — | — | (1,242) | — |
| Net income | $ 803 | $ 6,905 | $ 5,460 | $ 32,119 |
| **Basic earnings per Common share:** | | | | |
| Income from continuing operations | $ 0.02 | $ 0.17 | $ 0.16 | $ 0.83 |
| Loss from discontinued operations | — | — | — | (0.04) |
| Cumulative effect of change in accounting principle | — | — | (0.03) | — |
| Net income | $ 0.02 | $ 0.17 | $ 0.13 | $ 0.79 |
| **Diluted earnings per Common share:** | | | | |
| Income from continuing operations | $ 0.02 | $ 0.16 | $ 0.16 | $ 0.81 |
| Loss from discontinued operations | — | — | — | (0.04) |
| Cumulative effect of change in accounting principle | — | — | (0.03) | — |
| Net income | $ 0.02 | $ 0.16 | $ 0.13 | $ 0.77 |
| Basic weighted average number of shares outstanding (thousands) | 40,678 | 40,456 | 40,606 | 40,456 |

| | | | |
|---|---|---|---|
| Diluted weighted average number of shares outstanding (thousands) | 42,789 | 42,051 | 42,575 | 41,721 |

*See accompanying notes to the interim consolidated financial statements*

2

## ALDERWOODS GROUP, INC.

### CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY (unaudited)

**Expressed in thousands of dollars except number of shares**

| | Shares | Common Stock Par Value | Capital in Excess of Par Value | Accumulated Deficit | Accumulated Other Comprehensive Income | Total |
|---|---|---|---|---|---|---|
| Balance at December 31, 2005 | 40,458,864 | $ 405 | $ 743,126 | $ (172,405) | $ 26,627 | $ 597,753 |
| Comprehensive income: | | | | | | |
|   Net income | | | | 5,460 | | 5,460 |
|   Other comprehensive income (loss): | | | | | | |
|     Foreign currency translation adjustment, net of income taxes of $nil | | | | | 2,927 | 2,927 |
|     Unrealized loss on insurance invested assets, net of tax recovery of $2,125 | | | | | (4,099) | (4,099) |
|       Less: reclassification adjustments for realized gain on insurance invested assets included in net income | | | | | (21) | (21) |
|     Unrealized loss on derivatives, net of income taxes of $nil | | | | | 400 | 400 |
|       Less: reclassification adjustments for realized gains on derivatives included in net income, net of income taxes of $nil | | | | | (704) | (704) |
| Comprehensive income | | | | | | 3,963 |
| Stock-based compensation | | | 2,664 | | | 2,664 |
| Common stock issued: | | | | | | |
|   Stock issued as compensation in lieu of cash | 11,734 | | 213 | | | 213 |
|   Stock issued under equity incentive plan | 207,500 | 2 | 796 | | | 798 |
| Balance at October 7, 2006 | 40,678,098 | $ 407 | $ 746,799 | $ (166,945) | $ 25,130 | $ 605,391 |

*See accompanying notes to the interim consolidated financial statements*

3

## ALDERWOODS GROUP, INC.

### CONSOLIDATED STATEMENTS OF CASH FLOWS (unaudited)

**Expressed in thousands of dollars**

|  | 16 Weeks Ended | | 40 Weeks Ended | |
|---|---|---|---|---|
|  | October 7, 2006 | October 8, 2005 | October 7, 2006 | October 8, 2005 |
| **CASH PROVIDED BY (APPLIED TO)** | | | | |
| Operations | | | | |
| Net income | $ 803 | $ 6,905 | $ 5,460 | $ 32,119 |
| Loss from discontinued operations, net of tax | — | — | — | 1,678 |
| Cumulative effect of change in accounting principle | — | — | 1,242 | — |
| Items not affecting cash | | | | |
| Depreciation and amortization | 13,956 | 13,778 | 33,221 | 34,873 |
| Amortization of debt issue costs | 518 | 915 | 1,426 | 2,565 |
| Stock-based compensation | 1,068 | — | 2,664 | — |
| Insurance policy benefit reserves | 16,850 | 15,957 | 36,850 | 38,609 |
| Provision for asset impairment | 588 | 254 | 588 | (1,373) |
| Gain on disposal of business assets | (448) | (165) | (1,406) | (6,068) |
| Deferred income taxes | (511) | (1,699) | (767) | 11,050 |
| Premium on long-term debt repurchase | — | — | — | 282 |
| Other, including net changes in other non-cash balances | (10,690) | 9,903 | (16,822) | 3,054 |
| Net cash provided by continuing operations | 22,134 | 45,848 | 62,456 | 116,789 |
| Net cash used in discontinued operations | — | — | — | (601) |
|  | 22,134 | 45,848 | 62,456 | 116,188 |
| Investing | | | | |
| Proceeds on disposition of business assets | 841 | 3,757 | 3,748 | 14,916 |
| Purchase of property and equipment | (14,363) | (15,507) | (23,835) | (31,823) |
| Purchase of insurance invested assets | (25,059) | (24,794) | (68,694) | (90,025) |
| Proceeds on disposition and maturities of insurance invested assets | 10,421 | 6,702 | 35,697 | 54,193 |
| Net cash used in continuing operations | (28,160) | (29,842) | (53,084) | (52,739) |
| Net cash provided by discontinued operations | — | — | — | 7,906 |
|  | (28,160) | (29,842) | (53,084) | (44,833) |
| Financing | | | | |
| Increase in long-term debt | 20,900 | 47 | 20,900 | 5,199 |
| Repayment of long-term debt | (14,662) | (23,111) | (29,909) | (82,320) |
| Issuance of Common stock | 4 | 1,401 | 798 | 2,777 |
| Net cash provided by (used in) continuing operations | 6,242 | (21,663) | (8,211) | (74,344) |
| Net cash used in discontinued operations | — | — | — | (57) |
|  | 6,242 | (21,663) | (8,211) | (74,401) |
| Increase (decrease) in cash and cash equivalents | 216 | (5,657) | 1,161 | (3,046) |
| Cash and cash equivalents, beginning of period | 8,400 | 11,990 | 7,455 | 9,379 |
| Cash and cash equivalents, end of period | $ 8,616 | $ 6,333 | $ 8,616 | $ 6,333 |

*See accompanying notes to the interim consolidated financial statements*

## ALDERWOODS GROUP, INC.

### NOTES TO THE INTERIM CONSOLIDATED FINANCIAL STATEMENTS (unaudited)

**(Tabular amounts expressed in thousands of dollars except per share amounts)**

### NOTE 1.   NATURE OF OPERATIONS

Alderwoods Group, Inc., a Delaware corporation ("Alderwoods Group" and, together with its subsidiaries unless the context otherwise requires, the "Company"), is the second-largest operator of funeral homes and cemeteries in North America based on total revenue and number of locations. As of October 7, 2006, the Company operated 578 funeral homes, 70 cemeteries and 63 combination funeral homes and cemeteries throughout North America.

The Company's funeral operations encompass making funeral and cremation arrangements on an at-need or pre-need basis. The Company's funeral operations offer a full range of funeral services, including the collection of remains, registration of death, professional embalming, use of funeral home facilities, sale of caskets and other merchandise and transportation to a place of worship, funeral chapel, cemetery or crematorium.

The Company's cemetery operations assist families in making burial arrangements and offer a complete line of cemetery products (including a selection of burial spaces, burial vaults, lawn crypts, caskets, memorials, niches, mausoleum crypts and other merchandise), the opening and closing of graves and cremation services.

The Company's insurance operations sell a variety of insurance products, primarily to fund pre-need funeral services.

### NOTE 2.   SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

*Principles of consolidation*

The interim consolidated financial statements include the accounts of the Company, its subsidiary companies and operations controlled by the Company through sales and management agreements. All subsidiaries are wholly owned, except for a few companies with small minority interests. The interim consolidated financial statements also include the accounts of the funeral trusts, cemetery merchandise and service trusts and perpetual care trusts, and several pooled investment funds created for such trusts in which the Company has a variable interest and is the primary beneficiary.

All significant inter-entity balances and transactions have been eliminated in the interim consolidated financial statements. The interim consolidated financial statements have been prepared using the United States dollar and are presented in accordance with United States generally accepted accounting principles ("GAAP").

The interim consolidated financial statements include all adjustments, consisting only of normal recurring adjustments, which in management's opinion are necessary for a fair presentation of the financial results as of October 7, 2006, and for the 16 and 40 weeks ended October 7, 2006, and October 8, 2005. Except as indicated below with respect to the adoption of SFAS 123R, Stock-based payment, the interim consolidated financial statements have been prepared on a basis consistent with the accounting policies described in the Company's Annual Report on Form 10-K for the 52 weeks ended December 31, 2005, as filed with the U.S. Securities and Exchange Commission ("SEC") and should be read in conjunction therewith.

The results of operations for interim periods are not necessarily indicative of the results that may be expected for the full fiscal year or for any other interim period.

5

*Use of estimates*

The preparation of the interim consolidated financial statements in accordance with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the interim consolidated financial statements, and the reported amounts of revenue and expenses during the reporting period. As a result, actual amounts could significantly differ from those estimates.

*Stock-based compensation plans*

**Director Compensation Plan**

Pursuant to the Company's Director Compensation Plan (the "Director Compensation Plan"), each director of the Company who is not an employee of the Company or any of its subsidiaries has the option of receiving his or her annual base retainer and attendance fees in cash, Common Stock or a combination thereof. Further, each participant may elect to have Common Stock paid in the form of deferred Common Stock ("Deferred Stock"), which will be credited to a booking account in the name of the participant. The Deferred Stock is subject to a deferral period during which the participant has no right to transfer any rights under his or her Deferred Stock and has no other rights of ownership therein. The Company has reserved 100,000 shares of Common Stock for issuance as compensation in lieu of cash under the Director Compensation Plan.

**Employee Stock Purchase Plan**

In 2005, the Company's shareholders approved the adoption of a compensatory employee stock purchase plan to provide for the purchase on the open market of up to a maximum of 1,100,000 shares of Common Stock of the Company. Eligible employees may authorize payroll deductions of up to 5% of their regular base salary to purchase shares of Common Stock of the Company on the open market on a monthly basis. The Company will make a cash contribution to purchase shares of Common Stock of the Company as additional compensation to each participant equal to 50% of the employee's contribution for that month. For the 16 weeks ended October 7, 2006, a total of 26,946 shares were purchased and distributed to employees at an average price of $19.69 per share and compensation expense of $177,000 was incurred. For the 40 weeks ended October 7, 2006, a total of 74,042 shares were purchased and distributed to employees at an average price of $18.39 per share and compensation expense of $454,000 was incurred.

**2005-2007 Executive Strategic Incentive Plan**

The 2005-2007 Executive Strategic Incentive Plan, approved by the Board of Directors on July 21, 2005, is a performance based compensation plan designed to motivate and reward the senior management team for achieving shareholder value objectives. The plan provides cash awards to the senior executives based on the Company's Common Stock reaching the threshold of an average price of $17.00 for the period from December 1, 2007 to December 31, 2007. The amount of the cash award increases the more the stock price exceeds the $17.00 threshold target price. Each participant will be assigned a percentage share of an aggregate cash award incentive pool. Achieving an average stock price of $17.00 results in an aggregate cash award of $5,600,000. Achieving an average stock price of $18.00 results in an aggregate cash

6

award of $8,000,000. The aggregate cash award increases by $1.6 million for every $1.00 in appreciation of the average stock price beyond $18.00. In the event of a change in control of the Company, the cash awards would be calculated based upon the stock price on the date of the change in control and become payable within 30 days of the change in control.

**2005 Equity Incentive Plan**

In April of 2005, the Company's shareholders approved the 2005 Equity Incentive Plan that permits the grant of (i) options to the employees and members of the Company's Board of Directors, with or without tandem appreciation rights, and (ii) restricted Common Stock units. A total of 1,800,000 shares of Common Stock are reserved for grant under the plan. Stock options are granted with an exercise price equal to the Common Stock's fair market value on the date of the grant. Stock options granted to date have a 3-year vesting period and vest at a rate of 25% on the first, 25% on the second and 50% on the third anniversaries of the date of grant.

The tandem appreciation rights entitle the employee to exchange the employee's option right for a number of shares equal in value to the appreciated value of the options. The exchange of the option for the tandem appreciation right requires an immediate exercise of the tandem appreciation right and will cause the immediate termination of the related option right. An exchange of an option right for a tandem appreciation right may only be made when the relevant option is otherwise exercisable. Although the options granted had an exercise price equal to or greater than the market value of the underlying Common Stock on the grant date, the number of shares to be issued upon exercise is not determinable as it is dependent upon the exchange of the option for a tandem appreciation right.

The restricted Common Stock units granted to date do not vest for the first three years following the date of grant. Thereafter, the restricted Common Stock units vest during years 3 to 10 based upon the share price of the Company's Common Stock. After three years of service, the restricted Common Stock units vest 70% at a $17 share price, and an additional 15% at a $17.50 share price and the final 15% at an $18 share price. Once granted, the restricted Common Stock units are not included in total shares outstanding and are not included in the weighted average number of common shares outstanding in each period used to calculate basic earnings per share until vested.

**2002 Equity Incentive Plan**

On January 2, 2002 the Company implemented the 2002 Equity Incentive Plan that permits the grants of stock options to the employees and members of the Company's Board of Directors. A total of 4,500,000 shares of Common Stock are reserved for grant under the plan. Stock options are granted with an exercise price equal to the stock's fair market value at the date of grant. Except in certain cases, stock options have a 3-year vesting period and vest at a rate of 25% on the first, 25% on the second and 50% on the third anniversaries of the date of grant.

*Equity incentive plans and change in accounting policy*

Prior to January 1, 2006, the Company accounted for employee stock-based awards under the intrinsic value method, which followed the recognition and measurement principles of APB Opinion No. 25, Accounting for Stock Issued to Employees, and related Interpretations. Effective January 1, 2006, the

7

Company adopted Statement of Financial Accounting Standard No. 123R, "Share-Based Payment" ("SFAS 123R"). SFAS 123R requires measurement of compensation cost for employee stock-based awards based upon fair value over the requisite service period for awards expected to vest. Furthermore, under SFAS 123R, liability based awards are recorded at fair value through to their settlement date.

Pursuant to the provisions of SFAS 123R, the Company applied the modified-prospective transition method. Under this method, the fair value provisions of SFAS 123R are applied to new employee share-based payment awards granted or awards modified, repurchased or cancelled after December 31, 2005. Measurement and attribution of compensation cost for unvested awards at December 31, 2005, granted prior to the adoption of SFAS 123R, are recognized based upon the provisions of SFAS No. 123, Accounting for Stock-Based Compensation ("SFAS 123"), after adjustment for estimated forfeitures. Accordingly, SFAS 123R no longer permits pro-forma disclosure for income statement periods after December 31, 2005 and compensation expense will be recognized for all share-based payments earned after December 31, 2005 based on grant-date fair value.

The fair value of restricted stock units and the fair value of stock options are determined using the Black-Scholes valuation model, which is consistent with the valuation techniques previously utilized for options in the footnote disclosures required under SFAS No. 123, Accounting for Stock-Based Compensation, as amended by SFAS No. 148, Accounting for Stock-Based Compensation—Transition and Disclosure. The Company recorded stock-based compensation expense for equity incentive plans of $1,068,000 and $2,664,000 for the 16 and 40 weeks ended October 7, 2006, respectively. This resulted in an adjustment to operating cash flows of $1,068,000 and $2,664,000 in the 16 and 40 weeks ended October 7, 2006, respectively. The tax benefit associated with compensation expense for the 12 weeks and 40 weeks ended October 7, 2006 is not significant and no option value has been capitalized.

### Executive strategic incentive plan

Prior to the implementation of SFAS 123R, no compensation expense was recorded in the 52 weeks ended December 31, 2005 as the stock price at December 31, 2005 was less than the threshold target price for the Executive Strategic Incentive Plan.

With the adoption of SFAS 123R, this incentive plan is classified as a liability based award resulting in the measurement of the estimated fair value at each reporting date, until December 31, 2007 when the actual liability is determined and the award is settled. The Company records an expense equal to the portion of the fair value relative to the vesting term of the plan. The Company determines the fair value using a Monte Carlo model. This model uses term-to-expiry and stock price assumptions as at the measurement date, together with expected volatility, risk-free interest rate and dividend yield assumptions consistent with the valuation of the Company's stock options. The adoption of SFAS 123R resulted in a cumulative effect of change in accounting principle of $1,242,000, which reflects the estimated accrued liability as of January 1, 2006 (fair value of $6,624,000, based on a stock price of $15.87), the adoption date of SFAS 123R. Compensation expense of $1,394,000 and $4,358,000 in the 16 weeks and 40 weeks ended October 7, 2006, respectively, reflects the estimated accrued liability as of October 7, 2006 of $5,600,000 (fair value of $11,200,000, based on a stock price of $19.91).

8

*Pro-forma disclosure*

As a result of the adoption of SFAS 123R, for the 16 weeks ended October 7, 2006, income from continuing operations before income taxes was reduced by $2,462,000, income from continuing operations was reduced by $2,245,000, and net income was reduced by $2,245,000. For the 40 weeks ended October 7, 2006, income from continuing operations before income tax was reduced by $7,022,000, income from continuing operations was reduced by $6,781,000, and net income was reduced by $8,023,000. Basic and diluted earnings per share were reduced by $0.06 and $0.19 for both the 16 and 40 weeks ended October 7, 2006, respectively.

As the Company adopted the modified prospective-transition method of SFAS 123R, results for the 16 and 40 weeks ended October 8, 2005 have not been restated. If prior to December 31, 2005, the Company had elected to recognize compensation expense for its stock option plans, based on the fair value of the awards at the grant dates in accordance with SFAS 123, net income and basic and diluted earnings per share would have changed for the 16 and 40 weeks ended October 8, 2005 to the following pro-forma amounts:

|  | 16 weeks ended October 8, 2005 | | 40 weeks ended October 8, 2005 | |
|---|---|---|---|---|
| Net income, as reported | $ | 6,905 | $ | 32,119 |
| Total stock-based employee compensation expense determined under fair value-based method, net of tax | | (873) | | (1,821) |
| Pro forma net income | $ | 6,032 | $ | 30,298 |
| Net income per Common share: | | | | |
| Basic, as reported | $ | 0.17 | $ | 0.79 |
| Basic, pro forma | | 0.15 | | 0.75 |
| Diluted, as reported | | 0.16 | | 0.77 |
| Diluted, pro forma | | 0.14 | | 0.73 |

The following is a summary of the total number of outstanding stock options and restricted Common Stock units under both plans:

|  | Outstanding Options | | Weighted Average Exercise Price | | Outstanding Non vested Restricted Common Stock Units | | Weighted Average Exercise Price | |
|---|---|---|---|---|---|---|---|---|
|  | (thousands) | | (dollars per Common share) | | (thousands) | | (dollars per Common share) | |
| Balance at December 31, 2005 | 5,031 | $ | 10.75 | | 237 | $ | 15.99 | |
| Granted | — | | — | | — | | — | |
| Exercised | (207) | | 3.81 | | — | | — | |
| Cancelled | (19) | | 13.36 | | (5) | | 15.99 | |
| Balance at October 7, 2006 | 4,805 | $ | 11.03 | | 232 | $ | 15.99 | |

9

The following table summarizes information about stock options outstanding at October 7, 2006:

| Range of Exercise Prices | Number Outstanding | Weighted-Average Remaining Contractual Life | Weighted-Average Exercise Price | Number Exercisable | Weighted-Average Exercise Price |
|---|---|---|---|---|---|
| (dollars per Common share) | (thousands) | (in years) | (dollars per Common share) | (thousands) | (dollars per Common share) |
| $3.65 – $5.96 | 719 | 6.47 | $ 3.65 | 719 | $ 3.65 |
| $5.97 – $7.59 | 1,030 | 5.72 | 7.47 | 1,030 | 7.47 |
| $7.60 – $13.23 | 2,035 | 5.80 | 12.95 | 1,826 | 13.12 |
| $13.24 – $15.99 | 1,021 | 8.81 | 15.99 | 255 | 15.99 |
| | 4,805 | 6.52 | 11.03 | 3,830 | 10.01 |

As of October 7, 2006, the aggregate intrinsic value for stock options outstanding and exercisable was $42,650,000 and $37,899,000, respectively.

For the 40 weeks ended October 7, 2006, cash received from the exercise of stock options was $790,000. As of October 7, 2006, the unrecognized compensation expense related to stock options totaling $7,753,000 is expected to be recognized over a weighted average period of 1.1 years.

Other information pertaining to option activity is as follows:

| | 16 weeks ended | | 40 weeks ended | |
|---|---|---|---|---|
| | October 7, 2006 | October 8, 2005 | October 7, 2006 | October 8, 2005 |
| Total fair value of stock options vested | $ 1,088 | $ 974 | $ 2,865 | $ 2,183 |
| Total intrinsic value of stock options exercised | — | 2,919 | 3,202 | 3,627 |

The fair value of stock options used to compute the pro forma net income and income per Common share disclosures was calculated as of the grant date. To calculate fair value, the Company used the Black-Scholes option-pricing model with the following assumptions:

| | 16 weeks ended | | 40 weeks ended | |
|---|---|---|---|---|
| Weighted-average assumptions | October 7, 2006 | October 8, 2005 | October 7, 2006 | October 8, 2005 |
| Dividend yield | n/a | 0.0% | n/a | 0.0% |
| Expected volatility | n/a | 45.0% | n/a | 45.0% |
| Risk-free interest rate | n/a | 3.64% | n/a | 3.64% |
| Expected option life in years | n/a | 5.0 | n/a | 5.0 |
| Weighted average grant date fair value | n/a | $ 6.70 | n/a | $ 6.70 |

During the 40 weeks ended October 7, 2006, the Company did not issue stock options.

The Company uses the Black-Scholes option-pricing model for estimating the fair value of its stock options. The Black-Scholes option-pricing model was developed for use in estimating the fair value of

10

traded options that have no vesting restrictions and are fully transferable. In addition, option-pricing models require the input of highly subjective assumptions, including the expected price volatility and option life. The expected option life is based on the Predecessor's historical experience as well as the vesting periods and terms of the stock options. The Company uses expected volatility rates, which are based on a combination of the Company's historical volatility rates, plus the historical volatility rates of other companies in the death care industry, trended into future years. Changes in the subjective input assumptions can materially affect the fair value estimate, and therefore the existing models do not necessarily provide a reliable single measure of the fair value of the Company's stock options.

### Comparability

Certain comparative amounts have been reclassified to conform to the presentation adopted in the current year.

### NOTE 3.   LONG-TERM DEBT

Long-term debt consists of the following:

|  | October 7, 2006 | December 31, 2005 |
|---|---|---|
| Revolving credit facility (a) | $ 7,000 | $ 4,000 |
| Senior secured term loan B due in 2009 (a)(b) | 151,683 | 161,683 |
| 7.75% Senior unsecured notes due in 2012 (c) | 200,000 | 200,000 |
| Promissory notes and capitalized obligations, certain of which are secured by assets of certain subsidiaries | 5,784 | 7,792 |
|  | 364,467 | 373,475 |
| Less, current maturities of long-term debt | 2,185 | 2,435 |
|  | $ 362,282 | $ 371,040 |

(a)    In 2003, the Company entered into a senior secured facility (the "Credit Agreement"), which after subsequent amendments, includes a $368,000,000 Senior Secured Term Loan B due September 29, 2009 (the "Term Loan B") and a $75,000,000 revolving credit facility (the "Revolving Credit Facility"), of which $35,000,000 is available in the form of letters of credit.

The Revolving Credit Facility is intended to be used primarily to fund the Company's working capital requirements. The Revolving Credit Facility bears interest at a rate per annum in accordance with graduated pricing based upon the Company's consolidated leverage ratio, and the Company has the option to elect an interest rate equal to either (i) a base rate (8.25% at October 7, 2006), plus 1.75% (based upon the Company's consolidated leverage ratio at October 7, 2006), or (ii) LIBOR (5.37% for the three-month LIBOR at October 7, 2006), plus 2.75% (based upon the Company's consolidated leverage ratio at October 7, 2006). An annual fee of 0.50% is charged on the unused portion of the Revolving Credit Facility. The Revolving Credit Facility matures on September 29, 2008.

Material covenants in the Credit Agreement include a requirement to maintain a minimum interest coverage ratio and fixed charge coverage ratio, a requirement not to exceed a maximum leverage

11

ratio, an annual maximum on capital expenditures and cemetery development, and specified maximum amounts for capital lease obligations, indebtedness, acquisitions, certain investments, and sales of accounts receivable. Outstanding principal amounts and interest accrued and unpaid may, at the election of the requisite lenders, become immediately due and payable and further commitments by the lenders to make loans may, at the election of the requisite lenders, be terminated upon the occurrence of events of default specified in the Credit Agreement. As of October 7, 2006, the Company was in compliance with all covenants and was not in breach of any provision of the Credit Agreement that would cause an event of default to occur. The Credit Agreement is secured by specified real property, and substantially all personal property of Alderwoods Group and specified subsidiaries.

As of October 7, 2006, the amount available under the Revolving Credit Facility was $75,000,000, reduced by $18,930,000 in outstanding letters of credit.

(b)  The Term Loan B provides the Company with an option to elect an interest rate equal to either (i) a base rate (8.25% at October 7, 2006), plus 1.00%, or (ii) LIBOR (5.37% for the three-month LIBOR at October 7, 2006), plus 2.00%. The weighted average rate of interest was 7.45% at October 7, 2006. The Term Loan B is repayable in quarterly principal installments from October 7, 2006, to June 13, 2009 (subject to reduction for prepayments) of 0.25% of the aggregate principal amount of the Term Loan B outstanding as of December 3, 2004, with a lump sum payment of the then-outstanding amount on the maturity date. The Company has prepaid the required quarterly principal installments up to and including the third quarter of its 2007 fiscal year.

(c)  On August 19, 2004, the Company issued the 7.75% Senior Unsecured Notes, due in 2012 (the "Eight-Year Senior Unsecured Notes"). Interest accrues at an annual rate of 7.75% and is payable semi-annually on March 15 and September 15 or, if such day is not a business day, the next succeeding business day. At any time prior to September 15, 2007, the Company may, at its option, redeem up to 35% of the aggregate principal amount of the Eight-Year Senior Unsecured Notes at a redemption price of 107.75% of the stated principal amount, plus accrued and unpaid interest and Liquidated Damages (as defined in the indenture governing the Eight-Year Senior Unsecured Notes), if any, with net cash proceeds from specified equity offerings, provided at least 65% of the aggregate principal amount of the Eight-Year Senior Unsecured Notes remains outstanding and the redemption occurs within 90 days of the date of the closing of the specified equity offering. On or after September 15, 2008, the Company may, at its option, redeem all or part of the Eight-Year Senior Unsecured Notes at the redemption prices (expressed as percentages of the stated principal amount) set forth below, plus accrued and unpaid interest and Liquidated Damages, if any, if redeemed during the twelve-month period beginning on September 15 of the years indicated below:

| Year | Percentage |
|------|-----------|
| 2008 | 103.875 |
| 2009 | 101.938 |
| 2010 and thereafter | 100.000 |

The Credit Agreement and the Eight-Year Senior Unsecured Notes are guaranteed by substantially all of Alderwoods Group's wholly-owned U.S. subsidiaries, other than Alderwoods Group's insurance

12

subsidiaries and other specified excluded subsidiaries. Alderwoods Group, the parent company, has no independent assets or operations, and the guarantees of its guarantor subsidiaries are full and unconditional, and joint and several.

In certain change of control situations, Alderwoods Group may be required to make an offer to purchase the then-outstanding Eight-Year Senior Unsecured Notes at a price equal to 101% of their stated principal amount, plus accrued and unpaid interest to the applicable repurchase date and Liquidated Damages, if any.

The Credit Agreement and the indenture governing the Eight-Year Senior Unsecured Notes restrict the Company's ability to engage in asset sales. The Credit Agreement and the indenture governing the Eight-Year Senior Unsecured Notes prohibit dispositions of assets unless the assets disposed of fulfill the requirements of specified exceptions. The indenture governing the Eight-Year Senior Unsecured Notes excepts, among other exceptions, assets with a fair market value less than $5,000,000. One specified exception contained in the Credit Agreement is dispositions of any of a group of identified "discontinued assets"; another is dispositions of assets not exceeding $35,000,000 book value in the aggregate over the life of the Credit Agreement, provided that (i) the consideration received is at least equal to fair market value and (ii) not less than 75% of the consideration is paid in cash or cash equivalents. Within 270 days of the receipt of net proceeds from any such asset sale, the Company has the ability to apply such net proceeds at its option (or as otherwise required) to invest in non-current operating assets (or enter into agreements for such investment which agreements are consummated within 360 days of such receipt of asset sale proceeds). Up to $10,000,000 of such net proceeds in any fiscal year (but not in excess of $40,000,000 in the aggregate over the term of the Credit Agreement) may be applied to make capital expenditures. To the extent the Company receives net proceeds in excess of additional specified thresholds and such excess is not applied to invest in non-current operating assets or make capital expenditures as described in the two immediately preceding sentences, the Company must make mandatory repayments under the Credit Agreement and, after all indebtedness under the Credit Agreement has been repaid, offer to purchase the Eight-Year Senior Unsecured Notes at a purchase price equal to 100.00% of the stated principal amount, plus accrued and unpaid interest and Liquidated Damages, if any.

Covenants in the Credit Agreement and the indenture governing the Eight-Year Senior Unsecured Notes restrict, and under specified circumstances prohibit, the payment of dividends by the Company.

## NOTE 4.   LEGAL CONTINGENCIES

*Funeral Consumers Alliance, Inc. et al v. Alderwoods Group, Inc. et al* was filed in the United States District Court for the Northern District of California in April, 2005. This case has been transferred to the United States District Court for the Southern District of Texas, Case No. CV3394. To date, six separate class action lawsuits, including *Francis H. Rocha v. Alderwoods Group, Inc. et al, Marcia Berger v. Alderwoods Group, Inc. et al, Maria Magsarili and Tony Magsarili v. Alderwoods Group, Inc. et al, Caren Speizer v. Alderwoods Group, Inc. et al, and Frank Moroz v. Alderwoods Group, Inc. et al,* have been consolidated into this case ("Funeral Consumer Case"). Two other cases, also transferred to the United States District Court for the Southern District of Texas, *Pioneer Valley Casket Co. v. Alderwoods Group, Inc. et al ("Pioneer Valley")* and *Ralph Fancher et al v. Alderwoods Group, Inc. et al ("Fancher"),* were consolidated into the Funeral Consumer Case for purposes of discovery only. On June 13, 2006, the United States District Court for the Southern District of Texas granted Fancher's Notice of Voluntary Dismissal, with permission to

13

refile its case at another time. The only two remaining cases, therefore, are the Funeral Consumer Case and Pioneer Valley.

The Funeral Consumer Case is a purported class action on behalf of casket consumers throughout the United States. *Pioneer Valley* is a purported class action on behalf of independent casket distributors throughout the United States. Both class suits name as defendants the Company and three other public companies involved in the funeral or casket industry. The Funeral Consumer Case and *Pioneer Valley* allege that defendants violated federal and state antitrust laws by engaging in anticompetitive practices with respect to the sale and pricing of caskets. Both cases seek injunctions, unspecified amounts of monetary damages, and treble damages. Plaintiffs in these cases have yet to provide any meaningful information regarding their alleged damages. As a result, the Company cannot quantify its ultimate liability, if any, for the payment of damages. The Company believes plaintiffs' claims are without merit and intends to vigorously defend itself in these actions.

In addition to the funeral and casket antitrust lawsuits, the Company has received a Civil Investigative Demand, dated August 4, 2005, from the Attorney General of Maryland on behalf of itself and other undisclosed state attorneys general, who have commenced an investigation of alleged anticompetitive practices in the funeral industry. The Company has received similar Civil Investigative Demands from the Attorneys General of Florida and Connecticut.

*Richard Sanchez et al v. Alderwoods Group, Inc. et al* was filed in February 2005 in the Superior Court of the State of California, for the County of Los Angeles, Central District; Case No.BC328962. Plaintiffs seek to certify a nationwide class on behalf of all consumers who purchased funeral goods and services from the Company. Plaintiffs allege in essence that the Federal Trade Commission's Funeral Rule requires the Company to disclose its markups on all items obtained from third-parties in connection with funeral service contracts. Plaintiffs allege further that the Company has failed to make such disclosures. Plaintiffs seek to recover an unspecified amount of monetary damages, attorney's fees, costs and unspecified "injunctive and declaratory relief." The Company believes that plaintiffs' claims are without merit and intends to vigorously defend itself in this action.

On July 7, 2005, the Federal Trade Commission (the "FTC") issued a letter advisory opinion regarding the lawful construction of the term "cash advance item" as used in the Funeral Rule. The FTC opined with regard to a similar lawsuit in Texas state court: "The Commission believes that the court is incorrect in ruling that all goods or services purchased from a third-party vendor are cash advance items. This interpretation sweeps far too broadly, potentially bringing within its scope every component good or service that comprises a funeral. This was not and is not the Commission's intention in the "cash advance" provisions of the Rule. In our opinion, the term "cash advance item" in the Rule applies only to those items that the funeral provider represents expressly to be "cash advance items" or represents by implication to be procured on behalf of a particular customer and provided to that customer at the same price the funeral provider paid for them." The FTC sets forth its analysis in the remainder of the letter. The Company has learned that a number of plaintiffs to these actions along with the Funeral Consumers Alliance have filed a petition against the FTC in the District of Columbia Circuit Court asking the Court to overturn the FTC's July 7, 2005 Advisory Opinion.

A motion for summary judgment against plaintiffs on behalf of a related defendant was heard on August 14, 2006. After taking the matter under submission, the court ruled in favor of the defendant in a

14

manner consistent with the Company's historical practice and its interpretation of the Funeral Rule. Plaintiffs have until December 12, 2006 to appeal the judgement. The Court's ruling will become the law of the case and should dictate whether identical actions against the Company are dismissed.

  *Reyvis Garcia and Alicia Garcia v. Alderwoods Group, Inc., Osiris Holding of Florida, Inc*, a Florida corporation, d/b/a Graceland Memorial Park South, f/k/a Paradise Memorial Gardens, Inc., was filed in December 2004, in the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida, Case No.: 04-25646 CA 32. Plaintiffs are the son and sister of the decedent, Eloisa Garcia, who was buried at Graceland Memorial Park South in March 1986, when the cemetery was owned by Paradise Memorial Gardens, Inc. Initially, the suit sought damages on the individual claims of the Plaintiffs relating to the burial of Eloisa Garcia. Plaintiffs claimed that due to poor record keeping, spacing issues and maps, and the fact that the family could not afford to purchase a marker for the grave, the burial location of the decedent could not be located. In July, 2006, Plaintiffs amended their Complaint, seeking to certify a class of all persons buried at this cemetery whose burial sites cannot be located, claiming that this is due to poor record keeping, maps and surveys at the cemetery. The Plaintiffs are seeking unspecified monetary damages, as well as equitable and injunctive relief. The Company believes that the Plaintiffs' individual claims are without merit. No class has been certified in this matter and the Company believes that there is no basis for a class action. The Company intends to vigorously defend itself in this action.

  The ultimate outcome of the litigation matters described above cannot be determined at this time. An adverse decision in one or more of such matters could have a material adverse effect on the Company, its financial condition, results of operation and cash flows. However, the Company intends to aggressively defend the lawsuits.

  In addition, The Company is party to other legal proceedings in the ordinary course of business, and believes it has made adequate provision for estimated potential liabilities. The Company does not expect the outcome of these proceedings, individually or in the aggregate, to have a material adverse effect on its financial position, results of operations or liquidity.

## NOTE 5.   SUPPLEMENTARY STATEMENTS OF CASH FLOWS DISCLOSURE

  Supplemental disclosures related to the statement of cash flows consist of the following:

| | 16 weeks ended | | 40 weeks ended | |
| --- | --- | --- | --- | --- |
| | October 7, 2006 | October 8, 2005 | October 7, 2006 | October 8, 2005 |
| Decrease (increase) in assets: | | | | |
| Receivables, net of allowances | | | | |
| Trade | $         915 | $      5,354 | $      5,489 | $     16,837 |
| Other | (6,480) | 7,768 | (8,975) | (6,618) |
| Inventories | 679 | 1,023 | 1,036 | 769 |
| Prepaid expenses | 189 | (681) | (1,098) | 16,468 |
| Cemetery property | (4,170) | (2,960) | (7,604) | (7,036) |
| Other assets | (597) | (2,552) | (2,890) | (6,100) |

15

| Increase (decrease) in liabilities: | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Accounts payable and accrued liabilities | | 5,189 | | (9,064) | | 1,333 | | (19,566) |
| Net effect of pre-need receivables and deferred revenue | | (7,097) | | 9,377 | | (3,809) | | 12,310 |
| Other liabilities | | 797 | | (17) | | 6,051 | | (2,909) |
| Insurance policy liabilities | | (254) | | 1,077 | | (1,282) | | 1,844 |
| Other changes in non-cash balances | | 139 | | 578 | | (5073) | | (2,945) |
| | $ | (10,690) | $ | 9,903 | $ | (16,822) | $ | 3,054 |

| Supplemental information: | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Interest paid | $ | 12,177 | $ | 11,567 | $ | 24,677 | $ | 26,431 |
| Income taxes paid, net of refunds | | 2,908 | | 806 | | 2,258 | | 2,937 |
| Bad debt expense | | 655 | | 1,138 | | 2,124 | | 2,304 |
| Stock issued as compensation in lieu of cash | | 61 | | 42 | | 213 | | 106 |
| Non-cash investing and financing activities: | | | | | | | | |
| Restricted cash investing and financing activities: | | | | | | | | |
| Purchases of funeral, cemetery, and perpetual care trust investments | $ | 61,951 | $ | 145,441 | $ | 224,552 | $ | 501,874 |
| Proceeds on disposition and maturities of funeral, cemetery, and perpetual care trust investments | | 63,116 | | 125,693 | | 205,452 | | 538,809 |
| Increase in non-controlling interests in funeral, cemetery and perpetual care trusts | | 17,125 | | 15,222 | | 65,903 | | 38,568 |
| Decrease in non-controlling interests in funeral, cemetery and perpetual care trusts upon fulfillment of pre-need contracts | | 15,956 | | 28,760 | | 44,539 | | 65,171 |

## NOTE 6.   SUPPLEMENTARY FINANCIAL INFORMATION

A summary of certain balance sheet accounts is as follows:

| | | October 7, 2006 | | December 31, 2005 |
|---|---|---|---|---|
| Receivables, net of allowances: | | | | |
| Customer receivables | $ | 46,592 | $ | 50,459 |
| Allowance for doubtful accounts | | (11,948) | | (10,320) |
| Other | | 22,152 | | 12,723 |
| | $ | 56,796 | $ | 52,862 |

16

| | | | | |
|---|---|---|---:|---|
| Pre-need funeral receivables and trust investments: | | | | |
| Customer receivables | $ | 39,764 | $ | 38,438 |
| Allowance for contract cancellations and refunds | | (14,193) | | (15,988) |
| Funeral trust investments | | 295,071 | | 282,084 |
| Amounts receivable from funeral trusts | | 8,820 | | 29,893 |
| | $ | 329,462 | $ | 334,427 |
| | | | | |
| Pre-need cemetery receivables and trust investments: | | | | |
| Customer receivables | $ | 62,774 | $ | 61,749 |
| Unearned finance income | | (6,394) | | (6,232) |
| Allowance for contract cancellations and refunds | | (16,428) | | (15,648) |
| Cemetery merchandise and service trust investments | | 282,248 | | 267,453 |
| | $ | 322,200 | $ | 307,322 |
| | | | | |
| Cemetery property: | | | | |
| Developed land and lawn crypts | $ | 40,078 | $ | 38,368 |
| Undeveloped land | | 31,448 | | 31,243 |
| Mausoleums | | 45,667 | | 46,856 |
| | $ | 117,193 | $ | 116,467 |
| | | | | |
| Property and equipment: | | | | |
| Land | $ | 162,799 | $ | 162,287 |
| Buildings and improvements | | 401,173 | | 386,068 |
| Automobiles | | 9,541 | | 10,652 |
| Furniture, fixtures and equipment | | 76,835 | | 69,570 |
| Computer hardware and software | | 31,645 | | 29,061 |
| Accumulated depreciation and amortization | | (137,650) | | (114,737) |
| | $ | 544,343 | $ | 542,901 |
| | | | | |
| Other assets: | | | | |
| Intangible assets | $ | 20,856 | $ | 18,741 |
| Deferred finance costs | | 23,294 | | 23,359 |
| Accumulated amortization | | (16,684) | | (15,258) |
| Notes receivable | | 2,765 | | 3,016 |
| Other | | 12,278 | | 12,992 |
| | $ | 42,509 | $ | 42,850 |

17

Accounts payable and accrued liabilities:

| | | |
|---|---:|---:|
| Bank overdraft | $ 4,977 | $ 7,191 |
| Trade payables | 25,454 | 13,634 |
| Interest | 1,494 | 5,169 |
| Accrued liabilities | 14,099 | 21,629 |
| Accrued insurance | 21,382 | 21,261 |
| Accrued taxes | 38,353 | 32,199 |
| Other | 12,253 | 18,651 |
| | $ 118,012 | $ 119,734 |

Deferred pre-need contract revenue:

| | | |
|---|---:|---:|
| Funeral | $ 58,694 | $ 72,087 |
| Cemetery | 12,036 | 19,531 |
| | $ 70,730 | $ 91,618 |

Other liabilities:

| | | |
|---|---:|---:|
| Perpetual care liability | $ 8,539 | $ 7,860 |
| Deferred compensation | 15,787 | 9,929 |
| Other | 4,906 | 4,194 |
| | $ 29,232 | $ 21,983 |

## NOTE 7.   SEGMENT REPORTING

The Company's reportable segments are comprised of the three businesses it operates, each of which offers different products and services: funeral homes, cemeteries and insurance. There has been no change in the basis of this segmentation, accounting policies of the segments or the basis of measurement of segment profit or loss from that disclosed in the Company's Annual Report on Form 10-K for the 52 weeks ended December 31, 2005, as filed with the SEC.

The Company sells primarily to external customers, though any inter-segment sales or transfers occur at market price. The Company evaluates performance based on income from operations of the respective businesses.

| For the 16 weeks ended: | Funeral | | Cemetery | | Insurance | | Other | | Consolidated | |
|---|---:|---|---:|---|---:|---|---:|---|---:|---|
| Revenue earned from external sales: | | | | | | | | | | |
| October 7, 2006 | $ | 139,367 | $ | 55,769 | $ | 32,287 | $ | — | $ | 227,423 |
| October 8, 2005 | $ | 133,158 | $ | 52,519 | $ | 29,105 | $ | — | $ | 214,782 |
| Income from operations: | | | | | | | | | | |
| October 7, 2006 | $ | 24,947 | $ | 7,521 | $ | 1,859 | $ | (24,831) | $ | 9,496 |
| October 8, 2005 | $ | 15,980 | $ | 5,314 | $ | 1,353 | $ | (19,192) | $ | 3,455 |

18

| | | | | | |
|---|---|---|---|---|---|
| **Depreciation and amortization:** | | | | | |
| October 7, 2006 | $ 7,844 | $ 4,568 | $ 37 | $ 1,507 | $ 13,956 |
| October 8, 2005 | $ 7,718 | $ 4,597 | $ 54 | $ 1,409 | $ 13,778 |
| **Purchase of property and equipment:** | | | | | |
| October 7, 2006 | $ 13,809 | $ 921 | $ 14 | $ (381) | $ 14,363 |
| October 8, 2005 | $ 11,012 | $ 1,603 | $ 12 | $ 2,880 | $ 15,507 |
| **Development of cemetery property:** | | | | | |
| October 7, 2006 | $ — | $ 2,483 | $ — | $ — | $ 2,483 |
| October 8, 2005 | $ — | $ 568 | $ — | $ — | $ 568 |

**For the 40 weeks ended:**

| | | | | | |
|---|---|---|---|---|---|
| **Revenue earned from external sales:** | | | | | |
| October 7, 2006 | $ 368,020 | $ 135,105 | $ 78,559 | $ — | $ 581,684 |
| October 8, 2005 | $ 367,672 | $ 134,737 | $ 73,036 | $ — | $ 575,445 |
| **Income from operations:** | | | | | |
| October 7, 2006 | $ 70,816 | $ 18,419 | $ 3,941 | $ (57,388) | $ 35,788 |
| October 8, 2005 | $ 66,233 | $ 19,066 | $ 3,466 | $ (31,539) | $ 57,226 |
| **Depreciation and amortization:** | | | | | |
| October 7, 2006 | $ 19,545 | $ 10,521 | $ 88 | $ 3,067 | $ 33,221 |
| October 8, 2005 | $ 19,154 | $ 11,852 | $ 120 | $ 3,747 | $ 34,873 |
| **Purchase of property and equipment:** | | | | | |
| October 7, 2006 | $ 17,358 | $ 4,956 | $ 53 | $ 1,468 | $ 23,835 |
| October 8, 2005 | $ 18,333 | $ 3,546 | $ 86 | $ 9,858 | $ 31,823 |
| **Development of cemetery property:** | | | | | |
| October 7, 2006 | $ — | $ 5,517 | $ — | $ — | $ 5,517 |
| October 8, 2005 | $ — | $ 2,250 | $ — | $ — | $ 2,250 |
| **Total assets at:** | | | | | |
| October 7, 2006 | $ 1,111,360 | $ 825,114 | $ 359,824 | $ 30,882 | $ 2,327,180 |
| December 31, 2005 | $ 1,107,916 | $ 807,673 | $ 326,160 | $ 32,554 | $ 2,274,303 |
| **Goodwill at:** | | | | | |
| October 7, 2006 | $ 296,211 | $ — | $ — | $ — | $ 296,211 |
| December 31, 2005 | $ 295,890 | $ — | $ — | $ — | $ 295,890 |

19