**Exhibit Z**

**Part 3 of 3**

Net cash from continuing operating activities was $22.1 million for the 16 weeks ended October 7, 2006, compared to $45.8 million for the corresponding period in 2005. The decrease is due primarily to an $11.5 million settlement of an outstanding corporate receivable received in the corresponding period in 2005 and $7.3 million in withdrawals of excess funds from funeral and cemetery trusts in the corresponding period in 2005.

Net cash from continuing operating activities was $62.5 million for the 40 weeks ended October 7, 2006, compared to $116.8 million for the corresponding period in 2005. The decrease is primarily due to an $11.5 million settlement of an outstanding corporate receivable received in the corresponding period in 2005 and $25.4 million in withdrawals of excess funds from funeral and cemetery trusts in the corresponding period in 2005.

The Company's insurance subsidiary is subject to certain state regulations that restrict distributions, loans and advances from the subsidiary to the Company and its other subsidiaries. Dividends are only distributable after regulatory approval is obtained. The cash inflows from operations of the insurance subsidiary are primarily generated from insurance premiums, all of which are invested in insurance invested assets.

Net cash used in continuing investing activities was $28.2 million for the 16 weeks ended October 7, 2006, compared to $29.8 million for the corresponding period in 2005.

Net cash used in continuing investing activities was $53.1 million for the 40 weeks ended October 7, 2006, compared to $52.7 million for the corresponding period in 2005.

Net cash provided by continuing financing activities was $6.2 million for the 16 weeks ended October 7, 2006 reflecting net borrowings during the period, compared to $21.7 million use of cash for the corresponding period in 2005. The net change of $27.9 million was due primarily to net debt borrowings during the 16 weeks ended October 7, 2006, and by net debt repayments of $6.2 million compared to the corresponding period in 2005.

Net cash used in continuing financing activities was $8.2 million for the 40 weeks ended October 7, 2006, compared to $74.3 million for the corresponding period in 2005. The decrease of $66.1 million was primarily due to lower repayments of debt during the 40 weeks ended October 7, 2006, compared to the corresponding period in 2005.

*Long-Term Indebtedness*

The change in the Company's carrying amounts of long-term indebtedness is as follows:

| Issue | Long-Term Indebtedness Carrying Value December 31, 2005 | | Net increase (decrease) | | Long-Term Indebtedness Carrying Value October 7, 2006 | |
|---|---|---|---|---|---|---|
| | (in millions) | | (in millions) | | (in millions) | |
| Revolving Credit Facility | $ | 4.0 | $ | 3.0 | $ | 7.0 |
| Senior secured Term Loan B due in 2009 | | 161.7 | | (10.0) | | 151.7 |
| 7.75% Senior unsecured notes due in 2012 | | 200.0 | | — | | 200.0 |
| Promissory notes and capitalized obligations (a) | | 7.7 | | (1.9) | | 5.8 |
| Carrying amounts | $ | 373.4 | $ | (8.9) | $ | 364.5 |

(a)    The change represents the net amount of repayments and other adjustments.

The Credit Agreement and the Eight-Year Senior Unsecured Notes are guaranteed by substantially all of Alderwoods Group's wholly-owned U.S. subsidiaries, other than the Alderwoods Group's insurance subsidiary and certain other excluded subsidiaries. Alderwoods Group, Inc., the parent company, has no independent assets or operations, and the guarantees of its guarantor subsidiaries are full and unconditional, and joint and several.

Financial covenants under the Credit Agreement require the Company to maintain a minimum interest coverage ratio and fixed charge coverage ratio, and not to exceed a maximum leverage ratio. As of October 7, 2006, the Company met all of the financial covenants required by the Credit Agreement.

**Contractual Obligations and Commercial Commitments**

The following table details the Company's contractual obligations of continuing operations as of October 7, 2006. Significant changes to long-term debt are discussed above under "Long-Term Indebtedness."

| | | | Payments Due by Period | | |
| --- | --- | --- | --- | --- | --- |
| Contractual Obligations | Total | Less than 1 Year | 1 - 3 Years | 3 - 5 Years | More than 5 Years |
| | | | (in thousands) | | |
| Long-term debt (a) | $ 358,682 | $ — | $ 158,682 | $ — | $ 200,000 |
| Interest obligation on long-term debt | 135,709 | 26,349 | 52,036 | 42,843 | 14,481 |
| Promissory notes and capitalized obligations (a) (b) | 5,783 | 2,180 | 1,748 | 359 | 1,496 |
| Operating leases (c) | 35,674 | 6,553 | 9,109 | 6,265 | 13,747 |
| Total | $ 535,848 | $ 35,082 | $ 221,575 | $ 49,467 | $ 229,724 |

(a)     See Note 3 to the Company's interim consolidated financial statements included in Item 1 of Part I of this Quarterly Report on Form 10-Q.

(b)     Promissory notes and capitalized obligations include amounts payable under non-competition agreements and capitalized lease obligations.

(c)     Operating leases are primarily for premises and automobiles and expire over the next one to 28 years.

In addition to the operating leases noted in the table above, as of October 7, 2006, the Company leased approximately 1,136 vehicles under a master operating lease agreement, which has a minimum lease term of 12 months. The Company's practice is to continue these leases on a month-to-month basis after the expiry of the minimum lease term. Lease payments for these vehicles are projected to be $8.4 million over the next 12 months.

The Company issues purchase orders for the supply of goods and services for its operations. As of October 7, 2006, there were no significant or unusual purchase orders outstanding. The Company entered into agreements with certain suppliers of funeral and cemetery merchandise, and office supplies to obtain volume discounts. However, none of these agreements have committed purchase quantities or prices.

The following table details the Company's commercial commitments as of October 7, 2006.

| | | Amount of Commitment Expiration Per Period | | | |
| --- | --- | --- | --- | --- | --- |
| Commercial Commitments | Total Amounts Committed | Less than 1 Year | 1 - 3 Years | 3 - 5 Years | More than 5 Years |
| | | (in thousands) | | | |
| Lines of credit (a) | $ — | $ — | $ — | $ — | $ — |
| Standby letters of credit (b) | 18.9 | 18.9 | — | — | — |
| Total contractual cash obligations | $ 18.9 | $ 18.9 | $ — | $ — | $ — |

(a)     Relates to the Revolving Credit Facility described more fully in Note 3 to the Company's interim consolidated financial statements included in Item 1 of Part I of this Quarterly Report on Form 10-Q. The expiry date of the Revolving Credit Facility is September 29, 2008.

(b)     Standby letters of credit primarily relate to surety bonds for various pre-need sales trusting requirements and collateral for liability lines of insurance coverage for various years.

At October 7, 2006, the aggregate fair value of the Company's forward foreign currency exchange contracts and foreign currency option contracts was an asset of $0.6 million. There has been no material

change in the Company's forward foreign currency exchange contract and foreign currency option commitments, which are described under Item 7A. "— Quantitative and Qualitative Disclosures About Market Risk" in the Company's Annual Report on Form 10-K for the 52 weeks ended December 31, 2005, as filed with the SEC.

**Off-Balance Sheet Arrangements**

Off-balance sheet arrangements as of October 7, 2006, consist of operating leases noted above under "Contractual Obligations and Commercial Commitments".

**Other Information**

*EBITDA from Continuing Operations*

The Company's earnings from continuing operations before interest on long-term debt and refinancing costs, taxes, depreciation and amortization, provision for goodwill impairment and provision for asset impairment ("EBITDA"), a non-GAAP financial measure, are presented in the table below and reconciled to the Company's income from continuing operations, before cumulative effect of change in accounting principle. The Company considers EBITDA to be an important supplemental indicator of operating performance. The Company believes that EBITDA is frequently used by securities analysts, investors and other interested parties in the evaluation of the operating performance of companies with high yield debt, and the vast majority of companies with high yield debt present EBITDA when reporting their results. The Company believes EBITDA facilitates operating performance comparisons from period to period and company to company by backing out potential differences caused by variations in capital structures (affecting relative interest expense), tax positions (such as the impact on periods or companies of changes in effective tax rates or net operating losses), and the age and book depreciation of facilities and equipment (affecting relative depreciation expense). It is also one basis, subject to certain modifications, on which compliance with certain of the financial covenants under the Credit Agreement is determined and some payments under certain of the Company's compensation plans are calculated. EBITDA is not a term that has specific meaning in accordance with GAAP and may be calculated differently by other companies. EBITDA is not a measurement of the Company's financial performance under GAAP and should not be considered in isolation, as an alternative to net income, income from operations or any other performance measures derived in accordance with GAAP, or otherwise as a measure of a company's profitability, or as an alternative to cash flows from operating activities or otherwise as a measure of the Company's liquidity.

EBITDA has limitations as an analytical tool, and should not be considered in isolation, or as a substitute for analysis of results as reported under GAAP. Some of these limitations are:

- it does not reflect cash expenditures for capital expenditures or contractual commitments;

- it does not reflect changes in, or cash requirements for, working capital;

- it does not reflect the significant interest expense, or the cash requirements necessary to service interest or principal payments on indebtedness;

- although depreciation and amortization are non-cash charges, the assets being depreciated and amortized will often have to be replaced in the future, and EBITDA does not reflect cash requirements for such replacements;

- other companies, including other companies in the death care industry, may calculate these measures differently than the Company does, limiting their usefulness as a comparative measure; and

- it must be evaluated in conjunction with the discussion on results of operations for each of the periods.

Because of these limitations, EBITDA should not be considered as a measure of discretionary cash available to the Company to invest in the growth of its business or reduce its indebtedness.

| | 16 weeks ended | | 40 weeks ended | |
| --- | --- | --- | --- | --- |
| | October 7, 2006 | October 8, 2005 | October 7, 2006 | October 8, 2005 |
| | (millions of dollars) | | (millions of dollars) | |
| **EBITDA from continuing operations before cumulative effect of change in accounting principle:** | | | | |
| Income from continuing operations | $ 0.8 | $ 6.9 | $ 6.7 | $ 33.8 |
| Income taxes | 0.5 | (12.4) | 7.8 | 5.8 |
| Interest on long-term debt and refinancing costs | 8.6 | 9.0 | 21.5 | 23.5 |
| Depreciation | 14.0 | 13.8 | 33.2 | 34.9 |
| Provision for asset impairment | 0.5 | 0.3 | 0.6 | (1.4) |
| EBITDA from continuing operations | $ 24.4 | $ 17.6 | $ 69.8 | $ 96.6 |

*Restrictions*

The Credit Agreement and the indenture governing the Eight-Year Senior Unsecured Notes restrict the Company's ability to engage in asset sales. The Credit Agreement and indenture governing the Eight-Year Senior Unsecured Notes prohibit dispositions of assets unless the assets disposed of fulfill the requirements of specified exceptions. The indenture governing the Eight-Year Senior Unsecured Notes excepts, among other exceptions, assets with a fair market value less than $5,000,000. One specified exception contained in the Credit Agreement is dispositions of any of a group of identified "discontinued assets;" another is dispositions of assets not exceeding $35,000,000 book value in the aggregate over the life of the Credit Agreement, provided that (i) the consideration received is at least equal to fair market value and (ii) not less than 75% of the consideration is paid in cash or cash equivalents. Within 270 days of the receipt of net proceeds from any such asset sale, the Company has the ability to apply such net proceeds at its option (or as otherwise required) to invest in non-current operating assets (or enter into agreements for such investment which agreements are consummated within 360 days of such receipt of asset sale proceeds). Up to $10,000,000 of such net proceeds in any fiscal year (but not in excess of $40,000,000 in the aggregate over the term of the Credit Agreement) may be applied to make capital expenditures. To the extent the Company receives net proceeds in excess of additional specified thresholds and such excess is not applied to invest in non-current operating assets or make capital expenditures as described in the two immediately preceding sentences, the Company must make mandatory repayments under the Credit Agreement and, after all indebtedness under the Credit Agreement has been repaid, offer to purchase the Eight-Year Senior Unsecured Notes at a purchase price equal to 100.0% of the stated principal amount, plus accrued and unpaid interest and Liquidated Damages (as defined in the indenture governing the Eight-Year Senior Unsecured Notes), if any.

Covenants in the Credit Agreement and in the indenture governing the Eight-Year Senior Unsecured Notes restrict, and under specified circumstances prohibit, the payment of dividends by Alderwoods Group. The Company is not expecting to pay any dividends on the Common Stock in the foreseeable future.

The Company's insurance subsidiary is subject to certain state regulations that restrict distributions, loans and advances from the subsidiary to the Company and its other subsidiaries. The cash flow provided by operations of the insurance subsidiary for the 16 and 40 weeks ended October 7, 2006, was approximately $15.7 million and $34.1 million, respectively, all of which premiums have been used for net purchases of insurance invested assets.

47

*Operating Locations*

The Company's number of operating locations by country, state and province as of October 7, 2006, and the overall totals as of October 7, 2006, and December 31, 2005, are summarized in the table below.

| Country, State/Province | Number of Operating Locations | | | Total Number of Operating Locations |
|---|---|---|---|---|
| | Funeral | Cemetery | Combination | |
| **Canada** | | | | |
| British Columbia | 17 | — | 1 | 18 |
| Alberta | 11 | — | — | 11 |
| Saskatchewan | 22 | — | — | 22 |
| Manitoba | 3 | 1 | 2 | 6 |
| Ontario | 22 | — | — | 22 |
| Quebec | 14 | — | — | 14 |
| Nova Scotia | 6 | — | — | 6 |
| **Total Canadian** | **95** | **1** | **3** | **99** |
| **United States** | | | | |
| Alabama | 7 | — | 1 | 8 |
| Alaska | 3 | — | — | 3 |
| Arizona | 5 | — | 1 | 6 |
| Arkansas | 3 | — | — | 3 |
| California | 44 | 1 | 6 | 51 |
| Colorado | 3 | 1 | 1 | 5 |
| Connecticut | 1 | — | — | 1 |
| Florida | 32 | 7 | 8 | 47 |
| Georgia | 23 | 5 | 6 | 34 |
| Idaho | 3 | 1 | — | 4 |
| Illinois | 6 | 16 | 3 | 25 |
| Indiana | 10 | 4 | 1 | 15 |
| Kansas | 7 | — | — | 7 |
| Louisiana | 18 | 1 | 1 | 20 |
| Maryland | 2 | — | — | 2 |
| Massachusetts | 13 | — | — | 13 |
| Michigan | 12 | — | — | 12 |
| Minnesota | 9 | 1 | 1 | 11 |
| Mississippi | 17 | 1 | 3 | 21 |
| Montana | 4 | — | — | 4 |
| Nevada | 2 | — | 1 | 3 |
| New Hampshire | 4 | — | — | 4 |
| New Mexico | 5 | — | — | 5 |
| New York | 36 | 1 | — | 37 |
| North Carolina | 25 | 7 | 4 | 36 |
| Ohio | 13 | 4 | 1 | 18 |
| Oklahoma | 18 | 1 | 1 | 20 |
| Oregon | 18 | 1 | 3 | 22 |
| Pennsylvania | 5 | — | — | 5 |
| Rhode Island | 3 | — | — | 3 |
| South Carolina | 6 | 3 | 4 | 13 |
| Tennessee | 31 | 2 | 5 | 38 |
| Texas | 52 | 4 | 4 | 60 |
| Virginia | 18 | — | — | 18 |
| Washington | 19 | 3 | 3 | 25 |
| West Virginia | 3 | — | — | 3 |
| Puerto Rico | 3 | 5 | 2 | 10 |
| **Total United States** | **483** | **69** | **60** | **612** |
| **Overall total, as of October 7, 2006** | **578** | **70** | **63** | **711** |
| **Overall total, as of December 31, 2005** | **594** | **72** | **60** | **726** |

48

## ITEM 3.   QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

For information regarding the Company's exposure to certain market risks, see Item 7A. "—Quantitative and Qualitative Disclosures About Market Risk" in the Company's Annual Report on Form 10-K for the 52 weeks ended December 31, 2005, as filed with the SEC. As of October 7, 2006, there were no material changes in such matters disclosed in the Form 10-K.

## ITEM 4.   CONTROLS AND PROCEDURES

### Disclosure Controls and Procedures

The Company maintains a set of disclosure controls and procedures designed to ensure that information required to be disclosed by the Company in reports that it files or submits under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in SEC rules and forms. As of the end of the period covered by this report, an evaluation was carried out, under the supervision and with the participation of the Company's management, including the Chief Executive Officer, the Company's principal executive officer (the "CEO"), and the Chief Financial Officer, the Company's principal financial officer (the "CFO"), of the effectiveness of the Company's disclosure controls and procedures as of October 7, 2006. Based on that evaluation, as of the date of the evaluation, the CEO and CFO have concluded that the Company's disclosure controls and procedures are effective.

### Changes In Internal Controls Over Financial Reporting

During the 16 weeks ended October 7, 2006, the Company continued implementing a new pre-need trust accounting software system. The implementation has involved changes to processes, and accordingly, has required changes to internal controls.

Other than the changes discussed above, there have not been any changes in the Company's internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) promulgated by the SEC under the Securities Exchange Act of 1934) during the Company's most recently completed fiscal quarter that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

## FORWARD-LOOKING STATEMENTS

Certain statements contained in this Quarterly Report on Form 10-Q, including, but not limited to, information regarding the status and progress of the Company's operating activities, the plans and objectives of the Company's management, assumptions regarding the Company's future performance and plans, the expected closing of the merger with Service Corporation International, and any financial guidance provided in this Quarterly Report on Form 10-Q, are forward-looking statements within the meaning of Section 27A(i) of the Securities Act of 1933 and Section 21E(i) of the Securities Exchange Act of 1934. The words "believe," "may," "will," "estimate," "continues," "anticipate," "intend," "expect" and similar expressions identify these forward-looking statements, although not all forward-looking statements contain such identifying words. Risks and uncertainties that could cause or contribute to such differences include, without limitation, those discussed elsewhere in this Quarterly Report on Form 10-Q and particularly below under "Risk Factors" and under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

The information appearing in this Quarterly Report on Form 10-Q is accurate only as of the date hereof, as the Company's business, financial condition, results of operations or prospects may have changed after that date. Except as required by law, the Company undertakes no obligation to publicly release any revisions to these forward-looking statements to reflect events or circumstances after the date hereof or to reflect the occurrence of unanticipated events. All subsequent written and oral forward-looking statements attributable to the Company and persons acting on its behalf are qualified in their entirety by the cautionary statements contained in this section and elsewhere in this Quarterly Report on Form 10-Q.

# PART II

# OTHER INFORMATION

## ITEM 1.   LEGAL PROCEEDINGS

For information regarding the Company's legal proceedings, see Note 4 to the Company's interim consolidated financial statements included in Part I of this Quarterly Report on Form 10-Q, which Note 4 is incorporated herein by reference.

## ITEM 1A.   RISK FACTORS

Other than as set forth below, there have been no material changes from the risk factors previously disclosed in the Company's Annual Report on Form 10-K for the 52 weeks ended December 31, 2005, as filed with the SEC.

### Risks Related to the Proposed Transaction with Service Corporation International

*The proposed merger of the Company into a wholly owned subsidiary of Service Corporation International is subject to certain closing conditions that, if not satisfied or waived, will result in the transaction not being completed, which may cause the price of the Company's common stock to decline.*

The proposed merger of the Company into a wholly owned subsidiary of Service Corporation International is subject to customary conditions to closing, including the receipt of required regulatory approvals. Many of the conditions to the closing of the transaction are outside of the control of the Company. If any condition to the closing of the transaction is not satisfied or, if permissible, waived, the transaction will not be completed.

If the Company does not complete the transaction, the price of its common stock may fluctuate to the extent that the current market price reflects a market assumption that the transaction will be completed with each share of the Company's common stock being converted into the right to receive $20 in cash. The Company will also be obligated to pay certain professional fees and related expenses in connection with the transaction, whether or not the transaction is completed. In addition, the Company has expended, and will continue to expend, significant management resources in an effort to complete the transaction. If the transaction is not completed, the Company will have incurred significant costs, including the diversion of management resources, for which it will have received little or no benefit. Further, upon termination of the merger agreement under certain specified circumstances the Company or Service Corporation International may be required to pay a termination fee of $25 million to the other party.

*Whether or not the transaction with Service Corporation International is completed, the announcement and pendency of the transaction could cause disruptions in the Company's business, which could have an adverse effect on its business and financial results.*

Whether or not the transaction with Service Corporation International is completed, the announcement and pendency of the transaction could cause disruptions in the Company's business. Specifically:

- current and prospective employees may experience uncertainty about their future roles with the Company, which might adversely affect the Company's ability to retain key managers and other employees or hire new employees; and

- the attention of management may be directed toward the completion of the transaction, rather than toward the execution of existing business plans.

50

**ITEM 6.   EXHIBITS**

| Exhibit Number | Description |
|---|---|
| 2.1 | Fourth Amended Joint Plan of Reorganization of Loewen Group International, Inc., Its Parent Corporation and Certain of Their Debtor Subsidiaries (incorporated by reference to Exhibit 99.1 to the Form 8-K of The Loewen Group Inc., SEC File No. 1-12163, filed September 10, 2001) |
| 2.2 | Modification to the Fourth Amended Joint Plan of Reorganization of Loewen Group International, Inc., Its Parent Corporation and Certain of Their Debtor Subsidiaries (incorporated by reference to Exhibit 2.2 to the Form 8-K of The Loewen Group Inc., SEC File No. 1-12163, filed December 11, 2001) |
| 2.3 | Second Modification to the Fourth Amended Joint Plan of Reorganization of Loewen Group International, Inc., Its Parent Corporation and Certain of Their Debtor Subsidiaries (incorporated by reference to Exhibit 2.3 to the Form 8-K of The Loewen Group Inc., SEC File No. 1-12163, filed December 11, 2001) |
| 2.4 | Order Approving Modification of Fourth Amended Joint Plan of Reorganization of Loewen Group International, Inc., Its Parent Corporation and Certain of Their Debtor Subsidiaries and Compromise and Settlement of Claims Filed by Thomas Hardy (incorporated by reference to Exhibit 2.4 to the Form 8-K of The Loewen Group Inc., SEC File No. 1-12163, filed December 11, 2001) |
| 2.5 | Findings of Fact, Conclusions of Law and Order Confirming Fourth Amended Joint Plan of Reorganization of Loewen Group International, Inc., Its Parent Corporation and Certain of Their Debtor Subsidiaries, As Modified, dated December 5, 2001 (incorporated by reference to Exhibit 2.5 to the Form 8-K of The Loewen Group Inc., SEC File No. 1-12163, filed December 11, 2001) |
| 2.6 | Final Order dated December 7, 2001 (incorporated by reference to Exhibit 2.6 to the Form 8-K of The Loewen Group Inc., SEC File No. 1-12163, filed December 11, 2001) |
| 2.7 | Stock Purchase Agreement dated as of June 17, 2004, by and between Citizens Insurance Company of America and Mayflower National Life Insurance Company (incorporated by reference to Exhibit 2.7 to the Form 10-Q of Alderwoods Group, Inc., SEC File No. 000-33277, filed July 26, 2004) |
| 2.8 | Agreement and Plan of Merger, dated April 2, 2006, by and among Service Corporation International, Coronado Acquisition Corporation and Alderwoods Group, Inc. (incorporated by reference to Exhibit 2.1 to the Form 8-K of Alderwoods Group, Inc., SEC File No. 000-33277, filed April 4, 2006) |
| 3.1 | Certificate of Incorporation of Alderwoods Group, Inc. (incorporated by reference to Exhibit 3.1 to the Form 10-K of Alderwoods Group, Inc., SEC File No. 000-33277, filed March 28, 2002) |
| 3.2 | Bylaws of Alderwoods Group, Inc. (incorporated by reference to Exhibit 3.2 to the Form 10-K of Alderwoods Group, Inc., SEC File No. 000-33277, filed March 28, 2002) |
| 4.1 | Form of Stock Certificate for Common Stock (incorporated by reference to Exhibit 4.1 to the Form 10-12G/A of Loewen Group International, Inc., SEC File No. 000-33277, filed December 17, 2001) |
| 4.2 | Equity Registration Rights Agreement among Alderwoods Group, Inc. and certain holders of Common Stock. (incorporated by reference to Exhibit 4.2 to the Form 10-K of Alderwoods Group, Inc., SEC File No. 000-33277, filed March 28, 2002) |

51

| 4.3 | Warrant Agreement (incorporated by reference to Exhibit 4.3 to the Form 10-K of Alderwoods Group, Inc., SEC File No. 000-33277, filed March 28, 2002) |
|---|---|
| 4.4 | Form of Warrant Certificate (incorporated by reference to Exhibit A to Exhibit 4.3 to the Form 10-K of Alderwoods Group, Inc., SEC File No. 000-33277, filed on March 28, 2002) |
| 4.5 | Waiver of Registration Rights dated June 27, 2002, by and between Alderwoods Group, Inc., and Angelo, Gordon & Co. (incorporated by reference to Exhibit 4.6 to the Form 10-Q of Alderwoods Group, Inc., SEC file No. 000-33277, filed July 24, 2002) |
| 4.6 | Waiver of Registration Rights dated June 27, 2002, by and between Alderwoods Group, Inc. and Franklin Mutual Advisors, LLC (incorporated by reference to Exhibit 4.7 to the Form 10-Q of Alderwoods Group, Inc., SEC File No. 000-33277, filed July 24, 2002) |
| 4.7 | Waiver of Registration Rights dated June 27, 2002, by and between Alderwoods Group, Inc. and GSCP Recovery, Inc. and GSC Recovery II, L.P. (incorporated by reference to Exhibit 4.8 to the Form 10-Q of Alderwoods Group, Inc., SEC File No. 000-33277, filed July 24, 2002) |
| 4.8 | Waiver of Registration Rights dated June 27, 2002, by and between Alderwoods Group, Inc. and Oaktree Capital Management, LLC (incorporated by reference to Exhibit 4.9 to the Form 10-Q of Alderwoods Group, Inc., SEC File No. 000-33277, filed July 24, 2002) |
| 4.9 | Indenture governing the $7^3/4\%$ Senior Unsecured Notes due 2012 (incorporated by reference to Exhibit 4.9 to the Form 10-Q of Alderwoods Group, Inc., SEC File No. 000-33277, filed November 18, 2004) |
| 10.1 | Subordinated Bridge Loan Agreement dated January 23, 2004, among Alderwoods Group, Inc., Banc of America Bridge LLC, as administrative agent and initial bridge lender and the other bridge lenders party hereto and Bank of America Securities LLC, as sole lead arranger and sole book manager (incorporated by reference to Exhibit 10.1 to the Form 10-K of Alderwoods Group, Inc., SEC File No. 000-33277, filed March 16, 2004) |
| 10.2 | Credit Agreement dated September 17, 2003, among Alderwoods Group, Inc., Bank of America, N.A., as administrative agent, swing line lender, L/C Issuer and the other lenders party hereto (incorporated by reference to Exhibit 10.1 to the Form 10-Q of Alderwoods Group, Inc., SEC File No. 000-33277, filed November 12, 2003) |
| 10.3 | Amendment No. 1 dated January 23, 2004, to the Credit Agreement among Alderwoods Group, Inc., Bank of America, N.A. as administrative agent, swing line lender, L/C Issuer and the other lenders party hereto (incorporated by reference to Exhibit 10.3 to Form 10-K of Alderwoods Group, Inc., SEC File No. 000-33277, filed March 16, 2004) |
| 10.4 | Amendment No. 2 dated August 19, 2004, to the Credit Agreement among Alderwoods Group, Inc., Bank of America, N.A. as administrative agent, owing line lender, L/C Issuer and other lenders party hereto (incorporated by reference to Exhibit 10.4 to the Form 10-Q of Alderwoods Group, Inc., SEC File No. 000-33277, filed November 18, 2004) |
| 10.5 | Amendment No. 3 dated December 3, 2004, to the Credit Agreement among Alderwoods Group, Inc., Bank of America, N.A. as administrative agent, owing line lender, L/C Issuer and other lenders party hereto (incorporated by reference to Exhibit 10.1 to the Form 8-K of Alderwoods Group, Inc., SEC File No. 000-33277, filed December 8, 2004) |
| 10.6 | Amendment No. 4 dated March 18, 2005, to the Credit Agreement among Alderwoods Group, Inc., Bank of America, N.A. as administrative agent, owing line lender, L/C Issuer and other lenders party hereto (incorporated by reference to Exhibit 10.1 to the Form 8-K of Alderwoods Group, Inc., SEC File No. 000-33277, filed March 24, 2005) |

| *10.7 | Amended and Restated Employment Agreement dated August 1, 2005, by and between Alderwoods Group Canada Inc. and Kenneth A. Sloan (incorporated by reference to Exhibit 10.3 to the Form 8-K of Alderwoods Group, Inc., SEC File No. 000-33277, filed July 25, 2005) |
|---|---|
| *10.8 | Employment Agreement dated January 23, 2003, by and between Alderwoods Group, Inc. and Ellen Neeman (incorporated by reference to Exhibit 10.7 to Form 10-K of Alderwoods Group, Inc., SEC File No. 000-33277, filed March 16, 2004) |
| *10.9 | Amended and Restated Employment Agreement dated August 1, 2005, by and between Alderwoods Group Canada Inc. and Ross S. Caradonna (incorporated by reference to Exhibit 10.4 to the Form 8-K of Alderwoods Group, Inc., SEC File No. 000-33277, filed July 25, 2005) |
| *10.10 | Employment Agreement dated January 23, 2003, by and between Alderwoods Group, Inc. and Richard J. Scully (incorporated by reference to Exhibit 10.35 to Form 10-Q of Alderwoods Group, Inc., SEC File No. 000-33277, filed May 1, 2003) |
| *10.11 | Amended and Restated Employment Agreement dated August 1, 2005, by and between Alderwoods Group Canada Inc. and John S. Lacey (incorporated by reference to Exhibit 10.1 to the Form 8-K of Alderwoods Group, Inc., SEC File No. 000-33277, filed July 25, 2005) |
| *10.12 | Amended and Restated Employment Agreement dated August 1, 2005, by and between Alderwoods Group Canada Inc. and Paul A. Houston (incorporated by reference to Exhibit 10.2 to the Form 8-K of Alderwoods Group, Inc., SEC File No. 000-33277, filed July 25, 2005) |
| *10.13 | Employment Agreement dated May 10, 2005, by and between Alderwoods Group, Inc. and Aaron Shipper (incorporated by reference to Exhibit 10.1 to Form 8-K of Alderwoods Group, Inc., SEC File No. 000-33277, filed May 12, 2005) |
| *10.14 | Employment Agreement dated May 10, 2005, by and between Alderwoods Group, Inc. and Mark W. H. Wilson (incorporated by reference to Exhibit 10.2 to Form 8-K of Alderwoods Group, Inc., SEC File No. 000-33277, filed May 12, 2005) |
| *10.15 | Alderwoods Group, Inc. 2002 Equity Incentive Plan (incorporated by reference to Exhibit 10.27 to the Form 10-K of Alderwoods Group, Inc., SEC File No. 000-33277, filed March 28, 2002) |
| *10.16 | Alderwoods Group, Inc. 2005 Equity Incentive Plan (incorporated by reference to Exhibit 10.2 to the Form 8-K of Alderwoods Group, Inc., SEC File No. 000-33277, filed May 3, 2005) |
| *10.17 | Alderwoods Group, Inc. Employee Stock Purchase Plan (incorporated by reference to Exhibit 10.1 to the Form 8-K of Alderwoods Group, Inc., SEC File No. 000-33277, filed May 3, 2005) |
| *10.18 | Director Compensation Plan (incorporated by reference to Exhibit 10.28 to the Form 10-K of Alderwoods Group, Inc., SEC File No. 000-33277, filed March 28, 2002) |
| *10.19 | Alderwoods Group Canada Inc. 2003-2005 Executive Strategic Incentive Plan (incorporated by reference to Exhibit 10.40 to Form 10-Q of Alderwoods Group, Inc., SEC File No. 000-33277, filed July 24, 2003) |
| *10.20 | Amendment to the Alderwoods Group Canada Inc. 2003-2005 Executive Strategic Incentive Plan (incorporated by reference to Exhibit 10.5 to the Form 8-K of Alderwoods Group, Inc., SEC File No. 000-33277, filed July 25, 2005) |

| *10.21 | Alderwoods Support Function Annual Incentive Plan (incorporated by reference to Exhibit 10.19 to Form 10-K of Alderwoods Group, Inc., SEC File No. 000-33277, filed March 28, 2005) |
| *10.22 | Description of Compensation of Directors (incorporated by reference to Exhibit 10.20 to the Form 10-Q of Alderwoods Group, Inc., SEC File No. 000-33277, filed April 28, 2005) |
| *10.23 | Form of Indemnification Agreement between Alderwoods Group, Inc. and each of its directors and executive officers (incorporated by reference to Exhibit 10.33 to Form S-1/A of Alderwoods Group, Inc., SEC File No. 333-85316, filed July 25, 2002) |
| *10.24 | 2005-2007 Executive Strategic Incentive Plan of Alderwoods Group Canada Inc. (incorporated by reference to Exhibit 10.6 to the Form 8-K of Alderwoods Group, Inc., SEC File No. 000-33277, filed July 25, 2005) |
| *10.25 | Form of Director Non-Qualified Stock Option Agreement (2005 Equity Incentive Plan) (incorporated by reference to Exhibit 10.7 to the Form 8-K of Alderwoods Group, Inc., SEC File No. 000-33277, filed July 25, 2005) |
| *10.26 | Form of Employee Non-Qualified Stock Option Agreement (2005 Equity Incentive Plan) (incorporated by reference to Exhibit 10.8 to the Form 8-K of Alderwoods Group, Inc., SEC File No. 000-33277, filed July 25, 2005) |
| *10.27 | Form of Restricted Stock Units Agreement (2005 Equity Incentive Plan) (incorporated by reference to Exhibit 10.9 to the Form 8-K of Alderwoods Group, Inc., SEC File No. 000-33277, filed July 25, 2005) |
| *10.28 | Performance Plan Definitions and Performance Criteria on the Alderwoods Support Function Annual Incentive Plan (incorporated by reference to Exhibit 10.1 to the Form 8-K of Alderwoods Group, Inc., SEC File No. 000-33277, filed March 3, 2006) |
| 31.1 | Certification of Chief Executive Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002** |
| 31.2 | Certification of Chief Financial Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002** |
| 32.1 | Certifications of Chief Executive Officer and Chief Financial Officer pursuant to Section 906 of the Sarbanes-Oxley Act of 2002** |

*    Indicates management contract or compensatory plan or arrangement.

**    Filed herewith.

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this Report to be signed on its behalf by the undersigned, thereunto duly authorized.

ALDERWOODS GROUP, INC.

Dated: November 14, 2006                By:        /s/  KENNETH A. SLOAN

Kenneth A. Sloan
*Executive Vice President, Chief Financial Officer*
*(Principal Financial Officer and*
*Principal Accounting Officer)*

55

## INDEX TO EXHIBITS

| Exhibit Number | Description |
|---|---|
| 2.1 | Fourth Amended Joint Plan of Reorganization of Loewen Group International, Inc., Its Parent Corporation and Certain of Their Debtor Subsidiaries (incorporated by reference to Exhibit 99.1 to the Form 8-K of The Loewen Group Inc., SEC File No. 1-12163, filed September 10, 2001) |
| 2.2 | Modification to the Fourth Amended Joint Plan of Reorganization of Loewen Group International, Inc., Its Parent Corporation and Certain of Their Debtor Subsidiaries (incorporated by reference to Exhibit 2.2 to the Form 8-K of The Loewen Group Inc., SEC File No. 1-12163, filed December 11, 2001) |
| 2.3 | Second Modification to the Fourth Amended Joint Plan of Reorganization of Loewen Group International, Inc., Its Parent Corporation and Certain of Their Debtor Subsidiaries (incorporated by reference to Exhibit 2.3 to the Form 8-K of The Loewen Group Inc., SEC File No. 1-12163, filed December 11, 2001) |
| 2.4 | Order Approving Modification of Fourth Amended Joint Plan of Reorganization of Loewen Group International, Inc., Its Parent Corporation and Certain of Their Debtor Subsidiaries and Compromise and Settlement of Claims Filed by Thomas Hardy (incorporated by reference to Exhibit 2.4 to the Form 8-K of The Loewen Group Inc., SEC File No. 1-12163, filed December 11, 2001) |
| 2.5 | Findings of Fact, Conclusions of Law and Order Confirming Fourth Amended Joint Plan of Reorganization of Loewen Group International, Inc., Its Parent Corporation and Certain of Their Debtor Subsidiaries, As Modified, dated December 5, 2001 (incorporated by reference to Exhibit 2.5 to the Form 8-K of The Loewen Group Inc., SEC File No. 1-12163, filed December 11, 2001) |
| 2.6 | Final Order dated December 7, 2001 (incorporated by reference to Exhibit 2.6 to the Form 8-K of The Loewen Group Inc., SEC File No. 1-12163, filed December 11, 2001) |
| 2.7 | Stock Purchase Agreement dated as of June 17, 2004, by and between Citizens Insurance Company of America and Mayflower National Life Insurance Company (incorporated by reference to Exhibit 2.7 to the Form 10-Q of Alderwoods Group, Inc. SEC File No. 000-33277, filed July 26, 2004) |
| 2.8 | Agreement and Plan of Merger, dated April 2, 2006, by and among Service Company International, Coronado Acquisition Corporation and Alderwoods Group, Inc., (incorporated by reference to Exhibit 2.1 to the Form 8-K of Alderwoods Group, Inc., SEC File No. 000-33277, Filed April 4, 2006) |
| 3.1 | Certificate of Incorporation of Alderwoods Group, Inc. (incorporated by reference to Exhibit 3.1 to the Form 10-K of Alderwoods Group, Inc., SEC File No. 000-33277, filed March 28, 2002) |
| 3.2 | Bylaws of Alderwoods Group, Inc. (incorporated by reference to Exhibit 3.2 to the Form 10-K of Alderwoods Group, Inc., SEC File No. 000-33277, filed March 28, 2002) |
| 4.1 | Form of Stock Certificate for Common Stock (incorporated by reference to Exhibit 4.1 to the Form 10-12G/A of Loewen Group International, Inc., SEC File No. 000-33277, filed December 17, 2001) |
| 4.2 | Equity Registration Rights Agreement among Alderwoods Group, Inc. and certain holders of Common Stock. (incorporated by reference to Exhibit 4.2 to the Form 10-K of Alderwoods Group, Inc., SEC File No. 000-33277, filed March 28, 2002) |

56

| 4.3 | Warrant Agreement (incorporated by reference to Exhibit 4.3 to the Form 10-K of Alderwoods Group, Inc., SEC File No. 000-33277, filed March 28, 2002) |
|---|---|
| 4.4 | Form of Warrant Certificate (incorporated by reference to Exhibit A to Exhibit 4.3 to the Form 10-K of Alderwoods Group, Inc., SEC File No. 000-33277, filed on March 28, 2002) |
| 4.5 | Waiver of Registration Rights dated June 27, 2002, by and between Alderwoods Group, Inc., and Angelo, Gordon & Co. (incorporated by reference to Exhibit 4.6 to the Form 10-Q of Alderwoods Group, Inc. SEC File No. 000-33277, filed July 24, 2002) |
| 4.6 | Waiver of Registration Rights dated June 27, 2002, by and between Alderwoods Group, Inc. and Franklin Mutual Advisors, LLC (incorporated by reference to Exhibit 4.7 to the Form 10-Q of Alderwoods Group, Inc., SEC File No. 000-33277, filed July 24, 2002) |
| 4.7 | Waiver of Registration Rights dated June 27, 2002, by and between Alderwoods Group, Inc. and GSCP Recovery, Inc. and GSC Recovery II, L.P. (incorporated by reference to Exhibit 4.8 to the Form 10-Q of Alderwoods Group, Inc., SEC File No. 000-33277, filed July 24, 2002) |
| 4.8 | Waiver of Registration Rights dated June 27, 2002, by and between Alderwoods Group, Inc. and Oaktree Capital Management, LLC (incorporated by reference to Exhibit 4.9 to the Form 10-Q of Alderwoods Group, Inc., SEC File No. 000-33277, filed July 24, 2002) |
| 4.9 | Indenture governing the $7^3/4\%$ Senior Unsecured Notes due 2012 (incorporated by reference to Exhibit 4.9 to the Form 10-Q of Alderwoods Group, Inc., SEC File No. 000-33277, filed November 18, 2004) |
| 10.1 | Subordinated Bridge Loan Agreement dated January 23, 2004, among Alderwoods Group, Inc., Banc of America Bridge LLC, as administrative agent and initial bridge lender and the other bridge lenders party hereto and Bank of America Securities LLC, as sole lead arranger and sole book manager (incorporated by reference to Exhibit 10.1 to the Form 10-K of Alderwoods Group, Inc., SEC File No. 000-33277, filed March 16, 2004) |
| 10.2 | Credit Agreement dated September 17, 2003, among Alderwoods Group, Inc., Bank of America, N.A., as administrative agent, swing line lender, L/C Issuer and the other lenders party hereto (incorporated by reference to Exhibit 10.1 to the Form 10-Q of Alderwoods Group, Inc., SEC File No. 000-33277, filed November 12, 2003) |
| 10.3 | Amendment No. 1 dated January 23, 2004, to the Credit Agreement among Alderwoods Group, Inc., Bank of America, N.A. as administrative agent, swing line lender, L/C Issuer and the other lenders party hereto (incorporated by reference to Exhibit 10.3 to Form 10-K of Alderwoods Group, Inc., SEC File No. 000-33277, filed March 16, 2004) |
| 10.4 | Amendment No. 2 dated August 19, 2004, to the Credit Agreement among Alderwoods Group, Inc., Bank of America, N.A. as administrative agent, swing line lender, L/C Issuer and other lenders party hereto (incorporated by reference to Exhibit 10.4 to the Form 10-Q of Alderwoods Group, Inc., SEC File No. 000-33277, filed November 18, 2004) |
| 10.5 | Amendment No. 3 dated December 3, 2004, to the Credit Agreement among Alderwoods Group, Inc., Bank of America, N.A. as administrative agent, owing line lender, L/C Issuer and other lenders party hereto (incorporated by reference to Exhibit 10.1 to the Form 8-K of Alderwoods Group, Inc., SEC File No. 000-33277, filed December 8, 2004) |
| 10.6 | Amendment No. 4 dated March 18, 2005, to the Credit Agreement among Alderwoods Group, Inc., Bank of America, N.A. as administrative agent, owing line lender, L/C Issuer and other lenders party hereto (incorporated by reference to Exhibit 10.1 to the Form 8-K of Alderwoods Group, Inc., SEC File No. 000-33277, filed March 24, 2005) |

| | |
|---|---|
| 10.7 | Amended and Restated Employment Agreement dated August 1, 2005, by and between Alderwoods Group Canada Inc. and Kenneth A. Sloan (incorporated by reference to Exhibit 10.3 to the Form 8-K of Alderwoods Group, Inc., SEC File No. 000-33277, filed July 25, 2005) |
| 10.8 | Employment Agreement dated January 23, 2003, by and between Alderwoods Group, Inc. and Ellen Neeman (incorporated by reference to Exhibit 10.7 to Form 10-K of Alderwoods Group, Inc., SEC File No. 000-33277, filed March 16, 2004) |
| 10.9 | Amended and Restated Employment Agreement dated August 1, 2005, by and between Alderwoods Group Canada Inc. and Ross S. Caradonna (incorporated by reference to Exhibit 10.4 to the Form 8-K of Alderwoods Group, Inc., SEC File No. 000-33277, filed July 25, 2005) |
| 10.10 | Employment Agreement dated January 23, 2003, by and between Alderwoods Group, Inc. and Richard J. Scully (incorporated by reference to Exhibit 10.35 to Form 10-Q of Alderwoods Group, Inc., SEC File No. 000-33277, filed May 1, 2003) |
| 10.11 | Amended and Restated Employment Agreement dated August 1, 2005, by and between Alderwoods Group Canada Inc. and John S. Lacey (incorporated by reference to Exhibit 10.1 to the Form 8-K of Alderwoods Group, Inc., SEC File No. 000-33277, filed July 25, 2005) |
| 10.12 | Amended and Restated Employment Agreement dated August 1, 2005, by and between Alderwoods Group Canada Inc. and Paul A. Houston (incorporated by reference to Exhibit 10.2 to the Form 8-K of Alderwoods Group, Inc., SEC File No. 000-33277, filed July 25, 2005) |
| 10.13 | Employment Agreement dated May 10, 2005, by and between Alderwoods Group, Inc. and Aaron Shipper (incorporated by reference to Exhibit 10.1 to Form 8-K of Alderwoods Group, Inc., SEC File No. 000-33277, filed May 12, 2005) |
| 10.14 | Employment Agreement dated May 10, 2005, by and between Alderwoods Group, Inc. and Mark W. H. Wilson (incorporated by reference to Exhibit 10.2 to the Form 8-K of Alderwoods Group, Inc., SEC File No. 000-33277, filed May 12, 2005) |
| 10.15 | Alderwoods Group, Inc. 2002 Equity Incentive Plan (incorporated by reference to Exhibit 10.27 to the Form 10-K of Alderwoods Group, Inc., SEC File No. 000-33277, filed March 28, 2002) |
| 10.16 | Alderwoods Group, Inc. 2005 Equity Incentive Plan (incorporated by reference to Exhibit 10.2 to the Form 8-K of Alderwoods Group, Inc., SEC File No. 000-33277, filed May 3, 2005) |
| 10.17 | Alderwoods Group, Inc. Employee Stock Purchase Plan (incorporated by reference to Exhibit 10.1 to the Form 8-K of Alderwoods Group, Inc., SEC File No. 000-33277, filed May 3, 2005) |
| 10.18 | Director Compensation Plan (incorporated by reference to Exhibit 10.28 to the Form 10-K of Alderwoods Group, Inc., SEC File No. 000-33277, filed March 28, 2002) |
| 10.19 | Alderwoods Group Canada Inc. 2003-2005 Executive Strategic Incentive Plan (incorporated by reference to Exhibit 10.40 to Form 10-Q of Alderwoods Group, Inc., SEC File No. 000-33277, filed July 24, 2003) |
| 10.20 | Amendment to the Alderwoods Group Canada Inc. 2003-2005 Executive Strategic Incentive Plan (incorporated by reference to Exhibit 10.5 to the Form 8-K of Alderwoods Group, Inc., SEC File No. 000-33277, filed July 25, 2005) |

| | |
|---|---|
| 10.21 | Alderwoods Support Function Annual Incentive Plan (incorporated by reference to Exhibit 10.19 to Form 10-K of Alderwoods Group, Inc., SEC File No. 000-33277, filed March 28, 2005) |
| 10.22 | Description of Compensation of Directors (incorporated by reference to Exhibit 10.20 to the Form 10-Q of Alderwoods Group, Inc., SEC File No. 000-33277, filed April 28, 2005) |
| 10.23 | Form of Indemnification Agreement between Alderwoods Group, Inc. and each of its directors and executive officers (incorporated by reference to Exhibit 10.33 to Form S-1/A of Alderwoods Group, Inc., SEC File No. 333-85316, filed July 25, 2002) |
| 10.24 | 2005-2007 Executive Strategic Incentive Plan of Alderwoods Group Canada Inc. (incorporated by reference to Exhibit 10.6 to the Form 8-K of Alderwoods Group, Inc., SEC File No. 000-33277, filed July 25, 2005) |
| 10.25 | Form of Director Non-Qualified Stock Option Agreement (2005 Equity Incentive Plan) (incorporated by reference to Exhibit 10.7 to the Form 8-K of Alderwoods Group, Inc., SEC File No. 000-33277, filed July 25, 2005) |
| 10.26 | Form of Employee Non-Qualified Stock Option Agreement (2005 Equity Incentive Plan) (incorporated by reference to Exhibit 10.8 to the Form 8-K of Alderwoods Group, Inc., SEC File No. 000-33277, filed July 25, 2005) |
| 10.27 | Form of Restricted Stock Units Agreement (2005 Equity Incentive Plan) (incorporated by reference to Exhibit 10.9 to the Form 8-K of Alderwoods Group, Inc., SEC File No. 000-33277, filed July 25, 2005) |
| 10.28 | Performance Plan Definitions and Performance Criteria for the Alderwoods Support Function Annual Incentive Plan (incorporated by reference to Exhibit 10.1 to the Form 8-K of Alderwoods Group, Inc., SEC File No. 000-33277, filed March 3, 2006) |
| 31.1 | Certification of Chief Executive Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 31.2 | Certification of Chief Financial Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 32.1 | Certifications of Chief Executive Officer and Chief Financial Officer pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |

QuickLinks

ALDERWOODS GROUP, INC.
PART I FINANCIAL INFORMATION
ALDERWOODS GROUP, INC. CONSOLIDATED BALANCE SHEETS Expressed in thousands of dollars except number of shares
ALDERWOODS GROUP, INC. CONSOLIDATED STATEMENTS OF OPERATIONS (unaudited) Expressed in thousands of dollars except per share amounts and number of shares
ALDERWOODS GROUP, INC. CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY (unaudited) Expressed in thousands of dollars except number of shares
ALDERWOODS GROUP, INC. CONSOLIDATED STATEMENTS OF CASH FLOWS (unaudited) Expressed in thousands of dollars
Condensed Consolidating Balance Sheets (unaudited)
Condensed Consolidating Balance Sheets
Condensed Consolidating Statement of Operations (unaudited)
Condensed Consolidating Statement of Operations (unaudited)
Condensed Consolidating Statement of Operations (unaudited)
Condensed Consolidating Statement of Operations (unaudited)
Condensed Consolidating Statement of Cash Flows (unaudited)
Condensed Consolidating Statement of Cash Flows (unaudited)
PART II OTHER INFORMATION
SIGNATURES
INDEX TO EXHIBITS

EX-31.1 2 a2174493zex-31_1.htm EXHIBIT 31.1

Exhibit 31.1

### CERTIFICATION

I, Paul A. Houston, certify that:

1.    I have reviewed this quarterly report on Form 10-Q of Alderwoods Group, Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in this report;

4.    The Company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e), and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the Company and have:

   (a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c)    Evaluated the effectiveness of the Company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d)    Disclosed in this report any change in the Company's internal control over financial reporting that occurred during the Company's most recent fiscal quarter (the Company's fourth quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting; and

5.    The Company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Company's auditors and the audit committee of the Company's board of directors (or persons performing the equivalent functions):

   (a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information; and

   (b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

Date: November 14, 2006                    By:        /s/  PAUL A. HOUSTON

                                                      Paul A. Houston
                                      President, Chief Executive Officer and Director
                                              (Principal Executive Officer)

EX-31.2 3 a2174493zex-31_2.htm EXHIBIT 31.2

**Exhibit 31.2**

### CERTIFICATION

I, Kenneth A. Sloan, certify that:

1.  I have reviewed this quarterly report on Form 10-Q of Alderwoods Group, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in this report;

4.  The Company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e), and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the Company and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  Evaluated the effectiveness of the Company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  Disclosed in this report any change in the Company's internal control over financial reporting that occurred during the Company's most recent fiscal quarter (the Company's fourth quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting; and

5.  The Company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Company's auditors and the audit committee of the Company's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

Date: November 14, 2006                    By:          /s/  KENNETH A. SLOAN

                                                    Kenneth A. Sloan
                                                    Executive Vice President,
                                                    Chief Financial Officer
                                                    (Principal Financial Officer and
                                                    Chief Accounting Officer)

EX-32.1 4 a2174493zex-32_1.htm EXHIBIT 32.1

**Exhibit 32.1**

**CERTIFICATION PURSUANT TO 18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO SECTION 906 OF**
**THE SARBANES-OXLEY ACT OF 2002**

In connection with the Quarterly Report of Alderwoods Group, Inc. (the "Company") on Form 10-Q for the sixteen weeks ended October 7, 2006, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), each of the undersigned officers of the Company certifies, pursuant to 18 U.S.C. § 1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002, that, to such officer's knowledge:

(1)     The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)     The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company as of the dates and for the periods expressed in the Report.

Dated: November 14, 2006

/s/  PAUL A. HOUSTON

Paul A. Houston
President, Chief Executive Officer
and Director
(Principal Executive Officer)

/s/  KENNETH A. SLOAN

Kenneth A. Sloan
Executive Vice President,
Chief Financial Officer
(Principal Financial Officer)

The foregoing certification is being furnished solely pursuant to 18 U.S.C. § 1350 and is not being filed as part of the Report or as a separate disclosure document.