# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

---

DEBORAH PRISE, et al

Plaintiffs

vs.                                  Civil Action No. 06-1641

PRISE ALDERWOODS GROUP, INC., et al

Defendants

---

PROCEEDINGS

        Transcript of Hearing on Motions commencing on
Thursday, September 3, 2009, United States District Court,
Pittsburgh, Pennsylvania, before Honorable Joy Flowers Conti,
United States District Judge.


APPEARANCES:

For the Plaintiff:        KYLE T. McGEE, Esquire
                          LIBERTY WEYANDT, Esquire

For the Defendant:        BRETT D. KNIGHT, Esquire
                          AMY DIAS, Esquire



Reported by:              Virginia S. Pease
                          Official Court Reporter
                          619 USPO & Courthouse
                          Pittsburgh, Pennsylvania 15219
                          412.208.7385



Proceedings recorded by mechanical stenography.  Transcript
produced by computer-aided transcription.

1   have been missed, if any, they may have gone overboard and

2   really done a good job of identifying those whose e-mail

3   needed to be preserved.  So, I need to understand the key

4   individuals, how they were selected.

5          And following that, I need to understand, from the

6   plaintiffs point of view, what it is they think they are going

7   to be able to discern from an ability to have a wide,

8   encompassing search of the materials that are on the backup

9   tapes.  And in particular, the defense has said, look, a lot

10  of this stuff is just already there.  We're already admitting

11  that we have a community project, people weren't paid.  Am I

12  correct on this?  That the company had a policy where there

13  was community activities that were required, or encouraged,

14  and there was no payment for those?

15         MR. KNIGHT:  We're not even at the second part.

16  We're admitting there was a community program.  I don't have

17  the name of it.

18         THE COURT:  You say there's no pay records or

19  anything relating to that.

20         MR. KNIGHT:  No, I don't.  We've said that --

21         THE COURT:  Just a second.

22         MR. KNIGHT:  What we did say in the response was

23  that none of the e-mails that plaintiffs refer to, or none of

24  the attachments of e-mails that plaintiff refer to in their

25  motion deal with pay practices.  It deals with, they deal with

# Exhibit 2

1

```
 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3            SAN FRANCISCO/OAKLAND DIVISION

 4

 5   WILLIAM HELM, DEBORAH PRISE,        )
     HEATHER P. RADY, [see Complaint     )
 6   and Appendices for a listing of     )
     plaintffs] et al., on behalf of     )
 7   themselves and all other employees  )
     and former employees similarly      )
 8   situated,                           )
                                         )
 9            Plaintiffs,                )
                                         )
10        v.                             )  No. CV 08-1184-SI
                                         )
11   ALDERWOODS GROUP, INC.,             )
                                         )
12            Defendant.                 )
     _____ )
13

14

15

16             DEPOSITION OF DENNIS BAKER
                   October 31, 2009
17                 Tucson, Arizona

18

19

20

21

22         Reported by: Doug Kirkpatrick
           Certified Reporter No. 50705
23

24

25
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Dennis Baker**

70

1  not as such. But I said, you know, when you're
2  supposed to take your meal break, take your meal
3  break, leave the building, clock back in.
4      Q. (BY MR. KNIGHT) To your knowledge, did
5  Alderwoods as a company have a policy that employees
6  were supposed to do clock out during meal breaks but
7  continue working?
8          MS. GIFFORD: Objection?
9      A. I'm unaware of any policy like that.
10      Q. (BY MR. KNIGHT) Is it your understanding
11  that -- well, let me back up.
12          Alderwoods' policies required employees to
13  record all the time they worked; is that correct?
14          MS. GIFFORD: Objection.
15      A. Yes.
16      Q. (BY MR. KNIGHT) Okay. Is it your
17  understanding based on that policy that if an
18  employee did work during meal break, that pursuant to
19  Alderwoods' policy they should have recorded their
20  time?
21          MS. GIFFORD: Objection.
22      A. I think they had that option, yes.
23      Q. (BY MR. KNIGHT) Well, they had that
24  option. Is it -- were they required to --
25          MS. GIFFORD: Objection.

71

1      Q. (BY MR. KNIGHT) -- is my question.
2          MS. GIFFORD: Objection.
3      A. If they wanted to get paid for it, yes,
4  they were required to.
5      Q. (BY MR. KNIGHT) Was there any policy
6  telling them that they couldn't get paid for that
7  time?
8          MS. GIFFORD: Objection.
9      A. I don't believe so.
10      Q. (BY MR. KNIGHT) In your opinion as a
11  Alderwoods manager, employees who did not clock back
12  in if they had to work during their meal break, were
13  they violating Alderwoods' policy by not clocking
14  back in?
15          MS. GIFFORD: Objection.
16      A. I'm not sure. You know, I don't quite
17  understand the question exactly.
18          I mean, if they clocked out and then did
19  some work while they were clocked out, I don't think
20  that was a violation of Alderwoods' policy. I don't
21  think they would get in trouble for working when they
22  were clocked out.
23      Q. (BY MR. KNIGHT) But is that inconsistent
24  in your mind with the policy that they record all
25  hours worked?

72

1      A. Well, again, they record all hours worked
2  if they want to get paid for it, you know.
3      Q. Okay. Did employees in Arizona that you
4  supervised, in Phoenix, did any of them get paid a
5  piece rate for any of the work they performed?
6      A. Sometimes.
7      Q. And who -- which employees? Which
8  positions would get paid piece rate?
9      A. Funeral directors and embalmers.
10      Q. Uh-huh. Anyone else?
11      A. And there were some that were not licensed
12  individuals. You know, they would have fallen into
13  the assistant funeral director maybe or -- I didn't
14  see it on your list, but there was some that helped
15  with removals. And not everyone that helped on a
16  removal was a licensed funeral director/embalmer.
17  And that was -- that is what some of the piece work
18  was.
19      Q. Okay. So they got -- so there was a piece
20  rate for removals; is that right?
21      A. Yes.
22      Q. Do you recall what the rate was?
23      A. I don't. And it evolved and it changed.
24  It evolved.
25      Q. Okay. When you started as general

73

1  manager --
2      A. Yeah.
3      Q. -- was there a piece rate for removals?
4      A. I don't think so.
5      Q. When did it come into effect?
6      A. It may have started -- it's a guess. '04.
7  For sure came into play by '05.
8      Q. When you say for sure by '05, how do you
9  know for sure by '05?
10      A. I remember.
11      Q. And what was -- was there a written
12  policy?
13      A. Yes.
14      Q. Do you recall what the policy was?
15      A. Not specifically, but it had to do with --
16  as I recall, you know, there was X amount flat rate
17  for a removal.
18      Q. Uh-huh.
19      A. And I think there was an X amount flat rate
20  for an embalming if the individual opted to stay off
21  hours, I mean, you know, middle of the night --
22      Q. Uh-huh.
23      A. -- and embalm.
24          And then it also evolved. There was a
25  formula for receiving compensation for telephone

**NETWORK DEPOSITION SERVICES**
**Transcript of Dennis Baker**

20 (Pages 74 to 77)

74

1  work.
2       Q.  Okay.
3       A.  And this was later on during my stay in
4  Phoenix.  This was '05.
5       Q.  So prior to then how were employees paid
6  for removals and embalmings, if at all?
7       A.  Well, we had contract companies that would
8  make removals.
9       Q.  So was it the case that from the time you
10 became general manager until this piece rate policy
11 that you just discussed went into effect that a third
12 party did the removals?
13      A.  Yes.
14      Q.  And who did the embalmings?
15      A.  Licensed embalmers.  Our staff.
16      Q.  Uh-huh.  But they weren't paid a piece rate
17 prior to 2004 or 2005 for those embalmings?
18      A.  Well, they -- I'm not certain when the
19 piece rate for embalming developed.
20      Q.  Sure.
21      A.  Before -- before they -- before that
22 developed, I suspect they just -- third parties made
23 the removal and no licensed -- our staff wasn't there
24 in the middle of the night, so they didn't embalm in
25 the middle of the night.

75

1       Q.  So they embalmed during business hours?
2       A.  Yeah.
3       Q.  You may have mentioned this already, but I
4  didn't write it down if you did.  Do you recall what
5  the rate was, the flat rate was for removals?
6       A.  I don't.
7       Q.  Do you recall what it was for embalmings?
8       A.  I don't.
9       Q.  Do you recall what the flat rate was for
10 telephone calls?
11         MS. GIFFORD:  Objection.
12      A.  I don't.  I think the minimum time, as I
13 recall, was 15 minutes, you know.  Had something to
14 do with 15 minutes.  I think if you answered the
15 phone and said hello, how are you, and yes, the
16 funeral is next Thursday at 2 o'clock, I think that
17 you recorded 15 minutes and that it counted for 15
18 minutes of their hourly wage or something like that.
19      Q.  (BY MR. KNIGHT) Okay.
20      A.  It required some rather intricate
21 timekeeping.
22      Q.  When this piece rate policy started, went
23 into effect in whatever year it was 2004, 2005, were
24 employees required to record the hours or the time
25 they spent doing removals, after-hour removals?

76

1       A.  I don't recall the exact formula, you
2  know.  I don't recall whether they -- you know,
3  whether it was hourly or flat rate.  I can't
4  remember.
5       Q.  I guess for the removals, when you're
6  talking about flat rate, are you talking about like
7  they get $200 -- or let me ask that question.  Is
8  that what you're talking about, that they get a
9  certain dollar amount for removals?
10      A.  Yes.
11      Q.  Was there ever any minimum hourly component
12 to the removal policy such that they would get the
13 greater of $200 or, you know, three hours at their
14 hourly rate?
15         MS. GIFFORD:  Objection.
16      A.  I don't recall exactly.  But I think if the
17 removal, you know, took six hours --
18      Q.  (BY MR. KNIGHT) Uh-huh.
19      A.  -- it seems like maybe there was an option
20 for claiming six hours of pay as opposed to the --
21 say the flat rate was a hundred and fifty dollars or
22 something like that.  And I don't think it was that
23 much.  I don't recall.
24      Q.  Uh-huh.  And when the piece rate policy
25 went into effect for embalming, was there an option

77

1  for employees to claim their hours if their hours
2  were greater than the piece rate?
3       A.  I'm not sure.
4       Q.  And I think you mentioned with the
5  telephone calls, that there was a 15-minute minimum;
6  is that right?
7       A.  Seems like it.
8       Q.  Did they actually get a flat rate for
9  telephone work?
10         MS. GIFFORD:  Objection.
11      A.  I'm not positive.  But I'm thinking that
12 the minimum was like 15-minutes.  For some reason
13 that sticks in my mind.  And, you know, it's like I
14 said before, if they say hello, yes, the funeral's
15 next Thursday, three-minute phone call, I think they
16 could legitimately claim 15 minutes, which is a
17 fourth of an hour, which went to hourly.
18      Q.  (BY MR. KNIGHT) If the call is half an
19 hour, could they claim half an hour?
20      A.  I think so.
21      Q.  Okay.  Prior for the piece rate policy that
22 you mentioned going into effect, were employees at
23 your location in Phoenix responsible for answering
24 phones after hours?
25      A.  Yes.

**NETWORK DEPOSITION SERVICES**
**Transcript of Dennis Baker**

21 (Pages 78 to 81)

78

1   Q. Were they compensated for that time?
2   A. I don't think so.
3   Q. You would think so?
4   A. I don't think so.
5   Q. Why don't you think so?
6   A. Because I remember they were not.
7   Q. So you know they weren't or --
8   A. Yeah, there was no -- you know, in the --
9   prior to changes beginning to be implemented --
10  Q. Uh-huh.
11  A. -- there was no compensation. The funeral
12  directors and embalmers that were on call, they were
13  on call. They were required to answer the phone.
14  And I don't know of any provisions -- you know, they
15  weren't on the clock, they didn't record how many
16  phone calls they took. It was -- it was your night
17  in the barrel.
18  Q. Which -- which -- strike that.
19      Were you responsible for assigning
20  employees to be on call?
21  A. Yes.
22  Q. Do you recall which positions, job titles
23  had to be on call?
24  A. Funeral director/embalmers.
25  Q. And no other positions?

79

1   A. Again, there may be -- there was that
2   vague -- I don't know the exact precise title, you
3   know, the assistant, the nonlicensed individuals that
4   could make removals. Not administration and not the
5   grounds crew.
6   Q. But perhaps an assistant embalmer or
7   something, funeral director?
8   A. Perhaps, yes.
9   Q. Okay. Now, did individuals who were on
10  call for you prior to the policy, this piece rate
11  policy going into effect, did they ever complain to
12  you about not being compensated for time they spent
13  on call or time taking phone calls while on call?
14  A. Yes.
15  Q. What were their complaints?
16  A. They were working and not getting paid.
17  Q. What was your response?
18  A. You should have become a shoe salesman.
19  Q. Did you ever convey their complaints to
20  your manager?
21  A. Oh, possibly. I mean, I'm sure he was
22  aware of the complaints, yes.
23  Q. How are you sure that he was aware of them?
24  A. Well, it was an industry-wide, pervasive
25  complaint. You know, that was a downside of being

80

1   funeral director/embalmer, you had to work nights.
2   Q. Do you know whether industry-wide funeral
3   services providers like Alderwoods had policies not
4   to compensate employees for time they spent taking
5   phone calls at night?
6       MS. GIFFORD: Objection.
7   A. I'm of the opinion that there -- the
8   majority of the industry did not compensate for
9   evening work, yeah.
10  Q. (BY MR. KNIGHT) Do you know whether
11  Alderwoods had a company-wide policy prior to the
12  piece rate policy going into effect of not
13  compensating employees who took phone calls at
14  night?
15      MS. GIFFORD: Objection.
16  A. Yes.
17  Q. (BY MR. KNIGHT) How do you know of that
18  policy?
19  A. Well, I worked for Alderwoods and I knew
20  that there were employees that were answering the
21  phones at night and not being paid for that.
22  Q. Do you know whether employees at other
23  Alderwoods locations were being compensated for that
24  time?
25  A. It's my belief that it was company-wide.

81

1   Q. And what I need to understand is like what
2   do you base that belief on?
3   A. Well, conversations with employees from
4   other locations. You know, it's a pretty small
5   club.
6   Q. So you talked to employees at other
7   locations about phone calls while on call?
8   A. Yes.
9   Q. And they told you that they weren't getting
10  paid for it?
11  A. Yes.
12  Q. Do you recall the names of the employees?
13  A. No.
14  Q. Do you recall locations?
15  A. Not specifically.
16  Q. Do you recall when you had these
17  conversations?
18  A. Not specifically.
19  Q. Was there any policy in the five binders at
20  your locations that -- at least prior to this
21  piecework policy going into effect that discussed
22  whether employees would be compensated for doing on-
23  call work?
24  A. I don't ever recall seeing in print in any
25  of those policies or binders that said that they

**82**

1  would not be paid.  You know, I don't -- I don't
2  remember seeing that in print.  But in practice,
3  that's what happened.
4      Q.  Now, in your opinion, did that practice
5  violate the company policy that employees get paid
6  for all hours worked?
7          MS. GIFFORD:  Objection.
8      A.  You said in my opinion.
9      Q.  (BY MR. KNIGHT)  Uh-huh.
10     A.  Okay.  So in my opinion, it was the
11 company's practice to not compensate employees for
12 this off-hour, evening type work.
13         Now, whether that -- I never saw that in
14 print, I just know what happened.
15     Q.  And you believe this was a company-wide
16 policy and that it happened at all locations
17 throughout the country; is that right?
18     A.  Yes.
19     Q.  Did anyone ever tell you that it was a
20 company-wide policy happening in all locations
21 throughout the country?
22     A.  I don't recall anyone ever saying that, you
23 know.
24     Q.  Were you ever on call as a general
25 manager?

**83**

1      A.  Yes.
2      Q.  How frequently were you on call?
3      A.  For a while.  A year or so --
4      Q.  Uh-huh.
5      A.  -- I stayed on rotation with the other
6  licensed personnel.
7      Q.  Right.
8      A.  And then at first -- because for a while I
9  was on rotation with the other licensed individuals.
10     Q.  So you took ever second or third night?
11     A.  Right, something like that.  I was -- yes,
12 there were usually three or four, and we rotated
13 through weeknights and weekends.  Rotational.
14     Q.  And was there a point in time when you
15 dropped out of the rotation?
16     A.  Yes.
17     Q.  Why was that?
18     A.  Because I could.
19     Q.  Because you were a manager?
20     A.  Yes.
21     Q.  And you didn't want to do it?
22     A.  Yes.
23     Q.  Fair enough.
24         What about when you were location manager
25 in Oregon, were you in the rotation?

**84**

1      A.  Yes.
2      Q.  Do you recall what year -- approximately
3  what year it was that you were on call in Phoenix?
4      A.  Oh, '02, '03.  I really don't remember when
5  I stopped --
6      Q.  Uh-huh.
7      A.  -- taking calls.
8      Q.  On the evenings when you were on call, were
9  you the only person on call?
10     A.  I don't recall.  I don't recall.
11     Q.  Did you ever have like a phone service when
12 you were in Phoenix that took after-hours calls?
13     A.  Yes.
14     Q.  And what years did you have that?
15     A.  Well, early.  I mean, that changed in '04,
16 '05, you know.  Yeah, '04 probably.  Prior to that
17 the answering service took calls.
18     Q.  Okay.  So if there was a death in the
19 night --
20     A.  Yes.
21     Q.  -- would that call go to the answering
22 service?
23     A.  Yes.
24     Q.  And what would the answering service do?
25     A.  Call the funeral director/embalmer that was

**85**

1  on call.
2      Q.  Okay.  And then what would the funeral
3  director/embalmer on call do?
4      A.  Go make a removal.
5      Q.  Okay.  Now, I thought you had said that
6  prior to 2004, 2005, there was a service that did the
7  removals.
8      A.  There was sometimes.
9      Q.  But sometimes there wasn't?
10     A.  Right.
11     Q.  In your experience, having been on call in
12 Phoenix, would you receive a phone call every night
13 that you were on call, at least one call every
14 night?
15     A.  I'm sure there were nights that you would
16 get no phone calls.
17     Q.  Were there nights you would get multiple
18 phone calls?
19     A.  Yes.
20     Q.  Do you have any estimate as to how much --
21 what the average was in a particular night that you
22 would spend on the phone?
23     A.  Not really.  I mean, it varied, you know.
24     Q.  Would it be more than an hour on some
25 occasions?

**NETWORK DEPOSITION SERVICES**
**Transcript of Dennis Baker**

25 (Pages 94 to 97)

---

**94**

1  preapproved?
2      MS. GIFFORD: Objection.
3      A.  Not that I recall.
4      Q.  (BY MR. KNIGHT)  If you go down to
5  subsection G, it says On-Call.  Do you see that?
6      A.  Yes.
7      Q.  It reads, "A nonexempt employee is
8  considered to be, quote, on call, only when so
9  assigned by his or her manager.  On-call time is
10  normally compensable only while the employee is
11  actually working."
12      Did I read that correctly?
13      A.  Yes.
14      Q.  There's a -- the next paragraph down begins
15  "When a nonexempt employee is required to take phone
16  calls after completing their regular work schedule
17  and leaving the premises but is not required to
18  physically returned to work, the employee shall log
19  the start and end times of each phone call."  Do you
20  see that?
21      A.  Yes.
22      Q.  Is it your understanding that that was
23  Alderwoods' policy throughout the time you were
24  general manager at Phoenix?
25      MS. GIFFORD: Objection.

---

**95**

1      A.  No.
2      Q.  (BY MR. KNIGHT)  Okay.  And is this the
3  policy that -- this is the piece rate policy that you
4  said went into effect in 2004, 2005?
5      A.  This is the end result of that evolution
6  process that I was referring to.
7      Q.  Was there another policy before this one?
8      A.  Well, --
9      MS. GIFFORD: Objection.
10      A.  -- I don't recall it being cut and dried,
11  black and white.  In '04 or '05 it started changing.
12  And clear-cut, clearly cut, well-defined, it was
13  not.  Okay?
14      Q.  (BY MR. KNIGHT)  Here it's well-defined,
15  would you agree?
16      MS. GIFFORD: Objection.
17      A.  Yes.  What I'm saying, it evolved into
18  this.  It didn't start out to be this well-defined,
19  as I recall.
20      Q.  (BY MR. KNIGHT)  And when it started out,
21  how was it conveyed to you?
22      A.  In conference calls or -- you know, and
23  then I'm sure I got written direction from my
24  superiors.
25      Q.  When it first started, were you told that

---

**96**

1  employees were supposed to record their hours while
2  on call?
3      MS. GIFFORD: Objection.
4      A.  As I recall, when it first started, I was
5  told that there was going to be a means for employees
6  to receive compensation when they worked odd hours,
7  off-time, yes, which was news.  I mean, that was a
8  change.
9      Q.  (BY MR. KNIGHT)  And you said that you
10  thought this happened in 2004 and 2005.  Is there
11  anything you're tying that to?  Is there any basis
12  for those years?
13      A.  Nothing specifically.
14      Q.  Uh-huh.  Could it have been earlier than
15  2004?
16      MS. GIFFORD: Objection.
17      A.  I suppose it could have.
18      Q.  (BY MR. KNIGHT)  In your time as a general
19  manager or location manager, did any Alderwoods
20  employee ever tell you that they were incorrectly
21  completing their time cards?
22      MS. GIFFORD: Objection.
23      A.  No.
24      Q.  (BY MR. KNIGHT)  Are you aware of any
25  Alderwoods employee incorrectly completing their time

---

**97**

1  cards?
2      MS. GIFFORD: Objection.
3      A.  No.
4      Q.  (BY MR. KNIGHT)  Did you ever tell any
5  Alderwoods employee that he or she was -- that their
6  overtime was excessive?
7      A.  Probably.
8      Q.  Do you remember any specific instances?
9      A.  No.
10      Q.  Was one of your job responsibilities to
11  monitor -- and I'm speaking as both a general manager
12  and location manager -- were any of your job
13  responsibilities to monitor the overtime that
14  employees worked?
15      A.  I would say yes.  Yeah.
16      Q.  And did you ever create any reports to
17  report to your managers as to how much overtime
18  employees at your locations were working?
19      A.  I don't recall that.
20      Q.  Were you ever admonished by any of your
21  supervisors for the amount of overtime your employees
22  were working?
23      A.  I wouldn't say admonished.  I would say
24  that in management meetings there would be
25  discussions concerning overtime, and we would be --

---

**NETWORK DEPOSITION SERVICES**
**Transcript of Dennis Baker**

26 (Pages 98 to 101)

---

**98**

1  we managers would be encouraged to observe, watch and
2  regulate overtime and make sure it didn't get out of
3  hand or, you know, excessive.  You know, manage your
4  people.
5      Q.  Sure.  Did any of your supervisors ever
6  give you a budget of overtime hours?
7      A.  I don't recall that.
8      Q.  Did you ever tell any employee that you
9  supervised that they would not be compensated for any
10  hours they worked before or after their scheduled
11  shift?
12          MS. GIFFORD:  Objection.
13      A.  Well, you know, back when that was the
14  practice, I suspect I mentioned that to them.
15      Q.  (BY MR. KNIGHT)  Back when what was the
16  practice?
17      A.  To not pay them for working off hours.
18      Q.  You mean like the on-call hours?
19      A.  Right, right.
20      Q.  Okay.
21      A.  I mean, you know, that was -- I'm sure they
22  knew that coming in, and so yeah, I suppose.
23      Q.  Other than on-call work, did you ever tell
24  any employee that they would not be allowed to -- or
25  that they would not be compensated for any time they

**99**

1  worked before or after their schedule?
2          MS. GIFFORD:  Objection.
3      A.  I don't recall that, no.
4      Q.  (BY MR. KNIGHT)  Are you aware of any
5  employees at Alderwoods who had a certain number of
6  overtime hours per week guaranteed?
7      A.  No.
8      Q.  While you were with Alderwoods, did you
9  ever hear of anything called the Community Leadership
10  Program or Community Influencer Program?
11      A.  I don't recall that specific terminology.
12      Q.  Did you -- were you ever responsible for
13  creating a Leadership Network, something called a
14  Leadership Network at Alderwoods?
15      A.  I don't recall that specifically, no.
16      Q.  Did you ever fill out something called a
17  Leadership Network information sheet?
18      A.  Not that I recall.
19      Q.  Are you familiar with the term "Leadership
20  Network contact report"?
21      A.  Not really.
22      Q.  Were you ever asked to identify community
23  influencers at Alderwoods?
24          MS. GIFFORD:  Objection.
25      A.  I don't recall that term.

**100**

1      Q.  (BY MR. KNIGHT)  You don't recall the term
2  "influencer"?
3      A.  Community influencer.
4      Q.  Did you have to keep track of important
5  people in the community, important contacts in the
6  community?  Was that one of your job responsibilities
7  at Alderwoods?
8          MS. GIFFORD:  Objection.
9      A.  No.
10      Q.  (BY MR. KNIGHT)  Did any of the people you
11  supervised, were they required to generate lists of
12  community contacts or influencers to your knowledge?
13      A.  No.
14      Q.  When you were supervisor, did you or anyone
15  at your location ever participate in something called
16  a Community Seminar Program?
17      A.  I don't recall that.
18      Q.  When you were at Alderwoods, did you or any
19  of the people you supervised ever host community
20  events at the location that you supervised?
21      A.  Yes.
22      Q.  Okay.  Can you give me some examples?
23      A.  Oh, hospice groups would use our facility
24  for a meeting place.  Grief recovery groups would use
25  our location for a meeting place.  And we were

**101**

1  sometimes called on to, you know, speak at these
2  meetings or make an appearance.  And like I said, the
3  facility was used and we would, you know, provide
4  them with a place to meet and provide punch and
5  cookies and coffee.
6      Q.  So they would meet at the actual funeral
7  home location?
8      A.  Yes.
9      Q.  Did this happen in Phoenix?
10      A.  Yes.
11      Q.  Did this happen in Oregon?
12      A.  No.
13      Q.  Would this happen -- would these events or
14  these meetings happen during normal business hours?
15      A.  No.
16      Q.  So after hours?
17      A.  Yes.
18      Q.  Typically evenings?
19      A.  Yes.
20      Q.  And you said that you would sometimes be
21  asked to speak; is that right?
22      A.  Yes.
23      Q.  Would you personally speak?
24      A.  Sometimes.
25      Q.  Who would speak on other occasions?

**NETWORK DEPOSITION SERVICES**
**Transcript of Dennis Baker**

28 (Pages 106 to 109)

---

**106**

1   visitation or anything else going on, nobody would
2   stay there and keep the place open, no.
3        Q. (BY MR. KNIGHT) Okay. So someone would
4   have to be there simply to open the doors?
5        A. And then close the doors when they left,
6   yes.
7        Q. Would that person be the family services
8   counselor or --
9        A. Usually.
10       Q. So it would usually be the same person that
11  was speaking?
12       A. Yes. But, you see, a family service
13  counselor didn't speak every time they came, but
14  somebody had to be there to make the facility
15  available.
16       Q. Okay. So if an Alderwoods employee was
17  there but not speaking --
18       A. Right.
19       Q. -- would that person record their time that
20  they spent at the home?
21       A. I'm not sure.
22       Q. Did your Alderwoods location ever
23  participate in any food drives, either in Oregon or
24  Arizona?
25       A. Yes.

---

**107**

1        Q. And how would your location participate in
2   food drives?
3        A. Had a collection, drop-off box.
4        Q. Would it require employees to work on
5   weekends?
6        A. I don't think so.
7        Q. Would it require employees to work after
8   hours?
9        A. I don't think so.
10       Q. Did your location in Arizona or Oregon ever
11  host Mother's or Father's Day events?
12       A. Not that I recall.
13       Q. Did your locations in Arizona or Oregon
14  ever host holiday events like Memorial Day or --
15       A. Yes.
16       Q. -- Labor Day?
17       A. Yes.
18       Q. And what types of events would you host?
19       A. Memorial Day, and we also had Christmas
20  programs.
21       Q. What type of Memorial Day event would you
22  have?
23       A. Well, we'd have speakers come. You know,
24  we'd set up -- have a program, have a speaker.
25       Q. Uh-huh. During the day, during business

---

**108**

1   hours?
2        A. Well, on weekends. Memorial Day weekend.
3        Q. Were employees, Alderwoods location
4   employees required to be present at these programs?
5        A. Yes.
6        Q. Were they required to be present and off
7   the clock during these programs?
8             MS. GIFFORD: Objection.
9        A. I'm not certain on that.
10       Q. (BY MR. KNIGHT) Did you instruct the
11  employees to be present at these events?
12       A. Yes.
13       Q. Did you give them any instructions as to
14  whether they should clock in or not?
15       A. I don't recall specific instructions.
16       Q. Did your locations ever host church fund
17  raisers?
18       A. Not that I recall.
19       Q. Are you familiar with something called a
20  crash car event?
21       A. No.
22       Q. Are you familiar with a Relay for Life
23  event to support the American Cancer Society?
24       A. No.
25       Q. Are you familiar with something called

---

**109**

1   Remembrance of Loved Ones service?
2        A. Yes.
3        Q. What is that?
4        A. Well, if it's what I'm thinking of, that
5   was -- it's a decoration -- it's at Christmastime,
6   and all the families that lost a loved one during the
7   preceding year are invited to come to the Christmas
8   program. And they're given a decoration or tree
9   ornament to sign and place on the tree in remembrance
10  of the family member that they lost, and there's a --
11  you know, a little church program and, again, coffee
12  and Christmas cookies afterwards.
13       Q. What time of day would that be?
14       A. Evening.
15       Q. And would location employees be required to
16  attend?
17       A. Yes.
18       Q. All location employees?
19       A. Not all, but a good part.
20       Q. Which employees would be required?
21       A. Family service counselors and funeral
22  directors.
23       Q. Would the administrative staff be required
24  to attend?
25       A. Not usually.

---

**NETWORK DEPOSITION SERVICES**
**Transcript of Dennis Baker**

32 (Pages 122 to 125)

122

1    A.  Yes.
2    Q.  What positions?
3    A.  Counselors, sales counselors.
4    Q.  Funeral directors?
5    A.  No.
6    Q.  No embalmers?
7    A.  No.
8    Q.  Any administrators participate?
9    A.  No.
10   Q.  Did you participate?
11   A.  No.
12   Q.  Okay.  Did you ever give any instruction to
13   the employees who had preneed appointments as to
14   whether they should record their time, the time that
15   they spent in the appointment?
16   A.  I don't recall.
17   Q.  Was there any policy that they not be
18   compensated for their time in appointments?
19   A.  I don't recall that either.
20   Q.  If the appointment extended beyond -- well,
21   let me strike that.
22       Did family service counselors have
23   scheduled hours?
24   A.  Yes, they did.
25   Q.  And I might be getting terms confused.  I'm

123

1    saying family service counselors, but I think you are
2    calling them sales counselors?
3    A.  Semantics.  Same, same.
4    Q.  So we're talking about the same thing.
5       And I'm sorry, you said you think they did
6    have scheduled hours?
7    A.  Yes.
8    Q.  Scheduled by you?
9    A.  Basically.
10   Q.  Would their preneed appointments ever
11   extend beyond their scheduled hours?
12   A.  Yes.
13   Q.  If they did extend beyond their scheduled
14   hours, were they required to record their time?
15       MS. GIFFORD:  Objection.
16   A.  I'm not sure.
17   Q.  (BY MR. KNIGHT)  Is there any reason they
18   wouldn't have recorded their time?
19   A.  I'm not sure what the policy was.  I do not
20   recall what the policy was on the family service
21   counselors, salespeople, whatever you want to call
22   them.
23   Q.  Are you aware of any specific policy that
24   they were not allowed to record the time they spent
25   in preneeds appointments that went beyond their

124

1    scheduled hours?
2    A.  No, I'm not aware of it.
3    Q.  Are you aware of any employees who didn't
4    record the time they spent in preneeds appointments?
5    A.  Who did not?
6    Q.  Correct.
7    A.  I don't know whether they did or not.
8    Q.  So you're not aware of anyone who did not,
9    for example?
10   A.  I don't know whether they did or not.
11   Q.  Okay.  We talked earlier a little bit about
12   how overtime is supposed to be preapproved.  Do you
13   recall that?
14   A.  Yes.
15   Q.  Are you familiar with a company-wide
16   Alderwoods policy that the employees not be
17   compensated for overtime that was not preapproved?
18       MS. GIFFORD:  Objection.
19   A.  I'm aware that the company policy is that
20   it is supposed to be preapproved, yes.
21   Q.  (BY MR. KNIGHT)  Is it the company policy
22   that if it's not preapproved, they don't get paid for
23   it?
24       MS. GIFFORD:  Objection.
25   A.  That's the company policy.

125

1    Q.  (BY MR. KNIGHT)  Is that what you did?
2    A.  I'm sure there were times that overtime
3    evolved or developed that had not been planned or
4    scheduled that I approved.  You know, I'm sure I did
5    that.
6    Q.  That you approved after the fact?
7    A.  Yeah.
8    Q.  Did you ever refuse to pay someone overtime
9    because they hadn't come to you and had it approved
10   beforehand?
11   A.  Not that I recall.
12   Q.  Okay.  But you said you think that was the
13   company policy that you should have done that?
14   A.  Yes.
15   Q.  Why do you think that's the case?
16   A.  Well, I think it is the case.  I think we
17   just read that, you know.  And I think it was in as
18   well, too, that --
19   Q.  Well, do you recall where you read that?
20   A.  No.  One of these --
21   Q.  It's in one of these exhibits?
22   A.  Yes.
23   Q.  Okay.  I think if we look at Exhibit 5, and
24   I think if you look at subsection F, Overtime --
25   A.  Yes.

**NETWORK DEPOSITION SERVICES**
**Transcript of Dennis Baker**

34  (Pages 130 to 133)

---

130

1    from the Regional Vice President, Ken Dimond."
2        Is that how you spell Mr. Dimond's name, by
3    the way?
4        A. No.
5        Q. What is the correct spelling?
6        A. No "A".
7        Q. When you say these were corporate-wide
8    policies, what policies are you referring to?
9        A. Well, they -- any policies that -- any and
10   all policies. It's my understanding that the
11   policies that I was instructed to follow or that I
12   had were not specific to me at Phoenix Memorial; it's
13   my understanding that I had the same policies as
14   every other Alderwoods location.
15       Q. What was the basis for that understanding?
16   Where did you come to that conclusion?
17       A. Well, again, it's a pretty small club. I
18   had conversations with other Alderwoods employees. I
19   had meetings with other general managers. You know,
20   it's just -- I mean, it's common knowledge.
21       Q. Do you know at the time you left Alderwoods
22   how many locations it had nationwide?
23       A. I don't.
24       Q. Do you know how many states Alderwoods
25   operated in?

---

131

1        A. No. You know, a lot. But no. Specific
2    numbers, I don't.
3        Q. Did you in your positions with Alderwoods
4    have any corporate-wide responsibilities, meaning
5    were you responsible for company policies on a
6    corporate level?
7        A. No.
8        Q. Do you have any knowledge as to how many
9    employees Alderwoods had at the time you left the
10   company?
11       A. Not exactly, no. A lot. You know, but no,
12   I don't know.
13       Q. Okay. What new policy memoranda was faxed
14   to Ken Dimond? If you know.
15           MS. GIFFORD: Objection.
16       A. I don't have the specific.
17       Q. (BY MR. KNIGHT) What policy information
18   was faxed by Ken Dimond to you?
19       A. Well, the question presented to me was how
20   did I receive word of company policy, and one of the
21   ways I received company policy was via fax
22   memorandums coming down.
23       Q. Were there other ways?
24       A. Sure. I mean, verbally, telephonically,
25   over the phone policy was discussed, but there was

---

132

1    always a written version somewhere, I mean, you know.
2        Q. Would the policies always come from Ken
3    Dimond?
4        A. Either Ken Dimond, or when that other level
5    was evolved or came into play, either Ken Dimond or
6    his right-hand man to me, yes.
7        Q. Were you told by Ken Dimond or the
8    intermediary that the policies they were giving you
9    were company-wide policies?
10       A. It was my understanding that Alderwoods was
11   Alderwoods. And I know, I was led to believe that
12   they were trying to achieve the branding image and
13   uniformity across the board. And I don't ever recall
14   any of them saying specifically this is the same for
15   you as it is for those in North Carolina, but that
16   was my understanding.
17       Q. Let me refer you to paragraph 13.
18           Actually paragraph 12 would be better to
19   start.
20           You talked about earlier the company-wide
21   policy encouraging employees to volunteer in the
22   community, correct?
23       A. Yes.
24       Q. What types of activities were they
25   encouraged to do?

---

133

1        A. Church involvement, civic organizations,
2    fraternal organizations, volunteer work at schools,
3    you know, involvement with family activities, things
4    like that.
5        Q. And how was this encouragement conveyed to
6    them?
7        A. Verbally.
8        Q. By whom?
9        A. Ken Dimond.
10       Q. Would Ken Dimond meet with the employees?
11       A. No, he'd meet with me and --
12       Q. So how would the employees hear from Ken
13   Dimond that they were encouraged to participate in
14   the community?
15       A. I would tell them. I mean, I would relay
16   the encouragement. You know, point out that, you
17   know, it's a good thing to do.
18       Q. So what would you ask the employees that
19   were reporting to you to do in the way of community
20   involvement?
21       A. What I would do is say it would be good if
22   you, you know, were active in your church or if you
23   joined the American Legion or the Elks Lodge and
24   participated in, you know, activities in the
25   community. Go to the Chamber of Commerce meetings or

---

**NETWORK DEPOSITION SERVICES**
**Transcript of Dennis Baker**

35 (Pages 134 to 137)

---

**134**

1  things like that.
2      Q.  What would be the purpose of asking someone
3  to be active in their church?
4      A.  In the hopes of increasing market share,
5  name brand identification, get to know people.
6      Q.  So if you asked an employee to be active in
7  their church, for example, would you ask them to do
8  so in a way that promoted Alderwoods?
9      A.  Subliminally.
10     Q.  How did you hope that that would help
11 Alderwoods' business?
12     A.  Well, the hope is and the industry-wide
13 practice has always been, the people that work in
14 funeral homes, primarily funeral directors, and in
15 the old days funeral home owners, you know, become
16 involved in the community, be active, get to be
17 known.  And then -- hopefully favorably, you know.
18         And then, when a death occurs, they think
19 Oh, my gosh, you know, Grandma died, what are we
20 going to do?  Oh, let's call that nice man that I met
21 at church.  He's a funeral director at XYZ funeral
22 home.  That's how it works and that's the reason for
23 the encouragement.
24     Q.  Was it your expectation that these
25 employees would be trying to sell for Alderwoods

---

**135**

1  while they were involved in the community events?
2         MS. GIFFORD:  Objection.
3      A.  Subliminally, you know, sideways.
4      Q.  (BY MR. KNIGHT)  By making contacts in the
5  community?
6      A.  Exactly.
7      Q.  Were they expected to discuss Alderwoods'
8  preneed policies, for example?
9      A.  Not necessarily, no.
10     Q.  Now, for employees who -- when you were in
11 Arizona, did you hire any new employees?
12     A.  Yes.
13     Q.  Did you consider in hiring those employees
14 whether they were active in the community prior to
15 joining Alderwoods?
16     A.  No, I can't say that I did.
17     Q.  It wasn't a factor in hiring them one way
18 or another?
19     A.  No, probably not.
20     Q.  Did you hire any employees who were active
21 church-going members at the time you hired them?
22     A.  I think so.
23     Q.  Did you encourage those employees to join
24 other community organizations or do things other than
25 be part of the church that they were already a part

---

**136**

1  of?
2      A.  The encouragement that I passed along was
3  to encourage employees to -- you know, again, if they
4  chose to -- it wasn't a mandate, it wasn't an
5  order -- but it would be a good thing if they were to
6  become involved in community activities.  You know,
7  that's, you know -- when friends influence people,
8  that's the way market share grows is one theory.
9      Q.  Sure, yeah.  Well, did Ken Dimond ever tell
10 you to talk to your employees about doing more
11 community work?
12     A.  I think so.
13     Q.  Do you recall what he said in those
14 conversations?
15     A.  I think he said it would be a good idea if
16 the employees become involved in community
17 activities.
18     Q.  He didn't say they had to?
19     A.  No.
20     Q.  Are you aware of a company-wide policy
21 requiring employees to be involved in the community?
22         MS. GIFFORD:  Objection.
23     A.  It's my understanding there is a
24 company-wide policy to encourage people to become
25 involved in community activities.

---

**137**

1      Q.  (BY MR. KNIGHT)  Did you ever discuss
2  community activities or community service work in
3  evaluations with employees?
4      A.  I don't recall doing that.
5      Q.  Do you recall whether it's part of the
6  evaluation form for employees?
7      A.  For application?
8      Q.  Evaluation.
9      A.  Oh, evaluation.  I suspect it is included
10 in the evaluations, yes.
11     Q.  You suspect it is.  Do you recall seeing it
12 in there specifically?
13     A.  I think in evaluations -- I don't know that
14 they're preformed, you know, but I think it's a good
15 thing if employees are involved in community
16 activities.  I think they get kudos or a pat on the
17 back or a gold star.  You know, good for you, you're
18 active in the community, that's good.
19     Q.  In your time with Alderwoods was there one
20 like a uniform evaluation form that all the locations
21 used?
22     A.  I don't -- I don't know.  I suspect there
23 was, but I don't recall.
24     Q.  Did you notice any difference in
25 evaluations forms when you moved to Oregon from what

---

**NETWORK DEPOSITION SERVICES**
**Transcript of Dennis Baker**

39 (Pages 150 to 153)

150

1 should have put -- I didn't know I was going to -- I
2 should have said embalmers.
3      Q. You didn't know you were going to have to
4 answer these questions?
5      A. Not this detailed, no, I didn't.
6      So that should say embalmer. Embalmers
7 have to maintain their license in order for it to be
8 legal, and Alderwoods isn't going to -- you know, I'm
9 sure it's their policy company that their embalmers
10 have to be licensed.
11     Q. Uh-huh.
12     A. And that requires continuing ed training.
13     Q. Do you know what that continuing ed
14 training is for embalmers?
15     A. They have different courses and things.
16     Q. Do you know how many hours?
17     A. I don't know the specific number. I've
18 been out of the state for a while, and it varies.
19     Q. Do you know what it was when you were here?
20     A. No, I don't.
21     Q. Okay. You say in that sentence if an
22 employee completed their training requirements away
23 from the home and outside their regular workday, it
24 was not paid for.
25     A. I think so.

151

1      Q. You think so but you're not sure if it was
2 paid for?
3      A. I'm not sure.
4      Q. Are you aware of embalmers completing their
5 CLE or doing CLE while at the funeral home and during
6 the regular workday?
7      MS. GIFFORD: Objection. I think by
8 CLE you mean the continuing education?
9      Q. (BY MR. KNIGHT) Sorry, yeah. Continuing
10 embalmer education.
11     A. What's the question?
12     Q. Are you aware of embalmers doing or
13 fulfilling or -- start over.
14     Are you aware of embalmers performing
15 continuing education at the funeral home and during
16 the workday?
17     A. Yes. Some.
18     Q. And when that happened, would they be on
19 the clock?
20     A. Yes.
21     Q. Would they be compensated for it?
22     A. It's my understanding, yes.
23     Q. In paragraph 25 you say that you were aware
24 of the training policy because you received
25 communications on the subject from company executives

152

1 including the regional vice president, Ken Dimond.
2      What did Ken Dimond tell you about this
3 policy?
4      A. He told me to make certain that all my
5 licensed individuals obtain their necessary
6 continuing ed courses to maintain their licensure.
7      Q. Okay. Did he tell you that they should not
8 be compensated for that time?
9      A. He didn't say that.
10     Q. In paragraph 26 you say that you were
11 required by Ken Dimond to ensure that employees
12 attended the training events. What training events
13 did you mean?
14     A. Continuing ed classes.
15     Q. Okay.
16     A. I reminded the licensed employees to be
17 certain they met their requirement for continuing ed
18 classes. This is an annual thing.
19     Q. Were there specific classes that you
20 reminded them of or instructed them to attend?
21     A. Yes.
22     Q. And in the next sentence you say that you
23 sent an e-mail or e-mail reminders to employees and
24 posted signs indicating upcoming classes.
25     A. Yes.

153

1      Q. And then you say that employees were
2 required to attend. Do you see that?
3      A. Yes.
4      Q. Were there specific CLE classes that they
5 were required to attend?
6      MS. GIFFORD: Continuing education?
7      MR. KNIGHT: Sorry.
8      A. They're required to attend enough to get
9 the number of hours. And I don't think there are any
10 that are mandatory. There's a selection, there's a
11 choice, and you pick out of the choices the ones to
12 get your bottom line total, enough continuing ed
13 hours.
14     Q. (BY MR. KNIGHT) But there's a state law
15 saying you have to have a certain number of hours per
16 year or every two years; is that right?
17     A. Correct.
18     Q. But Alderwoods never required employees to
19 attend a specific continuing education class; is that
20 right?
21     MS. GIFFORD: Objection.
22     A. Not a specific one. They were required to
23 achieve the total.
24     Q. (BY MR. KNIGHT) Okay. Let me refer you
25 back to the first exhibit very briefly here.

**NETWORK DEPOSITION SERVICES**
**Transcript of Dennis Baker**

41 (Pages 158 to 161)

158

1    A. I don't see his name. It's alphabetical
2 and he's not in here.
3    Q. What's the name?
4    A. Head. John Head.
5    Q. What was his position?
6    A. Well, he was the same position as Ken
7 Dimond. Regional manager is what I thought of him
8 as.
9    Q. Did you ever attend a meeting with Shawn
10 Phillips?
11    A. Yes.
12    Q. How often do you attend a meeting with him?
13    A. Oh, in the four or five years I was there,
14 at least three or four.
15    Q. Did you meet with Shawn Phillips in person
16 on any of those occasions?
17    A. No. I mean, we wouldn't -- I never had a
18 one-on-one official business meeting with Shawn
19 Phillips, no.
20    Q. Did you ever discuss any of the policies
21 that you testified about in your affirmation, the
22 community work policy, the on-call policy or I think
23 the training policy, with Shawn Phillips?
24    A. Not that I recall.
25    Q. Do you know whether Shawn Phillips applied

159

1 the policies that you testified to to any other
2 locations in his region?
3    A. It's my understanding that he did.
4    Q. And it's your understanding for what
5 reason?
6    A. Well, because it's my understanding that it
7 was an Alderwoods' policy company-wide and that those
8 policy requirements come down from above, and I think
9 they came down from Shawn Phillips to Ken Dimond to
10 me.
11    Q. Do you know whether all states require
12 embalmers to have a license?
13    A. I believe all states except Colorado
14 require licensing is my understanding.
15    Q. Okay. So in Colorado, then, would the
16 training policy that you discuss in your affirmation,
17 would that apply to employees in Colorado?
18    A. I'm thinking not since they didn't require
19 licensure. In Colorado you can go embalm a body.
20    Q. I'll probably pass on that opportunity.
21    MR. KNIGHT: And I think I'm done.
22 I'll pass the witness. Thank you.
23    MS. GIFFORD: Okay.
24
25

160

1             EXAMINATION
2 BY MS. GIFFORD:
3    Q. Mr. Baker, I have just a few follow-up
4 questions. And I may jump around on topics. So if
5 it's confusing at all, let me know.
6    A. Okay.
7    Q. I believe you testified earlier that you
8 had some input into which employees made how much or
9 something to that effect.
10    A. Sure.
11    Q. What did you have input into?
12    A. Well, pay scale, how much employees were
13 paid, you know.
14    Q. Would that be either then their salary or
15 their hourly rate?
16    A. No.
17    Q. What would that be?
18    A. Hourly rate, right. That was -- the only
19 salaried people on staff besides myself would have
20 been the -- what I call sales manager, and he was on
21 salary, and I didn't discuss with my superiors his
22 pay. And I would discuss hourly wages for the
23 different employees with my superiors.
24    Q. Okay. And I'm going to draw your attention
25 back to Exhibit 4. And that first bullet point talks

161

1 about, quote, all employees must record all hours
2 actually worked.
3       When you were employed at Alderwoods, did
4 you understand that all hours actually worked that
5 was to be recorded on the time card was supposed to
6 include time spent volunteering in community events
7 or activities?
8    A. No. It was my understanding that
9 volunteering for community activities was not meant
10 to be recorded as hours worked.
11    Q. So if an employee recorded that time on
12 their time card, would that have been correct or
13 incorrect?
14    A. It would have been incorrect.
15    Q. Okay. And was it your understanding that
16 the -- all hours actually worked that employees were
17 supposed to record prior to the change in on-call
18 policy, was that supposed to include time spent on
19 call answering phone calls?
20    A. Prior to the evolution of the policy to
21 where they could get compensation for that on-call
22 status, being on call did not get compensation, was
23 not recorded as time on the clock.
24    Q. So in that time frame, if employees
25 had not recorded the phone calls or the time spent on

**NETWORK DEPOSITION SERVICES**
**Transcript of Dennis Baker**

44 (Pages 170 to 173)

---

170

1    Q.  Was your understanding that location
2  managers would also work on call?
3    A.  Optional.
4    Q.  Okay.
5    A.  Most location managers were funeral
6  directors and embalmers, so they -- therefore, they
7  could do the work that funeral directors and
8  embalmers do when they're on call.
9    Q.  And by that do you mean then that they had
10  the licenses required to perform the funeral director
11  and embalmer work?
12    A.  Exactly.
13    Q.  But they had the job title of location
14  manager?
15    A.  Exactly.  And you could be a location
16  manager and not be a funeral director or embalmer.
17    Q.  Okay.  Did Ken Dimond know that there were
18  employees at your location who were working on-call
19  shifts?
20    A.  Yes.
21    Q.  And I know you talked before about the
22  continuing education requirements for embalmers.
23    A.  Yes.
24    Q.  Were there any continuing education
25  requirements to your knowledge for the funeral

---

171

1  director license?
2    A.  I think so, but like I -- I get confused on
3  that.  And I've been in different states, and
4  different dates have different rules and
5  regulations.  But I think there are requirements in
6  Arizona for funeral directors to receive continuing
7  education in order to maintain their licensure.
8    Q.  And would it be the same with embalmers,
9  that there was a certain number of hours they had to
10  obtain?
11    A.  Yes.
12    Q.  Did employees ever attend continuing
13  education classes away from the funeral home
14  location?
15    A.  Yes.
16    Q.  And when they did that, were those classes
17  paid for by the employee or by Alderwoods?
18    A.  I think that the cost for the classes could
19  be paid by the company, but I don't think they were
20  paid for the time.
21    Q.  And where did --
22    A.  Attending the classes.
23    Q.  Where did that understanding come from?
24    A.  I took it to be company policy.
25    Q.  And I believe you testified you didn't have

---

172

1  any one-on-one official business meeting with Shawn
2  Phillips; is that right?
3    A.  Yes.
4    Q.  Did you ever meet him in person or were all
5  your contacts by phone?
6    A.  Oh, no, I met him in person.
7    Q.  Okay.  Do you --
8    A.  At meetings and things, yeah.
9    Q.  Did he ever come to one of your locations?
10    A.  Yes.  Sure.
11    Q.  And which location was that?
12    A.  Phoenix.
13    Q.  And I'm going to draw your attention to
14  Exhibit 6 again, which is the list titled "Opt-In
15  Plaintiffs."  Can you tell me how many pages are in
16  that exhibit?
17    A.  Yes.  There are 15.
18    Q.  And how many names are listed on that
19  exhibit?
20    A.  712.
21    Q.  And when you were directed to look at that
22  list and said, you know, don't spend a lot of time on
23  it, just do a scan, is it possible that your scan
24  missed some names that you would recognize?
25    A.  Yes.

---

173

1    Q.  Is it possible -- I know previously you
2  testified to several employees whose first names you
3  remembered.
4    A.  Right.
5    Q.  Is it possible that those employees are on
6  here and you just don't recognize their last names?
7    A.  Yes, I suppose it is.
8    Q.  And is it possible that some of the
9  employees may have changed their names since you
10  worked with them?
11    A.  Sure.
12    Q.  And in that case, would you recognize them
13  now?
14    A.  No.  Married names, no.  That's a
15  possibility for sure.
16    Q.  Okay.  And drawing your attention back to
17  the statement that you signed that's been marked as
18  Exhibit 2.
19    A.  Okay.
20    Q.  Did anyone coerce you into signing that
21  statement?
22    A.  No.
23    Q.  Were you promised anything --
24    A.  No.
25    Q.  Sorry.  Were you promised anything in

---

# Exhibit 3

**NETWORK DEPOSITION SERVICES**
**Transcript of Herbert Bath**

1

```
 1              IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF CALIFORNIA
 2                SAN FRANCISCO/OAKLAND DIVISION

 3

 4   WILLIAM HELM, DEBORAH PRISE, HEATHER P. RADY, et
     al., on behalf of themselves and all other employees
 5   and former employees similarly situated,

 6        Plaintiffs,

 7

 8   vs                                    No. CV-08-1184-SI

 9

10   ALDERWOODS GROUP, INC.,

11        Defendants.

12

13            DEPOSITION OF HERBERT C. BATH
              Taken on Behalf of the  Defendants
14       On October 23, 2009, beginning at 8:58 A.M.
                   In Coffeyville, Kansas

15                       APPEARANCES

16
     Appearing on behalf of the PLAINTIFFS:
17
     Annette Gifford
18   DOLIN, THOMAS & SOLOMON
     693 East Avenue
19   Rochester, New York 14607
     (585) 272-0540
20   agifford@theemploymentattorneys.com

21

22

23

24   REPORTED BY:  LESLIE A. SHELLEY, CSR

25
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Herbert Bath**

28 (Pages 106 to 109)

---

106

1   The policy states here that many states slash
2 provinces require a designated meal break after a
3 certain number of hours worked and indicates that
4 you may consult the HR specialist for your area for
5 assistance in determining the required meal periods.
6 Do you see that?
7   A  Um-hmm.
8   Q  And that's what the policy, in fact,
9 states?
10   A  Yes.
11   Q  How did meal breaks work at your location,
12 at the locations that you managed?
13   A  Most of the time, they -- they worked
14 just -- they alternated meal breaks. Sometimes
15 there was nobody else there, so there was no meal
16 break. I mean, they ate, but they were answering
17 the telephone or answering the door or -- or
18 something like that.
19   Q  Okay. Okay. Did the hourly employees at
20 the locations that you managed have to -- to clock
21 out for lunch breaks?
22   A  Yes.
23   Q  Were the employees at the locations that
24 you managed supposed to take lunch at a certain time
25 of day?

---

107

1   A  Not particularly.
2   Q  Okay. Were they supposed to spend a
3 certain amount of time on their lunch breaks?
4   A  Not particularly.
5   Q  Okay.
6   I mean, they had -- they had an hour, but
7 that wasn't always -- you know, they come back in
8 thirty minutes and take off early or -- or whatever,
9 but...
10   Q  Okay. Were the meal breaks at the
11 locations that you managed for hourly employees paid
12 or unpaid?
13   A  The lunch breaks were unpaid.
14   Q  And did the hourly employees at the
15 locations that you managed clock back in when they
16 returned from meal breaks?
17   MS. GIFFORD: Objection.
18   A  Most of the time, yes.
19   Q  (MS. MORGAN) Okay. So most of the time,
20 the employees that reported to you at the locations
21 that you managed clocked out for meal breaks when
22 their meal breaks started and clocked back in after
23 their meal breaks ended; is that correct?
24   A  That's correct.
25   Q  If an employee at the locations that you

---

108

1 managed worked through a meal break, did they
2 indicate that on their time sheets?
3   A  No.
4   Q  I'm sorry, time cards?
5   A  No.
6   Q  And is that -- did they ever indicate that
7 on their time cards if they worked through a meal
8 break?
9   MS. GIFFORD: Objection.
10   A  I assume they did, but I don't know that
11 they did.
12   Q  (MS. MORGAN) Okay.
13   A  We -- we were instructed to clock out and
14 clock back in whether we went anyplace to eat or
15 not. If we still answered the phone, we still had
16 to clock out and clock in.
17   Q  Okay. You're saying we, but you didn't
18 use a time clock; correct?
19   A  Right.
20   Q  Okay.
21   A  Right. But at my location, we were
22 instructed that whether you left the premises or
23 not, you had to clock out and clock in.
24   Q  Okay.
25   A  Even if you were the only one there and

---

109

1 had to answer the phone and answer the door.
2   Q  Okay. So you're -- it's your testimony
3 that employees at the locations that you managed
4 were instructed to clock in and clock out -- I'm
5 sorry, clock out and clock in for meal breaks,
6 regardless of whether they took their meal breaks or
7 not?
8   A  That's correct.
9   Q  And who instructed them to do so?
10   A  Dennis Phillips.
11   Q  When employees at your locations worked
12 through a meal break, did you authorize that their
13 time for that meal break -- I'm sorry, that that
14 time that they spent working be paid?
15   MS. GIFFORD: Objection.
16   A  If it wasn't on their time card, no. If
17 it was on their time card, yes.
18   Q  (MS. MORGAN) Did you ever authorize
19 employees to be paid for the time when they worked
20 through a meal break?
21   MS. GIFFORD: Objection.
22   A  Sure, if it was on their time card.
23   Q  (MS. MORGAN) And if it wasn't on their
24 time card?
25   A  No.

---

**NETWORK DEPOSITION SERVICES**
**Transcript of Herbert Bath**

29 (Pages 110 to 113)

110

1      Q   And if an employee worked through a meal
2   break and it was -- and that was reflected on their
3   time card, were they in fact paid for that time?
4      A   To my --
5         MS. GIFFORD:  Objection.
6      A   To my knowledge, they were.
7      Q   (MS. MORGAN)  I believe it's your
8   testimony, Mr. Bath, that if employees at the
9   locations that you -- if the hourly employees at the
10  locations that you managed worked through a meal
11  break and that time was not reflected on their time
12  cards, that you would not authorize payment for that
13  time; is that correct?
14     A   That's correct.
15     Q   And as the location manager for Altamont
16  and Chetopa, you were reviewing and signing the time
17  cards as their supervisor, indicating that they had
18  taken meal breaks when, in fact, they had not; is
19  that correct?
20        MS. GIFFORD:  Objection.
21     A   If it was on their time card, I wasn't --
22  yes, I wasn't there all the time.  If it was on
23  their time card and I was gone all week and come
24  home the day they turned the time cards in and I
25  signed it, if it wasn't on their time card, I didn't

111

1   authorize it.
2      Q   (MS. MORGAN)  But you did authorize it
3   because you signed it; correct?
4         MS. GIFFORD:  Objection.
5      A   If -- if it was on their time card, I
6   authorized it.  I signed and okayed it.  If it was
7   not on their time card, I did not authorize it.
8      Q   (MS. MORGAN)  Okay.  Were there instances,
9   Mr. Bath, when, as a location manager, you were
10  aware that employees were working through meal
11  breaks, that that time was not reflected on their
12  time cards, and that you signed time cards
13  indicating that they had taken meal breaks when, in
14  fact, they had not?
15        MS. GIFFORD:  Objection.
16     A   I'm sure there was.
17     Q   (MS. MORGAN)  Did you ever tell your
18  members of management that you were doing this?
19        MS. GIFFORD:  Objection.
20     A   I was instructed to tell them, my
21  employees that.
22     Q   (MS. MORGAN)  That's not my question,
23  Mr. Bath.  If you could answer my question.
24     A   My immediate supervisor is the one that
25  instructed me, so he knew that I was -- what I was

112

1   doing.
2      Q   Okay.  So did you tell any member of
3   management that you were signing time cards
4   reflecting that employees had taken lunch breaks
5   when, in fact, they had not?
6         MS. GIFFORD:  Objection.
7      A   I didn't tell them that I was signing it
8   when they had indicated that they were, but I told
9   them that -- that they weren't getting paid for
10  their lunch breaks.
11     Q   (MS. MORGAN)  Okay.  So what is the answer
12  to my actual question?
13     A   You're going to have to restate the
14  question.
15     Q   Okay.  My question was, did you ever tell
16  members of management that you were signing time
17  cards reflecting that employees had taken lunch
18  breaks when, in fact, they did not?
19        MS. GIFFORD:  Objection.
20     A   No.
21     Q   (MS. MORGAN)  Did you tell anybody else,
22  anybody in HR or payroll?
23        MS. GIFFORD:  Objection.
24     A   I -- I told my -- I didn't tell them that
25  I signed the card, but I told them they was putting

113

1   in time that they wasn't getting paid for.  But I
2   didn't tell them that I had signed a card that --
3   where they'd actually worked and it wasn't on there.
4      Q   (MS. MORGAN)  Okay.  Did any of the
5   employees who reported to you when you were area
6   manager or location manager ever receive piece work
7   pay?
8      A   Not to my knowledge, except they did get
9   commission for preneed insurance when they sold it.
10  It wouldn't be actually piece work, but it would
11  be...
12     Q   So no, none of the employees that reported
13  to you received piece work pay?
14     A   Not to my knowledge.
15     Q   If you could take a look at bullet five,
16  the bullet five of the Alderwoods' funeral home
17  procedures states, "Completed time cards sheets are
18  to be signed by the employee to verify that the card
19  accurately documents the actual hours worked.  The
20  employee's supervisor or manager must also sign the
21  time card sheet to verify that the hours are
22  accurate and that any overtime recorded is approved.
23  Is not acceptable for either the employee or manager
24  to sign the time card sheet in advance.  It has to
25  be signed after all hours are recorded."  Is that

**NETWORK DEPOSITION SERVICES**
**Transcript of Herbert Bath**

41 (Pages 158 to 161)

158

1       MS. GIFFORD: Objection.
2    A   Yes.
3       THE WITNESS: I'm going to need to take a
4    break.
5          (Off the record at 2:10 p.m.)
6          (On the record at 2:19 p.m.)
7    Q   (MS. MORGAN) Mr. Bath, if you could take
8    a look at Paragraph 12 of your affirmation. And
9    this paragraph refers to what you call the
10   Alderwoods' Community Work Policy. Do you see that?
11   A   Yes, ma'am.
12   Q   Okay. What do you mean by Alderwoods'
13   Community Work Policy?
14   A   That the employees participate in
15   community activities.
16   Q   Which employees?
17   A   All the employees.
18   Q   Hourly and salary?
19   A   Yes, ma'am.
20   Q   And what is -- what are the specifics of
21   this policy, that -- that hourly and salary
22   employees are supposed to participate in employee
23   activity -- in community activities?
24   A   Well, in -- in churches, in rotary,
25   Lions Club, all different functions of the community

159

1    service organizations.
2    Q   Any other details of this policy?
3       MS. GIFFORD: Objection.
4    A   No, not that I know of.
5    Q   (MS. MORGAN) Okay. When you state that
6    this policy required employees to volunteer their
7    time to outside community organizations, which
8    employees are you referring to?
9    A   All employees, hourly and salary.
10   Q   And this was the case for the employees
11   that worked in the locations that you managed?
12   A   Yes.
13   Q   Do you know whether this policy, as you've
14   described it, was in effect for employees at
15   locations other than the ones you managed?
16   A   I assume it was because it was discussed
17   on conference calls and in different meetings by the
18   managers and the area managers and...
19   Q   So you assume it was because it was
20   discussed in conference calls and at meetings?
21   A   Right.
22   Q   Any other thing upon which you base that
23   assumption?
24   A   Well, other than when we was in Orlando
25   one time, the -- Mr. Houston said that we were to be

160

1    active in all of the community organizations that we
2    could.
3    Q   But at that meeting, it was -- it was area
4    managers; correct?
5    A   Yes, all of the area managers were at that
6    meeting, yes.
7    Q   And so in his communication, he was
8    referring -- when he said that you were all supposed
9    to be involved in community activities, he was
10   referring to the area managers; correct?
11   A   I think --
12      MS. GIFFORD: Objection.
13      THE WITNESS: I'm sorry.
14   A   He was -- I think he was emphasizing that
15   all employees be active in the community.
16   Q   (MS. MORGAN) That all employees be active
17   in the community or that all employees were required
18   to be active?
19      MS. GIFFORD: Objection.
20   A   To be -- be active.
21   Q   (MS. MORGAN) So was it a requirement?
22   A   Well, I understood that it was. And --
23   and most everybody else re -- understood the same
24   thing, that I had talked to.
25   Q   And who were these other people that you

161

1    talked to?
2    A   Well, the -- area managers from --
3    from our area and Dennis and -- and Brent and
4    Gordon.
5    Q   So it's your testimony, Mr. Bath, that
6    employees, hourly and salary, were required to
7    participate in community activities?
8    A   That's my understanding, yes, ma'am.
9    Q   And you base this on the conference calls
10   you participated in, meetings that you attended, and
11   what Mr. Houston said that you've described?
12   A   Right.
13   Q   Anything else --
14   A   And -- and that was --
15   Q   -- that you base it on?
16   A   That was actually at one of our meetings.
17   Q   Okay.
18   A   In -- in Orlando that Mr. Houston said
19   that.
20   Q   Okay. Anything else that you base that
21   on?
22      MS. GIFFORD: Objection.
23   A   Not to my knowledge.
24   Q   (MS. MORGAN) What do you mean by the word
25   volunteer in Paragraph 12?

**Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg**
**866-565-1929**

162

1    A   They're required to volunteer.
2    Q   Right.  I'm -- I'm asking what you mean by
3  that.
4    A   Oh, okay.  That they're required to
5  participate.
6    Q   When you talk about outside community
7  organizations in Paragraph 12, are you referring to
8  any particular organizations?
9    A   No, just -- there was no specific org --
10  church, Lions Club.
11   Q   So it could be any community
12  organizations?
13   A   Yes, yes.  There was no -- no specifics
14  put on which type of community organizations.
15   Q   Are there any specifics put into how many
16  community organizations?
17   A   No, not to my knowledge.
18   Q   Okay.  What about how much time to spend
19  in the community organization?
20   A   Not to my knowledge.
21   Q   With respect to Par -- Paragraph 13, you
22  state, "Alderwoods was clear in expecting this
23  community work to be completed on a volunteer
24  basis."
25   A   Um-hmm.

163

1    Q   Do you see that?
2    A   Yes, ma'am.
3    Q   Who communicated this expectation to you?
4    A   Dennis, Brent, and Shawn Phillips.
5    Q   How did they communicate it to you?
6    A   Verbally.
7    Q   What did Dennis specifically say about
8  this expectation?
9    A   I don't remember his exact words, but it
10  was -- they were all three basically the same, you
11  know, we -- we want you to do this and we want the
12  employees to do this and...
13   Q   Want you to do what?
14   A   The -- volunteer for -- for these things.
15   Q   And you're saying that -- that
16  Mr. Phillips, Mr. Matherly, and --
17   A   Mr. Phillips.
18   Q   And Mr. Shawn Phillips all said the same
19  thing?
20   A   Basically.  I mean, not word for word, but
21  they all communicated the same message.
22   Q   Okay.  Did -- was there any other source
23  of this expectation other than these three
24  individuals?
25       MS. GIFFORD:  Objection.

164

1    A   Well, not other than Mr. Houston saying at
2  the meeting down there, that I -- that I remember.
3    Q   (MS. MORGAN)  But that's it?
4    A   As far as I remember, yes.
5    Q   So when you say Alderwoods was clear,
6  you're referring to Dennis Phillips, Shawn Phillips,
7  Brent Matherly, and the comment by Mr. Houston; is
8  that correct?
9    A   Correct.  That's correct.
10   Q   Okay.  What did Mr. Phillip --
11  Mr. Dennis Phillips, Mr. Shawn Phillips, and
12  Mr. Brent Matherly communicate to you about
13  community work being completed on a volunteer basis?
14   A   They said that they'd be -- they'd pay --
15  the company would pay for the dues, but they
16  wouldn't pay them for the work that they did.
17  Attending the meetings and that kind of thing.
18   Q   I'm sorry, you kind of trailed off there.
19   A   That -- I'm sorry.
20   Q   What were you saying, Mr. Bath?
21   A   Attending -- attending the meetings and
22  doing the work -- actual work, projects, and that
23  kind of thing, they wouldn't be compensated for.
24   Q   You state, however, Alderwoods paid all
25  dues for community organizations and events?

165

1    A   Yes.
2    Q   Okay.  What do you mean by that?
3    A   Well, they paid the -- the -- the dues if
4  you belonged to the Lions Club or the BPW or
5  whatever.
6    Q   And what do you base this knowledge on or
7  base -- I'm sorry, base this statement on?
8    A   I -- I've actually seen the -- the
9  checks -- or the petty cash receipts for Lions Club
10  dues and BPW dues and...
11   Q   You've seen receipts for dues for
12  community organizations for the employees at the
13  locations that reported to you?
14   A   Yes.
15   Q   Okay.  What about receipt -- have you seen
16  any receipts showing payment for dues for community
17  organizations or events for employees other than the
18  ones at the locations that you managed?
19   A   No.
20   Q   So do you really know whether Alderwoods
21  paid all dues for community organizations and
22  events?
23       MS. GIFFORD:  Objection.
24   A   Only the ones that I was over is all.
25   Q   (MS. MORGAN)  Paragraph 14, Mr. Bath, you

**NETWORK DEPOSITION SERVICES**
**Transcript of Herbert Bath**

67  (Pages 262 to 265)

---

262

1    A   I -- I don't.
2    Q   (MS. MORGAN)  Against Alderwoods?
3    A   No, I have no idea.
4    Q   Do you know whether he actually performed
5  any community work during the time that he worked
6  for Alderwoods?
7    A   Yes, he did.
8    Q   And what community work was that?
9    A   Well, he worked on Spring Fling and the
10  Pecan Fest.  And I think that was probably all, but.
11    Q   Okay.  Do you know whether he reported the
12  time he spent doing those things?
13    A   No, I do not.
14    Q   And do you know whether he was compensated
15  for it?
16    A   No, I do not.
17    Q   And Mr. Wilkinson, he wasn't required to
18  seek preapproval before he worked overtime; correct?
19    A   That's correct.
20      MS. GIFFORD:  Objection.
21    A   I'm sorry.  That's correct.
22    Q   (MS. MORGAN)  Were any of the employees
23  for whom you were responsible required to get
24  preapproval before they worked overtime?
25      MS. GIFFORD:  Objection.

---

263

1    A   Only to their location managers.
2    Q   (MS. MORGAN)  When --
3    A   Other than that that -- that was budgeted,
4  you know, their workweek, because some of it was
5  like forty-four hours, so part of that was -- was
6  overtime, but it was -- it was understood it was
7  regular overtime.
8    Q   Okay.  So it was already approved?
9    A   Yes, yes.
10    Q   Okay.  As location manager, did you ever
11  require any of the employees that reported to you to
12  get your approval before they worked overtime?
13      MS. GIFFORD:  Objection.
14    A   No.
15    Q   (MS. MORGAN)  And as area manager, did you
16  require any of the employees at the locations that
17  you managed to get approval -- preapproval from
18  their location managers before they worked overtime?
19      MS. GIFFORD:  Objection.
20    A   I don't remember that I did.
21    Q   (MS. MORGAN)  So you might have, but you
22  don't recall?
23    A   I -- I could have, but I do not recall.
24    Q   Okay.  Do you know whether any employees
25  at any of the locations for which you were

---

264

1  responsible as area manager, whether -- if those
2  employees worked overtime without getting
3  preapproval, whether they were compensated for that
4  time?
5      MS. GIFFORD:  Objection.
6    A   I don't know.  I really don't.
7    Q   (MS. MORGAN)  Do you know whether they
8  were to report that time?
9    A   I would assume so, yes.
10    Q   And as area manager, did you instruct the
11  location managers who reported to you that all
12  employees who worked overtime were required to
13  report that overtime?
14      MS. GIFFORD:  Objection.
15    A   I can't honestly say whether I did or not.
16  I think I did.
17    Q   (MS. MORGAN)  Okay.
18    A   But I'm not absolutely sure.
19    Q   And was it your understanding, Mr. Bath,
20  as an area manager at Alderwoods, that if an
21  employee performed overtime work and reported it,
22  that he should be compensated for it, whether or not
23  it was preapproved?
24      MS. GIFFORD:  Objection.
25    A   Yes.

---

265

1    Q   (MS. MORGAN)  Are you aware of any
2  situations where that -- that policy wasn't
3  followed?
4      MS. GIFFORD:  Objection.
5    A   The -- the one with Jolene and the one
6  with Larry.
7    Q   (MS. MORGAN)  But aside from that?
8    A   Is the only two that I know of.
9      MS. MORGAN:  Can we go off the record for
10  just a minute?
11      (Off the record at 4:54 p.m.)
12      (On the record at 4:55 p.m.)
13      MS. MORGAN:  I have no further questions
14  for Mr. Bath at this time.
15      MS. GIFFORD:  Okay.  I have some
16  questions, Mr. Bath, and I'm probably going to be
17  jumping around a bit from topic to topic, so if I
18  jump too quickly and you're confused at all, just
19  let me know.  Okay?
20      THE WITNESS:  Okay.
21      CROSS EXAMINATION
22    Q   (MS. GIFFORD)  One thing I just want to be
23  clear on, during the time when you were both a
24  location manager and an area manager for the
25  Altamont and Chetopa locations, you were serving

---

**NETWORK DEPOSITION SERVICES**
**Transcript of Herbert Bath**

266

1    both those roles at the same time; is that correct?
2       A    That's correct.
3       Q    And then for the other locations you
4    oversaw as area manager, you were only area manager
5    for those locations?
6       A    That's correct.
7       Q    Okay.  And I believe you testified
8    regarding some of the part-time employees and that
9    those employees would be called in as needed; is
10   that correct?
11      A    That's correct.
12      Q    Was there any general expectation as to
13   how many hours those employees would be called in
14   for, sort of on a maximum end?
15      A    No.
16      Q    Okay.
17      A    They just called them in as they needed
18   them, as they were busy, so.
19      Q    Okay.  And I believe you testified on a
20   couple of occasions you would receive bonuses?
21      A    Yes.
22      Q    Were any of the other employees at any
23   locations where you were an area manager ever
24   eligible for any kind of bonus?
25      A    Yes.

268

1       Q    And you testified about petty cash
2    receipts?
3       A    Yes.
4       Q    What would those receipts be?
5       A    For anything that petty cash was spent
6    for.
7       Q    So that was the receipt the employee would
8    bring in --
9       A    Yes.
10      Q    -- to be reimbursed on?
11      A    Yes.
12      Q    And what would happen to those receipts
13   when the employee was reimbursed?
14      A    They'd be given to the location
15   administrator.
16      Q    Okay.  And what did the location
17   administrator do with them?
18      A    I have no idea.  I think they just kept
19   them.  They reported them --
20      Q    Okay.
21      A    -- on up, but I think they actual kept the
22   receipts and just reported the categories, you know,
23   if it was postage or gasoline or whatever, it would
24   be the categories they reported on up.
25      Q    And who did they report that to?

267

1       Q    Okay.  And who -- who could be eligible?
2       A    Any manager or -- actually, anybody at the
3    funeral home.  If the funeral home qualified for the
4    bonus or the manager did, each one of the
5    employees -- full-time employees got a bonus.
6       Q    And would that include hourly employees?
7       A    Yes.
8       Q    Okay.  And just to make sure I'm clear,
9    was Larry Wilson an hourly or salaried employee?
10      A    Hourly.
11      Q    And was there a location manager at the
12   Oswego location?
13      A    No.
14      Q    Okay.
15      A    The -- the manager for Columbus was the
16   location manager for Columbus and Oswego.
17      Q    Okay.  And that was Larry Murdock?
18      A    Yes.
19      Q    Okay.
20      A    It changed, but it -- it was Larry, I
21   think, for the time period we was talking here.
22      Q    I believe you testified that, on occasion,
23   employees would get reimbursed from petty cash; is
24   that correct?
25      A    Yes, that's correct.

269

1       A    To financial in corporate.
2       Q    And what was the purpose of reporting that
3    up?
4       A    So they could keep track of the financial
5    status, expenses of the companies.
6       Q    Okay.  And were those reports used to
7    replenish the petty cash?
8       A    Yes, yes.
9       Q    Okay.  I believe you testified that when
10   you were at the training sessions in Florida, there
11   were several topics that was discussed, and one of
12   those was community involvement; is that correct?
13      A    Yes, that's correct.
14      Q    Can you -- what do you recall was
15   discussed about community involvement at those
16   meetings?
17      A    Actually, to -- to get involved with the
18   community because it was the best advertisement we
19   could get.  If the people knew the employees, then
20   they would call the funeral home.
21      Q    Okay.  And I believe you testified that it
22   was at one of those meetings that you heard
23   Paul Houston discussing community work; is that
24   right?
25      A    That's correct.

**NETWORK DEPOSITION SERVICES**
**Transcript of Herbert Bath**

69 (Pages 270 to 273)

---

270

1 Q And I believe you testified that you
2 understood his expectation was that all employees
3 were to be doing community work, not just salaried
4 employees?
5 A Correct.
6 Q And what gave you that understanding? Is
7 there something he said that --
8 A He made the comment that even the janitor
9 has a circle of influence.
10 Q Okay. And what did you take that to mean?
11 A That he was supposed to be involved in the
12 community.
13 Q He being the janitor --
14 A Right.
15 Q -- was supposed to be involved?
16 A Absolutely.
17 Q Okay. And I believe you testified before
18 that when -- I think it was Dennis Phillips would
19 come to visit your locations and you would visit
20 with him there in person, that one of the things you
21 would discuss was how to create more business?
22 A Yes.
23 Q And what were the kinds of ways you would
24 discuss with him about how to create more business?
25 A Well, through the community involvement,

---

271

1 advertising, preneed sales people. That's just some
2 of them, the ones I remember off the top of my head.
3 Q Okay. And I believe you testified that at
4 one point, Dennis Phillips instructed you that
5 employees were to clock out for lunch, whether they
6 left for lunch or not?
7 A That's correct.
8 Q Is that right? Did you pass that
9 instruction on to the employees who were in your
10 area?
11 A Yes.
12 Q And as far as you knew, did -- did those
13 employees complete their time cards according to
14 Mr. Phillips' instructions?
15 A Yes, as far as I know.
16 Q And would you have been authorized to tell
17 those employees not to do what Mr. Phillips told
18 them to do and to do it a different way?
19 A No.
20 Q I believe you testified that you contacted
21 HR specialists at one point about overtime?
22 MS. MORGAN: Object to the form of the
23 question.
24 A I don't -- I don't think I did.
25 Q (MS. GIFFORD) Okay.

---

272

1 A On HR.
2 Q Okay.
3 A I contacted Dennis Phillips and Brad --
4 Brent Matherly --
5 Q Okay.
6 A -- on the overtime, but I don't think I
7 did the...
8 Q Okay. So the only time you contacted HR
9 specialists was what you testified about before,
10 whether employees were exempt or not exempt?
11 A As far as my memory goes, yes.
12 Q As far as your memory. Okay. All right.
13 I want to bring your attention to Exhibit 1. And
14 the first bullet point on the first page there that
15 says all employees must record all hours actually
16 worked.
17 A Um-hmm.
18 Q And was your understanding that employees
19 were supposed to record on their time cards all
20 hours spent in community work?
21 A Yes.
22 Q On their time cards?
23 A It was, yes.
24 Q And did that understanding change at some
25 time?

---

273

1 A Yes. It did when Mr. Phillips told us
2 that they would be no longer paid for community
3 work.
4 Q Okay. And after that did you --
5 A I'm sorry.
6 Q Did you understand that they were not to
7 record those hours on their time cards?
8 A Yes.
9 Q And did you understand that employees,
10 when they were recording all hours actually worked,
11 were supposed to record time spent while they were
12 on call?
13 A Yes.
14 Q And did that understanding change at some
15 time?
16 A Well, yes, when they -- when I was
17 instructed that they -- company policy was not to
18 pay for on call, it was part of the job.
19 Q Okay. And when you received that
20 instruction, did you understand that you had the
21 authority to tell employees to put that on call time
22 on their time card anyway?
23 A No.
24 Q And did you understand that you had the
25 authority to tell employees that they could record

---

274

1   their community work on the time card, regardless of
2   the instructions you received?
3       A   No.
4       Q   When -- and I apologize for jumping
5   around. When Mr. Phillips gave the instruction that
6   employees were to clock out whether -- for meal
7   breaks whether they left or not, is that
8   something -- an instruction that was given to you
9   one-on-one or on a phone call, if you recall?
10      A   I don't recall. I -- I think it was on a
11  phone call, but it was just a one-on-one phone call,
12  it wasn't a...
13      Q   Okay. And after Mr. Phillips gave that
14  instruction, if your employees were clocking out but
15  continuing to stay and work through their lunch, was
16  your understanding that that procedure was the
17  correct or incorrect procedure?
18      A   Correct.
19      Q   And after you were told that employees
20  were not to be recording community work on their
21  time cards, when your employees would do community
22  work and not record it -- record it on their time
23  cards, did you understand that procedure to be
24  correct or incorrect?
25      A   Yes, correct.

275

1       Q   And when employees worked on call but did
2   not record that time on the time card, did you
3   understand that to be correct or incorrect?
4       A   Correct.
5       Q   And if employees attended -- did training
6   outside of the regular workday and away from the
7   funeral home but did not put that on their time
8   card, did you understand that procedure was correct
9   or incorrect?
10      A   Correct.
11          MS. MORGAN: Object to the form of the
12  question.
13          THE WITNESS: I'm sorry.
14          MS. MORGAN: The answer?
15      A   Correct.
16      Q   (MS. GIFFORD) Okay. And I believe when
17  you testified before about Larry Wilson, you
18  testified there was an occasion when he put
19  community work, recorded it on his time card, but
20  was not paid for it; is that correct?
21      A   That's correct.
22      Q   And you testified that that was the only
23  occasion you knew of when that happened; is that
24  right?
25      A   Yes, other than the on call time that he

276

1   put in.
2       Q   Okay. But just talking about community
3   work?
4       A   Yes, yes.
5       Q   Okay. And why was that the only occasion
6   when you knew of that happening?
7       A   I think that's the only time he put it on
8   his card.
9       Q   Okay. Do you know whether other employees
10  that you supervised knew what had happened to Larry
11  in that situation?
12      A   No, I don't.
13      Q   And after that occasion when Larry was
14  told not to put that time on his time card, did you
15  make sure other employees that you supervised
16  understood not to put that time on their cards?
17      A   Yes, I did.
18      Q   And I think you also testified to an
19  occasion when Larry Wilson had something close to
20  fifty-five hours on his time card and -- and you
21  told him that was excessive.
22      A   Yes.
23      Q   Why -- why would you describe that as
24  excessive?
25      A   Well, because they were budgeted for

277

1   forty-five.
2       Q   And what does that mean?
3       A   And -- well, that was -- that was what --
4   the average he was supposed to work was forty-five
5   hours a week.
6       Q   And who created that budget or
7   requirement?
8       A   Financial, the regional managers, and
9   myself all had input on it.
10      Q   Okay. And did you have the authority to
11  change that?
12      A   No.
13      Q   On that occasion when Larry wrote down
14  fifty-five hours, where those hours that he actually
15  worked?
16      A   To my knowledge, yes.
17      Q   And did you know, was he writing down
18  hours that he had not worked?
19      A   Not to my knowledge.
20      Q   All right. So -- sorry. Okay. And I
21  think before when we were talking about compensation
22  or salaries, you said your understanding was that
23  employees' compensation was budgeted, but their
24  overtime was not; is that correct?
25          MS. MORGAN: Object to the form of the

**NETWORK DEPOSITION SERVICES**
**Transcript of Herbert Bath**

73 (Pages 286 to 289)

286

1    A   I don't recall.
2    Q   Okay. And I think you testified that you
3  understood that that policy applied to location
4  managers, funeral directors, and embalmers; is that
5  correct?
6    A   That's correct.
7    Q   Other than location managers, funeral
8  directors, or embalmers, are there any employees you
9  know of who were scheduled to be on call?
10   A   No.
11   Q   Okay. And just -- I want to make sure
12 we're clear on one thing when we talk about funeral
13 directors and funeral directors being on call. Is
14 it -- when we talk about who could be on call, would
15 it be only funeral directors, would it be people
16 whose job title is funeral director slash embalmer,
17 are -- is there a difference to you or are those the
18 same?
19   A   Well, there's a difference statewide, but
20 there's not as far as I'm concerned.
21   Q   Okay. So that state difference is in the
22 licensing?
23   A   Yes, yes.
24   Q   Okay. So it's correct that funeral
25 directors would be on call?

287

1    A   Yes.
2    Q   And embalmers would be on call?
3    A   Yes.
4    Q   And funeral director/embalmers could also
5  be on call?
6    A   Right.
7    Q   Okay. And I believe you testified that at
8  one point in 2003 or 2004, there was a change from
9  on call calls going directly to the individual who
10 was on call and you got an answering service
11 involved?
12   A   Right.
13   Q   What change occurred to the on call duties
14 when the answering service came in?
15   A   Actually, none, except they were answering
16 the phone calls and they would relay the message to
17 who was on call and they would have to deal with it,
18 you know, call the family back or if they had a
19 question or, you know, make arrangements to removal
20 or.
21   Q   So they being the answering service would
22 take the initial calls as they came in?
23   A   Right.
24   Q   But the employees who were on call would
25 still -- they would still, I -- I take it, answer

288

1  inquiries that came into the funeral home?
2    A   Yes, yes.
3    Q   Would they still provide the pricing
4  information?
5    A   Yes.
6    Q   Did they still make arrangements by phone
7  call at that point?
8    A   Some arrangements.
9    Q   Okay. Or --
10   A   Some --
11   Q   -- appointments maybe?
12   A   Right, yes.
13   Q   Okay. And did they still have to respond
14 to death calls at that time?
15   A   Yes.
16   Q   Okay. And I believe you testified at one
17 point that Brent Matherly told you there was a no
18 pay policy for on call work. Can you tell me what
19 you meant by that?
20       MS. MORGAN: Object to the form of the
21 question.
22   A   I think on call -- just being on call you
23 didn't get paid for. If you were actually called
24 out to -- to do something, you did get called -- you
25 did get paid, but otherwise you did not.

289

1    Q   (MS. GIFFORD) So I guess what I want to
2  be clear on is did Mr. Matherly tell you that there
3  was a policy where you wouldn't get paid for on call
4  or did he tell you that there was no policy about
5  getting paid on call?
6        MS. MORGAN: Object to the form of the
7  question.
8    Q   (MS. GIFFORD) Does that make sense?
9    A   I think he just said that there was a
10 policy that there wouldn't be any on call --
11   Q   Okay.
12   A   -- pay as on call.
13       Now, if you're called out, then that's
14 different.
15   Q   Okay.
16   A   But just sitting there by the telephone
17 waiting or whatever.
18   Q   Okay. And so to be clear, then, employees
19 weren't paid for time when they were sitting waiting
20 for the telephone to ring; is that correct?
21   A   Correct.
22   Q   Were they paid for the time when they were
23 at home when they answered the call?
24   A   Most of the time not.
25   Q   Okay. And were they paid for the time

**NETWORK DEPOSITION SERVICES**
**Transcript of Herbert Bath**

74 (Pages 290 to 293)

290

1  that they spent talking to people while they were on
2  the phone, while they were still at their home away
3  from the location?
4      A   I don't think on the phone, but anything
5  that they were called out to do, they did -- were
6  paid.
7      Q   So if they left to do a removal?
8      A   Right.
9      Q   Or if they left to do an embalming?
10     A   Um-hmm.
11     Q   Except for I believe there were a couple
12  exceptions you testified --
13     A   Right.
14     Q   -- to earlier?
15     A   Right.  Generally.
16     Q   And again, just to be clear, were -- did
17  the location managers you knew have funeral director
18  licenses?
19         MS. MORGAN:  Object to the form of the
20  question.
21     A   Yes, all of them.
22     Q   (MS. GIFFORD) Okay.
23     A   All of them did that I know of.
24     Q   And did some or all of them have embalming
25  licenses?

291

1      A   Some did, all did not.
2      Q   Okay.
3      A   Well, now I'm not -- I think all of
4  them -- all of them did have -- that -- that I knew,
5  had embalmer's license, the managers did.
6      Q   Okay.  And earlier you gave an estimate of
7  the number of hours you thought employees would
8  spend training to maintain their funeral director or
9  embalming licenses?
10     A   Um-hmm.
11     Q   What was that estimate based on?
12     A   Just the hours that's required.
13     Q   Okay.  So --
14     A   Not traveling time or -- or seminar time
15  or -- just actual.
16     Q   And those were the hours required by the
17  state; is that right?
18     A   Correct.
19     Q   And they were continuing education hours?
20     A   Correct.
21     Q   So the state would say you need X number
22  of continuing education hours, and if you didn't do
23  that, you wouldn't keep your license?
24     A   Correct.
25     Q   Okay.  All right.  I want to draw your

292

1  attention again to Exhibit 4.
2      A   Okay.
3      Q   Which is the list of names.  And first,
4  for the record, I just want to note that -- well,
5  and you can tell me if I'm correct.  That the -- the
6  list is 15 pages long, I believe, and over 700
7  names?
8      A   Yes.
9      Q   Okay.  And as you sit here today, and I
10  know you looked through and tried to be careful in
11  identifying the people you know.  Is it possible
12  there are names in there that you know who you just
13  missed?
14     A   Possible.
15     Q   Is it possible there are names in there of
16  people you know, but they're -- you're forgetting
17  their names?
18     A   Possible.
19     Q   Is it possible that there are names in
20  there of people you know, but you didn't know how
21  their names were spelled, so you're not recognizing
22  them?
23     A   Yes.
24     Q   And is it possible that some of the
25  employees, and probably in particular maybe female

293

1  employees, may have changed their names or their
2  last names since you knew them?
3      A   Yes.
4      Q   Okay.  And I want to bring you back to
5  Exhibit 2, which is your statement.  And looking on
6  the front page there at Paragraph 4, and it refers
7  to seven locations.  And I know at some point today
8  we've been talking about ten locations or ten
9  facilities.  Can you tell me what the difference is
10  between -- why it says seven here and why we were
11  talking about ten facilities today?
12     A   Well, at different times I was area
13  manager for a different number of funeral homes and
14  cemeteries.
15     Q   Okay.  And I understand that the
16  cemeteries we talked about today.  Would these seven
17  locations be the main locations and not the
18  satellite locations?
19     A   Yes, yes.
20     Q   Okay.  And then drawing your attention to
21  Paragraph 9, where it talks about you understood
22  that each location had five binders containing the
23  policy information.
24     A   Correct.
25     Q   Do you know of any location, other than

294

1  the satellite locations, that did not have copies of
2  the binders?
3          MS. MORGAN:  Object to the form of the
4  question.
5      A  No, I think even the satellite locations
6  had them.
7      Q  (MS. GIFFORD)  Okay.  All right.  And now
8  I'm going to ask you to look on Page 4 at Paragraph
9  17.  And this is where that paragraph talks about
10  the requirement that all location managers hold
11  employee meetings to discuss best practices of where
12  employees could become involved in the community.
13  Do you see that?
14     A  Um-hmm.  Yes, ma'am.
15     Q  And I just want to make sure I'm clear on
16  this.  So I understand from your testimony that
17  location managers were required to hold weekly staff
18  meetings?
19     A  Correct.
20     Q  And they would talk about many things at
21  those staff meetings, but one of the things they
22  would discuss were best practices?
23     A  Correct.
24     Q  And there were many types of best
25  practices, and one type of best practice was where

295

1  employees could become involved in the community?
2      A  Yes.
3      Q  Okay.  Is there anything about what I said
4  that is incorrect or that we should change?
5      A  No.
6      Q  Okay.  And looking, then, at Paragraph 23,
7  which runs from the bottom of that page to the top
8  of the next page.
9      A  Um-hmm.
10     Q  Where it says that Brent Matherly and
11  Dennis Phillips told you the on call pay policy
12  came, quote, directly from up above.
13     A  Yes.
14     Q  And I know you said you -- you testified
15  earlier, I believe, that you didn't know who it was
16  that that policy came from specifically.
17     A  That's correct.
18     Q  Did you have an understanding of -- at
19  what level of the company that policy came from?
20     A  No, not com -- not completely.  I assumed,
21  but I did not.
22     Q  Okay.  Do you know whether it came from
23  someone who you supervised?
24     A  No.
25     Q  Who was below you?  Did it come from you?

296

1      A  No.
2      Q  Did you understand that it came from
3  Brent Matherly or Dennis Phillips?
4      A  No.
5      Q  Did you understand that it came from
6  someone above them?
7      A  Yes.
8      Q  But you don't know at what level above
9  them?
10     A  Right.
11     Q  Okay.  And then looking at Paragraph 26,
12  it says if an employee worked on their training
13  hours away from the funeral home and outside of the
14  regular workday, then it was not paid for by
15  Alderwoods.
16     A  Right.
17     Q  Is that a true and correct statement?
18     A  Yes.
19     Q  And what training hours were you referring
20  to?
21     A  The training for the licensing.
22     Q  And that would be the funeral director or
23  embalming license?
24     A  Right.
25     Q  And that would be the continuing education

297

1  hours?
2      A  Yes.  Or it could be for the insurance,
3  even though they weren't required, there's
4  continuing education for the insurance policy agency
5  too.
6      Q  Okay.  And looking through the statement
7  here today, is it -- is -- is it your testimony that
8  the statement is still truthful and accurate?
9      A  Yes.
10     Q  And is anything in your testimony today
11  intended to change your testimony in this statement?
12     A  No.
13         MS. MORGAN:  Object to the form of the
14  question.  His testimony is what it is.
15     Q  (MS. GIFFORD)  And did anyone coerce you
16  into signing this statement?
17     A  No.
18     Q  Did anyone pressure you into signing this
19  statement?
20     A  No.
21     Q  Were you promised anything in exchange for
22  signing this statement?
23     A  No.
24         MS. GIFFORD:  Okay.  Those are all the
25  questions I have.

# Exhibit 4

Deposition Transcript of Jason Burgess (08-11-09)

1

1    THE UNITED STATES DISTRICT COURT
   FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2     Civil Action No. 06-1641

3  _____

4           )
  DEBORAH PRISE and HEATHER   )
5  RADY on behalf of themselves )
  and all employees similarly )
6  situated,        )
           )
7     Plaintiffs,    )
           )
8  vs.          )
           )
9  ALDERWOODS GROUP, INC., and  )
  SERVICE CORPORATION INTERNATIONAL)
10          )
     Defendant.    )
11  _____)

12   DEPOSITION OF JASON ALEX BURGESS

13    (Taken by Defendants)

14   Charlotte, North Carolina

15   Tuesday, August 11, 2009

16

17

18

19

20

21

22

23

24    Reported in Stenotype by
   V. Dario Stanziola, CSR, RPR, CRR
25

2

1      APPEARANCES

Page 1

Deposition Transcript of Jason Burgess (08-11-09)

2   ON BEHALF OF THE PLAINTIFFS:

3           KYLE T. McGEE, Esquire
            Margolis Edelstein
4           525 William Penn Place, Suite 3300
            Pittsburgh, Pennsylvania 15219
5           (412) 355-4971
            kmcgee@margolisedelstein.com
6
    ON BEHALF OF THE DEFENDANT:
7
            TONYA B. BRAUN, Esquire
8           Jones Day
            325 John H. McConnell Boulevard
9           Suite 600
            Columbus, Ohio 43215
10          (614) 469-3939
            tbraun@jonesday.com
11

12

13

14

15

16

17

18

19          DEPOSITION OF JASON ALEX BURGESS,

20  a witness called on behalf of the Defendant, before

21  V. Dario Stanziola, CSR, RPR, CRR, Notary Public,

22  in and for the State of North Carolina, held at the

23  Hampton Inn Charlotte, 530 East Martin Luther King,

24  Jr. Boulevard, Charlotte, North Carolina, on

25  Tuesday, August 11, 2009, commencing at 9:34 a.m.

3

1                   INDEX OF EXAMINATIONS

2

3   By Ms. Braun           PAGE    5, 345, 355

4   By Mr. McGee           PAGE    285, 353, 357

                           Page 2

Deposition Transcript of Jason Burgess (08-11-09)

16    Q.   Do you have any present recollection today

17  of how many times you believe you had a discrepancy

18  regarding your time in these weekly meetings that you

19  had?

20    A.   No, ma'am.

21    Q.   No estimate?

22    A.   No, ma'am.

23    Q.   Do you recall receiving any other type of

24  compensation beyond your hourly wages?

25    A.   Yes, ma'am.  I had commission pay for

                                                          102

1  marker sales.

2    Q.   Are markers headstones?

3    A.   Yes, ma'am.

4    Q.   Okay.  Did you have to have any type of

5  special licensure to do marker sales?

6    A.   No, ma'am.

7    Q.   Is there any other type of compensation

8  other than your hourly wages and the commissions you

9  received for marker sales?

10    A.   No, ma'am.

11    Q.   Do you recall how the commission worked, do

12  you know what percentage it was or if it was a flat

13  fee for the marker?

14    A.   To the best of my knowledge, it was --

15  I'm almost positive it was 20 percent of what --

16  like, say, whatever the total amount would have

17  been for the marker.

18    Q.   Did you sell markers throughout your

                    Page 92

Deposition Transcript of Jason Burgess (08-11-09)

19    employment with Alderwoods?

20        A.   No.

21        Q.   When did you begin selling them?

22        A.   2004, sometime during that year.

23        Q.   And would you -- why did you start then?

24        A.   It was something new that Alderwoods

25    started doing.

                                                        103

1         Q.   So you didn't have the opportunity to sell

2    the markers prior to that time?

3         A.   No, ma'am.  No, ma'am.

4         Q.   Do you have any knowledge of any type of

5    compensation other employees at McEwen would have

6    received beyond their hourly wages?

7         A.   No, ma'am.

8         Q.   Do you know whether the commissions were

9    included in the calculation of your regular rate for

10   overtime?

11        A.   I don't understand the question.

12        Q.   You received overtime while you worked for

13   Alderwoods?

14        A.   Correct.

15        Q.   Overtime pay?

16        A.   Correct.

17        Q.   Okay.  Do you have any idea how the

18   compensation figured into the -- the pay you received

19   for overtime at Alderwoods?

20             MR. McGEE:  Object to the form, lack of

21        foundation.

                    Page 93

Deposition Transcript of Jason Burgess (08-11-09)

22     A.   As far as I -- no, as far as I know, the

23   way the commission was paid, it was paid -- because

24   when -- when you would sell a marker, you got two

25   pay stubs that week, one would actually be a

104

1   paycheck and one was a direct deposit pay stub.

2   Direct deposit pay stub would have been your normal

3   salary you got for a week.  The commission would

4   have been written in a check and you would have got

5   two that week instead of having one.

6     Q.   But you don't have any knowledge as to

7   whether the commissions were included in the rate you

8   received for your overtime in the weeks that you sold

9   the markers?

10     MR. MCGEE:  Object to form.

11     Q.   Do you know?

12     A.   No, ma'am, I don't know.

13     Q.   Did you ever see any type of policy as to

14   what would be included or what would be excluded in

15   overtime payments?

16     A.   I don't understand what you mean.

17     Q.   Did you ever see any type of -- let me put

18   it to you this way, did you ever see any type of

19   policy that discussed how overtime was calculated?

20     A.   No, ma'am.  The only thing I know that we

21   weren't paid overtime for was community service,

22   that was it.  And to me it should have been paid

23   seeing how we were required to be there, wear our

24   coat and tie and our name tag, telling who we are

Page 94

Deposition Transcript of Jason Burgess (08-11-09)

14    been taken off.  You know, or it could be

15    something -- it would be the same situation all the

16    way across, whether it be an eight-hour day or a

17    13-hour day, whichever the case may be.

18        Q.   But without a marking like that --

19        A.   Without a marking like that, I could not

20    tell you for sure.

21        Q.   Well, let's talk about that for a minute.

22    Because we -- you did tell me this for sure.  We

23    looked at this document.  You're telling me for sure

24    this is -- you were paid correctly?

25        A.   Yes, ma'am.

217

1         Q.   Okay.

2              MR. MCGEE:  Object to the form.

3         A.   Oh, yeah.

4         Q.   Were you paid correctly here?

5         A.   Yes, ma'am.  I guess the way I should

6     phrase it is if it has a mark on it, then we

7     weren't paid for it, it was taken off.  And you'll

8     -- and you would see on the -- like at the totals

9     here, where it had 51, 40 regular, 11 overtime, I

10    would -- that's my writing and I would fill it out

11    each week, that would be -- it would also have

12    lines through it where it says -- it may would say,

13    for example, 48, 49 regular -- you know, total, and

14    it would only say eight or nine overtime, would be

15    a line through the -- through the 11.

16        Q.   All right.  But unless we found a document

Page 196

Deposition Transcript of Jason Burgess (08-11-09)

326

1    had completely forgot about marker sales because it
2    was so minimal.
3        Q.   Okay.  So you did sell markers,
4    gravestones?
5        A.   Yes, sir.
6        Q.   And you did receive commissions for that;
7    is that correct?
8        A.   Yes, sir.
9        Q.   Okay.  You were an hourly employee; is that
10   correct?
11       A.   Yes, sir.
12       Q.   And as an hourly employee, you did have the
13   occasion to work overtime; isn't that true?
14       A.   Yes, sir.
15       Q.   What was your understanding as to how you
16   were to be compensated for hours worked over 40 in
17   any given workweek?
18       A.   Anything worked over 40 was
19   time-and-a-half.
20       Q.   Do you know whether the amount of
21   commission that you received was factored into the
22   base rate when calculating that time-and-a-half?
23       A.   I do not know.  The only thing I know
24   about the commissions is that they -- we got two
25   pay stubs.

327

Deposition Transcript of Jason Burgess (08-11-09)

1    Q.   So your commission payment was wholly
2  separate from -- from your hourly pay; is that
3  correct?
4    A.   Yes.
5    Q.   Okay. And by wholly separate, I mean wholly
6  separate, when you received it, you got two separate
7  pay stubs; is that correct?
8    A.   Yeah, I got one, it was a direct deposit,
9  and then the other envelope had an actual check in
10  it with my commission on it.
11    Q.   Okay.  Looking back now, do you wish to
12  check box E?
13    A.   Well, I guess because, I mean, I received
14  commission on -- on markers.  I'm still not even --
15  I really truly am not sure, beyond a shadow of a
16  doubt, if that applies to me or not.  The only
17  reason I say yes is because I received comission
18  off of marker sales.
19        MR. MCGEE:  At this time, we're going to
20        amend to -- we'll amend on the record that
21        we're going to have Mr. Burgess indicate that
22        his intention is to seek compensation under E,
23        if it can be proven along with the other opt
24        in plaintiffs who submitted information
25        sheets.  If you'd like us to produce you

328

1        another original, let me know, and I'll --
2        MS. BRAUN:  Well, we certainly would, but
3        I have to object because I haven't heard
                        Page 296

# Exhibit 5

1                IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF PENNSYLVANIA
2
                    Civil Action No. 06-1641
3                    Judge Joy Flowers Conti

4
DEBORAH PRISE and HEATHER RADY
5  on behalf of themselves and all
   employees similarly situated,
6
            Plaintiffs,
7
   vs.
8
   ALDERWOODS GROUP, INC.,
9
            Defendant.
10
   -----------------------------
11

12

13

14
                    2525 Glades Road
15                   Boca Raton, Florida
                     December 10, 2008
16                   9:55 a.m. - 7:20 p.m.

17

18
            DEPOSITION OF SHANE M. CARSWELL
19

20

21     Taken before Mark Rabinowitz, Registered Professional

22  Reporter and Notary Public for the State of Florida at

23  Large, pursuant to Notice of Taking Deposition filed in

24  the above cause.

25

**NETWORK DEPOSITION SERVICES**
**Transcript of Shane Carswell**

20  (Pages 74 to 77)

74

1        A    Most likely, the CPF.
2        Q    You don't really know the reasons behind that
3    bonus?
4        A    No, not really.  I don't recall.
5        Q    What was the amount of the bonus?
6        A    It was probably just a few hundred dollars.
7        Q    Any other type of compensation that you
8    received while you were at Alderwoods and your hourly
9    rate and these bonuses?
10        MR. LINGLE:  Objection to form.
11        A    None that I can think of, off the top of my
12    head right now.
13        Q    So no commissions, right?
14        A    No.
15        Q    Any awards of any type?
16        A    As far as merit or something along those lines?
17        Q    Yes.
18        A    Nothing in that type frame, no, not that I can
19    think of right now.
20        (Defendant's Exhibit 10 was marked for
21    identification).
22        Q    Mr. Carswell, I have handed you what has been
23    marked as Exhibit 10.  This is a printout of the details
24    of the checks that you received during your employment
25    with Alderwoods from December of 2003 to June of 2006.

75

1    It shows, among other things, the check date, the check
2    number, the gross wages, deductions, net pay and
3    itemized earnings.
4        If you would, take a look at the check date of
5    April 22nd of 2005, which is on page -- at the bottom of
6    the exhibit there are Bates numbers with "ALD."
7        A    Uh-hum.
8        Q    If you could, look at page ALD00167.
9        A    Okay.
10        Q    Then this first entry for the check dated
11    April 22nd, 2005, there is an earnings column underneath
12    a notation "Y/E bonus."  Do you see that?
13        A    Yes.
14        Q    Then there is an amount there of $441.90.
15        A    Okay.
16        Q    Does that help refresh your memory as to
17    whether you received a bonus?
18        A    A year-end bonus.  That's what that is.  That's
19    a year-end bonus, so yes.
20        Q    Then, if you would, turn to page ALD000169.
21    Take a look at the check dated August 4th, 2005.  It is
22    in the middle of that page.
23        A    Okay.  Yes.
24        Q    Underneath "earnings" it has "Y/E bonus" in
25    the amount of $178.54?

76

1        A    Yes.
2        Q    Does that refresh your memory as to whether
3    you got a bonus at that time?
4        A    It doesn't.  I may have, but I don't recall.
5        Q    You don't recall getting a bonus at that time?
6        A    I truly don't recall if I did or not.
7        Q    If you would, turn to page ALD000174.  The
8    last check entry on that page is check dated March 16th,
9    2006.  Underneath "earnings" it says "Y/E bonus" in the
10    amount of $412.80.  Do you see that entry?
11        A    Yes, I see it.
12        Q    Does that refresh your recollection about a
13    bonus that you received in March of 2006?
14        A    I think that's close to the one.  That's close
15    to the time I would have received it, the other bonus,
16    but I don't think that's the right amount.  I don't think
17    that's -- I know I received a bonus somewhere around that
18    period, because that's just prior to me leaving, but...
19        Q    But you recall it being --
20        A    More.
21        Q    -- close to $1,200 or $1,500?
22        A    Somewhere around that neighborhood, yeah.
23        Q    Did you receive overtime pay in most of the
24    weeks that you worked at Alderwoods?
25        A    Yes.

77

1        MR. LINGLE:  Objection to form.
2        Q    Did you ever receive piecework pay at the time
3    that you worked at Alderwoods?
4        A    Piecework as in what?
5        Q    If you will, take a look at the second page
6    of Exhibit 10, right in the middle of the page, a check
7    dated January 30th, 2004, underneath "earnings" it says
8    "piecework" in the amount of $115.  Do you know what
9    that might be for?
10        MR. LINGLE:  Objection to form.
11        A    I honestly don't know.
12        Q    Are you claiming in the lawsuit, Mr. Carswell,
13    that you received compensation in addition to your
14    hourly wage that was not included when calculating your
15    overtime rate?
16        MR. LINGLE:  Objection to form.
17        A    I'm not quite certain I understand what you are
18    asking.
19        (Defendant's Exhibit 11 was marked for
20    identification).
21        Q    If you would, take a look at Exhibit 11.  Are
22    you familiar with this document?
23        A    Yes.
24        Q    Is this an information sheet that you filled
25    out related to this lawsuit?

**NETWORK DEPOSITION SERVICES**
**Transcript of Shane Carswell**

21 (Pages 78 to 81)

78

1      A    Yes.
2      Q    Is it your signature at the bottom of the
3  document?
4      A    Yes, it is.
5      Q    When did you sign the document?
6      A    9/21/07.
7      Q    When did you receive this information sheet?
8      A    I will say somewhere close to this, at the time
9  that I signed it; so probably a day or two before that.
10     Q    Did anyone help you fill it out?
11     A    No.
12     Q    Did you discuss it with an attorney?
13     A    I spoke with someone on the phone about it, but
14  that's it.
15     Q    Someone from your attorney's office?
16     A    Someone from the attorney's office, yes.
17     Q    Did you fill out the checklist before you
18  spoke with this individual or after?
19     A    After.
20     Q    Was there more than one version of the
21  information sheet that you filled out?
22         MR. LINGLE: Objection to form.
23     A    I don't believe there was. I think there were
24  different forms, but not like this, I mean, as far as the
25  exact same thing.

79

1      Q    If you can, take a look at the dates of
2  employment. Is the information that you provided
3  regarding the date of employment with Alderwoods still
4  accurate?
5      A    Yes.
6      Q    The positions that you held with Alderwoods
7  and the dates of each position, is that accurate as
8  well?
9      A    Yes.
10     Q    The funeral home locations where you worked
11  during your employment with Alderwoods, is the
12  information that you provided still accurate?
13     A    Yes.
14     Q    Is it missing, though, the time that you spent
15  at the downtown location?
16     A    I don't think it's missing. It's just not
17  listed as downtown or separated as those chapels
18  individually because it was all one group.
19     Q    It is the Kraeer Funeral Home and ABC Jennings
20  Funeral Home. Then you also talk about how during the
21  last few months of your employment you were at the
22  downtown location?
23     A    Right. Exactly.
24     Q    Let me ask you this: These checkmarks that
25  you made next to paragraphs A, B, D and E, are those

80

1  indicating the reasons why you opted into the lawsuit?
2         MR. LINGLE: Objection to form.
3      A    Yes.
4      Q    You made those checkmarks?
5      A    Yes.
6      Q    If you will take a look at paragraph E, if you
7  can just review that paragraph, and let me know when you
8  have had a chance to read it over.
9      A    Okay. Yes.
10     Q    In this paragraph you are stating that you
11  believe you received compensation in addition to your
12  hourly rate that Alderwoods did not include when
13  calculating overtime due to you?
14     A    Correct.
15     Q    That's what I meant. That's what I'm asking
16  you about.
17     A    Okay.
18     Q    Are you referring to the bonuses that you
19  described?
20         MR. LINGLE: Objection to form.
21     Q    Is that the compensation that you are saying
22  was not included had calculating the overtime pay?
23         MR. LINGLE: Objection to form.
24     A    I think that would be some of those things
25  because they weren't included on a pay stub.

81

1         MR. LINGLE: I assume that you are not really
2  asking for his legal opinion as to what should be
3  included, right?
4         MS. MORGAN: Right.
5         MR. LINGLE: Okay.
6      Q    You didn't receive any commissions, correct?
7      A    None with Alderwoods, no.
8      Q    Do you know whether the bonuses you received
9  during your employment with Alderwoods were included in
10  calculating your overtime rate of pay?
11         MR. LINGLE: Objection to form.
12     A    I don't know. I don't believe so, but I don't
13  know for sure.
14     Q    If you believe that your bonuses were not
15  included in calculating your overtime rate of pay, what
16  are you basing that on?
17         MR. LINGLE: Objection to form.
18     A    What am I basing that on?
19     Q    Yes. What do you think your bonus pay may not
20  have been included in calculating your overtime pay
21  rate?
22     A    Because it didn't change my entire rate of pay.
23     Q    How do you know that?
24     A    I have seen my checks.
25     Q    So you are basing it on your review of your

82

1   paychecks?
2       A   From what I see on these, especially on these
3   forms and everything, it didn't affect my rate of
4   overtime pay.
5       Q   Did you ever complain about that to any
6   Alderwoods management?
7       MR. LINGLE:  Objection to form.
8       A   No.
9       Q   Did you ever call the hotline, the help line
10  to complain?
11      MR. LINGLE:  Objection to form.
12      A   About this?
13      Q   About compensation not being included in
14  calculating your overtime pay.
15      A   No.
16      Q   If you could, take a look at this check detail
17  listing.  That is Exhibit 10.
18      A   Okay.
19      Q   If you can, take a look at the very first page
20  of Exhibit 10, a check dated December 19th, 2003.
21      A   Yes.
22      Q   Do you see underneath "earnings" where it says
23  "overtime adjust"?
24      A   Yes.
25      Q   And then the amount of $36.26?

83

1       A   Yes.
2       Q   Do you know what that overtime adjustment was
3   for?
4       MR. LINGLE:  Objection to form.
5       A   On this, no.
6       Q   Do you know whether that overtime adjustment
7   accounted for your bonus compensation?
8       MR. LINGLE:  Objection to form.
9       A   Not that I'm aware of.
10      Q   So are you saying that you do know that it did
11  not account for your bonuses or that you don't know?
12      MR. LINGLE:  Objection to form.
13      A   I don't know.
14      Q   Is it possible this overtime adjustment does
15  account for your bonus?
16      MR. LINGLE:  Objection to form.
17      A   That I don't know.
18      Q   If you could, turn to page 3 of this exhibit,
19  which is ALD000157.  In the middle of that page there is
20  an entry for a check dated March 12th, 2004.  Underneath
21  "earnings" do you see an entry for "overtime adjust"?
22      A   Yes.
23      Q   Then there is an amount of $27.60?
24      A   Yes.
25      Q   Do you know what that overtime adjustment is

84

1   it for?
2       A   No, I don't.
3       Q   Is it possible that overtime adjustment
4   accounted for the bonus that you received?
5       MR. LINGLE:  Objection to form.
6       A   That I don't know.
7       Q   Can you turn to page 21, which is marked as
8   ALD000175.
9       A   Okay.
10      Q   There is an entry at the bottom of the page
11  for a check dated May 5th of 2006.
12      A   Yes.
13      Q   Underneath the "earnings" column there is an
14  entry for overtime adjustment.  Do you see that?
15      A   Yes.
16      Q   Then there is an amount of $12.07 for that
17  entry?
18      A   Yes.
19      Q   Do you know what this overtime adjustment is
20  for?
21      A   No.
22      Q   Isn't it possible that this overtime
23  adjustment accounts for the bonus that you received?
24      MR. LINGLE:  Objection to form.
25      A   I don't know.

85

1       (Defendant's Exhibit 12 was marked for
2   identification).
3       Q   I have handed you what I have marked as
4   Exhibit 12.  If you can, turn to the page Bates labeled
5   ALD004256.
6       A   Okay.
7       Q   This is a document produced by Alderwoods that
8   is labeled "worksheet for overtime calculation on Y/E
9   bonus."  It has your name and a bonus amount of $591.34.
10  Do you see that?
11      A   Yes.
12      Q   Do you see how there is a total adjustment
13  column?
14      A   Yes.
15      Q   And at the bottom it says $12.07?
16      A   Yes.
17      Q   Does reviewing this document refresh your
18  recollection as to whether the bonus you received in the
19  amount of $591.31 was included in calculating your
20  overtime pay rate?
21      MR. LINGLE:  Objection to form.
22      A   No, it doesn't.
23      Q   Is it possible that your overtime pay rate
24  was adjusted to account for the bonus you received of
25  $591.34?

**Johnstown**
**814-266-2042**

**Toll-Free**
**866-565-1929**

**Pittsburgh**
**412-281-7908**

158

1  have been. I'm trying to think of the -- you were
2  compensated some, but not always the right amounts, I
3  guess.
4      Q   On the occasions that you used the timecard to
5  punch in and out for on-call work, were you compensated
6  by Alderwoods for that time?
7      MR. LINGLE: Objection to form.
8      A   On the all-nighter card, you just punch once in
9  and out. That was it. You didn't punch in and out on
10  that. In the other instances where they had done it
11  before, you would punch in and punch out, but you
12  couldn't punch in before you got into the funeral home.
13      You were not really compensated for the time
14  that you were getting to the funeral home, which --
15      Q   The travel time is what you are talking about?
16      A   Yes, and the travel time back home. You were
17  not compensated for that. You were just compensated for
18  the time that you hit the clock.
19      Q   Are you saying on the times you performed
20  work, on-call work for Alderwoods, you were compensated
21  for the time that you reported except for your travel
22  time?
23      MR. LINGLE: Objection to form.
24      A   The travel time would be one, and then the
25  other one is the all-nighter. It was a flat fee. So in

159

1  some instances that might not be. You might not be
2  making the same amount of money where you would if you
3  had done an hourly. So it just depended on the
4  circumstances, and if so -- sometimes you would and
5  sometimes you wouldn't. It just depends on the work week
6  and the circumstances.
7      Q   Is there any work that you performed for
8  Alderwoods when you were on-call that you believe you
9  were not compensated for?
10      A   Yes.
11      Q   Okay. What work was that?
12      A   Night calls, prep work, those things, some
13  nights. Even with the flat rate, some nights you would
14  get called in, you know, an hour early when you were
15  still just getting paid that flat rate. You had to go
16  in early. I mean, there were nights that you didn't get
17  paid for exactly what you were doing.
18      Q   When do you mean by "night calls"? Is that
19  still the removal --
20      A   Yes.
21      Q   -- and the embalming work?
22      A   Yes.
23      Q   What aspect of that are you saying that you
24  may not have been compensated for?
25      MR. LINGLE: Objection to form.

160

1      A   I mean, there, again, there were time frames
2  as far as, you know, coming in and those things. The pay
3  might not have been if you had worked hourly, some of
4  those nights, too.
5      Q   Are you saying the difference between being
6  paid on a flat-fee basis versus being paid strictly for
7  your hours? Is that what you are saying?
8      A   Sometimes, yes, if that would have been the
9  case and they switched from one to the other. So it's
10  kind of, again, you get both sides of it. It's really
11  strange.
12      Q   Then you also mentioned prep work. What do
13  you mean by that?
14      A   Embalming.
15      Q   With respect to the embalming, is there any
16  on-call or any work that you actually performed for
17  Alderwoods while you were on-call related to embalming
18  that you believe you were not compensated for?
19      A   There were nights with the embalming that if
20  you got a call that came in late and it ran into the
21  morning, you are there. You are working straight
22  through, and you are no longer on that time clock their
23  suggestion that you are on. You know, it runs over into
24  the morning when you are still there working.
25      I mean, you can't clock out. You are supposed

161

1  to clock out for an hour and you can't. So, again, it's
2  the time that you are there.
3      Q   I'm not understanding that. What do you mean?
4      A   Say, for instance, you get a call at 5 o'clock
5  in the morning. You go to the residence, and you pick
6  that person up. You bring that person in, and you have
7  to embalm it. You get back by 6:00 or 6:30. Well, you
8  start embalming, because that was one of the rules. That
9  you have to embalm that body. So you are embalming that
10  body. The day crew comes in at 7:30, and you are still
11  there embalming it. It takes a couple of hours to embalm
12  a body.
13      Once you are on break -- you are supposed to
14  have a break before you start your day. You get out and
15  now you are working straight through the day, and it
16  overlaps each other, but you are not compensated in any
17  way for that. So you don't get your hour break that you
18  are supposed to. You just work through that, and you
19  don't leave to go home early, either. You have to work
20  until 5:00.
21      Q   When you are saying that you were not
22  compensated for that, are you saying you were not paid
23  overtime for that, but you were compensated for it as if
24  it was on your regular schedule?
25      A   Basically, the same as taking a lunch break.

**Johnstown**
**814-266-2042**

**Toll-Free**
**866-565-1929**

**Pittsburgh**
**412-281-7908**

# Exhibit 6

**NETWORK DEPOSITION SERVICES**
**Transcript of Millard Jude Daigle**

1

```
1              THE UNITED STATES DISTRICT COURT
2               FOR THE WESTERN DISTRICT OF
                         PENNSYLVANIA
3

4
   DEBORAH PRISE AND HEATHER   *CIVIL ACTION
5   RADY ON BEHALF OF           *
    THEMSELVES AND ALL          *
6   EMPLOYEES SIMILARY SITUATED*NO. 06-1641
                                *
7   VERSUS                      *
                                *
8   ALDERWOODS GROUP, INC.      *
    *   *   *   *   *   *   *   *   * **
9

10

11

12

13

14

15
                 Deposition of MILLARD JUDE
16   DAIGLE, 2456 Highway 20, Vacherie,
17   Louisiana 70090, taken in the offices of
18   Gaudet Kaiser, Certified Court Reporters,
19   601 Poydras Street, Suite 2003, New
20   Orleans, Louisiana 70130, on Monday, the
21   20th day of April, 2009.
22

23

24

25
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Millard Jude Daigle**

158

1    A.   No.
2    Q.   No.
3    A.   Pat Hadley, Michael Jiles.
4    Q.   So in paragraph 8 of your
5  affirmation, the other -- the employees
6  that you're referring to --
7    A.   Yeah.
8    Q.   -- are Pat Hadley, Michael
9  Jiles?
10   A.   And Kevin Rickmon.
11   Q.   And Kevin Rickmon.
12   A.   Right.
13   Q.   Are you referring to any other
14 employees?
15   A.   No.
16   Q.   Did you report Mr. Windham's
17 conduct to anybody at Alderwoods?
18   A.   No.
19   Q.   If you could turn to page 3 of
20 your affirmation and take a look at
21 paragraph 16.
22   A.   Okay.
23   Q.   In paragraph 16, you state that
24 during your employment with Alderwoods, you
25 occasionally received commissions and/or

159

1  performance-based bonuses, is that correct?
2    A.   I received performance-based
3  bonuses.  And when you say commissions, on
4  what?
5    Q.   Well, I'm asking you, Mr.
6  Daigle, because this is your affirmation,
7  so I need to know what you meant.
8    A.   Oh, okay.  Flower commissions.
9    Q.   That's what you meant there?
10   A.   Right.
11   Q.   So you received commissions for
12 flowers?
13   A.   Uh-huh (Affirmative Response).
14 Commissions on caskets in Louisiana are
15 against the law.
16   Q.   So you would sell flower
17 arrangements?
18   A.   Yes.
19   Q.   And what about the performance-
20 based bonuses, did you receive performance-
21 based bonuses?
22   A.   On two occasions.
23   Q.   What were those occasions?
24   A.   I can't remember specific dates.
25 I do remember that I got two of them, and

160

1  to the best of my knowledge, both of them
2  amounted to right in the area of $12,000.
3    Q.   Any other commissions or
4  performance-based bonuses that you were
5  referring to?
6    A.   No.
7    Q.   If you could take a look at
8  Exhibit 8.
9    A.   Okay.  Okay.  Which page?
10   Q.   Looking at the check, a check
11 dated March 25th, 2004, which is on page
12 ALD001179.
13   A.   And what date again?
14   Q.   March 25th, 2004.  It was the
15 check reflected at the bottom.
16   A.   Okay.
17   Q.   And the check on March 25th,
18 2004, reflects a bonus in the amount of
19 $8,026.77.
20   A.   Uh-huh (Affirmative Response).
21   Q.   Does that refresh your
22 recollection, Mr. Daigle, as to receiving a
23 bonus from Alderwoods?
24   A.   Yes.  Yes.
25   Q.   Okay.  And if you'll turn ahead

161

1  to March 15th, 2005, which is ALD001188.
2    A.   88.  Okay.
3    Q.   And it reflects a bonus in the
4  amount of $1038.80?
5    A.   Right.
6    Q.   Did you receive a bonus from
7  Alderwoods in that amount?
8    A.   Yes.
9    Q.   Then if you'll turn to page
10 ALD001192.
11   A.   Okay.
12   Q.   Into in the middle of the page
13 for a check dated August 4th, 2005.
14   A.   Uh-huh (Affirmative Response).
15   Q.   Do you see a bonus in the amount
16 of $421.56?
17   A.   Yes.
18   Q.   And did you in fact receive a
19 bonus from Alderwoods in that amount on
20 that date?
21   A.   Yes.
22   Q.   Other than these three bonuses,
23 Mr. Daigle, did you receive any other bonus
24 from Alderwoods between December of 2003
25 and December of 2005?

**NETWORK DEPOSITION SERVICES**
**Transcript of Millard Jude Daigle**

42 (Pages 162 to 165)

162

1       A.   No.  The -- well, never mind.
2       Q.   This exhibit also reflects
3   commissions.  If you'll take a look just on
4   the first page.
5       A.   Okay.
6       Q.   A check dated October 5th, 2003.
7   I'm sorry.  If you look at the bottom of
8   January 2nd, 2004.
9       A.   Okay.
10      Q.   And it says at need,
11  miscellaneous, and then there's an amount
12  of $133.50.  Would that be for a flower
13  arrangement, commissions on a flower
14  arrangement?
15      MS. DOUGLASS:
16          Objection.
17      THE WITNESS:
18          I can't remember.
19  EXAMINATION BY MS. MORGAN:
20      Q.   Okay.  To the extent that you
21  received at-need commissions at Alderwoods,
22  would those have been for flower
23  arrangements?
24      A.   Right.
25      Q.   Any other sales that you would

163

1   have received commissions on at Alderwoods?
2       A.   No.
3       Q.   Mr. Daigle, are you claiming in
4   the lawsuit that your bonuses and
5   commissions were not included in
6   calculating overtime pay rate?
7       A.   That's right.
8       Q.   And what do you base this on?
9       MS. DOUGLASS:
10          Objection.
11      THE WITNESS:
12          It was not broken down hourly.
13  It was just given in one amount.
14  EXAMINATION BY MS. MORGAN:
15      Q.   We talked about the three
16  bonuses that you received from December
17  2003 to the end of your employment at
18  Alderwoods, right?
19      A.   Right.  Right.
20      Q.   And are those three bonuses the
21  only bonuses that you're claiming were
22  excluded from calculating your overtime pay
23  rate?
24      MS. DOUGLASS:
25          Objection.

164

1       THE WITNESS:
2           As far as I know.
3   EXAMINATION BY MS. MORGAN:
4       Q.   And the flower, the commissions
5   on the flower arrangement sales that you
6   received from December 2003 to the end of
7   your employment with Alderwoods, are those
8   the commissions that you claim were
9   excluded from calculating your overtime pay
10  rate?
11      A.   Yes.
12      Q.   Anything else that -- any other
13  form of compensation that you believe was
14  not included in calculating overtime pay
15  rate?
16      A.   That's all I can think of.
17      Q.   Is there a dollar amount that
18  you're claiming was excluded from the
19  calculation?
20      A.   No.  No.
21      Q.   Do you recall receiving payment
22  for any adjustment, any overtime adjustment
23  in any paycheck you received from
24  Alderwoods?
25      A.   No.

165

1       Q.   Are you aware of any other
2   Alderwoods employees who -- let me back up.
3           Are you aware of any policy of
4   not including certain types of compensation
5   in employees' overtime pay rate
6   calculations?
7       A.   No, I'm not.
8       Q.   And are you aware of any other
9   Alderwoods employees who -- who's other
10  forms of compensation, like commissions or
11  bonuses, were not included in calculating
12  their overtime pay rate?
13      A.   Specifically, no.
14      Q.   And during the time that you
15  worked for Alderwoods between December 2003
16  and when you separated from Alderwoods the
17  end of November 2005, did you personally do
18  any community-service work?
19      A.   Personally, yeah.
20      Q.   You've identified some community
21  activities that you participated in.  All
22  Saints Day?
23      A.   Correct.
24      Q.   Was that one day a year or --
25      A.   One day.

# Exhibit 7

**NETWORK DEPOSITION SERVICES**
**Transcript of Steven Detschner**

1

```
 1                              VOLUME: I
                                PAGES:  1 to 251
 2                              EXHIBITS:  1 to 14

 3
                    UNITED STATES DISTRICT COURT
 4              WESTERN DISTRICT OF PENNSYLVANIA

 5
        Civil Action No. 06-1641
 6

 7      DEBORAH PRISE and HEATHER      )
        RADY, on behalf of            )
 8      themselves and all           )
        employees similarly          )
 9      situated,                    )
                      Plaintiffs,    )
10                                   )
        vs.                          )
11                                   )
        ALDERWOODS GROUP, INC.,      )
12                    Defendant.     )

13

14          DEPOSITION OF STEVEN A. DETSCHNER,

15      called as a witness on behalf of the

16      Defendant, pursuant to the applicable

17      provisions of the Federal Rules of Civil

18      Procedure, before Jeanette N. Maracas,

19      Registered Professional Reporter and Notary

20      Public in and for the Commonwealth of

21      Massachusetts, at the Holiday Inn Hotel,

22      929 Hingham Street, Rockland, Massachusetts,

23      on Friday, May 8, 2009, commencing at 9:23

24      a.m.

25
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Steven Detschner**

29 (Pages 110 to 113)

110

1          MR. EHRMAN: Thank you.
2     A. It appears to say "calling to set up funeral"
3        and then in the second line reads the word
4        "vault," "Fougiere," F O U G I E R E.
5     Q. What does it mean to call to set up a
6        funeral vault?
7     A. Calling to set up a funeral vault, I had
8        to call the vault company. Fougiere was a
9        contractor that we used for both vaults and
10       digging graves. I'm not sure exactly what
11       I called him for, but his name appears here
12       and that's what it says in the two lines.
13    Q. So you reported overtime for making a phone
14       call to set up a funeral vault. Is that
15       what this is?
16    A. What I wrote was calling to set up funeral
17       vault and Fougiere. I'm not sure what else
18       I may have done. I may have done more than
19       that. It just isn't annotated on the lines.
20       There's two lines here.
21    Q. And what is indicated is a phone call that
22       you made during that time, is that right?
23    A. Yes.
24    Q. Okay.
25    A. Calling to set up funeral and then it says

111

1        vault and Fougiere, so I may have called
2        various agencies regarding the funeral.
3        I'm not exactly certain on what this one
4        hour of overtime is in reference to
5        specifically.
6     Q. So it may actually reflect more than one
7        phone call or something in that time?
8     A. It's possible.
9            (Exhibit 9 marked for
10           identification.)
11    Q. Handing you Exhibit 9, I'd like to ask you
12       about the time sheet for September 23rd.
13       It's Page ALD 002647.
14    A. Okay.
15    Q. You reported three hours of overtime for
16       CPR training. What did that entail?
17    A. I'm not certain exactly what the nature of
18       this was. We were told that there's CPR
19       training. Actually, all I can say is that
20       I wrote CPR training down and I wrote three
21       hours from 5:00 p.m. to 8:00 p.m. I don't
22       know anything other than that I wrote it
23       down here. This is my handwriting.
24    Q. If you look at the first page of Exhibit 9,
25       for Thursday, September 23rd, it has listed

112

1        regular, eight hours, overtime, three hours.
2        So does that suggest to you that this 5:00
3        to 8:00 p.m. was after you worked the regular
4        shift?
5     A. Does this suggest that that was after my
6        work hours? Is that what you're asking me?
7     Q. Yes. It appears that you were scheduled
8        for eight hours to work on 9/23. You
9        did, and then you stayed three extra hours
10       for CPR training. Is that what's reflected
11       here?
12    A. The fact that I attended CPR training, I
13       don't recall where I attended, whether it
14       was there or another location.
15    Q. But it was immediately after your shift
16       ended, it appears?
17    A. It appears.
18    Q. Okay. And if you would turn to the
19       second-to-the-last page in this pack marked
20       ALD 002650 for September 29, 2004, you
21       reported four hours of overtime for CEUS
22       on day off.
23    A. Okay. CEUS, continuing education. I don't
24       know what the U stands for. I don't know
25       what the U stands for.

113

1     Q. Units?
2     A. It's possible, and then the S is just because
3        it's plural and on a day off.
4     Q. So what does -- strike that. "Continuing
5        education on day off," what does that mean?
6     A. It appears that I was mandated to come in
7        on my day off and I put in for compensation
8        for that.
9     Q. For attending a class, or something like
10       that? What would the continuing education
11       have been?
12    A. Traditionally it was in a class-type format.
13    Q. And that was your day off in this case?
14    A. Yes.
15           MS. DUGAN: Do you want to take a
16       break?
17           MS. GIFFORD: Sure.
18           (Lunch break)
19
20
21           AFTERNOON SESSION
22    BY MS. DUGAN:
23    Q. Mr. Detschner, did you receive any type of
24       compensation at Alderwoods besides your
25       hourly wage?

114

1    A. I believe, to my recollection, there was
2       the yearly bonus.
3    Q. Do you personally recall that you received
4       a yearly bonus?
5    A. It's my recollection that I did.
6    Q. How many bonuses do you recall receiving?
7    A. I believe it was at least one for one year.
8       It was a yearly bonus.
9    Q. Besides that yearly bonus, were there any
10      other types of bonuses that you received?
11   A. No.
12   Q. Do you know how the amount of the yearly
13      bonus was determined?
14   A. I'm not entirely certain. I believe that
15      it was a percentage of my income. It was a
16      cost-of-living raise is, I think, what it
17      was also known as, a cost-of-living bonus.
18   Q. You're not sure how that was calculated?
19   A. I'm not sure the inner workings of that.
20   Q. Did you receive any commissions during
21      your employment with Alderwoods?
22   A. No.
23   Q. Or any other forms of pay besides your
24      hourly wage, a bonus, any other forms of
25      pay you can recall?

115

1    A. Just hourly rates and overtime.
2    Q. Were you ever encouraged to arrive to work
3       before your scheduled start time?
4    A. There were times, yes.
5    Q. Can you give an example of a time when you
6       were encouraged to come in before your
7       scheduled start time?
8    A. I don't recall any specific examples, but
9       there were times when I would arrive half an
10      hour to 15 minutes prior to work to get
11      something ready.
12   Q. And was that at someone's request that you
13      came in early?
14   A. Generally it would be a request of one of
15      the supervisors or just the nature of the
16      task for that day if I was required to start
17      off a little earlier.
18   Q. But you don't recall any specific instances?
19   A. No, I don't recall anything specific.
20   Q. Are you aware of any Alderwoods employees
21      being encouraged to come in before their
22      scheduled shift?
23   A. I can't recall any specific instances. I
24      can't really speak for any other employees.
25      I'm not certain.

116

1    Q. Were you ever told not to clock in until your
2       scheduled start time?
3            MS. GIFFORD: Objection.
4    A. I've never heard that terminology used
5       before, "clocked in."
6    Q. Assuming that your day was scheduled to
7       start at 8:00 a.m., were you ever told not
8       to report any time you worked earlier than
9       your 8:00 a.m. start time?
10   A. I don't recall if it was ever verbalized
11      explicitly not to sign up for additional
12      hours. If it was a small amount of time,
13      then it was general consensus that you
14      didn't put in for it. If it was for, say,
15      an example is an hour or more and that was
16      substantial, then you put in for that.
17   Q. So you don't recall any absolute rule being
18      communicated to you that you can't report
19      time worked before your scheduled start time?
20   A. Not that I recall.
21   Q. Were you ever told that you would not be
22      paid for any time after your scheduled end
23      time on the other end of the day? Were you
24      ever told not to report any time that you
25      stayed after your scheduled end time?

117

1    A. I don't recall of any explicit conversation
2       regarding not being allowed to put in for
3       minutes worked overtime, but it was general
4       knowledge among myself and other employees
5       that we weren't to put in for inconsequential
6       amounts of time, for example, 20 minutes of
7       time or 19 minutes of time.
8    Q. At the end of the shift?
9    A. That's correct.
10   Q. But, again, you don't recall any specific
11      rule being communicated to you that you were
12      not allowed to report any time after your
13      scheduled end time, is that right?
14           MS. GIFFORD: Objection.
15   A. I don't remember any specific rule, to my
16      recollection, at this time.
17           (Exhibit 10 marked for
18      identification.)
19   Q. I'm handing you the document that's been
20      marked as Exhibit 10. It is a consent to
21      become a party plaintiff in this case. Do
22      you recognize this document?
23   A. It looks familiar.
24   Q. Does your signature appear on the second
25      page of this document?

**NETWORK DEPOSITION SERVICES**
**Transcript of Steven Detschner**

32 (Pages 122 to 125)

122

1   A. To Exhibit 11. And under the basic
2      information, it says Alderwoods records
3      show that you currently work or since
4      December 8, 2003, have previously worked
5      for Alderwoods as an apprentice funeral
6      director slash embalmer or funeral director
7      and/or location manager paid on an hourly
8      basis.
9   Q. So you felt that statement applied to you?
10  A. I recall that the statements that were
11     solicited to me matched up to my scenario,
12     my individual scenario.
13  Q. What other statements are you referring to
14     that match up to your scenario?
15  A. Regarding overtime, I remember working
16     overtime. I can't say with exact certainty
17     what -- I don't recall exactly what the
18     form stated, but I remember looking them
19     over and reading a couple of the lines and
20     thinking that, saying to myself that seemed
21     to fit with what I experienced.
22  Q. So you mentioned that you knew you had
23     worked overtime?
24  A. Right.
25  Q. And since you had worked overtime, you

123

1      thought the suit pertained to you?
2   A. I don't recall the exact wording of it,
3      but I remember that the overtime was
4      mentioned. I don't know the exact thing.
5      I just remember thinking to myself that
6      some of the bullets in the information
7      seemed to correlate with my situation.
8   Q. Are you referring to any of the bullets on
9      Exhibit 11?
10  A. I'm not entirely certain what my first --
11     when you say Exhibit 11, I'm not even
12     certain if this was the first piece of
13     paper that I received so I can't really
14     comment on -- I can't really comment if I
15     read this Exhibit 11 and agreed with it.
16  Q. Do you believe that you worked overtime
17     for Alderwoods for which you weren't paid?
18  A. Yes.
19  Q. And what is your understanding of the
20     claims in this lawsuit -- strike that. Is
21     it your understanding that this lawsuit is
22     about unpaid overtime?
23  A. Initially, I don't recollect what I felt
24     initially. I believe that overtime was
25     one of the components. I can't say with

124

1      absolute certainty if that was the only
2      thing that stuck out in my mind. There
3      may have been other issues which I don't
4      recall because I'm not exactly certain
5      exactly what I read and what I thought to
6      myself when I signed up for it.
7   Q. Did you ever bring any complaints or claims
8      against Alderwoods other than the claims
9      raised in this lawsuit?
10  A. I recall mentioning that and speaking with
11     some of the employees and even with David
12     Hunt that we were paid -- we were employees
13     and we were on call and it didn't seem to
14     be fair labor standards that we weren't
15     compensated for being on call even though
16     there was instances where we were on duty,
17     such as answering telephones or carrying
18     on conversations with various agencies
19     while we were on call.
20  Q. So did you raise a complaint to anyone at
21     Alderwoods?
22        MS. GIFFORD: Do you mean a formal
23     complaint?
24  Q. Formal or informal.
25  A. I did not raise any formal complaints, but

125

1      I raised the issue, as did another employee.
2      I do not recall exactly who it was, but I
3      remember that it was a topic of conversation
4      for a certain period of time.
5   Q. Specifically the issue of on-call work?
6   A. On-call work.
7   Q. You raised that issue with David Hunt, is
8      that right?
9   A. I brought it up with David Hunt.
10  Q. Did you raise any other informal complaints
11     to Alderwoods besides that?
12  A. I may have, and I'm not exactly certain. I
13     may have mentioned it to Jerry Tilton as
14     well. I know Jerry Tilton was aware of it,
15     though.
16  Q. You may have raised the on-call complaint to
17     Jerry Tilton?
18  A. I may have mentioned it. I do not believe
19     that I was the original member that pointed
20     it out.
21  Q. And what exactly did you complain about to
22     David Hunt with respect to on-call work?
23  A. I mentioned that when we were on call, we
24     would spend time on the telephone talking
25     to different family members, newspapers

**NETWORK DEPOSITION SERVICES**
**Transcript of Steven Detschner**

126

1  regarding obituaries, or even people would
2  call up and ask for information on funerals.
3  And it was the general feeling among all
4  the employees, it was common practice that
5  you only put in when you're on call for when
6  you physically left the building.  That was
7  brought up, that if we used the phone on our
8  on-call time, it was on our own, we weren't
9  to put in for time on the telephone when
10  we're on call.
11  Q.  We had seen some examples of time that you
12  reported for phone calls made earlier,
13  didn't we?  Do you recall?
14  A.  I recall looking at one in particular thing.
15  Q.  So there may have been some instances where
16  you reported overtime for time spent making
17  phone calls?
18  A.  If I was in the building, yes.  If I was at
19  home --
20  MS. GIFFORD:  When you say in the
21  building, you mean in the funeral home?
22  A.  At the funeral home.
23  Q.  So you reported phone time if you were in
24  the building?
25  A.  Right.

127

1  Q.  But you would not report phone time if you
2  were out of the building?
3  A.  Correct.
4  Q.  And why did you do it that way?
5  A.  In certain cases, if it was going to be an
6  hour or more of time, I'd have to come into
7  work and take care of it.  If it was ten,
8  15, 20 minutes of a spontaneous call at
9  home when I was on call, we just didn't get
10  paid for that.  We got paid if we went out.
11  There's no set method to track telephone
12  conversations when we're out of the building,
13  and when we're off duty even though we were
14  on call.
15  Q.  Did anyone instruct you one way or the
16  other as to whether you should report time
17  spent handling phone calls away from the
18  funeral home?
19  A.  I do not recall specifically myself speaking
20  with anyone and being the subject of a
21  conversation, but I know that another
22  individual raised the issue of, that they
23  were on the telephone with a family for an
24  extended amount of time and they weren't
25  compensated for it.

128

1  Q.  Who was on the phone for an extended amount
2  of time?
3  A.  The individual I recall is Bridget Murphy.
4  Other than that, I just don't recall.
5  Q.  What do you recall Bridget Murphy saying?
6  A.  I just recall Bridget Murphy complaining
7  that she had spoken with Jerry about that
8  she was on the telephone for an extended
9  period of time and that she felt she should
10  get paid for being on the telephone.
11  Q.  So Bridget told you that Bridget told
12  Jerry that she'd been on the phone for a
13  long time?
14  A.  Bridget was -- I was in the same room when
15  Bridget was speaking with employees.  Jerry
16  may have been present.  She may have been
17  speaking directly to Jerry or she made just
18  referenced in the conversation that she had
19  with Jerry.  I'm not very certain on the
20  exact nature of the conversation or who was
21  present in the room.
22  Q.  But you got the impression that Bridget
23  Murphy had complained to Jerry Tilton about
24  a long time that she spent on the phone
25  conversation?

129

1  A.  Yes.
2  Q.  And did Bridget tell you what Jerry, how
3  Jerry responded?
4  A.  I don't recall the exact nature, but I
5  remember the end result was that she was
6  not going to be compensated for it.
7  Q.  But you don't know what Jerry Tilton actually
8  said?
9  A.  I don't know if she was paid.  I don't know
10  what specifically Jerry said to her.
11  Q.  So you have no personal knowledge of any
12  manager telling any employee that you are
13  not allowed to report time spent in phone
14  calls while away from the funeral home?
15  MS. GIFFORD:  Objection.  Go ahead.
16  A.  I don't recall if I've ever heard that
17  particular statement.
18  Q.  Or specific directive?
19  A.  Yeah.
20  Q.  Do you know whether any employees did report
21  time that they spent handling phone calls
22  away from the funeral home?
23  A.  I don't know what was reported by other
24  employees.
25  Q.  Did you personally ever report time that

Exhibit 8

1

```
1              UNITED STATES DISTRICT COURT

2            WESTERN DISTRICT OF PENNSYLVANIA

3

4    DEBORAH PRISE and HEATHER RADY
     on behalf of themselves and all
5    employees similiarly situated,

6              Plaintiffs,

7         vs.

8    ALDERWOODS GROUP, INC., and SERVICE
     CORPORATION INTERNATIONAL,

9
               Defendants.
10   _____

11   Civil Action No. 06-1641

12

13

14

15

16             DEPOSITION OF JEFFREY DIGGS

17              Taken April 22, 2009
                Commencing at 9:30 a.m.
18        Volume I - Pages 1 - 153, inclusive

19

20
               Taken by the Defendant
21                      at
                   LANE POWELL
22           301 W. Northern Lights Blvd.
               Anchorage, AK  99503
23

24

25   Reported by: Susan J. Warnick, RPR
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Jeffrey Diggs**

38 (Pages 146 to 149)

146

1    MR. LINGLE: Object to the form.
2    THE WITNESS: Yes.
3  BY MR. FORESTIERE:
4    Q   Who told you that?
5    A   Scott, Kirstin, Debbie.
6    Q   Mr. Janssen, Ms. Boyd and Debbie --
7    A   Janssen.
8    Q   When did Mr. Janssen first tell you that you had to
9  work during your meal periods?
10   A   I don't recall the exact date.
11   Q   Did he tell you more than once?
12   A   I believe so.
13   Q   How many times did he tell you?
14   A   I have no idea.
15   Q   Do you recall generally when the first time was?
16   A   No.
17   Q   Do you recall when the last time was?
18   A   No.
19   Q   How many times did Ms. Boyd tell you you had to work
20  during your lunch?
21   A   I have no idea.
22   Q   Do you recall when the first time was?
23   A   No.
24   Q   Do you recall the last time?
25   A   No.

147

1    Q   How many times did Mrs. Janssen tell you that you had
2  to work through your lunch?
3    A   I have no idea.
4    Q   Do you recall when the first time was?
5    A   No.
6    Q   Do you recall when the last time was?
7    A   No.
8    Q   Down later on, at the bottom of that page, it says,
9  "Recording of hours." If you could read through that, I
10  have a couple of questions.
11       Have you had a chance to read through that
12  section, sir?
13   A   Yes.
14   Q   The first sentence says, quote, "All nonexempt
15  employees are required to record all hours worked each
16  day," end quote. Do you see that?
17   A   I do.
18   Q   And you didn't do that; correct?
19   A   I recorded the time as I was directed to record it.
20   Q   And that did not include all the hours you worked
21  each day; correct?
22   A   That did not include the hours which fell into a
23  piece work --
24   Q   So other than the piecemeal work, or piece work, did
25  you record all the hours on your time cards that you

148

1  worked?
2    A   Yes.
3    Q   It also states later on, near the bottom of the page,
4  that, quote, "Employees must review their time card/time
5  sheet, correct any errors, and sign it before submitting
6  it to their manager for approval;" do you see that, sir?
7    A   I do.
8    Q   And did you generally follow that requirement?
9    A   I generally signed it.
10   Q   Did you review it to see if it contained any errors
11  before you signed it?
12   A   No.
13   Q   Did you sign it with your full name or did you just
14  do your initials? Do you recall?
15   A   I'd say signature.
16   Q   Was there anything else noted on your time cards
17  other than -- I think you indicated that sometimes you'd
18  put in no lunch?
19   A   Sometimes.
20   Q   And you recorded the hours you worked other than
21  piecemeal -- or piece work?
22   A   Correct.
23   Q   Did you also reflect on your time cards the time that
24  you did piece work or removals?
25   A   Yes.

149

1    Q   Other than those entries we just talked about, did
2  you have any other entries on your time card that you can
3  recall?
4    A   Not that I'm aware of.
5        MR. FORESTIERE: I think that's all the
6  questions I have.
7        EXAMINATION
8  BY MR. LINGLE:
9    Q   Mr. Diggs, when you were -- I think you had referred
10  to it earlier as phone duties, so when you were not
11  scheduled to -- well, when you had the phone with you, did
12  you also do removals when you were scheduled just on phone
13  duty?
14   A   Usually both. Mine fell together. I had phone duty
15  and removal duty at the same time.
16   Q   When you would take a call and it wouldn't require
17  you to do a removal, I think that you said those calls
18  would range from two to 30 minutes; is that right?
19   A   Yes.
20   Q   Can you tell us, on average, how long those calls
21  would take?
22   A   On average?
23   Q   Yes.
24   A   So if you averaged it out, 10, 15 minutes a call.
25   Q   You were asked about a bunch of pay policies earlier.

# Exhibit 9

Case3:08-cv-01184-SI Document227-1 Filed11/30/09 Page61 of 67
**NETWORK DEPOSITION SERVICES**
**Transcript of Stephen Escobar**

1

```
 1              THE UNITED STATES DISTRICT COURT

 2          FOR THE WESTERN DISTRICT OF PENNSYLVANIA

 3

 4     ------------------------------

 5     DEBORAH PRISE and HEATHER      )

 6     RADY on behalf of themselves   )

 7     and all employees similarly    )

 8     situated,                      )

 9          Plaintiffs,               ) Civil Action No. 06-1641

10        vs.                         )

11     ALDERWOODS GROUP, INC.,        )

12          Defendant.                )

13     ------------------------------

14

15

16

17          Deposition of STEPHEN ESCOBAR, taken at

18          1312 McHenry Avenue, Modesto,

19          California, commencing at 10:06 a.m.,

20          Wednesday, March 11, 2009, before

21          Amanda J. Dunn, California CSR No. 13336.

22

23

24

25     PAGES 1 - 177
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Stephen Escobar**

77

1   employees will be compensated for all hours worked, end

2   quote.

3          Do you see that, sir?

4      A.   Yes.

5      Q.   Was that your understanding at the time that

6   you were performing your work at Alderwoods?

7      A.   No.

8      Q.   And why was that?  Why was that not your

9   understanding?

10     A.   Because of the -- you see, phone time, the

11  community service time.

12     Q.   Anything else?

13     A.   The being paid for overtime for removals.

14     Q.   Anything else?

15     A.   No.

16     Q.   On page ADL14 under the heading, "Guidelines of

17  Workday" -- do you see that?

18     A.   Yes.

19     Q.   It says, quote, arrangements to work -- strike

20  that.

21          Arrangements to regularly work more than 8

22  hours a day must be approved by your manager.

23          Do you see that -- end quote?

24     A.   Yes.

25     Q.   Was that your understanding during the time

**Johnstown**
**814-266-2042**

**Toll-Free**
**866-565-1929**

**Pittsburgh**
**412-281-7908**

**NETWORK DEPOSITION SERVICES**
**Transcript of Stephen Escobar**

78

1    that you worked at Alderwoods?

2        A.    No.

3        Q.    And why was that not your understanding?

4        A.    I've never heard that before.

5        Q.    You've never heard that in order to work

6    overtime, it had to be approved by your manager?

7        A.    Yes.

8        Q.    Did you work any overtime during the time that

9    you worked at Alderwoods?

10       A.    Yes.

11       Q.    And were you paid overtime?

12       A.    Not all of it, no.

13       Q.    Did you keep any records concerning the

14   overtime that you were not paid for?

15       A.    No.

16       Q.    No calendars?

17       A.    No.

18       Q.    No diaries?

19       A.    No.

20       Q.    By the way, when you previously said phone

21   time, were you talking about the on-call policy?

22       A.    On-call policy, yes.

23       Q.    On page ADL15, under section "D," Work

24   Schedule, it states, "Work schedules are established by

25   the manager of the location/department."

**NETWORK DEPOSITION SERVICES**
**Transcript of Stephen Escobar**

81

1     A.   No.

2     Q.   If you worked on Saturdays and Sundays, were

3 you paid regular time?

4     A.   Yes.

5     Q.   And you filled out the hours you worked for

6 those Saturdays and Sundays, correct, on your time card

7 or time sheet?

8     A.   I'm not sure about that.

9     Q.   Are you saying that when you were working on a

10 Saturday or Sunday at the facility, you did not record

11 all the time that you worked at that facility?

12     A.   Yes.

13     MR. LINGLE:  Object to the form.

14     THE WITNESS:  Oh.

15 BY MR. FORESTIERE:

16     Q.   And why was that?

17     A.   Because it would make the district manager mad.

18     Q.   Who was the district manager?

19     A.   Bill White, I think.

20     Q.   How do you know it would make him mad?

21     A.   That's what they said.  That's what Brad said.

22     Q.   So your testimony is that you did not record

23 all the time you worked on Saturdays and Sundays because

24 it would make Mr. White mad?

25     A.   Yes.

Johnstown
814-266-2042

Toll-Free
866-565-1929

Pittsburgh
412-281-7908

```
 1      Q.   Even though it was regular hours worked --

 2      A.   Yes.

 3      Q.   -- as opposed to overtime?

 4      A.   Yes.

 5      Q.   So Mr. White objected to paying you regular

 6 time for the full amount of time that you worked on

 7 Saturdays and Sundays?

 8      A.   Yes.

 9      Q.   And that came from Mr. Webb?

10      A.   Mr. Webb, yes.

11      Q.   And that was done orally with Mr. Webb?

12      A.   Yes.

13      Q.   When did those -- strike that.

14           Did you have more than one conversation with

15 Mr. Webb about that?

16      A.   No.

17      Q.   So you only had one conversation with him?

18      A.   Yes.

19      Q.   When did that occur?

20      A.   That would be two days in.

21      Q.   After you started working?

22      A.   Yes.

23      Q.   Where did that conversation take place?

24      A.   In the office.

25      Q.   When you say in the office, you indicated
```

Johnstown
814-266-2042

Toll-Free
866-565-1929

Pittsburgh
412-281-7908

## NETWORK DEPOSITION SERVICES
### Transcript of Stephen Escobar

103

```
 1    to do one here.
 2              When generally did you receive your paychecks?
 3    A.   Every two weeks.
 4    Q.   And were they personally delivered to you?
 5    A.   Yes.
 6    Q.   At the facility?
 7    A.   Yes.  Until I switched to direct deposit.
 8    Q.   And who'd you get your paycheck from?
 9    A.   From Vicky.
10    Q.   At the time that you received your paycheck,
11    did you review it to make sure that it was accurate?
12              MR. LINGLE:  Object to the form.
13              THE WITNESS:  Yes.
14    BY MR. FORESTIERE:
15    Q.   Okay.  For example, on page 8956, under
16    "Earnings" in the left-hand column, it says "Regular,"
17    right?
18    A.   Yes.
19    Q.   And the rate to the right of it says 12.50,
20    correct?
21    A.   Yes.
22    Q.   And it says hours, 128.  True?
23    A.   Yes.
24    Q.   Did you -- when you took a look at your
25    paychecks, did you confirm that the hours reflected were
```

**Johnstown**
814-266-2042

**Toll-Free**
866-565-1929

**Pittsburgh**
412-281-7908

**NETWORK DEPOSITION SERVICES**
**Transcript of Stephen Escobar**

104

1    the hours that you recorded to be paid?

2         MR. LINGLE:  Object to the form.

3         THE WITNESS:  I think the answer to the

4    question is a yes and a no.

5    BY MR. FORESTIERE:

6      Q.   All right.  Well, explain your answer then.

7      A.   No, because I didn't get community service.  I

8    didn't get some of the overtime.  And then the other one

9    that we talked about --

10     Q.   Okay.

11     A.   -- the telephone.

12     Q.   So my question is, to the time you reported to

13   Vicky, right?

14          In other words, every two weeks, you and Vicky

15   would sit down and have a conversation about how many

16   hours you worked for the prior two weeks?

17     A.   Yes.

18     Q.   And whatever that amount is -- in this case, it

19   would be 128 hours.

20     A.   Yes.

21     Q.   You would tell Vicky that?

22     A.   Yes.

23     Q.   And my question is, when you got your paycheck,

24   did you confirm when you received it that what you told

25   Vicky was correct?

Johnstown
814-266-2042

Toll-Free
866-565-1929

Pittsburgh
412-281-7908