# Exhibit 10

**NETWORK DEPOSITION SERVICES**
**Transcript of Ric Hensley**

1

```
 1              DEPOSITION OF RIC HENSLEY
 2                 October 28, 2009
 3         IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF CALIFORNIA
 4            SAN FRANCISCO/OAKLAND DIVISION
 5     ---------------------------------------
       WILLIAM HELM, DEBORAH PRISE,          )
 6     HEATHER P. RADY, et al., on behalf    )
       of themselves and all other          )
 7     employees and former employees        )
       similarly situated,                   )
 8                                            )
              Plaintiffs,                     )
 9                                            )Case No.
       vs.                                    )CV 08-1184-SI
10                                            )
       ALDERWOODS GROUP, INC.,                )
11                                            )
              Defendant.                      )
12     ---------------------------------------
13
14     APPEARANCES:
15
16                  FOR THE PLAINTIFFS:
17                  MICHAEL J. LINGLE, ESQ.
                    Thomas & Solomon LLP
18                  693 East Avenue
                    Rochester, New York 14607
19
20                  FOR THE DEFENDANT:
21                  MATT RAY, ESQ.
                    Jones Day
22                  2727 North Harwood Street
                    Dallas, Texas 75201-1515
23
24
25
```

**Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg**
**866-565-1929**

**NETWORK DEPOSITION SERVICES**
**Transcript of Ric Hensley**

13 (Pages 46 to 49)

46

1  McCarty Mortuary?
2      A.    Yes.
3      Q.    Were they kept with the seven or eight
4  binders of other policies?
5      A.    No, they were actually kept on my desk.
6  Easy access and where I could review those, you know,
7  periodically.
8      Q.    But you don't recall when that policy
9  came down?
10     A.    No, I don't.
11     Q.    Could it have been after SCI took over?
12     A.    No, it was probably in '06, latter part
13 of '06, I don't remember exactly. But it was before
14 SCI took over.
15     Q.    Well, do you recall who they came from?
16     A.    No, they came through corporate, I don't
17 remember exactly.
18     Q.    Where was corporate?
19     A.    Corporate was Barnaby, Canada, which was
20 the old office for The Lowen Group, which was the
21 company before that. Now, they switched offices after
22 that, I think Cincinnati was a main hub for them. I
23 don't remember, to tell you the truth.
24     Q.    What is your recollection of the
25 Alderwoods' Community Work Policy? And by that, I

47

1  mean, what was the policy?
2      MR. LINGLE: Objection.
3      A.    The policy, as I understand it, was
4  employees were required outside of the work, their
5  day-to-day duty jobs, to try to get community
6  involvement, whether that be with civic organizations,
7  church, that sort of stuff. And that obviously was to
8  bring in business.
9      Q.    Was it your understanding that all
10 employees in all job positions underneath you as
11 general manager were covered by that policy?
12     A.    Yes, yes.
13     Q.    What about the positions we talked about
14 earlier that did not report to you, do you know whether
15 they were covered by this policy?
16     A.    Such as maintenance --
17     MR. LINGLE: Objection.
18     A.    -- and florist and those?
19     Q.    Grave diggers?
20     A.    No. I don't know, I don't know if they
21 were required. It was more of a funeral home and
22 funeral directors' policy.
23     Q.    So to your knowledge, the community work
24 policy we've been discussing applied to any of the
25 types of positions that reported to you, correct?

48

1      A.    Yes.
2      MR. LINGLE: Objection.
3      Q.    But you don't know with respect to
4  positions that did not report to you?
5      MR. LINGLE: Objection.
6      A.    Yes, I do not know.
7      Q.    Let's go back and just talk about some
8  specific people.
9      Sharon Mayes I think you said was an
10 administrator?
11     A.    Yes.
12     Q.    Did the policy, the community work
13 policy, apply to her?
14     A.    Yes.
15     Q.    And do you know if she complied with the
16 policy?
17     A.    I don't know. I don't remember.
18     Q.    When you received the community work
19 policy and the binders you described, did you have a
20 meeting with your employees, meaning all employees
21 underneath you as general manager, to discuss it?
22     A.    Yes.
23     MR. LINGLE: Objection.
24     Q.    Where was that meeting?
25     A.    I believe that meeting was at McCarty's.

49

1      Q.    And to be clear, when I say "all
2  employees," I mean, all employees that worked at the
3  five locations?
4      A.    Reported to me. Yes, yes.
5      Q.    So, for example, Sharon Mayes would have
6  been at that meeting?
7      A.    Yes, yes.
8      Q.    Do you recall how long that meeting
9  lasted?
10     A.    I don't recall. It was just a communiqué
11 to them and explanation as the best I understood it as
12 to how this program is supposed to work, and what we're
13 supposed to do with it.
14     Q.    Do you recall the explanation you gave?
15     A.    No.
16     Q.    Sitting here today, do you recall any of
17 the employees who worked at any of the five locations,
18 meaning McCarty, Evergreen, Weaver, Woodhaven or
19 Rallings, who complied with the policy, meaning the
20 community work policy?
21     A.    They all complied with it, okay, they all
22 took the policy. Maybe not all of them did what they
23 were supposed to do with it, but they all complied with
24 it, as far as I know.
25     Q.    Okay. Maybe we have a language issue.

**NETWORK DEPOSITION SERVICES**
**Transcript of Ric Hensley**

54

1   in each week, once a week.  I don't remember
2   particularly where that went to, the administrator had
3   that communiqué, but if there was no activity for that
4   week, there was no activity.
5        Q.    So the administrator sent it in?
6        A.    Yeah, the administrator sent it in.  And
7   I don't know who they would send it to.  I don't
8   remember.
9        Q.    Did you review these weekly logs before
10  they were sent in?
11       A.    Yes.
12       Q.    Were there times when the weekly logs
13  were blank?
14       A.    Yes.
15       Q.    Was it more often than not that the
16  weekly logs were blank?
17            MR. LINGLE:  Objection.
18       A.    It was more often than not.
19       Q.    Let's start with McCarty Mortuary.
20            Did any of the employees at McCarty
21  Mortuary receive any kind of poor performance
22  evaluation because they weren't doing enough to comply
23  with the community work policy?
24       A.    No.
25       Q.    Was there any consequence for not

55

1   complying with the community work policy?
2        A.    Not to my knowledge.  Not to my
3   knowledge.
4        Q.    Were you aware of any employees within
5   the five locations you managed as the general manager
6   who received any type of negative consequence as a
7   result of not complying with the community work policy?
8        A.    No.
9            MR. LINGLE:  Objection.
10       Q.    On this weekly log, do you recall what
11  the columns were, what information had to be logged?
12       A.    I'm trying to picture it.  The employee's
13  name I believe was the first column, the date, I think
14  there was a column for an influencer's name.  If there
15  was a contact made or a meeting scheduled.  I believe
16  there was columns for that.  For instance, depending on
17  if they were interested in prearrangement and wanted to
18  come in the funeral home and talk.  I believe there was
19  address and phone number for those -- a column for
20  those influencers.
21       Q.    Do you know whether any of the community
22  activities that would be considered to comply with this
23  community work policy, attending a civic meeting, for
24  example, were done during normal work hours?
25       A.    Not to my knowledge.

56

1        Q.    As general manager, did you have
2   interaction with other general managers at Alderwoods
3   Group?
4        A.    No.
5        Q.    So do you know how other general managers
6   managed the community work policy process?
7        A.    I don't know.
8        Q.    If you could take a look at Exhibit 1,
9   which, again, is your affirmation.  We'll go back to
10  page 3. I want to ask you some specific questions.
11           Paragraph 12 says, "One of these policies
12  was Alderwoods' Community Work Policy."  And then the
13  next sentence says, "This companywide policy required
14  employees to volunteer their time to outside community
15  organizations and events."
16           Did I read that correctly?
17       A.    Yes.
18       Q.    First of all, you say, "companywide."
19  How do you know it was companywide?
20       A.    It was communicated to me by
21  Mitch Gerth.
22       Q.    That it was companywide?
23       A.    Companywide.
24       Q.    How was that communication made?
25       A.    By fax.

57

1        Q.    So there's a fax where he said this is
2   companywide?
3        A.    Yes.
4        Q.    And it says, "required employees to
5   volunteer."  And I'm reading from paragraph 12 there on
6   Exhibit 1.
7        A.    Yes.
8        Q.    We talked earlier about there were no
9   negative consequence that you were aware of, so what
10  did you mean by the word "required" there?
11           MR. LINGLE:  Objection.
12       A.    It was a part of their day-to-day job
13  duties.  And since it being company policy or a policy
14  come down from company, then we were required to
15  adhere.
16       Q.    It says, it goes on to say, "required
17  employees to volunteer their time to outside community
18  organizations and events."
19           Did the policy dictate how much time?
20       A.    No.
21       Q.    Did you ever advise employees underneath
22  you as general manager at the five locations how much
23  time they should commit?
24       A.    No.
25       Q.    Did Mr. Gerth ever tell you or

## NETWORK DEPOSITION SERVICES
### Transcript of Ric Hensley

58

1   communicate to you how much time should be committed?
2       A.   No.
3       Q.   The next paragraph, paragraph 13, says,
4   "Since Alderwoods expected this community work to be
5   done on a volunteer basis, the employees were not paid
6   for any time spent at these outside community
7   organizations and events." Did I read that correctly?
8       A.   Yes.
9       Q.   Earlier you said that you don't have any
10  specific recollection of people doing anything to
11  comply with this policy, although, you think a couple
12  people may have increased their activities.
13      A.   Yes.
14      Q.   As general manager, did you believe that
15  people who were volunteering for community activities
16  should be paid --
17          MR. LINGLE:  Objection.
18      Q.   -- by Alderwoods Group?
19      A.   Yes.
20      Q.   So if someone went to church, they should
21  be paid by Alderwoods Group?
22          MR. LINGLE:  Objection.
23      A.   No, that's not what I mean.
24      Q.   If someone joined a civic organization,
25  they should be paid by Alderwoods Group for the time

59

1   they spend at that civic organization?
2           MR. LINGLE:  Objection.
3       A.   No, not specifically.
4       Q.   Okay. What did you mean?
5       A.   I mean that the company should pay for
6   their time to be involved in that civic organization,
7   whether it be the paying for the dues to make sure that
8   they're in good standing with that club and
9   organization and the support of the company.
10      Q.   So the dues?
11      A.   Yes.
12      Q.   What about their time spent working with
13  the civic organization?
14      A.   I never addressed that specifically, so.
15      Q.   Did you address the dues issue
16  specifically either with your superiors or with your
17  direct or indirect reports?
18      A.   Yes, yes, we did talk about that, but
19  nothing was ever decided on that. And I don't think
20  anything went any further.
21      Q.   I think you said that at least one of
22  your employees was involved in the Mason's?
23      A.   Yeah. Tom Petty, I believe.
24      Q.   Was he involved in the Mason's before the
25  Alderwoods' Community Work Policy came out?

60

1       A.   Yes.
2       Q.   Do you know if the implementation of this
3   Alderwoods' Community Work Policy changed the manner in
4   which he engaged in his activities with the Mason's?
5           MR. LINGLE:  Objection.
6       A.   I'm sure that it did, yes, I'm sure that
7   he stepped up meetings and he was there more often,
8   more visible, and talked about the funeral home and the
9   business more, yes.
10      Q.   And on what do you base that?
11      A.   Just from verbal, just communication and
12  conversation with him and that sort of stuff.
13      Q.   So Mr. Petty indicated to you that he had
14  increased his activities at the Mason's?
15      A.   I don't remember specifics, but, yes,
16  that -- he stepped things up. And a lot of them did.
17      Q.   Okay. So you do remember having
18  conversations with Mr. Petty where he indicated he
19  stepped things up at the Mason's?
20      A.   I don't remember specifics, but I
21  remember Mr. Petty being a part of the Mason's, and
22  that being stepped up by him, yes.
23      Q.   Do you understand that the allegation in
24  this lawsuit is that Mr. Petty should be paid by
25  Alderwoods Group for being involved in the Mason's?

61

1           MR. LINGLE:  Objection.
2       A.   No, not specifically, no.
3       Q.   Is it your opinion as a general
4   manager -- well, let me back up.
5           As a general manager, you had
6   responsibility for reviewing time cards, right?
7       A.   Yes.
8       Q.   Making sure your employees got paid?
9       A.   Yes.
10      Q.   If there were issues, you would escalate
11  those to your manager?
12      A.   Yes.
13      Q.   As a general manager, was it your belief
14  that Mr. Petty should be compensated by Alderwoods
15  Group for being involved in the Mason's, for his time
16  where he spent time with the Mason's?
17          MR. LINGLE:  Objection.
18      Q.   Is that the way I felt then, or the way I
19  feel now?
20      Q.   Let's start with then.
21      A.   Let's start with then. Then it was never
22  discussed. It was not a part of -- I never had any of
23  the employees come to me and say, listen, you know,
24  we're doing this on a volunteer basis, we need to get
25  paid. That was never a discussion. Probably privately

**NETWORK DEPOSITION SERVICES**
**Transcript of Ric Hensley**

74

1    Q.   Before I get into this section, let me
2 just ask the question, were any of your employees, and
3 by "your employees," I mean, the employees that either
4 directly or indirectly reported to you as the general
5 manager, were any of them on call at any time?
6    A.   Yes.
7    Q.   And I'll come back and I'll get some
8 specifics.
9    A.   Okay.
10   Q.   Let's turn back to paragraph G in
11 Exhibit 4. And it starts with, "A nonexempt employee
12 is considered to be on call only when so assigned by
13 his or her manager." Did I read that right?
14   A.   Yes.
15   Q.   And was it your understanding that this
16 was Alderwoods Group's written policy on on call?
17       MR. LINGLE:  Objection.
18   A.   Yes.
19   Q.   It goes on to address on-call issues.
20 And I want to point your attention or direct your
21 attention, rather, to the final sentence of that first
22 paragraph. It says, "When the employee is called to
23 work during the on-call time, the employee will be paid
24 at the employee's appropriate pay rate," and then
25 there's a parenthetical that says "see callback section

75

1 below," end of parenthetical, then it goes on to say,
2 "In all instances, it is the employee's responsibility
3 to clock in when called in to work, and to clock out
4 when the work assignment was complete." Did I read
5 that correctly?
6   A.   Yes.
7   Q.   And was it your understanding that that
8 was Alderwoods Group's written policy on on-call pay?
9   A.   Yes.
10       MR. LINGLE:  Objection.
11   Q.   The first of those two sentences I just
12 read said, "When the employee is called to work during
13 the on-call time, the employee will be paid at the
14 employee's appropriate pay rate," right?
15   A.   Yes.
16   Q.   Was it your understanding that Alderwoods
17 Group's policy was to pay employees who were on call
18 for working if they were called to do something on
19 call?
20       MR. LINGLE:  Objection.
21   A.   If they got -- they were paid if they had
22 a death call. Only if they had to leave to go on an
23 actual death call. Any on-call work such as phone duty
24 was not paid.
25   Q.   Okay. Tell me what the death call is.

76

1   A.   Death call is they actually got a call,
2 for instance, at a home or hospital, and they had to
3 actually get out and go pick up the body and bring it
4 to the funeral home.
5   Q.   And for death calls, employees -- well,
6 let me back up.
7       What types of positions would be
8 responsible for responding to death calls? Is that a
9 funeral director? Is that an administrator?
10       MR. LINGLE:  Objection.
11   A.   No, it could be a funeral director's
12 assistant could have been on call. There were usually
13 a licensed funeral director that could have been gotten
14 a hold of had there been a legal issue or a specific
15 funeral director question. But the part-timers pulled
16 on call also, or funeral director's assistant, I'm
17 sorry.
18   Q.   So it could be funeral directors or
19 funeral director assistants?
20   A.   Right.
21   Q.   Any other positions?
22   A.   No, no administrators or anything like
23 that did death calls.
24   Q.   And when there was a death call, they
25 would actually receive a call to go retrieve a body?

77

1   A.   Yes.
2   Q.   And the time they spent retrieving the
3 body was compensable time?
4       MR. LINGLE:  Objection.
5   A.   Yes.
6   Q.   And during your tenure as general
7 manager, was there ever a time that someone responded
8 to a death call and was not compensated for the time
9 they spent?
10   A.   Not to my knowledge.
11   Q.   It was your policy as general manager, or
12 it was your understanding, rather, of Alderwoods
13 Group's policy that employees who responded to death
14 calls were to be paid for that time?
15   A.   Yes.
16       MR. LINGLE:  Objection.
17       MR. RAY:  What's the objection?
18       MR. LINGLE:  The objection is that's
19 confusing, because you're suggesting that they
20 paid for the actual hours of work for doing a
21 death call, and that's not true.
22       MR. RAY:  Well, thank you. Let's explore
23 that.
24 BY MR. RAY:
25   Q.   So for a death call, how were employees

**NETWORK DEPOSITION SERVICES**
**Transcript of Ric Hensley**

**90**

1 breaks?
2　　A.　Yes.
3　　Q.　Were they paid if they worked through
4 their lunch breaks?
5　　A.　Yes.
6　　Q.　Are you aware of any circumstance where
7 an employee who reported to you as general manager,
8 either directly or indirectly, worked through their
9 lunch break and were not paid for that time?
10　　　MR. LINGLE: Objection.
11　　A.　I'm not aware of any.
12　　　MR. RAY: What was wrong with that
13 question?
14　　　MR. LINGLE: The people that would
15　　actually best know whether or not they actually
16　　performed work during meal breaks even though they
17　　recorded the time would be employees. He doesn't
18　　have any knowledge about whether or not they did.
19　　That's a confusing question.
20 BY MR. RAY:
21　　Q.　Let's talk about whether you have
22 knowledge of people working through their lunch breaks.
23　　　You're aware that people worked through
24 their lunch breaks?
25　　A.　Yes.

**91**

1　　Q.　How are you aware of that?
2　　A.　Depending on the services. If we had a
3 12 noon service, we worked right through it until it
4 was over.
5　　Q.　And you actually worked in the McCarty
6 Mortuary, right?
7　　A.　Yes.
8　　Q.　And you were actually the acting location
9 manager there while you were general manager?
10　　A.　Yes.
11　　Q.　So you were familiar with when employees
12 there worked through their lunch breaks, right?
13　　A.　Yes.
14　　Q.　And by "there," I mean, McCarty Mortuary?
15　　A.　Right.
16　　Q.　And based on your observations, employees
17 based on services or what have you did work through
18 lunch breaks?
19　　A.　Yes.
20　　Q.　And it was certainly your understanding
21 and recollection that employees who worked through
22 their lunch breaks were paid for that time?
23　　A.　Yes.
24　　　MR. LINGLE: Objection.
25　　Q.　And when you reviewed time cards for

**92**

1 people at McCarty Mortuary, if they worked through
2 their lunch breaks, you ensured that they actually
3 recorded that time --
4　　　MR. LINGLE: Objection.
5　　A.　Yes.
6　　Q.　-- as time worked?
7　　A.　Yes.
8　　Q.　And that they were paid for it?
9　　　MR. LINGLE: Objection.
10　　A.　Yes.
11　　Q.　Employees who worked at one of the five
12 locations that you were responsible for as general
13 manager did at times have overtime?
14　　A.　Yes.
15　　Q.　And Alderwoods Group did pay some
16 overtime to these employees?
17　　A.　Yes.
18　　Q.　Were you, Mr. Hensley, required to budget
19 overtime in any way as general manager?
20　　A.　No.
21　　Q.　Would you have any pressure from your
22 superior to keep overtime limited in any way?
23　　A.　No.
24　　　MR. LINGLE: Just note my objection to
25　　the last question.

**93**

1　　Q.　Let's talk for a second about training.
2　　A.　Okay.
3　　Q.　During the time you were general manager,
4 and I want to limit this for the time up through the
5 end of 2006 before SCI took over.
6　　A.　Okay.
7　　Q.　Okay. So I'm focused only on Alderwoods
8 Group.
9　　　Was there any formal training for any of
10 the employees underneath you?
11　　A.　In what? What kind of training?
12　　Q.　Fair question. Let me see if I can
13 specify it.
14　　　Did Alderwoods Group have any type of
15 formal training program for any employees --
16　　　MR. LINGLE: Objection.
17　　Q.　-- that you recall?
18　　A.　We had OSHA training, that was done, I
19 believe, once every three months with each employee.
20 Nothing else specifically on training.
21　　Q.　So once every three months all employees
22 went through OSHA training?
23　　A.　Yeah. It may not have been every three
24 months, I don't remember exactly what the time period,
25 it was a couple, two or three times a year, and we

**NETWORK DEPOSITION SERVICES**
**Transcript of Ric Hensley**

94

1 logged all that, and they had personnel files that all
2 that was put into.
3      Q.    Who conducted that training, the OSHA
4 training?
5      A.    A lot of times I did.  But each
6 individual location had a safety officer, I guess is
7 what you would call it, and those changed all the time.
8 But they were responsible for conducting a lot of the
9 OSHA training that they would get from corporate and do
10 it at their individual location.
11      Q.    So you conducted some OSHA training?
12      A.    Yes.
13      Q.    When you conducted OSHA training, was it
14 for all the employees who reported to you at the five
15 locations, or only selected employees?
16      A.    Most of the time it was just for McCarty
17 Mortuary, for their employees at my location.  But
18 there were other times when I would actually go to the
19 other locations and do a training session over there
20 with them, because there was nobody else to do it.
21      Q.    And then there were also OSHA training
22 sessions conducted at the other locations by the safety
23 person?
24      A.    Yes.
25      Q.    And you weren't necessarily present at

95

1 all of those?
2      A.    No.
3      Q.    Is that correct?
4      A.    Right.
5      Q.    When you conducted the OSHA training, was
6 it done during regular business hours?
7      A.    Yes.
8      Q.    Were the employees who attended the OSHA
9 trainings you conducted compensated for the time they
10 spent --
11      A.    Yes.
12      Q.    -- at the OSHA training?
13      A.    Yes.
14      Q.    Are you aware of any time where an
15 employee at one of the five locations you were
16 responsible for was not paid for attending any OSHA
17 training?
18      A.    I'm not aware of any, no.
19      Q.    If you were aware that that had happened,
20 you would have taken steps to make sure they were
21 compensated?
22      A.    Yes.
23      Q.    Other than the OSHA training, you don't
24 recall any other formalized training, so to speak, from
25 Alderwoods Group --

96

1      MR. LINGLE:  Objection.
2      Q.    -- is that correct?
3      A.    No, no.
4      Q.    What about informal training?
5      MR. LINGLE:  Objection.
6      Q.    There was on-the-job training, I assume?
7      A.    Yes.
8      Q.    Were the employees compensated for
9 on-the-job training?
10      A.    Yes, yes.
11      Q.    Was it your understanding that Alderwoods
12 Group's policy was to pay employees for attending
13 training sessions like the OSHA training you described?
14      A.    Yes.
15      Q.    In your affirmation which is Exhibit 1,
16 there's a section on page 5 entitled Training Policy.
17 Do you see that?
18      A.    Yes.
19      Q.    And it says, "Alderwoods also had" -- let
20 me back up.  I'm starting on paragraph 26.  "Alderwoods
21 also had a company training policy which expected
22 funeral directors to maintain their licenses."  Did I
23 read that correctly?
24      A.    Yes.
25      Q.    Was this training policy referenced in

97

1 paragraph 26 written?
2      A.    I don't recall.
3      Q.    What is required for funeral directors to
4 maintain their licenses?
5      A.    Each funeral director in the State of
6 Tennessee has to perform ten continuing education
7 hours.  And then there is a state board licensing fee
8 for both funeral director and embalmer.  And those ten
9 hours can be seminars, death care meetings, anything
10 that is accredited by the state board.
11      Q.    Do funeral directors, can they get any
12 credit for those ten continuing education hours for the
13 work they're performing on a daily basis?
14      A.    No.
15      Q.    Do these seminars, or I think you said a
16 death care meeting --
17      A.    Yeah, yeah, yeah, yeah.
18      Q.    -- do they ever occur during regular
19 business hours?
20      A.    Funeral directors, a lot of them funeral
21 directors now go online and even then went online to
22 get their continuing education, and a lot of them would
23 do them on the clock.
24      Q.    And if the funeral directors did that on
25 the clock, and by that, I mean, get their continuing

**NETWORK DEPOSITION SERVICES**
**Transcript of Ric Hensley**

---

98

1　education hours online, would they be paid for it?
2　　A.　Yes.
3　　Q.　Let's go to paragraph 27. Second
4　sentence there. It says, "Alderwoods paid the costs
5　involved in completing the licensing requirements, but
6　funeral directors were not paid for the time spent
7　completing the work." Did I read that right?
8　　A.　Yes.
9　　Q.　Are you referring there to when funeral
10　directors would spend time completing their continuing
11　education hours outside of regular business hours?
12　　A.　Yes.
13　　Q.　But at times they did perform that work,
14　meaning getting their continuing education hours during
15　regular business hours?
16　　A.　At work. Yes, yes.
17　　Q.　And this is ten hours per year per
18　funeral director?
19　　A.　Ten hours every two years.
20　　Q.　Ten hours every two years?
21　　A.　Yeah, ten hours every two years.
22　　Q.　For each funeral director?
23　　A.　For each funeral director.
24　　Q.　Is that ten-hour requirement applicable
25　to assistant funeral directors?

---

99

1　　A.　No.
2　　Q.　Is it applicable to any job position
3　other than funeral directors?
4　　A.　No.
5　　Q.　Underneath you as general manager, I show
6　the funeral directors to be Randy Suffridge, Tracy
7　Mayes?
8　　A.　Randy Suffridge was a funeral director's
9　assistant.
10　　Q.　He's an assistant?
11　　A.　Yeah.
12　　Q.　You were the only funeral director at
13　McCarty Mortuary?
14　　A.　A McCarty's, yes.
15　　Q.　So the other funeral directors underneath
16　you when you were a general manager were Tracy Mayes?
17　　A.　Yes.
18　　Q.　Becky Dahl?
19　　A.　Yes.
20　　Q.　Jamie Beeler?
21　　A.　Yes.
22　　Q.　Ina Roberts?
23　　A.　Ina, yes.
24　　Q.　And Steve Miller?
25　　A.　Steve Miller and Ron Mayes.

---

100

1　　Q.　And Ron Mayes?
2　　A.　Yes.
3　　Q.　Okay. So six?
4　　A.　Yeah.
5　　Q.　Do you know if any of those six people we
6　just listed performed their continuing education hours
7　requirements outside of regular business hours during
8　the time you were general manager?
9　　A.　I don't know. I don't have the
10　knowledge.
11　　Q.　Did you ever have a discussion with any
12　of those six that we just talked about about whether
13　they should be compensated if in fact they did perform
14　their continuing education hours outside of regular
15　business hours?
16　　A.　No.
17　　　MR. LINGLE: Objection.
18　　Q.　So sitting here today, you don't know
19　whether there are any funeral directors who reported to
20　you as general manager who were not paid for time spent
21　getting their continuing education?
22　　A.　I'm not aware of any, no.
23　　Q.　In your affirmation, you say that, "This
24　is the policy of Alderwoods." How did you come to
25　learn that this is the policy, the training policy?

---

101

1　　A.　The training policy?
2　　Q.　Yes.
3　　A.　Well, they had training manuals, the
4　manuals that came down. And I don't remember specifics
5　of the manual, but that was included in some of those
6　seven or eight binders.
7　　Q.　But was the specific policy that you lay
8　out in your affirmation that time spent getting these
9　continuing education hours outside of regular business
10　hours would not be compensated, is that specific policy
11　written anywhere, to your knowledge?
12　　A.　I don't believe so. Not to my knowledge
13　specifically.
14　　Q.　And with respect to that specific policy,
15　how did you come to learn that was policy?
16　　A.　I think, I think there is -- there was a
17　training policy that was in one of the binders that
18　says something to the effect, funeral directors are
19　required to maintain -- kind of like it's worded
20　here -- required to maintain their license throughout
21　their tenure with Alderwoods. I don't think it
22　specifically said anything about the continuing
23　education, because that has changed over the years. We
24　used to not have to do continuing education.
25　　Q.　When did the continuing education

---

NETWORK DEPOSITION SERVICES
**Transcript of Ric Hensley**

114

```
1   Veterans?
2         MR. LINGLE:  Objection.
3      A.   No.
4      Q.   Have you ever heard of Holiday Cheer Box
5   Drive?
6         MR. LINGLE:  Objection.
7      A.   No.
8      Q.   Have you ever heard of small business
9   breakfast?
10        MR. LINGLE:  Objection.
11     A.   No.
12     Q.   Have you ever heard -- well, you know
13  what a garage sale is?
14     A.   Yes.
15     Q.   Okay.  Did y'all ever host a garage sale
16  like at your location, anything like that?
17     A.   No.
18     Q.   Have you ever heard of anything called
19  Flag Recovery Day?
20        MR. LINGLE:  Objection.
21     A.   No.
22     Q.   ID cards for children?
23        MR. LINGLE:  Objection.
24     A.   Yes, I've heard of it.
25     Q.   What is that?  What is your understanding
```

115

```
1   of that?
2      A.   My understanding is grade schools, DMV
3   comes in, takes pictures, kind of an ID kind of
4   driver's license type card for young children in case
5   they go missing.
6      Q.   Did Alderwoods Group, and by that, I
7   mean, the five locations you were responsible for, ever
8   do anything with ID cards for children?
9      A.   No.
10     Q.   Ever host a car wash of any type?
11     A.   No.
12     Q.   Did you or anyone, to your knowledge,
13  prepare a media kit for any Alderwoods location?
14        MR. LINGLE:  Objection.
15     A.   No.
16     Q.   Develop a mission statement for any
17  Alderwoods location?
18     A.   Alderwoods had a mission statement, yes.
19     Q.   Where was that located?
20     A.   It was actually located at each location.
21  They had a --
22     Q.   It was actually --
23     A.   Yeah, it had a big plaque right at the
24  front door.
25     Q.   Do you know what a community action plan
```

116

```
1   is?  Do you have an understanding of that?
2      A.   No.
3      Q.   Have you ever heard of best practices?
4         MR. LINGLE:  Objection.
5      Q.   Do you have any understanding of what
6   best practices are?
7         MR. LINGLE:  Objection.
8      A.   No.
9      Q.   Did you ever hear of anything at
10  Alderwoods called a market share report?
11     A.   Yes.
12     Q.   What was that?
13     A.   Market share report was simply keeping
14  tabs on your competition as to what kind of business or
15  what kind of volume they've been doing, and that gives
16  you a comparison of where you're at in the market.
17     Q.   Did you develop market share reports in
18  your role?
19     A.   Yes.
20     Q.   With respect to market share reports, did
21  you share that with the location managers?  How were
22  they used?
23     A.   Well, they were really used for budgets
24  during corporate meetings and budget meetings and that
25  sort of stuff.  They typed up those numbers and, you
```

117

```
1   know, would set your budgeting according to your volume
2   and compare it to your competition.
3      Q.   Have you ever heard of a program called I
4   Believe in Service?
5      A.   No.
6      Q.   Did you ever hear of something called
7   Success Spotlight?
8      A.   No.
9         MR. RAY:  I don't know if you want to
10  take a lunch.  I don't know how much more I have,
11  I've got more, but we can take a quick break.
12        Why don't we go off the record.
13        (Discussion off the record.)
14        (Recess taken.)
15  BY MR. RAY:
16     Q.   Mr. Hensley, I think earlier in your
17  deposition testimony you referred to preneeds or
18  preneeds appointment or something to that effect.  What
19  is preneeds?
20     A.   Preneed, prearrangements, yeah.  Anything
21  that's done before death is called a preneed or
22  prearrangement.
23     Q.   Are there actual like contracts that are
24  signed like prearrangement type contracts?
25     A.   Yes, yes.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Ric Hensley**

31 (Pages 118 to 121)

---

118

1    Q.    And is that a product then that
2  Alderwoods Group would try to sell or market?
3    A.    Yes, yes.
4    Q.    With respect to the locations that you
5  were responsible for as a general manager, would all of
6  the employees try to market or sell those
7  prearrangement type contracts?
8    A.    No, no. There were just certain
9  employees that were licensed, insurance licenseholders
10  that could sell preneed. We had a prearrangement
11  department that was headed up by one lady, and all of
12  those folks worked under her.
13    Q.    Did any of the employees that worked at
14  the five locations over which you were the general
15  manager work in this prearrangement department as well?
16    A.    Yes. Ina Roberts.
17    Q.    And she was a funeral director and
18  manager?
19    A.    Yes, she was a funeral director and
20  manager. She served for Woodhaven and Weaver's. And I
21  don't remember, Donna Mayes, Buddy Mayes' wife, was the
22  head of the preneed or the prearrangement program, so
23  she had different employees, they came and went, and I
24  don't remember their names, but Ina stayed the longest,
25  that's why I remember her the most.

---

119

1    Q.    And one of the Mayeses may have as well?
2    A.    Yeah, Donna Mayes, that was Buddy Mayes'
3  wife, she actually headed up this region as far as
4  preneeding is concerned.
5    Q.    Did Donna Mayes ever report to you either
6  directly or indirectly?
7    A.    No, no.
8    Q.    So of the people who reported to you when
9  you were general manager either directly or indirectly,
10  Ina Roberts was the only one?
11    A.    Was the only one, yes.
12    Q.    Other than Ina Roberts then, would any of
13  the other employees who reported to you directly or
14  indirectly as a general manager be responsible for
15  selling these prearrangements?
16    A.    No.
17    Q.    Is prearrangement the same thing as
18  preneeds?
19    A.    Yes.
20    Q.    Tell me about the process of selling
21  preneeds. I assume that contact could start either
22  way, either you reach out to someone --
23    A.    Yes, it's either by phone call, either
24  the customer is calling in or they actually walk into
25  the funeral home, and they just simply inquire as to

---

120

1  how we can go ahead and get our arrangements fixed up
2  and paid for before that time comes.
3    Q.    And Ina Roberts would deal with those?
4    A.    Ina would deal with those.
5    Q.    Would she be paid for the time she spent
6  dealing with those?
7    A.    Yes.
8    Q.    Are you aware of any time that she spent
9  dealing with these preneeds arrangements where she
10  wasn't paid for them?
11    A.    Not that I'm aware of.
12    Q.    Are you aware of any policy at Alderwoods
13  Group that provided that employees who dealt with these
14  preneeds arrangements would not be compensated if they
15  were dealing with them outside of their regular work
16  hours?
17    A.    I'm not aware of any policy.
18    Q.    And that's certainly not what you did
19  within your group?
20    A.    Right.
21    Q.    So if an employee in your group either
22  who reported to you directly or indirectly was working
23  on preneeds either arrangements or discussions outside
24  of the regular work hours, that would be treated as
25  time worked and they would be compensated, correct?

---

121

1    A.    Repeat the question.
2    Q.    If an employee in your group, either
3  someone who reported to you directly or indirectly was
4  working on preneeds appointments, arrangements and they
5  were working on those outside of their regular work
6  hours --
7    A.    Right.
8    Q.    -- that would be treated as time worked
9  and thus paid; is that right?
10    A.    No, no.
11    Q.    Okay. Tell me why not. What's wrong
12  about that statement?
13    A.    Ina, even though Ina got a salary, she
14  also, the preneed program is strictly a commission sale
15  only. So for those preneed counselors who sell
16  preneed, they didn't get a regular hourly wage or a
17  salary. It was strictly a commission.
18    Q.    Fair enough.
19          Ina was a manager also?
20    A.    Ina was a manager also.
21    Q.    So she was salaried?
22    A.    Yes, yes.
23    Q.    Was Ina then not eligible for overtime
24  work for any work performed outside of her regular
25  duties?

---

**NETWORK DEPOSITION SERVICES**
**Transcript of Ric Hensley**

122

1    A.   Not to my knowledge. She did get a
2  commission pay off of everything that she told, so I'm
3  sure that was it.
4    Q.   But other than Ina on your team, no one
5  else dealt with these preneeds issues?
6    A.   Right.
7    Q.   We talked earlier about lunch breaks and
8  if employees worked through lunch breaks what happened.
9  Did employees who reported to you either directly or
10 indirectly when you were a general manager get other
11 breaks besides lunch breaks?
12   A.   Yes.
13   Q.   Did they get paid during the time they
14 took those breaks?
15   A.   Yes.
16   Q.   Those were paid breaks?
17   A.   Yes.
18   Q.   To work overtime, were employees who
19 reported to you as general manager either directly or
20 indirectly required to get that overtime preapproved
21 before they worked it?
22   A.   No, no.
23   Q.   No requirement of preapproval during your
24 entire tenure as general manager?
25   A.   Not to my knowledge, yes.

123

1    Q.   So an employee who reported to you either
2  directly or indirectly could use his or her discretion
3  as to whether they needed to work overtime; is that
4  right?
5        MR. LINGLE: Objection.
6    A.   No.
7    Q.   Okay. Explain what you mean by that.
8    A.   If they worked overtime, if we had
9  services overnight or they worked overtime, they worked
10 overtime. There was nothing preapproved about it. It
11 was not left up to the employee's discretion, I mean,
12 we all knew what the schedule was, so.
13   Q.   Based on what services were out there?
14   A.   Yes, based on what was going on at the
15 time.
16   Q.   And if they worked overtime during your
17 tenure as general manager, they were paid the overtime?
18       MR. LINGLE: Objection.
19   A.   Yes.
20   Q.   Was overtime always scheduled during your
21 tenure as general manager?
22       MR. LINGLE: Objection.
23   A.   What do you mean "scheduled"?
24   Q.   Well, you were talking about when there
25 were services, so people knew they had to, you know, be

124

1  there for services or work overtime or what have you.
2    A.   Yes.
3    Q.   When there were services that required
4  overtime, would that be accounted for in the employee's
5  schedule; in other words, would an employee be
6  scheduled to work later on a particular day because of
7  known services?
8    A.   No, no.
9    Q.   So just so I understand this, the
10 employees knew what they needed to work based on what
11 was scheduled that day, right?
12   A.   Well, they knew what they were supposed
13 to work for the entire week, okay, on a certain
14 schedule.
15   Q.   Okay.
16   A.   Then if funeral services were thrown into
17 the mix of that during the week, that obviously would
18 have been overtime.
19   Q.   But you didn't have to preapprove, or no
20 manager had to preapprove their overtime?
21       MR. LINGLE: Objection.
22   A.   No.
23   Q.   Is that correct?
24   A.   That's correct.
25   Q.   Going back quickly to the preneeds or

125

1  prearrangement situation.
2    A.   Yeah.
3    Q.   I think you referenced an insurance
4  license?
5    A.   Yes.
6    Q.   So the person who deals with preneeds has
7  to have a license?
8    A.   Yes, sir. In the State of Tennessee, you
9  have to be a licensed life insurance agent, have to go
10 through all the licensing requirements, classes, and
11 pass an exam, and then once you're issued a license,
12 then you're eligible to sell prearranged funerals only.
13 You're not allowed to sell accident and health or
14 anything else.
15   Q.   I want to talk a little bit about the
16 type of compensation your employees received.
17       We've talked about Ina Roberts who was
18 salaried while she reported to you, right?
19   A.   Right.
20   Q.   With respect to the employees who were
21 paid on an hourly basis, were they eligible for any
22 bonus compensation?
23   A.   Not to my knowledge, no.
24   Q.   Were they eligible for any type of
25 incentive awards?

**NETWORK DEPOSITION SERVICES**
**Transcript of Ric Hensley**

134

1       (Discussion off the record.)
2       (Recess taken.)
3           MR. RAY: We can go back on the record.
4       I'll pass the witness.
5   EXAMINATION BY MR. LINGLE:
6       Q.   Mr. Hensley, I believe you were asked
7   this, but you did have a chance to review your
8   affirmation again today, and I just want to make sure
9   you've confirmed that it's completely truthful and
10  accurate --
11      A.   Yes.
12      Q.   -- as it was the day that you signed it?
13      A.   Yes.
14      Q.   You were asked a series of questions
15  about employees and their meal breaks. Do you recall
16  that?
17      A.   Yes.
18      Q.   It was only possible for you to be
19  physically present at one location at a time, right?
20      A.   Yes.
21      Q.   So it would be fair to say that you were
22  not always present at any of the other locations that
23  you were not at when employees may or may not have been
24  on meal breaks?
25      A.   Correct.

135

1       Q.   So and is it also true that there was a
2   point in time when the company emphasized making sure
3   employees recorded an hour for a meal break? Do you
4   recall that?
5       A.   Yes, yes.
6       Q.   Okay. So it is possible that employees
7   would have recorded a meal break and worked through
8   that time?
9       A.   True, yes.
10      Q.   But you wouldn't necessarily know because
11  you weren't present at all those locations?
12      A.   Exactly, right.
13      Q.   So would it be the case that employees
14  themselves would know whether or not they worked
15  through their meal breaks?
16      A.   Employees themselves, yes.
17      Q.   Do embalmers have any continuing
18  education requirements?
19      A.   Yes.
20      Q.   And so would they fall into that same
21  policy that you discussed earlier regarding that
22  training?
23      A.   Yes, same policy.
24      Q.   You were asked whether or not about
25  payment for overtime for employees towards the end of

136

1   your deposition. What I want to ask you now is, so if
2   employees weren't paid for all their on-call time that
3   they spent working, they weren't paid for overtime for
4   that either, right?
5       A.   Right.
6           MR. RAY: Objection, form.
7       Q.   And as far as if they worked community
8   service or spent time working community service, they
9   wouldn't have been paid overtime for that either,
10  correct?
11      A.   Right.
12      Q.   And the same would be for any training
13  time that they spent?
14      A.   Yes.
15          MR. RAY: Objection. Objection.
16      Q.   You were also asked about whether or not
17  you were aware of employees receiving any additional
18  compensation. Do you recall that?
19      A.   Yes.
20      Q.   Would the employees themselves again know
21  better whether or not they did receive additional
22  compensation?
23      A.   They would know best as far as their
24  paycheck is concerned, yes.
25      Q.   Okay. You were also asked about

137

1   employees accurately recording time.
2       A.   Yes.
3       Q.   Now, it's true based on your testimony
4   from earlier that employees did not record time for all
5   the time they spent working on call, right?
6       A.   Right.
7       Q.   So that would be an inaccuracy in their
8   time records, right?
9           MR. RAY: Objection.
10      A.   Yes.
11      Q.   The same for community service?
12      A.   Yes.
13      Q.   And for the training?
14      A.   Yes.
15          MR. RAY: Objection.
16      Q.   Now, you were also asked about employees
17  coming in prior to their scheduled start time for a
18  day. Do you recall that?
19      A.   Right, yes.
20      Q.   And I believe you said that they would
21  clock in if they were required to be there to do
22  something?
23      A.   Yes.
24      Q.   Would there be other times that employees
25  if they weren't necessarily required to be there they

**Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg**
**866-565-1929**

**NETWORK DEPOSITION SERVICES**
**Transcript of Ric Hensley**

36 (Pages 138 to 141)

---

138

1    would still come in early?
2        A.    Sometimes.
3        Q.    Would they get paid for that time then?
4        A.    No.
5        Q.    So there would be times employees would
6    come in early, do some work and not get paid for it?
7        A.    Yes.
8            MR. LINGLE: That's all the questions I
9    have right now.
10           MR. RAY: Okay.
11   CONTINUED EXAMINATION BY MR. RAY:
12       Q.    Let's go back and talk about meal breaks
13   for a second.
14       A.    Okay.
15       Q.    As general manager, is it accurate to say
16   that it was your approach in dealing with employees
17   that if they worked through meal breaks, they were to
18   be paid for that time?
19           MR. LINGLE: Objection.
20       A.    It was my understanding that company
21   policy required them as far as taking a one-hour lunch
22   break, they were to record that on their time card.
23       Q.    And if they worked through that lunch
24   break, is it also your understanding the company policy
25   required that they be paid for that time?

---

139

1        A.    Be paid for that time, yes.
2        Q.    And did you communicate that
3    understanding of policy in your communications to the
4    location managers when you discussed with them
5    policies?
6        A.    Yes.
7        Q.    You said embalmers have continuing
8    education requirements?
9        A.    Yes.
10       Q.    Are they the same, is it the same license
11   required of --
12       A.    Yes, it's the same licensing requirement
13   that it is for a funeral director.
14       Q.    We're talking over each other just a
15   little bit.
16       A.    I'm sorry.
17       Q.    And then there were some questions there
18   about where Mr. Lingle asked you about training,
19   training generally, whether training time was recorded
20   or what have you.
21       A.    Yes.
22       Q.    I just want to make sure the record's
23   clear.
24           The only training that you believe, the
25   only training time that you believe may not have been

---

140

1    recorded by any of the employees who reported to you
2    either directly or indirectly was training time by
3    funeral directors for their license requirements that
4    was done outside of regular work hours, correct?
5        A.    The funeral directors' training time,
6    yes.
7        Q.    And that's the only training time that
8    you think is possible, because I think you said you
9    didn't know if it was or not, but it's possible that
10   that training time was not record, correct?
11       A.    That training time was not recorded. But
12   like I said before, the community involvement that they
13   did outside of hours was not recorded as far as time.
14       Q.    I understand. I'm talking specifically
15   about training.
16       A.    Okay.
17       Q.    I want to make sure we understand what
18   you mean by training and where you think there was
19   maybe some time not recorded for training.
20       A.    Okay.
21       Q.    Okay?
22           I understand that with respect to funeral
23   directors who were engaged in getting their continuing
24   education requirements outside of normal business
25   hours, that you believe it's a possibility that time

---

141

1    might not have been recorded, correct?
2        A.    Correct.
3        Q.    Any other training time for any other
4    employee where you think that it was not, there's a
5    possibility it was not accurately recorded?
6        A.    Not to my knowledge.
7        Q.    I think there was also a question about
8    whether the employee or you or someone else would know
9    best what their compensation was, correct? Do you
10   recall that?
11       A.    Correct.
12       Q.    As general manager, certainly you know
13   whether your employees are eligible for bonuses, didn't
14   you?
15       A.    Yes.
16       Q.    And is your testimony any different now,
17   or has your testimony changed in any way that you
18   didn't believe that the hourly employees were eligible
19   for bonuses?
20       A.    I don't believe the hourly employees were
21   eligible, no.
22       Q.    Or for any type of incentive?
23       A.    For any type of incentive.
24       Q.    And then there was also, I had asked you
25   a question about employees coming in early?

---

# Exhibit 11

Deposition Transcript of Louise Johnson (07-17-09)

00001
1                    UNITED STATES DISTRICT COURT
2            FOR THE WESTERN DISTRICT OF PENNSYLVANIA
3
4   DEBORAH PRISE and HEATHER RADY on  )
    behalf of themselves and all       )
5   employees similarly situated,      )
                                       )
6               Plaintiffs,            )
                                       ) Civil Action
7       vs.                            ) No.: 06-1641
                                       )
8   ALDERWOODS GROUP, INC.,            )
                                       )
9               Defendant.             )
    _____)
10
11
12
13
14
15
16
17
18          Deposition of LOUISE JOHNSON, taken on behalf
19  of the Defendant, before Victoria A. Guerrero, CSR No.
20  8370, RPR, CRR, for the State of California, commencing
21  on Monday, July 17, 2009, 9:36 a.m., at Veritext
22  National Deposition & Litigation Services, 3090 Bristol
23  Street, Suite 190, Costa Mesa, California.
24
25  Pages 1 through 328
00002
1   APPEARANCES OF COUNSEL:
2
3       For the Plaintiff:
4
5           Margolis Edelstein
            BY:  KYLE T. MCGEE, ESQ.
6           525 William Penn Place, Suite 3300
            Pittsburgh, Pennsylvania  15219
            Phone (412) 355-4971  Fax (412) 642-2380
7           E-mail:  Kmcgee@margolisedelstein.com
8
9
10      For the Defendant:
11
12          Gurnee, Wolden & Daniels, LLP
            BY:  NICHOLAS P. FORESTIERE, ESQ.
            2240 Douglas Boulevard, Suite 150
13          Roseville, California  95661-3805
            Phone (916) 797-3100  Fax (916) 797-3131
14          E-mail:  Nicholas@gurneelaw.com
15
16
17
18
19
20
21
22
23
24
                         Page 1

Deposition Transcript of Louise Johnson (07-17-09)

25
00003
1                                    INDEX
2    Examination by:                                    Page
3    Mr. Forestiere                                        5
4    Mr. McGee                                           278
5    Mr. Forestiere                                      322
6    Mr. McGee                                           325
7
8
9                                EXHIBIT LIST
10
11   Exhibit No.              Description                Page
12   Exhibit 1    Amended Notice of Deposition of         14
               Louise Johnson
13
     Exhibit 2    Consent to Become a Party               26
14             Plaintiff
15   Exhibit 3    Employment Application; Bates           37
               No. ALD011567
16
     Exhibit 4    Cemetery and Funeral Program,           85
17             Application for Certificate of
               Registration as an Apprentice
18             Embalmer; Bates Nos. ALD011557
               and 011558
19
     Exhibit 5    US New Employee Welcome to              86
20             Alderwoods; Bates nos.
               ALD011564 through 011566
21
     Exhibit 6    Code of Business Conduct and            91
22             Ethics "Every Employee's
               Responsibility"; Bates No.
23             ALD011622
24   Exhibit 7    Acknowledgment of Receipt of           104
               employee Handbook; Bates No.
25             ALD11568
00004
1                            EXHIBIT LIST  (cont'd)
2
3    Exhibit No.              Description                Page
4    Exhibit 8    Alderwoods and You Employee           105
               Handbook; Bates Nos. ALD000065
5              through 000101
6    Exhibit 9    Funeral Home Procedures; Bates        137
               No. ALD000001
7
     Exhibit 10   Hours of Work and Overtime;           144
8              Bates Nos. ALD000004 through
               000008
9
     Exhibit 11   Earnings Statements; Bates Nos.       203
10             P08493 through 08564
11   Exhibit 12   EE Detail; Bates Nos. ALD004384       210
               through 004390
12
     Exhibit 13   Information Sheet  (No Bates)         213
13
     Exhibit 14   Letter dated 7-18-05 to Lynn          266
14             from Louise Johnson; Bates Nos.
               ALD0011575 through 011577
15
                                Page 2

Deposition Transcript of Louise Johnson (07-17-09)
Exhibit 15     Back Pay Request Form; Bates          271
               Nos. ALD011591 through 011596

16
17
18                          *  *  *
19
20
21
22
23
24
25
00005
1                   Monday, July 17, 2009; 9:36 a.m.
2                       Costa Mesa, California
3                              ooOoo
4                         LOUISE JOHNSON was
5     called as a witness by and on behalf of the Defendant,
6     and having been first duly sworn by the Certified
7     Shorthand Reporter, was examined and testified as
8     follows:
9
10                          EXAMINATION
11
12    BY MR. FORESTIERE:
13         Q    Could you state your full legal name for the
14    record, please?
15         A    Louise Elizabeth Johnson.
16         Q    And where do you reside, Miss Johnson?
17         A    Long Beach.
18         Q    And your social security number?
19         A    ████████████
20         Q    And your date of birth?
21         A    8-29-1984.
22         Q    Miss Johnson, my name a Nick Forestiere.  I'm
23    the attorney representing the defendants in this action,
24    Alderwoods.
25              Do you understand that?
00006
1         A    Yes.
2         Q    And today we're taking your deposition
3     concerning some claims you made in joining a lawsuit
4     against Alderwoods.
5              Do you understand that?
6         A    Yes.
7         Q    Have you ever had your deposition taken before?
8         A    No.
9         Q    I'm going to go over the ground rules in just a
10    second, then, about how things will proceed today.  I
11    just want to get a couple things as I was going through
12    the file correct.
13              You worked at the -- is it Harbor Lawn Funeral
14    Home?
15         A    The full name?
16         Q    Yes.
17         A    Harbor Lawn Mount Olive Memorial Park and
18    Mortuary.
19         Q    How is it that you generally refer to that so
20    that you understand it so I don't have to repeat that
21    long name with every question?
22         A    Call it Harbor Lawn.
23         Q    Harbor Lawn.  So if I use Harbor Lawn, you
24    understand I'm referring to that place of business that
25    you worked at that was owned by Alderwoods?
                              Page 3

Deposition Transcript of Louise Johnson (07-17-09)

```
16    A    We're not eligible.
17    Q    So the answer would be no?
18    A    Correct.
19    Q    Did you earn any commissions for package plans
20  -- strike that.
21         Did you sell any package plans?
22    A    I've sold package plans.
23    Q    And were you paid commissions on the package
24  plans you've sold?
25    A    Yes.
00051
1     Q    Do you have any disputes for the amount of
2   commissions you were paid for the packages you sold?
3     A    No.
4     Q    Have you ever paid any bonuses while you worked
5   at Harbor Lawn?
6     A    I can recall one bonus.  I don't believe that
7   there was any others.
8     Q    When was that bonus paid?
9     A    Sometime, I would estimate, between 2006 and
10  2007.
11    Q    What was that bonus paid for?
12    A    I think it reflected our location, meeting
13  certain goals, sales goals.
14    Q    Do you recall how much your bonus was?
15    A    It was less than $100.
16    Q    Was there a time of year that bonuses are
17  usually paid based upon the performance of a facility?
18    A    This is the only one that I can recollect.  The
19  only other.  We got our increases usually yearly.
20    Q    You talking about salary adjustment, wage
21  adjustments?
22    A    Yes.
23    Q    And that was based upon after performance
24  review?
25    A    Usually.
00052
1     Q    You said that there's only one bonus you ever
2   received during the entire time you worked at Harbor
3   Lawn, correct?
4     A    That I can recall.
5     Q    And that was in 2000 to 2007?
6     A    2007 -- 2006 to '8, somewhere in that window.
7     Q    And that was for less than a hundred dollars?
8     A    Yes.
9     Q    And based upon the performance of the facility?
10    A    Yes.  I don't know if it's important to note
11  that other employees, I know, received more than that
12  amount.  But it wasn't based individually on our
13  individual performance, but for some reason they got
14  different amounts.
15    Q    Did that make you upset?
16    A    Very much so.
17    Q    Why is that?
18    A    I think it was based on job title and there was
19  some people that were working in different position than
20  their job title reflected.  They were doing less work
21  and they got compensated more through this because of
22  their incorrect job title.
23    Q    Who are these people?
24    A    There was one individual who was mistitled, his
25  name was Richard Belcher.
00053
```

Page 22

# Exhibit 12

1

1          UNITED STATES DISTRICT COURT

2         WESTERN DISTRICT OF PENNSYLVANIA

3  DEBORAH PRISE and HEATHER RADY,
   on behalf of themselves and all
4  employees similarly situated,

5       Plaintiffs,

6  vs.

7  ALDERWOODS GROUP, INC. and
   SERVICE CORPORATION INTERNATIONAL,
8
        Defendants.
9  _____

10  Civil Action No. 06-1641 Civil
    Judge Joy Flowers Conti
11

12

13

14

15       DEPOSITION OF ROBERT GORDON JONES

16           Taken April 21, 2009
             Commencing at 9:30 a.m.
17
        Volume I - Pages 1 - 216, inclusive
18

19

20          Taken by the Defendants
                    at
21           Lane Powell Law Firm
    301 West Northern Lights Boulevard, Suite 301
22            Anchorage, Alaska

23

    Reported by:
24  Mary A. Vavrik, RMR

25

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Jones**

---

38

1  A   Correct.
2  Q   After you received this document, did you have
3  any questions concerning what your duties would
4  include in performing as a funeral director at
5  Evergreen?
6  A   No, sir.
7  Q   Did you ever ask anybody any questions about
8  this document?
9  A   Not that I recall. Nick, do you mind if we
10  take a quick break?
11        MR. FORESTIERE: Oh, sure.
12  Absolutely.
13        (A break was taken.)
14  BY MR. FORESTIERE:
15  Q   Let's see. Before we broke, we were talking
16  about your duties as the funeral director. And I
17  think we already established what your hourly
18  compensation initially was, around 18 bucks an hour
19  or so?
20  A   I believe so, yes, sir.
21  Q   And did you receive any other compensation when
22  you first started working at Evergreen in the
23  position of a funeral director?
24  A   No, sir.
25  Q   So no commissions?

---

39

1  A   Oh, sorry. Yes. We did receive commissions on
2  our markers, vaults, and urns over a certain dollar
3  figure.
4  Q   Did you receive any bonuses?
5  A   It was -- bonus potential existed, but I didn't
6  receive any until, I think, we came out of
7  bankruptcy as Alderwoods.
8  Q   What was the basis for a payment of a bonus?
9  A   I'm not sure what the criteria was, to be
10  honest with you. It's something to do with revenue
11  over the course of the year, but I don't know what
12  else went into the formula.
13  Q   What type of benefits did you receive when you
14  first started working as a funeral director?
15  A   Health, vacation. That's about it.
16  Q   Time off? How much did you get, two weeks a
17  year?
18  A   I believe so, yes, sir.
19  Q   And what was your understanding as to the
20  number of hours you would be working as a funeral
21  director when you first started with Evergreen?
22        MR. LINGLE: Object to the form.
23        THE WITNESS: At least 40 plus
24  on-call and overtime as needed.
25  BY MR. FORESTIERE:

---

40

1  Q   What was your general workweek starting?
2  A   When I started?
3  Q   Yes.
4  A   Monday through Friday, or five days a week,
5  about nine hours a day.
6  Q   How often would you work on call?
7  A   Let's see. When we -- when I started we were
8  on call three nights a week.
9  Q   Did that change after you got started?
10  A   Yes, sir.
11  Q   How did it change?
12  A   We lost staff members and had to cover some of
13  those shifts, and they were not replaced.
14  Q   So your on-call work increased, is that
15  correct?
16  A   Uh-huh.
17  Q   And how much did it increase to?
18  A   Quite a bit. I think towards the end I was on
19  call about five nights a week and taking the phones
20  at home on my day off, which was Sunday.
21  Q   When you were working from Monday through
22  Friday, was that basically from 8:00 to 5:00? You
23  said nine hours a day. When would you start; when
24  would you leave?
25  A   7:00 in the morning was when I was supposed to

---

41

1  start, and I would leave at the end of the day when
2  the work was done, which was generally about 6:00,
3  5:00.
4  Q   And that was Monday through Friday or Sunday
5  through Tuesday or --
6  A   Yeah. It was a five-day stretch.
7  Q   But you usually just work at least --
8  strike that. And that was at the facility, at the
9  Greenwood [sic] facility those hours from 7:00 to
10  5:00 or 6:00?
11  A   Reporting there and leaving from there at the
12  end of the day, but my duties would take me to
13  various churches, to the other locations for
14  cremation, Eagle River to meet families, that kind
15  of thing; but for the most part, reporting and
16  ending the day at the facility, Evergreen.
17  Q   Now, there were times that you worked overtime
18  and put those on your time cards, correct?
19  A   Correct.
20  Q   And you were subsequently paid for that time,
21  overtime, correct?
22  A   Yes, yes, sir.
23  Q   And you are claiming in this lawsuit overtime
24  above and beyond that, is that what I understand?
25  A   Yes, sir.

---

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Jones**

126

1 So I would usually wrap up my hourlies on Saturday.
2 Q Did you fill out your time card on a daily
3 basis?
4 A I did my best, yes, sir.
5 Q And it's your understanding that you had -- had
6 to have them completely completed and turned in on
7 Monday?
8 A Yes, sir.
9 Q And that was necessary in order to promptly
10 give you a paycheck?
11 A Yes, sir.
12 Q Who did you give them to?
13 A Mrs. Boyd.
14 Q Did she ever have any questions for you
15 concerning the time that you put on your time card?
16 A Not that I recall.
17 Q Did you ever have any questions for her about
18 the time you were putting down on your time card?
19 A No, sir.
20 Q Did you ever complain to her that the time on
21 your time card did not reflect all the time that you
22 worked?
23     MR. LINGLE: Object to the form.
24     THE WITNESS: Not formally.
25 BY MR. FORESTIERE:

127

1 Q What do you mean?
2 A More casually.
3 Q Okay. What did you say to her?
4 A Well, at the end of, say, you know, a 50-hour
5 workweek and I'm getting paid for 45, it would be
6 something along the lines of, man, I wish I was
7 getting paid for this, but nothing formal. I don't
8 whether she even acknowledged it or not, I don't
9 recall.
10 Q Never sent any -- strike that. You never sent
11 any letters to Mr. Janssen or Mrs. Boyd about not
12 being paid all the time that you worked?
13 A No, sir.
14 Q Ever complain to any other employees that you
15 are not being paid for all the time that you worked?
16     MR. LINGLE: Object to the form.
17     THE WITNESS: No, sir.
18 BY MR. FORESTIERE:
19 Q Did anybody at the -- you mentioned there was a
20 team meeting about once a month, correct?
21 A Yes, sir.
22 Q At these team meetings, were there any
23 complaints that people were not being paid for all
24 the time that they worked?
25     MR. LINGLE: Object to the form.

128

1     THE WITNESS: No, sir.
2 BY MR. FORESTIERE:
3 Q Are you aware of any letters sent by any of the
4 other employees to Mr. Janssen or anybody else in
5 the management of Alderwoods that they were not
6 being paid for all the time that they worked?
7 A No, sir.
8 Q Who was it that set your work schedule? Let's
9 talk about the time period now from December 2002 to
10 2004.
11 A And the question is who set my schedule?
12 Q Yes, sir.
13 A Mr. Janssen.
14 Q And how many weeks did he schedule you to work?
15 Strike that. How many hours a week did he schedule
16 you to work typically?
17 A Wow. Well --
18 Q And again, we are just talking about the
19 December 2002 to May 2004 time period.
20 A I guess typically the schedule as written
21 would -- would reflect 40 hours.
22 Q And that would generally be, what, eight hours
23 a day?
24 A Well, generally for me it would be 7:00 to
25 6:00, 7:00 to 5:00, something like that.

129

1 Q Was there a regular work schedule sheet that
2 would get passed around showing who worked what
3 hours?
4     MR. LINGLE: Object to the form.
5     THE WITNESS: No. The schedule would
6 be posted as a, you know, Sunday through Saturday
7 schedule with folks -- you know, with their times
8 posted or days to work, generally 8:00 to 5:00, but
9 my situation was a little bit different in that I
10 came early, stayed late, and would work weekends.
11 Q Did anybody ever instruct you to keep track of
12 your time that you worked?
13 A Other than --
14 Q Yeah, other than the written policies and
15 things that talk about that subject matter.
16 A No, sir.
17 Q Did Mr. Janssen ever tell you, hey, make sure
18 you keep track of all the hours that you work?
19 A No, sir.
20 Q Did Mrs. Boyd ever tell you that?
21 A No, sir.
22 Q Are you aware of any other employees at
23 Evergreen that worked more than 40 hours a week?
24 A Yes, sir.
25 Q Would you identify those employees for me,

## NETWORK DEPOSITION SERVICES
### Transcript of Robert Jones

38 (Pages 146 to 149)

146

1    A  Yes, sir.
2    Q  And that included overtime and regular hours
3  and piecemeal work?
4    A  Yes, sir.
5    Q  Did you have any reason to believe that that
6  information on your time card was not accurately
7  reflected in these earnings statements that you
8  received?
9        MR. LINGLE:  Object to the form.
10        THE WITNESS:  I did have some
11  reservations.
12  BY MR. FORESTIERE:
13    Q  Why don't you tell me about those.
14    A  Well, the -- the time cards that we were just
15  looking at have -- reflect two things, actually, the
16  agreement that Mr. Janssen and I had for the 40
17  hours plus fixed number of overtime hours, but the
18  hours -- the daily hours punching in and out don't
19  reflect those totals accurately.
20    Q  By the way, what was the total amount of fixed
21  hours of overtime that you were being paid whether
22  you worked them or not?
23    A  The 40 hours plus five hours of overtime.
24    Q  On a weekly basis?
25    A  Yes, sir.

147

1    Q  Okay.  Any other inaccuracies that you believe
2  existed in these earnings statements?
3    A  No, sir.
4    Q  Let's just take this earnings statement for the
5  period of April 3, 2004 through April 8, 2004, which
6  is the first page of this document.  Under earnings
7  it says that overtime that you worked, ten hours,
8  correct?
9    A  Yes, sir.
10    Q  Now, did that include the five hours or -- that
11  you had with Mr. Janssen about the fixed number of
12  overtime that you were to be paid?
13    A  Yes.
14        MR. LINGLE:  Object to the form.
15  BY MR. FORESTIERE:
16    Q  So would you take the overtime that was on your
17  time card and then add five hours, or how did that
18  work?
19        MR. LINGLE:  Object to the form.
20        THE WITNESS:  Well, it was -- without
21  doing any of the math for the daily hours, at the
22  end of the week it was 40 and five.
23  BY MR. FORESTIERE:
24    Q  So if the -- it's a two-week time period,
25  correct?

148

1    A  Correct.
2    Q  So the ten hours there would be two weeks at
3  five hours?
4    A  Yes, sir.
5    Q  Now, under -- going back on page -- this
6  earnings statement of April 3rd through April 8th,
7  Exhibit 12, I'm just now realizing it's actually
8  just a week.
9    A  The -- the --
10    Q  So why would it say ten hours of overtime?
11        MR. LINGLE:  Object to the form.
12        THE WITNESS:  The period ending was
13  the last day of that pay period.  The advice date
14  was, I believe, the date that we got paid.  So the
15  pay period just, as an example, ended on Saturday,
16  the 3rd, for example, and then we got paid on
17  whatever Wednesday, the 8th, was going to be.  I
18  believe that's what those dates are referring to.
19  BY MR. FORESTIERE:
20    Q  Okay.  So it's your understanding that it's a
21  two-week pay period, and the advice date is
22  different than what the pay period is?
23    A  Yes, sir.
24    Q  So this one when it says, "Pay period ending
25  April 3, 2004," would be for two weeks prior to that

149

1  date?
2        MR. LINGLE:  Object to the -- where
3  do you see April 3rd?
4        MR. FORESTIERE:  Upper right-hand
5  corner.
6        MR. LINGLE:  Do we not have the --
7  good grief.
8        MR. FORESTIERE:  Do I have them
9  copied off again incorrectly?  Is there an extra
10  copy on yours?
11        MR. LINGLE:  Yeah.  Did you want it
12  to be part of it or not, 3/20/04?
13        MR. FORESTIERE:  Well, it should
14  include everything, but who knows.  I had it copied
15  off.
16        MR. LINGLE:  I think it appears later
17  on, maybe the fourth page, is that right, in yours?
18        MR. FORESTIERE:  I have fourth is
19  3/6, 3/12.  Yeah, 3/20.  I have it as one, two,
20  three, four -- I have it as the fifth page.  So
21  someone did a really crappy job of copying this for
22  me.
23        MR. LINGLE:  What did you say your
24  second page is?
25        MR. FORESTIERE:  The first page is

154

BY MR. FORESTIERE:
1  Q   This seems to be adding money, though, doesn't
2  it, to the amount you are being paid?
3  A   Seems to.
4  Q   But you don't have any idea what that's for?
5  A   No, sir.
6  Q   The next page it's also on there, as well.  OT
7  ADG -- or ADJ.  Excuse me.  Do you see that?
8  A   Yes, sir.
9  Q   But again, you don't have any idea about what
10 that pertains to?
11 A   No, sir.
12 Q   On the earnings statement for the period ending
13 December 19, 2003 --
14 A   Sorry.  The dates again?
15 Q   December 19, 2003 in the upper right-hand
16 corner, that's -- there is some handwriting there on
17 some numbers?
18 A   Yes, sir.
19 Q   Whose handwriting is that?
20 A   Looks to be mine.
21 Q   Do you know what these numbers represent?
22 A   No, sir.  I don't know.
23 Q   Okay.  Okay.  There is also a statement dated
24 period ending May 9, 2003.

155

1  A   Can we go back?  I think I figured out what
2  those numbers are.
3  Q   Okay.  We are going back to the handwriting
4  numbers on the payroll statement for December 19,
5  2003?
6  A   Uh-huh, yes, sir.
7  Q   Okay.  Did you --
8  A   Yeah.  The top figure is a recording of the
9  gross pay year-to-date.  The figure below it is the
10 year-end bonus, and the summation of that
11 calculation is year-to-date gross paid minus the
12 bonus.
13 Q   What is that?  And I understand there it
14 says -- under the earnings report it has Y/E BNS.
15 A   Uh-huh.
16 Q   That's your understanding that's the year-end
17 bonus?  What does that mean to you?
18 A   I believe it means year-end bonus.
19 Q   And there is a number to the right $9,483.17.
20 A   Yes, sir.
21 Q   And that was your -- well, what did that --
22 explain what a year-end bonus is.
23      MR. LINGLE:  Object to the form.
24      THE WITNESS:  The year-end bonus was
25 a bonus that some of the employees got given out by

156

1  the company.
2  BY MR. FORESTIERE:
3  Q   How -- how was it earned?  Strike that.  How
4  was your bonus earned?
5      MR. LINGLE:  Object to the form.
6      THE WITNESS:  I was a very good
7  employee.
8  BY MR. FORESTIERE:
9  Q   How was it calculated?
10 A   I have no idea.
11 Q   Did you get this bonus every year?
12 A   No, sir.
13 Q   And you don't know how it was determined, other
14 than the fact that obviously they really liked your
15 work?
16 A   I don't know what the formula was, no, sir.
17 Q   Did you have any discussions with Mr. Janssen
18 about getting this year-end bonus for December 2003?
19 A   No -- no discussions regarding the figure
20 itself, just discussions between he and I on how the
21 firm could get to that point.
22 Q   What discussions did you have with him
23 concerning the bonus?
24 A   Oh, you know, how to increase revenue, keep the
25 cost down, that kind of thing.

157

1  Q   So he set at least some type of performance
2  criteria by which you would have to, at least in his
3  opinion, meet in order to get a year-end bonus?
4  A   For the firm itself, not specifically for me,
5  but for the -- for the funeral home.
6  Q   And what was the purpose of your calculation?
7  A   I believe the hourly salary agreement that
8  Scott and I had at that time was 60,000 a year.  So
9  I -- I was trying to determine how close to the 60
10 we got minus the bonus.
11 Q   If you take a look at the next page, it has the
12 period ending October 24, 2003.
13 A   Yes, sir.
14 Q   And there in the earnings report it has again
15 the Y/E BNS for $9,483.17.  Do you see that?
16 A   Yes, sir.
17 Q   Do you know why it would be reflected in that
18 month if it was a year-end bonus?
19      MR. LINGLE:  Object to the form.
20      THE WITNESS:  No, sir.  My guess is
21 the bonus must have come in before -- it must not
22 have -- I -- maybe I don't know what Y/E meant.  I
23 just took it, since it was on the December
24 statement, as being year-end, but obviously they
25 included it in the year-to-date.

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Jones**

170

```
 1   BY MR. FORESTIERE:
 2   Q  Do you have any other facts that you have not
 3   told me about concerning your claim for on-call
 4   work?
 5          MR. LINGLE:  Object to the form.  You
 6   can have him step out if you want, but there is more
 7   to that objection.
 8          MR. FORESTIERE:  I don't know.  Have
 9   him step out if you want, what is that?
10          MR. LINGLE:  I want to put more on
11   the record with that objection, so if you want him
12   to be out of the room, that's fine, but if not, I'll
13   just go for it.
14          MR. FORESTIERE:  I still don't
15   understand what you're saying.
16          MR. LINGLE:  I want to put a speaking
17   objection on the record, so if you want him to be
18   present, that's fine; if not, he can step out.
19          MR. FORESTIERE:  Okay.  Why don't you
20   step out because I'm just trying to get to know and
21   we can see, and then I can ask a follow-up question.
22          (Witness leaves the conference room.)
23          MR. LINGLE:  The question asks him
24   whether or not there is any additional facts.  First
25   of all, he's not a lawyer.  He may not know which
```

171

```
 1   facts do or don't support his claims for on-call
 2   work in the lawsuit.  Opposing counsel, if he has
 3   further questions about his on-call work, he's free
 4   to ask them.  That's why Mr. Jones is here.  Mr.
 5   Jones is not in a position to be making up questions
 6   for defense counsel, so it's an unfair question.
 7          And so Mr. Jones can certainly answer the
 8   question asked, but we think that the topic has been
 9   covered already by defense counsel.  If he has more
10   questions he's free to ask them, but certainly any
11   negative response to his question doesn't mean that
12   there aren't other facts that would support his
13   claim.  So --
14          MR. FORESTIERE:  Okay.  Let's bring
15   him back in.
16          (Witness returns to the conference room.)
17   BY MR. FORESTIERE:
18   Q  Okay.  Mr. Jones, just so you know, your
19   counsel made a record of his objection, but since he
20   can't instruct you not to answer, I want to know
21   basically if there is any other facts that you are
22   aware of concerning your claim for on-call work that
23   you have not provided here today.
24   A  Not that I know of.
25   Q  Okay.  No. D says -- strike that.  No. D
```

172

```
 1   pertains to not being compensated for all hours you
 2   spent working as an apprentice funeral
 3   director/embalmer, funeral director/embalmer,
 4   funeral director, or location manager.  Do you
 5   still -- are you still making that claim here today?
 6          MR. LINGLE:  I don't -- object to the
 7   form.  That's not what that one is about.
 8   BY MR. FORESTIERE:
 9   Q  Okay.  It says, "I believe I was not
10   compensated for all hours I spent working as an
11   apprentice funeral director/embalmer, funeral
12   director/embalmer, funeral director, and/or location
13   manager paid on an hourly basis from December 8,
14   2003 to the present because most he have those hours
15   were not preapproved."  Do you see that?
16   A  I see that.
17   Q  Okay.  Are you claiming that you were not
18   compensated for all hours that you worked that were
19   not preapproved?
20   A  Yes.
21   Q  Okay.  And have we covered that subject matter
22   during this lawsuit today -- or during this
23   deposition today or not?
24          MR. LINGLE:  Object to the form.
25          THE WITNESS:  I believe we have
```

173

```
 1   touched upon it, yes, sir.
 2   BY MR. FORESTIERE:
 3   Q  And then it says, "I believe I received
 4   compensation in addition to my hourly rate, such as
 5   bonuses, commissions, and other forms of additional
 6   pay that Alderwoods did not include when calculating
 7   overtime due to me while working as an apprentice
 8   funeral director/embalmer, funeral
 9   director/embalmer, funeral director and/or location
10   manager paid on an hourly basis during the period
11   December 8, 2003 to the present."  Do you see that,
12   sir?
13   A  Yes, sir.
14   Q  Can you explain to me what you are making a
15   claim for as set forth in that statement?
16          MR. LINGLE:  Object to the form.
17          THE WITNESS:  You know, I'm not
18   familiar with all the legal aspects of that
19   provision, but I don't believe any of my commissions
20   or the bonus were calculated into the overtime.
21   BY MR. FORESTIERE:
22   Q  I thought you said you didn't receive
23   commissions.  Was that just a misstatement?
24   A  Oh, that's right.  This is from the period that
25   we are talking about.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Jones**

45 (Pages 174 to 177)

---

174

1    MR. LINGLE: Well, he has set the
2  period, so don't -- don't base it off of that.
3  BY MR. FORESTIERE:
4    Q  Did you ever receive any commissions during the
5  time that you worked at Evergreen? I thought we
6  established this morning that you didn't, but --
7    A  No, we did. We got --
8    Q  Is that in addition to the piecework?
9    A  It was.
10   Q  What did you get a commission for?
11   A  Sales of vaults, markers, and urns above a
12  certain dollar level.
13   Q  But didn't you testify this morning that you
14  never exceeded that dollar level?
15     MR. LINGLE: Object to the form.
16  BY MR. FORESTIERE:
17   Q  I'll ask you now. Did you ever receive a
18  commission in selling those type of products?
19   A  Yes, sir.
20   Q  Okay. And when did you receive a commission
21  for selling those type of products?
22     MR. LINGLE: Object to form.
23     THE WITNESS: From October '95
24  through the bankruptcy filing, I believe.
25  BY MR. FORESTIERE:

---

176

1    A  No, sir.
2    Q  Do you know how much overtime you worked in
3  2003 that you were not paid for?
4      MR. LINGLE: Object to the form.
5      THE WITNESS: No, sir.
6  BY MR. FORESTIERE:
7    Q  Is there any way that we can determine that?
8  Strike that. Is there a way for you to determine
9  how many overtime hours you worked in 2003 that you
10  were not paid for?
11     MR. LINGLE: Object to the form.
12     THE WITNESS: Not at -- not that I
13  know of.
14  BY MR. FORESTIERE:
15   Q  Now, getting back to Exhibit 13, you didn't
16  check box C, correct?
17   A  Correct.
18   Q  So you are not claiming any type of
19  compensation that you spent for training or taking a
20  test, correct?
21   A  Correct.
22   Q  I want to talk a little bit about your
23  community service. Now, I understand that you are
24  claiming that you want to receive compensation for
25  community service work that you performed while

---

175

1    Q  Which was?
2    A  I can't recall.
3    Q  You don't know what year it was?
4    A  No, sir.
5    Q  Was it prior to December 2002?
6    A  Yes, I believe it was.
7    Q  Okay. Identify for me the bonuses you received
8  from -- or strike that -- during the time --
9  identify for me the bonuses you received during the
10  time period of December 2002 through May 2004.
11     MR. LINGLE: Object to the form.
12     THE WITNESS: I believe it was the
13  bonus that we were speaking to earlier as the -- as
14  the only one.
15  BY MR. FORESTIERE:
16   Q  That was a $7,000 figure, I think?
17     MR. LINGLE: Object to the form.
18  BY MR. FORESTIERE:
19   Q  Strike that. It's 9,483.17?
20   A  Yes, sir.
21   Q  And that was paid in 2003?
22   A  I believe so, yes, sir.
23   Q  Any other bonuses that you were paid for
24  from -- during the time of December 2002 to May
25  2004?

---

177

1  working at Evergreen, correct?
2    A  Yes, sir.
3    Q  All right. During the time period of December
4  2002 through May 2004, could you identify for me the
5  community service work that you wish to receive
6  compensation for?
7    A  None.
8    Q  Was there community service work that you
9  performed prior to December 2002 that you are
10  seeking to receive compensation for?
11   A  Yes, sir.
12   Q  What community service did you perform prior to
13  2002 that you want to receive compensation for?
14   A  The work I did with the Lions Club.
15   Q  Anything else?
16   A  No, sir.
17   Q  Okay. Can you identify for me the community
18  service work that you did concerning the Lions Club?
19   A  I did volunteer work with the Food Bank of
20  Alaska distributing food at our clubhouse, and I
21  worked the Tudor Road Bingo during the bingo events.
22  They donated money for our club if the members
23  worked emptying ashtrays and trash cans and helping
24  out the Tudor Road Bingo staff.
25   Q  Anything else?

---

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Jones**

51 (Pages 198 to 201)

198

1  A   No, sir.
2  Q   Do you recall how much the budget was for
3  overtime?
4  A   No, sir.
5  Q   When do you think that you first saw a budget
6  for overtime?
7  A   It was probably year 2000.
8  Q   Do you recall who you received that budget
9  from?
10 A   Mr. Janssen.
11 Q   Did Mr. Janssen make any statements to you when
12 he gave you that budget?
13 A   I'm sure he did.
14 Q   Do you recall what they were?
15 A   The -- I believe the statements that he made
16 were instructional in nature as in this is the
17 budget.  This is what we need to do to make sure
18 that we stick within what's allotted, but I don't
19 recall the specifics.
20 Q   Was the budget part of an overall budget that
21 was -- that Alderwoods had for its operations on a
22 given year?
23 A   For our firm, yes, sir.
24 Q   Do you recall who put together that annual
25 budget?

199

1  A   I'm not aware of anyone by name other than
2  Mr. Janssen.
3  Q   Were you involved in that process?
4  A   Very little.
5  Q   What involvement did you have?
6  A   Scott would occasionally ask me if -- when we
7  were reviewing those types of budget items if, you
8  know, I thought it was doable, and I would usually
9  answer in the affirmative.  And I don't know what
10 weight that carried with his ultimate decision, but
11 he was nice enough to ask me every once in a while.
12 Q   Are you aware of any budgets for overtime that
13 were used at other locations owned by Alderwoods?
14 A   No, sir.
15 Q   Were you ever told that you were incorrectly
16 completing your time cards?
17        MR. LINGLE:  Object to the form.
18        THE WITNESS:  Yes, sir.
19 BY MR. FORESTIERE:
20 Q   When was the first time that you were told that
21 you were incorrectly completing your time cards?
22 A   I don't recall.
23 Q   Who told you that?
24 A   Mr. Janssen.
25 Q   When did he tell you that?

200

1  A   I don't recall.
2  Q   Was it prior to December 2002?
3  A   Yes, sir.
4  Q   What did he tell you about your incompleting
5  your time cards -- incorrectly completing your time
6  cards?
7  A   On the time cards that we were looking at
8  earlier where, regardless of the punches in and out,
9  the bottom stated 40 regular, five OT, before the
10 correction, I would be recording the actual hours.
11 Q   And just so I'm clear, he told you to stop
12 recording the actual hours and just put 40 regular
13 and five overtime?
14 A   Yes, sir.
15 Q   Regardless of the number of hours, regular time
16 you worked?
17 A   That's correct.
18 Q   And regardless of the number of overtime hours
19 you worked?
20 A   That's correct.
21 Q   Were there times that you worked less than five
22 hours of overtime a week?
23 A   No, sir.  Only on vacation, I should say.
24 Q   You ever have a discussion with Mr. Janssen
25 about the fact that -- well, strike that.  Did you

201

1  think it was unfair that you were working more than
2  five hours overtime a week and not being paid for
3  it?
4        MR. LINGLE:  Object to the form.
5        THE WITNESS:  Did I think it was
6  unfair?  No, sir, not at the time.
7  BY MR. FORESTIERE:
8  Q   Why is that?
9  A   Because I was really dedicated to my craft and
10 I thought it was very important that I be there for
11 the families.
12 Q   Did you subsequently have a conversation with
13 Mr. Janssen about increasing the standard number of
14 overtime hours that you were being paid on a weekly
15 basis?
16 A   No, sir.
17 Q   Did you ever request for him to have it
18 increased more than five hours a week for overtime?
19 A   No, sir.
20 Q   Did you ever tell him that you were working
21 more than five hours a week for overtime?
22 A   I don't recall that I did, no, sir.
23 Q   Were you ever told that any other employees
24 that worked at Evergreen were incompletely
25 completing their time cards?

Exhibit 13

```
 1              UNITED STATES DISTRICT COURT
 2            NORTHERN DISTRICT OF CALIFORNIA
 3             SAN FRANCISCO/OAKLAND DIVISION
 4
   WILLIAM HELM, DEBORAH PRISE, ) No. CV 08-1184-SI
 5 HEATHER P. RADY, et al, on   )
   behalf of themselves and all )
 6 other employees and former   )
   employees similarly situated,)
 7                              )
                   Plaintiffs,  )
 8        v.                     )
                                )
 9 ALDERWOODS GROUP, INC.,      )
                                )
10              Defendant.       )
                                )
11
12
            DEPOSITION OF RICHARD KAMIENSKI
13
         Wednesday, October 21, 2009, 9:50 a.m.
14
15 Deposition Officer:
   Patricia Coward, CSR No. 5142
16
   Taken in the offices of:
17
   California Deposition Reporters
18 2509 West March Lane, Suite 160
   Stockton, California 95207
19
20
21
22
            CALIFORNIA DEPOSITION REPORTERS
23           CERTIFIED SHORTHAND REPORTERS
           2509 West March Lane, Suite 160
24           Stockton, California 95207
                   (209) 478-3377
25            Statewide (800) 442-3377
```

Page 1

1    A.    I believe it went on a paper spreadsheet.
2    Q.    So it wasn't in electronic data form where she
3    put it into a program, then pressed some button on a
4    computer?
5    A.    I honestly don't remember.  I don't believe it
6    was electronic.
7    Q.    And this was the procedure used at all six of
8    the locations, all six of the facilities that you
9    managed; is that correct?  The process that you
10   described?
11   A.    Yes.
12   Q.    Did the employee tally the number of hours on
13   their timecard before it was signed by them?
14   A.    I believe they did, yes.
15   Q.    Anything else involved in the collection of the
16   timecards and submitting them to the payroll department
17   for the payroll -- strike that.  Anything else involved
18   in the submission of the timecards for processing of
19   pay to the employees?
20       MS. GIFFORD: Objection.
21       THE WITNESS: Nothing else that I could think
22   of.
23       MR. FORESTIERE: I forgot.  Maybe I ought to do
24   this.  Once Shauna sent the stuff to Cincinnati, what
25   happened next?

Page 134

1    A.    We received paychecks.
2    Q.    Was it by express mail, or do you know how that
3    was done?
4    A.    I believe I received paychecks for the entire --
5    for all the facilities in overnight mail.
6    Q.    And how were those paychecks distributed to the
7    employees?
8    A.    They -- I would take them to each location and
9    give them, whatever number applied to whatever people
10   were working there, so if they went at this location, I
11   gave them their three, and then I'd go off and --
12   Q.    So you gave the employee, if the -- well, strike
13   that.  If the employee was there, did you give them the
14   paycheck?
15   A.    No.
16   Q.    Who did you give these paychecks to that were in
17   turn responsible for getting them to the employees?
18   A.    Usually the location manager, the senior
19   arranger, or the location administrator.
20   Q.    Did you ever have an employee come and complain
21   to you that the amount they were being paid in their
22   payroll check was incorrect?
23   A.    I don't remember any such case.
24   Q.    Did you ever have anybody on -- strike that.
25   Did you ever have anybody tell you that the employees

Page 135

1    were receiving payroll checks that did not include all
2    their pay?
3    A.    I don't remember --
4        MS. GIFFORD: Objection.
5        THE WITNESS: I don't remember any
6    conversations.
7        MR. FORESTIERE: Okay.  I'm going to talk a
8    little bit about the community service.  Were any of
9    the employees at the facilities you managed required to
10   perform any community service as part of their work?
11   A.    All employees were required to participate in
12   community.
13   Q.    And what did you understand that to include?
14   A.    Clarification, please.
15   Q.    Yeah.  What did you understand community service
16   to include?  I mean what was the community service they
17   were required to participate in?
18   A.    It could be anything, but they were required to
19   participate.  It could have been a service club, it
20   could have been a church group, anything along those
21   lines.  But everyone was supposed to participate in
22   something.
23   Q.    And how did you become aware of the employees
24   being required to perform community service?
25   A.    That was told to me by Bill Mitchell and/or

Page 136

1    Derrick Pate, and I had to report monthly, if not
2    bimonthly, to Bill Mitchell and Derrick Pate as to who
3    was doing what.
4    Q.    Were secretaries -- strike that.  Were there any
5    secretaries that were employed at the facilities that
6    you worked at?  People that just did purely clerical
7    work?
8    A.    We called them location administrators.
9    Q.    Okay.  They're required to perform community
10   service as well?
11   A.    Everyone.
12   Q.    That would be yes?
13   A.    That's yes.
14   Q.    So regardless of whether or not the community
15   service enhanced their ability to sell a pre-need, for
16   example, all employees were required to perform
17   community service?
18       MS. GIFFORD: Objection.
19       THE WITNESS: My understanding.
20       MR. FORESTIERE: And your understanding was
21   based upon what Mr. Mitchell and Mr. Pate told you?
22   A.    That's correct.
23   Q.    When did they tell you that all employees at the
24   facilities you managed were required to perform
25   community service?

Page 137

35 (Pages 134 to 137)

California Deposition Reporters
800 442-3377 (Toll Free)  (209) 478-7051 (fax)

080fefd8-945c-4daa-943f-0ea003beeafc

1   A.    Probably in midsummer of 2004.
2   Q.    So this would be a couple of months after you
3   started in April 2004?
4   A.    Yes.
5   Q.    Was this a new policy that they were telling you
6   they were implementing?
7         MS. GIFFORD: Objection.
8         THE WITNESS: They didn't tell me whether it was
9   new or old.
10        MR. FORESTIERE: When you started working in
11  April 2004, were you aware of any requirement of the
12  employees to perform any community service?
13  A.    No.
14  Q.    Were you completing any reports to Mr. Mitchell
15  or Mr. Pate prior to the summer of 2004 concerning the
16  community service that the employees were performing?
17  A.    No.
18  Q.    Did any employee ever come to you and say, "Hey,
19  I don't like the fact that I have to perform community
20  service," prior to the summer of 2004?
21        MS. GIFFORD: Objection.
22        THE WITNESS: Not that I recall.
23        MR. FORESTIERE: Okay. So, all right. Did
24  Mr. Mitchell and Mr. Pate make these statements to you
25  about the requirement of community service only orally?

Page 138

1   perform?
2         MS. GIFFORD: Objection.
3         THE WITNESS: Again, I don't remember any
4   training.
5         MR. FORESTIERE: No training for yourself or for
6   the employees; is that correct?
7         MS. GIFFORD: Objection.
8         THE WITNESS: To the best of my knowledge, there
9   was none.
10        MR. FORESTIERE: I'm talking about training
11  concerning the community service that they were
12  required to perform.
13  A.    Correct. I don't recall that at all.
14  Q.    What were the terms of the community service
15  policy -- strike that. Was there a policy that all the
16  employees were to perform community service?
17        MS. GIFFORD: Objection.
18        THE WITNESS: It was conveyed to me by Bill
19  Mitchell an/or Derrick Pate, every employee, whether
20  full-time or part-time, was to have some type of
21  community involvement.
22        MR. FORESTIERE: Was there any requirement as to
23  the amount of community service, and I'm talking about
24  the time, that they were required to perform?
25  A.    I don't remember anything about time.

Page 140

1         MS. GIFFORD: Objection.
2         THE WITNESS: I can't recall.
3         MR. FORESTIERE: Do you recall ever receiving
4   any e-mail from them saying that the employees that you
5   supervised had to perform community service?
6   A.    I don't recall.
7   Q.    Are you aware of any written policy stating that
8   the employees you managed were required to perform
9   community service?
10        MS. GIFFORD: Objection.
11        THE WITNESS: I don't recall.
12        MR. FORESTIERE: Did you ever see any documents
13  stating that the employees you were managing were
14  required to perform community service?
15        MS. GIFFORD: Objection.
16        THE WITNESS: To the best of my knowledge, no, I
17  don't remember seeing any documents.
18        MR. FORESTIERE: Did you receive any training
19  regarding the requirement that the employees you manage
20  perform community service?
21  A.    No, I don't recall any training.
22        MS. GIFFORD: Objection.
23        MR. FORESTIERE: Did the employees that you
24  supervised at the facilities receive any training
25  concerning the community service they were required to

Page 139

1   Q.    In other words, they had to do at least ten
2   hours of community service a week, any requirement in
3   that respect?
4   A.    I don't remember anything along those lines.
5   Q.    Or a minimum amount of community service they
6   had to perform on a monthly basis?
7   A.    I don't remember that, a time requirement there
8   either.
9   Q.    When a new employee was hired, did you tell them
10  about the community service requirement?
11        MS. GIFFORD: Objection. Go ahead.
12        MR. FORESTIERE: I can rephrase the question,
13  but it's going to be the same. When a new employee was
14  hired at the facilities you managed, did you tell them
15  about the community service requirement?
16  A.    I'm sure we discussed it.
17  Q.    You don't have an independent recollection as
18  you sit here today about it?
19  A.    No, I don't.
20  Q.    Do you recall telling any of the employees that
21  you managed that they were required to perform
22  community service?
23  A.    Yes, I do.
24  Q.    Who is it that you informed of that requirement?
25  A.    I remember having a staff meeting with all

Page 141

36 (Pages 138 to 141)

1  A.  No.
2  Q.  Okay.  So she always had to work eight hours a
3  day Monday through Friday and then meet with a family
4  on a Saturday?
5  A.  No.  She wasn't required -- we didn't have a
6  time structure for her.  She was paid straight
7  commission, and the hours she worked, whether she
8  worked 12 hours in a day or she worked an
9  hour-and-a-half to achieve her sales goal for that
10  day --
11  Q.  Okay.  That's -- very good.  I just want to
12  expand on that.  So she wasn't paid an hourly rate,
13  correct?
14  A.  To the best of my knowledge, I don't recall
15  paying her an hourly rate.
16  Q.  And you said she was purely on commission?
17  A.  I believe she was strictly on commission.
18  Q.  Are you aware of any Alderwoods policy that
19  required her to work in selling pre-need policies after
20  normal business hours without paying her for such work?
21  MS. GIFFORD: Objection.
22  THE WITNESS: No, I don't.
23  MR. FORESTIERE: Was any time kept of -- strike
24  that.  Were any records kept of the amount of time that
25  she spent performing her duties as a pre-needs sales

Page 162

1  counselor?  And I'm just using that term loosely.
2  Strike that.  Was she required to keep any time records
3  of the amount of time that she spent performing her
4  duties in selling pre-need insurance policies?
5  A.  I don't remember any time records from her.
6  Q.  Okay.  Let's switch gears about a different
7  subject matter.  And I'm sorry, I asked this question
8  again, and you probably already answered it, but did
9  any of the employees that you managed at any of the
10  facilities, required to take any type of training for
11  the performance of their jobs?
12  MS. GIFFORD: Objection.
13  THE WITNESS: Those -- the only ones I can think
14  of were the ones that were doing their apprenticeship
15  for their embalmer's license; that is, there was a
16  licensed embalmer training them.
17  MR. FORESTIERE: And that was to meet their
18  requirements by the state to obtain a license; is that
19  correct?
20  A.  That's correct.
21  Q.  They had to work under the direct supervision of
22  a licensed embalmer, correct?
23  A.  Correct.
24  Q.  Which usually meant they did all the work, and
25  the embalmer came a couple of times to come and check

Page 163

1  to see what they were doing?
2  A.  Basically, yes.
3  Q.  And that was done during normal business hours,
4  wasn't it?
5  MS. GIFFORD: Objection.
6  THE WITNESS: Most generally.
7  MR. FORESTIERE: Okay.  And if an embalmer was
8  working more than eight hours a day or 40 hours a week
9  in obtaining that training under the supervision of a
10  licensed embalmer, did they receive overtime pay for
11  that?
12  MS. GIFFORD: Objection.
13  THE WITNESS: It would -- it would be yes, to
14  the best of my recollection.
15  MR. FORESTIERE: In other words, they had to --
16  I know, see, I told you at the end of the day it gets a
17  little murky.  Stated another way, the embalmer still
18  had to report all the time that they worked on their
19  timecards even -- and that included all the time they
20  spent training under the licensed embalmer?
21  MS. GIFFORD: Objection.
22  THE WITNESS: Yes, that would be correct.
23  MR. FORESTIERE: Other than the training for the
24  licensed embalmer, was there any other training by any
25  other employees that you managed at the facilities?

Page 164

1  A.  I would do group training on customer service or
2  conducting a funeral service.
3  Q.  And where did that training take place?
4  A.  That would take place at the combination in
5  Seaside or in Salinas, the funeral home in Salinas, and
6  it would be done in a -- part of general meeting,
7  staff meeting.
8  Q.  And did those training or staff meetings take
9  place during normal business hours?
10  A.  During normal business hours, yes.
11  Q.  And if an employee that had to attend that
12  meeting resulted in his or her working overtime, would
13  they be paid overtime to attend that meeting?
14  MS. GIFFORD: Objection.
15  THE WITNESS: They would have, but to the best
16  of my recollection, I don't -- I didn't have meetings
17  that late in the day.
18  MR. FORESTIERE: Okay.  So to the best of your
19  recollection, no employee who attended these trainings,
20  sessions that you put on or the general meetings --
21  well, let me take them one at a time.  To the best of
22  your knowledge, no employee who attended these training
23  sessions incurred any overtime?
24  A.  To the best of my knowledge.
25  Q.  Okay.  And if they did incur overtime, then

Page 165

42 (Pages 162 to 165)

080fefd8-945c-4daa-943f-0ea003beeafc

| | |
|---|---|
| 1 would they be paid overtime for attending that training<br>2 session?<br>3     MS. GIFFORD: Objection.<br>4     THE WITNESS: It would have been approved, yes.<br>5     MR. FORESTIERE: It would be required to put it<br>6 on their timecard, correct?<br>7     MS. GIFFORD: Objection.<br>8     THE WITNESS: That is correct.<br>9     MR. FORESTIERE: And, okay. You also talked<br>10 about general meetings. When were those general<br>11 meetings held?<br>12 A.   Meetings were held at least once a month.<br>13 Q.   And that would be at the combo in Seaside or at<br>14 the Salinas facilities?<br>15 A.   That's correct.<br>16 Q.   And they would also be held during normal<br>17 business hours?<br>18 A.   That's correct.<br>19 Q.   And to your knowledge, all the employees should<br>20 have been able to attend those meetings without<br>21 incurring any overtime?<br>22 A.   That's correct.<br>23 Q.   And if they did, for whatever reason, incurred<br>24 overtime, they were required to put that on their<br>25 timecard?<br><br>Page 166 | 1 A.   As I stated, it was on-the-job training, so the<br>2 funeral service was actually going on, and they were<br>3 being shown what to do.<br>4 Q.   And the person providing that training was being<br>5 paid to provide it to the other part-time person?<br>6 A.   That's correct.<br>7 Q.   Any other persons -- strike that. Any other<br>8 employees at the facilities you supervised perform any<br>9 other training other than yourself and, what, the<br>10 licensed embalmer and this senior part-time employee?<br>11 A.   That would be all, but the senior part-time<br>12 employee is a plural. It wasn't one individual. It's<br>13 whoever had seniority in that crew that day that we<br>14 sent this new employee out with them.<br>15 Q.   Other than that person being -- other than that<br>16 function, that training being performed by a number of<br>17 potential part-time senior employees, other than them,<br>18 yourself, and a licensed embalmer, no other employee<br>19 that you supervised at the facilities provided any<br>20 training to any other employees?<br>21 A.   To the best of my knowledge, no.<br>22 Q.   I want to talk to you a little bit about meal<br>23 periods. Let me step back. Are you aware of any<br>24 policy by Alderwoods that required your employees to<br>25 provide training to other employees after normal<br><br>Page 168 |
| 1     MS. GIFFORD: Objection.<br>2     THE WITNESS: That's correct.<br>3     MR. FORESTIERE: And they would be paid for any<br>4 overtime that they incurred in attending those<br>5 meetings?<br>6     MS. GIFFORD: Objection, calls for speculation.<br>7     THE WITNESS: That would be my thought, yes.<br>8     MR. FORESTIERE: Do you recall if any employees<br>9 were required to train any other employees?<br>10 A.   I don't recall any situation. Let me rephrase<br>11 that. The part-time employees, generally was<br>12 on-the-job training, so a senior staff member would<br>13 take them and say, "Okay, this is what we do in this<br>14 situation. Just follow along with me, and we'll show<br>15 you how to do this."<br>16 Q.   Who would be the senior staff member that would<br>17 do that?<br>18 A.   It could be any one of a number of part-timers<br>19 who had seniority.<br>20 Q.   So you had senior part-timers training other<br>21 part-timers?<br>22 A.   That would show them what needed to be done in a<br>23 certain instance, yes.<br>24 Q.   And would that training occur during normal<br>25 business hours?<br><br>Page 167 | 1 business hours without compensating them for such work?<br>2     MS. GIFFORD: Objection.<br>3     THE WITNESS: I don't know of any policy.<br>4     MR. FORESTIERE: Are you aware of any policy by<br>5 Alderwoods that required the employees you supervised<br>6 to attain -- to attend training sessions after normal<br>7 business hours without paying them for attending that<br>8 training?<br>9     MS. GIFFORD: Objection.<br>10     THE WITNESS: I don't recall any situation.<br>11     MR. FORESTIERE: Let's talk a little about meal<br>12 periods, then. How were meal periods scheduled during<br>13 the time that you were the manager of these facilities?<br>14 A.   That was left up to the individual funeral homes<br>15 with the staffing that was available. They would set<br>16 their own meal times.<br>17 Q.   Who was responsible at each location for making<br>18 sure each of the employees received their meal periods?<br>19 A.   Two location managers, two funeral arrangers,<br>20 and myself at the combo.<br>21 Q.   You mentioned two location managers. For which<br>22 locations? Or which facilities?<br>23 A.   Was King City, Monterey, Seaside, Salinas had an<br>24 arranger, and then myself at the combo.<br>25 Q.   Well, the combo, was that Seaside?<br><br>Page 169 |

43 (Pages 166 to 169)

1  policy that would not pay employees for the overtime
2  they worked?
3      MS. GIFFORD: Objection.
4      THE WITNESS: I don't know of any.
5      MR. FORESTIERE: Are you aware of any company
6  policy that would not pay overtime to employees that
7  they worked if it was not preapproved?
8      MS. GIFFORD: Objection.
9      THE WITNESS: Again, I have no recollection.
10     MR. FORESTIERE: So to your knowledge, that
11 didn't occur?
12     MS. GIFFORD: Objection.
13     THE WITNESS: To the best of my knowledge, it
14 did not.
15     MR. FORESTIERE: And to your knowledge, each
16 employee was required to report all of the overtime on
17 their timecards?
18     MS. GIFFORD: Objection.
19     THE WITNESS: To my knowledge, yes, that was the
20 procedure.
21     MR. FORESTIERE: That was the company policy?
22     MS. GIFFORD: Objection.
23     THE WITNESS: To my knowledge, yes.
24     MR. FORESTIERE: Do you know which employees at
25 the facilities you managed worked any overtime?

Page 178

1  other employees more susceptible to work overtime at
2  the facilities you managed than other employees?
3  A.   Those would be the only ones.
4  Q.   And that would be because of the reasons we just
5  discussed?
6  A.   Yes.
7  Q.   To your knowledge -- strike that. Did any
8  employees ever complain to you that the amount of the
9  overtime hourly rate that they were to be paid was
10 incorrectly calculated?
11     MS. GIFFORD: Objection.
12     THE WITNESS: Not to my knowledge.
13     MR. FORESTIERE: What is your understanding as
14 to the hourly overtime rate calculation to be made when
15 an employee works overtime?
16     MS. GIFFORD: Objection.
17     THE WITNESS: I got lost in my thoughts, I'm
18 sorry. Could you repeat?
19     MR. FORESTIERE: Yeah. I'll make it simple,
20 more direct. Is it your understanding that when an
21 employee works overtime, they're supposed to get
22 one-and-a-half time their normal hourly rate?
23     MS. GIFFORD: Objection.
24     THE WITNESS: Yes, that's my understanding.
25     MR. FORESTIERE: Okay. Do you know how that is

Page 180

1  A.   I'm sorry, I couldn't recall that.
2  Q.   Was it particular to any type of position the
3  employees worked, where they'd be more exposed to work
4  overtime than other positions?
5      MS. GIFFORD: Objection.
6      THE WITNESS: Funeral arrangers, embalmers.
7  That should be it.
8      MR. FORESTIERE: I'm not going to put words in
9  your mouth, but funeral directors and arrangers, I mean
10 you could take a look at this list if you want, the
11 exhibit that had the codes, but -- and that was because
12 basically they had to service families' needs, funeral
13 service needs that may last into -- or may extend
14 beyond normal business hours?
15 A.   That's correct.
16 Q.   And it's hard to tell a family in need looking
17 for service that you can't work overtime and you got to
18 go home in the middle of the service?
19 A.   That's correct.
20 Q.   So it's better to pay the overtime than have an
21 unhappy or upset family by cutting a service short?
22     MS. GIFFORD: Objection.
23     THE WITNESS: Correct.
24     MR. FORESTIERE: So other than the funeral
25 arrangers, embalmers, and funeral directors, were any

Page 179

1  calculated when an employee receives a bonus? I'm
2  talking about the overtime hourly rate.
3  A.   No, I don't.
4  Q.   Are you aware of any policy by Alderwoods to
5  miscalculate the amount of the overtime hourly rate to
6  be paid to employees that worked overtime?
7      MS. GIFFORD: Objection.
8      THE WITNESS: Not to my knowledge.
9      MR. FORESTIERE: Are you aware of any mistake by
10 Alderwoods in miscalculating the amount of the overtime
11 hourly rate to be paid to any employees that worked
12 overtime?
13     MS. GIFFORD: Objection.
14     THE WITNESS: Not that I can recall.
15     MR. FORESTIERE: Do you know how commissions
16 would affect anyone that would -- well, strike that.
17 As far as you know, the people on commissions were not
18 paid an hourly rate, correct?
19 A.   As far as I can remember, yes, she was not.
20 Q.   Okay. And that was the only person that worked
21 on a commission basis at all the facilities that you
22 managed?
23 A.   That's correct.
24 Q.   So everybody else was paid an hourly rate?
25 A.   That's correct.

Page 181

46 (Pages 178 to 181)

080fefd8-945c-4daa-943f-0ea003beeafc

**Page 194**

1    A.    8:00 o'clock Monday morning, yes.
2    Q.    Right, Okay. How were these people that were
3    on call compensated for their on-call work?
4    A.    There was no compensation.
5    Q.    They didn't -- were these hourly employees?
6    Were they all hourly employees?
7    A.    Yes, they were all hourly employees. Well, no.
8    Let me rephrase that. Don was not an hourly employee.
9    Don was a manager, so he was salaried.
10   Q.    So he was exempt?
11   A.    He was exempt.
12   Q.    So like you, he could work all the hours and not
13   get paid a nickel of overtime?
14   A.    That's correct.
15   Q.    But as to Bart, Mikey, and the lady in Salinas,
16   they were hourly employees?
17   A.    That's correct.
18   Q.    And they didn't receive any compensation for
19   their on-call work?
20   A.    That's correct. Best of my knowledge.
21   Q.    Now, in performing their on-call duties, they
22   took, what, a pager with them?
23   A.    There were pagers available, yes.
24   Q.    Or, and I'm dating myself again, cell phones?
25   A.    They had cell phones, yes.

**Page 195**

1    Q.    They had the old brick cell phones? Have you
2    ever seen those? Yeah.
3          Okay, but they had some means by which they
4    could be contacted as a result of the answering service
5    forwarding the call?
6    A.    Correct. They didn't have to sit at home by a
7    telephone. They could move about.
8    Q.    Did they have any restrictions on what they
9    could do while they were on call?
10   A.    I don't know of any company restrictions.
11   Q.    Do you know if they ever recorded the amount of
12   time that they spent performing the on-call duties?
13   A.    Not to my knowledge.
14   Q.    Were they ever paid any piece or flat rate for
15   performing on-call services?
16   A.    Not to my knowledge.
17   Q.    And when they'd get a -- when they get a call,
18   and sometimes they call them death calls, I don't know
19   if that's the appropriate word, sounds so -- well, when
20   they'd get the call that there was a family at need
21   because of a loved one had passed, what would they do
22   upon receiving that call?
23   A.    It depends on what the -- the wishes of the
24   family were. The family would -- whoever is calling is
25   saying that, you know, "Joe Smith has passed away, and

**Page 196**

1    we'd like you to go to Monterey Peninsula Hospital
2    where he passed and bring him back to your mortuary,
3    and could we have a time to come in and speak with you
4    tomorrow and make funeral arrangements?"
5    Q.    So it's something, could just be basically
6    asking for, "Hey, I had a loved one that passed away.
7    He's at the coroner's office," or someplace, "and I
8    need to make arrangements for the funeral service"?
9    A.    Correct.
10   Q.    Did the on-call work include any type of
11   removals that were performed by any of these persons
12   that worked at the facilities, was it Bart, Mikey, the
13   lady in Salinas or Don?
14   A.    They might very well have made a removal.
15   Q.    Do you recall if that was a frequent or
16   infrequent event on these on-calls?
17   A.    It would have been infrequent.
18   Q.    It was more likely that when they called, they
19   just needed to make arrangements because a loved one
20   had recently passed?
21   A.    Correct. The other circumstance would be
22   somebody calling at that period of time wanting to know
23   what prices were because somebody had passed, and so
24   that they would have to answer those questions.
25   Q.    On a monthly basis, how many times did a person

**Page 197**

1    on call have to do removal? Or is it bimonthly? Or
2    I'm just throwing any time period out there; how
3    frequently was that done?
4    A.    I can't answer that because I wasn't -- I didn't
5    micro manage so I don't know how many times a month
6    somebody was going out on a removal.
7    Q.    What was involved with doing a removal? I mean
8    what's the paperwork? I mean there's paperwork
9    obviously. There needs to be a paper trail, correct?
10   A.    Actually at that particular time, none of --
11   only the coroner's office required a release.
12   Hospitals, we could go on a verbal from family, so
13   that if we called the hospital, and the hospital said,
14   "Yes, Joe Smith is ready," then generally it's always
15   best to move as soon as you can. And that's when the
16   removal would be made.
17         If it was the Monterey County coroner's office,
18   we'd have to wait until the next day because we need a
19   signed release from the family.
20   Q.    So the coroners would always require a receipt.
21   Hospitals, you're saying, at this time didn't?
22   A.    Just sign a logbook.
23   Q.    One of their logbooks at their facility?
24   A.    At their facility.
25   Q.    Because they wanted to know who was taking the

**Page 202**

```
 1   Q.    Okay.  And those monthly bills were kept at your
 2   office or at your facility?
 3   A.    I believe we were sending all our bills to
 4   Cincinnati because they were paid out of there.
 5   Q.    Did you keep any copies of those at your
 6   facility?
 7   A.    I don't think so.
 8   Q.    So when you got the monthly statement,
 9   beginning, end of the month, you would just package it
10   up and send to Cincinnati for payment?
11   A.    Correct.
12   Q.    Did you do that with a lot of other monthly
13   bills that came in?
14   A.    Yes.
15   Q.    Was there a sheet or report that you had to fill
16   out that kind of said, "Here are all the monthly bills,
17   here's the amount, and here's the back-up," and you'd
18   send it to Cincinnati for payment?
19   A.    Shauna was doing that, so I didn't do it
20   personally.
21   Q.    But is that your understanding as to what was
22   done of the bills that came in?
23   A.    It was my understanding.
24   Q.    There had to be some type of inventory made or
25   report made?
```

**Page 203**

```
 1   A.    That's my understanding, yes.
 2   Q.    And attached to the report or the back-up?
 3   A.    Correct.
 4   Q.    In case some accountant somewhere would want to
 5   see it?
 6   A.    Yes.
 7   Q.    Do you recall if those type of monthly reports
 8   that were sent to Cincinnati were kept at the
 9   facilities where you worked?
10   A.    I don't recall.
11   Q.    Would Shauna be the one to answer those
12   questions?
13   A.    Yes.
14   Q.    Did you have to sign these monthly reports that
15   were sent back to Cincinnati asking for payment of
16   these monthly bills?
17   A.    No.
18   Q.    You say that with a certain amount of relief.
19   Was that signed by Shauna?
20   A.    Yes.  There was a definite separation of duties
21   when it came to certain financial things.
22   Q.    You had to probably do that for proper
23   accounting purposes.
24         Okay.  Looks like I'm missing a couple of pages.
25   Why don't we take a -- give me about a ten-minute break
```

**Page 204**

```
 1   so I can just take a quick look and see what else.  I
 2   think I only have a couple more matters left, and then
 3   your attorney would probably want to ask some
 4   questions, so just give me about ten minutes so I can
 5   find out what I did with these pages, and then we'll
 6   get started again.
 7   A.    Okay.
 8         MR. FORESTIERE:  Thank you.
 9         THE WITNESS:  Thank you.
10             (A break was taken.)
11         MR. FORESTIERE:  Okay.  All right.  I'm just
12   going to go back to a couple of questions on the
13   on-call policy and then one other subject area, and
14   then I'm basically through.  So let me go back to the
15   on-call policies.  Were you aware of a policy by
16   Alderwoods that required you -- strike that.  Were you
17   aware of an Alderwoods policy that required the
18   recording of the amount of time spent by the employees
19   performing on-call work?
20         MS. GIFFORD:  Objection.
21         THE WITNESS:  No, I was not aware.
22         MR. FORESTIERE:  Were you aware of a policy of
23   Alderwoods for the employees to report the time they
24   spent on the calls they received while performing
25   on-call work?
```

**Page 205**

```
 1         MS. GIFFORD:  Objection.
 2         THE WITNESS:  To the best of my knowledge, I
 3   wasn't aware of it.
 4         MR. FORESTIERE:  Are you aware of any policy of
 5   Alderwoods to compensate its employees for the calls
 6   they received while they were performing on-call work?
 7   A.    I'm not aware of any policy.
 8   Q.    Did you receive any complaints about the
 9   employees that were on -- strike that.  Did you receive
10   any complaints from the employees that were performing
11   on-call work, that they were not being paid for it?
12   A.    Not that I can recall specifically.
13   Q.    Have you ever made such complaints to anybody?
14   A.    No.
15   Q.    Okay.  You left sometime I think in June 2005?
16   A.    Correct.
17   Q.    Why is it that you left employment of Alderwoods
18   at that time?
19   A.    My employment was terminated by Alderwoods.
20   Q.    Could you tell me why it was terminated?
21   A.    I don't know specifically why other than I had
22   used the 800 number to file a complaint against
23   Mr. Pate and Mr. Mitchell.  Shortly after that, I met
24   with the HR manager from Cincinnati.  I don't remember
25   his name either.  He informed me that he could not
```

52 (Pages 202 to 205)

1  A.   5,000-plus a month.  I was making 65,000 a year,
2  so.
3  Q.   Around 10,000?
4  A.   Somewhere around that, yeah.
5  Q.   Did they also pay you your accrued vacation and
6  all that kind of stuff, benefits, whatever you were
7  entitled to?
8  A.   I believe so, yeah.
9  Q.   Did you use -- did you list working for
10 Alderwoods when you applied for employment over at
11 Sky Lawn?
12 A.   Yes, I did.
13 Q.   Did they have any questions about why you had
14 left Alderwoods?
15 A.   No, they didn't.
16 Q.   Do you believe that this incident of leaving
17 Alderwoods had any affect on your ability to be hired
18 over at Sky Lawn?
19 A.   No, I don't think so.
20 Q.   Any issues about your getting any
21 recommendations from anybody at Alderwoods or listing
22 them as a reference?
23 A.   Repeat.
24 Q.   Yeah.  Bad question.  Did you list Alderwoods or
25 anybody at Alderwoods as a reference when you applied

Page 214

1  if I jump in, I'm not trying to be rude or shut you
2  down or anything.
3  THE WITNESS:  All right.
4  MR. FORESTIERE:  I'm just trying to get the
5  objection out before you answer.
6  MS. GIFFORD:  I want to go back to, I believe
7  you talked about bimonthly conference calls with the
8  general managers --
9  A.   Yes.
10 Q.   -- is that correct?  And who was on those phone
11 calls?
12 A.   Those conference calls were led by Bill
13 Mitchell, but every general manager in the State of
14 California was on that call along with the area
15 managers.
16 Q.   Okay.  So would Derrick Pate have been on those
17 calls?
18 A.   Derrick would have been on those calls.
19 Q.   Did the topic of overtime ever come up on those
20 calls?
21 A.   Yes.
22 Q.   And what would come up?
23 A.   We would be -- Bill Mitchell would review our
24 P&Ls.
25 Q.   And those are?

Page 216

1  for work at Sky Lawn?
2  A.   I listed Alderwoods, yes, as my prior employer.
3  Q.   Did you have any conversations with anybody at
4  Sky Lawn about whether they contacted Alderwoods
5  regarding your leaving them?
6  A.   Nothing was ever said to me.
7  Q.   So as far as you know, Alderwoods didn't do
8  anything to try to prevent your being employed at
9  Sky Lawn?
10 A.   Not that I know of.
11 MR. FORESTIERE:  Okay.  I think that's all the
12 questions I have at this time.  Sorry it took so long
13 to get through them.
14 --o0o--
15
16 EXAMINATION BY MS. GIFFORD
17
18 MS. GIFFORD:  All right.  Well, I have some
19 questions.  And my questions may jump somewhat from
20 topic to topic, so if you have any confusion or want
21 clarification, just let me know.
22 MR. FORESTIERE:  And I don't mean to interrupt,
23 but just so you know, I need an opportunity before you
24 answer to impose any objections to her questions just
25 like, you know, she interposed objections to mine.  So

Page 215

1  A.   Profit and loss statements.  And of course
2  salaries are one area on the profit and loss.  And we
3  would be each singled out for the amount of overtime
4  that we were paying at our particular facilities in
5  this conference call.
6  Q.   And when you say singled out, what would that
7  be?
8  A.   It would be that Mitchell would actually read,
9  "You had such a -- such a percentage of overtime as
10 compared to regular salaries.  And you are so much to
11 budget for the year, or you're over budget and -- for
12 the year."
13 Q.   Did he ever ask for explanations regarding the
14 amounts of overtime?
15 A.   No.
16 Q.   Okay.  Did either Bill Mitchell or Mr. Pate ever
17 reprimand you for not disciplining hourly employees?
18 MR. FORESTIERE:  Objection, vague.
19 THE WITNESS:  Not to my knowledge.
20 MS. GIFFORD:  Did either of them ever tell you
21 that you needed to be more active in disciplining
22 employees?
23 MR. FORESTIERE:  Objection, vague and leading.
24 THE WITNESS:  I don't remember any conversation.
25 MS. GIFFORD:  I want to talk about what's been

Page 217

55 (Pages 214 to 217)

080fefd8-945c-4daa-943f-0ea003beeafc

1  referred to as community service or community work.
2  And I believe you testified before that all employees
3  were required or expected to do that; is that correct?
4  A.   That's correct.
5  Q.   What was your understanding as to whether
6  employees would be paid for the time spent doing that
7  work?
8     MR. FORESTIERE: Objection, asked and answered.
9     THE WITNESS: This was done on a voluntary basis
10  supposedly by the employee.
11     MS. GIFFORD: So did that mean they would not be
12  paid for it?
13  A.   That's correct.
14  Q.   And where did you get that understanding from?
15  A.   From Mr. Mitchell and/or Mr. Pate.
16  Q.   Okay. Did you communicate that understanding to
17  the hourly employees who worked for you?
18  A.   I would have.
19  Q.   And was your understanding that those employees
20  were or were not to record community work on their
21  timecards?
22     MR. FORESTIERE: Objection, asked and answered,
23  leading.
24     THE WITNESS: I just -- my understanding, that
25  they were not to put those hours on their time.

Page 218

1     MS. GIFFORD: And did anyone who worked at one
2  of your facilities put those hours on their timecard?
3     MR. FORESTIERE: On, asked and answered and
4  leading.
5     THE WITNESS: I don't have a recollection at
6  this point.
7     MS. GIFFORD: Okay. Do you know why employees
8  were asked to do community work?
9     MR. FORESTIERE: Objection, calls for
10  speculation, asked and answered, leading.
11     THE WITNESS: It -- to solidify the corporate
12  image as a local operated funeral home. And to make
13  the employees and managers more palatable to the
14  community at large.
15     MS. GIFFORD: Was there a benefit to Alderwoods
16  from that?
17     MR. FORESTIERE: Objection, calls for
18  speculation, asked and answered, and vague and
19  ambiguous.
20     THE WITNESS: Yes. The benefit would be
21  increased revenue from increased services.
22     MS. GIFFORD: Okay. When you reported the
23  community work that was being done to Bill Mitchell,
24  did he ever tell you that certain employees needed to
25  spend more time on community work?

Page 219

1     MR. FORESTIERE: Objection, asked and answered,
2  leading.
3     THE WITNESS: He did indicate, to my
4  recollection, that every employee needed to be involved
5  in some type of community work.
6     MS. GIFFORD: And did he make any indication
7  regarding the amount of time or the number of events
8  employees were involved with?
9     MR. FORESTIERE: Objection, again, asked and
10  answered and leading.
11     THE WITNESS: Not to my knowledge. I don't
12  recall.
13     MS. GIFFORD: I believe you testified earlier
14  that there were three to four employees in the
15  locations you supervised who were participating in
16  community work?
17  A.   Yes.
18  Q.   And just to make sure the record is clear, were
19  those three or four hourly employees?
20  A.   No, they were not all hourly. There was
21  salaried -- one salaried, and the rest were hourly.
22  Q.   So one salary and then two to three hourly
23  employees?
24  A.   Correct.
25  Q.   And I believe you said you kept a written log of

Page 220

1  the community work that was done; is that correct?
2     MR. FORESTIERE: Objection, asked and answered
3  and leading.
4     THE WITNESS: I had an informal recording, yes.
5     MS. GIFFORD: Okay. And after you made that
6  log, do you know where it went, or was it sent to
7  anyone? Was it stored anywhere?
8     MR. FORESTIERE: Asked and answered, leading.
9     THE WITNESS: I don't believe I transmitted it.
10  It was -- it was on the bimonthly calls with Bill
11  Mitchell that we would discuss that.
12     MS. GIFFORD: So, and when you say those
13  bimonthly calls with Bill Mitchell, are those the same
14  ones that were attended by all of the general managers
15  in the state?
16  A.   That's correct.
17  Q.   Okay. And I believe you previously testified --
18  strike that. If employees at your locations had listed
19  community work on their timecards, would that have been
20  a correct or incorrect timecard entry?
21     MR. FORESTIERE: Objection, calls for
22  speculation, asked and answered, leading, vague and
23  ambiguous, disjunctive.
24     THE WITNESS: It would have been incorrect.
25  They weren't put down.

Page 221

56 (Pages 218 to 221)

080fefd8-945c-4daa-943f-0ea003beeafc

| | |
|---|---|
| 1      MS. GIFFORD: All right. And I'm going to ask<br>2 you to look at Exhibit 4 which was previously marked.<br>3   A.   Yes.<br>4   Q.   First I'm just going to ask, at the very bottom<br>5 line there, Mr. Forestiere had pointed to the Alderwood<br>6 employee help line. Is that the same help line you<br>7 called to make your report regarding Mr. Mitchell and<br>8 Mr. Pate?<br>9   A.   I did not use the 800 number. I used the web --<br>10 they had a special electronic website that I could go<br>11 to.<br>12   Q.   Okay. Do you remember what the website was<br>13 called?<br>14   A.   I don't.<br>15   Q.   Okay. Do you remember if it was related to the<br>16 help line or separate from it?<br>17   A.   I believe they were one in the same. You could<br>18 call or you could send an electronic letter.<br>19   Q.   All right. I'm going to ask you then to look at<br>20 the first paragraph and the second line of that<br>21 paragraph that you previously testified about there<br>22 that says, "The timecard/slash/sheet must show the time<br>23 the person begins work, the time they break for lunch,<br>24 the time they return from lunch, and the time they end<br>25 work for the day." Do you see that?<br><br>                                       Page 222 | 1   A.   I have it.<br>2   Q.   And I'm going to ask you to look at Paragraph 12<br>3 which reads, quote, "One of these policies was<br>4 Alderwoods' community work policy. This company-wide<br>5 policy required employees to volunteer their time to<br>6 outside community organizations and events." Is that<br>7 still your understanding today?<br>8   A.   Yes, it is.<br>9   Q.   And do you believe that statement to be truthful<br>10 and accurate?<br>11   A.   Yes, I do.<br>12   Q.   And then I'm going to ask you to look at the<br>13 next Paragraph 13 which says, quote, "Since Alderwoods<br>14 expected this community work to be done on a," quote,<br>15 "'volunteer basis,' the employees were not paid for any<br>16 time spent at these outside community organizations and<br>17 events." Is it your understanding today that that is<br>18 true and accurate?<br>19   A.   To the best of my recall, yes, it is.<br>20   Q.   And I'm going to ask you to look at<br>21 Paragraph 15, the second sentence there, says, quote,<br>22 "The primary purpose of the community work policy was<br>23 explained to me as Alderwoods wanting to be perceived<br>24 as the community funeral home in order to increase<br>25 business." Do you see that?<br><br>                                        Page 224 |
| 1   A.   Yes, I do.<br>2   Q.   Does that instruction include anything regarding<br>3 community work?<br>4       MR. FORESTIERE: Objection, document speaks for<br>5 itself.<br>6       THE WITNESS: No, it doesn't.<br>7       MR. FORESTIERE: And leading, sorry.<br>8       THE WITNESS: No, it doesn't.<br>9       MS. GIFFORD: And the first bullet point says,<br>10 "Employees must record all hours actually worked." Was<br>11 your understanding that all hours actually worked<br>12 should include community work?<br>13       MR. FORESTIERE: Objection, asked and answered,<br>14 leading.<br>15       THE WITNESS: It was my understanding all hours<br>16 worked were the hours to do their job at the facility.<br>17       MS. GIFFORD: And would that have included<br>18 community work?<br>19       MR. FORESTIERE: Objection, asked and answered,<br>20 leading.<br>21       THE WITNESS: No, to the best of my<br>22 recollection.<br>23       MS. GIFFORD: Okay. And I'm going to ask you to<br>24 turn now to Exhibit 1 which is your affirmation or<br>25 statement. And Page 3 of that statement.<br><br>                                        Page 223 | 1   A.   Yes, I see it.<br>2   Q.   Do you remember who explained that to you?<br>3   A.   It would have been either Derrick Pate or Bill<br>4 Mitchell or both of them.<br>5   Q.   Okay. But it sounds like you don't have a<br>6 specific recollection of which one of them?<br>7   A.   I don't.<br>8   Q.   Okay. And Paragraph 17 says, quote, "As a<br>9 general manager, I was required by the area manager,<br>10 Derrick Pate, and Bill Mitchell, the regional manager,<br>11 to discuss the importance of the Alderwoods community<br>12 work policy with all employees," period. Did you do<br>13 that?<br>14       MR. FORESTIERE: Objection, asked and answered.<br>15       THE WITNESS: Yes, I did.<br>16       MS. GIFFORD: And then Paragraph 18 says, quote,<br>17 "In the annual performance evaluation, employees were<br>18 evaluated on how much community work they had completed<br>19 that year." Do you see that?<br>20   A.   I see that.<br>21   Q.   Does that refresh your recollection as to<br>22 whether community work was part of an annual<br>23 evaluation?<br>24       MR. FORESTIERE: Objection, asked and answered,<br>25 misquotes his testimony, leading.<br><br>                                        Page 225 |

California Deposition Reporters
800 442-3377 (Toll Free)  (209) 478-7051 (fax)

080fefd8-945c-4daa-943f-0ea003beeafc

1      THE WITNESS: I believe it was. I believe it
2  was part of, but I just don't specifically remember.
3      MS. GIFFORD: Okay. Do you know, at the time
4  that you signed this statement, did you remember at
5  that time --
6  A.    When I signed --
7      MR. FORESTIERE: You got to let me get the
8  objection in.
9      THE WITNESS: I'm sorry.
10     MR. FORESTIERE: No, that's okay. Objection,
11 leading and speculation.
12     MS. GIFFORD: Go ahead.
13     MR. FORESTIERE: Go ahead.
14     THE WITNESS: Okay. Repeat the question,
15 please.
16     MS. GIFFORD: Sure. At the time you signed this
17 statement, did you -- did you remember the statement
18 was true at that time?
19     And I'll stipulate to all the same objections if
20 that helps.
21     MR. FORESTIERE: Thank you.
22     THE WITNESS: I believed it to be true, yes.
23     MS. GIFFORD: Okay. And I'm going to again just
24 sort of jump around topics here a little bit. You
25 talked before about the budget for your facilities. Do

Page 226

1      THE WITNESS: Yes, I --
2      MS. GIFFORD: And were employees paid for
3  answering those calls?
4      MR. FORESTIERE: Objection, asked and answered.
5      THE WITNESS: No, to the best of my knowledge,
6  they weren't.
7      MS. GIFFORD: Okay. To the best of your
8  knowledge, did employees put time on their timecard for
9  time spent answering those calls?
10 A.    To the best of my knowledge, no.
11 Q.    And was completing their timecards that way, did
12 you understand that to be the correct or incorrect way
13 to complete timecards?
14     MR. FORESTIERE: Objection, misleading,
15 disjunctive, speculation, vague.
16     THE WITNESS: Repeat, please.
17     MR. FORESTIERE: I'm sorry.
18     THE WITNESS: That's all right.
19     MS. GIFFORD: My question was: If an employee
20 answered a phone call while they were on call and then
21 did not record that time on their timecard, was that
22 the correct or incorrect way to complete the timecard?
23     MR. FORESTIERE: Could I have a stip on
24 objections so I don't --
25     MS. GIFFORD: Yeah, we can, same objections.

Page 228

1  you know who had the final say on determining that
2  budget?
3  A.    I don't know specifically who did, whether it
4  was corporate in Cincinnati or whether it was Bill
5  Mitchell. I don't know who had the final approval.
6  Q.    Okay. So was -- strike that. Okay. I want to
7  talk a little bit about the on-call work now. And I
8  believe you testified previously that employees who
9  were working on-call would receive and answer telephone
10 calls; is that correct?
11 A.    That's correct.
12 Q.    Were those telephone calls taken after regular
13 business hours?
14 A.    That's correct.
15 Q.    And were those phone calls answered away from
16 the facility locations?
17 A.    That's correct.
18 Q.    Okay. And was that work employees were
19 performing, then?
20     MR. FORESTIERE: Objection, vague.
21     MS. GIFFORD: I'm sorry, was that then work that
22 they were performing after hours and away from the
23 location?
24     MR. FORESTIERE: Objection, asked and answered,
25 disjunctive.

Page 227

1      THE WITNESS: Yeah, that was the way it was
2  supposed to be done, yes. They were not to report the
3  time.
4      MS. GIFFORD: And where did your understanding
5  come from that that was how it was supposed to be done?
6      MR. FORESTIERE: Asked and answered.
7      THE WITNESS: It would have come from Bill
8  Mitchell or Derrick Pate.
9      MS. GIFFORD: Okay. Did you have the authority
10 to tell employees to put community work on their
11 timecards?
12     MR. FORESTIERE: Objection, calls for
13 speculation.
14     THE WITNESS: No, I didn't have that authority.
15     MS. GIFFORD: Did you have the authority to tell
16 them to record the phone calls they took while on call
17 on their timecards?
18     MR. FORESTIERE: Same objection.
19     THE WITNESS: No, I didn't have any authority.
20     MS. GIFFORD: And just to make sure we're clear,
21 I believe you testified before that funeral directors
22 and arrangers were employees who would be scheduled for
23 on-call shifts; is that correct?
24 A.    That's correct.
25 Q.    Would location managers also perform on-call

Page 229

58 (Pages 226 to 229)

# Exhibit 14

**NETWORK DEPOSITION SERVICES**
**Transcript of Angela Keath**

1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE WESTERN DISTRICT OF PENNSYLVANIA

 3                        * * * * *

 4    DEBORAH PRISE AND HEATHER RADY
      ON BEHALF OF THEMSELVES AND ALL
 5    EMPLOYEES SIMILARLY SITUATED,

 6         Plaintiffs,

 7    vs.                        Civil Action No. 06-1641

 8    ALDERWOODS GROUP, INC.,

 9         Defendants.

10

11              DEPOSITION OF ANGELA KEATH

12        ON MARCH 5, 2009, BEGINNING AT 11:20 A.M.
                IN COFFEYVILLE, KANSAS

13

14                    APPEARANCES:

15    On behalf of the Plaintiffs:

16    Annette Gifford, Attorney at Law
      DOLIN, THOMAS & SOLOMON, LLP
17    693 East Avenue
      Rochester, New York 14607
18    (585) 272-0540
      agifford@theemploymentattorneys.com

19

20    On behalf of the Defendant:

21    Michelle Amy Morgan, Attorney at Law
      JONES DAY
22    2727 North Harwood Street
      Dallas, Texas 75201-1515
23    (214) 220-3939
      mamorgan@jonesday.com

24

25    REPORTED BY:  DAVID G. HARJO, CSR RPR
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Angela Keath**

---

90

1      Q   But Mike would ask you those types of
2 questions about other employees' overtime?
3      A   Yes.
4      MS. GIFFORD: Objection.
5      Q   (By Ms. Morgan) Do you know whether he
6 followed up with the employee, to ask the employee
7 about their specific overtime?
8      MS. GIFFORD: Objection.
9      THE WITNESS: I have no idea.
10      Q   (By Ms. Morgan) And David Hill would not
11 ask you the question as to -- questions as to why
12 somebody didn't take a lunch; is that right?
13      MS. GIFFORD: Objection.
14      THE WITNESS: Not typically.
15      Q   (By Ms. Morgan) And David Hill typically
16 wouldn't ask you questions about why somebody had a
17 certain overtime entry?
18      MS. GIFFORD: Objection.
19      THE WITNESS: Not typically.
20      Q   (By Ms. Morgan) And your rate of pay when
21 you started at Alderwoods was $9.50 an hour; is that
22 right?
23      A   Yes.
24      Q   And did it increase at any point?
25      A   I believe it went to ten after 90 days.

---

91

1      (Defendant's Exhibit 9 marked for
2 identification.)
3      Q   (By Ms. Morgan) I've handed you what's
4 been marked as Defendant's Exhibit 9. This is a new
5 employee form -- an Alderwoods' new employee form
6 regarding you, and it has your annual salary of
7 $9 -- I'm sorry, your hourly rate -- sorry, your
8 hourly rate at $9.50 an hour and a hire date of
9 August 1st, 2005. Does that match your recollection
10 as to your rate when you started working at
11 Alderwoods?
12      A   The rate is what I thought it was.
13      Q   Okay. But the hire date of August 1st,
14 2005 doesn't match your recollection of when you
15 started?
16      MS. GIFFORD: To clarify, I think before
17 she said that was her recollection but the document
18 you showed her before had a hire date of July 25, I
19 think.
20      MS. MORGAN: Okay. Thank you.
21      THE WITNESS: Yeah, I agreed with August
22 1st being my hire date, but Defendant's Exhibit 3
23 that says my start date was July 25th, I don't agree
24 with.
25      Q   (By Ms. Morgan) Okay. All right. Just to

---

92

1 clarify. Your recollection is that you -- you
2 actually started working at Alderwoods in the early
3 part of August 2005; is that correct?
4      A   I believe that the hire date of 8/1 is
5 more accurate than the previous document that says
6 the hire date of July 26.
7      Q   Okay. And that your -- and your
8 recollection is that your hourly rate was $9.50 an
9 hour when you first started working at Alderwoods;
10 is that right?
11      A   Yes.
12      Q   Okay.
13      (Defendant's Exhibit 10 marked for
14 identification.)
15      Q   (By Ms. Morgan) Then I believe it's your
16 recollection that your hourly rate increased to $10
17 an hour; is that right?
18      A   Yes.
19      Q   Okay. I've handed you what's been marked
20 as Defendant's Exhibit 10. This is an Alderwoods'
21 change in employee form, and this documentary
22 reflects that your hourly rate increased to $10 an
23 hour effective November 1st, 2005, following a
24 90-day probationary period. Does that match your
25 recollection, Mrs. Keath, as to when your salary

---

93

1 rate increased?
2      A   That would -- it would seem about right
3 with the August 1st start date, because that would
4 be 90 plus days afterwards.
5      Q   So it seems about right that your hourly
6 rate would have increased to $10 an hour effective
7 November 1st, 2005?
8      A   Yes.
9      Q   Did your hourly rate increase at any
10 other time during your employment with Alderwoods?
11      A   No.
12      Q   So you were making $10 an hour at the
13 time you separated from Alderwoods?
14      A   Yes.
15      Q   What was your pay period while you were
16 at Alderwoods?
17      MS. GIFFORD: Objection.
18      Q   (By Ms. Morgan) Every other week, two
19 weeks?
20      A   We got paid every two weeks.
21      Q   Did you receive any other type of
22 compensation while you were at Alderwoods, other
23 than your hourly rate and overtime pay?
24      MS. GIFFORD: Objection.
25      THE WITNESS: We had one -- I don't know

---

**Johnstown**
814-266-2042

**Toll-Free**
866-565-1929

**Pittsburgh**
412-281-7908

**NETWORK DEPOSITION SERVICES**
**Transcript of Angela Keath**

25 (Pages 94 to 97)

94

1  what you call it, incentive bonus. If you met so
2  many benchmarks your location got a bonus, and
3  because I worked at the location I got a percentage
4  of that bonus, and from my recollection, I think it
5  was -- it was under $50, was my bonus.
6      Q   (By Ms. Morgan) Is this bonus that you
7  just described the only other type of compensation
8  you got while you worked at Alderwoods, other than
9  your overtime pay and your hourly rate?
10     A   Yes.
11     Q   Do you remember when you received the
12 bonus?
13     A   I really have no idea.
14     Q   And your recollection is you just
15 received the one bonus; is that right?
16     A   Yes.
17     (Defendant's Exhibit 11 marked for
18 identification.)
19     Q   (By Ms. Morgan) I have handed you what's
20 been marked as Defendant's Exhibit 11. This is a
21 printout of the details of the checks that you --
22 that were issued to you during your employment at
23 Alderwoods, from August 2005 to July 2006, and it
24 shows, among other things, the check date and the
25 check number, gross wages, deductions, withholdings,

95

1  net pay, itemized earnings. If you would take a
2  moment to review this document, Mrs. Keath, and let
3  me know if it appears to reflect the details of the
4  paychecks you got from August 2005 to July 2006 when
5  you worked at Alderwoods.
6      MS. GIFFORD: Objection.
7      THE WITNESS: I will say I have never
8  seen the document before. It doesn't -- it doesn't
9  look like anything that I've ever seen before when I
10 was working at Alderwoods.
11     Q   Okay.
12     A   And then it says SEI, funerals which I
13 realize that they have been purchased by, of
14 something, some term, they are now one with SEI.
15     I guess it could be true, I don't know.
16 Without it actually being on pay stubs that I own, I
17 guess -- it appears to be a check detail of my
18 paychecks.
19     Q   (By Ms. Morgan) If you will turn to the
20 page marked ALD 008103, they are Bates numbers on
21 the bottom right-hand corner.
22     MS. GIFFORD: You got it.
23     THE WITNESS: Yeah.
24     Q   (By Ms. Morgan) Would you take a look at
25 the first entry on that page for a check dated March

96

1  16th, 2006.
2      A   Uh-huh.
3      Q   It reflects a bonus in the gross amount
4  of $72.13, and a net pay of $44.98.
5      A   Uh-huh.
6      Q   Does that -- does this information as
7  reflected on this document reflect your recollection
8  as to when you received a bonus from Alderwoods?
9      MS. GIFFORD: Objection.
10     THE WITNESS: I have no idea when it was,
11 but the net pay sounds about right. I knew it was
12 under $50 so --
13     Q   (By Ms. Morgan) So the amount of the bonus
14 corresponds with your recollection of the bonus that
15 you got from Alderwoods, but as for the timing, it
16 doesn't really help you remember?
17     A   No.
18     Q   Okay. In general, Ms. Keath, were you
19 reporting overtime hours that you worked most weeks?
20     MS. GIFFORD: Objection.
21     THE WITNESS: Did I report them as
22 opposed to working and not reporting them?
23     Q   (By Ms. Morgan) Yes.
24     A   Yeah, with the -- with the exception of
25 like my community service work, I didn't get paid to

97

1  do that, but as far as within my job description,
2  yes.
3      Q   So generally you were reporting the
4  overtime hours you worked most weeks with the
5  exception of the time that you spent performing
6  community work; is that right?
7      MS. GIFFORD: Objection.
8      THE WITNESS: Yes.
9      Q   (By Ms. Morgan) Okay. Did you ever
10 intentionally, deliberately not report overtime
11 hours that you worked?
12     MS. GIFFORD: Objection.
13     THE WITNESS: No.
14     Q   (By Ms. Morgan) And did any manager ever
15 question you about whether you were actually
16 reporting your time on your time cards?
17     MS. GIFFORD: Objection?
18     THE WITNESS: If I was --
19     Q   (By Ms. Morgan) Accurately?
20     A   Accurately; no.
21     Q   Were you compensated for all hours that
22 you reported on your time cards, including overtime
23 hours?
24     MS. GIFFORD: Objection.
25     THE WITNESS: As far as I know.

**Johnstown**
814-266-2042

**Toll-Free**
866-565-1929

**Pittsburgh**
412-281-7908

# Exhibit 15

1              IN THE UNITED STATES DISTRICT COURT
       FOR THE SOUTHERN DISTRICT OF PENNSYLVANIA

2                Civil Action No. 06-1641
3                 Judge Joy Flowers Conti

4
DEBORAH PRISE and HEATHER RADY
5  on behalf of themselves and all
   employees similarly situated,
6
7          Plaintiffs,

8  vs.

   ALDERWOODS GROUP, INC.,
9
          Defendant.
10
   -----------------------------
11

12

13

14

15             2525 Glades Road
              Boca Raton, Florida
16             December 11, 2008
              10:05 a.m. - 3:45 p.m.
17

18

19         DEPOSITION OF RICHARD T. KUHTA

20

21    Taken before Mark Rabinowitz, Registered Professional

22  Reporter and Notary Public for the State of Florida at

23  Large, pursuant to Notice of Taking Deposition filed in

24  the above cause.

25

NETWORK DEPOSITION SERVICES
**Transcript of Richard Kuhta**

12 (Pages 42 to 45)

42

1    THE REPORTER: Ms. Morgan, could we take a
2    short break?
3    MS. MORGAN: Sure.
4    (Recess taken 11:35 a.m. to 11:40 a.m.)
5    BY MS. MORGAN:
6    Q    Between December of 2003 and May of 2007, what
7    was your pay period -- every two weeks, twice a month?
8    A    We were paid every two weeks.
9    Q    In what form were you paid?
10   A    I believe it was electronic deposit or direct
11   deposit into our bank account.
12   Q    And you were paid an hourly pay rate; is that
13   correct?
14   A    Yes, ma'am.
15   Q    You also received overtime compensation from
16   Alderwoods, correct?
17   A    For the hours that I worked, yes, ma'am.
18   Q    Other than that type of compensation, did you
19   receive any other type of compensation while you were at
20   Alderwoods?
21   A    On occasion we were given a bonus. It may have
22   occurred at the end of the year, which was typical.
23   Q    At the end of the calendar year, the end of
24   the fiscal year?
25   A    I believe it was at the end of the calendar

43

1    year.
2    Q    What were the bonuses based on?
3    A    The budget.
4    Q    Based on meeting a particular budget, or based
5    on your work performance?
6    A    It had to do with -- this is confusing to me.
7    I don't know if it was -- it must have been coming in
8    under budget. You are budgeted for X number of dollars
9    in terms of expenses. It's somewhat confusing to me of
10   how they calculated the bonus, but it had to do with
11   budget, meeting budget, exceeding budget.
12   Q    Did it have to do with you as a funeral
13   director/embalmer meeting budget?
14   A    No, it was more with regard to your location,
15   how your location did with regard to their projected
16   budget, the projected and the actual budget.
17   Q    So the bonus that you received was based on
18   the location's performance related to budget?
19   A    Yes, ma'am.
20   Q    How many bonuses did you receive between
21   December of 2003 and May of 2007?
22   A    I don't remember.
23   Q    What was the amount of the bonus?
24   A    I don't remember.
25   (Defendant's Exhibit 2 was marked for

44

1    identification).
2    Q    Mr. Kuhta, I have handed you what has been
3    marked as Defendant's Exhibit 2. It is a printout of
4    the details of the checks that you received during your
5    employment at Alderwoods from December of 2003 and
6    through 2007. It shows -- among other things -- the
7    check date, the check number, the gross wages,
8    deductions, net pay and itemized earnings.
9    I would like you to just take a moment to look
10   through it. I'm going to point you to some particular
11   entries and ask you some questions about it.
12   A    Okay.
13   Q    The document has a number at the bottom
14   right-hand corner. I'm going to refer to those numbers
15   as Bates numbers. I'm going to give you those numbers
16   to help you get to the page that I'm talking about.
17   There are also page numbers for the document in the
18   upper right-hand corner.
19   A    Yes, ma'am.
20   Q    We may refer to both as we go through it to
21   make sure that we are literally on the same page. If
22   you would, turn to page 3 of the document which is
23   ALD002680. If you would, take a look at the entry check
24   date of March 25th, 2004. There is an entry for
25   earnings, Y/E bonus in the amount of $2,186.67. Do you

45

1    see that?
2    A    Yes, ma'am.
3    Q    Does reviewing that refresh your recollection
4    as to any bonuses you received during your employment
5    with Alderwoods?
6    A    Yes, ma'am, that could be it. Yes.
7    Q    So you could have received a bonus on March
8    25th, 2004, in the amount of $2,186.67?
9    A    I could have, yes, ma'am.
10   Q    Then, if you would, turn to page 15 of the
11   document, which is ALD002692. If you would, take a look
12   at the check dated August 4th, 2005.
13   A    Yes, ma'am.
14   Q    Underneath "earnings" it says Y/E bonus in the
15   amount of $260.43.
16   A    Yes, ma'am.
17   Q    Does that refresh your recollection as to the
18   bonus that you received during your employment with
19   Alderwoods?
20   A    It may have, yes, ma'am.
21   Q    So you may have received a bonus on August
22   4th, 2005, in the amount of $260.43?
23   A    Yes, ma'am.
24   Q    If you would, turn to page 23 of the document,
25   which is ALD002700.

**Johnstown**
814-266-2042

**Toll-Free**
866-565-1929

**Pittsburgh**
412-281-7908

**NETWORK DEPOSITION SERVICES**
**Transcript of Richard Kuhta**

13 (Pages 46 to 49)

46

1    A    Yes, ma'am.
2    Q    If you can, take a look at the very last
3    entry, a check dated August 4th, 2006.
4    A    Yes, ma'am.
5    Q    Under "earnings" there is an entry for Y/E
6    bonus in the amount of $269.23?
7    A    Yes, ma'am.
8    Q    Does that refresh your recollection as to the
9    bonus that you might have received during your
10   employment with Alderwoods?
11   A    It may have been, yes, ma'am.
12   Q    So you may have received a bonus in the amount
13   of $269.23 on August 4th of 2006?
14   A    Yes, ma'am.
15   Q    Other than your hourly pay, your overtime
16   compensation and bonuses, did you receive any other
17   types of compensation while you were at Alderwoods
18   between December of 2003 and May of 2007?
19   A    Not to my knowledge.
20   Q    Did you ever receive commission during that
21   time frame?
22   A    It's difficult to remember that time, what
23   occurred during that time period with regard to
24   commissions.
25   Q    Did you receive commissions during the time

47

1    that you worked at Alderwoods?
2    A    There was a time when I did make some
3    commissions, yes, ma'am.
4    Q    But you don't know if you made any
5    commissions --
6    A    That time period.
7    Q    -- between December of 2003 and May of 2007?
8    A    Yeah.
9    Q    On the occasions that you did receive
10   commissions, what did you receive commissions for?
11   A    Pre-need funeral arrangements.
12   Q    Was there a time period during which you sold
13   pre-need funeral arrangements?
14   A    Was there a time period?
15   Q    Yes.
16   A    There was. There was, but I don't remember
17   exactly what time period that was.
18   Q    There was a time period in which you did make
19   those pre-need sales and then you stopped?
20   A    Yes, ma'am.
21   Q    And then did you resume at any point?
22   A    No, ma'am.
23   Q    Why did you stop selling pre-needs?
24   A    Because I'm so involved in other aspects of
25   operating the funeral home, that there is no time to do

48

1    everything. So I chose to concentrate on operating the
2    funeral home.
3    Q    You do recall when you stopped selling --
4    A    No.
5    Q    -- pre-needs?
6    A    No, I don't.
7    Q    When you did sell pre-needs, how frequently
8    would you make those sales?
9    A    More towards the rare side.
10   Q    And by "rare," what do you mean -- like once a
11   year, a couple of times a month?
12   A    Maybe once every other month, once every two
13   months, every three months. There was no regularity to
14   any of it. It just happened. You could have two within
15   a two-week period and then nothing for five months.
16   Q    On the average, how much commissions did you
17   earn during the time that you were selling pre-needs?
18       MR. LINGLE: Objection to form.
19   A    I don't remember.
20   Q    Between December of 2003 and May of 2007, did
21   you receive overtime pay in most of your paychecks?
22       MR. LINGLE: Objection to form.
23   A    For the hours that I worked during the week, I
24   had five hours of overtime built into my regular pay.
25   Q    Does that mean for each of the paychecks that

49

1    you got between December of 2003 and May of 2007,
2    typically, there was overtime pay reflected in those
3    paychecks?
4    A    Yes, ma'am.
5    Q    And, typically, your paychecks would reflect
6    overtime pay for at least five hours of overtime?
7    A    Per week, yes, ma'am.
8    Q    Between December of 2003 and May of 2007, did
9    your paychecks ever reflect overtime pay in excess of
10   five hours of overtime per week?
11   A    Occasionally, yes.
12   Q    Just bear with me for a minute.
13   A    Yes, ma'am.
14   Q    If you would, turn to page 4 of Defendant's
15   Exhibit 2; which is ALD002681.
16   A    Yes, ma'am.
17   Q    If you could, take a look at the check dated
18   April 8th, 2004.
19   A    Yes, ma'am.
20   Q    In that check underneath the "earnings" column
21   it says "overtime." Then under "hours" it has 18.50
22   hours --
23   A    Yes, ma'am.
24   Q    -- and then an amount of $553.89?
25   A    Yes, ma'am.

Exhibit 16

**NETWORK DEPOSITION SERVICES**
**Transcript of Michael Lanza**

1

1     IN THE UNITED STATES DISTRICT COURT

2   FOR THE SOUTHERN DISTRICT OF PENNSYLVANIA

3

4 DEBORAH PRISE and HEATHER   )
 RADY, on behalf of themselves  )
5 and all employees similarly   )
 situated,          )
6             ) Civil Action No. 06-1641
   Plaintiffs,      )
7             ) Judge Joy Flowers Conti
  vs.           )
8             )
 ALDERWOODS GROUP, INC.,    )
9             )
   Defendant.       )
10

11   DEPOSITION UPON ORAL EXAMINATION

12         of

13      MICHAEL LANZA

14

15   Taken at 2611 East "E" Street

16     Tacoma, Washington

17

18

19

20

21

22

23 DATE: April 24, 2009

24 REPORTED BY: Robyn L. Fisher, CCR, RPR
        CCR No. 2590

25

86

1    So every time the phone rang at our home, we
2    had to answer it, "Powers Funeral Home," and it might be
3    a call for our kids or us, and people didn't know who
4    they were calling.
5    Q.   Who how long did that situation last?
6    A.   That lasted for about six to eight months.
7    Q.   Was there any discussion about taking you out
8    of the rotation of handling after-hours calls because of
9    that problem?
10   A.   It did when I started to lose my cool with it
11   because what was happening is if a call came in, we were
12   paid 15 minutes for a phone call.
13   So just to go through the scenario so that you
14   can see a clear picture of it, a death call occurred.
15   The institution calls the funeral home.  Whoever answers
16   the phone takes the information.  I had to call the
17   people who went out to pick the bodies up, or at times
18   actually I paged them.  So I made a call to the pager.
19   They'd call my phone back.  I'd give them all the
20   information.
21   If it was early enough in the evening, we were
22   required to contact the family to let them know that we
23   were contacted by the institution, that the body was
24   being brought to the funeral home and possibly try to set
25   up an appointment for the following day.

87

1    So that 15-minute pay didn't actually last
2    15 minutes.  It went beyond that.
3    In addition to that, my complaint was I can't
4    go anywhere.  I was stuck at home.  I could not leave the
5    house.
6    Q.   So your complaint to Mr. Coffey was basically
7    twofold.  One, obviously, you're stuck at the house --
8    you've already mentioned that -- to answer the calls that
9    had to come in?
10   A.   Yes.
11   Q.   And you also complained to him that the
12   15 minutes being allotted for the actual phone calls made
13   was inadequate?
14   A.   Yes, sir.
15   Q.   What did Mr. Coffey say in regards to this?
16   A.   His hands were tied; that was Cyndi Ross's
17   order that that be done.
18   Q.   That only 15 minutes be allotted for those type
19   of calls?
20   A.   Yes, sir.
21   Q.   Regardless of how long they occurred?
22   A.   That's correct.
23   Q.   Did you ever see that in a written policy
24   anywhere; that only 15 minutes would be allowed for these
25   type of calls?

88

1    A.   I can't remember, sir, but I do remember being
2    given a log sheet to fill out with those calls.
3    Q.   I think I have some in here, so we'll go
4    through that.
5    Did you ever see any written policy or
6    instructions saying no matter how long a call lasts, you
7    could only put down 15 minutes?
8    A.   I can't remember seeing any written policy on
9    that, no.
10   Q.   When was the time you were instructed to only
11   put down 15 minutes?
12   A.   When they took the answering service out, and
13   they had the funeral directors answering the phone is
14   when we were told that we were only getting 15 minutes
15   per call.
16   Q.   Do you recall what year that was?
17   A.   That was during Mr. Coffey's administration, so
18   I don't recall when he actually came on as manager.
19   Q.   I think you said sometime in 2003 or 2004.  My
20   notes are unclear.
21   A.   It must have been 03 because 04 --
22   Q.   You were gone by then?
23   A.   Yeah.
24   Q.   You said Dennis Christie replaced him?
25   A.   Right.  That's correct.

89

1    Q.   So Mr. Coffey's tenure would be 2003 and 04?
2    A.   Yes, sir.
3    Q.   That's when the 15-minute allotment was first
4    instituted?
5    A.   Yes, sir.  If I may add one more thing which
6    just came to mind.  It wasn't just Powers Funeral Home
7    that was being transferred.  It was Price-Helton's
8    telephones also, so I was answering the phone for two
9    funeral homes, as all directors were.
10   Q.   The name was Price?
11   A.   Price, P-R-I-C-E, hyphen, Helton.  I believe
12   it's H-I-L-T-O-N [sic].
13   Q.   Where was it located?
14   A.   Auburn, Washington.
15   Q.   Was that one of the facilities that was
16   previously owned by Mr. Noel; do you know?
17   A.   He didn't own them.  It was owned by The Loewen
18   Group, and that's Alderwoods.
19   Q.   Oh, I'm sorry.
20   Did you have a separate log sheet for
21   Price-Helton that you had to fill out?
22   A.   No, it was the same sheet, and we just had to
23   put down what funeral home the call was for.
24   Q.   Did they give you a separate cell phone for
25   that initially?

142

1    A.  I believe so, yes.
2    Q.  But as applied to you, I think you indicated
3  earlier, you had to remain on not the company premises
4  but your home because of the cell phone signal problem?
5    A.  That's correct, yes.
6    Q.  But as to the other employees or other funeral
7  directors that were on call, they were not required to
8  remain on company property when they were performing
9  their on-call duties, correct?
10       MS. GIFFORD:  Objection.  I'm just going
11  to object to asking him about what other people were
12  doing.
13       MR. FORESTIERE:  Well, wait.  He testified
14  -- well, go ahead and make the objection.
15       MS. GIFFORD:  I'm just saying he
16  previously testified as to what he understood the policy
17  to be, and I think the distinction of the policy related
18  to him versus the policy related to other people, it's an
19  unfair distinction to be asking him to draw.  He's
20  testifying to what he experienced the policies to be.
21    Q.  (By Mr. Forestiere:)  But you weren't the only
22  funeral director performing on-call duties, were you?  I
23  mean other funeral directors other than yourself
24  performed on-call duties, correct?
25    A.  That's correct.

143

1    Q.  Do you know of any requirement they had to stay
2  on the company premises when they were on call?
3    A.  No, sir.
4    Q.  They never told you that, correct?
5    A.  No, sir.
6    Q.  You never heard any manager tell a funeral
7  director or other employee that when they were on call
8  they had to stay at the company's premises, correct?
9    A.  That is correct.
10    Q.  All right.  Now, as to their homes.  Those
11  funeral directors were not required to stay at their
12  homes while they were on call, true?
13    A.  Yes, sir.
14    Q.  And you never heard any managers tell those
15  other employees or funeral directors that while they were
16  on call they had to stay at their homes, correct?
17    A.  Yes, sir.  That's correct.
18    Q.  And no funeral director or other employee ever
19  told you that they had to stay at their homes while they
20  were on call?
21    A.  That is correct.
22    Q.  And it was the company policy that those
23  employees that were on call could not consume alcohol or
24  drugs or other intoxicants?
25    A.  That's correct.

144

1    Q.  On Page 17 the second sentence starts as
2  follows, "When the employee is called to work during the
3  on-call time, the employee will be paid at the employee's
4  appropriate pay rate," and then it refers to the call
5  back section below.
6       Did you understand that to be the policy in
7  effect at the time that you worked for Alderwoods?
8       MS. GIFFORD:  Objection.
9    A.  Yes, sir.
10    Q.  It also states, "In all instances, it is the
11  employee's responsibility to clock in when called in to
12  work and to clock out when the work assignment is
13  complete."
14       Did you understand that to be the policy of
15  Alderwoods during the time that you worked for it?
16       MS. GIFFORD:  Objection.
17    A.  Yes, sir.
18    Q.  The next paragraph, the first sentence on
19  Page 17 states, "When a non-exempt employee is required
20  to take phone calls after completing the regular work
21  schedule and leaving the premises but is not required to
22  physically return to work, the employee shall log the
23  start and end times of each phone call;" do you see that?
24    A.  Yes, I do.
25    Q.  Was that the policy in effect during the time

145

1  that you worked for Alderwoods?
2       MS. GIFFORD:  Objection.
3    A.  Yes, sir.
4    Q.  And did you do that?
5    A.  Yes, sir.
6    Q.  It also states in the next sentence, "The
7  employee will be paid for the time spent in phone
8  conversations."
9       Was that the policy in effect during the time
10  that you performed work for Alderwoods?
11       MS. GIFFORD:  Objection.
12    A.  Yes, sir.
13    Q.  Did you get paid for the time that you spent on
14  your phone calls?
15    A.  No, sir.
16    Q.  Didn't you testify earlier that you got paid
17  for at least 15 minutes worth?
18    A.  Fifteen minutes of it, correct.
19    Q.  All right.  So you didn't get paid for what you
20  contend was all the time spent on the phone calls?
21    A.  Yes.  That's correct.
22    Q.  You only got paid for 15 minutes of it?
23    A.  I should say a portion of it, yes; 15 minutes
24  of it.  Correct.
25    Q.  By the way, were there some phone calls that

146

1   lasted less than 15 minutes?
2       A.  Most of them went beyond it.  I don't know if I
3   explained it earlier.  I'm not sure if I did or not.
4           When the call came in, it would ring the house.
5   It would either be a hospital, or it could be a home
6   death.  Then I had to call somebody to go pick the case
7   up.  Normally, I had to page somebody.  They had pagers.
8   They'd call my house back.  I'd give them the
9   information.
10          If it was a institution death, more or less a
11  hospital or nursing home, and the family wasn't present,
12  then we were required to call the family and let them
13  know that we were -- we were required to call the family
14  up to a certain time.  So if it was beyond I think
15  9 o'clock or 10 o'clock, we didn't called them anymore
16  until the next day.
17      Q.  You didn't want to disturb them that late at
18  night?
19      A.  Right.  We didn't want to bother them.
20      Q.  And what you're trying to tell me, the calls
21  obviously are lasting more than 15 minutes because,
22  really, there was sometimes multiple calls you had to
23  make?
24      A.  On the one call, yes.  That's correct.
25      Q.  Could have been at least three?

147

1       A.  Yes.
2       Q.  Did you record each of those phone calls
3   separately?
4       A.  Actually, what I did was I clocked in the time
5   that the call came in.
6           Example:  We'll just say 7 o'clock the call
7   came in, and I wrote in it was the first call for
8   whoever.  Then I called the removal service.  Removal
9   service called me back.  Contacted family for
10  appointment.  And what I did was I watched the clock when
11  I was done making the last call that could have been
12  either to the removal service or to the family.  That's
13  what I clocked it out at.
14      Q.  Okay.  So you didn't try to record each of the
15  conversations and try to get 15 minutes for each call?
16      A.  Oh, no, no, no, no.  I didn't do that.
17      Q.  I was trying to understand if that would be
18  allowed.
19      A.  No, no, no.
20      Q.  Did you ever try doing that and asking for
21  payment?
22      A.  No, no.  I wouldn't want to write that much.
23      Q.  Okay.  Then it goes on to say on that same
24  Page 17, "The recorded time will be included in
25  determining if an employee qualifies for overtime pay in

148

1   a work week;" do you see that, sir?
2       A.  That's under H?
3       Q.  No.  It's right above H, Call Back.
4       A.  Yes.  I do see that.
5       Q.  Was that policy in effect during the time that
6   you worked for Alderwoods?
7           MS. GIFFORD:  Objection.
8       A.  Yes, I believe.
9       Q.  Now let's go to the Call Back section.  The
10  first sentence states, "When a non-exempt employee is
11  called back to work after completing the regular work
12  schedule and leaving the premises, the employee shall be
13  paid for time actually worked upon leaving home or a
14  minimum number of hours, whichever is greater;" do you
15  see that?
16      A.  Yes.
17      Q.  Was that policy in effect during the time
18  that you worked for Alderwoods?
19          MS. GIFFORD:  Objection.
20      A.  I can't say that I remember that, no.  What I
21  can tell you I don't recall was the time leaving from
22  home.  I mean you were paid -- like I mentioned to you
23  earlier when we were being called out.
24          I don't know if I should bring this up or not.
25  We weren't called out anymore in 2003.

149

1       Q.  You were not called out anymore after 2003?
2       A.  No, because remember I mentioned earlier we had
3   a removal service.  So the funeral home was busy to the
4   point where we weren't being called out at night anymore.
5   We had a removal service bringing the bodies in.
6       Q.  That happened in 2003?
7       A.  Well, we had the removal service before the new
8   funeral home opened, so those call-back hours to the
9   funeral home was prior to us leaving the old premises.
10  We had hired a removal service to come in.
11      Q.  And that's why I'm trying to fix the date of --
12      A.  So this sort of a statement here, it may apply
13  to the company, but it did not apply to where I was at.
14  We had a removal service that was coming in.
15      Q.  There was no reason to leave your home and go
16  to --
17      A.  The funeral directors did not leave the house
18  anymore.
19      Q.  What I'm trying to do, Mr. Lanza, is try to get
20  a more precise date that that occurred.  You indicated it
21  was in 2003.  Do you know if was in fall, winter, spring,
22  summer?
23      A.  Well, it was in effect in 2003, because this is
24  only going back to 2003, this suit, I assume; is that
25  correct?

# Exhibit 17

1

```
 1            IN THE UNITED STATES DISTRICT COURT

 2         FOR THE WESTERN DISTRICT OF PENNSYLVANIA

 3

 4    _____

 5    DEBORAH PRISE and HEATHER RADY
      on behalf of themselves and all other
 6    employees similarly situated,
                                        Plaintiffs,
 7
      v.
 8
      ALDERWOODS GROUP, INC. and SERVICE
 9    CORPORATION INTERNATIONAL,
                                        Defendant.
10    _____

11

12

13            Examination Before Trial, held at the Law

14    Offices of DOLIN THOMAS & SOLOMON, LLP, The

15    Strong-Todd House, 693 East Avenue, Rochester, New

16    York 14607, on December 18th, 2008, commencing at

17    11:30 a.m.

18

19

20            DEPOSITION OF:    Kasi Long

21

22

23

24

25    REPORTED BY:  Karrie M. Utberg
```

Johnstown
814-266-2042

Toll-Free
866-565-1929

Pittsburgh
412-281-7908

34

KASI LONG by MS. DUGAN

1
2  from 2003 until 2007?
3  A. There was a bonus program at various times.
4     Sometimes we met the goal, sometimes we didn't. I
5     know I received bonuses. I don't specifically
6     recall what dates I would have received those or
7     whether I'm recalling Loewen Group bonuses or
8     Alderwoods bonuses. I mean, it all gets mushed
9     together a little bit.
10  Q. So, do you currently recall whether you received
11     any bonuses in 2003?
12  A. Not specifically. I would have to look at
13     something. You know, I don't recall when I ever
14     received a bonus.
15  Q. Do you recall whether you received a bonus at any
16     time from 2003 to 2007?
17  A. I believe we did receive a bonus or two, but not
18     specifically. I couldn't tell you the dates.
19  Q. What were the bonuses based on?
20  A. I don't specifically recall, because I remember
21     them to be very confusing. You had to meet many
22     different levels of requirements. I mean, it talks
23     about a percentage of your salary, but there was
24     also a lot of other issues. So I don't really
25     recall how it was calculated. It was confusing.

35

KASI LONG by MS. DUGAN

1
2  Q. Do you recall any specific amount that you ever
3     received in a bonus.
4  A. Not specifically, no.
5  Q. And I believe you previously said that you don't
6     recall any specific dates or years when you earned
7     a bonus; is that right?
8  A. Not specifically.
9  Q. Then, as far as you recall, you may not have
10     received any bonuses from Alderwoods from the
11     period 2003 to 2007?
12        MR. LINGLE: Object to the form.
13        THE WITNESS: I'm pretty certain that I
14     have received at least a bonus or two. I
15     don't know how many. I don't recall specific
16     dates.
17  MS. DUGAN:
18  Q. Do you recall it being within that period of years
19     from 2003 to 2007?
20  A. I can't specifically pick a date.
21  Q. Okay. Other than your hourly rate and the bonuses
22     that we just talked about, did you receive any
23     other forms of pay from Alderwoods?
24  A. There was a program where you could get commission
25     on flower sales.

36

KASI LONG by MS. DUGAN

1
2  Q. Did you actually earn commissions on flower sales?
3  A. Occasionally, yes.
4  Q. Did you earn commissions on anything else?
5  A. Not that I recall.
6  Q. When did you receive the commissions on flower
7     sales?
8  A. Dates, or when were we able to make a commission?
9  Q. I will break it down, because that was a bad
10     question.
11        If you made a sale of flowers and that sale
12     was eligible for a commission, when would you
13     receive the commission on that sale?
14  A. We could turn in the request for payment after the
15     funeral was paid in full.
16  Q. Do you recall during what period of years you were
17     eligible to earn commissions if you made flower
18     sales?
19        MR. LINGLE: Object to the form.
20        THE WITNESS: I don't specifically
21     recall when it started, but it was during the
22     time period that we are taking about, from
23     '03 to '07. I know that it was in place at
24     least some of that time.
25  BY MS. DUGAN:

37

KASI LONG by MS. DUGAN

1
2  Q. And during that time from '03 to '07, did you
3     personally earn some commissions on flowers sales?
4  A. Yes.
5  Q. How was the amount of commission determined?
6  A. It was a ten percent straight. So, if it was a
7     $200 sale you get ten percent.
8  Q. And who paid the commission?
9        MR. LINGLE: Object to the form.
10        THE WITNESS: I believe Alderwoods'
11     payroll.
12  MS. DUGAN:
13  Q. When you were earning commissions on flower sales,
14     what percentage or portion of your total income was
15     commissioned?
16        MR. LINGLE: Object to the form.
17        THE WITNESS: I would have no idea
18     without figuring that out.
19  MS. DUGAN:
20  Q. Over a period of a year, how much additional pay
21     would you earn on commissions?
22        MR. LINGLE: Object to the form.
23        THE WITNESS: I can't answer without
24     estimating.
25  MS. DUGAN:

Johnstown
814-266-2042

Toll-Free
866-565-1929

Pittsburgh
412-281-7908

194

KASI LONG by MS. DUGAN

1
2      sides. I'm not sure where you're coming
3      from. Was my bonus based on my overtime or
4      were my bonuses based on my full salary with
5      overtime or was the overtime based on how
6      much bonus I got, because it's neither, this
7      doesn't tell either/or.
8  BY MS. DUGAN:
9  Q. Putting bonuses aside for a minute --
10  A. The way I understand it, if you didn't pay me all
11     of the hours I was due and my bonus was based on
12     every hour that I worked, that's how they would
13     have calculated that percent of bonus.
14         If that is how I read that, that is how I
15     understood that to be. Then, yes, my bonus would
16     not have been correct, because I was just out of
17     overtime prior to my bonus being calculated.
18  Q. I understand. Putting bonuses aside for a moment,
19     when you were compensated for overtime that you
20     worked, how much were you paid for each overtime
21     hour that you worked?
22  A. Exact dollar amount or the rate of an overtime
23     hour, I believe I was paid time and a half of
24     whatever my prevailing wage was at that time for
25     the hourly rate.

195

KASI LONG by MS. DUGAN

1
2  Q. So, you were paid one and a half times your regular
3     rate for overtime pay; is that correct?
4  A. No. Let me think about overtime. So, if I worked
5     one hour overtime, yes, I would have been paid --
6     say my rate was $18 then I would have been paid $27
7     for that one hour.
8  Q. Are you making any claim with respect to the way
9     that Alderwoods calculated your overtime rate, the
10     amount that you would be paid for that one hour of
11     overtime in your example?
12         MR. LINGLE: Object to the form.
13         THE WITNESS: If this is telling me that
14     the bonuses should have been included when
15     they figured my overtime rate, yes. It's not
16     clear to me which ones weighed on the other
17     one.
18         So, yes, I checked it, because I knew
19     that somewhere along the way if either one of
20     those relied on the other, then either my
21     overtime wasn't calculated right or my bonus
22     wasn't. So, that is how I understand that
23     paragraph to be.
24  BY MS. DUGAN:
25  Q. Do you believe that this problem was caused by the

196

KASI LONG by MS. DUGAN

1
2      fact that you weren't compensated for all of the
3      overtime hours that you actually worked?
4         MR. LINGLE: Object to the form.
5         THE WITNESS: Without reviewing the
6      bonus policy and all of that stuff again, I
7      don't think that I can completely answer that
8      honestly.
9  BY MS. DUGAN:
10  Q. Do you know how Alderwoods calculated overtime pay?
11  A. Overtime pay that was on your timesheet?
12  Q. Yes.
13  A. It would have been your regular -- I believe, if I
14     recall correctly, it would have been my regular.
15     Like I would have had an hourly rate, say it was
16     $18 and I would have received any hours overtime
17     time and a half, that's how I understood it to be
18     calculated. I never noticed anything on my pay
19     stub that would have indicated anything different
20     than that.
21  Q. Did Alderwoods ever pay any overtime adjustment
22     payments to you?
23  A. I'm not aware of overtime adjustments. I'm not
24     sure what they are.
25  Q. If you would please look back at Exhibit No. 5.

197

KASI LONG by MS. DUGAN

1
2         Do you see where these pages are numbered in
3      the top right-hand corner?
4  A. Okay.
5  Q. I'm looking at page 10 of 26?
6  A. Okay.
7  Q. The first entry on that page was for a check dated
8     of 12-3-2004. Do you see under "earnings" there is
9     an entry for overtime, two hours, amount $51.24.
10    Then do you see below that where there was an
11    overtime adjustment?
12  A. I see that.
13  Q. Of 21 cents paid in tax?
14  A. Okay.
15  Q. Do you know what that overtime adjustment reflects?
16  A. I have no idea what that's for.
17  Q. Do you know whether that overtime adjustment is
18    paid -- excuse me; was paid to account for bonuses
19    or commissions or other forms of additional pay
20    that you received?
21        MR. LINGLE: Object to the form.
22        THE WITNESS: I'm not positive what it
23     is. I don't know what it represents. So I
24     can't answer that.
25  BY MS. DUGAN:

Johnstown
814-266-2042

Toll-Free
866-565-1929

Pittsburgh
412-281-7908

# Exhibit 18

1

1          IN THE UNITED STATES DISTRICT COURT
        FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2

    DEBORAH PRISE and HEATHER    )
3   RADY on behalf of themselves)
    and all employees similarly )  .
4   situated                     )
                                 )
5                                )
    versus                       ) CIVIL ACTION NO. 06-1641
6                                )
                                 )
7   ALDERWOODS GROUP, INC.       )

8

9

10        *************************************

11               ORAL DEPOSITION

12               BEVERLY MCDONALD

13              NOVEMBER 24, 2008

14        *************************************

15

16

17      ANSWERS AND ORAL DEPOSITION OF BEVERLY MCDONALD,

18   a witness produced at the instance of the Defendant,

19   was taken in the above-styled and numbered cause on

20   the 24TH day of NOVEMBER 2008, from 10:54 a.m. to

21   5:10 p.m., before VANESSA S. ROBERTSON, CSR in and for

22   the State of Texas, reported by machine shorthand, at

23   the offices of Jones Day, 2727 North Harwood, Dallas,

24   Texas, pursuant to the Pennsylvania Rules of Civil

25   Procedure.

**54**

1  Alderwoods? Every other week?
2    A   Every two weeks.
3    Q   What form of payment did you receive? Like a
4  check?
5    A   A check.
6    Q   Were there ever any pay periods in which you
7  believe you received less than your full pay?
8         MR. LINGLE: Object to the form.
9    A   Less than my hourly pay?
10   Q   (By Ms. Morgan) Yes.
11        MR. SAUL: Yeah, I think that really
12  requires some clarification, what do you mean by her
13  full pay?
14   Q   (By Ms. Morgan) Okay. Did you receive any
15  other types of compensation while you were at
16  Alderwoods?
17   A   Not that I can recall at this time.
18   Q   Did you ever receive a bonus?
19   A   I don't recall ever receiving one. I
20  received commission some.
21   Q   Okay. What did you receive commissions
22  for?
23   A   Markers.
24   Q   I'm sorry?
25   A   Markers.

**55**

1    Q   Can you tell me about that, about the
2  markers.
3    A   They are grave markers, gravestones.
4    Q   And you would receive commissions on your
5  sales of markers?
6    A   Yes.
7    Q   About how often would you receive commissions
8  for selling the markers?
9    A   When I sold them.
10   Q   Did you typically sell a marker each week?
11   A   I don't think there was anything typical
12  about marker sales.
13   Q   So there was a lot of variation?
14   A   Yes. And that was through the marker
15  company, typically.
16   Q   Your sale of markers was through a marker
17  company?
18   A   Yes.
19   Q   What was the marker company?
20   A   Hillside Monument in Snyder.
21   Q   In Snyder, Texas?
22   A   Yes. That was the last company.
23   Q   Was it -- was Hillside Monument a vendor of
24  the markers?
25   A   A vendor?

**56**

1    Q   When you say that you sold it through
2  Hillside Monument, I'm trying to understand what you
3  mean by sold it through them. Are they the ones that
4  supplied the marker?
5    A   Yes.
6    Q   Was it Alderwoods that paid you commissions
7  for those sales or was it Hillside Monument?
8    A   Hillside.
9    Q   So would you receive commission pay directly
10  from Hillside?
11   A   Yes.
12   Q   Did you receive any compensation from
13  Alderwoods for your sales of the markers?
14   A   Not that I can recall at this time.
15   Q   Did you ever receive any monetary awards?
16   A   Not that I can recall.
17   Q   Any other type of compensation that you
18  received when you worked at Alderwoods, other than the
19  commissions?
20   A   Not that I can recall at this time.
21        (Exhibit No. 11 was marked.)
22   Q   (By Ms. Morgan) I've handed you Exhibit 11,
23  which is a check detail listing.
24        Have you ever seen this document
25  before, Mrs. McDonald?

**57**

1    A   Not that I can recall.
2    Q   If you would take a moment to review it and
3  let me know if it appears to reflect details of
4  paychecks from your employment with Alderwoods.
5    A   I don't understand what you're asking on
6  that.
7    Q   If you take a look at the first entry on
8  Page 1 of Exhibit 11, it has your Social Security
9  number, then your name, then a column for the check
10  date, check number, and then provides information
11  about your wages and deductions and net pay. Is that
12  what appears to be reflected on that document?
13   A   Yes.
14   Q   And if we take a look at the various check
15  entries, underneath earnings, there's an entry for
16  overtime hours and amount. Do you see that for check
17  date December 5th, 2003?
18   A   Yes.
19   Q   And that information is provided for the
20  checks throughout your employment with Alderwoods
21  starting with December 5th of 2003, and then if you'll
22  flip to the last page of the Exhibit 11, through your
23  check date of November 17th, 2006; is that correct?
24        MR. SAUL: Objection. That's -- you
25  sort of asked more than one question in there, and

**NETWORK DEPOSITION SERVICES**
**Transcript of Beverly McDonald**

22 (Pages 82 to 85)

---

82

1   Q   (By Ms. Morgan)  Yes.
2   A   I guess.
3   Q   Because you clocked out after the fact,
4   correct?
5   A   Correct.
6   Q   So it's possible that your compensation for
7   April 7, 2004 didn't accurately reflect your hours
8   worked that day, correct?
9   A   It's possible.
10   Q   Is it also possible that you were overpaid on
11   other instances where you went back and clocked out?
12   A   Yes, it's possible.
13       MR. LINGLE:  Object to form.
14   Q   (By Ms. Morgan)  That you went back and
15   clocked out after the fact for days that you had not
16   clocked out?
17   A   It's possible.
18       (Exhibit No. 20 was marked.)
19       MS. MORGAN:  For the record,
20   Exhibit 20 is Bates labeled ALD000367 to ALD000368.
21   Q   (By Ms. Morgan)  Is Exhibit 20 a copy of your
22   time card from July 27th -- I'm sorry, July 25th, 2004
23   through July 29th, 2004?
24   A   Yes, it is.
25   Q   Did you sign this time card?

---

83

1   A   No, I did not.
2   Q   Why did you not sign the time card?
3   A   I don't recall.
4   Q   On July 25th, 2004, you clocked in for the
5   day; is that correct?
6   A   Yes, it is.
7   Q   Did you clock out for the day?
8   A   Yes, I did.
9   Q   On July 27th, 2004, you clocked in for the
10   day; is that correct?
11   A   Yes, I did.
12   Q   Did you clock out for the day on July 27th,
13   2004?
14   A   No, I did not.
15   Q   And on July 29th, 2004, did you clock in and
16   out for the day?
17   A   Yes, I did.
18   Q   On July 29th, 2004, did you go back and clock
19   out for a day that you had missed that week?
20   A   Yes, I did.
21   Q   And what day did you go back and clock out
22   for?
23   A   For the 27th and the 28th.
24   Q   And why did you do that?
25   A   Because I didn't clock out them days.

---

84

1   Q   Is it possible that in clocking out on July
2   29th, 2004 for July 27th and July 28th, 2004, that the
3   hours that you worked on those days was not properly
4   reflected?
5   A   It's possible.
6   Q   Is it possible that you were overpaid for
7   this week because those hours weren't properly
8   reflected?
9       MR. LINGLE:  Object to form.
10   Q   (By Ms. Morgan)  Or if those hours were not
11   properly reflected?
12       MR. LINGLE:  Object to form.
13   A   It's possible.
14   Q   (By Ms. Morgan)  Did your manager ever
15   question you about whether you were accurately
16   recording the time?
17   A   Not that I can recall.
18   Q   When you performed work after hours, did you
19   record that time on your time cards?
20   A   Yes, I did.
21   Q   Were you compensated for that time?
22   A   I don't recall if I was or not.
23   Q   Did you ever handle phone calls after
24   hours?
25   A   Yes, I did.

---

85

1   Q   What are some examples of when you handled
2   some after-hour calls?
3   A   An example?
4   Q   An example of a time that you handled a call
5   after hours.
6   A   1:00 o'clock in the morning.
7   Q   And what kind of calls would you be handling
8   at that time?
9   A   Telephone calls.
10   Q   And what would be the circumstances under
11   which you would handle a call after hours?
12   A   Somebody would either be deceased, somebody
13   would have questions about the cemetery, somebody
14   would have questions about a funeral, somebody would
15   have questions about prices.
16   Q   And how would you -- would you record these
17   out, the time that you spent handling after-hour
18   calls?
19   A   Yes, I would.
20   Q   And how would you record that time?
21   A   For a long time, we didn't record them at
22   all, and then we -- he brought me a sheet to put them
23   on.
24   Q   What time frame did you not record them at
25   all?

---

**Johnstown**
**814-266-2042**

**Toll-Free**
**866-565-1929**

**Pittsburgh**
**412-281-7908**

86

1    A   From when I started till -- I don't remember
2  the exact date.
3    Q   And then at some point, it changed?
4    A   Yes.
5    Q   Okay.  And what was the change?
6    A   To record them.
7    Q   And who told you about that change?
8    A   Bill Barlow.
9    Q   When did he tell you?
10   A   I don't recall the exact date.
11   Q   And how did you handle recording after-hours
12 phone calls after Bill Barlow gave you that
13 instruction?
14   A   I wrote them down on a sheet.
15   Q   Did you use an after-hour call log?
16   A   That could be the name of it.  I -- it was a
17 piece of paper.
18   Q   There was a form that you used?
19   A   Yes.
20   Q   Prior to the time that Bill Barlow told you
21 to record after-hour phone calls, had any manager told
22 you not to record your time for those after-hours
23 phone calls?
24   A   I don't recall if they did or not.
25   Q   And prior to the change that we just talked

87

1  about, did you record the time spent on after-hour
2  phone calls?
3    A   No.
4    Q   And why not?
5    A   I don't know why not.
6    Q   Do you know how other Alderwoods employees
7  handled the recording of time spent in after-hour
8  phone calls?
9    A   No, I don't.
10       (Exhibit No. 21 was marked.)
11       MS. MORGAN:  For the record,
12 Exhibit 21 is Bates labeled ALD000552 to ALD000553.
13   Q   (By Ms. Morgan)  Is Exhibit 21 an after-hours
14 call log that you used, Mrs. McDonald?
15   A   Yes, it is.
16   Q   Is this the form document that you testified
17 about earlier that you used to record after-hour
18 calls?
19   A   Yes.
20   Q   And is it your -- is that your signature on
21 the first page of Exhibit 21?
22   A   Yes, it is.
23   Q   And what was your practice in using the
24 after-hours call log?
25   A   My practice in using it?

88

1    Q   Yes.  How would you -- how would you utilize
2  it?
3    A   To write information down.
4    Q   So you would write down the date of the
5  call?
6    A   Yes.
7    Q   When it started?
8    A   Yes.
9    Q   When it ended?
10   A   Yes.
11   Q   The caller and purpose of the call?
12   A   Yes.
13   Q   And the time spent on the call?
14   A   I'd always write down 15 minutes a call.
15   Q   Would you write down 15 minutes no matter how
16 long the call took?
17   A   Yes.
18   Q   Are there times that the call took less than
19 15 minutes?
20   A   Yes.
21   Q   And times the call took more than 15
22 minutes?
23   A   Yes.
24   Q   And then total at the bottom of the
25 page, two hours, 120 minutes --

89

1    A   Yes.
2    Q   -- what does that reflect?
3    A   The 15-minute total of each call.
4    Q   Were you compensated for the time you spent
5  on the after-hour calls?
6    A   I don't recall.
7        (Exhibit No. 22 was marked.)
8    Q   (By Ms. Morgan)  Is Exhibit 22 a copy of your
9  after-hours call log for week ending July 1st, 2006?
10   A   Yes, it is.
11   Q   Is it your signature that appears on the
12 document?
13   A   Yes, it is.
14   Q   And on this after-hours call log, you would
15 record the date of the call; is that correct?
16   A   Yes.
17   Q   The start time of the call?
18   A   Yes.
19   Q   The end time of the call?
20   A   Yes.
21   Q   The caller and the purpose of the call?
22   A   Yes.
23   Q   And the time spent on the call?
24   A   Yes.
25   Q   Now, the time spent on the call, as

**Johnstown**
**814-266-2042**

**Toll-Free**
**866-565-1929**

**Pittsburgh**
**412-281-7908**

**NETWORK DEPOSITION SERVICES**
**Transcript of Beverly McDonald**

33 (Pages 126 to 129)

126

1    Q    And this second affirmation was made under
2    oath, correct?
3    A    Yes, it was.
4    Q    Did anyone help you prepare your second
5    affirmation?
6    A    The attorneys.
7    Q    And how did they help prepare it?
8    A    I talked to them on the phone.  They typed
9    it, sent it to me to sign.
10   Q    Then you signed it and sent it back?
11   A    Yes.
12   Q    Were there multiple versions of your second
13   affirmation?
14   A    I don't think so, not the second one.  I
15   don't remember.
16   Q    And why did you prepare a second affirmation
17   in this case?
18   A    To be more specific.
19   Q    To be more specific about what?
20   A    Things they needed to specify a little more,
21   the attorneys did.
22   Q    Do you know what those things were?
23   A    I don't recall off the top of my head what
24   they were.
25   Q    Do you recall looking at your second

127

1    affirmation, what items you needed to be more specific
2    about?
3    A    I think it was being more specific about
4    John, Mr. Jackson.
5    Q    Any other subject that you needed to be more
6    specific about?
7         MR. LINGLE:  Object to the form.
8    A    Not that I can recall at this time.
9    Q    (By Ms. Morgan)  Does your second affirmation
10   still reflect your current understanding?
11   A    Yes, it does.
12   Q    Paragraph 6, you state that you also knew of
13   several other employees in other job titles who were
14   subject to the preapproval for overtime policy,
15   correct?
16   A    Yes.
17   Q    And then you give the example of a
18   gravedigger who worked at the same location as you; is
19   that correct?
20   A    Yes.
21   Q    Okay.  Is that Mr. Jackson?
22   A    Yes, it is.
23   Q    With respect to the first part of that
24   paragraph, the several other employees in other job
25   titles who were subject to the preapproval for

128

1    overtime policy, who are those people?
2    A    Everyone.  I mean, the several others is we
3    discussed at meetings and things that they -- you
4    know, it was a policy for them, too, to not get paid
5    for overtime that wasn't preapproved.
6    Q    And those were the other funeral
7    director/embalmers?
8    A    Yes.
9    Q    That were in other locations in Texas?
10   A    Yes.
11   Q    Any employees in other job titles?
12   A    The gravedigger.
13   Q    Anybody else?
14   A    Not that I can recall at this time.
15   Q    Did you ever review time cards for these
16   other employees that you talked to?
17   A    No, I did not.
18   Q    Okay.  Did you ever review any of their
19   paychecks?
20   A    No, I did not.
21   Q    Do you claim that you received compensation,
22   in addition to your hourly wage, that was not included
23   in calculating your overtime pay?
24   A    I don't understand what you're asking.
25   Q    Okay.

129

1         (Exhibit No. 27 was marked.)
2    Q    (By Ms. Morgan)  Is Exhibit 27 the
3    information sheet that you filled out and submitted in
4    this lawsuit?
5    A    Yes, it is.
6    Q    And it's dated September 17th, 2007?
7    A    Yes, it is.
8    Q    And is that your signature on the document?
9    A    Yes, it is.
10   Q    On this document, it states, I opt into this
11   case because -- and it says, Check all that apply.  Do
12   you see that?
13   A    Yes, I do.
14   Q    And if you will go to Paragraph E, you
15   checked that box next to E?
16   A    Yes.
17   Q    Okay.  And if you will read over that
18   paragraph and let me know when you've had a chance to
19   read that.
20   A    Okay.
21   Q    And my questions are about that claim.
22   A    Okay.
23   Q    So are you claiming that you received
24   compensation, in addition to your hourly rate, that
25   were not included in calculating your overtime rate?

**Johnstown**
**814-266-2042**

**Toll-Free**
**866-565-1929**

**Pittsburgh**
**412-281-7908**

**130**

1    A   Yes.
2    Q   And what led you to conclude that other forms
3  of compensation were not included in calculating your
4  overtime pay?
5    A   Commissions from preneeds.
6    Q   Is that the commissions on the markers that
7  you were talking about earlier?
8    A   Some of the commissions on the markers,
9  yes.
10   Q   Any other form of compensation that you think
11 was not included in calculating your overtime pay?
12   A   Not that I can recall at this time.
13   Q   And why do you think your commissions were
14 not included in calculating your overtime pay?
15   A   I don't know why they weren't.
16   Q   But why -- you don't know why they weren't,
17 but why do you think they were not included?
18   A   I can't answer for somebody else.  I mean, I
19 don't -- I guess I don't understand what you're asking
20 again.
21   Q   I'm asking what you base that claim on.
22       MR. LINGLE:  Object to the form.
23   Q   (By Ms. Morgan)  You're claiming that your
24 commissions from preneeds were not included in
25 calculating your overtime pay, correct?

**131**

1    A   Because my overtime pay never changed or
2  anything.  It was time and a half.  That's all it was.
3  It never included anything else.
4    Q   So were any commissions from your preneeds
5  included in calculating your overtime pay?
6    A   Not that I'm aware of.
7    Q   What dollar amount was excluded from your
8  overtime pay calculation?
9        MR. LINGLE:  Object to the form.
10   A   I don't know.
11   Q   (By Ms. Morgan)  Did you ever complain to
12 anybody at Alderwoods about your overtime
13 calculation?
14   A   No, I did not.
15   Q   Why not?
16   A   I don't know why.
17   Q   Can you refer back to Exhibit 11.  It's the
18 check detail listing.
19   A   Okay.
20   Q   If you could take a look at the first page of
21 Exhibit 11, the first entry for check date for
22 December 5th, 2003 --
23   A   Okay.
24   Q   -- do you see that?
25   A   Yes, I do.

**132**

1    Q   And under the earnings column, do you see
2  overtime adjust, and then it looks like -- overtime
3  adjust, and then if you look over and see amount,
4  $14.87?
5    A   I see that.
6    Q   Do you see that?  Okay.
7        And then if you look to the middle
8  of the page, check date December 19th, 2003 --
9    A   Yes.
10   Q   -- under the earnings, it says, Overtime
11 adjust, and then under amount, $17.17?
12   A   Yes, I see that.
13   Q   Okay.  Then if you'll turn to the next page
14 for check date January 30th, 2004 and underneath
15 earnings, it says, Overtime adjust --
16   A   Yes.
17   Q   -- and then the amount of $20.19?
18   A   Yes.
19   Q   And then if you'll flip to -- if you see at
20 the bottom, Mrs. McDonald, there's ALD0 -- there's a
21 number that starts ALD, and then there are digits.
22   A   Uh-huh.
23   Q   I think it will be easier for me to refer to
24 those as we page through here.
25   A   All right.

**133**

1    Q   If you'll look at ALD000279.
2    A   Okay.
3    Q   And at the bottom of the page, there's a
4  check date August 13th, 2004.  And under the earnings
5  column, overtime adjust, and there's an amount
6  $24.95.  Do you see that?
7    A   Yes.
8    Q   Do you know what that overtime adjust
9  means?
10   A   No, I don't.
11   Q   Do you know whether these overtime
12 adjustments account for other forms of compensation?
13   A   No.
14       MR. LINGLE:  Object to the form.
15   Q   (By Ms. Morgan)  So you don't know what
16 overtime adjust means --
17       MR. LINGLE:  Object to the form.
18   Q   (By Ms. Morgan)  -- on this document?
19   A   No.
20   Q   Or what the amount means?
21       MR. LINGLE:  Object to form.
22   A   No, I don't.
23   Q   (By Ms. Morgan)  Is it possible that you did
24 receive overtime adjustments during your employment
25 with Alderwoods?

Johnstown
814-266-2042

Toll-Free
866-565-1929

Pittsburgh
412-281-7908

**NETWORK DEPOSITION SERVICES**
**Transcript of Beverly McDonald**

35 (Pages 134 to 137)

---

134

1          MR. LINGLE:  Object to the form.
2      A   Is it possible I received overtime
3  adjustments?  Yes.
4      Q   (By Ms. Morgan)  Do you know whether you
5  did?
6      A   I can't recall at this time if I did or
7  not.
8      Q   Is it possible that you received overtime
9  adjustments during your employment at Alderwoods?
10         MR. LINGLE:  Object to the form.
11     A   Yes, it's possible.
12     Q   (By Ms. Morgan)  And is it possible that if
13  you received overtime adjustments, that they accounted
14  for other forms of compensation that you received,
15  such as commissions?
16         MR. LINGLE:  Object to the form.
17     A   It's possible.
18     Q   (By Ms. Morgan)  Are you aware of a
19  company-wide policy of not including certain types of
20  compensation in overtime calculations?
21     A   A company-wide policy of not including them?
22     Q   Yes.
23     A   Yes.
24     Q   When did you first become aware of this
25  policy?

---

135

1      A   I don't remember the exact date.
2      Q   How did you become aware of them?
3      A   Employees talking about it, other Alderwoods
4  employees.
5      Q   Who were these other Alderwoods employees?
6      A   I don't recall their names.
7      Q   Are these other Alderwoods employees at the
8  location where you worked?
9      A   No.
10     Q   What locations were they from?
11     A   I don't remember which locations they were
12  from.
13     Q   What positions at Alderwoods did they hold?
14     A   Funeral director/embalmer.
15     Q   Are these the same employees that you talked
16  about other issues with?
17     A   Could be.
18     Q   Did any manager, any Alderwoods manager, tell
19  you there was a policy of not including certain types
20  of compensation in overtime pay?
21     A   Not that I can recall at this time.
22     Q   And what do you understand this policy of not
23  including certain types of compensation in employees'
24  overtime calculations to be?
25     A   My understanding of the policy --

---

136

1      Q   Yes.
2      A   -- to not include them?
3          That they weren't included.
4          MR. LINGLE:  Object to the form.
5      Q   (By Ms. Morgan)  And according to your
6  understanding, what types of pay were excluded?
7      A   My understanding would be commissions.
8      Q   Any other types of pay excluded?
9      A   Not that I can recall at this time.
10     Q   Do you know whether employees in different
11  positions were subject to similar policies?
12     A   We all were.  It was the same policy.
13     Q   And what do you base that understanding on?
14     A   Understanding on Alderwoods has the same
15  policies for everyone; we were uniform.
16     Q   Do you know whether any -- any other
17  Alderwoods employees had forms of compensation,
18  excluded from their overtime pay calculations?
19     A   Was I aware of any specific?
20     Q   Yes.  Of any other employees whose overtime
21  calculations excluded other forms of compensation.
22     A   I don't remember their exact names or when I
23  talked to them, just that it was at different meetings
24  and things.
25     Q   So other employees told you this?

---

137

1      A   Yes.
2      Q   But did you ever see their -- their pay
3  records?
4      A   No.
5      Q   So you base that on what other employees
6  verbally told you?
7      A   Yes.
8      Q   Could you take another look at Exhibit 27,
9  your information sheet.
10     A   Okay.
11     Q   Could you take a look at Paragraph A.
12         Just let me know when you've had a
13  chance to review that.
14     A   Okay.
15     Q   Are you claiming that you were not paid for
16  any community service work?
17     A   Yes, I am.
18     Q   And during the time that you were working for
19  Alderwoods, did you do any community service work?
20     A   Yes, I did.
21     Q   What community service work did you do?
22     A   Volunteer.  Like community service work of --
23  you want specific -- I mean, I don't understand what
24  you're asking here.
25     Q   Well, you're claiming that the company

---

**Johnstown**
**814-266-2042**

**Toll-Free**
**866-565-1929**

**Pittsburgh**
**412-281-7908**

206

1  to 40.
2  Q  Okay.  And, again, that didn't necessarily
3  reflect the number of hours you were working, it was
4  related to how many hours you were actually just being
5  paid for; is that right?
6  A  Yes.
7  Q  One of the questions that you were asked was
8  concerning additional forms of compensation that you
9  received during your employment.
10  You mentioned, I think, throughout
11  today's deposition, and I just want to make sure it's
12  clear, that you received commissions on -- what did
13  you receive commissions for?
14  A  For preneeds and markers.
15  Q  Okay.  Did the time records that you filled
16  out include all of the time that you worked?
17  A  No.
18  Q  Okay.  What time was not included on your
19  time records?
20  A  Everything but embalming or time that I
21  actually worked during the day.  And time to and from
22  calls, removals, waiting for justice of the peace to
23  show up, just a lot of -- just waiting time.
24  Q  And so now you're referring to work after
25  hours, right?

207

1  A  Yes.
2  Q  Okay.
3  A  Uh-huh.
4  Q  How about time after you took a call to get
5  ready to go out, did you record that time?
6  A  No, I didn't record that time.
7  Q  Okay.  And so since we're talking about after
8  work -- after-hours work, how did the policy change
9  during your employment with respect to what you would
10  be paid for after -- for on-call after-hours work?
11  A  It was the same, that I didn't get paid for
12  it -- I didn't get paid for it until we started the
13  time clock, and then I would just get paid for
14  embalming only.
15  Q  Okay.  So prior to the time clock, did you
16  receive payment for any on-call activity that you
17  worked?
18  A  No.
19  Q  Okay.  And then it changed -- your
20  recollection is that changed when there was a time
21  clock?
22  A  Yes.
23  Q  Okay.  And you said at that point you started
24  recording for embalming?
25  A  Yes.

208

1  Q  Okay.  How much time were you allowed to
2  record for embalming?
3  A  I wrote down three hours.
4  Q  Okay.  When you were doing an embalming, did
5  you ever work more than three hours?
6  A  Yes.
7  Q  Were you allowed to record any of the time
8  for any other on-call work, other than embalming, at
9  that time?
10  A  At that time, no.
11  Q  Was there another change in the policy --
12  A  Yes.
13  Q  -- at some point?
14  And how did the policy change?
15  A  When I could write down on-call times, actual
16  phone calls that I had to take.
17  Q  And so what were you allowed to write down?
18  A  Phone calls.
19  Q  Okay.  Was there a certain amount of time
20  that you're allowed to record?
21  A  15 minutes.
22  Q  And did the policy change, again, after
23  that?
24  A  Yes.
25  Q  How did it change?

209

1  A  I could write down the -- an estimated amount
2  of time that it actually took.
3  Q  Were there any other changes that you're
4  aware of for the on-call policy?
5  A  No.
6  Q  You were also shown, during your deposition,
7  a bunch of different pay records, some of which
8  reflected that you hadn't punched out on certain days;
9  do you recall that?
10  A  Yes.
11  Q  What would be the reasons why you wouldn't
12  have punched out?
13  A  If I was at the cemetery, I could go straight
14  home from the cemetery, instead of going back by the
15  office.  Really, if I was out of the office for
16  anything at all, I didn't have to go back by the
17  office to clock out.
18  Q  And what were you told to do in that
19  circumstance?
20  A  To write it in, at first.  And then, it was
21  just to punch out at the end of the week for all of
22  that.
23  Q  And who told you to do that?
24  A  Bill Barlow.
25  Q  So in days where you did that punch out at a

Exhibit 19

1

1          THE UNITED STATES DISTRTICT COURT
2      FOR THE WESTERN DISTRICT OF PENNSYLVANIA
                                           06-1641
3

4

                                           )
5    DEBORAH PRISE AND HEATHER              )
     RADY ON BEHALF OF THEMSELVES           )
6    AND ALL EMPLOYEES SIMILARLY            )
     SITUATED,                              )
7                                           )
          PLAINTIFFS,                       )
8                                           )
     v                                      )
9                                           )
     ALDERWOODS GROUP, INC.,                )
10                                          )
          DEFENDANT.                        )
11   -----------------------------------

12         DEPOSITION OF BARRY DOUGLAS MILES
13              (TAKEN by DEFENDANT)
14          CHARLOTTE, NORTH CAROLINA
15              APRIL 18, 2009
16

17

18

19   REPORTED BY:        Meredith R. Johnson
                         Court Reporter
20                       Notary Public
21

22

23

24

25

**NETWORK DEPOSITION SERVICES**
**Transcript of Barry Douglas Miles**

47 (Pages 182 to 185)

182

1  to be correct?
2      A   Mm-hmm.
3      Q   So tell me the process.  You get the
4  blank card, walk me through the process from when
5  you get this blank card without anything on it.
6      A   We sign it, we put the information there
7  with our name at the top, and then we start
8  filling it out.  Some is handwritten, some of it's
9  stamped.
10     Q   Why would there be some handwritten and
11 some stamped?
12     A   Probably because you forgot to stamp it.
13 That would be my guess.
14     Q   So when you stamp it the clock on the
15 puncher would record that accurate time but if you
16 came in and you were busy and you didn't stamp it
17 at that time --
18     A   Then I would go back and write it in.
19     Q   And there's a notation here, it looks
20 like some initials, right, just to the left of
21 where the time was recorded for October 31st.  Can
22 you tell me what that is.
23     A   The initials?
24     Q   Yes.
25     A   That's my initials.

183

1      Q   And why would you be initialing there?
2      A   I honestly don't know.
3      Q   Would it be fair to say that you would
4  initial next to a time where you hand wrote the
5  time in, verifying that that was the proper time
6  that you were working?
7      MS. DOUGLASS:   Objection.  I think he
8  answered the question.
9      A   I don't.
10     Q   That's fine.  If you don't know, you
11 don't know.  And there's a column, in the lefthand
12 column, is extra time.  And then the second day,
13 can you tell me what that says there?
14     A   It sounds like a house removal.
15 Stanley, something else.
16     Q   I'm sorry, the first notation for the
17 second day.
18     A   Insurance class, I think.
19     Q   Insurance class?
20     A   8 to 12:30.
21     Q   And what would that have been?
22     A   You know, I'm not sure.
23     Q   Would that possibly have been a
24 continuing education insurance class?
25     A   It could be.  Could be.

184

1      Q   And you put that time down as time that
2  you worked on that second day; is that correct?
3      A   Mm-hmm.
4      Q   And then if you look on the fourth day,
5  you have a notation there, shows you clocked in
6  November 2nd at 8.4.  Would that be eight hours
7  and four tenths of an hour into the day?
8      MS. DOUGLASS:   Objection.  A little after
9  eight.
10     Q   8:24.
11     A   A little after eight.
12     Q   And then you made a notation "no lunch."
13     A   Right.
14     Q   So that shows that you didn't take off
15 time for lunch and that you would -- your hours to
16 the left there are calculated from 8.4 to --
17     A   19.2.
18     Q   -- to 19.2.  And the total hours would
19 be 10.8 hours for that day.
20     A   That's written beside of it.
21     Q   And that's what you believe to be the
22 time that you -- this reflects the time you worked
23 for that day, correct?
24     A   Mm-hmm.
25     Q   And then down at the bottom, we see 60.3

185

1  added to 3.75, correct?
2      A   That's right.
3      Q   And would you flip to the very next page
4  and tell me what that document is.
5      A   It's the after-hours call log.
6      Q   And tell me what that is.
7      A   If you're on-call -- the policy was, you
8  got paid fifteen minutes per phone call if you
9  were on-call.  And a flat three-hour rate if you
10 went on a house removal.  Flat rate.  So that's
11 what that is.
12     Q   Okay.  Now, were you told to put your
13 actual time down here?
14     A   Yes.
15     Q   Okay.  So if you actually spent an hour
16 on a phone call, would you put an hour down?
17     A   No.  We put 15 minutes down.
18     Q   You just said you were told to put the
19 actual time you spent on the call down.
20     A   No.  The actual -- what they told us to
21 do, 15 minutes per phone call is what they told
22 us.  So that's what we did.
23     Q   They told --
24     A   Some phone calls are five minutes, some
25 are longer.

**Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg**
**866-565-1929**

**NETWORK DEPOSITION SERVICES**
**Transcript of Barry Douglas Miles**

48 (Pages 186 to 189)

186

1    Q   Okay.  So if the phone call was five
2    minutes, you put down 15 minutes?
3    A   That's what they said to do.
4    Q   What if the phone call was 30 minutes?
5    A   I put down 15 minutes.
6    Q   You were told to not record the actual
7    time, just record --
8    A   Fifteen minutes per phone call.
9    Q   Okay.  Why --
10   A   So you adjusted these times to equal 15
11   minutes.  If you go back and look through them,
12   they're adjusted to read 15 minutes.
13   Q   Okay.  So I'm just trying to clarify.
14   Does that mean you were told to put down the
15   actual time from start time to actual end time and
16   then put 15 minutes as time spent?
17   MS. DOUGLASS:  Objection.
18   A   No.
19   Q   Tell me.  I'm just trying to understand.
20   Tell me what that means?
21   A   It means 15 minutes per call.  If the
22   phone rings and I deal with that phone call and I
23   hang up the phone, that's 15 minutes.
24   Q   So why do you think that you would have
25   a start time and an end time listed if every phone

187

1    call was going to be worth 15 minutes?
2    MS. DOUGLASS:  Objection.
3    A   Because that's what we were told to do.
4    Q   No, no, no.  That's not what I'm asking
5    you.  You're telling me that you were told to put
6    down fifteen minutes per phone call, period.
7    A   Right.
8    Q   But why would you have a start time and
9    an end time if the direction was to put down 15
10   minutes no matter what?
11   A   Because that start time -- if you look
12   at it, that equals 15 minutes.
13   Q   I understand that that's what you wrote
14   down.
15   A   Right.
16   Q   But what I'm asking you is, if the
17   computation was supposed to be 15 minutes for
18   every single time, then why would they have a
19   start time and an end time if they say they're all
20   15 minutes?  Why would you have --
21   A   You have to ask them.  I don't know.
22   That's exactly what I was told to do and that's
23   what I did.
24   Q   Okay.  That's fine.  Now, this shows
25   employee signature.  Is that your signature?

188

1    A   Yeah.
2    Q   And the week ending 11/4/06?
3    A   Right.
4    Q   And who's the approver?
5    A   Danny Gibson.
6    Q   So you have three phone calls on
7    11/3/06?
8    A   Correct..
9    Q   Fifteen minutes each.
10   A   Right.
11   Q   And then you have a fourth entry here
12   that start time, what is that start time?  Can you
13   tell what that says.
14   A   Like 7 a.m.
15   Q   And the end time?
16   A   10 a.m.
17   Q   Okay.  And can you read what the caller
18   and purpose of call says?
19   A   For that particular time?
20   Q   Yes, sir.
21   A   That's home removal somewhere in Clover,
22   South Carolina.  Willard somebody.
23   Q   And the time spent in minutes?
24   A   180.
25   Q   And was that a minimum that you were

189

1    instructed to put down?
2    A   That was a minimum we were supposed to
3    put down.
4    Q   And what -- if the call lasted for five
5    hours?
6    A   We put down three hours down.
7    Q   Now, tell me where you got your
8    instructions to do that.  Who instructed you to do
9    that?
10   A   When the call logs were announced, it
11   was announced that you'll get paid 15 minutes per
12   phone call and three hours for removal.
13   Q   And how did you get that information?
14   A   Word of mouth, I guess.  I don't know to
15   be honest with you.
16   Q   Do you remember who told you that?
17   A   No, I don't.
18   Q   Did you ever see any documentation that
19   told you to do that?
20   A   Other than that first thing you saw
21   here.  It said something about a call log.
22   MS. DOUGLASS:  Could we take a break here.
23   MR. FARMER:  Absolutely.
24   (Off the Record 2:00 p.m.. to 2:10 p.m.)
25