# Exhibit 20

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Pramik**

1

```
 1           IN THE UNITED STATES DISTRICT COURT

 2        FOR THE WESTERN DISTRICT OF PENNSYLVANIA

 3

 4   DEBORAH PRISE and           )
     HEATHER RADY on behalf      )
 5   of themselves and all       )
     employees similarly         )
 6   situated,                   )
                                 )
 7              Plaintiffs,      )
                                 ) CIVIL ACTION
 8   vs.                         ) NO. 06-1641
                                 )
 9   ALDERWOODS GROUP, INC.,     )
                                 ) Judge Joy Flowers Conti
10              Defendant.       )
                                 )
11

12

     VIDEOTAPED
13   DEPOSITION OF:  ROBERT J. PRAMIK
14           DATE:  OCTOBER 16, 2008
15           TIME:  9:54 A.M.
16        TAKEN BY:  PLAINTIFFS
17        LOCATION:  HOLIDAY INN EXPRESS
                     5680 ALLENTOWN BOULEVARD
18                   HARRISBURG, PENNSYLVANIA
19

20

21   Reported By:
     SUSAN O'HARA MOORE, CSR, RMR, CLVS
22

     In Association with:
23   NETWORK DEPOSITION SERVICES
     Suite 1100 Gulf Tower
24   707 Grant Street
     Pittsburgh, PA 15219
25   412.281.7908
```

NETWORK DEPOSITION SERVICES
Transcript of Robert Pramik

34

1  Q   That's why we do it.
2  A   Things are coming back. I'm not as old
3  as I thought I was.
4     (Defendant's Deposition Exhibit No. 2 was
5  marked.)
6  BY MR. DeJULIUS:
7  Q   Okay. Now, I'm going to hand you what's
8  been marked as Defendant's Exhibit 2.
9  A   Let me also point out there was a mistake
10 in here that made me three years old. I forget
11 which one I saw that one on. That was quite
12 funny.
13 Q   Mr. Pramik, I've just handed you what's
14 been marked as Defendant's Exhibit 2. And I want
15 to ask you on the top left-hand corner, it says,
16 "Company/Division Neill Funeral Home Inc." Do
17 you see that?
18 A   Yes.
19 Q   Are you familiar with Neill Funeral Home,
20 Inc.?
21 A   Yeah, yeah. That's -- that's -- I think
22 that's what the actual funeral home is called
23 even though they're held -- they're held by
24 Loewen at that point in time, but -- it's kind of
25 a weird situation the way the Pennsylvania law is

35

1  in ownership of funeral homes. I think that was
2  the -- what do they call that? The -- I can't
3  remember what the title of that is called, but,
4  yes.
5  Q   What does Neill Funeral Home, Inc., do?
6  A   They're -- they're the legal name of the
7  funeral home in the State of Pennsylvania.
8  Q   Do they have any operations the -- the
9  corporation itself?
10 A   It's -- it's -- it's a name that they
11 funnel things through. It's just the legal name
12 to make it a legal licensed funeral home in the
13 State of Pennsylvania.
14 Q   Okay. To your knowledge, does it set any
15 human resource policies?
16 A   No.
17 Q   Provide employee benefits?
18 A   No.
19 Q   Have any financial control?
20 A   No.
21 Q   Set anybody's salary?
22 A   No.
23 Q   Have supervisory function over any
24 employees?
25 A   No.

36

1  Q   Have any employees itself?
2  A   No. And, again, this is the best of my
3  knowledge, because I don't know how the legal
4  structure works.
5  Q   I'm just -- just trying to clarify.
6  A   Sure.
7  Q   Okay. Well, let's go back to the MGM
8  position.
9  A   Can -- can I point out a mistake on this?
10 Q   If you want.
11 A   Okay. It says here, "Monthly
12 Salary/Hourly Rate $30 a day." That's not true.
13 That -- it's called piece rate. So if you -- if
14 you made a removal, you were paid $30 for that
15 removal. If you worked a viewing, you were
16 guaranteed a minimum of 30 -- $30. If it was a
17 long viewing, then you got an hourly wage on top
18 of that.
19 Q   Okay.
20 A   Same way -- anything you did was like a
21 per diem type thing. But it's not a day; it's
22 per occurrence.
23 Q   Okay. Do you recall approximately what
24 your salary was when you were MGM?
25 A   I think it was in the low -- either high

37

1  50s or low 60s.
2  Q   And I guess we can go back to Defendant's
3  Exhibit 1. And I believe on the left-hand side
4  it says, "New Annual Salary."
5  A   I don't know. My wife got my check.
6  Yeah, it says, 60.
7  Q   Okay. And does that refresh your
8  recollection that your salary was $60,000 as MGM?
9  A   Um-hum. If that's what it says, that's
10 what it was. Like I said, my wife got my checks.
11 I got my allowance.
12 Q   Did you receive any --
13 A   If you're married, you'll appreciate
14 that.
15 Q   I haven't seen a paycheck in quite
16 sometime.
17    Did you receive any other type of
18 compensation while you were MGM?
19 A   A bonus.
20 Q   Okay. And what was that bonus based on?
21 A   Several things, and that changes year to
22 year. But the year that I received my bonus
23 was -- again, I'm giving you the details that I
24 can remember. I'm sure there may be more. But
25 it was based on you had to make your -- your

**Johnstown**
**814-266-2042**

**Toll-Free**
**866-565-1929**

**Pittsburgh**
**412-281-7908**

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Pramik**

11 (Pages 38 to 41)

---

38

1  pre-need goal in sales and then you had to make
2  your budget. Again, I'm -- that's been a long
3  time ago. But it was -- there were several
4  factors involved. You had to -- you had to make
5  it was either your call volume or your
6  merchandise hit or whatever and then your
7  pre-need sales and things like that, and then
8  that made you eligible for your bonus.
9      Q   Okay. And -- and -- and you said the
10  year you received it. Did you receive a bonus
11  only once?
12     A   On tape. I was ripped off of my last
13  bonus. But, yes, I did receive one. And I
14  looked right in the camera to tell you that, too.
15     Q   Any other compensation while you were
16  MGM?
17     A   No. I was not privy to pre-need
18  commissions at that point in time.
19     Q   Okay. And --
20     A   Now, when you say compensation, I was
21  reimbursed for expenses, but that's -- I don't
22  consider that compensation.
23     Q   No.
24      When you were MGM, are there any pay
25  periods where you believe you received less than

---

39

1  your full pay as far as salary goes? Let's start
2  with salary.
3     A   One more time again.
4     Q   When you were MGM, was there any pay
5  period in which you believe you received less
6  than your full pay as far as salary goes?
7     A   I don't think so.
8     Q   Okay.
9     A   To the best of my knowledge, no.
10     Q   Okay. Do you know how your salary was
11  determined?
12     A   It was negotiated when I took the
13  position.
14     Q   And did you negotiate it?
15     A   I wasn't a very good negotiator, but,
16  yeah.
17     Q   And do you -- do you recall what types of
18  points were being negotiated as far as the salary
19  goes? Was there a salary chart of some sort?
20     A   Not that I was aware of. I -- I was
21  hired via the phone. I had a phone interview
22  with John DiPalma and Leon Sersun, I believe her
23  last -- I think it was Leon. Or, not Leon.
24     Q   Kirsten? Leanne?
25     A   Leanne. Leanne Sersun, yeah, yeah. I

---

40

1  had a telephone interview, and I think there was
2  one other person. There was another female on
3  that -- on that interview call.
4      And then after I got -- accepted the
5  position, I was offered the salary. And I tried
6  to get it bumped up, and I -- I wasn't very
7  successful. So I took what was offered.
8     Q   Okay. And do you know whether the salary
9  differed as far as geographical locations?
10     A   I found out later at an L.E. meeting
11  that, yes, the -- there was people making a lot
12  more money than I was.
13     Q   And were people making less money than
14  you?
15     A   No.
16     Q   Are you aware?
17     A   Not that I was aware.
18     Q   Okay.
19     A   I was the low man on the pole.
20     Q   Okay. As MGM, did you report the hours
21  that you worked -- you actually worked?
22     A   No.
23     Q   Did you ever use a time clock?
24     A   As MGM, no.
25     Q   As MGM, did you keep a personal record of

---

41

1  your time?
2     A   No. I'm sure my wife did.
3     Q   As MGM, did anyone set a work schedule
4  for you?
5     A   As far as time and things like that?
6     Q   Correct.
7     A   I would -- I would say no to that.
8     Q   And there was no schedule that said,
9  "Mr. Pramik will come in at 8:00 a.m. and work
10  until 6:00 p.m."?
11     A   No. They didn't have to set that with
12  me.
13     Q   Okay.
14     A   They knew I would work more than what I
15  was expected to.
16     Q   To your knowledge, did any MGM have a
17  work schedule set up like that?
18     A   Not to my knowledge, no.
19     Q   Were you scheduled to work a certain
20  number of hours per week?
21     A   No.
22     Q   At some point -- scratch that.
23      MS. GIFFORD: Do you want to take just
24  like a 10-minute break?
25      MR. DeJULIUS: Sure.

---

178

1    A   Paraphrasing, of course, not -- not --
2  not verbatim. Basically, the gist of the
3  conversation was, "Pre-need is our lifeblood.
4  Pre-need is our future. We need to push
5  pre-needs. You need to get your funeral
6  director's license because pre-needs is our
7  future. All funeral directors will become
8  licensed to sell the product."
9    Q   And did all funeral directors ever become
10  licensed?
11   A   When I was there, again, the only ones
12  that became licensed were Dan Huff, myself, Steve
13  Alleva, and I can't remember the girl down in
14  Paoli. I don't know if she ever passed her exam.
15   I know that John failed three times. I
16  know Steve was studying. And I know Rebecca was
17  studying. Whether or not they passed after I
18  left, I don't know.
19   Q   Now, funeral directors did get paid for
20  commission on pre-need sales. Correct?
21   A   Well, that's a -- that's another sore
22  subject. If you were a full-time employee -- and
23  here's where it differs. When we had that guy
24  that was just a licensed agent and not a funeral
25  director, he got 100 percent of his commission.

179

1  His commission wasn't 100 percent.
2  Hypothetically, let's say the commission for
3  selling it was 10 percent. He got the total
4  10 percent.
5    Licensed funeral directors that were
6  full-time employees, in that scenario I just gave
7  you, if the commission was 10 percent, they only
8  got half of that 10 percent because they were
9  considered full-time employees.
10   However, while they were meeting a family
11  to sell the pre-needs, they had to go off the
12  clock because they had a potential of getting a
13  commission.
14   Now, if they had met that family for two
15  or three hours and didn't sell the pre-need
16  policy, they didn't get reimbursed for those two
17  or three hours they spent with that family.
18   So they, theoretically, got cheated
19  twice. They got taken off the clock while they
20  were meeting that family; and, secondly, they
21  only got half of their commission for what the
22  total commission was.
23   Q   Okay. But when a pre-needs sale went
24  through, funeral directors did get paid a
25  commission?

180

1    A   Yes. And if that person died within a
2  certain time of after writing that policy, they
3  also took that commission back.
4    Q   A certain percentage depending on the
5  length of time that --
6    A   And, again, those hours spent to sell
7  that pre-need policy were never re --
8  re-compensated if that person died two months
9  after they wrote the policy.
10   Q   And we'll get -- we'll get to that policy
11  later. I just -- we need to take it
12  step-by-step.
13   Who told you the policy -- when -- when
14  did you become aware of Alderwoods' alleged
15  policy not to compensate employees for time spent
16  in pursuit of an insurance license outside of
17  normal business hours?
18   A   Ted Reese.
19   Q   Did anybody else tell you of that policy?
20   MS. GIFFORD: Object to form.
21   THE WITNESS: I argued with George Amato
22  at one time because Ted would not reimburse me
23  for the cost of my course to get my continuing ed
24  after Ted was gone, and George okayed me to get
25  compensated for my course, not my time but my

181

1  course.
2    Q   But you were an MGM at that point.
3  Correct?
4    A   That's correct, but I was still required
5  to have a license and I still had to get my
6  continuing ed.
7    Q   Correct. But you were salaried at that
8  point?
9    A   Correct.
10   Q   Did you ever talk to George Amato
11  regarding time employees spent pursuing an
12  insurance license outside of normal business
13  hours?
14   A   Yes.
15   Q   What did he say?
16   A   They'll get reimbursed for it when they
17  sell products and get commission; they're not
18  getting paid for their time that they're spending
19  to study.
20   Q   When did Mr. Amato tell you this?
21   A   I can't give you dates.
22   Q   Was this when you were MGM?
23   A   Yes.
24   Q   Was this a phone conversation?
25   A   Yes.

Johnstown
814-266-2042

Toll-Free
866-565-1929

Pittsburgh
412-281-7908

NETWORK DEPOSITION SERVICES
**Transcript of Robert Pramik**

51 (Pages 198 to 201)

198

1  you signed it?
2      A    I -- I did.  In fact, if I remember
3  correctly -- yeah, right there it is on page 2.
4  There was -- there was a -- I corrected
5  something.
6      Q    Okay.  And -- and I can't read that.
7      A    "Written notice."
8      Q    "Written notice."  Okay.
9      A    You've got -- you've got to learn to read
10  hieroglyphics when you're reading my handwriting.
11  My mom always used to tell me I should be a
12  doctor.
13      Q    Did -- were you approached to write this
14  affidavit?
15      A    When you say I was approached, I don't
16  know -- I mean, yeah, I was asked to give more
17  statements.
18      Q    Okay.  That's all --
19      A    So if you want to call that approached.
20      Q    That's all I need to know about that.
21      If you could look at paragraph 5.
22  Actually --
23      A    Well, I could answer that one now.  I
24  couldn't remember his name.  It's Bruce Bills.
25      MS. GIFFORD:  Wait for a question.

199

1      THE WITNESS:  Okay.
2  BY MR. DeJULIUS:
3      Q    Actually, it's paragraph 6, I guess.  And
4  you mentioned earlier that -- well, let me
5  read -- let me read paragraph 6, and then I'll
6  ask you some questions.
7      "Moreover, it is my understanding that
8  the written policy on pre-approval for overtime
9  policy the Alderwoods maintained in its" -- it
10  now says -- "written notice did not limit the
11  policy to a subset of hourly employees or to
12  certain job titles.  Instead, that written policy
13  applied to all hourly employees."  Do you see
14  that?
15      A    Yes.
16      Q    Why did you cross out "Policy and
17  Procedures Binder" and write "written notice"?
18      A    Because I don't have privy to the policy
19  and procedure binder.  And since I left in March
20  of '05, it's been a long time.  And I can't -- I
21  couldn't honestly state that it was in there
22  without physically seeing that policy and
23  procedure binder.
24      So, in effect, I didn't want to -- I
25  didn't want to put a false statement down.  So,

200

1  is it in there?  It could be.
2      A    Okay.
3      A    Without having privy to that, I don't
4  know if it's in there or not.
5      Q    Okay.  Let's go to the next exhibit.
6      A    Are we done with this one?
7      Q    For now.  We're going to ask you a couple
8  more questions on some of these other exhibits.
9      A    You're going to make me -- make me do
10  some research here, huh.
11      (Defendant's Deposition Exhibit No. 7 was
12  marked.)
13  BY MR. DeJULIUS:
14      Q    I'm handing you what's been marked as
15  Defendant's Exhibit 7.  This, again, if you -- is
16  your affirmation that you filed in April of 2008.
17      If you could again turn to the last page
18  of this document in paragraph -- page 4.  And is
19  that your signature on the bottom of this
20  affirmation?
21      A    Yes, it is.
22      Q    And this affirmation, to the best of your
23  knowledge, was accurate when you signed it?
24      A    Yes.
25      Q    To the best of your knowledge, is it

201

1  accurate still today?
2      A    Yes.
3      Q    Was the same procedure for the other
4  affirmations followed in this case where you
5  verbally provided them information?
6      A    Yes.
7      Q    Okay.  If you could turn to paragraph 14.
8      Paragraph 14 states:  While I was
9  employed by Alderwoods, I was aware that
10  Alderwoods had a meal break policy.  Under that
11  policy, the company recorded a full lunch or meal
12  break for employees, even when employees were
13  unable to take a break or were uninterrupted --
14  or were interrupted during a break.
15      Do you see that?
16      A    Yes.
17      Q    When did you become aware of this policy,
18  general timeframe?
19      A    Actually, Ted got a notice from -- I
20  think it was HR, and he brought it to our
21  attention.  "You guys have to start taking
22  lunch."  It was like, "Yeah, right.  When?"
23      And he says, "Well, I'm taking it off
24  your paycheck because we have to show that you're
25  taking a break and that we're giving you one."

**Johnstown**
**814-266-2042**

**Toll-Free**
**866-565-1929**

**Pittsburgh**
**412-281-7908**

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Pramik**

52 (Pages 202 to 205)

202

1    And I said, "Well, what -- what happens
2  if we don't get that break?" And he said, "We're
3  still -- I'm still taking a half hour off your
4  time card," and he did.
5    Q    When did Ted -- did you ever see this
6  notice that Ted got?
7    A    I didn't see -- well, I think he got
8  it -- I think he got it verbally from the HR
9  department.
10    And, again, 99.9 percent of everything
11  Ted told us, he followed up with a written memo,
12  which I don't have privy to.
13    Q    Okay. Other than -- let me -- let me ask
14  you another question.
15    Did Ted ever tell you -- scratch that.
16    I'm trying to get an idea of what this
17  notice said. Do you know if it said, "You must
18  provide your employees a break"?
19    A    I think he reiterated the fact that it's
20  a state law and, you know, we have to keep record
21  of your lunch breaks and things like that. And
22  it's like, "Well that's easy. We don't get one."
23    Q    And so --
24    A    Now, that -- that's not a fair statement.
25  Let me reemphasize that. The majority of the

203

1  time we didn't get one. There were days where we
2  didn't have funerals. Did we take a lunch break?
3  Yeah. Was it a set time? No. We did it
4  whenever we could. We may have been dressing
5  bodies and all of a sudden it's like, "Oh, it's
6  2:00. Let's go get something to eat."
7    So there were days that we did go to
8  lunch. But there were many, many days, because
9  we had three funeral homes to run and a limited
10  staff, we were always on the go, and so you
11  didn't get that lunch break, but you were docked
12  that lunch break as if you did take one.
13    Q    So you said it was state law that
14  employees must get lunch breaks, to your
15  knowledge?
16    A    Correct.
17    Q    Are you aware of other state laws that
18  require similar lunch breaks?
19    A    With other states? I -- I -- I don't
20  know that.
21    Q    Okay. And is the reasoning -- did Ted
22  ever give you the reasoning? I mean, was the
23  reasoning you weren't getting paid for those
24  lunch breaks because he needed to show that you
25  actually were getting a break --

204

1    A    Yes.
2    Q    -- for the record?
3    A    Yes.
4    Q    So he was, in effect, doctoring the
5  records to make it look like he was complying
6  with law?
7    A    Yes.
8    Q    The policy -- and correct me if I'm
9  wrong. The policy was not that employees should
10  not get paid for their lunch. The policy was
11  that employees must have lunch. Is that correct?
12    MS. GIFFORD: Object to form.
13    THE WITNESS: I would answer that no.
14  And my -- and I'll give you a reason why I say
15  no.
16    If I'm getting docked a half hour of pay
17  for a lunch break I'm entitled to and don't get
18  that lunch break and he's doing that based on his
19  decision, he's my boss, therefore, policy.
20  BY MR. DeJULIUS:
21    Q    Okay.
22    A    If he's instituting that, that's policy.
23    Q    Okay. Did -- are you aware that anybody
24  gave that policy to Mr. Reese?
25    MS. GIFFORD: Object to form.

205

1    THE WITNESS: Other than his telling us
2  at our round-table discussion or -- or -- or --
3  or our employee meeting that he just got off the
4  phone with HR and we have to give these lunch
5  breaks.
6  BY MR. DeJULIUS:
7    Q    Right. And my question's a little bit
8  different.
9    A    Okay.
10    Q    My question is -- and you just said it's
11  policy because it came from my -- my boss.
12    A    Correct.
13    Q    And the policy, as I understand it, is
14  "I'm going to mark a lunch period down.
15  Regardless of whether you work it or not, I'm
16  going to dock your pay."
17    A    Yes.
18    Q    That was Mr. Reese's policy?
19    MS. GIFFORD: Object to form.
20    THE WITNESS: Yes.
21  BY MR. DeJULIUS:
22    Q    And the question that I have is: Did
23  Mr. Reese get that policy -- ever tell you that
24  he got that policy from somebody else?
25    MS. GIFFORD: Object to form.

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Pramik**

53 (Pages 206 to 209)

206

1       THE WITNESS: Again, just that he
2   verbalized to us he just got notification from
3   HR.
4   BY MR. DeJULIUS:
5       Q   But the -- the notification from HR was
6   that employees must get lunch breaks?
7       A   Yes.
8       Q   The verbalization from HR, as you
9   understood it, was not "Dock your employees a
10  half hour and not pay them."
11      MS. GIFFORD: Object to form.
12      THE WITNESS: I -- I -- I don't know. I
13  don't know what the conversation was between --
14  only what he reiterated to us. I don't know if
15  HR said, "Dock them whether they take it or not."
16  I don't know that for a fact.
17  BY MR. DeJULIUS:
18      Q   Okay.
19      A   And I don't know that it didn't happen
20  either, in all fairness.
21      Q   That's fair.  You weren't -- you weren't
22  there.
23      A   Right.
24      Q   Is there any other indication that
25  Mr. Reese gave you that this policy extended

207

1   beyond his own policy?
2       MS. GIFFORD: Object to form.
3       THE WITNESS: I can't answer that,
4   honestly, but I can give you an objective opinion
5   because when he was -- it was from a conference
6   call with his boss that this HR thing came about.
7   So one can assume that. But when you assume, you
8   know how that goes.
9   BY MR. DeJULIUS:
10      Q   Right. And I'm not asking -- I don't
11  want you to assume or speculate. I'm asking you
12  about your own personal knowledge.
13      Did -- other than Mr. Reese, did anybody
14  from Alderwoods, any management, senior
15  management, someone above you, tell you not to
16  pay employees for their lunch break?
17      A   No.
18      Q   When you were MGM, did you pay employees
19  for their lunch break?
20      MS. GIFFORD: Object to form.
21  BY MR. DeJULIUS:
22      Q   Let me rephrase it because it's -- it's
23  not clear when I say -- say, "lunch break."
24      A   That's -- that's too general.
25      Q   When you were MGM, did you dock somebody

208

1   a lunch break, not pay them for a certain time,
2   even though they worked that time, in order to
3   make it appear as if they had lunch?
4       A   I did not dock their pay, no.
5       Q   Did anybody within your market have their
6   pay docked --
7       MS. GIFFORD: Object to form.
8   BY MR. DeJULIUS:
9       Q   -- for a lunch period that they didn't
10  take?
11      A   I'm not -- I don't know what their
12  procedures were. I can tell you about my market.
13      Q   And I asked about your market, within
14  your market.
15      A   Oh, I'm sorry.  I thought you said in the
16  other -- the other markets. I'm sorry. Can you
17  ask me again?
18      Q   Well, I asked you the first time whether
19  you had docked anybody's pay.
20      A   I did not.
21      Q   And the second question is:  Did anybody
22  in your pay have -- anybody in your market have
23  their pay docked for not taking a lunch break?
24      A   No.
25      MS. GIFFORD: Object to form.

209

1       THE WITNESS: No.
2   BY MR. DeJULIUS:
3       Q   Okay.  And then the third question --
4       A   Under my realm.
5       Q   Under your realm.
6       The third question is do you -- are you
7   aware of whether employees outside of your market
8   actually were not paid for a lunch break when
9   they worked through it?
10      MS. GIFFORD: Object to form.
11      THE WITNESS: I can tell you that that
12  same -- same conversation from HR was addressed
13  to them. How they responded to that, I can't
14  answer that.
15  BY MR. DeJULIUS:
16      Q   Well, you actually don't -- you weren't
17  actually on that phone call with HR.  Correct?
18      A   No.  But I know it came from a conference
19  call with him and the other MGMs.
20      Q   Because Ted told you?
21      A   Correct.
22      Q   Okay. Let me ask you this: The --
23  the -- the procedure, again, as far as employees
24  under your watch, when you were MGM, an employee
25  didn't have a lunch break, and so they -- they --

**Johnstown**
**814-266-2042**

**Toll-Free**
**866-565-1929**

**Pittsburgh**
**412-281-7908**

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Pramik**

66 (Pages 258 to 261)

258

```
 1     Q   23.
 2     A   Got it.
 3     Q   It states, "Defendant willfully violated
 4   its obligations under the FLSA and is liable to
 5   Plaintiffs."  Do you see that?
 6     A   Yes.
 7     Q   Are you aware of the basis for that
 8   contention?
 9        MS. GIFFORD:  Object to form.
10        THE WITNESS:  I don't even know what the
11   FLSA is.  I don't -- I don't -- and your question
12   is:  Do I understand what that means?
13        MS. GIFFORD:  We're going to -- we're
14   going to object to the extent this is asking for
15   a legal conclusion.  So he can't provide a legal
16   conclusion, but, you know, he might be able to
17   provide his lay opinion as to what he
18   understands.
19        MR. DeJULIUS:  I'm asking if he's aware
20   as to what that -- what that means in his
21   opinion.  I'm not -- we're not going to be able
22   to hold you to any legal conclusions that he
23   draws from them.
24        THE WITNESS:  I do not.
25   ///
```

259

```
 1   BY MR. DeJULIUS:
 2     Q   Okay.  Are you aware of any actions that
 3   Alderwoods took that you would consider willful?
 4        MS. GIFFORD:  Same objection.
 5        THE WITNESS:  Am I aware of any?
 6   BY MR. DeJULIUS:
 7     Q   Right.  Just your own recollection.
 8     A   In my opinion?  Yeah, I don't think we
 9   were paid for time worked.
10     Q   Okay.
11     A   And I think that was wrong.
12     Q   And what's the basis for "willful"?
13        MS. GIFFORD:  Object to form.
14        THE WITNESS:  Because it was brought to
15   their attention, and they still refused to pay
16   it.
17   BY MR. DeJULIUS:
18     Q   Who's "they"?
19     A   The company.
20     Q   Who -- who at the company?
21     A   When you went to your boss and you told
22   them, "Hey, look.  I've been on call," and this
23   that, this that.  "Well, that's the way it is.
24   You're not getting paid.  Sometimes the bear gets
25   you, and sometimes you get the bear."  That's
```

260

```
 1   their answer.
 2        And I worked those hours and wasn't paid
 3   for them.  That -- that was wrong.  So, yes, in
 4   my opinion, they willfully did not pay us for
 5   something we earned.
 6     Q   Okay.  Is there any other basis for
 7   "willful" that you're aware of?
 8     A   Not that I can --
 9        MS. GIFFORD:  Same objections.
10        THE WITNESS:  Not that I can recall.
11   That's the one freshest in my mind.
12        THE REPORTER:  I'm sorry?
13        THE WITNESS:  That's the one most
14   freshest and dear to my mind.
15        (Discussion off the record.)
16   BY MR. DeJULIUS:
17     Q   If you can go to paragraph 19 -- I'm
18   sorry, paragraph 19 i.
19     A   That's on that same page.
20     Q   Yeah.  And it states:  Subclass I:
21   Defendant's policy was not to include all
22   remuneration, such as bonuses and commissions, in
23   the calculation of Plaintiffs' overtime.
24        Do you see that?
25     A   Yeah, I'm rereading it.  It doesn't make
```

261

```
 1   sense to me, but I'm trying to make sense out of
 2   it.
 3        I'm reading it.  But, yeah, go ahead.  I
 4   see it.
 5     Q   Are -- are you aware of any instances
 6   where defendants -- when I say "defendants" --
 7   are you aware of any instances where Alderwoods
 8   did not include bonuses and commissions in the
 9   calculation of overtime?
10        MS. GIFFORD:  Same objections.
11        THE WITNESS:  I can speak personally.  I
12   was never paid overtime based on my commissions
13   and -- and bonuses.  They were paid separately.
14   BY MR. DeJULIUS:
15     Q   When you were an hourly employee?
16     A   Correct.  And my overtime was based
17   solely on my hourly wage.
18     Q   Okay.  And do you know when you were MGM
19   how overtime was calculated?
20     A   On your hourly wage.
21     Q   Was -- did it include bonuses or
22   commissions at that time?
23     A   No.
24     Q   When did you become aware -- was that a
25   policy that Alderwoods had?
```

# Exhibit 21

**NETWORK DEPOSITION SERVICES**
**Transcript of Deborah Prise**

1

```
 1          IN THE UNITED STATES DISTRICT COURT FOR THE
                WESTERN DISTRICT OF PENNSYLVANIA
 2
                         - - - -
 3
    DEBORAH PRISE and HEATHER RADY )
 4  on behalf of themselves and all)
    employees similarly situated,  )
 5                                  )
                   Plaintiffs,      )
 6                                  )
                   -vs-             )  Civil Action
 7                                  )  No. 06-1641
    ALDERWOODS GROUP, INC.,         )
 8                                  )  Judge Joy Flowers
                   Defendant.       )
 9
                         - - - -
10
                        VOLUME I
11
                         - - - -
12
            DEPOSITION OF:  DEBORAH PRISE
13
14          DATE:     November 6, 2008
                      Thursday, 9:59 a.m.
15
16          LOCATION:  JONES DAY
                       One Mellon Bank Center
17                     500 Grant Street, 45th Floor
                       Pittsburgh, PA  15219
18
19          TAKEN BY:  Defendant
20
21          REPORTED BY:  Catherine C. Leverty
                          Notary Public
22
                         - - - -
23          NETWORK DEPOSITION SERVICES
                   The Gulf Tower
24          707 Grant Street, Suite 1101
            Pittsburgh, Pennsylvania  15219
25                 412-281-7908
```

126

1     approve it and it was communicated to us at
2     least numerous times by at least Pat McDermott
3     as Alderwoods policy; I believe that to be the
4     truth.
5  Q. Getting back to what I asked before, your only
6     basis for believing that it was a nationwide
7     policy was that Pat McDermott told you that it
8     was an Alderwoods policy, then?
9  A. At least Pat McDermott, at least Pat McDermott.
10 Q. Can you think of anybody else who actually told
11    you it was an Alderwoods policy?
12 A. Not at this time.
13 Q. When you were working at Alderwoods, Ms. Prise,
14    did you make copies of any Alderwoods policies
15    to take home with you?
16 A. I don't recall.
17 Q. Did you review the motion your attorneys filed
18    for conditional certification at the outset of
19    this case?
20 A. I'm sure I did.
21 Q. As part of that review did you review the
22    policies that your counsel attached as exhibits
23    to that motion?
24 A. I don't remember, it's some time ago.
25 Q. Let me ask you about the next thing you say in

127

1     your affidavit, Ms. Prise. You speak about a
2     training policy; do you see that, on page 4?
3  A. Page 4, yes.
4  Q. Paragraph 25, you say that defendants maintained
5     a company-wide policy requiring licensed funeral
6     directors to train for and become licensed
7     insurance agents in states where pre-need
8     funeral sales could be funded by insurance?
9  A. Yes.
10 Q. It looks like licensed -- licensed funeral
11    directors, when you say that, is there a
12    difference between licensed and unlicensed
13    funeral directors, or are all funeral directors,
14    to your knowledge, licensed?
15 A. The terminology is licensed funeral director, so
16    that's just terminology. Like all my business
17    cards, I think it says licensed funeral
18    director, it's just a term.
19 Q. Was it your understanding that all Alderwoods
20    funeral directors in Pennsylvania had to become
21    licensed insurance agents?
22 A. I'm sorry, could you --
23 Q. Sure. Is it your understanding that while you
24    were with Alderwoods that all funeral directors
25    in the state of Pennsylvania had to become

128

1     licensed insurance agents?
2  A. We were told in a meeting that upper
3     management -- you know, because upper management
4     would send things down for us to learn in these
5     meetings, made a new requirement that all of us
6     had to have life insurance licenses.
7  Q. And when was that?
8  A. I don't remember, I'd have to review records, I
9     don't remember. I could tell you that if you go
10    through the IBIS records, we were given an IBIS
11    incentive to do it by a certain deadline, so
12    it's before I got my IBIS points for it.
13 Q. But you say it was a requirement; correct?
14 A. Correct.
15 Q. Were you told that it was a requirement?
16 A. Yes.
17 Q. That all Pennsylvania funeral directors obtain
18    insurance licenses?
19 A. I don't know if those are the exact words, but
20    that's the gist of it.
21 Q. Who told you that?
22 A. Pat McDermott, at least Pat McDermott, are
23    because -- no, no, these -- there's lots of
24    redundancy in our communications and, you know,
25    I would like to say I didn't know I'd need to

129

1     remember all these specifics at a time in the
2     future and I remembered the message.
3  Q. I understand, I understand you're not going to
4     remember every detail, I'm just asking you to
5     the best of your recollection.
6             What we're getting at, essentially,
7     is what formed the basis for what you said in
8     your affidavit, so I'm just trying to
9     understand, when you say in paragraph 25 that
10    there was this company-wide policy that they
11    obtain insurance licenses, what, in your mind,
12    supports that.
13 A. The meetings, plus, if you look at the annual
14    reports from around that time, and I can't tell
15    you what that time is, but I remember also
16    seeing in the annual reports, and town hall
17    meetings, that we were making a big push to make
18    revenues in pre-need sales, it was a
19    company-wide initiative.
20 Q. So was it the case that all the funeral
21    directors you worked with at Hirsch Funeral Home
22    had their licenses?
23 A. Some of them didn't pass the test.
24 Q. Who didn't pass the test?
25 A. Michael Hilgefort failed the exam, I think

**Johnstown**
**814-266-2042**

**Toll-Free**
**866-565-1929**

**Pittsburgh**
**412-281-7908**

# Exhibit 22

1

```
 1          IN THE UNITED STATES DISTRICT COURT FOR THE
                 WESTERN DISTRICT OF PENNSYLVANIA
 2
                          -  -  -  -
 3
    DEBORAH PRISE and HEATHER RADY )
 4  on behalf of themselves and all)
    employees similarly situated,  )
 5                                  )
                    Plaintiffs,     )
 6                                  )
                  -vs-              )  Civil Action
 7                                  )  No. 06-1641
    ALDERWOODS GROUP, INC.,         )
 8                                  )  Judge Joy Flowers
                    Defendant.      )
 9
10                        -  -  -  -
11          DEPOSITION OF:  HEATHER RADY
12                        -  -  -  -
13
                    DATE:    November 7, 2008
14                           Friday, 10:15 a.m.
15
                    LOCATION:  JONES DAY
16                             One Mellon Bank Center
                               500 Grant Street, 45th Floor
17                             Pittsburgh, PA  15219
18
                    TAKEN BY:   Defendant
19
20                  REPORTED BY:  Catherine C. Leverty
                                  Notary Public
21
22
                          -  -  -  -
23          NETWORK DEPOSITION SERVICES
                   The Gulf Tower
24          707 Grant Street, Suite 1101
            Pittsburgh, Pennsylvania  15219
25                   412-281-7908
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Heather Rady**

11 (Pages 38 to 41)

38

1     your time by Alderwoods?
2   A.  Mr. McDermott, at a staff meeting, I believe,
3     laid some ground rules once we got the time
4     clocks.
5   Q.  Do you recall being trained, before the time
6     clocks, about how to keep track of time?
7   A.  I was just given the appropriate form which we
8     handwrote our hours on and told to document the
9     hours.
10  Q.  When you got the time clock and you had to
11    submit them to Mr. McDermott what sort of
12    instructions did you receive about the time
13    clocks?
14  A.  We were told we couldn't clock in, I think it
15    was seven minutes, prior to our shift starting,
16    because, again, that's overtime, or unnecessary
17    overtime, so I think we had a window of seven
18    minutes before or seven minutes after our shift
19    to clock in.
20  Q.  So if you were scheduled from 9:00 to 5:00,
21    don't clock in before 8:53?
22  A.  Correct.
23  Q.  And don't clock out after 5:07?
24  A.  Correct.
25  Q.  What would happen if you started work before

39

1     9:00 o'clock, if you started at 8:45?
2   A.  And you did punch in, or you just showed up and
3     started working?
4   Q.  Was there any instruction about what to do if
5     you came in before your regularly scheduled
6     shift?
7   A.  You needed to get approved overtime.
8   Q.  Before you clocked in?
9   A.  Correct.
10  Q.  Could you get approval after you clocked in?
11  A.  You mean for the overtime that you may have
12    already worked prior to clocking in?
13  Q.  Right -- well, I am thinking of an example where
14    perhaps you were scheduled from 9:00 to 5:00,
15    you're not supposed to clock in before 8:53 but,
16    for whatever reason, you had something to do in
17    the morning and you would have come in at 8:30;
18    could you clock in at 8:30 and then get a
19    manager's approval at the end of the day for the
20    extra 30 minutes?
21  A.  I don't know, I don't know if that was the case
22    or not. It was just sort of the overall
23    understanding that what you were doing before
24    your official start time was volunteer time, if
25    you will.

40

1   Q.  How did you come to that understanding?
2   A.  I think that Mr. McDermott mentioned one time --
3     and it's hard to say because there were often
4     times when you needed to do that, to show up
5     early and begin working, but you just kind of
6     understood that it was part of the job.
7   Q.  What I'm trying to figure out is why would you
8     have this understanding?  Did someone tell that
9     to you?  Where do you think this came from?
10  A.  Well, just, first of all, the instruction that
11    you're not permitted to clock in prior to your
12    shift and you needed to clock out at your
13    scheduled time, or your scheduled finishing time
14    at the end of the day, and we were to ask for --
15    we had to have preapproved overtime, which, to
16    me, indicates that it needs to be approved
17    before you do it.
18  Q.  Now, were there occasions when you were a
19    funeral director or an apprentice that you
20    performed work before you clocked in that you
21    never sought approval for?
22  A.  Oh, sure.
23  Q.  Would that happen frequently?
24  A.  Frequently.
25  Q.  Like how frequently?

41

1   A.  I would say very frequently during times that we
2     actually had funeral services scheduled, because
3     there's a lot of work involved with setting up,
4     and errands, and so forth, you know, surrounding
5     the funeral service.
6   Q.  So you were doing work that, clearly, needed to
7     be done because it was related to a service;
8     right?
9   A.  Oh, sure.
10  Q.  So if the work needed to be done where -- didn't
11    you think you could go to a manager and tell
12    them that, you know, I have all this work I'm
13    going to have to do, I have all this work I have
14    to do early, I need to get the time approved,
15    did you ever do that?
16  A.  I think one time I was questioned after I had --
17    I had stayed late to wash cars, Mr. McDermott
18    had questioned why I didn't leave until 11:00,
19    and I told him that I was washing the cars in
20    preparation for the next day's service, and he
21    said well, you know, you could have gotten that
22    done in the morning, or a student could have
23    done that in the morning, but my position was
24    you have to anticipate the worst happening over
25    the night, we could have ended up with three

Johnstown
814-266-2042

Toll-Free
866-565-1929

Pittsburgh
412-281-7908

**NETWORK DEPOSITION SERVICES**
**Transcript of Heather Rady**

16 (Pages 58 to 61)

---

58

1  Bruce was only with the company, I believe, only
2  eight months.
3  Q.  When did you have this town hall meeting with
4  Ron Collins where community service was
5  discussed?
6  A.  Without looking at notes or documents I can't
7  tell you for sure.
8  Q.  Do you recall who else was present at that
9  meeting?
10  A.  I recall some of the staff members that were
11  present: Claudia Young was there, myself,
12  Pat McDermott, one of the part-timers, John
13  Foder, was there, Tom Mills, and I believe that
14  Michael Hilgefort was there.
15  Q.  These were people in the Pittsburgh market; is
16  that right?
17  A.  Correct.
18  Q.  It wasn't people from Ron Collins' entire
19  geographic area of responsibility?
20  A.  No.
21  Q.  And that town hall meeting that you just
22  referred to, it's at that meeting that you
23  recall him saying that employees needed to
24  belong to community organizations?
25  A.  Do I recall him?

---

59

1  Q.  In that meeting that you just described?
2  A.  Yes.
3  Q.  Was there ever any written policy, to your
4  knowledge, that said that employees need to
5  belong to at least one outside community
6  organization?
7  A.  Well, in the policies and procedures manual it's
8  written that we are to belong to an outside
9  organization, again, whether we put one
10  organization or ten organizations I don't know,
11  I don't know that there was a number placed upon
12  it.
13  Q.  Now, what are these policies and procedures
14  manuals you're referring to?  Can you describe
15  them in any more detail?
16  A.  They are a series of, I believe five binders,
17  and they were to be located in an area where all
18  employees had access to them at any time.  If
19  there was ever a question regarding policy or
20  procedure you could refer to these manuals.
21  Q.  Were they, like, three-ring binders?
22  A.  Yes.
23  Q.  And you had access to those binders in the
24  course of your employment at Alderwoods?
25  A.  I did.

---

60

1  Q.  And so you had a policy there that said you had
2  to belong to outside community organizations?
3  A.  Yes.
4  Q.  Do you recall what section of the binders that
5  was in?
6  A.  No, I don't even remember which binder.
7  Q.  Did you ever make a copy of that policy?
8  A.  I believe that I did.
9  Q.  Did you ever provide that policy to any of your
10  attorneys?
11  A.  I believe so.  I have so many documents, and I
12  believe that that one was included in those
13  documents.
14  Q.  Did anyone ever discuss this community work
15  policy with you after the meetings that you had
16  with Pat McDermott and the town hall meeting
17  with Ron Collins?
18  A.  It was discussed personally, it was just an
19  ongoing thing.  At several of the staff meetings
20  there was incentives through IBIS points, if you
21  joined an organization you would be awarded so
22  many points, so it was an -- ongoing,
23  continuing.
24      And the Collins Call-In Shows that
25  Ron Collins hosted, I believe once a month,

---

61

1  employees were encouraged to share so that if it
2  was an idea or an organization that others could
3  draw from, you know, they were, of course,
4  encouraged to share.
5  Q.  Now, did Pat McDermott ever tell you in any
6  meeting that employees who belonged to community
7  organizations would not be compensated for the
8  time they spent with those community
9  organizations?
10  A.  He did not use the word community organization,
11  he had made the comment that you're only paid
12  for the hours you work while you're in the
13  building.
14  Q.  Did you ever seek approval from Pat McDermott
15  for time spent doing community service work for
16  Alderwoods?
17  A.  No, I believe after the policies changed, and
18  again, I'm uncertain when the policy did change,
19  I'm thinking of a time when we did a petting zoo
20  for the 4th of July weekend, I believe one year
21  I was not paid for it, and then the policy
22  changed and the next year I was paid for that
23  time.
24  Q.  So that's an example of you being paid for time
25  you worked outside the Alderwoods facility?

---

**NETWORK DEPOSITION SERVICES**
**Transcript of Heather Rady**

18 (Pages 66 to 69)

66

1   Q. Were you expected to go, outside of normal work
2      hours, and find people who would be a community
3      influencer to report back to Alderwoods?
4   A. No, we were required to join organizations, but
5      not specifically to go find people.
6   Q. Okay. So if you found someone on your personal
7      time, say a hospice worker, and you thought they
8      would be a good contact, you would report that
9      to your manager?
10  A. Sure, personal or work time.
11  Q. Were you expected, after you reported that
12     person to your manager, to follow up with the
13     person to maintain the contact?
14  A. I would expect that they would.
15  Q. That the manager would?
16  A. Yes.
17  Q. You say, in paragraph 11, that defendants
18     required hourly employees to keep track of their
19     community work?
20  A. Correct.
21  Q. How were you supposed to keep track of your
22     community work?
23  A. It was really at our discretion. As I had
24     mentioned earlier, I just used a calendar and
25     then photocopied the calendar of -- my

67

1      appointments.
2   Q. You go on to say that you were expected to
3      provide detail on who the community work was
4      with and how that community influencer rated in
5      terms of importance to the community; did you do
6      that?
7   A. Only to the point where I would provide detail
8      on who the community work was with, but the
9      community influencer ratings were something more
10     that the managers were responsible for.
11  Q. When you say managers, are you referring to
12     location managers?
13  A. Yes, location managers, regional managers.
14  Q. Was there ever a written policy, to your
15     knowledge, that required location managers to
16     maintain the community influencer sheets?
17  A. That information, I would not have been privy
18     to.
19  Q. In paragraph 14 you say that defendants rewarded
20     employees who engaged in community work by
21     giving them incentive points?
22  A. Correct, yes.
23  Q. But you were also compensated for at least some
24     of your community work; is that right?
25  A. I believe at the very end of my employment.

68

1   Q. Was the petting zoo that you discussed earlier,
2      was that at the end of your employment?
3   A. We did that, I believe in 2005 and 2006, so,
4      yes.
5   Q. So when you say -- you said you believe you were
6      compensated at the very end of your employment?
7   A. Correct.
8   Q. At the very end of your employment were you
9      being compensated for all community work time?
10  A. My community work changed. I can't recall if I
11     was compensated for the B'nai Zion dessert
12     reception that we had gone to.
13        I know for sure that I wasn't
14     compensated for using a vehicle or for parking,
15     you know, fees associated with attending these
16     events, and I know for certain at the beginning
17     of my employment, when I was active with WQED,
18     that I was not compensated for the work.
19        Rotary, yes, because that occurred
20     during my work hours.
21  Q. But you know for a fact that there was some work
22     outside your normal work hours in 2006 that
23     you -- community work, that you were compensated
24     for; is that right?
25  A. Correct.

69

1   Q. Do you know how Alderwoods determined what work
2      you would be compensated for and what work you
3      would not be compensated for?
4   A. No, I don't.
5   Q. Did you ever ask anyone?
6   A. I'm thinking of a particular experience, but I
7      don't know if -- I had dealt with a call in
8      which a family had, literally, kept me up all
9      night, and they -- now, at that time we were not
10     paid for our on-call work, but, truly, when I
11     showed up for work the following morning I was
12     tired, I wasn't thinking clearly, and I told
13     Mr. McDermott that I want to be paid for those
14     hours during the night that I was up with this
15     family.
16        On that occasion I was paid, and then
17     after that I was not for any other calls that I
18     attended to during the night or morning.
19  Q. But would you consider that to be community
20     work?
21  A. No, no.
22  Q. Is it your claim in this case that Alderwoods
23     had a company-wide policy not to compensate
24     employees for community work?
25  A. Company-wide they were not compensating us for

70

1    community work.
2    Q. How do you know that?
3    A. I had been in contact with the funeral directors
4       in West Virginia when they came up for a
5       pre-need training, I guess you could call it,
6       and I think it was just the overall feeling and
7       consensus that we were expected to do a lot but
8       we weren't being paid for it.
9    Q. Did the funeral directors you spoke to from West
10      Virginia tell you they weren't being paid for
11      it?
12   A. I don't think they specifically said that.
13   Q. How do you know whether funeral directors in
14      other locations weren't being paid for community
15      work?
16   A. I recall reading affidavits of, I think, two
17      gentlemen in this case in which they indicated
18      they were not paid for such work.
19   Q. Putting aside the affidavits in this case, while
20      you were an employee at Alderwoods was it your
21      understanding that there was a company-wide
22      policy not to pay employees for community work?
23   A. I just knew that we were not, I never saw a
24      written policy, but I just knew that we were
25      not.

71

1    Q. When you say we, you knew that you were not;
2       correct?
3    A. Correct.
4    Q. Did you know what was going on in other states?
5    A. Not firsthand, no.
6    Q. Did you speak, outside of this example you gave
7       with the West Virginia people, did you speak
8       with funeral directors from other states?
9    A. There were -- we're talking strictly about
10      community service?
11   Q. Right.
12   A. No.
13   Q. Did you report to any of your managers which
14      community organizations you belonged to?
15   A. I did.
16   Q. And which ones were those, that you can recall?
17   A. WQED.
18   Q. And what does that stand for?
19   A. Channel 13, it's a public radio and broadcast
20      station here in Pittsburgh, WQED.
21         Pittsburgh Young Professionals, B'nai
22      Zion -- I wasn't a member of B'nai Zion, but
23      attended the dessert reception and awards
24      banquet.
25         The Rotary Club, and I think there

72

1    was one or two occasions when Deborah and I may
2    have attended a hospice event at Charles Morris
3    Center.
4    Q. Now, was your membership or your affiliation
5       with all of those organizations that you just
6       mentioned, was that done for the benefit of
7       Alderwoods, in your opinion?
8    A. In my opinion, yes.
9    Q. And WQED, how did that benefit Alderwoods?
10   A. I would go and answer telephones during their
11      campaigns, which were broadcast on TV, and what
12      they would do, they would announce that we have
13      volunteers here from the H. Samson Funeral Home,
14      Jones Day law firm, and so getting our name out
15      there, I thought, was a positive way of
16      advertising our business.
17   Q. And you reported that to your supervisors?
18   A. Yes, on those, you know -- the calendar that I
19      would photocopy and fax at the end of each
20      month.
21   Q. And would the calendar, would it indicate the
22      number of hours you spent doing those
23      activities?
24   A. I think that it did, I think that it did.
25   Q. Would it indicate the time of day you spent

73

1    doing those activities?
2    A. I think so.
3         MR. McGEE: Can you guys speak up a
4       little bit? I got an e-mail, people are having
5       trouble hearing you. It would help if you would
6       speak up for the people on the phone.
7         THE WITNESS: Sure.
8    BY MR. KNIGHT:
9    Q. The calendars you gave to your supervisors, did
10      they include personal information in addition to
11      the Alderwoods work, community work you were
12      doing?
13   A. Personal information such as?
14   Q. Personal appointments, doctors appointments,
15      what have you.
16   A. Doctors' appointments, things like that, had to
17      be approved by our managers.
18   Q. What I'm asking is would you copy all of that
19      information on the same calendar so --
20   A. No, I would not.
21   Q. So that calendar you gave only related to
22      community work?
23   A. Correct.
24   Q. And do you know what Mr. McDermott did with
25      those calendars, I think I asked you that

Johnstown
814-266-2042

Toll-Free
866-565-1929

Pittsburgh
412-281-7908

**NETWORK DEPOSITION SERVICES**
**Transcript of Heather Rady**

21 (Pages 78 to 81)

---

78

1  Q.  You took phone calls when you were on call;
2     correct?
3  A.  That's correct, yes.
4  Q.  And you're claiming you were not compensated for
5     taking the phone calls?
6  A.  That is correct.
7  Q.  What other types of work would you do on call
8     that you were not compensated for?
9  A.  Sometimes make removals, but just the on-call
10    process, itself, dealing with the families, and,
11    in the case of orthodox Jews who want to bury
12    within 24 hours, I mean, that involves a lot of
13    work, calling rabbis, cemetery caretakers,
14    gravediggers, you can be on the phone for
15    several hours, and it didn't matter if it was
16    3:00 in the morning or 10:00 at night.
17 Q.  You said removals, as well?
18 A.  Correct.
19 Q.  Would you get compensated for removals that you
20    would do?
21 A.  I would not.
22 Q.  You say I would not; what do you mean, just you,
23    was that unique to you?
24 A.  Well, I never, you know, asked Deborah or
25    Michael -- I didn't make very many removals, but

---

79

1     if it were necessary I would.  That's,
2     basically, what we had the students around for.
3  Q.  When you would make a removal would you have to
4     come into the funeral home?
5  A.  Correct.
6  Q.  And when you came in you did not punch in?
7  A.  No.
8  Q.  Why not?
9  A.  I made very few.
10 Q.  For the few that you did why did you not punch
11    in?
12 A.  I live about 45 miles away from my work, so
13    again, that's why students are employed, to sort
14    of offset, or help with the responsibilities
15    during the night.
16 Q.  But just talking about the few instances where
17    you had to make removals and you had to come to
18    the funeral home, why didn't you clock in when
19    you got to the funeral home?
20 A.  It was just sort of understood that that was
21    part of your job and it was what you needed to
22    do to get the job done.
23 Q.  Well, you needed to come to the funeral home;
24    correct?
25 A.  Correct, to get a vehicle.

---

80

1  Q.  But in order to do that you could have, in
2     theory, have clocked in and still gotten the job
3     done?
4  A.  Correct.
5  Q.  But you say it was understood that you weren't
6     supposed to?
7  A.  Um-hm.
8  Q.  Why was it -- how did you come to that
9     understanding?
10 A.  That it's just part of my job, and just as with
11    showing up early to make sure that bodies were
12    cosmetized and presentable for viewing, it was
13    just what you did.
14 Q.  Did anyone ever tell you not to clock in when
15    you came to the funeral home for a removal?
16 A.  Well, Mr. McDermott didn't specifically say for
17    removals, but he said you're only paid for the
18    work that you do while you're in the building.
19 Q.  I'm talking about a removal where you're
20    actually coming to the building and you have to
21    do work, perhaps, at night?
22 A.  Right.
23 Q.  So why wouldn't you have clocked in for that
24    time?
25 A.  Again, it's just understood that it's beyond the

---

81

1     normal work hours, the 9:00 to 5:00 work hours,
2     and so I just did not.
3  Q.  You testified earlier there was some work that
4     you did outside of normal work hours that you
5     would be compensated for, --
6  A.  Correct.
7  Q.  -- so what's so different about making the
8     removal?
9  A.  Well, again, the policy change, and I can't
10    pinpoint what year or what policy that changed,
11    but that's when -- and I'm calling them the
12    addendums, but that's when we had to start
13    tracking everything, even if somebody had called
14    the funeral home for -- they wanted to know
15    viewing times and you spent 30 seconds on the
16    phone, you had to write that information down.
17 Q.  Okay.  And at that point did you start punching
18    in when you were coming to the funeral home at
19    night?
20 A.  I don't know while we had the time clocks that I
21    ever made a removal, I can't be certain.
22 Q.  Were there any occasions prior to you getting
23    time clocks where you made a removal and you
24    recorded that time on your time sheet so it
25    would be paid?

---

**Johnstown**
**814-266-2042**

**Toll-Free**
**866-565-1929**

**Pittsburgh**
**412-281-7908**

**NETWORK DEPOSITION SERVICES**
**Transcript of Heather Rady**

23 (Pages 86 to 89)

86

1    enough.
2    Q.  So when we're looking at this time sheet from
3        November of 2005, do you believe that this time
4        sheet comes prior to the on-call logs coming
5        into effect?
6    A.  It may have, I'm not sure.
7    Q.  Is there any reason you would have recorded your
8        time on this -- your death call time on this
9        hourly time sheet if you were also recording it
10       on a call log?
11   A.  We would not have made that duplicate entry.
12   Q.  Okay.  Do you know whether you were paid for the
13       two hours you added on Tuesday, November 22nd,
14       from 2:30 to 4:30 a.m.?
15   A.  Well, it appears that Pete approved it, but
16       without seeing the actual pay log for that week
17       I don't know, but I would assume so because Pete
18       approved that.
19   Q.  You also mentioned, I think, earlier, that there
20       was a time when you said you stayed up all night
21       on a call with a family that Pat McDermott paid
22       you for; correct?
23   A.  Yes, that's correct.
24   Q.  So there were occasions when you were doing --
25       taking calls at night even before the time

87

1    sheets came out, that the call logs came out,
2    that you reported that time and you were
3    compensated for that time?
4    A.  One time that I can -- will never, never forget.
5    Q.  Well, we also have the time on your 11-26-05
6        time sheet?
7    A.  Yes, and I don't deny that, but I needed this
8        paper to refresh my recollection (indicating);
9        the William Balter case, I will never forget.
10   Q.  Because that was an all-night call?
11   A.  Yes.
12   Q.  Could there have been other times when you wrote
13       onto your time sheet time that you spent taking
14       calls or doing removals at night?
15   A.  There may have.
16   Q.  And if you did that, you don't recall any
17       occasion where you were told you would not be
18       compensated for that time that you wrote in?
19   A.  I don't recall.
20   Q.  You say in paragraph 17 of your affidavit that
21       defendants did not compensate me or other
22       employees for time spent engaging in on-call
23       activities; what other employees are you
24       referring to there?
25   A.  I'm referring to all of the other hourly funeral

88

1    directors who performed on-call duties.
2    Q.  Are you referring to hourly funeral directors in
3        the Pittsburgh market or --
4    A.  As well as nationwide.
5    Q.  How do you know that Alderwoods wasn't
6        compensating other funeral directors nationwide
7        for on-call duties?
8    A.  Well, I don't know for sure, but I can't believe
9        that they would allow Pat McDermott the autonomy
10       to make that decision just for the Pittsburgh
11       market.  Again, Alderwoods is a national
12       corporation, and so I can't believe that they
13       would allow Pat McDermott to say Pittsburgh
14       funeral directors aren't paid for call time.
15   Q.  But you were paid for some of your call time?
16   A.  Some.
17   Q.  So Pat McDermott was paying for some of your
18       call time but not other of your on-call time?
19   A.  Correct.
20   Q.  So was there a company-wide policy that said
21       that market general managers are supposed to pay
22       for some on-call time but not other on-call
23       time?
24   A.  I wouldn't think that it would be a
25       discretionary policy.

89

1         I was very upset about the William
2    Balter case, I, literally, was up all night, and
3    though we were not, as a practice, paid for
4    on-call time during the night, I was up all
5    night.  I couldn't call off work the next day
6    because we had funerals and I had to be present,
7    follow through with this Balter call that I had
8    taken through the night, so when I arrived at
9    work, like I had mentioned, I was shaking from
10   being up all night, just very tired and not
11   thinking clearly, so I wanted paid for my time.
12   Q.  And you went to whom?
13   A.  To Pat McDermott.
14   Q.  And he paid you; right?
15   A.  He said, I believe he said that he'll have to
16       talk to John Blute, and then, yes, ultimately I
17       was paid for that time.
18   Q.  Prior to the time when you were keeping call
19       logs did you ever ask Pat McDermott on any other
20       occasions to compensate you for work you did
21       while on call?
22   A.  I don't know if I did or not, I just remember
23       him reinforcing the statement that you're only
24       paid for hours spent working inside the
25       building, whether that would mean another

**Johnstown**
**814-266-2042**

**Toll-Free**
**866-565-1929**

**Pittsburgh**
**412-281-7908**

NETWORK DEPOSITION SERVICES
**Transcript of Heather Rady**

24 (Pages 90 to 93)

---

**90**

1  funeral director or all of us, collectively,
2  complaining to him, I can't recall, but that
3  will be forever ingrained in my mind, you're
4  only paid for the time spent working inside the
5  building.
6  Q.  Did anyone other than Pat McDermott ever make
7  this statement to you, that you'd only get paid
8  for time spent in the building?
9  A.  No, not that particular statement, no.
10  Q.  What other funeral directors in other Alderwoods
11  homes told you that they were not paid for time
12  spent on call?
13  A.  I remember having conversation with a funeral
14  director in Ohio, though his name escapes me
15  now, but we were doing a shipout to him, and I
16  remember being frustrated at not being able to
17  get in touch with him, and when we finally had
18  the opportunity to connect and talk I remember
19  him lamenting that he's the only person going
20  between two locations and he's overworked, he's
21  underpaid.
22      I remember talking with, I think her
23  name is Elaine Lista, in New York, same kind of
24  thing, with the new policies, you know, working
25  more, being underpaid, so I just -- I felt that

---

**91**

1  it was the general consensus of not only myself,
2  but other funeral directors, that we were
3  working a lot of hours and probably not being
4  paid for them.
5  Q.  But did this funeral director in Ohio tell you
6  that he was not getting paid for work he did
7  while on call, I'm asking a specific question?
8  A.  No, he, specifically, did not say that.
9  Q.  And what about New York funeral director?
10  A.  No, I just inferred from our conversation.
11  Q.  You inferred from a conversation in which they
12  said they were overworked and underpaid?
13  A.  Um-hm, and just, you know, having to join
14  community organizations, having families, how do
15  they juggle that responsibility, sort of thing.
16  Q.  Do you have knowledge of any funeral directors
17  outside the Pittsburgh market who worked while
18  on call and did not get paid for it?
19  A.  Not direct knowledge, not that they came to me
20  and said Heather, I'm not getting paid for my
21  on-call time, and aside from reading the
22  affidavits, no, that was not verbally
23  communicated to me.
24  Q.  Did you ever see any written policy from
25  Alderwoods that said you would not be paid for

---

**92**

1  work performed while on call?
2  A.  Written policy, no.
3  Q.  You say in paragraph 19 that in July of '05,
4  approximately, defendants announced that they
5  would be changing their company-wide on-call
6  policy --
7  A.  Okay.
8  Q.  -- to provide employees compensation for phone
9  calls they were required to take after
10  completing their regular work schedules and
11  leaving the premises; is that right?
12  A.  That is correct, yes.
13  Q.  And that's the call log that we've talked about
14  earlier?
15  A.  Correct, and that may encompass the Exhibit
16  No. 2 that we looked at.
17  Q.  After July of 2005 did you, in fact, record all
18  of your time you spent working while on call?
19  A.  I will say most of it.  Again, those times that
20  you're showing up early to make sure that a body
21  is properly cosmetized I may not have put in,
22  you know, the total.  There were other times
23  when I had to pass our local registrar's
24  office -- she is the one, the woman who
25  processed the death certificates -- I would

---

**93**

1  swing by and drop things off on my way in to
2  work and I wouldn't record those hours.
3  Q.  I'm asking you specifically about on-call time?
4  A.  Oh, on-call time.  After 2005, or after July of
5  2005?
6  Q.  Were there ever any occasions where you didn't
7  record time you spent working on call?
8  A.  Not that I can recall.
9  Q.  Okay.  And after July 2005 were you -- I should
10  say in approximately July of 2005 were you
11  instructed by anybody that you had to record all
12  time you spent working while on call?
13  A.  Yes, I believe that was even a written policy,
14  or it became a written policy, at that point.
15  Q.  That's a written policy that was in the policies
16  and procedures binder?
17  A.  Yes.
18  Q.  Are you making any claims in this case for any
19  unpaid on-call work after July of 2005?
20  A.  I'm not certain how a request for damages is
21  structured.  It would be something I would need
22  to talk with my counsel regarding.
23  Q.  Well, do you believe as you sit here today that
24  you were not compensated for any on-call work
25  that you performed after July of 2005?

---

**NETWORK DEPOSITION SERVICES**
**Transcript of Heather Rady**

130

1  would get an answer for me.
2  Q.  So is it the case that your only knowledge of a
3  company-wide policy not to pay employees for
4  time spent obtaining and maintaining insurance
5  licenses is the fact that Pete Johnson didn't
6  agree to pay it to you when you sought it, when
7  you sought such pay?
8  A.  He didn't agree to not pay me, he said that he
9  would check or talk with Randy Amos and get back
10  to me, which he never did.
11  Q.  But is that your only basis for concluding that
12  it was a company-wide policy not to pay
13  employees?
14  A.  I know that Deborah Prise was not paid for her
15  time spent studying and training for her
16  insurance license.
17  Q.  Okay.  But is there any other basis for you to
18  conclude that there was a company-wide policy
19  not to pay for insurance licenses?
20  A.  No.
21  Q.  Okay.  Now, in paragraph 29 of your affidavit
22  you speak about the preapproval for overtime
23  policy?
24  A.  Yes.
25  Q.  You say under that policy hourly employees were

131

1  not compensated for overtime unless the overtime
2  was preapproved?
3  A.  Correct.
4  Q.  We've talked about that, but I notice that in
5  paragraph 29 you don't say that that was a
6  company-wide policy and you do say it for your
7  other allegations; is there any reason you
8  weren't claiming it was a company-wide policy in
9  your affidavit?
10  A.  No, in fact, I did not pick that fact out until
11  you brought it to my attention now.
12  Q.  Is it your claim it was a company-wide policy?
13  A.  Yes.
14  Q.  And what's your basis for concluding that it was
15  a company-wide policy not to compensate for
16  overtime unless it was preapproved?
17  A.  I just don't believe that Alderwoods, being a
18  national company, that Pittsburgh would be
19  singled out as the only area of the country not
20  paid for preapproved overtime, and I also
21  recall reading minutes from a meeting in which
22  Bruce Bills, he was the RGM at the time,
23  indicated that overtime would not be paid unless
24  it was preapproved, so Bruce, being Pat's boss
25  at the time, I don't believe would have just

132

1  implied that it was a Pittsburgh-only policy.
2  Q.  Well, while you were employed with Alderwoods
3  were you aware that there was a written policy
4  that said that employees will be paid for all
5  time worked?
6  A.  In the policy and procedures manuals, yes.
7  Q.  So you're aware that that policy existed?
8  A.  Correct.
9  Q.  Are the policies in the policies and procedures
10  manual company-wide policies?
11  A.  They are.
12  Q.  So it wasn't a company-wide policy that
13  employees wouldn't be paid for all time worked?
14  A.  Well, that may have been what it said, but did
15  they follow through with it?  No, I don't
16  believe so.
17  Q.  So you believe that all markets throughout the
18  United States failed to comply with that policy?
19  A.  Yes.
20  Q.  What's your basis for concluding that markets
21  outside of Pittsburgh failed to comply with that
22  policy?
23  A.  Just the affidavits that I have read.
24  Q.  I'm speaking from your own personal knowledge?
25  A.  My own personal knowledge, I do not know.

133

1  Q.  In paragraph 30 of your affidavit you state that
2  the defendants maintained a written policy on
3  preapproval for overtime in their policies and
4  procedures binder?
5  A.  Correct.
6  Q.  Did this written policy state that overtime
7  would not be -- overtime that was not
8  preapproved would not be compensated?
9  A.  To the best of my memory, I don't believe so.  I
10  don't have a copy of it here in front of me, but
11  I don't believe so.
12  Q.  Maybe we can refresh your recollection.
13        - - - -
14  (Rady Exhibit No. 6 marked for identification.)
15        - - - -
16  BY MR. KNIGHT:
17  Q.  I'm going to hand you Exhibit 6, Ms. Rady.  Now,
18  Exhibit 6 is a document that has -- appears to
19  have funeral home procedures; do you see that at
20  the top of the page?
21  A.  Yes.
22  Q.  It says recording time worked, below that
23  (indicating)?
24  A.  Correct.
25  Q.  Before I ask you about this document, is this a

**Johnstown**
**814-266-2042**

**Toll-Free**
**866-565-1929**

**Pittsburgh**
**412-281-7908**

# Exhibit 23

```
 1           IN THE UNITED STATES DISTRICT COURT
      FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2
      DEBORAH PRISE AND HEATHER RADY ON BEHALF OF THEMSELVES
 3    AND ALL EMPLOYEES SIMILARLY SITUATED,

 4           Plaintiffs,

 5
      vs.                     Civil Action No.  06-1641
 6
      ALDERWOODS GROUP, INC.,
 7
             Defendants.
 8

 9           DEPOSITION OF JACK REDDICK
             TAKEN ON BEHALF OF THE DEFENDANT
10    ON AUGUST 29, 2009, BEGINNING AT 8:00 A.M.
             IN COFFEEVILLE, KANSAS
11

12                     APPEARANCES

13
      On behalf of the PLAINTIFFS: ANNETTE M. GIFFORD Thomas &
14    Solomon, LLP 693 East Avenue Rochester, New York 14607

15    (585)272-0540 agifford@theemploymentattorneys.com

16

17    On behalf of the DEFENDANT: TONYA B. BRAUN Jones Day

18    325 John H. McConnell Blvd., Suite 600 Columbus, Ohio

19    43215-2673 (614)469-3939 tbraun@jonesday.com

20

21

22

23

24

25    REPORTED BY:  Cheryl J. O'Meilia, C.S.R.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Jack Reddick**

50

1    Q.  What other types -- so that would be a
2  conversation that you would have with -- with Mike?
3    A.  Right.
4    Q.  What other kind of conversations did you have
5  with Mike when he was on site?
6    A.  About buying equipment that I worked with
7  that we would need that broke down or something and --
8  from Alderwoods, it was like pulling eye teeth to get
9  anything repaired or to get the equipment replaced and
10  stuff.
11    Q.  What else would you talk to him about?
12  Anything else?
13    A.  No, that would be about it.
14    Q.  When Brent said -- talked to you about your
15  overtime, quote on --
16    A.  Who?
17    Q.  When -- I'm sorry.  Excuse me, I misspoke.
18      When Mike you said was on site and would say
19  something to you about your overtime, were you -- was
20  that when you were -- was that when you were part time?
21    A.  No.
22    Q.  Well, what were you at that point?
23    A.  Full time.
24    Q.  Okay.  And you said before you can't recall
25  when you -- you had a change in status from --

51

1    A.  No, I really don't.
2    Q.  -- part time to full time?
3    A.  No.
4    Q.  Okay.  But when Mike mentioned overtime to
5  you, it was after you had -- your status had changed to
6  full time?
7    A.  Well, to be honest with you, I was more or
8  less full time from the day I started, but I never did
9  -- I did not get paid except for my 29 or 30 hours.
10    Q.  When we use the term full time, what do you
11  understand that to mean?
12    A.  Well, I was told it was 30 hours, but I
13  generally would put in 35 to 40 hours.  Any employee at
14  Potts Chapel can tell you that.
15    Q.  And you say -- when you say you generally put
16  in 35 to 40 hours, are you saying you did that
17  throughout the time?
18    A.  Basically from the time I -- excuse me.
19    Q.  Oh, go ahead.  Basically from the time --
20    A.  Basically from the time I started.
21    Q.  Uh-huh, through?
22    A.  Until David got fired.
23    Q.  Until when?
24    A.  Until David got fired.
25    Q.  Until David got fired, you -- you were

52

1  averaging working between 35 and 40 hours?
2    A.  At least.
3    Q.  And then you said David got fired.  When was
4  that?
5    A.  Let's see, when we had a manager named Don
6  Runyon, and we were without a manager approximately six
7  months before Don, I believe, come aboard.  Paul was
8  there not quite -- I'm -- I'm talking to myself here.
9  Oh.
10    Q.  Well, it's all being recorded, just so you
11  know.
12    A.  I'm sorry.  Approximately six months before
13  Don Runyon came aboard as manager.  I don't know when
14  that was.
15    Q.  Well, when we talked about other people that
16  worked at the Potts Chapel location, I don't remember
17  you mentioning Don.
18    A.  Well, yeah, he was one of the managers.
19    Q.  Okay.
20    A.  And Paul Edmondson.  I'm sorry.
21    Q.  So your testimony is that David Hill was
22  terminated at some point?
23    A.  Yes.
24    Q.  Okay.  And then someone else came aboard and
25  took his place?

53

1    A.  Yes.
2    Q.  And that was who?
3    A.  Don Runyon.
4    Q.  So he was the manager of Potts Chapel in
5  Independence, Kansas?
6    A.  Uh-huh.
7    Q.  But you don't know what time period?
8    A.  No.
9    Q.  Well, when did Paul -- you mentioned a Paul
10  Edmondson.  Who was that?
11    A.  He came aboard a month before Paul came
12  aboard, approximately October of '06 or November of
13  '06, one of the two, approximately.  That was under SCI.
14    Q.  What happened to Don?  Did he leave?
15    A.  Yes.
16    Q.  Okay.  So your testimony is that you worked
17  approximately 30 to 40 -- 35 to 40 hours a week from
18  the time you were employed up until the time David, in
19  your words, got fired; is that correct?
20    A.  Uh-huh.
21    Q.  Did something change after David was
22  terminated?
23    A.  Yeah.
24    Q.  What happened?  What changed in --
25    A.  Well --

**NETWORK DEPOSITION SERVICES**
**Transcript of Jack Reddick**

90

1          MS. GIFFORD: Objection. Go ahead.
2     A.   That I did?
3     Q.   (BY MS. BRAUN)  Yes, that you did, that you
4    worked in excess of 40 hours in a work week at any
5    point in this July of 2004 to July of 2005 time period?
6     A.   Not on the this -- not on the time clock, no.
7     Q.   Okay.  Well, understand where I'm -- what I'm
8    asking.
9     A.   All right.
10    Q.   Are you claiming that you worked hours in
11   excess of 40 in any -- in any week in the time between
12   July of 2004 and July of 2005?
13         MS. GIFFORD: Objection. Go ahead.
14    A.   I don't recall.
15    Q.   (BY MS. BRAUN)  You don't know whether you
16   did?
17    A.   No.
18    Q.   Because you don't have any -- you don't have
19   any records of what you actually worked?
20    A.   Right.  Just by looking at this, there's --
21         MS. GIFFORD: But she's asking for your
22   recollection outside of this.
23    Q.   (BY MS. BRAUN)  But this can -- the document
24   is there to help you refresh.
25    A.   The times that I was gone is generally the --

91

1    what these low hours were.  I did work more than some
2    of these hours that are on here.  Well, I'm -- I mean,
3    were -- went to different functions.
4     Q.   What do you mean you went to different
5    functions?
6     A.   Events, bean feeds, club meetings and stuff
7    like that representing the funeral home.
8     Q.   So you did some -- some activities in --
9     A.   PR.
10    Q.   Some PR activities?
11    A.   Yes.
12    Q.   Public relations --
13    A.   Yeah.
14    Q.   -- activities?  Okay.  So -- okay.
15    A.   Yeah.
16    Q.   You're saying that you could have done some
17   work like that that's -- that's not on here?
18    A.   No, we did a lot of that, yes.
19    Q.   Okay.  But my question is -- is:  Are you
20   claiming in this litigation that you worked beyond 40
21   hours in a work week in the July of 2004 to July of
22   2005 time period?
23         MS. GIFFORD: Objection.
24    A.   I don't recall.
25    Q.   (BY MS. BRAUN)  You don't know whether you

92

1    did or not?
2     A.   No, I don't -- I don't have...
3     Q.   And how would you have any way of knowing at
4    this point whether you did or you didn't?
5     A.   By what I know I did.
6     Q.   Okay.  Well, let's just --
7     A.   I have no record of it.
8     Q.   Well, let's just look at a week.  Like if you
9    -- on the first week here in -- in July of -- 30, 2004
10   check date.
11    A.   All right.
12    Q.   It says that over a two-week period of time,
13   your hours recorded were 16.45?
14    A.   And that was only two days, I believe --
15    Q.   That was --
16    A.   -- the first time I worked.
17    Q.   Okay.
18    A.   Yes.
19    Q.   Okay.  So you wouldn't --
20    A.   On the clock.
21    Q.   Okay.  So in the next pay period of 8/13/2004
22   --
23    A.   Yes.
24    Q.   -- check date?
25    A.   I was in Kentucky.

93

1     Q.   Okay.  So you -- your hours there are 6.18?
2     A.   Right.
3     Q.   Okay.  So are you claiming that you worked
4    overtime during that pay period?
5          MS. GIFFORD: Objection.
6     A.   Not if I was gone.
7     Q.   (BY MS. BRAUN)  And you were gone?
8     A.   I believe I was.
9     Q.   What about in 8/27/2004 check date, your hours
10   reflected there are 10.83?
11    A.   That's August 27th.  I don't recall.  I don't
12   know if that's right or not.
13    Q.   Right.  In -- in looking here today, how
14   would you -- how would you know whether it's right or
15   not?
16    A.   Because I know how many -- I say I know how
17   many, I know what I did when I was there and I don't
18   know how David manipulated the clock and stuff like
19   that, but I worked several hours that I didn't get paid
20   for and I very rarely worked less than 20 hours or so a
21   week, very rarely.
22    Q.   Very rarely worked less than 20 in a week?
23    A.   Yes.
24    Q.   Okay.  But you say you know what you worked,
25   but if we're looking at a particular, you know, pay

**NETWORK DEPOSITION SERVICES**
**Transcript of Jack Reddick**

29 (Pages 110 to 113)

### 110

1 And maybe two days, depends on how much time you have.
2 Q. And no one had any complaints about that?
3 A. No.
4     MS. GIFFORD: Objection.
5 A. Alderwoods was happy.
6 Q. (BY MS. BRAUN) But Chad and -- and -- Chad
7 Wickem and John Keith, who had been complaining
8 previously, they were no longer complaining?
9 A. No. But John wasn't there when Don come.
10 Q. No, John Keith was gone at that point?
11 A. Yeah, uh-huh.
12 Q. Okay.
13 A. Because Don asked how -- how he -- how in the
14 world did you guys keep from getting chewed out so much
15 about this overtime, and that's when they -- he told
16 them and so I started doing the same thing.
17 Q. Do you know whether -- do you know how
18 employees at locations other than Potts Chapel recorded
19 their time?
20 A. Not really, no. I don't know how they do it.
21 I don't know if they had a time clock or not.
22 Q. Do you know whether they -- whether they
23 reported all of the time that they worked, employees at
24 other locations, do you know whether they would --
25 reported all their time worked?

### 111

1 A. I don't know.
2 Q. Do you know whether they were paid for all
3 the time that they recorded?
4 A. I think they were paid for the time they
5 recorded, if not, we'd have probably heard about it.
6 Q. You think you would have heard about it
7 otherwise?
8 A. Yeah, pretty close-knit bunch.
9 Q. And when you say a close-knit bunch, you mean
10 people outside of Potts Chapel?
11 A. Uh-huh, other funeral homes, just like any
12 business, you know, you're -- you're friends with all
13 of them.
14 Q. Did employees at other locations that you --
15 Oswego, Miami, that you mentioned, Wichita, did you
16 ever hear employees at other locations complain about
17 their pay?
18 A. Couple of them.
19 Q. Who was that?
20 A. Larry Wilson.
21 Q. And where was he working?
22 A. Oswego.
23 Q. What was his title?
24 A. Funeral director.
25 Q. And what was his complaint?

### 112

1 A. Trying to short him on his pay and stuff.
2 Q. Anything more specific --
3 A. Getting on --
4 Q. -- than that?
5 A. Getting on -- getting on to him for overtime.
6 Q. Did he say anything more specific to you?
7 A. No.
8 Q. Anyone else complain to you about their pay?
9 A. They wasn't complaining to me, they just told
10 me that they was tired of it. Larry did. He wasn't --
11 call it complaining, if you want, but he was just
12 saying he was getting tired of it. He's about
13 retirement age and he says, "I don't have to put up
14 with it."
15 Q. Did anyone else, other than Larry, complain or
16 otherwise comment on their pay to you?
17 A. No.
18 Q. Or their hours worked?
19 A. Everybody complains about their hours worked.
20 Yes, everybody complains about that.
21 Q. About just having to work in general?
22 A. Not complaining, but just stating the fact
23 that, you know, it's -- it's a 24/7 job.
24 Q. But no other complaints, other than Larry,
25 about pay?

### 113

1 A. No.
2 Q. And you never saw the time cards or time
3 sheets of employees at other locations?
4 A. Just Cherryville.
5 Q. Right, but those are the same people that
6 worked at Independence; correct?
7 A. Right, but they don't have a time clock.
8 Q. They used time sheets --
9 A. Time sheets.
10 Q. -- when you worked out there?
11 A. Uh-huh.
12 Q. But we're still talking about the same group
13 of people?
14 A. Yes.
15 Q. That we've already discussed that work at
16 Independence?
17 A. Right.
18 Q. Were you required to sign your time card?
19 A. Yes.
20 Q. And what did you understand the signature to
21 mean?
22 A. That we worked those hours.
23 Q. And did you believe that the hours that were
24 recorded were accurate sometimes?
25     MS. GIFFORD: Objection.

**NETWORK DEPOSITION SERVICES**
**Transcript of Jack Reddick**

45 (Pages 174 to 177)

174

1  asking you is like did anyone else ever say to you,
2  "Alderwoods required me to join," in Angela's case, the
3  horse riding club?
4      A.  No, I never -- I never asked and never heard
5  that.
6      Q.  And as an Alderwoods employee, did you ever
7  -- did you ask to be paid for the time you spent in the
8  community service organizations or attending particular
9  events?
10     A.  I told them -- I was told we wouldn't be paid
11 or I wouldn't be paid because it was a -- just a PR
12 thing, we should do it, you know, for the company.
13     Q.  Do you know what other individuals who worked
14 at Potts Chapel were told about whether they would be
15 paid for their community service organization or
16 activities?
17     A.  No.
18     Q.  You don't know what they were told?
19     A.  No.
20     Q.  Only what you were told?
21     A.  Yes.
22     Q.  Okay.  And would it hold true that you don't
23 know what employees at other locations may have been
24 told about whether they would be paid or could be paid
25 for community service organization activities?

175

1      A.  No, I wouldn't know.
2      Q.  Did you ever see any type of policy that
3  addressed involvement in community service activities?
4          MS. GIFFORD:  Objection.  Go ahead.
5      A.  Did I?
6      Q.  (BY MS. BRAUN)  Yes, did you ever see a
7  policy?
8      A.  No.
9      Q.  So you never saw anything in writing regarding
10 community service participation?
11     A.  There's -- in -- in the big folders that they
12 have, they had about half as long as this table here,
13 big wide policy manuals and stuff like that.
14     Q.  Uh-huh.
15     A.  There was something in there about community
16 -- community service or something like that, but I
17 can't tell you what it was.  I -- there was a policy
18 that had something to do with community service.
19     Q.  But you don't know what it said?
20     A.  No.
21     Q.  Did you ever read it?
22     A.  I read it and it had something to do with
23 serving the community and -- serving the community and
24 I can't remember what all -- all it said.
25     Q.  So sitting here today, you don't recall what

176

1  it said other than something about servicing the
2  community?
3      A.  Yes.
4      Q.  You don't recall it saying anything about
5  whether or not individuals would be paid for the time
6  they spent in community service?
7          MS. GIFFORD:  Objection.
8      A.  No.
9      Q.  (BY MS. BRAUN)  You don't recall that?
10     A.  I don't recall.
11     Q.  Okay.  Or whether they would be required to
12 join a community service organization?
13     A.  I don't recall -- or recall seeing that.
14     Q.  You don't recall seeing that in there?
15     A.  No.
16     Q.  Do you recall seeing anything that
17 individuals would be required to record their time
18 spent in community service activities?
19     A.  No?
20     Q.  No?
21     A.  No.
22     Q.  You described the community service sheet and
23 the fact that you completed it, but do you -- do you
24 know whether others completed it at Potts Chapel?
25     A.  No, I don't know if they did or not.

177

1      Q.  Did you ever see anyone else's completed --
2  completed community service sheet?
3      A.  I saw the sheets, each one of them had it.  I
4  don't know if they completed it or not.
5      Q.  Did you always complete yours?
6      A.  Yes.
7      Q.  Every month you did?
8      A.  Yeah.
9      Q.  Okay.  And at the time --
10     A.  Don.
11     Q.  -- Mr. Runyon -- at the time Mr. Runyon came
12 onboard, you stopped seeing the sheets, you said.  You
13 didn't -- you didn't use the sheets, you didn't see
14 them lying --
15     A.  No.
16     Q.  -- you know, being available?        Where
17 would you pick them up, by the way?
18     A.  From the LA's office.
19     Q.  Okay.  So you never saw them again after Don
20 came onboard?
21     A.  No.
22     Q.  Did you have performance evaluations while
23 you were an Alderwoods employee?
24     A.  Yes.
25     Q.  Okay.  And in those evaluations, were you

# Exhibit 24

1              UNITED STATES DISTRICT COURT

2           WESTERN DISTRICT OF PENNSYLVANIA

3

4    DEBORAH PRISE and HEATHER RADY

5    on behalf of themselves and all

6    employees similarly situated,

7                    Plaintiffs,

8          vs.                    Case No. 06-1461

9                                 Hon. Joy Flowers Conti

10   ALDERWOODS GROUP, INC.,

11                  Defendant.

12   _____

13

14

15       The Deposition of JOHN SCHABLOSKI,

16       Taken at 630 East Chicago Street,

17       Coldwater, Michigan,

18       Commencing at 9:28 a.m.,

19       Friday, May 15, 2009,

20       Before Deana M. Van Dyke, CSR-3715.

21

22

23

24

25

**NETWORK DEPOSITION SERVICES**
**Transcript of John Schabloski**

70

1   A. Right.
2   Q. Did you ever question your pay on your paycheck?
3   A. Not really. I mean, I assumed that everything was
4      going as it should have been. I assumed I was getting
5      paid for the time I worked since she directed me to
6      work those hours.
7   Q. I'm going to hand you what's being marked as
8      Defendant's Exhibit 10. This is a document that
9      begins with Bates stamped 000004 through 8.
10            MARKED FOR IDENTIFICATION:
11            DEPOSITION EXHIBIT 10
12            11:25 a.m.
13  BY MS. BRAUN:
14  Q. You'll see at the bottom this is an excerpt from the
15     Alderwoods Manual from 2006. Is this a document
16     you've seen before, Mr. Schabloski?
17  A. I don't recall it.
18  Q. If I could draw your attention to the Bates stamped --
19     you see the Bates stamps at the bottom?
20  A. Yes.
21  Q. Could you go to number seven, please? Do you see the
22     heading under Roman numeral V, Employee
23     Responsibilities?
24  A. Yes.
25  Q. Take a look at that. It continues onto the next page.

71

1      This section of the policy regarding employee
2      responsibilities addresses letter B, that
3      hourly/non-exempt employees must accurately record
4      their time. Do you see that?
5   A. Yes.
6   Q. And under C, that the employees are responsible for
7      ensuring that their timecards and time sheets are
8      always accurate and to bring errors to their manager's
9      attention. Do you see that?
10  A. Yes.
11  Q. Therefore, was it ever your understanding that you
12     were to ensure that your timecard was accurate?
13            MS. GIFFORD: Objection. He said he hadn't
14     seen this before.
15  BY MS. BRAUN:
16  Q. Was it your understanding, regardless of whether
17     you've seen this document, that you were to ensure
18     that your timecard was accurate?
19  A. To the best of my ability it was accurate. To the
20     times that I punched in and out that were on the card
21     were accurate. She would not allow you to write on
22     the cards. There was no -- there was no possible way
23     you could do that.
24  Q. Why do you say she wouldn't allow you to write on the
25     card?

72

1   A. Because that question was asked to her one time and
2      she said the only person that can write on these
3      timecards is me.
4   Q. Who asked the question?
5   A. One of the employees in the group in the morning
6      wanted to know if we worked over and above the hours
7      of our schedule if we could write on the timecard and
8      she said absolutely not.
9   Q. How did she instruct -- what did she say about
10     reporting that time?
11  A. She never addressed it.
12  Q. Did you ask for clarification?
13  A. No. Again, we assumed that she was the manager of the
14     funeral home, that if she requested us to work -- I
15     mean, she certainly had recollection of asking us to
16     work. Being that she was the one that was in charge
17     of the timecards and could make the adjustments on the
18     time cards, we assumed that that was taken care of.
19  Q. So we're talking about circumstances under which you
20     would work beyond your 8:00 to 5:00 Monday through
21     Friday schedule. You've testified that you would do
22     that at the direction of Amanda Kirt, correct?
23  A. Right.
24  Q. Were there other circumstances under which you would
25     work beyond the 8:00 to 5:00 schedule Monday through

73

1      Friday?
2   A. Going to community events, church and Lions Club and
3      Rotary and Kiwanis, answering the telephone if the
4      telephone rang during the night.
5   Q. Okay. Any other circumstances you would work beyond
6      the 8:00 to 5:00 schedule Monday through Friday?
7   A. Not that I can recall. I mean, if somebody came to
8      the funeral home and knocked on the door and had a
9      question or they needed to return something or they
10     needed to pick up flower arrangements that were left
11     from the service that day, that happened occasionally,
12     but not every day of the week. If families were
13     dropping off photographs or clothing or those kind of
14     things, I consider that working, you were doing things
15     for the funeral home.
16  Q. Getting back to the situations where you said you
17     worked at Amanda's direction for the evening funerals
18     or for company training, for visitation or for an
19     evening service, was there any time when you did that
20     without -- outside the direction of Amanda's
21     direction?
22  A. Work?
23  Q. Were there times when you worked? You gave me the
24     examples that you worked, you know, attending the
25     evening funerals. You said you did that -- gave me

**NETWORK DEPOSITION SERVICES**
**Transcript of John Schabloski**

130

1   projects and doing community affairs through these
2   organizations.
3   Q.  Can you attribute any piece of business that the
4       funeral home received to your participation in any of
5       the community organizations that we've discussed?
6   A.  I can't give you certain names of people that came to
7       our funeral home because I was in those, no.
8   Q.  You testified that you did not report the number of
9       hours you spent in these community service
10      organizations to management at Alderwoods, correct?
11  A.  That's right.
12  Q.  It was never requested of you to report those hours?
13  A.  I didn't know how to go about doing that.
14  Q.  Was it ever requested that you needed to generally
15      report to Amanda or any member of --
16  A.  No, it was never asked.
17  Q.  You were never asked to report regarding your
18      involvement in the community activities?
19  A.  That's right.
20  Q.  Time or otherwise?
21  A.  Right.
22  Q.  Do you know if any other employee at Covell Funeral
23      Home reported their time or generally their activities
24      spent in community service to Amanda or any other
25      member of management at Alderwoods?

131

1           MS. GIFFORD: Objection.
2   A.  I don't know.
3   BY MS. BRAUN:
4   Q.  During your employment at Alderwoods were you
5       evaluated on your performance? Did you receive an
6       annual performance evaluation?
7   A.  No, I never did.
8   Q.  At Covell Funeral Home was there any sort of incentive
9       program to joining a community service organization?
10      Where you incentivized in way any to join?
11  A.  No, other than a requirement but there was no
12      incentive.
13  Q.  There was no incentive intensive program?
14  A.  No.
15  Q.  Have you ever heard of anything called I Believe In
16      Service?
17  A.  No.
18  Q.  Is it the first part of your employment between August
19      and November and December when you heard Amanda Kirt
20      make this statement you were not involved in a
21      community service organization?
22  A.  That's right.
23  Q.  And you were not disciplined during that time for not
24      being involved in a community service organization?
25  A.  That's correct.

132

1   Q.  At some point did you realize from reviewing your
2       paycheck that you were not being paid for time spent
3       doing community service?
4   A.  Yes.
5   Q.  When did you realize that?
6   A.  Probably a year after I started there. Probably six
7       months after I attended these meetings and was
8       contributing that time.
9   Q.  And what did you do when you realized that you were
10      not being paid for the time you spent volunteering and
11      attending meetings for the church, Rotary, Kiwanis,
12      and the Chamber of Commerce?
13  A.  There was -- I didn't do really anything. I assume
14      that -- I was led to believe that I was getting paid
15      for those hours.
16  Q.  But you testified at some point you realized that you
17      were not, correct?
18  A.  Right.
19  Q.  When you realized that did you take any action?
20  A.  No.
21  Q.  You didn't complain?
22  A.  No.
23  Q.  You stated that Amanda Kirt made a statement about
24      community service. Did you ever see any sort of
25      statement about community service in writing?

133

1   A.  No.
2   Q.  So you never saw a policy regarding community service
3       during the time you were an employee at Alderwoods?
4   A.  No.
5   Q.  And you never saw a statement addressing payment for
6       the community work? I just want to make sure you
7       understand the scope of what I'm saying. You never
8       saw a statement in writing regarding any alleged
9       requirement to participate --
10  A.  Yes.
11  Q.  -- in community work? And you never saw any sort of
12      statement in writing regarding whether there would be
13      payment for community work?
14  A.  No.
15  Q.  Other than I believe you said there may have been a
16      couple times that Amanda attended a Chamber of
17      Commerce meeting with you?
18  A.  Yes.
19  Q.  How many times was that?
20  A.  Two.
21  Q.  Other than that would there been any time when
22      she would have observed you performing any fundraising
23      activities for the other organizations?
24          MS. GIFFORD: Objection.
25  A.  No.

# Exhibit 25

**NETWORK DEPOSITION SERVICES**
**Transcript of Sandy Thomas**

1

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3          SAN FRANCISCO/OAKLAND DIVISION

4                  * * * * *

5    WILLIAM HELM, DEBORAH PRISE,          )
     HEATHER P. RADY, et al., on behalf )
6    of themselves and all other          )
     employees and former employees       )
7    similarly situated,                   )
                                           )
8          Plaintiffs,                     )
                                           )
9          vs.                             )    CASE NO.
                                           )    CV-08-1184-SI
10   ALDERWOODS GROUP, INC.,               )
                                           )
11         Defendant.                      )
     _____     )

12

13

14

15          DEPOSITION OF SANDY THOMAS

16    Taken on Monday, October 19, 2009

17              At 9:30 a.m.

18       At 5845 Dean Martin Drive

19           Las Vegas, Nevada

20

21

22

23

24

25   REPORTED BY:  CHRISTY LYN DeJONKER, CCR NO. 691

**NETWORK DEPOSITION SERVICES**
**Transcript of Sandy Thomas**

9 (Pages 30 to 33)

---

30

1  did you continue to use time sheets, or did you just
2  use the time clock?
3      A.  We continued to use the time sheets.
4      Q.  So did you continue to use time sheets
5  throughout the period of time that you were an
6  Alderwoods employee?
7      A.  Sure did.
8      Q.  It's just for that period, approximately June
9  of 2006 until December of 2006 you used both a time
10  clock and time sheets, correct?
11      A.  Correct.
12      Q.  Did you have an understanding that on the
13  time sheets they were, as this policy says, to record
14  the time actually worked by each employee?
15      A.  It was.
16      Q.  Did you instruct the employees who reported
17  to you to record all the time they actually worked?
18      MR. LINGLE:  Objection.
19      THE WITNESS:  Yes, I did.
20  BY MS. DIAS:
21      Q.  And did you record all of your time that you
22  actually worked?
23      A.  I did.
24      MR. LINGLE:  Objection.
25

---

31

1  BY MS. DIAS:
2      Q.  This goes on to say, "The time sheet must
3  show the time the person begins work."
4      Did the time sheets used at your location,
5  Mr. Thomas, show the time that the individuals began
6  working?
7      A.  In January, yes.
8      Q.  I'm sorry?
9      A.  Yes.
10      Q.  The time they broke for lunch, did you have
11  time sheets to indicate the time that both yourself and
12  your employees broke for lunch?
13      A.  Yes, I did.
14      Q.  So the time they returned to lunch, did the
15  time sheets used at your location indicate the time
16  that both you and the people who reported to you
17  returned from lunch?
18      A.  Return from lunch, yes.
19      Q.  And the time that the workday ended, did your
20  time sheets used at Thomas and Jones location also
21  record the time when both you and the people who
22  reported to you ended your workday?
23      A.  And time out, yes.
24      Q.  If you look at the first bullet, sir, it
25  indicates: "All employees must record all hours

---

32

1  actually worked unless exempt from timekeeping
2  requirements."
3      Did that happen at your location?  Did the
4  employees record all hours actually worked?
5      MR. LINGLE:  Objection.
6      THE WITNESS:  On the time sheet they had to
7  record the time.
8  BY MS. DIAS:
9      Q.  All the time that they worked?
10      A.  On the time sheet.
11      Q.  If you look at the third bullet, sir, it
12  says, "Many states/providences require a designated
13  meal break after a certain number of hours worked," and
14  indicates that you consult an HR specialist in your
15  area for assistance in determining the required meal
16  periods.
17      Tell me, if you would, how did meal breaks or
18  mealtime work at Thomas and Jones Funeral Home?
19      A.  Well, we were required to write -- record
20  that we had our lunch break, whether we got a chance to
21  do it or not.
22      Q.  I'm sorry?
23      A.  We were required to sign out.  It says out at
24  a certain time for lunch.  We were required to take
25  that hour-lunch break.  And there were times we didn't

---

33

1  get to do that.
2      Q.  When you say you were required to take it?
3      A.  We were told by management that you must --
4  it's mandatory to take your lunch break.
5      Q.  And who's the management that instructed you
6  that?
7      A.  The general manager.
8      Q.  Who was that?
9      A.  Down from Steve, on the way down to Linda to
10  Gerhardt, all of them, all the managers.  That was
11  their direction.
12      Q.  So you had to log out for a meal break?
13      A.  Right.
14      Q.  Did it have to be at a certain time of day?
15      A.  No, it didn't have to be at a certain time.
16  We just had to get it.
17      Q.  Did you have to take a certain amount of
18  time?
19      A.  We were told to take one-hour time for lunch.
20      Q.  Was it your understanding that that one-hour
21  lunch break would be paid or unpaid?
22      A.  It wouldn't be paid.  It wouldn't be paid.
23      Q.  So your employees --
24      MR. LINGLE:  Objection.
25

---

**NETWORK DEPOSITION SERVICES**
**Transcript of Sandy Thomas**

10 (Pages 34 to 37)

34

BY MS. DIAS:
1  Q.  The employees who reported to you logged out
2  every day for a meal break, correct?
3       MR. LINGLE: Objection.
4       THE WITNESS: Yes.
5  BY MS. DIAS:
6  Q.  And then at the end of an hour, logged back
7  in; is that correct?
8       A.  That is not true. Because there were times
9  when we didn't even get the lunch, but we still had to
10 log it out. And whether we worked it or not.
11 Q.  And if you worked it, were you paid for it?
12 A.  No.
13 Q.  Did employees ever indicate on their time
14 sheets that they had worked through a meal break?
15 A.  Many times.
16 Q.  And did they indicate -- or when they
17 indicated that they worked through their meal break,
18 did you authorize time or that time to be paid?
19      MR. LINGLE: Objection.
20      THE WITNESS: No.
21 BY MS. DIAS:
22 Q.  Was there ever an occasion when you
23 authorized individuals to be paid for time when they
24 were unable to stop working for a meal break?

35

1       MR. LINGLE: Objection.
2       THE WITNESS: Yes.
3  BY MS. DIAS:
4  Q.  So there were instances where you paid them?
5       MR. LINGLE: Objection.
6       THE WITNESS: I misunderstood that at first.
7  No, if they worked and they signed out, no, they didn't
8  get paid.
9  BY MS. DIAS:
10 Q.  And my question was: Do you ever remember a
11 circumstance where you paid individuals or you
12 authorized individuals to be paid for time when they
13 worked through a meal break?
14      MR. LINGLE: Objection.
15      THE WITNESS: Yes.
16 BY MS. DIAS:
17 Q.  Yes, there were times when you paid them?
18      MR. LINGLE: Objection.
19      THE WITNESS: Yes, there were times that they
20 didn't get paid that I authorized it, and they didn't
21 get paid.
22 BY MS. DIAS:
23 Q.  So there were times when you authorized them
24 to be paid for time, but then they weren't actually
25 paid for that?

36

1       A.  Yes.
2  Q.  How did that work?
3       MR. LINGLE: Objection.
4       THE WITNESS: Just, I guess, with the
5  timekeeper. Because when I did turn the time in, then
6  it went to the timekeeper, and the timekeepers would --
7  they would see it and it just wasn't paid. It was
8  overlooked.
9  BY MS. DIAS:
10 Q.  How do you know it wasn't paid?
11 A.  Because we -- James and Regina would show me
12 that they didn't get paid for that time.
13 Q.  They showed you their paycheck?
14 A.  They showed me their stub.
15 Q.  And how would you know that it was time
16 authorized for a meal break versus other time that you
17 authorized that wasn't paid?
18      MR. LINGLE: Objection.
19      THE WITNESS: Because it was, like, time for
20 lunch. It was time for lunch and time for anything
21 else over was marked at that time. So the time for
22 lunch, it's one hour. We didn't get that hour paid.
23 BY MS. DIAS:
24 Q.  Okay. I'm not following you. If you could
25 try to explain to me how it worked.

37

1       A.  Okay. On the time sheet that we used, it has
2  where you checked out for a one-hour lunch. You check
3  out from, say, 1:00 to 2:00, and you went on it. And
4  then from the total hours it says nine hours, but they
5  only got paid for eight hours.
6  Q.  And you compared that to their actual pay?
7  A.  To the actual pay.
8  Q.  What if there were circumstances where they
9  worked ten hours on that day?
10      MR. LINGLE: Objection.
11 BY MS. DIAS:
12 Q.  What were they paid for?
13 A.  If they --
14      MR. LINGLE: Objection.
15      THE WITNESS: If it was lunch, they still got
16 paid nine hours.
17 BY MS. DIAS:
18 Q.  Using my example, okay.
19      Did you ever work through your lunch period?
20 A.  Yes, I did.
21 Q.  How frequently did you work through your
22 lunch period?
23 A.  Most of the time.
24 Q.  What is most of the time to you?
25 A.  I worked five days. I worked through the

# NETWORK DEPOSITION SERVICES
## Transcript of Sandy Thomas

19 (Pages 70 to 73)

**70**

1   Q.   Who told you to do something differently?
2   A.   The general manager.
3   Q.   Which general manager?
4   A.   I have to put everything on John Gerhardt,
5   because he is the one who started telling us off record
6   things to do and it just filtered on down.
7   Q.   So John told you to do something differently?
8   A.   Yes.
9   Q.   And Robert after him told you to do something
10  differently?
11  A.   Robert, Steve.  I mean, Robert, yeah, all of
12  them down, down.
13  Q.   So Robert, Linda and Todd told you to do
14  something differently?
15  A.   Mostly what John had said.
16  Q.   And what did they tell you to do?
17  A.   They said on the -- when you're on call, like
18  I would be on call, you can only record 15 minutes of
19  your time.  You may spend 30 minutes or 40 minutes on
20  the call with one person, but you can only record 15
21  minutes.  And if you're on a call, you made a removal,
22  you were only given an hour time.  So this wasn't on
23  this procedure.  But that is the way we did it.  If you
24  were on a call for two hours, you only can log in for
25  one hour time.  If you're on a call with a person for

**71**

1   30 minutes, 35 minutes, you can only log 15 minutes for
2   each call.
3   Q.   How frequently were you on call longer than
4   15 minutes?
5   A.   It wasn't longer, but every time you make a
6   call -- because, first of all, you get a call from the
7   answering service, take all that information, then you
8   get ahold of a removal person, and you got to give them
9   that information.  It takes about 20, 25 minutes for
10  each call before you're done.
11  Q.   And that is how you instructed your -- or the
12  people who reported to you to record calls as well?
13  A.   As well, yes.
14  Q.   And that is throughout the period of time
15  that you worked for Alderwoods?
16  A.   Yes, ma'am.
17  Q.   So from the time you started in 2002,
18  whenever that was, until December of 2006?
19  A.   That is what we were instructed to do.
20  Q.   Did they ever send you a piece of paper or a
21  memo that instructed you in that fashion?
22  MR. LINGLE:  Objection.
23  THE WITNESS:  Did they ever give me a piece
24  of paper?  No, it was orally done.  It was said.
25

**72**

1   BY MS. DIAS:
2   Q.   It was always orally that they told you that;
3   is that right?
4   A.   Yes.
5   Q.   And did these general managers ever
6   communicate with anyone other than you in the home, or
7   was it just you?
8   MR. LINGLE:  Objection.
9   THE WITNESS:  At my location --
10  BY MS. DIAS:
11  Q.   Yes.
12  A.   -- would they instruct?  Would they
13  communicate with other people?  Yes, James said they
14  told him.
15  Q.   Directly?
16  A.   Directly, right.
17  Q.   Who did he say told him?
18  A.   John told him.  And then I don't think Robert
19  told him.  And Todd has told him.
20  Q.   Other than the general managers who you
21  reported to, did you ever speak with any other general
22  manager at Alderwoods?
23  A.   You mean, in this location?
24  Q.   In any location.
25  A.   No.

**73**

1   Q.   So it's fair to say that other than the
2   general managers that you've said, no other general
3   manager told you any policy or any procedure with
4   respect to recording on-call calls, correct?
5   A.   Correct.
6   Q.   Would it also be fair to say, then, other
7   than the general managers you reported to, you wouldn't
8   have any idea what any other general managers were
9   telling the people who reported to them, correct?
10  A.   I have no idea.
11  Q.   And would you agree with me, it's entirely
12  possible that they were giving different instructions
13  to the people who reported to them?
14  A.   It's possible.
15  Q.   Other than what was in the policy binders,
16  did you ever see any written memos from any Alderwoods
17  manager or department talking about work schedules and
18  recording overtime?
19  MR. LINGLE:  Objection.
20  THE WITNESS:  Other than?
21  BY MS. DIAS:
22  Q.   Yes.
23  A.   I can't recall.
24  Q.   Were you ever told that you were abusing
25  overtime or that your overtime was excessive?

**NETWORK DEPOSITION SERVICES**
**Transcript of Sandy Thomas**

74

1    A.  I was told that we have in my department, the
2  three of us, we were doing too much overtime.
3    Q.  Who told you that?
4    A.  Todd has told me that; John told me that.
5    Q.  Anyone else tell you that?
6    A.  No.
7    Q.  So John and Todd have told you that?
8    A.  Yes.
9    Q.  And that was by yourself and the people who
10  reported to you?
11    A.  Yes.  What it was, we were told -- I was told
12  that we got to contain the overtime.  We were working
13  too many hours, too many hours.  But we couldn't --
14  with just the three people and to work all we had, we
15  couldn't do it.
16    Q.  Were you ever told that overtime could not
17  exceed a certain number of hours?
18    A.  Yes, that is why we were not being able to
19  record all of our overtime.
20    Q.  What were you told was the limit of the
21  amount of overtime you could record?
22    A.  I wasn't given a specific time.  They just
23  said we had to cut.
24    Q.  I was just --
25    A.  Nothing specific.

75

1    Q.  I was just going on what you said.  You said
2  you were given a limit, and I was following up on that.
3  Were you given a specific limit?
4    A.  No.
5    Q.  Were you given any targeted amount of
6  overtime that was to be worked?
7    MR. LINGLE:  Objection.
8    THE WITNESS:  The only thing I was told is we
9  had to reduce our overtime.
10  BY MS. DIAS:
11    Q.  Were you ever reprimanded in any way for
12  having too much overtime?
13    MR. LINGLE:  Objection.
14    THE WITNESS:  Oh, yeah.
15  BY MS. DIAS:
16    Q.  In what way were you reprimanded?
17    A.  He just said you guys are withdrawn, you have
18  to cut your overtime.  Even if you can't schedule times
19  or something, but we have to cut overtime.
20    Q.  So your general manager told you that?
21    A.  Yes.
22    Q.  Any other type of reprimand?
23    A.  No, not that I know of.
24    Q.  Did you ever reprimand the people who
25  reported to you regarding the amount of overtime they

76

1  were working?
2    A.  No.
3    Q.  Did you conduct written performance
4  evaluations for the people who reported to you?
5    A.  Yes.
6    Q.  Was the amount of overtime they worked one of
7  the categories that you evaluated them on?
8    A.  No, I think it was just total performance.
9    Q.  And was your performance ever evaluated in
10  any way?
11    A.  Yes.
12    Q.  Was the amount of hours of overtime you
13  worked ever one of the categories that you were
14  evaluated on?
15    A.  I don't remember.
16    Q.  Did you ever hear that there was any type of
17  a budget for overtime at your location?
18    MR. LINGLE:  Objection.
19    THE WITNESS:  No.
20  BY MS. DIAS:
21    Q.  Did anyone ever tell you that they believed
22  that you were incorrectly completing your time sheets?
23    A.  No, no.
24    Before we go any further, can I be excused
25  for a minute?

77

1    MS. DIAS:  Sure.
2    (Whereupon, a recess was taken.)
3  BY MS. DIAS:
4    Q.  Mr. Thomas, paragraph 7 of your affirmation
5  says, "This corporate on-call pay policy is meant for
6  Alderwoods employees."
7    What employees are you referring to when you
8  say "Alderwoods employees"?
9    A.  That meant me, James and Regina.
10    Q.  All right.  So that is you as a location
11  manager/funeral director, and Regina and James as
12  arrangers, correct?
13    A.  Right.
14    (Exhibit 5 marked.)
15  BY MS. DIAS:
16    Q.  Let me show you what has been marked as
17  deposition Exhibit 5, which is a list of Alderwoods
18  positions and jobs.  And I would like to just draw your
19  attention to the jobs that are listed as nonexempt jobs
20  from the middle to the top of the page.  And the second
21  column here is a job description.
22    Now, individuals who are employed by
23  Alderwoods in the accounts payable administrator
24  position, did any such people ever report to you?
25    A.  In administration?

**NETWORK DEPOSITION SERVICES**
**Transcript of Sandy Thomas**

21 (Pages 78 to 81)

78

1      Q.  Yes.
2      A.  No.
3      Q.  Do you have any knowledge whether they were
4  ever required to work on-call time?
5      A.  No, I don't.
6      Q.  What about support office administrator?
7  Does a support office administrator ever report to you?
8         MR. LINGLE:  Objection.
9         THE WITNESS:  No.
10 BY MS. DIAS:
11     Q.  Do you know if they were ever required to
12 work on-call time?
13     A.  No, I don't.
14     Q.  Advance planning professional, did any of
15 them ever report to you?
16     A.  Never.
17     Q.  They never reported to you?
18     A.  Never.
19     Q.  So you wouldn't know, would you, whether they
20 were required to work on-call time, correct?
21     A.  Correct.
22     Q.  What about an apprentice embalmer?
23     A.  Never.
24     Q.  So you wouldn't have any knowledge if they
25 were required to work on-call time, correct?

79

1      A.  Correct.
2      Q.  What about an apprentice funeral director?
3      A.  No knowledge.
4      Q.  And apprentice funeral director embalmer?
5      A.  Never.
6      Q.  So no knowledge about whether they would have
7  to work on-call time, correct?
8      A.  Correct.
9      Q.  Arranger would be the position that Regina
10 and James had, correct?
11     A.  Correct.
12     Q.  And administrative assistant would be the
13 office manager-type position, correct?
14     A.  Correct.
15     Q.  And you have already told me about both of
16 those.  What about a funeral -- if you look at all
17 titles from funeral attendant down through the rest of
18 the nonexempt positions, did anybody who held any of
19 those positions ever report to you?
20     A.  No.
21     Q.  And so therefore, for all of the rest of
22 those positions that never reported to you, you have no
23 idea whether they were required to work on-call time,
24 correct?
25     A.  Correct.

80

1      Q.  Or if they were required to work on-call time
2  whether they were paid for it, correct?
3      A.  Correct.
4      Q.  Going back to paragraph 7 of your
5  affirmation, Mr. Thomas, we got on the first line to
6  Alderwoods employees and you have now defined what you
7  meant by they were paid for only part of the work that
8  they did while on call.  Here are you referring to the
9  fact that you -- when you say "only part of the work
10 that they did on call," are you referring to the fact
11 that you had put down all the time you were on phone
12 calls?
13     A.  Exactly.
14     Q.  Does that refer to anything else other than
15 that?
16     A.  No, no.
17     Q.  So under this policy I was instructed by my
18 manager Todd Noecker.  Is this spelled correctly?
19     A.  No, it's not spelled right.
20     Q.  What is the correct spelling?
21     A.  N-O-C-E-K-E-R.
22     Q.  You were instructed by Todd to only record 15
23 minutes while handling phone calls, regardless of how
24 long the phone call actually took.  You already told me
25 that.  Now, you note here in your affirmation that Todd

81

1  told you that, but you don't speak to the rest of your
2  general managers having told you that.
3         Did the rest of your general managers tell
4  you that?
5         MR. LINGLE:  Objection.
6         THE WITNESS:  Yes.
7  BY MS. DIAS:
8      Q.  You just --
9      A.  John Gerhardt --
10     Q.  Go ahead.  I'm sorry.  I interrupted you.
11     A.  John Gerhardt did.
12     Q.  So in addition to Todd here, you would add
13 John as well; is that correct?
14     A.  Correct.
15     Q.  You go on and say, "Therefore, I was not
16 compensated for all of my on-call work when it was
17 completed outside of the workday and away from the
18 funeral home."
19         Again, here we are talking about those
20 portions of the calls beyond 15 minutes you weren't
21 paid for, correct?
22     A.  Correct.
23     Q.  Paragraph 8, "In all my years at Alderwoods,
24 I have been instructed by management."
25         What management are you referring to here?

**NETWORK DEPOSITION SERVICES**
**Transcript of Sandy Thomas**

26 (Pages 98 to 101)

98

1    A. We, the employees, at the location.
2    Q. Every single employee?
3    A. Yeah.
4    Q. Well, let's take you first, I guess. As the
5  location manager and funeral director, what Alderwoods
6  training were you required to attend?
7    A. We had training at the Eastern location that
8  I would have to attend. It was about different policy
9  changes, different things they wanted to see be made
10 effected. I can't remember too many other things, but
11 I remember we would have to go once every six months or
12 so and do a training. Then I would take it back to the
13 employees, my employees.
14   Q. Was that training or was that a staff
15 meeting?
16   A. It was training, because they would have a --
17 they would show us, you know, different things, how
18 they wanted to see things go.
19   Q. So approximately every six months, you did
20 this from the time you started as an Alderwoods
21 employee in 2002?
22   A. I think -- what I can say is the first of
23 2006, and then again about September 2006, we did.
24 Those are the only two times I actually went into a
25 training session.

99

1    Q. Okay. Let me see if I understand. The first
2  time you recall having one of these training sessions
3  on policies was in the beginning of 2006, correct?
4    A. Correct.
5    Q. So can we then just eliminate from when you
6  started in 2002 until the beginning of 2006? There was
7  no training that you needed to attend; is that
8  accurate?
9    A. I'd say.
10   Q. So the first training is in the beginning of
11 2006, and that is at the Eastern location?
12   A. Right.
13   Q. And who conducted the training?
14   A. I can't recall who conducted the training. I
15 can't recall who conducted the training. Somebody from
16 HR, one of the general managers. No, it wasn't the
17 general manager.
18   Q. You don't recall?
19   A. I don't recall.
20   Q. Do you recall what the topic was?
21   A. No.
22   Q. Do you recall how long it lasted?
23   A. It lasted approximately six hours.
24   Q. And did it occur during the course of your
25 regular workday?

100

1    A. Yes.
2    Q. So you were paid for your time to attend that
3  training, correct?
4    A. Yes.
5    Q. So that's the first one in 2006. And then I
6  think you were beginning to make reference to the fact
7  there were two more later in 2006 that you were
8  recalling; is that right?
9    A. No. I said there was another one in
10 September 2006.
11   Q. Okay. And where was that one, also at
12 Eastern?
13   A. I'm trying to remember. Because we went --
14 that wasn't it. I'm going back even before, but no,
15 that was also on Eastern too. Yes.
16   Q. And do you remember who conducted the
17 training?
18   A. The same person, but I don't remember.
19   Q. Do you recall what the topic of the
20 September 2006 training was?
21   A. I wish I could.
22   Q. And do you recall how long that training
23 session lasted?
24   A. It lasted about six hours, the same.
25   Q. And was it the same, that it occurred during

101

1  the course of the regular workday?
2    A. Yes, it did.
3    Q. And so you were also paid for that training
4  session, correct?
5    A. Right.
6    Q. Any other training as a location manager or
7  funeral director during the period of time that you
8  were employed at Alderwoods?
9    A. No, not that I can recall.
10   Q. Now, let's take your arrangers. Well, let me
11 first ask you, your general managers, do you have any
12 idea, any training that they were required to take?
13   A. No, I don't.
14   Q. The arrangers who reported to you, James and
15 Regina, what training were they required to take at
16 Alderwoods?
17   A. They took the, more or less, staff meetings.
18 They would have a staff meeting on the proper way of
19 making removals.
20   Q. Anything else?
21   A. No.
22   Q. And were these training sessions or staff
23 meetings conducted by you?
24   A. No, they weren't conducted by me.
25   Q. Who conducted those meetings?

**NETWORK DEPOSITION SERVICES**
**Transcript of Sandy Thomas**

28 (Pages 106 to 109)

---

106

1 complete any mandatory online trainings while employed
2 by Alderwoods?
3     A.  Not to my knowledge.
4     Q.  You never instructed them to, correct?
5     A.  No.
6     Q.  And let's go to Exhibit 5.  Other than --
7 well, let me ask you this:  For any of the nonexempt
8 job positions on Exhibit 5, are you aware of anyone
9 employed in any of those job positions completing
10 mandatory online trainings while they were employed by
11 Alderwoods?
12     A.  No.
13     Q.  And if they did attend any online trainings,
14 number one, you wouldn't know about it, correct?
15     A.  Correct.
16     Q.  And number two, if they did, you would have
17 no way of knowing whether they were paid for that time
18 or not, correct?
19     A.  I would have no way of knowing.
20     Q.  Okay.  Paragraph 16 says that you had
21 conversations with co-workers and employees at other
22 locations who expressed that they were similarly
23 experiencing the training policy.  Let's take
24 co-workers first.  Who are the co-workers?
25     A.  The co-workers, like I said, I was talking

---

107

1 about Shane and Nascio are the only two.
2     Q.  So paragraph 16 is referring to just those
3 two gentlemen, correct?
4     A.  Yes.
5     Q.  And what were your conversations with them
6 about training?
7     A.  Well, when we were talking about being
8 compensated for, and I told them my people are not
9 being compensated, they said, Well, we go to these
10 meetings and we do this, but no, we don't get
11 compensated either.
12     Q.  So it's referring again to the yearly staff
13 meeting, correct?
14     A.  More or less.
15     Q.  Any other conversations with them about any
16 other trainings and pay relative to the trainings?
17     A.  Not really.
18     Q.  If you would turn to the next page of your
19 affirmation, Unrecorded Work Time Policy.  Alderwoods
20 headquarters maintained an unrecorded work time policy
21 while you were employed by Alderwoods.  When you say
22 "Alderwoods headquarters," are you again talking about
23 the Canadian operations?
24     A.  And those binders, yes.
25     Q.  And you are referring to something that

---

108

1 appeared in one of the five policy binders, correct?
2     A.  Correct.
3     Q.  And you say that under that policy employees
4 were encouraged or required not to record all overtime
5 hours worked.  What exactly did the policy state?
6     A.  Referring to this?
7     Q.  Right.  I'm just asking you what policy
8 you're referring to.
9     A.  I'm referring now to the oral policy, the
10 general manager's policy now.
11     Q.  So we are talking about something else that
12 was conveyed to you by your general managers, correct?
13     A.  Yes.
14     Q.  And it's the listing from Steve down through
15 Todd, those general managers, correct?
16     A.  Correct.
17     Q.  And it's not referring to anything that was
18 told to you by anyone other than them, correct?
19     A.  Correct.
20     Q.  So what did they tell you?
21     A.  They told us that under the agreement, you
22 know, whatever they were saying, it would be that if
23 you would -- they encouraged you to attend these
24 meetings, they required you to attend these meetings,
25 but we are not going to get paid for them, because if

---

109

1 it's after hours, we don't get paid.  And that is the
2 way it was.
3     Q.  So this is referring to staff meetings again?
4     A.  More or less.
5     Q.  Was there any other time that they encouraged
6 you or required you not to record?
7     A.  Yes.  Sometimes at the lunchtime, we couldn't
8 record.  And then viewings in the evening, you know,
9 from five to six, seven, whatever those hours, don't
10 record at all.
11     Q.  So don't record visitations?
12     A.  Don't record visitations.
13     Q.  And that would apply to you as well as --
14     A.  Yes.
15     Q.  Let me finish.
16     -- that would apply to you as well as to the
17 individuals who reported to you, correct?
18     A.  Yes.
19     Q.  Would that apply to the office administrator?
20     A.  If she stayed, yes.
21     Q.  Were there times that she stayed?
22     A.  There were times she stayed.
23     Q.  So we have attendance at the staff meetings,
24 we have the meal break, which we already talked about,
25 we have attending visitations, right?

---

**Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg**
**866-565-1929**

**NETWORK DEPOSITION SERVICES**
**Transcript of Sandy Thomas**

29 (Pages 110 to 113)

110

1    A. Correct.
2    Q. And to be fair, we have already talked about
3  the on-call time and not recording more than 15 hours
4  worked, right?
5    A. Fifteen minutes.
6    Q. I mean 15 hours worked. Any other time
7  that your general manager either encouraged you or
8  required you not to record?
9    A. Like I said, on Saturdays if I worked, I
10 worked a funeral on Saturday or something, I was told
11 not to record it.
12   Q. Did you ever tell the people who reported to
13 you not to record Saturday time?
14   A. No.
15   Q. Did they record a Saturday time?
16   A. Yes, they got paid.
17   Q. So they recorded it and they got paid?
18   A. Yes.
19   Q. So as far as Thomas Jones is concerned, the
20 encouragement or the directive not to write down hours
21 for Saturday time worked was just to you?
22   A. To me.
23   Q. Anything else that your general managers told
24 you about not recording all hours worked?
25   A. No, I think that pretty much covers it.

111

1    Q. And approximately how many Saturdays did you
2  work in a month at Alderwoods?
3    A. On average, at least three Saturdays.
4    Q. At least three Saturdays a month?
5    A. Sometimes more. I would say on average.
6    Q. What were you doing?
7    A. Directing a funeral; I was doing the funeral
8  services.
9    Q. So it was primarily to hold the actual
10 service itself?
11   A. Yes.
12   Q. And burial?
13   A. And burial, yes.
14   Q. In paragraph 20 you talk about you typically
15 worked overtime each week, but you were required not to
16 record. We already talked about what that would be.
17     You go on to say, "The company was aware that
18 I worked such overtime because my manager typically saw
19 me completing the work."
20     Are we referring to your general manager
21 again?
22   A. Yes.
23   Q. Not any other manager of management at
24 Alderwoods?
25   A. No.

112

1    Q. Now, you said your general managers, one,
2  never came to your location; the other one only a
3  couple times a month. So is it fair to say if you were
4  working unrecorded time that the general managers
5  weren't actually observing you do that?
6      MR. LINGLE: Objection.
7      THE WITNESS: They may not observe me doing
8  it, but they were on the phone with me. They knew I
9  was at the location; they knew I was working. And they
10 knew the day before that I would be working the
11 funeral, because I told them.
12 BY MS. DIAS:
13   Q. This is the Saturday work you're talking
14 about?
15   A. Right.
16   Q. Now, you go on to say, "Other employees
17 similarly did not record all of their overtime hours
18 because management required them not to."
19     What other employees are we talking about
20 here?
21   A. James Jones, he sometimes had to not record.
22 Because a lot of times he would work a few weeks in the
23 evening and then work Saturday. So he wouldn't record
24 the evening viewings.
25   Q. Does that -- does this refer to any other

113

1  employee other than Jim or James?
2    A. No. No, it doesn't.
3    Q. And in terms of not recording all of the
4  overtime because management required them not to, are
5  you intending to refer to anything other than the
6  evening viewings?
7      MR. LINGLE: Objection.
8      THE WITNESS: Like I said, the evening
9  viewings and the Saturdays, sometimes James, like if he
10 worked his sixth day, he couldn't record it.
11 BY MS. DIAS:
12   Q. I didn't follow that last part.
13   A. Okay. Five days he would work. If James
14 worked that Saturday, along with directing the funeral
15 with me, then he didn't record his time all the time.
16   Q. What would be the circumstances where he
17 would record it and when he wouldn't record it?
18   A. Okay. If it was a typical Saturday, he would
19 open the office for many hours, for four to six hours,
20 then he could record it.
21   Q. Okay.
22   A. Other than that, no. If it's working -- if
23 it was something like the funeral services, no.
24   Q. So was it -- I'm having -- is it that he
25 wasn't allowed to get paid more than four to six hours

**NETWORK DEPOSITION SERVICES**
**Transcript of Sandy Thomas**

30 (Pages 114 to 117)

114

1  on a Saturday, or it's that he wasn't allowed to get
2  paid for the service?
3      A. Like I said, if he worked on Thursday and
4  Friday, you know, doing visitations, and then he worked
5  Saturday, he didn't clock in. But if he didn't work no
6  services and he worked his Saturday, as just being in
7  the office, yeah, he got paid.
8      Q. I don't understand the distinction.
9      A. All right. If there were viewings that he
10  worked during the week, maybe it totaled to about six
11  hours or so, then they paid him for that. And then if
12  he had to work that Saturday for any reason, he didn't
13  get paid the Saturday. But if he just worked his five
14  regular days and worked half a day on Saturday, he got
15  paid a half a day, without any extra hours during the
16  week.
17      Q. So what's the rule, that he could only have a
18  certain number of overtime hours a week?
19      A. Well, it seemed like that. It would be that
20  he only had so many hours a week, but he wasn't given a
21  specific time of hours. They wanted to keep it down.
22  So I mean, like I said, if he worked a total of six
23  hours during the week and Saturday, it wasn't recorded.
24      Q. So as a practical matter, James never
25  recorded more than six hours of overtime in a week; is

115

1  that correct?
2      A. Well, that and plus the on-call night or
3  something on removal, he would record those. But if he
4  worked too many hours and then up to Saturday, he just
5  worked the funeral and went home.
6      Q. Did you tell him not to record that time?
7      A. I was told -- I was instructed to tell him,
8  yes.
9      Q. So anything other than -- or anything in
10  addition to six or seven of overtime hours per week,
11  James was instructed not to write down the overtime
12  hours; is that right?
13      A. Right.
14      Q. And was the same true with respect to Regina?
15      A. To Regina, yes.
16      Q. Anything more than six or seven hours of
17  overtime. And how about with you? Was the same rule
18  of thumb there, anything more than six to seven hours
19  of overtime a week you were instructed not to record?
20      A. Yes. I could say that safely.
21      Q. What if people were just like -- the
22  employees that reported to you, what if they were just
23  generally busy on their workload? Would general
24  overall business be a justified reason for writing down
25  and getting paid overtime?

116

1      MR. LINGLE: Objection.
2      THE WITNESS: No.
3  BY MS. DIAS:
4      Q. You wouldn't approve that as a reason, right?
5      A. No.
6      Q. Paragraph 21, "Neither I nor other employees
7  were ever compensated for such unrecorded hours."
8      Are you talking about any unrecorded hours
9  that we haven't already discussed? Meaning beyond six
10  or seven hours, the staff meetings. Are there any
11  other circumstances that we haven't already discussed?
12      A. I think we have covered it all.
13      Q. Okay. And 22, you had conversations with
14  co-workers and employees at other locations. Is it the
15  same two gentlemen?
16      A. Same two gentlemen, yes.
17      Q. And did it also relate to the things that
18  those same two gentlemen were told by your same line of
19  general managers?
20      A. Yes.
21      Q. If you refer to Exhibit 5, other than
22  arrangers and administrative assistants, do you have
23  any knowledge about what individuals who worked in all
24  of these other nonexempt job positions may or may not
25  have been told by their managers about recording all

117

1  overtime hours worked?
2      A. I have no idea.
3      Q. So you have no idea what they were told,
4  number one, right? You have no idea whether they
5  worked any unrecorded overtime hours --
6      A. None.
7      Q. -- correct?
8      And you wouldn't have any idea whether if
9  they worked overtime hours, whether they were
10  compensated for all of them, correct?
11      A. That's correct.
12      (Whereupon, a lunch recess was taken
13      from 12:25 p.m. to 12:51 p.m.)
14  BY MS. DIAS:
15      Q. Mr. Thomas, right before we left the room to
16  start our lunch break, there was a name that you
17  remembered, and I just wanted to make sure we got that
18  captured on the record. It was the last name of one of
19  your office administrators, right?
20      A. Yes. Petra Dennis is her last name.
21      Q. And it's D-E-N-N-I-S?
22      A. Yes.
23      Q. Thank you. Any luck on Linda?
24      A. Not yet.
25      Q. On the visitations that were done in the

130

1    A.  I can't tell.  It doesn't look like it.
2    Q.  It doesn't look like the way you checked them
3 in Exhibit 7, does it?
4         MR. LINGLE:  Objection.
5         THE WITNESS:  No.
6 BY MS. DIAS:
7    Q.  After studying them further, any idea whether
8 those are your checks that are put in those boxes?
9    A.  Like I said, they don't look like my checks.
10    Q.  What about the date, which appears to be
11 10/10/2007; is that your writing?
12    A.  That is my writing.
13    Q.  And what about the signature?
14    A.  The signature is mine.
15    Q.  And what about the writing underneath the
16 signature?
17    A.  That is mine.
18    Q.  Now, with respect to Exhibit 7 and Exhibit 8,
19 do you know why two separate information sheets were
20 submitted in the Pennsylvania lawsuit?
21    A.  No, I don't.
22    Q.  If you look at Exhibit 7, under A, you did
23 not check in that you wanted to opt into the case with
24 respect to the company permitting you to perform
25 community service and that you weren't paid for that,

131

1 but on Exhibit 8 that box is checked.
2         Can you explain the difference to me?
3    A.  No.
4    Q.  Which do you believe is accurate?
5    A.  Seven would be my -- I mean, I know I signed
6 this, but...
7    Q.  Seven would be the accurate one; is that
8 right?
9    A.  That is right.
10    Q.  Before we go to this, go back to Exhibit 6,
11 which is the second amended complaint.  And will you
12 look at appendix A and appendix B, which are the
13 collective names of the named plaintiffs in the case,
14 and let me know if you recognize any of those names.
15    A.  Only my name on both pages.
16    Q.  So as to all those other individuals, you
17 wouldn't know what locations they worked, correct?
18    A.  No.
19    Q.  You wouldn't know who their managers were,
20 correct?
21    A.  No.
22    Q.  You wouldn't know anything that they may or
23 may not have been told about how to record their time
24 at Alderwoods, correct?
25         MR. LINGLE:  Objection.

132

1         THE WITNESS:  No.
2 BY MS. DIAS:
3    Q.  Or how they were paid at Alderwoods, correct?
4    A.  No.
5    Q.  Or whether they worked any overtime that had
6 not been compensated by Alderwoods, correct?
7         MR. LINGLE:  Objection.
8         THE WITNESS:  No.
9 BY MS. DIAS:
10    Q.  Or any policies that may or may not have been
11 given to them by their managers, correct?
12    A.  Correct.
13         MS. DIAS:  That is all the questions I have,
14 Mr. Thomas.
15         MR. LINGLE:  Why don't we take a quick break.
16 I don't expect we will have much.
17         (Whereupon, a recess was taken.)
18              EXAMINATION
19 BY MR. LINGLE:
20    Q.  Mr. Thomas, just a few questions here to go
21 over.  You were asked a few questions about when you
22 became aware of this case.
23         Tell me about your best recollection of when
24 you became aware of the case and how you became
25 involved.

133

1    A.  I received a letter from the company, you
2 know, stating that it was a case.  And I responded to
3 it.  That is when I first got involved.
4    Q.  Do you recall when that occurred?
5    A.  About 2007.  I don't know what month.
6    Q.  What did you do in response to receiving that
7 letter?
8    A.  I just answered the question.
9    Q.  At that time, did you decide to participate?
10    A.  Yes.
11    Q.  So then your knowledge of the case started
12 back in 2007; is that accurate?
13    A.  That is accurate.
14    Q.  You were asked a series of questions
15 regarding recording your time.  Do you recall those?
16 Or through the day, in general, you were asked
17 questions about recording your time; is that right?
18    A.  Right.
19    Q.  And there was time you were not allowed to
20 record; is that correct?
21    A.  That's correct.
22    Q.  Were you allowed to record time you spent
23 working for meal breaks?
24    A.  No.
25    Q.  Were you allowed to record time that you

**NETWORK DEPOSITION SERVICES**
**Transcript of Sandy Thomas**

35  (Pages 134 to 137)

134

1 spent doing showings on the weekends?
2     A.  No.
3     Q.  Were you allowed to record the time you spent
4 doing visitations after your scheduled hours?
5     A.  No.
6     Q.  What time would you normally begin working in
7 the morning?
8     A.  I would begin working at 7 o'clock.
9     Q.  And what time would you record on your time
10 sheet that you began working?
11     A.  8:00.
12     Q.  Were you allowed to record that time you
13 spent working in the morning?
14     A.  No.
15     Q.  Would that be another example of unrecorded
16 work time?
17     A.  Yes.
18     Q.  Now, I know you were asked about that
19 earlier.  Did you forget to mention that earlier?
20     A.  I did.
21     Q.  Was any of that time we just discussed that
22 you were not allowed to record, was any of that
23 preapproved overtime that you could record?
24     A.  No.
25     Q.  In these policies we were discussing and have

136

1 this case?
2     A.  Yes.
3     Q.  And also, I just want to make sure we are
4 clear.  You were also asked different on-call work that
5 you did and you were asked about it and went over.  In
6 addition to not recording time spent on calls that
7 lasted more than 15 minutes, was it also the case that
8 you did not get paid for the removals that you did?
9     A.  I didn't get paid for removals if I had to do
10 them.
11     Q.  And also, were you -- when you received --
12 you discussed at least one bonus that you received
13 during your employment.  Do you recall that?
14     A.  I recall.
15     Q.  Did your overtime rate change when you
16 received the bonus?
17     A.  No.
18     Q.  Are you familiar with the laws enough to know
19 how overtime rates should be calculated when you
20 receive a bonus?
21     A.  No.
22     MR. LINGLE:  We don't have any further
23 questions.
24     MS. DIAS:  Okay.  Just a couple of follow-up
25 questions, Mr. Thomas.

135

1 been discussed today, was it your understanding that
2 those applied equally to, for example, James and Regina
3 who also worked in your location?
4     A.  Yes.
5     Q.  So with respect to recording time for meal
6 breaks and time that you spent working on weekends,
7 visitations at night and the time you spent working,
8 your timecard would not accurately reflect those hours;
9 is that right?
10     A.  That's right.
11     Q.  I want to ask you a couple of questions about
12 community work.  Can you tell us again what community
13 work that you did?
14     A.  Community work we did, we would -- we would
15 network, the doctors that come by on a Saturday, on the
16 weekend, when they were available, and we conducted a
17 training and exams at the church.
18     Q.  And I want to be clear.  I want to make sure
19 we are clear on this.  Was that time paid or unpaid?
20     A.  That was unpaid.
21     Q.  Are you making a claim in this lawsuit for
22 that unpaid work?
23     A.  Yes, I am.
24     Q.  So despite whether it's Exhibit 7 or 8, you
25 do want to assert a claim for community service work in

137

1     FURTHER EXAMINATION
2 BY MS. DIAS:
3     Q.  Now, when I asked you whether you had been
4 paid for the community events with the doctors, you
5 said you had.  Did you not understand my question when
6 I asked it?
7     A.  Not clearly, not the way it was asked, I
8 didn't.
9     Q.  I asked you if those occurred during the
10 regular workday and you said yes.  And I said, You were
11 paid for those, correct?  And you said correct.
12     So you are changing your testimony now?
13     A.  I'm not changing it.
14     MR. LINGLE:  Objection.
15     THE WITNESS:  What I meant was, the only way
16 we could get the doctors and things on the Saturday is
17 when the office hours weren't opened.  When I said
18 regular-time, I figured that.  But no, I wouldn't get
19 paid for that.  We did the doctors and things on the
20 weekends, on Saturday.
21 BY MS. DIAS:
22     Q.  Who is "we"?
23     A.  I said me and Regina.
24     Q.  Not James?
25     A.  No, because James would be at the other

**NETWORK DEPOSITION SERVICES**
**Transcript of Sandy Thomas**

36  (Pages 138 to 141)

### 138

1  location. That would be at the church. But James
2  would be at the funeral home, you know.
3      Q. Okay. So you and Regina participated in how
4  many of these events with doctors?
5      A. I know we did two. Because Regina didn't
6  come on board until 2002, mid-year. So we did two
7  within those four years.
8      Q. So in the entire period of time you were
9  employed by Alderwoods, you had two of these programs
10  with doctors on Saturdays with Regina helping you,
11  correct?
12      A. Correct.
13      Q. And you did not record the hours that you
14  spent doing those?
15      A. No.
16      Q. And why didn't you record the hours you spent
17  doing those?
18      A. Because it was Saturday, a weekend, and I was
19  told not to record time.
20      Q. And you were told by whom?
21      A. By the general manager.
22      Q. And were you not to record the time for the
23  same reason that you told me, that the general rule of
24  not more than six or seven hours of overtime a week?
25      A. Yes.

### 139

1      Q. The coming in to work before your scheduled
2  work time, you said you weren't allowed to record your
3  hours. Who wouldn't allow you to record those hours?
4      A. The general manager.
5      Q. Your general manager?
6      A. Yes, ma'am.
7      Q. And that was true for the entire period you
8  were employed by Alderwoods?
9      A. The entire time.
10      Q. And did any of the people who reported to you
11  start earlier than the time that they would report on
12  their time sheets?
13      A. James would.
14      Q. On what occasions?
15      A. We had to do a disinterment. We would go to
16  the cemetery for a disinterment. We had an early
17  veterans service. We had to be at the veteran's
18  cemetery at a certain time in the morning. Ship-outs
19  we needed to get the body to the airport.
20      Q. So how many occasions would this occur with
21  James?
22      A. I'd say in those years he did -- we did -- he
23  did it about eight times.
24      Q. Eight times over the course of the --
25      A. Over the course of those few years.

### 140

1      Q. Let me get a clean question.
2          So approximately eight times from when you
3  became an Alderwoods employee in 2002 through December
4  of 2006, James started his shift earlier than his
5  scheduled time, but that was not reflected on his time
6  sheet?
7      A. Was not reflected.
8      Q. Anyone else?
9      A. No. Because that was, like I said, that
10  would be something that men would do.
11      Q. And did you instruct him not to record his
12  actual time worked on his time sheet?
13      A. I just told him, you know, unrecorded time,
14  but we had to do it, yes.
15      Q. And the reason why he didn't record his time
16  is this same restriction -- let me finish my
17  question -- the same restriction of approximately six
18  to seven hours a week of overtime; is that correct?
19      A. That's correct.
20      Q. Okay. Now, in response to your counsel's
21  question, you said you weren't paid for removals. But
22  when I asked you about it, you told me you were paid an
23  hour of time for removals. So I need to ask you which
24  is correct.
25      A. Okay. It's correct that I was -- maybe I was

### 141

1  there two hours or so, and I would only get paid for
2  one hour. That would be the correct thing.
3      Q. So when you did a removal, you were paid for
4  one hour of time; is that correct?
5      A. Right.
6      Q. And is that true throughout the period of
7  time you were employed by Alderwoods?
8      A. Correct.
9      Q. And you would get paid one hour regardless of
10  how much time it took you?
11      A. Exactly.
12      Q. And on some occasions it took you more than
13  an hour; is that correct?
14      A. That's correct.
15      Q. On the few occasions that you told me you
16  made removals, correct?
17      A. Right.
18      Q. When Regina and James made removals on those
19  few occasions, did they also get paid an hour for their
20  time?
21      A. They got paid an hour.
22      Q. Regardless of how much time --
23      A. Regardless.
24      Q. Let me finish my question.
25          Regardless of how much time it took them,

**NETWORK DEPOSITION SERVICES**
**Transcript of Sandy Thomas**

37 (Pages 142 to 144)

142

1  they only got paid an hour, correct?
2      A.   Correct.
3          MS. DIAS:  That is all the questions I have.
4  We are all set.
5          (Thereupon, the deposition
6              concluded at 1:42 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

144

1
2              CERTIFICATE OF REPORTER
   STATE OF NEVADA )
3                  ) ss:
   COUNTY OF CLARK )
4      I, Christy L. DeJonker, a duly commissioned
   Notary Public, Clark County, State of Nevada, do hereby
5  certify:  That I reported the deposition of Sandy
   Thomas, commencing on Monday, October 19, 2009, at
6  9:30 a.m.
7      That prior to being deposed, the witness was
   duly sworn by me to testify to the truth.  That I
8  thereafter transcribed my said shorthand notes into
   typewriting and that the typewritten transcript is a
9  complete, true and accurate transcription of my said
   shorthand notes.  That review of the transcript was
10 requested.
11     I further certify that I am not a relative,
   employee or independent contractor of counsel of any of
12 the parties; nor a relative, employee or independent
   contractor of the parties involved in said action; nor
13 a person financially interested in the action; nor do I
   have any other relationship with any of the parties or
14 with counsel of any of the parties involved in the
   action that may reasonably cause my impartiality to be
15 questioned.
16     IN WITNESS WHEREOF, I have set my hand in my
   office in the County of Clark, State of Nevada, this
17 21st day of October, 2009.
18
19
20 _____
   CHRISTY LYN DeJONKER, CCR NO. 691
21
22
23
24
25

143

1
2              CERTIFICATE OF DEPONENT
   PAGE  LINE  CHANGE              REASON
3  _____
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14          * * * * *
15     I, Sandy Thomas, deponent herein, do hereby
   certify and declare the within and foregoing
16 transcription to be my deposition in said action; that
   I have read, corrected and do hereby affix my signature
17 to said deposition under penalty of perjury.
18
          _____
          SANDY THOMAS, Deponent
19
20
21
22
23
24
25

# Exhibit 26

**NETWORK DEPOSITION SERVICES**
**Transcript of Stacey Weinstein**

1

```
 1              UNITED STATES DISTRICT COURT
 2            NORTHERN DISTRICT OF CALIFORNIA
 3            SAN FRANCISCO/OAKLAND DIVISION
 4               CASE NO:  CV-08-1184-SI
 5
 6   WILLIAM HELM, DEBORAH PRISE,
     HEATHER P. RADY, [see Complaint and
 7   Appendices for a listing of plaintiffs]
     et al., on behalf of themselves and
 8   all other employees and former employees
     similarly situated,
 9
            Plaintiffs,
10
     vs.
11
     ALDERWOODS GROUP, INC.,
12
13           Defendant
14   _____/
15                        Sheraton
                          1825 Griffin Road
16                        Dania, Florida
                          Wednesday, October 21, 2009
17                        11:34 a.m. - 2:13 p.m.
18
19            DEPOSITION OF STACEY WEINSTEIN
20
21
22      Taken before Leslie Hanawalt, Court Reporter and
23   Notary Public for the State of Florida at Large,
24   pursuant to Notice of Taking Deposition filed in the
25   above cause.
```

## 30

1      A.   I did the day-to-day businesses of the
2   funeral home. People would come in with a death, I
3   would take care of the family on some days. Some
4   days I would do paperwork. Some days I would wash a
5   limousine. Some days I would go to another location.
6   Sometimes I would drive the hearse to the cemetery.
7   It changed every day.
8      Q.   Was there a particular location that was
9   your home base of operations?
10     A.   Yes.
11     Q.   What location was that?
12     A.   Coconut Creek.
13     Q.   That's where you would report every day to
14  work, correct?
15     A.   Yes.
16     Q.   Is that where your time card was located?
17     A.   Yes.
18     Q.   So that's where you would clock in every
19  day at work, right?
20     A.   Yes.
21     Q.   Did you have a particular starting time?
22     A.   Yes.
23     Q.   What was that?
24     A.   8 o'clock.
25     Q.   I am presuming 8 o'clock a.m.?

## 31

1      A.   Yes.
2      Q.   Was it your practice to clock in as soon
3   as you got to work?
4      A.   No.
5      Q.   What was your practice regarding clocking
6   in at the beginning of the day?
7      A.   We would wait until 8 o'clock and all line
8   up at the time clock and clock in because we all
9   weren't allowed to before that.
10     Q.   When you say we all, who is we all?
11     A.   Everybody in the building. Other funeral
12  directors, counselors, secretaries, everybody.
13     Q.   Was there anyone working at that location
14  other than the funeral directors, pre-needs
15  counselors, and what was the last category?
16     A.   Secretaries. Not that I remember.
17     Q.   How many funeral directors were there?
18     A.   It changed every day because we rotated
19  with West Palm Beach and North Miami Beach.
20     Q.   Were there any funeral directors whose
21  home base of operation was Coconut Creek like
22  yourself?
23     A.   Avi. Avi was Coconut Creek. And I think
24  Mark, I am not sure.
25     Q.   Do you remember their last names?

## 32

1      A.   No, I don't.
2      Q.   How many pre-needs counselors worked at
3   Coconut Creek?
4      A.   It changed daily.
5      Q.   Were there any who had Coconut Creek as
6   their home base of operations?
7      A.   No, it didn't work that way with
8   pre-needs.
9      Q.   How did it work with them?
10     A.   They rotated.
11     Q.   They always rotated amongst homes?
12     A.   Yes.
13     Q.   So when you are talking about people
14  lining up at 8 o'clock to clock in, as it relates to
15  pre-needs counselors, that was a different person
16  every day?
17     A.   Except for telemarketers, yes.
18     Q.   What's the difference between a pre-needs
19  counselor and a telemarketer?
20     A.   The telemarketers were always based in
21  Coconut Creek.
22     Q.   How many of those were there?
23     A.   Three.
24     Q.   Do you remember their names?
25     A.   Barbara, and there was, what was his name,

## 33

1   another guy and another lady. I can't remember right
2   now the names. I know it, but I can't remember.
3      Q.   So your practice was to wait and clock in
4   at 8 o'clock a.m. with all of the people who
5   presumably on a given day were at Coconut Creek in
6   the morning and were required to clock in, correct?
7         MR. LINGLE:  Objection.
8         THE WITNESS:  Correct.
9   BY MS. DIAS:
10     Q.   What was your typical practice as far as
11  when you arrived at the Coconut Creek location?
12     A.   Between 7:00 and 7:30.
13     Q.   When you came to work or the location, did
14  you start working?
15     A.   Yes.
16     Q.   Did all of the individuals start working
17  to your knowledge?
18     A.   Not all of them, most of them.
19     Q.   Do you remember which ones started
20  working?
21     A.   I know Barbara and the other guy that was
22  with her started. My secretary would start as soon
23  as she got there. And depending on how many deaths
24  we had that day, the other funeral director would
25  start as soon as he came in.

**NETWORK DEPOSITION SERVICES**
**Transcript of Stacey Weinstein**

34

1    Q.   Do you have any ability to testify
2    concerning the specific times that any of those
3    individuals arrived at work?
4         MR. LINGLE:  Objection.
5         THE WITNESS:  No.  I have their phone
6    numbers if you want to call them.
7    BY MS. DIAS:
8    Q.   That's fine.
9    A.   Okay.
10   Q.   Who told you that you weren't permitted to
11   clock in until 8 o'clock?
12   A.   Neal Hornfeld.
13   Q.   Did anyone else ever tell you that?
14   A.   Rick Hilkoff.
15   Q.   Anyone else?
16   A.   No.
17   Q.   And what specifically did Neal tell you?
18   A.   That we had to wait until 8 o'clock
19   because we could not get paid overtime.
20   Q.   You could not get paid any overtime?
21   A.   No, never.
22   Q.   And what did Rick tell you?
23   A.   That we had to -- well, the first time I
24   spoke to him was over the lunching because I never
25   clocked out for lunch because I worked through my

35

1    lunch every day.
2         And he came in one day and said you all
3    have to start clocking out for an hour for lunch
4    because they're not going to pay us any overtime.
5    Q.   Do you remember when that was?
6    A.   My first week there.
7    Q.   Why would Rick have been the person
8    telling you that?
9    A.   Because him and Neal were my bosses.  They
10   were the ones that hired me.
11   Q.   All right.  So you come in, you start
12   working, you don't clock in until 8:00 o'clock, was
13   there ever an occasion you clocked in prior to 8
14   o'clock?
15   A.   I don't know.
16   Q.   On your time sheets did you ever record
17   time that you worked prior to 8 o'clock?
18   A.   I don't recall, but I am sure there must
19   be.
20   Q.   So your time sheets would reflect the time
21   that you actually came in and started working,
22   correct?
23        MR. LINGLE:  Objection.
24        THE WITNESS:  No.
25

36

1    BY MS. DIAS:
2    Q.   Would they ever reflect any time prior to
3    8 o'clock a.m. as a starting time?
4    A.   Maybe on occasion if I forgot.
5    Q.   If you forgot what?
6    A.   That I had to wait.
7    Q.   I'm not talking about clocking in.  I am
8    talking about your time sheet, do you understand?
9    A.   No.  We all clocked in.
10   Q.   You told me that you clocked in and you
11   used time sheets when you were there; is that not
12   true?
13   A.   No.  The time sheets were only what was
14   clocked in.  Only what -- the time sheets were filled
15   out every Friday.  And what we did was wrote down
16   what was on -- what the clock time was onto the time
17   sheet.  That's it.  We just copied that.
18   Q.   Did you have fill out your own time sheets
19   on Fridays?
20   A.   I filled out everybody's.  That was my
21   job.
22   Q.   So you took at every Friday all the time
23   o'clock entries --
24   A.   Right.
25   Q.   -- that were on the cards and you conveyed

37

1    those in writing onto a written time sheet; is that
2    what you're telling me?
3    A.   Correct.
4    Q.   And you would do that for all individuals
5    at Coconut Creek?
6    A.   Yes.
7    Q.   Would you do it for any individuals at
8    West Palm Beach?
9    A.   No.
10   Q.   Did you do it for any individuals at Star
11   of David?
12   A.   No.
13   Q.   Would you do it for any individuals who
14   worked at Tamarac?
15   A.   No.
16   Q.   So why don't you finish telling me the
17   process of how time was presented.  You told me there
18   was a time clock, correct?
19   A.   Right.
20   Q.   And you clocked in the morning, correct?
21   A.   Correct.
22   Q.   And you clocked out when you left for the
23   day, correct?
24   A.   No, we clocked out for lunch and then
25   clocked back in after lunch and then out at the end

**NETWORK DEPOSITION SERVICES**
**Transcript of Stacey Weinstein**

11 (Pages 38 to 41)

38

1  of the day.
2      Q.   So each day should have at least four
3  entries, correct?
4      A.   Correct.
5      Q.   Were there ever circumstances where there
6  was more than that?
7      A.   There might have been.
8      Q.   For what, for example?
9      A.   For leaving to go to hospice and bring
10  cookies and do community service things.
11     Q.   So there might be additional clocking in
12  and clocking out during the course of the day?
13     A.   Yes.
14     Q.   So at the end of the week on Fridays, you
15  would take everybody's time cards and you would fill
16  out a single time sheet or individual time sheet?
17     A.   Single.
18     Q.   So you would fill out a single time sheet
19  for the Coconut Creek location, correct?
20     A.   Correct.
21     Q.   Did you sign that at all?
22     A.   I don't remember.
23     Q.   Then what would you do with it?
24     A.   Give it to Neal.
25     Q.   Then what happened?

39

1      A.   Then Neal would send it to the
2  headquarters that did payroll.
3      Q.   Once you handed it to Neal, did you have
4  any further involvement in that week's time
5  reporting?
6      A.   No.
7      Q.   And that process that you just described
8  for me, did that process take place throughout the
9  period of time when you were actually physically
10  working for Alderwoods Group?
11     A.   Yes.
12     Q.   Did it ever differ in any way?
13     A.   No.  Just if somebody didn't have -- like
14  if they forget to punch in and out for lunch, I'd
15  have to write it down to make sure everybody totaled
16  40 hours because they couldn't be over.
17     Q.   And that was Neal that told you they
18  couldn't be over 40, correct?
19     A.   Yes.
20     Q.   Did Neal tell you anyone who had told him
21  that there couldn't be overtime hours?
22     A.   No.  I've been told the other locations
23  and it was the same everywhere.
24     Q.   So it was the same at West Palm Beach?
25     A.   Yes.

40

1      Q.   And in being the same, you are referring
2  to the fact that no one could report any overtime
3  hours; is that right?
4      A.   Right.
5      Q.   And would you also say it was the same at
6  Star of David?
7      A.   Yes.
8      Q.   Meaning that no one could record any
9  overtime hours at that location?
10     A.   Unless they got it pre-approved with Rick
11  Hilkoff.
12     Q.   At the Star of David location?
13     A.   Right.  That was the only one that was a
14  little different.
15     Q.   And what about Tamarac, was it also the
16  same there that --
17     A.   Yes.
18     Q.   Let me finish.  That you would say that no
19  individuals were ever allowed to record overtime
20  hours?
21     A.   Yes.
22     Q.   So Star of David from your experience is
23  the only location where it was a little different,
24  and you said that is for individuals who worked there
25  they could request pre-approval of overtime from

41

1  Rick; is that right?
2      A.   Right.  If they got pre-approval.
3      Q.   And then if they got pre-approval, they
4  could work overtime and get paid, is that --
5      A.   That's what I understood.
6      Q.   And you understood that how?
7      A.   From when I was there.
8      Q.   From when you were actually working at
9  Star of David?
10     A.   Correct.
11     Q.   And did you ever request pre-approval of
12  overtime hours there?
13     A.   No.
14     Q.   So if you never requested pre-approval of
15  overtime, can I assume there was no occasion where
16  you ever requested pre-approval and that was denied?
17         MR. LINGLE:  Objection.
18  BY MS. DIAS:
19     Q.   Is that right?
20     A.   Right.  I didn't work there that much.
21     Q.   Do you know any individuals who requested
22  pre-approval from Rick Hilkoff?
23     A.   No.
24     Q.   Did you ever hear of anyone that requested
25  pre-approval overtime hours and it was denied?

**NETWORK DEPOSITION SERVICES**
**Transcript of Stacey Weinstein**

18 (Pages 66 to 69)

66

1    A.   Yes. Mark worked there on-call a couple
2  times and they didn't record it.
3    Q.   Other than Mark, do you know how anybody
4  recorded their time with respect to on-call time at
5  North Miami Beach?
6    A.   I spoke to a few of them. They told me
7  they didn't, that it was the same as us.
8    Q.   What about Star of David, how did they
9  record their time for on-call time?
10   A.   I don't know.
11   Q.   Who told you not to record your time for
12 on-call time?
13   A.   Neal Hornfeld.
14   Q.   Anyone else?
15   A.   Rick Hilkoff.
16   Q.   Anyone else?
17   A.   No.
18   Q.   What specifically do you remember Neal
19 telling you?
20   A.   He gave me the sheet of what nights I had
21 and what Mark had. And he said these are the ones
22 you are on-call and that's it. And when I was hired,
23 he explained to me that we would have to be on-call
24 and it was just part of our job and that we did not
25 get paid for it.

67

1    Q.   And what conversations did you have with
2  Rick about recording time for on-call time?
3    A.   Rick would just joke about it. Because
4  like if I had been up the whole night before and I'd
5  come in really tired, and he'd say you had a rough
6  night, and I said yes, and he'd say, oh, well.
7    Q.   But did he talk to you at all about
8  recording your time --
9        MR. LINGLE: Objection.
10 BY MS. DIAS:
11   Q.   -- for on-call time?
12   A.   No. He would just joke about how we would
13 have to come in tired and not get paid for it.
14   Q.   So the only manager you ever spoke with
15 about how to record on-call time was Neal; is that
16 correct?
17   A.   We didn't record it so.
18   Q.   Understood.
19   A.   Right.
20   Q.   The only conversation that you had with
21 any Alderwoods manager about not recording your time
22 for on-call time was Neal, correct?
23   A.   No. When I was hired, Rick Hilkoff and
24 Neal Hornfeld were both in the office telling me what
25 my duties were, explaining that we had to work

68

1  on-call, and we did not get paid for it. So both
2  managers were there.
3    Q.   Other than Rick and Neal, did you ever
4  speak with any Alderwoods manager about whether or
5  not to record on-call time?
6    A.   No.
7    Q.   Did you ever instruct anyone as their
8  supervisor about recording or not recording on-call
9  time?
10   A.   No.
11   Q.   So you never instructed Mark?
12   A.   No. He was there before me so he already
13 knew.
14   Q.   Were you ever paid for any piecework?
15   A.   What do you mean?
16   Q.   Anything known as piecework at your
17 location?
18       MR. LINGLE: Objection.
19       THE WITNESS: I don't know what you mean
20 by piecework.
21 BY MS. DIAS:
22   Q.   Did you ever hear the term piecework used
23 when you worked at Alderwoods?
24   A.   No.
25   Q.   Are you aware of anyone getting paid

69

1  piecework time for any activities?
2    A.   I don't know what piecework means.
3    Q.   When you turned in the weekly time sheets
4  for everyone who worked at the Coconut Creek
5  location, did it ever include any reference to
6  piecework time?
7    A.   No. The only other thing that I would put
8  down is if somebody sold a casket and was entitled to
9  a bonus. If you sell a casket over a certain amount
10 of money, you get a bonus for it. So I would just
11 put down if they sold a casket over some amount of
12 money for a bonus.
13   Q.   Other than that bonus for the sale of a
14 certain kind of casket and referencing the time in,
15 time out for lunch, back in from lunch, and time out
16 at the end of the day, was there ever anything that
17 you recorded on the weekly time sheet?
18   A.   No.
19   Q.   You made reference a couple times to
20 clocking in and out for a lunch break, tell me how
21 that worked.
22   A.   You just had to remember to clock out and
23 clock back in just an hour, any hour you wanted.
24 Because I never really took lunch, I ate at my desk
25 so I had to try to remember to clock in and out and

**NETWORK DEPOSITION SERVICES**
**Transcript of Stacey Weinstein**

19 (Pages 70 to 73)

70

1  back in.
2      Q.   You did that every day?
3      A.   Yes.  Sometimes I'd forget.
4      Q.   What happened in that circumstance?
5      A.   Neal would write it in.
6      Q.   And if other employees forgot to write in
7  their meal time, did Neal write that in for them?
8      A.   Yes.  I had to make sure that he wrote it
9  in because it could only equal 40 hours.
10     Q.   That was written in on the time card
11  itself?
12     A.   Yes.
13     Q.   And that was true for what locations that
14  Neal would do that?
15     A.   West Palm Beach, Coconut Creek, and
16  Tamarac.
17     Q.   So there was never an occasion where you
18  took a lunch break when you worked at Alderwoods?
19     A.   There were occasions, but very few.
20     Q.   And there were never occasions when anyone
21  who worked in other positions at Coconut Creek took
22  lunch breaks?
23     A.   The secretary always took hers.  But other
24  people -- a lot of times we were at cemeteries
25  burying people.  You can't just say hold on, it's my

71

1  lunch time.
2      Q.   That's right.  But you don't also have to
3  take lunch every day at the same time, did you?
4      A.   No.  But we had so many people to bury.
5  We were under staffed so greatly that I mean we were
6  busy all the time.
7          You know how many -- I probably worked
8  every other Saturday when Saturdays were my days off
9  because we were so backed up.
10     Q.   Would you be able to tell as you sit here
11  today the frequency with which any other employee at
12  these funeral homes took a meal break?
13     A.   No, I can't tell you exactly.
14     Q.   Because there were occasions, were there
15  not, when individuals did take meal breaks and didn't
16  work during those meal breaks?
17     A.   Yes.
18     Q.   The practice of writing in a meal break,
19  even if one wasn't taken, did that also take place at
20  the North Miami Beach location?
21     A.   Yes.
22     Q.   How do you know that?
23     A.   Because Mark would work there.  I'd have
24  to send Mark there a lot.
25     Q.   And in the occasions that he went there

72

1  and did not take a meal break, but forgot to clock in
2  and out --
3      A.   He would come back to me, and I would have
4  to have Neal do it when he showed up on Fridays.
5      Q.   What about the employees who actually
6  worked at North Miami Beach, who wrote it in for
7  them?
8      A.   Mark Ginsberg.
9      Q.   How do you know that?
10     A.   Because I talked to them.
11     Q.   Talked to who?
12     A.   The employees there.
13     Q.   And how did it work at Star of David with
14  respect to --
15     A.   I don't know.
16     Q.   As far as any Alderwoods location other
17  than West Palm Beach, North Miami Beach, Tamarac, and
18  Coconut Creek, do you know how meal breaks worked?
19     A.   No.
20     Q.   Do you know what employees' practices were
21  about whether they took a meal break or not?
22     A.   No.
23     Q.   Do you know what their practices may have
24  been as far as whether they recorded their time for
25  meal breaks that they weren't able to take?

73

1      A.   No.
2      Q.   Do you know anything about the practice at
3  all as far as whether individuals at other locations
4  were paid for a meal break every day?
5      A.   Other than those, no.
6      Q.   For the on-call time and the way that you
7  described to me that it worked at certain locations,
8  did you ever see anything in writing about on-call
9  time?
10     A.   Just every month, the calendar that Neal
11  would give us showing what night you had.
12     Q.   That was the only thing you ever saw in
13  writing, correct?
14     A.   Yes.
15     Q.   What about the practice that you described
16  that you were aware of in a couple of locations
17  regarding meal breaks, did you ever see anything in
18  writing about that?
19     A.   No.
20     Q.   Who told you that you needed to clock in
21  and out for meal breaks at your location whether you
22  took them or not?
23     A.   Neal Hornfeld.
24     Q.   Did any manager other than Neal have a
25  conversation with you about that procedure?

74

1    A.   Mark Ginsberg.
2    Q.   Any other manager of Alderwoods?
3    A.   Rick Hilkoff.  Those are the only ones I
4  can remember right now.
5    Q.   What did Rick tell you?
6    A.   That we had to clock.
7    Q.   Even if you didn't take a break?
8    A.   Yes.
9    Q.   And what did Ginsberg tell you?
10   A.   The same thing.  It was all in a meeting.
11   Q.   Tell me about the meeting.
12   A.   It was a monthly meeting where everybody
13  gets together, and they go over everything.  And I
14  hadn't clocked out for lunch on a day or something,
15  so it was brought up whether you take it or not, you
16  have to make sure you clock in and out and make sure
17  everybody else does in your location.
18   Q.   And who all was at this monthly meeting?
19   A.   Mark Ginsberg, Neal Hornfeld, Phil
20  Weinstein, Rick Hilkoff, me, and some other people
21  that I don't recall their names.
22   Q.   Do you know what job positions they held?
23   A.   Funeral directors or funeral managers or
24  pre-need managers.
25   Q.   So the categories of employees that were

75

1  at this monthly meeting when this process was
2  described were funeral directors, correct?
3    A.   Uh-huh.
4    Q.   Pre-needs counselors, correct?
5    A.   The pre-need manager.
6    Q.   Pre-need managers.  The location managers?
7    A.   Uh-huh.
8    Q.   Anyone else, any other job positions?
9    A.   The regional managers.
10   Q.   Anyone else?
11   A.   And the funeral home manager.  That's all
12  I can remember.
13   Q.   You indicated that Star of David included
14  a cemetery facility, as well as the funeral home,
15  correct?
16   A.   Right.
17   Q.   Do you know anything about what any of the
18  cemetery employees may have been told about recording
19  their time?
20   A.   No.
21   Q.   Did any of the cemetery employees work
22  on-call time?
23   A.   No, they can't.  You have to be licensed.
24   Q.   The monthly meeting that you referenced
25  where you were told about the needing to clock in and

76

1  out for meal breaks.  Since you called it a monthly
2  meeting, I am assuming this meeting took place once a
3  month?
4    A.   Right.  But I only went to it I think
5  twice my whole time there because I was always
6  working.
7    Q.   When these monthly meetings were held, was
8  it always for the same group of job positions that
9  you described as this one meeting?
10   A.   I don't know.  I only know that I only
11  went to two of them.
12   Q.   For the two you went to, it only included
13  just those job titles that you told me about,
14  correct?
15   A.   That I remember, yes.
16   Q.   Where was the monthly meeting held?
17   A.   One time it was held at Star of David, and
18  one time it was held at North Miami Beach.
19   Q.   And for the other times you wouldn't be
20  sure, correct?
21   A.   Correct.  I know that they had a couple of
22  them in West Palm Beach that I couldn't make because
23  I was too busy.
24   Q.   What time of day did these meetings occur?
25   A.   In the morning.

77

1    Q.   After 8 o'clock?
2    A.   No.  One of them was at 6:30 a.m. for
3  breakfast before work, and the other one was at 7:00
4  a.m.
5    Q.   Did you record your time for attending
6  those meetings?
7    A.   No.
8    Q.   Did anyone record their time for attending
9  those meetings?
10   A.   Not that I know of.
11   Q.   But you couldn't be sure with respect to
12  everybody, right?
13   A.   Right.
14   Q.   Were you told not to record your time of
15  the meeting?
16   A.   Yes.
17   Q.   By whom?
18   A.   Rick Hilkoff and his bosses, Sonny Levitt
19  was there.  I forgot he was there.  Sonny Levitt was
20  there at the time.  They told us not to.
21   Q.   When did they tell you not to?
22   A.   When we got to the meeting and they said
23  meeting adjourned and said just don't clock in.  Your
24  managers will write in the time for the day because
25  it ended around 9:00.  So they said just not to clock

**NETWORK DEPOSITION SERVICES**
**Transcript of Stacey Weinstein**

---

78

1  in and that our managers would write in our time.
2  Q.  The starting time?
3  A.  Yes.
4  Q.  Which would be?
5  A.  The 8:00 a.m.
6  Q.  And again, that would be written directly
7  on the time card itself?
8  A.  Correct.
9  Q.  Other than the locations, the five
10  locations that you were familiar with, do you know
11  whether monthly meetings were held at any other
12  Alderwoods locations?
13  A.  No, I don't know.
14  Q.  If they were held, you wouldn't know what
15  time they were held?
16  A.  Correct.
17  Q.  And if they were held, you wouldn't know
18  what other managers may have told people about
19  recording their time for the meeting, correct?
20  A.  Correct.
21  Q.  Or whether anyone was paid for attending
22  the meeting, correct?
23  A.  Correct.
24  Q.  Were there ever monthly meetings held for
25  the other jobs that were in the five funeral homes

---

79

1  that you are aware of?
2  A.  Yes.
3  Q.  Describe those for me.
4  A.  The pre-need counselors had a meeting at
5  my funeral home one time.  So I know the pre-need
6  counselors used to meet, but I think they met weekly.
7  Q.  Do you know for sure?
8  A.  They mentioned they met weekly.
9  Q.  Do you know what time all those meetings
10  took place?
11  A.  No, I don't.
12  Q.  Do you know whether they recorded their
13  time for those meetings?
14  A.  No idea.
15  Q.  Or whether they were paid for those
16  meetings?
17  A.  No idea.
18  Q.  Any other meetings that you are aware of
19  taking place?
20  A.  No.
21  Q.  When you went to Alderwoods, did you have
22  your funeral director's license?
23  A.  Yes.
24  Q.  You had attained that before you became
25  employed by Alderwoods, correct?

---

80

1  A.  Oh, yes.  I was a funeral director for 15
2  years before I worked there.
3  Q.  Is there anything you have to do in
4  Florida to maintain your funeral director's license?
5  A.  Yes, CEUs.  You have to get 12 CEUs every
6  two years plus your AIDS and Communicable Disease
7  CEUs to keep your license up.  And pay for the
8  renewal, of course.
9  Q.  So you have to have 12 hours every two
10  years?
11  A.  Yes.  And AIDS and Communicable Diseases,
12  which is one or two credits on that.
13  Q.  Is that included as part of the 12?
14  A.  No, it's separate.
15  Q.  So how many hours do you need for AIDS and
16  Communicable Diseases?
17  A.  It's one or two.  I don't remember.  If I
18  go home, I could tell you because I have all my
19  papers for every two years I have taken the test.
20  Q.  So one or two hours every two years?
21  A.  Yes.
22  Q.  And then the renewal of the license?
23  A.  Right.
24  Q.  How long is the license valid?
25  A.  Two years.

---

81

1  Q.  During the period of time that you worked
2  at Alderwoods from August 2004 until March 2005, did
3  you renew your license?
4  A.  Yes.
5  Q.  Who paid for the renewal license?
6  A.  Was it four -- hold on, let me think.
7  Yes, it goes every even year.  2010 is the next time
8  so 2008, and 2006.
9  Q.  So you would have renewed it in 2004?
10  A.  Right.
11  Q.  As well, correct?
12  A.  Yes.  And two on.
13  Q.  What month was it renewed in 2004?
14  A.  In August.
15  Q.  Before you went to Alderwoods?
16  A.  Yes.
17  Q.  From August 2004 to March 2005, did you
18  complete any hours of CEU training?
19  A.  Yes.  When you go to -- they have these
20  papers that they send you where you go to lectures,
21  and if you sit through the lecture, you get so many
22  hours.
23  Q.  So you sat through some lectures?
24  A.  Yes.
25  Q.  How many?  Again, I'm talking the time

---

**82**

1  period --
2      A.   Right.  It was only two in the time period
3  that you are talking about.
4      Q.   Two lectures?
5      A.   Yes.
6      Q.   How long did each lecture last?
7      A.   Six hours, six to eight hours.
8      Q.   Did you take those on a workday or on a
9  weekend?
10      A.   On a day off.
11      Q.   Did you record the time that you spent at
12  those classes?
13      A.   No.
14      Q.   You were not paid for that time?
15      A.   No.
16      Q.   Were you instructed not to record that
17  time?
18      A.   Yes.
19      Q.   By whom?
20      A.   Neal.
21      Q.   Any other manager of Alderwoods?
22      A.   Neal was the only one that I spoke to.
23      Q.   So you would have no knowledge of what any
24  other manager in the Alderwoods organization would
25  have told employees about recording that time or not?

**83**

1      A.   Correct.
2      Q.   Did you ever see anything in writing about
3  whether you were to record that time?
4      A.   I saw a lot of things in writing that all
5  contradicted what Neal orally told us.  But if you
6  did what was in writing and didn't do what Neal told
7  you, you got fired.  Like Avi did, Avi got fired
8  because of it because he fought with Neal over the
9  hours.
10      Q.   Let me go back.  I appreciate that, but
11  let me go back to my question.
12          Did you ever see anything in writing that
13  talked about not recording CEU hours?
14      A.   No.
15      Q.   The CEU hours are for the funeral
16  director's license, correct?
17      A.   Correct.  And embalmers.
18      Q.   Any other job categories that had to take
19  that training in Florida?
20      A.   I don't know.  The pre-need counselors
21  have to do something, but I don't know how many hours
22  they have to do.
23      Q.   Do you know whether they were ever paid
24  for the time that they spent?
25      A.   I don't know.

**84**

1      Q.   What about in any other states, do you
2  know the requirements of any licenses that need to be
3  held by any particular positions?
4      A.   I know that in New York.  I have a good
5  friend that's a funeral director there, but that's it
6  really.
7      Q.   What do you know about New York?
8      A.   That they also have to take CEUs.
9      Q.   What does CEU stand for?
10      A.   Continuing education.
11      Q.   What's the U?
12      A.   I don't know.
13      Q.   Who conducted the CEU training that you
14  attended?
15      A.   I don't remember.
16      Q.   Was it anyone at Alderwoods Group?
17      A.   No.
18      Q.   Other than attending the CEU, two CEU
19  lectures, did you have any other training when you
20  were employed by Alderwoods?
21      A.   Yes.  Arc Mesa.
22      Q.   Say that again?
23      A.   A-R-C M-E-S-A.  They give you these little
24  booklets that they mail to you.  And you read it and
25  take the test, and you fax them back the answers, and

**85**

1  that's how you get the rest of your CEUs.  I have
2  them dating back to 1994 in a file.
3      Q.   Who sends you these materials?
4      A.   I called up and I got them sent to my
5  house to take the test to renew my license.
6      Q.   Arc Mesa, is that the name of an
7  organization?
8      A.   Yes.
9      Q.   And again, this is for CEU credits?
10      A.   Right.
11      Q.   So in addition to the two lectures you
12  attended, you're telling me you got some materials
13  from this Arc Mesa?
14      A.   Right.
15      Q.   Which you read and took a test and
16  returned to them, correct?
17      A.   Correct.
18      Q.   You are telling me you did that during the
19  period August 2004 through March 2005?
20      A.   Yes.  Because I had to get it in August.
21  I was running late.  I had to get it in.  Mine came
22  in September 2005.
23      Q.   How many of these tests did you take under
24  Arc Mesa?
25      A.   I have to go home and count.  Somewhere

**NETWORK DEPOSITION SERVICES**
**Transcript of Stacey Weinstein**

24 (Pages 90 to 93)

90

1    A.   Yes.
2    Q.   How did that work, can you describe that
3  for me?
4    A.   It depends if it was an at need.  Like if
5  somebody dies, then while we are at work, we would
6  write the pre-need of the spouse of the person that
7  died because you're doing the at need and pre-need.
8  If I had just a pre-need to write on both spouses,
9  then I would do it at night or on the weekends.
10   Q.   How frequently did that happen?
11   A.   Pretty often, which I was lucky.  Because
12  if you do write it, you get a commission.  That's a
13  separate check.
14   Q.   The time that you spent in pre-needs
15  meetings, did you record that time?
16   A.   No.
17   Q.   Were you told not to record that time?
18   A.   Yeah, you are not allowed to.
19   Q.   Who told you that?
20   A.   Rick Hilkoff.
21   Q.   What did he say?
22   A.   Because it was commission only.  You only
23  got what you wrote for.  If you went to somebody's
24  house and talked to them three hours and they decided
25  not to write, you lost three hours.

91

1    Q.   But it's Rick who specifically told you
2  that?
3    A.   Yes.
4    Q.   Did you ever tell anyone not to record
5  their hours for time spent at pre-needs meetings?
6    A.   Not at pre-needs, no.
7    Q.   Is it fair to say or would you agree with
8  me that if someone worked in a job position that did
9  not or they weren't licensed to sell pre-needs, that
10  they, therefore, weren't spending time in pre-needs
11  meetings that they weren't getting paid for?
12   A.   Right.
13   Q.   Other than the five locations that you
14  were aware of, do you know in any other Alderwoods
15  location, first of all, who conducted pre-needs
16  meetings?
17   A.   No, I just know Rick did ours.
18   Q.   So you wouldn't know what job positions in
19  other states sold pre-needs?
20   A.   No idea.
21   Q.   And you would similarly have no idea if
22  they recorded their time for those meetings, correct?
23   A.   Correct.
24   Q.   Or if they were paid for these meetings?
25   A.   Correct.

92

1    Q.   Or what their managers may have told them
2  about conducting those meetings or recording their
3  time, correct?
4    A.   Correct.
5    Q.   Did you ever see anything in writing at
6  Alderwoods that indicated you weren't to put down or
7  record your time for pre-needs meetings?
8    A.   No.
9    Q.   Would it be fair to say that pre-needs
10  meetings that you had that took place during the
11  course of the normal work day from 8:00 to 5:00, that
12  you were paid for those meetings?
13   A.   Those meetings, yes.
14   Q.   You made reference to community service
15  activities, tell me about that.
16   A.   I used to buy cookies or candies, and I
17  would go to all the hospice units and talk to all the
18  nurses about getting business and nursing homes and
19  the Kiwanis of Deerfield Beach and everything just
20  try to get business.
21      They would pay you for your cookies or
22  whatever you bought, you would give your receipt and
23  they pay you for that, just not the time going to the
24  places.
25   Q.   When you say they, you mean Alderwoods?

93

1    A.   Yes.
2    Q.   And for your community service work, was
3  it limited to delivering these cookies and candies to
4  the types of places you told me about?
5    A.   No.
6    Q.   What else?
7    A.   We basically could do anything we wanted.
8  They would push us.  Rick Hilkoff would push us to
9  get out there and try to get the business.  You know,
10  so we would go to all the hospitals in the area.  I
11  used to make rounds every week to North Broward, to
12  University Hospital, to Coral Springs Hospital, to
13  Northwest Regional, and then Hospice by the Sea.  And
14  then I would go on Commercial Boulevard to the
15  hospice unit where they had all the different teams
16  on 31st Avenue and Commercial and talk to all those
17  nurses because they're home health care nurses.  So a
18  lot of stuff.
19   Q.   Anything else that you can think of that
20  you did?
21   A.   Not right now.
22   Q.   And what time of day did you do this?
23   A.   Usually on my day off or weekend or at
24  night.
25   Q.   Were there ever times you did it during

**NETWORK DEPOSITION SERVICES**
**Transcript of Stacey Weinstein**

1

```
 1              UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF CALIFORNIA
 2            SAN FRANCISCO/OAKLAND DIVISION
               CASE NO:  CV-08-1184-SI
 3

 4

    WILLIAM HELM, DEBORAH PRISE,
 5  HEATHER P. RADY, [see Complaint and
    Appendices for a listing of plaintiffs]
 6  et al., on behalf of themselves and
    all other employees and former employees
 7  similarly situated,

 8            Plaintiffs,

 9  vs.

10  ALDERWOODS GROUP, INC.,

11            Defendants.

12  _____/

13

14

15              33 Centennial Court
                Deerfield Beach, Florida 33442
                Saturday, November 7th, 2009
16              11:16 a.m. - 1:08 p.m.

17

18       DEPOSITION OF STACEY WEINSTEIN

19              VOLUME 2

20       Taken before Beverly Bourlier James,

21  Registered Professional Reporter, Certified Realtime

22  Reporter and Notary Public in and for the State of

23  Florida at Large, pursuant to Notice of Taking

24  Deposition filed in the above-mentioned cause.

25
```

---

22

1 BY MS. DUGAN:
2 Q. So you never told any other employees they
3 were abusing overtime, correct?
4 MR. LINGLE: Objection.
5 THE WITNESS: Correct, we weren't allowed
6 overtime.
7 BY MS. DUGAN:
8 Q. Did you ever hear any other employees being
9 told they were abusing overtime?
10 MR. LINGLE: Objection.
11 THE WITNESS: We weren't allowed to take
12 it, so no.
13 Q. The answer is no, you never heard other
14 employees being told they were abusing overtime?
15 MR. LINGLE: Objection.
16 THE WITNESS: That's correct, since we
17 weren't allowed to take it.
18 BY MS. DUGAN:
19 Q. Mrs. Weinstein, if you'd try to focus on
20 the question that I'm asking --
21 MR. LINGLE: She's answering the questions
22 that are asked. Her answers are fine.
23 MS. DUGAN: If you focus on the question
24 I'm asking and answer that question, we will
25

---

23

1 finish much more quickly today.
2 MR. LINGLE: She's a person under oath.
3 She's answering the questions truthfully and to
4 the best of her ability and that's all that's
5 required, and she's been doing fine.
6 BY MS. DUGAN:
7 Q. Do you know whether the overtime of any
8 Alderwoods employees was monitored?
9 A. Yes.
10 Q. Whose overtime was monitored?
11 A. Everybody at my branch, at Tamarac, and at
12 Okeechobee.
13 Q. When you say your branch, that's Coconut
14 Creek?
15 A. Correct.
16 Q. And at Tamarac?
17 A. Tamarac.
18 Q. What was the third one?
19 A. Okeechobee.
20 Q. Where is Okeechobee?
21 A. On Okeechobee Road in West Palm Beach.
22 Q. Oh, that's West Palm Beach, okay.
23 A. Yes.
24 Q. Okay. How was employees' overtime
25 monitored as those three locations?

---

24

1 A. The managers, which I was one of, would
2 have to make sure that the people did not clock in
3 before their allotted time. If they came in to work
4 at seven, that they weren't supposed to come in until
5 eight, I would have to make sure that they didn't
6 clock in until eight. And whether or not you took a
7 lunch, I'd have to make sure that they clocked out
8 for that hour. And I'd have to make sure that, even
9 if they stayed after five, they clocked out at five
10 and then stayed because we weren't allowed to take
11 overtime.
12 Q. So you monitored employees' overtime at
13 Coconut Creek?
14 A. Yes, and at Tamarac when I was there.
15 Q. You were responsible for monitoring
16 overtime at Tamarac?
17 A. When I was there, because their manager --
18 they changed managers a couple of times, so they
19 would have me fill in there.
20 Q. Did anyone monitor employees' overtime at
21 Tamarac when you weren't there?
22 A. Yes.
23 Q. How do you know that?
24 A. Because Okeechobee, Coconut Creek and
25 Tamarac are all over Neil Hornfeld, so all those

---

25

1 employees float and they go from one location to
2 another.
3 Q. And who at Tamarac would monitor employees
4 overtime when you weren't there?
5 A. That location manager.
6 Q. And I think you testified his name was
7 Rick, but didn't have a last name for Rick.
8 A. No, I don't, and there is one that was
9 also Mark. They changed a couple of times, so --
10 Q. Another manager at Tamarac was Mark
11 somebody?
12 A. Yes.
13 Q. Okay, and who would monitor employee
14 overtime at West Palm Beach?
15 A. Neil, Neil Hornfeld.
16 Q. Other than those three locations in Coconut
17 Creek, Tamarac and West Palm Beach, do you know
18 whether the overtime of any other Alderwoods
19 employees was monitored?
20 A. Other than those three?
21 Q. Yes.
22 A. No, I don't.
23 Q. Do you know whether any managers were
24 admonished for the amount of overtime that their
25 employees were working?

**NETWORK DEPOSITION SERVICES**
**Transcript of Stacey Weinstein**

8 (Pages 26 to 29)

---

**26**

1  MR. LINGLE: Objection.
2  THE WITNESS: I don't understand, what
3  does that word mean, admonished?
4  BY MS. DUGAN:
5  Q. Do you know whether any managers were
6  criticized for the amount of overtime that their
7  employees were working?
8  MR. LINGLE: Objection.
9  THE WITNESS: I know that we got yelled at
10  if somebody put overtime on their card and we
11  weren't allowed to have overtime.
12  BY MS. DUGAN:
13  Q. So my question is about managers. Do you
14  know whether any location managers --
15  A. Right, which I was one, and I got yelled
16  at if somebody put it on theirs, so, yes, I was a
17  manager.
18  Q. So you, as a manager, got yelled at for
19  time that employees actually reported on their time
20  cards?
21  A. Yes.
22  Q. Is that what you just said?
23  A. Yes, correct.
24  Q. Do you know of any other managers who were
25  criticized for the amount of overtime that their

---

**27**

1  employees were working?
2  MR. LINGLE: Objection.
3  THE WITNESS: I only know for the three,
4  Tamarac, West Palm Beach and mine, because we had
5  our meetings together.
6  BY MS. DUGAN:
7  Q. So do you know if any other location
8  managers were ever criticized for the overtime that
9  their employees were working?
10  MR. LINGLE: Objection.
11  THE WITNESS: I don't know if North Miami
12  Beach was criticized or not, but I know that they
13  were told that they couldn't have it. I don't
14  know if they were criticized.
15  BY MS. DUGAN:
16  Q. Okay. So is it fair to say that other than
17  yourself personally, you don't know if other location
18  managers were criticized for the amount of overtime
19  their employees worked, is that correct?
20  MR. LINGLE: Objection.
21  THE WITNESS: Correct.
22  BY MS. DUGAN:
23  Q. Did you ever see any reports of overtime?
24  MR. LINGLE: Objection.
25  THE WITNESS: No.

---

**28**

1  BY MS. DUGAN:
2  Q. Do you know whether there was a budget for
3  overtime at your location?
4  A. I don't know.
5  Q. Were you personally ever given a budget for
6  the number of hours that you were to work?
7  A. No.
8  Q. Did you ever see a budget of work hours for
9  any other employees?
10  A. No.
11  Q. And I'm assuming, then, you never set any
12  budget for the number of hours for the people who
13  reported to you?
14  A. Correct.
15  Q. If we could take a look at what has been
16  marked as Exhibit 4, which was the second amended
17  complaint in this case. If you can let me know when
18  you have that in front of you.
19  A. I have it in front of me.
20  Q. If you'll please turn to the second to the
21  last page, which I think you may have looked at last
22  time, at appendix A.
23  A. Hold on.
24  Yes.
25  Q. Do you see your name listed in the first

---

**29**

1  line of individuals on appendix A?
2  A. Yes, I do.
3  Q. You previously testified that you
4  understood you were a party Plaintiff in this case,
5  is that correct?
6  A. Yes.
7  Q. As a Plaintiff, are you aware that you are
8  a class representative?
9  MR. LINGLE: Objection.
10  THE WITNESS: Yes.
11  BY MS. DUGAN:
12  Q. Do you know what a class representative is?
13  A. It means that I'm listed on the class
14  action and like how you asked me to come here today,
15  I am.
16  Q. Do you know what your duties are as a class
17  representative?
18  MR. LINGLE: Objection. Don't answer that
19  question. The only way she would know what her
20  duties are is through conversation with counsel.
21  BY MS. DUGAN:
22  Q. I don't want you to tell me anything that
23  counsel told you; I'm asking for your personal
24  understand. Do you know what your duties are as a
25  class rep?

---

# Exhibit 27

Deposition Transcript of Jack Wilkinson (04-15-09)

```
00001
   1              IN THE UNITED STATES DISTRICT COURT
   2           FOR THE WESTERN DISTRICT OF PENNSYLVANIA
   3
       DEBORAH PRICE and HEATHER RADY
   4   on behalf of themselves and
   5   all employees similarly
       situated,
   6        Plaintiff,
   7
       vs.                            No. 06-1641
   8   ALDERWOODS GROUP, INC.,
            Defendants.
   9
  10             DEPOSITION OF JACK WILKINSON
             TAKEN ON BEHALF OF THE DEFENDANTS
  11       ON APRIL 15, 2009, BEGINNING AT 8:00 A.M.
                    IN COFFEYVILLE, KANSAS
  12
  13                   APPEARANCES:
  14   Appearing on behalf of the PLAINTIFF:
  15   Kyle T. McGee, Attorney at Law
       MARGOLIS EDELSTEIN
  16   525 William Penn Place
       Suite 3300
  17   Pittsburgh, Pennsylvania 15219
       (412) 355-4971
  18   kmcgee@margolisedelstein.com
  19
       Appearing on behalf of the DEFENDANT:
  20
       Tonya B. Braun, Attorney at Law
  21   JONES DAY
       325 John H. McConnell Blvd., Suite 600
  22   Columbus, Ohio 43215
       tbraun@jonesday.com
  23
  24
  25   REPORTED BY:  Lacy Antle, CSR, RPR
00002
   1                      CONTENTS
   2                                            PAGE
   3   Direct Examination by Ms. Braun            4
   4   Cross-Examination by Mr. McGee           184
   5   Redirect Examination by Ms. Braun        212
   6
   7
   8
   9                      Exhibits
  10   By Defendant:                           Page
  11   1  Funeral Home Procedures               64
  12   2  Timecard with 7/21 Entry              73
  13   3  Timecard with Handwritten Notations   80
  14   4  Timecard with 7/2 Entry               83
  15   5  Timecard with 10:45 p.m. Notation     88
  16   6  Company Document 12/5/03              91
  17   7  Information Sheet                     99
  18   8  Information Sheet                    101
  19   9  Witness Responses to Interrogatories 122
  20   10 Excerpt of 11/21/08 Letter           138
  21
  22
  23
```

Page 1

Deposition Transcript of Jack Wilkinson (04-15-09)

```
24  significant substance, that if it involved some
25  time, you know, little menial things like receiving
00066
 1  a phone call while I was on lunch and things like
 2  this, to my understanding, wasn't, you know, wasn't
 3  worthy to be written down, you know.  And that was,
 4  you know, the interpretation that I got from the --
 5  back when Lowen Group had discussed the fair labor
 6  act with me.  That's just the understanding that I
 7  came away from that with.
 8       Q    So everything of significance you would
 9  record --
10       A    Yes.
11       Q    -- correct?
12       A    Yes.
13       Q    Okay.  And the things that you considered
14  not to be of significance, you just gave the example
15  of a phone call during lunch.
16       A    Yes.
17       Q    Okay.  And how long would a phone call
18  like would last that you did not record?
19       A    It'd vary from a minute or two to, you
20  know, maybe four or five minutes.
21       Q    Okay.  But otherwise you would record that
22  time, is that what I understanding you to say?  If
23  it was beyond five minutes, would you record it?
24       MR. MCGEE:  Object to the form.
25       THE WITNESS:  No.
00067
 1       Q    (BY MS. BRAUN) You said that you wouldn't record
 2  a phone call if it was, you said, ranging from one to two
 3  minutes to five minutes; is that correct?
 4       A    Right, right, right.
 5       Q    Okay.
 6       A    I probably wouldn't have recorded it at
 7  all if it was just on my lunchtime, because it just,
 8  you know, I didn't think that it was something that
 9  had to be recorded, or needed to be recorded,
10  because of my understanding of, you know, what was
11  considered work, you know.
12       Q    Uh-huh.
13       A    I don't know that I ever had any phone
14  calls that went any longer than that, so.
15       Q    Any longer than the five minutes?
16       A    Yeah, yeah.
17       Q    To your knowledge, were you paid for all
18  of the time that you recorded on your time sheets
19  and later, the timecard?
20       A    Yes, to my knowledge I was.
21       Q    Okay.  During this time period of December
22  2003 or beginning of December 2003, do you recall
23  your hourly wage?
24       A    No, I don't.
25       Q    Okay.  Do you recall if you received any
00068
 1  other type of compensation in addition to your
 2  hourly wage?
 3       A    Yes, there were perhaps, as I mentioned a
 4  while ago, maybe three, two or three commissions
 5  that I received for the sale of a headstone.  There
 6  was a couple times that I remember that there were
 7  bonuses that were given, because -- and to my
 8  understanding it was because our region had an
```

Page 28

Deposition Transcript of Jack Wilkinson (04-15-09)

```
 9    exceptional, you know, had stayed above or below
10    budget, and so they gave us a bonus as a result of
11    that.  And like I say I only remember a couple of
12    times that happened and that was what I understood
13    to be the reason that we received that.  And then
14    I'm also a minister, so there were times that I
15    would preach a funeral service or sing for a funeral
16    service, and I would receive compensation for that.
17        Q    Okay.  The two to three times that you
18    said you sold headstones, would that have been in
19    the December 2003 until your termination time
20    period?
21        A    Yes.
22        Q    Okay.  Now, where did the commission come
23    from, the vendor that -- I'm trying to decide where
24    it came from.
25        A    It came from Alderwoods.
00069
 1        Q    It came from Alderwoods?
 2        A    Yes, it did.
 3        Q    Okay.  And what was the commission, do you
 4    recall the amount --
 5        A    I don't remember.
 6        Q    -- or percentage?
 7        A    I don't know, it was a percentage, but I
 8    don't remember what the percentage was.
 9        Q    Okay.  And you referred to bonuses, do you
10    recall whether you would have received any bonus
11    between December 2003 and your termination?
12        A    I'm sure that I did, yes.
13        Q    Okay.  And that was a one -- an annual
14    bonus, one-time-a-year bonus --
15        A    No, no.
16        Q    -- or was that something else?
17        A    It was only what I understood, like I
18    said, when it was our --
19        Q    Uh-huh.
20        A    -- when our region or our group of funeral
21    homes had come in -- you know, we had a period of
22    time where we were below budget, and it was not an
23    annual basis I don't believe, I think it was more of
24    a -- and I'm not sure if it was quarterly or
25    bi-annually or how it was.
00070
 1        Q    Okay.
 2        A    I just remember were getting a couple of
 3    bonus checks for that and there had only been a
 4    couple of times that I remember getting those.
 5        Q    Okay.  And, again, just for clarity, you
 6    think it might have been a couple times in the
 7    December 2003 --
 8        A    Yes.
 9        Q    -- until your termination period?
10        A    Yes.
11        Q    Okay.  And do you recall in what amount
12    those bonuses would have been?
13        A    I don't, no, I don't.
14        Q    Less than a hundred dollars?
15        A    Probably more than a hundred dollars, I
16    think, and to the best of my knowledge, it would
17    have been less than 200, but I don't remember
18    exactly.
19        Q    Okay.  And how often would you have a role
```

Page 29

Deposition Transcript of Jack Wilkinson (04-15-09)

```
20    in a funeral service that was compensated and how
21    often did you preach --
22        A    Oh, that --
23        Q    -- during the funeral service?
24        A    -- varied too, oh my, there, you know,
25    there were times that I would have, you know, maybe
00071
 1    three or four in a month and other times that I
 2    wouldn't have any, so I don't know how to -- for
 3    sure how to average that out.
 4        Q    And what type of compensation did you
 5    receive --
 6        A    Generally I would receive --
 7        Q    -- generally an amount or?
 8        A    -- $50 for preaching a service, for being
 9    the minister and 25 if I sang.
10        Q    Okay.  And the compensation that this
11    additional money that you received for singing and
12    for preaching a service, you know, in what form
13    was -- well, let me ask you this, who paid that?
14        A    I -- to the best of my remembrance,
15    earlier on it was an Alderwoods check, there was a
16    period of time there that I'm certain it was an
17    Alderwoods check.  And then there was a period of
18    time that it was a Bath Funeral Home check, and in
19    my remembrance, the reason that was, there was a
20    time there that they actually, I was on the clock as
21    a funeral, you know, working the funeral, and I
22    would minister for the service, and so I'd receive
23    that compensation and be on the clock at the same
24    time.
25        Q    Uh-huh.
00072
 1        A    And then Alderwoods had instructed me to
 2    go off the clock whenever I was ministering for a
 3    service, and so I would have to go off the time
 4    clock for a period of time, generally, an hour or
 5    so, while I was wearing the hat of the minister.
 6        Q    And did you then consider the preaching or
 7    the singing for the services to be duties that were
 8    outside your typical duties as an Alderwoods
 9    employee?
10             MR. MCGEE:  Objection to the form.
11             THE WITNESS:  Outside --
12        Q    (BY  MS. BRAUN) Were you -- let me ask you this,
13    when you were hired to work as an assistant funeral
14    director, were part of your job duties explained to you that
15    you would need to sing at a service?
16        A    No, no, they understood that I did, that I
17    did minister, and that I sang, but, no, it wasn't
18    part of my job description.
19        Q    You weren't told that singing would be
20    part of your job description?
21        A    No.
22        Q    And were you told that preaching at a
23    service would be part of your job description?
24        A    No.
25        Q    Okay.  Not part of your job duties?
00073
 1        A    No.
 2        Q    Okay.  We talked about the times, the
 3    specific times that you were scheduled to work
 4    during the work week --
```

Page 30

Deposition Transcript of Jack Wilkinson (04-15-09)

```
 3        A    Yes.
 4        Q    And then do you see at the bottom where it
 5   says "OT ADJ"?
 6        A    Yes.
 7        Q    Okay.  Do you have any understanding of
 8   what OT ADJ would represent here?
 9        A    I'm going to guess overtime adjustment.
10             MR. MCGEE:  I don't want you to guess,
11   Jack.
12             THE WITNESS:  I'm sorry.
13             MR. MCGEE:  You either know or you don't
14   know.
15             THE WITNESS:  I do not know.
16        Q    (BY  MS. BRAUN)  Okay.  Could it represent an
17   overtime adjustment?
18             MR. MCGEE:  Object to the form.
19        Q    (BY  MS. BRAUN)  You can go ahead and answer.
20             MR. MCGEE:  You can answer, sure.
21             THE WITNESS:  It could, yes.
22        Q    (BY  MS. BRAUN)  Okay.  And do you know what that
23   overtime ADJ represents?
24        A    I --
25             MR. MCGEE:  Object to the form.
00108
 1             THE WITNESS:  I don't know.
 2        Q    (BY  MS. BRAUN)  Do you know?
 3        A    I don't.
 4        Q    You say that you don't believe that the
 5   compensation -- or let me ask you this, is your
 6   claim that the compensation for the head markers, is
 7   your claim that that wasn't included in the OT
 8   compensation?
 9        A    I didn't think that it was, no.
10        Q    Okay.  Now, did you raise that at any
11   point during your employment?
12        A    Did I not.
13        Q    Okay.  And why not?
14        A    I didn't know that it would be something
15   that would be subject to that.  I didn't understand
16   it to be something that would be subject to
17   overtime.
18        Q    And is your claim -- do you have a claim
19   regarding the bonuses, I mean, what is -- you
20   mentioned that you received a bonus you believe; is
21   that time that you think should have been included?
22        A    Well --
23        Q    In the overtime --
24             MR. MCGEE:  I'm going to object to the
25   extent it calls for legal conclusion.  You can
00109
 1   answer to the extent possible.
 2        Q    (BY  MS. BRAUN)  I'm just asking if your claim in
 3   this litigation is.  I mean, you said that your claim in
 4   this litigation is that the commissions for the headstones,
 5   you think that wasn't included.
 6        A    Right.
 7        Q    Is your claim that you think it should
 8   have been included?
 9        A    Yes, yes.
10        Q    Okay.  Regarding the bonuses, is your
11   claim that you do not think the bonuses were
12   included in your regular calculation for overtime?
13        A    Yes.
```

Page 45

Deposition Transcript of Jack Wilkinson (04-15-09)

14     Q    Okay.  And is your claim that you believe
15 that the bonuses should have been included?
16     A    Yes.
17     Q    Okay.  Now, did you ever raise the fact
18 that you thought the bonuses should have been
19 included to any member of management during your
20 employment?
21     A    No.
22     Q    And why not?
23     A    Because I didn't understand that it could
24 be subject to overtime.
25     Q    Is there any other type of compensation
00110
1 that you received that you believe should have been
2 included in the overtime calculation that we haven't
3 addressed?
4     A    No.
5     Q    Were you aware of any type of policy that
6 certain forms of calculation would not be included
7 in the overtime calculation?
8         MR. MCGEE:  Objection to form.
9         THE WITNESS:  No.
10     Q    (BY  MS. BRAUN) And do you have any knowledge how
11 the overtime or the regular rate for OT purposes was
12 calculated for any other employee at Alderwoods?
13         MR. MCGEE:  Object to the form.
14         THE WITNESS:  No.
15     Q    (BY  MS. BRAUN) You testified earlier that you did
16 not need to seek preapproval for overtime; correct?
17     A    Correct.
18     Q    Okay.  Are you aware of any policy that
19 would have required any other Alderwoods employee to
20 seek preapproval for overtime?
21     A    A policy?
22         MR. MCGEE:  Object to the form.  You can
23 answer.
24         THE WITNESS:  I -- no, not as far as a
25 policy, no.  All I know is word of mouth.  I was
00111
1 told that they were required.
2         MS. BRAUN:  Let's take a break if that's
3 okay.
4         THE WITNESS:  Thank you.
5         (Break taken from 10:41 a.m. to
6 10:52 a.m.)
7     Q    (BY  MS. BRAUN) Do you know what the practice was
8 at Altamont as to whether employees sought preapproval for
9 overtime?
10     A    No, I don't know.
11     Q    And we spoke earlier about Larry Wilson
12 and his statement that he was required to have
13 preapproval; is that correct --
14     A    Yes.
15     Q    -- for overtime?
16     A    Yes.
17     Q    Okay.  Do you know the specific
18 circumstances under which he was required to obtain
19 preapproval?
20     A    No, I don't.
21     Q    Okay.  And so, therefore, would you know
22 if there were any exceptions to what he claimed was
23 a requirement to get preapproval?  Do you know if
24 there would be any exceptions to what he claimed was

Page 46

Deposition Transcript of Jack Wilkinson (04-15-09)

22    back.
23            Do you know what employees at other
24    locations other than Chetopa and Altamont had to do
25    while they were on call?
00163
1            MR. MCGEE:  Object to the form.
2            THE WITNESS:  No, I do not.
3        Q    (BY  MS. BRAUN) And it's not my intent to repeat,
4    but I think we established that you do not know what they
5    did while they were on call; correct?
6        A    I don't know specifics of what they did,
7    no.
8        Q    And you would not know if employees
9    outside of Chetopa and Altamont recorded their time
10   while on call?
11           MR. MCGEE:  Objection to the form.
12           THE WITNESS:  I don't know whether they
13   did or not.
14       Q    (BY MS. BRAUN) Okay.  Or whether they were paid
15   for it?
16       A    That's correct.
17       Q    We spoke before about some commission
18   compensation that you received on two or three
19   occasions for selling, was it gravestones, yes?
20       A    Headstones, yes.
21       Q    Headstones, excuse me.
22       Q    Do you have any recollection -- I believe
23   you said it was a percentage, percentage of the
24   headstone, but how much -- what is the cost for a
25   headstone?  Do you have a recollection of that?
00164
1        A    Oh, my, they vary -- extreme -- because
2    they can go anywhere from 175 to $200 and up.
3        Q    Okay.
4        A    And it's been too long ago for me to
5    remember how much those particular ones sold for,
6    but there's a wide variety.
7        Q    Okay.  Do you know if Kansas law requires
8    an individual to have both an insurance license and
9    a funeral director's license to do the pre-need?
10       A    I don't know.
11           MR. MCGEE:  Object to form.
12       Q    (BY  MS. BRAUN) And do you have any knowledge as
13   to whether funeral directors at other Alderwoods locations,
14   whether it was mandated that they obtain insurance licenses?
15       A    No, I don't.
16       Q    And you made no effort to obtain an
17   insurance license during your time at Alderwoods?
18       A    I did not.
19       Q    Okay.  Were you ever told that you would
20   not be paid for a certain period of time prior to
21   your scheduled work time?
22           MR. MCGEE:  Object to the form.
23           THE WITNESS:  Prior to my scheduled work
24   time?
25       Q    (BY  MS. BRAUN) Uh-huh, you had a scheduled work
00165
1    time?
2        A    I did, correct.
3        Q    And it was 8:00 a.m., as I recall?
4        A    8:00 to 12:00, and 1:00 to 5:00.
5        Q    So did anyone ever tell you that you
6    wouldn't be paid, for example, if you clocked in at
Page 68

Deposition Transcript of Jack Wilkinson (04-15-09)

```
 1   testified to 8:00 to noon, 1:00 to 5:00, how many
 2   days a week was that?
 3       A    That's five.
 4       Q    If my math is correct, how many hours
 5   would that be a week based on your general...
 6       A    40.
 7       Q    So if Herb is aware, as you've testified,
 8   that you would be doing work on call when the
 9   situation required it, Herb would then be aware that
10   you had to work overtime; correct?
11       A    Yes.
12       Q    And he was aware of this before he put you
13   on call?
14       A    Yes.
15       Q    Just as a point of clarification, the
16   phrase, "your termination from Alderwoods," that was
17   solely based on the fact that Alderwoods, at some
18   point in time, no longer owned the home; correct?
19       A    Correct.
20       Q    I believe your testimony under direct
21   examination was, for the time that you did record,
22   you were paid accordingly; correct?
23       A    Yes.
24       Q    And you were paid overtime; correct?
25       A    Yes.
00205
 1       Q    How were you paid overtime?
 2       A    On the basis of time and a half, anything
 3   over 40 hours.
 4       Q    I want to refer to you Defendant's Exhibit
 5   6 real quick.  It's my understanding, prior to
 6   today, had you ever seen this document before?
 7       A    I don't remember ever seeing this, no.
 8       Q    Okay.  Do you see the entry for
 9   January 30th, 2004?
10       A    Yes.
11       Q    What -- do you see where it says "hour
12   units"?
13       A    Yes.
14       Q    What does it say for "regular"?
15       A    80.4.
16       Q    Based on your understanding that you just
17   testified to, would that be an accurate reflection
18   of regular hours?
19       A    Well, my regular hours were to be 40 hours
20   a week.
21       Q    And how long were your pay periods?
22       A    Two week pay periods at this time.
23       Q    So it was the maximum number of regular
24   hours you could have in a two week pay period?
25       A    Eighty.
00206
 1       Q    And this document reflects at least one
 2   period there was more than 80 hours in a pay period;
 3   correct?
 4       A    That's what it reflects, yes.
 5       Q    Mr. Wilkinson, do you recall being asked
 6   some questions about -- let me refer you, just so
 7   we're clear, to Exhibit 8, Defendant's Exhibit 8.  I
 8   want to look at check box "E" and, you know, I think
 9   it's been repeated on the record, so I won't repeat
10   it, but this is the one that reflects other
11   compensation bonuses, commissions being reflected in
```

Page 85

Deposition Transcript of Jack Wilkinson (04-15-09)

12  your overtime pay.  And you were asked some
13  questions about whether you're claiming that bonuses
14  and commissions were -- whether part of your claim
15  is whether bonuses and commissions were included in
16  your overtime pay; correct?
17      A    Correct.
18      Q    You also gave some testimony about some
19  monies you had received from Alderwoods when you
20  sang or preached at a service; correct?
21      A    Correct.
22      Q    Would you also be claiming that those
23  payments for singing and preaching, are you claiming
24  that that should be included in your overtime
25  calculation, the same way you are claiming that the
00207
1   bonuses and commissions should be?
2       A    I hadn't thought about that, quite honest.
3   There was a period of time that -- maybe this is
4   more information than what you're asking for, but
5   there was a period of time that that was included.
6   It was a separate paycheck for the singing or the
7   preaching, and I was asked to go off of the time
8   clock, and then there was another time that it was
9   actually figured into my paycheck.  Then it was -- I
10  was left on the clock and it actually was figured
11  into the paycheck.  So, you know, I don't know an
12  answer to that question whether I feel like I'm
13  entitled to any overtime for that.
14      Q    Let's break that down a little bit you
15  said -- your testimony directly is you got, I
16  believe, $25 if you sang at a service?
17      A    Correct.
18      Q    And then 50 if you preached?
19      A    Correct.
20      Q    Then you said there were two points of
21  time, one when you were on the clock and it was --
22  and one when you weren't.
23      A    Correct.
24      Q    Which one was first?
25      A    The first was, I was on the clock and --
00208
1       Q    And just to be clear, this was all from
2   December 2003 through when --
3       A    Yes.
4       Q    -- Alderwoods left the home?
5       A    Yes.
6       Q    So when you were on the clock, how did you
7   receive these payments of $25 or 50 if you performed
8   that type of work?
9       A    I received a check, and if I remember
10  right, there was a period of time that they were
11  actually figured into my payroll.
12      Q    And how would that have been figured in,
13  if you know?
14      A    It would have been figured in on the basis
15  for $50 for the preaching and 25 for the singing,
16  it's a flat rate.
17      Q    Would it have been specifically itemized
18  if you remember?
19      A    Yes, yes.  That's the way I remember it,
20  and then, of course, whenever -- when I was asked to
21  go off the clock, they paid me in a check.  And I
22  believe that there was a period of time there, that
                        Page 86

Deposition Transcript of Jack Wilkinson (04-15-09)
```
23   it was actually an Alderwoods check.  There was
24   another period of time that it was a Bath Funeral
25   Home check.  And I couldn't tell you what frame --
00209
 1   timeframe.
 2        Q    And that was for the times that you were
 3   off the clock for the service?
 4        A    Yes.
 5        Q    Would it be a separate -- at that period
 6   of time would it be a separate check from your
 7   regular check?
 8        A    Yes.
 9        Q    Okay.  Now going back to my initial
10   question, do you recall testifying today that you
11   believe commissions and bonuses should have been
12   factored into your overtime compensation?
13        A    Yes.
14        Q    Do you believe, or are you making a claim,
15   if you know, that these payments should be included
16   as well?
17        A    I don't know.
18        Q    Fair enough.  Let me ask you this, if that
19   were compensable, would you want to be paid for
20   that?
21        A    Yes.
22        MR. MCGEE:  Can we just take five minutes?
23   I just want to review my notes one last time.
24        MS. BRAUN:  That's fine.
25        (Break taken from 2:23 p.m. to 2:27 p.m.)
00210
 1        Q    (BY  MR. MCGEE) Back on the record.
 2   Mr. Wilkinson, do you recall the time that Alderwoods sold
 3   the two Bath homes?
 4        A    I do.
 5        Q    And I believe you gave some testimony
 6   about a gentleman, is it Keith Balentine?
 7        A    Yes.
 8        Q    Who is Keith Balentine?
 9        A    He is -- was at that time, I believe, the
10   location manager at Columbus at Murdock Funeral
11   Home.
12        Q    Was that an Alderwoods location?
13        A    Yes.
14        Q    So Keith Balentine would have been an
15   Alderwoods employee?
16        A    Yes.
17        Q    And with respect to the testimony you gave
18   about Mr. Balentine around the time Alderwoods sold
19   the two Bath homes, could you tell me again what it
20   was you observed him do?
21        A    I didn't observe him, I was told --
22        Q    Oh, you were told, I apologize.
23        A    -- by Dora Boore and by Dorthy Bath that
24   he came to the Altamont funeral home and collected
25   everything that would be considered connected with
00211
 1   Alderwoods; anything with the letterhead on it,
 2   anything of the procedure manuals, anything that
 3   could have been connected with Alderwoods and
 4   collected it and took it out of the funeral home.
 5        Q    Where -- do you have an understanding of
 6   where he took those documents?
 7        A    I don't.
```
Page 87