# EXHIBIT 50

Berryhill, Monica (4-7-10)

1

1          IN THE UNITED STATES DISTRICT COURT

2      FOR THE WESTERN DISTRICT OF PENNSYLVANIA

3    ------------------------------------------------

4    DEBORAH PRISE and HEATHER RADY
     on behalf of themselves and all
5    employees similarly situated,

6          Plaintiffs,

7    vs.
                            File No. 06-1641
8    ALDERWOODS GROUP, INC.,

9          Defendant.

10   ------------------------------------------------

11

12          Deposition of Monica Berryhill taken before

13   Kimberly A. McCallum, a Notary Public in and for the

14   County of Anoka, State of Minnesota, on Wednesday the

15   7th day of April, 2010, commencing at approximately

16   9:20 a.m., at 200 West First Street, in the City of

17   Duluth, State of Minnesota.

18                    *        *        *

19

20

21

22

23

24

25

2

1                    APPEARANCES:

Berryhill, Monica (4-7-10)

16  A.  Correct.

17  Q.  What does that relate to?

18  A.  This relates to the funeral home's ability

19      or cemetery's ability to work hand in hand with

20      other groups or organizations to execute a

21      community event.  Whether I go to McDonald's

22      and see what portion they might play in this

23      community event or United Way.  It's -- as a

24      funeral home you don't have to be the only one

25      to orchestrate and conduct this event.  You can

144

1   be a sponsor in it.

2   Q.  So would this relate then to going out and

3       attempting to get other companies to sponsor

4       community events that the funeral home is

5       participating in?

6   A.  Be a sponsor of, multiple organizations,

7       multiple businesses sponsoring this event

8       together.

9   Q.  Okay.  And is this again a leadership

10      packet that the person providing the training

11      would have used?

12  A.  Yes, it is.

13  Q.  And does it appear to you that this would

14      have been used by the market growth managers

15      when they were training location managers and

16      general managers?

17  A.  That is correct.

18  Q.  And I take it again you don't know if this

Page 130

Berryhill, Monica (4-7-10)

19      was then distributed to those location or
20      general managers?
21      A.   I'm sorry, no.
22                      (WHEREUPON, Exhibit No. 7 was
23                      marked for identification.)
24   BY MS. GIFFORD:
25      Q.   Looking at what's been marked as

145

1       Exhibit 7.  Do you recognize this document?
2       A.   I do.
3       Q.   What is it?
4       A.   This is kind of the logistical part of
5       executing the different modules.  This is the
6       session that talks about there are going to be
7       expenses involved and please be considering
8       these expenses as you are planning this
9       activity.
10                      This is also the section of the
11      training program that reiterated that you need
12      to be remembering and keeping in mind how many
13      staff people are going to be involved in this
14      event, will this event occur during regular
15      business hours or on an evening or a weekend
16      and where you would -- and again, I haven't --
17      I'm going off memory on some of this.  And how
18      you would go about coding the expenses to this
19      event.
20      Q.   And can you show me where this document
21      says that?
                    Page 131

Berryhill, Monica (4-7-10)

22     A.    It does not say that.

23     Q.    And the term "discretionary spending," is

24     that what you are referring to with respect

25     to -- I'm sorry, let me go back and say that.

146

1              It says -- and I'm looking here now

2      at page 3 of the document which has Bates

3      number 9218?

4      A.    Uh-huh.

5      Q.    And it talks about learners being able to

6      define discretionary spending?

7      A.    Yep.

8      Q.    And I believe it says -- going down a few

9      bullet points it says that the total community

10     leadership budget, the discretionary spending

11     would be five percent of that?  I'm sorry, I'll

12     just read it.  It says, "Five percent of your

13     total community leadership budget should be

14     more than enough to cover these expenses."  Do

15     you see that part?

16     A.    Uh-huh.

17     Q.    And I'm sorry, that's yes?

18     A.    Yes.

19     Q.    And so what would that five percent, what

20     would that discretionary spending cover?

21     A.    All aspects of the event, whether you are

22     going to buy juice or balloons or compensating

23     employees for doing this after hours or not

24     during regular business hours.

Page 132

Berryhill, Monica (4-7-10)

25      Q.   Can you show me where it says compensating

147

1       employees is part of discretionary spending?
2       A.   I don't see that printed on these pages
3       that are in front of me.   I have that as
4       professional knowledge for being the geographic
5       trainer presenting this portion of the program.
6       Q.   And I believe you testified before that
7       you know who Ron Collins is?
8       A.   Yes.
9       Q.   And he was a VPO as well?
10      A.   Correct.
11      Q.   And if Mr. Collins testified that he --
12      the requirement to pay employees for community
13      work was never included in any corporate-wide
14      written document, would you have any reason to
15      dispute that testimony?
16      A.   Can you say the question again?
17      Q.   If Mr. Collins testified under oath that
18      there were no corporate-wide documents
19      indicating specifically the employees would be
20      paid for time spent community work?
21      A.   Okay.
22      Q.   Would you dispute that testimony?
23                   MR. MEACHAM:   Objection;
24              speculative.
25                   THE WITNESS:   Yeah, I don't

Berryhill, Monica (4-7-10)

148

1                  quite understand what the question

2                  is.  All employees -- it was the

3                  expectation of the company that any

4                  employee putting forth the time --

5      BY MS. GIFFORD:

6          Q.   Just to save us time --

7          A.   I don't want to be argumentative.

8          Q.   I'm not asking about understanding their

9      expectations.  I'm asking about what was

10     written in a document.

11         A.   Okay.

12         Q.   Do you know of any document, written

13     document that states that?

14         A.   No.

15                  MR. MEACHAM:  Objection;

16                  vague.  What does "states that" mean?

17     BY MS. GIFFORD:

18         Q.   Of any written document that states that

19     employees will be paid for community time spent

20     in community activities?

21         A.   No.  Can I follow that up by saying?

22                  MR. MEACHAM:  You may.

23                  THE WITNESS:  I do know there

24                  are documents that say any time spent

25                  by an employee engaged in work on

149

1                  behalf of the company will be

Page 134

# EXHIBIT 51

Deposition Transcript of Jason Burgess (08-11-09).txt

1

1                THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2                  Civil Action No. 06-1641

3

4     _____
      DEBORAH PRISE and HEATHER        )
5     RADY on behalf of themselves     )
      and all employees similarly      )
6     situated,                        )
                                       )
7              Plaintiffs,             )
                                       )
8     vs.                              )
                                       )
9     ALDERWOODS GROUP, INC., and      )
      SERVICE CORPORATION INTERNATIONAL)
10                                     )
               Defendant.             )
11    _____   )

12            DEPOSITION OF JASON ALEX BURGESS

13                 (Taken by Defendants)

14              Charlotte, North Carolina

15              Tuesday, August 11, 2009

16

17

18

19

20

21

22

23

24              Reported in Stenotype by
          V. Dario Stanziola, CSR, RPR, CRR
25

2

1                        APPEARANCES

Deposition Transcript of Jason Burgess (08-11-09).txt

19      A.   I believe it was the first and third

20   Friday of every month.

21      Q.   Were you ever told that you had to report

22   to Alderwoods's management regarding your

23   participation in community activities?

24      A.   No, ma'am.

25      Q.   Did you receive performance reviews while

166

1   you were an employee of Alderwoods, like an annual

2   performance review?

3      A.   I think so.  But I'm not sure.  I'm not a

4   hundred percent sure on that.  I think so.

5      Q.   And whatever recollection you may have of

6   those performance reviews, was your involvement in

7   community service addressed?

8      A.   Oh, yes, ma'am.  Any time -- any time you

9   sit down and talked to anybody about it, if

10   community service could be brought up, he always --

11   Maurice always would bring up community service

12   involvement.

13      Q.   And he would bring it up, what do you mean?

14   What would be said?

15      A.   Like even at staff meetings, you know, he

16   -- Maurice would always say let's remember, you

17   know, to do our community involvement.  Let's

18   remember to be, you know, good moral citizens in

19   the community and make sure the community knows

20   we're here and that we're still the same -- you

21   know, same funeral home, even though we're owned by

Page 150

Deposition Transcript of Jason Burgess (08-11-09).txt

22   a corporate conglomerate.  That we're all local

23   directors and that we're not people who's brought

24   in from other places.

25        Q.   Did you ever fill out any type of paperwork

167

1    to indicate what you had done in the community?

2         A.   No, ma'am.

3         Q.   Were you ever aware of anyone being

4    disciplined for their lack of involvement in the

5    community?

6         A.   No, ma'am.  That I do not know.

7         Q.   Your testimony is that Mr. Trull told you

8    to pick from one of several options for a community

9    organization?

10        A.   Yes, ma'am.

11        Q.   Okay.  And with respect to joining a

12   church, could you -- I just want to understand your

13   testimony.  It was your choice as to which church you

14   wanted to belong to?

15        A.   Yes, ma'am.  Because he wanted us to pick

16   a -- as he considered a fairly influential church

17   in the community.

18        Q.   Okay.  So you understood that he was

19   telling you to pick a church?

20        A.   Correct.

21        Q.   Okay.

22        A.   In my county, yes, ma'am.

23        Q.   Did he tell you that there would be any

24   repercussions if you decided not to join a church?

Page 151

Deposition Transcript of Jason Burgess (08-11-09).txt
                                                        169

1        A.   Yes, ma'am.

2        Q.   Okay.  And when did you first become a

3   member of the North Carolina Funeral Directors

4   Association?

5        A.   It was after April 2000.

6        Q.   And that was in response to?

7             Why did you decide to become a member?

8        A.   Because Maurice told us we needed to

9   become members of it.  That it would look good for

10  us, and that Alderwoods would look good -- it would

11  look good for Alderwoods' employees to be part of a

12  North Carolina organization as such.

13       Q.   Did he tell you it was a requirement of

14  your job?

15       A.   He never came right out and said it was

16  required.  He just said it would -- it would look

17  good.

18       Q.   Did he ever come out and say it was a

19  requirement of your job to join an organization,

20  community organization?

21       A.   No.  But he just said -- again, he

22  just -- Maurice said it would look good if you

23  were.

24       Q.   And did he ever come out and say that it

25  was a requirement for you to join some type of a

                                                        170

1   church?

                     Page 153

# EXHIBIT 52

1           IN THE UNITED STATES DISTRICT COURT

2       FOR THE WESTERN DISTRICT OF PENNSYLVANIA

3

4     --------------------------------

5   DEBORAH PRISE and HEATHER RADY )

6   on behalf of themselves and all)

7   employees similarly situated,  ) No. 06-1641

8                   Plaintiffs,    ) VOLUME I

9             vs.                  )

10  ALDERWOODS GROUP, INC.,        )

11                  Defendant.     )

12    --------------------------------

13

14

15       Deposition of MICHAEL S. BUTLER,

16       taken at 4700 Airport Plaza Drive,

17       Long Beach, California, commencing

18       at 9:28 A.M., Monday, March 9,

19       2009, before Cathryn L. Baker, CSR

20       No. 7695.

21

22

23

24

25   PAGES 1 - 207

**NETWORK DEPOSITION SERVICES**
**Transcript of Michael Butler**

20 (Pages 74 to 77)

---

74

1     A.  Where did that discussion take place?
2     Q.  Yes, sir.
3     A.  In the arrangement room in the mortuary.
4     Q.  Anybody else present?
5     A.  No.
6     Q.  What did you and Ms. Chung discuss at this
7  second meeting?
8     A.  The details of the position with regard to
9  after-hours coverage of the mortuary and phones.
10     Q.  Anything else?
11     A.  Briefing me on the staff, the staff that was
12  currently there, and what their responsibilities
13  were and my specific responsibilities in the funeral
14  home and to her, from a reporting standpoint.  And
15  of course my salary.
16     Q.  When you say salary, what are you referring
17  to?
18     A.  My hourly rate.
19     Q.  When you say you made reference to coverage
20  of the phones, are you referring to -- what are you
21  referring to when you said that?
22     A.  On-call responsibilities.
23     Q.  Do you specifically recall what those
24  responsibilities were?
25     A.  Yes.  Accepting telephone calls from

---

75

1  families and hospitals, the answering service, and
2  handling any issues that came up overnight.  And
3  either making the removals myself or using a
4  service, depending on the workload.
5     Q.  Did you receive a pager to perform those
6  duties?
7     A.  I did.
8     Q.  Did you talk about how you would be
9  compensated for that work?
10     A.  No.
11     Q.  What was your understanding as to how you'd
12  be compensated performing your on-call
13  responsibilities?
14     A.  Didn't give them a lot of thought.  It's
15  just been a situation where -- every mortuary is
16  unique, and so when I come into a situation and I'm
17  faced with coverage during the night, sometimes
18  that's looked at as an expected part of the job.
19  The old adage of engage to be on call or on call to
20  be engaged plays in.  And it was an unspoken
21  arrangement where I understood it to be, coverage
22  was necessary, but no mention was made by Ms. Ngo or
23  the company policy with regard to being paid for
24  that.  And I didn't discuss it with her, just the
25  responsibility for it.  In other words, we never set

---

76

1  out a fixed fee for that and I didn't ask about it.
2     MR. FORESTIERE:  Could you read my question
3  back to me please.
4     (The record was read by the
5     reporter as follows:
6     "Question:  What was your
7     understanding as to how you'd be
8     compensated performing your on-call
9     responsibilities?")
10  BY MR. FORESTIERE:
11     Q.  Did you have any discussions about
12  performing community service with Ms. Chung at the
13  second meeting?
14     A.  Not until about my last year there.
15     Q.  But at the second meeting you didn't have a
16  discussion about community service; is that correct?
17     A.  No.
18     Q.  But you mentioned your last year there you
19  had a discussion with her about that subject?
20     A.  Could you repeat that question.
21     Q.  You said you recall a conversation you had
22  with Ms. Chung during your last year working at
23  Melrose about community service?
24     A.  Yes.
25     Q.  Do you recall when that was?

---

77

1     A.  No.
2     Q.  You don't recall when it was during the last
3  year?
4     A.  No.
5     Q.  You don't recall the month?
6     A.  No.
7     Q.  Where did this meeting take place?
8     A.  In my office, which was a -- shared by two
9  other individuals on the staff.
10     Q.  Were they present at this meeting?
11     A.  Yes.
12     Q.  Who were they?
13     A.  I don't recall their names.  One male, one
14  female.
15     Q.  Were they employees at Melrose?
16     A.  Yes.
17     Q.  What were their positions?
18     A.  One was a funeral director like myself, and
19  the other was an apprentice embalmer, I believe.
20     Q.  But you don't recall the names?
21     A.  No.
22     Q.  So it was just the four of you, these two
23  individuals, yourself and Ms. Chung?
24     A.  That's correct.
25     Q.  And what did you discuss about the community

---

**Johnstown**
814-266-2042

**Toll-Free**
866-565-1929

**Pittsburgh**
412-281-7908

**NETWORK DEPOSITION SERVICES**
**Transcript of Michael Butler**

78

1  service?
2     A.  Well, Chung came to me in my office with the
3  other employees present and, in essence, described
4  that it is the wish of the company that its
5  employees who are funeral directors, in my job
6  classification, be active in the community to a
7  degree so that we can get our name and our face out
8  there in the community.  Help build up business in
9  the community.  That was the crux of her
10  conversation.
11     Q.  What was your response to her statements?
12     A.  I agreed.
13     Q.  Anything else discussed on community
14  service?
15     A.  She did make it clear that it was a
16  condition of continued employment, as far as the
17  company was concerned.
18     Q.  How did she make that clear?
19     A.  Orally.
20     Q.  What did she say?
21     A.  Just what I told you.
22     Q.  She said, "Unless you do it, you're going to
23  get fired"?
24     A.  No, I didn't say that.
25     Q.  Tell me what she said.

79

1     A.  I said it was a condition of continued
2  employment, is how it was put to me by Ms. Ngo.
3     Q.  She used those terms, that performing
4  community service was a condition of continued
5  employment?
6     A.  Yes.
7     Q.  What was your response to that?
8     A.  I agreed.  And she told me that I could
9  choose whatever extra curricular program that I
10  wanted to join, and that she would pay for that.
11  The company would pay for that.
12     Q.  What do you mean the company would pay for
13  that?
14     A.  Well, I chose, for instance, the Sunrise
15  Rotary.  The rotary club has dues, she asked me for
16  an expense report for paying those dues on my own,
17  which was 100, $200, then usual regular donations on
18  a regular basis while I was attending on behalf of
19  the funeral.  And I would pay those things and put
20  them on an expense report wherein I was reimbursed.
21     Q.  Anything else you and Ms. Chung discussed
22  concerning the performance of community service?
23     A.  Oh, to let her know what I chose and what
24  hours I would need to be away.  And I reported those
25  back to her.

80

1     Q.  How did you report those back to her?
2     A.  I don't recall if it was -- I'm pretty sure
3  it was just orally I told her that I would be going
4  to the early morning meetings.
5     Q.  How often were the meetings?
6     A.  Once a week.
7     Q.  How long were the meetings?
8     A.  An hour and a half, approximately.
9     Q.  How much time did you spend attending these
10  meetings?
11     A.  One morning per week.
12     Q.  Did you attend them every week?
13     A.  Yes.
14     Q.  When did you start attending the meetings?
15     A.  As I say, I don't recall the date that she
16  approached me about this, so I couldn't tell you the
17  date I started with Sunrise Rotary.  I don't recall.
18     Q.  Where is Sunrise Rotary located?
19     A.  In a hotel in Anaheim.  A local hotel.
20     Q.  Where is its office located?  That's where
21  they hold the meetings?
22     A.  I have no idea where its office is located.
23     Q.  Are you still a member of Sunrise Rotary
24  now?
25     A.  No.

81

1     Q.  Who is the president or representative at
2  Sunrise Rotary?
3     A.  I don't know who that was.  I don't recall
4  the name.  It was told to me but I don't recall the
5  name.
6     Q.  Where was the city Sunrise Rotary is located
7  in?
8     A.  Anaheim.  That's where the meetings were
9  held.
10     Q.  How long did you attend the meetings?
11     A.  Up until my termination, as best I recall.
12     Q.  That would be November 2003?
13     A.  3.
14     Q.  Do you remember how far in advance of
15  November 2003 you started attending these meetings?
16     A.  No, I don't.
17     Q.  Was it a couple of months?
18     A.  That would be fair to say.  At least a
19  couple of months.
20     Q.  Two to three months?
21     A.  I don't recall.
22     Q.  Would it be more than two to three months?
23     A.  Possibly.
24     Q.  Would it be less than two to three months?
25     A.  No.

**Johnstown**
**814-266-2042**

**Toll-Free**
**866-565-1929**

**Pittsburgh**
**412-281-7908**

# EXHIBIT 53

1

1      IN THE UNITED STATES DISTRICT COURT
       FOR THE SOUTHERN DISTRICT OF PENNSYLVANIA
2
           Civil Action No. 06-1641
3          Judge Joy Flowers Conti

4
DEBORAH PRISE and HEATHER RADY
5  on behalf of themselves and all
   employees similarly situated,
6
7          Plaintiffs,

   vs.
8
   ALDERWOODS GROUP, INC.,
9
           Defendant.
10
   ------------------------------
11

12

13

14

15              2525 Glades Road
                Boca Raton, Florida
16              December 10, 2008
                9:55 a.m. - 7:20 p.m.
17

18
           DEPOSITION OF SHANE M. CARSWELL
19

20

21    Taken before Mark Rabinowitz, Registered Professional

22  Reporter and Notary Public for the State of Florida at

23  Large, pursuant to Notice of Taking Deposition filed in

24  the above cause.

25

NETWORK DEPOSITION SERVICES
**Transcript of Shane Carswell**

26 (Pages 98 to 101)

98

1    A    Several times.
2    Q    When? When was the first time that he told
3    you that?
4    A    Probably when I first started.
5    Q    What was the context?
6    A    They were griping about people not taking lunch
7    breaks.
8    Q    Who was griping about people not taking lunch
9    breaks?
10   A    The managers, Bob Russell John Michael Jones.
11   They were griping about us not taking our lunch breaks.
12   Q    Was this at one of the staff meetings?
13   A    Yes.
14   Q    At one of the staff meetings when you first
15   started working at -- was this when you were working
16   at the Loewen Group, or when you were working at
17   Alderwoods?
18   A    Alderwoods.
19   Q    You say they were griping about people not
20   taking meal breaks?
21   A    Not clocking out for a meal break, yes.
22   Q    It was at that time Mr. Russell told you that
23   you had to clock out for a meal break, regardless of
24   whether or not you were actually taking one?
25   A    It was told to everyone at the meetings that

99

1    you have to clock out for your lunch break. What they
2    are saying in that context, in the funeral service
3    industry, is that you have to do that. We are telling
4    you to take your lunch break. If you have to answer the
5    phones, answer the phones. It's talking on both sides of
6    your mouth.
7    Q    But did he say that?
8    A    Yes.
9    Q    Did Mr. Russell say that even if you are
10   clocked out for your lunch break, you have to answer the
11   phones anyway?
12   A    Of course, you have to answer the phones,
13   because you can't just let them ring. That's what he
14   said. You have to answer the phones. You have to take
15   your lunch break. You have to do these things. Somebody
16   comes in, you have to see the person that comes in. Stop
17   your lunch. Come back to it. I mean, they are telling
18   us to come back, you know, three or four hours later
19   after you had started your lunch; you can't.
20        So, yes, he did tell us to take the lunch
21   breaks. He did tell us to make sure to answer the
22   phones. He also told us to answer the doors and meet
23   people.
24   Q    Did any other manager besides Bob Russell give
25   you that instruction?

100

1    A    Yes.
2    Q    Who were the other managers that gave you that
3    instruction?
4    A    Let's see. There would have been Bob Russell.
5    There was John Michael Jones, James Mullikin, Anthony
6    Sorrells, Jeff. Let's see. Who else would be there?
7         That's all I can think of off the top of my
8    head right now. But, I mean, it's told to you that, yes,
9    you have to take your lunch break, but you have to answer
10   the phones.
11   Q    So you have to take your lunch break, but you
12   also have to perform work --
13   A    Yes.
14   Q    -- during your meal break, is what you are
15   saying?
16   A    Yes.
17   Q    You are saying that you were instructed to
18   that effect by those managers that you just listed?
19   A    Absolutely.
20   Q    And the context was the group meetings?
21   A    Group meetings, individuals. It was said in
22   the office, everyone. It was in each chapel even. You
23   knew that's what they would say to you. That you have to
24   catch the phone. Somebody answer that and you are taking
25   your break.

101

1    Q    Were you paid overtime for all the overtime
2    hours that were reported on this timecard for the pay
3    period ending February 14th of 2004?
4         MR. LINGLE: Objection to form.
5    A    I was paid for the overtime that is listed on
6    here, yes.
7    Q    Turn to ALD000184. Can you take a look at the
8    timecard, the copy of the timecard, for March 6th of
9    2004.
10   A    Yes.
11   Q    That's your signature at the bottom of the
12   timecard, right?
13   A    Yes.
14   Q    Did your manager also sign off on your
15   timecard?
16   A    Yes, it looks Mike Angotti; yes, the assistant
17   manager.
18   Q    For this pay period ending March 6th, 2004, on
19   your timecard was reported a total of 55.25 hours; is
20   that right?
21   A    Correct.
22   Q    You were paid overtime for all of the overtime
23   hours that were reported on the card?
24        MR. LINGLE: Objection to form.
25   A    For the 15.25 hours that's listed, yes.

**Johnstown**
**814-266-2042**

**Toll-Free**
**866-565-1929**

**Pittsburgh**
**412-281-7908**

## NETWORK DEPOSITION SERVICES
### Transcript of Shane Carswell

35 (Pages 134 to 137)

---

**134**

1  A   Never.
2  Q   The other individuals that you mentioned,
3  for example, Roger Slater, do you know what community
4  service activities he was involved in?
5  A   I'm not a hundred percent certain. I think he
6  may have been in some type of an organization for retired
7  firemen, but I'm not a hundred percent certain.
8  Q   Was he a funeral director/embalmer?
9  A   Yes.
10 Q   Do you know how much time he spent with
11 activities with that organization?
12 A   I certainly don't.
13 Q   Do you know whether he reported any of that
14 time on his time sheets?
15 A   No, I don't.
16 Q   Do you know whether he was compensated for any
17 of that time?
18 A   I don't know.
19 Q   With respect to all of the individuals that
20 you listed -- Bob Russell, John Michael Jones, Felicia
21 Lopez, Larry Ott, Larry Sherman, Dave Ogburn -- do you
22 know how much time they spent performing community
23 service?
24 A   Not right off the top of my head, I don't.
25 I know that they did, but I don't know how much time.

---

**135**

1  Q   Do you know whether they ever reported their
2  time?
3  A   That I'm not certain of.
4  Q   Do you know whether they were compensated for
5  any time they spent performing community service?
6  A   That I don't know.
7  Q   Are you aware of any company-wide Alderwoods
8  policy of requiring hourly employees like funeral
9  directors/embalmers to belong to community
10 organizations?
11 A   There is something in there that I have seen
12 that they required that you belong to some type of
13 community organization, or involved in some type of
14 organization.
15 Q   When you say "there is something in there,"
16 what are you referring to?
17 A   In the manuals, in Alderwoods' books.
18 Q   So you are saying Alderwoods has some type of
19 written policy requiring hourly employees to be involved
20 in a community organization?
21 A   They did when I was there.
22 Q   How was this policy communicated to you?
23 A   In written form.
24 Q   Was it in the Alderwoods policy manuals?
25 A   I believe that's where it was.

---

**136**

1  Q   Any other way in which this policy was
2  communicated to you?
3  A   And verbally.
4  Q   By whom?
5  A   My boss.
6  Q   Who is that?
7  A   That was Jeff, or John Michael Jones, or Bob
8  Russell.
9  Q   Any other managers, other than those, that
10 communicated the policy to you?
11 A   None that I can think of down here, in Georgia
12 it was different. Different people in Georgia would do
13 it. All my bosses up there wanted us to do it.
14 Q   Anybody else?
15 A   Nobody that I can think of. Well, I don't
16 know. James Mullikin also in one of our town hall
17 meetings.
18 Q   What specifically was verbally communicated to
19 you by these managers about the community service?
20     MR. LINGLE: Objection to form.
21 A   That we need to be in a community meeting with
22 people, spending time outside of the funeral home with
23 people, joining organizations, making sure the people
24 know who we are.
25 Q   When you say "we needed to be spending time on

---

**137**

1  you in the community," who are you referring to?
2  A   All of the employees.
3  Q   All of the employees at the Kraeer Funeral
4  Home locations in Florida?
5  A   All of Kraeer's employees.
6  Q   Who communicated to you that all of the
7  Alderwoods' employees needed to be out performing
8  community service work?
9  A   James Mullikin.
10 Q   Do you know how any employees outside of the
11 Kraeer Funeral Home locations in Florida were, or the
12 one in Georgia where you worked at learned of this
13 policy?
14 A   James Mullikin. I mean, it was then the town
15 hall meetings he would hold because he is the regional
16 manger for the southeast region. He would hold these
17 meetings. That's what we would be told in some of these
18 meetings.
19 Q   Did you attend meetings other than the general
20 staff meetings that were held in the --
21 A   Yeah.
22 Q   -- downtown location?
23 A   Yes.
24 Q   What other meetings would you attend?
25 A   They would be at locations that were central

---

**Johnstown**
**814-266-2042**

**Toll-Free**
**866-565-1929**

**Pittsburgh**
**412-281-7908**

NETWORK DEPOSITION SERVICES
**Transcript of Shane Carswell**

36 (Pages 138 to 141)

138

1   to the other surrounding funeral homes that were owned by
2   Alderwoods. They considered them kind of a town hall
3   meeting. Then they would people from Miami come up,
4   because there are funeral homes in Miami. They would
5   have them come from out west to where everybody meets for
6   a meeting. That's when new policies and changes were
7   discussed and, you know, what we are supposed to be doing
8   and things like that.
9       Q   These meetings that you are describing, which
10  ones did you attend?
11      A   All of them that were here in this area in
12  Southeast Florida; when I was there, there were probably
13  maybe three of them.
14      Q   How many employees attended the three meetings
15  that you attended?
16      A   Probably 250 to 300 people depending on who
17  could make it and get there. Sometimes they couldn't all
18  get there.
19      Q   To what location did these employees come to
20  attend the meeting?
21      A   It's the downtown chapel. They would use the
22  Sample Road -- excuse me, the CPF chapel. We also went
23  to a -- there was one down in Miami. I can't think of
24  the name of it. It was a Jewish one, but I can't think
25  of the name of it.

139

1       Q   And at which of the three meetings did
2   Mr. Mullikin communicate information about community
3   service?
4       A   I would say all of them.
5       Q   What specifically did he communicate about
6   community service?
7       A   Again, that we need to be out in the community.
8   We need to make sure people know who we are. We need to
9   be a face out there for people to see and know.
10      Q   Did Mr. Mullikin instruct anyone as to how
11  many organizations they needed to be involved in?
12      A   No, I don't think so.
13      Q   Did he ever give any instructions about what
14  kind of community service activities people should be
15  involved in?
16      A   There were suggestions, but they weren't -- you
17  didn't have to actually do those exact ones, but there
18  were suggested ones.
19      Q   Which ones did he suggest?
20      A   Like the Rotary Club, Kiwanis and things like
21  that.
22      Q   Were those just examples?
23      A   Yes.
24      Q   Did Mr. Mullikin -- at any of those meetings
25  -- instruct employees as to how much time they should

140

1   spend being involved in community service activities?
2       A   I don't recall if he did or not.
3       Q   Did Mr. Mullikin communicate at any of these
4   three meetings that you attended whether people should
5   report the time they spent engaged in community service
6   activities?
7       A   I don't recall if he did or not.
8       Q   At any of these three meetings that you
9   attended, did Mr. Mullikin communicate any instructions
10  about whether or not people would be compensated for the
11  time that they spent involved in community service
12  activities?
13      A   I don't recall if he did or not.
14      Q   I believe you testified that you learned
15  about Alderwoods' policy regarding community service
16  involvement from Jeff; is that right, your operations
17  manager?
18      A   As far as me getting involved in things?
19      Q   Yes.
20      A   He had mentioned that since I'm the manager
21  there, yes, to get more involved out in the communities.
22      Q   Did he instruct you to get involved in any
23  particular community service organizations?
24      A   Not that I can think of.
25      Q   Did he instruct you to spend any certain

141

1   amount of time involved in the community service
2   organizations?
3       A   He didn't give a specific amount of time, no.
4       Q   Did Jeff instruct you as to whether the time
5   you spent involved in community organizations, whether
6   you should report that time?
7       A   Not that I recall, he didn't.
8       Q   Did he give you any instruction as to whether
9   you would be compensated for any time you spent involved
10  in community service organizations?
11      A   Not that I recall.
12      Q   What did John Michael Jones tell you about
13  Alderwoods' community service activities?
14      A   Other than they just wanted us to be in the
15  community and to be involved in all of the community.
16      Q   Is that all that he told you?
17      A   He wanted us to do it, you know, whenever we
18  were able to.
19      Q   Did he give you any information about whether
20  to report the time spent in those activities?
21      A   Not that I recall.
22      Q   Did he give you any information about whether
23  you would be compensated for the time you spent involved
24  in those activities?
25      A   Not that I recall, no.

**Johnstown**
**814-266-2042**

**Toll-Free**
**866-565-1929**

**Pittsburgh**
**412-281-7908**

**NETWORK DEPOSITION SERVICES**
**Transcript of Shane Carswell**

142

1    Q    John Russell. What was his position?
2    A    Bob Russell.
3    Q    Bob Russell.
4    A    He was, more or less, over all of the Kraeer
5    funeral homes and a couple of other chapels that were
6    involved with the Kraeer Group.
7    Q    Did Mr. Russell communicate any information to
8    you about Alderwoods' policy regarding community service
9    involvement?
10   A    Again, the same things the others did, just
11   telling us that we needed to be involved in our
12   communities.
13   Q    Did he ever give you any instructions about
14   why to report your time spent involved in community
15   service organizations?
16   A    Not that I recall, no.
17   Q    Did he ever give you new information about
18   whether you would be compensated for any time you spent
19   performing community service activities?
20   A    Not that I recall.
21   Q    Other than the three or so meetings that you
22   attended in the Southeast Florida area, did you attend
23   any other meetings where Alderwoods' policy regarding
24   community service was discussed?
25   A    Friday morning staff meetings for the funeral

143

1    directors.
2    Q    Any other meetings?
3    A    Not that I recall like that, no.
4    Q    These Friday morning staff meetings for
5    funeral directors, who would lead those meetings?
6    A    That would be Bob Russell and John Michael
7    Jones, and then Jeff would have been afterwards, after
8    John Michael left.
9    Q    At any of these Friday morning staff meetings
10   that you attended, did any of the managers leading the
11   meetings communicate any other information about
12   community service, other than what you have already
13   testified to?
14   A    It was always brought up at the staff meetings
15   about who has done what community service and things like
16   that. It was always brought up. It was kind of a recap
17   of the week.
18   Q    So the managers would talk about what types
19   of activities that people had been involved in?
20   A    Correct.
21   Q    At any of these Friday morning staff meetings,
22   did the managers leading the meetings communicate any
23   information about whether time spent performing
24   community service should be reported?
25   A    Not that I recall, no.

144

1    Q    At any of the Friday morning staff meetings,
2    did any of the managers leading the meetings communicate
3    any information about whether time spent involved
4    community organizations would be compensated?
5    A    Not that I recall, no.
6    Q    Other than the three meetings in Southeast
7    Florida, the Friday morning staff meetings and the
8    written policy that you talked about in your verbal
9    conversations with the managers, is there any other
10   source of information about Alderwoods' policies
11   regarding community service?
12   A    Nothing that I can think of right now.
13   Q    Do you have any knowledge, Mr. Carswell, about
14   any information provided to Alderwoods' employees at any
15   location outside of Georgia and Florida regarding
16   community service work?
17   A    Do I have knowledge of what other funeral homes
18   were doing?
19   Q    Yes.
20        MR. LINGLE: Objection to form.
21   A    Yes, because I have friends who worked for
22   Alderwoods in California; I know they were doing their
23   community service work there, too.
24   Q    Any other locations?
25   A    I'm trying to think if there were.

145

1        There was Hubert Baker in Savannah, Georgia.
2    That was a funeral director and a funeral home there.
3    Q    Anywhere else?
4    A    I'm just to think if there was anybody else
5    that I knew that worked for Alderwoods. The person in
6    California was David Greiner, G-R-E-I-N-E-R. Off the top
7    of my head, I can't any of anybody else right now.
8    Q    Is Hubert Baker the name of this person?
9    A    Yes, H-U-B-E-R-T.
10   Q    Is that the name of the employee that you
11   knew?
12   A    That's the name of the employee and the funeral
13   home.
14   Q    What position did David Greiner hold?
15   A    He was a manager of a funeral home there.
16   Q    The location manager?
17   A    Yes, the location manager of -- it was in San
18   Diego, but I can't recall the name of it right now.
19   Q    What do you know from David Greiner about
20   community service work in the San Diego location?
21   A    We talked on the phone a good bit. We were
22   friends. I know that he was involved in a couple of
23   community organizations there, but he has since moved
24   back to Atlanta. So I'm not sure what the involvement
25   was there.

Johnstown
814-266-2042

Toll-Free
866-565-1929

Pittsburgh
412-281-7908

## NETWORK DEPOSITION SERVICES
### Transcript of Shane Carswell

57 (Pages 222 to 225)

222

1    A    Yes.
2    Q    Your understanding of that policy was that all
3  hourly employees were supposed to perform community
4  service work, correct?
5    A    Yes.
6    Q    But was it your understanding that there was a
7  company-wide policy that employees were not supposed to
8  record the time that they spent doing community service
9  work?
10   A    No, there was a book to record that, but it
11  wasn't -- I mean, it wasn't your personal time sheet.
12  It was a different. The books that they had, the IBIS
13  book, that's where things were recorded in. Each funeral
14  director had one. We were supposed to keep our
15  information in there of what we are doing. But it wasn't
16  something to keep track of for hours or, you know, as far
17  as compensation for pay or anything like that. It was
18  just to keep track of what you are doing.
19   Q    Was it your understanding that there was a
20  company-wide policy that employees were not supposed
21  to record the time they spent performing community
22  service work?
23   A    I don't believe so. I don't believe there was
24  a policy saying not to record the time.
25   Q    Was it your understanding that there was a

223

1  company-wide policy not to compensate people for time
2  they spent performing community service work?
3    A    To the best of my knowledge -- I mean, again,
4  there were certain areas that you just did those things.
5  You didn't seek compensation for them.
6    Q    I understand that you may have not sought
7  compensation for it, or other employees may have not
8  sought compensation for it. But was it your
9  understanding that there was a company-wide policy not
10  to compensate people for community service time?
11       MR. LINGLE: Objection to form.
12       Answer the question.
13   A    In general, I think people were supposed to do
14  their community service during the hours that they were
15  working and if you didn't, then you do them afterwards.
16   Q    What was your understanding of any company-
17  wide policy about compensation for community work?
18       MR. LINGLE: Objection to form.
19   A    I didn't believe I was going to be paid. I
20  didn't believe that anybody was going to be paid for it.
21   Q    What do you base that on?
22   A    Past history.
23   Q    What past history?
24   A    I had been in the business for 15 years, and I
25  had never seen anybody get paid for it.

224

1    Q    I thought you testified previously that you
2  never spoke in anybody at Alderwoods about their
3  compensation?
4    A    I don't speak to them about what they are
5  making or doing. But none of us that I know of have ever
6  made any kinds of claims to get money out of it, never
7  tried to write it down on a time sheet.
8    Q    How do you know no Alderwoods employee ever
9  tried to report time they spent performing community
10  service work?
11   A    Just in general. People that have spoken,
12  that have talked. Again, I don't get into what they are
13  doing. It's not my business if they are getting paid for
14  it or not.
15   Q    You don't have any personal knowledge as to
16  why any other Alderwoods employee reported the time they
17  spent performing community service work?
18   A    Those people, I don't know if they have
19  reported it or recorded it.
20   Q    Or whether they were compensated for it,
21  right?
22   A    Or whether they were compensated or not.
23   Q    You were testifying about what would happen if
24  you worked overtime hours exceeding the pre-approved 52
25  hours --

225

1    A    Right.
2    Q    -- or hours --
3    A    Correct.
4    Q    -- of work per week, correct?
5    A    Right.
6    Q    It was your understanding that you were not
7  supposed to work hours in excess of 52?
8    A    Correct.
9        MR. LINGLE: Objection to form.
10   A    I wasn't supposed to work more than the 52
11  allotted hours each week, because it's allotted for the
12  entire month. So that's 216 hours a month.
13   Q    What would happen on occasions when you did
14  work hours in excess of 52 hours per week?
15   A    I don't know that I ever did, because it was
16  a two-week pay period. So it would level out.
17   Q    You don't know whether you actually worked
18  hours in excess of the 52 hours that were pre-approved?
19   A    Not that I'm aware of, I didn't.
20   Q    Do you know whether any other Alderwoods
21  employees worked in excess of the hours per week that
22  they were pre-approved for?
23   A    They may have. But, again, I don't know what
24  their compensation was for that, or if they were
25  compensated.

# EXHIBIT 54

1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE WESTERN DISTRICT OF PENNSYLVANIA

 3

 4

 5     -----------------------------------

 6   DEBORAH PRISE AND HEATHER RADY      :

 7                                       :

 8             Plaintiffs,               :
                                         :
 9      -vs-                             : Civil Action No.
                                         :      06-1641
10                                       :
                                         : Judge Joy Flowers
11   ALDERWOODS INC.                     : Conti
                                         :
12                                       :

13             Defendant                 :
                                         :
14     -----------------------------------

15

16                  VOLUME 1

17

18

19            This is the Deposition of RON COLLINS,
     called for examination pursuant to notice, taken before me,
20   the undersigned, John F. Waddell, CSR, at the Brock Room,
     Holiday Inn, 601 Scottsdale Drive, Guelph, Ontario, on the
21   24th day of March, 2010

22

23

24

25
```

2

```
 1   APPEARANCES:

 2

 3   Charles H. Saul, Esq.,

 4
     Margolis Edelstein
 5   525 William Penn Place,
     Suite 3300,
 6   Pittsburgh, PA 15219

 7
     Attorneys for the Plaintiffs
 8

 9

10   Annette Gifford, Ms.,

11
     Thomas & Solomon LLP
12   693 East Avenue
     Rochester, NY 14607

13

14   Attorneys for the Plaintiffs

15

16   Brent D. Knight, Esq.,

17

18   Jones Day
     77 West Wacker,
19   Chicago, Illinois 60601-1692

20

21   Attorneys for the Defendant

22

23

24

25
```

3

| | EXHIBIT NO. | INDEX TO EXHIBITS | PAGE NO. |
|---|---|---|---|
| 1 | | | |
| 2 | 1 | Document, Bates ALD000102 | 29 |
| 3 | 2 | Document, Bates ALD000103 | 25 |
| 4 | 3 | Document, Bates ALD000115-6 | 25 |
| 5 | 4 | Document, Bates ALD000108 | 40 |
| 6 | 5 | Document, Bates ALD000135-37 | 43 |
| 7 | 6 | Document, Bates ALD002065-68 | 49 |
| 8 | 7 | 30(b)(6) Notice of Deposition, | 51 |
| 9 | | three pages | |
| 10 | 8 | Document, Bates ALD 002070-75 | 60 |
| 11 | 9 | Document, Bates ALD002079-81 | 66 |
| 12 | 10 | Document, Bates ALD002338-39 | 69 |
| 13 | 11 | Document, Bates ALD002957 | 71 |
| 14 | 12 | Document, Bates ALD004056 | 72 |
| 15 | 13 | Document, Bates ALD004912-18 | 76 |
| 16 | 14 | Document, Bates ALD004923-24 | 77 |
| 17 | 15 | Document, Bates ALD004965 | 79 |
| 18 | 16 | Document, Bates ALD004969 | 86 |
| 19 | 17 | Document, Bates ALD004970 | 87 |
| 20 | 18 | Document, Bates ALD004971 | 90 |
| 21 | 19 | Document, Bates ALD004980-86 | 109 |
| 22 | 20 | Document, Bates ALD004987 | 111 |
| 23 | 21 | Document, Bates ALD005036-45, | 112 |
| 24 | | 5069 and others | |
| 25 | 22 | Document, Bates ALD005504-07 | 122 |

4

| | EXHIBIT NO. | INDEX TO EXHIBITS ( CONT'D) | PAGE NO. |
|---|---|---|---|
| 1 | | | |
| 2 | 23 | Document, Bates ALD006511 | 123 |
| 3 | 24 | Document, Bates ALD007053 | 125 |
| 4 | | and others | |
| 5 | 25 | Document, Bates ALD008416 | 137 |
| 6 | 26 | Document, Bates ALD008642 | 139 |
| 7 | | and 8446 | |
| 8 | 27 | Document, Bates ALD008473-80 | 140 |
| 9 | 28 | Document, Bates ALD008629 | 144 |
| 10 | | and others | |
| 11 | 29 | Document, Bates ALD008696-97 | 151 |
| 12 | 30 | Document, Bates ALD008698-99 | 152 |
| 13 | 31 | Document, Bates ALD008702 | 153 |
| 14 | 32 | Document, Bates ALD008703 | 154 |
| 15 | 33 | Document, Bates ALD087041 | 155 |
| 16 | 34 | Document, Bates ALD008725 | 158 |
| 17 | 35 | Document, Bates ALD006741-70 | 159 |
| 18 | 36 | Document, Bates ALD008771-8914 | 162 |
| 19 | 37 | Document, Bates ALD006016-82 | 166 |
| 20 | 38 | Document, Bates ALD009100 | 166 |
| 21 | 39 | Document, Bates ALD 009106-87 | 166 |
| 22 | 40 | Document, Bates ALD009188-94 | 168 |
| 23 | 41 | Document, Bates ALD009216-19 | 169 |
| 24 | 42 | Document, Bates ALD009220 | 170 |
| 25 | 43 | Document, Bates ALD010071-72 | 170 |

41

```
1    other title as well, or is it a separate position in
2    and of itself?
3         A.    This description describes a separate
4    position in and of itself.
5         Q.    Were there generally community
6    relations directors at the funeral homes or is this
7    some type of an isolated type of job?
8         A.    I wouldn't suggest it was isolated
9    across the company.  In the northeast it was seldom
10   that our operations were large enough to have a
11   community relations director in place at a funeral
12   home.  More typically, an example I could give you,
13   where a community relations director would work for an
14   entire market as opposed to an individual location.
15        Q.    Were there community relations
16   directors in the northeast where you were the VPO?
17        A.    There was one.
18        Q.    And where did that person work out of?
19        A.    Greensboro.  Hanes-Lineberry,
20   Greensboro, North Carolina.
21        Q.    What area did that community relations
22   director have responsibility for?
23        A.    The northern North Carolina market.
24        Q.    In the absence of a community
25   relations director who if anyone would be responsible
```

42

```
1    for performing the jobs, the responsibilities that we
2    see here under the bullets in the community relations
3    director job description?
4         A.    Depending again upon the size of the
5    market and size of the location it could be the
6    individual location manager or it could be a joint
7    effort between the individual location manager and the
8    market general manager.
9              It was really very ad hoc in terms of what
10   we were able to do.
11        Q.    Did you ever have call-ins where
12   people would call into a particular number?
13        A.    Yes.
14        Q.    Could you describe for us what those
15   were?
16        A.    We had a, we called it the Collins
17   call-in show and it was essentially an open line
18   conference call where we encouraged any and all
19   employees to join the call.  It was intended as a
20   forum for open communication where staff could ask
21   questions again, just like a town hall meeting only on
22   the telephone, about the direction of the company or
23   decisions that had been made or policies or concerns
24   that they might have or ideas or suggestions they
25   might have.  That was specific to the northeast.
```

43

```
1         Q.    And in those Collins call-ins did you
2    ever encourage employees to be involved in the
3    community so as to be able to grow the business?
4         A.    Yes.
5              EXHIBIT 5:  Document, Bates ALD000135-37
6    BY MR. SAUL:
7         Q.    I show you what's been marked as
8    Collins exhibit No. 5.  Do you recognize this as a job
9    description for location manager?
10        A.    I do.
11        Q.    It has ALD000135 on the bottom right
12   of the first page; is that correct?
13        A.    That's correct.
14        Q.    The third bullet says:
15        "Work with MGM or MSM to grow market share"
16        How did the location manager do that?
17        A.    By meeting with them, by sharing ideas
18   with them, by assisting in the execution of community
19   events, of pre-need seminars.  Various ways.
20        Q.    And a number of bullets down there I
21   see one that says:
22        "Retain heritage and grow market share
23        through active involvement with community,
24        religious and other organizations."
25        Was that also another responsibility of
```

44

```
1    the location manager?
2         A.    It was.
3         Q.    And was it his responsibility to make
4    sure that employees under him or her were also
5    fulfilling that responsibility?
6         A.    It would be.
7         Q.    A couple of bullets down it says:
8         "Control expenditures in line with budget."
9         That would be a responsibility of the
10   location manager; is that correct?
11        A.    Yes.
12        Q.    And controlling expenditures would
13   include controlling labour costs; is that correct?
14        A.    Correct.
15        Q.    On the second page the second bullet
16   from the bottom says:
17        "Relationship building -- developing and
18        maintaining a network of contacts, both
19        inside and outside the organization, who
20        may be able to supply information,
21        assistance or support for the work-related
22        goals.  This includes building and
23        maintaining friendly, relationships with
24        people who are, or might be, helpful in
25        achieving work-related goals."
```

1    A.  Well, we wish it started up on the

2  same day but frankly when we put our orders into

3  Office Depot or Staples in the US they ran out of

4  stock so it was a staggered program.  But it was a

5  corporate initiative to put time clocks in place.

6    Q.  Why did the corporation decide to put

7  time clocks in?

8    A.  To make more uniform the reporting of

9  hours.

10    Q.  Did Alderwoods ever have what's

11  referred to as piece rate work?

12    A.  In certain, at certain locations, yes.

13    Q.  Could you describe for us what your

14  understanding is of piece rate work?

15    A.  What I refer to as piecework is -- an

16  example would be if an employee was called out at

17  night to do a transfer of a deceased, that employee

18  would be paid a flat rate as opposed to an hourly rate.

19    Q.  Did that change at some point and

20  piece rates were kind of a no-no corporate wide or

21  what?

22    A.  Yes.

23    EXHIBIT 6:  Document, Bates ALD002065-68

24    BY MR. SAUL:

25    Q.  I'm going to show you what I've marked

1  as Collins exhibit 6, the Bates stamp is ALD002065.

2  This purports to be some minutes of a meeting of June

3  30, 2005 of the Edo Miller and Sons Funeral Home.  Do

4  you recall ever seeing this document before?

5    A.  No.

6    Q.  If you notice the second paragraph

7  there, full paragraph, it says piece rate work is no

8  longer acceptable.

9    Does that refresh your recollection at all

10  as to when piece rate was discontinued?

11    A.  With respect to the northeast it

12  doesn't.  This location was not in the northeast US.

13    Q.  Do you recall when the use of piece

14  rate payments was discontinued?

15    A.  I don't recall.  I'm not arguing that

16  it wasn't 2005.  It was somewhere in that area.

17    Q.  Was piece rate used for purposes of

18  when other employees were on call?

19    A.  If an employee was off they could also

20  be called in and would be provided with a piecework

21  rate.

22    Q.  I'm sorry, if the employee what?

23    A.  If they were on a day off and the

24  location was extremely busy and the location manager

25  might call, as an example, to an employee on their day

1  off and say if you're not busy would you like to come

2  in and do an embalming.  For that they may have

3  received piecework.

4    MR. KNIGHT:  Charles, can we take a two

5  minute break?

6    MR. SAUL:  Sure.  No problem.

7    --- Short recess 10:40-10:51

8    EXHIBIT 7:  30(b)(6) Notice of Deposition,

9    three pages

10    MR. SAUL:  We have marked as Collins

11  exhibit No. 7 the 30(b)(6) Notice of Deposition.

12    Brent, you wanted to say something?

13    MR. KNIGHT:  Yes.  Mr. Collins is only a

14  30(b)(6) witness and the only company witness to the

15  extent it's relating to the topic covered by that

16  notice.  And also for purposes of the 30(b)(6) topics

17  in the notice his knowledge only runs through December

18  31, 2007.

19    BY MR. SAUL:

20    Q.  Thank you.

21    Mr. Collins, I know you said after the

22  merger your function changed a bit but to your

23  knowledge did the pay policies remain the same through

24  2007 as they had existed before that?

25    A.  To my knowledge, yes.

1    Q.  And also we wanted to state for the

2  record that although we're in Canada we're using the

3  Federal Rules of Civil Procedure and everything is the

4  same as if we were holding this deposition in the

5  United States.  Do we agree on that?

6    MR. KNIGHT:  Yes.

7    BY MR. SAUL:

8    Q.  Mr. Collins, we were talking before

9  about the piece rate.  How are the hours the employee

10  worked when he or she was performing piecework

11  counted?  If somebody did -- let me start over.

12    As I understand it with piece rate,

13  whether the person worked one hour or three hours or

14  four hours they received the same amount, standard

15  amount of $50 or whatever it was for that particular

16  function' is that correct?

17    A.  Yes.

18    MR. KNIGHT:  Are you asking the company

19  policy or -- I don't understand.

20    BY MR. SAUL:

21    Q.  I'm talking about at the funeral homes

22  that used piece rate to pay employees.  In general the

23  way piece rate worked was that regardless of whether

24  the person worked 15 minutes, an hour or three hours,

25  they received the same lump sum of $50 or whatever the

1  rate was for that particular function; is that correct?
2       Q.   That's correct.
3       Q.   Up until the piece rate was eliminated
4  sometime around 2005 -- do you know when it was
5  eliminated, by the way?
6       A.   Well, it never really existed from the
7  standpoint of the corporation.  Piecework was a
8  legacy, funeral service legacy way of paying employees
9  but it was never an Alderwoods policy that piecework
10 be allowed.  What we were doing is picking up in our
11 audit work, in our field work, pockets of piecework
12 being paid and eliminating those as we found them.
13      But I'm not sure that answered your
14 question.
15      Q.   What did Alderwoods do to stop the
16 usage of piece rate?
17      A.   We did a review of, a location by location
18 review of practises and where we found piecework we
19 eliminated it.
20      Q.   Was there ever a memo sent out to all
21 the funeral homes saying stop using piece rate?
22      A.   I don't recall.  May I ask clarification?
23      Q.   Sure.
24      A.   From Human Resources in Toronto or
25 from myself or....?

1       Q.   From anyone that you're aware of, from
2  anyone at Alderwoods?
3       A.   I'm not certain whether there was a
4  memo sent out or not but....
5       Q.   Was that within your authority to do,
6  to send out to all the funeral homes a notice, you
7  know, stop using piece rate?
8       A.   I would expect it would be within my
9  authority to do that.  We weren't -- piecework wasn't
10 something that was carte blanche across all the
11 locations.  We were finding it in certain areas where
12 on a legacy basis it had been acquired as part of the
13 acquisition of the funeral home and continued to exist.
14 And it wasn't corporate policy and where we found it
15 we eliminated it.
16      Q.   Was piece rate used at funeral homes
17 in other regions besides northeast?
18      A.   I couldn't speak to it.  I expect it
19 was in certain pockets.
20      Q.   Who would be the person or persons
21 from Alderwoods who could speak to whether piece rate
22 was used in the other regions?
23      A.   The other two VPOs.
24      Q.   The other two VPOs were whom?
25      A.   Buddy Mayes and Shawn Phillips.



1       Q.   How many locations did you find out
2  were using piece rates?
3       A.   I'm sorry, I can't recall.
4       Q.   Would it have been more than five
5  funeral homes?
6       A.   I expect.
7       Q.   Do you believe it was more than a
8  hundred funeral homes?
9       A.   I wouldn't think so.
10      Q.   What about 50, above or below 50?
11      A.   I don't know.  My expectation is it
12 may have been less than 50.
13      Q.   So you're not sure?
14      A.   Not sure.
15      Q.   At the places that were using piece
16 rate how were the hours recorded that the person
17 worked during that time for that function?
18      A.   For the actual piecework?
19      Q.   Right.
20      A.   I'm not certain.  In some cases it
21 would simply be recorded in the funeral file that was
22 done by someone on piecework.  I mean, that's how we
23 would typically find it or, you know, just by our site
24 visits and by speaking to people is how we would
25 source it out.

1       There was no -- because there was no
2  corporate policy saying piecework was something that
3  could be used, methods of recording, whether hours
4  were recorded or not, I can't say for certain they
5  were.
6       Q.   Is it true that the hours were
7  generally not recorded when an employee did piecework.
8       MR. KNIGHT:  Object to the form of the
9  question.  You can answer if you know.
10      THE DEPONENT:  I'm not certain.
11      BY MR. SAUL:
12      Q.   Who would know the answer to that
13 question?
14      A.   I would suspect you might have to look
15 at a location by location basis.  Practises could vary.
16 Within the northeast US practises could vary.  Within
17 the entire corporation they could even more.
18      Q.   In general back when you were a VPO
19 how were the employees hours reported and to whom?
20 Suppose you have a particular location and you've got
21 employees either doing a time o'clock or a time sheet,
22 who did those time cards and time sheets go to?
23      A.   To the location manager.
24      Q.   And from the location manager where
25 did it go?

1          A.   To the location administrator to be
2    recorded and sent to payroll.
3          Q.   When you say the location
4    administrator was that somebody who was located
5    actually at the location or ---
6          A.   It -- sorry.
7          Q.   Go ahead.
8          A.   In some cases they would be physically
9    at the location.  If it was a small location the time
10   sheets could be forwarded to the market administrator
11   who would do the payroll.  It really depended upon the
12   size of the location.
13         Q.   And then it went from the location
14   administrator or MGM to payable in Toronto?
15         A.   In Burnaby.
16         Q.   And Burnaby is located where?
17         A.   Vancouver, British Columbia.
18         Q.   How was piece rate then recorded?  If
19   you got a time sheet or time clock which shows time
20   in, time out and so forth, how was piece rate then
21   recorded?
22         A.   I expect it would be a notation in
23   that time sheet saying that there was a lump sum
24   payment.
25         Q.   Let's suppose an employee worked 40

1    hours in the week as verified by the time clock?
2          A.   Yes.
3          Q.   In addition to that the employee did a
4    removal while on call in the evening?
5          A.   Yes.
6          Q.   And was paid let's say, by way of
7    example, $50 for that?
8          A.   Yes.
9          Q.   Was that $50 factored into when
10   calculating the regular rate for overtime?
11         A.   Yes.
12         Q.   And how was that done?
13         A.   It was done through our human resource
14   information system in Burnaby.
15         Q.   So let's suppose an employee then
16   worked 40 hours in a week and was at $10 an hour, okay?
17         A.   Yes.
18         Q.   And then the employee worked the piece
19   rate in the evening for $40?
20         A.   Right.
21         Q.   First of all, did the employee get any
22   type of overtime as a result of working that piece
23   rate at the $40?
24         A.   They would not.
25         Q.   Now let's suppose the next week the

1    employee worked 45 hours?
2          A.   Yes.
3          Q.   So overtime at time and a half, forget
4    the piece rate for a second, at time and a half then
5    it would be $15 an hour; correct?
6          A.   Yes.
7          Q.   Was the $40 an hour that we mentioned
8    in the previous week that the person did for piece
9    rate factored into that $10 an hour to get a regular
10   rate of $11 an hour which would be time and a half for
11   them?
12         A.   As I understand it, it would be, and
13   it would depend on the pay cycle itself.  If someone
14   was regularly working overtime and receiving
15   commission, for example, then it would be reconciled
16   on a bi-weekly basis.  I believe in some situations
17   where it wasn't that usual for someone to receive
18   commission or something that would gross-up that, it
19   would be done on an annual basis.
20         Q.   And to your knowledge the piecework
21   hours were not recorded; is that correct?
22         A.   To my knowledge the piecework hours
23   were not recorded.
24         Q.   Are you familiar with something called
25   an Awards For Excellence program?

1          A.   Yes.
2          Q.   What was that?
3          A.   I'm just trying to refresh my memory.
4    I'm sorry, it rings a bell so maybe I answered
5    prematurely yes, but I do recall an Awards For
6    Excellent program.
7          Q.   I don't know if this is going to
8    refresh your recollection or not but we'll give it a
9    shot.
10              EXHIBIT 8:  Document, Bates ALD 002070-75
11         BY MR. SAUL:
12         Q.   I show you what I've marked as Collins
13   exhibit No. 8.  Have you seen this document before?
14         A.   No.
15         Q.   At any rate, in about the middle it
16   says:
17              "Warren spoke to us about the Awards For
18              Excellence program and said that Bird
19              Hodges wants each employee to nominate
20              someone for this.  Nomination forms were
21              handed out so that everybody could
22              nominate who they feel deserves the Award
23              of Excellence".
24              Who's Bird Hodges?
25         A.   Bird Hodges was a regional general

```
1           Q.  And again reported to the compliance ---
2           A.  The compliance committee and to Paul,
3  myself and to the audit committee of the board.
4           Q.  If it occurred in another region it
5  would go to the VPO in that region?
6           A.  Yes.
7           Q.  When you said the compliance committee
8  where did the compliance committee sit or where were
9  they located?
10          A.  Physically in Toronto.
11          Q.  Who composed the compliance committee?
12          A.  Rep's -- representatives from Human
13 Resources, from Legal and from the internal audit
14 group itself.
15          Q.  Did the VPOs also attend those?
16          A.  No.
17          Q.  Then after the compliance committee
18 met did they prepare some type of report that would
19 then go to Paul Houston and to the appropriate VPO?
20          A.  I'm not certain whether the compliance
21 committee prepared it or whether Chuck Cosina, who was
22 the vice-president of compliance, would send it
23 directly.  But yes, there would be a report that would
24 go to Paul and to the audit committee.
25          Q.  And to what?
```

```
1           A.  And to the audit committee.
2           Q.  Is the audit committee different from
3  the compliance committee?
4           A.  The audit committee is a committee of
5  the board of directors.  The compliance committee is
6  staff.
7               EXHIBIT 9:  Document, Bates ALD002079-81
8           BY MR. SAUL:
9           Q.  This particular document I've had
10 marked Collins 9, ALD0002079 may not do us too much
11 good but let's take a look at it.
12              Have you seen this document before?
13          A.  No, I have not.
14          Q.  I didn't think so but let's take a
15 look at it.  It's dated September 29, 2005, and it's
16 purported to be a staff meeting.
17              Can you tell what region this is from?  It
18 talks about Warren?
19          A.  I can only expect -- they're talking
20 about the Brunswick News Obituaries and I'm expecting
21 that's Brunswick, Georgia.  So it would be the south
22 geography.
23          Q.  In about the second full paragraph it
24 says:
25              "Patty talked about the new time card and
```

```
1               the need to be sure and clock in and out
2               for lunch and the times it is permissable
3               not to and how to handle that."
4           Do you know who Patty used to be?
5           A.  Sorry, I don't.
6           Q.  What was the policy with regard to
7  employees being paid or not paid for their lunch
8  breaks?
9           A.  They were not to be paid for the lunch
10 breaks.
11          Q.  And what was the punch in/punch out
12 procedure with regard to lunches and/or sign-in/ sign-
13 out if they only had a list?
14          A.  They would punch or sign out, take
15 their lunch break and punch or sign back in.
16          Q.  Were employees required to go off the
17 site during their lunch or could they take their lunch
18 at the funeral home itself?
19          A.  They could take their lunch at the
20 funeral home.
21          Q.  Most of the time the lunch break was
22 half an hour; is that correct?
23          A.  Yes.
24          Q.  Let's suppose you've got an employee
25 there that has punched out?
```

```
1           A.  Correct.
2           Q.  In the middle of lunch break there's a
3  phone call that comes in and that employee is the only
4  one that's there at the time.  Would the employee be
5  expected to answer the phone at that point?
6           A.  It would depend.  The location might
7  have forwarded it to -- if that was the only employee
8  there they could have forwarded it to the call
9  answering service.  Difficult to say.
10          Q.  Would the employee be permitted to
11 answer the phone?
12          A.  Yes.
13          Q.  Let's assume the employee answers the
14 phone and it's a first call.  First call is what?
15          A.  It's a death call.  It's a hospital or
16 nursing home or family call, yes.
17          Q.  The employees on there for say a
18 minute?
19          A.  Okay.
20          Q.  Is the employee then supposed to punch
21 in and punch out during that minute phone call or do
22 they just take the phone call, hang up and proceed
23 with their business?
24          A.  Practically speaking I don't see how
25 an employee can punch out and then answer the phone
```

1  and then punch back in. My expectation would be that
2  the employee would speak to the location manner or the
3  employee supervisor and say that, well, everyone was
4  out, I took a call and spent approximately one minute
5  on the phone.
6        Q. Did the employee then get paid for
7  that one minute on the phone?
8        A. That would be my expectation, that it
9  would be factored in some way.
10       Q. So in that scenario the employee would
11 be paid, the employee would be out for half an hour
12 for lunch, would get paid for one minute out of the
13 30 minutes; is that correct?
14       A. Yes.
15       Q. Do you know who Clarissa Hollinger is?
16       A. I believe Clarissa worked in payroll
17 in Burnaby, British Columbia.
18       Q. Who is she with?
19       A. With Alderwoods Group.
20       Q. And what about Susan Rendall, do you
21 know who she is?
22       A. That, I'm sorry, I don't recall that
23 name.
24       EXHIBIT 10:  Document, Bates ALD002338-39
25       BY MR. SAUL:

1        Q. I show you what we have marked as
2  Collins exhibit No. 10. This is probably another
3  document you have never seen before but I'll ask any
4  way: Have you seen this document before?
5        A. I have not.
6        Q. This appears to be some minutes
7  regarding a meeting of the Doane, Beal & Ames Funeral
8  Home?
9        A. Doane, Beal & Ames, yes.
10       Q. You're familiar with that funeral
11 home?
12       A. I am.
13       Q. It says on here all overtime needs to
14 be pre-approved by a manager?
15       A. Yes.
16       Q. Could you tell us what the policy was
17 in regards to pre-approval for overtime?
18       A. As it states, that overtime that was
19 to be worked was to be pre-approved by the manager.
20       Q. And what was the policy if the
21 employee did not receive pre-approval and nevertheless
22 worked the overtime?
23       A. We would pay the overtime.
24       Q. Did you ever find out about instances
25 where employees had not received pre-approval and

1  nevertheless worked the overtime and were not paid?
2        A. I don't recall ever receiving
3  notification of that.
4        EXHIBIT 11:  Document, Bates ALD002957
5        BY MR. SAUL:
6        Q. I show you what's been marked as
7  Collins exhibit No. 11. Do you recognize this as a
8  memo from Paul Houston to a location manager with a
9  copy to yourself?
10       A. Yes.
11       Q. During the time that you worked for
12 Alderwoods was Paul Houston always the president and
13 CEO?
14       A. Alderwoods, yes.
15       MR. KNIGHT:  You're not asking about
16 Loewen, just Alderwoods?
17       BY MR. SAUL:
18       Q. Alderwoods.
19       This refers to a bonus range of five and
20 ten. What does that refer to?
21       A. I believe five to ten percent of that
22 employee's gross earnings.
23       Q. And that would be a merit bonus range,
24 bonus that the person would be receiving; is that
25 correct?

1        A. It would be a performance bonus.
2        Q. Right. We discussed this a little bit
3  before but would that performance be based in part on
4  how the employee managed labour costs?
5        A. It would appear from this, and this is
6  refreshing my memory, that this is based on calls and
7  averages. Again, I'm sorry, I'm not certain whether
8  this included operating margin which would then
9  include labour cost.
10       Q. It says:
11       "In your case the performance targets
12       would be Call/Internments and/or Averages
13       at the Location Level."
14       What does it mean by averages?
15       A. Average funeral sale.
16       Q. Do you know who David Glicker is?
17       A. No. I'm sorry, it doesn't -- I don't
18 recall that name.
19       EXHIBIT 12:  Document, Bates ALD004056
20       BY MR. SAUL:
21       Q. I show you what has been marked as
22 Collins exhibit No. 12. Do you recall ever receiving
23 this document?
24       A. I don't re -- if you could just give
25 me a minute.

1    Collins exhibit 17.  It says:
2                "Ron would like you to join our 11:00 a.m.
3                EST conference call this Monday February
4                19 to discuss the launch of the Alderwoods
5                Community Leadership Program."
6                Who was this for?  Who was supposed to be
7    on that conference call?
8         A.   Everyone.  It would appear that market
9    general managers -- from exhibit 17, Bonnie Kulba's
10   correspondence was to market general managers with
11   copies to the rest of the support team, operations
12   support team which would be the director of operations,
13   regional general managers, director of sales.
14               So it would be our entire operations
15   support team as well as the market general managers.
16        Q.   If you look on Collins exhibit 17 it
17   refers to the Alderwoods community leadership program
18   launches.  So the program would have launched on or
19   about February 9, 2004; is that correct?
20        A.   That's correct.
21        MR. KNIGHT:  I think you mean exhibit 18
22   says Alderwoods community leadership program launches.
23        MR. SAUL:  Right.  Did I misstate that?
24        MR. KNIGHT:  I think you said 17.
25        BY MR. SAUL:

1         Q.   Correct.  Collins exhibit 18 says
2    that.
3         A.   Okay.
4         Q.   Was this a one-time program or is
5    something that continued over, if it was launched each
6    year or something?
7         A.   This was the initial launch but it was
8    a continuing program.
9         Q.   It says community relations road map:
10               "Recently you received The Community
11               Relations Road Map for distribution to
12               your locations."
13               Who would have prepared the community
14   relations road map?
15        A.   The marketing department in Toronto.
16        A.   And the overall community leadership
17   program was developed by whom?
18        A.   By the marketing department in Toronto.
19        Q.   This would have been for the whole
20   country?
21        A.   Yes.
22        Q.   If you take a look a little bit
23   further down the page in Collins exhibit 17 it says:
24               "Section 1 - The Leadership Network
25               Program (previously called the influencer

1                program.]"
2                We talked about the community influencers
3    before.  How did this replace the influencer program?
4         A.   How did it?
5         Q.   How did the leadership network ---
6         A.   I'm sorry, first of all you're looking
7    at exhibit 18, correct?
8         Q.   Correct.
9         A.   You had said 17.
10        Q.   Sorry.
11        A.   I believe it's a more formal program
12   simply changed in name, replaced the influencer
13   program.
14        Q.   The location managers and location
15   employees would still be developing what they call
16   community influencer lists; is that correct?
17        A.   Yes.
18        Q.   Continue down exhibit 18, it says:
19               "Attached is the first Step of Section 1.
20               This first step requires location managers
21               to identify and create their Leadership
22               Network."
23               What was the leadership network?
24        A.   That would be identifying leaders in
25   the community.  That would be part of the network or

1    intended to be part of a future network.
2         Q.   And then it would be composed of what
3    at least before was referred to and continue to be
4    referred to as community influencers; is that correct?
5         A.   Yes.
6         Q.   Am I correct in saying that the purpose
7    of the community leadership program was primarily to
8    increase business for the company?
9         A.   Yes.
10        Q.   It continues on to say -- let's go
11   back.  It says the first step requires location
12   managers to identify and create their leadership
13   network.  Would the location managers in turn be
14   requiring their employees, hourly employees such as
15   funeral directors, to get them names of community
16   influencers?
17        A.   It would be my expectation, yes.
18        Q.   A little bit further down on Collins
19   exhibit 18 it says:
20               "There are two attachments in this email.
21               1.  A Zip file for all locations that
22               includes a letter of introduction to the
23               program, the tracking sheet to be used, as
24               well as instructions on how to use it."
25               Could you explain what that means, a Zip

```
 1    file for all locations was something that the market
 2    general managers were supposed to then forward on to
 3    their location managers?
 4            A.  Yes.
 5            Q.  Number 2 a little bit further down:
 6            "A Zip file for you containing a tool,
 7            together with instructions, that you will
 8            use to report activity on the program to
 9            your management team."
10            Could you describe what that was?  Is that
11    something that was communicated by the Internet or was
12    this hard copy or what?  I'm a little confused as to
13    what was being done here?
14            A.  I'm a little hazy on it but I assume,
15    because we're using Internet for communications, that
16    it would have been an Excel document or a file of some
17    sort that would be moved electronically.
18            Q.  To your knowledge would this same
19    document, Collins exhibit 10, where it starts out the
20    Alderwoods Community Leadership Program launches, was
21    that some document communicated to the other regions
22    as well as far as you know?
23            A.  It was a corporate program, my
24    expectation is it would have been communicated to the
25    other geographies.
```

```
 1            Q.  At the bottom it says:
 2            "Community relations has been identified
 3            as a key opportunity for us to try and
 4            differentiate ourselves in the communities
 5            where we serve."
 6            Would you agree with that statement?
 7            A.  Yes.
 8            Q.  If you continue on with the document
 9    to the third page which is ALD 004973 on the bottom,
10    are the next pages that were attached with this
11    community leadership program launch?
12            A.  To the best of my recollection.  I
13    haven't seen the document since 2004.
14            Q.  I understand.  On 4973 it says:
15            "To the Alderwoods Group team members:  As
16            you know, Alderwoods Group is set to
17            launch a comprehensive and results driven
18            initiative develop to increase your
19            business and your profile within the
20            community."
21            To your recollection was this document
22    distributed just to the MGMs or did it go down to the
23    location managers?
24            A.  My recollection is it was distributed
25    to the MGMs and then the MGMs would cascade it down to
```

```
 1    the location managers.
 2            Q.  Maybe it would be helpful if you could
 3    just describe for us your recollection of what this
 4    community leadership program was?
 5            A.  Similar to before, it was a collection
 6    of all -- identifying all community leaders that could
 7    impact the business of the funeral home and then set
 8    in place a process where they were contacted, we had
 9    contact with them and could build relationships with
10    them.
11            Q.  And what measures did you use to
12    evaluate the success of the program?
13            A.  Well, volume of business.  Business
14    volume was one key indicator.  That's really what the
15    program was all about.  So that was the end, the
16    expected end result.  The measurement along the way
17    would be a review of the tracking device by our market
18    general managers and regional general managers to
19    ensure that the program was being implemented.
20            Q.  And what were the MGMs tracking then?
21            A.  They would have been tracking, I
22    believe, I hadn't gotten this far in the document, but
23    I believe there was a tracking sheet included in the
24    program.
25            Q.  Is an example of that tracking sheet
```

```
 1    part of this document with Bates stamp ALD0049977?
 2            A.  Yes, I believe so.
 3            Q.  Who filled out this document, this
 4    tracking sheet?
 5            A.  It would be the responsibility of the
 6    location manager.
 7            Q.  And the location manager would have
 8    required the funeral directors and other hourly
 9    employees to provide him or her with the information
10    that goes on to the tracking sheet?
11            A.  That's correct.
12            Q.  And could you describe for us how this
13    tracking sheet worked?  Some of them are obviously
14    self-evident.  Under influencer category they would
15    put what, something like religious; is that correct?
16            A.  Yes.
17            Q.  Then the influencer's name and
18    organization, position, and could you describe for us
19    what else -- the telephone number of that individual I
20    guess would be the next block.  Then years in
21    organization.  That would be the influencer's years in
22    the organization?
23            A.  Yes, I believe that's what it says.
24            Q.  What was the ranking supposed to be,
25    the ranking 1 to 3 looks like?
```

```
 1   corporate policy?
 2          A.   In the end action or the tone of their
 3   correspondence?
 4          Q.   End action.
 5          A.   End action.  I believe that would be
 6   consistent.  I don't think it's an unreasonable
 7   request.
 8          --- Short recess 2:45-2:56
 9          EXHIBIT 25:  Document, Bates ALD008416
10   BY MR. SAUL:
11          Q.   Show you what I've marked as Collins
12   exhibit 25, which was provided to us as a page from an
13   Alderwoods Group policy manual, 2006.
14          Do you recognize the document?
15          A.   Yes, I do.
16          Q.   It says:
17          "Relationship With Our Community.
18          As a corporate citizen in many communities
19          the company encourages support of civic
20          organizations and employee involvement in
21          worthwhile causes."
22          Was that company policy for Alderwoods?
23          A.   Yes, it was.
24          Q.   Who would govern the corporate policy
25   manual?  Was this something just for location managers
```

```
 1   or was this for all employees?
 2          A.   All employees.
 3          Q.   It says:
 4          A Corporate Compliance Program has been
 5          established to coordinate, implement and
 6          line oversee compliance with the Code and
 7          with the Company corporate policies
 8          procedures and standards."
 9          What was the corporate compliance program?
10          A.   That was, well, it resulted -- down
11   below you'll see corporate compliance committee.
12   That's the corporate compliance committee that I was
13   referring to earlier.
14          Q.   I see.  And the internal compliance
15   audits were part of this corporate compliance policy?
16          A.   That's right.  The internal compliance
17   audits were part of the staff internal audit and
18   compliance department.  And then the corporate
19   compliance committee, they had a seat at that
20   committee, but also representatives from our legal
21   department and human resources department, to name two
22   others.  I'm not certain whether there were other
23   members or not.
24          Q.   Just so I'm a little bit clearer on
25   this, the corporate compliance committee, how did it
```

```
 1   get its information with which to ensure that there
 2   was compliance?
 3          A.   Through the internal compliance audits
 4   in the field, for example, and internal audits in the
 5   field.
 6          EXHIBIT 26:  Document, Bates ALD008442 and
 7   8446
 8          BY MR. SAUL:
 9          Q.   I show you what's been marked as
10   Collins 26, an excerpt from the 2004 Alderwoods
11   employee handbook that was submitted to us.
12          Do you recognize the document?
13          A.   Yes.
14          Q.   It has a description of fields for
15   locations and it has a section that has Hours and
16   Hours it has Regular, Overtime, Other and Source.
17          Who was this directed to?  Is this
18   something that's for employees to be aware of this or
19   location managers or both?
20          A.   I believe this may be location
21   managers and/or location administrators but I'm not
22   certain.
23          Q.   Then under amount Dollars it says
24   Piece Work?
25          A.   Yes.
```

```
 1          Q.   For any transactions that are
 2   calculated as a dollar amount.
 3          Is that that piecework we were talking
 4   about before where somebody's paid say a certain flat
 5   amount for like a removal?
 6          A.   I believe it would be, yes.
 7          EXHIBIT 27:  Document, Bates ALD008473-80
 8          BY MR. SAUL:
 9          Q.   This is a document received from
10   Alderwoods Group, Time Card/Time Sheets Verification
11   Checklist for Location/General Managers, Location
12   Administrators.  Do you recognize this document?
13          A.   Not readily.  I'm also looking for a
14   date on the document.
15          Q.   The very last page there's a date,
16   June 6, 2005 at the very bottom.
17          A.   Which is an attachment to the other
18   document.
19          Q.   Right.  It seems to go along with it
20   because that's a time card verification checklist.  So
21   it would appear that the document would have existed
22   on or after, the rest of it would have been from on or
23   after June 6, 2005?
24          A.   I would expect so.
25          Q.   If you could take a look at page 4 of
```

1       A.  I spoke with Chuck Gibson.

2       Q.  Who is Mr. Gibson?

3       A.  Mr. Gibson was my human resource

4   manager and continues to work in human resources with

5   Service Corp. International.

6       Q.  What was the purpose of the call?

7   What did you talk about with Mr. Gibson?

8       A.  The purpose was to refresh my memory

9   on various programs that we had in place when he and I

10  worked together, which was 2005, 2006.

11      Q.  About how long was your conversation

12  with Mr. Gibson?

13      A.  Perhaps, the first conversation was

14  perhaps 30 minutes.  The second conversation was

15  perhaps five minutes.

16      Q.  How long was your conversation

17  approximately with Betty Lombard?

18      A.  I would say perhaps 15 minutes.

19      Q.  And Shawn Burke?

20      A.  Less than 15 minutes.  I also spoke

21  with Rhonda Stewart.

22      Q.  Who is Rhonda Stewart?

23      A.  She was with corporate human resources,

24  the Toronto office, Alderwoods.

25      Q.  What did you talk to her about?

1       A.  Again just to refresh my memory on

2   various programs, corporate initiatives that were

3   taking place.

4       Q.  How long did you speak to Rhonda

5   Stewart?

6       A.  Approximately an hour.

7       Q.  Around when did you speak to her?

8       A.  About a week ago this past Tuesday, I

9   believe it was.  I'm not absolutely certain but within

10  the last two weeks.

11      Q.  Anyone else besides the individuals we

12  spoke about so far that you spoke to in preparation

13  for this deposition?

14      A.  I don't believe so.

15      Q.  Could you be a little bit more

16  specific as to what you talked about with Rhonda

17  Stewart?

18      A.  We talked about the exempt/non-exempt

19  classifications.  We talked about training matters.

20  --- Reporter interjection

21      Q.  Off the record.

22      --- Off the record discussion

23  BY MR. SAUL:

24      Q.  Did you talk to any of these

25  individuals as to what the practices were regarding

1   the payment of employees for community work?

2       A.  No, I don't believe so.

3       Q.  Are you at all being paid by

4   Alderwoods or SCI for any or all of this work or are

5   you just volunteering?

6       A.  I'm being paid.

7       Q.  Including for your deposition time?

8       A.  Yes.

9       Q.  If you don't mind, how much are you

10  getting paid?

11      A.  $200 an hour.

12      If I can just further that point, that's

13  the result of my severance agreement with Alderwoods/

14  Service Corp. International.

15      EXHIBIT 75:  Document, Bates #09231

16  BY MR. SAUL:

17      Q.  I show you what we have marked as

18  Collins exhibit 75.  Have you ever seen this document

19  before?

20      A.  No, I have not.

21      Q.  Can you tell from the document which

22  location was involved?

23      A.  It would appear to be a location in --

24  I apologize, my phone may go off -- it appears to be a

25  location in Oklahoma but I'm not certain which location

1   it is.

2       Q.  How would you have found out whether

3   or not employees were being paid for their community

4   activities say on weekends and evenings when they were

5   not on the clock, so to speak?

6       A.  It would have been recorded as part of

7   their either time card or time sheet.

8       Q.  Was there any way or any procedure to

9   find out whether or not employees were actually

10  recording their time for such activities?

11      A.  It would have been reviewed as part of

12  the compliance audit.

13      Q.  How would the compliance audit -- if

14  an employee, say a funeral director, had participated

15  in say a Mother's Day event and did not record the

16  time, was there any way for the auditor to find that

17  out by looking at the records?

18      A.  It would be difficult for an auditor

19  to find that out.  It was the responsibility of the

20  employee to record her or his time however.

21      Q.  Do you know of anything that was in

22  writing that would direct employees to record their

23  time for community activities that were outside the

24  person's regular work hours?

25      A.  The company policies would indicate

226

```
1    that they would record time for all time worked on
2    behalf of the company.
3         Q.   But do you know of anything that was
4    specific to the community activities in terms of
5    recording the time that was not during the regular
6    working hours?
7         A.   You mean a document at a specific
8    location that would say don't forget to record your
9    time, or something like that?
10        Q.   Whether it would be a specific
11   location or whether it would be corporate-wide, are
12   you aware of any document that says to record time
13   spent on community activities that are outside your
14   regular work day?
15        A.   I don't recall any, no.
16        Q.   So it's possible then that there were
17   employees within the company that were performing
18   community activities outside their regular work day,
19   were not recording it, were not recording that time,
20   and you would not know about that; is that correct?
21        MR. KNIGHT:   Object to form of question.
22   You can answer if you know.
23        THE DEPONENT:   Rephrase?
24        BY MR. SAUL:
25        Q.   Is it possible then that employees
```

227

```
1    were working during their non-regular work hours on
2    community activities and were not recording their time
3    for that?
4         A.   In certain locations it's possible
5    that that could be taking place.
6         Q.   Would you know whether or not that was
7    taking place?
8         A.   I would not.
9         EXHIBIT 76:   Document, Bates P05358
10        BY MR. SAUL:
11        Q.   I show you what's been marked as
12   Collins exhibit No. 76.   Have you seen this document
13   before?
14        A.   If I can just review it for a moment?
15        Q.   Sure.   Take your time.
16        A.   I don't know whether I have seen the
17   document specifically but I'm familiar with this
18   situation.
19        Q.   Who is Duane?
20        A.   Duane was the location manager at
21   Carpenter Funeral Home in upstate New York.
22        Q.   Would you describe for us in general
23   what the situation was?
24        A.   The situation was we were losing
25   market share to competition rather badly.
```

228

```
1         Q.   This was Duane's response to the
2    employees to try and build up that market share?
3         A.   This is a letter or memorandum that
4    Duane sent the employees asking for them to increase
5    their commitment to regain market share.
6         Q.   Part of that commitment to regain
7    market share was to participate in community
8    activities?
9         A.   That's correct.
10        Q.   Do you have any problem with the
11   letter that he sent out?   I should rephrase.
12        Would the letter be consistent with
13   company policy?
14        A.   With respect to community events?
15        Q.   Yes.
16        A.   Yes.
17        EXHIBIT 77:   Document, Bates P05361-62
18        BY MR. SAUL:
19        Q.   I show you what we have marked as
20   Collins exhibit 77, which appears to be a letter from
21   a Roger Hugo to a person by the name of Craig at
22   Carpenter's Funeral Home.   Who was Roger Hugo?
23        A.   We was a funeral director at
24   Carpenter's Funeral Homes.
25        Q.   The second page, can you identify what
```

229

```
1    this second page is?
2         A.   It appears to be a report to Craig who
3    was the market general manager.
4         Q.   The report on the second page talks
5    about funeral home staff wearing shirts with the
6    funeral home logo.   Were employees encouraged when
7    they participated in volunteer activities to wear
8    something with the company logo?
9         A.   I'm not certain that they were
10   encouraged.   It was really -- well, I should rethink
11   that answer.   I would say yes, they would be encouraged
12   to maybe something as simple as their name badge from
13   the funeral home.
14        Q.   The name badge would include the name
15   of the funeral home?
16        A.   Yes.
17        Q.   Do employees have business cards to
18   pass out at these voluntary activities?
19        A.   Location managers would.   Not all
20   funeral directors would.   They may have blank business
21   cards.   We did not provide business cards for all
22   funeral directors as a matter of course.
23        Q.   We can take a brief break.
24        --- Short recess 10:14-10:28
25        EXHIBIT 78:   Document, Bates P08155
```

Page 5

1                    INDEX TO EXHIBITS (CONT'D)

2   1EXHIBIT NO.                                    PAGE NO.

3       102      Document, Bates P12519              265

4       103      Document, Bates ALD005180           266

5       104      Document, Bates ALD003836           267

6       105      Document, Bates ALD005212-15        269

7       106      Document, Bates ALD005251           272

8       108      Document, Bates ALD002338-39        274

9       107      Document, Bates ALD004681           274

10      109      Document, Bates ALD002127-28        277

11      110      Document, Bates ALD010391           279

12      111      Document, Bates ALD009804           279

13      112      Document, Bates ALD009807           279

14      113      Document, Bates ALD009808           280

15      114      Document, Bates ALD005532-33        281

16      115      Documents, Bates ALD005587-88       283

17      116      Document, Bates ALD005590-91        284

18      117      Document, Bates ALD006508-11        285

19      118      Document, Bates ALDERWOODS0000582-87 286

20      119      Affirmation by Marilyn Thomas,      291

21               September 23, 2009

22      120      Affirmation by Richard Kamienski,   294

23               September 14, 2009

24

25

Page 238

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19          We used that term I believe yesterday but

20   could you describe for us what seamless service means?

21          A.  Seamless service was essentially a

22   program that was rolled out in 2003 perhaps and the

23   concept was that we would provide service to a family

24   that would exceed their expectations and provide for

25   all of their needs to the best of our extent.

Page 239

```
 1              Q.  Again, we touched on this yesterday a
 2   little bit but in providing that seamless service that
 3   would encompass also a situation where say a funeral
 4   director was on a lunch break and a call came in and
 5   there was nobody else to take it so the funeral
 6   director would be expected to take a call like that to
 7   provide service?
 8              A.  It could provide that, yes.  Include
 9   that, sorry.  It could also include walking with an
10   umbrella over someone's head to a car in the rain.
11   Many aspects of seamless service.
12              Q.  I notice there's a page Competency
13   Development, Bates Alderwoods 004787.  At the top it
14   says 2006, underneath that it says competency
15   development.
16              Do you have any idea why that whole page
17   would be blank like that?
18              A.  I don't know.  BPOs were being
19   developed in the field with some inconsistency, being
20   the first year they were being rolled out.  For
21   example, I could say the same thing about BPO No. 2,
22   if I was to review that I would suggest that is not
23   specific enough.
24              And so what we are really trying to do as
25   a corporation is grow our management and we were
```

# EXHIBIT 55

1

VOLUME: I
PAGES: 1 to 251
EXHIBITS: 1 to 14

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA

Civil Action No. 06-1641

DEBORAH PRISE and HEATHER          )
RADY, on behalf of                 )
themselves and all                 )
employees similarly                )
situated,                          )
            Plaintiffs,            )
                                   )
vs.                                )
                                   )
ALDERWOODS GROUP, INC.,            )
            Defendant.             )

DEPOSITION OF STEVEN A. DETSCHNER,
called as a witness on behalf of the
Defendant, pursuant to the applicable
provisions of the Federal Rules of Civil
Procedure, before Jeanette N. Maracas,
Registered Professional Reporter and Notary
Public in and for the Commonwealth of
Massachusetts, at the Holiday Inn Hotel,
929 Hingham Street, Rockland, Massachusetts,
on Friday, May 8, 2009, commencing at 9:23
a.m.

194

1   A.  The only thing that I remember is, going
2       back several hours ago I made mention that
3       I wrote on some sort of a form that I was
4       a member of two different various clubs and
5       I attended and joined the VFW.
6   Q.  Right.
7   A.  Documentarily-wise, I would submit like a
8       paper saying that I participated in a
9       certain thing and then Jerry would give me
10      a points card that was redeemable for various
11      things, whether they were gift certificates
12      or -- I don't recall exactly what the
13      nature of the point system calculator was.
14  Q.  You say you reported that information to
15      Jerry, did you say?
16  A.  Jerry.
17  Q.  What exactly did you report to him?
18  A.  Just that I did some community service,
19      I would write it down and give him the
20      piece of paper.
21  Q.  Can you give me an example of what kind
22      of description you would give or an example
23      of something you would report?
24  A.  The VFW fish fry, I did that on Friday night
25      and it was two and a half hours long.

195

1   Q.  Would you report to Jerry how much time you
2       spent at the activity?
3   A.  I recall that I did, but I don't recall
4       that he was concerned with the particular
5       amount of hours that I spent, just that I
6       did that.
7   Q.  Did you report any of the time you spent in
8       these community activities on your time
9       sheets?
10  A.  No.
11  Q.  Why not?
12  A.  It would be ludicrous to do that.  It would
13      be absolutely -- I would be the only guy in
14      the house doing that.
15  Q.  Why?
16  A.  Because that wasn't something we did.  It
17      was something that we knew better not to
18      document.
19  Q.  Do you personally think it would be ludicrous
20      to report time, for example, spent at a fish
21      fry on your work time sheet?
22          MS. GIFFORD:  Objection.
23  A.  I don't know what the underlying reason
24      why --
25  Q.  I'm asking you about your personal opinion.

196

1       I said why didn't you report it.  You said
2       it would be ludicrous.  You personally think
3       it would be ludicrous to report that time?
4           MS. GIFFORD:  Objection.
5   A.  I see no reason why time spent in the
6       interest of bettering a company could not
7       be compensatedable.
8   Q.  So why would it be ludicrous to report that
9       time on your time sheet?
10  A.  It was not something that we did at the
11      company across the board.
12  Q.  If you thought that was something that
13      you should be compensated for, did you say
14      anything to anybody to that effect?
15  A.  No.  I didn't want to make any trouble.
16  Q.  Did anyone instruct you one way or the
17      other whether you should report that time
18      on your time sheets?
19  A.  I was never instructed to document any sort
20      of time on a time sheet.
21  Q.  Were you ever instructed not to report
22      community service time on your time sheets?
23  A.  Not in so many words.
24  Q.  Did you ever try to report time that you
25      spent in community activities?

197

1   A.  Can you repeat that?  Did I ever try to?
2           MS. DUGAN:  Can you read that back,
3       please?
4           (Question read)
5   A.  I reported it to Jerry so that I could get
6       the points or so he would give me points.
7   Q.  Did you ever seek compensation for that time?
8   A.  Not on, not via the overtime rate.
9   Q.  You never reported that time on your time
10      sheets?
11  A.  That's correct.
12  Q.  Is that what you're saying?
13  A.  That's correct.
14  Q.  And you never said to anyone, hey, I'm
15      doing this stuff on behalf of the company,
16      I think I should be paid for it?
17          MS. GIFFORD:  Objection.
18  A.  I never raised an issue about it.
19  Q.  And no manager ever specifically prohibited
20      you from reporting time spent in community
21      activities?
22          MS. GIFFORD:  Objection.
23  A.  I was never hindered from doing community
24      service.
25          MS. DUGAN:  Can you read back my

# EXHIBIT 56

1

```
 1              UNITED STATES DISTRICT COURT

 2            WESTERN DISTRICT OF PENNSYLVANIA

 3

 4    DEBORAH PRISE and HEATHER RADY
      on behalf of themselves and all
 5    employees similiarly situated,

 6              Plaintiffs,

 7       vs.

 8    ALDERWOODS GROUP, INC., and SERVICE
      CORPORATION INTERNATIONAL,
 9
                Defendants.
10    _____

11    Civil Action No. 06-1641

12

13

14

15

16                 DEPOSITION OF JEFFREY DIGGS

17               Taken April 22, 2009
                 Commencing at 9:30 a.m.
18        Volume I - Pages 1 - 153, inclusive

19

20
                      Taken by the Defendant
21                           at
                       LANE POWELL
22           301 W. Northern Lights Blvd.
                 Anchorage, AK  99503
23

24

25    Reported by: Susan J. Warnick, RPR
```

NETWORK DEPOSITION SERVICES
**Transcript of Jeffrey Diggs**

74

1  BY MR. FORESTIERE:
2  Q  Have you ever written any documents and sent them to
3  anyone at Evergreen complaining about not being paid for
4  all the time that you worked at Evergreen?
5  A  No.
6       MR. LINGLE: Object to the form.
7       THE WITNESS: Sorry.
8  BY MR. FORESTIERE:
9  Q  Did you ever prepare and send any documents to anyone
10  at Evergreen for not being paid for the on-call services
11  you performed?
12       MR. LINGLE: Object to the form.
13       THE WITNESS: No.
14  BY MR. FORESTIERE:
15  Q  Did you ever prepare and send any documents to anyone
16  at Evergreen concerning not being paid all of the time
17  that you worked at Evergreen's?
18       MR. LINGLE: Object to form.
19       THE WITNESS: No.
20       MR. FORESTIERE:  Why don't we take a break.
21       (Recess taken.)
22  BY MR. FORESTIERE:
23  Q  Did you ever consider calling the confidential help
24  line concerning your not being paid all the hours that you
25  worked at Evergreen?

75

1  A  No.
2       MR. LINGLE: Object to the form.
3       MR. FORESTIERE: Let's mark this next.
4       (Exhibit 6 was marked.)
5  BY MR. FORESTIERE:
6  Q  Exhibit 6 is a three-page document identified ALD 1
7  through 3. It's an excerpt from the 2004 Alderwoods
8  Funeral Home Procedures and Cemetery Procedures Manual.
9       Have you had an opportunity to take a look at
10  that document, Mr. Diggs?
11  A  Yes.
12  Q  Are you familiar with this document?
13  A  No.
14  Q  The second sentence of the first paragraph states,
15  quote, "The time card/sheet must show the time the person
16  begins work, the time they break for lunch, the time they
17  return from lunch, and the time they end work for the
18  day," end quote. Do you see that?
19  A  I do.
20  Q  Was that your understanding as to how you were to
21  fill out your time cards while you performed work at
22  Evergreen?
23  A  It's my understanding you clock in, you clock out,
24  you clock back in, you clock out.
25  Q  So you clock in when you come to work; correct?

76

1  A  Yes.
2  Q  And then you clock out for lunch; correct?
3  A  If you took it.
4  Q  And then, if you took a lunch and you came back, you
5  clocked in?
6  A  Yes.
7  Q  And then you clocked out at the end of the day?
8  A  Yes.
9  Q  The second sentence there, the first bullet point, it
10  says, quote, "All employees must record all hours actually
11  worked unless exempt." Do you see that?
12  A  Yes.
13  Q  Did you understand that you were required to report
14  all the hours that you -- to work at Evergreen?
15       MR. LINGLE: Object to the form.
16       THE WITNESS: Yes.
17  BY MR. FORESTIERE:
18  Q  Lower on the page, fourth bullet point, it says, "If
19  an employee is eligible for and receives piece work pay,
20  the employee is still required to record the actual time
21  worked." Do you see that, sir?
22  A  I do.
23  Q  And was that your understanding as to recording time
24  when you performed piece work?
25  A  No.

77

1  Q  What was your understanding as to recording time when
2  you performed piece work?
3  A  That that was a flat rate, piece work.
4  Q  And what was your understanding as to it being a flat
5  rate piece of work?
6  A  A removal was $35.
7  Q  So every time you did a removal, you were paid $35?
8  A  Correct.
9  Q  And you were paid that amount regardless of the
10  amount of time it took to perform the removal?
11  A  Correct.
12  Q  And that's why it's referred to as a flat rate:
13  Because it doesn't matter how much time it took to do it,
14  you're only going to get paid X amount?
15  A  That's what it says, yes.
16  Q  And that's what your understanding was?
17  A  Flat rate, $35 per removal.
18  Q  Correct?
19  A  Correct.
20  Q  Now, who generally set your work schedule while you
21  were performing your duties at Evergreen?
22  A  Scott.
23  Q  Mr. Janssen?
24  A  Yes.
25  Q  How was that done? Did he perform a schedule for you

90

1  your time card and it was then reflected in these earnings
2  statements?
3       MR. LINGLE: Object to the form.
4  BY MR. FORESTIERE:
5  Q  To the best of your knowledge?
6  A  Yes.
7  Q  Down below that it says, "OT ADJ." Do you see that?
8  A  Yes.
9  Q  Do you know what that's for?
10  A  No.
11  Q  Under that it says, "Piece work." Do you see that?
12  A  Yes.
13  Q  Do you know what that's for?
14  A  Yes.
15  Q  Can you explain to me what that makes reference to?
16  A  Removals.
17  Q  That was the piece work that you were paid for doing
18  removals during this period of time?
19  A  Yes.
20  Q  And the amount there is $875; correct?
21       MR. LINGLE: You're not suggesting that's for
22  this period.
23       THE WITNESS: That's year to date.
24  BY MR. FORESTIERE:
25  Q  Oh, I'm sorry. You don't have anything for that

91

1  period. But for the year to date it's $875; correct?
2  A  Yes.
3  Q  And that was calculated at $35 a removal?
4  A  Best of my knowledge.
5  Q  So if we divided that number at least on this
6  earnings statement, we could determine the number of
7  removals that you made, at least from year to date, at
8  $875?
9  A  You could come close.
10  Q  When you worked at Evergreen, did any of the
11  employees complain to you that their earnings statements
12  did not include all the time that they performed work?
13       MR. LINGLE: Object to the form.
14       THE WITNESS: I heard that statement.
15  BY MR. FORESTIERE:
16  Q  Who did you hear it from?
17  A  Ed Bouwens.
18  Q  Anyone else?
19  A  I don't recall.
20  Q  What did Mr. Bouwens tell you about that?
21  A  I don't recall the exact conversation.
22  Q  Was it more than once that he made those statements
23  to you?
24  A  I don't recall.
25  Q  Do you recall the first time he made those statements

92

1  to you?
2  A  No, sir.
3  Q  Or the last time he made any such statements to you?
4  A  No, sir.
5  Q  While you worked at Evergreen, did any employees ever
6  complain to you that the earnings statements did not
7  include all the compensation that they were entitled to be
8  paid?
9       MR. LINGLE: Object to the form.
10       THE WITNESS: I don't recall.
11  BY MR. FORESTIERE:
12  Q  I think you stated that you were initially paid $21
13  an hour when you commenced works as a funeral director and
14  embalmer at Alderwoods; correct?
15  A  Yes.
16  Q  Did that change during the time you were there?
17  A  I don't believe so.
18  Q  Were there pay periods in which you believed you
19  received less than the full amount of your pay?
20       MR. LINGLE: Object to the form.
21       THE WITNESS: As reflected on what?
22       MR. FORESTIERE: Let me ask that question
23  differently.
24  BY MR. FORESTIERE:
25  Q  Were there ever any pay periods in which you believe

93

1  you received less than your full amount of pay based upon
2  the actual hours that you worked?
3       MR. LINGLE: Object to the form.
4       THE WITNESS: I believe that my pay checks were
5  identical to my time card. Saying, if it was on my time
6  card, I was paid for it.
7  BY MR. FORESTIERE:
8  Q  Did you ever complain to anybody that your time cards
9  did not reflect all the hours that you actually worked?
10       MR. LINGLE: Object to the form.
11       THE WITNESS: Did I ever complain?
12  BY MR. FORESTIERE:
13  Q  Yes, sir.
14  A  Not to my knowledge.
15  Q  Did you ever tell Mr. Janssen that you were working
16  more hours than those reflected on your time card?
17  A  No.
18  Q  Did you ever make that statement to Ms. Boyd?
19  A  No.
20       MR. FORESTIERE: Let's mark this as the next
21  exhibit.
22       (Exhibit 8 was marked.)
23  BY MR. FORESTIERE:
24  Q  I have marked as Exhibit 8 a document identified as
25  ALD 9539, consisting of a number of handwritten statements

Case3:08-cv-01184-SI   Document259-3   Filed07/27/10   Page46 of 87
NETWORK DEPOSITION SERVICES
**Transcript of Jeffrey Diggs**

35  (Pages 134 to 137)

134

1  facilities owned by Alderwoods concerning overtime?
2       MR. LINGLE: Object to the form.
3       THE WITNESS: Right now or then?
4  BY MR. FORESTIERE:
5  Q  During the time that you were working at Evergreen.
6  A  I never saw any policies on overtime.
7  Q  From any other facilities owned by Alderwoods?
8  A  No.
9  Q  Were you ever instructed not to report time that you
10  worked on your time card?
11       MR. LINGLE: Object to the form.
12       THE WITNESS: I was instructed on how to fill
13  out my piece work time card.
14  BY MR. FORESTIERE:
15  Q  And what instructions did you receive in that regard?
16  A  You write the name of the deceased down as a removal.
17  Q  Other than performing the piece work, were you ever
18  instructed not to report time that you worked on your time
19  card?
20  A  No.
21  Q  Are you aware of any company-wide policy used by
22  Evergreen that employees should not report all the work on
23  their time cards?
24       MR. LINGLE: Object to the form.
25       THE WITNESS: I'm not aware of any company-wide

135

1  policies.
2  BY MR. FORESTIERE:
3  Q  Are you aware of any company-wide policy of not
4  including all types of remuneration in calculating the
5  overtime rate to be paid employees who were to be paid
6  overtime?
7       MR. LINGLE: Object to the form.
8       THE WITNESS: I have no idea what you just
9  asked.
10  BY MR. FORESTIERE:
11  Q  "Remuneration," that word always throws me as well.
12       Are you aware of any policies that the company
13  had concerning how they calculate the overtime rate --
14       MR. LINGLE: Object --
15  BY MR. FORESTIERE:
16  Q  -- to be paid employees that performed overtime?
17       MR. LINGLE: Object to the form.
18       THE WITNESS: I would think that the company
19  would follow federal guidelines and state guidelines on
20  calculating overtime pay.
21  BY MR. FORESTIERE:
22  Q  Do you know of any policy where they did not do that?
23       MR. LINGLE: Object to the form.
24       THE WITNESS: I don't.
25  BY MR. FORESTIERE:

136

1  Q  Has any employee ever complained to you that
2  Evergreen did not properly calculate the overtime rate for
3  the overtime they worked?
4       MR. LINGLE: Object to the form.
5       THE WITNESS: No.
6  BY MR. FORESTIERE:
7  Q  Other than the three facilities comprising the
8  Evergreen facilities, did you work at any other Alderwoods
9  locations?
10  A  No.
11  Q  Are you aware that Alderwoods owns a number of
12  funeral homes and other funeral establishments other than
13  Evergreen?
14  A  Yes.
15  Q  Do you know how many funeral locations or
16  establishments Evergreen -- strike that.
17       Do you know of how many funeral homes and
18  establishments Alderwood owned other than the Evergreen
19  facility at the time that you worked for Evergreen?
20  A  My understanding was around 1400 facilities.
21  Q  And that was throughout the nation?
22  A  Yes.
23  Q  Do you know how many hourly employees Alderwoods
24  employed during that time that you were employed at
25  Evergreen?

137

1  A  No.
2  Q  Do you know how many funeral directors/embalmers
3  Alderwoods employed during the time that you worked at
4  Evergreen?
5  A  No.
6  Q  Were you physically present at any other facilities
7  owned by Alderwoods other than the Evergreen facilities we
8  identified, those three facilities?
9  A  No.
10  Q  So you never observed the employees working at any
11  other funeral homes owned by Alderwoods; correct?
12       MR. LINGLE: Object to the form.
13       THE WITNESS: Correct.
14  BY MR. FORESTIERE:
15  Q  You never reviewed any time cards that employees
16  filled out for other facilities? Strike that. Let me
17  rephrase that.
18       Did you ever review any time cards from
19  employees who worked at any other Alderwoods facilities?
20  A  No.
21  Q  Do you know if Mr. Janssen was in charge of any other
22  Alderwoods facilities other than Evergreen?
23  A  I don't know that he was.
24  Q  Now, during the course of this litigation your
25  attorneys were provided a request for production of

146

1      MR. LINGLE: Object to the form.
2      THE WITNESS: Yes.
3  BY MR. FORESTIERE:
4  Q   Who told you that?
5  A   Scott, Kirstin, Debbie.
6  Q   Mr. Janssen, Ms. Boyd and Debbie --
7  A   Janssen.
8  Q   When did Mr. Janssen first tell you that you had to
9  work during your meal periods?
10  A   I don't recall the exact date.
11  Q   Did he tell you more than once?
12  A   I believe so.
13  Q   How many times did he tell you?
14  A   I have no idea.
15  Q   Do you recall generally when the first time was?
16  A   No.
17  Q   Do you recall when the last time was?
18  A   No.
19  Q   How many times did Ms. Boyd tell you to work
20  during your lunch?
21  A   I have no idea.
22  Q   Do you recall when the first time was?
23  A   No.
24  Q   Do you recall the last time?
25  A   No.

147

1  Q   How many times did Mrs. Janssen tell you that you had
2  to work through your lunch?
3  A   I have no idea.
4  Q   Do you recall when the first time was?
5  A   No.
6  Q   Do you recall when the last time was?
7  A   No.
8  Q   Down later on, at the bottom of that page, it says,
9  "Recording of hours." If you could read through that, I
10  have a couple of questions.
11      Have you had a chance to read through that
12  section, sir?
13  A   Yes.
14  Q   The first sentence says, quote, "All nonexempt
15  employees are required to record all hours worked each
16  day," end quote. Do you see that?
17  A   I do.
18  Q   And you didn't do that; correct?
19  A   I recorded the time as I was directed to record it.
20  Q   And that did not include all the hours you worked
21  each day; correct?
22  A   That did not include the hours which fell into a
23  piece work --
24  Q   So other than the piecemeal work, or piece work, did
25  you record all the hours on your time cards that you

148

1  worked?
2  A   Yes.
3  Q   It also states later on, near the bottom of the page,
4  that, quote, "Employees must review their time card/time
5  sheet, correct any errors, and sign it before submitting
6  it to their manager for approval;" do you see that, sir?
7  A   I do.
8  Q   And did you generally follow that requirement?
9  A   I generally signed it.
10  Q   Did you review it to see if it contained any errors
11  before you signed it?
12  A   No.
13  Q   Did you sign it with your full name or did you just
14  do your initials? Do you recall?
15  A   I'd say signature.
16  Q   Was there anything else noted on your time cards
17  other than -- I think you indicated that sometimes you'd
18  put in no lunch?
19  A   Sometimes.
20  Q   And you recorded the hours you worked other than
21  piecemeal -- or piece work?
22  A   Correct.
23  Q   Did you also reflect on your time cards the time that
24  you did piece work or removals?
25  A   Yes.

149

1  Q   Other than those entries we just talked about, did
2  you have any other entries on your time card that you can
3  recall?
4  A   Not that I'm aware of.
5      MR. FORESTIERE: I think that's all the
6  questions I have.
7      EXAMINATION
8  BY MR. LINGLE:
9  Q   Mr. Diggs, when you were -- I think you had referred
10  to it earlier as phone duties, so when you were not
11  scheduled to -- well, when you had the phone with you, did
12  you also do removals when you were scheduled just on phone
13  duty?
14  A   Usually both. Mine fell together. I had phone duty
15  and removal duty at the same time.
16  Q   When you would take a call and it wouldn't require
17  you to do a removal, I think that you said those calls
18  would range from two to 30 minutes; is that right?
19  A   Yes.
20  Q   Can you tell us, on average, how long those calls
21  would take?
22  A   On average?
23  Q   Yes.
24  A   So if you averaged it out, 10, 15 minutes a call.
25  Q   You were asked about a bunch of pay policies earlier.

# EXHIBIT 57

```
 1              THE UNITED STATES DISTRICT COURT

 2           FOR THE WESTERN DISTRICT OF PENNSYLVANIA

 3

 4      ------------------------------

 5   DEBORAH PRISE and HEATHER        )

 6   RADY on behalf of themselves     )

 7   and all employees similarly      )

 8   situated,                        )

 9           Plaintiffs,              ) Civil Action No. 06-1641

10      vs.                           )

11   ALDERWOODS GROUP, INC.,          )

12           Defendant.               )

13   ------------------------------

14

15

16

17           Deposition of STEPHEN ESCOBAR, taken at

18           1312 McHenry Avenue, Modesto,

19           California, commencing at 10:06 a.m.,

20           Wednesday, March 11, 2009, before

21           Amanda J. Dunn, California CSR No. 13336.

22

23

24

25   PAGES 1 - 177
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Stephen Escobar**

45

1   Counselor.

2           MR. LINGLE:  Then don't misstate what he said.

3           MR. FORESTIERE:  Okay.  I can state my

4   questions the way I want.

5           MR. LINGLE:  Well, you can state your

6   questions, but you can't misstate what his testimony --

7           MR. FORESTIERE:  You can make your objection

8   and --

9           MR. LINGLE:  I'm telling you, do not misstate

10  his testimony.

11          MR. FORESTIERE:  Can you read back what he

12  stated in the question about coming out in January of

13  2004, please.

14          (Record read by the reporter.)

15  BY MR. FORESTIERE:

16      Q.   So the program they came out with was

17  concerning the community service that they wanted you to

18  network with them?

19      A.   Yes.

20      Q.   Okay.  So your understanding at the time that

21  you were hired -- strike that.

22          Did you have any understanding at the time that

23  you were hired that you were required to perform

24  community service?

25      A.   Yes.

**Johnstown**
814-266-2042

**Toll-Free**
866-565-1929

**Pittsburgh**
412-281-7908

1      Q.   What was your understanding at the time you
2    were hired?
3      A.   That we would work in the community in drumming
4    up business.
5      Q.   And how'd you come to that understanding?
6      A.   Brad told me that.
7      Q.   When did he tell you that?
8      A.   After I was hired.
9      Q.   When you say after you were hired, did you have
10   an approximate date that that conversation occurred?
11     A.   No, I don't.
12     Q.   How long after you were hired did he make that
13   statement to you?
14     A.   I don't know the approximate date so --
15     Q.   Was it a couple of days after you were hired?
16     A.   I guess it was a couple of days.
17     Q.   Was it a week after you were hired?
18          MR. LINGLE:   Object to the form.
19          THE WITNESS:   A couple days.
20   BY MR. FORESTIERE:
21     Q.   So your best recollection is it happened a
22   couple of days after you were hired?
23     A.   Yes.
24     Q.   Did you have any conversations with anybody
25   else about community service at the time or prior to

1      Q.   Do you have any idea about what that refers to?

2      A.   No.

3           MR. LINGLE:   Just note my continuing objection

4    to all these questions based on the fact that it was not

5    produced prior to this.   It was sprung on the witness

6    during the deposition.

7           MR. FORESTIERE:   Well, I can't tell you whether

8    that -- but I'm surely entitled to ask him about

9    documents he's completed.

10          MR. LINGLE:   Well, you're supposed to produce

11   them ahead of time.   You haven't been doing it -- you

12   haven't produced them, so I'm continuing to object to

13   all these questions.   You know that you cannot tell me

14   that they were produced, so continuous objections.

15   BY MR. FORESTIERE:

16     Q.   On page 31, about halfway in the middle of the

17   page, it says -- it looks like it says, "Piece work,

18   $100 for Saturday."

19          Do you see that?

20     A.   Yes.

21     Q.   Is that your handwriting?

22     A.   Yes.

23     Q.   What does that mean?

24     A.   That would be that I picked up somebody.

25          MR. LINGLE:   Objection.

NETWORK DEPOSITION SERVICES
**Transcript of Stephen Escobar**

122

1      Q.   Oh, holiday.  Okay.

2           Is that your handwriting, sir?

3      A.   Yes.

4      Q.   And what does that indicate?

5           MR. LINGLE:  Objection.

6           THE WITNESS:  Worked on a holiday.

7    BY MR. FORESTIERE:

8      Q.   For 4 hours of overtime, is that what you're

9    trying to indicate there?

10     A.   Yes.

11     Q.   On page 30, under "Extra Time," it says "Piece

12   Work" -- and it has some person's name -- and "TMR,

13   9/4/04."

14          Do you see that?

15     A.   Yes.

16     Q.   And to the right, it -- it looks like it says

17   50?

18     A.   Yes.

19     Q.   Is that all your handwriting?

20     A.   Yes.

21     Q.   What does TMR mean?

22          MR. LINGLE:  Object to the form.

23          THE WITNESS:  I don't know.

24   BY MR. FORESTIERE:

25     Q.   And can you read under "Piece Work," what

**Johnstown**
814-266-2042

**Toll-Free**
866-565-1929

**Pittsburgh**
412-281-7908

NETWORK DEPOSITION SERVICES
Transcript of Stephen Escobar

123

1    those -- what's written there?

2        A.    50.

3        Q.    No.  Under "Piece Work."

4        A.    Karen Mott.

5        Q.    Was that the name of -- well, do you know who

6    that is the name of?

7        A.    It's a girl I went to high school with.

8        Q.    Do you know why you put her name in there?

9        A.    Because I removed her from the house.

10       Q.    On page 24, on the left side column under

11   "Extra Time," it seems to indicate "Gomez."

12             Is that 150 or 50?

13       A.    50.

14       Q.    Okay.  Is that your handwriting?

15       A.    No.  That was not my handwriting.

16       Q.    Do you know if you were paid $50 for the

17   removal of a person named Gomez?

18       A.    As long as it was entered correctly in the

19   computer by this person.

20       Q.    On page 35, in the right-hand column under

21   regular -- it seems to say "Regular Time."  There's

22   handwriting there that says "1 Hour Lunch."

23             Is that your handwriting?

24       A.    No.

25       Q.    Do you know whose handwriting that is?

Johnstown
814-266-2042

Toll-Free
866-565-1929

Pittsburgh
412-281-7908

1    community to make us have more business.

2        Q.    Anything else?

3        A.    No.  That would be it.

4        Q.    Was there any other community service

5    organization that you joined in order to perform your

6    community service work while at Lakewood?

7        A.    No.

8        Q.    Were you ever compensated for at least some of

9    the community service work that you performed?

10       A.    No.

11       Q.    Do you recall the hotline or help line to

12   complain about the community service work that you

13   performed?

14           MR. LINGLE:  Object to the form.

15           THE WITNESS:  No.  Because I didn't know about

16   a hotline and a help line.

17   BY MR. FORESTIERE:

18       Q.    Weren't you made aware of that a couple of

19   months before you left as part of the orientation?

20       A.    Yeah.

21       Q.    You were?

22       A.    No, no.  That training.  I had nothing to do

23   with that other -- they never told us about a help line

24   or a hotline.  I had never heard of that.

25

```
 1    BY MR. FORESTIERE:

 2        Q.   Today's the first day you're hearing about it?

 3        A.   Yes.

 4        Q.   Did you ever attempt to report any time that

 5    you spent performing this community service work?

 6        A.   No.

 7        Q.   Did you ever sign an affidavit or declaration

 8    concerning this lawsuit?

 9        A.   I don't know.

10        Q.   Did you ever sign a document under penalty of

11    perjury stating any facts concerning this lawsuit?

12        A.   I don't remember.

13        Q.   Are you aware of any written policy by Lakewood

14    concerning the on-call work you performed?

15        A.   No.

16        Q.   Are you aware of any written policy concerning

17    overtime that you worked?

18        A.   No.

19        Q.   Are you aware of any written policy by the

20    company for not compensating you for work that you

21    performed while you were on call?

22        A.   No.

23        Q.   Are you aware of any policy for not

24    compensating you for work you performed concerning your

25    community service?
```

**Johnstown**
**814-266-2042**

**Toll-Free**
**866-565-1929**

**Pittsburgh**
**412-281-7908**

1      Q.    That's correct.  I don't know if that's

2  overtime or not.

3      A.    Telephone for the --

4      Q.    That's the on-call stuff?

5      A.    On-call.

6      Q.    Right.

7      A.    That's already been covered.

8      Q.    I think we've already covered that.

9      A.    Okay.  And then --

10          MR. LINGLE:  Can we go off for a second?

11          MR. FORESTIERE:  Yes.

12          (Discussion off the record.)

13  BY MR. FORESTIERE:

14      Q.    Okay.  Mr. Escobar, I want you to list for me,

15  please, the type of work you performed that you're

16  claiming is overtime that you were not paid.

17      A.    Okay.

18      Q.    All right.

19      A.    Piece work.

20      Q.    When you say -- okay.  Go ahead and give me the

21  list, and then we'll go back to it.

22      A.    Piece work, meals, working through meals, the

23  phone on-call, and hours that I was not told to put down

24  on my time card.

25      Q.    Anything else?

NETWORK DEPOSITION SERVICES
**Transcript of Stephen Escobar**

143

```
 1      A.   Yes.

 2      Q.   For the on-call services?  They gave you a

 3   telephone?

 4      A.   Yes.

 5      Q.   Okay.  Did you have to pay for that?

 6      A.   No.

 7      Q.   That was something the company paid for?

 8      A.   Yes.

 9      Q.   Was it a cell phone?

10      A.   Yes.

11      Q.   Would you agree that perhaps the cell phone

12   records would be a good indication of calls you received

13   to perform on-call services?

14      A.   Yes.

15      Q.   Now, you also talked about meal -- working

16   through meal periods.

17      A.   Yes.

18      Q.   And you claim that to also be overtime?

19      A.   Yes.

20      Q.   How often did that occur that you worked

21   through a meal period?

22      A.   I would say two times a week.

23      Q.   How's it that you were asked to do work through

24   a meal period -- strike that.

25           Could you explain to me how that occurred that
```

NETWORK DEPOSITION SERVICES
**Transcript of Stephen Escobar**

144

1    you missed a meal period or were forced to work during a

2    meal period?

3        A.   We were the busiest funeral home in this

4    county.

5        Q.   What work were you performing during your meal

6    periods typically?

7        A.   Whatever.  Whatever they needed.  I did

8    whatever they wanted me to.

9        Q.   You've got to tell us -- that's what I'm trying

10   to ask.

11       A.   Cremations, arranging for a service, picking up

12   flowers, getting the flowers ready for the service,

13   helping the embalmer get the people dressed.

14       Q.   Who was it that would generally tell you to do

15   this?

16       A.   It would be the manager.

17       Q.   I'm sorry.  Who?

18       A.   Manager.  Brad Webb.

19       Q.   Did you ever tell him, hey, I'm on my lunch

20   break?

21       A.   I tried to.

22       Q.   What was his response?

23       A.   Ha, ha -- no, I'm sorry.

24       Q.   Do you recall what his response was?

25       A.   That's okay.  There's work to be done.

**Johnstown**
**814-266-2042**

**Toll-Free**
**866-565-1929**

**Pittsburgh**
**412-281-7908**

# EXHIBIT 58

```
 1                    DEPOSITION OF RIC HENSLEY
 2                      October 28, 2009
 3             IN THE UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF CALIFORNIA
 4             SAN FRANCISCO/OAKLAND DIVISION
 5    ----------------------------------------
      WILLIAM HELM, DEBORAH PRISE,          )
 6    HEATHER P. RADY, et al., on behalf    )
      of themselves and all other           )
 7    employees and former employees        )
      similarly situated,                   )
 8                                          )
           Plaintiffs,                      )
 9                                          )Case No.
      vs.                                   )CV 08-1184-SI
10                                          )
      ALDERWOODS GROUP, INC.,               )
11                                          )
           Defendant.                       )
12    ----------------------------------------
13
14    APPEARANCES:
15
16             FOR THE PLAINTIFFS:
17             MICHAEL J. LINGLE, ESQ.
               Thomas & Solomon LLP
18             693 East Avenue
               Rochester, New York 14607
19
20             FOR THE DEFENDANT:
21             MATT RAY, ESQ.
               Jones Day
22             2727 North Harwood Street
               Dallas, Texas 75201-1515
23
24
25
```

46

1  McCarty Mortuary?
2      A.   Yes.
3      Q.   Were they kept with the seven or eight
4  binders of other policies?
5      A.   No, they were actually kept on my desk.
6  Easy access and where I could review those, you know,
7  periodically.
8      Q.   But you don't recall when that policy
9  came down?
10     A.   No, I don't.
11     Q.   Could it have been after SCI took over?
12     A.   No, it was probably in '06, latter part
13 of '06, I don't remember exactly.  But it was before
14 SCI took over.
15     Q.   Well, do you recall who they came from?
16     A.   No, they came through corporate, I don't
17 remember exactly.
18     Q.   Where was corporate?
19     A.   Corporate was Barnaby, Canada, which was
20 the old office for The Lowen Group, which was the
21 company before that.  Now, they switched offices after
22 that, I think Cincinnati was a main hub for them.  I
23 don't remember, to tell you the truth.
24     Q.   What is your recollection of the
25 Alderwoods' Community Work Policy?  And by that, I

47

1  mean, what was the policy?
2      MR. LINGLE:  Objection.
3      A.   The policy, as I understand it, was
4  employees were required outside of the work, their
5  day-to-day duty jobs, to try to get community
6  involvement, whether that be with civic organizations,
7  church, that sort of stuff.  And that obviously was to
8  bring in business.
9      Q.   Was it your understanding that all
10 employees in all job positions underneath you as
11 general manager were covered by that policy?
12     A.   Yes, yes.
13     Q.   What about the positions we talked about
14 earlier that did not report to you, do you know whether
15 they were covered by this policy?
16     A.   Such as maintenance --
17     MR. LINGLE:  Objection.
18     A.   -- and florist and those?
19     Q.   Grave diggers?
20     A.   No.  I don't know, I don't know if they
21 were required.  It was more of a funeral home and
22 funeral directors' policy.
23     Q.   So to your knowledge, the community work
24 policy we've been discussing applied to any of the
25 types of positions that reported to you, correct?

48

1      A.   Yes.
2      MR. LINGLE:  Objection.
3      Q.   But you don't know with respect to
4  positions that did not report to you?
5      MR. LINGLE:  Objection.
6      A.   Yes, I do not know.
7      Q.   Let's go back and just talk about some
8  specific people.
9      Sharon Mayes I think you said was an
10 administrator?
11     A.   Yes.
12     Q.   Did the policy, the community work
13 policy, apply to her?
14     A.   Yes.
15     Q.   And do you know if she complied with the
16 policy?
17     A.   I don't know.  I don't remember.
18     Q.   When you received the community work
19 policy and the binders you described, did you have a
20 meeting with your employees, meaning all employees
21 underneath you as general manager, to discuss it?
22     A.   Yes.
23     MR. LINGLE:  Objection.
24     Q.   Where was that meeting?
25     A.   I believe that meeting was at McCarty's.

49

1      Q.   And to be clear, when I say "all
2  employees," I mean, all employees that worked at the
3  five locations?
4      A.   Reported to me.  Yes, yes.
5      Q.   So, for example, Sharon Mayes would have
6  been at that meeting?
7      A.   Yes, yes.
8      Q.   Do you recall how long that meeting
9  lasted?
10     A.   I don't recall.  It was just a communiqué
11 to them and explanation as the best I understood it as
12 to how this program is supposed to work, and what we're
13 supposed to do with it.
14     Q.   Do you recall the explanation you gave?
15     A.   No.
16     Q.   Sitting here today, do you recall any of
17 the employees who worked at any of the five locations,
18 meaning McCarty, Evergreen, Weaver, Woodhaven or
19 Rallings, who complied with the policy, meaning the
20 community work policy?
21     A.   They all complied with it, okay, they all
22 took the policy.  Maybe not all of them did what they
23 were supposed to do with it, but they all complied with
24 it, as far as I know.
25     Q.   Okay.  Maybe we have a language issue.

58

1    communicate to you how much time should be committed?
2        A.    No.
3        Q.    The next paragraph, paragraph 13, says,
4    "Since Alderwoods expected this community work to be
5    done on a volunteer basis, the employees were not paid
6    for any time spent at these outside community
7    organizations and events." Did I read that correctly?
8        A.    Yes.
9        Q.    Earlier you said that you don't have any
10   specific recollection of people doing anything to
11   comply with this policy, although, you think a couple
12   people may have increased their activities?
13       A.    Yes.
14       Q.    As general manager, did you believe that
15   people who were volunteering for community activities
16   should be paid --
17           MR. LINGLE:  Objection.
18       Q.    -- by Alderwoods Group?
19       A.    Yes.
20       Q.    So if someone went to church, they should
21   be paid by Alderwoods Group?
22           MR. LINGLE:  Objection.
23       A.    No, that's not what I mean.
24       Q.    If someone joined a civic organization,
25   they should be paid by Alderwoods Group for the time

59

1    they spend at that civic organization?
2            MR. LINGLE:  Objection.
3        A.    No, not specifically.
4        Q.    Okay.  What did you mean?
5        A.    I mean that the company should pay for
6    their time to be involved in that civic organization,
7    whether it be the paying for the dues to make sure that
8    they're in good standing with that club and
9    organization and the support of the company.
10       Q.    So the dues?
11       A.    Yes.
12       Q.    What about their time spent working with
13   the civic organization?
14       A.    I never addressed that specifically, so.
15       Q.    Did you address the dues issue
16   specifically either with your superiors or with your
17   direct or indirect reports?
18       A.    Yes, yes, we did talk about that, but
19   nothing was ever decided on that.  And I don't think
20   anything went any further.
21       Q.    I think you said that at least one of
22   your employees was involved in the Mason's?
23       A.    Yes, yeah.  Tom Petty, I believe.
24       Q.    Was he involved in the Mason's before the
25   Alderwoods' Community Work Policy came out?

60

1        A.    Yes.
2        Q.    Do you know if the implementation of this
3    Alderwoods' Community Work Policy changed the manner in
4    which he engaged in his activities with the Mason's?
5            MR. LINGLE:  Objection.
6        A.    I'm sure that it did, yes, I'm sure that
7    he stepped up meetings and he was there more often,
8    more visible, and talked about the funeral home and the
9    business more, yes.
10       Q.    And on what do you base that?
11       A.    Just from verbal, just communication and
12   conversation with him and that sort of stuff.
13       Q.    So Mr. Petty indicated to you that he had
14   increased his activities at the Mason's?
15       A.    I don't remember specifics, but, yes,
16   that -- he stepped things up.  And a lot of them did.
17       Q.    Okay.  So you do remember having
18   conversations with Mr. Petty where he indicated he
19   stepped things up at the Mason's?
20       A.    I don't remember specifics, but I
21   remember Mr. Petty being a part of the Mason's, and
22   that being stepped up by him, yes.
23       Q.    Do you understand that the allegation in
24   this lawsuit is that Mr. Petty should be paid by
25   Alderwoods Group for being involved in the Mason's?

61

1            MR. LINGLE:  Objection.
2        A.    No, not specifically, no.
3        Q.    Is it your opinion as a general
4    manager -- well, let me back up.
5            As a general manager, you had
6    responsibility for reviewing time cards, right?
7        A.    Yes.
8        Q.    Making sure your employees got paid?
9        A.    Yes.
10       Q.    If there were issues, you would escalate
11   those to your manager?
12       A.    Yes.
13       Q.    As a general manager, was it your belief
14   that Mr. Petty should be compensated by Alderwoods
15   Group for being involved in the Mason's, for his time
16   where he spent time with the Mason's?
17           MR. LINGLE:  Objection.
18       A.    Is that the way I felt then, or the way I
19   feel now?
20       Q.    Let's start with then.
21       A.    Let's start with then.  Then it was never
22   discussed.  It was not a part of -- I never had any of
23   the employees come to me and say, listen, you know,
24   we're doing this on a volunteer basis, we need to get
25   paid.  That was never a discussion.  Probably privately

# EXHIBIT 59

1

1          UNITED STATES DISTRICT COURT

2          WESTERN DISTRICT OF PENNSYLVANIA

3     DEBORAH PRISE and HEATHER RADY,
      on behalf of themselves and all
4     employees similarly situated,

5          Plaintiffs,

6     vs.

7     ALDERWOODS GROUP, INC. and
      SERVICE CORPORATION INTERNATIONAL,

8
          Defendants.
9     ─────────────────────────────────

10    Civil Action No. 06-1641 Civil
      Judge Joy Flowers Conti
11

12

13

14

15         DEPOSITION OF ROBERT GORDON JONES

16            Taken April 21, 2009
              Commencing at 9:30 a.m.
17
         Volume I - Pages 1 - 216, inclusive
18

19

20            Taken by the Defendants
                       at
21            Lane Powell Law Firm
      301 West Northern Lights Boulevard, Suite 301
22            Anchorage, Alaska

23

      Reported by:
24    Mary A. Vavrik, RMR

25

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Jones**

150

1    4/3. The second page is 5/1. 4/17.
2          MR. LINGLE: Okay.
3          MR. FORESTIERE: Someone just put an
4    extra page on it.
5    BY MR. FORESTIERE:
6    Q   So getting back to my question, then, it's your
7    understanding that the pay period ending date, this
8    one we're talking about, April 3, 2004, includes the
9    prior two weeks of work?
10   A   Yes, sir.
11   Q   All right, sir. That makes more sense. Now,
12   getting back to that page, though, under earnings it
13   says, "piecework," and then it says, "this period,"
14   and then it has "$140," do you see that?
15   A   Yes, I do.
16   Q   What does that pertain to?
17   A   That must be the pay for those death calls that
18   would have been done that two-week period. So I --
19   Q   Are you contending in this lawsuit that you
20   didn't get paid for all of your death call work?
21         MR. LINGLE: Object to the form.
22         THE WITNESS: I believe that's the
23   case.
24   BY MR. FORESTIERE:
25   Q   Have you made any determination as to how many

151

1    times you made death calls that you were not paid
2    for?
3    A   No, sir.
4          MR. LINGLE: Object to the form.
5    BY MR. FORESTIERE:
6    Q   Well, obviously you have been paid in this
7    paycheck at least something for death calls,
8    correct?
9    A   Yes, sir.
10   Q   And was it your understanding that you were
11   doing death calls at $35 for each one?
12   A   That seems to be the case, yes, sir.
13   Q   Because it looks like this would indicate that
14   there was four death calls that you were paid for,
15   correct?
16   A   Yes, sir.
17   Q   Do you know how many death calls -- strike
18   that. Do you know if you were -- if you -- strike
19   that. Did you perform any death calls during this
20   two-week period that you were not paid?
21         MR. LINGLE: Object to the form.
22         THE WITNESS: Not that I recall.
23   BY MR. FORESTIERE:
24   Q   How can we determine the number of death calls
25   that you were not paid for?

152

1    A   Huh. If we compared the time cards to the
2    earnings statements would be a way to determine
3    that.
4    Q   What would be on the time cards that would lead
5    you to believe you performed a death call service?
6    A   Either the notation for PW or DC.
7    Q   What does PW stand for?
8    A   I believe it's piecework.
9    Q   So when you did perform death calls or
10   piecework, you put them on your time card, correct?
11   A   Yes, sir.
12   Q   And that should have then been taken from your
13   time card and put into your earnings statement?
14   A   Yes, sir.
15   Q   So if we determine that any of the time cards
16   in comparison to the earnings statement for the same
17   time period did not have the amount of compensation
18   equal to the number of death calls, then that would
19   indicate that you would be owed more money for death
20   call services that you were not paid for?
21         MR. LINGLE: Object to the form.
22         THE WITNESS: Yes, sir.
23   BY MR. FORESTIERE:
24   Q   And just so we can get a clear understanding of
25   the amount of -- being clear, let's take a look on --

153

1    just go three pages, and talking about the period
2    ending April 17, 2004. And on this earning it says,
3    "piecework, $35." Would that confirm what the base
4    rate was for -- or flat rate was for the piecework
5    you performed?
6    A   Yes, sir.
7    Q   It looks like there was only one during that
8    time period.
9    A   Yes, sir.
10   Q   Okay. Let's go back to the first page of
11   Exhibit 12, the April 3, 2004 time period. And
12   under piecework it says OT ADJ. Do you see that?
13   A   Yes, sir.
14   Q   What does that mean?
15         MR. LINGLE: Object to form.
16         THE WITNESS: I don't know.
17   BY MR. FORESTIERE:
18   Q   Did you ever have any discussions with
19   Mr. Janssen or -- is it Mrs. Boyd --
20   A   Uh-huh.
21   Q   -- about being paid additional monies for
22   overtime that would, quote, be adjusted for you and
23   indicated on your paycheck?
24         MR. LINGLE: Object to the form.
25         THE WITNESS: Not that I recall.

**Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg**
**866-565-1929**

# EXHIBIT 60

```
 1                UNITED  STATES  DISTRICT  COURT
 2            NORTHERN  DISTRICT  OF  CALIFORNIA
 3              SAN  FRANCISCO/OAKLAND  DIVISION
 4
     WILLIAM  HELM,  DEBORAH  PRISE,  )  No.  CV  08-1184-SI
 5   HEATHER  P.  RADY,  et al,  on    )
     behalf  of  themselves  and  all )
 6   other  employees  and  former    )
     employees  similarly  situated,)
 7                                     )
                        Plaintiffs,    )
 8           v.                        )
                                       )
 9   ALDERWOODS   GROUP,  INC.,        )
                                       )
10                   Defendant.        )
                                       )
11
12
                 DEPOSITION  OF  RICHARD  KAMIENSKI
13
                 Wednesday,  October  21,  2009,  9:50 a.m.
14
15               Deposition  Officer:
                 Patricia  Coward,  CSR  No.  5142
16
                 Taken  in  the  offices  of:
17
                 California  Deposition  Reporters
18               2509  West  March  Lane,  Suite  160
                 Stockton,  California  95207
19
20
21
22
                      CALIFORNIA  DEPOSITION  REPORTERS
23                    CERTIFIED  SHORTHAND  REPORTERS
                      2509  West  March  Lane,  Suite  160
24                      Stockton,  California  95207
                              (209)  478-3377
25                      Statewide  (800)  442-3377
```

Page 1

1    A.    I believe it went on a paper spreadsheet.
2    Q.    So it wasn't in electronic data form where she
3    put it into a program, then pressed some button on a
4    computer?
5    A.    I honestly don't remember. I don't believe it
6    was electronic.
7    Q.    And this was the procedure used at all six of
8    the locations, all six of the facilities that you
9    managed; is that correct?  The process that you
10   described?
11   A.    Yes.
12   Q.    Did the employee tally the number of hours on
13   their timecard before it was signed by them?
14   A.    I believe they did, yes.
15   Q.    Anything else involved in the collection of the
16   timecards and submitting them to the payroll department
17   for the payroll -- strike that.  Anything else involved
18   in the submission of the timecards for processing of
19   pay to the employees?
20         MS. GIFFORD: Objection.
21         THE WITNESS: Nothing else that I could think
22   of.
23         MR. FORESTIERE: I forgot. Maybe I ought to do
24   this. Once Shauna sent the stuff to Cincinnati, what
25   happened next?

Page 134

1    were receiving payroll checks that did not include all
2    their pay?
3    A.    I don't remember --
4          MS. GIFFORD: Objection.
5          THE WITNESS: I don't remember any
6    conversations.
7          MR. FORESTIERE: Okay. I'm going to talk a
8    little bit about the community service. Were any of
9    the employees at the facilities you managed required to
10   perform any community service as part of their work?
11   A.    All employees were required to participate in
12   community.
13   Q.    And what did you understand that to include?
14   A.    Clarification, please.
15   Q.    Yeah. What did you understand community service
16   to include?  I mean what was the community service they
17   were required to participate in?
18   A.    It could be anything, but they were required to
19   participate.  It could have been a service club, it
20   could have been a church group, anything along those
21   lines.  But everyone was supposed to participate in
22   something.
23   Q.    And how did you become aware of the employees
24   being required to perform community service?
25   A.    That was told to me by Bill Mitchell and/or

Page 136

1    A.    We received paychecks.
2    Q.    Was it by express mail, or do you know how that
3    was done?
4    A.    I believe I received paychecks for the entire --
5    for all the facilities in overnight mail.
6    Q.    And how were those paychecks distributed to the
7    employees?
8    A.    They -- I would take them to each location and
9    give them, whatever number applied to whatever people
10   were working there, so if they went at this location, I
11   gave them their three, and then I'd go off and --
12   Q.    So you gave the employee, if the -- well, strike
13   that. If the employee was there, did you give them the
14   paycheck?
15   A.    No.
16   Q.    Who did you give these paychecks to that were in
17   turn responsible for getting them to the employees?
18   A.    Usually the location manager, the senior
19   arranger, or the location administrator.
20   Q.    Did you ever have an employee come and complain
21   to you that the amount they were being paid in their
22   payroll check was incorrect?
23   A.    I don't remember any such case.
24   Q.    Did you ever have anybody on -- strike that.
25   Did you ever have anybody tell you that the employees

Page 135

1    Derrick Pate, and I had to report monthly, if not
2    bimonthly, to Bill Mitchell and Derrick Pate as to who
3    was doing what.
4    Q.    Were secretaries -- strike that. Were there any
5    secretaries that were employed at the facilities that
6    you worked at?  People that just did purely clerical
7    work?
8    A.    We called them location administrators.
9    Q.    Okay. They're required to perform community
10   service as well?
11   A.    Everyone.
12   Q.    That would be yes?
13   A.    That's yes.
14   Q.    So regardless of whether or not the community
15   service enhanced their ability to sell a pre-need, for
16   example, all employees were required to perform
17   community service?
18         MS. GIFFORD: Objection.
19         THE WITNESS: My understanding.
20         MR. FORESTIERE: And your understanding was
21   based upon what Mr. Mitchell and Mr. Pate told you?
22   A.    That's correct.
23   Q.    When did they tell you that all employees at the
24   facilities you managed were required to perform
25   community service?

Page 137

35 (Pages 134 to 137)

080fefd8-945c-4daa-943f-0ea003beeafc

1   A.   I would report it by location, by name, by
2   location, and by activity.
3   Q.   When you say by name, what are you referring to?
4   A.   Name of the individual.
5   Q.   Was there a written report like that that was
6   provided to Mr. Mitchell and Mr. Pate?
7   A.   I don't recall.
8   Q.   When -- did you ever tell Mr. Mitchell and
9   Mr. Pate that 90 percent of the employees at the
10  facility you managed refused to participate in
11  community service or failed to do so?
12     MS. GIFFORD:   Objection.
13     THE WITNESS:   That would be part of the
14  reporting conversation, yes.
15     MR. FORESTIERE:   And that would be the
16  conversation we're talking about, these monthly,
17  bimonthly meetings?
18  A.   That's correct, the conference call.
19  Q.   And what would they say in response to your
20  informing them of that?
21  A.   They would tell me that I needed to get
22  a-hundred-percent involvement.
23  Q.   Did they ever instruct you to discipline the
24  employees that were not participating or refusing to
25  participate in community service?

Page 146

1     MR. FORESTIERE:   Did you personally keep track
2   of any time performed by the employees for community
3   service?
4     MS. GIFFORD:   Objection.
5     THE WITNESS:   Clarify "time."
6     MR. FORESTIERE:   Yeah.  In other words, if Mr. X
7   performed community service, did you keep a time record
8   as to how much community service he performed?
9   A.   Oh.  No, I did not.
10  Q.   So just so I can make the question broader,
11  then, you did not keep any time records of community
12  service performed by any employees?
13  A.   That's correct.
14  Q.   What was the range of hours the employees that
15  were performing community service spent performing
16  community service?
17     MS. GIFFORD:   Objection.
18     THE WITNESS:   I have no idea.  I -- just no
19  recollection.
20     MR. FORESTIERE:   No ability to make any estimate
21  whatsoever?
22  A.   I'm sorry, no.
23  Q.   That's okay.  Did any employee come to tell you
24  that they were spending more than five hours a week
25  performing community service?

Page 148

1   A.   No.
2   Q.   Were the employees required to fill out any time
3   records about the community service they were
4   performing?
5   A.   No.
6   Q.   How would they report to you the community
7   service they were performing?
8   A.   Orally.
9   Q.   Did you ever tell any of the employees that they
10  would be evaluated on their performance review based
11  upon whether they were performing community service?
12     MS. GIFFORD:   Objection.
13     THE WITNESS:   I don't recall.
14     MR. FORESTIERE:   Do you recall if, in the
15  performance evaluation forms that Alderwoods gave you,
16  that there was any reference in them concerning the
17  performance of community service by the employees you
18  supervised?
19  A.   I don't recall the form.
20  Q.   To your knowledge, was any employee's
21  performance evaluated based upon whether they performed
22  any community service?
23     MS. GIFFORD:   Objection.
24     THE WITNESS:   No, I don't recall that being a
25  bearing on their evaluation.

Page 147

1     MS. GIFFORD:   Objection.
2     THE WITNESS:   Not to my recollection.
3     MR. FORESTIERE:   Did any employee ever come to
4   you and complain about having to perform community
5   service?
6   A.   Yes.
7   Q.   Which employees complained to you about having
8   to perform community service?
9   A.   I remember specifically the funeral arranger
10  from Mission Mortuary in Monterey saying with several
11  expletives that he would not perform community service.
12  Q.   And he didn't?
13  A.   And he didn't.
14  Q.   And no disciplinary action was taken against
15  him?
16     MS. GIFFORD:   Objection.
17     THE WITNESS:   None whatsoever.
18     MR. FORESTIERE:   And no evaluation of his
19  performance otherwise -- strike that.  No evaluation of
20  his performance was based upon the fact that he did not
21  perform community service?
22     MS. GIFFORD:   Objection.
23     THE WITNESS:   Not that I can recall.
24     MR. FORESTIERE:   You said Mission Mortuary.  Is
25  that the name of the mortuary now in Monterey?

Page 149

38 (Pages 146 to 149)

080fefd8-945c-4daa-943f-0ea003beeafc

1 referred to as community service or community work.
2 And I believe you testified before that all employees
3 were required or expected to do that; is that correct?
4 A.    That's correct.
5 Q.    What was your understanding as to whether
6 employees would be paid for the time spent doing that
7 work?
8      MR. FORESTIERE:  Objection, asked and answered.
9      THE WITNESS:  This was done on a voluntary basis
10 supposedly by the employee.
11     MS. GIFFORD:  So did that mean they would not be
12 paid for it?
13 A.    That's correct.
14 Q.    And where did you get that understanding from?
15 A.    From Mr. Mitchell and/or Mr. Pate.
16 Q.    Okay.  Did you communicate that understanding to
17 the hourly employees who worked for you?
18 A.    I would have.
19 Q.    And was your understanding that those employees
20 were or were not to record community work on their
21 timecards?
22     MR. FORESTIERE:  Objection, asked and answered,
23 leading.
24     THE WITNESS:  I just -- my understanding, that
25 they were not to put those hours on their time.

Page 218

1     MS. GIFFORD:  And did anyone who worked at one
2 of your facilities put those hours on their timecard?
3     MR. FORESTIERE:  On, asked and answered and
4 leading.
5     THE WITNESS:  I don't have a recollection at
6 this point.
7     MS. GIFFORD:  Okay.  Do you know why employees
8 were asked to do community work?
9     MR. FORESTIERE:  Objection, calls for
10 speculation, asked and answered, leading.
11     THE WITNESS:  It -- to solidify the corporate
12 image as a local operated funeral home.  And to make
13 the employees and managers more palatable to the
14 community at large.
15     MS. GIFFORD:  Was there a benefit to Alderwoods
16 from that?
17     MR. FORESTIERE:  Objection, calls for
18 speculation, asked and answered, and vague and
19 ambiguous.
20     THE WITNESS:  Yes.  The benefit would be
21 increased revenue from increased services.
22     MS. GIFFORD:  Okay.  When you reported the
23 community work that was being done to Bill Mitchell,
24 did he ever tell you that certain employees needed to
25 spend more time on community work?

Page 219

1     MR. FORESTIERE:  Objection, asked and answered,
2 leading.
3     THE WITNESS:  He did indicate, to my
4 recollection, that every employee needed to be involved
5 in some type of community work.
6     MS. GIFFORD:  And did he make any indication
7 regarding the amount of time or the number of events
8 employees were involved with?
9     MR. FORESTIERE:  Objection, again, asked and
10 answered and leading.
11     THE WITNESS:  Not to my knowledge.  I don't
12 recall.
13     MS. GIFFORD:  I believe you testified earlier
14 that there were three to four employees in the
15 locations you supervised who were participating in
16 community work?
17 A.    Yes.
18 Q.    And just to make sure the record is clear, were
19 those three or four hourly employees?
20 A.    No, they were not all hourly.  There was
21 salaried -- one salaried, and the rest were hourly.
22 Q.    So one salary and then two to three hourly
23 employees?
24 A.    Correct.
25 Q.    And I believe you said you kept a written log of

Page 220

1 the community work that was done; is that correct?
2     MR. FORESTIERE:  Objection, asked and answered
3 and leading.
4     THE WITNESS:  I had an informal recording, yes.
5     MS. GIFFORD:  Okay.  And after you made that
6 log, do you know where it went, or was it sent to
7 anyone?  Was it stored anywhere?
8     MR. FORESTIERE:  Asked and answered, leading.
9     THE WITNESS:  I don't believe I transmitted it.
10 It was -- it was on the bimonthly calls with Bill
11 Mitchell that we would discuss that.
12     MS. GIFFORD:  So, and when you say those
13 bimonthly calls with Bill Mitchell, are those the same
14 ones that were attended by all of the general managers
15 in the state?
16 A.    That's correct.
17 Q.    Okay.  And I believe you previously testified --
18 strike that.  If employees at your locations had listed
19 community work on their timecards, would that have been
20 a correct or incorrect timecard entry?
21     MR. FORESTIERE:  Objection, calls for
22 speculation, asked and answered, leading, vague and
23 ambiguous, disjunctive.
24     THE WITNESS:  It would have been incorrect.
25 They weren't put down.

Page 221

56 (Pages 218 to 221)

# EXHIBIT 61

1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE SOUTHERN DISTRICT OF PENNSYLVANIA

 3    _____

 4    DEBORAH PRISE and HEATHER      )
      RADY, on behalf of themselves  )
 5    and all employees similarly    )
      situated,                      )
 6                                   ) Civil Action No. 06-1641
              Plaintiffs,            )
 7                                   ) Judge Joy Flowers Conti
         vs.                         )
 8                                   )
      ALDERWOODS GROUP, INC.,        )
 9                                   )
              Defendant.             )
10    _____

11              DEPOSITION UPON ORAL EXAMINATION

12                            of

13                      MICHAEL LANZA

14    _____

15              Taken at 2611 East "E" Street

16                    Tacoma, Washington

17

18

19

20

21

22

23    DATE:  April 24, 2009

24    REPORTED BY:  Robyn L. Fisher, CCR, RPR
                    CCR No. 2590
25
```

**38**

1   essence? I should say under new ownership.
2       A.  A new corporate name. Outside of Ray Loewen
3   and a few other people that were up on the upper
4   management, it pretty well stayed the same.
5       Q.  Did you ever complete a separate application
6   for working for Alderwoods?
7       A.  Not to my knowledge. I can't remember doing
8   that.
9       Q.  When did you first become interested in working
10  at Powers?
11      A.  Around the date of this application.
12      Q.  That would be February 1st, 1993?
13      A.  Somewhere close to that, yes.
14      Q.  How did you find out about it? You said there
15  was some connection.
16      A.  Mr. Noel's son and I were friends, but it also
17  brings back to mind Robert Young, the pastor who is named
18  on here as a personal reference. He let me know that the
19  job was opening up, and that Mr. Noel wanted to talk to
20  me.
21      Q.  Did you believe that Powers was a good place to
22  work?
23      A.  Yes.
24      Q.  What had you heard about it prior to applying
25  for it?

**39**

1       A.  The company itself, the employees were really
2   important to that company. They looked out for the
3   employee. Their benefits were excellent, and it was a
4   pretty good working environment over at Powers.
5       Q.  Prior to you being employed at Powers, did you
6   see a written job description for the duties you'd be
7   performing as a funeral director or embalmer?
8       A.  No, sir.
9       Q.  At the time that you applied for the position,
10  did you have an understanding as to whether you'd be
11  working any overtime?
12      A.  Yes, sir.
13      Q.  What was your understanding in that regard?
14      A.  Anything above 40 hours was overtime.
15      Q.  Did you understand it was very common for a
16  funeral director to work overtime in your industry?
17      A.  Yes, sir.
18      Q.  Why was that?
19      A.  Because of the death calls that come in the
20  middle of the night, so we're on call 24/7.
21      Q.  At the time that you submitted your job
22  application, did you have a formal interview with
23  Mr. Noel?
24      A.  I did.
25      Q.  Did it occur before you submitted your

**40**

1   application or after?
2       A.  It was before the application.
3       Q.  Where did the interview take place?
4       A.  At Powers Funeral Home in Puyallup.
5       Q.  That was in his office?
6       A.  Yes.
7       Q.  What did you and Mr. Noel talk about?
8       A.  The work schedule, what the duties would
9   entail, and it was pretty similar to what I was doing at
10  Pipers.
11      Q.  Anything else?
12      A.  What days we would have off. How they rotated
13  holiday on-call schedules.
14      Q.  Anything else?
15      A.  And that the company was big enough where there
16  was room for growth, so there may be a time where they
17  could promote you into management's position.
18      Q.  Anything else that you discussed with them?
19      A.  Also they expected us to have community
20  activity where we were out in the community.
21      Q.  What did Mr. Noel say in that regard?
22      A.  That they wanted us to join some sort of
23  organization.
24      Q.  Anything else he said about that?
25      A.  No, sir.

**41**

1       Q.  What was your response to that?
2       A.  I told him I had no problem doing that.
3       Q.  Was there any discussion about whether you'd be
4   compensated for doing that work?
5       A.  No, sir.
6       Q.  Anything else that you discussed with Mr. Noel
7   during this interview?
8       A.  He wanted to know what religious preference I
9   was.
10      Q.  Anything else you discussed?
11      A.  No, sir.
12      Q.  Did you discuss anything about overtime?
13      A.  As I mentioned earlier, he mentioned anything
14  above 40 hours was overtime.
15      Q.  Did he mention to you that you would be
16  expected to work a lot of overtime as a funeral director
17  or embalmer?
18      A.  I did know that that funeral home was a lot
19  busier than the one I was at, so there would be more
20  overtime involved at Powers than was at my previous place
21  of employment.
22      Q.  So you knew that at the time you applied for
23  it?
24      A.  Yes, sir.
25      Q.  But you didn't have a discussion with Mr. Noel

190

1    Q.  Do you know whose writing is at the top of this
2  page?
3    A.  No, sir.  I do not.
4    Q.  At the time you signed this document, did you
5  read the descriptions for the parts that have A, B, C, D
6  and E on them?
7    A.  Yes.  I'm sure I did.
8    Q.  In reviewing those, did you make a
9  determination of which of those applied to your
10  situation?
11    A.  Yes.
12    Q.  Which ones did you determine applied to your
13  situation?
14    A.  Can I take a second to go through these?
15    Q.  Sure.
16    A.  A, B and C.
17    Q.  A, B and C, or A, B and D?
18    A.  A, B and D.  I'm sorry.
19    Q.  That's okay.  I know it's getting late.
20      You determined that A, B and D applied to your
21  situation, correct?
22    A.  Yes, sir.
23    Q.  And you also determined that C and E did not?
24    A.  That is correct.
25    Q.  Other than the type of compensation that is

191

1  described in A through E, are there other types of
2  compensation that you're seeking from Alderwoods for work
3  you performed for it?
4      MS. GIFFORD:  Objection.
5    A.  No, sir.
6    Q.  Let's talk a little bit now about your
7  community service.  I know we talked about it already a
8  bit.  Let's start with some basics.
9      During the time that you worked for Alderwoods,
10  did you perform any community service work?
11    A.  Yes, sir.
12    Q.  Could you identify that for me, please?
13    A.  I had a membership in the Christopher Columbus
14  Club, and I was also entertaining priests and ministers
15  after hours.
16    Q.  When you say "entertaining priests and
17  ministers after hours," was that just something that --
18    A.  Taking them out to dinner.
19    Q.  Anything else?
20    A.  No, sir.  They came to my house occasionally
21  also.
22    Q.  When did you start that activity?
23    A.  That commenced in 1993.
24    Q.  When did you stop doing that activity?
25    A.  Close to about the time I ceased employment

192

1  with them; 2004.
2    Q.  So it continued during the time that you were
3  performing work for Alderwoods?
4    A.  Yes, sir.
5    Q.  How often would you either take these persons
6  out to dinner or have dinner at your home?
7    A.  Ones or twice a month.
8    Q.  And did you do that for every month that you
9  were working for Alderwoods?
10    A.  I can't say it was done every month
11  consistently, but when it was done, it was done once or
12  twice a month.  If you're asking me from 1993 to 2004 if
13  it was done every month, I can't honestly say that it
14  was.
15    Q.  I'm not concerned about anything prior to the
16  date that you worked for Alderwoods, so let's just focus
17  on the period from January 2002 to August 2004, so we're
18  talking about a year and some months, almost two years.
19      During that period of time, do you recall
20  whether you had dinner once or twice a month every month?
21    A.  No.  I cannot recall that.
22    Q.  Would it be three or four months a year?
23    A.  It's safe to say about six months a year maybe,
24  seven months a year.
25    Q.  How long would these dinners last on average?

193

1    A.  Three hours, four hours.  If it was a priest I
2  liked, it was four hours.
3    Q.  Did you try to sell them any type of funeral
4  services or products during these dinners?
5    A.  No, sir.
6    Q.  Did you ever ask anyone at Alderwoods or from
7  the management of Alderwoods for compensation for the
8  time that you spent entertaining these priests or
9  ministers?
10    A.  The only compensation I received back was any
11  monies I laid out for the dinner.
12    Q.  So you asked for reimbursement of your
13  out-of-pocket expenses?
14    A.  Yes, sir.
15    Q.  Did they provide that?
16    A.  Yes.
17    Q.  Did you ask to be compensated for the time that
18  you spent entertaining them?
19    A.  No, sir.
20    Q.  Prior to your working at Powers, did you do any
21  type of entertaining for priests or ministers?
22    A.  Prior to being employed by Powers?
23    Q.  Yes, sir.
24    A.  I did with Pipers.
25    Q.  When you were taking the priests and ministers

NETWORK DEPOSITION SERVICES
**Transcript of Michael Lanza**

194

1  out for dinners or dinners at your home, was it still the
2  same frequency; about once or twice a month, six to seven
3  months a year?
4  A. At my home it was less; maybe three times, four
5  times a year. I used to have them pop up sometimes. I
6  didn't invite them. They'd come over.
7  Q. If you're active in the church that can happen.
8  I'm Catholic, so I know what you're talking about.
9  I was trying to basically establish at least
10  prior to your working for Powers you were doing this work
11  for Piper, and was it generally the same frequency or
12  less? Sounds like it was a little less.
13  A. With Piper it was less because Mr. Morley had
14  us do that during business hours.
15  Q. Taking them out to dinner?
16  A. So we'd take them out to lunch.
17  Q. Oh, okay. They like to be taken out for golf
18  too, you know.
19  A. I know.
20  Q. But did you also entertain them after hours
21  during the time that you worked for Piper?
22  A. No, sir.
23  Q. Why did you pick this type of community service
24  work while you were working for Alderwoods?
25  A. The type of community service by entertaining

195

1  ministers?
2  Q. Yes, sir.
3  A. I found that comfortable, and it was some sort
4  of community service that we had to do, so I picked that.
5  Q. It was also something you'd already
6  established, so you just used what you had established to
7  fulfill that requirement?
8  MS. GIFFORD: Objection.
9  Q. Do you understand my question? I mean you
10  already were doing this; taking priests out for
11  entertainment and dinners. In fact, I think you
12  indicated it was done while you were working for Pipers,
13  and that was prior to 1993, correct?
14  A. Yes.
15  Q. So it was something you were doing pretty much
16  every year since that time?
17  A. Yes, sir.
18  Q. Did you keep any time records about how much
19  time you spent doing entertaining for the priests and
20  ministers?
21  A. No, sir.
22  Q. Did you submit any written request for
23  compensation for the time that you spent entertaining the
24  priests and ministers?
25  A. Just the out-of-pocket expenses.

196

1  Q. But nothing as to your time, correct?
2  A. No.
3  Q. Did you ask anybody, "Hey, I'd like to get
4  compensated for entertaining these guys?"
5  A. Yes, sir.
6  Q. What was the response?
7  A. The response was the company did not pay
8  after-hours entertainment. And we also had asked if we
9  could join service clubs that met during the afternoon
10  for lunch, and we were told that that was restricted to
11  management only, and that the funeral directors were
12  expected to -- I'm getting tired -- to be active in the
13  community after hours.
14  Q. Okay. You gave me two different things.
15  A. I'm sorry.
16  Q. No, that's okay. I need to break it down so we
17  have a clear record.
18  A. Sure.
19  Q. You asked for compensation for the time you
20  spent entertaining, and the answer was no, correct?
21  A. That's correct.
22  Q. Who did you ask?
23  A. Mr. Noel.
24  Q. Anyone else or other than him?
25  A. No, sir.

197

1  Q. Who told you that joining an afternoon service
2  organization was restricted to management?
3  A. Mr. Noel.
4  Q. Did you have a specific club in mind that met
5  in the afternoon that you wanted to join?
6  A. Yes, sir.
7  Q. What was that?
8  A. Kiwanis.
9  Q. Did you tell them that was a group that you
10  wanted to join?
11  A. Yes, sir.
12  Q. And he still said no?
13  A. He said if they met during the afternoon, the
14  answer was no. It would have to be a group that met
15  after hours or before work in the morning.
16  Q. Does Kiwanis have that breakfast meeting early
17  in the morning?
18  A. I believe they did in Puyallup. They had a
19  7 o'clock meeting.
20  Q. Is there some reason you didn't want to go to
21  7 o'clock meetings?
22  A. I lived in Gig Harbor which meant I had to get
23  up earlier to cross that bridge, so yes, sir.
24  Q. I used to belong to Rotary Club, and I could
25  never make those early meetings.

# EXHIBIT 62

1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE WESTERN DISTRICT OF PENNSYLVANIA

3

4      _____

5    DEBORAH PRISE and HEATHER RADY
     on behalf of themselves and all other
6    employees similarly situated,
                                    Plaintiffs,
7
     v.
8
     ALDERWOODS GROUP, INC. and SERVICE
9    CORPORATION INTERNATIONAL,
                                    Defendant.
10     _____

11

12

13          Examination Before Trial, held at the Law

14   Offices of DOLIN THOMAS & SOLOMON, LLP, The

15   Strong-Todd House, 693 East Avenue, Rochester, New

16   York 14607, on December 18th, 2008, commencing at

17   11:30 a.m.

18

19

20          DEPOSITION OF:   Kasi Long

21

22

23

24

25   REPORTED BY:  Karrie M. Utberg

58

KASI LONG by MS. DUGAN
1
2  BY MS. DUGAN:
3  Q.  So, you would sometimes not put all of your hours
4      on your timesheet?
5  A.  Right.
6  Q.  Can you give me an example of when that would
7      occur?
8  A.  For example, if I was eating lunch at the funeral
9      home but the phone rang, you have to answer the
10     telephone.  If I happened to be sitting at the desk
11     and having my lunch and a customer walks in the
12     door, my lunch is interrupted.
13  Q.  So, primarily interrupted meal breaks?
14  A.  There were times that it would be meals.  There
15     were times at the end of the day I would get caught
16     on my way out of the door.  I mean, there's no
17     predictable hours for the funeral.  Things happen
18     all of the time.
19         I mentioned that I would get phone calls at
20     home regarding things that the on-call funeral
21     director may or may not be able to handle that they
22     would have question.  Those times would not
23     recorded that I would have been have been involved
24     in.
25         There were times I would have made phone

59

KASI LONG by MS. DUGAN
1
2  calls to family, if necessary from home, possibly.
3  We had continuing education training . We had those
4  holiday meals that we were required to be at, at
5  certain times.
6  Q.  Can you think of any other examples right now?
7  A.  At this time those are the ones that come directly
8      to mind.
9  Q.  Okay.  On gat least some occasions would your
10     weekly timecard accurately reflect the time that
11     you performed work?
12  A.  Yes.
13  Q.  From looking at the face of your timecard, would we
14     be able to tell on which occasions it accurately
15     reflected the time you actually worked or occasions
16     where maybe it didn't?
17  A.  Probably not.
18  Q.  If we wanted to try to identify some of those
19     occasions that you recall when your timecards did
20     not reflect all of the time that you worked, how
21     would we go about doing that?
22         MR. LINGLE:  Object to the form.
23         THE WITNESS:  I have no idea.
24  BY MS. DUGAN:
25  Q.  Any examples that you just gave of times whenever

60

KASI LONG by MS. DUGAN
1
2  you spent time working that was not reflected on
3  your timecard, was the reason for that unrecorded
4  work different every time?
5         MR. LINGLE:  Object to the form.
6         THE WITNESS:  I'm not sure I understand
7      the question.
8  BY MS. DUGAN:
9  Q.  Was it a case-by-case basis that you would work
10     hours that you did not report on your timecard or
11     can you say that there was any specific pattern as
12     to when you would work time that you would not put
13     on your card?
14         MR. LINGLE:  Object to the form.
15         THE WITNESS:  Not that comes to mind.
16  BY MS. DUGAN:
17  Q.  What did you do with your timesheet or your
18     timecard at the end of the week?
19  A.  Meaning, did I keep it?  I don't understand the
20     question.
21  Q.  Did you turn your timecard in to somebody?  What
22     happened with it after the whole week's time?
23  A.  Dwayne would look them over, he would sign them,
24     and then I would enter payroll.
25  Q.  Did Dwayne review all of the timecards for all of

61

KASI LONG by MS. DUGAN
1
2  the employees at the four locations?
3  A.  Yes.
4  Q.  And after he reviewed them, then you said you
5      entered the time into payroll?
6  A.  Yes.
7  Q.  Did Dwayne give all of the timesheets to you?
8  A.  Following his approval?
9  Q.  Yes.
10  Q.  And can you explain how you entered the time in
11     payroll from the timesheets?
12  A.  There was a computer system, so we found the
13     prompts, there was different ways to enter,
14     depending on the situation; regular hours, overtime
15     hours.
16  Q.  Did you have to tally the hours for each employee?
17  A.  Dwayne I believe, would do that and then sign them
18     before he gave them to me.
19  Q.  So, the individual employees would turn in their
20     timesheets to Dwayne without the time being
21     tallied?
22  A.  I believe we would add it.  He would review it,
23     check it, and check the adding, and then sign off
24     with his approval.

**118**

KASI LONG by MS. DUGAN

1    KASI LONG by MS. DUGAN
2  Q. Do you know whether or not Dwayne Hills approved
3.   any other employees to work overtime?
4  A. I'm sure at time he would have approved. Like I
5    said, he would sometimes send people home, if it
6    got to close to the weekend. He would sometimes do
7    the work himself, in order to avoid the overtime.
8    I mentioned that he sometimes adjusted Dan's
9    timesheet, if he didn't think Dan should have been
10   there some of those hours.
11  Q. Did you receive overtime pay at any time during
12    your employment with Alderwoods?
13     MR. LINGLE: Object to the form.
14     THE WITNESS: What date periods?
15  BY MS. DUGAN:
16  Q. Did you receive overtime pay at any time during
17    your employment with Alderwoods?
18  A. I do have a record of overtime. Yes, I did receive
19    overtime at various times.
20  Q. Did you ever get paid overtime after the time at
21    which Craig Duke verbally told you that overtime
22    had to be pre-approved in order to be paid?
23     MR. LINGLE: Object to the form.
24     THE WITNESS: I can't specifically
25     remember, because I, again, have told you I

**119**

KASI LONG by MS. DUGAN

1    KASI LONG by MS. DUGAN
2    can't remember the specific time period when
3    that policy was in effect.
4    So, by saying yes or no, I'm only
5    guessing. So, I can't answer that.
6  BY MS. DUGAN:
7  Q. Do you remember getting pre-approval to work
8    overtime at any time?
9  A. As I said, I can't give you a specific incident. I
10    can't place those dates specifically. I'm sure
11    that there is a time, if I had an evening
12    prearrangement or something was going on that I may
13    have requested overtime in order to be paid.
14    I know there are a lot of instances where I
15    would not have requested it. Like I said, it was
16    easier to just go with the flow, take your 40 hours
17    and not even push it, because it was more of a
18    hassle. They wanted to be a hassle.
19  Q. On the occasions when you worked overtime without
20    seeking pre-approval because it was a hassle, did
21    you ever tell anyone that you had performed the
22    overtime work?
23     MR. LINGLE: Object to form.
24     THE WITNESS: Can you rephrase that, or
25     just repeat the question first, please?

**120**

KASI LONG by MS. DUGAN

1    KASI LONG by MS. DUGAN
2  BY MS. DUGAN:
3  Q. On any of the occasions when you worked overtime
4    without seeking pre-approval, did you ever tell
5    anyone that you were performing overtime work?
6     MR. LINGLE: Object to form.
7     THE WITNESS: Tell anyone, my husband;
8     what, tell anyone in the location, tell
9     anyone in specifically my management?
10  BY MS. DUGAN:
11  Q. Did anyone ever observe you performing overtime
12    work that was not pre-approved?
13  A. Sure.
14  Q. Who observed you to perform --
15  A. Dwayne knew that most days I could not take lunch,
16    and he knew that my timesheet said that I had a
17    half an hour lunch break everyday. There were many
18    times when I was late getting out of there because
19    of phone calls.
20    There was a directive that came down
21    following the time clocks that specifically said
22    every timesheet has to show a half an hour lunch
23    break regardless, which to me was understood that,
24    whether you take a lunch or not every day your
25    timesheet has to say you had a 30-minute break.

**121**

KASI LONG by MS. DUGAN

1    KASI LONG by MS. DUGAN
2    They were obviously at that time protecting
3    themselves from something. It was clear, they
4    wanted that printed half an hour break on that
5    timesheet no matter what. I heard that on a
6    conference call, and Dwayne ensured that would
7    happen, and it become a joke because we couldn't
8    leave, if there was calling hours from 10 to 12 and
9    then another family coming in at 1.
10    So, you know, there were so many things that
11    went on, on any given day, lunch is not often an
12    option when you're busy.
13  Q. Aside from work being performed during a time that
14    was supposed to be a meal break --
15  A. Yes.
16  Q. -- Can you give me an example of a time that you
17    worked overtime that wasn't pre-approved?
18  A. There were times when I was committed to the
19    company to go to holiday dinners, we did have
20    community service. They wanted us in community
21    service to do community service. There could be a
22    variety of reasons. Like I said, if I had a phone
23    call on my way out the door, if I got phone calls
24    at home, yes, there would be other times besides
25    just meal breaks where I would be committed to the

**Johnstown**
**814-266-2042**

**Toll-Free**
**866-565-1929**

**Pittsburgh**
**412-281-7908**

146

KASI LONG by MS. DUGAN
1      KASI LONG by MS. DUGAN
2      else. I did have a pager and would occasionally
3      fill in, if someone was on vacation or if we were
4      extremely busy. There were times, but I wasn't on
5      the special schedule that I recall.
6      Q. During this time period from 2003 to 2007 were
7      there certain days, nights or weekends when you
8      were scheduled to be on-call?
9      A. Not scheduled without being asked ahead of time.
10     Not on a regular rotation like the other funeral
11     directors.
12     Q. Were there any restrictions on what you could do
13     after you left the funeral home for the day?
14        MR. LINGLE: Object to the form.
15        THE WITNESS: What exactly do you mean,
16     "restrictions"?
17     BY MS. DUGAN:
18     Q. Did Alderwoods replace any restrictions on your
19     after-work activities?
20        MR. LINGLE: Object to the form.
21        THE WITNESS: Me personally?
22     BY MS. DUGAN:
23     Q. Yes.
24     A. Are you asking my behavior or my availability for
25     work?

147

1      KASI LONG by MS. DUGAN
2      Q. Either. With your behavior did Alderwoods say
3      there were certain things that you could not do
4      after you left the funeral home?
5      A. Not that I specifically recall.
6      Q. Regarding availability, did Alderwoods place
7      certain restrictions or requirements on your
8      availability after you left the funeral home?
9        MR. LINGLE: Object to the form.
10        THE WITNESS: I think more verbally the
11     directors would have been required to be
12     within -- there may not have been a written
13     policy that says, you have to be within six
14     minutes of the funeral home, but they were
15     required to answer those pagers within a
16     certain amount of time. It was a known fact.
17        It was one of those unspoken rules which
18     occurs a lot in funeral directing, that you
19     can't, you know, drive to Rochester when
20     you're on-call and hope to be back to the
21     funeral home in five minutes.
22        First of all, you have to make sure your
23     pager works, your phone is on, and that you
24     can be reached, and back to the funeral home
25     in a timely manner to make a removal if it

148

1      KASI LONG by MS. DUGAN
2      comes up. Me, personally, at most times I
3      was not, but I did carry a page. And if it
4      went off, yes, I did call.
5      BY MS. DUGAN:
6      Q. Besides answering pages, was there any other type
7      of work that you were required to do away from the
8      funeral home from 2003 to 2007?
9      A. We were required to do community service. There
10     was a report every month that had to go out that
11     said who did what in the community. I considered
12     part of that when I took time to do community
13     events.
14        That was, to me, helping to promote my
15     funeral home that I worked at, along with the other
16     employees. It was required that we report it. It
17     was clear that they expected something on that
18     report from each employee.
19        In fact, Dwayne Hills would lie to make it
20     look like he did something. So, to me that said
21     obviously there is some value, they want to know
22     we're out there or it could effect our job.
23     Q. Maybe I was unclear. I'm asking about on-call
24     work. with regard to on-call work, were you
25     required to do anything other than addressing pages

149

1      KASI LONG by MS. DUGAN
2      that you received?
3      A. Me personally?
4      Q. Yes.
5      A. Not unless it was prior arranged where if they
6      needed an extra removal person or something, then I
7      would know ahead of time if I had to be expected to
8      come back in.
9      Q. Were there some nights when you did not receive any
10     pages at all?
11     A. Sure.
12     Q. How frequently would you receive pages after
13     leaving the location for the day?
14     A. It would vary, depending on how busy we were,
15     depending on who passed away. I would say on an
16     average if I answered calls back to the funeral
17     home on my time off, which would be evenings or
18     weekends, it could be anywhere from zero to two to
19     three hours a month. It just would depend on what
20     was going on at the funeral home.
21     Q. When you did have to respond to pages away from the
22     funeral home, did you keep any records of the time
23     you spent performing that work?
24     A. There may be. Towards the end, I know they
25     initiated the call log and the directors used it

**170**

KASI LONG by MS. DUGAN

1        KASI LONG by MS. DUGAN
2 believe one section of the evaluation talks about
3 building relationships. And as I discussed those
4 relationships that you encounter in every aspect of
5 your personal and professional life directly
6 involve whether or not people will possibly use
7 your funeral home.
8 Q. So, it is your testimony that you were evaluated on
9    your relationships in general?
10        MR. LINGLE: Object to the form.
11        THE WITNESS: I can't specifically say
12    that. As I said, I remember we looked at an
13    evaluation yesterday, and it did specifically
14    say relationship building, or something to
15    that regard.
16        That to me is not only within my
17    immediate community of employees that I work
18    with, but also the community in which I work,
19    how well I handle myself with those
20    relationships.
21 BY MS. DUGAN:
22 Q. Did you keep track of the time that you spent
23    participating in girl scout meetings and girl scout
24    trips?
25 A. I have all of my girl scout records that tell me

**171**

1        KASI LONG by MS. DUGAN
2 what dates I had meetings and that type of thing
3 that would be part of my girl scout records and
4 newsletters, and that type of thing.
5 Q. Do you have those records of your girl scout
6    activities in your possession currently?
7 A. At home, yes.
8 Q. Have you preserved those documents for purposes of
9    this lawsuit?
10 A. I didn't know I would need them for the lawsuit
11    necessarily, but I have them, because I have to
12    keep them for girl scouts USA.
13 Q. Have you turned over any of those records relating
14    to your involvement in the girl scouts to your
15    attorneys?
16 A. No.
17 Q. Did you report any of the time that you spent
18    involved with the girl scouts as time worked for
19    Alderwoods?
20 A. No.
21 Q. Why not?
22        MR. LINGLE: Object to the form.
23        THE WITNESS: Why not? Why didn't I
24    report it as time?
25 BY MS. DUGAN:

**172**

1        KASI LONG by MS. DUGAN
2 Q. Yes.
3 A. Well, there was no policy that said community
4    service should be included in time, but there was a
5    policy that said you've got to report every month
6    what community service you're involved in. No one
7    ever said, and here's how you get paid for it.
8 Q. Were you ever instructed not to report the time
9    that you spent?
10 A. Not specifically told, but never told to either.
11    Not specifically said, no.
12 Q. So, just to clarify you were never specifically
13    instructed one way or the other as to you should
14    report the time you spent involved in girl scout
15    activities?
16 A. No, but they were aware that we were involved in
17    community service outside of regular work hours and
18    no one ever requested that we claim that time or
19    that we should be compensated for that time, even
20    though they required us to give a report each month
21    that would specify what community events that we
22    participated in.
23 Q. We will get to those monthly reports in just a
24    second. Moving on to the Lions Club, did you
25    attend the Lions Club meetings as part of your job

**173**

1        KASI LONG by MS. DUGAN
2 duties for Alderwoods?
3 A. I would say that was even more so a club that would
4    have been for my direct involvement, because they
5    -- like I said, Dwayne hooked me up with the lady
6    that was involved. He requested that I join that
7    particular club. It was more for the benefit of
8    getting to know people that were older in our
9    community that would be a direct link to people
10    that may need our services, whether it be through
11    themselves personally or a parent, an elderly
12    parent or something.
13 Q. Did you personally keep track of the time that you
14    spent attending Lions Club meetings?
15 A. Not on any specific paper record, no, other than if
16    it got reported on that monthly sheet.
17 Q. Did you report time that you spent attending Lions
18    Club meetings as time work for Alderwoods on your
19    timecards?
20 A. I would have to think about that. The meetings for
21    Lions Club generally fell between 12 and 1, so it
22    was an hour-long meeting. I would have to, in
23    most cases had to have had a lunch in that time.
24    So, I may have been on the clock for part of the
25    time I was at the meeting and part of the time not

**Johnstown**
**814-266-2042**

**Toll-Free**
**866-565-1929**

**Pittsburgh**
**412-281-7908**

**NETWORK DEPOSITION SERVICES**
**Transcript of Kasi Long**

45 (Pages 174 to 177)

174

KASI LONG by MS. DUGAN

1  because of lunch break, but I was there during
2  regular work hours. As I said, the meetings were
3  from 12 to 1, I believe.
4  Q. If you were on the clock for some of the time that
5  you attended Lions Club meetings, were you paid for
6  that time that you were on the clock?
7  A. If I was on the clock, but at some point I would
8  have had to have my half an hour lunch break in
9  while I was there to, but it was an hour long
10  meeting.
11  Q. So, you may have been compensated for some of this
12  --
13  A. May have been for some and may have been not, and
14  anything above and beyond those regular lunch
15  meetings, if I had donated time outside of work
16  hours that would not have been on the clock.
17  Q. And, lastly, getting to the holiday dinners that
18  you said the staff at Carpenter's would host, when
19  did those dinners occur, during the day?
20  A. No, they were during the evening. Those were
21  outside of my regularly scheduled hours.
22  Q. And who organized these dinners?
23  A. Sometimes I would have a lot to do with that during
24  the work day. It would just depend on what year it

175

KASI LONG by MS. DUGAN

1  was, what we were doing. Dwayne did some of the
2  planing, I did some of the planing. It varied.
3  Q. Where were the dinners held?
4  A. We had a couple of churches, we had a couple at
5  restaurants. It just varied. Again, we tried to
6  mix it up a little bit, depending on what we were
7  doing.
8  Q. Did you keep track of the time that you spent
9  attending holiday dinners?
10  A. Not on a personal -- like, in my own personal hours
11  jotted. We would have probably added that to our
12  community report for the month.
13  Q. Did you report any time spent at holiday dinners as
14  time worked for Alderwoods on your timecard?
15  A. I don't believe that we were ever encouraged to do
16  that. I can't specifically recall a time that I
17  know for certain. I'm pretty certain those were
18  off the clock volunteer hours when we were at those
19  holiday dinners.
20  I mean, has it ever happened? I don't want
21  to say maybe once, but we were not encouraged to
22  put those hours in. It was kind of an expectation
23  that you will be there. It's outside of your
24  regular -- my regularly scheduled hours, for sure,

176

KASI LONG by MS. DUGAN

1  and it's expected that you will, you know, be
2  there. We were never told that we should clock
3  those hours.
4  Q. Were you ever told that you should not clock those
5  hours?
6  A. I don't recall specifically not being told, but
7  there was no policy in place that said you should
8  clock these hours. As I spoke about, we had to
9  record them as community service, but they expected
10  us to be there, expected us to report it to them,
11  knew we were there, obviously, by that report, but
12  did not make sure that we were being paid for those
13  hours.
14  Q. Is it your testimony that you may have attended one
15  of the holiday dinners on the clock?
16  A. It's a possibility, but I can't say for certain
17  that it is a for sure. I don't ever recall having
18  it said, geez, we're going to dinner tonight.
19  Lucky all of your guys are going to get some
20  overtime, no. I don't think we got paid for them.
21  Q. If you had been on the clock for a holiday dinner,
22  would you have been paid for the time that you were
23  on the clock --
24          MR. LINGLE: Object to the form.

177

KASI LONG by MS. DUGAN

1          THE WITNESS: If I had been on the
2  clock, meaning if it was during my regularly
3  scheduled hours?
4  BY MS. DUGAN:
5  Q. If you have reported any of the time that you were
6  at a holiday dinner to Alderwoods on your timecard,
7  would you have been paid for that time that you
8  reported?
9          MR. LINGLE: Object to the form of the
10  question.
11          THE WITNESS: I can't answer that. How
12  do I know if I hadn't turned it in?
13  BY MS. DUGAN:
14  Q. Did you ever report time on your timesheet for
15  which you were not paid?
16          MR. LINGLE: Object to the form.
17          THE WITNESS: Did I ever report time on
18  my timesheet for which I was not paid?
19  BY MS. DUGAN:
20  Q. Yes.
21  A. Reported on my timesheet? No.
22  Q. So, it's your recollection that you were
23  compensated for the hours that you did report on
24  your timesheet?

**Johnstown**
**814-266-2042**

**Toll-Free**
**866-565-1929**

**Pittsburgh**
**412-281-7908**

# EXHIBIT 63

1

1              IN THE UNITED STATES DISTRICT COURT

2           FOR THE WESTERN DISTRICT OF PENNSYLVANIA

3

4

5    DEBORAH PRISE and                    )
     HEATHER RADY,                        )
6                                         )
                       PLAINTIFFS,        )
7                                         )
     VS.                                  )  CIVIL ACTION
8                                         )  NO. 06-1641
     ALDERWOODS, INC.,                    )
9                                         )
                       DEFENDANT.         )
10

11

12

13

14              DEPOSITION OF HERBERT A. MAYES

15                    JUNE 23, 2010

16

17

18   ───────────────────────────────────────────────

19                   PEGGY F. MCCRORY
             Registered Professional Reporter
20                   P. O. Box 1093
                 Knoxville, TN  37901
21

22

23

24

25

**NETWORK DEPOSITION SERVICES**
**Transcript of Herbert Mayes**

11 (Pages 38 to 41)

38

1  tell from this which funeral home this is from?  I
2  notice --
3       A       With the people involved in
4  it, it would have to be Edo Miller.
5       Q       And the Warren that's about
6  the fifth paragraph down would apparently be
7  Warren Putnam?
8       A       Yes.
9       Q       And in the second paragraph
10 on the first page it says "Patty talked about the
11 new time cards and the need to be sure and clock
12 in after lunch and the times it is permissible not
13 to and how to handle that."
14             Do you recall time cards
15 being instituted at the Edo Funeral Home?
16      A       No.
17      Q       Did most of the funeral
18 homes in your region have time cards?
19      A       Time clocks and cards, yes.
20      Q       Okay.  About what percentage
21 would you say had time cards and time clocks at
22 the time of the merger, let's say.
23      A       At the time of the merger of
24 SCI?
25      Q       Yes.

39

1       A       I would think a hundred
2  percent.
3       Q       Okay.  And did employees
4  have half an hour or hour lunch break at the
5  funeral homes in your area?
6       A       I don't recall.
7       Q       Okay.  Those were unpaid
8  lunch breaks, though; is that correct?
9       A       Unpaid?
10      Q       Excuse me?
11      A       Unpaid?
12      Q       Yes.
13      A       Yes; uh-huh.
14      Q       Now, if an employee -- let's
15 take a case where an employee had a lunch break
16 from 12:00 to 12:30 p.m., for instance, and in
17 that time the employee was interrupted for 15
18 minutes and had to take a phone call and/or
19 somebody walked in and was working for 15 minutes
20 out of that, was the employee paid for those 15
21 minutes?
22      A       I can't -- I wasn't at the
23 locations, you know.  They should have been, but I
24 wasn't in the location to know how they handled it
25 at every location -- I wasn't --

40

1       Q       Do you know what the policy
2  was to be at least?
3       A       They were supposed to take
4  their lunch break and take it and if they were
5  interrupted they would have been paid for it.
6       Q       If they were interrupted for
7  15 minutes out of a half hour lunch break the
8  policy would be they would be paid for 15 minutes
9  and unpaid for 15 minutes?
10      A       If you were interrupted you
11 should have gone back in and clocked in back on
12 the clock.
13      Q       So, in other words, if from
14 12:10 to 12:25 there was an interruption they
15 should punch out at 12:10 and punch in at 12:25?
16      A       As soon as they went back to
17 work, yes.
18             (EXHIBIT NO. 7 WAS FILED.)
19 BY MR. SAUL:
20      Q       Show you Mayes Exhibit
21 Seven.  This was something that was given to us by
22 Alderwoods, and it's Bates stamped 4965.  Do you
23 recognize that person as Paul Houston?
24      A       Yes.
25      Q       And do you recognize what

41

1  this document came from?
2       A       No.
3       Q       Okay.  Do you recognize the
4  document?
5       A       No.
6       Q       Do you recall the
7  establishment of BPOs, businessman objectives?
8       A       Yes.
9       Q       And what was the purpose of
10 establishing businessman objectives?
11      A       You typically set BPOs for
12 every location.  It might be different in every
13 location.  You know, you basically outline what
14 the plans were for that location to achieve every
15 year.
16             (EXHIBIT NO. 8 WAS FILED.)
17 BY MR. SAUL:
18      Q       Show you what's been marked
19 as Mayes Exhibit Eight.  This may or may not have
20 all been one particular document.  We can go
21 through the different pages.  Let's take a look at
22 the first two pages.  It's a stamp of the first
23 page with the second pages Alderwoods 49 through
24 72.  Now, on the top portion it says "Ron would
25 like you to join our 11:00 o'clock a.m.

**NETWORK DEPOSITION SERVICES**
**Transcript of Herbert Mayes**

20 (Pages 74 to 77)

---

74

1    Q    Yeah. Memberships.
2    A    Didn't know you had to have
3    memberships in churches. No, not that I am aware
4    of.
5    Q    Okay. So if an employee
6    went to a Rotary Club meeting that was during work
7    hours was the policy that the employee would get
8    paid for that time?
9    A    Yes.
10   Q    And what if the Rotary Club
11   meeting was in the evening after work hours, was
12   the employee supposed to be paid for that time in
13   the evening as well?
14   A    Yes.
15   Q    Do you know if that actually
16   occurred that they were paid for that time?
17   A    My personal knowledge, I
18   don't know. I would assume they were because they
19   clocked in, clocked out.
20   Q    Okay. If they were at the
21   Rotary Club in the evening they wouldn't be by the
22   time clock, correct?
23   A    Unless they didn't clock out
24   until after me. I wasn't at the location so --
25   Q    So you don't know.

---

75

1    A    I don't know.
2    Q    Whose responsibility was it
3    to make sure that the employees were properly paid
4    for involvement in community organizations?
5    A    The location manager. And
6    then it would go to the location administrator and
7    then it would go to the market administration and
8    then the market manager.
9    Q    Okay. How were employees --
10   were employees informed in writing that they were
11   entitled to be paid for community activities that
12   were outside their regular work day?
13   A    I'm not sure.
14   Q    Were you ever present at a
15   meeting or meetings of employees where employees
16   were orally told that they would be paid for their
17   work outside work hours and community activities?
18   A    Not that I can recall.
19   Q    Okay. Let's take a Rotary
20   Club meeting, for instance, that occurred during
21   work hours, you testified already that an employee
22   would be paid for that time, correct?
23   A    Correct.
24   Q    Okay. Why would the company
25   pay for that activity?

---

76

1    MS. MORGAN: Object to the
2    form of the question.
3    You can answer if you can.
4    THE WITNESS: Typically most
5    of your civic club memberships were
6    inherited from former owners. You
7    always just paid. Most of them were
8    location managers. They really weren't
9    to hire the employees as much as
10   location managers went to Rotary Club.
11   BY MR. SAUL:
12   Q    Well, I'm not talking about
13   now the dues. I'm talking about why would the
14   company pay in situations where an employee was
15   involved in a community activity that occurred
16   during working hours?
17   MS. MORGAN: Object to the
18   form of the question.
19   You can answer if you can.
20   THE WITNESS: If I required
21   you to go somewhere then I would have
22   paid you.
23   BY MR. SAUL:
24   Q    Okay. And employees such as
25   funeral directors were expected to be involved in

---

77

1    community activities as part of their job; is that
2    correct?
3    A    Not necessarily.
4    Q    And what do you mean by not
5    necessarily?
6    A    Typically a location
7    manager -- depended on the size of the location,
8    the location manager usually took the lead road at
9    night and the funeral director was hired to
10   actually just to conduct the funeral service or
11   embalm bodies, you know, so that person could be
12   allowed time off to go to the civic meetings. So
13   you could be a funeral director working at a
14   funeral home and never participate in any
15   activities, really, outside the business.
16   Q    But that was one of their
17   specific responsibilities as listed in their --
18   A    An ideal situation, yes.
19   Q    Okay. Were employees
20   evaluated, given annual employee evaluations?
21   A    Yes.
22   Q    And were funeral directors
23   and other line employees evaluated?
24   A    Yes.
25   Q    Who were they evaluated by?

---