# EXHIBIT 64

1

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2
    DEBORAH PRISE and HEATHER   )
 3  RADY on behalf of themselves)
    and all employees similarly )
 4  situated                    )
                                )
 5                              )
    versus                      )  CIVIL ACTION NO. 06-1641
 6                              )
                                )
 7  ALDERWOODS GROUP, INC.      )

 8

 9

10       ************************************

11                   ORAL DEPOSITION

12                   BEVERLY MCDONALD

13                   NOVEMBER 24, 2008

14       ************************************

15

16

17       ANSWERS AND ORAL DEPOSITION OF BEVERLY MCDONALD,

18  a witness produced at the instance of the Defendant,

19  was taken in the above-styled and numbered cause on

20  the 24TH day of NOVEMBER 2008, from 10:54 a.m. to

21  5:10 p.m., before VANESSA S. ROBERTSON, CSR in and for

22  the State of Texas, reported by machine shorthand, at

23  the offices of Jones Day, 2727 North Harwood, Dallas,

24  Texas, pursuant to the Pennsylvania Rules of Civil

25  Procedure.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Beverly McDonald**

---

134

1        MR. LINGLE: Object to the form.
2        A    Is it possible I received overtime
3    adjustments? Yes.
4        Q    (By Ms. Morgan) Do you know whether you
5    did?
6        A    I can't recall at this time if I did or
7    not.
8        Q    Is it possible that you received overtime
9    adjustments during your employment at Alderwoods?
10        MR. LINGLE: Object to the form.
11        A    Yes, it's possible.
12        Q    (By Ms. Morgan) And is it possible that if
13    you received overtime adjustments, that they accounted
14    for other forms of compensation that you received,
15    such as commissions?
16        MR. LINGLE: Object to the form.
17        A    It's possible.
18        Q    (By Ms. Morgan) Are you aware of a
19    company-wide policy of not including certain types of
20    compensation in overtime calculations?
21        A    A company-wide policy of not including them?
22        Q    Yes.
23        A    Yes.
24        Q    When did you first become aware of this
25    policy?

---

135

1        A    I don't remember the exact date.
2        Q    How did you become aware of them?
3        A    Employees talking about it, other Alderwoods
4    employees.
5        Q    Who were these other Alderwoods employees?
6        A    I don't recall their names.
7        Q    Are these other Alderwoods employees at the
8    location where you worked?
9        A    No.
10        Q    What locations were they from?
11        A    I don't remember which locations they were
12    from.
13        Q    What positions at Alderwoods did they hold?
14        A    Funeral director/embalmer.
15        Q    Are these the same employees that you talked
16    about other issues with?
17        A    Could be.
18        Q    Did any manager, any Alderwoods manager, tell
19    you there was a policy of not including certain types
20    of compensation in overtime pay?
21        A    Not that I can recall at this time.
22        Q    And what do you understand about this policy of not
23    including certain types of compensation in employees'
24    overtime calculations to be?
25        A    My understanding of the policy --

---

136

1        Q    Yes.
2        A    -- to not include them?
3        That they weren't included.
4        MR. LINGLE: Object to the form.
5        Q    (By Ms. Morgan) And according to your
6    understanding, what types of pay were excluded?
7        A    My understanding would be commissions.
8        Q    Any other types of pay excluded?
9        A    Not that I can recall at this time.
10        Q    Do you know whether employees in different
11    positions were subject to similar policies?
12        A    We all were. It was the same policy.
13        Q    And what do you base that understanding on?
14        A    Understanding on Alderwoods has the same
15    policies for everyone; we were uniform.
16        Q    Do you know whether any -- any other
17    Alderwoods employees had forms of compensation,
18    excluded from their overtime pay calculations?
19        A    Was I aware of any specific?
20        Q    Yes. Of any other employees whose overtime
21    calculations excluded other forms of compensation.
22        A    I don't remember their exact names or when I
23    talked to them, just that it was at different meetings
24    and things.
25        Q    So other employees told you this?

---

137

1        A    Yes.
2        Q    But did you ever see their -- their pay
3    records?
4        A    No.
5        Q    So you base that on what other employees
6    verbally told you?
7        A    Yes.
8        Q    Could you take another look at Exhibit 27,
9    your information sheet.
10        A    Okay.
11        Q    Could you take a look at Paragraph A.
12        Just let me know when you've had a
13    chance to review that.
14        A    Okay.
15        Q    Are you claiming that you were not paid for
16    any community service work?
17        A    Yes, I am.
18        Q    And during the time that you were working for
19    Alderwoods, did you do any community service work?
20        A    Yes, I did.
21        Q    What community service work did you do?
22        A    Volunteer. Like community service work of --
23    you want specific -- I mean, I don't understand what
24    you're asking here.
25        Q    Well, you're claiming that the company

---

NETWORK DEPOSITION SERVICES
**Transcript of Beverly McDonald**

36 (Pages 138 to 141)

---

138

1    permitted you to perform community service?
2      A   Uh-huh.
3      Q   And at least some of the time was not paid
4    for it by Alderwoods; is that correct?
5      A   That's correct.
6      Q   Okay.
7      A   None of the time was paid for.
8      Q   Okay.  What I'm trying to understand is what
9    community service work you did that you believe you
10   were not compensated for.
11     A   The Mitchell County Community Mission,
12   Christmas in Action, and Business and Professional
13   Women.
14     Q   The Mitchell County Community Mission?
15     A   Yes.
16     Q   When did you start work for that
17   organization?
18     A   I don't recall the exact date.
19     Q   Was it before your employment with
20   Alderwoods?
21     A   No.
22     Q   During your employment with Alderwoods?
23     A   Yes.
24     Q   Okay.  Why did you decide to join?
25     A   I was told to.

---

139

1      Q   By whom?
2      A   Bill Barlow.
3      Q   And what did Mr. Barlow tell you?
4      A   That I had to join three community service
5    organizations.
6      Q   What else did he tell you about community
7    services?
8      A   It was Alderwoods' policy that everybody had
9    to be active in the community and join service
10   organizations.
11     Q   Why did you pick this particular
12   organization?
13     A   They were given to me on a list of these
14   three.
15     Q   Who gave you this list?
16     A   Bill Barlow.
17     Q   Were there other organizations on the list
18   other than these three?
19     A   No.  That's the three he would like me to
20   join.
21     Q   And what did you do in response to that
22   information?
23     A   I joined the three organizations.
24     Q   All at the same time?
25     A   No, it was different times.

---

140

1      Q   And what purpose does the Mitchell County
2    Community Mission serve?
3         MR. LINGLE:  Object to the form.
4      A   What purpose?
5      Q   (By Ms. Morgan)  Like what is the work of
6    this group?
7      A   They take donated clothes and funds and help
8    homeless and needy families.
9      Q   And how long were you involved with this
10   organization?
11     A   I don't recall specific dates.
12     Q   Are you still involved?
13     A   No.
14     Q   When did you stop being involved?
15     A   October of 2006.
16     Q   And why did you stop being involved?
17     A   Because I no longer had to be.
18     Q   What did membership in this organization
19   entail?
20     A   Meetings, helping -- if people on the
21   interstate was broke down, I had to take them gas or
22   food or things like that.  Just helping people.
23     Q   Did it involve time during the workday?
24     A   It did, but I never did any of it during the
25   workday because there was somebody else who could

---

141

1    cover that, you know, for the people who worked.
2      Q   When did you contribute time to the
3    organization?
4      A   After work.
5      Q   And what kinds of things did you do after
6    work for the organization?
7      A   I'd attend meetings, took people food, met
8    with families, took them food, brought them gas,
9    signed them into motels to spend the night before they
10   get on their way again.
11     Q   And how much time did you contribute to this
12   organization?
13     A   I don't know specific amounts.
14     Q   Did you contribute time on a weekly basis?
15     A   Yes.
16     Q   About how much time on a weekly basis?
17     A   Probably an -- on average, I mean ballpark
18   average, probably five hours a week or more.  Probably
19   between five to ten.
20     Q   Did you inform Mr. Barlow that you had joined
21   this organization?
22     A   Yes.
23     Q   Did you record -- keep any record of the
24   hours that you spent contributing time to this
25   organization?

---

Johnstown
814-266-2042
Toll-Free
866-565-1929
Pittsburgh
412-281-7908

**NETWORK DEPOSITION SERVICES**
**Transcript of Beverly McDonald**

37 (Pages 142 to 145)

---

142

1    A   No, I didn't keep any records.
2    Q   Did you ever seek compensation from
3  Alderwoods for the time you contributed to this
4  organization?
5            MR. SAUL:  Other than this suit, you
6  mean?
7            MS. MORGAN:  Yes.
8    A   No.
9    Q   (By Ms. Morgan)  Did you feel -- or did you
10  experience any personal enjoyment from your membership
11  in this organization?
12           MR. LINGLE:  Object to the form.
13    A   Any personal enjoyment?
14    Q   (By Ms. Morgan)  Yes.
15    A   No, not really.  I didn't enjoy doing it.
16    Q   Were any of your friends or family involved
17  in the organization?
18    A   No.
19    Q   Did you consider any aspect of your
20  participation in the organization to involve doing
21  work for Alderwoods?
22    A   All of it.  I mean, I just -- I wasn't there
23  because I liked it or it was fun or I wanted to do it;
24  I was there because I was told to do it.
25    Q   By Mr. Barlow?

---

143

1    A   Yes.
2    Q   Did Mr. Barlow ever evaluate you based on
3  your participation in the organization?
4            MR. LINGLE:  Object to form.
5    A   Not that I'm aware of.
6    Q   (By Ms. Morgan)  Did all of the employees at
7  the Kiker-Seale Funeral Home where you worked
8  participate in this organization?
9    A   No.
10    Q   Did anybody else, any other Alderwoods
11  employee?
12    A   Not that I can recall at this time.
13    Q   Do you know whether there was any requirement
14  that anybody -- any other Alderwoods employee at your
15  location participate in this organization other than
16  you?
17    A   There wasn't any requirement on them.  They
18  were part-time.
19    Q   Was Mr. Barlow involved in this
20  organization?
21    A   No.
22    Q   Were there any costs associated with
23  membership in it?
24    A   No.
25    Q   Did Mr. Barlow ever observe you doing work

---

144

1  for this organization?
2    A   Yes.
3    Q   When did he observe you doing work?
4    A   I don't remember the exact date.  We were at
5  another function.  A family had come up there and
6  needed help, so he did observe me, yeah.
7    Q   Any other circumstance under which Mr. Barlow
8  observed you performing work for the organization?
9    A   He would ask me about it the next day at the
10  meetings and things.  He would ask me how they went.
11    Q   Any other way that he was informed about your
12  activities on behalf of the organization?
13    A   No.
14    Q   Did you ever receive any compensation for
15  time that you spent performing services for this
16  organization?
17    A   No.
18    Q   Did you ever complain about doing these --
19  doing this community service activity but not getting
20  paid for it?
21    A   Yes.
22    Q   Who did you complain to?
23    A   I complained to my husband, my mom, other
24  Alderwoods employees at other locations.
25    Q   The other Alderwoods employees at other

---

145

1  locations that you complained to, who were they?
2    A   I don't recall their names.
3    Q   Were any of them management employees of
4  Alderwoods?
5    A   Bill Barlow was.
6    Q   So you complained --
7    A   But the rest of them --
8    Q   Okay.  So the only Alderwoods management
9  employee to whom you complained about participating in
10  this community service activity, but not getting paid
11  for it, was Mr. Barlow?
12    A   Yes.
13    Q   And how did Mr. Barlow respond to your
14  complaint?
15    A   That it was policy, that I had to join and
16  participate.
17    Q   Did he respond to your complaint about not
18  getting compensated for the time?
19    A   Yes.
20    Q   And how did he respond to that aspect of
21  your --
22    A   He didn't get paid.
23    Q   I'm sorry.
24    A   He didn't get paid for his either, so that
25  was his response.

---

# EXHIBIT 65

1

1
2
3
4

THE UNITED STATES DISTRTICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

06-1641

5
6
7

DEBORAH PRISE AND HEATHER                )
RADY ON BEHALF OF THEMSELVES             )
AND ALL EMPLOYEES SIMILARLY              )
SITUATED,                                )
                                         )

8

        PLAINTIFFS,                      )
                                         )

9

    v                                    )
                                         )

10

ALDERWOODS GROUP, INC.,                  )
                                         )

11

        DEFENDANT.                       )
------------------------------------------

12
13
14
15
16

DEPOSITION OF BARRY DOUGLAS MILES
(TAKEN by DEFENDANT)
CHARLOTTE, NORTH CAROLINA
APRIL 18, 2009

17
18
19

REPORTED BY:          Meredith R. Johnson
                      Court Reporter
                      Notary Public

20
21
22
23
24
25

**NETWORK DEPOSITION SERVICES**
**Transcript of Barry Douglas Miles**

72 (Pages 282 to 285)

282

1  to four hours per removal that you were not paid
2  for. And we've talked today and you say that you
3  were paid a minimum of three hours per removal so
4  if that's truly the average, it would be some of
5  the time that you would be shorted up to an hour,
6  roughly, I mean it's ballpark; is that correct?
7      MS. DOUGLASS: Objection. I'm going to just
8  object to this line of questioning that he doesn't
9  have the document that you're reading from.
10  You're kind of --
11      MR. FARMER: I apologize, that's my fault.
12      (Exhibit 11 Marked for Identification)
13      Q  I'm handing you what's been marked as
14  Exhibit 11 and if you could just look at the first
15  page and identify it for me.
16      A  Prise versus Alderwoods Group, civil
17  action number 06-CV-1641, dated November 21, 2008.
18      Q  And can you just read that first
19  sentence for me and who is the letter addressed
20  to.
21      A  It's addressed to Matthew W. Lampe,
22  Esquire, Jones Day, 222 East 41st Street, New
23  York, New York.
24      Q  And the first sentence, please.
25      A  "Dear Matt, Plaintiffs hereby supplement

283

1  their responses to interrogatory number three of
2  Defendant's first set of interrogatories to
3  individual Plaintiffs."
4      Q  Now if you turn to page 12 -- I'm sorry
5  12 is where you're first addressed, but let's talk
6  about page 13. And you can see on page 12 that
7  that's where we begin your supplemental.
8      A  Okay.
9      Q  If you could flip to the next page and
10  I'm looking at this third paragraph right here.
11  And you can see in there and just go ahead and
12  confirm what I previously spoke about, what you
13  previously supplemented your interrogatory
14  responses about, 10 to 20 minutes per call and
15  three to four hours per removal. Were all my
16  representations to you correct?
17      A  Yes.
18      Q  And in the next paragraph down if you
19  look, please, can you read the first sentence for
20  me.
21      A  "In addition to community work and
22  on-call work described above Plaintiff also
23  performed other overtime work that was not
24  compensated because it was not approved."
25      Q  And I previously inquired of you today

284

1  about whether there was any time that was not
2  approved or any overtime work that you submitted
3  that was not paid for and you said there was none.
4      A  None.
5      Q  So would you say this answer needs to be
6  supplemented because this needs to be taken out?
7      A  Yes.
8      MS. DOUGLASS: Objection.
9      A  I'm concerned about it was not approved.
10  At no time was any overtime have to be preapproved
11  and that's what I'm saying right there. It didn't
12  have to be preapproved. Never was.
13      Q  Okay. Fair enough. Now, we didn't talk
14  about this and this is my fault, you say on this
15  next one and I want to ask you if this is accurate
16  and then we can talk about it more if we need to.
17  You say in the second sentence of that fourth
18  paragraph. It begins with Plaintiff's current
19  recollection.
20      A  Mm-hmm.
21      Q  Can you read that sentence for me,
22  please.
23      A  "Plaintiff's current recollection, he
24  spent approximately 1.2 hours per week for the
25  entire period of his employment performing work

285

1  such as answering phones, assisting customers
2  during his meal breaks for which he was not
3  compensated.
4      Q  Would that be -- I mean, we did not talk
5  about that, but you didn't mention that you were
6  concerned about the meal break period. And I
7  think we saw in some of your pay records that you
8  marked that you had half lunchtimes, do you feel
9  like you were compensated, that you properly
10  recorded and were compensated for the time that
11  you --
12      A  Well, there was times --
13      MS. DOUGLASS: Objection.
14      A  -- that you were interrupted during your
15  lunch period. But again the 30 minutes was a
16  requirement so you just wrote 30 minutes down
17  there.
18      Q  So you think there were times where you
19  worked because you were interrupted and did not
20  record it on here?
21      A  Exactly.
22      Q  But we know from your records going
23  through earlier that you marked times when there
24  was no lunch, correct?
25      A  I did.

# EXHIBIT 66

NETWORK DEPOSITION SERVICES
**Transcript of John Peters**

1

```
 1            IN THE UNITED STATES DISTRICT COURT
 2         FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 3
 4   DEBORAH PRISE and          )
     HEATHER RADY on behalf     )
 5   of themselves and all      )
     employees similarly        )
 6   situated,                  )
                                )
 7            Plaintiffs,        )
                                ) CIVIL ACTION
 8   vs.                        ) NO. 06-1641
                                )
 9   ALDERWOODS GROUP, INC.,    )
                                ) Judge Joy Flowers Conti
10            Defendant.        )
                                )
11
12       VOLUME I, PAGES 1 THROUGH 210, INCLUSIVE
13
     DEPOSITION OF:  JOHN J. PETERS
14
                DATE:   JANUARY 15, 2009
15
                TIME:   10:09 A.M.
16
            TAKEN BY:  DEFENDANTS
17
            LOCATION:  NETWORK DEPOSITION SERVICES
18                     SUITE 2, 2000 LINGLESTOWN ROAD
                       HARRISBURG, PENNSYLVANIA
19
20
21   Reported By:
     SUSAN O'HARA MOORE, CSR, RMR, CLVS
22
     In Association with:
23   NETWORK DEPOSITION SERVICES
     Suite 1100 Gulf Tower
24   707 Grant Street
     Pittsburgh, PA 15219
25   412.281.7908
```

**138**

1    I just basically attended a meeting once
2  a month to discuss different things that was
3  going on with Hospice.
4    Q    Okay. And then the last -- and then we
5  can take a break.
6      The last thing I wanted to ask about was
7  your membership on the Greater Hazleton Chamber
8  of Commerce. Can you tell me how you became a
9  member?
10    A    I became a member because I joined. I
11  was in business for myself at that time, and I
12  thought it would be, you know, good to belong to
13  something like that as a business owner.
14    I did attend their meetings to see what's
15  going on in the community in which your business
16  is located.
17    MS. DUGAN: Okay. Would you like to take
18  a break?
19    MR. EHRMAN: For five minutes.
20    (Recess at 2:15 p.m. through 2:24 p.m.)
21  BY MS. DUGAN:
22    Q    Mr. Peters, based on the dates that you
23  listed for these various activities on your
24  resumé, it appears that these were all things
25  that you had done prior to coming to work for

**140**

1  continue your involvement in those particular
2  activities after you moved and started working
3  for Alderwoods?
4    A    No.
5    Q    Once you moved and started working for
6  Alderwoods -- which was around 2001. Is that
7  right?
8    A    October 1, 2001, yeah.
9    Q    At that time, you -- did you join any
10  other groups besides the Good Shepherd Catholic
11  Church and the Elks Club?
12    A    Within the funeral home -- the funeral
13  home sponsored a bus trip to Indiantown Gap
14  National Cemetery, and they made the arrangements
15  but I would go on the bus trip.
16    We would take, like, widows and widowers
17  on this trip and visit their loved ones,
18  husbands/wives that are buried there. We would
19  have different locations where we stopped, and
20  the people could get off and just pay respect to
21  their loved one's grave, place a flower,
22  whatever. They would do this around Memorial
23  Day, Veterans Day.
24    And then also within the funeral home I
25  gave -- I think it was one or two speeches I gave

**139**

1  Alderwoods. Is that right?
2    A    That is correct.
3    Q    And did you continue your involvement in
4  any of these activities after you started to work
5  for Alderwoods?
6    A    Oh, yes. I joined Good Shepherd Catholic
7  Church. I became active within the church,
8  ushered, helped with fundraising, selling raffle
9  tickets, things of that nature, Holy Name
10  Society.
11    And I joined the Elks. If my buddies in
12  Hazleton knew -- my buddies that belonged to the
13  Lions, if they knew I joined the Elks, they'd
14  shoot me. But I did join the Elks Club in Camp
15  Hill.
16    Q    Okay. So did you join the Good Shepherd
17  Catholic Church after you started working at
18  Alderwoods?
19    A    After I moved here, yes.
20    Q    And did you also join the Elks Club after
21  you moved here and started working for
22  Alderwoods?
23    A    Correct.
24    Q    With respect to the activities on your
25  resumé that we already talked about, did you

**141**

1  at a high school in the area that had career day.
2  And I would address the senior classes and talk
3  to them about if they would be interested in
4  funeral service. And I would tell them how to
5  get started and what's required of you if you
6  want to get licensed in Pennsylvania.
7    I believe I did that twice. And Bob
8  Pramik asked me to do that, and I did that. That
9  was a very interesting day.
10    Q    Can you think of anything else that you
11  did in the community when you started working at
12  Alderwoods?
13    A    I don't recall. I think that was -- that
14  was about it, yeah.
15    Q    And I think you distinguished the last
16  two things you mentioned, the high school career
17  day and the bus trip, from the others as things
18  that you did through the funeral home?
19    A    They made arrangements. When I say
20  "arrangements," they would get a bus, charter a
21  bus for the day. They put the ads in the Good
22  Shepherd Church bulletin about the Neill Funeral
23  Home of Camp Hill was sponsoring the bus trip to
24  Indiantown Gap.
25    As far as the high school, I really don't

**NETWORK DEPOSITION SERVICES**
**Transcript of John Peters**

37 (Pages 142 to 145)

---

142

1  know who contacted -- it was probably the
2  principal of the high school contacted the
3  funeral home that they were having a career day
4  and they wanted somebody to come in who was a
5  funeral director. They'd have a funeral
6  director, a lawyer there, an accountant there, a
7  doctor, different professionals, and I was there
8  representing the funeral industry.
9      Q  Okay. With respect to the bus trips that
10 the funeral home sponsored, what specifically did
11 you do with regard to these bus trips?
12     A  Well, not much at all. I mean, to be
13 there. You know, they're elderly people. I
14 would make sure they were -- I'd help them on and
15 off the bus. I'd walk them to the grave. They'd
16 have to show me, of course. You know, I'd walk
17 them to the grave. Hold their arm because, like
18 I said, they were elderly. Just be nice to them.
19     Q  So you actually went on the bus trip?
20     A  Yes.
21     Q  And accompanied the people who attended?
22     A  Yes.
23     Q  Did you do anything in preparing for the
24 bus trip?
25     A  No, not really. No. Of course, I should

---

143

1  say, we were in touch with the rectory of the
2  church to see how many people were coming. We
3  would fill up the bus pretty much.
4      Q  Do you recall the first time that you
5  attended one of these bus trips?
6      A  I don't recall the date.
7      Q  Do you know how many bus trips you went
8  on during your --
9      A  I was on three or four of them, I
10 believe. How ironic. I did the same thing when
11 I was in business for myself when I was in
12 Hazleton. I didn't charter a bus, but I had a
13 station wagon at the time and I got some people
14 together and I did the same thing myself from
15 Hazleton. I brought the people down. So it was
16 not an idea of Neill Funeral Home. I came up
17 with that idea years ago.
18     Q  It's a good idea.
19     A  I'm not, you know, patting myself on the
20 back or anything, but I came up with that idea
21 years ago, and I think it's a great thing to do.
22     Q  The three or four trips that you remember
23 going on with Alderwoods, do you recall -- do you
24 have any recollection as to what years those
25 trips happened in?

---

144

1      A  Can I guess?
2      Q  If you don't know --
3      A  It was -- I believe it was 2004. No.
4  I'm sorry. 2003, 2004.
5      Q  Okay.
6      A  Yeah.
7      Q  But you don't know for sure?
8      A  I don't know for sure. I'm just taking
9  an educated guess there.
10     Q  Did the bus trips happen during the day?
11     A  Yes.
12     Q  And were they during your scheduled work
13 time?
14     A  Yes.
15     Q  Did you report the time that you went on
16 these bus trips on your time sheets?
17     A  Yes.
18     Q  And, to your knowledge, did Alderwoods
19 compensate you for the time that you spent on
20 these bus trips?
21     A  The first year I went on it, they did.
22 The second year they didn't, for some reason.
23 Because I remember asking my wife, "I mean,
24 that's strange. They paid me last year. Why
25 didn't they pay me this year?"

---

145

1      Q  So you recall at least one time being
2  paid for going on the trip?
3      A  Yes. I was paid the first time.
4      Q  And then a time after that you were not
5  paid?
6      A  Correct.
7      Q  Do you know why you were not paid the
8  second time?
9      A  I have no idea.
10     MR. EHRMAN: Just so the record is clear
11 and I'm clear, he said three or four times.
12     Did you say three or four times, John,
13 that you went on those trips?
14     THE WITNESS: Three or four, yeah.
15     MR. EHRMAN: We covered two. What about
16 the third and fourth?
17     THE WITNESS: It was twice a year. So
18 2003, two trips; 2004, two trips.
19     MR. EHRMAN: You said you did get paid
20 for the first. You didn't get paid for the
21 second. Did you get paid for the third?
22 BY MS. DUGAN:
23     Q  Or was the testimony you were paid for
24 the first year and you were not paid for the
25 second year?

---

# EXHIBIT 67

**Page 1**

```
 1          IN THE UNITED STATES DISTRICT COURT
 2         FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 3                    *   *   *
 4   DEBORAH PRISE AND
 5   HEATHER P. RADY,
 6   on behalf of themselves
 7   and all other employees
 8   and former employees
 9   similarly situated,
10                Plaintiffs,
11        vs.              CASE NO.  CV 06-1641
12   ALDERWOODS GROUP, INC.,
13                Defendant.
14                    *   *   *
15        Deposition of SHAWN PHILLIPS, Witness
16   herein, called by the Plaintiffs for
17   cross-examination pursuant to the Rules of Civil
18   Procedure, taken before me, Angela S. Moore, a
19   Notary Public in and for the State of Ohio, at the
20   offices of Mike Mobley Reporting, 4555 Lake Forest
21   Drive, Blue Ash, Ohio, on Friday, April 16, 2010,
22   at 10:30 o'clock a.m.
23                    *   *   *
24
25
```

**Page 2**

```
 1        EXAMINATIONS CONDUCTED           PAGE
 2   BY MR. SAUL:..........................    12
 3   BY MS. BRAUN:.........................   126
 4   BY MR. SAUL:..........................   129
 5
 6               EXHIBITS MARKED
 7   (Thereupon, Phillips' Exhibit Number     20
 8   1, organizational chart, was marked
 9   for purposes of identification.)......
10   (Thereupon, Phillips' Exhibit Number     23
11   2, apprentice funeral
12   director/embalmer job description,
13   was marked for purposes of
14   identification.)......................
15   (Thereupon, Phillips' Exhibit Number     26
16   3, funeral director job description,
17   was marked for purposes of
18   identification.)......................
19   (Thereupon, Phillips' Exhibit Number     27
20   4, location manager job description,
21   was marked for purposes of
22   identification.)......................
23   (Thereupon, Phillips' Exhibit Number     29
24   5, training session handout, was
25   marked for purposes of ...............
```

**Page 3**

```
 1   identification.)......................
 2   (Thereupon, Phillips' Exhibit Number     29
 3   6, Community Leadership Program
 4   hand-out, was marked for purposes of
 5   identification.)......................
 6   (Thereupon, Plaintiffs' Exhibit          34
 7   Number 7, summary report charts, was
 8   marked for purposes of
 9   identification.)......................
10   (Thereupon, Plaintiffs' Exhibit          34
11   Number 8, Community Leadership
12   Overview, was marked for purposes of
13   identification.)......................
14   (Thereupon, Plaintiffs' Exhibit          36
15   Number 9, Community Leadership
16   Influencers, was marked for purposes
17   of identification.)...................
18   (Thereupon, Plaintiffs' Exhibit          39
19   Number 10, Community Leadership
20   Events packet, was marked for
21   purposes of identification.)..........
22   (Thereupon, Plaintiffs' Exhibit          40
23   Number 11, Community Leadership
24   Seminars packet, was marked for
25   purposes of identification.)..........
```

**Page 4**

```
 1   (Thereupon, Plaintiffs' Exhibit          41
 2   Number 12, Community Leadership
 3   Sponsorship packet, was marked for
 4   purposes of identification.)..........
 5   (Thereupon, Plaintiffs' Exhibit          42
 6   Number 13, Community Leadership
 7   Discretionary Spending packet, was
 8   marked for purposes of
 9   identification.)......................
10   (Thereupon, Plaintiffs' Exhibit          43
11   Number 14, Guide to Activity
12   Planning, was marked for purposes of
13   identification.)......................
14   (Thereupon, Plaintiffs' Exhibit          47
15   Number 15, September 20, 2006
16   bulletin, was marked for purposes of
17   identification.)......................
18   (Thereupon, Phillips' Exhibit Number     48
19   16, Community Leadership Program
20   letter, was marked for purposes of
21   identification.)......................
22   (Thereupon, Plaintiffs' Exhibit          49
23   Number 17, Community Relations road
24   map, was marked for purposes of
25   identification.)......................
```

```
 1    not be given to all employees.  Managers should
 2    provide this packet to an employee if a backpay
 3    issue arises.  Do you know what that refers to?
 4        A.   I don't.  Can we take a break real
 5    quick?
 6        Q.   Sure.
 7             (Thereupon, there was a brief
 8    recess taken.)
 9    BY MR. SAUL:
10        Q.   Do you recall any employees
11    getting backpay after the SCI merger?
12        A.   I don't.
13        Q.   On the second page of Exhibit 43,
14    it says:  6, question, what about rounding of
15    time?  And then the answer is, we are in the
16    process of defining guidelines for rounding of
17    time in and time out.  These guidelines will be
18    communicated once approved.  Do you know what
19    the policy was on rounding time in and time
20    out?
21        A.   I don't, because I left shortly
22    after September 4th of '07.
23        Q.   What about before that time, was
24    there any policy you are aware of?
25        A.   No, not that I recall.
```

```
 1        Q.   It talks about the breaks.  Let's
 2    talk about lunch break for a second.
 3        A.   Are you on the same document?
 4        Q.   No, we are done with it.  Let's
 5    talk about lunch breaks, what was the policy,
 6    as far as paying the employees for lunch
 7    breaks?
 8        A.   They were to take their lunch
 9    period as scheduled during the day, and it was
10    to be uninterrupted time, and if that time was
11    interrupted for any reason, a family walked
12    into the door, whatever the condition may be at
13    the funeral home, they were to be paid, they
14    were to clock back in and be paid for that
15    time.
16        Q.   Did they normally have a half hour
17    unpaid lunch break?
18        A.   They had a half hour paid.  It was
19    a paid lunch break, it wasn't unpaid.  It was
20    part of their normal routine, they work 8:00 to
21    5:00, take an hour lunch.
22        Q.   So employees had an hour lunch?
23        A.   Some had an hour, some had half
24    hour.
25        Q.   Okay.  And it was unpaid though?
```

```
 1        A.   Correct, sorry.
 2        Q.   Okay.  Fine.  Let's take a
 3    situation where the employee had a half hour
 4    unpaid lunch break.  Okay, let's take a
 5    situation, say, a funeral director and the
 6    funeral director is there, perhaps the only
 7    funeral director that is there and somebody
 8    comes in -- or let's -- I'm sorry, let's say
 9    there is a call that comes in.  And the call
10    lasted, say, ten to fifteen minutes.  What does
11    the employee do to get paid for that ten to
12    fifteen minutes?
13        A.   They just record that time on
14    their time sheet.
15        Q.   So if it took fifteen minutes,
16    then the employee would have fifteen minutes
17    paid, fifteen minutes unpaid?
18        A.   Correct.
19             (Thereupon, Phillips' Exhibit Number
20    44, March 16, 2006 e-mail, was marked for purposes
21    of identification.)
22    BY MR. SAUL:
23        Q.   I'll show you a document marked
24    44, and this is an e-mail from Kara Whitehead,
25    to a lot of people, with a cc to also a lot of
```

```
 1    people.  But if you see the second line above
 2    the subject line, your name is mentioned there.
 3        A.   Correct.
 4        Q.   Do you recall receiving this
 5    e-mail dated March 16, 2006?
 6        A.   Not specifically, no.
 7        Q.   Do you have any reason to believe
 8    you did not receive it?
 9        A.   No.
10        Q.   It says good afternoon, you may be
11    aware that we are trying to standardized our
12    practices around hours of work and overtime.
13    We have now received approval for our hours of
14    work and overtime policy and are preparing to
15    launch it.  We wanted to give you some advance
16    notice of what will be distributed shortly and
17    our proposed implementation plan for this
18    critical policy.  Do you know why this new
19    policy was being promulgated?
20        A.   No.
21        Q.   Again, it says:  We are trying to
22    standardize our practices around the hours of
23    work and overtime.  Were you aware of problems,
24    working overtime policies not being
25    standardized before this time?
```

# EXHIBIT 68

**NETWORK DEPOSITION SERVICES**
**Transcript of Robert Pramik**

1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2          FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 3
 4    DEBORAH PRISE and           )
      HEATHER RADY on behalf      )
 5    of themselves and all       )
      employees similarly         )
 6    situated,                   )
                                  )
 7              Plaintiffs,       )
                                  ) CIVIL ACTION
 8    vs.                         ) NO. 06-1641
                                  )
 9    ALDERWOODS GROUP, INC.,     )
                                  ) Judge Joy Flowers Conti
10              Defendant.        )
                                  )
11
12
      VIDEOTAPED
13    DEPOSITION OF: ROBERT J. PRAMIK
14            DATE:  OCTOBER 16, 2008
15            TIME:  9:54 A.M.
16        TAKEN BY:  PLAINTIFFS
17        LOCATION:  HOLIDAY INN EXPRESS
                     5680 ALLENTOWN BOULEVARD
18                   HARRISBURG, PENNSYLVANIA
19
20
21    Reported By:
      SUSAN O'HARA MOORE, CSR, RMR, CLVS
22
      In Association with:
23    NETWORK DEPOSITION SERVICES
      Suite 1100 Gulf Tower
24    707 Grant Street
      Pittsburgh, PA 15219
25    412.281.7908
```

82

1    February of 2007, to the best of your knowledge,
2    was it accurate then?
3        A    Yes.
4        Q    And, to the best of your knowledge, is it
5    accurate today?
6        A    Yes.
7        Q    Okay.  Did you physically write this
8    document, or this affirmation?
9        A    No.
10       Q    Okay.  Did you have assistance in
11   preparing it?
12       A    I don't know what you mean by
13   "assistance."  The best way -- it's like we're
14   here right now.  I'm saying it; she's writing it
15   down.
16       Q    Okay.  That's -- that was my question.
17       A    Okay.
18       Q    And was it your attorneys that assisted
19   you in writing down what you were saying?
20       A    Yeah.  They didn't assist me in what I
21   was saying.  They wrote down what I said.
22       Q    I understand, and I don't want to ask you
23   about those conversations.
24       A    Okay.
25       Q    Do you recall who approached you about

83

1    filing this affirmation?
2        A    It was a gentleman.  I can't remember his
3    name.  If you said his name, I would know it.
4        MS. GIFFORD:  Was it someone from our
5    office?
6        THE WITNESS:  Yes.
7        MS. GIFFORD:  That's okay.
8    BY MR. DeJULIUS:
9        Q    That's all I need to know.
10       A    I'm drawing a blank.
11       Q    That's all I need to know.
12            And do you recall when that occurred?
13       A    The specific date, no.
14       Q    Time period?  This was February of 2007.
15       A    So it was on about that -- that day.  It
16   was on about before that date or that date.
17       Q    Okay.  And if I can direct your attention
18   to paragraph 8, which is on page 2, the
19   affirmation states, "Defendants maintained a
20   company-wide policy requiring hourly employees,
21   such as funeral directors, to belong to at least
22   one outside community organization."  Do you see
23   that?
24       A    Yes.
25       Q    The -- the first word, "defendants," is

84

1    plural.  Do you see that?
2        A    Yes.
3        Q    Who do you refer to as "defendants,"
4    plural?
5        A    I would assume that would be Alderwoods.
6    Again, I don't know legal -- legal terminology.
7    I'm not a lawyer.
8        Q    Okay.  So "defendants" -- and just --
9    just to be clear, is referring solely to
10   Alderwoods?
11       A    Yes.
12       Q    Okay.  SCI -- the reason I ask is SCI was
13   actually in this lawsuit at the time that this
14   affirmation was filed.
15       A    I never worked -- I never worked for SCI.
16       Q    And that's my next question is that you
17   have no personal knowledge of any policies or
18   procedures from SCI.  Correct?
19       A    That is correct.
20       Q    Okay.  How did defendants define -- and
21   we're looking at paragraph 8.  It says,
22   "community organization."  What did you mean by
23   "community organization"?
24       A    Community involvement, whether it be the
25   Lions Club, Elks, the Moose, Legion, VFW, Red

85

1    Cross, Salvation Army, whatever.
2        Q    Okay.  And were any employees --
3        A    Not -- not poker clubs on Friday nights.
4    That didn't count.  It had to be a community-type
5    sponsored event.
6        Q    Okay.  And you mentioned funeral
7    directors, specifically, in this paragraph.
8        A    Yes.
9        Q    Were there other hourly employees besides
10   funeral directors that had to belong to at least
11   one outside community organization?
12       A    The word "had" is -- is what makes that
13   wrong.  They were encouraged to, but they did not
14   have to.
15       Q    So funeral directors had to belong to a
16   community organization?
17       A    Yes.
18       Q    Other hour employees were encouraged to?
19       A    Correct.
20       Q    Okay.  When did this policy requiring
21   funeral directors to belong to one outside
22   community organization occur?
23       A    You're asking me for a specific date?
24       Q    As best you can.  I mean, year, month.
25       A    Well, when -- when I -- back -- back when

# EXHIBIT 69

```
 1            IN THE UNITED STATES DISTRICT COURT
      FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2
      DEBORAH PRISE AND HEATHER RADY ON BEHALF OF THEMSELVES
 3    AND ALL EMPLOYEES SIMILARLY SITUATED,

 4          Plaintiffs,

 5
      vs.                    Civil Action No.  06-1641
 6
      ALDERWOODS GROUP, INC.,
 7
            Defendants.
 8

 9            DEPOSITION OF JACK REDDICK
           TAKEN ON BEHALF OF THE DEFENDANT
10    ON AUGUST 29, 2009, BEGINNING AT 8:00 A.M.
              IN COFFEEVILLE, KANSAS
11

12                APPEARANCES

13
      On behalf of the PLAINTIFFS: ANNETTE M. GIFFORD Thomas &
14    Solomon, LLP 693 East Avenue Rochester, New York 14607

15    (585)272-0540 agifford@theemploymentattorneys.com

16

17    On behalf of the DEFENDANT: TONYA B. BRAUN Jones Day

18    325 John H. McConnell Blvd., Suite 600 Columbus, Ohio

19    43215-2673 (614)469-3939 tbraun@jonesday.com

20

21

22

23

24

25    REPORTED BY:  Cheryl J. O'Meilia, C.S.R.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Jack Reddick**

58  (Pages 226 to 229)

226

1    Q.   While you were there by yourself, you said
2   you were working over 40 hours?
3    A.   Oh, yeah.
4    Q.   Okay.  And Don wasn't -- it was before Don
5   was there?
6    A.   Yes.
7    Q.   So you were recording that time?  You were
8   recording your overtime?
9    A.   On my time card, yes.
10   Q.   And were you paid for it?
11   A.   Yes.
12   Q.   And you didn't seek pre-approval for that
13  overtime?
14   A.   I didn't have to.
15   MS. GIFFORD:  Objection.
16   Q.   (BY MS. BRAUN) You didn't have to?
17   A.   No.  I was by myself.  Nobody there to do it.
18   Q.   And how long did that go on between the time
19  Mr. Hill left and the time --
20   A.   Well, they'd have to check and see when Mr.
21  Runyon was hired.  I don't know what -- what time he
22  was hired.
23   Q.   You don't have a recollection of whether that
24  was months or --
25   A.   It was --

227

1    Q.   -- weeks or --
2    MS. GIFFORD:  Objection.
3    A.   No, I don't know.          (Defendant's
4   Exhibit 9 marked for identification)
5    Q.   (BY MS. BRAUN) Let me hand you what will be
6   marked as Defendant's 9.  Mr. Reddick, this is a --
7   this is your affirmation.  Do you see that?
8    A.   Yes.
9    Q.   Okay.  But you didn't sign this document?
10  This is your conformed signature in the bot- -- at the
11  end?
12   A.   Yeah.
13   Q.   Okay.
14   MS. GIFFORD:  For the record, I think this
15  may have been refiled with a signature at a later date.
16   MS. BRAUN:  We're going to get to that.
17   (Defendant's Exhibit 10 marked for
18  identification)
19   Q.   (BY MS. BRAUN) Let me hand you what was
20  marked -- will be marked as Defendant's 10.  Okay.  Mr.
21  Reddick, Defendant's 10 is also an affirmation, your
22  affirmation?
23   A.   Uh-huh.
24   Q.   Yes?
25   A.   Yes.

228

1    Q.   Okay.  And is that your signature at the
2   bottom --
3    A.   Yes.
4    Q.   -- of the final page?
5    A.   Yes.
6    Q.   Okay.  And that's dated January 26, 2007?
7    A.   Yes.
8    Q.   Okay.  And Defendant's 9, it's not your
9   signature, but it's your conformed signature,
10  electronic signature, if you will, that's also dated
11  January 26, 2007?
12   A.   Yes.
13   Q.   Okay.  So my question is, is this a document
14  that -- that you recall looking at today?  Do you
15  recall this document?
16   A.   Yes.
17   Q.   Now, before you signed this document, did you
18  -- did you review this information in here?
19   A.   Yes.
20   Q.   Is this information that -- I mean, is this
21  something that you, yourself, drafted?
22   A.   No.
23   Q.   Where did this information come from?
24   A.   Well, I say drafted, I didn't do this.  I
25  wrote this stuff out on paper.

229

1    Q.   You wrote it out on paper?
2    A.   Uh-huh.  I think I did, yeah.
3    Q.   Do you have a recollection of writing out the
4   words on this document on paper?
5    A.   I either wrote it out or it was a
6   questionnaire that I wrote -- wrote on.
7    Q.   Could have been a questionnaire?
8    A.   Could have been.
9    Q.   Okay.  Here, again, in Number 3, Paragraph
10  Number 3 --
11   A.   Uh-huh.
12   Q.   -- it says July 2003.  We've established
13  today that's not accurate?
14   A.   Yeah, it's '04.
15   Q.   And Number 6?
16   A.   Yes.
17   Q.   You say that you're aware that the company
18  had a company-wide policy requiring hourly employees
19  such as assistant funeral directors to belong to at
20  least one outside community organization?
21   A.   Yes.
22   Q.   Is that accurate?
23   A.   That's why I joined the Elks Club upon Dave's
24  suggestion.  He said we was supposed to.
25   Q.   And a suggestion is not a requirement; is it?

NETWORK DEPOSITION SERVICES
**Transcript of Jack Reddick**

230

1      MS. GIFFORD: Objection.
2      A. Depends on how it's put to you. I took it as
3   saying I had to belong to some organization, so that's
4   why I renewed my membership in the Elks Club in
5   Cherryville, because we didn't have any members over
6   there.
7      Q. (BY MS. BRAUN) The same organization that
8   you'd previously been a part of since you were 21?
9      A. Yes.
10      MS. GIFFORD: Objection.
11      Q. (BY MS. BRAUN) In here, it says that the
12   policy, it was -- it was company-wide?
13      A. It was in their manual.
14      Q. What was in the manual?
15      A. What's that?
16      Q. You said something was in the manual. What
17   was in the manual?
18      A. That we belong to -- it was in that -- what I
19   was telling you about an organization, a community
20   service -- belong to an organization and performing
21   community service. It's in the Alderwoods manual.
22      Q. Is this the same one we were just talking
23   about?
24      A. Yes.
25      Q. Oh, okay. So now you remember that there was

231

1   something else in that manual or in that policy?
2      A. It was basically the same thing. Community
3   service, I didn't name out. I don't know what all it
4   said in it, but I --
5      Q. What do you remember that it said?
6      A. That you had to belong -- that you had to do
7   community service.
8      Q. But you didn't recall that when we talked
9   about it previously.
10      A. Right.
11      Q. Okay. But now you do?
12      A. When I see it, yes, I do.
13      Q. Okay. So what did it say?
14      A. I don't know all of it, except for other than
15   being community service and that's what I was doing,
16   was community service.
17      Q. Okay. So do you --
18      A. And then Dave suggested that I join the Elks
19   Club and that's what I did. I fell under that deal
20   that was in that manual of Alderwoods.
21      Q. Okay. So sitting here today, do you recall
22   that this -- that this policy that you believe you saw
23   in a binder said that assistant direct -- funeral
24   directors such as yourself had to belong to at least
25   one outside community organization?

232

1      MS. GIFFORD: Objection.
2      Q. (BY MS. BRAUN) I mean, that's my question.
3      A. Yeah.
4      Q. Because that's what it says, that's what your
5   sworn testimony is here on this piece of paper.
6      MS. GIFFORD: Objection.
7      A. Yes.
8      Q. (BY MS. BRAUN) Yes, that's what you think it
9   said?
10      A. Yes.
11      Q. And here you state that it was a company-wide
12   policy?
13      A. Potts Chapel Company, yes.
14      Q. The -- the policy was in -- was at Potts
15   Chapel?
16      A. Uh-huh.
17      Q. But you state here that it was a company-wide
18   policy?
19      A. Alderwoods. It comes out of Alderwoods'
20   book. All this stuff was in Alderwoods' policy manual.
21   I don't have that manual now because apparently they
22   took it all, what I didn't shred at their request.
23   It's gone.
24      Q. You state in Paragraph Number 7 that
25   employees were expected to use their membership in

233

1   volunteer community organizations to generate business
2   for the company?
3      A. Uh-huh.
4      Q. Why do you say that?
5      A. Because we weren't getting paid, expect us to
6   go out and do it for nothing.
7      Q. And did you, in fact, generate business for
8   the company?
9      A. I hope I did.
10      Q. Well, is there any evidence that you did?
11      A. I go to a little restaurant called Half Pints
12   and we sit at this one big table and drink coffee and
13   we've had nine funerals from that table. Now, did I do
14   it? I don't know, but they came to Potts Chapel.
15      Q. And this is from -- you said this is from a
16   restaurant you go to?
17      A. Uh-huh.
18      Q. And did you record the time that you spent
19   going to the restaurant on your community service?
20      A. This is after I get off work and I go out and
21   get coffee and drink tea and visit with them and stuff.
22      Q. I know. But my question was whether you
23   recorded the time you spent in the restaurant on your
24   community service form that you discussed?
25      A. I didn't record any of my time.

# EXHIBIT 70

**NETWORK DEPOSITION SERVICES**
**Transcript of John Schabloski**

1

```
 1              UNITED STATES DISTRICT COURT

 2            WESTERN DISTRICT OF PENNSYLVANIA

 3

 4   DEBORAH PRISE and HEATHER RADY

 5   on behalf of themselves and all

 6   employees similarly situated,

 7                      Plaintiffs,

 8         vs.                    Case No. 06-1461

 9                                Hon. Joy Flowers Conti

10   ALDERWOODS GROUP, INC.,

11                      Defendant.

12   _____

13

14

15         The Deposition of JOHN SCHABLOSKI,

16         Taken at 630 East Chicago Street,

17         Coldwater, Michigan,

18         Commencing at 9:28 a.m.,

19         Friday, May 15, 2009,

20         Before Deana M. Van Dyke, CSR-3715.

21

22

23

24

25
```

118

1  an employee of Alderwoods?
2  A.  I probably wouldn't have.
3  Q.  But you had been a member previously?
4  A.  Correct.  But, again, the only reason that I joined
5  Kiwanis, Rotary, and the Chamber of Commerce was it
6  was a requirement to be involved with community
7  affair and I didn't have -- I didn't have a whole
8  spectrum of community involvement things that I could
9  pick and choose from so I chose these.
10  Q.  What do you mean that you didn't have a whole spectrum
11  of things to choose from?
12  A.  How many more things would there be to pick from?  I
13  mean, remember I was one of three people and the other
14  two were involved in things in the community too and
15  you couldn't duplicate the same thing.
16  Q.  Why do you say you couldn't duplicate the same thing?
17  A.  Because that was by the standards that Amanda Kirt
18  told us that we couldn't duplicate organizations.  If
19  one was in it, then that's all that needed to be.
20  Q.  List off for a moment specifically about what you
21  allege Amanda Kirt to have said regarding community
22  service.  You originally testified that you heard that
23  you should -- you heard something about community
24  service involvement during a morning meeting; is that
25  correct?

119

1  A.  That's correct.
2  Q.  Was that the first time you heard anything about
3  community service with respect to your employment with
4  Alderwoods?
5  A.  Yes.
6  Q.  When do you recall that morning meeting taking place,
7  when was it in your employment?
8  A.  A little after when I joined them, probably late 2004.
9  Q.  So November, December 2004?
10  A.  Yeah, something like that.
11  Q.  Tell me specifically what she said and who was there.
12  Let's start with what she said.
13  A.  That each one of us needed to find at least one thing,
14  if not more, two or three things that we could get
15  involved in in the community.  She named different
16  things like you could get involved in a church, you
17  could get involved in volunteering at the hospital,
18  you could get involved in Rotary, Kiwanis.  One of my
19  fellow workers was involved in the Antique Car Club.
20  You had to be involved in something where you got
21  recognition and exposure to the community.
22  Q.  What do you mean by recognition?
23  A.  Well, that you could do a project and either get an
24  award or a picture in the newspaper or be recognized
25  that --

120

1  (Door interruption.)
2  MS. BRAUN:  Let's go off the record.
3  (Off the record at 1:30 p.m.)
4  (Back on the record at 1:35 p.m.)
5  BY MS. BRAUN:
6  Q.  Mr. Schabloski, we are back on the record.
7  A.  Okay.
8  Q.  We were talking about a meeting in late 2004.  I
9  believe you said it was a morning meeting, is that
10  correct, where Amanda Kirt spoke about community
11  service?
12  A.  Yes.
13  Q.  Was that the first time that you heard Amanda Kirt or
14  any member of management speak about community service
15  in relation to your employment at Alderwoods?
16  A.  Yes.
17  Q.  So prior to that you hadn't heard anything about
18  community service?
19  A.  No, I hadn't been there.  That's right, that's the
20  first time I heard it.
21  Q.  I mean, just to be clear, you were hired in August of
22  2004, correct?
23  A.  Correct.
24  Q.  But the first time you heard about a statement with
25  respect to community work or social clubs, was the

121

1  word you used, was in late 2004, probably November or
2  December, correct?
3  A.  That's correct.
4  Q.  Did you understand this, therefore, to be something
5  new?
6  A.  I don't know because I was new to the organization.  I
7  kind of assumed that it was new.  I mean, she brought
8  it up.
9  Q.  Because you had been working there for at least three
10  months at that point?
11  A.  Right, right.  Yes, it was something new.
12  Q.  I want to be clear on this because you've used a
13  different -- I've heard you use a couple different
14  terms.  I heard you say that Amanda said in the
15  morning meeting that everyone needed to find an
16  organization and then I've also heard you testify
17  today that you were requested to join an organization,
18  so what were you told?
19  A.  That we were -- we absolutely needed to find one.  We
20  were requested, it was mandatory.
21  Q.  Wasn't it a requirement?
22  A.  Yes, to work there.
23  Q.  Why do you say that it was a requirement to work
24  there?
25  A.  She said it was.  Because we had a fellow employee,

## 122

1     Dennis Johnson, said to her, there's nothing I can
2     find to join and she says you need to absolutely find
3     something, it's required of you to be at least
4     involved in one thing if you want to continue working
5     here, otherwise you will be terminated.
6 Q.  And this is the Dennis Johnson that you spoke to last
7     night prior to your deposition?
8 A.  Yes.
9 Q.  He was a part-time maintenance employee?
10 A.  Yes.
11 Q.  When do you recall Dennis Johnson -- did Dennis
12     Johnson make the statement that he couldn't find any
13     community service activity, did he make that in your
14     presence?
15 A.  Yes.
16 Q.  Was that also in the presence of others?
17 A.  Yes.
18 Q.  When was that?
19 A.  I would say some time late in 2004 after she made the
20     first announcement.
21 Q.  So there was a period of time at least that Dennis was
22     saying that he was -- had not been a member of any
23     organization between the time Amanda announced this
24     and when he brought it up?
25 A.  I would say probably a week between those two events.

## 123

1 Q.  Is it your testimony that he was threatened with
2     termination if he did not find a community service
3     activity?
4 A.  Yes.
5 Q.  Did Amanda Kirt say anything specifically to you about
6     any adverse consequences if you did not become
7     involved in a community activity?
8 A.  She just said to me, you're going to need to at least
9     find a couple things to do.
10 Q.  Or what?
11 A.  Well, it was previously explained what was going to
12     happen. She didn't repeat herself specifically to me.
13     That's when shortly thereafter I joined Kiwanis and
14     Rotary and the Chamber of Commerce to satisfy that
15     requirement.
16 Q.  Do you know if other employees at Covell Funeral Home
17     had been involved with community service organizations
18     prior to this statement that Amanda allegedly made?
19 A.  I don't know.
20 Q.  You don't know if they were previously involved?
21 A.  I don't know.
22 Q.  Do you know if Dennis Johnson became involved in a
23     community organization after he said he couldn't find
24     anything to become involved in?
25 A.  I believe he did. I don't know what it was. I don't

## 124

1     remember.
2 Q.  You say you believe he did but you don't know?
3 A.  Yes.
4 Q.  You don't know?
5 A.  I don't know.
6 Q.  Is it your understanding that Amanda's statement was
7     made to all Covell Funeral Home employees or was it
8     directed to a particular subset of employees?
9 A.  No, it was made to everybody.
10 Q.  Including the part-time employees?
11 A.  Yes.
12 Q.  Do you know what community service organizations the
13     employees at Covell Funeral Home were involved in?
14 A.  No, I don't.
15 Q.  So, for example, you do not know what organizations
16     Ron Colgran would have been involved in?
17 A.  No, I do not.
18 Q.  Do you know for certain whether he was involved with a
19     community service organization?
20 A.  I don't know.
21 Q.  Do you know what community service organization
22     Jennifer Holihan was involved in?
23 A.  No.
24 Q.  Do you know for a fact that she was involved with any?
25 A.  No.

## 125

1 Q.  With respect to Diane, the location administrator, do
2     you know what community service activities she was
3     involved with?
4 A.  No.
5 Q.  Do you know for a fact whether she was involved with
6     any?
7 A.  No.
8 Q.  Was anyone terminated during the course of your
9     employment on the basis of not being involved in
10     community service activities?
11 A.  No.
12 Q.  Was anyone disciplined at Covell Funeral Home during
13     the course of your employment for not being involved
14     in community service activities?
15         MS. GIFFORD: Objection.
16 A.  Not that I know of.
17 BY MS. BRAUN:
18 Q.  What did you understand the specific requirements to
19     be? You stated that Amanda said that you need to
20     become involved in a couple of things. What did you
21     take that to mean?
22 A.  Two or three different organizations.
23 Q.  That was your interpretation of what she said?
24 A.  Yes.
25 Q.  Do you know what employees outside of Covell Funeral

**NETWORK DEPOSITION SERVICES**
**Transcript of John Schabloski**

---

130

1 projects and doing community affairs through these
2 organizations.
3 Q. Can you attribute any piece of business that the
4 funeral home received to your participation in any of
5 the community organizations that we've discussed?
6 A. I can't give you certain names of people that came to
7 our funeral home because I was in those, no.
8 Q. You testified that you did not report the number of
9 hours you spent in these community service
10 organizations to management at Alderwoods, correct?
11 A. That's right.
12 Q. It was never requested of you to report those hours?
13 A. I didn't know how to go about doing that.
14 Q. Was it ever requested that you needed to generally
15 report to Amanda or any member of --
16 A. No, it was never asked.
17 Q. You were never asked to report regarding your
18 involvement in the community activities?
19 A. That's right.
20 Q. Time or otherwise?
21 A. Right.
22 Q. Do you know if any other employee at Covell Funeral
23 Home reported their time or generally their activities
24 spent in community service to Amanda or any other
25 member of management at Alderwoods?

---

131

1 MS. GIFFORD: Objection.
2 A. I don't know.
3 BY MS. BRAUN:
4 Q. During your employment at Alderwoods were you
5 evaluated on your performance? Did you receive an
6 annual performance evaluation?
7 A. No, I never did.
8 Q. At Covell Funeral Home was there any sort of incentive
9 program to joining a community service organization?
10 Where you incentivized in way any to join?
11 A. No, other than a requirement but there was no
12 incentive.
13 Q. There was no incentive intensive program?
14 A. No.
15 Q. Have you ever heard of anything called I Believe In
16 Service?
17 A. No.
18 Q. Is it the first part of your employment between August
19 and November and December when you heard Amanda Kirt
20 make this statement you were not involved in a
21 community service organization?
22 A. That's right.
23 Q. And you were not disciplined during that time for not
24 being involved in a community service organization?
25 A. That's correct.

---

132

1 Q. At some point did you realize from reviewing your
2 paycheck that you were not being paid for time spent
3 doing community service?
4 A. Yes.
5 Q. When did you realize that?
6 A. Probably a year after I started there. Probably six
7 months after I attended these meetings and was
8 contributing this time.
9 Q. And what did you do when you realized that you were
10 not being paid for the time you spent volunteering and
11 attending meetings for the church, Rotary, Kiwanis,
12 and the Chamber of Commerce?
13 A. There was -- I didn't do really anything. I assume
14 that -- I was led to believe that I was getting paid
15 for those hours.
16 Q. But you testified at some point you realized that you
17 were not, correct?
18 A. Right.
19 Q. When you realized that did you take any action?
20 A. No.
21 Q. You didn't complain?
22 A. No.
23 Q. You stated that Amanda Kirt made a statement about
24 community service. Did you ever see any sort of
25 statement about community service in writing?

---

133

1 A. No.
2 Q. So you never saw a policy regarding community service
3 during the time you were an employee at Alderwoods?
4 A. No.
5 Q. And you never saw a statement addressing payment for
6 the community work? I just want to make sure you
7 understand the scope of what I'm saying. You never
8 saw a statement in writing regarding any alleged
9 requirement to participate --
10 A. Yes.
11 Q. -- in community work? And you never saw any sort of
12 statement in writing regarding whether there would be
13 payment for community work?
14 A. No.
15 Q. Other than I believe you said there may have been a
16 couple times that Amanda attended a Chamber of
17 Commerce meeting with you?
18 A. Yes.
19 Q. How many times was that?
20 A. Two.
21 Q. Other than that would there have been any time when
22 she would have observed you performing any fundraising
23 activities for the other organizations?
24 MS. GIFFORD: Objection.
25 A. No.

---

# EXHIBIT 71

1

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3          SAN FRANCISCO/OAKLAND DIVISION

4                  * * * * *

5   WILLIAM HELM, DEBORAH PRISE,          )
    HEATHER P. RADY, et al., on behalf )
6   of themselves and all other          )
    employees and former employees       )
7   similarly situated,                   )
                                          )
8          Plaintiffs,                    )
                                          )
9      vs.                                )   CASE NO.
                                          )   CV-08-1184-SI
10  ALDERWOODS GROUP, INC.,               )
                                          )
11         Defendant.                     )
    _____    )

12

13

14

15          DEPOSITION OF SANDY THOMAS

16      Taken on Monday, October 19, 2009

17              At 9:30 a.m.

18      At 5845 Dean Martin Drive

19          Las Vegas, Nevada

20

21

22

23

24

25  REPORTED BY:  CHRISTY LYN DeJONKER, CCR NO. 691

86

1    A.  I can't recall.
2    Q.  Did you ever hear of anything called an
3  Influencer Program?
4    A.  No, I don't remember.
5    Q.  Did you ever create anything known as a
6  Leadership Network when you were employed by
7  Alderwoods?
8    A.  No, I didn't get into that program.
9    Q.  Did any of the individuals who reported to
10  you ever create anything known as a Leadership Network?
11    A.  No.
12    Q.  You never instructed them to do that,
13  correct?
14    A.  No.
15    Q.  Did you as the location manager at Thomas and
16  Jones ever fill out what was known as a Leadership
17  Network information sheet?
18    A.  I don't remember.
19    Q.  Did you ever direct any of the individuals
20  who reported to you to fill out a network information
21  sheet?
22    A.  Not that I can recall.
23    Q.  Did you ever set up anything known as a
24  Leadership Network Contact report?
25    A.  No.

87

1    Q.  Did you ever instruct any of the individuals
2  who reported to you to fill out that type of a report?
3    A.  No.
4    Q.  Did you ever identify a group of influencers
5  within your community while you were at Alderwoods?
6    A.  No.
7    Q.  Did you ever instruct anyone who reported to
8  you to identify any influencers?
9    A.  No.
10    Q.  Did you ever participate in community seminar
11  programs while you were employed at Alderwoods?
12    A.  No.
13    Q.  Did you ever instruct any of the people who
14  reported to you to participate in any community seminar
15  programs?
16    A.  No.
17    Q.  Did the Thomas and Jones Funeral Home ever
18  host any type of community events while you were at
19  Alderwoods?
20    A.  Yes, we did.
21    Q.  What type of events did you host?
22    A.  We had -- we did some networking with the
23  church.
24    Q.  I'm sorry?
25    A.  We did some networking with the church.  We

88

1  had where they come in and had different doctors and
2  things that came in and examined people for different
3  things.  We put that on.
4    Q.  When did those events occur?
5    A.  It occurred in 2006.
6    Q.  And did they occur during the course of the
7  regular work week?
8    A.  Yes.
9    Q.  So during your normal business hours?
10    A.  Normal business hours, yes.
11    Q.  So you were paid during the time you spent on
12  those programs, right?
13    A.  Right.
14    Q.  And any time that the individuals who
15  reported to you spent on those programs, they would
16  have been paid for it as well, correct?
17    A.  Correct.
18    Q.  Did your Alderwoods location -- and I'm going
19  to read a list of these things.  And my question is:
20  Did your location ever participate in these types of
21  events?  So, for example, did your location ever
22  participate in a food drive?
23    A.  No.
24    Q.  In any type of Father's Day or Mother's Day
25  event?

89

1    A.  No.
2    Q.  Any type of Memorial Day, Veteran's Day,
3  Patriot's Day event?
4    A.  No.
5    Q.  Any type of Christmas or Hanukkah event?
6    A.  No.
7    Q.  Did your location ever participate in any
8  church fundraisers?
9    A.  No.
10    Q.  Any chamber -- local Chamber of Commerce
11  events?
12    A.  No.
13    Q.  Ever conduct a crash car event?
14    A.  No.
15    Q.  Ever participate in a relay for life event to
16  support the American Cancer Society?
17    A.  No.
18    Q.  Ever host a remembrance of loved ones
19  service?
20    A.  No.
21    Q.  Ever host or conduct luncheons?
22    A.  We did a lunch with the -- with the ladies of
23  the church once.  We did that.  That was in 2006, too.
24    Q.  Okay.  That was just one time?
25    A.  One time.

**NETWORK DEPOSITION SERVICES**
**Transcript of Sandy Thomas**

35 (Pages 134 to 137)

134

```
1    spent doing showings on the weekends?
2        A.  No.
3        Q.  Were you allowed to record the time you spent
4    doing visitations after your scheduled hours?
5        A.  No.
6        Q.  What time would you normally begin working in
7    the morning?
8        A.  I would begin working at 7 o'clock.
9        Q.  And what time would you record on your time
10   sheet that you began working?
11       A.  8:00.
12       Q.  Were you allowed to record that time you
13   spent working in the morning?
14       A.  No.
15       Q.  Would that be another example of unrecorded
16   work time?
17       A.  Yes.
18       Q.  Now, I know you were asked about that
19   earlier.  Did you forget to mention that earlier?
20       A.  I did.
21       Q.  Was any of that time we just discussed that
22   you were not allowed to record, was any of that
23   preapproved overtime that you could record?
24       A.  No.
25       Q.  In these policies we were discussing and have
```

135

```
1    been discussed today, was it your understanding that
2    those applied equally to, for example, James and Regina
3    who also worked in your location?
4        A.  Yes.
5        Q.  So with respect to recording time for meal
6    breaks and time that you spent working on weekends,
7    visitations at night and the time you spent working,
8    your timecard would not accurately reflect those hours;
9    is that right?
10       A.  That's right.
11       Q.  I want to ask you a couple of questions about
12   community work.  Can you tell us again what community
13   work that you did?
14       A.  Community work we did, we would -- we would
15   network, the doctors that come by on a Saturday, on the
16   weekend, when they were available, and we conducted a
17   training and exams at the church.
18       Q.  And I want to be clear.  I want to make sure
19   we are clear on this.  Was that time paid or unpaid?
20       A.  That was unpaid.
21       Q.  Are you making a claim in this lawsuit for
22   that unpaid work?
23       A.  Yes, I am.
24       Q.  So despite whether it's Exhibit 7 or 8, you
25   do want to assert a claim for community service work in
```

136

```
1    this case?
2        A.  Yes.
3        Q.  And also, I just want to make sure we are
4    clear.  You were also asked different on-call work that
5    you did and you were asked about it and went over.  In
6    addition to not recording time spent on calls that
7    lasted more than 15 minutes, was it also the case that
8    you did not get paid for the removals that you did?
9        A.  I didn't get paid for removals if I had to do
10   them.
11       Q.  And also, were you -- when you received --
12   you discussed at least one bonus that you received
13   during your employment.  Do you recall that?
14       A.  I recall.
15       Q.  Did your overtime rate change when you
16   received the bonus?
17       A.  No.
18       Q.  Are you familiar with the laws enough to know
19   how overtime rates should be calculated when you
20   receive a bonus?
21       A.  No.
22           MR. LINGLE:  We don't have any further
23   questions.
24           MS. DIAS:  Okay.  Just a couple of follow-up
25   questions, Mr. Thomas.
```

137

```
1            FURTHER EXAMINATION
2    BY MS. DIAS:
3        Q.  Now, when I asked you whether you had been
4    paid for the community events with the doctors, you
5    said you had.  Did you not understand my question when
6    I asked it?
7        A.  Not clearly, not the way it was asked, I
8    didn't.
9        Q.  I asked you if those occurred during the
10   regular workday and you said yes.  And I said, You were
11   paid for those, correct?  And you said correct.
12           So you are changing your testimony now?
13       A.  I'm not changing it.
14           MR. LINGLE:  Objection.
15           THE WITNESS:  What I meant was, the only way
16   we could get the doctors and things on the Saturday is
17   when the office hours weren't opened.  When I said
18   regular-time, I figured that.  But no, I wouldn't get
19   paid for that.  We did the doctors and things on the
20   weekends, on Saturday.
21   BY MS. DIAS:
22       Q.  Who is "we"?
23       A.  I said me and Regina.
24       Q.  Not James?
25       A.  No, because James would be at the other
```

# EXHIBIT 72

1

```
 1            IN THE UNITED STATES DISTRICT COURT

 2         FOR THE WESTERN DISTRICT OF PENNSYLVANIA

 3

 4   DEBORAH PRISE, and HEATHER RADY )
     on behalf of themselves an all  )
 5   employees similarly situated,    )
                                      )
 6            Plaintiffs,             )
                                      )
 7       vs.                          ) Case No.: 06-1641
                                      )
 8   ALDERWOODS GROUP, INC.,          )
                                      )
 9            Defendant.              )
     _____)
10

11

12

13

14            DEPOSITION OF MATTHEW O. TWISS

15           Taken on Wednesday, April 29, 2009

16                 9:30 o'clock A.M.

17              At 2620 Regatta Drive

18                 Las Vegas, Nevada

19

20

21

22

23

24

25   Reported By:  Sandy A. Dahlheimer, CCR 431
```

Case3:08-cv-01184-SI   Document259-4   Filed07/27/10   Page34 of 41
NETWORK DEPOSITION SERVICES
**Transcript of Matthew Twiss**

38 (Pages 146 to 149)

146

1    getting paid?
2        A.   Well, six of one, half a dozen of the other.
3    It's a job.
4        Q.   There's no record of the time that you spent
5    there that you're aware of, written record?
6        A.   That's correct.
7        Q.   And you never turned it in to be paid?
8        A.   No.
9            MR. LINGLE:  Object to the form.
10   BY MR. DANIELS:
11       Q.   Was there a company wide policy, not just with
12   Gerhardt, but a company wide policy, Alderwoods' policy,
13   some policy that you looked at earlier today that required
14   the community service work?
15       A.   Yes.
16       Q.   Do you have a copy of that written policy?
17           MR. LINGLE:  Object to the form?
18           THE WITNESS:  No, I don't.
19   BY MR. DANIELS:
20       Q.   Have you ever seen a copy of the written
21   policy?
22           MR. LINGLE:  Object to the form.
23           THE WITNESS:  I have.
24   BY MR. DANIELS:
25       Q.   What did it say to your best recollection?

147

1        A.   Robert showed it to me.
2        Q.   Robert Falcon?
3        A.   Yeah.
4        Q.   What did it say?  What do you recall?
5        A.   Something to the effect that as an employee of
6    Alderwoods you must be involved in civic community duties.
7        Q.   Did it say you wouldn't be paid?
8        A.   It had nothing to do with compensation.  It's
9    part of your being an employee.  You must do this.
10       Q.   Was it a part of the binders that we talked
11   about earlier?
12           MR. LINGLE:  Object to the form.
13           THE WITNESS:  It wasn't a mission statement
14   binder.  It was in a folder.  Robert just showed it to me.
15   BY MR. DANIELS:
16       Q.   What was your response when he showed it to
17   you?
18       A.   I'd known this going in.  I knew that this is
19   what they expected.
20       Q.   Did you and Steve have a discussion about that
21   when you were first hired?
22       A.   Yes.
23       Q.   Did you ask him --
24       A.   He says it's encouraged.
25       Q.   It was encouraged to be involved in the

148

1    community?
2        A.   Strongly encouraged.
3        Q.   Was there discussion with Steve about pay?  Did
4    you ask him if you'd be paid?
5        A.   Yes.
6        Q.   What did he say?
7        A.   I said I understand this is something we do not
8    receive monetary rewards for, and he said absolutely no.
9        Q.   Did you receive any training about getting
10   involved in the community?
11       A.   No.  Discussion but no formal training.
12       Q.   And you also said you were involved in
13   Healthsouth trade fairs?
14       A.   Yes.
15       Q.   How many Healthsouth trade fairs did you
16   participate in?
17       A.   About four.
18       Q.   Where were they located?
19       A.   Different -- one was up at the Olympic Avenue
20   up off of Sunset.  Something like this but much bigger.
21       Q.   Who put --
22       A.   Nursing homes.  Health care center would set up
23   booths.  People that set up the stuff you put inside your
24   shoes, you know, ped stuff.  Different booths, and funeral
25   home -- John Gerhardt ordered a banner, Davis Funeral

149

1    Home.
2        Q.   And would you man that --
3        A.   And the pre-need people would go to one
4    particular one.  She and I would go.
5        Q.   What would you do?
6        A.   Stand there, hand out pens, cards, talk to
7    people about prearranging funeral homes.
8        Q.   How long was this?
9        A.   Four hours, five hours.
10       Q.   Four to five hours on four separate occasions?
11       A.   Yes.
12       Q.   Do you have any record of the time that you
13   spent.
14           MR. LINGLE:  Object to the.  Form?
15           THE WITNESS:  No record.  No.
16   BY MR. DANIELS
17       Q.   Did you ever -- were you paid for that time?
18       A.   I was paid for one.
19       Q.   Which one.  The first one?  The last one?
20       A.   The second one because I remember I
21   specifically asked John Gerhardt.
22       Q.   What did you ask him?
23       A.   I said can I clock in and clock out on this?
24       Q.   What did he say?
25       A.   He said yes.

# EXHIBIT 73

NETWORK DEPOSITION SERVICES
**Transcript of Stacey Weinstein**

1

```
 1              UNITED STATES DISTRICT COURT

 2             NORTHERN DISTRICT OF CALIFORNIA

 3            SAN FRANCISCO/OAKLAND DIVISION

 4               CASE NO:  CV-08-1184-SI

 5

 6   WILLIAM HELM, DEBORAH PRISE,
     HEATHER P. RADY, [see Complaint and
 7   Appendices for a listing of plaintiffs]
     et al., on behalf of themselves and
 8   all other employees and former employees
     similarly situated,
 9

               Plaintiffs,
10

     vs.
11

     ALDERWOODS GROUP, INC.,
12

13               Defendant

14   _____/

15                          Sheraton
                            1825 Griffin Road
16                          Dania, Florida
                            Wednesday, October 21, 2009
17                          11:34 a.m. - 2:13 p.m.

18

19
                 DEPOSITION OF STACEY WEINSTEIN
20

21

22      Taken before Leslie Hanawalt, Court Reporter and

23   Notary Public for the State of Florida at Large,

24   pursuant to Notice of Taking Deposition filed in the

25   above cause.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Stacey Weinstein**

25 (Pages 94 to 97)

94

1    the course of your work day?
2        A.   Yes.
3        Q.   How frequently would you say you did it in
4    the evenings and on your day off and weekends?
5        A.   Well, you would have to do it once a week
6    during the day and once a week at night because you
7    have different shifts at the hospitals.
8            So you have to get the day shift and the
9    night shift so you have to go to both so I used to go
10   every week.
11       Q.   Every week on your day off or in the
12   evenings or on a Saturday?
13       A.   Usually in the evenings because I would
14   try to get the night shift people so they'd only be
15   there at night.
16       Q.   So we're talking one evening a week?
17       A.   No.  Because I usually couldn't hit all of
18   them in one night.
19       Q.   How many evenings are we talking about?
20       A.   Two or three.
21       Q.   And how long would these visits last?
22       A.   About half an hour.
23       Q.   Do you know what community service type
24   activities anyone else engaged in?
25       A.   I know Mark was in like the Knights of

95

1    Columbus.  And Denise was in the Chamber of Commerce
2    Arta was in the Chamber of Commerce.  That's all I
3    know offhand.
4        Q.   When you say you were encouraged to do
5    these community service activities, who's the you
6    that's being referred to, what group of employees
7    were encouraged to do this, funeral directors?
8        A.   The funeral directors.
9        Q.   Anyone else?
10       A.   I am sure pre-need must have went out, but
11   I don't know how they handled it.
12       Q.   You don't know what they were asked to do?
13       A.   No.
14       Q.   And, therefore, you don't know what they
15   did, correct?
16       A.   Correct.
17       Q.   And you don't know when they did it,
18   correct?
19       A.   Correct.
20       Q.   You don't whether they recorded their time
21   for doing it, correct?
22       A.   Correct.
23       Q.   And, therefore, you don't whether they got
24   paid for doing anything that they might have done,
25   correct?

96

1        A.   Correct.
2            MR. LINGLE:  Objection.
3    BY MS. DIAS:
4        Q.   The activities that you noted some of the
5    other funeral directors engaged in, did they record
6    their time for those activities?
7        A.   No, you're not allowed to.
8        Q.   Who told you that you were not allowed to
9    record your time?
10       A.   Rick Hilkoff and Neal.
11       Q.   Do you remember specifically what they
12   told you?
13       A.   Yes.  Rick Hilkoff told me that when I
14   started there, since I was a girl, he wanted my face
15   to get out there and because I owned my own funeral
16   home and was well known in the area.  So he said he
17   wanted me to get my face out there and get everybody
18   to know where I am and do it as much as possible all
19   the time.
20           And Neal would always encourage me and say
21   I didn't see a receipt for cookies, where's the
22   cookies, come on, get out there.
23       Q.   What did they tell you about recording
24   your time for those activities?
25       A.   Not allowed to.

97

1        Q.   And that was both Rick and Neal?
2        A.   Yes, because we're not allowed any
3    overtime at all.
4        Q.   So were they -- I'm sorry -- did you ever
5    speak to any other manager at Alderwoods other than
6    Rick and Neal about community service activities?
7        A.   I asked Mark if he paid his people and he
8    said no.
9        Q.   Anyone else?
10       A.   No.
11       Q.   Other than funeral directors and your
12   guess that pre-need counselors did something, any
13   other job positions at the five homes that you're
14   aware of that were encouraged to do community
15   service?
16       A.   Well, every funeral director was.  And I
17   would assume every pre-need because they have to get
18   out there.  That's all I would know of.  I don't know
19   if anybody else did or not.
20       Q.   Did you ever encourage anyone else in
21   other job positions to perform community service?
22       A.   Other than funeral director and pre-need?
23       Q.   Yes.
24       A.   No.
25       Q.   What about any employees of Alderwoods

**NETWORK DEPOSITION SERVICES**
**Transcript of Stacey Weinstein**

26 (Pages 98 to 101)

98

1   outside of funeral directors and pre-needs counselors
2   in the five homes that you are familiar with, any
3   idea what people were told about community service?
4      A.   No, I just know that the secretaries had
5   to join the Chamber of Commerce and that was it.
6      Q.   The secretaries in your five homes?
7      A.   Yes, had to join the Chamber of Commerce.
8      Q.   You don't know about secretaries in any
9   other home, correct?
10     A.   No.
11     Q.   Or any other job position in any other
12  home, correct?
13     A.   No.
14     Q.   What they were told, correct?
15     A.   Correct.
16     Q.   What they did, correct?
17     A.   Correct.
18     Q.   Whether they recorded their time for it,
19  correct?
20     A.   Correct.
21     Q.   Or whether they were paid for it, correct?
22     A.   Correct.
23     Q.   Now, you said that Rick and Neal
24  encouraged community service, was it required?
25     A.   Yes.

99

1      Q.   Of the funeral directors?
2      A.   Uh-huh.
3      Q.   Is that a yes?
4      A.   Yes.  And the secretaries had to join the
5   Chamber of Commerce.
6      Q.   Anything else?
7      A.   And I heard them always telling the
8   pre-need to get out and do stuff.  I don't know what
9   they did.
10     Q.   Did you ever see anything in writing at
11  Alderwoods regarding community service?
12     A.   No.
13     Q.   Did you ever see anything in writing at
14  Alderwoods regarding whether you should or not record
15  your time spent on community service?
16     A.   No.
17     Q.   During the period of time August 2004
18  through March 2005 did you ever receive a written
19  performance evaluation?
20     A.   I think I did.  I don't remember.
21     Q.   Did any written performance evaluation
22  include evaluating you on your community service
23  work?
24     A.   I don't remember.
25     Q.   Did you from August 2004 through

100

1   March 2005 ever perform a written performance
2   evaluation for any other employee?
3      A.   Yes.
4      Q.   And did that written performance
5   evaluation include an evaluation of community service
6   work?
7      A.   No.
8      Q.   Who did you do a written performance
9   evaluation for?
10     A.   Avi.
11     Q.   Anyone else?
12     A.   No.
13     Q.   Why just Avi?
14     A.   Because he was brand new in the business,
15  and he had no idea what he was doing.  He just got
16  his license.  And he was fighting Neal because he
17  wanted -- he thought he should get paid for his
18  lunches and Neal was mad.  And he wanted him written
19  up for everything and anything and everything you can
20  think of that he did.
21     Q.   So you wrote him up concerning specific
22  events that occurred, correct?
23     A.   Right.
24     Q.   You didn't do an evaluation like a yearly
25  performance evaluation?

101

1      A.   No, no, no, that was Neal's job.
2      Q.   Were you ever evaluated concerning the
3   amount of pre-needs meetings that you held?
4      A.   No.
5      Q.   Did you ever evaluate anyone else
6   concerning the number of pre-needs meetings they
7   held?
8      A.   No.
9      Q.   Do you need to take a break?
10     A.   Yes.
11         (Thereupon, a break was taken.)
12         (Thereupon, Exhibit Numbers 7 and 8 were
13  marked for identification.)
14  BY MS. DIAS:
15     Q.   We have taken another break, and you have
16  taken some medication during the course of the
17  deposition, so I just want to ask you with your
18  physical condition right now and having taken that
19  additional medication, do you believe you are still
20  able as you sit there right now to testify truthfully
21  and honestly to my questions?
22     A.   Yes.
23         MR. LINGLE:  And I think from both
24  opposing counsel and our perspective certainly
25  as soon as you're not able to do that, we need

# EXHIBIT 74

**NETWORK DEPOSITION SERVICES**
**Transcript of Ray White**

1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DEBORAH PRISE and HEATHER RADY )
on behalf of themselves and    )
all employees similarly        )
situated,                      )
                               )
                  Plaintiffs,  )Civil Action
                               )No. 06-1641
     vs                        )
                               )
ALDERWOODS GROUP, INC.,        )
                               )
                  Defendant.   )

          The discovery deposition of

RAY WHITE, called by the Defendant, for examination,

pursuant to notice, taken before Julia A. Bauer,

CSR, RPR, a notary public within and for the County

of Cook and State of Illinois, at 3830 179th Street,

Hammond, Indiana, on the 21st day of July, A.D.,

2009, commencing at 9:35 a.m.

**118**

1    Q.   Did you join any community groups
2  while you were with Alderwoods?
3    A.   I was a member of it before I started
4  working Alderwoods.
5    Q.   What was that?
6    A.   Rotary, the chamber.
7    Q.   Did anyone ever tell you of any policy
8  that Alderwoods had that you had to be part of a
9  community organization?
10   MS. GIFFORD:  Objection.
11       Go ahead.
12  BY THE WITNESS:
13   A.   It was always brought down at the
14  little powwow meetings that they preferred that
15  every employee should take an active part in their
16  community to better -- not only -- for the sales
17  people, not only generating business for the
18  corporation, but also, they sold on a commission, so
19  they might improve their commission.  So they always
20  had asked that the employees be active in the
21  community, and not everybody in one group.  They
22  wanted everybody to take different groups and become
23  an active member in those.
24  BY MR. KNIGHT:
25   Q.   You said, powwow meetings, what were

**119**

1  you referring to?
2    A.   Zalo would have a meeting with
3  everybody, maybe, once a month going over the sales
4  numbers, the funeral numbers, the revenue, the
5  expenses, and then try and get everybody to become a
6  little more active role in getting the community
7  aware of Chapel Lawn.
8    Q.   Who else was present at these
9  meetings?
10   A.   It would have been all the sales --
11  the sale counselors, all the sales counselors, the
12  sales manager, sometimes some of the office ladies,
13  but they always had to have one hang back to answer
14  the phones.  But they'd try and have it at the
15  funeral home in the chapel area and get everybody in
16  there and just go over the numbers.  I mean,
17  everybody -- every month, you had a quota of what
18  they'd like you to try and hit, and that's for the
19  sales people.  That's what they had to go by.
20   Q.   There were employees at all of Zalo's
21  locations at these meetings?
22   A.   No.  He'd done one at Chapel Lawn, and
23  then he'd do another one at the other locations.
24   Q.   I thought there was just a couple of
25  you at Chapel Lawn?

**120**

1    A.   There was two at the funeral home.
2  The cemetery had three office ladies, a sales
3  manager, and then, like, six sales people.  And then
4  the groundsmen had -- there was, I think, eight
5  groundsmen.  So he'd try and get everybody in one
6  location.
7    Q.   Did Zalo ever tell you it was one of
8  your responsibilities to be part of a community
9  organization, that you had to join one?
10   A.   He told everybody that.  It was more
11  to benefit yourself, he told them.
12   Q.   Did they do anything to make sure
13  everyone was part of community organizations?
14   A.   No, he just asked.  The follow-up was
15  terrible.
16   Q.   At this point, were you a member of
17  the rotary club?
18   A.   Not the Griffith Rotary and not
19  Schererville.  I had joined after they -- I brought
20  in, and they fired me.  So they weren't paying --
21  and that was another thing, they wouldn't pay the
22  dues, the memberships.
23   Q.   So were you a member of the rotary in
24  your last four months of employment?
25   A.   No, I petitioned.  I wasn't a member

**121**

1  yet then.
2    Q.   And before that, were you a member of
3  any community organization while you were employed
4  with Alderwoods?
5    A.   Organizations?
6    Q.   (Nonverbal response.)
7    A.   You know, I'd say, I don't recall
8  because I know we volunteer a lot.  But as far as
9  you had to live in Schererville, and I didn't live
10  in Schererville, so I'd volunteered.  I think we
11  were all members of the chamber, the Schererville
12  chamber.
13   Q.   You said that you were petitioning to
14  be a member of the rotary?
15   A.   The rotary.  I was a member in
16  Griffith prior to me starting going to work for
17  Chapel Lawn.  And then I had to leave because I was
18  working in Crown Point at the time when I worked for
19  Geisen, and so I came back to -- that's when Zalo
20  said get re-involved in our communities.  So I went
21  back to Griffith Rotary to join -- somebody has to
22  take you and subscribe, and then they vote to become
23  a member.
24   Q.   Did you end up becoming a member?
25   A.   Not while I was employed for --