# Exhibit 75

Deposition Transcript of Louise Johnson (07-17-09).txt

00001

```
 1              UNITED STATES DISTRICT COURT
 2        FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 3
 4   DEBORAH PRISE and HEATHER RADY on   )
     behalf of themselves and all        )
 5   employees similarly situated,       )
                                         )
 6              Plaintiffs,              )
                                         ) Civil Action
 7        vs.                            ) No.: 06-1641
                                         )
 8   ALDERWOODS GROUP, INC.,             )
                                         )
 9              Defendant.               )
     _____)
10
11
12
13
14
15
16
17
18            Deposition of LOUISE JOHNSON, taken on behalf
19   of the Defendant, before Victoria A. Guerrero, CSR No.
20   8370, RPR, CRR, for the State of California, commencing
21   on Monday, July 17, 2009, 9:36 a.m., at Veritext
22   National Deposition & Litigation Services, 3090 Bristol
23   Street, Suite 190, Costa Mesa, California.
24
25   Pages 1 through 328
```

00002

```
 1   APPEARANCES OF COUNSEL:
 2
 3        For the Plaintiff:
 4
              Margolis Edelstein
 5            BY:  KYLE T. MCGEE, ESQ.
              525 William Penn Place, Suite 3300
 6            Pittsburgh, Pennsylvania  15219
              Phone (412) 355-4971  Fax (412) 642-2380
 7            E-mail:  Kmcgee@margolisedelstein.com
 8
 9
10        For the Defendant:
11
              Gurnee, Wolden & Daniels, LLP
12            BY:  NICHOLAS P. FORESTIERE, ESQ.
              2240 Douglas Boulevard, Suite 150
13            Roseville, California  95661-3805
              Phone (916) 797-3100  Fax (916) 797-3131
14            E-mail:  Nicholas@gurneelaw.com
15
16
17
18
19
20
21
22
23
24
```

Deposition Transcript of Louise Johnson (07-17-09).txt

21  is not to perform work for the company; do you see that?
22      A    I see that.
23      Q    And was that a policy that Alderwoods had in
24  effect during the time that you worked for him?
25      A    That may have been the written policy, but
00155
1   that's definitely not what we did.
2       Q    Are you saying that you -- for every meal
3   period you took, you worked through your lunch?
4       A    Not necessarily through the entire lunch, but
5   as we were sitting there eating, we would answer the
6   phone, answer the door, if somebody came in and needed
7   us, we'd leave our meal at our desk and go and help
8   them.
9       Q    And how long would that usually take to do that
10  type of work?
11      A    They were so different, every day was
12  different.  There was rarely an uninterrupted lunch
13  break, though, in the entire time I've been working
14  there.
15      Q    An uninterrupted for an entire hour or
16  uninterrupted for a half hour?
17      A    We could go five minutes and get a phone call
18  or we could go 45 minutes and get a phone call.  I mean,
19  it was different every single time.
20      Q    But you knew that you were entitled at least to
21  30 minutes, not less than 30 minutes for lunch, correct?
22      A    We were always told that we got an hour.  We
23  didn't know that it was supposed to be a half an hour.
24      Q    Did you keep any records concerning the amount
25  of time you were interrupted during your meal periods?
00156
1       A    No.  We just all knew that that's the way it
2   was.  Somebody had to do it.
3       Q    Did you ever make any complaint about being
4   interrupted during your meal periods to perform work to
5   anybody?
6       A    Curt, Kathy, and myself, we would constantly
7   complain just in personal conversation.
8       Q    You mean complain to each other?
9       A    Exactly.  We would only sort of go beyond that
10  if it was excessive.  But there was days where we were
11  so busy that it wasn't realistic.  There's nothing
12  anybody can do about it.
13      Q    What is your definition of excessive?
14      A    If we had a number of funerals throughout the
15  day, also appointments, and on top of that we have
16  people walking through the door that don't have
17  appointments, we don't turn them away.
18           If we have so much going on for one day or if
19  we're short-handed, then there's nothing you can do.
20  You just can't stop.
21      Q    Have you ever tried to quantify what you mean
22  by excessive?
23      A    Not really.  If it's to a point where you can't
24  sit down or use the rest room or even grab a bite to eat
25  while you're working, then that's -- that's a bit much.
00157
1   That's maybe when we would say something.
2       Q    And who would you say something to?
3       A    Normally we would go through Curt and sometimes
4   to Lynn.
5       Q    When you went to Curt, what was he to do about
                              Page 65

Deposition Transcript of Louise Johnson (07-17-09).txt
```
24      Q    More than ten over the six-year period?
25      A    At least.
00230
 1      Q    Did he tell you he ever made complaints to
 2 anybody in management about not being paid for all of
 3 the work he performed while on-call?
 4      A    He's never mentioned that to me.
 5      Q    What about Ms. DePeri, how many times has she
 6 told you that she was not paid fully for all of the
 7 on-call time that she worked?
 8      A    Everything should be the same for her if not a
 9 little more.
10      Q    So you think it's at least six times over the
11 last -- I'm sorry -- at least ten times or more over the
12 last six years?
13      A    At least.
14      Q    When was the first time you had a discussion
15 with her about that?
16      A    I don't recall.
17      Q    When was the last time you had a discussion
18 with her about that?
19      A    Within the last three months.
20      Q    She ever tell you that she complained to
21 anybody else about not being fully compensated for the
22 on-call duties she performed?
23      A    I've overheard her complaining to Curt.
24      Q    Other than Curt, did she complain to anybody
25 else that you're aware of?
00231
 1      A    I don't know.
 2      Q    Did she ever make any statements to you that
 3 she complained to anybody other than Curt about that
 4 matter?
 5      A    She hasn't told me.
 6      Q    So the answer would be no?
 7      A    Correct.
 8      Q    You were compensated for all the time that you
 9 performed your pre-need appointments?
10      A    I never did pre-need.  I'm not licensed to do
11 that.
12      Q    That's right.  My mistake.
13           During the times that you worked during your
14 meal breaks, what type of work did you perform?
15      A    Answering phones, answering the door when
16 people would come in, sometimes making calls if it was
17 in regards to a death certificate, sometimes we would be
18 working on things like death certificates or memorial
19 folders because they had to get done by a certain time.
20      Q    Did you ever work the lunch period and state it
21 on your time card saying no lunch?
22      A    I've done that.
23      Q    How many times have you done that during the
24 time period that you worked for Harbor Lawn?
25      A    That's everything up until the present?
00232
 1      Q    Yes, ma'am.
 2      A    At least ten.  More than that.
 3      Q    Was it on a weekly basis?
 4      A    For a while it was.  Over the last year we have
 5 slowed down a little.  Our case count has gone down
 6 overall.  So we haven't been as busy as we have been in
 7 previous years.
 8      Q    Would you say that the overall problems that
```
                         Page 96

                    Deposition Transcript of Louise Johnson (07-17-09).txt
 9   Harbor Lawn had concerning overtime and missed meal
10   periods has gotten significantly better over the year?
11           MR. MCGEE:  Object to the form.
12   BY MR. FORESTIERE:
13       Q    You can answer.
14       A    We haven't had as many problems with that, I
15   don't think, but I think it's largely in part that we're
16   not as busy as we used to be.
17       Q    Would that be, in part, your opinion due to the
18   use of a service center that SCI is using?
19       A    It's not just that.  It's our case count is
20   down.
21       Q    Less people are dying?  Or less people come to
22   your funeral for services, it sounds like?
23       A    That's true.  And it seems like the death rate
24   has been a little slow lately.
25       Q    How many times a week would you work through
00233
 1   your lunch period?
 2       A    Work through the entire thing or just through
 3   part of it?
 4       Q    Part of it.
 5       A    I'd say almost every single day we have at
 6   least one interruption during our lunch break.
 7       Q    So for the past six years you have not had a
 8   meal period that was not interrupted?
 9       A    There's probably been a handful of lunches that
10   have been uninterrupted, but we don't eat our food hot.
11       Q    So would you say there's less than five times
12   in the last six years that you did not have an
13   uninterrupted lunch period?
14       A    Well, it's over six years, it's a little more
15   than that.  But I can say the majority of lunches we
16   have taken have had at least one interruption.
17       Q    You went to saying it happened every week,
18   every day, every week; is that not true or true for the
19   last six years?
20       A    We might get away with one day a week, maybe,
21   where we didn't get interrupted.  But again, that's
22   purely based on how busy we are.  Sometimes we'll go a
23   couple months where we're not busy and then the next few
24   months every single day we were constantly interrupted.
25       Q    I'm just asking for averages.  I'm not asking
00234
 1   for perfect recollection, talking six year period.  I'm
 2   just trying to get a handle on how to analyze what the
 3   company may or may not owe you for these break periods,
 4   meal periods.
 5           Would you say it's fair to say that on average,
 6   four days a week you were interrupted in your meal
 7   periods?
 8       A    I think that would be reasonable.
 9       Q    And how many of those four days a week did you
10   report on your time card for compensation, on average?
11       A    I'm sure we've -- probably put about half down.
12       Q    So would it be fair to say that at two meal
13   periods a week you were interrupted and were not
14   compensated for the interruption?
15       A    Again, for the two that we were interrupted, we
16   were paid.  And two that we were interrupted, we were
17   not paid?
18       Q    That's what I'm trying to understand.  Is that
19   what your best recollection and estimate is?
                              Page 97

                    Deposition Transcript of Louise Johnson (07-17-09).txt
20       A    That might be what it evens out to.
21       Q    So just so we have a clear record, there, on
22  average, were two meal periods you worked per week that
23  you were not compensated for?
24       A    Probably.
25       Q    And that would be at least during the entire
00235
 1  time you worked as a funeral director, correct?
 2       A    Yes.
 3       Q    Did Alderwoods have a policy that required you
 4  to work through your meal periods?
 5       A    It was understood that we would do what we
 6  needed to do whether we were eating or not.
 7       Q    Did you ever see a written policy by Alderwoods
 8  saying all employees must work throughout their meal
 9  periods?
10            MR. McGEE:  Object to the form.
11  BY MR. FORESTIERE:
12       Q    You never saw anything in writing that way, did
13  you?
14       A    I don't recall.
15       Q    Did any Alderwoods manager ever tell you that
16  you had to work throughout all of your meal periods
17  while at Harbor Lawn?
18       A    Nobody's ever said that you must work through
19  all of your meal breaks; but in the same token, it was
20  expected that we wouldn't leave.  The three of us
21  funeral directors, there was an unspoken rule we don't
22  go anywhere.  We're still on the premises, so we're
23  still available.  So therefore they were constantly
24  interrupting us.
25       Q    Why couldn't you rotate among the three of you
00236
 1  to handle all of these interruptions during your meal
 2  periods?
 3       A    We did to some extent.  Like the phone would
 4  ring, one person would answer it, someone would come to
 5  the door, I would get up and answer it, the next phone
 6  call, the other director answers it.
 7       Q    No.  I'm talking about today.  You're on meal
 8  interruption duty and the other two people can take
 9  their meal period uninterrupted; did you ever talk about
10  doing that?
11       A    Did you ever get six phone calls at once?
12       Q    Yeah, I do.  And I put them on hold and go to
13  the next one.
14       A    It's what we've always had to do.  And if
15  someone's died, you can't do that.
16       Q    So the answer is:  Did you ever have those
17  discussions or not?
18       A    It's unrealistic.
19       Q    Miss Johnson, I understand it may be
20  unrealistic.  My question is did you have such
21  discussions with Curt and Kathy about rotating amongst
22  yourselves the duty to take all the interruptions during
23  the meal periods so that the other two could have
24  uninterrupted lunches?
25       A    We never discussed that because it just wasn't
00237
 1  an option for us.
 2       Q    By the way, you never signed any affidavits or
 3  declarations concerning this lawsuit, have you?
 4       A    None that I know of.
                              Page 98

Deposition Transcript of Louise Johnson (07-17-09).txt
20  part that moment because it can't wait?
21      A     With the urgent death certificates, yes.
22      Q     It wouldn't be every death certificate?
23      A     Not every death certificate.
24      Q     How do you know the difference between an
25  urgent death certificate and one that can wait?
00298
1      A     It's when the burial's going to take place.  We
2  just know what needs to be done and when we're running
3  out of time.
4      Q     Okay.  Let's talk about the phone calls on meal
5  breaks.  Do you believe you're expected to answer the
6  telephone while eating lunch?
7              MR. FORESTIERE:  Objection.
8              THE WITNESS:  Yes.
9  BY MR. MCGEE:
10      Q     Why is that?
11      A     Through common knowledge at our funeral home,
12  we know that the best way to serve our families is to
13  have somebody competent answering the phone.  We can't
14  all leave, we have to be in the building, so that when
15  that person calls who's had a death, we're able to help
16  them immediately.
17      Q     When you say we all can't leave, how do you
18  mean by we all?
19      A     Myself and the other two funeral directors.
20      Q     Are there occasions when there are phone calls
21  during the lunch period and all funeral directors on the
22  premises are on the phone?
23      A     It has happened.
24      Q     Have there been occasions where the other two,
25  and I mean Mr. Owen and Ms. DePeri, were on the phone
00299
1  and the phone rings?
2      A     Yes.
3      Q     And if you're on lunch under that scenario, you
4  believe it's part of your job to answer that phone?
5      A     Yes.
6      Q     What would happen if you didn't answer the
7  phone?
8              MR. FORESTIERE:  Objection.
9              THE WITNESS:  Theoretically, we could lose a
10  potential case.  If it's somebody that were already --
11  we've got the case, um, they may have an urgent need
12  that, you know, we can't help them with; we're not
13  serving our families to the best of our abilities by
14  ignoring their phone call.
15  BY MR. MCGEE:
16      Q     Let me ask you this:  Do you believe as a
17  funeral director you're in the customer service
18  industry?
19      A     Absolutely.
20      Q     So as part of your job, you try to do your best
21  job to appeal to what your customers would like at all
22  times, correct?
23              MR. FORESTIERE:  Objection.
24              THE WITNESS:  The way we have to do our jobs is
25  one step even beyond normal customer service because you
00300
1  have the added emotion of having a death.  So beyond
2  regular customer service, beyond treating your customer
3  the best, we have to be there emotionally for our
4  families.

Page 124