# TABLE OF CONTENTS
## EXCERPTS OF DEPOSITION TRANSCRIPTS

| Tab | Name |
|-----|------|
| 1 | Baker, Dennis |
| 2 | Bath, Herbert |
| 3 | Berryhill, Monica |
| 4 | Burgess, Jason Alex |
| 5 | Burkle, Clark F. |
| 6 | Butler, Michael |
| 7 | Carswell, Shane |
| 8 | Collins, Ron |
| 9 | Daigle, Millard Jude |
| 10 | Detschner, Steven A. |
| 11 | Diggs, Jeffrey |
| 12 | Escobar, Stephen |
| 13 | Garmback, Janet |
| 14 | Gonzales, Donna |
| 15 | Hensley, Ric |
| 16 | Hoachlander, Shelley |
| 17 | Johnson, Louise |
| 18 | Johnson, Peter |
| 19 | Jones, Robert Gordon |
| 20 | Kamienski, Richard |
| 21 | Keath, Angela |
| 22 | Kuhta, Richard |
| 23 | Lanza, Michael |
| 24 | Leal, Adrian F. |
| 25 | Long, Kasi |
| 26 | Mayes, Herbert |
| 27 | McDonald, Beverly |
| 28 | Miles, Barry Douglas |

| Tab | Name |
|-----|------|
| 29 | Ore, William |
| 30 | Peters, John |
| 31 | Phillips, Shawn |
| 32 | Pramik, Robert |
| 33 | Prise, Deborah |
| 34 | Rady, Heather |
| 35 | Reddick, Jack |
| 36 | Reno, Michael |
| 37 | Schabloski, John |
| 38 | Stearns, James |
| 39 | Stiffler, Nathan |
| 40 | Takesian, Stephen |
| 41 | Thomas, Sandy |
| 42 | Trull, Maurice |
| 43 | Twiss, Matthew O. |
| 44 | Walker, Sandra |
| 45 | Weinstein, Stacey |
| 46 | White, Ray |
| 47 | Wilkinson, Jack |

**TAB 1**

NETWORK DEPOSITION SERVICES
Transcript of Dennis Baker

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO/OAKLAND DIVISION

| | |
|---|---|
| WILLIAM HELM, DEBORAH PRISE, HEATHER P. RADY, [see Complaint and Appendices for a listing of plaintffs] et al., on behalf of themselves and all other employees and former employees similarly situated,<br><br>        Plaintiffs,<br><br>    v.<br><br>ALDERWOODS GROUP, INC.,<br><br>        Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) No. CV 08-1184-SI<br>)<br>)<br>)<br>)<br>) |

DEPOSITION OF DENNIS BAKER
October 31, 2009
Tucson, Arizona

Reported by: Doug Kirkpatrick
Certified Reporter No. 50705

c77c7411-3269-486b-8d78-6375d43a630f

NETWORK DEPOSITION SERVICES
Transcript of Dennis Baker

Page 7

1      A.   Approximately July of '06.

2      Q.   And what position did you hold with

3  Alderwoods?

4      A.   Location manager at that time.

5      Q.   Okay.  How long were you employed by

6  Alderwoods?

7      A.   Approximately six years.

8      Q.   And can you list all the positions you held

9  during those six years with Alderwoods?

10     A.   Started out as funeral director/embalmer

11  and gravitated and evolved into general manager.

12     Q.   When did you become a general manager?

13     A.   Approximately early '02.

14     Q.   So you joined Alderwoods in approximately

15  2000 or 2001; is that right?

16     A.   Yes.

17     Q.   And you were a funeral director/embalmer at

18  that point?

19     A.   Yes.

20     Q.   And then after a year or two you became a

21  general manager; is that right?

22     A.   Yes.

23     Q.   And then at some point after that did you

24  become a location manager?

25     A.   Yes.

c77c7411-3269-486b-8d78-6375d43a630f

NETWORK DEPOSITION SERVICES
Transcript of Dennis Baker

1      A.   Well, again, they record all hours worked

2   if they want to get paid for it, you know.

3      Q.   Okay.  Did employees in Arizona that you

4   supervised, in Phoenix, did any of them get paid a

5   piece rate for any of the work they performed?

6      A.   Sometimes.

7      Q.   And who -- which employees?  Which

8   positions would get paid piece rate?

9      A.   Funeral directors and embalmers.

10     Q.   Uh-huh.  Anyone else?

11     A.   And there were some that were not licensed

12  individuals.  You know, they would have fallen into

13  the assistant funeral director maybe or -- I didn't

14  see it on your list, but there was some that helped

15  with removals.  And not everyone that helped on a

16  removal was a licensed funeral director/embalmer.

17  And that was -- that is what some of the piece work

18  was.

19     Q.   Okay.  So they got -- so there was a piece

20  rate for removals; is that right?

21     A.   Yes.

22     Q.   Do you recall what the rate was?

23     A.   I don't.  And it evolved and it changed.

24  It evolved.

25     Q.   Okay.  When you started as general

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

c77c7411-3269-486b-8d78-6375d43a630f

NETWORK DEPOSITION SERVICES
Transcript of Dennis Baker

Page 73

1   manager --

2       A.   Yeah.

3       Q.   -- was there a piece rate for removals?

4       A.   I don't think so.

5       Q.   When did it come into effect?

6       A.   It may have started -- it's a guess.  '04.

7   For sure came into play by '05.

8       Q.   When you say for sure by '05, how do you

9   know for sure by '05?

10      A.   I remember.

11      Q.   And what was -- was there a written

12  policy?

13      A.   Yes.

14      Q.   Do you recall what the policy was?

15      A.   Not specifically, but it had to do with --

16  as I recall, you know, there was X amount flat rate

17  for a removal.

18      Q.   Uh-huh.

19      A.   And I think there was an X amount flat rate

20  for an embalming if the individual opted to stay off

21  hours, I mean, you know, middle of the night --

22      Q.   Uh-huh.

23      A.   -- and embalm.

24           And then it also evolved.  There was a

25  formula for receiving compensation for telephone

c77c7411-3269-486b-8d78-6375d43a630f

NETWORK DEPOSITION SERVICES
Transcript of Dennis Baker

Page 74

1    work.

2        Q.    Okay.

3        A.    And this was later on during my stay in

4    Phoenix.    This was '05.

5        Q.    So prior to then how were employees paid

6    for removals and embalmings, if at all?

7        A.    Well, we had contract companies that would

8    make removals.

9        Q.    So was it the case that from the time you

10   became general manager until this piece rate policy

11   that you just discussed went into effect that a third

12   party did the removals?

13       A.    Yes.

14       Q.    And who did the embalmings?

15       A.    Licensed embalmers.   Our staff.

16       Q.    Uh-huh.   But they weren't paid a piece rate

17   prior to 2004 or 2005 for those embalmings?

18       A.    Well, they -- I'm not certain when the

19   piece rate for embalming developed.

20       Q.    Sure.

21       A.    Before -- before they -- before that

22   developed, I suspect they just -- third parties made

23   the removal and no licensed -- our staff wasn't there

24   in the middle of the night, so they didn't embalm in

25   the middle of the night.

c77c7411-3269-486b-8d78-6375d43a630f

NETWORK DEPOSITION SERVICES
Transcript of Dennis Baker

1    Q.    So they embalmed during business hours?

2    A.    Yeah.

3    Q.    You may have mentioned this already, but I

4    didn't write it down if you did.  Do you recall what

5    the rate was, the flat rate was for removals?

6    A.    I don't.

7    Q.    Do you recall what it was for embalmings?

8    A.    I don't.

9    Q.    Do you recall what the flat rate was for

10   telephone calls?

11                 MS. GIFFORD:  Objection.

12   A.    I don't.  I think the minimum time, as I

13   recall, was 15 minutes, you know.  Had something to

14   do with 15 minutes.  I think if you answered the

15   phone and said hello, how are you, and yes, the

16   funeral is next Thursday at 2 o'clock, I think that

17   you recorded 15 minutes and that it counted for 15

18   minutes of their hourly wage or something like that.

19   Q.    (BY MR. KNIGHT)  Okay.

20   A.    It required some rather intricate

21   timekeeping.

22   Q.    When this piece rate policy started, went

23   into effect in whatever year it was 2004, 2005, were

24   employees required to record the hours or the time

25   they spent doing removals, after-hour removals?

c77c7411-3269-486b-8d78-6375d43a630f

NETWORK DEPOSITION SERVICES
Transcript of Dennis Baker

1   for employees to claim their hours if their hours

2   were greater than the piece rate?

3       A.   I'm not sure.

4       Q.   And I think you mentioned with the

5   telephone calls, that there was a 15-minute minimum;

6   is that right?

7       A.   Seems like it.

8       Q.   Did they actually get a flat rate for

9   telephone work?

10                  MS. GIFFORD:   Objection.

11      A.   I'm not positive.  But I'm thinking that

12  the minimum was like 15-minutes.  For some reason

13  that sticks in my mind.  And, you know, it's like I

14  said before, if they say hello, yes, the funeral's

15  next Thursday, three-minute phone call, I think they

16  could legitimately claim 15 minutes, which is a

17  fourth of an hour, which went to hourly.

18      Q.   (BY MR. KNIGHT)  If the call is half an

19  hour, could they claim half an hour?

20      A.   I think so.

21      Q.   Okay.  Prior for the piece rate policy that

22  you mentioned going into effect, were employees at

23  your location in Phoenix responsible for answering

24  phones after hours?

25      A.   Yes.

c77c7411-3269-486b-8d78-6375d43a630f

NETWORK DEPOSITION SERVICES
Transcript of Dennis Baker

Page 85

1    on call.

2        Q.   Okay.  And then what would the funeral

3    director/embalmer on call do?

4        A.   Go make a removal.

5        Q.   Okay.  Now, I thought you had said that

6    prior to 2004, 2005, there was a service that did the

7    removals.

8        A.   There was sometimes.

9        Q.   But sometimes there wasn't?

10       A.   Right.

11       Q.   In your experience, having been on call in

12   Phoenix, would you receive a phone call every night

13   that you were on call, at least one call every

14   night?

15       A.   I'm sure there were nights that you would

16   get no phone calls.

17       Q.   Were there nights you would get multiple

18   phone calls?

19       A.   Yes.

20       Q.   Do you have any estimate as to how much --

21   what the average was in a particular night that you

22   would spend on the phone?

23       A.   Not really.  I mean, it varied, you know.

24       Q.   Would it be more than an hour on some

25   occasions?

c77c7411-3269-486b-8d78-6375d43a630f

NETWORK DEPOSITION SERVICES
Transcript of Dennis Baker

Page 99

1    worked before or after their schedule?

2              MS. GIFFORD:  Objection.

3         A.    I don't recall that, no.

4         Q.    (BY MR. KNIGHT)  Are you aware of any

5    employees at Alderwoods who had a certain number of

6    overtime hours per week guaranteed?

7         A.    No.

8         Q.    While you were with Alderwoods, did you

9    ever hear of anything called the Community Leadership

10   Program or Community Influencer Program?

11        A.    I don't recall that specific terminology.

12        Q.    Did you -- were you ever responsible for

13   creating a Leadership Network, something called a

14   Leadership Network at Alderwoods?

15        A.    I don't recall that specifically, no.

16        Q.    Did you ever fill out something called a

17   Leadership Network information sheet?

18        A.    Not that I recall.

19        Q.    Are you familiar with the term "Leadership

20   Network contact report"?

21        A.    Not really.

22        Q.    Were you ever asked to identify community

23   influencers at Alderwoods?

24              MS. GIFFORD:  Objection.

25        A.    I don't recall that term.

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

c77c7411-3269-486b-8d78-6375d43a630f

NETWORK DEPOSITION SERVICES
Transcript of Dennis Baker

Page 100

1     Q.   (BY MR. KNIGHT)  You don't recall the term

2  "influencer"?

3     A.   Community influencer.

4     Q.   Did you have to keep track of important

5  people in the community, important contacts in the

6  community?  Was that one of your job responsibilities

7  at Alderwoods?

8          MS. GIFFORD:  Objection.

9     A.   No.

10    Q.   (BY MR. KNIGHT)  Did any of the people you

11  supervised, were they required to generate lists of

12  community contacts or influencers to your knowledge?

13    A.   No.

14    Q.   When you were supervisor, did you or anyone

15  at your location ever participate in something called

16  a Community Seminar Program?

17    A.   I don't recall that.

18    Q.   When you were at Alderwoods, did you or any

19  of the people you supervised ever host community

20  events at the location that you supervised?

21    A.   Yes.

22    Q.   Okay.  Can you give me some examples?

23    A.   Oh, hospice groups would use our facility

24  for a meeting place.  Grief recovery groups would use

25  our location for a meeting place.  And we were

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

c77c7411-3269-486b-8d78-6375d43a630f

**NETWORK DEPOSITION SERVICES**
**Transcript of Dennis Baker**

114

1      Q.   Did you ever have a location spokesman at

2  any of your locations?

3      A.   No.

4      Q.   For any of your locations, did you or

5  anyone you supervised ever develop something called a

6  community action plan?

7      A.   I don't recall that.

8      Q.   Did you or anyone that you supervised at

9  Alderwoods ever prepare a planning calendar of events

10 for your location?

11     A.   Well, no, I don't think so.

12     Q.   Did you or anyone at your locations ever

13 prepare something called a community events tracking

14 report?

15     A.   I don't think so.

16     Q.   Did your location in Phoenix or in Oregon

17 have a Web site?

18     A.   I think that was just being developed in --

19 in late '05.  I think we had a Web site, but it was

20 in the infant stage.

21     Q.   Was there anyone in particular that was

22 responsible for the contents of the Web site?

23     A.   Well, I'm sure somebody was, but I don't

24 know who.

25     Q.   Anyone at your location who was adding

C E R T I F I C A T E

BE IT KNOWN that I took the foregoing deposition; that I was then and there a Certified Reporter in the State of Arizona; that by virtue thereof, I was authorized to administer an oath; that the witness, DENNIS BAKER, before testifying was duly sworn to testify to the whole truth and nothing but the truth; and the testimony of the witness was reduced to writing under my direction.

I DO FURTHER CERTIFY that I am not a relative or attorney of either party or otherwise interested in the event of this action.

( XX ) Pursuant to request, notification was provided that the deposition is available for review and signature.

( ) Deposition review and signature was waived.

WITNESS my hand this 2nd day of November, 2009.

_____

DOUG KIRKPATRICK, CR# 50705

**TAB 2**

NETWORK DEPOSITION SERVICES
Transcript of Herbert Bath

Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO/OAKLAND DIVISION


WILLIAM HELM, DEBORAH PRISE, HEATHER P. RADY, et
al., on behalf of themselves and all other employees
and former employees similarly situated,

    Plaintiffs,


vs                                    No. CV-08-1184-SI


ALDERWOODS GROUP, INC.,

    Defendants.


DEPOSITION OF HERBERT C. BATH
Taken on Behalf of the  Defendants
On October 23, 2009, beginning at 8:58 A.M.
In Coffeyville, Kansas

APPEARANCES

Appearing on behalf of the PLAINTIFFS:

Annette Gifford
DOLIN, THOMAS & SOLOMON
693 East Avenue
Rochester, New York 14607
(585) 272-0540
agifford@theemploymentattorneys.com




REPORTED BY:  LESLIE A. SHELLEY, CSR

3390cbc8-3d19-4743-88f5-f4e08c3a784c

NETWORK DEPOSITION SERVICES
Transcript of Herbert Bath

Page 170

1    people in the -- in the town or the area.
2         Q    But in these communications, what did he
3    say about compensation for involvement in community
4    work?
5         A    He said there wouldn't be any.
6         Q    Now, Mr. Wilson, was he salaried or
7    hourly?
8         A    Hourly.
9         Q    And you're saying on one occasion he
10   turned his time in that he spent doing community
11   work?
12        A    Yes.
13        Q    Okay.  And did he -- did you review his
14   time cards on that occasion?
15        A    I don't think I did on that occasion.
16        Q    How did it come to your attention that
17   there was an issue about whether he'd be compensated
18   for that time or not?
19        A    He called me and told me that he wasn't
20   going to be and then Dennis Phillips also told me
21   that he was not going to be compensated for it.
22        Q    And do you know whether, in fact, he was
23   compensated or not?
24        A    No, I do not.
25        Q    Do you know what community work he was

3390cbc8-3d19-4743-88f5-f4e08c3a784c

NETWORK DEPOSITION SERVICES
Transcript of Herbert Bath

Page 171

1    performing on that occasion?

2         A    I think he was involved in a golf

3    tournament at Oswego.

4         Q    Do you know what amount of hours or time

5    Mr. Wilson reported for his participation in the

6    golf tournament?

7         A    No, I don't.

8         Q    Any other instance where an employee who

9    worked at a location that you managed, either as

10   area manager or location manager, reported time

11   spent in community work?

12        A    I'm sure there were, but I don't know of

13   any, you know, offhand.

14        Q    All right.  If it did happen, do you know

15   whether the employee was compensated or not?

16             MS. GIFFORD:  Objection.

17        A    Yes, they were.

18        Q    (MS. MORGAN)  They were compensated for

19   their community time if they reported it?

20        A    Um-hmm.  It was during regular -- regular

21   business hours.

22        Q    Okay.  So Mr. Bath, I'm trying to

23   understand what your understanding of this community

24   work policy was.  Are you saying that it was only

25   hours that were spent doing community work that were

NETWORK DEPOSITION SERVICES
Transcript of Herbert Bath

Page 181

1    performance evaluation the community activities they

2    were involved in; correct?

3         A    That was one of --

4         Q    Okay.

5         A    -- the criteria.

6         Q    Okay.  Did you ever reward anybody -- any

7    of these location managers in any way or penalize a

8    location manager in any way with respect to how much

9    community activity they had done?

10        A    No.

11        Q    Okay.  I want to ask you about the

12   community work activities of employees at the

13   locations that you managed who were not location

14   managers.  You said at some point in time, you

15   started asking the location managers about those

16   activities?

17        A    Yes.

18        Q    And what did you inquire of the location

19   managers about that?

20        A    Just if the employees were -- were taking

21   part in the community activities and -- and what

22   they were.

23        Q    Did you get details?

24        A    On some I did, some I didn't.

25        Q    Did you ask how much time they spent in

3390cbc8-3d19-4743-88f5-f4e08c3a784c

NETWORK DEPOSITION SERVICES
Transcript of Herbert Bath

Page 182

1    those community activities?

2         A    No.

3         Q    Did the involvement of employees, other

4    than location managers, at the locations for which

5    you had responsibility factor in in any way into

6    their -- into your view of their performance?

7              MS. GIFFORD:  Objection.  Go ahead.

8         A    No.

9         Q    (MS. MORGAN)  Never evaluated any of them

10   based on it?

11        A    Correct.

12             MS. GIFFORD:  Objection.

13        A    I'm sorry.  That's correct.

14        Q    (MS. MORGAN)  You could take a look at

15   Paragraph 17 of your affirmation.  What requirement

16   did Mr. Matherly or Mr. Phillips impose on location

17   managers with respect to meetings to discuss best

18   practices of where employees could become involved

19   in the community?

20        A    It was required for -- once a week for the

21   location managers to have a staff meeting.  At that

22   time, they talked about several different things,

23   but they also were to talk best practices that was

24   working someplace that might not be working

25   someplace else or -- or that kind of thing.

3390cbc8-3d19-4743-88f5-f4e08c3a784c

NETWORK DEPOSITION SERVICES
Transcript of Herbert Bath

Page 193

1    Q    (MS. MORGAN)  What community events did
2  you host?
3    A    Hosted the Christmas tree memorial
4  program.  Also, we had a seminar on senior citizens
5  for durable power of attorney, social security
6  information, that kind of thing.
7    Q    Anything else?
8    A    Not that I remember.
9    Q    And when did you host the Christmas tree
10 memorial program?
11   A    We did it two years.  I think it was in
12 2001 and 2002, I believe.
13   Q    Who assisted you in hosting that, if
14 anyone?
15   A    Dorothy did and Dora and Jack.
16   Q    Anybody else?
17   A    Not to my mem -- memory.
18   Q    Did the -- did the Christmas tree memorial
19 program take place during regular work hours?
20   A    No.
21   Q    When did it --
22   A    One -- one did.  One did.  The other one
23 didn't.  The other one was in the evening.
24   Q    Okay.  So the -- the one that did take
25 place during normal business hours, did Dorothy,

3390cbc8-3d19-4743-88f5-f4e08c3a784c

NETWORK DEPOSITION SERVICES
Transcript of Herbert Bath

Page 194

1    Dora, and Jack re -- report the time they spent?

2         A    Yes.

3         Q    And were they compensated for it?

4         A    Yes.  To my knowledge, they were, yes.

5         Q    With respect to the Christmas tree

6    memorial program that took place outside of regular

7    business hours, did Dorothy, Dora, or Jack record

8    the time that they spent assisting?

9         A    I don't think so.

10        Q    Were they compensated for it?

11        A    Not to my knowledge.

12        Q    And how much time did they spend?

13        A    Oh, it was probably an hour and a half to

14   two hours.

15        Q    Total?

16        A    Each, yes.

17        Q    They each spent about --

18        A    About an hour and a half --

19        Q    -- an hour and a half?

20        A    -- to two hours, yes.

21        Q    The seminar on senior citizens --

22        A    Um-hmm.

23        Q    -- anybody assist with that?

24        A    Dorothy and Dora did.  I don't think Jack

25   did on that one.

3390cbc8-3d19-4743-88f5-f4e08c3a784c

NETWORK DEPOSITION SERVICES
Transcript of Herbert Bath

Page 195

1      Q    And did that seminar take place during
2  regular business hours?
3      A    One did, two did not.
4      Q    So it took place three times?
5      A    Yes.  We had it afternoon and evening one
6  day and then in Chetopa, evening, the next day.
7      Q    With respect to the seminar and senior
8  citizens that took place during the regular work
9  day, did Mrs. Bath and Mrs. Boore --
10     A    Um-hmm.
11     Q    -- report the time they spent?
12     A    Yes.
13     Q    And were they compensated for it?
14     A    Yes.
15     Q    With respect to the seminar that -- on
16  senior citizens that took place outside of regular
17  work hours, did they report their time?
18     A    I don't think so.
19     Q    Were they compensated for it?
20     A    Not to my knowledge.
21     Q    How much time was spent?
22     A    Probably the one in Altamont, an hour and
23  a half to two hours.  The one in Chetopa, probably
24  three to three and a half hours.
25     Q    And that was how much time they each

3390cbc8-3d19-4743-88f5-f4e08c3a784c

NETWORK DEPOSITION SERVICES
Transcript of Herbert Bath

Page 235

1      A    Correct.

2      Q    And of the employees at the locations that

3  you managed, either as area manager or location

4  manager, how many funeral director embalmers were

5  paid on an hourly basis?

6      A    Probably four or five.

7      Q    When you say that this on call pay policy

8  was company wide, what do you mean?

9      A    I assumed it was company wide.  You know,

10 everybody in the company was under the same orders.

11     Q    And what did you base that assumption on?

12     A    Just that I was -- that was the orders I

13 was given and everybody was supposed to be the same.

14     Q    But only -- only Dennis Phillips

15 communicated this to you; correct?

16     A    That's correct.

17     Q    And he communicated it to you verbally?

18     A    That's correct.

19     Q    So you don't know what other area managers

20 or location managers were told by their managers;

21 correct?

22     A    Correct.

23          MS. GIFFORD:  Objection.

24     A    Correct.

25     Q    (MS. MORGAN)  And you understood this

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

NETWORK DEPOSITION SERVICES
Transcript of Herbert Bath

Page 236

1    policy to only apply to funeral directors embalmers;

2    correct?

3              MS. GIFFORD:  Objection.

4        Q    (MS. MORGAN)  I'm sorry, and location

5    manager?

6        A    Yes, correct.

7        Q    Do you know whether any funeral directors

8    or embalmers or location managers in areas other

9    than the ones for which you had supervisor

10   responsibility, either as an area manager or

11   location manager, do you know whether this on call

12   pay policy, as you've described it, applied to them?

13       A    No, I do not know.

14       Q    So you don't know whether they reported

15   their on call time?

16       A    No, I do not.

17       Q    And you don't know whether they were

18   compensated for it?

19       A    No.

20       Q    If you could take a look at Paragraph 20.

21   Okay.  When you say funeral directors were typically

22   on call every evening because of the small size of

23   the funeral homes, what funeral homes are you

24   referring to?

25       A    The -- my -- my locations,

3390cbc8-3d19-4743-88f5-f4e08c3a784c

NETWORK DEPOSITION SERVICES
Transcript of Herbert Bath

Page 237

1    Cooper-Althouse, Potts in Independence, Murdocks in

2    Columbus and Oswego, Carlson's in Emporia.

3        Q    And so you're -- you were referring only

4    to the -- to the small funeral homes for which you

5    had management responsibility --

6        A    Correct.

7        Q    -- correct?

8        A    Correct.

9        Q    You're not referring to any others?

10        A    Right.

11        Q    Okay.  And what on call work did the

12    funeral directors -- what on call work did the

13    hourly funeral directors and embalmers at the

14    locations that you managed perform?

15        A    They answered the phone calls off business

16    hours, responded on death calls.  They were actually

17    paid for the death calls and the embalmings and

18    that.

19        Q    Okay.  If you could take a look at

20    Paragraph 21, where you said that employees are also

21    responsible for performing embalmings and removals

22    while on call and were not always compensated for

23    their work, what are you referring to there?

24        A    Well, one -- one evening, Larry Murdock --

25    or not Larry Murdock.  Larry Wilson was -- was at

3390cbc8-3d19-4743-88f5-f4e08c3a784c

NETWORK DEPOSITION SERVICES
Transcript of Herbert Bath

Page 238

1    home, he wasn't on call, the funeral home in
2    Columbus, there was nobody there, he got a call and
3    so he was required -- or he went and picked up the
4    body, did the embalming, and didn't get paid for it.
5         Q    Is that the only instance you're referring
6    to?
7         A    As far as I know, yes.
8         Q    Okay.  Just that one instance --
9         A    Yes.
10        Q    -- involving that --
11        A    As far as I know.
12        Q    -- one employee?
13        A    As far as I know.
14        Q    Okay.  And as far as you know, all other
15   employees who performed embalming or removals while
16   they were on call were compensated for their work?
17             MS. GIFFORD:  Objection.
18        A    As far as I know, yes, they were.
19        Q    (MS. MORGAN)  Okay.  Let's talk about the
20   phone calls.  Okay.  At Paragraph 20, you talk about
21   as part of the funeral director position, employees
22   handled these calls but were not paid by Alderwoods
23   for any time spent on these calls since they were
24   outside of the regular workday and off site from the
25   funeral home.  Do you see that?

3390cbc8-3d19-4743-88f5-f4e08c3a784c

NETWORK DEPOSITION SERVICES
Transcript of Herbert Bath

Page 240

1    Q    And who did he say told them this?

2    A    Dennis Phillips.

3    Q    When was that?

4    A    I'm estimating it was in 2002.

5    Q    Any other instructions that you were aware

6    of or heard -- heard about regarding whether or not

7    funeral director embalmers at the locations for

8    which you had management responsibility were --

9    regarding whether they were to record their time or

10   not spent on after-hour calls?

11            MS. GIFFORD:  Objection.

12   A    No, I was not aware of any.

13   Q    (MS. MORGAN)  Do you know whether funeral

14   directors embalmers at the locations for which you

15   were responsible, either as area manager or location

16   manager, do you know whether they reported the time

17   they spent on after-hour calls?

18   A    Not for sure.  No, I'm not.

19   Q    And do you know whether they were

20   compensated for that time?

21   A    No, I'm not for sure.

22   Q    If you could take a look at Paragraph 22.

23   A    Um-hmm.

24   Q    The last sentence there.  How were you

25   aware of work -- the work involved while funeral

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

3390cbc8-3d19-4743-88f5-f4e08c3a784c

NETWORK DEPOSITION SERVICES
Transcript of Herbert Bath

Page 241

1    directors were on call and handling phone calls?

2        A    Most of the time they -- when I talked to

3    them the next day, they told me.  Like I said, I

4    didn't talk to all of them every -- every day, but

5    usually three or four times a week I talked to them.

6        Q    But you don't know whether they reported

7    that time?

8            MS. GIFFORD:  Objection.

9        A    No, I don't.

10       Q    (MS. MORGAN)  And you don't know whether

11   they were compensated for it?

12       A    No, I don't.

13       Q    If you could take a look at Paragraph 23.

14       A    Okay.

15       Q    It talks about your being made aware of

16   the on call pay policy from regional managers,

17   Brent Matherly and Dennis Phillips.

18       A    Um-hmm.

19       Q    Okay.  You -- you testified about what

20   Dennis Phillips told you --

21       A    Um-hmm.

22       Q    -- regarding the on call pay policy.

23           What about Brent Matherly, what did he

24   tell you?

25           MS. GIFFORD:  Objection.  Go ahead.

3390cbc8-3d19-4743-88f5-f4e08c3a784c

NETWORK DEPOSITION SERVICES
Transcript of Herbert Bath

Page 242

1        A     He made the same -- same comment, that
2    they weren't -- there was no on call policy -- I
3    mean, no pay policy for on call.
4        Q     (MS. MORGAN)  And did you have the same
5    understanding with respect to what -- did -- did you
6    have the same understanding as to whom that policy
7    applied to?
8        A     I assumed it was to all employees.
9        Q     Not just funeral directors, embalmers?
10       A     Correct.
11       Q     And what did you base that on?
12       A     That I was told.  Just what I -- I was
13   told from the -- Dennis and --
14       Q     Okay.
15       A     -- Brent.
16       Q     All right.  Just talking specifically
17   about what Brent Matherly told you, when did he tell
18   you this?
19       A     I think it was in a meeting in his office.
20       Q     And when was that?
21       A     I can't tell you exactly, but it was
22   probably in 2003.
23       Q     Other than the locations for which you had
24   management responsibility, Mr. Bath, you don't know
25   whether or not employees recorded time spent on

3390cbc8-3d19-4743-88f5-f4e08c3a784c

NETWORK DEPOSITION SERVICES
Transcript of Herbert Bath

Page 243

1  call; correct?

2      A    No, I do not.

3      Q    Okay.  And you don't know whether or not

4  they were compensated for it?

5      A    No, I do not.

6      Q    Did either Brent Matherly or

7  Dennis Phillips specifically indicate to you that

8  the policy was company wide?

9      A    They said it --

10         MS. GIFFORD:  Objection.  Sorry, go ahead.

11      A    They said it came from up above.

12      Q    (MS. MORGAN) And --

13      A    And I assumed that was from -- from

14  Shawn Phillips or on up.

15      Q    You assumed that but you don't know?

16      A    I -- no, I do not.  I do not.

17      Q    You don't know who they were referring to

18  when they said directly from up above?

19      A    No, I do not.

20      Q    Okay.  Paragraph 23, you state that you

21  expressed your frustration at the policy of not

22  compensating employees for their on call work.

23      A    Yes, ma'am.

24      Q    Okay.  To whom did you express this

25  frustration?

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

NETWORK DEPOSITION SERVICES
Transcript of Herbert Bath

Page 303

1    locations, they prepared them, the manager --
2    location managers did.
3        Q    And you only -- this was only done for a
4    two to three-month period of time?
5        A    That's correct.
6        Q    Did you review the reports prepared by
7    other location managers in your area?
8        A    I glanced over them, I didn't, you know,
9    read word for word.
10       Q    And after you faxed these reports to the
11   regional manager, do you have any idea what was done
12   with the reports?
13       A    No.
14       Q    Do you know whether the regional managers
15   reviewed them?
16       A    I -- no, I don't.  I assume they did, but
17   I don't know that.
18       Q    Do you know whether the regional managers
19   used those reports for any purpose?
20       A    No.  I know we discussed them at -- at
21   different times, you know, if there's a question or
22   a comment that they had on them, but I don't --
23   that's all I -- you know, I don't have any idea what
24   they used them for.
25       Q    Are you aware of any consequences,

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

3390cbc8-3d19-4743-88f5-f4e08c3a784c

NETWORK DEPOSITION SERVICES
Transcript of Herbert Bath

Page 304

1    negative or positive, with respect to any of the

2    employees at any of the locations for which you were

3    responsible as a area manager or location manager,

4    with regard to community activity performed by those

5    employees?

6              MS. GIFFORD:  Objection.

7        A    No.

8        Q    (MS. MORGAN)  Don't know whether their

9    community activity had any impact whatsoever on

10   their employment at Alderwoods?

11             MS. GIFFORD:  Objection.

12       A    Not to my knowledge, it didn't.

13       Q    (MS. MORGAN)  To your knowledge, it had no

14   impact?

15       A    Right.

16       Q    Can you take a look at Paragraph 26 of

17   your affirmation?

18       A    Okay.

19       Q    With respect to Paragraph 26, when you

20   say -- when you use the word employee, what

21   employees are you referring to?

22             MS. GIFFORD:  Objection.

23       A    Funeral directors, embalmers, insurance

24   personnel, license people.

25       Q    (MS. MORGAN)  Anyone else?

3390cbc8-3d19-4743-88f5-f4e08c3a784c

NETWORK DEPOSITION SERVICES
Transcript of Herbert Bath

Page 308

1                           CERTIFICATE

2

3           I, Leslie A. Shelley, Certified

4    Shorthand Reporter, do hereby certify that the

5    above-named HERBERT C. BATH was by me first duly sworn

6    to testify the truth, the whole truth, and nothing but

7    the truth, in the case aforesaid; that the above and

8    foregoing deposition was by me taken in shorthand

9    and thereafter transcribed; that the same was taken,

10   pursuant to stipulations hereinbefore set out; and

11   that I am not an attorney for nor relative of any of

12   said parties or otherwise interested in the event of

13   said action.

14

15           IN WITNESS WHEREOF, I have hereunto

16   set my hand and official seal this 29th day of

17   OCTOBER, 2009.

18

19                    _____

20                    Leslie A. Shelley, CSR

21                    CSR No. 01917

22

23

24

25

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

3390cbc8-3d19-4743-88f5-f4e08c3a784c

**TAB 3**

NETWORK DEPOSITION SERVICES
Transcript of Monica Berryhill

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

----------------------------------------------------

DEBORAH PRISE and HEATHER RADY
on behalf of themselves and all
employees similarly situated,

      Plaintiffs,

vs.

                      File No. 06-1641

ALDERWOODS GROUP, INC.,

      Defendant.

----------------------------------------------------

      Deposition of Monica Berryhill taken before

Kimberly A. McCallum, a Notary Public in and for the

County of Anoka, State of Minnesota, on Wednesday the

7th day of April, 2010, commencing at approximately

9:20 a.m., at 200 West First Street, in the City of

Duluth, State of Minnesota.

               *    *    *

3649f917-b4c4-4a1c-b20b-271c40754eca

NETWORK DEPOSITION SERVICES
Transcript of Monica Berryhill

Page 109

1    average are you growing?

2    A.    Sales averages, products.

3    Q.    In your experience, is being involved with

4    the community an important aspect of the

5    funeral home business?

6    A.    Incredibly important.

7    Q.    Again, speaking specifically about your

8    time prior to the merger, did Alderwoods

9    encourage its location to be involved in the

10   community?

11   A.    Yes, it did.

12   Q.    When you were -- prior to the time you

13   were a trainer when you were at the Bell

14   Brothers' location, was that location involved

15   in the community at all?

16   A.    Yes.

17   Q.    And how did that happen?

18   A.    Rotary memberships, BNI, which is another

19   business group organizations, community fairs,

20   senior expos, church dinners.

21   Q.    Anything else?

22   A.    Public speaking.

23   Q.    And which employees were involved in those

24   activities?

25   A.    Most often the location manager.

NETWORK DEPOSITION SERVICES
Transcript of Monica Berryhill

Page 110

1    Q.    Uh-huh.

2    A.    And then those people who wanted to be

3    involved in those things were given the

4    opportunity to choose whether they wanted to

5    participate in Senior Expo or not or whether

6    they wanted to be part of Rotary or not.  It

7    was encouraged but not required.

8    Q.    Who did participate?

9    A.    Various employees.  Are you needing names?

10   Q.    Did the funeral directors participate in

11   those activities?

12   A.    In those specifics that I've listed there

13   was some funeral director participation in the

14   Winter Fest.  I don't know if that's the name

15   of it.

16   Q.    Anything else?

17   A.    Funeral directors may come down for an

18   hour or two during the senior expos.  And

19   again, you are asking specifically about

20   funeral directors?

21   Q.    Yeah, we can talk about the funeral

22   directors now.  Were any of the funeral

23   directors involved in Rotary?

24   A.    One of the funeral directors was involved

25   in Lions.  Charlie was involved in Rotary.  And

3649f917-b4c4-4a1c-b20b-271c40754eca

NETWORK DEPOSITION SERVICES
Transcript of Monica Berryhill

Page 111

1    with those memberships their dues were paid and

2    the time they spent doing those things was also

3    compensated and logged.

4    Q.   How do you know it was compensated and

5    logged?

6    A.   Because I'd approve for it.

7    Q.   Was there anything on the time card

8    denoting that it was community work?

9    A.   It would be whatever activity they were

10   participating in, so BNI meeting, seven a.m. to

11   eight a.m.  So that would have been handwritten

12   because they would not have been at the funeral

13   home.

14             Or instead of like for Lions like

15   instead of the time that he would have been at

16   Lions or the Saturday they would have come to

17   the Winter Fest they would have written their

18   hours that they were at Winter Fest and

19   referenced what activity or group it would have

20   been.

21   Q.   So all of those events would have been

22   handwritten as opposed to punched?

23   A.   Possibly.  Most often.  I mean, if they

24   weren't there to punch the clock, yes, it would

25   be handwritten in.

3649f917-b4c4-4a1c-b20b-271c40754eca

NETWORK DEPOSITION SERVICES
Transcript of Monica Berryhill

Page 112

1    Q.   Are there some events that would have been
2    just punched and not handwritten?
3    A.   The activities that took place during
4    regular business hours, like Senior Expo, they
5    wouldn't have punched a time clock because they
6    would have already been in.  So come to work at
7    8:30, they were working the day, but some of
8    that is to come down to the Duluth
9    Entertainment Convention Center and spend a
10   couple hours at a booth there and then they go
11   home after punching out at the funeral home or
12   leaving from there.
13   Q.   Did you have to initial or sign off on
14   every handwritten entry?
15   A.   Yes.
16   Q.   Were the office administrators involved in
17   community events at all?
18   A.   Not then.  I mean, now they are.
19   Q.   Okay.  When did that change?
20   A.   SCI is a corporate sponsor for diabetes,
21   so we do the diabetes walk every year.  We just
22   finished one a couple of weeks ago.  And all
23   job codes were active in that.  It's something
24   we all really enjoy doing.  And that's a lot of
25   what the community involvement is.  Again, it's

3649f917-b4c4-4a1c-b20b-271c40754eca

NETWORK DEPOSITION SERVICES
Transcript of Monica Berryhill

Page 113

1    not required, but if you want to participate,
2    you are compensated for doing so.  And it ends
3    up being something fun.
4    Q.   And it helps grow the business?
5    A.   Yeah.  Again, it's encouraged, but some
6    people aren't those membership-type people or
7    have family commitments or kids or church and,
8    you know, have chosen not to participate in
9    those things.
10   Q.   Did the full-time non-licensed funeral
11   directors participate in community events?
12   A.   Some of them, yes.
13   Q.   Did the pre-need salespeople participate?
14   A.   Yes.
15   Q.   Do all those out still participate in
16   community events?
17   A.   Yes.
18   Q.   Going back to 2002 when you were a
19   co-manager --
20   A.   Yeah.
21   Q.   -- did you ever communicate to employees
22   that they were to record their time for events
23   in the community?
24   A.   Often.
25   Q.   And when did you do that?

3649f917-b4c4-4a1c-b20b-271c40754eca

NETWORK DEPOSITION SERVICES
Transcript of Monica Berryhill

Page 114

1    A.   At staff meetings:  We've got this
2    activity coming up, you know.  Remember, you're
3    compensated for doing community work, so if
4    it's something you want to participate in, make
5    sure you get your hours written down and you
6    are not required to do it, you are not going to
7    be thought of any differently, but it's good
8    for the business, it's good for us retaining
9    our jobs and certainly famiies which we love.
10   Q.   How did you know that that was time that
11   employees were supposed to be paid for?
12   A.   Because any work that's performed on
13   behalf of the funeral home they need to be paid
14   for.
15   Q.   I know that I've seen before a page in the
16   Alderwoods -- one of those employment policy
17   binders we talked about that says:  All hours
18   worked will be paid?
19   A.   Correct.
20                MR. MEACHAM:  Objection.
21   BY MS. GIFFORD:
22   Q.   Have you seen that?  Have you seen an
23   Alderwoods policy that says to the effect that
24   all hours worked will be paid?
25   A.   To the effect, yes.  That exact wording, I

3649f917-b4c4-4a1c-b20b-271c40754eca

NETWORK DEPOSITION SERVICES
Transcript of Monica Berryhill

Page 148

1           quite understand what the question
2           is.  All employees -- it was the
3           expectation of the company that any
4           employee putting forth the time --
5   BY MS. GIFFORD:
6       Q.   Just to save us time --
7       A.   I don't want to be argumentative.
8       Q.   I'm not asking about understanding their
9   expectations.  I'm asking about what was
10  written in a document.
11      A.   Okay.
12      Q.   Do you know of any document, written
13  document that states that?
14      A.   No.
15                  MR. MEACHAM:  Objection;
16          vague.  What does "states that" mean?
17  BY MS. GIFFORD:
18      Q.   Of any written document that states that
19  employees will be paid for community time spent
20  in community activities?
21      A.   No.  Can I follow that up by saying?
22                  MR. MEACHAM:  You may.
23                  THE WITNESS:  I do know there
24          are documents that say any time spent
25          by an employee engaged in work on

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

3649f917-b4c4-4a1c-b20b-271c40754eca

NETWORK DEPOSITION SERVICES
Transcript of Monica Berryhill

Page 149

1           behalf of the company will be
2           compensated for that time.
3    BY MS. GIFFORD:
4        Q.   All right.  Thank you.
5                    (WHEREUPON, Exhibit No. 8 was
6           marked for identification.)
7    BY MS. GIFFORD:
8        Q.   And directing you to what's been marked as
9        Exhibit 8, do you recognize that document?
10       A.   Vaguely.
11       Q.   Okay.  Is that document part of the same
12       training program we've been discussing?
13       A.   I don't believe so, no.
14       Q.   Okay.  What does this document relate to?
15       A.   I believe this was a similar program that
16       would have come out between the period of 2002
17       and 2004.  And I can say that for certain.
18       Q.   Okay.  And how do you know that?
19       A.   Because as a location manager it was
20       presented to me and I was responsible for using
21       the leadership network contact to report.
22       Q.   And this I think it was in your first
23       stint as location manager at the Bell and Jarvi
24       Dowd locations?
25       A.   That is correct.

3649f917-b4c4-4a1c-b20b-271c40754eca

NETWORK DEPOSITION SERVICES
Transcript of Monica Berryhill

Page 240

1   STATE OF MINNESOTA)
                     )
2   COUNTY OF ANOKA   )

3

4           I, KIMBERLY A. MCCALLUM, hereby certify that
    I reported the deposition of Monica Berryhill on the
    7th day of April, 2010, in Duluth, Minnesota and that
5   the witness was by me first duly sworn to tell the
    truth, the whole truth and nothing but the truth
6   concerning the matter in controversy aforesaid;

7           That I was then and there a Notary Public in
    and for the County of Anoka, State of Minnesota;

8

9           That by virtue thereof I was duly authorized
    to administer an oath;

10          That the foregoing transcript is a true and
    correct transcript of my stenographic notes in said
11  matter, transcribed under my direction and control;

12          That the cost of the original has been
    charged to the party who noticed the deposition, and
13  that all parties who ordered copies have been charged
    at the same rate for such copies;

14

15          That the reading and signing of the
    deposition by said witness was not waived;

16          That I am not related to nor an employee of
    any of the attorneys or parties hereto, nor a
17  relative or employee of any attorney or counsel
    employed by the parties hereto, nor financially
18  interested in the outcome of the action and have no
    contract with the parties, attorneys or persons with
19  an interest in the action that affect or has a
    substantial tendency to affect my impartiality;

20

21          WITNESS MY HAND AND SEAL the 13th day of
    April, 2010.

22

23

24

                        _____
25                      KIMBERLY A. MCCALLUM

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

3649f917-b4c4-4a1c-b20b-271c40754eca

**TAB 4**

NETWORK DEPOSITION SERVICES
Transcript of Jason Alex Burgess

Page 1

THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
Civil Action No. 06-1641

_____
                                 )
DEBORAH PRISE and HEATHER         )
RADY on behalf of themselves      )
and all employees similarly       )
situated,                         )
                                  )
          Plaintiffs,             )
                                  )
vs.                               )
                                  )
ALDERWOODS GROUP, INC., and       )
SERVICE CORPORATION INTERNATIONAL )
                                  )
          Defendant.              )
_____)

DEPOSITION OF JASON ALEX BURGESS

(Taken by Defendants)

Charlotte, North Carolina

Tuesday, August 11, 2009

Reported in Stenotype by
V. Dario Stanziola, CSR, RPR, CRR

ea8d0784-dc62-4143-b5a3-cad356c7c557

NETWORK DEPOSITION SERVICES
Transcript of Jason Alex Burgess

Page 135

1   relating to hours that you worked?

2       A.   Correct.

3       Q.   Okay.  And if we look at this document at

4   the bottom, it says there are 51 total hours --

5       A.   Correct.

6       Q.   -- that you worked in this week?

7       A.   Yes, ma'am.

8       Q.   Okay.  And that would be 40 hours regular

9   and 11 hours overtime.  Is that what the notation

10  says?

11      A.   Yes, ma'am.

12      Q.   Okay.  Right above that, do you see where

13  it says removal?

14      A.   Yes, ma'am.

15      Q.   And there's three hours --

16      A.   Correct.

17      Q.   -- listed there?

18           Okay.  Below that, what is that -- what

19  does that say?

20      A.   It says telephone, one hour.

21      Q.   Okay.  So this is an occasion when you

22  recorded time that you spent on the telephone?

23      A.   Yes, ma'am.

24      Q.   Would this have been -- what kind of

25  situation would this have been where you were

ea8d0784-dc62-4143-b5a3-cad356c7c557

NETWORK DEPOSITION SERVICES
Transcript of Jason Alex Burgess

Page 136

1    recording time spent on the telephone?

2         A.    Where they had -- where the family just

3    kept -- would have kept calling and kept calling

4    with questions about services and about insurance

5    and about, you know, wanting to pay with the

6    insurance, life insurance policy.  Or it may have

7    been a situation where they wanted to call and

8    decided they wanted to set an appointment and then

9    call back and said we want to change it or may have

10   been a situation where they called back and just

11   had questions about things.

12        Q.    Okay.  Looking at this document, can you --

13   would this hour that you recorded for telephone time,

14   would that have occurred outside of the 8 o'clock to

15   5 o'clock time period that you have -- excuse me, the

16   8 o'clock to 10 o'clock time period that you have

17   recorded here?

18        A.    Yes, ma'am.

19        Q.    Would have been outside of that?

20        A.    Correct.

21        Q.    Okay.

22        A.    Anything that was written on these cards

23   then, happened after those hours.

24        Q.    Anything that was written at the bottom?

25        A.    At the bottom, happened outside of those

ea8d0784-dc62-4143-b5a3-cad356c7c557

NETWORK DEPOSITION SERVICES
Transcript of Jason Alex Burgess

Page 137

1    hours.

2         Q.   Outside of the hours that were recorded?

3         A.   Yes, ma'am.

4         Q.   Okay.  Okay.  So here you recorded an hour

5    for that time?

6         A.   Correct.

7         Q.   And would you agree with me that you were

8    paid for an hour at that time?

9         A.   Yeah, I would agree.

10        Q.   Okay.

11             THE WITNESS:  I'm sorry, yes.

12        Q.   And you were never told at any point that

13   you couldn't record that telephone time?

14        A.   At that point, no, I had not.

15        Q.   Were you ever told that you couldn't record

16   the telephone time?

17        A.   To the best of my knowledge, later on --

18   later on in the years after -- when they started

19   cracking down on overtime, yes, ma'am.

20        Q.   What is it -- what is it that you think you

21   were told?

22        A.   Is that with the -- with the whole time

23   card -- when the time clock came in was when we

24   couldn't record it.  To the best of my knowledge,

25   what I can remember, was the time we couldn't

ea8d0784-dc62-4143-b5a3-cad356c7c557

NETWORK DEPOSITION SERVICES
Transcript of Jason Alex Burgess

1    this is a document that you signed; is that correct?

2        A.   Yes, ma'am.

3        Q.   Okay.  So this is a representation of a

4    time card that -- is this a time card you completed

5    or --

6        A.   Yes, ma'am.

7        Q.   -- time notepad you completed?

8        A.   Yes, ma'am.

9        Q.   Okay.  That's your handwriting, writing in

10   the hours?

11       A.   Yes, ma'am.

12       Q.   Okay.  And it says down at the bottom

13   52 hours total?

14       A.   Correct.

15       Q.   Would this have been a week -- can you tell

16   from looking at this, whether this would have been a

17   week where you were scheduled to work 50 hours?

18       A.   Yeah, I would say yes, ma'am, I would

19   think so.

20       Q.   Do you see under Tuesday?

21       A.   Um-hum.

22       Q.   Is there a reference there to telephone

23   time?

24       A.   One hour, yes, ma'am.

25       Q.   Okay.  And that would be one hour in

ea8d0784-dc62-4143-b5a3-cad356c7c557

NETWORK DEPOSITION SERVICES
Transcript of Jason Alex Burgess

Page 140

1    addition to the time that's recorded here?

2        A.   Correct.

3        Q.   So in addition to the -- to the eight

4    through ten --

5        A.   Um-hum.

6        Q.   -- that you have recorded under Tuesday?

7        A.   Yes, ma'am.

8        Q.   Okay.  Do you have any reason to believe

9    that you were not paid for the hour of telephone time

10   that you recorded here?

11       A.   Um-um.  No, ma'am.

12       Q.   So at this point in time, you're recording

13   telephone time if you had telephone time?

14       A.   Yes, ma'am.

15       Q.   Okay.  And again, that would be telephone

16   time outside your scheduled hours?

17       A.   Correct.

18       Q.   While you were on call, is that why this

19   would come up?

20       A.   Yes, ma'am.

21       Q.   Okay.  So this telephone time is hours --

22   time worked on the telephone while you were on call?

23       A.   Correct.

24       Q.   Okay.  I'll hand you what we'll have marked

25   as Defendant's 5.

NETWORK DEPOSITION SERVICES
Transcript of Jason Alex Burgess

Page 149

1    while on call by?

2        A.   Maurice Trull.

3        Q.   Did anyone ever -- anyone else in

4    Alderwoods management ever instruct you regarding

5    payment for your time worked on call?

6        A.   No, ma'am.

7        Q.   And we saw several examples of a time that

8    you had recorded for time spent on the phone while on

9    call?

10       A.   Correct.

11       Q.   Okay.  So you certainly recorded time spent

12   on the phone while on call --

13       A.   Correct.

14       Q.   -- at certain times during your

15   employment --

16       A.   Yes, ma'am.

17       Q.   -- with Alderwoods.

18            Okay.  Now, is your testimony that there

19   was a time that you stopped recording the time you

20   spent on call -- while you were on the phone while on

21   call?

22       A.   To the best of my knowledge, yes, ma'am.

23       Q.   You think there may have been a time when

24   you stopped doing that?

25       A.   Yes, ma'am.

ea8d0784-dc62-4143-b5a3-cad356c7c557

NETWORK DEPOSITION SERVICES
Transcript of Jason Alex Burgess

Page 165

1      Q.   And you mentioned the Monroe Alive
2  Festivals?
3      A.   Um-hum. Yes, ma'am.
4      Q.   They were held in the summer?
5      A.   Yes, ma'am.
6      Q.   Okay.  Those were held during your
7  employment with Alderwoods?
8      A.   Correct.
9      Q.   Okay.  Does Monroe continue to hold those
10 festivals?
11     A.   To the best of my knowledge, yes, ma'am,
12 they still do.
13     Q.   Okay.  Did you continue to attend the
14 festival after your employment?
15     A.   No, ma'am.
16     Q.   And you said that was held in the summer?
17     A.   Yes, ma'am.
18     Q.   And how often was it held, the festival?
19     A.   I believe it was the first and third
20 Friday of every month.
21     Q.   Were you ever told that you had to report
22 to Alderwoods's management regarding your
23 participation in community activities?
24     A.   No, ma'am.
25     Q.   Did you receive performance reviews while

ea8d0784-dc62-4143-b5a3-cad356c7c557

NETWORK DEPOSITION SERVICES
Transcript of Jason Alex Burgess

1   you were an employee of Alderwoods, like an annual

2   performance review?

3       A.   I think so.  But I'm not sure.  I'm not a

4   hundred percent sure on that.  I think so.

5       Q.   And whatever recollection you may have of

6   those performance reviews, was your involvement in

7   community service addressed?

8       A.   Oh, yes, ma'am.  Any time -- any time you

9   sit down and talked to anybody about it, if

10  community service could be brought up, he always --

11  Maurice always would bring up community service

12  involvement.

13      Q.   And he would bring it up, what do you mean?

14  What would be said?

15      A.   Like even at staff meetings, you know, he

16  -- Maurice would always say let's remember, you

17  know, to do our community involvement.  Let's

18  remember to be, you know, good moral citizens in

19  the community and make sure the community knows

20  we're here and that we're still the same -- you

21  know, same funeral home, even though we're owned by

22  a corporate conglomerate.  That we're all local

23  directors and that we're not people who's brought

24  in from other places.

25      Q.   Did you ever fill out any type of paperwork

ea8d0784-dc62-4143-b5a3-cad356c7c557

NETWORK DEPOSITION SERVICES
Transcript of Jason Alex Burgess

1    to indicate what you had done in the community?

2         A.   No, ma'am.

3         Q.   Were you ever aware of anyone being

4    disciplined for their lack of involvement in the

5    community?

6         A.   No, ma'am.  That I do not know.

7         Q.   Your testimony is that Mr. Trull told you

8    to pick from one of several options for a community

9    organization?

10        A.   Yes, ma'am.

11        Q.   Okay.  And with respect to joining a

12   church, could you -- I just want to understand your

13   testimony.  It was your choice as to which church you

14   wanted to belong to?

15        A.   Yes, ma'am.  Because he wanted us to pick

16   a -- as he considered a fairly influential church

17   in the community.

18        Q.   Okay.  So you understood that he was

19   telling you to pick a church?

20        A.   Correct.

21        Q.   Okay.

22        A.   In my county, yes, ma'am.

23        Q.   Did he tell you that there would be any

24   repercussions if you decided not to join a church?

25        A.   No, ma'am.

ea8d0784-dc62-4143-b5a3-cad356c7c557

NETWORK DEPOSITION SERVICES
Transcript of Jason Alex Burgess

1      A.   Yes, ma'am.

2      Q.   Okay.  And when did you first become a

3  member of the North Carolina Funeral Directors

4  Association?

5      A.   It was after April 2000.

6      Q.   And that was in response to?

7           Why did you decide to become a member?

8      A.   Because Maurice told us we needed to

9  become members of it.  That it would look good for

10 us, and that Alderwoods would look good -- it would

11 look good for Alderwoods' employees to be part of a

12 North Carolina organization as such.

13     Q.   Did he tell you it was a requirement of

14 your job?

15     A.   He never came right out and said it was

16 required.  He just said it would -- it would look

17 good.

18     Q.   Did he ever come out and say it was a

19 requirement of your job to join an organization,

20 community organization?

21     A.   No.  But he just said -- again, he

22 just -- Maurice said it would look good if you

23 were.

24     Q.   And did he ever come out and say that it

25 was a requirement for you to join some type of a

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

NETWORK DEPOSITION SERVICES
Transcript of Jason Alex Burgess

Page 187

1    know that there's people that they recognize in the
2    community who work here.
3         Q.   And when you say we would come back and
4    ask, are you meaning, like, you would go back and
5    ask?
6         A.   Myself -- yeah, myself or if sometimes
7    you'd hear Steve gripe about it, about having to
8    go.
9         Q.   About having to go to what?
10        A.   To the Monroe Alive Festival.  Because we
11   really thought it was a waste of time, just to be
12   honest with you.
13        Q.   So your testimony is that you specifically
14   questioned why you should have to be seen at the
15   Monroe festival?
16        A.   Correct.
17        Q.   And their response was?
18        A.   So that the community would be able to
19   put a local face with a local funeral director
20   there, even though we weren't -- we were owned by a
21   conglomerate, they would still know that we had
22   local people working there and they would recognize
23   somebody in the community there.
24        Q.   And how would they recognize you?
25        A.   By seeing us out, knowing our names,

ea8d0784-dc62-4143-b5a3-cad356c7c557

NETWORK DEPOSITION SERVICES
Transcript of Jason Alex Burgess

Page 188

1   seeing us in our attire.  We had our coat and tie,
2   our name tag on.  That's basically it.  Because
3   it's not like I'd walk up to you strangerly (sic)
4   and say, hey, I'm Jason Burgess, I'm a funeral
5   director for McEwen Funeral Home.  I wouldn't do
6   anything like that.  I'd just wear my name tag.
7       Q.   Okay.  So you didn't approach people --
8       A.   No.
9       Q.   -- while you were at the festival?
10      A.   Oh, no, ma'am.  No, ma'am.
11      Q.   And did you approach people when you were
12  at church to talk business?
13      A.   No.  Only person -- only person I
14  introduced myself to and told who I was and where I
15  worked at was my pastor, and that was it.  And his
16  response was, I'm sorry.
17      Q.   And when you attended the Masonic Lodge
18  meetings --
19      A.   Yes, ma'am.
20      Q.   -- were you introducing yourself to people,
21  telling them where you worked?
22      A.   No, ma'am, because they already knew.
23      Q.   Were you discussing business during your
24  Masonic Lodge meetings?
25      A.   Only if somebody had a question about

ea8d0784-dc62-4143-b5a3-cad356c7c557

NETWORK DEPOSITION SERVICES
Transcript of Jason Alex Burgess

Page 189

1    some insurance or about a cemetery property or
2    about -- you know, pre-need questions that, you
3    know, ask about different options like they might
4    have.  They might say, can we come in today, you
5    know, is it true that you can actually lock a price
6    in and it be good down the road?  And I'd say yes,
7    I've heard that.  I could put you in contact with
8    somebody who could handle that for you.  I don't do
9    that, but I can help you with -- help you find
10   somebody who can.
11        Q.   Were those type of conver- -- or type of
12   questions come up at every Masonic Lodge meeting that
13   you had?
14        A.   No, ma'am, no.  Most of the time it was,
15   are you guys busy, you know, or -- you know, if so
16   and so passed away, do you have -- you know, do you
17   have Mr. Jones at your funeral or do you have
18   Mrs. Jones at your funeral home or whatever.
19        Q.   So in this litigation, are you seeking
20   compensation for the time you spent involved in -- in
21   these activities that we discussed?
22        A.   I think so, yes, ma'am.  I think I should
23   be paid for them.  Now, the Sunday morning, Sunday
24   evening service, that's a little grey for me
25   because I feel like, you know, even though they

ea8d0784-dc62-4143-b5a3-cad356c7c557

NETWORK DEPOSITION SERVICES
Transcript of Jason Alex Burgess

Page 209

1      A.   I do not know.

2      Q.   Okay.  You don't know whether other

3  employees were encouraged to belong to community

4  service organizations?

5      A.   I never heard them say specifically, you

6  know, like, for example, Steve, you need to belong

7  to an organization or, Phillip, you need to partake

8  in this situation.

9      Q.   You never heard that?

10     A.   No, ma'am.  Nothing specific like that.

11     Q.   And for those that you'd had some knowledge

12 of individuals who belonged to community

13 organizations?

14     A.   Correct.

15     Q.   Okay.  But do you know specifically why

16 they belonged to those particular organizations?

17     A.   I do not.

18     Q.   And Mr. Trull never formerly -- when I say

19 formerly, there was no systematic way that Mr. Trull

20 followed up with you regarding your involvement in

21 the community?

22          MR. McGEE:  Object to the form.

23     A.   No, he never come right out and asked

24 hey, you know, did you go here or did you go there.

25     Q.   Was there any kind of incentive program, or

ea8d0784-dc62-4143-b5a3-cad356c7c557

NETWORK DEPOSITION SERVICES
Transcript of Jason Alex Burgess

Page 210

1   were you ever offered an incentive for becoming
2   involved with the community organization?
3          A.   No, ma'am.
4          Q.   Have you ever heard of a program called I
5   Believe in Service?
6          A.   No, ma'am.
7          Q.   Do you have any knowledge as to whether
8   employees at other locations were encouraged to
9   belong to community service organizations?
10         A.   I do not know for 100 percent.
11         Q.   Okay.  Do you have any knowledge as to
12  whether employees at other locations, other than
13  McEwen, were encouraged to belong to community
14  service organizations?
15         A.   I know that Ken Poe belonged to the
16  Rotary Club, I know that much.  And Brandon Cook
17  belonged to a Rotary division in Charlotte.  But
18  beyond that, I don't know.  I know that Ken was an
19  avid golfer, so if he played in the tournament, I
20  don't know.  Our paths didn't cross at the time.
21  But I'm sure he did on some level for some time.
22         Q.   You're sure that he did what?
23         A.   He may have played in the tournament.  I
24  don't know for sure.  I mean, like I said, our
25  paths never crossed.  But with him being the avid

ea8d0784-dc62-4143-b5a3-cad356c7c557

```
 1                    CERTIFICATE OF REPORTER

 2    STATE OF NORTH CAROLINA

 3    COUNTY OF MECKLENBURG

 4              I, V. Dario Stanziola, the officer before

 5    whom the foregoing deposition was taken, do hereby

 6    certify that the witness whose testimony appears in

 7    the foregoing deposition was duly sworn by me; that

 8    the testimony of said witness was taken by me to

 9    the best of my ability and thereafter reduced to

10    typewriting under my direction; that I am neither

11    counsel for, related to, nor employed by any of the

12    parties to the action in which this deposition was

13    taken, and further that I am not a relative or

14    employee of any attorney or counsel employed by the

15    parties thereto, nor financially or otherwise

16    interested in the outcome of the action.

17

18

19                    V. DARIO STANZIOLA

20                    Shorthand Reporter

21                    Notary Public in and for

22                    County of Mecklenburg

23                    State of North Carolina

24

25
```

**TAB 5**

NETWORK DEPOSITION SERVICES
Transcript of Clark Burkle

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA


DEBORAH PRISE AND HEATHER RADY )
on behalf of themselves and    )
all employees similarly        )
situated,                      )
                               )
            Plaintiffs,        )   Civil Action
                               )   No. 06-1641
    vs                         )
                               )
ALDERWOODS GROUP, INC.         )
                               )
            Defendant.         )


        The discovery deposition of CLARK F. BURKLE,

called by the Defendant, for examination, pursuant to

notice, taken before Cheryl McDowell, CSR-2662, RPR, a

notary public within and for the County of Livingston and

State of Michigan, at the Quality Inn, 3121 East Grand

River Avenue, in the City of Lansing, Michigan, on the

25th day of September, A.D., 2009, commencing at 9:30 a.m.

9f109b84-da23-428f-b67b-0511a7502073

NETWORK DEPOSITION SERVICES
Transcript of Clark Burkle

Page 56

1           Alderwoods location schedules on-call work?

2    A.     No, I don't.

3    Q.     And the other location managers you spoke of at

4           Gorsline who are scheduled to work on call, they

5           were also salaried location managers?

6    A.     As far as I know.

7    Q.     But prior to you becoming a salaried location

8           manager, your testimony is that you don't -- you

9           have no understanding or knowledge as to who was

10          scheduled to be on call --

11   A.     That's correct.

12   Q.     -- or how it was scheduled?

13   A.     Yes.

14   Q.     Okay.  So at that time while you were a part-time

15          employee, you wouldn't have any idea as to how

16          individuals scheduled to work on call would have

17          recorded their time?

18   A.     I have no idea.

19   Q.     Okay.  Or how they were compensated for that work?

20   A.     That's correct, I don't know.

21   Q.     In your time working for Gorsline Funeral Home, have

22          you ever seen a written policy addressing how

23          employees would be compensated for on-call work?

24   A.     No, I haven't.

25   Q.     Did you ever hear a manager instruct anyone as to

9f109b84-da23-428f-b67b-0511a7502073

```
1    STATE OF MICHIGAN      )
                            ) SS.
2    COUNTY OF LIVINGSTON )

3               CERTIFICATE OF NOTARY PUBLIC

4                         I certify that this transcript

5    is a complete, true, and correct record of the

6    testimony of the deponent to the best of my ability

7    taken on Friday, September 25, 2009.

8                         I also certify that prior to

9    taking this deposition, the witness was duly sworn

10   by me to tell the truth.

11                        I also certify that I am not a

12   relative or employee of a party, or a relative or

13   employee of attorney for a party, have a contract

14   with a party, or am financially interested in the

15   action.

16

17

18

19

20   Cheryl McDowell

21   _____

22   Cheryl McDowell, CSR-2662, RPR
     Notary Public, Livingston County
     State of Michigan
23   Commission Expires September 13, 2013

24

25
```

**TAB 6**

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA


------------------------------

DEBORAH PRISE and HEATHER RADY )

on behalf of themselves and all)

employees similarly situated,  ) No. 06-1641

             Plaintiffs,  ) VOLUME I

      vs.            )

ALDERWOODS GROUP, INC.,        )

        Defendant.    )

------------------------------


      Deposition of MICHAEL S. BUTLER,

      taken at 4700 Airport Plaza Drive,

      Long Beach, California, commencing

      at 9:28 A.M., Monday, March 9,

      2009, before Cathryn L. Baker, CSR

      No. 7695.


PAGES 1 - 207

Johnstown
814-266-2042

Toll-Free
866-565-1929

Pittsburgh
412-281-7908

NETWORK DEPOSITION SERVICES
Transcript of Michael Butler

Page 76

1    out a fixed fee for that and I didn't ask about it.

2          MR. FORESTIERE:  Could you read my question

3    back to me please.

4                (The record was read by the

5                reporter as follows:

6                    "Question:  What was your

7                understanding as to how you'd be

8                compensated performing your on-call

9                responsibilities?")

10   BY MR. FORESTIERE:

11       Q.   Did you have any discussions about

12   performing community service with Ms. Chung at the

13   second meeting?

14       A.   Not until about my last year there.

15       Q.   But at the second meeting you didn't have a

16   discussion about community service; is that correct?

17       A.   No.

18       Q.   But you mentioned your last year there you

19   had a discussion with her about that subject?

20       A.   Could you repeat that question.

21       Q.   You said you recall a conversation you had

22   with Ms. Chung during your last year working at

23   Melrose about community service?

24       A.   Yes.

25       Q.   Do you recall when that was?

1    service?

2        A.   Well, Chung came to me in my office with the

3    other employees present and, in essence, described

4    that it is the wish of the company that its

5    employees who are funeral directors, in my job

6    classification, be active in the community to a

7    degree so that we can get our name and our face out

8    there in the community.  Help build up business in

9    the community.  That was the crux of her

10   conversation.

11       Q.   What was your response to her statements?

12       A.   I agreed.

13       Q.   Anything else discussed on community

14   service?

15       A.   She did make it clear that it was a

16   condition of continued employment, as far as the

17   company was concerned.

18       Q.   How did she make that clear?

19       A.   Orally.

20       Q.   What did she say?

21       A.   Just what I told you.

22       Q.   She said, "Unless you do it, you're going to

23   get fired"?

24       A.   No, I didn't say that.

25       Q.   Tell me what she said.

NETWORK DEPOSITION SERVICES
Transcript of Michael Butler

Page 79

1    A.   I said it was a condition of continued
2   employment, is how it was put to me by Ms. Ngo.
3    Q.   She used those terms, that performing
4   community service was a condition of continued
5   employment?
6    A.   Yes.
7    Q.   What was your response to that?
8    A.   I agreed.  And she told me that I could
9   choose whatever extra curricular program that I
10  wanted to join, and that she would pay for that.
11  The company would pay for that.
12   Q.   What do you mean the company would pay for
13  that?
14   A.   Well, I chose, for instance, the Sunrise
15  Rotary.  The rotary club has dues, she asked me for
16  an expense report for paying those dues on my own,
17  which was 100, $200, then usual regular donations on
18  a regular basis while I was attending on behalf of
19  the funeral.  And I would pay those things and put
20  them on an expense report wherein I was reimbursed.
21   Q.   Anything else you and Ms. Chung discussed
22  concerning the performance of community service?
23   A.   Oh, to let her know what I chose and what
24  hours I would need to be away.  And I reported those
25  back to her.

Johnstown
814-266-2042

Toll-Free
866-565-1929

Pittsburgh
412-281-7908

8a8920f5-8aef-431a-a20e-1f9585d8a7c3

NETWORK DEPOSITION SERVICES
Transcript of Michael Butler

Page 100

1   you would go back to the funeral home for as part of

2   your on-call work when the alarm went off?

3           THE WITNESS:  Yes.  There was additional

4   on-call work that would involve the alarm system

5   that would act up, and that would be one or two

6   times a month that would require about two hours of

7   my time.  I would have to meet the police at the

8   location, unlock the fence, unlock the building.  Go

9   around with the cops, check the prep room with the

10  bodies.  Secure it once again.  Set the alarm.

11  Verify the alarm was set.  And then leave and go

12  home and get back in bed.  So that scenario came up

13  probably twice a month with the alarm system.

14  BY MR. FORESTIERE:

15      Q.   Going back to the on-call basis, the number

16  of hours.  You said 20 to 25 calls per month and

17  that generated how many hours p month?

18      A.   The calls, on average, would go between 15

19  minutes to an hour and a half, depending on the

20  call.

21      Q.   If we take the average of that, would that

22  be fair?

23      A.   I would say the average of that would be

24  fine.

25      Q.   And then you'd multiple that by 20, 25 calls

8a8920f5-8aef-431a-a20e-1f9585d8a7c3

NETWORK DEPOSITION SERVICES
Transcript of Michael Butler

Page 109

1   BY MR. FORESTIERE:

2       Q.    Anything other than the $25 gift card?

3       A.    Not that I recall.

4       Q.    Did you receive any compensation based on

5   commissions?

6       A.    No.

7       Q.    Did you receive any compensation -- I'm

8   talking about the entire time that you worked at

9   Melrose.  Let's keep that period in mind.  During

10  the entire time that you worked at Melrose, did you

11  receive any commission?

12      A.    No.

13      Q.    During the entire time that you worked at

14  Melrose, did you receive any flat rate or piecemeal

15  payments for any work that you performed?

16      A.    Not that I recall.

17      Q.    Other than the hourly rate that you were to

18  be paid, did you receive any other compensation?

19      A.    On occasion, as discussed with Ms. Ngo, I

20  would receive compensation in the form of overtime

21  that could be added to my pay as a result of the

22  alarm, for instance, or staying late with a family

23  in the mortuary after 5:00 o'clock on limited

24  occasions.

25      Q.    But that would be an hourly compensation or

8a8920f5-8aef-431a-a20e-1f9585d8a7c3

NETWORK DEPOSITION SERVICES
Transcript of Michael Butler

Page 147

1    this document?

2        A.   Probably the first time that I signed the

3    document I did.  I didn't read it every time.

4        Q.   It didn't change, though, from document to

5    document, though, has it?

6        A.   Not that I'm aware of.

7        Q.   Is that a true statement at the time that

8    you signed this document?

9            MS. GIFFORD:  Objection.

10           THE WITNESS:  I don't know that that's what

11   the statement was on the pay slips.  Well, I guess

12   with my signature there.  That's what it says.

13   BY MR. FORESTIERE:

14       Q.   It also says, quote, "I declare under

15   penalty of perjury that all of the information that

16   I have provided on this timecard is true and

17   complete, and I did not work any unauthorized

18   overtime and I have taken all of my rest period and

19   meal period breaks."  Do you see that?

20       A.   Yes.

21       Q.   And that was on this document when you

22   signed it, wasn't it?

23       A.   Yes.

24       Q.   Can you describe for me how it was you

25   recorded the time that you performed work while at

8a8920f5-8aef-431a-a20e-1f9585d8a7c3

NETWORK DEPOSITION SERVICES
Transcript of Michael Butler

Page 187

1     A.   I read it as -- or applied it and checked it
2  because I received additional compensation other
3  than any other forms of payment.  And I remember a
4  gift card that my manager gave me from the company.
5  I don't know if it came out of her purse or if she
6  used company funds to purchase it, but it was small
7  little gifts of that nature that I received as
8  additional compensation for work that I had
9  performed, I guess, in a satisfactory manner.
10    Q.   Did you understand E to mean that you wanted
11  money paid from the defendants for work you
12  performed that you were not paid for?
13         MS. GIFFORD:  Objection.
14         THE WITNESS:  That's not how I read it.
15  BY MR. FORESTIERE:
16    Q.   You read it as something you received, in
17  fact that you were paid, other than hourly
18  compensation?
19    A.   Yes.  That's how I understood it.
20    Q.   Like a gift card?
21    A.   Yes, sir.  That's how I understood it.
22    Q.   Regarding the on-call work that you
23  performed while working at Melrose, did you have any
24  restrictions as to what you could do while you were,
25  quote, "on call," end quote?

8a8920f5-8aef-431a-a20e-1f9585d8a7c3

NETWORK DEPOSITION SERVICES
Transcript of Michael Butler

Page 189

1    Q.   Were you aware of any written company
2   policies that stated that you would not be
3   compensated for community service work?
4        MS. GIFFORD:  Objection.
5        THE WITNESS:  No.
6   BY MR. FORESTIERE:
7    Q.   Did anybody ever tell you not to submit time
8   for performing on-call services?
9    A.   Mrs. Ngo told me that.
10   Q.   Have we already covered those situations
11  where that occurred?
12   A.   Yes.
13   Q.   Did anybody ever tell you not to record time
14  for community service work you performed?
15   A.   No.
16   Q.   Did you ever attempt to submit time for
17  community service work that was refused or not
18  approved?
19   A.   Yes.
20   Q.   When did that occur?
21   A.   I don't recall.
22   Q.   How many times did it occur?
23   A.   I would say it occurred the majority of the
24  time that I was involved with the Sunrise Rotary
25  Club in the mornings.

```
 1    STATE OF CALIFORNIA   ) ss:

 2    COUNTY OF LOS ANGELES )

 3

 4         I, CATHRYN L. BAKER, C.S.R. No. 7695, do

 5    hereby certify:

 6         That the foregoing deposition of MICHAEL

 7    S. BUTLER was taken before me at the time and place

 8    therein set forth, at which time the witness was

 9    placed under oath by me;

10         That the testimony of the witness and all

11    objections made at the time of the examination were

12    recorded stenographically by me, were thereafter

13    transcribed under my direction and supervision and

14    that the foregoing is a true record of same.

15         I further certify that I am neither

16    counsel for nor related to any party in said action,

17    nor in any way interested in the outcome thereof.

18         IN WITNESS WHEREOF, I have subscribed my

19    name this  23  day of  March          ,

20    2009.

21

22

23    _____

24         Cathryn L. Baker, C.S.R. No. 7695

25
```

**TAB 7**

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF PENNSYLVANIA

Civil Action No. 06-1641
Judge Joy Flowers Conti

DEBORAH PRISE and HEATHER RADY
on behalf of themselves and all
employees similarly situated,

        Plaintiffs,

vs.

ALDERWOODS GROUP, INC.,

        Defendant.

------------------------------

2525 Glades Road
Boca Raton, Florida
December 10, 2008
9:55 a.m. – 7:20 p.m.

DEPOSITION OF SHANE M. CARSWELL

Taken before Mark Rabinowitz, Registered Professional
Reporter and Notary Public for the State of Florida at
Large, pursuant to Notice of Taking Deposition filed in
the above cause.

Johnstown
814-266-2042

Toll-Free
866-565-1929

Pittsburgh
412-281-7908

809ad07d-c731-4311-a7be-9c994e8b8373

NETWORK DEPOSITION SERVICES
Transcript of Shane Carswell

Page 115

1    A    No, no one did.

2    Q    But I'm asking you if you did?

3    A    No.

4    Q    Why not?

5    A    Because it would probably end up more hours

6    than I ended up working during the week.

7    Q    What do you mean?

8    A    I worked 40, 50 hours during the week, and then

9    I'm doing this weekends and nights.  I mean, we are

10   talking about if I reported all of that, you might as

11   well write two paychecks for me.  You spend a lot of time

12   with these people.

13   Q    So is the answer:  No, you didn't report the

14   time that you spent engaged in this type of overtime

15   activity?

16   A    No.

17   Q    And the reason you didn't report it is what?

18   A    Because it was just something that you were

19   supposed to do.  It's not something that you are supposed

20   to be quote, unquote, compensated for.  You are supposed

21   to do it for the good of the company.

22   Q    Other than your understanding that you weren't

23   supposed to report the time that you spent performing

24   this type of overtime work, is there any other reason

25   that you didn't report that time?

NETWORK DEPOSITION SERVICES
Transcript of Shane Carswell

Page 118

1   advertising/noncommunity service work, you said that
2   you would do it every couple of weeks?
3       A       Roughly.
4       Q       Did you report any of the time you spent
5   engaged in this activity?
6       A       Reporting it written down?
7       Q       Did you report it on your timecards?
8       A       No.
9       Q       Why not?
10      A       Because, you know, honestly because they just
11  told you to do it.  Again, these are the things that you
12  were supposed to do.  It's community services.  You are
13  meeting with these people.
14      Q       But I thought you said it wasn't community
15  service?
16      A       Again, it's not community service when you are
17  taking out one member, one person from a church.  That's
18  not community service; to me it's not; they might say
19  it is.
20      Q       This activity of taking out clergy that you
21  characterized as advertising-type of work --
22      A       Uh-hum.
23      Q       -- you testified that you did not report the
24  time you spent engaged in that activity, correct?
25      A       Correct.

809ad07d-c731-4311-a7be-9c994e8b8373

NETWORK DEPOSITION SERVICES
Transcript of Shane Carswell

Page 119

1      Q      What I'm asking you is:  Why did you not
2    report it?
3      A      That's a good question.  Honestly, I can't tell
4    you why I didn't report it.
5      Q      Were you not compensated for that time because
6    it was not reported?
7      A      I wasn't compensated for it because of that --
8    because I didn't report it, as far as written down.
9      Q      Let's talk about the other activity that you
10   mentioned, the Gay Pride Parade.  What type of activity
11   was involved in that, what type of activity did you do
12   for the Gay Pride Parade?
13     A      The same thing, preparation, being there,
14   handing out information, advertising, promotions.
15     Q      During what period of time between December of
16   2003 and May of 2006 were you involved in the Gay Pride
17   Parade activity?
18     A      That would have been 2006 and 2005, both years,
19   I believe, in June.  I'm just trying to remember what the
20   parade is.  It was really fun because -- it was before my
21   back surgery.  So it was May.
22     Q      So May of 2005?
23     A      Yes.
24     Q      Again, in May of 2006?
25     A      Yes.

809ad07d-c731-4311-a7be-9c994e8b8373

NETWORK DEPOSITION SERVICES
Transcript of Shane Carswell

Page 121

1    Q     Was the Gay Pride Parade an organization in
2  and of itself?
3    A     It's the Stone Wall Festival.
4    Q     Was there any formal process of joining the
5  Stone Wall Festival?
6    A     You had to submit an application.  It's been
7  quite a few years since I have done this, so I don't
8  remember exactly how the procedure was.  I set up a booth
9  out there and everything on the first one.  I don't
10 recall exactly what all was involved.  It's been a few
11 years now since I have done it.
12   Q     Why did you become involved in the Gay Pride
13 Parade?
14   A     I'm gay.
15   Q     So you had personal reasons for joining the
16 parade?
17   A     Also, at that time I was the gay funeral
18 director/embalmer in Wilton Manors and people were
19 beginning to know that.  That's part of the advertising.
20 It's part of what people wanted.  Wilton Manors is a very
21 gay town.  They were tired of going to a funeral director
22 that didn't appreciate them and didn't know what their
23 needs were.
24        So me being that person, that was perfect
25 advertisement.  That was perfect for me to get involved

809ad07d-c731-4311-a7be-9c994e8b8373

NETWORK DEPOSITION SERVICES
Transcript of Shane Carswell

Page 122

1    in and to promote that funeral home.

2        Q    Did you consider any aspect of your

3    involvement in the Gay Pride Parade personal or social?

4        A    I'm sure some.  But, I mean, my main reason was

5    because I wanted to make that funeral home a success.  I

6    mean, to be quite honest, watching the parade is pretty

7    boring.

8        Q    There were personal social aspects of your

9    involvement, but you are also saying it was maybe for

10   advertisement?

11       A    Yes, for me to be able to promote that funeral

12   home.  I was given something that, you know, I thought I

13   could do something really good with.

14       Q    Did you consider any aspect of the activities

15   that you performed related to the Gay Pride Parade

16   involved doing work for Alderwoods?

17       A    Oh, yeah.

18       Q    What aspects of it?

19       A    The preparation, doing those things, getting

20   things set up, the research, again, being there.  In late

21   May/early June in Florida is pretty hot and pretty

22   miserable.  Being out there handing out literature,

23   talking to people, introducing myself -- as we call it,

24   as we say in South Florida, shaking hands and kissing

25   babies.  That's what I was doing.  I was there working.

1    I wasn't really there to have a great time.  I was make
2    sure the people knew who I was.
3         Q    So of the 12 to 15 hours a week for those few
4    months related to the Gay Pride Parade, how much of that
5    time do you believe was for doing work for Alderwoods?
6         A    All of that time was.  That was preparation for
7    that.
8         Q    Did any Alderwoods manager instruct you to get
9    involved in the Gay Pride Parade?
10        A    No.
11        Q    Here you ever evaluated at Alderwoods based
12   on your participation in the Gay Pride Parade activity?
13        A    No.
14        Q    Did every employee at your Alderwoods location
15   participate in the Gay Pride Parade activities?
16        A    Let's see.  I would say probably half a dozen
17   people.
18        Q    And this is from the ABC Jennings location or
19   from --
20        A    From all, all of the Kraeer locations, but they
21   were there, again, on my behalf of ABC Jennings to
22   promote that.
23        Q    Did you ask these individuals to participate?
24        A    Actually, they were just there.  So I
25   volunteered them.  I gave them beads and told them to

Page 124

1    hand them out.

2           Q     They were just there on their own accord?

3           A     For the most part, yeah.  There were a couple

4    there that were there because of me, though.  Bill

5    Santmyer was there, was one.

6           Q     When you say it was because of you, was it

7    because you told him to be there?

8           A     I asked him if he wanted to go, and he said

9    yes.

10          Q     Did your request that he participate with that

11   -- did you consider that part of the work that he

12   performed for Alderwoods?

13          A     No, I don't really think so.  I don't think it

14   would have been considered that, even though I'm not sure

15   if it was really on the clock when he was there or not.

16   So I'm not certain.

17          Q     Did you report any of the time that you spent

18   involved in the Gay Pride Parade -- the preparation or

19   the parade itself -- on your Alderwoods timecards or

20   time sheets?

21          A     No.

22          Q     Why not?

23          A     I honestly have no idea why I didn't.  I don't

24   know.

25          Q     Were you compensated for any of the time that

809ad07d-c731-4311-a7be-9c994e8b8373

NETWORK DEPOSITION SERVICES
Transcript of Shane Carswell

Page 125

1    you spent in the Gay Pride Parade activities by
2    Alderwoods?
3        A    No.
4        Q    Were you not compensated for that time because
5    you didn't report it?
6        A    That I'm not certain of.  I'm really not
7    certain on that.
8        Q    If you had reported the time that you spent
9    involved in the Gay Pride Parade on your timecards for
10   Alderwoods, you don't know why you would have been
11   compensated for not?
12       A    I'm not certain if I would have.  I'm not sure.
13       Q    Were there any costs associated with your
14   involvement in the Gay Pride Parade?
15       A    There were costs for the beads and things like
16   that that I purchased.
17       Q    Who paid for them?
18       A    I initially paid for them, and then I was
19   reimbursed.
20       Q    By who?
21       A    By my manager, Jeff.
22       Q    So Alderwoods, through Jeff, reimbursed you
23   for the costs associated with the Gay Pride Parade
24   activities?
25       A    Yes.

809ad07d-c731-4311-a7be-9c994e8b8373

NETWORK DEPOSITION SERVICES
Transcript of Shane Carswell

Page 127

1       A       They were all required to do it.  So my
2   encouragement was:  Here, go out and let's go do
3   something.  Take some money and go do something.
4       Q       You are saying you encouraged them to do it,
5   I believe you said on the clock?
6       A       Uh-hum.
7       Q       What do you mean by that?
8       A       If we were not busy with funerals or something,
9   you know, I will encourage them to do it while they were
10  working.
11      Q       So during your regularly-scheduled hours --
12      A       Right.
13      Q       -- you would encourage them to do it?
14      A       Yes.
15      Q       Did you encourage them to do it after their
16  regularly-scheduled hours?
17      A       Actually, no.
18      Q       Why not?
19      A       Because I didn't like doing it much on my time
20  off.
21      Q       Did the employees that were under your
22  supervision during the time that you were a location
23  manager actually participate in community service
24  activities?
25      A       Bill did some.  I can't remember the

809ad07d-c731-4311-a7be-9c994e8b8373

NETWORK DEPOSITION SERVICES
Transcript of Shane Carswell

Page 128

1   organizations that he did it with, and Edy was very

2   active in her church.

3       Q      I'm sorry.  Who was?

4       A      Edy.  She was my secretary.

5       Q      What is her last name?

6       A      Sands, S-A-N-D-S.

7       Q      You don't remember what activities Bill

8   Santmyer was involved in?

9       A      I really can't recall.  There were a couple of

10  small little things that I know he was doing, but I can't

11  recall what they were.

12      Q      What was the name of the other employee that

13  reported to you?

14      A      That was the weekend secretary.  I can't think

15  of her name.

16      Q      I'm sorry.  I think I asked you that before.

17  I apologize.

18          Did you instruct Mr. Santmyer or Ms. Sands

19  to record the time they spent performing community

20  service work?

21      A      If it was off the clock, they were somewhere

22  else, then I would tell them, you know, make sure and

23  write it down.

24      Q      And did they?

25      A      Typically, they never did anything off the

809ad07d-c731-4311-a7be-9c994e8b8373

NETWORK DEPOSITION SERVICES
Transcript of Shane Carswell

Page 129

1   clock.  So they always did it when they were working.

2       Q     As far as you know, any community service

3   activities that Mr. Santmyer or Ms. Sands engaged in

4   on behalf of Alderwoods, they performed during their

5   regularly-scheduled workday?

6       A     Yes.

7       Q     So would they have been compensated for that

8   time?

9       A     It would have been their regular hours, so yes.

10      Q     Were there any employees that you supervised

11  that did not participate in community service

12  activities?

13      A     Those were the only employees that I

14  supervised.  I haven't had any other employees that I

15  supervised.

16      Q     All of the employees you supervised did

17  participate in community service activities?

18      A     Yes.

19      Q     What would have been the consequence had they

20  not participated in community service activities?

21      A     That would have been up to the general mangers

22  and the operations managers, as far as what would have

23  been said or done.  All I could have done was report that

24  they weren't.

25      Q     Did you evaluate the employees you supervised

Johnstown                Toll-Free              Pittsburgh
814-266-2042           866-565-1929           412-281-7908

809ad07d-c731-4311-a7be-9c994e8b8373

NETWORK DEPOSITION SERVICES
Transcript of Shane Carswell

Page 130

1   based on their participation in any community service

2   activities?

3       A    No.

4       Q    When you were identifying the community

5   service activities that you engaged in, you mentioned

6   volunteer time with different hospitals; is that right?

7       A    Again, with staff, doing things with them, like

8   Holy Cross Hospital is one.  I would volunteer to take

9   out the sisters there, the nuns, spend time with them a

10  little.

11      Q    During what time period between December of

12  2003 and May of 2006 did you engage in that activity?

13      A    It was during the time that I was at ABC

14  Jennings.

15      Q    Was that the only time you participated in

16  that activity?

17      A    Yes.

18      Q    About how much time did you spend engaged in

19  that activity?

20      A    Maybe once a month.

21      Q    About how many hours?

22      A    Just a couple.

23      Q    Just a couple on each occasion?

24      A    Yes.

25      Q    Did you report the time you spent engaged in

809ad07d-c731-4311-a7be-9c994e8b8373

NETWORK DEPOSITION SERVICES
Transcript of Shane Carswell

Page 152

1      Q      Were you not compensated for the time you

2      spent doing work from home because you didn't report it?

3      A      Some of it, probably, yeah.

4      Q      Is there any other overtime work that you

5      performed that you are claiming you were not compensated

6      for --

7           MR. LINGLE:  Objection to form.

8      Q      -- other than taking work home and the

9      community service work?

10     A      Nothing that I could think of right at the

11     moment.

12     Q      Between December of 2003 and May of 2006, were

13     you ever on-call at Alderwoods?

14     A      Yes.

15     Q      When were you on-call?

16     A      When I worked at CPF, at least twice a month.

17     Q      Any other time periods during which you were

18     on-call?

19     A      When I was the manager of Jennings, all the

20     time.

21     Q      I'm sorry.  You said when you were that

22     manager of Jennings?

23     A      All the time.

24     Q      What do you mean?

25     A      When you are a funeral director, you are

809ad07d-c731-4311-a7be-9c994e8b8373

NETWORK DEPOSITION SERVICES
Transcript of Shane Carswell

Page 153

1  responsible.  So if I have a day off and my phone is
2  ringing, I could be called at any time to answer
3  questions, asking me things, asking me where things are,
4  what to do; anything.
5       Q      You were the manager at ABC Jennings for about
6  a year?
7       A      Just over a year, I believe, yeah.
8       Q      Other than the time that you were at CPF, and
9  when you were the location manager in ABC Jennings, were
10 there any other time periods during which you were
11 on-call?
12      A      Not that I recall, no, not for that time
13 period.
14      Q      Not between December of 2003 and May of 2006?
15      A      Yes.  Yeah.
16      Q      During the time you were at CPF, you said you
17 were on-call at least twice a month?
18      A      At least, yeah.
19      Q      What did it mean for the CPF location to be
20 on-call?
21      A      If someone died, you went and pick them up and
22 brought them back, if they needed to be embalmed, you
23 embalmed them; then if they didn't, then you put them in
24 the cooler.
25      Q      So removals and embalmings?

809ad07d-c731-4311-a7be-9c994e8b8373

NETWORK DEPOSITION SERVICES
Transcript of Shane Carswell

Page 154

1     A      Removals and embalmings, yes.

2     Q      Any other type of work that you would perform

3  while on-call?

4     A      Not at night, no.

5     Q      Where would you typically be when you were

6  on-call?

7     A      Home.

8     Q      Was the on-call schedule set up by that -- who

9  set up the on-call schedule?

10     A      It was in CPF.  It was a little different,

11  because it was mainly -- the person that actually did the

12  night calls during the week, the weekends that he was

13  off, people would be put on-call for that.  It was the

14  same schedule as everybody else, but there was a section

15  on it for night coverage.  So it was the shift that he

16  was on.

17     Q      Who set that up?

18     A      I think -- if I remember correctly -- Wayne

19  Jarvis did.

20     Q      During the time that you were at CPF, you

21  might be on-call on a weeknight or on the weekends?

22     A      Typically, it was the weekends, but other times

23  it would be weeknights, too.

24     Q      Were there any restrictions on what you could

25  do while you were on-call?

809ad07d-c731-4311-a7be-9c994e8b8373

NETWORK DEPOSITION SERVICES
Transcript of Shane Carswell

Page 156

1    the funeral home, get the hearse, go pick up the body,

2    get back and do all of that within an hour. You're

3    staying home. It's feasible. It's just not possible to

4    do it if you are not at home.

5            You really have to stay at home. So people

6    would stay at the funeral home.

7        Q    During the time you were on-call, did you stay

8    at your house?

9        A    Yes.

10       Q    How would you be contacted?

11       A    They would call my phone, my house phone.

12       Q    Your house phone?

13       A    Yeah.

14       Q    Were there times that you were on-call that

15   you did not perform any work for Alderwoods?

16       A    Maybe once or twice.

17       Q    Almost all the time that you were on-call, you

18   performed some type of work for Alderwoods --

19       A    Yes.

20       Q    -- either a removal or embalming?

21       A    Yes.

22       Q    Did you report the time that you spent

23   performing work for Alderwoods while you were on-call?

24       A    Yes.

25       Q    Did you report it on your timecard?

NETWORK DEPOSITION SERVICES
Transcript of Shane Carswell

Page 157

1      A      No, it was a different timecard.

2      Q      How did you report the work that you performed

3   while you were on-call?

4      A      You punched in on a timecard, on a separate

5   timecard.  It's actually in here.  There was a copy of

6   one in here (indicating).  It says "all-nighter," and you

7   punch in at 8 o'clock, and you punch out at roughly 7

8   o'clock the next morning.

9      Q      Were you compensated for all of the time that

10   you performed work when you were on-call that you

11   actually reported?

12               MR. LINGLE:  Objection to form.

13      A      That kind of depends.  Yes and no.  Honestly,

14   it really is.  You were paid -- in some occasions you

15   were paid for the hours that you worked.  So if you got

16   the call at 10 o'clock.  Then when you got to the funeral

17   home, you punched in and that was supposedly it.  But,

18   typically, they told you that you are supposed to be paid

19   from the time the phone rings until the time that you get

20   back.  That wasn't always the case.  There were other

21   times when they were paying a flat fee at night, $150,

22   $200, just to do the night work.

23               So it varied.  You were compensated some, but

24   not -- in some ways yes and in some ways no.  In some

25   ways it was not the right amount, in some ways it might

809ad07d-c731-4311-a7be-9c994e8b8373

NETWORK DEPOSITION SERVICES
Transcript of Shane Carswell

Page 158

1   have been.  I'm trying to think of the -- you were
2   compensated some, but not always the right amounts, I
3   guess.
4         Q     On the occasions that you used the timecard to
5   punch in and out for on-call work, were you compensated
6   by Alderwoods for that time?
7               MR. LINGLE:  Objection to form.
8         A     On the all-nighter card, you just punch once in
9   and out.  That was it.  You didn't punch in and out on
10  that.  In the other instances where they had done it
11  before, you would punch in and punch out, but you
12  couldn't punch in before you got into the funeral home.
13              You were not really compensated for the time
14  that you were getting to the funeral home, which --
15        Q     The travel time is what you are talking about?
16        A     Yes, and the travel time back home.  You were
17  not compensated for that.  You were just compensated for
18  the time that you hit the clock.
19        Q     Are you saying on the times you performed
20  work, on-call work for Alderwoods, you were compensated
21  for the time that you reported except for your travel
22  time?
23              MR. LINGLE:  Objection to form.
24        A     The travel time would be one, and then the
25  other one is the all-nighter.  It was a flat fee.  So in

809ad07d-c731-4311-a7be-9c994e8b8373

NETWORK DEPOSITION SERVICES
Transcript of Shane Carswell

Page 159

1   some instances that might not be.  You might not be

2   making the same amount of money where you would if you

3   had done an hourly.  So it just depended on the

4   circumstances, and if so -- sometimes you would and

5   sometimes you wouldn't.  It just depends on the work week

6   and the circumstances.

7        Q      Is there any work that you performed for

8   Alderwoods when you were on-call that you believe you

9   were not compensated for?

10       A      Yes.

11       Q      Okay.  What work was that?

12       A      Night calls, prep work, those things, some

13  nights.  Even with the flat rate, some nights you would

14  get called in, you know, an hour early when you were

15  still just getting paid that flat rate.  You had to go

16  in early.  I mean, there were nights that you didn't get

17  paid for exactly what you were doing.

18       Q      When do you mean by "night calls"?  Is that

19  still the removal --

20       A      Yes.

21       Q      -- and the embalming work?

22       A      Yes.

23       Q      What aspect of that are you saying that you

24  may not have been compensated for?

25            MR. LINGLE:  Objection to form.

NETWORK DEPOSITION SERVICES
Transcript of Shane Carswell

Page 160

1       A       I mean, there, again, there were time frames

2   as far as, you know, coming in and those things.  The pay

3   might not have been if you had worked hourly, some of

4   those nights, too.

5       Q       Are you saying the difference between being

6   paid on a flat-fee basis versus being paid strictly for

7   your hours?  Is that what you are saying?

8       A       Sometimes, yes, if that would have been the

9   case and they switched from one to the other.  So it's

10  kind of, again, you get both sides of it.  It's really

11  strange.

12      Q       Then you also mentioned prep work.  What do

13  you mean by that?

14      A       Embalming.

15      Q       With respect to the embalming, is there any

16  on-call or any work that you actually performed for

17  Alderwoods while you were on-call related to embalming

18  that you believe you were not compensated for?

19      A       There were nights with the embalming that if

20  you got a call that came in late and it ran into the

21  morning, you are there.  You are working straight

22  through, and you are no longer on that time clock their

23  suggestion that you are on.  You know, it runs over into

24  the morning when you are still there working.

25              I mean, you can't clock out.  You are supposed

Johnstown                Toll-Free                Pittsburgh
814-266-2042           866-565-1929             412-281-7908

809ad07d-c731-4311-a7be-9c994e8b8373

NETWORK DEPOSITION SERVICES
Transcript of Shane Carswell

Page 161

1    to clock out for an hour and you can't.  So, again, it's
2    the time that you are there.
3        Q    I'm not understanding that.  What do you mean?
4        A    Say, for instance, you get a call at 5 o'clock
5    in the morning.  You go to the residence, and you pick
6    that person up.  You bring that person in, and you have
7    to embalm it.  You get back by 6:00 or 6:30.  Well, you
8    start embalming, because that was one of the rules.  That
9    you have to embalm that body.  So you are embalming that
10   body.  The day crew comes in at 7:30, and you are still
11   there embalming it.  It takes a couple of hours to embalm
12   a body.
13            Once you are on break -- you are supposed to
14   have a break before you start your day.  You get out and
15   now you are working straight through the day, and it
16   overlaps each other, but you are not compensated in any
17   way for that.  So you don't get your hour break that you
18   are supposed to.  You just work through that, and you
19   don't leave to go home early, either.  You have to work
20   until 5:00.
21       Q    When you are saying that you were not
22   compensated for that, are you saying you were not paid
23   overtime for that, but you were compensated for it as if
24   it was on your regular schedule?
25       A    Basically, the same as taking a lunch break.

809ad07d-c731-4311-a7be-9c994e8b8373

NETWORK DEPOSITION SERVICES
Transcript of Shane Carswell

Page 162

1   You were supposed to take it, but you couldn't.  So they
2   take it out and you do it anyway.
3        Q     Did you report the time, all of the time, you
4   spent embalming in those instances?
5        A     It's all in the forms that they have in each
6   person's file, each deceased person.  It's in their file
7   when the embalming started and when it finished.  It
8   tells when a person was picked up, the time of death and
9   everything.  So all of that is recorded in those files.
10       Q     Was it also reflected on your timecards?
11       A     If you punched in, whenever you punched in in
12  the morning, it would just run over into it.  You just
13  wrote it down.  Say you punched in that you were in the
14  prep from 9:30 in the morning.  You put it in.  I was
15  here from 7 o'clock this morning.  Then when that shift
16  ended.  I was still there.  So, yeah, you put that on
17  there.
18       Q     I guess what I'm not understanding is:  What
19  part of that time do you believe that you were not
20  compensated for?
21       A     The time between, say, from 7:00 to 8 o'clock
22  you were supposed to actually be on a break.  You were
23  supposed to take your hour break in the morning.  You
24  come in later than everybody else.  You are supposed to
25  take that hour break.  If you are there embalming a body,

809ad07d-c731-4311-a7be-9c994e8b8373

NETWORK DEPOSITION SERVICES
Transcript of Shane Carswell

Page 163

1  you just can't stop in the middle of it.  You have to

2  continue with it and finish that out and then you go.

3  Then at that time it's 8:30, 9 o'clock in the morning.

4  You have to finish up.  So you start your day there

5  because you are busy.

6      Q    Were you on the clock throughout that whole

7  time period from 7:00 to 8:30?

8      A    Yes, but you are also supposed to take off that

9  hour break.  So they will take it out whether or not you

10 do it.  Some nights they did and some nights they don't.

11 So you would have -- just like the lunch breaks.  You

12 would have that half-hour that you would have to write

13 down that you took off, whether you take it or not.

14      Again, this is one of those instances where I

15 have that hour that I'm supposed to take off and I can't.

16      Q    You are saying that there were occasions you

17 worked through a break?

18      A    Yes.

19      Q    It's those occasions that you worked through

20 a break that you are saying you believe you were not

21 compensated for?

22      A    Correct.

23      Q    Any other aspects of the on-call work that you

24 believe that you were not compensated for, other than

25 working through a break on those types of occasions?

809ad07d-c731-4311-a7be-9c994e8b8373

NETWORK DEPOSITION SERVICES
Transcript of Shane Carswell

Page 164

1      A     Not that I can think of right at the moment.

2      Q     During the time you were on-call at the CPF,

3  you said the type of work that you performed was either

4  a removal or embalming; is that right?

5      A     Both, yeah.

6      Q     Any other types of work that you performed

7  when you were on-call?

8      A     No.

9      Q     Of the on-call work that you performed during

10 the time you were at the CPF, is there any on-call work

11 that you performed for which you did not report the

12 time?

13     A     I don't recall if I did or not.  I don't know

14 if I did or not.  I'm not sure.

15     Q     You don't know if there was any time that you

16 spent performing work for Alderwoods that you did not

17 report?

18     A     I don't think so, but I'm not a hundred percent

19 certain.

20     Q     Moving to the time that you were the location

21 manager at Jennings, what did it mean to be on-call,

22 then?

23     A     If anybody needs anything, if anybody has any

24 questions, you are the person that they call.  You are

25 in charge of that building.  So, I mean, the day after

809ad07d-c731-4311-a7be-9c994e8b8373

NETWORK DEPOSITION SERVICES
Transcript of Shane Carswell

Page 175

1      A      No, I don't think so.

2      Q      Are you aware of any company-wide Alderwoods

3  policy of not compensating employees for work that they

4  performed while on-call?

5           MR. LINGLE:  Objection to form.

6      A      I don't know if I am or not.  As far as like

7  written or verbal or what?

8      Q      Just any knowledge that you have of any

9  company-wide policy that employees would not be

10 compensated for actually performing work while on-call.

11     A      Not that I'm aware of, no.

12          (Defendant's Exhibit 17 was marked for

13 identification).

14     Q      I'm handing you what I have marked as Exhibit

15 17.  Is Exhibit 17 a copy of a sworn affirmation that

16 you submitted in this case?

17     A      Yes.

18     Q      Is that your signature on the affirmation?

19     A      Yes.

20     Q      What's the date on that affirmation?

21     A      Actually, I can't see it.

22     Q      Do you recall the date that you signed the

23 affirmation?

24     A      It was in April of 2000-something.

25     Q      No, you can't recall?

809ad07d-c731-4311-a7be-9c994e8b8373

NETWORK DEPOSITION SERVICES
Transcript of Shane Carswell

Page 220

1      Q      Those were done by Alderwoods?

2      A      Yes.

3             MR. LINGLE:  I don't think I have any further

4      questions at this time.

5             MS. MORGAN:  I have some more questions.

6                       REDIRECT EXAMINATION

7      BY MS. MORGAN:

8      Q      Mr. Carswell, you were testifying about how

9      you did not report the community -- the hours you spent

10     doing community service during the time that you were at

11     Alderwoods, correct?

12     A      Correct.

13     Q      I believe you testified that you didn't record

14     that time because you didn't think you would get paid

15     for it, correct?

16     A      Correct.

17     Q      Did any Alderwoods manager ever instruct you

18     not to record the time that you spent performing

19     community work?

20     A      I don't believe so.

21     Q      Did any Alderwoods manager ever instruct you

22     that you would not be compensated for any time that you

23     spent performing community service work?

24     A      I don't recall.  I don't believe so.

25     Q      You testified that it was your understanding

809ad07d-c731-4311-a7be-9c994e8b8373

NETWORK DEPOSITION SERVICES
Transcript of Shane Carswell

Page 222

1    A    Yes.

2    Q    Your understanding of that policy was that all

3    hourly employees were supposed to perform community

4    service work, correct?

5    A    Yes.

6    Q    But was it your understanding that there was a

7    company-wide policy that employees were not supposed to

8    record the time that they spent doing community service

9    work?

10   A    No, there was a book to record that, but it

11   wasn't -- I mean, it wasn't your personal time sheet.

12   It was a different.  The books that they had, the IBIS

13   book, that's where things were recorded in.  Each funeral

14   director had one.  We were supposed to keep our

15   information in there of what we are doing.  But it wasn't

16   something to keep track of for hours or, you know, as far

17   as compensation for pay or anything like that.  It was

18   just to keep track of what you are doing.

19   Q    Was it your understanding that there was a

20   company-wide policy that employees were not supposed

21   to record the time they spent performing community

22   service work?

23   A    I don't believe so.  I don't believe there was

24   a policy saying not to record the time.

25   Q    Was it your understanding that there was a

809ad07d-c731-4311-a7be-9c994e8b8373

NETWORK DEPOSITION SERVICES
Transcript of Shane Carswell

Page 223

1    company-wide policy not to compensate people for time
2    they spent performing community service work?
3        A    To the best of my knowledge -- I mean, again,
4    there were certain areas that you just did those things.
5    You didn't seek compensation for them.
6        Q    I understand that you may have not sought
7    compensation for it, or other employees may have not
8    sought compensation for it.  But was it your
9    understanding that there was a company-wide policy not
10   to compensate people for community service time?
11              MR. LINGLE:  Objection to form.
12              Answer the question.
13       A    In general, I think people were supposed to do
14   their community service during the hours that they were
15   working and if you didn't, then you do them afterwards.
16       Q    What was your understanding of any company-
17   wide policy about compensation for community work?
18              MR. LINGLE:  Objection to form.
19       A    I didn't believe I was going to be paid.  I
20   didn't believe that anybody was going to be paid for it.
21       Q    What do you base that on?
22       A    Past history.
23       Q    What past history?
24       A    I had been in the business for 15 years, and I
25   had never seen anybody get paid for it.

809ad07d-c731-4311-a7be-9c994e8b8373

234

## CERTIFICATE OF OATH

STATE   OF     FLORIDA)

COUNTY OF MIAMI-DADE)


      I, the undersigned authority, certify that SHANE M. CARSWELL personally appeared before me and was duly sworn.

      Witness my hand and official seal this 22nd of December 2008.


_____

Mark Rabinowitz, RPR

Notary Public - State of Florida

My Commission: DD480924

Expires: November 20, 2009

235

REPORTER'S DEPOSITION CERTIFICATE


STATE   OF     FLORIDA)

COUNTY OF MIAMI-DADE)



        I, Mark Rabinowitz, Registered Professional

Reporter, certify that I was authorized to and did

stenographically report the deposition of SHANE M.

CARSWELL; that a review of the transcript was requested;

and that the transcript is a true and complete record of

my stenographic notes.


        I further certify that I'm not a relative,

employee, attorney, or counsel of any of the parties,

parties' attorney, or counsel connected with the action,

nor am I financially interested in the action.


        Dated this 22nd day of December 2008.




                                    Mark Rabinowitz, RPR

**TAB 8**

NETWORK DEPOSITION SERVICES
Transcript of Ron Collins

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

```
-----------------------------------
DEBORAH PRISE AND HEATHER RADY     :
                                   :
                                   :
            Plaintiffs,            :
                                   :
                                   :
   -vs-                            : Civil Action No.
                                   :    06-1641
                                   :
                                   : Judge Joy Flowers
                                   : Conti
ALDERWOODS INC.                    :
                                   :
                                   :
            Defendant              :
                                   :
-----------------------------------
```

VOLUME 1

This is the Deposition of RON COLLINS,
called for examination pursuant to notice, taken before me,
the undersigned, John F. Waddell, CSR, at the Brock Room,
Holiday Inn, 601 Scottsdale Drive, Guelph, Ontario, on the
24th day of March, 2010

a5ce9b99-f0d2-4065-bbd9-e64916915cd0

NETWORK DEPOSITION SERVICES
Transcript of Ron Collins

Page 30

1   decision?

2           A.  The perceived ability of the

3   individual.

4           Q.  That would include how well they

5   fulfilled their responsibilities as funeral director;

6   is that correct?

7           A.  That would be one of the components,

8   yes.

9           Q.  Beside having a job description which

10  required them to retain heritage and grow market share

11  through active involvement with community, religious

12  and other organizations, how would Alderwoods

13  encourage employees to fulfil that responsibility?

14          A.  We paid them for it.

15          Q.  That's a good incentive.

16          Any other ways that Alderwoods encouraged

17  employees to participate in the communities?

18          A.  We had other programs.  I'm not sure

19  it directly related to community involvement.  We had

20  our, in the northeast our I believe In Service program.

21          Q.  Who developed that program?

22          A.  It was actually brought to us by a

23  market general manager in Greensboro, North Carolina.

24          Q.  Can you describe for me what that

25  program was?

a5ce9b99-f0d2-4065-bbd9-e64916915cd0

NETWORK DEPOSITION SERVICES
Transcript of Ron Collins

Page 46

1          A.  Yes.

2          Q.  If the employee went out on lunch and

3     punched out at twelve and punched back in at 12:30

4     they were not paid for that time; correct?

5          A.  Correct.

6          Q.  If an employee went out and

7     participated in a community event in furtherance of

8     the employee's duties to involve him or herself in the

9     community and build the business, was the employee

10    paid for that and, if so, why was the employee paid

11    for that?

12         A.  The employee was paid for that and

13    because they were -- that activity was on behalf of

14    the location.  They were a paid employee and they're

15    conducting that community activity as a requirement of

16    their job.

17         Q.  Let's go back to that employee whose

18    normal work hours were 9:00 a.m. to 5:00 p.m.

19         If an employee worked say that evening

20    after hours, or let me say not work but if an employee

21    went and participated in a community activity on

22    behalf of Alderwoods in the evening was that generally

23    just as important as if the employee was doing that

24    during the regular working hours?

25         A.  Yes.

a5ce9b99-f0d2-4065-bbd9-e64916915cd0

NETWORK DEPOSITION SERVICES
Transcript of Ron Collins

Page 47

1        Q.   Was the employee supposed to be paid
2    if say there was an Elks meeting in the evening that
3    they went to?
4        A.   Yes.
5        Q.   Did Alderwoods pay dues for
6    organizations that employees joined such as the Elks
7    or the Lions Club?
8        A.   On an ad hoc basis.  Each individual
9    situation around community involvement could be
10   different.  By that I mean if it was a requirement, a
11   new organization that they were joining and deemed by
12   management that it would be of benefit to the
13   organization, then those dues would be paid.
14       Q.   Did all or most of your funeral homes
15   have time clocks for employees to punch in and punch
16   out?
17       A.   Depended upon the size of the funeral
18   home.  As I recall, I believe if there were less than
19   three or four employees we didn't bear the expense of
20   a time clock; we continued to use time sheets instead.
21       MR. KNIGHT:  Are you talking about a
22   particular time frame where time clocks were being
23   used?
24       BY MR. SAUL:
25       Q.   Let's put it in a time frame.

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

a5ce9b99-f0d2-4065-bbd9-e64916915cd0

NETWORK DEPOSITION SERVICES
Transcript of Ron Collins

Page 91

1    the employees would be able to go and clock in or sign
2    a time sheet.  The same with the holiday, the memorial
3    event, it would take place in the chapel of a funeral
4    home.
5              Q.  If somebody was a funeral director
6    would they be able to use the time clock out at the
7    cemetery?
8              A.  Typically they wouldn't be at a
9    cemetery event or it would be one of what we call
10   combos.  Hanes-Lineberry, for example, in Greensboro,
11   it has a funeral home on a cemetery and so you could
12   have cemetery and funeral home personnel there, they
13   would both have access to time clocks.
14             Q.  What about if there was let's say an
15   employee that was a member of the Elks and that
16   person's dues were paid by the company?
17             A.  Yes.
18             Q.  If the employee went to an Elks
19   meeting in the evening during non-working time was the
20   employee paid for that, expect to be paid for that
21   time as well?
22             A.  Yes.
23             Q.  And then if the employee was, if that
24   facility that that funeral director or other hourly
25   employee worked at was at a facility that had a time

a5ce9b99-f0d2-4065-bbd9-e64916915cd0

NETWORK DEPOSITION SERVICES
Transcript of Ron Collins

Page 92

1  clock what would the method of recording be for that

2  employee for the time spent at the Elks Club in the

3  evening?

4          A.  They would come back in and it would

5  be written on to their time card and initialled by

6  both themselves and the location manager.

7          Q.  You should have Collins exhibit 18 in

8  front of you?

9          A.  Yes.

10         Q.  If you look, that appears to be the

11  rest of Collins exhibit 17?

12         A.  Right.

13         Q.  If you take a look at 17 and then the

14  Bates stamps follow each other and this appears to be

15  a continuation of that.

16         MR. KNIGHT:  You guys just had this faxed

17  in?

18         MR. SAUL:  Oh, no, we had that document,

19  it had writing on it.

20         MR. KNIGHT:  Oh, okay.

21         BY MR. SAUL:

22         Q.  Let's go back then.  This referred to

23  the community event contest, or I'm sorry, the

24  community leadership program, and the date of the

25  first page is February 8, 2004.  I was reading from

NETWORK DEPOSITION SERVICES
Transcript of Ron Collins

Page 116

1          of this you should be able to create a

2          plan that will help you grow your business."

3          Who is this directed to?  Is this to the

4   MGM or the location manager, this particular document?

5          A.   I think it was a combination of both

6   but particularly to the location manager.

7          Q.   How were the location managers held

8   accountable for following through on this

9   responsibility regarding community involvement and

10  growing the business?

11         A.   In the same fashion they would be held

12  accountable for any leadership program.

13         Q.   To your knowledge did the local

14  managers follow through and do what they were supposed

15  to do under this project?

16         A.   To varying degrees, yes.

17         Q.   What do you mean by varying degrees?

18         A.   Some location managers were stronger

19  than others and some location managers had a greater

20  commitment to a formal program than others.  So

21  varying degrees in terms of the level of activity and

22  the quality of the activity.

23         Q.   Would the degree of how well they were

24  committed to and followed through on the community

25  leadership program be a factor in whether or not that

a5ce9b99-f0d2-4065-bbd9-e64916915cd0

NETWORK DEPOSITION SERVICES
Transcript of Ron Collins

Page 196

1                    C-E-R-T-I-F-I-C-A-T-E-

2

3    PROVINCE OF ONTARIO          )

4    COUNTY OF YORK               )

5        I, John F. Waddell, Chartered Shorthand Reporter in

6    the Province of Ontario, do hereby certify that RON COLLINS

7    was duly sworn or affirmed to testify the truth, the whole

8    truth and nothing but the truth, and that the deposition by

9    him as above set forth was reduced to writing by me.

10       That the within and foregoing deposition was taken

11   by me at the time and place herein specified and in

12   accordance with the within stipulations; the reading and

13   signing of the witness to his deposition having not been

14   waived.

15       That the foregoing deposition is a true and accurate

16   reflection of the proceedings taken in the above case.

17       That I am not counsel, attorney, or relative of

18   either party or otherwise interested in the event of this

19   suit.

20       IN TESTIMONY WHEREOF, I have placed my hand this

21   31st day of March, 2010

22                              ------------------------

23                              John F. Waddell, CSR

24                              Computer-Aided Transcription

25

a5ce9b99-f0d2-4065-bbd9-e64916915cd0

NETWORK DEPOSITION SERVICES
Transcript of Ron Collins

Page 198

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

```
-----------------------------------
DEBORAH PRISE AND HEATHER RADY      :
                                    :
                                    :
             Plaintiffs,            :
                                    :
                                    :
   -vs-                             : Civil Action No.
                                    :      06-1641
                                    :
                                    : Judge Joy Flowers
                                    : Conti
ALDERWOODS INC.                     :
                                    :
                                    :
             Defendant              :
                                    :
-----------------------------------
```

VOLUME 2

        This is the continued Deposition of RON
COLLINS, called for examination pursuant to notice, taken
before me, the undersigned, John F. Waddell, CSR, at the
Brock Room, Holiday Inn, 601 Scottsdale Drive, Guelph,
Ontario, on the 25th day of March, 2010

847cd91e-f930-41a1-b286-9313cc28b141

NETWORK DEPOSITION SERVICES
Transcript of Ron Collins

Page 203

1    --- Upon commencing at 9:22 a.m.

2                RON COLLINS, Witness previously sworn

3                CONTINUED EXAMINATION BY MR. SAUL:

4                Q.  Mr. Collins, we spoke about the

5    community influencer program and follow-up to that

6    leadership program and so on.  Were all Alderwoods

7    funeral homes required to participate in those

8    programs?

9                A.  That was the expectation, yes.

10               Q.  Did a funeral home have the option of

11   opting out of the program?

12               A.  Not formally opting out of it, no.

13               Q.  Informally they could opt out of it?

14               A.  Well, in practise some did.  Some

15   simply didn't embrace the program and whether they

16   opted out totally or not, the efforts were seen in the

17   results, in the tracking.  In certain locations we

18   were getting good traction in the program, in other

19   locations we weren't.

20               Q.  In the locations where you were not

21   getting good traction the company nevertheless tried

22   to get those locations to come on board, so to speak,

23   and participate as they should be in community

24   activities?

25               A.  Yes, we did.

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

847cd91e-f930-41a1-b286-9313cc28b141

NETWORK DEPOSITION SERVICES
Transcript of Ron Collins

Page 225

1    it is.

2              Q.  How would you have found out whether

3    or not employees were being paid for their community

4    activities say on weekends and evenings when they were

5    not on the clock, so to speak?

6              A.  It would have been recorded as part of

7    their either time card or time sheet.

8              Q.  Was there any way or any procedure to

9    find out whether or not employees were actually

10   recording their time for such activities?

11             A.  It would have been reviewed as part of

12   the compliance audit.

13             Q.  How would the compliance audit -- if

14   an employee, say a funeral director, had participated

15   in say a Mother's Day event and did not record the

16   time, was there any way for the auditor to find that

17   out by looking at the records?

18             A.  It would be difficult for an auditor

19   to find that out.  It was the responsibility of the

20   employee to record her or his time however.

21             Q.  Do you know of anything that was in

22   writing that would direct employees to record their

23   time for community activities that were outside the

24   person's regular work hours?

25             A.  The company policies would indicate

847cd91e-f930-41a1-b286-9313cc28b141

NETWORK DEPOSITION SERVICES
Transcript of Ron Collins

Page 226

1    that they would record time for all time worked on
2    behalf of the company.
3           Q.  But do you know of anything that was
4    specific to the community activities in terms of
5    recording the time that was not during the regular
6    working hours?
7           A.  You mean a document at a specific
8    location that would say don't forget to record your
9    time, or something like that?
10          Q.  Whether it would be a specific
11   location or whether it would be corporate-wide, are
12   you aware of any document that says to record time
13   spent on community activities that are outside your
14   regular work day?
15          A.  I don't recall any, no.
16          Q.  So it's possible then that there were
17   employees within the company that were performing
18   community activities outside their regular work day,
19   were not recording it, were not recording that time,
20   and you would not know about that; is that correct?
21          MR. KNIGHT:  Object to form of question.
22   You can answer if you know.
23          THE DEPONENT:  Rephrase?
24          BY MR. SAUL:
25          Q.  Is it possible then that employees

847cd91e-f930-41a1-b286-9313cc28b141

NETWORK DEPOSITION SERVICES
Transcript of Ron Collins

Page 234

1    please?

2             BY MR. SAUL:

3             Q.  I'll try again.

4             Was there ever any type of assessment or

5    evaluation as to the value to the company of the

6    employees participating in community activities

7    outside their work?  In other words, did the expense

8    justify the -- was it justified by the expense?

9             A.  I think there was -- I'm not certain

10   there was a -- I don't believe there was a study

11   specific to that additional labour expense, per se.

12   There was on-going discussion and reviews on whether

13   the company's obvious push towards increasing

14   community events was reaping any growth in the

15   marketplace.  I believe yesterday I stated that it was

16   anecdotal at best and somewhat subjective whether it

17   was helping in any specific location or market.

18            Q.  Did the company ever evaluate what

19   that additional expense was for the labour outside the

20   regular work day for the participation in community

21   activities by the employee?

22            A.  I don't believe they ever evaluated

23   any additional expense for that initiative.  It was

24   included in overall labour costs and the budgeting for

25   the location.  And in many cases it was community work

847cd91e-f930-41a1-b286-9313cc28b141

NETWORK DEPOSITION SERVICES
Transcript of Ron Collins

Page 235

1   that was taking place within the regular work day.

2           Q.  Was that a separate line item under

3   labour expense or was it just factored into the whole

4   labour?

5           A.  Just a factor into the whole labour.

6   Labour expense.

7              PAGES 236 THROUGH 242 MARKED

8                   CONFIDENTIAL

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

847cd91e-f930-41a1-b286-9313cc28b141

NETWORK DEPOSITION SERVICES
Transcript of Ron Collins

Page 300

1    expectations for employees to participate in the

2    community?

3              A.  Yes.

4              Q.  Were all hourly employees expected to

5    participate in the community?

6              A.  No.

7              Q.  With respect to the job description of

8    apprentice funeral director/embalmer, were all funeral

9    directors/embalmers participating in community events?

10             A.  No, they were not.

11             Q.  Were all funeral directors/embalmers

12   contacting community influencers?

13             A.  No, they were not.

14             Q.  With respect to arrangers, were all

15   arrangers participating in community events?

16             A.  No, they were not.

17             Q.  Were all arrangers contacting

18   community influencers?

19             A.  No, they were not.

20             Q.  Were all assistant funeral directors

21   participating in community events?

22             A.  No, they were not.

23             Q.  Were all assistant funeral directors

24   contacting community influencers?

25             A.  No, they were not.

NETWORK DEPOSITION SERVICES
Transcript of Ron Collins

Page 301

1          Q.  Were all community relations directors
2     participating in community events?
3          A.  Yes, they were.
4          Q.  Were all community relations directors
5     contacting community influencers?
6          A.  Yes, they were.
7          Q.  Were all funeral directors
8     participating in community events?
9          A.  No, they were not.
10          Q.  Were all funeral directors contacting
11     community influencers?
12          A.  No, they were not.
13          Q.  Funeral directors/embalmers, were all
14     funeral directors/embalmers participating in community
15     events?
16          A.  No, they were not.
17          Q.  Were all funeral directors/embalmers
18     contacting community influencers?
19          A.  No, they were not.
20          Q.  Were all employees that held the title
21     Funeral Services Support Level 4 participating in
22     community events?
23          A.  No, they were not.
24          Q.  Were all those employees contacting
25     community influencers?

NETWORK DEPOSITION SERVICES
Transcript of Ron Collins

Page 302

1          A.  No, they were not.

2          Q.  Were all location administrators

3    participating in community events?

4          A.  No, they were not.

5          Q.  Were all location administrators

6    contacting community influencers?

7          A.  No, they were not.

8          Q.  Finally, were all location managers

9    participating in community events?

10         A.  Yes, they were.

11         Q.  I want to reference exhibit 31.  Do

12   you recall going over exhibit 31 with Mr. Saul?

13         A.  Yes, I do.

14         Q.  If an employee is seen by management

15   as going above and beyond the line of duty and aiding

16   a visitor or family, was the expectation that in

17   addition to potentially receiving points, that that

18   person would also have been compensated for the time

19   they spent aiding or visiting a family, monetarily

20   compensated?

21         A.  Yes, they would have been monetarily

22   compensated.

23         Q.  And would they have been reporting

24   their hours while they were doing that?

25         A.  They would have.

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

NETWORK DEPOSITION SERVICES
Transcript of Ron Collins

Page 311

1                   C-E-R-T-I-F-I-C-A-T-E-

2

3    PROVINCE OF ONTARIO            )

4    COUNTY OF YORK                 )

5         I, John F. Waddell, Chartered Shorthand Reporter in

6    the Province of Ontario, do hereby certify that RON COLLINS

7    was duly sworn or affirmed to testify the truth, the whole

8    truth and nothing but the truth, and that the deposition by

9    him as above set forth was reduced to writing by me.

10        That the within and foregoing deposition was taken

11   by me at the time and place herein specified and in

12   accordance with the within stipulations; the reading and

13   signing of the witness to his deposition having not been

14   waived.

15        That the foregoing deposition is a true and accurate

16   reflection of the proceedings taken in the above case.

17        That I am not counsel, attorney, or relative of

18   either party or otherwise interested in the event of this

19   suit.

20        IN TESTIMONY WHEREOF, I have placed my hand this

21   31st day of March, 2010

22                            -------------------------

23                            John F. Waddell, CSR

24                            Computer-Aided Transcription

25

847cd91e-f930-41a1-b286-9313cc28b141

**TAB 9**

NETWORK DEPOSITION SERVICES
Transcript of Millard Jude Daigle

Page 1

THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF
PENNSYLVANIA


DEBORAH PRISE AND HEATHER   *CIVIL ACTION
RADY ON BEHALF OF           *
THEMSELVES AND ALL          *
EMPLOYEES SIMILARY SITUATED*NO. 06-1641
                            *
VERSUS                      *
                            *
ALDERWOODS GROUP, INC.      *
* * * * * * * * * * **


          Deposition of MILLARD JUDE
DAIGLE, 2456 Highway 20, Vacherie,

Louisiana 70090, taken in the offices of

Gaudet Kaiser, Certified Court Reporters,

601 Poydras Street, Suite 2003, New

Orleans, Louisiana 70130, on Monday, the

20th day of April, 2009.

da5aa629-e9d2-4503-831f-d3c7f84a1f4e

NETWORK DEPOSITION SERVICES
Transcript of Millard Jude Daigle

Page 142

1      A.     No.

2      Q.     Were you evaluated based on the

3   community work that you did?

4      A.     Not on community work, no.

5      Q.     Are you aware of whether any

6   other Alderwoods employees received

7   performance evaluations?

8      A.     I'm -- specifically, no.

9      Q.     When Mr. Windham gave you your

10  performance evaluation, what were you

11  evaluated based on?

12     A.     Job performance.

13     Q.     And what did that include?

14     A.     The way I did funerals, the way

15  I did arrangements, how I handled

16  clientele, the amount of complaints or

17  whatever, you know.

18     Q.     And the only performance

19  evaluation you can recall is just the one?

20     A.     That I can remember, yes.

21     Q.     Did Mr. Windham meet with you to

22  go over the results?

23     A.     Yes.

24     Q.     So the two of you talked about

25  the results, but you just don't recall if

da5aa629-e9d2-4503-831f-d3c7f84a1f4e

NETWORK DEPOSITION SERVICES
Transcript of Millard Jude Daigle

Page 166

1       Q.    Or what did that entail?

2       A.    One day a year, 10 hours

3  probably.

4       Q.    And Carnival or Mardi Gras?

5       A.    Yeah.  Probably the same thing:

6  One day, 10- to 12-hour day.

7       Q.    The Greek festival?

8       A.    Approximately, 10 hours.

9       Q.    Was that once a year?

10       A.    Once a year.

11       Q.    And the Elks Club?

12       A.    Two hours per month.

13       Q.    And you had testified previously

14  that no one at Alderwoods would be aware of

15  your Elks Club participation, is that

16  correct?

17       A.    That's correct.

18       Q.    For the All Saints Day, was

19  there an organization that you had to join

20  or anything to participate in that?

21       A.    No.  It was all of the people

22  that worked for our funeral homes and for

23  our cemeteries that participated.

24       Q.    And was that all the Alderwoods

25  employees who worked at funeral homes just

da5aa629-o9d2-4503-831f-d3c7f84a1f4e

NETWORK DEPOSITION SERVICES
Transcript of Millard Jude Daigle

Page 170

1    All Saints Day event fell on a day, on a
2    regular workday, would you have reported
3    that time?
4         A.    Yes.  We would report the
5    regular time, no overtime.
6         Q.    And if All Saints Day fell on a
7    regular workday and you reported the
8    regular time for that day, would you have
9    been compensated for it?
10        A.    We would have been compensated
11   for regular time, but not overtime.
12        Q.    You would have been compensated
13   for the time you actually reported?
14        A.    Eight hours.
15        Q.    And if All Saints Day fell on a
16   day that you were not regularly scheduled
17   to work, would you have reported the time?
18        A.    If it happened on a day where we
19   were not scheduled to work, no, I wouldn't
20   have reported it.
21        Q.    And why not?
22        A.    Because we were just expected to
23   show up.
24        Q.    But no one ever told you not to
25   report it?

NETWORK DEPOSITION SERVICES
Transcript of Millard Jude Daigle

Page 174

1      A.    That's right.
2      Q.    Did you report the time that you
3   spent in the Mardi Gras event?
4      A.    No, usually didn't.
5      Q.    Why not?
6      A.    During that day, part of the
7   day, that was -- may have been a holiday,
8   but, you know, we worked.  We were there a
9   lot longer than that during the day.
10     Q.    I'm sorry.  So you didn't report
11  it because it was a holiday?
12     A.    Yeah.
13     Q.    Did anyone at Alderwoods ever
14  tell you not to report the time that you
15  spent participating in the Mardi Gras
16  event?
17     A.    No.
18     Q.    Were you compensated for any of
19  the time that you spent in the Mardi Gras
20  event?
21     A.    No.  I take that back.  If it
22  was a holiday, yes.  You know, we were --
23  we were given straight time, but anything
24  after eight hours, no.
25     Q.    So if Mardi Gras day fell on a

da5aa629-e9d2-4503-831f-d3c7f84a1f4e

NETWORK DEPOSITION SERVICES
Transcript of Millard Jude Daigle

1    holiday, you were compensated for eight

2    hours of the day?

3         A.    Right.  Right.

4         Q.    And did you spend time above the

5    eight hours?

6         A.    Oh, yes, quite a bit of

7    preparation.  It normally went 12 hours.

8         Q.    Did you report any of the

9    additional time that you spent at the Mardi

10   Gras event?

11        A.    No.  No.

12        Q.    And were you compensated for the

13   time over eight hours?

14        A.    No.

15        Q.    And why did you not report time

16   spent above eight hours?

17        A.    It would not have done any good.

18   We wouldn't have been compensated for it.

19        Q.    But you did not report it?

20        A.    That's correct.

21        Q.    Do you know whether any other

22   employees reported the time they spent at

23   the Mardi Gras event?

24        A.    No.

25        Q.    Do you know whether any other

da5aa629-e9d2-4503-831f-d3c7f84a1f4e

NETWORK DEPOSITION SERVICES
Transcript of Millard Jude Daigle

THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF
PENNSYLVANIA

DEBORAH PRISE AND HEATHER    *CIVIL ACTION
RADY ON BEHALF OF            *
THEMSELVES AND ALL           *
EMPLOYEES SIMILARY SITUATED*NO. 06-1641
                             *
VERSUS                       *
                             *
ALDERWOODS GROUP, INC.       *
*  *  *  *  *  *  *  *  *  **

Deposition of MILLARD JUDE
DAIGLE, 2456 Highway 20, Vacherie,

Louisiana 70090, taken in the offices of

Gaudet Kaiser, Certified Court Reporters,

601 Poydras Street, Suite 2003, New

Orleans, Louisiana 70130, on Monday, the

20th day of April, 2009.

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

da5aa629-e9d2-4503-831f-d3c7f84a1f4e

NETWORK DEPOSITION SERVICES
Transcript of Millard Jude Daigle

1    the people that belong to the Elks clubs

2    are older guys that are going to be using

3    our services before long, get right down to

4    it.

5        Q.    How long were you involved with

6    the Elks Club?

7        A.    Since I've been 18.

8        Q.    And why did you join?

9        A.    Just it was the thing to do in

10   my home town and I just stayed with it all

11   these years, never once thinking that I was

12   going to be in the funeral business, you

13   know?

14       Q.    So were there some personal or

15   social aspects of belonging to it?

16       A.    Yeah, a lot of social aspects

17   and a lot of good friends belonged to it,

18   so, you know.

19       Q.    What about family, did you have

20   family members that belonged?

21       A.    None of my family members

22   belonged to it, no.

23       Q.    But good friends of yours?

24       A.    Correct.

25       Q.    Are you still part of the Elks

NETWORK DEPOSITION SERVICES
Transcript of Millard Jude Daigle

Page 183

1    Club?

2         A.    Not anymore.

3         Q.    When did you stop participating?

4         A.    Probably, I'm just guessing, a

5    year or two ago, when I didn't have time to

6    devote to it anymore.

7         Q.    So you were still part of the

8    Elks Club after you separated from

9    employment with Alderwoods?

10        A.    Just for a short time.

11        Q.    Did anyone at Alderwoods ever

12   tell you to participate in the Elks Club?

13        A.    Not specifically, no.

14        Q.    Were any other Alderwoods

15   employees told to participate in the Elks

16   Club?

17        A.    No.

18        Q.    Anybody else at Alderwoods that

19   you knew of who was in the Elks Club?

20        A.    No.

21        Q.    Was there like a local chapter

22   or something that you participated in?

23        A.    There are chapters all over the

24   United States.  There's probably seven or

25   eight of them here in New Orleans, and

da5aa629-e9d2-4503-831f-d3c7f84a1f4e

NETWORK DEPOSITION SERVICES
Transcript of Millard Jude Daigle

Page 185

1    the Elks Club know that you were with
2    Alderwoods?
3         A.    Simple.  Every time I went in
4    there, I had an Alderwoods pin on.
5         Q.    And why did you wear the
6    Alderwoods pin to your Elks Club meetings?
7         A.    Because I wore one every day
8    with my suit.
9         Q.    But as you testified previously,
10   you joined the Elks Club at 18, long before
11   you ever worked for Alderwoods, right?
12        A.    Right.  Right.
13        Q.    I believe you also testified
14   that nobody at Alderwoods would have known
15   of your participation at the Elks Club, is
16   that right?
17        A.    Not at the Elks Club, no.
18        Q.    Other than All Saints Day, Mardi
19   Gras, the Greek festival and the Elks Club,
20   did you participate in any other community
21   activities or organizations during the time
22   you worked at Alderwoods?
23        A.    Nothing comes to mind, no.
24        Q.    Were you encouraged or requested
25   to get involved in the community by anybody

NETWORK DEPOSITION SERVICES
Transcript of Millard Jude Daigle

Page 192

1    Q.    And what funeral directors do
2 you know of that participated in community
3 work?
4    A.    Well, I would see all of the
5 funeral directors that I worked with at All
6 Saints.
7    Q.    So you personally observed other
8 funeral directors at the All Saints event?
9    A.    Right.
10    Q.    What about the other Alderwoods
11 events?
12    A.    I never saw anybody at the Greek
13 festival.  I saw a lot of them at Carnival;
14 none at the Elks Club.
15    Q.    Do you have any knowledge of any
16 funeral directors participating in any
17 other activities besides the All Saints and
18 the Carnival?
19    A.    Not in particular, no.
20    Q.    And it was your understanding,
21 Mr. Daigle, that community activity was
22 encouraged from funeral directors, but not
23 from other Alderwoods employees?
24    A.    It was -- are you saying that
25 the only people that were expected to do

da5aa629-e9d2-4503-831f-d3c7f84a1f4e

NETWORK DEPOSITION SERVICES
Transcript of Millard Jude Daigle

Page 193

1    that was funeral directors?

2         Q.    Yes.   Is that what you're

3    saying?

4         A.    Yes.   Funeral directors and

5    embalmers, yes.

6         Q.    So embalmers were expected to

7    perform community activities, too?

8         A.    Yes.

9         Q.    Any other categories of

10   employees?

11        A.    No.

12        Q.    How do you know, Mr. Daigle,

13   that embalmers were expected to perform

14   community activities?

15        A.    This was never mentioned during

16   the time that I worked for Alderwoods.  But

17   previous to that, this was something that

18   was always mentioned.  Every licensed

19   person in the company was encouraged to

20   participate in any kind of community

21   service that they could to promote

22   themselves and promote the business.

23        Q.    You said this was prior to

24   Alderwoods?

25        A.    And it went right on through,

NETWORK DEPOSITION SERVICES
Transcript of Millard Jude Daigle

Page 195

1    Q.    Okay.  What is the source from
2    Alderwoods of this expectation?
3    A.    No source from Alderwoods.
4    Q.    Do you know whether there were
5    any consequences for any funeral director
6    or embalmer or any other Alderwoods
7    employee for not participating in community
8    activities?
9    A.    Don't know.
10    Q.    Were there any costs associated
11    with your participation in any of these
12    community activities?
13    A.    In what -- what do you mean, in
14    what way?
15    Q.    Here's an example.  Were there
16    any membership fees for the Elks Club, for
17    example?
18    A.    Yes.  But that was something I
19    paid.  I was a member anyway.  I never
20    expected them to pay for that.  But that's
21    the only one.
22    Q.    So you never asked anybody at
23    Alderwoods to cover the cost for Elks Club?
24    A.    No.  No.
25    Q.    And why not?

da5aa629-e9d2-4503-831f-d3c7f84a1f4e

NETWORK DEPOSITION SERVICES
Transcript of Millard Jude Daigle

Page 198

1   with the funeral home and they knew that I
2   was there representing them.
3        Q.    But at some point in time during
4   your participation of the Elks Club, you
5   did derive personal and social enjoyment of
6   it since you joined at 18 and continued
7   participating in it until after you worked
8   for Alderwoods, right?
9        MS. DOUGLASS:
10            Objection.
11       THE WITNESS:
12            Some, yes.  I don't know what
13  percentage.  I don't know, you know.  Maybe
14  1 percent out of the 5.  I don't know what
15  you're getting at.
16  EXAMINATION BY MS. MORGAN:
17       Q.    At your location, Mr. Daigle,
18  was there any incentive program for
19  participating in community work?
20       A.    No.
21       Q.    Are you aware of any incentive
22  program for participating in community work
23  used at any other Alderwoods location that
24  you're aware of?
25       A.    Not that I'm aware of.

NETWORK DEPOSITION SERVICES
Transcript of Millard Jude Daigle

Page 199

1     Q.     Have you ever heard of a program
2  called I Believe In Service, or IBIS?
3     A.     No.
4     Q.     Are you aware of any company-
5  wide policy of requiring community work?
6     A.     Not specifically.
7     Q.     And are you aware of any
8  company-wide policy addressing whether
9  community work should be reported or paid?
10    A.     No.
11    Q.     Mr. Daigle, are you claiming
12  that you were not paid for any on-call
13  work?
14    A.     Yes.
15    Q.     What are the -- what did it mean
16  at your Alderwoods locations where you
17  worked for you to be on-call?
18    A.     I was expected to be available
19  any time I was off of work to answer any
20  questions that might come up, you know,
21  after hours, quote prices, answer
22  questions.
23    Q.     Anything else?
24    A.     Give estimates.
25    Q.     Anything else?

da5aa629-e9d2-4503-831f-d3c7f84a1f4e

NETWORK DEPOSITION SERVICES
Transcript of Millard Jude Daigle

Page 200

1      A.     Give general information about
2  visitations and funerals, funeral times.
3      Q.     Any other on-call work?
4      A.     No.
5      Q.     Were you in the job positions
6  that you held at Alderwoods from December
7  2003 through November 2005, were you
8  expected to be on-call?
9      A.     We were expected to be available
10 to answer any questions that might come up.
11     Q.     Does that mean that you were
12 expected to be on-call?
13     A.     Yes.
14     Q.     When?  When were you expected to
15 be on-call?
16     A.     We were expected to answer
17 questions, be available all the time.  If
18 they called us, we had to answer, you know,
19 and had to answer the phone.
20     Q.     Was there any on-call schedule,
21 any certain days that you were on-call?
22     A.     No.  No.
23     Q.     And you've been saying we, we
24 were expected to be on-call.  Who were you
25 referring to?

da5aa629-e9d2-4503-831f-d3c7f84a1f4e

Page 201

1    A.    Myself and Ronnie.

2    Q.    And Ronnie was your location

3  manager, right?

4    A.    That's correct.

5    Q.    Did he also do funeral-director

6  work?

7    A.    Yes, he did.

8    Q.    Were there ever certain days or

9  weekends, et cetera, where Ronnie was

10  expected to be on-call and you were not or

11  that you were expected to be on-call and he

12  was not?

13    A.    No.  We were both expected to

14  answer the phone if somebody had a problem.

15    Q.    So it was not a situation where

16  one of you was designated for a certain

17  time?

18    A.    No.  No.

19    Q.    Is all of the on-call work for

20  which you're claiming you were not

21  compensated, did that all involve answering

22  questions by phone?

23    A.    Yes.

24  MS. DOUGLASS:

25        Objection.

da5aa629-e9d2-4503-831f-d3c7f84a1f4e

NETWORK DEPOSITION SERVICES
Transcript of Millard Jude Daigle

Page 202

1    EXAMINATION BY MS. MORGAN:
2        Q.    Did you ever report on your
3    timecards the time that you spent answering
4    questions by phone?
5        A.    No.
6        Q.    Did anyone at Alderwoods ever
7    tell you not to report the time you
8    spent --
9        A.    No.
10       Q.    Did anybody at Alderwoods ever
11   tell you not to report the time that you
12   spent answering questions by phone?
13       A.    No.
14       Q.    Did anyone at Alderwoods ever
15   tell you not to report the time that you
16   spent doing on-call work?
17       A.    No.
18       Q.    Are you aware of anyone at
19   Alderwoods being told by any Alderwoods
20   manager not to report the time they spent
21   on-call?
22       A.    No.
23       Q.    And do you believe, Mr. Daigle,
24   that you were ever compensated for the time
25   that you spent doing on-call work?

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

da5aa629-e9d2-4503-831f-d3c7f84a1f4a

NETWORK DEPOSITION SERVICES
Transcript of Millard Jude Daigle

Page 205

1       A.      No, I didn't.

2       Q.      Did any Alderwoods manager ever

3   tell you that you would not be compensated

4   for work you performed while you were

5   on-call?

6       A.      No.

7       Q.      So if no one from Alderwoods

8   told you not to report the time you spent

9   working while you were on-call and no one

10  ever told you that you wouldn't be

11  compensated for it, how come you never

12  reported the time you spent doing on-call

13  work?

14      A.      The reason is, I knew that there

15  was -- there was no purpose in reporting it

16  because we would not be compensated for it.

17  That's just the way it was.  It was

18  expected of us to take calls, be available.

19      Q.      Well, if the expectation was

20  that you would be available to take calls

21  but no one ever told you not to report that

22  time, why did you feel like there would be

23  no purpose to reporting it?

24      MS. DOUGLASS:

25          Objection.

NETWORK DEPOSITION SERVICES
Transcript of Millard Jude Daigle

Page 209

1    work.

2        A.    Right.

3        Q.    And what I was asking you about

4    was what your -- the basis of your belief

5    that the other funeral directors that you

6    named were not compensated for on-call

7    time.

8        A.    Okay.  The simple answer is, we

9    were told not to put anything beyond 40

10   hours on our timecards, not to show any

11   overtime, no overtime allowed, and if you

12   did community service, on-call, and all of

13   -- and worked during the day, you would --

14   you would come out with a lot more than 40

15   hours.  So we didn't put it down.  I didn't

16   put it down.  And I'm certain that that's

17   the reason why the other funeral directors

18   didn't put it down as well.  I don't know

19   that specifically.

20       Q.    So you don't know specifically

21   whether other funeral directors reported

22   the time they spent on-call?

23       A.    I never saw them report it, no.

24       Q.    You never saw them report the

25   time, so you don't know what they reported?

NETWORK DEPOSITION SERVICES
Transcript of Millard Jude Daigle

Page 210

1      A.    No.

2      Q.    Right?

3      A.    Couldn't say.

4      Q.    And you also don't know whether

5  they were compensated for on-call time?

6      A.    How could I?

7      Q.    Well, I'm just asking you, Mr.

8  Daigle, whether you do know.

9      A.    No, I don't.

10     Q.    Okay.  Do you hold any insurance

11  agent -- I'm sorry.  Did you hold any

12  insurance agent license during the time you

13  worked for Alderwoods?

14     A.    No.

15     Q.    To sell pre-needs, would you

16  have needed an insurance license?

17     A.    Yes, I would.

18     Q.    Is it a requirement in

19  Louisiana?

20     A.    Yes, it is.

21     Q.    So did you ever sell any

22  pre-needs while you worked at Alderwoods?

23     A.    Not with Alderwoods, but with

24  the previous companies, I would.

25     Q.    Okay.  So just make sure I've

da5aa629-e9d2-4503-831f-d3c7f84a1f4e

260

1

## REPORTER'S CERTIFICATE

2

3

4          I, **ROBERT K. TUCKER**, Certified Court

5    Reporter, State of Louisiana, do hereby

6    certify that the above-mentioned witness,

7    after having been first duly sworn by me to

8    testify to the truth, did testify as

9    hereinabove set forth;

10         That the testimony was reported by

11   me in shorthand and transcribed under my

12   personal direction and supervision, and is

13   a true and correct transcript, to the best

14   of my ability and understanding;

15         That I am not of counsel, not

16   related to counsel or the parties hereto,

17   and not in any way interested in the

18   outcome of this matter.

19                                    OFFICIAL SEAL
                                      ROBERT K. TUCKER
20   _____              Certified Court Reporter
                                      In and for the State of Louisiana
21   **ROBERT K. TUCKER**             Certificate Number 87367
                                      Certificate expires 12-31-08
22   **CERTIFIED COURT REPORTER**

23   **STATE OF LOUISIANA**

24

25

**TAB 10**

NETWORK DEPOSITION SERVICES
Transcript of Steven Detschner

Page 1

VOLUME: I
PAGES: 1 to 251
EXHIBITS: 1 to 14

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA

Civil Action No. 06-1641

DEBORAH PRISE and HEATHER          )
RADY, on behalf of                 )
themselves and all                 )
employees similarly                )
situated,                          )
          Plaintiffs,              )
                                   )
vs.                                )
                                   )
ALDERWOODS GROUP, INC.,            )
          Defendant.               )

        DEPOSITION OF STEVEN A. DETSCHNER,

called as a witness on behalf of the

Defendant, pursuant to the applicable

provisions of the Federal Rules of Civil

Procedure, before Jeanette N. Maracas,

Registered Professional Reporter and Notary

Public in and for the Commonwealth of

Massachusetts, at the Holiday Inn Hotel,

929 Hingham Street, Rockland, Massachusetts,

on Friday, May 8, 2009, commencing at 9:23

a.m.

b5497ddd-92c3-4142-b30a-6f8be4751c65

NETWORK DEPOSITION SERVICES
Transcript of Steven Detschner

Page 77

|          |    |    |                                                    |
|----------|----|----|----------------------------------------------------|
|          | 1  | A. | No.                                                |
|          | 2  | Q. | So you only used these forms if you were           |
| 11:19:55 | 3  |    | working in excess of eight hours on a given        |
| 11:19:57 | 4  |    | day, is that right?                                |
| 11:19:58 | 5  | A. | Yes.                                               |
| 11:19:59 | 6  | Q. | Or if you were working on a day that you were      |
| 11:20:02 | 7  |    | scheduled to be off, is that accurate?             |
| 11:20:03 | 8  | A. | That's accurate.                                   |
| 11:20:04 | 9  | Q. | Okay.  On the second page, 2494, does your         |
| 11:20:14 | 10 |    | signature appear on this page?                     |
| 11:20:15 | 11 | A. | Yes.                                               |
| 11:20:17 | 12 | Q. | What was the purpose of your signature on          |
| 11:20:19 | 13 |    | this form?                                         |
| 11:20:25 | 14 | A. | I was signing that I worked two hours of           |
| 11:20:28 | 15 |    | overtime completing a removal that commenced       |
| 11:20:33 | 16 |    | at 5:00 p.m. when I was off duty.  Apparently      |
| 11:20:36 | 17 |    | when I was off of my regular eight-hour            |
| 11:20:40 | 18 |    | shift, I was on call and it started at 5:00        |
| 11:20:45 | 19 |    | a.m. and it ended at 7:00 p.m. on the 26th,        |
| 11:20:51 | 20 |    | 5:00 p.m., it started at 5:00 p.m. and ended       |
| 11:20:55 | 21 |    | at 7:00 p.m.  It was a two-hour removal.           |
| 11:21:01 | 22 | Q. | So does your signature verify the accuracy         |
| 11:21:05 | 23 |    | of this information that you filled out?           |
|          | 24 |    | Is that what you're saying?                        |
| 11:21:09 | 25 |    |           MS. GIFFORD:  Objection.                 |

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

b5497ddd-92c3-4142-b30a-6f8be4751c65

NETWORK DEPOSITION SERVICES
Transcript of Steven Detschner

Page 78

|  |  |  |  |
|--|--|--|--|
| | 1 | A. | My signature verifies that it took at least |
| | 2 | | two hours to do this removal. |
| 11:21:18 | 3 | Q. | So the actual times that you wrote the 5:00 |
| 11:21:22 | 4 | | p.m. to 7:00 p.m., may not be the actual time |
| 11:21:26 | 5 | | that you performed the work? |
| 11:21:29 | 6 | A. | I may have taken a little longer. |
| 11:21:32 | 7 | Q. | It may have taken less than two hours? |
| 11:21:34 | 8 | A. | It's possible. |
| 11:21:37 | 9 | Q. | So you may have recorded two hours and |
| 11:21:41 | 10 | | actually worked more than two hours? |
| 11:21:42 | 11 | A. | That's correct. |
| 11:21:43 | 12 | Q. | Or you may have recorded two hours and |
| 11:21:45 | 13 | | actually worked less than two hours? |
| 11:21:49 | 14 | A. | It's possible. Funerals, embalmings -- I'm |
| 11:21:55 | 15 | | sorry. Removals in this case of 12604 were |
| 11:22:03 | 16 | | credited in two-hour blocks. It was a |
| 11:22:06 | 17 | | minimum. It was a two-hour block is what |
| 11:22:09 | 18 | | you were compensated for. |
| 11:22:10 | 19 | Q. | Okay. And there's a signature on the line |
| 11:22:16 | 20 | | beside Authorization. Whose signature is |
| 11:22:20 | 21 | | that, do you know? |
| 11:22:21 | 22 | A. | It's not legible. I don't know. I can't |
| | 23 | | say with absolute certainty whose signature |
| 11:22:34 | 24 | | it is. |
| 11:22:34 | 25 | Q. | Do you know what was the purpose of that |

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

b5497ddd-92c3-4142-b30a-6f8be4751c65

NETWORK DEPOSITION SERVICES
Transcript of Steven Detschner

Page 125

|  |  |  |  |
|---|---|---|---|
|  | 1 |  | I raised the issue, as did another employee. |
|  | 2 |  | I do not recall exactly who it was, but I |
| 01:04:56 | 3 |  | remember that it was a topic of conversation |
| 01:05:00 | 4 |  | for a certain period of time. |
| 01:05:01 | 5 | Q. | Specifically the issue of on-call work? |
| 01:05:03 | 6 | A. | On-call work. |
| 01:05:04 | 7 | Q. | You raised that issue with David Hunt, is |
| 01:05:07 | 8 |  | that right? |
| 01:05:07 | 9 | A. | I brought it up with David Hunt. |
| 01:05:08 | 10 | Q. | Did you raise any other informal complaints |
| 01:05:12 | 11 |  | to Alderwoods besides that? |
| 01:05:13 | 12 | A. | I may have, and I'm not exactly certain. I |
| 01:05:18 | 13 |  | may have mentioned it to Jerry Tilton as |
| 01:05:21 | 14 |  | well. I know Jerry Tilton was aware of it, |
| 01:05:23 | 15 |  | though. |
| 01:05:23 | 16 | Q. | You may have raised the on-call complaint to |
| 01:05:25 | 17 |  | Jerry Tilton? |
| 01:05:26 | 18 | A. | I may have mentioned it. I do not believe |
| 01:05:29 | 19 |  | that I was the original member that pointed |
| 01:05:32 | 20 |  | it out. |
| 01:05:42 | 21 | Q. | And what exactly did you complain about to |
| 01:05:46 | 22 |  | David Hunt with respect to on-call work? |
| 01:05:48 | 23 | A. | I mentioned that when we were on call, we |
|  | 24 |  | would spend time on the telephone talking |
| 01:05:57 | 25 |  | to different family members, newspapers |

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

b5497ddd-92c3-4142-b30a-6f8be4751c65

NETWORK DEPOSITION SERVICES
Transcript of Steven Detschner

Page 126

|  |  |  |
|---|---|---|
|  | 1 | regarding obituaries, or even people would |
|  | 2 | call up and ask for information on funerals. |
| 01:06:10 | 3 | And it was the general feeling among all |
| 01:06:15 | 4 | the employees, it was common practice that |
| 01:06:19 | 5 | you only put in when you're on call for when |
| 01:06:21 | 6 | you physically left the building.  That was |
| 01:06:23 | 7 | brought up, that if we used the phone on our |
| 01:06:33 | 8 | on-call time, it was on our own, we weren't |
| 01:06:37 | 9 | to put in for time on the telephone when |
| 01:06:42 | 10 | we're on call. |
| 01:06:43 | 11 | Q. We had seen some examples of time that you |
| 01:06:47 | 12 | reported for phone calls made earlier, |
| 01:06:49 | 13 | didn't we?  Do you recall? |
| 01:06:51 | 14 | A. I recall looking at one in particular thing. |
| 01:06:54 | 15 | Q. So there may have been some instances where |
| 01:06:56 | 16 | you reported overtime for time spent making |
| 01:06:59 | 17 | phone calls? |
| 01:06:59 | 18 | A. If I was in the building, yes.  If I was at |
| 01:07:01 | 19 | home -- |
| 01:07:02 | 20 | MS. GIFFORD:  When you say in the |
| 01:07:03 | 21 | building, you mean in the funeral home? |
| 01:07:04 | 22 | A. At the funeral home. |
|  | 23 | Q. So you reported phone time if you were in |
| 01:07:09 | 24 | the building? |
| 01:07:10 | 25 | A. Right. |

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

b5497ddd-92c3-4142-b30a-6f8be4751c65

NETWORK DEPOSITION SERVICES
Transcript of Steven Detschner

Page 139

|  |  |  |  |
|---|---|---|---|
|  | 1 |  | for any on-call work besides handling phone |
|  | 2 |  | calls away from the funeral home? |
| 01:21:43 | 3 | A. | Are you referring to before I was a funeral |
| 01:21:45 | 4 |  | director? |
| 01:21:45 | 5 | Q. | At any point in time, do you claim that you |
| 01:21:48 | 6 |  | performed on-call work and were unpaid for |
| 01:21:52 | 7 |  | on-call work? |
| 01:21:52 | 8 | A. | Yes. |
| 01:21:53 | 9 | Q. | For doing anything other than answering |
|  | 10 |  | phone calls away from the funeral home or |
| 01:21:57 | 11 |  | is the phone call the thing that you claim |
| 01:22:00 | 12 |  | you weren't compensated for? |
| 01:22:01 | 13 | A. | Phone calls are what stand out in my mind. |
| 01:22:04 | 14 | Q. | Okay. |
| 01:22:06 | 15 | A. | I don't want to -- there may have been other |
| 01:22:09 | 16 |  | instances, dropping off paperwork, something |
| 01:22:12 | 17 |  | after hours, but I can't recall any |
| 01:22:14 | 18 |  | specifics. |
| 01:22:15 | 19 | Q. | With respect to this lawsuit, is it the |
| 01:22:16 | 20 |  | phone call time that you're complaining |
| 01:22:18 | 21 |  | about in this case? |
| 01:22:21 | 22 | A. | I would say the phone call time would be |
| 01:22:23 | 23 |  | the primary, would be one of the primary |
| 01:22:27 | 24 |  | factors in this. |
| 01:22:27 | 25 | Q. | And you did not handle phone calls when |

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

b5497ddd-92c3-4142-b30a-6f8be4751c65

NETWORK DEPOSITION SERVICES
Transcript of Steven Detschner

Page 140

| | | | |
|---|---|---|---|
| | 1 | | on call until the time that you were a |
| | 2 | | funeral director, is that right? |
| 01:22:34 | 3 | A. | That's pretty accurate to state, yeah. |
| 01:22:36 | 4 | Q. | So your complaint with respect to unpaid |
| 01:22:39 | 5 | | on-call work has to do with the time period |
| 01:22:41 | 6 | | after you became a funeral director, is |
| 01:22:43 | 7 | | that right, and were handling the phone |
| 01:22:45 | 8 | | calls at home? |
| | 9 | A. | Regarding phone call work, yes. |
| 01:22:51 | 10 | Q. | And you raised the issue with David Hunt, |
| 01:22:55 | 11 | | you said, sometime after June 2004? |
| 01:22:58 | 12 | A. | Right. |
| 01:22:58 | 13 | Q. | What did you say to Mr. Hunt? |
| 01:23:00 | 14 | A. | I remember pointing out to David that the |
| 01:23:04 | 15 | | Massachusetts fair labor laws stated that |
| 01:23:07 | 16 | | any individual that was working on an on-call |
| 01:23:11 | 17 | | basis should be compensated for, I believe, |
| 01:23:15 | 18 | | if my recollection serves me correctly, four |
| 01:23:17 | 19 | | hours of overtime rate pay to be on call. |
| 01:23:22 | 20 | Q. | Just to be available on call? |
| 01:23:24 | 21 | A. | That's correct. |
| 01:23:26 | 22 | Q. | So your complaint was that you weren't |
| 01:23:27 | 23 | | being compensated just for being on call, |
| 01:23:31 | 24 | | regardless of what you actually did while |
| 01:23:32 | 25 | | on call? |

b5497ddd-92c3-4142-b30a-6f8be4751c65

NETWORK DEPOSITION SERVICES
Transcript of Steven Detschner

Page 149

|  |  |  |  |
|---|---|---|---|
|  | 1 | A. | No.  All the overtime that we documented |
|  | 2 |  | was following the guidelines of being |
| 01:35:03 | 3 |  | pre-approved. |
| 01:35:03 | 4 | Q. | When you say following the guidelines of |
| 01:35:07 | 5 |  | pre-approved, you didn't always have verbal |
| 01:35:10 | 6 |  | approval in advance of performing the work, |
| 01:35:14 | 7 |  | did you? |
| 01:35:15 | 8 | A. | Not verbal approval.  There was a standard. |
| 01:35:17 | 9 | Q. | An understood, there was an understanding |
| 01:35:20 | 10 |  | that certain tasks were already pre-approved? |
| 01:35:23 | 11 | A. | Pre-approved and designated for certain |
| 01:35:26 | 12 |  | periods of time blocks. |
| 01:35:32 | 13 | Q. | In those instances, you didn't need any |
| 01:35:34 | 14 |  | kind of verbal okay from a manager before |
| 01:35:38 | 15 |  | performing those types of work, is that |
| 01:35:39 | 16 |  | right? |
| 01:35:41 | 17 | A. | For certain instances, that's correct. |
| 01:35:43 | 18 | Q. | And you would be paid for that time? |
| 01:35:46 | 19 | A. | Yes. |
| 01:35:48 | 20 | Q. | So the only time for which you claim you |
| 01:35:52 | 21 |  | weren't paid are blocks of less than an |
| 01:35:57 | 22 |  | hour that you may have worked before or |
| 01:35:59 | 23 |  | after a shift or after the shift in the |
|  | 24 |  | evening, is that right? |
| 01:36:05 | 25 | A. | Right, before or after my eight o'clock to |

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

b5497ddd-92c3-4142-b30a-6f8be4751c65

NETWORK DEPOSITION SERVICES
Transcript of Steven Detschner

Page 150

|          |    |     |                                                     |
|----------|----|-----|-----------------------------------------------------|
|          | 1  |     | 5:00 p.m. shift and over the -- let's say          |
|          | 2  |     | if an embalming took a little longer than          |
| 01:36:20 | 3  |     | a two-hour block, that was the standard time        |
| 01:36:23 | 4  |     | issuance for removal and embalming, would be        |
| 01:36:27 | 5  |     | a three-hour block.  If it took me three            |
| 01:36:30 | 6  |     | and a half hours, we would document the three       |
| 01:36:32 | 7  |     | hours we worked because that was a standard.        |
| 01:36:34 | 8  | Q.  | Did you ever document more than three hours         |
| 01:36:36 | 9  |     | for an embalming if it was a difficult              |
| 01:36:39 | 10 |     | embalming that for some reason took longer?         |
| 01:36:41 | 11 | A.  | If it was understood that it could be               |
| 01:36:43 | 12 |     | justified.                                          |
| 01:36:43 | 13 | Q.  | If you felt it could be justified?                  |
| 01:36:45 | 14 |     | MS. GIFFORD:  Objection.                            |
| 01:36:48 | 15 | Q.  | I don't know what you mean, "if it could be         |
| 01:36:50 | 16 |     | justified."                                         |
| 01:36:54 | 17 | A.  | There are certain extenuating circumstances         |
| 01:36:55 | 18 |     | that would make an embalming take longer            |
| 01:36:59 | 19 |     | than others.  If it was a pretty normal             |
| 01:37:01 | 20 |     | case, your two hours removal and one hour           |
| 01:37:05 | 21 |     | for embalming would suffice.  If it took            |
| 01:37:09 | 22 |     | longer and you can explain why it took longer       |
|          | 23 |     | and the manager agreed that that was all            |
| 01:37:13 | 24 |     | right, then it was fine, they would                 |
| 01:37:17 | 25 |     | compensate you for it.                              |

b5497ddd-92c3-4142-b30a-6f8be4751c65

NETWORK DEPOSITION SERVICES
Transcript of Steven Detschner

Page 182

|   |   |   |   |
|---|---|---|---|
|  | 1 |  | Ames Funeral Homes. |
|  | 2 | Q. | So you never did anything in the community |
| 02:23:26 | 3 |  | or did any volunteer work that you just |
| 02:23:28 | 4 |  | personally decided to do that was unrelated |
| 02:23:30 | 5 |  | to Alderwoods? |
| 02:23:31 | 6 |  | MS. GIFFORD: Are we talking at the |
| 02:23:32 | 7 |  | time he was employed there? |
| 02:23:34 | 8 | Q. | Yes, during your employment. Did you ever |
| 02:23:38 | 9 |  | personally on your own get involved in the |
| 02:23:41 | 10 |  | community in a way that was unrelated to |
| 02:23:50 | 11 |  | Alderwoods? |
| 02:23:51 | 12 | A. | I mean, there are certain times that the |
| 02:23:53 | 13 |  | Elks Club, that I didn't every minute say |
| 02:23:56 | 14 |  | I was a member of the community, but, I mean, |
|  | 15 |  | on the outlying pretense of why I joined |
| 02:24:02 | 16 |  | was to be a representative. What I did was |
| 02:24:11 | 17 |  | I volunteered there as Steve Detschner who |
| 02:24:14 | 18 |  | worked at Doane, Beal & Ames Funeral Homes, |
| 02:24:18 | 19 |  | he's a funeral director. |
| 02:24:20 | 20 | Q. | So you're saying Alderwoods was the impetus, |
| 02:24:23 | 21 |  | the reason you got involved in the first |
| 02:24:24 | 22 |  | place? |
| 02:24:24 | 23 | A. | I joined these groups because I was told |
| 02:24:29 | 24 |  | that community service was highly expected |
| 02:24:33 | 25 |  | from their employees and it was strongly |

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

b5497ddd-92c3-4142-b30a-6f8be4751c65

NETWORK DEPOSITION SERVICES
Transcript of Steven Detschner

Page 183

|  | 1 | encouraged. |
|---|---|---|
|  | 2 | Q. Are you seeking compensation in this lawsuit |
| 02:24:38 | 3 | for all of the time that you spent in any |
| 02:24:42 | 4 | Moose Club or Elks Club activity? |
| 02:24:45 | 5 | A. I'm seeking compensation for -- I don't know |
| 02:24:53 | 6 | how to answer for all time. |
| 02:24:55 | 7 | Q. For example, if you were at an Elks Club |
| 02:24:58 | 8 | fish fry that you attended for two and a |
| 02:25:01 | 9 | half hours, do you claim that you're entitled |
| 02:25:05 | 10 | to compensation for the full two and a half |
| 02:25:07 | 11 | hours that you spent at the Elks Club fish |
| 02:25:18 | 12 | fry? |
| 02:25:18 | 13 | A. I don't know how to break down -- I wouldn't |
|  | 14 | know how to break down the time that I |
| 02:25:23 | 15 | spent there. |
| 02:25:24 | 16 | Q. I don't either. |
| 02:25:25 | 17 | A. I'm sorry, but I don't really know how to |
| 02:25:28 | 18 | answer that question because it's difficult. |
| 02:25:31 | 19 | MS. GIFFORD: She's not asking |
| 02:25:32 | 20 | about how much time you spent. What she's |
| 02:25:34 | 21 | saying was all that time that you're seeking |
| 02:25:38 | 22 | to recover in the lawsuit, whatever the |
| 02:25:40 | 23 | amount is. |
| 02:25:40 | 24 | A. I wouldn't be a member of those organizations |
| 02:25:42 | 25 | if it hadn't been for me wanting to be a |

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

NETWORK DEPOSITION SERVICES
Transcript of Steven Detschner

Page 184

| | | |
|---|---|---|
| | 1 | positive member, a team player in the funeral |
| | 2 | home.  I wouldn't have done any of those |
| 02:25:50 | 3 | things if I hadn't received feedback from |
| 02:25:52 | 4 | my managers regarding my community service |
| 02:25:56 | 5 | and I wouldn't have done any of that if the |
| 02:25:59 | 6 | issue was never raised. |
| 02:26:00 | 7 | Q.  I understand.  That was your motivation |
| 02:26:02 | 8 | for getting involved in the first place, |
| 02:26:04 | 9 | correct? |
| 02:26:04 | 10 | A.  Right. |
| 02:26:04 | 11 | Q.  What I'm asking is was any of the time |
| 02:26:09 | 12 | that you spent at Moose Club or Elks Club |
| | 13 | activities purely personal social time |
| 02:26:15 | 14 | for which you are not seeking to be |
| 02:26:18 | 15 | compensated? |
| 02:26:18 | 16 | MS. GIFFORD:  Objection.  Go ahead. |
| 02:26:27 | 17 | A.  I'm not demanding to be compensated for |
| 02:26:29 | 18 | every second that I was at the different |
| 02:26:32 | 19 | functions, but I did join those clubs and |
| 02:26:37 | 20 | participate in those functions because I was |
| 02:26:40 | 21 | an employee of Doane, Beal & Ames and I |
| 02:26:42 | 22 | wanted to be a representative of them while |
| 02:26:48 | 23 | in those organizations. |
| 02:26:56 | 24 | Q.  Okay.  Did anyone at Alderwoods specifically |
| 02:27:03 | 25 | instruct you to join the Moose Club and the |

b5497ddd-92c3-4142-b30a-6f8be4751c65

NETWORK DEPOSITION SERVICES
Transcript of Steven Detschner

Page 196

|  |  |  |  |
|---|---|---|---|
|  | 1 |  | I said why didn't you report it. You said |
|  | 2 |  | it would be ludicrous. You personally think |
| 02:40:13 | 3 |  | it would be ludicrous to report that time? |
| 02:40:14 | 4 |  | MS. GIFFORD: Objection. |
| 02:40:17 | 5 | A. | I see no reason why time spent in the |
| 02:40:21 | 6 |  | interest of bettering a company could not |
| 02:40:23 | 7 |  | be compensatedable. |
| 02:40:30 | 8 | Q. | So why would it be ludicrous to report that |
| 02:40:35 | 9 |  | time on your time sheet? |
| 02:40:37 | 10 | A. | It was not something that we did at the |
| 02:40:41 | 11 |  | company across the board. |
| 02:40:41 | 12 | Q. | If you thought that was something that |
| 02:40:50 | 13 |  | you should be compensated for, did you say |
| 02:40:50 | 14 |  | anything to anybody to that effect? |
| 02:40:50 | 15 | A. | No. I didn't want to make any trouble. |
| 02:40:54 | 16 | Q. | Did anyone instruct you one way or the |
| 02:40:56 | 17 |  | other whether you should report that time |
| 02:40:57 | 18 |  | on your time sheets? |
| 02:40:58 | 19 | A. | I was never instructed to document any sort |
| 02:41:01 | 20 |  | of time on a time sheet. |
| 02:41:03 | 21 | Q. | Were you ever instructed not to report |
| 02:41:06 | 22 |  | community service time on your time sheets? |
| 02:41:12 | 23 | A. | Not in so many words. |
| 02:41:13 | 24 | Q. | Did you ever try to report time that you |
|  | 25 |  | spent in community activities? |

b5497ddd-92c3-4142-b30a-6f8be4751c65

NETWORK DEPOSITION SERVICES
Transcript of Steven Detschner

Page 197

|  |  |  |  |
|---|---|---|---|
|  | 1 | A. | Can you repeat that?  Did I ever try to? |
|  | 2 |  | MS. DUGAN:  Can you read that back, |
| 02:41:25 | 3 |  | please? |
| 02:41:33 | 4 |  | (Question read) |
| 02:41:33 | 5 | A. | I reported it to Jerry so that I could get |
| 02:41:36 | 6 |  | the points or so he would give me points. |
| 02:41:39 | 7 | Q. | Did you ever seek compensation for that time? |
| 02:41:44 | 8 | A. | Not on, not via the overtime rate. |
| 02:41:51 | 9 | Q. | You never reported that time on your time |
| 02:41:53 | 10 |  | sheets? |
| 02:41:53 | 11 | A. | That's correct. |
| 02:41:54 | 12 | Q. | Is that what you're saying? |
| 02:41:56 | 13 | A. | That's correct. |
| 02:41:59 | 14 | Q. | And you never said to anyone, hey, I'm |
| 02:42:01 | 15 |  | doing this stuff on behalf of the company, |
| 02:42:04 | 16 |  | I think I should be paid for it? |
| 02:42:06 | 17 |  | MS. GIFFORD:  Objection. |
| 02:42:08 | 18 | A. | I never raised an issue about it. |
| 02:42:14 | 19 | Q. | And no manager ever specifically prohibited |
| 02:42:19 | 20 |  | you from reporting time spent in community |
| 02:42:23 | 21 |  | activities? |
| 02:42:23 | 22 |  | MS. GIFFORD:  Objection. |
| 02:42:29 | 23 | A. | I was never hindered from doing community |
|  | 24 |  | service. |
| 02:42:33 | 25 |  | MS. DUGAN:  Can you read back my |

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

b5497ddd-92c3-4142-b30a-6f8be4751c65

NETWORK DEPOSITION SERVICES
Transcript of Steven Detschner

Page 198

|   |   |   |
|---|---|---|
|   | 1 | question, please? |
|   | 2 | (Question read) |
| 02:42:47 | 3 | A. I don't recall ever being prohibited. |
| 02:42:50 | 4 | Q. Do you know whether any other employees |
| 02:42:53 | 5 | reported on their time sheets time that |
| 02:42:54 | 6 | they spent in community work? |
| 02:42:57 | 7 | A. Not to my knowledge. |
| 02:42:59 | 8 | Q. You don't know one way or the other whether |
| 02:43:03 | 9 | they did? |
| 02:43:05 | 10 | A. I don't believe anybody did, but I have no |
| 02:43:11 | 11 | documentation support other than the fact |
| 02:43:12 | 12 | that we knew we were doing it on our own |
| 02:43:15 | 13 | time. |
| 02:43:16 | 14 | Q. So you have no first-hand knowledge as to |
| 02:43:17 | 15 | whether anyone else was reporting that |
| 02:43:19 | 16 | time on their time sheets? |
| 02:43:21 | 17 | MS. GIFFORD: Objection. |
| 02:43:22 | 18 | A. I have no way of tracking their time sheets. |
| 02:43:29 | 19 | Q. Whenever you reported activities to Jerry |
| 02:43:37 | 20 | Tilton in connection with the rewards |
| 02:43:40 | 21 | program, did you keep any personal record |
| 02:43:42 | 22 | of the activities that you reported to him? |
|   | 23 | A. It may have been on a pocket calendar that |
| 02:43:51 | 24 | I had, but other than that, I didn't keep |
| 02:43:54 | 25 | any sort of documentation.  It was my |

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

b5497ddd-92c3-4142-b30a-6f8be4751c65

NETWORK DEPOSITION SERVICES
Transcript of Steven Detschner

Page 216

| | | |
|---|---|---|
| | 1 | policy.'"  Do you have any information or |
| | 2 | knowledge that Alderwoods had a, quote, |
| 03:15:43 | 3 | "community work policy"? |
| 03:15:45 | 4 | MS. GIFFORD:  Objection. |
| | 5 | A.  The name "community work policy," I don't |
| 03:15:54 | 6 | recall that. |
| 03:15:55 | 7 | Q.  That specific title -- |
| 03:15:57 | 8 | A.  No. |
| 03:15:57 | 9 | Q.  -- being attached to anything?  What about |
| 03:16:05 | 10 | Subparagraph B on the next page which states, |
| 03:16:07 | 11 | "defendants implemented an 'on-call pay |
| 03:16:10 | 12 | policy.'"  Did you ever see something called |
| 03:16:13 | 13 | an on-call pay policy? |
| 03:16:14 | 14 | MS. GIFFORD:  Objection. |
| 03:16:17 | 15 | A.  I don't know of any policies regarding pay. |
| 03:16:22 | 16 | Q.  So no, you don't know of a, quote, "on-call |
| 03:16:26 | 17 | pay policy" that Alderwoods had? |
| 03:16:28 | 18 | A.  I'm not familiar with anything named on-call |
| 03:16:31 | 19 | pay policy. |
| 03:16:33 | 20 | Q.  Moving down to Subparagraph G, it states |
| 03:16:36 | 21 | that "defendant implemented a 'pre-approval |
| 03:16:40 | 22 | for overtime pay policy.'"  Have you ever |
| 03:16:45 | 23 | heard or seen something called the |
| 03:16:48 | 24 | pre-approval for overtime pay policy? |
| 03:16:50 | 25 | MS. GIFFORD:  Objection. |

b5497ddd-92c3-4142-b30a-6f8be4751c65

NETWORK DEPOSITION SERVICES
Transcript of Steven Detschner

Page 251

1        COMMONWEALTH OF MASSACHUSETTS)

2        SUFFOLK, SS. )

3

4                I, Jeanette Maracas, Registered
         Professional Reporter and Notary Public in
         and for the Commonwealth of Massachusetts, do

5        hereby certify that there came before me on
         the 8th day of May, 2009, at 9:23 a.m., the

6        person hereinbefore named, who was by me duly
         sworn to testify to the truth and nothing but

7        the truth of his knowledge touching and
         concerning the matters in controversy in this

8        cause; that he was thereupon examined upon
         his oath, and his examination reduced to

9        typewriting under my direction; and that the
         deposition is a true record of the testimony

10       given by the witness.

11               I further certify that I am neither
         attorney or counsel for, nor related to or

12       employed by, any attorney or counsel employed
         by the parties hereto or financially

13       interested in the action.

14               In witness whereof, I have hereunto
         set my hand this 18th day of May, 2009.

15

16

17

18

19                       Notary Public

20                       My commission expires 9/6/13

21

22

23

24

25

b5497ddd-92c3-4142-b30a-6f8be4751c65

**TAB 11**

NETWORK DEPOSITION SERVICES
Transcript of Jeffrey Diggs

Page 1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF PENNSYLVANIA


DEBORAH PRISE and HEATHER RADY
on behalf of themselves and all
employees similiarly situated,

       Plaintiffs,

   vs.

ALDERWOODS GROUP, INC., and SERVICE
CORPORATION INTERNATIONAL,

       Defendants.
_____

Civil Action No. 06-1641




DEPOSITION OF JEFFREY DIGGS

Taken April 22, 2009
Commencing at 9:30 a.m.

Volume I - Pages 1 - 153, inclusive




Taken by the Defendant
at
LANE POWELL
301 W. Northern Lights Blvd.
Anchorage, AK  99503



Reported by: Susan J. Warnick, RPR

96832057-fd66-463b-9c71-51eca2e9727f

NETWORK DEPOSITION SERVICES
Transcript of Jeffrey Diggs

Page 73

1   A    No.

2   Q    As part of your job position were you required to

3   perform any community service?

4   A    Required?

5   Q    Yes, sir.

6   A    No.

7   Q    Did you ever complain to anyone about not being paid

8   for all the hours that you worked?

9           MR. LINGLE:  Object to the form.

10          THE WITNESS:  I don't recall.

11  BY MR. FORESTIERE:

12  Q    Did you ever complain to anyone about performing your

13  on-call work?

14          MR. LINGLE:  Object to the form.

15          THE WITNESS:  I don't recall.

16  BY MR. FORESTIERE:

17  Q    Did you ever complain about not being compensated for

18  all the hours that you worked at Evergreen?

19          MR. LINGLE:  Object to the form.

20          THE WITNESS:  I don't recall.

21  BY MR. FORESTIERE:

22  Q    Did you ever complain to anyone about not being paid

23  any overtime that you worked that you were not paid for?

24          MR. LINGLE:  Object to the form.

25          THE WITNESS:  I don't recall.

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

96832057-fd66-463b-9c71-51eca2e9727f

NETWORK DEPOSITION SERVICES
Transcript of Jeffrey Diggs

Page 109

1    Alderwoods for work you performed at Evergreen for the

2    boxes A, C and E?

3    A    Yes.

4    Q    Now, other than the boxes A, B, C, D and E, are there

5    any other bases for compensation that you're claiming for

6    the type of -- strike that.

7         Other than the types of compensation reflected

8    in A through E, are there other types of compensation that

9    you're seeking to be paid for work you performed at

10   Evergreen?

11        MR. LINGLE:  Object to the form.

12   BY MR. FORESTIERE:

13   Q    Do you understand my question?

14   A    Yeah.  You're asking me is there anything that's not

15   on this page that I'm looking for.

16   Q    That's right, to be paid for for the work you

17   performed at Evergreen.

18   A    No.

19   Q    Are you aware of any company-wide policy used by

20   Evergreen requiring any of its employees to perform

21   community service work?

22        MR. LINGLE:  Object to the form.

23        THE WITNESS:  Can you repeat that question?

24        MR. FORESTIERE:  Have it read back, please.

25        (Requested record read.)

96832057-fd66-463b-9c71-51eca2e9727f

NETWORK DEPOSITION SERVICES
Transcript of Jeffrey Diggs

Page 110

1          THE WITNESS:  Requiring, no.

2    BY MR. FORESTIERE:

3    Q    Are you aware of any company-wide policy used by

4    Evergreen discussing whether community service work time

5    should be reported?

6          MR. LINGLE:  Object to the form.

7          THE WITNESS:  No.

8    BY MR. FORESTIERE:

9    Q    Have any of the employees employed by Evergreen

10   complained to you that they were required to perform

11   community service work?

12   A    No.

13   Q    Have any of the employees at Evergreen ever

14   complained to you that they were not being paid for their

15   community service work?

16         MR. LINGLE:  Object to the form.

17         THE WITNESS:  No.

18   BY MR. FORESTIERE:

19   Q    Let's talk about your on-call work that you

20   performed.

21          What did you understand your duties were when

22   you were on call?

23         MR. LINGLE:  Object to the form.

24         THE WITNESS:  On call to do what?  Answer the

25   telephones or to make removals?

NETWORK DEPOSITION SERVICES
Transcript of Jeffrey Diggs

Page 112

1    A    Yes.

2    Q    How many times were you performing phone duties?

3              MR. LINGLE:  Object to the form.

4              THE WITNESS:  Usually phone duties two nights a

5    month.

6    BY MR. FORESTIERE:

7    Q    And how much time on those two nights a month would

8    you be performing phone duties?

9              MR. LINGLE:  Object to the form.

10             THE WITNESS:  Let me make sure I understand what

11   you're asking.  How much time I would be answering the

12   phone?

13   BY MR. FORESTIERE:

14   Q    Well, I'm trying to understand what your

15   understanding is of phone duties versus on-call duties.

16   Because other people have testified basically that they're

17   on call also answering the phone; they seem to understand

18   it's all in one function.  But you seem to have a

19   different understanding, and that's what I'm trying to

20   explore.

21   A    My understanding is phone duty is, at 5:00 in the

22   afternoon the phone is diverted to a cell phone, which I

23   will carry and answer that phone throughout the night up

24   until it is undiverted from that cell phone the next

25   morning.  So let's say from five P.M. in the afternoon

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

96832057-fd66-463b-9c71-51eca2e9727f

NETWORK DEPOSITION SERVICES
Transcript of Jeffrey Diggs

Page 113

1  until eight A.M. the next morning, that's phone duty.

2  Q    And so they would give you a cell phone that you

3  would carry with you to answer the phone?

4  A    Yes.

5  Q    And you were scheduled to do that how often?

6  A    Two nights a month.

7  Q    Two nights a week?

8  A    No, a month.

9  Q    Two nights a month.

10           And when you performed phone duty two nights a

11  month, how often would you actually receive calls?

12  A    Every night.

13  Q    So every time that you were on phone duty you

14  received a call; is that correct?

15  A    Sure.  You bet.

16  Q    How long would the calls last?

17  A    Variations.

18  Q    Can you give me a range?

19  A    You can range from two minutes to 30 minutes.

20  Q    How many calls would you receive on an average on the

21  nights that you were on phone duty?

22  A    Nights you were on phone duty, probably 10 to 15

23  calls.

24  Q    And how was it that you would be scheduled to be on

25  phone duty?  Would Mr. Janssen tell you that?

96832057-fd66-463b-9c71-51eca2e9727f

NETWORK DEPOSITION SERVICES
Transcript of Jeffrey Diggs

Page 114

1    A    Yes.

2    Q    Was that also put on that board on the wall?

3    A    Usually.

4    Q    Did you have any restrictions as to what you could do

5    while you were on phone duty?

6    A    Yes.

7    Q    What were the restrictions?

8    A    You could not take the phone into public access

9    areas.  You couldn't take it to church, grocery store,

10   soccer.  Couldn't go anywhere.

11   Q    Where were you when you were on phone duty?

12            MR. LINGLE:  Object to the form.

13   BY MR. FORESTIERE:

14   Q    Do you understand my question?

15   A    Where was I physically?

16   Q    Yes, sir.

17   A    Home.

18   Q    Did you ever record any of the time that you spent on

19   phone duty?

20   A    No.

21   Q    Did you ever try to obtain compensation for the time

22   that you were on phone duty?

23   A    No.

24   Q    Did you ever report the time on your time card that

25   you spent on phone duty?

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

96832057-fd66-463b-9c71-51eca2e9727f

NETWORK DEPOSITION SERVICES
Transcript of Jeffrey Diggs

Page 115

1   A    I did not.

2   Q    Have you ever attempted to calculate the total amount

3   of time that you spent on phone duty during the time that

4   you were employed at Evergreen?

5         MR. LINGLE:  Object to the form.

6         THE WITNESS:  I just figured in my head right

7   here, two nights a month, roughly 14 hours -- 28 hours.

8   BY MR. FORESTIERE:

9   Q    Twenty-eight hours --

10  A    A month.

11  Q    -- for every month that you were employed at

12  Evergreen?

13  A    Best of my knowledge.

14  Q    Was there a reason why you didn't report this time on

15  the time cards?

16  A    For me it was more of a hassle than it was worth.

17  Q    Did you ever tell anyone that you didn't report the

18  time on your time cards while you were performing this

19  phone duty?

20  A    Yes.

21  Q    Who did you tell?

22  A    Kirstin.

23  Q    Did you tell her more than one time?

24  A    I may have mentioned to her more than once that I

25  wasn't keeping track of that.

96832057-fd66-463b-9c71-51eca2e9727f

NETWORK DEPOSITION SERVICES
Transcript of Jeffrey Diggs

Page 116

1    Q    Do you recall how many times you told her that?

2    A    No.

3    Q    What was her response to your statement?

4    A    I don't recall.

5    Q    Were you ever paid for any of the time that you spent

6    on phone duty?

7    A    Not to my knowledge.

8    Q    Are you aware of any company-wide policy of not

9    compensating employees for work they did while performing

10   these phone duties?

11            MR. LINGLE:  Object to the form.

12            THE WITNESS:  I'm not aware of any company-wide

13   policy pertaining to any phone duty responsibilities.

14   BY MR. FORESTIERE:

15   Q    And that would include a policy of not compensating

16   employees for this work?

17            MR. LINGLE:  Object to the form.

18            THE WITNESS:  I'm not aware of any company-wide

19   policy pertaining to phone duties.

20   BY MR. FORESTIERE:

21   Q    Let's not play games.

22            MR. LINGLE:  Don't characterize that -- he's not

23   playing games; he's answering your questions.

24   BY MR. FORESTIERE:

25   Q    My question was:  Have you ever seen a policy whereby

96832057-fd66-463b-9c71-51eca2e9727f

NETWORK DEPOSITION SERVICES
Transcript of Jeffrey Diggs

Page 125

1    ended.

2            MR. FORESTIERE:  I'm not asking him whether he's

3    seen the document; I'm not asking whether it's in effect.

4    My question is whether that's his understanding at the

5    time he was performing his duties.

6            MR. LINGLE:  Well, that's why I asked if it was

7    based on the manual.  Because the manual was not in place,

8    based on the date on here, when he was actually employed.

9            MR. FORESTIERE:  I understand that.

10   BY MR. FORESTIERE:

11   Q    Do you understand my question?

12   A    Can you repeat that?

13   Q    That last sentence basically said that it's your

14   responsibility to clock in and out when you perform these

15   on-call duties.

16            Is it your understanding that you were not

17   required to do that because you were paid a flat rate of

18   $35 for each removal?

19            MR. LINGLE:  Object to the form.

20            THE WITNESS:  It was my understanding not to

21   clock in or out for removal.

22   BY MR. FORESTIERE:

23   Q    And why was that?

24   A    It is flat rate.

25   Q    The next paragraph, it says, "When a nonexempt

96832057-fd66-463b-9c71-51eca2e9727f

NETWORK DEPOSITION SERVICES
Transcript of Jeffrey Diggs

Page 126

1  employee is required to take phone calls after completing

2  the regular work schedule and leaving the premises but is

3  not required to physically return to work, the employee

4  shall log the start and end times of each phone call."

5          Do you see that?

6  A    I do.

7  Q    And that was your understanding at that time that you

8  were on what we defined as phone duty?

9  A    That was my understanding, yes.

10 Q    And you said you didn't do it because it was just a

11 hassle to do; correct?

12 A    Yes.

13 Q    Are you aware of any company-wide policy by Evergreen

14 of requiring employees to become licensed and not

15 compensating them for the time and expense of doing so?

16         MR. LINGLE:  Object to the form.

17         THE WITNESS:  No.

18 BY MR. FORESTIERE:

19 Q    Has any employee, during the time that you worked at

20 Evergreen, ever complained to you that they were required

21 to be licensed and were not compensated for the time of

22 doing so?

23         MR. LINGLE:  Object to the form.

24         THE WITNESS:  No.

25 BY MR. FORESTIERE:

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

96832057-fd66-463b-9c71-51eca2e9727f

1                      REPORTER'S CERTIFICATE

2          I, SUSAN J. WARNICK, RPR, and Notary Public in

3   and for the State of Alaska do hereby certify:

4         That the witness in the foregoing proceedings was

5   duly sworn; that the proceedings were then taken before me

6   at the time and place herein set forth; that the testimony

7   and proceedings were reported stenographically by me and

8   later transcribed under my direction by computer

9   transcription; that the foregoing is a true record of the

10   testimony and proceedings taken at that time; and that I

11   am not a party to nor have I any interest in the outcome

12   of the action herein contained.

13         IN WITNESS WHEREOF, I have hereunto subscribed my

14   hand and affixed my seal this 27th day of April,

15   2009.

16

17

18                   SUSAN J. WARNICK,
                         Registered Professional Reporter

19                   Notary Public for Alaska

20
   My Commission Expires:  April 8, 2010

21

22

23

24

25