**TAB 12**

NETWORK DEPOSITION SERVICES
Transcript of Stephen Escobar

Page 1

THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

-----------------------------

DEBORAH PRISE and HEATHER          )

RADY on behalf of themselves       )

and all employees similarly        )

situated,                          )

        Plaintiffs,                ) Civil Action No. 06-1641

     vs.                          )

ALDERWOODS GROUP, INC.,            )

        Defendant.                 )

-----------------------------

Deposition of STEPHEN ESCOBAR, taken at

1312 McHenry Avenue, Modesto,

California, commencing at 10:06 a.m.,

Wednesday, March 11, 2009, before

Amanda J. Dunn, California CSR No. 13336.

PAGES 1 - 177

Johnstown                    Toll-Free                   Pittsburgh
814-266-2042              866-565-1929              412-281-7908

4ebe35e9-e05c-4c4b-bcd9-4ed04ae729b2

NETWORK DEPOSITION SERVICES
Transcript of Stephen Escobar

Page 115

1    Q.   And what was your understanding as to what
2    happened to them after you gave it to them?
3    A.   They would enter them into the computer.
4    Q.   Now, on some of the entries -- I'll refer you
5    to pages 3, 4, and 20.  It looks like maybe 6 as well.
6         3, 4, 5, 6 -- just for example there's
7    handwriting that says "No Lunch."
8    A.   Yes.
9    Q.   Do you see that?
10   A.   Yes.
11   Q.   Is that your handwriting?
12   A.   Yes.
13   Q.   And what does that indicate?
14   A.   They didn't let me take lunch.
15   Q.   So the days that you didn't get lunch, you
16   indicated that on your time cards; is that correct?
17   A.   Yes.
18   Q.   And on page 35, on the left side there, it
19   says -- it looks like it says, "No Transaction Report."
20   On page 35, sir.
21        Do you see that on the left-hand side?
22   A.   Yes.
23   Q.   Do you know what that refers to -- strike that.
24        First of all, is that your handwriting?
25   A.   No.

NETWORK DEPOSITION SERVICES
Transcript of Stephen Escobar

Page 116

1    Q.   Do you have any idea about what that refers to?

2    A.   No.

3         MR. LINGLE:  Just note my continuing objection

4    to all these questions based on the fact that it was not

5    produced prior to this.  It was sprung on the witness

6    during the deposition.

7         MR. FORESTIERE:  Well, I can't tell you whether

8    that -- but I'm surely entitled to ask him about

9    documents he's completed.

10        MR. LINGLE:  Well, you're supposed to produce

11   them ahead of time.  You haven't been doing it -- you

12   haven't produced them, so I'm continuing to object to

13   all these questions.  You know that you cannot tell me

14   that they were produced, so continuous objections.

15   BY MR. FORESTIERE:

16   Q.   On page 31, about halfway in the middle of the

17   page, it says -- it looks like it says, "Piece work,

18   $100 for Saturday."

19        Do you see that?

20   A.   Yes.

21   Q.   Is that your handwriting?

22   A.   Yes.

23   Q.   What does that mean?

24   A.   That would be that I picked up somebody.

25        MR. LINGLE:  Objection.

4ebe35e9-e05c-4c4b-bcd9-4ed04ae729b2

NETWORK DEPOSITION SERVICES
Transcript of Stephen Escobar

1    BY MR. FORESTIERE:

2        Q.    What do you mean, you picked up somebody?

3              MR. LINGLE:  Objection.

4              THE WITNESS:  Picked up a person from a house.

5    BY MR. FORESTIERE:

6        Q.    You did a removal?

7              MR. LINGLE:  Objection.

8              THE WITNESS:  Mmm-hmm.

9    BY MR. FORESTIERE:

10       Q.    Do you know how many times you did that while

11   employed at Lakewood?

12             MR. LINGLE:  Objection.

13             MR. FORESTIERE:  Counselor, if it's a

14   continuing objection, you've already made it.  If it's a

15   new objection, then you can --

16             MR. LINGLE:  The whole line of questioning is

17   improper, I think, so --

18             MR. FORESTIERE:  You've already --

19             MR. LINGLE:  I'm going to object to each

20   question to make sure that it's clear on the record.

21   Each question is objectionable.

22             MR. FORESTIERE:  Can you read back my question,

23   please.

24             (Record read by the reporter.)

25

4ebe35e9-e05c-4c4b-bcd9-4ed04ae729b2

NETWORK DEPOSITION SERVICES
Transcript of Stephen Escobar

Page 118

1    BY MR. FORESTIERE:

2         Q.   Do you have the question in mind, sir?

3         A.   I do.  I don't know the exact number.

4         Q.   Do you have an estimate?

5              MR. LINGLE:  Object to the form.

6              THE WITNESS:  That number would be really hard

7    to determine.

8    BY MR. FORESTIERE:

9         Q.   Well, was it more than once?

10        A.   Yes.

11        Q.   We know that, right?

12        A.   Yes.

13        Q.   If you had conducted a removal, would you

14   usually note it on your time card?

15             MR. LINGLE:  Objection.

16             THE WITNESS:  Not every time.

17   BY MR. FORESTIERE:

18        Q.   But was it your common practice to do so?

19             MR. LINGLE:  Object to the form.

20             THE WITNESS:  Depending if my manager wanted me

21   to or not.

22   BY MR. FORESTIERE:

23        Q.   And who would that be, Mr. Webb?

24        A.   Yes.

25        Q.   And when would he want you to do it, and when

4ebe35e9-e05c-4c4b-bcd9-4ed04ae729b2

NETWORK DEPOSITION SERVICES
Transcript of Stephen Escobar

Page 119

1    would he not want you to do it?

2         MR. LINGLE:  Object to the form.

3    BY MR. FORESTIERE:

4         Q.   Did he give you instructions about when to do

5    it and when not to do it?

6         A.   Yes.

7         MR. LINGLE:  Object to the form.

8    BY MR. FORESTIERE:

9         Q.   What instructions would he give you?

10        A.   Whatever the district manager would say.

11        Q.   Who was the district manager?

12        A.   Bill.

13        Q.   Do you know his last name?

14        A.   I don't remember his last name.

15        Q.   So are you saying that every time you did a

16   removal, you had to check with Mr. Webb, and he in turn

17   had to check with Bill to determine whether or not you

18   could write an entry on your time card concerning a

19   removal you performed?

20        MR. LINGLE:  Object to the form.

21        THE WITNESS:  Yes.

22   BY MR. FORESTIERE:

23        Q.   And these instances where you had written on

24   your time card, you've gotten approval from both

25   Mr. Webb and Bill to write the amount of the removal

Johnstown              Toll-Free            Pittsburgh
814-266-2042         866-565-1929         412-281-7908

NETWORK DEPOSITION SERVICES
Transcript of Stephen Escobar

Page 120

1    that you performed on your time card?

2          MR. LINGLE:  Object to the form.

3          THE WITNESS:  Yes.

4  BY MR. FORESTIERE:

5       Q.   How much did you get paid for each removal?

6       A.   Like $50.

7       Q.   And that was in addition to your hourly rates?

8       A.   Yes.

9       Q.   So on page 31, it says, "Piece work, $100, for

10  Saturday," that would reflect two removals, correct?

11      A.   Yes.

12          MR. LINGLE:  Objection.

13  BY MR. FORESTIERE:

14      Q.   Page 32, it says, "$50, piece work."  It says

15  the name "Dickerson."  That would reflect payment for

16  one removal?

17          MR. LINGLE:  Objection.

18          THE WITNESS:  Yes.

19  BY MR. FORESTIERE:

20      Q.   On page 37, in the upper left-hand corner of

21  the time card under your name, under -- it looks like it

22  says "Extra Time."

23          Do you see that?

24      A.   No, I don't.

25      Q.   These entries here, sir.

NETWORK DEPOSITION SERVICES
Transcript of Stephen Escobar

Page 130

1       A.   No.

2       Q.   Are you claiming that you're entitled to three

3  hours of work for every Sunday during the time that you

4  were employed with Lakewood?

5       A.   Yes.

6       Q.   Do you have a list of the names of the persons

7  that you had discussions with concerning the funeral

8  services offered by Lakewood?

9            MR. LINGLE:  Object to the form.

10            THE WITNESS:  No.

11  BY MR. FORESTIERE:

12       Q.   Do you recall any other names?

13       A.   No.

14       Q.   Did Mr. Webb also perform these community

15  services at the church on Sundays?

16       A.   Yes.

17       Q.   Do you know if he's making any claim for that

18  type of community service?

19       A.   I do not know.

20       Q.   How long have you been a member of the

21  Latter-Day Saints?

22       A.   Since I was born.

23       Q.   Which church did you perform these services at?

24       A.   It would with the Fine Road Chapel in Modesto.

25       Q.   How long have you been attending that church?

4ebe35e9-e05c-4c4b-bcd9-4ed04ae729b2

NETWORK DEPOSITION SERVICES
Transcript of Stephen Escobar

Page 131

1      A.    Let's see -- approximately eight years.

2      Q.    How long prior to employment with Lakewood were

3  you a member of that church?

4      A.    The Fine Road Chapel?

5      Q.    Yes, sir.

6      A.    Probably about 1995.

7      Q.    Why'd you pick that organization to perform

8  your community service?

9      A.    Because it was easier to do.

10     Q.    Because you're already a member of it?

11     A.    Yeah.

12     Q.    Did Lakewood ever pay for any out-of-pocket

13  expenses you incurred in performing these services?

14     A.    No.

15     Q.    Did you incur any out-of-pocket expenses in

16  performing these services?

17     A.    Except hours worked, no.

18     Q.    What would you generally talk about in trying

19  to sell the funeral services that were available at

20  Lakewood?

21     A.    I would talk with them about pre-need.

22     Q.    What would you talk to them about that?

23     A.    I would say that I could get someone to talk to

24  them about pre-need.

25     Q.    Anything else?

NETWORK DEPOSITION SERVICES
Transcript of Stephen Escobar

Page 132

1    A.   That it's better to do pre-need than -- what is
2    that -- at-need?
3    Q.   Yes.  To do advanced planning?
4    A.   Yes.
5    Q.   Did you talk to them about anything else?
6    A.   No.  That's basically it.
7    Q.   Did you talk to them anything about the price
8    lists or costs of doing --
9    A.   Yes.
10   Q.   -- pre-need versus at-need?
11   A.   Yes.  We had price lists.
12   Q.   Did you take that with you to these meetings
13   that you had with these parishioners?
14   A.   Yes.
15   Q.   Did you give them copies of the price lists?
16   A.   Yes.
17   Q.   Did anybody at Lakewood attempt to evaluate
18   your community service work with the Latter-Day Saints?
19   A.   No.
20   Q.   And that was an organization you chose,
21   correct?
22   A.   Yes.
23   Q.   No one instructed you to join that particular
24   group?
25   A.   Yes.

4ebe35e9-e05c-4c4b-bcd9-4ed04ae729b2

NETWORK DEPOSITION SERVICES
Transcript of Stephen Escobar

Page 134

1   community to make us have more business.

2        Q.   Anything else?

3        A.   No.  That would be it.

4        Q.   Was there any other community service

5   organization that you joined in order to perform your

6   community service work while at Lakewood?

7        A.   No.

8        Q.   Were you ever compensated for at least some of

9   the community service work that you performed?

10       A.   No.

11       Q.   Do you recall the hotline or help line to

12   complain about the community service work that you

13   performed?

14            MR. LINGLE:  Object to the form.

15            THE WITNESS:  No.  Because I didn't know about

16   a hotline and a help line.

17   BY MR. FORESTIERE:

18       Q.   Weren't you made aware of that a couple of

19   months before you left as part of the orientation?

20       A.   Yeah.

21       Q.   You were?

22       A.   No, no.  That training.  I had nothing to do

23   with that other -- they never told us about a help line

24   or a hotline.  I had never heard of that.

25

4ebe35e9-e05c-4c4b-bcd9-4ed04ae729b2

NETWORK DEPOSITION SERVICES
Transcript of Stephen Escobar

Page 135

1    BY MR. FORESTIERE:
2        Q.    Today's the first day you're hearing about it?
3        A.    Yes.
4        Q.    Did you ever attempt to report any time that
5    you spent performing this community service work?
6        A.    No.
7        Q.    Did you ever sign an affidavit or declaration
8    concerning this lawsuit?
9        A.    I don't know.
10       Q.    Did you ever sign a document under penalty of
11   perjury stating any facts concerning this lawsuit?
12       A.    I don't remember.
13       Q.    Are you aware of any written policy by Lakewood
14   concerning the on-call work you performed?
15       A.    No.
16       Q.    Are you aware of any written policy concerning
17   overtime that you worked?
18       A.    No.
19       Q.    Are you aware of any written policy by the
20   company for not compensating you for work that you
21   performed while you were on call?
22       A.    No.
23       Q.    Are you aware of any policy for not
24   compensating you for work you performed concerning your
25   community service?

4ebe35e9-e05c-4c4b-bcd9-4ed04ae729b2

NETWORK DEPOSITION SERVICES
Transcript of Stephen Escobar

Page 136

1          MR. LINGLE:  Object to the form.

2          THE WITNESS:  No.

3  BY MR. FORESTIERE:

4      Q.   Did you ever attend any type of training for

5  which you were not compensated for?

6      A.   No.

7      Q.   When generally did you conduct your pre-need

8  appointments with people that you sold funeral services

9  with?

10     A.   I didn't -- are you talking about community

11 service?

12     Q.   No.  I'm talking about your -- strike that.

13 Let me step --

14     A.   Yeah.  You know what's going on.

15     Q.   When you worked at the Lakewood facility, did

16 you have any appointments with individuals concerning

17 the prepaid services you were going to sell them?

18     A.   No.

19     Q.   Were you aware of any written policy by

20 Lakewood that stated you were to work during your meal

21 periods?

22     A.   Can you repeat the question.

23     Q.   Sure.  In fact, let me clarify a little more.

24          Are you aware of any written policy by

25 Alderwoods that you were required to work during your

4ebe35e9-e05c-4c4b-bcd9-4ed04ae729b2

NETWORK DEPOSITION SERVICES
Transcript of Stephen Escobar

Page 142

1    refer to as on-call.

2         A.   Yes.

3         Q.   All right.  And what was your -- and you might

4    have said this earlier, but please refresh my

5    recollection -- the amount of time you spent doing

6    on-call that you were not compensated for?

7         A.   Well, there was three of us at the funeral

8    home.  So you divide that by how many weeks.  I'd say

9    per week -- so it would at least be twice or three times

10   a week, depending on if you were on a weekend.

11        Q.   So you're performing on-call duties two to

12   three times a week, correct?

13        A.   At least.

14        Q.   And how many hours are you claiming for unpaid

15   on-call services you rendered for each of those times?

16        A.   It would be from 5 o'clock when I quit until

17   8 o'clock the next morning when I would arrive.

18        Q.   So from 5:00 to 8:00 a.m. -- so you're claiming

19   that entire period?

20        A.   Yes.

21        Q.   Did you perform retrievals for that entire

22   period of time?

23        A.   Yes.  Retrievals or phone calls.  Does that

24   make --

25        Q.   Did you have a -- you had a telephone, correct?

4ebe35e9-e05c-4c4b-bcd9-4ed04ae729b2

NETWORK DEPOSITION SERVICES
Transcript of Stephen Escobar

Page 143

1      A.   Yes.

2      Q.   For the on-call services?  They gave you a

3  telephone?

4      A.   Yes.

5      Q.   Okay.  Did you have to pay for that?

6      A.   No.

7      Q.   That was something the company paid for?

8      A.   Yes.

9      Q.   Was it a cell phone?

10     A.   Yes.

11     Q.   Would you agree that perhaps the cell phone

12  records would be a good indication of calls you received

13  to perform on-call services?

14     A.   Yes.

15     Q.   Now, you also talked about meal -- working

16  through meal periods.

17     A.   Yes.

18     Q.   And you claim that to also be overtime?

19     A.   Yes.

20     Q.   How often did that occur that you worked

21  through a meal period?

22     A.   I would say two times a week.

23     Q.   How's it that you were asked to do work through

24  a meal period -- strike that.

25          Could you explain to me how that occurred that

4ebe35e9-e05c-4c4b-bcd9-4ed04ae729b2

NETWORK DEPOSITION SERVICES
Transcript of Stephen Escobar

Page 144

1  you missed a meal period or were forced to work during a

2  meal period?

3      A.    We were the busiest funeral home in this

4  county.

5      Q.    What work were you performing during your meal

6  periods typically?

7      A.    Whatever.  Whatever they needed.  I did

8  whatever they wanted me to.

9      Q.    You've got to tell us -- that's what I'm trying

10  to ask.

11      A.    Cremations, arranging for a service, picking up

12  flowers, getting the flowers ready for the service,

13  helping the embalmer get the people dressed.

14      Q.    Who was it that would generally tell you to do

15  this?

16      A.    It would be the manager.

17      Q.    I'm sorry.  Who?

18      A.    Manager.  Brad Webb.

19      Q.    Did you ever tell him, hey, I'm on my lunch

20  break?

21      A.    I tried to.

22      Q.    What was his response?

23      A.    Ha, ha -- no, I'm sorry.

24      Q.    Do you recall what his response was?

25      A.    That's okay.  There's work to be done.

4ebe35e9-e05c-4c4b-bcd9-4ed04ae729b2

NETWORK DEPOSITION SERVICES
Transcript of Stephen Escobar

1      Q.   Did you ever attempt to submit any time for
2  working through your lunch periods?
3      A.   I've done a few, but not many -- with the
4  records that you showed me.
5      Q.   How much time are you claiming for unpaid --
6  strike that.
7           How much time are you claiming for overtime for
8  working through your meal periods?
9      A.   At least two hours a week.
10     Q.   And for how many weeks are you claiming?
11     A.   Until I no longer was there.  October.
12     Q.   So two hours a week for every week that you
13  worked at Lakewood?
14     A.   Yes.
15     Q.   And then I think the last category you've
16  indicated for unpaid overtime was hours not -- not told
17  to take down or hours not recorded?  Is that --
18     A.   Yes.
19     Q.   Okay.  Well, why don't you put it in your words
20  so I can use that appropriately.  What is the overtime
21  for the hours not -- hours not reported, is that a good
22  way to describe it?
23     A.   That's good.
24     Q.   Okay.  As to hours not reported, tell me how
25  that occurred.

4ebe35e9-e05c-4c4b-bcd9-4ed04ae729b2

NETWORK DEPOSITION SERVICES
Transcript of Stephen Escobar

Page 174

1   STATE OF CALIFORNIA        ) ss:

2   COUNTY OF LOS ANGELES      )

3

4           I, Amanda J. Dunn, CSR No. 13336, do hereby

5   certify:

6           That the foregoing deposition testimony was

7   taken before me at the time and place therein set forth

8   and at which time the witness was administered the oath;

9           That the testimony of the witness and all

10  objections made by counsel at the time of the

11  examination were recorded stenographically by me, and

12  were thereafter transcribed under my direction and

13  supervision, and that the foregoing pages contain a

14  full, true and accurate record of all proceedings and

15  testimony to the best of my skill and ability.

16          I further certify that I am neither counsel

17  for any party to said action, nor am I related to any

18  party to said action, nor am I in any way interested in

19  the outcome thereof.

20          IN WITNESS WHEREOF, I have subscribed my name

21  this 20th day of March, 2009.

22

23

24          _____

25          AMANDA J. DUNN, CSR No. 13336

Johnstown              Toll-Free              Pittsburgh
814-266-2042          866-565-1929          412-281-7908

4ebe35e9-e05c-4c4b-bcd9-4ed04ae729b2

**TAB 13**

NETWORK DEPOSITION SERVICES
Transcript of Janet Garmback

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

_____

DEBORAH PRISE, HEATHER RADY,   )
et al., on behalf of           )
themselves and all other       )
employees similarly situated,  )
                               )
            Plaintiffs,        ) Civil Action No. 06-1641
                               )
      vs.                      )
                               )
ALDERWOODS GROUP, INC.,        )
                               )
            Defendant.         )
_____


Deposition Upon Oral Examination

of

JANET GARMBACK

_____


Taken at 714 Lakeway Drive
Bellingham, Washington


DATE:  June 23, 2010

REPORTED BY:  Patricia A. Blevins, CCR
              CCR NO. 2484

93b9415f-abce-4de6-a9b1-ed192f79d7e8

NETWORK DEPOSITION SERVICES
Transcript of Janet Garmback

Page 36

1      A.   No.

2      Q.   And what else did Nick say about community work?

3      A.   That was it.

4      Q.   Just simply that the company would like its

5   employees to do community work?

6      A.   Correct.

7      Q.   Did Nick discuss whether the company had said they

8   would pay employees for doing community work?

9      A.   No.

10      Q.   Do you have an independent understanding of

11   whether the company would pay employees for doing community

12   work?

13      A.   No.

14      Q.   So during the course of your employment, ma'am, is

15   it safe to say, then, that you had never heard of a policy

16   like the one described in Paragraph 19(a) of the complaint?

17           MS. CRESSMAN:   Objection.

18      A.   No, just being reported, as I said.

19      Q.   So you were not aware of a community work policy

20   like the one described in Paragraph 19(a)?

21           MS. CRESSMAN:   Objection.

22      A.   Correct.

23      Q.   Do you know whether any employees at your location

24   performed community work?

25      A.   Yes.  I did.

93b9415f-abce-4de6-a9b1-ed192f79d7e8

NETWORK DEPOSITION SERVICES
Transcript of Janet Garmback

Page 37

1      Q.   You did?

2      A.   (Witness nods.)

3      Q.   And what kind of community work did you perform?

4      A.   I was on a pandemic task force.

5      Q.   And when did you participate in the pandemic task

6   force?

7      A.   I think they held that in 2006.

8      Q.   Who's "they"?

9      A.   "They" is Whatcom County.

10      Q.   Why did you choose to participate in the pandemic

11   task force?

12      A.   Because we had the opportunity to be the only

13   funeral home in Whatcom County to participate in it.

14      Q.   And what time frame was your participation?  Was

15   it a day?  Several days?

16      A.   It was, like, one day every three months.

17      Q.   And when you participated in the pandemic task

18   force, were you paid by your employer?

19      A.   Yes.

20      Q.   Do you believe there was any time you spent

21   participating in the pandemic task force that you weren't

22   paid for?

23      A.   No.

24      Q.   Did you do any other community work when you were

25   employed by the company?

93b9415f-abce-4de6-a9b1-ed192f79d7e8

NETWORK DEPOSITION SERVICES
Transcript of Janet Garmback

Page 38

1      A.   No.

2      Q.   Are you aware of anybody else who performed

3  community work at your location?

4      A.   No.

5      Q.   Are you aware of anyone who performed community

6  work at other locations?

7      A.   No.

8      Q.   Were you the only employee at your location who

9  participated in the pandemic task force?

10      A.   Yes.

11      Q.   Did anyone ever tell you that you would not be

12  paid for the time you spent participating in the pandemic

13  task force?

14      A.   No.

15      Q.   To the contrary, you were told you would be paid?

16      A.   Yes.

17      Q.   Take a look back at what we've marked as

18  Exhibit 3, in Paragraph 19(b).  During your employment, had

19  you heard of a policy like the one described in 19(b)?

20      A.   Yes.

21      Q.   What about 19(c)?  During your employment, had you

22  heard of a policy like the one described in 19(c)?

23      A.   No.

24      Q.   19(d)?  Had you heard of a policy during your

25  employment like the one described in 19(d)?

93b9415f-abce-4de6-a9b1-ed192f79d7e8

NETWORK DEPOSITION SERVICES
Transcript of Janet Garmback

Page 92

1       A.   No.  It was a piece of information that was sent
2   to us to post so that all employees could see it.
3       Q.   Okay.  So those flyers and such didn't instruct
4   employees to participate in community work.
5       A.   No.  They were informational fliers.
6       Q.   Did your manager or anyone at your location
7   instruct employees to participate in community work?
8       A.   No.
9       Q.   No employees were ever required, as far as you
10  know, at your location to perform community work?
11      A.   Correct.
12      Q.   You mentioned that Nick and Sig were involved with
13  their churches and other organizations.
14      A.   Yes.
15      Q.   But that that involvement was outside of the
16  workday, correct?
17      A.   Yes.
18      Q.   Are you aware of Nick or Sig ever participating in
19  community work during the workday?
20      A.   Yes.  Occasionally, Nick would go to a Chamber of
21  Commerce meeting.
22      Q.   What about Sig?
23      A.   No, he did not.
24      Q.   Your testimony is Sig did not perform community
25  work during the workday?

93b9415f-abce-4de6-a9b1-ed192f79d7e8

NETWORK DEPOSITION SERVICES
Transcript of Janet Garmback

Page 97

1                    C E R T I F I C A T E

2

3    STATE OF WASHINGTON )
                        ) ss.
4    COUNTY OF KING      )

5

6            I, the undersigned officer of the Court, under my
     commission as a notary public in and for the State of
7    Washington, hereby certify that the foregoing deposition
     upon oral examination of the witness named herein was taken
8    stenographically before me and thereafter transcribed under
     my direction;

9

             That the witness before examination was first duly
10   sworn by me to testify truthfully; that the transcript of
     the deposition is a full, true and correct transcript of the
11   testimony, including questions and answers and all
     objections, motions, and exceptions of counsel made and
12   taken at the time of the foregoing examination;

13           That I am neither attorney for nor a relative or
     employee of any of the parties to the action; further, that
14   I am not a relative or employee of any attorney or counsel
     employed by the parties hereto nor financially interested in
15   its outcome.

16           IN WITNESS WHEREOF, I have hereunto set my hand

17   and seal this _____ day of _____ 2010.

18

19

20                    _____

21                    PATRICIA A. BLEVINS

22                    NOTARY PUBLIC in and for the

23                    State of Washington, residing

24                    at Federal Way.

25                    My commission expires 10/15/12.

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

93b9415f-abce-4de6-a9b1-ed192f79d7e8

**TAB 14**

Page 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA

No. 06-1641

DEBORAH PRISE and HEATHER RADY
on behalf of themselves and all employees similarly
situated,

        Plaintiffs,

vs.

ALDERWOODS GROUP, INC. And SERVICE
CORPORATION INTERNATIONAL,

        Defendants.

DEPOSITION OF DONNA GONZALES
March 13, 2009
9:50 a.m.

At the Homewood Suites by Hilton
1520 Sunport Place, SE
Albuquerque, New Mexico  87106

PURSUANT TO THE FEDERAL RULES OF CIVIL PROCEDURE
this deposition was:

TAKEN BY: MICHELLE AMY MORGAN
          ATTORNEY FOR THE DEFENDANTS

REPORTED BY: KAREN RODRIGUEZ, NM CCR #55
             KMR Court Reporters, etc., LLC
             Post Office Box 16346
             Albuquerque, New Mexico  87191-6346

9b5844b4-1613-46bc-b430-fc276bf498ed

NETWORK DEPOSITION SERVICES
Transcript of Donna Gonzales

Page 108

1    Q.  What type of overtime work were you performing in
2    those four to five hours?
3    A.  Funeral director.
4    Q.  Were you doing any on-call work at that time?
5    A.  No.
6    Q.  Were the funeral director activities just a type
7    of activities you would perform after regular hours?
8    A.  Yes.
9    Q.  Are you claiming that you were not compensated
10   for overtime hours that you worked during the time that
11   you were doing the cremains and --
12   A.  No, I'm not claiming that.
13   Q.  So you were compensated for the overtime work
14   that you performed from the time you took on cremains
15   responsibilities until your termination?
16   A.  Yes.
17        MS. WEYANDT:  Object to form.
18   Q.  (By Ms. Morgan)  So is the timeframe for which
19   you're claiming that you were not compensated for
20   overtime work between December of 2002 and June and July
21   of 2003?
22   A.  Correct.
23   Q.  What overtime work did you perform that you're
24   claiming that you were not compensated for?
25   A.  I was on call from, let's say, whenever my

9b5844b4-1613-46bc-b430-fc276bf498ed

NETWORK DEPOSITION SERVICES
Transcript of Donna Gonzales

Page 109

1  funeral directing was over -- let's say it was over at
2  9:00.  Whatever time I finished doing the funeral
3  directing I was on call for removals from that time
4  until 8:00 in the morning, when I would go back to work
5  at 8:00 in the morning.
6      Q.  Any other type of overtime work you would perform
7  that you're claiming you were not compensated for?
8      A.  Well, I believe I wasn't compensated for my
9  overtime that I was getting because they never gave me
10  my raise.  So I was wasn't getting paid the overtime
11  that I was supposed to be getting, because they never
12  gave me the raise that they were supposed to give me.
13     Q.  Are you claiming that the overtime pay rate was
14  wrong because it didn't incorporate your raise?
15     A.  What I'm claiming is that they didn't give me my
16  raise that they promised they were supposed to give me.
17  They never gave me the raise.  They never gave me the
18  bonus.  I worked for $8 an hour for several months
19  without getting my compensation of what I was supposed
20  to get.
21     Q.  So are you saying that whatever overtime hours of
22  work that you performed should have been paid at the
23  higher rate?
24     A.  Correct.
25     Q.  At some point you were paid $8 an hour instead of

9b5844b4-1613-46bc-b430-fc276bf498ed

NETWORK DEPOSITION SERVICES
Transcript of Donna Gonzales

Page 114

1  be two people on call.  One person was number one, and

2  the other was number two.  What it means is that you

3  have to be available when you get a call on a death

4  removal.

5       If there was a home death, you'd have to have two

6  people go to the home death.  So you'd be first on call,

7  and then they'd call the second person on call on a home

8  death.  One person cannot go to a removal at a home

9  death.  If it was at a nursing home or if it was at the

10 hospital, then it would be just the number one person on

11 call.  You'd only go by yourself on call.

12      Q.  During the timeframe when you were on call for

13 removals, so December 2002 to June or July of 2003, how

14 often were you on call for removals?

15      A.  Every night.  Maybe once out of the week I might

16 not be, if they could find somebody else to do it.

17      Q.  How was it communicated to you that you were

18 going to be on call?

19      A.  They would let me know before the end of the

20 night, before 5:00, before the supervisor would leave.

21      Q.  Who would assign you to on call?

22      A.  There was the person in the embalming room that

23 actually did the assigning for the on call.

24      Q.  Who was that?

25      A.  I don't recall his name.  I'll have to think

9b5844b4-1613-46bc-b430-fc276bf498ed

NETWORK DEPOSITION SERVICES
Transcript of Donna Gonzales

Page 115

1    about that one.

2        Q.  Did that same individual make the on-call

3    assignments throughout the whole period of time you were

4    doing removals?

5        A.  There would be more than one person.  But I

6    believe there was -- there was, like, a guy.  I remember

7    his name was Max.  But he worked at Merkley-Mitchell,

8    and he -- because we picked up for all the funeral

9    homes.  So he sometimes would make the schedule, that I

10   can recall, or -- I can't remember his name, the guy

11   that worked at Humphrey Mortuary in the embalming room.

12   Brad.

13           MS. WEYANDT:  I am sorry, I didn't hear you.

14           THE WITNESS:  Brad, maybe.  I don't know for

15   sure his name.  If I would see it, I would tell you.  If

16   I could see it on the paper of a list of employees, I

17   would tell you his name.

18       Q.  (By Ms. Morgan)  And would Brad or Max just

19   verbally tell you you're going to be on call?

20       A.  At first, yes.  And then they finally started

21   making a schedule, which would be on paper.

22       Q.  Did they make the schedule on a weekly basis?

23       A.  Yes.

24       Q.  You were assigned every single night to removals?

25       A.  Yes.

NETWORK DEPOSITION SERVICES
Transcript of Donna Gonzales

Page 119

1   would sit at the mortuary and answer the phone until

2   they would call me.  Then I would transfer it over to

3   the answering service.  So if I was at the mortuary, I

4   would answer the phones.  Once I would leave the

5   mortuary, then I could transfer them to the answering

6   service.

7       Q.  So if you were on call and at the mortuary,

8   that's when you would answer the phones?

9       A.  Yes.  And I would vacuum, and I would do the

10  dishes and whatever needed to be done.

11      Q.  But this was all while you were on call?

12      A.  Yes.

13      Q.  When you were on call, did you typically wait at

14  home to be called, or did you typically stay at the

15  mortuary?

16      A.  I typically waited at home.  Occasionally I

17  waited at the mortuary because there was already a call

18  that came in, but it wasn't ready.  So they were going

19  to call you back to let you know when the body was

20  available.  So with, like, a home death and the family

21  wanted one hour with the body, then we'd wait one hour.

22  Instead of going home and then coming back and, you

23  know, getting prepared, I would just wait there until

24  it's time.  When the families were ready for us to go

25  pick up the body, I would leave the mortuary and go pick

9b5844b4-1613-46bc-b430-fc276bf498ed

NETWORK DEPOSITION SERVICES
Transcript of Donna Gonzales

Page 121

1   is the time that you just described when you would

2   answer the phones and do other tasks at the mortuary

3   included in the time that you spent performing removals,

4   or is that something different?

5       A.  No.  That is something different.

6       Q.  So for the time that you spent answering phones

7   at the mortuary -- about how much time would you spend

8   doing that in a typical week?

9       A.  During my removals, you're asking?

10      Q.  Yes.

11      A.  It varied.

12      Q.  Is there any range that you could give?

13      A.  I can't give that range.

14      Q.  Other than answering the phone and performing

15  cleaning tasks and other things that you did at the

16  mortuary and handling the on-call removal tasks, was

17  there any other type of work that you performed while

18  you were on call?

19      A.  No.

20      Q.  Did you report to Alderwoods the time that you

21  spent on call?

22              MS. WEYANDT:  Object to form.

23              THE WITNESS:  Can you repeat that question?

24  Did I report?

25      Q.  (By Ms. Morgan)  Let me go back for a minute.

9b5844b4-1613-46bc-b430-fc276bf498ed

NETWORK DEPOSITION SERVICES
Transcript of Donna Gonzales

Page 128

1   that.

2       Q.  So the instances when you moved a body from

3   one Alderwoods mortuary to another, that activity took

4   place during your regular work hours?

5       A.  Yes.

6       Q.  So were you compensated according to your regular

7   hourly rate?

8       A.  Yes.

9       Q.  So you're saying you didn't get anything extra,

10  anything additional for performing that work?

11      A.  Correct.

12      Q.  Do you think you should have?

13      A.  Yes.

14      Q.  Why is that?

15      A.  Because only removal persons would be able to do

16  that job.  A receptionist would not be able to do that

17  job, or anybody else that didn't do removals wouldn't be

18  able to do that job.

19      Q.  But this activity of moving one body from one

20  mortuary to another, that was not overtime work;

21  correct?

22      A.  No.

23      Q.  Were there any instances where you were

24  performing a removal in the sense of a body not being

25  moved between Alderwoods locations, but rather picked up

9b5844b4-1613-46bc-b430-fc276bf498ed

NETWORK DEPOSITION SERVICES
Transcript of Donna Gonzales

Page 129

1    from some outside location and brought to the mortuary
2    where you believe you ultimately were not paid for that?
3        A.  Yes.
4        Q.  What were those instances?
5        A.  For instance, during your regular work hours, if
6    there was a removal to be done during your regular work
7    hours -- if my job was doing cremains or doing funeral
8    directing or doing reception, if there was a removal to
9    be done during the day, they would send me out to do the
10   removal, and I wouldn't get paid to do the removal.  I
11   would just get paid my regular 7.50 an hour or $8 an
12   hour.  They didn't pay you to do a removal as a removal
13   person during your regular work hours.
14       Q.  And the removals you performed during your
15   regular work hours, those were not overtime work?
16       A.  No.
17       Q.  Were there any other instances where you believe
18   you ultimately were not paid the 25 to $35 for a removal
19   that you performed?
20       A.  Any other instances?
21       Q.  Yeah.
22       A.  No.
23       Q.  During the time that you were on call, were there
24   any restrictions that Alderwoods placed on you as to
25   what you could do?

9b5844b4-1613-46bc-b430-fc276bf498ed

NETWORK DEPOSITION SERVICES
Transcript of Donna Gonzales

Page 140

1    shelf, something like that.
2         Then we would kind of put -- we would tag the
3    people anyway.  But just so the embalmer would know how
4    many people were in the freezer and which shelf they
5    were in and things like that.  So that form went on the
6    door.  There was, like, a clip on the door where the
7    embalmers were at.  That's the form we would put on the
8    embalmer's door, now that I remember.
9         Q.  And that form was for the embalmer's use?
10        A.  Yes.
11        Q.  Was that form used for any other purpose that you
12   know of?
13        A.  I don't know.
14        Q.  Are you familiar with any logs that you would use
15   to record after-hour calls?
16        A.  No.  I think those were the only two forms that
17   were used.  One went to the embalmer, and one was the
18   log on the desk in the garage.
19        Q.  For removals that you performed after hours, were
20   you compensated for the time that you spent performing
21   the removals?
22        A.  No.
23        Q.  Never?
24        A.  There was just one fee that they paid you.  That
25   was $25 or 35.  That's all they paid you.  It didn't

9b5844b4-1613-46bc-b430-fc276bf498ed

NETWORK DEPOSITION SERVICES
Transcript of Donna Gonzales

Page 141

1   matter if it took two hours or five hours to do the
2   removal.  You only got paid $35.  It was just per
3   removal.  It didn't matter the hours you spent doing it.
4       Q.  Were you compensated for the time that you spent
5   engaged in the preparatory work of getting yourself
6   ready to go do a removal?
7       A.  No.
8       Q.  Did you ever report that time to Alderwoods?
9       A.  I questioned it, yes.
10      Q.  You questioned it.  But did you ever report it on
11  a timecard or in any other way to Alderwoods?
12      A.  No.
13      Q.  You say you questioned it.  What do you mean by
14  that?
15      A.  Well, I questioned it as far as getting paid for
16  the hours that you spent going to the removals, picking
17  up the body, by the time you got back to the mortuary
18  and if you had to go to a different mortuary, by the
19  time you got back to Humphrey Mortuary.  But their
20  answer was it was only one flat fee of -- like I said, I
21  don't remember if it was $25 or $35.  That's what they
22  paid, and that's just the way it was.
23      Q.  When you questioned this, who did you present
24  your question to?
25      A.  I believe it was Derreck.

9b5844b4-1613-46bc-b430-fc276bf498ed

NETWORK DEPOSITION SERVICES
Transcript of Donna Gonzales

Page 170

1    Q.  To whom?

2    A.  To Bill Mitchell.

3    Q.  Is that included in the letter that you

4  previously testified about?

5    A.  No.

6    Q.  Did you complain to him verbally?

7    A.  Verbally, on the phone.

8    Q.  What was his response, if any?

9    A.  He would look into it.

10   Q.  Are you aware that Mr. Mitchell ever looked into

11  it?

12   A.  Not that I know of.

13   Q.  Did you complain to anybody else about

14  Mr. Greiner's conduct?

15   A.  No.

16   Q.  Are you also claiming in this lawsuit that you

17  were not paid for time that you spent working through

18  meal breaks?

19   A.  Yes, ma'am.

20   Q.  Was this confined to the time that David Greiner

21  was manager?

22   A.  No.

23   Q.  During what period of time do you believe you

24  were not paid for time you spent working through meal

25  breaks?

9b5844b4-1613-46bc-b430-fc276bf498ed

NETWORK DEPOSITION SERVICES
Transcript of Donna Gonzales

Page 171

1        A.  I'd say from January on.

2        Q.  Did you ever seek preapproval to work through a

3    meal break?

4        A.  The supervisor was right in front of me.

5        Q.  So is that yes, you sought preapproval, or no,

6    you didn't?

7        A.  Yes.

8        Q.  From what supervisor would you seek preapproval?

9        A.  Derreck Pate.

10       Q.  Would --

11       A.  Can I revise that answer?

12       Q.  Sure.

13       A.  It's not that you needed preapproval.  It's just

14   that somebody had to help the clients, the customers.

15   So usually they would call me to go help the customers.

16   So it wasn't that there had to be preapproval.  If you

17   were upstairs and they needed anything -- if they needed

18   their cremains, if they needed some kind of assistance,

19   I would be the one that would be called.  So I would go

20   downstairs and help the customers.  There wasn't

21   preapproval.  We don't know when people are going to

22   walk in when we're having lunch.  It was just whatever

23   was going to happen happened while you were eating lunch

24   or something like that.  So there was no preapproval.

25       Q.  So you were not required to get preapproval to

9b5844b4-1613-46bc-b430-fc276bf498ed

NETWORK DEPOSITION SERVICES
Transcript of Donna Gonzales

Page 172

1    work through a meal break?

2        A.  No.

3        Q.  Was working through a meal break something that

4    an Alderwoods' manager would ask you to do?

5        A.  No.  It was normal.  That was an everyday thing.

6        Q.  Would it be at the instruction of an Alderwoods'

7    manager?

8        A.  Well, we weren't going to leave the customer --

9    the bell would ring at the door.  If you were upstairs,

10   somebody would have to run downstairs and help the

11   customer.  So it was -- how do I want to put it?  It

12   wasn't, like, a preapproval.  It wasn't a planned thing.

13   It wasn't, like, something that we would take turns

14   doing or anything like that.  It was just whoever walked

15   in the door, they had a bell.  So if you were upstairs,

16   somebody would have to run downstairs and help the

17   customer.

18       Q.  How would you report time that you worked through

19   a meal break?

20       A.  I didn't.

21       Q.  You never reported --

22       A.  If I didn't take a lunch at all at all, I would

23   put, "no lunch," on my timecard.  Even if I had punched

24   out and then I didn't end up taking a lunch, then I

25   would put, "no lunch."

9b5844b4-1613-46bc-b430-fc276bf498ed

NETWORK DEPOSITION SERVICES
Transcript of Donna Gonzales

Page 173

1    Q.  So you would handwrite in, "no lunch"?

2    A.  Handwrite it in, yes, correct.

3    Q.  That was on occasions when you took no lunch

4    whatsoever?

5    A.  Correct.

6    Q.  On the other occasions, are you saying your lunch

7    would get interrupted, your meal break would get

8    interrupted?

9    A.  Yes.

10    Q.  Then you would resume your meal break at a later

11    point in time?

12    A.  If you could.

13    Q.  On the occasions that your lunch was interrupted,

14    would you report any time that you spent working during

15    that break on your timecards?

16    A.  No.

17    Q.  Why not?

18    A.  I don't know.

19    Q.  I'm sorry?

20    A.  I don't know.  That was just a normal thing, an

21    everyday thing that just -- you were there to help the

22    customer.  That's what I was there for, to help the

23    customer, and lunch breaks didn't matter.

24    Q.  Did any Alderwoods' manager ever tell you not to

25    report time that you spent working during a meal break?

9b5844b4-1613-46bc-b430-fc276bf498ed

NETWORK DEPOSITION SERVICES
Transcript of Donna Gonzales

Page 177

1    time from your timecards?

2        A.  No.

3        Q.  Are you aware of any other employees who worked

4    through or were interrupted during a meal break but were

5    not compensated for the time they were working?

6        A.  No.

7        Q.  Are you aware of any company-wide policy that

8    employees could not report all the hours worked if they

9    worked during or through a break?

10       A.  Repeat your question.

11       Q.  Are you aware of any Alderwoods policy that

12   employees could not report all hours they worked if they

13   worked during or through a meal break?

14       A.  No, I'm not aware of it.

15       Q.  Are you aware of any Alderwoods' policy whereby

16   employees would not be compensated for the time they

17   spent working if they worked through or were interrupted

18   from a meal break?

19       A.  No.

20       Q.  How many hours of uncompensated time are you

21   claiming with respect to time that you worked through

22   meal breaks or got interrupted during meal breaks?

23       A.  I can't calculate it at this time.

24       Q.  In your interrogatory responses, in your

25   supplemental interrogatory responses, you stated that

9b5844b4-1613-46bc-b430-fc276bf498ed

NETWORK DEPOSITION SERVICES
Transcript of Donna Gonzales

Page 196

1              IN THE UNITED STATES DISTRICT COURT
            WESTERN DISTRICT OF PENNSYLVANIA
2
    NO. 06-1641
3
    DEBORAH PRISE and HEATHER RADY
4   on behalf of themselves and all employees similarly
    situated,
5
            Plaintiffs,
6
    vs.
7
    ALDERWOODS GROUP, INC. And SERVICE
8   CORPORATION INTERNATIONAL,
9           Defendants.
10          CERTIFICATE OF COMPLETION OF DEPOSITION
11     I, Karen Rodriguez, CCR #55, DO HEREBY CERTIFY that
    on March 13, 2009, the deposition of DONNA GONZALES was
12  commenced before me at the request of MICHELLE AMY
    MORGAN, and sealed original thereof retained by:
13
            MICHELLE AMY MORGAN
14          Attorney for the Defendants
            2727 North Harwood Street
15          Dallas, Texas 75201-1515
            (214) 220-3939
16
17     I FURTHER CERTIFY that copies of this certificate
    have been mailed or delivered to the following counsel
18  and parties not represented by counsel appearing at the
    taking of the deposition.
19
            LIBERTY J. WEYANDT
20          Attorney for the Plaintiffs
            525 William Penn Place
21          Suite 3300
            Pittsburgh, PA 15219
22          (412) 281-4256
23     I FURTHER CERTIFY that examination of this transcript
    and signature of the witness was required.
24
25     I FURTHER CERTIFY that the cost of the original and
    one copy of the deposition to MICHELLE AMY MORGAN is

9b5844b4-1613-46bc-b430-fc276bf498ed

NETWORK DEPOSITION SERVICES
Transcript of Donna Gonzales

Page 197

1    I FURTHER CERTIFY that I did administer the oath to
the witness herein prior to the taking of this
2  deposition; that I did thereafter report in stenographic
shorthand the questions and answers set forth herein,
3  and the foregoing is a true and correct transcript of
the proceeding had upon the taking of this deposition to
4  the best of my ability.

5    I FURTHER CERTIFY that I am neither employed by nor
related to any of the parties or attorneys in this case,
6  and that I have no interest in the final disposition of
this case in any court.

7

8

_____
9                         KAREN RODRIGUEZ, CCR
Certified Reporter #55
10                        License Expires 12/31/09

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Johnstown              Toll-Free              Pittsburgh
814-266-2042         866-565-1929          412-281-7908

9b5844b4-1613-46bc-b430-fc276bf498ed

**TAB 15**

# NETWORK DEPOSITION SERVICES
## Transcript of Ric Hensley

Page 1

DEPOSITION OF RIC HENSLEY

October 28, 2009

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO/OAKLAND DIVISION

--------------------------------------
WILLIAM HELM, DEBORAH PRISE,          )
HEATHER P. RADY, et al., on behalf    )
of themselves and all other          )
employees and former employees       )
similarly situated,                   )
                                      )
        Plaintiffs,                   )
                                      )Case No.
vs.                                   )CV 08-1184-SI
                                      )
ALDERWOODS GROUP, INC.,               )
                                      )
        Defendant.                    )
--------------------------------------


APPEARANCES:


            FOR THE PLAINTIFFS:

            MICHAEL J. LINGLE, ESQ.
            Thomas & Solomon LLP
            693 East Avenue
            Rochester, New York 14607


            FOR THE DEFENDANT:

            MATT RAY, ESQ.
            Jones Day
            2727 North Harwood Street
            Dallas, Texas 75201-1515

d5f13f10-43ee-414a-96ed-b78f12fac2f3

NETWORK DEPOSITION SERVICES
Transcript of Ric Hensley

1    A.        We may, yeah, yeah.

2    Q.        When you say not all of them did what

3    they were supposed to do with the policy, what does

4    that mean?  What did you mean by that?

5    A.        Well, that means, you know, if you were

6    supposed to try to go out and join a civic

7    organization, not all of them did.  If you tried to get

8    some of them to go to church, not all of them did.

9    That's what I mean by comply.

10   Q.        So not everyone in one of these five

11   locations actually got involved in the community?

12   A.        Exactly.

13   Q.        Do you recall which employees in these

14   five locations over which you were the general manager

15   did go out and get involved in the community?

16   A.        Well, I did.  My managers did.  But I

17   don't remember -- you know, I don't remember specifics

18   as to actually what these other employees done or --

19   you know, again, there was a log, a spreadsheet for

20   these community work policy binders there were supposed

21   to be logged each week as to what they have done and

22   who they have talked to and that sort of stuff.

23   Q.        So you said you did?

24   A.        I did.

25   Q.        What did you do?

d5f13f10-43ee-414a-96ed-b78f12fac2f3

NETWORK DEPOSITION SERVICES
Transcript of Ric Hensley

Page 53

1    A.    No, I don't remember specifics.

2    Q.    I think you said that they were required

3  to log on a spreadsheet weekly what they were doing?

4    A.    Yes.

5    Q.    Where was that spreadsheet maintained?

6    A.    In the binder, in the community work

7  policy binder.

8    Q.    And was there one of those binders at

9  each location?

10   A.    At each location.

11   Q.    Was that binder in the McCarty Mortuary

12 on your desk?

13   A.    Yes, yeah, that was on my desk.

14   Q.    So would people actually come into your

15 office weekly and fill it out?

16   A.    Yes.

17   Q.    Did you monitor it weekly to make sure

18 that people were in fact filling it out on a weekly

19 basis?

20         MR. LINGLE:  Objection.

21   A.    It was supposed to be done weekly, but it

22 was not always done weekly, because you always -- you

23 didn't always have information to put on that each

24 week.  And if you didn't have any information to put on

25 it, that's how it was sent back in.  It had to be sent

d5f13f10-43ee-414a-96ed-b78f12fac2f3

NETWORK DEPOSITION SERVICES
Transcript of Ric Hensley

1    in each week, once a week.  I don't remember

2    particularly where that went to, the administrator had

3    that communiqué, but if there was no activity for that

4    week, there was no activity.

5         Q.      So the administrator sent it in?

6         A.      Yeah, the administrator sent it in.  And

7    I don't know who they would send it to.  I don't

8    remember.

9         Q.      Did you review these weekly logs before

10   they were sent in?

11        A.      Yes.

12        Q.      Were there times when the weekly logs

13   were blank?

14        A.      Yes.

15        Q.      Was it more often than not that the

16   weekly logs were blank?

17                MR. LINGLE:  Objection.

18        A.      It was more often than not.

19        Q.      Let's start with McCarty Mortuary.

20                Did any of the employees at McCarty

21   Mortuary receive any kind of poor performance

22   evaluation because they weren't doing enough to comply

23   with the community work policy?

24        A.      No.

25        Q.      Was there any consequence for not

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

d5f13f10-43ee-414a-96ed-b78f12fac2f3

NETWORK DEPOSITION SERVICES
Transcript of Ric Hensley

1    complying with the community work policy?

2        A.      Not to my knowledge.  Not to my

3    knowledge.

4        Q.      Were you aware of any employees within

5    the five locations you managed as the general manager

6    who received any type of negative consequence as a

7    result of not complying with the community work policy?

8        A.      No.

9        MR. LINGLE:  Objection.

10       Q.      On this weekly log, do you recall what

11   the columns were, what information had to be logged?

12       A.      I'm trying to picture it.  The employee's

13   name I believe was the first column, the date, I think

14   there was a column for an influencer's name.  If there

15   was a contact made or a meeting scheduled.  I believe

16   there was columns for that.  For instance, depending on

17   if they were interested in prearrangement and wanted to

18   come in the funeral home and talk.  I believe there was

19   address and phone number for those -- a column for

20   those influencers.

21       Q.      Do you know whether any of the community

22   activities that would be considered to comply with this

23   community work policy, attending a civic meeting, for

24   example, were done during normal work hours?

25       A.      Not to my knowledge.

d5f13f10-43ee-414a-96ed-b78f12fac2f3

Page 77

1      A.      Yes.

2      Q.      And the time they spent retrieving the

3   body was compensable time?

4              MR. LINGLE:  Objection.

5      A.      Yes.

6      Q.      And during your tenure as general

7   manager, was there ever a time that someone responded

8   to a death call and was not compensated for the time

9   they spent?

10     A.      Not to my knowledge.

11     Q.      It was your policy as general manager, or

12  it was your understanding, rather, of Alderwoods

13  Group's policy that employees who responded to death

14  calls were to be paid for that time?

15     A.      Yes.

16             MR. LINGLE:  Objection.

17             MR. RAY:  What's the objection?

18             MR. LINGLE:  The objection is that's

19         confusing, because you're suggesting that they

20         paid for the actual hours of work for doing a

21         death call, and that's not true.

22             MR. RAY:  Well, thank you.  Let's explore

23         that.

24  BY MR. RAY:

25     Q.      So for a death call, how were employees

d5f13f10-43ee-414a-96ed-b78f12fac2f3

NETWORK DEPOSITION SERVICES
Transcript of Ric Hensley

1   compensated?

2        A.       They were able to put two additional

3   hours on their time card for the death call.  99

4   percent of the time, a death call takes less than an

5   hour and a half.  But there were times when maybe a

6   home call or an extenuating trauma call would require

7   that person to be maybe three or four hours.  But they

8   only got paid for the two.

9        Q.       So 99 percent of the time death calls

10  took an hour and a half or less, correct; is that

11  right?

12       A.       Yes.

13       Q.       Are you aware of any times during the

14  time you were general manager where a death call took

15  more than two hours?

16       A.       Yes.

17       Q.       How many times?

18               MR. LINGLE:  Objection.

19       Q.       Was it more than five times?

20       A.       Oh, yes.

21       Q.       Where it took more than two hours?

22       A.       Yes.

23       Q.       Roughly how many times?

24               MR. LINGLE:  Objection.

25               And just to be clear, nobody wants you to

d5f13f10-43ee-414a-96ed-b78f12fac2f3

NETWORK DEPOSITION SERVICES
Transcript of Ric Hensley

Page 81

1    right?

2         A.        Yes.

3         Q.        What positions were responsible for being

4    on call?

5                   MR. LINGLE:   Objection.

6         A.        Funeral directors and funeral directors'

7    assistants.

8         Q.        Any other positions that reported to you

9    directly or indirectly that were scheduled to be on

10   call during the time you were general manager?

11        A.        No.

12        Q.        So it was only funeral directors and

13   funeral director assistants, correct?

14        A.        Yes.

15        Q.        And then you would schedule, I think you

16   said you scheduled them because -- you scheduled them

17   kind of across the board because you would cover

18   different locations?

19        A.        Yes, yes.

20        Q.        So did you coordinate with the location

21   managers?

22        A.        Yes.

23        Q.        What was the typical on-call schedule for

24   an individual; in other words, would an individual be

25   on call a couple nights a week and one weekend day?

d5f13f10-43ee-414a-96ed-b78f12fac2f3

NETWORK DEPOSITION SERVICES
Transcript of Ric Hensley

1    Q.    It's correct to say that you never

2   suggested to your upper management that they be paid

3   more than two hours if the death call took more than

4   two hours; is that right?

5    A.    That's fair, yes.

6    Q.    Earlier you said when I asked you a

7   question about piece work, I think you referred to it

8   as the on-call payment?

9    A.    Yes, yes.

10    Q.    Is this what you're referring to, this

11   two hour pay for death calls, two hours worth of pay

12   for death calls?

13    A.    Yes, yes.

14    Q.    If you could go back to Exhibit 1, and

15   I'm now looking at the second paragraph of Section G.

16    A.    Oh, Exhibit 1.

17    Q.    I'm sorry, not Exhibit 1, Exhibit 4.

18   Exhibit 4.

19    A.    Okay.  Yeah.

20    Q.    The second paragraph of Section G.  Are

21   you there?

22    A.    Yes.

23    Q.    It says, "When a nonexempt employee is

24   required to take phone calls after completing the

25   regular work schedule and leaving the premises but is

d5f13f10-43ee-414a-96ed-b78f12fac2f3

```
 1              C E R T I F I C A T E

 2    STATE OF TENNESSEE

 3

 4    COUNTY OF KNOX

 5          I, Thomas J. Dorsey, Registered Professional

 6    Reporter and Notary Public, do hereby certify that I

 7    reported in machine shorthand the deposition of RIC

 8    HENSLEY, called as a witness at the instance of the

 9    Defendant, that the said witness was duly sworn by me;

10    that the reading and subscribing of the deposition by

11    the witness was not waived; that the foregoing pages

12    were transcribed under my personal supervision and

13    constitute a true and accurate record of the deposition

14    of said witness.

15          I further certify that I am not an attorney or

16    counsel of any of the parties, nor an employee or

17    relative of any attorney or counsel connected with the

18    action, nor financially interested in the action.

19          Witness my hand and seal this the 28th day of

20    October, 2009.

21                              _____

22                              Thomas J. Dorsey, RPR
                                Certified Shorthand Reporter
23                              and Notary Public
                                My Commission Expires:
24                              September 26, 2012

25
```

**TAB 16**

NETWORK DEPOSITION SERVICES
Transcript of Shelley Hoachlander

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DEBORAH PRISE and HEATHER,          :
RADY, on behalf of themselves       :
and all employees similarly         :   Civil Action No.
situated,                           :   06-1641
          Plaintiffs,               :
                                    :
     vs.                            :
                                    :
ALDERWOODS GROUP, INC.,             :
          Defendant.                :


          DEPOSITION OF:   SHELLEY HOACHLANDER
          TAKEN BY:        Plaintiffs
          BEFORE:          Jennifer Chance
                           Court Reporter - Notary Public

          DATE:            April 9, 2010 at 11:06 a.m.

          PLACE:           3510 Trindle Road
                           Camp Hill, Pennsylvania


APPEARANCES:

     MARGOLIS EDELSTEIN
     BY:  KYLE T. McGEE, ESQUIRE
          FOR - PLAINTIFFS

     JONES DAY
     BY:  JENNIFER G. BETTS, ESQUIRE
          FOR - DEFENDANT

ca239181-bbe9-4c05-b602-f9fb66ce1d41

NETWORK DEPOSITION SERVICES
Transcript of Shelley Hoachlander

Page 109

1    mentioned the term -- first of all, do you need a break?

2         A     Can you tell I have to go to the bathroom?

3              MR. McGEE:  It's a good time for a break.  Why

4    don't we go off the record?

5              (Short recess.)

6    BY MR. McGEE:

7         Q     Ms. Hoachlander, we have talked a little bit

8    today about the term community work, community events has

9    come up a couple of times, and I believe you testified

10   that employees were encouraged to perform community work;

11   is that correct?

12        A     Yes.

13        Q     You also said that it was not mandatory, is

14   that correct, if I understand your testimony?  Is that

15   also correct?

16        A     Yes.

17        Q     When you say they were encouraged to perform

18   community work, what does that mean?

19        A     Basically they just asked that we get out

20   there, get involved, be members of things.

21        Q     What kind of things?

22        A     If we didn't have a church, find a church.

23   That wasn't like -- they didn't tell us to do that.  They

24   just wanted us to have a presence.  To do things like Elks

25   clubs or rotary clubs, do some community service somehow,

ca239181-bbe9-4c05-b602-f9fb66ce1d41

NETWORK DEPOSITION SERVICES
Transcript of Shelley Hoachlander

Page 114

1    Q    Now I want to step back:  You had said you did
2  a lot of planning.  Did you do a lot of planning for the
3  first night out events or --
4    A    Yeah.
5    Q    In all the years that you have been with it
6  since 2003?
7    A    Yes.
8    Q    When you did this planning, did you do it
9  during your normal business hours?
10   A    Yes.
11   Q    While at work?
12   A    Yes.
13   Q    From your office?
14   A    Yes.
15   Q    Which would be basically your 8:30 to 4:00,
16  4:30 to 5:00, regular hours?
17   A    Yes.
18   Q    So you were always paid for that time?
19   A    Yes.
20   Q    The event itself, 5:00 to 8:30, were you on the
21  clock for that as well?
22   A    Yes.
23   Q    And you were paid for that?
24   A    Yes.
25   Q    Who else attended with you?

NETWORK DEPOSITION SERVICES
Transcript of Shelley Hoachlander

Page 115

1    A    Bob Schellenberg has attended, Joe Batista,

2  Jack Dafner (phonetic).  He doesn't work for us anymore.

3  One year some members from Rolling Green attended with us,

4  which is one of our cemeteries and an SCI cemetery.

5    Q    Let me stop you there.  Were there others from

6  SCI or Alderwoods other than those you named?

7    A    No.

8    Q    All of those hourly employees from Alderwoods

9  or SCI that attended this event, do you know whether they

10  were paid?

11    A    Yes.

12    Q    When you say yes, you know, I assume that means

13  yes, they were paid?

14    A    Yes.  I did their time sheets.

15    Q    So that's how you know.  All right.  Were you

16  instructed to put that time on your card by anybody or how

17  did you know to record that time?

18    A    I was told, and I don't remember by who

19  exactly, any time that we work is to be paid time.  And

20  somewhere along the way, somebody had even questioned you

21  are getting paid, right?  And I can't remember who that

22  was, but I've been told on several occasions that, you

23  know, make sure you put it on your time card.

24    Q    Did Bob Pramik participate in this event?

25    A    No.  This was after Bob.

ca239181-bbe9-4c05-b602-f9fb66ce1d41

NETWORK DEPOSITION SERVICES
Transcript of Shelley Hoachlander

Page 124

1   cemetery, which is also SCI.

2         Q     So just the two of you?

3         A     Yes.

4         Q     And did you record your time?

5         A     Yes.

6         Q     And were you paid for it?

7         A     Yes.

8         Q     Anything else that you did personally by way of

9   community work?

10        A     I belong to several organizations that

11  sometimes are after hours, Executive Women International,

12  Harrisburg Business Women, American Business Women

13  Association, that fall, in the evening hours.

14        Q     How long have you been a member of these

15  various organizations you just mentioned?

16        A     EWI has been at least three years, ABWA maybe

17  eight months.  Senior Outreach Services is in the morning,

18  so that's during normal hours.  Harrisburg Business Women

19  is during the day.  So really the only two at night are

20  the EWI and ABWA.

21        Q     Well, why did you join those organizations?

22        A     For referrals, networking, educational -- EWI

23  is exclusive, so no other funeral home can join, and it's

24  a lot of referral based --

25        Q     When you say networking, that's part of the

ca239181-bbe9-4c05-b602-f9fb66ce1d41

NETWORK DEPOSITION SERVICES
Transcript of Shelley Hoachlander

Page 125

1  business, you want to make contacts, get yourself out

2  there, have a presence in the community?

3      A    Right.

4      Q    And you joined all of those organizations after

5  being employed by Alderwoods or SCI?

6      A    Yes.

7      Q    I believe you gave the dates at that point.

8  The ones that were in the evenings, did you record and

9  were you paid for that time?

10      A    Yes.

11      Q    Any other organizations?

12      A    Not in the evening, no.

13      Q    Okay.  So for you personally, was there any --

14  putting aside, with the exception of the benefits, so

15  that's a little different, all of the other organizations

16  you got involved in, can we agree that you did that

17  because SCI or Alderwoods, depending on time frame,

18  encouraged you to do that and they wanted you to do that?

19      A    Yes.

20      Q    And the time that you spent working in those

21  organizations and with those organizations, you put down

22  on your card and you believe you were paid for that and

23  you were paid for that, right?

24      A    Yes.

25      Q    And the benefits were different, you said you

ca239181-bbe9-4c05-b602-f9fb66ce1d41

NETWORK DEPOSITION SERVICES
Transcript of Shelley Hoachlander

Page 225

1          C E R T I F I C A T I O N

2          I, JENNIFER CHANCE, a Court Reporter - Notary

3     Public authorized to administer oaths and take depositions

4     in the trial of causes, and having an office in

5     Harrisburg, Pennsylvania, do hereby certify that the

6     foregoing is the testimony of SHELLEY HOACHLANDER.

7          I further certify that before the taking of

8     said deposition the witness was duly sworn; that the

9     questions and answers were taken down stenotype by the

10    said Reporter-Notary, approved and agreed to, and

11    afterwards reduced to computer printout under the

12    direction of said Reporter.

13         I further certify that the proceedings and

14    evidence are contained fully and accurately in the notes

15    taken by me on the within deposition to the best of my

16    ability, and that this copy is a correct transcript of the

17    same.

18         In testimony whereof, I have hereunto inscribed

19    my hand this 22nd day of April, 2010.

20

21

                    Jennifer A. Chance,
22                  Court Reporter-Notary Public

23

24

25

ca239181-bbe9-4c05-b602-f9fb66ce1d41

**TAB 17**

NETWORK DEPOSITION SERVICES
Transcript of Louise Johnson

Page 1

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DEBORAH PRISE and HEATHER RADY on )
behalf of themselves and all )
employees similarly situated, )
                                   )
            Plaintiffs,            )
                                   ) Civil Action
      vs.                          ) No.: 06-1641
                                   )
ALDERWOODS GROUP, INC.,            )
                                   )
            Defendant.             )
_____)

            Deposition of LOUISE JOHNSON, taken on behalf

of the Defendant, before Victoria A. Guerrero, CSR No.

8370, RPR, CRR, for the State of California, commencing

on Monday, July 17, 2009, 9:36 a.m., at Veritext

National Deposition & Litigation Services, 3090 Bristol

Street, Suite 190, Costa Mesa, California.


Pages 1 through 328

1d21e3be-c57c-4cb1-9f11-213fc513cf37

NETWORK DEPOSITION SERVICES
Transcript of Louise Johnson

Page 45

1      A     No.  Nobody else was there.

2      Q     After he hired you did -- let's take a step

3   back.

4            Did he talk to you about any on-call work?

5      A     No.  At that time that position was not an

6   on-call position.

7      Q     Did he talk with you at that time about any --

8   strike that.

9            You had never performed or been required to

10  perform any community service work, correct?

11     A     Correct.

12     Q     Did he tell you that he'd be the one scheduling

13  your hours or did he tell you how those hours would be

14  scheduled?  Or was it just fixed 8:00 to 5:00?

15     A     These are fixed 8:00 to 5:00 Saturday and

16  Sunday.

17     Q     What was your work week?

18     A     That was it, Saturday and Sunday only.  When

19  there was holidays, since the rest of the staff would be

20  off, it was almost considered like a weekend and I

21  filled that position.

22     Q     So it's not a full-time position?

23     A     It was not a full-time position.

24     Q     Did you get a written job description as to

25  what your duties would include when you were hired?

1d21e3be-c57c-4cb1-9f11-213fc513cf37

NETWORK DEPOSITION SERVICES
Transcript of Louise Johnson

Page 67

1     Q     Do you recall whether you performed any on-call

2     duties in the position of funeral director and

3     apprentice embalmer?

4     A     I may have during that time.

5     Q     Do you recall how much on-call duties you

6     performed during that time?

7     A     If I did any on-call duties, I usually only

8     covered for somebody, maybe one or two nights a month,

9     if that, to the best of my recollection.

10    Q     Did that occur when you were a funeral director

11    and apprentice embalmer?

12    A     Probably.

13    Q     How many times has that occurred when you were

14    a funeral director apprentice embalmer?

15    A     I would estimate maybe one or two nights a

16    month, if that.

17    Q     Did that change when you became a funeral

18    director/embalmer?

19    A     No.  I still only cover when the others can't

20    do it.

21    Q     Who sets forth -- well, let me take a step

22    back.

23          What is your understanding of on-call duties in

24    your position?

25    A     If I was to be on-call, I have to be available

1d21e3be-c57c-4cb1-9f11-213fc513cf37

NETWORK DEPOSITION SERVICES
Transcript of Louise Johnson

Page 68

1    to answer my phone after normal business hours.  I have

2    to be able to provide pricing information over the phone

3    and answer any family's questions.  Sometimes I need to

4    make calls on their behalf.  And this may be anytime

5    after 5:00 p.m. till 8:00 a.m. the next morning.

6           There's been occasions where -- this hasn't

7    happened to me personally because I've gotten lucky, but

8    others have had had to go to the office.  It just hasn't

9    come up with the calls that I received when I was

10   on-call.  But I may have had to go into the office

11   should I have had that come up in a conversation with

12   the family.

13   Q    Okay.  But you haven't done that, correct?

14   A    I have not.

15   Q    You have not gone to the office while you've

16   been on on-call duty, correct?

17   A    Correct.

18   Q    Who schedules the on-call duty rotation?

19   A    I would say Curt Owen.

20   Q    You don't know?

21   A    Everything was somewhat established when I came

22   into my position.  As far as I've been there, it's

23   always been rotated between Curt Owen and Kathy DePeri.

24   They're the two directors on call.  If it's not one,

25   it's the other.  And they already had their system set

1d21e3be-c57c-4cb1-9f11-213fc513cf37

NETWORK DEPOSITION SERVICES
Transcript of Louise Johnson

Page 69

1    up when I came into it.

2        Q    So it's only when Curt Owen or Kathy DePeri

3    cannot cover on-calls when they call you in?

4        A    Yes.

5        Q    Anybody else in the rotation?

6        A    No.

7        Q    Anybody else substituting for the rotation

8    other than yourself?

9        A    No.

10       Q    By the way, when you were the

11   secretary/receptionist position you described when you

12   first got hired, who was your immediate supervisor?

13       A    Curt Owen.

14       Q    Who was your immediate supervisor in the

15   funeral director/apprentice embalmer position?

16       A    Curt Owen.

17       Q    What about for the position funeral

18   director/embalmer?

19       A    Curt Owen.

20       Q    Who did Curt Owen report to?

21       A    Lynn Stucker.

22       Q    And he's the general manager?

23       A    Yes.

24       Q    And I'm sorry, what was Curt Owen's position

25   again?

1d21e3be-c57c-4cb1-9f11-213fc513cf37

NETWORK DEPOSITION SERVICES
Transcript of Louise Johnson

Page 128

1    they would have had me doing and so that's why I didn't

2    want to do it.

3        Q    What did you think the compensation was worth?

4    What did you mean by that?

5        A    I don't enjoy being woken up at 3:00 in the

6    morning to talk to somebody on the phone.  I've had

7    people call with the most ridiculous questions.  They're

8    not ridiculous to them but, they are to me at 3:00 in

9    the morning.

10            And it's not just that I get the call and I get

11   paid for the call, but then I'm awake, I can't go back

12   to sleep, I've got to get up in a few more hours and go

13   to work.  And I could get called six more times in

14   between then.

15       Q    And you didn't think being paid what you were

16   paid was worth all that upsetness or disruption?

17       A    No.  Well, we get paid for the call, yes, but

18   that doesn't save the rest of my night.  Or if I'm out

19   socially I would have to interrupt my time.  I didn't

20   want to do that.

21       Q    Okay.  Any other complaints about the on-call

22   duties you were performing that you made to Mr. Owens?

23       A    Not really.  It was so rare that I didn't end

24   up doing it.

25       Q    What about making complaints to Mr. Stucker

1d21e3be-c57c-4cb1-9f11-213fc513cf37

NETWORK DEPOSITION SERVICES
Transcript of Louise Johnson

Page 149

1   every day, but that's what we wrote down.

2       Q    Did you ever write down on your time cards that

3   you worked through lunch?

4       A    Occasionally.

5       Q    And when you put that on your time card, were

6   you paid for the time that you worked during your lunch?

7       A    I think we were paid and then for a while we

8   were paid incorrectly and then they corrected that after

9   that.

10      Q    Okay.  So how were you paid incorrectly?

11      A    There was their certain penalty hour that they

12  weren't giving us where they were paying us our regular

13  rate instead of an overtime rate because of when we took

14  our lunch break or how long it was for if we worked

15  through it.  It was all very confusing, it still is.

16          They figured out there was a problem.  They

17  compensated us for a period of time where they know

18  there was that problem, they went back through the time

19  cards and looked.

20      Q    Okay.  So to your knowledge, then, they

21  corrected that problem concerning the meal periods?

22      A    May still be going on.  We just don't know.

23      Q    Well, have you worked through meal period and

24  put it on your time card within the last month?

25      A    Probably.

1d21e3be-c57c-4cb1-9f11-213fc513cf37

NETWORK DEPOSITION SERVICES
Transcript of Louise Johnson

Page 150

1    Q    Well, were you paid for that working through
2    your lunch?
3    A    I think so.
4    Q    And were you paid the additional time that you
5    were entitled to for working through your lunch?
6    A    I think so.
7    Q    Do you have any reason to believe that you were
8    not paid the incorrect amount of compensation for
9    working through your meal periods?
10   A    Only if they did another calculation error,
11   which I wouldn't know.
12   Q    Why wouldn't you know that?
13   A    Nobody's been able to effectively explain how
14   the extra hours, the extra pay works.  And so whenever
15   we turn in a time card like that, we just give 'em our
16   best guess, we don't know.  We don't understand how it
17   works.
18   Q    Well, you give them the hours you worked and
19   it's their responsibility to make sure you get correctly
20   compensated for it, correct?
21   A    I think it's their responsibility, but they
22   expect us to add it up and then they just put it in.
23   Q    When you say they expect you to add what up?
24   A    The hours worked, the overtime, and all of the
25   penalties associated with the meal breaks, they expect

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

1d21e3be-c57c-4cb1-9f11-213fc513cf37

NETWORK DEPOSITION SERVICES
Transcript of Louise Johnson

Page 160

1    Q    Okay.  Going back to Exhibit 10 on page five,
2  it states a second or third sentence, quote, The time
3  record should show time in and out for every day worked
4  (including meal breaks, lunch) and time performing work
5  while on-call (e.g., answering phone calls, removal,
6  etc.).
7         Do you see that?
8    A    Yes.
9    Q    And was that Alderwoods' policy during the time
10 that you worked for it?
11   A    That was the written policy.
12   Q    Did you record the phone calls you received
13 while you were on-call?  Did you have a log to do that
14 or documents to fill out?
15   A    For a while on our time card we would -- we
16 weren't putting the in and out time, we would just put
17 eight hours, ten hours.  On that we would put four phone
18 calls.  But then later on as we began to use, like, a
19 time clock or time sheets, there was actually a log for
20 overtime -- or on-call phone calls.
21   Q    So while you're on call there is a log
22 telephone sheet that you're required to fill out,
23 correct?
24   A    Yes.
25   Q    And doesn't that have where you list what the

1d21e3be-c57c-4cb1-9f11-213fc513cf37

NETWORK DEPOSITION SERVICES
Transcript of Louise Johnson

Page 176

1    Q    Next sentence says, If there are greater
2  restrictions on the employee's on-call duty, on-call
3  time may be compensable.  The employee and manager
4  consult with the human resources.
5         Did you ever do that?
6    A    We were sort of interested, but we didn't know
7  that that was an option we could do.
8    Q    So you didn't ever consult with the human
9  resources about greater restrictions on on-call that --
10   A    No.
11   Q    It says, When the employee is called to work
12 during the on-call time, the employees will be paid at
13 the employee's appropriate pay rate.  Says see call
14 section below; do you see that?
15        Again, back on Exhibit 10, page six, G, looks
16 like it's the second sentence before the end of the
17 paragraph.
18        Was that the policy in effect at Alderwoods
19 during the time that you worked for it?
20   A    They paid us differently.  When I first started
21 we got -- if you were on-call one night you would get
22 one hour overtime standard.  And then for each phone
23 call you would get 15 minutes of overtime.  So no matter
24 what, if you didn't get any phone calls, you still got
25 one hour overtime just for being on call.

1d21e3be-c57c-4cb1-9f11-213fc513cf37

NETWORK DEPOSITION SERVICES
Transcript of Louise Johnson

Page 177

1    After that it was changed to we got paid 15

2  minutes of overtime for every phone call we got and it

3  was supposed to be within a 15 minute block.  It doesn't

4  matter how many minutes were in that, you got paid for

5  that 15 minutes.

6        So if you waited another 15 minutes to make

7  your next phone call, then you would get your second 15

8  minutes, if that makes sense.

9    Q    No, it doesn't, but I'll have you explain it to

10  me in a second.

11        The first one I understand, I think.  And the

12  second one, it says 15 minutes of overtime for each

13  phone call.

14    A    Yes.

15    Q    And then you lost me after that.

16    A    But then let's say you make your phone call, so

17  you get 15 minutes of overtime.  But within that next 15

18  minutes you make two more phone calls.  You don't get

19  your 15 minutes for each one of those.

20    Q    Okay.  So you get 15 minutes for the number of

21  calls you make during those minutes.

22    A    Right.  And then if you, like, an hour later

23  you make another phone call, you get another 15 minutes.

24    Q    And what you're doing is juxtaposing that

25  against the prior policy that every phone call you made

1d21e3be-c57c-4cb1-9f11-213fc513cf37

NETWORK DEPOSITION SERVICES
Transcript of Louise Johnson

Page 219

1    accurate?

2        A     I think that should also say 2007.

3        Q     What about these X's in the middle of the page

4    where it says A, B, C, D and E; who put those Xs at

5    those boxes, B, D, and E?

6        A     It was probably the same person that wrote

7    everything at the top.

8        Q     Okay.  But wasn't you, correct?

9        A     It was not me.

10       Q     Do you agree with the boxes that are checked

11   on -- do you agree the way that this document is filled

12   out as far as to checking boxes B, D, and E and not C or

13   A?

14       A     Yes.

15       Q     Okay.  And that's why you signed this document

16   was to affirm that B, D, and E were correct?

17       A     Yes.

18       Q     So as far as number A that deals with community

19   service, you're not claiming any community service as

20   part of your claim in this lawsuit, correct?

21       A     Correct.

22       Q     And same thing with C, you're not claiming any

23   compensation for time spent training for and taking a

24   test to become a licensed insurance agent or in time

25   maintaining that license?

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

1d21e3be-c57c-4cb1-9f11-213fc513cf37

NETWORK DEPOSITION SERVICES
Transcript of Louise Johnson

Page 228

1  I was submitting so much overtime for the week that I

2  kind of -- I couldn't put any more without attracting a

3  lot of attention and a lot of trouble, particularly from

4  Tracy.

5      Q    Are you aware of any policy that Alderwoods had

6  for not fully compensating employees that were

7  performing on-call duties?

8          MR. McGEE:  Object to the form.

9          THE WITNESS:  I don't know.

10 BY MR. FORESTIERE:

11     Q    Did anyone from Alderwoods ever tell you not to

12 report all the time you worked while you were performing

13 on-call duties?

14     A    Don't believe that they ever said that.

15     Q    Did you ever see a written policy issued by

16 Alderwoods saying that people performing on-call duties

17 would not be fully compensated for the work they

18 performed?

19     A    I've never seen anything.

20     Q    Do you know of anyone that worked at Harbor

21 Lawn that was not fully compensated for their on-call

22 duties other than yourself?

23     A    Most likely Curt and Kathy.

24     Q    How do you know that?

25     A    Through personal conversation in the office.

NETWORK DEPOSITION SERVICES
Transcript of Louise Johnson

Page 328

1                        CERTIFICATE

2                            OF

3            CERTIFIED SHORTHAND REPORTER

4

5           The undersigned Certified Shorthand Reporter

6   and Deposition Officer of the State of California does

7   hereby certify:

8           That the foregoing deposition was taken before

9   me at the time and place therein set forth, at which

10  time the witness was duly sworn by me;

11          That the testimony of the witness and all

12  objections made at the time of the deposition were

13  recorded stenographically by me and was thereafter

14  transcribed, said transcript being a true and correct

15  copy of the proceedings thereof.

16          In witness whereof, I have subscribed my name

17  this date: _____.

18

19

20

21          _____

            Victoria A. Guerrero, CSR No. 8370
22

23

24

25

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

1d21e3be-c57c-4cb1-9f11-213fc513cf37

**TAB 18**

NETWORK DEPOSITION SERVICES
Transcript of Peter Johnson

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


- - -

DEBORAH PRISE AND HEATHER     )
RADY,                         )
                              )
              Plaintiffs,     )
                              )
        vs.                   ) No. 06-1641
                              )
ALDERWOODS, INC.,             )
                              )
              Defendant.      )
                     - - -

        DEPOSITION OF PETER I. JOHNSON

        FRIDAY, APRIL 8, 2010

                     - - -

     The deposition of PETER I. JOHNSON, called as a
witness by the Plaintiffs, pursuant to notice and the
Federal Rules of Civil Procedure pertaining to the
taking of depositions, taken before me, the
undersigned, Rebecca L. Schnur, Notary Public in and
for the Commonwealth of Pennsylvania, at the offices of
Margolis Edelstein, 525 William Penn Place, Suite 3300,
Pittsburgh, Pennsylvania, 15219, commencing at
9:30 o'clock a.m., the day and date above set forth.

                     - - -

           NETWORK DEPOSITION SERVICES
                 1101 GULF TOWER
                 707 GRANT STREET
           PITTSBURGH, PENNSYLVANIA 15219

                     - - -

NETWORK DEPOSITION SERVICES
Transcript of Peter Johnson

Page 51

1      (Whereupon, Deposition Exhibit 9 was marked
2   for identification.)
3   Q    I show you what's been marked as Johnson
4   Exhibit Number 9.  Now, let's just ignore the
5   handwritten scribble that's on here.  I'm not going to
6   ask you anything about that.
7      MS. DUGAN:  Just to clarify for the record,
8   is it true that the handwriting that appears on
9   this document did not appear on the document as we
10   produced it with the Bates label on?
11      MR. SAUL:  Correct.  It does not.  I'm going
12   to try to get a clean copy.
13      MS. DUGAN:  Okay.
14   Q    This document refers to an Alderwoods
15   community leadership program.  Do you recall the
16   Alderwoods community leadership program?
17      MS. DUGAN:  Take a minute to look through all
18   the pages.
19   A    Yeah, I don't -- It's not striking --
20   Specifically, I don't remember.  I have no idea when
21   this is from.
22   Q    So you don't recognize the document then?
23   A    I don't remember.
24   Q    Okay.
25   A    Truthfully, I don't remember.

4745406d-f48b-43fd-a4b5-377c055b9ed3

NETWORK DEPOSITION SERVICES
Transcript of Peter Johnson

Page 52

1          (Whereupon, Deposition Exhibit 10 was marked
2      for identification.)
3      Q    I show you what's been marked as Exhibit 10.
4  And, again, please ignore the handwritten part of it.
5          Do you recognize these e-mails that appear on
6  this page?
7      A    I don't remember specifically getting this
8  e-mail six years ago.
9      Q    The first one is dated August 1, 2004 from
10  Pat McDermott to Michael Hilgefort and to Peter
11  Johnson.  Correct?
12      A    That's what it states.  Correct.
13      Q    And Hilgefort at that time was location
14  manager at Hirsch?
15      A    I believe so.
16      Q    And you were the location manager at Brandt.
17  Correct?
18      A    Correct.
19      Q    Do you recall preparing calendars regarding
20  the community leadership program?
21      A    As I had said yesterday -- not yesterday --
22  Sorry -- earlier, I don't remember.  I just -- I don't
23  remember anybody specifically writing anything down for
24  this.
25      Q    The e-mail on the bottom part from Amato to

4745406d-f48b-43fd-a4b5-377c055b9ed3

NETWORK DEPOSITION SERVICES
Transcript of Peter Johnson

Page 53

1    McDermott, Amos, Pramik, Tunstall, and Blute refers to
2    reports for the community leadership program.  Do you
3    recall any reports regarding the community leadership
4    program?
5        A    Again, I just -- We had that report that I
6    talked about earlier.  Whether it was community
7    leadership or not I couldn't tell you specifically, but
8    there was that report of activities and things that we
9    would report to -- I would report to Pat on a regular
10   basis.
11       Q    Was it ever explained to you why the company
12   was asking for these types of reports?
13       A    Specifically, I don't know that it ever was.
14   This is why I want to know it.  I don't recall that.
15       Q    Did the company encourage community
16   development as a way to grow the business?
17       A    If you go back to the job descriptions, it
18   was one of the things that was listed there, and it
19   was -- it would always be nice if somebody did.
20       Q    And the company encouraged community
21   involvement so as to grow the business.  Is that
22   correct?
23       A    That's your perception of it.  I don't know
24   what -- I can't speak for the whole company.
25       Q    Did you ever receive any communications,

4745406d-f48b-43fd-a4b5-377c055b9ed3

NETWORK DEPOSITION SERVICES
Transcript of Peter Johnson

Page 56

1          Do you recall any communications from
2    corporate higher-ups to that effect?
3          A    The only thing that I can recall that seems
4    vaguely familiar to this is having to try to come up
5    with a budget for anything that we may do for the year.
6          Q    Was that a line item for your budget?
7          A    A line item for our budget?  I don't know.
8    You know, I don't know if we did it something like this
9    or this or how we do it.  I just remember, is there
10   something you had planned this year and what was it
11   going to cost.  But, you know, the long and short of it
12   is, we really had no control over our budgets.
13         Q    Do you recall the term "community
14   influencers"?
15         A    Sounds familiar, but, specifically, I can't
16   say 100 percent yes or no.
17         Q    Do you recall something referred to as a
18   community leadership program?
19              MS. DUGAN:  Objection.  I believe that's been
20         asked and answered.
21         Q    Do you recall anything to that effect?
22         A    Specifically, I don't recall.
23         Q    Do you recall a community leadership program
24   binder?
25         A    I have no idea.  They're just things that I

4745406d-f48b-43fd-a4b5-377c055b9ed3

NETWORK DEPOSITION SERVICES
Transcript of Peter Johnson

Page 57

1   didn't think I would ever need to remember.
2        Q    Do you recall best practices program?
3        A    I remember there were -- I don't know if it
4   was a program or not, but I remember the different
5   people had best practices within their -- you know, our
6   MGM, Randy Amos, had some best practices that he
7   thought were good customer service relation kind of
8   things.  Specifically what was in it I don't recall,
9   but I remember he had some best practices.  Whether the
10  company had their own specifically I don't remember.
11       Q    Do you recall there being something referred
12  to as "best community practices"?
13       A    I have no idea.
14       Q    Do you recall something referred to as
15  "success spotlight"?
16       A    Doesn't strike a bell.
17            MR. SAUL:  I'll try to get clean copies of
18       these as well.
19            MS. DUGAN:  We've produced clean copies.
20       Correct?
21            MR. SAUL:  That's what I'll get, and I'll
22       substitute the clean ones here.
23       Q    Do you know who Vicki Clark is?
24       A    Yeah, I remember the name, but I don't
25  remember what her title was.

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

4745406d-f48b-43fd-a4b5-377c055b9ed3

NETWORK DEPOSITION SERVICES
Transcript of Peter Johnson

Page 94

1  it seems like it may have been -- I think we had a
2  poster that was similar to this, but I'm not sure
3  100 percent.
4      Q    And this is entitled, just for the record, "I
5  Believe in Service Award Program."  At the bottom it
6  says, "Alderwoods Group" and ALD004927.
7           When employees did volunteer work in the
8  community during working time, were they paid for that?
9      A    They should have been, yes.  I have an
10 employee that did that.
11     Q    The policy was that they should be paid for
12 the time that they performed community work during
13 working time.  Is that correct?
14     A    That's my understanding of how we took it
15 locally at least.
16     Q    And what if the employee was involved in
17 community activity during nonworking time; was the
18 employee to be paid for that as well?
19     A    That's vague in my opinion, that questioning.
20          You know, the way I see it simply is this:
21 If it was something that we encouraged or asked them to
22 do, then, yes.  If it's something that they did on
23 their own, that -- You know, if I -- For example, I
24 belong to the Masons.  If I was a Mason and I went to
25 it, nobody from Alderwoods, nobody from SCI asked me to

4745406d-f48b-43fd-a4b5-377c055b9ed3

NETWORK DEPOSITION SERVICES
Transcript of Peter Johnson

Page 95

1    join it and I belonged to it, if I went to the meeting,
2    I, personally, wouldn't put time down for it.  It's
3    simply time I put -- That's why your question seems
4    vague to me because I can't answer it specifically with
5    the way --
6         Q    What about with respect to belonging to
7    churches or synagogues; was that something that
8    employees would be paid for, if they went to church
9    services or synagogue services on their own time?
10        A    I don't know how each location would have
11   done it.  You know, if you joined specifically for
12   business purposes, I mean, you might have a question of
13   saying that might be something to think about; but if
14   you belonged to a church or a synagogue before you were
15   hired and you went on a regular basis anyway, then I
16   don't know.  You know, that would be -- I don't know
17   what a company policy on that would be.
18        Q    Did you ever encourage employees to belong to
19   any community organizations or attend any community
20   events?
21        A    Again, it was, you know, it would be
22   wonderful if they did.  You know, I'm never going to
23   tell anybody not to join anything, but it would be
24   wonderful.
25        Q    Did you do anything to encourage them to work

4745406d-f48b-43fd-a4b5-377c055b9ed3

NETWORK DEPOSITION SERVICES
Transcript of Peter Johnson

Page 96

1    in the community?

2          A     Did I do anything in particular?

3          Q     Yeah.  Did you ever do anything to encourage

4    them to participate in community events?

5          A     I don't know that I did anything in

6    particular other than set up, you know, the

7    Adopt-A-Highway and really work on the petting zoo, 4th

8    of July thing.  Other than that, I don't know anything

9    that -- I can't recall anything that I specifically

10   did.

11         Q     Were employees paid for the time they

12   worked -- all the time that they participated in the

13   4th of July event?

14         A     The expectation was, yes, 100 percent.

15         Q     Were the employees -- What work was involved

16   in putting on the July 4th event?

17         A     Not to pat myself on the back, probably

18   90 percent of it was done by me.  It was simply going

19   out and buying everything that was needed.  I typically

20   did that except for the year that I was in a

21   wheelchair.  Go out and buy the items that were needed,

22   the hot dogs, the drinks, the ice, bring coolers in,

23   getting the sign made.  And then the work that truly

24   was -- The gentleman from the petting zoo came in, set

25   up on his own.  We put a table out.  We put the hot

4745406d-f48b-43fd-a4b5-377c055b9ed3

NETWORK DEPOSITION SERVICES
Transcript of Peter Johnson

Page 126

1                    C-E-R-T-I-F-I-C-A-T-E

2       I, Rebecca L. Schnur, the undersigned, do hereby

3   certify that the foregoing pages are a true and correct

4   transcript of my stenotypy notes taken of the

5   proceedings held at the above-referenced address on the

6   above-referenced date.

7

8

9       _____
        Rebecca L. Schnur
10      Notary Public in and for the
        Commonwealth of Pennsylvania
11      My Commission Expires:  June 16, 2013

12                      -  -  -

13

14

15

16

17

18

19

20

21

22

23

24

25

**TAB 19**

NETWORK DEPOSITION SERVICES
Transcript of Robert Jones

Page 1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF PENNSYLVANIA

DEBORAH PRISE and HEATHER RADY,
on behalf of themselves and all
employees similarly situated,

     Plaintiffs,

vs.

ALDERWOODS GROUP, INC. and
SERVICE CORPORATION INTERNATIONAL,

     Defendants.

_____

Civil Action No. 06-1641 Civil
Judge Joy Flowers Conti

DEPOSITION OF ROBERT GORDON JONES

Taken April 21, 2009
Commencing at 9:30 a.m.

Volume I - Pages 1 - 216, inclusive

Taken by the Defendants
at
Lane Powell Law Firm
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska

Reported by:
Mary A. Vavrik, RMR

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

72061a54-5157-4519-8455-94be4a32d6e4

NETWORK DEPOSITION SERVICES
Transcript of Robert Jones

Page 150

1    4/3.  The second page is 5/1.  4/17.

2                    MR. LINGLE:  Okay.

3                    MR. FORESTIERE:  Someone just put an

4    extra page on it.

5    BY MR. FORESTIERE:

6    Q    So getting back to my question, then, it's your

7    understanding that the pay period ending date, this

8    one we're talking about, April 3, 2004, includes the

9    prior two weeks of work?

10   A    Yes, sir.

11   Q    All right, sir.  That makes more sense.  Now,

12   getting back to that page, though, under earnings it

13   says, "piecework," and then it says, "this period,"

14   and then it has "$140," do you see that?

15   A    Yes, I do.

16   Q    What does that pertain to?

17   A    That must be the pay for those death calls that

18   would have been done that two-week period.  So I --

19   Q    Are you contending in this lawsuit that you

20   didn't get paid for all of your death call work?

21                    MR. LINGLE:  Object to the form.

22                    THE WITNESS:  I believe that's the

23   case.

24   BY MR. FORESTIERE:

25   Q    Have you made any determination as to how many

72061a54-5157-4519-8455-94be4a32d6e4

NETWORK DEPOSITION SERVICES
Transcript of Robert Jones

Page 151

1    times you made death calls that you were not paid

2    for?

3    A    No, sir.

4             MR. LINGLE:  Object to the form.

5    BY MR. FORESTIERE:

6    Q    Well, obviously you have been paid in this

7    paycheck at least something for death calls,

8    correct?

9    A    Yes, sir.

10   Q    And was it your understanding that you were

11   doing death calls at $35 for each one?

12   A    That seems to be the case, yes, sir.

13   Q    Because it looks like this would indicate that

14   there was four death calls that you were paid for,

15   correct?

16   A    Yes, sir.

17   Q    Do you know how many death calls -- strike

18   that.  Do you know if you were -- if you -- strike

19   that.  Did you perform any death calls during this

20   two-week period that you were not paid?

21             MR. LINGLE:  Object to the form.

22             THE WITNESS:  Not that I recall.

23   BY MR. FORESTIERE:

24   Q    How can we determine the number of death calls

25   that you were not paid for?

NETWORK DEPOSITION SERVICES
Transcript of Robert Jones

Page 177

1   working at Evergreen, correct?

2   A     Yes, sir.

3   Q     All right.  During the time period of December

4   2002 through May 2004, could you identify for me the

5   community service work that you wish to receive

6   compensation for?

7   A     None.

8   Q     Was there community service work that you

9   performed prior to December 2002 that you are

10  seeking to receive compensation?

11  A     Yes, sir.

12  Q     What community service did you perform prior to

13  2002 that you want to receive compensation for?

14  A     The work I did with the Lions Club.

15  Q     Anything else?

16  A     No, sir.

17  Q     Okay.  Can you identify for me the community

18  service work that you did concerning the Lions Club?

19  A     I did volunteer work with the Food Bank of

20  Alaska distributing food at our clubhouse, and I

21  worked the Tudor Road Bingo during the bingo events.

22  They donated money for our club if the members

23  worked emptying ashtrays and trash cans and helping

24  out the Tudor Road Bingo staff.

25  Q     Anything else?

72061a54-5157-4519-8455-94be4a32d6e4

NETWORK DEPOSITION SERVICES
Transcript of Robert Jones

Page 178

1    A    No, sir.

2    Q    Let's talk about the volunteer work at the

3    Lions Club for the Food Bank.  Do I have that right?

4    Did I mix my apples and oranges?

5    A    Volunteer work with the Lions Club for the Food

6    Bank.  No.  That's accurate.

7    Q    Let me get the word volunteer out of it.  When

8    did you start performing -- strike that.  Did you

9    ever become a member of the Lions Club?

10   A    Yes, sir.

11   Q    When did you become a member of the Lions Club?

12   A    It was -- I believe it was in the spring

13   of '96.

14   Q    Was that before or after you started working at

15   Evergreen?

16   A    After.

17   Q    Does the Lions Club membership have dues?

18   A    Yes, sir.

19   Q    Who paid the dues?

20   A    Evergreen.

21   Q    Are there any other periodic expenses

22   concerning your membership in the Lions Club that

23   Evergreen paid for?

24   A    No, sir.

25   Q    Did you ever have to come out of pocket

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

72061a54-5157-4519-8455-94be4a32d6e4

NETWORK DEPOSITION SERVICES
Transcript of Robert Jones

Page 179

1   concerning any expenses by being a member of the
2   Lions Club that Evergreen did not pay for?
3   A    No, sir.
4   Q    Why did you join the Lions Club?
5   A    It was a -- well, I joined the Lions Club
6   because I thought it was a good organization.
7   Q    How much time per week did you -- strike that.
8   How much time per week did you perform work at the
9   Lions Club?
10  A    It was probably six hours a month.
11  Q    And what did you do for those six hours?
12  A    Well, you know, one of them would be lunch, and
13  the other would be split between distributing food
14  from our clubhouse on behalf of the Food Bank to the
15  people in the neighborhood.  You know, would sign up
16  for two-, three-hour shifts.  And then the Tudor
17  Road Bingo was usually like a four-hour shift.
18  Q    So there would be weekly lunch meetings that
19  you would attend usually?
20  A    During the week?
21  Q    Yes.  How often were the lunch periods?
22  A    Every Wednesday.
23  Q    And how much time on a Wednesday would you
24  spend at lunch?
25  A    Oh, when I went, probably an hour and 15

72061a54-5157-4519-8455-94be4a32d6e4

NETWORK DEPOSITION SERVICES
Transcript of Robert Jones

Page 180

1    minutes.

2    Q    How often did you attend the lunches?

3    A    About once a month.

4    Q    Do they charge for lunch?

5    A    Gosh, I don't recall.

6    Q    So how much on a monthly basis did you spend

7    performing community service for the Lions Club?

8                    MR. LINGLE:  Object to the form.

9                    THE WITNESS:  Spend in hours?

10   BY MR. FORESTIERE:

11   Q    Yes, sir.

12   A    About five or six hours a month.

13   Q    When did you stop being a member of the Lions

14   Club?

15   A    I was a member for two years.

16   Q    So that ended about spring of 1998?

17   A    I'd say that's accurate.

18   Q    Was there a reason why you stopped attending --

19   strike that.  Was there a reason why you stopped

20   performing community service for the Lions Club?

21   A    I quit participating in the club altogether.

22   Q    And why did you do that?

23   A    I -- the workload wouldn't allow me to make the

24   lunches even once a month, so it just wasn't working

25   out.  Our schedules didn't work together.

72061a54-5157-4519-8455-94be4a32d6e4

NETWORK DEPOSITION SERVICES
Transcript of Robert Jones

Page 183

1    Q     What is your understanding as to that
2    requirement?
3    A     The funeral directors had to join a service
4    organization.
5    Q     And how did you become aware of that
6    requirement?
7    A     Mr. Janssen told me that.
8    Q     You recall when it was he first told you that?
9    A     It was October '95.
10   Q     Was there any written policy that you are aware
11   of requiring -- well, strike that.  Was the
12   community service requirement particular to anybody,
13   or did it apply to everybody that worked at
14   Evergreen?
15   A     It was particular to the directors and family
16   service counselors or pre-need sales people.
17   Q     That would be the funeral directors and family
18   service counselors pre-need?
19   A     Uh-huh.
20   Q     You have got to say yes.
21   A     Oh, yes.
22   Q     And do you know what the purpose of requiring
23   these people in those positions to perform community
24   service?
25                   MR. LINGLE:  Object to the form.

72061a54-5157-4519-8455-94be4a32d6e4

NETWORK DEPOSITION SERVICES
Transcript of Robert Jones

Page 187

1    performing community service work while employed at

2    Evergreen?

3                    MR. LINGLE:  Object to the form.

4                    THE WITNESS:  No, sir.

5    BY MR. FORESTIERE:

6    Q    Any other community service work you performed

7    other than with the Boys and Girls Club and the

8    Lions Club?

9    A    No, sir.

10   Q    Do you know if there is any community service

11   work that was imposed at any other facilities

12   operated by Alderwoods?

13                   MR. LINGLE:  Object to the form.

14                   THE WITNESS:  Could you restate the

15   question?

16   BY MR. FORESTIERE:

17   Q    Are you aware of any community service

18   requirements that were -- strike that.

19                   MR. FORESTIERE:  Why don't you read

20   my question back.  It's getting to that part of the

21   day.

22               (The requested record was read.)

23   BY MR. FORESTIERE:

24   Q    Let me ask the question again.  Are you aware

25   of any community service work requirement that was

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

72061a54-5157-4519-8455-94be4a32d6e4

NETWORK DEPOSITION SERVICES
Transcript of Robert Jones

Page 188

1    imposed by Alderwoods at any of the other facilities
2    that it owned?
3    A    No, sir.
4    Q    Did you receive any type of training related to
5    the community service obligation that was imposed
6    upon you at the Evergreen facility?
7    A    No, sir.
8                MR. FORESTIERE:  Why don't we go
9    ahead and take a break.  We are just about getting
10   close to the end.
11               (A break was taken.)
12   BY MR. FORESTIERE:
13   Q    Are you aware of any other -- strike that.  Are
14   you aware of any policies implemented at any other
15   Alderwoods facilities concerning community service?
16   A    No, sir.
17   Q    Or concerning on-call services?
18   A    No, sir.
19   Q    Or concerning overtime, payment of overtime,
20   that is?
21   A    No, sir.
22   Q    Or about not recording hours worked on time
23   cards?
24   A    No, sir.
25   Q    Or policies at Alderwoods facilities requiring

72061a54-5157-4519-8455-94be4a32d6e4

NETWORK DEPOSITION SERVICES
Transcript of Robert Jones

Page 189

1    preapproval of overtime?

2    A    No, sir.

3    Q    Or how overtime rates were calculated at other

4    facilities?

5    A    No, sir.

6    Q    And on your on-call work that we talked about

7    earlier today, did you attempt to report that time

8    to anyone and request payment for it?

9                    MR. LINGLE:  Object to the form.

10                   THE WITNESS:  If -- nothing other

11   than what was recorded on the time sheet, so I guess

12   the answer is no.

13   BY MR. FORESTIERE:

14   Q    So other than the time you put on your time

15   sheets doing on-call work, you didn't report any

16   other time that you performed for on-call services?

17   A    No, sir.

18   Q    And is there a reason why you didn't do that?

19                   MR. LINGLE:  Object to the form.

20                   THE WITNESS:  Yeah.

21   BY MR. FORESTIERE:

22   Q    Could you tell me what that is, please?

23   A    I was so passionate about my job and my

24   position that the compensation really wasn't an

25   issue for me.

72061a54-5157-4519-8455-94be4a32d6e4

NETWORK DEPOSITION SERVICES
Transcript of Robert Jones

Page 190

1   Q    When people called you, they were already in
2   pretty much dire straits and need?
3   A    Most of the time.
4   Q    Did you tell Mr. Janssen that you were doing
5   on-call services and not reporting all your time?
6   A    No, sir.
7   Q    Did you tell anyone at Evergreen that you were
8   performing on-call services and not reporting all
9   your time?
10  A    No, sir.
11  Q    Are you aware of any company policy at
12  Evergreen for not compensating employees for
13  performing on-call services?
14              MR. LINGLE:  Object to form.
15              THE WITNESS:  No, sir.
16              MR. FORESTIERE:  Can I have the
17  question and answer read back, please.
18          (The requested record was read.)
19  BY MR. FORESTIERE:
20  Q    Are you aware of any company policy at
21  Evergreen for employees not reporting all the
22  overtime they worked?
23              MR. LINGLE:  Object to the form.
24              THE WITNESS:  No, sir.
25  BY MR. FORESTIERE:

72061a54-5157-4519-8455-94be4a32d6e4

NETWORK DEPOSITION SERVICES
Transcript of Robert Jones

Page 191

1    Q    Are you aware of any company-wide policy at
2    Evergreen for not recording -- strike that.  Are you
3    aware of any company-wide policy at Evergreen for
4    employees not recording all the time they worked on
5    their time cards?
6                   MR. LINGLE:  Object to the form.
7                   THE WITNESS:  No, sir.
8    BY MR. FORESTIERE:
9    Q    Are you aware of any company-wide policy
10   employed by Evergreen to intentionally miscalculate
11   the overtime rate to be paid its employees for
12   overtime?
13   A    No, sir.
14                  MR. LINGLE:  Object to form.
15   BY MR. FORESTIERE:
16   Q    Are you aware of any company-wide policy
17   employed at Evergreen for employees not to record or
18   report the time they spent performing community
19   services?
20                  MR. LINGLE:  Object to the form.
21                  THE WITNESS:  No, sir.
22   BY MR. FORESTIERE:
23   Q    Were you involved in any type of pre-needs
24   appointments?
25   A    Yes, sir.

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

72061a54-5157-4519-8455-94be4a32d6e4

NETWORK DEPOSITION SERVICES
Transcript of Robert Jones

Page 193

1    they are supposed to?

2                    MR. LINGLE:  Object to the form.

3                    THE WITNESS:  No, sir.

4    BY MR. FORESTIERE:

5    Q    Are you aware of any company-wide policy that

6    the employees should not take their rest periods

7    when they are supposed to?

8                    MR. LINGLE:  Object to the form.

9                    THE WITNESS:  No, sir.

10   BY MR. FORESTIERE:

11   Q    Have you ever seen a written policy prepared by

12   Alderwoods that employees were not to take their

13   meal periods?

14   A    No, sir.

15   Q    Or that they were not to take their rest

16   periods?

17   A    No, sir.

18   Q    Or that they were not to record all of their

19   time they worked at Evergreen?

20   A    No, sir.

21   Q    Or that they were not to report all the

22   overtime they worked?

23   A    No, sir.

24   Q    Or not to report all the time they spent

25   performing on-call services?

72061a54-5157-4519-8455-94be4a32d6e4

NETWORK DEPOSITION SERVICES
Transcript of Robert Jones

Page 194

1    A    No, sir.

2    Q    Or not to report all the time they spent

3    performing any type of training that Evergreen may

4    have required for their jobs?

5    A    No, sir.

6    Q    Or that they were not to report their time for

7    performing community service work?

8    A    No, sir.

9    Q    Are you aware of any policy adopted by

10   Evergreen regarding the preapproval of overtime pay?

11   A    Nothing other than the policy that we have

12   looked at initially regarding preapproval.

13   Q    What was your understanding as to whether or

14   not preapproval was required before someone worked

15   overtime?

16   A    For me?

17   Q    Yeah.  What was your understanding during the

18   time you worked at Evergreen regarding whether

19   preapproval was required before any employees worked

20   any overtime?

21   A    Well, my understanding was that all the

22   employees other than myself needed to have approval

23   prior to reaching the overtime period.

24   Q    And was that a policy that you enforced during

25   the time that you were the manager?

72061a54-5157-4519-8455-94be4a32d6e4

NETWORK DEPOSITION SERVICES
Transcript of Robert Jones

Page 215

1              REPORTER'S CERTIFICATE

2         I, MARY A. VAVRIK, RMR, Notary Public in

3    and for the State of Alaska do hereby certify:

4         That the witness in the foregoing

5    proceedings was duly sworn; that the proceedings

6    were then taken before me at the time and place

7    herein set forth; that the testimony and proceedings

8    were reported stenographically by me and later

9    transcribed under my direction by computer

10   transcription; that the foregoing is a true record

11   of the testimony and proceedings taken at that time;

12   that the witness requested signature; and that I am

13   not a party to nor have I any interest in the

14   outcome of the action herein contained.

15        IN WITNESS WHEREOF, I have hereunto

16   subscribed my hand and affixed my seal this _____

17   day of _____ 2009.

18

19
                        _____
20                      MARY A. VAVRIK,
                        Registered Merit Reporter
                        Notary Public for Alaska
21

22        My Commission Expires:  November 5, 2012

23

24

25

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

72061a54-5157-4519-8455-94be4a32d6e4

**TAB 20**

1              UNITED STATES DISTRICT COURT
2            NORTHERN DISTRICT OF CALIFORNIA
3             SAN FRANCISCO/OAKLAND DIVISION
4

WILLIAM HELM, DEBORAH PRISE, ) No. CV 08-1184-SI
5  HEATHER P. RADY, et al, on   )
   behalf of themselves and all )
6  other employees and former   )
   employees similarly situated,)
7                               )
                   Plaintiffs,  )
8       v.                      )
                               )
9  ALDERWOODS GROUP, INC.,      )
                               )
10                 Defendant.   )
                               )
11
12

        DEPOSITION OF RICHARD KAMIENSKI
13
        Wednesday, October 21, 2009, 9:50 a.m.
14
15      Deposition Officer:
        Patricia Coward, CSR No. 5142
16
        Taken in the offices of:
17
        California Deposition Reporters
18      2509 West March Lane, Suite 160
        Stockton, California 95207
19
20
21
22
            CALIFORNIA DEPOSITION REPORTERS
23           CERTIFIED SHORTHAND REPORTERS
            2509 West March Lane, Suite 160
24           Stockton, California 95207
                   (209) 478-3377
25            Statewide (800) 442-3377

                                              Page 1

**COPY**

1   employee was exempt from timekeeping requirements?

2   A.      I can't think of a situation where I did.

3   Q.      Under that, it says, quote, "Many

4   states/slash/provinces  require a designated meal break

5   after a certain number of hours worked," end quotes.

6   Do you see that?

7   A.      Yes, I do.

8   Q.      What was your understanding as to the designated

9   meal break that your nonexempt employees were required

10  to take?

11  A.      They were I believe to take a half an hour

12  minimum after working four hours, I believe.

13  Q.      And to your knowledge, is that what the

14  employees did at the facilities that you managed?

15          MS. GIFFORD:   Objection.

16          THE WITNESS:   To my knowledge, that's what they

17  did.

18          MR. FORESTIERE:   It next states, quote, "You may

19  consult the HR specialist for your area for assistance

20  in determining the required meal period," end quote.

21  Do you see that?

22  A.      Yes, I do.

23  Q.      Did you ever do that, consult an HR specialist

24  concerning the required meal periods?

25  A.      I can't recall if I did or not.

Page 123

080fefd8-945c-4daa-943f-0ea003beeafc

```
 1    Q.      Do you ever recall any instance where you had
 2    any questions about the designated meal breaks your
 3    employees were to take?
 4    A.      I can't recall.
 5    Q.      Next it says, quote -- going back to Exhibit 1
 6    on the first page, "If an employee is eligible for and
 7    receives piecework pay, an employee is still required
 8    to record the actual time worked," end quote.  Do you
 9    see that?
10    A.      Yes, I do.
11    Q.      Do you know if any of your employees performed
12    any type of piecework?
13    A.      I don't believe I had anybody doing piecework.
14    Q.      Being paid on a flat-rate basis?
15    A.      I don't believe I had.
16    Q.      Everybody was paid on an hourly basis, to your
17    knowledge?
18            MS. GIFFORD:   Objection.
19            THE WITNESS:   With the exception of myself and
20    the other two nonexempt --
21            MR. FORESTIERE:   That's correct.
22    A.      Or the other two exempt, excuse me.
23    Q.      Yeah.  As to all the hourly, nonexempt
24    employees, it was your understanding basically that
25    they were just paid a wage for the performance of their
```

Page 124

1    duties?

2            MS. GIFFORD:  Objection.

3            THE WITNESS:  Yes, sir.

4            MR. FORESTIERE:  They were paid a flat rate in

5    addition to their wages, correct?

6    A.      I don't remember paying anybody a flat rate.

7    Q.      The next bullet point states, quote,

8    "Complete -- or completed timecard --" I'm sorry, let

9    me start over.  Quote, "Complete timecards/slash/sheet

10   are to be signed by the employee to verify that the

11   card accurately documents the hour -- the actual hours

12   worked," end quote.  Do you see that?

13   A.      I see that.

14   Q.      Is that your understanding as to what the

15   employees were doing when they signed their timecards?

16           MS. GIFFORD:  Objection.

17           THE WITNESS:  Yes.

18           MR. FORESTIERE:  They were verifying that the

19   timecard accurately reflects the actual hours they

20   worked?

21           MS. GIFFORD:  Objection.

22           THE WITNESS:  Yes.

23           MR. FORESTIERE:  Did any employee ever tell you

24   that he was signing his timecard with inaccurate hours

25   stated in it?

Page 125

080fefd8-945c-4daa-943f-0ea003beeafc

1    you leave your personal files there at the facility
2    where you worked?
3    A.      My personal files left with me.
4    Q.      Where are those files today?
5    A.      Could be in a box in my garage; they could be in
6    the dump somewhere.
7    Q.      Have you destroyed any of your personal files
8    after learning that this lawsuit was filed?
9    A.      No.
10   Q.      Do you plan to destroy them now?
11   A.      No.
12   Q.      Were there any employees at the facilities you
13   managed that did not perform community service?
14   A.      Yes.
15   Q.      Do you recall who they were?
16   A.      I recall -- again, we're in the situation with
17   names, and I can tell you that out of that number that
18   we talked about, I had ten percent probably of the
19   employees.  I had three or four employees that were
20   participating in community events, and the rest either
21   refused directly or refused quietly and didn't do
22   anything.
23   Q.      So just so I understand, you only had
24   ten-percent compliance with the requirement by the
25   employees to perform community service?

Page 143

```
1    A.      Correct.

2    Q.      And 90 percent either told you they weren't

3    going to do it or they just didn't do it?

4    A.      Correct.

5    Q.      Was any discipline taken against the 90 percent

6    that refused to perform or did not perform community

7    service?

8            MS. GIFFORD:  Objection.  Go ahead.

9            THE WITNESS:  Not to my knowledge.

10           MR. FORESTIERE:  Could I have that question read

11   back, please?

12                     (Record read.)

13           MR. FORESTIERE:  I'm talking about the

14   90 percent of the employees, right.  I mean that's what

15   we're --

16   A.      Yes.  I did not personally reprimand them or

17   have any problem with it.  Now, whether or not Bill

18   Mitchell or Derrick Pate spoke with them, I have no

19   idea.

20   Q.      So you personally did not take any discipline

21   against any of the 90 percent of the employees that

22   either refused to perform community service or failed

23   to perform community service, correct?

24   A.      That's correct.

25   Q.      And you said something that you were filling out
```

California Deposition Reporters
800 442-3377 (Toll Free)  (209) 478-7051 (fax)

080fefd8-945c-4daa-943f-0ea003beeafc

1    A.      No.

2    Q.      Were the employees required to fill out any time

3    records about the community service they were

4    performing?

5    A.      No.

6    Q.      How would they report to you the community

7    service they were performing?

8    A.      Orally.

9    Q.      Did you ever tell any of the employees that they

10   would be evaluated on their performance review based

11   upon whether they were performing community service?

12           MS. GIFFORD:  Objection.

13           THE WITNESS:  I don't recall.

14           MR. FORESTIERE:  Do you recall if, in the

15   performance evaluation forms that Alderwoods gave you,

16   that there was any reference in them concerning the

17   performance of community service by the employees you

18   supervised?

19   A.      I don't recall the form.

20   Q.      To your knowledge, was any employee's

21   performance evaluated based upon whether they performed

22   any community service?

23           MS. GIFFORD:  Objection.

24           THE WITNESS:  No, I don't recall that being a

25   bearing on their evaluation.

Page 147

080fefd8-945c-4daa-943f-0ea003beeafc

1          MS. GIFFORD:  Objection.

2          THE WITNESS:  Not to my recollection.

3          MR. FORESTIERE:  Did any employee ever come to

4    you and complain about having to perform community

5    service?

6    A.      Yes.

7    Q.      Which employees complained to you about having

8    to perform community service?

9    A.      I remember specifically the funeral arranger

10   from Mission Mortuary in Monterey saying with several

11   expletives that he would not perform community service.

12   Q.      And he didn't?

13   A.      And he didn't.

14   Q.      And no disciplinary action was taken against

15   him?

16         MS. GIFFORD:  Objection.

17         THE WITNESS:  None whatsoever.

18         MR. FORESTIERE:  And no evaluation of his

19   performance otherwise -- strike that.  No evaluation of

20   his performance was based upon the fact that he did not

21   perform community service?

22         MS. GIFFORD:  Objection.

23         THE WITNESS:  Not that I can recall.

24         MR. FORESTIERE:  You said Mission Mortuary.  Is

25   that the name of the mortuary now in Monterey?

Page 149

080fefd8-945c-4daa-943f-0ea003beeafc

```
 1    business hours without compensating them for such work?
 2              MS. GIFFORD:  Objection.
 3              THE WITNESS:  I don't know of any policy.
 4              MR. FORESTIERE:  Are you aware of any policy by
 5    Alderwoods that required the employees you supervised
 6    to attain -- to attend training sessions after normal
 7    business hours without paying them for attending that
 8    training?
 9              MS. GIFFORD:  Objection.
10              THE WITNESS:  I don't recall any situation.
11              MR. FORESTIERE:  Let's talk a little about meal
12    periods, then.  How were meal periods scheduled during
13    the time that you were the manager of these facilities?
14    A.        That was left up to the individual funeral homes
15    with the staffing that was available.  They would set
16    their own meal times.
17    Q.        Who was responsible at each location for making
18    sure each of the employees received their meal periods?
19    A.        Two location managers, two funeral arrangers,
20    and myself at the combo.
21    Q.        You mentioned two location managers.  For which
22    locations?  Or which facilities?
23    A.        Was King City, Monterey, Seaside, Salinas had an
24    arranger, and then myself at the combo.
25    Q.        Well, the combo, was that Seaside?
```

080fefd8-945c-4daa-943f-0ea003beeafc

1   were told to incorrectly complete their timecards?

2         MS. GIFFORD:   Objection.

3         THE WITNESS:   I don't remember any such

4   conversations.

5         MR. FORESTIERE:   Do you recall if you received

6   anything in writing from any of the employees stating

7   that they were instructed to inaccurately complete

8   their timecards?

9         MS. GIFFORD:   Objection.

10        THE WITNESS:   I don't recall any communication.

11        MR. FORESTIERE:   I think you said that the

12  employees received half hour for their meal break; is

13  that correct?

14  A.      That's correct.

15  Q.      And that was for all of the facilities that you

16  managed?

17  A.      Yes.

18  Q.      Are you aware of any company policy requiring

19  the employees at the facilities that you managed to

20  work through their meal periods?

21        MS. GIFFORD:   Objection.

22        THE WITNESS:   No, I'm not aware of any.

23        MR. FORESTIERE:   Are you aware of any company

24  policy requiring the employees that you supervised to

25  interrupt their employees during their meal periods to

Page 174

1    perform work?

2         MS. GIFFORD:  Objection.

3         THE WITNESS:  I'm not aware of any.

4         MR. FORESTIERE:  Are you aware of any company

5    policies that the employees were not to report any

6    missed meal periods on their timecards?

7         MS. GIFFORD:  Objection.

8         THE WITNESS:  I'm not aware of any of those.

9         MR. FORESTIERE:  Are you aware of any company

10   policy that the employees were not to report any

11   interrupted meal periods on their timecards?

12        MS. GIFFORD:  Objection.

13        THE WITNESS:  No, I'm not aware.

14        MR. FORESTIERE:  Okay.  Let's change a little

15   subject matter here.  I want to talk about the overtime

16   that was paid to the employees at the facilities that

17   you supervised.  Could you tell me how -- I'm sorry,

18   I'll get it out.  Did any employees work overtime at

19   the facilities that you managed?

20   A.    I'm sure there were overtime hours.

21   Q.    How was that handled in regards to the hours

22   that they worked?  They're usually scheduled to only

23   work 40 hours, correct?

24   A.    Correct.

25   Q.    Okay.  So when somebody had to work overtime,

California Deposition Reporters
800 442-3377 (Toll Free)  (209) 478-7051 (fax)

080fefd8-945c-4daa-943f-0ea003beeafc

```
 1    who would be taking call that night with myself as the
 2    back-up for any location.
 3    Q.     Were all employees at all the facilities you
 4    managed required to perform on-call-duty work?
 5    A.     Not all.
 6    Q.     Which employees were required to perform
 7    on-call-duty work?
 8    A.     Funeral directors, funeral arrangers.
 9    Q.     And other than those -- wait, other than the
10    funeral arrangers and funeral directors, no other
11    employees at any of the facilities you managed were
12    required to perform on-call-duty work?
13           MS. GIFFORD:  Objection.
14           THE WITNESS:  As best as I can recall.
15           MR. FORESTIERE:  Do you recall the names of the
16    funeral directors and arrangers who performed
17    on-call-duty services?
18    A.     Don, Bart, Mikey.  I can't remember her name in
19    Salinas.
20    Q.     I'm going to put "lady in Salinas."
21    A.     Thank you.  And myself.
22    Q.     And yourself.  Who was responsible for
23    scheduling the on-call-duty work?  In other words, was
24    there a rotation that was -- everyone participated in
25    so nobody was doing on-call every weekend?  I mean how
```

Page 189

```
 1        THE WITNESS:  Yeah, that was the way it was

 2   supposed to be done, yes.  They were not to report the

 3   time.

 4        MS. GIFFORD:  And where did your understanding

 5   come from that that was how it was supposed to be done?

 6        MR. FORESTIERE:  Asked and answered.

 7        THE WITNESS:  It would have come from Bill

 8   Mitchell or Derrick Pate.

 9        MS. GIFFORD:  Okay.  Did you have the authority

10   to tell employees to put community work on their

11   timecards?

12        MR. FORESTIERE:  Objection, calls for

13   speculation.

14        THE WITNESS:  No, I didn't have that authority.

15        MS. GIFFORD:  Did you have the authority to tell

16   them to record the phone calls they took while on call

17   on their timecards?

18        MR. FORESTIERE:  Same objection.

19        THE WITNESS:  No, I didn't have any authority.

20        MS. GIFFORD:  And just to make sure we're clear,

21   I believe you testified before that funeral directors

22   and arrangers were employees who would be scheduled for

23   on-call shifts; is that correct?

24   A.   That's correct.

25   Q.   Would location managers also perform on-call
```

Page 229

080fefd8-945c-4daa-943f-0ea003beeafc

```
 1    work?
 2    A.     That's correct.
 3    Q.     Okay.  And I'm going to ask you to go back again
 4    to Exhibit 4.  Sorry to keep switching.  And again,
 5    that first bullet point there that says, "All employees
 6    must record all hours actually worked."  Was your
 7    understanding that all hours actually worked included
 8    time spent answering phone calls while on call?
 9            MR. FORESTIERE:  Objections, asked and answered,
10    leading.
11            THE WITNESS:  It's my understanding that it
12    meant that they were to record their time that it took
13    them to do their job during normal working hours.
14            MS. GIFFORD:  And was it your understanding that
15    that's what the employees at your location did record?
16            MR. FORESTIERE:  Objection, vague and leading.
17            THE WITNESS:  It's my understanding.
18            MS. GIFFORD:  Okay.  While we're still on that
19    same document, I'm going to ask you to look again at
20    the third bullet point which says, quote, "Many
21    states/provinces require a designated meal break after
22    a certain number of hours worked."  Do you see that?
23    A.     Yes, I do.
24    Q.     Did employees at the locations you supervised
25    ever work through their lunches?
```

California Deposition Reporters
800 442-3377 (Toll Free)  (209) 478-7051 (fax)

080fefd8-945c-4daa-943f-0ea003beeafc

```
 1          MR. FORESTIERE:   Objection, asked and answered,
 2     leading.
 3          THE WITNESS:   Given the nature of the business,
 4     I'm sure it happened.
 5          MS. GIFFORD:   Okay.  And when you say that, what
 6     do you mean?
 7     A.     Well, it's hard when you have a two-person
 8     operation, and one of those two people are out on a
 9     funeral service starting at 11:00 o'clock, that the
10     other person that's in the funeral home and is required
11     to keep the doors open can't get out to lunch until the
12     other person comes back.
13     Q.     When you say, "required to keep the doors open,"
14     what do you mean?
15     A.     We were to make every effort, as I remember it,
16     to make sure that our facilities were open to the
17     public from 8:00 to 5:00 Monday through Friday.
18     Q.     And where did your understanding of that
19     requirement come from?
20     A.     It would have come from Bill Mitchell.
21     Q.     Were you aware of any specific instances when
22     employees worked through their lunch breaks?
23          MR. FORESTIERE:   Objection, asked and answered,
24     leading, vague and ambiguous.
25          THE WITNESS:   Not specifically, no, I don't
```

Page 231

080fefd8-945c-4daa-943f-0ea003beeafc

1    recall.

2            MS. GIFFORD:   Okay.  Do you know when employees

3    worked through their lunch breaks, what their timecards

4    would reflect?

5            MR. FORESTIERE:   Objection, asked and answered,

6    leading, lacks foundation, vague and ambiguous.

7            THE WITNESS:   Their timecard would reflect a

8    lunch period far beyond the first four hours if they

9    took a lunch period.

10           MS. GIFFORD:   And when you say that, can you

11   clarify what you mean?

12           MR. FORESTIERE:   Same objections.  Go ahead.

13           THE WITNESS:   Well, if the -- I'm sorry.

14           MR. FORESTIERE:   No, no problem.

15           THE WITNESS:   If the funeral director didn't get

16   back until 3:00 o'clock, then that would have been the

17   time that the administrative assistant finally got to

18   have a lunch break if one was taken at all.

19           MS. GIFFORD:   Okay.

20   A.      But without specific time records in front of

21   me, I can't be sure.

22   Q.      Okay.  This is very much jumping topics, but

23   going back to Norma who sold the pre-needs policies --

24   A.      Yes.

25   Q.      -- putting aside the list we've looked at today,

Page 232

1   STATE OF CALIFORNIA            )
                                   ) SS.
2   COUNTY OF SAN JOAQUIN          )

3

4        I, Patricia Coward, Certified Shorthand Reporter

5   of the State of California, do hereby certify:

6        That on the date and time herein indicated, the

7   witness herein named appeared before me for the purpose

8   of giving their deposition; that after the witness was

9   sworn by me in all respects as required by law, I took

10  down in shorthand the said witness' testimony and the

11  proceedings had at the time of the giving of such

12  testimony; that I thereafter transcribed my shorthand

13  notes of such testimony by computer-aided

14  transcription, the above and foregoing being a full,

15  true, and correct transcript of all proceedings had and

16  testimony given.

17

18        _Patricia Coward_
          _____

19        Patricia Coward, CSR No. 5142

20

21

22

23

24

25

**TAB 21**

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

* * * * *

DEBORAH PRISE AND HEATHER RADY
ON BEHALF OF THEMSELVES AND ALL
EMPLOYEES SIMILARLY SITUATED,

    Plaintiffs,

vs.                Civil Action No. 06-1641

ALDERWOODS GROUP, INC.,

    Defendants.


DEPOSITION OF ANGELA KEATH

ON MARCH 5, 2009, BEGINNING AT 11:20 A.M.
IN COFFEYVILLE, KANSAS


APPEARANCES:

On behalf of the Plaintiffs:

Annette Gifford, Attorney at Law
DOLIN, THOMAS & SOLOMON, LLP
693 East Avenue
Rochester, New York 14607
(585) 272-0540
agifford@theemploymentattorneys.com


On behalf of the Defendant:

Michelle Amy Morgan, Attorney at Law
JONES DAY
2727 North Harwood Street
Dallas, Texas 75201-1515
(214) 220-3939
mamorgan@jonesday.com


REPORTED BY:  DAVID G. HARJO, CSR RPR

0345f93d-747a-49ae-9248-69455e3d64ff

NETWORK DEPOSITION SERVICES
Transcript of Angela Keath

Page 184

1      A      No.

2             MS. GIFFORD:  Objection.

3      Q      (By Ms. Morgan) Did you ever see any

4   written policy addressing whether time spent in

5   community work should be recorded or reported?

6             MS. GIFFORD:  Objection.

7             THE WITNESS:  No.

8      Q      (By Ms. Morgan) Okay, let's take a break.

9             (Recess.)

10     Q      (By Ms. Morgan) Mrs. Keath, did you ever

11  perform on-call work --

12     A      No.

13     Q      -- when you were at Alderwoods?  No?

14            So do you have any claims in this lawsuit

15  related to any on-call work that you performed?

16     A      No.

17     Q      Did you ever handle phone calls after

18  hours?

19     A      No.

20     Q      Did you ever perform any work for

21  Alderwoods that was not at -- that you did not

22  physically perform at an Alderwoods location?

23            MS. GIFFORD:  Objection.

24            THE WITNESS:  You mean like work from

25  home?

0345f93d-747a-49ae-9248-69455e3d64ff

NETWORK DEPOSITION SERVICES
Transcript of Angela Keath

Page 185

1        Q    (By Ms. Morgan) Yeah.  Did you ever --
2        A    Not -- we're removing that whole
3   community service aspect?
4        Q    Yes.
5        A    So it was not at the location?  No.
6        Q    So you never, for example, took paperwork
7   home from Alderwoods and did the paperwork at home
8   and then came back to the location?
9        A    No.
10       Q    Were there any Alderwoods employees that
11  you were aware performed on-call work?
12       A    Yeah, the funeral directors were on call.
13       Q    Any other Alderwoods employees that you
14  are aware of that were on call?
15       A    No.
16       Q    Are you aware of any location
17  administrators that were on call?
18       A    Not that I know of.
19       Q    Do you hold any professional licenses?
20       A    No.
21       Q    Just so I'm clear, you don't have any
22  funeral director license?
23       A    No.
24       Q    And you do not have any insurance agent
25  license?

0345f93d-747a-49ae-9248-69455e3d64ff

NETWORK DEPOSITION SERVICES
Transcript of Angela Keath

Page 216

1          THE WITNESS:  Nobody has ever asked me

2    for an exact number to figure it up, I don't know.

3          Q    (By Ms. Morgan) You don't know?

4          A    (Shook head.)

5          Q    You testified that you were never on call

6    at Alderwoods; correct?

7          A    Correct.

8          Q    And you also testified that you don't

9    have any claims in this lawsuit related to

10   performing on-call work that you believe you were

11   not compensated for; correct?

12         A    Correct.

13         Q    Were other employees at the Potts Chapel

14   location on call?

15         A    Yes.

16         MS. GIFFORD:  Objection.

17         Q    (By Ms. Morgan) What other employees at

18   the Potts Chapel location during the time that you

19   worked there were on call?

20         A    The funeral directors, John and Chad, and

21   David, but David, that was just part of being a

22   manager.

23         Q    And David was salaried; is that correct?

24         A    Yeah.  He would take call if one of the

25   guys was busy and it was their night to be on call;

0345f93d-747a-49ae-9248-69455e3d64ff

NETWORK DEPOSITION SERVICES
Transcript of Angela Keath

Page 217

1    he was the backup, but, yes, he was salaried.

2         Q     Was there an on-call schedule?

3         A     They kind of worked it out amongst

4    themselves, but the basis of it was every other

5    night and every other weekend.

6         Q     Was David Hill a funeral director, as

7    well?

8         A     Yes.

9         Q     Was he an embalmer, too?

10        A     Yes.

11        Q     So when you said that they worked it out

12   among themselves, do you mean John, Chad and David?

13        A     Well, John and Chad, they were the ones

14   that had the schedule and if, you know, if they were

15   both busy or, you know, they wanted the weekend off,

16   David would cover for them if something came up that

17   they couldn't be on call.

18        Q     And what were -- do you know what the

19   funeral directors did when they were on call?

20        A     I know that they were required to be

21   within a certain perimeter mile wise, so they had to

22   be within so many minutes responding, is actually I

23   think how it went, to the funeral home, and they

24   answered the phones if people died.  It wasn't just

25   if people died, if there was a service going on

0345f93d-747a-49ae-9248-69455e3d64ff

NETWORK DEPOSITION SERVICES
Transcript of Angela Keath

Page 220

1    call the funeral director and give them the
2    information, pick up place, their names, all the
3    information that they need, and then the funeral
4    director would put on his suit, drive to the
5    location, pick up the removal vehicle and then go
6    pick up the body.
7         Q    Do you know whether the funeral directors
8    at your location kept track of the time they worked
9    while they were on call?
10        A    Yeah, they kept track of that time.  They
11   -- most of the time -- the policy was, if you were
12   to get called out in the middle of the night, you
13   got three hours of guaranteed hours.  Three pay
14   hours.  If it took you five to complete that removal
15   and embalming then you got paid the extra five too.
16   If it took you an hour-and-a-half, the other
17   hour-and-a-half was compensation for having to get
18   up during the middle of the night and go make the
19   removal, but you got three hours for having to get
20   up and leave.
21             I know that for a long time there was a
22   lot of discussion as to, did that three hours start
23   when you left your house from the minute that you
24   got the call it, or did it not start until you got
25   to the funeral home.

0345f93d-747a-49ae-9248-69455e3d64ff

NETWORK DEPOSITION SERVICES
Transcript of Angela Keath

Page 224

1    they were using their own personal cell phones to
2    take these calls and they thought that they should
3    have had been compensated for that, and it lasted
4    for a very short time, and then they quit doing
5    that.
6         Q    During the time that the phone log --
7    after hour phone logs were in place, were -- were
8    the funeral directors at your location who were
9    using the after hour phone logs being compensated
10   for the time that they reported on the logs?
11             MS. GIFFORD:  Objection.
12             THE WITNESS:  Yes, I added it to their
13   payroll.  They would have to give me their time logs
14   and then for every call that was within a longer
15   span of time than three minutes they got 15 minutes.
16        Q    (By Ms. Morgan) So the after hour phone
17   logs after they -- after they were filled out they
18   were given to you?
19        A    Yes.  They got attached to their time
20   card.
21        Q    And you would add those hours to the
22   hours that were on the time cards; is that correct?
23        A    Yes.
24        Q    And after the after hour phone logs were
25   no longer being used at the location, are you aware

0345f93d-747a-49ae-9248-69455e3d64ff

NETWORK DEPOSITION SERVICES
Transcript of Angela Keath

Page 225

1    of any way in which time spent on after hour calls
2    were reported?
3         A    No, I don't know of any way they were.
4         Q    And you don't believe that the funeral
5    directors at the Potts Chapel location were being
6    compensated for time they spent on after hour calls
7    after the phone logs were no longer become used?
8         A    I don't know of any way that they were.
9         Q    Aside from answering the calls, when the
10   funeral directors were on call at Potts Chapel
11   during the time that you worked there, you talked
12   about other -- you talked about other work that they
13   would perform which included removals; is that
14   right?
15        A    Uh-huh.
16        Q    And how would time spent doing removals
17   be reported?
18             MS. GIFFORD:  Objection.
19             THE WITNESS:  A removal is in with that
20   three hours to do an embalming.  You get a death
21   call, they got paid for three hours, which all that
22   encompassed getting the call, getting out of bed,
23   getting showered, driving to the location, picking
24   up the vehicle to go make that removal, bring the
25   body back and then embalming, and all of that was

0345f93d-747a-49ae-9248-69455e3d64ff

NETWORK DEPOSITION SERVICES
Transcript of Angela Keath

Page 226

1  encompassed in that three hours.  If it took five,

2  they got paid for five; if it only took an

3  hour-and-a-half, the other hour-and-a-half was

4  compensation for just the aggravation of having to

5  get up in the middle of night.

6      Q    (By Ms. Morgan) As the location

7  administrator at the funeral home, at the Potts

8  Chapel Funeral Home, how -- how would that -- that

9  time or those three hours be reported?

10          MS. GIFFORD:  Objection.

11     Q    (By Ms. Morgan) Was it on the time card --

12     A    It was on their time card.

13     Q    Okay.

14     A    They would just list, like when you clock

15  in and out and then there's always an extra little

16  period -- extra spot somewhere, and they would just

17  write, you know, Smith removal, Wilson removal, you

18  know, whoever, whatever body they picked up, and

19  then for every one I gave them three hours.

20     Q    And there were instances where more than

21  three hours would be reported for a removal or

22  embalming; is that right?

23     A    Yes.

24     Q    And on those occasions, how would -- how

25  would that be reflected on the time card?

0345f93d-747a-49ae-9248-69455e3d64ff

NETWORK DEPOSITION SERVICES
Transcript of Angela Keath

Page 227

1    A    It might say, you know, Wilson removal
2  four hours, instead of there's the three that I just
3  needed the last name for, they would just give me
4  more details, you know, I was here from 1:00 to 7:00
5  instead of 1:00 to 3:00.  There wasn't a specific
6  system that I needed to know the time that you were
7  here, I just needed to know how many hours above
8  three did you get, did you need.
9    Q    Okay.  And so the funeral director would
10  write that on -- write --
11    A    They would write it on their time card.
12    Q    They would write either the three hours
13  or if it was more than three hours they would write
14  however many hours they spent on the time card; is
15  that right?
16    A    Yes.
17    Q    Okay.  And then you would add those hours
18  in with the other hours when you were tallying up
19  the hours on people's time card; is that right?
20    A    Yes.
21    Q    Do you know, Mrs. Keath, whether the
22  funeral directors at the Potts Chapel location were
23  ever not compensated for the after hours on call
24  work that they reported on their time cards?
25         MS. GIFFORD:  Objection.

0345f93d-747a-49ae-9248-69455e3d64ff

NETWORK DEPOSITION SERVICES
Transcript of Angela Keath

Page 228

1          THE WITNESS:  If it was on their time
2     card I added it into their time.  So, no, I don't
3     know -- I don't know.  I know if I got -- I got the
4     time card and it was on there, I reported it.  So I
5     don't know.
6          Q    (By Ms. Morgan) Do you know of any
7     instances where -- okay, I guess what you're saying
8     then is that you don't know -- you don't know
9     whether they were actually compensated for it, all
10    that you know is that it was entered into payroll;
11    is that right?
12         A    Yes.
13         Q    Okay.
14         A    Once I submitted it to corporate I don't
15    know what happened after that, I never saw their
16    check stubs or thinking, they all came Fed Ex'ed in
17    a sealed envelope and they were all in sealed
18    envelopes, so I just distributed the checks.  I
19    don't know.
20         Q    So you don't have any knowledge about
21    what any other -- about any other Alderwoods
22    employee's compensation?
23         A    No, I don't know.
24         Q    During the time that Mike Skolaut was
25    performing the location manager responsibilities at

0345f93d-747a-49ae-9248-69455e3d64ff

NETWORK DEPOSITION SERVICES
Transcript of Angela Keath

Page 250

C E R T I F I C A T E

1                

2      I, David Harjo, Certified Shorthand

3  Reporter within and for the State of Oklahoma, do

4  hereby certify that the above-named ANGELA KEATH was

5  by me first duly sworn to testify the truth, the

6  whole truth, and nothing but the truth, in the case

7  aforesaid; that the above and foregoing deposition

8  was by me taken in shorthand and thereafter

9  transcribed; and that I am not an attorney for nor

10  relative of any of said parties or otherwise

11  interested in the event of said action.

12      IN WITNESS WHEREOF, I have hereunto set

13  my hand and official seal this 11th day of March

14  2009.

15

16         David Harjo, CSR RPR

17

18

19

20

21

22

23

24

25

0345f93d-747a-49ae-9248-69455e3d64ff

**TAB 22**

NETWORK DEPOSITION SERVICES
Transcript of Richard Kuhta

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF PENNSYLVANIA

Civil Action No. 06-1641
Judge Joy Flowers Conti

DEBORAH PRISE and HEATHER RADY
on behalf of themselves and all
employees similarly situated,

        Plaintiffs,

vs.

ALDERWOODS GROUP, INC.,

        Defendant.

-----------------------------

2525 Glades Road
Boca Raton, Florida
December 11, 2008
10:05 a.m. - 3:45 p.m.

DEPOSITION OF RICHARD T. KUHTA

    Taken before Mark Rabinowitz, Registered Professional

Reporter and Notary Public for the State of Florida at

Large, pursuant to Notice of Taking Deposition filed in

the above cause.

6f381973-b55f-43c8-8a6e-e27a4eee4da4

NETWORK DEPOSITION SERVICES
Transcript of Richard Kuhta

Page 96

1    time was not compensated?

2         A    Yes.

3         Q    During the time that you were working for

4    Alderwoods between December of 2003 and May of 2007, did

5    you do any community service work?

6         A    Yes, ma'am.

7         Q    What work did you do?

8         A    I was a member of the United States Navy.  I

9    gave talks and discussions with my fellow servicemen.  I

10   also performed cremation services for two of my member's

11   parents who had passed away.

12        Q    Any other community service work that you

13   performed?

14        A    No.

15        Q    Were you a member of United States Navy before

16   you began working at Alderwoods?

17        A    Yes, ma'am.

18        Q    When did you join?

19        A    August of 1983.

20        Q    Did you ever give talks or discussions with

21   fellow servicemen before December of 2003?

22        A    I don't recall specifically that my entire unit

23   was aware that I was a licensed funeral director/embalmer

24   and could come to me for any particular questions they

25   had with regard to funeral services or the particulars

6f381973-b55f-43c8-8a6e-e27a4eee4da4

NETWORK DEPOSITION SERVICES
Transcript of Richard Kuhta

Page 97

1   of that.  There was a continued ongoing conversation with

2   regard to that before.

3           I just want to adjust that.  1983 was actually

4   1984, if that matters at all.

5       Q    So you are saying that prior to December of

6   2003 you might have had talks or discussions with fellow

7   servicemen in the Navy, but it wasn't particular to

8   being a licensed funeral director/embalmer?

9           MR. LINGLE:  Objection to form.

10      A    It would have to do with funeral service in

11  general and things to know about funerals, because we

12  are all going to be going through this with our parents,

13  eventually.

14      Q    Is there any part of the activities that you

15  were doing with regard to the U.S. Navy that you viewed

16  as being work for Alderwoods?

17          MR. LINGLE:  Objection to form.

18      A    Just my association with the Navy, and my

19  association with Alderwoods, and their connection between

20  the two, and always the possibility of someone using our

21  firm or an Alderwoods firm because of my connection and

22  my association with those people.

23      Q    You would have been associated with the U.S.

24  Navy, regardless of whether you worked for Alderwoods or

25  not, right?

NETWORK DEPOSITION SERVICES
Transcript of Richard Kuhta

Page 98

1      A      Yes, ma'am.

2             MR. LINGLE:  Objection to form.

3      Q      Did your involvement with the U.S. Navy --

4  in terms of giving talks and discussions with fellow

5  servicemen -- continue after your employment with

6  Alderwoods ended?

7      A      My employment with Alderwoods just ended in May

8  of 2007.

9      Q      Right.  Have you continued to give talks and

10 discussions with fellow servicemen after?

11     A      My continued association with the United States

12 Navy, yes, it has continued afterwards; and just as of

13 November 2007 I retired from the Navy.  So that's over.

14     Q      After your retirement, did you continue to

15 give talks and discussions with your fellow servicemen

16 about funeral services and the like?

17     A      No.

18     Q      Did any Alderwoods employee ever instruct you

19 to join or participate in a community organization?

20            MR. LINGLE:  Objection to form.

21     A      Management wanted their funeral directors

22 to have memberships in the community, but they were

23 particularly a Jewish membership because our firm is

24 Jewish firm.  And I being gentile couldn't offer anything

25 to join a Jewish organization.  So my connection to the

6f381973-b55f-43c8-8a6e-e27a4eee4da4

NETWORK DEPOSITION SERVICES
Transcript of Richard Kuhta

Page 100

1    Q      Did he identify any particular organization
2    that you needed to join?
3    A      No, ma'am.
4    Q      There was no other organization -- other than
5    the United States Navy -- that you were involved in in
6    terms of community service?
7    A      No, ma'am.
8    Q      How much time did you spend engaged in
9    activities related to your membership with the U.S. Navy
10   that you regarded as performing work for Alderwoods?
11   A      I was with my unit for one weekend a month.
12   During that time I could speak my members at any time.
13   So there was a continued association there.  They could
14   ask me questions.  The forum was always open.  They knew
15   who to come to.  I was readily available all weekend
16   long, eight hours Saturday and eight hours Sunday.  And
17   this was for 20 years.
18   Q      Were you required to attend that -- were you
19   required to meet with your unit one weekend a month?
20   A      Yes, ma'am.
21   Q      Where did that requirement come from?
22          MR. LINGLE:  Objection to form.
23   Q      Who required you to meet?
24   A      It's promulgated from Washington.
25   Q      Was this like your reserve duty?

Johnstown              Toll-Free              Pittsburgh
814-266-2042          866-565-1929          412-281-7908

6f381973-b55f-43c8-8a6e-e27a4eee4da4

NETWORK DEPOSITION SERVICES
Transcript of Richard Kuhta

Page 101

1        A      Yes, ma'am.

2        Q      You were required by the government to do this

3    reserve duty one weekend a month?

4        A      Yes, ma'am.

5        Q      You are saying that you used that time as an

6    opportunity to speak to other service members about

7    opportunities in the funeral business?

8              MR. LINGLE:  Objection to form.

9        A      To answer general questions.

10       Q      Did you ever report the time that you spent

11   performing this activity on your time records when you

12   were working for Alderwoods?

13       A      To Alderwoods?

14       Q      Yes.

15       A      No, ma'am, I have not.

16       Q      And why not?

17       A      I guess because in my mind I never -- at the

18   time I didn't view it as being community involvement

19   because they were indicating that you should join clubs

20   like the Knights of the Pythias, the Kiwanis and the

21   Lion's Club; local community things like the Chamber

22   of Commerce.

23            It didn't fit into my mind as being that type

24   of thing, and also it wasn't primarily a Jewish

25   organization again, you know.

6f381973-b55f-43c8-8a6e-e27a4eee4da4

NETWORK DEPOSITION SERVICES
Transcript of Richard Kuhta

Page 105

1      A      Navy training.

2      Q      Are you aware of any Alderwoods policy

3  requiring employees to perform community service work?

4      A      A policy?

5      Q      Yes.

6      A      No, ma'am.

7      Q      Do you know whether any of the other employees

8  at Eternal Light Funeral Home performed community

9  service work for Alderwoods?  I mean, between December

10  of 2003 and May of 2007, whether any of the other

11  employees at the Eternal Light Funeral Home were

12  performing community service work?

13      A      Dale Granger was a member of the North Miami

14  Beach Chamber of Commerce.

15      Q      I believe you had testified that Mr. Granger

16  was paid on a salary basis?

17      A      Yes, ma'am, he was.

18      Q      Any other Alderwoods employees that were at

19  your location who were performing community service

20  work?

21      A      No, ma'am.

22          MR. LINGLE:  Could you read the last three or

23  four questions and answers back, please.

24          THE REPORTER:  Sure.

25          (The questions and answers referred you were

6f381973-b55f-43c8-8a6e-e27a4eee4da4

NETWORK DEPOSITION SERVICES
Transcript of Richard Kuhta

Page 106

1    read back).

2         Q    Mr. Kuhta, if you could, take a look at

3    Defendant's Exhibit 3, paragraph B.  Let me know when

4    you have had a chance to review that.

5         A    Yes, ma'am.

6         Q    Mr. Kuhta, are you claiming in this lawsuit

7    that you performed on-call work after your regular work

8    hours, and at least some of the time was not paid for

9    by Alderwoods?

10        A    Yes, ma'am.

11        Q    During the time that you were employed with

12   Alderwoods between December of 2003 and May of 2007,

13   were you ever on-call?

14        A    Yes, ma'am.

15        Q    When were you on-call?

16        A    In the evenings, ma'am.

17        Q    Did you have an on-call schedule?

18        A    We did.

19        Q    What was your on-call schedule, typically?

20        A    It was typically two to three nights a week.

21        Q    Did Mr. Granger set that schedule?

22        A    Yes, ma'am.

23        Q    And what did it mean at your location to be

24   on-call?

25        A    It meant if the detail office at Levitt

6f381973-b55f-43c8-8a6e-e27a4eee4da4

NETWORK DEPOSITION SERVICES
Transcript of Richard Kuhta

Page 107

1    Weinstein called you after hours, it was with regard

2    to a death.  That a family wanted to speak to a funeral

3    director.

4         Q    Was there any other type of work involved with

5    being on-call, other than taking phone calls?

6         A    That was generally it.

7         Q    Generally, when you were scheduled to be

8    on-call, did the on-call work involve removals?

9         A    For myself, no.

10        Q    What about embalmings?

11        A    No, ma'am.

12        Q    Generally, did the on-call work that you did

13   involve returning to the funeral home?

14        A    Generally, no.

15        Q    Were there occasions when you did need to

16   return to the funeral home?

17        A    On occasion, yes.

18        Q    What would that be in relation to?  Why would

19   you need to rush to the funeral home?

20             MR. LINGLE:  Objection to form.

21        A    As an example:  If you had to pull a pre-need

22   file and access that and find out some important

23   information that you would not have at home, you would

24   have to open the funeral home if it was in the middle of

25   the night, and a special procedure had to be performed

6f381973-b55f-43c8-8a6e-e27a4eee4da4

NETWORK DEPOSITION SERVICES
Transcript of Richard Kuhta

Page 108

1    on the body in the middle of the night.  It's a special

2    Hebrew/Jewish procedure that would have to be performed.

3    It would have to be done relatively immediately, but

4    those incidences were somewhat rare, somewhat.

5         Q    On the occasions where you needed to return to

6    the funeral home when you were on-call, did you punch in

7    and out using the time clock?

8         A    No, ma'am.

9         Q    Why not?

10        A    Because it was after hours.  We were on-call,

11   and there was no record of it.  You just did what you had

12   to do.

13        Q    Other than taking phone calls and returning to

14   the funeral home on these rather rare occasions that you

15   needed to pull a file or perform a certain procedure,

16   was there any other type of work that you performed

17   while you were on-call?

18        A    Most of it was phone work.

19        Q    How often -- when you were on-call -- would

20   you have to take a phone call?

21        A    It's very difficult to say.

22        Q    It wasn't every single time that you were

23   on-call?

24        A    Correct.

25        Q    So there could be occasions where you were

6f381973-b55f-43c8-8a6e-e27a4eee4da4

NETWORK DEPOSITION SERVICES
Transcript of Richard Kuhta

Page 113

1  even know what their titles are above that.

2      Q     Was this expectation that you be on-call a

3  certain amount of time during each week?  You were

4  expected to be on-call and scheduled to be on-call two

5  or three nights a week, right?

6      A     We would share coverage seven nights a week,

7  correct.

8      Q     Did any Alderwoods manager ever instruct or

9  direct you not to report the time that you spent working

10  when you were on-call?

11      A     No, ma'am.  It was just never done.

12      Q     You never reported the time that you spent

13  performing work while you were on-call, correct?

14          MR. LINGLE:  Objection to form.

15      A     Yes, ma'am.  That's correct.

16      Q     When you say "it was never done," do you know

17  whether any other Alderwoods employee recorded it or

18  reported their time?

19      A     I have never heard of them recording their

20  time.

21          MR. LINGLE:  Could we take a quick break?

22          MS. MORGAN:  Sure.

23          (Recess taken 2:35 p.m. to 2:55 p.m.)

24          MS. MORGAN:  Back on the record.

25  BY MS. MORGAN:

6f381973-b55f-43c8-8a6e-e27a4eee4da4

NETWORK DEPOSITION SERVICES
Transcript of Richard Kuhta

Page 114

1    Q    I believe you testified, Mr. Kuhta, that no
2  Alderwoods manager ever instructed you not to record the
3  time that you spent performing work while you were
4  on-call, right?
5    A    Yes, ma'am.  That's correct.
6    Q    When you testified that you had never heard of
7  anyone recording their time, did you have discussions
8  with any Alderwoods employees as to whether or not they
9  recorded the time they spent performing work while they
10 were on-call?
11   A    No, ma'am, there was no discussion.
12   Q    You don't have any personal knowledge as to
13 whether any other Alderwoods employee recorded the time
14 they spent working while they were on-call?
15   A    It was never discussed.  No one ever said I
16 recorded my time.  There was no purpose in recording it.
17   Q    But do you have any personal knowledge as to
18 whether any Alderwoods employee actually did record the
19 time that they spent while they were on-call?
20   A    No, ma'am, I do not.
21   Q    You had testified that your location managers,
22 regional directors and Southeast district manager
23 communicated to you that there was an expectation that
24 there was on-call; is that right?
25        MR. LINGLE:  Objection to form.

6f381973-b55f-43c8-8a6e-e27a4eee4da4

NETWORK DEPOSITION SERVICES
Transcript of Richard Kuhta

Page 115

1     A     Yes, we had to take call and still do.

2     Q     Did any Alderwoods manager ever communicate to

3  you that you will not be compensated for work while you

4  were on-call?

5     A     No, ma'am, it was never discussed.

6     Q     Did you ever, personally, keep track of any of

7  the time that you worked while you were on-call?

8     A     No, ma'am, I have not.

9     Q     What is the number of hours that you spent

10 actually working while you were on-call from December

11 of 2003 and May of 2007?

12          MR. LINGLE:  Objection to form.

13     A     I don't know, ma'am.

14     Q     Did you ever complain to any Alderwoods

15 manager about not being compensated for time you spent

16 performing work while you were on-call?

17          MR. LINGLE:  Objection to form.

18     A     No, ma'am.

19     Q     Why not?

20     A     Because it was an accepted -- it was an

21 understood industry standard that you take call, and

22 you are not paid for it.

23     Q     When you say "it was an understood industry

24 standard," what do you mean by that?

25     A     To the best of my knowledge, I never heard of

6f381973-b55f-43c8-8a6e-e27a4eee4da4

NETWORK DEPOSITION SERVICES
Transcript of Richard Kuhta

Page 137

1

2                 REPORTER'S DEPOSITION CERTIFICATE

3

4

5    STATE  OF    FLORIDA)

6    COUNTY OF MIAMI-DADE)

7

8

9         I, Mark Rabinowitz, Registered Professional

10   Reporter, certify that I was authorized to and did

11   stenographically report the deposition of RICHARD T.

12   KUHTA; that a review of the transcript was requested;

13   and that the transcript is a true and complete record

14   of my stenographic notes.

15

16        I further certify that I am not a relative,

17   employee, attorney, or counsel of any of the parties,

18   parties' attorney, or counsel connected with the action,

19   nor am I financially interested in the action.

20

21        Dated this 22nd day of December 2008.

22

23

24

25                        Mark Rabinowitz, RPR

6f381973-b55f-43c8-8a6e-e27a4eee4da4

**TAB 23**

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF PENNSYLVANIA

_____

DEBORAH PRISE and HEATHER          )
RADY, on behalf of themselves      )
and all employees similarly        )
situated,                          )
                                   ) Civil Action No. 06-1641
          Plaintiffs,              )
                                   ) Judge Joy Flowers Conti
   vs.                             )
                                   )
ALDERWOODS GROUP, INC.,            )
                                   )
          Defendant.               )
_____

DEPOSITION UPON ORAL EXAMINATION

of

MICHAEL LANZA

_____

Taken at 2611 East "E" Street

Tacoma, Washington

DATE:  April 24, 2009

REPORTED BY:  Robyn L. Fisher, CCR, RPR
              CCR No. 2590

3a69689e-c597-4bee-a3bf-dae486d1a304

NETWORK DEPOSITION SERVICES
Transcript of Michael Lanza

1   you were performing work at Powers?

2       A.    Yes, sir.

3       Q.    And I'm saying positions other than funeral

4   director and embalmer.

5       A.    Yes, sir.

6       Q.    Could you identify those for me, please?

7       A.    I'm trying to think the exact year, and I think

8   it was 2001.

9             Mr. Noel and his son had resigned their

10  positions.  At the time, Mr. Noel's son was the manager

11  of the funeral home, and they had resigned, and they were

12  moving out of state.

13      Q.    I don't mean to interrupt, but you mentioned

14  his son.  Could you give us his name?

15      A.    Rick Noel.

16      Q.    You said somebody was retired and moving out of

17  state?

18      A.    They were both moving out of state; Mr. Noel

19  and his son.

20      Q.    What happened as a result of their moving out

21  of state?

22      A.    We were without a manager to the funeral home.

23      Q.    How did that affect whether you obtained any

24  other positions?

25      A.    The company asked if I would step into that

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

3a69689e-c597-4bee-a3bf-dae486d1a304

NETWORK DEPOSITION SERVICES
Transcript of Michael Lanza

Page 57

1  position and take over the management of the funeral

2  home.

3     Q.   Did you do that?

4     A.   Yes, sir.

5     Q.   Did that occur sometime in 2000?

6     A.   I think it was 2001.

7     Q.   And what did you understand your duties to be

8  as a manager of Powers at that time?

9     A.   I was to see the day-to-day operation of the

10  funeral home, have staff meetings with the staff, sign

11  any checks that needed to be signed for purchasing and

12  whatnot.

13        I was also required to do all of the work after

14  5 o'clock so no overtime was going to be encountered by

15  any other employee.

16     Q.   Were you responsible for scheduling the

17  employees' work hours?

18     A.   Well, their work hours were pretty well clear

19  the days they had to come to work.  It was up to me if

20  they were going to schedule a vacation to make sure their

21  vacations were scheduled, make sure they had their days

22  off that they were going to take off.  It was pretty well

23  standard what days they had on and off.  If they were

24  sick, they had to call me in enough time to let me know

25  that they weren't coming in.

3a69689e-c597-4bee-a3bf-dae486d1a304

NETWORK DEPOSITION SERVICES
Transcript of Michael Lanza

Page 77

1    A.   Yes, sir.

2    Q.   And the hourly rate at the time your employment

3    ended was $20.36 an hour?

4    A.   I believe so, yes.

5    Q.   Any reason to believe that was not correct?

6    A.   You know, I think it's right.  I thought it was

7    higher, but that might be correct.

8    Q.   In the remarks it says you moved to Colorado?

9    A.   Yes.  That's correct.

10   Q.   Now, before you were manager, who supervised

11   your work?

12   A.   Mr. Noel.

13   Q.   Did your job title ever change from apprentice

14   embalmer and funeral director to an actual funeral

15   director and embalmer?

16   A.   Not with them.  No, sir.

17   Q.   So after you reassumed your duties as an

18   apprentice funeral director and embalmer, who did you

19   report to?

20   A.   Brian Curnow.

21   Q.   Could you spell his last name, please?

22   A.   C-U-R-N-O-W.

23   Q.   Did you have any other supervisors other than

24   Mr. Curnow?

25   A.   At the time that he was at the funeral home?

3a69689e-c597-4bee-a3bf-dae486d1a304

NETWORK DEPOSITION SERVICES
Transcript of Michael Lanza

Page 78

1   Q.   Yeah.  From the time that you were there until
2   the time you left, did you have any other --
3   A.   Yes.  Yes.
4   Q.   Oh, okay.  Who else supervised you?
5   A.   Steve Clevenger.
6   Q.   Anybody else?
7   A.   Yes.  Blane Coffey.
8   Q.   C-O-F-F-E-E?
9   A.   C-O-F-F-E-Y.
10  Q.   Anyone else?
11  A.   I can't remember his name.  He was the last
12  one.  Dennis something or other.  Can't remember his last
13  name.
14           MS. GIFFORD:  Christie.
15  A.   Dennis Christie.  That's it.
16  Q.   For what period of time did Mr. Curnow
17  supervise your work?
18  A.   For a short period of time.  I think he was
19  only there for, gosh, I'm going to have to take a guess;
20  maybe six to seven months.
21  Q.   Do you recall what year that was?
22  A.   It was after me, so I resigned.
23  Q.   You said February, March of 2002.
24  A.   So he came on shortly after I did, and I think
25  he stayed up until I think January of the following year.

3a69689e-c597-4bee-a3bf-dae486d1a304

NETWORK DEPOSITION SERVICES
Transcript of Michael Lanza

Page 79

1    Q.   2003?

2    A.   Yes.

3    Q.   What was his position?

4    A.   He was the general manager.

5    Q.   And Steve Clevenger; for what period of time

6    did he supervise your work?

7    A.   I think he was only there maybe three months.

8    Q.   Was that in 2003 as well?

9    A.   Yes.

10   Q.   Was he also a general manager?

11   A.   Yes, sir.

12   Q.   And Blane Coffey; what period of time did he

13   supervise your work?

14   A.   Mr. Coffey supervised my work up until Dennis

15   Christie came on, and I can't give you the date.  I don't

16   know.

17   Q.   Was it sometime commencing in 2003?

18   A.   It was commencing in 2003 and ending in 2004 at

19   some time.

20   Q.   Was he also a general manager?

21   A.   Yes, sir.

22   Q.   Then Mr. Christie commenced supervising your

23   work after Mr. Coffey, correct?

24   A.   Yes.  That's right.

25   Q.   Would that commencement start in about 2004?

3a69689e-c597-4bee-a3bf-dae486d1a304

NETWORK DEPOSITION SERVICES
Transcript of Michael Lanza

Page 80

1    A.    Yes, sir.

2    Q.    And, of course, then you left, correct?

3    A.    Yes.

4    Q.    Did you ever have any discussions with

5    Mr. Curnow concerning overtime that you were working?

6    A.    I'm trying to think if that was the time we

7    dismissed the answering service.  I can't recall if it

8    was during his time or Mr. Coffey's time.  With

9    Mr. Curnow, no, there was no discussions about -- he

10   tried to limit the overtime, but Powers Funeral Home is a

11   very busy home, so it's kind of hard to keep it an

12   eight-hour day.

13   Q.    So you don't recall if you had any discussions

14   with him about overtime?

15   A.    I really can't.

16   Q.    What about discussions with Mr. Curnow about

17   performing community service work?

18   A.    He never brought that up.

19   Q.    By the way, after you stopped being general

20   manager, you still performed community service work; is

21   that correct?

22   A.    I went to a club.  I went out more or less at

23   that point for myself.  I got to know people, so I did.

24   I did go out.  They knew who I was.  They knew what I

25   did.

3a69689e-c597-4bee-a3bf-dae486d1a304

NETWORK DEPOSITION SERVICES
Transcript of Michael Lanza

Page 81

1    Q.   Did you enjoy performing the community service
2    work?
3              MS. GIFFORD:  Objection.
4    A.   Yes.
5    Q.   Did the other funeral directors after you
6    stopped being manager commence doing any community
7    service work?
8              MS. GIFFORD:  Objection.
9    A.   I'd have to answer that knowing when Mr. Morgan
10   came on staff, because he did.  I don't know when he
11   started work with us.
12   Q.   Mr. Morgan was another funeral director?
13   A.   Yes.
14   Q.   Did you have any discussions with Mr. Curnow
15   about performing after-hour on-call duties?
16   A.   As I said, it would depend on when that
17   answering service was dismissed.  I don't recall if it
18   was dismissed during his time or not.  I can't recall
19   having a conversation with him on that.
20   Q.   What about with Mr. Clevenger; do you recall
21   any conversations that you had with him concerning
22   overtime?
23   A.   I remember him claiming that I had too much
24   overtime one particular week.
25   Q.   What did you discuss in that regard?

3a69689e-c597-4bee-a3bf-dae486d1a304

NETWORK DEPOSITION SERVICES
Transcript of Michael Lanza

Page 84

1    and nobody else was astronomically low or something?

2       A.   No.

3       Q.   Did you have any conversations with

4    Mr. Clevenger concerning community service work?

5       A.   No, sir.

6       Q.   Did you have any conversations with

7    Mr. Clevenger concerning after-hour on-call duties?

8       A.   No, sir.

9       Q.   Did you have any conversations with Mr. Coffey

10   concerning overtime?

11      A.   Yes, sir.

12      Q.   What were your discussions with him in that

13   regard?

14      A.   That was the time that the answering service, I

15   know for a fact, we no longer engaged in the answering

16   service.

17      Q.   So it was dismissed?

18      A.   Yes.

19      Q.   What did you discuss with him about the results

20   or the consequences of dismissing the answering service?

21      A.   When they dismissed the answering service, they

22   were forwarding the funeral home phones to our cell

23   phone.

24           At the time I was living out in Graham,

25   Washington.   There was only one cell phone tower that

3a69689e-c597-4bee-a3bf-dae486d1a304

NETWORK DEPOSITION SERVICES
Transcript of Michael Lanza

1   the lines of the conversation you had with Mr. Clevenger

2   concerning the overtime concerning embalming?

3       A.   They'd always had a problem with us working

4   late at night.  They wanted that overtime cut down.

5       Q.   But I was trying to get at that this was a

6   continuing problem, and you had a discussion initially

7   with Mr. Clevenger about that matter concerning the

8   astronomical one, but you also had a conversation about

9   that with Mr. Coffey because that was an ongoing issue?

10      A.   That was an ongoing issue for a long time, yes.

11      Q.   Other than the overtime concerning the death

12  calls and the embalming issues, did you have any

13  discussions with Mr. Coffey concerning overtime?

14      A.   No.

15      Q.   Did you have any discussions with Mr. Coffey

16  concerning community service work?

17      A.   No.

18      Q.   Any discussions with Mr. Coffey concerning the

19  after-hour on-call work other than what you testified to?

20      A.   No, sir.

21      Q.   Did you have any discussions with Mr. Christie

22  concerning overtime?

23      A.   Let me just clear that up.

24           I believe at that point when Mr. Christie came

25  on we didn't have the phone problem anymore.  It was the

3a69689e-c597-4bee-a3bf-dae486d1a304

NETWORK DEPOSITION SERVICES
Transcript of Michael Lanza

Page 92

1    same story.  If we were too busy, he wanted most of the

2    work done within the eight hours.

3        Q.   You didn't have the overtime problem anymore

4    with the after-hours calls, correct?

5        A.   That is correct.

6        Q.   But you still had, as you indicated before, a

7    continuing problem keeping the overtime down after hours

8    for embalming?

9        A.   Yes.

10       Q.   Any other discussions you had with Mr. Christie

11   other than that concerning the overtime?

12       A.   No, sir.

13       Q.   Did you have any discussions with Mr. Christie

14   concerning the community service work?

15       A.   No, sir.

16       Q.   Or performing on-call duties -- no.  Not an

17   issue because you said you guys weren't doing that

18   anymore; is that correct?

19       A.   That's correct.

20       Q.   Other than the Powers facility, did you work at

21   any other facilities owned by Alderwoods?

22       A.   There was a period of time where I'd go up to

23   Price-Helton Funeral Home in Auburn.

24       Q.   When did you start going up there?

25       A.   I really don't recall.  To be honest with you,

NETWORK DEPOSITION SERVICES
Transcript of Michael Lanza

Page 191

1  described in A through E, are there other types of
2  compensation that you're seeking from Alderwoods for work
3  you performed for it?
4           MS. GIFFORD:  Objection.
5      A.   No, sir.
6      Q.   Let's talk a little bit now about your
7  community service.  I know we talked about it already a
8  bit.  Let's start with some basics.
9           During the time that you worked for Alderwoods,
10  did you perform any community service work?
11     A.   Yes, sir.
12     Q.   Could you identify that for me, please?
13     A.   I had a membership in the Christopher Columbus
14  Club, and I was also entertaining priests and ministers
15  after hours.
16     Q.   When you say "entertaining priests and
17  ministers after hours," was that just something that --
18     A.   Taking them out to dinner.
19     Q.   Anything else?
20     A.   No, sir.  They came to my house occasionally
21  also.
22     Q.   When did you start that activity?
23     A.   That commenced in 1993.
24     Q.   When did you stop doing that activity?
25     A.   Close to about the time I ceased employment

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

3a69689e-c597-4bee-a3bf-dae486d1a304

NETWORK DEPOSITION SERVICES
Transcript of Michael Lanza

Page 192

1  with them; 2004.

2      Q.   So it continued during the time that you were

3  performing work for Alderwoods?

4      A.   Yes, sir.

5      Q.   How often would you either take these persons

6  out to dinner or have dinner at your home?

7      A.   Ones or twice a month.

8      Q.   And did you do that for every month that you

9  were working for Alderwoods?

10     A.   I can't say it was done every month

11  consistently, but when it was done, it was done once or

12  twice a month.  If you're asking me from 1993 to 2004 if

13  it was done every month, I can't honestly say that it

14  was.

15     Q.   I'm not concerned about anything prior to the

16  date that you worked for Alderwoods, so let's just focus

17  on the period from January 2002 to August 2004, so we're

18  talking about a year and some months, almost two years.

19          During that period of time, do you recall

20  whether you had dinner once or twice a month every month?

21     A.   No.  I cannot recall that.

22     Q.   Would it be three or four months a year?

23     A.   It's safe to say about six months a year maybe,

24  seven months a year.

25     Q.   How long would these dinners last on average?

3a69689e-c597-4bee-a3bf-dae486d1a304

NETWORK DEPOSITION SERVICES
Transcript of Michael Lanza

Page 193

1    A.   Three hours, four hours.  If it was a priest I
2    liked, it was four hours.
3    Q.   Did you try to sell them any type of funeral
4    services or products during these dinners?
5    A.   No, sir.
6    Q.   Did you ever ask anyone at Alderwoods or from
7    the management of Alderwoods for compensation for the
8    time that you spent entertaining these priests or
9    ministers?
10    A.   The only compensation I received back was any
11    monies I laid out for the dinner.
12    Q.   So you asked for reimbursement of your
13    out-of-pocket expenses?
14    A.   Yes, sir.
15    Q.   Did they provide that?
16    A.   Yes.
17    Q.   Did you ask to be compensated for the time that
18    you spent entertaining them?
19    A.   No, sir.
20    Q.   Prior to your working at Powers, did you do any
21    type of entertaining for priests or ministers?
22    A.   Prior to being employed by Powers?
23    Q.   Yes, sir.
24    A.   I did with Pipers.
25    Q.   When you were taking the priests and ministers

NETWORK DEPOSITION SERVICES
Transcript of Michael Lanza

Page 194

1   out for dinners or dinners at your home, was it still the
2   same frequency; about once or twice a month, six to seven
3   months a year?
4       A.   At my home it was less; maybe three times, four
5   times a year.  I used to have them pop up sometimes.  I
6   didn't invite them.  They'd come over.
7       Q.   If you're active in the church that can happen.
8   I'm Catholic, so I know what you're talking about.
9            I was trying to basically establish at least
10  prior to your working for Powers you were doing this work
11  for Piper, and was it generally the same frequency or
12  less?  Sounds like it was a little less.
13      A.   With Piper it was less because Mr. Morley had
14  us do that during business hours.
15      Q.   Taking them out to dinner?
16      A.   So we'd take them out to lunch.
17      Q.   Oh, okay.  They like to be taken out for golf
18  too, you know.
19      A.   I know.
20      Q.   But did you also entertain them after hours
21  during the time that you worked for Piper?
22      A.   No, sir.
23      Q.   Why did you pick this type of community service
24  work while you were working for Alderwoods?
25      A.   The type of community service by entertaining

3a69689e-c597-4bee-a3bf-dae486d1a304

NETWORK DEPOSITION SERVICES
Transcript of Michael Lanza

Page 195

1    ministers?

2        Q.    Yes, sir.

3        A.    I found that comfortable, and it was some sort

4    of community service that we had to do, so I picked that.

5        Q.    It was also something you'd already

6    established, so you just used what you had established to

7    fulfill that requirement?

8            MS. GIFFORD:  Objection.

9        Q.    Do you understand my question?  I mean you

10   already were doing this; taking priests out for

11   entertainment and dinners.  In fact, I think you

12   indicated it was done while you were working for Pipers,

13   and that was prior to 1993, correct?

14       A.    Yes.

15       Q.    So it was something you were doing pretty much

16   every year since that time?

17       A.    Yes, sir.

18       Q.    Did you keep any time records about how much

19   time you spent doing entertaining for the priests and

20   ministers?

21       A.    No, sir.

22       Q.    Did you submit any written request for

23   compensation for the time that you spent entertaining the

24   priests and ministers?

25       A.    Just the out-of-pocket expenses.

NETWORK DEPOSITION SERVICES
Transcript of Michael Lanza

1          All right.  Let's talk about the membership in

2     the Christopher Club.  When did you first become a member

3     in that organization?

4        A.   1997, I believe.

5        Q.   How was it that you joined the club at that

6     time?

7        A.   That was an organization that I joined.  It

8     still is in effect.  It's an all-men Italian

9     organization.

10       Q.   Do you have to be invited to join or sponsored?

11       A.   I inquired about the membership with the fellow

12    who sponsored me.

13       Q.   Who did you inquire --

14       A.   I knew you were going to ask me that; the

15    fellow who sponsored me?

16       Q.   Yes, sir.

17       A.   Louis Costanti.

18       Q.   What was required to join the membership for

19    the Christopher Club?

20       A.   I just had to sign the application, pay the

21    dues, go down to the club, and they initiated me after I

22    gave a speech as to why I wanted to be a member.

23       Q.   Okay.  So you belonged to this club during the

24    time you worked for Alderwoods?

25       A.   Yes, sir.

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

3a69689e-c597-4bee-a3bf-dae486d1a304

NETWORK DEPOSITION SERVICES
Transcript of Michael Lanza

Page 199

1    Q.   How much time did you spend at this club during
2    the time that you worked at Alderwoods?
3    A.   There was a meeting once a month.
4    Q.   How long would the meeting last?
5    A.   Started at 7 o'clock, and by the time we
6    finished it was about 10:00.
7    Q.   This was in the evening, obviously?
8    A.   Yes, sir.
9    Q.   What happened at the meetings?
10   A.   Oh, we discussed what we were going to do for
11   the community and Christmas dinners and Italian talk.
12   Q.   Did you have any out-of-pocket expenses
13   concerning the Christopher Club that you were reimbursed
14   by Alderwoods?
15   A.   There was no out-of-pocket expenses.  We just
16   paid our dues.
17   Q.   Did Alderwoods pay your dues?
18   A.   I paid the dues.
19   Q.   Did you ask Alderwoods for reimbursement for
20   the dues you paid?
21   A.   Yes, sir.
22   Q.   Did they pay them?
23   A.   No, sir.
24   Q.   Who did you ask that the dues be paid?
25   A.   Mr. Noel.

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

3a69689e-c597-4bee-a3bf-dae486d1a304

NETWORK DEPOSITION SERVICES
Transcript of Michael Lanza

Page 203

1    Q.   Did you fill that out for the Christopher
2    Columbus Club?
3    A.   Yes, sir.
4    Q.   Did you fill that form out also for your
5    entertaining priests and ministers?
6    A.   Yes, sir.
7    Q.   Did you keep a copy of any of those records?
8    A.   No, I did not.
9    Q.   Were you ever evaluated concerning the amount
10   of community service work you performed?
11        MS. GIFFORD:   Objection.
12   A.   No, sir.
13   Q.   Did you enjoy the time that you spent
14   entertaining the priests and ministers?
15        MS. GIFFORD:   Objection.
16   A.   I selected that because I did enjoy time with
17   them, but I did that because it was community service for
18   the funeral home.  That's why I selected that particular
19   activity, I guess.
20   Q.   Because you enjoyed it, correct?
21   A.   Yes.
22   Q.   And you also wanted to get credit for something
23   you enjoyed; in other words, it's a dual purpose?
24   A.   Well, I would have liked to have gone home
25   after a full day too, but I didn't.

3a69689e-c597-4bee-a3bf-dae486d1a304

NETWORK DEPOSITION SERVICES
Transcript of Michael Lanza

Page 204

1   Q.   Well, the priests and ministers you'd been
2   doing for a while.
3   A.   Yeah.
4   Q.   That's what I'm saying.
5        The Christopher Columbus Club; did you enjoy
6   being involved with those activities as well?
7   A.   Yes, sir.
8   Q.   Did you ever see any written policies prepared
9   by Alderwoods requiring its employees to perform
10  community service work?
11            MS. GIFFORD:   Objection.
12  A.   I can't recall that I did or have.
13  Q.   Do you recall any written policies by
14  Alderwoods addressing whether community time should be
15  reported or paid?
16            MS. GIFFORD:   Objection.
17  A.   No, sir.
18  Q.   I think you said Mr. Morgan also did some type
19  of community service work that consisted of --
20  A.   Softball.
21  Q.   For what organization?
22  A.   He is a member of the LDS church, and they had
23  their own softball team.
24  Q.   That would be the Mormons?
25  A.   Yes, sir.

3a69689e-c597-4bee-a3bf-dae486d1a304

NETWORK DEPOSITION SERVICES
Transcript of Michael Lanza

Page 244

1                  C E R T I F I C A T E

2

3

STATE OF WASHINGTON )
4                             ) ss.
COUNTY OF KING      )

5

6          I, the undersigned officer of the Court, under my
commission as a Notary Public in and for the State of
7    Washington, hereby certify that the foregoing deposition
upon oral examination of the witness named herein was
8    taken stenographically before me and thereafter
transcribed under my direction;

9

10         That the witness before examination was first duly
sworn by me to testify truthfully; that the transcript of
11   the deposition is a full, true and correct transcript of
the testimony, including questions and answers and all
12   objections, motions, and exceptions of counsel made and
taken at the time of the foregoing examination;

13

14         That I am neither attorney for, nor a relative or
employee of any of the parties to the action; further,
15   that I am not a relative or employee of any attorney or
counsel employed by the parties hereto, nor financially
16   interested in its outcome.

17

18         IN WITNESS WHEREOF, I have hereunto set my hand and
seal this 5th day of May, 2009.

19

20

21                         \S\ROBYN L. FISHER
Robyn L. Fisher, Notary Public in
22                         and for the State of Washington,
residing at Kent.

23

24                         My commission expires:  9-19-2012

25

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

3a69689e-c597-4bee-a3bf-dae486d1a304

**TAB 24**

NETWORK DEPOSITION SERVICES
Transcript of Adrian Leal

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF PENNSYLVANIA

_____

DEBORAH PRISE and HEATHER          )
RADY, on behalf of themselves      )
and all employees similarly        )
situated,                          )
                                   ) Civil Action No. 06-1641
          Plaintiffs,              )
                                   ) Judge Joy Flowers Conti
    vs.                            )
                                   )
ALDERWOODS GROUP, INC.,            )
                                   )
          Defendant.               )
_____

DEPOSITION UPON ORAL EXAMINATION

of

ADRIAN F. LEAL

_____

Taken at 600 University Street, Suite 320

Seattle, Washington

DATE:  April 23, 2009

REPORTED BY:  Robyn L. Fisher, CCR, RPR
              CCR No. 2590

379eae4c-658d-4960-8ab2-ce059b182950

NETWORK DEPOSITION SERVICES
Transcript of Adrian Leal

Page 28

1    A.    It was random.  And also I was also asked to
2    participate on calls with one of the other directors
3    either from Evergreen or Bauer.
4    Q.    When you assisted with the funeral services,
5    what is your best estimate of the frequency that you
6    would do that on a weekly basis?
7    A.    Oh, it could be once to twice a week.
8    Q.    Did that occur during the time that you worked
9    for Alderwoods?
10    A.    Yes, it did.
11    Q.    And you also said you were participating in on
12    calls?
13    A.    Yes, I was.
14    Q.    Can you state what you understand an on-call
15    duty is or on-call duties you performed?
16    A.    Yes.  You would take the phones home with you,
17    and you were responsible for answering and fielding all
18    phone calls that were directed to either of the three
19    funeral homes that shift you were designated to be on
20    call for.
21    Q.    You said all three funeral homes, so you did
22    the on-call service as part of your duties for
23    Schaefer-Shipman?
24    A.    Yes.  You would be required to take three cell
25    phones home with you and answer calls for all three of

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

379eae4c-658d-4960-8ab2-ce059b182950

NETWORK DEPOSITION SERVICES
Transcript of Adrian Leal

Page 29

1    those locations.

2         Q.   How often would you take -- maybe I'm getting

3    confused and need parts of this defined -- how often

4    would you take the cell phones home for the other two

5    facilities, Evergreen Everett and Bauer Snohomish, on a

6    weekly basis?

7         A.   It was a rotation, so once to twice a week

8    depending on what the rotation was.

9         Q.   And again, I don't know how it was all set up,

10   so you have to excuse me.  I'm kind of reaching in the

11   dark here.

12              Were the on-call duties consolidated for all

13   three facilities to one individual?

14        A.   Yes, it was.

15        Q.   Okay.  And you did that once or twice a week

16   for all three facilities during the time that you were

17   employed by Alderwoods?

18        A.   Yes, sir.

19        Q.   I'll get into that more later but I just wanted

20   to clarify that.

21              Going back to Exhibit 2, it states that your

22   supervisor was Jon Gordon; is that correct?

23        A.   Yes, sir.

24        Q.   Where did Mr. Gordon work?

25        A.   At Schaefer-Shipman.

379eae4c-658d-4960-8ab2-ce059b182950

NETWORK DEPOSITION SERVICES
Transcript of Adrian Leal

Page 59

1        Q.    Did he tell you how often you would be on call?

2        A.    They had a rotation, so it was every third

3    weekend or every other weekend.  It just depends on who

4    was there.  And once during the week.

5        Q.    When you say once during the week, one night

6    during the week?

7        A.    One night during the week, Monday through

8    Friday.

9        Q.    And every third or every other weekend?

10       A.    Yes.

11       Q.    Did you have any other discussions with

12   Mr. Gordon at this time concerning the on-call duties?

13       A.    Yes.  How was I compensated for it?

14       Q.    What was the discussion in that regard?

15       A.    He said you were compensated by every phone

16   call you get.

17       Q.    What did you understand him to mean by that?

18       A.    That every time that phone rang and I answered

19   it, I was to log in 15 minutes.

20       Q.    So you were required to keep track of the phone

21   calls you received; is that correct?

22       A.    Yes.  I was required to keep a log for all

23   three phones that I was in charge of.

24       Q.    Were you also required to state in that log how

25   much time you spent on each call?

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

379eae4c-658d-4960-8ab2-ce059b182950

NETWORK DEPOSITION SERVICES
Transcript of Adrian Leal

Page 60

1      A.    I was.

2      Q.    Was this on a form that the facility provided?

3      A.    Yes.

4      Q.    Did the form have a name?

5      A.    On-call log, if you will.

6      Q.    What did it look like?

7      A.    It had a grid on it.  It had the date, the

8  number that was calling, family name, if you can get

9  that, what the subject matter was.

10     Q.    When these calls came in, would you write down

11  that information?

12     A.    Yes.  You'd have to keep an ongoing log of

13  every single call that you intercepted.

14     Q.    Did you have to also track the amount of time

15  that you spent on that log?

16     A.    Yes.

17     Q.    Were you true and accurate with the time that

18  you put down --

19     A.    Absolutely.  Well, the phone had a timer on it.

20     Q.    I'm not trying to infer anything, but you've

21  got to let me finish asking the question.

22     A.    Oh, I'm sorry.

23     Q.    I don't know how much of that you got.

24                    (Question read back.)

25     A.    I'm sorry.

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

379eae4c-658d-4960-8ab2-ce059b182950

NETWORK DEPOSITION SERVICES
Transcript of Adrian Leal

Page 64

1        A.    Just, you know, it was kind of a new concept to
2    me.  I had never done that for any of my other employers.
3        Q.    Anything else that you discussed with
4    Mr. Gordon about community service?
5        A.    Would I be compensated for it?
6        Q.    What was your discussions in that regard?
7        A.    He said that would be negative.
8        Q.    Any other discussions about compensation?
9        A.    It kind of got to a nil point at that point in
10   time.
11       Q.    What do you mean a nil point?
12       A.    He didn't want to discuss it anymore.
13       Q.    So you did not have any discussions?
14       A.    Yeah.
15       Q.    Did you have any discussions with Mr. Gordon
16   concerning the phone service duties?
17            MS. GIFFORD:  Objection.  Go ahead.
18       Q.    Or did we already discuss those?
19       A.    I believe we did.
20       Q.    Did you handle any death calls that came in
21   after hours?
22       A.    Yes, I did.
23       Q.    Did you have any discussions with Mr. Gordon
24   concerning that?
25       A.    Well, since I lived far enough away from the

379eae4c-658d-4960-8ab2-ce059b182950

NETWORK DEPOSITION SERVICES
Transcript of Adrian Leal

Page 65

1  funeral home, it wasn't cost effective for me to go on a

2  call.  They had other people in the area we could

3  dispatch to make those calls that would be a lot more

4  economical than calling me in, so we had exercised the

5  other option.

6      Q.    What was the other option?

7      A.    The funeral directors that were in the area

8  that would be willing to take the call.

9      Q.    So you didn't have to perform that type of

10  work?

11      A.    Just the phone and the logistics as far as

12  getting someone to take care of the first call and

13  escorting the decedent back to the funeral home.

14      Q.    Did you perform any services at all concerning

15  death calls?

16      A.    Oh, yeah.  If I was there on premises, like if

17  it was right around 5 o'clock or so.

18      Q.    So certainly you handled them when they came in

19  during your scheduled hours or when you first started

20  work and near the end of the day, correct?

21      A.    Or just about getting ready to leave and, oh,

22  we just got a call.

23      Q.    But after your scheduled hours did you perform

24  any services concerning death calls?

25      A.    I believe I just answered that as far as -- if

379eae4c-658d-4960-8ab2-ce059b182950

NETWORK DEPOSITION SERVICES
Transcript of Adrian Leal

Page 100

1    employee handbook available at the Schaefer-Shipman

2    facility?

3                  MS. GIFFORD:   Objection.

4         A.   There would be a copy of that document, I

5    believe, in the facility.

6         Q.   Did you ever have any questions about the

7    handbook that you received?

8         A.   No.

9         Q.   Did you ever ask anybody questions about the

10   handbook you received?

11        A.   I talked to Jon about the handbook.

12        Q.   When did you talk to Jon about the handbook?

13        A.   After the on-call situation was introduced.

14        Q.   What did you say to him in that regard?

15        A.   If it was mandatory and how one gets

16   compensated for it.

17        Q.   So you reviewed the handbook to determine those

18   issues?

19        A.   Um-hmm.   Yes.

20        Q.   And did you make any statements to Mr. Gordon

21   about the handbook?

22        A.   Yes.

23        Q.   What did you tell him?

24        A.   About the on-call policy.

25        Q.   What was your understanding as to the on-call

379eae4c-658d-4960-8ab2-ce059b182950

NETWORK DEPOSITION SERVICES
Transcript of Adrian Leal

Page 101

1    policy in the handbook?

2        A.   Well, he told me verbally what the policy there

3    was.

4        Q.   Mr. Gordon did?

5        A.   Yes, he did.

6        Q.   Did you attempt to verify what he was telling

7    you verbally?

8        A.   What he had told me, I asked him the same thing

9    back, and he said that it's correct; that it's our policy

10   here.

11       Q.   So did you read the handbook to confirm

12   verbally what Mr. Gordon told you about the on-call

13   spiel?

14       A.   It was contradictory, what he was telling me,

15   but he said that was their policy.

16       Q.   Okay.  That's what I'm trying to understand.

17   What did you understand was the on-call policy in the

18   handbook versus what Mr. Gordon was telling you?

19       A.   Yes.

20       Q.   But what was the difference?

21       A.   The difference was that the way he explained it

22   and the way you got paid was different from the way it

23   was listed in the book.

24       Q.   So what was your understanding as to how it was

25   listed in the book?

NETWORK DEPOSITION SERVICES
Transcript of Adrian Leal

Page 102

1      A.   That you were only going to be taking one phone
2   home and be on call for one particular location, and you
3   would be paid for the on call.  It didn't actually spell
4   out how you got paid or you only got paid per phone call.
5   It didn't list all those issues.
6      Q.   What was Mr. Gordon's response to your stating
7   what you believed to be stated in the handbook regarding
8   the on-call policy?
9      A.   He said it was their policy.
10     Q.   When you say "their policy" --
11     A.   I'm talking about Schaefer-Shipman.
12     Q.   Are you saying that Schaefer-Shipman was using
13  a different policy than what was stated in the handbook?
14          MS. GIFFORD:   Objection.
15     A.   I have no idea.  I was a new employee, so I was
16  having go to by what my manager told me.
17     Q.   Well, he was telling you something different
18  than what was in the handbook, correct?
19     A.   Correct.
20     Q.   And he was telling you that that was the way
21  they did it there, correct?
22     A.   Correct.
23     Q.   And what they did there was different than what
24  was in the handbook, at least the way you understood it
25  to say?

379eae4c-658d-4960-8ab2-ce059b182950

NETWORK DEPOSITION SERVICES
Transcript of Adrian Leal

Page 103

1        A.   Yes.

2        Q.   Are you aware of any other policies in the

3    handbook that were different than the policies that

4    Mr. Gordon told you were in effect at that facility?

5             MS. GIFFORD:  Objection.

6        A.   Not that I can recall.

7        Q.   Ever heard of something called the confidential

8    help line?

9        A.   No.

10       Q.   Is this the first time you're hearing about it

11   today?

12       A.   I had heard that reference made during the

13   Alderwoods training that we received at Acacia that if

14   there is any type of thing that you need to talk to

15   somebody at a higher level other than your location, you

16   can call this hotline, if you will.

17       Q.   That's the first you heard of the hotline was

18   at this training at Acacia?

19       A.   Yes.

20            MR. FORESTIERE:  Could you read the answer

21   back, please?

22                 (Answer read back.)

23       Q.   Did you ever attempt to use the hotline

24   concerning the discrepancy in the policy that Mr. Gordon

25   told you concerning the on-call duties that were

379eae4c-658d-4960-8ab2-ce059b182950

NETWORK DEPOSITION SERVICES
Transcript of Adrian Leal

Page 115

1    "Overtime," it's the third paragraph, last sentence

2    states, "Employees must receive payment for overtime

3    hours worked."  Do you see that statement?

4         A.   Yes, I do.

5         Q.   Did you understand that that was the policy of

6    Alderwoods during the time that you worked for it?

7              MS. GIFFORD:  Objection.

8         A.   Yes, I do.

9         Q.   Going a little further down on Section G, "On

10   call," the second sentence says, "On-call time is

11   normally compensable only while the employee is actually

12   working.  Employees scheduled for on-call duty are not

13   required to remain on the company premises or to be

14   confined to their homes or to any particular place,

15   provided they remain within a reasonable travel distance

16   of the location (as determined by management.)" Do you

17   see that, sir?

18        A.   Yes.

19        Q.   Did you understand that that was the policy of

20   Alderwoods during the time that you worked for it?

21             MS. GIFFORD:  Objection.

22        A.   Yes.

23        Q.   And the next sentence says, "On-call employees

24   are required to not consume alcohol or other

25   intoxicants."  Did you understand that that was the

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

379eae4c-658d-4960-8ab2-ce059b182950

NETWORK DEPOSITION SERVICES
Transcript of Adrian Leal

Page 116

1    policy of Alderwoods during the time that you worked for

2    it?

3              MS. GIFFORD:  Objection.

4         A.   Yes.

5         Q.   In Page 17, the first paragraph at the top, the

6    last sentence.  It states, "In all instances, it is the

7    employee's responsibility to clock in when called in to

8    work and to clock out when the work assigned is

9    complete."  Did you understand that to be the policy of

10   Alderwoods during the time that you worked for it?

11             MS. GIFFORD:  Objection.

12        A.   I do.

13        Q.   The next paragraph down, the first sentence

14   states, "When a non-exempt employee is required to take

15   phone calls after completing their regular work schedule

16   and leaving the premises but is not required to

17   physically return to work, the employee shall log the

18   start and end times of each phone call.  The employee

19   will be paid for the time spent in phone conversations.

20   The recorded time will be included in determining if an

21   employee qualifies for overtime pay in a work week."  Do

22   you see that, sir?

23        A.   Yes, I do.

24        Q.   Did you understand that to be the policy of

25   Alderwoods during the time that you worked for it?

379eae4c-658d-4960-8ab2-ce059b182950

NETWORK DEPOSITION SERVICES
Transcript of Adrian Leal

Page 175

1    an adjustment.  It never happened.

2         Q.   I understand.  You can only say what he told

3    you.

4         A.   Yes, sir.

5         Q.   He told you he'd take care of it?

6         A.   Um-hmm.

7         Q.   And after that, it never happened, and you

8    don't know why it never happened?

9         A.   Correct.

10        Q.   I don't think we're disagreeing.  I just want

11   to get clear on the record what your understanding is and

12   what exactly transpired, okay?

13        A.   Um-hmm.

14        Q.   Are you aware of any Alderwoods policy

15   requiring employees to perform on-call work and not

16   paying them for it?

17             MS. GIFFORD:  Objection.

18        A.   Can you rephrase that, please?

19        Q.   Yes.  Are you aware of any Alderwoods policy

20   that requires their employees to perform on-call work and

21   not pay them for it?

22             MS. GIFFORD:  Objection.

23             MR. EHRMAN:  Objection.

24        A.   I'm not aware of any volunteerism that they're

25   asking you to do and not get paid for it.

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

379eae4c-658d-4960-8ab2-ce059b182950

NETWORK DEPOSITION SERVICES
Transcript of Adrian Leal

Page 186

1    questions I have, Mr. Leal.  Thank you for your time

2    today.

3                    MS. GIFFORD:  Can I just check with Jim

4    and look at my notes before we continue?

5                    MR. FORESTIERE:  Sure.  Absolutely.

6                        (Brief recess taken.)

7

8                        EXAMINATION

9    BY MS. GIFFORD:

10       Q.   I was just wanting to ask about the on-call

11   work that you did, and I know you testified previously

12   that you would receive calls and answer the phones.

13       A.   Yes.

14       Q.   Was there any other work that you did when you

15   were on call?

16       A.   Other than if I did receive a death call, and I

17   had to dispatch and call the other funeral director or

18   whoever we were going to select to go on an actual call,

19   there would be a subsequent call if we did get the

20   approval from that family to make removal.

21       Q.   That would be an outgoing call rather than

22   incoming?

23       A.   Yes.

24       Q.   Were you paid 15 minutes for outgoing calls?

25       A.   No.

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

379eae4c-658d-4960-8ab2-ce059b182950

NETWORK DEPOSITION SERVICES
Transcript of Adrian Leal

Page 195

1                    C E R T I F I C A T E

2

3

STATE OF WASHINGTON )
4                    ) ss.
COUNTY OF KING       )

5

6        I, the undersigned officer of the Court, under my
commission as a Notary Public in and for the State of
7    Washington, hereby certify that the foregoing deposition
upon oral examination of the witness named herein was
8    taken stenographically before me and thereafter
transcribed under my direction;

9

10       That the witness before examination was first duly
sworn by me to testify truthfully; that the transcript of
11   the deposition is a full, true and correct transcript of
the testimony, including questions and answers and all
12   objections, motions, and exceptions of counsel made and
taken at the time of the foregoing examination;

13

14       That I am neither attorney for, nor a relative or
employee of any of the parties to the action; further,
15   that I am not a relative or employee of any attorney or
counsel employed by the parties hereto, nor financially
16   interested in its outcome.

17

18       IN WITNESS WHEREOF, I have hereunto set my hand and
seal this 4th day of May, 2009.

19

20

21                      \S\ROBYN L. FISHER
                        Robyn L. Fisher, Notary Public in
22                      and for the State of Washington,
                        residing at Kent.

23

24                      My commission expires:  9-19-2012

25

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

379eae4c-658d-4960-8ab2-ce059b182950

**TAB 25**

NETWORK DEPOSITION SERVICES
Transcript of Kasi Long

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

_____

DEBORAH PRISE and HEATHER RADY
on behalf of themselves and all other
employees similarly situated,
                         Plaintiffs,

v.

ALDERWOODS GROUP, INC. and SERVICE
CORPORATION INTERNATIONAL,
                         Defendant.
_____

          Examination Before Trial, held at the Law

Offices of DOLIN THOMAS & SOLOMON, LLP, The

Strong-Todd House, 693 East Avenue, Rochester, New

York 14607, on December 18th, 2008, commencing at

11:30 a.m.

          DEPOSITION OF:    Kasi Long

REPORTED BY:  Karrie M. Utberg

0964fc9e-2fd4-47c3-acbb-8a629ecab991

NETWORK DEPOSITION SERVICES
Transcript of Kasi Long

Page 159

1                KASI LONG by MS. DUGAN                159

2   Q.  Do you know whether employees working at other

3       locations were paid for time that they were

4       on-call?

5   A.  I would not know that for sure.

6   Q.  You mentioned community work that you performed

7       during your employment with Alderwoods, and

8       specifically you mentioned the girl scouts, holiday

9       dinners and the lions club; is that right?

10  A.  Those are the three that were most closely in that

11      time period that we discussed.

12  Q.  Did you perform any other community work, other

13      than those three examples, other than your

14      employment with Alderwoods?

15  A.  I mean we were always trying to come up with ways.

16      I'm sure there were things that we did that I'm not

17      specifically recalling at this particular moment.

18      Which ones fell into that time period, I would have

19      to think more about it.  Those are the three that,

20      you know, I can for sure through those dates know

21      that I was involved in.  Lions club was part of

22      that time.  I think I was done in 2004.

23  Q.  What activities did you do with the girl scouts

24      organization?

25  A.  I held -- I believe at that time we were having

0964fc9e-2fd4-47c3-acbb-8a629ecab991

NETWORK DEPOSITION SERVICES
Transcript of Kasi Long

1          KASI LONG by MS. DUGAN                160

2      either weekly or biweekly meetings for a couple of

3      hours each meeting and then I would sometimes take

4      them on trips.

5   Q.  When did the meetings occur for the girl scouts?

6   A.  Those would have been outside of my regular work

7      hours in the evenings during the week.

8   Q.  Weekday evenings?

9   A.  Most of the time, but I'm sure we had meeting on

10      the weekend occasionally, trips or whatever.

11   Q.  When did you became involved in the girl scouts

12      organization?

13   A.  I want to say 2002.  That's my best estimate at

14      this time.

15   Q.  Why did you get involved with the girl scouts at

16      that time, in 2002?

17   A.  My daughter is obviously in girl scouts with me,

18      but we're requested and looked upon to do some

19      community stuff.  That was something that

20      interested me.  So, I would chose something

21      obviously, if I'm going to be in a community event

22      for my job, it's going to be something that

23      interests me.  Otherwise, what's the point?  I

24      mean, it has to be something that I enjoy, as well,

25      so, I did that.

0964fc9e-2fd4-47c3-acbb-8a629ecab991

NETWORK DEPOSITION SERVICES
Transcript of Kasi Long

Page 161

1        KASI LONG by MS. DUGAN                    161

2   Q.  Other than the girl scouts meetings and girl scouts

3       trips, are there any other activities that you did

4       with the girl scouts?

5   A.  Specifically general girl scout things.  I can't

6       think of -- I mean, those would be the major times

7       that I spent with them during the meetings on a

8       trip or overnight camp.

9   Q.  Are you still involved with the girl scouts

10      organization today?

11  A.  I am.

12  Q.  What activities did you do with the lions club?

13  A.  There was a weekly -- I don't think it was weekly.

14      Maybe biweekly meetings.  There were sometimes

15      events that I would attend.  And a couple of things

16      I attended, I'm not positive the dates, whether it

17      fell within the '03 period or before.  I would

18      assist in like an Easter egg hunt they would have

19      in the community, different things.  Mainly, I went

20      to the meetings.  I didn't do a lot of the

21      fundraiser things with them.

22  Q.  When were the meetings held for the lions club that

23      you attended?

24  A.  When I first began in lions club, I believe they

25      were approximately 12 to 1 during the day.  They

0964fc9e-2fd4-47c3-acbb-8a629ecab991

NETWORK DEPOSITION SERVICES
Transcript of Kasi Long

Page 173

1          KASI LONG by MS. DUGAN                173

2     duties for Alderwoods?

3  A.  I would say that was even more so a club that would

4     have been for my direct involvement, because they

5     -- like I said, Dwayne hooked me up with the lady

6     that was involved.  He requested that I join that

7     particular club.  It was more for the benefit of

8     getting to know people that were older in our

9     community that would be a direct link to people

10    that may need our services, whether it be through

11    themselves personally or a parent, an elderly

12    parent or something.

13 Q.  Did you personally keep track of the time that you

14    spent attending Lions Club meetings?

15 A.  Not on any specific paper record, no, other than if

16    it got reported on that monthly sheet.

17 Q.  Did you report time that you spent attending Lions

18    Club meetings as time work for Alderwoods on your

19    timecards?

20 A.  I would have to think about that.  The meetings for

21    Lions Club generally fell between 12 and 1, so it

22    was an hour-long meeting.  I would have had to, in

23    most cases had to have had a lunch in that time.

24    So, I may have been on the clock for part of the

25    time I was at the meeting and part of the time not

0964fc9e-2fd4-47c3-acbb-8a629ecab991

NETWORK DEPOSITION SERVICES
Transcript of Kasi Long

Page 174

1      KASI LONG by MS. DUGAN                      174
2      because of lunch break, but I was there during
3      regular work hours.  As I said, the meetings were
4      from 12 to 1, I believe.
5   Q. If you were on the clock for some of the time that
6      you attended Lions Club meetings, were you paid for
7      that time that you were on the clock?
8   A. If I was on the clock, but at some point I would
9      have had to have my half an hour lunch break in
10     while I was there to, but it was an hour long
11     meeting.
12  Q. So, you may have been compensated for some of this
13     --
14  A. May have been for some and may have been not, and
15     anything above and beyond those regular lunch
16     meetings, if I had donated time outside of work
17     hours that would not have been on the clock.
18  Q. And, lastly, getting to the holiday dinners that
19     you said the staff at Carpenter's would host, when
20     did those dinners occur, during the day?
21  A. No, they were during the evening.  Those were
22     outside of my regularly scheduled hours.
23  Q. And who organized these dinners?
24  A. Sometimes I would have a lot to do with that during
25     the work day.  It would just depend on what year it

0964fc9e-2fd4-47c3-acbb-8a629ecab991

NETWORK DEPOSITION SERVICES
Transcript of Kasi Long

Page 221

1                                                     221

2                    REPORTER'S CERTIFICATION

3

STATE OF NEW YORK )
4   COUNTY OF MONROE  )

5              I, KARRIE UTBERG, being a Shorthand

6   Reporter in the County of Monroe, State of New York,

7   do certify that I reported in Stenotype Shorthand the

8   proceedings in the above-titled matter, that the

9   foregoing pages were scoped under my direction and

10  control, and constitute a true, accurate, and correct

11  record of those Stenotype Shorthand notes.

12             I further certify that I am neither

13  attorney or counsel for any of the parties, nor a

14  relative or employee of any attorney or counsel

15  connected with the action, nor financially interested

16  in the outcome of the action.

17

18

19

20                              KARRIE UTBERG

21  Dated at Rochester, New York

22  this 9th day of January, 2009.

23

24

25

0964fc9e-2fd4-47c3-acbb-8a629ecab991

**TAB 26**

NETWORK DEPOSITION SERVICES
Transcript of Herbert Mayes

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA


DEBORAH PRISE and          )
HEATHER RADY,              )
                          )
            PLAINTIFFS,    )
                          )
VS.                        ) CIVIL ACTION
                          ) NO. 06-1641
ALDERWOODS, INC.,          )
                          )
            DEFENDANT.     )


DEPOSITION OF HERBERT A. MAYES

JUNE 23, 2010

_____

PEGGY F. MCCRORY
Registered Professional Reporter
P. O. Box 1093
Knoxville, TN  37901

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

NETWORK DEPOSITION SERVICES
Transcript of Herbert Mayes

Page 73

1    other employees were getting active in their

2    communities or is that something that you

3    delegated?

4              A          Delegated.

5              MS. MORGAN:  Object to the

6         form of the question.  Sorry.  Didn't

7         mean to talk over you.

8              THE WITNESS:  Delegated.

9         Except in my own location, and I was

10        involved.

11   BY MR. SAUL:

12             Q          I see.  Okay.  Do you recall

13   what the policy was for paying employees for their

14   involvement in the community?

15             A          They were paid -- I mean,

16   most of them all went during the day working

17   hours.  They were clocked in, clocked out.

18             Q          Okay.  So if they were

19   involved in the -- well, what type of community

20   events -- name some of them.

21             A          Rotary Club, the Lion's Club

22   and things like that.

23             Q          I see.  Did the company ever

24   pay for memberships for employees in churches?

25             A          In churches?

f82579ab-3b68-4f72-97e7-e07402820ff8

NETWORK DEPOSITION SERVICES
Transcript of Herbert Mayes

Page 74

1        Q        Yeah.  Memberships.

2        A        Didn't know you had to have

3    memberships in churches.  No, not that I am aware

4    of.

5        Q        Okay.  So if an employee

6    went to a Rotary Club meeting that was during work

7    hours was the policy that the employee would get

8    paid for that time?

9        A        Yes.

10       Q        And what if the Rotary Club

11   meeting was in the evening after work hours, was

12   the employee supposed to be paid for that time in

13   the evening as well?

14       A        Yes.

15       Q        Do you know if that actually

16   occurred that they were paid for that time?

17       A        My personal knowledge, I

18   don't know.  I would assume they were because they

19   clocked in, clocked out.

20       Q        Okay.  If they were at the

21   Rotary Club in the evening they wouldn't be by the

22   time clock, correct?

23       A        Unless they didn't clock out

24   until after me.  I wasn't at the location so --

25       Q        So you don't know.

f82579ab-3b68-4f72-97e7-e07402820ff8

Case3:08-cv-01184-SI  Document276-8  Filed09/10/10  Page205 of 499

Page 76

1          MS. MORGAN:  Object to the

2      form of the question.

3          You can answer if you can.

4          THE WITNESS:  Typically most

5      of your civic club memberships were

6      inherited from former owners.  You

7      always just paid.  Most of them were

8      location managers.  They really weren't

9      to hire the employees as much as

10     location managers went to Rotary Club.

11  BY MR. SAUL:

12      Q          Well, I'm not talking about

13  now the dues.  I'm talking about why would the

14  company pay in situations where an employee was

15  involved in a community activity that occurred

16  during working hours?

17          MS. MORGAN:  Object to the

18      form of the question.

19          You can answer if you can.

20          THE WITNESS:  If I required

21      you to go somewhere then I would have

22      paid you.

23  BY MR. SAUL:

24      Q          Okay.  And employees such as

25  funeral directors were expected to be involved in

f82579ab-3b68-4f72-97e7-e07402820ff8

NETWORK DEPOSITION SERVICES
Transcript of Herbert Mayes

Page 77

1    community activities as part of their job; is that
2    correct?
3                 A         Not necessarily.
4                 Q         And what do you mean by not
5    necessarily?
6                 A         Typically a location
7    manager -- depended on the size of the location,
8    the location manager usually took the lead road at
9    night and the funeral director was hired to
10   actually just to conduct the funeral service or
11   embalm bodies, you know, so that person could be
12   allowed time off to go to the civic meetings.  So
13   you could be a funeral director working at a
14   funeral home and never participate in any
15   activities, really, outside the business.
16                Q         But that was one of their
17   specific responsibilities as listed in their --
18                A         An ideal situation, yes.
19                Q         Okay.  Were employees
20   evaluated, given annual employee evaluations?
21                A         Yes.
22                Q         And were funeral directors
23   and other line employees evaluated?
24                A         Yes.
25                Q         Who were they evaluated by?

f82579ab-3b68-4f72-97e7-e07402820ff8

NETWORK DEPOSITION SERVICES
Transcript of Herbert Mayes

Page 114

1                    C E R T I F I C A T E

2    STATE OF TENNESSEE:

3    COUNTY OF KNOX:

4                         I, Peggy F. McCrory,

5              Registered Professional Reporter and

6              Notary Public, do hereby certify that I

7              reported in machine shorthand the

8              foregoing proceedings; that the

9              foregoing pages, numbered 1 to 99,

10             inclusive, were typed by me using

11             computer-aided transcription and

12             constitute a true and accurate record

13             of said proceedings.

14                         I further certify that I am

15             not an attorney or counsel of any

16             attorney or counsel connected with the

17             action, nor financially interested in

18             the action.

19                         Witness my hand and official

20             seal this the 30th day of June, 2010.

21                    ----------------------

                      Peggy F. McCrory
22                    Registered Professional Reporter

23                    Notary Public at Large

24                    My Commission Expires:  10-05-10.

25

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

f82579ab-3b68-4f72-97e7-e07402820ff8

**TAB 27**

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

```
DEBORAH PRISE and HEATHER  )
RADY on behalf of themselves)
and all employees similarly )
situated                    )
                            )
                            )
versus                      ) CIVIL ACTION NO. 06-1641
                            )
                            )
ALDERWOODS GROUP, INC.      )
```

*****************************************

ORAL DEPOSITION

BEVERLY MCDONALD

NOVEMBER 24, 2008

*****************************************

ANSWERS AND ORAL DEPOSITION OF BEVERLY MCDONALD,

a witness produced at the instance of the Defendant,

was taken in the above-styled and numbered cause on

the 24TH day of NOVEMBER 2008, from 10:54 a.m. to

5:10 p.m., before VANESSA S. ROBERTSON, CSR in and for

the State of Texas, reported by machine shorthand, at

the offices of Jones Day, 2727 North Harwood, Dallas,

Texas, pursuant to the Pennsylvania Rules of Civil

Procedure.

e72e4767-1aa0-4706-9316-f389fe45cd48

NETWORK DEPOSITION SERVICES
Transcript of Beverly McDonald

Page 85

13:10    1       Q    What are some examples of when you handled

2    some after-hour calls?

3       A    An example?

13:10    4       Q    An example of a time that you handled a call

5    after hours.

6       A    1:00 o'clock in the morning.

13:10    7       Q    And what kind of calls would you be handling

8    at that time?

9       A    Telephone calls.

13:10    10       Q    And what would be the circumstances under

11    which you would handle a call after hours?

12       A    Somebody would either be deceased, somebody

13    would have questions about the cemetery, somebody

14    would have questions about a funeral, somebody would

15    have questions about prices.

13:10    16       Q    And how would you -- would you record these

17    out, the time that you spent handling after-hour

18    calls?

19       A    Yes, I would.

13:10    20       Q    And how would you record that time?

21       A    For a long time, we didn't record them at

22    all, and then we -- he brought me a sheet to put them

23    on.

13:11    24       Q    What time frame did you not record them at

25    all?

e72e4767-1aa0-4706-9316-f389fe45cd48

NETWORK DEPOSITION SERVICES
Transcript of Beverly McDonald

Page 86

1        A     From when I started till -- I don't remember

2    the exact date.

13:11    3        Q     And then at some point, it changed?

4        A     Yes.

13:11    5        Q     Okay.  And what was the change?

6        A     To record them.

13:11    7        Q     And who told you about that change?

8        A     Bill Barlow.

13:11    9        Q     When did he tell you?

10        A     I don't recall the exact date.

13:11   11        Q     And how did you handle recording after-hours

12    phone calls after Bill Barlow gave you that

13    instruction?

14        A     I wrote them down on a sheet.

13:12   15        Q     Did you use an after-hour call log?

16        A     That could be the name of it.  I -- it was a

17    piece of paper.

13:12   18        Q     There was a form that you used?

19        A     Yes.

13:12   20        Q     Prior to the time that Bill Barlow told you

21    to record after-hour phone calls, had any manager told

22    you not to record your time for those after-hours

23    phone calls?

24        A     I don't recall if they did or not.

13:12   25        Q     And prior to the change that we just talked

e72e4767-1aa0-4706-9316-f389fe45cd48

NETWORK DEPOSITION SERVICES
Transcript of Beverly McDonald

Page 87

1    about, did you record the time spent on after-hour

2    phone calls?

3         A    No.

13:13    4         Q    And why not?

5         A    I don't know why not.

13:13    6         Q    Do you know how other Alderwoods employees

7    handled the recording of time spent in after-hour

8    phone calls?

9         A    No, I don't.

10                   (Exhibit No. 21 was marked.)

11                   MS. MORGAN:  For the record,

12    Exhibit 21 is Bates labeled ALD000552 to ALD000553.

13:14    13         Q    (By Ms. Morgan)  Is Exhibit 21 an after-hours

14    call log that you used, Mrs. McDonald?

15         A    Yes, it is.

13:14    16         Q    Is this the form document that you testified

17    about earlier that you used to record after-hour

18    calls?

19         A    Yes.

13:15    20         Q    And is it your -- is that your signature on

21    the first page of Exhibit 21?

22         A    Yes, it is.

13:15    23         Q    And what was your practice in using the

24    after-hours call log?

25         A    My practice in using it?

e72e4767-1aa0-4706-9316-f389fe45cd48

NETWORK DEPOSITION SERVICES
Transcript of Beverly McDonald

Page 90

1    documented here, ranges from 15-minute calls to a

2    39-minute call; is that correct?

3            A    Yes, uh-huh.

13:18    4    Q    Did you record the time spent on calls

5    differently in this log than you did on the -- on

6    Exhibit 21?

7            A    Yes, I did.

13:18    8    Q    Why?

9            A    Because these were actual time of calls.

10    This was a -- on 22.  On 21, it was 15 minutes a call

11    is what I was told.

13:19    12    Q    So you recorded your time differently because

13    you were instructed to record your time differently?

14            A    I was instructed I received 15 minutes a

15    call.  Then at one point, I was told to write down my

16    actual time of the call.  Apparently it changed

17    between these two.

13:19    18    Q    So Exhibit 22, in the time spent column,

19    reflects actual -- the actual time spent on each

20    call?

21            A    Not actual time, a really close estimation,

22    because I didn't write it in seconds and things like

23    that.  It's -- you know.

13:20    24    Q    But it reflects your best estimate of the

25    actual time spent on the call?

e72e4767-1aa0-4706-9316-f389fe45cd48

NETWORK DEPOSITION SERVICES
Transcript of Beverly McDonald

Page 138

1       permitted you to perform community service?

2            A    Uh-huh.

15:07   3            Q    And at least some of the time was not paid

4       for it by Alderwoods; is that correct?

5            A    That's correct.

15:07   6            Q    Okay.

7            A    None of the time was paid for.

15:07   8            Q    Okay.  What I'm trying to understand is what

9       community service work you did that you believe you

10      were not compensated for.

11           A    The Mitchell County Community Mission,

12      Christmas in Action, and Business and Professional

13      Women.

15:08   14           Q    The Mitchell County Community Mission?

15           A    Yes.

15:08   16           Q    When did you start work for that

17      organization?

18           A    I don't recall the exact date.

15:08   19           Q    Was it before your employment with

20      Alderwoods?

21           A    No.

15:08   22           Q    During your employment with Alderwoods?

23           A    Yes.

15:08   24           Q    Okay.  Why did you decide to join?

25           A    I was told to.

e72e4767-1aa0-4706-9316-f389fe45cd48

NETWORK DEPOSITION SERVICES
Transcript of Beverly McDonald

Page 139

| | | | |
|---|---|---|---|
| 15:08 | 1 | Q | By whom? |
| | 2 | A | Bill Barlow. |
| 15:08 | 3 | Q | And what did Mr. Barlow tell you? |
| | 4 | A | That I had to join three community service |

organizations.

15:08    6    Q    What else did he tell you about community

7    services?

8    A    It was Alderwoods' policy that everybody had

9    to be active in the community and join service

10    organizations.

15:08    11    Q    Why did you pick this particular

12    organization?

13    A    They were given to me on a list of these

14    three.

15:09    15    Q    Who gave you this list?

16    A    Bill Barlow.

15:09    17    Q    Were there other organizations on the list

18    other than these three?

19    A    No.  That's the three he would like me to

20    join.

15:09    21    Q    And what did you do in response to that

22    information?

23    A    I joined the three organizations.

15:09    24    Q    All at the same time?

25    A    No, it was different times.

e72e4767-1aa0-4706-9316-f389fe45cd48

NETWORK DEPOSITION SERVICES
Transcript of Beverly McDonald

Page 140

15:09    1        Q    And what purpose does the Mitchell County

         2    Community Mission serve?

         3                   MR. LINGLE:  Object to the form.

         4        A    What purpose?

15:09    5        Q    (By Ms. Morgan)  Like what is the work of

         6    this group?

         7        A    They take donated clothes and funds and help

         8    homeless and needy families.

15:09    9        Q    And how long were you involved with this

        10    organization?

        11        A    I don't recall specific dates.

15:10   12        Q    Are you still involved?

        13        A    No.

15:10   14        Q    When did you stop being involved?

        15        A    October of 2006.

15:10   16        Q    And why did you stop being involved?

        17        A    Because I no longer had to be.

15:10   18        Q    What did membership in this organization

        19    entail?

        20        A    Meetings, helping -- if people on the

        21    interstate was broke down, I had to take them gas or

        22    food or things like that.  Just helping people.

15:10   23        Q    Did it involve time during the workday?

        24        A     It did, but I never did any of it during the

        25    workday because there was somebody else who could

e72e4767-1aa0-4706-9316-f389fe45cd48

NETWORK DEPOSITION SERVICES
Transcript of Beverly McDonald

Page 143

              1        A     Yes.
15:13         2        Q     Did Mr. Barlow ever evaluate you based on
              3    your participation in the organization?
              4                    MR. LINGLE:   Object to form.
              5        A     Not that I'm aware of.
15:14         6        Q     (By Ms. Morgan)  Did all of the employees at
              7    the Kiker-Seale Funeral Home where you worked
              8    participate in this organization?
              9        A     No.
15:14        10        Q     Did anybody else, any other Alderwoods
             11    employee?
             12        A     Not that I can recall at this time.
15:14        13        Q     Do you know whether there was any requirement
             14    that anybody -- any other Alderwoods employee at your
             15    location participate in this organization other than
             16    you?
             17        A     There wasn't any requirement on them.  They
             18    were part-time.
15:14        19        Q     Was Mr. Barlow involved in this
             20    organization?
             21        A     No.
15:14        22        Q     Were there any costs associated with
             23    membership in it?
             24        A     No.
15:15        25        Q     Did Mr. Barlow ever observe you doing work

e72e4767-1aa0-4706-9316-f389fe45cd48

NETWORK DEPOSITION SERVICES
Transcript of Beverly McDonald

Page 146

15:17    1      Q     The other organization that you mentioned,

2    Mrs. McDonald, was that Christmas in Action?

3      A     Yes.

15:17    4      Q     Okay.  And when did you join that group?

5      A     I don't remember the exact date.  I don't

6    remember the year on that one either.

15:18    7      Q     Was it during your employment with

8    Alderwoods?

9      A     Yes.

15:18    10      Q     And why did you join?

11      A     I was told to.

15:18    12      Q     Was Christmas in Action one of the community

13    service organizations that Mr. Barlow suggested?

14      A     Yes.

15:18    15      Q     And what type of activity does Christmas in

16    Action engage in?

17      A     They help winterize houses and rebuild them,

18    put roofs and clean them up for elderly people.

15:18    19      Q     And how long were you involved in that

20    organization?

21      A     I don't recall exact dates or how long

22    exactly it was.

15:18    23      Q     Are you still involved?

24      A     No.

15:19    25      Q     Did your involvement stop at the time that

e72e4767-1aa0-4706-9316-f389fe45cd48

NETWORK DEPOSITION SERVICES
Transcript of Beverly McDonald

Page 147

1       your employment with Alderwoods ended?

2              A      Yes.

15:19   3              Q      And what type of activities did you do with

4       respect to Christmas in Action?

5              A      Whatever everyone else was doing, you know,

6       helping build or pick up trash or whatever was needed

7       to do at specific homes.

15:19   8              Q      Did you spend time doing activities

9       associated with that group during the workday?

10             A      No.

15:19   11             Q      What -- when did you spend time doing work

12      for the organization?

13             A      In the evenings and maybe a day -- days off

14      every now and then.

15:19   15             Q      How much time did you contribute to this

16      organization on a weekly basis?

17             A      On a weekly basis?  I don't know.  It was

18      pretty much just in the month of April.

15:20   19             Q      And about how much time would you spend in

20      the Aprils that you were involved?

21             A      Probably 10 to 20 hours a week, just in

22      April.

15:20   23             Q      And did you consider any aspect of your

24      membership in the organization to involve doing work

25      for Alderwoods?

e72e4767-1aa0-4706-9316-f389fe45cd48

NETWORK DEPOSITION SERVICES
Transcript of Beverly McDonald

Page 152

| | | |
|---|---|---|
| 15:41 | 1 | Q    Did you keep any records of the time you |
| | 2 | spent involved in activities for the organization? |
| | 3 | A    No. |
| 15:41 | 4 | Q    Any Alderwoods employees observe you doing |
| | 5 | work for this organization? |
| | 6 | A    No. |
| 15:41 | 7 | Q    Did you report any of the time you spent |
| | 8 | doing work for the organization to Alderwoods? |
| | 9 | A    No. |
| 15:41 | 10 | Q    Why not? |
| | 11 | A    I wasn't paid for it.  I wouldn't get paid |
| | 12 | for it. |
| 15:41 | 13 | Q    And why did you think that? |
| | 14 | A    That was policy. |
| 15:41 | 15 | Q    And who told you that was the policy, if |
| | 16 | anybody? |
| | 17 | A    Bill Barlow. |
| 15:41 | 18 | Q    Did he tell you not to keep track of the time |
| | 19 | you spent performing activities for the |
| | 20 | organization? |
| | 21 | A    He didn't tell me not to keep track of it. |
| | 22 | Just -- it didn't matter if I turned it in or not.  I |
| | 23 | mean, it wouldn't be paid.  But, no, he didn't |
| | 24 | specifically tell me, do not keep track of it. |
| 15:42 | 25 | Q    Did he tell you not to turn it in to |

e72e4767-1aa0-4706-9316-f389fe45cd48

NETWORK DEPOSITION SERVICES
Transcript of Beverly McDonald

Page 153

1    Alderwoods?

2         A    Uh-huh.

3                   MR. SAUL:  Was that a "yes"?

4         A    Yes.

15:42  5         Q    (By Ms. Morgan)  Did he give you a reason for

6    that?

7         A    It isn't paid for.  It isn't paid.

15:42  8         Q    Did you ever receive any compensation for the

9    time you spent doing activities for this

10   organization?

11        A    No.

15:42  12        Q    Did you complain about doing these activities

13   but not getting paid?

14                   MR. LINGLE:  Object to the form.

15        A    Yes.

15:42  16        Q    (By Ms. Morgan)  To whom did you complain?

17        A    Bill Barlow.

15:42  18        Q    And how did he respond?

19        A    He didn't get paid for his community service

20   either.

15:42  21        Q    Did you complain to any other Alderwoods

22   management employees about doing community service

23   activities but not getting paid for it?

24        A    About doing community service, in general, or

25   that specific --

e72e4767-1aa0-4706-9316-f389fe45cd48

NETWORK DEPOSITION SERVICES
Transcript of Beverly McDonald

Page 158

1    on call?

2         A    That means if anything happened after hours,

3    you took care of it.

15:48    4    Q    Were you expected to be on call?

5         A    Yes.

15:48    6    Q    When?

7         A    Every other week.

15:49    8    Q    And where would you be while you were on

9    call?

10        A    At home, out and about, you know, just

11   wherever I was, I was on call.  If I went to the

12   grocery store, I was still on call.

15:49   13    Q    Did you have to be at any particular location

14   when you were on call?

15        A    No.

15:49   16    Q    And who set up the on-call schedule?

17        A    Bill Barlow.

15:49   18    Q    How would you learn that you were scheduled

19   to be on call?

20        A    It was every other week.

15:49   21    Q    What did you do while you were on call?  What

22   type of work?

23        A    Whatever was needed.

15:49   24    Q    Can you give some examples of something that

25   you might do when you were on call?

e72e4767-1aa0-4706-9316-f389fe45cd48

NETWORK DEPOSITION SERVICES
Transcript of Beverly McDonald

Page 159

|       |    |   |                                              |
|-------|----|---|----------------------------------------------|
|       | 1  | A | Removals, embalmings, met with families.     |
| 15:50 | 2  | Q | Anything else?                               |
|       | 3  | A | Not that I can recall at this time, I'm sure |
|       | 4  |   | there was a lot more that I did, but that was the main |
|       | 5  |   | things that we did on call.                  |
| 15:50 | 6  | Q | Were there any restrictions on what you could |
|       | 7  |   | do during the time you were on call?         |
|       | 8  | A | Yes.                                         |
| 15:50 | 9  | Q | What were those?                             |
|       | 10 | A | We couldn't travel outside of Mitchell       |
|       | 11 |   | County.                                      |
| 15:50 | 12 | Q | I'm sorry, what?                             |
|       | 13 | A | Do not travel outside of Mitchell County.    |
| 15:50 | 14 | Q | Any other restrictions?                      |
|       | 15 | A | Of course, you know, don't drink.  Be        |
|       | 16 |   | available, have a cell phone with you all the time or |
|       | 17 |   | be at home, you know, where you can hear the phone. |
| 15:50 | 18 | Q | Anything else?                               |
|       | 19 | A | Not that I can recall at this time.          |
| 15:51 | 20 | Q | And how would you be contacted during the    |
|       | 21 |   | time you were on call if you needed to perform work? |
|       | 22 | A | Through a cell phone or a house phone.       |
| 15:51 | 23 | Q | Did you keep track of the time you worked    |
|       | 24 |   | while you were on call?                      |
|       | 25 | A | Keep track of it by my own personal records  |

NETWORK DEPOSITION SERVICES
Transcript of Beverly McDonald

Page 161

|       |    |   |                                             |
|-------|----|---|---------------------------------------------|
|       | 1  | A | No.                                         |
| 15:52 | 2  | Q | Was there any Alderwoods work that you were |
|       | 3  |   | performing when you were on call that you did not |
|       | 4  |   | record?                                     |
|       | 5  | A | Time to and from -- like from my house to the |
|       | 6  |   | hospitals, from the hospitals, waiting on transfer |
|       | 7  |   | companies to show up to take the body from one place |
|       | 8  |   | to the next, waiting for justice of the peaces, |
|       | 9  |   | removals at -- really, removals at wreck scenes, |
|       | 10 |   | things like that.                           |
| 15:53 | 11 | Q | And why did you not record that time?       |
|       | 12 | A | They weren't paid.                          |
| 15:53 | 13 | Q | What do you mean by that?                    |
|       | 14 | A | They weren't -- they weren't paid; just     |
|       | 15 |   | embalming was paid.                         |
| 15:53 | 16 | Q | Your understanding was that the only time on |
|       | 17 |   | call spent performing embalming was paid for? |
|       | 18 | A | Yes.                                        |
| 15:53 | 19 | Q | So that was the only time that you would    |
|       | 20 |   | record?                                     |
|       | 21 | A | Yes.                                        |
| 15:53 | 22 | Q | What about phone calls, though?             |
|       | 23 | A | The phone calls on the call log, when the   |
|       | 24 |   | call log started, yes.                      |
| 15:53 | 25 | Q | Yes.                                        |

Johnstown                  Toll-Free                  Pittsburgh
814-266-2042            866-565-1929            412-281-7908

e72e4767-1aa0-4706-9316-f389fe45cd48

NETWORK DEPOSITION SERVICES
Transcript of Beverly McDonald

Page 162

1      A    I did get paid for them -- you know, I turned

2    them in.  I don't know if I got paid for them or not,

3    but I turned them in as work.

15:54  4      Q    Did anyone ever tell you not to record time

5    that you spent on call doing these other -- this other

6    type of work?

7      A    Did they ever tell me not to?  Bill Barlow,

8    if I asked him, he -- you know, I just got paid for

9    embalming.  That was the understanding.  That was what

10   I was told by Bill.

15:54  11     Q    So Mr. Barlow told you you were only going to

12   get paid for time spent embalming?

13     A    Yes.

15:54  14     Q    But did he ever tell you, don't record time

15   spent performing other tasks when you're on call?

16     A    Yes.

15:54  17     Q    He did give you that instruction?

18     A    Yes.  When I asked him about it, that was as

19   he instructed.

15:55  20     Q    How many hours did you actually spend working

21   during your on-call time?

22                    MR. LINGLE:  Object to the form.

23     A    I don't remember.  It varied.

15:55  24     Q    (By Ms. Morgan)  Was there a range of hours

25   that it varied?

e72e4767-1aa0-4706-9316-f389fe45cd48

NETWORK DEPOSITION SERVICES
Transcript of Beverly McDonald

Page 219

1               IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2

DEBORAH PRISE and HEATHER    )
3 RADY on behalf of themselves)
and all employees similarly )
4 situated                     )
                              )
5                              )
versus                       ) CIVIL ACTION NO. 06-1641
6                              )
                              )
7 ALDERWOODS GROUP, INC.      )

8

9      *************************************************

10       REPORTER'S CERTIFICATION/FILING CERTIFICATE
          ORAL DEPOSITION OF BEVERLY MCDONALD
11             TAKEN ON NOVEMBER 24, 2008

12     *************************************************

13

14        I, VANESSA S. ROBERTSON, Certified Shorthand

15   Reporter in and for the State of Texas, hereby certify

16   pursuant to the Pennsylvania Federal Rules of Civil

17   Procedure present to the following:

18        That this deposition transcript is a true record

19   of the testimony given by BEVERLY MCDONALD, the

20   witness named herein, on NOVEMBER 24, 2008 after said

21   witness was duly sworn/affirmed by me.

22        That the deposition transcript was submitted on

23   the _____ day of _____2008 to

24   MR. CHARLES H. SAUL, for examination, signature and

25   return to me by _____, 200_.

Johnstown              Toll-Free              Pittsburgh
814-266-2042         866-565-1929          412-281-7908

e72e4767-1aa0-4706-9316-f389fe45cd48

NETWORK DEPOSITION SERVICES
Transcript of Beverly McDonald

Page 220

1        That the deposition transcript _____ was

2    returned to U.S. Legal Support on _____, 200_

3    was properly executed by the witness to the deposition

4    officer, and the attached change/correct sheet

5    contains any changes, and the reasons therefore, made

6    by the witness.

7        That the deposition transcript _____ was not

8    returned to the deposition officer by the witness.

9        That the original deposition transcript, or a

10   copy thereof, together with copies of all exhibits,

11   was delivered on the _____ day of _____, 200_

12   to MS. MICHELLE AMY MORGAN for the safekeeping and use

13   at trial.

14       That the amount of time used by each party at the

15   deposition is as follows:

16       MS. MICHELLE AMY MORGAN - 5 hours, 4 minutes

17       MR. MIKE LINGLE - 10 minutes

18       That pursuant to information given to the

19   deposition officer at the time said testimony was

20   taken, the following includes counsel for all parties

21   of record:

22       MR. CHARLES H. SAUL, Attorney for Plaintiff.

23       MS. MICHELLE AMY MORGAN, Attorney for Defendant.

24       MR. MIKE LINGLE, Attorney for Plaintiff.

25       That a copy of this certification was served on

NETWORK DEPOSITION SERVICES
Transcript of Beverly McDonald

Page 221

1    all parties shown herein.

2        Certified to by me this _____ day of _____

3    A.D., 2008.

4

5

6

7

8

9

10   _____

11   VANESSA S. ROBERTSON, CSR
     TEXAS CSR 4930
     EXPIRATION DATE:  12/31/09
12   FIRM REGISTRATION NO. 343

13   U.S. LEGAL SUPPORT
     5910 NORTH CENTRAL EXPRESSWAY
14   SUITE 100
     DALLAS, TEXAS 75206
15   (214) 741-6001

16

17

18

19

20

21

22

23

24

25

e72e4767-1aa0-4706-9316-f389fe45cd48

**TAB 28**

NETWORK DEPOSITION SERVICES
Transcript of Barry Douglas Miles

Page 1

THE UNITED STATES DISTRTICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
06-1641

```
                                    )
DEBORAH PRISE AND HEATHER           )
RADY ON BEHALF OF THEMSELVES        )
AND ALL EMPLOYEES SIMILARLY         )
SITUATED,                           )
                                    )
        PLAINTIFFS,                 )
                                    )
v                                   )
                                    )
ALDERWOODS GROUP, INC.,             )
                                    )
        DEFENDANT.                  )
------------------------------------
```

DEPOSITION OF BARRY DOUGLAS MILES

(TAKEN by DEFENDANT)

CHARLOTTE, NORTH CAROLINA

APRIL 18, 2009

```
REPORTED BY:      Meredith R. Johnson
                  Court Reporter
                  Notary Public
```

5785e779-eb59-4917-9c99-bd763dd59ec4

NETWORK DEPOSITION SERVICES
Transcript of Barry Douglas Miles

Page 132

1    A    They just answered the phone.  They had
2  no other role.
3    Q    Did any of the Carruthers locations --
4  did they have an answering service, a third party
5  answering service or was it --
6    A    After hours.
7    Q    After hours?
8    A    After hours, the phone was diverted to
9  Gastonia which in turn was diverted to an
10  answering service.
11    Q    A third party?
12    A    A third party.
13    Q    When the funeral director was on-call,
14  was there anyone else that was on-call other than
15  the funeral directors at the locations?
16    A    No.
17    Q    Just funeral directors?
18    A    Just funeral directors.
19    Q    Did the location have a cell phone or a
20  pager that was passed around for whoever was
21  on-call?
22    A    We had a pager, that was before we used
23  cell phones at that point.
24    Q    They weren't the size of a gigantic
25  suitcase, the cell phones at that point.

5785e779-eb59-4917-9c99-bd763dd59ec4

NETWORK DEPOSITION SERVICES
Transcript of Barry Douglas Miles

Page 185

1    added to 3.75, correct?
2           A    That's right.
3           Q    And would you flip to the very next page
4    and tell me what that document is.
5           A    It's the after-hours call log.
6           Q    And tell me what that is.
7           A    If you're on-call -- the policy was, you
8    got paid fifteen minutes per phone call if you
9    were on-call.  And a flat three-hour rate if you
10   went on a house removal.  Flat rate.  So that's
11   what that is.
12          Q    Okay.  Now, were you told to put your
13   actual time down here?
14          A    Yes.
15          Q    Okay.  So if you actually spent an hour
16   on a phone call, would you put an hour down?
17          A    No.  We put 15 minutes down.
18          Q    You just said you were told to put the
19   actual time you spent on the call down.
20          A    No.  The actual -- what they told us to
21   do, 15 minutes per phone call is what they told
22   us.  So that's what we did.
23          Q    They told --
24          A    Some phone calls are five minutes, some
25   are longer.

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

NETWORK DEPOSITION SERVICES
Transcript of Barry Douglas Miles

Page 203

1  and to including termination."

2       Q    So it seems from that that the

3  Alderwoods company policy that they wanted the

4  actual time recorded by the employees, isn't it

5  correct, that they worked?

6       MS. DOUGLASS:  Objection.

7       A    Yeah.

8       Q    And they took it so seriously that they

9  said you could be terminated if you falsified your

10  time records, correct?

11       A    Correct.

12       Q    And can you -- I'm sorry go back to the

13  document and the last -- it's the first sentence

14  of the last of the second paragraph under G,

15  please, on page 91.  It's ALD0006.

16       A    The first sentence?

17       Q    Yes, sir.

18       A    "A non-exempt employee is considered to

19  be on-call" --

20       Q    No, I'm sorry, next paragraph.

21       A    "When a non-exempt employee is required

22  to take phone calls, after completing their

23  regular work schedule and leaving the premises,

24  but is not required to physically return to work,

25  the employee shall log the start and end of each

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

5785e779-eb59-4917-9c99-bd763dd59ec4

NETWORK DEPOSITION SERVICES
Transcript of Barry Douglas Miles

Page 204

1    phone call" -- the employee will be made -- "The

2    employee will be paid for the time spent in phone

3    conversation."

4         Q    So it appears from this, that the

5    Alderwoods company policy clearly was not the same

6    as the policy that you understood it, correct?

7         MS. DOUGLASS:  Objection.

8         A    It appears that way, but again, we get

9    back to what we were told.

10        Q    I understand.  And I want to talk to you

11   more about that in a second.  I'm just trying to

12   establish what this policy, what the company

13   policy was, so we can figure out where the

14   deviation was.

15             And going to the last page on that,

16   please.  The last page, page ALD0008, can you read

17   the subheading B.

18        A    "Hourly non-exempt employees must

19   accurately record using time clock/time sheet all

20   hours of work including."

21        Q    And then five.

22        A    "Time performing work while on-call,

23   e.g. answering phone calls, removals."

24        Q    And then could you read C, please.

25        A    "Employees are responsible for ensuring

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

5785e779-eb59-4917-9c99-bd763dd59ec4

NETWORK DEPOSITION SERVICES
Transcript of Barry Douglas Miles

Page 214

1          A     And I didn't know any different.

2          Q     Did you know whether or not this -- the

3    minimum policy as you understood it, applied to

4    anyone outside of the Carruthers Funeral Home

5    umbrella?

6          A     No, I don't know.

7          Q     You don't know?

8          A     No.

9          Q     Were -- did any other employees -- did

10   any other positions other than the funeral

11   director position, would they have recorded

12   time -- on-call time on the after-hours call log?

13         A     Yes.

14         Q     Okay.  What other positions would have

15   done that?

16         A     It could have been an hourly position.

17   Somebody to help us.  There was one particular

18   on-call person that was on-call with me and the

19   other guy, Leon Leonard (phonetic) who's now

20   deceased.  But he would go on removals with us.

21   I'd call him at home, we'd meet, get the car and

22   go back, do the removal.  And he'd fill out a time

23   sheet.

24         Q     Did you ever see how anyone in -- other

25   than the funeral director position -- filled out

NETWORK DEPOSITION SERVICES
Transcript of Barry Douglas Miles

Page 229

1    Q    When do you think that he conveyed that

2  message to you?

3    A    It was soon after SCI took over.

4    Q    Okay.  Do you think that -- now, was the

5  policy called the minimum policy or are we just

6  using that language here today?

7    A    I think we're just using that language

8  here today.

9    Q    Do you ever recall being told that if

10  you get a phone call you should put down a

11  15-minute minimum?  Do you remember --

12    A    Yeah, you got 15 minutes for phone

13  calls.

14    Q    Well, specifically a 15-minute minimum?

15    A    I remember, the way it was conveyed, if

16  you got a phone call, you record 15 minutes for

17  that phone call.

18    Q    Okay.  You never heard if it takes --

19  you never heard that if -- they want you to record

20  your actual time so that if it goes beyond 15

21  minutes you should put your actual time down?

22    MS. DOUGLASS:  Objection.

23    A    I don't think so.

24    Q    How many -- other than the funeral

25  director position, what positions would be

5785e779-eb59-4917-9c99-bd763dd59ec4

NETWORK DEPOSITION SERVICES
Transcript of Barry Douglas Miles

Page 230

1    receiving phone calls like that?

2         A    Just us.

3         Q    Just funeral directors?

4         A    Mm-hmm.

5         Q    Other than the funeral director

6    position, what positions would be called out on

7    removals?

8         A    It would be a part-time person.

9         Q    Part-time?

10        A    Yeah.

11        Q    So a part-time person who would -- they

12   wouldn't be worried about overtime anyway

13   because --

14        A    No, no.

15        Q    They would be concerned about the hours

16   they were paid, but they wouldn't be worried about

17   overtime.

18        A    No.

19        Q    How many part-time people do you think

20   there are at any given time in the Carruthers

21   group?

22        A    No more than one or two.

23        Q    Okay.

24        MS. DOUGLASS:  Objection.  I'm also curious

25   as to what the timeframe is that we're talking

5785e779-eb59-4917-9c99-bd763dd59ec4

NETWORK DEPOSITION SERVICES
Transcript of Barry Douglas Miles

Page 242

1    Q    Two years.  So anywhere from five to six
2  times a year or five to eight times a year you'd
3  go for two years?
4    A    (Nods head up and down)
5    Q    And these were hour long meetings?
6    A    Hour, hour and a half.
7    Q    Do you know if other positions other
8  than funeral director were encouraged to join
9  community service organizations?
10    A    Not that I'm aware of.  I mean it was
11  only on his mind to be community orientated.
12    Q    And why is that?
13    A    Nature of the business.
14    Q    Because you get commissions?
15    A    No, it has nothing to do with
16  commissions.
17    Q    But you --
18    A    They wanted you there to shake hands and
19  influence people.  It had nothing to do with
20  commission, nothing like that.
21    Q    Other than Mr. Pearce discussing this
22  with you, did you see any memos or documents or
23  policies about community service?
24    A    There was a whole group of stuff about
25  community involvement that came from Alderwoods.

5785e779-eb59-4917-9c99-bd763dd59ec4

NETWORK DEPOSITION SERVICES
Transcript of Barry Douglas Miles

Page 243

1    Different binders, I mean it's a whole big

2    conglomerate of stuff and that's what brought on

3    being a member of a civic club.

4         Q    How many -- it sounded -- and correct me

5    if I'm wrong -- it sounded to me that you said

6    that there were a couple of years based on the

7    timeframe where you were encouraged to do that,

8    but didn't.  And then in '05 or '06 --

9         A    I don't think it was a couple of years,

10   I think it was a couple of months.

11        MS. DOUGLASS:  Let him finish his question.

12        Q    I'm just trying to figure out if there

13   was -- were you ever threatened with termination

14   if you didn't join?

15        A    Not in so many words, no.

16        Q    Did -- were you ever -- let me just

17   clarify it, were you ever told that you would be

18   fired if you didn't join?

19        A    No, I did not.

20        Q    Were you ever told that your salary,

21   your pay, would suffer if you didn't join?

22        A    No.

23        Q    Were you ever told that you would be

24   disciplined if you didn't join?

25        A    It was leading in that direction.

5785e779-eb59-4917-9c99-bd763dd59ec4

NETWORK DEPOSITION SERVICES
Transcript of Barry Douglas Miles

Page 244

1    Q    I'm asking you specifically the

2    question.

3    A    I felt that way.  My feelings were that

4    way.

5    Q    I'm trying to pin down exactly so I can

6    understand.  Were you ever told specifically that

7    if you did not join a community service group that

8    you would be disciplined?  Were you ever told that

9    specifically?

10   A    Not in so many words.

11   Q    So no, you were never told that

12   specifically?

13   A    Not in many so many words.

14   Q    And I need you to answer my question of

15   specifically.  And I understand what you're

16   saying, just for the record, I need it to be

17   clear.  And I understand what you're saying and

18   it's in there, it's clear.  I'm trying to

19   understand, were you told specifically that if you

20   did not --

21   A    No..

22   Q    -- join a community service group, you

23   will be disciplined?

24   A    No.

25   Q    Okay.  Are there any funeral directors

5785e779-eb59-4917-9c99-bd763dd59ec4

NETWORK DEPOSITION SERVICES
Transcript of Barry Douglas Miles

Page 246

1  meeting the people.

2       Q    Okay.  Can you tell me whether or not

3  there were any funeral directors that did not join

4  some kind of a community group?

5       A    No.

6       Q    Okay.  So you just don't know whether

7  they did or not?

8       A    No, I don't.

9       Q    Are you aware of any funeral director

10  that was disciplined because they did not join a

11  group?

12       A    No.

13       Q    Are you aware of any funeral director or

14  anyone that was disciplined or that was terminated

15  because they did not join a group?

16       A    No.

17       Q    Are you aware of anyone whose pay was

18  affected in any way because they did not join a

19  group?

20       A    No.

21       Q    How familiar are you with -- you said

22  there was all this stuff that came out along with

23  it, what can you tell me about that stuff?

24       MS. DOUGLASS:  Objection.

25       A    There were CDs, there were pamphlets, I

5785e779-eb59-4917-9c99-bd763dd59ec4

NETWORK DEPOSITION SERVICES
Transcript of Barry Douglas Miles

Page 249

1    bit more about community service.  Have you ever
2    heard of IBIS, do you know what that is?
3          A    No.
4          Q    Have you ever heard of the I Believe In
5    Service program?
6          A    Yes, not the acronym.
7          Q    Okay.  What was that?
8          A    That was a program established by
9    Alderwoods.  That's about all I can tell you about
10   it.  I don't know.
11         Q    Do you know what the program was, just
12   generally?
13         A    I don't remember.
14         Q    Okay.  Do you know what the community
15   leadership program was?
16         A    Don't remember.
17         Q    Okay.  With regard to your community
18   service, did you ever -- when you went to these --
19   how do you spell optimist by the way, the
20   Optimists Club?
21         A    Yeah, I can't tell you.
22         Q    Okay.  I just, I apologize for this
23   question, I'm just trying to understand you.  You
24   say you've been going to these meetings there
25   for -- you went there years ago and you've been

5785e779-eb59-4917-9c99-bd763dd59ec4

NETWORK DEPOSITION SERVICES
Transcript of Barry Douglas Miles

Page 251

1    just asked if you did.

2         A    No, I did not.

3         Q    Did you ever have any families from

4    people you met at the Dallas Optimists Club come

5    into the location and use your services and said,

6    hey, it's because I know you from there?

7         A    No, they just used the funeral home.

8         Q    They just would have used it anyway?

9         A    Yeah.

10        Q    When you would go the Optimists Club,

11   did you have business cards?

12        A    Mm-hmm.

13        Q    Would you pass them out there?

14        A    They had a barrel or a little fishbowl

15   and we would drop them in every week and a prize

16   was awarded to the one that was pulled out.

17        Q    Did you ever hand them out to the

18   members there?

19        A    No, I did not.

20        Q    Did you ever bring any marketing

21   materials to try to sell people?

22        A    No.

23        Q    Did you ever talk to anyone there

24   saying, hey, you should come over to my funeral

25   home, we're the best in the land or anything like

5785e779-eb59-4917-9c99-bd763dd59ec4

NETWORK DEPOSITION SERVICES
Transcript of Barry Douglas Miles

Page 276

1    worked.
2         A    Other than them being long.
3         Q    Did she keep --
4         A    No, she did not keep any records.
5         Q    No calendars or diaries?
6         A    No, no.  Well, a calendar was days
7    on/days off.  She would look on her calendar and
8    know that I had three days off coming up or four
9    days coming up.
10        Q    But she wouldn't keep track of -- she
11   didn't clock you in and out?
12        A    No.
13        Q    My wife would like to do that to me.
14        A    Punch me in and out, not clock.
15        Q    You also stated in your interrogatory
16   responses that you believe that all employees were
17   subject to all of the alleged wrongful conduct.
18   But we've already identified today that nobody
19   else besides funeral directors at your locations
20   that you're aware of, were required as you
21   understand it to do community service, correct?
22        A    Mm-hmm..
23        Q    And we've already limited the amount,
24   the number -- we've limited who would have -- be
25   responsible for on-call work, correct?

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

5785e779-eb59-4917-9c99-bd763dd59ec4

NETWORK DEPOSITION SERVICES
Transcript of Barry Douglas Miles

1       MS. DOUGLASS:  Objection.

2       A      (Nods head up and down)

3       Q      And we've already limited who would have

4   training responsibilities and requirements for the

5   insurance licenses, correct?

6       MS. DOUGLASS:  Objection.

7       A      (No verbal response)

8       Q      And we've also already limited who would

9   have overtime requirements that we've talked

10  about, the problems that we've talked about,

11  correct?

12      MS. DOUGLASS:  Objection.

13      A      Yes.

14      Q      Okay.  So at this point in time, you can

15  say that you would agree that not all employees

16  were subject to these alleged wrongful acts,

17  correct?

18      MS. DOUGLASS:  Objection.

19      A      Yes.

20      Q      Thank you.  Almost getting close, I

21  promise.  One thing I want to clean up, when I was

22  speaking to you earlier -- and this is going to be

23  short and sweet, I promise -- I had asked you

24  about your time with Alderwoods.  I had asked some

25  general conclusory statements based on your

5785e779-eb59-4917-9c99-bd763dd59ec4

NETWORK DEPOSITION SERVICES
Transcript of Barry Douglas Miles

Page 304

1   golf tournament on this day and I would write on

2   the board, Doug to assist.

3        Q    Now, these golf tournaments, how many

4   times per year was there a golf tournament?

5        A    Twice a year and it was all day.

6        Q    So two times a year, there was an

7   all-day golf tournament --

8        A    Right.

9        Q    -- through Optimists Club?

10       A    Right.  Through Optimists Club.

11       Q    And your managers knew that you were --

12       A    Right.

13       Q    -- attending that --

14       MR. FARMER:  Objection.  Form.

15       A    Yes.

16       Q    -- because you had written that on the

17   board?

18       A    Right.  And they played in some of them,

19   too.

20       Q    Okay.  I'd like to talk a little bit

21   when the -- what we've been referring today as the

22   minimum time policy which is the 15 minutes and

23   three hours for activities that you did on-call.

24   I'd like to ask you some questions about that.  I

25   think you mentioned that it had been implemented

5785e779-eb59-4917-9c99-bd763dd59ec4

NETWORK DEPOSITION SERVICES
Transcript of Barry Douglas Miles

1    Q    Just answer my question here.  You were

2  never told not to record your community -- let me

3  ask the question again.  Let me ask this, no one

4  ever said to you do not record or submit your time

5  for continuing education or community service,

6  correct?

7    A    It never came up.

8    Q    So you were never told that?

9    A    Never told.

10    Q    You have no personal knowledge

11  whatsoever of where Ken Pearce got that policy

12  from, correct?

13    A    No, I don't, but I assume that in

14  discussion with maybe Mr. Rhinehart and Mr. Gibson

15  they came up with these time periods based on

16  experience.

17    Q    But you don't know?

18    A    I don't know.

19    Q    When you would go to do a removal and

20  you would go to the funeral home first, was there

21  ever an occasion when you would clock in when you

22  got to the funeral home?

23    A    No.

24    Q    What if you had a removal and you got

25  there at 6 o'clock in the morning, and you knew

5785e779-eb59-4917-9c99-bd763dd59ec4

NETWORK DEPOSITION SERVICES
Transcript of Barry Douglas Miles

Page 319

1              CERTIFICATE OF REPORTER
2
   STATE OF NORTH CAROLINA        )
3  COUNTY OF MECKLENBURG          )

4       I, MEREDITH R. JOHNSON, the officer before
   whom the foregoing deposition was taken, do hereby
5
   certify that the witness whose testimony appears
6
   in the foregoing deposition was duly sworn by me;
7
   that the testimony of said witness was taken by me
8
   to the best of my ability and thereafter reduced
9
   to typewriting under my direction; that I am
10
   neither counsel for, related to, nor employed by
11
   any of the parties to the action in which this
12
   deposition was taken, and further that I am not a
13
   relative or employee of any attorney or counsel
14
   employed by the parties thereto, nor financially
15
   or otherwise interested in the outcome of the
16
   action.
17
        This, the 23rd day of April, 2009.
18

19            _____

20            MEREDITH R. JOHNSON
              Notary Public in and for
21            County of Gaston
              State of North Carolina
22            Notary Number
23
24
25

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

5785e779-eb59-4917-9c99-bd763dd59ec4

**TAB 29**

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

- - -

DEBORAH PRISE and HEATHER RADY,      )
on behalf of themselves and all      )
employees similarly situated,        )
                                     )
            Plaintiffs,              )
                                     ) Civil Action
       vs.                           ) No. 06-1641
                                     )
ALDERWOODS GROUP, INC. and SERVICE   )
CORPORATION INTERNATIONAL,           )
                                     )
            Defendants.              )

- - -

Deposition of WILLIAM OPIE BERNARD ORE

Thursday, March 19, 2009

- - -

        The deposition of WILLIAM OPIE BERNARD ORE,
one of the plaintiffs herein, called as a witness
by the defendants, pursuant to notice and the
Federal Rules of Civil Procedure pertaining to the
taking of depositions, taken before me, the
undersigned, Jessica L. Tapia, a Notary Public in
and for the Commonwealth of Pennsylvania, at the
Holiday Inn, 930 East Grafton Road, Fairmont, West
Virginia 26554, commencing at 9:51 o'clock a.m.,
the day and date above set forth.

- - -

        Network Deposition Services
          Suite 1101, Gulf Tower
            707 Grant Street
       Pittsburgh, Pennsylvania  15219
            (412)281-7908

- - -

NETWORK DEPOSITION SERVICES
Transcript of William Opie Bernard Ore

Page 112

1    Christmas caroling or helping with Ron?

2        A    No, the only type of written reports

3    we did were telephone calls, and that was it.

4        Q    All right.  So you didn't record

5    anything that you did out in the community?

6        A    No.

7        Q    You were never asked to do that?

8        A    No.

9        Q    At any time when you were employed

10   there, did anyone ever tell you that you had to

11   belong to a community organization?

12       A    No.

13       Q    Now, you mentioned recording something

14   about phone calls.  Is that correct?

15       A    Right.

16       Q    What are you referring to with that

17   statement?

18       A    Like the night that I was on call, you

19   would like, say, somebody called the answering

20   service and, you know, the answering service would

21   call me at home.  They would give me the phone

22   number and I would call that person at home.

23   That's how we did our night calls.

24       Q    So you actually filled out a sheet.

25   Is that what you're saying?

006ba1cf-a1ec-4f89-a7a7-69cc6122f2be

NETWORK DEPOSITION SERVICES
Transcript of William Opie Bernard Ore

Page 113

1      A      Yes.

2      Q      What did you put on it?

3      A      Like, how many minutes your call was.
4   The first thing you put on it was who it was, the
5   deceased, the family's name, and you put down the
6   address.  Underneath that, you put how much time
7   you spent on the phone.

8      Q      Did you use this sheet, if you will --
9   did you use that at the beginning -- when you were
10  first employed, were you using the sheet to record
11  your phone calls while you were on call?

12     A      I can't say.  I don't remember.

13     Q      But at some point, you did begin
14  recording the time?

15     A      Yes.

16     Q      Now, did you understand -- why were
17  you recording?  What was your understanding of why
18  you recorded the time?  Why did you record the
19  time?

20     A      So we would get paid for it.

21     Q      So you would get paid for it?

22     A      Yes.

23     Q      So were you indeed paid for it?

24     A      Yes.

25     Q      Okay.  I am going to hand you what I

006ba1cf-a1ec-4f89-a7a7-69cc6122f2be

NETWORK DEPOSITION SERVICES
Transcript of William Opie Bernard Ore

Page 114

1    will have marked as Exhibit 8.

2           (Thereupon, Defendant's Exhibit No. 8

3        was marked for identification.)

4    BY MS. BRAUN:

5        Q    I am handing you a document that has

6    been previously produced in this litigation Bates

7    stamped 1767.  This is entitled at the top "Edo

8    Miller and Sons Call Out Time Sheet."

9           MR. EHRMAN:  Was this produced?

10          MS. BRAUN:  Yes.

11          MR. EHRMAN:  I know it's Bates

12       stamped, but I will be honest with you, I

13       didn't see any documents from Jones Day on

14       this case.  I had sent an e-mail to Brent.

15       Quite honestly, these documents -- now, I'm

16       speaking for myself when I say this.  As

17       far as I know, there were no documents

18       produced.

19          MS. BRAUN:  Well, we can certainly

20       clarify that by speaking to Brent.

21          MR. EHRMAN:  I just want you to know

22       that we made the request.  There were no

23       documents produced before this deposition

24       concerning William Ore.  Go ahead.

25          MS. BRAUN:  Okay.

006ba1cf-a1ec-4f89-a7a7-69cc6122f2be

NETWORK DEPOSITION SERVICES
Transcript of William Opie Bernard Ore

Page 115

1    BY MS. BRAUN:

2         Q    My question to you is, we were just

3    talking about sheets that you used to record call

4    time.  Correct?

5         A    Yes.

6         Q    Is this an example of that, an example

7    of a sheet you would have used?

8         A    The call out sheets, yes, most

9    definitely.

10        Q    And on this sheet, if you look down

11   almost to the bottom, it allows for you to state

12   the total amount that you're claiming for the

13   call.  Is that correct?

14        A    Right.

15        Q    On here, on this particular occasion,

16   you were claiming an hour?

17        A    Right.

18        Q    And is this your signature here?

19        A    But you know, this isn't -- yes, this

20   is it.  This is also -- I think this was an actual

21   embalming, if you want to know the truth.  I don't

22   think this was a phone call.  It doesn't matter.

23   It's all the same that you're talking about.  Yes.

24        Q    Let me ask you this.  You think this

25   may have been an embalming?

006ba1cf-a1ec-4f89-a7a7-69cc6122f2be

NETWORK DEPOSITION SERVICES
Transcript of William Opie Bernard Ore

Page 116

1    A    It is either that -- because if I
2 remember now, at some point, what you were asking
3 a minute ago, I think we finally got those to
4 where like, say, I came in and picked a body up
5 real quick, I could write down his name -- that is
6 not right.  I am not sure we did get those.  For
7 time on phone only, I guess that's what it is.
8    Q    So here we see that you have recorded
9 an hour of time?
10   A    Right.
11   Q    You agree with that?
12   A    Yes.
13   Q    And this may be -- you believe this is
14 a document you would have used to record phone
15 time; correct?
16   A    Right.
17   Q    If I could follow-up on what you just
18 said.  You also believe that you may have used
19 this sheet or a sheet that was similar to this to
20 record other time?
21   A    Right.
22   Q    For like an embalming, you used that
23 example.  Is that correct?
24   A    Yes.
25   Q    And would you use a sheet similar to

006ba1cf-a1ec-4f89-a7a7-69cc6122f2be

NETWORK DEPOSITION SERVICES
Transcript of William Opie Bernard Ore

Page 117

1   this sheet or a similar sheet to record time for

2   something, other than phone calls and embalming?

3       A       Well, you know, pick-ups.

4       Q       And what, in your understanding, was

5   that you were recording the time so that -- for

6   what?

7               MR. EHRMAN:  What do you mean, by

8        pick-ups?

9       Q       That he was recording the time for,

10  for example, you said you used a sheet, maybe this

11  sheet, a similar sheet, for recording times for

12  embalming; correct?

13      A       Right, and picking up deceased.  Is

14  that what you mean?

15      Q       And picking up deceased.  And you were

16  recording that time for what purpose?  For the

17  same purpose as recording the time for the phone

18  calls?

19      A       Yeah.

20      Q       So that you could be compensated?

21      A       Right.

22      Q       And then my question is, do you

23  believe that you were compensated when you

24  actually turned in a sheet like this?

25      A       Yes.

006ba1cf-a1ec-4f89-a7a7-69cc6122f2be

NETWORK DEPOSITION SERVICES
Transcript of William Opie Bernard Ore

Page 118

1    Q    And do you recall when you started
2  filling out sheets, either this sheet or a similar
3  sheet, for the pick-ups for the deceased or the
4  embalming?
5    A    No, ma'am.  I couldn't tell you
6  exactly when we started.
7    Q    But from the time you started using
8  the sheets until the end of your employment, you
9  consistently filled out these sheets?
10   A    Yes.  I remember what this was now.
11 This wasn't an embalming.  This is when I had to
12 type an obit and send it through to the paper.
13   Q    You had to write up -- you typed up an
14 obituary?
15   A    Yes, and I had to send it through the
16 phone.
17   Q    So you asked to be paid for your time,
18 and believe you were paid for that time?
19   A    Right.
20   Q    If we could stick with that exhibit
21 for a moment.  Where it says "time called out,"
22 the third line there, and then the next line says
23 "time leaving funeral home," in fact, this sheet
24 does allow for time other than recording phone
25 calls.  Correct?

006ba1cf-a1ec-4f89-a7a7-69cc6122f2be

NETWORK DEPOSITION SERVICES
Transcript of William Opie Bernard Ore

Page 119

1    A    Well, the time called out would be
2  2:30.  The time leaving the funeral home, you
3  would put 3:00.  You know, obviously, you can't
4  fill this paper out if you're sitting at your
5  house.  That's why it's written like that.  By the
6  time you leave the funeral home -- say, you make a
7  death call and you put the body back there and you
8  leave the funeral home to go home, you can't --
9  you see what I'm saying.  You got to write down
10  what time you are leaving the funeral home.  There
11  is no way to drive back and say I got home at
12  3:40.
13    Q    Let me ask you this question.  When
14  you -- this says 2:30 to 3:30 on here.  Are we
15  talking in the night, like 2:30 a.m. to
16  3:30 a.m.?
17    A    Right.
18    Q    When you -- are you saying that you
19  would go to the funeral home when you got a call
20  like this in the night?
21    A    To use the computer, yes, you had to.
22  There was no way to do this at home.
23    MR. EHRMAN:  When you say "this,"
24    Exhibit 8; correct?  You're looking at
25    Exhibit 8?

006ba1cf-a1ec-4f89-a7a7-69cc6122f2be

NETWORK DEPOSITION SERVICES
Transcript of William Opie Bernard Ore

Page 120

1        THE WITNESS:  Yes.

2        MR. EHRMAN:  For the record.

3  BY MS. BRAUN:

4     Q     So are you saying that during this

5  2:30 a.m. to 3:30 a.m. period, you would go to the

6  funeral home?

7     A     Right.

8     Q     Tell me exactly why you would have to

9  go to the funeral home?  Because you're embalming

10 the body?

11    A     Because this is writing an obit right

12 here.

13    Q     Explain that to me.

14    A     I would have went up to the office to

15 probably Mary or Flo's office and got on the

16 computer.  And they have like a --

17       MR. EHRMAN:  Why would you go in at

18    2:00?  Let's start at the beginning.

19    A     Because that has to be in the paper by

20 6:00.  They have to be in in the morning.  It

21 doesn't really have to be, but the family likes it

22 to be.

23       Anyway, you go in there.  There is a

24 format on the computer that they use that you type

25 everything in.  After that, then you have to take

006ba1cf-a1ec-4f89-a7a7-69cc6122f2be

NETWORK DEPOSITION SERVICES
Transcript of William Opie Bernard Ore

Page 121

1    it off.  A lot of the people down there didn't

2    have e-mail.  You had to fax them over.

3        Q    The obituary?

4        A    Right.  They would proof it and fax

5    you everything back saying it's okay.

6        Q    Okay.  So this time reflects the time

7    that you spent on the obituary?

8        A    Right, writing the obituary and all of

9    that.

10       Q    Were there also occasions when you

11   might record time in some other manner, than on

12   these call out sheets?

13            MR. EHRMAN:  Do you mean time call

14       time?  We have talked a different --

15            MS. BRAUN:  Let me clarify.

16       Q    We're talking about, this is on call

17   time for these time sheets that we're talking

18   about currently.  Correct?

19       A    Right.

20       Q    Like Defendant's Exhibit 8?

21       A    Yes.

22       Q    Could you also record time using

23   another vehicle, for example, writing it on your

24   time card?

25       A    Flip them over on the back and write

006ba1cf-a1ec-4f89-a7a7-69cc6122f2be

NETWORK DEPOSITION SERVICES
Transcript of William Opie Bernard Ore

Page 206

1      A      No, ma'am.

2      Q      My intent isn't to have asked you this

3    twice, but I need to ask you, did you keep any

4    personal record of your involvement in setting up

5    the tables, you know, at the church or your

6    involvement with the sunrise services?

7      A      No, ma'am.

8      Q      Now, you also testified that you had

9    seen a written on call policy.  Is that correct?

10     A      Procedure.

11     Q      And you thought you saw that in the

12   binders?

13     A      Yes, binders.

14     Q      Now, was it your understanding that

15   the binders contained -- let me ask you this

16   question.  What was your understanding of to whom

17   the binder policies/procedures applied to?  Who

18   did those apply to?

19     A      I mean, they applied to everybody.  Is

20   that what you're asking, or who they came from?

21     Q      I'm asking who they applied to.

22     A      I believe they applied to everybody.

23     Q      When you say everybody, who do you

24   mean?

25     A      Full-time, part-time staff also,

006ba1cf-a1ec-4f89-a7a7-69cc6122f2be

NETWORK DEPOSITION SERVICES
Transcript of William Opie Bernard Ore

Page 207

1    whatever your job, you know what I mean.

2         Q     So you are talking about employees at

3    Edo Miller?

4         A     Right.

5         Q     Do you know if those policies applied

6    to employees outside your location, the policies

7    in the binders that we're talking about?  Do you

8    know if they applied to employees at other

9    locations?

10        A     You want to know if they had binders

11   in other funeral homes?

12        Q     Yes.  Do you know if they did?

13        A     I couldn't say and be accurate, no.

14        Q     In the on call policy that you believe

15   you saw in the binders, we have talked previously

16   about three separate circumstances under which you

17   recorded, whether it be a name of a person or

18   hours?

19             MR. EHRMAN:  Recorded time?

20             MS. BRAUN:  Recorded --

21        Q     I'm specifically not saying time

22   because sometimes you said you just recorded the

23   name of a deceased; correct?

24        A     Right.

25        Q     There were three different methods

006ba1cf-a1ec-4f89-a7a7-69cc6122f2be

NETWORK DEPOSITION SERVICES
Transcript of William Opie Bernard Ore

Page 208

1    that you had to make some record of what you did
2    on call?
3        A      Right.
4        Q      Did this on call policy that you
5    believe you saw address, specifically address, you
6    know, how to use, for example, how to use the time
7    card and write down the name of the deceased?  Did
8    that say that in that policy?
9        A      I don't remember about that.
10       Q      Do you -- I'm not trying to ask you
11   twice.  I don't think -- are we clear on what you
12   believe the policy to say.  What is your
13   recollection of what that policy said?
14       A      The on call policy?
15       Q      Yes.
16       A      I mean, I don't remember most of it.
17   The only thing I remember in it is like the no
18   drinking.  Most of it was common sense stuff.  You
19   know, it told you how you were supposed to act and
20   carry yourself as an employee of Alderwoods.
21       Q      I think that's all I have.
22              MR. EHRMAN:  We are going to start on
23          the redirect.  I spoke to Tonya and I
24          advised her Christina, that you're going to
25          ask a majority of the questions.

006ba1cf-a1ec-4f89-a7a7-69cc6122f2be

NETWORK DEPOSITION SERVICES
Transcript of William Opie Bernard Ore

Page 247

```
1                    CERTIFICATE
2  COMMONWEALTH OF PENNSYLVANIA, )
                                 )  SS:
3  COUNTY OF ALLEGHENY.          )
4       I, Jessica L. Tapia, do hereby certify that
   before me, a Notary Public in and for the
5  Commonwealth aforesaid, personally appeared
   WILLIAM OPIE BERNARD ORE, who then was by me first
6  duly cautioned and sworn to testify the truth, the
   whole truth, and nothing but the truth in the
7  taking of his oral deposition in the cause
   aforesaid; that the testimony then given by him as
8  above set forth was by me reduced to stenotypy in
   the presence of said witness, and afterwards
9  transcribed by means of computer-aided
   transcription.
10
        I do further certify that this deposition
11 was taken at the time and place in the foregoing
   caption specified, and was completed SINE DIE.
12
        I do further certify that I am not a
13 relative, counsel or attorney of either party, or
   otherwise interested in the event of this action.
14
     IN WITNESS WHEREOF, I have hereunto set my
15 hand and affixed my seal of office at Pittsburgh,
   Pennsylvania, on this _____ day of _____,
16 2009.
17
18
19

   _____
20        Jessica L. Tapia, Notary Public
          In and for the Commonwealth of
21        Pennsylvania
          My commission expires August 19, 2010.
22
                    - - -
23
24
25
```

Johnstown                  Toll-Free                 Pittsburgh
814-266-2042            866-565-1929              412-281-7908

**TAB 30**

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA


DEBORAH PRISE and        )
HEATHER RADY on behalf   )
of themselves and all    )
employees similarly      )
situated,                )
                         )
          Plaintiffs,    )
                         ) CIVIL ACTION
vs.                      ) NO. 06-1641
                         )
ALDERWOODS GROUP, INC.,  )
                         ) Judge Joy Flowers Conti
          Defendant.     )
                         )


     VOLUME I, PAGES 1 THROUGH 210, INCLUSIVE


DEPOSITION OF:  JOHN J. PETERS

          DATE:  JANUARY 15, 2009

          TIME:  10:09 A.M.

     TAKEN BY:  DEFENDANTS

     LOCATION:  NETWORK DEPOSITION SERVICES
                SUITE 2, 2000 LINGLESTOWN ROAD
                HARRISBURG, PENNSYLVANIA



Reported By:
SUSAN O'HARA MOORE, CSR, RMR, CLVS

In Association with:
NETWORK DEPOSITION SERVICES
Suite 1100 Gulf Tower
707 Grant Street
Pittsburgh, PA 15219
412.281.7908

NETWORK DEPOSITION SERVICES
Transcript of John Peters

Page 107

1     to work the overtime?

2          A     Yes, um-hum.

3          Q     Did anyone ever tell you that if you

4     failed to follow the policy of getting your

5     overtime approved, then you won't be paid for the

6     overtime that you actually work?

7          A     I was never really told that.

8          Q     Do you have any knowledge or information

9     about the procedure that was followed at

10    locations outside of your market for getting

11    overtime approved?

12         A     I really don't know what transpired

13    outside the market.

14         Q     Okay.  Before, when we were talking about

15    your schedule, you explained that you were

16    typically scheduled to be on call two nights a

17    week.  Is that right?

18         A     That's correct.

19         Q     And that meant that you were on call from

20    5:00 p.m. to 8:00 a.m.  Correct?

21         A     Correct.

22         Q     What exactly did it mean to be on call?

23         A     To take death calls.  5:00 they turn the

24    phones over to the answering service.  A death

25    call would come in to the answering service.  The

91b3fc88-1028-4ea8-9920-87cd8c73d901

NETWORK DEPOSITION SERVICES
Transcript of John Peters

1   answering service would call me immediately.

2          When speaking with the answering service,
3   they would basically give me the name of the
4   deceased, next of kin, phone number, place of
5   death.  And then I would call the family just to
6   let them know that, you know, that we received --
7   it was a courtesy call, really, to reassure the
8   family that we've been notified and we'll take
9   care of everything for them and to get verbal
10  permission about embalming.

11     Q     Was there anything other than receiving
12  calls from the answering service and making the
13  courtesy call to the family that you were
14  required to do while you were on call?

15     A     There were -- you know, you just didn't
16  get phone calls because somebody died.  It was --
17  maybe we had three other calls on and maybe a
18  member of one of those three families called to
19  question and couldn't wait until the morning and
20  they would call the funeral home, which I had no
21  problem with.

22          I called them back immediately and tried
23  to answer their question and reassure them and
24  make sure everything was okay.  I just wanted to
25  keep them at ease.

NETWORK DEPOSITION SERVICES
Transcript of John Peters

Page 109

1    Q    And did all of the calls that came to you
2    while you were on call come through the answering
3    service?
4    A    Correct, after 5:00.
5    Q    Were you required to perform any other
6    work while on call besides calling families and
7    answering questions?
8    A    Well, if the family did give us verbal
9    permission to do embalming, of course I would
10   make arrangements to have the body removed to our
11   funeral home, either Harrisburg or Camp Hill.
12   And once I received the human remains, then I
13   would start the embalming process.
14   Q    So to make the arrangements to have the
15   body removed, what did you actually have to do?
16   A    I called the gentleman that made removals
17   for the funeral home, and he would bring the
18   deceased to funeral home.
19   Q    And when the deceased arrived at the
20   funeral home, did you do the embalming
21   immediately then?
22   A    Yes, I did.
23   Q    Did you always do it right away, or was
24   that sometimes --
25   A    I always did it right away.

NETWORK DEPOSITION SERVICES
Transcript of John Peters

Page 110

1     Q     So were there some nights that you were
2  scheduled to be on call when no calls came in?
3     A     Oh, yes.  But there'd be other calls.
4  Not necessarily death calls, but there were other
5  calls that would come into the funeral home.
6     Q     Were there some nights when you were
7  scheduled to be on call when no calls at all
8  would come into the funeral home?
9     A     Oh, yes.  Very seldom, but it did happen
10 when no calls would come in.
11    Q     So occasionally when you were scheduled
12 to work on call for the night, you might not
13 actually have to perform any work?
14    A     Well, if nobody died, of course.
15    Q     And -- but then other times you would get
16 calls and would have to do work while you were
17 scheduled --
18    A     Most times.
19    Q     -- to be on call?
20    A     Um-hum.
21    Q     When you did have to perform work while
22 on call, did you keep track of the time that you
23 spent actually working?
24    A     Oh, yes, because I had to put that on my
25 time sheet.

91b3fc88-1028-4ea8-9920-87cd8c73d901

NETWORK DEPOSITION SERVICES
Transcript of John Peters

Page 114

1    you were scheduled to be on call from 5:00 p.m.

2    until 8:00 a.m.  Is that right?

3         A    Correct.

4         Q    And during the time that you were

5    scheduled to be on call, were there any

6    restrictions placed on where you could go or what

7    you could do during the hours that you were to be

8    on call?

9         A    When you were on call, you were to be --

10   how can I phrase it?  You can go out because we

11   had pagers.

12        Q    So you had to be available?

13        A    You had to be available.  You had to have

14   your pager.  And they would page you immediately

15   if they couldn't get you by phone, yeah.

16        Q    And when you were scheduled to be on

17   call, you didn't report on your time sheet 5:00

18   p.m. to 8:00 a.m.  Is that right?

19        A    I put down -- when it finally came to my

20   knowledge --

21             MR. EHRMAN:  Listen to her question.

22             THE WITNESS:  Repeat the question.

23   BY MS. DUGAN:

24        Q    When you were scheduled to work on

25   call -- let's say it's Tuesday night and you're

91b3fc88-1028-4ea8-9920-87cd8c73d901

NETWORK DEPOSITION SERVICES
Transcript of John Peters

Page 115

1   scheduled to be on call on Tuesday.  Would your

2   time sheet show on Tuesday an entry for 5:00 p.m.

3   to 8:00 a.m.?

4        A     No.  I put down the hours I actually

5   worked.

6        Q     Okay.  So you would keep track of time

7   that you actually spent answering a call or doing

8   an embalming, actually responding to a call that

9   came in?

10       A     Um-hum, yes.

11       Q     But you would not report the full period

12   of hours --

13       A     No.

14       Q     -- that you were required to be

15   available.  Is that right?

16       A     No, no, I did not.

17       Q     Okay.  And did you always, throughout

18   your entire employment with Alderwoods, keep

19   track of the time that you actually spent engaged

20   in work while on call?

21       A     Yes, I always kept -- when I was on call

22   and I had to work, I put it down.

23       Q     You put it down on your time sheet?

24       A     On the time sheet.

25       Q     Okay.  Now, the hours that you put down

91b3fc88-1028-4ea8-9920-87cd8c73d901

NETWORK DEPOSITION SERVICES
Transcript of John Peters

Page 140

1    continue your involvement in those particular

2    activities after you moved and started working

3    for Alderwoods?

4         A     No.

5         Q     Once you moved and started working for

6    Alderwoods -- which was around 2001.  Is that

7    right?

8         A     October 1, 2001, yeah.

9         Q     At that time, you -- did you join any

10   other groups besides the Good Shepherd Catholic

11   Church and the Elks Club?

12        A     Within the funeral home -- the funeral

13   home sponsored a bus trip to Indiantown Gap

14   National Cemetery, and they made the arrangements

15   but I would go on the bus trip.

16              We would take, like, widows and widowers

17   on this trip and visit their loved ones,

18   husbands/wives that are buried there.  We would

19   have different locations where we stopped, and

20   the people could get off and just pay respect to

21   their loved one's grave, place a flower,

22   whatever.  They would do this around Memorial

23   Day, Veterans Day.

24              And then also within the funeral home I

25   gave -- I think it was one or two speeches I gave

91b3fc88-1028-4ea8-9920-87cd8c73d901

NETWORK DEPOSITION SERVICES
Transcript of John Peters

Page 141

1    at a high school in the area that had career day.
2    And I would address the senior classes and talk
3    to them about if they would be interested in
4    funeral service.  And I would tell them how to
5    get started and what's required of you if you
6    want to get licensed in Pennsylvania.
7         I believe I did that twice.  And Bob
8    Pramik asked me to do that, and I did that.  That
9    was a very interesting day.
10        Q    Can you think of anything else that you
11   did in the community when you started working at
12   Alderwoods?
13        A    I don't recall.  I think that was -- that
14   was about it, yeah.
15        Q    And I think you distinguished the last
16   two things you mentioned, the high school career
17   day and the bus trip, from the others as things
18   that you did through the funeral home?
19        A    They made arrangements.  When I say
20   "arrangements," they would get a bus, charter a
21   bus for the day.  They put the ads in the Good
22   Shepherd Church bulletin about the Neill Funeral
23   Home of Camp Hill was sponsoring the bus trip to
24   Indiantown Gap.
25        As far as the high school, I really don't

91b3fc88-1028-4ea8-9920-87cd8c73d901

NETWORK DEPOSITION SERVICES
Transcript of John Peters

Page 144

1      A      Can I guess?

2      Q      If you don't know --

3      A      It was -- I believe it was 2004.  No.

4  I'm sorry.  2003, 2004.

5      Q      Okay.

6      A      Yeah.

7      Q      But you don't know for sure?

8      A      I don't know for sure.  I'm just taking

9  an educated guess there.

10     Q      Did the bus trips happen during the day?

11     A      Yes.

12     Q      And were they during your scheduled work

13  time?

14     A      Yes.

15     Q      Did you report the time that you went on

16  these bus trips on your time sheets?

17     A      Yes.

18     Q      And, to your knowledge, did Alderwoods

19  compensate you for the time that you spent on

20  these bus trips?

21     A      The first year I went on it, they did.

22  The second year they didn't, for some reason.

23  Because I remember asking my wife, "I mean,

24  that's strange.  They paid me last year.  Why

25  didn't they pay me this year?"

91b3fc88-1028-4ea8-9920-87cd8c73d901

NETWORK DEPOSITION SERVICES
Transcript of John Peters

Page 145

1    Q    So you recall at least one time being
2  paid for going on the trip?
3    A    Yes.  I was paid the first time.
4    Q    And then a time after that you were not
5  paid?
6    A    Correct.
7    Q    Do you know why you were not paid the
8  second time?
9    A    I have no idea.
10       MR. EHRMAN:  Just so the record is clear
11  and I'm clear, he said three or four times.
12       Did you say three or four times, John,
13  that you went on those trips?
14       THE WITNESS:  Three or four, yeah.
15       MR. EHRMAN:  We covered two.  What about
16  the third and fourth?
17       THE WITNESS:  It was twice a year.  So
18  2003, two trips; 2004, two trips.
19       MR. EHRMAN:  You said you did get paid
20  for the first.  You didn't get paid for the
21  second.  Did you get paid for the third?
22  BY MS. DUGAN:
23    Q    Or was the testimony you were paid for
24  the first year and you were not paid for the
25  second year?

91b3fc88-1028-4ea8-9920-87cd8c73d901

NETWORK DEPOSITION SERVICES
Transcript of John Peters

Page 146

1   A    Yeah, I should have rephrased that.
2   There were two years.  There was 2003, 2004.  Two
3   trips in 2003; two trips in 2004.  2003, I was
4   paid.  Okay.  2004, the two trips, I was not
5   paid.
6        Q    And also, just to be clear, before you
7   said you weren't positive if it was in 2003 and
8   in 2004 that you went on the trips.
9        A    I'm not sure of the years, but I do know
10  I was paid the one year and I was not paid the
11  second.
12       Q    Okay.  With respect to the high school
13  career day that you attended, you believe you
14  attended the career day two different times.  Is
15  that right?
16       A    It was two years in a row.
17       Q    And was it just one visit each of those
18  two years?
19       A    Correct.
20       Q    And you don't remember specifically which
21  two years?
22       A    No, I do not.
23       Q    And I'm assuming you went during the
24  school day to talk to the students.  Is that
25  correct?

91b3fc88-1028-4ea8-9920-87cd8c73d901

NETWORK DEPOSITION SERVICES
Transcript of John Peters

Page 147

1     A     Correct.

2     Q     Do you recall whether those days were --

3     strike that.

4          Did you recall whether you visited the

5     school during your regularly scheduled workday?

6     A     It was during the workday.

7     Q     Do you recall how much time you spent at

8     the school?

9     A     I don't recall.

10    Q     Do you recall whether you reported the

11    time that you spent at the school on your time

12    sheet?

13    A     To be very honest, I did put it on my

14    time sheet, but I don't recall if I was paid or

15    not.  I don't recall that.

16    Q     You put it on your time sheet both times

17    you went?

18    A     Yes, yes.

19    Q     And you don't recall either time if you

20    were paid?

21    A     I don't recall.

22    Q     Okay.  Going back to the Elks Club, which

23    you mentioned you joined, when did you decide to

24    join that organization?

25    A     Bob Pramik and I were talking because he

91b3fc88-1028-4ea8-9920-87cd8c73d901

NETWORK DEPOSITION SERVICES
Transcript of John Peters

Page 153

1    Hill Elks Club?

2         A    No.

3         Q    When did you end your membership with the

4    Elks Club?

5         A    Right after my injury.

6         Q    And why did you leave the Elks Club at

7    that time?

8         A    I was -- just came out of surgery, back

9    operation, and I just didn't feel good.  You

10   know, getting out was difficult, walking was

11   difficult.  So I just dropped the membership.

12        Q    Would you say you ended the membership

13   because you personally found it difficult --

14        A    Yeah.

15        Q    -- to continue participating?

16        A    Yes.

17        Q    And that would have been in May of 2005?

18        A    A little after.  Maybe June of 2005, in

19   through there.

20        Q    Okay.  Did anyone from Alderwoods

21   instruct you to join the Good Shepherd Catholic

22   Church?

23        A    Not really.

24        Q    I know you mentioned that Bob Pramik

25   suggested that you join the Camp Hill Elks Club.

91b3fc88-1028-4ea8-9920-87cd8c73d901

NETWORK DEPOSITION SERVICES
Transcript of John Peters

Page 154

1    Did anyone else from Alderwoods suggest that you
2    join the Elks Club?
3         A    No.  But Ted Reese -- he more or less
4    suggested to me -- he didn't care what
5    organization I join, but he thought it would be
6    good for the funeral home to get active in the
7    community.  I'm a firm believer -- as you can see
8    in my resumé, I'm a firm believer in that.
9         Q    In what?
10        A    In joining local organizations in your
11   community.
12        Q    Because, generally, it's good for the
13   community to get involved in community
14   activities?
15        A    Yeah, because they give back to the
16   community what the community has given to them
17   over the years.
18        Q    And that's important to you personally?
19        A    Personally, yes.
20        Q    Did anyone from Alderwoods ever tell you
21   that you were specifically required to belong to
22   at least one outside community organization?
23        A    No, not really.
24        Q    Did you ever hear anyone else being told
25   that they had to belong to at least one outside

91b3fc88-1028-4ea8-9920-87cd8c73d901

NETWORK DEPOSITION SERVICES
Transcript of John Peters

Page 155

1    community organization?

2        A      I really don't know.

3        Q      Did anyone from Alderwoods ever tell you

4    that you were expected to use your membership in

5    a community organization to generate business for

6    the funeral home?

7        A      They didn't really come out and say it

8    that way, but that's basically what it's all

9    about, to get out and active in the community and

10   let the people know you're a funeral director and

11   where you're a funeral director at.

12       Q      Did anyone ever specifically tell you

13   that you were specifically to generate business

14   for the funeral home?

15       A      Ted Reese talked about that.

16       Q      What did Ted Reese say?

17       A      He said it's good to get active in Camp

18   Hill to let the people know, you know, that

19   you're with the Neill Funeral Home.

20              I totally disagree with that.  If you

21   want to join an organization, it's not because of

22   business; it's because you have an interest in

23   that organization and believe and do what they

24   stand for.  It's not because -- I don't believe

25   joining something because of business.  I mean,

91b3fc88-1028-4ea8-9920-87cd8c73d901

NETWORK DEPOSITION SERVICES
Transcript of John Peters

Page 156

1  okay, it's good if you get maybe some work out of

2  it, but that's not the reason why I would join

3  something.

4      Q      And was that personally your reason for

5  joining the groups you did?

6      A      Yeah, because, like I had mentioned

7  before, I was an Elk at one time.  And I didn't

8  join all these organizations for business.

9      Q      Did Ted Reese say anything more specific

10  about what you were expected to do to promote the

11  business --

12      A      No.

13      Q      -- in your community organizations?

14      A      No, he did not.  No.

15      Q      Did the other employees you worked with

16  belong to community organizations?

17      A      Well, my wife was asked, but she didn't

18  join any organizations.

19      Q      What was -- you're talking about Sue

20  Davis.  Is that right?

21      A      Um-hum.

22      Q      What was Sue asked?

23      A      She was asked by Ted to get active in the

24  community.  She's not a joiner.  She doesn't

25  belong in all that.  Some people are; some people

91b3fc88-1028-4ea8-9920-87cd8c73d901

NETWORK DEPOSITION SERVICES
Transcript of John Peters

Page 158

1   why we're talking about Sue, because she's not

2   involved in any of this.  I don't know why we're

3   bringing her name up.

4           MR. EHRMAN:  Which actually is a good

5   point.  I'll let you answer the question.

6           Why don't you rephrase or re-ask the

7   question.  Go ahead.

8   BY MS. DUGAN:

9       Q     Sue Peters was one of your co-workers at

10  Alderwoods.  Is that right?

11      A     Correct.

12      Q     Was she ever disciplined, to your

13  knowledge, for failing to join a community

14  organization?

15      A     No.

16      Q     Did the other employees that you worked

17  with besides Sue Davis belong to at least one

18  community organization?

19      A     I really don't know.

20      Q     Did anyone from Alderwoods ever say what

21  would happen if you didn't belong to at least one

22  community organization?

23      A     No, they never...

24      Q     Did anyone at Alderwoods ask you to

25  report on the various things that you did in your

91b3fc88-1028-4ea8-9920-87cd8c73d901

NETWORK DEPOSITION SERVICES
Transcript of John Peters

Page 159

1      community?

2              A      No.

3              Q      Do you know whether any other employees

4      were asked to report on their community

5      activities to Alderwoods?

6              A      No.

7              Q      Did you ever report any of the time that

8      you spent involved on community activities on

9      your time sheets at work?

10             A      No.

11             Q      Did anyone give you any instruction one

12     way or the other as to whether you should report

13     time spent in community activities on your time

14     sheets?

15             A      It was on your own time.

16             Q      When you were doing these various things

17     in the community, was anyone from Alderwoods

18     present?

19             A      At the Elks Club, Bob Pramik would be

20     there.

21             Q      Some of the time?

22             A      Some of the time.

23             Q      Was Bob Pramik always with you every time

24     you were doing something with the Elks Club?

25             A      No.

91b3fc88-1028-4ea8-9920-87cd8c73d901

NETWORK DEPOSITION SERVICES
Transcript of John Peters

Page 160

1    Q    And what about the other activities?  Was
2  someone from Alderwoods present when you were
3  engaged in other community activities?
4    A    No, I don't recall.
5    Q    Did Alderwoods ever offer you any sort of
6  incentive for getting involved in the community?
7    A    No.
8    Q    Have you ever heard of a program called
9  "I Believe in Service," or IBIS, I-B-I-S?
10    A    I heard it just the other day somewhere.
11  I never heard of such an organization.
12    Q    You never heard of that during your
13  employment with Alderwoods.  Is that right?
14    A    No.
15    Q    Did you personally keep any records of
16  the amount of time that you spent involved in the
17  Good Shepherd Catholic Church?
18    A    No, I never kept records.
19    Q    Did you ever keep records of the time
20  that you spent involved in the Elks Club?
21    A    No.
22    Q    So do you know, for example, how many
23  hours you spent working on fundraisers for the
24  Good Shepherd Catholic Church?
25    A    How many?  I have no idea how many hours.

91b3fc88-1028-4ea8-9920-87cd8c73d901

NETWORK DEPOSITION SERVICES
Transcript of John Peters

Page 267

1              REPORTER'S CERTIFICATE

2         I, SUSAN O'HARA MOORE, RMR, CSR, notary

3    public in and for the State of Pennsylvania, do

4    hereby certify:  That the witness named in the

5    foregoing Deposition, to wit, JOHN J. PETERS, was

6    present and duly sworn to testify the truth in

7    the within-entitled action on the day and date

8    and at the time and place therein specified;

9         That the testimony of said witness was

10   reported by me in shorthand and was thereafter

11   transcribed under my direction into computerized

12   transcription;

13        That the foregoing constitutes a full,

14   true, and correct transcript of said deposition

15   and of the proceedings which took place;

16        That the witness was given an opportunity

17   to read and, if necessary, correct said

18   deposition and to subscribe the same;

19        That I am a disinterested person to the

20   said action;

21        IN WITNESS WHEREOF, I have hereunto

22   subscribed my signature on this 11th day of

23   February, 2009.  My commission expires

24   04/11/2011.

25

**TAB 31**

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

* * *

DEBORAH PRISE AND

HEATHER P. RADY,

on behalf of themselves

and all other employees

and former employees

similarly situated,

              Plaintiffs,

        vs.                 CASE NO.  CV 06-1641

ALDERWOODS GROUP, INC.,

              Defendant.

* * *

        Deposition of SHAWN PHILLIPS, Witness
herein, called by the Plaintiffs for
cross-examination pursuant to the Rules of Civil
Procedure, taken before me, Angela S. Moore, a
Notary Public in and for the State of Ohio, at the
offices of Mike Mobley Reporting, 4555 Lake Forest
Drive, Blue Ash, Ohio, on Friday, April 16, 2010,
at 10:30 o'clock a.m.

* * *

NETWORK DEPOSITION SERVICES
Transcript of Shawn Phillips

Page 50

1    Collins' 16?

2              A.    In what?

3              Q.    In Phillips' Exhibit 16.  You

4    notice in the first paragraph it says:  By now

5    you have received your community relations road

6    map?

7              A.    Yes, it would be.

8              Q.    It is what would be referred to?

9    Okay.  Am I correct in saying that this

10   community relations program was not to be

11   performed solely by the location manager

12   himself or herself, but rather it was the

13   funeral home employees as a whole to get

14   involved to meet community influencers and

15   participate in community activities?

16              MS. BRAUN:  Objection.  Form.

17              THE WITNESS:  It was the location

18   manager's responsibility to be involved and

19   encourage his staff to be involved with them as

20   well.

21   BY MR. SAUL:

22              Q.    Okay.  Now, if -- if a community

23   activity, say a golf event or something of that

24   nature, during working time, was the funeral

25   director or hourly employees who participated

1c522070-0758-44c4-a9be-ed6652a486e8

NETWORK DEPOSITION SERVICES
Transcript of Shawn Phillips

Page 51

1    in that community event paid for that time?

2         A.   Yes.

3         Q.   Okay.  How did they record their

4    time for something like that?

5         A.   It would be just the normal

6    timekeeping systems.

7         Q.   And what if there was an event

8    such as a Mother's Day event on a Sunday, was

9    that -- were the employees paid for

10   participation in those types of events?

11        A.   Well, Sunday doesn't necessarily

12   mean they are overtime.  That could be their

13   regular time to work.

14        Q.   Correct.  Let's assume Sunday was

15   not the employee's regular day of work.

16        A.   Okay.

17        Q.   Was the employee paid for

18   participating in that activity that occurred on

19   a Sunday?

20        A.   Yes.

21        Q.   What if an employee, say a funeral

22   director, was asked by his or her location

23   manager to join, for instance, the Elks club,

24   and the employee went to the Elks club meeting

25   in the evening on non regular work hours, was

1c522070-0758-44c4-a9be-ed6652a486e8

NETWORK DEPOSITION SERVICES
Transcript of Shawn Phillips

Page 52

1   that time to be -- was that time compensated?

2          A.   Absolutely.

3          Q.   And how was that time -- how was

4   that time entered?

5          A.   As overtime.

6          Q.   And was that -- I mean,

7   physically, did they punch in, punch out, sign

8   time sheets?

9          A.   Some businesses had time clocks,

10  some had time sheets, so each one was different

11  how they recorded their time.

12         Q.   And was that -- was there anything

13  written down specifically with regard to

14  entering time for involvement in community

15  events on nonworking time?

16         A.   Specific to community involvement,

17  I don't believe so.  But the overtime was to be

18  recorded.

19         Q.   Was there any training of location

20  managers with respect to how to have employees

21  record their community activity time for

22  purposes of payment of their wages?

23         A.   Say that again.

24         Q.   I was afraid you would say that.

25  Was there anything in writing which explained

NETWORK DEPOSITION SERVICES
Transcript of Shawn Phillips

Page 61

1    program was done properly you saw positive
2    results, correct?
3           A.   Correct.
4           Q.   What did they do -- I'm trying to
5    find out what was doing the program properly in
6    your estimation, what did that mean?
7           A.   It meant that the location manager
8    was getting out in the community, talking to
9    influencers, talking to key people in our
10   community, hosting key events, sponsorships and
11   keeping their brand name out there.
12          Q.   And that would be in addition to
13   location managers, the funeral directors and
14   other employees, correct?
15          A.   They could be involved in it, yes.
16          Q.   And they were encouraged to be
17   involved in it, correct?
18          A.   Encouraged to, yes.
19          Q.   And when an employee -- when the
20   funeral directors and other employees were
21   involved in community activities on nonworking
22   time, according to you, they were paid; is that
23   correct?
24          A.   Correct.
25          Q.   And that's because the company, in

NETWORK DEPOSITION SERVICES
Transcript of Shawn Phillips

Page 98

1          A.   I believe she was at one of our
2    funeral homes up in northern California.
3               (Thereupon, Plaintiffs' Exhibit
4    Number 39, affidavit of Marilyn Thomas, was marked
5    for purposes of identification.)
6    BY MR. SAUL:
7          Q.   Show you Phillips' Exhibit 39.  If
8    you would take a minute to read through it.
9    You have had a chance to read through it?
10         A.   Yes, sir.
11         Q.   If you would take a look at
12   paragraph 11, it says:  As an Alderwoods
13   employee, I was expected to be involved with
14   community organizations and actively
15   participate in their events.  Would you say
16   that that statement would be a correct
17   statement for Alderwoods' funeral directors,
18   arrangers and similarly-classified employees?
19         A.   I would say she was encouraged but
20   not expected.
21         Q.   It says:  Personally, I was
22   involved with the Italian-Catholic Federation,
23   Knights of Columbus, Madonna Del Sasso Church
24   and Salinas Chamber of Commerce.  I was never
25   compensated for the hours I worked in these

1c522070-0758-44c4-a9be-ed6652a486e8

NETWORK DEPOSITION SERVICES
Transcript of Shawn Phillips

Page 127

1    grow market share through active involvement

2    with community, religious and other

3    organizations.

4             A.    Yes.

5             Q.    Do you recall that?

6             A.    Yes.

7             Q.    And my question to you is, do you

8    perceive that as a requirement for the funeral

9    home -- or excuse me, for the apprenticeship

10   funeral director/embalmer position?

11            A.    It's encouraged for them to go out

12   and promote the business to help them grow

13   their market share.

14            Q.    So did all apprenticeships, if you

15   know, director/embalmers participate in growing

16   market share through involvement in the

17   community, religious or other organizations?

18            A.    No.

19            Q.    You were also previously asked,

20   and this was Exhibit 3, about a funeral

21   director job description, which similarly

22   stated under the responsibility section retain

23   heritage and grow market share through active

24   involvement in community, religious and other

25   organizations.  Same question, was that a --

1c522070-0758-44c4-a9be-ed6652a486e8

NETWORK DEPOSITION SERVICES
Transcript of Shawn Phillips

Page 128

1    did all funeral home directors, to your

2    knowledge, participate in such activities?

3           A.    Not all of them, no.

4           Q.    And so would you therefore say it

5    was a requirement for the position or not?

6           A.    No.

7           Q.    I want to draw your attention to,

8    back to an exhibit that was placed before you,

9    Phillips' 46, it was entitled hours working

10   overtime, US at the top.  Do you have that in

11   front of you?

12          A.    Yes.

13          Q.    I believe you testified that you

14   are not sure when this particular document was

15   implemented; is that correct?

16          A.    Correct.

17          Q.    Now, do you recall whether this

18   Phillips' 46 addressed how employees were to be

19   paid when they were called back to work after

20   hours, for example, to perform a removal?

21          A.    It does.

22          Q.    And would the payment policy as

23   stated in Phillips' 46, how would that -- how

24   would that have compared to Phillips' 52, if

25   you could turn your attention to that document

NETWORK DEPOSITION SERVICES
Transcript of Shawn Phillips

Page 134

1    STATE OF OHIO          )

2    COUNTY OF MONTGOMERY )  SS:   CERTIFICATE

3              I, Angela S. Moore, a Notary

4    Public within and for the State of Ohio, duly

5    commissioned and qualified,

6              DO HEREBY CERTIFY that the

7    above-named SHAWN PHILLIPS, was by me first duly

8    sworn to testify the truth, the whole truth and

9    nothing but the truth.

10             Said testimony was reduced to

11   writing by me stenographically in the presence

12   of the witness and thereafter reduced to

13   typewriting.

14             I FURTHER CERTIFY that I am not a

15   relative or Attorney of either party, in any

16   manner interested in the event of this action,

17   nor am I, or the court reporting firm with which

18   I am affiliated, under a contract as defined in

19   Civil Rule 28(D).

20

21

22

23

24

25

1c522070-0758-44c4-a9be-ed6652a486e8

NETWORK DEPOSITION SERVICES
Transcript of Shawn Phillips

Page 135

1          IN WITNESS WHEREOF, I have hereunto

2    set my hand and seal of office at Dayton, Ohio, on

3    this _ _ _ _ day of _ _ _ _ _ _ _ _, 2010.

4

5                    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
                     ANGELA S. MOORE
6                    NOTARY PUBLIC, STATE OF OHIO
                     My commission expires 2-28-2011

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**TAB 32**

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA


DEBORAH PRISE and        )
HEATHER RADY on behalf   )
of themselves and all    )
employees similarly      )
situated,                )
                         )
          Plaintiffs,    )
                         ) CIVIL ACTION
vs.                      ) NO. 06-1641
                         )
ALDERWOODS GROUP, INC.,  )
                         ) Judge Joy Flowers Conti
          Defendant.     )
                         )


VIDEOTAPED
DEPOSITION OF:  ROBERT J. PRAMIK

          DATE:  OCTOBER 16, 2008

          TIME:  9:54 A.M.

     TAKEN BY:  PLAINTIFFS

     LOCATION:  HOLIDAY INN EXPRESS
                5680 ALLENTOWN BOULEVARD
                HARRISBURG, PENNSYLVANIA




Reported By:
SUSAN O'HARA MOORE, CSR, RMR, CLVS

In Association with:
NETWORK DEPOSITION SERVICES
Suite 1100 Gulf Tower
707 Grant Street
Pittsburgh, PA 15219
412.281.7908

2cd53174-4031-4f60-920e-06c6923416c4

NETWORK DEPOSITION SERVICES
Transcript of Robert Pramik

Page 15

1    A    Yes.

2    Q    And then what position did you hold after

3    funeral director?

4    A    A licensed funeral director.

5    Q    Did you have another position with the

6    company after that?

7    A    Yes.

8    Q    And what was that position?

9    A    Then I was promoted to supervisor; and

10   then after that I was promoted to location

11   manager; and then after that I was promoted to

12   market general manager.

13   Q    Okay.  And do you recall when you were

14   promoted to location manager?

15   A    I -- I -- I -- it was either in 2002 or

16   2003.

17   Q    Okay.

18   A    I -- I -- I think it was during the

19   summer.  I think.  Spring or summer.

20   Q    I'm going to hand you a couple of payroll

21   documents to help you refresh your

22   recollection --

23   A    Sure.

24   Q    -- just so we can get the dates right as

25   we go through this.

2cd53174-4031-4f60-920e-06c6923416c4

NETWORK DEPOSITION SERVICES
Transcript of Robert Pramik

Page 16

1          (Comments off the record.)

2          (Defendant's Deposition Exhibit No. 1 was

3     marked.)

4     BY MR. DeJULIUS:

5          Q     Mr. Pramik, I've handed you what's been

6     marked as Defendant Exhibit 1.  It's a series of

7     payroll records.  Have -- have you seen any of

8     these documents before?

9          A     I -- I don't recall.

10          MS. GIFFORD:  Why don't you -- I'm sorry.

11     Why don't you take your time and look through

12     them first.

13          THE WITNESS:  Yeah, I'm going to look

14     through them here.

15     BY MR. DeJULIUS:

16          Q     Okay.  Mr. Pramik, if you could look at

17     the first page, which is ALD002364, it states --

18          A     I'm not sure where -- oh.  Down here at

19     the bottom.  Okay.

20          Q     You're on the right page.

21          A     Got it.

22          Q     And if you look on the right -- on the

23     left-hand side, there's a notation that says,

24     "Effective Date."  Do you see that?

25          A     9/15/2003?

NETWORK DEPOSITION SERVICES
Transcript of Robert Pramik

Page 17

1      Q      Correct.

2      A      Okay.

3      Q      And does that refresh your recollection

4  as to when you became the MGM?

5      A      Yeah.  There -- I'd like to point out

6  there's some mistakes on this form.  My birthday

7  is wrong.

8      Q      Okay.  But is the date -- the effective

9  date of when you became MGM, to the best of your

10  recollection --

11      A      Yeah, I think it was on or about -- I

12  know -- I knew it was in September.  I couldn't

13  remember the exact year.

14      Q      Okay.  So September of 2003?

15      A      Yes.

16      Q      And does that help you refresh your

17  recollection as to when you became location

18  manager, about how many years before that?

19      A      No.  I know I was -- I was location

20  manager prior to that.

21      Q      Okay.  Were you location manager -- how

22  many years were you location manager?  Do you

23  recall?

24      A      I think a year.  I'm not sure.  I don't

25  remember anymore.

2cd53174-4031-4f60-920e-06c6923416c4

NETWORK DEPOSITION SERVICES
Transcript of Robert Pramik

Page 30

1      Q     Okay.  And were the funeral directors?
2      A     No.  Two -- two -- two of the funeral
3   director were salary.
4      Q     Okay.  So two funeral directors were
5   salary; and, to the best of your knowledge, five
6   funeral directors were hourly?
7      A     Correct.
8      Q     And, as far as the full-time staff, the
9   four individuals -- two receptionists, one MA,
10  and one funeral director assistant -- were they
11  all hourly?
12     A     Yes.  Now, it's hard -- it's hard to
13  explain all this.  The one -- the other funeral
14  director that I had mentioned, when she became
15  location manager, she went to salary.  And that
16  would have been Rebecca Donahue.  I don't
17  remember when we switched her to salary versus
18  hourly.  But when she took over as location
19  manager in Camp Hill, she was put on salary.
20        And -- and, I'm sorry.  The question
21  again?
22     Q     I don't think I have one.
23     A     No, the question that I just answered to.
24     Q     I don't recall.  You've -- you've
25  answered it.

2cd53174-4031-4f60-920e-06c6923416c4

NETWORK DEPOSITION SERVICES
Transcript of Robert Pramik

Page 85

1    Cross, Salvation Army, whatever.
2         Q     Okay.  And were any employees --
3         A     Not -- not poker clubs on Friday nights.
4    That didn't count.  It had to be a community-type
5    sponsored event.
6         Q     Okay.  And you mentioned funeral
7    directors, specifically, in this paragraph.
8         A     Yes.
9         Q     Were there other hourly employees besides
10   funeral directors that had to belong to at least
11   one outside community organization?
12        A     The word "had" is -- is what makes that
13   wrong.  They were encouraged to, but they did not
14   have to.
15        Q     So funeral directors had to belong to a
16   community organization?
17        A     Yes.
18        Q     Other hour employees were encouraged to?
19        A     Correct.
20        Q     Okay.  When did this policy requiring
21   funeral directors to belong to one outside
22   community organization occur?
23        A     You're asking me for a specific date?
24        Q     As best you can.  I mean, year, month.
25        A     Well, when -- when I -- back -- back when

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

2cd53174-4031-4f60-920e-06c6923416c4

NETWORK DEPOSITION SERVICES
Transcript of Robert Pramik

Page 105

1    You will belong to one community event.
2        Q     Okay.  And you cannot recall when that
3    policy change took place?
4        A     No.
5        Q     Is that the policy change that you
6    believe took place while you were MGM?
7        A     I think it was when Ted was MGM.
8        Q     Okay.  While you were MGM, did the amount
9    of community service that each funeral director
10   conducted -- did that vary from funeral director
11   to funeral director?
12       A     One more time.  I'm sorry.
13       Q     It's okay.
14           When you were MGM, you supervised a
15   number of funeral directors.  Did the amount of
16   community service that each individual funeral
17   director do vary?
18       A     Yes.
19       Q     Did it vary from location to location?
20       A     Well, that's a -- in my market, even
21   though I had four locations, I technically had
22   two because the Reese and the two Neills shared
23   employees.  If -- if that location was busy, they
24   went there.  But everybody was hubbed out of
25   Harrisburg.  So it's a tough question to answer

2cd53174-4031-4f60-920e-06c6923416c4

NETWORK DEPOSITION SERVICES
Transcript of Robert Pramik

Page 112

1    organization?

2         A    Yes.

3         Q    What level of participation was required

4    by the policy?

5         A    Well, I don't think it was ever told to

6    them that they have to run for office or anything

7    like that, but to be a -- an active member.

8    Again, not just a cardholder, but be -- be

9    actively involved in the -- in the organization.

10        Q    And -- and how did Alderwoods define

11   "active member"?

12        A    I don't think it was ever to the point

13   where you had to attend every meeting.  It was

14   just, like, "Get involved in that community."

15   And, again, that binder gave them an opportunity

16   to report on that meeting that they went to, what

17   they did to -- I hate to use the word "expose,"

18   because they didn't take their clothes off.  For

19   lack of a better word -- you know what I mean.

20   To -- to let them know who they were.

21        Q    Did -- was there any discipline if an

22   employee skipped a meeting?

23        A    No.

24        Q    You know, if -- if an employee belonged

25   to an organization but didn't attend meetings

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

NETWORK DEPOSITION SERVICES
Transcript of Robert Pramik

Page 113

1    enough, what happened?

2        A     When they would submit their payment

3    voucher to -- to renew their membership, we would

4    question them.  "Look, you've never been to any

5    of their meetings.  Why would we want to support

6    you in that organization?  You didn't go to any

7    of the meetings.  So it's a waste of our money.

8    If you're going to go to the meetings, yeah,

9    we'll support you in that.  But you either need

10   to find a different organization or -- or start

11   attending those meetings."

12       Q     And were employees evaluated on their

13   participation in the -- in the organizations?

14       A     I think that's a strong term.  I think

15   they were just encouraged to get more active.

16   And, you know, we would talk about it.  And some

17   would -- they would -- they would come back

18   excited.  "Wow, you know what this organization

19   does?"  Yadda, yadda, yadda, so.

20       Q     Was any discipline action ever taken

21   because an employee wasn't active enough?

22       A     Not under my realm, no.

23       Q     Okay.  Do you know whether any discipline

24   was taken for employees in other markets?

25       A     I wouldn't be privy to that because one

2cd53174-4031-4f60-920e-06c6923416c4

NETWORK DEPOSITION SERVICES
Transcript of Robert Pramik

Page 115

1    before the break.  And paragraph 10, it says,

2    "...community work was mandated by defendants and

3    was even included in the job descriptions for

4    funeral directors."  Do you see that?

5         A    Um-hum.

6         Q    And the community --

7         A    Yes.  I'm sorry.

8         Q    The community work is what we'd been

9    discussing earlier, belonging to community

10   organizations.  Is that correct?

11        A    Yes.

12        Q    And this only belongs to funeral

13   directors.  Correct?

14        A    I'm -- I'm sorry.  What belongs?

15        Q    It's my fault.  Bad question.

16        A    No, no.  You don't need to apologize.

17        Q    The -- the policy that individuals had to

18   belong to a community organization only applied

19   to funeral directors.

20        A    Yes.

21        Q    Okay.  Did all of the funeral directors

22   that you supervised belong to at least one

23   community organization?

24        A    Yes.

25        Q    At any point did a funeral director not

NETWORK DEPOSITION SERVICES
Transcript of Robert Pramik

Page 119

1    that "You can be terminated."  I don't think it
2    was, "You will be terminated."  "You can be
3    terminated" is how it was put.
4         Q     And where was that policy located?
5         A     It was verbal, and I can't -- without --
6    without documents in front of me, I don't know if
7    it was in one of Ted's memos or not.
8         Q     Did you ever tell anybody that they could
9    be terminated if they did not belong to a
10   community organization?
11        A     I can't specifically recall that.
12   Whether I did or not, I don't remember.
13        Q     Did anyone besides Ted Reese tell you
14   that someone who did not belong to a community
15   organization could be terminated?
16        A     Not to my -- I can't -- I can't honestly
17   answer that yes or no.  I don't remember.  I
18   don't -- I don't remember if anybody did or not.
19   Whether they did or not is another thing.  I
20   don't remember.
21        Q     Do you know whether anyone in other
22   markets besides your market was told that they
23   could be terminated if they didn't belong to a
24   community organization?
25        A     Again, I really don't.  Other than

NETWORK DEPOSITION SERVICES
Transcript of Robert Pramik

Page 120

1    sharing budget time at meetings with them, I have
2    no idea what they did or didn't do in their
3    market.
4         Q    Okay.
5         A    I had no reason to know, and nor did I
6    waste my time in trying to find out what they did
7    versus what I did.
8         Q    Okay.  So -- so you don't know whether or
9    not in other markets funeral directors had to
10   belong to a community organization, do you?
11        A    I do not.
12        Q    And you don't know whether any sort of
13   action was taken if funeral directors in other
14   markets did not --
15        A    I do not.
16        Q    -- participate?
17        A    I do not.
18        Q    How much time, after being hired by
19   Alderwoods, did someone have to join a community
20   organization?
21        A    I don't know if they ever gave us a time
22   specific, like you had 30 days or you had
23   60 days.  I don't think it was ever time
24   specific.  I think -- I think the MGM on his
25   one-on-one meetings would talk to them like on

2cd53174-4031-4f60-920e-06c6923416c4

NETWORK DEPOSITION SERVICES
Transcript of Robert Pramik

Page 139

1      Q      And you have no actual knowledge of
2   specific individuals who were not paid by
3   Alderwoods for their work in community service
4   outside of your market?
5      A      Outside my market, no.
6      Q      Okay.  And which employees inside your
7   market did you not pay for their work in
8   community service?
9      A      Any of them.  All of them.
10     Q      And when you say, "all of them," you mean
11  all of the full-time funeral directors?
12     A      Hourly.
13     Q      Okay.  Mr. Pramik, let's go to the
14  on-call policy.
15     A      Where -- where are you at?
16     Q      I'll get you there.
17     A      Okay, okay.
18     Q      I'm just trying to direct you here so you
19  don't get surprised when I switch topics on you.
20          If you go to paragraph 18 and 19 -- it's
21  on page 3 of Exhibit 5.  And I'm just going to
22  read them together and discuss them.
23          Paragraph 18 states, "Defendants
24  maintained a company-wide on call pay policy."
25          Paragraph 19 states, "Under this policy,

2cd53174-4031-4f60-920e-06c6923416c4

NETWORK DEPOSITION SERVICES
Transcript of Robert Pramik

Page 140

1    employees were typically required to be on call

2    at least every other night and every other

3    weekend while employed by defendants and the on

4    call shifts were from 5 p.m. to 8 a.m."

5           Do you see that?

6       A    Yes.

7       Q    Okay.  And, again, you state,

8    defendants -- with regard to this on-call policy.

9    Does defendants, plural, in this instance also

10   mean Alderwoods Group, Inc.?

11      A    Yes.

12      Q    And no one else?

13      A    Correct.

14      Q    Okay.  This on-call requirement -- did it

15   apply only to funeral directors?

16      A    Yes.

17      Q    Did it apply to full-time funeral

18   directors or part-time funeral directors?

19      A    We didn't have any part-time funeral

20   directors.  It was all full-time.

21      Q    Okay.  Did this on-call policy that --

22      A    I have to take that back.  There was a

23   part-time funeral director in Paoli, and that was

24   Steve Alleva's brother.  I can't -- his last name

25   was Alleva, but I can't remember his first name.

2cd53174-4031-4f60-920e-06c6923416c4

NETWORK DEPOSITION SERVICES
Transcript of Robert Pramik

Page 141

1    He -- he would cover from time to time when Steve

2    got busy.

3         Q     And did Steve Alleva's brother ever

4    participate in on-call?

5         A     Yes.

6         Q     What was his on-call schedule?  Do you

7    recall?

8         A     Same as ours.  However, I must point out

9    that on weekends it was different.

10        Q     When you say, "on weekends it was

11   different," what do you mean?

12        A     Well, the 5:00 p.m. to 8:00 p.m. was

13   Monday through Friday.

14        Q     Okay.

15        A     5:00 p.m. to 8:00 a.m.  I'm sorry.

16        Q     And on the weekends, it was the entire

17   weekend, 24 hours?

18        A     Correct.  You usually had two people on

19   call, and they rotated; but it was a 24-hour

20   shift, yes.

21        Q     Okay.  Did you have any part-time staff

22   that did removals or care centers or anything

23   like that that was also on call?

24             MS. GIFFORD:  Object to form.

25             THE WITNESS:  Part-time employees to do

2cd53174-4031-4f60-920e-06c6923416c4

NETWORK DEPOSITION SERVICES
Transcript of Robert Pramik

Page 142

1    removals, yes.  I don't know what -- what was the
2    other --
3    BY MR. DeJULIUS:
4         Q    Were they on call?
5         A    That's vague.  Were they at our beckon
6    call, yes; but they could say no.
7         Q    So they didn't have an on-call schedule?
8         A    We had -- we had -- we had a pool of
9    people that would do removals for us.  And you
10   could call this person and he could say, "No, I
11   don't feel like it."  So you'd call the next
12   person.  And if you couldn't get anybody to do
13   it, then the on-call funeral director did it.
14        Q    Okay.  So this on-call policy that we're
15   talking about applied only to funeral directors?
16        A    Absolutely.
17        Q    Okay.  Did the hours ever change as far
18   as when individuals were supposed to be on -- on
19   call?
20        A    Other than what I -- what I alluded to
21   about weekends versus weekdays, no.
22        Q    Okay.  So this schedule of 5:00 p.m. to
23   8:00 a.m. every other night and every other
24   weekend was the schedule for the entire time that
25   you were MGM?

2cd53174-4031-4f60-920e-06c6923416c4

NETWORK DEPOSITION SERVICES
Transcript of Robert Pramik

Page 143

1      A      No.

2      Q      Okay.  How was it different?

3      A      We were short-staffed when it was every

4   other night.  And Ted never went on call with us;

5   so he was out of the loop.

6           So when I took over as MGM, I became part

7   of the on-call team.  So it gave employees more

8   time that they didn't have to go on every other

9   night.

10          So it -- sometimes I didn't.  Like if I

11  was away at a meeting, then that would revert

12  back and I would be off the call list.  But

13  whenever I was in town, I would go back on the

14  call list.

15     Q      Okay.  And other markets outside the

16  Harrisburg market --

17     A      No knowledge.

18     Q      You have no knowledge of what their

19  on-call schedule was?

20     A      No.

21     Q      But that would vary depending on the

22  number of funeral directors available.  Correct?

23     A      And number of locations in that -- in

24  that area -- in that market.

25     Q      Okay.  If you would turn to paragraph

2cd53174-4031-4f60-920e-06c6923416c4

NETWORK DEPOSITION SERVICES
Transcript of Robert Pramik

Page 146

1        A       Ted.  Ted Reese.

2        Q       Did you ever call HR about this issue?

3        A       About that issue, no.

4        Q       Did you ever talk to Ted Reese's

5    supervisor about payment for on-call work

6    performed from your own house?

7        A       No.

8        Q       Did you become aware of the policy of not

9    paying individuals for work performed on call

10   from their own home from any other source besides

11   Ted Reese?

12       A       No.

13       Q       Did you ever see a written policy?

14       A       After I approached Ted on it, I'm 75 to

15   80 percent sure that he wrote a memo about it.

16           Ted was notorious for his memos.

17   Whenever he verbally talked to you about it, he'd

18   follow it up with a written memo.  Again, I don't

19   have privy to those memos at this time.

20       Q       And so this was sometime before September

21   of 2003 when Ted Reese was the MGM and you were

22   either a funeral director or location manager.

23   Correct?

24           MS. GIFFORD:  Object to form.

25           Go ahead.

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

2cd53174-4031-4f60-920e-06c6923416c4

NETWORK DEPOSITION SERVICES
Transcript of Robert Pramik

Page 148

1       Q     Who was that MGM?

2       A     I think it was John Blute.

3       Q     Now, John Blute -- was that when he was

4    the regional general manager?

5       A     That was when he was an MGM.

6       Q     Okay.  Did you ever talk to the regional

7    general manager about the policy of not paying

8    employees for work they performed from their

9    house while they were on call?

10      A     I would never bring that up to him.

11      Q     So is the answer, no?

12      A     That is, no.

13      Q     And when you became MGM, did you ever

14   revisit the issue -- this policy of not paying

15   employees while they were working from home?

16      A     I fielded complaints from the employees,

17   but never went any further with it, no.

18      Q     Okay.  Did you ever undergo any training

19   regarding paying employees who were working on

20   call?

21      A     No.

22      Q     Were you ever at any company-wide

23   meetings to discuss paying employees while they

24   were on call?

25      A     No.

2cd53174-4031-4f60-920e-06c6923416c4

NETWORK DEPOSITION SERVICES
Transcript of Robert Pramik

Page 149

1    Q     Were you at any regional meetings to
2  discuss paying employees while they were on call?
3    A     Nope.
4    Q     And, to your knowledge, did this policy
5  of paying employees while they were on call ever
6  change while you were at Alderwoods at any time?
7    A     I'm -- I'm sorry.  I -- I half digested
8  it, and I lost -- I lost it.
9    Q     That's okay.
10   A     I'm sorry.
11   Q     At any time while you worked at
12 Alderwoods, did the policy change regarding
13 payment of people while they were on call?
14   A     No.
15   Q     Okay.  Just to get the context down, when
16 the employees would come to you and complain,
17 would they -- would they write down on their time
18 card -- what -- what -- how would it come up when
19 they would come and complain to you?
20   A     "It's not fair.  You know, I was up two,
21 three hours last night, and I'm not getting paid
22 for it.  This sucks."
23         That's exactly how they approached me on
24 it.
25   Q     But what was the complaint?  What --

NETWORK DEPOSITION SERVICES
Transcript of Robert Pramik

Page 384

1          REPORTER'S CERTIFICATE

2          I, SUSAN O'HARA MOORE, RMR, CSR, notary

3     public in and for the State of Pennsylvania, do

4     hereby certify:  That the witness named in the

5     foregoing Deposition, to wit, ROBERT J. PRAMIK,

6     was present and duly sworn to testify the truth

7     in the within-entitled action on the day and date

8     and at the time and place therein specified;

9          That the testimony of said witness was

10    reported by me in shorthand and was thereafter

11    transcribed under my direction into computerized

12    transcription;

13         That the foregoing constitutes a full,

14    true, and correct transcript of said deposition

15    and of the proceedings which took place;

16         That the witness was given an opportunity

17    to read and, if necessary, correct said

18    deposition and to subscribe the same;

19         That I am a disinterested person to the

20    said action;

21         IN WITNESS WHEREOF, I have hereunto

22    subscribed my signature on this 27th day of

23    October, 2008.  My commission expires 04/11/2011.

24

25                Susan O'Hara Moore, RMR, CSR, CLVS

**TAB 33**

NETWORK DEPOSITION SERVICES
Transcript of Deborah Prise

Page 1

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA

- - - -

DEBORAH PRISE and HEATHER RADY )
on behalf of themselves and all )
employees similarly situated,  )
                                )
            Plaintiffs,         )
                                )
            -vs-                 ) Civil Action
                                ) No. 06-1641
ALDERWOODS GROUP, INC.,         )
                                ) Judge Joy Flowers
            Defendant.          )

- - - -

VOLUME I

- - - -

DEPOSITION OF:  DEBORAH PRISE

            DATE:    November 6, 2008
                     Thursday, 9:59 a.m.


            LOCATION:    JONES DAY
                         One Mellon Bank Center
                         500 Grant Street, 45th Floor
                         Pittsburgh, PA  15219


            TAKEN BY:    Defendant


            REPORTED BY:    Catherine C. Leverty
                            Notary Public


- - - -
NETWORK DEPOSITION SERVICES
The Gulf Tower
707 Grant Street, Suite 1101
Pittsburgh, Pennsylvania  15219
412-281-7908

645bc265-24c5-4d78-9fdb-c377eb16c0bd

NETWORK DEPOSITION SERVICES
Transcript of Deborah Prise

Page 88

1                              - - - -
2              (Whereupon, at 12:20 a luncheon recess was
3        taken, the proceedings to resume at 1:12 p.m.)
4                              - - - -
5              A-F-T-E-R-N-O-O-N  S-E-S-S-I-O-N
6                              - - - -
7    BY MR. KNIGHT:
8    Q.    Before the break we were talking about your
9          allegations in your first affidavit in this case
10         related to what you call the community work
11         policy?
12   A.    Yes.
13   Q.    If you worked, if you did what you call
14         community work during normal business hours, or
15         during your normal, regularly scheduled hours,
16         would you have been compensated for it?
17   A.    During normal business hours, yes.
18   Q.    If you did community work after business hours
19         but had the time preapproved would you have been
20         compensated for that time?
21   A.    If you had the time preapproved, yes.
22   Q.    Did you ever seek preapproval for community work
23         that you did outside your regularly scheduled
24         hours?
25   A.    Yes.

NETWORK DEPOSITION SERVICES
Transcript of Deborah Prise

Page 89

1    Q.   And were you granted approval for that time?

2    A.   Partially.

3    Q.   What do you mean, partially?

4    A.   Well, there was, like, a cocktail affair that

5         B'nai Zion had, and I got partially paid for

6         that.

7    Q.   When you sought preapproval did you seek

8         preapproval for a certain amount of time?

9    A.   I don't recall.

10   Q.   When you say you were partially paid for it,

11        were you only paid for certain hours, or what do

12        you mean by that?

13   A.   I wasn't paid for all of my time that I took

14        there, I was paid for part of it.

15   Q.   Do you remember how much of it you were paid

16        for?

17   A.   No.

18   Q.   From whom would you seek preapproval?

19   A.   The time I remember, Pat McDermott, and then I

20        quit because it was general, general knowledge

21        that if we had engagements and community

22        activity outside of the clock time that they

23        wouldn't be preapproved, or it wouldn't be

24        approved, that was general knowledge.

25   Q.   Okay.  When we're talking about this cocktail

645bc265-24c5-4d78-9fdb-c377eb16c0bd

NETWORK DEPOSITION SERVICES
Transcript of Deborah Prise

Page 99

1          participating in was in the community newspaper.
2     Q.   Was it your belief that you were acting as an
3          Alderwoods representative when you were working
4          with Dorothy's Friends?
5     A.   With Dorothy's Friends I'd say that I was
6          partially acting as an Alderwoods representative
7          because I had to do community service for them,
8          but I was, and still am with them, personally.
9          They're committed to their cause.
10    Q.   So even though you've left Alderwoods you've
11         remained involved with Dorothy's Friends?
12    A.   Hardly at the same level.
13    Q.   But you've remained involved?
14    A.   At a minimal level.
15    Q.   What about Haddasah, are you still involved with
16         them?
17    A.   No.
18    Q.   What about the cemetery and social action
19         committee?
20    A.   No.
21    Q.   What about doing educational seminars?
22    A.   No.
23                        - - - -
24         (Prise Exhibit No. 4 marked for identification.)
25                        - - - -

NETWORK DEPOSITION SERVICES
Transcript of Deborah Prise

Page 114

1    A.    I don't mean to ridicule, but I can't pick up a
2          body in my car, I have to get equipment, and
3          things like that, so, no, I wouldn't be paid
4          from the time I was called to the time I got to
5          the funeral home, I wouldn't get paid until I
6          got to the funeral home, and then.
7    Q.    Well, were you actually one of the people who
8          were picking up a body from someone's home, is
9          that something that you had to do?
10   A.    On occasion.
11   Q.    And on those occasions when you did that, the
12         time that you spent away from the funeral home
13         at the deceased person's home picking up the
14         body, speaking with the deceased person's, you
15         know, family, would you be compensated for that
16         time?
17   A.    Generally that happened over the phone from
18         home, the just picking up the body part happened
19         on rare occasion, and I'd go to the funeral home
20         and check in, and I think, to the best of my
21         recollection, I was paid for that.
22               It wasn't something that I did very
23         often after hours, most of my on-call time was
24         spent on the phone from my home or wherever I
25         was.  I wasn't paid.

NETWORK DEPOSITION SERVICES
Transcript of Deborah Prise

Page 117

1       long it takes.

2   Q.  Would calls sometimes last more than an hour?

3   A.  Yes, because some -- well, not typically, but

4       sometimes the family would say will you call me

5       when the deceased is back at the funeral home,

6       and by the time the removal person went and got

7       the body, yeah, it could be, like, 3:00, maybe,

8       you got the call, 5:00 o'clock in the morning

9       the body -- it could definitely take well over

10      an hour of your time.

11  Q.  But that wasn't typically the case?

12  A.  It happened, I wouldn't want to guess at it.

13  Q.  When you were a funeral director did Alderwoods

14      pay you any sort of rate for time you spent on

15      call?

16  A.  Never.

17  Q.  In paragraph 22 of your affidavit it indicates

18      that as a manager you were aware that

19      defendants' failure to pay employees for work

20      done while on call is a nationwide policy; do

21      you see that?

22  A.  Yes.

23  Q.  Was that the case the entire time you were a

24      location manager?

25  A.  No, it changed, to the best of my recollection,

NETWORK DEPOSITION SERVICES
Transcript of Deborah Prise

1    around July 2005.  They changed the policy

2    around then, to the best of my knowledge.

3  Q.  And what was the policy change in July 2005?

4  A.  That you would get paid for your on-call time.

5  Q.  Prior to July of 2005 how were you aware that

6    failure to pay for work done while on call was a

7    company-wide policy?

8  A.  Because in meetings -- usually when we learned

9    about things they were in these monthly meetings

10   that we had, and it was frequently announced

11   that this was as per policy.  You know, it was

12   often the tone of the firm and something that

13   was highly encouraged -- or not encouraged,

14   that's too light of a word, was uniformity.

15 Q.  When you say policy, what do you mean?

16 A.  Policy, you know, I'd almost say that a

17   better -- well, it's semantics, rule.

18 Q.  Well, what do you mean by rule, then?

19 A.  Regulation, policy.  You know, I -- I can't

20   describe it any better.

21 Q.  Well, was there anything written that said that

22   employees weren't to be paid for work they

23   performed while on call?

24 A.  Well, in the policy manual it was written that

25   you didn't get paid unless it was preapproved.

645bc265-24c5-4d78-9fdb-c377eb16c0bd

NETWORK DEPOSITION SERVICES
Transcript of Deborah Prise

Page 194

1    COMMONWEALTH OF PENNSYLVANIA )        CERTIFICATE
2    COUNTY OF ALLEGHENY          )        SS:
3         I, Catherine C. Leverty, a Court Reporter and
4    Notary Public in and for the Commonwealth of
5    Pennsylvania, do hereby certify that the witness,
6    DEBORAH PRISE, was by me first duly sworn to testify
7    to the truth, the whole truth, and nothing but the
8    truth; that the foregoing deposition was taken at the
9    time and place stated herein; and that the said
10   deposition was recorded stenographically by me and
11   then reduced to printing under my direction, and
12   constitutes a true record of the testimony given by
13   said witness.
14        I further certify that the inspection, reading
15   and signing of said deposition were waived by counsel
16   for the respective parties and by the witness.
17        I further certify that I am not a relative or
18   employee of any of the parties, or a relative or
19   employee of either counsel, and that I am in no way
20   interested directly or indirectly in this action.
21        IN WITNESS WHEREOF, I have hereunto set my hand
22   and affixed my seal of office this 18th day of
23   November, 2008.
24        _____
25                         Notary Public

Johnstown           Toll-Free           Pittsburgh
814-266-2042        866-565-1929        412-281-7908

645bc265-24c5-4d78-9fdb-c377eb16c0bd

**TAB 34**

NETWORK DEPOSITION SERVICES
Transcript of Heather Rady

Page 1

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA

- - - -

DEBORAH PRISE and HEATHER RADY )
on behalf of themselves and all )
employees similarly situated,  )
                                )
              Plaintiffs,       )
                                )
         -vs-                   ) Civil Action
                                ) No. 06-1641
ALDERWOODS GROUP, INC.,         )
                                ) Judge Joy Flowers
              Defendant.        )

- - - -

DEPOSITION OF:  HEATHER RADY

- - - -

DATE:      November 7, 2008
           Friday, 10:15 a.m.

LOCATION:  JONES DAY
           One Mellon Bank Center
           500 Grant Street, 45th Floor
           Pittsburgh, PA  15219

TAKEN BY:  Defendant

REPORTED BY:  Catherine C. Leverty
              Notary Public

- - - -

NETWORK DEPOSITION SERVICES
The Gulf Tower
707 Grant Street, Suite 1101
Pittsburgh, Pennsylvania  15219
412-281-7908

NETWORK DEPOSITION SERVICES
Transcript of Heather Rady

Page 61

1      employees were encouraged to share so that if it
2      was an idea or an organization that others could
3      draw from, you know, they were, of course,
4      encouraged to share.
5  Q.  Now, did Pat McDermott ever tell you in any
6      meeting that employees who belonged to community
7      organizations would not be compensated for the
8      time they spent with those community
9      organizations?
10 A.  He did not use the word community organization,
11     he had made the comment that you're only paid
12     for the hours you work while you're in the
13     building.
14 Q.  Did you ever seek approval from Pat McDermott
15     for time spent doing community service work for
16     Alderwoods?
17 A.  No, I believe after the policies changed, and
18     again, I'm uncertain when the policy did change,
19     I'm thinking of a time when we did a petting zoo
20     for the 4th of July weekend, I believe one year
21     I was not paid for it, and then the policy
22     changed and the next year I was paid for that
23     time.
24 Q.  So that's an example of you being paid for time
25     you worked outside the Alderwoods facility?

NETWORK DEPOSITION SERVICES
Transcript of Heather Rady

Page 62

1    A.    One example.

2    Q.    Are there other examples of that?

3    A.    There may be, but nothing is -- at this moment
4          nothing is coming to mind.

5    Q.    So there may be other examples of you doing
6          community service work outside of Alderwoods
7          locations that you would have been paid for?

8    A.    There may be, but again, I would need to see pay
9          records.

10   Q.    You referenced that there was a written
11         community policy in the policies and procedures
12         binders; is that correct?

13   A.    Correct.

14   Q.    Did that written policy say that employees would
15         not be compensated for that time?

16   A.    Without seeing it in front of me, I don't think
17         so, I don't think it stated that.

18   Q.    A minute ago, Ms. Rady, you said that the policy
19         changed, at some point; what policy are you
20         referring to?

21   A.    We had to -- I guess I'll call it a pay policy,
22         and earlier I had mentioned that we recorded our
23         time, both handwritten as well as on the time
24         clock.  Well, when it changed to having to punch
25         in with the time clock, any time outside of the

NETWORK DEPOSITION SERVICES
Transcript of Heather Rady

Page 67

1      appointments.
2   Q.   You go on to say that you were expected to
3        provide detail on who the community work was
4        with and how that community influencer rated in
5        terms of importance to the community; did you do
6        that?
7   A.   Only to the point where I would provide detail
8        on who the community work was with, but the
9        community influencer ratings were something more
10       that the managers were responsible for.
11  Q.   When you say managers, are you referring to
12       location managers?
13  A.   Yes, location managers, regional managers.
14  Q.   Was there ever a written policy, to your
15       knowledge, that required location managers to
16       maintain the community influencer sheets?
17  A.   That information, I would not have been privy
18       to.
19  Q.   In paragraph 14 you say that defendants rewarded
20       employees who engaged in community work by
21       giving them incentive points?
22  A.   Correct, yes.
23  Q.   But you were also compensated for at least some
24       of your community work; is that right?
25  A.   I believe at the very end of my employment.

6d22c9fb-77db-4a30-9090-a7dc74ce86c9

NETWORK DEPOSITION SERVICES
Transcript of Heather Rady

Page 68

1  Q.  Was the petting zoo that you discussed earlier,
2      was that at the end of your employment?
3  A.  We did that, I believe in 2005 and 2006, so,
4      yes.
5  Q.  So when you say -- you said you believe you were
6      compensated at the very end of your employment?
7  A.  Correct.
8  Q.  At the very end of your employment were you
9      being compensated for all community work time?
10 A.  My community work changed.  I can't recall if I
11     was compensated for the B'nai Zion dessert
12     reception that we had gone to.
13              I know for sure that I wasn't
14     compensated for using a vehicle or for parking,
15     you know, fees associated with attending these
16     events, and I know for certain at the beginning
17     of my employment, when I was active with WQED,
18     that I was not compensated for the work.
19              Rotary, yes, because that occurred
20     during my work hours.
21 Q.  But you know for a fact that there was some work
22     outside your normal work hours in 2006 that
23     you -- community work, that you were compensated
24     for; is that right?
25 A.  Correct.

6d22c9fb-77db-4a30-9090-a7dc74ce86c9

NETWORK DEPOSITION SERVICES
Transcript of Heather Rady

Page 179

1    highway with a garbage bag picking up trash, and

2    it was a period of or a span of several miles.

3 Q.  And was there any insignia or any indication

4    that you were an employee of Alderwoods while

5    you were doing that?

6 A.  No, I don't think that we had Alderwoods shirts,

7    but that portion of -- goodness, is it -- it's

8    not Semple -- I forget the name of the road

9    right now -- there is a sign that says this

10   portion of Adopt-a-Highway, and it says Brandt

11   Funeral Home employees.

12 Q.  Do you recall what day of the week you would do

13   this?

14 A.  I think it was during work hours that we did it.

15 Q.  Were you compensated for the time you spent

16   doing Adopt-a-Highway?

17 A.  If it was during work hours, yes.  We only did

18   it one time, we were required, I think to do it

19   once a month, but my experience was that we -- I

20   had done it once.

21 Q.  And you believe you were compensated for it?

22 A.  I think it occurred during work time.

23 Q.  The top bullet point on page 10, you mention a

24   statement made by Randy Howard regarding after

25   hours pre-needs appointments --

6d22c9fb-77db-4a30-9090-a7dc74ce86c9

NETWORK DEPOSITION SERVICES
Transcript of Heather Rady

Page 203

1  COMMONWEALTH OF PENNSYLVANIA )        CERTIFICATE

2  COUNTY OF ALLEGHENY          )     SS:

3        I, Catherine C. Leverty, a Court Reporter and

4  Notary Public in and for the Commonwealth of

5  Pennsylvania, do hereby certify that the witness,

6  HEATHER RADY, was by me first duly sworn to testify

7  to the truth, the whole truth, and nothing but the

8  truth; that the foregoing deposition was taken at the

9  time and place stated herein; and that the said

10  deposition was recorded stenographically by me and

11  then reduced to printing under my direction, and

12  constitutes a true record of the testimony given by

13  said witness.

14        I further certify that the inspection, reading

15  and signing of said deposition were waived by counsel

16  for the respective parties and by the witness.

17        I further certify that I am not a relative or

18  employee of any of the parties, or a relative or

19  employee of either counsel, and that I am in no way

20  interested directly or indirectly in this action.

21        IN WITNESS WHEREOF, I have hereunto set my hand

22  and affixed my seal of office this 17th day of

23  November, 2008.

24                    _____

25                              Notary Public

6d22c9fb-77db-4a30-9090-a7dc74ce86c9

**TAB 35**

NETWORK DEPOSITION SERVICES
Transcript of Jack Reddick

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DEBORAH PRISE AND HEATHER RADY ON BEHALF OF THEMSELVES
AND ALL EMPLOYEES SIMILARLY SITUATED,

        Plaintiffs,

vs.                 Civil Action No.  06-1641

ALDERWOODS GROUP, INC.,

        Defendants.


        DEPOSITION OF JACK REDDICK
        TAKEN ON BEHALF OF THE DEFENDANT
    ON AUGUST 29, 2009, BEGINNING AT 8:00 A.M.
        IN COFFEEVILLE, KANSAS


            APPEARANCES


On behalf of the PLAINTIFFS: ANNETTE M. GIFFORD Thomas &
Solomon, LLP 693 East Avenue Rochester, New York 14607

(585)272-0540 agifford@theemploymentattorneys.com


On behalf of the DEFENDANT: TONYA B. BRAUN Jones Day

325 John H. McConnell Blvd., Suite 600 Columbus, Ohio

43215-2673 (614)469-3939 tbraun@jonesday.com


REPORTED BY:  Cheryl J. O'Meilia, C.S.R.

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

cb4f1969-01b0-440e-b1af-4dbfd8bd7096

NETWORK DEPOSITION SERVICES
Transcript of Jack Reddick

1        A.   Uh-huh.

2        Q.   Okay.  So -- and you said -- was that with

3   Kiwanis?

4        A.   I believe that was Kiwanis.

5        Q.   Were you a member of Kiwanis?

6        A.   No.

7        Q.   You had just gone to the event?

8        A.   Yes.

9        Q.   Okay.

10       A.   Uh-huh.

11       Q.   Were you a member of any type of organization

12  at the time you started working for Alderwoods?

13       A.   Masons.

14       Q.   The Masons?

15       A.   Lodge, uh-huh.

16       Q.   Anything else?

17       A.   No.

18       Q.   Did you -- had -- you had gone to at least

19  this one bean feed that Kiwanis had put on.  Had -- had

20  you been to bean feeds previous to that?

21       A.   Yes.

22       Q.   Is that a -- like a common type of fundraiser

23  here?

24       A.   It's a yearly -- yearly.

25       Q.   It's an annual fundraiser that Kiwanis does?

cb4f1969-01b0-440e-b1af-4dbfd8bd7096

NETWORK DEPOSITION SERVICES
Transcript of Jack Reddick

Page 167

1     A.   Yes.

2     Q.   In Independence?

3     A.   Yes.

4     Q.   And you had been to it before you said?

5     A.   Yes.

6     Q.   And had you attended other types of community

7  events in Independence like the bean feed that Kiwanis

8  did prior to becoming employed with Alderwoods?

9     A.   Before?  Oh, yes.

10     Q.   Like what?  Like what are some examples of

11  other things?

12     A.   Lions Club.

13     Q.   Like what kind of events would they do, Lions

14  Club?

15     A.   Pancake feed, pancake fundraiser, Lutheran

16  school would have a fundraiser.  I belong to the

17  Methodist church and they have a -- different types of

18  fundraisers and stuff.

19     Q.   Uh-huh.

20     A.   Cherryville has -- I think it's called Cherry

21  -- Cherry Blossom Festival or something like that that

22  we -- we go to.

23     Q.   Anything else you can recall attending before

24  you went to -- before you became employed by Alderwoods

25  in July '04?

cb4f1969-01b0-440e-b1af-4dbfd8bd7096

NETWORK DEPOSITION SERVICES
Transcript of Jack Reddick

Page 168

1     A.    No.

2     Q.    No?

3     A.    (Shakes head).

4     Q.    And then after you became an employee of

5  Alderwoods, did you continue your membership with the

6  Masons Lodge?

7     A.    Yes.

8     Q.    Did you continue going to the Kiwanis bean

9  feed?

10    A.    Yes.

11    Q.    Did you continue going to Lions Club pancake

12  --

13    A.    Yes.

14    Q.    -- pancake breakfast?        And did you

15  continue going to events at the Lutheran school?

16    A.    Yes.

17    Q.    And did you keep your membership in the

18  Methodist church?

19    A.    Yes.

20    Q.    And did you continue going to the Cherry

21  festival?

22    A.    Uh-huh.

23    Q.    In Cherry- -- in Cherryville?  Excuse me.

24       Okay.  Was there anything in addition that

25  you did after you became a member of -- excuse me --

cb4f1969-01b0-440e-b1af-4dbfd8bd7096

NETWORK DEPOSITION SERVICES
Transcript of Jack Reddick

Page 169

1    after you became an employee of Alderwoods?

2        A.    I renewed my membership in the Elks Club.

3    The Elks Club in Independence closed and I didn't know

4    Cherryville had one, so I -- Dave suggested that I

5    renew my membership over there if I could get back in,

6    which I did.

7        Q.    And that's the Elks Club?

8        A.    Uh-huh.

9        Q.    And you said the one in Independence had

10   closed?

11       A.    Yes.

12       Q.    Anything else?

13       A.    No.

14       Q.    And you say that -- that David asked you to

15   see if you could renew your membership or was that your

16   idea or did he ask you about it or --

17       A.    Yeah, I didn't know -- he asked me if I

18   belonged to the Elks Club and I said, "Well, I did

19   years ago" --

20       Q.    Uh-huh.

21       A.    -- because -- but I said, you know, it's

22   closed and I said, "There's no Elks Club around here."

23   I mean, there was one in Parsons, but --

24       Q.    Uh-huh.

25       A.    -- he said, "Well, they got an Elks Club in

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

cb4f1969-01b0-440e-b1af-4dbfd8bd7096

NETWORK DEPOSITION SERVICES
Transcript of Jack Reddick

1    Cherryville."  I said, "Well, I didn't know that."  And

2    he said, "Well, you ought to see if you could renew

3    your membership," so I did.

4        Q.   And did that -- how long had you been a

5    member of the Elks Club?

6        A.   Since I was 21.

7        Q.   Oh, okay.  So you had been a member of that

8    Elks Club in Independence for a number of years?

9        A.   Yes.

10       Q.   Okay.  Okay.  So you thought it was a good

11   service organization?

12       A.   Uh-huh.

13       Q.   Is that a "yes"?

14       A.   Yes.

15       Q.   And how long had you been a member of the

16   Masons Lodge before you started working with -- for

17   Alderwoods?  Excuse me.

18       A.   Maybe a year.  I was going to drop it, but

19   Dave wanted me to stay in it because the two other

20   employees belonged to it.

21       Q.   Okay.  You say that Dave wanted you to --

22   Dave Hill want you to stay in it?

23       A.   Uh-huh.

24       Q.   Did he tell you you had to stay in it?

25       A.   He didn't say I had to, but the way it was

cb4f1969-01b0-440e-b1af-4dbfd8bd7096

NETWORK DEPOSITION SERVICES
Transcript of Jack Reddick

Page 171

1   put to you.

2       Q.   And in terms of the Elks Club renewing your

3   Elks Club membership, were you told you had to do that?

4       A.   No, it was suggested that I did.

5       Q.   You mentioned that you thought some others --

6   other employees that you worked with were members of

7   the Masons Lodge; is that right?

8       A.   Oh, they are, they have been for years.

9       Q.   Who is that?

10      A.   Max Henries and Lee Cain.  And Marvin.

11      Q.   Max, Marvin and who was the other one?

12      A.   Lee.

13      Q.   Oh, and Lee.  Are those part-time individuals?

14      A.   Yeah.

15      Q.   Okay.  Are -- are you aware of anyone else

16  that you -- you worked with in that -- kind of that

17  2004 period that you were hired until, you know, 2006,

18  when you took the other position and the ownership

19  changed?  Were you aware of other people belonging to

20  community organizations, people you worked with at

21  Potts Chapel?

22      A.   I'm not sure what all they belonged to.  They

23  -- they belonged to organizations, I mean, most people

24  do, but I -- I don't know what all it was.  I didn't

25  ask them.

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

cb4f1969-01b0-440e-b1af-4dbfd8bd7096

NETWORK DEPOSITION SERVICES
Transcript of Jack Reddick

Page 176

1    it said other than something about servicing the

2    community?

3           A.   Yes.

4           Q.   You don't recall it saying anything about

5    whether or not individuals would be paid for the time

6    they spent in community service?

7                MS. GIFFORD:   Objection.

8           A.   No.

9           Q.   (BY MS. BRAUN)   You don't recall that?

10          A.   I don't recall.

11          Q.   Okay.   Or whether they would be required to

12   join a community service organization?

13          A.   I don't recall -- or recall seeing that.

14          Q.   You don't recall seeing that in there?

15          A.   No.

16          Q.   Do you recall seeing anything that

17   individuals would be required to record their time

18   spent in community service activities?

19          A.   No.

20          Q.   No?

21          A.   No.

22          Q.   You described the community service sheet and

23   the fact that you completed it, but do you -- do you

24   know whether others completed it at Potts Chapel?

25          A.   No, I don't know if they did or not.

cb4f1969-01b0-440e-b1af-4dbfd8bd7096

NETWORK DEPOSITION SERVICES
Transcript of Jack Reddick

Page 177

1      Q.   Did you ever see anyone else's completed --
2   completed community service sheet?
3      A.   I saw the sheets, each one of them had it.   I
4   don't know if they completed it or not.
5      Q.   Did you always complete yours?
6      A.   Yes.
7      Q.   Every month you did?
8      A.   Yeah.
9      Q.   Okay.   And at the time --
10      A.   Don.
11      Q.   -- Mr. Runyon -- at the time Mr. Runyon came
12   onboard, you stopped seeing the sheets, you said.   You
13   didn't -- you didn't use the sheets, you didn't see
14   them lying --
15      A.   No.
16      Q.   -- you know, being available?            Where
17   would you pick them up, by the way?
18      A.   From the LA's office.
19      Q.   Okay.   So you never saw them again after Don
20   came onboard?
21      A.   No.
22      Q.   Did you have performance evaluations while
23   you were an Alderwoods employee?
24      A.   Yes.
25      Q.   Okay.   And in those evaluations, were you

cb4f1969-01b0-440e-b1af-4dbfd8bd7096

NETWORK DEPOSITION SERVICES
Transcript of Jack Reddick

Page 179

1      A.    Yeah.

2      Q.    And he would say, "You need to get out there

3  in the community"?

4      A.    Yeah, yes.

5      Q.    Okay.  Did he make -- do you have any idea

6  whether he made statements like that to the other

7  employees that worked at Potts Chapel?

8      A.    No.

9      Q.    You don't know what other employees may have

10  been told or what was said to them regarding

11  participation in the community?

12     A.    No.

13     Q.    Your knowledge is limited to what he may have

14  said to you, to Chad and to John?

15     A.    Right.

16     Q.    Because you sat together?

17     A.    Yes.

18     Q.    Okay.  And do you know if Chad or John were

19  ever reprimanded for -- for their lack of participation

20  --

21     A.    No.

22     Q.    -- in the community?

23     A.    No.  When -- when I -- when I have said Chad

24  or John, I'm saying that we're all -- he doesn't --

25  when Dave was talking about overtime or community

cb4f1969-01b0-440e-b1af-4dbfd8bd7096

NETWORK DEPOSITION SERVICES
Transcript of Jack Reddick

Page 180

1    service or whatever, he didn't say John, Chad or Jack,

2    he'd just be sitting there talking and saying "guys" or

3    "you guys." He didn't point a finger at -- you know,

4    and he'd say, "You need -- can you get out and do some

5    community service?" Well, I knew he wasn't talking

6    about me because I turned my mine in, so was he talking

7    to them? I don't know.

8        Q.   But you were the only people in the room?

9        A.   Right.

10       Q.   Okay. And in term of the Elks Club, you'd

11   said that you had been an Elks Club member beginning

12   when you were 21 years old?

13       A.   Uh-huh, yes.

14       Q.   And so -- I mean, I don't want to put you on

15   the spot, but about approximately how many years was --

16   were you an Elks Club member then?

17       A.   Probably --

18       Q.   Before you went on hiatus?

19       A.   Let's see, probably 40 years.

20       Q.   And how many -- how -- how long have you

21   lived in -- in Independence?

22       A.   Since April of '72.

23       Q.   And since '72, how many times do you think

24   you've attended the fundraiser, the -- you know, with

25   Kiwanis or -- or otherwise, like the bean feed type

cb4f1969-01b0-440e-b1af-4dbfd8bd7096

NETWORK DEPOSITION SERVICES
Transcript of Jack Reddick

Page 181

1    fundraiser that you described?

2        A.   Oh, as I told you, I was on the ambulance

3    service, so I've been -- I've been to them ever since

4    I've been to town to all this kind of stuff to be out

5    in the public.

6        Q.   Okay.

7        A.   I've always worked with the public.

8        Q.   So going back to '72, probably?

9        A.   Yeah.

10       Q.   Okay.  And are you still a member of the Elks

11   Club?

12       A.   Yes.

13       Q.   Are you still a member of the Masons Lodge?

14       A.   Yes.

15       Q.   And you're still attending bean feed

16   fundraisers, going to pancake breakfasts, attending

17   fundraisers for the Lutheran school?

18       A.   Uh-huh.

19       Q.   Still a member of the Methodist church?

20       A.   Yes.

21       Q.   Okay.  And you still go to the Cherry Bloom

22   Festival -- or Blossom, was it, maybe?

23       A.   Yes.

24       Q.   Excuse me.  So that was a yes to all of those?

25       A.   Yes.

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

NETWORK DEPOSITION SERVICES
Transcript of Jack Reddick

Page 201

1      Q.   And when you put on that name tag, did you
2   write Potts Chapel on it?
3      A.   No, they all knew I worked there.
4      Q.   And when I asked you, like, if you were
5   incentivized to belong there, you -- you said, well,
6   you didn't have to -- you didn't pay or the -- your
7   employer, Alderwoods, did not pay?
8      A.   No.
9      Q.   But was there any other type of, you know,
10  program like if you -- you know, if you do the
11  community service work, you know, we'll get you a cake
12  on Friday or something?  I mean, that's what I'm asking
13  about.  Was there some other type of program, like if
14  you participate in this community service, then we'll
15  make sure that, you know, we bring donuts in on Friday
16  for you?
17     A.   Oh, no.  No.
18     Q.   And that's what I'm asking you about.  Okay.
19     A.   No.
20     Q.   All right.  And do you have any idea as to
21  whether employees at other locations, there may have
22  been programs, incentive type programs for -- for them
23  to belong in community service organizations or
24  participate in activities?
25     A.   Not that I know of.  I mean, no knowledge of

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

cb4f1969-01b0-440e-b1af-4dbfd8bd7096

NETWORK DEPOSITION SERVICES
Transcript of Jack Reddick

Page 202

1    it.

2         Q.   Have you ever heard of a program called I

3    Believe in Service?

4         A.   I Believe in Service?

5         Q.   Service?

6         A.   I don't -- not off the top of my head, no.

7         Q.   No?  Were you ever told that you would lose

8    your job if you did not continue to belong to the

9    Masons Lodge?

10        A.   Not that I would lose my job.  I was given the

11   impression that I wouldn't be working there if I didn't

12   attend some functions, not per se joining a club, but

13   if I didn't do the community service, I was given the

14   impression or left a feeling that I wouldn't work there.

15        Q.   You said you -- how long have you been a

16   member of the Methodist church?

17        A.   I was baptized there.

18        Q.   So since birth, basically?

19        A.   (Nods head).

20        Q.   Okay.  And are you also -- I just want to be

21   very clear because we talked about, you know, are you

22   seeking compensation for time you spent involved in

23   community service activities and with organizations and

24   being a member of the Methodist church was -- was one

25   that you named.

cb4f1969-01b0-440e-b1af-4dbfd8bd7096

NETWORK DEPOSITION SERVICES
Transcript of Jack Reddick

Page 232

1           MS. GIFFORD:  Objection.

2      Q.   (BY MS. BRAUN)  I mean, that's my question.

3      A.   Yeah.

4      Q.   Because that's what it says, that's what your

5  sworn testimony is here on this piece of paper.

6           MS. GIFFORD:  Objection.

7      A.   Yes.

8      Q.   (BY MS. BRAUN)  Yes, that's what you think it

9  said?

10      A.   Yes.

11      Q.   And here you state that it was a company-wide

12  policy?

13      A.   Potts Chapel Company, yes.

14      Q.   The -- the policy was in -- was at Potts

15  Chapel?

16      A.   Uh-huh.

17      Q.   But you state here that it was a company-wide

18  policy?

19      A.   Alderwoods.  It comes out of Alderwoods'

20  book.  All this stuff was in Alderwoods' policy manual.

21  I don't have that manual now because apparently they

22  took it all, what I didn't shred at their request.

23  It's gone.

24      Q.   You state in Paragraph Number 7 that

25  employees were expected to use their membership in

cb4f1969-01b0-440e-b1af-4dbfd8bd7096

NETWORK DEPOSITION SERVICES
Transcript of Jack Reddick

Page 233

1    volunteer community organizations to generate business

2    for the company?

3         A.   Uh-huh.

4         Q.   Why do you say that?

5         A.   Because we weren't getting paid, expect us to

6    go out and do it for nothing.

7         Q.   And did you, in fact, generate business for

8    the company?

9         A.   I hope I did.

10        Q.   Well, is there any evidence that you did?

11        A.   I go to a little restaurant called Half Pints

12   and we sit at this one big table and drink coffee and

13   we've had nine funerals from that table.  Now, did I do

14   it?  I don't know, but they came to Potts Chapel.

15        Q.   And this is from -- you said this is from a

16   restaurant you go to?

17        A.   Uh-huh.

18        Q.   And did you record the time that you spent

19   going to the restaurant on your community service?

20        A.   This is after I get off work and I go out and

21   get coffee and drink tea and visit with them and stuff.

22        Q.   I know.  But my question was whether you

23   recorded the time you spent in the restaurant on your

24   community service form that you discussed?

25        A.   I didn't record any of my time.

cb4f1969-01b0-440e-b1af-4dbfd8bd7096

NETWORK DEPOSITION SERVICES
Transcript of Jack Reddick

Page 234

1    Q.   Did you report the fact that you went to the
2  restaurant at all on your community service sheet?
3    A.   Yes.
4    Q.   You would put the time that you went to drink
5  coffee?
6    A.   Not time.
7    Q.   I'm sorry, did you record the fact that you
8  went to the restaurant --
9    A.   Yes.
10    Q.   -- on the sheet?
11    A.   Yes.  At that time, it was called Kenzies,
12  not Half Pints.
13    Q.   And is that time that you believe that you
14  should be compensated for, that you're seeking
15  compensation for in this litigation?
16    A.   Well, it's a group --
17       MS. GIFFORD:  Objection.
18    A.   It's a group that meets out there -- well,
19  they're out there about every day.
20    Q.   (BY MS. BRAUN)  Uh-huh.
21    A.   And I go out after work about 6:00 o'clock
22  and I stay until about 8:00 o'clock or so and then I
23  leave.  That's when everybody starts leaving.  They're
24  talking about hunting, they're talking about fishing,
25  they're talking about traveling, they're talking about

cb4f1969-01b0-440e-b1af-4dbfd8bd7096

NETWORK DEPOSITION SERVICES
Transcript of Jack Reddick

Page 235

1    camping.   It's a group that gathers out there.

2         Q.    But my question was, in this litigation, are

3    you seeking compensation for the time that you spent at

4    this restaurant after work?

5         A.    Yes.

6         Q.    Paragraph 8 says, "While I worked for

7    Alderwoods I was involved in a number of community

8    organizations."   Have we discussed today the

9    organizations in which you belonged?

10        A.    Yes.

11        Q.    In Paragraph 10, it talks about forms that

12   detail the type of work that you did, the amount and

13   the date that the work was done?

14        A.    Yes.

15        Q.    Is that referring to the charts that we --

16   that you described to me today?

17        A.    Yes, ma'am.

18        Q.    And Paragraph 11, you talk about being

19   evaluated on your participation?

20        A.    Yes.

21        Q.    What do you mean by that?

22        A.    Like when we'd have our meetings, Mike would

23   get those things and he would come in and tell me that

24   I was doing a good job, community service, "Keep up the

25   good work," and I says, "Okay, I will," and --

cb4f1969-01b0-440e-b1af-4dbfd8bd7096

NETWORK DEPOSITION SERVICES
Transcript of Jack Reddick

Page 287

1                        CERTIFICATE

2

3

4        I, CHERYL O'MEILIA, Certified Shorthand Reporter,

5   do hereby certify that the above-named Jack Reddick was

6   by me first duly sworn to testify the truth, the whole

7   truth, and nothing but the truth, in the case

8   aforesaid; that the above and foregoing deposition was

9   by me taken and transcribed pursuant to agreement, and

10  under the stipulations hereinbefore set out; and that I

11  am not an attorney for nor relative of any of said

12  parties or otherwise interested in the event of said

13  action.

14

15       IN WITNESS WHEREOF, I have hereunto set my hand and

16  official seal this 8th day of September, 2009.

17

18       CHERYL J. O'MEILIA, C.S.R.

19       State of Oklahoma, No. 1574

20

21

22

23

24

25

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

cb4f1969-01b0-440e-b1af-4dbfd8bd7096

**TAB 36**

Deposition of Michael T. Reno                          03/26/10
        Prise v. Alderwoods Group, Inc.

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

*   *   *   *   *

DEBORAH PRISE, et al.,          )
                                )
            Plaintiffs,         )
                                )
        vs.                     )  CASE NO.:
                                )  2:10-cv-00162-RCJ-LRL
ALDERWOODS GROUP, INC.,         )
                                )
            Defendants.         )
_____)

DEPOSITION OF MICHAEL T. RENO

Taken on Friday, March 26, 2010

At 10:00 a.m.

At 3773 Howard Hughes Parkway, Suite 390N

Las Vegas, Nevada

Reported By: Lori M. Unruh, R.D.R., C.C.R. #389

WESTERN REPORTING SERVICES, INC.
Las Vegas, Nevada (702) 474-6255

Deposition of Michael T. Reno                    03/26/10
          Prise v. Alderwoods Group, Inc.

Page 70

1      Q     So this is sort of community service work.

2      A     For the benefit of the mortuary.

3      Q     During the time that you were working for

4  Alderwoods, did you participate in any community

5  service --

6      A     I did not because I was too busy.

7      Q     Now earlier we talked about the events such as

8  the Christmas events and the lighting of the candles where

9  Alderwoods would ask you to come in.

10          Is that consistent with what we're talking about

11  with the community service events?

12      A     Sure it is.  It definitely is consistent.

13      Q     About how many times had you participated in

14  events like those?

15      A     Six times.  And these times were at the mortuary.

16  They weren't off property for me.

17      Q     Were these held during working hours?

18      A     After hours.

19      Q     After hours.  Were you paid for your time?

20      A     No.

21      Q     And I believe you mentioned earlier that you did

22  not log the time?

23      A     I did not.  And it was approximately a hundred

24  hours.

25      Q     So a hundred hours for about six events?  How

WESTERN REPORTING SERVICES, INC.
Las Vegas, Nevada (702) 474-6255

Deposition of Michael T. Reno                    03/26/10
              Prise v. Alderwoods Group, Inc.

Page 113

1                    CERTIFICATE OF REPORTER

2   STATE OF NEVADA    )
                       ss:
3   COUNTY OF CLARK    )

4           I, Lori M. Unruh, a Certified Court Reporter

5   licensed by the State of Nevada, do hereby certify:

6           That I reported the taking of the deposition

7   of the witness, MICHAEL T. RENO, commencing on Friday,

8   March 26, 2010, at 10:00 a.m.  That prior to being

9   examined the witness was by me duly sworn to testify to

10  the truth.  That I thereafter transcribed my said

11  shorthand notes into typewriting and that the typewritten

12  transcript of said deposition is a complete, true and

13  accurate transcription of said shorthand notes.

14          I further certify (1) that I am not a relative

15  or employee of an attorney or counsel of any of the

16  parties, nor a relative or employee of any attorney or

17  counsel involved in said action, nor a person financially

18  interested in the action, and (2) that transcript review

19  by the witness pursuant to FRCP 30(e) not requested.

20          IN WITNESS WHEREOF, I have hereunto set my hand

21  in my office in the County of Clark, State of Nevada, this

22  _____ day of _____, 2010.

23

24

25                    _____
                      Lori M. Unruh, RDR, CCR No. 389

WESTERN REPORTING SERVICES, INC.
Las Vegas, Nevada (702) 474-6255

dcd6f7ee-3858-4989-93e0-d9a408349994

**TAB 37**

NETWORK DEPOSITION SERVICES
Transcript of John Schabloski

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF PENNSYLVANIA

DEBORAH PRISE and HEATHER RADY

on behalf of themselves and all

employees similarly situated,

              Plaintiffs,

      vs.                 Case No. 06-1461

                         Hon. Joy Flowers Conti

ALDERWOODS GROUP, INC.,

              Defendant.

_____

      The Deposition of JOHN SCHABLOSKI,

      Taken at 630 East Chicago Street,

      Coldwater, Michigan,

      Commencing at 9:28 a.m.,

      Friday, May 15, 2009,

      Before Deana M. Van Dyke, CSR-3715.

1852c36f-c164-4a7f-883d-7d6600be703c

NETWORK DEPOSITION SERVICES
Transcript of John Schabloski

Page 76

1   A.   Uh-huh.

2   Q.   Now, did you record the time you spent working while

3        you were on call?

4   A.   If it was done through the Traverse City location.

5   Q.   Can you describe what you would do in terms of keeping

6        track of your time on call?

7   A.   You'd punch in using the time clock and for the

8        reasons, making removals, doing embalmings,

9        occasionally maybe waiting on a family, making family

10       arrangements if the family requested you do that at

11       that time.

12  Q.   I'm trying to understand.  If you received a call

13       while you were on call, something needed to be done,

14       you needed to do a removal, needed to do an embalming

15       or meet with the family and making arrangements, you

16       could go to Traverse City, correct, and clock in?

17  A.   Yes.

18  Q.   Did you do that?

19  A.   I did.

20  Q.   And did you stay clocked in until you finished

21       whatever you were doing?

22  A.   Yes.

23  Q.   And then you would punch out?

24  A.   Yes.

25  Q.   And return home?

1852c36f-c164-4a7f-883d-7d6600be703c

NETWORK DEPOSITION SERVICES
Transcript of John Schabloski

Page 77

1    A.    Yes.

2    Q.    Was there any instance in which you did not record

3          time that you worked while you were on call?

4    A.    I can think of maybe a couple times that I forgot to

5          punch in.  I just went to the funeral home, made the

6          removal, did the embalming, and then punched out but I

7          forgot to punch in.

8    Q.    So there would only have been one punch on your

9          timecard; is that what you're saying?

10   A.    Correct.

11   Q.    Do you think you were paid for that time?

12   A.    I don't know.

13   Q.    Other than the couple of times that you may have

14         forgot one of the punches on the time clock for a

15         particular occasion when you worked on call, is there

16         any other time you wouldn't record the time you worked

17         on call?

18              MS. GIFFORD:  At the Traverse City location

19         or anywhere are you talking about?

20              MS. BRAUN:  I want to talk about anywhere.

21   A.    No.

22   BY MS. BRAUN:

23   Q.    So your procedure would be if you got a call to go to

24         Traverse City to clock in and then do what you needed

25         to do, whether it be removal, whether it be embalming?

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

1852c36f-c164-4a7f-883d-7d6600be703c

NETWORK DEPOSITION SERVICES
Transcript of John Schabloski

Page 80

1    A.   Other than you could not have any overtime hours.

2    BY MS. BRAUN:

3    Q.   But my question was did anyone ever state to you you

4         will not be paid for the time you worked on call?

5    A.   No.

6    Q.   In fact, you'd clock in for the time you spent on

7         call?

8    A.   Right.

9    Q.   And you believe you were paid for that time?

10   A.   I don't know that for a fact but I assumed -- we just

11        assumed we were paid.  There would be no reason why

12        you would not think you wouldn't be paid.

13   Q.   Right, because you recorded the time on the time

14        clock?

15   A.   Yes.

16   Q.   We talked about your schedule and we talked about

17        there were times when Amanda Kirt directed you to do

18        work outside of your schedule, correct?

19   A.   Correct.

20   Q.   So there were, indeed, times that you worked beyond 40

21        hours in a work week, correct?

22   A.   Correct.

23   Q.   I'm going to hand you what is going to be marked as

24        Defendant's Exhibit 11.  This is Bates stamped 10709

25        through 19.

1852c36f-c164-4a7f-883d-7d6600be703c

NETWORK DEPOSITION SERVICES
Transcript of John Schabloski

Page 120

1           (Door interruption.)

2           MS. BRAUN:  Let's go off the record.

3           (Off the record at 1:30 p.m.)

4           (Back on the record at 1:35 p.m.)

5  BY MS. BRAUN:

6  Q.   Mr. Schabloski, we are back on the record.

7  A.   Okay.

8  Q.   We were talking about a meeting in late 2004.  I

9       believe you said it was a morning meeting, is that

10      correct, where Amanda Kirt spoke about community

11      service?

12 A.   Yes.

13 Q.   Was that the first time that you heard Amanda Kirt or

14      any member of management speak about community service

15      in relation to your employment at Alderwoods?

16 A.   Yes.

17 Q.   So prior to that you hadn't heard anything about

18      community service?

19 A.   No, I hadn't been there.  That's right, that's the

20      first time I heard it.

21 Q.   I mean, just to be clear, you were hired in August of

22      2004, correct?

23 A.   Correct.

24 Q.   But the first time you heard about a statement with

25      respect to community work or social clubs, was the

1852c36f-c164-4a7f-883d-7d6600be703c

NETWORK DEPOSITION SERVICES
Transcript of John Schabloski

Page 121

1    word you used, was in late 2004, probably November or
2    December, correct?
3  A.  That's correct.
4  Q.  Did you understand this, therefore, to be something
5    new?
6  A.  I don't know because I was new to the organization.  I
7    kind of assumed that it was new.  I mean, she brought
8    it up.
9  Q.  Because you had been working there for at least three
10    months at that point?
11  A.  Right, right.  Yes, it was something new.
12  Q.  I want to be clear on this because you've used a
13    different -- I've heard you use a couple different
14    terms.  I heard you say that Amanda said in the
15    morning meeting that everyone needed to find an
16    organization and then I've also heard you testify
17    today that you were requested to join an organization,
18    so what were you told?
19  A.  That we were -- we absolutely needed to find one.  We
20    were requested, it was mandatory.
21  Q.  Wasn't it a requirement?
22  A.  Yes, to work there.
23  Q.  Why do you say that it was a requirement to work
24    there?
25  A.  She said it was.  Because we had a fellow employee,

1852c36f-c164-4a7f-883d-7d6600be703c

NETWORK DEPOSITION SERVICES
Transcript of John Schabloski

Page 130

1          projects and doing community affairs through these

2          organizations.

3     Q.   Can you attribute any piece of business that the

4          funeral home received to your participation in any of

5          the community organizations that we've discussed?

6     A.   I can't give you certain names of people that came to

7          our funeral home because I was in those, no.

8     Q.   You testified that you did not report the number of

9          hours you spent in these community service

10         organizations to management at Alderwoods, correct?

11    A.   That's right.

12    Q.   It was never requested of you to report those hours?

13    A.   I didn't know how to go about doing that.

14    Q.   Was it ever requested that you needed to generally

15         report to Amanda or any member of --

16    A.   No, it was never asked.

17    Q.   You were never asked to report regarding your

18         involvement in the community activities?

19    A.   That's right.

20    Q.   Time or otherwise?

21    A.   Right.

22    Q.   Do you know if any other employee at Covell Funeral

23         Home reported their time or generally their activities

24         spent in community service to Amanda or any other

25         member of management at Alderwoods?

1852c36f-c164-4a7f-883d-7d6600be703c

NETWORK DEPOSITION SERVICES
Transcript of John Schabloski

Page 131

1            MS. GIFFORD:   Objection.

2    A.   I don't know.

3    BY MS. BRAUN:

4    Q.   During your employment at Alderwoods were you

5         evaluated on your performance?  Did you receive an

6         annual performance evaluation?

7    A.   No, I never did.

8    Q.   At Covell Funeral Home was there any sort of incentive

9         program to joining a community service organization?

10        Where you incentivized in way any to join?

11   A.   No, other than a requirement but there was no

12        incentive.

13   Q.   There was no incentive intensive program?

14   A.   No.

15   Q.   Have you ever heard of anything called I Believe In

16        Service?

17   A.   No.

18   Q.   Is it the first part of your employment between August

19        and November and December when you heard Amanda Kirt

20        make this statement you were not involved in a

21        community service organization?

22   A.   That's right.

23   Q.   And you were not disciplined during that time for not

24        being involved in a community service organization?

25   A.   That's correct.

1852c36f-c164-4a7f-883d-7d6600be703c

NETWORK DEPOSITION SERVICES
Transcript of John Schabloski

Page 138

1    Q.    And you did not record the time you spent on the

2          phone?

3    A.    No.

4    Q.    Did someone tell you not to record the time you spent

5          on the phone?

6    A.    No.

7    Q.    But in the same breath they didn't tell you to record

8          it either but your previous testimony is that you

9          understood that you should clock in for the time you

10         spent working on call, correct?

11   A.    That's right.  But how was I going to do that 15 miles

12         away when the phone was ringing or someone banging on

13         my front door?

14   Q.    Did you ever ask for clarification as to what you

15         should do about the time you spent answering a

16         telephone call or while on a call?

17   A.    No.

18   Q.    You never asked for clarification?

19   A.    No.

20   Q.    Did you ever discuss with another employee what they

21         did regarding the time they spent answering telephone

22         calls while on call?

23   A.    No.

24   Q.    So you have no knowledge as to whether another

25         employee working on call would have recorded that

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

1852c36f-c164-4a7f-883d-7d6600be703c

NETWORK DEPOSITION SERVICES
Transcript of John Schabloski

Page 142

1      flowers up.  It was more than just unlocking the door

2      and opening the door.  I mean, you helped them with

3      these.  It could be all the way from two, three plants

4      up to 25, 30 plants.  It'd all depend on what was left

5      and how big the service was.

6   Q.  So if the family was coming to you and asking for

7      assistance with the potted plants, I just want to

8      understand what funeral home is that it occurred in?

9      Could that occur like at Traverse City?  I mean, would

10      there be potted plants you'd be help --

11   A.  It could be.

12   Q.  And if there were potted plants at Traverse City,

13      would you record your time because you were at

14      Traverse City and the time clock was there?

15   A.  If you remembered to go through the garage door and do

16      it.

17   Q.  Are you saying there may be times that you would help

18      with the potted plants in another location other than

19      Traverse City?

20   A.  Right.

21   Q.  So is it your testimony that you wouldn't record the

22      time if you were at another location having to help

23      with the potted plants?

24   A.  There was no place to record the time other than at

25      Traverse City.  To answer your question, yes, you

1852c36f-c164-4a7f-883d-7d6600be703c

NETWORK DEPOSITION SERVICES
Transcript of John Schabloski

Page 143

1          would not record your time.

2     Q.   How many times do you recall assisting with potted

3          plants at Elk Rapids?

4     A.   In my two years that I was there or year and a half?

5     Q.   During the course of your employment.

6     A.   Probably 12, 15 times.

7     Q.   How many times do you recall assisting with potted

8          plants at the Kingsley location over the course of

9          your employment?

10    A.   Three, four.

11    Q.   Do you have any independent recollection today of how

12         long it took you on each of the 12 occasions at Elk

13         Rapids to assist with potted plants?

14              MS. GIFFORD:  Objection.

15    A.   It all depended.  I don't know how long it would have

16         taken me.

17    BY MS. BRAUN:

18    Q.   Do you have any recollection today as to how long it

19         would have taken you to assist the three times at

20         Kingsley regarding the potted plants?

21              MS. GIFFORD:  Objection.

22    A.   No.

23    BY MS. BRAUN:

24    Q.   What's the greatest amount of time you believe it

25         could have taken you to assist with a potted plant?

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

1852c36f-c164-4a7f-883d-7d6600be703c

NETWORK DEPOSITION SERVICES
Transcript of John Schabloski

Page 208

1                    CERTIFICATE OF NOTARY

2     STATE OF MICHIGAN )

3                      ) SS

4     COUNTY OF INGHAM  )

5

6               I, DEANA M. VAN DYKE, a Notary Public in

7          and for the above county and state, do hereby certify

8          that the above deposition was taken before me at the

9          time and place hereinbefore set forth; that the

10         witness was by me first duly sworn to testify to the

11         truth, and nothing but the truth; that the foregoing

12         questions asked and answers made by the witness were

13         duly recorded by me stenographically and reduced to

14         computer transcription; that this is a true, full and

15         correct transcript of my stenographic notes so taken;

16         and that I am not related to, nor of counsel to either

17         party nor interested in the event of this cause.

18

19

20

21                    _____

22                    DEANA M. VAN DYKE, CSR-3715

23                    Notary Public,

24                    Ingham County, Michigan

25     My commission expires:  February 27, 2011

1852c36f-c164-4a7f-883d-7d6600be703c

**TAB 38**

NETWORK DEPOSITION SERVICES
Transcript of James Stearns

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

----------------------------------------------------

DEBORAH PRISE and HEATHER RADY
on behalf of themselves and all
employees similarly situated,

        Plaintiffs,

vs.
                        File No. 06-1641
ALDERWOODS GROUP, INC.,

        Defendant.

----------------------------------------------------


        Deposition of James Stearns taken before

Kimberly A. McCallum, a Notary Public in and for the

County of Anoka, State of Minnesota, on Thursday the

8th day of April, 2010, commencing at approximately

9:30 a.m., at 200 West First Street, in the City of

Duluth, State of Minnesota.

                *    *    *

c6f0c9c5-853a-42a1-88c8-19ced7858018

NETWORK DEPOSITION SERVICES
Transcript of James Stearns

Page 65

1    says, "check all that apply."  And on your form
2    you did not check box A; is that correct?
3     A     That is correct.
4     Q     So is it fair to say that during the time
5    you worked at Alderwoods you did not perform
6    any community work for which you were not
7    compensated?
8     A     That's a true statement.
9     Q     Okay.  Are you aware of anyone else who
10   had to work community events or community work
11   for Alderwoods that did not receive
12   compensation?
13    A     You would have to approach my coworkers.
14   I don't know how to answer that for them.  I
15   don't know if they were or not.
16    Q     Did anyone ever tell you that they worked
17   a community event and didn't get paid for it?
18    A     No, not that I'm aware of.
19    Q     Okay.  And now no one -- so no one at the
20   Bell Brothers or Jarvi Dowd said that they have
21   done community work?
22                    MR. EHRMAN:  As far as he
23              knows?
24                    THE WITNESS:  As far as I
25              know.

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

NETWORK DEPOSITION SERVICES
Transcript of James Stearns

Page 157

1    STATE OF MINNESOTA)
                      )
2    COUNTY OF ANOKA   )

3

            I, KIMBERLY A. MCCALLUM, hereby certify that
4    I reported the deposition of James Stearns on the 8th
     day of April, 2010, in Duluth, Minnesota and that the
5    witness was by me first duly sworn to tell the truth,
     the whole truth and nothing but the truth concerning
6    the matter in controversy aforesaid;
7            That I was then and there a Notary Public in
     and for the County of Anoka, State of Minnesota;
8

            That by virtue thereof I was duly authorized
9    to administer an oath;
10           That the foregoing transcript is a true and
     correct transcript of my stenographic notes in said
11   matter, transcribed under my direction and control;
12           That the cost of the original has been
     charged to the party who noticed the deposition, and
13   that all parties who ordered copies have been charged
     at the same rate for such copies;
14

            That the reading and signing of the
15   deposition by said witness was not waived;
16           That I am not related to nor an employee of
     any of the attorneys or parties hereto, nor a
17   relative or employee of any attorney or counsel
     employed by the parties hereto, nor financially
18   interested in the outcome of the action and have no
     contract with the parties, attorneys or persons with
19   an interest in the action that affect or has a
     substantial tendency to affect my impartiality;
20

21           WITNESS MY HAND AND SEAL the 13th day of
     April, 2010.
22

23

                        _____
24                      KIMBERLY A. MCCALLUM
                             Court Reporter
25

c6f0c9c5-853a-42a1-88c8-19ced7858018

**TAB 39**

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DEBORAH PRISE and HEATHER      )
RADY, on behalf of themselves  )
and all employees similarly    )
situated,                      )
                               )
            Plaintiffs,        )
                               )
      vs.                      ) Civil Action No. 06-1641
                               )
ALDERWOODS GROUP, INC.,        )
                               )
            Defendants.        )
_____)

DEPOSITION OF NATHAN ROBERT STIFFLER

Glendale, Arizona
April 19, 2010
2:49 p.m.

REPORTED BY:

Cindy Bachman

Certified Reporter No. 50763

325d7e35-07f1-4ea0-95a2-3062cf8887ba

NETWORK DEPOSITION SERVICES
Transcript of Nathan Robert Stiffler

Page 82

1    Q.  Do you recall how the transition happened?
2  I mean, was it just an abrupt change?

3    A.  I don't recall the transition.

4    Q.  Okay.  We had talked earlier about the job
5  description of all the employees being required to
6  participate in community work as part of their job
7  description, correct?

8    A.  We talked about that?  You had me read the job
9  description there.

10    Q.  Yeah, we had talked about the provisions in the
11  job description about community work.

12    A.  Yeah, you had me read a bullet point.

13    Q.  Okay.  Do you know which employees at your
14  location are involved in community work?

15    A.  SCI or Alderwoods?

16    Q.  Let's talk about Alderwoods.

17    A.  Okay.  This was four years ago.  I don't recall
18  any of my employees being involved with community work.

19    Q.  Were you involved in any community work while
20  at Alderwoods?

21    A.  Alderwoods.  What kind of community work?

22    Q.  Things like attending religious functions or
23  gatherings, being members at different lodges or clubs.

24    A.  Are you asking if I was representing Alderwoods
25  at one of these events or was I there?

325d7e35-07f1-4ea0-95a2-3062cf8887ba

NETWORK DEPOSITION SERVICES
Transcript of Nathan Robert Stiffler

Page 84

1       A.  Steve Takesian.

2       Q.  While at Alderwoods, did you do anything to

3   encourage your employees to participate in community

4   work?

5       A.  I don't recall.

6           MS. WEYANDT:  What number are we on?

7           THE COURT REPORTER:  10.

8           (Deposition Exhibit No. 10 was marked.)

9   BY MS. WEYANDT:

10      Q.  I'll show you what we'll marked as Exhibit

11  No. 10, which -- the sticker covers the first Bates

12  stamped page.  So the second page is ALD 4972 through

13  ALD 4979.  Do you recall ever seeing this document?

14      A.  No.

15          (Deposition Exhibit No. 11 was marked.)

16  BY MS. WEYANDT:

17      Q.  I'll hand you what we're marking as Exhibit

18  No. 11, which is P13070 through P13072.  It says at the

19  top "Introduction:  Welcome to the Alderwoods Group

20  Community Leadership Program."

21      A.  No, I've never seen this document.

22      Q.  Do you know what the Alderwoods Group Committee

23  Leadership Program is?

24      A.  No.

25      Q.  Never heard of it?

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

325d7e35-07f1-4ea0-95a2-3062cf8887ba

NETWORK DEPOSITION SERVICES
Transcript of Nathan Robert Stiffler

Page 85

1      A.  No.

2          (Deposition Exhibit No. 12 was marked.)

3   BY MS. WEYANDT:

4      Q.  I'm handing you what we've marked as Exhibit

5   No. 12, which is ALD 8771 through 8914.  It says

6   "Alderwoods Group, Community Leadership Influencers

7   for: Location/General Manager."  Have you seen this

8   document before?

9      A.  No.

10     Q.  Did you ever attend any kind of training about

11  community leadership within Alderwoods?

12     A.  No.

13         (Deposition Exhibit No. 13 was marked.)

14  BY MS. WEYANDT:

15     Q.  I'm handing what we'll mark as Exhibit No. 13,

16  which is ALD 9106 through 9187.  It says "Alderwoods

17  Group, Community Leadership, Community Seminars for:

18  Location Managers/General Managers."

19     A.  Uh-huh.

20     Q.  Have you ever seen this document before?

21     A.  No.

22     Q.  Have you ever attended a training --

23     A.  Nothing.

24     Q.  -- about this subject?

25         Do you know if there were any binders at your

325d7e35-07f1-4ea0-95a2-3062cf8887ba

NETWORK DEPOSITION SERVICES
Transcript of Nathan Robert Stiffler

Page 86

1   Alderwoods location that would have contained --

2          A.  I never did see any of these documents.

3          Q.  -- training materials?

4          A.  I never seen any of these documents.

5          Q.  Okay.

6               MR. NAYLOR:  Wait for her to finish.

7               THE WITNESS:  I'm sorry.

8               (Deposition Exhibit No. 14 was marked.)

9   BY MS. WEYANDT:

10         Q.  I'm handing you what we've marked as Exhibit

11  No. 14, ALD 8741 through ALD 8770.  It says "Alderwoods

12  Group, Community Leadership Overview for: Location

13  Managers/General Managers."  Have you ever seen this

14  packet of documents?

15         A.  No.

16               (Deposition Exhibit No. 15 was marked.)

17  BY MS. WEYANDT:

18         Q.  I'm handing you what we're marking as Exhibit

19  No. 15, which is P11066 through P11067.  It says

20  "Alderwoods Group, Community Relation Road Map."

21         A.  Uh-huh.

22         Q.  And the second page looks like a map.  Have you

23  ever seen --

24         A.  No.

25         Q.  -- this document before?

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

325d7e35-07f1-4ea0-95a2-3062cf8887ba

NETWORK DEPOSITION SERVICES
Transcript of Nathan Robert Stiffler

Page 87

1     A.  No.

2     Q.  Would you remember seeing the second page of

3 this document?

4     A.  Yes, I would definitely remember that.

5     Q.  Have you ever heard about a community relations

6 road map within Alderwoods?

7     A.  No.

8     Q.  SCI wouldn't happen to have a community

9 relations road map?

10    A.  Nothing like this, no.

11    Q.  Have you ever heard of the leadership network

12 program?

13    A.  Are we talking Alderwoods?

14    Q.  Yes.

15    A.  No.

16        (Deposition Exhibit No. 16 was marked.)

17 BY MS. WEYANDT:

18    Q.  I'll show you what we're marking as Exhibit No.

19 16, which is P13692 through P13723.  It says

20 "Alderwoods Group, Living the Values: Competency

21 Development Resource Guide."  Have you ever seen this

22 document?

23    A.  No.

24    Q.  With Alderwoods, if employees -- now you talked

25 about this Steve -- Takesian, is that how you say it?

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

325d7e35-07f1-4ea0-95a2-3062cf8887ba

NETWORK DEPOSITION SERVICES
Transcript of Nathan Robert Stiffler

Page 88

1        A.   Takesian.

2        Q.   -- Takesian's community work.  Do you know if

3   there was any manner in which the company would

4   communicate to the employees that they would be paid

5   for community involvement?

6             MR. NAYLOR:  Object to the form.

7             THE WITNESS:  Ask that again.

8   BY MS. WEYANDT:

9        Q.   If an employee did community work, do you know

10  if there was any communication from Alderwoods as to

11  how they would be paid for that work?

12       A.   I don't know of any communication.

13       Q.   Do you know if either you or the Alderwoods

14  company did anything to ensure that the employees were

15  paid for their community work?

16            MR. NAYLOR:  Object to the form.

17            THE WITNESS:  If they did any work outside

18  normal company hours that represented the company, they

19  would be compensated for it.

20  BY MS. WEYANDT:

21       Q.   And how do you know that?

22       A.   How do I know what?

23       Q.   How do you know that policy?

24            MR. NAYLOR:  Object to the form.

25            THE WITNESS:  I don't know about other

325d7e35-07f1-4ea0-95a2-3062cf8887ba

NETWORK DEPOSITION SERVICES
Transcript of Nathan Robert Stiffler

Page 179

1

STATE OF ARIZONA        )
2                       )  ss.
COUNTY OF MARICOPA  )
3                       BE IT KNOWN that the foregoing deposition
was taken before me, CINDY BACHMAN, a Certified
4   Reporter No. 50763, for the State of Arizona, and by
virtue thereof authorized to administer an oath; that
5   the witness before testifying was duly sworn by me to
testify to the whole truth; that the questions
6   propounded to the witness and the answers of the
witness thereto were taken down by the Voice Writing
7   method and translated into text via speech recognition
under my direction; that the transcript was available
8   to read and sign; that the foregoing pages are a true
and correct transcript of all proceedings had upon the
9   taking of said deposition, all done to the best of my
skill and ability.
10                      I FURTHER CERTIFY that I am in no way
related to any of the parties hereto nor am I in any
11  way interested in the outcome hereof.
                        DATED at Phoenix, Arizona, this 27th day
12  of April, 2010.

13

                                _____
14                              Cindy Bachman, CR
                                Certified Reporter No. 50763
15

16

17

18

19

20

21

22

23

24

25

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

**TAB 40**

NETWORK DEPOSITION SERVICES
Transcript of Stephen Takesian

Page 1

THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA


DEBORAH PRISE and HEATHER RADY   )
on behalf of themselves and all  )
employees similarly situated,    )
                                 )
          Plaintiffs,            )
                                 )
     vs.                         ) Civil Action No. 06-1641
                                 )
ALDERWOODS GROUP, INC.,          )
                                 )
          Defendant.             )
                                 )
_____  )




          Deposition of STEPHEN TAKESIAN,

          taken at 101 North First Avenue,

          Phoenix, Arizona, commencing at

          9:42 a.m., Thursday, April 30,

          2009, before Shannon Stevenson,

          RPR, Arizona CSR No. 50461

fb1972bd-caad-4b8d-8189-4a22f58148a9

NETWORK DEPOSITION SERVICES
Transcript of Stephen Takesian

Page 38

1    Mr. Takesian?

2           A       It is.

3           Q       Is this your employment application?

4           A       It is.

5           Q       And was this application filled out in

6    response to the ad that you read in the newspaper?

7           A       Yes.

8           Q       In the first page where we -- where it says

9    list the hours you are available to work, do you see that

10   there's several boxes with the week across the top of it?

11          A       Yes.

12          Q       Were you looking for a full-time position?

13          A       Yes.

14          Q       And then you indicated that on Wednesday you

15   have written in Masonic Lodge 6:00 p.m.  Is that correct?

16          A       That's correct.

17          Q       What does that mean?

18          A       That's the only night I could not work.

19          Q       You are a Mason?

20          A       I am.

21          Q       I see you are wearing your ring.  How long

22   have you been a Mason?

23          A       Four years, five years, I think.

24          Q       You were a Mason prior to your employment at

25   Alderwoods Group?

fb1972bd-caad-4b8d-8189-4a22f58148a9

NETWORK DEPOSITION SERVICES
Transcript of Stephen Takesian

Page 39

1        A        I was.

2        Q        Then you list your high school and some of

3   your other post-high school education; correct?

4        A        Correct.

5        Q        Then below it says, "why do you want to work

6   for our company," and you wrote what?

7        A        "Have background in funeral business."

8        Q        What was that background that you are

9   referring to?

10       A        My apprenticeship, some of my time in the

11  military.  I was a military escort the last eight months of

12  my Naval career.

13       Q        Okay.  If we go to the second page it lists

14  your most recent employer Lawson Products; is that a correct

15  statement?

16       A        Yes.  That was Premiere.

17       Q        So Lawson Premiere are the nuts and bolts

18  that you --

19       A        Right.

20       Q        You have to let me finish my question.

21                That was the nuts and bolts sales position

22  that you held; correct?

23       A        Correct, that was the one that was sold.

24       Q        Curious about the next one.  You were also

25  selling Ultralite scooters.

NETWORK DEPOSITION SERVICES
Transcript of Stephen Takesian

Page 97

1          A          Service Commissioner.

2          Q          Did you -- you told me you were a member of

3     the Masonic Lodge prior to your work at Alderwoods Group?

4          A          Yes.

5          Q          Were you a chairman of the Mayor's Aging

6     Service Commission prior to your work at Alderwoods?

7          A          Yes.

8          Q          Any other community services that you worked

9     at?

10         A          Perish council member.

11         Q          Catholic church?

12         A          Armenian church.

13         Q          Okay.

14         A          Cub scout leader.  That's about it.

15         Q          We're going to talk more about that in

16    further detail.

17                    In any event, just so I have a clear

18    understanding, the 17 to 23 extra hours involved, among

19    other things, your work while you were doing things that

20    would benefit the company at the Masonic Lodge, while

21    working with the Mayor's Aging Service, your Armenian

22    church; is that correct?

23         A          Yes.  It would benefit myself, too.  It not

24    only benefits the company, myself too.

25         Q          In the sense you were making more sales?

fb1972bd-caad-4b8d-8189-4a22f58148a9

NETWORK DEPOSITION SERVICES
Transcript of Stephen Takesian

1     A       To be familiar with the family, to have the

2   ability to, for lack of a better unkind term, upsell them.

3     Q       That benefit the company?

4     A       Absolutely.

5     Q       And it benefited you as well?

6     A       If they bought something.

7     Q       Were you told that you had to go to these

8   viewings?

9     A       No.

10    Q       Again, same question with the community

11  service.  Were you told that you had to do that?

12    A       No, I wasn't told that.  But the only way to

13  do it in this business was to do that and that was the

14  experience of other people in the business and in the

15  industry.

16    Q       Okay.  I'm sorry to skip around.  Did anyone

17  tell you how to fill out the time cards or was it pretty

18  much you could do it just by looking at it?

19    A       I think Rob showed examples or something.

20    Q       Same thing with the time sheets?

21    A       Yeah.  We had a whole thing about that at the

22  8:00 meetings.

23    Q       When you say you "had a whole thing about

24  that," what would happen?

25    A       When it would change, whatever would come

Page 112

1   must report all hours actually worked unless exempt from

2   timekeeping requirements as permitted in compliance with all

3   federal and state/provincial regulation."

4        A      Yes.

5        Q      Did you record all the time actually worked?

6        A      I recorded the time on my time card of the

7   work I did within the property, yeah.

8        Q      Any time that you spent off the property you

9   did not record; is that correct?

10       A      Correct.  Or the times I would come in when I

11  would have a family show up on my day off, and I would be

12  called by work to come in.

13       Q      Why did you not record that time?

14       A      Usually it would be like afternoon hour or

15  two.  It was to follow up with paperwork or sales and

16  sometimes I did and sometimes I didn't.  Depending on the

17  weekend, sometimes my card wouldn't be there anymore because

18  she had -- Debbie had taken it the following -- the previous

19  Friday and had worked on the card or something.

20       Q      Did you ever seek to be paid for that time?

21       A      I would mention it.

22       Q      Were you paid?

23       A      I don't know.

24       Q      Was there ever an occasion where you entered

25  your start and stop time, for instance, on the time clock

fb1972bd-caad-4b8d-8189-4a22f58148a9

NETWORK DEPOSITION SERVICES
Transcript of Stephen Takesian

Page 145

1    Q        And there were two others.  Boy Scouts was

2    another one.  What were the other ones?

3    A        Pardon me?

4    Q        I thought you said the community --

5             MR. EHRMAN:  Actually, it was Cub Scouts.

6    Q        BY MR. DANIELS:  I think it's asked and

7    answered, but I'll speed up the process.  What community

8    services did you participate in that you believe you were

9    not compensated?

10   A        I was -- once a week I went to a senior

11   center.  I visited the senior center either running the

12   bingo or having lunch with them or explaining services to

13   them or just being there.

14   Q        Just give me the list of the community

15   services you did and then talk about each one individually.

16   There was the senior center, your Masonic Lodge; is that

17   correct?

18   A        Correct.

19   Q        And you told me your Armenian church?

20   A        Yes, I was, perish council member.

21   Q        And was it the Cub Scouts?

22   A        Yes.

23   Q        Any others?

24   A        Not that I can think of right now.

25   Q        Okay.  If you think of another one, let me

fb1972bd-caad-4b8d-8189-4a22f58148a9

NETWORK DEPOSITION SERVICES
Transcript of Stephen Takesian

Page 146

1    know, okay?

2         A       I will.

3         Q       The senior center, what was the name of that

4    senior center?

5         A       There's 22 senior centers in the city of

6    Phoenix, I went to all of them.

7         Q       I just thought of something.  Was the work

8    that you did at 22 senior service centers in conjunction

9    with the time you spent on the Mayor's Aging --

10        A       I wasn't a member of that commission when I

11   was employed at Alderwoods, but I used all that experience

12   and all those people that I had met over the years to gain

13   access to these people.

14        Q       Okay.  So your experience working on the

15   Mayor's Commission for Senior Aging assisted you in your

16   service that you did to the senior centers; correct?

17        A       Yes.

18        Q       And how many hours per week did you spend at

19   the senior centers?

20        A       Usually one day a week doing my community

21   service.

22        Q       A full day?

23        A       Most of the day.

24        Q       What would be the hours?

25        A       In between 8:00 and 5:00 I would normally

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

fb1972bd-caad-4b8d-8189-4a22f58148a9

NETWORK DEPOSITION SERVICES
Transcript of Stephen Takesian

Page 151

1   do community service and it was still listed 8:00 to 5:00,

2   were you actually paid for some of the time that you were

3   not on site?

4                    MS. DOUGLASS:  Objection to form.

5                    THE WITNESS:  If it was 8:00 to 5:00 during

6   the week, I was paid 40 hours.

7        Q        BY MR. DANIELS:  Regardless if you were at

8   Phoenix Memorial Park or at a senior service center?

9        A        During the week, yeah, during the day.

10       Q        However, is it your testimony that times

11  before or after that 8:00 to 5:00 schedule you were not paid

12  for it or on weekends?

13       A        If I was helping with a viewing, usually no.

14       Q        Okay.

15       A        Why would you help with a viewing, because --

16       Q        Like you said, upsell?

17       A        Upsell.

18       Q        Again, so I can get closure on this one

19  issue.  There were times then that you were paid for at

20  least part of the time that you were doing community service

21  work; is that a correct statement?

22       A        Sure.

23       Q        All right.  Thank you.

24                And you said at least one day a week you were

25  doing your community service at the senior centers?

fb1972bd-caad-4b8d-8189-4a22f58148a9

NETWORK DEPOSITION SERVICES
Transcript of Stephen Takesian

Page 154

1        Q        Did you do that?

2        A        Yes.

3        Q        How often?

4        A        In that year maybe seven times.  Business

5    card in the monthly newsletter, business cards up on the

6    walls.

7        Q        Okay.  Each time you attended a meeting, did

8    you go to, for the most part, all weekly meetings?

9        A        Yes.  I was an officer during that time.

10       Q        Okay.  During the 15 months then that you

11   were working, that's approximately 60 meetings then;

12   correct?  You are shaking your head yes.  I need an answer.

13       A        Yes.

14       Q        And each one was three to four hours.  Was a

15   portion of that three to four hours used for your own

16   personal experience as a Mason?

17                MS. DOUGLASS:  Objection to form.

18       Q        BY MR. DANIELS:  You can go ahead and answer.

19       A        Absolutely.

20       Q        Okay.  In fact, another way of looking at it

21   is would you have attended the Mason meetings even if you

22   were not selling and/or making presentations on behalf of

23   Phoenix Memorial Park?

24       A        Yeah.  That's not why I was a Mason.

25       Q        That's the question I was getting at.

fb1972bd-caad-4b8d-8189-4a22f58148a9

NETWORK DEPOSITION SERVICES
Transcript of Stephen Takesian

Page 155

1      A      That's not why I was a Mason.

2      Q      I think you said you were a Mason before?

3      A      Correct.

4      Q      However, once you began working there, you

5   spent at least some of the time, is what your testimony is,

6   I believe, selling funeral --

7      A      I was on the funeral committee there too.

8      Q      How much, if you can quantify for me, of the

9   three to four hours each meeting would you attribute to work

10  that you did that benefited Phoenix Memorial Park?

11     A      I wouldn't be able to tell you, I don't know.

12     Q      Would it be less than an hour, more than an

13  hour?

14            MS. DOUGLASS:  Objection.

15            THE WITNESS:  I don't know.  I don't

16  remember.  It depended.  Sometimes it would be all

17  afternoon.  I would be at a funeral, Masonic funeral all

18  afternoon, or I would be -- that night I would be at my

19  Masonic meeting and someone would bring their paperwork from

20  another situation and say I want you to look at this.

21     Q      BY MR. DANIELS.  Thank you for that.  I'm

22  talking about the 6:00 meetings on Wednesday.  I know you

23  told me that you may have spent a lot of time in a Mason

24  related funeral.  I'm trying to get a quantity of just the

25  meetings, the three- or four-hour-long meetings.  How much

fb1972bd-caad-4b8d-8189-4a22f58148a9

NETWORK DEPOSITION SERVICES
Transcript of Stephen Takesian

Page 161

1      Q      Okay.  Cub Scouts.  What's your role with the

2  Cub Scouts?

3      A      I was a cub master.

4      Q      Was this during the period of time that --

5      A      No.

6      Q      -- you were at Phoenix Memorial Park?

7      A      No.

8      Q      Did any of the work that -- did you do

9  anything within the Cub Scouts that benefited Phoenix

10  Memorial Park?

11      A      No.

12      Q      We put an end to that one then quickly.

13             Any other community service programs that you

14  participated in while working at Phoenix Memorial Park that

15  you believe was uncompensated?

16      A      Not that I can recall right now.

17      Q      There was a policy in effect that you were

18  aware of at Phoenix Memorial Park that required you to

19  participate in the community service events that you and I

20  just talked about?

21      A      It was expected.

22      Q      It was a written policy?

23      A      I'm not sure.  That was just driven home to

24  us by Rob and not a lot of people did that.  Unfortunately a

25  lot of people didn't understand that concept.  I think they

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

fb1972bd-caad-4b8d-8189-4a22f58148a9

NETWORK DEPOSITION SERVICES
Transcript of Stephen Takesian

Page 162

1   went on their insurance background.

2         Q        When you say not a lot of people, you talking

3   funeral directors?

4         A        No.  The family service professionals.

5   Funeral directors did nothing prospecting.  It wasn't that

6   type of ability with them.

7         Q        If you know, who was selling -- the title of

8   the person who was selling pre-need insurance product?

9         A        Whom?

10        Q        Yours is family service counselor?

11        A        Correct.

12        Q        Was there a different title for someone that

13  was selling pre-need with an insurance license?

14        A        Not that I know of.

15        Q        They were all family service professional or

16  counselor?

17        A        Correct.

18        Q        The difference was they had their license?

19        A        Correct.

20        Q        Did any of the product you sell, was it under

21  trust?

22        A        No.

23        Q        Were you -- in Arizona are you allowed to

24  sell trust without having an insurance license?

25        A        No, we are not.

fb1972bd-caad-4b8d-8189-4a22f58148a9

NETWORK DEPOSITION SERVICES
Transcript of Stephen Takesian

Page 163

1      Q       Did anyone evaluate your role in these

2   various community services?

3               MS. DOUGLASS:  Objection.

4               THE WITNESS:  No, but they were questioned

5   all the time.

6      Q       BY MR. DANIELS:  By whom?

7      A       Rob and Nathan.

8      Q       What did they question you on?

9      A       Where did I go, what did I do, what did I

10  accomplish.

11     Q       Did they appear to be pleased with your work

12  or what response did you get?

13     A       You know, it was always -- and I can only

14  speak for myself with regards to Rob and/or Nathan.  They

15  wanted to see results.  This talking was just talking.

16     Q       You said some folks didn't participate in

17  community service activities such as you.  What would happen

18  to them?

19     A       Nothing.

20     Q       Were they ever disciplined or reprimanded?

21     A       No.

22     Q       Were there any costs associated with your

23  involvement with the senior centers?

24     A       Sure.

25     Q       What were those costs?

fb1972bd-caad-4b8d-8189-4a22f58148a9

NETWORK DEPOSITION SERVICES
Transcript of Stephen Takesian

Page 232

1    STATE OF ARIZONA        )
                             ) ss
2    COUNTY OF MARICOPA      )

3

4        BE IT KNOWN that the foregoing deposition was taken

5    before me, SHANNON STEVENSON, a Certified Reporter in and

6    for the County of Maricopa, State of Arizona; that the

7    witness before testifying was duly sworn to testify to the

8    whole truth; that the questions propounded to the witness

9    and the answers of the witness thereto were taken down by me

10   in shorthand and thereafter reduced to computer-aided

11   transcription under my direction; that the foregoing

12   231 pages are a true and correct transcript of all

13   proceedings had upon the taking of said deposition, all done

14   to the best of my skill and ability.

15       I FURTHER CERTIFY that I am in no way related to any of

16   the parties hereto, nor am I in any way interested in the

17   outcome hereof.

18   (    )  Signature was requested.

19   (XXX)  Signature was not requested.

20       DATED at Phoenix, Arizona, this 11th day of May, 2009.

21

22

23   _____

                       SHANNON STEVENSON, CR, RPR
24                     Certified Reporter
                       Certificate No. 50461

25

fb1972bd-caad-4b8d-8189-4a22f58148a9

**TAB 41**

NETWORK DEPOSITION SERVICES
Transcript of Sandy Thomas

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO/OAKLAND DIVISION

* * * * *

WILLIAM HELM, DEBORAH PRISE,       )
HEATHER P. RADY, et al., on behalf )
of themselves and all other        )
employees and former employees     )
similarly situated,                )
                                   )
        Plaintiffs,                )
                                   )
    vs.                            )  CASE NO.
                                   )  CV-08-1184-SI
ALDERWOODS GROUP, INC.,            )
                                   )
        Defendant.                 )
_____   )

DEPOSITION OF SANDY THOMAS

Taken on Monday, October 19, 2009

At 9:30 a.m.

At 5845 Dean Martin Drive

Las Vegas, Nevada

REPORTED BY:  CHRISTY LYN DeJONKER, CCR NO. 691

fcc82a7c-be5a-4a53-805a-809e071852ac

NETWORK DEPOSITION SERVICES
Transcript of Sandy Thomas

Page 41

1    piecework pay.

2            Did you ever receive piecework pay at

3    Alderwoods?

4        A.    No.

5        Q.    Did any of the employees who reported to you

6    ever receive piecework pay at Alderwoods?

7        A.    No.

8        Q.    If you look at the next bullet, it says,

9    "Completed timecard sheets are to be signed by the

10   employee to verify the card accurately documents the

11   actual hours worked."

12           Do you see that?

13       A.    I see that.

14       Q.    Now, with respect to meal breaks, when

15   individuals worked through meal breaks, this policy was

16   not followed, was it?

17       A.    It wasn't.

18       Q.    And it wasn't followed by you on occasion,

19   correct?

20       A.    Well, I signed it.

21       Q.    But it did not accurately reflect all time

22   worked, correct?

23       A.    No.

24       Q.    And it goes on to say, "The employee's

25   supervisor and manager must also sign the timecard

fcc82a7c-be5a-4a53-805a-809e071852ac

NETWORK DEPOSITION SERVICES
Transcript of Sandy Thomas

Page 61

1        A.    Correct.

2        Q.    And if you look at the very bottom of 12,

3   after the hyphen, it indicates that they are only to be

4   signed after all hours worked have been recorded,

5   correct?

6              MR. LINGLE:  Objection.

7              THE WITNESS:  That is what it states here.

8   BY MS. DIAS:

9        Q.    If you look at Procedure under Call Logs, No.

10  1, it says, "Nonexempt employees who are on call are

11  required to carry and maintain a call log."

12             Do you see that?

13       A.    The first?

14       Q.    Yes.

15       A.    I see that.

16       Q.    Did the employees who reported to you carry

17  and maintain call logs?

18       A.    Yes.

19       Q.    And did you carry and maintain a call log?

20       A.    Yes.

21       Q.    And did you understand the call log, the

22  purpose of a call log to record all calls that you had

23  during regular work hours?

24       A.    Yes, I did.

25       Q.    And is that how you so instructed your

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

fcc82a7c-be5a-4a53-805a-809e071852ac

NETWORK DEPOSITION SERVICES
Transcript of Sandy Thomas

Page 62

1    employees or the employees who reported to you?

2         A.   Yes.

3         Q.   And to your knowledge, did they record all

4    phone calls?

5         A.   Yes.

6         Q.   And to your knowledge, did you record all

7    phone calls?

8         A.   I did.

9         Q.   Item No. 5 indicates that "Location managers

10   or general managers must verify and sign their

11   respective employees' call logs each week."

12            Did you verify the call logs of the employees

13   who reported to you?

14            MR. LINGLE:  Objection.

15            THE WITNESS:  Yes.

16   BY MS. DIAS:

17        Q.   If you skip two pages, Mr. Thomas -- well,

18   let me ask you first, the first page there indicates at

19   the top, weekly time sheet.  You see that, weekly time

20   sheet?  Is this the format that the time sheets

21   followed for the Thomas and Jones Funeral Home?

22        A.   I'm trying to remember.  I don't remember the

23   time sheet being exactly this way.

24        Q.   That's fine.  You don't recall if this is the

25   format that was used?

fcc82a7c-be5a-4a53-805a-809e071852ac

NETWORK DEPOSITION SERVICES
Transcript of Sandy Thomas

Page 64

1      A.   James worked on on call, I worked on-call
2  overtime.
3      Q.   Anyone else other than yourself and James?
4      A.   No.
5      Q.   So throughout the period of time when you
6  began working for Alderwoods until December of 2006,
7  the only people for Thomas and Jones Funeral Home who
8  worked on-call time was yourself and James Jones; is
9  that right?
10     A.   And Regina.  I'm sorry, Regina Bell.  She
11 worked on call.
12     Q.   Was there some type of schedule that you had
13 in place for who would work on call on what days?
14     A.   Yes.
15     Q.   What was that?
16     A.   Usually I would work on Monday nights on
17 call; I would take calls on Monday.  James would take
18 on Wednesday, and Regina would be Thursday, Thursday on
19 call.
20     Q.   What about Tuesdays?
21     A.   Someone else from another location.
22     Q.   Someone else from another --
23     A.   These are just the three days that the three
24 of us worked.  The office manager didn't work on call.
25     Q.   So the office manager never worked on call,

fcc82a7c-be5a-4a53-805a-809e071852ac

NETWORK DEPOSITION SERVICES
Transcript of Sandy Thomas

Page 65

1    correct?

2        A.    Correct.

3        Q.    And that is true for -- and that would be

4    true for Patty, Maria and Petra, none of the three of

5    them worked on-call time, correct?

6        A.    That's correct.

7        Q.    And the other three of you -- yourself, James

8    and Regina -- only worked on-call time one night a

9    week?

10       A.    A week.

11       Q.    And was that true from the time that you

12   started working for Alderwoods through December of

13   2006?

14       A.    No, no.  Because sometimes -- yeah, we didn't

15   leave it that way.  Because sometimes we would not do

16   the same day, but yeah.

17       Q.    So the answer to my question is yes, it was

18   for that entire period of time each of you only worked

19   one night per week of on-call time?

20       A.    Yes.

21       Q.    And what types of duties did you perform

22   while on call?

23       A.    Well, from 5 o'clock in the evening until 8

24   o'clock the next morning, we were on call for all calls

25   received from the answering service.  And at that time,

fcc82a7c-be5a-4a53-805a-809e071852ac

NETWORK DEPOSITION SERVICES
Transcript of Sandy Thomas

Page 85

1    A.   No.

2    Q.   And you say, "I had conversations with

3 co-workers and employees at other locations."  Any

4 other employees you spoke with?

5    A.   No.

6    Q.   So paragraph 11 refers to Shane Melody and

7 Nascio, solely, and that involved discussions that they

8 had with the same general manager as you, correct?

9    A.   Correct.

10    Q.   Did you ever have any discussions with any

11 employees of Alderwoods who reported to general

12 managers, other than your line of general managers,

13 about what they may have been told about working

14 on-call time?

15    A.   I can't recall.

16    Q.   So you wouldn't be able to speak to what any

17 other line general managers might have told people who

18 reported to them, correct?

19    A.   Correct.

20    Q.   And that would be true for your position as a

21 location manager and arranger, as well as all of these

22 other positions at Alderwoods, correct?

23    A.   Correct.

24    Q.   Have you or did you ever hear of something at

25 Alderwoods called the Community Leadership Program?

fcc82a7c-be5a-4a53-805a-809e071852ac

NETWORK DEPOSITION SERVICES
Transcript of Sandy Thomas

Page 86

1        A.    I can't recall.

2        Q.    Did you ever hear of anything called an

3   Influencer Program?

4        A.    No, I don't remember.

5        Q.    Did you ever create anything known as a

6   Leadership Network when you were employed by

7   Alderwoods?

8        A.    No, I didn't get into that program.

9        Q.    Did any of the individuals who reported to

10  you ever create anything known as a Leadership Network?

11       A.    No.

12       Q.    You never instructed them to do that,

13  correct?

14       A.    No.

15       Q.    Did you as the location manager at Thomas and

16  Jones ever fill out what was known as a Leadership

17  Network information sheet?

18       A.    I don't remember.

19       Q.    Did you ever direct any of the individuals

20  who reported to you to fill out a network information

21  sheet?

22       A.    Not that I can recall.

23       Q.    Did you ever set up anything known as a

24  Leadership Network Contact report?

25       A.    No.

fcc82a7c-be5a-4a53-805a-809e071852ac

NETWORK DEPOSITION SERVICES
Transcript of Sandy Thomas

Page 87

1     Q.   Did you ever instruct any of the individuals
2   who reported to you to fill out that type of a report?
3     A.   No.
4     Q.   Did you ever identify a group of influencers
5   within your community while you were at Alderwoods?
6     A.   No.
7     Q.   Did you ever instruct anyone who reported to
8   you to identify any influencers?
9     A.   No.
10     Q.   Did you ever participate in community seminar
11   programs while you were employed at Alderwoods?
12     A.   No.
13     Q.   Did you ever instruct any of the people who
14   reported to you to participate in any community seminar
15   programs?
16     A.   No.
17     Q.   Did the Thomas and Jones Funeral Home ever
18   host any type of community events while you were at
19   Alderwoods?
20     A.   Yes, we did.
21     Q.   What type of events did you host?
22     A.   We had -- we did some networking with the
23   church.
24     Q.   I'm sorry?
25     A.   We did some networking with the church.  We

fcc82a7c-be5a-4a53-805a-809e071852ac

NETWORK DEPOSITION SERVICES
Transcript of Sandy Thomas

Page 88

1  had where they come in and had different doctors and
2  things that came in and examined people for different
3  things.  We put that on.
4      Q.   When did those events occur?
5      A.   It occurred in 2006.
6      Q.   And did they occur during the course of the
7  regular work week?
8      A.   Yes.
9      Q.   So during your normal business hours?
10     A.   Normal business hours, yes.
11     Q.   So you were paid during the time you spent on
12 those programs, right?
13     A.   Right.
14     Q.   And any time that the individuals who
15 reported to you spent on those programs, they would
16 have been paid for it as well, correct?
17     A.   Correct.
18     Q.   Did your Alderwoods location -- and I'm going
19 to read a list of these things.  And my question is:
20 Did your location ever participate in these types of
21 events?  So, for example, did your location ever
22 participate in a food drive?
23     A.   No.
24     Q.   In any type of Father's Day or Mother's Day
25 event?

fcc82a7c-be5a-4a53-805a-809e071852ac

NETWORK DEPOSITION SERVICES
Transcript of Sandy Thomas

Page 118

1    evenings, I just want to make sure I understood what

2    you were telling me.  It's not only that Regina and

3    James didn't get paid for those visitations, they

4    weren't permitted to put down the visitations on their

5    time sheets, correct?

6         A.   Correct.

7         Q.   I thought that is what you said.  I just

8    wanted to make sure.

9              Other than the couple of seminars that you

10   referred to that were at the home and the one day of

11   volunteering at hospice, is there any other community

12   work that you did at Alderwoods as a representative of

13   the funeral home?

14        A.   No, not that I remember.

15        Q.   And I know you mentioned Regina attended the

16   hospice day with you.  Other than that, was there any

17   type of community work that any other employees at

18   Thomas Jones performed while you were employed by

19   Alderwoods?

20        A.   Okay.  James did go to a school once and did

21   a presentation for the school at the funeral home, yes.

22        Q.   He did that one time?

23        A.   One time, yes.

24        Q.   Do you remember what the presentation was?

25        A.   No, I don't remember.

fcc82a7c-be5a-4a53-805a-809e071852ac

NETWORK DEPOSITION SERVICES
Transcript of Sandy Thomas

Page 119

1      Q.    Did he do it during the course of the regular

2    workday?

3      A.    Yes.

4      Q.    Was he therefore paid for the time he spent

5    doing that?

6      A.    Yes.

7      Q.    Anything else that you can remember for

8    either Regina or James?

9      A.    Yes.  Sometimes like on the early Sunday

10   morning or Sunday we had to do some viewings, and then

11   we weren't compensated.  Like, when I say early Sunday,

12   if we had to transport a body to the airport for a

13   ship-out, you know, a couple of hours, we did it.  It's

14   like volunteer.

15     Q.    Okay.  So that sort of falls into the

16   category of beyond kind of six or seven hours of

17   overtime a week, whatever you did was not recorded

18   time, right?

19     A.    Right.

20     Q.    Now, on those written performance evaluations

21   that you did for the folks who reported to you, did you

22   evaluate them in any way recording any work that they

23   did in the community?

24     A.    No, because usually we didn't do any work.

25     Q.    Okay.  By the same token, when you were

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

fcc82a7c-be5a-4a53-805a-809e071852ac

NETWORK DEPOSITION SERVICES
Transcript of Sandy Thomas

Page 120

1  evaluated by your general manager, were you evaluated
2  at all based upon work you did in the community?
3      A.   No.
4      Q.   Okay.  Did your administrative assistant do
5  any work in the community?
6      A.   No.
7      Q.   And that would be true for all three of the
8  women?
9      A.   Yes, ma'am.
10     Q.   With the exception of the work that your
11 arrangers did and the times that they recorded or
12 didn't record and so forth, do you have knowledge of
13 what any arrangers did at any other Alderwoods
14 locations other than Thomas and Jones?
15     A.   No, I don't.
16     Q.   Or what they may have been told about
17 recording their time; you wouldn't have any knowledge
18 of that for arrangers, right?
19     A.   No, I wouldn't.
20     Q.   And similarly, other than what you know your
21 administrative assistants were told, you don't have any
22 knowledge about what managers may have told other
23 administrative assistants in other homes about
24 recording their time or working, correct?
25     A.   Correct.

fcc82a7c-be5a-4a53-805a-809e071852ac

NETWORK DEPOSITION SERVICES
Transcript of Sandy Thomas

Page 144

1                    CERTIFICATE OF REPORTER

2    STATE OF NEVADA   )
                       )    ss:
3    COUNTY OF CLARK   )

4            I, Christy L. DeJonker, a duly commissioned
     Notary Public, Clark County, State of Nevada, do hereby
5    certify:  That I reported the deposition of Sandy
     Thomas, commencing on Monday, October 19, 2009, at
6    9:30 a.m.

7            That prior to being deposed, the witness was
     duly sworn by me to testify to the truth.  That I
8    thereafter transcribed my said shorthand notes into
     typewriting and that the typewritten transcript is a
9    complete, true and accurate transcription of my said
     shorthand notes.  That review of the transcript was
10   requested.

11           I further certify that I am not a relative,
     employee or independent contractor of counsel of any of
12   the parties; nor a relative, employee or independent
     contractor of the parties involved in said action; nor
13   a person financially interested in the action; nor do I
     have any other relationship with any of the parties or
14   with counsel of any of the parties involved in the
     action that may reasonably cause my impartiality to be
15   questioned.

16           IN WITNESS WHEREOF, I have set my hand in my
     office in the County of Clark, State of Nevada, this
17   21st day of October, 2009.

18

19

20           _____

     CHRISTY LYN DeJONKER, CCR NO. 691
21

22

23

24

25

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

fcc82a7c-be5a-4a53-805a-809e071852ac

**TAB 42**

NETWORK DEPOSITION SERVICES
Transcript of Maurice Trull

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


----------------------------X
                            :
DEBORAH PRISE and HEATHER    :
RADY,                        :
            Plaintiffs,      :
                            :
vs.                          : Civil Action No.: 06-1641
                            : Judge Joy Flowers Conti
ALDERWOODS, INC.,            :
                            :
            Defendant.       :
----------------------------X




DEPOSITION OF MAURICE TRULL
(Taken by Defendant)
Monroe, North Carolina
April 16, 2010




Reported By:  Tobi L. Minich
              Registered Professional Reporter
              Notary Public

NETWORK DEPOSITION SERVICES
Transcript of Maurice Trull

Page 81

1       A.   No.

2       Q.   Did you ever receive any communication or

3  directive from Alderwoods regarding community work while

4  you were location manager?

5       A.   Specifically, I cannot recall any notification

6  about involvement in community work.

7       Q.   Have you ever heard of the Community

8  Leadership Program with Alderwoods, does that sound

9  familiar to you?

10      A.   No.

11      Q.   Do you recall any communications coming from

12 any managers above you with Alderwoods, just talking

13 about community work or the importance of community

14 work?

15      A.   No.

16      Q.   Pre SCI acquisition, were any employees at

17 your location involved in any type of community work?

18      A.   To my knowledge, no, other than myself.

19      Q.   And what type of community work were you

20 involved with?

21      A.   Well, civic work, Rotary Club, Lions Club,

22 SAGES.

23      Q.   SAGES, what is that?

24      A.   That's a club that's in Indian Trail, North

25 Carolina.  It's seniors -- let me write it down here.

0cf0c6d1-d3b0-42fc-b55b-428222159054

NETWORK DEPOSITION SERVICES
Transcript of Maurice Trull

Page 137

1                    CERTIFICATE OF REPORTER

2

3

4    STATE OF NORTH CAROLINA )

5    COUNTY OF MECKLENBURG    )

6              I, Tobi L. Minich, the officer before whom the

7    foregoing deposition was taken, do hereby certify that

8    the witness whose testimony appears in the foregoing

9    deposition was duly sworn by me; that the testimony of

10   said witness was taken by me to the best of my ability

11   and thereafter reduced to typewriting under my

12   direction; that I am neither counsel for, related to,

13   nor employed by any of the parties to the action in

14   which this deposition was taken, and further that I am

15   not a relative or employee of any attorney or counsel

16   employed by the parties thereto, nor financially or

17   otherwise interested in the outcome of the action.

18

19

20

                          _____
21                        Tobi L. Minich
                          Registered Professional Reporter
22                        and Notary Public in and for
                          North Carolina
23                        My Commission Expires:  8/17/2011

24

25

0cf0c6d1-d3b0-42fc-b55b-428222159054

**TAB 43**

NETWORK DEPOSITION SERVICES
Transcript of Matthew Twiss

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DEBORAH PRISE, and HEATHER RADY )
on behalf of themselves an all )
employees similarly situated, )
                       )
      Plaintiffs, )
                       )
    vs. ) Case No.: 06-1641
                       )
ALDERWOODS GROUP, INC., )
                       )
      Defendant. )
_____ )

DEPOSITION OF MATTHEW O. TWISS

Taken on Wednesday, April 29, 2009

9:30 o'clock A.M.

At 2620 Regatta Drive

Las Vegas, Nevada

Reported By: Sandy A. Dahlheimer, CCR 431

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

77bf5638-f629-45b4-887c-ae9e31cac6a8

NETWORK DEPOSITION SERVICES
Transcript of Matthew Twiss

1    Q.   That was a policy change you were to like write

2    that in obviously if you were at home and take a phone

3    call?

4    A.   Well, it was sporadic.  They had a book once

5    and that disappeared, and then you're supposed to take

6    these nights and then it became more and more nights

7    because the service, the answering service couldn't find

8    anybody, but that was where you wrote it in.  You wrote it

9    in on the left-hand column.

10   Q.   Okay.  We're going to go into greater detail

11   about the on-call and phones and things like that, but

12   what I'm understanding is that, because you were not on

13   site, you couldn't punch a time card, that's when you

14   would make the handwritten entries?

15   A.   For the phones?

16   Q.   Yes, for the phones.

17   A.   Right.

18   Q.   Would there be other handwritten entries you

19   would make like missed lunch, worked on calls, did a

20   community service?

21   A.   You -- yeah, there was nothing structured, you

22   know.  I mean it changed with the management.  It was a

23   mish-mash.

24   Q.   So depending on who your manager was at the

25   time --

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

77bf5638-f629-45b4-887c-ae9e31cac6a8

NETWORK DEPOSITION SERVICES
Transcript of Matthew Twiss

Page 132

1   better things.  I don't even remember the exact cause as

2   to why it fizzled.

3        Q.    Can you pull out Exhibit Number 4.

4              We're going to talk about some of the specific

5   allegations in the Complaint.

6              Turn to page 3 of the Complaint.  The

7   allegation paragraph 19 (a).  Are we on the same page

8   there?

9        A.    Yeah.

10       Q.    19(a) of the Complaint, I'm paraphrasing,

11  states that the defendant Alderwoods implemented a

12  community work policy pursuant to which Alderwoods did not

13  compensate the employees for such time spent in community

14  work and furtherance of the employee's business.

15             You see that?

16       A.    Yes, I do.

17       Q.    And in Exhibit 3 you stated that that in fact

18  was one of the allegations that you personally was

19  involved in; is that right?

20       A.    Yes.

21       Q.    Let's talk about that.

22             While working at Alderwoods Group, did you

23  participate in community service activities?

24       A.    Yes.

25       Q.    Where?

77bf5638-f629-45b4-887c-ae9e31cac6a8

NETWORK DEPOSITION SERVICES
Transcript of Matthew Twiss

Page 133

1      A.    St. Viator's Catholic Church.

2      Q.    How do you spell that?

3      A.    V-i-a-t-o-r-s.

4      Q.    That's a Catholic church here in Las Vegas?

5      A.    Yes, it is.

6      Q.    Any others?

7      A.    There's Healthsouth trade fairs that we had to
8  do in the community.

9      Q.    Any others?

10     A.    We were encouraged to Rotary, Kiwanis, things
11  like that.

12     Q.    Did you go to any of that?

13     A.    I did not, no.

14     Q.    So the two that you participated in were,
15  excuse me, St. Viator's Catholic Church and Healthsouth
16  health fairs.

17     A.    Yes.

18     Q.    Let's talk about St. Viator's Catholic Church.
19  What did you do there?  And let me lay a little
20  foundation.

21           Number one, are you Catholic?

22     A.    Yes.

23     Q.    Was that your home parish?

24     A.    No.

25     Q.    What is your home parish?

77bf5638-f629-45b4-887c-ae9e31cac6a8

NETWORK DEPOSITION SERVICES
Transcript of Matthew Twiss

Page 134

1      A.    It was at the time St Joseph's up on Sahara on
2   the west side of Las Vegas.
3      Q.    Where is St. Viator's located?
4      A.    On Eastern Avenue down many blocks from the
5   funeral home.
6      Q.    So it's closer to the funeral home than where
7   your parish was?
8      A.    Yes, it is.
9      Q.    Thank you.  I'm not real familiar with
10   Las Vegas.  I appreciate that.
11          So how many hours or days did you spend at
12   St. Viator's Catholic Church where it was benefiting or
13   servicing Alderwoods Group or Davis Funeral Home?
14      A.    Two hours a week.
15      Q.    What did you do?
16      A.    Attended Mass, sometimes there would be nightly
17   meetings.
18      Q.    When you attended that Mass, was that on a
19   Sunday?
20      A.    Sometimes, but it was also in the mornings
21   before work.
22      Q.    Were you participating in the Mass as a
23   Catholic as well?
24          MR. LINGLE:  Object to the form.
25   BY MR. DANIELS:

77bf5638-f629-45b4-887c-ae9e31cac6a8

NETWORK DEPOSITION SERVICES
Transcript of Matthew Twiss

Page 135

1    Q.    In other words, did you take Communion?  Did
2    you pray?
3    A.    I wouldn't have normally done that, no.  So I
4    was not.  This was strictly for Alderwoods.
5    Q.    What would you do?
6    A.    Be seen.  They were trying to break into that
7    parish, so to speak.
8    Q.    Did you give talks?  I'm Catholic as well so
9    I'm going to exclude from the entry song to the exit song,
10   the Mass itself, you're saying you did not participate in
11   that when you went to St. Viator's Catholic Church for
12   purposes of benefiting Alderwoods; is that right?
13   A.    Right.
14   Q.    So what would you do before or after the Mass
15   itself?
16   A.    Talk to certain people that I knew had already
17   gone there that we had served in the parish.
18   Q.    How would you do that?
19         MR. LINGLE:  Object to the form.
20   BY MR. DANIELS:
21   Q.    In other words, did you have a meeting with
22   them?  Would you see --
23   A.    Say hello, shake their hand.  Yeah, talk to
24   them afterwards.  There was breakfast meetings.
25   Q.    Are you a member of the Knights of Columbus?

77bf5638-f629-45b4-887c-ae9e31cac6a8

NETWORK DEPOSITION SERVICES
Transcript of Matthew Twiss

Page 146

1  getting paid?

2      A.   Well, six of one, half a dozen of the other.

3  It's a job.

4      Q.   There's no record of the time that you spent

5  there that you're aware of, written record?

6      A.   That's correct.

7      Q.   And you never turned it in to be paid?

8      A.   No.

9           MR. LINGLE:  Object to the form.

10  BY MR. DANIELS:

11      Q.   Was there a company wide policy, not just with

12  Gerhardt, but a company wide policy, Alderwoods' policy,

13  some policy that you looked at earlier today that required

14  the community service work?

15      A.   Yes.

16      Q.   Do you have a copy of that written policy?

17           MR. LINGLE:  Object to the form?

18           THE WITNESS:  No, I don't.

19  BY MR. DANIELS:

20      Q.   Have you ever seen a copy of the written

21  policy?

22           MR. LINGLE:  Object to the form.

23           THE WITNESS:  I have.

24  BY MR. DANIELS:

25      Q.   What did it say to your best recollection?

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

77bf5638-f629-45b4-887c-ae9e31cac6a8

NETWORK DEPOSITION SERVICES
Transcript of Matthew Twiss

Page 147

1      A.    Robert showed it to me.

2      Q.    Robert Falcon?

3      A.    Yeah.

4      Q.    What did it say?  What do you recall?

5      A.    Something to the effect that as an employee of

6  Alderwoods you must be involved in civic community duties.

7      Q.    Did it say you wouldn't be paid?

8      A.    It had nothing to do with compensation.  It's

9  part of your being an employee.  You must do this.

10     Q.    Was it a part of the binders that we talked

11  about earlier?

12           MR. LINGLE:  Object to the form.

13           THE WITNESS:  It wasn't a mission statement

14  binder.  It was in a folder.  Robert just showed it to me.

15  BY MR. DANIELS:

16     Q.    What was your response when he showed it to

17  you?

18     A.    I'd known this going in.  I knew that this is

19  what they expected.

20     Q.    Did you and Steve have a discussion about that

21  when you were first hired?

22     A.    Yes.

23     Q.    Did you ask him --

24     A.    He says it's encouraged.

25     Q.    It was encouraged to be involved in the

77bf5638-f629-45b4-887c-ae9e31cac6a8

NETWORK DEPOSITION SERVICES
Transcript of Matthew Twiss

Page 148

1   community?

2        A.   Strongly encouraged.

3        Q.   Was there discussion with Steve about pay?  Did

4   you ask him if you'd be paid?

5        A.   Yes.

6        Q.   What did he say?

7        A.   I said I understand this is something we do not

8   receive monetary rewards for, and he said absolutely no.

9        Q.   Did you receive any training about getting

10  involved in the community?

11       A.   No.  Discussion but no formal training.

12       Q.   And you also said you were involved in

13  Healthsouth trade fairs?

14       A.   Yes.

15       Q.   How many Healthsouth trade fairs did you

16  participate in?

17       A.   About four.

18       Q.   Where were they located?

19       A.   Different -- one was up at the Olympic Avenue

20  up off of Sunset.  Something like this but much bigger.

21       Q.   Who put --

22       A.   Nursing homes.  Health care center would set up

23  booths.  People that set up the stuff you put inside your

24  shoes, you know, ped stuff.  Different booths, and funeral

25  home -- John Gerhardt ordered a banner, Davis Funeral

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

77bf5638-f629-45b4-887c-ae9e31cac6a8

NETWORK DEPOSITION SERVICES
Transcript of Matthew Twiss

Page 149

1    Home.
2        Q.   And would you man that --
3        A.   And the pre-need people would go to one
4    particular one.  She and I would go.
5        Q.   What would you do?
6        A.   Stand there, hand out pens, cards, talk to
7    people about prearranging funeral homes.
8        Q.   How long was this?
9        A.   Four hours, five hours.
10       Q.   Four to five hours on four separate occasions?
11       A.   Yes.
12       Q.   Do you have any record of the time that you
13   spent.
14            MR. LINGLE:  Object to the.  Form?
15            THE WITNESS:  No record.  No.
16   BY MR. DANIELS
17       Q.   Did you ever -- were you paid for that time?
18       A.   I was paid for one.
19       Q.   Which one.  The first one?  The last one?
20       A.   The second one because I remember I
21   specifically asked John Gerhardt.
22       Q.   What did you ask him?
23       A.   I said can I clock in and clock out on this?
24       Q.   What did he say?
25       A.   He said yes.

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

77bf5638-f629-45b4-887c-ae9e31cac6a8

NETWORK DEPOSITION SERVICES
Transcript of Matthew Twiss

Page 150

1    Q.   Did you ask him about the first fair, whether
2  or not you'd be paid?

3    A.   It was expected to go and he said no.

4    Q.   So you asked him and he said no, I'm not going
5  to pay you?

6    A.   Yes.  He said this is all part of the -- I said
7  okay.

8    Q.   The third and fourth trade fair you attended,
9  you asked to be paid?

10   A.   I did not ask on the third and fourth.

11   Q.   Why not?

12   A.   Because I knew what the answer would be.

13   Q.   You would not be paid?

14   A.   Yeah.

15   Q.   Do you know why he paid you on the second one?

16   A.   Caught him in a weak moment.  I don't know.

17   Q.   So you were not paid for the first, third, and
18  fourth --

19   A.   I believe there were three total that I
20  actually -- there were three.  I was paid for one and not
21  the other two.

22   Q.   Were you receiving training on how to man these
23  booths?

24   A.   A little, yeah.

25   Q.   Who gave you that?

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

77bf5638-f629-45b4-887c-ae9e31cac6a8

NETWORK DEPOSITION SERVICES
Transcript of Matthew Twiss

Page 152

1          You got it?

2     A.    Got it.

3     Q.    It's talking about the Alderwoods implemented

4  on-call pay policy.

5          Under the policy employees were suffered or

6  permitted to perform work by handling calls and other work

7  related issues after normal business hours, but Alderwoods

8  would not compensate employees for work performed outside

9  of regular workday off-site from the funeral home.

10         We've already talked on this quite a bit, and

11  you said that you were on call two to three days a week on

12  average; is that correct?

13    A.    Sometimes it was more.

14    Q.    Was it sometimes less as well?

15    A.    No.

16    Q.    Would you record at least one hour of on-call

17  time every time you were on your on call?

18    A.    Yes.

19    Q.    And it was your previous testimony that you

20  were only allowed to record one hour?

21    A.    Right.

22    Q.    And that's per night, per time on call?

23    A.    Right.

24    Q.    Was it an expectation that you were going to

25  take calls, or was it a voluntary type situation?

77bf5638-f629-45b4-887c-ae9e31cac6a8

NETWORK DEPOSITION SERVICES
Transcript of Matthew Twiss

Page 178

1           THE WITNESS:  No.

2   BY MR. DANIELS:

3       Q.    Do you know what this document is, the ePayroll

4   Transaction Report?

5       A.    No.

6       Q.    When you say you've seen something similar to

7   this, have you actually seen this document?

8       A.    No, no.

9       Q.    Then we go to the next page, 1250.  It's

10  entitled Funeral Home Payroll, Payroll Entry Data for Pay

11  Period August 27, 2004.

12          Do you recognize that document?

13      A.    No.

14      Q.    Here it indicates that you worked 40 hours

15  regular, 10.9 hours overtime, and one hours of phone; is

16  that right?

17      A.    Yes.

18      Q.    Then if we go to the next -- second-to-the-next

19  document, there's a what appears to be a time card.

20          Is that what your time cards looked like while

21  you were working at Davis Funeral Home?

22      A.    Yes.

23      Q.    Then on the left-hand side from Wednesday it

24  appears you wrote in one hour phones?

25      A.    Yes.

77bf5638-f629-45b4-887c-ae9e31cac6a8

NETWORK DEPOSITION SERVICES
Transcript of Matthew Twiss

Page 179

1    Q.    Does that mean that that week you worked only
2  one night of on call?
3    A.    That's all I could put so that's what I put.
4    Q.    I thought you could put one hour per night per
5  week?  In other words, if you worked four nights of call,
6  you would get four hours of on-call time.
7    A.    This was 2004?
8    Q.    Yes.
9    A.    Yes.
10   Q.    So here this week you worked one hour -- worked
11 one night of on call?
12   A.    Yes.
13   Q.    If we go to 1253, it appears that your recorded
14 and were paid 40 hours of regular time and 4.7 hours of
15 overtime; correct?
16   A.    Yes.
17   Q.    And if you continue to the next pay card or
18 time card, there is no notation that you worked any on
19 call; correct?
20   A.    Correct.
21   Q.    So there were weeks that you did not work on
22 call?
23   A.    That I recorded.
24   Q.    Well, I understand that, but earlier you
25 testified that you would record at least one hour per

77bf5638-f629-45b4-887c-ae9e31cac6a8

NETWORK DEPOSITION SERVICES
Transcript of Matthew Twiss

Page 185

1       A.    Yes, it is.

2       Q.    Were you at one time then told to start signing

3    the time cards?

4       A.    Yes.

5       Q.    Here we also see two hours phone.  Do you see

6    that?

7       A.    Yes, I do.

8       Q.    In the previous page it indicates --

9       A.    They actually did pay me.

10      Q.    If you look at 1311, you record -- that is your

11   signature again.  I see that, and you record two hours

12   phones, and you were actually paid two hours; correct?

13      A.    Yes.

14      Q.    Interesting now.  This is one where you

15   indicate where you had to hand write in on the last entry

16   for Sunday five clock for some reason --

17      A.    For Saturday?

18      Q.    Is that Saturday?  You're right.  It's

19   Saturday.

20            That's a case where you told me earlier

21   sometimes you just couldn't get to the time clock so you'd

22   write it in?

23      A.    Yeah.

24      Q.    If we look at 1315, we see recorded two hours

25   phones on Tuesday and one hour phone on Friday.  You sign

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

77bf5638-f629-45b4-887c-ae9e31cac6a8

NETWORK DEPOSITION SERVICES
Transcript of Matthew Twiss

Page 186

1    it.  In fact, are paid for three hours of phones.

2         A.    Yes.

3         Q.    That was a good day for you, a good week, 65

4    hours that you were paid.

5              MR. LINGLE:  Object to the form.

6    BY MR. DANIELS:

7         Q.    Right.  40 hours regular time and 28.33 hours

8    overtime.

9         A.    Yeah, pretty typical.

10        Q.    Okay.  Again, I'm not going to go through this

11   whole exercise.

12             Get you to look at 1409.  You see that there?

13   You were on call a lot.

14        A.    Uh-huh.

15        Q.    Four days of on call; correct?

16        A.    Yes.

17        Q.    And you were paid for those four hours?

18             MR. LINGLE:  Object to the form.

19   BY MR. DANIELS:

20        Q.    Right?

21        A.    Yes.

22        Q.    Then at 1412.

23        A.    Uh-huh.

24        Q.    There we got four hours for on call and you say

25   one of these say equals one personal day.  What does that

77bf5638-f629-45b4-887c-ae9e31cac6a8

NETWORK DEPOSITION SERVICES
Transcript of Matthew Twiss

1    hours, and other conditions of employment; more

2    specifically, the records kept by Alderwoods failed to

3    adequately and accurately disclose among other things the

4    hours worked each work day, the total hours worked each

5    work week, and/or the total overtime compensation for each

6    work week and are liable to the plaintiffs.

7            Other than what you have already told us today,

8    what is the basis for that claim or bases for that claim?

9        A.    Other than what I've answered and this is kind

10   of a question to you is that two-month log that we had and

11   what the manager's office disappeared.  Would that be

12   another basis?  I don't know.

13       Q.    If you think it may be, sure.

14       A.    I would think so.

15       Q.    That's the log where you were logging in your

16   on-call time?

17       A.    Yes.

18       Q.    Can you describe that log for me?

19       A.    It was in a folder, and it was on the desk as

20   you walked into the manager's office and always there to

21   be reached by employees.

22       Q.    How big was it?

23       A.    A regular folder.

24       Q.    So is it like a folder that would open up --

25       A.    A binder, three-ring binder.

77bf5638-f629-45b4-887c-ae9e31cac6a8

NETWORK DEPOSITION SERVICES
Transcript of Matthew Twiss

Page 204

1     Q.    It would contain some 8-a-half-by-11 pieces of
2   paper?
3     A.    Yes.
4     Q.    Were there preprinted words --
5     A.    On call log.
6     Q.    And then what would you enter, if anything?
7     A.    What you did -- removals, nighttime, and
8   anything on the side that you could think of had to come
9   in at night for anything.
10     Q.    Did it have a stop and start time on it?
11     A.    Yep, record everything.
12     Q.    So you recorded the time you started and the
13   time you finished?
14     A.    Yes.
15     Q.    Anything else that you would record?
16     A.    That was basically it.
17     Q.    Now, was that when Steve was the manager,
18   Robert was the manager, or Laura was the manager?
19     A.    Started with Steve as the manager, disappeared
20   with Steve as the manager.
21     Q.    So this was early on in your working for Davis
22   Funeral Home; correct?
23     A.    Yes.
24     Q.    Other than the overtime claim and the, you
25   know, paid wages that we've already talked about, do you

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

77bf5638-f629-45b4-887c-ae9e31cac6a8

```
 1    STATE OF NEVADA    )
                         )  ss
 2    COUNTY OF CLARK    )
                              CERTIFICATE OF REPORTER
 3
              I, Sandy A. Dahlheimer, CCR #431, Clark County,
 4
      State of Nevada, do hereby certify:
 5
              That I reported the taking of the deposition of
 6
      MATTHEW O. TWISS, commencing on the 29th of April, 2009,
 7
      at the hour of 9:30 a.m., and that prior to being examined
 8
      the witness was by me duly sworn to testify to the truth,
 9
      the whole truth, and nothing but the truth.  That I
10
      thereafter transcribed my said shorthand notes, and that
11
      the typewritten transcript of said deposition is a
12
      complete, true, and accurate transcription of my shorthand
13
      notes.
14
              I further certify that I am not a relative or
15
      employee of the parties, attorneys, or counsel involved in
16
      said action, nor a person financially interested in the
17
      action.
18
              IN WITNESS WHEREOF, I have hereunto set my hand in
19
      my office in the County of Clark, State of Nevada, this
20
      4th day of May, 2009.
21

22

23

24          _____
            SANDY A. DAHLHEIMER, CCR 431
25
```

**TAB 44**

NETWORK DEPOSITION SERVICES
Transcript of Sandra Walker

Page 1

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE WESTERN DISTRICT OF PENNSYLVANIA

_____

DEBORAH PRISE and HEATHER RADY on      )
behalf of themselves and all           )
employees similarly situated,          )
                                       )
  Plaintiffs,                          )
                                       )
         vs.                           ) Civil Action 06-1641
                                       )
ALDERWOODS GROUP, INC.,                )
                                       )
  Defendant.                           )

_____

          Deposition Upon Oral Examination Of

                   SANDRA WALKER

_____




                  8 o'clock a.m.

                  April 14, 2010

              620 South Hill Park Drive

                Puyallup, Washington






REPORTED BY:  Yvonne A. Gillette, CCR No. 2129.

NETWORK DEPOSITION SERVICES
Transcript of Sandra Walker

Page 37

1      Q      But their work and what they were doing was

2   not something that you would pay a lot of attention

3   to?

4      A      No.

5      Q      Would you agree with the statement that,

6   although your understanding is that community work was

7   not required, that funeral directors were strongly

8   encouraged to participate?

9      A      No.  Can I elaborate on that?  I object to

10  the word strongly.  It was encouraged, but no one

11  really enforced it.

12     Q      Okay.

13     A      It was more of a best practice.  So if you

14  didn't do it in your location, it's not like you would

15  get in trouble.

16     Q      Okay.

17     A      And speaking from my experience -- you

18  wanted to go over Powers.  I believe that's how we

19  lost a lot of our market share.  We didn't do

20  community outreach.

21     Q      Would I be correct that you would not really

22  know what community outreach work was done by funeral

23  directors, because your focus was truly on the

24  administrative side of the business?

25     A      During 2001 to 2007, that is correct.

7f64577e-0e8a-4204-95e5-8c57c30e4f78

NETWORK DEPOSITION SERVICES
Transcript of Sandra Walker

Page 39

1   Do you have to do it?  No.

2        Q     Did you do it?

3        A     I did because I liked it.  And this is from

4   2007, the time frame.

5        Q     And before that?

6        A     It never existed because it was Alderwoods.

7        Q     But they had other programs, correct?

8        A     Not official programs like this.

9        Q     Okay.  Were there individuals that you were

10  aware of in 2001 up to 2007 who participated in

11  community work and were paid?

12       A     I don't know.

13       Q     Okay.  I guess what I'm getting to, was it

14  your understanding, if you performed community work

15  from 2001 to 2007, you would be paid for the time of

16  that community work?

17       A     That is correct, yes.  And I can give you a

18  specific example just on conference calls.  Say you

19  took an administrator to lunch, even though you are

20  eating lunch, you are still paid for that.  It's paid

21  lunch.

22       Q     Okay.  What if an individual would

23  participate, let's say, in the Lion's Club, and he had

24  joined the Lion's Club for the reason that he wanted

25  to get the name of the funeral home out there?

NETWORK DEPOSITION SERVICES
Transcript of Sandra Walker

1        A       He would be paid.

2        Q       And what was the manner in which you would

3    keep this time?

4        A       Washington state has a 40-hour work week.

5    So you record your time daily on your time card.  And

6    then you would then calculate overtime into that, if

7    there was overtime.

8        Q       What is the present policy for work

9    performed in community work?

10       A       You're paid for everything you do in

11   relation to anything that's company related.  So if

12   you are working on behalf of the company, you are paid

13   no matter what it is.

14       Q       So that is the same policy that existed when

15   it was Alderwoods?

16       A       That is my understanding of it, yes.

17       Q       Would it be fair to say though that with

18   regard to the way the practice was actually carried

19   out for funeral directors, that you were not hands on,

20   you were not in direct relation to the work they would

21   have performed?

22       A       Before '07, that is correct.

23       Q       So am I correct that your understanding of

24   the policy may be different than what actually

25   happened in practice as far as the funeral directors?

7f64577e-0e8a-4204-95e5-8c57c30e4f78

NETWORK DEPOSITION SERVICES
Transcript of Sandra Walker

Page 80

1    Performance Counts, performance development process.

2    Do you know anything about that?

3         A    No.

4         Q    Okay.

5         A    And Ron Collins is from another region of

6    the geography.

7         Q    Okay.  Then the next document.  And I

8    frankly don't see on this first page.  The second page

9    has Bates stamp ALD 004972.  The page I'm looking at

10   on the front is Deposition Exhibit Johnson 9,

11   community leadership program.  Do you see that typed

12   in the middle of the page?

13        A    Um-hum.

14        Q    Were you familiar with the community

15   leadership program?  Does that mean anything to you?

16        A    No.

17        Q    If you turn over to the third page, it says,

18   to the Alderwoods group team members.  Do you know

19   whether there were teams in place for the community

20   leadership program?

21        A    Not in the state of Washington.

22        Q    As you leaf through these pages on this

23   exhibit, does any of that look familiar to you?

24        A    No, it does not.

25        Q    Okay.  The next document, which is ALD

7f64577e-0e8a-4204-95e5-8c57c30e4f78

NETWORK DEPOSITION SERVICES
Transcript of Sandra Walker

Page 112

1              C E R T I F I C A T E

2    State of Washington    )

3                           )  Ss.

4    County of King         )

5

6         I, the undersigned Certified Court Reporter and

7    an Officer of the Court under my commission as a Notary

8    Public for the State of Washington, hereby certify that the

9    foregoing deposition upon Oral examination of SANDRA WALKER

10   was taken before me on April 14, 2010 and transcribed under

11   my direction;

12        That the witness was duly sworn by me to testify

13   truthfully; that the transcript of the deposition is a full,

14   true, and correct transcript to the best of my ability; that

15   I am neither attorney for, nor a relative or employee of,

16   any of the parties to the action or any attorney or counsel

17   employed by the parties hereto, nor financially interested

18   in its outcome.

19        IN WITNESS WHEREOF, I have hereunto set my hand

20   and seal this date, April 22, 2010:

21

22                         /S/Yvonne A. Gillette
                           _____
23                         Yvonne A. Gillette

24   NOTARY PUBLIC in and for the State of Washington,

25   residing at Renton.  Commission expires 6/9/2010.

7f64577e-0e8a-4204-95e5-8c57c30e4f78

**TAB 45**

# NETWORK DEPOSITION SERVICES
## Transcript of Stacey Weinstein

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO/OAKLAND DIVISION

CASE NO:  CV-08-1184-SI


WILLIAM HELM, DEBORAH PRISE,
HEATHER P. RADY, [see Complaint and
Appendices for a listing of plaintiffs]
et al., on behalf of themselves and
all other employees and former employees
similarly situated,

      Plaintiffs,

vs.

ALDERWOODS GROUP, INC.,


      Defendant

_____/

                    Sheraton
                    1825 Griffin Road
                    Dania, Florida
                    Wednesday, October 21, 2009
                    11:34 a.m. - 2:13 p.m.


DEPOSITION OF STACEY WEINSTEIN


    Taken before Leslie Hanawalt, Court Reporter and

Notary Public for the State of Florida at Large,

pursuant to Notice of Taking Deposition filed in the

above cause.

70e70b81-7724-4310-b163-c7064b1a8932

NETWORK DEPOSITION SERVICES
Transcript of Stacey Weinstein

Page 61

1          So we were on-call from 5:00 p.m. until
2     8:00 a.m.
3          Q.    How many days a week were you on-call?
4          A.    Two?
5          Q.    Was it the same days?
6          A.    They would -- no, not always.
7          Q.    What job position worked on-call time?
8          A.    Funeral directors.
9          Q.    So during the period of time that you were
10    employed at the Coconut Creek location for
11    Alderwoods, the only individuals at any of those
12    homes who performed on-call time were funeral
13    directors; is that fair?
14         A.    Yes.  Or a funeral director manager
15    because you had to be licensed to be on-call.  It's a
16    state requirement.
17         Q.    Licensed as a funeral director?
18         A.    Yes.
19         Q.    So if you worked, if you personally worked
20    two days a week on-call, was anyone else working
21    on-call the same night as you?
22         A.    No.
23         Q.    Who worked on-call the other five nights
24    of --
25         A.    It rotated.  It rotated.  It might be Mark

NETWORK DEPOSITION SERVICES
Transcript of Stacey Weinstein

Page 65

1    have told any of the employees at those other
2    locations about how they were supposed to work on
3    actual time, correct?
4         A.    Correct.
5         Q.    And you wouldn't know who specifically
6    worked the on-call time, correct?
7         A.    Correct.
8         Q.    And you wouldn't know how they record
9    their time in any way for on-call time, correct?
10        A.    Correct.
11        Q.    And you wouldn't know how they were paid
12   in any way for on-call time, correct?
13        A.    Correct.
14        Q.    How did you record your time for on-call
15   time?
16        A.    We didn't.
17        Q.    You recorded no time at all?
18        A.    Right.
19        Q.    For anything that you did during on-call?
20        A.    Correct.
21        Q.    Is that correct?
22        A.    Correct.
23        Q.    At North Miami Beach, do you know whether
24   any of the individuals who worked on-call time
25   recorded their time?

NETWORK DEPOSITION SERVICES
Transcript of Stacey Weinstein

Page 68

1    on-call, and we did not get paid for it.  So both
2    managers were there.
3          Q.    Other than Rick and Neal, did you ever
4    speak with any Alderwoods manager about whether or
5    not to record on-call time?
6          A.    No.
7          Q.    Did you ever instruct anyone as their
8    supervisor about recording or not recording on-call
9    time?
10         A.    No.
11         Q.    So you never instructed Mark?
12         A.    No.  He was there before me so he already
13   knew.
14         Q.    Were you ever paid for any piecework?
15         A.    What do you mean?
16         Q.    Anything known as piecework at your
17   location?
18               MR. LINGLE:  Objection.
19               THE WITNESS:  I don't know what you mean
20         by piecework.
21   BY MS. DIAS:
22         Q.    Did you ever hear the term piecework used
23   when you worked at Alderwoods?
24         A.    No.
25         Q.    Are you aware of anyone getting paid

70e70b81-7724-4310-b163-c7064b1a8932

NETWORK DEPOSITION SERVICES
Transcript of Stacey Weinstein

Page 95

1   Columbus.  And Denise was in the Chamber of Commerce
2   Arta was in the Chamber of Commerce.  That's all I
3   know offhand.
4        Q.    When you say you were encouraged to do
5   these community service activities, who's the you
6   that's being referred to, what group of employees
7   were encouraged to do this, funeral directors?
8        A.    The funeral directors.
9        Q.    Anyone else?
10        A.    I am sure pre-need must have went out, but
11   I don't know how they handled it.
12        Q.    You don't know what they were asked to do?
13        A.    No.
14        Q.    And, therefore, you don't know what they
15   did, correct?
16        A.    Correct.
17        Q.    And you don't know when they did it,
18   correct?
19        A.    Correct.
20        Q.    You don't whether they recorded their time
21   for doing it, correct?
22        A.    Correct.
23        Q.    And, therefore, you don't whether they got
24   paid for doing anything that they might have done,
25   correct?

70e70b81-7724-4310-b163-c7064b1a8932

NETWORK DEPOSITION SERVICES
Transcript of Stacey Weinstein

Page 96

1      A.    Correct.
2            MR. LINGLE:   Objection.
3  BY MS. DIAS:
4      Q.    The activities that you noted some of the
5  other funeral directors engaged in, did they record
6  their time for those activities?
7      A.    No, you're not allowed to.
8      Q.    Who told you that you were not allowed to
9  record your time?
10     A.    Rick Hilkoff and Neal.
11     Q.    Do you remember specifically what they
12 told you?
13     A.    Yes.  Rick Hilkoff told me that when I
14 started there, since I was a girl, he wanted my face
15 to get out there and because I owned my own funeral
16 home and was well known in the area.  So he said he
17 wanted me to get my face out there and get everybody
18 to know where I am and do it as much as possible all
19 the time.
20          And Neal would always encourage me and say
21 I didn't see a receipt for cookies, where's the
22 cookies, come on, get out there.
23     Q.    What did they tell you about recording
24 your time for those activities?
25     A.    Not allowed to.

70e70b81-7724-4310-b163-c7064b1a8932

NETWORK DEPOSITION SERVICES
Transcript of Stacey Weinstein

Page 97

1      Q.    And that was both Rick and Neal?

2      A.    Yes, because we're not allowed any

3   overtime at all.

4      Q.    So were they -- I'm sorry -- did you ever

5   speak to any other manager at Alderwoods other than

6   Rick and Neal about community service activities?

7      A.    I asked Mark if he paid his people and he

8   said no.

9      Q.    Anyone else?

10      A.    No.

11      Q.    Other than funeral directors and your

12   guess that pre-need counselors did something, any

13   other job positions at the five homes that you're

14   aware of that were encouraged to do community

15   service?

16      A.    Well, every funeral director was.  And I

17   would assume every pre-need because they have to get

18   out there.  That's all I would know of.  I don't know

19   if anybody else did or not.

20      Q.    Did you ever encourage anyone else in

21   other job positions to perform community service?

22      A.    Other than funeral director and pre-need?

23      Q.    Yes.

24      A.    No.

25      Q.    What about any employees of Alderwoods

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

70e70b81-7724-4310-b163-c7064b1a8932

NETWORK DEPOSITION SERVICES
Transcript of Stacey Weinstein

1      Q.    Of the funeral directors?

2      A.    Uh-huh.

3      Q.    Is that a yes?

4      A.    Yes.  And the secretaries had to join the

5  Chamber of Commerce.

6      Q.    Anything else?

7      A.    And I heard them always telling the

8  pre-need to get out and do stuff.  I don't know what

9  they did.

10     Q.    Did you ever see anything in writing at

11  Alderwoods regarding community service?

12     A.    No.

13     Q.    Did you ever see anything in writing at

14  Alderwoods regarding whether you should or not record

15  your time spent on community service?

16     A.    No.

17     Q.    During the period of time August 2004

18  through March 2005 did you ever receive a written

19  performance evaluation?

20     A.    I think I did.  I don't remember.

21     Q.    Did any written performance evaluation

22  include evaluating you on your community service

23  work?

24     A.    I don't remember.

25     Q.    Did you from August 2004 through

70e70b81-7724-4310-b163-c7064b1a8932

NETWORK DEPOSITION SERVICES
Transcript of Stacey Weinstein

1    March 2005 ever perform a written performance

2    evaluation for any other employee?

3         A.    Yes.

4         Q.    And did that written performance

5    evaluation include an evaluation of community service

6    work?

7         A.    No.

8         Q.    Who did you do a written performance

9    evaluation for?

10        A.    Avi.

11        Q.    Anyone else?

12        A.    No.

13        Q.    Why just Avi?

14        A.    Because he was brand new in the business,

15   and he had no idea what he was doing.  He just got

16   his license.  And he was fighting Neal because he

17   wanted -- he thought he should get paid for his

18   lunches and Neal was mad.  And he wanted him written

19   up for everything and anything and everything you can

20   think of that he did.

21        Q.    So you wrote him up concerning specific

22   events that occurred, correct?

23        A.    Right.

24        Q.    You didn't do an evaluation like a yearly

25   performance evaluation?

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

70e70b81-7724-4310-b163-c7064b1a8932

NETWORK DEPOSITION SERVICES
Transcript of Stacey Weinstein

Page 102

1      to know.

2              THE WITNESS:  Okay.

3  BY MS. DIAS:

4      Q.    During the period of time August 2004

5  through March 2005, did you ever hear of anything at

6  Alderwoods called the community leadership program?

7      A.    No.

8      Q.    Did you ever -- all of my questions from

9  now until I tell you when they are not, and I will

10  specifically tell you when they are not, all of my

11  questions I'm going to go through now are directed to

12  the time period August 2004 when you were hired by

13  Alderwoods through March 2005.

14      A.    Okay.

15      Q.    So during that period, did you ever hear

16  anything at Alderwoods called an Influencer Program?

17      A.    No.

18      Q.    During that period, did you ever create

19  any type of leadership network at Alderwoods?

20      A.    No.

21      Q.    Did you ever direct anyone to create a

22  leadership network?

23      A.    No.

24      Q.    During that period did you ever fill out

25  anything known as a leadership network information

70e70b81-7724-4310-b163-c7064b1a8932

NETWORK DEPOSITION SERVICES
Transcript of Stacey Weinstein

Page 103

1    sheet?

2         A.    No.

3         Q.    Did you ever direct anyone to fill out a

4    leadership network information sheet?

5         A.    No.  I don't know what that is.

6         Q.    During that period, did you ever set up

7    anything known as a leadership network contact

8    report?

9         A.    No.

10        Q.    Did you ever direct anyone to prepare such

11   a report?

12        A.    No.

13        Q.    Were you ever directed to identify a group

14   of influencers during that period?

15        A.    What do you mean?

16        Q.    Just that word.

17        A.    Not that I know of.  I am not sure what it

18   means.

19        Q.    Did you ever direct anyone to identify a

20   group of influencers?

21        A.    I don't know what it means, so.

22        Q.    Did you, again during that time period,

23   ever participate in any community seminar programs?

24        A.    Community seminar programs, no.

25        Q.    Did you ever host any community events?

70e70b81-7724-4310-b163-c7064b1a8932

NETWORK DEPOSITION SERVICES
Transcript of Stacey Weinstein

1      Q.    Did the five Alderwoods homes that you're
2   familiar with have a Web site?
3      A.    At that time, no, they did not.
4      Q.    So it would be fair to say that you never
5   did anything to develop any content for any Web site
6   for any of those locations?
7      A.    No, everything was hand done.
8      Q.    Were you ever directed to keep anything
9   called a notebook of best practice ideas?
10     A.    No.
11     Q.    Did you ever direct anyone to create such
12  a notebook?
13     A.    No.
14     Q.    Were you ever directed to develop anything
15  known as a market share report?
16     A.    No.
17     Q.    Did you ever direct anyone to prepare such
18  a report?
19     A.    No.
20     Q.    Did any of the locations that you're aware
21  of ever receive an award of excellence?
22     A.    Not that I know of.
23     Q.    Were you ever directed to complete
24  anything known as a community service promotion form?
25     A.    No.

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

70e70b81-7724-4310-b163-c7064b1a8932

NETWORK DEPOSITION SERVICES
Transcript of Stacey Weinstein

Page 114

1        Q.    Did you ever direct anyone to prepare such
2    a form?
3        A.    No.
4        Q.    Did you ever hear the term success
5    spotlight when you were employed at Alderwoods?
6        A.    No.
7        Q.    Did you ever hear of a program called I
8    believe in service?
9        A.    No.
10       Q.    Did you ever know a manager at Alderwoods
11   by the name of Wayne Tago?
12       A.    No.
13       Q.    Did you ever attend any political debates
14   as a representative of Alderwoods?
15       A.    No.
16       Q.    Did you ever direct anyone to attend a
17   political debate as a representative of Alderwoods?
18       A.    No.
19       Q.    Can we go off the record.
20             (Thereupon, a discussion was held off the
21         record.)
22             MR. LINGLE:  At this time the witness has
23         indicated it would be difficult to continue due
24         to the pain she's experiencing.  So for now we
25         agreed to adjourn the deposition and defense

NETWORK DEPOSITION SERVICES
Transcript of Stacey Weinstein

Page 118

1          REPORTER'S DEPOSITION CERTIFICATE

2

3          I, LESLIE HANAWALT, Court Reporter, certify

4     that I was authorized to and did stenographically

5     report the deposition of STACEY WEINSTEIN, that a

6     review of the transcript was requested; that

7     transcript is a true and complete record of my

8     stenographic notes of the deposition by said witness.

9          I further certify that I am not a relative,

10    employee, attorney or counsel of any of the parties,

11    nor am I a relative or employee of any of the

12    parties' attorney or counsel connected with the

13    action.

14         Sworn to and subscribed before me this

15    22nd day of October, 2009.

16

17                    _____

                      Leslie Hanawalt
18                    Court Reporter

19

20

21

22

23

24

25

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

70e70b81-7724-4310-b163-c7064b1a8932

**TAB 46**

NETWORK DEPOSITION SERVICES
Transcript of Ray White

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DEBORAH PRISE and HEATHER RADY )
on behalf of themselves and    )
all employees similarly        )
situated,                      )
                               )
                 Plaintiffs,  )Civil Action
                              )No. 06-1641
     vs                       )
                              )
ALDERWOODS GROUP, INC.,       )
                              )
                 Defendant.   )


          The discovery deposition of

RAY WHITE, called by the Defendant, for examination,

pursuant to notice, taken before Julia A. Bauer,

CSR, RPR, a notary public within and for the County

of Cook and State of Illinois, at 3830 179th Street,

Hammond, Indiana, on the 21st day of July, A.D.,

2009, commencing at 9:35 a.m.

1a5aa13f-2a14-4190-8b79-8cac4bcb9abb

NETWORK DEPOSITION SERVICES
Transcript of Ray White

Page 120

1      A.      There was two at the funeral home.

2  The cemetery had three office ladies, a sales

3  manager, and then, like, six sales people.  And then

4  the groundsmen had -- there was, I think, eight

5  groundsmen.  So he'd try and get everybody in one

6  location.

7      Q.      Did Zalo ever tell you it was one of

8  your responsibilities to be part of a community

9  organization, that you had to join one?

10      A.      He told everybody that.  It was more

11  to benefit yourself, he told them.

12      Q.      Did they do anything to make sure

13  everyone was part of community organizations?

14      A.      No, he just asked.  The follow-up was

15  terrible.

16      Q.      At this point, were you a member of

17  the rotary club?

18      A.      Not the Griffith Rotary and not

19  Schererville.  I had joined after they -- I brought

20  in, and they fired me.  So they weren't paying --

21  and that was another thing, they wouldn't pay the

22  dues, the memberships.

23      Q.      So were you a member of the rotary in

24  your last four months of employment?

25      A.      No, I petitioned.  I wasn't a member

1a5aa13f-2a14-4190-8b79-8cac4bcb9abb

NETWORK DEPOSITION SERVICES
Transcript of Ray White

Page 124

1      Q.     So what organizations did you join for

2  the purposes of networking?

3           MS. GIFFORD:  Objection.

4  BY THE WITNESS:

5      A.     I didn't really join that many

6  organizations.  I networked everyday.  I didn't have

7  to join them.  I mean, you can't join the Catholic

8  church when you're Protestant, and you can't join an

9  Orthodox church.  So you network them.  Even though

10 you can't join them, you network them.  And you

11 network the subgroups within that church.  The Altar

12 and Rosary Society, the men's club, the Knights of

13 Columbus, the fair group that holds St. Mary's

14 Western Days.  It's a big group.  You go up and you

15 volunteer, and hopefully, you get more than one

16 employee to show up and volunteer with your Chapel

17 Lawn logo T-shirts on, and you volunteer, and work

18 their Western Days.

19 BY MR. KNIGHT:

20     Q.     But you didn't actually join an

21 organization for the purposes of networking?

22          MS. GIFFORD:  Objection.

23 BY MR. KNIGHT:

24     Q.     Is that right?

25     A.     No, I didn't need to join it to

1a5aa13f-2a14-4190-8b79-8cac4bcb9abb

NETWORK DEPOSITION SERVICES
Transcript of Ray White

Page 125

1    network it.

2            Q.      Do you know whether Jeff Sachs joined

3    any community organizations for the purposes of

4    networking?

5            A.      No.  I'm not aware if he did.  He was

6    real big with the Veteran's groups.  His dad was.

7    So they invite Jeff Sachs because of his dad.

8            Q.      Were you -- did Zalo Wilson tell you

9    to report your community service work to anyone at

10   Alderwoods?

11           A.      No.  Him and I would talk about it

12   because I would tell him -- Zalo was gifted as far

13   as the computer.  So if we needed papers printed and

14   needed them to look good, you told Zalo what you

15   wanted.  He would design it.  And we'd copy it and

16   take it.  So Zalo knew what was going on because a

17   lot of people used him for his ability to make a

18   computer work better.

19           Q.      Were you required to keep a list of

20   any community organizations you contacted?

21           A.      No, no.  We'd just talk about it, Zalo

22   and I, in the mornings when he'd come, or if I

23   needed him to work on something.  And then he'd

24   always ask -- he'd follow-up with how well it went.

25   But we made special packages for each group.

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

1a5aa13f-2a14-4190-8b79-8cac4bcb9abb

NETWORK DEPOSITION SERVICES
Transcript of Ray White

1    Q.    So you weren't required to fill

2  anything out that got sent up the chain of command

3  at Alderwoods?

4    A.    No.  They were just about the numbers.

5    Q.    Do you know if Zalo Wilson reported to

6  any of his supervisors about any of the people in

7  the community you had contacted?

8    A.    I'm sure he probably reported it.

9    Q.    Do you know how he reported it?

10   A.    Their meetings.

11   Q.    You're not aware of him actually

12  submitting any documents?

13   A.    No.

14        MR. KNIGHT:  Do you want to take a

15      break for lunch?

16        MS. GIFFORD:  Sure.

17           (A lunch break was taken.)

18  BY MR. KNIGHT:

19   Q.    Mr. White, were you paid for any of

20  the time that you spent meeting with firefighters in

21  the last four months of your employment with

22  Alderwoods?

23   A.    I don't believe so.

24   Q.    Did any of that time occur during your

25  regular business hours during the workweek?

1a5aa13f-2a14-4190-8b79-8cac4bcb9abb

NETWORK DEPOSITION SERVICES
Transcript of Ray White

Page 134

1          Q.     And did you -- the time you spent on
2     those visits, did you put them in the book that you
3     described of the, I guess, unpaid time?
4          A.     I don't believe so.
5          Q.     Why not?
6          A.     It was just part of that -- sell that
7     community.  Sell the funeral home to the community.
8          Q.     Were you told not to record that time?
9          A.     I can't recall if Zalo ever told me
10    not to report it.
11         Q.     Did anyone ever tell you not to record
12    it?
13         A.     I can't recall that.  He'd be the only
14    one who would tell me.
15         Q.     Well, your previous general manager as
16    well; right?
17         A.     Ron Raypath, basically, it was sell
18    the funeral home.  Get out there and meet as many
19    people as you can.  It was a brand new place.
20         Q.     But I'm asking, did he tell you not to
21    record that time?
22         A.     No, I don't believe so.
23         Q.     So why didn't you record it?
24         A.     Because it was just after-hours.  I
25    was doing it in early morning.  I'm not going to

1a5aa13f-2a14-4190-8b79-8cac4bcb9abb

NETWORK DEPOSITION SERVICES
Transcript of Ray White

Page 135

1    drive to the cemetery or the funeral home at 4:30 to

2    clock-in to meet at the fire department before -- or

3    say if I did it on Saturday, I'm not going to drive

4    20 minutes just to clock-in, and then drive back to

5    where I was going to start, so...

6         Q.    Well, didn't you want to be paid for

7    it?

8         A.    I really didn't think -- I just

9    thought if we sold it, and we got -- the more

10   business we wrote, the more funerals we had.

11   Eventually, we would get one of those -- what do

12   they call them?  Bonuses, raging bonuses that

13   corporations throw out so many times.  And that was

14   the goal.  Hopefully, if we do this well, we're

15   going to get the bonus that pays off everything that

16   we've done.  Unfortunately, they change the rules as

17   you're going.

18        Q.    Did anyone at Alderwoods tell you that

19   it was a company policy not to record the time you

20   spent in the community pitching services?

21             MS. GIFFORD:  Objection.

22   BY THE WITNESS:

23        A.    Did anybody tell me not to record it?

24   BY MR. KNIGHT:

25        Q.    Did anyone tell you that it was a

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

1a5aa13f-2a14-4190-8b79-8cac4bcb9abb

NETWORK DEPOSITION SERVICES
Transcript of Ray White

Page 142

1    I Believe in Service?

2           A.      No.

3           Q.      Are you aware of any incentive program

4    that any other Alderwoods location used to reward

5    people for community participation?

6           A.      No.

7           Q.      Are you aware of any company-wide

8    policy, all of Alderwoods, that required people to

9    be part of a community organization as part of their

10   job duties at Alderwoods?

11          A.      No, I'm not aware.

12                  MS. GIFFORD:   Objection.

13   BY MR. KNIGHT:

14          Q.      And are you aware of any, again,

15   company-wide policy that -- or addressing, I guess,

16   whether work in the community should be paid?

17          A.      No.

18                  MS. GIFFORD:   Objection.

19   BY THE WITNESS:

20          A.      No.

21   BY MR. KNIGHT:

22          Q.      Were you required to be on-call after

23   your regularly scheduled hours?

24          A.      Yes.

25          Q.      And how often were you on-call?

1a5aa13f-2a14-4190-8b79-8cac4bcb9abb

NETWORK DEPOSITION SERVICES
Transcript of Ray White

Page 146

1    take the body back to their place.  So I have no
2    idea how many calls we did.
3           Q.     What was the procedure you would use
4    while on-call to record your time, if any?
5           A.     When we got in, we were supposed to
6    clock-in, go make the removal, whether the embalming
7    or not.  When we were finished, we would clock-out
8    and go home.
9           Q.     So you'd have to go to a location
10   before --
11          A.     You could clock-in.
12          Q.     So you went to the location and
13   clocked-in before you even went to the house
14   where --
15          A.     Yeah, the cop was at the funeral home.
16          Q.     Would you pick up a car while you were
17   there?
18          A.     I had the minivan.  So I had the van.
19   Unless it was a house call, we took the hearse, and
20   we had to call a second person to come and go with
21   us.
22          Q.     And for how long was that the
23   procedure that you would go and clock-in first,
24   finish the job and clock-out?
25          A.     That was the preferred procedure at

1a5aa13f-2a14-4190-8b79-8cac4bcb9abb

NETWORK DEPOSITION SERVICES
Transcript of Ray White

Page 147

1    the time Ron Redpath was there.

2              Q.     So for as long as you can recall?

3              A.     Yeah.

4              Q.     Is there any time that you spent doing

5    removals and embalming while on-call that you claim

6    you should be compensated for in this lawsuit?

7                     MS. GIFFORD:  Objection.

8    BY THE WITNESS:

9              A.     I think it's all part of the -- again,

10   it's on the timecards.  If we put the hours in, we

11   should be compensated for them.  And there were

12   definitely hours in that book that wasn't

13   compensated for.

14   BY MR. KNIGHT:

15             Q.     What about when you took phone calls,

16   were you keeping track of the time you spent on the

17   phone?

18             A.     No.

19             Q.     Did anyone tell you not to do that?

20             A.     I don't believe so.

21             Q.     Did anyone ever tell you you should

22   keep track of the time you spent answering phone

23   calls?

24             A.     No.

25             Q.     Did you ever ask about that?

1a5aa13f-2a14-4190-8b79-8cac4bcb9abb

NETWORK DEPOSITION SERVICES
Transcript of Ray White

Page 148

1    A.    No.

2    Q.    Do you believe you should be

3 compensated for that time?

4         MS. GIFFORD:  Objection.

5 BY THE WITNESS:

6    A.    Do I believe?  If it was for the

7 company, why not.

8 BY MR. KNIGHT:

9    Q.    Did your manager know that you were --

10 did your manager know when you took a phone call at

11 night?

12    A.    Yes.

13    Q.    How would they know?

14    A.    Because we'd report it the next

15 morning.  If we had a house call or a death call, he

16 knew we got a call in the middle of the night.  So

17 he knew we were on the phone with them.  If it was

18 an out-of-town death, figure an extra hour on the

19 phone with another funeral director making

20 arrangements to get a body back to your place.

21    Q.    You said sometimes people call to

22 check on pricing or arrangements.

23    A.    Yeah.

24    Q.    Would you tell your managers about

25 those calls?

1a5aa13f-2a14-4190-8b79-8cac4bcb9abb

NETWORK DEPOSITION SERVICES
Transcript of Ray White

Page 151

1    that would refresh your memory?

2              A.      No, no.

3              Q.      Do you think it's more than five hours

4    per week?

5              A.      Possibly around there.

6              Q.      It's around five hours per week?

7              A.      Possibly.

8              Q.      Did anyone at Alderwoods tell you that

9    there was a company-wide policy not to compensate

10   employees for time they spent taking phone calls

11   while on-call?

12             MS. GIFFORD:   Objection.

13   BY THE WITNESS:

14             A.      I'm not aware of that, no.

15   BY MR. KNIGHT:

16             Q.      Did you ever ask what the company

17   policy was with respect to phone calls?

18             A.      No.

19             MS. GIFFORD:   Same objection.

20   BY MR. KNIGHT:

21             Q.      Were there ever occasions where you

22   were on-call, but weren't able to be reached by the

23   answering service?

24             A.      No.

25             Q.      Were you ever disciplined for not

1a5aa13f-2a14-4190-8b79-8cac4bcb9abb

NETWORK DEPOSITION SERVICES
Transcript of Ray White

Page 152

1    being available while on-call?

2         A.    No.

3         Q.    Did an Alderwoods manager ever tell

4    you not to report time you worked while on-call?

5              MS. GIFFORD:  Objection.

6    BY THE WITNESS:

7         A.    No.

8    BY MR. KNIGHT:

9         Q.    Did an Alderwoods manager ever tell

10   you you would not be compensated for work while

11   on-call?

12             MS. GIFFORD:  Objection.

13   BY THE WITNESS:

14        A.    No.

15   BY MR. KNIGHT:

16        Q.    Are you aware of any policy for

17   compensating employees at other funeral homes for

18   their on-call work?

19             MS. GIFFORD:  Objection.

20   BY THE WITNESS:

21        A.    No.

22   BY MR. KNIGHT:

23        Q.    Did you have your funeral director

24   license when you began to work at Alderwoods?

25        A.    Yes.

1a5aa13f-2a14-4190-8b79-8cac4bcb9abb

NETWORK DEPOSITION SERVICES
Transcript of Ray White

Page 165

1  BY THE WITNESS:

2      A.    Well, unfortunately, a lot of those

3  volunteer events, I was still on-call.  We would

4  work those events, and then if we got a death call,

5  I would have to leave, and then do the work, and

6  then come back if it was still going on.

7  BY MR. KNIGHT:

8      Q.    Volunteer events, are you talking

9  about the meetings?

10     A.    Meetings and the -- say, the

11  Schererville Corn Roast, the St. Mary's Western Day

12  Carnival, the Lake County Fair.  Even though I was

13  on-call, if I got busy, we'd have to go back in,

14  leave the fair, do the work, and then come back.

15     Q.    But you would be compensated for that

16  work if you --

17     A.    Only if we clocked-in for making that

18  removal and doing the prep work.  But the

19  volunteering time, we didn't go clock-in and then

20  work the carnival.

21     Q.    Well, that kind of gets into Part A,

22  the community.  I mean, I guess, it could be a hazy

23  line.  But was there ever any occasion where you

24  were on-call, okay, you're on-call, you get a phone

25  call, you have to go into the funeral home, that you

1a5aa13f-2a14-4190-8b79-8cac4bcb9abb

Page 166

1    didn't clock-in when you got to the funeral home?

2         A.     There's possibly been one or two

3    times.

4         Q.     Do you know what they would have been?

5         A.     They're on the timecards because Zalo

6    told me to write them in, and he signed off on them.

7         Q.     Were you compensated for the time?

8         A.     Hopefully.

9         Q.     We've talked about the removals.

10   We've talked about taking phone calls while you were

11   on-call where you didn't have to do a removal.  Are

12   there any other -- is there any other phone calls or

13   any other -- strike that.

14              MS. GIFFORD:  Do you want to take a

15         ten-minute break?

16              MR. KNIGHT:  Yeah.

17                  (A break was taken.)

18                       (Document marked as White

19                        Exhibit No. 10 for

20                        identification.)

21   BY MR. KNIGHT:

22         Q.     Mr. White, the court reporter has

23   marked as Exhibit 10 a document that's entitled,

24   Raymond E. White's response to defendant's first

25   request for production of documents.  Did you see

1a5aa13f-2a14-4190-8b79-8cac4bcb9abb

NETWORK DEPOSITION SERVICES
Transcript of Ray White

Page 228

1           A.      Partial.

2           Q.      Partial.  But you said you don't know

3     if it was partial or not?

4           A.      Right.

5           Q.      But you will agree that at least this

6     document reflects that for every pay period you

7     worked after December 2003 you were getting at least

8     some overtime?

9           A.      Partial overtime.

10          Q.      I believe in response to a question

11    from Ms. Gifford you said that you were told by

12    management that everybody should be involved in a

13    community organization?

14          A.      Correct.

15          Q.      But you weren't personally involved in

16    any community organizations; isn't that correct?

17          A.      Not a member.

18          Q.      Right.

19                  You also said that you didn't

20    report the time it took you to arrive to the funeral

21    home after you received a call?

22          A.      No.

23          Q.      Why didn't you report that time?

24          A.      I could -- they, actually, said if we

25    wanted to, we could write it in.

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

1a5aa13f-2a14-4190-8b79-8cac4bcb9abb

NETWORK DEPOSITION SERVICES
Transcript of Ray White

Page 229

1       Q.      Who said that?

2       A.      Zalo.

3       Q.      Why didn't you write it in?

4       A.      It was just, pay me what I was

5   working.

6       Q.      So it was your choice not to write the

7   time in?

8               MS. GIFFORD:  Objection.

9   BY THE WITNESS:

10      A.      Yes.

11  BY MR. KNIGHT:

12      Q.      What about the time you spent working

13  with the people in the community or soliciting

14  business in the community, were you told not to

15  report that time?

16      A.      No.

17      Q.      And then Mr. Gifford asked you a

18  series of questions related to lunch breaks.  Did

19  you punch-out during lunch breaks?

20      A.      If we took it and left, yes.

21      Q.      If you had to do work during lunch

22  break, did you punch back in?

23      A.      A lot of times our lunch was pop.  We

24  drank a pop.

25      Q.      Were you punching-out during lunch

1a5aa13f-2a14-4190-8b79-8cac4bcb9abb

NETWORK DEPOSITION SERVICES
Transcript of Ray White

Page 232

1                    FURTHER EXAMINATION

2    BY MS. GIFFORD:

3         Q.     I have just a couple.  I promise it'll

4    be quick.

5                    In the time when Zalo Wilson was

6    your supervisor, was there any hours of overtime

7    that was submitted to Alderwoods' payroll that Zalo

8    Wilson had not approved to be submitted to payroll?

9         A.     I have no idea.

10        Q.     Did you ever submit overtime hours to

11   payroll yourself without going through Zalo?

12        A.     No.  Zalo approved it all.

13        Q.     And if you hadn't submitted it, is

14   there any reason to think anybody else would have

15   submitted overtime on your behalf?

16        A.     No.

17        Q.     You testified that you did not write

18   in the time you spent traveling to the funeral

19   home --

20        A.     No.

21        Q.     -- when you received a call while you

22   were on-call?

23        A.     Correct.

24        Q.     If you had written that in, would you

25   have been paid for that time?

1a5aa13f-2a14-4190-8b79-8cac4bcb9abb

NETWORK DEPOSITION SERVICES
Transcript of Ray White

Page 233

1        A.      Yes.

2        Q.      And if it had caused you to exceed the

3    overtime that had been submitted, would you have

4    been paid for that additional time?

5                MR. KNIGHT:  Object to the form of the

6        question.

7    BY MS. GIFFORD:

8        Q.      Do you know?

9        A.      Well, if Zalo paid me part of the

10   overtime, I'd a got it.

11       Q.      You think you would have gotten all of

12   it?

13       A.      Eventually.

14       Q.      Did you eventually -- were you

15   eventually paid for all of the overtime hours that

16   you worked?

17       A.      I believe they still owe me hours.

18                MS. GIFFORD:  Those are all the

19       questions I have.

20                MR. KNIGHT:  Okay.  Thank you for your

21       time.

22                THE REPORTER:  Signature?

23                MS. GIFFORD:  Reserve.

24                (Whereupon, the deposition

25                concluded at 4:05 p.m.)

1a5aa13f-2a14-4190-8b79-8cac4bcb9abb

NETWORK DEPOSITION SERVICES
Transcript of Ray White

Page 235

1                     CERTIFICATE

2                          OF

3          CERTIFIED SHORTHAND REPORTER

4

5          I, JULIA A. BAUER, a Certified Shorthand

6    Reporter of the State of Illinois, CSR License No.

7    084-004543, do hereby certify:

8          That previous to the commencement of the

9    examination of the aforesaid witness, the witness

10   was duly sworn by me to testify the whole truth

11   concerning the matters herein;

12         That the foregoing deposition transcript

13   was stenographically reported by me and was

14   thereafter reduced to typewriting under my personal

15   direction and constitutes a true and accurate record

16   of the testimony given and the proceedings had at

17   the aforesaid deposition;

18         That the said deposition was taken before

19   me at the time and place specified;

20         That I am not a relative or employee or

21   attorney or counsel for any of the parties herein,

22   nor a relative or employee of such attorney or

23   counsel for any of the parties hereto, nor am I

24   interested directly or indirectly in the outcome of

25   this action.

1a5aa13f-2a14-4190-8b79-8cac4bcb9abb

NETWORK DEPOSITION SERVICES
Transcript of Ray White

Page 236

1       IN WITNESS WHEREOF, I do hereunto set my

2   hand at Chicago, Illinois, this 5th day of August,

3   2009.

4

5

6

7

8                   _____

8                   JULIA A. BAUER, CSR, RPR

9                   CSR License No. 084-004543

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1a5aa13f-2a14-4190-8b79-8cac4bcb9abb

**TAB 47**

NETWORK DEPOSITION SERVICES
Transcript of Jack Wilkinson

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DEBORAH PRICE and HEATHER RADY
on behalf of themselves and

all employees similarly
situated,
  Plaintiff,

vs.        No. 06-1641
ALDERWOODS GROUP, INC.,
  Defendants.

DEPOSITION OF JACK WILKINSON
TAKEN ON BEHALF OF THE DEFENDANTS
ON APRIL 15, 2009, BEGINNING AT 8:00 A.M.
IN COFFEYVILLE, KANSAS

APPEARANCES:

Appearing on behalf of the PLAINTIFF:

Kyle T. McGee, Attorney at Law
MARGOLIS EDELSTEIN
525 William Penn Place
Suite 3300
Pittsburgh, Pennsylvania 15219
(412) 355-4971
kmcgee@margolisedelstein.com

Appearing on behalf of the DEFENDANT:

Tonya B. Braun, Attorney at Law
JONES DAY
325 John H. McConnell Blvd., Suite 600
Columbus, Ohio 43215
tbraun@jonesday.com

REPORTED BY: Lacy Antle, CSR, RPR

869e63a0-0274-4333-9be4-5b29226c572e

NETWORK DEPOSITION SERVICES
Transcript of Jack Wilkinson

Page 49

1   Work on weekends if we had a body in state or a
2   funeral, particularly if it was my weekend off --
3   on, but on call.  But at times if we had a funeral
4   also on the weekend that I was off, then, like I
5   said, by nature of it being a small funeral home, I
6   also helped with those funerals too.
7        Q    And you did say that you were scheduled to
8   work on call every other weekend --
9        A    Yes.
10       Q    -- is that correct?
11            Who else worked on call?
12       A    Herb Bath.
13       Q    Anyone else?
14       A    Not that I'm aware of.
15       Q    Okay.  You said that some evenings you
16   worked, was that on an on call basis?
17       A    Yes, there were evenings that I worked on
18   call.
19       Q    Okay.
20       A    It wasn't any set particular time, it was
21   just if Herb needed to be gone or wanted to be gone.
22       Q    So I'm just trying to understand, would he
23   tell you, "You need to be on call," on a particular
24   evening?
25       A    Yes.

869e63a0-0274-4333-9be4-5b29226c572e

NETWORK DEPOSITION SERVICES
Transcript of Jack Wilkinson

1      Q    Okay.  So it was a designated evening that

2   you would be on call?

3      A    Yes.

4      Q    Okay.  But you're saying that would vary

5   depending on Herb's needs?

6      A    Yes.

7      Q    Okay.  Whereas the every other weekend on

8   call was more of a set schedule?

9      A    Yes, yes.

10     Q    You said visitations were typically

11   7:00 to 9:00 p.m.?

12     A    Typically the visitation lasted from

13   7:00 to 8:00 --

14     Q    7:00 to 8:00?

15     A    -- but we stayed opened until 9:00,

16   roughly.

17     Q    Okay.  And you said that you sometimes

18   came in as early as 6:00 --

19     A    Yes.

20     Q    -- prior to a visitation?

21          Okay.  And were the visitations, were they

22   scheduled, I mean would you know in advance --

23     A    Yes.

24     Q    -- that you needed to work a visitation?

25     A    Yes.

869e63a0-0274-4333-9be4-5b29226c572e

NETWORK DEPOSITION SERVICES
Transcript of Jack Wilkinson

Page 87

1    Q    Okay.  Now, you would get the call and you
2  said you would make the death call.
3    A    Yes.
4    Q    But I want to fully understand what that
5  would entail?
6    A    Okay.  They would call me, and I'd get up
7  and dress and put on the proper attire to be going
8  out and meeting anybody in the public, it's hard
9  telling what else I might do, you know, just to get
10 ready --
11   Q    Sure.
12   A    -- you know, but then I'd go downstairs
13 and before I left I'd clock in and then go and make
14 the removal wherever it might be, nursing home,
15 hospital, a home, and then generally the body would
16 go to the funeral home in Altamont where we did our
17 embalming, and then when I returned back to Chetopa,
18 I would clock back out.
19   Q    Okay.  Is there any circumstances under
20 which you would not follow that procedure, that you
21 would not go downstairs and go into the funeral and
22 clock in before you went out on the death call?
23   A    Not that I recall.
24   Q    I'm going to hand you what will be marked
25 as Defendant's Exhibit 5, and, again, if I can draw

869e63a0-0274-4333-9be4-5b29226c572e

NETWORK DEPOSITION SERVICES
Transcript of Jack Wilkinson

Page 139

1  reviewed.  Do you recall seeing this document?

2      A    I don't specifically remember seeing this

3  one, no.

4      Q    Okay.  Do you recall signing a

5  verification for these supplemental responses?

6      A    For this?  No, I don't, I don't recall

7  signing them no.

8      Q    Okay.  Well, let's take a look at this for

9  a moment.  The third paragraph states, "Through

10  company policies and practices, which were

11  communicated verbally and in writing, Alderwoods

12  required employees, including plaintiff, to work on

13  call shifts."  We've touched on on call policies,

14  specifically, whether there was an on call policy

15  addressing whether employees would be paid for on

16  call work.  You recall no such policy; correct?

17      A    Right.

18          MR. MCGEE:  Object to the form.

19      Q    (BY  MS. BRAUN) Is there any type of -- do you

20  recall any other type of written policy regarding on call

21  work?

22      A    I do not.

23      Q    Are you aware of any?

24      A    No.

25      Q    What, if any, verbal communication was

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

869e63a0-0274-4333-9be4-5b29226c572e

NETWORK DEPOSITION SERVICES
Transcript of Jack Wilkinson

Page 152

1    Q    Okay.  And what was -- what's the
2  congregation?
3    A    Community Bible Church.
4    Q    Community Bible Church?
5    A    Uh-huh.
6    Q    And when did you first become a member of
7  Community Bible Church, if you recall?
8    A    Let's see, well, it'd have been 1994 we
9  actually began that church.
10    Q    Were you a founder or --
11    A    I was.
12    Q    Yeah?  Okay.
13        Now, you say that was the only community
14  organization of which you were a member --
15    A    Yes.
16    Q    -- during your Alderwoods employment.  Did
17  you have involvement in other community activities,
18  that you recall, during your Alderwoods employment?
19    A    No, not that I can recall.
20    Q    Were you encouraged to become involved in
21  the community by any Alderwoods member of
22  management?
23    A    I don't recall being, no.
24    Q    Okay.  Do you know if other employees at
25  Chetopa were encouraged to be involved in the

869e63a0-0274-4333-9be4-5b29226c572e

NETWORK DEPOSITION SERVICES
Transcript of Jack Wilkinson

Page 153

1    community?

2        A    Not that I'm aware of.

3        Q    Okay.  Do you know if employees at the

4    Altamont location were encouraged by any member of

5    Alderwoods management to become involved in the

6    community?

7        A    Not that I know of.

8        Q    Focusing on Chetopa, Charlotte was the

9    other individual --

10       A    Yes.

11       Q    -- that worked with you there?

12            Do you know if she had any community

13   involvement?

14       A    As I said, she was a member of the same

15   congregation that I was.

16       Q    Oh, sorry.  Uh-huh.

17       A    I can't think of anything else that she

18   was -- her husband was actually the pastor at the

19   time, and he's since passed away, now her son is, so

20   that's the crux of her life.

21       Q    And now focusing on Altamont, do you have

22   any knowledge of whether employees there were

23   involved in community organizations or activities?

24       A    I believe that Herb Bath was, and I'm

25   trying to think of anything specific.  He's the

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

869e63a0-0274-4333-9be4-5b29226c572e

NETWORK DEPOSITION SERVICES
Transcript of Jack Wilkinson

Page 155

1    was.

2        Q    Okay.  Did you at any -- let me rephrase

3    that.  Was there any type of incentive for you to be

4    involved in the Community Bible Church or any other

5    type of organization?

6        A    Not that I know of, no.

7            MR. MCGEE:  You mean regarding

8    Alderwoods?

9        Q    (BY  MS. BRAUN) Is there any incentives, did

10   Alderwoods management, you know, incentivize you to belong

11   to the Community Bible Church?

12       A    No.

13       Q    No?  Okay.  Did you receive evaluations

14   while you were an employee at Alderwoods of

15   Alderwoods?

16       A    I'm sure, I probably did, but I don't

17   specifically remember them.

18       Q    Do you remember, if you did receive such

19   an evaluation, formal or informal, a member of

20   management bringing up community service during

21   that --

22       A    I don't.

23       Q    -- evaluation?

24       A    No, I don't.

25       Q    Are you aware of -- well, let me ask you

869e63a0-0274-4333-9be4-5b29226c572e

NETWORK DEPOSITION SERVICES
Transcript of Jack Wilkinson

Page 156

1    this, did you ever provide any kind of report to

2    Alderwoods management regarding your involvement

3    with the Community Bible Church?

4         A    Not that I recall.

5         Q    Okay.  You were -- were you ever -- do you

6    recall ever being asked to provide a report, for

7    example, the number of, you know -- time you spent

8    there or what you did?

9         A    No.

10        Q    Okay.  Never asked?

11        A    Not that I recall.

12        Q    Okay.  Do you know if any employee at the

13   Altamont location was ever asked to report on their

14   involvement in the community?

15        A    Not that I'm aware of.

16        Q    Okay.  Do you have any knowledge of any

17   Alderwoods employee, beyond the Chetopa and Altamont

18   locations, being required to participate in

19   community activities?

20        A    I'm not aware of anybody being required

21   to, no.

22        Q    Were you aware of any incentive program

23   being used at any location, other than Chetopa or

24   Altamont, to encourage community participation?

25        A    Not that I recall.

869e63a0-0274-4333-9be4-5b29226c572e

NETWORK DEPOSITION SERVICES
Transcript of Jack Wilkinson

Page 157

1     Q     Have you ever heard of a program called "I
2    Believe in Service"?
3     A     I don't remember hearing of it, no.
4     Q     Were you ever told, as an Alderwoods
5    employee, that it was an expectation of you to get
6    out in the community and become involved with
7    projects or activities or organizations?
8     A     I don't remember being encouraged to, no.
9     Q     Okay.  Would you consider any of the time
10   that you've spent as a founder of the Community
11   Bible Church, consider that to be work for
12   Alderwoods?
13    A     No, no.
14    Q     That was a personal issue for you?
15    A     Yes, yes.
16          MR. MCGEE:  I think that explains why the
17   witness didn't check that box.
18    Q     (BY  MS. BRAUN) Okay.  And let's just continue
19   talking about community work for a minute.  Did you ever see
20   anything in writing regarding community work as an
21   Alderwoods employee?
22    A     I don't -- I don't remember seeing
23   anything, no.
24    Q     And in any of the conversations you had
25   with employees at other locations, there was no

Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg
866-565-1929

NETWORK DEPOSITION SERVICES
Transcript of Jack Wilkinson

Page 159

1    call; correct?

2         A     Yes, yes, ma'am.

3         Q     He was a salaried member of management;

4    correct?

5         A     I assume he was salary.

6         Q     Do you know if employees at locations

7    beyond Chetopa and Altamont used call logs while on

8    call?

9         A     I do not.

10        Q     Okay.  While you worked on call during

11   your Alderwoods employment, you testified that you

12   would go downstairs to the funeral home and clock

13   in; correct?

14        A     Yes.

15        Q     Okay.  Do you know whether employees at

16   locations outside Cheto --

17        A     Chetopa.

18        Q     -- Chetopa -- God, I got to get it

19   right -- and Altamont recorded their time on call in

20   that same manner, using a time clock; do you know?

21        A     I know Chetopa and Altamont, I don't know

22   about the other locations.

23        Q     Okay.  And for your time spent on call,

24   for the time you had clocked in and recorded, you

25   were paid your hourly rate; correct?

NETWORK DEPOSITION SERVICES
Transcript of Jack Wilkinson

Page 160

1      A    I was, yes.

2      Q    Okay.  And do you know if employees

3   outside Cheto -- goodness --

4           MR. MCGEE:  Chetopa.

5      Q    (BY MS. BRAUN) -- I need more caffeine --

6   Chetopa -- maybe I've had too much -- Chetopa and Altamont

7   were compensated in the same manner?

8           MR. MCGEE:  Objection to form.

9           THE WITNESS:  I don't know personally.

10     Q    (BY  MS. BRAUN) You don't know how employees at

11  other locations were compensated for their time on call?

12     A    No, I don't.

13     Q    Okay.  And outside of Chetopa and

14  Altamont, do you know which positions at other

15  Alderwoods locations were required to work on call?

16     A    I know because of conversations with Larry

17  Wilson that he was.

18     Q    And his position again, was?

19     A    Location manager at Oswego.

20     Q    Uh-huh.  Do you know of any other

21  employees, in particular job positions, were

22  required to work on call at Oswego?

23     A    No, I don't.

24     Q    And do you know which positions at any

25  location other than Oswego and Chetopa and Altamont?

869e63a0-0274-4333-9be4-5b29226c572e

NETWORK DEPOSITION SERVICES
Transcript of Jack Wilkinson

Page 225

1                    CERTIFICATE

2

3          I, Lacy Antle, Certified Shorthand

4    Reporter, do hereby certify that the above-named JACK WILKINSON

5    was by me first duly sworn to testify the truth, the

6    whole truth, and nothing but the truth, in the case

7    aforesaid; that the above and foregoing deposition

8    was by me taken in shorthand and thereafter

9    transcribed; and that I am not an attorney for nor

10   relative of any of said parties or otherwise

11   interested in the event of said action.

12

13

14

15          IN WITNESS WHEREOF, I have hereunto set my

16   hand and official seal this 22nd day of April, 2009.

17

18

19

20

21

22          _____

23               Lacy Antle, CSR RPR

24

25

869e63a0-0274-4333-9be4-5b29226c572e