# TABLE OF CONTENTS
## DECLARATIONS OF FIELD LEVEL NON-EXEMPT AND EXEMPT EMPLOYEES

| Tab | Name |
|-----|------|
| 1 | Alleva, Steve |
| 2 | Anton, George |
| 3 | Ballard, Constance |
| 4 | Bollinger, Karen |
| 5 | Cain, Waldo |
| 6 | Cardell, Donald |
| 7 | Clark, William |
| 8 | Clisby, Chad |
| 9 | Crisp, Donald |
| 10 | Crowe, Patrick |
| 11 | Curnow, Brian |
| 12 | D'Andrea, Daniel |
| 13 | Dias, Joe |
| 14 | Eagan, Charles |
| 15 | Eddy, Sharon |
| 16 | Elliott, James |
| 17 | Fogg, Margaret |
| 18 | Forrest, Wendy 9/9/10 |
| 19 | Forrest, Wendy 11/4/09 |
| 20 | Friden, Paul |
| 21 | Gibson, Jill 11/12/09 |
| 22 | Gibson, Jill 9/8/10 |
| 23 | Goni, Helen |
| 24 | Greeno, Donald |
| 25 | Harper, William Ray |
| 26 | Jones, Jay |
| 27 | Jones, Regina |

| Tab | Name |
|---|---|
| 28 | Korell, Karee |
| 29 | Krueger, Richard |
| 30 | Lange-Louris, Lisa |
| 31 | LaPlaunt, Daniel |
| 32 | Laska, Robert |
| 33 | Lawrence, Gloria |
| 34 | Lay, John |
| 35 | Luciano, Christopher |
| 36 | Maldonado, Michael |
| 37 | Mann, Kelley |
| 38 | McCarthy, Eleanor |
| 39 | Messier, Claudia |
| 40 | Nowatka, Steven |
| 41 | Obenauf, Jason |
| 42 | Patterson, William |
| 43 | Powell, William |
| 44 | Pruitt, Jeanne |
| 45 | Rizzotto, Michael |
| 46 | Rogers, Kenneth |
| 47 | Roman, Alfred |
| 48 | Rosa, Melissa |
| 49 | Rosen, Joseph |
| 50 | Santmyer, William |
| 51 | Schwab, Roxann |
| 52 | Schwinghamer, Steven |
| 53 | Sears, William |
| 54 | Sims, Mertie |
| 55 | St. Laurent, Andrew 9/9/10 |
| 56 | St. Laurent, Andrew 11/12/09 |
| 57 | Strang, Robert Clayton |

| Tab | Name |
|-----|------|
| 58 | Sydlowski, Deborah |
| 59 | Turnage, Brenda |
| 60 | Warn, Robin |
| 61 | Welch, Sharon |
| 62 | Wentworth, Shirley |
| 63 | Young, Annette |

**TAB 1**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

**WILLIAM HELM, et al.,**
**On behalf of themselves and all other**
**employees and former employees similarly**
**situated,**

Plaintiffs,

v.

**ALDERWOODS GROUP, INC.,**

Defendants.

Case No. 3:08-CV-01184 SI

**DECLARATION OF STEVE**
**ALLEVA**

1  DECLARATION OF STEVE ALLEVA

2  I, Steve Alleva, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

3  1.  My name is Steve Alleva. I work in Paoli, Pennsylvania. I am over 21 years of

4  age, suffer no legal disability, and am otherwise competent to make this Declaration.

5  2.  All the statements in this Declaration are true and accurate. I have personal

6  knowledge of the facts set forth in this Declaration, and could testify to them competently if

7  called to do so.

8  3.  I currently work at Alleva Funeral Home, Inc. Alleva Funeral Home used to be an

9  Alderwoods location. I began working there in January 1995 as a Location Manager and have

10  held this position ever since.

11  Piece Rate/Lump Sum

12  4.  From roughly 2004 to 2007, Funeral Directors at Alleva were paid a minimum of 3

13  hours at an overtime rate for after-hours removals. Employees recorded the time they spent

14  performing an after-hours removal. If the removal lasted longer than 3 hours, employees were

15  paid the time actually spent performing the removal. If the removal lasted less than 3 hours,

16  employees were still paid for 3 hours work.

17  5.  Beginning in roughly 2007, Alleva Funeral Home paid Funeral Directors an hour

18  and a half plus $40 for performing after-hours removals. The hour and a half payment for after-

19  hours removals was made at an overtime rate if an employee had already reached 40 hours for a

20  week.

21  6.  Removals typically take 2 hours or less, depending on the location of the removal

22  in relation to the funeral home. It is rare that removals take longer than 2 hours.

23  7.  The hour and a half plus $40 policy may overcompensate employees depending on

24  their hourly rate and the time spent performing the removal.

25  8.  I am not aware of Alderwoods' policy on piece rate and/or lump sum payments

26  and do not know how other locations paid employees for after-hours removals.

27  Community Work

28  9.  Since I became Location Manager, I have always strongly encouraged Funeral

- 2 -

1   Arrangers, Funeral Directors, Apprentice Funeral Directors, and Embalmers who work at Alleva

2   Funeral Home to become involved in the community.

3     10. The funeral home pays all fees and dues for community work performed on behalf

4   of the location.

5     11. Employees are compensated for the time they spend performing community work

6   during normal business hours and outside normal business hours.

7     12. I also sometimes give employees the option to leave work early if they performed

8   community work. In other words, if employees attended community activities after hours, they

9   could leave early on a Friday but were paid as if they worked a full day. For example, if an

10   employee attended Kiwanis events after hours and told me that she attended a Kiwanis event for 3

11   hours on a Wednesday night, I would allow her to leave work 3 hours early on the following

12   Friday (*i.e.,* at 2 p.m.).

13     13. I rely on my employees to accurately report to me the time that they spend at

14   community activities. In theory, employees could on occasion be overcompensated if they over-

15   estimate the time it actually took for them to perform community work.

16     14. I understand that this Declaration is being provided voluntarily in a lawsuit

17   brought against Alderwoods Group, Inc. in which the Plaintiffs allege that they have not been

18   properly paid for all time worked.

19     15. Before speaking with any attorney for Alderwoods, I was told that the attorney

20   represents Alderwoods and does not represent me. I also was told that the employees who filed

21   the lawsuit seek to have the class certified, and that the matter of class certification has not been

22   ruled upon by the Court; and that the class is certified and assuming I am a member of the class,

23   then the attorneys for Alderwoods Group, Inc. will be directly opposing my interest as a class

24   member.

25     16. Prior to speaking with the attorney for Alderwoods, I was also told that I did not

26   have to answer any questions. I was told that the interview was purely voluntary and that if I did

27   not wish to speak, there would be no adverse impact on me.

28     17. The attorney for Alderwoods provided me with an opportunity to review the

1   Declaration and to make any corrections. The attorney told me that I could refuse to sign the

2   Declaration without any adverse impact on me.

3        I declare under penalty of perjury that the foregoing is true and correct.

4   Dated: September 10, 2010

Steve Alleva

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TAB 2**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM HELM, et al.<br>On behalf of themselves and all employees similarly situated,<br><br>        Plaintiffs,<br><br>    vs.<br><br>ALDERWOODS GROUP, INC., et al.<br><br>        Defendants. | **CASE NO.   3:08-CV-01184 SI**<br><br>**DECLARATION OF GEORGE ANTON** |

1

DECLARATION OF GEORGE ANTON:

I, George Anton, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.      My name is George Anton. I am a resident of Deerfield Beach, Florida. I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.      All the statements in this Declaration are true and accurate. I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.      I am currently an Assistant Support Staff employee for Kraeer Funeral Homes and Cremation Services. For approximately 21 years, from 1988 through December 2006, I worked at the Kraeer Cal-Crematory, intially as a support staff, and by 1990 as the Crematory Manager. I was Crematory Manager for the Kraeer Cal-Crematory during the time Alderwoods Group Inc. owned and operated the facility from 2002 through 2006.

4.      In my position as Crematory Manager for Alderwoods at the Kraeer Cal-Crematory, I was a salaried employee. I reported to Robert Russell, a Regional Manager. At the crematory, I had two and sometimes three hourly employees who reported directly to me. These individuals were crematory operators and assisted me with the operations at the crematory. Two of these employees were generally full-time and one part-time.

5.      In the course of my 18 years working as Crematory Manager at the Kraeer Cal-Crematory, I gained knowledge of Alderwoods' timekeeping policies and pay practices and how they were implemented at this location.

2

### After-Hours Removals

6.      At Kraeer Cal-Crematory, we would sometimes perform removals. On occasion, these removals were after-hours. The hourly employees who assisted with removals were paid for their work by the hour. The hourly employees would be paid for overtime if they exceeded 40 hours of work in a given week.

7.      Hourly employees were not paid a "piece" rate for removals. From time to time, when needed, we would employ a third-party removal service to perform removals. Only the removal service was paid a "piece" rate for removals.

8.      I have no knowledge of a company-wide Alderwoods policy requiring hourly employees to perform after-hours work without pay. Employees were paid for all the time they worked, including any overtime work.

### Overtime

9.      I am unaware of any Alderwoods policy that encouraged or required managers not to pay overtime that was not pre-approved. The hourly employees who reported to me at the Crematory were not required to obtain pre-approval for overtime worked during my tenure as Crematory Manager.

10.      In my experience, Alderwoods employees were always paid for the time they worked, including overtime. The hourly employees at the Crematory would record their time on time cards by punching in and punching out. All hourly employees were paid time-and-a-half for any overtime worked.

11.      I never encouraged, required, or requested any hourly employee at the Crematory to not record their time for hours worked, including overtime. Nor do I recall of any instance in which an hourly employee failed to record his or her overtime.

3

1    12.   My Regional Manager never encouraged, required, or requested me
2    to have hourly employees not record their hours worked for overtime.

3
4    "Community Work Policy"

5    13.   I never saw or heard of an Alderwoods policy requiring employees to
6    participate in any community organization.  Nor was I aware of an Alderwoods policy that
7    required employees to perform community work outside the regular work day without pay.
8    No such policy was ever communicated to me during my employment with Alderwoods.

9
10   14.   Alderwoods employees were encouraged to be active in the
11   community, but it was not mandatory.  Employees at the Kraeer Cal-Crematory would
12   participate in community work, including the annual Seafood Fest, Fishing Rodeo and
13   other activities that raised money for charitable causes.  No hourly employees were
14   required to participate.  If an hourly employee volunteered to participate in these
15   community activities, they were paid their hourly rate, or overtime if over 40 hours in a
16   week, for all hours while working at these events.

17   15.   I would perform evaluations of the hourly employees who reported to
18   me approximately every two years.  I did not discuss their involvement in community
19   service as part of the evaluation.  Community service was not on the written evaluation
20   that I submitted to Alderwoods for each of my employees.

21
22   Pre-Needs Sales

23   16.   The Alderwoods funeral homes in my region of Florida had a
24   separate sales staff that sold pre-needs insurance to families.  Neither I nor any of my
25   staff at the Crematory ever participated in pre-needs presentations or sales.

26
27
28

4

17.     I do recall that employees would get a referral fee from Alderwoods

for any pre-needs referrals that they made to the pre-needs staff. Alderwoods, however,

did not require any employees make referrals.

Meal Breaks

18.     Full-time staff were permitted a one hour meal break during their

shift. On occasion, some of the Crematory staff would have to work during their

scheduled meal break. Employees recorded their time if they did so and were paid for

the time worked.

19.     Alderwoods did not require that employees deduct a full meal break

from their work hours each day if that is not what they took. Generally, any employee at

the Crematory whose lunch was interrupted for work would take their meal break later.

20.     I never encouraged, required, or requested any employee who

worked for me at the Crematory not to record their time worked during a meal break.

Training

21.     As crematory operators, training was required for the hourly

employees both initially when they were hired and periodically during their tenure with the

Crematory. An Alderwoods employee, usually Paul Woods, would come to the

Crematory and train the hourly employees on safety and data recording procedures.

22.     All training was done on the job, and the hourly employees would be

paid for any hours spent in training. On occasion, an hourly employee may have to travel

to a location where a training course was being provided. The employee was paid for all

travel and time spent attending those training sessions.

23.     I understand that this Declaration is being provided voluntarily in a

lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they

5

have not been properly paid for all time worked.  Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me.

24.     Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions.  I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

25.     The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections.  The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: November _13_, 2009

GEORGE ANTON

6

**TAB 3**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WILLIAM HELM, et al.
On behalf of themselves and all employees
similarly situated,

        Plaintiffs,

    vs.

ALDERWOODS GROUP, INC., et al.

        Defendants.

CASE NO.    3:08-CV-01184 SI

**DECLARATION OF CONSTANCE
BALLARD**

## DECLARATION OF CONSTANCE BALLARD

I, Constance Ballard, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.     My name is Constance Ballard.  I am a resident of Cameron Park, California.  I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.     All the statements in this Declaration are true and accurate.  I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.     I currently work at Chapel of the Pines Funeral Home.  Under Alderwoods, I worked at Memory Chapel.  I began working there in June 2004.

4.     At Memory Chapel, I was an office manager.  I was a full-time, hourly employee.  I took care of accounts payable, contracts, answering the telephone, and assisting the funeral directors.

Overtime

5.     I rarely worked overtime.  I would do so only if something came up in the office that had to be completed before the next work day.

6.     At Memory Chapel, there was a time clock in which we punched our time cards.  However, because the location was so small, we stopped using the time clock and just submitted time sheets with our time.

7.     Time sheets were submitted to a funeral director, Scott Layton, who handled

payroll. We were paid time and a half for overtime.

8.     I did not receive any bonuses or commissions.

9.     I was always paid for the overtime I worked. I was always able to get approval from my manager before I worked overtime. I was never asked to not record time as overtime.

After-Hours Removals

10.    After-hours removals were paid $50 per removal. The employees who worked on after-hours removals generally made $10 or $11 an hour. Generally, a removal took between an hour and two hours. Only part-time employees worked on after-hours removals.

"Community Work Policy"

11.    I was not encouraged or required to participate in any community organizations.

12.    There was no incentive program to encourage employees to participate in community activities or organizations.

13.    I only received an evaluation from my supervisor in my first year at Memory Chapel. I do not recall being asked about community service.

Training

14.    I did not receive any training at Alderwoods. Any training on office procedures or systems was on-the-job training.

Meal Breaks

15.    Lunch break was either an hour or a half-hour, depending on when you came into

work that day. I was never required to work through a lunch break. If I did so, it was because I chose to do so. I was not required to punch out or record a lunch that I did not take.

16.     Before speaking with any attorney for Alderwoods, I was told that the employees who filed the lawsuit seek to have the class certified, and that the matter of class certification has not been ruled upon by the Court. I was also told that if the class is certified and assuming I am a member of the class, then the attorneys for Alderwoods will be directly opposing my interest as a class member.

17.     I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked. Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me.

18.     Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions. I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

19.     The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections. The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 9 , 2009

*Constance Ballard*
CONSTANCE BALLARD

**TAB 4**

1
2
3          UNITED STATES DISTRICT COURT
4          NORTHERN DISTRICT OF CALIFORNIA
5

| | |
|---|---|
| WILLIAM HELM, et al. | ) CASE NO.   3:08-CV-01184 SI |
| On behalf of themselves and all employees | ) |
| similarly situated, | ) DECLARATION OF KAREN |
| | ) BOLLINGER |
| Plaintiffs, | ) |
| vs. | ) |
| | ) |
| ALDERWOODS GROUP, INC., et al. | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |
| | ) |
| | ) |

## DECLARATION OF KAREN BOLLINGER

I, Karen Bollinger, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.      My name is Karen Bollinger.  I am a resident of San Diego, California.  I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.      All the statements in this Declaration are true and accurate.  I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.      I currently work at Humphrey Mortuary, which used to be an Alderwoods location. I began working there in March 2005 as a family service counselor.  As a family service counselor, I took care of families' pre-need arrangements.  In addition to scheduled calls at the funeral home, I had appointments in the field and conducted some cold-calling of care centers and facilities to set up appointments for pre-need presentations.

4.      As a family service counselor for Alderwoods, I was paid both hourly and by commission.  In addition to my hourly pay, I would make a commission on pre-need sales.  The net commission I received was calculated by subtracting my hourly pay from my gross commission.  My goal is always to make money from commissions, not wages alone.  There have been only a few weeks in which I was paid hourly, without commission.  I generally worked about 40 hours a week for Alderwoods.

Overtime

5.      I was paid overtime when I worked more than 8 hours a day or 40 hours in a week. When I was paid overtime, my base pay and the overtime was substituted for commissions, if the

1    hourly pay was greater than the commission.  I do not recall ever having to obtain approval from a

2    supervisor before working overtime.

3
           6.       I was never told not to record my time.  Rather, I always recorded my time.
4

5    After-Hours Work

6
           7.       I occasionally did work after-hours with pre-need sales, but did not make cold-calls
7
8    after-hours.  I never performed after-hours removals.

9
     "Community Work Policy"
10

11
           8.       I was encouraged to participate in community activities, like breakfasts and
12
13   lunches, but I always had too many appointments and was generally too busy to get involved in

14   community organizations.   I was paid for the breakfasts and lunches I attended, and I recorded the

15   time I spent at these activities on my time sheet.  Community service was not a requirement of my

16
     position.
17

18   Training

19
           9.       I received training in pre-need sales when I started at the funeral home.  My first
20

21   week consisted of training by my manager and learning about contracts, policies and procedures.

22   The next two to three weeks I shadowed another family service counselor.  I was paid hourly for

23   this time.
24

25         10.      I also attended office safety training and training on Alderwoods policies.  These

26   sessions were held during regular business hours.  I recorded my time for these training sessions,

27   but was probably earning commissions at that time.  I had no after-hours training.

28

Meal Breaks

11.    My lunch break was 30 minutes, but I did not take it on a set schedule. If I did not take a lunch break, it was of my own choosing. I was never told to record a lunch break that I had not taken.

12.    Before speaking with any attorney for Alderwoods, I was told that the employees who filed the lawsuit seek to have the class certified, and that the matter of class certification has not been ruled upon by the Court. I was also told that if the class is certified and assuming I am a member of the class, then the attorneys for Alderwoods will be directly opposing my interest as a class member.

13.    I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked. Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me.

14.    Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions. I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

15.    The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections. The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

1    I declare under penalty of perjury that the foregoing is true and correct.

2

3

4    Dated: November **5**, 2009                     _Karen Bollinger_

5                                                   KAREN BOLLINGER

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TAB 5**

1                        UNITED STATES DISTRICT COURT

2                   NORTHERN DISTRICT OF CALIFORNIA

3

4   WILLIAM HELM, et al.               )  **CASE NO.   3:08-CV-01184 SI**

5   On behalf of themselves and all employees )
    similarly situated,                )  **DECLARATION OF WALDO CAIN**

6                                )
              Plaintiffs,         )

7         vs.                      )

8   ALDERWOODS GROUP, INC., et al.     )

9               Defendants.       )

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                1

DECLARATION OF WALDO CAIN

I, Waldo Cain, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.     My name is Waldo Cain. I am a resident of Independence, Kansas. I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.     All the statements in this Declaration are true and accurate. I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.     I have worked for Potts Chapel in Independence, Kansas for 24 years, from 1985 through present.

4.     From 2002 through 2006, during the time Alderwoods owned and operated Potts Chapel, I was a part-time hourly employee. I worked as a funeral attendant. My job involved assisting with funerals, providing support to the funeral director, working at visitations, and helping to clean up after services at the funeral home. I also performed removals when necessary.

5.     During the 2002 through 2006 time period, I never worked overtime, nor was I aware of any overtime policies.

6.     To the best of my recollection, I did not work more than 8 hours in any one day, or 40 hours in any one week during the time Alderwoods operated Potts Chapel. Generally, I would be asked to work whenever there was a funeral or body to be picked up and brought back to the funeral home. On average, there were only about 150 funerals a year at the two Potts Chapel

2

locations in Independence and Cherryvale.  There were four other part-time employees who assisted the funeral director, and I don't recall any of those individuals working overtime.

7.      Before Alderwoods assumed ownership, hourly employees like me recorded our time on time sheets.  When Alderwoods assumed ownership, a time clock was installed and hourly employees had to record their time by punching in and punching out.

8.      I always recorded all the time that I worked for Alderwoods by punching my time card.  Generally, I would work approximately 20 hours each month.  On rare occasions, I would work 30 or 40 hours in a month.

9.      I was paid for every hour that I worked for Alderwoods.  On one occasion, a secretary made an error on the hours that I worked, but when I brought the error to the attention of management, it was corrected and I was paid for the actual hours that I worked.

10.     None of my managers, or any other employee at Alderwoods, ever encouraged, required, or requested me not to record the time that I worked.  I never heard of anyone at Potts Chapel request hourly employees not to record the time they worked, including overtime.

11.     On occasion, I also performed removals of bodies from homes, hospitals and other locations back to the funeral home.  I was paid hourly for each removal, and would record my time spent on a removal by punching in and punching out.

12.     I was not involved in the selling of pre-needs policies, nor was I ever required to make pre-needs presentations or sell pre-needs policies.

3

13.     I was not required to participate in community organizations or perform community work as an employee of Alderwoods. I was a member of both the Lions and Masons, but I did not represent Potts Chapel or Alderwoods when I attended functions held by these organizations. I joined these groups voluntarily and would have done so regardless of my work at Potts Chapel. I never reported on my activities in the community to any Alderwoods managers, or completed a community service report form, nor was I ever required to do so.

14.     On occasion I would work through the lunch hour. When I did so, I would stay "on the clock" and not punch out so I would be paid for the time I worked through lunch. If I missed lunch, I would take my lunch break later that day.

15.     No one at Alderwoods ever encouraged, required, or requested me to perform work but not record the hours that I worked.

16.     While at Potts Chapel during the time Alderwoods operated the funeral homes, I had limited training. I recall an orientation meeting held by Alderwoods management at our location shortly after Alderwoods assumed ownership. The orientation was held during normal working hours, and the hourly employees recorded the time spent at that meeting by punching the time clock.

17.     I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked. Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me. I also was told that the employees who filed the lawsuit seek to have the class certified, and that the matter of class certification has not been ruled upon by the Court; and that if the class is certified and assuming I

4

am a member of the class, then the attorneys for Alderwoods Group, Inc. will be directly opposing my interest as a class member.

18.    Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions. I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

19.    The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections. The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: October 2 9, 2009

_Waldo Cain_

WALDO CAIN

5

**TAB 6**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WILLIAM HELM, et al.,
On behalf of themselves and all other
employees and former employees similarly
situated,

        **Plaintiffs,**

        **v.**

**ALDERWOODS GROUP, INC.,**

        **Defendants.**

**Case No. 3:08-CV-01184 SI**

**DECLARATION OF DONALD
CARDELL**

DECLARATION OF DONALD CARDELL

I, Donald Cardell, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.      My name is Donald Cardell.  I am a resident of Fresno, California.  I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.      All the statements in this Declaration are true and accurate.  I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.      I am currently the Location Manager of the Whitehurst, Sullivan, Burns & Blair Funeral Home in Fresno, California.  I have worked at the location since 1973, including the time period when Alderwoods Group, Inc. owned and operated Whitehurst, Sullivan, Burns & Blair.  I first worked on a part-time basis and then worked as a Funeral Director from around 2000 until 2002 or 2003, when I became Location Manager.

4.      In the course of my 37 years working at Whitehurst, Sullivan, Burns & Blair Funeral Home, I gained knowledge of Alderwoods' timekeeping policies and pay practices and how they were implemented at this location.

Piece Rate

5.      During the time period when Alderwoods owned and operated Whitehurst, Sullivan, Burns & Blair Funeral Home, a piece rate of $25 was paid to certain employees for "nights on-call."  Only Funeral Directors, Managers, and designated part-time staff trained in "nights on-call" were ever "on-call" at Whitehurst, Sullivan, Burns & Blair.  Only Funeral Directors and designated part-time staff trained in "nights on-call" were paid a piece rate (hereinafter "on-call employees") since the Managers were salaried exempt employees.

6.      The $25 piece rate was paid regardless of whether on-call employees ever actually took a call.  Thus, on-call employees would often receive $25 for doing no work at all.

7.      Whitehurst, Sullivan, Burns & Blair also paid a piece rate ranging from $25 to $50 to on-call employees who performed after-hours removals or took after-hours calls.  This piece rate payment would be paid instead of the $25 on-call piece rate payment.  An on-call employee performing a single-man removal (a removal requiring only one on-call employee) would receive

- 2 -

a higher piece-rate payment than two on-call employees performing a single removal.  For example, a single-man removal might pay a $50 piece rate, whereas a 2-person removal might pay each on-call employee $25.

8.      As a Funeral Director, I personally received piece rate payments both for being on-call and for performing after-hours removals.

9.      On-call employees answering after-hours calls or performing after-hours removals were required to record their hours on a time sheet.

10.     Removals typically took no longer than 1.5 hours.

11.     An after-hours call could take anywhere from 15 minutes to 1 hour.

12.     As a Location Manager, I have sometimes paid on-call employees a higher piece rate for a removal that took longer than a typical removal.  For example, removals for certain homicides where the coroner was called to the scene may take as many as 4 hours.  Because on-call employees recorded their time spent on a removal, I would review their time sheet and often pay them a higher piece rate for the 4 hour removal.  If I normally paid $35 for a typical removal lasting 1.5 hours, I might decide to pay more for a removal lasting 4 hours.

13.     The actual piece rate amount changed from year-to-year.  I remember that at one point the on-call piece rate payment for doing no work was $15 and then it increased to $25.

Meal and Rest Breaks

14.     Time at Whitehurst, Sullivan, Burns & Blair is currently written on a time sheet.  For a period of about 3 years prior to January 1, 2008 time was recorded on time clocks.  Before that, the location again used time sheets.

15.     Employees at Whitehurst, Sullivan, Burns & Blair have always received a one hour meal break.  However, if the funeral home is extremely busy one day, employees may get only 30 minutes for their meal break.

16.     As a Funeral Director, I recorded the time that I spent on my meal break.  As a salaried Location Manager, I do not record my meal break time.

17.     One of two people in the front office typically answers the phone during the day.  Lunch breaks are staggered at the location so that someone is available to answer the phone.  As a

result, employees typically receive at least a 30 minute uninterrupted meal break.

18.    If an employee gets interrupted during his or her meal break and I am aware of it, that employee can discuss it with me and I will ensure that the employee either receives thirty-minutes of uninterrupted time or that he or she is compensated for the time worked during his or her meal break.

19.    However, on occasion, especially when the location was using time clocks, employees may have taken a call during their meal break that is not recorded and I am not made aware of. If that was the case, the employee was not compensated for time worked during his or her meal break.

20.    As a Funeral Director, I sometimes took lunch breaks without clocking out.

21.    As a Funeral Director I took two 15 minute breaks per day, but I did not record them, and was paid for all my break time.

Community Work

22.    While Alderwoods owned the location, employees at Whitehurst, Sullivan, Burns & Blair were encouraged to participate in community activities. There was no requirement that employees become involved in the community and no repercussions if employees did not join community activities.

23.    I am heavily involved in community organizations such as service clubs, rotary clubs, and the Catholic Professional Business Club. I try to do most of my community work during business hours, but I sometimes attend meetings at night and on weekends.

24.    In my current position as a salaried exempt Location Manager, I am not compensated for my community work.

25.    As a Funeral Director under Alderwoods, I recorded all my hours spent on community work and was compensated for it.

26.    I would not, however, record hours spent attending certain dinners. For example, the owners of Whitehurst, Sullivan, Burns & Blair would often invite me to a community organization's dinner and would pay for my dinner at the event. Because the dinner was free and I was invited and attending voluntarily, I did not consider that "work" and would not record my

1  hours spent at such events.

2       27.    Only one or two employees at Whitehurst, Sullivan, Burns & Blair are currently

3  involved in community work.  These employees are an Arranger and a Funeral

4  Director/Embalmer.  The Arranger does very little community work, while the Funeral

5  Director/Embalmer is very involved in community work.  Both of these employees record their

6  hours spent at such events and are compensated for their time.

7       28.    Some voluntary activities are not compensated.  For example, recently much of my

8  staff attended the Greek Food Festival.  Whitehurst, Sullivan, Burns & Blair bought tickets to the

9  event for all the staff and their families.  Staff and their families could choose to either attend or

10  not attend the event.  Staff who attended but did not volunteer at the event were not compensated

11  for their hours attending the event.  Staff who volunteered at the event were compensated for their

12  time.

13       29.    I understand that this Declaration is being provided voluntarily in a lawsuit

14  brought against Alderwoods Group, Inc. in which the Plaintiffs allege that they have not been

15  properly paid for all time worked.  Before speaking with any attorney for Alderwoods, I was told

16  that the attorney represents Alderwoods and does not represent me.  I also was told that the

17  employees who filed the lawsuit seek to have the class certified, and that the matter of class

18  certification has not been ruled upon by the Court; and that the class is certified and assuming I

19  am a member of the class, then the attorneys for Alderwoods Group, Inc. will be directly

20  opposing my interest as a class member.

21       30.    Prior to speaking with the attorney for Alderwoods, I was also told that I did not

22  have to answer any questions.  I was told that the interview was purely voluntary and that if I did

23  not wish to speak, there would be no adverse impact on me.

24       31.    The attorney for Alderwoods provided me with an opportunity to review the

25  Declaration and to make any corrections.  The attorney told me that I could refuse to sign the

26  Declaration without any adverse impact on me.

27       I declare under penalty of perjury that the foregoing is true and correct.

28

Dated: September 9, 2010

Donald Cardell

**TAB 7**

1

2

3 UNITED STATES DISTRICT COURT

4 NORTHERN DISTRICT OF CALIFORNIA

5

6 WILLIAM HELM, et al.
On behalf of themselves and all employees
7 similarly situated,

8        Plaintiffs,

9    vs.

10 ALDERWOODS GROUP, INC., et al.

11        Defendants.

CASE NO.    3:08-CV-01184 SI

DECLARATION OF WILLIAM CLARK

# DECLARATION OF WILLIAM CLARK

I, William Clark, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.    My name is William Clark. I am a resident of Madison, Mississippi. I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.    All the statements in this Declaration are true and accurate. I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.    I am currently the manager of the Baldwin-Lee Funeral Home, with locations in Jackson and Pearl, Mississippi. I took over day to day management of Baldwin-Lee in 2005, when it was an Alderwoods location.

Overtime

4.    No pre-approval was required for overtime. Usually, there were only two funeral directors at each location, and therefore I generally knew what each employee was doing. Also, the directors had an on-call schedule. We were generally under-budget on overtime, so pre-approval was not a concern.

5.    I never told any employee not to record overtime, or to record overtime as regular time. I instructed my employees to always put down any time they worked. Time was recorded on a time clock, so if an employee was working late, they simply did not punch out.

After-Hours Work

6.    After-hours removals were handled through our sister location, the Wright &

Ferguson Funeral Home, also in Jackson, Mississippi.   Funeral directors remained on-call,
however, for residence removals, which always required two employees. The funeral director on-
call was on the clock, at the funeral home, until 9 p.m.  Often, there would be visitations during
that time. After 9 p.m., the funeral director could leave the funeral home, but remained on-call.  If
called out for a removal, the funeral director was paid hourly from the time he or she left for the
removal until the time they returned.

"Community Work Policy"

7.    I encouraged the funeral directors to join a community organization, like Lions
Club or Rotary, but I never made this mandatory.  Other employees were not encouraged or
discouraged from participating in community activities.  We never used any incentive programs at
the funeral home to encourage employees to participate in community service.  I have never heard
of a program called "I Believe in Service."

8.    The funeral home paid for dues and fees for community activities.  If an activity
carried over into the evening, the employee would continue to be paid for his time.  Most of the
community groups, like Lions Club and Rotary, met during business hours.

9.    I did not consider community service in my evaluations of employees.

Pre-Need Sales

10.    We had pre-need counselors who sold pre-need insurance policies.  Only the pre-
need counselors sold these policies.  Our office manager had a pre-need insurance license, but she
was not active in sales.  Alderwoods paid all the licensing fees for the sales personnel.  Only pre-
need counselors were required to obtain an insurance license.  The sales staff was paid a

combination of an hourly wage and commissions.  They were paid overtime if they accrued sufficient hours during the week.

Training

11.    There was a training period for new employees.  This training occurred during normal work hours and was paid.

Meal Breaks

12.    Lunch breaks lasted 30 minutes.  There were times when a funeral director or other employee might have to work through a scheduled break.  If they did so, they were compensated for the time that they worked.

13.    I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked.  Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me.

14.    Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions.  I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

15.    The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections.  The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

1    I declare under penalty of perjury that the foregoing is true and correct.

2

3

4    Dated: November 6, 2009

WILLIAM CLARK

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TAB 8**

1

2

3                    UNITED STATES DISTRICT COURT

4                  NORTHERN DISTRICT OF CALIFORNIA

5                                    )   CASE NO.    3:08-CV-01184 SI

6    WILLIAM HELM, et al.            )
     On behalf of themselves and all employees   )
7    similarly situated,             )   DECLARATION OF CHAD CLISBY
                                     )
8               Plaintiffs,          )
                                     )
9          vs.                       )
                                     )
10   ALDERWOODS GROUP, INC., et al.  )
                                     )
11              Defendants.          )
                                     )
12                                   )
                                     )
13                                   )
                                     )
14                                   )
                                     )

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DECLARATION OF CHAD CLISBY

I, Chad Clisby, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.     My name is Chad Clisby. I am a resident of Houston, Texas. I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.     All the statements in this Declaration are true and accurate. I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.     I am currently the manager of Memorial Oaks Funeral Home in Houston, Texas. I previously was the location manager of Earthman Funeral Directors-Hunters Creek in Houston, Texas. This was an Alderwoods location when I was hired as location manager. I worked at Hunters Creek from August 2005 until 2008. I was a salaried employee throughout this period.

4.     Hunters Creek consisted of 3 to 4 full-time employees, including funeral directors and the office manager. There were also several part-time employees. As a location manager, I reviewed the employees' time cards at the end of the pay cycle (I do not remember if this was at the end of every week or every other week). I never altered the time entered by the employee. Occasionally, with the employee, we would correct errors in the time recorded (for example, if the employee had failed to punch in one day).

Overtime

5.     My employees at Hunters Creek worked overtime on a number of occasions, such as if there was a large visitation that was running late, or if work needed to be performed on a weekend. I do not specifically recall a "pre-approval" policy for overtime. I set schedules for

employees' overtime, so that I could manage the overtime that they worked. Generally, therefore, I knew ahead of time who would be working overtime. However, when I was out of the office, the employees would work overtime without first consulting with me. They were paid for the overtime that they worked, even though they had not gotten pre-approval of the overtime.

6.     I never told employees not to record overtime that they had worked, or to record it as regular time. Employees were always fully paid for the overtime that they worked. Overtime was paid at time and a half.

7.     Other than pre-need sales staff, the hourly employees at the funeral home were not paid bonuses or commissions. I am not sure how the pre-need sales staff was paid, as they did not directly report to me.

After-Hours Work

8.     After-hours removals were handled by a 24-hour Care Center, which was a central location for the Houston funeral homes. That location took care of all transportation, delivery, and embalming of the deceased. Accordingly, the funeral directors at Hunters Creek did not perform after-hours removals.

9.     Nor were the funeral directors or any other employee at Hunters Creek on-call for after-hours business calls. There was an answering service at the central Care Center that took care of after-hours calls. In the rare circumstance that a call came in that the Care Center could not handle, they called me directly.

"Community Work Policy"

10.     I did encourage the hourly employees to be involved in the community. However,

I do not recall any of my employees at Hunters Creek becoming involved in community activities or organizations.  They were not required to participate in community activities and there were no incentive programs to encourage their participation in such activities or organizations.  For example, I do not recall ever hearing about a Community Leadership Program, or an Influencer Program, or a program called "I Believe in Service."  I do not recall any forms on which employees reported their community service to me or Alderwoods.

11.     I did not consider community involvement when evaluating employees.  I focused on client satisfaction and other operating metrics.

Pre-Need Sales

12.     Other than the dedicated pre-need sales staff, no other employees were encouraged or required to sell pre-need policies.  Funeral directors were responsible only for funeral services and at-need business.  They did not sell pre-need policies.  I do not recall that any of the funeral directors or other employees sought to obtain a license to sell pre-need insurance when I was manager.

Training

13.     Funeral directors in Texas are required to take 16 hours of continuing education credits every two years.  This requirement only applied to funeral directors.  Alderwoods paid for all courses and credits required for the funeral directors to maintain their licenses.  The funeral directors were paid for their time to attend these courses, even if they were after-hours.

Meal Breaks

14.     Employees were given an hour for lunch break.  On occasion, they might work

through some or all of their lunch break. Typically, they would just take a later break. If the employee did not take a full lunch break, or if they did not take a lunch break at all, the employee was paid for the time that he or she worked. Employees were not required or instructed to record a lunch break that they had not taken.

15.     I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked. Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me.

16.     Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions. I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

17.     The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections. The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.


Dated: November 13, 2009                    _Cerodd Coz_____
                                             CHAD CLISBY

**TAB 9**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM HELM, et al.<br>On behalf of themselves and all employees<br>similarly situated,<br><br>              Plaintiffs,<br><br>       vs.<br><br>ALDERWOODS GROUP, INC., et al.<br><br>              Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**CASE NO.    3:08-CV-01184 SI**

**DECLARATION OF DONALD CRIPS**

*CRISP*

1

DECLARATION OF DONALD CRISP

I, Donald Crisp, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.   My name is Donald Crisp. I am a resident of Wichita, Kansas. I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.   All the statements in this Declaration are true and accurate. I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.   I am currently a Funeral Director at Hillside Funeral Home in Wichita, Kansas. I began working at Hillside in September 2004 as a full time funeral director. At the time I was hired to work at Hillside, it is my understanding that Acacia was owned and operated by Alderwoods Group, Inc.

4.   As a funeral director, I performed a variety tasks including meeting with families, preparing for funerals, and performing removals

5.   As a funeral director at Hillside for Alderwoods from September 2004 through December of 2006, I was always an hourly, full time employee working 40 or more hours each week.

6.   I was always paid time-and-a-half for any overtime I ever worked. My time was recorded on time cards, which I used to punch in and punch out.

7.   Alderwoods paid me for all the overtime I worked. I don't recall any policy which required my overtime to be pre-approved, nor do I recall ever having my overtime not approved.

2

8.   None of my managers, or any other employee at Alderwoods, ever encouraged, required, or requested me not to record my overtime.

9.   No one at Alderwoods ever encouraged, required, or requested me to perform work but not record the time that I worked. I always recorded the time that I worked, including overtime.

10.   As a funeral director, I would be "on call" approximately three nights a week. My "on call" duties consisted of performing removals of bodies from various locations to the funeral home or answering after-hours calls to the funeral home.

11.   For removals, I would be paid hourly and record my time from the time I received the call at home until I returned home. I was not paid a "piece rate" for removals.

12.   Answering phones while "on call" consisted of speaking with families or others who called the funeral home after hours. Each on call employee would use a phone log to record their time. For any call that lasted 15 minutes or less, I was paid for 15 minutes. If a call lasted more than 15 minutes, then I was paid for each minute the call lasted.

13.   I was not involved in the selling of pre-need policies, nor was I ever required to obtain a pre-need insurance license, make pre-need presentations or sell pre-need policies. Alderwoods used family service counselors exclusively to sell pre-need policies and make presentations.

14.   I never heard of something at Alderwoods called the "Community Leadership Program," or "Influencer Program." I never heard of "I Believe in Service" or "Success Spotlight." I was not required to participate in community organizations or perform community work as an employee of Alderwoods. I never reported on my

3

activities with any organizations to any Alderwoods managers, or completed a community service report form, nor was I ever required to do so.

15.   I had an annual evaluation while working for Hillside when it was operated by Alderwoods. No one ever evaluated me on my participation in community service, or the amount of overtime I recorded.

16.   Alderwoods permitted a 30 minute to an hour meal break every day. I would always take the full 30 minutes, unless I had to work through lunch or my meal break was interrupted by work. On any occasion that my meal break would be interrupted because of work, I would be paid for working through my break. I would also take my meal break later that day. None of my managers or other Alderwoods employees ever encouraged, required, or requested me not to record my time that I worked through a meal break.

17.   As a funeral director I was required by the state to complete 12 hours of continuing education every two years. I would complete these courses while on the clock and be paid for my time spent attending courses. I don't recall any other mandatory training.

18.   I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked. Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me. I also was told that the employees who filed the lawsuit seek to have the class certified, and that the matter of class certification has not been ruled upon by the Court; and that if the class is certified and assuming I am a member of the class, then the attorneys for Alderwoods Group, Inc. will be directly opposing my interest as a class member.

4

19.     Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions. I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

20.     The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections. The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct

Dated: November 12, 2009

DONALD CRISP

5

**TAB 10**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WILLIAM HELM, et al.
On behalf of themselves and all employees
similarly situated,

        Plaintiffs,

    vs.

ALDERWOODS GROUP, INC., et al.

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)

CASE NO.    3:08-CV-01184 SI

**DECLARATION OF PATRICK CROWE**

1

DECLARATION OF PATRICK CROWE:

I, Patrick Crowe, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.    My name is Patrick Crowe.  I am a resident of Levittown, New York.  I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.    All the statements in this Declaration are true and accurate.  I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.    I am the General Manager of the Vernon C. Wagner Funeral Homes located in Hicksville and Plainview, New York.  I have worked for the Wagner Funeral Homes since the 1980s, including the time period 2002 through 2006 when Alderwoods Group, Inc. owned and operated Wagner Funeral Homes.

4.    In my position as General Manager for Alderwoods at the Wagner Funeral Homes, I was a salaried employee.  From 2002 through 2006, I had approximately six full-time and ten part-time hourly employees working at the two Wagner Funeral Homes locations who reported directly to me.  These individuals included approximately four full-time funeral directors, one full-time administrative assistant, one full-time support staff, and ten part-time funeral support staff.

5.    In the course of my more than 20 years working at Wagner Funeral Homes, including as General Manager while Alderwoods operated it, I gained knowledge of Alderwoods' timekeeping policies and pay practices and how they were implemented at this location.

2

<u>After-Hours Removals</u>

6.      From 2002 through 2006 at Wagner Funeral Homes, removals were performed by both funeral directors and a third-party removal service.  Funeral directors or other hourly employees who performed removals would be paid by the hour, including any overtime, and be required to record their time for a removal by punching their time card on the time clock.

7.      From November 2001 through October 2004, the hourly employees operated under a collective bargaining agreement which governed "on-call" procedures, including the manner in which hourly employees would be compensated for after-hours removals.  The collective bargaining agreement included provisions regarding wages, hours, and meal breaks, as well as a grievance and arbitration provision.  All grievances, including those related to the wage and hour provisions included in the collective bargaining agreement, were required to be submitted to binding arbitration.  If not submitted in accordance with the terms of the collective bargaining agreement, the agreement precluded a covered hourly employee to pursue the grievance in any other forum.

8.      Hourly employees were not paid a "piece" rate for removals.

9.      I have no knowledge of a company-wide Alderwoods policy requiring hourly employees to perform after-hours work without pay.  Employees were paid for all the time they worked, including any overtime work.  No hourly employees were required to work prior to clocking in, or after clocking out, nor am I aware of any Alderwoods policy requiring hourly employees to do so.

<u>Overtime</u>

10.     I am unaware of any Alderwoods policy that encouraged or required managers not to pay overtime that was not pre-approved.  The hourly

3

employees who reported to me at the Wagner Funeral Homes were not required to obtain pre-approval for overtime worked. I am not aware of any hourly employee who worked overtime and was not paid for that overtime.

11. In my experience, Alderwoods employees were always paid for the time they worked, including overtime. The hourly employees at the Wagner Funeral Homes would record their time on time cards by punching in and punching out. All hourly employees were paid time-and-a-half for any overtime worked.

12. I never encouraged, required, or requested any hourly employee at the Wagner Funeral Homes to not record their time for hours worked, including overtime. Nor do I recall of any instance in which an hourly employee failed to record his or her overtime.

13. My Regional Manager never encouraged, required, or requested me to have hourly employees not record their hours worked for overtime.

14. During the time Wagner Funeral Homes operated under a collective bargaining agreement, from November 2001 through October 2004, I was the only person who took after-hours phone calls. After the collective bargaining agreement expired, both the funeral directors and I would take the after-hours phone calls. Answering phones while "on call" consisted of speaking with families or others who called the funeral home after hours. For any call that lasted 15 minutes or less, the funeral directors were paid for 15 minutes of overtime. If a call lasted more than 15 minutes, then the funeral director was paid for each minute the call lasted.

15. None of the hourly employees were paid bonuses or commissions.

"Community Work Policy"

4

16.   I never saw or heard of an Alderwoods policy requiring employees to participate in any community organization. Nor was I aware of an Alderwoods policy that required employees to perform community work outside the regular work day without pay. No such policy was ever communicated to me during my employment with Alderwoods.

17.   I would perform evaluations of the hourly employees who reported to me approximately every year. I used an Alderwoods form to record the evaluation. I did not discuss their involvement in community service as part of the evaluation, nor do I recall seeing any place on the Alderwoods form that included the topic of community service. Accordingly, I did not include community service on the written evaluation that I submitted to Alderwoods for each of my employees.

Pre-Need Sales

18.   Funeral directors provided the pre-need sales and presentations at Wagner Funeral Homes. No other hourly employees participated in pre-need sales. Funeral directors would be on the clock for any time they worked on pre-need sales or presentations. I am not aware of any funeral director not recording their time while involved in selling pre-need funeral arrangements or making presentations to customers. Nor am I aware of any Alderwoods policy requiring funeral directors to work "off the clock" on pre-need sales or meetings.

Meal Breaks

19.   The hourly employees at Wagner Funeral Homes were permitted a half hour meal break for lunch and two fifteen minute breaks during the day. On occasion, some of the staff would have to work during their scheduled meal break. Employees recorded their time if they did so and were paid for the time worked.

5

20.   Alderwoods did not require that employees deduct a full meal break from their work hours each day if that is not what they took.  Generally, any employee at the Wagner Funeral Homes whose lunch was interrupted for work would take their meal break later.

21.   I never encouraged, required, or requested any employee who worked for me at the Wagner Funeral Homes not to record their time worked during a meal break.

Training

22.   The hourly employees would have to attend training sessions or meetings periodically.  These meetings were always held during the business day, and the hourly employees would be paid for any hours spent in training.

23.   I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked.  Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me.

24.   Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions.  I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

25.   The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections.  The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  November __, 2009

PATRICK CROWE

7

**TAB 11**

1

2

3                     UNITED STATES DISTRICT COURT

4                   NORTHERN DISTRICT OF CALIFORNIA

5

6   WILLIAM HELM, et al.                    )   CASE NO.     3:08-CV-01184 SI
    On behalf of themselves and all employees )
7   similarly situated,                      )   **DECLARATION OF BRIAN CURNOW**
                                             )
8              Plaintiffs,                   )
                                             )
9        vs.                                 )
                                             )
10  ALDERWOODS GROUP, INC., et al.           )
                                             )
11             Defendants.                   )
                                             )
12                                           )
                                             )
13                                           )
                                             )
14                                           )

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **DECLARATION OF BRIAN CURNOW**

I, Brian Curnow, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.      My name is Brian Curnow.  I am a resident of Sammamish, Washington.  I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.      All the statements in this Declaration are true and accurate.  I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.      I am currently the owner and manager of Curnow Funeral Home and Cremation Service, with locations in Bellevue and Sumner, Washington.  Prior to this, I worked at Mills & Mills Funeral Home and Park in Olympia, Washington and Powers Funeral Home in Puyallup, Washington in various roles between 1989 and 2002.  Both locations became Alderwoods locations in 2002.

4.      From August 2001 to June 2002, I was the market manager for the Seattle Region. In June 2002, I became General Manager of Powers.  These were salaried positions.  In December 2002, I left Alderwoods and started my own funeral home.

5.      In the course of time with Alderwoods as a market manager and at Powers, I gained knowledge of Alderwoods' timekeeping policies and pay practices and how they were implemented at these locations.

After-Hours Removals

6.      When I worked at Mills & Mills, funeral directors were rarely required to perform after-hours removals. Part-time staff performed most removals after-hours. Funeral directors were

"on-call" one night a week should part-time staff require assistance.

7.      When I left Mills & Mills, employees were paid the greater of the piece rate of $50 per removal and their hourly rate for three hours per removal. The piece rate was generally more than the employee would make hourly, even on overtime. Removals generally took about two hours, depending on the location of the removal.

8.      Powers handled after-hours removals differently from Mills & Mills. Powers contracted out to a third-party removal service to conduct after-hours removals. Therefore, Powers' staff did not perform after-hours removals.

9.      I have no knowledge of a company-wide Alderwoods policy requiring hourly employees to perform after-hours work without pay. Employees were paid for all the time they worked, including any overtime work.

Overtime

10.     I am unaware of a company-wide Alderwoods policy that stated that employees would not be paid if overtime was not pre-approved. Towards the end of my time with Alderwoods, it issued a policy requiring pre-approval for overtime, but it did not specify that employees were not to be paid for time worked. Instead, it meant that employees should notify their managers ahead of time if they were to work over-time. However, employees at Powers generally were not required to obtain pre-approval for overtime worked during my tenure at these locations.

11.     In my experience, Alderwoods employees were always paid for the time they worked, including overtime. As a manager, I monitored time cards submitted by the employees,

and if an employee was working too much overtime, I would adjust his schedule. I never instructed an employee to not record overtime.

      12.    Only sales staff and funeral directors earned commissions.

"Community Work Policy"

      13.    I never saw or heard of a company-wide policy requiring employees to participate in any community organization. Nor was I aware of a company-wide policy that required employees to perform community work outside the regular work day without pay. No such policy was ever communicated to me during my employment with Alderwoods.

      14.    Alderwoods employees were encouraged to be active in the community, but it was not mandatory. There were funeral directors who did not participate in any community organizations.

      15.    During evaluations of funeral directors, I would occasionally discuss community service. However, my priority was the employee's job performance. Community service was not on the written evaluation that was submitted to Alderwoods for each employee. I did not discuss community service when evaluating other employees.

Pre-Need Sales

      16.    Both Alderwoods funeral homes and cemeteries in my region of Washington had a separate sales staff that sold pre-need insurance to families. Funeral directors and other funeral home and cemetery staff did not sell pre-need policies.

      17.    Alderwoods did not require that sales staff become licensed to sell pre-need insurance. No license was required to sell cemetery pre-need policies or to sell funeral trust

policies.  A state license was required to sell pre-need funeral insurance policies.  It is my understanding that sales employees who took the insurance classes to become licensed were reimbursed for their classes.

18.     Sales staff were paid overtime for pre-need calls if they exceeded 40 hours in a work week.  In Washington, sales staff were paid either their hourly wage or their commission, depending on which was greater.

Meal Breaks

20.     Full-time staff were permitted a meal break during their shift.  On occasion, some staff would choose to work during their scheduled meal break.  Employees recorded their time if they did so and were paid for the time worked.  Generally, only funeral directors would work through a lunch.  Other funeral home staff took lunch breaks on a rotational basis and rarely had to work during lunch.  Alderwoods did not require that employees deduct a full meal break from their work hours each day if that is not what they took.

21.     I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked.  Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me.

22.     Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions.  I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

23.     The attorney for Alderwoods provided me with an opportunity to review the

1   Declaration and to make any corrections.  The attorney told me that I could refuse to sign the

2   Declaration without any adverse impact on me.

3   I declare under penalty of perjury that the foregoing is true and correct.

4

5

6   Dated: November _3_, 2009

7                                                              BRIAN CURNOW

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TAB 12**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WILLIAM HELM, et al.
On behalf of themselves and all employees
similarly situated,

        Plaintiffs,

    vs.

ALDERWOODS GROUP, INC., et al.

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)

**CASE NO.    3:08-CV-01184 SI**

**DECLARATION OF DANIEL
D'ANDREA**

1

DECLARATION OF DANIEL D'ANDREA:

I, Daniel D'Andrea, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.      My name is Daniel D'Andrea.  I am a resident of Deerfield Beach, Florida.  I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.      All of the statements in this Declaration are true and accurate.  I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.      I am currently a Funeral Director/Embalmer Supervisor for Kraeer Funeral Homes and Cremation Services.  I've worked for the Kraeer Funeral Home business since 1977.  From 2003 through 2006, I worked as a manager at the Kraeer Funeral Home Central Care Facility on Sample Road, Pompano Beach, Florida.  I was the night manager at this embalming facility from 2003 through 2005, and the day manager from 2005 through 2006.  From 2002 through 2006, Alderwoods owned and operated this facility.

4.      In my position as Manager for Alderwoods at the Kraeer Funeral Home embalming facility, I was a salaried employee.  At the center, I had two and sometimes three hourly employees who reported directly to me.  These employees assisted with embalmings and removals of the deceased from various locations to the embalming center.  These individuals were generally full-time hourly employees.

2

5.    In the course of my four years working as Manager for Aldwerwoods at the Kraeer Funeral Home embalming facility, I gained knowledge of Alderwoods' timekeeping policies and pay practices and how they were implemented at this location.

After-Hours Removals

6.    At the Kraeer Funeral Home embalming facility, we would sometimes perform removals. On occasion, these removals were after-hours. The hourly employees who assisted with removals were paid for their work by the hour. The hourly employees would be paid for overtime if they exceeded 40 hours of work in a given week.

7.    Hourly employees were not paid a "piece" rate for removals. From time to time, when needed, we would employ a third-party removal service to perform removals. Only the removal service was paid a "piece" rate for removals.

8.    I have no knowledge of a company-wide Alderwoods policy requiring hourly employees to perform after-hours work without pay. Employees were paid for all the time they worked, including any overtime work.

Overtime

9.    I am unaware of any Alderwoods policy that encouraged or required managers not to pay overtime that was not pre-approved. The hourly employees who reported to me at the embalming facility were not required to obtain pre-approval for overtime worked during my tenure as Manager.

10.    In my experience, Alderwoods employees were always paid for the time they worked, including overtime. The hourly employees at the embalming facility

3

would record their time on time cards by punching in and punching out. All hourly employees were paid time-and-a-half for any overtime worked.

11.    I never encouraged, required, or requested any hourly employee at the embalming facility to not record their time for hours worked, including overtime. Nor do I recall of any instance in which an hourly employee failed to record his or her overtime.

12.    My Regional Manager never encouraged, required, or requested me to have hourly employees not record their hours worked for overtime.

"Community Work Policy"

13.    I never saw or heard of an Alderwoods policy requiring employees to participate in any community organization. Nor was I aware of an Alderwoods policy that required employees to perform community work outside the regular work day without pay. No such policy was ever communicated to me during my employment with Alderwoods.

14.    Alderwoods employees were encouraged to be active in the community, but it was not mandatory. If an hourly employee volunteered to participate in community activities, they were paid their hourly rate, or overtime if over 40 hours in a week, for all hours while working at these events.

15.    I would perform evaluations of the hourly employees who reported to me approximately every two years. I did not discuss their involvement in community service as part of the evaluation. Community service was not on the written evaluation that I submitted to Alderwoods for each of my employees.

4

Pre-Needs Sales

16.     The Alderwoods funeral homes in my region of Florida had a separate sales staff that sold pre-needs insurance to families.  Neither I nor any of my staff at the embalming facility ever participated, or were required to participate, in pre-needs presentations or sales.

17.     To the best of my recollection, none of the Funeral Directors or staff at the Kraeer Funeral Homes ever did, or were required to do, pre-needs presentations or sales.

Meal Breaks

18.     Full-time staff were permitted a half-hour meal break during their shift for lunch, and one hour for dinner.  On rare occasions, some of the staff would have to work during their scheduled meal break.  Employees recorded their time if they did so and were paid for the time worked.

19.     Alderwoods did not require that employees deduct a full meal break from their work hours each day if that is not what they took.  Generally, any employee at the embalming facility whose lunch was interrupted for work would take their meal break later.

20.     I never encouraged, required, or requested any employee who worked for me not to record their time worked during a meal break.

Training

21. At the embalming facility, training was required for the hourly employees both initially when they were hired and periodically during their tenure.

22. All training was done on the job, and the hourly employees would be paid for any hours spent in training. On occasion, an hourly employee may have to travel to a location where a training course was being provided. The employee was paid for all travel and time spent attending those training sessions.

23. I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked. Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me.

22. Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions. I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

23. The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections. The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: October **29**, 2009

_____

DANIEL D'ANDREA

6

**TAB 13**

1
2                       UNITED STATES DISTRICT COURT
3                     NORTHERN DISTRICT OF CALIFORNIA
4
5  WILLIAM HELM, et al.,                    Case No. 3:08-CV-01184 SI
   On behalf of themselves and all other
6  employees and former employees similarly    DECLARATION OF JOE DIAS
   situated,
7
                   Plaintiffs,
8
          v.
9
   ALDERWOODS GROUP, INC.,
10
                   Defendants.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DECLARATION OF JOE DIAS

I, Joe Dias, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.   My name is Joe Dias.  I am a resident of Turlock, California.  I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.   All the statements in this Declaration are true and accurate.  I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.   I am the Location Manager of Whitehurst, Norton, Dias Funeral Home in Turlock, California.  I have been the Manager of this funeral home for the past 27 years, including the entire time period when Alderwoods Group, Inc. owned and operated Whitehurst, Norton, Dias Funeral Home.

4.   In my position as Location Manager for Alderwoods at the Whitehurst, Norton, Dias Funeral Home, I was a salaried employee.  I had one or two full-time hourly employees and two or three part-time hourly employees who reported directly to me.  These individuals included my secretary, a family services employee, and part-time funeral support staff.

5.   In the course of my 27 years working at Whitehurst, Norton, Dias Funeral Home, I gained knowledge of Alderwoods' timekeeping policies and pay practices and how they were implemented at this location.

Piece Rate

6.   During the period Alderwoods operated Whitehurst, Norton, Dias Funeral Home, removals were performed by me and one or two part-time hourly employees.  I never had full-time hourly employees assist me with removals.

7.   I paid a $20 piece rate for after-hours removals at Whitehurst, Norton, Dias Funeral Home.  This piece rate was in addition to their hourly wage.

8.   Part-time employees assisting me on after-hours removals were required to record their time for a removal by punching their time card on the time clock.

9.   After-hours removals typically took 2-3 hours.

10.   The hourly employees would be paid for overtime if they exceeded 40 hours of

1   work in a given week, which was very rare.

2       11.   This was a policy that I implemented at my location. It was not a formal

3   Alderwoods policy. I am not aware what Alderwoods' policy was on piece rate and I am not

4   aware of whether other locations paid piece rate.

5   <u>Meal and Rest Breaks</u>

6       12.   During the time period when Alderwoods owned and operated Whitehurst, Norton,

7   Dias Funeral Home, time was recorded by punching a time card on a time clock.

8       13.   Full-time staff were permitted a one hour meal break and two 15 minute breaks

9   during their shift. Part-time employees were permitted a 1 hour lunch break after working 6

10  hours.

11      14.   Meal breaks are staggered at Whitehurst, Norton, Dias Funeral Home. My

12  secretary typically answers the phone, but if she is on a meal break, I or another employee will

13  answer the phone.

14      15.   Most employees received at least 30 minutes of uninterrupted time during their

15  meal breaks. If employees worked during their meal break and did not record that time on their

16  time cards, they would not be compensated for that time because I would not be aware that they

17  had worked.

18      16.   During the time period when Alderwoods owned and operated Whitehurst, Norton,

19  Dias Funeral Home, employees did not record their rest breaks in any way. I am aware, however,

20  that employees took two 15 minute breaks per day.

21  <u>Community Work</u>

22      17.   During the time period when Alderwoods owned and operated Whitehurst, Norton,

23  Dias Funeral Home, I had one or two full-time hourly employees and two or three part-time

24  hourly employees who reported directly to me. These individuals included my secretary, a family

25  services employee, and a part-time funeral support staff.

26      18.   None of the individuals employed by me perform community work.

27      19.   I understand that this Declaration is being provided voluntarily in a lawsuit

28  brought against Alderwoods Group, Inc. in which the Plaintiffs allege that they have not been

-3-

1   properly paid for all time worked.  Before speaking with any attorney for Alderwoods, I was told

2   that the attorney represents Alderwoods and does not represent me.  I also was told that the

3   employees who filed the lawsuit seek to have the class certified, and that the matter of class

4   certification has not been ruled upon by the Court; and that the class is certified and assuming I

5   am a member of the class, then the attorneys for Alderwoods Group, Inc. will be directly

6   opposing my interest as a class member.

7        20.     Prior to speaking with the attorney for Alderwoods, I was also told that I did not

8   have to answer any questions.  I was told that the interview was purely voluntary and that if I did

9   not wish to speak, there would be no adverse impact on me.

10        21.     The attorney for Alderwoods provided me with an opportunity to review the

11   Declaration and to make any corrections.  The attorney told me that I could refuse to sign the

12   Declaration without any adverse impact on me.

13        I declare under penalty of perjury that the foregoing is true and correct.

14   Dated: September 9, 2010

15                                                      Joe Dias

16

17

18

19

20

21

22

23

24

25

26

27

28