**TAB 14**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM HELM, et al.<br>On behalf of themselves and all employees<br>similarly situated,<br><br>       Plaintiffs,<br><br>   vs.<br><br>ALDERWOODS GROUP, INC., et al.<br><br>       Defendants. | **CASE NO.   3:08-CV-01184 SI**<br><br>**DECLARATION OF CHARLES EAGAN** |

# DECLARATION OF CHARLES EAGAN

I, Charles Eagan, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.      My name is Charles Eagan.  I am a resident of New Orleans, Louisiana.  I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.      All the statements in this Declaration are true and accurate.  I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.      I am currently the manager of the Leitz-Eagan Funeral Home in Metairie, Louisiana.  When Alderwoods owned the funeral home, I was the local manager and, at one point, the market growth manager for all the funeral homes in the New Orleans area.

4.      The Leitz-Eagan Funeral Home consisted of four funeral directors and another 10 or so part-time staff.  There was a punch clock that the employees used to record their time.

Overtime

5.      Alderwoods' policy was to obtain pre-approval before working overtime.  This was never a problem at my location.  Overtime is part of the job and sometimes a funeral director had to stay late or work on a Saturday, depending on when visitations and funeral services were scheduled.  They were paid for any overtime that they worked, even if they could not see me beforehand.

6.      Hourly employees did not receive bonuses or commissions.

<u>After-Hours Work</u>

7.      The staff at Leitz-Eagan did not perform removals.  There was a central location for the New Orleans area at which embalming and removals were handled.

8.      Funeral directors could be on-call to take business calls in the evening, though I usually tried to take these myself.  If a funeral director handled a business call, they were paid at their hourly rate for the length of the call.  If they had accrued sufficient time for overtime, they were paid overtime for the duration of the call.

<u>"Community Work Policy"</u>

9.      I encouraged my employees to participate in community activities, but I did not require that they do so.  I would occasionally have meetings to discuss community involvement with employees, particularly the funeral directors.  I did so because a number of my employees, including funeral directors, did not participate in any community activities.

10.     I did not use any incentive programs to try to entice the employees to participate in community activities or organizations.  I do not recall a program called "I Believe in Service."  The employees' community service was not a part of my evaluation of their job performance.

<u>Pre-Need Sales</u>

11.     The funeral directors did not sell pre-need insurance because Alderwoods did not permit them to do so.  There was a separate sales staff, consisting of pre-need counselors, who were licensed to sell pre-need policies.  It is my understanding that the insurance company paid for their licensing.

Training

12.     Funeral directors had to take continuing education credits to maintain their license. They were paid for the time they attended these courses.  The funeral home also paid their course fees.  About half the classes were during the day, the other half in the evening.  Regardless of the time, the funeral directors were paid for the time that the attended.

13.     Alderwoods would have training seminars or meetings to discuss company policies, practices, and procedures, or new systems.  These were held during the day and the employees who attended were on the clock and were paid for their time.

Meal Breaks

14.     If an employee worked through a meal break, they were paid for their time.  I never instructed the employees to punch out for a lunch break that they were not going to take.

15.     I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked.  Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me.

16.     Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions.  I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

17.     The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections.  The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 9, 2009

CHARLES EAGAN

**TAB 15**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM HELM, et al., On behalf of themselves and all other employees and former employees similarly situated, | Case No. 3:08-CV-01184 SI DECLARATION OF SHARON EDDY |
| Plaintiffs, | |
| v. | |
| ALDERWOODS GROUP, INC., | |
| Defendants. | |

DECLARATION OF SHARON EDDY

I, Sharon Eddy, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.      My name is Sharon Eddy. I am a resident of La Verne, California. I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.      All the statements in this Declaration are true and accurate. I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.      I am currently the Office Manager of the Custer Christiansen Funeral Home in Covina, California. I have worked at the location since 1995, including the time period when Alderwoods Group, Inc. owned and operated Custer Christiansen.

4.      In the course of my 15 years working at Custer Christiansen Funeral Home, I gained knowledge of Alderwoods' timekeeping policies and pay practices and how they were implemented at this location.

5.      While Alderwoods owned the location, as part of my duties as Office Manager, I collected and reviewed time cards and submitted time cards to management.

Meal and Rest Breaks

6.      Since around 2004, time at Custer Christiansen has been kept by punching in and out using a time clock. Before that, the location used written time sheets.

7.      Employees at Custer Christiansen have always received a half hour meal break.

8.      I have always recorded the time that I spent on my meal breaks, and I have never recorded a meal break that I did not in fact take.

9.      One of my responsibilities as Office Manager is answering the phone, and lunch breaks are staggered at the location so that someone is always available to answer the phone. As a result, I almost always received a 30 minute uninterrupted meal break.

10.     I believe I was compensated for all the time I worked while Alderwoods owned Custer Christiansen.

11.     I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the Plaintiffs allege that they have not been

-2-

1    properly paid for all time worked. Before speaking with any attorney for Alderwoods, I was told

2    that the attorney represents Alderwoods and does not represent me. I also was told that the

3    employees who filed the lawsuit seek to have the class certified, and that the matter of class

4    certification has not been ruled upon by the Court; and that if the class is certified and assuming I

5    am a member of the class, then the attorneys for Alderwoods Group, Inc. will be directly

6    opposing my interest as a class member.

7         12.     Prior to speaking with the attorney for Alderwoods, I was also told that I did not

8    have to answer any questions. I was told that the interview was purely voluntary and that if I did

9    not wish to speak, there would be no adverse impact on me.

10         13.     The attorney for Alderwoods provided me with an opportunity to review the

11    Declaration and to make any corrections. The attorney told me that I could refuse to sign the

12    Declaration without any adverse impact on me.

13        I declare under penalty of perjury that the foregoing is true and correct.

14    Dated: September 8, 2010              *Sharon K. Eddy*
                                           Sharon Eddy

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TAB 16**

1

2

3                    UNITED STATES DISTRICT COURT

4                  NORTHERN DISTRICT OF CALIFORNIA

5                                        ) **CASE NO.   3:08-CV-01184 SI**

6    WILLIAM HELM, et al.               )
     On behalf of themselves and all employees )
7    similarly situated,                ) **DECLARATION OF JAMES ELLIOTT**
                                         )
8            Plaintiffs,                 )
                                         )
9        vs.                            )
                                         )
10   ALDERWOODS GROUP, INC., et al.     )
                                         )
11           Defendants.                )
                                         )
12                                       )
                                         )
13                                       )
                                         )
14  ────────────────────────────────────)

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DECLARATION OF JAMES ELLIOTT

I, James Elliott, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.      My name is James Elliott.  I am a resident of San Angelo, Texas.  I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.      All the statements in this Declaration are true and accurate.  I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.      I am currently a funeral director and assistant manager at Johnson's Funeral Home in San Angelo, Texas.  I was only a funeral manager when the funeral home was owned by Alderwoods. I began working at the funeral home in 1971.  Under Alderwoods, I was a full-time, hourly employee, working 40 to 50 hours per week.

Overtime

4.      I generally worked overtime for rosaries, visitations, and death calls.  I was paid time and a half for overtime.  I was always paid for the overtime that I recorded.  I was never told not to record overtime that I had worked.  I was never required to get "pre-approval" from my supervisor before working overtime.  Most of my overtime, such as on-call work, was scheduled in advance.

After-Hours Work

5.      I was on-call for after-hours removals approximately four times a month.  When on-call, I would remain at the funeral home until 9 p.m., then respond to calls at home from the rest of the night.  There was also a non-funeral director employee who was on call for removals.  This

way, there were always at least 2 employees present for each removal.

6.     For removals that occurred in town, we were paid for at least two hours for each removal. If I had accrued enough hours to qualify for overtime, I was paid overtime for the removal. I would estimate that 99% of the removals were completed within two hours, and most took significantly less time. If the removal was out of town, the time allotted for the removal was increased.

7.     When I was on-call, I also responded to business calls. If I did so, I was paid for the time of the call. However, most calls were taken by our evening answering service, and I was notified of a call only if an emergency or if the call was for a removal.

Pre-Need Sales

8.     I did sell pre-need policies for awhile, but stopped when Alderwoods switched to another pre-need insurance company. I was never required to sell pre-need policies. When I did sell pre-need policies, I was paid on commission. The pre-need presentations that I made to families were during business hours, and I was on-the-clock and paid hourly for this time, in addition to any commission I might make. After I ceased selling pre-need policies, I no longer made any commissions as a funeral director.

Community Activities

9.     I was encouraged to participate in community activities. The only community organization I participated in was Kiwanis. Kiwanis meetings were held during lunch hour on weekdays. The funeral home would pay for my dues and fees. I did not join any other community organizations, nor was I required to do so.

10.     I do not recall any incentive programs to encourage employee participation in community service activities.  Community service was never part of any evaluation my supervisor gave me.

Meal Breaks

11.     We were given an hour for lunch break.  There were times when I took a shorter lunch break so as to finish work.  I was always paid for the time that I worked.  I was never required to record a lunch break, or record a full one-hour break, when I had not taken one.

Training

12.     The funeral home paid for my continuing education credits to maintain my funeral director's license.  Most of the courses then were on-line, and we took these courses during the work day, while on-the-clock and being paid.  I do not recall taking any off-site courses, or courses during the evening.

13.     Before speaking with any attorney for Alderwoods, I was told that the employees who filed the lawsuit seek to have the class certified, and that the matter of class certification has not been ruled upon by the Court.  I was also told that if the class is certified and assuming I am a member of the class, then the attorneys for Alderwoods will be directly opposing my interest as a class member.

14.     I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked.  Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me.

15.     Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions. I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

16.     The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections. The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.


Dated: November  9 , 2009                           _____ Elliott _____
                                                    JAMES ELLIOTT

**TAB 17**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WILLIAM HELM, et al.
On behalf of themselves and all employees
similarly situated,

        Plaintiffs,

    vs.

ALDERWOODS GROUP, INC., et al.

       Defendants.

CASE NO.    3:08-CV-01184 SI

**DECLARATION OF MARGARET FOGG**

### DECLARATION OF MARGARET FOGG

I, Margaret Fogg, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.      My name is Margaret Fogg.  I am a resident of Eastham, Massachusetts.  I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.      All the statements in this Declaration are true and accurate.  I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.      I am currently an office manager at Nickerson Funeral Home in Orleans, Massachusetts, which is part of the Doane, Beal and Ames Funeral Home on Cape Cod.  I have been an office manager for Doane, Beal and Ames for about 15 years, including the years when Doane, Beal and Ames was owned by Alderwoods (when my title was called "location administrator").  I have also been an office manager at Doane, Beal and Ames' South Dennis and West Harwich locations.

4.      As an office manager/location administrator for Alderwoods, I was a full-time employee.  For part of this time, I was hourly, and for part I was salaried.  Alderwoods always paid me for the time that I worked.

5.      For part of my time with Alderwoods, in addition to my normal duties as office manager, I also handled payroll.  I entered employees' time cards into the payroll system.  No changes were ever made to the time cards without employee input.  I believe that only the employee could change the time recorded on their time card.

Overtime

6.    When I worked for Alderwoods, I recorded all time that I worked.  I was paid time and a half for overtime.

7.    I worked approximately 5 hours of overtime per week.  Occasionally, I worked on a weekend.  I always was paid for the overtime I worked.  I was never told to not record overtime that I had worked, or to record it as regular time.

8.    The policy at the time I worked for Alderwoods was to get approval from your supervisor before working overtime.  I do not believe approval was required for on-call work. Even if approval was not obtained, the employee was paid for time worked.  As one of my managers said, "no one works for free."  I do not remember an instance when Alderwoods did not pay overtime that was recorded.

After-Hours Removals

9.    I did not work on after-hour removals.  However, I recall from working payroll that employees were paid for after-hours telephone calls in 15 minute increments per phone call.  Thus, if a call lasted only 2 minutes, they would be paid for 15 minutes.  If a call lasted 17 minutes, the employee was paid for another 15 minute increment (in other words, they were paid for 30 minutes).

"Community Work Policy"

10.    Employees were encouraged, but not required to participate in community service. Alderwoods paid for dues and fees.  There were many employees, including funeral directors, who did not participate in community activities.

11.     If I participated in a community activity during regular business hours, such as attending career day at a local high school with a funeral director, I was paid for my time.

12.     I do not believe that I was ever asked about community service or activities as part of an evaluation by my supervisor.

Pre-Need Sales

13.     I did not sell pre-need policies.   I am aware that, in Massachusetts, a funeral director must be licensed to sell pre-need insurance policies.   Alderwoods paid for insurance licenses and courses.

Training

14.     Anytime there was a meeting or training that staff and employees attended, they were paid for their time.  For example, if there was a staff meeting at 7:00 a.m., I would record the time I spent at the meeting on my time card.

15.     Whenever a new office procedure or system was introduced, I was trained on the new system.  I was paid for the time I was trained on the new procedure or system.

Meal Breaks

16.     As a full-time employee, I received a half-hour meal break.  Occasionally, I worked through my meal break when there was a lot of work to be done.  I did so voluntarily and I was paid for the time I worked.

17.     Before speaking with any attorney for Alderwoods, I was told that the employees who filed the lawsuit seek to have the class certified, and that the matter of class certification has

not been ruled upon by the Court.  I was also told that if the class is certified and assuming I am a member of the class, then the attorneys for Alderwoods will be directly opposing my interest as a class member.

18.     I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked.  Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me.

19.     Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions.  I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

20.     The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections.  The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: _10  October_, 2009          _Margaret Fogg_
                                       MARGARET FOGG

**TAB 18**

1

2

3        UNITED STATES DISTRICT COURT

4        NORTHERN DISTRICT OF CALIFORNIA

5

6    WILLIAM HELM, et al.                      ) CASE NO.    3:08-CV-01184 SI
     On behalf of themselves and all employees )
7    similarly situated,                       )
                                               ) **DECLARATION OF WENDY FORREST**
8              Plaintiffs,                      )
                                               )
9          vs.                                 )
                                               )
10   ALDERWOODS GROUP, INC., et al.            )
                                               )
11             Defendants.                     )
                                               )
12                                             )
                                               )
13                                             )
                                               )
14                                             )
                                               )
15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **DECLARATION OF WENDY FORREST**

I, Wendy Forrest, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.    My name is Wendy Forrest.  I am a resident of San Diego, California.  I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.    All the statements in this Declaration are true and accurate.  I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.    I currently work at Humphrey Mortuary, which used to be an Alderwoods location. I began working there in March 2006 as the office manager.

4.    As the office manager at Humphrey Mortuary, I was a full-time, hourly employee. I handled payroll, contracts, accounts receivable, billing and depositing checks, and answer the telephone.  I worked 40-plus hours a week.

Overtime

5.    I worked about two hours a week overtime every week.  This time consisted of me staying late when we were busy, such as when I was preparing for an end-of-the-month audit. There was a time clock that we used to punch in and out.

6.    I was always paid for the overtime I worked.  I was paid time and a half.  I was paid for overtime even when I did not get the overtime pre-approved by my manager.  I do not recall a policy requiring employees to get pre-approval for overtime.

7.    I was never told not to record time that I had worked or to record overtime as

regular time.

8.      I did not receive bonuses or commissions.

9.      When I worked payroll, I received the time cards from the employees. I entered their time into a self-calculating spreadsheet, which the manager reviewed. Neither I nor my manager ever changed an employee's recorded time.

After-Hours Removals

10.     At one time, employees were paid a flat three hours for every after-hours removal at their individual rate of pay, including overtime if they had reached the requisite level of hours. Removals were usually performed by drivers who were scheduled to be on duty. Now, a service center handles all removals.

11.     Funeral directors were paid for 15 minutes for each after-hours telephone call they received. They may have been paid by the minute if the call lasted longer than 15 minutes.

"Community Work Policy"

12.     Employees were encouraged to participate in community organizations. There was a bulletin board that listed various community activities. We were paid for the time we spent participating in community activities or organizations. We wrote up the time on our time cards.

13.     I do not recall if there was a specific community service policy. There was no incentive program to encourage participation in community activities or organizations. I did not participate in any community organizations or activities. I was not required to do so.

14.     I was evaluated annually by my supervisor. Community activities were not part of

my evaluation.

Training

15.    I received on-the-job training when I started from one of the other office staff.  I was paid for this time.

Meal Breaks

16.    Lunch breaks lasted 30 minutes.  Occasionally, I worked through a lunch break and was paid for this time.  This was rare, because the funeral home would make us take a lunch.  I was never told to record a lunch that I did not take.

17.    Before speaking with any attorney for Alderwoods, I was told that the employees who filed the lawsuit seek to have the class certified, and that the matter of class certification has not been ruled upon by the Court.  I was also told that if the class is certified and assuming I am a member of the class, then the attorneys for Alderwoods will be directly opposing my interest as a class member.

18.    I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked.  Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me.

19.    Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions.  I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

20.    The attorney for Alderwoods provided me with an opportunity to review the

Declaration and to make any corrections. The attorney told me that I could refuse to sign the

Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 4, 2009

WENDY FORREST

**TAB 19**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WILLIAM HELM, et al.,
On behalf of themselves and all other
employees and former employees similarly
situated,

          Plaintiffs,

    v.

ALDERWOODS GROUP, INC.,

          Defendants.

Case No. 3:08-CV-01184 SI

DECLARATION OF WENDY
FORREST

DECLARATION OF WENDY FORREST

I, Wendy Forrest, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.  My name is Wendy Forrest. I am a resident of San Diego, California. I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.  All the statements in this Declaration are true and accurate. I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.  I currently work at Humphrey Mortuary, which used to be an Alderwoods location. I began working there in March 13, 2006 as the Office Manager.

4.  As the office manager at Humphrey Mortuary, I was a full-time, hourly employee. I handled payroll, contracts, accounts receivable, billing and depositing checks, and answered telephones. I worked 40-plus hours a week.

Community Work

5.  Employees at Humphrey Mortuary have always been encouraged to participate in community organizations. There are no repercussions for failure to join community organizations or participate in community activities.

6.  All employees that participated in community activities on behalf of Humphrey Mortuary both during normal working hours and outside normal working hours are paid for their time.

7.  During the time that it was an Alderwoods location, I personally participated in a number of community activities on behalf of Humphrey Mortuary, such as Kiwanis events, including activities that occurred outside normal working hours. I have always recorded the time that I spent at community activities on behalf of the location and been paid for this time.

Meal Breaks

8.  While Humphrey Mortuary was an Alderwoods location, time was recorded on a time clock. Employees were instructed to clock in and out for their lunch breaks.

9.  Lunch breaks lasted 30 minutes. Some employees ate lunch at the location while others went outside the location.

- 2 -

1      10.    Since I began working there, a receptionist has always been on duty during normal

2   working hours at Humphrey's Mortuary.  Employees are instructed to tell the receptionist when

3   they go on lunch so that they will not to be interrupted.  As a result, employees' 30-minute lunch

4   breaks are rarely interrupted.

5      11.    Further, employees are instructed not to pick up the phone or meet with clients

6   during their lunch breaks.  If they do so, that is their choice.

7      12.    If, for some reason, an employee's lunch break is interrupted, they are instructed to

8   clock back in or take a longer lunch break so they get 30 minutes of uninterrupted time.

9      13.    Personally, my lunch break has very rarely ever been interrupted.

10      14.    I understand that this Declaration is being provided voluntarily in a lawsuit

11   brought against Alderwoods Group, Inc. in which the Plaintiffs allege that they have not been

12   properly paid for all time worked.

13      15.    Before speaking with any attorney for Alderwoods, I was told that the attorney

14   represents Alderwoods and does not represent me.  I also was told that the employees who filed

15   the lawsuit seek to have the class certified, and that the matter of class certification has not been

16   ruled upon by the Court; and that the class is certified and assuming I am a member of the class,

17   then the attorneys for Alderwoods Group, Inc. will be directly opposing my interest as a class

18   member.

19      16.    Prior to speaking with the attorney for Alderwoods, I was also told that I did not

20   have to answer any questions.  I was told that the interview was purely voluntary and that if I did

21   not wish to speak, there would be no adverse impact on me.

22      17.    The attorney for Alderwoods provided me with an opportunity to review the

23   Declaration and to make any corrections.  The attorney told me that I could refuse to sign the

24   Declaration without any adverse impact on me.

25      I declare under penalty of perjury that the foregoing is true and correct.

26   Dated: September 9, 2010

27                                             Wendy Forrest

28

- 3 -

**TAB 20**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM HELM, et al. On behalf of themselves and all employees similarly situated,<br><br>       Plaintiffs,<br><br>    vs.<br><br>ALDERWOODS GROUP, INC., et al.<br><br>       Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

CASE NO.   3:08-CV-01184 SI

**DECLARATION OF PAUL FRIDEN**

1

DECLARATION OF PAUL FRIDEN

I, Paul Friden, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.     My name is Paul Friden. I am a resident of Kent, Washington. I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.     All the statements in this Declaration are true and accurate. I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.     I am currently a Location Manager at Price-Helton Funeral Home in Auburn, Washington. I began working at Price-Helton Funeral Home in January 2005 as a full time funeral director-apprentice. I received my funeral director's license in May 2005 and remained a funeral director through July 2005, at which time I accepted a salaried position as Location Manager. Prior to that time, I worked at Powers Funeral Home in Puyallup, Washington as a full-time funeral director-apprentice. At the time I worked at Powers Funeral Home as a funeral director-apprentice and Price-Helton Funeral as funeral director-apprentice, funeral director, and Location Manager it is my understanding that those funeral homes were owned and operated by Alderwoods Group, Inc.

4.     As a funeral director-apprentice and funeral director, I performed a variety tasks including meeting with families, preparing for funerals, embalming, and performing removals.

5.     As a funeral director-apprentice at Price-Helton and Powers Funeral Homes, and later as a funeral director at Price-Helton Funeral Home for Alderwoods from

2

September 2004 through the end of July 2005, I was always an hourly, full-time employee working 40 hours each week, or more depending upon how busy we were.

6. From September 2004 through July 2005, I would work ten or fewer hours of overtime each week. I was always paid time-and-a-half for any overtime I ever worked. My time was recorded on time cards, which I used to punch in and punch out.

7. Alderwoods paid me for all the overtime I worked. Generally, we had to obtain approval from our manager before working overtime; however, I don't recall my manager ever not approving my overtime. If I didn't obtain approval for overtime, but still worked, I was always paid for that time. As a manager, I asked the employees I supervised to obtain approval from me before working overtime. I don't recall ever not approving a request for overtime work, nor do I recall not paying someone for overtime they worked without first seeking my approval.

8. None of my managers, or any other employee at Alderwoods, ever encouraged, required, or requested me not to record my overtime. I was never required to perform any work before clocking-in in the morning, or after clocking-out in the evening. In addition, as a Location Manager at Price-Helton, I never requested any hourly employee not to record their overtime, or require an hourly employee to perform any work before clocking-in in the morning, or after clocking-out in the evening.

9. No one at Alderwoods ever encouraged, required, or requested me to perform work but not record the time that I worked. As an hourly employee, I always recorded the time that I worked, including overtime. As a Location Manager, I never encouraged, required, or requested any hourly employee to perform work but not record the time that they worked.

10. As a funeral director-apprentice and funeral director, I would be "on call" approximately one night a week. My "on call" duties consisted of performing removals of bodies from various locations to the funeral home or answering after-hours

3

1  calls to the funeral home. I received the calls on a cell phone provided by the funeral

2  home.

3      11.    For removals, I would be paid a minimum of $40 for each removal.

4  Removal calls generally took about 1 ½ hours to complete. If a removal took longer than

5  three hours, then I would be paid for each hour after that, however, I don't recall any

6  removals that ever took that long.

7

8      12.    Answering phones while "on call" consisted of speaking with families

9  or others who called the funeral home after hours. For any call that lasted 15 minutes or

10 less, I was paid for 15 minutes. If a call lasted more than 15 minutes, then I was paid for

11 each minute the call lasted. I kept track of my time on a call log.

12     13.    As a funeral director-apprentice and later funeral director, I was not

13 involved in the selling of pre-need policies, nor was I ever required to make pre-need

14 presentations or sell pre-need policies. Alderwoods used family service counselors

15 exclusively to sell pre-need policies and make presentations. If I ever attended a pre-

16 need presentation, I would clock-in and be paid for attending the meeting.

17

18     14.    I don't recall ever hearing about an Alderwoods "Community Work

19 Policy," or heard of "I Believe In Service." I recall hearing about "Success Spotlight," but I

20 don't recall what that was. Although I was encouraged to be active in the community, I

21 was not required to participate in community organizations or perform community work as

22 an employee of Alderwoods. I never reported on my activities with any organizations to

23 any Alderwoods managers, or completed a community service report form, nor was I ever

24 required to do so. If I attended a community activity as a representative of the funeral

25 home (i.e. wearing my funeral home name tag and promoting the funeral home), I was

26 paid my hourly wage for attending.

27     15.    To the best of my knowledge, I did not have an annual evaluation

28 while working at Powers Funeral Home as an apprentice or as a funeral director or

4

1 embalmer, or at Price-Helton Funeral Homes while working as Funeral
2 Director/Embalmer. No one ever evaluated me on my participation in community service,
3 or the amount of overtime I recorded. As a manager, I never evaluated anyone on their
4 participation in community activities.

5      16.   Alderwoods permitted a 30 minute meal break every day. I would
6 take the full 30 minutes, unless I had to work through lunch or my meal break was
7 interrupted by work. On any occasion that my meal break would be interrupted because
8 of work, I would be paid for working through my break. I would also take my meal break
9 later that day. None of my managers or other Alderwoods employees ever encouraged,
10 required, or requested me not to record my time that I worked through a meal break.
11
12      17.   The funeral homes would hold training sessions, mostly about safety
13 issues, from time to time. I would clock-in and clock-out for every meeting, and was paid
14 my hourly wage for all the training sessions I attended.

15      18.   As an Alderwoods hourly employee, and later as a manager, I was
16 not aware of any Alderwoods policies which required hourly employees not to record
17 overtime, or time spent at training sessions or other meetings. Nor was I aware of any
18 Alderwoods policy which required hourly employees to participate in uncompensated
19 community work for the funeral home.
20
21      19.   I understand that this Declaration is being provided voluntarily in a
22 lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they
23 have not been properly paid for all time worked. Before speaking with any attorney for
24 Alderwoods, I was told that the attorney represents Alderwoods and does not represent
25 me. I also was told that the employees who filed the lawsuit seek to have the class
26 certified, and that the matter of class certification has not been ruled upon by the Court;
27 and that if the class is certified and assuming I am a member of the class, then the
28

5

1   attorneys for Alderwoods Group, Inc. will be directly opposing my interest as a class

2   member.

3         20.      Prior to speaking with the attorney for Alderwoods, I was also told

4   that I did not have to answer any questions. I was told that the interview was purely

5   voluntary and that if I did not wish to speak, there would be no adverse impact on me.

6

7         21.      The attorney for Alderwoods provided me with an opportunity to

8   review the Declaration and to make any corrections. The attorney told me that I could

9   refuse to sign the Declaration without any adverse impact on me.

10        I declare under penalty of perjury that the foregoing is true and correct.

11

12    Dated: November _11_, 2009

13                                              PAUL FRIDEN