**TAB 26**

1
2
3                    UNITED STATES DISTRICT COURT

4                   NORTHERN DISTRICT OF CALIFORNIA

5                                    )   CASE NO.    3:08-CV-01184 SI
6   WILLIAM HELM, et al.             )
    On behalf of themselves and all employees )
7   similarly situated,              )   DECLARATION OF JAY JONES
                                     )
8              Plaintiffs,           )
                                     )
9         vs.                        )
                                     )
10  ALDERWOODS GROUP, INC., et al.   )
                                     )
11             Defendants.           )
                                     )
12                                   )
                                     )
13                                   )
                                     )
14                                   )
                                     )
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## DECLARATION OF JAY JONES

I, Jay Jones, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.      My name is Jay Jones.  I am a resident of Corinth, Mississippi.  I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.      All the statements in this Declaration are true and accurate.  I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.      I am currently the manager of Memorial Funeral Home in Corinth, Mississippi. Memorial was an Alderwoods location.  I became a manager in 2004 or 2005.  Prior to that, I was a funeral director and embalmer at the funeral home.

4.      As a funeral director, I was an hourly employee.  I worked full-time, and generally worked 45 to 50 hours in a week.

Overtime

5.      I generally worked 5 to 10 hours of overtime a week, which included evening and weekend work.  I was never told not to record my overtime, or to record the overtime I had worked as regular time.  I was not required to get pre-approval from my supervisor before I worked overtime.  Memorial Funeral Home had only two funeral directors for three locations, so our supervisor was aware that we often had to work overtime.  I am not aware of a specific Alderwoods policy that required pre-approval for overtime.  I was always paid for the overtime that I worked.

6.      I did not receive commissions as an hourly employee.

After-Hours Work

7.     After-hours removals were paid on a combination flat-fee/hourly basis.  We were paid for at least two hours for each removal at our hourly rate.  We would be paid our overtime rate if we had reached that level of hours.  Generally, a removal might take at most an hour and a half.  If a removal took longer than two hours, we recorded our actual time and were paid for it. All staff were paid in this manner for after-hours removals.

"Community Work Policy"

8.     We were encouraged to get out into the community.  I joined Kiwanis and a couple of activities within my church.  I would have participated in my church activities regardless of the funeral home policy.  Kiwanis usually met at lunch, during the work day.  The funeral home paid dues and fees for community organizations.

9.     I do not recall any incentive programs to encourage community participation by employees.  I do not recall a program called "I Believe in Service."  My community activities were never part of any evaluation by my supervisor.

Pre-Need Sales

10.     I did not sell pre-need policies.  There was a salesperson who handled these policies.  At one point, there was a funeral director who had a pre-need license and she handled walk-in business.  The funeral home paid for the insurance licensing.  Funeral directors were not required to obtain a pre-need license or sell pre-need policies, nor was it encouraged.  I believe that pre-need sales were paid by commission.

Training

11.    There was mandatory training for all employees, such as safety training or sexual harassment training.  This training was always held during the work day and we were paid for attending it.  There was no other training that was required.

Meal Breaks

12.    There were occasions when the funeral home was busy and I was unable to take my lunch break.  If I chose to work through a lunch break, I was paid for my time.  Often, if I had worked through a lunch break, I would simply leave earlier or come in later the next day. Alternatively, I might be paid overtime for the time worked.  I was encouraged by my supervisor to take my lunch breaks, but I was never told to record a lunch break that I did not take.

13.    Before speaking with any attorney for Alderwoods, I was told that the employees who filed the lawsuit seek to have the class certified, and that the matter of class certification has not been ruled upon by the Court.  I was also told that if the class is certified and assuming I am a member of the class, then the attorneys for Alderwoods will be directly opposing my interest as a class member.

14.    I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked.  Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me.

15.    Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions.  I was told that the interview was purely voluntary and that if I did

not wish to speak, there would be no adverse impact on me.

      16.    The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections. The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 11, 2009

_____
JAY JONES

**TAB 27**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WILLIAM HELM, et al.
On behalf of themselves and all employees
similarly situated,

      Plaintiffs,

    vs.

ALDERWOODS GROUP, INC., et al.

      Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**CASE NO.   3:08-CV-01184 SI**

**DECLARATION OF REGINA JONES**

## DECLARATION OF REGINA JONES

I, Regina Jones, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.      My name is Regina Jones.  I am a resident of Brandon, Mississippi.  I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.      All the statements in this Declaration are true and accurate.  I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.      I am currently an employed as a funeral director at the Baldwin-Lee Funeral Home in Pearl, Mississippi.  I have worked at Baldwin-Lee since August 2001.  Baldwin-Lee is a former Alderwoods location.

4.      As a funeral director at Baldwin-Lee, I was an hourly employee.  I generally worked between 47 and 52 hours a week, depending on the rotation schedule.  Baldwin-Lee used a time clock to record time worked.

Overtime

5.      During Alderwoods' ownership, my overtime consisted of embalmings, removals, and visitations.  Overtime was generally scheduled in advance – an on-call rotation was established.  There were occasions when I worked overtime that was not scheduled.  If my manager was present at the funeral home, he would know why we had to work the overtime.  If my manager was not present, we would tell him why we had to work overtime the following day.  I was always paid for the overtime that I worked.

After-Hours Work

6.      The funeral directors were on-call for after-hours removals.  We were required to be physically present at the funeral home until 9 p.m. in the evening, and were paid for that time.  We went off the clock at 9 p.m. and left the funeral home, but remained on-call for after-hours removals.  If I received a call for a residence removal, I would be paid hourly from the time I left home until I returned.  I took a removal vehicle home with me when I was on-call, so that I could drive directly to the residence and not have to come into the funeral home first.

7.      There was a separate group of employees who handled non-residence removal calls.  These were full-time employees at another Alderwoods location who worked a night-shift.  I was called out for residence removals because Alderwoods required at least two employees at every residence removal.

8.      Occasionally I would receive business call in the evening when I was on-call.  Up to 9 p.m., I was on the clock.  Afterwards, I was paid hourly for the time of the call.  I often did not record the time for short calls, but this was my choice.  I was not told that I should not record this time.  If I received a longer call (e.g., longer than 5 minutes), I would write in my time for that call on my time card.

"Community Work Policy"

9.      We were strongly encouraged to be active in the community, but never required to do so.  I was a member of several organizations, which I had joined prior to Alderwoods' ownership of the funeral home.  I do not recall doing anything specific to promote the funeral home at these organizations' functions.

10. I do not recall any incentive program to encourage employees to participate in community activities. I have never heard of a program called "I Believe in Service." My participation in community groups was not part of any evaluation I received from my supervisor.

Pre-Need Sales

11. I did not sell pre-need policies. No funeral directors sold pre-need policies under Alderwoods, and we were not encouraged to do so. Alderwoods had a separate pre-need staff of licensed insurance agents. I do not know how they were paid.

Training

12. Occasionally, I would attend meetings related to Alderwoods' business, practices, or procedures. These were always held during the work day, and I was paid for my attendance.

Meal Breaks

13. There were times when I chose to work through a lunch break. I would simply not punch out for lunch. My manager strongly recommended that we take a lunch and needed to know if we had not taken a break, so that he could properly manage our schedule. If I worked through a lunch break, I was paid for the time that I had worked. I was never told to punch out for a lunch that I had not or was not going to take.

14. Before speaking with any attorney for Alderwoods, I was told that the employees who filed the lawsuit seek to have the class certified, and that the matter of class certification has not been ruled upon by the Court. I was also told that if the class is certified and assuming I am a member of the class, then the attorneys for Alderwoods will be directly opposing my interest as a class member.

15. I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked. Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me.

16. Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions. I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

17. The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections. The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 10, 2009

_Regina Jones_
REGINA JONES

**TAB 28**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM HELM, et al.<br>On behalf of themselves and all employees<br>similarly situated,<br><br>             Plaintiffs,<br><br>      vs.<br><br>ALDERWOODS GROUP, INC., et al.<br><br>             Defendants. | ) **CASE NO.    3:08-CV-01184 SI**<br>)<br>)<br>) **DECLARATION OF KAREE KORELL**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

1

DECLARATION OF KAREE KORELL

I, Karee Korell, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.     My name is Karee Korell.  I am a resident of Kirkland, Washington.  I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.     All the statements in this Declaration are true and accurate.  I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.     I am currently a Location Manager at Acacia Memorial Park and Funeral Home in Seattle, Washington.  I began working at Acacia in August 2005 as a full time funeral director.  At the time I was hired to work at Acacia, it is my understanding that Acacia was owned and operated by Alderwoods Group, Inc.

4.     As a funeral director, I performed a variety tasks including meeting with families, preparing for funerals, embalming, and performing removals

5.     As a funeral director at Acacia for Alderwoods from 2005 through December of 2006, I was always an hourly, full time employee working 40 or more hours each week.

6.     Initially, I worked only some overtime, but in early 2006 through the end of that year I began working approximately 50 to 60 hours each week.  I was always paid time-and-a-half for any overtime I ever worked.  My time was recorded on time cards, which I used to punch in and punch out.

2

7.     Alderwoods paid me for all the overtime I worked.  I don't recall any policy which required my overtime to be pre-approved, nor do I recall ever having my overtime not approved.

8.     None of my managers, or any other employee at Alderwoods, ever encouraged, required, or requested me not to record my overtime.  I was never required to perform any work before clocking in the morning.

9.     No one at Alderwoods ever encouraged, required, or requested me to perform work but not record the time that I worked.  I always recorded the time that I worked, including overtime.

10.     As a funeral director, I would be "on call" approximately two to three nights a week.  My "on call" duties consisted of performing removals of bodies from various locations to the funeral home or answering after-hours calls to the funeral home. I received the calls on my cell phone and was not required to be at home during my on-call hours.

11.     For removals, I would be paid a minimum of three hours for each removal I performed.  If a removal took less than three hours, I was paid the full three hours.  Each removal call generally took about 1 ½ hours to complete.  It was rare that a removal took any longer than 2 hours.  If a removal took longer than three hours, then I was paid for each hour after that, however, I don't recall any removals that ever took that long.

12.     Answering phones while "on call" consisted of speaking with families or others who called the funeral home after hours.  For any call that lasted 15 minutes or less, I was paid for 15 minutes.  If a call lasted more than 15 minutes, then I was paid for each minute the call lasted.

3

13. I was not involved in the selling of pre-need policies, nor was I ever required to make pre-need presentations or sell pre-need policies. Alderwoods used family service counselors exclusively to sell pre-need policies and make presentations.

14. I was never told about or saw an Alderwoods "Community Work Policy," or heard of "I Believe In Service" or "Success Spotlight." I was not encouraged or required to participate in community organizations or perform community work as an employee of Alderwoods. I never reported on my activities with any organizations to any Alderwoods managers, or completed a community service report form, nor was I ever required to do so.

15. To the best of my knowledge, I did not have an annual evaluation while working for Acacia when it was operated by Alderwoods. No one ever evaluated me on my participation in community service, or the amount of overtime I recorded.

16. Alderwoods permitted a 30 minute meal break every day. I would take the full 30 minutes, unless I had to work through lunch or my meal break was interrupted by work. On any occasion that my meal break would be interrupted because of work, I would be paid for working through my break. I would also take my meal break later that day. None of my managers or other Alderwoods employees ever encouraged, required, or requested me not to record my time that I worked through a meal break.

17. I don't recall having to take any required training or attend meetings. As part of obtaining my funeral director's license I was required to "shadow" my manager during the day. I was always paid for the time that I did this.

18. I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked. Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me. I also was told that the employees who filed the lawsuit seek to have the class

4

certified, and that the matter of class certification has not been ruled upon by the Court; and that if the class is certified and assuming I am a member of the class, then the attorneys for Alderwoods Group, Inc. will be directly opposing my interest as a class member.

19.    Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions.  I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

20.    The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections.  The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 3, 2009

KAREE KORELL

5

**TAB 29**

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

CASE NO.   3:08-CV-01184 SI

WILLIAM HELM, et al.
On behalf of themselves and all employees
similarly situated,

**DECLARATION OF RICHARD KRUEGER**

Plaintiffs,

vs.

ALDERWOODS GROUP, INC., et al.

Defendants.

## DECLARATION OF RICHARD KRUEGER

I, Richard Krueger, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.      My name is Richard Krueger.  I am a resident of Conroe, Texas.  I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.      All the statements in this Declaration are true and accurate.  I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.      I am currently the manager of the Cashner Funeral Home in Conroe, Texas.  I was a funeral director and manager at the funeral home during the years that Alderwoods owned Cashner Funeral Home.  At that time, the funeral home employed 2 to 3 funeral directors, myself, 3 to 4 part-time employees, and 2 administrative staff.

Overtime

4.      Overtime was time and a half.  No pre-approval for overtime was required.  When work needed to be completed, it was understood that the employee would work overtime.  We never had an issue with employees recording too much overtime at my location.  Employees were always paid for the overtime that they worked.

After-Hours Work

5.      Employees who performed after-hours removals were paid their hourly rate, including overtime if they accrued sufficient hours in the week, plus an additional flat rate.  The amount of the additional rate would depend on whether the removal involved prep work.  A simple removal had a flat rate of $20, while the flat rate for a removal and prep was $50.  This rate did

change.

6.      When an employee was on-call, they did not need to be at the funeral home. They were paid from the time they got the call until it was completed. If a funeral director took a business call after hours, they were paid 15 minutes per call. If the call lasted longer than 15 minutes, they were paid another 15-minute increment.

"Community Work Policy"

7.      We made community activities available to the employees, but participation in community organizations was never a requirement of employment. If an employee attended a lunch (like a Kiwanis lunch), Alderwoods paid fees, dues, and the employee's time while at the activity. Most community activities took place during regular business hours and were on-the-clock.

8.      There was no incentive programs to encourage employees to participate in community organizations. I do not recall a program called "I Believe in Service." Employees were not evaluated on their community participation.

Pre-Need Sales

9.      At times, funeral directors were allowed to sell pre-need policies if they were licensed. The funeral home paid for the licensing. They were paid commissions on their sales. There was also a pre-need sales staff. They received 60 days of hourly wages when they began, then were paid on commission. Funeral directors were not required to sell pre-need policies.

Training

10.      The funeral home paid for re-licensing and continuing education courses for the

funeral directors. Likewise, employees were paid for any training required by Alderwoods.

<u>Meal Breaks</u>

11. Employees were to take a lunch break, but the realities of the business meant that there were times when an employee might choose to work through a lunch. If they did so, they were paid for their time. They were never told to record a lunch break they did not take.

12. I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked. Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me.

13. Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions. I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

14. The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections. The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: November _11_, 2009

RICHARD KRUEGER

**TAB 30**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WILLIAM HELM, et al.,
On behalf of themselves and all other
employees and former employees similarly
situated,

        Plaintiffs,

    v.

ALDERWOODS GROUP, INC.,

        Defendants.

Case No. 3:08-CV-01184 SI

DECLARATION OF
LISA LANGE-LOURIS

1  DECLARATION OF LISA LANGE-LOURIS

2      I, Lisa Lange-Louris, pursuant to 28 U.S.C. § 1746, do hereby declare and state as

3  follows:

4      1.      My name is Lisa Lange-Louris. I am a resident of Richfield, Minnesota. I am

5  over 21 years of age, suffer no legal disability, and am otherwise competent to make this

6  Declaration.

7      2.      All the statements in this Declaration are true and accurate. I have personal

8  knowledge of the facts set forth in this Declaration, and could testify to them competently if

9  called to do so.

10     3.      I am currently a Funeral Director at seven different funeral homes in Minnesota,

11  including the Kapala Glodek Malone Funeral Home. I have worked at the location since 1988,

12  except I took approximately two years off between 2005 and 2007. I worked at the location

13  during the time period when Alderwoods Group, Inc. owned and operated Kapala Glodek Malone

14  Funeral Home.

15     4.      In the course of my 20 years working at Kapala Glodek Malone Funeral Home, I

16  gained knowledge of Alderwoods' timekeeping policies and pay practices and how they were

17  implemented at this location.

18  Piece Rate

19     5.      For a few months in 2005 before I left, when the location was very short staffed,

20  management at Kapala Glodek Malone Funeral Home assembled a voluntary on-call list for after-

21  hours removals. Employees who volunteered to perform after-hours removals during this time

22  period were paid a flat rate of $85 per removal.

23     6.      To the best of my knowledge, when I came back in 2007, Kapala Glodek Malone

24  Funeral Home was no longer paying the flat rate of $85 per removal, and was instead paying

25  employees performing after-hours removals by the hour.

26     7.      I agreed to perform after-hours removals and received piece rate pay.

27     8.      I received a call for an after-hours removal approximately once per week or once

28  every two weeks during this period of time in 2005.

- 2 -

1      9.     Removals typically took between an hour and a half and three hours, depending on

2  the location of the removal.

3      10.    The time spent on a removal varied depending on where the funeral director lived

4  in the metropolitan area.

5      11.    During this period of time, I received more under this system than I would have

6  received at my regular hourly rate, but for longer removals, it was not more than I would have

7  received at my overtime rate. I felt that the system was fair and that the time balanced out, since

8  some shorter removals resulted in more compensation than my hourly rate would have, while

9  other longer removals did not.

10      12.    Between 2005 and 2007, when I was not working, I have no personal knowledge

11  about the removal practices at Kapala Glodek Malone Funeral Home.

12      13.    I understand that this Declaration is being provided voluntarily in a lawsuit

13  brought against Alderwoods Group, Inc. in which the Plaintiffs allege that they have not been

14  properly paid for all time worked. Before speaking with any attorney for Alderwoods, I was told

15  that the attorney represents Alderwoods and does not represent me. I also was told that the

16  employees who filed the lawsuit seek to have the class certified, and that the matter of class

17  certification has not been ruled upon by the Court; and that the class is certified and assuming I

18  am a member of the class, then the attorneys for Alderwoods Group, Inc. will be directly

19  opposing my interest as a class member.

20      14.    Prior to speaking with the attorney for Alderwoods, I was also told that I did not

21  have to answer any questions. I was told that the interview was purely voluntary and that if I did

22  not wish to speak, there would be no adverse impact on me.

23      15.    The attorney for Alderwoods provided me with an opportunity to review the

24  Declaration and to make any corrections. The attorney told me that I could refuse to sign the

25  Declaration without any adverse impact on me.

26      I declare under penalty of perjury that the foregoing is true and correct.

27

28

Dated: September ⬯, 2010

Lisa Lange-Louris

**TAB 31**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WILLIAM HELM, et al.
On behalf of themselves and all employees
similarly situated,

        Plaintiffs,

   vs.

ALDERWOODS GROUP, INC., et al.

      Defendants.

) CASE NO.   3:08-CV-01184 SI
)
)
)
) **DECLARATION OF DANIEL**
) **LAPLAUNT**
)
)
)
)
)
)
)
)

1

DECLARATION OF DANIEL LaPLAUNT

I, Daniel LaPlaunt, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.      My name is Daniel LaPlaunt. I am a resident of Centralia, Washington. I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.      All the statements in this Declaration are true and accurate. I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.      I am currently a Location Manager at Sticklin Funeral Chapel in Centralia, Washington. I began working at Sticklin in March 1999 as a funeral director/embalmer apprentice. I obtained my funeral director's license in March 2000. Shortly after I was I hired, through December 2006, it is my understanding that Sticklin was owned and operated by Alderwoods Group, Inc.

4.      As a funeral director for Sticklin, I performed a variety tasks including meeting with families, preparing for funerals, embalming, and performing removals. From 2002 through December of 2006, I was always an hourly, full-time employee working 40 or more hours each week.

5.      During the time period 2002 through 2006, I would also work overtime on occasion. I would average approximately 2 to 3 hours each week of overtime during this period. I was always paid time-and-a-half for any overtime I ever worked. My time was initially recorded on time sheets. At some point in 2004, Alderwoods installed a time clock, and I recorded my time on time cards, which I used to clock-in and clock-out.

6. Alderwoods paid me for all the overtime I worked. My manager preferred that I checked with him before working overtime, but I don't recall any Alderwoods policy which required my overtime to be pre-approved. Nor do I recall ever having my overtime not approved. If I ever worked any overtime that my manager did not initially approve, I would be paid for working that overtime.

7. None of my managers, or any other employee at Alderwoods, ever encouraged, required, or requested me not to record my overtime. I was never required to perform any work before clocking-in the morning or clocking-out at night.

8. No one at Alderwoods ever encouraged, required, or requested me to perform work but not record the time that I worked. I always recorded the time that I worked, including overtime.

9. When I was first hired at Sticklin, the manager had a bonus program which rewarded employees for certain sales of merchandise. By 2002, however, Alderwoods required our manager to discontinue the program as it was not authorized by the company. I don't recall receiving any bonuses or commissions after that program was discontinued.

10. As a funeral director, I would be "on call" approximately seven nights a month. My "on call" duties consisted of performing removals of bodies from various locations to the funeral home or answering after-hours calls to the funeral home. I received the calls on a cell phone issued by the funeral home.

11. Removals performed after hours were generally performed by a funeral director and part time employee. During the 2002 through 2006 time period, we were paid by the hour for each removal plus an additional $40 per removal. I would record my time for each removal from the time I took the call until the time the removal was completed. Removal calls generally took from about 20 minutes to 2 hours to complete.

3

12.     Answering phones while "on call" consisted of speaking with families or others who called the funeral home after hours.  For any call that lasted 15 minutes or less, I was permitted to record 15 minutes for my time.  If a call lasted more than 15 minutes, then I recorded each additional minute the call lasted.

13.     I was not involved in the selling of pre-need policies, nor was I ever required to make pre-need presentations or sell pre-need policies.  Alderwoods used advanced planning personnel exclusively to sell pre-need policies and make presentations.  It is my understanding that in order to sell pre-need policies you are required to have a license.  No one at Alderwoods ever required me to obtain such a license.

14.     I was never told about or saw an Alderwoods "Community Work Policy," or heard of "I Believe In Service" or "Success Spotlight."  Although I was encouraged by my manager at Sticklin to participate in community organizations, I was never required to do so.

15.     To the best of my knowledge, I did not have an annual evaluation while working for Sticklin when it was operated by Alderwoods.  No one ever evaluated me on my participation in community service, or the amount of overtime I recorded.

16.     None of my managers or other Alderwoods employees ever encouraged, required, or requested me not to record my time that I worked through a meal break.

17.     During 2002 through 2006, I was the training coordinator for Sticklin.  We would have annual certification training and other periodic training meetings mostly related to safety issues.  These meetings were held during normal business hours, and the hourly employees, including myself, would be on the clock and paid to attend these meetings.  I don't recall any Alderwoods policy that

4

1  required after hours training sessions for which employees were required to attend

2  off the clock and not paid.

3       18.   I understand that this Declaration is being provided voluntarily in

4  a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that

5  they have not been properly paid for all time worked. Before speaking with any

6  attorney for Alderwoods, I was told that the attorney represents Alderwoods and

7  does not represent me. I also was told that the employees who filed the lawsuit

8  seek to have the class certified, and that the matter of class certification has not

9  been ruled upon by the Court; and that if the class is certified and assuming I am a

10  member of the class, then the attorneys for Alderwoods Group, Inc. will be directly

11  opposing my interest as a class member.

12

13       19.   Prior to speaking with the attorney for Alderwoods, I was also

14  told that I did not have to answer any questions. I was told that the interview was

15  purely voluntary and that if I did not wish to speak, there would be no adverse

16  impact on me.

17

18       20.   The attorney for Alderwoods provided me with an opportunity to

19  review the Declaration and to make any corrections. The attorney told me that I

20  could refuse to sign the Declaration without any adverse impact on me.

21       I declare under penalty of perjury that the foregoing is true and correct to the

22  best of my recollection.

23

24       Dated: November 1Z, 2009

25                                                DANIEL LaPLAUNT

26

27

28

5

**TAB 32**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM HELM, et al.<br>On behalf of themselves and all employees<br>similarly situated,<br><br>      Plaintiffs,<br>    vs.<br><br>ALDERWOODS GROUP, INC., et al.<br><br>      Defendants. | ) CASE NO.   3:08-CV-01184 SI<br>)<br>)<br>) DECLARATION OF ROBERT LASKA<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

1

DECLARATION OF ROBERT LASKA

I, Robert Laska, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.      My name is Robert Laska. I am a resident of Hicksville, New York. I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.      All the statements in this Declaration are true and accurate. I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.      I am currently a Funeral Director at the Vernon C. Wagner Funeral Homes in Hicksville, New York. I began working at Wagner Funeral Homes in 2000 as a part-time receptionist, greeter and funeral support staff. In August 2003, I began a residency at Wagner Funeral Homes as a full-time funeral director, and received my funeral director's license in August 2004. At that time, I continued to work full-time as a funeral director at Wagner Funeral Homes. Shortly after I was I hired in 2000, through December 2006, it is my understanding that Wagner Funeral Homes was owned and operated by Alderwoods Group, Inc.

4.      As a part-time employee between 2000 and August 2003, I worked approximately 12 hours a week. I did not work any overtime during this period. When I began my residency as a funeral director in August 2003 through December 2006, I was always an hourly, full-time employee working 40 or more hours each week.

5.      As a funeral director at Wagner Funeral Homes, I would work overtime on occasion. I would work on average approximately 5 to 10 hours each week of overtime. I was always paid time-and-a-half for any overtime I ever worked. My time was initially recorded on time sheets. At some point after August 2004, Alderwoods

2

1  installed a time clock, and I recorded my time on time cards, which I used to clock-in and
2  clock-out.

3

4      6.      Alderwoods paid me for all the overtime I worked. I would check with
5  my manager before working overtime, who would always approve it. If I ever worked any
6  overtime that my manager did not initially approve, I would be paid for working that
7  overtime.

8      7.      None of my managers, or any other employee at Alderwoods, ever
9  encouraged, required, or requested me not to record my overtime. I was never required
10  to perform any work before clocking-in the morning or clocking-out at night.

11

12      8.      No one at Alderwoods ever encouraged, required, or requested me
13  to perform work but not record the time that I worked. I always recorded the time that I
14  worked, including overtime.

15      9.      I did not receive any bonuses or commissions when I worked for
16  Alderwoods at the Wagner Funeral Homes.

17

18      10.     As a part-time employee, and during my residency as a funeral
19  director, I was never on call for after hours work. About two months after I received my
20  funeral director's license, I would be on call periodically. Only the funeral directors at
21  Wagner Funeral Homes would be on call after hours. My "on call" duties consisted of
22  performing removals of bodies from various locations to the funeral home or answering
23  after-hours calls to the funeral home. I received the calls on a cell phone issued by the
24  funeral home, or had the calls forwarded to my home phone.

25      11.     Removals performed after hours were generally performed by a
26  funeral director. Depending upon where the removal was, a part time employee would
27  assist. Whenever I did a removal, I would record my time from when I first received the
28  call until the removal was completed. Removals were done "on the clock" and we were

3

paid our hourly wage, including any overtime. We did not receive a "piece rate" for removals. At times, we would use tradesmen – a third party service – to perform removals.

12.   Answering phones while "on call" consisted of speaking with families or others who called the funeral home after hours. I recorded my time for phone calls in 15 minute intervals. For any call that lasted less than a full 15 minute interval, I was permitted to record the full 15 minutes for my time. It would be rare that a call would last more than 15 minutes.

13.   I was not involved in the selling of pre-need policies, nor was I ever required to make pre-need presentations or sell pre-need policies.

14.   I was never told about or saw an Alderwoods "Community Work Policy." I was never required to participate in community work as either a part-time employee, during my funeral director's residency, or as a funeral director. As a funeral director, I was encouraged to participate in community activities but was not required to do so. I participate in community organizations, including the Knights of Columbus, but I would be active in these organizations regardless of my work at Alderwoods as I enjoy being active in my community.

15.   I would have an evaluation annually. No one ever evaluated me on my participation in community service, or the amount of overtime I recorded.

16.   Alderwoods permitted a 30 minute meal break every day. I would always take the full 30 minutes. I never had to work through my meal break, and never had my meal break interrupted by work. None of my managers or other Alderwoods employees ever encouraged, required, or requested me to work through my meal break and not record my time.

4

17.     While working for Alderwoods at Wagner Funeral Homes, we would have periodic training and other meetings mostly related to safety issues. These meetings usually were held on Friday afternoons, but always during normal business hours. The hourly employees, including myself, would be on the clock and paid to attend these meetings. I don't recall any Alderwoods policy that required after hours training sessions for which employees were required to attend off the clock and not be paid.

18.     I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked. Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me. I also was told that the employees who filed the lawsuit seek to have the class certified, and that the matter of class certification has not been ruled upon by the Court; and that if the class is certified and assuming I am a member of the class, then the attorneys for Alderwoods Group, Inc. will be directly opposing my interest as a class member.

19.     Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions. I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

20.     The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections. The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: November ___, 2009

ROBERT LASKA

5

**TAB 33**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WILLIAM HELM, et al.,
On behalf of themselves and all other
employees and former employees similarly
situated,

        Plaintiffs,

    v.

ALDERWOODS GROUP, INC.,

        Defendants.

Case No. 3:08-CV-01184 SI

**DECLARATION OF GLORIA LAWRENCE**

DECLARATION OF GLORIA LAWRENCE

I, Gloria Lawrence, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.     My name is Gloria Lawrence. I am a resident of Los Angeles, California. I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.     All the statements in this Declaration are true and accurate. I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.     I am currently location manager at Custer Christiansen Mortuary in Covina, California. I began working at Custer Christian in 2001. When I began, I was an apprentice funeral director. I became a funeral director in 2003. Shortly thereafter, I became an assistant manager. I was a full-time hourly employee from 2002 until about 2004 or 2005, when I became location manager.

4.     Custer Christiansen was an Alderwoods location.

Piece Rate

5.     For a brief time when Custer Christiansen was an Alderwoods location, piece rate payments were made for after-hours removals.

6.     To the best of my recollection, piece rate was paid for after-hours removals for a few weeks in 2002 or 2003 and then discontinued. Piece rate has not been paid for any purpose since this time.

7.     At the time piece rate was paid, only part-time employees received it.

8.     The current practice at the home is to use a removal service for after-hours removals.

Meal Breaks

9.     Employees at Custer Christiansen take 1 hour lunch breaks. This has been the policy since I started at Custer Christiansen in 2001. They are encouraged to leave the location for lunch. Custer Christiansen rotates lunches so that there is always someone available to answer the phone.

10.   Custer Christiansen has a dual time clock and time sheet system. Employees are told to mark the time that they take for lunch on their time sheets and to punch in and out with the time clock.

11.   In the extremely unusual event that an employee would answer the phone or meet with a client during a lunch break, I have instructed employees to record the time for which they had to stop working. Employees usually note on their time sheets the period of time that they stopped working (i.e., from 12:30 to 12:45) with an explanation of what the interruption was.

12.   If an employee's lunch break is interrupted, he or she usually still gets at least 30 minutes uninterrupted lunch.

Community Work

13.   All employees at Custer Christiansen are encouraged to perform community work. Any community work performed by employees on behalf of Custer Christiansen is compensated, including community work performed outside normal business hours. This has been the policy since I began working at the location.

14.   I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the Plaintiffs allege that they have not been properly paid for all time worked.

15.   Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me. I also was told that the employees who filed the lawsuit seek to have the class certified, and that the matter of class certification has not been ruled upon by the Court; and that the class is certified and assuming I am a member of the class, then the attorneys for Alderwoods Group, Inc. will be directly opposing my interest as a class member.

16.   Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions. I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

17.   The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections. The attorney told me that I could refuse to sign the

- 3 -

1    Declaration without any adverse impact on me.

2        I declare under penalty of perjury that the foregoing is true and correct.

3    Dated: September 8, 2010                    Gloria Lawrence
                                                 Gloria Lawrence

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 4 -

**TAB 34**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM HELM, et al.<br>On behalf of themselves and all employees<br>similarly situated,<br><br>       Plaintiffs,<br><br>  vs.<br><br>ALDERWOODS GROUP, INC., et al.<br><br>       Defendants. | CASE NO.   3:08-CV-01184 SI<br><br>DECLARATION OF JOHN LAY |

## DECLARATION OF JOHN LAY

I, John Lay, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.      My name is John Lay.  I am a resident of Oakland Park, Florida.  I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.      All the statements in this Declaration are true and accurate.  I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.      I am currently a funeral attendant at Kraeer Funeral Home in Pompano Beach, FL. I have worked for Kraeer Funeral Home for ten years, including the years when it was owned by Alderwoods.  I have always been an hourly employee.  I worked full-time for Alderwoods, 40-hours a week.

4.      As a funeral attendant, my job is to drive the hearse, flower van or limousine for funeral services, to assist at funeral services and visitations in greeting and seating family members, to write and collect prayer cards, and other miscellaneous duties.

5.      As an hourly employee, I recorded my time using a time card and punch clock.

Overtime

6.      During the time Alderwoods owned Kraeer, I worked overtime, usually when there was a late visitation.  I might stay an extra 2 to 4 hours on a given night.  When I worked overtime, I was paid time and a half.

7.      When I worked for Alderwoods, I did not receive commissions or bonuses.

Occasionally, employees might receive a monetary gift at Christmas.

8.    The practice under Alderwoods was for overtime to be approved by the manager so that he could manage scheduling.  There may have been a few occasions when I was unable to get approval before working overtime.  I was paid for the overtime that I worked on these occasions.  I was always paid for the time I worked.

9.    I was never told to not record overtime that I had worked, or to record it as regular time.

After-Hours Removals

10.    I only performed one removal for Alderwoods, which was during work hours. Kraeer had a removal team, which was a group of employees whose job it was to handle removals. Removals were usually performed by an Alderwoods employee, but in the past they have outsourced removals.

"Community Work Policy"

11.    Alderwoods encouraged employees to participate in community activities.  I would sometimes go to luncheons, but this was always in the context of driving clergy in the funeral home limousine.  I was paid for this time.

12.    Kraeer had a booth at a seafood festival, but I did not attend.  Employees were never required to participate in community activities or organizations.  I do not recall seeing any written policy regarding community service.

13.    Kraeer currently has an employee whose job is community relations work.  This employee performed the same function under Alderwoods, but had a different title.

**Pre-Need Sales**

14.     I did not sell pre-need policies.  At most, I occasionally talked to customers or family members about pre-need policies when asked a question while driving the limousine.  I was never required to sell pre-need policies.

**Meal Breaks**

15.     As a full-time employee, I received meal breaks.  On rare occasions, I have had to work through a lunch break.  When this occurred, I made a note of this on a sheet that is submitted with the time card.  I was always paid for the time I worked during a lunch break.  If working through lunch meant that I had more than 40 hours at the end of the week, I was paid overtime.

16.     Before speaking with any attorney for Alderwoods, I was told that the employees who filed the lawsuit seek to have the class certified, and that the matter of class certification has not been ruled upon by the Court.  I was also told that if the class is certified and assuming I am a member of the class, then the attorneys for Alderwoods will be directly opposing my interest as a class member.

17.     I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked.  Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me.

18.     Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions.  I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

19.   The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections.  The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: _Nov.  11_____, 2009

JOHN LAY

**TAB 35**

1

2

3 UNITED STATES DISTRICT COURT

4 NORTHERN DISTRICT OF CALIFORNIA

5

6 WILLIAM HELM, et al.                          ) CASE NO.    3:08-CV-01184 SI
   On behalf of themselves and all employees    )
7 similarly situated,                           )
                                                ) DECLARATION OF CHRISTOPHER
8            Plaintiffs,                         ) LUCIANO
                                                )
9        vs.                                     )
                                                )
10 ALDERWOODS GROUP, INC., et al.               )
                                                )
11           Defendants.                         )
                                                )
12                                              )
                                                )
13                                              )
                                                )
14                                              )
                                                )
15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DECLARATION OF CHRISTOPHER LUCIANO

I, Christopher Luciano, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.      My name is Christopher Luciano. I am a resident of Chatham, Massachusetts. I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.      All the statements in this Declaration are true and accurate. I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.      I am currently a location manager at Nickerson Funeral Home in Orleans, Massachusetts, which is part of the Doane, Beal and Ames Funeral Home on Cape Cod. From 2002 to 2004, I worked at the Romano Funeral Home in Providence, RI as a funeral director. Romano Funeral Home was owned by Alderwoods at the time. In 2004, I became a funeral director for Doan, Beal and Ames in Massachusetts. Doane, Beal and Ames also was an Alderwoods funeral home. I became a location manager about a year and a half ago.

4.      As a funeral director for Alderwoods, I was a full-time, hourly employee. I worked about 40 to 50 hours per week at both Romano and Doane, Beal and Ames. I recorded my time on a time card that was submitted to payroll or to my supervisor.

Overtime

5.      When I worked for Alderwoods, I recorded all time that I worked. I was paid time and a half for overtime. I did not receive any commissions or bonuses. Only managers received commissions or bonuses.

6.      I was never told to not record overtime that I had worked, or to record it as regular time.  I was always paid for overtime that I worked.

7.      At Romano, I did not obtain pre-approval for overtime because there were only two people working after-hours.  Later, I was required to obtain pre-approval for overtime with the exception of after-hours removals.  I never had any trouble getting approval for overtime.

After-Hours Removals

8.      At Romano, I was on-call for after-hours removals every other day, because there were only two funeral directors at that location.  I averaged about 2 calls a week at Romano.

9.      At Doane, Beal and Ames, I was on-call for after-hours removals 8 nights of the month.  I averaged one removal a night that I was on-call.

10.     At both locations, I was on the clock and paid from the time I was called until the time I returned home.  Any phone calls I had to make as part of the removal were included in this time.  I was paid hourly for this time.

"Community Work Policy"

11.     Employees were encouraged, but not required, to participate in community organizations.  Alderwoods paid for dues and fees (like a dinner fee).  This was an option for any employee that wanted to participate.  However, not many employees were active in community organizations.

12.     I am a member of the Knights of Columbus and the Lions Club.  My participation in these organizations was not required by Alderwoods.

13.     I do not recall a community service "policy."   When I was evaluated by my supervisor, community service was not part of the evaluation.

Pre-Need Sales

14.     I was not required to and did not sell pre-need policies when I worked for Alderwoods.  At Romano, I did sell "trust" policies, which did not require a license, but there was no commission for such policies.  In Massachusetts, a license is required to sell pre-need insurance policies.  Alderwoods paid for any time selling pre-needs, as well as for courses and tests to obtain the insurance license.  The insurance examination took place during the day and was on-the-clock.

Training

15.     Alderwoods paid for the training of funeral directors.  Alderwoods paid for all licensing courses and would host courses at Alderwoods locations.  Most courses were conducted during regular business hours and employees were paid for their time spent at these courses.  Continuing education (CEU) courses were usually scheduled for the morning and early afternoon.

16.     I was paid for the time I spent at these courses and even provided a company car when the course was held off-site.  This applied to funeral directors as well as apprentice funeral directors.

Meal Breaks

17.     As a full-time employee, I received meal breaks.  At Romano, I stayed on the clock for my meal breaks and was paid for this time.  At Doane, Beal and Ames, I was given a half-hour meal break.  If I did not take my meal break, I simply did not punch out at the time clock.  I was never asked to record a meal break or punch out when I did not take a meal break.

18.     Before speaking with any attorney for Alderwoods, I was told that the employees who filed the lawsuit seek to have the class certified, and that the matter of class certification has not been ruled upon by the Court. I was also told that if the class is certified and assuming I am a member of the class, then the attorneys for Alderwoods will be directly opposing my interest as a class member.

19.     I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked. Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me.

20.     Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions. I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

21.     The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections. The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: _Nov 2, 2009_, 2009

CHRISTOPHER LUCIANO

**TAB 36**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM HELM, et al.,<br>On behalf of themselves and all other employees and former employees similarly situated,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>ALDERWOODS GROUP, INC.,<br><br>　　　　　Defendants. | Case No. 3:08-CV-01184 SI<br><br>DECLARATION OF MICHAEL MALDONADO |

DECLARATION OF MICHAEL MALDONADO

I, Michael Maldonado, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.     My name is Michael Maldonado. I work in Hughson, California. I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.     All the statements in this Declaration are true and accurate. I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.     I have worked for Lakewood Funeral Home, located in California, since 2002. I started as a part-time funeral attendant, but am now a full-time funeral arranger.

4.     During the time I worked at the Lakewood Funeral Home location, it was my understanding that Alderwoods Group, Inc. owned and operated Lakewood Funeral Home where I worked.

Piece Rate/ Lump Sum

5.     From the time that I started working there, Lakewood Funeral Home has paid part-time funeral attendant employees lump sums for after-hours removals. Generally speaking, full time employees do not receive these lump sum payments.

6.     Employees keep track of their hours spent on after-hours removals, are compensated for those hours, and receive a $35 bonus per removal on top of their hourly wages.

7.     If an employee takes 2.5 hours to conduct a removal, they are paid for those 2.5 hours, plus they receive an additional $35. If an employees takes 30 minutes to conduct a removal, they are paid for those 30 minutes, plus they receive an additional $35.

8.     Removals usually take 1.5 to 2.0 hours.

9.     Lump sum work is paid through paychecks, and time is handwritten on a card.

Meal Break/ Rest Break

10.     Time is kept on handwritten cards.

11.     From 2002 until today, full time employees get an hour for lunch.

12.     It has always been the practice that a receptionist answers the phones at Lakewood

-2-

1   Funeral Home, but if an employee is the only person there and eating lunch when the phone rings,

2   that employee will often answer the phone.

3         13.     Every employee handles lunch break interruptions differently.

4         14.     Personally, if I answer a phone call that is only 5 or 10 minutes long, I do not take

5   a longer lunch break.

6         15.     If the interruption is longer, I will often tack on the time I spent on the phone to the

7   end of my lunch break. In this way, I will still take an hour for lunch.

8         16.     Usually, even with interruptions, I still get at least 30 minutes for lunch.

9   Community Work

10        17.     I have never joined a community organization on behalf of Lakewood Funeral

11   Home. Before 2010, I do not recall ever being encouraged to do so.

12        18.     I understand that this Declaration is being provided voluntarily in a lawsuit

13   brought against Alderwoods Group, Inc. in which the Plaintiffs allege that they have not been

14   properly paid for all time worked. Before speaking with any attorney for Alderwoods, I was told

15   that the attorney represents Alderwoods and does not represent me. I also was told that the

16   employees who filed the lawsuit seek to have the class certified, and that the matter of class

17   certification has not been ruled upon by the Court; and that the class is certified and assuming I

18   am a member of the class, then the attorneys for Alderwoods Group, Inc. will be directly

19   opposing my interest as a class member.

20        19.     Prior to speaking with the attorney for Alderwoods, I was also told that I did not

21   have to answer any questions. I was told that the interview was purely voluntary and that if I did

22   not wish to speak, there would be no adverse impact on me.

23        20.     The attorney for Alderwoods provided me with an opportunity to review the

24   Declaration and to make any corrections. The attorney told me that I could refuse to sign the

25   Declaration without any adverse impact on me.

26        I declare under penalty of perjury that the foregoing is true and correct.

27

28

1   Dated: September 9 , 2010

Michael Maldonado
Michael Maldonado

**TAB 37**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WILLIAM HELM, et al.
On behalf of themselves and all employees
similarly situated,

          Plaintiffs,

   vs.

ALDERWOODS GROUP, INC., et al.

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**CASE NO.   3:08-CV-01184 SI**

**DECLARATION OF KELLEY MANN**

1

DECLARATION OF KELLEY MANN

I, Kelley Mann, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1. My name is Kelley Mann. I am a resident of Hiram, Georgia. I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2. All the statements in this Declaration are true and accurate. I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3. I am currently the general manager of Forest Lawn Memorial Gardens, a cemetery in College Park, Georgia. Prior to that time, I was an office manager at Kennesaw Memorial Park, a cemetery in Marietta, Georgia, and Georgia Memorial Park Funeral Home and Cemetery in Marietta, Georgia. I worked at Georgia Memorial Park on the cemetery side of the business from 1985 through early 2004, and Kennesaw from 2004 through April 2007. It is my understanding that from early 2000 through December 2006, when I worked at both Georgia Memorial and Kennesaw, the cemeteries were owned and operated by Alderwoods Group, Inc. from approximately 2001 through 2006.

4. As office manager, I was responsible for payroll, entering contracts, paying bills, and other administrative duties. Accordingly, I was familiar with Alderwoods' time keeping procedures and pay practices, and how they were implemented at this location from 2002 through 2006. I was a full-time, hourly employee the entire time I worked for Alderwoods at these locations. I worked 40 to 45 hours a week. On rare

2

back up for the answering service if a family needed to speak with someone. I recorded all of the time I spent on those phone calls, and was paid for my time doing so. None of the other cemetery hourly employees took phone calls after hours.

### After-Hours Removals

10.    None of the cemetery staff at either Georgia Memorial or Kennesaw conducted after-hours removals.

### "Community Work Policy"

11    The hourly employees were not required to be involved in community activities or organizations. I conducted annual evaluations of some of the hourly employees who reported to me. I never discussed with them as part of their evaluation their participation in community activities or organizations. I also was evaluated annually by my manager. My manager never evaluated me on the basis of my involvement in community organizations or activities.

12.    Before Alderwoods assumed ownership of the two locations where I worked from 2002 to 2006, I was involved with the Shriners organization. This was an activity that I participated in voluntarily, on my own time. No one at Alderwoods required me to be a member of that, or any, organization as part of my employment.

13.    Although I recall hearing about a Community Leadership Program, I am not aware of the details of the program as it was not something the employees at the cemetery would have been involved in. I am not aware of any hourly employee who was required to participate in any such program.

### Pre-Need Sales

14.    The hourly maintenance staff and office employees were not required to participate in pre-need presentations or make pre-need sales. Alderwoods had a

4

separate staff of family service counselors who were responsible for pre-need sales and presentations. On rare occasions, if a family came to the cemetary office and needed assistance, I would help them fill complete paperwork for pre-need applications. I did this during normal business hours and was paid for my time.

15.     Family service counselors worked at different locations, including Georgia Memorial and Kennesaw. These individuals would be required to record their time by clocking in and clocking out when they were working. They were compensated for the hours they worked, or based on their commissions, whichever was greater. None of the family service counselors who worked at Kennesaw or Georgia Memorial were paid less than their hourly rate for the hours they worked.

<u>Training</u>

16.     We would have staff meetings from time to time for all of the cemetery workers, including the maintenance employees and the office staff. These sessions were held during the day and all of the hourly employees were on-the-clock and paid for attending.

17.     When family service counselors were hired, they also had training and were paid their hourly rate while attending training sessions. In addition, these newly hired family service counselors were paid an additional sum to compensate for the lack of commissions earned from sales of policies because they were attending training and not selling policies.

<u>Meal Breaks</u>

18.     Employees received a half-hour for lunch. There were times, depending on how many burials were being conducted at the cemetery, when an hourly employee worked through their lunch break. If they did so, they were paid for their time. Usually, however, the employee would simply take a later lunch. I never told the

5

employees to record a lunch break if they had not taken the break. I was always paid for any time I ever worked through lunch.

19.    Alderwoods management would remind me to make sure that I, and the other hourly employees, took a lunch break each day.

20.    I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked. Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods. I also was told that the employees who filed the lawsuit seek to have the class certified, and that the matter of class certification has not been ruled upon by the Court; and that if the class is certified and assuming I am a member of the class, then the attorneys for Alderwoods Group, Inc. will be directly opposing my interest as a class member.

21.    Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions. I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

22.    The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections. The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.


Dated: November 12, 2009                    _Kelley J. Mann_

                                            **KELLEY MANN**


6

**TAB 38**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WILLIAM HELM, et al.
On behalf of themselves and all employees
similarly situated,

        Plaintiffs,

    vs.

ALDERWOODS GROUP, INC., et al.

        Defendants.

CASE NO.    3:08-CV-01184 SI

**DECLARATION OF ELEANOR
MCCARTHY**

1

DECLARATION OF ELEANOR MCCARTHY:

I, Eleanor McCarthy, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.      My name is Eleanor McCarthy. I am a resident of Deerfield Beach, Florida. I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.      All the statements in this Declaration are true and accurate. I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.      I am currently a Senior Arranging Director for Kraeer Funeral Homes at the Sample Road Chapel in Pompano Beach, Florida. I've worked for the Kraeer Funeral Home business since 1971. From 2002 through 2006, I worked as a manager at the Kraeer Funeral Home Sample Road Chapel in Pompano Beach, Florida, during which time Alderwoods owned and operated the facility.

4.      In my position as Manager for Alderwoods at the Kraeer Funeral Home Sample Road Chapel, I was a salaried employee. At the Sample Road Chapel, I had two and sometimes three hourly employees who reported directly to me. These employees assisted me with funeral arrangements, meeting with families, and other day to day operations of the Chapel. Generally, I had one part-time and two full-time hourly employees working with me.

2

5.      In the course of my years working as Manager at the Sample Road Chapel, I gained knowledge of Alderwoods' timekeeping policies and pay practices and how they were implemented at this location.

### After-Hours Removals

6.      At the Kraeer Funeral Home, we would sometimes perform removals. On occasion, these removals were after-hours.  The hourly employees who assisted with removals were paid for their work by the hour.  The hourly employees would be paid for overtime if they exceeded 40 hours of work in a given week.  The removals were performed exclusively by the employees at the embalming center, and not by the employees at the Sample Road Chapel where I was manager.

7.      Hourly employees were not paid a "piece" rate for removals.  From time to time, when needed, we would employ a third-party removal service to perform removals.  Only the removal service was paid a "piece" rate for removals.

8.      I have no knowledge of a company-wide Alderwoods policy requiring hourly employees to perform after-hours work without pay.  Employees were paid for all the time they worked, including any overtime work.

### Overtime

9.      I am unaware of any Alderwoods policy that encouraged or required managers not to pay overtime that was not pre-approved.  The hourly employees who reported to me at the Sample Road Chapel were not required to obtain pre-approval for overtime worked during my tenure as Manager.

3

10.     In my experience, Alderwoods employees were always paid for the time they worked, including overtime.  The hourly employees at the Sample Road Chapel would record their time on time cards by punching in and punching out.  All hourly employees were paid time-and-a-half for any overtime worked.

11.     I never encouraged, required, or requested any hourly employee at the embalming facility to not record their time for hours worked, including overtime.  Nor do I recall of any instance in which an hourly employee failed to record his or her overtime.

12.     My Regional Manager never encouraged, required, or requested me to have hourly employees not record their hours worked for overtime.

"Community Work Policy"

13.     I never saw or heard of an Alderwoods policy requiring employees to participate in any community organization.  Nor was I aware of an Alderwoods policy that required employees to perform community work outside the regular work day without pay.  No such policy was ever communicated to me during my employment with Alderwoods.

14.     Alderwoods employees were encouraged to be active in the community, but it was not mandatory.  If an hourly employee volunteered to participate in community activities, they were paid their hourly rate, or overtime if over 40 hours in a week, for all hours while working at these events.

15.     I don't recall doing annual evaluations for any of the hourly employees who reported to me, nor do I recall ever discussing with an hourly employee

4

their involvement in community service as part of their performance at the Sample Road Chapel.

Pre-Needs Sales

16.    The Alderwoods funeral homes in my region of Florida had a separate sales staff that sold pre-needs insurance to families. Neither I nor any of my staff at the Sample Road Chapel ever participated, or were required to participate, in pre-needs presentations or sales.

17.    None of the Funeral Directors or staff at the Kraeer Funeral Home Sample Road Chapel ever did, or were required to do, pre-needs presentations or sales. Instead, pre-needs counselors were assigned to each funeral home location, including the Sample Road Chapel.

Meal Breaks

18.    Full-time staff were permitted a half-hour meal break during their shift for lunch, and one hour for dinner. On some occasions, some of the staff would have to work during their scheduled meal break. Employees recorded their time if they did so and were paid for the time worked.

19.    Alderwoods did not require that employees deduct a full meal break from their work hours each day if that is not what they took. Generally, any employee at the Sample Road Chapel whose lunch was interrupted for work would take their meal break later.

5

20.   I never encouraged, required, or requested any employee who worked for me not to record their time worked during a meal break.

Training

21.   Training was required for the hourly employees both initially when they were hired and periodically during their tenure.

22.   All training was done on the job, and the hourly employees would be paid for any hours spent in training.  On occasion, an hourly employee may have to travel to a location where a training course was being provided.  The employee was paid for all travel and time spent attending those training sessions.

23.   I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked.  Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me.

22.   Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions.  I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

23.     The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections.  The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 12, 2009                    *Eleanor McCarthy*

                                            **ELEANOR MCCARTHY**

7

**TAB 39**

1

2

3 UNITED STATES DISTRICT COURT

4 NORTHERN DISTRICT OF CALIFORNIA

5 ) CASE NO. 3:08-CV-01184 SI

6 WILLIAM HELM, et al. )
On behalf of themselves and all employees )
7 similarly situated, ) DECLARATION OF CLAUDIA
) MESSIER
8 Plaintiffs, )
)
9 vs. )
)
10 ALDERWOODS GROUP, INC., et al. )
)
11 Defendants. )
)
12 )
)
13 )
)
14 )
)

# DECLARATION OF CLAUDIA MESSIER

I, Claudia Messier, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.  My name is Claudia Messier. I am a resident of Riverside, California. I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.  All the statements in this Declaration are true and accurate. I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.  I currently work at Green Acres Funeral Home. From April 22, 2002 until October 10, 2008, I worked at Custer Christiansen Mortuary in Covina, California. Custer Christiansen was an Alderwoods location.

4.  At Custer Christiansen, I was an embalmer/funeral arranger. I was an hourly employee and worked forty plus hours a week.

Overtime

5.  Custer Christiansen used a computer system known as AS 400, in which employees directly entered their time. There was no time clock. A column was provided for entry of overtime and double-time.

6.  I was always paid for the overtime that I worked. I was never told to record overtime I had worked as regular time.

After-Hours Removals

7.  I was never on-call for removals at Custer Christiansen because I lived in Riverside,

which is not near Covina.  There were always a couple of employees on-call.  Being on-call at Custer Christiansen was an option, not a requirement.  Managers asked for volunteers, and employees volunteered because they would receive overtime and be paid more.

8.      Custer Christiansen also used a third party removal company for some removals.

"Community Work Policy"

9.      Employees at Custer Christiansen were encouraged to participate in community activities.  This consisted of my being asked on a couple of occasions whether I wanted to participate in an activity.  I did not join any community organizations or get involved in any activities when I was at Custer Christiansen.

10.     I do not recall any incentive programs to encourage community service.  I do not recall a program called "I Believe in Service."  Community service and activity was not part of my evaluation by my supervisor.  I was not required to participate in any community organizations.

Pre-Need Sales

11.     I did not sell pre-need policies.  There was a pre-need staff who handled pre-need sales.  I was never asked to sell pre-need policies and it was not encouraged to do so.

Training

12.     Every year I had to take a refresher course for funeral arrangers.  This was a state requirement for funeral arrangers.  Alderwoods held refresher courses during business hours at several locations.  I was paid for the time I spent at each course.

Meal Breaks

13.    I received an hour for lunch break.  I never worked through a lunch break and always took my break.  Sometimes, I might come back from lunch break early.  I would be paid for the time that I worked.

14.    Before speaking with any attorney for Alderwoods, I was told that the employees who filed the lawsuit seek to have the class certified, and that the matter of class certification has not been ruled upon by the Court.  I was also told that if the class is certified and assuming I am a member of the class, then the attorneys for Alderwoods will be directly opposing my interest as a class member.

15.    I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked.  Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me.

16.    Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions.  I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

17.    The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections.  The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

1    I declare under penalty of perjury that the foregoing is true and correct.

2

3

4    Dated: November 10, 2009

                                          CLAUDIA MESSIER

**TAB 40**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WILLIAM HELM, et al.
On behalf of themselves and all employees
similarly situated,

        Plaintiffs,

    vs.

ALDERWOODS GROUP, INC., et al.

        Defendants.

**CASE NO.   3:08-CV-01184 SI**

**DECLARATION OF STEVEN
NOWATKA**

1

DECLARATION OF STEVEN NOWATKA:

I, Steven Nowatka, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.    My name is Steven Nowatka. I am a resident of Deerfield Beach, Florida. I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.    All the statements in this Declaration are true and accurate. I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.    I am currently a Funeral Director for Kraeer Funeral Homes at the Deerfield Beach Chapel in Deerfield Beach, Florida. I've worked for the Kraeer Funeral Home business since 1966. From 2002 through 2006, I worked as a Funeral Director at the Kraeer Funeral Home Deerfiled Beach, during which time Alderwoods owned and operated the facility.

4.    In my position as Funeral Director for Alderwoods at the Kraeer Funeral Home Deerfield Beach Chapel, I was a salaried employee. I reported to Robert Russell, a Regional Manager. At the Deerfield Beach Chapel, I had five hourly employees who reported directly to me. These employees assisted me with funeral arrangements, meeting with families, and other day to day operations of the Chapel. Generally, I had two full time and three part time hourly employees working with me.

5.     In the course of my years working as a Funeral Director at the Deerfield Beach Chapel, I gained knowledge of Alderwoods' timekeeping policies and pay practices and how they were implemented at this location.

After-Hours Removals

6.     At the Deerfield Beach Chapel while it was operated by Alderwoods, we would not perform removal services.  Removals were handled by the Kraeer Funeral Homes embalming group working out of the Sample Road location in Pompano Beach, Florida.  To the best of my knowledge, the removals were performed mostly by hourly employees who were paid for their work by the hour.  The hourly employees would be paid for overtime if they exceeded 40 hours of work in a given week.

7.     Hourly employees were not paid a "piece" rate for removals.  From time to time, when needed, the embalming center would employ a third-party removal service to perform removals.  Only the removal service was paid a "piece" rate for removals.

8.     I have no knowledge of a company-wide Alderwoods policy requiring hourly employees to perform after-hours work without pay.  Employees were paid for all the time they worked, including any overtime work.

Overtime

9.     I am unaware of any Alderwoods policy that encouraged or required managers not to pay overtime that was not pre-approved.  Hourly employees at the Deerfield Beach Chapel were supposed to obtain pre-approval for any substantial

3

overtime that they worked from Robert Russell, the Regional Manager.  Nominal overtime hours did not require pre-approval.

10.     Alderwoods employees were always paid for the time they worked, including overtime.  In my experience, any overtime that required pre-approval was always approved.  If for some reason an overtime request was not approved, but an hourly employee worked that overtime anyway, the employee was paid for that overtime. The hourly employees at the Deerfield Beach Chapel would record their time on time cards by punching in and punching out.  All hourly employees were paid time-and-a-half for any overtime worked.

11.     I never encouraged, required, or requested any hourly employee at the Deerfield Beach Chapel to not record their time for hours worked, including overtime. Nor do I recall of any instance in which an hourly employee failed to record his or her overtime.

12.     My Regional Manager never encouraged, required, or requested me to have hourly employees not record their hours worked for overtime.

"Community Work Policy"

13.     I never saw or heard of an Alderwoods policy requiring employees to participate in any community organization.  Nor was I aware of an Alderwoods policy that required employees to perform community work outside the regular work day without pay. No such policy was ever communicated to me during my employment with Alderwoods.

4

14.     Alderwoods employees were encouraged to be active in the community, but it was not mandatory.

15.     I would perform evaluations of the hourly employees who reported to me at the Deerfield Beach Chapel approximately twice every year.  I did not discuss their involvement in community service as part of the evaluation.  Community service was not on the written evaluation that I submitted to Alderwoods for each of my employees.

Pre-Needs Sales

16.     I am not aware of who was responsible for pre-needs sales at the Alderwoods Funeral Homes in Florida.  Neither I nor any of my staff at the Deerfield Beach Chapel ever participated, or were required to participate, in pre-needs presentations or sales.

Meal Breaks

17.     Full-time staff were permitted a half-hour meal break during their shift for lunch.  On some occasions, some of the staff would have to work during their scheduled meal break.  Employees recorded their time if they did so and were paid for the time worked.

18.     Alderwoods did not require that employees deduct a full meal break from their work hours each day if that is not what they took.  Generally, any employee at the Deerfield Beach Chapel whose lunch was interrupted for work would take their meal break later that day.

5

19.     I never encouraged, required, or requested any employee who worked for me not to record their time worked during a meal break.

Training

20.     Our employee training at the Deerfield Beach Chapel consisted mostly of monthly meetings at the funeral home.

22.     All training was done on the job, and the hourly employees would be paid for any hours spent in training or meetings.

23.     I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked.  Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me.

22.     Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions.  I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

6

23.    The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections.  The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  October 3̲0̲, 2009

_____

STEVEN NOWATKA

7

**TAB 41**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WILLIAM HELM, et al.,
On behalf of themselves and all other
employees and former employees similarly
situated,

              Plaintiffs,

     v.

ALDERWOODS GROUP, INC.,

          Defendants.

Case No. 3:08-CV-01184 SI

DECLARATION OF
JASON OBENAUF

DECLARATION OF JASON OBENAUF

I, Jason Obenauf, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.    My name is Jason Obenauf. I am a resident of Fresno, California. I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.    All the statements in this Declaration are true and accurate. I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.    I am currently the Location Manager of the Stephens & Bean Funeral Home in Fresno, California. I have worked as a Location Manager at the location since 2000, except for a brief period of time I was the Market Manager.

4.    In the course of my 10 years working at Stephens & Bean Funeral Home, I gained knowledge of Alderwoods' timekeeping policies and pay practices and how they were implemented at this location.

Piece Rate

5.    From approximately 2003 to 2005, Stephens & Bean Funeral Home paid a piece rate of $100 to on-call employees who performed after hours removals.

6.    To my recollection, there was no Alderwoods policy that required or permitted locations to pay for removals at a piece rate.

7.    Employees volunteered to perform after hours removals; they were never required to do so. At Stephens & Bean, only part-time employees actually volunteered. I cannot recall any full-time employees who performed after hours removals or were paid piece rate pay. I do not believe that any of these part-time employees who performed after hours removals would have worked enough hours to be eligible for overtime pay.

8.    Removals typically took no longer than an hour. Part-time employees typically performed between zero and five after hours removals per week, although the number would vary.

9.    Employees liked the piece rate system, and were always paid a great deal more under the piece rate system than they would have been at their hourly rate. The part-time

1   employees performing after hours removals made between $9 and $10 per hour, and received

2   approximately ten times what they would have received at their hourly rate under the piece rate

3   system.

4        10.   Even if the part-time employees had qualified for overtime, they still received a

5   great deal more under the piece rate system than they would have at their overtime rate of pay,

6   which would have been between $12 and $15 per hour.

7        11.   As a Location Manager, I have sometimes paid employees their hourly rate for

8   removals that took longer than a typical removal.  For example, for out-of-town removals that

9   lasted several hours, I paid the employee's hourly wage, instead of piece rate.

10       12.   I cannot recall any employee complaints about the piece rate pay system, and if an

11  employee would have complained that a removal took longer than usual, I would have

12  compensated the employee at his or her hourly rate instead.

13  Meal and Rest Breaks

14       13.   Employees at Stephens & Bean have always received an hour meal break.  They

15  use time clocks to punch out for their meal breaks and to punch in when the break is over.

16       14.   As Location Manager, I have always encouraged employees to stay in the break

17  room during meal breaks, and I made sure that their duties, such as answering the phones or

18  greeting families, were covered by other employees.  As a result, employees typically received an

19  uninterrupted meal break, and almost always received at least thirty minutes of uninterrupted

20  break time.

21       15.   I cannot recall any employee's meal break being interrupted, except, possibly, to

22  ask the employee a brief question.

23       16.   I am not aware of any employee punching out for a lunch that he or she did not in

24  fact take.

25       17.   I believe that all employees at Stephens & Bean have been compensated for all

26  time they have worked.

27       18.   I understand that this Declaration is being provided voluntarily in a lawsuit

28  brought against Alderwoods Group, Inc. in which the Plaintiffs allege that they have not been

- 3 -

1  properly paid for all time worked.  Before speaking with any attorney for Alderwoods, I was told

2  that the attorney represents Alderwoods and does not represent me.  I also was told that the

3  employees who filed the lawsuit seek to have the class certified, and that the matter of class

4  certification has not been ruled upon by the Court; and that the class is certified and assuming I

5  am a member of the class, then the attorneys for Alderwoods Group, Inc. will be directly

6  opposing my interest as a class member.

7       19.     Prior to speaking with the attorney for Alderwoods, I was also told that I did not

8  have to answer any questions.  I was told that the interview was purely voluntary and that if I did

9  not wish to speak, there would be no adverse impact on me.

10      20.     The attorney for Alderwoods provided me with an opportunity to review the

11  Declaration and to make any corrections.  The attorney told me that I could refuse to sign the

12  Declaration without any adverse impact on me.

13      I declare under penalty of perjury that the foregoing is true and correct.

14  Dated: September 9, 2010

15                                              Jason Obenauf

16

17

18

19

20

21

22

23

24

25

26

27

28

-4-

**TAB 42**

1

2

3                   UNITED STATES DISTRICT COURT

4                NORTHERN DISTRICT OF CALIFORNIA

5

6 WILLIAM HELM, et al.

On behalf of themselves and all employees

7 similarly situated,

8             Plaintiffs,

9       vs.

10 ALDERWOODS GROUP, INC., et al.

11           Defendants.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CASE NO.**    **3:08-CV-01184 SI**

**DECLARATION OF WILLIAM PATTERSON**

# DECLARATION OF WILLIAM PATTERSON

I, William Patterson, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.      My name is William Patterson. I am a resident of San Diego, California. I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.      All the statements in this Declaration are true and accurate. I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.      I am currently a funeral director at the Beardsley-Mitchell Funeral Home in San Diego, California. I have been at Beardsley since February 2009. Prior to working at Beardsley, I worked at Humphrey Mortuary in Chula Vista, California. I started at Humphrey Mortuary in September 2006, when it was an Alderwoods location. I was paid for all the time that I worked.

Overtime

4.      As a funeral director for Alderwoods, I averaged about 45 to 50 hours per week. The overtime that I worked consisted mostly of meeting with families and church services. Pre-approval was not required to work overtime. I was never told not to record overtime that I worked, or to record it as regular time. I was always fully paid for the overtime that I worked, even if I had not received pre-approval.

5.      I did not receive any bonuses or commissions.

After-Hours Work

6.      I performed after-hour removals for about two weeks when I started with

Alderwoods, then decided not to continue performing removals. Removals at Humphrey's were usually performed by drivers who were scheduled for after-hours work. They worked a full night-shift. Some funeral directors assisted with removals for additional income, but funeral directors were not required to perform removals.

7.     If I received a call for a removal, I received 3 hours at my hourly rate, or my overtime rate if I had reached the hours threshold. All the removals I performed were completed within 3 hours. Usually, the removals took one and a half to two hours.

8.     For after-hours business calls, I was paid 15 minutes for any call. If the call lasted longer than 15 minutes, I would be paid another 15 minutes. Thus, if I had a 20 minute call, I would be paid for 30 minutes.

"Community Work Policy"

9.     I was not really encouraged to participate in community activities. Rather, my supervisor told me that I could do so. For a while, I joined a networking group. I spent an hour a week and additional hour once a month participating in this group. I was told that I could report the time I spent there on my time card, but I did not feel the need to report my time because this was something I wanted to do and Alderwoods was paying for the fees and dinners. I was not required to join this or any other organization.

Pre-Need Sales

10.     I did not sell pre-need policies at Humphrey. There was a pre-need counselor who sold these policies. Alderwoods did not require that I obtain a license to sell pre-need policies.

Training

11.     During my orientation, I was paid for the time I spent training for my position.  I did not have any other training under Alderwoods.

Meal Breaks

12.     I generally took my lunch breaks.  If I did not take a lunch break, I was paid for the time I worked.  Usually, I would always end up taking a lunch break at some point during the day.  I was never told to record a lunch break that I had not taken.

13.     Before speaking with any attorney for Alderwoods, I was told that the employees who filed the lawsuit seek to have the class certified, and that the matter of class certification has not been ruled upon by the Court.  I was also told that if the class is certified and assuming I am a member of the class, then the attorneys for Alderwoods will be directly opposing my interest as a class member.

14.     I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked.  Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me.

15.     Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions.  I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

16.     The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections.  The attorney told me that I could refuse to sign the

Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.


Dated: November 1( , 2009

WILLIAM PATTERSON