**TAB 43**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WILLIAM HELM, et al.
On behalf of themselves and all employees
similarly situated,

      Plaintiffs,

   vs.

ALDERWOODS GROUP, INC., et al.

      Defendants.

CASE NO.   3:08-CV-01184 SI

**DECLARATION OF WILLIAM POWELL**

## DECLARATION OF WILLIAM POWELL

I, William Powell, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.     My name is William Powell.  I often go by the name Toby.  I am a resident of Pulaski, Tennessee.  I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.     All the statements in this Declaration are true and accurate.  I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.     I am currently the location manager at the Carr & Erwin Funeral Home in Pulaski, Tennessee.  During the years when Alderwoods owned Carr & Erwin, I was a funeral director.  I was an hourly employee at that time.

4.     There were usually four funeral directors at Carr & Erwin under Alderwoods.  Additional staff included an office manager, a pre-need sales counselor, and a part-time employee.  I was a full-time funeral director.  My hours varied from 30 to 60 per week, depending on how busy we were.

Overtime

5.     We were paid time and a half for overtime.  Alderwoods used a time clock to report time.  When I stayed late, for example, if there was a visitation that was scheduled after-hours, I would clock out later and be paid overtime if I had accrued enough hours for overtime.  I was always paid for overtime that I worked.

6.     Time was submitted to the office manager at the end of the week.  She checked the

time cards and any discrepancies were addressed with the employee.  Time was always approved; it was never changed by the manager or office manager.

7.     I did not have to get pre-approval from my manager to work overtime.  We worked on a schedule, and the funeral director scheduled to work late would accrue overtime.  I do not recall a specific policy that stated I had to get pre-approval before each instance of overtime.  I was always paid for the time I worked.

8.     Funeral directors did not receive commissions under Alderwoods.  The only bonus I ever received was an end of the year bonus given to the funeral home based on meeting business targets.  I was fully paid for any overtime I recorded.

After-Hours Work

9.     Funeral directors rotated on-call time in the evenings.  I was paid hourly for after-hours removals.  When I had accrued enough hours for overtime, I was paid overtime for any after-hours removal.  The time it would take to complete the removal varied depending on the location of the removal.

"Community Work Policy"

10.     We were encouraged to participate in community activities, but we were never required to perform community service.  The only community activities I participated in were with my church, such as helping with the Christmas Nativity Pageant.  I did not represent the funeral home at these activities, and these were activities in which I would have participated regardless of the funeral home policy.

11.     I was not involved in any other community activities.  The funeral home did not

have any incentive programs to encourage community service. For example, I do not recall a program called "I Believe in Service."

Pre-Need Sales

12. If asked by a family, I would provide information regarding pre-need policies, but I did not sell pre-need policies. There was a pre-need counselor at the funeral home who sold these policies and had an insurance license. I was never required to obtain an insurance license. Selling pre-need policies was not a requirement of the funeral director position.

Training

13. I do not recall any after-hours training programs. Any training programs I attended were at work and while I was on the clock. There was one year where we went to Nashville for a continuing education course. We were paid for this time.

Meal Breaks

14. I generally received a lunch break every day. If I ever chose to work through a lunch break, I stayed on the clock and was paid for time. I was not required to record a lunch break I did not take.

15. Before speaking with any attorney for Alderwoods, I was told that the employees who filed the lawsuit seek to have the class certified, and that the matter of class certification has not been ruled upon by the Court. I was also told that if the class is certified and assuming I am a member of the class, then the attorneys for Alderwoods will be directly opposing my interest as a class member.

16. I understand that this Declaration is being provided voluntarily in a lawsuit brought

against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked. Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me.

17.   Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions. I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

18.   The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections. The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.


Dated: November _5_, 2009                           _William Powell_____
                                                      WILLIAM POWELL

**TAB 44**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| WILLIAM HELM, et al.<br>On behalf of themselves and all employees<br>similarly situated,<br><br>        Plaintiffs,<br>    vs.<br><br>ALDERWOODS GROUP, INC., et al.<br><br>        Defendants. | CASE NO.    3:08-CV-01184 SI<br><br>DECLARATION OF JEANNE PRUITT |

1

DECLARATION OF JEANNE PRUITT

I, Jeanne Pruitt, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.    My name is Jeanne Pruitt. I am a resident of Chehalis, Washington. I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.    All the statements in this Declaration are true and accurate. I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.    I have worked for Sticklin Funeral Chapel in Centralia, Washington since August 2001. From 2001 until December 2006, I was the office administrator at Sticklin. Currently, I am the office manager.

4.    When I began working at Sticklin, the funeral home was owned and operated by Alderwoods Group, Inc. My job as the office administrator involves handling contracts, paying bills, doing payroll, running reports, performing various administrative duties, and providing occasional general support to the funeral director.

5.    As a full-time hourly employee, I worked 40 hours a week, and on occasion worked overtime. I would average about five hours of overtime a month.

6.    While working for Alderwoods, I initially recorded my time on time sheets. In 2004, Alderwoods installed a time clock and I recorded my time on time cards, which I used to clock-in and clock-out. I always recorded all of the hours I worked, including any overtime. I was always paid for all of the time that I worked, including overtime.

2

7.    I did not have to obtain the approval of my manager before working overtime. If I worked overtime that was not approved, I would always be paid for it.

8.    None of my managers, or any other employee at Alderwoods, ever encouraged, required, or requested me not to record my time, including overtime. I was never required to work prior to clocking-in when I arrived for work in the morning, or after clocking-out when I left in the evening.

9.    During the time I worked for Alderwoods at Sticklin, I was never required to be on-call.

10.    I was never required to, nor did I ever, perform removals of bodies. Because I was responsible for payroll I knew how hourly employees were paid for removals. From 2001 until sometime in 2002 or 2003, hourly employees were credited a minimum of 2 hours for each removal they performed. If a removal took less than 2 hours, then they would be credited with and paid for 2 hours. For any removal that took more than two hours, the hourly employees were credited with the actual time it took to do the removal. Sometime in 2003 or 2004, the removal pay policy changed. Hourly employees were credited with the actual hours it took to do the removal, plus $40 for each removal. Hourly employees were to record their time from the time they took the removal call until the removal was complete. Removals generally took anywhere from less than one hour to two hours. Removals taking longer than three hours were rare.

11.    I was not involved in the selling of pre-need policies, nor was I ever required to make pre-need presentations or sell pre-need policies. Alderwoods had one or two people who worked out of the Sticklin Funeral Chapel who handled pre-need policies and presentations. No other hourly employees were involved in pre-need work at Sticklin.

12.    I was not required to participate in community organizations or perform community work as an employee of Alderwoods. I don't recall having an annual

3

performance evaluation while working for Alderwoods at Sticklin. I was never evaluated on my participation in community activities.

13.    I never heard of, was told about, or saw an Alderwoods "Community Work Policy." I never heard of any employee incentive programs, including "I Believe in Service," or "Success Spotlight."

14.    When I worked for Alderwoods at Sticklin I never received a bonus, or was paid commissions.

15.    While at Sticklin, Alderwoods permitted a one hour lunch break every day. I would take the full 30 minutes, unless I had to work through lunch or my meal break was interrupted by work. On any occasion that my meal break would be interrupted because of work, I would be paid for working through my break. I would also take my meal break later that day. None of my managers or other Alderwoods employees ever encouraged, required, or requested me not to record my time that I worked through a meal break.

16.    No one at Alderwoods ever encouraged, required, or requested me to perform work but not record the hours that I worked.

17.    While at Sticklin during the time Alderwoods operated the funeral home, I would attend administration training sessions periodically. I recall at least one of these sessions being held in Seattle. I also would travel to various locations in the area to train other administrative employees. The training sessions were always held during normal business hours, and I would always be paid my hourly wage while attending training sessions.

18.    I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked. Before speaking with any attorney for

4

Alderwoods, I was told that the attorney represents Alderwoods and does not represent me. I also was told that the employees who filed the lawsuit seek to have the class certified, and that the matter of class certification has not been ruled upon by the Court; and that if the class is certified and assuming I am a member of the class, then the attorneys for Alderwoods Group, Inc. will be directly opposing my interest as a class member.

19. Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions. I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

20. The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections. The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct. to the best of my memory.

Dated: November 11, 2009

Jeanne M Pruitt

JEANNE PRUITT

**TAB 45**

1                    UNITED STATES DISTRICT COURT

2                    NORTHERN DISTRICT OF CALIFORNIA

3

4    WILLIAM HELM, et al.                    )    CASE NO.    3:08-CV-01184 SI
     On behalf of themselves and all employees )
5    similarly situated,                       )    DECLARATION OF MICHAEL
                                              )    RIZZOTTO
6                                             )
              Plaintiffs,                     )
7                                             )
          vs.                                 )
8                                             )
     ALDERWOODS GROUP, INC., et al.           )
9                                             )
              Defendants.                     )
10                                            )

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

DECLARATION OF MICHAEL RIZZOTTO

I, Michael Rizzotto, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.    My name is Michael Rizzotto. I am a resident of Fresh Meadows, New York. I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.    All the statements in this Declaration are true and accurate. I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.    I am the Location Manager of the Cusimano and Russo Funeral Home located in Brooklyn, New York. I have worked for Cusimano and Russo Funeral Home since 1998, including the time period 2002 through 2006 when Alderwoods Group, Inc. owned and operated Wagner Funeral Homes.

4.    In my position as Location Manager for Alderwoods at the Cusimano and Russo Funeral Home, I was a salaried employee. From 2002 through 2006, I supervised approximately seven or eight employees, two full-time and five or six part-time hourly employees. These individuals usually included two full-time funeral directors, a part-time administrative assistant, and four or five part-time funeral support staff.

5.    In the course of my more than 10 years working at Cusimano and Russo Funeral Home, I gained knowledge of Alderwoods' timekeeping policies and pay practices and how they were implemented at this location.

2

### After-Hours Removals

6. From 2002 through 2006 at Cusimano and Russo Funeral Homes, after hours removals were performed by a third-party removal service. No funeral home staff performed after hours removals.

### Overtime

7. I have no knowledge of a company-wide Alderwoods policy requiring hourly employees to perform after-hours work without pay. Employees were paid for all the time they worked, including any overtime work. No hourly employees were required to work prior to clocking in, or after clocking out, nor am I aware of any Alderwoods policy requiring hourly employees to do so.

8. I am unaware of any Alderwoods policy that encouraged or required managers not to pay overtime that was not pre-approved. The hourly employees who reported to me at Cusimano and Russo Funeral Home were not required to obtain pre-approval for overtime worked. I am not aware of any hourly employee who worked overtime and was not paid for that overtime.

9. In my experience, Alderwoods employees were always paid for the time they worked, including overtime. The hourly employees at the Cusimano and Russo Funeral Home initially reported their time by filling out time sheets. In 2004, Alderwoods installed a time clock, and hourly employees would record their time on time cards by punching in and punching out. All hourly employees were paid time-and-a-half for any overtime worked.

10. I never encouraged, required, or requested any hourly employee at the Cusimano and Russo Funeral Home not to record their time for hours worked, including overtime. Nor do I recall of any instance in which an hourly employee failed to record his or her overtime.

3

11. My Regional Manager never encouraged, required, or requested me to have hourly employees not record their hours worked for overtime.

12. I was the only person who was "on call" and took after-hours phone calls.

13. None of the hourly employees were paid bonuses or commissions.

"Community Work Policy"

14. I never saw or heard of an Alderwoods policy requiring employees to participate in any community organization. Nor was I aware of an Alderwoods policy that required employees to perform community work outside the regular work day without pay. No such policy was ever communicated to me during my employment with Alderwoods.

15. I am not aware of any hourly employee at Cusimano and Russo who performed community work, or engaged in community activities on behalf of Alderwoods.

16. I would perform evaluations of the hourly employees who reported to me approximately every year. I used an Alderwoods form to record the evaluation. I did not discuss their involvement in community service as part of the evaluation, nor do I recall seeing any place on the Alderwoods form that included the topic of community service. Accordingly, I did not include community service on the written evaluation that I submitted to Alderwoods for each of my employees.

Pre-Need Sales

17. Funeral directors and I provided the pre-need sales and presentations at Cusimano and Russo Funeral Home. No other hourly employees participated in pre-need sales. Funeral directors would be on the clock for any time they worked on pre-need sales or presentations. I am not aware of any funeral director not recording their time while involved in selling pre-need funeral arrangements or making

4

presentations to customers. Nor am I aware of any Alderwoods policy requiring funeral
directors to work "off the clock" on pre-need sales or meetings.

### Meal Breaks

18.     The hourly employees at Cusimano and Russo Funeral Home were
permitted a half hour meal break for lunch. On occasion, some of the staff would have to
work during their scheduled meal break. Employees recorded their time if they did so and
were paid for the time worked.

19.     Alderwoods did not require that employees deduct a full meal break
from their work hours each day if that is not what they took. Generally, any employee at
the Cusimano and Russo Funeral Home whose lunch was interrupted for work would take
their meal break later.

20.     I never encouraged, required, or requested any employee who
worked for me at the Cusimano and Russo Funeral Home not to record their time worked
during a meal break.

### Training

21.     The hourly employees would have to attend training sessions or
meetings periodically. These meetings were always held during the business day, and
the hourly employees would be paid for any hours spent in training.

22.     Funeral directors were required to obtain continuing education
credits. Alderwoods would pay for the courses, and the funeral directors would be paid
on the clock when studying for the credits.

23.     I understand that this Declaration is being provided voluntarily in a
lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they
have not been properly paid for all time worked. Before speaking with any attorney for

1  Alderwoods, I was told that the attorney represents Alderwoods and does not represent

2  me.

3       24.    Prior to speaking with the attorney for Alderwoods, I was also told

4  that I did not have to answer any questions. I was told that the interview was purely

5  voluntary and that if I did not wish to speak, there would be no adverse impact on me.

6

7       25.    The attorney for Alderwoods provided me with an opportunity to

8  review the Declaration and to make any corrections. The attorney told me that I could

9  refuse to sign the Declaration without any adverse impact on me.

10       I declare under penalty of perjury that the foregoing is true and correct.

11

12       Dated: November 12, 2009

13                                    MICHAEL RIZZOTTO

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

6

**TAB 46**

1

2

3  UNITED STATES DISTRICT COURT

4  NORTHERN DISTRICT OF CALIFORNIA

5

6  WILLIAM HELM, et al.
   On behalf of themselves and all employees
7  similarly situated,

8              Plaintiffs,

9          vs.

10 ALDERWOODS GROUP, INC., et al.

11             Defendants.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

)  CASE NO.    3:08-CV-01184 SI
)
)
)  **DECLARATION OF KENNETH**
)  **ROGERS**
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

# DECLARATION OF KENNETH ROGERS

I, Kenneth Rogers, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.     My name is Kenneth Rogers.  I am a resident of Colorado City, Texas.  I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.     All the statements in this Declaration are true and accurate.  I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.     I am currently retired.  I worked at the Kiker-Seale Funeral Home in Colorado City, Texas for 14 years, including the years when Alderwoods owned the funeral home.  I left Kiker-Seal Funeral Home about three years ago.

4.     I was an hourly employee at Kiker-Seale.  I helped the funeral directors with conducting funerals and answering phones.

Overtime

5.     I never worked any overtime at Kiker-Seale.  There was a time clock at the funeral home that was used to punch in and out of work.

6.     I was always paid for the time I worked.  I was never told to not record time, or record it inaccurately.

Removals

7.     There were a few occasions when I assisted with removals at the request of the funeral director.  This might occur when the deceased was particularly heavy and the funeral

director required assistance.  I was not required to do any work I was not willing to do.  On at least one occasion I assisted with a removal at night.  I was paid hourly for the time I assisted with removals.

"Community Work Policy"

8.      I was never required to participate in community activities by my supervisor at the funeral home.  I was a member of the Masonic Lodge and Kiwanis prior to my employment at Kiker-Seale.

Pre-Need Sales

9.      I did not sell pre-need policies.  I did not talk business with families, but only consoled them.  Only the funeral directors who sold pre-need policies would discuss pre-need insurance with the families.

Training

10.     Any training I was provided was "on-the-job" training for which I was paid.

Meal Breaks

11.     I did receive lunch breaks when I worked a full day.  I do not recall an occasion when I had to work through a lunch break.  I would punch out for break and punch back in to work.

12.     Before speaking with any attorney for Alderwoods, I was told that the employees who filed the lawsuit seek to have the class certified, and that the matter of class certification has not been ruled upon by the Court.  I was also told that if the class is certified and assuming I am a

member of the class, then the attorneys for Alderwoods will be directly opposing my interest as a class member.

13.    I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked.  Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me.

14.    Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions.  I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

15.    The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections.  The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: November _4_, 2009

_____
KENNETH ROGERS

**TAB 47**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **WILLIAM HELM, et al.,**<br>**On behalf of themselves and all other**<br>**employees and former employees similarly**<br>**situated,**<br><br>                    **Plaintiffs,**<br><br>        **v.**<br><br>**ALDERWOODS GROUP, INC.,**<br><br>                    **Defendants.** | **Case No. 3:08-CV-01184 SI**<br><br>**DECLARATION OF ALFRED**<br>**ROMAN** |

DECLARATION OF ALFRED ROMAN

I, Alfred Roman, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.      My name is Alfred Roman. I am a resident of Delano, California. I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.      All the statements in this Declaration are true and accurate. I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.      I am the Location Manager of Delano Mortuary in Delano, California. I have been the Manager of this funeral home for the past 3 years. Prior to that I was a part-time, hourly Funeral Attendant for a period of 12 years, including the time period when Alderwoods Group, Inc. owned and operated Delano Mortuary.

4.      In the course of my 15 years working at Delano Mortuary, I gained knowledge of Alderwoods' timekeeping policies and pay practices and how they were implemented at this location.

Piece Rate

5.      During the time Alderwoods owned Delano Mortuary, I worked weekends and evenings on a part-time basis.

6.      I was paid a piece rate for after-hours and weekend rosaries and removals. A rosary involves getting the deceased ready, setting up the flowers, and greeting the family. A removal typically took one hour and 15 minutes. Rosaries typically took four hours.

7.      I cannot recall the piece rate amount for removals and rosaries, but it was approximately $40. I was paid the same amount for both activities.

8.      I recorded my time spent on removals and rosaries on my time sheet. I recorded my time even though I was paid the piece rate for after-hours removals and rosaries in place of my hourly wage.

9.      I believe that if a removal or rosary took a particularly long time, I could speak to my manager and receive a greater piece rate payment.

10.     I understand that this Declaration is being provided voluntarily in a lawsuit

- 2 -

1   brought against Alderwoods Group, Inc. in which the Plaintiffs allege that they have not been

2   properly paid for all time worked.  Before speaking with any attorney for Alderwoods, I was told

3   that the attorney represents Alderwoods and does not represent me.  I also was told that the

4   employees who filed the lawsuit seek to have the class certified, and that the matter of class

5   certification has not been ruled upon by the Court; and that the class is certified and assuming I

6   am a member of the class, then the attorneys for Alderwoods Group, Inc. will be directly

7   opposing my interest as a class member.

8       11.     Prior to speaking with the attorney for Alderwoods, I was also told that I did not

9   have to answer any questions.  I was told that the interview was purely voluntary and that if I did

10  not wish to speak, there would be no adverse impact on me.

11      12.     The attorney for Alderwoods provided me with an opportunity to review the

12  Declaration and to make any corrections.  The attorney told me that I could refuse to sign the

13  Declaration without any adverse impact on me.

14      I declare under penalty of perjury that the foregoing is true and correct.

15  Dated: September 8, 2010

        Alfred Roman

- 3 -

**TAB 48**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WILLIAM HELM, et al.,
On behalf of themselves and all other
employees and former employees similarly
situated,

        Plaintiffs,

    v.

ALDERWOODS GROUP, INC.,

        Defendants.

Case No. 3:08-CV-01184 SI

DECLARATION OF MELISSA ROSA

DECLARATION OF MELISSA ROSA

I, Melissa Rosa, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.      My name is Melissa Rosa. I am a resident of San Jose, California. I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.      All the statements in this Declaration are true and accurate. I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.      Willow Glen Funeral Home, Mission Chapel of Rancadore & Alameda, and Johnson's Funeral Home work together, report to the same manager, and follow the same policies. All three locations were owned by Alderwoods Group, Inc and subsequently acquired by SCI.

4.      I have worked for this group of funeral homes since 1990. I worked out of Mission Chapel of Rancadore & Alameda from 1990 through 2007, including the time period Alderwoods Group, Inc. owned and operated the location. I have worked out of the Willow Glen Funeral Home since 2007.

5.      From 1990 through 2000 I worked as an Arranger and as a Funeral Director Assistant. I became a licensed Funeral Director in 2000, and I held the position of licensed Funeral Director from 2000 until 2008, when I was promoted to Location Manager.

6.      In addition to my duties as funeral director, I was also a Market Administrator under Alderwoods for about two or three years. To my recollection, as a Market Administrator, I was responsible for inputting employees' time into the computer.

7.      In the course of my career working at the Willow Glen, Mission Chapel, and Johnson's Funeral Home ("the locations"), I gained knowledge of Alderwoods' timekeeping policies and pay practices and I know how they were implemented at these locations.

Piece Rate

8.      From approximately 1997 to 2006, the locations paid a piece rate of $75 to full-time Funeral Directors and Assistant Funeral Directors for after-hours removals. However, for certain removals, such as long-distance removals, these employees were paid at their hourly rate

-2-

1    instead of at the piece rate.

2        9.      Part-time Funeral Directors and Assistant Funeral Directors also performed after-

3    hours removals. To the best of my recollection, they were paid differently, receiving two to four

4    hours of guaranteed pay per removal, instead of piece rate pay.

5        10.     I cannot recall any Alderwoods corporate policy that required or permitted

6    locations to pay for removals at a piece rate; to the best of my recollection it was a market policy.

7        11.     Since 2006, removals are performed by service center employees or an outside

8    central care facility, and I am unaware of how after-hours removals are compensated.

9        12.     The employees performing after-hours removals varied by location. The three

10   locations that I worked at were so small that most staff members performed some removals; but I

11   am aware of some other larger locations that had employees whose only job was to perform

12   removals.

13       13.     Employees volunteered to perform after-hours removals at my locations; no

14   employee was required to perform after-hours removals, and employees were never penalized for

15   refusing to perform an after-hours removal. If no employees volunteered for after-hours

16   removals, the locations used an outside removal service.

17       14.     I never volunteered for after-hours removals and never received piece rate pay.

18       15.     Removals typically took no longer than two hours. The time spent on a removal

19   varied depending on many factors such as where the employee lived, and whether the family was

20   ready for an immediate removal.

21       16.     Employees received more under the piece rate system than they would have if they

22   were paid at their regular hourly rate. I am not aware of any hourly employees performing after-

23   hours removals who made more than $25 per hour.

24       17.     Even at their overtime rate, employees received greater than or equal to the

25   amount they would have received for a typical two hour removal.

26       18.     Full-time employees also took after-hours phone calls. Full-time employees

27   answering after-hours calls were paid by the hour at the overtime rate, and generally received a

28   minimum of 15 minutes of overtime pay per call.

1      19.    Full-time employees received overtime pay anytime they worked more than eight

2   hours in a day, even if they did not work forty hours in the week.

3   Meal and Rest Breaks

4      20.    Full-time employees at the locations have always been entitled to a one hour meal

5   break.

6      21.    Employees recorded the in and out times for their meal breaks on their time sheets,

7   which were always recorded by hand; we did not have a time clock.

8      22.    Many employees left the locations during their meal break to go grocery shopping

9   or run errands.

10     23.    Employees could refuse to take calls or see families during meal breaks to ensure

11  that the meal break was uninterrupted.  If an employee's meal break was interrupted, the

12  employee could choose to extend his or her meal break to make up for the time.

13     24.    Because our meal breaks were scheduled to be a full hour, even when our meal

14  breaks were interrupted, employees typically received at least thirty minutes of uninterrupted

15  break time.

16     25.    Sometimes, when an employee's lunch was substantially interrupted, such as when

17  a family came in unexpectedly, employees recorded their time and were paid for it.

18     26.    I believe that I was fully compensated for all time worked during meal and rest

19  breaks.

20  Community Work

21     27.    During the time that Alderwoods owned the locations, the locations employed

22  Apprentice Embalmers, Arrangers, Funeral Director Assistants, Funeral Director/Embalmers,

23  Funeral Directors, and Location Managers.

24     28.    Employees were encouraged to participate in community activities.  There was no

25  requirement that employees become involved in the community and no repercussions if

26  employees did not join community activities.

27     29.    I have participated in community activities both during business hours and after

28  business hours.

30.     For after-hours community events such as dinners, the locations paid the ticket costs for the employee and sometimes for the employee's spouse.  Sometimes the locations paid employees by the hour for the time they spent at after-hours community events; other times the locations allowed employees to come in a certain number of hours late or leave a certain number of hours early to correspond with the time spent at the community event, and still paid them for a full day of work.

31.     I believe that I was compensated for all of the time I spent at community activities as a representative of the company.

32.     I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the Plaintiffs allege that they have not been properly paid for all time worked.  Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me.  I also was told that the employees who filed the lawsuit seek to have the class certified, and that the matter of class certification has not been ruled upon by the Court; and that the class is certified and assuming I am a member of the class, then the attorneys for Alderwoods Group, Inc. will be directly opposing my interest as a class member.

33.     Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions.  I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

34.     The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections.  The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 10, 2010

Melissa Rosa

**TAB 49**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM HELM, et al.<br>On behalf of themselves and all employees<br>similarly situated,<br><br>   Plaintiffs,<br><br>  vs.<br><br>ALDERWOODS GROUP, INC., et al.<br><br>   Defendants. | CASE NO. 3:08-CV-01184 SI<br><br>**DECLARATION OF C. JOSEF ROSEN** |

# DECLARATION OF C. JOSEF ROSEN

I, C. Josef Rosen, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.  My name is Curtis Josef Rosen.  I am a resident of Fort Lauderdale, Florida.  I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.  All the statements in this Declaration are true and accurate.  I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.  I am currently a full-time funeral director at ABC Jennings in Fort Lauderdale, FL.  During the time of Alderwoods ownership, I worked at the Kraeer Funeral Home.

4.  I was an hourly employee for Alderwoods.  During my time at Kraeer Funeral Home, I worked about 60 to 80 hours a week because the funeral home was very busy.

5.  As a funeral director, I arranged and conducted funeral and memorial ceremonies.

6.  As an hourly employee, I kept my time on a time card.  I would punch in and out of a time clock.

Over-Time

7.  My after-hours work consisted primarily of viewings and funerals.  I did not work any removals.  When I worked overtime, I would circle "40" on the time card and put the over-time hours next to it.

8.  I recorded all time that I worked on overtime.  Overtime did not require pre-

approval from a manager. I was unaware of a policy that required me to get approval from my manager before I worked overtime. I was never told to not record time that I had worked.

9.    I was paid time and a half for overtime. The only commission I ever received as a funeral director was on flowers sold. I never received any other commission or bonus during the period I worked for Alderwoods.

After-Hours Removals

10.    As a funeral director, I did not work any removals. Kraeer had a removal team that performed removals. These were full-time employees who just worked removals. If they were not available, Kraeer hired a third party removal service.

11.    As a funeral director, I rarely if ever spoke to the family for purposes of removals. The removal service instructed the family that the funeral director would be contacting them the following day. I was never "on call" for removals.

"Community Work Policy"

12.    I was told when I was hired that participation in community organizations was encouraged, but never heard anything more about community activities after that. I never had time to participate in community organizations.

13.    I do not recall being asked about participation in community organizations in any evaluation by my supervisor. I was never required to participate in community organizations.

14.    I do not recall any incentive programs to promote participation in community activities or organizations.

Pre-Need Sales

15.    I was never required to sell pre-need policies, and I never sold pre-need policies. There was a pre-need counselor who sold these policies. I was not aware of any funeral directors who sold pre-need policies.

Training

16.    As a funeral director, I was required to take continuing education, or CEU, courses. These courses were usually held on one day during the year and all the funeral directors would attend. The courses were held at Kraeer and, usually, during business hours. If there was an after-hours course, I was paid overtime for my attendance.

Meal Breaks

17.    As a full-time employee, I received meal breaks. I punched off the clock for meal breaks and punched back in when the meal break was over. I was usually able to take a lunch.

18.    During meal breaks, I would sometimes take a call from a family. I did so on my own volition, and I did not record the time for this because I thought to do so was frivolous. I was never told not to record time that I spent working during a meal break. Nor was I ever told to record a meal break that I did not take.

19.    I was never asked to not record time that I had worked.

20.    Before speaking with any attorney for Alderwoods, I was told that the employees who filed the lawsuit seek to have the class certified, and that the matter of class certification has not been ruled upon by the Court. I was also told that if the class is certified and assuming I am a member of the class, then the attorneys for Alderwoods will be directly opposing my interest as a

class member.

21.    I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked.  Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me.

22.    Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions.  I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

23.    The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections.  The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: _October 29_, 2009                    _C. Josef Rosen_
                                             C. Josef Rosen

**TAB 50**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WILLIAM HELM, et al.
On behalf of themselves and all employees
similarly situated,

        Plaintiffs,

   vs.

ALDERWOODS GROUP, INC., et al.

        Defendants.

CASE NO.   3:08-CV-01184 SI

DECLARATION OF WILLIAM
SANTMYER

# DECLARATION OF WILLIAM SANTMYER

I, William Santmyer, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.    My name is William Santmyer.  I am a resident of Fort Lauderdale, Florida.  I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.    All the statements in this Declaration are true and accurate.  I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.    I am currently a funeral attendant at ABC Jennings in Fort Lauderdale, FL.  I worked at all the locations for ABC Jennings and Kraeer Funeral Home during the time that Alderwoods owned these funeral homes.  I have always been an hourly employee.  I worked full-time for Alderwoods, 40-hours a week.

4.    As a funeral attendant, I am a "jack of all trades" and do everything except embalming.  I perform removals, work at visitations, assist in moving bodies, assist in cremation, and have worked in printing and details.  I have worked on evening removals and visitations.

Overtime

5.    During the time Alderwoods owned the funeral homes, I usually worked 60 to 70 hours a week, although the amount of overtime I worked varied.  In addition to my weekly 40-hour shift, I often worked on Saturday evenings, from 8:30 p.m. on Saturday until 8:30 a.m.  When I worked these weekends, I would work at the funeral home location on Sample Road.

6.    I received time and a half for overtime that I worked.  I did not receive any

commissions or bonuses.  Only managers received commissions or bonuses.

7.     I was never told not to record time that I had worked.  I worked overtime in the chapel on visitations, in details (obtaining death certificates and other paperwork), and on removals.

8.     There was a period of about 2 to 3 months when the person submitting my time was not correctly submitting my overtime, because she was typing the numbers incorrectly.  After speaking with the payroll person, this situation was straightened out.  I was paid correctly afterwards.

After-Hours Removals

9.     I did perform after-hours removals.  I was paid hourly for removals.  Occasionally, I would work a removal with a funeral director, if I needed assistance with a body or if the removal was from a family home, but I would handle removals from hospitals and nursing homes by myself.

10.     I was never "on-call" for removals.  I performed removals during scheduled overtime, such as on Saturday evenings.  There was also a removal service that was generally called in for removals as a backup when we were busy.

"Community Work Policy"

11.     Alderwoods encouraged employees to participate in community organizations if possible.  Because I was working 60 to 70 hour weeks, I never had time to participate in any community organizations.  I was never told that such participation was a requirement of my position with the funeral home.

12.    I once went to a lunch with a funeral director as part of an "outreach" for the Funeral Home. I was paid for that time. The Funeral Home had a booth at the Seafood Festival on a Saturday and asked for volunteers to man the booth. I volunteered for a chance to go to the beach and socialize with my co-workers. My supervisor did not require me to participate in this activity.

Pre-Need Sales

13.    I did not sell pre-need policies. I occasionally brought people to the funeral home to talk about it with those who sold pre-need policies. I did not receive a commission on pre-need sales, though I did receive a monetary award for any referrals I made.

Training

14.    The majority of the training for my position at the Funeral Home was on-the-job training. Occasionally, the funeral directors would hold a meeting to teach how to participate in different denominations' funeral services. They would teach things like when to kneel and when to stand. This training was usually held in the afternoon, and I was paid for my time attending this training. I never had to attend any after-hours training or courses.

Meal Breaks

15.    As a full-time employee, I do receive meal breaks. However, there were times when it was not possible to take a meal break – for example, if I was waiting in a doctor's office to get a signature on a death certificate or if I was at a funeral service. I would usually try to take 5 to 10 minutes for myself when I was on the road. If I worked through lunch, I was paid for it.

16.    Before speaking with any attorney for Alderwoods, I was told that the employees

who filed the lawsuit seek to have the class certified, and that the matter of class certification has not been ruled upon by the Court. I was also told that if the class is certified and assuming I am a member of the class, then the attorneys for Alderwoods will be directly opposing my interest as a class member.

17.     I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked. Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me.

18.     Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions. I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

19.     The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections. The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.


Dated: _OctoBEr/ 28_____, 2009          _William Santmyer_____
                                            WILLIAM SANTMYER

**TAB 51**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM HELM, et al.<br>On behalf of themselves and all employees<br>similarly situated,<br><br>    Plaintiffs,<br><br>    vs.<br><br>ALDERWOODS GROUP, INC., et al.<br><br>    Defendants. | CASE NO.    3:08-CV-01184 SI<br><br>**DECLARATION OF ROXAN SCHWAB** |

## DECLARATION OF ROXAN SCHWAB

I, Roxan Schwab, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.      My name is Roxan Schwab.  I am a resident of Lockeford, California.  I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.      All the statements in this Declaration are true and accurate.  I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.      I am currently the general manager of Mission Memorial Park and Seaside Funeral Home in Seaside, California and Mission Mortuary in Monterey, California.  Under Alderwoods, I was a market growth manager.  I had responsibility for numerous funeral homes in the Monterey, Sacramento, and Northern California regions.  As of 2006, I had responsibility for, among other funeral homes, Whitehurst Muller, Whitehurst Terry, Seaside Chapel, Mission Memorial Park and Mission Mortuary.

4.      As a market growth manager, I essentially managed the location managers and promoted the growth of the funeral home market.  I was also responsible for new hire procedures and instructed new employees at Alderwoods locations on wage and hour procedures.

Overtime

5.      I do not recall ever seeing an "Unrecorded Work Time Policy" at Alderwoods.  Nor were hourly employees ever encouraged or required not to record all overtime hours worked.  I instructed new hires at all Alderwoods locations to keep accurate time.

6.      Overtime was any time over 8 hours in a day or 40 hours in a week.  Employees

were told to record time worked to the minute. There was no company policy to not record overtime.

7.      There was no Alderwoods policy that stated that if an employee did not get pre-approval for overtime hours, the employee would not be allowed to record that time, or be paid for those hours. Pre-approval was not the normal policy, but was required only at problem locations that had been recording an unusually heavy amount of overtime. Employees were always paid for time worked, even if not approved.

8.      I never attended a staff meeting with my local managers in which any of them stated that overtime submitted without approval would not be paid.

9.      I never attended a staff meeting with any of my location managers in which any of them informed staff that they should not record all of their overtime hours and should instead keep hours low.

After-Hours Removals

10.      Employees who took phone calls after-hours were paid 15 minutes for a phone call. If a call lasted longer than 15 minutes, they were paid an additional 15-minute increment.

11.      At the funeral homes in my region, employees who performed after-hours removals were paid an hourly rate for 3 hours minimum per call. The removals were handled by part-time employees.

"Community Work Policy"

12.      All employees were encouraged to participate in community activities. Usually, it was the family service counselors, not the funeral directors, who were active in the community.

There was no Alderwoods policy that required hourly employees to volunteer their time to outside community organizations or events.

13.    I instructed employees at all locations in my region that community outreach was to be paid. For example, if an employee went to the Lion's Club representing the location, they were paid an hourly rate, plus any fees or dues. There was no Alderwoods policy that required hourly employees not be paid for any time spent at outside community organizations or events. No such policy was ever communicated to hourly employees by me or any manager in my presence.

14.    Alderwoods did not require that employees record in a log book their community involvement, although managers were required to record community involvement per location. Time spent at community activities was recorded on the employees' time sheet.

15.    I am not aware of an Alderwoods corporate policy on community service. The vice president for the region pushed community service. However, hourly employees were never required to participate in community service. Community service was not a part of any evaluation that I made of hourly employees.

Pre-Need Sales

16.    Family service counselors sold pre-need policies, both cemetery and funeral. Some funeral directors sold pre-need policies, particularly at smaller locations that could not be adequately served by a family service counsel.

17.    Employees who sold pre-need policies were paid by the hour or on commission, whichever was greater. Most individuals who sold pre-need policies wanted to make commissions instead of hours.

18.     I instructed employees to punch out for meal breaks.  They were not told to punch out even if they did not take a meal break.  If an employee was unable to take a meal break, they were supposed to write "no lunch" on their time card.

19.     I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked.  Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods.

20.     Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions.  I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

21.     The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections.  The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.


Dated: November 10, 2009                    _____
                                            ROXAN SCHWAB

**TAB 52**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WILLIAM HELM, et al.
On behalf of themselves and all employees
similarly situated,

       Plaintiffs,

   vs.

ALDERWOODS GROUP, INC., et al.

       Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CASE NO.   3:08-CV-01184 SI

**DECLARATION OF STEVEN
SCHWINGHAMER**

# DECLARATION OF STEVEN SCHWINGHAMER

I, Steven Schwinghamer, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.     My name is Steven Schwinghamer. I am a resident of Fort Myers, Florida. I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.     All the statements in this Declaration are true and accurate. I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.     I am currently the manager of Kiser Funeral Home in Fort Myers, Florida. I was the location manager for this funeral home when it was owned by Alderwoods Group, Inc.

Overtime

4.     Under Alderwoods, the part-time employees at Kiser Funeral Home generally did not receive any overtime because they worked only 20 or 30 hours a week. Full-time employees were paid overtime if they worked more than 40 hours in a week. They were paid at time and a half.

5.     I did not require that employees obtain pre-approval before working overtime. Employees who worked overtime generally worked an hour or two later in the day to finish a visitation, a service or a report that was due, and I usually was present and aware of why they were staying late. Employees were always paid the overtime they worked, regardless of whether I had approved it beforehand. I never told the employees that they would only be paid for overtime that I had approved. If they had too much overtime, I would manage the employee's schedule; I did

not withhold payment for time worked.

6.     I never instructed my employees to not record their time worked or to not record overtime. To the contrary, I told my employees to always record the time that they had worked. I was not aware of an Alderwoods policy requiring employees to not record time.

7.     As the location manager, I reviewed the employees' time sheets and signed off on them. I never made any changes to an employee's time sheet without the employee's consent. The employee would initial on any change I made to a time sheet. I seldom had to make any changes to time recorded by employees, and changes were made only if there was an inconsistency, such as incorrect addition of hours. I never changed an employee's time to reduce their overtime.

After-Hours Work

8.     During the time Kiser Funeral Home was owned by Alderwoods, after-hours removals were handled by a third-party removal company. No employees of the funeral home performed removals.

9.     The funeral directors and myself rotated on-call responsibility to answer business calls after-hours. For a period of time, we shared the rotation with funeral directors from two other funeral homes in the Fort Myers area. No other hourly employees were on-call.

10.     After-hours calls were first taken by an answering service. If the on-call funeral director was required to respond, the funeral director was paid at his or her hourly rate for 15 minutes per call, for every call (whether received or outgoing). The vast majority of calls received took less than 15 minutes to resolve, and most took less than 5 minutes. The funeral director

would fill out a call sheet the next day to record the number of calls received or made and turn it in weekly with his or her time sheet for approval.

**"Community Work Policy"**

11. Employees were never required to participate in community organizations. I did suggest to employees that they be active in the community. However, I did not consider their community service when I evaluated employees. Nor did I use any incentive programs to encourage employees to become active in community organizations.

**Pre-Need Sales**

12. Under Alderwoods, Kiser Funeral Home sold only pre-need trust policies, not insurance policies. Funeral directors did not sell pre-need policies. The only employees at Kiser Funeral Home who sold any pre-need policies was myself and Ann Progler, a funeral clerk who was licensed to sell and write pre-need contracts. She sold at least 90% of these policies during the work day, during which she was on the clock, and earned a bonus for each contract sold. She also would meet families after-hours to sign contracts. I understand that she did so only when she knew the family was going to sign the contract, as opposed to prospecting or cold-calling, and that she made more on the bonus than she would have from her hourly wage.

**Training**

13. Funeral directors were required to take continuing education courses to maintain their license. The funeral directors generally took on-line courses during business hours, and were paid for the time that they completed these courses. I do not recall any funeral directors taking after-hours courses. Only funeral directors had to complete this training, and no other employees

were required to attend any training.

## Meal Breaks

14.     I required my employees to take a lunch break, but there were times when the funeral home was so busy that they were unable to do so. When an employee worked through his or her lunch break, the employee would note "no lunch" on their time sheet. The employees were always paid for the time they worked, including the time they worked when they skipped a lunch break when it was necessary due to being busy. I never required or encouraged the employees to record a lunch break that they had not taken. I did require employees who split their lunch break (taking multiple short breaks in place of the long lunch hour) to record their break in one block of time, but I did not tell them to record the full lunch break if that was not equal to the amount of time that they were on break.

15.     I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked. Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me.

16.     Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions. I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

17.     The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections. The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 12, 2009

STEVEN SCHWINGHAMER

**TAB 53**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM HELM, et al.,<br>On behalf of themselves and all other<br>employees and former employees similarly<br>situated,<br><br>            **Plaintiffs,**<br><br>    v.<br><br>**ALDERWOODS GROUP, INC.,**<br><br>            **Defendants.** | Case No. 3:08-CV-01184 SI<br><br>**DECLARATION OF WILLIAM<br>SEARS** |

1   DECLARATION OF WILLIAM SEARS

2       I, William Sears, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

3       1.      My name is William Sears.  I work in Greensboro, North Carolina.  I am over 21

4   years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

5       2.      All the statements in this Declaration are true and accurate.  I have personal

6   knowledge of the facts set forth in this Declaration, and could testify to them competently if

7   called to do so.

8       3.      I am currently Location Manager for Hanes Lineberry Sedgefield Chapel in

9   Greensboro, North Carolina.  I began working for Hanes Lineberry North Elm Chapel in 2002 as

10  a licensed Funeral Director and Embalmer.  The Hanes Lineberry locations were Alderwoods

11  location when I was first hired.  I became Location Manager at Hanes Lineberry Sedgefield

12  Chapel when it was taken over by SCI.

13  <u>Piece Rate/Lump Sum</u>

14      4.      When I first began working for Hanes Lineberry, Funeral Directors who

15  performed after-hours removals were paid at least 3 hours for a removal.  Employees were

16  instructed to record their time spent performing after-hours removals.  If the removal took longer

17  than 3 hours, employees were paid for however long it took.  If the removal took less than 3

18  hours, employees were still paid 3 hours.  If an employee had already reached 40 hours for the

19  week, he/she was paid his/her time and a half rate for the 3 hours.

20      5.      The only time that a Funeral Director ever performed an after-hours removal is if

21  there was a family member present or if the death occurred at a family's home and the family was

22  present.  Otherwise, a removal service performed the removal.

23      6.      I personally was called for an after-hours removal at most twice a month.

24      7.      Most removals took no longer than 2 hours depending on the location of the

25  removal.  I can never recall being out on a removal for longer than 3 hours.  As a result, in many

26  cases, the 3 hour policy overcompensated employees.

27      8.      When SCI took over Hanes Lineberry, after-hours removals were paid strictly by

28  the hour.  This is the current policy at Hanes Lineberry.

-2-

1      9.    I do not know how other locations paid employees for after-hours removals.

2  Community Work

3      10.    Since I began working at Hanes Lineberry, all employees have been encouraged to

4  join community organizations and/or be involved in community activities.  Participation in

5  community activities is not required.  There are no negative repercussions if an employee chooses

6  not to participate in community activities.

7      11.    All time spent performing community work on behalf of Hanes Lineberry, both

8  during normal working hours and outside normal working hours, has always been compensated

9  since I began working at this location.  For example, employees at our location, including Funeral

10  Directors, have volunteered at church breakfasts that occur outside normal working hours (for

11  example, at 6:30 a.m.).  Those who attended the breakfast functions were paid for their time.

12      12.    I understand that this Declaration is being provided voluntarily in a lawsuit

13  brought against Alderwoods Group, Inc. in which the Plaintiffs allege that they have not been

14  properly paid for all time worked.

15      13.    Before speaking with any attorney for Alderwoods, I was told that the attorney

16  represents Alderwoods and does not represent me.  I also was told that the employees who filed

17  the lawsuit seek to have the class certified, and that the matter of class certification has not been

18  ruled upon by the Court; and that the class is certified and assuming I am a member of the class,

19  then the attorneys for Alderwoods Group, Inc. will be directly opposing my interest as a class

20  member.

21      14.    Prior to speaking with the attorney for Alderwoods, I was also told that I did not

22  have to answer any questions.  I was told that the interview was purely voluntary and that if I did

23  not wish to speak, there would be no adverse impact on me.

24      15.    The attorney for Alderwoods provided me with an opportunity to review the

25  Declaration and to make any corrections.  The attorney told me that I could refuse to sign the

26  Declaration without any adverse impact on me.

27      I declare under penalty of perjury that the foregoing is true and correct.

28

Dated: September _10_, 2010

William Sears

**TAB 54**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WILLIAM HELM, et al.
On behalf of themselves and all employees
similarly situated,

Plaintiffs,

vs.

ALDERWOODS GROUP, INC., et al.

Defendants.

CASE NO.   3:08-CV-01184 SI

DECLARATION OF MERTIE SIMS

1

DECLARATION OF MERTIE SIMS

I, Mertie Sims, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.     My name is Mertie Sims. I am a resident of Alpharetta, Georgia. I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.     All the statements in this Declaration are true and accurate. I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.     I have worked for Roswell Funeral Home in Roswell, Georgia since 1999. From 1999 until about 2002 or 2003, I was a receptionist at Roswell Funeral Home. In 2002 or 2003, I became an assistant office manager, and in 2004 or 2005, I became the office manager, which is my position today.

4.     Shortly after I was hired, the Roswell funeral home was owned and operated by Alderwoods Group, Inc. My job as assistant office manager and office manager involves handling contracts, paying bills, doing payroll, running reports, performing various administrative duties, and providing occasional general support to the funeral director. Because my duties included payroll responsibilities, I am familiar with how hourly employees recorded time, and were paid for the time recorded at Roswell Funeral Home.

5.     As a full-time hourly employee, I worked 40 hours a week, and on occasion worked overtime.

6.     While working for Alderwoods, I initially recorded my time on time sheets. In 2003, Alderwoods installed a time clock and I recorded my time on

2

time cards, which I used to clock-in and clock-out. I always recorded all of the hours I worked, including any overtime. I was always paid for all of the time that I worked, including overtime.

7. Generally, hourly employees, including me, had to obtain approval prior to working overtime. If I worked overtime that was not approved, I would always be paid for it.

8. None of my managers, or any other employee at Alderwoods, ever encouraged, required, or requested me not to record my time, including overtime. I was never required to work prior to clocking-in when I arrived for work in the morning, or after clocking-out when I left in the evening.

9. During the time I worked for Alderwoods at Roswell Funeral Home, I was never required to be on-call. Roswell Funeral Home employed a father and son to work on-call for after hours removals. Both were paid hourly for the time they were on-call.

10. Funeral directors would sometimes be forwarded calls from the answering service after hours. Funeral directors who took calls recorded their time, and were paid for their time spent on these calls. No other hourly employees were required to do any after hours, on-call work.

11. I was never required to, nor did I ever, perform removals of bodies.

12. Alderwoods never required me to obtain a pre-need insurance license or sell pre-need policies. I obtained my license on my own, and sold a handful of policies, for which I was paid a commission. I was always working on the clock when I made pre-need presentations and handled pre-need sales, and was paid hourly for the time as well. Alderwoods also had separate family service counselors

3

who were responsible for selling pre-needs policies. Alderwoods did not require funeral directors or any other hourly employees to sell pre-need policies.

13.   I was not required to participate in community organizations or perform community work as an employee of Alderwoods. If anyone chose to volunteer to work an event in the community sponsored by Alderwoods, such as an ice cream social, or Memorial Day service, the hourly employees would be paid for the time they attended these events.

14.   I would have an annual evaluation by my manager. My evaluation was not based on, nor did my manager ever discuss with me as part of my evaluation, my involvement in community activities or organizations.

15.   While at Roswell Funeral Home, Alderwoods permitted a half-hour lunch break every day. I would take the full 30 minutes, unless I had to work through lunch or my meal break was interrupted by work. On any occasion that my meal break would be interrupted because of work, I would be paid for working through my break. None of my managers or other Alderwoods employees ever encouraged, required, or requested me not to record my time that I worked through a meal break.

16.   No one at Alderwoods ever encouraged, required, or requested me to perform work but not record the hours that I worked.

17.   I don't recall having to attend any training sessions while at Roswell during the time Alderwoods operated the funeral home.

18.   I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they have not been properly paid for all time worked. Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and

4

1  does not represent me. I also was told that the employees who filed the lawsuit

2  seek to have the class certified, and that the matter of class certification has not

3  been ruled upon by the Court; and that if the class is certified and assuming I am a

4  member of the class, then the attorneys for Alderwoods Group, Inc. will be directly

5  opposing my interest as a class member.

6

7          19.    Prior to speaking with the attorney for Alderwoods, I was also

8  told that I did not have to answer any questions. I was told that the interview was

9  purely voluntary and that if I did not wish to speak, there would be no adverse

10 impact on me.

11         20.    The attorney for Alderwoods provided me with an opportunity to

12 review the Declaration and to make any corrections. The attorney told me that I

13 could refuse to sign the Declaration without any adverse impact on me.

14

15     I declare under penalty of perjury that the foregoing is true and correct.

16     Dated: November _13_, 2009

17                                              MERTIE SIMS

18

19

20

21

22

23

24

25

26

27

28

5

**TAB 55**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WILLIAM HELM, et al.
On behalf of themselves and all employees
similarly situated,

        Plaintiffs,

    vs.

ALDERWOODS GROUP, INC., et al.

        Defendants.

CASE NO.    3:08-CV-01184 SI

**DECLARATION OF ANDY ST.
LAURENT**

DECLARATION OF ANDY ST. LAURENT

I, Andy St. Laurent, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.    My name is Andy St. Laurent. I am a resident of Peoria, Arizona. I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.    All the statements in this Declaration are true and accurate. I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.    I am currently a cemetery grounds keeper at Phoenix Memorial Park and Mortuary in Phoenix, Arizona. I began working at Phoenix Memorial Park and Mortuary in 1999 as a part-time associate/funeral support staff. In 2000, when Alderwoods Group, Inc. assumed ownership of Phoenix Memorial Park, I became a full-time courier. As a courier, I would pick up certificates of death, perform removals of remains from various locations to the funeral home, and assist with funerals when needed.

4.    I worked as courier until 2005, when I became a funeral arranger for approximately 9 months. Later that year, I took the position of cemetery groundskeeper which I hold today. It is my understanding that from 2000 through 2006, Alderwoods owned and operated Phoenix Memorial Park and Mortuary.

5.    As a courier, funeral arranger, and cemetery grounds keeper for Alderwoods, I was always an hourly, full time employee working 40 or more hours each week.

PH-1205422v1

2

6.     As a courier and funeral arranger, I would sometimes work 45 to 55 hours a week. As a cemetery groundskeeper, I would sometimes work as much as 55 to 60 each week. I was always paid time-and-a-half for any overtime I ever worked. My time was recorded on time cards, which I used to punch in and punch out.

7.     Although I had to get prior approval from my manager before I worked overtime, Alderwoods paid me for all the overtime I worked. I don't recall ever having my overtime not approved, but if I ever worked overtime which was not previously approved, I would still be paid time-and-a-half for the overtime worked.

8.     None of my managers, or any other employee at Alderwoods, ever encouraged, required, or requested me not to record my overtime.

9.     No one at Alderwoods ever encouraged, required, or requested me to perform work but not record the time that I worked. I always recorded the time that I worked, including overtime.

10.     I never received commissions or bonuses.

11.     Prior to working as a cemetery groundskeeper, I would be "on call" approximately three to four nights a week. My "on call" duties consisted of performing removals of bodies from various locations to the funeral home or answering after-hours calls to the funeral home.

12.     For removals, I would be paid $55 for each removal I performed. Some nights I would not make any removals, other nights I could make two or three. Each removal call generally took 1 ½ to 2 hours to complete. On very rare occasions a removal may take longer, but I don't recall any removal taking longer than 3 hours.

13.     Answering phones while "on call" consisted of speaking with families or others who called the funeral home after hours. For any call that lasted 15 minutes or

less, I would record 15 minutes of work. If a call lasted more than 15 minutes, then I would record each additional minute. The minutes recorded for each call were credited to my weekly hours.

14.    I was not involved in the selling of pre-need policies, nor was I ever required to make pre-need presentations or sell pre-need policies. Alderwoods used cemetery sales counselors to sell pre-need policies and make presentations.

15.    I was not required to participate in community organizations or perform community work as an employee of Alderwoods. Although I was involved with the local Elks Club, I participated with that organization voluntarily, on my own time. I never reported on my activities with any organizations to any Alderwoods managers, or completed a community service report form, nor was I ever required to do so.

16.    I was evaluated by my manager on an annual basis. My evaluation never took into account my participation in community work.

17.    Alderwoods permitted a 30 minute meal break every day. I would take the full 30 minutes, unless I had to work through lunch or my meal break was interrupted by work. On any occasion that my meal break would be interrupted because of work, I would be paid for working through my break. None of my managers or other Alderwoods employees ever encouraged, required, or requested me not to record my time that I worked through a meal break, and I was always paid for any work I performed during a meal break.

18.    The only training that I was ever required to attend was cremation training in 2004. The training took place in Chicago, and I was paid for the time that I attended the training session.

19.    I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that they

have not been properly paid for all time worked.  Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me.  I also was told that the employees who filed the lawsuit seek to have the class certified, and that the matter of class certification has not been ruled upon by the Court; and that if the class is certified and assuming I am a member of the class, then the attorneys for Alderwoods Group, Inc. will be directly opposing my interest as a class member.

20.    Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions.  I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

21.    The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections.  The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: November _13_, 2009

Andy St. Laurent

PII-1205422v1

5

**TAB 56**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WILLIAM HELM, et al.,
On behalf of themselves and all other
employees and former employees similarly
situated,

    Plaintiffs,

  v.

ALDERWOODS GROUP, INC.,

    Defendants.

Case No. 3:08–CV-01184 SI

**DECLARATION OF ANDREW ST. LAURENT**

DECLARATION OF ANDREW ST. LAURENT

I, Andrew St. Laurent, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.     My name is Andrew St. Laurent. I work in Sun City, Arizona. I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.     All the statements in this Declaration are true and accurate. I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.     I worked for Phoenix Memorial from 1999 through November 2009 as an hourly employee under the following job titles: Courier, Runner, Funeral Arranger, and Superintendent.

4.     During the time that I worked at the Phoenix, Arizona location, it is my understanding that Alderwoods Group, Inc. owned and operated Phoenix Memorial, including the Arizona location where I worked.

Piece Rate/ Lump Sum

5.     When I started at Phoenix Memorial in 1999, lump sum payments were made for after-hours phone calls and after-hours removals.

6.     I do not remember whether Phoenix Memorial paid lump sums in November 2009 still for phone calls, but it did not make lump sum payments for removals at that time because Phoenix Memorial stopped doing their own removals when SCI bought Alderwoods.

7.     Piece rate payment was $55 per removal. If the removal took longer than 3 hours, you were paid your hourly rate on top of that. Payment was made through your paycheck with withholdings. You generally made more with lump sum payments than at an hourly rate.

8.     On my time card I would write "removal" and the person's name if it took less than three hours for their removal. I only kept track of my hours that exceeded three hours. If it took me four and a half hours to do a removal, I wrote 1.5 hours on my time card, in addition to "removal" and the name of the person who was removed. If the time above three hours took me past 40 hours for a work week, I was paid for that time at my overtime rate of pay.

9.     For years there were two of us that did after-hours removals, and then it was just

1 me. Some months I did up to 30 removals. The time it took to do a removal depended on where
2 we went, whether it was a house call or to a nursing home.

3     10.    Removals took anywhere from 20 minutes to two hours. It was very rare that a
4 removal took more than three hours. I do not remember how many times my removals ran over
5 three hours.

6 <u>Community Work</u>

7     11.    Throughout my employment at Phoenix Memorial, all employees have been
8 encouraged to perform community work. I personally have never performed community work on
9 behalf of the location.

10     12.    I believe that any community work performed by an employee on behalf of the
11 funeral home is paid, whether it is performed during normal work hours or outside normal work
12 hours.

13     13.    I understand that this Declaration is being provided voluntarily in a lawsuit
14 brought against Alderwoods Group, Inc. in which the Plaintiffs allege that they have not been
15 properly paid for all time worked.

16     14.    Before speaking with any attorney for Alderwoods, I was told that the attorney
17 represents Alderwoods and does not represent me. I also was told that the employees who filed
18 the lawsuit seek to have the class certified, and that the matter of class certification has not been
19 ruled upon by the Court; and that the class is certified and assuming I am a member of the class,
20 then the attorneys for Alderwoods Group, Inc. will be directly opposing my interest as a class
21 member.

22     15.    Prior to speaking with the attorney for Alderwoods, I was also told that I did not
23 have to answer any questions. I was told that the interview was purely voluntary and that if I did
24 not wish to speak, there would be no adverse impact on me.

25     16.    The attorney for Alderwoods provided me with an opportunity to review the
26 Declaration and to make any corrections. The attorney told me that I could refuse to sign the
27 Declaration without any adverse impact on me.

28     I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 9, 2010

Andrew St. Laurent

**TAB 57**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WILLIAM HELM, et al.
On behalf of themselves and all employees
similarly situated,

        Plaintiffs,

   vs.

ALDERWOODS GROUP, INC., et al.

       Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)

CASE NO.    3:08-CV-01184 SI

**DECLARATION OF ROBERT
CLAYTON STRANG**

1

DECLARATION OF ROBERT CLAYTON STRANG

I, Robert Clayton Strang, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.     My name is Robert Clayton Strang.  I am a resident of Lynnwood, Washington.  I am over 21 years of age, suffer no legal disability, and am otherwise competent to make this Declaration.

2.     All the statements in this Declaration are true and accurate.  I have personal knowledge of the facts set forth in this Declaration, and could testify to them competently if called to do so.

3.     I am currently a funeral director/embalmer intern at Schaefer-Shipman Funeral Home in Marysville, Washington.  In March 2006, I began working as a funeral director/embalmer intern at Acacia Memorial Park and Funeral Home in Seattle, Washington.  At the time I was hired to work at Acacia, it is my understanding that Acacia was owned and operated by Alderwoods Group, Inc.  I worked at Acacia until November 2007.

4.     As a funeral director/embalmer intern, I performed a variety tasks including meeting with families, preparing for funerals, embalming, and performing removals.  At Acacia, I was always an hourly, full time employee working 40 or more hours each week.

6.     I would average approximately 25 hours of overtime each week.  I was always paid time-and-a-half for any overtime I ever worked.  My time was recorded on time cards, which I used to punch in and punch out.

2

7.     Alderwoods paid me for all the overtime I worked.  I don't recall any policy which required my overtime to be pre-approved, nor do I recall ever having my overtime not approved.

8.     None of my managers, or any other employee at Alderwoods, ever encouraged, required, or requested me not to record my overtime.  I was never required to perform any work before clocking in-the morning or after clocking-out in the evening.

9.     No one at Alderwoods ever encouraged, required, or requested me to perform work but not record the time that I worked.  I always recorded the time that I worked, including overtime.

10.     My overtime work consisted mostly of after hours removals.  For each removal I performed, I would record my time from the time I left my house until I returned home.  I would be paid a minimum of three-and-a-quarter hours for each removal I performed.  If a removal took less than three hours, I was paid the full three-and-a-quarter hours.  Each removal call generally took about 2 hours to complete.  If a removal took longer than three-and-a-quarter hours, then I was paid for each hour after that.

11.     As a funeral director/embalmer intern at Acacia, I was not required to be "on call."  On occasion, a funeral director who was on call would ask me to be his back up.  When I agreed to be a back up, a funeral director would call me on my cell phone and ask me to assist on certain calls.  I would always record my time for this work, and be paid time-and-a-half for the time I worked.

12.     I was not involved in the selling of pre-need policies, nor was I ever required to make pre-need presentations or sell pre-need policies.  Alderwoods used family service counselors exclusively to sell pre-need policies and make presentations.

3

13.   I never received a bonus or commission when working at Acacia.

14.   I was never told about or saw an Alderwoods "Community Work Policy," or heard of "I Believe In Service" or "Success Spotlight." I was not encouraged or required to participate in community organizations or perform community work as an employee of Alderwoods. I never reported on my activities with any organizations to any Alderwoods managers, or completed a community service report form, nor was I ever required to do so. I don't recall any incentive programs for community activities at Acacia.

15.   I had an annual evaluation while working for Acacia when it was operated by Alderwoods. No one ever evaluated me on my participation in community activities, or the amount of overtime I recorded.

16.   Alderwoods permitted a 30 minute meal break every day. I would take the full 30 minutes, unless I had to work through lunch or my meal break was interrupted by work. On any occasion that my meal break would be interrupted because of work, I would be paid for working through my break. I would also take my meal break later that day. None of my managers or other Alderwoods employees ever encouraged, required, or requested me not to record my time that I worked through a meal break.

17.   I recall attending periodic training sessions or meetings involving safety issues or continuing education at Acacia. These sessions were held at the funeral home during normal business hours. I was always on the clock when attending these sessions and would be paid for attending. I don't recall any Alderwoods policy requiring hourly employees to attend training sessions after hours and off the clock.

18.   I understand that this Declaration is being provided voluntarily in a lawsuit brought against Alderwoods Group, Inc. in which the plaintiffs allege that

4

they have not been properly paid for all time worked.  Before speaking with any attorney for Alderwoods, I was told that the attorney represents Alderwoods and does not represent me.  I also was told that the employees who filed the lawsuit seek to have the class certified, and that the matter of class certification has not been ruled upon by the Court; and that if the class is certified and assuming I am a member of the class, then the attorneys for Alderwoods Group, Inc. will be directly opposing my interest as a class member.

19.     Prior to speaking with the attorney for Alderwoods, I was also told that I did not have to answer any questions.  I was told that the interview was purely voluntary and that if I did not wish to speak, there would be no adverse impact on me.

20.     The attorney for Alderwoods provided me with an opportunity to review the Declaration and to make any corrections.  The attorney told me that I could refuse to sign the Declaration without any adverse impact on me.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: November _11_, 2009

ROBERT CLAYTON STRANG

5

**TAB 58**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WILLIAM HELM, et al.,
On behalf of themselves and all other
employees and former employees similarly
situated,

Plaintiffs,

v.

ALDERWOODS GROUP, INC.,

Defendants.

Case No. 3:08-CV-01184 SI

DECLARATION OF DEBORAH
SYDLOWSKI

1   DECLARATION OF DEBORAH SYDLOWSKI

2        I, Deborah Sydlowski, pursuant to 28 U.S.C. § 1746, do hereby declare and state as

3   follows:

4        1.    My name is Deborah Sydlowski. I am a resident of Laingsburg, Michigan. I am

5   over 21 years of age, suffer no legal disability, and am otherwise competent to make this

6   Declaration.

7        2.    All the statements in this Declaration are true and accurate. I have personal

8   knowledge of the facts set forth in this Declaration, and could testify to them competently if

9   called to do so.

10       3.    I am currently the General Manager of five Gorsline Runciman Funeral Homes in

11  Lansing, East Lansing, Mason, Williamston and Dewitt, Michigan. I have managed these

12  locations since 2000, including during the time period when Alderwoods Group, Inc. owned and

13  operated Gorsline Runciman Funeral Homes.

14       4.    In the course of my 10 years working at Gorsline Runciman Funeral Homes, I

15  gained knowledge of Alderwoods' timekeeping policies and pay practices and how they were

16  implemented at these locations.

17  Community Work

18       5.    While Alderwoods owned the location, Gorsline Runciman Funeral Homes

19  employed Apprentice Funeral Directors, an Arranger, Funeral Director Assistants, Funeral

20  Director/Embalmers, and Location Managers.

21       6.    Gorsline Runciman employees, including Apprentice Funeral Directors, an

22  Arranger, Funeral Director Assistants, Funeral Director/Embalmers, and Location Managers,

23  were encouraged to participate in community activities. There was no requirement that

24  employees become involved in the community and no repercussions if employees did not

25  participate in community activities.

26       7.    Employees at Gorsline Runciman have always kept track of their time on paper

27  time sheets, and at times, a time clock has also been used, in addition to these paper time sheets.

28       8.    Employees, including Apprentice Funeral Directors, an Arranger, Funeral Director

-2-

1   Assistants, Funeral Director/Embalmers, and Location Managers, participated in community

2   events both during business hours and after business hours, on nights and weekends.

3          9.      Alderwoods always paid any expenses associated with participating in community

4   events (i.e. ticket costs, dues, etc.).

5          10.     I instructed employees to report all time spent on all company-related community

6   activities, both during business hours and after business hours.

7          11.     To my knowledge, employees recorded their hours spent at such events on their

8   written time sheets.

9          12.     Employees were compensated for all time they spent at all company-related

10  community activities, both during business hours and after business hours, so long as they

11  recorded the time on their written time sheets.

12         13.     For example, Gorsline Runciman Funeral Homes often bought tickets for

13  community events, such as dinners, and gave the tickets to Apprentice Funeral Directors, an

14  Arranger, Funeral Director Assistants, Funeral Director/Embalmers, and Location Managers.

15  These employees were always paid for all of the time they spent at these after-hours community

16  events, so long as they recorded the time on their written time sheets.

17         14.     Employees also recorded their community work on Gorsline Runciman Funeral

18  Homes' activities calendar.

19         15.     I always ensured that all employees were paid for their community work, and I am

20  aware of no instance where an employee was not compensated for work in the community on

21  behalf of Alderwoods.

22         16.     I understand that this Declaration is being provided voluntarily in a lawsuit

23  brought against Alderwoods Group, Inc. in which the Plaintiffs allege that they have not been

24  properly paid for all time worked. Before speaking with any attorney for Alderwoods, I was told

25  that the attorney represents Alderwoods and does not represent me. I also was told that the

26  employees who filed the lawsuit seek to have the class certified, and that the matter of class

27  certification has not been ruled upon by the Court; and that the class is certified and assuming I

28  am a member of the class, then the attorneys for Alderwoods Group, Inc. will be directly

- 3 -

1   opposing my interest as a class member.

2        17.    Prior to speaking with the attorney for Alderwoods, I was also told that I did not

3   have to answer any questions.  I was told that the interview was purely voluntary and that if I did

4   not wish to speak, there would be no adverse impact on me.

5        18.    The attorney for Alderwoods provided me with an opportunity to review the

6   Declaration and to make any corrections.  The attorney told me that I could refuse to sign the

7   Declaration without any adverse impact on me.

8        I declare under penalty of perjury that the foregoing is true and correct.

9   Dated: September 9, 2010

                        Deborah S Sydlowski
                        Deborah Sydlowski

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 4 -