UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM HELM, et al.<br>On behalf of themselves and all employees similarly situated,<br><br>           Plaintiffs,<br>   vs.<br><br>ALDERWOODS GROUP, INC., et al.<br><br>           Defendants. | ) CASE NO.   3:08-CV-01184 SI<br>)<br>) **DECLARATION OF BUDDY MAYES**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## DECLARATION OF BUDDY MAYES

I, Buddy Mayes, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1. I am over 21 years of age, have personal knowledge of the facts set forth in this declaration, and could testify to them competently if called to do so.

2. I was employed by Alderwoods Group, Inc. ("Alderwoods") as Vice President of Operations for the Southeast United States from approximately 1999 until November 2006. I was employed by The Loewen Group, Alderwoods' predecessor, beginning in the mid-1990's. Prior to becoming VPO, I was, among other things, a Regional Manager and Director of Operations for the South. After Alderwoods merged with a subsidiary of Service Corporation International in November 2006, I stayed on as Director of Operations for the sale locations in the Southeast U.S.

3. Alderwoods was managed by an Executive Committee, which consisted of the Chairman of the Board of Directors, the President and Chief Executive Officer, the Chief Financial Officer, and the Chief Information Officer. As Vice President of Operations, I reported directly to Paul Houston, Alderwoods' President and CEO. When I first became VPO, I had responsibility for about five states. In approximately 2004, my responsibility expanded and I managed the locations from Puerto Rico to Texas, and north to about Tennessee. I managed a team that included a Director of Operations, a Director of Sales Operations, a Human Resources Specialist, a Controller, and as many as 14 Regional General Managers. The Regional General Managers reported up through the Director of Operations and the Director of Sales Operations. A Recruiter and a Trainer also had dotted line reporting responsibility to me.

4. In my territory, the Director of Sales Operations managed the sales teams that sold pre-need insurance at the locations, while the Director of Operations was responsible for operational issues. In most areas within my territory, pre-need sales were not handled by Funeral Directors, but by sales teams whose sole responsibility was pre-need sales. In those locations, only the sales teams and not Funeral Directors could sell pre-need. In smaller locations without sales teams, Funeral Directors would be permitted to sell pre-need.

5.  The funeral home and cemetery locations in my geography typically were managed by a Location Manager. Depending on his or her duties and number of employees, a Location Manager might be exempt from overtime requirements. Some Location Managers were salaried, while others earned an hourly wage. At some locations with few employees, Location Managers and Funeral Directors were responsible for nearly every aspect of the operation, including administrative duties, selling pre-need insurance, embalming, arranging funeral services, taking phone calls and performing removals. Slightly larger locations might have a Location Administrator or Assistant Administrator to handle administrative matters, freeing up other employees to meet with families and provide funeral services. Some locations, but not all, employed students whom Funeral Directors, Embalmers, and Location Managers were expected to supervise and mentor.

6.  Among my job responsibilities as Vice President of Operations for the Southeast was to ensure compliance with company policies. Accordingly, I am very familiar with Alderwoods' policies related to wage and hour issues.

7.  As a former Vice President of Operations at Alderwoods, I am aware that Alderwoods had a written policy requiring non-exempt employees to record and be paid for all hours worked. This policy was included in its policy and procedures binders that were maintained at each location, and all my communications regarding recording time emphasized the need to record all time.

8.  In order to ensure that time was accurately reported, Alderwoods had a policy that required non-exempt employees to verify time cards or timesheets by signing them. Their managers or supervisors also were required to review the time cards or timesheets and sign them. Alderwoods relied on the representations of its hourly employees and their managers that all time was correct. Any non-exempt employees or managers who did not submit accurate time acted in contravention of company policy, and neither payroll, HR, nor I would have any way of knowing about it.

2

9. I did not track overtime records in my territory. I did not place any limit on the number of overtime hours employees could work. To my knowledge, no manager in my territory told any employee that they were limited in the number of overtime hours they could work or record. If anyone did, it was against my directives and company policy.

10. I have no knowledge of any hourly employees working without being compensated for their time. If it happened, it was contrary to both my directives and company policy.

11. Alderwoods did not have a policy requiring non-exempt employees to work in the community without compensation. No such policy appears in any policies or procedures manual and no such policy was ever communicated to me or by me as Vice President of Operations for the Southeast. There likewise was no policy requiring employees to belong to at least one community organization. Alderwoods did encourage community involvement by funeral homes, but it was not required. Employees were expected to report all time performing community service for Alderwoods' benefit, and they were compensated for all such time. If it employees were not compensated for such time it was against company policy and my directives.

12. I am aware of certain initiatives such as the Community Leadership Program, community events tracking, and Leadership Network Information sheets. These programs required Location Managers to identify and track opportunities to become visible in the community as well as key community contacts. Only certain hourly employees would have participated in these programs and their participation would have occurred during normal business hours. For the most part, only employees who dealt with customers, such as Funeral Directors, ever had contact with the community as members of the location. Other job titles, like Gravediggers for example, would have had little community contact.

13. The manner in which these programs were run varied from location to location. For example, some locations were very active in the community. Other locations were less active, and still other locations did no work in the community at all. Often, community activity would be dictated by the community itself; in smaller communities, maintaining contact with

3

influencers may not be as important to business. The extent to which Location Managers kept formal contact information on community influencers also varied greatly, as did the extent of voluntary assistance from non-exempt employees. Again, to the extent hourly employees participated in any community-related programs they were required to be compensated for their time.

14. Alderwoods never had a company-wide policy requiring hourly employees to train off the clock. Regardless of the type of training, it was to be compensated. And this requirement applied even if the training was off-site or after working hours.

15. As I noted above, many locations had sales teams that were solely responsible for selling pre-need. Other employees, such as Funeral Directors, could not sell pre-need at those locations. At locations without sales teams, Funeral Directors who wanted to obtain their insurance licenses could ask their manager for permission to sell policies. If the manager approved, the employee would be compensated for time they spent studying for and taking the required test. Whether an employee would be permitted to sell pre-need insurance would vary by area and location.

16. Alderwoods required non-exempt employees to receive manager pre-approval for overtime work. This policy was stated in Alderwoods' policy and procedures manuals. The purpose of this policy was to allow managers to keep track of the amount of overtime being worked. By requiring pre-approval, managers could determine whether the overtime truly was required or whether the work could be performed by other employees or at another time without requiring overtime pay. The pre-approval policy did not permit managers to refuse to pay overtime actually worked. Failure to get pre-approval from their Location Manager could result in discipline, but employees always were paid for all time worked, whether or not it was pre-approved. There never was any policy that employees were not paid for unapproved overtime. I am not aware of any managers who refused to pay overtime. Any managers who did refuse to pay overtime, pre-approved or not, were in violation of company policy and my directives to management.

17. Alderwoods never had a policy requiring or permitting employees to omit or deduct hours actually worked. In fact, any such policy would have directly contradicted the written policy that all time worked be recorded. Employees were required to record their start time and their finish time each day. They were not permitted to work before punching in, nor could they work after clocking out. Any locations that permitted off-the-clock work violated the written company policy that all time worked must be recorded and also violated my directions to management and non-exempt employees.

18. Alderwoods' policy always required employees to report any work performed while on call, including phone calls, and be compensated for it. If any manager refused to pay all on-call time or limited compensation to a certain number of minutes per call or per removal, it was against my instruction and against company policy.

19. Whether non-exempt employees took phone calls or conducted removals varied to a great extent. Many locations had third-party answering services and third-party removal services to handle both after hours phone calls and removals. The answering service would take an after hours call and transfer the call to the removal service to handle the removals of the deceased. Even when Alderwoods employees were required to handle calls and removals, they often were handled by part-time employees. To the extent full-time employees handled calls and removals, it was almost always Funeral Directors, not other employees.

20. Alderwoods never had a company policy that on call work be paid piece rate. It was, however, discovered that some locations paid piece rate for certain types of work, such as removals or phone calls. These were practices carried over from the former owners who owned the locations before Alderwoods purchased them. When Alderwoods learned of any instances of piece work pay carried over from former owners, it put a stop to the practice immediately. Instead, Alderwoods would pay employees the greater of a minimum number of hours for a task or their actual hours worked. In certain locations, for example, employees were paid a minimum of four hours for a removal, but the minimum time would vary from region to region

depending on the distances employees would have to drive and the amount of traffic congestion typically experienced.

21. In 2006, Alderwoods rolled out a standardized method of tracking on call time that provided employees with logs to track their on-call time instead of writing it on their time cards as had been past practice. This was not a new policy, but a confirmation of existing policy and the creation of a uniform way to track on-call time.

22. To the extent employees sold pre-needs policies or did any work after their scheduled hours, they were required to report their time. While it may have sometimes happened that employees met with families after scheduled hours, Alderwoods' policy was clear that they had to record all time just as during the regular work day. They were not permitted to punch out and continue working, nor could their manager refuse to record their work time. Alderwoods absolutely never had a policy requiring employees to schedule pre-needs meetings after business hours. Any manager who expressed such a requirement to employees was in violation of company policy.

23. Also, Alderwoods never had a policy requiring employees to work during their meal break or to miss lunch breaks that were deducted from their hours worked. On any occasion where employees may have had to perform a work-related task while on a meal break, they were required to record their time and then resume their full break.

6

24. Alderwoods never had any policy that commissions or bonuses would not be included in employees' regular rate of pay for purposes of determining overtime pay. No such policy appears in any policies or procedures manual and no such policy was ever communicated to me or by me. To the contrary, it is my understanding that such commissions and bonuses should be included in overtime calculations to the extent required by U.S. law.

I declare under penalty of perjury under the laws of the United States of America the foregoing is true and correct.

November __, 2009

*Buddy Mayes* (signature)
Buddy Mayes