1  STEVEN H. GURNEE, ESQ. SB# 66056
   JOHN A. MASON, ESQ. SB# 166996
2  NICHOLAS P. FORESTIERE, ESQ. SB# 125118
   GURNEE & DANIELS LLP
3  2240 Douglas Boulevard, Suite 150
   Roseville, CA 95661-3805
4  Telephone      (916) 797-3100
   Facsimile      (916) 797-3131
5
   Attorneys for Defendants
6  ALDERWOODS GROUP, INC.

7                     UNITED STATES DISTRICT COURT

8                   NORTHERN DISTRICT OF CALIFORNIA

9                      (SAN FRANCISCO DIVISION)

10

11  WILLIAM HELM, DEBORAH PRISE,          )  Case No. CV 08-1184 SI
    HEATHER P. RADY, et al., on behalf of )
12  themselves and all other employees and former )  **DECLARATION OF NICHOLAS P.**
    employees similarly situated,         )  **FORESTIERE IN SUPPORT OF**
13                                        )  **DEFENDANT ALDERWOODS GROUP,**
                                          )  **INC.'S RENEWED MOTION TO SEVER**
14                 Plaintiffs,            )  **COMPLAINT PURSUANT TO FRCP 21**
                                          )  **FOR MISJOINER OF PLAINTIFFS**
15         vs.                            )
                                          )
16  ALDERWOODS GROUP, INC.,               )  Date:      May 20, 2011
                   Defendants            )  Time:      9:00 a.m.
17                                        )  Dept:      10
                                          )
18  _____)

19

20       I, Nicholas P. Forestiere, declare as follows:

21       1.      I am an attorney at law, duly licensed to practice before the U.S. District Court for

22  the Northern District of California, and I am a partner with the law firm of Gurnee & Daniels LLP,

23  counsel of record for the defendants in this action.   I submit this Declaration in support of

24  Defendant's Renewed Motion to Sever.  The facts contained herein are based on my own personal

25  knowledge, and if called to do so, I could and would competently testify to their truth.

26

27  **DECLARARTION OF FORESTIERE IN SUPPORT OF**
28  **DEFENDANT'S MOTION TO SEVER**
    **Case No. CV 08-1184 SI**                                              1

2.     Attached hereto as **Exhibit 1** are true and correct copies of lists of the named plaintiffs who have joined this action that our office has compiled based upon the appendices to the plaintiffs' Second Amended Complaint and excerpts of the Court's Docket.

3.     Attached hereto as **Exhibit 2** is a true and correct copy of the Court's December 29, 2009 Order Denying Plaintiffs' Motion for Class Certification (Docket No. 230).

4.     Attached hereto as **Exhibit 3** is a true and correct copy of the Court's May 28, 2010 Order denying Defendant's original Motion to Sever without prejudice (Docket No. 248).

5.     Attached hereto as **Exhibit 4** is a true and correct copy of the Court's March 9, 2011 Order denying Plaintiffs' Renewed Motion for Class Certification (Docket No. 294).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this Declaration was executed on April 4, 2011, at Roseville, California.

_____/S/Nicholas P. Forestiere_____
Nicholas P. Forestiere

**DECLARARTION OF FORESTIERE IN SUPPORT OF**
**DEFENDANT'S MOTION TO SEVER**
**Case No. CV 08-1184 SI**

2

**EXHIBIT 1**

## *HELM V. ALDERWOODS*

## LIST OF PLAINTIFFS

|  | PLAINTIFF |
|---|---|
| 1. | **Acevez Holden, Mary** |
| 2. | **Aldrich, Frederick R.** |
| 3. | **Alenxander, Merlin** |
| 4. | **Alvidrez, Elias** |
| 5. | **Arnold, Steven A.** |
| 6. | **Baasch, James A.** |
| 7. | **Bowen, Robert** |
| 8. | **(Brandt) Chatman, Debbie** |
| 9. | **Breindel, Michele** |
| 10. | **Camp, Lawrence F.** |
| 11. | **Castellari, William** |
| 12. | **Chernetsky, Robert** |
| 13. | **Clary, Corey W.** |
| 14. | **Coleman, Johnny** |
| 15. | **Cosper, Kathryn** |
| 16. | **Craig, Diane** |
| 17. | **Crouch, James** |
| 18. | **Diggs, Jeffrey A.** |
| 19. | **Dildy, Katherine** |
| 20. | **Dominguez, Louie** |
| 21. | **Dumont, Marc A.** |
| 22. | **Durden, James C.** |
| 23. | **Escobar, Stephen** |
| 24. | **Farmer, Marisia** |
| 25. | **Ferguson, John C.** |
| 26. | **Foran, Darn D.** |
| 27. | **Fulcher, Strother** |

| 28. | Giacone, Kenneth |
|-----|------------------|
| 29. | Grant, Elizabeth M. |
| 30. | Green, Donna M. |
| 31. | Gwyn, William O. |
| 32. | Hagerty Linda T. |
| 33. | Hamilton, Rickie |
| 34. | Hammock, Larry |
| 35. | Hazen, Douglas |
| 36. | Helm, William |
| 37. | Henderson, Carrie |
| 38. | Henderson, James |
| 39. | Hirrel, Bernard M. |
| 40. | Holden, Mary |
| 41. | Holder, James |
| 42. | Hudson, William |
| 43. | Hugo, Roger |
| 44. | Idemoto, Robert |
| 45. | Johnson III, Julius E. |
| 46. | Johnson, Johnny |
| 47. | Jones, Robert |
| 48. | Keath, John |
| 49. | King, Wilton |
| 50. | Kirkatrick, Eddie |
| 51. | Klein, Henry |
| 52. | Knight, Betty |
| 53. | Kolwyck, Scott W. |
| 54. | Langley, Ronald |
| 55. | Lewis, Frank |
| 56. | Lowther, Charles |
| 57. | Malmi, Sarah |
| 58. | Martz, Steven L. |

| 59. | Mathews Eugenia C. |
|-----|--------------------|
| 60. | McFerran, Nick |
| 61. | Meizler, Paul D. |
| 62. | Metcalf, Harold E. |
| 63. | Naperalsky, Michael |
| 64. | Oberski, Sean J. |
| 65. | Petersen, Richard E. |
| 66. | Pool, J.D. |
| 67. | Prise Deborah |
| 68. | Rady, P. Heather |
| 69. | Ray, Melissa |
| 70. | Reddick, Jack L. |
| 71. | Riggs, Stephanie |
| 72. | Robertson, Dennis |
| 73. | Sachs, Jeffrey |
| 74. | Salhus, Richard E. |
| 75. | Schabloski, John |
| 76. | Schnell, David |
| 77. | Seiz, Warren L. |
| 78. | Shaw, Robert |
| 79. | Shuff, William H. |
| 80. | Sloan, Myra S. |
| 81. | Smith, Monecia |
| 82. | Spiese, Jody P. |
| 83. | Stampke, Mikal |
| 84. | Stump, Gregory |
| 85. | Summers, Torrey |
| 86. | Sutter III, William T. |
| 87. | Steinhoff, Francis |
| 88. | Tafoya Jr. Joseph G. |
| 89. | Takesian, Stephen |

| 90.  | Tawney, Jerry        |
|------|----------------------|
| 91.  | Taylor, Tori         |
| 92.  | Thomas, Sandy        |
| 93.  | Tiller, Steven       |
| 94.  | Tillman, Philip R.   |
| 95.  | Trejo, Florida D.    |
| 96.  | Walker, Gayle        |
| 97.  | Weinstein, Stacy     |
| 98.  | Whaley, James        |
| 99.  | White, George T.     |
| 100. | Wickman, Chad        |
| 101. | Wyatt, David         |
| 102. | Zalenski, John S.    |

**EXHIBIT 2**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

WILLIAM HELM, et al.,

    Plaintiffs,

  v.

ALDERWOODS GROUP, INC.,

    Defendant.

_____/

No. C 08-01184 SI

**ORDER DENYING PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION**

  On December 17, 2009, the Court heard oral argument on plaintiffs' motion for class certification. Having carefully considered the arguments of the parties and the papers submitted, the Court hereby DENIES plaintiffs' motion.

**BACKGROUND**

  The subject of this litigation is a wage and hour dispute brought by current and former employees of Alderwoods Group, Inc. ("Alderwoods"), a provider of funerary services. As set forth in detail in this Court's July 29, 2009 Order (Docket No. 174), this action originated with a complaint filed in the United States District Court for the Western District of Pennsylvania, *Prise, et al. v. Alderwoods Group, Inc., et al.*, No. 06-1641. That complaint originally included both state law claims and federal claims under the Fair Labor Standards Act ("FLSA") against Alderwoods and several other related defendants. The district court in *Prise* declined to exercise supplemental jurisdiction over plaintiffs' state law claims, leaving only the FLSA claims. The dismissal of the state law claims resulted in the filing of a class action complaint in the Alameda County Superior Court on December 5, 2007 entitled *Helm, et al. v. Alderwoods Group Inc., et al.*, alleging state law wage and hour claims against

1   Alderwoods.[1]

2         On February 27, 2008, defendants removed the action to federal court, invoking this Court's

3   diversity jurisdiction under the Class Action Fairness Act ("CAFA").  *See* 28 U.S.C. § 1332(d).  The

4   operative version of plaintiffs' complaint is the Second Amended Complaint ("SAC"), filed on August

5   14, 2009.  As defined in the SAC, plaintiffs bring suit on behalf of a putative class consisting of "those

6   employees and former employees of defendant who were suffered or permitted to work by defendant

7   and not paid their regular or statutorily required rate of pay for all hours worked."  SAC ¶ 19.  The

8   putative class consists of "several thousands of employees," a "significant percentage" of whom are in

9   California.  *Id.*  ¶ 24.  The SAC alleges ten causes of action, including violations of California's Labor

10  Code; violations of the wage and hour laws of 37 other states and Puerto Rico; unlawful business

11  practices in violation of California's Unfair Competition Law; and common law claims for unjust

12  enrichment, conversion, fraud, misrepresentation, breach of contract, breach of the implied covenant

13  of good faith and fair dealing, and quantum meruit.  Plaintiffs allege that Alderwoods implemented eight

14  nationwide policies, as set forth in a policy manual and policy memoranda disseminated to all

15  Alderwoods funeral homes, that deprived plaintiffs of adequate compensation for time worked.  These

16  policies were: failing to compensate employees for time spent (1) "on-call," (2) performing "community

17  work," (3) attending mandatory training, or (4) meeting with clients to discuss "pre-need purchases";

18  (5) requiring employees to work during meal breaks; (6) refusing to pay overtime unless it had been pre-

19  approved; (7) directing employees not to record their hours for all time worked; and (8) failing to

20  correctly calculate an employee's regular rate of pay for purposes of determining his or her overtime

21  rate.  This action involves no federal claims.

22        Presently before the Court is plaintiffs' motion seeking certification of this lawsuit as a class

23  action.  Plaintiffs have defined eight separate subclasses, one for each of the alleged violations listed

24  above.   Each subclass contains a sub-subclass consisting of only California employees, but the

25  subclasses are not otherwise differentiated by jurisdiction.

26  **I.      Subclass I: Community Work Policy**

27  ────────────────────

28       [1]    Plaintiffs dismissed the other defendants, leaving Alderwoods as the only remaining
     defendant.

2

United States District Court
For the Northern District of California

Subclass 1 consists of current and former hourly employees who were allegedly required to perform unpaid "community work" in order to generate business and increase revenues for Alderwoods. In support of their allegation that Alderwoods maintained a company-wide policy to this effect, plaintiffs submit declarations from eight of the named plaintiffs and cite the deposition testimony of eleven others. *See, e.g.*, Carswell Depo., Pltf. Ex. 68, at 135:7-137:9 (Georgia and Florida employee was instructed by managers and read in company policy manual that employees were "require[d] . . . to belong to some type of community organization"); Kamienski Aff., Pltf. Ex. 49, ¶¶ 12-15 (California General Manager was informed by Area Manager, his superior, that employees "were supposed to perform [community] work for the company on a purely volunteer basis, not a paid basis. This work was to be completed outside of their regular scheduled work day"); Bath Aff., Pltf. Ex. 39, ¶¶ 15-16 (Kansas Area Manager was told by Regional Managers, his superiors, "that under the Alderwoods corporate policy community work was an expectation but was never compensated," and was "required . . . to communicate the policy to employees at each of [his] locations and ensure they understood and complied with it").

Plaintiffs further allege that they were required to report their community service hours and were evaluated based on their participation in community work. For example, a New York employee testified that employees were required to report their hours and that "[i]t was clear that [Alderwoods] expected something on that report from each employee," to the extent that one coworker would falsely report community service hours. *See* Long Depo., Pltf. Ex. 80, at 149:9-22. A General Manager employed in California stated that he was "required to regularly check in with employees to ensure they were completing community work" and to "keep upper management aware" of employees' completion of such work. Kamienski Aff. ¶ 16. He stated that employees' annual performance review took into account how much community work they had performed. *Id.* ¶ 18.

To demonstrate the existence of a nationwide community work policy, plaintiffs rely heavily on the Alderwoods Community Leadership Program, which they describe in their class certification motion as a "company-wide initiative Alderwoods launched in January 2004." Pltf. Mot. for Class Cert. at 8. Plaintiffs' evidence includes portions of the Program binders distributed to all Alderwoods locations. The binders were intended to provide each Alderwoods location with "a comprehensive plan for

3

1   building strong and long-term relationships between your location and the community in which you

2   operate." Pltf. Ex. 3, at 13070. The binders set forth detailed, step-by-step instructions each location

3   was to follow. *Id.* at 13075-81.

4          Alderwoods asserts that it maintained no company-wide policy requiring unpaid community

5   work. It points to declarations and deposition testimony from plaintiffs who stated they were either not

6   required to perform community work or were compensated for such work. *See, e.g.,* Burgess Depo.,

7   Def. Ex. N-3, at 169:13-23 (North Carolina employee was never told that community involvement was

8   a "requirement," but was told such involvement "would look good"); Johnson Depo., Def. Ex. N-13,

9   at 45:9-11 (California employee was not required to, and did not, perform any community work); Rady

10  Depo., Def. Ex. N-28, at 61:17-62:17, 68:21-24 (Pennsylvania employee did not believe policy manual

11  stated employees would not be compensated for community work, and stated that, pursuant to a "policy

12  change" near the end of her employment, she was compensated for several instances of community

13  work).

14         Alderwoods further asserts that plaintiffs' reliance on the Community Leadership Program is

15  misplaced because that effort was an incentive program expressly aimed at overtime exempt managers,

16  not non-exempt hourly employees. *See* Pltf. Ex. 2 at 4971 ("Th[e] first step requires *location managers*

17  to identify and create their Leadership Network.") (emphasis added).

18

19  **II.     Subclass II: On-Call Policy**

20         Plaintiffs allege that Alderwoods maintained a nationwide policy of requiring employees to take

21  phone calls and perform other on-call work, such as removal and embalming, outside of regular work

22  hours and without compensation. *See, e.g.,* Bath Aff. ¶¶19-23 (Kansas employee was required to handle

23  phone calls and perform embalmings and removals off-the-clock and was "not always compensated for

24  [his] work," and was told by Regional managers that on-call policy "was company-wide and came

25  'directly from up above' and could not be changed."); Detschner Depo., Pltf. Ex. 70, at 125:23-126:10

26  (same in Massachusetts).

27         Plaintiffs's allegations concern two time periods. Plaintiffs allege that, prior to March 2006,

28  Alderwoods employees were paid a piece rate for on-call work such as removals, but were not paid for

4

United States District Court
For the Northern District of California

telephone calls and other work performed off-site. *See, e.g.*, Diggs Depo., Pltf. Ex. 71, at 77:1-14 (Alaska); Gonzales Depo., Pltf. Ex. 74, at 54:1-3 (New Mexico). In March 2006, however, Alderwoods changed its policy and began compensating employees on an hourly basis for answering phone calls and performing other on-call work; as part of this policy, Alderwoods provided a form log on which employees were directed to record their on-call work time. Plaintiffs have submitted an August 2005 PowerPoint presentation prepared by the company discussing the policy change. *See generally* Pltf. Ex. 24. Plaintiffs allege, however, that even after the policy change, Alderwoods continued its practice of not compensating employees for time spent getting ready to respond to calls, including showering, dressing, and travel time. *See, e.g.*, Gonzales Depo. at 135:5-136:25 (New Mexico plaintiff not compensated for the 15 minutes she spent preparing to go out on each removal).

Alderwoods asserts that it had no uniform policy requiring employees to perform uncompensated on-call work. Alderwoods cites deposition testimony of plaintiffs who stated they were not required to perform on-call work. *See, e.g.*, Keath Depo., Def. Ex. N-17, at 184:10-185:18 (Kansas plaintiff); Takesian Depo., Def. Ex. N-31, at 126:19-127:4 (Arizona plaintiff).

Alderwoods also cites deposition testimony indicating that some employees were compensated on an hourly basis for on-call work as of July 2005, or even earlier. *See* Rady Depo. at 93:3-94:7 (Pennsylvania plaintiff stated that Alderwoods' compensation policy for on-call work changed as of July 2005); Prise Depo., Def. Ex. N-27, at 117:17-118:14 (same); *see also* Kamienski Depo., Def. Ex. N-16, at 124:11-15 (California manager employed from April 2004 to June 2005 did not have any employees paid on a piece rate basis); Greeno Decl., Def. Ex. O-25, ¶ 10 (employees in California paid on hourly basis for on-call work as early as 2002 or 2003).

## III.   Subclass III: Training Compensation Policy

Plaintiffs make allegations concerning two categories of training employees were allegedly required to attend on an unpaid, off-the-clock basis. First, plaintiffs allege that employees were required to attend job training, including health-related training, continuing education classes, sexual harassment training, and OSHA training. *See, e.g.*, Weinstein Aff., Pltf. Ex. 65, ¶ 13 (Florida employee required to attend training outside regular work day, and was told by Regional Manager that Alderwoods would

United States District Court
For the Northern District of California

1   not compensate for training); McDonald Aff., Pltf. Ex. 55, ¶¶ 14-17 (Texas employee required to attend

2   training both during and outside regular work day, and was told by manager that Alderwoods would not

3   compensate for training completed outside the work day); Hollis Aff., Pltf. Ex. 46, ¶ 20 (New York

4   employee stated Alderwoods' training policy was "rigidly enforced by company management").

5          Second, plaintiffs allege that, in states where pre-need funeral sales may be funded by insurance,

6   Alderwoods required all licensed funeral directors to become licensed insurance agents, and did not

7   compensate them for time spent attending insurance classes, studying for and taking exams, or meeting

8   continuing education requirements.  *See* Pramik Aff., Pltf. Ex. 56, ¶¶ 21-29 (Pennsylvania employee);

9   Prise Aff., Pltf. Ex. 58, ¶¶ 25-31 (same); Rady Aff., Pltf. Ex. 60, ¶¶ 22-28. (same); Takesian Depo., Pltf.

10  Ex. 88, at 125:1-126:4 (Arizona employee not compensated for time spent in licensing classes and on

11  course and test materials, but was told he would be compensated once he earned his license).

12         Alderwoods asserts that not all employees in all states were required to attend training, even

13  within the same position.  *See, e.g.*, Weinstein Depo., Def. Ex. N-34, at 63:4-10 (Florida employee

14  stated that the company's training policy "only applied to the funeral directors we hired and that was

15  it"); Korrell Decl., Def. Ex. O-30, ¶ 17 (Washington funeral director not required to attend any training

16  outside of work hours); Diggs Depo., Def. Ex. N-9, at 70:23-71:9 (Alaska funeral director did not attend

17  any training because Alaska does not require continuing education to maintain a funeral director

18  license). Alderwoods further asserts that some employees stated they were paid for time spent attending

19  training, even when it occurred outside their regular work day.  *See* Detschner Depo., Def. Ex. N-8, at

20  111:15-112:17 (Massachusetts employee reported three hours of overtime for CPR training).

21         Alderwoods also submits evidence to support its argument that it did not require employees to

22  become licensed insurance agents in order to make pre-needs sales, and that employees who did so were

23  compensated for their time.  *See* Curnow Decl., Def. Ex. O-14, ¶ 17.

24

25  **IV.    Subclass IV: Pre-Needs Policy**

26         Plaintiffs allege that Alderwoods maintained a company-wide policy of requiring employees to

27  make pre-needs presentations and sell pre-needs funeral policies – policies which allow an individual

28  to prepay funeral and death services during his or her lifetime – after work hours without compensation.

1  Plaintiffs allege that Alderwoods required them to schedule such pre-needs appointments based on the

2  convenience of the family, regardless of whether the appointment fell outside an employee's normal

3  work hours, and that management monitored employees' compliance with the policy. *See, e.g.*, Johnson

4  Aff., Pltf. Ex. 47, ¶¶12-17 (Mississippi funeral director required to schedule appointments at the

5  convenience of the family; although all presentations were reported to management, employee was not

6  compensated for time); Hollis Aff. ¶¶ 13-18 (same in New York); Daigle Depo., Pltf. Ex. 69, at 232:2-

7  233:10 (Louisiana funeral director performed off-the-clock pre-needs work up to three times per week).

8  Alderwoods counters that, in some locations, it maintained a separate sales staff or designated

9  individual to handle pre-needs presentations and sales. *See* Burkle Depo., Def. Ex. N-4, at 36:20-37:4

10  (Michigan location maintained a staff of two employees to make pre-needs sales); Ore Depo., Def. Ex.

11  N-24, at 31:1-25 (Pennsylvania location had an outside pre-needs salesperson who was not paid by

12  Alderwoods). Alderwoods further asserts that some plaintiffs who did perform such presentations and

13  sales outside regular work hours were compensated for their time. *See, e.g.*, Friden Decl., Def. Ex. O-

14  21, ¶ 13 (Washington funeral director ordinarily left pre-needs work to designated pre-needs counselors,

15  but was paid when he did need to attend pre-needs presentations); Harper Decl., Def. Ex. O-25, ¶ 8 (in

16  Texas, funeral directors who did pre-needs work after hours were compensated).

17

18  **V.    Subclass V: Meal Break Policy**

19  Plaintiffs allege that Alderwoods suffered or permitted its employees to perform work during

20  meal or rest breaks without compensation. Plaintiffs cite affidavits of numerous employees stating that

21  their meal and rest breaks were eliminated or interrupted on a regular basis in order to perform unpaid

22  work. *See* Detschner Aff., Pltf. Ex. 42, ¶ 10 (Massachusetts); Keath Aff., Pltf. Ex. 50, ¶ 12 (Kansas);

23  Lanza Aff., Pltf. Ex. 53, ¶ 12 (Washington); Long Aff., Pltf. Ex. 54, ¶ 13 (New York); McDonald Aff.

24  ¶ 13 (Texas); Takesian Aff., Pltf. Ex. 62, ¶¶ 9-12 (in Arizona, office manager would alter time cards that

25  did not exclude a full meal break from hours worked each day, even on days when the employee had

26  worked through his or her meal break). Plaintiffs assert that employees were told during staff meetings

27  that no overtime could be accrued for work performed during meal breaks, that there would be no paid

28  meal or rest breaks, and that all employees must clock in and out for a 30-minute lunch. Plaintiffs cite

1   the minutes of a staff meeting held on May 24, 2006, which state, "Everyone must punch out for lunch";

2   "There should be no overtime accrued for lunch periods"; and "No paid lunches or breaks."  Pltf. Ex.

3   28 at 2338.

4          Alderwoods contends that it had no policy denying employees compensation for missed breaks.

5   Alderwoods points to the statements of some plaintiffs that when they missed a break, they reported the

6   time and were paid for it.  *See, e.g.*, Lanza Depo., Def. Ex. N-19, at 51:12-52:20 (Washington employee

7   paid for work performed during breaks); Cain Decl., Def. Ex. O-9, ¶ 14 (Kansas employee missed lunch

8   breaks "on occasion," but would remain on the clock in order to be paid for that time); Elliot Decl., Def.

9   Ex. O-18, ¶ 11 (Texas employees were given an hour for lunch, but were not required to record a full

10  lunch break if they worked some or all of that time).

11         Alderwoods further asserts that, during staff meetings, employees were only told they must clock

12  out for meal break actually taken, and were not told they would not be paid for working through meal

13  breaks.  Alderwoods notes that the meeting minutes cited by plaintiffs reflect that employees should note

14  missed lunch breaks on their time cards and could seek payment for that time.  Pltf. Ex. 28 at 2338 ("If

15  you do not get a lunch break and you are expecting to be paid, approval is required by a Manager"); *id.*

16  at 10515 ("If you do not take lunch – say why, you cannot go without lunch everyday, not acceptable").

17

18  **VI.    Subclass VI: Pre-Approval Policy**

19         Plaintiffs allege that Alderwoods maintained a policy of requiring them to obtain pre-approval

20  for overtime hours and refusing to compensate them for non-pre-approved hours.  Plaintiffs first cite

21  Alderwoods' policy manual, as well as company memos and meeting minutes, to support their

22  allegations regarding the existence of a uniform policy.  *See* Pltf. Ex. 29 (February 2004 policy manual

23  stating that a manager must sign a completed time card "to verify that the hours are accurate and that

24  any overtime recorded is approved"); Pltf. Ex. 30 (2005 policy manual stating, "All overtime . . . must

25  be approved in advance by management"); Pltf. Ex. 31 at 561 (Pittsburgh meeting minutes stated that

26  "any and all overtime must be pre-approved . . . . Any overtime that is submitted without prior approval

27  will not be paid"); 12519 (Missouri staff memo stated that "no overtime [will] be paid without prior

28  approval").  Plaintiffs also cite the affidavits of employees who testified that Alderwoods permitted

8

them to work overtime hours that had not been pre-approved and did not compensate them for those hours. *See, e.g.*, Detschner Aff. ¶ 8 (Massachusetts); Johnson Aff. ¶ 21 (Mississippi employee assigned overtime by management, but not compensated for it); Jones Aff., Pltf. Ex. 48, ¶ 18 (Alaska); Kuhta Aff., Pltf. Ex. 51, ¶ 7 (Florida).

Alderwoods argues that plaintiffs' own testimony shows greatly varying experiences, with some plaintiffs testifying that they were paid for overtime regardless of whether it had been pre-approved. *See, e.g.*, Burgess Depo. at 112:2-115:21 (North Carolina employee's non-pre-approved overtime typically paid anyway); Diggs Depo. at 131:1-24 (Alaska employee not required to seek pre-approval for overtime); Escobar Depo., Def. Ex. N-10, at 77:21-78:7 (California employee not required to seek pre-approval for overtime).

Alderwoods asserts that its policy manual establishes only that working overtime without approval "may lead to disciplinary action," not that employees would not be paid for that time. Def. Ex. S, ex. 3, at 08 ("Working overtime that has not been pre-approved by the employee's manager may lead to disciplinary action.").

## VII.    Subclass VII: Unrecorded Work Time Policy

Subclass VII consists of employees who were allegedly directed not to record off-the-clock work they performed and therefore were not compensated for that work. Plaintiffs allege that Alderwoods instructed employees not to clock in early or clock out late, despite being aware that employees performed work before or after their scheduled shifts; plaintiffs further allege that managers would sometimes physically alter their timesheets in order to reduce the hours reported. *See, e.g.*, Burgess Depo., Pltf. Ex. 66, at 131:14-132:6 (North Carolina employee was told, "you're not going to be paid for it if you punch in early"); *id.* at 95:22-25 (management "marked off" overtime times reported on time sheet); Detschner Depo. at 115:2-117:16 (Massachusetts employee was often asked to come in 15 to 30 minutes early, but employees were discouraged from reporting "inconsequential amounts of time, for example, 20 minutes"); Garza Depo., Pltf. Ex. 73, at 55:5-14 (Texas employee instructed to clock in and out at regular times despite being asked to perform work before and after scheduled shifts).

Alderwoods points to deposition testimony indicating that some plaintiffs were not instructed

9

1    to refrain from clocking in or out when they performed work before or after a scheduled shift. *See, e.g.,*

2    Diggs Depo. at 103:1-25, 107:1-9 (Alaska employee consistently recorded hours longer than his

3    scheduled shift); Schabloski Depo., Def. Ex. N-30, at 87:25-88:6 (Michigan employee never told to

4    come in early or stay late without recording the time); Wilkinson Depo., Def. Ex. N-36, at 96:3-97:6

5    (Kansas employee routinely asked to come in before scheduled shift but always recorded the time and

6    did not believe his timecard was ever altered to omit the time).

7

8    **VIII.   Subclass VIII: Regular Rate Policy**

9       Plaintiffs allege that Alderwoods failed to include all remuneration, including bonuses and

10   commissions, in calculating employees' regular rate of pay for purposes of determining their overtime

11   rate of pay. Plaintiffs submit as evidence of this policy an email sent by human resources personnel at

12   SCI, the company that acquired Alderwoods in November 2006, stating that Alderwoods "was not

13   calculating the OT [overtime] premium correctly. They did NOT take the bonus into consideration

14   when calculating the OT for the employees." Pltf. Ex. 34 at 12847.

15      Alderwoods asserts that it had no policy of excluding bonuses and commission from an

16   employee's regular rate of pay. It submits a declaration from its Senior Payroll Manager, accompanied

17   by additional emails, stating that plaintiffs' evidence reveals only a temporary glitch in Alderwoods'

18   software around the time of the merger with SCI which was corrected by issuing back pay to the

19   affected employees. *See* Hollinger Decl., Def. Ex. U.

20

21                 **LEGAL STANDARD**

22      The decision whether to certify a class is committed to the discretion of the district court within

23   the guidelines of Federal Rule of Civil Procedure 23 ("Rule 23"). *See* Fed. R. Civ. P. 23; *Cummings*

24   *v. Connell*, 316 F.3d 886, 895 (9th Cir. 2003). A court may certify a class if a plaintiff demonstrates that

25   all of the prerequisites of Rule 23(a) have been met, as well as at least one of the requirements of Rule

26   23(b). *See* Fed. R. Civ. P. 23; *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996).

27      Rule 23(a) provides four prerequisites that must be satisfied for class certification: "(1) the class

28   is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact

**United States District Court**
For the Northern District of California

1    common to the class; (3) the claims or defenses of the representative parties are typical of the claims

2    or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests

3    of the class."  Fed. R. Civ. P. 23(a).

4          A plaintiff seeking certification must also establish that one or more of the grounds for

5    maintaining the suit are met under Rule 23(b), including (1) that there is a risk of substantial prejudice

6    from separate actions; (2) that declaratory or injunctive relief benefitting the class as a whole would be

7    appropriate; or (3) that common questions of law or fact predominate and the class action is superior

8    to other available methods of adjudication.  Fed. R. Civ. P. 23(b).

9          In determining the propriety of a class action, the court must focus solely on whether the

10   requirements of Rule 23 are met, not whether the plaintiff has stated a cause of action or will prevail on

11   the merits.   *Staton v. Boeing Co.*, 327 F.3d 938, 954 (9th Cir. 2003).  Accordingly, the court must

12   accept as true the substantive allegations made in the complaint. *In re Petroleum Prods. Antitrust Litig.*,

13   691 F.2d 1335, 1342 (9th Cir. 1982); *Blackie v. Barrack*, 524 F.2d 891, 901 (9th Cir. 1975).  However,

14   although the court may not require preliminary proof of the substance of the plaintiff's claims, it "need

15   not blindly rely on conclusory allegations which parrot Rule 23 requirements," but may also "consider

16   the legal and factual issues presented by plaintiff's complaint."  2 Alba Conte & Herbert B. Newberg,

17   *Newberg on Class Actions* § 7.26 (4th ed. 2005).  The court should conduct an analysis that is as

18   rigorous as necessary to determine whether class certification is appropriate. *Gen. Tel. Co. of the Sw.*

19   *v. Falcon*, 457 U.S. 147, 161 (1982).

20

21                                            **DISCUSSION**

22         Each of plaintiffs' ten causes of action arises from the same basic factual allegation:  that

23   Alderwoods maintained company-wide policies that deprived its employees of adequate compensation.

24   Accordingly, the Court's discussion will focus on whether the named plaintiffs can represent the

25   putative class with respect to any of the eight specific policies identified in the SAC.  Plaintiffs contend

26   that they can satisfy each of the requirements of Rule 23(a), as well as the "predominance" and

27   "superiority" requirements of Rule 23(b)(3).

28         Plaintiffs have undoubtedly presented a factual question common to all members of the putative

class, namely, whether the allegedly company-wide policies existed. Under Rule 23(b)(3)'s predominance requirement, however, the court must go beyond asking whether any common questions exist and ask whether these common questions "predominate over any questions affecting only individual members" of the putative class. Fed. R. Civ. P. 23(b)(3). In other words, the predominance analysis focuses on "the relationship between the common and individual issues. When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." *Hanlon*, 150 F.3d at 1022 (internal quotation marks and citation omitted). Ultimately, the Rule 23(b)(3) inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Id.* (citation omitted).

## I.      Subclass I: Community Work Policy

Plaintiffs assert that Subclass I presents several common factual questions, including whether Alderwoods maintained a company-wide policy requiring employees to do unpaid, off-the-clock community work, tracked employees' compliance with the policy, and evaluated employees based on their performance. As described above, the declarations and deposition testimony submitted by the parties reflect variation as to whether plaintiffs in different locations were subject to a community work policy. For example, although plaintiffs from Georgia, Florida, Kansas, California, and New York stated that community work was required, a different California plaintiff as well as plaintiffs from North Carolina and Pennsylvania either stated that they were not required to perform community work or were compensated for such work. The Pennsylvania plaintiff further alluded to a "policy change" during her employment with Alderwoods. To resolve plaintiffs' claims with regard to the community work policy, the Court would therefore need to inquire on an individual basis whether each of Alderwoods' funeral home locations implemented this policy, whether any location or locations changed their policy with respect to compensation for community work during the period at issue in the suit, and whether the policy was specific to any particular position or positions, such as funeral directors.

Plaintiffs' counsel asserted at oral argument that the existence of a community work requirement could be proved on a common basis by evidence of a written policy, in the form of materials related to

1   the Alderwoods Community Leadership Program. However, the Community Leadership program gives

2   rise to individual inquiries as to which category or categories of employees were included and whether

3   and when the program was implemented in each location. Accordingly, the Court finds that Subclass

4   I is not appropriate for class treatment.

5

6   **II.   Subclass II: On-Call Policy**

7        Plaintiffs assert that Subclass II presents common issues as to whether Alderwoods required

8   employees to perform unpaid on-call work, paid them on a piece rate prior to March 2006, and

9   continued even after March 2006 to fail to compensate for all on-call time worked. The operative

10  question in this dispute, however, is not whether employees were asked to perform on-call work, but

11  whether they were properly compensated for it. Plaintiffs point to documents showing the existence of

12  a piece-rate payment policy. The declarations and deposition testimony submitted by the parties,

13  however, shows significant variation in employees' experiences with regard to compensation. Although

14  Kansas and Massachusetts plaintiffs stated they were not compensated for on-call work, and Alaska and

15  New Mexico plaintiffs testified they were compensated on a piece-rate basis, two Pennsylvania plaintiffs

16  stated that Alderwoods switched to hourly compensation as of July 2005, one California manager

17  testified that the piece rate did not exist as of April 2004, and another California manager stated that

18  employees there were paid on an hourly basis for on-call work as of 2002 or 2003. Despite plaintiffs'

19  counsel's assertions at oral argument that the on-call claim is amenable to common proof by means of

20  a written policy, the evidence submitted by the parties demonstrates that the Court's analysis of whether

21  plaintiffs were required to perform on-call work without proper pay would be highly individualized.

22  Accordingly, class treatment of Subclass II is not appropriate.

23

24  **III.   Subclass III: Training Compensation Policy**

25        Plaintiffs assert that Subclass III presents a common issue as to whether Alderwoods required

26  employees to attend mandatory training sessions and did not compensate employees for attending

27  training when it fell outside their regular work hours. Again, the evidence submitted by the parties

28  reflects a variety of experiences with respect to compensation for training. Florida, Texas, and New

13

1    York plaintiffs stated that they were required to attend various types of training after work and were not

2    compensated for that time.  On the other hand, a Massachusetts plaintiff was paid for after-work

3    training.

4           There is also great variance in the evidence with regard to plaintiffs' training allegations

5    concerning funeral directors.  Although several Pennsylvania plaintiffs and one Arizona plaintiff stated

6    they were not compensated for licensing and continuing education requirements, Washington and

7    Alaska funeral directors stated they did not need to attend any training because those states did not

8    require continuing education.

9           Resolution of plaintiffs' claims concerning the training policy would primarily require

10   consideration of individual issues.  The Court would need to determine, for example, the specific funeral

11   home or homes in which any such policy was applied, and which category or categories of employees

12   it was applied to.  Moreover, resolving this issue with regard to funeral directors would require inquiry

13   into each state's requirements for maintaining a funeral director's license.  In light of these issues, the

14   Court concludes that individual questions predominate and that Subclass III is inappropriate for class

15   consideration.

16

17   **IV.     Subclass IV: Pre-Needs Policy**

18          Plaintiffs assert that Subclass IV involves the common issue whether employees were required

19   to schedule pre-needs presentations at the convenience of families, even if such appointments had to be

20   scheduled outside regular work hours, and were not compensated for time spent making such

21   presentations.  However, once again, the evidence reflects varying experiences. Mississippi, New York,

22   and Louisiana plaintiffs testified at their depositions that they were required to make off-the-clock,

23   unpaid pre-needs appointments.  On the other hand, Washington and Texas funeral directors, among

24   others, stated that they were compensated for making after-hours pre-needs presentations.  In addition,

25   several plaintiffs testified that their funeral home locations maintained a separate salesperson or sales

26   staff to take care of pre-needs sales.  Thus, it is clear that resolving plaintiffs' claims under Subclass IV

27   would require individualized inquiries into the circumstances present at each funeral home location,

28   overwhelming any common questions.

14

**United States District Court**
For the Northern District of California

## V.    Subclass V: Meal Break Policy

Plaintiffs identify several common issues under Subclass V, including whether employees were required or permitted to work through lunch breaks without pay, whether management was aware of this practice and even altered employee time cards to exclude payment for work done during breaks, and whether employees were told during meetings that they could not seek payment for work performed during a break.  Plaintiffs' own identification of supposedly common issues, however, reveals the individualized nature of the questions the Court will have to resolve.  In particular, individualized inquiry is required to determine whether a given manager was aware that a given employee worked during his or her meal break, whether any managers altered time cards to exclude time spent working during meal breaks, and whether particular staff meetings included instructions not to seek payment for work done during a break.  Because individualized issues would overwhelm any common issues presented with respect to this set of allegations, the Court finds that class treatment of Subclass V is not warranted.

## VI.    Subclass VI: Pre-Approval Policy

Plaintiffs assert that Subclass VI presents common issues, including whether employees were required to obtain pre-approval for overtime or would not be paid for such work, and whether this pre-approval policy was contained in Alderwoods' policy manuals, policy memos, and announced at staff meetings.  As stated above with respect to other subclasses, the significant variations among plaintiffs regarding whether they were able to obtain compensation undermines plaintiffs' claim that this subclass is amenable to common proof.  While Massachusetts, Mississippi, Alaska, and Florida employees stated that they were not paid for overtime that had not been pre-approved, North Carolina, California, and another Alaska employee stated that they were not subject to any pre-approval policy.  The Court also has doubts regarding plaintiffs' ability to prove a uniform policy of not compensating for non-pre-approved overtime hours in light of the evidence that the policy manual stated only that failing to obtain pre-approval may lead to discipline, not nonpayment.

## VII.    Subclass VII: Unrecorded Work Time Policy

Plaintiffs assert that Subclass VII presents common issues as to whether Alderwoods' policy directed employees not to record all their work time, and whether management was aware that employees performed work before or after their scheduled shifts but directed employees not to record that time and even altered time sheets to reduce the number of hours worked.  As with plaintiffs' meal break policy claim, plaintiffs' construction of the issues presented by this subclass reveals that class treatment is not appropriate.  To resolve the claims of this subclass, the Court would need to determine whether individual managers were aware that their employees worked off-the-clock, whether these managers encouraged or directed employees not to record that time, and whether any managers altered time cards that did reflect pre- and post-shift work.  These questions are not amenable to classwide proof and would overwhelm any common issues presented by Subclass VII.

## VIII.    Subclass VIII: Regular Rate Policy

Plaintiffs state that Subclass VIII presents a common question regarding whether Alderwoods "systematically" failed to include bonuses and commissions in an employee's regular rate of pay. Plaintiffs' counsel stated at oral argument that this claim may be supported by common proof of an unlawful regular rate policy.  Based on the evidence submitted, however, the Court has serious doubts as to plaintiffs' ability to prove that Alderwoods had a uniform policy of excluding certain types of remuneration in calculating the regular rate of pay, as opposed to a temporary glitch.  In addition, although plaintiffs assert that the failure to include bonuses and commissions presents a classwide issue, plaintiffs will need to prove on an individual basis whether each plaintiff was even eligible to receive bonuses and commissions in his or her job category.

In sum, the Court finds that with respect to each of the eight policies identified in the SAC, individual factual issues would overwhelm any common questions presented, regardless of the whether, as plaintiffs claim, wage and hour laws are substantially similar across jurisdictions.  Plaintiffs acknowledge that the legal questions presented in this case are to be "answered for all class members on the same basic facts."  Mot. for Class Cert. at 30.  Where those facts require extensive individualized

**United States District Court**
For the Northern District of California

inquiry, any similarity in the various states' wage and hour laws cannot salvage plaintiffs' bid for certification under Rule 23(b)(3). Moreover, this case presents certain overarching legal questions that must also be answered on an individualized basis. For example, although plaintiffs purport to define the class to include only "hourly non-exempt employees," they offer little information on how the various states determine an employee's exempt status. Whether each position included in the putative class (e.g., funeral director, office manager, etc.) is a non-exempt position must be determined on an individualized basis, position-by-position and state-by-state. Plaintiffs also offer little information as to each state's statute of limitations for wage claims.

For the foregoing reasons, the Court finds that plaintiffs have not shown that common questions predominate over individual questions, and therefore have not satisfied the requirements of Rule 23(b)(3).

## II.   Remaining Rule 23(b) Arguments

Plaintiffs assert in the alternative that they are entitled to certification under Rule 23(b)(1) or Rule 23(b)(2). Rule 23(b)(1) provides for the certification of a class action to "eliminate the possibility of adjudications in which the defendant will be required to follow inconsistent courses of continuing conduct." *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1194 (9th Cir. 2001) (citation omitted). Plaintiffs acknowledge that, under Ninth Circuit law, class certification under this rule is inappropriate where the primary relief sought is money damages. *Id.* at 1193. In their papers, plaintiffs therefore ask the Court to certify the suit only for the liability phase. *See* Fed. R. Civ. P. 23(c)(4) ("When appropriate, an action may be brought or maintained as a class action with respect to particular issues."). However, as discussed in detail above, the question of Alderwoods' liability is predicated on a number of significant individualized factual questions that are not appropriate for class treatment. Accordingly, certification under Rule 23(b)(1) is inappropriate.

A court may certify a class under Rule 23(b)(2) where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). It appears that plaintiffs have abandoned their position that certification is warranted under

**United States District Court**
For the Northern District of California

1  Rule 23(b)(2), as their reply brief makes no mention of this argument and they did not raise it at oral

2  argument.  In any event, under Ninth Circuit law, "Class certification under Rule 23(b)(2) is appropriate

3  only where the primary relief sought is declaratory or injunctive." *Zinser*, 253 F.3d at 1195.

4  Certification of a class seeking money damages is appropriate only where that relief is "merely

5  incidental" to a claim for injunctive relief.  *Id.*  Plaintiffs have acknowledged for purposes of Rule

6  23(b)(1) that their primary claim in this case is for money damages, not injunctive relief.  As defendant

7  points out, plaintiffs' suit encompasses only the period of time before Alderwoods was taken over by

8  SCI, and only seeks relief as to policies in effect up to that time.  *See* SAC ¶ 14.  Because "the bulk of

9  the suit focuses on the old policy," and there are no claims related to SCI's policies in this lawsuit,

10  certification under Rule 23(b)(2) is not appropriate.  *See Stuart v. Radioshack Corp.*, No. 07-4499, 2009

11  WL 281941, at *13 (N.D. Cal. Feb. 5, 2009).

12

13  **CONCLUSION**

14        For the foregoing reasons and for good cause shown, plaintiffs' motion for class certification is

15  DENIED.  (Docket No. 187).

16

17        **IT IS SO ORDERED.**

18

19  Dated: December 29, 2010

20                                                        SUSAN ILLSTON
                                                         United States District Judge

21

22

23

24

25

26

27

28

**EXHIBIT 3**

Case3:08-cv-01184-SI   Document248   Filed05/28/10   Page1 of 2

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| WILLIAM HELM, et al., | No. C 08-01184 SI |
| Plaintiffs, | **ORDER DENYING DEFENDANT'S MOTION TO SEVER WITHOUT PREJUDICE** |
| v. | |
| ALDERWOODS GROUP, INC, | |
| Defendant. | |
| _____/ | |

Defendant's motion to sever is currently set for hearing on June 4, 2010. Pursuant to Civil Local Rule 7-1(b), the Court finds this matter appropriate for resolution without oral argument and hereby VACATES the hearing.[1] Having considered the papers submitted, and for good cause shown, the Court DENIES defendant's motion without prejudice to renewal at a later date.

**DISCUSSION**

The subject of this litigation is a wage and hour dispute brought by current and former employees of Alderwoods Group, Inc. ("Alderwoods"), a provider of funerary services. On December 29, 2009, the Court issued an order denying plaintiffs' motion for class certification. (Docket No. 230). In the motion now before the Court, Alderwoods seeks an order severing the claims of each of the more than 100 named plaintiffs pursuant to Federal Rule of Civil Procedure 21. Alderwoods asks that the Court sever plaintiffs' claims, dismiss all plaintiffs except lead plaintiff William Helm, and require each individual plaintiff, including Mr. Helm, to file separate complaints in separate actions.

_____

[1] The case management conference set for 3:00 p.m. on June 4, 2010 will remain on calendar.

**United States District Court**
For the Northern District of California

Federal Rule of Civil Procedure 20 provides that multiple plaintiffs may join in a single action if (1) they assert a right to relief that arises "out of the same transaction, occurrence, or series of transactions or occurrences," and (2) they raise "any question of law or fact common to all plaintiffs." Fed. R. Civ. P. 20(a)(1). "If the test for permissive joinder is not satisfied, a court, in its discretion, may sever the misjoined parties, so long as no substantial right will be prejudiced by the severance." *Coughlin v. Rogers*, 130 F.3d 1348, 1350 (9th Cir. 1997); *see also* Fed. R. Civ. P. 21 ("[T]he court may at any time . . . sever any claim against a party."). Even if the permissive joinder requirements are met, the court may sever to avoid delay, jury confusion, or prejudice to the moving party. Fed. R. Civ. P. 20(b); *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1296 (9th Cir. 2000).

In the Court's view, Alderwoods has raised serious issues with respect to the propriety of the joinder of more than 100 plaintiffs in this action. However, in light of plaintiffs' representation that they need further time to conduct additional discovery for the purpose of renewing their motion for class certification, the Court believes that granting severance at this time would be premature. Alderwoods' motion to sever is therefore DENIED. The denial is without prejudice to renewal if plaintiffs have not filed their renewed motion for class certification within sixty days from the date of this order.

## CONCLUSION

Defendant's motion to sever is DENIED without prejudice. (Docket No. 232).

**IT IS SO ORDERED.**

Dated: May 28, 2010

_____
SUSAN ILLSTON
United States District Judge

2

**EXHIBIT 4**

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

WILLIAM HELM, et al.

    Plaintiffs,

 v.

ALDERWOODS GROUP INC.,

    Defendant.

_____/

No. C 08-01184 SI

**ORDER DENYING PLAINTIFFS'
RENEWED MOTION FOR CLASS
CERTIFICATION**

  On October 1, 2010, the Court heard argument on plaintiffs' renewed motion for class certification. Having considered the arguments of counsel and the papers submitted, the Court hereby DENIES plaintiffs' motion.

**BACKGROUND**

  The subject of this litigation is a wage and hour dispute brought by current and former employees of Alderwoods Group, Inc. ("Alderwoods"), a provider of funerary services. As set forth in detail in this Court's July 29, 2009 Order (Docket No. 174), this action originated with a complaint filed in the United States District Court for the Western District of Pennsylvania, *Prise, et al. v. Alderwoods Group, Inc., et al.*, No. 06-1641. That complaint originally included both state law claims and federal claims under the Fair Labor Standards Act ("FLSA") against Alderwoods and several other related defendants. The district court in *Prise* declined to exercise supplemental jurisdiction over plaintiffs' state law claims, leaving only the FLSA claims. The dismissal of the state law claims resulted in the filing of a class action complaint in the Alameda County Superior Court on December 5, 2007 entitled *Helm, et al. v. Alderwoods Group Inc., et al.*, alleging state law wage and hour claims against

1   Alderwoods.[1]  On February 27, 2008, defendants removed the action to federal court, invoking this

2   Court's diversity jurisdiction under the Class Action Fairness Act ("CAFA").  *See* 28 U.S.C. § 1332(d).

3

4       In September 2009, plaintiffs moved to certify this case as a class action, on behalf of "those

5   employees and former employees of defendant who were suffered or permitted to work by defendant

6   and not paid their regular or statutorily required rate of pay for all hours worked."  Second Amended

7   Complaint (SAC) ¶ 19.  Plaintiffs had alleged that Alderwoods implemented eight nationwide policies,

8   as set forth in a policy manual and policy memoranda disseminated to all Alderwoods funeral homes,

9   that deprived plaintiffs of adequate compensation for time worked.  Plaintiffs defined eight separate

10  classes, one for each of the alleged violations contained in the nationwide policies.  These policies were:

11  failing to compensate employees for time spent (1) "on-call," (2) performing  "community work," (3)

12  attending mandatory training, or (4) meeting with clients to discuss "pre-need purchases"; (5) requiring

13  employees to work during meal breaks; (6) refusing to pay overtime unless it had been pre-approved;

14  (7) directing employees not to record their hours for all time worked; and (8) failing to correctly

15  calculate an employee's regular rate of pay for purposes of determining his or her overtime rate.

16      On December 29, 2009, the Court denied plaintiff's motion for class certification.  Although

17  plaintiffs presented a factual question common to all members of the putative class — whether the

18  allegedly company-wide policies existed — the Court found that common questions did not

19  "predominate over any questions affecting only individual class members."  Fed. R. Civ. P. 23(b)(3).

20  Some claims depended on individualized answers as to whether and when the allegedly nationwide

21  policies were implemented in each location, and with regard to which categories of employees.  Other

22  claims required the resolution not merely of whether there was a uniform policy requiring the

23  performance of certain types of work, but rather how individual employees were compensated for that

24  work.  The case would also have required inquiry into specific details of different state laws regarding,

25  for example, the licensing of funeral directors.

26

27  ───────────────
    [1]  Plaintiffs have dismissed their claims against all defendants originally named in this case other
28  than Alderwoods Group, Inc.  A related case, *Bryant v. Service Corporation International*, No. 08-1190,
    is pending in this Court against the entity that purchased Alderwoods in 2006.

2

1    Presently before the Court is plaintiffs' renewed motion for class certification.  Though still

2    relying on the allegations contained in their Second Amended Complaint, Plaintiffs have limited their

3    certification motion to three claims, brought by three classes of California employees.  Plaintiffs request

4    that the remainder of their claims be dismissed without prejudice.  They also move for Thomas &

5    Solomon LLP and Margolis Edelstein to be appointed as co-lead class counsel.[2]

6

7    **I.    Community Work Class**

8         Plaintiffs define the first proposed class as follows:

9         Current and former hourly employees of Alderwoods who worked in the job titles
          Apprentice Funeral Director/Embalmer, Arranger, Assistant Funeral Director, Community
10        Relations Director, Funeral Director/Embalmer, Funeral Director, and Location Manager
          at any Alderwoods location [in California] during the relevant limitations period and were
11        encouraged or required to perform "Community Work" so as to increase revenue for
          Alderwoods but were not compensated by Alderwoods for such time spent engaging in
12        community work outside regular work hours.

13   Pl. Mot. at 1.[3]

14        Plaintiffs argue that community work is a work requirement—and is even listed as a job duty

15   in the job descriptions—of those categories of employee included in the proposed class.  Pl. Ex. 2.  As

16   evidence of defendant's systematic failure to pay those employees, plaintiffs have submitted an email

17   from a South Carolina-based Alderwoods Market General Manager stating that community work

18   undertaken "during the normal work day . . . is mandatory and the employee would be paid his or her

19   normal rate," but that community work undertaken "after hours" is only "strongly encouraged and may

20   be recognized in a non monetary way."  Pl. Ex. 20.  Plaintiffs also argue that even if defendant did not

21   _____

22   [2] Plaintiffs and defendants in this action are represented by the same lawyers, respectively, as
     are the plaintiffs and defendants in the related *Bryant v. Service Corporation International* action.
23   Motions to certify were filed both in this action and in the *Bryant* action on September 28, 2009.  The
     motions in this action were heard first, and on December 29, 2009, certification was denied.  At that
24   point, plaintiffs withdrew the then-pending class motion in *Bryant*.  Six months later, in June, 2010,
     plaintiffs filed a renewed motion for certification in this action, and a month after that refiled the motion
25   to certify in *Bryant*.  Both the motion in *Bryant* and the instant renewed motion for certification have
     now been argued and fully briefed.  The cases raise similar issues and present similar and sometimes
26   overlapping factual backgrounds. The Court decided the motions in *Bryant*  first, and relies on the
     analysis in that order as foundational to the decision in this case.

27   [3] In their renewed motion, plaintiffs requested nationwide certification for this class.  After a
     hearing on a certification motion in the related case *Bryant*, plaintiffs filed a reply brief in which they
28   limited their request to certification of a California class.

United States District Court
For the Northern District of California

have a specific policy of not paying employees for after hours community work, it is nonetheless liable for failing to compensate because it made no efforts to investigate or monitor whether its policies and practices complied with the law.  In support of this argument, plaintiffs rely on evidence that defendant lacked a specific policy instructing employees to record time devoted to community work outside their regular work day (although defendant did have a general directive to record all hours worked).  Collins Depo., Pl. Ex. 54, at 225:2–226:15; Mayes Depo., Pl. Ex. 63, at 75:9–18; Berryhill Depo., Pl. Ex. 50, at 146:25–148:21.  Plaintiffs also point to a detailed description of the community work requirement in a company-wide initiative called the Community Leadership Program ("CLP"), which fails to mention that employees should be compensated for community work performed outside of regular work hours.  Berryhill Depo., Pl. Ex. 50, 144:25–147:3; Pl. Exs. 6–12.

## II.    On-Call Class

Plaintiffs define the second proposed class as follows:

> Current and former hourly employees of Alderwoods who worked at any Alderwoods location [in California] and were paid piece rate payments for certain tasks performed during their on-call shift without basing the payment on the actual time spent performing such tasks.

Pl. Mot. at 2.[4]  From plaintiffs' arguments, it appears that this class is meant to be limited to those who worked on call shifts in addition either to eight-hour days or forty-hour weeks, such that all on call work was overtime work.  Additionally, not only were the class members paid lump sum premiums that were not based on the actual time spent performing the tasks, they were paid instead of (rather than in addition to) hourly wages.

As evidence that defendant had a policy of piecework pay, plaintiffs point to audits identifying "systemic" problems as early as 2004, as well as the payroll records of individual plaintiffs.  They argue the policy lasted until at least March 2006.  Citing 29 C.F.R. § 778.310, they argue that this policy itself was illegal, no matter how much each employee was compensated individually.

---

[4]  In their renewed motion, plaintiffs requested nationwide certification for this class.  After a hearing on a certification motion in the related case *Bryant*, plaintiffs filed a reply brief in which they limited their request to certification of a California class.

4

### III.   Meal Break Class

Plaintiffs divide the third proposed class into two subclasses that they define as follows:

**Subclass 1:**  Current and former hourly employees of Alderwoods who worked at an Alderwoods location in California and did not receive an uninterrupted 30 minute meal period.

**Subclass 2:** Current and former hourly employees of Alderwoods who worked at an Alderwoods location in California and were not compensated for their full meal period when their meal period was interrupted.

Renewed Motion at 2.  At the October 1 hearing, plaintiff explained that both subclasses would have a claim for a one-hour pay "penalty" that California assesses against employers who fail to provide an uninterrupted lunch break.  The latter subclass would also have a claim for full compensation for the thirty minute period that was interrupted rather than only for the actual time of the interruption.

As evidence of interrupted lunch breaks, plaintiffs point to defendant's "seamless service" program, which allegedly required employees to interrupt their lunch breaks to answer calls and assist customers.  Carswell Depo., Pl. Ex. 53, 98:25–100:25; Escobar Depo., Pl. Ex. 57, 143:15–144:25; Bath Depo., Pl. Ex. 49, 106:11–106:18; Long Depo., Pl. Ex. 62, 58:8–58:12, 120:15–121:12; Miles Depo., Pl. Ex. 65, 285:4–285:21.  This happened either because the locations were too busy to permit employees to take lunch breaks, or because the locations were only staffed by one person.  Pl. Ex. 42 at ALD022077.

Plaintiffs also cite evidence that defendant compensated employees whose lunch periods were interrupted only for the portion of the lunch break worked, not for the full time required by California law.  Collins, Pl. Ex. 54,  67:6–69:14; Phillips, Pl. Ex. 67, 106:4–107:18 (Western Region VPO); Cardell Decl., Def. Ex. H-6, at ¶ 18 (California Location Manager); Lawrence Decl., Def. Ex. H:33, at ¶ 11 (California Location Manager).

### LEGAL STANDARD

The decision whether to certify a class is committed to the discretion of the district court within the guidelines of Federal Rule of Civil Procedure 23 ("Rule 23").  *See* Fed. R. Civ. P. 23; *Cummings v. Connell*, 316 F.3d 886, 895 (9th Cir. 2003).  A court may certify a class if a plaintiff demonstrates that all of the prerequisites of Rule 23(a) have been met, as well as at least one of the requirements of Rule

1   23(b). *See* Fed. R. Civ. P. 23; *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996).

2       Rule 23(a) provides four prerequisites that must be satisfied for class certification: "(1) the class

3   is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact

4   common to the class; (3) the claims or defenses of the representative parties are typical of the claims

5   or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests

6   of the class." Fed. R. Civ. P. 23(a).

7       A plaintiff seeking certification must also establish that one or more of the grounds for

8   maintaining the suit are met under Rule 23(b), including (1) that there is a risk of substantial prejudice

9   from separate actions; (2) that declaratory or injunctive relief benefitting the class as a whole would be

10  appropriate; or (3) that common questions of law or fact predominate and the class action is superior

11  to other available methods of adjudication. Fed. R. Civ. P. 23(b).

12      In determining the propriety of a class action, the court must focus solely on whether the

13  requirements of Rule 23 are met, not whether the plaintiff has stated a cause of action or will prevail on

14  the merits. *Staton v. Boeing Co.*, 327 F.3d 938, 954 (9th Cir. 2003). Accordingly, the court must

15  accept as true the substantive allegations made in the complaint. *In re Petroleum Prods. Antitrust Litig.*,

16  691 F.2d 1335, 1342 (9th Cir. 1982). However, although the court may not require preliminary proof

17  of the substance of the plaintiff's claims, it "need not blindly rely on conclusory allegations which parrot

18  Rule 23 requirements," but may also "consider the legal and factual issues presented by plaintiff's

19  complaint." 2 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 7.26 (4th ed. 2005). The

20  court should conduct an analysis that is as rigorous as necessary to determine whether class certification

21  is appropriate. *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 161 (1982).

22

23                                    **DISCUSSION**

24  **I.    Community Work Class**

25      Rule 23(a)'s first requirement is that a class be sufficiently numerous that it would be

26  impracticable to join all members individually. Where "the exact size of the class is unknown, but

27  general knowledge and common sense indicate that it is large, the numerosity requirement is satisfied."

28  1 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 3.3 (4th ed. 2002). Classes with

**United States District Court**
For the Northern District of California

6

relatively small membership are regularly certified. *See Jordan v. Los Angeles*, 669 F.2d 1311, 1319 (9th Cir.) (thirty-nine class members), *vacated on other grounds*, 459 U.S. 810 (1982).

To demonstrate numerosity, plaintiffs point to an estimate that over 2,500 non-exempt employees worked at Alderwoods locations in California from December 3, 2003 through February 28, 2008. Schmuck Decl., Pl. Reply Decl. Ex. 3, at ¶¶ 8–9, 11-12. This number, they conclude, is "common sense" evidence that the proposed class is sufficiently numerous.

However, plaintiffs' proposed class comes from a pool of California employees holding seven job titles, not from a pool of all non-exempt employees. Plaintiffs provide no evidence that would enable the Court even to estimate how many California non-exempt employees held these job titles during the relevant period of time. Additionally, the proposed class consists only of those employees who performed uncompensated after-hours community work. Plaintiffs have presented evidence of only *one employee* who held one of the in-class job titles and claims to have performed uncompensated after-hours community work. Escobar Depo., Pl. Ex. 57, 135:4–135:6. Moreover, plaintiffs have presented evidence from one manager that a vast majority of employees in the six offices with which he was familiar disregarded the community work requirement entirely. Kamanski Depo., Pl. Ex. 60, 146:8–146:14. And defendant has presented evidence of employees who held the job titles but did not perform uncompensated after-hours community work and therefore would not be included in the class. *E.g.* Maldonado Decl., Def. Ex. H-36, ¶ 17; Messier Decl., Def. Ex. H-39, ¶¶ 9–10. Plaintiffs are asking the Court to make a logical numerical leap that neither their allegations nor their evidence can support.

Moreover, as is discussed at some length in the related *Bryant* order, plaintiffs cannot point to a company-wide written policy, and do not point to a company-wide practice, regarding non-payment for community service work. Liability for underpayment of any class member could only be demonstrated after individualized inquiry as to that employee's work history, and would reflect specific – and potentially idiosyncratic – instructions by location managers. Under these circumstances, common questions would not predominate.

Under these circumstances, the Court DENIES certification of the Community Work Class.

**United States District Court**
For the Northern District of California

## II.   On-Call Class

Plaintiffs' theory for the On-Call Class is that it was illegal to pay piece rate premiums rather than an overtime hourly rate, no matter how much compensation each individual employee actually received.  This presents a common question of law.  Nonetheless, individual questions predominate. Plaintiffs do not allege that defendant had a state-wide policy *not* to pay hourly wages for overtime on-call work.  Rather, they present some evidence that this payment method was a systemic problem.  But liability depends on *why* it was a systemic issue:  because employees were told not to record the hours or for some other reason.  The evidence that is currently before the Court indicates that the answer to this question will vary from location to location, depending on the idiosyncratic instructions given by different supervisors. *See, e.g.,* Maldonado Decl., Def. Ex. H-36, ¶ 6 ("[California's Lakewood Funeral Home e]mployees keep track of their hours spent on after-hours removals, are compensated for those hours, and receive a $35 bonus per removal on top of their hourly wages.").

Plaintiffs argue that payroll records prove that this method of compensation was done statewide, as they list earnings for "regular" work in a way that includes number of hours worked, but that they list earnings for "piecework" without including the number of hours worked. *See, e.g.,* Helm Payroll Records, Pl. Ex. 26.  However, it is not clear from the payroll records — which include a separate line for overtime hours — that defendant's failure to list the hours worked on piecemeal tasks immediately next to the piecemeal premiums received means that the time taken to perform the tasks was not listed elsewhere and compensated at an hourly rate.  Rather, it is only through proffers from different employees as to whether they reported any of the on call hours that they worked as overtime hours that the payroll records can be interpreted.  As discussed above, some employees *were* paid an hourly wage for overtime on call work. *See, e.g.,* Maldonado Decl., Def. Ex. H-36, ¶ 6.  Even if these employees are not members of the class, their declarations undermine plaintiffs' argument that they can show a statewide policy via the payroll records.  Plaintiffs have failed to show that liability is susceptible to common proof, and thus they have failed to show that common issues predominate.  The motion to certify the On-Call Class is DENIED.

**United States District Court**
For the Northern District of California

**III.    Meal Break Class**

     **A.    Uninterrupted lunch breaks**

Defendant first argues that California law regarding lunch breaks is in a state of flux at this time, counseling against certification of this subclass. The Court disagrees. To quote a sister court, the legal uncertainty regarding an employer's obligation with respect to meal periods under California law "has been a recent source of heartburn for courts." *Dilts v. Penske Logistics, LLC*, 267 F.R.D. 625, 637–38 (S.D. Cal. 2010). However, even though this question "is presently before the California Supreme Court in *Brinker Restaurant v. Superior Court*, until that decision has issued this Court must proceed as best it can." *Id.* at 638; *see also Brinker Restaurant Corp. v. Super. Ct.*, 165 Cal. App. 4th 25, 31, *review granted*, 85 Cal. Rptr. 3d 688 (2008).

In the circumstances of this case, the Court finds that this subclass cannot be certified. Plaintiffs argue that defendant's "seamless service" rule is a policy that fails to provide for meal breaks, and therefore defendant violated its affirmative duty under California law. Upon closer examination, however, it is clear that it is not the seamless service policy itself that allegedly violated California law, but rather how that policy was enacted in various locations given the specific employment levels and workload in those locations. *See* Cardell Decl., Def. Ex. H-6, ¶ 17 ("Lunch breaks are staggered at the location so that someone is available to answer the phone"); *id.* ¶ 18 ("I will ensure that the employee either receives thirty-minutes of uninterrupted time or that he or she is compensated for the time worked during his or her meal break"); Dias Decl., Def. Ex. H-13, ¶ 17 ("Meal breaks are staggered . . . .").

Plaintiffs' attempt to analogize this case to *Ross v. U.S. Bank National Association* fails. In *Ross*, the defendant had a security policy of having at least two employees on duty at all times, as well as a practice of scheduling only two employees to work on Sundays, and the plaintiffs limited their class to Sunday shift workers. C 07-2951, 2009 WL 4282426, at * 6–* 7 (N.D. Cal. Nov. 25, 2009). Although not all plaintiffs worked shifts where only two employees were scheduled to work, and thus individual questions would arise in the case regarding liability, the limited scope of the class ensured that "significant common questions of law and fact" would first need to be answered. *Id.* at * 9.

Here, plaintiffs have not presented any evidence as to how often defendant employed either only one worker at a location, or did not employ enough workers to address the needs of company clients

United States District Court

For the Northern District of California

1  without cutting into the workers' lunch break.  Nor is the class defined in a way that might account for

2  staffing and work levels.  Thus, even reading California law to require an employer to affirmatively act

3  to make a meal period available where the employee is relieved of all duty, the Court has no way to

4  know whether common questions or individual questions will predominate.  Rather, it appears that

5  individual-by-individual, location-by-location analysis will be required to determine liability.  Plaintiffs

6  have not met their burden with regard to this subclass.

7

8          **B.    Compensation for interrupted lunch breaks**

9        This subclass faces the same problems as the first subclass, plus additional problems due to

10  defendant's evidence that some California employees received hour-long lunch breaks.  *E.g.* Obenauf

11  Decl., Def. Ex. H-41, ¶¶ 13–15 (all employees were supposed to have a one-hour lunch break; they

12  typically received an uninterrupted meal break; and they almost always received at least thirty minutes

13  of uninterrupted break time).  Some hour-long-lunch employees are included within this subclass, even

14  though under plaintiffs' legal theory, failure to compensate those plaintiffs for an interrupted lunch

15  break would not give rise to liability unless they failed to receive an uninterrupted thirty-minute break.

16  Plaintiffs have not met their burden to show that common questions will predominate.

17

18  **IV.    Superiority**

19        Finally, under Rule 23(b)(3), plaintiffs must also show "that a class action is superior to other

20  available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

21  "Where classwide litigation of common issues will reduce litigation costs and promote greater

22  efficiency, a class action may be superior to other methods of litigation."  *Valentino*, 97 F.3d at 1234.

23        Here, the liability of defendants for any of the claims made will depend on the resolution of

24  factual questions employee-by-employee, office-by-office.  Trial of all these claims together would

25  neither reduce litigation costs nor promote greater efficiency.  To the contrary, any jury trial of this

26  matter would devolve into an endless series of mini-trials, with respect to liability as well as damages.

27  Accordingly, plaintiffs' motion for certification of these classes is DENIED.

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CONCLUSION

For the foregoing reasons, the Court DENIES plaintiffs' renewed motion for class certification. (Doc. 256.)  Therefore, the Court need not reach plaintiffs' motion for Thomas & Solomon LLP and Margolis Edelstein to be appointed as co-lead class counsel.[5]

**IT IS SO ORDERED.**

Dated: March 9, 2011

SUSAN ILLSTON
United States District Judge

---

[5]  Because plaintiffs' request to have the remainder of their claims dismissed without prejudice appears to have been contingent on the Court certifying a class action, the Court will not dismiss those claims at this time.

11